1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

FEDERAL TRADE COMMISSION,

Civil Action No. 2:23-cv-0932-JHC

10

    Plaintiff,

**AMENDED COMPLAINT FOR**
**PERMANENT INJUNCTION,**

11

    v.

**CIVIL PENALTIES, MONETARY**
**RELIEF, AND OTHER**

12

AMAZON.COM, INC., a corporation;

**EQUITABLE RELIEF**

13

NEIL LINDSAY, individually and as an officer of
AMAZON.COM, INC.;

14

15

RUSSELL GRANDINETTI, individually and as
an officer of AMAZON.COM, INC.; and

16

JAMIL GHANI, individually and as an officer of
AMAZON.COM, INC.,

17

    Defendants.

18

19

    Plaintiff, the Federal Trade Commission ("FTC" or "the Commission"), alleges:

20

    1.    Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of

21

the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and the

22

Restore Online Shoppers' Confidence Act, ("ROSCA"), 15 U.S.C. § 8404, which authorize the

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

1

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1  FTC to seek, and the Court to order, permanent injunctive relief, restitution, civil penalties, and

2  other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC

3  Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C. § 8403.

4  ## SUMMARY OF CASE

5      2.      For years, Defendant Amazon.com, Inc. ("Amazon") and its leadership have

6  knowingly duped millions of consumers into unknowingly enrolling in its Amazon Prime service

7  ("Nonconsensual Enrollees" or "Nonconsensual Enrollment").  Specifically, Amazon used

8  manipulative, coercive, or deceptive user-interface designs known as "dark patterns" to trick

9  consumers into enrolling in automatically-renewing Prime subscriptions.

10     3.      The Nonconsensual Enrollment problem was well known within Amazon.  The

11 company's internal documents are littered with references to "accidental" signups.  In early

12 2019, for example, an Amazon survey showed ▓▓▓▓▓ of consumers stated their reason for

13 cancelling Prime was that they never intended to enroll in the first place.  And in September

14 2020, Amazon estimated that ▓▓▓▓▓▓▓▓ Prime subscribers were "unaware" they had

15 subscribed to Prime.

16     4.      In a draft memorandum from late 2020, Amazon designers and researchers

17 documented the company's use of techniques "designed to mislead or trick users to make them

18 do something they don't want to do, like signing up for a recurring bill."

19     5.      Some Amazon employees pushed the company executives responsible for

20 Prime—including Defendants Neil Lindsay ("Lindsay"), Russell Grandinetti ("Grandinetti") and

21 Jamil Ghani ("Ghani")—to address Nonconsensual Enrollment and make changes so that

22 Amazon would not be tricking its customers.  One employee, for example, wrote to Ghani:  "The

23 AMENDED COMPLAINT
   Case No. 2:23-cv-0932-JHC

way I see it, we are not winning for customers by ignoring the simple and obvious lack of

information but applauding a business gain.  We congratulate when someone changes a headline

color, or the style of a table, but don't notice we are not even telling customers what they are

signing up for . . . ."

6.      Despite their knowledge of the problem and pleas from some employees to fix it,

Amazon and its leadership—including Lindsay, Grandinetti, and Ghani—slowed, avoided, and

even undid user experience changes that they knew would reduce Nonconsensual Enrollment

because those changes would also negatively affect Amazon's bottom line.  As one internal

memorandum stated, Amazon decided "clarifying" the enrollment process was not the "right

approach" because it would cause a "shock" to business performance.

7.      For years, Amazon also knowingly complicated the cancellation process for

Prime subscribers who sought to end their membership.  Under significant pressure from the

Commission—and aware that its practices are legally indefensible—Amazon substantially

revamped its Prime cancellation process for at least some subscribers shortly before the filing of

the Complaint for Permanent Injunction, Civil Penalties, Monetary Relief, and Other Equitable

Relief ("Complaint").  Dkt. #1.  However, prior to that time, the primary purpose of the Prime

cancellation process was not to enable subscribers to cancel, but rather to thwart them.  Fittingly,

Amazon named that process "Iliad," which refers to Homer's epic about the long, arduous Trojan

War.  Amazon designed the Iliad cancellation process ("Iliad Flow") to be labyrinthine, and

Amazon and its leadership—including Lindsay, Grandinetti, and Ghani—slowed or rejected user

experience changes that would have made Iliad simpler for consumers because those changes

adversely affected Amazon's bottom line.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1   8.   As with Nonconsensual Enrollment, the Iliad Flow's complexity resulted from

2   Amazon's use of dark patterns—manipulative design elements that trick users into making

3   decisions they would not otherwise have made.

4   ## JURISDICTION AND VENUE

5   9.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

6   and 1345.

7   10.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(1),

8   (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

9   ## PLAINTIFF

10   11.   The FTC is an independent agency of the United States Government created by

11   the FTC Act, which authorizes the FTC to commence this district court civil action by its own

12   attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act,

13   15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

14   The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits the sale of goods or

15   services on the Internet through negative option marketing without meeting certain requirements

16   for disclosure, consent, and cancellation to protect consumers.  A negative option is an offer in

17   which the seller treats a consumer's silence—*i.e.*, their failure to reject an offer or cancel an

18   agreement—as consent to be charged for goods and services.  16 C.F.R. § 310.2(w).

19   ## DEFENDANTS

20   12.   Defendant Amazon transacts and has transacted business in this District and

21   throughout the United States.  It is one of the world's largest online retailers, and is

22

23   AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    headquartered in Seattle, Washington, with its principal place of business at 410 Terry Avenue

2    North, Seattle, Washington 98109.

3         13.    At all times relevant to this Amended Complaint, acting alone or in concert with

4    others, Amazon advertised, marketed, distributed, or sold a paid subscription service, Prime, that

5    gives subscribers throughout the United States access to additional services otherwise

6    unavailable or available only at an additional charge to other consumers.  Among other things,

7    these premium services include expedited "free" delivery of merchandise from Amazon's vast

8    online marketplace, streaming content, and grocery delivery.

9         14.    Defendant Lindsay resides in Laguna Beach, California.  Lindsay has worked as a

10   senior Amazon executive since 2010.  From February 2018 through November 2021, Lindsay

11   was the Amazon executive with the most responsibility for the Prime subscription program,

12   which he managed as an Amazon Vice-President and Senior Vice-President.  During this period,

13   Lindsay joined Amazon's S-Team, which runs the entire company and reports directly to the

14   CEO.

15        15.    From February 2018 through November 2021, acting alone or in concert with

16   others, Lindsay formulated, directed, controlled, had the authority to control, or participated in

17   the acts and practices of Amazon, including the acts and practices set forth in this Amended

18   Complaint.  Lindsay participated in these unlawful acts and practices by directing that they

19   continue despite knowing the consumer injury they caused.

20        16.    Lindsay's participation in the unlawful acts and practices set forth in this

21   Amended Complaint includes, among other things:   (a) in mid-2018, Lindsay declined to

22   implement changes that would have avoided Nonconsensual Enrollment; (b) Lindsay

23   AMENDED COMPLAINT
     Case No. 2:23-cv-0932-JHC

1  participated in a June 17, 2019 meeting with Defendant Grandinetti at which these executives

2  decided not to make changes that would reduce Nonconsensual Enrollment; (c) in December

3  2020, Lindsay participated in a decision to reverse changes that would help prevent

4  Nonconsensual Enrollment; and (d) Lindsay oversaw Amazon employees who studied the Iliad

5  Flow, including the complications it presented to subscribers attempting to cancel, and who

6  developed simpler alternatives, which Lindsay did not implement.

7        17.     Lindsay knew these acts and practices would cause consumer injury because,

8  among other things:  (a) Lindsay directed a "deep dive" into the Nonconsensual Enrollment

9  problem in 2018 and received numerous memoranda addressing Nonconsensual Enrollment

10  including, among others, a 2019 memorandum entitled "Customer Frustrations Elimination

11  Program: Prime Frustrations" ("Prime Frustrations Memo") that identified the fact that

12  "customers sign up without knowing they did" as a "customer problem"; and (b) Lindsay

13  received internal memoranda, emails, and oral communications describing the Iliad Flow and the

14  complications it presented to Prime subscribers attempting to cancel, and he knows, and has

15  known at all times relevant to this Amended Complaint, that the Iliad Flow is not simple.

16        18.     Defendant Lindsay has transacted business in this District and throughout the

17  United States, and continues to transact business in this District and throughout the United

18  States.

19        19.     Defendant Grandinetti resided in the United States during the majority of the

20  period during which he participated in the acts and practices set forth in this Amended Complaint

21  (Grandinetti moved to the United Kingdom in 2021 to further his employment with Amazon).

22  Grandinetti oversees Amazon's Prime subscription program as an Amazon Senior Vice-President

23  AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    with a portfolio that includes Prime.  During this period, Grandinetti was a member of Amazon's

2    S-Team, which runs the entire company and reports directly to the CEO.

3        20.    From at least January 1, 2018 through the present, acting alone or in concert with

4    others, Grandinetti formulated, directed, controlled, had the authority to control, or participated

5    in the acts and practices of Amazon within the United States, including the acts and practices set

6    forth in this Amended Complaint.  As an Amazon executive with authority over the Prime

7    enrollment and cancellation process within the United States, Defendant Grandinetti participated

8    in these unlawful acts and practices by directing that they continue despite knowing the

9    consumer injury they caused.

10       21.    Grandinetti's participation in the unlawful acts and practices set forth in this

11   Amended Complaint and occurring within the United States includes, among other things:  (a)

12   Grandinetti directed the preparation of, and reviewed, the Prime Frustrations Memo summarizing

13   the Nonconsensual Enrollment problem; (b) Grandinetti ran a June 17, 2019 meeting with

14   Defendant Lindsay and others in which Grandinetti discussed the Prime Frustrations Memo and

15   directed subordinates not to address Nonconsensual Enrollment unless it could be resolved while

16   maintaining Prime subscription numbers; and (c) Grandinetti oversaw, and continues to oversee,

17   Amazon employees who studied the Iliad Flow including the complications it presented to

18   subscribers attempting to cancel, and who developed simpler alternatives, which Grandinetti did

19   not implement.

20       22.    Grandinetti knew these acts and practices would cause consumer injury because,

21   among other things:  (a) he reviewed the 2019 memorandum, which identified the fact that

22   "customers sign up without knowing they did" as a major "customer problem"; and (b) he

23   AMENDED COMPLAINT
     Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1   knows, and has known at all times relevant to this Amended Complaint, that the Iliad Flow is not

2   simple.

3        23.    Defendant Grandinetti has transacted business in this District and throughout the

4   United States, and continues to transact business in this District and throughout the United

5   States.

6        24.    Defendant Ghani resides in Bellevue, Washington.  Since 2019, Ghani has

7   overseen Prime's subscription program as a Vice-President.  From 2019 through the present,

8   acting alone or in concert with others, Ghani formulated, directed, controlled, had the authority

9   to control, or participated in the acts and practices of Amazon, including the acts and practices

10  set forth in this Amended Complaint.  As an Amazon executive with authority over the Prime

11  enrollment and cancellation process, Ghani participated in these unlawful acts and practices by

12  directing that they continue despite knowing the consumer injury they caused.

13       25.    Ghani's participation in the unlawful acts and practices set forth in this Amended

14  Complaint includes, among other things:  (a) Ghani participated in a December 2020 decision to

15  reverse changes that would help prevent Nonconsensual Enrollment; and (b) Ghani oversaw, and

16  continues to oversee, Amazon employees who studied the Iliad Flow and the complications it

17  presented subscribers attempting to cancel, and who developed simpler alternatives, which Ghani

18  did not implement.

19       26.    Ghani knew these acts and practices would cause consumer injury because,

20  among other things:  (a) Ghani received dozens of internal memoranda, emails, and oral

21  communications describing the Nonconsensual Enrollment problem including, for example, a

22  2020 memorandum entitled "US Prime Performance Update"; and (b) Ghani received internal

23  AMENDED COMPLAINT
    Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1   memoranda, emails, and oral communications describing the Iliad Flow and the complications it

2   presented to subscribers attempting to cancel, and he knows, and has known at all times relevant

3   to this Amended Complaint, that the Iliad Flow is not simple.

4         27.     Defendant Ghani has transacted business in this District and throughout the

5   United States, and continues to transact business in this District and throughout the United

6   States.

7                                        **COMMERCE**

8         28.     At all times relevant to this Amended Complaint, Defendants have maintained a

9   substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of

10  the FTC Act, 15 U.S.C. § 44.

11                         **DEFENDANTS' BUSINESS ACTIVITIES**

12        29.     Consumers pay $139 per year or $14.99 monthly to subscribe to Prime.  Prime

13  subscription fees account for $25 billion of Amazon's annual revenue.

14        30.     Approximately 70% of Amazon's revenue comes from American consumers.

15        31.     Subscribers are critical to Amazon's overall ecommerce business because Prime

16  subscribers spend more than ███████ as much shopping on Amazon as compared to non-

17  Prime shoppers.

18        32.     Consequently, one of Amazon's primary business goals—and *the* primary

19  business goal of Prime—is increasing subscriber numbers.

20        33.     Within Amazon's corporate structure, the Prime organization or department

21  ("Prime Organization") operates Prime.  Amazon evaluates the Prime Organization's

22  performance based on the number of subscribers.

23  AMENDED COMPLAINT
    Case No. 2:23-cv-0932-JHC

                                                        Federal Trade Commission
                                                        600 Pennsylvania Ave., NW
                                                        Washington, DC 20580
                                                        (202) 326-3320

1

**Typical Prime Enrollment Experiences**

2

     34.    Consumers can subscribe to Prime through multiple pathways including through

3 Amazon devices (like the Amazon Fire TV streaming device), while using Prime Video, or

4 through Prime's unique webpage ("Prime Central").  However, ▮▮▮ subscriptions occur through

5 the Amazon shopping checkout process.

