# EXHIBIT 1

Facilities,'' or 10 CFR part 52, ''Licenses, Certifications, and Approvals for Nuclear Power Plants.''

The staff is also issuing for public comment a regulatory analysis (ADAMS Accession No. ML22250A472). The staff developed a regulatory analysis to assess the value of issuing or revising a regulatory guide as well as alternative courses of action.

As noted in the **Federal Register** on December 9, 2022 (87 FR 75671), this document is being published in the ''Proposed Rules'' section of the **Federal Register** to comply with publication requirements under 1 CFR chapter I.

### III. Backfitting, Forward Fitting, and Issue Finality

Issuance of DG–5079, if finalized, would not constitute backfitting as defined in 10 CFR 50.109, ''Backfitting,'' and as described in NRC Management Directive (MD) 8.4, ''Management of Backfitting, Forward Fitting, Issue Finality, and Information Requests'' (ADAMS Accession No. ML18093B087); constitute forward fitting as that term is defined and described in MD 8.4; or affect issue finality of any approval issued under 10 CFR part 52, ''Licenses, Certifications, and Approvals for Nuclear Power Plants.'' As explained in DG–5079, applicants and licensees would not be required to comply with the positions set forth in this guide.

### IV. Submitting Suggestions for Improvement of Regulatory Guides

A member of the public may, at any time, submit suggestions to the NRC for improvement of existing RGs or for the development of new RGs. Suggestions can be submitted on the NRC's public website at *https://www.nrc.gov/reading-rm/doc-collections/reg-guides/contactus.html*. Suggestions will be considered in future updates and enhancements to the ''Regulatory Guide'' series.

Dated: April 18, 2023.
For the Nuclear Regulatory Commission.
**Meraj Rahimi,**
*Chief, Regulatory Guide and Programs Management Branch, Division of Engineering, Office of Nuclear Regulatory Research.*
[FR Doc. 2023–08532 Filed 4–21–23; 8:45 am]
**BILLING CODE 7590–01–P**

---

## FEDERAL TRADE COMMISSION

### 16 CFR Part 425

**RIN 3084–AB60**

### Negative Option Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Federal Trade Commission (''FTC'' or ''Commission'') seeks public comment on proposed amendments to the Commission's Negative Option Rule (or ''Rule'') to combat unfair or deceptive practices that include recurring charges for products or services consumers do not want and cannot cancel without undue difficulty.

**DATES:** Written comments must be received on or before June 23, 2023. Parties interested in presenting views orally should submit a request to do so as explained below, and such requests must be received on or before June 23, 2023.

**ADDRESSES:** Interested parties may file a comment online or on paper, by following the instructions in the Request for Comment part of the **SUPPLEMENTARY INFORMATION** section below. Write ''Negative Option Rule; Project No. P064202'' on your comment and file your comment online through *https://www.regulations.gov*. If you prefer to file your comment on paper, mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex N), Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Hampton Newsome, Attorney, (202) 326–2889, Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

### I. Overview

The Commission seeks comment on a proposal to improve its existing regulations for negative option programs. These programs are widespread in the marketplace and can provide substantial benefits for sellers and consumers. However, consumers cannot reap these benefits when marketers fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible. Problematic negative option practices have remained a persistent source of consumer harm for decades, saddling shoppers with recurring payments for products and services they never intended to purchase or did not want to continue buying. In the past, the Commission sought to address these practices through individual law enforcement cases and a patchwork of laws and regulations. Nevertheless, problems persist, and consumers continue to

submit thousands of complaints to the FTC each year.

To solicit input about these issues, the Commission published an advance notice of proposed rulemaking (ANPR) on October 2, 2019 (84 FR 52393). After reviewing the comments received in response and issuing an ''Enforcement Policy Statement Regarding Negative Option Marketing'' on November 4, 2021 (86 FR 60822), the Commission, as detailed in this document, now proposes to amend the existing Rule to implement new requirements to provide important information to consumers, obtain consumers' express informed consent, and ensure consumers can easily cancel these programs when they choose. All these proposed changes would be applicable to all forms of negative option marketing in all media (*e.g.*, telephone, internet, traditional print media, and in-person transactions).[1]

### II. Negative Option Marketing

Negative option offers come in a variety of forms, but all share a central feature: each contain a term or condition that allows a seller to interpret a customer's silence, or failure to take an affirmative action, as acceptance of an offer.[2] Before describing the proposed amendments, it is helpful to review the various forms such an offer can take. Negative option marketing generally falls into four categories: prenotification plans, continuity plans, automatic renewals, and free trial (*i.e.*, free-to-pay or nominal-fee-to-pay) conversion offers.

Prenotification plans are the only negative option practice currently covered by the Commission's Negative Option Rule. Under such plans (*e.g.*, product-of-the-month clubs), sellers provide periodic notices offering goods to participating consumers and then send—and charge for—those goods only if the consumers take no action to decline the offer. The periodic announcements and shipments can continue indefinitely. In continuity plans, consumers agree in advance to receive periodic shipments of goods or provision of services (*e.g.*, bottled water

---

[1] The Commission proposes to issue such amendments pursuant to Section 18 of the FTC Act, which authorizes the Commission to promulgate rules specifying acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(2).

[2] The Commission's Telemarking Sales Rule defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services ''under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.'' 16 CFR 310.2(w).

delivery), which they continue to receive until they cancel the agreement. In automatic renewals, sellers (*e.g.,* a magazine publisher, credit monitoring service provider, etc.) automatically renew consumers' subscriptions when they expire, unless consumers affirmatively cancel the subscriptions. Finally, with free trial marketing, consumers receive goods or services for free (or at a nominal fee) for a trial period. After the trial period, sellers automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services.

Some negative option offers include upsell or bundled offers, where sellers use consumers' billing data to sell additional products from the same seller or pass consumers' billing data to a third party for their sales. An upsell occurs when a consumer completes a first transaction and then receives a second solicitation for an additional product or service. A bundled offer occurs when a seller packages two or more products or services together so they cannot be purchased separately.

### III. FTC's Current Negative Option Rule

The Commission first promulgated the Rule in 1973 pursuant to the FTC Act, 15 U.S.C. 41 *et seq.,* finding some negative option marketers committed unfair and deceptive practices that violated Section 5 of the Act, 15 U.S.C. 45. The Rule applies only to prenotification plans for the sale of goods and, therefore, does not reach most modern negative option marketing.[3]

The current Rule requires prenotification plan sellers to disclose their plan's material terms clearly and conspicuously before consumers subscribe. It enumerates seven material terms sellers must disclose: (1) how subscribers must notify the seller if they do not wish to purchase the selection; (2) any minimum purchase obligations; (3) the subscribers' right to cancel; (4) whether billing charges include postage and handling; (5) that subscribers have at least ten days to reject a selection; (6) that if any subscriber is not given ten days to reject a selection, the seller will credit the return of the selection and postage to return the selection, along with shipping and handling; and (7) the

frequency with which announcements and forms will be sent.[4] In addition, sellers must provide particular periods during which they will send introductory merchandise, give consumers a specified period to respond to announcements, provide instructions for rejecting merchandise in announcements, and promptly honor written cancellation requests.[5]

### IV. Other Current Regulatory Requirements

Several other statutes and regulations also address harmful negative option practices. First, Section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices, has traditionally served as the Commission's primary mechanism for addressing deceptive negative option claims. Additionally, the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. 8401–8405, the Telemarketing Sales Rule, 16 CFR part 310, the Postal Reorganization Act (*i.e.,* the Unordered Merchandise Statute), 39 U.S.C. 3009, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693–1693r, all address various aspects of negative option marketing. ROSCA, however, is the only law primarily designed to do so.

#### A. Section 5 of the FTC Act

Section 5(a) of the FTC Act, 15 U.S.C. 45(a), is the core consumer protection statute enforced by the Commission. That section broadly addresses "unfair or deceptive acts or practices" but has no provisions that specifically address negative option marketing.[6] Therefore, in guidance and cases, the FTC has highlighted five basic Section 5 requirements that negative option marketing must follow to avoid deception.[7] First, marketers must

disclose the material terms of a negative option offer including, at a minimum: the existence of the negative option offer; the offer's total cost; the transfer of a consumer's billing information to a third party, if applicable; and how to cancel the offer. Second, Section 5 requires that these disclosures be clear and conspicuous. Third, sellers must disclose the material terms of the negative option offer before consumers agree to the purchase. Fourth, marketers must obtain consumers' consent to such offers. Finally, marketers must not impede the effective operation of promised cancellation procedures and must honor cancellation requests that comply with such procedures.

Although these basic guidelines are useful, the legality of a particular negative option depends on an individualized assessment of the advertisement's net impression and the marketer's business practices. In addition to these deception-based requirements, the Commission has repeatedly stated billing consumers without consumers' express informed consent is an unfair act under the FTC Act.[8]

#### B. ROSCA

Enacted by Congress in 2010 to address ongoing problems with online negative option marketing, ROSCA contains general provisions related to disclosures, consent, and cancellation.[9] ROSCA prohibits charging or attempting to charge consumers for goods or services sold on the internet through any negative option feature unless the marketer: (1) clearly and conspicuously discloses all material terms of the

---

[3] The Rule defines "negative option plan" narrowly to apply only to prenotification plans. 16 CFR 425.1(c)(1). In 1998, the Commission clarified the Rule's application to such plans in all media, stating that it "covers all promotional materials that contain a means for consumers to subscribe to prenotification negative option plans, including those that are disseminated through newer technologies." 63 FR 44555, 44561 (Aug. 20, 1998).

[4] 16 CFR 425.1(a)(1)(i)–(vii).

[5] 16 CFR 425.1(a)(2) and (3); 425.1(b).

[6] Under the FTC Act, "unfair or deceptive acts or practices" include acts or practices involving foreign commerce that cause or are likely to cause reasonably foreseeable injury within the United States or involve material conduct occurring within the United States. 15 U.S.C. 45(a)(4)(A). Section 5(n) of the FTC Act provides that "unfair" practices are those that cause or are likely "to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. 45(n).

[7] See *Negative Options: A Report by the Staff of the FTC's Division of Enforcement,* 26–29 (Jan. 2009), *https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff/p064202negativeoption report.pdf.* In discussing the five principal Section 5 requirements related to negative options, the report cites to the following pre-ROSCA cases, FTC v. *JAB Ventures,* No. CV08–04648 (C.D. Cal. 2008); FTC v. *Complete Weightloss Center,* No.

1:08cv00053 (D.N.D. 2008); FTC v. *Berkeley Premium Nutraceuticals,* No. 1:06cv00051 (S.D. Ohio 2006); FTC v. *Think All Publ'g,* No. 4:07cv11 (E.D. Tex. 2006); FTC v. *Hispanexo,* No. 1:06cv424 (E.D. Va. 2006); FTC v. *Consumerinfo.com,* No. SACV05–801 (C.D. Cal. 2005); FTC v. *Conversion Mktg.,* No. SACV04–1264 (C.D. Cal. 2004); FTC v. *Mantra Films,* No. CV03–9184 (C.D. Cal. 2003); FTC v. *Preferred Alliance,* No. 103–CV0405 (N.D. Ga. 2003); *United States* v. *Prochnow,* No. 102–CV–917 (N.D. Ga. 2002); FTC v. *Ultralife Fitness, Inc.,* No. 2:08–cv–07655–DSF–PJW (C.D. Cal. 2008); *In the Matter of America Isuzu Motors,* FTC Docket No. C–3712 (1996); FTC v. *Universal Premium Services,* No. CV06–0849 (C.D. Cal. 2006); FTC v. *Remote Response,* No. 06–20168 (S.D. Fla. 2006). The report also cited the FTC's previously issued guidance, *Dot Com Disclosures* (2002), archived at *https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-issues-guidelines-internet-advertising/0005dotcomstaffreport.pdf.*

[8] Courts have found unauthorized billing to be unfair under the FTC Act. *See, e.g.,* FTC. v. *Neovi, Inc.,* 604 F.3d 1150, 1157–59 (9th Cir. 2010), *amended by* 2010 WL 2365956 (9th Cir. June 15, 2010); FTC v. *Amazon.com, Inc.,* No. C14–1038–JCC, 2016 WL 10654030, at *8 (W.D. Wash. Apr. 26, 2016); FTC v. *Ideal Fin. Sols., Inc.,* No. 2:13–CV–0143–JAD, 2015 WL 4032103, at *8 (D. Nev. June 30, 2015).

[9] 15 U.S.C. 8401–8405.

transaction before obtaining the consumer's billing information, regardless of whether a material term directly relates to the terms of the negative option offer;[10] (2) obtains a consumer's express informed consent before charging the consumer's account; and (3) provides simple mechanisms for the consumer to stop recurring charges.[11] ROSCA, however, does not prescribe specific steps marketers must follow to comply with these provisions.

ROSCA also addresses offers made by, or on behalf of, third-party sellers during, or immediately following, a transaction with an initial merchant.[12] In connection with these offers, ROSCA prohibits post-transaction, third-party sellers from charging or attempting to charge consumers unless the seller: (1) before obtaining billing information, clearly and conspicuously discloses the offer's material terms; and (2) receives the consumer's express informed consent by obtaining the consumer's name, address, contact information, as well as the full account number to be charged, and requiring the consumer to perform an additional affirmative action indicating consent.[13] ROSCA also prohibits initial merchants from disclosing billing information to any post-transaction third-party seller for use in any internet-based sale of goods or services.[14]

Furthermore, a violation of ROSCA is a violation of a Commission trade regulation rule under Section 18 of the FTC Act.[15] Thus, the Commission may seek a variety of remedies for violations of ROSCA, including civil penalties under Section 5(m)(1)(A) of the FTC Act;[16] injunctive relief under Section 13(b) of the FTC Act;[17] and consumer redress, damages, and other relief under Section 19 of the FTC Act.[18] Although Congress charged the Commission with enforcing ROSCA, it did not direct the FTC to promulgate implementing regulations.

## C. Telemarketing Sales Rule

The Telemarketing Sales Rule ("TSR"), 16 CFR part 310, prohibits deceptive telemarketing acts or practices, including those involving negative option offers, and certain types of payment methods common in deceptive negative option marketing. The TSR only applies to negative option offers made over the telephone. Specifically, the TSR requires telemarketers to disclose all material terms and conditions of the negative option feature, including the need for affirmative consumer action to avoid the charges, the date (or dates) the charges will be submitted for payment, and the specific steps the customer must take to avoid the charges. It also prohibits telemarketers from misrepresenting such information and contains specific requirements related to payment authorization.[19]

## D. Other Relevant Requirements

EFTA[20] and the Unordered Merchandise Statute also contain provisions relevant to negative option marketing.[21] EFTA prohibits sellers from imposing recurring charges on a consumer's debit cards or bank accounts without written authorization.[22] The Unordered Merchandise Statute provides that mailing unordered merchandise, or a bill for such merchandise, constitutes an unfair method of competition and an unfair trade practice in violation of Section 5 of the FTC Act.[23]

## V. Limitations of Existing Regulatory Requirements

The existing patchwork of laws and regulations does not provide industry and consumers with a consistent legal framework across media and offers. For instance, as discussed above, the current Rule does not cover common practices such as continuity plans, automatic

renewals, and trial conversions.[24] In addition, ROSCA and the TSR do not address negative option plans in all media—ROSCA's general statutory prohibitions against deceptive negative option marketing only apply to internet sales, and the TSR's more specific provisions only apply to telemarketing. Yet, harmful negative option practices that fall outside of ROSCA and the TSR's coverage still occur.[25]

Additionally, the current framework does not provide clarity about how to avoid deceptive negative option disclosures and procedures. For example, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. Instead, the statute requires marketers to provide "simple mechanisms" for the consumer to stop recurring charges without guidance about what is simple.

## VI. Past Rulemaking and Enforcement Efforts

The Commission initiated its last regulatory review of the Negative Option Rule in 2009,[26] following a 2007 FTC workshop and subsequent Staff Report.[27] The Commission completed the review in 2014.[28] At the time, the Commission found the comments supporting the Rule's expansion "argue convincingly that unfair, deceptive, and otherwise problematic negative option marketing practices continue to cause substantial consumer injury, despite determined enforcement efforts by the Commission and other law enforcement agencies."[29] It also noted practices not covered by the Rule (e.g., trial

---

[10] *See In re: MoviePass, Inc.,* No. C–4751 (Oct. 5, 2021).

[11] 15 U.S.C. 8403. ROSCA incorporates the definition of "negative option feature" from the Commission's Telemarketing Sales Rule, 16 CFR 310.2(w).

[12] ROSCA defines "post-transaction third-party seller" as a person other than the initial merchant who sells any good or service on the internet and solicits the purchase on the internet through an initial merchant after the consumer has initiated a transaction with the initial merchant. 15 U.S.C. 8402(d)(2).

[13] 15 U.S.C. 8402(a).

[14] 15 U.S.C. 8402(b).

[15] 15 U.S.C. 8404 (citing Section 18 of the FTC Act, 15 U.S.C. 57a).

[16] 15 U.S.C. 45(m)(1)(A).

[17] 15 U.S.C. 53(b).

[18] 15 U.S.C. 57b(a)(1), (b).

[19] 16 CFR 310.3(a).

[20] 15 U.S.C. 1693–1693r.

[21] 15 U.S.C. 3009.

