# EXHIBIT 3

Generally, information collected as part of the New Hire Information Collection may be kept confidential from the public under exemption 6 of the Freedom of Information Act (FOIA), which protects information that "would constitute a clearly unwarranted invasion of personal privacy." [3] However, the release of information such as the educational history of the new hire or the start date of employment would not likely constitute a clearly unwarranted invasion of personal privacy and may be disclosed under the FOIA.

Determinations regarding disclosure to third parties of any confidential portions of the information collection that are considered exempt under the FOIA will be made in accordance with the Privacy Act.[4] Relevant Privacy Act statements are provided when a respondent logs in to the portal and before the respondent is asked to provide any information. The Board may make disclosures in accordance with the Privacy Act's routine use disclosure provision, which permits the disclosure of a record for a purpose which is compatible with the purpose for which the record was collected.[5]

Such routine uses are listed in specific systems of records notices, which apply to this information collection and which can be found in: (1) The System of Records Notice for BGFRS–1, FRB-Recruiting and Placement Records, located at: *https://www.federalreserve.gov/files/BGFRS-1-recruiting-and-placement-records.pdf;* (2) the System of Records Notice for BGFRS–4, FRB-General Personnel Records, located at: *https://www.federalreserve.gov/files/BGFRS-4-general-personnel-records.pdf;* (3) the System of Records Notice for BGFRS–7, FRB—Payroll and Leave Records, located at: *https://www.federalreserve.gov/files/BGFRS-7-payroll-and-leave-records.pdf;* (4) the System of Records Notice for BGFRS–24, FRB—EEO General Files, located at: *https://www.federalreserve.gov/files/BGFRS-24-eeo-general-files.pdf;* and/or (5) the System of Records Notice for BGFRS–34, FRB–ESS Staff Identification Card File, located at: *https://www.federalreserve.gov/files/BGFRS-34-ess-staff-identification-card-file.pdf.*

*Current actions:* On May 25, 2021, the Board published a notice in the **Federal Register** (86 FR 28107) requesting public comment for 60 days on the extension with revision, of the New Hire Information Collection (FR 27). The revisions remove certain fields from the information collected on this form regarding direct deposits. The comment period for this notice expired on July 26, 2021.The Board did not receive any comments. The revisions will be implemented as proposed.

Board of Governors of the Federal Reserve System, October 27, 2021.

**Michele Taylor Fennell,**
*Deputy Associate Secretary of the Board.*
[FR Doc. 2021–23804 Filed 11–3–21; 8:45 am]

**BILLING CODE 6210–01–P**

---

# FEDERAL TRADE COMMISSION

## Enforcement Policy Statement Regarding Negative Option Marketing

**AGENCY:** Federal Trade Commission.

**ACTION:** Commission policy statement.

---

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") has issued a policy statement to provide guidance regarding its enforcement of various statutes and FTC regulations addressing negative option marketing and operating. This Statement is intended to assist the business community and practitioners by providing specific guidance on the Commission's interpretation of existing law as it applies to negative option practices. This Statement may also assist the courts in developing an appropriate framework for interpreting and applying the various statutes and regulations addressing negative option marketing discussed herein.

**DATES:** The Commission announced the issuance of the Statement on October 29, 2021.

**FOR FURTHER INFORMATION CONTACT:** Tom Dahdouh (202–326–2552), Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction and Background

The Federal Trade Commission ("FTC" or "Commission") issues this Policy Statement to provide guidance regarding its enforcement of various statutes and FTC regulations addressing negative option marketing and operating.[1] This Statement is intended to assist the business community and practitioners by providing specific guidance on the Commission's interpretation of existing law as it applies to negative option practices. This Statement may also assist the courts in developing an appropriate framework for interpreting and applying the various statutes and regulations addressing negative option marketing discussed herein.

Negative option offers come in a variety of forms, but all share a central feature: Each contains a term or condition under which the seller may interpret a consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement as acceptance or continuing acceptance of the offer.[2] Typically, negative option arrangements include, but are not limited to, automatic renewals, continuity plans, free-to-pay or fee-to-pay conversions, and prenotification plans. Automatic renewals allow sellers (*e.g.,* a magazine publisher) to unilaterally renew consumers' subscriptions when they expire, unless consumers affirmatively cancel their subscriptions by a certain date. Continuity plans allow consumers to agree in advance to receive periodic shipments of goods or provision of services (*e.g.,* bottled water delivery), which they continue to receive until they cancel the agreement. Free trial marketing (*e.g.,* free-to-pay conversions) provides consumers the opportunity to receive goods or services for free (or at a nominal fee) for a trial period. After the trial period, sellers can automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services. Finally, under prenotification plans[3] (*e.g.,* book-of-the-month clubs), sellers provide periodic notices offering goods to participating consumers and then send—and charge for—those goods only if the consumers

---

(such as continuing health insurance benefits for the child or spouse of a new employee who is transferring from another federal agency).

[1] This Policy Statement elaborates on principles annunciated by the Commission in individual cases and rules issued over the course of many years. This Policy Statement does not confer any rights on any person and does not operate to bind the FTC or the public. In any enforcement action, the Commission must prove the challenged act or practice violates one or more existing statutory or regulatory requirements. In addition, this Policy Statement does not preempt federal, state, or local laws. Compliance with those laws, however, will not necessarily preclude Commission law enforcement action under the FTC Act or other statutes. Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this Policy Statement as not a "major rule," as defined by 5 U.S.C. 804(2).

