# EXHIBIT 6



December 2, 2019

The Honorable April J. Tabor
Acting Secretary, Federal Trade Commission
Office of the Secretary
Suite CC-5610 (Annex J)
600 Pennsylvania Avenue, NW
Washington, D.C. 20580

>  Re:   *Negative Option Rule (16 C.F.R. Part 425) (Project No. P064202); Advance Notice of Proposed Rulemaking: Request for Public Comment, 84 Fed. Reg. 52393-01, 2019*

Dear Acting Secretary Tabor:

The Attorneys General of the States of Colorado, Delaware, District of Columbia, Illinois, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Dakota, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin ("States"), in response to an Advance Notice of Proposed Rulemaking ("Notice") published in the Federal Register, 84 Fed. Reg. 52393 (October 2, 2019), hereby submit comments on the Federal Trade Commission ("FTC") Rule on Use of Prenotification Negative Option Plans, 16 C.F.R. Part 425 (hereinafter referred to as the "PNOR" or the "Rule").

As the chief law enforcement officers within their respective jurisdictions, the States appreciate the opportunity to offer their viewpoint on the effectiveness of the PNOR in its current form and make concrete suggestions as to how the Rule can be improved to protect consumers. The States are on the front line in combatting deceptive and unfair negative option plans that can take any number of forms. Often these plans ultimately leave consumers confused, misled and out of pocket significant sums of money. The States continue to remain active in this area by promoting public education, fielding thousands of consumer complaints and taking enforcement action when necessary.

The existing PNOR was originally promulgated in 1973, with technical amendments being made in 1998. This Rule regulated only one type of negative option marketing – the prenotification negative option plan – for the delivery of merchandise where consumers receive periodic announcements that merchandise will be delivered unless they decline the terms within a set time

1

frame. In 2009, the Commission sought input on whether to extend the scope of the Rule to regulate other forms of negative option marketing, most notably "trial conversions." *See* 74 Fed. Reg. 22720, 22721 (May 14, 2009). Seventeen states submitted comments to the Commission urging it to take additional steps to protect consumers from prevalent deceptive and unfair business practices in the marketing of negative option plans.

The Commission found that the comments supporting the PNOR's expansion "argue convincingly that the unfair, deceptive and otherwise problematic negative option marketing practices continue to cause substantial consumer injury, despite determined enforcement efforts by the Commission and other law enforcement agencies." 79 Fed. Reg. 44271, 44275 (July 31, 2014). The Commission expressly noted that state law enforcement agencies urged the Commission to expand the Rule to cover additional types of negative options, particularly trial conversion offers. *Id.* at 42274. Nonetheless, the Commission declined to expand or enhance the PNOR at that time, suggesting that enforcement tools provided by the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310 and especially the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. §§ 401-8405, which had recently been enacted, might prove adequate to address existing issues. *Id.* at 44275-76. The Commission stated that it would continue to monitor the marketplace and would "consider whether changes in the marketplace warrant reevaluation of the Commission's rules" and "[i]f the Commission concludes that ROSCA and its other enforcement tools do not provide adequate protection for consumers, it can then consider, based on a more complete record, whether and how to amend the Rule." *Id.* at 44276.

The States commend the Commission for now revisiting this important issue. The Notice acknowledges that "recent [Commission enforcement] cases and the high volume of ongoing complaints suggests there is prevalent, unabated consumer harm in the marketplace" involving negative option marketing. 84 Fed. Reg. at 52396. The States agree. While it is our opinion that ROSCA has helped to combat some of the abuses with respect to sales conducted over the internet, ROSCA lacks specificity as to how informed consent should be obtained or how clear and conspicuous disclosures should be made. Significant problems continue in any type of marketing where a consumer's silence is deemed to be acceptance, thereby upsetting the common expectation that a consumer is not bound until there is a mutual agreement – in effect a handshake where each party affirmatively accepts the material terms of the agreement. This is not what happens in negative option marketing in which consumers often find themselves in a sales plan where they are being billed and called upon to pay for products and services; and the circumstances fail to show that material terms were clearly and conspicuously disclosed or affirmatively agreed upon. Further, when consumers seek to extricate themselves from these plans, they often run into multiple roadblocks in effectuating a cancellation and obtaining a refund of monies paid.

