# EXHIBIT B

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

9   FEDERAL TRADE COMMISSION,

10          Plaintiff,

11      v.

12   AMAZON.COM, INC.,

13          Defendant.

**Case No. 2:23-cv-0932**

**PLAINTIFF'S MOTION TO DESEQUESTER DOCUMENTS CLAWED BACK BY DEFENDANT**

NOTE ON MOTION CALENDAR:
Friday, July 7, 2023

14
15
16
17
18
19
20
21
22
23

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    Amazon's Efforts to Shield "Sensitive" Documents from Discovery ................... 2

        1.    Amazon Labels Nonprivileged, but Sensitive, Documents "Privileged and Confidential." ...................................................... 2

        2.    Amazon Regularly Included "Silent Attorneys" on Nonprivileged Emails. ..................................................................... 4

    B.    Amazon's Self-Described Diligent Pre-Production Privilege Reviews ................. 5

    C.    Amazon's Untimely Clawbacks ........................................................................... 5

        1.    Amazon's Six-Weeks-Late Objection to the Purportedly Privileged, Twice-Produced "May 4 Memo" ............................................... 6

        2.    Amazon's Seesaw Privilege Claims over the Six-Times-Produced, and Later Clawed-Back, "July 14 Memo" ...................................... 7

        3.    Amazon's February 7, 2023 Clawback of 38 Additional Documents ........ 8

ARGUMENT ................................................................................................................. 9

I.    AMAZON WAIVED ANY PRIVILEGE CLAIM OVER THE CLAWED BACK DOCUMENTS. ........................................................................................................ 9

    A.    Amazon's Prior Productions Could Not Have Been Inadvertent. ....................... 10

    B.    Amazon Did Not Take "Reasonable Steps" to Prevent Production of the July 14 Memo. .................................................................................................. 12

    C.    Amazon Did Not Act "Promptly" to Remedy Its Purportedly Inadvertent Productions. ...................................................................................................... 12

II.    AN *IN CAMERA* REVIEW LIKELY WILL REVEAL AMAZON NEVER HAD A VALID PRIVILEGE CLAIM OVER THE CLAWED BACK DOCUMENTS. ............. 14

    A.    The Clawed Back Documents Were Only Privileged If Sent for the Primary Purpose of Giving or Receiving Legal Advice. ................................................. 15

    B.    Amazon's Capricious Use of the "Privileged and Confidential" Label and "Silent Attorney" Communications Cannot Support Their Privilege Claims. ..... 15

CONCLUSION ............................................................................................................. 17

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932

i

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Bruno v. Equifax Info. Servs., LLC*, 2019 WL 633454 (E.D. Cal. Feb 14, 2019) ........................ 16

*Callan v. Christian Audigier, Inc.*, 263 F.R.D. 564 (C.D. Cal. 2009) ......................................... 10

*Chandola v. Seattle Housing Auth.*, 2014 WL 5023518 (W.D. Wash. Oct. 7, 2014).................. 17

*Ecological Rts. Found. v. FEMA*, 2017 WL 24859 (N.D. Cal. Jan. 3, 2017)............................... 12

*ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247 (E.D. Va. 2012)........................................ 11

*Fisher v. United States*, 425 U.S. 391 (1976) .............................................................................. 15

*In re Chase Bank USA, N.A. Check Loan Contract Litig.*,
   2011 WL 3268091 (N.D. Cal. July 28, 2011)............................................................................. 17

*In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992) .................................................. 14

*In re Grand Jury Matter*, 147 F.R.D. 82 (E.D. Pa. 1992)............................................................ 16

*In re Grand Jury*, 23 F.4th 1088 (9th Cir. 2021) ........................................................................ 15

*Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28 (E.D.N.Y. 2013) .............................. 16

*L.D. v. United Behavioral Health*, 2022 WL 3139520 (N.D. Cal. Aug. 5, 2022) ....................... 14

*Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*,
   2010 WL 275083 (S.D. Cal. Jan. 13, 2010)............................................................................... 13

*Multiquip, Inc. v. Water Mgmt. Sys. LLC*, 2009 WL 4261214 (D. Idaho Nov. 23, 2009)............ 10

*Mycone Dental Supply Co. v. Creative Nail Design Inc.*,
   2013 WL 4758053 (N.D. Cal. Sept. 4, 2013) ............................................................................ 13

*N.M. Oncology & Hematology Consultants, Ltd. v. MV/GBW Presbyterian
   Healthcare Servs.*, 2017 WL 5644390 (D.N.M. Feb. 27, 2017)................................................ 10

*Northrop Grumman Sys. Corp. v. United States*, 120 Fed. Cl. 436 (2015) ................................. 10

*Nueder v. Battelle Pac. Nw. Nat'l Lab'y*, 194 F.R.D. 289 (D.D.C. 2000)............................. 16, 17

*Oracle America, Inc. v. Google*, 2011 WL 5024457 (N.D. Cal. Oct. 20, 2011) ......................... 16

*Skansgaard v. Bank of Am., N.A.*, 2013 WL 828210 (W.D. Wash. Mar. 6, 2013)...................... 12

*T&W Holding Co., LLC v. City of Kemah*, 2022 WL 16948565 (S.D. Tex. Nov. 15, 2022)....... 12

*United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065 (N.D. Cal. 2002) ....................... 17

*United States v. Citgo Petro. Corp.*, 2007 WL 1125792 (S.D. Tex. Apr. 16, 2007)................... 12

*Williams v. District of Columbia*, 806 F. Supp. 2d 44 (D.D.C. 2011)......................................... 12

*Xu v. FibroGen, Inc.*, 2023 WL 3475722 (N.D. Cal. May 15, 2023)........................................... 13

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    ii

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

**Rules**

Fed. R. Civ. P. 26(b)(5)(B) ........................................................................... 9

Fed. R. Evid. 502(b) ............................................................................. 10, 12

**Regulations**

16 C.F.R. § 2.11(d)(1)(ii)(B) ...................................................................... 9

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                         iii                    Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## **INTRODUCTION**

Plaintiff Federal Trade Commission ("FTC") files this motion to restore its access to 54 documents clawed back by Defendant Amazon.com, Inc. ("Amazon") during the FTC's investigation (the "Clawed Back Documents"), and thereafter sequestered by the FTC.  Amazon either waived privilege as to these documents or never had a valid privilege claim.

As detailed in the FTC's concurrently filed Complaint, Amazon knew for years it charged consumers ("nonconsensual enrollees") for Prime memberships consumers did not know they had.  Additionally, through what Amazon internally called the "Iliad" cancellation process,[1] the company knowingly complicated consumers' Prime cancellations.  Recognizing these were, to borrow Amazon's euphemisms, "sensitive" and "controversial" issues, Amazon tried to cloak relevant documents under specious attorney-client privilege claims.  For example, Amazon employees (1) marked documents related to "sensitive" topics "privileged and confidential," even when not seeking legal advice, and (2) sent "silent attorney" communications—*i.e.*, communications directed to businesspersons concerning business matters, but that are also sent to attorneys to whom the author asks no questions and from whom the author receives no response.

In multiple FTC investigations, Amazon, after outside counsel conducted self-described "robust" and "thorough" privilege reviews, produced many documents bearing these dubious privilege designations.  It was only in the late stages of the investigation leading to this case that Amazon sought to undo some of those carefully considered decisions by clawing back 54 documents previously produced, often more than once, to the FTC.

Amazon's clawback attempt must fail for two reasons.  First, Amazon waived any privilege that might previously have applied to the Clawed Back Documents because it cannot prove it produced the documents inadvertently, took reasonable steps to prevent their production,

---

[1] Amazon's internal name for its cancellation process (Iliad) appropriately refers to Homer's 200,000-word, 15,000-line epic about the Trojan War.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                   1                          Federal Trade Commission
                                                                                    600 Pennsylvania Avenue NW
                                                                                    Washington, DC 20580
                                                                                    (202) 326-3320

and acted promptly to correct its "errors."  Second, it is likely that if the Court reviews the Clawed Back Documents—which the FTC has provided *in camera*—it will determine they were never privileged because their primary purpose was neither to seek nor provide legal advice.

<u>**BACKGROUND**</u>

A.   **Amazon's Efforts to Shield "Sensitive" Documents from Discovery**

    1.   **Amazon Labels Nonprivileged, but Sensitive, Documents "Privileged and Confidential."**

Amazon's practice was to mark potentially problematic documents—including those related to Prime enrollment and cancellation—"privileged and confidential" not because they were privileged, but to protect damaging documents from disclosure.

One former Amazon employee, for example, testified:

> QUESTION:   Did anyone ever instruct you to write or include the phrase "privileged and confidential" on documents, whether or not the documents were, in your mind, privileged and confidential?
>
> ANSWER:   Yeah, I think so.
>
> . . .
>
> QUESTION:   . . . [A]re you aware of the label "privileged and confidential" being placed on a document related to [Prime] enrollment or cancellation that was not, in your mind, actually privileged and confidential?
>
> ANSWER:   Yes.

Ex. A at 164, 166.  Another former employee testified "we were told to start marking things 'privileged and confidential'" if they contained "sensitive topic[s]," including documents related to "clarity"—Amazon's internal jargon for work related to "clarifying" enrollment processes so consumers understood they were enrolling in Prime.  Ex. A at 217, 220.  Yet another employee wrote in an email that he and his colleagues were "very familiar with the sensitivity of this topic

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                        2

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   [nonconsensual enrollment] and take all communications seriously by marking them P&C

2   [privileged and confidential]."  Ex. A at 191.

3       Similarly, one manager involved with an internal effort to encourage Amazon to change

4   enrollment practices received instructions to mark material "privileged" when it "might be

5   controversial later."  Ex. A at 188.  He also testified about a designer who would "sometimes

6   label materials privileged and confidential that were not actually privileged or confidential . . . to

7   protect communications that might be sensitive."  Ex. A at 182.  Regarding whether these

8   "sensitive" materials sought or contained legal advice, he testified:  "[s]ome did, most didn't."

    Ex. A at 182.

9       Another former manager testified her area of the company used, for VP-level

10  memoranda, a template containing a "privileged and confidential" label.  Ex. A at 282-83.  She

11  further explained Amazon had a "general practice" of labelling documents transmitted to VPs as

12  "privileged and confidential" regardless of their content.  Ex. A at 283.

13      Amazon manager Nahshon Davidai, who handled considerable work related to Prime

14  enrollment (Ex. A ¶ 11), likewise instructed his subordinates to label enrollment-related

    documents "privileged and confidential."  ████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ███████████████  *See* Ex. A at 175.  Employees emailed the study to Davidai and a dozen

17  other non-lawyer colleagues.  Ex. A at 169.   Davidai "replied all," appended "P&C" to the

18  subject line, and added a single Luxembourg-based corporate attorney (Susan Kremer).  *Id.*; Ex.

    A ¶ 19.  Yet, Davidai actually wrote nothing but:  "+ Susan, making P&C, seeking legal

19  guidance.  *Team, let's please keep Clarity communications as P&C.*"  Ex. A at 169 (emphasis

20  added).

21      Finally, in one telling instance, Davidai's superior, Cem Sibay, indicated merely adding

22  "P&C" was not enough:  employees should not discuss nonconsensual enrollment over email at

23  all.  Specifically, in 2019, an Amazon employee raised concerns when the employee enrolled in

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                      3

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Prime accidentally after reaching a checkout page version he described as "particularly nasty"—*i.e.*, deceptive.  Ex. A at 213.  Another employee responded:  "Sounds like we are tricking customers to sign up for [P]rime without them realizing that they did it."  *Id.*  As the conversation continued, a researcher added the label "--Privileged & Confidential, do not forward--."  Ex. A at 209.  Thirty minutes later, Sibay responded "it's not appropriate to have this conversation over email, and increasingly a mass one at that (just adding P&C does little)."  Ex. A at 209.

### 2.      Amazon Regularly Included "Silent Attorneys" on Nonprivileged Emails.

In conjunction with their misuse of the "privileged and confidential" label, Amazon employees also sought to shield communications by unnecessarily including in-house attorneys on emails directed to nonlawyers while neither seeking nor obtaining legal advice from them. *See, e.g.*, Ex. A at 233 (Amazon employee adding "including legal for advice" to email chain, while directing no questions to the lawyers and two questions to non-lawyer subordinates); *id.* at 195 (Amazon executive writing "seeking [attorney's] counsel" at top of email while directing no questions to, and obtaining no response from, attorney); *id.* at 207 (executive writing "adding [attorney] for his counsel" and then directing email to non-lawyer colleague).  These features typify non-privileged "silent attorney" communications.

Notably, Amazon Senior Vice President Russell Grandinetti testified he has labelled emails "seeking counsel," but "many times," attorneys did not respond. Ex. A at 274.  Another Amazon employee testified more directly:

> QUESTION:        Were you ever . . . instructed to copy attorneys on
>                  correspondence even if the attorneys didn't really have
>                  anything to do with that correspondence?  . . .
>
> ANSWER:          Yes.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    4                          Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Ex. A at 163-164.  Indeed, one former employee used the phrase "requesting privilege" rather than "requesting legal advice."  Ex. A at 248.  This terminology makes sense, of course, because she sought to shield the communication from discovery, not obtain legal advice.

**B.      Amazon's Self-Described Diligent Pre-Production Privilege Reviews**

At different times relevant here, the FTC engaged in multiple investigations of Amazon. In "Investigation 1," Amazon produced at least 25 of the Clawed Back Documents to FTC staff in the FTC's Bureau of Competition.  Ex. A ¶ 44.  Prior to the clawbacks, Amazon assured the FTC it conducted a "robust privilege review," Ex. A at 24, boasting "[e]ach individual document" it produced "was reviewed and assessed—*often more than once*—for responsiveness and privilege," *id.* at 30 (emphasis added).  Amazon also claimed to have reviewed "each part" of each document, along with "any other available context," to assess privilege.  Ex. A at 31.

In "Investigation 2," Amazon produced at least six of the Clawed Back Documents to the FTC's Bureau of Competition, each of which was also produced in Investigation 1.  Ex. A ¶¶ 45, 48(a).  As with Investigation 1, Amazon characterized its privilege review as "thorough."  Ex. A at 90, 96-97.

Separately, on March 16, 2021, the Commission issued a Civil Investigative Demand ("CID") in the Bureau of Consumer Protection investigation leading to this case (the "Dark Patterns Investigation").  Ex. A at 50-64.  Despite the CID's extensive scope, Amazon produced fewer than 30,000 documents over two years.  Ex. A ¶ 17.  Amazon gave various excuses for its limited, slow productions including, as relevant here, the need "for attorneys to review documents before they are produced," including for privilege.  Ex. A at 43.

**C.      Amazon's Untimely Clawbacks**

During the late stages of the Dark Patterns Investigation, after touting the strength of its privilege review in this and the other two FTC investigations, Amazon began clawing back documents.  In many cases, Amazon had produced the documents more than once, and up to six

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                     5                        Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
times.  Many of these documents already contained privilege redactions, and Amazon only began attempting to claw them back long after learning of its "inadvertent" productions.

3
4
### 1.   Amazon's Six-Weeks-Late Objection to the Purportedly Privileged, Twice-Produced "May 4 Memo"

5
6
One of the documents Amazon now seeks to clawback (IC1[2]) is a May 4, 2021 memorandum (the "May 4 Memo").  Ex. A ¶¶ 20-28.  Based on privilege log descriptions and

7
testimony from Amazon employees, the May 4 Memo was prepared for a May 2021 meeting at

8
which several Amazon executives, with two in-house attorneys also present, decided to change

9
the Prime enrollment and cancellation processes.  Ex. A at 114-116, 125, 137-138.  Amazon then

10
produced the May 4 Memo to the FTC at least twice, with privilege redactions.  Ex. A ¶ 27; *id.* at

11
302 (identifying IC1 as produced with redactions).

12
The FTC marked the May 4 Memo as an exhibit at its December 2, 2022 investigational

13
hearing (an administrative deposition) of Amazon executive Russell Grandinetti.  Ex. A at 261.

14
Four attorneys who also represented Amazon appeared on behalf of Mr. Grandinetti.  Ex. A at

15
258.  None of the four asserted the May 4 Memo was privileged during the hearing.  *Id.*  Those

16
attorneys took a copy of the May 4 Memo exhibit with them after the hearing, and also had

17
access to an electronic copy of the exhibit that the FTC sent to Amazon counsel's administrative

18
assistant for printing.  Ex. A at 277 (counsel took exhibit copies); Ex. A ¶ 83; *id.* at 255 (email to

19
outside counsel's assistant, attaching May 4 Memo).  For the ensuing *six weeks*, not one of

20
Amazon's 30-plus outside attorneys (Ex. A ¶¶ 9-10) asserted a privilege objection as to the May

21
4 Memo.  Counsel's non-objection was hardly surprising.  Amazon had already produced the

22
May 4 Memo at least twice with redactions (making clear an attorney made a judgment about

23
what to disclose).  Ex. A ¶ 27; *id.* at 302 (IC1 produced with redactions).

---

[2] "IC1" refers to the first document in the *in camera* set the FTC is contemporaneously submitting on a thumb drive. *See* Ex. A at 302-308 (identifying all "IC" documents).

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    6                              Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

At no time prior to January 11, 2023—*41 days after the FTC used the document at an investigational hearing*—did Amazon claim the May 4 Memo was privileged.  On January 11, the FTC again marked the May 4 Memo at another investigational hearing.  Ex. A ¶ 24.  This time, Amazon asserted a privilege objection.  Specifically, Amazon's outside counsel, undeterred by his four colleagues' silence during the December 2 hearing (not to mention his and his 30-plus colleagues' silence in the 41 intervening days), deemed it "extraordinary" and "so troubling" that the FTC would use the twice-produced and already-privilege-redacted document.  Ex. A at 138, 140.  Two days later, Amazon formally clawed back the May 4 Memo and two related documents.  Ex. A ¶ 26; *id.* at 74.  In a subsequent privilege log, moreover, Amazon asserted the May 4 Memo was attorney work product, but, notably, did *not* assert an attorney-client privilege claim.[3]  Ex. A ¶ 26.

## 2. Amazon's Seesaw Privilege Claims over the Six-Times-Produced, and Later Clawed-Back, "July 14 Memo"

At various times prior to February 2023, and in three different investigations, Amazon produced six copies or versions of a July 14, 2021 memorandum (the "July 14 Memo").  Ex. A ¶ 29; *id.* at 77 (describing *in camera* documents IC4, IC6, IC17, IC22, IC31, and IC48 as the "same" or "substantially similar").  Amazon produced one copy *without* redactions in this investigation (IC6), two copies *with* redactions in this investigation (IC17, IC22), one copy without redactions in both Investigation 1 and Investigation 2 (IC31), and one copy without redactions in Investigation 1 (IC48).  Ex. A ¶¶ 35, 36.  The sixth copy (IC4) took a more circuitous path.  First, Amazon withheld it in full, listing it on an August 2022 privilege log.  Ex. A ¶ 30.  Then, in a January 5, 2023 letter, Amazon's counsel *expressly told the FTC it had determined this version of the July 14 Memo was only "partially privileged"* and that it was

---

[3] This, of course, heightens the disingenuousness of Amazon's indignation with FTC counsel.  Apparently, in Amazon's view, the FTC should have respected privilege claims that Amazon itself did not even make.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    7                              Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

therefore producing a redacted version, as part of a production of six deprivileged documents. Ex. A at 253.

Just two weeks later, Amazon reversed course yet again.  Specifically, at a January 20 investigation hearing, the FTC marked a previously produced, unredacted version of the July 14 Memo (IC31) as an exhibit.[4]  After asking for a break, Amazon's counsel declared the July 14 Memo an "inadvertent production" and "privileged," stating the memo had "been treated as [privileged] in the context of this investigation"—*i.e.*, the Dark Patterns Investigation—and made a verbal clawback request.  Ex. A at 297.  This was a half-truth at best:  in this investigation alone, the July 14 Memo had alternately been treated as nonprivileged, fully privileged, and partially privileged (the position taken just 15 days prior in writing).  Ex. A ¶¶ 30-31, 35-36.  In both Investigation 1 and Investigation 2, it had been treated as nonprivileged.  Ex. A ¶ 36.

On February 7, 2023—18 days after the investigational hearing—Amazon clawed back five more copies of the July 14 Memo, including the version (IC4) it had partially deprivileged on January 5.  Ex. A ¶ 34.  Without mentioning that January 5 determination, Amazon said it had learned unspecified "additional facts" justifying the privilege reversal.  Ex. A at 77-78.  On at least two separate occasions, Amazon refused to identify a single one of those "additional facts." Ex. A at 82-83, 203.

### 3.     Amazon's February 7, 2023 Clawback of 38 Additional Documents

For more than two months after the FTC used the May 4 Memo at the December 2 investigational hearing, Amazon said nothing about the vast majority of documents it now seeks to claw back.  In fact, even though Amazon flagged yet another document (IC40) as potentially privileged at a December 20, 2022 investigational hearing, it did not claw back that document for another seven weeks.  Ex. A ¶¶ 38-39.

---

[4] At the time it marked this unredacted exhibit, FTC counsel was unaware Amazon had redacted, as partially privileged, other copies of the July 14 Memo.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                        8

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Not until February 7, 2023 did Amazon submit a lengthy list of additional clawbacks (Ex. A ¶ 41).[5]  Amazon provided little explanation for the clawbacks, instead simply declaring the documents "privileged" and "inadvertently produced."  Ex. A at 77-78.  Tellingly, although Amazon claimed to have "learned additional [but unspecified] facts" relating to the six copies of the July 14 Memo, Ex. A at 77, it made no such claim regarding the remaining 38 documents in the February 7 letter,[6] Ex. A at 78-79, nor did Amazon provide any explanation of how and when it discovered the purportedly inadvertent productions.  On a subsequent meet-and-confer call, Amazon declined to provide additional information.  Ex. A at 203.

## ARGUMENT

Because Amazon cannot establish (1) its original productions of the Clawed Back Documents were inadvertent, (2) that it took reasonable steps to prevent production of the July 14 Memo, and (3) that it acted promptly to remedy its purported errors, Amazon waived any privilege claim as to the Clawed Back Documents.  Moreover, even if there were no waiver, the Court should conduct an *in camera* review of the Clawed Back Documents, which likely are not privileged at all given Amazon's documented misuse of privilege claims.

## I   AMAZON WAIVED ANY PRIVILEGE CLAIM OVER THE CLAWED BACK DOCUMENTS.

To avoid a finding of waiver, Amazon must prove (1) its prior productions of the Clawed Back Documents were "inadvertent"; (2) it took "reasonable steps to prevent" the productions; and (3) it "promptly took reasonable steps to rectify" the purportedly inadvertent productions.

---

[5] Amazon demanded the FTC "return or destroy" clawed-back material, falsely claiming on multiple occasions that the FTC was required to do so, in an apparent attempt to complicate the FTC's ability to file this motion.  *See e.g.*, Ex. A at 74, 78.  However, pursuant to 16 C.F.R. § 2.11(d)(1)(ii)(B), the Commission elected to "[s]equester such material until such time as [a] . . . court may rule on . . . the claim of privilege[.]"  As described in Ex. A ¶¶ 46-52, after sequestering the documents, the FTC used a filter team to prepare the documents for *in camera* submission and compile limited, nonprivileged information relevant to this motion.  *See* Ex. A at 302-08 (chart containing information regarding Clawed Back Documents, including information provided by filter team); *see also* Fed. R. Civ. P. 26(b)(5)(B) (permitting party informed of inadvertent production to "present the [documents] to the court . . . for a determination of the [privilege] claim").

[6] Two weeks later, Amazon vaguely asserted that "further review and fact finding" had led to the clawbacks listed in the February 7 letter.  Ex. A at 83.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932

9

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Fed. R. Evid. 502(b).  Amazon bears the burden of establishing each element.  *See, e.g.*, *Callan v. Christian Audigier, Inc.*, 263 F.R.D. 564, 566 & n.3 (C.D. Cal. 2009) (citation omitted) (adopting "standard practice" of placing burden on party seeking to prevent waiver).  Because, for each Clawed Back Document, Amazon fails on at least one element, a finding of waiver is appropriate.

## A. Amazon's Prior Productions Could Not Have Been Inadvertent.

A production is "inadvertent" if, *inter alia*, it was a "mistake" rather than intentional. *See, e.g.*, *Multiquip, Inc. v. Water Mgmt. Sys. LLC*, 2009 WL 4261214, at *4 (D. Idaho Nov. 23, 2009).  Therefore, where a party makes a "knowing production, after careful review," the "logical assumption" is the party waived privilege.  *Northrop Grumman Sys. Corp. v. United States*, 120 Fed. Cl. 436, 439 (2015); *see also N.M. Oncology & Hematology Consultants, Ltd. v. MV/GBW Presbyterian Healthcare Servs.*, 2017 WL 5644390, at *5-6 (D.N.M. Feb. 27, 2017) (party could not "credibly" claim inadvertence where, as here, it "carefully reviewed each [produced] document").

For at least three reasons, Amazon cannot meet its burden of proving inadvertence.  *First*, as described *supra* p. 5, Amazon repeatedly touted the thoroughness and deliberateness of its privilege reviews, which included having at least one attorney review all produced documents. In fact, at least in Investigation 1—in which Amazon produced both the May 4 Memo and the July 14 Memo—Amazon claimed to have reviewed "each part" of each document and "any other available context."  Ex. A at 31.  Therefore, it is evident Amazon made deliberate decisions it now regrets—perhaps only after recognizing the documents' significance to this case[7]—not the type of mistakes addressed by Rule 502.

---

[7] Consistent with the likelihood that Amazon's clawbacks are strategic, Amazon has repeatedly justified its clawbacks with the bizarre claim that it had treated certain documents as privileged in "this investigation" (but not others).  *See, e.g.*, Ex. A at 74 (contrasting treatment of May 4 Memo in "separate investigations" with its handling of the document in "this investigation"); *id.* at 297 (same, for July 14 Memo).  Of course, whether a document is privileged does not depend on the investigation in which it is produced.  Only the document's significance—*i.e.*, the harm it can cause Amazon's legal position—varies.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                        10

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Second,* there is no question Amazon waived privilege with respect to the 21 Clawed Back Documents it previously produced with redactions (including the May 4 Memo and July 14 Memo). Ex. A at 302-08 (identifying 21 documents originally produced with redactions).[8] Producing a redacted document is an unmistakable indication at least one attorney reviewed the document and made intentional privilege decisions. *See, e.g.*, *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 255 (E.D. Va. 2012) (rejecting clawback attempt in part because document "was produced in redacted form, indicating that, in fact, it had been reviewed by [the party] before production"). This is particularly true for the July 14 Memo, which Amazon redacted and produced as part of a production set of just six deprivileged documents. Ex. A at 253.

*Third*, Amazon previously produced at least 16 Clawed Back Documents at least twice[9] (and up to six times[10]), again including the May 4 Memo and July 14 Memo.[11] Ex. A ¶¶ 48, 49(a), 51. Another 12 documents may not be identical to one another but appear to be different versions of the same document.[12] Ex. A ¶¶ 49(b)-51. Especially considering Amazon's thorough privilege review, it makes no sense that the company would make the exact same privilege "mistake" multiple times (not to mention, for the May 4 Memo, yet again at and after the December 2 investigational hearing, when none of Amazon's attorneys declared the

---

[8] These documents, referenced by their *in camera* exhibit number, are: IC1, IC3, IC4, IC12, IC17, IC22, IC24, IC25, IC27, IC28, IC36, IC41, IC42, IC43, IC44, IC45, IC46, IC47, IC49, IC51, and IC53. Ex. A at 302-08 (sixth column).

[9] These documents, referenced by their *in camera* exhibit number, are: IC1, IC7, IC14, IC15, IC26, IC31, IC32, IC33, IC34, IC36, IC38, IC41, IC42, IC43, IC44, and IC45. Ex. A at 302-08 (second column from right).

[10] The following Clawed Back Documents are six different copies of the same document: IC14, IC26, IC38, IC41, IC42, and IC43. Ex. A at 302-08 (second column from right).

[11] It is possible, if not likely, that there are more Clawed Back Documents that Amazon produced at least twice. Because, however, the FTC sequestered the Clawed Back Documents, it did not conduct this analysis. For example, the FTC did not compare fully Clawed Back Documents to one another. Additionally, the FTC could not determine whether there remain non-clawed-back copies of any Clawed Back Documents. Amazon, of course, could determine how many Clawed Back Documents it had produced on multiple occasions and provide the answer in its opposition to the motion.

[12] These documents, referenced by their *in camera* exhibit number, are: IC4, IC6, IC13, IC17, IC22, IC23, IC24, IC25, IC28, IC47, IC48, and IC49. Ex. A 302-08 (right-most column).

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                    11                    Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

document privileged).  *See, e.g.*, *T&W Holding Co., LLC v. City of Kemah*, 2022 WL 16948565, at *4 (S.D. Tex. Nov. 15, 2022) (party's repeated production of a document "indicat[es] that the production was not an isolated mistake"); *United States v. Citgo Petro. Corp.*, 2007 WL 1125792, at *5 (S.D. Tex. Apr. 16, 2007) (party could not claim inadvertence where party had "twice disclosed the privilege[d] documents in different forms at different times").

### B.   Amazon Did Not Take "Reasonable Steps" to Prevent Production of the July 14 Memo.

To establish the requisite "reasonable steps" to prevent disclosure of privileged documents, a party must explain its privilege review "methodology."  *Williams v. District of Columbia*, 806 F. Supp. 2d 44, 49 (D.D.C. 2011) (citation omitted).  Disclosure of a document as part of a "relatively *de minimis* production" weighs in favor of waiver.  *Id.* at 50.  As described above, Amazon produced the July 14 Memo as part of a set of just six deprivileged documents. It is inconceivable that, if this document is actually privileged, Amazon could have taken reasonable steps to prevent disclosure of it and nevertheless produced it as part of this *de minimis* production of previously withheld documents.[13]

### C.   Amazon Did Not Act "Promptly" to Remedy Its Purportedly Inadvertent Productions.

Even if Amazon could prove inadvertence and reasonable precautions, it cannot prove it acted "promptly" to correct its inadvertent productions, because it decidedly did not.  *See* Fed. R. Evid. 502(b).  "Numerous courts have held that once a party realizes a document has been accidentally produced, it must assert privilege with *virtual immediacy*."  *Ecological Rts. Found. v. FEMA*, 2017 WL 24859, at *7 (N.D. Cal. Jan. 3, 2017) (cleaned up) (emphasis added); *see also Skansgaard v. Bank of Am., N.A.*, 2013 WL 828210, at *3 (W.D. Wash. Mar. 6, 2013) ("[C]law back requests should be made immediately, with delays of even a few weeks

---

[13] For the remaining Clawed Back Documents, Amazon appears to have taken reasonable pre-production steps to protect privilege, assuming it can meet its burden to prove its statements about the thoroughness of its privilege review process, *see supra* p. 5.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                    12                    Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

determined to be too long . . . ."); *Xu v. FibroGen, Inc.*, 2023 WL 3475722, at *6 (N.D. Cal. May 15, 2023) (finding waiver where party "began [its] investigation" of privileged document four days after receiving notice of its production; "failed to put [opposing counsel] on notice of its investigation"; and waited just seven more days to claw back document).

Amazon's failure to act promptly is most glaring for the May 4 Memo.  The law is clear: "if a privileged document is used at a deposition, and the privilege holder fails to object *immediately*, the privilege is waived."  *Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083, at *5 (S.D. Cal. Jan. 13, 2010) (collecting cases) (emphasis added); *Mycone Dental Supply Co. v. Creative Nail Design Inc.*, 2013 WL 4758053, at *3 (N.D. Cal. Sept. 4, 2013) (producing party "should have recalled the document that was used in the deposition immediately after the deposition").  Far from acting immediately—*i.e.*, at or right after the December 2 investigational hearing—Amazon and its well-resourced legal team did not claw back the May 4 Memo for *41 days*.  *See supra* pp. 6-7.

Amazon also dragged its feet in clawing back the July 14 Memo.  After objecting to the FTC's use of one copy of the document at a January 20 investigational hearing and definitively declaring it "privileged," Amazon waited *18 days* to claw back five other copies and, even then, only did so after prompting by the FTC.  Ex. A ¶¶ 32-34.  *See FibroGen*, 2023 WL 3475722, at *6 (finding waiver based on 11-day delay).  Presumably, Amazon simply needed to search its production databases for other copies of the document—a task that should take hours, not days.

Amazon's delays extend to the other Clawed Back Documents.  Specifically, where, as here, a party is put on notice of privilege issues with its production, it must promptly review the production for inadvertently produced documents.  *See, e.g.*, *Luna*, 2010 WL 275083, at *6 (finding waiver where "use of the [privileged document] . . . put [the producing party] on notice that its document production was defective"; the party "should have taken prompt and diligent steps to reassess its document production"); *see also Mycone Dental*, 2013 WL 4758053, at *3

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                              13                     Federal Trade Commission
                                                                          600 Pennsylvania Avenue NW
                                                                          Washington, DC 20580
                                                                          (202) 326-3320

1
2

(after "immediately" clawing back document used at deposition, party should have "then conducted a more thorough and timely investigation into the rest of the production").

3
4
5
6
7
8
9
10
11

Here, Amazon knew or should have known it had a problem with its productions no later than the December 2, 2022 investigational hearing. *See supra* pp. 6-7. (In fact, ten days earlier, the FTC alerted Amazon to an apparent inadvertent production of a different document, which Amazon subsequently clawed back. Ex. A at 223, 225.) *At a minimum*, Amazon was aware of "issues" by December 20, when Amazon identified another purportedly inadvertently produced document (IC40[14]) at an investigational hearing. Ex. A ¶ 38. Eschewing its burden of demonstrating promptness, the company has refused to reveal what steps it took, or when, to identify the 44 Clawed Back Documents listed in its February 7 letter. The available evidence— primarily Amazon's 67-day delay from December 2 to February 7—demonstrates Amazon did not act promptly. Accordingly, it waived privilege over the Clawed Back Documents.[15]

12

## II   AN *IN CAMERA* REVIEW LIKELY WILL REVEAL AMAZON NEVER HAD A VALID PRIVILEGE CLAIM OVER THE CLAWED BACK DOCUMENTS.

13
14
15
16

Because Amazon waived privilege, the Court need not determine whether Amazon ever had a valid privilege claim as to the Clawed Back Documents. If, however, the Court reaches this question, it should conduct an *in camera* review, given Amazon's repeated misuse of "privileged and confidential" claims.[16] Based on the facts described *supra* pp. 2-5, it is likely the

17
18
19
20
21
22
23

[14] Amazon clearly did not act promptly to claw back this document, waiting 49 days after it identified the document as potentially privileged at an investigational hearing to actually claw it back. Ex. A ¶¶ 38-39.

[15] Amazon clawed back five documents on January 5, 2023. Ex. A ¶ 40. Amazon has not stated when it learned of these "inadvertent" productions and therefore cannot, without correcting that deficiency, prove promptness.

[16] The threshold showing required to justify an *in camera* review is "not high." *L.D. v. United Behavioral Health*, 2022 WL 3139520, at *11 (N.D. Cal. Aug. 5, 2022) (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1074 (9th Cir. 1992)). In particular, the party seeking *in camera* review "need only show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal . . . the materials is not privileged." *Id.* (quoting *Grand Jury Investigation*, 974 F.2d at 1075).) The FTC easily clears this bar based on Amazon's overuse of the "privileged and confidential" label and silent-attorney emails, *see supra* pp. 2-5, and the bizarre circumstances surrounding Amazon's clawbacks, *see supra* pp. 5-9, which may reflect that the clawbacks are strategic rather than clear, undisputable privilege claims.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    14

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

relevant documents were not sent for the "primary purpose" of obtaining or providing legal advice.

### A. The Clawed Back Documents Were Only Privileged If Sent for the Primary Purpose of Giving or Receiving Legal Advice.

The attorney-client privilege applies only where the "primary purpose" of the document "is to give or receive legal advice, as opposed to business . . . advice." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021), *certiorari dismissed as improvidently granted*, 143 S. Ct. 543.[17]  That is because the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* at 1092 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).  The Ninth Circuit adopted this "primary purpose" test to avoid the situation presented here, where a company "add[s] layers of lawyers to every business decision in hopes of insulating [it] from scrutiny in any future litigation." *Id.* at 1093-94.

Because the FTC sequestered the Clawed Back Documents pending the outcome of this motion, it cannot apply the "primary purpose" test to specific documents.  Nevertheless, the non-privileged facts described *supra* pp. 2-5 make clear the Clawed Back Documents likely were *not* for the primary purpose of obtaining legal, as opposed to business, advice.  In fact, in many cases, the documents likely were only labeled "privileged" or sent to silent attorneys in anticipation of exactly this situation:  to manufacture an unfounded privilege claim.

### B. Amazon's Capricious Use of the "Privileged and Confidential" Label and "Silent Attorney" Communications Cannot Support Their Privilege Claims.

For both factual and legal reasons, the Court should give no weight to any "privileged and confidential" markings on the Clawed Back Documents.  Factually, the overwhelming

---

[17] For three documents, including the May 4 Memo, Amazon asserted work-product protection. Ex. A at 302-08 (fifth column).  To support that claim, Amazon must establish that it prepared the documents "because of the prospect of litigation" and that they "would not have been created in substantially similar form but for the prospect of that litigation." *In re: Grand Jury Subpoena*, 357 F.3d 900, 907-08 (9th Cir. 2004) (citations omitted).

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                              15                    Federal Trade Commission
                                                                        600 Pennsylvania Avenue NW
                                                                        Washington, DC 20580
                                                                        (202) 326-3320

evidence establishes Amazon marked documents it deemed "sensitive" (including documents relating to Prime enrollment and cancellation) "privileged and confidential," not just those seeking or providing legal advice. *See supra* pp. 2-4; *see also In re Grand Jury Matter*, 147 F.R.D. 82, 87 (E.D. Pa. 1992) (labelling documents "privileged and confidential" was "indicative" of attempt to shield them from investigative authorities). Courts repeatedly have found simply labelling a document "privileged and confidential" does not "automatically confer" privileged status. *Oracle America, Inc. v. Google*, 2011 WL 5024457, at *3 (N.D. Cal. Oct. 20, 2011); *see also Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 38 (E.D.N.Y. 2013) ("[T]he attorney-client privilege is not available merely by stamping a document that was prepared by an attorney, which contains solely business advice, 'PRIVILEGED AND CONFIDENTIAL' [or] 'Advice of Counsel.'"), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (second alternation in original) (citation omitted).

Relatedly, Amazon's use of "silent attorney" communications does not support their privilege claims. Silent attorney communications—*i.e.*, those that (1) are not, on their face, genuinely directed to an attorney, and (2) prompt no response from the attorney—are not privileged because they are not genuinely meant to "facilitate the rendering of legal advice." *Bruno v. Equifax Info. Servs., LLC*, 2019 WL 633454, at *5 (E.D. Cal. Feb 14, 2019) (considering the absence of "any indication that either attorney responded to the emails" as evidence that they were not sent for the purpose of obtaining legal advice). This fact is true regardless of whether attorneys are placed on the "To" or "Cc" line. *See, e.g.*, *Nueder v. Battelle Pac. Nw. Nat'l Lab'y*, 194 F.R.D. 289, 295 (D.D.C. 2000) ("[D]ocuments prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged.") (citation omitted); *Oracle*, 2011 WL 5024457 at *2 (email not "directed to" an attorney even when attorney appeared on the "To:" line). Similarly, "[m]erely forwarding a communication to a lawyer with the subject line 'legal review needed' is not sufficient to confer the privilege to the initial communication . . . ." *In re Chase Bank USA, N.A. Check Loan*

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                16                      Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Contract Litig.*, 2011 WL 3268091, at *3 (N.D. Cal. July 28, 2011).  Thus, Amazon's practice of adding attorneys in the midst of an email chain, *see supra* pp. 4-5, cannot protect earlier emails in the chain from disclosure.

Finally, as at least one court in this district has observed, "extra scrutiny is required where in-house counsel is involved, as in-house counsel often act in both a legal and non-legal business capacity."  *Chandola v. Seattle Housing Auth.*, 2014 WL 5023518, at *1 (W.D. Wash. Oct. 7, 2014); *see also Neuder*, 194 F.R.D. at 295 (D.D.C. 2000) ("In cases that involve in-house counsel, it is necessary to apply the privilege cautiously and narrowly . . . .").  Accordingly, for communications with in-house counsel, Amazon "must make a '*clear showing'* that the 'speaker' made the communications for the purpose of obtaining or providing legal advice." *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) (emphasis added) (citation omitted).

## **CONCLUSION**

The FTC respectfully requests that the Court enter the attached proposed order allowing the FTC to desequester the Clawed Back Documents.

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                    17                          Federal Trade Commission
                                                                                      600 Pennsylvania Avenue NW
                                                                                      Washington, DC 20580
                                                                                      (202) 326-3320

## <u>LOCAL RULE 7(e) CERTIFICATION</u>

I certify that this memorandum contains 5,852 words.  The FTC has concurrently filed a Motion for Leave to Exceed Word Limit.

Dated: June 21, 2023

       s/ Evan Mendelson
EVAN MENDELSON (D.C. Bar #996765)
OLIVIA JERJIAN (D.C. Bar #1034299)
THOMAS MAXWELL NARDINI
(IL Bar #6330190)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2749; ojerjian@ftc.gov (Jerjian)
(202) 326-2812; tnardini@ftc.gov (Nardini)

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932

18

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## **CERTIFICATE OF SERVICE**

I, Evan Mendelson, certify that on June 21, 2023, I electronically filed the foregoing

motion with the Clerk of the Court using the CM/ECF system.  Additionally, I have directed a

process server to hand deliver the foregoing motion, and any attachments thereto, to the

Defendant's registered agent:  Corporation Service Company, 251 Little Falls Drive,

Wilmington, DE 19808.  I will also provide a courtesy copy of this motion to counsel for the

Defendant by email today.

By: /s/ Evan Mendelson

PLAINTIFF'S MOTION TO
DESEQUESTER
Case No. 2:23-cv-0932                                                     19

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

# Exhibit A

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | |
| AMAZON.COM, INC. | |
| Defendant. | |

**DECLARATION OF ADAM ROTTNER**

(Pursuant to 28 U.S.C. § 1746)

    I, Adam Rottner, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I could and would testify as follows:

1.    I am a United States citizen and am over eighteen years of age.  I am employed by the Federal Trade Commission ("FTC" or the "Commission") as a Senior Investigator in the Division of Enforcement, Bureau of Consumer Protection.  My office address is 600 Pennsylvania Avenue, NW, Washington, DC 20580.

1

2.     As an Investigator with the FTC, my duties include investigating possible violations of the laws and regulations the FTC enforces and possible violations of Orders obtained by the Commission.

3.     In my duties as an Investigator, I engage in discovering, reviewing, and capturing website content; making undercover calls and purchases; preserving evidence; and analyzing data as it relates to investigations to which I am assigned.

4.     I was assigned to work on the Commission's investigation into this matter in February 2021.

5.     A number of attachments are included with this declaration.  In accordance with FTC procedures and this Court's rules, information from some of these attachments may have been redacted in order to protect sensitive information such as financial account numbers, personally identifiable information, and FTC undercover identities.

6.     Consistent with Local Rule 10(e)(10), highlighting has been added to the attachments to indicate excerpts referenced in this declaration or the accompanying motion.

## DARK PATTERNS INVESTIGATION

7.     On March 16, 2021, the FTC issued a Civil Investigative Demand ("CID") to Amazon.com, Inc ("Amazon"), initiating this investigation (the "Dark Patterns Investigation").

8.     Later that month, counsel for the FTC was contacted by Laura Kim, a Partner at Covington & Burling, LLP ("Covington"), who was retained to represent Amazon. Covington has represented Amazon continuously since March 2021 in this investigation.

2

9.      On May 17, 2023, I reviewed the investigational hearing transcripts from this investigation at which attorneys from Covington made appearances.  In total, 27 attorneys from Covington appeared throughout the course of these investigational hearings.

10.      In addition to the 27 Covington attorneys who attended investigational hearings, I reviewed email correspondence between the FTC and Covington and identified at least four other attorneys from Covington who appear to have worked on this matter.

11.      I reviewed the Investigational Hearing transcript of Nahshon Davidai.  During his testimony, Davidai stated that he was heavily involved with work related to Prime enrollment.

## OTHER FTC INVESTIGATIONS

12.      Separate from the Bureau of Consumer Protection's Dark Patterns Investigation, the FTC's Bureau of Competition initiated what I will refer to as "Investigation 1." Covington was retained to represent Amazon in Investigation 1.

13.      The FTC's Bureau of Competition also initiated what I will refer to as "Investigation 2." Covington was retained to represent Amazon in Investigation 2.

14.      My understanding is that documents produced to the FTC by Amazon in Investigation 1 have Bates prefix "Amazon-FTC-CID."  For Investigation 2, the Bates prefix used by Amazon may reveal the subject matter of the investigation, so in this Declaration and Attachment 37, that Bates prefix has been replaced with "AMZN-Investigation2."

15.      My understanding is that documents bearing Bates numbers with both the "Amazon-FTC-CID" prefix and the "AMZN-Investigation2" prefix were produced in both Investigation 1 and Investigation 2.

3

**PRODUCTION DOCUMENTS**

16.    In response to the March 2021 Dark Patterns CID, Amazon began producing documents

to the FTC on April 15, 2021.

17.    In total, Amazon has produced 29,998 documents in this investigation.

    a.    8,826 documents were produced between April 15, 2021 and February 18, 2022.

    b.    19,154 documents were produced between October 7, 2022 and February 13,

       2023.

18.    On April 4, 2023, I used an FTC computer to access the *Relativity* E-discovery Software

("Relativity") database containing documents related to the FTC's Dark Patterns

Investigation.  The database includes documents produced by the Defendants to the FTC.

19.    I accessed the "Search" feature in *Relativity* and ran searches for the document with the

Bates number AMZN_00091284.  AMZN_00091284 contains an August 31, 2020 invite

for an October 12, 2020 meeting with the title, "Content Clarity Measurement

Framework," an attached study, and emails relating to, and rescheduling, the October 12,

2020 meeting.

    a.    I reviewed the invite and confirmed that on October 27, 2020, Nahshon Davidai

       added Susan Kremer to the email exchange and changed the title to "P&C:

       Content Clarity Measurement Framework."

    b.    Per Ms. Kremer's *LinkedIn* profile, she is Senior Corporate Counsel at Amazon,

       and is based in Luxembourg.

4

1

2                                    **THE "MAY 4 MEMO"**

3    20.   I reviewed the transcript of the FTC's December 2, 2022 investigational hearing of

4          Amazon executive Russell Grandinetti, which is excerpted in Attachment 32[1] to this

5          declaration.

6    21.   At the December 2, 2022 investigational hearing, FTC counsel marked as Exhibit RG 6 a

7          document with Bates number Amazon-FTC-CID_09246136.  (Attachment 32 at 218:7-

8          13.)  Because an Amazon privilege log provides a date of May 4, 2021 for this document,

9          I refer to the document as the "May 4 Memo."  The document is "IC1" in the *in camera*

10         submission being provided to the Court.

11   22.   At the December 2 hearing, Mr. Grandinetti was represented by four attorneys from

12         Covington, which also represented Amazon throughout this investigation.  None of Mr.

13         Grandinetti's attorneys objected, or asserted any privilege claim, to the May 4 Memo.

14         (Attachment 32 at 218:7-220:10.)

15   23.   I also reviewed the transcript from the January 11, 2023 investigational hearing of a

16         corporate representative of Amazon (excerpted in Attachment 15).

17   24.   During the January 11, 2023 investigational hearing, FTC counsel again marked a copy

18         of the May 4 Memo, as Exhibit 15.  (Attachment 15 at 279:16-25 (exhibit marked).)

19              a.   Specifically, the January 11 transcript indicates that Exhibit 15 contains Bates

20                   numbers Amazon-FTC-CID_09246134 through Amazon-FTC-CID_09246147,

21                   which includes Amazon-FTC-CID_09246136—the beginning Bates number for

22

23

---

[1] All attachments to this declaration are identified in ¶¶ 53-89.

1    the May 4 Memo marked at the December 2 investigational hearing.  (Attachment

2    15 at 296:7-10.)

3      b.  A subsequent privilege log provided by Amazon confirms that Exhibit 15 from

4    the January 11 investigational hearing contains a "parent" message (IC34, starting

5    with Bates number ending -34) in addition to the May 4 Memo itself (IC1,

6    starting with Bates number ending -36, which was marked as RG 6 at the

7    December 2 investigational hearing).

8  25.  At the January 11 investigational hearing, the Covington attorney representing Amazon

9    stated that the May 4 Memo was attorney-client privileged and attorney work product,

10    and "formally stat[ed] the company's intention . . . to claw back this document."

11    (Attachment 15 at 280:22-281:7.)

12  26.  Two days later, on January 13, 2023, Covington sent a written clawback request for the

13    cover message to the May 4 Memo (Amazon-FTC-CID_09246134; IC34), the attached

14    May 4 Memo (Amazon-FTC-CID_09246136; IC1), and a third document that, based on

15    privilege log descriptions, appears to be another copy or version of the May 4 Memo

16    (Amazon-FTC-CID_09246157; IC36).  On the corresponding privilege log, Amazon only

17    claimed attorney work-product protection, and not attorney-client privilege, as to the May

18    4 Memo (IC1) and the other document (IC36).

19  27.  Each of the three documents clawed back in the January 13 letter also bore a second

20    Bates number (with an Investigation 2 prefix), indicating that they were each produced

21    twice:  once in each investigation.

22  28.  Amazon employees' investigational hearing testimony confirms that there was a meeting

23    in May 2021 that resulted in changes to Amazon's Prime enrollment and cancellation

1    flows.  (Attachment 14 at 178:10-15, 180:14-16, 190:15-24, 231:15-18; Attachment 15 at

2    283:17-284:13.)

3        a.   The employees further confirmed that a memo was prepared for the May 2021

4            meeting.  (Attachment 14 at 188:8-10; Attachment 15 at 279:16-280:5.)  Many

5            Amazon executives were present at the meeting, in addition to two Amazon in-

6            house attorneys.  (Attachment 14 at 180:25-181:7, 229:25-230:12, 278:19-279:13;

7            Attachment 15 at 284:14-285:1.)

8                                **THE "JULY 14 MEMO"**

9    29.   Amazon has identified the following six documents as different "versions of the same (or

10    a substantially similar) document":  Amazon-FTC-CID_08427042 / AMZN-

11    Investigation2-003149387 (IC31), Amazon-FTC-CID_009910965 (IC48),

12    AMZN_00045917 (IC4), AMZN_00112860 (IC6), AMZN_00137986 (IC17), and

13    AMZN_00138070 (IC22).  (Attachment 8 at 1.)  Because Amazon's privilege log entries

14    identify this document as a July 14, 2021 "memorandum" or "document," I am referring

15    to it as the "July 14 Memo."

16    30.   Amazon included one version of the July 14 Memo (AMZN_00045917; IC4) on an

17    August 4, 2022 privilege log provided to the FTC in this investigation (the Dark Patterns

18    Investigation), and stated that it was withholding the document in full as attorney-client

19    privileged.

20    31.   On January 5, 2023, Amazon informed the FTC it had determined the same version of the

21    July 14 Memo (AMZN_00045917; IC4) was *not* fully privileged.  Specifically, Amazon

22    wrote that it had determined the memo was "partially privileged."  (Attachment 30 at 2.)

23

7

1    At the same time, Amazon stated it was producing a copy of the July 14 Memo with

2    redactions.  (Attachment 30 at 2.)

3    32.    I have reviewed the transcript of the January 20, 2023 investigational hearing of a

4    corporate representative for Amazon (excerpted in Attachment 35).  At that hearing, the

5    FTC marked a different copy of the July 14 Memo (Amazon-FTC-CID_08427042 /

6    AMZN-Investigation2-003149387; IC31) as an exhibit.  (Attachment 35 at 372:12-20.)

7    Amazon's counsel asked for a break and then, after the break, stated the document was

8    "an inadvertent production," was "privileged," and "has been treated as such in the

9    context of this investigation," referencing the Dark Patterns Investigation.  (Attachment

10    35 at 373:19-374:16.)  Amazon's counsel did not make any reference to the copy of the

11    July 14 Memo that the company had told the FTC 15 days earlier was only "partially

12    privileged."  (Based on a discussion with FTC counsel, it is my understanding that as of

13    the date of the hearing, FTC counsel was unaware that Amazon had claimed another

14    version of the document was partially privileged.)  Amazon's counsel added:  "We will

15    follow up, consistent with our conversation off the record, with a formal clawback

16    request."  (Attachment 35 at 374:17-23.)

17    33.    On February 3, 2023, FTC counsel sent an email to Amazon counsel (Attachment 36)

18    noting that Amazon had not yet sent a written clawback request for the July 14 Memo.

19    34.    On February 7, 2023, Amazon counsel sent a letter clawing back six copies of the July 14

20    Memo.  (Attachment 8 at 1.)  Specifically, Amazon wrote that the six inadvertently

21    produced documents "came to Amazon's attention during the January 20, 2023

22    investigational hearing of Amazon's corporate designee, Lisa Leung."  (Attachment 8 at

23    1.)  In addition to the version of the July 14 Memo marked at the January 20

8

1    investigational hearing, Amazon wrote that it had "identified five versions of the same (or

2    a substantially similar) document that were inadvertently produced either in the instant

3    investigation [the Dark Patterns Investigation] or in unrelated FTC investigations."

4    (Attachment 8 at 1.)  Amazon added that the six versions of the July 14 Memo "are

5    protected by Amazon's attorney-client privilege and work product doctrine" and that

6    "Amazon has learned additional facts that confirm the privileged nature of these

7    documents."  (Attachment 8 at 1-2.)

8         a.   In corresponding privilege logs, Amazon only claimed attorney-client privilege,

9              not attorney work-product protection, over the July 14 Memo.  Amazon withheld

10             the entire copy of each memo, rather than producing any copies with privilege

11             redactions.

12   35.  One of the six versions of the July 14 Memo clawed back by Amazon on February 7 was

13        the document (AMZN_00045917; IC4) that Amazon had told the FTC on January 5,

14        2023 was only "partially privileged."  I reviewed Amazon's February 7 clawback letter

15        and confirmed that it did not reference that prior representation.

16   36.  Of the other five versions of the July 14 Memo clawed back by Amazon, one was

17        originally produced in the Dark Patterns Investigation with no redactions (IC6) according

18        to the filter team, as described in ¶ 47 below; two were originally produced in the Dark

19        Patterns Investigation with redactions (IC17, IC22) according to Amazon privilege logs;

20        one was produced in Investigation 1 with no redactions (IC48) according to the filter

21        team, as described in ¶ 47 below; and one was produced in both Investigation 1 and

22        Investigation 2 with no redactions (IC31) according to the filter team, as described in ¶ 47

23        below.

9

**OTHER CLAWED BACK DOCUMENTS**

37.  On November 22, 2022, counsel to the FTC notified Amazon of a production document with the Bates number AMZN_00102776 (IC9) that contained potentially privileged information.  On November 29, 2022, counsel for Amazon sent a clawback request for this document.

38.  On December 20, 2022, at the investigational hearing of Amazon executive Dharmesh Mehta, FTC counsel marked as Exhibit 9 (or "Mehta 9") a document starting with Bates number Amazon-FTC-CID-04911365.  (Attachment 34 at 110:5-12.)  The document consisted of a cover email and an attachment to the email.  (*Id.*)  At the conclusion of the hearing, counsel for Mr. Mehta—a Covington attorney who also represented Amazon— "reserve[d] the right to claw . . . back [Mehta 9] if we determine that it is privileged and confidential."  (*Id.* at 154:22-155:2.)

39.  Amazon did not claw back Mehta 9 until February 7, 2023.  (Attachment 8 at 2.)

    a.  Specifically, the February 7 clawback letter contains a document with Bates number Amazon-FTC-CID-0491136<u>6</u> (IC40), which I have assumed is the attachment to the email that was the first page of Mehta 9:  Amazon-FTC-CID-0491136<u>5</u>.

40.  On January 5, 2023, counsel for Amazon sent a clawback request to the FTC that covered five documents with the Bates numbers AMZN_00064610 (IC7), AMZN_00118740 (IC11), AMZN_00118757 (IC12), AMZN_00120240 (IC13), and AMZN_00126647 (IC15).

41.  On February 7, 2023, counsel for Amazon sent a clawback request to the FTC that covered the six copies of the July 14 Memo referenced above (¶¶ 29-36) and 40

1    additional documents with the Bates numbers AMZN_00045918, AMZN_00160403,

2    AMZN_00067288, AMZN_00126489, AMZN_00117727, AMZN_00138192,

3    AMZN_00140183, AMZN_00140201, AMZN_00143228, AMZN_00154689,

4    AMZN_00026293, AMZN_00026294, AMZN_00137982, AMZN_00137994,

5    AMZN_00138019, AMZN_00138020, AMZN_00138045, AMZN_00141381,

6    AMZN_00118757 (which had already been clawed back in the January 5 letter),

7    Amazon-FTC-CID_09818779, Amazon-FTC-CID_09389533, Amazon-FTC-

8    CID_09454557, Amazon-FTC-CID_09839753, Amazon-FTC-CID_09839018, Amazon-

9    FTC-CID_08784437, Amazon-FTC-CID_09246136 (which had already been clawed

10   back in the January 13 clawback letter), Amazon-FTC-CID_09840614, Amazon-FTC-

11   CID_09795274, Amazon-FTC-CID_09795246, Amazon-FTC-CID_09407590, Amazon-

12   FTC-CID_09839042, Amazon-FTC-CID_08784408, Amazon-FTC-CID_09929606,

13   Amazon-FTC-CID_04911366, Amazon-FTC-CID_04910919, Amazon-FTC-

14   CID_04910933, Amazon-FTC-CID_04910969, Amazon-FTC-CID_04910492, Amazon-

15   FTC-CID_04910496, and Amazon-FTC-CID_04910521.

16   42.   On April 6, 2023, counsel to the FTC notified Amazon of a production document with

17        the Bates number AMZN_00141912 (IC30) that contained potentially privileged

18        information.  On April 20, 2023, counsel for Amazon sent a clawback request for this

19        document.

20            **INFORMATION REGARDING CLAWED BACK DOCUMENTS**

21   43.   Below, I refer to the 54 documents referenced in ¶¶ 26, 30, and 37-42 as the "Clawed

22        Back Documents."

23

11

44. Based on Bates prefixes, Amazon produced 25 of the Clawed Back Documents in Investigation 1.

45. Based on Bates prefixes, Amazon produced six of the Clawed Back Documents in Investigation 2.

46. Counsel for the FTC engaged a filter review, or taint, team to prepare the Clawed Back Documents referenced above for submission to the Court and to provide information referenced in paragraphs 47-52 below.  The filter team consisted of an FTC paralegal and FTC attorney—both of whom were not on the case team—working under the supervision of an Assistant Director in the Division of Enforcement.

47. The filter team compiled the original, as-produced versions of the Clawed Back Documents and looked at them in order to determine how many were originally produced to the FTC with redactions (*i.e.*, had black redaction boxes on the face of the document).

   a. The team determined that 21 of the Clawed Back Documents were originally produced with redactions.  These documents are identified in the filter team chart, which is Attachment 37 to this Declaration.

48. The filter team also looked at the original, as-produced versions of the Clawed Back Documents in order to determine how many of them were stamped with Bates numbers from both Investigation 1 and Investigation 2, which would indicate that the documents were produced twice.

   a. The team determined that six of the Clawed Back Documents contained Bates numbers from both investigations.  These documents are identified in the filter team chart (Attachment 37).

1    49.    For 31 of the documents that Amazon clawed back, Amazon produced replacement

2           versions with redactions.  These are described as "partially" redacted in the filter team

3           chart (Attachment 37).  I reviewed the replacement, redacted versions of the Clawed

4           Back Documents to determine how many of the replacements were the same or similar to

5           one another, which would indicate that the original Clawed Back Documents had been

6           produced multiple times before being clawed back.

7           a.    I determined that of the 31 Clawed Back Documents for which Amazon provided

8                 replacements, 10 were the same as other Clawed Back Documents.  (This assumes

9                 that the redacted portions of the document, which Amazon has asserted are

10                privileged, are the same as one another.)  The 10 documents are identified in the

11                filter team chart (Attachment 37).

12          b.    I determined that an additional 9 Clawed Back Documents (beyond those

13                identified in subparagraph 49(a) above) were substantively similar to one another,

14                meaning the documents appeared to be different versions of the same document

15                and shared some identical language.  Two of the 9 documents (IC32, IC33) are

16                also part of the six Clawed Back Documents with Bates stamps from both

17                Investigation 1 and Investigation 2 (see ¶ 15).  The 9 documents are identified in

18                the filter team chart (Attachment 37).

19   50.    Additionally, as described above, Amazon itself identified six copies of the July 14

20          Memo that it fully clawed back (*i.e.,* without providing replacement versions with

21          redactions) as the "same" or "substantially similar" to one another.  One of these

22

23

13

1     documents is also part of the six Clawed Back Documents with Bates stamps from both

2     Investigation 1 and Investigation 2.

3   51.   Based on the information in paragraphs 48-50 above, I determined that Amazon produced

4     copies of 16 of the Clawed Back Documents multiple times and that Amazon produced

5     substantively similar copies of an additional 12 of the Clawed Back Documents multiple

6     times.  It is possible that there are more documents that fit either of these categories, but I

7     have not been able to review documents that Amazon clawed back in full because the

8     FTC has sequestered those documents.

9   52.   Attachment 37 is a chart providing information for each Clawed Back Document.  The

10     chart contains eight columns related to the filter team's work, as described above.  Unless

11     otherwise noted, the columns and data in the chart were provided to me by the filter team.

12       a.   The first column ("IC") identifies each document by an "IC" (*in camera*) exhibit

13         number, as provided by the filter team.

14       b.   The second column, ("Bates Number(s)") identifies the Bates number applied to

15         the produced document by Amazon.  For the most part, these Bates numbers came

16         from the clawback letters sent by Amazon.  The filter team checked those

17         documents to see if any had two different Bates numbers stamped on them,

18         which, as described above, indicates they were produced in two different

19         investigations.  For Investigation 2, the Bates prefix may reveal the subject matter

20         of the investigation, so in Attachment 37 we have replaced the Bates prefix with

21         "AMZN-Investigation2."

22

23

14

1      c.   The third column ("Full or Partial Clawback") reads "Full" when Amazon did *not*

2        produce a replacement version of the clawed back document with privilege

3        redactions and "Partial" when a redacted replacement version was provided.

4      d.   The fourth column ("Date of Clawback") was added by me and reflects the date a

5        document was clawed back (as described above), based on my review of

6        correspondence and Amazon's privilege logs.

7      e.   The fifth column ("Privilege Asserted by Amazon") was added by me and reflects

8        the privilege(s) that Amazon is asserting over the document, based on my review

9        their privilege logs.

10        i.   For seven of the documents (IC40, IC50-55), I have been unable to locate

11          any corresponding privilege log provided by Amazon and therefore do not

12          know what privilege Amazon is asserting.  For these same documents, I

13          have not been able to locate a replacement version of the document.

14          Therefore, I have identified them as "full," rather than "partial,"

15          clawbacks.

16      f.   The sixth column ("Was Clawed Back Version Redacted when Originally

17        Produced?") identifies which Clawed Back Documents were originally produced

18        by Amazon with privilege redactions.

19      g.   The seventh column ("Is the Document the Same as Another Clawed Back

20        Document?") was added by me and identifies which, if any, of the Clawed Back

21        Documents are the same as another Clawed Back Document, based on the process

22        identified in ¶ 49 above.

23

h. The eighth column ("Is the Document Similar to Another Clawed Back Document?") was added by me and identifies which, if any, of the Clawed Back Documents are substantively similar to another Clawed Back Document, based on the process identified in ¶¶ 49-50 above. By "substantively similar," I mean that the documents generally appear to be different versions of the same document and share some identical language.

## OTHER DOCUMENTS

53. Attached hereto as **Attachment 1** is a true and correct copy of a letter from Covington attorney Addison Thompson to FTC attorney David Schwartz dated July 29, 2022.

54. Attached hereto as **Attachment 2** is a true and correct copy of a letter from Covington attorney Addison Thompson to FTC attorney David Schwartz dated June 17, 2022.

55. Attached hereto as **Attachment 3** is a true and correct copy of a letter from Covington attorney John Graubert to FTC attorney Jonathan Cohen dated June 27, 2022.

56. Attached hereto as **Attachment 4** is a true and correct copy of a list the FTC compiled of in-house Amazon attorneys. This list was created by combining the attorney lists Amazon submitted to the FTC with their privilege logs.

57. Attached hereto as **Attachment 5** is a true and correct copy of the FTC's March 16, 2021 Civil Investigative Demand to Amazon.

58. Attached hereto as **Attachment 6** is a true and correct copy of a March 14, 2022 Business Insider article with the title, "*Internal documents show Amazon has for years knowingly tricked people into signing up for Prime subscriptions. 'We have been deliberately confusing,' former employee says.*"

16

59.   Attached hereto as **Attachment 7** is a true and correct copy of a letter from six Covington attorneys to FTC attorney Jonathan Cohen dated January 13, 2023.

60.   Attached hereto as **Attachment 8** is a true and correct copy of a letter from six Covington attorneys to FTC attorney Jonathan Cohen dated February 7, 2023.

61.   Attached hereto as **Attachment 9** is a true and correct copy of a letter from six Covington attorneys to FTC attorney Jonathan Cohen dated February 21, 2023.

62.   Attached hereto as **Attachment 10** is a true and correct copy of a letter from Covington attorney Thomas Barnett to FTC attorney Kelly Fabian dated March 15, 2022.

63.   Attached hereto as **Attachment 11** is a true and correct copy of a letter from Covington attorney Thomas Barnett to FTC attorney Kelly Fabian dated May 6, 2022.

64.   Attached hereto as **Attachment 12** is a true and correct copy of an email from FTC attorney Olivia Jerjian to Covington attorney Laura Kim and others dated April 6, 2023 and timestamped 4:23 PM.

65.   Attached hereto as **Attachment 13** is a true and correct copy of a letter from six Covington attorneys to FTC attorney Jonathan Cohen dated April 20, 2023.

66.   Attached hereto as **Attachment 14** is a true and correct copy of transcript excerpts from the November 18, 2022 investigational hearing of David Clark.

67.   Attached hereto as **Attachment 15** is a true and correct copy of transcript excerpts from the January 11, 2023 Commission Rule 2.7(h) investigational hearing of Amazon, through its corporate representative Jamil Ghani.

68.   Attached hereto as **Attachment 16** is a true and correct copy of transcript excerpts from the August 16, 2022 investigational hearing of Reid Nelson.

17

1    69.   Attached hereto as **Attachment 17** is a true and correct copy of transcript excerpts from
2          the July 19, 2022 investigational hearing of Molly O'Donnell.
3    70.   Attached hereto as **Attachment 18** is a true and correct copy of exhibit "ND17" from the
4          November 30, 2022 investigational hearing of Nahshon Davidai.
5    71.   Attached hereto as **Attachment 19** is a true and correct copy of transcript excerpts from
6          the August 19, 2022 investigational hearing of David Edelstein.
7    72.   Attached hereto as **Attachment 20** is a true and correct copy of exhibit "NB14" from the
8          January 18, 2023 investigational hearing of Nikki Baidwan.
9    73.   Attached hereto as **Attachment 21** is a true and correct copy of exhibit "JG11" from the
10         November 16, 2022 investigational hearing of Jamil Ghani.
11   74.   Attached hereto as **Attachment 22** is a true and correct copy of transcript excerpts from a
12         February 21, 2023 Meet and Confer between counsel for the FTC and Amazon.
13   75.   Attached hereto as **Attachment 23** is a true and correct copy of a document produced by
14         Amazon to the FTC beginning with Bates number AMZN_00027905, along with its two
15         attachments beginning with Bates numbers AMZN_00027906 and AMZN_00027929,
16         respectively.
17   76.   Attached hereto as **Attachment 24** is a true and correct copy of exhibit "3" from the
18         January 20, 2023 Commission Rule 2.7(h) investigational hearing of Amazon, through its
19         corporate representative Lisa Leung.
20   77.   Attached hereto as **Attachment 25** is a true and correct copy of transcript excerpts from
21         the July 18, 2022 investigational hearing of Monique Mascio.
22
23

18

78.   Attached hereto as **Attachment 26** is a true and correct copy of an email from FTC attorney Jonathan Cohen to Covington attorney Laura Kim and others dated November 22, 2022.

79.   Attached hereto as **Attachment 27** is a true and correct copy of a letter from Amazon in-house attorney Benjamin Langner to FTC attorney Jonathan Cohen dated November 29, 2022.

80.   Attached hereto as **Attachment 28** is a true and correct copy of exhibit "KM16" from the October 25, 2022 investigational hearing of Katey Muus.

81.   Attached hereto as **Attachment 29** is a true and correct copy of exhibit "NB9" from the January 18, 2023 investigational hearing of Nikki Baidwan.

82.   Attached hereto as **Attachment 30** is a true and correct copy of a letter from Amazon in-house attorney Benjamin Langner to FTC attorney Jonathan Cohen dated January 5, 2023.

83.   Attached hereto as **Attachment 31** is true and correct copy of an email from FTC paralegal Margaret Cole to a Covington administrative assistant (receptionlo@cov.com), dated December 2, 2022 and timestamped 11:59 AM.  Based on a discussion with Ms. Cole, it is my understanding that the May 4 Memo was attached to this email.

84.   Attached hereto as **Attachment 32** is a true and correct copy of transcript excerpts from the December 2, 2022 investigational hearing of Russell Grandinetti.

85.   Attached hereto as **Attachment 33** is a true and correct copy of transcript excerpts from the August 23, 2022 investigational hearing of Masuma Henry.

86.   Attached hereto as **Attachment 34** is a true and correct copy of transcript excerpts from the December 20, 2022 investigational hearing of Dharmesh Mehta.

19

87.    Attached hereto as **Attachment 35** is a true and correct copy of transcript excerpts from the January 20, 2023 Commission Rule 2.7(h) investigational hearing of Amazon, through its corporate representative Lisa Leung.

88.    Attached hereto as **Attachment 36** is a true and correct copy of an email from FTC counsel Max Nardini to Amazon counsel dated February 3, 2023.

89.    Attached hereto as **Attachment 37** is a true and correct copy of the FTC filter team chart as referenced above in paragraph 52.

 I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18, 2023.

_____

Adam Rottner

20

# Attachment 1

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T  +1 415 591 6000



## I.   Amazon's Review Process

Amazon's productions in this matter have been massive by any measure.  As described previously, Amazon has produced millions of pages of documents collected from over 130 custodians, and continues to collect, review, and produce documents as part of the FTC-requested refresh.  To identify this universe of produced materials, Amazon applied more than 1,200 unique search terms, which were developed following extensive negotiations with the Commission and intended to cover potentially relevant information ████████████████████████  Amazon has collected, reviewed, and produced these materials to your office according to the obligations in ██████████████████████████████████████████subject to agreed-upon modifications.



**COVINGTON**

Amazon's June 17, 2022 letter described how the com_an_ a__lied a robust _rivile_e review so as to withhold or redact onl_ those documents that contain information sub_ect to the attorne_-client _rivile_e and_or work _roduct doctrine. In _articular, Amazon im_lemented a thorou_h, multi-ste_ review _rocess that reviewed and assessed each individual document for res_onsiveness and _rivile_e. Amazon's holistic a__roach considered the contents of each document, its corresponding family members, and other available content in assessing privilege. Amazon did not rely on any single factor, such as indicia of privilege on the face of a document; for example, the inclusion of an attorney or the words "privileged and confidential" on a communication were insufficient in this process to lead to the withholding or redaction of a document.

The overall volume of privileged documents is consistent with the range that Amazon predicted in fall 2020, and supports a conclusion that the company's privilege review was measured and resulted only in the withholding of privileged content. Specifically, in its November 17, 2020 letter, Amazon explained that, based on the information available at the time, the company expected approximately 10%-18% of the total review population would consist of responsive and privileged documents. Following a review and production to date of more than 1.6 million documents, roughly 11% of the total documents produced are privileged (in whole or part), which is at the lower end of the November 2020 estimate. Moreover, Amazon has produced tens of thousands of documents with redactions because only portions of those documents were privileged.

Of course, as you acknowledged in our July 18, 2022 meet and confer, in a review and production of this size and scope, some inadvertent errors are inevitable. Amazon is committed to correcting any identified errors, as it has done to date. Consistent with well-recognized law, Amazon has clawed back on a timely basis privileged materials that were inadvertently produced. Amazon also has identified documents that it later determined were not privileged, and has produced them. And Amazon continues to review documents in response to the issues the FTC has raised, and will produce any privilege-downgraded materials promptly. Contrary to your suggestion, this has not been a one-way ratchet—to date, Amazon has downgraded a similar number of documents as it has clawed back. Finally, the number of documents that Amazon has either clawed-back or downgraded constitutes a miniscule percentage of the more than 1.6 million documents produced to date, well within the range of what is acceptable.



**COVINGTON**

COVINGTON



COVINGTON



**COVINGTON**





# Attachment 2

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000



We write in response to your May 23, 2022 letter regarding Amazon's approach to the attorney-client privilege and work product doctrine.

Amazon to date has produced approximately 1,400,000 documents from more than 130 custodians, as well as more than 100 terabytes of data (the equivalent of approximately 7.5 *billion* pages of text), in accordance with prior agreements with your office regarding the format, sequencing, and content of Amazon's production of documents and privilege logs.  As appropriate under settled law, and as agreed with your office, Amazon withheld and redacted documents that include information subject to the attorney-client privilege and/or work product doctrine.[1]  As detailed below, Amazon was careful to withhold only privileged material and went through resource intensive efforts to create a log of withheld documents.  The percentage of documents logged is small: only around 11% of documents produced were deemed privileged in whole or part.[2]

These metrics are consistent with the fact that Amazon implemented a thorou_h, multi-ste_ review_rocess to ensure _roduction of res_onsive, non-_rivile_ed material. Each individual document was reviewed and assessed—often more than once—for responsiveness and privilege.  Amazon did not rely solely on batch coding or facial indicia of privilege (such as "privileged and confidential" identifiers and attorney involvement) to determine privilege.

---

[1] As agreed, Amazon also redacted personally identifiable information ("PII").  *See* Jan. 7, 2021 letter from the FTC to Amazon.

[2] This total is on the low end of the estimate that Amazon provided to the FTC at the time: "10-18% of the review population will be both responsive and privileged." *See, e.g.*, Nov. 25, 2020 Letter from Amazon to the FTC.



**COVINGTON**

Rather, Amazon took a holistic approach that also considered the substance of each document, its corres_ondin_ famil_ members, and an_ other available context and assessed the privileged status of each email in a thread, each part of a document, and each attachment. Where appropriate, Amazon utilized redactions rather than withholding documents in their entirety. Amazon's review process was designed to only withhold privileged materials.

Of course, no document production of this scale can be perfect—and there is no legal requirement of perfection—and so, consistent with the Federal Rules of Civil Procedure and established law, Amazon has identified and clawed back on a timely basis any privileged materials that were inadvertently produced and has occasionally located documents that on further review were determined not to be privileged, and has produced them.

Amazon likewise implemented a robust logging process in this matter that addressed each document that was withheld or redacted, notwithstanding the enormous scope and cost of doing so. The privilege logs and descriptions align with practices approved by courts. *See, e.g.*, *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, 297 F.R.D. 55, 60 (S.D.N.Y. 2013); *In re Imperial Corp. of Am.*, 174 F.R.D. 475, 478 (S.D. Cal. 1997). *See also* Part II.E, *infra*. Amazon's log descriptions, especially when viewed in tandem with the entirety of each log entry, provide more than enough information for the Commission to assess Amazon's privilege claims.

Amazon's logs also adhered to the agreed-upon format described in the January 7, 2021 letter from your office, which itself reflected multiple months of careful negotiations that balanced the Commission's desire for information against the burdens associated with conducting a privilege review on such an enormous scale. Moreover, since early 2021, Amazon has provided dozens of privilege logs to the Commission as part of an agreed-upon, rolling production of documents and logs that is now substantially complete (with the exception of the recent, updated refresh). Not once during that period (which was more than a year) did the Commission express concerns about the produced privilege logs. Now the Commission is asking Amazon to undertake a time-consuming and expensive re-review of large swaths of its productions, to apply new privilege descriptions, and to re-do its privilege logs without any reasonable basis for imposing such an enormous burden. The Commission's request is even more unreasonable given that it waited until the end of the production process to raise questions regarding the privilege logs. It would have been far more efficient—and less expensive—for Amazon to have made adjustments during the initial review process rather than to undertake an entirely new review after the fact. Further, the Commission seeks for Amazon to do so on a schedule that would be wholly unrealistic in any event. As explained below, Amazon's privilege review and logs fall squarely within settled precedent and are consistent with prior discussions and agreement with your office.



**COVINGTON**



**COVINGTON**

**COVINGTON**



**COVINGTON**



**COVINGTON**

**COVINGTON**



**COVINGTON**



**COVINGTON**



# Attachment 3

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6000

**Via Electronic Mail**

June 27, 2022

**CONFIDENTIAL**

Jonathan Cohen
Attorney, Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

Re:   Amazon.com, FTC Matter No. 2123050

Jonathan:

We were puzzled and surprised by your latest letter dated June 14, 2022. Your account of the history of this investigation is inaccurate and misleading, and leaves out key aspects of Amazon's prior and ongoing cooperation with staff, including our extensive work with your predecessor Katherine Johnson. As explained below, we are focusing our current efforts on responding to the very extensive new demands you made in April. While we do not want to engage in a point-by-point exchange of letters correcting the record, there are a few points that we thought we could constructively make in the interest of moving forward in this matter.

**Cooperation and agreements with Katherine.** As we have been from the start of this investigation, we continue to be committed to working with staff to bring this matter to a resolution. We reached an agreement with Katherine to identify a reasonable scope of materials that could be produced on the timeline sought by the FTC, starting in April 2021. For example, as discussed with Katherine on April 15, 2021, we agreed to limit the production of the cancellation and signup flows to screenshots with narrative descriptions.[1] On April 29, 2021 we agreed to limit the document productions to emails from three priority custodians with significant oversight related to Prime enrollment and cancellation.[2] After we had produced a

---

[1] *See, e.g.*, April 1, 2021 email from L. Kim to K. Johnson ("What we proposed was a narrative response, accompanied by screenshots where applicable, describing the enrollment and cancellation processes in as much detail as possible given the shortness of time and complexity I described above, by April 23."); April 17, 2021 letter from L. Kim to K. Johnson ("summariz[ing] Amazon's proposed production schedule pursuant to the modifications we discussed" for "Document Request 1, including descriptions and visuals for both desktop and mobile").

[2] *See* May 3, 2021 email from L. Kim to K. Johnson ("Second, we are moving forward with collecting and reviewing internal communications for the three agreed-upon custodians identified in our April 15

Jonathan Cohen                                          CONFIDENTIAL
Page 2
June 27, 2022

significant volume of materials "based on our initial agreements to narrow the scope," in July 2021, Katherine agreed to "let you know . . . if we need anything else."[3]  Afterwards, following supplemental requests from Katherine in July and August 2021, we further agreed with Katherine on September 10, 2021 to run targeted searches to most efficiently identify additional documents that would be most pertinent to staff's inquiry.[4]  We continued to work with Katherine over the next several months to respond to her additional requests, including through the production of emails from five additional custodians, the production of content experiments, providing information on additional projects, and producing customer frustration tickets specifically identified by staff.[5]  Throughout this process, Amazon worked hard to provide the FTC with the materials that would best respond to its questions and the priorities that were identified to us.

 Your letter seems to suggest that Amazon was not entitled to rely on these agreements reached in cooperation with Katherine over the course of many months.  That is a striking assertion given the consistent good-faith engagement and agreement on both sides.  In light of that agreement, Amazon reasonably relied on Katherine's representations and appropriately responded to the specific requests she made on behalf of the FTC.  Indeed, Amazon worked diligently to provide the FTC with the materials it requested, and often on expedited timelines.  After several months of silence, we also re-initiated contact with Katherine in early February 2022, at which time she advised us that she was focused on other matters.  Despite the lack of continued engagement from Katherine, we nonetheless continued to move forward with this matter and our productions consistent with our agreements.  The FTC cannot, simply as a result of your entry into this case two months ago, now disavow its prior agreements.

 We received our first letter from you on April 19, 2022.  That letter outlined extensive new requests, including the production of emails from at least nine new custodians and using numerous additional search terms.  Despite the breadth of these demands, you imposed a deadline of less than three weeks for Amazon to analyze your requests, collect new materials, review them for responsiveness and privilege, and complete its productions.  When we raised the unreasonableness of this deadline, you informally acknowledged that you could allow Amazon a brief extension but that you needed to make a decision in this matter by the end of this summer.

---

production."); August 10, 2021 letter from K. Johnson to L. Kim ("By agreement, these [email searches] were initially limited to three custodians, Neil Lindsay, Cem Sibay, and Jamil Ghani.").

[3] *See* July 8, 2021 email from K. Johnson to L. Kim ("I hope to let you know by the 16th if we need anything else."); July 16, 2021 email from K. Johnson to L. Kim ("We do have some follow up.  For now, I'm requesting some clarification on documents that have already been produced.  However, we likely will be requesting additional documents within the scope of the CID that were not previously produced (based on our initial agreements to narrow the scope and take a first look).").

[4] *See* September 10, 2021 email from L. Kim to K. Johnson ("We will also move forward with reviewing and producing responsive non-privileged emails and documents collected from the five custodians identified in our April 17 letter using the same search terms we used for the initial three custodians.").

[5] *See id.*; September 30, 2021 letter from Amazon to K. Johnson; October 25, 2021 letter from Amazon to K. Johnson; November 5, 2021 letter from Amazon to K. Johnson; November 17, 2021 letter from Amazon to K. Johnson; December 23, 2021 letter from Amazon to K. Johnson; February 18, 2022 letter from Amazon to K. Johnson.

Jonathan Cohen                                                    CONFIDENTIAL
Page 3
June 27, 2022

We explained in our May 5 meeting and in our correspondence why it is impossible to comply with your requests as delivered in the timeframe allotted, but you have refused to entertain any modifications to your extremely broad requests. As we have been from the beginning, we nonetheless remain committed to cooperating in good faith to bring your inquiries to a resolution.

**Certifications and attestations**. We have explained to you that your position on this issue is inconsistent with long-standing practice in FTC investigations, and that we have prioritized submission of responses to portions of specifications as we are able in an effort to facilitate your investigation. Despite this, Amazon has agreed to provide attestations with each individual submission, as you can see on our two most recent submissions on June 10 and June 13 (the day before your most recent letter to us).

**Pace of production**. First, we have not heard back from you on whether you were able to access the several thousand pages of documents produced earlier in this case that you were evidently unaware of. Based on your statement that you had only seen about 4,800 documents, it appears that the last production you have seen was our November 5, 2021 production. Before your arrival to this matter, we made three additional productions of over 1000 documents each through February. Please confirm that you now have downloaded and can access all Amazon documents up to and including Bates number AMZN_00045179.

Second, it is entirely appropriate and necessary for attorneys to review documents before they are produced. The collection of ESI according to the search terms you requested has resulted in a very substantial population of documents, with a relatively smaller population of materials that are actually responsive. We are following reasonable procedures to prevent production of privileged materials and to avoid unnecessary disclosure of highly sensitive proprietary information. Although there may be circumstances in which resort to the Commission's rules with respect to clawbacks may be appropriate, those rules still require that the holder of the privilege take reasonable steps to prevent the disclosure. Furthermore we do not agree that the existence of this procedure fully protects respondents from all the adverse effects of an inadvertent production. In addition, in an effort to get you the materials you need, we have already put substantial resources into our review process, including more than doubling the number of reviewers.

**Amazon's search process**. Amazon has conducted a diligent and reasonable search to respond to the FTC's requests, including your most recent demands. For example, we began by collecting emails from the eight key custodians most likely to have documents responsive to the FTC's requests. Then, we reviewed documents using search terms most likely to identify documents related to the Prime signup and cancellation processes. To respond to your additional requests, we have broadened our search of the emails of those eight custodians and have also collected from additional custodians. We will begin producing those emails to you shortly.

Your suggestion that it was improper not to search Chime communications simply ignores our extensive prior communications with your office. We have not searched Chime communications because we were not asked to do so. As you have now made clear that you also seek those records, we will begin the process of investigating the logistics of such a production.

Jonathan Cohen                                             CONFIDENTIAL
Page 4
June 27, 2022

**Privilege logs**.  As you know, the burdensome process of preparing a privilege log is ordinarily handled in FTC investigations at the completion of a party's responses to a CID. Nevertheless, we have provided a privilege log of the redacted documents to you and will prepare additional privilege logs for you.

**Process flow evolution**.  As we also explained at some length to Katherine in our June 21, 2021 letter, like any other online consumer service provider Amazon has made numerous incremental changes on the website throughout the relevant time period.  We did produce, more than a year ago, screen shots of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and have now produced recordings showing several of those flows and had a senior Prime executive walk you through those recordings.  Nevertheless, we are looking into your suggestion that we try to re-create those processes as of March 1, 2018.  If that is not feasible, we will try to find another way to identify any "material" changes to the flows in the relevant time period.

**Missing attachments**.  We will look into the documents you identified.  As a general matter, our vendor has instructions to capture attachments together with their parent documents.  Links, however, may or may not still lead to live locations or documents so we may not have all of the material and content you describe.  We will investigate further.

We remain open to discussing what you need in order to be able to make a decision on this matter in the time frame you have described.  But as noted above, your response to our proposals for moving the matter forward expeditiously, for example on trying to develop a reasonable approach to custodian and search term searches of ESI, has been to refuse to make *any* modifications.  We do not believe this approach is likely to serve either of our interests or ultimately satisfy you.  However, we remain committed to working with you to get you the information you need to bring this matter to a conclusion.

Sincerely,

John Graubert

# Attachment 4

| # | Attorney Name | Title |
|---|---|---|
| colspan | **Amazon In-House Attorneys Included on Privilege Logs** | |
| 1 | Albrektson, Claire | Senior Legal Counsel |
| 2 | Ali, Josephine | Fuse Legal |
| 3 | Bachman, Bryson L. | Sr. Corporate Counsel |
| 4 | Bangs, Jon | Corporate Counsel |
| 5 | Barton, Justin | Corporate Counsel |
| 6 | Bloom, Karen | Corporate Counsel, Consumer |
| 7 | Borden, Dan | Legal Director |
| 8 | Bruney, Craig | Associate General Counsel |
| 9 | Buharali, Zeynep | Corporate Counsel |
| 10 | Buitrago, Ana | Legal Director and Associate General Counsel |
| 11 | Butler, Christine | Corporate Counsel |
| 12 | Cassinello Herrera, Eva | Legal Counsel |
| 13 | Castle, Matt | Corporate Counsel |
| 14 | Chosiad, Craig | Senior Corporate Counsel |
| 15 | Cohen, Cameron | Associete General Counsel, Payments |
| 16 | Condal, Johanna | Corporate Counsel, Prime Now |
| 17 | Croft, Dawn | Corporate Counsel |
| 18 | Cusick, Keri | Director, Small Business Empowerment (Attorney) |
| 19 | Deal, Michael | Vice President & Associate General Counsel |
| 20 | Dean, Jeff | Associate General Counsel |
| 21 | DeVore, Andrew | Vice President & Associate General Counsel |
| 22 | Donovan, John | Corporate Counsel |
| 23 | Dunn, Marla | Corporate Counsel, Retail |
| 24 | Dunn, Patrick | Senior Corporate Counsel |
| 25 | Dutrey, Valentin | Legal Counsel |
| 26 | England, Mark | Corporate Counsel |
| 27 | Fellner, Gabor | Senior Legal Counsel |
| 28 | Filloy, Joe | Corporate Counsel, Operations |
| 29 | Findley, Tara | Corporate Counsel |
| 30 | Fischer, Oliver | Senior Corporate Counsel |
| 31 | Flesch, Katharina | Senior Corporate Counsel |
| 32 | Garry, Ben | Senior Corporate Counsel |
| 33 | Goldberg, Jeffrey | Regulatory Associate General Counsel |
| 34 | Gore, Michael | Corporate Counsel |
| 35 | Grad, Justin | Senior Corporate Counsel |
| 36 | Gupta, Seema | Senior Counsel |
| 37 | Habben, Stephanie | Litigation Paralegal |
| 38 | Hallisky, Seann | Corporate Counsel |
| 39 | Heard, Jennifer | Corporate Counsel |
| 40 | Heider, Nicole | Senior Corporate Counsel, Labor & Employment |
| 41 | Herrmann, Kristina | Associate General Counsel |
| 42 | Huseman, Brian | Vice President, Public Policy |
| 43 | Jackson, Nathan | Associate General Counsel |
| 44 | Jacobs, Johannes | Senior Corporate Counsel |
| 45 | Johnson, Zach | |

| # | Attorney Name | Title |
|---|---|---|
| colspan | **Amazon In-House Attorneys Included on Privilege Logs** | |
| 46 | Jones, Nick | Corporate Counsel, Digital Video |
| 47 | Kaplan, Dan | Corporate Counsel, NA Consumer |
| 48 | Khan, Munice | Corporate Counsel |
| 49 | Kohn, Lisa | Director, Public Policy (Attorney) |
| 50 | Komai, Hiromi | Corporate Counsel |
| 51 | Kremer, Susan | Corporate Counsel |
| 52 | Landew, Lori | General Counsel |
| 53 | Langner, Benjamin | Corporate Counsel |
| 54 | Leslie, Tim | Vice President & Associate General Counsel |
| 55 | Lin, Jonny | Corporate Counsel |
| 56 | MacArthur, Kelly Jo | VP and Associate General Counsel |
| 57 | MacDonald, Christina | Corporate Counsel |
| 58 | Macko, Michael | Corporate Counsel |
| 59 | Mee, Donald | Senior Corporate Counsel |
| 60 | Michel, Kelly | Associate Corporate Counsel, Digital Music |
| 61 | Miller, Michael | VP and Associate General Counsel |
| 62 | Monachese, Raffaela | Corporate Counsel |
| 63 | Montesano, Marco | Senior Corporate Counsel |
| 64 | Morgan, John | Associate General Counsel |
| 65 | Morgan, Mia | Corporate Counsel |
| 66 | Morrill, Meghann | Corporate Counsel |
| 67 | Morton, Kirsty | Corporate Counsel |
| 68 | Naud, Alexandre | Associate Corporate Counsel |
| 69 | Nazeri, Kaspar | Legal Director and Associate General Counsel |
| 70 | Nelson, Ashley | Corporate Counsel, Softlines |
| 71 | Nelson, Laird | Corporate Counsel |
| 72 | Nguyen, Michael | Corporate Counsel, Payments |
| 73 | Pagani, Rebecca | Senior Corporate Counsel |
| 74 | Phair, Daniella | Senior Corporate Counsel |
| 75 | Piedra, Ana | Corporate Counsel, PMX |
| 76 | Pieger, Madeleine | Corporate Counsel, Digital Legal |
| 77 | Posner, Amy | AGC Litigation & Regulatory |
| 78 | Putkova, Ekaterina | Corporate Counsel |
| 79 | Ramo, Fernanda | Associate General Counsel |
| 80 | Ressmeyer, Karen | Senior Corporate Counsel |
| 81 | Reynoso, Daniel | Legal Counsel III |
| 82 | Richter, Azalea | Corporate Counsel |
| 83 | Roark, Stephanie | Corporate Counsel |
| 84 | Romero, Diego | Senior Corporate Counsel |
| 85 | Romp, Erin | Senior Corporate Counsel, EU Prime Legal Lead |
| 86 | Scarafia, Barbara | Legal Driector and Associate General Counsel, Europe |
| 87 | Schrader, Nadja | Corporate Counsel |
| 88 | Schultz, Aimee | Corporate Legal Counsel |
| 89 | Shastry, Renuka | Legal Counsel, Strategy & Planning, New Initiatives |
| 90 | Sheehan, Kathy | Associate General Counsel |

| | Amazon In-House Attorneys Included on Privilege Logs | |
|---|---|---|
| # | **Attorney Name** | **Title** |
| 91 | Sidney, Nick | Corporate Counsel |
| 92 | Sternberg, Luke | Associate General Counsel |
| 93 | Stone, John | Vice President and Associate General Counsel |
| 94 | Stump, Bryan | Corporate Counsel |
| 95 | Tajuddin, Emily | Corporate Counsel, Kindle |
| 96 | Thomson, Katie | VP and Associate General Counsel |
| 97 | Totti, Silvia | Corporate Counsel |
| 98 | Tuladhar, Praju | Corporate Counsel, Payments |
| 99 | Van Zyl, Hildegard | Corporate Counsel |
| 100 | Varghese, David | Associate Corporate Counsel |
| 101 | Varigos, Margarita | Corporate Counsel, Global Store |
| 102 | Weien, Geoffrey | Corporate Counsel, Payments |
| 103 | Wildmann, Claudia | Corporate Counsel |
| 104 | Williams, Mike | Senior Corporate Counsel, Payments |
| 105 | Wong, Kay | Senior Corporate Counsel |
| 106 | Worth, Stephen | Associate General Counsel |
| 107 | Wotka, Linn | Legal Counsel |
| 108 | Wright, Charles | Senior Corporate Counsel, Litigation & Regulatory |
| 109 | Yen, Joshua | Associate Corporate Counsel |
| 110 | Yilmaz, Asim | Legal Director |
| 111 | Yoo, Brian | Corporate Counsel, Payments |
| 112 | Zapolsky, David | SVP, General Counsel, and Secretary |

# Attachment 5



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Office of the Secretary

March 16, 2021

<u>Via FedEx</u>
Jeffrey Bezos, CEO
Amazon.com, Inc.
410 Terry Avenue North
Seattle, WA 98109

     FTC Matter No. 2123050

Dear Mr. Bezos:

     The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of a non-public investigation.  Our purpose is to determine whether the "Company" as defined in the enclosed CID Schedule has engaged in unfair or deceptive acts or practices in connection with its Amazon Prime subscription services by automatically enrolling consumers without their prior express informed consent or failing to provide a simple mechanism for a consumer to stop recurring charges in violation of the Federal Trade Commission Act, 15 U.S.C. § 45, or the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401, et seq., and whether Commission action to obtain monetary relief would be in the public interest.  Please read the attached documents carefully.  Here are a few important points we would like to highlight:

1. **Contact FTC counsel, Katherine Johnson at (202) 326-2185 or kjohnson3@ftc.gov, as soon as possible to schedule a telephone call to be held within 14 days.**  During that telephone call, FTC counsel can address any questions or concerns you have regarding this CID, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs.  Please read the attached documents for more information about that meeting.

2. **You must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

3. **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.**  We will not disclose the information under the Freedom of Information Act, 5 U.S.C. § 552.  We may disclose the information in response to a valid request from Congress, or to other civil or criminal law enforcement agencies for their official law enforcement purposes.  The FTC or other agencies may use and disclose your response in any civil

or criminal proceeding, or if required to do so by law.  However, we will not publicly disclose your information without giving you prior notice.

4.  **Please read the attached documents closely.**  They contain important information about how you should provide your response.

Please contact FTC counsel as soon as possible to set up an initial meeting.  We appreciate your cooperation.

Very truly yours,

April J. Tabor
Secretary



United States of America
Federal Trade Commission

## *CIVIL INVESTIGATIVE DEMAND*

| 1. TO | 1a. MATTER NUMBER |
|---|---|
| Amazon.com, Inc.<br>Attn: Jeffrey Bezos, CEO<br>410 Terry Avenue North<br>Seattle, Washington 98109 | 2123050 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

### 2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |
| | |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule.  Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

## APRIL 15, 2021 BY 5:00 PM

### 3. SUBJECT OF INVESTIGATION

See attached Schedule and attached resolution(s).

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Adam Rottner (202-326-2580; arottner@ftc.gov/Lashanda Freeman (202-326-3204; lfreeman@ftc.gov), 600 Pennsylvania Ave., NW, Mailstop CC-9528, Washington, DC 20580 | Katherine Johnson (202-326-2185; kjohnson3@ftc.gov) 600 Pennsylvania Ave., NW, Mailstop CC-9528 Washington, DC 20580 |

| DATE ISSUED<br>March 16, 2021 | COMMISSIONER'S SIGNATURE |
|---|---|

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

Ex. A, Page 52 of 308

## Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____   _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

**FEDERAL TRADE COMMISSION ("FTC")**
**CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE**
**FTC File No. 2123050**

**Meet and Confer:**  You must contact **FTC counsel, Katherine Johnson, at (202) 326-2185 or kjohnson3@ftc.gov**, as soon as possible to schedule a telephonic meeting to be held within fourteen (14) days after You receive this CID.  At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation.  The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of electronically stored information.  You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all documentary materials used in preparing responses to this CID.  The FTC may require the submission of additional Documents later during this investigation.  **Accordingly, You must suspend any routine procedures for Document destruction and take other measures to prevent the destruction of Documents in Your possession, custody, or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third-party or You believe those Documents are protected from discovery.  *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:**  The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.  We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552.  We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation.  Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency.  However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production**:  Contact **Katherine Johnson at (202) 326-2185 or kjohnson3@ftc.gov** by telephone or email at least five (5) days before the return date for instructions on how to produce information responsive to this CID.

**Certification of Compliance**:  You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by signing the "Certification of Compliance" attached to this CID.

**Certification of Records of Regularly Conducted Activity**:  Attached is a Certification of Records of Regularly Conducted Activity.  Please execute and return this Certification with Your response.  Completing this certification may reduce the need to subpoena You to testify at future proceedings to establish the admissibility of Documents produced in response to this CID.

**Definitions and Instructions**:  Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## I.    SUBJECT OF INVESTIGATION

Whether the "Company" as defined herein has engaged in unfair or deceptive acts or practices in connection with its Amazon Prime subscription service by automatically enrolling consumers without their prior express informed consent or failing to provide a simple mechanism for a consumer to stop recurring charges in violation of the Federal Trade Commission Act, 15 U.S.C. § 45, or the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401, et seq., and whether Commission action to obtain monetary relief would be in the public interest.  See also attached resolution(s).

## II.    SPECIFICATIONS

**Applicable Time Period:**  Unless otherwise directed, the applicable time period for the requests set forth below is from **March 1, 2018, until the date of full and complete compliance with this CID**.

### A.    INTERROGATORIES

1.    Describe fully and in detail each step consumers must take to Enroll in Amazon Prime, including any variations in steps due to alternative purchasing offers presented during the Enrollment process, or due to different products, time periods, or programs.  If these steps differ depending on the platform or device through which the consumer is exercising the option to Enroll, e.g., mobile devices or desktop applications, describe the steps for each platform and device separately.

2.    For each step listed in response to Interrogatory No. 1, explain (1) the benefit of such step to the consumer and to the Company; (2) whether such step is necessary to achieve Enrollment and if so, why; and (3) if not necessary, whether You contend it is reasonable to require such step as a prerequisite to Enrolling, and the basis for that contention.

3.    For each variation listed in response to Interrogatory No. 1 explain (1) the benefit of such variation to the consumer and to the Company; (2) whether such variation is necessary to achieve Enrollment, and if so, why the variation is necessary; and (3) if not necessary to achieve Enrollment, whether You contend that it is reasonable to require such variation as a prerequisite to Enrollment, and the basis for that contention.

4.    List every circumstance in which a consumer may be Enrolled in Amazon Prime with a Negative Option Feature.

5.    For each Enrollment using a Negative Option Feature listed in response to Interrogatory 4:

Ex. A, Page 55 of 308

a.   Describe the Company's notifications and disclosures to consumers relating to all material terms of the offer or arrangement; and

b.   State how and when the Company obtained from the consumers their express informed consent to participate or be Enrolled in Amazon Prime.

6.   Describe fully and in detail each step consumers must take to Unsubscribe from Amazon Prime, including any variations in steps due to alternative offers presented during the Unsubscribe process, or for different products, time periods, or programs.  If these steps differ depending on the platform or device through which the consumer is exercising the option to Unsubscribe, e.g., mobile devices or desktop applications, describe the steps for each platform and device separately.

7.   For each step listed in response to Interrogatory No. 6, explain (1) the benefit of such step to the consumer and to the Company; (2) whether such step is necessary to successfully Unsubscribe and if so, why; and (3) if not necessary to successfully Unsubscribe, whether You contend that it is reasonable to require such step as a prerequisite to Unsubscribing, and the basis for that contention.

8.   For each variation listed in response to Interrogatory No. 6 explain (1) the benefit of such variation to the consumer and to the Company; (2) whether such variation is necessary to successfully Unsubscribe and if so, why the variation is necessary; and (3) if not necessary to Unsubscribe, whether You contend it is reasonable to require such variation as a prerequisite to Unsubscribing, and the basis for that contention.

9.   State whether the Company maintains or has access to metrics or other data regarding how many consumers Enrolled in Amazon Prime attempt to Unsubscribe but do not complete the process, or choose other alternatives offered by the Company during the Unsubscribe process, such as pausing, converting a monthly membership to an annual membership, or switching to a Prime Video only membership.  If so, describe all such metrics and provide all such data.

10.  Describe all circumstances where the hyperlink that allows a consumer to Unsubscribe from Amazon Prime does not appear concurrently with other information immediately upon navigating to the Amazon Prime membership management page and, for each such circumstance, explain fully the reason for such non-concurrent display of information.

11.  If you contend the process for Unsubscribing from Amazon Prime is as simple as the process to Enroll in Amazon Prime, describe fully and in detail all facts that support Your contention.  If not, explain why.

12.  State all steps the Company has taken to survey, test, or otherwise ascertain consumers' interpretations, attitudes, knowledge, attributes, behaviors, beliefs, characteristics, comprehension, demographics, interpretation, preference, recall,

traits, or usage patterns or any other consumer attribute with respect to Enrolling in or Unsubscribing from Amazon Prime.

13.    Describe the Company's policies, practices, and procedures relating to Enrolling in or Unsubscribing from Amazon Prime, including, but not limited to, handling of complaints concerning Enrolling in or Unsubscribing from Amazon Prime, and any material limitations concerning how and when consumers may Enroll in or Unsubscribe from Amazon Prime.

14.    Identify all persons involved in the development, design, and implementation of the Enrollment and Unsubscribe process for Amazon Prime, including all persons working for or affiliated with the Company that managed, supervised, enforced, approved, or helped create the policies, practices, and procedures relating to the Enrollment and Unsubscribe process for Amazon Prime.

**B.    DOCUMENT REQUESTS**

1.    Documents sufficient to show each page of the Enrollment and Unsubscribe processes for Amazon Prime for all platforms, applications, and devices, and for each set of materially different steps (including any variations to any of these over the Applicable Time Period), including but not limited to real-time recording of the processes using Camtasia or similar software that records on-screen activity.

2.    All Documents (including but not limited to analyses, copy tests, emails, memoranda, reports, research, studies, or surveys) relating to consumer perception or understanding of Enrolling in or Unsubscribing from Amazon Prime.  Responsive Documents include, but are not limited to:

a.    All Documents referring or relating to consumer attitudes, attributes, behaviors, beliefs, characteristics, comprehension, demographics, interpretation, preference, recall, traits, or usage patterns of Enrolling in or Unsubscribing from Amazon Prime; and

b.    All Documents referring or relating to A/B testing, choice modeling, content variation testing, conversion rates, eye tracking or other usability studies, multivariate testing, split testing, take rates, and consumer satisfaction surveys.

3.    All Documents (including but not limited to analyses, copy tests, emails, memoranda, reports, research, studies, or surveys) relating to any internal research, report, data evaluation, third-party consultation, in-house presentation, or any other communication or form of investigation relating to, concerning, informing, or bearing upon the process to Enroll in or Unsubscribe from Amazon Prime, including the traits, behaviors, characteristics, demographics, or usage patterns of consumers who Enroll in or Unsubscribe or fail to Enroll in or Unsubscribe from membership in Amazon Prime.

-4-

4.     Documents sufficient to show the Company's policies, procedures, and practices, including, but not limited to, any internal correspondence referring or relating to the creation or modification of such policies, procedures, or practices, relating to the processes for Enrolling in or Unsubscribing from Amazon Prime, including how, when, and where consumers may Enroll in or Unsubscribe from Amazon Prime and how Enrollment and Unsubscribing is confirmed.

5.     All Documents (including but not limited to analyses, copy tests, emails, memoranda, reports, research, studies, or surveys) relating to the creation, development, design, or implementation of the processes for Enrolling in or Unsubscribing from Amazon Prime.

6.     All Documents relating to whether the Company has clearly and conspicuously disclosed all material terms of the transaction before the Company obtained the billing information of consumers who have participated or have been Enrolled in Amazon Prime, including Documents that disprove or tend to call into question whether the Company has provided such disclosures.

7.     All Documents relating to whether the Company has obtained from consumers who have participated or have been Enrolled in Amazon Prime their express informed consent to be charged before the Company charged them, including Documents that disprove or tend to call into question whether the Company has obtained such express informed consent.

8.     All Documents relating to whether the Company has provided a simple mechanism to stop recurring charges for consumers who have participated or have been Enrolled in Amazon Prime, including Documents that disprove or tend to call into question whether the Company has provided such simple mechanism.

9.     All Documents relating or referring to any complaints involving Enrolling in or Unsubscribing from Amazon Prime, including internal correspondence relating to such complaints.

10.    All Documents relating to any communications between the Company (or any affiliated person or entity) and any local, state, or federal government or industry regulatory body, including but not limited to the National Advertising Divisions of the Council of Better Business Bureaus or the Electronic Retailing Self-Regulation Program, concerning Unsubscribing from Amazon Prime.

**NOTICE:  This CID does not seek any information that is prohibited from disclosure under the Cable Communications Policy Act of 1984 ("Cable Act"), 47 U.S.C. §§ 551 *et seq.*, the Satellite Television Extension and Location Act ("STELA"), 47 U.S.C. § 338(i), or the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701 *et seq.*  To the extent that You are, for purposes of ECPA, a provider of Electronic Communications Service or Remote Computing Service to a customer or subscriber about whom this CID seeks information, do not divulge a record or information pertaining to such customer or subscriber or the content of such customer's or subscriber's communications, other than**

**the content, records, and information specifically requested in this CID.  If You have any questions, please contact FTC counsel before providing responsive information.**


## III.   DEFINITIONS

The following definitions apply to this CID:

D-1.   "**Advertisement**" or "**Advertising**" or "**Ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service.  Advertising media includes, but is not limited to: packaging and labeling; promotional materials; print; television; radio; and Internet, social media, and other digital content.

D-2.   "**Amazon Prime**" means the online subscription service You provide to consumers that allows them to access additional services and content such as same, one or two-day delivery of goods; streaming of music and video; e-books; gaming; and grocery shopping services.

D-3.   "**Company**," "**You**," or "**Your**" means **Amazon.com, Inc.**, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

D-4.   "**Document**" means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A).

D-5.   "**Enroll**" **and any variations thereof** means the mechanism by which a consumer accepts an offer or arrangement to receive a product or service from the Company, whether through silence, failure to take affirmative action to reject such offer or arrangement, or otherwise.

D-6.   "**Identify**" or "**the Identity of**" requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of Your contact persons at the business or organization.

D-7.   "**Negative Option Feature**" means in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

D-8.   "**Unsubscribe**" **and any variations thereof** means the mechanism by which a consumer may temporarily or permanently stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

## IV.   <u>INSTRUCTIONS</u>

I-1.   **Petitions to Limit or Quash**:  You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date.  Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2).  **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.**  16 C.F.R. § 2.7(k); *see also* § 2.11(b).  **If You file a petition to limit or quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.**  15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2.   **Withholding Requested Material / Privilege Claims**:  For specifications requesting production of Documents or answers to written interrogatories, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c).  The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information.  If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material.  Otherwise, produce all responsive information and material without redaction.  16 C.F.R. § 2.11(c).  The failure to provide information sufficient to support a claim of protected status may result in denial of the claim.  16 C.F.R. § 2.11(a)(1).

I-3.   **Modification of Specifications**:  The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID.  16 C.F.R. § 2.7(l).

I-4.   **Scope of Search**:  This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

I-5.   **Identification of Responsive Documents**:  For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification.  Documents that may be responsive to more than one specification of this CID need not be produced more than once.  If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

I-6.   **Maintain Document Order**:  For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored.  If Documents are removed from their original folders, binders, covers, containers, or

electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

I-7.     **Numbering of Documents**:  For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

I-8.     **Production of Copies**:  For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state as of the time You received this CID.  Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.     **Production in Color**:  For specifications requesting production of Documents, You must produce copies of Advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.    **Electronically Stored Information**:  For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-11.    **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to written interrogatories, if any responsive materials contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

        Sensitive PII includes an individual's Social Security number; an individual's biometric data; and an individual's name, address, or phone number in combination with one or more of the following:  date of birth, driver's license or state identification number (or foreign country equivalent), military identification number, passport number, financial account number, credit card number, or debit card number.  Biometric data includes biometric identifiers, such as fingerprints or retina scans, but does not include photographs (with the exception of photographs and corresponding analyses used or maintained in connection with facial recognition software) or voice recordings and signatures (with the exception of those stored in a database and used to verify a person's identity).  SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-12.    **Interrogatory Responses**:  For specifications requesting answers to written interrogatories:  (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct by signing Your answers

under the following statement:  "I verify under penalty of perjury that the foregoing is true and correct.  Executed on (date).  (Signature)."  The verification must be submitted contemporaneously with Your interrogatory responses.

**CERTIFICATION OF COMPLIANCE**
**Pursuant to 28 U.S.C. § 1746**

I, _____, certify the following with respect to the Federal Trade

Commission's ("FTC") Civil Investigative Demand directed to Amazon.com, Inc. (the

"Company") (FTC File No. 2123050) (the "CID"):

1. The Company has identified all documents, information, and/or tangible things

("responsive information") in the Company's possession, custody, or control responsive to the

CID and either:

      (a) provided such responsive information to the FTC; or

      (b) for any responsive information not provided, given the FTC written objections

          setting forth the basis for withholding the responsive information.

2. I verify that the responses to the CID are complete and true and correct to my

knowledge.


    I certify under penalty of perjury that the foregoing is true and correct.


Date: _____

                                  _____
                                    Signature

                                  _____
                                    Printed Name

                                  _____
                                    Title

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.       I, _____, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.       I have authority to certify the authenticity of the records produced by Amazon.com, Inc. (the "Company") and attached hereto.

3.       The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

       a)       Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

       b)       Were kept in the course of the regularly conducted activity of the Company; and

       c)       Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____        _____
                                              Signature

# Attachment 6

# Internal documents show Amazon has for years knowingly tricked people into signing up for Prime subscriptions. 'We have been deliberately confusing,' former employee says.

**Eugene Kim**

Mar 14, 2022, 2:53 PM

- **Amazon was aware of customer complaints about feeling tricked into signing up for the Prime membership for years, internal emails and documents show.**

- **The company has internally discussed clarifying the signup language since at least 2017, but it hasn't made many changes so far.**

- **Plans to avoid confusing customers were considered, but shelved because they reduced overall subscription growth.**

Amazon has worried for years that it tricks customers into signing up for Prime subscriptions. A previously undisclosed inquiry from the Federal Trade Commission has put more pressure on the company to fix it.

Internal documents obtained by Insider show the company has been concerned since at least 2017 that user interface designs on Amazon.com have led customers to feel manipulated into signing up for Prime.

These design decisions, commonly known as "dark patterns," push customers into acting unintentionally often through misleading imagery or intentionally vague offers. For example, a single click on the "Get FREE Two-Day Delivery with Prime" tab at check out — with no additional confirmation step — gets shoppers automatically enrolled into a 30-day free trial of Amazon's Prime program, which later converts to a paid membership unless the user cancels it. For cancellations, users have to jump through a number of pages to end the subscription.

Amazon was aware of these complaints for years but did not take serious action, according to these previously unreported internal documents and six current and former employees who spoke to Insider. In several cases, fixes for these issues were proposed and considered, but resulted in lower subscription growth when tested, and were shelved by executives, the documents show.

Some employees have also been worried by the increased attention from the Federal Trade Commission on subscription sign-ups, which may put the onus on Amazon to take further action. The agency is already scrutinizing the company in a sprawling antitrust probe, and earlier this year the FTC's chairperson, Lina Khan, publicly issued general warnings about so-called dark patterns and difficult-to-cancel subscriptions. The company has also faced multiple lawsuits in recent years from shoppers who said they were tricked into signing up for Prime.

The FTC has asked Amazon about its subscription practices in recent years, according to people familiar with the matter who spoke on condition of anonymity for fear of retaliation from Amazon. Amazon

corporate lawyers held private meetings with members of the Prime team as recently as 2021 in response to these inquiries, these people said.

The confusion over sign-ups isn't limited to Prime, and Amazon is now looking to clarify language over other subscription services as well, internal documents show.

These issues come as Prime, best known for free delivery and streaming video content, has enjoyed unprecedented growth to become one of the most popular subscription programs in the world, with more than 200 million members as of last year. Prime, to former CEO Jeff Bezos and other top Amazon executives, represents the best of the company's mission in putting the customer first by offering fast delivery and a bevy of other perks at what it perceives to be a bargain price of $139 a year in the US.

But Amazon's perfunctory measures on addressing subscriber confusion also run counter to these professed values of customer-centricity, and show how the giant retailer can sometimes use the veil of customer obsession to its advantage — in this case, enticing users to free delivery when the motivation is boosting membership count and revenue.

In an email to Insider, Amazon's spokesperson said the sign-up and cancellation process for Prime are "simple and transparent and clearly present customers with choices and the implications of those choices."

"Customer transparency and trust are top priorities for us. By design we make it clear and simple for customers to both sign up for or cancel their Prime membership. We continually listen to customer feedback and look for ways to improve the customer experience," Jamil Ghani, VP of Amazon Prime, said in a statement.

As recently as this year, Amazon has internally proposed clearer subscription offers and cancellation processes across its Prime, Prime Video, Kindle Unlimited, and Amazon Music services. At least one proposed change — an end to messages that "shamed" the customer for not subscribing — has been implemented.

The FTC declined to comment for this article.

**'We have been deliberately confusing'**

For years, customer-focused teams inside Amazon have repeatedly come up with potential solutions, but these suggestions were not implemented or were disregarded in favor of prioritizing subscription growth over sign-up clarity, according to documents viewed by Insider.

Internal reports from the Shopper Frustrations team in 2017, when Amazon faced multiple lawsuits about Prime's sign-up process, show steps to improve language clarity around one particular point of confusion: the "FREE shipping" button. An internal report at the time said, "The button's label 'Continue with FREE 1-day shipping' did not adequately convey that the customer was signing up for a membership."

"Unintentional sign-ups erode customer trust," one of the documents said. "Either way improvements in clarity during sign-up are needed," another document said.

After testing different prompts, the Prime team discovered the default "Get FREE Two Day Shipping" tab was creating a lot of confusion and dissatisfaction. Instead, they found the "Start your 30-day free trial" term was much clearer.

Those concerns, however, were not completely addressed, and the recommendations were not implemented at the time, according to the documents and people directly familiar with the matter.

A year later, in a 2018 internal report, Amazon found that customers "did not understand the impact of their choice" when they clicked on buttons titled "Continue with FREE 1-day shipping" or "Get free two day shipping." It said the customers didn't understand the "FREE 2-day shipping with Prime" label required a subscription, leading to "frustration over unexpected financial obligation." The report gave the issue a "critical" status, pointing out that "Prime signups are not always transparent."

Amazon has made some changes to the sign-up page since then, but the current and former employees who spoke to Insider said repeated red flags in the sign-up process have not been meaningfully addressed, even now.

According to a 2020 internal report, the Prime team again suggested replacing the small yellow check-out box with a bigger, more prominent blue check-out box that said "Start your 30-day free trial," alongside auto-renewal pricing information. But when Insider created a new Amazon account this month, the check-out page was mostly identical to its 2020 design, with a yellow check-out prompt that said, "Get FREE Two-Day Delivery with Prime" — a term customers have complained about since at least 2017.

"We have been deliberately confusing," one of the people who spoke with Insider said. "It's very un-Amazonian in terms of customer obsession."



Amazon Prime sign-up screen in 2017 Amazon



Amazon Prime sign-up page, March 2022. Amazon has made several changes to its sign-up page, including clarification a user was signing up for a "FREE trial" of Prime, but many old issues that Amazon knew confused customers have gone unchanged. Amazon

The lack of change may have to do with internal tests that showed that clearer language led to fewer sign-ups.

The new language in 2017, for instance, had led to a negative impact of "260,000 annualized paid Prime members," which would have required a 12% increase in Prime users to offset, one email obtained by Insider said. Still, customer confusion was an issue for Prime: One data point from August 2017 found that 17,131 of the 25,542 cancellation requests directly handled by the Prime team were related to "accidental sign-ups."

Even the company's most senior leaders were aware of this problem. In 2017, former senior vice president of marketplace Sebastian Gunningham asked the Prime team to "go faster on Shopper Frustrations" related to this issue, one of the emails said. Ghani, Prime's VP, asked for better ways to measure whether a sign-up is a "good" sign-up after reviewing customer insights. Greg Greeley, Prime's leader at the time, appeared to find excuses elsewhere, questioning whether the accidental sign-ups might have been due to the color of the button.

"Shoppers in countries that are new to online shopping may not know that a yellow button means they're buying Prime, like we do," Greeley said, according to one of the emails.

The Prime team was aware it was making a tradeoff for more members at the expense of customer satisfaction. One email from 2017 said the ambiguous language was going to "tip the balance from customer centricity toward sign-up business goals."

One person said Amazon's behavior was more rooted in the company's biased love for Prime's value. The Prime team truly believed membership was an "intrinsic good" that would benefit every shopper, this person said. It was a notion underscored by Amazon's founder, Jeff Bezos, who said "you'd be irresponsible not to be a member" in his 2016 annual shareholder letter.

"What that meant was anything they did to keep you as a Prime member was actually customer-focused," another person said. "It's so obvious the wrong things were being done."

Gunningham and Greeley declined to comment.

**Amazon's sign-up practices gets attention from US regulators**

The FTC has been quizzing Amazon about its Prime sign-up flow in recent years, prompting Amazon's corporate lawyers to hold confidential meetings with some team members last year, according to people familiar with the matter.

The agency wanted to know if there was a pattern of deception in the Prime signup process, and whether Amazon's top leaders were deliberately involved in the effort, these people said. FTC representatives also searched for additional documents Amazon could share regarding this issue. It's unclear if the probe is still on-going.

In this case, the FTC may be looking for violation of consumer protection laws, not antitrust policies, according to Steven Salop, a law professor at Georgetown University. In Europe, Amazon could be liable for "abuse of dominance," but the US doesn't have that type of offense in its antitrust laws, he said.

"It's really consumer protection – deceptive conduct," Salop said in an email.

Further crackdown may be in the cards. Khan, the FTC chair, tweeted in January that the language around sign-ups and cancellations for subscription services in general should not have any ambiguity.

"FTC has made clear that to comply with law, businesses must ensure sign-ups are clear, consensual, and easy to cancel," her tweet said.

The FTC, in fact, issued detailed guidance to companies in October about "deploying illegal dark patterns that trick or trap consumers into subscription services." The regulator said it's "ramping up" its enforcement following an increase in complaints about "the financial harms caused by deceptive sign up tactics, including unauthorized charges," according to the announcement, which did not mention Amazon or any other companies specifically.

Amazon Prime's multi-step cancellation process could also come under further scrutiny. Last year, an activist group led by Public Citizen filed a complaint with the FTC asking for an investigation into how Amazon Prime's complex cancellation process is designed to "unfairly and deceptively undermine the will of the consumer."

The petition followed a similar complaint filed by the Norwegian Consumer Council last year. In the complaint, the agency accused Amazon of using these so-called dark patterns to subtly trick users into doing things they didn't intend to do.

"Throughout the process, Amazon manipulates users through wording and graphic design, making the process needlessly difficult and frustrating to understand," the complaint said.

Internal documents also show that Amazon intentionally drew out the process of canceling a Prime membership. Under a project code-named "Iliad," Amazon created multiple layers of questions and new offers before a Prime member could cancel their subscription, in hopes of reducing member churn. The number of cancellations dropped by 14% at one point in 2017 following the launch of Iliad, and fewer members were navigating to the final cancellation page, one of the documents said.

"Although this data is directional, retention appears to be trending positively," it said. This process, intended to persuade customers to not cancel, is common among subscription services, and is not directly related to the questions Prime received from the FTC. Implementations from the Iliad project, including a four-step cancellation process, appear to still be active.

**'High-clarity proposals' but few changes**

Amazon has made at least one notable change to the Prime sign-up process in recent years, in order to prevent the negative "shaming" of customers, according to an internal email. The option to decline a free Prime trial offer now comes with a simple "No thanks" tab instead of the longer "No Thanks, I don't want FREE Two-Day Shipping" that was previously on the page.

"There is a well established external trend (negatively perceived) called 'customer shaming' and we're even specifically called out in some cases," one internal email said.

Other efforts to clean up its language are underway.

In 2020, Amazon internally created a mock draft with "high-clarity proposals" around its many subscription services, including Prime, Amazon Music, and Kindle Unlimited.

For Prime, the company suggested adding the exact price and auto-renew details in the checkout page, and sending out proactive reminders before their renewals. It also recommended different color schemes and bigger tabs to make the buttons more prominent. Other suggestions include an additional pop-up window to reaffirm enrollment into the free trial and a link to easily "undo" an accidental sign-up. It made similar suggestions for other non-Prime services. None of those recommendations appear to have been implemented yet, based on Insider's order earlier this month.

In 2021, Amazon conducted another internal study, called "Digital Subscriptions Workflow Consistency," according to internal documents seen by Insider. The report recommended the broader promotion of the existing "Your Subscriptions and Memberships" page, a centralized portal that lists every Amazon subscription service the user is enrolled in. Also, it suggested agreeing on an "Amazon-wide standard for digital subscription and cancellation workflows" to give a more consistent look and procedure across its services.

The 2021 study recommended — again — the use of an additional confirmation page for all trial services. It said customers were "displeased when there wasn't an additional step" before starting the free trial, calling the current workflow "an unwelcome surprise."

"This was a trust buster for these customers, and hints at why accidental sign-ups happen," it said.

That study also recommended making the cancellation process less confusing by "reducing the number of confirmation buttons and overall clicks during subscription cancellation, in favor of a 'resubscribe' button after cancellation is complete."

Earlier this year, other parts of Amazon embarked on similar clarifying projects. Prime Video, for example, launched Project Clean Slate, a new initiative aimed at making it easier to understand what content is free or not.

"Clean Slate reimagines the Prime Video CX across devices and surfaces, with a focus on simplifying the discovery of content free to Prime members to ensure our service is useful and personal," an internal document said.

Despite all these proposals, Amazon's practice has been to stand behind the legal reasoning of its fine print.

Buried deep in the Conditions of Use every customer needs to agree to, Amazon says payment is required "unless you notify us before a charge."

That was the explanation Amazon lawyers gave in response to a 2017 class-action suit led by Latoya Christmas that alleged Amazon "concealed, suppressed and/or omitted" material facts about the Prime sign-up process, leading to unintentional charges for the then-$99 annual membership fee.

"Each time a customer makes a purchase using Amazon's standard check-out page, they accept the COUs," the lawyer's declaration said, referring to Amazon's Conditions of Use. "If a customer does not want to accept the COUs, they are free to cancel their purchase."

---

*Do you work at Amazon? Got a tip? Contact reporter Eugene Kim via the encrypted messaging apps Signal or Telegram (+1-650-942-3061) or email (ekim@insider.com). Reach out using a nonwork device.*

*Check out Insider's source guide for other tips on sharing information securely*

# Attachment 7

# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6000

January 13, 2023

## CONFIDENTIAL TREATMENT REQUESTED

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

Re:   FTC Matter No. 2123050

Dear Mr. Cohen:

Amazon.com, Inc. ("Amazon") writes to address FTC staff's improper use of privileged documents, which were inadvertently produced in unrelated FTC investigations, during the January 11 investigational hearing of Amazon's corporate designee, Jamil Ghani. As a preliminary matter, we confirm our oral request that pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), the FTC return, delete, or destroy the documents bearing the following beginning Bates numbers:

> Amazon-FTC-CID_09246134 / AMZN-MGM-2R-009353260
> Amazon-FTC-CID_09246136 / AMZN-MGM-2R-009353262
> Amazon-FTC-CID_09246157 / AMZN-MGM-2R-009353283

These documents, which include a Chime chat and associated memoranda, are protected by Amazon's attorney-client privilege and work product doctrine, and were inadvertently produced in response to separate investigations conducted by the FTC's Bureau of Competition. In this investigation, Amazon has withheld and logged similar versions of these documents. Under the FTC's rules of practice, staff is required to "promptly return or destroy" this material. 16 C.F.R. § 2.11(d)(1)(ii).

Please promptly confirm, in writing, that you have deleted or destroyed the above-referenced documents and all existing data associated with these documents, including any copies of the documents and associated data contained on the original production media provided to you, as well as any copies that may exist on internal databases or networks, including all associated metadata, extracted text, or native files, or any materials derived from or incorporating the protected information. Please also confirm you have destroyed or deleted any reference to these documents from other documents, including your work product. After the clawed-back documents have been appropriately updated in your document review platform, we ask that you please ensure that your document review platform is re-indexed, if necessary, to account for any changes in searchable text.

Pursuant to 16 C.F.R. § 2.11(a)(1), included with this letter is a supplemental log of the withheld information based on a claim of protected status, as that term is defined in § 2.7(a)(4). Amazon determined that the items identified on this log are entitled to protected status according to governing legal principles.

Jonathan Cohen
January 13, 2023
Page 2

       In addition, we also write to express our serious concern that staff did not alert us to these documents when it identified them, and in fact, actually attempted to use these documents in a deposition without first determining if they were inadvertently produced.  Each of the memos has a "Privileged and Confidential – Attorney-Client Work Product" stamp and refers to its legal purpose.  The Chime chat, which attaches these memos, has a subject that includes "Privileged and Confidential."  That chat also includes individuals that FTC staff knows are counsel for Amazon.

       Moreover, Amazon has repeatedly invoked the privilege over this category of documents to staff.  As Mr. Ghani testified, these documents relate to a meeting of Amazon employees and counsel in May 2021 to obtain legal advice regarding the Prime enrollment and cancellation processes.  In past individual IHs, Amazon counsel have repeatedly informed FTC staff that meetings and related memoranda from May 2021 regarding this subject matter are privileged.  Specifically, Amazon counsel asserted that these meetings and related memoranda were privileged at the individual IHs of Mr. Clark, Mr. Lindsay, Mr. Ghani, and Mr. Hills.

       It is disappointing and surprising that FTC staff, with knowledge of the above facts, would attempt to introduce the above-referenced documents in the January 11 IH without first conferring with Amazon's counsel to determine whether these documents were inadvertently produced.  We request that if staff identifies any other documents that are (or appear to be) privileged, that staff immediately stop review of those documents and alert us to this fact.


                              Sincerely,


                               /s/


                              Laura Kim
                              John Graubert
                              John Hall
                              Laura Flahive Wu
                              Stephen Anthony
                              Megan Rodgers

# Attachment 8

**COVINGTON**

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

February 7, 2023

**CONFIDENTIAL TREATMENT REQUESTED**

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C.  20580

> Re:   FTC Matter No. 2123050

Dear Mr. Cohen:

Amazon.com, Inc. ("Amazon") writes to raise issues related to the inadvertent production of certain privileged documents.

**I.   Documents clawed back during January 20, 2023 corporate IH.**

First, Amazon writes to follow up regarding the inadvertent production of privileged documents that came to Amazon's attention during the January 20, 2023 investigational hearing of Amazon's corporate designee, Lisa Leung. As a preliminary matter, we confirm our oral request that, pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), the FTC return, delete, or destroy the document bearing the following beginning Bates numbers, which was inadvertently produced in unrelated FTC investigations:

> Amazon-FTC-CID_08427042 / AMZN-MGM-2R-003149387

In addition to the above document, which was the subject of Amazon's objection during Ms. Leung's investigational hearing, Amazon has identified five versions of the same (or a substantially similar) document that were inadvertently produced either in the instant investigation or in unrelated FTC investigations. We therefore request that, pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), the FTC return, delete, or destroy the documents bearing the following beginning Bates numbers:

> Amazon-FTC-CID_09910965
> AMZN_00045917
> AMZN_00112860
> AMZN_00137986
> AMZN_00138070

The six above-referenced documents, which include a meeting memorandum, are protected by Amazon's attorney-client privilege and work product doctrine, and were inadvertently produced in this investigation or in response to separate investigations conducted by the FTC's Bureau of Competition. Amazon has learned additional facts that confirm the

Jonathan Cohen
February 7, 2023
Page 2

privile_ed nature of these documents.  Under the FTC's rules of practice, staff is required to "promptly return or destroy" this material. 16 C.F.R. § 2.11(d)(1)(ii).

**II.**     **Other clawbacks.**

     Second, in addition to the documents listed above, Amazon has identified additional privileged documents that were inadvertently produced in this investigation and unrelated FTC investigations.  Accordingly, pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), Amazon requests that the FTC return, delete, or destroy the documents bearing the following beginning Bates numbers:

     AMZN_00045918
     AMZN_00160403
     AMZN_00067288
     AMZN_00126489
     AMZN_00117727
     AMZN_00138192
     AMZN_00140183
     AMZN_00140201
     AMZN_00143228
     AMZN_00154689
     AMZN_00026293
     AMZN_00026294
     AMZN_00137982
     AMZN_00137994
     AMZN_00138019
     AMZN_00138020
     AMZN_00138045
     AMZN_00141381
     AMZN_00118757
     Amazon-FTC-CID_09818779
     Amazon-FTC-CID_09389533
     Amazon-FTC-CID_09454557
     Amazon-FTC-CID_09839753
     Amazon-FTC-CID_09839018
     Amazon-FTC-CID_08784437
     Amazon-FTC-CID_09246136
     Amazon-FTC-CID_09840614
     Amazon-FTC-CID_09795274
     Amazon-FTC-CID_09795246
     Amazon-FTC-CID_09407590
     Amazon-FTC-CID_09839042
     Amazon-FTC-CID_08784408
     Amazon-FTC-CID_09929606
     Amazon-FTC-CID_04911366
     Amazon-FTC-CID_04910919
     Amazon-FTC-CID_04910933

Jonathan Cohen
February 7, 2023
Page 3

          Amazon-FTC-CID_04910969
          Amazon-FTC-CID_04910492
          Amazon-FTC-CID_04910496
          Amazon-FTC-CID_04910521

      The above-referenced documents are protected by Amazon's attorney-client privilege and work product doctrine, and were inadvertently produced in this investigation or in response to separate investigations conducted by the FTC's Bureau of Competition.

***

      Please promptly confirm, in writing, that you have deleted or destroyed the above-referenced documents and all existing data associated with these documents, including any copies of the documents and associated data contained on the original production media provided to you, as well as any copies that may exist on internal databases or networks, including all associated metadata, extracted text, or native files, or any materials derived from or incorporating the protected information.  Please also confirm you have destroyed or deleted any reference to these documents from other documents, including your work product.  After the clawed-back documents have been appropriately updated in your document review platform, we ask that you please ensure that your document review platform is re-indexed, if necessary, to account for any changes in searchable text.

      Pursuant to 16 C.F.R. § 2.11(a)(1), Amazon will follow up shortly with a supplemental log of the withheld information based on a claim of protected status, as that term is defined in § 2.7(a)(4).  Amazon determined that the items identified on this forthcoming log are entitled to protected status according to governing legal principles. Amazon will also provide replacement copies of the documents that omit the protected information, along with the appropriate metadata.

      We continue to have serious concerns about staff's conduct with respect to categories of documents over which Amazon has claimed privilege.  As we have previously requested, we ask that if staff identifies any other documents that are (or appear to be) privileged, that staff immediately stop review of those documents and alert us to this fact.

             Sincerely,

              /s/

             Laura Kim
             John Graubert
             John Hall
             Laura Flahive Wu
             Stephen Anthony
             Megan Rodgers

# Attachment 9

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

February 21, 2023

## CONFIDENTIAL TREATMENT REQUESTED

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

Re:   FTC Matter No. 2123050

Dear Mr. Cohen:

Amazon.com, Inc. ("Amazon") writes in response to staff's February 17, 2023 email regarding certain privilege issues.  We address staff's questions below.

1. *What is the basis for your view that, pursuant to 16 C.F.R. 2.11(d)(1), we must return or destroy the materials at issue, rather than sequester them?  (To provide you an assurance:  to the best of our ability to ascertain this, no disputed materials are being used, and everything is either sequestered or being sequestered.)*

Staff should not diverge from its customary practice of returning or destroying inadvertently disclosed materials.  Pursuant to 16 C.F.R. § 2.11(d)(1)(ii), staff must either (1) return or destroy any inadvertently disclosed materials or (2) sequester such materials until an Administrative Law Judge (ALJ) or court rules on the privilege claims.  Here, however, there is no "proceeding or action resulting from the investigation" pursuant to which we are awaiting a ruling on the privilege claims.  Moreover, staff has not challenged Amazon's privilege claims, so there is no ruling from an ALJ or court pending.  Accordingly, there is no reason for staff to sequester these materials.  Thus, we have asked staff to return or destroy Amazon's privileged materials, consistent with staff's customary practice.  Please inform Amazon if staff instead intends to sequester documents pending review by an ALJ or court and confirm whether Commission staff has destroyed or sequestered the materials identified in each of our prior claw back requests.

2. *What is the difference, if any, between correspondence covering privilege-related issues coming from Ben and correspondence coming from you?  Relatedly, who is responsible for Amazon's production within the meaning of 16 C.F.R. 2.11(a)(1), including the privilege claims in particular?*

Amazon is represented in this matter by both internal Amazon counsel and Covington.  As such, communications from either internal counsel or Covington are sent on behalf of Amazon.  Pursuant to 16 C.F.R. § 2.11(a)(1), Amazon has attested to its privilege logs.  *See, e.g.*, Amazon's Correspondence Dated October 7, 2022; November 22, 2022; and December 12, 2022.

Jonathan Cohen
February 21, 2023
Page 2

3. *Please explain your concerns about the Commission's handling of "categories" of documents that Amazon currently considers privileged. What are the categories? It's one thing if we see something that looks privileged. In a couple of instances, we've brought such documents to your attention. But it feels like Amazon wants us to conduct a privilege review on its behalf. In any event, if you want to ask us to be "on the lookout," so to speak, for things that slipped through your review and fall within "categories" (yet do not appear facially privileged), we need to know what categories you mean.*

Amazon is not asking staff to conduct an independent privilege review. Rather, Amazon expects that staff will adhere to its legal and ethical obligations not to review and use documents that it should reasonably understand to have been inadvertently produced. Staff's continued attempts to use apparently privileged materials relating to the May 2021 meeting without seeking guidance from Amazon counsel as to their privileged status prior to use has violated this requirement.

Staff has repeatedly sought to use documents in investigational hearings that contain apparent indications of their privileged nature. As we previously informed you in our communication on January 13, 2023, such indications include "Privileged and Confidential" and "Attorney-Client Work Product" stamps; references to the document's legal purpose; communications involving individuals that FTC staff knows are counsel for Amazon; and documents inadvertently produced in other pending investigations that appear on a privilege log in this matter. It is improper for staff to use documents that it should understand to have been inadvertently produced.

For example, we have repeatedly raised staff's attempts to use documents that relate to a meeting of Amazon employees and counsel in May 2021 to obtain legal advice regarding the Prime enrollment and cancellation processes. During individual investigational hearings, Amazon counsel repeatedly informed FTC staff that meetings and related memoranda from May 2021 regarding this subject matter are privileged. Specifically, Amazon counsel asserted that these meetings and related memoranda were privileged at the individual IHs of Mr. Clark, Mr. Lindsay, Mr. Ghani, and Mr. Hills. Thus staff has known since October 21 – the first investigational hearing of Amazon personnel conducted in this matter – that documents that relate to these meetings and the legal advice provided during such meetings were privileged. You have nonetheless continued your repeated attempts to use such documents in subsequent investigational hearings.

4. *What are the "additional acts" that Amazon learned that ostensibl confirm" that certain documents ou re erence in our Februar 7 corres ondence are, in fact, rivile ed? When did Amazon learn these facts and wh ? Do those additional con irmator acts ex lain on onl the clawbacks in Section I o that letter, or also those in Section II? And wh did Amazon not investi ate the otential or rivilege further based on whatever rior sus icions o rivile e it harbored et onl recentl "confirm[ed]"? We don't understand Amazon's narrative as to how this happened.*

Should Amazon identify concerns that an inadvertent roduction of rivile ed material might have occurred, it is appropriate for Amazon to conduct additional fact finding. This fact

Jonathan Cohen
February 21, 2023
Page 3

findin_ hel_s Amazon to determine the _rivile_ed nature of the material at issue.  It also might
identify additional material that was inadvertentl_ _roduced.  On the limited occasions Amazon
has identified such concerns, Amazon has undertaken such steps as appropriate.  Such a practice
is reasonable and among the prompt and diligent steps Amazon may take to correct an
inadvertent error.

 With respect to the documents listed in our Februar_ 7 letter  Amazon did not harbor
"_rior sus_icions of _rivile_e."  Amazon discovered the inadvertent _roduction of the first
document listed in Section I durin_ the Januar_ 20  2023 investi_ational hearin_.  Amazon's
counsel objected on the record  orall_ notified Commission staff as to the _rivile_ed nature of
this material, and requested that Commission staff return or destro_ all co_ies of the document.
Followin_ this immediate re_uest for clawback of the document  Amazon took _rom_t and
diligent steps to confirm the scope of the inadvertentl_ _roduced material  includin_ interviews
and review of additional documents.  Similar copies of this document are listed in Section I.
Amazon also conducted further review and fact findin_ to identif_ additional inadvertently
_roduced documents.  Amazon's _rocess resulted in the written clawback request for the
additional documents listed in Section II of our Februar_ 7 corres_ondence.  Amazon has
consistentl_ a__lied a _rom_t  reasonable  and dili_ent process to correct the inadvertent
production of privileged material once discovered.

5. *Amazon produced various significant documents to the FTC multiple times, with
   redactions, and following a supposedly painstaking – and certainly time-consuming –
   privilege review.  We then conducted a substantial portion of our investigation (including
   numerous IHs) reasonably assuming that we could use what Amazon produced.  We
   made strategic and practical decisions accordingly.  To provide one small example, we
   would have questioned certain witnesses differently had you withheld this material
   initially.  Now, after the previously-scheduled IHs have concluded, and both sides have
   done much work, Amazon has clawed things back.  What remedy does Amazon propose?*

 Amazon has produced tens of thousands of documents in this investigation, and staff has
used many of those documents during investigational hearing testimony.  Amazon has not made
any claim of inadvertent production for the vast majority of those documents.  On the few
occasions when Amazon discovered inadvertently produced materials, Amazon promptly
notified staff pursuant to 16 C.F.R. § 2.11(d)(1).  Moreover, staff has not identified how the
materials at issue—which include documents produced in a separate Commission
investigation—impacted staff's "strategic and practical decisions" in this matter.

 Despite Amazon having repeatedly raised concerns about staff's use of documents with
apparent indications of privilege, staff took no steps to confirm that any such materials had not
been produced inadvertently.  Indeed, staff rejected Amazon's October 17, 2022 proposal to
resolve privilege issues in advance of investigational hearing testimony.  To the extent that staff
made strategic decisions based on certain documents containing indications of privilege, staff
should have raised such issues earlier in this investigation, as Amazon proposed on October 17.
Accordingly, no remedy is appropriate.

Jonathan Cohen
February 21, 2023
Page 4

Sincerely,

/s/

Laura Kim
John Graubert
John Hall
Laura Flahive Wu
Stephen Anthony
Megan Rodgers

# Attachment 10

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T   +1 202 662 6000



**COVINGTON**



**COVINGTON**



COVINGTON





V.  Communications that Include Third Parties

Amazon conducted a thorough privilege review, including closely reviewing documents sent to or received by third parties. Documents to or from third parties may appropriately be withheld and therefore appear on the privilege logs—for example, the third party may not break privilege (*e.g.*, Priv-Log-0042483, an email between Amazon and outside counsel), the email may be an attachment to a wholly privileged communication seeking legal advice (*e.g.*, Priv-Log-0042483), or privilege may exist pursuant to a joint defense agreement or common interest between Amazon and the third party (*e.g.*, Priv-Log-0011699).



VI.  Redactions or Withholding of Documents

Amazon has conducted a thorough privilege review, including applying redactions where appropriate. Applying redactions is a time consuming, burdensome, and manual process performed by individual reviewers. While Amazon provided detailed guidance to ensure that redactions would be applied consistently and correctly, in light of the number of documents involved and the manual nature of this process, some inconsistency in redactions is inevitable.



**COVINGTON**



# Attachment 11

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**CONFIDENTIAL TREATMENT REQUESTED**



**COVINGTON**



**COVINGTON**



**COVINGTON**



IV.   Communications that Include Third Parties

As _art of its thorou_h _rivile_e review, Amazon already closely reviewed documents sent to or received from third parties. As referenced in Amazon's March 15, 2022 letter, there are many reasons why a document to or from a third party may appropriately be withheld and therefore appear on the privilege logs—*e.g.*, a communication with outside counsel (*e.g.*, Priv-Log-0042483, an email between Amazon and outside counsel), an attachment to a wholly privileged communication seeking legal advice (*e.g.*, Priv-Log-0042483), or a common interest or joint defense communication (*e.g.*, Priv-Log-0011699), among other reasons.

**COVINGTON**



As to the vague, general request by Staff for Amazon to "re-review redacted or withheld documents," Staff has put forth no evidence to suggest that such an incredibly burdensome process is warranted or likely to provide any value to its investigation. Amazon reiterates that it conducted a thorou_h_rivile_e review as _art of its res_onse to the Second Re _uest, which included guidance on how to apply manual redactions properly and consistently. When considering the size of Amazon's production—over 3.3 million documents and over 17.6 million pages—some inconsistencies in manual redactions may exist. But nothing in Staff's letter or Amazon's privilege review process warrants the substantial task of re-reviewing all documents partially redacted or withheld for privilege.

\* \* \*



# Attachment 12

| | |
|---|---|
| **From:** | Jerjian, Olivia |
| **To:** | LKim@cov.com; jgraubert@cov.com |
| **Cc:** | Cohen, Jonathan; Nardini, Thomas; Rottner, Adam; Cole, Margaret; Hoffman, Elena; Frech, Jacob; Zwonik, Ryan; Anthony, Stephen; Flahive Wu, Laura; jhall@cov.com; ASiegel@cov.com; Capuano, Marc; Moran, Jordan; ARemick@cov.com; Kelly, Kevin; NAgama@cov.com; CHiggins@cov.com; HJohnson@cov.com; ZNoble@cov.com; MRodgers@cov.com; Rutherford, Miranda; Ledain, Lelia A; Martin, Austin; Charles, Amber; Maldonado, Kassandra; Austin, Tarek; rmiller@cov.com; Jacobs, Eli J; Grossman, Rachel; Ponder, Jayne |
| **Subject:** | Amazon.com, Inc., FTC Matter No. 2123050 |
| **Date:** | Thursday, April 6, 2023 4:23:12 PM |

Counsel,

We agree that we should schedule a meeting to discuss the transcripts, some other administrative issues, and most important, next steps.  Jonathan is in Chicago for depositions for part of next week, so we suggest Monday, April 17, at 10:15 or 1:45, either in person or via Zoom (your choice).  We'd like to set aside at least two hours, as we'll have a lot to cover.

With respect to the IH transcripts, we reached out to you on February 22, 2023 to provide you with an opportunity to inspect them via Relativity, provided you shared with us the information required for us to enable your access to Relativity. On March 31, you provided us with a list of the attorneys who would be reviewing, along with their corresponding emails. You still have not provided us with their cell phone numbers, which are necessary to provide access through Relativity.

Separately, please immediately review AMZN_00141912, which could contain privileged information, and advise us promptly if you intend to claw it back (and if so, provide a log and, if appropriate, a redacted replacement).  Out of an abundance of caution, we've sequestered this document.

Best,
Olivia

Olivia C. Jerjian
Federal Trade Commission
Bureau of Consumer Protection
Division of Enforcement
600 Pennsylvania Avenue, NW | Washington DC 20580
202.326.2749
ojerjian@ftc.gov

# Attachment 13

**COVINGTON**

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

April 20, 2023

**CONFIDENTIAL TREATMENT REQUESTED**

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

      Re:    FTC Matter No. 2123050

Dear Mr. Cohen:

      Amazon.com, Inc. ("Amazon") writes in response to staff's April 6, 2023 email regarding AMZN_00141912.  Amazon writes to respectfully request that pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), the Federal Trade Commission return, delete, or destroy AMZN_00141912. This document contains material protected by Amazon's attorney-client privilege and was inadvertently produced.

      We also respectfully request that you return, delete, or destroy all existing data associated with the document listed above, including any copies of the documents and associated data contained on the original production media provided to you, as well as any copies that may exist on internal databases or networks, including all associated metadata, extracted text, or native files, or any materials derived from or incorporating the protected information. After the clawed-back document has been appropriately updated in your document review platform, we ask that you please ensure that your document review platform is re-indexed, if necessary, to account for any changes in searchable text. Finally, we respectfully request that you send us written confirmation once all inadvertently produced material has been returned, deleted, or destroyed.

      Accompanying this letter is a replacement version of this document that omits protected information, along with appropriate metadata. Pursuant to 16 C.F.R. § 2.11(a)(1), included with this production is a supplemental log of the withheld information based on a claim of protected status, as that term is defined in § 2.7(a)(4). Amazon determined that the items identified on this log are entitled to protected status according to governing legal principles.

                         Sincerely,

                         /s/

                         Laura Kim
                         John Graubert
                         John Hall
                         Laura Flahive Wu
                         Stephen Anthony
                         Megan Rodgers

# Attachment 14

1                    FEDERAL TRADE COMMISSION
2   In the Matter of:          )
                               )
3   AMAZON.COM, INC.,          ) File No. 2123050
                               )
4            a Corporation.    )
5
6    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
7   INVESTIGATIVE HEARING, SWORN TESTIMONY OF DAVID CLARK
                    November 18, 2022
8
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
9
10        INVESTIGATIVE HEARING, SWORN TESTIMONY OF DAVID
11   CLARK, produced as a witness and duly sworn, was taken
12   in the above-styled and numbered cause on November 18,
13   2022, from 8:46 a.m. until 5:03 p.m., before Suzanne
14   Kelly, Registered Professional Reporter, Certified
15   Realtime Reporter, reported by stenographic method at
16   the Federal Trade offices located at 1999 Bryan
17   Street, Suite 2150, Dallas, Texas.
18
19
20   Reported by:  Suzanne Kelly, CSR, RDR, CRR
21   Job:  58300
22
23
24
25

178

Clark

Amazon.com, Inc.                                              11/18/2022

```
 1   on the conference line please state their names?

 2               MR. JACOBS:  Eli Jacobs, Covington

 3   and Gross.

 4               MS. JERJIAN:  Thank you.

 5   BY MS. JERJIAN:

 6       Q.  Mr. Clark, did you discuss the substance

 7   of your testimony with anyone during the lunch

 8   break?

 9       A.  No.

10       Q.  I believe you tested earlier that the

11   only meaningful communication that you recall

12   regarding mistaken sign-ups is what you named the

13   "privileged meeting."  Correct?

14               MS. RODGERS:  Objection.  Form.

15               THE WITNESS:  Yes, that's correct.

16   BY MS. JERJIAN:

17       Q.  Okay.  How do you know it's privileged?

18       A.  The purpose of that meeting was to seek

19   legal guidance.

20       Q.  Did someone tell you it's considered

21   privileged?

22       A.  We were seeking legal guidance from our

23   Legal Team and Consumer and it was, therefore, a

24   privileged meeting.

25       Q.  So you -- you knew that on your own?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Clark

Amazon.com, Inc.                                        11/18/2022

1        A.  I'm aware of that through our legal

2   training and our Legal Team said it was a

3   privileged meeting.

4        Q.  So you know -- you're basing your

5   statement as "privileged" on what your in-house

6   Amazon counsel told you?

7              MS. RODGERS:  I'm going to --

8   sorry.  Done with the question?

9              MS. JERJIAN:  Yes.

10             MS. RODGERS:  I'm going to instruct

11   you not to answer as to things that in-house

12   counsel or your legal team here told you or

13   didn't tell you.

14             So only -- to the extent you can

15   answer it on your own without that, go ahead.

16   BY MS. JERJIAN:

17       Q.  Yeah.  I'm just looking for a "yes" or

18   "no."

19       A.  Yes.  I learned through the Legal Team

20   it was privileged.

21       Q.  And by "Legal Team," you're referring to

22   in-house counsel?

23       A.  In-house counsel followed up by --

24             MS. RODGERS:  Objection.  So

25   you're -- you're still asking him about the

180

Clark

Amazon.com, Inc.                                              11/18/2022

```
 1    contents of conversations between counsel and
 2    him.
 3              So, I'm -- I'm going to instruct
 4    him not to answer what he heard from attorneys,
 5    whether they were in-house counsel at Amazon or
 6    outside counsel.
 7              MS. JERJIAN:  I'm just asking about
 8    how he knows it's privileged.  But I think he's
 9    answered that.
10    BY MS. JERJIAN:
11       Q.  Are you going to follow your counsel's
12    instruction not to respond?
13       A.  Yes.
14       Q.  Okay.  When did this privileged meeting
15    take place?
16       A.  I believe it was May 21.
17       Q.  Do you know what date?
18       A.  I don't recall.
19       Q.  Was it early May?
20       A.  I don't recall.
21       Q.  Did you talk at this meeting without
22    telling what you would have said?
23              "Yes" or "no"?
24       A.  Yes.
25       Q.  Who was present at this meeting?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Clark

Amazon.com, Inc.                                          11/18/2022

```
 1       A.  I don't recall everyone that was present
 2   at the meeting but I believe Doug Herrington,
 3   Russ Grandinetti, Neil Lindsay, our consumer
 4   lawyer, Michael Miller, the Prime Team lawyer, I
 5   don't recall his name.
 6              And some other folks that I don't
 7   recall.
 8       Q.  Was it an in-person meeting?
 9       A.  I was not in person.  I don't recall if
10   anybody else was in person or not.
11       Q.  Yes or no, was it a Zoom meeting?
12       A.  It was a Chime meeting.
13       Q.  Okay.  Sorry.  So it was a virtual
14   meeting?  Yes or no?
15              MS. RODGERS:  Object to the form.
16   Partially, yes.
17   BY MS. JERJIAN:
18       Q.  And again, I'm just looking for a "yes"
19   or "no."
20              Was there was a component, were
21   there attendees who attended in person?
22              Yes or no?
23       A.  I believe so, yes.
24       Q.  Who attended in person?
25       A.  I don't recall.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

182

Clark

Amazon.com, Inc.                                           11/18/2022

```
 1        Q.  You attended on Chime?
 2        A.  Yes.
 3        Q.  Where did the in-person component occur?
 4              MS. RODGERS:  Objection.
 5    Foundation.
 6              THE WITNESS:  I don't recall.
 7    BY MS. JERJIAN:
 8        Q.  Was it one of the Amazon's offices?
 9              MS. RODGERS:  Objection.
10    Foundation.  Form.
11              THE WITNESS:  I believe, yes.
12    BY MS. JERJIAN:
13        Q.  And without telling me the contents,
14    I -- the contents of the meeting, what was the
15    purpose of the meeting?
16        A.  We were seeking legal -- the team was
17    seeking legal guidance.
18        Q.  Did Neil Lindsay speak at this meeting,
19    yes or no?
20        A.  I assume yes, but I don't recall
21    specifically.
22        Q.  Well, did Mr. Grandinetti speak at this
23    meeting, yes or no?
24        A.  I assume so but I don't specifically
25    recall.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

183
Clark
Amazon.com, Inc.                                    11/18/2022

1        Q.  Did Doug Herrington speak at this
2    meeting, yes or no?
3        A.  I assume yes, but I don't specifically
4    recall.
5        Q.  Did legal counsel speak at this meeting,
6    yes or no?
7        A.  Yes.
8        Q.  Was legal advice conveyed to you during
9    this meeting, yes or no?
10       A.  Yes.
11       Q.  Regardless of how you became aware, what
12   was the first time that you became aware that
13   there was a regulatory inquiries being made into
14   enrollment and cancellation of those with respect
15   to Prime?
16              MS. RODGERS:  Object to the form,
17   scope.
18              THE WITNESS:  I don't recall
19   specifically.  I know it -- I don't recall.
20   BY MS. JERJIAN:
21       Q.  It was prior to this privileged meeting?
22       A.  I don't recall.
23       Q.  Was it when you became CEO?
24       A.  I don't recall.
25       Q.  So just to be clear, you don't have any

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

184

Clark

Amazon.com, Inc.                                    11/18/2022

1    recollection as to when you became aware of

2    regulatory inquiry into the Prime flows?

3                MS. RODGERS:  Objection to form.

4                THE WITNESS:  I do not.

5    BY MS. JERJIAN:

6        Q.  Were you aware that there was regulatory

7    inquiry into the enrollment and the cancellation

8    of flows?

9                MS. RODGERS:  Objection to the

10   form.

11               THE WITNESS:  It -- I know as a

12   result of the privileged conversation there was

13   discussion.  But short of that, I don't recall.

14   BY MS. JERJIAN:

15       Q.  So was that the only instance where you

16   remember -- withdrawn.

17               Is that the only instance where --

18   that you remember sitting here today, where you

19   remember regulatory inquiry into the flows being

20   a topic of discussion?

21               MS. RODGERS:  Objection to form.

22               THE WITNESS:  I don't recall

23   another instance.

24   BY MS. JERJIAN:

25       Q.  Sitting here today, you can't remember

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

185

Clark

Amazon.com, Inc.                                           11/18/2022

1    any other times.  Right?

2              MS. RODGERS:  Objection.  Form.

3    Asked and answered.

4              THE WITNESS:  I don't remember any

5    other times.

6    BY MS. JERJIAN:

7         Q.  Okay.  Sitting here today.  Right?

8         A.  Sitting here today.

9         Q.  Throughout your time as SVP and CEO, how

10   many meetings did you attend where there were at

11   least two member of the S Committee and in-house

12   counsel present?

13        A.  Numerous because there were multiple S

14   Team members in the Consumer Business so they

15   were often multiple members who were on the

16   Consumer Team in meetings.

17             Can you -- is there -- can you be

18   more specific than what you're looking for?

19        Q.  No.  That was my question.

20             Did legal counsel speak during

21   those meetings?

22             MS. RODGERS:  Objection.  Form.

23   Vague.

24             THE WITNESS:  It would depend on

25   the meeting.

186

Clark

Amazon.com, Inc.                                              11/18/2022

```
 1   BY MS. JERJIAN:
 2        Q.  Did legal counsel provide legal advice
 3   during those meetings?
 4             MS. RODGERS:  Objection.  Form.
 5             THE WITNESS:  If it was a meeting
 6   seeking legal advice.
 7   BY MS. JERJIAN:
 8        Q.  Okay.  What meetings are you thinking
 9   of?  Not the legal advice ones.  Just the
10   meetings where you -- that you recall were to
11   SVP -- I'm sorry -- two S Committee members at
12   least attended with in-house counsel?
13        A.  I'm not particularly -- thinking of
14   anything in particular.
15        Q.  Nothing coming to mind right now?
16        A.  Nothing.  A staff meeting would have
17   multiple people and/or legal people because they
18   are sort of part of the staff.  But there are
19   many other meetings.  Nothing is coming to mind.
20        Q.  What's a staff meeting?
21        A.  A meeting with Mike Drex or the Consumer
22   Leadership Team.
23        Q.  And do legal counsel usually provide
24   legal advice during those meetings, yes or no?
25             MS. RODGERS:  Objection.  Form.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

187

Clark

Amazon.com, Inc.                                          11/18/2022

```
 1              THE WITNESS:  If there's a topic
 2    that's being discussed that's seeking legal
 3    guidance.
 4    BY MS. JERJIAN:
 5        Q.  Just generally, what topics would those
 6    be?
 7              MS. RODGERS:  Objection to -- I'm
 8    going to instruct you not to answer as to
 9    specific communications where you were asking for
10    legal advice or legal advice that was provided to
11    you.
12    BY MS. JERJIAN:
13        Q.  Are you going to follow your counsel's
14    instruction?
15        A.  Yes.
16        Q.  Okay.  So following your counsel's
17    instruction, can you give a response to my
18    question to the extent that you can?
19        A.  I guess I'm not sure how to answer.  You
20    know, I would -- it could be any number of
21    subjects that we wanted legal -- legal guidance
22    on how to proceed or on the method that was being
23    considered to proceed.
24        Q.  You can't -- you can't list -- give me
25    the subject matter areas generally while
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Clark

Amazon.com, Inc.                                            11/18/2022

```
 1    complying with your legal counsel's instruction?
 2         A.  I don't think there was a general topic
 3    that would be specific topics.
 4         Q.  And you can't respond to my question
 5    without -- while following your legal counsel's
 6    instruction?
 7         A.  I don't believe I can.
 8         Q.  Okay.  Yes or no, was there a memo or a
 9    document prepared for the privileged meeting?
10         A.  Yes.
11         Q.  Yes or no, did you write any portion of
12    the written -- of the document?
13         A.  No.
14         Q.  Can you list the authors of the
15    document?
16         A.  I don't recall who wrote the document.
17         Q.  Did legal counsel draft the document,
18    yes or no?
19         A.  I don't know.
20         Q.  Did Mr. Lindsay draft part of a
21    document, yes or no?
22              MS. RODGERS:  Objection.  Form.
23              THE WITNESS:  I don't know.
24    BY MS. JERJIAN:
25         Q.  Did you read the document ahead of time,
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

189

Clark

Amazon.com, Inc.                                             11/18/2022

1    yes or no?

2        A.  No. I believe I read it as part of the

3    reading time at the meeting.

4        Q.  How many people approximately attended

5    this meeting?

6        A.  I don't recall the count.

7        Q.  More than 10?

8            MS. RODGERS:  Objection to form.

9            THE WITNESS:  I don't recall.

10   BY MS. JERJIAN:

11       Q.  Was it a small?  Do you remember it

12   being a small meeting, yes or no?

13           MS. RODGERS:  Objection to form.

14           THE WITNESS:  I don't think I would

15   class it as small, but I don't remember how many

16   were there.

17   BY MS. JERJIAN:

18       Q.  Yes or no, were there any subsequent

19   meetings discussing -- withdrawn.

20           Yes or no, were there any

21   subsequent meetings following -- withdrawn again.

22           Were there any subsequent meetings

23   as a result of this privileged meeting, yes or

24   no?

25           MS. RODGERS:  Objection.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

190

Clark

Amazon.com, Inc.                                          11/18/2022

```
 1    Foundation.  Form.
 2              THE WITNESS:  From -- for me, I
 3    don't know of any follow -- I don't recall any
 4    follow-ups that I was in.
 5    BY MS. JERJIAN:
 6        Q.  How about generally?
 7        A.  I don't know.
 8        Q.  So, no, there were no follow-up
 9    meetings?
10              MS. RODGERS:  Objection.  Form.
11              THE WITNESS:  Yeah.  I was not
12    involved in any follow-up meetings.  I don't know
13    if there were others.
14    BY MS. JERJIAN:
15        Q.  Yes or no, were there any decisions made
16    at this meeting?
17        A.  Yes.
18        Q.  Yes or no, were changes to the
19    enrollment flow made as a result of this meeting?
20        A.  I believe so, yes.
21        Q.  Yes or no, were changes to the
22    cancellation flow made as a result of this
23    meeting?
24        A.  I believe so, yes.
25        Q.  Did everyone -- yes or no, did everyone
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

191
Clark
Amazon.com, Inc.                                    11/18/2022

1    participate in the decision that was made?

2              MS. RODGERS:  Objection.  Form.

3              THE WITNESS:  I don't recall

4    specifically.  It was largely seeking legal

5    guidance as an outcome of the recommendation, so.

6    BY MS. JERJIAN:

7        Q.  Did you participate, yes or no, in the

8    decision that was made?

9              MS. RODGERS:  Objection to form.

10             THE WITNESS:  Yes.

11   BY MS. JERJIAN:

12       Q.  Did Mr. Lindsay?

13             MS. RODGERS:  Same objection.

14             THE WITNESS:  I -- I believe so but

15   I don't recall specifically.

16   BY MS. JERJIAN:

17       Q.  Did Mr. Grandinetti?

18             MS. RODGERS:  Same objection.

19             THE WITNESS:  I believe so, but I

20   don't recall specifically.

21   BY MS. JERJIAN:

22       Q.  How about Mr. Herrington?

23             MS. RODGERS:  Same objection.

24             THE WITNESS:  I believe so, but I

25   don't recall specifically.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

192

Clark

Amazon.com, Inc.                                          11/18/2022

```
 1    BY MS. JERJIAN:
 2         Q.  Did Mr. Ghani attend this meeting, yes
 3    or no?
 4         A.  I believe so, yes.
 5         Q.  Did Mr. Sabai attend this meeting, yes
 6    or no?
 7         A.  I don't recall if he was there or not.
 8         Q.  Did Mr. Ghani speak at the meeting?
 9         A.  I believe so. But I don't remember
10    specifically.
11         Q.  Did something prompt the meeting, yes or
12    no?
13             MS. RODGERS:  I'm going to object
14    and instruct the witness not to answer to the
15    extent it would cause you to reveal information
16    that was communicated to you from an attorney.
17    BY MS. JERJIAN:
18         Q.  Are you going to follow your counsel's
19    instruction?
20         A.  Yes.
21         Q.  Can you respond to my question while
22    following your counsel's instruction?
23         A.  I don't recall the origin of the
24    meeting.
25         Q.  Can you tell me who set up the meeting?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

193
Clark
Amazon.com, Inc.                                    11/18/2022

1        A.  I assume Neil or someone on his team,
2    but I don't recall.
3               THE COURT REPORTER:  I'm sorry?  I
4    assume?
5               THE WITNESS:  I assume Neil or
6    someone on his team, but I don't recall
7    specifically.
8    BY MS. JERJIAN:
9        Q.  I'm going to show you what's being
10   marked as "Exhibit 6."
11              MS. RODGERS:  Thank you.
12              (Investigation Exhibit Number 6
13   marked.)
14   BY MS. JERJIAN:
15       Q.  Do you recognize this document?
16       A.  Yes.
17       Q.  It's your response to the CID that was
18   served on you.  Correct?
19       A.  Yes.
20       Q.  Did you draft the responses?
21       A.  Yes.
22       Q.  Looking at Page 2 --
23              MS. RODGERS:  Do you mean the one
24   marked "2" or the second page?
25              MS. JERJIAN:  The second page of

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

226

Clark

Amazon.com, Inc.                                    11/18/2022

1    BY MS. JERJIAN:

2         Q.  Okay.

3         A.  And I think there have been enhancements

4    made and will likely continue to be as there is

5    with everything over time, but the process always

6    seemed very simple to me.

7         Q.  What enhancements are you referring to?

8         A.  There were changes made out of the

9    privileged meeting, I believe, or made.

10        Q.  What changes?

11        A.  I don't recall specifically.

12        Q.  Okay.  What are you basing your

13   knowledge on?  So I think earlier, you testified

14   that you never went through a cancellation flow.

15   Right?

16             MS. RODGERS:  Objection to form.

17             THE WITNESS:  I said outside of the

18   conversation in May.

19   BY MS. RODGERS:

20        Q.  So your understanding of how complex the

21   cancellation flow is, is entirely based on that

22   May meeting that you're referring to?

23             MS. RODGERS:  Objection.  Form.

24             THE WITNESS:  I don't recall having

25   gone through it other than that.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

227

Clark

Amazon.com, Inc.                                        11/18/2022

```
 1   BY MS. JERJIAN:
 2       Q.  Okay.
 3               MS. JERJIAN:  Can we go off the
 4   record for a two-minute break?
 5               MS. RODGERS:  Okay.
 6               (Recess taken.)
 7   BY MS. JERJIAN:
 8       Q.  Okay.  Mr. Clark, going back to the May
 9   meeting that was privileged, can you tell me who
10   led that meeting?
11               MS. RODGERS:  Objection to form.
12               THE WITNESS:  I don't recall who
13   the specific sort of presenter was that brought
14   the doc.
15   BY MS. JERJIAN:
16       Q.  It was Neil Lindsay, yes or no?
17               MS. RODGERS:  Objection to form.
18   Objection to form.
19               THE WITNESS:  I don't recall.
20   BY MS. JERJIAN:
21       Q.  Do you recall if there was legal
22   counsel?
23               MS. RODGERS:  Objection to form.
24               THE WITNESS:  I don't recall.
25   BY MS. JERJIAN:
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

228

Clark

Amazon.com, Inc.                                                11/18/2022

1        Q.  Who requested the meeting?  Just a name.

2        A.  I'm not sure.  I wouldn't have seen it.

3    It would have come through my calendar.

4        Q.  So yes or no, you became aware of a

5    meeting because you got a calendar invite?

6        A.  Yes.

7        Q.  But not before that?

8        A.  I don't recall.

9        Q.  When did you get the invite?

10       A.  I don't -- my EA would have gotten the

11   invite.

12       Q.  Was the document circulated ahead of

13   time?

14            MS. RODGERS:  Object to form.

15            THE WITNESS:  No. I assume it -- I

16   got it right before the meeting and read it

17   during the reading time.

18   BY MS. JERJIAN:

19       Q.  Did you get it by e-mail?

20            MS. RODGERS:  Objection to form.

21            THE WITNESS:  I believe so, yes.

22   BY MS. JERJIAN:

23       Q.  So you got it by e-mail right at the

24   start of the meeting?

25            MS. RODGERS:  Objection to form.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

229

Clark

Amazon.com, Inc.                                          11/18/2022

1                 THE WITNESS:  I don't know exactly
2    when, but sometime I would imagine shortly before
3    the meeting.  But I'm not sure.
4    BY MS. JERJIAN:
5         Q.  What do you mean by "shortly before the
6    meeting"?
7         A.  Oftentimes, I would get the e-mails for
8    some time during the day of the meeting for
9    meetings that day.
10        Q.  Like an hour before the meeting, two
11   hours?
12                MS. RODGERS:  Objection to form.
13   BY MS. JERJIAN:
14        Q.  For this meeting -- meeting
15   specifically.
16                THE WITNESS:  It varies.  I don't
17   know.  BY MS. JERJIAN:
18        Q.  Okay.  Did everyone who attended the
19   meeting get a copy of the document?
20                MS. RODGERS:  Objection.
21   Foundation.
22                THE WITNESS:  I don't know.  I
23   assume.
24   BY MS. JERJIAN:
25        Q.  So I think you testified that you

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

230

Clark

Amazon.com, Inc.                                          11/18/2022

```
 1   attended, Mr. Herrington attended, Mr. Ghani,
 2   Lindsay, Grandinetti attended as well as legal
 3   counsel.
 4              Was there anyone who attended that
 5   meeting that was at a higher level than you?
 6              MS. RODGERS:  Objection.  Form.
 7   Foundation.
 8              THE WITNESS:  No.
 9   BY MS. JERJIAN:
10      Q.  You were at the highest level at that
11   meeting?
12      A.  Yes.
13      Q.  And who was the most junior attendee at
14   the meeting?
15              MS. RODGERS:  Objection to form.
16              THE WITNESS:  I don't know.
17   BY MS. JERJIAN:
18      Q.  Was Mr. Ghani one of the more junior
19   people who attended the meeting?
20              MS. RODGERS:  Objection to form.
21              THE WITNESS:  I don't recall who --
22   who else was at the meeting.  So I'm not sure.
23   BY MS. JERJIAN:
24      Q.  What level was Mr. Ghani?
25      A.  10.
```

231

Clark

Amazon.com, Inc.                                          11/18/2022

1          Q.  Who on the Prime Team attended?

2          A.  I don't recall.

3          Q.  So you don't recall anyone else besides

4     Mr. Lindsay and Mr. Ghani?

5          A.  I recall there being other people there,

6     but I don't recall who they were.

7          Q.  Was it because you hadn't met them

8     before or is it because -- well, I'll just stop

9     there.

10              Was it because you didn't meet them

11    before?

12              MS. RODGERS:  Objection.  Form.

13              THE WITNESS:  I just don't recall.

14    BY MS. JERJIAN:

15         Q.  I think you testified there were also

16    changes made to the cancellation flow after the

17    meeting.  Correct?

18         A.  Yes.  I believe so.

19         Q.  Did any of the changes involve adding

20    additional pages to the cancellation flow?

21              MS. RODGERS:  Objection.  Form.

22              THE WITNESS:  I don't recall the

23    specifics.

24    BY MS. JERJIAN:

25         Q.  So you don't know if changes were made

232
Clark
Amazon.com, Inc.                                    11/18/2022

1   to add additional pages to the cancellation flow?

2               MS. RODGERS:  Objection to form.

3               THE WITNESS:  I don't recall the

4   specifics of what we changed.

5   BY MS. JERJIAN:

6       Q.  Okay.  So it's possible that that could

7   have been one of the changes?

8               MS. RODGERS:  Same objection.

9               THE WITNESS:  Yeah.  I don't

10  recall.

11              MS. RODGERS:  Same objection.

12  BY MS. JERJIAN:

13      Q.  Well, did any of the changes to the

14  sign-up flow make it easier to enroll into Prime?

15              MS. RODGERS:  Objection to form.

16              THE WITNESS:  I don't recall the

17  specifics.

18  BY MS. JERJIAN:

19      Q.  Did any of the changes reduce the number

20  of disclosures made to consumers?

21              MS. RODGERS:  Objection to form.

22              THE WITNESS:  I don't recall the

23  specifics.

24  BY MS. JERJIAN:

25      Q.  Can you tell me what True SPC is?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

273

Clark

Amazon.com, Inc.                                      11/18/2022

1                MS. RODGERS:  Objection.

2     Foundation.

3                THE WITNESS:  I don't know.

4     BY MS. JERJIAN:

5        Q.  Did you -- did you discuss your

6     one-on-one meetings with Mr. Jassy with

7     Mr. Selipsky?

8        A.  No.

9        Q.  Did you interact with Mr. Selipsky?

10       A.  Not really.

11       Q.  So your areas were very siloed?

12               MS. RODGERS:  Objection to form.

13               THE WITNESS:  Generally, yes.

14               MS. JERJIAN:  I think we can take a

15    five-minute break and go off the record.

16               (Recess taken.)

17    BY MS. JERJIAN:

18       Q.  Mr. Clark, did you discuss the substance

19    of your testimony with anyone at any break today?

20       A.  No.

21       Q.  Okay.  I just want to -- I just want to

22    make sure I'm understanding your testimony

23    correctly with respect to the changes that were

24    made to the cancellation enrollment flows after

25    the May 2021 meeting that we've been calling "the

Ex. A, Page 127 of 308

274

Clark

Amazon.com, Inc.                                                          11/18/2022

1   privileged meeting."

2              Do you remember any changes or

3   anything about changes that were made to do an

4   enrollment flow after the May privileged meeting?

5              MS. RODGERS:  Objection to form.

6              THE WITNESS:  I do not.

7   BY MS. JERJIAN:

8      Q.  Do you remember the direction of the

9   changes that were made?

10              MS. RODGERS:  Objection to form.

11   BY MS. JERJIAN:

12      Q.  Even if not specifics?

13      A.  What do you mean by "direction"?

14      Q.  Like were there changes made to simplify

15   the cancellation flow for instance?

16              MS. RODGERS:  I'm going to instruct

17   you not to answer to the extent it calls for

18   information that, you know, advice from counsel

19   that occurred during that meeting or the reason

20   why changes should be made that came out during

21   that meeting?

22   BY MS. RODGERS:

23      Q.  Are you going to follow your counsel's

24   instruction?

25      A.  Yes.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

275

Clark

Amazon.com, Inc.                                                    11/18/2022

1          Q.  Can you respond to the question?

2          A.  I -- I don't have anything I can respond

3     to that wasn't privileged in that conversation.

4          Q.  Okay.  But -- so you do remember but you

5     can't respond because of the instruction?  Is

6     that correct?

7          A.  I don't recall any details of it.

8     But --

9          Q.  But you recall -- but for the counsel's

10    instruction, you'd be able to give me a more

11    substantive response.  Correct?

12              MS. JERJIAN:  Objection to the

13    form.

14              THE WITNESS:  Perhaps.

15    BY MS. JERJIAN:

16         Q.  What -- yes or no?  It's not "perhaps."

17              So yes, you would be able to give

18    me?

19         A.  Yes.

20         Q.  Okay.  And do you remember anything with

21    respect to the changes that were made to the

22    enrollment flow after the May -- May 2021

23    meeting?

24         A.  I don't recall.

25         Q.  You can't remember anything?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

276

Clark

Amazon.com, Inc.                                        11/18/2022

```
 1        A.  That was changed after the fact?
 2                 No.  I don't remember the details.
 3        Q.  Beyond the details generally.
 4        A.  I don't remember.
 5                 MS. RODGERS:  Objection to form.
 6                 THE WITNESS:  I don't remember the
 7   changes.
 8   BY MS. JERJIAN:
 9        Q.  But do you remember the direction in
10   which the changes were going towards?
11                 MS. RODGERS:  Objection to form.
12   Vague.
13                 THE WITNESS:  Not without getting
14   into the privileged meeting.
15   BY MS. JERJIAN:
16        Q.  So you do remember you just cannot tell
17   me because it's privileged.  Is that right?
18        A.  I don't recall the details of the
19   changes.
20        Q.  But you remember the general direction
21   of the changes were going towards.  Correct?
22        A.  Yes.
23                 MS. RODGERS:  Objection.  Form.
24                 THE WITNESS:  Yes.
25   BY MS. JERJIAN:
```

277

Clark

Amazon.com, Inc.                                          11/18/2022

1       Q.  And -- and the only reason you can't

2    share that with me today is because it's

3    privileged?

4               MS. JERJIAN:  Is counsel going to

5    make a privilege objection or?

6               MS. RODGERS:  What's the question?

7    I feel like there is a bunch of questions wrapped

8    into one.

9               MS. JERJIAN:  I was trying to

10   assess how much -- what Mr. Clark knows about --

11   about changes that were made to enrollment flow

12   after the May 2021 meeting.

13              MS. RODGERS:  So the -- sorry.  The

14   question was what?  Can you read it back?

15              THE COURT REPORTER:  The last?

16              MS. JERJIAN:  Sure.

17              THE COURT REPORTER:  Was:  "I was

18   trying to assess what Mr. Clark knows about

19   changes that were made to enrollment flow after

20   the May 2021 meeting."

21              MS. RODGERS:  And Mister -- you can

22   and if you know what changes were made.  You can

23   state the changes, yes.

24              THE WITNESS:  I don't recall the

25   changes.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

278
Clark
Amazon.com, Inc.                                    11/18/2022

```
 1   BY MS. JERJIAN:
 2       Q.  You don't remember the specific changes
 3   but do you remember the direction of the changes?
 4               MS. RODGERS:  Objection to form.
 5   Vague.
 6               THE WITNESS:  I don't recall what
 7   was changed after.
 8   BY MS. JERJIAN:
 9       Q.  Were the changes geared to clarify the
10   sign-up process for customers?
11               MS. RODGERS:  Objection.
12               Can we take a pause and go off the
13   record and -- and talk with the witness about
14   privilege for a minute?
15               MS. JERJIAN:  Sure.
16               MS. RODGERS:  Thank you.
17               (Recess taken.)
18   BY MS. JERJIAN:
19       Q.  Who -- I -- and I think I asked you this
20   before.  I just want to make sure I have as
21   complete a list as you can remember.
22               Who was at the May meeting?
23       A.  I believe Doug Herrington was there.
24       Q.  Okay.  Maybe -- how about this?  Let me
25   list the people that you've said.
```

279

Clark

Amazon.com, Inc.                                                11/18/2022

```
 1        A.  Okay.
 2        Q.  And then you tell me if I have missed
 3   anyone.
 4        A.  Okay.
 5        Q.  So you were there.  Doug Herrington,
 6   Russ Grandinetti, Neil Lindsay, Michael Miller,
 7   Praju Tuladhar.
 8             Anyone else?
 9             MS. RODGERS:  Object to the form.
10             THE WITNESS:  Did you say "Jamil"?
11   BY MS. JERJIAN:
12        Q.  No.  I did not say --
13        A.  Jamil was there.
14        Q.  Okay.
15        A.  I'm pretty sure.
16        Q.  I think you said Jim Sedami
17   (phonetically) might have been there.  Is there
18   anyone else?
19        A.  I don't recall whether he was there or
20   not.
21        Q.  Okay.
22        A.  There were other people but I don't
23   recall who else.
24        Q.  You can't recall anyone else besides the
25   one we just -- the ones we just listed today?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

280

Clark

Amazon.com, Inc.                                          11/18/2022

1        A.  I do not.

2        Q.  Okay.  It was no one put -- you were the

3   highest L level present at that meeting?

4              In other words, Mr. Bezos was not

5   there.  Correct?

6              MS. RODGERS:  Object to the form.

7              THE WITNESS:  I -- correct.  I was

8   the -- I think I was the most senior person

9   there.

10  BY MS. JERJIAN:

11       Q.  Okay.  Let me show you what I'm marking

12  as "Exhibit 10."

13             (Investigation Exhibit Number 10

14  marked.)

15  BY MS. JERJIAN:

16       Q.  This is an e-mail that you sent or

17  rather it's an e-mail chain to which you

18  responded, I believe, twice, the most recent

19  being March 20th, 2020.  Correct?

20       A.  I will see -- I see one from me.  I seen

21  one response from me on here.

22       Q.  Do you -- towards the bottom of the

23  first page --

24       A.  Is there one down there?

25       Q.  -- is there a response at 9:33 p.m. from

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 15

1                    FEDERAL TRADE COMMISSION

2

3   In the Matter of:            )
                                 ) No. 2123050
4   AMAZON.COM, INC.             )
                                 )
5                                )

6

7                2.7(h) Investigational Hearing

8                 AMAZON.COM, INCORPORATED

9                     JAMIL A. GHANI

10

11

                    Federal Trade Commission
12          Henry M. Jackson Federal Building
              915 Second Avenue, Suite 2896
13                 Seattle, Washington

14

15

16

17

18

19

20

21

22

23   DATE:  January 11, 2023

24   REPORTED BY:  Wade J. Johnson, RPR
                    CCR No.:  2574
25

279

Ghani

Amazon.com, Inc.                                      1/11/2023

1       A.  Without revealing privileged conversations

2  that I had with counsel, I state again that Project

3  Café was initiated and has been pursued independent and

4  irrespective of any regulatory matters.

5       Q.  How about in the EU?

6                 MR. HALL:  Same objection.  Same

7  cautionary instruction to the witness.  In addition, it

8  has absolutely nothing to do with this case and is

9  outside the jurisdiction of the FTC.

10                With those objections --

11      A.  Without revealing privileged conversations

12 with counsel, I can state again that Project Café was

13 initiated in the second quarter of 2021 and has been

14 pursued irrespective of and independent of any

15 regulatory matters in the EU.

16                (Exhibit 15 marked for

17                 identification.)

18      Q.  Mr. Ghani, I'm showing you what I'm marking as

19 Exhibit 15.  This is a chat dated May 4th, 2021,

20 entitled ███████████████████████████

21 ████████████████████       And there is an attachment

22 to this chat that begins on the third page.  And this

23 document is entitled ████████████████████████████

24 ███████████████       Do you see that?

25      A.  I do.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

280

Ghani

Amazon.com, Inc.                                           1/11/2023

1      Q.   There was a meeting for which this memorandum
2   was drafted, correct?
3      A.   Yes, there was a meeting.  This was work
4   product of Praju Tuladhar, lead counsel for Amazon
5   Prime.
6              MR. HALL:  Olivia, can we have a moment
7   off the record for me to consult with my team and the
8   witness as to whether or not this might be an
9   inadvertently produced privileged document?
10              MS. JERJIAN:  Sure.  Let's go off the
11   record.
12                   (A brief recess was taken.)
13              MS. JERJIAN:  Can we go on the record.
14              MR. HALL:  We're back on the record?
15              So, before we just broke, counsel for the
16   FTC marked a document as Exhibit 15.  It contains a
17   variety of Bates numbers, none of which are from
18   productions in this investigation.  The document is
19   marked, on every single page, privileged and
20   confidential, attorney-client work product, or words to
21   that effect.
22              I have during the break consulted with
23   the witness who is here today.  This document indeed is
24   work product and attorney-client privileged.
25              We believe it was inadvertently produced

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

281

Ghani

Amazon.com, Inc.                                    1/11/2023

1  in whatever were the other matters in which -- and I

2  don't know the circumstances, of course -- in which the

3  FTC received this.  I just know that it's apparent from

4  the Bates numbers that it was not in this

5  investigation.

6              I am formally stating the company's

7  intention now to claw back this document.  We will

8  provide you with the appropriate written notification,

9  but please consider my statement today to be the

10  clearest possible statement that we believe this to be

11  a privileged document, and we are asking you to treat

12  it accordingly, and all copies, now that we have

13  notified you of our position and our formal clawback

14  request.

15              And I will likewise not permit any

16  further instruction about the document or the

17  document's content.

18              MR. COHEN:  Do you mean questioning?

19              MR. HALL:  Any questioning about the

20  document or its contents by counsel for the FTC of this

21  witness.

22              MS. JERJIAN:  Are you going to follow

23  your attorney's instruction?

24              MR. COHEN:  Before we proceed with the

25  questioning, let me acknowledge the request.  As we

282

Ghani

Amazon.com, Inc.                                         1/11/2023

1    indicated off the record, we anticipate counsel will

2    provide us with a written request pursuant to 211(b)(1)

3    little 1, I think, 16 CFR 211(d).

4              We propose that we continue to question

5    the witness regarding this document under a full

6    reservation of rights to avoid any need to recall

7    Mr. Ghani later should for any reason the document not

8    ultimately be clawed back.  That request was declined.

9    Therefore, we are where we are, and we will await

10   counsel's written request and respond accordingly.

11             MR. HALL:  I would just note -- I just

12   want to put -- again, I'm seeing this for the first

13   time, but, on the very first page of this document, the

14   parties listed include a number of individuals who are

15   counsel for Amazon.

16             The document, as I said, repeatedly is

17   marked privileged and confidential, attorney work

18   product.  If anything is extraordinary about this it is

19   that the FTC chose, without notice to Amazon, to mark a

20   document that they obtained from a source outside of

21   this investigation and seek to question this witness

22   without alerting us in the first instance.  That is so

23   troubling.

24             So, of course, I'm maintaining the

25   privilege of this document, and, of course, I'm

283

Ghani

Amazon.com, Inc.                                        1/11/2023

1    instructing the witness not to answer any questions

2    about it.

3              And, Mr. Ghani, will you accept and

4    follow my instruction?

5              MS. JERJIAN:  Isn't that my question to

6    ask?

7              MR. HALL:  Well, Olivia, if you'd prefer

8    to ask it, go ahead.

9              MR. COHEN:  We just need to note for the

10   record, I don't think that it is constructive to have a

11   debate about the circumstances surrounding this

12   document on the record.  I just note that we disagree

13   with most of what Mr. Hall just said.

14       Q.  (By Ms. Jerjian)  Mr. Ghani, are you going to

15   follow your counsel's instruction?

16       A.  I am.

17       Q.  Was there a meeting in May 2021 to discuss

18   changes to the cancelation and enrollment flows, yes or

19   no?

20              MR. HALL:  Let me provide my cautionary

21   instruction now about not revealing anything that

22   involved the advice of counsel.  And I would just want

23   you to be careful in responding to any questions here,

24   to give it a yes or no.  I think this probably is

25   subject to a yes or no.

284

Ghani

Amazon.com, Inc.                                          1/11/2023

1          THE WITNESS:  Can I speak to my counsel
2    to seek his counsel?
3          MR. HALL:  Yes, of course you can.
4          MS. JERJIAN:  Sure.
5          Off the record.
6              (A brief recess was taken.)
7          MS. JERJIAN:  Can we go back on the
8    record.  I believe I had a question pending.
9          Do you mind reading it back.
10              (The previous question was
11              read back.)
12      A.  Yes, there was a meeting with counsel and
13    members of the C Team in May 2021 on those topics.
14      Q.  Can you list the names of the people who
15    attended this meeting.
16      A.  I don't recall all the attendees, but Praju
17    Tuladhar was the leader of the meeting and the preparer
18    of the document.  And Praju was at the time the lead
19    lawyer for Prime.  Myself, Neil Lindsay, Doug
20    Herrington, and Dave Clark.  I believe there were
21    others there, for example, from my team, like Ben
22    Hills.
23      Q.  Did Mr. Grandinetti attend?
24      A.  I can't recall if Mr. Grandenetti was there or
25    not.  He would have been invited, but I can't recall if

285

Ghani

Amazon.com, Inc.                                        1/11/2023

1    he was there.

2        Q.  Did you review information pertaining to this

3    meeting ahead of today's IH, yes or no?

4              MR. HALL:  This meeting which we've

5    established was with counsel and plainly is privileged.

6    I'm not going to have him answer any further questions

7    about it.  You now know the nonprivileged information,

8    the fact of the meeting and the persons who attended,

9    including counsel, but I believe everything else is

10   privileged.

11       Q.  Are you going to follow your counsel's

12   instruction?

13       A.  I am.

14       Q.  What was the date of this meeting?

15       A.  I don't know the precise date in the month,

16   but it was towards the latter part of May 2021.

17       Q.  The second half?  Is that what you mean by

18   latter part?

19       A.  Yeah.

20       Q.  Without revealing -- I'm not asking you for

21   details -- so without revealing the information

22   discussed, what was the general subject matter of the

23   meeting?

24              MR. HALL:  Objection.  Calls for the

25   disclosure of privileged information.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ghani

Amazon.com, Inc.                                                    1/11/2023

1              I instruct the witness not to answer.

2       Q.  Are you going to follow your counsel's

3   instruction?

4       A.  I am.

5       Q.  How long did the meeting last?

6              MR. HALL:  If you can answer that.

7       A.  I'm trying to remember.  I can't recall

8   exactly how long, but I would estimate probably

9   90 minutes.

10             MS. JERJIAN:  Can we go off the record.

11                  (A brief recess was taken.)

12             MS. JERJIAN:  We can go back on the

13   record.

14      Q.  Mr. Ghani, aside from Praju Tuladhar, did

15   anyone else participate in the drafting of the document

16   for the May 2021 meeting?

17             MR. HALL:  I'm going to object.  It's

18   outside of his personal knowledge, in any event.  But

19   it's clearly been established that this is a privileged

20   document from Amazon's perspective.  And I'm not going

21   to allow any further questioning about it.  We'll

22   follow up as appropriate with our notification.

23      Q.  Are you going to follow your counsel's

24   instruction not to respond?

25      A.  I am.

287

Ghani

Amazon.com, Inc.                                          1/11/2023

1      Q.  Mr. Ghani, what is Amazon's understanding of a
2  dark pattern?
3      A.  It's an industry or, I don't know, press way
4  of describing online experiences that are -- create
5  friction or confusion for users.
6      Q.  To Amazon's knowledge, does it have any dark
7  patterns in the cancelation experience?
8      A.  Our online cancelation flow provides a simple,
9  straightforward process for canceling.  So Amazon does
10  not believe that our cancelation flow contains dark
11  patterns.
12      Q.  Did Mr. Bezos receive any customer complaints
13  relating to difficulties with respect to navigating the
14  cancelation flow?
15      A.  In the course of preparing for the deposition
16  today, I did not encounter or am aware of any examples
17  of Mr. Bezos receiving complaints from customers on
18  that particular topic.
19      Q.  Did Mr. Bezos receive any critiques with
20  respect to issues with the cancelation flow?
21      A.  Could you be more specific.  What do you mean
22  by critiques?
23      Q.  Criticisms.  For one reason or another, it's
24  not good.
25               MR. HALL:  Objection.  Vague.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ex. A, Page 145 of 308

293

Ghani

Amazon.com, Inc.                                                    1/11/2023

1    and we are taking that request under advisement.  We

2    are not permitting them to take the exhibits today, so

3    the record is clear about that.

4              MR. HALL:  Mr. Cohen, what's the reason

5    for not permitting us to take the exhibits today, as

6    you have in all the other IHs?  And why is it that you

7    are taking under advisement a request for copy of the

8    transcript, when you have refused and indeed in most

9    cases even ignored our request for transcripts of prior

10   IHs?

11             MR. COHEN:  We're not going to discuss

12   this on the record, but I'd be more than happy to have

13   a conversation with you off the record.

14             Let's go off the record.

15                       (A brief recess was taken.)

16             MR. COHEN:  Back on the record.

17             Mr. Hall has informed the Commission

18   that, notwithstanding the hearing officer's instruction

19   to leave the exhibits in the room, he is going to take

20   one of the exhibits, the one that was marked, I believe

21   15, again, notwithstanding the hearing officer's

22   instruction.

23             And just so the instruction is clear,

24   Ms. Jerjian, if you could just give him the instruction

25   to leave the document here.

294

Ghani

Amazon.com, Inc.                                              1/11/2023

```
 1                  MS. JERJIAN:  Mr. Ghani, could you please
 2      leave the document labeled as Exhibit 15 in the record.
 3                  MR. HALL:  We're going to remove that
 4      document.  And, indeed, I'm going to make a request of
 5      you, which is that, right now, you give me any other
 6      physical or electronic copies you have of this document
 7      before I leave today.  Will you do that?
 8                  MS. JERJIAN:  I believe that I'm --
 9                  Are you going to follow your attorney's
10      instruction?
11                  MR. HALL:  What are you asking of him?
12                  MS. JERJIAN:  If he's going to follow his
13      attorney's instruction not to leave Exhibit 15 in the
14      record.
15                  THE WITNESS:  I don't have a copy of
16      Exhibit 15.
17                  MR. HALL:  I'm holding it right now.  And
18      I could just tell you, we're going to take it with us.
19      And I'm making a request of you and the other FTC
20      counsel that, at this moment, you should provide to me
21      copies of each one of these documents that I have
22      alerted you we believe to be inadvertently produced
23      privileged documents.
24                  Will you provide me with all other
25      copies, aside from the counsel copy and the marked copy
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

295

Ghani

Amazon.com, Inc.                                    1/11/2023

1    that I'm holding in front of me right now?  Will you?

2                MR. COHEN:  Mr. Hall, you've previously

3    said that you would submit a request in writing.  We'll

4    await that request.

5                MR. HALL:  Okay.  So you're denying that

6    request, and you're retaining copies of a document that

7    I have told you we believe to be inadvertently produced

8    and a privileged document.  You're disregarding my

9    request, and you're going to retain those copies.  Is

10   that correct?

11               MR. COHEN:  You're entitled to your

12   interpretation of what's transpired.  Again, we refer

13   you to the rule, we refer you to the earlier portion of

14   the transcript where you indicated that you would make

15   a written request.  You can do that as early as this

16   evening.

17               MR. HALL:  Okay.  I think I have my

18   answer.  We'll just note for the record that the

19   Exhibit 15 -- it's probably worth putting in the

20   record, these Bates numbers, which, again, are not from

21   this matter.  The first page of Exhibit 15 has the

22   Bates mark ███████████████ .

23               MS. JERJIAN:  There's a second Bates

24   stamp, too.

25               MR. COHEN:  Yeah, please read the second

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

296

Ghani

Amazon.com, Inc.                                                    1/11/2023

1    Bates stamp, Mr. Hall.

2              MR. HALL:  I recognize that.

3              And the document runs through

4    AMZN-MGM-2R-00935303.  I have not had an opportunity to

5    see whether or not those Bates numbers run

6    consecutively.

7              Also on the first page is another Bates

8    number, AMAZON-FTC-CID_09246134.  If I'm interpreting

9    this correctly, that sequence of Bates numbers runs to

10   AMAZON-FTC-CID_09246147.

11             And then the remainder of this

12   document -- well, perhaps, it was cut off in the

13   copying.  I can't -- I can't tell.  But the document

14   after that begins with the Bates No.

15   AMAZON-MGM-2R-009353274 and contains only that Bates

16   stamp through the last page.

17             That's the best description I can give of

18   the document right now.

19             And I am taking with me the marked copy,

20   the counsel copy, and I understand to be my request for

21   all other copies to have been denied by the FTC.

22             MR. COHEN:  You have heard the hearing

23   officer direct you to leave the document here,

24   Mr. Hall.

25             MR. HALL:  And I'm going to take them

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 16

```
 1                    FEDERAL TRADE COMMISSION
 2
 3   In the Matter of:              )
 4   AMAZON.COM, INC.               )  No. 2123050
 5   --------------------------------)
 6
 7                        August 16, 2022
 8
 9                     Investigational Hearing
10                         REID NELSON
11
12                    Federal Trade Commission
13                Henry M. Jackson Federal Building
14                 915 Second Avenue, Suite 2896
15                      Seattle, Washington
16
17
18
19
20
21
22
23
24   REPORTED BY:  Wade J. Johnson, RPR
25                 CCR No.:  2574
```

Nelson

Amazon.com, Inc.                                                8/16/2022

1    confidentiality.  For inquiries about access, contact Reid N.

2    at," and then it's blank.

3           Did I read that correctly?

4       A.   Yeah.

5       Q.   Did you redact any portion of this document for any

6    reason other than confidentiality?

7       A.   I redacted it due to the sensitivity of the topic.

8       Q.   And by sensitivity of the topic, you don't mean

9    that the topic contained legal advice, but, rather, you mean

10   something else?

11           MS. VANDRUFF:  Objection to form.

12           You may answer the question if you can answer

13   it without communicating any information that you received

14   from a lawyer.  And if we need to take a break, we can do

15   that.

16           THE WITNESS:  Okay.

17      Q.   Do you want to take a break?  It's fine with me.

18      A.   I'm fine to keep going.

19      Q.   Okay.

20      A.   The question was, I redacted it --

21           MR. COHEN:  Can you read back the question,

22   please.

23                       (The previous question was

24                        read back.)

25      A.   I redacted it because of the sensitivity of the

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ex. A, Page 152 of 308

Nelson

Amazon.com, Inc.                                                    8/16/2022

1    content of the research findings.

2       Q.   So you redacted it -- I want to make sure I

3    understand correctly -- not because it contained legal

4    advice, but because you considered the research findings to

5    be sensitive?

6              MS. VANDRUFF:  Counsel, can we -- I would like

7    to just take a break to make sure that we're not --

8              MR. COHEN:  Take your time.  Take your time.

9    This is important.

10             MS. VANDRUFF:  May I take the document.

11             MR. COHEN:  We're off the record.

12                   (A brief recess was taken.)

13             MR. COHEN:  Back on the record.

14                   (The previous question was

15                    read back.)

16             MS. VANDRUFF:  You may answer that question,

17   as long as you do not convey the substance of any legal

18   advice you received from counsel.

19      A.   Yeah, so I redacted this operating under guidance

20   from counsel.

21      Q.   Without telling me anything that any lawyers told

22   you, did you observe a practice at Amazon of redacting

23   sensitive material?

24      A.   No.

25      Q.   Was this the only instance in which you redacted a

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

225

Nelson

Amazon.com, Inc.                                        8/16/2022

1    piece of material that you considered sensitive?

2        A.   Yes.

3        Q.   Without telling me, again, anything that any

4    lawyers told you to do or not to do -- this is just a

5    yes-or-no question -- did you ever confer -- this a yes-or-no

6    question -- with any lawyer about this document in

7    particular?

8             MS. VANDRUFF:  You may answer that question,

9    which is a yes-or-no question.

10       A.   No.

11       Q.   I will try it a different way, not because the

12   answer is wrong or something, but did you ever confer with

13   any lawyer one way or the other about redactions to this

14   document in particular?

15       A.   No.

16       Q.   You made the decision to redact this document,

17   correct?

18       A.   Yes.

19       Q.   Why did you make the decision?

20            MS. VANDRUFF:  You may answer that question,

21   Mr. Nelson, provided that you do not convey the substance of

22   any advice you were given by counsel.

23       A.   I was operating under general -- or under guidance

24   from counsel.

25            MR. COHEN:  Let's go off the record for a

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                              8/16/2022

1    moment.

2                          (A brief recess was taken.)

3                 MR. COHEN:  Let's go back on the record.

4         Q.   What was it, to you, that made this information

5    sensitive?

6         A.   It involves customers feeling like they've lost

7    trust and have had a harmful outcome.

8         Q.   And it was your view, was it not, that, by

9    redacting this portion, which relates to loss of trust and

10   unintentional enrollment, that this document could then have

11   a broader circulation?

12                MS. VANDRUFF:  Objection to form.

13                You may answer the question if you're able to

14   do so without conveying advice received from counsel.

15        A.   Yes.

16        Q.   When you prepare documents and memoranda at Amazon,

17   do you -- did you use a template?

18        A.   Yeah, kind of, yeah.

19        Q.   Did any of the templates you used default to

20   privileged and confidential?

21        A.   No, I don't believe so.

22        Q.   Did anyone other than a lawyer -- I'm only asking

23   you things that might have been told to you or instructions

24   by people that are not lawyers.  So this is a yes-or-no

25   question -- ever instruct you to put privileged and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                                    8/16/2022

1    confidential on a document without regard to the content of

2    the document?

3              MS. VANDRUFF:  May I ask, are we

4    distinguishing -- I understand that you've asked about the

5    individual conveying that advice, but I think it's important

6    for Mr. Nelson to understand that, if the individual

7    conveying that advice was conveying legal advice, that that

8    is a subject on which he should be very cautious.

9              So can I ask you to rephrase the question.

10   Q.   Yes.  Setting aside any instance where you received

11   an instruction from an attorney or any instance where anyone

12   gave you an instruction that they identified as being on

13   behalf of an attorney, were there instances in which anyone

14   told you to place privileged and confidential on a document?

15   Full stop.

16   A.   No.

17             MS. VANDRUFF:  Thank you.

18   Q.   So, when you decided to place -- when privileged

19   and confidential appeared on a document that you authored,

20   you decided to place it there, correct?

21             MS. VANDRUFF:  If you can answer the question

22   without conveying the substance of legal advice, you may

23   answer the question.

24   A.   Yes, it was my decision.

25   Q.   What criteria did you use to determine whether or

Ex. A, Page 156 of 308

# Attachment 17

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:              )
                                    ) File No. 2123050
 4   Amazon.com, Inc.               )
     _____)
 5
                                    Tuesday, July 19, 2022
 6
                                    Held at:
 7                                  Federal Trade Commission
                                    915 Second Avenue
 8                                  Suite 2896
                                    Seattle, Washington 98174
 9

10           The above-entitled matter came on for
     investigational hearing, pursuant to subpoena, at 9:34 a.m.
11   Pacific Time.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

235

O'Donnell

Amazon.com, Inc.                                              7/19/2022

1       A.   Yes.

2       Q.   Was there an attorney present?

3       A.   They may have had an attorney join but I can't

4   remember why.  Like, I do remember something about that, but

5   I don't remember why the attorney joined.  Somebody must

6   have asked a sensitive question.

7       Q.   Was the -- was it typical for an attorney to

8   participate in these ask-me-anything sessions?

9       A.   We didn't have them very often so I don't know

10   what was typical.  Like, this was the only one that we had

11   with Neil Lindsay.

12       Q.   Did you have them with senior leaders?

13       A.   No.

14       Q.   Did you have them with other sort of the mid level

15   leaders?

16       A.   Yeah, occasionally, like Jun Wakabayashi would.

17       Q.   Were lawyers present during his ask-me-anything

18   sessions?

19       A.   No.

20       Q.   Do you remember which lawyer was present?

21       A.   I don't.

22       Q.   It was just one lawyer though?

23       A.   I think so.

24       Q.   Do you recall whether the lawyer said anything?

25       A.   I don't think that they did.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

236

O'Donnell

Amazon.com, Inc.                                         7/19/2022

1      Q.   I think might have asked you this, but the
2   questions were submitted in advance?
3      A.   No.  We were just -- yeah, all really just showed
4   up and started firing questions at Neil.
5      Q.   Were there any questions about unintentional
6   enrollment that you recall?
7      A.   It might have come up, but I don't remember the
8   specifics.
9      Q.   Do you recall Mr. Lindsay stating that sometimes
10  people -- in words or substance -- that sometimes people
11  join Prime by mistake, but then they discover that they love
12  it and are glad they joined?
13     A.   I do remember that, actually, yeah.  That must
14  have been when the lawyer joined.
15     Q.   So let's break that down a little bit.
16          So the lawyer was already there before Mr. Lindsay
17  stated that?
18     A.   No.  I think that the lawyer popped in at some
19  point.  I don't know if Neil sent a note and said, "You need
20  to join for some of these questions" that were being asked.
21          So I think I do remember that comment.  I do also
22  remember there was some conversations about gender
23  discrimination within the work as well.  So, like, I think
24  that that was one of the things that got up brought up.
25  That might also be one of the reasons that the attorney came

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ex. A, Page 160 of 308

237

O'Donnell

Amazon.com, Inc.                                                    7/19/2022

1    in.  But I don't recall that the attorney was there the

2    whole time.

3         Q.   What was your reaction to Mr. Lindsay's comment?

4         A.   I kind of, like, through my hands up, but I didn't

5    actually throw my hands up in the air.  But that was my

6    reaction, of course.  It just felt like that was what we

7    were up against, in general.

8         Q.   And when you say what you "were up against," do

9    you mean the attitude at the SVP level, that it didn't make

10   any difference whether people were unintentionally enrolled?

11        A.   I felt like we had really significant hurdles to

12   change hearts and minds at the S Team level to get these

13   changes.

14        Q.   And Mr. Lindsay's comment reinforced that view?

15        A.   Yeah.

16        Q.   Did you discuss Mr. Lindsay's comment with anyone?

17        A.   I'm sure I talked about it with AmyLeigh and

18   Rachel and David and Enrique.

19        Q.   What about the chat?

20        A.   Oh, yeah.  There's always a chat going on during

21   these meetings.  In the meeting, no, we probably weren't in

22   the chat where Neil could see.

23        Q.   In the side chat, do you recall whether that

24   covers this comment from Mr. Lindsay?

25        A.   I'm sure it did.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

251

O'Donnell

Amazon.com, Inc.                                                    7/19/2022

1        A.   I believe that we shared some of the --

2        Q.   This is just a yes or no question, so I want to

3   be -- and I apologize that I'm interrupting you, but we need

4   to be very careful here.

5        A.   Sure.  Sure.

6        Q.   So just yes or no without telling me what they

7   were.

8             Were any materials collected?

9        A.   I think so.  Yes.

10       Q.   And when were those materials collected?

11       A.   Around that time.  Like, late spring, early

12  summer, I think, of 2021.

13       Q.   And without telling me what materials were

14  collected, what was the -- in general, the volume of

15  materials that were collected from you?

16       A.   From GPX, not a lot because like I said it was not

17  something we dedicated a ton of sources to research on.

18       Q.   But the materials, when you say "not a lot," was

19  it hundreds of pages of stuff, or as opposed to thousands of

20  pages of stuff?

21       A.   Maybe like 20, 30, 40 pages of stuff.

22       Q.   Forty pages of stuff.

23             Who was in charge of organizing the collection

24  effort?

25       A.   I'm assuming it was our legal team, but I'm not

Ex. A, Page 162 of 308

252

O'Donnell

Amazon.com, Inc.                                                    7/19/2022

1    sure who was responsible for that.

2        Q.   Who in GPX was responsible for responding to your

3    request?

4        A.   I responded, and I believe David might have also

5    responded as well.

6        Q.   At any point in time has anyone either expressly

7    stated or implied to you that you shouldn't write things

8    down related to nonconsensual enrollment?

9        A.   Yes.

10       Q.   Has anyone other than an attorney ever given you

11   that instruction or implied that you shouldn't write things

12   down related to nonconsensual enrollment?

13       A.   Yes.

14       Q.   Who was of the person -- well, when the person who

15   was not an attorney gave you that instruction, did they

16   attribute the instruction to an attorney?

17       A.   I'm trying to remember the specific instance.  I

18   think they probably did.

19       Q.   They probably did.  And again, when did that

20   instruction take place?

21       A.   I think it was late spring, early fall.

22       Q.   Late spring or early fall?

23       A.   Late spring, early summer.  Sorry.  I'm also

24   terrible with dates.

25       Q.   Were you ever -- just yes or no -- told or

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

253

O'Donnell

Amazon.com, Inc.                                    7/19/2022

1    instructed to copy attorneys on correspondence even if the
2    attorneys didn't really have anything to do with that
3    correspondence?  Just yes or no.
4         A.   Yes.
5         Q.   And when did that instruction take place?
6         A.   Well, again, that was probably -- is this all
7    happening at the same time?  I guess it would be spring and
8    early summer of 2021 is when it felt like it came up.
9         Q.   So in spring and early summer of 2021, there were
10   a number of instructions from attorneys and from
11   non-attorneys about -- let me withdraw the question.
12            Just yes or no.
13            Did anyone ever instruct you to write or include
14   the phrase "privileged and confidential" on documents,
15   whether or not the documents were, in your mind, privileged
16   and confidential?
17        A.   Yeah, I think so.
18        Q.   Did anyone give you that instruction who was not
19   an attorney?
20        A.   I think so.
21        Q.   Was that instruction attributed to attorneys?
22        A.   Probably, yes.
23        Q.   Did anyone ever instruct you or imply that you
24   shouldn't preserve information related to enrollment or
25   cancellation?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

254

O'Donnell

Amazon.com, Inc.                                                7/19/2022

1        A.   No.  That I shouldn't --

2        Q.   Should not preserve.

3        A.   No.

4        Q.   Are you aware of anyone who took any type of

5   measure of any sort to destroy, delete, or otherwise alter

6   any information related to enrollment or cancellation?

7        A.   Not that I know of.

8             MR. COHEN:  Let's go off the record for a

9   moment.

10                      (Recessed at 5:25 p.m.)

11                      (Reconvened at 5:31 p.m.)

12   BY MR. COHEN:

13        Q.   At any point in time during your tenure at Amazon,

14   did you ever place or cause to be placed the phrase

15   "privileged and confidential" on a document that, in your

16   mind, was not actually privileged and confidential?  Just

17   yes or no.

18        A.   On a specific study or any document?

19        Q.   Any document.

20        A.   I feel like yes, we were instructed, but it

21   probably wasn't my document.  Does that make sense?

22        Q.   Well, regardless of whether you were instructed or

23   what you were instructed to do, at any point in time did you

24   place or cause to be placed the label "privileged and

25   confidential" on any document related to enrollment and

255

O'Donnell

Amazon.com, Inc.                                                        7/19/2022

1    cancellation in any way, and that document -- and let me

2    withdraw the question.  I'll say it better.

3           At any point in time during your tenure at Amazon,

4    did you ever place or cause to be placed the phrase

5    "privileged and confidential" on any document that was not

6    actually privileged and confidential in your mind?

7       A.   I'm going to say not that I recall, but I think

8    there are documents that I contributed to that were

9    considered -- that were labeled "privileged and

10   confidential."  Sorry.  I did not put the "privileged and

11   confidential" on the document.

12      Q.   You are aware, are you not, that -- well, let me

13   ask it this way:  Are you aware of whether -- withdrawn.

14           Regardless of who placed the label "privileged and

15   confidential" on a particular document, are you aware of the

16   label "privileged and confidential" being placed on a

17   document related to enrollment or cancellation that was not,

18   in your mind, actually privileged and confidential?

19      A.   Yes.

20      Q.   Just yes or no:  Did that occur after March 1st,

21   2021?

22      A.   I think it happened both before and after.

23      Q.   Okay.  Are you aware of any instance in which

24   anybody copied an attorney on correspondence related to

25   enrollment or cancellation for which the attorney was not

256

O'Donnell

Amazon.com, Inc.                                    7/19/2022

1    integral in the communication?

2         A.   Yes.

3         Q.   Did that happen before or after March 2021?

4         A.   I think that happened both before and after.

5         Q.   Are you aware of any instances in which the --

6    just a moment.  I withdraw the question.  Just give me a

7    moment.

8              Are you aware of any instances in which an

9    attorney was invited to a meeting in which enrollment or

10   cancellation issues or enrollment and cancellations issues

11   were discussed, but the attorneys' presence was not

12   necessary to the discussion?

13        A.   I believe so, yes.

14        Q.   Did that happen before or after March 1st, 2021,

15   or both?

16        A.   I think both.

17        Q.   Approximately what was the number of such

18   meetings?

19        A.   I don't remember.  Sorry.

20        Q.   Was it more than one?

21        A.   Yes.

22        Q.   Was it more than ten?

23        A.   No, I don't think so.

24        Q.   What about the number of emails for which an

25   attorney was included on the correspondence who was not

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 18

| From: | Balakrishnan, Sanjay [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BSANJAYA54] |
|---|---|
| Sent: | 10/27/2020 9:53:11 AM |
| To: | Davidai, Nahshon [ndavidai@amazon.com]; Qiao, Fang [fangqiao@amazon.com]; Hills, Benjamin [bhills@amazon.com]; Srinivasan, Bharath [bharaths@amazon.com] |
| CC: | Baidwan, Nikki [nikbai@amazon.com]; Moeller, Caroline [cmmoell@goodreads.com]; Schmitz, Erik [eschmitz@amazon.lu]; Maceratesi, Federico [maceratf@amazon.lu]; Wolman, Roy [royie@amazon.com]; Leung, Lisa [lileung@amazon.com]; Lahood, Simone [lahood@amazon.com]; Chowdhuri, Numair [cnumair@amazon.com]; Morey, Rex [rexford@amazon.com]; Loeb, Sam [samaloeb@amazon.com]; Roberts, Ericha [rericha@amazon.com]; Kremer, Susan [skremer@amazon.com] |
| Subject: | RE: Content Clarity Measurement Framework |
| Attachments: | 20201023_Content_Clarity.docx |

**EXHIBIT**
11.30.22
17
Davidai

+ Ben and Bharath, and retaining privilege.

Team, thanks for leading this, may I also request you connect with Ben/Bharath and discuss how to connect this with the plan to have onboarding/clarity widgets which will change the signal set and intervention set available for clarity.

Sanjay

**From:** Davidai, Nahshon <ndavidai@amazon.com>
**Sent:** Tuesday, October 27, 2020 8:57 AM
**To:** Qiao, Fang <fangqiao@amazon.com>; Balakrishnan, Sanjay <bsanjay@amazon.co.uk>
**Cc:** Baidwan, Nikki <nikbai@amazon.com>; Moeller, Caroline <cmmoell@goodreads.com>; Schmitz, Erik <eschmitz@amazon.lu>; Maceratesi, Federico <maceratf@amazon.lu>; Wolman, Roy <royie@amazon.com>; Leung, Lisa <lileung@amazon.com>; Lahood, Simone <lahood@amazon.com>; Chowdhuri, Numair <cnumair@amazon.com>; Morey, Rex <rexford@amazon.com>; Loeb, Sam <samaloeb@amazon.com>; Roberts, Ericha <rericha@amazon.com>; Kremer, Susan <skremer@amazon.com>
**Subject:** P&C: Content Clarity Measurement Framework

+ Susan, making P&C, seeking legal guidance. Team, let's please keep Clarity communications as P&C. thx.

**Nahshon Davidai | Amazon.com Prime | 470-733-6760**

**From:** Qiao, Fang <fangqiao@amazon.com>
**Sent:** Monday, October 26, 2020 3:33 PM
**To:** Balakrishnan, Sanjay <bsanjay@amazon.co.uk>; Davidai, Nahshon <ndavidai@amazon.com>
**Cc:** Baidwan, Nikki <nikbai@amazon.com>; Moeller, Caroline <cmmoell@goodreads.com>; Schmitz, Erik <eschmitz@amazon.lu>; Maceratesi, Federico <maceratf@amazon.lu>; Wolman, Roy <royie@amazon.com>; Leung, Lisa <lileung@amazon.com>; Lahood, Simone <lahood@amazon.com>; Chowdhuri, Numair <cnumair@amazon.com>; Morey, Rex <rexford@amazon.com>; Loeb, Sam <samaloeb@amazon.com>; Roberts, Ericha <rericha@amazon.com>
**Subject:** RE: Content Clarity Measurement Framework

Hi Team – Please see our latest doc, we are still working on a few FAQ's, but would appreciate feedback on the doc as it stands right now.

Thanks
-Fang

CONFIDENTIAL TREATMENT REQUESTED

**From:** Balakrishnan, Sanjay <bsanjay@amazon.co.uk>
**Sent:** Sunday, October 11, 2020 8:16 AM
**To:** Davidai, Nahshon <ndavidai@amazon.com>
**Cc:** Qiao, Fang <fangqiao@amazon.com>; Baidwan, Nikki <nikbai@amazon.com>; Moeller, Caroline <cmmoell@goodreads.com>; Schmitz, Erik <eschmitz@amazon.lu>; Maceratesi, Federico <maceratf@amazon.lu>; Wolman, Roy <royie@amazon.com>; Leung, Lisa <lileung@amazon.com>; Lahood, Simone <lahood@amazon.com>; Chowdhuri, Numair <cnumair@amazon.com>; Morey, Rex <rexford@amazon.com>; Loeb, Sam <samaloeb@amazon.com>; Roberts, Ericha <rericha@amazon.com>
**Subject:** Re: Content Clarity Measurement Framework

+1- many teams will be amidst prime day dial up .

Team , aware that you have been trying to schedule this for a while , feel free to send the doc out in case offline feedback helps you keep moving .

Sanjay


On 11 Oct 2020, at 06:40, Davidai, Nahshon <ndavidai@amazon.com> wrote:

Team – may I request that we pls reschedule this? I'm double-booked at this time... + Sam to help. Thx and sorry for the wkd note, just conscious of this being a 7am meeting on a Monday. thx


**Nahshon Davidai⎮ Amazon.com Prime⎮470-733-6760**

-----Original Appointment-----
**From:** Qiao, Fang <fangqiao@amazon.com>
**Sent:** Monday, August 31, 2020 2:59 PM
**To:** Qiao, Fang; Davidai, Nahshon; Balakrishnan, Sanjay; Baidwan, Nikki; Moeller, Caroline; Schmitz, Erik; Smyth, Julian; Maceratesi, Federico; Wolman, Roy
**Cc:** Leung, Lisa; Lahood, Simone; Chowdhuri, Numair; Morey, Rex
**Subject:** Content Clarity Measurement Framework
**When:** Monday, October 12, 2020 7:00 AM-8:00 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Chime ID: 6289606757

---

### ***DO NOT FORWARD THIS MEETING INVITE***
*Note: The beginning of the meeting will be devoted to reading time.*

**Meeting Purpose:** As a followup from the last content clarity leadership review, we are currently working on a set of indicators to answer whether a customer is aware that he/she have joined Prime, a paid subscription program. We would like to take this time to share our finding discuss the proposed framework.

**Questions/Changes**:

**Doc/Topic Owner: Fang Qiao**

**Note Taker: Fang Qiao**

| In-Person [list alpha by last | Remote [list alpha by last | Amazon Chime Meeting Information |
|---|---|---|

AMZN_00091285

| name] | name] | |
|---|---|---|
| Required: | Required: | AV Conference Room |
| 1. Nahshon Davidai<br>2. Sanjay Balakrishnan<br>3. Baidwan, Nikki<br>4. Moeller, Caroline<br>5. Schmitz, Erik<br>6. Smyth, Julian<br>7. Maceratesi, Federico<br>8. Wolman, Roy<br><br>Optional:<br>9. Leung, Lisa | 1. Name<br>2. Name<br>3. Name<br><br>Optional:<br>4. Name<br>5. Name | • Amazon Chime bridge: 6289606757<br>• Meeting PIN: 6289606757<br><br>Phone:<br>• US Toll Free: +1-855-552-4463<br>• International: https//chime.aws.dialinnumbers/<br>• Meeting PIN: 6289606757 |
| Updates to invite:<br>• | | |

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00091286



CONFIDENTIAL TREATMENT REQUESTED



CONFIDENTIAL TREATMENT REQUESTED



CONFIDENTIAL TREATMENT REQUESTED

AMZN_00091289



CONFIDENTIAL TREATMENT REQUESTED



CONFIDENTIAL TREATMENT REQUESTED

AMZN_00091291



CONFIDENTIAL TREATMENT REQUESTED

AMZN_00091292

# Attachment 19

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:              )

 4   AMAZON.COM, INC.               )  No. 2123050

 5   ----------------------------------)

 6

 7                        August 19, 2022

 8

 9                 Investigational Hearing

10                   DAVID A. EDELSTEIN

11

12                 Federal Trade Commission

13             Henry M. Jackson Federal Building

14              915 Second Avenue, Suite 2896

15                   Seattle, Washington

16

17

18

19

20

21

22

23

24   REPORTED BY:  Wade J. Johnson, RPR

25                 CCR No.:  2574
```

42

Edelstein

Amazon.com, Inc.                                                8/19/2022

1   to resolve that, then they would also record that as part of

2   the customer frustrations database.

3          So, for almost any question about customers, you

4   could go back and see whether there had been any previous

5   research, what things were most frustrating to our customers.

6   They had a top ten list.

7                  MR. NARDINI:  Let's go off the record for one

8   second.

9                          (A brief recess was taken.)

10                 MR. NARDINI:  Back on the record, please.

11     Q.   (By Mr. Nardini)  So we were discussing customer

12  frustrations, which you mentioned was under Reid Nelson and

13  moved sort of in and out of CEX over time.  Is that correct?

14     A.   Yes.  This again comes into the very complicated

15  organizational reporting structure changes and what was

16  technically inside of CEX versus not quite inside of CEX.

17     Q.   That's fair.

18     A.   But, fundamentally, it was part of the Consumer org

19  for most of its life.

20     Q.   Got it.

21          And so who would customer frustrations and Reid

22  Nelson have reported up to in this org?

23     A.   When I left, it was reporting to Katey Muus,

24  M-u-u-s, who was the director of Customer Experience.

25     Q.   And who was Katey reporting up to?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

43

Edelstein

Amazon.com, Inc.                                                    8/19/2022

```
1          A.   I knew you were going to ask that.  Llew Mason.
2     And I don't actually know what Llew's tile was.  I think he
3     was a VP of Customer Experience -- or VP of Consumer, rather.
4          Q.   Do you know who Llew Mason would have reported up
5     to?
6          A.   I think Llew reported to Jeff Wilke, but I don't
7     actually know that, but I cannot think of anyone who would
8     have been between them.
9          Q.   Understood.
10         A.   Yeah, not my org, so not my political structure to
11    have to pay attention to.
12         Q.   What conversations did you have with the Customer
13    Frustrations group regarding enrollment and cancellation?
14         A.   Reid, the whole time that I knew him, worked with
15    him, was very cognizant that the Prime signup and
16    cancellation, and all of our signup and cancellation
17    businesses, were, if not actually illegal, then possibly
18    perceived that way.  And so he was always very careful in
19    email to only send emails labeled attorney-client privilege,
20    with a lawyer cc'd, not always asking for legal advice, which
21    I understand makes them not actually privileged, but he was
22    always very careful in email to only have conversations sort
23    of under that umbrella.
24         Q.   Before we go into the content there, I just want to
25    sort of take this step by step because we're in a sensitive
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

44

Edelstein

Amazon.com, Inc.                                              8/19/2022

1    area and sort of do yes-or-no questions here.

2              So your understanding is that Reid Nelson would

3    sometimes label materials privileged and confidential that

4    were not actually privileged or confidential?

5        A.   In my understanding of what it actually means to be

6    privileged and confidential, yes.

7        Q.   And do you know who would have directed Reid to do

8    this?

9        A.   I think, no one in particular.  Reid had been in

10   tech for a long time, like me, and I think just knew that it

11   was his responsibility to protect communications that might

12   be sensitive.

13       Q.   So, to your understanding, the emails that you were

14   about to discuss did not seek or contain legal advice?  Yes

15   or no.

16       A.   Some did, most didn't.

17              MR. NARDINI:  Could we go off the record.

18                  (A brief recess was taken.)

19              MR. NARDINI:  Could we go back on the record,

20   please.

21       Q.   (By Mr. Nardini)  So I'd like to hear more about

22   your emails between -- your emails with Reid Nelson, but

23   please limit any disclosure regarding these emails to

24   material that did not involve the seeking or obtaining or

25   conveying of legal advice.

45

Edelstein

Amazon.com, Inc.                                               8/19/2022

1        A.   Okay.

2        Q.   Do you understand?

3        A.   I understand.

4        Q.   Thank you.

5             Do you recall a specific email with Mr. Nelson

6    regarding cancellation and enrollment on the subject?

7        A.   Most of our emails about that subject were later,

8    when we were working on the Subscription Clarity Project.

9    And in those cases, there were at least a few where Reid

10   included a lawyer on the email, but did not ask, nor receive,

11   legal advice, they were just sort of in the room.

12       Q.   So, limiting it to the topic, what was the topic of

13   those emails?

14       A.   They were statistics about number of complaints

15   about signups; passing on user studies by other teams, which

16   involved customers running into the Prime signup experience

17   and being frustrated by it; discussions of possible solutions

18   and strategies for getting leadership to sign off on making

19   improvements to that experience.

20            There was also, sometime in the first six months

21   that I was managing that team, Reid sent an email to me and

22   my manager, Jun, asking to come over and discuss signup and

23   cancellation, since -- I think he felt that, because I was in

24   that role, there was a possibility for us to make

25   improvement, since the previous management of that team was

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

108

Edelstein

Amazon.com, Inc.                                                    8/19/2022

1        Q.   I think you had mentioned that that occurred in
2    early 2021?
3        A.   Mm-hmm.
4        Q.   And you mentioned that you were not in attendance
5    at the S Team meeting, but that it occurred approximately
6    around that time period.
7        A.   Yes.
8        Q.   So do you recall if that meeting occurred before or
9    after the first QBR?
10       A.   This Exhibit DE-3, first QBR?
11       Q.   Yes.  Thank you.  The GPX QBR.
12       A.   Well after.
13       Q.   Do you recall if that occurred after the second GPX
14   QBR?
15       A.   Well after that, I think.
16       Q.   Oh, right.  And I take it because those were 2020
17   and this is 2021.
18            So then what about relative to the conversations
19   that you were having regarding the Subscription Clarity
20   Project.  It would have come after that project was
21   initiated, correct?
22       A.   Yes.
23       Q.   So sometime between then and this other meeting
24   with Llew Mason and Jamil Ghani?
25       A.   Mm-hmm.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

109

Edelstein

Amazon.com, Inc.                                              8/19/2022

```
 1      Q.    Got it.  Okay.

 2            Do you recall during this -- strike that.

 3            Are there any other major meetings that you would

 4      add to this chronology regarding enrollment and cancellation

 5      issues at the moment?

 6      A.    No major meetings.  Discussions within my team.  It

 7      would come up during my one-on-ones with Nikki Baidwan.  It

 8      would come up occasionally in my conversations with Nahshon

 9      Davidai.  But no sort of other formal meetings, explicit

10      conversations, that I can remember.

11      Q.    Do you recall a meeting with Neil Lindsay regarding

12      enrollment and cancellation issues?

13      A.    Not a specific meeting, but Neil was doing a series

14      of online, what, if we'd all been in the office, would have

15      been lunch meetings, sort of social lunch meetings with teams

16      in his org, as a way for him to meet teams and be available

17      for questions.

18            And in the QA period, one of the people on my team

19      asked about dark patterns signing up for Prime.  And Neil's

20      response was something to the effect of, We feel like, once

21      people are Prime members, they'll see what a great program it

22      is, so we're okay with that.

23      Q.    So was he being essentially dismissive of the

24      problem at hand?  Was that your understanding?

25      A.    Yes.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

110

Edelstein

Amazon.com, Inc.                                                    8/19/2022

1      Q.   What was the reaction in the meeting to that
2   statement?
3      A.   There were a few audible gasps for people who had
4   their microphone on.  There was discussion in the sort of
5   side channel chat that was happening, people saying, What the
6   hell did he just say?  And then a great deal of discussion
7   one-on-one afterwards.
8      Q.   And do you recall when this video meeting occurred
9   with Neil Lindsay?
10     A.   Probably July or August of 2021, because it was not
11  long before I started the process of leaving.
12     Q.   Did you ever speak with Mr. Lindsay regarding his
13  comment?
14     A.   No.
15     Q.   But you mentioned you spoke with others regarding
16  his comment.  Is that right?
17     A.   Yeah, other people on my team, yeah.
18     Q.   And what was the reaction?
19     A.   The reactions ranged from disappointment to
20  disgust.  After I left the team, most of my team found other
21  jobs, and I think that comment was certainly one of the
22  reasons for that.
23     Q.   I note that that comment comes at the end of our
24  chronology --
25     A.   Yeah.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

195

Edelstein

Amazon.com, Inc.                                           8/19/2022

1    and certainly in my team meetings.

2         Q.   And I know we've referenced the hackathon a couple

3    of times.  Do you recall when that was?

4         A.   That would have been August or September of 2019,

5    relatively early in my tenure there.

6         Q.   So, to your knowledge, would Amazon have had the

7    technological capability to auto cancel individuals who

8    signed up through UPDP but then abandoned their cart?

9         A.   Absolutely.

10        Q.   And to your knowledge, they did not do so?

11        A.   As far as I know.

12        Q.   And to your knowledge, individuals in that

13   circumstance would be counted as -- in metrics of

14   subscription for Prime?

15        A.   Yes.

16        Q.   While at Amazon, was there a general practice of

17   marking documents as privileged and confidential regardless

18   of their content?

19        A.   No.  Almost every document was marked Amazon

20   confidential, but most things were not marked privileged and

21   confidential.  Yeah.

22        Q.   Were you aware of any templates that defaulted to

23   privileged and confidential language regardless of the

24   content?

25        A.   None that I encountered.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

196

Edelstein

Amazon.com, Inc.                                                 8/19/2022

1        Q.    Were you ever instructed by a non-attorney to mark
2    material as privileged and confidential?
3        A.    Yes.
4        Q.    Were you instructed to mark material as privileged
5    and confidential without regard to its specific content?
6        A.    No.  It was always in the context of something that
7    might be controversial later.
8        Q.    Were you ever a participant in a presentation in
9    which you were instructed to mark materials as privileged and
10   confidential without regard to their specific content?
11       A.    No.
12       Q.    Okay.  We'll stop on that.
13             MR. NARDINI:  We'll stay on the record.
14       Q.    Big picture, how is the success of the Prime
15   organization evaluated?
16       A.    It is entirely evaluated, as far as I understand,
17   on worldwide Prime signups.  Subsidiary to that is expansion
18   into other countries, making Prime available in other
19   countries, but that, again, is measured on Prime signups, the
20   number of countries that they've expanded into.
21       Q.    Was reduction in customer frustrations ever a
22   meaningful part of the evaluation of the Prime organization
23   while you were employed there?
24       A.    Not at any serious level.  Certainly, with the
25   Customer Experience Outcomes, my team was trying to make that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

197

Edelstein

Amazon.com, Inc.                                             8/19/2022

1    an important issue, but it was never an important part of
2    the -- our goal was for it to be part of the main Prime
3    quarterly business review, and that never happened.
4                    MR. NARDINI:  Let's go off the record.
5                         (A brief recess was taken.)
6                    MR. NARDINI:  Let's go back on the record.
7                    We have concluded this investigational hearing
8    for the day.  We will hold it open.
9                    And with that, let's go off the record.
10                       (Signature reserved.)
11                   (Hearing adjourned at 6:01 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 20

EXHIBIT

NB14

1/18/23

| | |
|---|---|
| **From:** | Schmitz, Erik [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ESCHMITZ] |
| **Sent:** | 5/18/2020 10:54:32 AM |
| **To:** | Nelson, Reid [reidn@amazon.com]; Muller, Thomas [tmuller@amazon.fr]; Dunn, Marla [mpdunn@amazon.com]; Edelstein, David [edelstei@amazon.com]; Gotschall, Mary Pat [marypat@amazon.com]; Moeller, Caroline [cmmoell@goodreads.com]; Baidwan, Nikki [nikbai@amazon.com] |
| **CC:** | Ferrault, Perrine [ferrault@amazon.fr] |
| **Subject:** | RE: Privilege and Confidential: "Are you Prime?" Survey results |

Adding Nikki and Caroline

Reid, you are right: We are committed to maintain high standards and quality of our Prime experience. For that, we have been working on several fronts and I believe our US team has been in touch with you since the January review. As such, Nikki, Caroline, myself and Nahshon are possibly the right group to brainstorm or discuss the proposals you have in mind. Should we have a call to discuss?

**From:** Nelson, Reid
**Sent:** Monday, May 18, 2020 7:43 PM
**To:** Muller, Thomas <tmuller@amazon.fr>; Dunn, Marla <mpdunn@amazon.com>; Edelstein, David <edelstei@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>
**Cc:** Ferrault, Perrine <ferrault@amazon.fr>; Schmitz, Erik <eschmitz@amazon.lu>
**Subject:** Re: Privilege and Confidential: "Are you Prime?" Survey results

--Retaining Privilege--

Hi Thomas,

We've had several Leadership reviews on this topic over the years, up to Russ Grandinetti, Neil Lindsay, Jamil Ghani, Cem Sibay, and Greg Greely. We started these CX discussions with Prime Acquisition in 2015 when we first observed customers complaining about accidental sign ups through naturalistic shopping research. We are reinjecting design efforts and leadership visibility on it with this latest workstream. This was an outcome from a January VP review of our recent NPA/NAC Research on Amazon.de (subscription clarity was a top theme, see full report). We are very familiar with the sensitivity of the topic, and take all communications seriously by marking them P&C.

Llew Mason is our Sponsor from Consumer Engagement. This workstream is part of a QBR goal to partner with teams to propose design solutions that address Thematic Customer Frustrations. This is one of three frustration themes we're tackling through this goal.

A key element for a successful VP/SVP review is that we combine any proposed design solutions with a balanced narrative of all the data we know about the topic. Our shopping research insights are one data source; CS data, behavioral metrics, and surveys are another.

Hopefully this is enough clarity on the objectives of the workstream. I think I can speak on behalf of Erik & Team that we all want to make Prime Acquisition & Retention a great, trustworthy experience for WW customers. If a call is needed for further clarification, please let me know.

Thanks,
Reid

**From:** "Muller, Thomas" <tmuller@amazon.fr>
**Date:** Monday, May 18, 2020 at 4:47 AM

CONFIDENTIAL TREATMENT REQUESTED

**To:** "Nelson, Reid" <reidn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, "Edelstein, David" <edelstei@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Cc:** "Ferrault, Perrine" <ferrault@amazon.fr>, "Schmitz, Erik" <eschmitz@amazon.lu>
**Subject:** RE: Privilege and Confidential: "Are you Prime?" Survey results

*Adding Perrine FR Prime lead and Erik EU lead for Clarity initiative for visibility*

Hello Reid,

Many thanks for reaching out and for this detailed email.

Would you mind letting us know who is your sponsor on this subscription clarity initiative?
We are wondering if you aligned with Prime leadership when you started this stream.
More precisely have you already synced with Prime teams working on this topic (Erik for EU, Nahshon for WW)?

This clarity initiative is a sensitive topic and we would like to make sure goals and purposes are aligned before sharing sensitive data.
Let us know if a short call would help to clarity all this.

Thomas

**De :** Nelson, Reid <reidn@amazon.com>
**Envoyé :** vendredi 15 mai 2020 03:18
**À :** Muller, Thomas <tmuller@amazon.fr>; Dunn, Marla <mpdunn@amazon.com>; Edelstein, David <edelstei@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>
**Objet :** Privilege and Confidential: "Are you Prime?" Survey results

**--Privileged & Confidential, Do Not Forward--**

Hi Thomas,

One of our top Shopper Frustration Themes is *Subscription Clarity: Customers unknowingly signing up for or having trouble cancelling a recurring subscription like Amazon Prime*. David's team (Global Prime Experience) and my team (Shopper Frustrations) are kicking off a workstream where we will brainstorm design solutions that address these problems, then present those solutions to relevant VP/SVP decision-makers (along with supporting customer data).

There are 26 frustrations in the Shopper Frustrations database specific to the theme of Subscription Clarity. These insights come from naturalistic shopping studies where we've observed customers encounter Prime Acquisition & Retention CX in the wild, in multiple locales, dating back several years.

To further refine our body of evidence on this topic, we kindly ask that your team share the results from the recent survey where Amazon.fr Prime members were asked to confirm whether or not they believed they were Prime. If the survey has been replicated in any other locales, please share as well (or provide POCs). And if you have any other relevant corroborating evidence to share beyond this survey (e.g., CS data), please let us know.

Thanks very much.
~Reid

AMZN_00099748
Ex. A, Page 192 of 308

# Attachment 21

| | |
|---|---|
| **From:** | Ghani, Jamil [/o=Amazon/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=936d03bedff744ea9b349f9c8cb5988a-ghanijam] |
| **Sent:** | 1/6/2021 4:01:07 PM |
| **To:** | Hills, Benjamin [bhills@amazon.com]; Tuladhar, Praju [tuladhar@amazon.com]; Davidai, Nahshon |
| | [ndavidai@amazon.com] |
| **Subject:** | Re: P&C - next steps on clarity |

**EXHIBIT**
*11.16.22*
*11*
*Ghani*

Perfect. Just confirmed with Kerry.

**From:** "Hills, Benjamin" <bhills@amazon.com>
**Date:** Wednesday, January 6, 2021 at 3:58 PM
**To:** Jamil Ghani <ghanijam@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>, "Davidai, Nahshon" <ndavidai@amazon.com>
**Subject:** RE: P&C - next steps on clarity

Thank you Jamil,

Nikki is actively working on the doc. and scheduling.  To ensure we have all the pieces in order Nikki had asked for an opening between Feb. 10th – end of Feb.   Nikki and myself had chatted, and we want to make sure we have a couple pre-reviews, and get all the info needed (and also have to consider OLR's, Re-org, etc.).  I want to make sure that timing is ok?

Thanks,

Ben

**From:** Ghani, Jamil
**Sent:** Wednesday, January 06, 2021 3:16 PM
**To:** Tuladhar, Praju <tuladhar@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Davidai, Nahshon <ndavidai@amazon.com>
**Subject:** FW: P&C - next steps on clarity

Maintaining P&C

See discussion with Neil about followup meeting from the Llew subscription clarity discussion in Dec.

Nahshon, if you have moment, could you add 1 line in pricing doc after the performance miss explaining we will come back with a CWG discussion in Q1 to align on mental model and testing roadmap?

**From:** Jamil Ghani <ghanijam@amazon.com>
**Date:** Wednesday, January 6, 2021 at 3:11 PM
**To:** Neil Lindsay <nlindsay@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Subject:** Re: P&C - next steps on clarity

I agree completely and we are working quickly on exactly what you outlined. I will add a line to pricing doc saying that we are scheduling a follow up. Thanks.

**From:** Neil Lindsay <nlindsay@amazon.com>
**Date:** Wednesday, January 6, 2021 at 11:48 AM

CONFIDENTIAL TREATMENT REQUESTED

**To:** Jamil Ghani <ghanijam@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Subject:** Re: P&C - next steps on clarity

I think this is an important HDT to bring to Doug, Russ and Dave C. We should expose it, even in tomorrow's pricing doc, and it will likely come up on 2020 goals review. You should have someone write a doc that summarizes the customer frustrations and sources of the concern and level of concern, the actions and test we've taken and the results, the alternative positions we could take, arguing pros and cons, with data (if we have it) on how many people we suspect ultimately sign up accidentally, but that remain and are happy versus not, etc. – and then lets get guidance. Feels like this is urgent as the goals discussion will likely force it.

**From:** "Ghani, Jamil" <ghanijam@amazon.com>
**Date:** Wednesday, January 6, 2021 at 11:44 AM
**To:** "Lindsay, Neil" <nlindsay@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Cc:** "Ghani, Jamil" <ghanijam@amazon.com>
**Subject:** P&C - next steps on clarity

Seeking Praju's counsel

One question for you based on the dialogue we just had on pricing.

I was in a meeting led by Llew's customer frustrations/CX team in late December on clarity in subscription CX (not just Prime but lots of conversation about Prime as you would expect). They were putting forth some standards that Prime knows would be significant headwinds to sign ups and are counter to where I think we landed with you and Doug. The group was aware of the reversal of the changes in the US and the document reflected the confusion on whether we are serious or not on this topic. He and I agreed that there is a real tension between the ongoing push to improve CX (his team leading for Consumer, with Russ's encouragement) and the concrete decisions to be made in Prime upsells and their headwind to growth. We both recognize the balancing act needed here but worry that we need some more top-down alignment on questions like: "How worried are we about the customer frustrations feedback on subscriptions/Prime?"; "What levers are we comfortable with to address these issues, given the likely business impact?"; and "On what timeline do we seek to address?". I am not clear that where we landed with Doug allows much action on clarity per the review you and I had with the team in the summer. The reality is that the changes we made in September are deemed to be near the "mimimum bar" of what we wanted to improve (e.g., call out the price outside of T&Cs, make negative CTA as prominent as positive, remove shadow boxes around buttons). But as you know, the changes nevertheless had a significant negative impact.

So, the questions I have for you are:
- Am I missing something on where we stand? Do you have a clearer pov on how to thread this needle that I need to snap to?
- If you agree that there is a difficult tension here, do you think having a conversation with Doug, Russ, you, Llew, me could help clarify the roadmap of what we will and won't do?

Happy to hope on a quick call to discuss.

Jamil

# Attachment 22

1                  FEDERAL TRADE COMMISSION

2

3

4    In the Matter of:          ) File No. 2123050

5    AMAZON.COM, INC.,          )

6    --------------------------)

7

8

9

10

11               Tuesday, February 21, 2023

12

13                      Via Zoom

14

15                    Meet & Confer

16

17

18

19

20

21

22

23

24

25

13

Meet and Confer

Amazon.com, Inc.                                                2/21/2023

1    moment, Jonathan.  You said that the letters do
2    not contain the attestation?
3             MR. COHEN:  That's our position.
4             MS. KIM:  Why is that?
5             MR. COHEN:  Because the rule says --
6    and maybe I misread the letters.  But the rule
7    says its the lead attorney or attorney
8    responsible for supervising the review of the
9    material and who made the determination to assert
10   the claim.
11            You need to identify that person, and
12   possibly you have.  That's why I'm asking whether
13   is that -- if you point us to a letter from Ben
14   that you say satisfies that obligation, are we to
15   infer that Ben is the lead attorney or attorney
16   responsible for supervising the review of the
17   material and who made the determination to assert
18   the claim?
19            MS. KIM:  We've already told you
20   multiple times that we have provided the
21   attestation consistent with 211A1 in various
22   letters, and we cited them again in the letter
23   from today: October 7th, November 22nd, and
24   December 12th.  And those were submitted by
25   Amazon with the appropriate attestation.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

14
Meet and Confer
Amazon.com, Inc.                                    2/21/2023

1           I'm not -- again, I'm really confused
2    as to what remaining questions there really are
3    at this point.
4           MR. COHEN:  Okay.  Well, maybe I can
5    ask it a little bit more -- on a little different
6    way.
7           Who is the attorney responsible for
8    supervising the review of the material, and who
9    made the determination to assert the protected
10   status claims at issue?
11          MS. KIM:  So just to be absolutely
12   clear, Ben Langner submitted the letters that
13   contain the attestation consistent with 211A1
14   which says the attestation shall be by the lead
15   attorney or attorney responsible for supervising
16   the review of the material who made the
17   determination to assert the claim.
18          MR. COHEN:  Therefore, you want us to
19   take, and I am now taking, that the attorney
20   responsible within the meaning of 211A is Mr.
21   Langner?
22          MS. KIM:  He's the lead attorney or
23   the attorney responsible for supervising the
24   review of the material and who made --
25          MR. COHEN:  And he made --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

15
Meet and Confer

Amazon.com, Inc.                                                    2/21/2023

1          MS. KIM:  Correct.
2          MR. COHEN:  That's Mr. Langner, okay.
3    Thank you.
4          Let's go to the number 3, and number 3
5    is one where actually -- by the way, clarifying
6    that it's Mr. Langner is very helpful to us.  So
7    I appreciate that.
8          In terms of number 3, we disagree with
9    some of the characterizations, and you probably
10   would disagree with how we characterize some
11   things.  But the -- I guess I have a couple of
12   questions.  So let's set side the May 2021
13   meeting.
14         There's a paragraph kind of midway
15   down the page that says, for example, you've
16   mentioned privilege issues, raised privilege
17   issues concerning that meeting.  But are there
18   other categories beyond the May 2021 meeting that
19   you feel we should -- and I'm using this term
20   loosely -- like be on guard?
21         I don't know what we would do.  But,
22   Laura, you told me that like there's also this
23   meeting in August of 2018 and we feel that
24   meeting is privileged even though we didn't
25   always necessarily think that way and if you see

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

16

Meet and Confer

Amazon.com, Inc.                                              2/21/2023

```
 1   anything, you should call.  We would take that
 2   under advisement.
 3            What other than the May 2021 meeting
 4   is -- is in the categories of things we should
 5   kind of take under advisement as potentially
 6   privileged?
 7            MS. KIM:  So I don't think I can relay
 8   all of that just extemporaneously, Jonathan,
 9   during this particular phone call.  But the
10   letter itself gives you -- and this is not new
11   material.  It gives you a number of different
12   factors that we think should help you make that
13   determination.
14            So the paragraph preceding that
15   paragraph you just cited provides you a number of
16   guidelines for you to consider.  I'm not going to
17   be able to put that all together just, you
18   know -- like I said, extemporaneously.
19            MR. COHEN:  Well, I don't fault you
20   for that.  But can you follow-up with a list of
21   other categories?  I mean, there's a difference,
22   I think, that is really important between
23   identifying categories that we should be on the
24   lookout for and identifying considerations.
25            So for instance, one of the
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Meet and Confer

Amazon.com, Inc.                                          2/21/2023

1    Some of other things I think are maybe a little

2    bit more valuable in terms of reaching the

3    conclusion that you want us to be thinking about.

4              But hopefully you can appreciate why

5    it's problematic to tell us to look for

6    indications like privileged and confidential when

7    that indication is on so many documents, often in

8    conjunction with -- at least some other

9    theoretical or maybe minor indication that might

10   counsel in favor of the material being

11   privileged, coupled with many, many other

12   considerations pointing in the other direction,

13   including the fact that you produced it to us

14   after a painstaking review.  But we are thinking

15   carefully about how to address this problem.

16             MS. KIM:  Okay.  So I see we just have

17   eight minutes left.  I do want to reserve at

18   least a few minutes at the end for a couple of

19   things I wanted to cover with you.  So if you

20   want to move on to another topic, that might be

21   helpful at this point.

22             MR. COHEN:  Yeah.  I do have some

23   things about the -- with respect to the privilege

24   log, and I can also stay a little bit longer.  If

25   you can't, you can't -- that maybe we're not

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

28

Meet and Confer

Amazon.com, Inc.                                              2/21/2023

1   going to get to.  I didn't know you were going to
2   raise other things, but I'll do the best that I
3   can.
4           I don't need to spend a lot of time on
5   number 4 because my interpretation is that you
6   will not provide us any information with respect
7   to the additional facts that were learned to
8   confirm or establish that these materials were
9   privileged.  Maybe we can sort of skip past it
10  because am I right you're not going to provide us
11  any of that information?  Not when it was
12  discovered, who discovered it, what it was,
13  something like that?
14          MS. KIM:  Not at this point, but if
15  there are particular questions you have, I can
16  check with the client.
17          MR. COHEN:  Well, I mean, it would be
18  worth it for you to go back to the client because
19  again -- and maybe this was not done on purpose.
20  I suspect -- well, I don't think it was done on
21  purpose.  But this sort of late stage clawbacks
22  have put us in a tricky position, and it would be
23  helpful to know what exactly happened so that we
24  could understand why it was that this wasn't
25  ascertained earlier and what it was exactly that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Meet and Confer

Amazon.com, Inc.                                    2/21/2023

1    was even ascertained in the first place.

2             Likewise, with respect to 5, I took

3    your position to be just that we haven't been

4    prejudiced; therefore, there's no remedy for us

5    from your perspective.

6             MS. KIM:  So starting with number 5, I

7    don't -- I don't understand what the basis would

8    be for a remedy at this point.  So it really

9    wasn't clear to me from the question as written

10   in your e-mail, Jonathan, what the -- what you

11   would have done differently or what should have

12   happened.  It was confusing, the questions.  So

13   we tried to answer your question the best that we

14   could in our letter to try to move things

15   forward.

16            In terms of going back to number 4, we

17   do -- we did produce to you a privilege log.  I'm

18   not able to share with you the particular, you

19   know, what investigation I undertook in detail or

20   share with you other privileged information,

21   although you might want to know the answers to

22   those questions.  So no, that's -- that's not

23   something that I could provide in greater detail.

24            MR. COHEN:  Okay.  So we just need to

25   take at face value that that's what happened?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Meet and Confer

Amazon.com, Inc.                                              2/21/2023

1            MS. KIM:  In connection -- in
2    conjunction with the privilege -- the privilege
3    log that we provided to you as well.
4            MR. COHEN:  Well, specifically in
5    conjunction to the late discovery of the
6    privileged or allegedly protected status of these
7    materials.
8            MS. KIM:  I mean, I've given you a
9    letter that lays out our basis for making the
10   claims.  I'm not really sure what more I can give
11   you.  So yes, that's -- that's my work.
12           MR. COHEN:  I guess we disagree as to
13   whether the letter actually lays out the basis
14   for making the claims or explains why it is that
15   the claims were made as late as they were.
16           But just turning back to the number 5,
17   I mean, some of these things are -- are fairly
18   rudimentary.  There was a clawback in the last IH
19   and, you know, we -- there was a lot of back and
20   forth with counsel.  I think sort of in the
21   moment everything was handled well by both sides.
22           But nevertheless, you know, we --
23   we're anticipating being able to question that
24   witness about that particular document and then
25   weren't able to do that.  So I don't think it's

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 23

| From: | Ghani, Jamil [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=936D03BEDFF744EA9B349F9C8CB5988A-GHANIJAM] |
|---|---|
| Sent: | 2/8/2021 9:21:14 AM |
| To: | Grandinetti, Russell [russ@amazon.com]; Lindsay, Neil [nlindsay@amazon.com]; Tuladhar, Praju [tuladhar@amazon.com] |
| CC: | Curran, John [johncurr@amazon.com] |
| Subject: | Re: prime review |
| Attachments: | 20201222_APPENDIX - 2021_OP2_FINAL (P&C).pdf; 20201222_2021_OP2_Prime_Financial_Review_Final (P&C).pdf |

Marking thread as P&C and adding Praju for his counsel

Hi Russ –

We had previously scheduled an OP2 forecast review with you and John in December. But you might recall we opted as a group to send the document by mail (reattached here for your ease). I'd of course be happy to schedule a review. We would add a bit of an update on the country launches as well. Let me know if the docs prompt additional questions we didn't answer.

Just let me know how you'd like to proceed. Thanks,

Jamil

---

**From:** "Grandinetti, Russell" <russ@amazon.com>
**Date:** Monday, February 8, 2021 at 9:09 AM
**To:** Neil Lindsay <nlindsay@amazon.com>, Jamil Ghani <ghanijam@amazon.com>
**Cc:** "Curran, John" <johncurr@amazon.com>
**Subject:** prime review

Am going through a current draft of s-team goals – the finance team included goals that are relevant, am a co-owner, etc. – one group that's in the list are the prime goals (member growth, PMGMS, launches). Seems like it might be worth having a proper review of all these forecasts vs. just waiting to hash this out in the goals mtg (where we cover a large volume of stuff and it's not a great place to talk through what's driving forecasts, tailwinds/headwinds, etc. is something like this planned? or could we?

AMZN_00027905
Ex. A, Page 207 of 308

# Attachment 24



EXHIBIT
3

**From:** Sibay, Cem (Jem) [/O=AMAZON/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=CEMS]
**Sent:** 1/29/2019 12:36:12 PM
**To:** Mittal, Pranav [pranavm@amazon.com]; Nelson, Reid [reidn@amazon.com]
**CC:** Schmitz, Erik [eschmitz@amazon.lu]; Ogborn, Ryan [ogborn@amazon.com]; Teska, Danielle [teskad@amazon.com]; Chishti, Avais [chishti@amazon.co.uk]; Singh, Rajneesh [rajneesh@amazon.com]; Green, Liz [lizgreen@amazon.com]; Atkins, Jonathan [atkjonat@amazon.com]; Dunn, Marla [mpdunn@amazon.com]; Ressmeyer, Karen [karenr@amazon.com]; Carrel, David [dccarrel@amazon.com]; Henry, Masuma [masumah@amazon.com]; Chiarella, Sharon [sharonch@amazon.com]; Hamel, Andrew [ahamel@amazon.com]; Ivaniukovich, Veronica [veronici@amazon.com]; Maceratesi, Federico [maceratf@amazon.lu]; Harman, Hannah [harmah@amazon.co.uk]; Santini, Lou [santini@amazon.lu]; Leung, Lisa [lileung@amazon.com]; Hagen, Linnea [hagenl@amazon.com]; Bracken, Janelle [bjanelle@amazon.com]; Gotschall, Mary Pat [marypat@amazon.com]; Burghardt, Jake [jbu@amazon.com]
**Subject:** RE: Privileged & Confidential - Re: Prime Interstitial in UK

Team- Settled non-engaging customers are of little value to prime (one of the reasons we ~~have an~~ inactive policy as a backstop). I appreciate the passion on the topic, we do share it as well. But it's not appropriate to have this conversation over email, and increasingly a mass one at that (just adding P&C does little). I am ok with anyone in the company holding us to a high bar, holding us accountable on behalf of the customer, etc. But let's put in the right mechanisms please, and not in a haphazard way for more in-depth comments, personal opinions, customer research, etc. beyond when flagging an obvious misstep in CX/content.

-----Original Message-----
From: Mittal, Pranav <pranavm@amazon.com>
Sent: Tuesday, January 29, 2019 12:34 PM
To: Nelson, Reid <reidn@amazon.com>
Cc: Schmitz, Erik <eschmitz@amazon.lu>; Ogborn, Ryan <ogborn@amazon.com>; Teska, Danielle <teskad@amazon.com>; Chishti, Avais <chishti@amazon.co.uk>; Singh, Rajneesh <rajneesh@amazon.com>; Green, Liz <lizgreen@amazon.com>; Atkins, Jonathan <atkjonat@amazon.com>; Dunn, Marla <mpdunn@amazon.com>; Ressmeyer, Karen <karenr@amazon.com>; Carrel, David <dccarrel@amazon.com>; Henry, Masuma <masumah@amazon.com>; Chiarella, Sharon <sharonch@amazon.com>; Hamel, Andrew <ahamel@amazon.com>; Sibay, Cem (Jem) <cems@amazon.com>; Ivaniukovich, Veronica <veronici@amazon.com>; Maceratesi, Federico <maceratf@amazon.lu>; Harman, Hannah <harmah@amazon.co.uk>; Santini, Lou <santini@amazon.lu>; Leung, Lisa <lileung@amazon.com>; Hagen, Linnea <hagenl@amazon.com>; Bracken, Janelle <bjanelle@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Burghardt, Jake <jbu@amazon.com>
Subject: Re: Privileged & Confidential - Re: Prime Interstitial in UK

Hi Reid,

As shared in the last Lucent review, we were working of testing out of this design paradigm and have done so in all locales other than UK. In UK the team did run the tests but the business team decided to keep the current designs based on estimated member impact. Erik/Avais - Can you add more information on the reasons for decision as you're closer to the discussion?

On ███████████████ not being a good measure for customer satisfaction or quality of acquisition, I agree with your POV. As mechanisms, to address this we are including ██████████████ in our definition of ██████ We are also planning to pause all memberships with no benefit usage in X days.

Best,
Pranav

Sent from my iPhone

> On Jan 29, 2019, at 12:06 PM, Nelson, Reid <reidn@amazon.com> wrote:
>
> --Privileged & Confidential, do not forward--
>
> [Adding relevant leaders from CXT, RED & Prime]
>
> Team, I'd like to propose a POV that ███████████████ alone is not an adequate measure of █████████ nor is it a measure of ████████ This is because of the following behavior we have observed through UX Research (IT-3829<https://research.amazon.com/browse/IT-3829>): Customers are unknowingly ████████████████████ because 1) they signed up accidentally and/or didn't see auto-renewal terms, 2) we didn't send them reminders / charge communications, and 3) they didn't check their card activity.
>
> In other words: If customers don't know they've signed up for an auto-renewing membership, and if they don't check their bills, ███████████████████ If we make the Sign Up Experience more transparent, fewer people will accidentally sign up (and more people will know about cancellation terms),

therefore fewer people will unknowingly become 90-day Settled Members. Also, regarding CS metrics, these
people won't know to contact CS (until they eventually discover they're Prime, assuming they ever
discover this).
>
> Jem / Dave / Lou, we first raised these customer frustrations to the Prime Acquisition team in October
2016. And again with the Prime Leadership Team in May 2017. More recently in the Project Lucent review in
September 2018. It's 2019 now, and customers are still accidentally signing up for Prime. In all these
meetings, we've agreed this is a poor customer experience. What's the mechanism to drive change here?
>
>
> Here are some choice words used by customers to describe these acquisition experiences (from a study in
June 2018):
>
> [cid:image008.png@01D45C6E.79C700F0]<https://drive.corp.amazon.com/doc
> uments/Core%20Shopping%20Experience%20(CSX)/User%20Research/2018/18-11
> %20LATAM%20X-Border%20Shopping%20Study/Highlights/Prime/P15-%20Paola%2
> 0didn't%20know%20she%20signed%20up,%20had%20incaccurate%20understandin
> g%20of%20Prime%20benefits,%20and%20didn't%20know%20how%20billings%20wo
> rked.mp4>
>
> [cid:image007.png@01D45C6E.79C700F0]<https://drive.corp.amazon.com/doc
> uments/Core%20Shopping%20Experience%20(CSX)/User%20Research/2018/18-11
> %20LATAM%20X-Border%20Shopping%20Study/Highlights/Prime/P4%20-%20Rafae
> l%20signed%20up%20via%20SPC,%20with%20T&Cs%20below%20the%20fold,%20got
> %20email%20in%20English,%20thought%20he%20could%20cancel%20by%20replyi
> ng,%20because%20settled%20member.mp4>
>
> [cid:image009.png@01D45C6E.79C700F0]<https://drive.corp.amazon.com/doc
> uments/Core%20Shopping%20Experience%20(CSX)/User%20Research/2018/18-11
> %20LATAM%20X-Border%20Shopping%20Study/Highlights/Prime/P15%20-%20Javie
> r%20had%20no%20idea%20he%20signed%20up%20for%20Prime,%20nor%20its%20be
> nefits%20or%20cost,%20and%20found%20cancellation%20too%20many%20steps.
> mp4>
>
> [cid:image006.png@01D45C6E.79C700F0]<https://drive.corp.amazon.com/doc
> uments/Core%20Shopping%20Experience%20(CSX)/User%20Research/2018/18-11
> %20LATAM%20X-Border%20Shopping%20Study/Highlights/Prime/P7%20-%20Jenni
> fer%20signed%20up%20for%20Prime%20thinking%20it%20would%20work%20in%20
> Chile,%20never%20saw%20T&Cs%20below%20the%20fold,%20got%20a%20welcome%
> 20email%20in%20English,%20only%20recovered%20because%20she%20has%20car
> d%20security%20notifications.mp4>
>
> [cid:image010.png@01D45C6E.79C700F0]<https://drive.corp.amazon.com/doc
> uments/Core%20Shopping%20Experience%20(CSX)/User%20Research/2018/18-11
> %20LATAM%20X-Border%20Shopping%20Study/Highlights/Prime/P23%20-%20Samu
> el%20clicked%20the%20yellow%20continue%20button%20not%20realizing%20it
> %20was%20signing%20him%20up,%20didn't%20initially%20see%20the%20small%
> 20link%20to%20opt%20out.mp4>
>
>
> From: "Schmitz, Erik" <eschmitz@amazon.lu>
> Date: Tuesday, January 29, 2019 at 8:51 AM
> To: "Ogborn, Ryan" <ogborn@amazon.com>, "Teska, Danielle"
> <teskad@amazon.com>, "Chishti, Avais" <chishti@amazon.co.uk>, "Mittal,
> Pranav" <pranavm@amazon.com>, "Singh, Rajneesh" <rajneesh@amazon.com>,
> "Green, Liz" <lizgreen@amazon.com>, "Atkins, Jonathan"
> <atkjonat@amazon.com>, "Nelson, Reid" <reidn@amazon.com>
> Cc: "Ivaniukovich, Veronica" <veronici@amazon.com>, "Maceratesi,
> Federico" <maceratf@amazon.lu>, "Harman, Hannah"
> <harmah@amazon.co.uk>, "Santini, Lou" <santini@amazon.lu>, "Leung,
> Lisa" <lileung@amazon.com>
> Subject: RE: Prime Interstitial in UK
>
> Adding Lisa and Lou
>
> Hi Ryan,
>
> We are all in full agreement that we don't want to trick customers into a Membership they don't want.
We constantly monitor metrics that provide us with consolidated view of any such ▮deterioration across our
CX ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Also, worthwhile to
note that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and any signup is looked in
the context of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>
> Now coming to this specific example of UPDP, we have data that suggests that the current template is
not driving increased customer frustration/inadvertent signups. Some key call outs below:
>
> 1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL TREATMENT REQUESTED

> 3.  A slight variation of the button to remove the stacking effect performed significantly lower in terms of ███████████████████████████████████████████████████████████████

>
> However, while the above data points above do not support the customer anecdotes shared in this thread, we are still fully committed to test into a new CX to improve clarity for the customers and at the same time support it with data about the increased satisfaction ███████████████████████████ We are currently planning to address many if not all of the already identified customer frustrations through three different projects:
>
> 1.  A series of additional tests with different designs of the button (mocks attached, CTA option 1 and FR winner). We want to launch these experiments as soon as possible, after the locations are unblocked from the ASU (Automated Ship Upsell) launch. We are aiming at 02/07 right now.
> 2.  Adding Prime as ASIN to the cart. With this new feature, customers will a) see Prime in the cart on the final confirmation page and b) can remove it again before finishing the order. (see attached asinization screenshot for the CX of the cart). This project is above the line for 2019.
> 3.  MFA (PSD2) in all EU. With this, customers will need to verify
> every charge on their credit card with a challenge from their bank
> (not Amazon). This challenge includes a reference on the amount and
> the reason for the upcoming charge (this also includes free trials for
> the first charge after the 30 days). This challenge will be triggered
> when customers sign up for Prime. The following pop up to confirm the
> upcoming payment is probably the most clear way to inform the customer
> what they are signing up for. [September]
>
> Overall, we are committed to make sure that we continue to take data-driven decisions to address these issues structurally and are moving as fast as we can to address them. Happy to set up a call to discuss this further.
>
> Thanks,
> Erik
>
> From: Ogborn, Ryan <ogborn@amazon.com>
> Sent: Tuesday, January 29, 2019 04:05
> To: Teska, Danielle <teskad@amazon.com>; Chishti, Avais
> <chishti@amazon.co.uk>; Mittal, Pranav <pranavm@amazon.com>; Singh,
> Rajneesh <rajneesh@amazon.com>; Green, Liz <lizgreen@amazon.com>;
> Atkins, Jonathan <atkjonat@amazon.com>; Nelson, Reid
> <reidn@amazon.com>
> Cc: Ivaniukovich, Veronica <veronici@amazon.com>; Maceratesi, Federico
> <maceratf@amazon.lu>; Schmitz, Erik <eschmitz@amazon.lu>; Harman,
> Hannah <harmah@amazon.co.uk>
> Subject: Re: Prime Interstitial in UK
>
> +Jonathan for visibility, +Reid for research insights
>
> Agree with Rajneesh on this being a
> trustbuster<https://w.amazon.com/index.php/GeneralImpactDefinitions#Delivery_Experience>; if this isn't
> dialed down in the next business day, I will file this as a Sev 2 given the impact to customer trust.
>
> Attaching the screenshot of UPDP in prod.
> Weblab ID:
> 109364<https://weblab-redesign.amazon.com/#PRIME_109364/data-analysis/
> primary/GBAmazon/T1/C>
> SIM: Multivariate
> testing<https://issues.amazon.com/issues/PRIMECEO-1544>
>
> From: "Teska, Danielle" <teskad@amazon.com<mailto:teskad@amazon.com>>
> Date: Monday, January 28, 2019 at 8:31 AM
> To: "Chishti, Avais"
> <chishti@amazon.co.uk<mailto:chishti@amazon.co.uk>>, "Ogborn, Ryan"
> <ogborn@amazon.com<mailto:ogborn@amazon.com>>, "Mittal, Pranav"
> <pranavm@amazon.com<mailto:pranavm@amazon.com>>, "Singh, Rajneesh"
> <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>, "Green, Liz"
> <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>
> Cc: "Ivaniukovich, Veronica"
> <veronici@amazon.com<mailto:veronici@amazon.com>>, "Maceratesi,
> Federico" <maceratf@amazon.lu<mailto:maceratf@amazon.lu>>, "Schmitz,
> Erik" <eschmitz@amazon.lu<mailto:eschmitz@amazon.lu>>, "Harman,
> Hannah" <harmah@amazon.co.uk<mailto:harmah@amazon.co.uk>>
> Subject: Re: Prime Interstitial in UK
>
> Avias or Fede, can you send the link to the weblab?
>

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00099855

```
> From: "Chishti, Avais"
> <chishti@amazon.co.uk<mailto:chishti@amazon.co.uk>>
> Date: Friday, January 25, 2019 at 6:11 AM
> To: "Ogborn, Ryan" <ogborn@amazon.com<mailto:ogborn@amazon.com>>,
> "Mittal, Pranav" <pranavm@amazon.com<mailto:pranavm@amazon.com>>,
> "Singh, Rajneesh" <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>,
> "Green, Liz" <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>
> Cc: "Teska, Danielle" <teskad@amazon.com<mailto:teskad@amazon.com>>,
> "Ivaniukovich, Veronica"
> <veronici@amazon.com<mailto:veronici@amazon.com>>, "Maceratesi,
> Federico" <maceratf@amazon.lu<mailto:maceratf@amazon.lu>>, "Schmitz,
> Erik" <eschmitz@amazon.lu<mailto:eschmitz@amazon.lu>>, "Harman,
> Hannah" <harmah@amazon.co.uk<mailto:harmah@amazon.co.uk>>
> Subject: RE: Prime Interstitial in UK
>
> +Hannah
>
> Thanks Ryan for raising this.
>
> We have also internally discussed it at length and I agree that the current CTA doesn't pass the smell
test and can be improved. As I write, we are testing some revised CTA designs to move away from this
layout.
> The reason this template is still live is due to customer data suggesting ███████████
███████████████████████████ with this CTA. However, I have conviction that we can
definitely improve this CTA that drives more net-settled member in a way that address customer clarity
and also drives more long-term paid members.
>
> Fede - can you update this thread once we have results from our
> launched tests
>
> Thanks,
> Avais
>
>
> From: Ogborn, Ryan <ogborn@amazon.com<mailto:ogborn@amazon.com>>
> Sent: 24 January 2019 19:43
> To: Mittal, Pranav <pranavm@amazon.com<mailto:pranavm@amazon.com>>;
> Singh, Rajneesh <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>;
> Green, Liz <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>
> Cc: Teska, Danielle <teskad@amazon.com<mailto:teskad@amazon.com>>;
> Ivaniukovich, Veronica
> <veronici@amazon.com<mailto:veronici@amazon.com>>; Maceratesi,
> Federico <maceratf@amazon.lu<mailto:maceratf@amazon.lu>>; Schmitz,
> Erik <eschmitz@amazon.lu<mailto:eschmitz@amazon.lu>>; Chishti, Avais
> <chishti@amazon.co.uk<mailto:chishti@amazon.co.uk>>
> Subject: Re: Prime Interstitial in UK
>
> Thanks, all!
>
> The particular issue with this CX was the "Continue_pay later" messaging that initially looked like a
quick opt-out but was actually an additional button to register for Prime trial. The "No thanks…" issue
is exaggerated in this scenario if the customer is scanning for an opt-out and there are two stacked
buttons that do the same thing.
>
> From: "Mittal, Pranav" <pranavm@amazon.com<mailto:pranavm@amazon.com>>
> Date: Thursday, January 24, 2019 at 11:37 AM
> To: "Singh, Rajneesh"
> <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>, "Green, Liz"
> <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>, "Ogborn, Ryan"
> <ogborn@amazon.com<mailto:ogborn@amazon.com>>
> Cc: "Teska, Danielle" <teskad@amazon.com<mailto:teskad@amazon.com>>,
> "Ivaniukovich, Veronica"
> <veronici@amazon.com<mailto:veronici@amazon.com>>, "Maceratesi,
> Federico" <maceratf@amazon.lu<mailto:maceratf@amazon.lu>>, "Schmitz,
> Erik" <eschmitz@amazon.lu<mailto:eschmitz@amazon.lu>>, "Chishti,
> Avais" <chishti@amazon.co.uk<mailto:chishti@amazon.co.uk>>
> Subject: Re: Prime Interstitial in UK
>
> +Fede, Erik and Avais from the EU team.
>
> Erik, Avais - This CX has been highlighted as a customer frustration before as well. Can you folks
share the plan to fix it?
>
> Thanks,
> Pranav
>
> From: "Singh, Rajneesh"
> <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>
```

> Date: Thursday, January 24, 2019 at 11:01 AM
> To: "Green, Liz" <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>,
> "Ogborn, Ryan" <ogborn@amazon.com<mailto:ogborn@amazon.com>>
> Cc: "Teska, Danielle" <teskad@amazon.com<mailto:teskad@amazon.com>>,
> "Ivaniukovich, Veronica"
> <veronici@amazon.com<mailto:veronici@amazon.com>>,
> "pranavm@amazon.com<mailto:pranavm@amazon.com>"
> <pranavm@amazon.com<mailto:pranavm@amazon.com>>
> Subject: RE: Prime Interstitial in UK
>
>
> + Pranav
>
> Pranav- Please take a look at the feedback that Ryan shared. ==Sounds like we are tricking customers to sign up for prime without them realizing that they did it.== This is a trust buster. Ryan can share more details if you like.
>
> Thanks,
> Rajneesh
>
> From: Green, Liz
> Sent: Thursday, January 24, 2019 10:53 AM
> To: Singh, Rajneesh <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>;
> Ogborn, Ryan <ogborn@amazon.com<mailto:ogborn@amazon.com>>
> Cc: Teska, Danielle <teskad@amazon.com<mailto:teskad@amazon.com>>;
> Ivaniukovich, Veronica
> <veronici@amazon.com<mailto:veronici@amazon.com>>
> Subject: RE: Prime Interstitial in UK
>
> Pranav Mittal (pranavm@) runs the Prime Content Experimentation team.
>
> From: Singh, Rajneesh
> <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>
> Sent: Thursday, January 24, 2019 10:50 AM
> To: Ogborn, Ryan <ogborn@amazon.com<mailto:ogborn@amazon.com>>; Green,
> Liz <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>
> Cc: Teska, Danielle <teskad@amazon.com<mailto:teskad@amazon.com>>;
> Ivaniukovich, Veronica
> <veronici@amazon.com<mailto:veronici@amazon.com>>
> Subject: RE: Prime Interstitial in UK
>
> Thanks for bringing it up Ryan. Sounds like we are tricking customers to sign up for prime without them realizing that they did it.
>
> Liz- Do you know who the Prime contact is these days to take a look?
>
>
> From: Ogborn, Ryan
> Sent: Thursday, January 24, 2019 9:27 AM
> To: Green, Liz <lizgreen@amazon.com<mailto:lizgreen@amazon.com>>;
> Singh, Rajneesh <rajneesh@amazon.com<mailto:rajneesh@amazon.com>>
> Cc: Teska, Danielle <teskad@amazon.com<mailto:teskad@amazon.com>>;
> Ivaniukovich, Veronica
> <veronici@amazon.com<mailto:veronici@amazon.com>>
> Subject: Prime Interstitial in UK
>
> ==I ran into a particularly nasty UPDP in UK and only realized that I'd signed up for prime as the page was turning to SPC.== I'd try to repro it but now I have prime trial that doesn't end until Feb 23. I'm checking marketing announcements but haven't been able to locate it just yet.
>
> Basic page layout illustrated below (I didn't notice the "pay later" portion until after I had clicked it):
>
> [cid:image001.png@01D4B3D4.183E1EF0]
> <image001.png>
> <image002.png>
> <image003.png>
> <image004.png>
> <image005.png>
> <image006.png>

# Attachment 25

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:              )
                                    ) FTC Matter No. 2123050
 4   Amazon.com, Inc.               )
     _____)
 5
                                    Monday, July 18, 2022
 6
                                    Held at:
 7                                  Federal Trade Commission
                                    915 Second Avenue
 8                                  Suite 2896
                                    Seattle, Washington 98174
 9

10            The above-entitled matter came on for
     investigational hearing, pursuant to subpoena, at 9:58 a.m.
11   Pacific Time.

12

13

14

15

16

17

18

19

20

21

22

23

24
     Reported by:
25   April D. Biedermann, RSR, CCR License No. 21028823
```

Mascio

Amazon.com, Inc.                                    7/18/2022

1   changes, and then we would compare that to the baseline,

2   which is like the current experience of like okay, if we

3   just make one change, we're having a negative -- a drop in

4   sign-ups of ten BIP's, and then if you cost factor that into

5   dollars, that caught over one -- do you see what I'm

6   saying -- over one year, and we needed to provide that

7   metric to them.

8        Q.   Did you provide that metric to Nahshon Davidai?

9        A.   Yeah.  I set up the experiment, and I believe

10  Caroline like took it over, because the evaluation of those

11  metrics, it took time, and she had worked with a BI team on

12  quantifying that.  And from what I recall, and this could

13  have changed, the experiment in the end from what I

14  recall -- I actually could be wrong.  My initial reaction is

15  that I want to say that the feedback was:  "It's going to

16  cost too much.  We would lose X" -- some amount of millions

17  of dollars.

18            And so once that then was clear, then the decision

19  just sat somewhere, and I don't know what happened to it.

20       Q.   How do you know this?

21       A.   From Caroline.

22       Q.   Okay.  And did you ever hear this feedback

23  yourself, what Caroline told you?

24       A.   Well, what I noticed was after some time, these

25  things weren't really discussed in emails anymore.  It felt

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

45

Mascio

Amazon.com, Inc.                                      7/18/2022

```
 1   like these things were more hush-hush, and like, I was also
 2   being kept out of them.  So like I set up that experiment,
 3   but I don't really -- didn't really ever see the results.
 4        Q.   Okay.
 5        A.   And I don't recall an email ever being sent
 6   around.  So like what it felt like to me is only my feeling,
 7   my intuition, my -- yeah, was that there -- it felt like
 8   there was like some secret group of people who like talked
 9   about this, and then it wasn't shared broadly, it wasn't
10   transparent, and I understood at the time that that was just
11   because it was a sensitive topic, and also we had -- we were
12   told to start marking things "privileged and confidential,"
13   and so it also indicated to me that there was a preparation
14   for some kind of defense of what was happening, and it felt
15   very, very bad being there and like being in that
16   environment and talking about it.
17        Q.   So just to clarify, you got that sense that it was
18   a stop sort of put on these clarity improvements, because
19   people stopped talking about that --
20        A.   Well, so hold --
21        Q.   -- concept?
22        A.   Yes.  And I would say a stop, not on the clarity
23   improvements, because simultaneously when I was doing my
24   part still on the little things, but it was like that
25   decision being made on moving forward with like this big
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Mascio

Amazon.com, Inc.                                          7/18/2022

```
 1   decision to reset the baseline.
 2        Q.   So in other words, were the clarity improvements
 3   that you and your -- the other people on your team were
 4   suggesting, they were not implemented; is that what you're
 5   saying, to the best of your knowledge?
 6        A.   Yes.  To the best of my knowledge.
 7        Q.   And when you said that --
 8        A.   But I just also want to acknowledge, it's very
 9   complex.  It's like I can say that, but then as I'm saying
10   that to you, I'm unraveling in my head what it actually
11   means, because there's what -- what use code, which offer
12   type.  So, like, I can say to the best of my knowledge, but
13   maybe there's also a defense side.  This were some changes
14   made.  Does that make sense?  I'm not saying that no changes
15   were made.  There were some changes made, but like the reach
16   and the scale of those needed to come from like leadership
17   to change things on a mass scale.
18        Q.   And the change on the mass scale did not happen to
19   the best of your knowledge, correct?
20        A.   Yeah, yeah, sorry.
21        Q.   And it sounds like one of the differences that you
22   felt was that there was some kind of defense being prepared,
23   is that correct, that you said?
24        A.   It just felt like things got -- let me --
25        Q.   Whereas, before you did not have that feeling?
```

47

Mascio

Amazon.com, Inc.                                                    7/18/2022

1        A.   Well, because normally there's so much

2    transparency, like everything is in an email and over lunch,

3    and then it felt like it shifted and things weren't as

4    transparent, and we weren't talking about these in emails.

5    It was like hush-hush, or there was an air of like there's

6    meetings happening and decisions being made that I was not

7    part of.  So.

8        Q.   Do you remember a meeting that you were not part

9    of specifically that gave you that feeling?

10       A.   Yeah.  There's definitely meetings between, like,

11   Caroline, Nahshon and Nikki, and I don't know who else.

12       Q.   Okay.  And you mentioned earlier that you were

13   given instructions to start marking things "privileged and

14   confidential."

15            Where did you get that instruction from?  Who told

16   you that?

17       A.   I believe, I want to say -- I want to say someone

18   from legal either came to a meeting and told us that, or

19   else it was announced like in a stand-up in the morning.

20       Q.   So was this information disseminated to a wide

21   group of people at the same time?

22       A.   It was to my team.

23       Q.   To your team, okay.

24       A.   Yeah, my direct teams, like under Nikki.  When I

25   say "my team," I'll say Nikki's team, because within Prime

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

48

Mascio

Amazon.com, Inc.                                                7/18/2022

1    there's a bunch of different teams that are my teams but

2    I'll say Nikki, so the people under Nikki.

3        Q.   Okay.  And were you provided with factors in

4    evaluating whether something was to be marked privileged and

5    confidential, or --

6        A.   Good question.

7        Q.    -- or was it more of a mark everything -- as much

8    as possible as privileged and confidential?

9        A.   That's a really good question.  There would have

10   been factors, because we didn't mark everything privileged

11   and confidential, and I'm -- I don't recall the language

12   that was used.  Yeah, I don't recall language that was used.

13       Q.   Do you recall in your day-to-day practice how you

14   started marking things differently as privileged and

15   confidential; whereas, maybe before you wouldn't have?

16       A.   Yeah.  I believe on documents that I created in

17   reference to clarity, I began to put "Privileged and

18   Confidential" like, on the bottom left-hand side to be more

19   conscious of that.

20       Q.   Okay.  But you didn't used to do that from the

21   beginning of your time on the team?

22       A.   I don't believe that I did, no.

23       Q.   Okay.

24            MS. JERJIAN:  I think this is a good time to

25   take a break.  Do you --

49

Mascio

Amazon.com, Inc.                                                    7/18/2022

1            THE WITNESS:  Yeah, sure.

2            MS. JERJIAN:  Let's take a five-minute break.

3                 (Recessed from 11:04 to 11:20 a.m.)

4       BY MS. JERJIAN:

5       Q.   So, Ms. Mascio, you mentioned earlier that you got

6    a directive or your team got a directive at some to start

7    marking things as privileged and confidential that weren't,

8    up zero to that point, marked as privileged and

9    confidential, correct?

10      A.   Yeah.  Up to that point it was -- it didn't feel

11   like there was any need for us to do that.

12      Q.   Okay.  And do you remember when that was?  When

13   that change occurred?

14      A.   Yeah.  It felt like it was -- from what I recall,

15   it was like the same timeline that we started about clarity

16   issues.

17      Q.   And do you remember, like, in terms of a month?

18      A.   Yeah, I would say --

19      Q.   Or a year?  I'd do a year.

20      A.   In 2020.

21      Q.   Okay.  And --

22      A.   Or the beginning of 2020, maybe, like, I would say

23   March of 2020.

24      Q.   And what are you basing this on?

25      A.   I'm basing this on my recollection of it being in

# Attachment 26

| From: | Cohen, Jonathan |
| To: | Kim, Laura |
| Cc: | Cole, Margaret; Hoffman, Elena; Frech, Jacob; Zwonik, Ryan; Rottner, Adam; Graubert, John; Hall, John; Siegel, Andrew; Moran, Jordan; Remick, Ali; Kelly, Kevin; Agama, Nicole; Higgins, Christina; Johnson, Haley; Noble, Zaria; Rodgers, Megan; Rutherford, Miranda; Ledain, Lelia A; Ponder, Jayne; Jacobs, Eli J; Charles, Amber; Grossman, Rachel; Flahive Wu, Laura; Anthony, Stephen; Nardini, Thomas; Capuano, Marc; Jerjian, Olivia; Violette, William |
| Subject: | Amazon - Possible Inadvertent Production |
| Date: | Tuesday, November 22, 2022 4:21:51 PM |

Amazon previously informed us of the extensive, searching, and holistic privilege review the company conducted before producing materials to the Commission. Relying on this information, we have generally treated all materials we received from you in whole or without redaction as unprivileged material available for our use and review.

However, we recently identified three individual messa_es within a lon_er conversation that ma_ contain inadvertentl_ - roduced _rivile_ed information. Please see AMZN_102778, messa_es at 15:54:49, 16:00:49, and 16:02:23, and please advise as to whether these messages represent privileged information. For the time being, and pending your response, we will sequester these messages from further use and review. If these messages are privileged, please produce a version of AMZN_102778 with these messages redacted, along with updated privilege log entries for each message. Although we are entitled to a replacement version immediately, given the holiday, please provide the redacted document and log entries by November 29.

Jonathan Cohen
Enforcement Division | Bureau of Consumer Protection | Federal Trade Commission
600 Pennsylvania Avenue, N.W., CC-9528  Washington, D.C.  20580
(202) 326-2551 | jcohen2@ftc.gov

# Attachment 27



| | |
|---|---|
| Benjamin Langner<br>Senior Corporate Counsel<br>Litigation & Regulatory<br>Amazon.com, Inc.<br>Direct Dial: 206-266-1842<br>Email: langnerb@amazon.com | Mailing Address:<br>P.O. Box 81226<br>Seattle, WA 98108-1266<br>Courier Delivery Address:<br>2021 7th Avenue<br>Seattle, WA 98121 |

### CONFIDENTIAL TREATMENT REQUESTED

November 29, 2022

**Via Email**

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

  Re: FTC Matter No. 2123050

Dear Mr. Cohen:

   Amazon.com Inc. ("Amazon") writes to respectfully request that pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii) the Federal Trade Commission return delete or destroy the document identified in our November 22 2022 email AMZN_00102778. This document contains material protected by Amazon's attorney-client privilege and was inadvertently produced.

   We also respectfully request that you return, delete, or destroy all existing data associated with AMZN_00102778, including any copies of the document and associated data contained on the original production media provided to you, as well as any copies that may exist on internal databases or networks, including all associated metadata, extracted text, or native files, or any materials derived from or incorporating the protected information. . After the clawed-back document has been appropriately updated in your document review platform, we ask that you please ensure that your document review platform is re-indexed, if necessary, to account for any changes in searchable text. Finally, we respectfully request that you send us written confirmation once all inadvertently produced material has been returned, deleted, or destroyed.

   Accompanying this letter is a replacement version of this document that omits protected information, along with appropriate metadata. Pursuant to 16 C.F.R. § 2.11(a)(1), included with this production is a supplemental log of the withheld information based on a claim of protected status, as that term is defined in § 2.7(a)(4). Amazon determined that the item identified on this log is entitled to protected status according to governing legal principles.

**CONFIDENTIAL TREATMENT REQUESTED**

Sincerely,

/s/

Benjamin Langner
Senior Corporate Counsel, Litigation & Regulatory
Amazon.com, Inc.

2

# Attachment 28

**From:** Nelson, Reid [/o=Amazon/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=reidn]

**Sent:** 4/21/2021 10:01:07 AM

**To:** Muus, Katey [kateymuu@amazon.com]; Neuman, Steven [neumansn@amazon.com]; Magnusson, Nathan [magnun@amazon.com]; Ong (Design Tech), Tim [timong@amazon.com]; Dunn, Maria [mpdunn@amazon.com]; Gotschall, Mary Pat [marypat@amazon.com]

**Subject:** Re: Shopper frustration examples (Privileged & Confidential)



Thank Katey-

I've shared the guidance with D2AS as an input to their Dave Limp / Tobin follow-ups.

To get the doc into the Prime CWG Appendix, we could use your assistance in requesting that Nikki and Ben accommodate this. If they're aligned, then we need to determine who would be making any height/length adjustments, whether that's Shopping Design vs. Prime.

---

**From:** "Muus, Katey" <kateymuu@amazon.com>

**Date:** Tuesday, April 20, 2021 at 1:47 PM

**To:** "Nelson, Reid" <reidn@amazon.com>, "Neuman, Steven" <neumansn@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>

**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Thanks, all. Yes, this is the right doc to add to the clarity appendix and share with D2AS, wondering if we can scale down the imagery to make it take up less pages for the appendix?

---

**From:** "Nelson, Reid" <reidn@amazon.com>

**Date:** Monday, April 19, 2021 at 1:34 PM

**To:** "Neuman, Steven" <neumansn@amazon.com>, "Muus, Katey" <kateymuu@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>

**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Thank you for sharing this doc Steven. Katey is this what you were thinking in terms of "snackable" content for the May 6 CWG doc?

While everyone is on the line: There is a parallel inspection on subscription clarity happening within the digital subscriptions orgs. The D2AS team had a QBR with Dave Limp last week, and evidently Dave and his LT got excited about the subscription clarity discussion, and gave them some follow-up actions on. The owning PM reached out to me asking if we had any updates from our Shopper Frustrations Clarity initiative. I wonder if we could share this Rio patterns doc, given that it is largely applicable to most Amazon subscription programs (not just Prime)?

CONFIDENTIAL TREATMENT REQUESTED

**From:** "Neuman, Steven" <neumansn@amazon.com>
**Date:** Monday, April 19, 2021 at 12:59 PM
**To:** "Muus, Katey" <kateymuu@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Sure thing! This was the doc that we handed off as guidance to the Prime team. It's self-contained and in straightforward language.
https://amazon.awsapps.com/workdocs-beta/index.html#/document/2e3a64f7c067f0bb89205591ff6fe1ae221aa187042c08b0197e314703539d118

Steven Neuman
Senior UX Designer

🔷 Rio Design System

He / Him / His

---

**From:** "Muus, Katey" <kateymuu@amazon.com>
**Date:** Monday, April 19, 2021 at 12:56 PM
**To:** "Neuman, Steven" <neumansn@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Can you link me to it again? Apologies if I've missed it in this thread.

---

**From:** "Neuman, Steven" <neumansn@amazon.com>
**Date:** Monday, April 19, 2021 at 12:37 PM
**To:** "Muus, Katey" <kateymuu@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

We're thinking more pithy that the guidance doc we pulled together for the team? Maybe just a cut down version of that?

Steven Neuman
Senior UX Designer

🔷 Rio Design System

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100525

He / Him / His

**From:** "Muus, Katey" <kateymuu@amazon.com>
**Date:** Monday, April 19, 2021 at 12:06 PM
**To:** "Neuman, Steven" <neumansn@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Is there something snackable we can provide for the appendix in the doc that's going to Clark?

**From:** "Neuman, Steven" <neumansn@amazon.com>
**Date:** Monday, April 19, 2021 at 11:40 AM
**To:** "Magnusson, Nathan" <magnun@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Muus, Katey" <kateymuu@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Hi all,

Sorry for the delay. Just returning from vacation.

Nathan already provided the content guidelines, which largely covers the delta between what we proposed and they implemented. Our consultation work heavily relied on the close combination of interaction design, information architecture, and content to improve the experience. To Reid's point, the little tweaks here to the content have impact, and to Katey's point, it is really hard to discern exactly what was altered because they maintained the overall UI advice, but changed the content. I did a lot of toggling back and forth to see the differences.

We now have posted our design "best practices" to the new Rio Beta site — The guideline for color usage cohesion is in the Color foundation with regards to the use of an older, now-deprecated green hue. It's very likely they are using an AUI override. The guidelines that we relied upon for constructing the overall design can be found in our Interaction foundation.

There's still some bugs being worked out on the Rio site, but we can point folks to this long term, as it is going to be our single point of truth.

Steve

**Steven Neuman**
Senior UX Designer

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100526

**Rio Design System**

He / Him / His

**From:** "Magnusson, Nathan" <magnun@amazon.com>
**Date:** Wednesday, April 14, 2021 at 2:20 PM
**To:** "Ong (Design Tech), Tim" <timong@amazon.com>, "Muus, Katey" <kateymuu@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Neuman, Steven" <neumansn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Hi everyone – The guideline for focusing on customer goals and not inserting ourselves in in our voice article. It echoes the retail brand trait that reminds us to "focus on the customer and what we can help them to achieve, not on talking about ourselves."

**From:** "Ong (Design Tech), Tim" <timong@amazon.com>
**Date:** Wednesday, April 14, 2021 at 1:35 PM
**To:** "Muus, Katey" <kateymuu@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Neuman, Steven" <neumansn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Thanks Reid.

@Nathan, @Steven...do we have this "best practice" guidance documented anywhere yet? I know the workshops were focused on these specific Prime use-cases, but hoping we can generalize the guidance so that those who weren't in the workshops can understand what they should do in similar situations.

-to

**From:** Katey Muus <kateymuu@amazon.com>
**Date:** Wednesday, April 14, 2021 at 9:53 AM
**To:** "Nelson, Reid" <reidn@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, Nathan Magnusson <magnun@amazon.com>, Steven Neuman <neumansn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Thank you Reid, this is super helpful. I knew it was almost but not quite the same, and now I know why!

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100527

**From:** "Nelson, Reid" <reidn@amazon.com>
**Date:** Wednesday, April 14, 2021 at 9:49 AM
**To:** "Muus, Katey" <kateymuu@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Neuman, Steven" <neumansn@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

[+Nathan/Steven, retaining privilege]

The experiment screenshots Nikki shared are showing the *Free Trial* use case, which is what we focused on in our Rio consultation. The main issue with the mocks in the last Llew/Jamil review is that they were showing the *Hard Offer* use case, and the CTA treatments they provided were not meeting our bar (even you were tripped up by them, if you recall). Overall, I'm quite happy to see the Treatment they experimented with. It's a vast improvement the Control screenshot shown to the left of it.

That being said, there are some CX elements that are not completely in-line with the recommendations that came out of our 'best practices' workstream:

•    The heading language **'we're giving you'**. Nathan gave feedback to the team that this seems a little hand wavey and off-brand for us (while acknowledging that it is probably performant). Our recommendation was to focus the heading on the core order-specific benefit, e.g., "Get these items faster with Prime".

•    We were intentional about removing the **"Save $7.64 on delivery"** messaging shown in their experiment and control treatments. What they're doing there is showing a 'ship savings' based off the paid standard shipping default, which is confusing/misleading considering that customers can get slow free shipping without Prime. This is a known customer frustration, hence why we took that out of the Rio Mocks.

I believe this is the latest Rio PC mock we landed on through our work stream. Like I said, the experiment treatment they landed on is close and checks a lot of the boxes!

AMZN_00100528

**amazon.com**

SHOPPING & PAYMENT

# Get these items faster with Prime

**prime**

There's more to Prime

✓ Fast, FREE delivery (no more minimum orders)
✓ Award-winning movies and TV shows
✓ Ad-free music streaming




**To get these items by tomorrow, Feb 5 by 8 PM, start your free 30-day Prime trial.**

Cancel anytime. Auto-renews at $12.99/month.

Not now    Start 30-day FREE trial

By signing up, you agree to the Amazon Prime Terms and authorize us to charge your default payment method or another payment method on file. Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $12.99/month + any taxes, you may cancel any time by visiting Your Account. For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping Benefits page to check various shipping options.

Having difficulties? Please visit our Help page to learn more about placing an order

Conditions of Use | Privacy Notice © 1996-2020 Amazon.com, Inc.

---

**From:** "Muus, Katey" <kateymuu@amazon.com>
**Date:** Wednesday, April 14, 2021 at 9:27 AM
**To:** "Ong (Design Tech), Tim" <timong@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** FW: Shopper frustration examples (Privileged & Confidential)

Reducing audience to my team, including legal for advice.

Tim and Reid, do you feel that the images below reflect the recommendations we made to the Prime team?

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100529

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Tuesday, April 13, 2021 at 11:22 PM
**To:** "Muus, Katey" <kateymuu@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>, "Hills, Benjamin" <bhills@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>
**Cc:** "Moeller, Caroline" <cmmoell@goodreads.com>
**Subject:** RE: Shopper frustration examples (Privileged & Confidential)

+Caroline.

Hi Katey, we are not reviewing a design deck. My team has recently tested the design recommendations provided by the Shopping Design — we are compiling data and will review you and the team. We will include screenshots of the test experience in the document ( below).



-Nikki

**From:** Muus, Katey <kateymuu@amazon.com>
**Sent:** Tuesday, April 13, 2021 4:50 PM
**To:** Baidwan, Nikki <nikbai@amazon.com>; Nelson, Reid <reidn@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Dunn, Maria <mpdunn@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Hi Nikki,

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100530

Is there a design deck being reviewed as part of the meeting? If so, I'd like to get early eyes on that as our teams worked closely on defining best practices and previous designs presented haven't reflected that workstream.

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Monday, April 12, 2021 at 9:52 PM
**To:** "Nelson, Reid" <reidn@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>, "Hills, Benjamin" <bhills@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>
**Cc:** "Muus, Katey" <kateymuu@amazon.com>
**Subject:** RE: Shopper frustration examples (Privileged & Confidential)

Hi Reid, Thank you – I emailed Ulrich as well, so hopefully between us, we will get the data we need. For the larger document, as you know, we have gone through multiple reviews with Llew, Jamil and Neil at this stage and are working on incorporating their feedback and direction into the document. As discussed previously, we are aiming to present a balanced view of the situation based on inputs from both teams and our options moving forward. We will share the most up to date version prior to the meeting.

Thanks,

Nikki

**From:** Nelson, Reid <reidn@amazon.com>
**Sent:** Monday, April 12, 2021 6:27 PM
**To:** Baidwan, Nikki <nikbai@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Dunn, Maria <mpdunn@amazon.com>
**Cc:** Muus, Katey <kateymuu@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Hi Nikki,

I just sent an email to Ulrich requesting that he share the excel files.

As per Mary Pat's reply below, there were additional content updates in the first 1.5 pages of the narrative section as well as Appendix C. Can you review these changes and let us know your thoughts?

Thanks,       **Highlighting in original;**
Reid            **not added by FTC**

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Monday, April 12, 2021 at 10:09 AM

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100531

To: "Nelson, Reid" <reidn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>, "Hills, Benjamin" <bhills@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>

Cc: "Muus, Katey" <kateymuu@amazon.com>
Subject: RE: Shopper frustration examples (Privileged & Confidential)

Hi Reid, we do have a table summarizing the impacts from these experiments in the document – do you have an Excel version of the table you can share as I see some metrics here that we did not have previously. Thanks,

Nikki

From: Nelson, Reid <reidn@amazon.com>
Sent: Friday, April 2, 2021 10:20 AM
To: Gotschall, Mary Pat <marypat@amazon.com>; Baidwan, Nikki <nikbai@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Dunn, Maria <mpdunn@amazon.com>
Cc: Muus, Katey <kateymuu@amazon.com>
Subject: Re: Shopper frustration examples (Privileged & Confidential)

--retaining privilege--

Hi Nikki and Ben,

In addition to the edits/suggestions Mary Pat shared (attached again for convenience), please also note that Ulrich updated the table from our UPDP weblab meta-analysis. It now includes CS impacts from the 2018 experiments, which were missing previously. The trends are similar to what we observed in the 2020 experiments. Note that we see the biggest improvements when we make meaningful changes to the opt in / opt out CTAs. Price prominence also had a large impact, though to a lesser degree than the CTAs. Attaching an updated version of the meta-analysis doc that includes these new figures.

Please chime in with your perspectives at your earliest convenience. Or if it would be helpful we can certainly meet to discuss over a call.

Thanks,
Reid

From: Mary Pat Gotschall <marypat@amazon.com>
Date: Wednesday, March 31, 2021 at 3:52 PM
To: "Baidwan, Nikki" <nikbai@amazon.com>, "Hills, Benjamin" <bhills@amazon.com>, "Dunn, Maria" <mpdunn@amazon.com>
Cc: "Muus, Katey" <kateymuu@amazon.com>, "Nelson, Reid" <reidn@amazon.com>
Subject: Re: Shopper frustration examples (Privileged & Confidential)

Hi Nikki and Ben –

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100532

Since the CWG meeting to review the Prime Account CX Satisfaction has been rescheduled, I'd love to <mark>revisit this conversation</mark>. Re-attaching the doc for your convenience.

Thanks,
Mary Pat

**From:** "Baldwan, Nikki" <nikbai@amazon.com>
**Date:** Friday, March 19, 2021 at 2:51 PM
**To:** "Gotschall, Mary Pat" <marypat@amazon.com>, "Hills, Benjamin" <bhills@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>
**Cc:** "Muus, Katey" <kateymuu@amazon.com>, Reid Nelson <reidn@amazon.com>
**Subject:** RE: Shopper frustration examples (Privileged & Confidential)

Hi Mary-Pat, we just heard from Jamil that the meeting next week is likely to be postponed. I don't know the reasons or when it will be moved to. Will update you as we know more.

Nikki

**From:** Gotschall, Mary Pat <marypat@amazon.com>
**Sent:** Friday, March 19, 2021 2:15 PM
**To:** Hills, Benjamin <bhills@amazon.com>; Dunn, Marla <mpdunn@amazon.com>; Baldwan, Nikki <nikbai@amazon.com>
**Cc:** Muus, Katey <kateymuu@amazon.com>; Nelson, Reid <reidn@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

Hi Ben and Nikki – following up to see if you had any questions or feedback on the updated language we provided last week on the Prime Account CX Satisfaction doc. I do feel strongly that it's important to include the following two points in the document 1) communicate the breadth of data sources around the customer problem and 2) help shine the light on the recent analysis that Ulrich did (hits on quantity but meaningful improvements on quality of sign-ups).

Would love to hear your perspective and hopefully align prior to the meeting next week.

Highlighting in original;
not added by FTC

Thanks,
Mary Pat

**From:** "Gotschall, Mary Pat" <marypat@amazon.com>
**Date:** Thursday, March 11, 2021 at 3:54 PM
**To:** "Hills, Benjamin" <bhills@amazon.com>, Reid Nelson <reidn@amazon.com>, "Dunn, Marla" <mpdunn@amazon.com>
**Cc:** "Baldwan, Nikki" <nikbai@amazon.com>, "Muus, Katey" <kateymuu@amazon.com>
**Subject:** Re: Shopper frustration examples (Privileged & Confidential)

<mark>Katey & Marla</mark>

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100533

Ex. A, Page 237 of 308

Hi Ben and Nikki

Chiming in on this thread. First off, thank you again for giving us the opportunity to participate in the authorship of this document. We're all excited to have this discussion with leadership.

Reid and I took a spin at some edits in a couple paragraphs in the first 1.5 pages of the doc. The goal here was to help us get aligned on how we are framing the customer data/insights, and also the learnings from Ulrich's recent meta analysis. As per ongoing feedback in this thread and others, 1) we believe the doc needs to demonstrate the breadth of data sources around this customer problem (e.g., it's more than simply UX research insights and the cancel survey), and 2) we wanted to highlight early in the doc that that although past clarity experiments have resulted in large hits to the "quantity" of members, the data are showing meaningful improvements in the "quality" of those who sign up. Based on the data, we don't agree with the current framing in the document that these experiments *"resulted in significant headwinds to the business in terms of signups and paid members without a direct measure that we have improved trust for members"*

We also went through Appendix C and streamlined it to make it more scannable -- e.g., removing the frustration ticket tables, and making the customer profile images a little smaller. At the same time, we removed one theme (around the confirmation CX), and added what we believe is a more impactful theme related to brand impact -- including an extract from a Jeffbi email. The Appendix has now been trimmed down to 2 pages, instead of 3.5 pages. We'd like to keep the length and content as is -- as we believe it is easily scannable while adding unique value and insight.

Track changes are on, along with some comments. While it may seem like a lot of "red", some of this is just minor editing and not major content changes. Please do take a look at the comments as well, and let us know your thoughts for those, as we think they are important questions.

Lastly, Shopping Design and GPX met today to review the mocks that we've been collaborating on. Some concerns were voiced about the Hard Offer C7 language, so would appreciate that your team review the mocks appendix with us before they go up to leadership (should we move forward with mocks in this doc at all).

Thanks,
Mary Pat

**Highlighting in original;
not added by FTC**

**From:** "Hills, Benjamin" <bhills@amazon.com>
**Date:** Wednesday, March 10, 2021 at 10:52 AM
**To:** Reid Nelson <reidn@amazon.com>
**Cc:** "Baidwan, Nikki" <nikbai@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** RE: Shopper frustration examples

My sense is they get it. They are super seasoned executives that understand subscriptions and marketing practices (more than most in the world), and how customers react to them. I also get the sense that they want to make sure we do have this discussion because they've (Dave C, Doug H) been asking Jamil for benchmarking, which is part of the reason we're having this meeting although the teams are aligned on how to move forward, so will be judgement. We've

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100534

---

---

captured the magnitude of the customer frustration, and the verbatim from the studies, I'm trying to think of what would be missing to which they won't get it. Perhaps (since Liew requested) you can ask Liew if there's something specific (and different) he'd suggest to add if it's not coming through.

**From:** Nelson, Reid
**Sent:** Wednesday, March 10, 2021 9:13 AM
**To:** Hills, Benjamin <bhills@amazon.com>
**Cc:** Baldwan, Nikki <nikkbai@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>
**Subject:** Re: Shopper frustration examples

It's a great question. Can you take a dig in the Quip I pulled together, and let me know if you think leaders are feeling that pain? Do we know if Dave Clark has seen these emails that were sent to Jeff, for example? The one I just transcribed at the top of the quip pretty eloquently describes the problem and the ickyness it creates for the customer. I don't know if Dave, Doug, etc are feeling that pain as I haven't been in a discussion with them about it.

I've only been in the room with one SVP when we talked about this topic (Russ). I was the notetaker, and sat there quietly observing. This was the tone of the room: Folks mostly seemed to agree with the descriptor 'clickbait', even if apprehensively. Russ chuckled at the phrase 'confirmshaming', because he likes puns. Neil seemed embarrassed by the CX. Cem was a bit defensive about it. Liew made the argument he's made in the past that customers probably just need two buttons. The general guidance from Russ was "Fix these transparency numbers, and still hit your numbers" (but as you know from discussions with myself, with Ulrich, and I'm sure in your own internal team discussions – it's going to be very hard to hit these numbers by taking away some of those anti-patterns).

One of the requests from Liew in our December review was that we ensure that the C-team feels the pain these non-Prime customers are feeling, as he doesn't believe they are experiencing it enough. He even suggested having them all shop as non-Prime for a month...

So I'll pass the question back to you. You all were in the meeting with Doug last December where the UPDP clarity launch decision was reversed. The document Caroline shared from that Doug review was a bit light on the "customer" (in fairness, it sounds like y'all had to pull it together pretty quickly). At any rate, I don't know if these folks are truly feeling the customer impact in the way we'd like them to. What are your thoughts having been in the room with some of them more recently?

**From:** "Hills, Benjamin" <bhills@amazon.com>
**Date:** Wednesday, March 10, 2021 at 8:57 AM
**To:** "Nelson, Reid" <reidn@amazon.com>
**Cc:** "Baldwan, Nikki" <nikkbai@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** RE: Shopper frustration examples

I guess, taking a step back, are we sure they don't feel the pain of those with pain (given the escalation they, themselves receive). I'm not sure we need to point out any more than we are that there are some upset customers. If there's something specific that you think will sway the decision from a judgement call that is imperative for them, happy to figure that out, else, It thinks it's pretty obvious (certainly for me, an Liew, Jamil, and Neil) that we have a big judgement call to make.

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100535

From: Nelson, Reid
Sent: Wednesday, March 10, 2021 8:33 AM
To: Hills, Benjamin <bhills@amazon.com>
Cc: Baldwan, Nikki <nikkbai@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>
Subject: Re: Shopper frustration examples

Hey Ben/Nikki,

Let me have a look at this and come back with something. I think we can make screenshots smaller, and maybe do some trimming on the quote length.

I did want to reach out about our other thread, on how we get leaders to feel the pain. There are other VOC channels outside of UX research that were represented in our original Jamil/JLew doc in December, which aren't being included in the CWG doc. E.g., The emails to JeffB, social media posts, anti-patterns blogs, app reviews, etc.

I took a swim through Heartbeat yesterday to focus on some keywords that would hone in on customers complaining about CX issues specifically (as opposed to general complaints about unknown charges). Please have a look at this Quip where I gathered examples. I'm wondering how we can help leaders understand that some customers are taking to more public avenues to complain about this stuff – and the general sentiment they're expressing ("you've lost a loyal customer", etc)? There's a brand impact here that is hard to capture in any quantitative weblab metric. This feels like an important input when we ask leaders if they're willing to tolerate status quo.

Keen to hear your thoughts on how to weave this in. Could we include an example or two, then provide a link to the quip for the fuller set, should they be interested in taking a look?

From: "Hills, Benjamin" <bhills@amazon.com>
Date: Wednesday, March 10, 2021 at 6:20 AM
To: "Nelson, Reid" <reidn@amazon.com>
Cc: "Baldwan, Nikki" <nikkbai@amazon.com>
Subject: Shopper frustration examples

Good morning Reid,

I took out the references to the tickets per JJews feedback, we're still at almost 2 pages. Per the request to simplify the appendix, can you trim to 1 page (presuming we keep the pictures, that'd be about 5). Let me know which 5 and I'll keep/put in.

Thanks,

Ben

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100536

## Appendix C: Shopper frustrations tagged to theme 'Prime Account CX Satisfaction

### Theme: Calls to Actions (CTAs)

CTAs provide customers with "critical path" buttons or links to move through and make key decisions in a subscription flow. Customers sometimes click on these buttons not reading or understanding their labels and/or have trouble discovering the CTA to opt out of a subscription.

"Honestly I'm indifferent to the 3 euro shipping cost. So, No...(clicks)...Oh wait I clicked the wrong one...(Sighs)...Usually the button that is marked in yellow is the one to continue without doing anything else. But in this case it was to continue AND make you Prime. And the 'No Thank You' was not highlighted. You should highlight both, because they're equally important. It's like I fell into a trap for stupid people, because I hadn't read it. I was just clicking it thinking it was the way to continue." - ▮ Madrid, 2016, **Video**

### Theme: Difficulty comprehending that this is a paid, auto-renewing subscription

Even when customers understand they're signing up for a subscription trial, not all are doing so with the understanding that these trials will automatically renew. This is because key details are presented in legal T&Cs, typically at the bottom of a page in small print. Customers, moving quickly, frequently overlook or ignore those T&Cs (or if they have

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100537

**Accessibility/zoom settings enabled, this information can show up outside of their viewport).**

"I didn't have any idea of what Prime was. I didn't read this well. I'm going through the order process, and then there's a surprise 500 pesos at the end of the month. Or something that I wasn't aware of, that I wasn't asking for. This small print really bothers me. It should be clearer in saying 'You are using the Prime Service, and if you don't cancel in a month, they'll charge you 500 pesos.' Not everyone is going to read this condition, that's the truth. They just say 'Yes, I want it, I accept, I accept, I accept'." [redacted] Mexico City, 2017, **Video**

**Theme: Issues related to confusing and/or misleading language in marketing content**

Customers are sometimes confused by phrases in Prime upsells like *"Why pay for shipping?"* or *"No thanks, I don't want free shipping"*. These can make customers incorrectly conclude that they must be Prime to get free shipping (when they can already get core free shipping as a non-Prime customer with a minimum order threshold).

"They keep telling me and telling me (to get Prime)! And this tiny link, 'No thanks, I don't want free shipping', Ayyy! (Rolls eyes)" [redacted] Mexico City, **Video**

**Theme: Issues with confirmation messages and emails**

Customers sometimes overlook or misinterpret subscription confirmations, like 'Welcome to Prime' messages in checkout, post-sign-up emails, etc.

"[Reading welcome e-mail after an unintentional sign up] So...'your 30-day trial'...'try Amazon benefits for 30 days'...'free delivery'...So I think you can get those benefits starting now, if you just subscribe now...(Moderator: Did you already sign up?)...No, I don't think so" [redacted] Toulouse, 2016, **Video** (starts at 53sec)

**Theme: Customers not feeling in control of their renewal**

Unwanted auto-renewals is a common frustration for any subscription service (not just Amazon subscriptions). Customers like to be in control over their decisions, and are frustrated when they don't receive proactive renewal reminders and/or when it's difficult to disable auto-renew. The fear of forgetting to cancel can sometimes lead prospective customers to avoid signing up to begin with.

"That's how Amazon links you in to their service, you know. You get a free 30 days. What happens? Most people forget the 30 days. I'm one of those people, if I don't write it down - it's forgotten. The 30 days passes, two months go by and you look at your credit card and you say 'What am I being charged for?' You call Amazon and they say 'oh you had the free 30 days and it expired 3 months ago. I ain't going to remember something 30 days from now.'" [redacted] Atlanta, 2017, **Video**

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100538

**Theme: Difficulty finding a way to undo or cancel a subscription**

Customers are frustrated when they cannot instantly "undo" an unwanted membership sign up within the context of that sign up. These customers must go through self-service cancellation, but this is sometimes difficult for them to find. For example, there is no path to self-service cancellation when customers click on "Prime" within the mobile hamburger menu. Customers must instead open Your Account > Manage Prime membership (or by searching for "Cancel Prime" in a product search). Once they find their way to the Manage Prime Membership page, the cancellation option is hidden behind a "Manage membership" drop down.

"Let's have a look under 'My Prime'...(Scrolling through benefits)...blah blah blah...(Scrolls to footer)...There it is, 'Manage my Membership'. You [Amazon] put that at the very bottom of the screen. That was already clear to me, you rascals...It's very time-consuming, you have to go all the way down first (to find the ingress)" - ▇▇▇▇ Munich, 2019, **Video** (starts at 2 min 0 sec)

**Theme: Difficulties finishing the cancellation workflow**

Customers are frustrated by the number of steps involved in cancellation, and the clarity of whether they've finished the process or not. We have observed some customers click "End membership", and then abandon the flow prematurely, not realizing there are additional steps to finalize the cancellation.



CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100539

"That's not great, that was misleading. You click on 'Cancel' and I assume it's cancelled. Then I must confirm it again and this ad appears again. Then you think it is cancelled and they offer to extend it." – Christian, Vienna, 2019, **Video**

**Theme: Frustration related to partial refunds**

Partial refunds are especially frustrating when the customer did not want a subscription to begin with.



"I already cancelled it. But it got cancelled with a charge that is weird. They say that they are going to refund me just a part of the money, but not all of it. They said that they were going to refund 10 dollars, and that's a little less, it's not the whole amount ($12.99 x 3). And that's just bad! Because…it's simply something that I didn't want." ██████ Santiago de Chile, 2018, **Video**

**Theme: Negative downstream impacts caused by subscription CX issues**

Unexpected sign ups / renewals can erode customer trust, making customers re-evaluate their relationship with Amazon. Frustration is exacerbated when customers go through multiple billing cycles before discovering there is a problem.

"So it's saying they are charging me $12.99/month for Prime. I didn't notice this (on my credit card bill) because it's such a small amount of money. If you didn't tell me about this (I would have never known). We're looking at an infringement from Amazon. I think it's serious because they charge you without letting you know….I'm disappointed. I would expect something different from Amazon." ██████ Santiago de Chile, 2018, **Video**

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00100540

# Attachment 29

EXHIBIT

NB9
1 / 18 / 23

| From: | Baidwan, Nikki [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NIKBAI6DB] |
| Sent: | 1/29/2021 12:34:22 PM |
| To: | Nelson, Reid [reidn@amazon.com]; Hills, Benjamin [bhills@amazon.com]; Gotschall, Mary Pat |
| | [marypat@amazon.com]; Tuladhar, Praju [tuladhar@amazon.com] |
| Subject: | RE: Privileged & Confidential: HDT on approach |
| Attachments: | SF inputs to Prime doc - Privileged and Confidential.docx |

Reid, Just read the doc ( attached here again). It is 2.5 pages that I cannot include as-is in the final doc. Are you able to summarize in an assertion around Customer pain points, impact with data and key contributing factors? I think those are the main points the doc hits on.

**From:** Nelson, Reid <reidn@amazon.com>
**Sent:** Friday, January 29, 2021 10:48 AM
**To:** Hills, Benjamin <bhills@amazon.com>; Baidwan, Nikki <nikbai@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Tuladhar, Praju <tuladhar@amazon.com>
**Subject:** Re: Privileged & Confidential: HDT on approach

I think the "Whys" are pretty well captured in the doc that Mary Pat sent over yesterday, so please have a look at that.

Prime was aligned on fixing these issues before the Doug review, so these are not new recommendations. I guess a question I have is does Prime still have the "110% commitment" and passion for fixing these issues that they have expressed in the past? I understand the Doug pressure put Neil and Jamil in a tough spot, but I'm assuming the team still has heartburn about this stuff? Or has the mental model actually changed and Prime is now OK with anti-patterns in their upsell CX?

Once there is a doc version that assimilates what we sent over yesterday, and that has a clear section for us to voice these desired "now vs. later" changes, we're happy to populate it.

**From:** "Hills, Benjamin" <bhills@amazon.com>
**Date:** Friday, January 29, 2021 at 10:42 AM
**To:** "Baidwan, Nikki" <nikbai@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Subject:** RE: Privileged & Confidential: HDT on approach

Jumping in as well, (thanks all for bringing this together).  And the why's behind the suggestions (any data would be useful).

Ben

**From:** Baidwan, Nikki
**Sent:** Friday, January 29, 2021 10:41 AM
**To:** Nelson, Reid <reidn@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Tuladhar, Praju <tuladhar@amazon.com>
**Subject:** RE: Privileged & Confidential: HDT on approach

Thanks Reid. Can you help write that out as your POV in the debate? We already have plans around cancel flow this year – are you aware and aligned on efforts there?

**From:** Nelson, Reid <reidn@amazon.com>
**Sent:** Friday, January 29, 2021 10:34 AM

**To:** Baidwan, Nikki <nikbai@amazon.com>; Gotschall, Mary Pat <marypat@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Tuladhar, Praju <tuladhar@amazon.com>
**Subject:** Re: Privileged & Confidential: HDT on approach

[+Ben to bring everyone up to speed]

Thanks for the clarification Nikki, appreciate the transparency that this is still in flux given the lack of a mitigation plan.

As to Shopping Design's perspective, this is what we're thinking for "fast" changes. We're not asking for every verbatim to be fixed immediately, rather the most critical trustbreaking anti-patterns:

• There needs to be two buttons

• The positive CTA needs to state what the person is signing up for (if we want to talk about "getting free one day shipping on this order", perhaps it could be in subtext under the button? Maybe that helps mitigate a bit?)

• No more button shadows under positive CTA

• The "No thanks" can't use misleading language, or put words in the customer's mouth. Important to remember that NPAs can get core free shipping without signing up for Prime.

• Similarly no more language like "Why pay X.XX for shipping?" or "Save X.XX on shipping", especially when customers are above CFS threshold.

• Price and auto-renew must be displayed on UPDP, and not only in fine-print legal text

• Cancellation needs to be simplified

• Auto-reminder followed by auto-cancel for X+ month inactives (e.g., follow the Netflix model...similar to Project Phoenix, but we actually notify the customer to give them a chance to keep their membership, before cancelling)

For further improvements that could come later (but hopefully not *much* later):

• Playing with button colors, not using yellow only for the positive CTA.

• A broader look at clarity updates in the holistic shopping journey. E.g., BBOP, Ship Option upsells should convey price and auto-renew in contextual subtext

• Easier subscription management, ability to turn off auto-renew as a toggle w/o going through cancellation.

• Auto-renewal reminders for everyone, at least for the initial trial.

---

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Friday, January 29, 2021 at 9:58 AM
**To:** Mary Pat Gotschall <marypat@amazon.com>, "Nelson, Reid" <reidn@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Subject:** RE: Privileged & Confidential: HDT on approach

Hi Mary Pat & Reid,

Thanks for sending the doc – have not read it yet. Will do and get back with questions.

On the HDT, I'm working on the appropriate way to word it. It's Scope & Speed of changes or as Sanjay put it "Do we change before we can measure or first get the right measurement of clarity and then make changes." What I am trying to convey below is that Prime believes we should at least update the positive CTA. We know it will have an impact and we do not have a plan to mitigate that impact. I need to think through and discuss within Prime if, in the absence of a mitigation plan, we should dial back our recommendation even more and recommend that we leave signup as is. Sorry this is not clearer yet.

I believe SD perspective is that we should make more changes and address all issues identified in customer verbatims with urgency. That's the input I am looking for from your team. I can talk around 4 PM today to discuss more. That will give me time to process the material you've already sent as well. Let me know if that works.

CONFIDENTIAL TREATMENT REQUESTED

Thanks,

Nikki

**From:** Gotschall, Mary Pat <marypat@amazon.com>
**Sent:** Thursday, January 28, 2021 4:36 PM
**To:** Nelson, Reid <reidn@amazon.com>; Baidwan, Nikki <nikbai@amazon.com>; Tuladhar, Praju <tuladhar@amazon.com>
**Subject:** Re: Privileged & Confidential: HDT on approach

Hi Nikki –
First, attached is the customer POV inputs for the doc. Let us know if you have questions or want to talk through what we included.

Second, do you have an updated HDT response? I don't see Prime's perspective or response to the "scope and speed" of the debate (other than not having a concrete plan)? And I'm assuming you'd like Shopping Designs POV on the scope and speed of the debate?

Thanks – happy to hop on a call if that is helpful!
Mary Pat

**From:** Reid Nelson <reidn@amazon.com>
**Date:** Thursday, January 28, 2021 at 11:01 AM
**To:** "Baidwan, Nikki" <nikbai@amazon.com>, "Gotschall, Mary Pat" <marypat@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Subject:** Re: Privileged & Confidential: HDT on approach

Additions/edits in-line to clarify some additional "key reasons" for confusion w/ the existing UPDP. These are all of equal importance. It's the sum of all of these that are leading to accidental or misinformed sign ups.

Would be a good idea if the screenshot in Appendix A included call outs to all of these problems. Will make it a lot easier for folks to understand the full breakdown of what all is broken in the present CX.

So if reading this correctly, are we suggesting that we should only make changes to the button text of the positive CTA? Are we suggesting to not update the negative CTA? Or are we saying that we need to do both? It's not totally clear.

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Thursday, January 28, 2021 at 12:30 AM
**To:** Mary Pat Gotschall <marypat@amazon.com>, "Tuladhar, Praju" <tuladhar@amazon.com>
**Cc:** "Nelson, Reid" <reidn@amazon.com>
**Subject:** Privileged & Confidential: HDT on approach

Adding Praju and requesting privilege
Thank you both. One other request is to provide your input on the HDT. Still working on my side but below is what I have so far so you can react to it. We do want to get input specifically on the UPDP CX, but if you have suggestions on how to frame this more broadly, please do send.

Prime and the Shopping Design team are debating the scope and speed of actions we should take to address our legacy experiences. The most debated experience is the current signup experience in checkout, including a full page interstitial (UPDP). The current UPDP CX is of concern due to the high likelihood that customers can sign up for Prime without realizing because i) customers click on the UPDP sign up button "Get FREE one-day delivery", not realizing this signs

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00080796

them up for a Prime membership, ii) customers click on the yellow sign up button without reading the label because yellow buttons are used as normal "continue" / "purchase" buttons elsewhere on Amazon, iii) customers fail to discover the "No thanks" option presented as a low prominence link rather than a button, iv) customers click the grey box under the sign up CTA incorrectly thinking this is a separate opt-out button, v) the "No thanks" option uses the misleading phrase "No thanks, I don't want FREE shipping", and vi) price and auto-renew details are shown exclusively in fine print legal text at the bottom of the page (Note: in the case of DE, these financial details are entirely absent from UPDP << *we'd need to confirm this is still true today, but this was the case in our 2019 DE study*). See Appendix A for screenshots. Prime's preference, in line with the strategy outlined above, is that we update our signup experiences to ensure positive CTAs are clear. Customers should understand they are signing up for Prime when clicking the positive CTA. From past experiments, we realize this improvement in clarity has a significant cost in terms of paid members. In Sep 2020, we introduced a set of clarity updates which included changing the decline option from a link to a No Thanks button, ensuring the price of Prime was visible outside the T&Cs, and ensuring the accept CTA included "Prime" or "Free Trial" (see Appendix A). These changes were estimated to have an annualized global impact of ▮▮▮▮▮▮ and were reversed in Dec 2020 (*From Reid: As per parallel thread, we should do the due diligence to provide customer impact metrics from the Sep 2020 clarity updates, not just paid impact*). Based on prior experiments[1], we believe the CTA changes are the primary driver of this impact and a positive CTA change alone may have an impact in the range of ▮▮ ▮▮▮▮▮▮▮▮ While we may be able to mitigate some of this impact, we do not yet have a concrete plan to address a headwind of this magnitude.

Thanks,

Nikki

**From:** Gotschall, Mary Pat <marypat@amazon.com>
**Sent:** Wednesday, January 27, 2021 5:17 PM
**To:** Baidwan, Nikki <nikbai@amazon.com>
**Cc:** Nelson, Reid <reidn@amazon.com>
**Subject:** Re: Follow-up

+ Reid

Thanks for the follow up Nikki. And yes, happy to contribute to the doc. We will plan to lift the content from the Dec doc on the customer problem/root causes and get to you by EOD tomorrow.

Thanks,
Mary Pat

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Wednesday, January 27, 2021 at 11:54 AM
**To:** "Gotschall, Mary Pat" <marypat@amazon.com>
**Subject:** RE: Follow-up

<<Katey to bcc>>

Hi Mary Pat, I'm working on redrafting the document for the CWG review and will be reaching out for inputs from your team. As a starting point, I want to reflect the customer POV as the first insight/assertion in the doc. Can your team provide the content for this assertion – feel free to include the right heading, commentary, anecdotes and I think an Appendix or separate document with compiled customer frustrations/anecdotes could be useful as well. I assume most of this content is available, so let me know if I can have it by EOD 1/28 – earlier would be great, of course.

**There is a consistent set of concerns emerging in customer anecdotes and research:** Customers report concerns with mistaken signups, not being notified about renewing memberships and difficulty cancelling. (Appendix with verbatim, customer frustration tickets etc)

Thanks,

Nikki

---

**From:** Muus, Katey <kateymuu@amazon.com>
**Sent:** Tuesday, January 26, 2021 4:36 PM
**To:** Baidwan, Nikki <nikbai@amazon.com>
**Subject:** Re: Follow-up

Hi Nikki,

Thank you, I am aligned with this approach. Mary Pat would be your best point of contact to provide content and POV from our team. I'm happy to listen if anyone needs to bounce ideas or thoughts.

-Katey

---

**From:** "Baidwan, Nikki" <nikbai@amazon.com>
**Date:** Tuesday, January 26, 2021 at 4:30 PM
**To:** "Muus, Katey" <kateymuu@amazon.com>
**Subject:** Follow-up

Hi Katey, I wanted to reach out directly on next steps for the CWG review document. Just had a quick debrief with Jamil and the broad feedback was that we need to have a crisp, clear POV on how Prime plans to handle the issue. We need to pick a position and articulate a clear mental model with supporting data. In this context, we can also call out clear areas where we have opposing data, input or POV.

So, if you're OK with it – I'd like to take a little time to re-write the document along the above lines and outline areas where we need your team's help. Also happy to include an FAQ or other format where you can disagree or present an alternate approach, if needed. If you have any content/thoughts already framed that you would like to share, please do so.

Hope this works and thanks for the time and effort your team has spent on this with us.

Thanks,

Nikki

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00080798

# Attachment 30



| Benjamin Langner | Mailing Address: |
|---|---|
| Senior Corporate Counsel | P.O. Box 81226 |
| Litigation & Regulatory | Seattle, WA 98108-1266 |
| Amazon.com, Inc. | Courier Delivery Address: |
| Direct Dial: 206-266-1842 | 2021 7th Avenue |
| Email: langnerb@amazon.com | Seattle, WA 98121 |

**CONFIDENTIAL TREATMENT REQUESTED**

January 5, 2023

<u>**Via Email**</u>

Jonathan Cohen
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

     Re:    <u>FTC Matter No. 2123050</u>

Dear Mr. Cohen:

    Amazon.com, Inc. ("Amazon") writes to respectfully request that pursuant to 16 C.F.R. § 2.11(d)(1)(i)-(ii), the Federal Trade Commission return, delete, or destroy the documents listed below. These documents contain material protected by Amazon's attorney-client privilege and were inadvertently produced.

- AMZN_00064610
- AMZN_00118740
- AMZN_00118757
- AMZN_00120240
- AMZN_00126647

    We also respectfully request that you return, delete, or destroy all existing data associated with the documents listed above, including any copies of the documents and associated data contained on the original production media provided to you, as well as any copies that may exist on internal databases or networks, including all associated metadata, extracted text, or native files, or any materials derived from or incorporating the protected information. After the clawed-back documents have been appropriately updated in your document review platform, we ask that you please ensure that your document review platform is re-indexed, if necessary, to account for any changes in searchable text. Finally, we respectfully request that you send us written confirmation once all inadvertently produced material has been returned, deleted, or destroyed.

**CONFIDENTIAL TREATMENT REQUESTED**

Accompanying this letter are replacement versions of these documents that omit protected information, along with appropriate metadata. Pursuant to 16 C.F.R. § 2.11(a)(1), included with this production is a supplemental log of the withheld information based on a claim of protected status, as that term is defined in § 2.7(a)(4). Amazon determined that the items identified on this log are entitled to protected status according to governing legal principles.

Amazon is also producing six previously withheld documents from the custodial files of Russell Grandinetti, Doug Herrington, and C.R. Brown that Amazon subsequently determined to be not privileged or partially privileged. For your convenience, below is a chart to identify the Bates numbers of existing slipsheets and the privilege log numbers of the withheld documents corresponding to the new privilege log numbers and Bates numbers.

| Slipsheet Bates Number | Original Log Number | Updated Log Number | Updated Bates Numbers |
|---|---|---|---|
| AMZN_00045677 | LOG02_000000240 | N/A | AMZN_00045677 – AMZN_00045677.0010 |
| AMZN_00045713 | LOG02_000000774 | N/A | AMZN_00045713 – AMZN_00045713.0014 |
| AMZN_00045876 | LOG02_000000022 | N/A | AMZN_00045876 – AMZN_00045876.0004 |
| AMZN_00045916 | LOG02_000000504 | N/A | AMZN_00045916 – AMZN_00045916.0001 |
| AMZN_00045917 | LOG02_000000505 | LOG12_000003237 | AMZN_00045917 – AMZN_00045917.0007 |
| N/A | LOG03_000002147 | LOG12_000003238 | AMZN_00148842 – AMZN_00148852 |

Sincerely,

*/s/*

Benjamin Langner
Senior Corporate Counsel, Litigation & Regulatory
Amazon.com, Inc.

2

# Attachment 31

| From: | Cole, Margaret |
|---|---|
| To: | receptionlo@cov.com |
| Subject: | FTC Deposition - to print |
| Date: | Friday, December 2, 2022 11:59:59 AM |
| Attachments: | May 6 meeting invite.pdf |

Attached – 3 copies, please.  Thank you!

Maggie

# Attachment 32

Page 1

1

2                        IN THE MATTER OF:

3                        AMAZON.COM, INC.

4

5

6                   FRIDAY, DECEMBER 2ND, 2022

7                     RUSSELL GRANDINETTI

8                          9:13 a.m.

9

10   Held at the offices of:

11                   COVINGTON & BURLING LLP

12                       22 BISHOPSGATE

13                          LONDON

14                         ENGLAND

15                        EC2N 4BQ

16

17

18   COURT REPORTER:  CHRIS LANG

19

20

21

22

23

24

25   JOB NO. 219931

Page 6

 1

 2                                    Friday, December 2, 2022

 3     (9:13 a.m.)

 4     MR. COHEN:  Let's go on the record.

 5            Good morning everyone, my name is Jonathan Cohen,

 6        I am an attorney with the Federal Trade Commission, and

 7        in the capacity of today's proceeding I am serving as

 8        the hearing official.  With me today is my colleague,

 9        Maggie Cole.  Before going further, if counsel for

10        Covington could introduce themselves.

11     MR. ANTHONY:  Stephen Anthony with the law firm of

12        Covington & Burling LLP on behalf of Mr. Grandinetti.

13     MR. GRAUBERT:  John Graubert, from Covington, for the

14        witness.

15     MS. WEINBERG:  Ingrid Weinberg from Covington, for the

16        witness.

17     MS. DANCE:  Caecilia Dance from Covington for the witness.

18     MR. COHEN:  And sir, if could you identify yourself for the

19        record, please.

20     THE WITNESS:  Sure.  Russell Grandinetti.

21     MR. COHEN:  Thank you.

22            So before we move on to a couple of things that the

23        reporter will address, I do want to confirm, as I think

24        is important, that the Commission will comply with all

25        applicable rules and applicable regulations under the

1              Russell Grandinetti

2      Commission's policies and procedures and applicable

3      orders and I want to confirm that counsel for Covington

4      will do the same.

5  MR. ANTHONY:  So stipulated.

6  THE COURT REPORTER:  Will counsel please stipulate that in

7      lieu of formally swearing in the witness, the reporter

8      will instead ask the witness to acknowledge that their

9      testimony will be true under the penalties of perjury in

10     the United States that counsel will not object to the

11     admissibility of the transcript based on proceeding in

12     this way and that the witness has verified that he is in

13     fact Russell Grandinetti?

14 MR. ANTHONY:  So stipulated for Mr. Grandinetti.

15 MR. COHEN:  Can we hear that from Mr. Grandinetti, as well.

16 THE WITNESS:  So stipulated.

17 THE COURT REPORTER:  Are you happy to proceed in that way?

18 MR. COHEN:  Yes.

19 THE COURT REPORTER:  Thank you.  Please proceed.

20 MR. COHEN:  Thank you, Mr. Reporter.

21                 RUSSELL GRANDINETTI

22 having acknowledged their testimony will be true under the

23 penalties of perjury testified as follows:

24 By Mr. Cohen:

25 Q.  Mr. Grandinetti, have you provided testimony before in

1                    Russell Grandinetti

2        contingent on the second, avoiding a reduction in sign

3        ups?

4    MR. ANTHONY:  Object to the form.

5    A.  I can think of conversations, for example, where we

6        might be talking about something like customer reviews,

7        and in our conversations as a team sometimes customer

8        reviews actually reduce purchases because they help

9        customers determine that a product isn't what they are

10       interested in.  And if we found that customer reviews

11       were reducing purchases when customers, because it helps

12       customers understand that they didn't want to buy item,

13       we would be glad that that happened.

14           Separately in the same conversation we might also be

15       talking about ways to improve the presentation of

16       reviews that could help customers increase purchases in

17       total.

18   Q.  Mr. Grandinetti, that is not really responsive, because

19       I am talking about enrollment and sign ups.  So my

20       question is, is there a particular conversation that you

21       can identify for me, or a particular instruction or

22       memo, any communication to anyone in which you gave

23       someone the instruction to try to reduce confusion

24       associated with enrollment without making that

25       instruction contingent on no reduction in sign ups?

1              Russell Grandinetti

2    MR. ANTHONY:  Objection.  The question is argumentative.

3        Are you asking him to identify documents in

4        a deposition?  I object to the form.

5            You may answer.

6    A.  I don't recall.

7    Q.  Let's mark as 82, and 82 --

8        (Exhibit RG 6              marked for identification)

9    MS. COLE:  6.

10   Q.  Sorry, 6, let's mark as exhibit 6 a document that has

11       a couple of Bates numbers on it.  One of which is

12       Amazon-FTC-CID_09246136, and I will represent to you,

13       Mr. Grandinetti, that we believe you saw this document.

14       Before you look through the whole thing what I am going

15       to do is I am going to ask you to look only at the

16       title, and then subsequently only at the purpose and

17       background section.  And what I am asking you to do is

18       confirm to me that I am correct that you have in fact

19       seen this document before.  Do my instructions make

20       sense, Mr. Grandinetti?

21   A.  I think so.

22   Q.  Okay.  So I am handing it to you, Mr. Grandinetti, and

23       handing a copy to your counsel, and again I want you to

24       first look just at the top, which reads

25

```
 1              Russell Grandinetti
 2       ████████████" and I only want you to read lines,
 3       let's say 1 through 4, that says "███████████
 4       ████████" and confirm for me that this is a document,
 5       even if you don't remember every little bit, that you
 6       have seen.  I will also note that this document has some
 7       redactions in it, Mr. Grandinetti.  Those have been done
 8       by counsel, not the FTC.
 9   A.  You want me to read through line 4?
10   Q.  Read through line 4.  I just want to make sure that you
11       have seen this document before.
12   A.  I am not sure, based on reading those four lines.
13   Q.  Why don't you go a little further down.  I don't want
14       you to go beyond, let's say the end of the first
15       paragraph.
16           And again I am not looking for a perfect
17       recollection of the document, just confirmation that you
18       have seen it before?
19   A.  Again, even by reading that I cannot confirm that I have
20       read that document.
21   Q.  Okay, let's flip it over and set that aside.
22   A.  Can I finish reading the whole of the first paragraph.
23   Q.  I'll let you do the whole first paragraph.  I want you
24       to, because I will represent to you that we think you
25       have seen this document.
```

Page 220

1           Russell Grandinetti

2   A.  Okay.

3   Q.  If you don't know, if you haven't seen it, you haven't

4       seen it and if you are not sure, you are not sure.

5   A.  Okay.

6   Q.  Do you --

7   A.  I am still unsure.  It is possible, but --

8   Q.  It is possible but you are not sure.  Let me see if

9       I can -- let's flip it over for now and let me see if

10      I can refresh your recollection a little bit.

11  MR. ANTHONY:  He means flip it over and put it aside.

12      (Exhibit RG 7           marked for identification)

13  Q.  Yes, put it aside.  Let's see if I can refresh your

14      recollection a little bit as to whether you have seen

15      this document.  Let's mark as exhibit 7.  I am giving

16      a copy to the witness and I will give a copy momentarily

17      to counsel.  This is a Chime chat.  Exhibit 7 is

18      00126484 it is a chat in which you participated,

19      Mr. Grandinetti, and lots of other people participated

20      and there is a document that is attached called "Prime

21      headwinds update".  And I have some questions about this

22      document.  You are copied on this chat and received the

23      Prime headwinds update, correct?

24  A.  Again I don't recall the meeting specifically.  It seems

25      possible.

```
 1                  Russell Grandinetti

 2   Q.  I think you may have told me this already.  You are

 3       a member of the C team, correct?

 4   A.  The consumer leadership team?  Yes, apologies, sometimes

 5       it is also abbreviated as CLT, or CT.

 6   Q.  Okay, thank you.  Let me direct you to the Bates number

 7       126492.

 8   MR. ANTHONY:  Counsel I am going to make an objection for

 9       the record.  I believe that we logged a version of this

10       document in our privilege log and so we are not waiving

11       any privilege claim over this document.

12   MR. COHEN:  We stipulate that the fact that you permit me to

13       question Mr. Grandinetti about this does not constitute

14       a waiver of any rights you may have to claw back or

15       otherwise, any other rights that you may have associated

16       with this document.

17   MR. ANTHONY:  I appreciate that stipulation, and depending

18       on the questions that you ask the witness, I will

19       address privilege issues should they arise.

20   By Mr. Cohen:

21   Q.  Just so we don't get too far off track, you were telling

22       me that sometimes the CLT team is abbreviated as the

23       C team, and you are a member of that team, correct?

24   A.  Yes.

25   Q.  And you were a member of that team on May 6?
```

1              Russell Grandinetti

2         "CX satisfaction upsell originates [skipping the

3         parenthetical] from a Prime account CX satisfaction

4         document C team reviewed on May 6."

5         Did I read that part correctly, Mr. Grandinetti?

6    A.  I think so.

7    Q.  And your interpretation, is it not, it is your

8         interpretation, is it not, that that is a reference to

9         a C team review that occurred on May 6, 2021?

10   A.  If I read this, that would be my guess.

11   Q.  Did you attend a C team review of any sort on May 6,

12        2021?

13   A.  I do not recall.

14   Q.  Did you attend a C team review at any point in May 2021?

15   A.  I don't recall.

16   Q.  Did you attend any meetings in May 2021 at which issues

17        related to the Prime checkout enrollment flow were

18        discussed?

19   A.  I don't recall having done so.

20   Q.  Let me direct to you line 207.  Same page.

21        "CX satisfaction cancel [there is a parenthetical]

22        also originates from the Prime account CX satisfaction

23        document C-team reviewed on May 6".

24        Did I read that part correctly?

25   A.  I think so.

1                    Russell Grandinetti

2    Q.   And does this refresh your recollection, do you recall,

3         as to whether you attended a meeting on May 6, 2021 with

4         the C team?

5    A.   I don't recall having done so.

6    Q.   Did you attend any meetings with the C team in 2021 at

7         which any issue related to the Prime cancellation flow

8         was discussed?

9    A.   In the whole year?

10   Q.   In the whole year.

11   A.   I can't recall meeting specifically on cancellation

12        flow.

13   Q.   Can you recall any meetings at which the cancellation

14        flow was discussed?

15   A.   It is possible, but I am not sure.

16   Q.   Can you recall any C team meetings in 2021 in which the

17        enrollment flow, the Prime checkout enrollment flow was

18        discussed, even if it was not the only topic that was

19        discussed at the meeting?

20   A.   It is a topic that might normally be discussed in

21        overall Prime reviews, like even for kind of the overall

22        Prime program updates, like annual plan reviews, which

23        would be normal for me to attend.

24   Q.   And you attend C team meetings as a matter of course, or

25        at least you did in 2021, correct?

1                    Russell Grandinetti

2   A.  Sometimes.

3   Q.  Could you look back at your calendar and ascertain

4       whether you attended the meeting on May 6, 2021?

5   A.  I don't know if that's possible, but if it is I suppose

6       I could.

7   Q.  Do you have your phone with you today?

8   A.  I don't.

9   Q.  Do you typically travel places without your phone?

10  A.  Err, I knew today would be, would require a lot of

11      focus, and so I elected to leave my phone in my office.

12  Q.  Was that the sole reason why you elected to leave your

13      phone in your office?

14  A.  Yes.

15  Q.  Other days that require a lot of focus you leave your

16      phone in your office?

17  A.  I often work from home.

18  Q.  When was the last time you went anywhere for a whole day

19      without your phone?

20  A.  I am not sure.

21  Q.  Let's turn to -- I will back up for a moment.

22          Can you access your Amazon calendar through any

23      means other than through your personal phone?

24  A.  Through my laptop as well.

25  Q.  Can you do it from another laptop, a public laptop?

```
 1              Russell Grandinetti
 2     review", correct?
 3  A.  Yes it does.
 4  Q.  Who is Mr. Curran?  If I am saying that correctly?
 5  A.  John Curran was my finance partner.
 6  Q.  What is one's finance partner at Amazon?
 7  A.  He is the person that is part of the finance
 8      organization that I would work with in the wide variety
 9      of things related to tracking the business.
10  Q.  You do not identify your email as privileged and
11      confidential, did you?
12  A.  It doesn't appear so.
13  Q.  Why not?
14  MR. ANTHONY:  Object to form.
15  A.  I don't remember what I was thinking when I wrote it.
16  Q.  It is not a request for legal advice, is it?
17  A.  My email is not.
18  Q.  Mr. Ghani sends his response back to you as marked
19      privileged and confidential and he adds Praju Tuladhar
20      for his counsel, correct?
21  A.  I am sorry, could you just repeat the question, please.
22  Q.  In Mr. Ghani's response to you.
23  A.  Yes, sir.
24  Q.  He responds to you and marks the thread as P&C.  That's
25      the first few words, the first four words, and then adds
```

1              Russell Grandinetti

2     Praju Tuladhar for his counsel, correct?

3  A.  It appears so, yes.

4  Q.  Your interpretation of his, Mr. Ghani's response was

5     that he was responding to your inquiry, correct?

6  MR. ANTHONY:  Object to the form.

7  A.  It seems like he is responding to me.

8  Q.  Is he responding to anyone else?

9  A.  Well, there are other people on the "to" line.

10 Q.  So he is responding to, I understand literally --

11 A.  Apologies, not to be argumentative, he addresses it "hi

12    Russ" so he is certainly addressing it to me.

13 Q.  That is what I was about to add.  He is addressing you.

14    So you interpreted the paragraph that begins with

15    "we" and then "just let me know how you'd like to" well,

16    you interpreted the paragraph that begins with "we" as

17    something he was addressing to you?

18 MR. ANTHONY:  Objection to form.

19 A.  Not necessarily.

20 Q.  Well, he doesn't say "hi Russ".

21 A.  It includes me, but the "we" here to me could also

22    include other people that are on this email and/or

23    possibly referring to his team, or -- it is hard for me

24    to know what he meant.

25 Q.  Why don't you read that paragraph and see whether that

```
 1                    Russell Grandinetti

 2        refreshes your recollection regarding what he meant.

 3   MR. ANTHONY:  I object to the form of the question.

 4   A.  Okay.

 5   Q.  Okay.  So the "we", and I think this is the point that

 6        you may have been at least implying a moment ago, the

 7        "we" you understood that to be Mr. Ghani and

 8        Mr. Lindsay, correct?

 9   MR. ANTHONY:  Object to the form.

10   A.  I would have just read the "we" as some form of the

11        Prime team.

12   Q.  The Prime team.

13   A.  It could include Neil, but perhaps other people as well.

14   Q.  Okay.  But it is the Prime team and then you and John,

15        which is later in the first sentence, you interpreted

16        "you" as Russ, right?

17   A.  Yes, yes.

18   Q.  And you interpreted "John" as Mr. Curran?

19   A.  Yes.

20   Q.  But you didn't interpret any of this as addressed to

21        Mr. Tuladhar, did you?

22   MR. ANTHONY:  Objection.

23   A.  I disagree with that.

24   Q.  Okay.  Explain which portions you interpreted as

25        directed to Mr. Tuladhar.
```

1                    Russell Grandinetti

2  A.  I interpret this as a response to my email, and in this

3      context I interpret that as if Mr. Tuladhar has

4      additional thoughts he should add them.

5  Q.  Did Mr. Tuladhar add additional thoughts?

6  A.  I can't remember.

7  Q.  Is there something specific that you understood

8      Mr. Ghani to be requesting Mr. Tuladhar to analyze?

9  MR. ANTHONY:  Objection to the form.

10 A.  It is not uncommon for communication like this to

11     include or add counsel in case counsel has advice to

12     offer the group that's having the conversation.

13 Q.  When you say in case counsel might have thoughts, that

14     would be the secondary purpose of the communication,

15     correct?

16 MR. ANTHONY:  Objection.  Foundation.

17 A.  I considered it inclusive in the conversation or the

18     communication that Jamil is trying to send.

19 Q.  What do you mean by inclusive in your response?

20 A.  That he is welcoming Mr. Tuladhar to add something if he

21     feels it relevant.

22 Q.  Is he requesting that Mr. Tuladhar do so?

23 MR. ANTHONY:  Objection.  Foundation.  Speculation.

24 A.  I believe he is doing it implicitly.

25 Q.  Your understanding of this, and I think we are almost

                          Russell Grandinetti

1

2      finished here, but your understanding of this is when

3      Mr. Ghani added this exchange, added Mr. Tuladhar to

4      this exchange that began "hi Russ" and so forth, he was

5      implicitly asking for Mr. Tuladhar to provide any advice

6      that he saw fit?

7  MR. ANTHONY:  Objection.

8  A.  Yes.

9  Q.  But he is not specifying the subject of the advice that

10     he would like Mr. Tuladhar to provide, correct?

11 MR. ANTHONY:  Objection.

12 A.  I can't see any such specification.

13 Q.  And he is inviting Mr. Tuladhar, your understanding was

14     that he is inviting Mr. Tuladhar to provide advice but

15     he is not directing him to do so, correct?

16 MR. ANTHONY:  Objection.

17 A.  It is hard for me to speculate.

18 Q.  Well, was your understanding that Mr. Tuladhar was

19     required to provide advice in response to this email?

20 A.  No.

21 MR. ANTHONY:  Objection.

22 Q.  Let's set this aside.

23     More broadly, has anyone ever told you to mark

24     a document privileged without regard to whether it

25     contained a reflected -- whether it contained legal

Page 252

```
 1                    Russell Grandinetti
 2       them.
 3   Q.  So in situations where there is no request for counsel,
 4       those are circumstances in which the sender of the
 5       communication doesn't think that counsel's input would
 6       be relevant?
 7   MR. ANTHONY:  Objection.  Mischaracterizes testimony.
 8   A.  That's a different case that you ask about.
 9   Q.  Well, I am trying to understand the circumstances under
10       which things are labeled privileged, and so you were
11       told if you are asking for advice, or seeking input,
12       right?
13   MR. ANTHONY:  Objection.  The testimony speaks for itself.
14   A.  If relevant.
15   Q.  If relevant.  If the advice is relevant to the subject
16       that is being discussed?
17   MR. ANTHONY:  Objection.
18   A.  No, what I intend is if the counsel, in viewing the
19       communication, thinks that there is an issue relevant
20       for them to offer advice on they are welcome to add it.
21   Q.  I understand, I think, better, thank you.  So if
22       relevant is from the counsel's perspective?
23   A.  Yes.
24   Q.  Okay.  But it is not a direction to provide advice, it
25       is an inquiry to the attorney as to whether advice might
```

Page 253

1            Russell Grandinetti

2       be relevant?

3   MR. ANTHONY:  Object to the form.

4   A.  It is an interest in getting advice if the attorney

5       deems it relevant.

6   Q.  Have you ever labeled something "seeking counsel" or

7       "for counsel", similar to what we just saw on exhibit 9?

8   A.  Yes.

9   Q.  Have attorneys typically responded to those requests?

10  MR. ANTHONY:  Object to the form.

11  A.  Sometimes yes.  Many times no.

12  Q.  Who provided you, and I am looking for a name here if

13      you can give me one, who provided you with a framework

14      for identifying things as privileged that you have

15      explained to me?

16  A.  I can't remember.  I can't remember.

17  Q.  Can you remember, do you know whether it was an attorney

18      or a non-attorney?

19  MR. ANTHONY:  Objection.  Foundation.  I would instruct the

20      witness not to disclose the substance of any

21      communications with counsel.  If you can answer the

22      question, you may do so.

23  Q.  And my question is just does the advice come from

24      an attorney or not an attorney?

25  A.  My recollection is, having learned about this topic many

Page 254

1                    Russell Grandinetti

2        years ago from an attorney or from counsel inside the

3        company.

4    Q.  And are you familiar with the concept of ASINization?

5    A.  I am familiar with the word.

6    Q.  What does the word mean?

7    A.  I think the word has some technical definitions that

8        I may not fully be familiar with, or fully aware of the

9        implications of it.  My simple understanding is that

10       treating something like an item in the store.

11   Q.  Are you familiar with efforts made in the United States

12       to use ASINization as a means to try to reduce the

13       number of reported mistaken sign ups.

14   A.  I am not sure.

15   Q.  Just to wrap this up, you are not able to provide any

16       testimony about those efforts one way or the other?

17   A.  I don't remember being involved in any conversations

18       where those two things were so directly connected.

19   Q.  Well, are you familiar with efforts to use ASINization

20       to try to reduce confusion amongst consumers as to

21       whether they had enrolled in Prime?

22   A.  I don't remember.

23   Q.  So you can't provide any testimony about those efforts?

24   A.  I cannot.

25   Q.  ASINization has occurred in Germany, hasn't it?

```
 1                    Russell Grandinetti

 2      received the instruction to preserve materials?

 3  A.  Since that time post Covid I have been working almost

 4      always at home and I do everything virtually on my

 5      computer.

 6  Q.  So there would be no notes on handwritten materials post

 7      Covid?

 8  A.  No.

 9  Q.  Or highlighting?

10  A.  No, not on documents.

11  MR. COHEN:  Let's go off the record.

12  (6:23 p.m.)

13                          (break taken.)

14  (6:25 p.m.)

15  MR. COHEN:  Back on the record.  So the FTC, the Commission

16      is holding this investigational hearing open.

17      Covington & Burling on behalf of Mr. Grandinetti has

18      objected to that, and that objection is noted on the

19      record.  Additionally, Covington & Burling on behalf of

20      Mr. Grandinetti has requested a copy of the transcript

21      of this investigational hearing.  We have declined that

22      request at this time, and Covington & Burling on behalf

23      of Mr. Grandinetti has objected to that decision.  That

24      objection is preserved, as is their observation to

25      holding the investigational hearing open.
```

```
 1                    Russell Grandinetti

 2          Finally, with respect to copies of exhibits, the

 3      commission is permitting Mr. Grandinetti's counsel to

 4      take those exhibits with them, subject to

 5      Mr. Grandinetti's agreement that he will not use the

 6      fact that we have permitted Mr. Grandinetti to remove

 7      those exhibits against us or to our prejudice with

 8      respect to any future arguments related to

 9      Mr. Grandinetti's asserted entitlement to the

10      transcript.

11          How did I do?

12   MR. ANTHONY:  Nothing to add.

13   MR. COHEN:  Let's go off the record.

14   (6:26 p.m.)

15       (Whereupon, the deposition concluded at 6:26 p.m.)

16

17

18

19

20

21

22

23

24

25
```

```
                                                           Page 280
 1                   Russell Grandinetti

 2                CERTIFICATE OF REPORTER

 3          I, CHRIS LANG, the officer before whom the

 4     foregoing deposition was taken, do hereby certify that the

 5     foregoing transcript is a true and correct record of the

 6     testimony given; that said testimony was taken by me and

 7     thereafter reduced to typewriting under my direction; and

 8     that I am neither counsel for, related to, nor employed by

 9     any of the parties to this case and have no interest,

10     financial or otherwise, in its outcome.

11     Dated: December 14, 2022

12

13                    Chris Lang

14                 _____
                       Chris Lang
15

16

17

18

19

20

21

22

23

24

25
```

# Attachment 33

```
 1                    FEDERAL TRADE COMMISSION
 2
 3  In the Matter of:              )
 4  AMAZON.COM, INC.               )  No. 2123050
 5  -------------------------------)
 6
 7                      August 23, 2022
 8
 9                  Investigational Hearing
10                   MASUMA WALJI HENRY
11
12                  Federal Trade Commission
13              Henry M. Jackson Federal Building
14               915 Second Avenue, Suite 2896
15                   Seattle, Washington
16
17
18
19
20
21
22
23
24  REPORTED BY:  Wade J. Johnson, RPR
25               CCR No.:  2574
```

135

Henry

Amazon.com, Inc.                                              8/23/2022

1          Q.   That's helpful.

2          A.   Yeah.

3          Q.   You said that there are indicators here -- and I

4    know we spoke about this before --

5          A.   Yeah.

6          Q.   -- but just to make sure I understand.

7          A.   Sure.

8          Q.   I appreciate it.

9               So you said that there are indicators here that

10   demonstrate to you that this is a more normal document.  Is

11   that right?

12         A.   Yes.

13         Q.   And one of them was font, I think I just heard,

14   right?

15         A.   Mm-hmm.

16         Q.   So what about the font tells you that?

17         A.   There are rules of using like a non-serif -- this

18   is non-serif font, right?  So you have to use non-serif font.

19   It has to be at least a certain font size.  And this

20   generally pass -- I don't know what font size this is, but

21   it's not super small.

22         Q.   Would you say it approximates maybe Font Size 12?

23   Is that a fair statement, or would it be smaller?

24         A.   I think it's ten.

25         Q.   Okay, font Size 10.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

136

Henry

Amazon.com, Inc.                                     8/23/2022

1       A.   Yeah.   The template has all this stuff in it.   And,

2  also, you have to have the margin numbers, the row numbers

3  and the margins.   You also have to have the page numbers.

4  There's a special way to format the footnotes.

5            And so another kind of thing that appears in the

6  template, all the tables and appendixes are properly labeled.

7  The appendix can be as long as you want it, which is the

8  cheat to get away from the six pages, but there's a good

9  chance no one will read the appendix.   Many VPs have a rule

10  that they don't read the appendix.   They just rip it off

11  because they know what people are doing.   But any design

12  documents, you need pictures, right?   So --

13       Q.   So the word "update," the font size around

14  Point 10, the non-serif font, the numbers running down the

15  lines on the left-hand side, the page numbers, the formatting

16  of the footnote, the formatting of the appendices, all sort

17  of taken collectively, indicate to you that this is a more

18  formal document that would have had vice president review?

19       A.   Yes.   And the fact that it says, "Privileged and

20  confidential," which I'm not actually sure --

21       Q.   And is that because privileged and confidential was

22  included in every template of the standard documents that

23  were circulated to individuals of a certain level at Amazon?

24       A.   Yes.

25       Q.   And what level was that?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

137

Henry

Amazon.com, Inc.                                      8/23/2022

1       A.   You, typically, only use the template when it's to
2   a VP meeting, VP or higher meeting.   And the templates has
3   the privileged and confidential in it, as it does the margin
4   rows and all that other stuff.
5       Q.   And so you're pointing to the privileged and
6   confidential stamp at the bottom, left corner of the
7   memorandum here?
8       A.   Yes.
9       Q.   So that would have been included in a general
10  template, along with everything else you've just described,
11  as a general practice at Amazon --
12      A.   Yes.
13      Q.   -- of documents of this type?
14      A.   Yes.
15      Q.   Regardless of the content?
16      A.   Yes.   The general advice, I remember given to me
17  early -- I don't remember if it was Jeff or from Sharon, both
18  were my bosses.   But anything that's going up to that level
19  marked privileged and confidential so that it's protected.
20  I'm not sure it actually protects anything, but that's what
21  we were told do.   So even emails to VPs, often we marked
22  them.
23      Q.   And so you mentioned you were told that by two
24  nonlawyers, one of whom was Sharon Chiarella?
25      A.   Yeah.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

138

Henry

Amazon.com, Inc.                                                    8/23/2022

1       Q.   And who was the other?

2       A.   Jeff Gelfuso, my boss when I first started.

3       Q.   And, again, that was without regard to specific

4    content, simply things being elevated to be marked as

5    privileged and confidential?

6       A.   Yes.

7       Q.   One other item about this document is that it is

8    six pages.  Is that also an indicator of formality --

9       A.   Yes, absolutely.

10       Q.   -- as a general practice at Amazon?

11       A.   Yes.  A document can be no longer.  They are

12    actually called six-pagers, and they're not more than six

13    pages.  Yeah, people have very, very careful about that.

14       Q.   Got it.  So another telltale sign is that it cuts

15    off at six, and then you can have an appendix that is as long

16    as you want, but the front pages have to be six or less?

17       A.   Yes.  And the risk is people may not read the

18    appendix.  So that's the risk of doing that cheat.

19       Q.   Fair.

20            Looking back at the meeting invite that we looked

21    at earlier.

22       A.   This one?

23       Q.   The one before that.

24       A.   This one?

25       Q.   Yes.  MH-4.  Thank you.

# Attachment 34

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:                  )

 4   AMAZON.COM, INC.                   ) File No. 2123050

 5   ----------------------------------  )

 6                            Tuesday, December 20, 2022

 7

 8                            Suite 2896

 9                            Federal Trade Commission

10                            Henry M. Jackson Federal Building

11                            915 Second Avenue

12                            Seattle, Washington 98174

13

14                             VOLUME I

15

16        The above-entitled matter came on for

     investigational hearing, pursuant to civil

17
     investigative demand, at 8:28 a.m.

18

19

20

21

22

23

24

25
```

Mehta

Amazon.com, Inc.                                    12/20/2022

1   counterfeit and product authenticity and safety areas from a

2   policy perspective.  I can't remember exactly when he left the

3   policy team and moved over to the business side, so he may

4   have still been on the policy team at this time.

5       Q.  As you did with the 2019 testimony, did you do a mock

6   or a practice or something akin to that?

7           MR. ANTHONY:  Objection; scope.

8           Also, further, I'm sure Mr. Cohen is not asking you to

9   disclose attorney communications, but you should not disclose

10  any attorney communications.

11          THE WITNESS:  Yes, we did do a practice hearing.

12      Q.  (By Mr. Cohen)  I'm not sure if you know this, but

13  I'll just ask this anyway.

14          Do you happen to know off the top whether either

15  Mr. Diznoff or Ms. Lister is a registered lobbyist?

16          THE WITNESS:  I don't know.

17          MR. ANTHONY:  Objection; scope.

18          THE WITNESS:  I don't know.

19      Q.  (By Mr. Cohen)  Do you know whether they work

20  exclusively at Amazon?

21          MR. ANTHONY:  Objection; scope.

22          THE WITNESS:  I don't know.

23          MR. ANTHONY:  Mr. Cohen, how does that relate in any

24  way to the Civil Investigative Demand, DM 1?  Could you answer

25  that for me?

Mehta

Amazon.com, Inc.                                            12/20/2022

1            MR. COHEN:  Let's mark as --

2            MR. ANTHONY:  So you've ignored my question.

3            MR. COHEN:  No, I'm going to demonstrate it to you

4       through this document.

5            Let's mark as Mehta 9 a copy of a document Bates

6       No. Amazon-FTC-CID_04911365.

7            (Exhibit Number 9 was marked for identification.)

8       Q.   (By Mr. Cohen)  This is an e-mail with an

9       attachment from Mr. Diznoff to Mr. Mehta and Ms. Lister that

10      follows an e-mail from Mr. Mehta to Mr. Diznoff and

11      Ms. Lister.  Both of those exchanges took place on March 3rd,

12      2020.

13           First, Mr. Mehta --

14           MR. ANTHONY:  Before you ask a question, I'd like to

15      take a break and have discussion with the witness about

16      privilege matters, please.

17           MR. COHEN:  Okay.  Let's go off the record.

18           Before we go off the record, though, I'm going to ask,

19      as I know you will, Stephen, to limit your discussion to

20      issues related to privilege matters.  Thank you.

21           (Pause in proceedings from 11:30 a.m. to 11:42 a.m.)

22           MR. COHEN:  Let's go back on the record.

23           I understand from counsel that he's going to make an

24      objection and an instruction.

25           MR. ANTHONY:  So my objection is that these questions

111

Mehta

Amazon.com, Inc.                                                    12/20/2022

1      about these ███████████████████████████████

2      ████████████████  are not within the scope of the CID that's

3      Exhibit DM 1.  That is my objection.

4            My instruction to the witness is, in answering

5      questions on this topic, the witness must not disclose any

6      communications to or from counsel.

7            Proceed.

8            MR. COHEN:  Thank you.

9            Q.  (By Mr. Cohen)  Other than issues related to

10     privilege, did you discuss the substance of your testimony on

11     the last -- during the last break?

12           A.  No, I did not.

13           Q.  Other than with respect to issues related to

14     privilege, did you discuss the substance of prospective

15     testimony that you might provide during the last break?

16           A.  No.

17           Q.  A couple more questions about Ms. Lister and

18     Ms. [Sic] Diznoff.

19           Ms. Lister -- and I apologize if you said this

20     already, but what title did she hold, if you know?

21           A.  At this time, she would have been a director in U.S.

22     Public -- in the U.S. Public Policy team.

23           Q.  And she had a -- what did you understand her function

24     to be in a general way?

25           A.  Katharine, I think, had been at Amazon for a little

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

153
Mehta

Amazon.com, Inc.                                                    12/20/2022

1        A.  Yes.

2        Q.  Roughly speaking, how many people have you given such

3    an instruction to?

4        A.  There probably have been five or ten over the years.

5        Q.  What instruction did you give?

6        A.  I've given instruction both ways.  I've seen

7    discussions where a topic is, I believe, a privileged

8    discussion and is directly seeking legal advice but was not

9    marked as such, and I've told someone, I think you should -- I

10   think this is privileged, but you should go talk to your

11   lawyer or my lawyer and go understand for sure, and if so, fix

12   this.

13           And then I've given guidance the other way, where I

14   see discussions and I go, This is maybe highly confidential,

15   but it's not a privileged discussion and shouldn't be marked

16   as such.

17       Q.  So those were instances in which you saw subordinates

18   marking things privileged that from your perspective were not,

19   in fact, privileged?

20       A.  I've seen both ways.  People forgetting to mark things

21   privileged that should be, in my best assessment -- I'm not a

22   lawyer, but in my best assessment, I thought that should be

23   privileged, and places that something had been marked

24   privileged that I thought shouldn't be.  And in both cases, I

25   give kind of my advice and then point people to legal counsel

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

154

Mehta

Amazon.com, Inc.                                                    12/20/2022

1    to make the final determination.

2              MR. COHEN:  Lets go off the record.

3              (Pause in proceedings from 12:46 p.m. to 12:51 p.m.)

4              MR. COHEN:  We're back on the record.

5         So we are going to -- there's been some discussion

6    regarding some, at this point, relatively standard

7    stipulations with one additional piece of conversation or

8    notation for the record as well.

9              The FTC are going to hold open the -- this

10   investigational hearing.  Counsel for Mr. Mehta objects to

11   that, and we note that objection.

12             Counsel for Mr. Mehta has requested a copy of the

13   transcript of today's investigational hearing.  We've declined

14   to provide one for the time being.  And counsel for Mr. Mehta

15   objects to that, and that objection is noted and preserved.

16             Counsel for Mr. Mehta has requested a copy of the

17   exhibits that have been provided today.  We -- the FTC has

18   agreed to do so, subject to the fact that Mr. Mehta has agreed

19   that our providing those exhibits to him and his counsel will

20   not work to the FTC's prejudice in any way.

21             Then there's a fourth issue.  Mr. Anthony.

22             MR. ANTHONY:  Yes.  On behalf of Mr. Mehta, with

23   regard to Exhibit Mehta 9, we reserve the right to claw this

24   back if we determine that it is privileged and confidential,

25   and the fact that I allowed the witness to answer questions

155

Mehta

Amazon.com, Inc.                                              12/20/2022

```
 1    about it, as I understood, Mr. Cohen, you agree, does not
 2    diminish or waive our right to claw it back.
 3          MR. COHEN:  We did not -- and just to confirm, we did
 4    not -- it is not our position of the fact that you allowed
 5    Mr. Mehta to answer questions about it means that you no
 6    longer have an ability to claw it back.  And we would ask that
 7    you provide us with correspondence or written request pursuant
 8    to Commission rules if you do elect to claw it back.
 9          MR. ANTHONY:  Very well.
10          MR. COHEN:  All right.  We'll go off the record.
11          (Whereupon, the foregoing investigational hearing was
12    adjourned at 12:52 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

156

1                        **CERTIFICATE OF REPORTER**

2

3    DOCKET/FILE NUMBER:  2123050

4    CASE TITLE:  In the Matter of:  Amazon.com, Inc.

5    HEARING DATE:  December 20, 2022

6

7        I HEREBY CERTIFY that the transcript contained herein is

8    a full and accurate transcript of the steno notes transcribed

9    by me on the above cause before the FEDERAL TRADE COMMISSION

10   to the best of my knowledge and belief.

11

12                DATED:  January 3, 2023

13

14        _____John M.S. Botelho_____
                 JOHN M.S. BOTELH , CCR, RPR
15

16

17

18

19

20

21

22

23

24

25

# Attachment 35

# In the Matter of:

## Amazon.com, Inc.

*January 20, 2023*
*Lisa Leung*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Leung
Amazon.com, Inc.                                                  1/20/2023

1  multipage checkout to the Java-based system, we decided
2  that with the migration of Amazon's checkout flow we
3  would jump to single-page checkout. It saved a lot of
4  development and engineering time.
5       BY MR. COHEN:
6       Q. So the purpose of TrueSPC was to save
7  development and engineering time, not improve clarity.
8       MS. WU: Objection to form.
9       THE WITNESS: The primary intent of TrueSPC was
10  to reduce engineering time as a part of Amazon's
11  migration from Gurupa to the Java-based system.
12      BY MR. COHEN:
13      Q. It's the company's position, is it not, that
14  although TrueSPC didn't make clarity worse, TrueSPC
15  didn't improve clarity; right?
16      MS. WU: Objection to form.
17      THE WITNESS: We didn't look at TrueSPC as a
18  clarity measure. It was a change that was required by
19  other reasons, and we decided to make changes to the
20  checkout experience.
21      BY MR. COHEN:
22      Q. And those changes to the checkout experience
23  were not intended to correct any clarity issues
24  associated with the preceding experience; right?
25      MS. WU: Objection to form and scope.

1       THE WITNESS: We believe our signup experience
2  was clear and legally compliant before as we do after
3  TrueSPC.
4       BY MR. COHEN:
5       Q. And just --
6       A. There's no issue to correct. That's what I'm
7  responding to.
8       Q. Okay. So the -- that's helpful.
9       Some -- after May 6, 2021, it remained the case
10  or -- that Amazon has not made the decline CTA a button
11  in all aspects of Prime enrollment.
12      MS. WU: Objection to form.
13      THE WITNESS: Sorry. Can you repeat the
14  question?
15      BY MR. COHEN:
16      Q. I can ask it a little bit better.
17      So there's various pathways in which
18  individuals can enroll in Prime; correct?
19      A. Correct.
20      Q. And as we sit here today, some of those still
21  involve situations in which the decline CTA is not a
22  button but is rather a link; correct?
23      MS. WU: Objection to form.
24      THE WITNESS: Can you be more specific as to
25  the location?

1       BY MR. COHEN:
2       Q. For instance, in the Prime checkout enrollment
3  flow.
4       MS. WU: Objection to form.
5       THE WITNESS: Can you also be more specific?
6  It varies by desktop versus mobile.
7       BY MR. COHEN:
8       Q. Well, actually, maybe you could be more
9  specific.
10      Is there any point in the Prime checkout
11  enrollment flow where the decline CTA is still a link
12  rather than a button?
13      MS. WU: Objection to form.
14      THE WITNESS: With the change of TrueSPC we
15  are rolling out those changes, and so over a period of
16  time we would have rolled out those changes. As a part
17  of TrueSPC, the negative CTA was also changed to a
18  button.
19      BY MR. COHEN:
20      Q. So it is no longer the case that anywhere in
21  the Prime enrollment process the decline CTA is a link
22  rather than a button?
23      MS. WU: Objection to form.
24      THE WITNESS: I'm pausing in my response
25  because it's hard for me to say in every single use

1  case that we've captured every single one. For our
2  main use case, which is the Prime enrollment flow, it
3  is now a button.
4       BY MR. COHEN:
5       Q. When did that become the case?
6       A. Again, we've tested iterations to the Prime
7  positive CTA over many years and over different
8  iterations. We've tested it, as we've discussed, in
9  buttons in multiple iterations, so it's hard for me to
10  say the exact times that the signup CTA has been a
11  button.
12      MR. COHEN: Okay. Let's mark as Exhibit 15 --
13  there's two Bates numbers here, so I'll read the first
14  one, which is AMZN-MGM-2R-003149387.
15      And I'm  rovidin  a co    to the witness  and
16  I'm _oin_ to direct _ ou to the _a_e of the memorandum
17  marked 4 and s_ ecificall_ line 104.
18      Exhibit Number 15  AMZN-MGM-2R-003149387
19  through AMZN-MGM-2R-003149394, was marked for
20  identification.)
21      THE WITNESS: I'm sorry. Page?
22      BY MR. COHEN:
23      Q. I think it's page 4. The top Bates number ends
24  9390, and I'm directing you to line 104.
25      A. Okay.

93 (Pages 369 to 372)

Leung

Amazon.com, Inc.

1/20/2023



373

```
1        I'm on line 104, yes.
2     Q. So what changes -- line 104 reads, "          ▮
3   ▮                                        "
4     A. That's what's stated in that line, correct.
5     Q. ▮
6
7                                                    f
8
9
10                                                  y
11
12
13
14
15
16        And then it goes on.
17        Did I read that portion correctly?
18    A. Yes, you have.
19        MS. WU:  Counsel, I'm sorr_ to inter ect.
20   Could I ask for a break so that I can assess a matter
21   of privilege?
22        Just for the record, we're looking at a
23   document that was produced to the FTC by Amazon in the
24   context of a different investigation, and it is labeled
25   Privileged and Confidential.
```

374

```
1         I will be brief, but I just want to look into
2   it.
3         MR. COHEN:  Take your time.
4         MS. WU:  Thank you.
5         MR. COHEN:  We'll excuse ourselves.
6         (Recess)
7         MR. COHEN:  And before I do an_ thin_ else, I
8   will turn it over to Ms. Wu to say some stuff.
9         MS. WU:  Well, first of all, Counsel, thank you
10   for the break.
11        We have ascertained that the document marked as
12   Exhibit 15  which was _ roduced in the retail
13   investigation and the MGM investi_ation_ is an
14   inadvertent production. This document is _ rivile_ed
15   and has been treated as such in the context of this
16   investigation.
17        We will follow up, consistent with our
18   conversation off the record, with a formal clawback
19   request. We understand that the parties are reserving
20   their positions with regard to this document, and we
21   appreciate that you won't question the witness with
22   regard to the context of this -- the contents of this
23   document during the balance of the IH today.
24        MR. COHEN:  Let me respond with a couple of
25   agreements and clarifications.
```

375

```
1         Number one, we agree that all parties are
2   reserving their rights.
3         Number two, we did propose off the record that
4   you permit us to question the witness with respect to
5   this document and with -- under a full reservation of
6   rights, including the ability to claw back any portion
7   of the transcript that relates to the document if this
8   is ultimately ascertained to be privileged. We did
9   make that request, and that proposal or that offer was
10   declined.
11        Additionally, I did indicate -- and I'm not
12   sure that you intended to be precluding this, but I did
13   indicate and I am going to ask one, possibly two
14   additional questions that I can do without actually
15   looking at the document, in order to obtain
16   instructions, simply to make a record and preserve the
17   commission's rights in that regard.
18        So I'm going to go forward and do that, and if
19   you want to go off the record briefly and talk with
20   your client about that --
21        MS. WU:  No.  That's fine, Counsel.
22        What I'm going to do, and just for clarity of
23   the record, I am taking the privileged document from
24   the witness so she does not have it in front of her as
25   she's being asked these questions, and I will provide
```

376

```
1   the instruction.
2         Thank you, Counsel.
3         MR. COHEN:  Okay.  All right.  Well, we'll
4   start with that.
5         Ma'am, I would ask that you return the document
6   to the witness for the purpose of me asking her
7   questions in order to be able to obtain an
8   instruction.
9         It's not a waiver for her to see it.
10        MS. WU:  I believe it's improper to ask a
11   question based on a document which has been clawed
12   back, although provisionally, and for that reason we
13   decline to have the witness offer testimony when
14   consulting the privileged material.
15        BY MR. COHEN:
16    Q. Are you going to follow your attorney's
17   instruction and not refer to Exhibit 15?
18    A. Yes.
19        MR. COHEN:  Okay.  And I'll ask a couple more
20   questions.  I just want to make absolutely sure the
21   best I can because we're going to get into some
22   fistfight over who's holding the document.
23        Counsel, are you waiving any right that you may
24   otherwise have that I have failed to make a sufficient
25   record of an attempt to question the witness regarding
```

94 (Pages 373 to 376)

Leung

Amazon.com, Inc.                                                                 1/20/2023

377

1    this document?
2         MS. WU:  We understand and we have declined
3    your offer to question the witness without a waiver,
4    and we have to decline given our ethical obligation to
5    consult with our client about this document.
6         MR. COHEN:  And to be clear, Amazon will not
7    contend that we've -- we waived any rights by failing
8    to pose questions and receive instructions not to
9    answer.
10        MS. WU:  I am instructing the witness not to
11   answer questions based on the document which was
12   previously identified as Exhibit 15.
13        BY MR. COHEN:
14   **Q.  I'll try one other thing and then I'll set it**
15   **aside.**
16        **Do you recall, ma'am, the first paragraph of**
17   **the document that was labeled as Exhibit 15?**
18        MS. WU:  And I'm -- you can answer that
19   question yes or no.
20        THE WITNESS:  I don't recall.
21        BY MR. COHEN:
22   **Q.  Do you recall any other part of the document**
23   **that was labeled as Exhibit 15?**
24   A.  I do not recall.
25   **Q.  Can you provide me any information at all about**

378

1    **the document that was labeled as Exhibit 15?**
2    A.  I cannot, no.
3         MR. COHEN:  So you -- let's set -- I'm setting
4    it aside just so that counsel can see.  I'm putting it
5    down there (indicating).
6         MS. WU:  Thank you, Counsel.
7         MR. COHEN:  But, again, we are trusting that
8    you are not going to contend that we failed to make a
9    sufficient record of an attempt.
10        MS. WU:  Correct.
11        And both sides preserve all rights with regard
12   to any future dispute about the privilege in regard to
13   the document.
14        BY MR. COHEN:
15   **Q.  I do want, though, to -- I am entitled, though,**
16   **to ask about the circumstances surrounding the**
17   **preparation of the document that is Exhibit 15, so do**
18   **you know who the author of Exhibit 15 was or is?**
19        MS. WU:  And, Counsel, similar to the situation
20   we had earlier, it's the company's position that
21   Ms. Leung is not prepared to provide testimony as a
22   corporate representative as to the subject of
23   privileged evidence, and for that reason, the witness
24   is not prepared to answer questions related to the
25   document identified for the record as Exhibit 15 or the

379

1    events related to that document.
2         THE WITNESS:  I decline to state.
3         BY MR. COHEN:
4    **Q.  And I apologize.  We've had this issue before.**
5    **When you say you decline to state, are you**
6    **refusing to answer my question or are you declining to**
7    **answer on the basis of your counsel's instruction?**
8    A.  I don't recall the document, so I cannot state
9    the author.
10   **Q.  Okay.  So you are not following your**
11   **attorney's instruction; you just are unable to state**
12   **the author.**
13        MS. WU:  Counsel, just perhaps for clarity,
14   there's no instruction to the witness.  However, I've
15   made clear that she has not been prepared to testify
16   concerning the document marked for the record as
17   Exhibit 15.
18        BY MR. COHEN:
19   **Q.  So you lack knowledge, for whatever reason, you**
20   **lack knowledge as to the author of Exhibit 15?**
21   A.  I don't recall Exhibit 15.
22   **Q.  Do you recall the purpose of the preparation of**
23   **Exhibit 15?**
24        MS. WU:  Objection.  Privilege.
25        And at this point I will instruct the witness

380

1    not to answer as to the purpose of preparing the
2    document identified for the record as Exhibit 15 on the
3    basis of privilege.
4         BY MR. COHEN:
5    **Q.  Are you going to follow your attorney's**
6    **instruction?**
7    A.  Yes.
8    **Q.  Returning back to the May 6, 2021 meeting, just**
9    **to make sure that we have a sufficient record, just yes**
10   **or no, were any decisions made in that meeting?**
11        MS. WU:  Objection to form.
12        And I instruct the witness not to testify as to
13   the contents of the meeting on the basis of privilege.
14   In addition, she's not represented to testify as to
15   privileged matters.
16        BY MR. COHEN:
17   **Q.  Are you going to follow your attorney's**
18   **instruction?**
19   A.  Yes.
20   **Q.  Okay.**
21   **Were any decisions with respect to changes in**
22   **the Prime enrollment flow made during the**
23   **May 6, 2021 meeting?**
24        MS. WU:  Objection to form.
25        And I instruct the witness not to answer on the

95 (Pages 377 to 380)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# Attachment 36

| | |
|---|---|
| **From:** | Nardini, Thomas |
| **To:** | Maldonado, Kassandra; Cohen, Jonathan; Jerjian, Olivia; Rottner, Adam; Cole, Margaret; Frech, Jacob; Hoffman, Elena |
| **Cc:** | Kim, Laura; Graubert, John; Flahive Wu, Laura; Anthony, Stephen; Remick, Ali; Siegel, Andrew |
| **Subject:** | FTC Matter No. 2123050 |
| **Date:** | Friday, February 3, 2023 2:51:00 PM |

Counsel:

During the January 20, 2023 Enrollment Corporate IH, you took the position that Exhibit 15 (Bates stamped ████████████ ) is privileged and said that you would follow up with a written clawback request, as required by Commission rules. To date, we have not received this request. If we do not receive this by Tuesday (February 7) at 5 PM ET, we will assume that it is not forthcoming. In that case, please let us know you availability for a brief meet and confer on Wednesday-Friday of next week to coordinate a time to question Amazon's corporate designee on this document.

Separately, in response to your correspondence dated January 24, 2023, regarding the documents referenced in your January 5 and January 13 letters, consistent with Commission rules we are sequestering these documents.

Best,
Max

# Attachment 37

# ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 1 | AMZN-Investigation2-00935326-AMZN-Investigation2-00935328.2; Amazon-FTC-CID_09246136-Amazon-FTC-CID_09246156 | Full | 1/13/2023 | Attorney Work Product | Yes | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 2 | AMZN_0026293 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 3 | AMZN_0026294-AMZN_00026297 | Full | 2/07/2023 | Attorney-Client Communication | Yes | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 4 | AMZN_00045917-AMZN_00045917.0007 | Full | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Identified by Amazon as the "same" or "substantially similar" to IC6, IC17 IC22, IC31, IC48 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC6, IC17 IC22, IC31, IC48 |
| 5 | AMZN_00045918-AMZN_00045942 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 6 | AMZN_00112860-AMZN_00112867 | Full | 2/07/2023 | Attorney-Client Communication | No | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC17, IC22, IC31, IC48 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC17 IC22, IC31, IC48 |
| 7 | AMZN_00064610-AMZN_00064622 | Partial | 1/05/2023 | Attorney-Client Communication | No | Yes: Same as IC15 | Yes: Similar to IC13 |
| 8 | AMZN_00067288-AMZN_00067290 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 9 | AMZN_00102776-AMZN_00102784 | Partial | 11/29/2022 | Attorney-Client Communication | No | No | No |

1

## ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 10 | AMZN_00117727-AMZN_00117734 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 11 | AMZN_00118740-AMZN_00118750 | Partial | 1/05/2023 | Attorney-Client Communication | No | No | No |
| 12 | AMZN_00118757-AMZN_00118771 | Partial | 1/05/2023 2/07/2023 | Attorney-Client Communication | Yes | No | No |
| 13 | AMZN_00120240-AMZN_00120251 | Partial | 1/05/2023 | Attorney-Client Communication | No | No | Yes: Similar to IC7, IC15 |
| 14 | AMZN_00126489-AMZN_00126515 | Partial | 2/07/2023 | Attorney-Client Communication | No | Yes:  Same as IC26, IC38, IC41, IC42, IC43 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 15 | AMZN_00126647-AMZN_00126659 | Partial | 1/05/2023 | Attorney-Client Communication | No | Yes: Same as IC7 | Yes: Similar to IC13 |
| 16 | AMZN_00137982-AMZN_00137985 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 17 | AMZN_00137986-AMZN_00137993 | Full | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6, IC22, IC31, IC48 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6 IC22, IC31, IC48 |
| 18 | AMZN_00137994-AMZN_00138018 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 19 | AMZN_00138019 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 20 | AMZN_00138020-AMZN_00138044 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |

2

## ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 21 | AMZN_00138045-AMZN_00138069 | Full | 2/07/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 22 | AMZN_00138070-AMZN_00138077 | Full | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6 IC17, IC31, IC48 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6 IC17, IC31, IC48 |
| 23 | AMZN_00138192-AMZN_00138211 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | Yes: Similar to IC28 |
| 24 | AMZN_00140183-AMZN_00140200 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | Yes: Similar to IC25 |
| 25 | AMZN_00140201-AMZN_00140218 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | Yes: Similar to IC24 |
| 26 | AMZN_00141381-AMZN_00141407 | Partial | 2/07/2023 | Attorney-Client Communication | No | Yes: Same as IC14, IC38, IC41, IC42, IC43 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 27 | AMZN_00143228-AMZN_00143233 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | No |
| 28 | AMZN_00154689-AMZN_00154710 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | Yes: Similar to IC23 |
| 29 | AMZN_00160403-AMZN_00160411 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 30 | AMZN_00141912-AMZN_00141913 | Partial | 4/12/2023 | Attorney-Client Communication | No | No | No |

3

## ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 31 | AMZN-Investigation2-003149387-AMZN-Investigation2-00314394; Amazon-FTC-CID_08427042-Amazon-FTC-CID_08427049 | Full | 2/07/2023 | Attorney-Client Communication | No | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6, IC17, IC22, IC48 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6, IC17, IC22, IC48 |
| 32 | AMZN-Investigation2-006784462-AMZN-Investigation2-006784489; Amazon-FTC-CID_08784408-Amazon-FTC-CID_08784435 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | Yes: Similar to IC14, IC26, IC32, IC33, IC38, IC41, IC42, IC43, IC47, IC49 |
| 33 | AMZN-Investigation2-006784491-AMZN-Investigation2-006784518; Amazon-FTC-CID_08784437-Amazon-FTC-CID_08784464 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | Yes: Similar to IC14, IC26, IC32, IC38, IC41, IC42, IC43, IC47, IC49 |
| 34 | AMZN-Investigation2-009353260-AMZN-Investigation2-009353261; Amazon-FTC-CID_09246134-Amazon-FTC-CID_09246135 | Full | 1/13/2023 | Attorney-Client Communication | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 35 | Intentionally Omitted | | | | | | |
| 36 | AMZN-Investigation2-009353283-AMZN-Investigation2-0093531303; Amazon-FTC-CID_09246157-Amazon-FTC-CID_09246177 | Full | 1/13/2023 | Attorney Work Product | Yes | Unable to determine because fully clawed back | Unable to determine because fully clawed back |

4

## ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 37 | Amazon-FTC-CID_09389533-Amazon-FTC-CID 09389536 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 38 | Amazon-FTC-CID_09407590-Amazon-FTC-CID 09407616 | Partial | 2/07/2023 | Attorney-Client Communication | No | Yes; Same as IC14, IC26, IC41, IC42, IC43 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 39 | Amazon-FTC-CID_09454557-Amazon-FTC-CID 09454583 | Partial | 2/07/2023 | Attorney-Client Communication | No | No | No |
| 40 | Amazon-FTC-CID_04911366-Amazon-FTC-CID 04911369 | Full | 2/07/2023 | Unknown | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 41 | Amazon-FTC-CID_09795246-Amazon-FTC-CID 09795272 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Same as IC14, IC26, IC38, IC42, IC43 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 42 | Amazon-FTC-CID_09795274-Amazon-FTC-CID 09795300 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Same as IC14, IC26, IC38, IC41, IC43 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 43 | Amazon-FTC-CID_09818779-Amazon-FTC-CID 09818805 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Same as IC14, IC26, IC38, IC41, IC42 | Yes: Similar to IC32, IC33, IC47, IC49 |
| 44 | Amazon-FTC-CID_09839018-Amazon-FTC-CID 09839041 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Same as IC45 | No |
| 45 | Amazon-FTC-CID_09839042-Amazon-FTC-CID 09839065 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | Yes: Same as IC44 | No |

5

## ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 46 | Amazon-FTC-CID_09839753-Amazon-FTC-CID_09839813 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | No |
| 47 | Amazon-FTC-CID_09840614-Amazon-FTC-CID_09840641 | Partial | 2/07/2023 | Attorney-Client Communication; Attorney Work Product | Yes | No | Yes: Similar to IC14, IC26, IC32, IC33, IC38, IC41, IC42, IC43, IC49 |
| 48 | Amazon-FTC-CID_09910965-Amazon-FTC-CID_09910972 | Full | 2/07/2023 | Attorney-Client Communication | No | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6, IC17, IC22, IC31 | Yes: Identified by Amazon as the "same" or "substantially similar" to IC4, IC6, IC17, IC22, IC31 |
| 49 | Amazon-FTC-CID_09929606-Amazon-FTC-CID_00929633 | Partial | 2/07/2023 | Attorney-Client Communication | Yes | No | Yes: Similar to IC14, IC26, IC32, IC33, IC38, IC41, IC42, IC43, IC47 |
| 50 | Amazon-FTC-CID_04910492-Amazon-FTC-CID_04910494 | Full | 2/07/2023 | Unknown | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 51 | Amazon-FTC-CID_04910496-Amazon-FTC-CID_04910520 | Full | 2/07/2023 | Unknown | Yes | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 52 | Amazon-FTC-CID_04910521-Amazon-FTC-CID_04910524 | Full | 2/07/2023 | Unknown | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 53 | Amazon-FTC-CID_04910919-Amazon-FTC-CID_04910931 | Full | 2/07/2023 | Unknown | Yes | Unable to determine because fully clawed back | Unable to determine because fully clawed back |

6

# ATTACHMENT 37 – FILTER TEAM CHART

| IC | Bates Number(s) | Full or Partial Clawback | Date of Clawback | Privilege Asserted by Amazon | Was Clawed Back Version Redacted when Originally Produced? | Is the Document the Same as Another Clawed Back Document? | Is the Document Similar to Another Clawed Back Document? |
|---|---|---|---|---|---|---|---|
| 54 | Amazon-FTC-CID_04910933-Amazon-FTC-CID_04910968 | Full | 2/07/2023 | Unknown | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |
| 55 | Amazon-FTC-CID_04910969-Amazon-FTC-CID_04910973 | Full | 2/07/2023 | Unknown | No | Unable to determine because fully clawed back | Unable to determine because fully clawed back |

7