# Exhibit A

HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

AMAZON.COM, INC., *et al.*,

Defendants.

Civil Action No. 2:23-cv-0932-JHC

**BRIEF OF AMICUS CURIAE THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

NOTE ON MOTION CALENDAR:
November 10, 2023

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................... 5

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................. 5

ARGUMENT.......................................................................................... 4

    I.   THE FTC'S NOVEL THEORIES OF PROHIBITED PRACTICES, IF ACCEPTED,
       WOULD CREATE ENORMOUS MARKET UNCERTAINTY ......................................... 4

    A. No Federal Statute Or Regulation Prohibits So-Called "Dark Patterns,"
        As Evidenced By FTC Regulatory History .................................................. 4

    B. The FTC's Vague Definitions Of "Dark Patterns" Create Confusion
        About Widespread Marketing Practices, Undermining Key ROSCA
        Policy .................................................................................................. 7

    II.  THE FTC'S NOVEL THEORY OF PROHIBITED PRACTICES, IF ACCEPTED,
       WOULD INCREASE CONSUMER COSTS AND DECREASE CONSUMER CHOICES .... 11

    III. FORSAKING CUSTOMARY NOTICE-AND-COMMENT PROCESSES, THE FTC
       UNDERMINES DUE PROCESS FOR THE REGULATED COMMUNITY ...................... 12

CONCLUSION ....................................................................................... 15

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

ii

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Power Co. v. E.P.A.*,
 208 F.3d 1015 (D.C. Cir. 2000) ................................................................ 13

*Caring Hearts Personal Home Services, Inc. v. Burwell*,
 824 F.3d 968 (10th Cir. 2016) ................................................................. 13

*Christopher v. SmithKline Beecham Corp.*,
 567 U.S. 142 (2012) .............................................................................. 14

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020) ...................................................................... 4, 15

*Environmental Integrity Project v. E.P.A.*,
 425 F.3d 992 (D.C. Cir. 2005) .................................................................. 15

*FCC v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012) ......................................................................... 7, 15

*Long Island Care at Home, Ltd. v. Coke*,
 551 U.S. 158 (2007) ....................................................................... 12, 13

*Paulsen v. Daniels*,
 413 F.3d 999 (9th Cir. 2005) ................................................................. 13

**Statutes**

5 U.S.C. § 553 ..................................................................................... 13

15 U.S.C. § 8401 ............................................................................*passim*

15 U.S.C. § 8402 ............................................................................... 2, 5

15 U.S.C. § 8403 ............................................................................ 2, 5, 6

15 U.S.C. § 8404 ............................................................................... 2, 5

15 U.S.C. § 8405 ............................................................................... 2, 5

**Other Authorities**

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

iii

Daniel Castro, *The FTC's Efforts to Label Practices "Dark Patterns" Is an Attempt at Regulatory Overreach That Will Ultimately Hurt Consumers*, Information Technology & Innovation Foundation (Jan. 4, 2023) ........................ 9

Dissenting Statement of Commissioner Christine S. Wilson, *Enforcement Policy Statement Regarding Negative Option Marketing* .................................................... 14

FTC, *Enforcement Policy Statement Regarding Negative Option Marketing* (October 2021) ........................................................................................................... 14

IHRSA – The Global Health & Fitness Association, Comment ID FTC-2023-0033-0863 (2023) ............................................................ 9

Interactive Advertising Bureau, Comment ID FTC-2023-0033-1000 (2023) ............................................................ 10

International Carwash Association, Comment ID FTC-2023-0033-1142 (2023) ............................................................ 10

International Franchise Association, Comment ID FTC-2023-0033-0856 (2023) ............................................................ 9

*Small Businesses Generate 44 Percent Of U.S. Economic Activity*, U.S. Small Business Administration, No. 19-1 ADV (Jan. 30, 2019) ................... 10

Tony Chen, et al., *Thinking inside the subscription box: New research on e-commerce consumers*, McKinsey & Company (Feb. 9, 2018) ..................... 8, 12

Zhoudan Xie, *Regulation and Jobs: The Unequal Employment Effects of Regulatory Uncertainty*, Regulatory Studies Center at The George Washington University (Apr. 29, 2021) ..................................................................... 8

