# EXHIBIT A

HONORABLE JOHN H. CHUN

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9  FEDERAL TRADE COMMISSION,

Plaintiff,
10

v.
11

AMAZON.COM, INC., *et al.*,
12

Defendant.
13

14

| | |
|---|---|
| Case No. 2:23-cv-0932-JHC | |
| **[PROPOSED] BRIEF OF *AMICUS CURIAE* INTERACTIVE ADVERTISING BUREAU IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS** | |

15

16

17

18

19

20

21

22

23

24

25

26

27

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 1

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

## Table of Contents

I.    INTRODUCTION ...................................................................................................... 3

II.   ARGUMENT .............................................................................................................. 4

    A.   What the FTC's Complaint describes as "dark patterns" are merely a
series of normal and lawful business practices cobbled together and
grouped under ominous buzzwords. ................................................................. 4

    B.   The FTC's theory around "dark patterns" as articulated in its Complaint
presents a non-legitimate interest in regulating truthful speech. ...................... 12

III.  CONCLUSION.......................................................................................................... 15

BRIEF OF AMICUS CURIAE IAB            Akin Gump Strauss Hauer & Feld LLP
(2:23-cv-0932-JHC) - 2                     2001 K Street NW
                                             Washington, DC 20006
                                             (202) 887-4000

## I.   INTRODUCTION

Founded in 1996 and headquartered in New York City, the Interactive Advertising Bureau ("IAB") represents over 700 leading media companies, brand marketers, agencies, and technology companies that are responsible for selling, delivering, and optimizing digital advertising and marketing campaigns.  IAB's members account for 86 percent of online advertising expenditures in the United States.  Working with member companies, IAB develops both technical standards and best practices for the industry.  In addition, IAB compiles and makes available research studies and reports that identify industry trends and provide industry-wide insights.  IAB also educates brands, agencies, and the wider business community on the importance of digital marketing.  The organization is committed to professional development and elevating the knowledge, skills, expertise, and diversity of the workforce across the digital advertising and marketing industry.

IAB is concerned about the Federal Trade Commission's ("FTC's") effort to regulate and punish truthful statements made in advertising based on what the FTC calls "dark patterns."[1]  The FTC's "dark patterns" are described ominously in its Complaint, but in substance they largely include a handful of benign, ordinary statements made in the course of Amazon marketing the benefits of its Prime membership and "design elements" chosen by Amazon, such as the use of color to draw a consumer's attention, to communicate Amazon's message that Prime is valuable. If the FTC is found to have stated a claim as a matter of law under Section 5 of the FTC Act based on these allegations, the IAB fears that advertisers and their employees will have no way to predict whether and when they are running afoul of the law.  By seeking to punish truthful marketing that the FTC deems to be too convincing, the FTC is asking this Court to interpret Section 5 of the FTC Act so broadly and so subjectively that any government whim will be sufficient to state a claim, including against individuals who cannot be fairly said to have ever been on notice that normal, truthful conduct is suddenly punishable.

---

[1] IAB focuses its briefing here on the problems with the FTC's "dark patterns" theory and the resulting indeterminacy it creates for advertisers (and their employees) and the risks to truthful speech.  That said, IAB agrees with Amazon (Dkt. No. 84) that nothing the FTC alleges in this case represents a violation of the Restore Online Shopper Confidence Act ("ROSCA").

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 3

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

1    The Court should require that the FTC, when it seeks to challenge communicative activity

2    in marketing, be able to allege (and ultimately prove) that the communications in questions are

3    deceptive or misleading.  In the absence of such a holding, the FTC will be given license to pursue

4    what has long been held to be an illegitimate government interest, namely a prohibition on the

5    dissemination of truthful speech.  And the FTC Act's regulation of advertising would become so

6    capacious as to be limited by nothing more than which companies are disfavored by the current

7    leadership at the FTC.  This is not and should not be the law.  The FTC's reliance on buzzwords

8    in the absence of a genuine theory of consumer harm based on deceptive marketing should not be

9    permitted to move forward.

10   ## II.    ARGUMENT

11   ### A.    What the FTC's Complaint describes as "dark patterns" are merely a series
     of normal and lawful business practices cobbled together and grouped under
12   ominous buzzwords.

