1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

AMAZON.COM, INC., *et al.*

     Defendants.

**Case No. 2:23-cv-0932-JHC**

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO
DISMISS AMENDED COMPLAINT**

NOTED ON MOTION CALENDAR:
Friday, December 8, 2023

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD......................................................................................................... 2

ARGUMENT ...................................................................................................................... 2

I.     AMAZON FAILED TO CLEARLY AND CONSPICUOUSLY DISCLOSE
       PRIME'S MATERIAL TERMS (COUNT II)............................................................ 3

       A.    The Context Within Which Amazon Displays Prime's Material Terms
             Makes It Unlikely Consumers Will Notice Them. ..................................... 5

             1.    Amazon Gives Consumers No Reason to Look for, or Notice, Its
                   Small-Print UPDP Disclosures. .................................................... 7

             2.    Amazon's "SPC" Page Hides Prime's Material Terms Until After
                   Consumers Agree to "Try Prime."............................................... 11

       B.    Even Ignoring Context, Amazon's Disclosures of Material Terms Are Not
             Clear and Conspicuous. ........................................................................... 13

       C.    Amazon Knows, Based on Evidence from Its Own Customers, That Ordinary
             Shoppers Do Not See Prime's Material Terms....................................... 16

       D.    Amazon Impermissibly Discloses Prime's Terms and Conditions *After*
             Obtaining Billing Information. ................................................................. 18

       E.    Amazon's Reliance on Distinguishable Contract Law and Auto-Renewal
             Cases Is Misplaced................................................................................... 18

II.    AMAZON FAILED TO OBTAIN CONSUMERS' EXPRESS INFORMED
       CONSENT TO AUTOMATICALLY-RENEWING PRIME SUBSCRIPTIONS
       (COUNTS I, III)...................................................................................................... 22

       A.    Amazon Does Not Obtain Consent to Prime's Material Terms. .......... 23

             1.    Amazon Does Not Tell Consumers the Consequences of Clicking
                   Its "Enrollment" Buttons............................................................ 23

             2.    Amazon Is Not Permitted to Knowingly Charge Millions of
                   Nonconsensual Prime Members. ................................................. 28

       B.    Amazon Does Not Obtain *Informed* Consent. ...................................... 31

III.   AMAZON DID NOT PROVIDE SIMPLE PRIME CANCELLATION
       MECHANISMS (COUNT IV). ............................................................................... 31

       A.    Amazon's Iliad Cancellation Flow Was Not Simple............................. 32

             1.    Amazon Forced Consumers to Find an "End Membership" Button
                   That Did Not End Membership.................................................... 32

             2.    After Entering the Iliad Flow, Consumers Had to Request
                   Cancellation Three Additional Times......................................... 35

3.  The Iliad Flow Provided Repetitive, Distracting Information and Options to Derail Consumers' Cancellation Attempts.............................. 35

4.  Amazon Knew the Iliad Flow Was Not Simple......................................... 36

B.  Amazon Redirected Consumers Who Attempted to Cancel by Phone to the Iliad Flow.................................................................................................... 37

IV.  THE INDIVIDUAL DEFENDANTS HAD THE AUTHORITY TO CONTROL OR DIRECTLY PARTICIPATED IN AMAZON'S VIOLATIONS. ............................. 38

A.  The Complaint More Than Adequately Pleads Grandinetti, Lindsay, and Ghani's Liability for Amazon's Unlawful Cancellation Flow (Count IV).......... 38

1.  Rule 9(b) Does Not Apply. ........................................................... 39

2.  Under Any Pleading Standard, the FTC Plausibly Alleges Each Individual Defendant Had Authority to Control or Directly Participated in Maintaining the Iliad Flow. ................................. 40

B.  The Complaint More Than Adequately Pleads Grandinetti's Liability for Amazon's Unlawful Enrollment Practices (Counts I-III).................................... 42

V.  THE COMPLAINT DOES NOT VIOLATE DEFENDANTS' DUE PROCESS RIGHTS. ..................................................................................................... 43

A.  Defendants' Vagueness Arguments Fail Because ROSCA and the FTC Act Are Clear and the FTC Has Not Asserted a "Dark Patterns Theory."................. 44

B.  Defendants Had Fair Notice of What ROSCA and the FTC Act Require........... 46

C.  The Rule of Lenity Is Inapplicable. ....................................................... 48

VI.  DEFENDANTS ARE LIABLE FOR CIVIL PENALTIES BECAUSE THEY KNEW THEY WERE VIOLATING ROSCA. ................................................... 49

A.  Defendants Knew of ROSCA's Existence.............................................. 49

B.  The Complaint More Than Plausibly Alleges Defendants' Actual Knowledge, or "Knowledge Fairly Implied," of Their ROSCA Violations. ............................. 50

CONCLUSION.................................................................................................... 52

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - ii

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
*Adams v. Amazon.com, Inc.*, 2023 WL 4002534 (W.D. Va. June 14, 2023)...............................28

4
*Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................................2

5
*Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381 (2nd Cir. 1986) ...............................6

6
*Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883 (9th Cir. 2009) ...................................................3

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) .........................................................11

7
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................2

8
*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ..................... 14, 15, 23, 24

9
*Bittner v. United States*, 598 U.S. 85 (2023) ...............................................................................49

*Butcher v. Knudsen*, 38 F.4th 1163 (9th Cir. 2022)...............................................................45, 46

10
*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50 (D.D.C. 2000).........................................45

11
*Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011) ...................................40

*Capps v. JPMorgan Chase Bank, N.A.*, 2023 WL 3030990 (C.D. Cal. Apr. 21, 2023)..............19

12
*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*
13
    447 U.S. 557 (1980)................................................................................................47

*Chabolla v. ClassPass Inc.*, 2023 WL 4544598 (N.D. Cal. June 22, 2023)......................5, 6, 26
14
*City of Almaty v. Khrapunov*, 956 F.3d 1129 (9th Cir. 2020).......................................................2

15
*Cole v. U.S. Cap., Inc.*, 389 F.3d 719 (7th Cir. 2004) ..........................................................14, 15

*Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83 (S.D.N.Y. 2021) .......................................4
16
*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018)..................................................15, 24

17
*Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) ......................................................19

18
*Dumont v. Reily Foods Co.*, 934 F.3d 35 (1st Cir. 2019) .............................................................3

*Dyson, Inc. v. Garry Vacuum, LLC*, 2010 WL 11595882 (C.D. Cal. July 19, 2010)..................39
19
*Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172 (W.D. Wash. 2014)......................................28

20
*Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012) .........................................4

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).....................................................46, 47
21
*FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861 (N.D. Cal. Nov. 29, 2018) .........................12

22
*FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067 (N.D. Cal. 2018)................................39, 42

*FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338 (D. Nev. 2014) ..................................................6
23
*FTC v. Benning*, 2010 WL 2605178 (N.D. Cal. June 28, 2010)................................................40

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - iii

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*FTC v. Cantkier*, 767 F. Supp. 2d 147 (D.D.C. 2011) ..................................................... 39

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ...................................... 6

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ...................................................... 38

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................... 4, 14, 17

*FTC v. Dinamica Financiera LLC*, 2010 WL 9488821 (C.D. Cal. Aug. 19, 2010).................... 40

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005)........................................... 42

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) ...................................................... 13

*FTC v. Health Formulas, LLC*, 2015 WL 2130504 (D. Nev. May 6, 2015) .............................. 31

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015) ...................................................... 13

*FTC v. Loewen*, 2013 WL 5816420 (W.D. Wash. Oct., 29, 2013)............................................. 40

*FTC v. Publishers Clearing House*, 104 F.3d 1168 (9th Cir. 1997)........................................ 40, 42

*FTC v. Quincy Bioscience Holding Co., Inc.*, 389 F. Supp. 3d 211 (S.D.N.Y. 2019)................. 42

*FTC v. Sterling Drug, Inc.*, 317 F.2d 669 (2d Cir. 1963) ...................................................... 6

*FTC v. Swish Mktg*, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010)............................................. 42

*FTC v. World Media Brokers Inc.*, 2004 WL 432475 (N.D. Ill Mar. 2, 2004).......................... 40

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)........................... 44, 46, 47, 48

*Gaker v. Citizens Disability, LLC*, --- F. Supp. 3d ----,
2023 WL 1777460 (D. Mass. Feb. 6, 2023) ...................................................... 5, 14

*General Electric Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ...................................................... 46

*Gershfield v. TeamViewer US, Inc.*, 2023 WL 334015 (9th Cir. Jan. 20, 2023) ................... 21, 22

*Hall v. Time, Inc.*, 2020 WL 2303088 (C.D. Cal. Mar. 13, 2020)............................................. 21

*Heinz v. Amazon.com, Inc.*, 2023 WL 4466904 (E.D. Cal. July 11, 2023) ............................... 19

*Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012)........................................................... 2

*Hooper v. Jerry Ins. Agency. LLC*, --- F. Supp. 3d ----,
2023 WL 3992130 (N.D. Cal. June 1, 2023)........................................................... 19

*In re Grand Jury Matter*, 147 F.R.D. 82 (E.D. Pa. 1992)........................................................ 51

*In re Kraft, Inc.*, 114 F.T.C. 40 (1991) ...................................................................... 30

*In re Ring LLC Privacy Litig.*, 2021 WL 2621197 (C.D. Cal June 24, 2021)............................ 25

*In re Vistaprint Corp. Mktg. & Sales Practices Litig.*,
2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ...................................................... 11

*Karem v. Trump,* 960 F.3d 656 (D.C. Cir. 2020)........................................................... 47

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) .......................................................... 44

*Keebaugh v. Warner Bros. Ent. Inc.*, 2022 WL 7610032 (C.D. Cal. Oct. 13, 2022) ................... 5

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - iv

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) ................................................................ 18

*Landers v. Quality Comms., Inc.*, 771 F.3d 638 (9th Cir. 2014) ...................................... 2

*Lee v. Intelius, Inc.*, 737 F.3d 1254 (9th Cir. 2013)................................................. 24, 25

*Lopez v. Dave Inc.*, 2022 WL 17089824 (N.D. Cal. Nov. 21, 2022)................................... passim

*Marsh v. Zaazoom Solutions, LLC*, 2012 WL 952226 (N.D. Cal. Mar. 20, 2012)...................... 31

*NetChoice, LLC v. Bonta*, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023)........................... 47

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ........................... 6, 14, 23

*Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254 (E.D.N.Y. 2019) .............................. 4

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505 (9th Cir. 2023) ......................... passim

*Okorocha v. Duff*, 596 F. App'x 537 (9th Cir. 2015) ............................................. 47

*Organic Consumers Ass'n v. Sanderson Farms, Inc.*,
    284 F. Supp. 3d 1005 (N.D. Cal. 2018) ...................................................... 4

*Orion Ins. Group v. Wash. State Off. of Minority & Women's Bus. Enters.*,
    2017 WL 3387344 (W.D. Wash. Aug. 7, 2017)................................................. 44

*Perkins v. N.Y. Times Co.*, 2023 WL 3601489 (S.D.N.Y. May 23, 2023) ......................... 21

*Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975)........................... 4

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) ................................. 4, 16

*Rutter v. Apple Inc.*, 2022 WL 1443336 (N.D. Cal. May 6, 2022)............................. 21

*Sadlock v. Walt Disney Co.*, 2023 WL 4869245 (N.D. Cal. July 31, 2023) ..................... 9

*Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1 (Cal. Ct. App. 2021)................... 5, 6, 13

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ................................................ 44

*Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
    --- F. Supp. 3d ----, 2023 WL 2768453 (N.D. Cal. Mar. 9, 2023)........................... 39

*Snell v. G4S Secure Solutions (USA) Inc.*, 424 F. Supp. 3d 892 (E.D. Cal. 2019)............ 10

*Strow v. B&G Foods, Inc.*, 633 F. Supp. 3d 1090 (N.D. Ill. 2022) ........................... 3

*Sullivan v. All Web Leads, Inc.*, 2017 WL 2378079 (N.D. Ill. June 1, 2017)................. 14

*United States v. Mincoff*, 574 F.3d 1186 (9th Cir. 2009)................................... 44

*United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D. Cal. 2021) ............. 32, 35

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996)..................... 49

*United States v. Shill*, 740 F.3d 1347 (9th Cir. 2014)..................................... 48

*United States v. Tech. Commc'ns Indus., Inc.*, 1986 WL 15489 (E.D.N.C. Dec. 22, 1986) ...... 49

*United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)................ 40

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ............................. 39

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - v

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Viveros v. Audible, Inc.*, No. 23-cv-0925-JLR, 2023 WL 6960281
   (W.D. Wash. Oct. 20, 2023) ............................................................................ 22

*Walker v. Fred Meyer, Inc.*, 953 F.3d 1082 (9th Cir. 2020) ...................................... 3

*Walkingeagle v. Google LLC*, 2023 WL 3981334 (D. Or. June 12, 2023) ..................... 11, 20, 21

*Washington v. Internet Order, LLC*, 2015 WL 918694 (W.D. Wash. Mar. 2, 2015) .................. 30

*William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255 (9th Cir. 1995) ........................ 30

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019) ........................................ 15

## Statutes

15 U.S.C. § 45(m)(1) ........................................................................... 3, 49

15 U.S.C. § 8403(1) ........................................................................... 3, 4, 18, 19

15 U.S.C. § 8403(2) ........................................................................... 22, 30, 31

15 U.S.C. § 8403(3) ........................................................................... 31

15 U.S.C. § 8404 .............................................................................. 48

## Rules

Fed. R. Civ. P. 9(b) .......................................................................... 39

## Other Authorities

Dictionary.com, https://www.dictionary.com/browse/simple ..................................... 31

Speech of Hon. Zachary T. Space of Ohio, 156 Cong. Rec. E2165-02 (Dec. 15, 2010) ............. 31

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - vi

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## **INTRODUCTION**

Millions of consumers who visited Amazon to shop instead found themselves enrolled in automatically-renewing Amazon Prime subscriptions without their knowledge or consent.   That result was the foreseeable—and widely known within Amazon—consequence of Amazon's failure to tell consumers clicking buttons like "Get Free Two-Day Shipping" would enroll them in a Prime free trial and that the trial would automatically convert to a paying membership. When these and other consumers attempted to cancel their Prime subscriptions through the aptly named "Iliad" cancellation flow, Amazon first forced them to locate an "end membership" button that did not end membership.  Consumers then had to navigate additional screens that did not allow them to cancel and instead made repeated retention offers.  Far from being simple, this process resulted in millions of Prime members continuing to be charged for memberships they thought they had cancelled.

