The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

                Plaintiff,

    v.

AMAZON.COM, INC. *et al.*,

                Defendants.

No. 2:23-cv-0932-JHC

DECLARATION OF KENNETH E. PAYSON IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO FILE A STANDALONE MOTION IN LIMINE

I, Kenneth E. Payson, declare as follows:

1.      I am a partner at the law firm Davis Wright Tremaine LLP, counsel for Defendants Amazon.com, Inc.; Neil Lindsay; Russell Grandinetti; and Jamil Ghani in the above-captioned case. To the best of my knowledge, the matters set forth herein are true and correct and, if called as a witness, I could and would testify competently thereto.

2.      I submit this declaration in support of Defendants' Motion for Leave to File a Standalone Motion in Limine and in accordance with the Western District of Washington's Local Civil Rule 7(d)(5). The parties have met and conferred in good faith, have exchanged emails, and spoke by phone in an attempt to resolve the disputes raised in Defendants' Motion for Leave to File a Standalone Motion in Limine and in the Standalone Motion in Limine Regarding Public FTC Statements.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

3.      On May 8, 2025, the parties exchanged emails regarding Defendants' intent to file the Motion for Leave to File a Standalone Motion in Limine. **Exhibit 1** contains a true and accurate copy of the parties' email exchange.

4.      The parties held a telephonic meet and confer on May 8, 2025, in a good faith effort to resolve their dispute The counsel participants in that conferral were Colin MacDonald and Jeffrey Tang for the FTC, and myself, Joseph Reiter, Joseph Aronsohn, Laura Flahive Wu, and Theo Lesczynski for Defendants. Following the meet and confer, the parties exchanged further correspondence confirming they were unable to reach agreement, thus Defendants communicated that they would file their motions. *See* Exhibit 1.

5.      **Exhibit 2** contains a true and accurate excerpted copy of the Rule 30(b)(6) deposition testimony of FTC Assistant Director of the Enforcement Division Amanda Basta. Exhibit 2 is excerpted to only include testimony that is relevant to this Motion.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on this 9th day of May, 2025, in Seattle, Washington.


                                        *s/ Kenneth E. Payson*
                                        Kenneth E. Payson

DECLARATION OF KENNETH E. PAYSON ISO
MOTION FOR LEAVE TO FILE STANDALONE MOTION IN LIMINE
(2:23-cv-0932-JHC) - 2

# EXHIBIT 1

| | |
|---|---|
| **From:** | Joseph Aronsohn <jaronsohn@hueston.com> |
| **Sent:** | Thursday, May 8, 2025 9:06 PM |
| **To:** | MacDonald, Colin; Joseph A. Reiter; Cohen, Jonathan; Jerjian, Olivia; Ware, Jonathan; Saunders, Anthony R.; Hoffman, Elena; Zwonik, Ryan; Mejia-Portillo, Johana; Taylor, Phoebe CTR; Mendelson, Evan; Tang, Jeffrey; Sifuentes, Rachel |
| **Cc:** | Moez M. Kaba; Amazon/FTC [INT]; Howard, Jim; Payson, Kenneth; Lesczynski, Theo; Kim, Laura; Flahive Wu, Laura; Anthony, Stephen; Graubert, John; Kelly, Kevin |
| **Subject:** | Re: FTC v. Amazon - Motion in Limine |

Colin,

Thank you for confirming the FTC's position. Throughout this case, the FTC has "repeatedly objected" to "the Negative Option Rule rulemaking" as "irrelevant to this litigation." Dkt. 220 at 4. But as we have detailed in prior briefing and explained again on today's call, the FTC's rulemaking statements—including, without limitation, the statements about ROSCA cited in prior briefing—will be relevant to numerous issues at trial, including to the FTC's substantive claims, the FTC's demand for civil penalties, and Defendants' affirmative defenses. Accordingly, we understand that the parties are at an impasse, and we will file our motion.

From our call, we also understand that the FTC will oppose any request to move the dispositive motion deadline, including a request made at a conference with the Court. If that is incorrect, or if the FTC reconsiders its position, please let us know as soon as possible.

Best,

Joseph


**Joseph Aronsohn**
_____

## HUESTON HENNIGAN LLP

D: 213.788.4375
jaronsohn@hueston.com
Biography

_____

**From:** MacDonald, Colin <cmacdonald@ftc.gov>
**Sent:** Thursday, May 8, 2025 4:57 PM
**To:** Joseph Aronsohn <jaronsohn@hueston.com>; Joseph A. Reiter <jreiter@hueston.com>; Cohen, Jonathan <jcohen2@ftc.gov>; Jerjian, Olivia <ojerjian@ftc.gov>; Ware, Jonathan <jware1@ftc.gov>; Saunders, Anthony R. <ASAUNDERS@ftc.gov>; Hoffman, Elena <ehoffman@ftc.gov>; Zwonik, Ryan <rzwonik@ftc.gov>; Mejia-Portillo, Johana <jmejiaportillo@ftc.gov>; Taylor, Phoebe CTR <ptaylor3@ftc.gov>; Mendelson, Evan <emendelson@ftc.gov>; Tang, Jeffrey <jtang@ftc.gov>; Sifuentes, Rachel <rsifuentes@ftc.gov>
**Cc:** Moez M. Kaba <mkaba@hueston.com>; Amazon/FTC [INT] <amazon-ftc@hueston.com>; Howard, Jim <jimhoward@dwt.com>; Payson, Kenneth <kennethpayson@dwt.com>; Lesczynski, Theo <theolesczynski@dwt.com>; Kim, Laura <lkim@cov.com>; Flahive Wu, Laura <lflahivewu@cov.com>; Anthony, Stephen <santhony@cov.com>; Graubert, John <jgraubert@cov.com>; Kelly, Kevin <kkelly@cov.com>
**Subject:** RE: FTC v. Amazon - Motion in Limine

Counsel,

I'm following up on our call earlier. First, regarding Amazon's motion in limine regarding statements about the negative option rulemaking, our ability to take a position is limited by our knowledge of the universe of statements to which it would apply. We do not stipulate to the admission of the 2019 Advance Notice of Proposed Rulemaking, the 2023 Notice of Proposed Rulemaking, the 2024 Final Rule, or other documents specifically cited in prior briefing to the Court. This is all the more true given Amazon's stated intent to seek their admission for all purposes, rather than limited to specific uses. To the extent there are other statements you would like us to consider, please reference the specific statement at issue.

Second, regarding the schedule proposal, as noted, we do not think a motion to "clarify" or otherwise alter the dispositive and *Daubert* deadline is permissible under the Court's November 5 Order. Regardless, we would oppose a motion to postpone the deadline for dispositive and *Daubert* motions, but we are open to a conference with the Court on the issue.

As always, we are happy to meet and confer regarding these and other matters.

Regards,

**Colin D. A. MacDonald** (he/him) | Attorney | Federal Trade Commission
Northwest Regional Office | 915 Second Ave., Ste. 2896 | Seattle, WA 98174
Tel.: (206) 220-4474 | Fax: (206) 220-6366 | Web: www.ftc.gov

---

**From:** Joseph Aronsohn <jaronsohn@hueston.com>
**Sent:** Thursday, May 8, 2025 11:06 AM
**To:** MacDonald, Colin <cmacdonald@ftc.gov>; Joseph A. Reiter <jreiter@hueston.com>; Cohen, Jonathan <jcohen2@ftc.gov>; Jerjian, Olivia <ojerjian@ftc.gov>; Ware, Jonathan <jware1@ftc.gov>; Saunders, Anthony R. <ASAUNDERS@ftc.gov>; Chaudhry, Sana <schaudhry@ftc.gov>; Hoffman, Elena <ehoffman@ftc.gov>; Zwonik, Ryan <rzwonik@ftc.gov>; Mejia-Portillo, Johana <jmejiaportillo@ftc.gov>; Taylor, Phoebe CTR <ptaylor3@ftc.gov>; Mendelson, Evan <emendelson@ftc.gov>
**Cc:** Moez M. Kaba <mkaba@hueston.com>; Amazon/FTC [INT] <amazon-ftc@hueston.com>; Howard, Jim <jimhoward@dwt.com>; Payson, Kenneth <kennethpayson@dwt.com>; Lesczynski, Theo <theolesczynski@dwt.com>; Kim, Laura <lkim@cov.com>; Flahive Wu, Laura <lflahivewu@cov.com>; Anthony, Stephen <santhony@cov.com>; Graubert, John <jgraubert@cov.com>; Kelly, Kevin <kkelly@cov.com>
**Subject:** Re: FTC v. Amazon - Motion in Limine

12:30 PM PT works for us, thanks. We'll circulate an invite.

**Joseph Aronsohn**

---

# HUESTON HENNIGAN LLP

D: 213.788.4375
jaronsohn@hueston.com
Biography

---

**From:** MacDonald, Colin
**Sent:** Thursday, May 08, 2025 10:56 AM
**To:** Joseph A. Reiter; Cohen, Jonathan; Jerjian, Olivia; Ware, Jonathan; Saunders, Anthony R.; Chaudhry, Sana; Hoffman, Elena; Zwonik, Ryan; Mejia-Portillo, Johana; Taylor, Phoebe CTR; Mendelson, Evan
**Cc:** Joseph Aronsohn; Moez M. Kaba; Amazon/FTC [INT]; Howard, Jim; Payson, Kenneth; Lesczynski, Theo; Kim,

Laura; Flahive Wu, Laura; Anthony, Stephen; Graubert, John; Kelly, Kevin
**Subject:** RE: FTC v. Amazon - Motion in Limine

Counsel,

We are available at 12:30pm or between 2pm and 3:30pm Pacific today, or we can look for available times on Monday. We are also able to meet and confer about Joseph Aronsohn's proposal regarding the dispositive motions deadline. Please let us know if either of those times works for you.

Thanks,
Colin

**Colin D. A. MacDonald** (he/him) | Attorney | Federal Trade Commission
Northwest Regional Office | 915 Second Ave., Ste. 2896 | Seattle, WA 98174
Tel.: (206) 220-4474 | Fax: (206) 220-6366 | Web: www.ftc.gov

---

**From:** Joseph A. Reiter <jreiter@hueston.com>
**Sent:** Thursday, May 8, 2025 6:00 AM
**To:** Cohen, Jonathan <jcohen2@ftc.gov>; Jerjian, Olivia <ojerjian@ftc.gov>; Ware, Jonathan <jware1@ftc.gov>; Saunders, Anthony R. <ASAUNDERS@ftc.gov>; Chaudhry, Sana <schaudhry@ftc.gov>; MacDonald, Colin <cmacdonald@ftc.gov>; Hoffman, Elena <ehoffman@ftc.gov>; Zwonik, Ryan <rzwonik@ftc.gov>; Mejia-Portillo, Johana <jmejiaportillo@ftc.gov>; Taylor, Phoebe CTR <ptaylor3@ftc.gov>; Mendelson, Evan <emendelson@ftc.gov>
**Cc:** Joseph Aronsohn <jaronsohn@hueston.com>; Moez M. Kaba <mkaba@hueston.com>; Amazon/FTC [INT] <amazon-ftc@hueston.com>; Howard, Jim <jimhoward@dwt.com>; Payson, Kenneth <kennethpayson@dwt.com>; Lesczynski, Theo <theolesczynski@dwt.com>; Kim, Laura <lkim@cov.com>; Flahive Wu, Laura <lflahivewu@cov.com>; Anthony, Stephen <santhony@cov.com>; Graubert, John <jgraubert@cov.com>; Kelly, Kevin <kkelly@cov.com>
**Subject:** FTC v. Amazon - Motion in Limine

Counsel – Defendants intend to file a motion in limine this week to admit at trial the FTC's public statements regarding ROSCA that were made in connection with the rulemaking process for the new Negative Option Rule. Please let us know when a member of your team is available to meet and confer today or tomorrow.