6

     35.    The basic consumer checkout enrollment experience proceeds as follows on both

7 desktop and mobile devices.  Consumers who are not Prime members visit Amazon's website—

8 www.Amazon.com—to shop.  They place items in their cart, and then provide (or confirm) their

9 billing and address information.  They then select a large orange "Continue" button, which

10 typically appears in the lower right corner of the page, and move through additional pages to

11 proceed with their purchase.  Finally, consumers either complete their order by purchasing the

12 items in their cart or abandon their cart.

13

     36.    Amazon presents all consumers who are not Prime subscribers with at least one

14 opportunity (also known as an "upsell")—and often several opportunities—to join Prime before

15 those consumers place their order on the final checkout page.  Amazon has two primary types of

16 upsells that enroll consumers: interstitials and non-interstitials.  An interstitial is a page that

17 interrupts consumers' online shopping experience by appearing before the page that consumers

18 seek to access in the first place.  In contrast, non-interstitial upsells are elements imbedded

19 within checkout pages, including shipping-option selection and payment pages.

20

21

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

10

37.     On desktop devices, Amazon has several Prime upsells: an interstitial upsell called the Universal Prime Decision Page ("UPDP"), and three non-interstitial upsells called the Shipping Option Select Page ("SOSP"), Single Page Checkout ("SPC"), and True Single Page Checkout ("TrueSPC").  On mobile devices, Prime upsells mirror those on desktop, and include the UPDP, SOSP, and SPC.

38.     **UPDP on Desktop**.  Amazon calls the Prime interstitial upsell the Universal Prime Decision Page.  Although the UPDP has changed over time, it generally interrupts consumers' online shopping experience by presenting them with a prominent button to enroll in Prime and a comparatively inconspicuous link to decline.  Consumers cannot avoid the UPDP.  The upsell forces consumers to select either the button or the link to proceed to checkout.  *See* Attachments A–D.



39.     The UPDP's orange button, which enrolls a consumer in Prime if clicked, is located toward the bottom right of the screen and often includes language referencing "free shipping" or a "free trial."  For instance, in May 2018, the UPDP orange button read: "Get FREE Two-Day Shipping."  *See* Attachment A.  In February 2020, the button read "Get FREE Two-Day Delivery."  *See* Attachment B.  In some instances, the button reads "Start Your 30-Day Prime FREE Trial" or a variant thereof, as it did in October 2018 and July 2020.  *See* Attachments C and D.  Additionally, the button is stacked above a gray box that either states

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

11

"Enjoy Prime FREE for 30 days," *see* <u>Attachment A and B</u>, "No minimum order size," "No

commitments. Cancel anytime," *see* <u>Attachments C and D</u>, or similar language.

40.    If a consumer clicks the orange button, Amazon enrolls the consumer in a Prime

free trial, even if the consumer later abandons the cart and does not order the merchandise.

41.    The UPDP's blue link, which declines the Prime membership if clicked, is located

towards the bottom left of the screen and includes language that the consumer will not receive

"free shipping."  For example, in 2018, the blue link read "No thanks, I do not want fast, free

shipping," *see* <u>Attachment A</u>, and in February 2020 read "No thanks, I do not want fast, FREE

delivery," *see* <u>Attachment B</u>.  Sometimes the blue link refers to benefits more generally.  For

example, in October 2018, the link stated "Continue without the Amazon Prime benefits."  *See*

<u>Attachment C</u>.  More recently, the link states "No thanks."  *See* <u>Attachment D</u>.

42.    The contrast between an orange "double-stacked" button to enroll in Prime and a

blue link to decline prioritizes the enrollment option over the decline option and creates a visual

imbalance.  *See* <u>Attachments A–D</u>.

43.    The UPDP does not adequately disclose the price of the monthly auto-renewal

feature of Prime.  That information is located in small print at the bottom of the page, along with

a link to the Prime terms and conditions.  *See* <u>Attachments A–D</u>.

44.    By October 2022, Amazon modified the circumstances under which prospective

members see the UPDP.  Amazon distinguishes between (i) existing Amazon accountholders

who are not Prime subscribers, but have shopped on Amazon before and created a profile with

shipping and billing information, and (ii) consumers who have not shopped on Amazon before or

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    are otherwise not associated with an existing customer profile.  At present, the checkout flow

2    UPDP presents as follows to consumers with an existing Amazon account:

3          (a)      The UPDP contains a banner across the top reading:  "thank you for being

4    a loyal customer.  We're giving you Prime FREE for 30 days," with a line immediately below

5    stating the date by which the customer will receive the items "with Prime."  *See* Attachment E.

6
7
8

**Test, thank you for being a loyal customer.
We're giving you Prime FREE for 30 days.**

Receive eligible items **Thursday, Dec. 22 by 8PM** with Prime

9          (b)      On the right-hand side beneath the banner, Amazon places a chart

10   comparing the delivery cost without Prime ($5.99 in Attachment E) with the free delivery cost of

11   Prime.  Below the chart, Amazon states how much money the consumer would save on their

12   "Prime eligible items" with "FREE Prime Delivery" on the order.  Amazon also states that

13   "After your FREE trial, Prime auto-renews for just $14.99/month."  *See* Attachment E.

14
15
16
17
18
19
20



21          (c)      On the bottom right-hand side, Amazon places a double-stacked button.

22   The orange top button reads "Get FREE Prime Delivery with Prime," and the bottom grey box

23   AMENDED COMPLAINT                                    Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                            600 Pennsylvania Ave., NW
                                                          Washington, DC 20580
                                                          (202) 326-3320

reads "Enjoy Prime FREE for 30 days."  *See* <u>Attachment E</u>.  If the consumer clicks on the orange

button, Amazon enrolls the consumer into Prime, even if the consumer does not complete the

order for the items in their cart.

> (d)     On the bottom left-hand side, Amazon has placed a blue link that reads
"No thanks."  A consumer clicking this link would avoid a Prime membership and proceed to the
following page of the checkout flow.  *See* <u>Attachment E</u>.



> (e)     To continue purchasing the item(s) in their cart, consumers must either
choose the larger orange "Get FREE Prime delivery" button or the smaller blue "No thanks"
link.  *See* <u>Attachment E</u>.

> (f)     At the very bottom of the page, in small print, Amazon presents a link to
the Prime terms and conditions, and text stating: "Your Amazon Prime membership continues
until cancelled.  If you do not wish to continue for $14.99/month plus any applicable taxes, you
may cancel anytime by visiting Your Account and adjusting your membership settings."  *See*
<u>Attachment E</u>.

45.     At present, the UPDP within the checkout flow presents as follows to consumers
who set up a brand-new Amazon account in making their first purchase:

> (a)     The UPDP reads "Try Prime FREE for 30 days and save $5.99 on this
order in both shipping and savings.  Cancel anytime" at the top.  Underneath, Amazon adds
"After your trial, Prime is only $14.99/month."  Amazon also includes a table listing additional

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

14

Prime benefits, such as "Fast, FREE delivery on Prime eligible items," "All the music + top podcasts ad-free on Amazon Music," and "Prime Video."  *See* <u>Attachment F</u>.

(b)       Amazon then shows two buttons.  The orange button on the right states "Sign up for Prime" and the grey button on the left states "Not right now."  If a consumer clicks on the "Sign up for Prime," Amazon immediately enrolls the consumer.  *See* <u>Attachment F</u>.

(c)       At the bottom of the page, in small print, Amazon presents a link to the Amazon Prime terms and conditions, as well as text that reads: "Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $14.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings."  *See* <u>Attachment F</u>.

(d)       The UPDP appears "on top" of the last page of the checkout flow, forcing the consumer to select "Sign up for Prime" or "Not right now" to proceed to the last page of the checkout flow.  *See* <u>Attachment F</u>.



46.       Separate from the UPDP, various Prime upsells appear as elements within the online checkout flow, which itself appears in various versions to consumers depending on factors

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    (*i.e.*, whether a consumer has previously declined a Prime upsell).  There are three desktop

2    checkout flow variations:  a) the Shipping Option Select Page, b) the Single Page Checkout page,

3    and c) the True Single Page Checkout.

4          47.    **SOSP on Desktop.**  The Shipping Option Select Page sought to enroll consumers

5    in Prime by providing them a series of shipping options, with estimated delivery dates, and pre-

6    selecting the fastest shipping option, which also enrolled consumers in Prime.  The upsell

7    promised, for example, "FREE Same-Day Delivery" and a "30-day FREE trial of Prime," but

8    failed to disclose Prime's price or the fact that the subscription service would renew

9    automatically.  The SOSP provided only a belated, inconspicuous disclosure of the terms of

10   Prime membership.

11         48.    In particular, the SOSP checkout flow on desktop began with a page where the

12   consumer could check out, followed by a page to select or input a shipping address, and then a

13   "Choose your shipping options" page, where consumers selected their shipping options for the

14   items they were purchasing.  *See* <u>Attachment G</u>, at 3–4.  This page displayed the different

15   shipping options, including speed and price.  The SOSP shipping options page preselected the

16   first option—"FREE Same-Day Delivery with a free trial of Amazon Prime"—which would

17   enroll the consumer in Prime.  If the consumer did not want free shipping with Prime, the

18   consumer needed to select another option to avoid a Prime membership.  Above the shipping

19   options, Amazon displayed an orange banner stating "Good news [name], we're giving you a 30-

20   day FREE trial of Prime."  The page did not show the price of a Prime subscription, nor did it

21   disclose the monthly auto-renewal.  *See* <u>Attachment G</u>, at 4.

22

23   AMENDED COMPLAINT                                  Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                         600 Pennsylvania Ave., NW
                                                        Washington, DC 20580
                                                        (202) 326-3320

1

2

3

4

5

6

7

8

9

10



11      49.     Once the consumer selected a shipping option, the consumer proceeded to the

"payment method" page to choose the payment method (e.g., credit card).  The page made no

mention of Prime even though Amazon would automatically charge the chosen payment method

for Prime after the 30-day free trial expired.  *See* <u>Attachment G</u>, at 5.

14      50.     After the consumer selected a payment method, the consumer proceeded to a

UPDP page that required consumers to choose between options to "Start your Prime FREE trial"

(which continues to enroll the consumer in Prime), and to decline (which avoids a Prime

membership).  *See* <u>Attachment G</u>, at 6.  The options were visually imbalanced, with the sign-up

option being larger and a brighter color.  The page top stated, in large font, "we're giving you a

30-day FREE trial of Prime."  Beneath that text, in smaller font, read "After your FREE trial,

Prime is just $12.99/month."  At the very bottom, in the middle of a block of text in small font,

was the statement "Your Amazon Prime membership continues until cancelled.  If you do not

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

17

1    wish to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting

2    Your Account and adjusting your membership settings."

3        51.    Either selection brought the consumer to the final "checkout" page.  This page

4    displayed the total price of the item(s) in the consumer's cart.  The total did not include the price

5    of a Prime membership, even for consumers who reached the checkout page by selecting the free

6    shipping button that enrolled them in Prime.  *See* <u>Attachment G</u>, at 7.

7        52.    If Amazon enrolled the consumer into Prime at any point in the SOSP checkout

8    flow, Amazon displayed "[Name], congratulations!  Your 30-day free trial of Prime has started.

9    You can cancel anytime."  *See* <u>Attachment G</u>, at 7.  The text did not disclose Prime's price, nor

10   did it disclose the monthly auto-renewal.



16       53.    Amazon discontinued the SOSP checkout version by October 2022, after Amazon

17   had received a Civil Investigative Demand ("CID") from the Commission in March 2021, and a

18   second CID in June 2022.

19       54.    **SPC on Desktop.**  The Single Page Checkout presented consumers with multiple

20   Prime upsells, including on the final "checkout" page.  Like the SOSP, the SPC upsells did not

21   contemporaneously disclose Prime's price or the fact that the subscription would auto-renew,

22

23   AMENDED COMPLAINT                                          Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                                 600 Pennsylvania Ave., NW
                                                               Washington, DC 20580
                                                               (202) 326-3320

and they contained misleading language.  If selected, at least one SPC upsell enrolled the consumer in Prime, even if the consumer did not complete the online checkout process.

55.     Similar to the SOSP version, the SPC checkout flow began with a page that asked the consumer to confirm their billing address, then a page that displayed the different shipping options from which consumers chose.  *See* <u>Attachment H</u>, at 3–4.

56.     Like in the SOSP version, the SPC shipping options page emphasized the first option—"FREE Same-Day Delivery with a free trial of Amazon Prime."  *See* <u>Attachment H</u>, at 4.  The SPC also displayed an orange banner above the shipping options, which stated "Good news [name], we're giving you a 30-day FREE trial of Prime."  The page did not disclose Prime's price, nor did it disclose the monthly auto-renewal.

57.     Once a consumer selected a shipping option, the consumer proceeded to the final checkout page.  *See* <u>Attachment H</u>, at 5.  If the consumer did not select the "shipping option" that would enroll them in Prime, Amazon presented additional Prime upsells.  For example, Amazon sometimes presented a prominent blue box in the center of the page.  On the left side of the box, Amazon stated, in bold, "[Name], we'd hate for you to miss out on unlimited fast, FREE delivery," and "Save $7.52 on eligible items in this order and enjoy unlimited fast, FREE delivery when you try Prime FREE for 30 days."   On the right side of the box, Amazon displayed a gray button that read "Try Prime FREE for 30 days," with "No hassle.  No commitment. Cancel anytime" underneath.  Amazon enrolled consumers who clicked on this gray button in Prime, even if those consumers did not complete their purchase.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

19

1



2

3

4

5      58.    Consumers enrolled in Prime through the SPC if they pressed a prominent button

6   labelled "Try Prime FREE for 30 days," or selected the "Fast FREE Delivery" shipping option.

7   The SPC did not include information about Prime's price or auto-renewal.  *See* <u>Attachment H</u>,

8   at 5.