[22] EFTA provides that the Commission shall enforce its requirements, except to the extent that enforcement is specifically committed to some other federal government agency, and that a violation of any of its requirements shall be deemed a violation of the FTC Act. Accordingly, the Commission has authority to seek injunctive relief for EFTA violations, just as it can seek injunctive relief for other Section 5 violations.

[23] The Commission has authority to seek the same remedies for violations of the Unordered Merchandise Statute that it can seek for other Section 5 violations. The Commission can seek civil penalties pursuant to Section 5(m)(1)(B) of the FTC Act from violators who have actual knowledge that the Commission has found mailing unordered merchandise unfair. 15 U.S.C. 45(m)(1)(B).

[24] Indeed, the prenotification plans covered by the Rule represent only a small fraction of negative option marketing. In 2017, for instance, the Commission estimated that fewer than 100 sellers ("clubs") were subject to the current Rule's requirements. 82 FR 38907, 38908 (Aug. 16, 2017).

[25] For instance, the Commission recently brought two cases under Section 5 involving negative option plans that did not involve either internet sales or telemarketing. *FTC and State of Maine v. Health Research Labs., LLC,* No. 2:17–cv–00467–JDL (D. Me. 2018); and *FTC and State of Maine v. Mktg. Architects,* No. 2:18–cv–00050 (D. Me. 2018).

[26] 74 FR 22720 (May 14, 2009).

[27] *See Negative Options, supra* note 7, at 26–29.

[28] 79 FR 44271 (July 31, 2014).

[29] The Commission cited a number of its law enforcement actions challenging negative option marketing practices, including, for example, *FTC v. Process Am., Inc.,* No. 14–0386–PSG–VBKx (C.D. Cal. 2014) (processing of unauthorized charges relating to negative option marketing); *FTC v. Willms,* No. 2:11–cv–00828 (W.D. Wash. 2011) (internet free trials and continuity plans); *FTC v. Moneymaker,* No. 2:11–cv–00461–JCM–RJJ (D. Nev. 2012) (internet trial offers and continuity programs); *FTC v. Johnson,* No. 2:10–cv–02203–RLH–GWF (D. Nev. 2010), (internet trial offers); and *FTC v. John Beck Amazing Profits, LLC,* No. 2:09–cv–04719 (C.D. Cal. 2009) (infomercial and telemarketing trial offers and continuity programs).

conversions and continuity plans) accounted for most of its enforcement activity in this area. Nevertheless, the Commission declined to expand or enhance the Rule, concluding that amendments were not warranted at that time because the enforcement tools provided by the TSR and, especially, ROSCA, which had only recently become effective, might prove adequate to address the problems generated by deceptive or unfair negative option marketing. However, the Commission emphasized that, if ROSCA and its other enforcement tools failed to adequately protect consumers, the Commission would consider whether and how to amend the Rule.[30]

Since that review, the problems with negative options have persisted. The Commission and states continue to bring cases regularly that challenge negative option practices, including more than 30 recent FTC cases. These matters involved a range of deceptive or unfair practices, including inadequate disclosures for "free" offers and other products or services, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures.[31] In addition, the Commission continues to receive thousands of complaints each year related to negative option marketing. These cases and the high volume of ongoing complaints suggests there is prevalent, unabated consumer harm in the marketplace.

## VII. 2019 Advance Notice of Proposed Rulemaking

Given these continued concerns, the Commission published its 2019 ANPR seeking comments on the current Rule, as well as possible regulatory measures to reduce consumer harm created by deceptive or unfair negative option marketing.[32] Specifically, the Commission sought comment on

various alternatives, including amendments to existing rules to further address disclosures, consumer consent, and cancellation. The Commission also requested input on whether and how it should use its authority under Section 18 of the FTC Act to expand the Negative Option Rule to address prevalent, unfair, or deceptive practices involving negative option marketing.[33] In response, the Commission received 17 comments, which we discuss in Section IX.[34]

## VIII. 2021 Enforcement Policy Statement

On November 4, 2021, the Commission published an "Enforcement Policy Statement Regarding Negative Option Marketing" to provide guidance regarding its enforcement of various statutes and FTC regulations.[35] The Statement enunciates various principles rooted in FTC case law and previous guidance related to the provision of information to consumers, consent, and cancellations. Among these principles, the Statement emphasized ROSCA's requirement that sellers disclose all material terms related to the underlying product or service that are necessary to prevent deception, regardless of

whether that term relates directly to the terms of the negative option offer.[36] In addition, consistent with ROSCA, judicial decisions applying Section 5, and cases brought by the Commission, the seller should obtain the consumer's acceptance of the negative option feature offer separately from any other portion of the entire transaction. Finally, regarding cancellation, the Statement explained negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature.

## IX. Comments Received in Response to the ANPR

Commenters generally supported the current FTC Negative Option Rule. However, as detailed below, they split on whether the Commission should amend the Rule to include new requirements. Some argued existing provisions are adequate, and any additional regulations could harm businesses and consumers by creating unnecessary, overly prescriptive directives that discourage innovation. Others contended that the Commission should expand or consolidate existing requirements into a single rule applicable to all types of negative option marketing in all types of media in order to adequately protect consumers.

### A. General Views on Negative Option Marketing

*Benefits:* Several commenters emphasized the benefits of negative option marketing to both consumers and businesses and warned new regulations may limit consumer options.[37] They discussed the ease and simplicity such plans offer consumers by allowing them to avoid time-consuming and inefficient transactions. The Service Contract Industry Council (SCIC) and the News Media Alliance explained such arrangements greatly reduce "the disruption to a consumer's daily life" by allowing them to maintain their service without going through the enrollment process "month after month, or year after year." They also help customers avoid problems such as breaks in service when they forget to renew.

The Entertainment Software Association (ESA), which represents video and computer game companies, added subscriptions allow "consumers to replenish commodity items (such as personal care products), enjoy new

---

[30] 79 FR at 44275–76.

[31] Examples of these matters include: *FTC* v. *Triangle Media Corp.,* 3:18–cv–01388–LAB–LL (S.D. Cal. 2019); *FTC* v. *Credit Bureau Ctr., LLC,* No. 17–cv–00194 (N.D. Ill. 2018); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2018); *FTC, Illinois, and Ohio* v. *One Techs., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014); *FTC* v. *Health Formulas, LLC,* No. 2:14–cv–01649–RFB–GWF (D. Nev. 2016); *FTC* v. *Nutraclick LLC,* No. 2:16–cv–06819–DMG (C.D. Cal. 2016); *FTC* v. *XXL Impressions,* No. 1:17–cv–00067–NT (D. Me. 2018); *FTC* v. *AAFE Products Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *Pact Inc.,* No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC* v. *Tarr,* No. 3:17–cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *DOTAuthority.com, Inc.,* No. 0:16–cv–62186–WJZ (S.D. Fla. 2018); *FTC* v. *Bunzai Media Group, Inc.,* No. CV15–04527–GW(PLAx) (C.D. Cal. 2018); and *FTC* v. *RevMountain, LLC,* No. 2:17–cv–02000–APG–GWF (D. Nev. 2018).

[32] 84 FR 52393 (Oct. 2, 2019).

[33] Section 18 of the FTC Act authorizes the Commission to promulgate rules that define with specificity acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(1)(B). The Commission may issue regulations "where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. 57a(b)(3). The Commission may make such a prevalence finding if it has issued cease and desist orders regarding such acts or practices, or any other available information indicates a widespread pattern of unfair or deceptive acts or practices. Rules under Section 18 "may include requirements prescribed for the purpose of preventing such acts or practices."

[34] The comments, which are at *www.regulations.gov,* include: Association of National Advertisers (ANA) (#0082–0008); Performance-Driven Marketing Institute (PDMI) (#0082–0018); Retail Energy Supply Association (RESA) (#0082–0016); The Association of Magazine Media (MPA) (#0082–0019); National Consumers League (NCL) (#0082–0013); ACT—The App Association (#0082–0017); Association for Postal Commerce ("PostCom") (#0082–0009); Retail Industry Leaders Association (RILA) (#0082–0005); Ralph Oakley (#0082–0004); Chris Hoofnagle (#0082–0002); Pennsylvania Office of Attorney General (on behalf of The Attorneys General of the States of Colorado, Delaware, District of Columbia, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin) ("State AGs") (#0082–0012); Service Contract Industry Council (SCIC) (#0082–0007); Truth in Advertising (TINA) (#0082–0014); Rep. Mark Takano (#0082–0003); Digital Media Association (DiMA) (#0082–0015); The Entertainment Software Association and Internet Association (ESA) (#0082–0011); News Media Alliance ("the Alliance") (#0082–0006).

[35] 86 FR 60822.

[36] The Commission recently alleged a negative option seller's failure to disclose it was impeding access to its movie subscription service violates ROSCA. *In the Matter of MoviePass, Inc.* No. C–4751 (Oct. 5, 2021).

[37] SCIC, ESA, MPA, and RESA.

items or personalized items at designated intervals (such as clothing and food), and obtain access to products or services at discounts or with members-only benefits (such as entertainment and content services).'' The Association of Magazine Media (MPA), an association of magazine publishers, noted that current automatic renewal subscriptions feature high transparency, offer ease of use, facilitate long-term customer relationships, provide a ''frictionless customer service experience,'' save costs, and allow consumers to receive continuous delivery for as long as they wish. According to MPA, free trials also allow consumers to sample magazine titles before committing to a subscription purchase.

Additionally, commenters detailed the benefits such renewals provide businesses. MPA stated they help companies avoid the substantial costs of processing invoices and checks each month. For publishers, automatic renewals reduce costs by eliminating multiple notices, forestalling fraudulent mailings, and preventing costly interruptions in service. Retail Energy Supply Association (RESA) also noted automatic renewal plans are critical in the competitive energy supply industry because they promote competition in states with restructured energy markets.

*Negative Aspects:* However, not all commenters saw inherent benefit in the growing negative option market. Commenter Hoofnagle, a law professor, cautioned the shift to subscription services has caused businesses to become ''laser-focused'' on enrollment and retention at the expense of the underlying product or consumer value.[38] In his view, the new focus on subscriptions ''corrupts innovation'' because it motivates companies to ''invest in psychological tricks to maintain continuous charging'' instead of creating the ''best, most compelling products.'' According to Hoofnagle, large, dominant platforms devote resources to developing manipulative subscription systems (*i.e.,* ''dark patterns'') that induce consumers to sign up for products and services they would not otherwise pay for. Hoofnagle asserted that, ultimately, subscription maintenance becomes the firm's ''terminal goal.''

*B. Information on Current Practices and Deception in the Market*

Various commenters submitted information about the scope, volume,

and types of negative option marketing, indicating negative options involving free trials, continuity, and auto-renewal programs are pervasive and growing in number. Additionally, many commenters asserted deceptive negative option practices continue to be prevalent, with some describing particular issues with free trials. Finally, commenters discussed ongoing state enforcement efforts related to these problems.

*Expansion of Negative Option Marketing:* Several commenters indicated negative option marketing continues to grow dramatically. For instance, according to a 2018 McKinsey & Company study, the subscription e-commerce market increased more than 100% over a five-year period prior to the study's publication.[39] The largest retailers in that market generated $2.6 billion in sales in 2016. A consumer survey prepared for the same study showed nearly half of the respondents had enrolled in at least one negative option subscription, while 35% enrolled in three or more.[40] PDMI also noted the study demonstrates consumers' familiarity with these programs and their embrace of ''the benefits such plans provide including convenience, lower cost and the ability to try something for free before purchasing.'' PDMI suggested the number of such programs has likely increased since the study's completion. It also observed that negative option sales via mobile devices have increased in recent years, including the display of ''shoppable ads'' on most social media platforms. However, it cautioned against projecting the results. Given rapid changes in technology and advertising models in the digital space media, PDMI emphasized the difficulty of predicting ''how consumers may choose to purchase goods and services even just a few years from now.'' Finally, PDMI explained most negative options appear online, offering a wide array of products and services from major brands including ''media services, meal preparation kits, shaving and beauty products, beer and wine, contacts and ordinary household consumables.''

*Prevalence of Deceptive Practices Generally:* In addition to the sheer volume of negative option marketing, commenters identified evidence of ongoing, widespread deceptive

practices. No commenter argued otherwise. TINA, for example, explained negative options are one of its top complaint categories. These complaints usually involve consumers who unwittingly enroll in programs and then find it difficult or impossible to cancel. In addition, NCL cited a 2017 national telephone survey commissioned by *CreditCards.com* finding 35% of U.S. consumers have enrolled in at least one automatically renewing contract without realizing it. Referring to another survey conducted in 2016, TINA noted that unwanted fees associated with trial offers and automatically renewing subscriptions ranked as ''the biggest financial complaint of consumers.''[41]

The State AGs also detailed specific deceptive or unfair practices they see regularly, including the ''lack of informed consumer consent, lack of clear and conspicuous disclosures, failure to honor cancellation requests and/or refusal to provide refunds to consumers who unknowingly enrolled in plans.'' They further explained the nature of the underlying products often fails to alert consumers of their enrollment in a negative option program. For instance, many offers involve credit monitoring or anti-virus computer programs costing less than $20 a month and have no tangible presence for consumers. The State AGs explained that consumers are often unaware of having ordered these products, never use them, and never notice them on their bills. The State AGs further explained these transactions often pull consumers into a stream of recurring payments by obtaining credit card information to ostensibly pay for a small shipping charge. As a result, many ''consumers have been billed for such services for years before discovering the unauthorized charges.''

Commenters also noted the ongoing enforcement efforts and litigation in recent years involving negative option marketing. In addition to FTC cases, TINA stated that more than 100 federal class actions involving various negative option terms and conditions have been filed since 2014. Notwithstanding these actions, according to TINA, ''the incidence of deceptive negative option offers continues to rise.'' Citing the increase in consumer complaints and consumer harm in recent years, Representative Takano stated, ''deceptive online marketing and

---

[38] NCL also asserted ''[t]here is abundant evidence that consumers are harmed by negative option clauses.''

[39] *See* ESA.

[40] *See* Tony Chen, et al., *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 9, 2018), *https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.*

[41] *See* Rebecca Lake, *Report: Hidden Fees Are #1 Consumer Complaint, mybanktracker.com* (updated Oct. 16, 2018), *https://www.mybanktracker.com/money-tips/money/hidden-fees-consumer-complaint-253387.*

unclear recurring payment plans are leaving too many consumers on the hook for products they may not want or even know they purchased." [42]

In addition to inadequate disclosures and consent procedures, commenters stated some businesses continue to thwart consumers' efforts to cancel recurring payments. NCL cited the 2017 *CreditCards.com* survey finding nearly half of all respondents (42%) complained about "the level of difficulty companies have created for the contract/service cancellation process." [43] Further, consistent with the Commission's enforcement history, the State AGs explained many harmful unfair or deceptive practices involve the failure to provide "consumers with a simple cancellation method." NCL added some companies hide behind complex procedures "to prevent cancellation while others surprise consumers with price increases or contract renewals." The State AGs stated the sellers often deny consumers refunds and force them "to pay to return the unordered goods." Finally, Hoofnagle concluded businesses make cancellation difficult in order to raise consumer transaction costs and deter them from ending the contract. "To put this in another perspective," he wrote, "companies would never put such transaction costs in the way of a purchase option." Noting numerous complaints from consumers stymied in their efforts "through long telephone hold times and otherwise," the State AGs also explained that current practices often require consumers to cancel using a different method than the one used to sign up for the program. Further, they often force consumers to listen to multiple upsells before allowing cancellation.

*Specific Problems with Free Trials:* Several commenters noted particular problems with free trials or trial conversions. According to the State AGs, advertisements for free-to-pay conversion offers often lure consumers by promising a "free" benefit while failing to clearly and conspicuously disclose future payment obligations. These offers sometimes include information to distract consumers from reading the actual purchase terms. The State AGs report these deceptive practices are "rampant online and throughout social media." These agencies further state, "trial conversions

are rife with the potential for abuse and deception," as companies induce consumers with offers that imply no obligation.

Despite current requirements such as ROSCA, the State AGs observed sellers still often fail to clearly and conspicuously disclose recurring payment obligations incurred by consumers who sign up for these trials. In addition, to gain access to consumer accounts, sellers often charge a small shipping fee for the "free trial" and obtain credit card information in the process. Consumers confronting these sellers often face fees to return the unordered goods and have difficulty obtaining refunds and cancelling their subscriptions.

Additionally, as commenters correctly noted, FTC complaint data indicates substantial problems with free trial marketing. According to NCL and TINA, a Better Business Bureau study of FTC data titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements" demonstrated complaints about free trials doubled between 2015 and 2017, with complaints during the period reaching nearly 37,000 and losses totaling more than $15 million. The BBB study, which the State AGs also cited, shows losses in FTC "free trial offer" cases exceeded $1.3 billion (over the ten years covered by the study). NCL stated that, according to the BBB, the average consumer loss for a free trial is $186. [44]

Other studies reveal similar trends. TINA noted the FBI's internet Crime Complaint Center recorded a rise in complaints about free trial offers, growing from 1,738 in 2015 to 2,486 in 2017, with losses totaling more than $15 million. Similarly, a 2019 *Bankrate.com* survey cited by NCL found that 59% of consumers have signed up for "free trials" that automatically converted into a recurring payment obligation "against their will." In NCL's view, these data point to "a troubling, and costly problem for American consumers."