[2] The Commission's Telemarking Sales Rule (16 CFR part 310) defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 CFR 310.2(w).

[3] The Commission's Rule on the "Use of Prenotification Negative Option Plans" (16 CFR part 425) only covers this type of negative option marketing.

take no action to decline the offer. The periodic announcements and shipments can continue indefinitely.[4]

Negative option programs are widespread in the marketplace and can provide substantial benefits for sellers and consumers. At the same time, consumers suffer costs when marketers fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible. Over the years, unfair or deceptive negative option practices have remained a persistent source of consumer harm, often saddling shoppers with recurring payments for products and services they did not intend to purchase or did not want to continue to purchase.[5] To address this problem, the Commission and states regularly bring cases challenging a variety of harmful negative option practices. These matters involve a range of deceptive or unfair practices, including inadequate disclosures of hidden charges in ostensibly "free" offers and other products or services, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures.[6] In addition, the Commission receives thousands of complaints each year related to negative option marketing. The number of ongoing cases and high volume of complaints demonstrate there is prevalent, unabated consumer harm in the marketplace.

The FTC's enforcement actions primarily rely on Section 5 of the FTC Act (15 U.S.C. 45(a)), the Restore Online Shoppers' Confidence Act ("ROSCA") (15 U.S.C. 8401 through 8405), and the Telemarketing Sales Rule (16 CFR part 310). However, the Rule on the Use of Prenotification Negative Option Plans (16 CFR part 425), the Electronic Fund Transfer Act ("EFTA") (15 U.S.C. 1693 through 1693r), and the Postal Reorganization Act (i.e., the Unordered Merchandise Statute) (39 U.S.C. 3009) also address various aspects of negative option marketing.

*Section 5 of the FTC Act:* Section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices, is the core consumer protection statute enforced by the Commission, and therefore, has traditionally served as the primary mechanism for addressing deceptive negative option claims.[7] In its guidance and cases, the FTC has highlighted four basic Section 5 requirements negative option marketing must follow to comply with Section 5.[8] First, marketers must clearly and conspicuously disclose the material terms of a negative option offer including, at a minimum, key terms such as the existence of the negative option offer, the offer's total cost, and how to cancel the offer.[9] Second, sellers must disclose these material terms before consumers agree to the purchase.[10] Third, marketers must obtain consumers' express informed consent to such offers.[11] Finally, marketers must not erect unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures, and must honor cancellation requests that comply with such procedures.[12] Although these basic guidelines are useful, the legality of a particular negative option depends on an individualized assessment of the advertisement's net impression and the marketer's business practices.[13]

*ROSCA:* Enacted by Congress in 2010 to address ongoing problems with online negative option marketing, ROSCA prohibits charging or attempting to charge consumers for goods or services sold on the internet through any negative option feature[14] unless the marketer: (1) Clearly and conspicuously discloses all material terms of the transaction[15] before obtaining the consumer's billing information; (2) obtains a consumer's express informed

[4] In addition, some negative option offers include upsell or bundled offers, where sellers use consumers' billing data to sell additional products from the same seller or pass consumers' billing data to a third party for their sales. An upsell occurs when a consumer completes a first transaction and then receives a second solicitation for an additional product or service. A bundled offer occurs when a seller packages two or more products or services together so they cannot be purchased separately.

[5] See, e.g., n. 6 infra.

[6] Recent examples of these matters include: *FTC v. JDI Dating, Ltd.,* No. 1:14–cv–08400 (N.D. Ill. 2014); *FTC, State of Illinois, and State of Ohio v. One Technologies, LP,* No. 3:14–cv–05066 (N.D. Cal. 2014); *FTC v. Health Formulas, LLC,* No. 2:14–cv–01649–RFB–GWF (D. Nev. 2016); *FTC v. BunZai Media Group, Inc.,* No. 2:15–cv–04527–GW–PLA (C.D. Cal. 2015); *FTC v. NutraClick LLC,* No. 2:16–cv–06819–DMG–JPR (C.D. Cal. 2016) (NutraClick I); *FTC v. DOTAuthority.com, Inc.,* No. 0:16–cv–62186–WJZ (S.D. Fla. 2016); *FTC v. XXL Impressions,* No. 1:17–cv–00067–NT (D. Me. 2017); *FTC v. AAFE Products Corp.,* No. 3:17–cv–00575 (S.D. Cal. 2017); *FTC v. RevMountain, LLC,* No. 2:17–cv–02000–APG–GWF (D. Nev. 2017); *FTC v. Pact, Inc.,* No. 2:17–cv–01429 (W.D. Wash. 2017); *FTC v. Tarr,* No. 3:17–cv–02024–LAB–KSC (S.D. Cal. 2017); *FTC v. Credit Bureau Center, LLC,* No. 17–cv–00194 (N.D. Ill. 2017); *FTC v. AdoreMe, Inc.,* No. 1:17–cv–09083 (S.D.N.Y. 2017); *FTC v. Triangle Media Corp.,* No. 3:18–cv–01388–LAB–LL (S.D. Cal. 2018); *In re: UrthBox, Inc.,* No. C–4676 (FTC 2019); *FTC v. Elite IT Partners, Inc.,* No. 2:19–cv–00125–RJS (D. Utah 2019); *FTC v. Apex Capital Group, LLC,* No. 2:18–cv–09573–JFW–JPR (C.D. Cal. 2018); *FTC v. AH Media,* No. 3:19–cv–04022–JD (N.D. Cal. 2019); *FTC v. Age of Learning, Inc.,* No. 2:20–cv–07996 (C.D. Cal. 2020); *FTC v. NutraClick, LLC,* No. 2:20–cv–08612 (C.D. Cal. 2020) (NutraClick II).