In short, the problems observed in 2009 appear even more prevalent today. The collective experience of the States indicates that trial conversions are rife with the potential for abuse and deception. Companies often lure consumers with words like "free" and "trial period," thereby implying that the trial comes with no obligation on the part of the consumer (i.e., the consumer has nothing to lose). In reality, consumers often have an obligation to take some affirmative step to avoid being caught in a cycle of continuous charges. Consistent with the States' experiences, a December 2018 report from the Better Business Bureau ("BBB"), shows losses in "free trial offer" cases pursued by the Commission over the last ten years exceed $1.3 billion. From 2015 through

2017, the BBB received 36,986 complaints pertaining to these so-called "free trials." Data from the FBI Internet Crime Complaint Center suggest that these complaints are on the rise from year to year.[1]

As detailed below, the States have taken a number of enforcement actions involving negative option plans and welcome additional regulation to address deceptive and unfair practices. The States strongly urge the Commission to take additional steps to enhance consumer protections in this area, particularly concerning trial conversions.

I.   **State Enforcement Efforts**

The States have taken dozens of enforcement actions in the last several years, which demonstrate that problems persist in this area and that additional regulatory action is needed. For example, since 2010, New York has reached 23 negative option settlements involving membership programs (including settlements with Classmates and FTD), credit monitoring programs, dietary supplements and apparel and has obtained over $10 million in consumer restitution and over $14 million in penalties, costs and fees.

   A.  **Multistate Investigations and Settlements**

   - **Sirius XM Radio**:  Sirius XM Radio, Inc., a satellite radio company, was the subject of a multi-state investigation involving 45 states and the District of Columbia. The investigation concerned Sirius's cancellation and renewal practices, through which consumers were automatically charged without adequate disclosure, according to the investigation. In 2014, Sirius agreed to pay the states $3.8 million and clearly and conspicuously disclose automatic renewal provisions in future advertising, sales, and subscriber communications. Sirius further agreed to simplify and streamline their cancellation process and clearly, conspicuously disclose how subscribers could cancel Sirius services.

   - **Classmates, Inc. and FTD, Inc.**:  In May 2015, Classmates and FTD agreed to an $11 million settlement with 22 states. Classmates, a social networking service that helps its paid members reconnect with former classmates, and FTD, a flower delivery company, allowed third-party marketers to charge their customers for goods or services they allegedly did not want. Unless consumers took affirmative steps prior to the end of a subscription term, the subscription would automatically renew, which was not adequately disclosed to consumers, as the States alleged. Classmates and FTD also entered into marketing and data-sharing agreements with third parties, such as discount buying clubs and travel rewards programs that ran advertisements on Classmates' and FTD's websites for "free-trial memberships," which converted to paid subscription-based programs without adequate disclosure to consumers, the states alleged. Classmates and FTD allegedly failed to adequately disclose that these third-party advertisements directed consumers to entirely different websites.

---

[1] Steve Baker, BBB International Investigations Initiative, "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements" (Dec. 2018).

3

- **Internet Order LLC et al.**:  In August 2015, the Attorneys General of New York, Pennsylvania, and Washington entered into settlements with Internet Order LLC and its CEO over their alleged deceptive online marketing of language programs. Internet Order marketed and sold language learning programs to consumers at less than half the price of the programs' publisher.  However, its advertisements did not clearly and conspicuously disclose that consumers who accepted the trial offer would be automatically enrolled in a "rapid fluency program," and Internet Order would continue to send CDs unless consumers followed a specific cancellation process, as alleged by the States.  Although these higher-level CDs were marketed as a "free trial," consumers were billed for CDs they did not return at their own expense after thirty days.  The settlements established a $1 million fund to provide restitution to consumers nationwide.