**Regulations**

16 C.F.R. §310.2 .................................................................................................................. 4

Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52,393 (Oct. 2, 2019) ..................................................................*passim*

Negative Option Rule, 88 Fed. Reg. 24716 (Apr. 24, 2023)................................*passim*

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## INTEREST OF AMICUS CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber has a strong interest in ensuring that all businesses can continue lawfully using widespread marketing practices to fairly compete in the marketplace.[1] If this Court accepts the Federal Trade Commission's theory that existing law incorporates an unarticulated ban on overbroad and vaguely defined "dark patterns," then businesses will have no means to conform their conduct with the law, resulting in tremendous market uncertainty, consumer harm, and fair-notice concerns to the regulated community.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For years, the Federal Trade Commission ("FTC") acknowledged that the primary law designed to address negative option marketing, Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401–05, fails to provide "clarity" on what internet marketing techniques or features satisfy or do not satisfy ROSCA's requirements for obtaining informed consumer consent and providing simple cancellation mechanisms for goods or services sold through negative option features. *See, e.g.*, 84 Fed. Reg.

---

[1] No party or counsel authored this proposed brief. No party, no counsel, and no person other than amicus and its members made a monetary contribution intended to fund this brief.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

v

52393, 52396 (2019) ("[T]he current [legal] framework does not provide clarity about how to avoid deceptive negative option disclosures and procedures."). Moreover, neither ROSCA nor current FTC regulations prohibit or require any particular mechanism or form for providing disclosure, obtaining informed consent, or cancelling a subscription. Accordingly, businesses have long used different marketing techniques to encourage purchases or discourage cancellations by spotlighting features that their consumers might enjoy or need. They did so consistent with ROSCA's policies to "develop[]" the internet "as a marketplace" and to "give sellers an opportunity to fairly compete" in "online commerce." 15 U.S.C. § 8401(2).

Wanting to provide the missing legal "clarity," the FTC announced in 2019 that it would amend its Negative Option Rule, but it did not propose its new rule until April 2023. The proposed rule sought both to define and establish key terms and methods for complying with statutory disclosure, consent, and cancellation requirements and to regulate the use of so-called "dark pattern" techniques for obtaining or discouraging cancellations. During the notice-and-comment process, the regulated community responded, cautioning against the adoption of indeterminate rules that could saddle companies with unsustainable costs.[2] Small businesses that rely on negative option features, for example, objected to certain proposed amendments that would upend their business models and harm consumers.

While the FTC may still adopt the proposed rule despite these concerns and enforce the new requirements (subject to any legal challenge to the rule's validity), it has not yet done so. Instead, the FTC has decided that it would file this lawsuit against Amazon and its executives, not only to punish them, but also to establish

---

[2] *See, e.g.*, U.S. Chamber of Commerce, Comment ID FTC-2023-0033-0885 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-0885.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

2

precedent it could brandish in future proceedings against others. Notwithstanding the FTC's own admissions that current law does not provide necessary clarity, it alleges that Defendants failed to adhere to unannounced and unpromulgated rules and seeks to establish a nationwide ban on purported dark pattern techniques that cannot be found in any existing statute or regulation. This is a quintessential case of attempted regulation by enforcement, and this Court should not permit it.

The FTC's theory of unlawful conduct here, if accepted, would have wide-ranging consequences far beyond this case. The alleged prohibited "dark patterns," as defined, would sweep up lawful and traditional marketing practices used by at least hundreds of thousands of businesses. Still worse, because the FTC's proposed definitions are wholly subjective, businesses would have no means to conform their conduct with the law and thus would likely forego even non-prohibited conduct for fear of accidentally crossing the line. The FTC's vague standards would disproportionately harm small businesses, which lack the resources to ascertain whether the FTC's proposed unlawful "design elements" prohibit customary marketing techniques.