13   Ironically in a case alleging "manipulative design elements," Am. Compl. ¶¶ 8, 232 (Dkt.

14   65), the FTC's Complaint uses bureaucratese and terminology that has a negative connotation

15   designed to distract from the reality that nothing the FTC is alleging is actually false or misleading.

16   Behind harrowing language like "dark patterns" and using official-sounding titles (but really just

17   made-up terms coined by a consultant)[2] like "Interface Interference," "Forced Action,"

18   "Confirmshaming" and "Roach Motel," *id.* ¶ 231, the FTC has brought a lawsuit alleging a series

19   of what it deems "deceptive" dark patterns but then asks this Court NOT to find that Amazon

20   deceived consumers in violation of Section 5 of the FTC Act, but rather to find that Amazon

21   unfairly "charged consumers without their express informed consent" or did not "clearly and

22   conspicuously disclose all material terms." *Id.* ¶¶ 263, 272, 275, Counts I–III.  The FTC's suit

23   focuses on the use of color, the effectiveness of repetition, and the order in which Amazon presents

24   terms of sale—in each case, providing screenshots that reveal that Amazon always provided clear

25   ---

26   [2] The terms used by the FTC appear to have been drawn from Harry Brignull, a consultant in the United Kingdom,
     who provides "expert witness services" for "dark patterns" (another term he coined). https://www.ftc.gov/
     system/files/documents/public_events/1586943/dark_patterns-workshop-bios.pdf; *see also* https://www.deceptive.
27   design/types.

options to decline the offer that Amazon made and never identifying what the lawful alternative was supposed to be.  If the FTC's lawsuit is held to be sufficient as a matter of law, advertisers and their employees will have no way of predicting when the FTC will determine that they have violated the law.  Except, perhaps, that when the FTC is headed by someone with a public vendetta against a company, that company and its employees should assume that no matter how they market, the FTC will find or invent a new buzzword to attack them.[3]

Digging behind the FTC's consultant-created branding, the actual substance of what they are complaining about is entirely legitimate, not nefarious.  Under the heading "***Forced Action***," the FTC complains about Amazon "forc[ing] the consumer to choose whether to enroll in Prime before allowing the consumer to complete her purchase."  Am. Compl. ¶ 231(a)(i).  Of course, whether a customer signs up for Prime *will affect the purchase price* and the terms of shipment, *see id.* ¶ 45, so not "forcing" the consumer to make the decision would mean Amazon is not giving the consumer the opportunity to avoid shipping costs.  In other words, the FTC's Complaint in this regard is about the moment in which Amazon asks the consumer a key question that will determine the price she will pay for her purchase.  Interestingly, this negative sounding "Forced Action" has nothing to do with whether Amazon charged the consumer for Prime without consent.  Indeed, the "Forced Action" is "forcing" the consumer to provide consent (or not) to buy Prime.  If forcing someone to consent to buying something is then used in a complaint asserting that the retailer did not get consent, there is simply no way for IAB members, or any advertisers, or any of their respective employees, to know how the FTC expects retailers to offer something like Prime to a customer or when they will be the subject of a suit seeking penalties by the federal government.

Using a real-world example shows the problematic nature of the FTC's theory.  When a consumer goes to the Space Needle website (https://www.spaceneedle.com/) to buy tickets to the Space Needle, she is offered "Best Value" tickets that include tickets to the Space Needle and the

---

[3] *See* Lina M. Khan (now Chairperson of the FTC), *Amazon's Antitrust Paradox*, 126 Yale L.J. 3 (2017).

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

Chihuly Garden and Glass museum.  The "BEST VALUE" statement is in all capital letters and highlighted in red.



If the consumer elects not to immediately grab the "Best Value" tickets and scrolls down, she is given the option of buying just Space Needle tickets.



After deciding how many tickets to purchase and the time and date the consumer wants to visit the Space Needle, the consumer clicks "Add to Cart."  At that time, the below screen pops up again offering the "BEST VALUE" option – a way to "[s]ave by combining two iconic experiences." To select that option, the consumer clicks on a box that is colored in orange that reads "Sounds Great."  To decline that option, the consumer clicks on a dark blue box that reads "No Thanks." The boxes are next to each other.

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 6

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

1

2

3

4

5

6

7



8   Under the FTC's theory of "Forced Action" dark patterns, the Space Needle has violated Section

9   5 of the FTC Act by forcing the consumer to consider the offer (twice) to combine Space Needle

10  tickets with tickets to the Chihuly Garden and Glass exhibit.