Amazon's failures to provide clear enrollment processes and simple cancellation mechanisms are apparent from the screenshots attached to and described in the FTC's Complaint, notwithstanding Amazon's contextless, false, and misleading descriptions.  The Court, however, need not decide that issue at this stage.   Rather, Amazon's motion must fail if it is *plausible* the FTC is right—*i.e.*, if it is plausible that (1) ordinary consumers did not understand they were enrolling in automatically-renewing Amazon Prime subscriptions while trying to buy products (Counts I-III) and (2) Amazon's cancellation process was not simple (Count IV).  Although the Court could easily draw that inference from the face of the enrollment and cancellation flows themselves, the Complaint also discusses copious evidence—drawn from Amazon's own documents and data—supporting these allegations and the Individual Defendants' liability for them.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 1

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

**LEGAL STANDARD**

On a Rule 12(b)(6) motion to dismiss, the Court must "accept as true all well pleaded facts in the complaint and construe them in the light most favorable" to the plaintiff.  *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (cleaned up).  A Complaint survives a motion to dismiss when it "state[s] a claim for relief that is plausible on its face."  *Landers v. Quality Comms., Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint is "plausible" when it "allows the court to draw the reasonable inference" of liability.  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Therefore, dismissal is inappropriate unless it "appears beyond doubt that plaintiff can prove no set of facts in support of its claims which would entitle it to relief."  *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020) (cleaned up).  Here, there is no question the FTC's Complaint meets and, in fact, far surpasses this standard.

**ARGUMENT**

Amazon's motion fails on all counts.  First, the Complaint provides convincing evidence that Amazon did not clearly and conspicuously disclose Prime's auto-renewal and price—or, in many cases, the fact that consumers were enrolling in Prime at all—prior to obtaining consumers' billing information and enrolling them in Prime.  Second, the facts detailed in the Complaint more than demonstrate Prime enrollees frequently did not consent at all to becoming Prime members or to Prime's auto-renewal and price, and certainly did not provide express *informed* consent.  Third, the Complaint pleads facts demonstrating Amazon's cancellation process was not simple.

The Individual Defendants' motion fares no better because the Complaint plausibly alleges, at a minimum, that each Individual Defendant had the authority to correct Amazon's unlawful conduct but declined to do so.  Additionally, Defendants' due process argument fails for the straightforward reason that no Defendant actually asserts the relevant statutes are unconstitutionally vague.  Finally, Defendants cannot escape the prospect of civil penalties because the FTC more than plausibly alleges each Defendant knew ROSCA existed and knew, or

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 2

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

had knowledge "fairly implied on the basis of objective circumstances" (15 U.S.C. § 45(m)(1)),

that their actions violated ROSCA.

## I.     AMAZON FAILED TO CLEARLY AND CONSPICUOUSLY DISCLOSE PRIME'S MATERIAL TERMS (COUNT II).

The Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403(1),

requires Amazon to "clearly and conspicuously disclose[] all material terms" of Prime before

obtaining consumers' billing information.  "Clear" means "reasonably understandable," and

"conspicuous" means "readily noticeable to the consumer." *Walker v. Fred Meyer, Inc.*, 953

F.3d 1082, 1091 (9th Cir. 2020) (quotation marks omitted) (defining "clear and conspicuous"

under Fair Credit Reporting Act).   A "clear and conspicuous" disclosure, therefore, is one that a

"reasonable [consumer] would notice and understand." *Barrer v. Chase Bank USA, N.A.*, 566

F.3d 883, 892 (9th Cir. 2009) (defining "clear and conspicuous" under Truth in Lending Act);

*see also* Mot.[1] at 7 (Amazon approvingly citing FTC statement that disclosures are clear and

conspicuous if they are "*easily* noticeable and understood by 'ordinary consumers'" (emphasis

added)).  The "reasonable consumer" is not an "erudite reader" inclined to carefully parse a

website "like a federal judge reading a statute." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st

Cir. 2019); *see also Strow v. B&G Foods, Inc.*, 633 F. Supp. 3d 1090, 1102 (N.D. Ill. 2022)

("Again, consumers are not judges.  This Court will not impose on average consumers an

obligation to question the labels they see and parse them as lawyers might for ambiguities . . . ."

(quotation marks omitted)).  Rather, the reasonable consumer is "an ordinary consumer acting

reasonably under the circumstances . . . who is not versed in the art of inspecting and judging a

---

[1] Citations to the "Motion" refer to Amazon's Motion to Dismiss, filed under seal at Dkt. #85 and in redacted form at Dkt. #84.  Citations to the "Individuals' Motion" refer to Defendants Neil Lindsay, Russell Grandinetti, and Jamil Ghani's Motion to Dismiss (Dkt. #83).  Page number citations refer to the numbering in the footer of each motion, rather than the numbering in the ECF header at the top of the page.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 3

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

product." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854 (N.D. Cal. 2012) (cleaned up).[2]

Because ROSCA is a consumer protection statute, "any misleading ambiguity [in defendants' disclosures] . . . should be resolved in favor of the consumer." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010) (cleaned up) (applying principle to Truth in Lending Act); *see also Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser."). This is particularly true at the motion to dismiss stage: "courts grant motions to dismiss under the reasonable consumer test only in rare situations in which the facts alleged in the complaint compel the conclusion as a matter of law that consumers are not likely to be deceived." *Organic Consumers Ass'n v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1014 (N.D. Cal. 2018) (quotation marks omitted); *see also Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 96 (S.D.N.Y. 2021) (inappropriate to dismiss claims about reasonable consumer that do not "border on fantasy" or are not "patently implausible").

The FTC's Complaint more than plausibly alleges ordinary consumers would not readily notice and understand three material terms of the Prime enrollment transaction: (1) that they are enrolling in Prime, (2) that their Prime membership automatically renews, and (3) Prime's monthly cost.[3] The Complaint easily clears this low bar in several ways. First, although wholly ignored by Amazon, the context in which Amazon enrolls consumers in Prime and "discloses" Prime's terms—as part of the product-checkout process—makes it unlikely consumers would

---

[2] Amazon misleadingly cites an Eastern District of New York case for the notion that "ordinary internet users . . . 'know there are terms and conditions attached when they . . . order merchandise on Amazon . . . because it would be difficult to exist in our technological society without some generalized awareness of the fact.'" Mot. at 7-8 (quoting *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020)). Amazon fails to tell the Court that this quote is from a discussion of what that court thought the law *ought* to be, not what the law actually is. *Nicosia*, 384 F. Supp. 3d at 278-79.

[3] Amazon does not dispute that these terms are "material" and that ROSCA therefore required Amazon to "clearly and conspicuously disclose[]" them. 15 U.S.C. § 8403(1); *see also FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (information is "material" if it is "important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product" (quotation marks omitted)).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 4

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

look for, find, and understand the relevance of those terms.  Second, Amazon's disclosures are generally small print, below (sometimes far below) the relevant enrollment button, and overshadowed by the page's marketing text and graphics.  Third, Amazon, based on actual data from studying consumers, drew the same inference it now says is implausible—that many consumers *did not* notice and understand Prime's disclosures of material terms.  Fourth, regardless of whether consumers would see or understand the disclosures, Amazon violated ROSCA by only displaying them *after* obtaining consumers' billing information.  Finally, the caselaw cited by Amazon does not allow it to escape liability for the reasons detailed below.

> **A.    The Context Within Which Amazon Displays Prime's Material Terms Makes It Unlikely Consumers Will Notice Them.**

When evaluating the conspicuousness of online disclosures, "the full context of the transaction is ***critical***."  *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *5 (N.D. Cal. June 22, 2023) (emphasis original; quotation marks omitted); *see also Gaker v. Citizens Disability, LLC*, --- F. Supp. 3d ----, 2023 WL 1777460, at *6 (D. Mass. Feb. 6, 2023) (applying "totality of the circumstances inquiry" to determine whether terms were "clear and conspicuous").  Although some courts "have focused on factors such as font size and graphic layout to determine whether a user would be on inquiry notice that he was consenting to an agreement," focusing on these considerations alone can lead to "inconsistent decisions."  *Keebaugh v. Warner Bros. Ent. Inc.*, 2022 WL 7610032, at *6 (C.D. Cal. Oct. 13, 2022) (cleaned up) (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 26 (Cal. Ct. App. 2021)).  Instead, courts properly examine "the full context of the transaction . . . to determin[e] whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms."  *Keebaugh*, 2022 WL 7610032, at *6 (quoting *Sellers*, 289 Cal. Rptr. 3d at 26); *see also id.* (criticizing the parties for only addressing the "visual elements" of the webpage to the exclusion of the remaining "context of the transaction").

The Ninth Circuit endorsed this contextual approach in a case heavily relied upon by Amazon.  *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516-17 (9th Cir. 2023); *see also*

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 5

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Chabolla*, 2023 WL 4544598, at *6 (explaining that Ninth Circuit in *Oberstein* "opted to apply the [contextual] approach, rather than discredit it"). In *Oberstein*, the Ninth Circuit explained that a user who "contemplates some sort of continuing relationship" with an entity is more likely to "scrutinize the [website] for small text" than a user "merely attempting to start a free trial." *Oberstein*, 60 F.4th 505 at 516-17 (9th Cir. 2023) (quoting and discussing, with approval, *Sellers*, 289 Cal. Rptr. 3d at 24); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound . . . .").

Similarly, in FTC Act cases, courts "consider the advertisement in its entirety [rather than] engag[ing] in disputatious dissections. The entire mosaic should be viewed rather than each tile separately." *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2nd Cir. 1986) (quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)). Therefore, when considering how the ordinary consumer would interpret a website or other marketing materials, courts consider the overall "net impression" left by the website. *See, e.g.*, *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1063 (C.D. Cal. 2012), *aff'd in part, vacated in part on other grounds*, 815 F.3d 593 (9th Cir. 2016); *see also FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1350-51 (D. Nev. 2014) ("The Loan Note and Disclosure document's net impression is likely to mislead because of the way the terms are presented . . . , not because Defendants' counsel can pull out the important terms and rearrange them in large bullet point lists that allow for a clearer understanding of their effects."), *reversed on other grounds*, 141 S. Ct. 1341 (2021).

Here, the relevant context—primarily, Amazon's strategy of embedding its Universal Prime Decision Page ("UPDP") and Single Page Checkout ("SPC") Prime enrollment pages within the product checkout process—made it unlikely many ordinary consumers would notice Amazon had enrolled them in a Prime free trial or that the Prime free trial automatically converted to a paid membership after 30 days.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 6

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   **1.    Amazon Gives Consumers No Reason to Look for, or Notice, Its Small-Print UPDP Disclosures.**

2   A shopper attempting to purchase items on Amazon typically places those items in their

3   shopping cart, and then proceeds through four screens by clicking a large orange button on each

4   screen to move to the next screen.  Compl. ¶¶ 34-35, Att. G at 1-5.[4]  After those four screens, the

5   product purchaser encounters the UPDP (Compl. Att. G at 6), examples of which are shown in

6   Figure 1 (desktop) and Figure 2 (mobile) below:

7

8

9   

10

11

12

13

14

15

16

17

18   *Figure 1 (Desktop UPDP; Compl. Att. B)*

19

20

21

22

23   _____
[4] All citations to the "Complaint" refer to the FTC's Amended Complaint, filed under seal at Dkt. #69 and in redacted form at Dkt. #67.

PLAINTIFF'S OPPOSITION TO                                          Federal Trade Commission
DEFENDANTS' MOTIONS TO DISMISS                          600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 7                                            Washington, DC 20580
                                                                                            (202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12


Figure 2 (Mobile UPDP; Compl. Att. M)

13
Generally, the UPDP page header does not tell consumers they have a choice to accept or

14
reject a Prime free trial.  Instead, in many cases, as in Figures 1 and 2, Amazon simply declares

15
"we're giving you a 30-day FREE Trial of Prime"—treating the trial as an automatic add-on to

the consumer's product purchase.  *See also* Compl. Att. E, G at 6, L at 7, M, O at 5.  That

16
impression is bolstered by Amazon's telling consumers what "Your Prime benefits include"

17
(Figure 1), in present tense, again implying the consumer need not do anything else to receive the

18
benefits.  *See also* Compl. Att. G at 6.  Amazon makes the problem worse by providing a single

19
large orange button on the page, which the shopper might reasonably think is their only option

20
for proceeding with their product purchase.  Compl. ¶ 39.  Beyond that, the single large orange

button often reads, as in Figures 1 and 2, "Get FREE Two-Day Delivery" or similar language,

21
again implying the button relates only to the shopper's product purchase.  *See also* Compl. Att.

22
A.  Counterintuitively, clicking the "delivery" button actually enrolls the consumer in Prime,

23

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 8

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*even if the consumer does not finish the product purchase*.[5]  Compl. ¶ 40.  (Unbeknownst to many consumers, the small blue link to the left of or below the orange button—which sometimes says "No thanks" or states that the consumer will continue without "fast, FREE delivery"—permits the consumer to finish their product purchase without enrolling in Prime.  *See Id.* ¶¶ 41, 42, 44, 207 (consumers overlook "no thanks" link), 231(c)(i), (d)(ii) (same).)

The UPDP page therefore does not make clear the consumer is making *any* decision, much less a decision to enter a "continuing relationship" with Amazon.  *Oberstein*, 60 F.4th at 516-17.  Consumers merely trying to finish their product purchase would have no reason to read, notice, or even look for the small print Prime terms at the bottom of the page.  But Prime's material terms—its auto-renewal, price, and sometimes even the fact that the consumer is enrolling in Prime—generally are *only* disclosed in this small-print boilerplate.  Although Amazon now claims that none of this is even plausibly true, Amazon has known since at least 2018 that "customers did not realize [UPDP] was a Prime upsell."  Compl. ¶ 195.