**Joseph A. Reiter**

---

**HUESTON HENNIGAN LLP**

D: 213.788.4536
T: 949.229.8640
jreiter@hueston.com
Biography

523 West 6th St Suite 400
Los Angeles CA 90014

---

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

# EXHIBIT 2

**Page 1**

1           UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                  AT SEATTLE

4    --------------------------

5    FEDERAL TRADE COMMISSION,

6              Plaintiff,

7    v.                         No. 2:23-cv-0932-JHC

8    AMAZON.COM, INC., et al.,

9              Defendant.        VOLUME I

10   --------------------------

11

12   30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                ON BEHALF OF

14           FEDERAL TRADE COMMISSION

15

16         Tuesday, September 10, 2024

17                  8:51 AM

18

19

20

21   Reported by: Denise Dobner Vickery, RMR, CRR

22   JOB NO.: J11644778

**Page 2**

1

2

3

4

5         Tuesday, September 10, 2024

6                  8:51 AM

7

8         Video-Recorded 30(b)(6) Deposition of

9    AMANDA BASTA on behalf of Federal Trade Commission,

10   held at the offices of:

11

12           COVINGTON & BURLING LLP

13           One CityCenter

14           850 Tenth Street NW

15           Washington, DC 20001

16

17

18         Pursuant to notice, before Denise Dobner

19   Vickery, Certified Realtime Reporter, Registered

20   Merit Reporter, and Notary Public in and for the

21   District of Columbia.

22

**Page 3**

1    APPEARANCES:

2

3    Representing the Plaintiff:

4           FEDERAL TRADE COMMISSION

5           BUREAU OF CONSUMER PROTECTION

6           Division of Enforcement

7           BY:  EVAN M. MENDELSON, ESQ.

8           BY:  OLIVIA JERJIAN, ESQ.

9           600 Pennsylvania Avenue NW

10          Washington, DC 20580

11          202.326.3320

12          emendelson@ftc.gov

13

14   Representing the Defendants:

15          HUESTON HENNIGAN

16          BY:  MOEZ M. KABA, ESQ.

17          BY:  MICHAEL TODISCO, ESQ.

18          BY:  JOSEPH ARONSOHN, ESQ. (Via Zoom)

19          523 West 6th Street, Suite 400

20          Los Angeles, CA 90014

21          213.788.4340

22          mkaba@hueston.com

**Page 4**

1    APPEARANCES:

2

3    VIDEOGRAPHER: Nathan Kane

4

5    ALSO PRESENT: Laura Craig

6                 Ben Langner, Senior Corporate

7                 Counsel, Amazon

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 5

```
 1                        INDEX
 2    EXAMINATION OF AMANDA BASTA              PAGE
 3    BY MR. KABA                                  7
 4    AFTERNOON SESSION                          228
 5               DEPOSITION EXHIBITS
 6    NUMBER     DESCRIPTION                    PAGE
 7    EXHIBIT 1   Top E-mail September 6, 2024    38
 8                RE: FTC v. Amazon - Defendants'
 9                Notice of 30(b)(6) Deposition
10    EXHIBIT 2   FTC's Second Supplemental       82
11                Responses and Objections to Amazon's
12                First Set of Interrogatories
13    EXHIBIT 3   Amended Complaint              129
14    EXHIBIT 4   Restore Online Shoppers'       135
15                Confidence Act (ROSCA)
16    EXHIBIT 5   Proposed Rules FTC 16 CFR Part 425 184
17                Negative Option Rule, Monday,
18                April 24, 2023
19    EXHIBIT 6   Notices FTC Enforcement Policy 381
20                Statement Regarding Negative
21                Option Marketing, Thursday,
22                November 4, 2021
```

Page 6

```
 1          P R O C E E D I N G S
 2                   - - -
 3          THE VIDEOGRAPHER:  This is Tape
 4  No. 1 to the videotaped deposition of Amanda Basta
 5  in the matter of FTC verse Amazon, et al., being
 6  heard before the United States District Court,
 7  Western District Division of Seattle, Case Number
 8  2:23-cv-0932.
 9          This deposition is being held at
10  850 10th Street, Northwest, Washington, DC, on
11  September 10, 2024 at 8:51 AM.
12          My name is Nathan Kane and I'm the
13  videographer.  The court reporter is Denise Vickery.
14          Counsel, will you please introduce
15  yourselves and affiliation and the witness will be
16  sworn.
17          MR. KABA:  It's Moez Kaba of
18  Hueston Hennigan on behalf of the defendants, and
19  I'm joined by colleagues whose appearance is noted
20  on the record.
21          MR. MENDELSON:  Evan Mendelson on
22  behalf of the plaintiff Federal Trade Commission,
```

Page 7

```
 1  and I will be joined shortly by Olivia Jerjian also
 2  on behalf of the Federal Trade Commission.
 3                   - - -
 4             AMANDA BASTA
 5  called for examination, and, after having been duly
 6  sworn, was examined and testified as follows:
 7                   - - -
 8             EXAMINATION
 9                   - - -
10  BY MR. KABA:
11     Q.  Good morning, Ms. Basta.
12     A.  Good morning.
13     Q.  Could you just state and spell your
14  full name and your title at the Federal Trade
15  Commission?
16     A.  Sure.  Amanda, A-m-a-n-d-a, Basta
17  B-a-s-t-a.  I'm Assistant Director within the
18  Division of Enforcement in the Bureau of Consumer
19  Protection.
20     Q.  Okay.  And for how long have you been
21  the Assistant Director within the Division of
22  Enforcement in the Bureau of Consumer Protection?
```

Page 8

```
 1     A.  Since August of 2018.
 2     Q.  And what title did you have before
 3  that?
 4     A.  I was a staff attorney.
 5     Q.  Within which division?
 6     A.  The Enforcement Division.
 7     Q.  So same division?
 8     A.  Yes.
 9     Q.  And for how long were you a staff
10  attorney?
11     A.  10 years.  I started in September of
12  2008.
13     Q.  Okay.  What were you doing before
14  September of 2008?
15     A.  I was an associate at Kirkland & Ellis
16  from August of 2004 until August of 2008.
17     Q.  Okay.  And when did you graduate law
18  school?
19     A.  2002.
20     Q.  And where did you go to law school?
21     A.  University of Chicago.
22     Q.  And what did you do between graduation
```



Page 37

1    A.   Yes.

2    Q.   Okay.  Do you recall around what time

3  period that Amazon policy was in place?

4    A.   I don't.

5    Q.   Okay.  Did you meet with anyone to

6  prepare for today's deposition?

7    A.   Yes.  I met with Mr. Mendelson,

8  Ms. Jerjian, Mr. Nardini, Mr. Kohm.

9    Q.   When did you have these meetings or

10  this meeting?

11    A.   We met a number of times over the last

12  two weeks, and primarily I was meeting with

13  Mr. Mendelson, you know, running through questions I

14  had as I was preparing myself.

15    Q.   How many meetings did you have to

16  prepare for your deposition today?

17    A.   We had, I want to say, four in-person

18  meetings and we spoke on the phone probably most

19  days in the last -- most weekdays during last two

20  weeks.

21    Q.   Okay.  So you probably spent tens of

22  hours preparing for the deposition?

Page 38

1    A.   With counsel I would say 10 to 15 and

2  probably about that on my own.

3    Q.   Okay.  So 20 to 30 hours preparing for

4  your deposition today; fair?

5    A.   Yes, I mean, specifically for the

6  deposition.  Because I'm involved in the day-to-day

7  doings in the case, some stuff comes easier than

8  others.

9    Q.   Sure.  Sure.

10       Other than the four individuals you

11  mentioned that you met with, have you spoken to

12  anyone else about your deposition today?

13    A.   No.

14       MR. KABA:  Okay.  Okay.  Let's

15  mark as Exhibit 1 to your deposition.

16       (Document marked for

17  identification as Basta Exhibit 1.)

18  BY MR. KABA:

19    Q.   It's an e-mail exchange between

20  Mr. Mendelson, your counsel here, and Mr. Aronsohn,

21  who is a colleague of mine.

22       Ms. Basta, I want to focus on

Page 39

1  Mr. Aronsohn's e-mail dated September 5, 2024, and

2  he identifies in this e-mail a series of topics.

3    A.   Uh-huh.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   Okay.  And you understand that with

7  respect to each of these topics -- and we'll talk

8  about them during our time together -- you have been

9  designated by the FTC as the person most

10  knowledgeable to testify about those topics?

11    A.   Yes.

12    Q.   Okay.  Thank you.

13       Okay.

14    A.   Can we take a break for a quick second?

15    Q.   Yes.

16    A.   This will not stick on.

17       THE VIDEOGRAPHER:  We are off the

18  record at 9:23.

19       (Recess.)

20       THE VIDEOGRAPHER:  We are back on

21  the record at 9:26.  At 9:00 -- yeah.

22       MR. KABA:  We have the microphones

Page 40

1  sorted now, I think.  I hope.

2  BY MR. KABA:

3    Q.   Ms. Basta, have you ever been a member

4  of Prime?

5    A.   Yes.

6    Q.   Are you currently?

7    A.   Yes.

8    Q.   Do you know when you joined?

9       MR. MENDELSON:  Objection.  Scope.

10       THE WITNESS:  No.  (Laugh).

11  BY MR. KABA:

12    Q.   No?

13    A.   A long time ago.

14    Q.   Do you know how you joined?

15       MR. MENDELSON:  Objection.  Scope.

16       THE WITNESS:   I don't remember

17  exactly.  I know it was something that I had thought

18  about and wanted to do.  So I sought out kind of how

19  to enroll and enrolled as its own.  You know, I

20  don't know exactly when, but I know that I was like,

21  oh, I order from Amazon a lot.  I should join Prime.