9      59.    Amazon displayed delivery options underneath the blue box.  The first delivery

10  option is "FREE Same-Day Delivery with your free trial of Prime."  If a consumer selected this

11  option and then clicked on the "Place Your Order" yellow button on the top right side of the

12  screen, Amazon enrolled that consumer.  *See* <u>Attachment H</u>, at 5.

13



14

15

16

17

18

19

20     60.    Nowhere on this page did Amazon disclose Prime's price or its monthly auto-

21  renewal feature.  *See* <u>Attachment H</u>, at 5.

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

20

61.     If a consumer selected an option to enroll in Prime, the next page (which the consumer needed to get through to complete the product purchase) showed after-the-fact disclaimers.  First, in the middle of the page, blue text read: "A 30-day FREE trial of Amazon Prime has been added to your order.  Your order has been upgraded to fast, FREE shipping." Beneath this, in smaller black font, read: "After your free trial, Prime is just $12.99/month. Cancel anytime."  Second, on the right, beneath the orange "Place your order" button in small font was a block of text that linked to terms and conditions and included the lines: "Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $12.99/month plus any applicable taxes after your first month, you may cancel anytime by visiting Your Account."  *See* Attachment H, at 6.

62.     Amazon discontinued the SPC in late 2022, after it received a CID from the Commission in March 2021, and a second CID in June 2022.

63.     **TrueSPC on Desktop.**  In October 2022, Amazon replaced SPC with a modified version of the checkout flow it calls True Single Page Checkout.  *See* Attachments I–K. TrueSPC consolidates the checkout flow's multiple pages onto a single page that includes four vertically stacked steps, with the first step (entry or confirmation of the shipping address) at the top.  Each step corresponds with a page that existed previously in the SPC version of the checkout flow.  As the consumer completes a step, that step minimizes and the next step expands for the consumer to complete.  Though Amazon regularly modifies the TrueSPC checkout flow, it always includes at least one Prime upsell on the TrueSPC flow after the consumer has entered their billing information.

AMONDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

21

64.     TrueSPC contains many problematic elements present in the UPDP, SOSP, and SPC—including misleading language and other manipulative designs—which lead consumers to enroll in Prime without consent.

65.     The TrueSPC checkout experience varies depending on whether the consumer already has an Amazon account with saved default billing and shipping information.  *Compare* Attachment I *with* Attachments J and K.

66.     Consumers who already have an Amazon account and have already provided billing information must sign in and click a large orange button labelled "Continue" to reach the next step.  Amazon presents such consumers with a UPDP that interrupts the checkout flow.  To proceed to the next page in the TrueSPC checkout flow, consumers must either choose the large orange "Get FREE Prime Delivery with Prime" button or the "No thanks" link.  *See* Attachment I, at 3.  Regardless of the consumer's choice, the consumer then reaches the TrueSPC checkout page.



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

22

67.     Consumers who have not yet set up an Amazon account see a different version of the UPDP.  *See* <u>Attachment K</u>, at 4.



68.     The TrueSPC checkout page involves discrete steps numbered one through four on the left and an "Order Summary" box on the right.  *See* <u>Attachment I</u>, at 4.  The consumer must address all four elements on the left to place an order.

69.     The first element is the shipping address, and the second element is the payment method.  Consumers who already have an Amazon account can change their shipping address and payment method; consumers who do not already have an account must input this information.  *See* <u>Attachment I</u>, at 4.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



70.     Amazon does not expand the third element, "Offers," to consumers who do not already have an Amazon account, so those consumers skip this element. *See* <u>Attachment I</u>, at 4.

71.     The fourth element, "Review items and shipping," summarizes the consumer's cart contents. *See* <u>Attachment I</u>, at 4. Assuming the consumer did not enroll in Prime via the UPDP page, this element also presents two Prime upsells. Amazon has placed the first upsell within a large blue banner. On the right side of that blue banner, Amazon has a grey button that reads "Get FREE Prime Delivery with Prime," with "No hassle. No Commitments. Cancel Anytime" underneath. On the left side of the blue banner, Amazon states "Free Trial" and "we're giving you Prime FREE for 30 days!" Amazon also includes "Get your Prime eligible items for ~~$5.99~~ FREE," crossing out the price of shipping without Prime in red.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

24

1

2

3

4

5



6      72.      If a consumer clicks on the grey button "Get FREE Prime Delivery with Prime,"

7   Amazon replaces the blue banner with a white box and changes the text to: "A 30-day FREE trial

8   of Amazon Prime has been added to your order. Your order has been upgraded to fast, FREE

9   shipping."  *See* Attachment I, at 5.  In smaller font, the text also reads "After your free trial,

10  Prime is just $14.99/month. Cancel anytime."  The consumer can continue their purchase without

11  Prime only if the consumer clicks on a small box that displays the "quantity" of Prime

12  subscriptions and selects "Delete" instead of "1."

13

14

15

16

17

18

19

20     73.      Amazon placed the second upsell in the delivery options stating "Free Trial" and

21  "we're giving you Prime FREE for 30 days!"  *See* Attachment I, at 4.  The first delivery option

22  then reads: "FREE Prime Delivery with your free trial of Prime," with "Fast, FREE Delivery"

23

AMENDED COMPLAINT                                                        Federal Trade Commission
Case No. 2:23-cv-0932-JHC                                                600 Pennsylvania Ave., NW
                                                                         Washington, DC 20580
                                                                         (202) 326-3320

1   immediately underneath.  If a consumer selects this delivery option and then clicks on "Place

2   your order and pay," Amazon enrolls the consumer in Prime.

3

4   

5

6

7

8

9

10

11          74.     For those consumers who have not enrolled in Prime, the third element ("Offers")

12   automatically opens after they input their shipping and payment information, and it presents a

13   version of the UPDP.  *See* Attachment J, at 7.  A list of "Prime Benefits" appears above an

14   orange button ("Sign up for Prime") that adds a membership to the consumer's order, and a

15   smaller white button ("Not right now") that declines Prime.  To continue, the consumer must

16   choose one of these options or close the element by clicking a small link in the upper right.  *See*

17   Attachment J, at 7.

18

19

20

21

22

23   AMENDED COMPLAINT                                      Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                             600 Pennsylvania Ave., NW
                                                           Washington, DC 20580
                                                           (202) 326-3320

1
2
3
4
5
6
7
8
9
10
11
12
13



14        75.    Amazon immediately enrolls consumers who select the orange "Sign up for

15 Prime."  *See* Attachment K, at 5.

16        76.    If the consumer moves past the third element without enrolling, Amazon presents

17 Prime again as part of the fourth element ("Items and shipping").  *See* Attachment J, at 8.  This

18 element enables the consumer to adjust the quantity of items in the cart.  Amazon also presents

19 Prime three additional times within this fourth element:  a button ("Get FREE One-Day Delivery

20 with Prime"), a shipping option selection choice ("FREE One-Day Delivery with your free trial

21 of Amazon Prime"), and a hyperlink ("join now").  Consumers who have still not added a Prime

22

23 AMENDED COMPLAINT                                    Federal Trade Commission
   Case No. 2:23-cv-0932-JHC                            600 Pennsylvania Ave., NW
                                                        Washington, DC 20580
                                                        (202) 326-3320

membership to their order at this point can click a large orange "Place your order" box to complete their checkout.  *See* <u>Attachment J</u>, at 8.



77.     Since at least 2018, Prime upsells on the mobile checkout flow have mirrored those on desktop checkout, and have included the SOSP, UPDP, and the SPC.

78.     Navigating Prime upsells on mobile devices is more difficult than on a desktop. Amazon often places material terms such as price and auto-renewal terms at the very bottom of the mobile page—past the point viewable on the screen unless the consumer scrolls down— where consumers are least likely to see this information.  On mobile devices, consumers are also more likely to select a prominent option without scrutinizing fine print.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

28

1        79.    **Mobile (Past).**  The mobile Shipping Option Select Page contained similar

2   problematic elements to the desktop SOSP, including the pre-selection of a fast-shipping option

3   that would enroll consumers in Prime and a belated, inconspicuous disclosure of the terms of

4   Prime membership.

5        80.    The mobile SOSP (like the desktop SOSP) began with the "shipping option"

6   selection page.  The first, pre-selected option was "FREE Same-Day Delivery with Amazon

7   Prime."  Three other shipping options, which were not preselected and would not enroll the

8   consumer in Prime, are further below.  *See* Attachment L, at 4.



18       81.    After clicking "Continue," the consumer proceeded to "payment method" pages

19  to select the payment method.  *See* Attachment L, at 5-6.  As on desktop, the "payment method"

20  page did not mention Prime, even though Amazon will charge this payment method for Prime.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

29

82.     After selecting payment information, the consumer proceeded to a UPDP page

that stated at the top: "[Name], we're giving you 30 days of Prime for $12.99 FREE."  *See*

Attachment L, at 7.  The mobile page then listed several "shopping benefits" (e.g., "Prime

Delivery" and "Exclusive Deals") and "entertainment benefits" (e.g., "Prime Video" and "Prime

Music").  Below these Prime benefits was a yellow button, "Start your Prime FREE trial," with

black text beneath it, "Don't worry, cancel anytime."  The yellow button enrolled the consumer

in Prime.  Below that was a white button: "No Thanks," which declined Prime.  To this point on

the screen (and prior screens), Amazon had not disclosed that Prime will auto-renew once the

free trial expired, or that it costs $12.99 per month.

 

83.     Finally, beneath "No Thanks," located within terms and conditions were Prime's

auto-renewal terms and monthly cost.  To view this text, many consumers would need to scroll

down on their mobile device.  *See* Attachment L, at 7.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1  84.     If the consumer selected "Start your Prime FREE trial," Amazon enrolled the

2  consumer in Prime and took the consumer to the final "checkout" page.  Text toward the top of

3  the page read: "Congratulations, your Prime free trial has started!"  The page did not state

4  Prime's price or that the subscription would auto-renew.  At this point, even if the consumer

5  abandoned the cart without completing checkout, Amazon still enrolled them in Prime.  There

6  was no option on the "checkout" page for the consumer to cancel or undo their Prime

7  subscription.  *See* <u>Attachment L</u>, at 8.

8  85.     The Universal Prime Decision Page on mobile devices contained similar

9  problematic elements as the UPDP on desktop.

10  86.     The UPDP on mobile (like the desktop version) required consumers to either

11  accept or decline a Prime subscription before allowing them to continue shopping.  *See*

12  <u>Attachment M</u>.  The mobile UPDP failed to make clear that the consumer would enroll in Prime

13  by selecting "Get FREE two-day shipping."  The mobile UPDP disclosed some terms, but only

14  at the bottom of the screen in a block of small print text, which stated "If you do not wish to

15  continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your

16  Account and adjusting your membership settings."

17

18

19

20

21

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

31

1
2
3
4
5
6
7
8
9
10



11    87.    The Single Page Checkout on mobile also contained similar problematic elements

12  as SPC on desktop.

13    88.    Mobile SPC, like mobile SOSP, began with a "shipping options" page that

14  included an option for "FREE Two-Day Delivery with Amazon Prime," and several other non-

15  Prime shipping options.  *See* Attachment N, at 3-4.  The consumer then enters payment

16  information.  *See* Attachment N, at 5-6.

17    89.    If the consumer selected one of the non-Prime shipping options (and after

18  selecting a payment method), the consumer proceeded to the checkout page and encountered two

19  Prime upsells.  First, consumers could enroll in Prime if they selected "Try Prime FREE . . .

20  we're giving you a 30-day FREE trial of Amazon Prime.  No commitments, cancel anytime."

21  *See* Attachment N, at 7.  Second, under "Shipment details," consumers could select (among

22

23  AMENDED COMPLAINT                              Federal Trade Commission
    Case No. 2:23-cv-0932-JHC                       600 Pennsylvania Ave., NW
                                                      Washington, DC 20580
                                                        (202) 326-3320

1    other, non-Prime options) "FREE Same-Day Delivery with your free trial of Prime. Fast FREE

2    Delivery."  The page does not disclose Prime's price or its auto-renewal feature.

3         90.    If the consumer selected the option for a Prime free trial, the consumer proceeded

4    to an updated version of the checkout page that read:  "[Name], your Prime FREE 30-day trial

5    has been added below," and in smaller font below stated Prime's price and auto-renewal feature.

6    *See* Attachment N, at 8.  Further below, Amazon added Prime to the consumer's cart for

7    purchase, listing the price of the free trial as $0.00 and the "quantity" as "1."  To remove Prime

8    from the purchase, the consumer needed to select the dropdown menu and change the product

9    quantity from "1" to "0."

10        91.    **Mobile (Current).**  In 2022, Amazon modified the mobile checkout enrollment

11    flow.

12        92.    The current mobile upsells contain many of the same problematic elements as the

13    prior mobile upsells—including misleading language and manipulative designs—which lead

14    consumers to enroll in Prime without their consent.

15        93.    Consumers using mobile devices to navigate to Amazon.com can select a product

16    by clicking a large yellow button ("Add to Cart"), and continue shopping, or a large orange

17    button ("Buy Now") to proceed directly to the checkout.  *See* Attachment O, at 1.  Consumers

18    who continue shopping add additional products to their cart by clicking the large yellow "Add to

19    Cart" button, until they finish and choose another large yellow button ("Proceed to checkout"),

20    which takes the consumer to the next step.  *See* Attachment O, at 2.

21

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

33

94.     At this point, the consumer signs in (if the consumer has not already) and clicks a large yellow "Continue" button to proceed to a mobile UPDP.  Consumers who have already signed in proceed directly to the mobile UPDP.

95.     Consumers without an account must create one before reaching the mobile UPDP. Creating an account involves four steps:  entering an email address, creating a password, and adding an address and a payment method.  *See* <u>Attachment O</u>, at 3-4.  Completing these steps takes the consumer to the mobile UPDP.