*Ongoing Law Enforcement Efforts:* The State AGs detailed dozens of enforcement actions taken in recent years to address the proliferation of deceptive negative option claims. According to these agencies, their actions "demonstrate that problems persist in this area and that additional regulatory action is needed." For example, over the last decade, New

York alone has reached 23 negative option settlements involving a variety of products and services such as membership programs, credit monitoring, dietary supplements, and apparel. These cases have garnered over $10 million in consumer restitution and $14 million in penalties, costs, and fees. The State AGs also described several of the larger settlements reached through multistate investigations, as well as from individual states, involving negative option offers for products and services such as satellite radio, social networking services, language learning programs, security monitoring, and dietary supplements. They also recounted representative stories of consumers who ordered what they thought were free, no-obligation samples but found themselves enrolled in costly programs. The Commission's recent cases in this area address many, if not all, of the same concerns.

## C. Opposition to New Requirements

No commenter opposed the existing Rule, which applies only to prenotification plans. ANA, for example, noted it provides consumers with transparency regarding material terms of marketed advance consent plans and choices regarding which products or services they want to receive. The Rule also provides "businesses flexibility to engage in marketing that benefits consumers." In addition, ANA stated it enables consumers to purchase goods and services over time and gain exposure to "new, exciting, and useful products and services to which they likely would not have been exposed in the absence of advanced consent arrangements."

Industry members generally opposed any new regulatory provisions for negative option marketing, arguing existing laws are adequate. [45] According to these commenters, current requirements provide adequate consumer protections, and enforcement agencies possess ample tools to address deceptive practices. The current framework furnishes, in MPA's words, "a sweeping landscape of federal and state laws that govern such programs, including ROSCA, the TSR, EFTA, and the [Unordered Merchandise Statute]." SCIC added that new credit card rules from MasterCard and Visa contain compliance requirements for auto renewal programs and thus augment the existing regulatory framework. As ESA explained, existing laws "are thorough and allow businesses the flexibility to craft messages and operational

---

[42] Congressman Mark Takano represents California's 41st District in the United States House of Representatives.

[43] Brady Porche, *Poll: Recurring charges are easy to start, hard to get out of, Creditcards.com* (Aug. 22, 2017), *https://www.creditcards.com/credit-card-news/autopay-poll.php.*

[44] Steve Baker, *Subscription traps and deceptive free trials scam millions with misleading ads and fake celebrity endorsements,* Better Business Bureau (Dec. 2018), *https://www.bbb.org/globalassets/local-bbbs/council-113/media/bbb-study-free-trial-offers-and-subscription-traps.pdf.*

[45] *See* ANA, RESA, MPA, PostCom, RI, SCIC, DiMA, ESA, and the Alliance.

procedures'' based on their customers, the message's medium, available technologies for consent, and cost-effective cancellation methods. In ANA's view, since ''violations of the various standards are heavily enforced,'' additional requirements would fail to ''prevent bad and dishonest actors from behaving unfairly or deceptively in the marketplace.'' Finally, some commenters suggested the number of actions the FTC has brought in recent years demonstrates the agency already has adequate law enforcement tools to combat deceptive negative option marketing.[46]

Industry members also cautioned that new regulations might diminish the benefits provided by negative option offers and hamper innovation.[47] For example, ESA argued current law enforcement requirements adequately address ''deceptive or abusive negative option practices'' without overly burdensome new regulation. Others, like DIMA and MPA, warned new regulations using a restrictive ''one-size-fits-all model'' would ultimately harm consumers because, for example, they would restrict marketers' ability to tailor their offers to consumers' wishes. MPA also noted an expanded Rule might over-burden legitimate businesses to consumers' detriment while failing to halt specific problems already subject to existing federal statutes, FTC rules, and state laws.[48]

These commenters also cautioned against adding regulations absent sufficient information about problematic practices. Specifically, the Alliance recommended the FTC refrain from imposing new requirements without ''clear evidence of a significant problem justifying such measures.'' Similarly, ANA asked FTC to identify a ''clear record'' of perceived harms so that businesses can provide meaningful comments and clearly identify any gaps in the regulations.

### D. Concerns About Existing State Requirements

Many industry commenters also stated a growing number of state laws address many forms of negative option marketing. According to PDMI, for example, there are currently at least 18 state laws, and many more are sure to follow.[49] Notable among these is California's negative option statute, which addresses disclosures, consent, and accessible and cost-effective cancellation. Virginia has a similar law that provides civil penalties of $5,000 per violation, as well as a private right of action. ESA complained many of these state laws ''have imposed unique and inconsistent requirements'' on marketers. PDMI noted, for instance, Florida, Hawaii, and New Mexico laws reference inconsistent renewal periods (six, one, and two months, respectively). Other states have differing requirements for notifications prior to the renewal period (e.g., Florida (30–60 days); New York (15–30 days); North Carolina (15 to 45 days)).[50]

Several industry commenters emphasized these inconsistent state requirements create problems. PDMI, for example, explained they impose ''a considerable burden on companies that utilize negative option marketing, particularly small businesses.'' The lack of uniformity requires some companies to create ''multiple different order pathways and disclosures'' for consumers in different states. For example, many marketers must fashion a single ''order experience'' and set of disclosures that comply with the most restrictive law. According to PDMI, the continued proliferation of differing state requirements has made an onerous and burdensome compliance process even worse. For example, while California's automatic renewal law appears most burdensome to many, Vermont's recent statute is more restrictive in certain aspects (e.g., consent requires consumers to check a box). In addition, the District of Columbia now requires a seller to obtain separate affirmative consent before a free trial converts to a paid subscription. PDMI explained compliance issues could lead to contract

voidance and potential exposure in class action litigation.

PDMI argued these various state laws have not helped consumers. Its members' anecdotal observations suggest little difference in results, such as cancellation rates, between states with differing degrees of restrictive requirements. In its view, these observations may indicate consumers have become generally familiar with negative option programs. At the same time, it contended the more restrictive state laws have imposed significant compliance costs while offering little actual consumer benefit. Thus, PDMI believes consumers and businesses would benefit from a single FTC Rule that preempts state regulation in this area. ESA agreed, explaining that if ''FTC regulations in the negative option space could have a preemptive effect,'' it would be interested in ''exploring a uniform regime that allows for growth and flexibility in the industry, much as the current framework permits.''

In contrast, MPA argued that an expanded FTC Rule would layer on top of the existing ''patchwork'' and fail to provide a consistent legal framework for industry and consumers. In its view, ''publishers should be afforded the flexibility to tailor their subscription offers to their readers within the bounds of existing laws.''

Finally, TINA argued the proliferation of state requirements, as well as MasterCard and Visa's new rules, reflect ''an attempt to fill the gap in federal enforcement.''[51] According to TINA, the resulting collection of state rules and credit card policies leaves consumers with different levels of protection depending on where they live or what credit card they use. Thus, in TINA's opinion, ''the uniform protection'' an updated FTC Rule ''can offer is much needed.''

### E. Need for Additional Consumer Education

Several commenters suggested the Commission focus on improving existing consumer education efforts.[52] ESA recommended updated industry guidance and additional consumer education in lieu of issuing new regulatory requirements. However, other commenters argued the Commission should not rely on consumer education alone. Hoofnagle, for example, described consumer and business education as ''an uneconomical'' tool for addressing problems associated with

---

[46] See ESA, ANA, MPA.

[47] Two commenters specifically argued any new rule should avoid creating duplicative requirements for their members. First, SCIE, which represents service contract companies, argued State agencies typically regulate their members, and any new FTC rule should avoid any duplicative or potentially conflicting requirements. Similarly, the App Association urged the Commission to consider ''excluding software apps and digital platforms'' from expanded requirements ''until there is an adequate evidence base demonstrating that its extension to the app economy is appropriate, as part of its scaled, flexible approach to implementing ROSCA.''

[48] See also ANA.

[49] See, ANA, ESA, PDMI, SCIC, MPA, TINA. Examples of State laws include: California (Cal. Bus. & Prof. Code secs. 17600–17606), Vermont (9 V.S.A. sec. 2454a); District of Columbia (D.C. Code secs. 28A–201 to 28A–204); Florida (Fla. Stat 501.165); Hawaii (Haw. Rev. Stat. sec. 481–9.5); North Carolina (N.C. Gen. Stat. sec. 75–41); and New York (N.Y. Gen. Oblig. Law sec. 5–903(2)).

[50] RESA also asked the Commission to exclude from its rule any activities ''already regulated by state public service commissions'' such as competitive retail electricity and natural gas suppliers. ACIC explained that many of these state laws exempt contracts that renew for a period of a month or less and instead focus on longer term renewing contracts. Additionally, many states have elected to exempt contracts that consumers may cancel at any time with a pro rata refund required to be provided to the consumer upon cancellation.

[51] See, e.g., MasterCard, ''Transaction Processing Rules,'' at https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/transaction-processing-rules.pdf.

[52] See DiMA, ESA.

negative options. He explained that such education must compete "with hundreds of" other consumer priorities, from "organic food labeling to energy efficiency ratings," and creates direct and indirect costs, including consumer time, potential consumer confusion, and even misapprehension. The State AGs, who supported education initiatives, similarly warned, "such efforts will likely reach only a small fraction of the consuming public." Thus, they recommended the Commission use its authority to issue "clear-cut rules" to help companies avoid deceptive marketing practices that "have caused, and continue to cause, substantial consumer harm."

### F. Limitations of Existing Requirements

Several commenters discussed the limitations of existing requirements. For example, the State AGs discussed ROSCA's shortcomings, arguing while the statute has helped combat abuses over the internet, it "lacks specificity as to how informed consent should be obtained or how clear and conspicuous disclosures should be made." They also noted ROSCA does not provide "any concrete, bright line requirements that allow enforcement agencies to readily identify violations." Given existing limitations, the State AGs concluded new regulatory provisions are necessary to establish specific, clear rules to help businesses' compliance efforts and to allow states to easily identify nonconforming practices. TINA also asserted ROSCA and FTC requirements lack needed specificity regarding cancellation requirements, noting ROSCA only directs marketers to provide "simple mechanisms for a consumer to stop recurring charges." In contrast, PDMI said the concept of simple cancellation is well understood by sellers in the marketplace.

### G. Support for New Regulations

Several commenters supported additional FTC regulations to address negative option marketing.[53] The State AGs, for example, strongly urged the Commission to expand the existing Rule or issue new regulations "to combat deceptive and unfair marketing . . . in all forms of negative option marketing, with additional provisions to address issues that arise with respect to trial conversion offers." Similarly, commenter Oakley recommended "very strong regulations to stop companies from signing people up for unwanted products/services." PDMI, an industry group, favored amending the Rule to

broaden its "scope to apply to all forms of negative option marketing." In its view, such a rule "would provide greater protection to consumers, would enhance business compliance and would lower overall compliance costs." PDMI also opined that "consumers and business would benefit from federal preemption of state law regulation in this area." Representative Takano concluded, "it is time we update the tools and policies designed to ensure companies no longer profiteer through these deceptive practices." TINA added the Rule needs updates to ensure both consumers and businesses obtain the full benefits of negative options. It further argued the current requirements leave consumers vulnerable and provide incentives for businesses to "silently hope consumers forget about them." It predicted that, without changes to the Rule, the trend of deceptive trial offers and subscriptions will continue to grow. In TINA's opinion, updates would "be minimally burdensome to companies" because they would merely require businesses to be "forthcoming and straightforward" with their customers.

*Scope:* Commenters supporting new provisions generally recommended the Commission expand the Rule's existing regulatory scope to cover all negative option marketing methods in all media, and consolidate requirements.[54] The State AGs identified unfair or deceptive practices, such as those associated with free trials, which occur in the marketplace but are not covered by the current Negative Option Rule. They also suggested free-to-pay solicitations deserve closer scrutiny than other negative option features due to the longstanding evidence of deceptive tactics, prevalence of consumer complaints about unauthorized charges, and consumer risks associated with these offers.

PDMI agreed a consolidated Negative Option Rule would provide a significant benefit. It explained having requirements in "five different places" imposes burdens on both consumers and businesses and heightens the risk of inadvertent non-compliance. Scattered requirements also create a "trap for the unwary for businesses who do not realize that they must ferret out" applicable mandates across "a wide swath of the federal regulatory landscape." According to PDMI, consolidation of negative option marketing into a single rule would minimize burdens on marketers, reduce consumer confusion, and enhance compliance. Therefore, PDMI recommended the FTC revise its Rule to

include all negative option types and to include ROSCA's three core provisions regarding notice, consent, and cancellation. In its view, "this would provide a solid foundation for protecting consumers and providing businesses with one uniform set of requirements that can be easily and consistently implemented across all channels and markets."

*Need for Flexibility:* Several commenters urged the Commission to employ a flexible approach that accounts for technological changes. They cautioned overly prescriptive rules would jeopardize the consumer benefits of negative options and harm the businesses that provide them.[55] MPA, for example, stated the FTC should not micromanage "lawful business conduct" because such an approach would neither enhance business compliance nor benefit consumers. Several commenters raised concerns about overly prescriptive regulatory requirements because a "one size fits all" approach reduces flexibility and hampers innovation. For example, according to ESA, new regulations would likely create standardization that "is unworkable across all industries, media, and technology." It added an effort to account for all the various iterations of a subscription offer or sales medium would be impractical or unreasonable. Finally, SCIC noted that FTC staff has emphasized the need for marketers to be "free to use their many tools of creativity to figure out the best way to convey that information."

According to PDMI, rules "need to be sufficiently fluid to permit marketers to adapt their offerings" to current and future media channels. It explained that market changes occur too quickly for any Commission rule to stay apace. Therefore, PDMI strongly urged the Commission to follow its historical "performance" standard approach and "avoid dictating precisely how disclosure must be made, consent must be obtained, or cancellation methods must be implemented." For instance, it recommended leaving terms such as "clear and conspicuous" and "express informed" consent undefined to "preserve flexibility in the face of rapidly changing technology" and ensure meeting the FTC's goals without rigid restrictions.

*Important Information:* Beyond the need for flexibility, the commenters provided specific disclosure recommendations. NCL, for example, suggested the Rule require businesses "to clearly and conspicuously disclose their renewal terms prior to the entry of

---

[53] NCL, Oakley, TINA, State AGs, PDMI, Takano, and Hoofnagle.

[54] *See, e.g.,* State AGs, PDMI, and TINA.

[55] *See, e.g.,* App Association, ESA, and ANA.

payment information.'' It also recommended the Commission incorporate the ''clear and conspicuous'' definition from both California's and the District of Columbia's automatic renewal statutes. In NCL's view, these disclosures should specifically include cancellation instructions and deadlines, renewal dates, contract length, amendment notifications, renewal costs, contract changes at renewal, and business contact information. Hoofnagle asserted sellers also should provide a total cost disclosure so consumers understand what they will be paying each year, as opposed to monthly.

NCL also argued the Rule should require marketers to send notifications electronically, and, for contracts of six months or more, by postal mail, with links, phone numbers, and prepaid postcards appropriate to the medium. The State AGs urged the Commission to require important disclosures (*e.g.,* billing information and requests for acceptance) on a separate page free of ''any other information that may serve as a distraction.''

*Consent:* Commenters offered a variety of suggestions regarding possible consent requirements. The State AGs recommended requiring ''consumers to take a separate, affirmative action'' to consent to negative option features, such as ''clicking an 'I Agree' button to accept the trial product'' accompanied by disclosures about the ''terms of the offer, including the amount and frequency of payments.'' The State AGs and TINA recommended requirements directing businesses to obtain consent after the trial period expires. TINA noted the District of Columbia now requires companies offering free trials of a month or more to notify consumers between one and seven days before the expiration of the free trial and obtain affirmative consent to the renewal prior to charging consumers.

As described above, the App Association suggested the Commission provide flexibility in any new regulations, but particularly those involving consent. It advocated for a ''flexible and outcome-driven regulatory environment'' that would allow small businesses to create ''the best way for their company to implement this specific requirement'' and ''encourage new innovative approaches in consumer transparency.'' Given the likelihood of future technological changes (*e.g.,* faster devices that consumers will want to use quickly), the App Association suggested any new FTC provisions include ''flexible yet stable requirements that protect the consumer's right to choose but at the same time do not stifle innovation.''

*Cancellation:* Several commenters provided specific recommendations for new cancellation rules, including, for example, that the FTC require businesses to provide a cancellation mechanism that mirrors the customer's method of enrollment.[56] TINA explained consumers should be able to cancel their negative options in ''an easy and specific manner'' using procedures that are ''at least as easy as the subscription process.'' In its view, at a minimum, if a consumer subscribed online, they should be able to cancel online. The lack of such specific requirements leaves consumers vulnerable to a company's interpretation of what ''simple'' might mean under ROSCA. It also urged the Commission to consider Visa's new rules requiring businesses to provide an ''easy way to cancel the subscription'' online, similar to unsubscribing from an email distribution list. TINA additionally noted California's new rule mandating an easy-to-use cancellation mechanism online, such as a termination email. The State AGs similarly recommended the FTC require ''that consumers be allowed to cancel their memberships by the same method as their enrollment (as well as by other methods, at the business's option).'' The App Association, however, urged flexibility in any new cancellation requirements and cautioned against ''overly-prescriptive approaches.'' Instead, it recommended FTC allow ''marketers to decide how to implement their own notification system to stop reoccurring charges,'' and to efficiently scale approaches based on consumer expectations and needs.