[7] Section 5 specifically states "unfair or deceptive acts or practices in or affecting commerce . . . are . . . declared unlawful." The FTC Act defines "unfair or deceptive acts or practices" to include such acts or practices involving foreign commerce that cause or are likely to cause reasonably foreseeable injury within the United States or involve material conduct occurring within the United States (15 U.S.C. 45(a)(4)(A)). It also defines "unfair" practices as those that cause or are likely "to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition" (15 U.S.C. 45(n)).

[8] See Negative Options: A Report by the Staff of the FTC's Division of Enforcement, 26–29 (Jan. 2009), *https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff/p064202negativeoptionreport.pdf.* In discussing the principal Section 5 requirements related to negative options, the report cites to the following pre-ROSCA cases, *FTC v. JAB Ventures,* No. CV08–04648 (C.D. Cal. 2008); *FTC v. Complete Weightloss Center,* No. 1:08cv00053 (D.N.D. 2008); *FTC v. Berkeley Premium Nutraceuticals,* No. 1:06cv00051 (S.D. Ohio 2006); *FTC v. Think All Publ'g,* No. 4:07cv11 (E.D. Tex. 2006); *FTC v. Hispanexo,* No. 1:06cv424 (E.D. Va. 2006); *FTC v. Consumerinfo.com,* No. SACV05–801 (C.D. Cal. 2005); *FTC v. Conversion Mktg.,* No. SACV04–1264 (C.D. Cal. 2004); *FTC v. Mantra Films,* No. CV03–9184 (C.D. Cal. 2003); *FTC v. Preferred Alliance,* No. 103–CV0405 (N.D. Ga. 2003); *United States v. Prochnow,* No. 1:02–CV–0917 (N.D. Ga. 2002); *FTC v. Ultralife Fitness, Inc.,* No. 2:08–cv–07655–DSF–PJW (C.D. Cal. 2008); *In the Matter of American Isuzu Motors,* No. C–3712 (FTC 1997); *FTC v. Universal Premium Services,* No. CV06–0849 (C.D. Cal. 2006); *FTC v. Remote Response,* No. 06–20168 (S.D. Fla. 2006); and FTC's *Dot Com Disclosures* guidance.

[9] See, e.g., FTC v. JAB Ventures; FTC v. Complete Weightloss Center; FTC v. NutraClick, LLC I.

[10] See, e.g., FTC v. JAB Ventures; Complete Weightloss Center; FTC v. Berkeley Premium Nutraceutical; FTC v. Think All Publ'g. Disclosures earlier in the transaction may be necessary to avoid deception. See e.g., FTC's Dot Com Disclosures guidance.

[11] E.g., FTC v. Neovi, Inc., 604 F.3d 1150, 1157–59 (9th Cir. 2010), amended by 2010 WL 2365956 (9th Cir. June 15, 2010); FTC v. Amazon.com, Inc., No. C14–1038–JCC, 2016 WL 10654030, at *8 (W.D. Wash. Apr. 26, 2016); FTC v. Ideal Fin. Sols., Inc., No. 2:13–CV–00143–JAD, 2015 WL 4032103, at *8 (D. Nev. June 29, 2015); FTC v. BunZai Media Group, Inc.

[12] See, e.g., FTC v. Universal Premium Services; FTC v. Remote Response; FTC v. Berkeley Premium Nutraceuticals; FTC v. Hispanexo; FTC v. Age of Learning, Inc.

[13] See, e.g., Negative Options: A Report by the Staff of the FTC's Division of Enforcement, 28.

[14] 15 U.S.C. 8403. ROSCA incorporates the definition of "negative option feature" from the Commission's Telemarketing Sales Rule, 16 CFR 310.2(w). ROSCA also contains a finding that "Third party sellers used a free trial period to enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships. This use of 'free-to-pay conversion' and 'negative option' sales took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period." 15 U.S.C. 8401(8). Finally, in addition to addressing negative option marketing, ROSCA contains provisions related to third party "post transaction" offers. See, e.g., 15 U.S.C. 8402.