B. **Lawsuits by Individual States**

- **Nutra Pills, Inc.**: In 2010, the Colorado Attorney General sued Nutra Pills, Inc., which marketed acai berry-based products through free-trial conversions.  This suit was prompted by over 1,000 consumer complaints.  Under the terms of the resulting settlement, Nutra Pills must make clear, conspicuous disclosures to consumers regarding the terms of any subscription plan.  Consumers must give their express authorization to any charges which Nutra Pills levies, and current subscribers must authorize that they would like to remain enrolled every year.  The settlement additionally streamlined the cancellation process, allowing consumers to cancel in the same manner that they signed up to receive a free sample.

- **Safe Home Security, Inc.**: In this ongoing litigation, the Massachusetts Attorney General is alleging that a home security monitoring company demands payment of its monthly fee regardless of whether its system is working properly or a consumer is disputing a bill.  Safe Home Security allegedly routinely automatically renews agreements which consumers have attempted to cancel, and charges late fees and compound interest should the consumer cease payment.

- **Foreman Turf Specialties, Inc. d/b/a TLC: The Lawn Company**: The Lawn Company ("TLC") mailed flyers advertising its lawn care services to Massachusetts consumers, but, according to a lawsuit filed by the Massachusetts Attorney General, did not disclose that these services would renew from "season to season."  Though TLC claimed that consumers could cancel by writing or calling in a request, many consumers still had pesticides applied to their lawns and were charged for this service, despite allegedly not authorizing TLC to do so.  In 2017, this case was resolved through a Consent Judgment, with TLC paying nearly $300,000 in restitution and civil penalties.

## II. Consumer Experiences and Harm

Further evidence of the need to revise the PNOR can be found in representative consumer stories including:

- Consumer A was browsing Facebook in search of weight loss programs and clicked on a tab advertising a product sample for just the cost of shipping. Consumer A entered her credit card information for the $3.98 shipping and handling and her shipping address. Immediately, Consumer A received a pop-up notice for an advanced weight loss product, and the order was suddenly for "5" bottles of the product and the bill jumped to $199.00. Consumer A immediately called, stating she only ordered the free sample for $3.98 shipping costs. Consumer tried to cancel but was told the order has already been processed and could not be canceled. The consumer returned the product the day it arrived, but never received a refund.

- Consumer B paid $9.85 online for two vials of a product, with the understanding that they were free samples and that she only had to pay shipping. About two weeks later, two charges totaling $187.66 appeared on Consumer B's credit card. Consumer B contacted the business and was told to contact the vendor within 14 days of receipt and state he did not like the products. Consumer was told this was the way to avoid recurring subscription fees of about $187.66 per month. The business agreed to cancel the "subscription" and would refund the charges. Consumer B did not receive a refund as promised.

- Consumer C ordered a face cream after viewing an advertisement on her cellphone. The advertised cost was $4.95 for shipping of a free sample of the product. The consumer was charged $100 twice for the product. She returned the product, and attempted to get a refund by calling the customer service line. Consumer C never received a refund for either charge and canceled the debit card she used in the transaction to avoid future charges.

- Consumer D, a member of the armed forces, purchased a product from an online retailer thinking that she was only ordering a single item. Consumer D received a discount on her initial purchase from the website, but had no idea that applying for the discount enrolled her in a negative option program. Consumer D was charged every month for nearly three and a half years, totaling over $1,500. The negative option program did not include the automatic shipment of items, and Consumer D was not aware that she was being charged until she was contacted by a state Attorney General investigating the retailer.

- Consumer E saw an advertisement on Facebook for a $2.00 bracelet. She purchased the bracelet, not realizing that the purchase automatically enrolled her in the retailer's monthly membership club, at the cost of $25.00 a month. Consumer E was charged over $250.00 in membership fees until she was made aware of the charges. Consumer E was able to get a full refund through mediation efforts of her state Attorney General.