Consequently, rather than risk aggressive enforcement action, many businesses and individuals will simply cease offering valuable services and marketing options to their customers. This, in turn, would inhibit the "development [of the internet] as a marketplace" and kneecap the ability of many businesses to "fairly compete" in "online commerce," contrary to ROSCA's explicit purposes. *See* 15 U.S.C. § 8401(2). Consumers also would be worse off because negative option features increase choices and decrease costs. Above all, by leapfrogging notice-and-comment processes here and seeking to establish a precedent for imposing sanctions on companies for engaging in conduct that is not clearly prohibited (if at all) by the plain language of ROSCA, the FTC is depriving the regulated community of fair notice of the prohibited conduct

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

3

or the ability to have their views considered in notice-and-comment rulemaking. "[W]hen so much is at stake," the "[FTC] should turn square corners in dealing with people," rather than sidestep mandatory processes. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).

For all these reasons and more, this Court should dismiss the Amended Complaint, forcing the FTC to properly return to its ongoing rulemaking process.

## ARGUMENT

### I. THE FTC'S NOVEL THEORIES OF PROHIBITED PRACTICES, IF ACCEPTED, WOULD CREATE ENORMOUS MARKET UNCERTAINTY

The FTC enforces a patchwork of laws that regulates "negative option marketing," including its own Negative Option Rule, which it is currently amending. *See* 88 Fed. Reg. 24716, 24717 (amending 16 C.F.R. § 425.1). The central feature of "negative option marketing" involves marketing techniques designed such that the absence of affirmative action constitutes consumer consent. *See, e.g.*, 16 C.F.R. §310.2(w).

### A. No Federal Statute Or Regulation Prohibits So-Called "Dark Patterns," As Evidenced By FTC Regulatory History

The FTC has recognized that "ROSCA[] is the only law primarily designed to" regulate negative option marketing. 84 Fed. Reg. at 52394. Enacted by Congress in 2010, ROSCA declares that the "Internet has become an important channel of commerce in the United States." 15 U.S.C. § 8401(1). "To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." *Id.* § 8401(2). Consistent with these policy goals, ROSCA imposes general provisions on negative option marketers related to disclosure, consent, and cancellation practices. *See* 15 U.S.C. §§ 8401–05.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

4

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

Section 4 of ROSCA states that "it shall be unlawful for any person to charge . . . any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature . . . unless the person – (1) provides text that clearly and conspicuously discloses all material terms," "(2) obtains a consumer's express informed consent," and "(3) provides simple mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403.

ROSCA does not define what it means by "clear[] and conspicuous[] disclos[ure]," "express informed consent," or "simple mechanisms." Nor does it prohibit the use of negative option features as long as the above-listed disclosure, consent, and cancellation conditions are met. Accordingly, and consistent with ROSCA's express policy goals, businesses have lawfully used a wide range of negative option features both to "compete" in and to "develop[]" the internet as an "important channel of commerce in the United States." *Id*. §§ 8401(1)–(2).

Because the FTC recognizes that ROSCA "provides no details regarding steps marketers must follow to comply with [its] provisions," it recently attempted to define key terms related to disclosure, consent, and cancellation. 84 Fed. Reg. at 52395. In April 2023, the FTC proposed rulemaking to "provide clarity about how to avoid deceptive negative option disclosures and procedures." 88 Fed. Reg. at 24718. The proposed rule, according to the FTC, would provide "clearer guardrails" to avoid "the gray areas in current statutes and regulations." *Id*. at 24727–28. One "gray area" is the standard for "clearly and conspicuously," which the FTC proposes to define as "easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers" based on eight criteria. *Id*. at 24734–35 (proposing 16 C.F.R. §§ 425.2, 425.4). The proposed rule additionally defines "simple cancellation mechanism," because "ROSCA lacks specificity about cancellation procedures and the placement, content,

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

5

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

and timing of cancellation-related disclosures." *Id.* at 24718, 24735 (proposing 16 C.F.R. § 425.6). Finally, the proposed rule gives "guidance on how to comply" with "express informed consent." *Id.* at 24727, 24735 (proposing 16 C.F.R. § 425.5).