11       Under the heading of "***Interface Interference***" (more consultant-created branding), the

12  FTC complains about the color that Amazon uses when it describes a major benefit of Prime ("Free

13  shipping") and about "warning icons" explaining the benefits forfeited by cancelling Prime, which

14  the FTC alleges will "evoke[] anxiety and fear of loss in consumers."  Am. Compl. ¶ 231(b)(ii).

15  Once again, the FTC does not here suggest that anything that Amazon says is untrue or that the

16  consumer is deceived in any way.  Indeed, the FTC acknowledges that Amazon "reveal[s] the

17  terms and conditions of Prime" in the Prime purchase process but complains that "most versions .

18  . . reveal the terms and conditions of Prime only once …."  *Id.* ¶ 231(b)(i).  If the Court allows

19  these types of allegations to underpin an FTC Act lawsuit, IAB members will be left to wonder

20  what color (if any) is appropriate when communicating truthfully to a consumer and how many

21  times they are required to reveal the relevant terms and conditions to satisfy the FTC.

22       Using the Space Needle example above, the FTC should be concerned about the use of red

23  to draw the customer's attention to the "BEST VALUE" as well as the Space Needle's choice of

24  color and wording in trying to entice someone to also buy tickets to the Chihuly Garden and Glass

25  exhibit.  Under the FTC's theory, these are more use of dark patterns by the Space Needle to harm

26  consumers in violation of the FTC Act.

27

Another example: if a consumer wants to subscribe to the Seattle Times, she will find herself confronted with three options:

One of the options involves just digital access and another involves digital access and delivery of the Sunday paper.  The second option provides more for the consumer than the first but is cheaper ($1 for 5 weeks and $4.99 per week thereafter) than the first option ($1 for 4 weeks and $4.99 per week thereafter).  Is the Seattle Time's use of a banner highlighted in white with the word's "Top Pick" going to "evoke anxiety and fear of loss in consumers" such that they take the Sunday delivery when they might not have otherwise wanted it?  Is this a violation of the FTC Act?  How is this different than what Amazon does in offering Prime?

The FTC's derogatory title of "***Obstruction ('Roach Motel')***" is misleading.  Under what the FTC calls "obstruction," the FTC complains that "some consumers cannot find the less prominent 'No Thank You' link," *id.* ¶ 231(c)(i); but in every instance in the Complaint where the FTC provides an example of this "less prominent" link, it is found directly next to or below the more prominent (i.e., highlighted) link, *id.* ¶¶ 44(d), 66, 82, 86, 96, 98, 99, 100, 101.  Again, if this is not enough, what is?  How are IAB's members supposed to provide sufficiently prominent links so that every consumer will be able to find those links when the FTC is complaining that adjacent links are not enough?  How are IAB's members' employees supposed to know when they are at risk of an individual suit seeking penalties for such banal design choices?  Is this yet a third "dark

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 8

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

pattern" employed by the Space Needle to "deceive" consumers into buying Chihuly Garden and Glass tickets?  After all, the Space Needle does have the "No Thanks" button in a darker somewhat harder to see box next to the "Sounds Great" option.

The FTC also complains that Amazon has created a "roach motel" that "forc[es] consumers who have already expressed an intent to cancel . . . to view marketing and reconsider options other than cancellation."  *Id.* ¶ 231(c)(ii).  But efforts to make certain that someone want to unsubscribe before actually unsubscribing them are common.  For instance, if one goes to the FTC's website and signs up for news alerts and then wants to unsubscribe, one will encounter the FTC's own unsubscription "roach motel" — a much more cumbersome process than what is described in the FTC's complaint against Amazon.  Once one subscribes to receive emails from the FTC on various topics, he will receive emails containing press releases and other news from the FTC on those topics.  At the bottom of each email, there is a line that says "[t]o update or delete your subscription at any time, visit your subscriber preferences page."



Following the hyperlink, which is not nearly as prominent in its size or color as "More news from the FTC," leads to a multi-step process before actually getting to a screen where one can unsubscribe.  The first screen requires one to enter his email address and then click "Submit." Then he must provide his password and click "Submit" again.  Having finally arrived at the screen one needs to reach to unsubscribe, the user sees a list of the FTC's various alert topics to which "[you] are subscribed."  The most prominent buttons direct the user to click specific topics to "delete" and then to click "Submit" to unsubscribe from those individual topics.  The option to delete one's account entirely is in much smaller text.