Even UPDP versions on which the orange button reads "Start my 30-day FREE trial" (as in Figure 3 below) or "Start Your 30-day Prime FREE trial" (Compl. Att. C) still give consumers no reason to search out any terms—or "scrutinize the page for small text," *Oberstein*, 60 F.4th at 516-17—because there is no indication anywhere on the button, or in the page's header or marketing content, that there *are* any such terms.  *See, e.g.*, *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *11 (N.D. Cal. July 31, 2023) ("[Plaintiff] undoubtedly knew that he was purchasing a subscription with Disney, but that—by itself—does not mean he should have known there was a Subscription Agreement to which he would be bound.").

---

[5] In some UPDP versions—such as Figure 1, but not Figure 2—a gray "shadow button" beneath the "delivery" button reads "Enjoy Prime FREE for 30 days" or something similar.  *See also* Compl. Atts. A, E, I at 3. Consumers are just as, if not more, likely to interpret that button as an alternative to the orange "Free Delivery" button as they are to read it as somehow clarifying what "Free Delivery" means.  *See, e.g.*, Compl. ¶ 220 (Amazon considered "remov[ing] shadow boxes around buttons" to *improve* clarity).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 9

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320



*Figure 3 (Desktop UPDP; Compl. Att. D)*

That is particularly true here because some ordinary Amazon shoppers do not realize they have any alternative but to click the orange button if they want to finish their product purchase. Again, Amazon now claims this confusion is implausible, but the company previously recognized "the option to decline Prime enrollment 'is not clear/prominent so customers miss it' and click on the enrollment [button] inadvertently." Compl. ¶ 195.

Additionally, Amazon claims that on some of its UPDP pages (such as Figure 3 above), Prime's price and auto-renewal terms are displayed twice—or, as Amazon says, "multiple" times. Mot. at 11. That argument, however, is based on the false premise that the following text is a disclosure that Prime auto-renews: "After your FREE trial, Prime is just $12.99/month." The quoted language discloses only price, *not* auto-renewal, at the end of the free trial.[6] At the very least, it is more than plausible consumers would not understand they will be charged $12.99 per month if they do nothing but accept a "FREE trial." In any event, Amazon cannot prevail on its motion to dismiss by claiming that *some* of its enrollment pages are good enough. *See Snell v.*

---

[6] Confusingly, Amazon also inflates the number of Complaint attachments that have a second price disclosure by citing three examples (Compl. Atts. A-C) that contain just a single disclosure, in small print. Mot. at 11.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 10

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*G4S Secure Solutions (USA) Inc.*, 424 F. Supp. 3d 892, 904 (E.D. Cal. 2019) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015)).   !

### 2. Amazon's "SPC" Page Hides Prime's Material Terms Until After Consumers Agree to "Try Prime."

Amazon showed consumers who managed to click through the UPDP without enrolling in Prime another Prime upsell on the SPC "checkout" page.  This page fails to display Prime's terms until *after* the consumer might have looked for them.  Specifically, as pictured below in Figure 4, Amazon encouraged consumers to click a button to "Try Prime FREE for 30 days."  At the time consumers clicked that button, Amazon did not disclose *anywhere* on the page that Prime auto-renews or its price.[7]  Compl. ¶ 58.  Instead, Amazon called Prime "FREE" four separate times and claimed the free trial comes with "no commitments."  Therefore, Amazon's assertion that each enrollment page "discloses the price and auto-renewal features on the same page where users click to enroll in Prime," Mot. at 8, is simply false.[8]  In fact, as the Complaint alleges (*id.* ¶¶ 56-58), when the consumer decides to enroll in Prime, Amazon fails to disclose Prime's terms at all, much less to do so clearly and conspicuously.

---

[7] The same is true for Amazon's "Ship Option Select Page" ("SOSP").  *See* Compl. Att. G at 4.  That page allows consumers to select a "FREE trial of Prime" without any disclosure of Prime's auto-renewal or price.

[8] Amazon is also incorrect that *any* same-page disclosure of material terms qualifies as clear and conspicuous.  Mot. at 8.  The two cases cited by Amazon do not support its claim.  *See In re Vistaprint Corp. Mktg. & Sales Practices Litig.*, 2009 WL 2884727, at *4 (S.D. Tex. Aug. 31, 2009) (finding website nondeceptive where, unlike here, disclosures were referenced above where consumer provided consent *and* disclosures themselves were "immediately beside" where consumer provided consent *and* disclosures were "in the same size and color as most of the print on the webpage"); *Walkingeagle v. Google LLC*, 2023 WL 3981334, at *3-4 (D. Or. June 12, 2023) (finding auto-renewal disclosures clear and conspicuous where, unlike here, they were directly above the enrollment button, with minimal surrounding text, and accompanied by a second disclosure, also above the enrollment button, of "monthly charge" and billing start date).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 11

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1



*Figure 4 (Desktop SPC Before Clicking "Try Prime FREE"; Compl. Att. H at 5)*

Only after consumers click the button to enroll in Prime does Amazon disclose, in the third block of text under the "Place your order" button (as shown in Figure 5 below), that Prime automatically renews, for $12.99 per month, after the free trial.[9]  At that point, however, it is at least plausible—and in fact highly likely—an ordinary consumer would assume they had already signed up for free Prime and, when clicking "Place your order," were merely purchasing the product they wanted.  Such a user is unlikely to "scrutinize the page for small text" or hidden terms, especially terms related to Prime rather than their product purchase.  *Oberstein*, 60 F.4th at 516-17; *see also FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861, at *9 (N.D. Cal. Nov. 29, 2018) (misrepresentations not cured by disclosure after consumer "agreed to enroll," even

---

[9] This same pattern—clicking a button to enroll in Prime followed by an after-the-fact disclosure—occurs on Amazon's recently created "TrueSPC" checkout page.  Compl. Att. I at 4-5.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 12

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

though contract had not yet been finalized); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (rejecting relevance of disclaimer "found on the contract that consumers eventually sign with the defendant"); *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015) ("fine-print disclosures" after consumers began ordering process did not overcome misleading net impression.  After all, a "consumer that does not expect to be bound by contractual terms is less likely to be looking for them."  *Sellers*, 289 Cal Rptr. 3d at 25 (explaining that consumer buying "a single pair of socks" likely would not "expect to be bound by contractual terms").



*Figure 5 (Desktop SPC After Clicking "Try Prime FREE"; Compl. Att. H at 6)*

### B.   Even Ignoring Context, Amazon's Disclosures of Material Terms Are Not Clear and Conspicuous.

Amazon fatally ignores the context, and some of the facts, described above, instead focusing exclusively on font sizes, styles, colors, and proximity to enrollment buttons.  Mot. at 8-12.  Even viewing the Complaint through Amazon's selectively narrow lens, the FTC more

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 13

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

than plausibly alleges many ordinary customers would neither see nor understand Prime's price and auto-renewal terms or, in some cases, that they are enrolling in Prime at all.  Contrary to Amazon's assertions, those terms are presented in small print, below (sometimes far below) the enrollment button, often starting on the opposite side of the page as the button, and overshadowed by marketing text and graphics on the page, which are missing from Amazon's cropped screenshots.  Therefore, the terms are not clearly and conspicuously disclosed.

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).   As such, courts routinely find fine print terms and conditions like Amazon's inconspicuous.  *See, e.g.*, *Cyberspace.com*, 453 F.3d at 1198 (FTC Act case; "small-print disclosures" on back of printed material were insufficient to put consumers on notice they were "agree[ing] to pay a monthly fee"); *Cole v. U.S. Cap., Inc.*, 389 F.3d 719, 731 (7th Cir. 2004) (Fair Credit Reporting Act case; text not clear and conspicuous where "disproportionately small compared to the surrounding text" and "appears to be designed to ensure minimal attention by the reader"); *Lopez v. Dave Inc.*, 2022 WL 17089824, at *1 (N.D. Cal. Nov. 21, 2022) (contract case; text not "reasonably conspicuous" when "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements").

Additionally, even under the laxer standards for conspicuousness applicable in contract law as opposed to ROSCA (*see infra* Section I.E), courts are critical of, and often deem inconspicuous, disclosures located *below* the enrollment button to which they apply.  *See, e.g.*, *Nguyen*, 763 F.3d at 1178 (contract case; finding lack of "reasonable notice" of contract terms even where "Terms of Use" link appeared "directly below" the relevant button); *Gaker*, 2023 WL 1777460, at *6 (contract case; recognizing general rule that "a consumer is less likely to be bound to terms agreed to on the internet where the terms were located below the 'accept' or 'submit' button or were otherwise hidden or difficult to access") (citing *Sullivan v. All Web*

*Leads, Inc.*, 2017 WL 2378079, at *7 (N.D. Ill. June 1, 2017)); *Lopez*, 2022 WL 17089824, at *2 (contract case; refusing to find a hyperlink conspicuous where it was "below the 'Join' button, meaning a user could enter their mobile number and click 'Join' without reviewing the remainder of the page").

Even text immediately *above* an enrollment button may be deemed inconspicuous, especially where "other visual elements . . . draw the user's attention away." *Berman*, 30 F.4th at 856-57. More generally, disclosures are not conspicuous if consumers must "parse through confusing or distracting content and advertisements" to see them. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019). "If everything on the screen is written with conspicuous features, then nothing is conspicuous." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018).

Here, Amazon's disclosures of Prime's material terms are generally below (sometimes far below) the enrollment buttons on both UPDP and SPC, if they are there at all. *See* Figures 1-5; Compl. Atts. A-D, F, G at 6, H at 5-6, J at 6, K at 4, L at 7, M, O at 5. On desktop versions of UPDP, the disclosures start on the far-left side of the page, while the orange enrollment button is on the right. *See, e.g.*, Figure 1; Compl. Atts. A-D, F, G at 6, H at 5-6. On mobile versions of UPDP, the disclosures are sometimes not even visible without scrolling down past the button. Compl. ¶¶ 83, 96, 100, 102; Compl. Atts. L at 7, O at 5.[10] On both versions, the UPDP disclosures are generally far from the page's more prominent marketing text and graphics, again in plain, small print. *See* Figures 1-5; Compl. Atts. A-D, G at 6, L at 7, M, O at 5.

Similarly, the SPC auto-renewal and price disclosures (*see* Figure 5 above) are the type of fine print disclosures courts routinely reject. *See, e.g.*, *Cole*, 389 F.3d at 731. The SPC disclosures are in the middle of the third block of text *below* the "Place your order" button, after

---

[10] Amazon claims it must require scrolling on mobile devices because it would otherwise by required to pack "miniscule text" into a "few square inches." Mot. at 12 n.6. Even a cursory look at Amazon's mobile UPDP pages, however, reveals the actual problem: Amazon has used almost the entire screen for marketing rather than displaying Prime's material terms. *See* Compl. Atts. L at 7, O at 5.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 15

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

statements about Amazon's "privacy notice," unrelated "conditions of use," and other "terms." *See* Figure 5; Compl. Att. H at 6.  In that third block of text, Amazon references other unspecified "Terms and Conditions" and then, in bold text in the middle of the paragraph, mentions "Prime" for the first time and discloses auto-renewal and price.  *Id.*  Therefore, the user could easily click "Place your order" without ever seeing this text.

Thus, Amazon is simply incorrect when it claims Prime's price and auto-renewal terms are located "directly on top of or below each enrollment button."  Mot. at 9 (cleaned up).  In fact, the disclosures are only very rarely either above the enrollment button or *directly* below it.

### C.  Amazon Knows, Based on Evidence from Its Own Customers, That Ordinary Shoppers Do Not See Prime's Material Terms.

For the foregoing reasons, Amazon's arguments regarding clarity and conspicuousness should be rejected without looking beyond Amazon's enrollment pages themselves.  That, however, does not mean, as Amazon suggests, the Court must ignore all evidence in the Complaint demonstrating ordinary consumers' *actual* experiences with Prime enrollment.  As the Ninth Circuit explained, such "empirical evidence is helpful in determining what a reasonable consumer will understand and readily notice."  *Rubio*, 613 F.3d at 1200.  Therefore, where "persuasive and directly relevant evidence is available," the parties' "armchair empiricism is comparatively unhelpful."  *Id.*

Here, the Complaint alleges Amazon possessed, reviewed, and relied upon exactly the type of "persuasive and directly relevant evidence" embraced by the Ninth Circuit—namely, user studies and other data showing that consumers did not see or understand Prime's material terms. For example:

- From November 2018 to February 2019, Amazon determined that roughly ███ ███ [11] of Prime members who cancelled their subscriptions gave, "I did not mean to sign up for Amazon Prime" as their reason for cancellation.  Compl. ¶ 177.

[11] The FTC has redacted the public version of this Opposition consistent with the Court's ruling on Amazon's requests to seal the Complaint and Amended Complaint.  Dkt. #79.  The FTC has concurrently filed an unredacted, sealed version of the Opposition.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 16

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

- A company newsletter called the "issue of accidental Prime-sign ups" "well documented," explaining that Amazon shoppers either "signed up accidentally and/or didn't see auto-renewal terms."  Compl. ¶ 179.

- ████████████████████████████████████████████████████████
  ████████████████████████████████████  Compl. ¶ 231(d)(ii).

- ███████████████████████████████████████████
  ████████████████████████████████████████████████████
  ███████████  Compl. ¶ 193.

- A memorandum prepared for a June 2019 meeting with Defendant Grandinetti explained that the product checkout Prime enrollment pages (*i.e.*, UPDP and SPC) confused consumers about whether they were enrolling and made it difficult for them to understand Prime's price and auto-renew feature.  Compl. ¶ 205.

- Defendant Ghani wrote to Defendant Lindsay that certain September 2020 changes to Prime were near the "minimum bar" of clarity improvements but "nevertheless had a significant negative impact" on enrollment.  Compl. ¶ 220.