22  BY MR. KABA:



Page 61

1  calling a toll-free number, speaking to a human and
2  saying, "I wish to cancel my subscription," is a
3  simple mechanism --
4              MR. MENDELSON:  Objection.
5  BY MR. KABA:
6      Q.  -- to cancel?
7              MR. MENDELSON:  Objection.  Calls
8  for opinion.  Vague.
9              THE WITNESS:  I mean, it depends
10  on the context, right?  If the consumer has to -- I
11  mean, how long is the phone call?  Are there save
12  offers?  Are there impediments?
13              All of this is contextual.  So it
14  may be a simple mechanism in some cases.  It may not
15  in others.  And certainly if they call asking to
16  cancel and are directed to an online flow that is
17  itself complicated and not simple, that's not
18  simple.
19  BY MR. KABA:
20      Q.  Okay.  So I want to go through this.
21      A.  Uh-huh.
22      Q.  I want you to be for now --

Page 62

1      A.  Uh-huh.
2      Q.  -- with me that there are consumers who
3  call --
4      A.  Uh-huh.
5      Q.  -- Amazon's toll-free number and say,
6  "I wish to cancel Prime," and can cancel Prime that
7  way.  Okay?
8      A.  Uh-huh.
9      Q.  You understand?
10      A.  Yes.
11      Q.  Okay.  So you identified a number of
12  things that you would then want to consider as part
13  of the context for whether or not that mechanism,
14  that is, calling a toll-free number, complies with
15  ROSCA's requirement of a simple mechanism to cancel?
16      A.  Yes.
17      Q.  Okay.  One of the things you said is
18  relevant to the inquiry is how long the telephone
19  call takes?
20      A.  Yes.
21      Q.  Do you know how long it takes for a
22  consumer to cancel their Prime subscription by

Page 63

1  calling the Amazon toll-free number?
2              MR. MENDELSON:  Objection.  Vague.
3              THE WITNESS:  (Pause).  I'm
4  struggling because, again, my understanding is the
5  first time that somebody -- or when somebody calls,
6  they're not immediately given the option to cancel
7  over the phone.  So that -- it's making it
8  difficult.
9              I don't know at what point in the
10  call they get to that.  So, yeah, I would want to
11  know kind of what -- what happens in the run-up.
12  BY MR. KABA:
13      Q.  That's something you would want to
14  know; correct?
15      A.  Uh-huh.  Yes.
16      Q.  You do not know, though?
17      A.  No.
18      Q.  Okay.  So let's focus on my question
19  again, Ms. Basta.
20              Regardless of the content of the phone
21  call for now?
22      A.  Uh-huh.

Page 64

1      Q.  Okay.  You with me?
2      A.  Yes.
3      Q.  Regardless of what the consumer is told
4  on the telephone, how -- do you know how long it
5  takes for a consumer to call the toll-free number,
6  no matter what the Amazon customer service rep says
7  on the phone, for them to then be able to cancel
8  their Prime subscription?
9      A.  I do not.
10      Q.  Okay.  Do you know if it takes more
11  than one minute?
12      A.  I do not.
13      Q.  Do you know if it takes less than one
14  minute?
15      A.  I do not.
16      Q.  Okay.  The second thing you mentioned
17  is, are there save offers.
18              What is a save offer?
19      A.  A save offer is when somebody says,
20  okay, we'll cancel, but first you may want
21  to -- before you cancel, we'll offer you three
22  months for free.  And then -- and try to get the



Page 65

1  person to stay in the program versus canceling.  So
2  it's -- it's marketing offers that are kind of
3  interspersed with the cancellation transaction.
4      Q.  Okay.  Do you know when a customer
5  calls Amazon to cancel their Prime subscription
6  whether they are presented with any save offers at
7  all?
8      A.  I don't.
9      Q.  Okay.  And there's nothing unlawful
10  about presenting a sales -- a save offer to a
11  customer who is seeking to cancel; correct?
12      A.  Not currently, no.
13          MR. MENDELSON:  Objection.  Calls
14  for a legal opinion.
15          THE WITNESS:  Sorry.
16  BY MR. KABA:
17      Q.  I'm sorry.  We got the --
18      A.  Entangled.
19      Q.  We got a little entangled there.  So
20  let me try again.
21          Ms. Basta, ROSCA does not prohibit a
22  company from presenting a save offer, as you've

Page 66

1  defined it, to a consumer who calls or goes online
2  or chats to cancel; correct?
3          MR. MENDELSON:  Objection.  Scope.
4  Calls for legal opinion.
5          THE WITNESS:  There's no per se
6  bar, no.
7  BY MR. KABA:
8      Q.  Thank you.
9          I think because I asked "does not" and
10  then you said "no," we've now got a double negative.
11  So I'm going to try it one more time.
12      A.  (Laugh.)
13      Q.  Ms. Basta, regardless of the mechanism
14  to cancel either on the phone, through the website
15  cancellation flow, through the chatbot or through
16  the e-mail, ROSCA does not prohibit a company from
17  presenting a save offer prior to processing a
18  cancellation request; correct?
19      A.  There's --
20          MR. MENDELSON:  Same objections.
21          THE WITNESS:  There's no pro se
22  prohibition on save offers in ROSCA.

Page 67

1  BY MR. KABA:
2      Q.  So my statement is correct.  Yes?
3          MR. MENDELSON:  Same objection.
4          THE WITNESS:  I'm trying to avoid
5  the double negative.
6  BY MR. KABA:
7      Q.  My statement is correct that ROSCA does
8  not bar or prohibit a company from presenting a save
9  offer prior to processing a cancellation request;
10  correct?
11      A.  To the extent that it does not -- to
12  the extent that there is a simple mechanism even
13  with a save offer, yes.
14      Q.  Okay.  So if a consumer can call to
15  cancel their Prime subscription and before the
16  subscription is canceled they get an offer that
17  says, hey, we'll give you a discount or why don't
18  you -- we'll give you three more months for free,
19  that's not prohibited by ROSCA; correct?
20          MR. MENDELSON:  Objection.  Vague.
21          THE WITNESS:  If it -- it is not
22  prohibited by ROSCA if the mechanism is simple

Page 68

1  overall, yes.
2  BY MR. KABA:
3      Q.  Okay.  So that's where I'm struggling
4  because you're saying -- to decide whether or not
5  something is simple, you need to look at context;
6  right?
7      A.  Yes.
8      Q.  So some -- a mechanism may be simple in
9  one case and not simple in another, depending on
10  lots of various other factors that you would
11  consider; correct?
12          MR. MENDELSON:  Objection.  Vague.
13  Calls for legal opinion.
14          THE WITNESS:  So I think, you
15  know, like advertising.  It's the -- it's the
16  overall impression, right?  And where there are
17  features of a mechanism that cause it not to be
18  simple for consumers, then that's going to violate
19  ROSCA.
20          If -- if there are ways to present
21  that offer in a way that allows the mechanism to be
22  simple, then it will pass muster under ROSCA.  But



Page 69

1    that's -- it's hard to analyze any of it in a vacuum
2    because -- and with, you know, how consumers
3    interact with it.
4            It's just, you know, were they
5    placed on a hold?  Is it their first call?  Is it
6    their third call?  Is it, you know, is it very clear
7    that when the save offer like three months free ends
8    that it will resume, and at what rate?  And just
9    making sure consumers understand what the
10   transaction that they're entering into is and that
11   is very context-dependent.
12   BY MR. KABA:
13       Q.   Okay.  So going back to just my
14   question.
15       A.   Uh-huh.
16       Q.   It is the FTC's position that a
17   cancellation mechanism can be simple in one context
18   and no longer simple in a different context,
19   depending on various other features or criteria that
20   the FTC would consider; correct?
21           MR. MENDELSON:  Objection.  Vague.
22           THE WITNESS:  Well, not the FTC.

Page 70

1    Ultimately, the court.
2    BY MR. KABA:
3        Q.   That's fair.
4            But you are the one bringing the claim;
5    right?
6        A.   Yes.
7        Q.   Okay.  So it is the FTC's position that
8    a cancellation mechanism can be simple in one
9    context and not simple in another context, and
10   whoever is deciding on the ROSCA violation would
11   need to consider all sorts of different criteria in
12   order to make that determination; correct?
13           MR. MENDELSON:  Objection.  Vague.
14           THE WITNESS:  I mean, if they're
15   applying the same criteria across circumstances, I
16   would imagine those cases would come out very
17   similarly.
18           But I don't think it's like for
19   company A, you look at XYZ.  For company B, you look
20   at 123.  I think you look at the same sets of
21   factors across all of them, and that's going to give
22   you a fairly consistent result.

Page 71

1    BY MR. KABA:
2        Q.   Right.  I think you think I'm asking
3    you a different question than maybe I'm asking you.
4    That's my fault.
5        A.   Okay.
6        Q.   So let me -- let me try again.
7            It is the FTC's position -- well, I'll
8    ask you more broadly.
9            It is the FTC's position that whether
10   or not a disclosure is clear and conspicuous is
11   context-specific; correct?
12       A.   Absolutely.
13       Q.   It is the FTC's position that whether
14   or not you obtained informed consent is
15   context-specific; correct?
16       A.   Yes.
17       Q.   It is the FTC's position that whether
18   or not a mechanism to cancel is simple is
19   context-specific; correct?
20       A.   Yes.
21       Q.   And so you don't look only at the
22   disclosure or only at the mechanism.

Page 72

1            You look at all sorts of other criteria
2    to decide whether or not there is a ROSCA violation;
3    correct?
4        A.   I'm struggling with the word
5    "criteria."
6        Q.   Features?
7        A.   Facts.  Do we have evidence that
8    consumers are actually confused when they're
9    presented with it?  You know, some may be features,
10   you know, of the way that it's designed.  Is there,
11   you know, a lot of -- a lot of things distracting
12   the consumer?
13           You know, there's -- so criteria is
14   just the word I'm struggling with, but there's a lot
15   of facts, which is why we conduct a full
16   investigation, right?
17           Because we want to know, you know, what
18   evidence is out there that tells us how consumers
19   are interacting with it and how, you know, what the
20   company understands about consumer's interaction
21   with it.  What facts are there in terms of the
22   design.



AMANDA BASTA Vol. I 30b6                     September 10, 2024
FTC vs AMAZON.COM, INC., et al.                        77–80

Page 77

1  knowing exactly what's happening in those time
2  periods, analyzing it in a vacuum just doesn't work.
3  BY MR. KABA:
4       Q.  Okay.  So then just to be clear, with
5  respect to figuring out whether a cancellation
6  mechanism is simple, you couldn't identify sort of
7  objective quantitative criteria that you could say,
8  I've checked these boxes.  It makes the mechanism
9  simple.
10       Is that fair?
11       A.  Yes.
12       Q.  Instead you would need to look at, as
13  we've now talked about many times, context-specific
14  interactions, you know, specific other features of
15  the mechanism to decide whether or not it is simple;
16  correct?
17            MR. MENDELSON:  Objection.  Scope.
18  Vague.
19            THE WITNESS:  Yes.
20  BY MR. KABA:
21       Q.  Okay.  Prior to the FTC's investigation
22  launching in February of 2021, are you aware of any

Page 78

1  FTC communication or instruction or correspondence
2  or message of any kind to Amazon telling Amazon that
3  the FTC believed that Amazon's flows or Prime itself
4  violated ROSCA?
5            MR. MENDELSON:  Objection.  Scope.
6            THE WITNESS:   Not Prime itself.
7  I know in 2014, the FTC sued Amazon over failure to
8  provide express informed consent based on some
9  varied disclosures in a different -- in a different
10  mobile flow, and so certainly the idea that that put
11  in terms and conditions in -- in certain contexts
12  could deprive of express informed consent was a
13  concept familiar to Amazon.
14  BY MR. KABA:
15       Q.  Okay.  So you're, again, answering a
16  different question than the one I've asked.
17       A.  Uh-huh.
18       Q.  So I would like you -- it will be
19  helpful, so that I don't have to ask my question
20  multiple times, if you could at least initially just
21  focus on responding to my question.
22       A.  Uh-huh.