96.     When a consumer reaches the mobile UPDP, Amazon divides the page, with a footer (sometimes known as a "sticky footer") that occupies the screen's bottom half, rendering only a portion of the top half visible unless the consumer scrolls down.  *See* <u>Attachment O</u>, at 5.

 

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

97.     At the top of the mobile UPDP, Amazon informs the consumer that "we're giving you 30 days of Prime for FREE."  *See* <u>Attachment O</u>, at 5.  Smaller text below reads:  "After your FREE trial, Prime is just $14.99/month," but does not reference Prime's auto-renewal feature.  Consumers can view this section without scrolling.



98.     The sticky footer on the lower half of the screen contains double-stacked buttons: the top yellow "Get FREE Two-Day Delivery with Prime" button and an image appearing to be a gray lower button labelled "Save $5.99 instantly on this order."  *See* <u>Attachment O</u>, at 5.  Amazon enrolls consumers who click the yellow button in Prime.  As such, a consumer can enroll in Prime without viewing the portion of the page that the sticky footer hides.



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

35

1          99.       If a consumer scrolls down, Amazon shows consumers a table comparing the

2    "Perks of Prime" with "Without Prime."  *See* <u>Attachment O</u>, at 5.  For instance, perks of Prime

3    include "Fast, FREE delivery on Prime eligible items," "[a]ll the music + top podcasts ad-free on

4    Amazon Music," and "Prime Video – Enjoy award-winning Amazon Originals, movies and TV

5    shows" whereas without Prime, a consumer has "[m]inimum order requirements," "[m]usic

6    listening with ads," and Prime Video "[n]ot included."

7

8

9

10                                   

11

12

13

14

15

16

17

18

19

20

21

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

36

100.     The following text is visible at the bottom of the sticky footer, in the smallest type on the screen:  "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and . . . See all."  *See* <u>Attachment O</u>, at 5.  If the consumer continues scrolling, additional information about Prime's "Terms and Conditions" and "Shipping Benefits" becomes visible in small text beneath the "No thanks" link.  A sentence in the middle of this additional text reads:  "Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $14.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings."



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

37

101.    If a consumer clicks the downward arrow on the top right of the sticky footer, Amazon also reveals the additional text beneath the "No thanks" link.  The arrow is adjacent to the yellow "Get Free Two-Day Delivery with Prime" button that will enroll the consumer in Prime.  If a consumer clicks the button while attempting to click the adjacent sticky footer arrow, Amazon enrolls the consumer in Prime.



102.    Consumers cannot view the full text beneath the "No thanks" link without scrolling or clicking the sticky footer arrow.  However, consumers can enroll in Prime by selecting the large yellow "Get FREE Two-Day Delivery with Prime" button without scrolling. *See* <u>Attachment O</u>, at 5.

103.    Consumers can proceed with their purchase if they select either the yellow button or the blue "No thanks" link.  *See* <u>Attachment O</u>, at 5.

104.    If the consumer selects the yellow "Get FREE Two-Day Delivery with Prime" button, Amazon brings the consumer to a final page with a yellow "Place your order" button and "Congratulations, your Prime free trial has started!  We'll email you about all Prime benefits" underneath.  Therefore, Amazon enrolls the consumer in Prime before the consumer has even placed the order.  The final page of the flow also contains an "Order Total" that does not include Prime's price.  *See* <u>Attachment O</u>, at 6.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

105.     On this final page, the consumer can change or confirm shipping and billing information, remove products from the cart, and make other changes such as adding gift receipts or providing delivery instructions.  *See* Attachment O, at 6.  The consumer can also select a shipping method.

106.     The yellow button labelled "Place your Order" allows consumers to make their purchase.  *See* Attachment O, at 6.  Prime's price and auto-renewal feature do not appear on the page, the consumer cannot remove Prime, and the consumer cannot back up and choose "No thanks" to Prime on the prior page.

107.     In each pathway (UPDP, SOSP, SPC, TrueSPC, and mobile), Amazon fails to provide clear and conspicuous disclosures regarding the Prime subscription program's material terms:  its price, and the fact that it renews automatically unless the consumer affirmatively cancels.  Furthermore, in each pathway (UPDP, SOSP, SPC, TrueSPC, and mobile), Amazon does not provide any disclosures at all before Amazon collects billing information from consumers.

108.     **Prime Video.**  Prime Video is a distinct product from Prime.  Specifically, Prime Video is a subscription-based video streaming service.  Although it is possible to sign up for Prime Video alone, it is difficult to do so.

109.     Amazon's webpage tricked consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option.

110.     In particular, Amazon initially offers Prime Video as part of the full, more expensive Prime package to consumers who reach the Prime Video homepage (or "storefront") to enroll in Prime Video.  *See* Attachment P, at 1.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

39



111.    Capitalizing on some consumers' inability to appreciate the difference between "Prime" and "Prime Video," the Prime Video enrollment process fails to clarify Amazon will enroll them in Prime rather than the less expensive Prime Video, on both desktop and mobile platforms.  This causes some consumers to enroll in Prime, rather than Prime Video, unknowingly.

112.    Consumers can reach the Prime Video storefront through various ways, including by searching "Prime Video" in an online search engine or the Amazon search bar.

113.    The initial Prime Video storefront displays the Prime Video logo at the top and an orange button labelled "Watch with Prime. Start your 30-day free trial."  *See* Attachments P and V.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

40

114.    Amazon brings consumers who press the orange button to a second page and prompts them to sign in (if they have an Amazon account) to confirm billing information, or to create an account and submit billing information.  This page also contains small print links to the Amazon Prime Conditions of Use and Privacy Notice at the bottom of the page.  *See* <u>Attachment V</u>, at 2-5.

115.    Amazon does not, to this point, present the consumer with any marketing regarding Prime, as opposed to Prime Video.

116.    After sign in or account creation, Amazon brings consumers to a page containing, from top to bottom:

(a)    the Prime logo with "Watch now, cancel anytime. Start your 30-day free trial";

(b)    the email associated with the account;

(c)    a table with "Confirm your details" at the top followed by the plan type, which is "Prime.  Enjoy unlimited streaming of thousands of movies and TV shows plus FREE Two-Day Delivery on millions of items.  $14.99/month after trial" (to get Prime Video rather than Prime, the consumer must click a gray "change" box to the right);

(d)    the consumer's email, payment method, and billing address;

(e)    at the bottom, "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your preferred card or another available credit card on file after your 30-day free trial. Your Prime membership continues until cancelled. If you don't want to continue

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

41

for $14.99/month plus any applicable taxes, you may cancel anytime by visiting

Your Account and adjusting your membership settings;" and

(f)      an orange button in the bottom right corner, labelled "Start your free trial."

The button sits immediately above a gray area with text reading "Change or

cancel plan anytime.  Pay later."  *See* Attachment P, at 2 and Attachment V, at 6.



117.    To enroll in Prime Video (instead of Prime), the consumer must click on the

"Change" button for the Plan information toward the top of the page, change the plan on the

subsequent page, and then navigate back to confirm the Prime Video selection.  *See* Attachment

P, at 2 and Attachment V, at 6.

118.    Until recently, when the customer clicked the "Start your free trial" button,

Amazon enrolled the customer in Prime—not Prime Video—but then immediately took the

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    customer to the Prime Video storefront page, where the customer can select the "Watch now"

2    button to begin a movie.  *See* <u>Attachment P</u>, at 3.  Above the "Watch Now" button, Amazon

3    included "Prime" and "Included with Prime."



10    119.    After receiving the June 30, 2022 CID, Amazon changed the Prime Video

11    enrollment flow for Prime.  Now, when consumers click "Start your free trial" Amazon shows at

12    least some consumers a page titled "Welcome to Prime, [name]" that describes certain Prime

13    membership services.  On this page, there is no option to cancel the Prime membership.  Toward

14    the bottom are two buttons: on the left "Discover Prime benefits" (gray button) takes consumers

15    to an overview of Prime-related services, and on the right "OK" (blue button) continues to the

16    Prime Video storefront.  *See* <u>Attachment V</u>, at 7-8.

17    120.    **Prime Video (Mobile).**  Consumers may also enroll in Prime through Prime

18    Video on a mobile device.

19    121.    Like Prime Video on desktop, Prime Video on mobile tricked consumers into

20    signing up for Prime instead of Prime Video, which would be a lower-cost option.

21    122.    Like desktop Prime Video, the Prime Video mobile storefront displays the Prime

22    Video logo at the top and, toward the bottom of the page, an orange button labelled "Watch with

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

1    Prime.  Start your 30-day free trial."  Above the orange button, in blue text, reads "Prime" and

2    then, in white text, "Watch for $0.00 with Prime."  *See* <u>Attachment U</u>, at 1.



14        123.    Amazon brings consumers who press the orange button to a "Welcome" page to

15    sign in (if they have an Amazon account) to confirm billing information, or to create an account

16    and submit billing information.  The page also contains links to "Amazon's Conditions of Use

17    and Privacy Notice."  *See* <u>Attachment U</u>, at 2.

18        124.    After sign in or account creation, Amazon then brings consumers to a page that

19    asks consumers to "Confirm your details," and includes the following information from top to

20    bottom:

21        (a)    Next to "Plan" reads:  "Prime.  Enjoy unlimited streaming of thousands of

22               movies and TV shows plus FREE Two-Day Delivery on millions of items.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

44

($14.99/month after trial)."  Next to this text is an arrow similar to a greater-than

sign (">").

(b)      The page also lists consumer's email, payment method, and billing address

information.

(c)      There is then a link to Amazon Prime terms and conditions, as well as

Prime's price and auto-renewal feature.

(d)      Toward the bottom is an orange button "Start your free trial" with black

text beneath: "Change or cancel plan anytime.  Pay later." *See* <u>Attachment U</u>, at 5.



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

45

125.    To enroll in Prime Video (instead of Prime), the consumer must click on the "Plan" information toward the top of the page, change the plan on the subsequent page, and then navigate back to confirm the Prime Video selection.

126.    If the consumer simply clicks the orange "Start your free trial" button, Amazon enrolls the consumer in Prime—not Prime Video—but then immediately takes the consumer to the Prime Video storefront page.  *See* <u>Attachment U</u>, at 6.



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

46

**Prime's Four-Page, Six-Click, Fifteen-Option Iliad Cancellation Process**

127.    Under substantial pressure from the Commission, Amazon changed its Iliad cancellation process in or about April 2023, shortly before the filing of the Complaint.  Prior to that point, there were only two ways to cancel a Prime subscription through Amazon:  a) through the online labyrinthine cancellation flow known as the "Iliad Flow" on desktop and mobile devices; or b) by contacting customer service.

128.    The Iliad Flow required consumers intending to cancel to navigate a four-page, six-click, fifteen-option cancellation process.  In contrast, customers could enroll in Prime with one or two clicks.

129.    Although consumers may have enrolled in Prime through devices other than computers and smartphones, such as through the Prime Video application on the Amazon FireStick and Fire TV, they could not cancel via these same technologies.  Instead, they had to use the Iliad Flow or call customer service.

130.    Amazon launched the Iliad Flow in 2016, and did not substantially change it in the United States until in or about April 2023.

131.    To cancel via the Iliad Flow, a consumer had to first locate it, which Amazon made difficult.  Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page, which consumers could reach by selecting the "Account & Lists" dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ("Prime Membership").  This took the consumer to the Prime Central Page.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

47

132.     Once the consumer reached Prime Central, the consumer had to click on the "Manage Membership" button to access the dropdown menu.  That revealed three options.  The first two were "Share your benefits" (to add household members to Prime) and "Remind me before renewing" (Amazon then sent the consumer an email reminder before the next charge).  *See* <u>Attachment Q</u>, at 1-2.

133.     The last option was "End Membership."  The "End Membership" button did not end membership.  Rather, it took the consumer to the Iliad Flow.  *See* <u>Attachment Q</u>, at 2-3.  It was impossible to reach the Iliad Flow from Amazon.com in fewer than two clicks.



134.     Consumers could also reach the Iliad Flow by contacting customer service, asking to cancel, and receiving a link to the Iliad Flow.  Amazon required customer service representatives to encourage consumers seeking to cancel to do so via the Iliad Flow.

135.     Consumers could also reach the Iliad Flow from Amazon.com by typing "cancel membership" in the search bar.  This produced an "Alexa" answer that included an "End Your Amazon Prime Membership" link.  *See* <u>Attachment T</u>, at 2.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



136.    Clicking the link did not end Prime membership.  Instead, it took the consumer to another page with a heading that read:  "End Your Amazon Prime Membership."  The page contained a button labelled "End Your Prime Membership."  Pressing the button did not end Prime Membership.  Instead, it took the consumer to the Iliad Flow.  *See* <u>Attachment T</u>, at 3-4.

137.    The search bar pathway to the Iliad Flow varied somewhat depending on what search the consumer ran.  For instance, searching "how to turn off Prime," or "cancel prime" (rather than "how to cancel Prime") took the consumer to a page with a link to Prime Central, from which the consumer had to then locate the path to the Iliad Flow.  Searching "End

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

Membership" took the consumer to a page with three blue links under the heading "Closing your Amazon account," and a subheading "Get information on how to close your Amazon account." The middle link was "cancel membership."  Clicking "cancel membership" did not cancel membership.  Instead, it took the consumer to the Iliad Flow.

138.    Typing "cancel membership" in the search bar on a mobile device brought the consumer to the Iliad Flow through similar steps.  *See* Attachment S.

139.    Thus, to reach the Iliad Flow, consumers had to do one of the following: 1) contact customer service and inform a customer service agent that they wanted to cancel and click the cancellation link the customer service agent provides; 2) navigate from Amazon.com to the Prime account management page (Prime Central), locate the "manage membership" dropdown, and press a button labelled "End Membership"; or 3) search "How to cancel membership" in the Amazon search bar, then move through subsequent steps to reach the Iliad Flow—frequently, selecting a link reading "End Your Amazon Prime Membership" and then pressing a button reading "End Your Prime Membership."