Hoofnagle, who discussed the negative impacts of abusive cancellation procedures, suggested the Commission prohibit certain specific ''transaction costs'' imposed on some consumers. Such practices include requiring users to repeatedly request cancelling, to sign in with additional security (*e.g.,* requiring a CAPTCHA completion), to accept third-party scripting, and to re-enter information such as a credit card number. Hoofnagle agreed with other commenters that ''cancellation should never be more transactionally burdensome than enrollment'' and there should be ''symmetry between purchase and cancel.'' He also recommended the FTC consider a ''one-time 'no' rule'' to require marketers to accept a consumer's first ''cancel'' request and end the transaction without trying to convince the consumer to change their minds or pitching further offers.

*Material Changes:* Commenters also recommended requirements to address material changes to contract conditions after the consumer enrolls, including changes to price, service, goods, and other material terms. According to TINA, for example, the FTC should require businesses to notify consumers of such changes and provide them an opportunity to cancel before the terms take effect. TINA stated current FTC requirements, as well as ROSCA, do not address ''instances in which the terms may change.'' Several states, including Virginia, California, and Oregon, require businesses to provide consumers with a clear and conspicuous notice of the material change as well as information about how to cancel ''in a manner that is capable of being retained by the consumer.''[57]

*Reminders:* Commenters also recommended requiring businesses to provide additional reminders as part of their negative option offerings.[58] For example, TINA supported imposing a notice requirement prior to subscription expiration containing cancellation instructions similar to VISA's new rules. Those rules require an electronic reminder, sent to consumers a week before the trial period expires, with a link to an online cancellation page. TINA also argued for regular, ongoing notice of the agreement terms along with cancellation instructions. In its view, ''such a requirement is important to protect consumers from paying for products or services they do not want or need.'' According to Representative Takano, such reminders ''will help decrypt the complex nature of negative option agreements'' and ensure businesses cannot continue to charge consumers who intended to make only a single purchase.

The State AGs agreed, explaining periodic disclosures ensure consumers are aware of recurring charges and ''help prevent the continuation of unknowing or unwanted enrollment in these plans.'' They recommended notifications at regular intervals for month-to-month plans, with appropriately worded subject lines (*e.g.,* ''Important Billing Information''), coupled with a convenient cancellation method. For services that renew annually, the State AGs contended that, before charging for renewal, companies should notify consumers within a specified period

---

[56] Takona and TINA.

[57] TINA also noted that a bill introduced into the House in 2019, the Unsubscribe Act (H.R. 2683), contains similar requirements. *See also* Takano, NCL, and Hoofnagle. For free trials, NCL argued the Rule should require marketers to obtain express consent before increasing the price of service for an established customer.

[58] TINA, Takano, and State AGs.

about the timing, amount, and billing method along with convenient cancellation procedures. Finally, both the State AGs and Hoofnagle suggested the FTC consider whether periods of consumer inactivity (e.g., 24 months) for a subscribed service should trigger notifications.

*Miscellaneous Recommendations:* The commenters provided several other recommendations for new requirements, including provisions involving refunds, consumer contact information, deletion of consumer data, and amendments to the TSR. First, the State AGs proposed requiring businesses to provide full refunds to consumers "unwittingly enrolled in a negative option plan." Second, they suggested the Rule require businesses to obtain a consumer's email address at the initial consent and send a confirmatory email describing the service or product, the amount and timing of any payments, the payment collection method, and a toll-free cancellation number. For offers involving goods, the State AGs stated businesses should include an invoice in every shipment containing the seller's name and address, the negative option program terms, return instructions, and a toll-free phone number or email address for cancellation. Third, Hoofnagle asserted a rule should require consumer data deletion after "a reasonable amount of time" to provide customers with a "true exit" from the transaction. Fourth, the State AGs urged the Commission to amend and expand the TSR's negative option provisions to require sellers to record entire customer transactions and retain such recordings for a specified period. In addition, they recommended the TSR require marketers to provide full refunds in response to complaints unless the company can provide a phone call recording "establishing the consumer's affirmative consent."

*Banning Certain Enrollment Methods:* The State AGs suggested the Commission limit, or prohibit, certain types of negative option marketing that are, in their opinion, "inherently unreliable." First, they suggested a ban on "free-to-pay conversion programs" (e.g., free trial magazine subscriptions) to consumers at retail checkout in brick-and-mortar stores. According to the State AGs, cashiers fail to disclose the material terms and conditions of these offers, including the fact that consumers will receive a monthly bill after the trial ends. Retailers use the consumer's signature authorizing the entire purchase (e.g., groceries, etc.) as consent for the negative option program, and then rely on "inconspicuous" terms on the sale receipt as evidence of consent.

The State AGs identified this practice as an "inherently unreliable means of obtaining consumers' informed consent and should be prohibited."

Second, the State AGs urged the Commission to ban the use of consumers' check endorsements to obtain consent to be periodically billed for goods or services. They asserted this practice has led to widespread fraud. Specifically, some businesses send consumers checks for small dollar amounts that appear to come from a familiar company. Small print disclosures near the endorsement line on the reverse of the check indicate that, by cashing the check, consumers are enrolling in a recurring payment program. According to the State AGs, this practice, which has generated many complaints, "is inherently unreliable and should be prohibited" because consumers do not scrutinize the small print on the back of these checks and thus have no reason to expect their signature is consent for a recurring payment program.

Finally, the State AGs argued, without further explanation, the FTC Rule should either ban or place restrictions on "upsell offers that the consumer must respond to before being able to cancel."

## X. Prevalence of Deceptive or Unfair Practices Involving Negative Option Marketing and the Need for the Proposed Amendments

Consistent with the Commission's past conclusions, the recent comments confirm that deceptive practices involving negative option marketing remain prevalent and that additional requirements are needed to protect consumers. In 2014, the Commission found "that unfair, deceptive, and otherwise problematic negative option marketing practices continue[d] to cause substantial consumer injury, despite determined enforcement efforts by the Commission and other law enforcement agencies." [59] The evidence since indicates matters have not improved, and, in fact, may be worse. As detailed in Section IX, the commenters provided substantial evidence—in the form of complaint data, studies, survey results, and law enforcement actions—demonstrating deceptive negative option marketing practices remain prevalent. The FTC, the states, and consumer organizations continue to receive thousands of complaints from consumers who unwittingly enrolled in programs and then find it difficult or impossible to cancel. Additionally, studies cited by commenters confirm a

pattern of consumer ensnarement in unwanted recurring payments. Commenters also highlighted the many recent federal and state enforcement actions related to negative options, as well as nearly 100 class action cases filed in the last six years.

The Commission and the states continue to regularly bring cases challenging negative option practices. These matters involve a range of deceptive or unfair practices, including inadequate information regarding free trials and other products or programs, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures.[60] The existence of these cases and complaints demonstrates that some commenters' contention that all the problems are being addressed is simply not true. In fact, given the considerable limitations of FTC and state enforcement resources, these law enforcement actions likely represent only the tip of the iceberg—a conclusion corroborated by the complaint and survey evidence in the record.

In the ANPR, the Commission explained it receives thousands of complaints a year related to negative option marketing. In addition, State AGs and other commenters detailed ongoing problems with inadequate disclosures, the failure to obtain consent, poor or nonexistent cancellation procedures, and the refusal to honor cancellation requests and refund demands. They further explained deceptive free trial offers are "rampant online and throughout social media," and often lure consumers into recurring payments without clearly and conspicuously disclosing future payment obligations.[61] The evidence offered by commenters also demonstrates many sellers do not provide consumers with simple cancellation methods and, instead, create obstacles, such as long telephone hold times or multiple upsells, to impede consumers from terminating

---

[59] 79 FR 44271, 44275 (July 31, 2014).

[60] Examples of these matters include: *FTC* v. *Triangle Media Corp.*, No. 3:18–cv–01388–LAB–LL (S.D. Cal. 2019); *FTC* v. *Credit Bureau Ctr., LLC,* No. 17–cv–00194 (N.D. Ill. 2018); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2018); *FTC* v. *One Techs., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014); *FTC* v. *Health Formulas, LLC,* No. 2:14–cv–01649– RFB–GWF (D. Nev. 2016); *FTC* v. *Nutraclick LLC,* No. 2:16–cv–06819–DMG (C.D. Cal. 2016); *FTC* v. *XXL Impressions,* No. 1:17–cv–00067–NT (D. Me. 2018); *FTC* v. *AAFE Products Corp.,* No. 3:17–cv– 00575 (S.D. Cal. 2017); *FTC* v. *Pact Inc.,* No. 2:17– cv–1429 (W.D. Wash. 2017); *FTC* v. *Tarr,* No. 3:17– cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *DOTAuthority.com, Inc.,* No. 0:16–cv– 62186–WJZ (S.D. Fla. 2018); *FTC* v. *Bunzai Media Group, Inc.,* No. CV15–04527–GW(PLAx) (C.D. Cal. 2015); and *FTC* v. *RevMountain, LLC,* No. 2:17–cv– 02000–APG–GWF (D. Nev. 2018).

[61] State AGs.

their contracts. These practices are further reflected in the Commission's recent cases.[62]

## XI. Proposed Amendments—Objectives and Content

To address these ongoing problems, the Commission proposes to amend the current Negative Option Rule with the objective of setting clear, enforceable performance-based requirements for all negative option features in all media. The proposed amendments are designed to ensure consumers understand what they are purchasing and allow them to cancel their participation without undue burden or complication. As discussed below, the proposed Rule (retitled "Rule Concerning Recurring Subscriptions and Other Negative Option Plans") addresses the most important issues related to negative option marketing, including misrepresentations, disclosures, consent, and cancellation. These proposed changes, which replace existing provisions in the Rule, enhance and clarify existing requirements currently dispersed in other rules and statutes. They also consolidate all requirements, such as those in the TSR, specifically applicable to negative option marketing. Further, the proposed Rule would allow the Commission to seek civil penalties and consumer redress in contexts where such remedies are currently unavailable, such as deceptive or unfair practices involving negative options in traditional print materials and face-to-face transactions (*i.e.*, in media not covered by ROSCA or the TSR) and misrepresentations (which are not expressly covered by ROSCA, even when on the internet).

In developing this proposal, and consistent with concerns raised in the comments, the Commission sought to enhance consumer protections while avoiding detailed, prescriptive requirements that would impede innovation. By generally proposing flexible standards, the Commission seeks to establish rules that will not impede advances or become irrelevant as the market changes, while protecting consumers from widespread deceptive or unfair practices.

*Coverage:* The Commission proposes eliminating the current Rule's prescriptive requirements applicable to prenotification plans and replacing them with the flexible, but enforceable, standards detailed below. The proposed requirements would apply to all forms

of negative option marketing, including prenotification and continuity plans, automatic renewals, and free trial offers.[63] This expanded coverage would establish a common set of requirements applicable to all types of negative option marketing.

The proposed Rule defines "negative option feature" to mean a contract provision under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer. This definition is consistent with the TSR and ROSCA (which references the TSR's definition of negative option). The proposed term includes, but is not limited to, automatic renewals, continuity plans, free-to-pay conversion or fee-to-pay conversions, and pre-notification negative option plans.[64] Additionally, the proposed Rule covers offers made in all media, including internet, telephone, in-person, and printed material. The Commission's experience, confirmed by many commenters, demonstrates that negative option features pose the same risks across media and sales methods. The amendments would establish a comprehensive scheme for regulation of negative option marketing in a single rule, thus consolidating existing negative option-specific provisions in one location. This change will facilitate compliance by providing one-stop regulatory shopping, as noted by the State AGs and PDMI.

*Misrepresentations:* Section 425.3 of the proposed Rule prohibits any person from misrepresenting, expressly or by implication, any material fact regarding the *entire* agreement—not just facts related to a negative option feature. FTC enforcement experience demonstrates misrepresentations in negative option marketing cases continue to be prevalent and often involve deceptive representations not only related to the

negative option feature but to the underlying product (or service) or other aspects of the transaction as well. Such deceptive practices may involve misrepresentations related to costs, product efficacy, free trial claims, processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, cancellation, or any other material representation.[65]

This provision falls within the Commission's Section 5 authority and its separate authority under ROSCA. The proposed provision provides the FTC with the ability to seek civil penalties and consumer redress for material misrepresentations in media other than telemarketing or the internet. The record demonstrates this type of provision is necessary. Specifically, despite the Commission's current authority to obtain redress and injunctions under ROSCA and injunctive relief under Section 5 of the FTC Act, the Commission's many enforcement actions over the past several years have failed to stem the tide of deceptive negative option practices online and in person. Ensuring great relief against those who deceive consumers will benefit both consumers and honest sellers who must compete with those who engage in deception.

*Important Information:* Section 425.4 of the proposed Rule requires sellers to provide the following important information prior to obtaining the consumer's billing information: (1) that consumers' payments will be recurring, if applicable, (2) the deadline by which consumers must act to stop charges, (3) the amount or ranges of costs consumers may incur, (4) the date the charge will be submitted for payment, and (5) information about the mechanism consumers may use to cancel the recurring payments.

The failure to provide this information is a deceptive or unfair practice. As detailed in the comments (*e.g.*, TINA and State AGs), many sellers fail to provide adequate disclosures, thereby luring consumers into

---

[62] *See, e.g., FTC* v. *Triangle Media Corp.,* No. 3:18–cv–01388–LAB–LL (S.D. Cal. 2019); *FTC* v. *AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); and *FTC* v. *One Techs., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014).

[63] The proposed Rule would apply to "negative option sellers," which are defined in the proposal as persons selling, offering, promoting, charging for, or otherwise marketing a negative option feature. With certain exceptions, the FTC Act provides the agency with jurisdiction over nearly every economic sector. Certain entities or activities are wholly or partially exempt from FTC jurisdiction under the FTC Act, including most depository institutions, non-profits, transportation and communications common carriage, and the business of insurance. For instance, under Sections 4 and 5 of the FTC Act, the Commission's jurisdiction does not apply to non-profit organizations generally, but it does extend to non-profits that provide economic benefits to their for-profit members, *e.g.,* trade and professional associations. *See California Dental Ass'n* v. *FTC,* 526 U.S. 756 (1999).

[64] Section II of this Notice contains descriptions of these various plans.

[65] *See, e.g., FTC* v. *Tarr,* No. 3:17–cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC* v. *First American Payment Systems,* Case 4:22–cv–00654 (E.D. Tex. 2022); *FTC* v. *XXL Impressions,* No. 1:17–cv–00067–NT (D. Me. 2018); *US* v. *MyLife.com, Inc.,* No. 2:20–CV–6692–JFW–PDx (C.D. Cal. 2021); *FTC and State of Maine* v. *Health Research Labs., LLC,* No. 2:17–cv–00467–JDL (D. Me. 2018); *FTC and State of Connecticut* v. *Leanspa, LLC,* No. 3:11–cv–01715–JCH (D. Conn. 2013); *FTC* v. *WealthPress, Inc. et al.,* No. 3:23–cv–00046 (M. D. Fla. 2023); *FTC* v. *BunZai Media Group, Inc.,* No. CV15–04527–GW(PLAx) (C.D. Cal. 2018); *FTC* v. *Willms,* No. 2:11–cv–00828 (W.D. Wash. 2011); *FTC* v. *Universal Premium Services,* No. CV06–0849 (C.D. Cal. 2006); *FTC* v. *Remote Response,* No. 06–20168 (S.D. Fla. 2006); and *FTC* v. *Jeremy Johnson, et al.,* No. 2:10–cv–02203 (D. Nev. 2016).

purchasing goods or services they do not want. Moreover, the proposal is consistent with ROSCA, which requires sellers to clearly and conspicuously disclose "all material terms of the transaction before obtaining the consumer's billing information." Specifically, the proposed Rule, like ROSCA, would require sellers to disclose any material conditions related to the underlying product or service that is necessary to prevent deception, regardless of whether that term directly relates to the terms of the negative option offer.[66] Complementing ROSCA, the proposal also specifies the types of information sellers must provide so that they have more certainty and consumers receive the information they need to understand the terms of their enrollment. This provision is consistent with Commission orders in this area, requiring no more than any advertisement would need to be non-deceptive.

The proposal does not mandate a long list of prescriptive disclosures, such as renewal dates or business contact information, as some commenters suggested. There is an inherent tradeoff between providing consumers with additional information and ensuring they see and understand the information they need (*i.e.,* consumers may miss important information if the important points are surrounded by useful but less critical information).

Further, to help ensure consumers actually see and understand this important information, the proposed Rule contains general requirements for the location and form of the necessary information in written, telephone, and in-person offers. The FTC's law enforcement experience and consumer complaints are replete with examples of hidden disclosures, including those in fine print, buried in paragraphs of legalese and sales pitches, and accessible only through hyperlinks.[67] Making the rules of the road clear prevents deception by businesses trying to take advantage of the gray areas in current statutes and regulations; the possibility of civil penalties deters those who are engaging in fraudulent practices. Moreover, these clearer guidelines should level the playing field for legitimate businesses, freeing them from having to compete against those employing deception.

Specifically, consistent with the Commission's Policy Statement, the proposed amendments require marketers to present this information "clearly and conspicuously," a term defined in the proposed amendments. Under the proposal, this information should be difficult to miss (*i.e.,* easily noticeable) or unavoidable and easily understandable by ordinary consumers. In addition, all required information, regardless of media, should not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the required information, including any information not directly related to the material terms and conditions of any negative option feature. The proposed amendments also contain requirements related to visual, audible, and written disclosures consistent with the principles enunciated in the Policy Statement. For example, in any communication that is solely visual or solely audible, the disclosure should be made through the same means through which the communication is presented. Additionally, written disclosures should appear immediately adjacent to the means of recording the consumer's consent for the negative option feature. Again, the Commission's law enforcement experience as well as the comments demonstrate the need for this direction, which should benefit businesses who are trying to make non-deceptive claims by leveling the playing field.