[15] The Commission has brought several cases alleging a failure to disclose adequately the terms of the negative option feature. See, e.g., FTC v. NutraClick II; FTC v. Triangle Media Corporation; FTC v. AAFE Products Corp. The Commission recently alleged failure to disclose a material term of the underlying service that was necessary to prevent deception violated this provision of ROSCA. In re: MoviePass, Inc., No. C–4751 (October 5, 2021).

consent before charging the consumer's account; [16] and (3) provides simple mechanisms for the consumer to stop recurring charges.[17]

ROSCA also addresses offers made by, or on behalf of, third-party sellers during, or immediately following, a transaction with an initial merchant. Specifically, ROSCA prohibits post-transaction, third-party sellers [18] from charging or attempting to charge consumers unless the seller: (1) Before obtaining billing information, clearly and conspicuously discloses the offer's material terms; and (2) receives the consumer's express informed consent by obtaining the consumer's name, address, contact information, as well as the full account number to be charged, and requiring the consumer to perform an additional affirmative action indicating consent.[19] ROSCA also prohibits initial merchants from disclosing billing information to any post-transaction third-party seller for use in any internet-based sale of goods or services.[20]

Furthermore, ROSCA provides a violation of that Act is a violation of a Commission trade regulation rule under Section 18 of the FTC Act.[21] Thus, the Commission may seek a variety of remedies for violations of ROSCA, including civil penalties under Section 5(m)(1)(A) of the FTC Act; [22] injunctive relief under Section 13(b) of the FTC Act; [23] and consumer redress, such as damages, and other relief under Section 19 of the FTC Act.[24] Although Congress charged the Commission with enforcing ROSCA, it did not direct the FTC to promulgate implementing regulations.[25]

*Telemarketing Sales Rule:* The TSR prohibits deceptive telemarketing acts or practices, including those involving negative option offers, and certain types of payment methods common in deceptive negative option marketing. Specifically, the TSR requires telemarketers to disclose all material terms and conditions of the negative option feature, including the need for affirmative consumer action to avoid the charges, the date (or dates) the charges will be submitted for payment, and the specific steps the customer must take to avoid the charges. It also prohibits telemarketers from misrepresenting such information and contains specific requirements related to payment authorization.[26] Finally, the TSR prohibits the use of payment methods often used in deceptive marketing, including negative options, such as remotely created checks.[27] The rule, however, only applies to negative option offers made over the telephone.

*Prenotification Plan Rule:* The Commission promulgated the "Use of Prenotification Negative Option Plans" Rule ("Prenotification Plan Rule") (16 CFR part 425).[28] The Prenotification Plan Rule requires sellers of such plans to clearly and conspicuously disclose their plan's material terms before consumers subscribe. It enumerates seven material terms sellers must disclose: (1) How subscribers must notify the seller if they do not wish to purchase the selection; (2) any minimum purchase obligations; (3) the subscribers' right to cancel; (4) whether billing charges include postage and handling; (5) that subscribers have at least ten days to reject a selection; (6) that, if any subscriber is not given ten days to reject a selection, the seller will credit the return of the selection and postage to return the selection, along with shipping and handling; and (7) the frequency with which announcements and forms will be sent.[29] In addition, sellers must provide particular periods during which they will send introductory merchandise, give consumers a specified period to respond to announcements, provide instructions for rejecting merchandise in announcements, and promptly honor written cancellation requests.[30]

The Prenotification Plan Rule applies only to plans like book-of-the-month clubs in which sellers provide periodic notices offering goods to participating consumers and then send—and charge for—those goods only if the consumers take no action to decline the offer. These types of plans, however, account for only a small fraction of current negative option marketing. Therefore, the rule does not reach most modern negative option marketing.[31]

*Other Relevant Requirements:* EFTA [32] and the Unordered Merchandise Statute [33] also contain provisions relevant to negative option marketing. EFTA prohibits sellers from imposing recurring charges on a consumer's debit cards or bank accounts without written authorization. The Unordered Merchandise Statute provides that mailing unordered merchandise, or a bill for such merchandise, constitutes an unfair method of competition and an unfair trade practice in violation of Section 5 of the FTC Act.

## II. Principles for Negative Option Marketing

Given the number of applicable statutory and regulatory requirements and the ongoing problems in the marketplace, the Commission now issues the following enforcement guidance based on its enforcement history.[34] This guidance covers three areas commonly addressed by the Commission in its negative option cases: Disclosures, consent, and cancellation. These principles convey the Commission's current views on the application of relevant statutes and regulations to negative option marketing

---

[16] *See, e.g., FTC* v. *BunZai Media Group, Inc.; FTC* v. *Health Formulas, LLC;* and *FTC* v. *JDI Dating, Ltd.*

[17] *See, e.g., FTC* v. *Age of Learning, Inc.; FTC* v. *AdoreMe, Inc.;* and *FTC, State of Illinois, and State of Ohio* v. *One Technologies.*

[18] ROSCA defines "post-transaction third-party seller" as a person other than the initial merchant who sells any good or service on the internet and solicits the purchase on the internet through an initial merchant after the consumer has initiated a transaction with the initial merchant. 15 U.S.C. 8402(d)(2).

[19] 15 U.S.C. 8402(a).

[20] 15 U.S.C. 8402(b).

[21] 15 U.S.C. 8404. Section 18 of the FTC Act is 15 U.S.C. 57a.

[22] 15 U.S.C. 45(m)(1)(A).

[23] 15 U.S.C. 53(b).

[24] 15 U.S.C. 57b(a)(1) and (b).