- Consumer F responded to offers for "free" samples of two skin care products and provided her credit card information to pay the $4.95 shipping fee for each. Soon after, she began receiving more and more products and was charged $88.95 for each. The consumer had a

5

difficult time tracking down the company to cancel the subscriptions because the packages did not include the company name. When she finally reached a customer service representative, she was told that she could not return the unwanted products. The company only agreed to provide a partial refund after she threatened to contact her credit card company and the Better Business Bureau. Although the consumer subsequently received two emails saying that "future charges have been cancelled…," she continued to be billed for the products and had accumulated $1,800 in unauthorized charges for the two products at the time of her complaint.

Finally, data continues to suggest that consumers are not fully apprised of the terms of engagement whereby they find themselves interminably locked into a negative option plan.  For instance, the Oregon Attorney General surveyed 126 Oregonians who bought a product and were, unbeknownst to them, signed up for a "Passport to Health" (PTH) program, for which they were later charged. The Oregon Attorney General found:

- The average age of an Oregon consumer signed up for PTH was 76 years old;
- 96% of consumers did not now that they were signing up for PTH;
- One consumer who knowingly signed up for PTH did so "because she was tired of being harassed," and signed up so that the company "would leave her alone";
- Every responding consumer stated that they had never used PTH.

This survey and investigation also revealed that 4,226 Oregonians were signed up and/or billed for PTH between January 2008 and June 2010. 89.8% of these consumers had canceled their PTH membership by June 2010.

### III.   The States' Responses to the Commission's Questions

The States' responses to some of the questions posed by the Commission in the Notice are below.

#### A. There is a continuing need for the Rule (Question 1).

As the Notice states, the PNOR was promulgated in 1973 to address prenotification negative option plans for the sale of goods (e.g., book-of-the-month clubs) only, and "does not reach most modern negative option marketing."  84 Fed. Reg. at 52394.  Although such subscription services still exist, they are no longer the primary source of negative option plan complaints to the States.  Regardless, the Rule should stay in place to ensure that companies offering such services adhere to the Rule's requirements.  However, as set forth more fully below, additional regulation is warranted to address other forms of negative option solicitations that are more prevalent and that continue to cause substantial consumer harm in the marketplace.

#### B. Unfair and deceptive practices are occurring in the marketing of negative option plans, particularly with "free" trial offers that are not covered by the Rule, and a lack of clear disclosures surrounding refund and cancellation policies (Question 15).

6

There are a number of unfair or deceptive practices not covered by the Rule that are occurring in the marketplace. Many of these practices involve free-to-pay or nominal fee-to-pay conversion offers made over the internet or via other methods, such as telephonically. Many negative option complaints the States receive involve such free-to-pay or nominal fee-to-pay conversion offers. As described further below, some of the deceptive or unfair practices not covered by the Rule include lack of informed consumer consent, lack of clear and conspicuous disclosures, failure to honor cancellation requests and/or refusal to provide refunds to consumers who unknowingly enrolled in plans.

For example, the States have seen a pattern of complaints from consumers who discover unauthorized charges on their credit card or bank statement and/or received unordered goods after responding to an online solicitation for a "free" trial of a health or beauty product. Such offers are rampant online and throughout social media.[2] Despite ROSCA, the fact that consumers who accepted the offers were also agreeing to accept regular deliveries of one or more products for which they would typically be charged approximately $90 each was not clearly and conspicuously disclosed. The peddlers of these products were able to obtain consumers' credit card or bank account information by asking consumers to provide it ostensibly to pay a small shipping charge for the free trial product. Consumers who became aware of their enrollment in the negative option program were forced to pay to return the unordered goods, and in many cases, had difficulty obtaining a refund or cancelling their subscription.