Moreover, and notwithstanding that neither the plain text of ROSCA nor its implementing regulations prohibits any particular methods of obtaining informed consent or cancelling subscriptions, the FTC now claims that this Court should declare that certain such practices, which it disparagingly labels "dark patterns," are illegal under ROSCA. "Dark patterns," according to the FTC, are "manipulative design elements that trick users into making decisions they would not otherwise have made." Amended Compl. ¶ 8. The FTC further identifies and defines six unlawful "dark pattern" techniques, none of which is referenced in ROSCA or current regulations:

1. "**Forced Action**" – "a design element that requires users to perform a certain action to complete a process or to access certain functionality";

2. "**Interface Interference**" – "a design element that manipulates the user interface in ways that privilege certain specific information";

3. "**Obstruction ('Roach Motel')**" – "a design element that involves intentionally complicating a process through unnecessary steps to dissuade consumers from an action";

4. "**Misdirection**" – "a design element that focuses a consumer's attention on one thing to distract from another";

5. "**Sneaking**" – "a design element that consists of hiding or disguising relevant information, or delaying its disclosure";

6. "**Confirmshaming**" – "a design element that uses emotive wording around the disfavored option to guilt users into selecting the favored option." *Id.* ¶ 231.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

6

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### B. The FTC's Vague Definitions Of "Dark Patterns" Create Confusion About Widespread Marketing Practices, Undermining Key ROSCA Policy

The FTC purports to define "dark patterns" as "manipulative design elements that trick users," *id.* ¶ 8, but apart from not being contained in ROSCA or in any promulgated regulation, that definition is far too indeterminate. There is no more "fundamental principle in our legal system" than the rule "that laws which regulate persons or entities must give fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *accord United States v. Williams*, 553 U.S. 285, 306 (2008) (noting that "indetermina[te]" laws rely on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings"). Nor do the six allegedly manipulative techniques described by the FTC (the illegality of much or all of which seems to rest on nothing more than the FTC's *ipse dixit*) provide the requisite clarity.

If, for instance, the *Seattle Times* promoted a special subscription service that covered high school sports, what legitimate marketing tactic could it use? Its customary captions or colors might prove too "manipulative." A local HVAC company offering annual tune-ups might also warn its customers of costly repairs during the winter should they cancel their subscription, but in doing so, it might inadvertently, and suddenly-unlawfully, "confirmshame." The examples of indeterminacy here are endless because it has long been an important part of business to encourage purchases or discourage cancellations by highlighting important features.

As such, if this Court were to adopt the FTC's proposed ban on "dark patterns," businesses and individuals would have no practical means to conform their conduct to the law. They instead would be left with "wholly subjective judgments" from the FTC. *Williams*, 553 U.S. at 306. Such an outcome would then create tremendous

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

7

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

market uncertainty about the legality of widespread marketing practices, leading ultimately to results that run headlong into a key goal of ROSCA: To "develop[]" the internet as "an important channel of commerce." 15 U.S.C. §§ 8401(1)–(2).

First, a ruling in the FTC's favor would inhibit investments and jobs, because businesses are unlikely to invest if they cannot be reasonably sure about the rules to which their conduct must conform. As a senior policy analyst at The George Washington University recently explained, increased regulatory "uncertainty can lead to significant declines in hiring, investment, consumption, and output in the economy."[3] Indeed, "[i]ncreased uncertainty makes firms more cautious about their decisions because adjustment costs of inputs [*e.g.*, recruitment, training, firing, and productivity losses] make it expensive to reverse the decisions."[4] The analyst further explains that these "costs are economically significant, estimated to be around 10 to 20 percent of annual wages" for any one firm.[5]

Second, and relatedly, a ruling in the FTC's favor would discourage innovation. Negative option features promote innovation because they foster "deep insights into customer behavior to personalize the experience."[6] Yet, as the leading think tank for science and technology policy concludes, "[i]f the FTC continues down this path of labeling data-driven design practices as potentially illegal activity and conflating illegal practices with bad design, businesses will face a legal minefield . . . for failing to anticipate regulators' subjective analysis of their product design decisions."[7] This

---

[3] Zhoudan Xie, *Regulation and Jobs: The Unequal Employment Effects of Regulatory Uncertainty*, Regulatory Studies Center at The George Washington University (Apr. 29, 2021), *available at* https://perma.cc/9NXE-ZHCB.

[4] *Id.* (citation omitted).

[5] *Id.* (citations omitted).

[6] Tony Chen, et al., *Thinking inside the subscription box: New research on e-commerce consumers*, McKinsey & Company (Feb. 9, 2018), *available at* https://perma.cc/QCG2-XB55.