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 9

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   This example is not meant to suggest that there is anything wrong with the FTC unsubscription

17   process.  The user who previously subscribed may not want to fully unsubscribe so the FTC needs

18   to understand the scope of what the user wants.  That said, the FTC is accusing Amazon and even

19   individuals of violating the FTC Act for creating an unsubscription process that is less cumbersome

20   than the FTC's process.  How are IAB's members and their employees supposed to know what is

21   permissible when following the FTC's example would probably be deemed by the FTC as using

22   dark patterns to deter consumers from unsubscribing from services they previously chose?

23          The FTC uses more negative consultant-speak in terming similarly truthful, obvious

24   disclosures and optionality "***Misdirection***" and "***Sneaking***."  Am. Compl. ¶ 231(d), (e).  The

25   allegations are generally contradicted by the screenshots included in the Complaint and, more

26   importantly, have nothing to do with whether Amazon charged consumers without their consent

27

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

or clearly provided its terms and conditions.  The FTC instead appears to be raising the bar on what the standard is without any former guidance, support in the law, or explanation for advertisers on where the new, legally unsupported bar is.

The FTC's final example of a dark pattern is another curious consultant-word— "*Confirmshaming*."  All the FTC alleges here is that Amazon "uses emotive wording around the disfavored option to guilt users into selecting the favored option."  Am. Compl. ¶ 231(f).  The wording that purportedly creates that guilt?  "No thanks, I do not want fast, free shipping" and "we'd hate for you to miss out on unlimited fast, FREE delivery."  *Id.* ¶¶ 41, 207, 231(f).  If a consumer feels guilt at turning down free shipping, doesn't that mean that the consumer likely wants free shipping?  If the consumer likely wants free shipping, shouldn't a retailer be able to offer it to them?  Once again, the FTC makes no argument that anything Amazon said was misleading or dishonest.  And none of this goes to the claims included in the Counts on which the FTC is actually suing Amazon.  Moreover, if what the FTC complains about as "shaming" is potentially unlawful, IAB's members and its employees will be left wondering what language (if any) they are allowed to use to convince customers to purchase a good or service before being subject to legal penalties.

Section 5 of the FTC Act is meant to protect consumers from substantial injury that is not reasonably avoidable by consumers themselves.  *See, e.g.*, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010), *as amended* (June 15, 2010) (involving the creation and delivery of unverified checks).  "Injury" is not the same as making "a successful sale," which is what the FTC's "dark patterns" allegations describe.  Indeed, none of the FTC's dark pattern allegations suggest that consumers were injured as a result of those patterns.  And if a successful sale is enough even when the marketing was open, obvious, and truthful, and when a consumer's ability to avoid it was provided adjacent to the purchase option, then every sale has the potential of being "substantial injury."  Was the person who decided to add the Chihuly Garden and Glass tickets to her purchase

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

of the Space Needle tickets injured?  Substantially so?  This would put IAB's members (and all advertisers and their individual employees) in a completely untenable position.

Notably, where the "unfair acts" prohibition in Section 5 of the FTC Act *has* been applied previously by the FTC to truthful speech in advertising, it was in a *challenge* to industry-wide restrictions on "truthful, non-deceptive advertising"—not *punishing* it.  *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) (challenging industry association rule restricting truthful advertising by its members); *cf. also Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) (FTC challenging as "unfair" misrepresentative claims that tobacco products were "light" or had "lowered tar and nicotine").

Where the FTC cannot allege that any customers have been deceived—as opposed to convinced by Amazon's description of Prime's benefits—it should not be relieved of its burden via clever wordplay.  Despite the inventiveness of its language, the FTC's alleged "dark patterns" are simply "selling and artistic choice," and what the FTC is actually alleging is that consumers were convinced by an advertiser's accurate description of a program's benefits.  Unless and until the FTC can present a Complaint that focuses its allegations on actual misleading or deceptive conduct and/or facts that support the actual counts on which it wishes to proceed, the FTC should not be allowed to proceed further.  If this case is allowed to proceed, advertisers and their employees will be left wondering what behavior the FTC can and will come after.  Is the use of colors or the accurate touting of the benefits of a product or service it wants to sell or simply asking a consumer whether it wants an additional service (or free shipping) inappropriate and unlawful under the FTC Act?  If so, is it all colors or just some?  Are some benefits allowed to be mentioned, but not others?  Can certain benefits only be mentioned once?  Which ones?  The result is that enforcement will become completely capricious, which is what the FTC seems to want.