- Amazon estimated in September 2020 that ████████ Prime members were unaware they were enrolled in Prime.  (This fact is discussed in greater detail, *infra* Section II.A.2.)  Compl. ¶ 178.  As part of making that estimate, Amazon considered ██████████████████████████████████████████████████
  █████████████████████████████████████████████████████████

  *Id.*

Amazon's contention that these facts are "categorically irrelevant" or "subjective" (Mot. at 12-13) is unusual and unsupported.  Even under an objective test, evidence does not become irrelevant merely because it is based on actual people's experiences rather than argument of counsel.  Just the opposite—while extrinsic evidence of actual deception is not required under the FTC Act or ROSCA, it can be "highly probative" when available.  *Cyberspace.com*, 453 F.3d

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 17

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    at 1201.  Indeed, in the Lanham Act context, courts applying an objective reasonable consumer

2    test "generally *require* extrinsic evidence" regarding how consumers interpret "deceptive

3    advertising."  *Kraft, Inc. v. FTC*, 970 F.2d 311, 319 (7th Cir. 1992) (emphasis added).  The law

4    therefore does not support Amazon's position that actual consumers' experiences are irrelevant.

5        **D.    Amazon Impermissibly Discloses Prime's Terms and Conditions *After***
             **Obtaining Billing Information.**

6        ROSCA unambiguously requires Amazon to disclose Prime's material terms "*before*

7    obtaining the consumer's billing information."  15 U.S.C. § 8403(1) (emphasis added).  This

8    requirement is important because consumers are more likely to understand the purpose for which

9    they are providing their billing information if the merchant first tells them what the information

10   is being used for.  Yet Amazon blatantly violates this statutory requirement.  In particular,

11   Amazon collects consumers' billing information in connection with the consumers' product

12   purchase, *before* making the UPDP and SPC Prime upsells.  Amazon then uses that billing

13   information to charge consumers who later enroll, whether consensually or not, in Prime.  *See,*

14   *e.g.*, Compl. Att. G at 5 (Amazon obtains billing information), 6 (Amazon makes inconspicuous

15   disclosure); Compl. Att. N at 6 (Amazon obtains billing information), 8 (Amazon makes

16   inconspicuous disclosure).  This is particularly problematic when consumers are enrolled in

     Prime and then abandon their shopping cart (Compl. ¶¶ 40, 84), and therefore never complete the

17   original transaction for which they provided the billing information.

18       **E.    Amazon's Reliance on Distinguishable Contract Law and Auto-Renewal**
             **Cases Is Misplaced.**

19       The cases cited by Amazon cannot erase their violations.  Those cases generally either

20   (1) interpret contract law, which imposes a less stringent conspicuous-disclosure standard than

21   ROSCA (and which Amazon would still struggle to satisfy in any event), or (2) are auto-renewal

     cases involving far different facts.

22       **Contract law.**  Many of Amazon's cases relate to the enforceability of forum-selection or

23   arbitration clauses found in website terms and conditions.  In that context, courts will find an

1    enforceable contract where, *inter alia*, a website "provides *reasonably conspicuously notice*"—

2    often in the form of a hyperlink— "of the terms to which the consumer will be bound."

3    *Oberstein*, 60 F.4th at 515 (emphasis added); *see also Dohrmann v. Intuit, Inc.*, 823 F. App'x

4    482, 483 (9th Cir. 2020) (examining "whether a *hyperlink* to a website's terms of use [was]

5    *sufficiently conspicuous*" (emphasis added)).  That rule is based on the fact that a contract is

6    enforceable if the website puts a reasonable consumer on "inquiry notice of the agreement's

7    existence and contents."  *Dohrmann*, 823 F. App'x at 483 (cleaned up).  This standard—whether

8    a *hyperlink* is *sufficiently conspicuous* to put consumers on inquiry notice of a contract's

9    contents—is far less demanding than ROSCA's requirement of *clear and conspicuous* disclosure

10   of an agreement's actual *terms*.  *See* 15 U.S.C. § 8403(1) (requiring "text"—not hyperlink to

     text—that "clearly and conspicuously discloses all materials terms of the transaction").[12]

11          Beyond that, Amazon likely cannot even clear the relatively low contract-law bar, much

12   less the heightened ROSCA bar, because the contract cases Amazon cites all involved more

13   conspicuous disclosures than Amazon's enrollment pages.  *See, e.g.*, *Oberstein*, 60 F.4th at 516-

14   17 (link to disclosures was "distinguished from the rest of the text," "not buried on the bottom of

15   the webpage or placed outside the action box," and was "located *directly* on top of or below each

16   action button" (emphasis added)); *Dohrmann*, 823 F. App'x at 484 (disclosure was "directly

17   under" the button and was the only emphasized text on the "relatively uncluttered" page); *Heinz

18   v. Amazon.com, Inc.*, 2023 WL 4466904, at *1-2 (E.D. Cal. July 11, 2023) (hyperlink to Terms

19   and Conditions was "directly below" button and thus "sufficiently conspicuous" to enforce

20   forum selection clause therein); *Capps v. JPMorgan Chase Bank, N.A.*, 2023 WL 3030990, at *4

21   (C.D. Cal. Apr. 21, 2023) (relevant disclosure was "in bolded text immediately above" the

22   button); *Hooper v. Jerry Ins. Agency. LLC*, --- F. Supp. 3d ----, 2023 WL 3992130, at *3 (N.D.

---

[12] Amazon's argument that its hyperlinks to Prime's terms and conditions are sufficient, standing alone, to satisfy ROSCA (Mot. at 11) fails for two additional reasons.  First, Amazon never tells the Court what information it shows to a user who clicks the hyperlinks.  Second, Amazon's hyperlinks are themselves inconspicuously buried in small-print disclosures.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 19

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   Cal. June 1, 2023) (relevant text was "directly" below the action button, and webpage was

2   "uncluttered," consisting only of "a field for a phone number, the 'Continue' button, and the

3   [relevant disclosure]").

4        **Auto-renewal cases**.  Amazon also cites a small handful of cases in which courts have

5   granted motions to dismiss under state auto-renewal laws, which, like ROSCA, contain clear-

6   and-conspicuous-disclosure requirements.  However, it is entirely unremarkable that some *other*

7   complaints did not state plausible claims for relief.

8        Unsurprisingly, the cases cited by Amazon are factually distinguishable.  Again, context

9   matters; in none of the cases did the defendant use Amazon's tactic of tricking consumers who

10  are trying to buy a standalone product into instead signing up for an unrelated subscription

11  service.  *See supra* Section I.A.  Additionally, unlike here, none of the cases cited by Amazon

12  included compelling evidence the defendant knew many ordinary consumers either did not see or

13  understand the defendant's disclosure of material terms.

14       Even ignoring those facts, none of the enrollment pages from these cases contain terms as

15  facially inconspicuous as Amazon's.  In *Walkingeagle v. Google LLC*, 2023 WL 3981334, at *4

16  (D. Or. June 12, 2023), for example, the court found the auto-renewal and price terms shown in

17  Figure 6 below clear and conspicuous.  This page, unlike Amazon's UPDP and SPC, displays the

18  service's price, billing start date, and auto-renewal terms in relatively uncluttered text *above* the

19  enrollment button.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 20

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13



*Figure 6 (Enrollment Page from* Walkingeagle v. Google LLC, *2023 WL 3981334 (D. Or. June 12, 2023))*

14  Similarly, in *Gershfield v. TeamViewer US, Inc.*, 2023 WL 334015 (9th Cir. Jan. 20, 2023), the

15  Ninth Circuit affirmed a district court's finding the disclosures in Figure 7 below clear and

16  conspicuous.[13]   Again, unlike here, the page is uncluttered, the text is all the same size, and the

17  fact of auto-renewal is bolded immediately above the action button.  Amazon's other auto-

18  renewal cases are similarly distinguishable.  *See Hall v. Time, Inc.*, 2020 WL 2303088, at *1

19  (C.D. Cal. Mar. 13, 2020) (auto-renewal disclosure was "directly above" checkout button and

20  then again above the "submit order" button), *aff'd*, 857 Fed. App'x 385 (9th Cir. 2021); *Rutter v.*

21  *Apple Inc.*, 2022 WL 1443336, at *6 (N.D. Cal. May 6, 2022) (dismissing "vague" claim that

22  cancellation policy was not disclosed clearly and conspicuously, while granting leave to amend);

23  *Perkins v. N.Y. Times Co.*, 2023 WL 3601489, at *4 (S.D.N.Y. May 23, 2023) (auto-renewal

[13] The Figure 7 screenshot is available on the district court docket:  *Gershfield v. TeamViewer US, Inc., et al.*, Case No. 23-cv-0058, Dkt. # 30-3 at 2 (May 11, 2021).

PLAINTIFF'S OPPOSITION TO                                    Federal Trade Commission
DEFENDANTS' MOTIONS TO DISMISS                               600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 21                               Washington, DC 20580
                                                             (202) 326-3320

disclosure was *twice* displayed above the checkout button, and once "directly above" the checkout button).[14]



*Figure 7 (Enrollment Page from* Gershfield v. TeamViewer US, Inc*., 2023 WL 334015 (9th Cir. Jan. 20, 2023))*

## II. AMAZON FAILED TO OBTAIN CONSUMERS' EXPRESS INFORMED CONSENT TO AUTOMATICALLY-RENEWING PRIME SUBSCRIPTIONS (COUNTS I, III).

In addition to requiring Amazon to provide clear and conspicuous disclosure of Prime's material terms, ROSCA required it to "obtain[] a consumer's express informed consent" to those terms.[15]  15 U.S.C. § 8403(2).  Amazon concedes this consent requires at least the same "unambiguous manifestation of assent" required for the formation of a contract.  Mot. at 14. However, while such assent is necessary, it is not sufficient to satisfy ROSCA.  ROSCA requires not just consent but "express *informed* consent."  Here, the Complaint more than plausibly

---

[14] Recently, another court in this District granted a motion to dismiss state law auto-renewal claims related to Amazon's Audible service.  *See Viveros v. Audible, Inc.*, No. 23-cv-0925-JLR, 2023 WL 6960281 (W.D. Wash. Oct. 20, 2023).  That case too presents distinguishable facts:  the disclosures were *above* the enrollment button, and "[s]everal disclosures [were] reiterated in a box in the upper left" of the enrollment page.  *Id.* at *7.  A copy of the relevant enrollment page is at *Viveros* Dkt. #1-2 at 21.

[15] Amazon concedes that if the FTC has adequately pleaded its ROSCA count for lack of express informed consent (Count III), it has also adequately pleaded its FTC Act count based on Amazon's unfair enrollment practices (Count I).  Mot. at 6 n.3.

alleges Amazon fails to obtain express informed consent in two ways: (1) by failing to obtain *any* consent to enrollment in Prime and its material terms, and (2) by failing to clearly and conspicuous disclose Prime's material terms, resulting in a lack of *informed* consent.

### A. Amazon Does Not Obtain Consent to Prime's Material Terms.

#### 1. Amazon Does Not Tell Consumers the Consequences of Clicking Its "Enrollment" Buttons.

Consumers consent to contract terms by taking "some action, such as clicking a button or checking a box, that *unambiguously* manifest [their] assent to those terms." *Berman*, 30 F.4th at 856 (emphasis added).[16]  However, a user's button click establishes consent "only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* at 857.  Therefore, the fact that a reference to "terms and conditions" appears in "proximity" to, or even "directly above," an enrollment button is insufficient, standing alone, to establish consent.  *Id.; see also Nguyen*, 763 F.3d at 1178-79 ("[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.").  Based on these principles, the Ninth Circuit in *Berman* held that consumers who clicked the green "Continue" button in Figure 8 below had not consented to the "Terms & Conditions" referenced immediately above the button.  The Court explained that although the website stated, "I understand and agree to the Terms & Conditions," it "did not indicate to the user what action would constitute assent to those terms and conditions."  *Id.* at 858.  "Likewise," the Court added, "the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions."  *Id.*

---

[16] Many of the cases cited herein, including *Berman*, apply state contract law.  Federal courts routinely apply "ordinary state-law principles that govern the formation of contracts."  *Nguyen*, 763 F.3d at 1175 (quotation marks omitted).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 23

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4



5

*Figure 8 (Enrollment Button in* Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022))*

6

7      Even where websites state that "by clicking" a specific button, the consumer will be

8   deemed to have agreed to specific terms, courts find no consent where the "by clicking"

9   statement is itself inconspicuous.  *See, e.g.*, *Cullinane*, 893 F.3d at 64 (finding consumer did not

10   consent to terms in part because of inconspicuous "text used to notify potential users that the

11   creation of an Uber account would bind them to the link terms").  The Ninth Circuit, for

12   example, expressed "skepticism" that a consumer had consented to the "Offer Details" in the

13   gray box in Figure 9 below, despite the fact that the text immediately above the "YES" button

14   stated:  "By clicking 'Yes,' I have read and agreed to the Offer Details to the right."  *Lee v.*

15   *Intelius, Inc.*, 737 F.3d 1254, 1259-60 (9th Cir. 2013).[17]  The court noted the relevant text,

16   although directly above the "Yes" button, was in "small, light-colored print."  *Id.* at 1260.  The

17   Court also considered the context of the transaction, explaining that, as here, the consumer could

18   reasonably have clicked "Yes" to complete the purchase of the product they had been trying to

19   buy, rather than to agree to a new contract.  *Id.; see also Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d

20   454, 467 (S.D.N.Y. 2017) (refusing to find consent because even though consumer checked box

21   agreeing to hyperlinked terms, the screen on which consent was purportedly obtained "was

22   structured as part of a process to verify a phone number," creating the inference that "the Terms

23   of Service related only to the [phone text message] verification").

---

[17] Figure 9 is taken from the PACER version of the Ninth Circuit's opinion:  *Lee v. Intelius, Inc.*, Case No. 11-35810, Dkt. # 64-1 at 17 (9th Cir. Dec. 16, 2013).

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Figure 9 (Enrollment Screen in* Lee v. Intelius, Inc.*, 737 F.3d 1254 (9th Cir. 2013))*

Additionally, courts have held statements *below* an enrollment button explaining the consequences of clicking the button do not create consent because "a user could . . . click [the button] without reviewing the remainder of the page." *Lopez*, 2022 WL 17089824, at *2. At the very least, when a company relies on a statement below the relevant button to explain the consequences of clicking the button, that explanation should be *immediately* below the button. *See, e.g.*, *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *5 (C.D. Cal June 24, 2021) (courts generally find consent "where the user is provided with an opportunity to review the terms of service in the form of a hyperlink *immediately* above or below a button that must be clicked to affirmative acknowledge the terms" (emphasis added)).