Page 79

1       Q.  And Mr. Mendelson will have an
2  opportunity at the end of the deposition to ask you
3  additional questions that he might have of you to
4  get out additional testimony that you may wish to
5  provide.
6       Do you understand?
7       A.  Yes, but I think I did answer the
8  question.  You asked about messages to Amazon about
9  violations or about --
10       Q.  Why don't I -- why don't I --
11       A.  Yeah, try it again.
12       Q.  -- ask you my question.  Okay?
13       A.  Uh-huh.
14       Q.  Prior to the FTC's investigation
15  launching in February of 2021 --
16       A.  Uh-huh.
17       Q.  -- are you aware of any communication,
18  correspondence, direction from the FTC telling
19  Amazon that Amazon's Prime enrollment flow or
20  cancellation flow violated ROSCA?
21       A.  Not Prime --
22            MR. MENDELSON:  Same objection.

Page 80

1            THE WITNESS:   Not Prime, no.
2  BY MR. KABA:
3       Q.  Okay.  And you contend that in a
4  different context, the FTC had filed suit in 2014
5  with respect to certain disclosures that were in
6  terms and conditions; correct?
7       A.  Yes.
8       Q.  So from that time in 2014 --
9       A.  Uh-huh.
10       Q.  -- even -- even that other action, if
11  we included that.  From 2014 through February 2021
12  when the FTC launched its investigation in this
13  case, that's about seven years; right?
14       A.  Yes.
15       Q.  Are you aware of any correspondence
16  message communication to Amazon that Amazon's
17  enrollment flows or cancellation flows violated
18  ROSCA?
19            MR. MENDELSON:  Same objection.
20            THE WITNESS:  No.
21  BY MR. KABA:
22       Q.  Okay.  As of what date does the FTC



Page 81

1   contend Amazon's enrollment flows violated ROSCA?
2        A.   I'd have to look back at the complaint,
3   but I believe 2018.
4        Q.   And as of what date does the FTC
5   contend Amazon's cancellation flows violated ROSCA?
6        A.   I think, again, I'd have to look at the
7   complaint, but I believe it's approximately the same
8   time period.
9        Q.   Let me see if I can help you.
10          By the way, we talked about Consumer
11  Sentinel complaints, but it wasn't consumer
12  complaints that triggered this investigation to
13  Prime; right?
14       A.   Not initially.  As I said, we looked at
15  them pretty early on.
16       Q.   Right.  So, again, my question.
17       A.   Uh-huh.
18       Q.   I could see you were probably very good
19  questioner at depositions because the way you're
20  responding.
21          My question is:  It was not consumer
22  complaints that launched or triggered the

Page 82

1   investigation into Prime; correct?
2        A.   Correct.
3            MR. KABA:  Thank you.
4            I'm going to mark as Exhibit 2 the
5   FTC's Second Supplemental Responses and Objections
6   to Amazon's First Set of Interrogatories.
7            (Document marked for
8   identification as Basta Exhibit 2.)
9   BY MR. KABA:
10       Q.   And I'm going to focus you on the
11  bottom of page 52 to the top of -- I'm sorry -- on
12  page 52 and 53.
13          And if you look at page 53 --
14       A.   Uh-huh.
15       Q.   -- Ms. Basta.
16          By the way, you recognize these as the
17  FTC's responses and objections to Amazon's
18  interrogatories; correct?
19       A.   Yes.
20       Q.   And you see on the last page,
21  it's -- it's signed under penalty of perjury by
22  Mr. Mendelson?

Page 83

1        A.   Yes.
2        Q.   And that means that the responses
3   contained in this document are true; correct?
4        A.   Yes.
5        Q.   And Mr. Mendelson is your counsel here
6   and counsel for the FTC in this case; correct?
7        A.   Yes.
8        Q.   Okay.  And if you look at page 53.
9        A.   Uh-huh.
10       Q.   You see it says:
11          "Amazon's Enrollment Flows have
12  violated ROSCA and Section 5 since at least 2014."
13       A.   Uh-huh.
14       Q.   Do you see that?
15       A.   Yes.
16       Q.   "And its Cancellation Flows since at
17  least 2016"; correct?
18       A.   Yes.
19       Q.   Okay.  So it's -- you said you believed
20  it was 2018, but you wanted to refresh your memory.
21       A.   Uh-huh.
22       Q.   Yes?

Page 84

1        A.   Yes.
2        Q.   Does this refresh your memory that the
3   FTC contends Amazon's enrollment flows have violated
4   ROSCA since at least 2014?
5        A.   Yes.
6        Q.   And that the cancellation flows since
7   at least 2016?
8        A.   Yes.
9        Q.   Okay.  From 2014 up until the
10  investigation and litigation in this case, can you
11  identify a single communication from the FTC telling
12  Amazon that its flows -- its enrollment flows
13  violated ROSCA and Section 5?
14       A.   No.
15          MR. MENDELSON:  Objection.  Scope.
16  BY MR. KABA:
17       Q.   From 2016 up until the time of the
18  investigation and litigation in this case, can you
19  identify a single instance in which the FTC told
20  Amazon that its cancellation flows violated ROSCA
21  and Section 5?
22          MR. MENDELSON:  Objection.  Scope.



Page 89

1  then.

2         So that's -- when you're asking it kind

3  of lumped together, I'm just having trouble

4  answering it.

5     Q.  Okay.  So I'm not asking you that every

6  flow is publicly available at every time.

7         Does that help clarify for you?

8     A.  Can you ask it again?

9     Q.  Sure.

10        We can do it in reference to --

11    A.  Uh-huh.

12    Q.  -- to the -- to the FTC's verified

13  responses --

14    A.  Sure.

15    Q.  -- to Amazon's interrogatory.

16        The FTC has said that since at least

17  2014 Amazon's enrollment flows have continuously

18  violated ROSCA; correct?

19    A.  Yes.

20    Q.  Okay.  And at least at -- as of the

21  dates those violating allegedly flows existed, they

22  were available to the public; correct?

Page 90

1     A.  Yes.

2     Q.  Okay.  And so someone could have gone

3  on in 2014 or 2015 or 2016 and seen what the FTC

4  would contend is enrollment flow that violates

5  ROSCA; correct?

6         MR. MENDELSON:  Objection.  Vague.

7         THE WITNESS:  Yes.

8  BY MR. KABA:

9     Q.  Okay.  Similar question with respect to

10  the FTC's contention that Amazon's cancellation

11  flows have violated ROSCA since at least 2016.

12  Okay?

13    A.  Uh-huh.

14    Q.  Someone -- sorry.  Strike that.  Let me

15  take one step back.

16        Since at least 2016, Amazon's

17  cancellation flows as they existed as of the

18  relevant time were publicly available; correct?

19    A.  Yes.

20    Q.  So someone could have gone on in 2016

21  or 2017 or 2018 and viewed -- publicly viewed

22  Amazon's cancellation flow as it existed at the time

Page 91

1  that the FTC now contends violated ROSCA; correct?

2     A.  Yes.

3     Q.  Okay.  Thank you.

4         Are you aware of the FTC receiving --

5  strike that.

6         Are you aware of the FTC looking at

7  consumer complaints or interest group complaints or

8  public reporting about Amazon's Prime enrollment

9  flows prior to launching the investigation in

10  February 2021?

11    A.  Can you repeat it?

12    Q.  Sure.

13        Did the FTC look at consumer complaints

14  or interest group complaints or public reporting

15  about Prime -- Amazon's Prime flows enrollment and

16  cancellation prior to launching the investigation in

17  February 2021?

18        MR. MENDELSON:  Objection.  Scope.

19        THE WITNESS:  Not that I'm aware

20  of.

21  BY MR. KABA:

22    Q.  Okay.  When we talk about -- do you

Page 92

1  think it's fair to characterize the FTC's complaint

2  in this action as concerning Amazon's flows?

3     A.  (Pause.)

4     Q.  I just want to get the same --

5     A.  Go on.

6         Well, I was going to say too I think I

7  as me or I as the representative of the Commission?

8     Q.  Well, you as the person most

9  knowledgeable at the Commission --

10    A.  Okay.

11    Q.  -- about the topics that we're here to

12  talk about.

13    A.  Yes.

14    Q.  Do you -- is it fair to characterize

15  the FTC's complaint in this action as concerning

16  Amazon's flows?

17    A.  Yes.

18    Q.  Okay.  And then when we refer to

19  "Amazon's flows," is it fair to say that that

20  pertains to Amazon's enrollment in Prime flow and

21  cancellation of Prime flow -- flows?

22    A.  Yes, with one caveat on the enrollment



Page 93

1  flows.

2       Q.   Okay.

3       A.   They look very different.  So sometimes

4  answering in a general way I don't know.  It may get

5  challenging.

6       Q.   Okay.  That's perfectly fair.

7            And when I ask questions concerning the

8  flows, you -- it's perfectly fair for you to say,

9  well, I draw a distinction between a particular flow

10  and another.  But it's a fair point.  So let's make

11  sure the record is clear.

12           There are various enrollment flows for

13  a consumer to enroll in Prime; correct?

14      A.   Yes.

15      Q.   And they look very different?  Your

16  words.

17      A.   Yes.

18      Q.   Okay.  Does the FTC contend that every

19  single one of those flows violates ROSCA?

20      A.   We identified a number in the

21  complaint, and so I would say those.  The SOSP, the

22  UPDP, SPC, TrueSPC, and the Prime Video pathway to

Page 94

1  enrollment in Prime.  And then we also mentioned --

2  with respect to cancellation, we mentioned a few

3  other things but --

4       Q.   Okay.

5       A.   -- enrollment, yes.

6       Q.   So if I wanted to understand which of

7  the enrollment flows the FTC contends violates

8  Prime, I would just look at what's in the complaint?

9       A.   The complaint and the interrogatory

10  responses, yes.

11      Q.   Okay.

12      A.   That lays it out fully.

13      Q.   Okay.  And there are flows that are not

14  identified in the complaint or the interrogatory

15  responses; correct?