140.    Once consumers reached the Iliad Flow, they had to proceed through its entirety—spanning three pages, each of which presented consumers several options, beyond the Prime Central page—to cancel Prime.  *See* Attachment Q.

141.    On the first page of the Iliad Flow, Amazon forced consumers to "[t]ake a look back at [their] journey with Prime" and presented them with a summary showing the Prime services they used.  Amazon also displayed marketing material on Prime services, such as Prime Delivery, Prime Video, and Amazon Music Prime.  Amazon placed a link for each service and encouraged consumers to access them immediately, *i.e.*, "Start shopping today's deals!", "You

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

50

can start watching videos by clicking here!", and "Start listening now!"  *See* <u>Attachment Q</u>, at 3.

Clicking on any of these options took the consumer out of the Iliad Flow.

You still have **7 days left** to enjoy your Prime benefits until the next billing cycle

Your benefit usage   PRIME BENEFITS USED:   **PAST 12 MONTHS** | PAST 30 DAYS

0   Packages shipped for free with Prime Delivery. Start shopping today's deals!

0   Movies and TV shows watched with Prime Video. You can start watching videos by clicking here!

0   Songs listened to with Amazon Music Prime. Start listening now!

*Does not include Add-On subscription usage from Amazon Music Unlimited Plan, and Prime Video Rentals or channel subscriptions.*

142.     Also, on page one of the Iliad Flow, Amazon presented consumers with three

buttons at the bottom.  "Remind Me Later," the button on the left, sent the consumer a reminder

three days before their Prime membership renews (an option Amazon had already presented the

consumer once before, in the "Manage Membership" pull-down menu through which the

consumer entered the Iliad Flow).  The "Remind Me Later" button took the consumer out of the

Iliad Flow without cancelling Prime.  "Keep My Benefits," on the right, also took the consumer

out of the Iliad Flow without cancelling Prime.  Finally, "Continue to Cancel," in the middle,

also did not cancel Prime but instead proceeded to the second page of the Iliad Flow.  *See*

<u>Attachment Q</u>, at 3.  Therefore, consumers could not cancel their Prime subscription on the first

page of the Iliad Flow.



AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

51

143.     On the second page of the Iliad Flow, Amazon presented consumers with

alternative or discounted pricing, such as the option to switch from monthly to annual payments

(and vice-versa), student discounts, and discounts for individuals with EBT cards or who receive

government assistance.  Amazon emphasized the option to switch from monthly to annual

payments by stating the amount a consumer would save at the top of this page in bold.  Clicking

the orange button ("Switch to annual payments") or the links beneath took the consumer out of

the Iliad Flow without cancelling.  *See* <u>Attachment Q</u>, at 4.



144.     Right above these alternatives, Amazon stated "Items tied to your Prime

membership will be affected if you cancel your membership," positioned next to a warning icon.

*See* <u>Attachment Q</u>, at 4.

145.     Amazon also warned consumers that "[b]y cancelling, you will no longer be

eligible for your unclaimed Prime exclusive offers," and hyperlinked to the Prime exclusive

offers.  *See* <u>Attachment Q</u>, at 4.  Clicking this link took the consumer out of the Iliad Flow

without cancelling.

> ⚠ **Items tied to your Prime membership will be affected if you cancel your membership.**
>
> 1. By cancelling, you will no longer be eligible for your unclaimed **Prime exclusive offers.**

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    146.    Finally, at the bottom of Iliad Flow page two, Amazon presented consumers with

2    buttons offering the same three options as the first page: "Remind Me Later," "Continue to

3    Cancel," and "Keep My Membership" (labelled "Keep My Benefits" on the first page).  *See*

4    Attachment Q, at 4.  Once again, consumers could not cancel their Prime subscription on the

5    second page of the Iliad Flow.  Choosing either "Remind Me Later" or "Keep My Membership"

6    took the consumer out of the Iliad Flow without cancelling.  Consumers had to click "Continue

7    to Cancel" to access the third page of the Iliad Flow.

8    147.    On the third page of the Iliad Flow, Amazon showed consumers five different

9    options, only one of which, "End Now"—presented last, at the bottom of the page—

10   immediately cancelled a consumer's Prime membership.  *See* Attachment Q.  Pressing any of the

11   first four buttons took the consumer out of the Iliad Flow without immediately cancelling.

12   148.    On the third page of the Iliad Flow, the first and second options—"Remind Me

13   Later" and "Keep My Membership"—were substantially identical to the buttons on the Iliad

14   Flow's first two pages.  Therefore, Amazon forced consumers who reach the Iliad Flow's last

15   page to view the "Remind Me Later" option four times (including once to enter the Iliad Flow)

16   and the "Keep My Membership" option three times.  *See* Attachment Q, at 5.



17

18

19

20

21

22

23   AMENDED COMPLAINT                                          Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                                  600 Pennsylvania Ave., NW
                                                                Washington, DC 20580
                                                                (202) 326-3320

1       149.    The third option, "Pause on [date]," would "pause" or put on hold—but not

2   cancel—a consumer's Prime membership.  Amazon did not charge "paused" members for Prime

3   but made it simple for "paused" members to re-join Prime through a single "quick-resume" click.

4   Amazon presented the "pause" option adjacent to a warning icon and text stating that, "[b]y

5   pausing, [consumers] will no longer be eligible for [their] unclaimed Prime exclusive offers,"

6   and provided links to "Prime exclusive offers" (which if clicked exit the Iliad Flow without

7   canceling).  *See* <u>Attachment Q</u>, at 5.



**Pause your Prime membership:**

⚠️  Items tied to your Prime membership will be affected if you pause your membership.

1.  By pausing, you will no longer be eligible for your unclaimed Prime exclusive offers. Click here to see your offers.

Pause on September 02, 2022

Your benefits access will continue until September 02, 2022. After that date, your billing and benefits will be paused, and you will no longer be charged for your Prime membership. Use the quick-resume function anytime to regain access to your Prime benefits. Learn More.

[Pause on September 02, 2022]

14       150.    Amazon regularly sent promotional materials to "paused" members to encourage

15   them to un-pause Prime with a single click.

16       151.    Above the fourth and fifth options—the "End on [date]" and "End Now"

17   options—Amazon also added a warning icon and text that states "[b]y cancelling, [consumers]

18   will no longer be eligible for [their] unclaimed Prime exclusive offers."  *See* <u>Attachment Q</u>, at 5.

19       152.    The fourth option, "End on [date]," turned off Prime's auto-renew feature.  It did

20   not immediately cancel the consumer's membership.  Instead, the membership would end when

21   the current billing cycle concluded, and the consumer would not receive a refund.  *See*

22   <u>Attachment Q</u>, at 5.

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

54

1

153.     The fifth and final option, "End Now," immediately cancelled a consumer's

2    Prime membership (and Amazon refunded a pro-rated amount for the balance of the billing

3    cycle).  Thus, only one of the five options presented immediately cancelled a consumer's

4    membership.  *See* Attachment Q, at 5.

5

6

7

8

9

10

11

12



13

154.     Therefore, to complete the Iliad Flow and cancel a Prime membership, the

14    consumer needed to click a minimum of six times from Amazon.com:  Prime Central →

15    "Manage Membership" → "End Membership" → "Continue to Cancel" → "Continue to Cancel"

16    → "End Now."  *See* Attachment Q.

17

155.     Amazon limited refunds available through the Iliad Flow to one monthly charge,

18    although Amazon did not disclose this to subscribers entering the flow.  Consequently, a

19    Nonconsensual Enrollee who discovered Prime charges after a few months could not obtain a

20    full refund online.  In contrast, a consumer who called customer support and was not redirected

21    to the Iliad Flow could obtain a greater refund because customer service representatives have

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    discretion to provide one (for instance, if a consumer complains about Nonconsensual

2    Enrollment).

3         156.    The Iliad Flow was also accessible through a mobile device.  Similar to the Iliad

4    Flow on desktop, the Iliad Flow on mobile was also difficult for consumers to locate and

5    presented a complex array of options across multiple pages.  Cancelling via the Iliad Flow on a

6    mobile device was an eight-page, eight-click minimum process.

7         157.    On a mobile device, a consumer entered the Iliad Flow by 1) tapping on "My

8    Account," 2) selecting "Manage Prime Membership" from a dropdown menu on the second

9    page, 3) selecting "Manage membership" on the third page, 4) selecting "Manage membership"

10    on the fourth page, and 5) selecting "End my Membership" on the fifth page.  *See* Attachment R,

11    at 1-5.

12         158.    On the sixth page, the consumer seeking to cancel began the mobile equivalent of

13    the Iliad Flow.  Specifically, on this page, Amazon presented benefits information similar to the

14    desktop Iliad Flow, and stated at the top of the page "[Name], thank you for being a member

15    with us.  Take a look back at your journey with Prime."  *See* Attachment R, at 6.  Amazon

16    included the same three options—"Keep My Benefits," "Continue to Cancel," and "Remind Me

17    Later"—although consumers had to scroll down to view them.  None of these options ended the

18    Prime membership.  Consumers who selected "Continue to Cancel" proceeded to a seventh page.

19    *See* Attachment R, at 6.

20         159.    On the seventh page, Amazon presented alternate payment options similar to

21    those in the desktop Iliad Flow:  Amazon placed the three options at the bottom of the page in

22

23    AMENDED COMPLAINT
    Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

the same order.  *See* <u>Attachment R</u>, at 7.  Pressing "Continue to Cancel" did not end the membership.  It took the consumer to an eighth and final page.  *See* <u>Attachment R</u>, at 7.

160.    On the eighth and final page, Amazon presented five buttons.  The first three were "Pause on [date]," "Keep My Membership," and "Remind Me Later."  The consumer had to scroll down to view the fourth and fifth.  The fourth ("End on [date]") turned off auto-renew, but did not immediately cancel, and consumers who chose this option did not receive a refund.  Only the fifth and final button ("End Now") immediately cancelled the membership.  Amazon refunded consumers who pressed this button a pro-rated amount for the balance of the monthly billing cycle.  *See* <u>Attachment R</u>, at 8.

161.    Amazon designed the Iliad Flow (both desktop and mobile) to inform consumers about a) Prime benefits they would lose by cancelling Prime, and b) alternative payment methods available to them to keep Prime.

162.    Amazon did not design the Iliad Flow to be simple or easy for consumers.  The Iliad Flow inhibits or prevents many consumers who intend to cancel from cancelling their membership.

163.    Amazon measured the Iliad Flow's success based on the number of Prime cancellations it prevented.  In 2020, ██ of subscribers who clicked on "End Membership" to enter the Iliad Flow did not cancel.  ████████████ of those Prime subscribers who entered the Iliad Flow but failed to cancel subsequently used no Prime services within the next thirty days.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

57

████████████████████████████ **for the Prime Enrollment Flow**

164.    Although consumers can enroll in Prime through many entry points, a majority of prospective Prime members begin subscriptions by enrolling in free trials that Amazon offers during its ecommerce shopping checkout process.  Because these trial memberships are the principal way that Amazon solicits Prime subscribers, the Prime Organization focuses extensively on how Amazon presents these trials to consumers.

165.    Amazon's Prime Organization regularly tests new designs for the UPDP, SOSP, SPC, TrueSPC, mobile, and other elements of the checkout enrollment flow that prospective subscribers see.

166.    ████████████████████████████████████████

167.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

168.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

169.    ████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

58

1     170. ███████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████

4     171. ███████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ██████████████████

8     172. ███████████████████████████████████████

9 ████████████████████████████████████████

10 ██████████████████████████████████████

11 ███████████████████████████████████████

12 ███████████████████████████████████████

13 ██████████████████████████████

14     173. ███████████████████████████████████████

15 ███████████████████████████████████████

16 ███████████████████████████████████████

17     174.    In fact, lower-level Amazon designers, marketers, and researchers urged company

18 leadership to ████████████████████████████████ One

19 Amazon employee wrote to Defendant Vice-President Jamil Ghani on July 30, 2020 about ██

20 ███████████████████████████████████

            21     An unknown $12.99 charge could mean grocery money for a family, gas to fill
up a car, or just the last bit of money to make rent. . . .  Do we think that they

22

23 AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

59

should also [have] to call customer service to ask for a refund, when they discover this unknown charge [for Prime]?

. . . .

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

175.     When an Amazon program manager similarly pointed out in an email chain sent to a large number of recipients that ████████████████████████████████ ██████████████████████████████████████████ Amazon Vice President Cem Sibay scolded him:  "[I]t's not appropriate to have this conversation over email, and increasingly a mass one at that (just adding P&C [privileged and confidential] does little)." Sibay and Defendants Ghani, Lindsay, and Grandinetti failed to implement any meaningful change.

176.     ███████████████████████████████████████ which has led to dark patterns and consequently Nonconsensual Enrollment.

**Amazon's Knowledge of Nonconsensual Enrollment**

177.     Amazon knows that Nonconsensual Enrollment is widespread.  In fact, Amazon periodically surveys consumers who cancel Prime to determine their reason.  For example, from November 2018 to February 2019, ████ of U.S. consumers Amazon surveyed gave "I did not mean to sign up for Amazon Prime" as their "[r]eason for cancellation."

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1  178.    In September 2020, Amazon also performed an internal study that quantified the

2  number of subscribers "unaware" that they had subscribed to Prime based on five considerations:

3  ██████████████████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████████

7  ████████████████    Based on these factors, Amazon estimated that ██████████████ Prime

8  subscribers were "unaware" that they had subscribed to Prime.

9  179.    Nonconsensual Enrollment is both so widespread and well-understood at Amazon

10  that the company's internal documents are littered with references to "accidental" signups.  One

11  company newsletter circulated among Prime Organization designers and researchers explained:

12      The issue of accidental Prime-sign ups is well documented . . . .  Customers
        unknowingly become ███████████████████████████
13      because 1) they signed up accidentally and/or didn't see auto-renewal terms, 2)
        we didn't send them reminders or charge communications, and 3) they didn't
14      check their card activity.