Finally, the FTC's comprehensive definition of "clear and conspicuous," developed through years of enforcement experience, covers all the concepts provided in California and DC laws' "clear and conspicuous" definitions with one exception. That exception, the fact that the DC definition requires that disclosures be visually proximate to any request for consumer consent, is incorporated by the proposed Rule in a separate consent section.[68]

*Consent:* Section 425.5 of the proposed Rule also requires negative option sellers to obtain consumers' express informed consent before charging them. The failure to obtain such consent is a deceptive or unfair practice, and the record demonstrates how pervasive this problem has become.[69] Thus, the proposed consent

requirements are necessary given how easily marketers can enroll consumers in negative option programs without actual consent.

Proposed Section 425.5 is consistent with ROSCA's basic "express informed consent" requirement while providing more guidance on how to comply. This more detailed guidance removes ambiguity for marketers, while leveling the playing field and providing deterrence. Moreover, the provision provides flexibility to allow for innovation and change over time. The proposed Rule achieves these goals by requiring marketers to: (1) obtain the consumer's unambiguously affirmative consent to the negative option feature separately from any other portion of the offer; (2) refrain from including any information that "interferes with, detracts from, contradicts, or otherwise undermines" the consumer's ability to provide express informed consent; (3) obtain the consumer's unambiguously affirmative consent to the entire transaction; and (4) obtain and maintain (for three years or a year after cancellation, whichever is longer) verification of the consumer's consent.[70]

These requirements address commenters' (*e.g.,* TINA, Rep. Takano, and State AGs) concerns that many sellers employ inadequate consent procedures to increase enrollment in negative option programs. By providing more specificity regarding the steps sellers must take to ensure they obtain consumer consent, these provisions will also help address the deceptive use of so-called "dark patterns," sophisticated design practices that manipulate users into making choices they would not otherwise have made.[71] Indeed, consumer agreement to any free-to-pay conversion or negative option feature or any other automatic renewal provision obtained through the use of deceptive or unfair dark patterns does not constitute express informed consent.

The provisions also address the unique challenges presented by negative option offers, even for marketers trying to comply with the law. Specifically,

---

[66] *See In re: MoviePass, Inc.,* No. C–4751 (Oct. 5, 2021).

[67] *See, e.g., FTC* v. *Triangle Media Corp.,* No. 3:18–cv–01388–LAB–LL (S.D. Cal. 2019); *FTC* v. *Tarr,* No. 3:17–cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC* v. *One Techns., LP,* No. 3:14–cv–05066 (N.D. Cal. 2014).

[68] Cal. Bus. & Prof. Code section 17601 and DC Code section 28A–202.

[69] *See, e.g.,* State AGs comments; *FTC* v. *Bunzai Media Group, Inc.,* No. CV15–04527–GW(PLAx) (C.D. Cal. 2018); *FTC* v. *Health Formulas, LLC,* No. 2:14–cv–01649–RFB–GWF (D. Nev. 2016); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2018);

*FTC and State of Maine* v. *Health Research Laboratories, LLC,* No. 2:17–cv–00467–JDL (D. Me. 2018) (Section 5); *FTC* v. *XXL Impressions,* No. 1:17–cv–00467–NT (D. Me. 2018) (Section 5).

[70] The Commission seeks comment on whether the proposed Rule should contain a different recordkeeping period.

[71] The FTC recently released a report describing these practices, which include disguising ads to look like independent content, making it difficult for consumers to cancel subscriptions or charges, burying key terms or junk fees, and tricking consumers into sharing their data. *See Bringing Dark Patterns to Light,* FTC Staff Report (Sept. 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.*

consumers can easily focus solely on the aspects of an offer that mirror the offers they regularly encounter (*e.g.,* the quality, functionality, one-time price of the item, and the availability of a free trial offer). Thus, many consumers think they are consenting to these core attributes but miss the other unusual price term—the negative option feature. The proposal addresses these issues by requiring marketers to obtain consent for the negative option feature separately from the rest of the offer and other parts of the transaction, thereby ensuring the consent is informed.[72] For instance, according to the comments, sellers offering negative option features through in-person transactions frequently use consumers' signatures on the entire purchase as consent for the negative option. Further, in effect, the requirement for a separate negative option consent prohibits certain negative option enrollment methods, such as the use of retail sales receipts or check endorsements, in which the customer's signature serves a dual purpose (*e.g.,* negative option enrollment and promotional check cashing). As commenters noted, such practices appear to be particularly attractive to those committing fraud. Finally, the Rule requires sellers to obtain consent for the entire transaction to ensure consumers also agree to elements of the agreement not specifically related to the negative option feature.[73]

To maintain consistency with the TSR, the proposed consent provision also contains a cross-reference to 16 CFR part 310 to inform sellers of that regulation and includes specific mention of TSR requirements for consent in transactions involving preacquired account information and a free-to-pay conversion.[74] However, beyond the basic steps discussed above and these current TSR requirements, the proposed consent requirements contain no prescriptive provisions requiring sellers to implement specific practices.

Instead, the proposed Rule provides guidance for sellers making written offers (including those on the internet) to assure they have obtained the consumer's unambiguously affirmative consent. Specifically, for all written offers (including over the internet),

sellers may obtain express informed consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the negative option feature, and no other portion of the offer.[75] This approach should protect consumers and marketers alike. Consumers are assured they pay for only the goods and services they choose, and marketers can opt for the certainty of avoiding liability by adhering to the Commission's proposed means of compliance. Alternatively, marketers are free to innovate as long as they meet the express informed consent standard.

In the free trial context, while marketers must obtain consumers' express informed consent prior to being charged, the proposal does not require sellers to obtain an additional (or alternative) round of consent after the trial's completion. Although such additional consent would remind many consumers of their ongoing purchases, the failure to provide this second round of consent does not necessarily constitute an unfair or deceptive practice.[76] For example, if sellers follow the proposed Rule's disclosure and consent requirements, consumers should understand they are enrolled in, and will be charged for, the negative option feature once the free trial ends. Nonetheless, the Commission invites comment on whether additional (or alternative) measures are necessary to prevent unfairness or deception and ensure consumers have adequate notice concerning the initiation of recurring purchases or payments following the completion of a free trial. For example, the Commission seeks comment on whether sellers offering free trials should be required to obtain an additional round of consent before charging a consumer at the completion of the free trial.

*Simple Cancellation Mechanism ("Click to Cancel"):* Easy cancellation is an essential feature of a fair and non-

deceptive negative option program. If consumers cannot easily leave the program when they wish, the negative option feature is little more than a means of charging consumers for goods or services they no longer want. Unfortunately, the record demonstrates easy cancellation is all too often illusory.[77] To address this persistent unfair and deceptive practice, the proposed Rule, consistent with ROSCA and California requirements, directs sellers to provide a simple cancellation mechanism to immediately halt any recurring charges.[78] However, while ROSCA's cancellation provision is laudable, it has failed to eliminate the barriers many marketers have erected to keep consumers from canceling. Specifically, many marketers take advantage of the ambiguity of the term simply to thwart or delay consumers' attempts to cancel. The Commission's cases, as well as the State AGs' and TINA's comments, demonstrate the need for clearer guardrails in this area. To construct these guardrails, the proposed Rule requires the mechanism to be at least as simple as the one used to initiate the charge or series of charges. Because sellers have huge incentives to create a frictionless purchasing process, ensuring cancellation is equally simple should remove barriers, such as unreasonable hold times or verification requirements. The lack of detailed requirements affords businesses flexibility in meeting the proposed Rule's simple cancellation standard.

The proposal also requires sellers to provide a simple cancellation mechanism through the same medium used to initiate the agreement, whether, for instance, through the internet, telephone, mail, or in-person. On the internet, this "Click to Cancel" provision requires sellers, at a minimum, to provide an accessible cancellation mechanism on the same website or web-based application used for sign-up. If the seller allows users to sign up using a phone, it must provide, at a minimum, a telephone number and ensure all calls to that number are answered during normal business hours. Further, to meet the requirement that the mechanism be at least as simple as the one used to initiate the recurring charge, any telephone call used for cancellation cannot be more expensive than the call used to enroll (*e.g.,* if the

---

[72] *See, e.g., FTC* v. *Jason Cardiff (Redwood Scientific),* No. ED 18–cv–02104 SJO (PLAx) (C.D. Cal. 2018); *FTC* v. *DOTAuthority.com, Inc.,* No. 0:16–cv–62186–WJZ (S.D. Fla. 2018); *FTC* v. *JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2014).

[73] The Commission recently alleged that failure to disclose a material term of the underlying service that was necessary to prevent deception violated this provision of ROSCA. *In re: MoviePass, Inc.,* No. C–4751 (Oct. 5, 2021).

[74] 16 CFR 310(a)(7).

[75] To avoid potential conflicts with EFTA, this proposed provision does not apply to transactions covered by the preauthorized transfer provisions of that Act, 15 U.S.C. 1693e, and Regulation E, 12 CFR 1005.10. Those EFTA provisions, which apply to a range of preauthorized transfers including some used for negative options, contain various prescriptive requirements (*e.g.,* written consumer signatures that comply with E-Sign, 15 U.S.C. 7001–7006, evidence of consumer identity and assent, the inclusion of terms in the consumer authorization, and the provision of a copy of the authorization to the consumer) beyond the measures identified in the proposed Rule. Consequently, compliance with the proposed Rule would not necessarily ensure compliance with Regulation E. For example, use of a check box for consent without additional measures may not comply with Regulation E's more specific authorization requirements.

[76] 15 U.S.C. 57a(a)(1)(B).

[77] *See, e.g.,* NCL and State AGs.

[78] The TSR requires disclosure of the material terms of a seller's cancellation policy (if one exists) and prohibits misrepresentations about cancellation policies. 16 CFR 310.3. However, it does not contain specific cancellation mechanism requirements.

sign-up call is toll free, the cancellation call must also be toll free). For a recurring charge initiated through an in-person transaction, the seller must offer the simple cancellation mechanism through the internet or by telephone in addition to, where practical, the in-person method used to initiate the transaction.

The proposed Rule provides for this flexible approach in lieu of, as some commenters suggested, prohibitions against a list of specific practices (*e.g.*, additional security requirements, third-party scripting, etc.) that may impair cancellation. Specific prohibitions may be counterproductive, solving today's issues only to inadvertently provide a road map to tomorrow's deception. Unscrupulous sellers, for example, can simply circumvent detailed prohibitions and employ new infinitely clever means to thwart consumers. The proposed performance standard avoids this eventuality. Additionally, such restrictions may prohibit legitimate measures used by sellers for security reasons or other purposes. The proposed provision, therefore, mandates results and provides the flexibility to meet them.

The proposed Rule does not contain a separate provision requiring refunds for consumers "unwittingly enrolled in a negative option plan," as some commenters suggested. Such a provision is not needed to prevent deception because enrolling consumers without their express informed consent would already violate the proposed Rule's consent requirements (proposed Section 425.5).

Finally, the proposed Rule does not adopt a commenter recommendation to augment cancellation provisions by requiring sellers to completely delete consumer data following cancellation to provide consumers with a "true exit." Although such a procedure may be desirable for many consumers, the record does not support an assertion that the practice of retaining consumer data after cancellation is inherently unfair or deceptive, nor would a requirement related to data deletion prevent other unfair or deceptive practices related to negative options.[79] Instead, this issue involves questions of relief related to broader privacy issues, and thus falls outside the scope of this proceeding.

*Additional Offers Before Cancellation* (*"Saves"*)*: The proposed Rule also contains a provision for sellers who seek to pitch additional offers or modifications (*i.e.*, defined as a "Save" in the proposed Rule) during a

consumer's cancellation attempt. Under the proposal, before making such pitches, the seller must first ask consumers whether they would like to consider such offers or modifications (*e.g.*, "Would you like to consider a different price or plan that could save you money?"). If consumers decline this invitation, the seller must desist from presenting such offers and cancel the negative option arrangement immediately. If they accept, the seller can pitch the alternative offers. To prevent consumers from entering a protracted series of such offers, the proposed Rule also clarifies that a consumer's consent to receive additional offers or modifications applies only to the cancellation attempt in question and not to subsequent attempts. Thus, consumers could disengage during the "save" attempt (*e.g.*, by hanging up, closing the browser, or disconnecting the chat) and avail themselves of the easy cancellation during a separate, subsequent attempt. As noted in the comments (*e.g.*, NCL and State AGs), evidence demonstrates many businesses have created unnecessary and burdensome obstacles in the cancellation process, including forcing uninterested consumers to listen to multiple upsells before allowing cancellation, that are not outweighed by countervailing benefits to consumers or competition. This is an unfair and deceptive practice. The proposed provision would effectively prohibit such practices by giving consumers the ability to avoid them, while allowing sellers to pitch new offers to those consumers who find these additional offers desirable. In addition, this provision should not create any significant burden for sellers.

*Reminders and Confirmations:* For contracts involving the automatic delivery of physical goods (*e.g.*, pet food), the proposed Rule does not, as some commenters recommended, mandate confirmatory emails or periodic reminders. In situations where the seller has otherwise clearly disclosed the terms of the deal, obtained consent, and provided a simple cancellation mechanism, the record does not support an assertion that the absence of these reminders is inherently unfair or deceptive, given the requirement that sellers must provide all material information upfront. Moreover, while the lack of a reminder may result in some consumers paying for goods they do not want based simply on the lack of diligence, any injury is reasonably avoidable by consumers themselves. Specifically, each delivery serves as a reminder of the contract,

allowing consumers to reasonably avoid further payments by contacting the company and cancelling the arrangement. Thus, the record does not support an assertion that such an agreement is inherently unfair.

Subscriptions and other negative option arrangements that do not involve physical goods, however, present a different issue. As some commenters explained, because these services may have no regular, tangible presence for consumers (*e.g.*, data security monitoring or subscriptions for online services), many consumers may reasonably forget they enrolled in such plans and, as a result, incur perpetual charges for services they do not want or use. Thus, the failure to provide reminders for such contracts meet all three elements of unfairness.[80]

Accordingly, the Commission proposes to require sellers to provide an annual reminder to consumers enrolled in negative option plans involving anything other than physical goods. Under the proposal, such reminders must identify the product or service, the frequency and amount of charges, and the means to cancel (see proposed Section 425.7). As a matter of good business practice, many sellers already provide such reminders to consumers enrolled in these programs. However, even for those who do not, the proposal should impose little additional burden (*e.g.*, a short, generic email). The Commission seeks comment on this proposal, including, for example, whether the Commission should narrow the coverage of the proposed language by types of covered services or time duration between reminders.

*Material Changes:* The proposed Rule does not contain a provision addressing the need for notices when sellers make material changes to a negative option contract. Because these contracts can last years, and even decades, the original agreement often allows the seller to change material terms of the agreement such as price, services, and product quantity. As commenters noted, some states have requirements addressing this issue. However, whether such a practice is unfair or deceptive depends heavily on the facts presented in each case (*e.g.*, consumers may reasonably expect a small annual increase in price for some products or

---

[79] 15 U.S.C. 57a(a)(1)(B).

[80] *FTC Policy Statement on Unfairness*, appended to *International Harvester Co.*, 104 F.T.C. 949 (1984). "To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." *Id.*

services, but not massive increases or even small increases for different products). Because consumer interpretation of these claims is so fact dependent, it is not practical to draw a universal line between legal and violative behavior. Thus, the Commission can best address issues in this area on a case-by-case basis through law enforcement actions. Given the importance of this issue, however, the Commission seeks further comment on whether and how the Rule can address this issue consistent with FTC's authority to combat unfair or deceptive practices.

*Penalties:* Under the proposal, the civil penalties for the Rule would continue to reflect the amounts set out in 16 CFR 1.98(d).

*State Requirements:* The Federal Trade Commission Act does not explicitly preempt state law, and the legislative history of the FTC Act indicates that Congress did not intend the FTC to occupy the field of consumer protection regulation.[81] Accordingly, any preemptive effect of a Rule would be limited to instances where it is not possible for a private party to comply with both state and the Commission regulations, or where application of state regulations would frustrate the purposes of the Rule.[82]

Therefore, Section 425.7 of the proposed Rule specifies that the Rule would not supersede, alter, or affect state statutes or regulations relating to negative option marketing, except to the extent that a state statute, regulation, order, or interpretation is inconsistent with the proposed Rule. The proposal also indicates state requirements are not inconsistent with the Rule to the extent they afford greater protection to consumers. The Commission invites comment on whether the proposed Rule conflicts with any existing state requirements.

*Consumer Education:* The Commission plans to continue its efforts to provide information to help consumers with their purchasing decisions and avoid ensnarement in unwanted recurring payment programs. However, consumer education does not provide a substitute for improving existing regulatory provisions.

Consumer education is likely to have a limited benefit where sellers lure consumers into an agreement without consumers' knowledge, particularly with the use of dark patterns.