[25] ROSCA states a violation "of this chapter or any regulation prescribed under this chapter shall be treated as a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) regarding unfair or deceptive acts or practices." 15 U.S.C. 8404(a).

[26] 16 CFR part 310.3(a).

[27] 80 FR 77520 (December 14, 2015). The TSR Notice of Proposed Rulemaking (78 FR 41200 (July 9, 2013)) noted negative option cases where the defendants used unauthorized remotely created checks. *E.g., FTC* v. *FTN Promotions, Inc.,* Civ. No. 8:07–1279 (M.D. Fla. Dec. 30, 2008) (Stip. Perm. Inj.) (defendants allegedly caused more than $171 million in unauthorized charges to consumers' accounts for bogus travel and buyers' clubs in part by using unauthorized remotely created checks).

[28] The Commission issued the rule after finding some negative option marketers committed unfair and deceptive practices that violated Section 5 of the Act, 15 U.S.C. 45.

[29] 16 CFR 425.1(a)(1)(i) through 425.1(a)(1)(vii).

[30] 16 CFR 425.1(a)(2) and (3); § 425.1(b).

[31] The Prenotification Plan Rule defines "negative option plan" narrowly to apply only to prenotification plans. 16 CFR 425.1(c)(1). In 1998, the Commission clarified the rule's application to such plans in all media, stating it "covers all promotional materials that contain a means for consumers to subscribe to prenotification negative option plans, including those that are disseminated through newer technologies . . . ." 63 FR 44555, 44561 (Aug. 20, 1998). In 2017, the Commission estimated fewer than 100 sellers ("clubs") were subject to the current rule's requirements. 82 FR 38907, 38908 (Aug. 16, 2017).

[32] 15 U.S.C. 1693 through 1693r.

[33] 39 U.S.C. 3009.

[34] In an October 2, 2019 document (84 FR 52393), the Commission sought comment on the need for amendments to the "Rule Concerning the Use of Prenotification Negative Option Plans" (*i.e.,* "Negative Option Rule" (16 CFR part 425)) to help consumers avoid recurring payments for products and services they did not intend to order and to allow them to cancel such payments without unwarranted obstacles. The Commission will continue to closely monitor compliance with the rules and laws applicable to negative option marketing, and is still considering various options in the rule review proceeding for the Negative Option Rule.

and, as such, should help marketers in their compliance efforts and better understand how the Commission enforces the law.

*Disclosures:* ROSCA [35] requires marketers to clearly and conspicuously disclose the material terms of the transaction.[36] Pursuant to longstanding precedent, any express claim or deliberately implied claim is presumed to be material.[37] Moreover, the FTC's cases for failure to disclose under Section 5 of the FTC Act are generally consistent with ROSCA.[38] Those terms at minimum should include:

• Any material terms related to the underlying product or service that are necessary to prevent deception, regardless of whether that term directly relates to the terms of the negative option offer; [39]

• That consumers will be charged [40] for the good or service, or that those charges will increase after any applicable trial period ends, and, if applicable, that the charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such charges;

• Each deadline (by date or frequency) by which the consumer must act in order to stop the charges;

• The amount (or range of costs) the consumer will be charged or billed and, if applicable, the frequency of such charges a consumer will incur unless the consumer takes timely steps to prevent or stop those charges;

• The date (or dates) each charge will be submitted for payment; and

• All information necessary to cancel the contract.

These disclosures must be clear and conspicuous.[41] To meet this standard, offers should be difficult to miss (*i.e.,* easily noticeable) or unavoidable and easily understandable by ordinary consumers, including:

• In any communication that is solely visual or solely audible, the disclosure should be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure should be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

• A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, should stand out from any accompanying text or other visual elements so it is easily noticed, read, and understood.

• An audible disclosure, including by telephone or streaming video, should be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

• In any communication using an interactive electronic medium, such as the internet or software, the disclosure should be unavoidable. A disclosure is not clear and conspicuous if a consumer needs to take any action, such as clicking on a hyperlink or hovering over an icon, to see it.

• The disclosure should use diction and syntax understandable to ordinary consumers and should appear in each language in which the representation that requires the disclosure appears.

• The disclosure should comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

• The disclosure should not be contradicted or mitigated by, or inconsistent with, anything else in the communication.[42]

• When the representation or sales practice targets a specific audience,

such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

Additionally, if the disclosures are in writing (including on the internet), they should:

• if related to the negative option feature, appear immediately adjacent to the means of recording the consumer's consent for the negative option feature;

• if not related to the negative option feature, appear before consumers make a decision to buy (*e.g.,* before they "add to shopping cart"); and

• not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read and understand the disclosures, including any information not directly related to the material terms and conditions of any negative option feature.

For all telephone and other oral offers, the disclosures should not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to understand the disclosures, including any information not directly related to the material terms and conditions of any negative option feature.

*Consent:* [43] ROSCA, judicial decisions applying Section 5, and cases brought by the Commission under those laws make clear marketers should obtain the consumer's express informed consent before charging the consumer.[44] To attain express informed consent, the negative option seller should:

• obtain the consumer's acceptance of the negative option feature offer separately from any other portion of the entire transaction;

• not include any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature; [45]

• obtain the consumer's unambiguously affirmative consent to the negative option feature; [46]

---

[35] Any reference to ROSCA in these principles applies only to internet transactions, consistent with that statute's coverage.