Deceptive free or nominal fee-to-pay negative option offers are also associated with a variety of services, such as credit monitoring or anti-virus computer programs for which consumers are billed on a monthly basis. In some cases, the monthly charges for these services are small—less than $20— and because consumers do not receive any product that might otherwise alert them to the fact that they are enrolled in a negative option program, coupled with the fact that the monthly charge is often a relatively nominal amount, there is an increased danger that consumers will not readily discover the unauthorized charges on their accounts. These free-to-pay conversion solicitations often lure consumers with advertisements emphasizing that consumers are being offered a free benefit. Companies may offer deceptive explanations for the need for consumers to provide their billing information. The fact that by accepting the free benefit, consumers are agreeing to be charged on a periodic basis for goods or services is not clearly and conspicuously disclosed. Finally, the advertisements often draw consumers' attention away from the small print details of the negative option plan through the use of brightly colored links and/or arrows encouraging consumers to accept the offer. In some cases, consumers have been billed for such services for years before discovering the unauthorized charges. And when they finally discover the charges, and challenge them, they are often denied refunds.

Other unfair or deceptive practices include not providing consumers with a simple way to cancel the plans, including not allowing them to cancel via the same method by which they enrolled or requiring them to listen to multiple upsells before cancellation is allowed. Companies may also refuse to provide refunds for the period of time the consumer was unwittingly enrolled in the

---

[2] For example, in November 2017, the Better Business Bureau in West Palm Beach, Florida reported that it received more than 4,000 complaints against a company that fulfilled orders for various product lines. *See* https://www.cbsnews.com/news/private-label-skin-hashtag-fulfullment-beauty-cream-business-investigation/.

7

negative option plan and instead limit refunds only to the month in which the consumer discovered the enrollment and tried to cancel.

### C. There is a need for new regulatory provisions to prevent deception by negative option plans not covered by the Rule (Questions 20 and 21).

As acknowledged by the Commission, despite the passage of ROSCA, there is "prevalent, unabated consumer harm in the marketplace" from negative option marketing. 84 Fed. Reg. at 52396. Although ROSCA requires, among other things, clear and conspicuous disclosure of material terms and consumers' informed consent to be billed pursuant to a negative option offer, the statute does not include any concrete, bright line requirements that allow enforcement agencies to readily identify violations. New regulatory provisions are necessary to establish specific requirements that both put companies on notice of the requirements they must follow and allow states to more readily identify nonconforming solicitations.

The Commission is best positioned to determine whether the PNOR should be expanded or new regulations promulgated. Either way, a nuanced approach designed to address the different harms caused by different types of negative option plans is warranted. For example, where a consumer has agreed to pay for a magazine subscription for a specified time period, it is arguable that the consumer would view an auto-renew feature as a convenience and may expect an offer to include it. So, the safeguards needed under these circumstances to ensure informed consent may differ than those needed for other types of transactions, such as free-to-pay conversions, which tend to pose more risk of consumer deception or unfairness.

Given the long-standing evidence of deceptive tactics used to market free-to-pay conversions, the prevalence of consumer complaints of unauthorized charges from them, and the consumer risks associated with such offers, free-to-pay solicitations deserve closer scrutiny and regulation. Even if measures to address the problems decrease the number of consumers who respond to a negative option offer, consumers deserve to understand what they are getting, rather than accepting a "free trial" offer without understanding there are strings attached.

### D. Proposed Modifications and Additions (Question 22).

As noted, the current Rule is tailored to a specific type of negative option plan with features that are materially different from the negative option solicitations prevalent in the marketplace today. As the States indicated above, whether the Rule is amended to fit a broader array of situations, or a new rule is promulgated designed to address other forms of negative option solicitations that have become even more common since the Rule was issued in 1973, any rule should apply to: (1) marketing through any method (whether online, telemarketing or otherwise) and (2) both goods and services.

1. Informed Consent

To ensure informed consent for any negative option solicitation presented through electronic media, we recommend that companies be mandated to require consumers to take a separate, affirmative action to consent to the negative option feature of the offer. For example, in

8

the context of free or nominal fee-to-pay conversions, the consumer would be required to take action, such as clicking an "I Agree" button to accept the trial product, and would also be required to take a second, separate action, such as clicking an "I Agree" button to show consent to be charged for goods or services after the trial period has ended. The disclosure accompanying the "I Agree" button should include the terms of the offer, including the amount and frequency of payments. To avoid the deceptive marketing tactics that are prevalent in the market today, it is crucial to require companies to present such billing information and request for acceptance on a separate page that does not include any other information that may serve as a distraction.