[7] Daniel Castro, *The FTC's Efforts to Label Practices "Dark Patterns" Is an Attempt at Regulatory Overreach That Will Ultimately Hurt Consumers*, Information Technology & Innovation Foundation

---

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

8

would "ultimately limit[] the development of better" products and services for our nationwide economy.[8]

Third, a ruling in the FTC's favor would upend numerous business models. For example, and as recently explained to the FTC by the International Franchise Association, many of its nearly 800,000 franchised businesses invested in their "franchise systems based on a business model that includes as a core component a membership program," many of which may include automatic renewals, but nevertheless contain crucial distinctions from other types of negative option features.[9] One important distinction is the typical "month-to-month continuous service contract of the kind often used by the health and fitness industry" in brick-and-mortar facilities where consumers "can access immediate, in-person [help] to address customer service needs."[10] These models stand in stark contrast to other subscription services that, while also using automatic renewals, do not have in-person help to navigate or cancel services. Despite these differences, hundreds of thousands of businesses that depend on automatically recurring membership programs would face the specter of enforcement actions based on claims that they employed unlawful "dark patterns," forcing many of them to displace their proven business models due to uncertain legal liability.

Although these adverse effects would plague businesses of all sizes, small businesses would bear the brunt of these costs because they have fewer resources to devote to ensuring that they comply with the vague standards proposed by the FTC. This is very troubling since "[s]mall businesses are the lifeblood of the U.S. economy":

---

(Jan. 4, 2023), *available at* https://perma.cc/SC8S-BSDJ.

   [8] *Id.*

   [9] International Franchise Association, Comment ID FTC-2023-0033-0856, at 1 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-0856.

   [10] IHRSA – The Global Health & Fitness Association, Comment ID FTC-2023-0033-0863, at 5 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-0863.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

9

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

creating "two-thirds of net new jobs," "driv[ing] U.S. innovation and competitiveness," and "account[ing] for 44 percent of U.S. economic activity."[11]

To illustrate, the Interactive Advertising Bureau, which represents more than "86 percent of online advertising expenditures" nationwide, stated that indeterminate rules prohibiting negative option features "will disproportionately impact small businesses" that do not "have the resources" for "complicated compliance program[s]."[12] The International Carwash Association, which represents more than 60,000 retail car washes that employ more than 220,000 employees, also worried that "inadvertent noncompliance from [its] small business owners due to a lack of clarity in the rules could subject car wash facilities" to "substantial" penalties.[13]

Consequently, given the threat of aggressive regulatory enforcement over indeterminate rules, many sellers would simply cease "compet[ing] with one another for consumers' business" by ending their popular negative option features. 15 U.S.C. § 8401(2). The fact that the FTC named individuals in this action further underscores the uncertainty that many reluctant business owners or executives would face as they consider whether to continue using traditional marketing techniques against aggressive FTC enforcement actions over indeterminate "dark patterns." It would be easier to stop using such features altogether than to face the prospect of FTC enforcement actions. This would be especially true among small sellers, who often lack the resources to ascertain whether "design elements" on their websites are unlawful. But this is not what Congress intended. *See* 15 U.S.C. §§ 8401(1)–(2).

---

[11] *Small Businesses Generate 44 Percent Of U.S. Economic Activity*, U.S. Small Business Administration, No. 19-1 ADV (Jan. 30, 2019), *available at* https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/.

[12] Interactive Advertising Bureau, Comment ID FTC-2023-0033-1000, at 8 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-1000.

[13] International Carwash Association, Comment ID FTC-2023-0033-1142, at 1 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-1142.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

10

## II. THE FTC'S NOVEL THEORY OF PROHIBITED PRACTICES, IF ACCEPTED, WOULD INCREASE CONSUMER COSTS AND DECREASE CONSUMER CHOICES

Consumers also would be worse off with a ruling in favor of the FTC. "[N]egative option programs . . . provide substantial benefits for sellers *and consumers*." 88 Fed. Reg. at 24716 (emphasis added). Consumer benefits include "the ease and simplicity" that negative option features "offer consumers by allowing them to avoid time-consuming and inefficient transactions." *Id*. at 24719. These features further "help customers avoid problems such as breaks in service." *Id*. This benefit is particularly important for goods or services in energy, health care, and other critical industries, because a break in the provision of these goods or services could be devasting to consumers who rely upon uninterrupted deliveries.