**B.    The FTC's theory around "dark patterns" as articulated in its Complaint presents a non-legitimate interest in regulating truthful speech.**

The FTC's theory of "dark patterns" crosses a dangerous line when it comes to the regulation of commercial speech.  The FTC appears to seek to punish, ban, and regulate speech that it has not—and cannot—allege is untruthful by applying the label "dark patterns."  As the

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

Court considers Defendants' due process arguments, the Court should weigh the obvious chilling effect on legitimate commercial speech against the contrasting illegitimacy of the government interest at issue here.

The Constitution accords "a lesser protection to commercial speech than to other constitutionally guaranteed expression," but even in that context, "the protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978)). There "can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Id.* But if, as here, "the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed." *Id.* at 564.

Prohibiting truthful speech that is too convincing is decidedly not a legitimate government interest. Even analyzed under the rubric of "commercial speech," the "disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information," and therefore "only false, deceptive, or misleading commercial speech may be banned." *Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 142 (1994) (overturning ban on truthful advertising by attorneys who advertise credentials) (citations omitted). In the commercial speech context, the Supreme Court has made clear that "speech remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011). This is true even where the speech is designed to market pharmaceuticals: "The more benign and, many would say, beneficial speech of pharmaceutical marketing is also entitled to the protection of the First Amendment. If pharmaceutical marketing affects treatment decisions, it does so because doctors find it persuasive. Absent circumstances far from those presented here, the fear that speech might persuade provides no lawful basis for quieting it." *Id.*

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 13

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

When the government "prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996).  "The special dangers that attend complete bans on truthful, nonmisleading commercial speech cannot be explained away by appeals to the 'commonsense distinctions' that exist between commercial and noncommercial speech." *Id.* at 502 (citing *Va. bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (2013)).

"Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth." *Id.* at 503 (citing *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 96 (1977)).  Yet, that is precisely what the FTC is alleging as part of its "dark patterns" case against Amazon.  Notably, the FTC does not seek to ban Amazon from selling Amazon Prime.  Rather, the FTC seems to want to regulate how Amazon *communicates*, truthfully, the benefits of Prime to its customers.  *Cf. Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47–48 (2017) ("The law tells merchants nothing about the amount they are allowed to collect from a cash or credit card payer. . . . What the law does regulate is how sellers may communicate their prices. . . . In regulating the communication of prices rather than prices themselves, § 518 regulates speech.").[4]

The IAB urges that this Court evaluate Defendants' broader arguments, including Due Process arguments, in light of the obvious illegitimacy of the FTC's interest in prohibiting the dissemination of truthful, even if commercial, speech.

---

[4] The Court in *Expressions Hair Design* remanded for the Court of Appeals to consider the First Amendment argument in the first instance.  The Second Circuit subsequently certified a statutory interpretation question to New York state court, which confirmed that the merchant could truthfully communicate its prices to customers under the relevant statute.  *See* 32 N.Y.3d 382, 393 (2018).

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 14

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

### III.    CONCLUSION

For the reasons set forth above, the FTC's Complaint should be dismissed.

Dated: October 25, 2023                    Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP    FENWICK & WEST LLP

Corey W. Roush (*pro hac vice* pending)    By: */s/ Brian D. Buckley*
Robert S. Strauss Tower                    Brian D. Buckley, WSBA No. 26423
2001 K Street, N.W.                        401 Union Street, 5th Floor
Washington, DC 20006                       Seattle, WA  98101
Telephone:      (202) 887-4000             Telephone:      (206) 389-4510
Email:          croush@akingump.com        Facsimile:      (206) 389-4511
                                           Email:          bbuckley@fenwick.com

*Attorneys for Amicus Curiae Interactive*
*Advertising Bureau*

BRIEF OF AMICUS CURIAE IAB
(2:23-cv-0932-JHC) - 15

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000

**LCR 7(E) WORD-COUNT CERTIFICATION**

As required by Western District of Washington Local Civil Rule 7(e), I certify that this memorandum contains 3,829 words.

Dated:  October 25, 2023

FENWICK & WEST LLP


By: */s/ Brian D. Buckley*
Brian D. Buckley

Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000