Here, Amazon's UPDP and SPC pages fail to tell users they consent to Prime's auto-renewal and price (and, for many UPDP versions, to enrollment in Prime at all) when they click various buttons. In some versions of UPDP, as in Figure 10 below (a cropped version of Figure 1), consumers clicked to "Get FREE Two-Day Delivery" on their product purchase on the right

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 25

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

side of the page and then were told, on the left side of the page, below the button and in far less prominent text, that "By signing up," they agreed to Prime's terms.  *See also* Compl. Att. A.



*Figure 10 (Desktop UPDP; Compl. Att. B)*

The "by signing up" text is inconspicuous standing alone, but even setting that aside, no reasonable consumer would understand that "by signing up" actually meant "by clicking 'get free two-day shipping.'"  *See also* Compl. Att. M.  At least one court has rejected similarly ambiguous "by signing up" language.  *See Chabolla*, 2023 WL 4544598, at *5 ("The textual notice on the . . . webpage refers only to 'signing up.' . . . It is unclear whether 'signing up' means clicking the 'Continue' button . . . , completing the sign-up webflow, or something else."). On other UPDP versions, the enrollment button said "Start my 30-day FREE trial" (*see* Figure 3 above)—an improvement from "Get Free Two-Day Shipping"—but the text explaining the consequences of clicking the button was still inconspicuous (in small print far from the button) and did not make clear that "signing up" referred to clicking "Start my 30-day free trial."  *See, e.g.*, Compl. Atts. C, E, G at 6, I at 3, L at 7, O at 5.  The UPDP problems are compounded by the fact that some ordinary consumers reasonably would not have seen or recognized any alternative to clicking the orange enrollment button if they wanted to complete their underlying product purchase; in other words, these consumers would not know they had any option other than clicking the button.  *See supra* Section I.A.1.

SPC fares no better.  Specifically, as shown in Figure 11 below (a cropped version of Figure 5), SPC *only* displays Prime's terms and conditions far below, rather than immediately below, the SPC "Place your order" button.  *See also* Compl. Atts. I at 5, J at 9.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 26

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5
6
7
8
9
10
11
12
13
14



*Figure 11 (Desktop SPC; Compl. Att. H at 6)*

15   The full terms and conditions are the fourth set of linked terms beneath the "Place your order"

16   button, located in the third block of text beneath the button, and are not even identified as the

*Prime* Terms and Conditions.  Instead, Amazon simply states "By placing your order, you agree

17   to Terms and Conditions," after already stating the user agreed to an unrelated "privacy notice,"

18   unrelated "conditions of use," and other unspecified "terms."  Then, in the next sentence,

19   Amazon finally says, "Your Amazon Prime membership continues until cancelled."  Even that

20   sentence does not indicate that clicking "Place your order" has anything to do with Prime, rather

21   than the consumer's originally intended product purchase.

22       Tellingly, Amazon resorts to a series of false or misleading statements to support its

23   claim to have obtained users' consent to Prime enrollment and Prime's material terms.  Mot. at

14-16.  First, Amazon states that on "every page" containing a Prime enrollment button,

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 27

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

"consumers are informed that clicking the button will enroll them in Prime and/or begin a free trial period." Mot. at 14. That is simply not true for the reasons already explained above. Even if it were true, however, the question is not only whether consumers consented to enrollment in a Prime trial, but also whether they consented to Prime's auto-renewal and price terms.

Second, Amazon contends that "nearly every action button itself includes the words 'Prime' and/or 'Free Trial.'" Mot. at 14. Again, this is false. Three of the 12 UPDP pages attached to the Complaint contain enrollment buttons that do not mention Prime or a free trial. *See* Compl. Atts. A, B, M. Further, for all versions of SPC, Amazon's contention is inconsistent with its clear-and-conspicuous argument. There, Amazon contends "Place your order" is the "action button." *See supra* Section I.A.2; Mot. at 9. That button, of course, does not include the words "Prime" or "Free Trial."

Third, Amazon claims users can only click the enrollment buttons "after viewing the [material-term] disclosures." Mot. at 14. This is a flagrant misstatement. The disclosure text is almost always below the enrollment button, and there is absolutely nothing stopping a consumer from clicking the button without ever viewing those disclosures. *See, e.g.*, *Lopez* 2022 WL 17089824, at *2 (where hyperlink was "below the 'Join' button, . . . a user could enter their mobile number and click 'Join' without reviewing the remainder of the page (and seeing the hyperlink)").[18]

### 2. Amazon Is Not Permitted to Knowingly Charge Millions of Nonconsensual Prime Members.

Amazon accuses the FTC of omitting the "necessary context" for Amazon's 2020 estimate that ██████ Prime subscribers were "unaware" they were Prime members. Mot. at 15-16; Compl. ¶ 178. Specifically, Amazon argues it does not matter the company knowingly

---

[18] The consent cases cited by Amazon are distinguishable on their facts. Mot. at 14-15. In one, customers were required to click a button "*next to* text that says '*by placing your order*, you agree to Amazon.com's privacy notice and conditions of use.'" *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1173 (W.D. Wash. 2014) (emphasis added). In the other, text "immediately beneath" the "Continue" button explicitly referenced that consumers agreed to terms "by continuing"—*i.e.*, clicking the "continue" button. *See Adams v. Amazon.com, Inc.*, 2023 WL 4002534, at *1 (W.D. Va. June 14, 2023).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 28

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1  continued billing ███████ people who did not know they were in Prime because ███████

2  is a small number relative to the total number of Prime members, and thus the Commission

3  cannot prove that a "significant minority" of Prime consumers were misled.  Mot. at 15.  In

4  effect, Amazon asks the Court to find these ███████ Amazon customers to be among the

5  unfortunate "obtuse" consumers whom, Amazon claims, the law does not protect.  *Id.* at 7.  This

6  argument misunderstands the significance of Amazon's ███████ estimate, disregards

7  ROSCA's plain text, and ignores the evidence that Amazon's disclosures are not clear and

    conspicuous.

8         First, the ███████ unaware Prime members are hardly the limit of those whom

9  Amazon deceived.  The fact that ███████ active subscribers were "unaware" Prime members

10 *in 2020* does not mean that only ███████ Prime members *ever* unknowingly enrolled in

11 Prime.  Specifically, this number obviously excludes all "members" whom Amazon signed up

12 without their knowledge prior to 2020, who subsequently realized that fact and cancelled.

13 Moreover, many consumers may have been tricked into signing up, but then decided to keep

14 Prime (rather than cancel).  That fact says nothing about whether those consumers consented at

15 the time of their enrollment.  In fact, Amazon's strategy was to convert nonconsensual enrollees

16 into willing Prime members.  *See* Compl. ¶ 184 (Defendant Lindsay "explained that once

17 consumers become Prime members—even unknowingly—they will see what a great program it

18 is and remain members").  Additionally, even a consumer who is "aware" they are a Prime

19 member does not necessarily know their membership automatically renews.  Furthermore, even

20 if ███████ were the actual number of deceived enrollees, it is not relevant that ███████ is

21 a small percentage of *all* Prime members because the FTC has only challenged the flows through

22 which *some* of Amazon's members enrolled.  Finally, at this point the FTC has to rely on

23 Amazon's own untested estimates.  This is precisely why courts at this stage draw all inferences

    in the plaintiff's favor.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 29

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    Second, the "significant minority" test is simply not applicable to ROSCA's requirement

2    to obtain express informed consent prior to billing any consumers.  15 U.S.C. § 8403(2).  Rather,

3    the Commission developed the test as a method for determining whether consumers'

4    understanding of implied advertising claims was "reasonable."  *See, e.g.*, *In re Kraft, Inc.*, 114

5    F.T.C. 40, 121-22 (1991).  Specifically, if a "significant minority" of consumers understand an

6    advertisement to be making a claim (of product efficacy or some other product attribute), then

7    that minority's interpretation is considered reasonable and the advertiser violates the FTC Act if

8    the implied claim is false or misleading.  *Id.* at 121-22, 133.  ROSCA, however, unambiguously,

9    bars billing consumers without "express informed consent."  It simply does not allow Amazon to

     use sign-up flows that result in its charging millions of nonconsensual enrollees.[19]

10    Third, even on the question whether Amazon's disclosure of Prime's material terms was

11    clear and conspicuous (*see supra* Section I), the FTC Act's "significant minority" test does not

12    save Amazon.   Congress enacted ROSCA to go beyond the protections already provided by

13    existing consumer protection laws.  *See Washington v. Internet Order, LLC*, 2015 WL 918694, at

14    *5 (W.D. Wash. Mar. 2, 2015) ("Despite the existence of numerous consumer protection laws in

15    various states, Congress enacted ROSCA to specifically regulate the type of negative-option

16    selling alleged here . . . .").  Thus, determining whether Prime's material terms are clear and

17    conspicuous under ROSCA—not merely whether the flows are nondeceptive under the FTC

18    Act—cannot be subject to the same test.

     In any event, as one of the cases relied upon by Amazon explains, when a defendant

19    "intentionally attempt[s] to deceive"—which may be true when the defendant's "false

20    representations were knowingly made"—courts "presume consumers were in fact deceived" and

21    shift the burden to the defendant to prove otherwise.  *See William H. Morris Co. v. Group W,

22    Inc.*, 66 F.3d 255, 258-59 (9th Cir. 1995).  In such cases, the plaintiff therefore need not prove

23    ---

[19] Contrary to Amazon's claim (Mot. at 15 n.11), the FTC has never conceded that the "ordinary" or "reasonable" consumer standards govern ROSCA's express informed consent requirement.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 30

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

that a "significant minority" of consumers understood the advertisement to make a particular claim. *Id.*

### B. Amazon Does Not Obtain *Informed* Consent.

ROSCA requires sellers to obtain consent that is both express and informed. 15 U.S.C. § 8403(2). Consent can only be *informed* if consumers notice and understand what they are consenting to. *See, e.g.*, *Marsh v. Zaazoom Solutions, LLC*, 2012 WL 952226, at *8 (N.D. Cal. Mar. 20, 2012) (ROSCA "contemplates full disclosure and transparency of transactions to consumers"). Therefore, disclosures that are not "clear and conspicuous" "cannot serve as the basis for customers' express, informed consent." *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015). Because the Complaint more than plausibly alleges Amazon did not make clear and conspicuous disclosures, *see supra* Section I, it equally plausibly alleges consumers did not give express informed consent for automatically-renewing Prime subscriptions.[20]

### III. AMAZON DID NOT PROVIDE SIMPLE PRIME CANCELLATION MECHANISMS (COUNT IV).

ROSCA requires Amazon to provide "simple mechanisms[21] for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account." 15 U.S.C. § 8403(3). "Simple" in this context means "easy." *See, e.g.*, Dictionary.com, https://www.dictionary.com/browse/simple (last accessed Nov. 14, 2023) (defining "simple" as "easy to understand, deal with, use, etc."); *see also* Speech of Hon.

---

[20] Amazon's footnoted effort at avoiding liability for its strategy of enrolling Prime members through Prime Video (Mot. at 15 n.9) is unconvincing. The Complaint plausibly alleges that Amazon did not obtain consent to enroll consumers in *Prime*, but rather led them to believe they were merely enrolling in the less expensive *Prime Video*. Amazon does so by telling consumers who go to the "Prime Video" storefront that they can "Watch with Prime. Start your 30-day free trial." Compl. ¶ 113. Consumers who click that button are told "Watch now, cancel anytime"—without any reference to Prime's other benefits, again creating the impression that the sign-up is solely about Prime Video. *Id.* ¶ 116. These facts support the reasonable inference that many consumers only consented, if at all, to Prime Video enrollment, not Prime enrollment.

[21] Without any explanation for its sleight of hand, Amazon replaces the "s" in "simple mechanisms" with brackets in order to change the statute's plural "simple mechanisms" to the singular "simple mechanism[]." Mot. at 16. The distinction, however, does not matter here because Amazon provides no simple mechanism.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 31

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Zachary T. Space of Ohio, 156 Cong. Rec. E2165-02 (Dec. 15, 2010) (ROSCA requires businesses to "provide easy ways to opt out of any agreement or subscription service, empowering consumers to control their enrollment").  Applying this easy-cancellation requirement, one court found a cancellation process violated ROSCA where, after a consumer called customer service, "instead of simply processing the cancellation and ending the call," the company resorted to "a six-part 'retention' sales script aimed at convincing the customer not to cancel."  *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1167-69 (C.D. Cal. 2021). The *MyLife* court correctly held that "[n]o reasonable factfinder could find this mechanism 'simple.'"  *Id.* at 1169.

Here, the Complaint plausibly alleges that Amazon's self-described Iliad cancellation flow was not simple, instead mirroring *MyLife*'s unlawful retention sales script.  Further, Amazon's argument that it also offered simple cancellation by phone is contradicted by the facts set forth in the Complaint.

**A.     Amazon's Iliad Cancellation Flow Was Not Simple.**

Amazon complicated its online cancellation process by (1) making it difficult for consumers to find the starting point for the Iliad Flow and falsely labeling that starting point "End Membership," (2) forcing consumers to request cancellation four times before honoring the request, and (3) repeatedly providing links, buttons, and other distracting information designed to derail customers before they completed the process.  In fact, Amazon measured the success of the Iliad Flow not by whether it made cancellation easy, but instead by how many cancellations it prevented.

**1.     Amazon Forced Consumers to Find an "End Membership" Button
That Did Not End Membership.**

As detailed in the Complaint, to cancel online, Prime members had to both find the entrance to the Iliad Flow (typically by locating a button reading "End Membership") *and* understand that when they clicked "End Membership," they had not ended their membership but instead only started the process.  To find the "End Membership" button, a consumer first had to

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 32

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

navigate to the "Prime Central" page.  Compl. ¶ 131.  To find that page, consumers had to select

the "Account & Lists" dropdown menu on Amazon's homepage, find the third column of

dropdown links in that menu, and the click the eleventh option in that third column, which

merely said "Prime Membership."  *Id.*  Upon arriving at the Prime Central page, consumers then

had to click "Manage Membership," which would open a menu that included the "End

Membership" button, as pictured in Figure 12 below.  *Id.* ¶ 132.  Immediately above that button,

Amazon placed text reading:  "By ending your membership you will lose access to your Prime

benefits."  Clicking "End Membership," however, did not end one's membership, or result in

loss of access to Prime benefits, but rather simply *started* the Iliad Flow.  *Id.* ¶ 133.  In other

words, if a consumer clicking "End Membership" reasonably thought he or she had ended their

membership, Amazon nevertheless continued billing them for Prime.  Compl. ¶ 140.