16      A.   Yes.

17      Q.   And so the FTC does not contend, at

18  least at this point, that those flows violate ROSCA;

19  correct?

20      A.   The allegations are those in the

21  complaint and the interrogatories, yes.  So if

22  they're not mentioned, they're not part of the

Page 95

1  allegations currently.

2       Q.   Okay.  So if neither the complaint nor

3  the interrogatory responses identify any particular

4  enrollment flow, then at least at this point, the

5  FTC does not contend that that version of the flow

6  violates ROSCA; correct?

7       A.   Not in the litigation, no.

8       Q.   Okay.  We have double negatives, and

9  you're adding a qualifier that's confusing to me.

10      A.   Okay.

11      Q.   So I'm going -- I'm going to try that.

12           So it might be easier if I'm saying

13  "correct" and what you intend to tell me is yes,

14  that statement is correct --

15      A.   Uh-huh.

16      Q.   -- for you to just say "correct" --

17      A.   Okay.

18      Q.   -- as opposed to "not in this, no" --

19      A.   Uh-huh.

20      Q.   -- which muddies the record a bit.

21           If neither the complaint nor the

22  interrogatory responses identify any particular

Page 96

1  Prime enrollment flow, then at least for the purpose

2  of this litigation, the FTC does not contend that

3  that version of the flow violates ROSCA; correct?

4       A.   Correct.

5       Q.   Okay.  Thank you.

6            I want to talk to you a little bit

7  about dark patterns.

8            Are you familiar with the phrase "dark

9  patterns"?

10      A.   I am.

11      Q.   Okay.  Can you define what a dark

12  pattern is?

13      A.   A dark pattern is a design element

14  that -- I'd have to look at actually the complaint

15  for the -- for the actual definition of it.

16           But generally speaking, it is a design

17  element that fools, tricks, and misleads consumers

18  into not understanding kind of what they are doing

19  on a particular website.

20      Q.   Okay.  Is there -- is the use of dark

21  patterns prohibited as a matter of law?

22      A.   There is no per se prohibition on the



Page 97

1  use of dark patterns.

2        Q.  Can you identify for us any statute or

3  law that uses the phrase "dark patterns"?

4              MR. MENDELSON:  Objection.  Scope.

5              THE WITNESS:   Anywhere?

6  BY MR. KABA:

7        Q.  In America.

8        A.  None that -- that the FTC enforces.

9        Q.  Okay.  Can you -- so you cannot

10  identify any statute or law that the FTC enforces

11  that even uses the phrase "dark patterns"; correct?

12       A.  That uses the phrase, correct.

13       Q.  And can you think of any law or statute

14  in America that uses the phrase "dark patterns,"

15  whether or not the FTC enforces?

16             MR. MENDELSON:  Objection.  Scope.

17             THE WITNESS:   I don't know that

18  I've ever looked.

19  BY MR. KABA:

20       Q.  So is the answer you cannot?

21       A.  I -- I can't, but I wouldn't -- there

22  may be.  I just wouldn't know.

Page 98

1        Q.  I'm asking because you -- when I asked

2  you that question, you said "none that the FTC

3  enforces."  So I just want to make sure.

4        A.  Right, because those are the ones I'm

5  familiar with.  That's -- so thinking it through

6  the -- the universe of statutes enforced by the FTC,

7  I am not aware.  Like none of those use the term

8  "dark patterns."

9        Q.  Okay.  So I want to make sure I have a

10  full answer and so because it seemed like you were

11  giving a qualifier.

12       A.  Uh-huh.  Sure.

13       Q.  I want to make sure I have --

14       A.  Uh-huh.

15       Q.  -- a complete record.

16             Whether or not the FTC is in charge of

17  enforcing it --

18       A.  Uh-huh.

19       Q.  -- can you identify any law in America

20  that uses the term "dark patterns"?

21       A.  I don't know whether there are any or

22  aren't.  So I can't identify, no.

Page 99

1        Q.  Okay.  And you've already agreed with

2  me that there is no law that bars or prohibits the

3  use of dark patterns as a rule; correct?

4        A.  Sure.  There's no per se bar, yes.

5        Q.  Okay.  You keep -- you have said now

6  "per se bar" --

7        A.  Right.

8        Q.  -- a number of times.

9              What does "per se bar" mean?

10       A.  So there's no -- nothing that says you

11  cannot use a dark pattern.  There are, you know, in

12  terms of other laws that exist.  So take the FTC

13  Act, which prohibits deceptive and unfair practices

14  in commerce.

15             If a dark pattern causes something to

16  be deceptive, then that would be a violation of the

17  FTC Act, regardless of whether the FTC Act says

18  "dark patterns" or not.

19             In the ROSCA context, if the use of a

20  dark pattern causes the disclosures not to be clear

21  and conspicuous or a consumer to not be able to give

22  express informed consent, then that would violate

Page 100

1  ROSCA.

2              So when I say there's no law -- there's

3  no law that says dark patterns are illegal; however,

4  dark patterns can be used in the course of illegal

5  conduct.

6              I guess that's the distinction I'm

7  trying to draw.

8        Q.  Okay.  So, but ROSCA itself does not

9  speak to dark patterns; correct?

10       A.  No.  It speaks to clear and conspicuous

11  disclosure and express informed consent.

12       Q.  We keep doing the I ask you "correct,"

13  your answer is "yes, that's correct," but you say

14  "no" and it --

15       A.  Yeah.

16       Q.  So I just want to be --

17       A.  Yeah.

18       Q.  You and I understand what you're saying

19  because we're sitting here talking about it --

20       A.  Uh-huh.  Sure.

21       Q.  -- but the record needs to be clean.

22             ROSCA itself does not speak to dark



AMANDA BASTA Vol. I 30b6
FTC vs AMAZON.COM, INC., et al.

September 10, 2024
157–160

Page 157

1  comply -- all a consumer would need to know about
2  complying with ROSCA is just what the words on the
3  page say, that is, the text of ROSCA?
4      A.  That is -- that is what gives you what
5  you need to do to comply with ROSCA, yes.
6      Q.  Okay.  But then you've also told me
7  that clear and conspicuous is context-specific;
8  right?
9          That's what you testified to earlier?
10      A.  Correct.
11      Q.  And express informed consent is
12  context-specific; correct?
13      A.  Yes.
14      Q.  And simple mechanisms is
15  context-specific; right?
16      A.  Yes.
17      Q.  So where would I look as a business
18  owner that wants to comply with ROSCA to understand
19  in what context something is clear and conspicuous
20  versus the same disclosure no longer being clear and
21  conspicuous?
22      A.  Again, I think the case law provides a

Page 158

1  lot of -- of guidance in that regard.
2      Q.  Okay.  And that's what I'm trying to
3  understand.
4      A.  Uh-huh.  Yeah.
5      Q.  Like, I want to know what are the
6  sources of defining these terms to provide me with
7  notice of what I need to do to comply.
8          Do you understand?
9      A.  Yes.
10      Q.  Okay.  And you believe that the primary
11  source to understand what the terms that the statute
12  uses mean is case law?
13      A.  I don't think that's -- I don't think
14  that's what I've said.
15          I think the statute -- it's the statute
16  first and then to understand how courts view it, or
17  not even to understand.  It providers information
18  about how courts view it because of the context
19  specificity.
20          So if I want to have a small print
21  disclosure, you know, that is three paragraphs into
22  text, then I'm going to look for cases where there

Page 159

1  are similar disclosures and see what courts have
2  kind of looked at to determine whether those are
3  clear and conspicuous or not.
4      Q.  Yeah.  So -- so let me say this.
5          Every element of this statute --
6      A.  Uh-huh.
7      Q.  -- requires, according to the FTC,
8  consideration of not just the disclosure themselves
9  or the mechanism itself, but the context within
10  which the disclosure is made or the cancellation
11  mechanism is offered; right?
12          MR. MENDELSON:  Objection.  Form.
13          THE WITNESS:  That's -- yeah,
14  that's true.  A lot of advertising you'll see cases
15  talking about the net impression of the
16  advertisements.  It's very similar.
17  BY MR. KABA:
18      Q.  Okay.  So I'm not asking you about
19  other advertising.  So just -- again, we keep doing
20  this thing where I ask you what I think is a pretty
21  straightforward question, and you want to provide
22  additional -- pardon the pun -- context.

Page 160

1          So I want to try to see if I can get an
2  answer --
3      A.  Uh-huh.
4      Q.  -- just to my answer first.
5      A.  Uh-huh.
6      Q.  According to the FTC, every element of
7  this statute requires consideration of not just the
8  disclosure itself or the cancellation mechanism
9  itself, but actually the context in which the
10  disclosure appears or the cancellation mechanism is
11  offered; correct?
12      A.  Yes.
13      Q.  The statute itself, however, does not
14  tell you in what context something becomes unclear
15  or unconspicuous; right?
16          MR. MENDELSON:  Objection.  Form.
17  BY MR. KABA:
18      Q.  I'll ask you different.
19          This -- although context really matters
20  here --
21      A.  Uh-huh.
22      Q.  -- the statute itself does not



AMANDA BASTA Vol. I 30b6
FTC vs AMAZON.COM, INC., et al.

September 10, 2024
161–164

Page 161

1  delineate context for you; correct?

2       A.  Correct.  It says what it says.

3       Q.  Okay.  And is there any FTC guidance

4  on -- on this context-specific analysis of ROSCA

5  compliance?

6             MR. MENDELSON:  Objection.  Scope.

7             THE WITNESS:  I mean, the FTC

8  certainly provides -- we have a Business Blog that,

9  again, kind of talks about when we bring a case what

10  things kind of triggered scrutiny or triggered the

11  concerns that are outlined in the complaint, right?

12             So, but in terms of whether or not

13  something applies is a decision by the court, right?

14  So that's the -- so what the FTC says in some ways

15  doesn't matter.  It's -- it's helpful guidance in

16  terms of if you want to, you know, prevent scrutiny,

17  right?  Because we go by what the courts say.

18             When we're looking for practices

19  that violate, we're looking at how the practices

20  line up with the statute and line up with our

21  understanding of those terms, but it's

22  not -- there's no magic wand.

Page 162

1  BY MR. KABA:

2       Q.  Yeah, I understand.

3             There's no -- there's no checklist of

4  things that one could look at and say if you -- as

5  long as you check these boxes, you comply with

6  ROSCA; correct?

7       A.  Correct.

8       Q.  The FTC has never put out there some

9  objective list of criteria that one could review and

10  say, oh, I do all of these things, therefore, I

11  comply with ROSCA; right?

12       A.  Right, and that's because consumers

13  interact with things differently.  So that -- that's

14  why it matters.

15       Q.  Okay.  So some sources of guidance for

16  a business --

17       A.  Uh-huh.

18       Q.  -- to determine whether or not they are

19  ROSCA compliant could then be cases the FTC has

20  brought in the past; right?