15  180.    In fact, as Amazon knows, consumers do not always carefully study their credit

16  card activity or notice an Amazon charge for Prime (especially when they are expecting other

17  Amazon charges for routine purchases).  Consequently, as one internal memorandum explained,

18  "[i]f customers unknowingly sign up, or are unaware of auto-renew, they can go through

19  multiple billing cycles without using benefits."

20  181.    When dissatisfied consumers call Amazon's customer service to cancel their

21  Prime membership, customer service representatives record the reason the consumer gives.

22  Amazon studied consumers who asked to cancel their Prime membership and reported to

23  AMENDED COMPLAINT                                         Federal Trade Commission
    Case No. 2:23-cv-0932-JHC                              600 Pennsylvania Ave., NW
                                                                Washington, DC 20580
                                                                     (202) 326-3320

customer service that they had signed up unintentionally to determine the time between when the

enrollment occurred and the consumer's call.  Amazon then reported the results in a

memorandum labelled "privileged and confidential":

(a) ██████████████████████████████████████████████

██████ meaning Amazon has charged them once without consent.

(b) ███████████████████████████████████████████████

meaning that Amazon has charged them three times without consent.

(c) ██████████████████████████████████████████████

meaning that Amazon has charged them six times without consent.

(d) █████████████████████████████████████████████

██████ meaning that Amazon has charged them twelve times without consent.

182.     Amazon knows who nearly all Nonconsensual Enrollees are, yet refunds only

those Nonconsensual Enrollees who eventually notice the charges and complain.

183.     Prime Organization designers and researchers referred to the design changes

necessary to stop Nonconsensual Enrollment as "clarity" improvements.  The problem—as

Amazon leadership understood—was that clarity improvements reduced subscriptions and,

therefore, profit.  One 2020 internal memorandum concerning "Prime Renewals: Product

Strategy for 2021" explained the tension this way:  projects that improve clarity "'right size' the

member balance to intentional and genuine members, thereby being a bad guy to total Prime

member balance.  This puts these projects at odds with other member balance accretive

Acquisition and Retention projects:  as a result, these projects have inevitably been BTL [below

the line] in stack ranked prioritizations."

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

62

184.     Instead of correcting the causes of Nonconsensual Enrollment, Amazon

leadership focuses energy and investment into iterating ███████████████████

████████████████████████████████████████████████████████

For example, in part to address Nonconsensual Enrollment after the fact—and without reducing

subscription balance—Amazon encourages Nonconsensual Enrollees to begin using the benefits

for which Amazon is already charging them without their consent.  In a meeting with Amazon

designers, Defendant Lindsay was asked about Amazon's use of dark patterns during the Prime

enrollment process.  Lindsay explained that once consumers become Prime members—even

unknowingly—they will see what a great program it is and remain members, so Amazon is

"okay" with the situation.  Accordingly, Amazon declined to remove problematic design

elements from its checkout enrollment flow.

185.     Amazon has known since at least 2016 that its Prime checkout enrollment flow

contains design elements that trick people into signing up.  In particular, designers within the

Prime Organization and researchers within a separate Shopping Design Organization

(responsible for studying consumer complaints) knew these design elements caused

Nonconsensual Enrollment and urged Amazon leadership to change them.  For example, in late

2020, designers and researchers prepared a draft memorandum explaining, in detail, Amazon's

use of design techniques "designed to mislead or trick users to make them do something they

don't want to do, like signing up for a recurring bill, favoring shareholder value over user value."

186.     Notably, in a different 2021 draft memorandum entitled "Clarity in Prime

Subscription Communications" that designers and researchers prepared for Amazon executive

Dave Clark, the authors recounted how the Shopping Design Organization had studied "mistaken

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

signups since 2016" and identified the problem "to Prime leadership."  Defendant Ghani directed

subordinates to revise this language because it "reads accusatory."

187.    Importantly, Prime Organization and Shopping Design Organization researchers,

designers, and marketers prevailed upon Amazon leadership to experiment with clarity

improvements four times:  in 2018, 2019, 2020, and 2021.  Throughout the process, Amazon

leadership did not object to clarity improvements so long as Prime subscriptions did not fall.

Each time Amazon clarified the Prime enrollment process, however, subscriptions did fall.  And

each time, Amazon leadership ordered the changes undone.

**Amazon's 2018 Decision to Defer Enrollment Process Changes**

188.    Beginning in 2014, the predecessor to the Shopping Design Organization began

an effort to identify, study, and resolve "customer frustrations," or consumer experience issues

across the entire suite of Amazon subscription services, including Prime, Kindle Unlimited,

Audible, and others.  This effort became known within Amazon as the Customer Frustrations

Elimination Program ("CFEP").

189.    As part of the CFEP, researchers compiled a list of user experience issues

identified by analyzing information consumers provided (including reasons for cancelling

Prime), individual customer frustration "tickets," and observational "shop-along" research during

which researchers would observe customers shopping on Amazon.

190.    CFEP researchers created a database of consumer "frustrations" to which

participants across Amazon could contribute, and through which participants across Amazon

could search.  Through the database, CFEP researchers centralized Amazon's consumer research

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

64

to facilitate collaboration between the CFEP team and the organizations within Amazon (*e.g.*, the Prime Organization) responsible for—and able to eliminate—a given "frustration."

191.    Amazon measures CFEP's performance based ███████████████████████ ████████████████    In contrast, Amazon measures the Prime Organization's performance based on ███████████████████████████████████

192.    In April 2018, at the direction of Amazon's leadership, including Defendant Lindsay, CFEP researchers reviewed the database ████████████████████ ████████████████████████

193.    CFEP researchers evaluated ████████████████████████ ████████████████████████████████ ██████████████████████████████████ ███████    Through this process, CFEP researchers ████████████████████ ██████████████████████████████████ ████████████████████

194.    The Shopping Design Organization's work overlapped with Project Lucent, a Prime Organization initiative aimed at increasing clarity and reducing Nonconsensual Enrollment by "simplifying cluttered templates," phasing out "design paradigms which could be confusing to the customer," and "making the sign-up flow more intuitive," among other goals. In 2018, Defendant Lindsay received an internal memorandum regarding Project Lucent, which confirmed "Prime identified the need to increase clarity during the Prime sign-up and on-boarding process."

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

65

195.     Project Lucent researchers found the UPDP contained numerous problematic elements.  For example, according to the same 2018 document: (1) the button to enroll in Prime "does not make it clear that consumers are signing up for Prime"; (2) the option to decline Prime enrollment "is not clear/prominent so customers miss it" and click on the enrollment option inadvertently; (3) Prime branding is not prominent on the UPDP "so customers did not realize this was a Prime upsell"; and (4) the price of Prime and the fact that the subscription service would auto-renew "was not prominent so customers did not realize the associated cost."

196.     To address these problems, the Project Lucent team tested several "clarity" improvements intended to clarify the UPDP on a small segment of consumers in the United States.

197.     Specifically, Amazon changed the enrollment button from "Get FREE two-day shipping" to "Start your 30-day FREE trial."  Amazon also modified the link declining Prime from "Continue without fast, free shipping" to "No Thanks."  Additionally, Amazon clarified the price of a Prime subscription as well as its auto-renew feature outside of the fine print terms and conditions.

198.     Testing revealed, however, that making these clarity improvements would ██████████████████████████████████████  In particular, the change to "Start your 30-day FREE trial" resulted in ███████████████████████████████████ the change to "No Thanks" ███████ ███████████████████ and the price and auto-renew clarification ████████████████

199.     On September 24, 2018, Prime and Shopping Design executives met to discuss Project Lucent and the CFEP findings related to Nonconsensual Enrollment.  The Shopping Design Organization had no authority to implement changes within the Prime Organization's

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

66

area of responsibility, which includes the checkout enrollment flow.  The primary question at this

meeting was "how many Prime signups [is] Amazon . . . willing to lose in order to prevent

unintended Prime Signup[.]"  At the meeting, Prime Organization representatives opposed

changes that would reduce subscription numbers because Amazon evaluates Prime's

performance substantially based on subscription numbers.  Shopping Design Organization

researchers and leadership favored changes designed to reduce Nonconsensual Enrollment

because Amazon evaluates Shopping Design based partly on how many customer "frustrations"

it eliminates.

200.    Executives acknowledged at the meeting that the enrollment flow lacked

transparency. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

201.    Because the Project Lucent clarity improvements negatively affected subscription

numbers, the Prime Division pulled the plug on Project Lucent.

**Amazon's 2019 Decision to Defer Enrollment Process Changes**

202.    After the Prime Organization failed to address the problems in the Prime

enrollment flow that CFEP identified, the Shopping Design Organization escalated the issue to

Defendant Grandinetti, who had authority over both Organizations.  Within Amazon,

"escalations" occur to "break ties" when two organizations within Amazon disagree.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

67

203.     Consistent with Amazon's general practice, the Prime and Shopping Design Organizations attempted to jointly prepare a memorandum for Grandinetti describing the testing Amazon had conducted as part of Project Lucent, the work CFEP researchers performed, the business implications, and the prior decision to halt changes.

204.     On June 17, 2019, high-level representatives of both Organizations met with Defendant Grandinetti.  Every member in attendance, including Defendants Lindsay and Grandinetti, read the memorandum at the beginning of the meeting.

205.     The document identified the issue: "Prime signups are not always transparent" and "customers sign up without knowing they did."  The document highlighted specific design attributes contributing to Nonconsensual Enrollment.  Among other things, the memorandum explained that the checkout enrollment flow confused some consumers about whether they were enrolling and made it difficult for them to understand Prime's price and auto-renew feature.

206.     The memorandum further stated these issues were ███████ that Amazon should address, but also stated that changes to resolve those issues would cause short-term enrollment to decrease.

207.     The attendees of the June 17, 2019 meeting discussed their options, including ████████████████████████████████████████████ ██████████████ on the option to decline Prime (e.g., "No Thanks, I do not want fast, FREE shipping").  Defendant Lindsay even suggested something he called "scary"—that Amazon should consider making it as easy to decline Prime as to enroll.  The meeting participants also discussed specific associated changes, such as changing the decline link to a button to make consumers less likely to overlook it.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

208.     Eventually, Defendant Grandinetti vetoed any changes that would reduce enrollment.  He directed the Prime Organization to improve the checkout enrollment flow as much as it could—but only "while not hurting signups."  Consequently, Amazon continued to use the designs that caused Nonconsensual Enrollment.

**Amazon's 2020 Decision to Defer Enrollment Process Changes**

209.     In 2020, product marketers and researchers on the Prime Content Experimentation and Optimization team ("CE&O") within the Prime Organization reignited "clarity" efforts to improve trust (*i.e.*, to reduce Nonconsensual Enrollment).  One marketer gave a presentation on clarity to Prime Organization supervisors Nahshon Davidai and Omar Kalim.  The presentation stated that clarity improvements would "[f]oster customer trust with straightforward messaging" because the lack of clarity within the Prime checkout enrollment flow is a "root cause of customer friction."  The presentation suggested that the Prime Organization had not implemented proposed changes because "business goals" (paid subscriber numbers) and "customer clarity" require "a delicate balance."

210.     After reviewing the presentation, Davidai agreed that Amazon should replace their checkout Prime upsells "with something that meets [their] clarity bar."  Accordingly, the Prime Division then sought the requisite approval from Defendants Ghani and Lindsay to make design changes to the checkout enrollment flow likely to reduce enrollment.

211.     The Prime Organization prepared a document entitled "Prime Framework for Clarity" that summarized the problem and options to address it.  In particular, the memorandum explained that, as a result of manipulative design, Amazon had "accumulated a significant clarity debt that [it] need[ed] to start paying down."  Furthermore, its "approach to clarity [had] been

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

69

short sighted" because "experiments [had] been focused on impact to paid members and signups" using the existing problematic checkout enrollment flow as a baseline, which made changes difficult because changes that reduced problematic elements lowered enrollment.  The memorandum proposed "considering the impact on member trust and brand equity" instead.

212.    The document framed the issue this way:  "[w]e seek leadership feedback on i) are we willing to take an initial membership hit to reset our clarity baseline, and if so, ii) how fast we should move to fix these defects."

213.    After Defendant Ghani approved a draft on June 3, 2020, the Prime Organization organized a "Prime Clarity and Member Trust Review" with Defendant Lindsay on July 24, 2020.  At least initially, Lindsay agreed to support the CE&O team's push for clarity.

214.    Following the meeting, in September 2020, the Prime Organization fixed several key problems with the UPDP in the United States including:  (a) changing the "decline" option from a link to a "No thanks" button; (b) making Prime's price visible outside the terms and conditions; and (c) re-labelling the enrollment button with wording that included "Prime" or "Free Trial" (collectively, the "September 2020 Changes").

215.    As predicted, the September 2020 Changes reduced Prime's subscription numbers.

216.    By November 2020, however, it became clear that the September 2020 Changes would cause Prime to miss its financial goals.  On December 3, 2020, Defendants Lindsay and Ghani met with various Prime Organization leaders and another executive, Doug Herrington, to review Prime's performance. ██████████████████████████████████████████████████████████████████████████████████████████████████

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

70

The memorandum further explained that, as a consequence, the Prime Organization would roll

back the September 2020 Changes and return to the version of the enrollment checkout flow ███

████████████████████████████████████.

217.  Defendants Ghani and Lindsay decided to make this rollback permanent.  In this

regard, the Prime Organization continued to implement Defendant Grandinetti's original

instruction not to make changes that would reduce subscriptions.