*Exempted Activities:* The Commission seeks comment on whether the Rule should exempt any entities or activities that are otherwise subject to the Commission's authority under the FTC Act. In the comments, various interests, such as energy sellers and service contract providers, urged the Commission to exempt their industries. They argued existing state licensing and other requirements that already apply to their activities adequately address the problems noted above and further rules would only interfere with the existing regulatory structure. They note that some state laws (*e.g.,* California) contain exemptions for activities such as service contract sellers and administrators, as well as state public utility commission licensees.

Those commenting on this issue should detail which, if any, industries should be exempt, or not exempt, and why, including whether the proposed Rule would impose requirements that conflict with state regulations targeted to a specific industry sector, or are antithetical to the goals of such state laws.

## XII. The Rulemaking Process

As explained in Section XIII of this document, the Commission invites interested parties to submit data, views, and arguments on the proposed amendments to the Negative Option Rule and the issues and questions raised in this document. The comment period will remain open until June 23, 2023.[83] To the extent practicable, all comments will be available on the public record and posted at the docket for this rulemaking on *https:// www.regulations.gov.* The Commission will provide an opportunity for an informal hearing if an interested person requests to present their position orally. *See* 15 U.S.C. 57a(c). Any person interested in making a presentation at an informal hearing must submit a comment requesting to make an oral submission, and the request must identify the person's interests in the proceeding and indicate whether there are any disputed issues of material fact that need to be resolved during the hearing. *See* 16 CFR 1.11(e). The comment should also include a statement explaining why an informal

hearing is warranted and a summary of any anticipated testimony. If the Commission schedules an informal hearing, either on its own initiative or in response to request by an interested party, a separate notice will issue. *See id.* 1.12(a).

The Commission can decide to finalize the proposed rule if the rulemaking record, including the public comments in response to this NPRM, supports such a conclusion. The Commission may, either on its own initiative or in response to a commenter's request, engage in additional processes, which are described in 16 CFR 1.12, 1.13. Based on the comment record and existing prohibitions against deceptive or unfair negative option marketing under Section 5 of the FTC Act and other rules and statutes, the Commission does not here identify any disputed issues of material fact that need to be resolved at an informal hearing. The Commission may still do so later, on its own initiative or in response to a persuasive showing from a commenter.

## XIII. Request for Comments

The Commission seeks comments on all aspects of the proposed requirements, including the likely effectiveness of the proposed Rule in helping the Commission combat unfair or deceptive practices in negative option marketing. The Commission also seeks comment on various alternatives to the proposed regulation, to further address disclosures, consumer consent, and cancellation. It also seeks comment on other approaches, such as the publication of additional consumer and business education. The Commission seeks any suggestions or alternative methods for improving current requirements. In their replies, commenters should provide any available evidence and data that supports their position, such as empirical data, consumer perception studies, and consumer complaints.

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before June 23, 2023. Write ''Negative Option Rule; Project No. P064202'' on your comment. Your comment— including your name and your state— will be placed on the public record of this proceeding, including, to the extent practicable, on the website *https:// www.regulations.gov.*

Because of the agency's heightened security screening, postal mail addressed to the Commission will be subject to delay. We strongly encourage you to submit your comments online through the *https://www.regulations.gov*

---

[81] *See, e.g., Am. Fin. Servs. Ass'n* v. *FTC,* 767 F.2d 957, 989 (D.C. Cir. 1985).

[82] Preemption would occur where there is an ''actual conflict between the two schemes of regulation [such] that both cannot stand in the same area.'' *Fla. Lime & Avocado Growers, Inc.,* v. *Paul,* 373 U.S. 132, 141 (1963). *See also Am. Fin. Servs.,* 767 F.2d 957 (Credit Practices Rule); *Harry and Bryant Co.* v. *FTC,* 726 F.2d 993 (4th Cir. 1984) (Funeral Rule); *Am. Optometric Assoc.* v. *FTC,* 626 F.2d 896 (D.C. Cir. 1980) (Ophthalmic Practices Rule).

[83] The Commission elects not to provide a separate, second comment period for rebuttal comments. *See* 16 CFR 1.11(e) (''The Commission may in its discretion provide for a separate rebuttal period following the comment period.'').

website. To ensure that the Commission considers your online comment, please follow the instructions on the web-based form.

If you file your comment on paper, write "Negative Option Rule; Project No. P064202" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex N), Washington, DC 20580. If possible, please submit your paper comment to the Commission by overnight service.

Because your comment will be placed on the public record, you are solely responsible for making sure that your comment does not include any sensitive or confidential information. In particular, your comment should not contain sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure your comment does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any "[t]rade secret or any commercial or financial information which . . . is privileged or confidential"—as provided in Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and FTC Rule 4.10(a)(2), 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with FTC Rule 4.9(c), 16 CFR 4.9(c). In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request and must identify the specific portions of the comment to be withheld from the public record. *See* FTC Rule 4.9(c). Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted publicly at *https://www.regulations.gov*—as legally required by FTC Rule 4.9(b), 16 CFR 4.9(b)—we cannot redact or remove your comment, unless you submit a confidentiality request that meets the requirements for such treatment under

FTC Rule 4.9(c), and the General Counsel grants that request.

Visit the FTC website to read this document and the news release describing it. The FTC Act and other laws that the Commission administers permit the collection of public comments to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive public comments it receives on or before June 23, 2023. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/policy-notices/privacy-policy*.

## XIV. Preliminary Regulatory Analysis and Regulatory Flexibility Act Requirements

Under Section 22(a) of the FTC Act, 15 U.S.C. 57b–3(a), the Commission must issue a preliminary regulatory analysis for a proceeding to amend a rule if the Commission: (1) estimates that the amendment will have an annual effect on the national economy of $100 million or more; (2) estimates that the amendment will cause a substantial change in the cost or price of certain categories of goods or services; or (3) otherwise determines that the amendment will have a significant effect upon covered entities or upon consumers. The Commission has preliminarily determined that the proposed amendments to the Rule will not have such effects on the national economy; on the cost of goods and services offered for sale by mail, telephone, or over the internet; or on covered parties or consumers. The proposed amendments contain requirements related to consumer disclosures, consumer consent, and cancellation. In developing these proposals, the Commission has sought to minimize prescriptive requirements and provide flexibility to sellers in meeting the Rule's objectives. In addition, most sellers provide some sort of disclosures, follow consent procedures, and offer cancellation mechanisms in the normal course of business. Thus, compliance with the proposed requirements should not create any substantial added burden. The Commission, however, requests comment on the economic effects of the proposed amendments.

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601–612, requires that the Commission conduct an Initial Regulatory Flexibility Analysis ("IRFA") with a proposed rule and a Final Regulatory Flexibility Analysis ("FRFA"), if any, with the final rule, unless the Commission certifies that the

rule will not have a significant economic impact on a substantial number of small entities. *See* 5 U.S.C. 603–605. The RFA requires an agency to provide an IRFA with the proposed Rule and a FRFA with the final rule, if any. The Commission is not required to make such analyses if a rule would not have such an economic effect, or if the rule is exempt from notice-and-comment requirements.

The Commission does not have sufficient empirical data at this time regarding the affected industries to determine whether the proposed amendments to the Rule may affect a substantial number of small entities as defined in the RFA. However, a preliminary analysis suggests the proposed amendments to the Rule would not have a significant economic impact on small entities. The proposed amended rule would apply to all businesses using Negative Option Features in the course of selling goods or services. Small entities in potentially any industry could incorporate a negative option feature into a sales transaction. The Commission is unaware, however, of any source of data identifying across every industry the number of small entities that routinely utilize negative option features. Based on the comments received in response to the ANPR, and on the Commission's own experience and expertise, the Commission believes the use of negative option features may be more prevalent in some industries than others, for example, computer security services, online streaming services, and service contract providers. The Commission lacks sufficient data to determine the portion of total estimated affected companies (see estimate in the Paperwork Reduction Act analysis in section XV) that qualify as small businesses across each industry. Therefore, the Commission seeks comments on the percentage of affected companies that qualify as small businesses.

In addition, it is also unclear whether the proposed amendments to the Rule would have a significant economic impact on small entities. However, as noted in Section XV, the impact of the proposed requirements on all firms, whether small businesses or not, may not be substantial. As discussed in that section, the FTC estimates the majority of firms subject to the proposed recordkeeping requirements already retain these types of records in the normal course of business. The FTC anticipates many transactions subject to the Rule are conducted via the internet, minimizing burdens associated with compliance. Additionally, most entities

subject to the Rule are likely to store data though automated means, which reduces compliance burdens associated with record retention. Furthermore, regarding the proposed disclosure requirements, it is likely the substantial majority of sellers routinely provide these disclosures in the ordinary course as a matter of good business practice. Moreover, many state laws already require the same or similar disclosures as the Rule would mandate. Finally, some negative option sellers are already covered by the Telemarketing Sales Rule and thus subject to its disclosure requirements. The Commission therefore anticipates that the Rule will not have a significant economic impact on small entities. Nevertheless, because the precise costs to small entities of updating their systems and disclosures are difficult to predict, the Commission has decided to publish the following IRFA pursuant to the RFA and to request public comment on the impact on small businesses of the proposed amendments.

### A. Description of the Reasons Why Action by the Agency Is Being Considered

As described in this document, the proposed amendments address unfair or deceptive practices in negative option marketing. The FTC, other federal agencies, and state attorneys general have brought multiple actions to stop and remedy the harms caused by negative option marketing. The record demonstrates, however, that existing authorities fall short because there is no uniform legal framework, which leaves entire sectors of the economy under-regulated and constrain the relief that the Commission may obtain for law violations. In the ANPR, the Commission explained it receives thousands of complaints a year related to negative option marketing. As discussed above in Sections VI, VII, and IX, the proposed changes, which replace existing provisions in the Rule, enhance and clarify existing requirements currently dispersed in other rules and statutes. They also consolidate all requirements, such as those in the TSR, specifically applicable to negative option marketing. Further, the proposed Rule would allow the Commission to seek civil penalties and consumer redress in contexts where such remedies are currently unavailable, such as deceptive or unfair practices involving negative options in traditional print materials and face-to-face transactions (*i.e.,* in media not covered by ROSCA or the TSR) and misrepresentations (which are not expressly covered by ROSCA, even when on the internet).

### B. Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Amendments

The objective of the proposed amendments is to curb deceptive or unfair practices occurring in negative option marketing. The legal basis for the proposed amendments is Section 18(b)(3) of the FTC Act, 15 U.S.C. 57a(b)(3), which provides the Commission with authority to issue a notice of proposed rulemaking where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent.

### C. Description and Estimate of the Number of Small Entities to Which the Proposed Amendments Will Apply

The proposed amendments affect sellers, regardless of industry, engaged in making negative option offers, defined by the Rule to mean any person ''selling, offering, promoting, charging for, or otherwise marketing goods or services with a Negative Option Feature.'' As discussed in the introduction to this section, determining a precise estimate of how many of these are small entities, or describing those entities further, is not readily feasible because the staff is not aware of published, comprehensive revenue and/or employment data for all possible affected entities, which come from a variety of different industries and which may or may not sell goods or services with negative options. The Commission invites comment and information on this issue.

### D. Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements

The proposed rule amendments would require negative option sellers to disclose certain information about negative option features, obtain a consumer's express informed consent and maintain records of consumer consent for three years after the initial transaction or one year after cancellation (whichever is longer), and provide consumers a simple mechanism for cancellation. The estimates for the proposed recordkeeping and disclosure requirements are set out within the Paperwork Reduction Act analysis in Section XV. As mentioned in the earlier introductory section of the IFRA, the impact of these proposed requirements on small entities is most likely not significant. The small entities potentially covered by these amendments will include all such entities subject to the Rule (*e.g.,* for purposes of the proposed amendment,

entities selling goods or services through negative option offerings). The professional skills necessary for compliance with the proposed amendments would include sales and clerical personnel. The Commission invites comment on these issues.

### E. Duplicative, Overlapping, or Conflicting Federal Rules

As discussed in this document, the proposed amendments contain certain provisions that are similar to or expand on requirements in the TSR as well as ROSCA. The proposed amendments would establish a common set of requirements applicable to all types of negative option marketing. The Commission anticipates these changes will facilitate compliance and reduce potential confusion among sellers and consumers regarding their compliance obligations for sales involving negative option offers. The FTC has not identified any other federal statutes, rules, or policies currently in effect that may duplicate or conflict with the proposed rule. As explained above, the proposed amendments have been specifically drafted to avoid any conflict with EFTA and Regulation E. The proposed amendments are also consistent with the existing requirements of the TSR, *see supra* Section XI, while filling a regulatory gap by extending protections to other, non-telemarketing transactions. The Commission invites comment and information regarding any potentially duplicative, overlapping, or conflicting federal statutes, rules, or policies.

### F. Description of Any Significant Alternatives to the Proposed Amendments

In formulating the proposed amendments, the Commission has made every effort to avoid imposing unduly burdensome requirements on sellers. To that end, the Commission has avoided, where possible, proposing specific, prescriptive requirements that could stifle marketing innovation or otherwise limit seller options in using new technologies. In addition, the Commission has sought comments as detailed in Section XI of this document on several alternatives, including provisions related to consent requirements (additional consent for free trials) and reminder requirements (narrowing the scope of product types requiring reminders). The former would likely increase burdens on sellers but, at the same time, may benefit consumers by helping to ensure they do not become enrolled in negative option arrangements they do not want. The latter alternative would likely decrease

burden but may fail to help consumers cancel programs they are unaware of. The Commission seeks comments on the ways in which the proposed amendments could be modified to reduce costs or burdens for small entities. If the comments filed in response to this document identify small entities that would be affected by the proposed Rule, as well as alternative methods of compliance that would reduce the economic impact of the proposed Rule on such entities, the Commission will consider the feasibility of such alternatives and determine whether they should be incorporated into the final Rule.

## XV. Paperwork Reduction Act

The current Rule contains various provisions that constitute information collection requirements as defined by 5 CFR 1320.3(c), the definitional provision within the Office of Management and Budget ("OMB") regulations implementing the Paperwork Reduction Act ("PRA"). OMB has approved the Rule's existing information collection requirements through January 31, 2024 (OMB Control No. 3084–0104). The proposed amendments make changes in the Rule's recordkeeping and disclosure requirements that will increase the PRA burden as detailed below. Accordingly, FTC staff will submit this notice of proposed rulemaking and associated Supporting Statement to OMB for review under the PRA.[84]

*Estimated Annual Hours Burden:* 265,000 hours.

The estimated burden for recordkeeping compliance is 53,000 hours and the estimated burden for the requisite disclosures is 212,000 hours. Thus, the total PRA burden is 265,000 hours. These estimates are explained below.

### Number of Respondents

FTC staff estimates there are 106,000 entities currently offering negative option features to consumers. This estimate is based primarily on data from the U.S. Census North American Industry Classification System (NAICS) for firms and establishments in industry categories wherein some sellers offer free trials, automatic renewal, prenotification plans, and continuity plans. Based on NAICS information as well as its own research and industry knowledge, FTC staff identified an estimated total of 530,000 firms

involved in such industries.[85] However, FTC staff estimates that only a fraction of the total firms in these industry categories offer negative option features to consumers. For example, few grocery stores and clothing retailers, which account for approximately a third of the of the total estimate from all industry categories, are likely to regularly offer negative option features. In addition, some entities included in the total may qualify as common carriers, exempt from the Commission's authority under the FTC Act. Accordingly, the Commission estimates that approximately 106,000 business entities (20%) offer negative option features to consumers.

### Recordkeeping Hours

The proposed Rule would require negative option sellers to retain records sufficient to verify consumer consent related to a negative option feature and consideration of further offers prior to cancellation for at least 3 years, or until one year after the consumer cancels the contract or the contract is otherwise terminated, whichever period is longer. FTC staff estimates the majority of firms subject to the Rule already retain these types of records in the normal course of business. Under such conditions, the time and financial resources needed to comply with disclosure requirements do not constitute "burden" under the PRA.[86] Moreover, staff anticipates that many transactions subject to the Rule are conducted via the internet and most entities subject to the Rule are likely to store data though automated means, which reduces compliance burdens associated with record retention. Accordingly, staff estimates that 53,000 entities subject to the Rule will require approximately one hour per year to comply with the Rule's recordkeeping requirements, for an annual total of 53,000 burden hours.

### Disclosure Hours

The proposed Rule would require negative option sellers to provide several disclosures to consumers including the amount to be charged, the deadline the consumer must act to avoid charges, the date charges will be submitted for payment, the cancellation mechanism the consumer can use to end the agreement, reminders for recurring payments involving non-physical goods, and requests related to further offers prior to cancellation.[87] Staff anticipates that the substantial majority of sellers routinely provide these disclosures in the ordinary course as a matter of good business practice. For these sellers, the time and financial resources associated with making these disclosures do not constitute a "burden" under the PRA because they are a usual and customary part of regular business practice. 5 CFR 1320.3(b)(2). Moreover, many state laws require the same or similar disclosures as the Rule mandates. In addition, approximately 2,000 negative option sellers are already covered by the Telemarketing Sales Rule and subject to its disclosure requirements. Accordingly, to reflect these various considerations, FTC estimates the disclosure burden required by the Rule will be, on average, two hours each year for each seller subject assuming estimated to be subject the Rule, for a total estimated annual burden of 212,000 hours.

*Estimated Annual Labor Cost:* $5,689,550.