[36] Of course, sellers fail to disclose adequately material terms if the disclosed terms are not truthful and substantiated.

[37] *See, e.g., FTC Statement on Deception,* 103 F.T.C. 174, 182 (1984) (*appended to Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1984)); *Thompson Medical Co.,* 104 F.T.C. 648, 816 (1984).

[38] The Commission has consistently brought cases for deceptive and pure omissions of material fact. *See, e.g., FTC* v. *Roca Labs, Inc.,* 345 F. Supp. 3d 1375, 1390 (M.D. Fla. 2018); *FTC* v. *NPB Advert., Inc.,* 218 F. Supp. 3d 1352, 1361 (M.D. Fla. 2016); *FTC* v. *Am. Standard Credit Sys., Inc.,* 874 F. Supp. 1080, 1088 (C.D. Cal. 1994); *FTC* v. *BlueHippo Funding, LLC,* 762 F.3d 238, 241 (2d Cir. 2014). *But see, In re International Harvester,* 104 F.T.C. 949, 1059 (1984) (Not all omissions are deceptive or unfair. "The number of facts that may be material to consumers—and on which they may have prior misconceptions—is literally infinite.")

[39] The Commission recently alleged a negative option seller's failure to disclose it was impeding access to its movie subscription service violates ROSCA. *In the Matter of MoviePass, Inc.*

[40] "Charge," "Charged," or "Charging," for the purposes of this Policy Statement, means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

[41] *Supra* at nn. 9 and 15.

[42] An example of an inadequate disclosure is one where the consumer sees an offer upfront, in an electronic or written advertisement or on the landing page of a website, which is materially different from the terms of the offer presented in later stages, such as later web pages, of the ordering process. *See, e.g., FTC* v. *E.M.A. Nationwide, Inc.,* 767 F.3d 611, 633 (6th Cir. 2014); *FTC* v. *Fed. Loan Modification Law Ctr., LLP,* No. SA–CV–09–401– CJC (MLGx) (C.D. Cal. 2010); *FTC* v. *Grant Connect, LLC,* 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011).

[43] Negative option sellers covered by the Telemarketing Sales Rule should also ensure they are complying with the consent requirements in 16 CFR 310.4 specifically applicable to transactions involving a free-to-pay conversion and preacquired account information.

[44] *Supra* at nn. 11 and 16.

[45] Such information could appear on the product page itself (*e.g.,* extraneous language that interferes with the consumer's ability to provide consent) or in another location (*e.g.,* a separate web page containing information materially contradicting the information on the consent page).

[46] A "pre-checked box" does not constitute affirmative consent. In addition, the seller should clearly disclose the name of the billing entity authorized by the consumer's consent.

- obtain the consumer's unambiguously affirmative consent to the entire transaction; and

- be able to verify the consumer's consent.

*Cancellation:* ROSCA requires negative option sellers to provide a simple, reasonable means for consumers to cancel their contracts.[47] To meet this standard, negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature. For example, to ensure compliance with this simple cancellation mechanism requirement, negative option sellers should not subject consumers to new offers or similar attempts to save the negative option arrangement that impose unreasonable delays on consumers' cancellation efforts.[48] In addition, negative option sellers should provide their cancellation mechanisms at least through the same medium (such as website or mobile application) the consumer used to consent to the negative option feature. The negative option seller should provide, at a minimum, the simple mechanism over the same website or web-based application the consumer used to purchase the negative option feature. If the seller also provides for telephone cancellation, it should provide, at a minimum, a telephone number, and answer all calls to this number during normal business hours, within a short time frame, and ensure the calls are not lengthier or otherwise more burdensome than the telephone call the consumer used to consent to the negative option feature.

Finally, to comply with Section 5, a seller's cancellation procedures for negative option features should be effective. Sellers should not impede the effective operation of promised cancellation procedures, and should honor cancellation requests that comply with such procedures. In implementing effective cancellation procedures, marketers should not, among other things: Hang up on consumers who call to cancel; place them on hold for an unreasonably long time; provide false information about how to cancel; or misrepresent the reasons for delays in processing consumers' cancellation

requests.[49] If ROSCA applies, sellers must comply with both that statute and Section 5 of the FTC Act.

By direction of the Commission, Commissioner Wilson dissenting.

**April J. Tabor,**

*Secretary.*

## Concurring Statement of Commissioner Noah Joshua Phillips

I support the Commission's decision to issue an enforcement policy regarding negative option marketing. Negative option marketing—a ubiquitous feature of businesses from newspapers to water bottle delivery to video streaming—is currently covered by a patchwork of laws and regulations: Section 5 of the FTC Act, the Restore Online Shoppers' Confidence Act, the Telemarketing Sales Rule, the Rule on the Use of Prenotification Negative Option Plans, the Electronic Fund Transfer Act, and the Unordered Merchandise Statute. This policy statement sets forth a framework to explain what the Commission expects of participants in this space, apprising marketers of their obligations and informing consumers of their rights.