2. <u>Require Periodic Notices</u>

Periodic disclosures to consumers notifying them that they are enrolled in a negative option plan would increase the likelihood that consumers are aware, or are reminded, of the recurring charges and help prevent the continuation of unknowing or unwanted enrollment in these plans. For month-to-month plans, these notices should be provided to consumers at regular intervals via email and include an appropriately worded subject line, such as "Important Billing Information," as well as a convenient method for consumers to cancel the service. For services that renew annually, the Rule should require companies to notify consumers within a specified time period before billing consumers for the renewal. The notice should disclose the timing, amount, and method by which the company intends to bill consumers for the goods or services and provides a convenient method for consumers to cancel the service. The Commission may also want to consider whether notice, with or without a requirement that the company cancel the service if the consumer does not respond, should be required for sustained periods of inactivity in appropriate cases.

3. <u>Phone Solicitations</u>

For solicitations made by telephone, the TSR already establishes certain requirements applicable to any negative option feature, namely, prohibiting the misrepresentation of any material aspect of the offer including, but not limited to, the fact that the consumer will be charged unless he or she takes an affirmative action to avoid the charge(s), the dates the charge will be submitted for payment, and the specific steps that the customer must take to avoid the charges. The Commission should amend the TSR to include additional requirements pertaining to negative option solicitations, such as requiring the company to record the entire transaction and retain it for a specified period of time and provide a full refund if the consumer complaints of unauthorized charges, unless the company is able to provide the consumer with the recording of the phone call establishing the consumer's affirmative consent to be charged.

4. <u>Additional Requirements after Initial Acceptance of the Offer</u>

Companies should be required to obtain an email address from the consumer as part of the acceptance process and immediately send a confirming email with a subject line of "Important Billing Information" or similar language. The body of the email should clearly and conspicuously disclose the following information: the service or product(s) that the consumer has agreed to purchase, the amount and timing of any payments, the method by which the company will collect

9

those payments, and a toll-free number that consumers can call, or other easy means, to cancel any subscription or other service and obtain a refund if the consumer did not authorize the charges.

For negative option offers that involve the shipment of goods to the consumer, companies should be required to include in every shipment an invoice that clearly and conspicuously discloses the name and address of the seller, the terms of the negative option program, instructions as to how the consumer can return the product and obtain a refund, and a toll-free phone number or email address that consumers can use to cancel their subscription.

### 5. Banning Certain Methods of Obtaining Informed Consent

In addition to establishing safeguards to ensure that companies obtain consumers' informed consent to the terms of the offer, the Commission should also consider banning certain methods for obtaining informed consent that are inherently unreliable. For example, one national retailer has been offering negative option free-to-pay conversion programs to consumers on the checkout line as they pay for a purchase. Cashiers offer them the opportunity to receive free trial magazine subscriptions and/or other benefits, such as a discount on future purchases, without disclosing the material terms and conditions, including that after a trial period, consumers will be billed monthly for a membership program. The retailer then purports to use the consumer's signature authorizing the purchase from the retailer as the consumer's consent to be billed monthly on the same account for the membership program, relying on inconspicuous language printed on the sales receipt stating that by providing their signature to authorize their purchase and providing their birth date, consumers are agreeing to a monthly charge for a membership program. Not surprisingly, consumers have complained that they were unaware that they would be charged for the membership program. Including the terms of a negative option program on a sales receipt is an inherently unreliable means of obtaining consumers' informed consent and should be prohibited.