Negative option features decrease costs. Cost savings come from "automatic renewal subscriptions" that "facilitate long-term [and predictable] customer relationships." *Id*. at 24720. By way of example, the Retail Energy Association's negative option features allow its providers "to achieve lower rates for consumer[s] by pursuing forward looking energy purchasing strategies for [a] more stable customer base."[14] Cost savings are further found in "automatic renewals" that "eliminat[e] multiple notices, forestall[] fraudulent mailings, and prevent[] costly interruptions in service." *Id*. at 24720. News and magazine publishers, for instance, noted that their features help them "avoid the costs of creating and disseminating multiple renewal notices, monitoring and detecting erratic changes to subscriber files, and re-enrolling customers if subscriptions lapse."[15] Those cost savings are then passed on to their

---

[14] Retail Energy Supply Association, Comment ID FTC-2019-0082-0016 (2019), *available at* https://www.regulations.gov/comment/FTC-2019-0082-0016.

[15] News-Media Alliance, Comment ID FTC-2023-0033-0873 (2023), *available at* https://www.regulations.gov/comment/FTC-2023-0033-0873.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

11

consumers.[16] Consulting firm McKinsey likewise found "cost efficiencies."[17] In fact, businesses must be cost competitive, as customers "are willing to subscribe only where automated purchasing gives them tangible benefits, such as lower costs."[18]

Customers "also want something new and innovative" from the marketplace.[19] Free trials, for example, allow them to "enjoy new items or personalized items" so that they may explore novel products or services they otherwise might not try. 88 Fed. Reg. at 24719–20. And because "consumers are quick to cancel services that don't deliver [either] a superior experience" or "value," businesses must innovate to deliver "something new."[20] As explained above, however, a ruling in favor of the FTC would inhibit innovation among the other consumer benefits just described.

## III. FORSAKING CUSTOMARY NOTICE-AND-COMMENT PROCESSES, THE FTC UNDERMINES DUE PROCESS FOR THE REGULATED COMMUNITY

Finally, the FTC is currently conducting rulemaking to provide legal "clarity" over the same type of conduct alleged to be unlawful here. As a result, the regulated community never had fair notice that such conduct is prohibited. That further militates against reading the FTC's indeterminate definitions of "dark patterns" into ROSCA.

The U.S. Congress enacted the Administrative Procedure Act ("APA") to provide "fair notice" of prohibited conduct through "notice and comment rulemaking." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). Before an agency can create legally binding (or "legislative") rules, the APA requires an agency to give the public "notice" of, and "an opportunity to" comment on, its proposed rule. 5 U.S.C.

---

[16] *Id.*
[17] Tony Chen, *et al.*, *supra* n.6.
[18] *Id.*
[19] *Id.*
[20] *Id.*

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

12

§ 553(b)–(c). Courts have long recognized that this process is structured to promote "fairness and informed administrative decisionmaking," *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005), and so that regulations provide clarity, *Long Island Care at Home,* 551 U.S. at 174.

Notice-and-comment procedures take time. The agency must notify the public, invite comment, respond to argument, and explain its decision. *See* 5 U.S.C. § 553 (b)–(c). Unsurprisingly, then, agencies sometimes attempt to sidestep this process and instead regulate the public through other means that "explain[], interpret[], defin[e] and often expand[] the commands in the regulations." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020 (D.C. Cir. 2000). Law is thus purportedly "made, without notice and comment [and] without public participation." *Id*. When "law" is made this way, "troubling questions [arise] about due process and fair notice—questions like whether and how people can be fairly expected to keep pace with and conform their conduct to all this churning and changing 'law.'" *Caring Hearts Personal Home Services, Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.).

Those "troubling questions" are heightened here given that the FTC is bringing an enforcement action over the same conduct that is subject to ongoing rulemaking. The FTC set out four years ago to provide direction to the market on negative option features given that "the current framework does not provide clarity." 84 Fed. Reg. at 52394, 52396.