*Figure 12 (Prime Central "Manage Membership"
Dropdown; Compl. Att. Q at 2)*

Alternatively, a Prime member could attempt to find the Iliad Flow through the Amazon

search bar.  On this point, Amazon falsely contends the FTC's Complaint admits that searching

"Cancel Prime" starts the cancellation process (Mot. at 17) or provides a "direct ingress into

Prime's cancellation flow" (*id.* at 18 n.13).  In fact, the Complaint clearly states that typing

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 33

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

"Cancel Prime" in the search bar simply brings up a page with a link to "Prime Central," from which the consumer would need to click the "End Membership" button that does not end membership. Compl. ¶ 137. If the consumer instead searched for "Cancel *Membership*" in the Search Bar, an "Alexa Answer" would direct the consumer to a page titled "End Your Prime Membership." *Id.* ¶ 135. As pictured in Figure 13 below, that "End Your Prime Membership" page stated: "You can end your Prime membership by selecting the End Membership button on this page." That was a lie. The button labeled "End Your Prime Membership" did not end your Prime membership, instead putting the consumer at the start of the cancellation flow. *Id.* ¶ 136.



*Figure 13 ("End Your Prime Membership" Page; Compl. Att. T at 3)*

Finally, consumers could reach the Iliad Flow by contacting Amazon customer service and asking to cancel. Rather than simply honor the member's cancellation request, the representative generally would send the consumer a link that put them at the start of the online cancellation flow. Compl. ¶¶ 134, 139.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 34

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### 2. After Entering the Iliad Flow, Consumers Had to Request Cancellation Three Additional Times.

Second, once inside the Iliad Flow, the consumer had to navigate past three more pages, each of which required them to reaffirm (for the second, third, and fourth times) that they wanted to cancel. The header on the first page of the Iliad Flow thanked the consumer "for being a member with us" and invited them to "take a look back at your journey with Prime"—language that falsely indicates the consumer had *already* ended that "journey" when they clicked End Membership. Compl. Att. Q at 3. If the consumer stopped at this point, they would continue being billed for Prime. Instead, the consumer had to click "Continue to Cancel" on the bottom of the page. Compl. ¶ 142. That button, however, did not cancel the Prime membership, but took the consumer to the second page of the Iliad Flow, where the consumer again had to click a "Continue to Cancel" button that did not cancel their membership. *Id.* ¶ 146. Finally, on the third page, consumers could click "End Now" or "End on [Date]" to cancel their memberships. *Id.* ¶ 153. Amazon continued to charge any consumer who stopped anywhere short of the final "End Now" or "End on [Date]" buttons. *Id.* ¶¶ 140, 154.

### 3. The Iliad Flow Provided Repetitive, Distracting Information and Options to Derail Consumers' Cancellation Attempts.

Just as the *MyLife* defendant unlawfully used a "six-part retention script" to complicate consumers' cancellation attempts, 567 F. Supp. 3d at 1167-69, Amazon bombarded consumers who already had chosen to end their Prime memberships with links, offers, and other information that would remove them from the Iliad Flow. On the first page of the Iliad Flow, for example, Amazon offered consumers links to "Start shopping today's deals!" or "start watching videos by clicking here!" Compl. ¶ 141. Clicking these links removed the consumer from the Iliad Flow. *Id.* The first page also offered a "Remind Me Later" and "Keep My Benefits" option, even though Amazon had already offered the "Remind Me Later" option on the "Manage Membership" page. *Id.* ¶ 142. On the second page of the Iliad Flow, Amazon offered alternative pricing links, such as "Switch to annual payments," "[A]re you a student?" or "Have an EBT

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 35

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

card/receive government assistance." *Id.* ¶ 143.  Amazon also, beneath a large warning icon,

invited consumers to view their "Prime exclusive offers."  *Id.* ¶ 145.  The second page also

featured a "Remind Me Later" button (for the third time) and a "Keep My Membership" button

(for the second time).  *Id.* ¶ 146.  At the top of the third page of the Iliad Flow, Amazon again

offered "Remind Me Later" (for the fourth time) and "Keep My Membership" (for the third

time).  *Id.* ¶ 148.  Consumers who scrolled to the bottom of the page could click to finally end

their membership, but only after ignoring two more links to see their "Prime exclusive offers."

*Id.* ¶¶ 149, 151.

### 4.     Amazon Knew the Iliad Flow Was Not Simple.

The Iliad Flow not only needlessly and unlawfully complicated consumers' cancellation

processes, but also prevented consumers who wanted to cancel, and thought they had cancelled,

from actually doing so.  In fact, rather than aiming to create an easy cancellation process,

Amazon measured the Iliad Flow's success based on the number of Prime cancellations it

prevented.  Compl. ¶ 163.  In 2020, ███ of subscribers who clicked Amazon's misleading "End

Membership" buttons did not have their memberships cancelled because they did not proceed

through all three subsequent Iliad Flow pages.  *Id.*  Amazon may be correct that *some* people

who entered the Iliad Flow simply changed their minds about cancelling.  Mot. at 19.  Amazon,

however, simply ignores the fact that in 2020 alone, more than ████████ Prime members

clicked "End Membership" or otherwise entered but did not complete the Iliad Flow, *and*

subsequently used no Prime benefits within the next 30 days.  *Id.* ¶ 163.  This fact alone supports

the reasonable—and at the pleading stage, mandatory—inference that at least those ████████

consumers thought they cancelled Prime but actually had not.  In any event, the fact that Amazon

may have succeeded in changing *some* consumers' minds does not mean it was permitted to use

an unlawfully complex cancellation process to do so.[22]

---

[22] Amazon could, of course, have tried to change someone's mind immediately *after* processing their cancellation.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 36

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2      Amazon attempts to defend its illegal practices with a series of implausible and irrelevant

3  factual assertions.  *See* Mot. at 18-20.  Amazon first claims the Iliad Flow merely "ensures

4  members cancel with complete and accurate information, rather than by mistake or

   misunderstanding."  *Id.* at 18.  But there is no realistic possibility—and certainly not one that is

5  cognizable at the pleading stage—that a consumer who searches out and clicks a button labeled

6  "End Membership" did so by "mistake" or simply "misunderstood" what the words "End

   Membership" mean.

7

8      Maybe, Amazon adds, consumers click "End Membership" "out of curiosity" or to see if

9  Amazon would offer them a better deal.[23]  Mot. at 19.  Again, at the pleading stage, that is not an

   inference the Court can draw.  Additionally, Amazon is welcome to provide "complete and

10 accurate information" to Prime members throughout their Prime membership or even

11 immediately after they cancel; what Amazon cannot lawfully do is repeatedly refuse to cancel

12 memberships for the sake of providing more and more "information," all in the hope that the

   consumer will give up, whether accidentally or intentionally.

13

14     Finally, Amazon provides no support for its fallacious claim that the Iliad Flow "reflects

   the FTC's own recommendations."  Mot. at 19.  Moreover, Amazon's reference to Iliad as

15 reflecting "widely understood industry practice" (*id.*) is both unsupported and, in any event,

16 irrelevant to whether Amazon's cancellation process was "simple."

17     **B.      Amazon Redirected Consumers Who Attempted to Cancel by Phone to the
             Iliad Flow.**

18     The Complaint alleges Amazon "required customer service representatives to encourage

19 consumers seeking to cancel"—including those who had expressly "ask[ed] to cancel"—to

20 instead "do so via the Iliad Flow."  Compl. ¶¶ 134, 139.  Amazon cannot require customer

21

22 _____
   [23] Amazon claims the FTC agrees that attempts to retain consumers by offering them deals just prior to, rather than
   just after, cancellation is "pro-consumer."  For that proposition, however, Amazon cites a concurring statement by a
23 single former Commissioner.  Mot. at 19 (citing Ex. 3 at 6 & n.2 (Concurring Statement of Commissioner Noah
   Joshua Phillips)).

1
2

service agents to divert callers to the complex Iliad Flow and then escape liability by claiming

phone cancellation, for anyone permitted to complete it, is simple.[24]

3

## IV.   THE INDIVIDUAL DEFENDANTS HAD THE AUTHORITY TO CONTROL OR DIRECTLY PARTICIPATED IN AMAZON'S VIOLATIONS.

4

5

6

7

8

9

10

11

12

13

The Individual Defendants concede, as they must, that they are liable for Amazon's FTC

Act and ROSCA violations if they "participated directly in, *or* had the authority to control, the

unlawful acts or practices at issue."  Individuals' Mot. at 9 (emphasis added) (quoting *FTC v.

Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016)).  For all their handwringing about the

FTC's "shocking" decision to sue them, purportedly in "[defiance of] a century of the FTC's

own standards" (Individuals' Mot. at 1, 5), Defendants Lindsay and Ghani do not dispute the

FTC has pled sufficient facts demonstrating their authority to control or direct participation in

Amazon's unlawful enrollment practices (Counts I-III).  Instead, they only challenge the

sufficiency of the FTC's allegations regarding their involvement in Amazon's unlawful

*cancellation* practices (Count IV).  Defendant Grandinetti argues the FTC's allegations are

insufficient on both enrollment and cancellation.  The Individual Defendants' arguments all fail.

14

### A.   The Complaint More Than Adequately Pleads Grandinetti, Lindsay, and Ghani's Liability for Amazon's Unlawful Cancellation Flow (Count IV).

15

16

17

18

19

20

Individual Defendants argue the Complaint fails to adequately plead individual liability

for Amazon's cancellation practices because the pleadings do not meet Rule 9(b)'s particularity

requirement for claims alleging "fraud" or "mistake."  This argument fails for two reasons.  First,

Rule 9(b) does not apply to the FTC's statutory claim that Amazon and the Individual

Defendants failed to implement simple Prime cancellation mechanisms.  Second, under any

pleading standard, the FTC has plausibly alleged each Individual Defendant had the requisite

authority to control or directly participated in Amazon's unlawful conduct.

21

22

23

---

[24] Amazon also claims members can "initiate the cancellation process by using Amazon's online chat feature," but Amazon cites paragraph 139 of the Complaint, which does not mention an online chat feature.  Nor is that "feature" referenced anywhere else in the Complaint.  In fact, the Complaint makes clear that its references to "contacting" customer service refer exclusively to phone calls.  *See* Compl. ¶ 129 (to cancel, consumers "had to use the Iliad Flow or *call* customer service" (emphasis added)).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 38

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## 1.     Rule 9(b) Does Not Apply.

Individual Defendants, without explanation, declare the FTC's claims against them "sound in fraud" and, therefore, the heightened Rule 9(b) standard applies.  Individuals' Mot. at 7-8.  That is incorrect.  Rule 9(b) only applies to a claim where (1) fraud is an "essential element" of the claim or (2) the plaintiff "allege[s] a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis" for the claim.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  Here, fraud is self-evidently not an "essential element" of the claim that Defendants did not provide simple Prime cancellation mechanisms. Therefore, Rule 9(b) only applies if the FTC's cancellation claim alleges a "unified course of fraudulent conduct and relies entirely on that course of conduct" to support the claim—*e.g.*, if the claim is based on "intentional and ongoing misrepresentations."  *Dyson, Inc. v. Garry Vacuum, LLC*, 2010 WL 11595882, at *5 (C.D. Cal. July 19, 2010); *see also Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, --- F. Supp. 3d ----, 2023 WL 2768453, at *8 (N.D. Cal. Mar. 9, 2023) (claim alleged "unified course of fraudulent conduct" where defendant had "long advertised [drug] as effective . . . despite knowing the product is ineffective").

Here, the FTC's cancellation claim, detailed in paragraphs 127-163 of the Complaint, focuses primarily on the difficulty of the Iliad Flow, rather than relying on "intentional and ongoing misrepresentations."  There is therefore no basis for applying Rule 9(b).  Tellingly, the Individual Defendants provide no meaningful argument to the contrary, instead citing cases related to other, non-ROSCA FTC Act violations that more closely resemble fraud, and even then misleadingly describing those cases.  *See* Individuals' Mot. at 7-8.[25]

---

[25] In one case cited by the Individual Defendants, the court declined to decide whether Rule 9(b) applied.  *See FTC v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1076 n.3 (N.D. Cal. 2018).  In another case, the court theorized that Rule 9(b) "*may* serve an important safeguarding function" where the government is a plaintiff *and* "brings an accusation of implicit dishonesty," but the court again declined to decide Rule 9(b)'s applicability.  *FTC v. Cantkier*, 767 F. Supp. 2d 147, 155 (D.D.C. 2011) (emphasis added).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 39

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

**2.      Under Any Pleading Standard, the FTC Plausibly Alleges Each Individual Defendant Had Authority to Control or Directly Participated in Maintaining the Iliad Flow.**

3

Even if Rule 9(b) applied, the Amended Complaint is sufficiently detailed to meet this

4

standard because it identifies "the who, what, when, where, and how of the misconduct charged."

5

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quotation marks

omitted).[26]  Contrary to Individual Defendants' arguments about diffuse responsibility within

6

Amazon, the FTC need not establish *sole* authority to control to prevail against an individual

7

defendant.  *See, e.g.*, *FTC v. World Media Brokers Inc.*, 2004 WL 432475, at *9 (N.D. Ill.

8

Mar. 2, 2004) (finding individual liability where executive "did not have sole control").

9

Additionally, an individual can be held liable based on authority to control even if they did not

10

"exercise" that authority.  *FTC v. Loewen*, 2013 WL 5816420, at *7 (W.D. Wash. Oct., 29,

11

2013).  Here, although an "individual's status as a corporate officer . . . is sufficient to show the

requisite control," *FTC v. Dinamica Financiera LLC*, 2010 WL 9488821, at *10 (C.D. Cal. Aug.

12

19, 2010) (citing *FTC v. Publishers Clearing House*, 104 F.3d 1168, 1170 (9th Cir. 1997)), the

13

Complaint's allegations go further by detailing the scope of the Individual Defendants' authority

14

over the Iliad Flow, as well as, for Lindsay and Ghani, their direct participation in Amazon's

15

decision not to fix the violations.