21       A.  Certainly.

22       Q.  I think you mentioned the FTC's

Page 163

1  Business Blog; correct?

2       A.  Sure.

3       Q.  FTC enforcement actions; right?

4       A.  Yes.

5       Q.  FTC settlements that delineate what a

6  business needs to do to comply with ROSCA in the

7  future; right?

8       A.  Yes.

9       Q.  And these are all places that one could

10  look to say, okay, this is the kind of things I need

11  to ensure I'm doing to comply with ROSCA --

12       A.  Sure.

13       Q.  -- right?

14       A.  Correct.

15       Q.  Okay.  On -- on this -- this simple

16  mechanisms for cancellation, you agree you've

17  already told me simple mechanisms isn't defined in

18  the statute; right?

19       A.  Correct.

20       Q.  Can you think of any -- any case where

21  a court has defined "simple mechanisms"?

22       A.  United States versus MyLife.

Page 164

1       Q.  U.S. versus MyLife?

2       A.  Yes.  They found that a six-part

3  cancellation flow was not simple mechanism.

4       Q.  Do you know if in MyLife they also

5  off -- if MyLife had also offered a toll-free number

6  to call?

7       A.  I don't know.

8       Q.  Do you know if MyLife also offered

9  cancellation through a chat feature?

10       A.  I don't know.

11       Q.  Do you know if MyLife also offered

12  cancellation through e-mail?

13       A.  I don't know.

14       Q.  Okay.  And do you under -- does simple

15  mechanism mean every single cancellation pathway

16  needs to be simple, or just that there needs to be a

17  simple cancellation pathway?

18             MR. MENDELSON:  Objection.  Scope.

19             THE WITNESS:  Let me -- the

20  statute says "simple mechanisms."  I don't know --I

21  mean, here our allegation is that there -- there was

22  not a simple mechanism -- at least one simple



AMANDA BASTA Vol. I 30b6                                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                        209–212

Page 209

1    Q.   What FTC prior enforcement actions have
2    said about those terms; right?
3              MR. MENDELSON:  Objection.  Form.
4              THE WITNESS:  Well, I don't know
5    that I would put it exactly that way.
6              Like I said, the prior orders draw
7    from the case law in the definitions of the terms.
8    So, yes, the prior enforcement actions themselves
9    are more of a window into, like, the kind of
10   behaviors that concern -- that are of concern.
11   BY MR. KABA:
12       Q.   Okay.  So other than the prior court
13   decisions, the language that's being used in the
14   disclosures of material terms, how the material
15   terms are being disclosed, how consumers are
16   interacting with those terms, what consumers are
17   saying about their interaction with those terms,
18   what other relevant context needs to be considered
19   to determine whether or not there's a ROSCA
20   violation?
21       A.   Sure.  For example, what did the
22   company -- how did the company view the

Page 210

1    information -- the -- the flows.  How did -- what
2    did they know.  What data did they have.  You know,
3    like I said, witness testimony about kind of
4    potential issues.  That's also a piece of it.
5        Q.   Well, that seems to be speaking to
6    knowledge; right?
7        A.   Well, no, it's both.  For example,
8    if -- again, kind of going to -- to some of the
9    facts of this case.
10             Amazon had a policy that terms needed
11   to be clearly and conspicuously disclosed.  They
12   were doing a lot of work around the idea that
13   consumers were not aware of the terms.  I think at
14   one point it was identified as like a top 3 customer
15   frustration, and they were trying to figure out why
16   and part of it was because key information was
17   missing from the enrollment flows.
18             So it's stuff like that.  It goes
19   partially to knowledge, but it also goes partially
20   to whether there's a violation because it was
21   something that was persisting and not being
22   corrected.

Page 211

1              I mean, that's -- that's all part of
2    the soup.
3        Q.   Right.  So that's what I'm
4    trying -- I'm trying to understand.  You've used a
5    good metaphor, actually.
6              In order to determine whether or not
7    there's a ROSCA violation, you need to consider a
8    soup with lots of different ingredients.  Yes?
9        A.   Yes.
10       Q.   And I just want to know what those
11   ingredients are, not necessarily specific to this
12   case.  Generally.
13       A.   Sure.
14       Q.   So --
15             MR. MENDELSON:  Objection.  I'm
16   sorry.  Go ahead.
17   BY MR. KABA:
18       Q.   So the ingredients that we've
19   identified so far are the language used in the
20   disclosures themselves.  Yes?
21       A.   Yes.
22       Q.   Other language used around marketing

Page 212

1    and the context of those disclosures.  Yes?
2        A.   Yes.
3        Q.   The way that that language is being
4    presented.  Yes?
5        A.   Yes.
6        Q.   And the way can include colors used,
7    font size used, location on the page, etc.  Yes?
8        A.   Yes.
9        Q.   How consumers are interacting with that
10   language?
11       A.   Yes.
12       Q.   What consumers report after the fact
13   about how they interacted with the flows; correct?
14       A.   Yes.
15       Q.   And so, again, just generally speaking,
16   what other things does one need to consider as part
17   of this, to use your word, soup of factors that you
18   would look at to determine whether or not there's a
19   ROSCA violation?
20             MR. MENDELSON:  Objection.  Scope.
21             THE WITNESS:  Again, evidence
22   from the company regarding what was -- what was



AMANDA BASTA Vol. I 30b6                                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                      213–216

Page 213

1  happening around those flows, around those
2  processes.  That's -- you know, like I said,
3  testimony of witnesses who were involved in design
4  and changes and, you know, again, it will vary some
5  case to case based on what's available and -- but
6  those are all things that go into it in any given
7  case.
8  BY MR. KABA:
9      Q.  Okay.  You would agree with me that
10  there is no formula that we can look at to determine
11  what is a clear and conspicuous disclosure; right?
12      A.  I don't --
13          MR. MENDELSON:  Objection.  Scope.
14          THE WITNESS:  -- agree with that
15  at all.
16  BY MR. KABA:
17      Q.  You think there is a formula?
18      A.  I think if you look at the case law and
19  tease out the principles that that gives you a
20  pretty good roadmap for how to comply with ROSCA.
21      Q.  Okay.  Let me -- just tell me agree or
22  disagree --

Page 214

1      A.  Uh-huh.
2      Q.  -- with the following statement:
3          There is no set formula for a clear and
4  conspicuous disclosure.
5          MR. MENDELSON:  Objection.  Scope.
6  BY MR. KABA:
7      Q.  Agree or disagree?
8      A.  Agree because it's context-specific.
9      Q.  Okay.  That's my question.
10      A.  Okay.
11      Q.  You would agree that there is no
12  formula that someone can go look at and say, if I
13  satisfy this formula, my disclosures are clear and
14  conspicuous; correct?
15      A.  Right.  There's no --
16          MR. MENDELSON:  Same objection.
17          THE WITNESS:  There's no
18  checklist, to use a term used earlier.  Correct.
19  BY MR. KABA:
20      Q.  And so things that we've talked about
21  that the FTC may consider include things like where
22  the disclosure is placed of the material terms;

Page 215

1  right?
2      A.  Correct.
3      Q.  And if I put the material terms -- does
4  the FTC identify anywhere or does ROSCA identify
5  anywhere where the disclosure must be placed to
6  satisfy ROSCA?
7          MR. MENDELSON:  Objection.  Scope.
8          THE WITNESS:  No.
9  BY MR. KABA:
10      Q.  Okay.  Another thing that you might
11  consider is the prominence of the disclosure;
12  correct?
13      A.  Yes.
14      Q.  And that the prominence means what
15  here?
16      A.  Could mean font size.  It could mean
17  whether -- it could mean font color.  It could mean
18  placement.  It could mean whether a consumer has to
19  acknowledge that they've seen the disclosure before
20  they take the, you know, operative action.
21          Again, it could be something like
22  making the consumer re-input their billing

Page 216

1  information specifically to engage in a transaction.
2  That would be a good way, you know, to figure out
3  whether they intended to or whether they understood
4  what they were doing.  You know, there's a lot of
5  different ways again.
6      Q.  Context-specific.
7      A.  Well, context-specific, but also, you
8  know, it may depend.  I mean, context-specific.  It
9  depends on people's creativity.  It depends on
10  people's understanding.  It depends on what -- you
11  know, there may be something that on the surface you
12  might not recognize as clear and conspicuous, but
13  data might show that it's clear and conspicuous.
14      Q.  Okay.  So --
15      A.  You know.  So there's a lot of
16  different ways to determine it, but at the end of
17  the day, you got to make sure that consumers are
18  understanding that's the touchstone.
19      Q.  Okay.  So, but in order for -- the FTC
20  has said that -- you're familiar with the Dot Com
21  Disclosures?
22      A.  Yes.



AMANDA BASTA Vol. I 30b6                                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                        253–256

Page 253

1  showed you -- strike that.  Let me -- let me try the
2  question.
3      So if I showed you the Walmut+
4  enrollment flows, could you look at those flows and
5  tell us whether or not they violate ROSCA?
6          MR. MENDELSON:  Objection.  Scope.
7          THE WITNESS:  No.  I could tell
8  you whether I would have concerns about one, but I
9  could not tell you definitively one way or the
10  other.
11  BY MR. KABA:
12     Q.  Okay.  And would the same be true
13  regardless of what company negative option feature
14  enrollment flow I presented to you?  Like could you
15  look at anyone's negative option enrollment flow and
16  tell us whether or not they violate ROSCA?
17         MR. MENDELSON:  Same objection.
18         THE WITNESS:  I don't know that
19  anyone could do it on the fly.  That's why we
20  conduct investigations and we seek information.
21  BY MR. KABA:
22     Q.  Okay.  So my question is a yes or a no.