218.  Separately, a Shopping Design senior researcher formed a "Clarity Working

Group" to improve the enrollment and cancellation process across *all* of Amazon's subscription

programs, including Prime, Audible, Kindle Unlimited, and Amazon Music Unlimited.  It

produced a memorandum and design mockups comparing the then-current versions of

problematic enrollment and cancellation processes across Amazon with revised versions

intended to "increase clarity during subscription sign-up, renewal, and cancellation."  For

instance, with respect to Prime, the Clarity Working Group recommended that the enrollment

button needs to clearly state that a customer is signing up for a 30-day free trial or a paid

subscription rather than only stating the customer will receive "FREE" shipping.  The Clarity

Working Group further highlighted the fact that customers had trouble finding the ingress to the

Iliad Flow and prematurely abandoned the Iliad Flow under the incorrect assumption they had

completed cancellation of their Prime subscription.  The Clarity Working Group also proposed

metrics to evaluate performance ████████████████████████████████.

The Clarity Working Group presented its memorandum and design mockups to Defendant Ghani

and a Shopping Design executive, Llew Mason, on December 16, 2020.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

71

1

2      219.    The Clarity Working Group's December 16, 2020, memorandum urged Amazon

3    not to "let financial impact impede efforts to build a trustworthy [customer experience]."  It

4    further noted the decision to roll back the September 2020 Changes would "improve growth

5    metrics" but at the expense of engaging in a ▮▮▮▮▮▮▮▮▮  The Clarity Working Group

6    asked Mason and Defendant Ghani to "urgently revisit this rollback strategy with the right

7    decision-makers."

8    **Amazon's 2021 Decision to Make Certain Changes in Response to Regulatory Pressure**

9      220.    On January 6, 2021, Ghani emailed Lindsay.  Ghani explained that he had met

10   with the Shopping Design Clarity Working Group, which put "forth some standards that Prime

11   knows would be significant headwinds to sign ups and are counter to where I think we landed

12   with you and Doug [Herrington]."  Ghani further acknowledged the "real tension between the

13   ongoing push to improve [the customer experience] . . . and the concrete decisions to be made in

14   Prime upsells and their headwind to growth," describing that process as a "balancing act."  Ghani

15   also explained to Lindsay "[t]he reality is that the changes we made in September to Prime

16   templates where (sic) deemed to be near the 'minimum bar' of what we wanted to improve (e.g.,

17   call out the price outside of the [terms and conditions], make negative [button or link] as

18   prominent as positive (sic), remove shadow boxes around buttons).  But as you know, the

19   changes nevertheless had a significant negative impact."

20     221.    Defendant Lindsay elected to prepare yet another memorandum for yet another

21   executive, Senior Vice President Dave Clark, to again facilitate a decision among Lindsay,

22   Ghani, and others regarding whether to make any changes.

23   AMENDED COMPLAINT
     Case No. 2:23-cv-0932-JHC

222.     Specifically, Defendant Lindsay explained to Defendant Ghani:  "I may land in the same place, but given how hot this topic is in the press lately, and the risk of regulatory action in some countries, I [am] [sic] wondering how you might thread the needle . . . between making it easy to join, easy not to mistakenly join and not unduly difficult to unsubscribe[.]"

223.     Additionally, Defendant Lindsay asked for "benchmarking," or analyses of the enrollment and cancellation processes Amazon's competitors use.  Defendants Lindsay and Ghani sought to determine whether, regardless of Amazon's own behavior or legal obligations, its competitors appeared to use more pernicious enrollment and cancellation design techniques. The Prime Organization then compiled the requested "benchmarking" information comparing the Prime checkout enrollment flow and the Iliad Flow to competitors' enrollment and cancellation experiences.

224.     The Prime Organization further prepared a draft memorandum that Defendants Ghani and Lindsay approved.  That memorandum posed several questions, including "[h]ow much friction should we add to the signup process knowing that these initiatives come[] at a cost in terms of signups and member balance?"  The memorandum answered:  "Based on results from our experiments, we believe tightening clarity at a single transaction at signup is not the right approach and that such highly impactful changes to the [customer experience] should not be introduced abruptly given the shock to business performance[.]"

225.     The Prime Organization's memorandum asked:  "How easy should we make it to cancel Prime?"  It also framed the issue as whether Amazon should simplify the Iliad Flow for some consumers, "while taking others through a longer path, communicating the benefits of a membership and persuading them to stay Prime. . . .  If not, should we lean in towards a strategy

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

73

1    that simplifies cancelation across the board, including enabling a one click cancellation for all

2    customers . . . ?"  However, Defendants Lindsay and Ghani made no changes.

3         226.    In assisting with the memorandum, one Clarity Working Group member noted the

4    existence of "consumer watchdogs [who] say the manipulative 'dark pattern' design makes it

5    hard for people to end membership."

6         227.    On March 16, 2021, the FTC issued a CID to Amazon seeking information

7    necessary to evaluate whether the Prime enrollment process and the Iliad Flow violated the

8    Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-05.  At that point,

9    Amazon's in-house counsel (and, later, its outside counsel) assumed greater control over

10   business decisions involving the Prime enrollment process and the Iliad Flow.

11        228.    Clark met with Defendants Lindsay and Ghani on May 6, 2021, less than two

12   months after the CID.  Amazon decided to make changes to the enrollment and Iliad flows either

13   during or as a result of this meeting.

14        229.    Amazon made these changes as a result of pressure from both the FTC and

15   European Union regulators.

16        230.    In the second quarter of 2021, Amazon initiated a project to shorten the Iliad Flow

17   in the European Union.  As discussed above, *see* Paragraphs 127 and 130, Amazon made

18   changes to the Iliad Flow in the United States in or about April 2023.

19                **Manipulative Designs in the Checkout Enrollment and Iliad Flows**

20        231.    The manipulative designs (sometimes called dark patterns) Amazon uses, or has

21   used, in its Prime enrollment flows and the Iliad Flow include the following elements:

22

23   AMENDED COMPLAINT                               Federal Trade Commission
     Case No. 2:23-cv-0932-JHC                      600 Pennsylvania Ave., NW
                                                    Washington, DC 20580
                                                    (202) 326-3320

(a)     <u>Forced Action</u>.  "Forced Action" is a design element that requires users to perform a certain action to complete a process or to access certain functionality.

(i)     Amazon uses Forced Action in the UPDP version of its Prime enrollment flow, during which Amazon forces the consumer to choose whether to enroll in Prime before allowing the consumer to complete her purchase.  In fact, at least as of 2018, Amazon knew that some consumers clicked on yellow buttons expecting only to continue the checkout process rather than to enroll in Prime.

(ii)     Amazon also uses Forced Action in its Iliad Flow by forcing the consumer to proceed through multiple screens to cancel their subscription.  The presence of Forced Action complicates the Iliad Flow.

(b)     <u>Interface Interference</u>.  "Interface Interference" is a design element that manipulates the user interface in ways that privilege certain specific information relative to other information.

(i)     Amazon uses Interface Interference in its Prime checkout enrollment flow, most versions of which reveal the terms and conditions of Prime only once during the purchase process, and then only in a small, easy-to-miss font.  Amazon also uses repetition and color to direct consumers' attention to the words "free shipping" and away from Prime's price, which leads some consumers to enroll without providing informed consent.

(ii)     Amazon also uses Interface Interference in the Iliad Flow by emphasizing options that divert the consumer from the flow without cancelling and by employing warning icons near the option to cancel, which evokes anxiety and fear of loss in consumers.  The presence of Interface Interference complicates the Iliad Flow.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1    (c)    Obstruction ("Roach Motel").  "Obstruction," also known as the "roach

2    motel" technique, is a design element that involves intentionally complicating a process through

3    unnecessary steps to dissuade consumers from an action.

4    (i)    Amazon uses Obstruction throughout its Prime checkout

5    enrollment flows by making the option to decline enrollment difficult to locate.

6    In fact, since at least 2018, Amazon has known that some consumers cannot find the less

7    prominent "No Thank You" link to decline enrollment.

8    (ii)    Amazon also uses Obstruction in its Iliad Flow by:  (1) making the

9    ingress to the Iliad Flow difficult for consumers to locate; and (2) forcing consumers who have

10    already expressed an intent to cancel by locating and entering the Iliad Flow to view marketing

11    and reconsider options other than cancellation.  The presence of Obstruction complicates the

12    Iliad Flow.

13    (d)    Misdirection.  "Misdirection" is a design element that focuses a

14    consumer's attention on one thing to distract from another.

15    (i)    Amazon uses Misdirection in its Prime checkout enrollment flow

16    by presenting asymmetric choices that make it easier to enroll in Prime than not.  Additionally,

17    certain versions of Amazon's checkout enrollment flow offer consumers only a less prominent

18    blue link to decline Prime.

19    (ii)    Internal materials from Amazon identify the use of a link rather

20    than a button as a type of "misdirection."  In fact, Amazon has known for years that presenting

21    consumers with visually unequal options is problematic.  As one email from a senior researcher

22    recounts, "[d]ating back to 2017, we have made multiple requests (at the Neil [Lindsay] and

23
AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Jamil [Ghani] level) that the [Prime] team move to a more customer-friendly and accessible CX [customer experience], whereby we would use two equally prominent buttons for the Sign Up vs. No Thanks." ████████████████████████████████████████████████████ ████████████████████████████████  Amazon also uses Misdirection in certain versions of the Prime checkout enrollment flow by failing to label the button that enrolls consumers in Prime with text indicating what pressing the button will do.  For example, Amazon has known for years that some consumers do not understand that buttons labelled "Get FREE two-day shipping" actually enroll the consumer in the Prime subscription program.

(iii)     Amazon also uses Misdirection in its Iliad Flow by presenting consumers with asymmetric choices that make it easier to abandon an attempted Prime cancellation than to complete it.  In particular, Amazon uses attractors such as animation, a contrasting color blue, and text to draw consumers' attention to "Remind me later" and "Keep my benefits" options rather than "Continue to Cancel."  Amazon further misdirects consumers who have entered the Iliad Flow by presenting visually appealing options to perform acts other than cancel, such as exploring the benefits of the subscription service (thereby exiting the Iliad Flow).  The presence of Misdirection complicates the Iliad Flow.

(e)     Sneaking.  "Sneaking" is a design element that consists of hiding or disguising relevant information, or delaying its disclosure.  Amazon uses Sneaking by failing to clearly and conspicuously disclose Prime's terms and conditions during its enrollment checkout flow, including its price and auto-renew attribute.  Amazon also employs Sneaking by failing to show Prime's price or its auto-renewal feature in the consumer's cart.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

(f)     Confirmshaming.  "Confirmshaming" is a design element that uses emotive wording around the disfavored option to guilt users into selecting the favored option. Until at least 2020, the Prime checkout enrollment flow used confirmshaming by requiring consumers who sought to decline Prime to click a link stating "No thanks, I do not want fast, free delivery":



Amazon used such confirmshaming despite internal analyses questioning the propriety of this wording.  Amazon's most recent TrueSPC enrollment pathway continues to use a form of confirmshaming when it claims:  "we'd hate for you to miss out on unlimited fast, FREE delivery."

### Amazon's Other Subscription Programs Have Similar Features

232.     Amazon operates other subscription services including Audible (audiobooks and podcasts), Kindle Unlimited (eBooks and digital media), Amazon Music Unlimited (streaming music), and Subscribe & Save (regularly-scheduled delivery of consumer goods).  These other subscription services also use similar manipulative design elements that trick consumers into signing up and thwart their cancellation attempts.

233.     Amazon's internal usage numbers demonstrate the problem.  ███████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

234.     Design concepts that Amazon employs in Prime—its largest subscription service—are readily transferrable to Amazon's other subscription programs.  Indeed, the Amazon designers and researchers who unsuccessfully urged Amazon to change Prime enrollment and cancellation processes also asked Amazon executives to make similar changes to Amazon's other subscription programs.  As with Prime, however, Amazon leadership slowed or prevented clarity-enhancing and legally-required design changes that would reduce subscription numbers.

### Amazon's Misuse of the "Privileged" Label on Documents

235.     Amazon and its executives, including Defendants Lindsay, Grandinetti, and Ghani, misused "privileged" designations on documents addressing issues related to Nonconsensual Enrollment and the Iliad Flow:

(a)     Amazon and its executives, including Defendants Lindsay, Grandinetti, and Ghani, labelled or forwarded material as "privileged" when the material addressed issues related to Nonconsensual Enrollment or the Iliad Flow but did not contain or seek legal advice.  Amazon and its leadership further directed subordinates to follow this improper practice.  For example, one employee wrote in a January 20, 2021 email that "clarity is a P&C [privileged and confidential] topic."  In another, a Prime VP stated, "it's not appropriate to have this conversation [on a lack of clarity in an enrollment upsell] over email, and increasingly a mass one at that (just adding P&C does little)."

(b)     Amazon and its executives, including Defendants Lindsay and Ghani, included phrases such as "for counsel" or "seeking counsel" or similar at the

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

79

1    beginning of email correspondence addressing issues related to Nonconsensual

2    Enrollment or the Iliad Flow—typically copied to one lawyer along with many

3    businesspeople—when the correspondence did not contain a request for legal

4    advice.  Amazon and its leadership further directed subordinates to follow this

5    improper practice.

6    (c)    Amazon and its executives, including Defendants Lindsay, Grandinetti,

7    and Ghani, included attorneys in certain meetings about Nonconsensual

8    Enrollment and the Iliad Flow for the purpose of attempting to render the

9    meetings privileged.  For instance, Amazon withheld all information regarding the

10   May 6, 2021 meeting referenced in Paragraph 228.  Amazon and its leadership

11   further directed subordinates to follow this improper practice.