As indicated above, staff estimates existing covered entities will require approximately 53,000 hours to comply with the proposed rule's recordkeeping provisions. Applying a clerical wage rate of $18.75/hour,[88] recordkeeping maintenance for existing telemarketing entities would amount to an annual cost of approximately $993,750.

The estimated annual labor cost for disclosures for all entities is $4,695,800. This total is the product of applying an estimated hourly wage rate for sales personnel of $22.15[89] to the estimate of

---

[84] The PRA analysis for this rulemaking focuses strictly on the information collection requirements created by and/or otherwise affected by the amendments.

[85] Examples of these industries include sellers of software, streaming media, social media services, financial monitoring, computer security, fitness services, groceries and meal kits, dietary supplements, sporting goods, home service contracts, home security systems, office supplies, pet food, computer supplies, cleaning supplies, home/lawn maintenance services, personal care products, clothing sales, energy providers, newspapers, magazines, and books. The NAICS does not provide estimates for all of these categories. Where such data is unavailable, the staff has used its own estimates based on its knowledge of these industry categories.

[86] Under the PRA, the time, effort, and financial resources necessary to comply with a collection of information that would be incurred by persons in the normal course of their activities (*e.g.,* in compiling and maintaining business records) does not constitute burden from the Rule where the associated recordkeeping is a usual and customary part of business activities. 5 CFR 1320.3(b)(2).

[87] Because all legitimate sellers offer consumers some sort of cancellation mechanism in the normal course of business, the proposed Rule's requirement for a simple cancellation mechanism is unlikely to create additional burdens.

[88] This figure is derived from the mean hourly wage shown for Information and Record Clerks. *See Occupational Employment and Wages—May 2021,* Bureau of Labor Statistics, U.S. Department of Labor (March 31, 2022), Table 1 ("National employment and wage data from the Occupational Employment Statistics survey by occupation, May 2021"), *available at https://www.bls.gov/news.release/pdf/ ocwage.pdf.*

[89] This figure is derived from the mean hourly wage shown for Sales and related occupations. *See Occupational Employment and Wages, supra.*

212,000 hours for compliance with the Rule's disclosure requirements.

Thus, the estimated annual labor costs are $5,689,550 [($993,750 recordkeeping) + ($4,695,800 disclosure)].

*Estimated Annual Non-Labor Cost*

The capital and start-up costs associated with the Rule's recordkeeping provisions are *de minimis.* Any disclosure or recordkeeping capital costs involved with the Rule, such as equipment and office supplies, would be costs borne by sellers in the normal course of business.

Pursuant to Section 3506(c)(2)(A) of the PRA, the FTC invites comments on: (1) whether the disclosure, recordkeeping, and reporting requirements are necessary, including whether the resulting information will be practically useful; (2) the accuracy of our burden estimates, including whether the methodology and assumptions used are valid; (3) how to improve the quality, utility, and clarity of the disclosure requirements; and (4) how to minimize the burden of providing the required information to consumers.

## XVI. Communications by Outside Parties to the Commissioners or Their Advisors

Pursuant to Commission Rule 1.18(c)(1), the Commission has determined that communications with respect to the merits of this proceeding from any outside party to any Commissioner or Commissioner advisor shall be subject to the following treatment. Written communications and summaries or transcripts of oral communications shall be placed on the rulemaking record if the communication is received before the end of the comment period. They shall be placed on the public record if the communication is received later. Unless the outside party making an oral communication is a member of Congress, such communications are permitted only if advance notice is published in the Weekly Calendar and Notice of ''Sunshine'' Meetings.[90]

### List of Subjects in 16 CFR Part 425

Advertising, Trade practices.

For the reasons set out in this document, the Commission proposes to amend part 425 of title 16 of the Code of Federal Regulations as follows:

■ 1. Revise part 425 to read as follows:

90 *See* 15 U.S.C. 57a(i)(2)(A); 16 CFR 1.18(c).

## PART 425—RULE CONCERNING RECURRING SUBSCRIPTIONS AND OTHER NEGATIVE OPTION PLANS

Sec.
425.1   Scope.
425.2   Definitions.
425.3   Misrepresentations.
425.4   Important information.
425.5   Consent.
425.6   Simple cancellation (''Click to Cancel'').
425.7   Annual reminders for negative option features not involving physical goods.
425.8   Relation to State laws.

**Authority:** 15 U.S.C. 41–58.

### § 425.1   Scope.

This Rule contains requirements related to any form of negative option plan in any media, including, but not limited to, the internet, telephone, in-print, and in-person transactions.

### § 425.2   Definitions.

(a) *Billing information* means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(b) *Charge, charged,* or *charging* means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

(c) *Clear and conspicuous* means that a required disclosure is easily noticeable (*i.e.,* difficult to miss) and easily understandable by ordinary consumers, including in all of the following ways:

(1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

(2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

(3) An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

(4) In any communication using an interactive electronic medium, such as the internet, phone app, or software, the disclosure must be unavoidable. A disclosure is not clear and conspicuous if a consumer must take any action, such as clicking on a hyperlink or hovering over an icon, to see it.

(5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

(6) The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

(7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

(8) When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, ''ordinary consumers'' includes members of that group.

(d) *Negative option feature* is a provision of a contract under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer, including, but not limited to:

(1) an automatic renewal;
(2) a continuity plan;
(3) a free-to-pay conversion or fee-to-pay conversion; or
(4) a pre-notification negative option plan.

(e) *Negative option seller* means the person selling, offering, promoting, charging for, or otherwise marketing goods or services with a negative option feature.

(f) *Save* means an attempt by a seller to present any additional offers, modifications to the existing agreement, reasons to retain the existing offer, or similar information when a consumer attempts to cancel a negative option feature.

### § 425.3   Misrepresentations.

In connection with promoting or offering for sale any good or service with a negative option feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act (''FTC Act'') for any negative option seller to misrepresent, expressly or by implication, any material fact related to the transaction, such as the negative option feature, or any material fact related to the underlying good or service.

**§ 425.4  Important information.**

(a) *Disclosures.* In connection with promoting or offering for sale any good or service with a negative option feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for a negative option seller to fail to disclose to a consumer, prior to obtaining the consumer's billing information, any material term related to the underlying good or service that is necessary to prevent deception, regardless of whether that term directly relates to the negative option feature, and including but not limited to:

(1) That consumers will be charged for the good or service, or that those charges will increase after any applicable trial period ends, and, if applicable, that the charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such charges;

(2) The deadline (by date or frequency) by which the consumer must act in order to stop all charges;

(3) The amount (or range of costs) the consumer will be charged and, if applicable, the frequency of such charges a consumer will incur unless the consumer takes timely steps to prevent or stop those charges;

(4) The date (or dates) each charge will be submitted for payment; and

(5) The information necessary for the consumer to cancel the negative option feature.

(b) *Form and content of required information.*

(1) Clear and conspicuous: Each disclosure required by paragraph (a) of this section must be clear and conspicuous.

(2) Placement:

(i) If directly related to the negative option feature, the disclosures must appear immediately adjacent to the means of recording the consumer's consent for the negative option feature; or

(ii) If not directly related to the negative option feature, the disclosures must appear before consumers make a decision to buy (*e.g.,* before they "add to shopping cart").

(3) Other information: All communications, regardless of media, must not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures, including any information not directly related to the material terms and conditions of any negative option feature.

**§ 425.5  Consent.**

(a) *Express informed consent.* In connection with promoting or offering for sale any good or service with a negative option feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for a negative option seller to fail to obtain the consumer's express informed consent before charging the consumer. In obtaining such expressed informed consent, the negative option seller must:

(1) Obtain the consumer's unambiguously affirmative consent to the negative option feature offer separately from any other portion of the transaction;

(2) Not include any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature;

(3) Obtain the consumer's unambiguously affirmative consent to the rest of the transaction; and

(4) Keep or maintain verification of the consumer's consent for at least three years, or one year after the contract is otherwise terminated, whichever period is longer.

(b) *Requirements for negative option features covered in the Telemarketing Sales Rule.* Negative option sellers covered by the Telemarketing Sales Rule must comply with all applicable requirements provided in part 310 of this title, including, for transactions involving preacquired account information and a free-pay-conversion, obtaining from the customer, at a minimum, the last four (4) digits of the account number to be charged and making and maintaining an audio recording of the entire telemarketing transaction as required by part 310.

(c) *Documentation of unambiguously affirmative consent for written offers.* Except for transactions covered by the preauthorized transfer provisions of the Electronic Fund Transfer Act (15 U.S.C. 1693e) and Regulation E (12 CFR 1005.10), a negative option seller will be deemed in compliance with the requirements of paragraph (a)(3) of this section for all written offers (including over the internet or phone applications), if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the negative option feature and no other portion of the transaction. The consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's

acceptance of the negative option feature.

**§ 425.6  Simple cancellation ("Click to Cancel").**

(a) *Simple mechanism required for cancellation.* In connection with promoting or offering for sale any good or service with a negative option feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for the negative option seller to fail to provide a simple mechanism for a consumer to cancel the negative option feature and avoid being charged for the good or service and immediately stop any recurring charges.

(b) *Simple mechanism at least as simple as initiation.* The simple mechanism required by paragraph (a) of this section must be at least as easy to use as the method the consumer used to initiate the negative option feature.

(c) *Minimum requirements for simple mechanism.* At a minimum, the negative option seller must provide the simple mechanism required by paragraph (a) of this section through the same medium (such as internet, telephone, mail, or in-person) the consumer used to consent to the negative option feature, and:

(1) For internet cancellation, in addition to the requirements of paragraphs (a) and (b) of this section, the negative option seller must provide, at a minimum, the simple mechanism over the same website or web-based application the consumer used to purchase the negative option feature.

(2) For telephone cancellation, in addition to the requirements of paragraphs (a) and (b) of this section, the negative option seller must, at a minimum, provide a telephone number, and assure that all calls to this number are answered promptly during normal business hours and are not more costly than the telephone call the consumer used to consent to the negative option feature.

(3) For in-person sales, in addition to the requirements of paragraphs (a) and (b) of this section, the negative option seller must offer the simple mechanism through the internet or by telephone in addition to, where practical, an in-person method similar to that the consumer used to consent to the negative option feature. If the simple mechanism is offered through the telephone, all calls must be answered during normal business hours and, if applicable, must not be more costly than the telephone call the consumer used to consent to the negative option feature.

(d) *Saves:* The seller must immediately cancel the negative option

feature upon request from a consumer, unless the seller obtains the consumer's unambiguously affirmative consent to receive a Save prior to cancellation. Such consent must apply only to the cancellation attempt in question and not to subsequent attempts. The negative option seller must keep or maintain verification of the consumer's consent to receiving a Save prior to cancellation for at least three years, or one year after the contract is otherwise terminated, whichever period is longer.

## § 425.7   Annual reminders for negative option features not involving physical goods.

In connection with sales with a negative option feature that do not involve the automatic delivery of physical goods, it is a violation of this Rule and an unfair act or practice in violation of Section 5 of the FTC Act for a negative option seller to fail to provide consumers reminders, at least annually, identifying the product or service, the frequency and amount of charges, and the means to cancel. At a minimum, such reminders must be provided through the same medium (such as internet, telephone, or mail) the consumer used to consent to the negative option feature. For in-person sales, the negative option seller must provide the reminder through the internet or by telephone in addition to, where practical, an in-person method similar to that the consumer used to consent to the negative option feature.

## § 425.8   Relation to State laws.

(a) *In general*. This part shall not be construed as superseding, altering, or affecting any other State statute, regulation, order, or interpretation relating to negative option requirements, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.

(b) *Greater protection under State law*. For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part if the protection such statute, regulation, order, or interpretation affords any consumer is greater than the protection provided under this part.

By direction of the Commission, Commissioner Wilson dissenting.

**April J. Tabor,**
*Secretary.*

**Note:** the following statements will not appear in the Code of Federal Regulations:

## Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya

Today the Commission has voted out a proposal for a much-needed update to the FTC's nearly 50-year-old Negative Option Rule. As the Commission knew when the rule was passed in 1973, companies too often manipulate consumers into paying for subscriptions for goods and services that they don't want. The problem has only gotten worse. Today, we are proposing to not only lay out clear rules of the road for marketing negative option plans, but also to mandate that companies make it as easy to cancel as they make it to sign up in the first place.

Negative option plans refer to any situation where the customer is presumed to continue to accept an agreement or offer unless they affirmatively decline it. This structure can be harmless, and can even benefit consumers, when properly disclosed. Problems arise when businesses manipulate consumers away from taking that affirmative step, which can result in customers paying for things they don't want or need. Where consumer protection laws are inadequate, or inadequately enforced, dishonest companies will keep developing ways to make it easier to inadvertently subscribe, and ever harder to cancel, harming consumers and honest competitors along the way.

The original Negative Option Rule addressed what we call "prenotification plans." These are where sellers provide consumers with notice of the product, send the product, and then charge for it unless the consumer affirmatively declines. Since then, the Commission has gained other authorities to help address deceptive negative options, including the Telemarketing Sales Rule and the Restore Online Shoppers' Confidence Act. The Commission has actively enforced these rules and laws, including in over 30 cases from just the past few years.[1] In 2021, we issued a

policy statement articulating the Commission's various existing authorities.[2]

But these authorities have left major gaps. TSR applies only to telemarketing, ROSCA only to online shopping, and the existing Negative Option Rule only to prenotification plans. Meanwhile, even as we've been busy enforcing these laws, negative option marketing has only increased, along with abuses. Some companies are using ever more sophisticated dark patterns to thwart consumer efforts to cancel a product or service. Some consumers report thinking they've successfully canceled, only to find out later that they didn't notice a nearly invisible button that they needed to click in order to finalize their decision.

Accordingly, today's proposed rulemaking draws on Section 5's prohibition against unfair or deceptive practices. Specifically, it proposes to amplify ROSCA's simple-cancellation mandate and applies it across the full universe of negative option marketing. As the Commission has found in case after case, companies can make it easy to sign up—sometimes inadvertently—for an ongoing good or service and make it difficult to leave. Many gyms reportedly require members to cancel in person or via certified or notarized mail.[3]

You might sign up for a cell phone plan online, but to cancel, you have to call an 800 number, wait on hold for a customer service representative, and then speak to that representative, who will keep you on the line to try to convince you to stay. These companies are betting that customers will be too impatient, busy, or confused to jump through every hoop.

Canceling a subscription should be easy. That's why the proposed update to the Negative Option Rule sets forth clear standards on what we call "click-to-cancel": the obligation to make cancellation simple and easy. For example, the proposed rule requires any cancellation to be offered through the same medium as the subscription. Most importantly, it "must be at least as easy to use as the method the consumer used to initiate the negative option feature."

---

[1] Examples of these matters include: *FTC* v. *Triangle Media Corp.*, 3:18–cv–01388–LAB–LL (S.D. Cal. 2019); *FTC* v. *Credit Bureau Ctr., LLC*, No. 17–cv–00194 (N.D. Ill. 2018); *FTC* v. *JDI Dating, Ltd.*, No. 1:14–cv–08400 (N.D. Ill. 2018); *FTC* v. *Health Formulas, LLC*, No. 2:14–cv–01649–RFB–GWF (D. Nev. 2016); *FTC* v. *Nutraclick LLC*, No. 2:16–cv–06819–DMG (C.D. Cal. 2016); *FTC* v. *XXL Impressions*, No. 1:17–cv–00067–NT (D. Me. 2018); *FTC* v. *AAFE Products Corp.*, No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC* v. *Pact Inc.*, No. 2:17–cv–1429 (W.D. Wash. 2017); *FTC* v. *Tarr*, No. 3:17–cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC* v. *AdoreMe, Inc.*, No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC* v. *DOTAuthority.com, Inc.*, No. 0:16–cv–62186–WJZ (S.D. Fla. 2018); *FTC* v. *Bunzai Media Group, Inc.*, No. CV15–04527–

GW(PLAx) (C.D. Cal. 2018); and *FTC* v. *RevMountain, LLC*, No. 2:17–cv–02000–APG–GWF (D. Nev. 2018).

[2] Fed. Trade Comm'n, Enforcement Policy Statement Regarding Negative Option Marketing (2021), *https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf.*

[3] *See, e.g.,* Jeremy Glass, *I Tried to Quit Three Gyms in 1 Day and Ended Up a Stronger Man,* Men's Health (Apr. 14, 2020) *https://www.menshealth.com/fitness/a32085243/how-i-canceled-gym-memberships/.*

To take a simple example, this would put an end to companies requiring you to call customer service to cancel an account that you opened on their website.

The proposed rule contains other proposed consumer protections, as well. Businesses marketing negative option products and services must clearly and conspicuously disclose key material terms—including when any trial period ends, the deadline to cancel, the frequency of charges, the date of payments, and cancellation information—before collecting any billing information from the customer. The Commission also proposes a requirement that businesses get the consumer's unambiguously affirmative consent to the negative option feature of the transaction, separate from any other agreement. The proposal would still allow a business to try to persuade customers to stay, such as by offering perks or discounts. But it would have to get the customer's express consent before doing so.

These are some of the key components of today's Notice of Proposed Rulemaking, which seeks comment on the proposal to update and modernize the Commission's existing authority around negative option plans. If adopted, this rule would enable more efficient enforcement. It would create a more powerful deterrent by introducing the risk of civil penalties. And it would allow the Commission to return money to wronged consumers. The proposed rule would also provide clarity across industries about sellers' obligations when engaging in negative option marketing. The click-to-cancel section of the proposed rule would give companies clear and specific instructions around making it at least as easy to cancel their products and services as it is to register for them.