Drawing upon decisions by federal courts and the Commission about negative options, the policy statement lays out expectations concerning disclosures, consent from consumers, and how marketers must handle the consumer's ability to cancel. ROSCA, for example, requires a seller to provide ''simple mechanisms for a consumer to stop recurring charges''.[1] The policy statement explains how the Commission interprets that, including a cancellation mechanism that is as easy to accomplish as signing up, whilst preserving the opportunity for a business to make an offer to induce a consumer to stay.[2] If you have ever signed up for something online but had to wait on hold on the telephone to cancel, this policy is for you.

Commissioner Wilson takes no issue with the substance of the policy statement itself, but instead is concerned about superseding the rulemaking process. Where the issuance of a statement supplants the rulemaking process effectively to declare a new ''rule'' solely by guidance and without notice and comment, I share that

reservation.[3] Where, as here, the Commission is explaining its view of obligations under existing authorities, I think it better to pursue a lighter, less ''regulatory'' touch in the first instance. The Commission can pursue rulemaking later, if, and when, we determine a rule change is necessary.

Negative option marketing rulemaking implicates the requirements of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act. Even though the Commission has begun this process,[4] this kind of rulemaking sensibly includes regulatory guardrails that have certain timing constraints and could require the consumption of substantial agency resources. The policy statement provides immediate guidance to industry, without the wait. If followed, there may be no need for a new rule. Apprising industry of its obligations, and saving consumers money they might otherwise lose because of problematic negative option marketing practices, is a win for both.

## Dissenting Statement of Commissioner Christine S. Wilson

Today the Commission issues a Policy Statement Regarding Negative Option Marketing to ''provide guidance regarding its enforcement of various statutes and FTC regulations addressing negative option marketing and operating.'' The Commission takes this step even though we have an open rulemaking on precisely the topics covered in the Policy Statement.[1] Prior to the arrival of new agency leadership, the FTC had issued policy guidance during the pendency of a related rulemaking on only one occasion, and

---

[47] *Supra* at 17.

[48] While a request to consider an offer or discount would not amount to an unreasonable delay, multiple requests for a consumer to listen to additional offers, lengthy pitches, or ignoring a consumer's request to decline further offers could amount to an unreasonable delay.

[49] *See, e.g., FTC* v. *Universal Premium Services; FTC* v. *Remote Response; FTC* v. *Hispanexo; FTC* v. *Berkeley Premium Nutraceuticals.*

[1] 15 U.S.C. 8403.

[2] The moment at which a consumer is about to cancel may be the moment when they can get the best deal. *Cf.* A.O. Hirschman, *Exit, Voice, and Loyalty* (1970).

[3] *See* Dissenting Statement of Commissioner Noah Joshua Phillips Regarding the Policy Statement on Breaches by Health Apps and Other Connected Devices (Sept. 15, 2021), at *https://www.ftc.gov/ public-statements/2021/09/dissenting-statement- commissioner-noah-joshua-phillips-regarding- policy.* The Health Breach Notification Rule is governed by Administrative Procedures Act rulemaking requirements, and the FTC's ongoing rulemaking efforts are directed to an existing rule. The policy statement subverted the rulemaking process by declaring something illegal where the Commission had never done so before, in a situation where I do not believe the underlying statute applies. The circumstances here are different, in part because, in the negative option marketing space, there is no comprehensive rule that covers all marketing in all media. In the HBNR context, my concern was heightened by a policy statement that, *inter alia,* undermined two rulemaking processes and contradicted standing guidance from the agency.

[4] Advance Notice of Proposed Rulemaking, 84 FR 52393 (Oct. 2, 2019) (seeking comment on need for amendments to the Rule Concerning the Use of Prenotification Negative Option Plans (16 CFR part 425)) to help consumers avoid recurring payments for products and services they did not intend to order and to allow them to cancel such payments without unwarranted obstacles).

[1] See 84 FR 52393 (Oct. 2, 2019).

in that instance noted its intention to refrain from enforcement actions in the area.[2] But today's initiative marks the third time in as many months new agency leadership has issued expansive policy directives while related rulemakings proceed.[3] Publishing guidance during the pendency of a related rulemaking short-circuits the receipt of public input and conveys disdain for our stakeholders. I believe this practice does not constitute good government, so I dissent.

The FTC currently enforces several statutes that address negative option marketing,[4] including the Restore Online Shoppers' Confidence Act,[5] the Telemarketing Sales Rule,[6] the Use of Prenotification Negative Plans Rule,[7] the Postal Reorganization Act (also known as the Unordered Merchandise Rule),[8] and the Electronic Funds Transfer Act.[9] In addition, the FTC has brought numerous cases challenging negative option practices not covered by these statutes using Section 5 of the FTC Act.[10] Thus, there is a significant body of law in the form of FTC consents and litigated cases involving negative option practices.

In 2019, the Commission published a **Federal Register** Notice seeking comment on whether the Commission should expand its Prenotification Negative Option Rule to cover all types of negative option marketing, noting

deceptive practices persist and the current regulatory patchwork does not provide a consistent framework for businesses.[11] We received 17 comments from business groups, consumer groups, and state attorneys general in response to that request for comment, representing a range of views and containing substantive and insightful information.