Similarly, another practice that has led to widespread fraud in the past and should be prohibited is the practice of using consumers' endorsement of a check as consent to be billed periodically for goods or services. Specifically, certain industry players have sent consumers a check for a small amount of money in the mail that appeared to come from a retailer with whom the consumer had recently transacted business. Above or below the endorsement line on the check was a small print disclosure advising consumers that by cashing or depositing the check, they were agreeing to enroll in a membership program for which they would be billed annually. This deceptive method of allegedly obtaining consumers' consent to be billed for a membership program generated countless complaints from consumers who were unwittingly enrolled in, and subsequently billed for, a membership program. Using a consumer's endorsement of a check as evidence of informed consent is inherently unreliable and should be prohibited. Consumers have no reason to expect that endorsing a check carries any other consequence and therefore, consumers undoubtedly do not scrutinize any small print that may be included on the reverse side of the check.

### 6. Define Simple Cancellation Processes

Cancellation of negative option plans is made difficult for consumers when they are required by the seller to cancel using a different method of communication than the method by which they agreed to the offer. The States receive numerous complaints from consumers who are

stymied in their efforts to cancel, through long telephone hold times or otherwise. To reduce this difficulty, the States propose requiring that consumers be allowed to cancel their memberships by the same method as their enrollment (as well as by other methods, at the business's option). For example, if a consumer enrolled through an internet website, the company should be required to provide a simple internet cancellation option. The Rule should also limit or prohibit upsell offers that the consumer must respond to before being able to cancel.

7. <u>Refunds</u>

The Rule should require that consumers who are unwittingly enrolled in a negative option plan are entitled to a refund from the date of the enrollment, not just the fees for the month that they discover and request cancellation of the enrollment.

E. **Consumer Education (Question 25).**

Consumer education is an important tool to protect consumers from fraud and the Commission serves an important role in educating consumers nationwide. While it would be worthwhile for the Commission to engage in educational initiatives to warn the public through outreach events, consumer alerts and educational brochures about negative option solicitations, such efforts will likely reach only a small fraction of the consuming public. Thus, it is vitally important for the Commission to also use its regulatory authority to promulgate clear-cut rules that will prevent companies from engaging in the types of deceptive marketing practices that have caused, and continue to cause, substantial consumer harm.

IV. <u>Conclusion</u>

The States appreciate that the Commission has recognized that problems persist with negative option marketing and is taking a second look at ways to improve its existing regulations in this area. The undersigned strongly urge the Commission to expand the existing PNOR or promulgate new regulations to combat deceptive and unfair marketing and business practices in all forms of negative option marketing, with additional provisions to address issues that arise with respect to trial conversion offers.

BY THE UNDERSIGNED:

PHILIP J. WEISER
Attorney General
COLORADO

KATHLEEN JENNINGS
Attorney General
DELAWARE

KARL A. RACINE
Attorney General
DISTRICT OF COLUMBIA

KWAME RAOUL
Attorney General
ILLINOIS

THOMAS J. MILLER
Attorney General
IOWA

ANDY BESHEAR
Attorney General
KENTUCKY

AARON M. FREY
Attorney General
MAINE

BRIAN E. FROSH
Attorney General
MARYLAND

MAURA HEALEY
Attorney General
MASSACHUSETTS

DANA NESSEL
Attorney General
MICHIGAN

KEITH ELLISON
Attorney General
MINNESOTA

AARON D. FORD
Attorney General
NEVADA

GURBIR S. GREWAL
Attorney General
NEW JERSEY

HECTOR BALDERAS
Attorney General
NEW MEXICO

12

LETITIA JAMES
Attorney General
NEW YORK

WAYNE STENEHJEM
Attorney General
NORTH DAKOTA

ELLEN F. ROSENBLUM
Attorney General
OREGON

JOSH SHAPIRO
Attorney General
PENNSYLVANIA

PETER F. NERONHA
Attorney General
RHODE ISLAND

T.J. DONOVAN
Attorney General
VERMONT

MARK R. HERRING
Attorney General
VIRGINIA

BOB FERGUSON
Attorney General
WASHINGTON

JOSHUA L. KAUL
Attorney General
WISCONSIN