While the regulated community commented on the advance notice and waited for the proposed rule, the FTC took the unprecedented step of issuing enforcement policy guidance on the same topics covered in its rulemaking. In 2021, the FTC issued its Enforcement Policy Statement Regarding Negative Option Marketing that conveyed

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

13

high-level "principles"—but not specific definitions—for ROSCA rules.[21] Yet as Commissioner Wilson noted in her dissent, "the FTC had issued policy guidance during the pendency of a related rulemaking on only one occasion" prior to 2020, and even then, it had "noted its intention to refrain from enforcement actions."[22] She concluded that "[p]ublishing guidance during the pendency of a related rulemaking . . . does not constitute good government."[23] Nor do these general principles provide fair warning of the prohibited conduct alleged here. *See generally Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–57, n.15 (2012) (identifying instances in which agencies failed to provide fair notice).

Then in April 2023—shortly before this lawsuit—the FTC issued its notice to amend the Negative Option Rule. *See* 88 Fed. Reg. at 24716. The proposed rule, as mentioned, hopes to "provide clarity." *Id.* at 24737. "By providing specificity regarding the steps sellers must take," the proposal continues, "these provisions will also help address the deceptive use of so-called 'dark patterns.'" *Id.* at 24727. The term "dark patterns" does not appear in the 2019 advance notice or the 2021 enforcement statement. Its genesis rather appears to be a very recent September 2022 FTC staff report. *Id.* n.71. In light of the proposed seismic changes, detailed comments about the proposed rule swelled nearly a hundredfold from the advance notice. But the FTC did not wait to respond to these comments or issue clarity before filing this lawsuit.

---

[21] FTC, *Enforcement Policy Statement Regarding Negative Option Marketing*, at 2 (October 2021), https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf.

[22] Dissenting Statement of Commissioner Christine S. Wilson, *Enforcement Policy Statement Regarding Negative Option Marketing*, No. P064202, at 1 (Oct. 28, 2021), *available at* https://www.ftc.gov/system/files/documents/public_statements/1598067/negative_option_policy_statement_csw_dissent.pdf.

[23] *Id.*

BRIEF OF AMICUS CURIAE THE CHAMBER OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

14

Notwithstanding the years-long notice-and-comment process to provide fair notice, the FTC has twice now "pull[ed] a surprise switcheroo on regulated entities" over the marketing conduct it deems forbidden. *Environmental Integrity Project v. E.P.A.*, 425 F.3d 992, 996 (D.C. Cir. 2005). Such "abrupt" changes in enforcement posture not only confirm that the regulated community lacked "sufficient notice of what [was] proscribed" here, *Fox Television*, 567 U.S. at 254, it also demonstrates disregard for the longstanding reliance interest over negative option features as detailed above, *see supra* I.B; *see also Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 ("When an agency changes course, as [the FTC] did here, it must 'be cognizant [of] . . . reliance interests.'").

The Chamber, therefore, urges this Court not to adopt an interpretation of ROSCA through the FTC's enforcement-by-litigation strategy here that effectively seeks a nationwide ban over indeterminate "dark patterns" or "manipulative design elements." These alleged prohibitions both fail to provide fair notice to the regulated community of what conduct is prohibited and create tremendous market uncertainty.

## CONCLUSION

This Court should dismiss the Amended Complaint, forcing the FTC to properly return to its rulemaking process for negative option marketing.

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600

Dated: October 25, 2023

Respectfully submitted,

/s/ *Daniel D. Birk*
Daniel D. Birk
  *pro hac vice application pending*
John K. Adams
  *pro hac vice application pending*
EIMER STAHL LLP
224 South Michigan Ave.,
Suite 1100
Chicago, IL 60604
(312) 660-7600
dbirk@eimerstahl.com
jadams@eimerstahl.com

*Counsel for Amicus Curiae the*
*Chamber of Commerce of the United*
*States of America*

Jackson Wilder Maynard, Jr.
WSBA No. 43481
Maynard Law PLLC
111 21st Ave SW
Olympia, WA 98501
(850) 519-3495

*Local Counsel for Amicus Curiae the*
*Chamber of Commerce of the United*
*States of America*

BRIEF OF AMICUS CURIAE THE
CHAMBER OF THE UNITED STATES
OF AMERICA IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
Case No. 2:23-cv-00932

16

Eimer Stahl LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600