16

First, the Complaint alleges Individual Defendants are all corporate officers of Amazon

17

with the specific authority to direct and manage Prime.[27]  Grandinetti is the Amazon Senior Vice

President overseeing Prime, including the Iliad Flow, meaning he had—and still has—the

18

authority to direct changes to the Prime cancellation process.  *See* Compl. ¶¶ 19, 21.  From

19

20

[26] Rule 9(b), even if it applies, does not require that the FTC plead each individual's *role* in Defendants' misconduct with particularity.  *See FTC v. Benning*, 2010 WL 2605178, at *4 (N.D. Cal. June 28, 2010) ("[I]f the precise [corporate] fraudulent acts and practices are outlined with particularity, pleading an individual's 'authority to control' with 'particularity' would not advance the notice purpose behind Rule 9(b).")

21

[27] Individual Defendants are incorrect that the Complaint "lumps" them together.  Individuals' Mot. at 15-16.  Rather, the Complaint sufficiently "differentiate[s] [its] allegations" by "identify[ing] the role of each defendant." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) (quotation marks omitted). Moreover, "[t]here is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Id.*

22

23

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 40

February 2018 through November 2021, Lindsay was "the Amazon executive with the most responsibility for the Prime subscription program" and, in that role, "received internal memoranda, emails, and oral communications describing the Iliad Flow and the complications it presented to Prime subscribers attempting to cancel." *Id.* ¶¶ 14, 17(b).  Ghani, a Vice President overseeing Prime, is "an Amazon executive with authority over the Prime . . . cancellation process." *Id.* ¶ 24.  The Amended Complaint alleges all three executives oversaw—and Grandinetti and Ghani continue to oversee—Amazon subordinates who studied the Iliad Flow, including the barriers the flow erected to prevent subscribers from canceling.  Despite having the authority to do so, the Individual Defendants failed to implement any of the simpler alternatives their subordinates designed because those alternatives would have adversely affected Amazon's bottom line.  *Id.*  ¶¶ 7, 16-17 (Lindsay), 21-22 (Grandinetti), 24-25 (Ghani).

Alternatively, the Complaint pleads that Ghani and Lindsay participated directly in maintaining the complex Iliad Flow by slowing or rejecting changes that would have simplified it.  Compl. ¶ 6.  An Amazon senior researcher, for example, formed the "Clarity Working Group" ("CWG"), which produced proposals to improve the cancellation processes across all of Amazon's subscription programs, including Prime, and highlighted consumers' trouble finding and completing the existing cancellation flows.  *Id.* ¶ 218.  The Clarity Working Group presented these proposals and findings to Ghani, who in turn presented them to Lindsay.  *Id.* ¶¶ 218, 220.  The Amended Complaint alleges Lindsay and Ghani participated in Amazon's failure to implement the CWG's proposals, or make any changes to the Iliad Flow in the United States, until long after the FTC started its investigation.  *Id.* ¶¶ 221-230.  These allegations, taken together, raise more than a plausible inference that Lindsay and Ghani directly participated in maintaining Amazon's unlawful cancellation process.  For the same reason, the Individual Defendants are simply incorrect when they state they had no "meaningful role in the Prime cancellation flows" or in "modifying them, or directing others to do so."  Individuals' Mot. at 15.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 41

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Moreover, the cases on which the Individual Defendants rely do not support their

argument.  In *FTC v. Quincy Bioscience Holding Co., Inc.*, 389 F. Supp. 3d 211, 220

(S.D.N.Y. 2019), the court found the complaint sufficiently alleged that both the president and

the CEO of the corporate defendant had the authority to control the practices at issue, but not that

the CEO had knowledge of those practices.  Proof of knowledge, however, is only necessary to

obtain equitable monetary relief from individuals, not to prove liability, and the Individual

Defendants do not challenge the FTC's ability to obtain equitable monetary relief (as opposed to

civil penalties) here.[28]  *See Publishers Clearing House*, 104 F.3d at 1170-71 (explaining that

proof of "knowledge" of wrongdoing is only necessary for the FTC to obtain "restitution").  The

Individual Defendants also rely on *FTC v. Swish Mktg*, 2010 WL 653486 (N.D. Cal. Feb. 22,

2010), which found "individual liability insufficiently pled where it was alleged only that (a) the

individual defendant, Benning, was the CEO of the corporation; and (2) consumers had filed

complaints with the defendants, the BBB, and law enforcement." *FTC v. Am. Fin. Benefits Ctr.*,

324 F. Supp. 3d 1067, 1080 (N.D. Cal. 2018) (citing *Swish Mktg.*, 2010 WL 653486, at *5-6)

(cleaned up).  As described above, the allegations in the Amended Complaint far exceed that bar.

**B.      The Complaint More Than Adequately Pleads Grandinetti's Liability for
Amazon's Unlawful Enrollment Practices (Counts I-III).**

Regardless of which pleading standard applies,[29] the Amended Complaint sets forth

sufficient facts demonstrating Grandinetti's authority to control Prime's unlawful enrollment

processes and direct participation in maintaining those processes.

---

[28] As discussed *infra* Section VI, there *is* a knowledge requirement applicable to the FTC's civil penalties request, which the FTC's Complaint adequately pleads.  There too, *Quincy Bioscience* does not help the Individual Defendants because the *Quincy Bioscience* complaint failed to allege the CEO knew about corporate misrepresentations, *see* 389 F. Supp. 3d at 221; here, by contrast, the Complaint alleges the Individual Defendants were aware of Amazon's enrollment and cancellation misconduct.

[29] Because Counts I-III rely in part on Amazon's failure to clearly and conspicuously disclose material information, they more closely resemble the type of FTC deception cases in which Ninth Circuit district courts are split on the applicability of Rule 9(b).  *See Am. Fin. Benefits*, 324 F. Supp. 3d at 1076 n.3 ("Courts within the Ninth Circuit and elsewhere are split as to whether Rule 8 or Rule 9(b) applies to claims brough under Section 5 of the FTC Act.").  While Rule 9(b) should not apply, *see, e.g.*, *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005), the Amended Complaint satisfies either pleading standard.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 42

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

First, as explained above, Grandinetti is the Amazon Senior Vice President overseeing Prime.  Thus, he had—and still has—the authority to direct changes to the Prime enrollment process.  He also exercised that authority.  In 2018 and 2019, Amazon's Shopping Design Organization could not agree with its Prime Organization on whether to implement fixes to Amazon's unclear enrollment flows.  *See* Compl. ¶¶ 199-202.  In particular, the Prime Organization did not want to implement clarity improvements that would decrease enrollment. *Id.* ¶ 199.  In Amazon, when two groups have a dispute they are unable to resolve, they can escalate the dispute to the person with authority over both groups to "break the tie."  *Id.* ¶ 202. Here, the dispute was escalated to Grandinetti precisely because he had "authority" over both organizations.  *Id.*

Second, and relatedly, Grandinetti, in response to the escalation, directly participated in maintaining Prime's unlawful enrolment flows by vetoing "any changes that would reduce enrollment" and "directing the Prime Organization to improve the checkout enrollment flow as much as it could—but only 'while not hurting signups.'"  Compl. ¶¶ 207-08.  He made that decision after reading a memorandum stating that "Prime signups are not always transparent" and "customers sign up without knowing they did."  *Id.* ¶¶ 205-06.  Grandinetti cannot prevail on his motion to dismiss by minimizing this entire course of events as mere attendance at "a single, multi-organization meeting in 2019."  Individuals' Mot. at 10.

## V.   THE COMPLAINT DOES NOT VIOLATE DEFENDANTS' DUE PROCESS RIGHTS.

Next, Defendants assert the action should be dismissed because the Complaint violates their due process rights.  Mot. at 20-27; Individuals' Mot. at 12-15.  In particular, Defendants argue the FTC's supposed "dark patterns theory"—but not the FTC Act or ROSCA—is unconstitutionally vague and deprived them of "fair notice."  Individual Defendants further assert that the rule of lenity should apply in their favor.  These arguments all fall flat.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 43

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

### A.   Defendants' Vagueness Arguments Fail Because ROSCA and the FTC Act Are Clear and the FTC Has Not Asserted a "Dark Patterns Theory."

3       Amazon and the Individual Defendants assert the FTC's "proposed 'dark patterns'

4   standard is unconstitutionally vague."  Mot. at 20; Individuals' Mot. at 12.  For two reasons, this

    due process argument fails.

5       First, as even the cases Defendants cite make clear, the vagueness doctrine applies where

6   a *statute* or *regulation* fails to provide a reasonable opportunity to know what conduct is

7   prohibited.  *See* Mot. at 20-24 (citing cases holding statutes or regulations unconstitutionally

    vague); *Kashem v. Barr*, 941 F.3d 358, 369 (9th Cir. 2019) ("The void-for-vagueness doctrine

8   . . . guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes."

9   (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018)) (emphasis added)); *Orion Ins.*

10  *Group v. Wash. State Off. of Minority & Women's Bus. Enters.*, 2017 WL 3387344, at *14 (W.D. Wash.

11  Aug. 7, 2017) (holding a "*law* is unconstitutionally vague if it fails to provide a reasonable

12  opportunity to know what conduct is prohibited") (quoting *United States v. Mincoff*, 574 F.3d

    1186, 1201 (9th Cir. 2009) (emphasis added)).  Critically, Defendants do not argue *the FTC Act*

13  *or ROSCA* are "vague."  To the contrary, Defendants concede ROSCA is a "clear statute."  Mot.

14  at 24; *see also id.* at 20 (asserting "Amazon satisfies ROSCA's *plain terms*" (emphasis added));

15  Individuals' Mot. at 13 (referring to ROSCA's "three simple tenets").[30]

16      Second, even without that fatal flaw, Defendants' arguments rest on a blatant falsehood—

17  that the FTC's Complaint "assumes that . . . a prohibition [on dark patterns exists]," or attempts

18  to "enforce a supposed prohibition against 'dark patterns.'"  Mot. at 20.  In support of this

19  assertion, Amazon cites to four Complaint paragraphs that merely use the phrase "dark patterns."

20  *Id.* (citing Compl. ¶¶ 2, 8, 176, 231).  No paragraph alleges the existence of a dark patterns

    prohibition.  Rather, for the detailed reasons explained *supra* Sections I-IV, the Complaint

21

22  ---
    [30] Even if Defendants had not conceded the point, they could not establish ROSCA or the FTC Act are
    unconstitutionally vague.  In civil cases, "[l]esser degrees of specificity" are permitted and "[t]he standards are
23  especially lax for civil statutes that regulate economic activities."  *Wyndham*, 799 F.3d at 250 (quotation marks
    omitted).  "For those statutes, a party lacks fair notice when the relevant standard is so vague as to be no rule or
    standard at all."  *Id.* (quotation marks omitted).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 44

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

plausibly alleges Defendants violated existing law (the FTC Act and ROSCA) by failing to provide clear and conspicuous disclosures, obtain express informed consent, and provide simple cancellation mechanisms.  Defendants used, among other strategies, manipulative design elements sometimes called "dark patterns" to commit these specific violations, just as scores of FTC defendants have done in the past.  *See generally* Dkt. #87-13 (discussing other FTC cases involving dark patterns).  In short, Defendants miscast the FTC's Complaint as alleging violations of a non-existent dark patterns ban, rather than what they admit are ROSCA's "plain terms," and then improperly attack the supposed ban on due process grounds.

Amazon attempts to bolster its strawman attack on the FTC's purported "dark patterns theory" by noting that "dark patterns" are not mentioned in ROSCA or the FTC Act.  Mot. at 23. Amazon cites to two cases—*Butcher v. Knudsen* and *Bynum v. U.S. Capitol Police Board*— that, it claims, transform this modest observation into a constitutional violation.  *See* Mot. at 23. However, these cases are patently inapposite.  In both, a private party challenged a regulation as unconstitutionally vague, and the government responded by attempting to "clarify" the regulation's meaning with an interpretation found nowhere in its text.  In each case, the court found the regulation vague and rejected the government's attempts to save it with purportedly clarifying language.  *See Butcher v. Knudsen*, 38 F.4th 1163, 1175 (9th Cir. 2022) (administrative rule requiring registration of political committees was unconstitutionally vague notwithstanding Montana's extratextual assertion that the regulation excluded "casual political acts"); *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 57-59 (D.D.C. 2000) (ban on "demonstration activity" in the U.S. Capitol was insufficiently clear despite government's extratextual assertion that the regulation included a ban on "prayer").  Here, by contrast, Defendants have not asserted ROSCA or the FTC Act are vague, and the FTC has not attempted to import a "dark patterns" ban into either statute.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 45

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

**B.      Defendants Had Fair Notice of What ROSCA and the FTC Act Require.**

2

Neither Amazon nor the Individual Defendants can save their "vagueness" arguments by

3

recasting them as a failure by the FTC to provide "fair notice."  As an initial matter, "fair notice"

4

and "vagueness" doctrines substantially overlap—indeed, vagueness may be established by

5

demonstrating a lack of fair notice.  *See, e.g., Butcher*, 38 F.4th at 1169 ("In evaluating whether a

6

law is unconstitutionally vague, we ask whether it fails to provide a person of ordinary

7

intelligence fair notice of what is prohibited." (quotation marks omitted)); *see also FCC v. Fox

8

Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system

9

is that laws which regulate persons or entities must give fair notice of conduct that is forbidden

10

or required.").  Therefore, Defendants' "fair notice" arguments fail for the same reasons as their

"vagueness" arguments—they are not attacking a statute or regulation, but rather a (non-existent)

11

"theory."

12

Additionally, when a "case involves ordinary judicial interpretation of a civil statute," the

13

"relevant question is not whether [defendant] had fair notice of the FTC's *interpretation* of the

14

statute, but whether [defendant] had fair notice of what the *statute itself* requires."  *FTC v.

15

Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015) (emphasis original).  That is

16

precisely the case here.  As in *Wyndham*, "the FTC is asking the federal courts to interpret [the

FTC Act and ROSCA] . . . to decide whether [these statutes] prohibit[] the alleged conduct."  *Id*.