Page 254

1      A.  Correct.
2      Q.  So let me ask you -- let me ask you
3  again my question, which is --
4      A.  Uh-huh.
5      Q.  If it's hard to understand, let me know
6  and I'll change the question.
7          My question for you is:  For anything
8  that the FTC may claim is a negative option feature,
9  could you look at the flows themselves and determine
10  whether or not they violate ROSCA?  Yes or no.
11         MR. MENDELSON:  Same objection.
12         THE WITNESS:  No.
13  BY MR. KABA:
14     Q.  Okay.  Thank you.
15         Now, the FTC has alleged in this case
16  that Amazon's flows -- enrollment flows going back
17  to 2014 to, I believe, present violate ROSCA --
18     A.  Yes.
19     Q.  -- correct?
20     A.  Yes.
21     Q.  Okay.  Has the FTC told Amazon, "You
22  need to change your flows in the following ways to

Page 255

1  comply with ROSCA"?
2      A.  Again, there's no one set way Amazon
3  would have to change its flows to comply with ROSCA.
4      Q.  So is --
5      A.  But yes.  In -- in a way, yes.
6      Q.  Okay.  So I want the specific instance.
7          Has the FTC said to Amazon, "If you
8  make the following changes to your flow, you will
9  comply with ROSCA"?
10     A.  Not in those words, no.
11     Q.  In any words similar to those words,
12  has the FTC said, "Amazon, if you make these changes
13  to your flows, you will comply with ROSCA"?
14     A.  So the FTC has identified a number of
15  the problems with the flows, and presumably if those
16  problems were corrected, you'd still have to see how
17  consumers interact with the resulting flows, but
18  that certainly would be a long step towards.
19  But I -- so I don't have a definitive
20  list because there's a lot of ways you can
21  accomplish it.
22     Q.  Okay.  So you're -- you're changing my

Page 256

1  question and actually not providing me something
2  that I think is responsive to the question.
3          So if you're having a hard time with my
4  question, ask me that to restate the question.
5          I'm asking you:  Can you identify a
6  single instance in which the FTC has said to Amazon,
7  "If you change A, B, C, D, and E, you will comply
8  with ROSCA"?
9      A.  We haven't had those conversations, no.
10     Q.  Okay.  Sitting here today,
11  September 10, 2024 --
12     A.  Uh-huh.
13     Q.  -- are you prepared to identify a list
14  of changes that if Amazon implements those changes,
15  the FTC will conclude that it complies with ROSCA?
16  Yes or no.
17     A.  I can sit here today and identify some
18  ways Amazon could comply with ROSCA.  Would it be a
19  comprehensive A to Z soup to nuts all of the ways?
20  No.
21     Q.  Okay.  So my question again:  Sitting
22  here today, over a year into this litigation, are



AMANDA BASTA Vol. I 30b6                          September 10, 2024
FTC vs AMAZON.COM, INC., et al.                               257–260

Page 257

1  you prepared to identify a list of things that if
2  Amazon changes those things, it will comply with
3  ROSCA, according to the FTC?  Yes or no.
4          MR. MENDELSON:  Objection.  Asked
5  and answered.
6          THE WITNESS:  I think I answered
7  it.
8          There are certain things that
9  certainly would comply with ROSCA, and I can
10  identify those.  There may be others and -- but,
11  again, those are going to depend on what Amazon
12  makes them look like, operate like.
13          So that -- so, for example, for
14  the cancellation, when you go to any Amazon site,
15  there could be a large button that says "End
16  membership in Prime."  And when the person clicks
17  that button, nothing else happens besides their --
18  their membership is ended.
19          By the same token, rather than
20  interspersing Prime offers with other transactions
21  where people may not be looking to enroll, you could
22  have a big button that says "Sign up for Amazon

Page 258

1  Prime."  And when they click on that button, terms
2  are only relating to Prime, including the duration,
3  the auto renewal terms.  The monthly terms are
4  presented, and then the consumer has to enter their
5  billing information in order to consent with those
6  terms.
7          Those are two really simple ways
8  to -- to do that.  There may be myriad others.  Like
9  I said, we've listed all the -- identified all the
10  problems with the flows, and each of those would
11  need to be corrected.
12          But how that there is -- companies
13  are given discretion in how to correct that, as long
14  as it ends up resulting in consumers being given
15  clear and conspicuous disclosures and express
16  informed consent.
17  BY MR. KABA:
18  Q.  Okay.  So let's break that up a little
19  bit.
20  A.  Uh-huh.
21  Q.  So you're -- what the FTC has done is
22  identify problems with the flows; correct?

Page 259

1  A.  Yes.
2  Q.  Has the FTC identified for Amazon how
3  to solve those problems?
4  A.  That may differ.  Depending on the
5  problem, that may differ.  I mean, we --
6  Q.  So my question is not that.
7  A.  Right.
8  Q.  It's a yes or a no question in there.
9  A.  Right.
10  Q.  I feel like I'm asking you yes or no
11  questions and I'm getting sort of monologues in
12  response.
13          So there's no question pending.  Let me
14  ask my question, please.
15          My question, yes or no:  To your
16  knowledge, has the FTC identified what Amazon must
17  do to solve the problems the FTC believes exists
18  with the flows?
19  A.  I just gave two solutions, but no,
20  not -- not a list of all of the things that can be
21  done to correct all of the problems.
22  Q.  Okay.  So let me get that.

Page 260

1          So the FTC has not identified to Amazon
2  a list of all the things Amazon can do to resolve or
3  to come into compliance, according to the FTC, with
4  ROSCA; correct?
5          MR. MENDELSON:  Objection.  Asked
6  and answered.
7          THE WITNESS:  Correct.
8  BY MR. KABA:
9  Q.  Okay.  And even you, sitting here
10  today, are not prepared to provide a list of all of
11  the things Amazon could do to come into compliance,
12  according to the FTC, with ROSCA; correct?
13  A.  I don't have the technical knowledge of
14  Amazon's systems to be able to do that.
15  Q.  Okay.  You said one of the things that
16  maybe could happen is a big button --
17  A.  Uh-huh.
18  Q.  -- on every Amazon page that says "End
19  membership."
20          Do you recall that?
21  A.  "End membership in Prime," yes.
22  Q.  Okay.  So what would the words have to



AMANDA BASTA Vol. I 30b6                          September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                293—296

Page 293

1      A.   Again, for fair notice, just the
2   statute.
3      Q.   So the answer is no, there is nothing
4   further?
5      A.   Correct.
6      Q.   Okay.  Other than -- you have -- let me
7   ask you a different way.
8           What FTC documents or publications
9   provided guidance to Amazon or the industry at large
10  about the things that it must do to comply with
11  ROSCA?
12          MR. MENDELSON:  Objection.  Scope.
13          THE WITNESS:   Again, I think the
14  prior enforcement actions, which we identify in our
15  interrogatory responses, provide a good roadmap.
16  The orders also provide a good roadmap for
17  compliance.
18  BY MR. KABA:
19     Q.   What orders?
20     A.   The orders that were entered in those
21  enforcement actions, whether by consent or by a
22  court.

Page 294

1      Q.   Anything else?
2      A.   Again, case law.
3      Q.   Anything else?
4      A.   I mean, certainly the negative option
5   policy statement would outline what things the
6   Commission was interested in in terms of enforcing
7   or ensuring the negative option programs are
8   appropriately disclosed.  So, again, in terms of
9   conduct, that would be problematic.  It's a good
10  starting point.
11     Q.   Okay.  Anything else?
12          So you said FTC enforcement actions,
13  the orders entered in those enforcement actions,
14  case law, and the negative option policy statement
15  are all places that Amazon or the industry at large
16  could look to get the FTC's guidance on what it must
17  do to comply with ROSCA; correct?
18     A.   Well, certainly to look at what -- what
19  conduct has been alleged to be problematic and what
20  conduct has been alleged or courts have found to be
21  problematic in terms of providing the appropriate
22  notice and obtaining the appropriate consents.  And

Page 295

1   then the orders, again, I think give -- give a
2   roadmap in terms of how to comply.
3      Q.   Okay.  So that's -- that's what I'm
4   trying to understand.
5      A.   Uh-huh.
6      Q.   So what I asked you is:  If Amazon or
7   industry wanted to understand how to comply with
8   ROSCA --
9      A.   Uh-huh.
10     Q.   -- your testimony is:  They could look
11  at FTC enforcement actions, the orders entered those
12  FTC -- in those FTC enforcement actions, case law,
13  and the negative option policy statement; correct?
14          MR. MENDELSON:  Objection.  Scope.
15          THE WITNESS:  Yes.
16  BY MR. KABA:
17     Q.   Anything else?
18          MR. MENDELSON:  Same objection.
19          THE WITNESS:   Besides the
20  statute, no.
21  BY MR. KABA:
22     Q.   Okay.  Thank you.

Page 296

1          Is there -- you mentioned that you
2   can't determine just by looking at a flow whether or
3   not it complies with ROSCA; is that right?
4          MR. MENDELSON:  Objection.  Form.
5   Scope.
6          THE WITNESS:   Sitting here today
7   with an unfamiliar flow, correct.
8   BY MR. KABA:
9      Q.   Okay.  Now, in the complaint, I just
10  want to ask you.  We looked at -- on page 11.
11     A.   Uh-huh.
12     Q.   We talked about the "UPDP on Desktop."
13     A.   Yes.
14     Q.   Do you recall that?
15          And you said, oh, here the button which
16  says "Get FREE Two-Day Shipping"; right?
17     A.   Yes.
18     Q.   And -- but this is an excerpt of a
19  larger page, isn't it?
20     A.   Yes.
21     Q.   Okay.  So the -- the text on the page
22  that the FTC is taking issue with that's identified



AMANDA BASTA Vol. I 30b6                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                    349–352

Page 349

1    the thing.  So in this case, simple.

2        Q.   Okay.  And the FTC has identified some

3    20-odd things that one would consider and decide, in

4    this case at least, in deciding whether or not

5    something is simple; correct?

6            Do you want me to help you?

7        A.   Yes, please.

8        Q.   Okay.  Let's go to Exhibit 2, please.

9        A.   Sure.

10       Q.   Which is, again, for purpose of the

11   record, this is a document that the FTC produced in

12   this case --

13       A.   Yes.

14       Q.   -- in response to certain questions

15   we've asked in this litigation; right?

16       A.   Yes.

17       Q.   So go to page 50.

18           You see it says:

19           "Determining whether an online

20   cancellation process is 'simple' is a fact-specific

21   inquiry into that particular process, not

22   necessarily determined solely by the number of

Page 350

1    clicks to cancel."

2        A.   Yes.

3        Q.   And then the FTC lists I think it's

4    some 20-odd different things that would be

5    considered to decide whether or not something is

6    simple; right?

7            MR. MENDELSON:  Objection.  Form.

8            THE WITNESS:  Yeah.  To the extent

9    that they're pertinent, yes.

10   BY MR. KABA:

11       Q.   Okay.  And can you identify for us any

12   case, enforcement proceeding, policy document,

13   statute, rule or regulation that lists all of these

14   things as factors that a company must consider in

15   order to determine whether or not its cancellation

16   mechanism is simple?

17           MR. MENDELSON:  Objection.  Form.

18           THE WITNESS:  (Reviews document.)

19           I'm just looking to see whether

20   there was an interrogatory where we identified

21   cases.

22   BY MR. KABA:

Page 351

1        Q.   So what I'm specifically asking about

2    is with respect to the 20 some-odd factors --

3        A.   Uh-huh.

4        Q.   -- listed on page 50, 51, over to 52

5    that the FTC contends are things that would be

6    considered in order to determine whether or not a

7    cancellation mechanism is simple.

8            Are you with me?

9        A.   Yes.

10       Q.   Can you identify for us any case,

11   policy document, rule, regulation, FTC guidance that

12   lists all of these things as the factors that one

13   would need to consider in order to comply with the

14   ROSCA requirement for a simple cancellation

15   mechanism?

16       A.   So not in a single case.  Not in a

17   single case.  So, again, because it's a

18   fact-specific inquiry, you're going to get that from

19   cases alleging cancellation violations.  The

20   business practices that were alleged to be

21   violative.

22           You will get it from some cases like

Page 352

1    U.S. versus MyLife, which looked, you know, a court

2    looked at one and gleaned some principles, and --

3    but there's not a single document that lists out

4    because of the fact-specific nature of the inquiry.