12   236.    Amazon and Defendants Lindsay, Grandinetti, and Ghani performed or directed

13   these improper practices because they understood that Nonconsensual Enrollment and the Iliad

14   Flow would inevitably result in government investigations.

15   237.    By identifying (and causing others to identify) communications concerning

16   Nonconsensual Enrollment and the Iliad Flow as privileged when they were not, Amazon and

17   Defendants Lindsay, Grandinetti, and Ghani obstructed the FTC's investigation, delaying the

18   Commission's ability to access the falsely-labelled material.

19   238.    When these acts occurred, Amazon and Defendants Lindsay, Grandinetti, and

20   Ghani knew that the Commission's investigatory proceeding was foreseeable or underway.

21   Amazon and Defendants Lindsay, Grandinetti, and Ghani intended to interfere with the

22   Commission's investigatory proceeding and, in fact, did so in the manner alleged herein.

23   AMENDED COMPLAINT
     Case No. 2:23-cv-0932-JHC

                                                  Federal Trade Commission
                                                  600 Pennsylvania Ave., NW
                                                  Washington, DC 20580
                                                  (202) 326-3320

1

**Amazon's Other Attempts to Delay the Commission's Investigation**

2      239.    On March 16, 2021, the Commission issued a CID to Amazon seeking

3   information regarding the enrollment and cancellation practices associated with Prime.  The CID

4   directed Amazon to respond by April 15, 2021.  Amazon assured the Commission that it would

5   cooperate, but did not.

6      240.    Amazon has over 1.5 million employees—*i.e.*, potential document custodians—

7   and its internal communications are replete with acronyms and other jargon—*i.e.*, potential

8   search terms—not readily identifiable to outsiders.  Accordingly, as with any discovery process,

9   the Commission had to, and did, rely on Amazon to participate in good faith in the discovery

10   planning process, including by identifying appropriate custodians and search terms.

11      241.    During at least one phone call shortly following the issuance of the CID,

12   Amazon's counsel assured the FTC's counsel that, in substance, "I will get you what you need."

13   Amazon's counsel also told the FTC's counsel that Amazon would work "to identify the most

14   efficient means of providing [the FTC] with the information [it] need[s] to complete [its]

15   investigation."  These assurances are consistent with any opposing counsel's obligation to

16   engage in good faith discovery planning.  As detailed below, however, Amazon did not follow

17   through on these assurances, instead, for example, proposing search terms and custodians that led

18   the Commission away from key documents.

19      242.    In the context of the customary need to rely on opposing counsel to act in good

20   faith, Amazon counsel's significant experience working on FTC investigations, Amazon's

21   promise to "get you what you need," the massive amount of potential document custodians and

22   search terms (many of which were unknowable to the Commission), and other express

23   AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

assurances of cooperation throughout the Subject Period, the Commission agreed to rely on

Amazon to provide—in the first instance—a sufficient response to the CID, including reasonable

search terms and custodians, to enable the Commission to fairly evaluate Amazon's Prime

enrollment and cancellation practices.  However, the Commission always reserved its right to ask

for additional responsive information and additional search terms and custodians.

243.    Accordingly, during the Subject Period, in response to Amazon's assurances of

cooperation and that Amazon would provide the Commission what it needed, the Commission

temporarily accepted the eight custodians (out of approximately 500 employees with potentially-

responsive information) and narrow search terms Amazon proposed.  The Commission relied on

Amazon's assurances that the custodians and search terms selected by Amazon would provide

the information the FTC needed.

244.    By March 14, 2022, one year later, Amazon had produced only a small amount of

material—fewer than 9,000 documents—using the custodians and search terms that it had

proposed.

245.    On March 14, 2022, *Business Insider* published information leaked from current

and former Amazon employees regarding the problems with Amazon's Prime checkout

enrollment flow and the Iliad Flow.  The Commission quickly ascertained that Amazon had

failed to disclose much of the now-leaked documents and information to the Commission,

despite the fact that at least some of it was responsive to the outstanding CID.  Amazon withheld

the information by identifying combinations of search terms and custodians it knew would not

surface the most probative—and inculpatory—material.  Among other things, Amazon failed to

identify as custodians key individuals who communicated extensively about the Prime

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

enrollment and cancellation processes, including the most knowledgeable employees on these subjects.  Amazon also failed to identify as custodians individuals the *Business Insider* article named as key decision-makers regarding the Nonconsensual Enrollment problem and the Iliad Flow.

246.    In contrast, two of the eight custodians identified by Amazon performed little work germane to the investigation.  But for the *Business Insider* article, Amazon's failure to identify relevant custodians and search terms may have gone undiscovered.

247.    Pursuant to its reservation of rights, on April 19, 2022, the Commission issued an extensive follow-up demand for additional information.  Amazon did not comply with this demand, instead making the incredible claim that doing so would take 30 months.

248.    On June 30, 2022, the Commission issued an additional CID to Amazon as well as CIDs to various current and former employees seeking documents and testimony.  Amazon also did not comply with the June 30, 2022 CID.

249.    Instead, on August 5, 2022, Amazon and certain individual CID recipients (including Defendants Lindsay, Ghani, and Grandinetti) petitioned the Commission to quash the June 2022 CIDs.  On September 21, 2022, the Commission denied the petition in every material respect.  Three Commissioners noted with respect to one legal question Amazon raised as a basis to delay or avoid providing testimony:  "The issue raised by this dispute is just one of many challenges facing FTC staff when pursuing complex investigations of targets that may perceive benefits to prolonging discovery."  Although the Commission ordered Amazon and the individual petitioners to fully comply, they did not.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

83

250.     Amazon's effort to delay the Commission's investigation included its failure to identify custodians—including employees who worked the most on clarity issues on enrollment and cancellation—and search terms reasonably likely to surface the most probative information. In addition to Amazon's failure to identify custodians and search terms during the Subject Period that would have produced the material to which the *Business Insider* article referred, Amazon did not identify any Shopping Design Organization custodians at all.

251.     Amazon largely failed to timely produce the documents the CIDs require. Although Prime is the world's largest subscription program, Amazon produced fewer than 30,000 documents during the entire two-year investigation.  Small businesses routinely produce more material to Commission investigators.  Moreover, Amazon did not produce most of those documents before October 2022—eighteen months after the Commission's initial CID.

252.     Amazon's false cooperation assurances described in Paragraphs 239 through 251 constituted intentional misconduct meant to delay the Commission's investigation and the Complaint.  Furthermore, these false cooperation assurances misled the Commission and affirmatively concealed the causes of action asserted herein during the Subject Period. Amazon's wrongful conduct foreseeably caused, and did in fact cause, delay of the Commission's investigation of all Defendants, including Lindsay, Grandinetti, and Ghani.

253.     At all times, the Commission acted diligently.  Among other things, during the Subject Period, the Commission reviewed material Amazon produced and provided feedback to Amazon Counsel through correspondence and teleconferences.  The Commission also made supplemental requests and, to expedite Amazon's response, demanded that the company accept a timeline for its production.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

254.    Amazon's bad faith response to the Commission's CID constitutes an extraordinary circumstance beyond the Commission's control.  But for Amazon's effort to frustrate the Commission's investigation, the Commission would have filed this action many months earlier.  Amazon's false cooperation assurances described in Paragraphs 239 through 251 delayed the Commission's investigation during the period from April 15, 2021 (the initial CID return date) and March 14, 2022 (the publication of the *Business Insider* article).

255.    Amazon's largely unsuccessful petition to quash delayed the Commission's investigation during the period of its pendency, from August 5, 2022 until September 21, 2022.

256.    Based on the facts and violations of law alleged in this Amended Complaint, the FTC has reason to believe that Defendants are violating, and are about to violate, laws enforced by the Commission because Defendants have engaged in ROSCA violations repeatedly and knowingly for years.  Those violations are ongoing.  Even if Amazon halts or has halted some problematic conduct, Amazon has consistently pressured its employees to maintain Prime subscription numbers, meaning the incentive for enrollment and cancellation process violations remains.

257.    Additionally, until shortly before the Commission filed the Complaint, Amazon used the Iliad Flow to persuade consumers to keep their Prime subscriptions.  Amazon only revamped Iliad in response to pressure from the Commission, and without such pressure—including this lawsuit—Amazon would likely restore Iliad.  Furthermore, the revamped cancellation process still contains problematic elements because the cancellation process remains difficult to locate on both desktop and mobile.  Amazon still requires five clicks on desktop and six on mobile for consumers to cancel from Amazon.com.  And both flows still require

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

85

1    consumers to proceed through extraneous information unnecessary to the cancellation process

2    and presented solely to discourage cancellation.  The continued presence of these problematic

3    elements illustrates that, although the form of the cancellation flow recently changed, Amazon's

4    mindset has not.

5        258.    Indeed, Amazon considers changes to Prime enrollment and cancellation

6    mechanisms as "two-way door" decisions, meaning that those changes can be undone at any

7    time.

8        259.    Amazon is one of the world's largest and most well-resourced companies.  It has

9    extensive legal resources including in-house and outside counsel with expertise in the FTC Act,

10   ROSCA, and the company's other consumer protection obligations.  Amazon embedded in-

11   house counsel within the Prime Organization, and key decisionmakers Defendants Lindsay,

12   Ghani, and Grandinetti routinely conferred with such in-house counsel, including in-house

13   attorney Praju Tuladhar, regarding obligations under the FTC Act, ROSCA, and other consumer

14   protection laws and regulations.

15       260.    Accordingly, Amazon and Defendants Lindsay, Ghani, and Grandinetti, have

16   actual knowledge or knowledge fairly implied on the basis of objective circumstances that their

17   actions are unfair or deceptive and are prohibited by ROSCA.

18                      **VIOLATIONS OF THE FTC ACT**

19       261.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

20   or practices in or affecting commerce."

21       262.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are

22   likely to cause substantial injury to consumers that consumers cannot reasonably avoid

23   AMENDED COMPLAINT
     Case No. 2:23-cv-0932-JHC

                                          Federal Trade Commission
                                          600 Pennsylvania Ave., NW
                                          Washington, DC 20580
                                          (202) 326-3320

themselves and that is not outweighed by countervailing benefits to consumers or competition.

15 U.S.C. § 45(n).

## COUNT I

**Unfairly Charging Consumers Without Consent**
**(All Defendants)**

263.    In numerous instances, as described in Paragraphs 2 through 238 above,

Defendants have charged consumers without their express informed consent.

264.    Defendants' actions cause or are likely to cause substantial injury to consumers

that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing

benefits to consumers or competition.

265.    Therefore, Defendants' acts or practices as set forth in Paragraph 263 constitute

unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS CONFIDENCE ACT

266.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15

U.S.C. §§ 8401-05, which became effective on December 29, 2010.  Congress passed ROSCA

because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its

development as a marketplace, the Internet must provide consumers with clear, accurate

information and give sellers an opportunity to fairly compete with one another for consumers'

business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

267.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers

for goods or services sold in transactions effected on the Internet through a negative option

feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R.

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

§ 310(w), unless the seller:  (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges.  *See* 15 U.S.C. § 8403.

268.    The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

269.    As described in Paragraphs 2 through 238, Defendants have created and manage several negative option features as defined by the TSR, 16 C.F.R. § 310.2(w), including Prime.

270.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes a violation of a rule under section 18 of the FTC Act, 15 U.S.C. § 57a, and constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

271.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $50,120 for each violation of ROSCA, 16 C.F.R. § 1.98(d).

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

88

1

## COUNT II

2

**Violation of ROSCA—Inadequate Disclosures**
**(All Defendants)**

3

4

272.     In numerous instances, in connection with charging consumers for goods or

5

services sold in transactions effected on the Internet through a negative option feature, as

6

described in Paragraphs 2 through 238 above, Defendants failed to clearly and conspicuously

7

disclose all material terms of the transaction, including the price of Prime, its auto-renewal

8

provision, and cancellation requirements, before obtaining the consumer's billing information.

9

273.     Defendants' practices as set forth in Paragraph 272 are violations of Section 4 of

10

ROSCA, 15 U.S.C. § 8403(1), and are therefore violations of a rule promulgated under Section

11

18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or

12

deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

13

274.     Defendants committed the violations set forth in Paragraph 272 with the

14

knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

15

## COUNT III

16

**Violation of ROSCA—Nonconsensual Enrollment**
**(All Defendants)**

17

275.     In numerous instances, in connection with charging consumers for goods or

18

services sold in transactions effected on the Internet through a negative option feature, as

19

described in Paragraphs 2 through 238 above, Defendants failed to obtain the consumer's express

20

informed consent before charging the consumer's credit card, debit card, bank account, or other

21

financial account for the transaction.

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

276.    Defendants' practices as set forth in Paragraph 275 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(2), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

277.    Defendants committed the violations set forth in Paragraph 275 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT IV

### Violation of ROSCA—Failure To Provide Simple Cancellation Mechanism
### (All Defendants)

278.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 2 through 238 above, Defendants fail to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

279.    Defendants' practices as set forth in Paragraph 278 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(3), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

280.    Defendants committed the violations set forth in Paragraph 278 with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

90

1

**<u>CONSUMER INJURY</u>**

2         Consumers are suffering, have suffered, and will continue to suffer substantial injury as a

3 result of Defendants' violations of the FTC Act and ROSCA.  Absent injunctive relief by this

4 Court, Defendants are likely to continue to injure consumers and harm the public interest.

5

**<u>PRAYER FOR RELIEF</u>**

6         Wherefore, Plaintiff requests that the Court:

7         A.      Enter a permanent injunction to prevent future violations of the FTC Act and

8 ROSCA by Defendants;

9         B.      Award Plaintiff monetary civil penalties from Defendants for every violation of

10 ROSCA;

11         C.      Award monetary and other relief within the Court's power to grant; and

12         D.      Award any additional relief as the Court determines to be just and proper.

13

14

15

16

17

18

19

20

21

22

23

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Respectfully submitted,

Dated: September 20, 2023

/s/ Evan Mendelson

EVAN MENDELSON (DC Bar #996765)
OLIVIA JERJIAN (DC Bar #1034299)
THOMAS MAXWELL NARDINI
(IL Bar #6330190)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2749; ojerjian@ftc.gov (Jerjian)
(202) 326-2812; tnardini@ftc.gov (Nardini)

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

AMENDED COMPLAINT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3320

92