We invite members of the public to weigh in on these proposed amendments to the Negative Option Rule. As we move forward with the rulemaking process, we will carefully review public comments when deciding whether and how to craft a rule that would protect consumers from these potentially unfair or deceptive practices.

This proposed rulemaking is part of a broader effort at the Commission to examine how we can deploy our scarce resources to achieve maximum impact. Using our rulemaking tools to clarify the law for market participants across the board and activate civil penalties and redress is a key part of this effort. We thank the FTC team for their terrific work in this area. Whether it's unwanted subscription or hidden junk fees, ending exploitative business practices will continue to be a focus of this Commission.

## Dissenting Statement of Commissioner Christine S. Wilson

Today the Commission announces a notice of proposed rulemaking (NPRM) suggesting modifications to the Commission's Rule Concerning the Use of Prenotification Negative Option Plans (Negative Option Rule or Rule). The Commission first sought comment on amendments to this Rule in an advance notice of proposed rulemaking (ANPR) published in October 2019.[1] At that time, the Commission explained that abuses in negative option marketing persisted despite the Commission's active enforcement. The existing Negative Option Rule covers a narrow category of negative option marketing, prenotification negative option plans. Other types of negative option features are covered by other statutes or rules [2] enforced by the Commission, and deceptive practices in connection with negative option plans have been challenged under Section 5 of the FTC Act. The Commission noted in the ANPR that differing requirements in the Commission's varied statutes, rules and Section 5 enforcement actions did not provide a consistent, cohesive framework for enforcement and business guidance. The Commission proposed expanding the Negative Option Rule to synthesize the legal requirements within one rule. I supported seeking comment on this proposal because clarity with respect to regulatory requirements benefits consumers and businesses.[3]

The proposed Rule the Commission announces today may achieve the goal of synthesizing the various requirements in one rule—but it also sweeps in far

more conduct than previously anticipated. The broadened scope of the Rule would extend far beyond the negative option abuses cited in the ANPR, and far beyond practices for which the rulemaking record supports a prevalence of unfair or deceptive practices. In fact, the Rule would capture misrepresentations regarding the underlying product or service *wholly unrelated to the negative option feature.* For these reasons, I dissent.

The comments received in response to the ANPR, consumer complaints, and the Commission's enforcement actions demonstrate that abuses in negative option marketing persist despite our active enforcement in this area. As the NPRM explains, some marketers misrepresent or fail to disclose clearly and conspicuously the terms, or even the existence, of negative option features; fail to obtain consumers' express, informed consent to the recurring charges; fail to provide a simple mechanism to cancel; and/or engage in activities designed to frustrate consumers' ability to cancel. I agree that these issues are prevalent in the market.

The scope of the proposed Rule is not confined to negative option marketing. It also covers any misrepresentation made about the underlying good or service sold with a negative option feature. Notably, as drafted, the Rule would allow the Commission to obtain civil penalties, or consumer redress under Section 19 of the FTC Act, if a marketer using a negative option feature made misrepresentations regarding product efficacy or any other material fact. The proposed text is as follows:

### 425.3  Misrepresentations

In connection with promoting or offering for sale any good or service with a negative option feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act ("FTC Act") for any negative option seller to misrepresent, expressly or by implication, any material fact related to the transaction, such as the negative option feature, *or any material fact related to the underlying good or service.* (Emphasis added).

The NPRM confirms that the scope of this provision is intended to extend beyond the terms of the negative option feature. Specifically, the NPRM explains that "the proposed Rule prohibits any person from misrepresenting, expressly or by implication, any material fact regarding the *entire* agreement—not just facts related to a negative option feature." It further explains that "[s]uch deceptive practices may involve misrepresentations related to costs, product efficacy, free trial claims,

---

[1] 85 FR 52393 (Oct. 2, 2019).

[2] Specifically, the FTC enforces several statutes and rules that address negative option marketing, including the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. 8401–8405; the Telemarketing Sales Rule (TSR), 16 CFR part 310; the Postal Reorganization Act (also known as the Unordered Merchandise Rule), 39 U.S.C. 3009; and the Electronic Funds Transfer Act, 15 U.S.C. 1693–1693r.

[3] In 2020, rather than take the next step in the rulemaking process and issue an NPRM, the Commission chose to issue a Policy Statement on Negative Option Marketing, from which I dissented. This Commission repeatedly has issued Policy Statements in the midst of ongoing rulemakings addressing precisely the same issues. Publishing guidance during the pendency of a related rulemaking short-circuits the receipt of public input, conveys disdain for our stakeholders, and does not constitute good government. *See* Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Enforcement Policy Statement Regarding Negative Option Marketing (Oct. 2021), *https://www.ftc.gov/system/files/documents/public_statements/1598067/negative_option_policy_statement_csw_dissent.pdf.*

processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, cancellation, or any other material representation.''

Consequently, marketers using negative option features in conjunction with the sale of a good or service could be liable for civil penalties or redress under this Rule for product efficacy claims or any other material representation even if the negative option terms are clearly described, informed consent is obtained, and cancellation is simple. Consider a dietary supplement marketed with a continuity plan that is advertised to relieve joint pain. The Commission alleges the joint pain claims are deceptive and unsubstantiated. The Rule could apply. A grocery delivery service offered via subscription asserts that the consumer's shopping lists will not be shared, but in fact the service does share the information for advertising purposes—a privacy misrepresentation. The Rule could apply. Cosmetics purchased through a monthly subscription service are marketed as Made in USA but in fact are made elsewhere. The Rule could apply.

The Commission does not have authority to seek civil penalties in *de novo* Section 5 cases. And the Commission's ability to seek consumer redress was gravely curtailed by the Supreme Court's decision in *AMG* that found the Commission does not have authority to seek consumer redress under Section 13(b) of the FTC Act.[4] This proposed Rule would fill that vacuum when marketers use a negative option feature.

The NPRM explains that the inclusion of non-negative option related misrepresentations is needed because "FTC enforcement experience demonstrates misrepresentations in negative option marketing cases continue to be prevalent and *often involve deceptive representations not only related to the negative option feature but to the underlying product (or service) or other aspects of the transaction as well.*'' (Emphasis added). The NPRM cites ten cases as representative of these prevalent deceptive representations. Thus, the NPRM asserts that our law enforcement experience demonstrates that marketers that misrepresent negative option features typically do so in conjunction with other deception.

The Commission is authorized to issue a notice of proposed rulemaking when it "has reason to believe that the unfair or deceptive acts or practices

which are the subject of the proposed rulemaking are prevalent."[5] Importantly, we did not seek comment in the ANPR about whether an expanded negative option rule should address general misrepresentations; no comments are cited in the NPRM to support the inclusion of these provisions. Absent the above-quoted brief explanation with the accompanying case cites, the NPRM does not offer evidence that negative option marketing writ large is permeated by deception. If that were the case, it might be appropriate to fold in representations about *any* material fact.

In addition, we know that negative option marketing is used lawfully and non-deceptively in a broad array of common transactions—newspaper subscriptions, video streaming services, delivery services, etc. Will the expansion of the Rule as proposed discourage companies from using negative option features, that consumers prefer and enjoy, because of potential liability? Does the inclusion of product efficacy and any other material information in this proposed Rule over-deter the negative option abuses that the Rule purportedly was primarily designed to prevent? The NPRM does not discuss these issues. I encourage the public to address these issues in their comments in response to this NPRM.

It is possible the Commission would exercise prosecutorial discretion and not allege violations of the Rule for all advertising claims, privacy or data security issues, or claims regarding secondary characteristics (*e.g.*, Made in USA or environmental claims). But the NPRM does not indicate a limiting principle to this proposed provision. This Commission, in many areas, has demonstrated a zeal and willingness to push beyond the boundaries of our authority.

In the wake of *AMG*, this Commission has proposed broad, sweeping rules for privacy and data security (the Commercial Surveillance and Data Security ANPR), as well as pricing and fees (the "junk fees" or Unfair or Deceptive Fees ANPR). As I noted in my dissents, the scope of those proposals extended far beyond practices for which Commission law enforcement and other evidence have established a prevalence of deceptive or unfair practices.[6] In July

2021, this Commission promulgated a final Made in USA labeling rule that include a definition of "labeling" that, in my view, went beyond my Congressional authority to regulate labels.[7] The Commission also has employed or announced novel applications of our existing rules that I believe similarly extend beyond our regulatory authority. For example, in September 2021, the Commission issued a Policy Statement on Breaches by Health Apps and Other Connected Devices that included a novel interpretation of the Health Breach Notification Rule that expanded both the covered universe of entities and the circumstances under which the Commission will initiate enforcement.[8]

With respect to negative options, this NPRM states that the proposed rule is consistent with the Commission's ROSCA cases. I disagree. ROSCA Section 8403 states that for goods or services sold through a negative option feature, the seller must "clearly and

[4] *AMG Capital Mgmt., LLC* v. *FTC,* 141 S. Ct. 1341 (2021).

[5] 15 U.S.C. 57a(b)(3).

[6] *See* Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Advance Notice of Proposed Rulemaking—Junk Fees (Oct. 2022) (explaining that the proposal could launch rules that regulate the way prices are conveyed to consumers across nearly every sector of the economy and is untethered from a solid foundation of FTC enforcement), *https://www.ftc.gov/system/*

*files/ftc_gov/pdf/commissioner-wilson-dissenting-statement-junk-fees-anpr.pdf;* Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Trade Regulation Rule on Commercial Surveillance and Data Security (Aug. 2022) (noting that many practices discussed in the ANPR are presented as clearly deceptive or unfair despite the fact that they stretch far beyond practices with which we are familiar, given our extensive law enforcement experience, and wander far afield of areas for which we have clear evidence of a widespread pattern of unfair or deceptive practices), *https://www.ftc.gov/system/files/ftc_gov/pdf/Commissioner%20Wilson%20Dissent%20ANPRM%20FINAL%2008112022.pdf.*

[7] *See* Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Final Rule related to Made in U.S.A. Claims (July 2021), *https://www.ftc.gov/system/files/documents/public_statements/1591494/2021-07-01_commissioner_wilson_statement_musa_final_rule.pdf.* The dissent explained that the Rule was not supported by the plain language of Section 45a of the FTC Act that provided authority for the Commission to promulgate a rule addressing "labels" or "the equivalent thereof." The language of the Rule described labels to include stylized marks in online advertising or paper catalogs and potentially other advertising marks, such as hashtags, that contain MUSA claims.

[8] *See* Christine S. Wilson, Dissenting Statement of Commissioner Christine S. Wilson, Policy Statement on Breaches by Health Apps and Other Connected Devices (Sept. 2021), *https://www.ftc.gov/system/files/documents/public_statements/1596356/wilson_health_apps_policy_statement_dissent_combined_final.pdf; see also* Separate Statement of Commissioner Christine S. Wilson Concurring in Part, Dissenting in Part, *FTC* v. *Avant, LLC* (Apr. 15, 2019) (dissenting with respect to the maiden use of the Telemarketing Sales Rule (TSR) provision related to novel payments (specifically remotely created checks) in a non-fraud case), *https://www.ftc.gov/system/files/documents/public_statements/1514073/avant_inc_1623090_separate_statement_of_christine_s_wilson_4-15-19.pdf.* In the *Avant* matter, the Commission sought to impose liability under the TSR against a legitimate company, selling legitimate products, in circumstances not contemplated when the Rule was promulgated to address fraudulent businesses abusing these types of payments. *Id.*

conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information.'' The requirement in ROSCA to disclose ''all material terms of the transaction'' cannot reasonably be interpreted to include all product efficacy claims or any material fact about the underlying good or service. A term of the transaction is distinct from an advertising claim or other potentially material information.

The cases in which I supported alleging violations of ROSCA under this Section clearly involved material terms of the transaction. In MoviePass, consumers purchased a movie subscription and the term at issue was whether the subscription was unlimited.[9] In WealthPress, another recent matter alleging violations of ROSCA under this Section, the terms at issue were included by the marketer in the ''terms and conditions'' section of the website and consumers were required affirmatively to agree to accept the terms to complete the transaction.[10] The facts in these cases do not support a reading of the ROSCA ''material term of the transaction'' language to include *any* advertising claim.

It is useful also to recall the genesis of ROSCA and the specific grant of authority Congress provided the Commission. As noted in the findings, ROSCA was promulgated to address a specific abuse in negative option marketing prevalent at that time—third-party upsells of products or services made during check-out for an initial purchase that included negative option features.[11] The terms of the third-party offer that included the negative option feature were not adequately disclosed and consumers were not given an opportunity to consent to a transfer of their billing information to a third-party. They were then locked into recurring charges to which they had not consented and often had difficulty cancelling. The provisions in Section 8403 were ancillary to the intent of the statute and there is no indication in the statute or the legislative history that they were intended to confer on the Commission authority to seek civil penalties or redress for representations wholly unrelated to the terms of the negative option feature. In other words,

this proposed Negative Option Rule is inconsistent with the FTC's prior ROSCA cases.

The proposed Rule also will treat marketers differently for purposes of potential monetary liability for Section 5 violations, depending on whether they sell products or services with or without negative option features.

The careful reader may observe that the Commission's Telemarketing Sales Rule (TSR) also includes a prohibition on general misrepresentations.[12] But the TSR was promulgated pursuant to Congressional authorization.[13] The legislative history and Statement of Basis and Purpose of the TSR also provide a substantial evidentiary basis establishing that outbound telemarketing routinely was used as a vehicle for fraud and deception— marketers disturbed consumers in the solitude of their homes, and subjected them to deception and aggressive sales tactics that caused significant consumer injury.[14]

I appreciate staff's steadfast efforts to protect consumers from deceptive negative option practices. I might have supported a tailored rule to address the negative option marketing abuses prevalent in our law enforcement experience that consolidated various legal requirements. This proposal instead attempts an end-run around the Supreme Court's decision in *AMG* to confer *de novo* redress and civil penalty authority on the Commission for Section 5 violations unrelated to deceptive or unfair negative option practices.

For these reasons, I dissent.

[FR Doc. 2023–07035 Filed 4–21–23; 8:45 am]

**BILLING CODE 6750–01–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

### 33 CFR Part 117

**[Docket No. USCG–2022–0221]**

**RIN 1625–AA09**

### Drawbridge Operation Regulation; Rancocas Creek, Burlington County, NJ

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to modify the operating schedule that governs the US Route 543 (Riverside-Delanco) Bridge across Rancocas Creek, mile 1.3, at Burlington County, NJ. The proposed rule allows the drawbridge to change its operating schedule to reduce the number of bridge openings during off-peak hours. We invite your comments on this proposed rulemaking.

**DATES:** Comments and related material must reach the Coast Guard on or before May 24, 2023.

**ADDRESSES:** You may submit comments identified by docket number USCG– 2022–0221 using Federal Decision Making Portal at *https:// www.regulations.gov*. See the ''Public Participation and Request for Comments'' portion of the **SUPPLEMENTAL INFORMATION** section below for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this proposed rule, call or e-mail Mr. Mickey D. Sanders, Fifth Coast Guard District (dpb); telephone (757) 398–6587, email *Mickey.D.Sanders2@uscg.mil*.

**SUPPLEMENTARY INFORMATION:**

### I. Table of Abbreviations

CFR    Code of Federal Regulations
DHS    Department of Homeland Security
FR    Federal Register
OMB    Office of Management and Budget
NPRM    Notice of Proposed Rulemaking
§    Section
U.S.C.    United States Code

### II. Background, Purpose and Legal Basis

On May 23, 2022, we published a Test Deviation (TD) entitled Drawbridge Operation Regulation; Rancocas Creek, Burlington County, NJ, in the **Federal Register** (86 FR 16153). We received no comments on this rule. The US Route 543 (Riverside-Delanco) Bridge across Rancocas Creek, mile 1.3, at Burlington County, NJ, has a vertical clearance of 4 feet above mean high water in the closed-to-navigation position. The bridge currently operates under 33 CFR 117.745(b).

The Rancocas Creek is used predominately by recreational vessels and pleasure crafts. The three-year, monthly average number of bridge openings from 7 a.m. to 3 p.m., Monday through Friday, 7 a.m. to 1 p.m., Saturday and Sunday, and from 8 p.m. to 11 p.m., daily, as drawn from the data contained in the bridge tender logs, is presented below.

---

[9] *See* Concurring Statement of Commissioner Christine S. Wilson, *In re Moviepass, Inc.* (June 7, 2021), *https://www.ftc.gov/system/files/documents/ public_statements/1590708/commissioner_wilson_ concur_moviepass_final.pdf*.

[10] *See* Christine S. Wilson, Concurring Statement of Commissioner Christine S. Wilson, *WealthPress Holdings, LLC* (Jan. 2023), *https://www.ftc.gov/ system/files/ftc_gov/pdf/2123002wealthpresswilson concurstmt.pdf*.

[11] *See* 15 U.S.C. 8401.

[12] 16 CFR 310.3(a)(2)(iii) (prohibiting misrepresentations regarding ''[a]ny material aspect of the performance, efficacy, nature, or central characteristic of the goods or services that are the subject of a sales offer'').

[13] Telemarketing and Consumer Fraud and Abuse Prevention Act. 15 U.S.C. 6101 *et seq.*

[14] *See, e.g.*, 60 FR 43842 (Aug. 23, 1995) (Statement of Basis and Purpose for the Commission's Rule).