The Policy Statement acknowledges the ongoing rulemaking and states the Commission "will continue to closely monitor compliance with the rules and laws applicable to negative option marketing, and is still considering various options in the rule review proceeding for the Negative Option Rule." A good government approach would be to publish this proposed guidance in the **Federal Register** with a discussion of how it comports with or differs from the comments we received in the rulemaking and seek comment on the proposed guidance.

Particularly given Chair Khan's stated goal of "democratizing" the FTC, one could be forgiven for viewing this as the best way in which to proceed. Alternatively, we could assimilate the feedback we received, close the rulemaking, and then publish this guidance. But the former approach is preferable—having determined as a unanimous Commission to embark on this rulemaking, rendering it moot at this early stage is akin to the elimination of opportunities for public input that the majority undertook in its changes to the Rules of Practice.[12]

There is no question the Commission has the authority to issue policy statements explaining its interpretation of the rules and laws it enforces. Moreover, this practice is a beneficial one: The FTC's business guidance facilitates transparency with respect to agency priorities and policy preferences, educates the business community, and drives compliance with the law. Our Division of Consumer and Business Education has received numerous awards for its publications, and I found FTC guidance documents helpful for client counseling purposes when I was in private practice.[13] Here, I agree this

Policy Statement provides information that will be useful to businesses, and I largely support the guidance contained in the document. I believe, however, the Commission should either provide this guidance within the context of the open rulemaking or close the rulemaking and then issue the guidance.

For these reasons, I dissent.

[FR Doc. 2021–24094 Filed 11–3–21; 8:45 am]

**BILLING CODE 6750–01–P**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

**[Docket No. FDA–2020–E–2124]**

## Determination of Regulatory Review Period for Purposes of Patent Extension; SEVENFACT

**AGENCY:** Food and Drug Administration, Health and Human Services (HHS).

**ACTION:** Notice.

---

**SUMMARY:** The Food and Drug Administration (FDA or the Agency) has determined the regulatory review period for SEVENFACT and is publishing this notice of that determination as required by law. FDA has made the determination because of the submission of an application to the Director of the U.S. Patent and Trademark Office (USPTO), Department of Commerce, for the extension of a patent which claims that human biological product.

**DATES:** Anyone with knowledge that any of the dates as published (see **SUPPLEMENTARY INFORMATION**) are incorrect may submit either electronic or written comments and ask for a redetermination by January 3, 2022. Furthermore, any interested person may petition FDA for a determination regarding whether the applicant for extension acted with due diligence during the regulatory review period by May 3, 2022. See "Petitions" in the **SUPPLEMENTARY INFORMATION** section for more information.

**ADDRESSES:** You may submit comments as follows. Please note that late, untimely filed comments will not be considered. Electronic comments must be submitted on or before January 3, 2022. The *https://www.regulations.gov* electronic filing system will accept comments until 11:59 p.m. Eastern Time at the end of January 3, 2022. Comments received by mail/hand delivery/courier (for written/paper submissions) will be considered timely if they are postmarked or the delivery service

---

[2] *See* Enforcement Policy Statement Regarding Certain Imported Textile, Wool, and Fur Products (Jan. 3, 2013), *https://www.ftc.gov/news-events/press-releases/2013/01/ftc-announces-enforcement-policy-statementretailersdirectly; see also* 76 FR 68690 (Nov. 7, 2001); Press Release, FTC Seeks Public Input in Review of Textile Labeling Rules (Nov. 1, 2011), *https://wwwftc.gov/news-events/press-releases/2011/11/ftc-seeks-publicinputreview-textile-labeling-rules.*

[3] *See* Christine S. Wilson, FTC Comm'r, Dissenting Statement of Commissioner Christine S. Wilson Regarding the Policy Statement on Breaches by Health Apps and Other Connected Devices at 6 (Sept. 15, 2021), *https://www.ftc.gov/public-statements/2021/09/dissenting-statement-commissioner-christine-s-wilson-regardingpolicy* (describing issuance of Policy Statement on Breaches by Health Apps and Other Connected Devices during a related rulemaking; also describing rescission of agency guidance on treatment of debt in premerger notification context during a rulemaking covering precisely that issue).

[4] The Enforcement Policy Statement Regarding Negative Option Marketing explains that while negative options can take various forms, the central feature is "each contains a term or condition under which the seller may interpret a consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement as acceptance or continuing acceptance of the offer."

[5] 15 U.S.C. 8401 through 8405.

[6] 16 CFR 310.

[7] 16 CFR 425.

[8] 39 U.S.C. 3009.

[9] 15 U.S.C. 1693 through 1693r.

[10] *See* 84 FR 52393, 52395–96 (Oct. 2, 2019) (ANPRM describing the cases the Commission has brought under Section 5 of the FTC Act).

[11] 84 FR 52393, 52394 (Oct. 2, 2019).

[12] 86 FR 38542 (July 22, 2021); *see also* Press Release, FTC Votes to Update Rulemaking Procedures, Sets Stage for Stronger Deterrence of Corporate Misconduct (July 1, 2021), *https://www.ftc.gov/news-events/pressreleases/2021/07/ftc-votes-update-rulemaking-procedures-sets-stage-stronger.*

[13] While in private practice, I also found informative the business guidance provided by expert FTC staff during speeches and panels. Unfortunately, our staff has been prohibited from delivering public remarks since Chair Khan's arrival in June.