17

at 253.  Because Defendants do not even attempt to demonstrate that they lacked fair notice of

18

what ROSCA and the FTC Act require, they plainly had the required fair notice.

19

In support of its "fair notice" argument, Amazon cites *General Electric Co. v. EPA*,

20

53 F.3d 1324, 1329 (D.C. Cir. 1995), for the proposition that regulated parties must be able to

determine "with 'ascertainable certainty,' the standards with which the agency expects parties to

21

conform."  Mot. at 21.  But the "ascertainable certainty" standard is inapplicable here.  A party

22

may be entitled to "ascertainable certainty" of an agency's standards if a court must "defer to an

agency interpretation" of a statute or regulation (*e.g.*, where applying *Chevron* or *Auer*

23

deference), or the agency itself is acting as the adjudicator.  *Wyndham*, 799 F.3d at 254.  Neither

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 46

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

is the case here.  Because "this case involves ordinary judicial interpretation of a civil statute, . . . the ascertainable certainty standard does not apply."  *Id.* at 253.  In other words, Amazon's argument fails for the straightforward reason that it is the Court, not the FTC, that will determine whether Defendants violated the two clear statutes at issue here.

*FCC v. Fox Television Stations* is similarly inapposite.  *See* Mot. at 24; Individuals' Mot. at 12.  *Fox* held the FCC failed to provide broadcasters fair notice of the FCC's "indecency" rules before sanctioning them through the FCC's own administrative adjudicatory process. 567 U.S. at 253-54.  This holding has no bearing on this case because, again, this case "involves ordinary judicial interpretation of a civil statute," and the Court, not the FTC, is the adjudicator. *Wyndham*, 799 F.3d at 253.  For the same reason, *Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020), does not help Defendants.  *See* Mot. at 26; Individuals' Mot. at 14-15.  *Karem* enjoined the White House Press Secretary's decision—effectively, an executive branch adjudication—to revoke a reporter's pass, because there were no "explicit rules" governing suspensions.  *Karem*, 960 F.3d at 664-66.

Amazon, moreover, argues that, based on the "widespread industry use of negative options and so-called 'dark patterns'" there is "simply no way" it could have had "fair notice" that its conduct was "unlawful."  Mot. at 26.  As discussed, the FTC has brought many enforcement actions regarding negative options and unfair and deceptive conduct, including cases in which dark patterns contributed to that deception.  *See generally* Dkt. # 87-13. However, even if Amazon's assertion were true, the fact that others in the industry may also be violating the law provides no due process defense.[31]  Nor is it relevant that "[n]one of those practices [challenged in certain other ROSCA cases] is at issue in this case," Mot. at 23-24, or

---

[31] In a footnote, Amazon asserts "the FTC's 'dark patterns' theory raises serious questions under the First Amendment."  Mot. at 21 n.15.  Amazon does not meaningfully develop this argument, so it is waived.  *See, e.g.*, *Okorocha v. Duff*, 596 F. App'x 537, 539 (9th Cir. 2015).  In any case, even if Defendants' conduct were speech, "commercial speech is not entitled to any First Amendment protection if it is misleading or related to illegal activity."  *NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *5 (N.D. Cal. Sept. 18, 2023) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563-64 (1980)).

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 47

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   that the FTC has previously sought individual liability under ROSCA only against CEOs,

2   Individuals' Mot. at 14-15.  The fact that the FTC may sue other companies or individuals for

3   different conduct that also violates ROSCA does not make either ROSCA or the FTC Act

4   unconstitutionally vague.

5           Finally, Amazon asserts "the FTC has admitted" the "current legal framework—as the

6   FTC wants to interpret it—is unclear," because the FTC is engaged in negative option

7   rulemaking, held a related workshop, and wrote in a Notice of Proposed Rulemaking ("NPRM")

8   that the "framework" "does not provide clarity about how to avoid deceptive negative option

9   disclosures and procedures."  Mot. at 24-25 (quoting Dkt. #87-1 at 4).  As a threshold matter, the

10  quoted statement comes nowhere near establishing ROSCA or the FTC Act are

11  unconstitutionally vague or fail to provide fair notice, and Defendants do not argue otherwise.

12  *See, e.g.*, *Wyndham*, 799 F.3d at 250 (statute is invalid "where the relevant standard is so vague

13  as to be no rule or standard at all").  Beyond that, the NPRM consistently expresses that the

14  Commission is simply seeking to "improve . . . existing regulations for negative option

15  programs."  Dkt. #87-1 at 2; *see also id.* at 13 (negative option rule will provide "more

16  specificity").  Relatedly, Amazon faults the FTC for its supposedly "premature attempt to

17  legislate through litigation," suggesting the FTC must wait until it enacts the "proposed, future

18  rule" covering negative options.  Mot. at 26.  The notion that the FTC cannot enforce ROSCA,

19  which has been in effect for more than a decade, until the FTC promulgates a separate rule is

20  absurd and finds no support in the law.  *See* 15 U.S.C. § 8404 (authorizing enforcement by

21  Federal Trade Commission).

22          **C.**     **The Rule of Lenity Is Inapplicable.**

23          The Individual Defendants also argue the rule of lenity requires the law be "construed

24  strictly" in their favor.  Individuals' Mot. at 12.  This assertion is patently incorrect because the

25  rule of lenity applies only to ambiguous criminal statutes.  *See, e.g.*, *United States v. Shill*, 740

26  F.3d 1347, 1354-55 (9th Cir. 2014) ("The rule of lenity requires ambiguous criminal laws to be

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 48

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   interpreted in favor of the defendants subjected to them." (cleaned up)).  ROSCA and the FTC

2   Act are neither ambiguous nor criminal statutes.  The Individual Defendants cite to Justice

3   Gorsuch's (non-majority) opinion, joined by only one other Justice, in *Bittner v. United States*,

4   598 U.S. 85, 101 (2023), but that opinion changes nothing.  Rather, it *would have* applied the

5   rule of lenity (had it commanded the majority) to a statute that "ha[d] criminal as well as civil

6   ramifications."  *Id.* at 103.  In particular, the statute at issue imposed both "civil penalties" and

    "criminal sanctions" for "willfully violating" the Act.  *Id.*  That is not the case here.

7   **VI.    DEFENDANTS ARE LIABLE FOR CIVIL PENALTIES BECAUSE THEY**
8   **        KNEW THEY WERE VIOLATING ROSCA.**

9           Defendants all concede the FTC Act permits the Court to impose civil penalties if they

10  violated ROSCA "with actual knowledge or knowledge fairly implied on the basis of objective

11  circumstances."  15 U.S.C. § 45(m)(1)(A); Mot. at 27; Individuals' Mot. at 15-16.  This is not, as

12  Defendants claim, an "actual knowledge" requirement.  Mot. at 27; *United States v. Tech.*

13  *Commc'ns Indus., Inc.*, 1986 WL 15489, at *3 (E.D.N.C. Dec. 22, 1986) ("Actual knowledge is

14  not required.")  Rather, the FTC may prevail by proving *either* that Defendants were actually

15  aware of ROSCA's existence and that they were violating it, *or* that "a reasonable person under

16  the circumstances would have known of the existence of [ROSCA] and that the action[s] charged

17  violated [ROSCA]."  *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 141 (4th Cir. 1996).

18  Here, taking the facts in the light most favorable to the FTC, the Complaint more than

    sufficiently alleges Amazon and the Individual Defendants knew, or should have known, both of

    ROSCA's existence and that Amazon's enrollment and cancellation flows violated ROSCA.

19          **A.      Defendants Knew of ROSCA's Existence.**

20          Neither Amazon nor the Individual Defendants dispute the Complaint sufficiently pleads

21  they knew, or should have known, of ROSCA's existence.  Mot. at 27-28; Individuals' Mot.

22  at 15-17.[32]  Nor could they—Amazon is "one of the world's largest and most well-resourced

_____

[32] In a separate, non-penalty section of their motion, the Individual Defendants assert, without explanation, that "the FTC does not . . . allege" they knew about ROSCA.  Individuals' Mot. at 13.  That throwaway line is insufficient to raise the argument and is incorrect for the reasons explained above.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 49

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

companies" with "extensive legal resources including in-house and outside counsel with expertise in the FTC Act, ROSCA, and the company's other consumer protection obligations." Compl. ¶ 259.  The Individual Defendants were high-level executives tasked with managing Prime—the world's largest subscription service—including its enrollment and cancellation flows.  *See supra* Section IV.  As such, each was a key decision-maker with respect to the Prime enrollment and cancellation flows.  *See id.*  ROSCA is one of the primary statutes governing those activities.  Unsurprisingly, Individual Defendants also "routinely conferred with such in-house counsel . . . regarding obligations under the FTC Act, ROSCA, and other consumer protection laws and regulations."  Compl. ¶ 259.  All of these facts support the reasonable inference Defendants were aware of ROSCA.

### B.    The Complaint More Than Plausibly Alleges Defendants' Actual Knowledge, or "Knowledge Fairly Implied," of Their ROSCA Violations.

The Complaint pleads more than sufficient facts to demonstrate Defendants' actual knowledge of their ROSCA violations or, at a minimum, that a reasonable person (or entity) in Defendants' position would have recognized they were violating ROSCA.  Faced with these undeniable facts, Amazon pretends the Complaint's only allegation relevant to knowledge is paragraph 259 (Mot. at 28), but the Complaint is replete with allegations supporting Amazon's actual knowledge or knowledge "fairly implied" of its ROSCA violations.  In fact, there is an entire complaint section titled "Amazon's *Knowledge* of Nonconsensual Enrollment" (Compl. at 60, ¶¶ 177-187) that Amazon tellingly ignores in its penalty argument.  Among other facts, Amazon knew ▮▮▮▮▮ of Prime members who cancelled never meant to sign up (*id.* ¶ 177), Amazon documents referred to "accidental" sign-ups as a "well documented" issue (*id.* ¶ 179), and Amazon deprioritized efforts to "right size" the Prime membership to only include "intentional and genuine members" in order to maximize profits (*id.* ¶ 183).  *See also supra* Section I.C.

The Individual Defendants, like Amazon, make the false claim that the FTC "pleads only a single fact" demonstrating knowledge.  Individuals' Mot. at 16.  In fact, the Complaint alleges

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 50

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   the Individual Defendants received extensive warnings about problems with Prime's enrollment

2   and cancellation processes, all of which support the reasonable inference that they at least had

3   "knowledge fairly implied" of Amazon's violations.  In 2018, for example, Lindsay was told that

4   the Prime Organization "identified the need to increase clarity during the Prime sign-up."

5   Compl. ¶ 194.  In 2019, Lindsay and Grandinetti were told that Prime "customers sign up

6   without knowing they did," particularly in the product-checkout flows described *supra* Sections

7   I.A-B, and that other customers had difficulty "understand[ing] Prime's price and auto-renew

8   feature."  Compl. ¶ 205.  In 2020, Ghani and Lindsay allowed clarity improvements to go

9   forward—until they saw how much of an impact the improvement had on member balance (i.e.,

10  profits).  *Id.* ¶¶ 213-17.  All of this was sufficient, in fact, for Lindsay to foresee a lawsuit like

    this one, writing to Ghani about "the risk of regulatory action in some countries."  *Id.* ¶ 222.[33]

11         Defendants' use of spurious privilege claims to conceal enrollment- and cancellation-

12  related communications also establish their consciousness of guilt.  *See* Compl. ¶ 235; *In re*

13  *Grand Jury Matter*, 147 F.R.D. 82, 87 (E.D. Pa. 1992) (inaccurately labelling documents

14  "privileged and confidential" was "indicative" of attempt to shield them from investigative

15  authorities).  For instance, Lindsay and Ghani "included phrases such as 'for counsel' or 'seeking

16  counsel' or similar at the beginning of email correspondence addressing issues related to

17  Nonconsensual Enrollment or the Iliad Flow . . . when the correspondence did not contain a

18  request for legal advice."  Compl. ¶ 235(a).  In one email, an Amazon employee nonsensically

19  declared "clarity" of Amazon's enrollment and cancellation practices to be a "P&C [privileged &

    confidential] topic."  *Id.*  In another, an Amazon Vice President declared it "not appropriate" to

20

21  ───────────────

22  [33] For these same reasons, it is farcical for the Individual Defendants to claim that the FTC's civil penalty request relies "entirely on the cynical, speculative, and baseless inference that because the Individuals consulted with counsel, they must have been advised that their conduct was illegal."  Individuals' Mot. at 16.  Additionally, the FTC does not, and will not, ask the Court to infer knowledge of illegality from consultations with counsel.  Rather, the FTC's allegation that the Individuals consulted with counsel about ROSCA (Compl. ¶ 259) is one fact supporting they knew ROSCA *existed*—a point they do not meaningfully contest.

23

discuss the lack of clarity in an Amazon enrollment page "over email, and increasingly a mass one at that." *Id.* These are not the actions of a company that knows it has done nothing wrong.

## CONCLUSION

For the foregoing reasons, the FTC respectfully requests the Court deny Defendants' motions to dismiss.

## LOCAL RULE 7(e) CERTIFICATION

I certify that this memorandum contains 16,685 words, in compliance with the Court's September 29, 2023 Order (Dkt. #75).


Dated: November 17, 2023          /s/ Evan Mendelson
                                  EVAN MENDELSON (D.C. Bar #996765)
                                  OLIVIA JERJIAN (D.C. Bar #1034299)
                                  THOMAS MAXWELL NARDINI
                                  (IL Bar #6330190)
                                  Federal Trade Commission
                                  600 Pennsylvania Avenue NW
                                  Washington DC 20580
                                  (202) 326-3320; emendelson@ftc.gov (Mendelson)
                                  (202) 326-2749; ojerjian@ftc.gov (Jerjian)
                                  (202) 326-2812; tnardini@ftc.gov (Nardini)

                                  COLIN D. A. MACDONALD (WSBA # 55243)
                                  Federal Trade Commission
                                  915 Second Ave., Suite 2896
                                  Seattle, WA 98174
                                  (206) 220-4474; cmacdonald@ftc.gov (MacDonald)

                                  Attorneys for Plaintiff
                                  FEDERAL TRADE COMMISSION

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No. 2:23-cv-0932-JHC - 52

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320