5        Q.   Okay.  So that's what I wanted.  So

6    that's the part I'd like.  I want to make sure I

7    understand.

8        A.   Uh-huh.

9        Q.   So in this case, in response to a

10   question we asked in this litigation, the FTC

11   identified some 20-odd things that would be

12   considered to decide whether or not a cancellation

13   mechanism is simple; right?

14           MR. MENDELSON:  Objection.  Form.

15           THE WITNESS:  (Pause).

16   BY MR. KABA:

17       Q.   That's what we're looking at in this

18   Exhibit 2; correct?

19       A.   Right.  I'm just looking back at the

20   question to make sure.

21           (Reviews document.)

22           Can you ask the question again?



AMANDA BASTA Vol. I 30b6
FTC vs AMAZON.COM, INC., et al.

September 10, 2024
353—356

Page 353

1    Q.  Yeah.

2        In this case, in response to a question

3    we asked in this litigation, the FTC identified some

4    20-odd things that would be considered to determine

5    whether or not a cancellation mechanism is simple;

6    right?

7    A.  Yes.

8    Q.  And there is not a single document that

9    you could identify for us that lists out all of

10   these criteria; correct?

11   A.  No.

12   Q.  Is that correct?

13   A.  Oh, yes, that's correct.  Sorry.

14   Q.  The FTC has never put out a document or

15   guidance saying that these are the 20 some-odd

16   things you would consider in order to determine

17   whether or not a cancellation mechanism is simple;

18   correct?

19   A.  (Pause.)  I don't believe so, but I'm

20   not a hundred percent sure.

21   Q.  Okay.  Let's -- I want to ask you about

22   a couple of these.

Page 354

1    A.  Sure.

2    Q.  On page 51, it says:

3        "The number of steps a consumer must

4    complete in order to cancel."

5        That's one of the things that is

6    considered in order to assess whether or not a

7    cancellation mechanism is simple; right?

8    A.  Sorry.  Where is?  Which bullet are you

9    looking at?

10   Q.  On page 51.

11   A.  51.  Okay.

12   Q.  Uh-huh.  Yeah.  It's the second bullet

13   from the top.

14   A.  Got it.

15   Q.  So one of the things the FTC identifies

16   as relevant to the inquiry to determine whether or

17   not a cancellation mechanism is simple is "The

18   number of steps a consumer must complete in order to

19   cancel"; right?

20   A.  Yes.

21   Q.  Can you tell us in an objective

22   quantifiable way what number of steps it takes for

Page 355

1    something to be simple versus not simple?

2    MR. MENDELSON:  Objection.  Scope.

3    THE WITNESS:  I mean, again,

4    there's no one-size-fits-all.  I mean, here the

5    number of steps that the Iliad Flow required was not

6    simple.  Among other things, it made consumers have

7    to confirm their intent to cancel multiple times

8    before actually canceling.

9        If you took any step, if you

10   clicked any of the other buttons, you were taken out

11   of the flow and it wasn't entirely clear that you

12   had not canceled.

13        I mean, that's -- that's what we

14   mean by the number of steps.  So you could have two

15   steps; right?  One which is completely distracting

16   and completely obstructing the ability to cancel,

17   and that might not be simple.  A three- or four-step

18   path that doesn't do that might be simple.

19        Again, without seeing what the

20   path would look like, I can tell you why here it's

21   not, but in a vacuum, no.

22   BY MR. KABA:

Page 356

1    Q.  Right.

2        So not everyone who's going to -- who

3    wants to comply with ROSCA has the benefit of the

4    FTC filing a lawsuit against them; right?  Or the

5    burden.

6    MR. MENDELSON:  Objection.  Scope.

7    BY MR. KABA:

8    Q.  You'd agree that there are lots of

9    people who violate ROSCA that the FTC never brings

10   an action against; right?

11   MR. MENDELSON:  Objection.  Scope.

12   THE WITNESS:  I don't know one

13   way or the other.

14   BY MR. KABA:

15   Q.  Do you believe that there are people in

16   the marketplace today that are violating ROSCA that

17   the FTC has not brought an action against?

18   MR. MENDELSON:  Objection.  Scope.

19   THE WITNESS:  Possibly but --

20   BY MR. KABA:

21   Q.  You haven't looked into it?

22   A.  -- I don't know one way or the other.



Page 361

1    Q.    Do you have guidance on any of those?

2    A.    No, because, again, it will depend on.

3    Q.    Okay.  So that's my --

4    A.    Yeah.

5    Q.    I don't know why the distinction would

6    then matter, but my --

7    A.    Just "length of time to cancel" is a

8    little vague to me.  I just -- because how long is

9    the overall process?  How long is any step in the

10   process?  Because that could matter.

11   Q.    Yeah.  Ms. Basta, I will stipulate to

12   you that the FTC's own response here "The length of

13   time to cancel" is probably vague.

14         So with that common understanding.

15         The FTC is the one that told us the

16   length of time to cancel --

17   A.    Sure.

18   Q.    -- matters; right?

19   A.    Well, I think --

20   Q.    So the FTC is the one that told us "The

21   length of time to cancel" is a relevant

22   consideration on whether or not a mechanism is

Page 362

1    simple; correct?

2    A.    Sure.

3    Q.    And what I want to know from you is:

4    Is there something out there in the guidance that

5    the FTC has published or anywhere where a business

6    could say, okay, if it takes 20 seconds or 30

7    seconds or 40 seconds or 2 minutes to get through

8    and cancel, that's simple, but if it takes more than

9    that time, it's no longer simple?

10         MR. MENDELSON:  Objection.  Scope.

11         THE WITNESS:  Right.  Well,

12   that -- and that's my difficulty because I think you

13   and I are using that term differently.

14         "The length of time to cancel."

15   The time from a -- the time a consumer begins the

16   effort to cancel until they are actually

17   successfully unsubscribed from that process is what

18   I think gets looked at.

19         To reduce it down the way the

20   question does to the number of seconds, that

21   presumes that they've already found the place, and I

22   think it's a broader inquiry than that.

Page 363

1         So, but no, there is -- there is

2    no guidance there.

3    BY MR. KABA:

4    Q.    Okay.

5    A.    I just want to be -- I just want to

6    make sure we're clear.

7    Q.    So even the broader inquiry about the

8    length of time it takes to cancel, is there any

9    guidance on how long is too long in -- in order to

10   comply with ROSCA?

11         MR. MENDELSON:  Objection.  Scope.

12         THE WITNESS:  No.

13   BY MR. KABA:

14   Q.    Okay.

15   A.    Again, it's going to be

16   context-specific.

17   Q.    "The number of alternatives to

18   cancellation presented to a consumer seeking to

19   cancel."

20         Do you see that?

21   A.    Yes.

22   Q.    Again, same question.

Page 364

1         Is there guidance from the FTC on how

2    many alternatives to cancellation are too many in

3    order to comply with ROSCA?

4    A.    Again --

5         MR. MENDELSON:  Same objection.

6         THE WITNESS:  -- you're asking

7    about a single document?

8    BY MR. KABA:

9    Q.    Well, I'm asking if I want to look

10   at -- I want to present alternatives to cancellation

11   to present to a customer.

12   A.    Uh-huh.

13   Q.    Where do I look to see what are too

14   many alternatives to present versus a just right

15   amount?

16         MR. MENDELSON:  Same objection.

17         THE WITNESS:   So, again, there's

18   no single document.  However, if you look at the

19   cases that have been brought, the enforcement

20   actions that have been brought, whether by a consent

21   decree or through litigation, then it will outline

22   business practices that were found to violate ROSCA



Page 405

1 Amazon is using to say those things.

2          That's what is underlying the

3 complaint; correct?

4          MR. MENDELSON:  Objection.  Vague.

5          THE WITNESS:  It's about lack of

6 disclosure, lack of consent, lack of simple

7 mechanism, and the unfair practice that results from

8 or that -- that is parallel with the lack of express

9 informed consent.

10 BY MR. KABA:

11     Q.  So, and, again, you're sort of reciting

12 the elements of the statute.

13     A.  Right.

14     Q.  But we've talked about throughout the

15 day today that this is not a complaint about false

16 statements made by Amazon; right?

17     A.  Correct.  It's not a deception case.

18     Q.  Right.  It's not a complaint about

19 false or deceptive statements made by Amazon;

20 correct?

21     A.  Yes.

22     Q.  What this is about in the context of

Page 406

1 even those elements that you recited, as we talked

2 about with respect to dark patterns and otherwise,

3 is the things, the actual words Amazon is using to

4 present to consumers for enrollment and cancellation

5 and how that information is being presented to

6 consumers; correct?

7          MR. MENDELSON:  Objection.  Vague.

8 Witness should answer, but we're at 4:31.

9          THE WITNESS:  And whether it's

10 adequately disclosed to consumers, but yes.

11          MR. KABA:  Okay.  Thank you.  We

12 can break for today.

13          MR. MENDELSON:  All right.

14 Thanks.

15          THE VIDEOGRAPHER:  We are off the

16 record at 4:31.

17

18      (Signature not waived, the deposition

19 recessed for the day at 4:31 PM.)

20

21          *   *   *

22

Page 407

1              CERTIFICATE OF REPORTER

2 DISTRICT OF COLUMBIA    )

3          I, Denise Dobner Vickery, CRR, RMR and

4 Notary Public, hereby certify the witness, AMANDA

5 BASTA, was by me first duly sworn to testify to the

6 truth; that the said deposition was recorded by me

7 and thereafter reduced to printing under my

8 direction; and that said deposition is a true

9 transcript of my original stenographic notes.

10          I certify the inspection, reading and

11 signing of said deposition were NOT waived by

12 counsel for the respective parties and by the

13 witness; that I am not a relative or employee of any

14 of the parties, or a relative or employee of either

15 counsel, and I am in no way interested directly or

16 indirectly in this action.

17 CERTIFIED TO THIS 20TH DAY OF SEPTEMBER, 2024.

18

19                    _Denise D. Vickery_

                   DENISE DOBNER VICKERY, CRR,RMR

20                 Notary Public in and for the

                   District of Columbia

21

22 My Commission expires:  March 14, 2028

Page 408

1              DEPOSITION ERRATA SHEET

2

3 Our Assignment No. J11644778

4 Case Caption: FEDERAL TRADE COMMISSION vs.

5 AMAZON.COM, INC., et al.

6

7          DECLARATION UNDER PENALTY OF PERJURY

8          I declare under penalty of perjury

9 that I have read the entire transcript of

10 my Deposition taken in the captioned matter

11 or the same has been read to me, and

12 the same is true and accurate, save and

13 except for changes and/or corrections, if

14 any, as indicated by me on the DEPOSITION

15 ERRATA SHEET hereof, with the understanding

16 that I offer these changes as if still under

17 oath.

18          Signed on the _____ day of

19 _____, 2024.

20

21 _____

22          AMANDA BASTA

