1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

FEDERAL TRADE COMMISSION,

     Plaintiff,

    v.

AMAZON.COM, INC., *et al*.

     Defendants.

**Case No. 2:23-cv-0932-JHC**

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AS TO
LIABILITY AGAINST ALL
DEFENDANTS**

NOTE ON MOTION CALENDAR:
Tuesday, June 24, 2025

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................... 1

3

STATEMENT OF FACTS ..................................................................................... 2

I.      PRIME "CHECKOUT" ENROLLMENT ..................................................... 2

4

    A.      Prime Enrollment Through the "Multi-Page Pipeline" .......................... 2

5

        "SOSP" Prime Offer .......................................................................... 3

6

        "UPDP" Prime Enrollment Page ....................................................... 4

        Single Page Checkout ("SPC") Prime Offers ................................... 14

7

    B.      Prime Enrollment Through "TrueSPC" ................................................ 16

8

    C.      Amazon Amassed Evidence of Unintentional Prime Enrollment, While the Individual Defendants Refused to Make Changes. ................................. 18

9

        1.      Amazon Leadership Rebuffed 2017 Efforts by the Shopping Design and Content Testing Teams to Fix Nonconsensual Enrollment. .............. 18

10

11

        2.      Amazon Leadership Rejected 2018 Efforts by the Shopping Design and Content Testing Teams to Fix Nonconsensual Enrollment. .............. 19

12

        3.      Amazon Leadership Refused Proposals to Fix Nonconsensual Enrollment in 2019. ................................................................. 21

13

        4.      Amazon Launches and Again Quickly Reverses Clarity Improvements in Late 2020, All at Amazon Leadership's Direction. ...... 22

14

        5.      In Response to the FTC's Investigation, Amazon Leaders Finally Approve, But Slow-Walk, Clarity Improvements. .................................. 25

15

    D.      Amazon's Cancellation Survey Confirms Subscribers' Nonconsensual Enrollment. .......................................................................... 28

16

II.     PRIME CANCELLATION ......................................................................... 30

17

    A.      Amazon Forced Consumers to Find an "End Membership" Button That Did Not End Membership. ...................................................... 31

18

    B.      After Entering the Iliad, Consumers Must Request Cancellation Three Additional Times. ................................................................ 34

19

        1.      Marketing Page ...................................................................... 34

20

        2.      Offers Page ............................................................................. 37

21

        3.      Cancellation Page ................................................................... 38

22

    C.      Amazon's Two-Page Version of the Iliad Includes Many of the Same Problems as the Three-Page Version. ................................................... 39

23

    D.      Amazon and Its Leadership Developed the Iliad to Stop Consumers from Cancelling and Were Aware of the Confusion It Caused. .................. 39

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - i

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

E.    Prime Subscribers Who Do Not Finish the Iliad Use Less Benefits Than They Did Before Attempting to Cancel. ............................................................ 42

F.    Amazon Redirects Consumers Who Attempt to Cancel by Phone to the Iliad. ... 44

LEGAL STANDARD.............................................................................................................. 44

ARGUMENT ......................................................................................................................... 45

I.    PRIME IS SOLD WITH A "NEGATIVE OPTION FEATURE" AND IS THEREFORE COVERED BY ROSCA .................................................................... 45

II.    AMAZON FAILED TO CLEARLY AND CONSPICUOUSLY DISCLOSE PRIME'S MATERIAL TERMS (COUNT II).................................................... 46

A.    A Facial Analysis of the Enrollment Processes Confirms Amazon's Failure to Clearly and Conspicuously Disclose Prime's Material Terms. ...................... 48

1.    The Context Within Which Amazon Displays Prime's Material Terms Makes It Unlikely Consumers Will Notice Them. .................................. 48

2.    Even Ignoring Context, Amazon's Disclosures of Prime's Material Terms Are Not Clear and Conspicuous. .................................................... 53

B.    Undisputed Empirical Evidence Confirms Prime's Material Terms Are Not Clearly and Conspicuously Disclosed. ................................................................ 55

C.    Amazon Impermissibly Discloses Prime's Terms and Conditions *After* Obtaining Billing Information. ............................................................................. 55

III.    AMAZON FAILS TO OBTAIN CONSUMERS' EXPRESS INFORMED CONSENT TO AUTOMATICALLY RENEWING PRIME SUBSCRIPTIONS (COUNTS I, III)............................................................................................. 56

A.    Amazon Does Not Obtain Consent to Prime's Material Terms. ....................... 57

1.    Amazon Does Not Tell Consumers the Consequences of Clicking Its "Enrollment" Buttons.......................................................................... 57

2.    Empirical Evidence Supports the Conclusion That Amazon Did Not Obtain Consumers' Consent to Prime Enrollment. ................................. 60

B.    Amazon Does Not Obtain *Informed* Consent to Prime Enrollment. ................... 61

IV.    AMAZON DID NOT PROVIDE SIMPLE PRIME CANCELLATION MECHANISMS (COUNT IV). ................................................................... 61

A.    Amazon's Iliad Cancellation Flow Was Not Simple. ........................................... 62

1.    Amazon Forced Consumers to Find an "End Membership" Button That Did Not End Membership.................................................................. 62

2.    After Entering the Iliad, Consumers Had to Request Cancellation Three Additional Times. .......................................................................... 62

3.    The Iliad Provided Repetitive, Distracting Information and Options....... 63

4.    Undisputed Empirical Evidence Supports a Finding That the Iliad Is Not

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Simple. ................................................................................................ 64

B.  Amazon's Other Methods for Cancelling Prime Do Not Save Them from Liability.......................................................................................... 64

V.  THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR AMAZON'S ROSCA AND FTC ACT VIOLATIONS. ............................................................. 65

A.  The Individual Defendants Are Liable for Prime's Enrollment Practices............ 65

B.  The Individual Defendants Are Liable for Prime's Cancellation Practices.......... 67

VI. DEFENDANTS' EQUITABLE AND DUE PROCESS AFFIRMATIVE DEFENSES ALL FAIL................................................................................... 68

A.  Defendants Cannot Support Their Equitable Defenses. ..................................... 68

1.  The FTC Engaged in No Misconduct. ........................................................ 69

2.  Defendants Do Not Assert Constitutional Injury to Support Their Unclean Hands Defense. ............................................................................ 70

3.  Defendants Do Not Identify Any Material "Affirmative Misrepresentation" to Support Equitable Estoppel.................................... 70

B.  Defendants' Due Process Defenses Fail As a Matter of Law. ............................. 70

CONCLUSION.......................................................................................... 73

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - iii

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 44

4    *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017) .................................................... 58

5    *Baccei v. United States*, 632 F.3d 1140 (9th Cir. 2011). .............................................................. 70

6    *Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883 (9th Cir. 2009) ............................................ 46, 48

7    *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ........................... 53, 54, 57

     *Celotex Corp. v. Catlett*, 477 U.S. 317 (1986) ............................................................................. 44

8    *Chabolla v. ClassPass Inc.*, 2023 WL 4544598 (N.D. Cal. June 22, 2023) ........................... 48, 59

9    *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) .................................................. 54, 57

10   *Dumont v. Reily Foods Co.*, 934 F.3d 35 (1st Cir. 2019) .............................................................. 46

11   *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843 (N.D. Cal. 2012) ........................................ 47

12   *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) ...................................................... 44

13   *FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861 (N.D. Cal. Nov. 29, 2018) ......................... 52

     *FTC v. Amazon.com, Inc.*, 71 F. Supp. 3d 1158 (W.D. Wash. 2014) .......................................... 56

14   *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .................................................... 65

15   *FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ............................................... 48, 53

16   *FTC v. Doxo, Inc.*, --- F. Supp. 3d ----, 2025 WL 887311 (W.D. Wash. Mar. 21, 2025)............ 46

17   *FTC v. Green Eq. Sols.*, 2023 WL 7107273 (C.D. Cal. Sept. 29, 2023) ............................... 69, 70

18   *FTC v. Health Formulas, LLC*, 2015 WL 2130504 (D. Nev. May 6, 2015) ............................... 61

19   *FTC v. Loewen*, 2013 WL 5816420 (W.D. Wash. Oct., 29, 2013)............................................... 65

     *FTC v. World Media Brokers Inc.*, 2004 WL 432475 (N.D. Ill. Mar. 2, 2004)............................ 65

20   *In re Ring LLC Privacy Litig.*, 2021 WL 2621197 (C.D. Cal June 24, 2021) ............................. 58

21   *Kahn v. Walmart Inc.*, 107 F.4th 585 (7th Cir. 2024) .................................................................. 47

22   *Keebaugh v. Warner Bros. Ent. Inc.*, 2022 WL 7610032 (C.D. Cal. Oct. 13, 2022) .................. 48

23   *Lee v. Intelius, Inc.*, 737 F.3d 1254 (9th Cir. 2013) ..................................................................... 58

*Lopez v. Dave Inc.*, 2022 WL 17089824 (N.D. Cal. Nov. 21, 2022)........................................ 53, 58

*Marsh v. Zaazoom Sols., LLC*, 2012 WL 952226 (N.D. Cal. Mar. 20, 2012) ............................. 61

*McCollough v. Johnson, Rodenberg & Lauinger*, 587 F. Supp. 2d 1170 (D. Mont. 2008) ......... 68

*Metro. Group Prop. & Cas. Ins. Co. v. Fite*, 738 F. Supp. 3d 1371 (W.D. Wash. 2024) ...... 44, 68

*Narambatal v. DHS*, --- F. Supp. 3d ----, 2025 WL 754530 (W.D. Wash. Mar. 10, 2025).......... 44

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ...................................... 49, 53, 57

*Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505 (9th Cir. 2023) ................................ 49, 51, 52

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) .................................................. 47, 55

*Sadlock v. Walt Disney Co.*, 2023 WL 4869245 (N.D. Cal. July 31, 2023) ................................ 51

*SEC v. Sands*, 902 F. Supp. 1149 (C.D. Cal. 1995) ................................................................ 69

*Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1 (Cal. Ct. App. 2021) ............................. 48, 49, 53

*United States v. DeBorba*, 713 F. Supp. 3d 1042 (W.D. Wash. 2024) ...................................... 71

*United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011) ............................................................ 71

*United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757 (C.D. Cal. 2020) ..................... 46, 62, 63

*United States v. Ruby Co.*, 588 F.2d 697 (9th Cir. 1978) ..................................................... 68, 70

*Walker v. Fred Meyer, Inc.*, 953 F.3d 1082 (9th Cir. 2020) ................................................. 46, 47

*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) ................................................................ 68

*Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019) ............................................................ 54

**Statutes**

15 U.S.C. § 45(a)(1)................................................................................................................. 56

15 U.S.C. § 57a(a)(1)(B).......................................................................................................... 72

15 U.S.C. § 8403 ..................................................................................................................... 45

15 U.S.C. § 8403(1) ..................................................................................................... 46, 55, 56

15 U.S.C. § 8403(2) ............................................................................................................ 56, 61

15 U.S.C. § 8403(3) ................................................................................................................. 61

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - v

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

**Rules**

Fed R. Civ. P. 56(a) ................................................................................................ 44

3

**Regulations**

16 C.F.R. § 310.2(w) .............................................................................................. 45

4

5

**Other Authorities**

Dictionary.com, https://www.dictionary.com/browse/simple ...................................... 61

6

Order Denying Motion to Dismiss, *United States v. Adobe, Inc., et al.*, No. 24-cv-3630,

   Dkt. No. 84 (N.D. Cal. May 2, 2025) ...................................................................... 46

7

8

Speech of Hon. Zachary T. Space of Ohio, 156 Cong. Rec. E2165-02 (Dec. 15, 2010).............. 61

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## **INTRODUCTION**

For years, Amazon has knowingly enrolled millions of shoppers in automatically renewing Prime subscriptions without their knowledge or consent.  Specifically, Amazon places Prime enrollment buttons within the product-checkout flow, and then labels those enrollment buttons things like "Get FREE Two-Day Shipping" or "Place your order."  Employees across several Amazon and Prime teams tried to fix this problem—described by one as an "unspoken cancer" (Att.[1] 37 at 4)—only to be rebuffed by Amazon executives, including Individual Defendants Jamil Ghani, Neil Lindsay, and Russell Grandinetti, who repeatedly were unwilling to accept the sign-up drops that accompanied efforts to ensure shoppers did not accidentally enroll.  Defendants compounded the enrollment scheme by needlessly and unlawfully complicating Prime cancellation through the aptly named "Iliad" process, which, among other problems, forced consumers to click "End Membership" buttons that did not end membership and confirm their desire to cancel four times before Amazon agreed to stop billing them.

This case is appropriate for partial summary judgment because there is no genuine dispute of material fact regarding the manner in which Amazon enrolled consumers in Prime or the steps required to cancel.  In fact, at the time it denied Defendants' motions to dismiss, the Court reviewed those same undisputed enrollment practices and found the disclosure of Prime's material terms on the challenged "UPDP" enrollment page "on their face were not clear and conspicuous," which also meant that Amazon "did not receive consumers' 'express informed consent' to enroll in Prime."  Dkt. #165 at 18 n.4, 27.  Furthermore, the Court held that the Prime "cancellation methods, as alleged, violate ROSCA."  *Id.* at 31 n.7.  At the time, the Court could only consider matters alleged in the FTC's Amended Complaint.  Since then the evidence—and the resulting undisputed facts—has only gotten stronger.  The FTC therefore respectfully moves for summary judgment as to liability against all Defendants.

---

[1] All "Attachment" cites reference attachments to the Declaration of Evan Mendelson, filed concurrently herewith. All page number cites for Attachments and docket entries refer to the ECF header information at the top of the page.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 1

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## STATEMENT OF FACTS

2

### I.    PRIME "CHECKOUT" ENROLLMENT

3

A shopper attempting to buy a product from Amazon typically encounters several Prime

4

upsell offers during the product-checkout process.  Prior to October 2022, Amazon referred to

5

that checkout process, and the Prime offers contained therein, as the Multi-Page Pipeline

6

("MPP").  In October 2022, Amazon modified the checkout process, launching "TrueSPC" to

7

replace the MPP.  As described below, there is no genuine dispute of material fact as to the

8

workings of both checkout processes and the Prime enrollment pages contained therein.

9

### A.    Prime Enrollment Through the "Multi-Page Pipeline"

Prior to entering the MPP, an Amazon shopper looking to purchase a product clicked an

10

orange "Add to Cart" button on the product's "detail page" and then an orange "Proceed to

11

checkout" button on the page that immediately followed.  *See, e.g.*, Att. 4 at 7-8.  Some shoppers

12

next saw a "Choose a billing address" page, on which they again had to click an orange button to

13

proceed with their product purchase.  *Id.* at 9.  From here, Amazon made at least three Prime

offers to certain consumers proceeding through the MPP, as pictured in Figure 1.  Att. 67 at 28.

14

15

16

17

18

19

20

21

22

23



*Figure 1: MPP Flow Chart (Att. 68 at 28)*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 2

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Those offers were contained in the (1) "Ship Option Selection Page" ("SOSP"); (2) "Universal Prime Decision Page" ("UPDP") or "SOSP Prime Decision Page" ("SOSP PDP"); and (3) "Single Page Checkout" page ("SPC").

### 1.    "SOSP" Prime Offer

At the start of the MPP, some consumers with saved "defaults"—*i.e.*, saved billing and address information—and all customers without saved defaults saw the Ship Option Select Page, an example of which is pictured in Figure 2. *See* Att. 2 at 15 (customer with defaults might see SOSP), 27 (all customers without defaults see SOSP).



*Figure 2: SOSP (Att. 4 at 10)*

On this page, Amazon told consumers they were receiving a "30-day FREE trial of Prime" and then offered them a series of shipping options, the first of which, labeled "Today," promised them free, same-day (or otherwise-accelerated) shipping with their free trial of Prime. Att. 4 at 10.  The SOSP page did not disclose Prime's price or that fact that memberships auto-renew for a monthly fee.  *Id.*  Nor did it disclose that the Prime free trial had not been "given" to the shopper, but was instead an offer they could accept or reject.  *Id.*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 3

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Consumers who select the "Prime" shipping option on SOSP were not immediately

enrolled in Prime. *Id.* at 16-17. Rather, regardless of which shipping option they choose,

consumers clicked the orange SOSP "Continue" button and arrived at the "Payment Selection

Page" (Figure 3). *Id.* This was the page on which Amazon obtained consumers' billing

information. It is also yet another page on which consumers clicked an orange button to proceed

with their product purchase:



*Figure 3: Payment Selection Page (Att. 4 at 18)*

**2.      "UPDP" Prime Enrollment Page**

The next page of the MPP was the UPDP, which remains in use today. After clicking the

"Continue" button on the Payment Selection Page, shoppers next saw either the "UPDP" or

related "SOSP PDP" Prime enrollment page. Specifically, shoppers who selected one of the

non-Prime shipping options on SOSP saw the UPDP. Att. 2 at 16-18; *supra* Figure 1. Shoppers

who selected the Prime shipping option on SOSP were instead shown what is called the SOSP

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 4

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

PDP.  *Id.*  SOSP PDP was simply a variant of UPDP, and is discussed at the end of this section.

Amazon has used several different versions of its UPDP page, an example of which, from May 2021, is Figure 4.  *See* Att. 4 at 19.[2]  The UPDP page has varied slightly over time, and the version a consumer sees depends on, among other things, whether they are using a mobile or desktop device, whether they have a Prime-shipping-eligible item in their cart, and whether they are eligible for a Prime free trial (as opposed to only a paying membership).  Att. 2 at 30-33.



*Figure 4:  UPDP (May 2021) (Att. 4 at 19)*

Despite these variations, it is undisputed that all versions of the UPDP share certain features.  *First*, to proceed past the UPDP and complete their product purchase, consumers must either click the "positive CTA"[3] (a button that enrolls them in Prime) or the "negative CTA" (a

---

[2] Unless otherwise noted, all images of Prime enrollment pages in this Motion were identified by Amazon as "representative images" as of particular points in time.  *See* Att. 2 at 32-39.

[3] In online user-experience design, CTA stands for "call to action."

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 5

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

link or button that declines the Prime offer). Att. 132 at 100:11-16, 105:17-22, 119:7-11. In the example above, the "positive CTA" is the button reading "Get FREE Same-Day Delivery," and the "negative CTA" is the button reading "No thanks, I do not want FREE delivery." *Second*, the UPDP enrollment button is the same color and style as the orange buttons previously clicked by shoppers to continue with their product purchases. Att. 4 at 15-18. *Third*, clicking the orange button immediately enrolls the consumer in Prime without, for example, a confirmation popup window. Att. 2 at 11-12. *Fourth*, even if the consumer does not complete their product purchase after clicking the enrollment button, and therefore does not need or receive the "same-day delivery" they elected, Amazon *still* enrolls them in Prime. *See, e.g.*, Att. 132 at 88:17-89:21, 103:8-18. *Fifth*, Amazon does not display Prime's price, the fact that there is a price, or the fact that the price auto-renews[4] every month to shoppers prior to their arrival at the UPDP page. Att. 2 at 14-19. *Sixth*, Amazon bills consumers for the Prime membership (either immediately or after a free-trial period) using the payment method previously provided on the "Payment Selection Page" or the shopper's "default" payment method provided in a prior visit to Amazon.com. Att. 2 at 12; Att. 132 at 114:22-115:22; *see infra* pp. 55-56 (explaining that this timing itself is illegal).

UPDP enrollment pages have appeared in various iterations described below.

### a.    Free Trial Desktop UPDP – Pre-March 2020

Prior to the March 2020 onset of the COVID pandemic, Amazon maintained several versions of the desktop UPDP, each of which was substantially similar to the May 2021 example included above. *See, e.g.*, Att. 6; Att. 7; Att. 8 at 15.[5] In all of these versions, Prime's price and the fact that it auto-renews were only disclosed in fine-print terms and conditions at the bottom of the page. Moreover, the enrollment button read "Get FREE Two-Day [or One-Day or Same-

---

[4] Throughout this Motion, the FTC uses "auto-renew" to refer both to the fact that a free trial converts to a paying membership after 30 days and to the fact that the membership automatically renews every 30 days thereafter until the consumer cancels.

[5] Amazon did not identify Attachment 8 as containing "representative images."

1  Day] Delivery."

2      **b.      Free Trial Mobile UPDP – Pre-March 2020**

3          Pre-March 2020 mobile UPDP enrollment pages, such as in Figure 5 below, were similar

4  to desktop versions.  Clicking "Get FREE Two-Day Shipping" enrolled the consumer in Prime,

5  while Prime's price and auto-renewal were only disclosed in the fine-print terms and conditions.

6

7

8                              

9

10

11

12

13

14

15

16

17

18                    *Figure 5:  Mobile UPDP (May 2019) (Att. 9)*

19      **c.      Free Trial UPDP – "Order Agnostic"/March 2020-September
              2020**

20          For six months in the middle of 2020, in response to the COVID pandemic and related

21  shipping delays, Amazon stopped using UPDP pages focused on shipping speeds (Att. 36 at 3

22  (lines 67-69)), instead pivoting to "order agnostic" UPDP pages highlighting Prime's other

23

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 7

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    benefits, such as Prime Video.  *See, e.g.*, Att. 11 at 8-10.[6]  Outside of March-September 2020,

2    Amazon also has used these "order agnostic" pages when a consumer does not have a Prime-

3    shipping-eligible item in their cart.  *See id.*  On these pages, the enrollment button generally read

4    "Start my 30-day FREE trial," as in the July 2020 example below.  Att. 10.  In this example,

5    Amazon disclosed Prime's price outside of the fine print ("After your FREE trial, Prime is just

6    $12.99/month"), but in relatively inconspicuous text compared to the page header and marketing

7    material.  Amazon still only displayed the fact that Prime auto-renews in fine print:[7]



   *Figure 6:  "Order Agnostic" UPDP (July 2020) (Att. 10)*

             **d.    "Free Trial" UPDP – September 17, 2020 – December 3, 2020
                     Clarity Improvements**

         In mid-September 2020, Amazon reverted to making shipping-based upsells, rather than

   "order agnostic" upsells.  At that same time, however, as described in greater detail *infra* pp. 22-

   ---

   [6] Amazon did not identify Attachment 11 as containing "representative images."  It is a December 2021 slide deck
   describing "Prime UPDP CX [Customer Experience] Updates."

   [7] Amazon has argued that the language stating that Prime is $12.99 per month "[a]fter your FREE trial" is a
   disclosure not only of price, but also auto-renewal.  That is simply not true, as Amazon's own internal policies
   recognize.  *See, e.g.*, Att. 3 at 2 (describing the "After your free trial" language as a price disclosure; by contrast,
   statement that Prime "continue[s] until cancelled" is auto-renewal disclosure).  In any event, the proper
   characterization of this language is immaterial to the resolution of this Motion.

PLAINTIFF'S MOTION FOR PARTIAL                                              Federal Trade Commission
SUMMARY JUDGMENT                                                         600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 8                                                Washington, DC 20580
                                                                                (202) 326-3320

25, Amazon decided to implement certain short-lived clarity improvements, reflected in Figure 7

below (Att. 8 at 14).  Among other improvements, Amazon changed the enrollment button to

read "Start your Prime FREE trial" (rather than "Get FREE Two-Day Shipping"), converted the

"No Thanks" decline link to a decline button, and removed the language after "No Thanks" that

declared a customer who declines Prime does not want "fast, free shipping."  *See* Figure 4;

Figure 7.  Defendants now disclosed Prime's price in a subheader at the top of the page, far from

the enrollment button.



*Figure 7:  UPDP (September 2020 Clarity Improvements) (Att. 8 at 14)*

### e.    Free Trial UPDP – December 2020 – January 2022

The above-described UPDP clarity improvements did not last long.  *See infra* pp. 22-25.

In December 2020, Amazon reverted to UPDP pages similar to Figure 4 (Att. 4 at 19), with a

"Get FREE Two-Day Shipping" enrollment button and a decline link that requires the consumer

to click that they do not want "fast, free shipping."  Figure 8 below shows an example mobile

UPDP from this time period.  Att. 11 at 12.  Here again, the "Get FREE Prime Delivery" button

immediately enrolled the consumer in Prime.  On this page, moreover, Prime's price and auto-

renewal were not displayed at all, unless the consumer clicked "See all" in the bottom right or

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 9

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

scrolled all the way down the page.  *See* Att. 132 at 106:14-108:16 (confirming these facts for

the identical Attachment 54 at 40).

3

4

Therefore, a consumer could enroll in Prime without Prime's price or the fact that it auto-

renews even appearing on the screen.  As always, the consumer also would be enrolled if they

5

6

7

8

9

10

11

12

13

14

15

16



*Figure 8:  Mobile UPDP (December 2021) (Att. 11 at 12)*

17

18

clicked "Get FREE Prime Delivery" and then never even finished purchasing the product being

"delivered."

19

#### f.     Free Trial UPDP – February 2022-present

20

21

22

As described *infra* pp. 25-28, Amazon, in February 2022, made certain changes to the

UPDP in response to the FTC's investigation.  This round of changes stopped well short of the

temporary September 2020 improvements (Figure 7).  For example, Amazon, rather than change

the enrollment button to read "Start Your 30-Day Free Trial," simply added "with Prime" to the

23

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 10

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

end of "Get FREE One-Day Delivery," as pictured in Figures 9 and 10 below.  Att. 67 at 16, 23.[8]
Amazon also added price information outside of the fine print, but, on desktop, included it within
marketing text above the enrollment button.



*Figure 9:  UPDP (May 2022) (Att. 67 at 23)*

On mobile, the price information is in an inconspicuous subheader far from the
enrollment button.  Auto-renewal information—*i.e.*, that Prime "continues until cancelled"—is
not available at all on mobile without clicking "see all" or scrolling down the page:

---

[8] Amazon did not identify Attachment 67 as containing "representative images."  The images are from a May 2022
presentation to Amazon executives regarding Prime enrollment.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 11

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



*Figure 10:  Mobile UPDP (May 2022) (Att. 67 at 16)*

### g.    "Hard Offer" UPDP

Not all Amazon shoppers are eligible for Prime free trials.  Those who are ineligible instead generally receive what Amazon refers to as a Prime "hard offer," meaning they are immediately charged for their first membership month.[9]  Figure 11 below shows a May 2021 "hard offer" UPDP.  Att. 12 at 19.  Here, clicking the button reading "Get FREE Delivery with Prime" results in an *immediate* charge of $12.99 (plus taxes), which is only disclosed in the list of Prime "benefits."

---

[9] Rather than a "hard offer," some Amazon shoppers receive a "paid trial," typically offering them a week of Prime for $1.99 before it converts to an automatically renewing monthly membership.  *See, e.g.* Att. 54 at 35.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 12

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10



*Figure 11:  "Hard Offer" UPDP (Att. 12 at 19)*

In other words, despite not having an "Order Total," billing information section, or anything else generally present on an e-commerce checkout page, Amazon treats this as a checkout screen for a Prime membership.[10]  A consumer who clicks "Get FREE Delivery with Prime" in order to "save $7.21 instantly" with "fast, FREE delivery" is instead instantly *charged* $12.99 and enrolled in an automatically renewing Prime subscription.  The only alternative to completing the Product purchase without being immediately charged $12.99 is to click "No thanks, I do not want FREE delivery."  Confusingly, consumers forced to click that they "do not want FREE delivery" remain eligible for, and in fact were previously promised, free delivery— in the form of "core" free shipping rather than "Prime" free shipping.  *See infra* p. 51; Att. 132 at 105:7-106:4.

---

[10] The mobile version of the UPDP "hard offer" page has many of the same problems.  *See* Att. 12 at 41.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 13

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3              **h.      SOSP PDP – Desktop and Mobile**

4        As described above, a shopper who selects the "Prime" shipping option on the Ship

Option Select Page proceeds to the SOSP PDP variant of UPDP.  This page, pictured below (Att.

4 at 12), functions in the same manner as UPDP, with the orange button immediately enrolling

consumers in Prime.



*Figure 12:  SOSP PDP (Att. 4 at 12)*

         **3.      Single Page Checkout ("SPC") Prime Offers**

         Regardless of whether a consumer enrolled in Prime on the UPDP or SOSP PDP page,

they next arrived at the SPC checkout page, which allowed them to complete their product

purchase.  If the consumer had not yet enrolled in Prime, Amazon made at least two Prime offers

on the SPC page: the blue rectangular box below in the Figure 13 below (called the "SPC

Stripe") and the first "delivery option" toward the bottom of the image, labeled "Today" (called

the "SPC ISOA [In-line Shop Option Ad]").  Att. 4 at 26.  Amazon pre-populated the payment

1    information at the top of the page with the information previously provided, either on the MPP's

2    Payment Selection Page, *see supra*, or on a prior visit to Amazon.com.



*Figure 13: SPC Before Clicking "Try Prime FREE" (Att. 4 at 26)*

16          At the moment the consumer clicked either the "Try Prime FREE" button in the SPC

17   Stripe or the "Today" button in the SPC ISOA, Amazon did not display Prime's price or the fact

18   that it auto-renewed. Rather, that information appears only *after* the consumer clicked either

19   button, as pictured in Figure 14. Att. 4 at 27.[11] Specifically, Amazon added the price and auto-

20   renewal information in bolded fine-print in the third paragraph beneath the "Place your order"

21   button. Amazon placed this information in the subheader underneath the larger blue text

22   advertising the "FREE trial of Amazon Prime" on the left side of the page.

---

[11] The mobile version of the SPC free trial Prime offer is at Attachment 4 at 42.

1

2

3

4

5

6

7

8

9

10

11

12

13



14    *Figure 14:  SPC After Clicking "Try Prime Free" (Att. 4 at 27)*

On this screen, the orange "Place your order" button both completed the consumer's product purchase and enrolled them in Prime.  To "Place your order" without enrolling in Prime, the consumer had to locate and click the small "Delete" link next to the Prime logo in the middle of the page.[12]  Att. 132 at 121:19-24.

### B.    Prime Enrollment Through "TrueSPC"

In or around October 2022, Amazon shifted from the Multi-Page Pipeline to what it calls " TrueSPC."  The difference between the two is pictured in the Figure 15 (Att. 67 at 28):

---

[12] On the "hard offer" version of SPC—for shoppers ineligible for free trials—consumers who click to try Prime see a pop-up window.  Att. 12 at 27-28, 42.  They then either click a "No Thanks" button to decline Prime or a "Join Prime for Fast, FREE Delivery" button, in which they are immediately enrolled in Prime and charged $12.99 plus taxes.  *Id.*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 16

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5
6
7
8
9
10
11



*Figure 15: MPP and TrueSPC Flow Charts (Att. 67 at 28)*

12    When it launched TrueSPC, Amazon stopped using the SOSP (and SOSP PDP) and

13  started showing the UPDP only to consumers with saved default billing information.  For all

14  such consumers, Amazon uses previously stored billing information to charge them for Prime if

15  they "enroll" on the UPDP page, meaning the consumer is billed for their Prime membership

16  with information they did not provide to Amazon, or even confirm, on their current site visit.

    Att. 2 at 12.

17    All consumers, regardless of whether they encounter the UPDP, proceed to a revamped

18  version of SPC to complete their product purchases.  On this SPC, there are separate panels for

19  consumers to enter, or confirm their previously-provided, shipping and billing information.  Att.

20  2 at 12-15.  The final panel on this SPC, which consumers reach only after entering or

21  confirming their payment information, contains essentially the same SPC Stripe and SPC ISOA

22  upsell options as before.  *Id.*  As in the earlier version of SPC, customers who select the Prime

23

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 17

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    option in either case are enrolled in Prime when they click the "Place your order" button.[13]

2    **C.    Amazon Amassed Evidence of Unintentional Prime Enrollment, While the
         Individual Defendants Refused to Make Changes.**

3    Although a facial analysis of the above-described enrollment methods clearly

4    demonstrates Defendants' ROSCA violations, *see infra* pp. 46-55, the additional undisputed facts

5    described below further support a summary ruling against Amazon and demonstrate the

6    Individual Defendants' liability for Amazon's unlawful practices.  Specifically, the evidence

7    shows that non-executive employees across several Prime and Amazon teams, including the

8    Amazon Shopping Design team, the Prime Content Testing team, the Global Prime Experience

9    ("Prime GPX") team, and the Amazon Benchmarking team, for years told Amazon and Prime

10   leadership that consumers were enrolling in Prime unintentionally or without understanding

11   Prime's material terms.  Prime and Amazon executives, including Defendants Ghani, Lindsay,

12   and Grandinetti, nevertheless blocked clarity improvements because of the resulting decreases in

     Prime enrollment and, therefore, revenues.

13   **1.    Amazon Leadership Rebuffed 2017 Efforts by the Shopping Design
             and Content Testing Teams to Fix Nonconsensual Enrollment.**

14   As early as 2015, Amazon's "Shopping Design" team[14] began observing, in one-on-one

15   observations of Amazon customers, those customers signing up for Prime accidentally, including

16   through both the UPDP and SPC enrollment pages. Att. 14 at 4.  By 2017, the Prime Content

17   Testing team[15] agreed that UPDP, and particularly its "Get FREE Two-Day Shipping"

     enrollment button, created "confusion" between Prime enrollment and the product-checkout

18   process.  Att. 15 at 2-3.  In response, in early 2017, the Content Testing team experimented with

19

20   ───────────────

     [13] On the TrueSPC version of SPC, some consumers see a UPDP-like "panel" or "modal" offer after entering or

21   confirming their payment information.  *See* Att. 2 at 23-24.

     [14] The Amazon Shopping Design team was a team of user-experience researchers and designers who worked with

22   teams across Amazon, including the Prime organization.  Att. 90 at 33:1-37:17.

     [15] The Prime Content Testing team's function was to "make small UX changes to various Prime locations to try to

23   get more people to sign up for Prime and more people to engage with Prime benefits and stay Prime members."  Att.
     59 at 13:1-15:22.

    Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

changing the text on the UPDP enrollment button from "Get FREE Two-Day Shipping" to "Start your 30-day FREE trial." *Id.* at 2. Despite the resulting enrollment decrease, the Content Testing team recommended making the change permanent and taking additional steps with the goal—quixotic, it turns out—of "prevent[ing] this from ever sliding downhill again." *Id.* at 3. To that end, the team, in late 2017, circulated new guidelines" "to focus on raising the clarity bar." Att. 22 at 2. Those guidelines included being "ABSOLUTELY clear to the customer so that they know if they are signing up for Prime or declining the offer." *Id.* Among other rules, Amazon had to include the word "Prime" on the Prime enrollment button, and the decline link could not include language like "I don't want free shipping." *Id.*

Contemporaneous documents confirm that, just one month into 2018, Prime leadership, including Defendant Lindsay, then Amazon's Vice President of Prime and Marketing (Att. 136 at 15:11-21), recognized the negative impact of these clarity[16] guidelines on Prime enrollment. Specifically, Amazon employees reported to Lindsay and others that Prime was missing its enrollment goals by ███. Att. 17 at 3-4. Lindsay asked for "context" for that miss. *Id.* at 3. Lindsay's direct report, Cem Sibay (Att. 136 at 26:22-27:10), responded that the primary driver of the enrollment decline were "changes launched in late November [2017] to update Call To Actions (CTAs) in order to make the [free trial] Signup process more clear to customers." *Id.* at 2. Jeff Wilke (Lindsay's then-boss, *see* Att. 136 at 18:14-19) replied: "Should we immediately revert to the old CTA language?" Att. 91 at 3. Within days, Amazon did just that, rushing to reinstate the "Get FREE Two-Day Shipping" Prime enrollment buttons. Att. 39 at 3-4.

### 2. Amazon Leadership Rejected 2018 Efforts by the Shopping Design and Content Testing Teams to Fix Nonconsensual Enrollment.

Following the early 2018 rollback of clarity improvements, the Prime Contest Testing team tried again to fix the problem, launching "Project Lucent." Att. 19 at 5. As part of Project

---

[16] At Amazon, the "clarity" workstreams were "a series of initiatives" focused on clarifying the Prime enrollment and cancellation process. *See* Dkt. #52 ¶ 6.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 19

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    Lucent, the team ran a series of large-scale tests on different versions of UPDP—with and

2    without clarity improvements.  This time, the Content Testing team did not experiment with

3    changing the enrollment button.  Instead, they ran tests that, *inter alia*, changed the Prime decline

4    link to a button and removed its "I do not want fast, FREE shipping" language.  That change

5    alone resulted in a ▆ drop in Prime sign-ups, as pictured in Figure 16 (Att. 20 at 13):



Figure 16: "Project Lucent" Experiment (Att. 20 at 13)

16        Concurrent with the Contest Testing team's Project Lucent experiments, the Shopping

      Design team updated Defendant Lindsay and other Amazon VPs regarding Amazon shopper

17    "frustrations."[17]  The update includes a video reel of consumers signing up for Prime

18    unintentionally.  Att. 21 at 2.  The VPs "agreed that this is one of the least customer friendly

19    things we do."  *Id.*  At that meeting, Prime "leaders," presumably including Lindsay, also

20    confirmed they were aware of the "Top 3" frustrations (including nonconsensual enrollment) and

21    "have heard other teams advocating for solutions to these pain points."  Att. 75 at 3, 8.

---

[17] The Amazon Shopping Design team maintained a database of Amazon customer "frustrations" that the team
observed "through direct observation of customer behavior in real shopping tasks."  Att. 75 at 7.

PLAINTIFF'S MOTION FOR PARTIAL                          Federal Trade Commission
SUMMARY JUDGMENT                                        600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 20                          Washington, DC 20580
                                                        (202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Nevertheless, in the fall of 2018, the Prime organization decided not to launch the Project Lucent changes, "due [to] large drops in Prime Sign Ups (███ in some cases)" without an improvement in the percentage of sign-ups remaining members 90 days later.  Att. 24 at 2. Prime made this decision even in the face of "experiment data show[ing] that ███ of . . . [Non-Prime Amazon] customers will experience Unintended Prime Signups in 2019" without the improvements.  Att. 143 at 2.  Summarizing the events of the prior year, Mary Pat Gotschall, manager of the user experience ("UX") researchers within the Shopping Design team (Att. 90 at 38:21-39:15), wrote that the reason clarity improvements were not implemented was "a lack of alignment at the VP level in solving customer frustrations when the solutions could have negative financial impact."  Att. 25 at 2.

### 3. Amazon Leadership Refused Proposals to Fix Nonconsensual Enrollment in 2019.

In March 2019, Amazon's Shopping Design team reported the Prime unintentional-enrollment issue to Defendant Grandinetti, who was the Amazon Senior Vice President with oversight of the Shopping Design team.  Att. 28 at 15:10-12, Att. 77 at 13:8-17, 14:22-15:4. Specifically, Shopping Design reported to Defendant Grandinetti that Defendant Lindsay's Prime organization "ha[d] not launched [changes] that would eliminate unintended Prime signup frustrations because these improvements will negatively impact [revenues] or would not improve [the rate at which free-trial members becoming paying members]."  Att. 26 at 5.  The Shopping Design team again identified Lindsay as the relevant VP "team owner."  *Id.* at 6.  Grandinetti agreed that Lindsay was the proper "VP owner" for the nonconsensual-enrollment issue and asked for a meeting with Lindsay "to drive alignment on next steps to resolve or agree not to fix."  Att. 48.

Three months later, the Prime organization (including Lindsay) and the Shopping Design team met with Grandinetti.  Att. 69.  Grandinetti was the most senior attendee and was the only

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 21

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Senior Vice President and Amazon "S-Team"[18] member in attendance. Att. 119 at 10-12. At that meeting, Grandinetti instructed "that we should be solving for the [signup] frustration without any impact to . . . without much impact to . . . Prime acquisition." Att. 68 at 47:15-17. Later, Grandinetti reiterated the same point by email, setting the impossible-to-achieve goal of "improv[ing] message clarity while not hurting signups." Att. 27 at 2.

Later in 2019, all three Individual Defendants received a memorandum from yet another Amazon team: the "Benchmarking" organization. The memorandum outlined the experiences of several Japanese Amazon customers who "felt 'tricked' by Amazon, having signed up for Prime involuntarily by thinking they were simply clicking to progress with their purchase." Dkt. #254-11 at 1. A subsequent Amazon survey of US Prime members—across all enrollment methods, not merely the challenged "checkout" enrollment methods described above—found that ▆▆ of Prime members who had joined in the prior year did so unintentionally, while another ▆▆ could not remember how they enrolled. *Id.* at 12.[19]

### 4. Amazon Launches and Again Quickly Reverses Clarity Improvements in Late 2020, All at Amazon Leadership's Direction.

In December 2019, Jody Biggs—a Director in the Amazon Shopping organization that included the Shopping Design team (Att. 59 at 120:8-121:5) —flagged for Prime's Director of Member Growth, Nahshon Davidai, that the then-current UPDP appeared to be "hiding the [option to] proceed to checkout without signing up for Prime." Att. 30 at 3. Davidai agreed and forwarded the email to the head of Prime's Content Testing team, who also agreed: "For the CTA, it's just painful and something we need to fix. . . . Given the rising concerns and visibility around this experience, feels like we need to do something pretty quickly." *Id.* at 2. Davidai then forwarded these emails to Ghani (who had recently assumed control of the Prime

---

[18] The "S-Team" is the "senior management team at Amazon" and "works together as a whole to manage Amazon's entire worldwide business." Att. 119 at 11-12.

[19] Notably, even that ▆▆ is likely an underestimate, as the survey relied on respondents to "self-report" their Prime status (Dkt. #255-33 at 2), meaning the survey excluded potential respondents who unintentionally enrolled and had not yet learned they had done so.

organization, *see* Att. 119 at 9-10), asking for his buy-in to "reset" UPDP to a "much less

egregious state." *Id.*

      One month later, the Prime Content Testing team ran an experiment that once again

included changing the "Get FREE Two-Day Delivery" UPDP enrollment button to "Start my

Prime FREE trial." Att. 32 at 2. "Based on the early results," the team estimated a "███████

signups drop (-██████ annualized signups)," while simultaneously confirming the changes to

have improved "clarity," as validated by a ████ "drop in Prime cancellations for one of the

treatments." *Id.* Nevertheless, notes from a follow-up meeting again describe leadership as a

"headwind" to clarity improvements: "direction from senior leaders has been to solve for clarity

while not sacrificing growth." Att. 34 at 2.

      In June 2020, the Content Testing team prepared a memorandum for Defendant Ghani,

reporting: "At a high level, we know that a portion of Prime members were not aware when they

signed up for Prime." Att. 36 at 2. The team explained it had worked with the Prime GPX

team—Prime's in-house team of user-experience researchers and designers (Att. 59 at 64:3-

65:9)—to develop "guidelines" for "how clear a Prime upsell needs to be at a minimum level."

Att. 36 at 2. Specifically, the two teams recommended that the enrollment button "clearly

indicate the action customers are taking by clicking (*e.g.*, "Join Prime," not "Get FREE Two-Day

Delivery") and "[n]egative CTAs must be equally weighted with the positive CTA"—*i.e.,* not a

hyperlink next to a button. *Id.* at 3. At the ensuing meeting, one attendee referred to Prime

unintentional enrollment as an "***unspoken cancer***" and a "symptom of the past" that Prime

"need[ed] to correct now." Att. 37 at 4 (emphasis added). Meeting attendees, including Ghani,

agreed "that we need to make changes to enhance clarity, and we have identified the right clarity

CX [customer experience] guidelines to focus on." Att. 35 at 2. At around this same time, a

Prime Content testing team employee pleaded with Ghani to fix nonconsensual enrollment:

"Coming from a place of empathy and care for our customers, we should be look at this as a

defect in our product—especially now. An unknown $12.99 charge could mean grocery money

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 23

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3

for a family, gas to fill up a car, or just the last bit of money to make rent." Att. 94 at 4. Ghani arranged to meet with the employee, noting to in-house counsel that he planned to "coach her on what she puts in email." *Id.* at 3.

4
5
6
7
8
9
10
11
12

In July 2020, the Content Testing team and Ghani presented Defendant Lindsay, to whom Ghani reported at the time, the plan to implement "clarity" guidelines. Att. 38. The memorandum for that meeting summarized the situation: "We have accumulated a significant clarity debt that we need to start paying down: Customer anecdotes suggest that our Prime CX does not meet an acceptable clarity bar for many customers. . . . We need to take immediate action to address these pressing CX issues." *Id.* at 3. At the end of the meeting, Ghani and Lindsay provided approval to go ahead with implementing the clarity guidelines. Att. 101 at 2; *see also* Att. 40 at 3. On September 17, 2020, Prime launched the improved UPDP shown in Figure 7 above, featuring, *inter alia*, a "Start Your 30-day FREE Trial" enrollment button and a "No Thanks" decline button.

13
14
15
16
17
18
19
20
21
22
23

Within about two months, Amazon fell behind its Prime member enrollment goal for the year, kicking off extensive internal discussions. *See, e.g.*, Atts. 45-46. One Prime organization employee wrote to Ghani and Lindsay that, although the September 2020 changes "improve[] signup clarity and address[] long-standing customer frustrations," they had cost Amazon ███████ ██████ paid members in 2.5 months alone. Dkt. #139-1 at 86. On December 3, 2020, the Content Testing team met with Ghani, Lindsay, and other Amazon leaders to discuss the sharp enrollment drop. Ghani admits that, at that meeting, he, Defendant Lindsay, and then-Senior Vice President Doug Herrington made the decision to again "roll back" the clarity improvements. Att. 44 at 209:11-210:4. Contemporaneous notes confirm that the three executives decided to "lean away from" improving the clarity of Prime enrollment and instead "focus more on driving overall members." Dkt. #288-1 at 2. They made this decision notwithstanding the Content Testing team's continued "strong[] belie[f] that the currently live templates represent a 'minimum bar,' and we have user testing research and customer frustration

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 24

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

data to show that each of the changes made is a significant contributor to . . . clarity." Att. 45. Defendant Lindsay, however, feared that clarity improvements would drive away *unintentional* enrollees who nevertheless "end up being happy."[20]

Unsurprisingly, undoing the clarity improvements also reversed the Prime enrollment slide.  The improvement in enrollment numbers, in fact, was staggering even to Amazon employees.  Upon being informed that the "estimated impact of the UPDP [clarity reversal] is ▮▮▮▮ paid members annualized" and that "[s]ignup rates improved between ▮▮▮▮▮▮▮," Davidai responded "holy crap." Att. 46.  A colleague responded "insane" to the same figures. Att. 78.  Members of the Prime Content Testing team, however, were disappointed.  One wrote: "we are back to the original UPDP templates in the US, and I am doubtful we will make changes to that in 2021." Att. 47 at 2.  Her European counterpart responded:  "I really hope all this didn't mean everything we did so far was for nothing.  *Id.* at 3.

### 5.    In Response to the FTC's Investigation, Amazon Leaders Finally Approve, But Slow-Walk, Clarity Improvements.

Following Ghani and Lindsay's December 2020 clarity reversal, Ghani encouraged the Prime organization to cease its "focus on prevent[ing]" nonconsensual enrollment and instead pivot to after-the-fact "detection and correction of mistaken signups." Att. 49 at 3.  Ghani also wrote to Lindsay that as a result of the December decision to roll back clarity improvements, he did not believe there was room for "much action on clarity," especially given that the rolled back changes were "near the 'minimum bar' of what we wanted to improve." Att. 80 at 3.  Lindsay agreed, adding that this was an "important HDT [hotly debated topic]" to bring to Grandinetti, among others.  *Id.*  Ultimately, however, Ghani and Lindsay decided to postpone the Grandinetti meeting in order to think more about how to improve clarity "without as severe consequences."

---

[20] At least two other people recall Lindsay raising the same argument—that Prime should continue enrolling unintentional enrollees because those enrollees end up being happy—in a different meeting. *See* Att. 41 at 85:12-87:7; Att. 42 at 236:9-237:15.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 25

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

Att. 50.   The meeting between Ghani, Lindsay, and other senior leaders[21] eventually occurred on May 6, 2021 (the "May 6 Meeting") and was reframed to consider next steps in light of the FTC's intervening March 15, 2021 civil investigative demand.  *See* Att. 111 at 5 ("Due to regulatory scrutiny on the Prime upsell experience, we may be required to make more immediate changes, mostly likely to the UPDP CX . . . ."); *see also id.* at 9 (same, for cancellation); Dkt. #52 ¶¶ 8-13.

4

5

6

At the May 6 Meeting, attendees, including Ghani and Lindsay, agreed Amazon should move Prime's material terms into the marketing portion of the UPDP page—*i.e.*, outside of the fine-print terms and conditions.  Att. 53 at 2.  They nevertheless expressly decided *not* to adopt the "Start my Prime Free Trial" enrollment button that had caused enrollment declines (while also improving clarity) in the past.  Att. 54 at 17.  They also decided against changing the UPDP Prime decline option from a link to a more conspicuous button, on the absurd logic that doing so would introduce "undue friction" to consumers attempting to sign up.  Att. 54 at 18.  In other words, the changes approved at the May 6 Meeting stopped well short of what the company had launched and then undone in late 2020.

7

8

9

10

11

12

13

14

The undisputed facts show that Amazon decided to slow-play even these relatively modest clarity improvements, which Amazon dubbed "CX satisfaction" changes.[22]  Att. 99 at 2.  The Content Testing team estimated that, as a technical matter, the time to implement the changes in the U.S. was about two weeks.  Att. 54 at 15.  Ghani, however, did not launch the changes until February 2022, nine months after the May 6 Meeting.  The slow implementation was Ghani's deliberate decision.  At a July 14, 2021 meeting, Ghani and his direct reports provided "guidance that minimizing the business impact and phasing a rollout [of the clarity improvements]" was the priority.  Att. 58 at 2 (emphasis added); Att. 59 at 212:15-213:9.

15

16

17

18

19

20

21

22

23

[21] Amazon has asserted that Grandinetti did not attend this meeting.  He did, however, receive the memorandum prepared for the meeting.  Att. 88.

[22] Defendant Lindsay disapproved of the name "clarity" (*see supra* note 16) for efforts to clarify enrollment and cancellation, leading Defendant Ghani and a colleague to change the codename to "CX satisfaction."  Att. 99 at 2.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 26

Notably, even though the Shopping Design team urged the improvements be implemented prior to the 2021 holiday season due to "the influx of seasonal/holiday shoppers and the heightened risk of customer harm," the Prime organization resisted.  Att. 60 at 4.

In February 2022, after approving implementation of the changes, Ghani relayed the decision to Defendant Grandinetti, who, as of November 2021, directly supervised Ghani.  Att. 61 at 113:13-114:14; Att. 62 at 10; Att. 28 at 22:12-16, 24:17-24.  The improvements once again caused a steeper-than-anticipated enrollment decline.  Amazon originally estimated it would lose ███████ paying US Prime members as result of the changers, but was forced to revise that estimate up to ████████ lost members.  Att. 62 at 3 (compare first row in "Scenario 1" to first row in "Scenario 4").  Based on contemporaneous documents, only the FTC's investigation prevented Amazon from once again reversing course.  A March 2022 document prepared for Amazon leadership explained:  "If we roll back the changes that are already live in the US (or delay until Dec.), we'll recoup [the] negative impact [of the clarity changes].  However, this would postpone what we believe is an improved CX and also *raise concerns in discussions with the FTC when we meet with them in Q2*."  Att. 92 at 6 (emphasis added).  Similarly, in March 2022, Ghani urged his team to "delay as much as possible" making the clarity improvements outside of the United States "if you aren't being pressured by regulators."  Att. 61 at 136:16-18; Att. 63 at 4.  Ghani reported this purposeful delay to Grandinetti.  Att. 125.

At around this same time, the Amazon Benchmarking team—which conducted the above-described 2019 survey revealing substantial nonconsensual enrollment—returned to Ghani to inform him of their plan to revisit the issue with Grandinetti because it had not been resolved.  Dkt. #255-18 at 6.  After a lengthy discussion regarding what the Benchmarking team should tell Grandinetti, the team updated Grandinetti in private on or around March 16, 2022.  Dkt. #255-18; Att. 129 at 3.  Grandinetti requested a follow-up meeting, at which the Benchmarking team reiterated its view that the recent UPDP changes would not "fully address the [nonconsensual enrollment] issue" in part because the "visual nature of the accept and decline CTA boxes . . .

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 27

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    was regularly mentioned as a pain point by customers we interviewed." Dkt. #255-15 at 4.

2        Tellingly, Grandinetti did not mandate changes after receiving the Benchmarking team

3    report. Instead, he continued to set the tone from the top that Prime enrollment was critical to

4    Amazon's success. Following an August 2022 meeting with Grandinetti, a Prime employee

5    reported that Grandinetti directed the Prime organization to be "laser focused on driving member

6    growth." Att. 65. He added that the Prime team "need[ed] to adopt a tone of hunger for growth

7    and dissatisfaction for our current projected growth rates. Even if we hit our goals they're not

8    enough. Amazon needs us to drive higher growth." *Id.*

        ### D.    Amazon's Cancellation Survey Confirms Subscribers' Nonconsensual Enrollment.

9        It is undisputed that ███████████ of Prime subscribers have explicitly told

10    Amazon they "did not intend" to sign up for Prime. This information is obtained by Amazon as

11    part of its "cancellation survey," offered to subscribers immediately after they cancel Prime. Att.

12    72 ¶¶ 52-53. Amazon conducted the first iteration of the survey between November 1, 2018 and

13    February 28, 2019. Att. 71 at 2-4. Among ██████ U.S. respondents, █████ said that they

14    cancelled Prime because they "did not mean to sign up for Amazon Prime." *Id.* Among almost

15    ██████ U.S. respondents who had been Prime members for less than one year, █████ said they "did

16    not mean to sign up." *Id.*

17        Beginning in mid-2020, Amazon conducted a larger-scale, "standardized" version of the

18    survey and has accumulated ██████ of responses since then. Att. 72 ¶ 39. Question 3 of the

19    survey asks consumers why they cancelled Prime. One answer option is: "I did not intend to

20    sign up for Prime." *Id.* at 34. Similarly, Question 4 asks consumers to select all "additional

21    reasons" they cancelled Prime, again offering "I did not intend to sign up for Prime" as an

22    option. *Id.* It is undisputed that █████ of all Prime members who enroll through UPDP indicate,

23    in response to Question 3 or 4, that they did not intend to sign up for Prime. Att. 72 at 94

    (Figures 44-45). For SPC, the figure is █████ and, for SOSP PDP, ███. *Id.* These results do not

    include those consumers who inadvertently signed up for Prime, but still did not know they had

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 28

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    it, and therefore could not take the cancellation survey.

2        It is also undisputed that clarity changes in the UPDP, described above, correspond to

3    fluctuations in "did not intend" responses.  For example, ███ of Prime members who enrolled

4    from September-December 2020, when Amazon implemented short-lived clarity improvements,

5    later stated that they did not intend to sign up for Prime.  Att. 72 at 45-47.  Once Amazon undid

6    these changes, unintentional enrollment increased by over ███, with ███ of all UPDP

7    respondents saying they "did not intend" to sign up.  *Id.*  Then, when Amazon, in February 2022,

8    implemented certain half-measures in response to the FTC's investigation (*see supra* pp. 25-28),

9    the unintentional enrollment percentage dropped to ███ — between the ███ rate from late 2020

10   and the ███ rate following the December reversal.  *Id.*

11       Similarly, it is undisputed that almost ██████ subscribers who enrolled through the

12   first image below (Figure 17), as part of a Content Testing experiment, indicated they did not

13   intend to enroll, when compared to the second, clearer version.  Specifically, ███ of survey

14   respondents who signed up through the top image "did not intend" to sign up, compared to

15   ███ of people who enrolled through the bottom version.  Att. 74 ¶¶ 10-11; Att. 134 at 6.



*Figure 17: UPDP from January 2021 Experiment (Att. 134 at 6)*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 29

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Figure 18:  UPDP from January 2021 Experiment (Att. 134 at 6)*

In late 2020, an Amazon economist used the cancellation survey results to estimate the extent of Prime nonconsensual enrollment.  The economist concluded that ▮ of all U.S. Prime members still in their free-trial period were more likely than not to have enrolled in Prime unintentionally.  Att. 102 at 3.  Amazon disputes the significance of the economist's work—based on newfound self-criticism of its own cancellation survey—but not the accuracy of his calculations.  Att. 132 at 174:2-13.  The same economist calculated that in 2020 alone, ▮ ▮ U.S. consumers signed up for Prime unintentionally.  Att. 135 at 3.

## II.    PRIME CANCELLATION

Amazon calls the process by which Prime members cancel their subscriptions online the "Iliad."  *See, e.g.*, Att. 130 at 3.  The undisputed facts demonstrate that Amazon has complicated the Iliad by (1) making it difficult for consumers to find its entry point and misleadingly labeling the entry button "End Membership" and (2) forcing consumers to request cancellation four times, including by clicking another misleading "end" button, before honoring the request.  Amazon and Prime leadership were aware of these problems, but did nothing to fix them until taking certain half-measures in response to concerns raised by the FTC and European Commission.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 30

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### A.   Amazon Forced Consumers to Find an "End Membership" Button That Did Not End Membership.

To cancel, Prime members first had to find the entrance to the Iliad, on the "Prime Central" page.  According to Amazon, there are several ways to find the Prime Central page.  Att. 104 ¶ 36.  Prime members could navigate to their individual Amazon "Account" page by (1) clicking "Accounts and Lists" in the top right corner of the Amazon home page; (2) hovering over "Accounts and Lists" and then selecting the third link in the second column ("Account"); or (3) clicking on the three lines on the top left of the home page and then clicking "Your Account" or "Hello, [name]."  *Id.* ¶ 36(a)-(d).  Once on the Account page, the consumer then had to click a button labeled "Prime" (from among 12 other buttons) to reach Prime Central.  *Id.* at 307.

Alternatively, to reach Prime Central directly, a consumer can (1) hover over "Accounts and Lists" on the Amazon homepage and select the 15th link in the second column ("Memberships and Settings"), which brings them to a page on which they must click a white button labeled "Prime Membership Settings," or (2) hover over the "Account & Lists" dropdown menu on Amazon's homepage, then click the sixteenth option in the second column, which reads "Prime Membership."  Att. 104 ¶ 36(a); *id.* at 262, 284-85.  Finally, according to Amazon, consumers could search on Amazon.com for "cancel Prime," which results in the consumer receiving a result featuring a link to reach Prime Central.  Att. 104 ¶ 36(h).

Upon arriving at Prime Central, consumers had to locate and click a "Manage Membership" link toward the top right corner of the page, pictured in Figure 19 (Att. 103 at 28):

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 31

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2



*Figure 19:  Prime Central*

Clicking "Manage Membership" opened a menu, pictured in Figure 20, that included an "End Membership" button.  Immediately above that button, Amazon placed text reading:  "By ending your membership you will lose access to your Prime benefits."  Clicking "End Membership," however, did not either end one's membership, or result in loss of access to Prime benefits, but rather simply allowed a consumer to *start* the Iliad process.  In other words, if a consumer clicking "End Membership" reasonably thought he or she had "ended their membership," Amazon nevertheless continued billing them for Prime.

1

2

3

4

5

6

7

8

9

10



Figure 20:  Prime Central "Management Membership" Dropdown (Att. 150 at 115)

11

12    There are also two ways to proceed directly to the Iliad without navigating through Prime

13    Central.  According to Amazon, a consumer can search Google for something like "cancel

14    Prime" and then click a search result reading "Cancel Your Amazon Prime Membership."  Att.

15    104 ¶ 36(i).  That takes the consumer to an Amazon.com page, pictured in Figure 21 (Att. 150 at

16    154), titled "End Your Amazon Prime Membership" and containing the following text:  "You

17    can cancel Prime by selecting the End Your Prime Membership button this page."  Clicking the

18    "End Your Prime Membership" does not end the Prime membership, but rather puts the Prime

19    member at the start of the Iliad.  *Id.* at 158.  Consumers can reach this same misleading "End

20    Your Amazon Prime Membership" page by selecting the "Help" link all the way in the Amazon

21    footer and then clicking a button that reads, "End Your Amazon Prime Membership; Cancel your

22    membership easily via this page."  *Id.* at 120-29.

23

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 33

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6



*Figure 21: "End Your Amazon Prime Membership" Page (Att. 103 at 369)*

7

**B.    After Entering the Iliad, Consumers Must Request Cancellation Three Additional Times.**

8

9    After clicking "End Membership," the consumer has to navigate through three more

10    pages, each of which requires them to reaffirm (for the second, third, and fourth times) that they

11    want to cancel. Amazon referred to these pages as the "Marketing Page," the "Offer Page," and

the "Cancellation" Page, respectively.

12    **1.    Marketing Page**

13    The "Marketing Page" is the first page consumers encounter after clicking "End

14    Membership," assuming they have not closed their browser thinking they already completed the

cancellation process.  The page does little to disabuse Prime subscribers of the notion that they

15    *already* have cancelled their memberships, and in fact adds to that impression.   For example, in

16    one version of the Marketing Page (Declaration of Adam Rottner, Att. 3), the header thanked the

17    consumer "for being a member with us" and invited them to "take a look back at your journey

18    with Prime"—language that indicates the consumer *already* ended that "journey" when they

19    clicked End Membership.  In fact, however, the consumer needed to click a button on the bottom

of the page to continue with cancellation.  In the image below, that button reads "Continue to

20    Cancel."

21

22

23

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 34

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10



*Figure 23: Iliad "Marketing Page"*

11    More recently, as shown below (Declaration of Adam Rottner, Att. 4), the marketing

12  page tells consumers who just clicked "end membership" how many "days left" there are in their

13  billing cycle—implying that the membership will end after those "days left."

14

15

16

17

18

19

20

21

22

23

*Figure 22: Iliad "Marketing Page" (Top Half)*

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 35

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1      On mobile devices, as in the images above and below, the consumer also has no way of

2   realizing there are any more steps to take because the bottom-of-the-page "Continue to cancel"

3   button is not visible without scrolling down (Rottner Declaration, Att. 5):



*Figure 24:  Iliad "Marketing Page" (Bottom Half)*

      For much of the relevant time period, the Marketing Page presented Prime members with

an additional hurdle not shown above.  In particular, the button that is now labeled "Continue to

Cancel" was previously labeled "Cancel My Membership" or "End My Benefits," again creating

the false impression that clicking the button would result in a completed cancellation.  *See, e.g.*,

Att. 98 at 3-6 ("End My Benefits"); Att. 89 at 4 (same); Att. 105 at 5, 9 ("Cancel My Benefits");

Att. 113 at 6 (same).  Amazon, in fact, starting using the "End My Benefits" label, rather than the

less-confusing "Continue to Cancel," precisely because testing "End My Benefits" showed

"surprisingly strong results" in preventing cancellations—specifically, ███ additional

retained U.S. Prime members every year, as of 2018.  Att. 97 at 4.  There is no evidence that

Amazon considered whether these ███ retained members were simply confused, as opposed

to having made a conscious decision not to cancel.  Years later, in response to concerns raised by

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 36

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

the European Commission, Amazon reverted the button label to "Continue to Cancel."  Att. 95 at 4, 7.  That change led to more completed cancellations.  Att. 83 at 2.  Amazon decided in mid-2021 that it would make this change in Europe, but stalled doing so in the United States until October 2022.  Att. 95 at 4, 7 (Europe); Att. 107 at 3 (US).

On all versions of the Marketing Page, clicking any of the links or buttons on the page other than the "Continue to Cancel" or "End My Benefits" buttons removes the consumer from the Iliad.[23]

## 2.    Offers Page

Consumers who clicked "End My Benefits" or "Continue to Cancel" on the Marketing Page were not done.  Instead, they encountered the Offers Page.  On that page, Amazon presented alternative Prime payment plans to members seeking to cancel; in particular, as pictured below, they suggested switching from monthly to annual payments (or vice versa) or considering a student membership or membership for consumers receiving government financial assistance.  Here again, a consumer had to click "Continue to Cancel" to continue the Iliad, thereby expressing their cancellation intent for the third time.  Amazon also, for the third time, offered a "Remind Me Later" option and, for the second time, offered a "Keep My Benefits [or Membership]" option.   Att. 113 at 7.

---

[23] Amazon considered, but rejected, the idea of opening Iliad's "informational links"—such as the "today's deals" link in Figure 22 above—in new browser tabs, rather than navigating the consumer away from the Iliad.  Att. 95 at 7.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 37

*Figure 25: Iliad "Offers Page" (Att. 113 at 7)*

### 3.    Cancellation Page

On the third and final page of the Iliad (the "Cancellation Page"), consumers must, for the fourth time, confirm their desire to end their membership.  The first two options on the page, however, are "Remind Me Later" (offered for the fourth time) and "Keep My Membership" (offered for the third time, including the earlier "Keep My Benefits" button).  Consumers who click either option, or who do nothing at all, continue paying for Prime.  This page too contains elements that lead consumers to think they are done with cancellation.  Specifically, as pictured below, the progress bar at the top of the page is full, even before the consumer completes cancellation.  *See* Att. 100 at 11 (recognizing that consumers understood progress bar "to indicate all steps to be complete").  Additionally the "sorry to see you go" page header once again implies a completed cancellation—*i.e.*, that the member has already "gone."  In fact, a

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 38

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    consumer who simply leaves the page will continue to be billed for Prime.



*Figure 26: Iliad "Cancellation Page" (Att. 113 at 8)*

**C.    Amazon's Two-Page Version of the Iliad Includes Many of the Same Problems as the Three-Page Version.**

In response to European Commission and FTC investigations, Amazon launched a two-page version of the Iliad in the United States in late March 2023. *See* Att. 108 (launch announcement containing screenshots); Att. 111 at 2 (response to European Commission and FTC); Att. 95 at 4 (response to European Commission). The two-page flow removes the Iliad "Offers" page and replaces it with a shortened "Cancellation" page. Att. 108 at 4-5. It is otherwise largely unchanged from the three-page version, including the Membership Page and the steps required to reach the Membership Page.

**D.    Amazon and Its Leadership Developed the Iliad to Stop Consumers from Cancelling and Were Aware of the Confusion It Caused.**

Amazon and its leadership have long been aware of the Iliad's complexity and

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 39

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

consumers' difficulty completing it.  In fact, the complexity is a feature, not a bug:  "The goal of project Iliad was to improve [Prime's] ability to retain members who attempt to cancel their membership."  Att. 89 at 2; *see also* Att. 109 at 12 ("When a member enters the [pre-Iliad version of the Prime cancellation flow], they are presented with a series of options *designed to prevent them from canceling their membership*.  The goal of project Iliad is to *expand* our retention messaging capabilities and enable the launch of *more* retention offers." (emphasis added)).

As early as April 2018, the Amazon Shopping Design team recommended to Defendant Lindsay that Prime "[prioritize] clarification of Prime cancellation flow so that customer does not think they have finished when they have not."  Att. 75 at 9.  There was no apparent follow-up.  In the same November 2019 memorandum in which the Amazon Benchmarking team raised the nonconsensual-enrollment issue, *see supra* p. 22, they also alerted all three Individual Defendants of Iliad concerns raised by Japanese Prime members:  "When participants did wish to cancel their Prime membership, they were unsure about the process."  Dkt. #255-11 at 13.  The Benchmarking team's "firsthand analysis" "showed a minimum of 12 actions were required from the Amazon homepage to cancel Prime membership."  Again, nothing changed.

About six months later, Prime's Content Testing team reported to Defendant Ghani that, although it was aware of Iliad-related confusion, the team had instead taken on the unending task of convincing Prime executives to fix unintentional enrollment:  "While we have also identified significant room for content improvements in our cancel flow (moving CTA buttons above the fold, reducing unnecessary content on the page, reducing the number of clicks to cancel), we view the current signup upsell experience in UPDP as more critical to short term clarity and have not yet identified a minimum CX bar proposal for retention locations."  Att. 36 at 3.

Another six months later, in December 2020, the Amazon Shopping Design team reported to Ghani that "[s]elf-service cancellation can be difficult for customers to find, because the ingress is not surfaced prominently in all expected locations and/or because it uses an

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 40

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

unintuitive label . . . Through UX research, we have observed customers overlook or fail to identify with this kind of 'manage membership' language [on Prime Central], where they instead seek out the more precise term 'Cancel.'"  Att. 93 at 7-8.  The team added that it had "observed customers in UX research misunderstand their progress during self-service cancellation, sometimes abandoning the flow early thinking they had finished it."  *Id.* at 5.  They also reported that some Prime subscribers "don't realize that there are multiple steps, and . . . abandon the flow prematurely on the incorrect assumption that they finished."  *Id*. at 8.

Ultimately, at the urging of the Shopping Design team, Amazon amended the purpose of the May 6, 2021 meeting regarding nonconsensual enrollment (*see supra* pp. 25-26) to include Iliad confusion and complexity.  *See* Dkt. #140-2 at 134-35.  In the "May 6 Memo," which all three Individual Defendants received and which was prepared with Ghani and Lindsay's input (*see* Dkt. #218-1 at 6-7; Att. 88 at 2), Amazon wrote:  "Through [customer service] contact mining, cancel survey free form text, and customer studies, we are aware that some customers find the online cancellation flow hard to find and navigate."  Att. 111 at 7-8.  The memorandum also confirms Prime members' "confusion" finding the ingress to the Iliad and recognizes that the "end membership" button on Prime Central "likely sets the expectation that the CTA is not a flow but an action"—*i.e.*, that the button will immediately cancel the subscription rather than enter them into the Iliad.  *Id.*

At the May 6 Meeting, attendees, including Ghani and Lindsay, decided the "guiding principle" for the Iliad should be causing people who already decided to click "End Membership," "to pause and think a bit before cancelling."  Att. 53 at 2.  Consistent with that decision, Amazon refused to implement "1-click cancellation" because it (supposedly) was not "actually in [consumers'] best interests."  *Id.*

A June 2021 memorandum, reviewed by Ghani, confirms the Prime organization considered—in response to concerns raised by the European Commission—"improv[ing] ingress to Iliad" by "mak[ing] it easier to find Iliad from PC/account management widget," but decided

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 41

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   not to do so in order to "limit the specific commitments we make to EC."  Att. 9 at 5.  Amazon

2   estimated making Iliad easier to find would lose Prime ███████████ subscribers.  *Id.* at 8.

3   An earlier version of this document confirms Amazon also considered renaming the confusing

4   "End Membership" Prime Central button in order to make clear that the "button will not

5   immediately cancel" (Att. 79 at 4, 8), but apparently decided not to do so.  Contemporaneous

6   documents make clear Ghani was heavily involved in discussions regarding how to change Iliad

7   in response to European Commission inquiries.  Atts. 81, 82.  Ultimately, Amazon delayed

8   making even minimal changes to Iliad in the United States (such as relabeling the "End My

9   Benefits" Marketing Page button) until the fall of 2022, and did not launch a two-page version of

10  Iliad in the United States until the end of March 2023, more than two years after the FTC's

    investigation started and only months before the litigation began.  Att. 106 at 2; Att. 108 at 2.

11          Throughout this period, employees across Amazon's Shopping Design team and Prime's

12  GPX team objected to Iliad's complexity.  One Shopping Design team member wrote:  "Our

13  cancellation flow is embarrassing.  It's crazy to me how defensive they [the Prime organization]

14  are about it."  Att. 76 at 2.  A Prime GPX document was equally critical:  "The cancellation

15  experience will continue to erode customer trust and brand reputation.  The current flow has

16  significant accessibility challenges that put our members at risk of being confused at a very

17  critical moment in their membership."  Att. 85 at 9.  One Prime GPX copywriter was more blunt:

18  "The reason people are confused by the Iliad flow is that it's confusing and a UX anti-pattern[24]

19  called a Roach Motel that literally gets us posted to sites like Darkpatterns.org and the New York

    Times.  We can't get rid of that thing fast enough."  Att. 87 at 5.

20          **E.    Prime Subscribers Who Do Not Finish the Iliad Use Less Benefits Than They
                    Did Before Attempting to Cancel.**

21          Every year, ███████████ do not finish the Iliad.  Specifically, although the

22  percentage has varied over time, it is undisputed that approximately ████ of all Prime subscribers

23
    ─────────────────────
    [24] "Anti-pattern" is an alternative term for "dark pattern."

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 42

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

that enter the Iliad do not finish it.  Att. 120 at 3.  Notably, approximately ▆▆▆▆▆ of those

failed cancellers *do not use any Prime benefits* for the 90 days after the failed cancellation

(excluding the first five days of that period).[25]  *See* Att. 72 at 57 (¶ 119), 59 (Figure 28).

Additionally, the ▆▆▆▆▆ of failed cancellers do not proceed past the first Iliad page (the

Marketing Page).  Att. 130 at 2 .  Similarly, ▆▆▆ consumers who exit the Iliad take no "exit

action"—meaning, for example, that they simply close their browsers—rather than affirmatively

clicking a button or link that might signal they made an affirmative decision not to cancel.  Att.

130 at 4-5.  Amazon recognized this as evidence that "customers may think they have

successfully canceled their membership . . . and exit the flow (by exiting the window or clicking

out of the flow) when in fact, they have to confirm on the last confirmation page."  *Id.*

Amazon has asserted that consumers leave Iliad at the Marketing Page not because they

think they are finished, but because Amazon has reminded or informed them of Prime's benefits

and, therefore, they have chosen to remain Prime members.  If Amazon were correct, benefit

usage among failed cancellers would *increase* after their unfinished Iliad visit.  In fact, the

opposite is true: consumers who do not complete the Iliad are *more* likely to use zero Prime

benefits in the 90 days after exiting the flow than they were in the 90 days before entering.  Att.

72 at 58-59.  Similarly, Prime subscribers who exit the Iliad without clicking a link or button

(*e.g.*, consumers who simply close their browser) are ▆▆▆ *more* likely to have no benefit usage

in the ensuing 90 days than are Prime members who affirmatively accept an offer within Iliad to

remain Prime members.  *Id.* at 61.  In other words, Prime subscribers who enter Iliad but fail to

cancel or to affirmatively accept an offer to remain in Prime are *less* likely to use their benefits

after leaving Iliad than they were before entering it.

---

[25] This does not mean that the other ▆▆▆▆ are aware they are Prime members.  Rather, it is easy for Prime members to use Prime benefits without realizing they are doing so.  For example, Amazon defaults Prime members to Prime free shipping, meaning a consumer who thinks they have cancelled Prime can "use" their Prime shipping benefit without ever choosing to do so.  *See, e.g.*, Att. 121 at 13-17.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 43

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**F.    Amazon Redirects Consumers Who Attempt to Cancel by Phone to the Iliad.**

Until mid-2019, Amazon generally permitted customers who could locate the customer service phone number to cancel by calling customer service and speaking with an agent.  This was a problem for Amazon because customer service agents did not try to convince Prime subscribers not to cancel.  *See* Att. 124 at 2 ("[T]here is a lost opportunity to save Prime members who are in the process canceling:  [Customer Service] agents do not optimize for providing members pertinent information that encourages members to remain Prime . . . .").  Amazon "fixed" that problem by instructing customer service agents to respond to cancellation requests not by honoring the requests, but instead by sending consumers a link to enter the Iliad.  *See id.*; Att. 123 at 4-5.  Amazon estimated that by sending consumers these links, rather than simply cancelling their memberships, Amazon would "save" ███████ Prime members annually.  Att. 123 at 4.  Even customers who are able to cancel by phone must endure, on average, a nine-minute phone call to do so.  Att. 124 at 2.

## <u>LEGAL STANDARD</u>

 "Summary judgment is warranted when the evidence, viewed in the light most favorable to the non-moving party, shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Narambatal v. DHS*, --- F. Supp. 3d ----, 2025 WL 754530, at *3 (W.D. Wash. Mar. 10, 2025) (Chun, J.) (quoting Fed R. Civ. P. 56(a)).  "A fact is 'material' if it might affect the outcome of the case."  *Metro. Group Prop. & Cas. Ins. Co. v. Fite*, 738 F. Supp. 3d 1371, 1375-76 (W.D. Wash. 2024) (Chun, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "genuine" "only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Id.* at 1376 (quoting *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)).  "The moving party bears the burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law."  *Id.* (citing *Celotex Corp. v. Catlett*, 477 U.S. 317, 323 (1986)).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 44

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

## ARGUMENT

There is no genuine dispute regarding the facts establishing that Prime is a subscription program covered by the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  Nor is there any dispute regarding the manner in which Amazon enrolled consumers in Prime and the steps Amazon required to allow them to cancel.  Those undisputed enrollment and cancellation practices violate ROSCA because Amazon fails to clearly and conspicuously disclose Prime's material terms, obtain express informed consent from Prime enrollees, or provide simple mechanisms to cancel Prime.  Similarly, summary judgment is appropriate as to the Individual Defendants because there is no genuine dispute regarding material facts establishing each Individual Defendant had the authority to control or directly participated in Amazon's unlawful enrollment and cancellation practices.  Finally, in the alternative, the FTC is entitled to judgment as a matter of law regarding the Amazon's affirmative defenses.

## I.    PRIME IS SOLD WITH A "NEGATIVE OPTION FEATURE" AND IS THEREFORE COVERED BY ROSCA.

At the motion-to-dismiss stage, Defendants did not dispute that Prime is a subscription service subject to ROSCA.  *See* Dkt. #165 at 14.  Nevertheless, because Defendants have hinted that they might now challenge this conclusion, the FTC briefly addresses it here.

ROSCA's enrollment and cancellation provisions apply to "goods or services sold in a transaction effected on the Internet through a negative option feature."  15 U.S.C. § 8403.  Prime is plainly a "service" sold "on the Internet."  Therefore, ROSCA applies if Amazon sells Prime through a "negative option feature."  ROSCA incorporates the FTC's Telemarketing Sales Rule ("TSR") definition of "negative option feature":  "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  15 U.S.C. § 8403 (incorporating 16 C.F.R. § 310.2(w)).

Prime fits squarely within this definition because each month or year that a customer fails to take "affirmative action" to cancel their membership, Amazon interprets that failure as the

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 45

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   customer's acceptance to remain a Prime member and continue paying the monthly or annual

2   fee.  Other courts have reached the obvious conclusion that automatically renewing subscription

3   programs like Prime are sold through "negative option features" and therefore fall within

4   ROSCA.  *See, e.g.*, Order Denying Motion to Dismiss, *United States v. Adobe, Inc., et al.*, No.

5   24-cv-3630, Dkt. No. 84 (N.D. Cal. May 2, 2025) ("Subscriptions that automatically renew by

    default unless the consumer affirmatively cancels are 'textbook example[s] of a negative option

6   feature.'") (quoting *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 762 (C.D. Cal.

7   2020)); *FTC v. Doxo, Inc.*, --- F. Supp. 3d ----, 2025 WL 887311, at *10 (W.D. Wash. Mar. 21,

8   2025) ("The statutory definition [of negative option feature] is not as narrow as Defendants

9   argue, and courts have applied it broadly to renewal subscriptions.").

## II.     AMAZON FAILED TO CLEARLY AND CONSPICUOUSLY DISCLOSE
10          PRIME'S MATERIAL TERMS (COUNT II).

11          ROSCA requires Amazon to "clearly and conspicuously disclose[] all material terms" of

12   Prime before obtaining consumers' billing information.  15 U.S.C. § 8403(1).  "Clear" means

13   "reasonably understandable," and "conspicuous" means *readily* noticeable to the consumer."

     *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1091 (9th Cir. 2020) (emphasis added; quotation

14   marks omitted) (defining "clear and conspicuous" under Fair Credit Reporting Act); *see also*

15   Dkt. 165 at 17 (Court adopting this standard).  A "clear and conspicuous" disclosure, therefore,

16   is one that a "reasonable [consumer] would notice and understand."  *Barrer v. Chase Bank USA,*

17   *N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (defining "clear and conspicuous" under Truth in

18   Lending Act); *see also* Dkt. #84 at 7 (Amazon approvingly citing FTC statement that disclosures

19   are clear and conspicuous if they are "*easily* noticeable and understood by 'ordinary consumers'"

20   (emphasis added)).

21          The "reasonable consumer" is not an "erudite reader" inclined to carefully parse a

22   website "like a federal judge reading a statute."  *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st

     Cir. 2019).  Rather, the reasonable consumer is "an ordinary consumer acting reasonably under

23   the circumstances . . . who is not versed in the art of inspecting and judging a product."  *Elias v.*

*Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854 (N.D. Cal. 2012) (cleaned up).   As the Seventh Circuit has explained:  "In applying consumer protection laws, we do not typically hold consumers to the standard of Adam Smith's *homo economicus*, a perfectly rational human being who gathers evidence and evaluates the optimal amount of information. . . . We have limited time, computational skills, and memories, and we rationally use mental shortcuts to deal with those limits."  *See Kahn v. Walmart Inc.*, 107 F.4th 585, 596 (7th Cir. 2024).  The reasonable consumer standard therefore recognizes that "consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items. . . . This low degree of care does not make consumers unreasonable—it makes them human, and even economically rational when search costs and transaction costs are included in the utility calculus.  But it also makes them vulnerable to exploitation by unfair and deceptive practices."  *Id.* at 597.  Similarly, the Ninth Circuit has held that when applying consumer protection statutes like ROSCA, "any misleading ambiguity [in defendants' disclosures] . . . should be resolved in favor of the consumer."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010) (cleaned up) (applying principle to Truth in Lending Act).

Additionally, the FTC is not required to show that consumers were deceived or misled in order to prove a disclosure is not clear and conspicuous.  Rather, where the law requires  a "clear and conspicuous" disclosure, a disclosure that does not meet that bar is "*ipso facto* 'misleading.'"  *Id.* at 1200.  Relatedly, as the Court held at the motion-to-dismiss stage, where disclosures "on their face [are] not clear and conspicuous, . . . the Court need not consider whether a 'significant minority' of consumers were deceived."  Dkt. #165 at 18 n.4.[26]

Here, the undisputed facts prove that ordinary consumers would not readily notice and

---

[26] Even if the Court were to apply a "significant minority" test, the question is not whether a "significant minority" of consumers were "deceived" (though the FTC does clear this bar) because the FTC has not brought a deception count.  Rather, the FTC would need to establish, at most, that a "significant minority" of consumers did not "readily notice," *Walker*, 953 F.3d at 1091, Prime's material terms.  The Court can, as it did before, reach that conclusion from the face of the Prime enrollment pages or based on the undisputed empirical evidence, *see infra*.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 47

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

understand three material terms of the Prime enrollment transaction: (1) that they are enrolling in Prime, (2) that their Prime membership automatically renews, and (3) Prime's monthly cost.[27] As explained below, the Court can reach that conclusion from a facial analysis of the undisputed enrollment processes themselves. Beyond that, however, the undisputed empirical evidence regarding actual consumer behavior supports entry of summary judgment.

### A.    A Facial Analysis of the Enrollment Processes Confirms Amazon's Failure to Clearly and Conspicuously Disclose Prime's Material Terms.

The clarity and conspicuousness of disclosures can be determined as a matter of law from a facial analysis. *Barrer*, 566 F.3d at 892. This Court, in fact, ruled at the motion-to-dismiss stage that the "material disclosures in UPDP on their face were not clear and conspicuous." Dkt. #165 at 18 n.4. The Court was correct for two main reasons. First, the context in which Amazon enrolls consumers in Prime and "discloses" Prime's terms—as part of the product-checkout process—makes it unlikely consumers would look for, find, and understand the relevance of those terms. Second, Amazon's disclosures generally appear in small print, below (sometimes far below) the relevant enrollment button, and overshadowed by the marketing text and graphics on the page on which they appear. Amazon also violated ROSCA by only displaying the disclosures *after* obtaining consumers' billing information.

### 1.    The Context Within Which Amazon Displays Prime's Material Terms Makes It Unlikely Consumers Will Notice Them.

When evaluating the conspicuousness of online disclosures, "the full context of the transaction is *critical*." *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *5 (N.D. Cal. June 22, 2023) (emphasis original; quotation marks omitted). Courts properly examine "the full context of the transaction . . . to determin[e] whether a given textual notice is sufficient . . . ." *Keebaugh v. Warner Bros. Ent. Inc.*, 2022 WL 7610032, at *6 (C.D. Cal. Oct. 13, 2022) (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 26 (Cal. Ct. App. 2021)); *see also Nguyen v. Barnes &*

---

[27] These terms are all "material" because this information is "important to consumers and, hence, like to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 48

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound . . . ."). The Ninth Circuit endorsed this contextual approach in a case previously relied upon by Amazon: *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 516-17 (9th Cir. 2023) (cited in Dkt. #84 at 16, 18, 21). The Ninth Circuit explained that a user who "contemplates some sort of continuing relationship" with an entity is more likely to "scrutinize the [website] for small text" than a user "merely attempting to start a free trial." *Oberstein*, 60 F.4th 505 at 516-17 (quoting, and approvingly discussing, *Sellers*, 289 Cal. Rptr. 3d 1, 26); *see also* Dkt. #165 at 19 (recognizing *Oberstein*'s holding that when "a consumer is attempting to start a free trial, especially when it is offered as a gift," that consumer is unlikely to search the page for small-text disclosures).

　　Here, the relevant context—primarily, Amazon's strategy of embedding its UPDP and SPC Prime enrollment pages within the product-checkout process—made it unlikely many ordinary consumers would even look for Prime's material terms, much less notice that Amazon was enrolling them in a Prime free trial or that the Prime free trial automatically renewed as a paying subscription.

### a.　UPDP Context

　　As described above, consumers encounter the UPDP while attempting to purchase a product on Amazon. *See supra* pp. 4-14. That context introduces myriad problems that result in consumers being unlikely to look for, notice, or read Prime's material terms.

　　First, the UPDP does not make clear that consumers are even being given a choice regarding whether to enroll in Prime. The page header generally simply declares "we're giving you a 30-day FREE Trial of Prime"—treating the trial as an automatic add-on to the consumer's product purchase. That impression is further proven by Amazon's telling consumers what "Your Prime benefits include," in present tense, again implying the consumer need not do anything else to receive the benefits. *See supra* pp. 4-14 (Figures 4-10).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 49

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Second, Amazon increases the deception by providing a single large orange button on the UPDP, which the shopper might reasonably think is their only option for proceeding with their product purchase. Pictured below are the buttons a consumer must click to proceed with their product purchase on the four pages before reaching UPDP. Att. 4 at 15-18. The fifth button ("Get "FREE Same-Day Delivery"), by contrast, enrolls the consumer in Prime. Att. 4 at 19. Therefore, "a reasonable consumer could believe that they did not have a choice and the only path to move past the [UPDP] was to click the prominent orange button, which registered them for Prime immediately." Dkt. #165 at 23.



Third, for most of the last seven years, the UPDP enrollment button has read "Get FREE Same-Day Delivery" or similar language, again indicating the button relates only to the shopper's product purchase. *See supra* pp. 4-14. Counterintuitively, clicking the "Same-Day Delivery" button actually enrolls the consumer in Prime, *even if the consumer does not finish the product purchase*. The Court previously found that "the text of the two options in the UPDP could lead a reasonable consumer to believe that the buttons are only related to shipping speed, and not a Prime membership." Dkt. #165 at 23.[28] Or, as an Amazon user-experience research manager more bluntly stated: "how the HELL will people know they are SIGNING UP FOR A PRIME TRIAL?" Att. 138 at 4.

Fourth, far from clearly and conspicuously disclosing the UPDP Prime offer, Amazon

---

[28] In some desktop, but not mobile, UPDP versions, a gray "shadow button" beneath the "delivery" button reads "Enjoy Prime FREE for 30 days" or something similar. *See, e.g.*, Att. 4 at 19. Consumers are just as, if not more, likely to interpret that button as an alternative to the orange "Free Delivery" button as they are to read it as somehow clarifying what "Free Delivery" means. In other words, consumers interpreting the gray "shadow button" (reading "Enjoy Prime FREE for 30 days") as an alternative to the orange "Free Delivery" button may be choosing the orange button mistakenly believing that this choice *declines* Prime, when in reality, it enrolls them immediately.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 50

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

further obscures the offer by relying on consumers to have an unreasonably nuanced understanding of the distinction between *Amazon's* "*core* free shipping" and *Prime's* "*fast*, free shipping." Specifically, Amazon offers "core free shipping" to non-Prime members on all items exceeding a certain dollar amount (currently, $35). Att. 132 at 105:23-106:6. Amazon, in fact, touts this core free shipping early in the product-checkout process, telling non-Prime shoppers that they already qualify for core "free shipping" on certain items even without joining Prime. *See, e.g.*, Att. 4 at 14 ("FREE delivery"), 15 ("Your order qualifies for FREE Shipping! Select this option at checkout."), 17 ("FREE Shipping") . Then, on the UPDP page, Amazon generally offers consumers a choice between clicking to "Get FREE Two-Day Delivery" and clicking a link to decline "fast, free shipping." As a result, many consumers have no way of understanding that (1) they do not actually need to click "Get FREE Two-Day Delivery" to get the core free shipping Amazon already promised, and (2) clicking to decline "fast, free shipping" leaves them still eligible for *core* "free shipping." *See, e.g.*, Att. 132 at 100:11-101:1, 119:7-18. Reasonable shoppers, therefore, easily could think that they are clicking "Get FREE Two-Day Delivery" to accept Amazon's prior promise of core free shipping, rather than to enroll in Prime. Worse yet, Amazon sometimes tells shoppers they are "saving" money by clicking the enrollment button, even if those consumers are already entitled to free shipping. *See, e.g.*, Att. 5. In fact, the consumer is only saving money if they otherwise would have chosen to pay for *fast* shipping.

Fifth, even UPDP versions, such as the "order agnostic" UPDP, on which the orange button reads "Start FREE trial" or something similar (*see, e.g.*, Att. 11 at 15), still give consumers no reason to search out any terms—or "scrutinize the page for small text," *Oberstein*, 60 F.4th at 516-17—because there is no indication anywhere on the button, or in the page's header or marketing content, that there *are* any such terms. *See, e.g.*, *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *11 (N.D. Cal. July 31, 2023) ("[Plaintiff] undoubtedly knew that he was purchasing a subscription with Disney, but that—by itself—does not mean he should have known there was a Subscription Agreement to which he would be bound."). That is particularly

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 51

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   true here because many ordinary Amazon shoppers do not realize they have any alternative but

2   to click the orange button if they want to finish their product purchase.

3       The UPDP page therefore does not make clear the consumer is making *any* decision,

4   much less a decision to enter a "continuing relationship" with Amazon. *Oberstein*, 60 F.4th at

5   516-17. Consumers merely trying to finish their product purchase would have no reason to read,

6   notice, or even look for the small print disclosures of Prime's material terms at the bottom of the

    page.

7               **b.    SPC Context**

8       The context in which consumers encounter the SPC page and its Prime offers and

9   disclosures also makes consumers unlikely to read, notice, or look for the disclosures. As

10  described *supra* pp. 14-16, SPC is the page on which consumers complete their product

    purchase. It also contains at least two Prime offers, but, for each, Amazon fails to display

11  Prime's terms until *after* the consumer might have looked for them. For example, Amazon

12  encourages consumers to click an SPC button reading "Try Prime FREE for 30 days." At the

13  time consumers click that button, Amazon does not disclose *anywhere* on the page that Prime

14  auto-renews or its price. Instead, Amazon calls Prime "FREE" four separate times and claims the

15  free trial comes with "no commitments." *See* Att. 4 at 26. Amazon only discloses Prime's

16  material terms *after* consumers click the "Try Prime FREE" button. Moreover, Amazon only

    does so in the third block of text under the "Place your order" button. *Id.* at 27. At that point,

17  however, it is more likely than not that ordinary consumers would assume they already had

18  signed up for a Prime free trial and, when clicking "Place your order," were completing their

19  product purchase. Such a user is unlikely to "scrutinize the page for small text" or hidden terms,

20  especially terms related to Prime rather than their product purchase. *Oberstein*, 60 F.4th at 516-

21  17; *see also FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861, at *9 (N.D. Cal. Nov. 29, 2018)

22  (misrepresentations not cured by disclosure after consumer "agreed to enroll," even though

23  contract had not yet been finalized). After all, a "consumer that does not expect to be bound by

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 52                    Federal Trade Commission
                                                 600 Pennsylvania Avenue NW
                                                 Washington, DC 20580
                                                 (202) 326-3320

contractual terms is less likely to be looking for them." *Sellers*, 289 Cal Rptr. 3d at 25 (explaining that consumer buying "a single pair of socks" likely would not "expect to be bound by contractual terms").

**2.    Even Ignoring Context, Amazon's Disclosures of Prime's Material Terms Are Not Clear and Conspicuous.**

Even ignoring context and focusing purely on the visual elements of the UPDP and SPC enrollment pages, those pages do not clearly and conspicuously disclose Prime's price or auto-renewal.   Instead, the terms are generally presented in small print, below the enrollment button, often starting on the opposite side of the page as the button, and overshadowed by marketing text and graphics.

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).  This is particularly true when the law, as here, requires *clear and conspicuous* disclosures.  Moreover, courts routinely find fine-print terms and conditions like Amazon's inconspicuous.  *See, e.g.*, *Cyberspace.com*, 453 F.3d at 1198 ( "small-print disclosures" on back of printed material were insufficient to put consumers on notice they were "agree[ing] to pay a monthly fee").  Additionally, even under the laxer standards for conspicuousness applicable in contract law as opposed to ROSCA, courts are critical of, and often deem inconspicuous, disclosures located *below* the enrollment button to which they apply.  *See, e.g.*, *Nguyen*, 763 F.3d at 1178 (finding lack of "reasonable notice" of contract terms even where "Terms of Use" link appeared "directly below" the relevant button); *Lopez v. Dave Inc.*, 2022 WL 17089824, at *2 (N.D. Cal. Nov. 21, 2022) (refusing to find a hyperlink conspicuous where it was "below the 'Join' button, meaning a user could enter their mobile number and click 'Join' without reviewing the remainder of the page").  Even text immediately *above* an enrollment button may be deemed inconspicuous, especially where "other visual elements . . . draw the user's attention away." *Berman*, 30 F.4th at 856-57.  More generally, disclosures are not conspicuous if consumers must "parse through

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 53

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    confusing or distracting content and advertisements" to see them. *Wilson v. Huuuge, Inc.*, 944

2    F.3d 1212, 1221 (9th Cir. 2019).  "If everything on the screen is written with conspicuous

3    features, then nothing is conspicuous." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir.

4    2018).

5        Here, Amazon's disclosures of Prime's material terms are generally below (sometimes

6    far below) the enrollment buttons, if they appear at all.  On desktop UPDPs, the disclosures start

7    on the far-left side of the page, while the orange enrollment button is on the right.  *See supra* 4-

8    14.  On mobile UPDPs, the disclosures are sometimes not even visible when consumers click to

9    enroll.  *Id.*  On both versions, the Prime disclosures are generally far from the page's more

10   prominent marketing text and graphics and are in small print.  *See* Dkt. #165 at 24 (Court:

11   "Here, a reasonable consumer seeking to complete a purchase on Amazon's marketplace could

12   miss the small print at the bottom of the [UPDP].").  Even pages that include a price disclosure

13   outside of the fine print do so in a way that all but ensures the text will blend into the marketing

14   material on the page.  Specifically, they place the price in the same paragraph as text advertising

15   Prime's benefits (*see, e.g.*, Att. 67 at 23 (left side)) or as a comparatively small subheader

16   between a much larger header and flashier marketing graphics or images (*see, e.g.*, *id.* at 16 (left

17   side)).

18       Similarly, the SPC auto-renewal and price disclosures are the type of fine print courts

19   routinely reject.  *See, e.g.*, *Berman*, 30 F.4th 849, 857.  The SPC disclosures are in the middle of

20   the third block of text *below* the "Place your order" button, after statements about Amazon's

21   "privacy notice," unrelated "conditions of use," and other "terms."  *See* Att. 4 at 27.  In that third

22   block of text, Amazon references other unspecified "Terms and Conditions" and then, in bold

23   text in the middle of the paragraph, mentions "Prime" for the first time and discloses auto-

     renewal and price.  *Id.*  The page as a whole is packed with additional information regarding the

     consumer's product purchase.  *Id.*  Therefore, the user could easily click "Place your order"

     without ever seeing this text.  The same is true for the Prime price information displayed in the

subheader underneath the large blue text advertising the "FREE trial of Amazon Prime" that appears on the lefthand side of SPC *after* a consumer clicks to "Try Prime FREE." *Id.*

> ### B.    Undisputed Empirical Evidence Confirms Prime's Material Terms Are Not Clearly and Conspicuously Disclosed.

Although clarity and conspicuousness can be determined as a matter of law, "empirical evidence is helpful in determining what a reasonable consumer will understand and readily notice." *Rubio*, 613 F.3d at 1200.  Therefore, even though it would be proper for the Court to grant summary judgment based solely on a facial analysis of UPDP and SPC, the Court need not ignore empirical evidence.  Specifically, the undisputed results of the Prime "cancellation survey" (*see supra* pp. 28-30) show not only (as discussed in the express informed consent argument, *see infra* p. 61) that many consumers "did not intend" to enroll in Prime, but also that the percentage of unintentional enrollees increased when Amazon made its Prime disclosures less prominent and decreased when Amazon made them more prominent.  The only plausible explanation for this pattern is that the Court's prior facial analysis finding Prime's material terms to be difficult to locate is accurate.  *See* Dkt. #165 at 21-26.

> ### C.    Amazon Impermissibly Discloses Prime's Terms and Conditions *After* Obtaining Billing Information.

ROSCA unambiguously requires Amazon to disclose Prime's material terms "*before* obtaining the consumer's billing information." 15 U.S.C. § 8403(1) (emphasis added).  The Court rejected Amazon's prior efforts to avoid this requirement, holding that the "plain language of ROSCA . . . requires the billing information be collected after the disclosures, not before." Dkt. #165 at 26.  This requirement is important because consumers are more likely to understand the purpose for which they are providing their billing information if the merchant first tells them what the information is being used for.

Amazon blatantly violates this statutory requirement.  Specifically, Amazon collects consumers' billing information in connection with the consumers' product purchases, *before* making the UPDP and SPC Prime upsells.  Amazon then uses that previously-obtained billing

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 55

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    information to charge consumers who later enroll, whether consensually or not, in Prime.  *See,*

2    *e.g.*, Att. 4 at 18 (Amazon obtains billing information), 19 (Amazon makes inconspicuous

3    disclosure).  This is particularly problematic when consumers abandon their product purchase

4    after clicking a button that enrolls them in Prime, and therefore never even complete the original

5    transaction for which they provided their billing information.  Even worse, in some cases,

6    Amazon does not collect or confirm a consumer's billing information at all during their site visit

7    before enrolling them in Prime.  Specifically, if a customer has provided "default" billing

8    information on a prior visit, Amazon simply uses that information to bill the consumer for Prime.

9    *See* Att. 2 at 12.  In short, Amazon has violated the requirement that it only obtain consumer's

     billing information *after* making the required Prime disclosures.  15 U.S.C. § 8403(1).

10   ### III.    AMAZON FAILS TO OBTAIN CONSUMERS' EXPRESS INFORMED CONSENT TO AUTOMATICALLY RENEWING PRIME SUBSCRIPTIONS (COUNTS I, III).

11

12          In addition to requiring Amazon to clearly and conspicuously disclose Prime's material

13   terms, ROSCA requires it to "obtain[] a consumer's express informed consent" to those terms.

14   15 U.S.C. § 8403(2).[29]  Amazon previously conceded that ROSCA requires *at least* the same

     "unambiguous manifestation of assent" required for the formation of a contract.  Dkt. #84 at 14.

15   However, while such assent is necessary, it is not sufficient to satisfy ROSCA.  ROSCA requires

16   not just consent but "express *informed* consent."  Amazon fails to obtain express informed

17   consent in two ways:  (1) by failing to obtain *any* consent to enrollment in Prime and its material

18   terms, and (2) by failing to clearly and conspicuously disclose Prime's material terms, resulting

19   in a lack of *informed* consent.

20

21

22   ---

     [29] If the FTC proves Amazon violated ROSCA by failing to obtain express informed consent (Count III), then the
     FTC also has proven a violation of the FTC Act's ban on "unfair" practices (Count I).  *See* 15 U.S.C. § 45(a)(1)
23   (barring "unfair . . . acts or practices in or affecting commerce"); *see also FTC v. Amazon.com, Inc.*, 71 F. Supp. 3d
     1158, 1164 (W.D. Wash. 2014) ("Courts have repeatedly held that billing customers without permission causes
     injury for the purposes of asserting a claim under Section 5 of the FTC Act.").

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 56

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

A.    **Amazon Does Not Obtain Consent to Prime's Material Terms.**

1.    **Amazon Does Not Tell Consumers the Consequences of Clicking Its "Enrollment" Buttons.**

Consumers generally consent to contract terms by taking "some action, such as clicking a button or checking a box, that *unambiguously* manifests [their] assent to those terms." *Berman*, 30 F.4th at 856 (emphasis added).[30]  However, a user's button click establishes consent "only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* at 857.  Therefore, the fact that a reference to "terms and conditions" appears in "proximity" to, or even "directly above," an enrollment button is insufficient, standing alone, to establish consent.  *Id.*  Based on these principles, the Ninth Circuit in *Berman* held that consumers who clicked the green "Continue" button in Figure 27 below had not consented to the "Terms & Conditions" referenced immediately above the button.  The Court explained that although the website stated, "I understand and agree to the Terms & Conditions," it "did not indicate to the user what action would constitute assent to those terms and conditions." *Id.* at 858.



*Figure 27:  Enrollment Button in* Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022)*

Even where websites state that "by clicking" a specific button, the consumer will be deemed to have agreed to specific terms, courts find no consent where the "by clicking" statement is itself inconspicuous.  *See, e.g.*, *Cullinane*, 893 F.3d at 64 (finding consumer did not

---

[30] Many of the cases cited herein, including *Berman*, apply state contract law.  Federal courts routinely apply "ordinary state-law principles that govern the formation of contracts."  *Nguyen*, 763 F.3d at 1175 (quotation marks omitted).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 57

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

consent to terms in part because of inconspicuous "text used to notify potential users that the creation of an Uber account would bind them to the linked terms").  The Ninth Circuit, for example, expressed "skepticism" that a consumer had consented to the "Offer Details" in the gray box in Figure 28 below, despite the fact that the text immediately above the "YES" button stated:  "By clicking 'Yes,' I have read and agreed to the Offer Details to the right."  *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1259-60 (9th Cir. 2013).[31]  The court noted the relevant text, although directly above the "Yes" button, was in "small, light-colored print."  *Id.* at 1260.  The Court also considered the context of the transaction, explaining that, as here, the consumer could reasonably have clicked "Yes" to complete the purchase of the product they had been trying to buy, rather than to agree to a new contract.  *Id.; see also Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) (refusing to find consent because even though consumer checked box agreeing to hyperlinked terms, the screen on which consent was purportedly obtained "was structured as part of a process to verify a phone number," creating the inference that "the Terms of Service related only to the [phone text message] verification").

Additionally, courts have held statements *below* an enrollment button explaining the consequences of clicking the button do not create consent because "a user could . . . click [the button] without reviewing the remainder of the page."  *Lopez*, 2022 WL 17089824, at *2.  At the very least, when a company relies on a statement below the relevant button to explain the consequences of clicking the button, that explanation should be *immediately* below the button. *See, e.g.*, *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *5 (C.D. Cal June 24, 2021) (courts generally find consent "where the user is provided with an opportunity to review the terms of service in the form of a hyperlink *immediately* above or below a button that must be clicked to affirmatively acknowledge the terms") (emphasis added).

---

[31] Figure 28 is taken from the PACER version of the Ninth Circuit's opinion:  *Lee v. Intelius, Inc.*, Case No. 11-35810, Dkt. # 64-1 at 17 (9th Cir. Dec. 16, 2013).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 58



*Figure 28 (Enrollment Screen in* Lee v. Intelius, Inc.*, 737 F.3d 1254 (9th Cir. 2013))*

Here, Amazon's UPDP page fails to tell users they consent to Prime's auto-renewal and price (and, for many UPDP versions, to enrollment in Prime at all) when they click various buttons. In some versions, consumers clicked to "Get FREE Two-Day Delivery" on their product purchase on the right side of the page and then were told, on the left side of the page, below the button and in far less prominent text, that "by signing up," they agreed to Prime's terms. *See supra* pp. 4-14. The "by signing up" text is inconspicuous standing alone, but even setting that aside, ordinary consumers would not understand that "by signing up" actually meant "by clicking 'get free two-day shipping.'"

At least one other court has rejected similarly ambiguous "by signing up" language. *See Chabolla*, 2023 WL 4544598, at *5 ("The textual notice on the . . . webpage refers only to 'signing up.' . . . It is unclear whether 'signing up' means clicking the 'Continue' button . . . , completing the sign-up webflow, or something else."). On some UPDPs, the enrollment button said, "Start my 30-day FREE trial"—an improvement from "Get Free Two-Day Shipping"—but the text explaining the consequences of clicking the button was still inconspicuous (in small print

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 59

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

far from the button) and did not make clear that "signing up" referred to clicking "Start my 30-day free trial."  *See supra* p. 8.  These consent problems are compounded by the fact that some ordinary consumers reasonably would not have seen or recognized any alternative to clicking the orange enrollment button if they wanted to complete their underlying product purchase.  This Court reached the same conclusion in denying Defendants' motions to dismiss:  "[T]he [UPDP] enrollment button does not make it clear that by clicking 'Get FREE Two-Day Delivery,' the customer completed the sign-up process with no additional steps."  Dkt. #165 at 29.

Again, SPC fares no better.  Specifically, as discussed *supra* pp. 14-16, SPC *only* displays Prime's terms and conditions far below, rather than immediately below, the SPC "Place your order" button.  The full terms and conditions are the fourth set of linked terms beneath the "Place your order" button, located in the third block of text beneath the button, and are not even identified as the *Prime* Terms and Conditions.  *See* Att. 4 at 27.  Instead, Amazon simply states, "By placing your order, you agree to Terms and Conditions," after already stating the user agreed to an unrelated "privacy notice," unrelated "conditions of use," and other unspecified "terms."  Then, in the next sentence, Amazon finally says, "Your Amazon Prime membership continues until cancelled."  *Id.*  Even that sentence does not indicate that clicking "Place your order" has anything to do with Prime, rather than the consumer's originally intended product purchase.

### 2. Empirical Evidence Supports the Conclusion That Amazon Did Not Obtain Consumers' Consent to Prime Enrollment.

The Court should find in the FTC's favor on the issue of consent based on the facial analysis above.  Again, however, the empirical evidence provides further support for the FTC's claims.  Specifically, ▮ of UPDP enrollees, ▮of SPC enrollees, and ▮of SOSP PDP enrollees expressly told Amazon they were cancelling Amazon Prime because they "did not intend" to enroll in the first place.  *See supra* pp. 28-30.  After Defendants Lindsay and Ghani's decision to roll back September 2020 clarity improvements, the UPDP unintentional-enrollment percentage jumped to ▮.  *Id.*  These percentages almost certainly underestimate

nonconsensual enrollment because only a consumer that is aware they are a Prime member, and is able to navigate the Iliad (as opposed to not cancelling at all or being forced to contact customer service to cancel), can take the cancellation survey.

     **B.**    **Amazon Does Not Obtain *Informed* Consent to Prime Enrollment.**

ROSCA requires sellers to obtain consent that is both express and informed.  15 U.S.C. § 8403(2).  Consent can only be *informed* if consumers notice and understand what they are consenting to.  *See, e.g.*, *Marsh v. Zaazoom Sols., LLC*, 2012 WL 952226, at *8 (N.D. Cal. Mar. 20, 2012) (ROSCA "contemplates full disclosure and transparency of transactions to consumers").  Therefore, disclosures that are not "clear and conspicuous" "cannot serve as the basis for customers' express, informed consent." *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015).  Because the undisputed facts establish Amazon did not make clear and conspicuous disclosures, *see supra* Section I, those same facts prove consumers did not give express informed consent.  The Court already reached the same conclusion:  "[T]he failure to disclose the material terms clearly and conspicuously—namely, the failure to disclose that consumers were even signing up for Prime in the first place—means that Amazon did not receive consumers' 'express informed consent.'"  Dkt. #165 at 27.

**IV.**    **AMAZON DID NOT PROVIDE SIMPLE PRIME CANCELLATION MECHANISMS (COUNT IV).**

ROSCA requires Amazon to provide "simple mechanisms for a consumer to stop recurring charges."  15 U.S.C. § 8403(3).  "Simple" in this context means "easy." *See, e.g.*, Dictionary.com, https://www.dictionary.com/browse/simple (last accessed May 25, 2025) (defining "simple" as "easy to understand, deal with, use, etc."); *see also* Speech of Hon. Zachary T. Space of Ohio, 156 Cong. Rec. E2165-02 (Dec. 15, 2010) (ROSCA requires businesses to "provide easy ways to opt out of any agreement or subscription service, empowering consumers to control their enrollment").  Applying this easy-cancellation requirement, one court found a cancellation process violated ROSCA where, after a consumer called customer service, "instead of simply processing the cancellation and ending the call," the

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 61

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

company resorted to "a six-part 'retention' sales script aimed at convincing the customer not to cancel." *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1167-69 (C.D. Cal. 2021). The court held that "[n]o reasonable factfinder could find this mechanism 'simple.'" *Id.* at 1169.

Here, the Iliad was not simple, and the availability of other cancellation methods for a subset of consumers does not save Amazon.

### A.    Amazon's Iliad Cancellation Flow Was Not Simple.

Amazon complicated the Iliad by (1) making it difficult for consumers to find the starting point and falsely labeling that starting point "End Membership," (2) forcing consumers to request cancellation four times, sometimes including clicking a misleading "End My Benefits" button, before honoring the request, and (3) repeatedly providing links, buttons, and other distracting information designed to derail customers before they completed the process.

### 1.    Amazon Forced Consumers to Find an "End Membership" Button That Did Not End Membership.

To cancel their Prime memberships, consumers first had to enter the Iliad. As detailed above, Amazon knew that this was not a simple task. *See supra* pp. 39-42. It generally took at least three clicks and required consumers to locate a page called "Prime Central" and understand that the "Manage Membership" link on Prime Central—which was comparatively inconspicuous relative to the page's marketing material—was the ingress point to the Iliad. Assuming consumers did click on the "Manage Membership" link, they next had to click "End Membership" and intuit that, in doing so, they had not ended their membership, but instead only started the process. Other paths to the Iliad also relied on consumers finding, and then clicking, a different "end membership" button and understanding it would not immediately "end membership," despite Amazon expressly saying it would. *See supra* p. 33.

### 2.    After Entering the Iliad, Consumers Had to Request Cancellation Three Additional Times.

Consumers next had to navigate through three more pages, each of which required them to reaffirm (for the second, third, and fourth times) that they wanted to cancel. For much of the

relevant period, Amazon made that problem worse by mislabeling the only button that allowed the consumer to continue with cancellation "End My Benefits" or "Cancel My Benefits"—again creating the false impression that the consumer was finished upon clicking that button. *See supra* pp. 36-37. In fact, Amazon chose these misleading button labels precisely because they resulted in fewer people successfully cancelling their subscriptions. *Id.* The Marketing Page header also generally advanced the impression that consumers had completed cancellation by, for example, asking them to "look back" at their journey with Prime and by hiding the button to proceed with cancellation at the bottom of the page. *Id.*

> **3.      The Iliad Provided Repetitive, Distracting Information and Options.**

Just as the *MyLife* defendant unlawfully used a "six-part retention script" to complicate consumers' cancellation attempts, 567 F. Supp. 3d at 1167-69, Amazon bombarded consumers who already had chosen to end their Prime memberships with links, offers, and other information that would remove them from the Iliad. On the first page of the Iliad, for example, Amazon offered consumers links to "Start shopping today's deals!" or "start watching videos by clicking here!" *See supra* Figure 22. Sometimes, these exit-option buttons and links were the *only* clickable options available to consumers who did not scroll down the page to find the button to proceed with cancellation. For example, in Figure 23 above, the only button a consumer sees upon reaching the Marketing Page is the button to "Use your Prime benefits today." Amazon also made the deliberate decision to have these links immediately steer consumers away from the Iliad, rather than opening the links in separate browser tabs. *See supra* note 23.

The Marketing Page also offered a "Remind Me Later" and "Keep My Benefits" option, even though Amazon had already offered the "Remind Me Later" option on the Prime Central page. On the second page (the "Offer Page") of Iliad, Amazon offered alternative pricing links, such as "Switch to annual payments," "[A]re you a student?" or "Have an EBT card/receive government assistance?" *See supra* Figure 25. Amazon also, beneath a large warning icon, invited consumers to view their "Prime exclusive offers." *Id.* The second page featured a

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 63

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

"Remind Me Later" button (for the third time) and a "Keep My Membership" button (for the second time), each of which removed the consumer from the Iliad.  At the top of the third page of the Iliad, Amazon again offered "Remind Me Later" (for the fourth time) and "Keep My Membership" (for the third time) options.  Consumers who scrolled to the bottom of the page could click to finally end their membership, but only after ignoring two more links to see their "Prime exclusive offers."  *See supra* Figure 26.

### 4. Undisputed Empirical Evidence Supports a Finding That the Iliad Is Not Simple.

As described above, *see supra* pp. 42-43, there is substantial, undisputed evidence indicating that Prime subscribers who fail to complete the Iliad generally only do so because they think they have finished the process, and not because they changed their minds.  For example, ▮▮▮▮ of Iliad failed cancellers *do not use any Prime benefits* for the next 90 days.  Additionally, the fact that ▮▮▮ failed cancellers do not proceed past the Marketing Page, and do not affirmatively click a button to remain a Prime member (rather than simply closing their browsers), demonstrates that consumers believed they finished the Iliad after clicking "End Membership" and reaching the Marketing Page.  Finally, Prime subscribers who enter the Iliad but fail to cancel are *less* likely to use their benefits after leaving Iliad than they were before entering it, indicating that they were not convinced to stay by being reminded of their benefits. *See supra* p. 43.

### B. Amazon's Other Methods for Cancelling Prime Do Not Save Them from Liability.

In their Answer to the FTC's Amended Complaint, Defendants asserted they comply with ROSCA by permitting phone and email cancellation.  Dkt. #171 ¶¶ C, G.  Neither cancellation option saves Amazon.  Email cancellation in particular is an afterthought.  *See* Att. 121 at 27 ("Amazon's website does not direct individuals to this email address to cancel, but any individual who interacts with customer service via email may reply to this email address to cancel.").  Over the 4.5 years starting in January 2019, just ▮▮▮▮ Prime members cancelled

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 64

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

their membership by email, compared to approximately ███████ through Iliad.  *Id.* at 29; Att. 120 at 3.  Phone cancellation—█████████████████████ (about ████ U.S. cancellations over 4.5 years, *see* Att. 121 at 29)—is still far less prominent than Iliad cancellation.  More importantly, phone cancellation is not simple because Amazon, to prevent cancellations, instructs customer service agents to redirect callers to the Iliad, unquestionably complicating the cancellation process.  *See supra* p. 44.

## V.    THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR AMAZON'S ROSCA AND FTC ACT VIOLATIONS.

The Individual Defendants have conceded, as they must, that they are liable for Amazon's FTC Act and ROSCA violations if they "participated directly in, *or* had the authority to control, the unlawful acts or practices at issue."  Dkt. #83 at 15 (emphasis added) (quoting *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016)).  To prevail on the authority-to-control prong, the FTC need not establish *sole* authority to control.  *See, e.g.*, *FTC v. World Media Brokers Inc.*, 2004 WL 432475, at *9 (N.D. Ill. Mar. 2, 2004) (finding individual liability even where executive "did not have sole control").  Additionally, an individual can be held liable based on authority to control even if they did not "exercise" that authority.  *FTC v. Loewen*, 2013 WL 5816420, at *7 (W.D. Wash. Oct., 29, 2013).

Here, the FTC is entitled to judgment as a matter of law against all Individual Defendants on either the authority-to-control or direct-participation prongs of individual liability.

### A.    The Individual Defendants Are Liable for Prime's Enrollment Practices.

There can be no dispute that Ghani and Lindsay had the authority to control Prime enrollment (and cancellation) because *Amazon repeatedly admitted this* during the FTC's investigation.  In particular:

- On April 15, 2021, Amazon described Ghani and Lindsay as two of the three executives with "the *most consistent management authority*" over "the policies, practices, and procedures" "relating to the Enrollment and [Cancellation] process for Amazon Prime."  Att. 112 at 3-4 (emphasis added).

- On May 24, 2022, Amazon stated that Ghani and Lindsay had "consistent oversight over the Prime enrollment and cancellation process and visibility into material decisions," "would have been included in any significant discussion of . . . enrollment and cancellation," and "*were most responsible for any decisions in those areas*." Att. 131 at 2, 5 (emphasis added).

- On August 5, 2022, Amazon again described Ghani and Lindsay as two of the three individuals "who have or had *primary oversight and leadership over the Prime program*." Att. 119 at 9 (emphasis added). From March 2018 through September 2019, Ghani "was responsible for all aspects of the Prime business outside the United States." *Id.* Since October 2019, Ghani, as Vice President for Global Prime, "oversees the worldwide Prime business," including the United States, and "*resolv[es] the high-level judgments and debates within the Prime organization* and across Amazon where the Prime organization is confused." *Id.* at 9-10 (emphasis added). Until November 2021, Ghani reported to Lindsay, who was "Vice President of Prime and Marketing." *Id.* at 10. In this role, Lindsay oversaw "*all aspects of Prime* and Marketing worldwide." *Id.* (emphasis added).

Moreover, overwhelming evidence demonstrates these statements are true and that Ghani and Lindsay not only controlled Prime, but also directly participated in its unlawful enrollment practices. *See supra* pp. 18-28. For example, in 2018 and 2019, Lindsay participated in decisions not to fix enrollment-clarity issues. In 2020, Ghani and Lindsay approved certain clarity improvements before rapidly deciding to reverse course in the face of steep enrollment drops. In May 2021, Ghani and Lindsay participated in the decision to take half-measures to "clarify" Prime enrollment, with Ghani subsequently slowing the pace of those changes.

Grandinetti too had both authority to control and directly participated in Prime's unlawful enrollment practices. Since November 2021, Ghani has reported to Grandinetti rather than

Lindsay. Dkt. #171 at 6 (Amazon: "The Prime organization began reporting to Mr. Grandinetti in November 2021."); Att. 28 at 22:12-16, 24:17-24. Even prior to Grandinetti's having official Prime authority, he had *de facto* authority over, and in any event directly participated in, Amazon's June 2019 decision not to address the nonconsensual-enrollment issue if doing so would hurt Prime enrollment. *See supra* pp. 21-22. The Benchmarking team also pushed Grandinetti in 2022 to address Amazon's enrollment practices, apparently to no avail, as Grandinetti instead focused on Prime's mission to drive Amazon's growth. *See supra* pp. 27-28.

> **B.    The Individual Defendants Are Liable for Prime's Cancellation Practices.**

On cancellation, Amazon's admissions regarding Ghani and Lindsay's authority to control are equally accurate and inculpatory. *See supra* pp. 39-42. Specifically, the Shopping Design and Benchmarking teams flagged the complexity of Prime cancellation for Lindsay in 2018 and 2019, but got nowhere. The Contest Testing teams and Shopping Design teams raised the same issues to Ghani in 2019 and 2020, also without success. Ultimately, Lindsay and Ghani participated in preparing the May 6 Memo that framed the Iliad's problems for discussion at a meeting both attended. At that meeting, Ghani, Lindsay, and other attendees decided, *even with the FTC's investigation pending*, that their goal was to cause people who had already decided to "end membership" "to pause and think a bit before cancelling." Att. 53 at 2. Thereafter, Ghani participated in, and closely managed, which changes Amazon was willing, and not willing, to make in response to European Commission and FTC pressure. *See supra* pp. 41-42.

Since November 2021, the Prime team has reported to Grandinetti, indisputably giving him authority to control Prime cancellation. Additionally, Grandinetti received the May 6 Memo detailing customer confusion with Iliad, and Ghani thereafter updated him regarding progress (or lack thereof) in simplifying Iliad. *See, e.g.*, Att. 125. Grandinetti nevertheless did nothing to solve Iliad's complexity.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 67

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

## VI.    DEFENDANTS' EQUITABLE AND DUE PROCESS AFFIRMATIVE DEFENSES ALL FAIL.

A plaintiff moving for summary judgment is "not obligated to negate affirmative

defenses." *McCollough v. Johnson, Rodenberg & Lauinger*, 587 F. Supp. 2d 1170, 1176 (D.

Mont. 2008).  Rather, an affirmative defense defeats summary judgment only where a defendant

supports "each element of the affirmative defense [with] summary judgment evidence." *Id.*

Therefore, to the extent Defendants intend to rely on an affirmative defense to defeat the FTC's

liability arguments, Defendants must put forward evidence to support that defense.

Nevertheless, in the event that the Court does not grant the FTC summary judgment as to

liability, the FTC moves for summary judgment as to certain affirmative defenses, the resolution

of which would streamline trial.  In particular, summary judgment is appropriate as to

Defendants' Unclean Hands, Equitable Estoppel, and Laches defenses (collectively, the

"Equitable Defenses"; *see* Dkt. #171 at 73-74) and Defendants' Vagueness and Fair Notice

defenses (collectively, the "Due Process Defenses"; *see id.* at 65-69).  Because Defendants bear

the burden of proving their affirmative defenses, the FTC meets its summary judgment burden

by "showing that [Defendants lack] evidence of an essential element of [their] claim or defense."

*Metro Group*, 738 F. Supp. 3d at 1376.  "[T]he burden then shifts to [Defendants] to identify

specific facts from which a factfinder could reasonably find in the nonmoving party's favor." *Id.*

Here, Defendants cannot support several elements of the Equitable Defenses, and their

Due Process Defenses fail as a matter of law.

### A.    Defendants Cannot Support Their Equitable Defenses.

Defendants can only prevail on the Equitable Defenses if they prove "affirmative

misconduct" by the FTC.  Dkt. #205 at 5-10 (citing cases).  To support equitable estoppel or

laches, that affirmative misconduct must cause a "serious injustice." *Watkins v. U.S. Army*, 875

F.2d 699, 706 (9th Cir. 1989) (equitable estoppel); *United States v. Ruby Co.*, 588 F.2d 697, 705

n.10 (9th Cir. 1978) ("[E]ven if there were some allowance for laches against the government,

there is no reason why that doctrine should not be subject to at least the same strictures as

1  estoppel.").  Similarly, for unclean hands, the affirmative misconduct must be "so outrageous as

2  to cause constitutional injury."  *FTC v. Green Eq. Sols.*, 2023 WL 7107273, at *2 (C.D. Cal.

3  Sept. 29, 2023); *see also SEC v. Sands*, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995) (defendant

4  asserting unclean hands "must show such egregiousness that the resulting prejudice to defendant

5  rises to a constitutional level") (internal quotation marks omitted).  Defendants come nowhere

6  close to offering facts or evidence to establish "affirmative misconduct" or "substantial

7  injustice," and also fail to establish other elements of their estoppel defense.

### 1.    The FTC Engaged in No Misconduct.

8  Defendants allege the FTC committed "affirmative misconduct" by (1) serving witnesses

9  with civil investigative demands ("CIDs")—effectively, subpoenas for documents and

10  testimony—at their homes on or around the Fourth of July, (2) not sharing, with Amazon's

11  counsel, the FTC's CIDs to current and former Amazon-employee witnesses, (3) insufficiently

12  accommodating Amazon counsel's scheduling requests (or so Amazon claims), (4) making an

13  alleged "false statement" to one witness and "attempt[ing] to coerce" another witness not to

14  contact Amazon, (5) purportedly asking witnesses to reveal privileged information, and (6)

15  taking improper positions regarding the extent to which counsel for *Amazon* could also represent

16  *witnesses* in confidential FTC investigational hearings.  Att. 137 at 5-7.

17  If the Defendants put forth any specific evidence of these allegations in their Opposition

18  to this Motion, the FTC will address it.  Even if proven, however, Defendants' allegations do not

19  amount to the type of egregious misconduct that would justify entering judgment for Defendants.

20  Specifically, service of document and testimony subpoenas is not misconduct (even near the

21  Fourth of July), nor is keeping investigation-related information confidential from the target of

22  the investigation or refusing to honor some of counsel's "scheduling requests."  Similarly, even

23  if it happened—and it did not—making a false statement to a single witness about the extent to

which an investigation is confidential does not create a "substantial injustice."  Additionally,

Defendants' dispute with FTC staff regarding the extent to which Amazon's counsel could also

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 69

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

represent witnesses in FTC investigational hearings was resolved *in Amazon's favor* by an FTC

Order permitting Amazon's counsel to do exactly what they seek to punish the FTC for

"attempting" to prevent them from doing.[32]  Finally, the FTC will respond to Defendants'

allegations regarding "coercion" and seeking attorney-client privileged information from

witnesses if Defendants identify any examples or provide any evidence.  As described by

Defendants (Att. 137 at 5-7), however, neither claim rises to the level of a "substantial injustice"

justifying the Equitable Defenses.

> **2.    Defendants Do Not Assert Constitutional Injury to Support Their Unclean Hands Defense.**

A showing of unclean hands against the government requires proof of "constitutional

injury."  *Green Eq. Sols.*, 2023 WL 7107273, at *2.  Defendants cannot identify any such injury,

much less provide evidence to support it.  Therefore, their unclean hands defense fails.

> **3.    Defendants Do Not Identify Any Material "Affirmative Misrepresentation" to Support Equitable Estoppel.**

Equitable estoppel is only available against the government when the government has

made an "affirmative misrepresentation or "affirmative[ly] conceal[ed] . . . a material fact," and

the defendant relies on that misrepresentation or omission.  *Ruby*, 588 F.2d at 703-704; *see also*

*Baccei v. United States*, 632 F.3d 1140, 1147 (9th Cir. 2011).  Defendants have not identified

any misrepresentation or concealment of a material fact by the FTC to Defendants, or any

reliance by the Defendants on such misrepresentation or concealment.  Therefore, the equitable

estoppel defense fails.

> **B.    Defendants' Due Process Defenses Fail As a Matter of Law.**

In its Motion to Dismiss, Amazon admitted that ROSCA is a "clear statute," Dkt. #84 at

31, but argued that the FTC's "theory" of liability was unconstitutionally vague and that the FTC

had not provided "fair notice" of that theory to Defendants.  The Court rightfully rejected those

---

[32] *See* Order Granting in Part and Denying in Part Omnibus Petition to Limit or Quash Civil Investigative Demands (Sept. 21, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/2123050AmazonPTQOpinion.pdf.

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 70

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    arguments.  Dkt. #165 at 40-45.  Now, Defendants claim to "plead a traditional as-applied

2    challenge to ROSCA."  Dkt. #214 at 17.  Whether framed as a "vagueness" or "fair notice"

3    defense, Defendants' argument fails because they committed straightforward violations of

4    ROSCA's clear terms.

5          The question for Defendants' as-applied challenge is whether, "as applied to [this]

6    specific factual scenario, a reasonable person of average intelligence in [Defendants'] position

7    would be on notice that their conduct was legally prohibited."  *United States v. DeBorba*, 713 F.

8    Supp. 3d 1042, 1066 (W.D. Wash. 2024); *see also United States v. Mitchell*, 652 F.3d 387, 405

9    (3d Cir. 2011) (as-applied challenge requires showing law's "application to a particular person

10    under particular circumstances deprived that person of a constitutional right") (internal quotation

11    marks omitted).  The answer here is plainly yes because the concepts of "clear and conspicuous"

12    disclosures, "express informed consent," and "simple" cancellation mechanisms are all

13    straightforward.  "Consent" and "clear and conspicuous" are oft-invoked legal concepts,[33] and

14    "simple" has a plain meaning.  A person of ordinary intelligence, therefore, was on notice that

15    failing to obtain consent (such as by accepting unintentional enrollees), not disclosing terms

16    clearly and conspicuously (such as by putting them in fine print), and making cancellation

17    difficult (such as through misleading button labels) was illegal.

18          Defendants appear to rely on two main arguments:  (1) that the FTC is attempting to

19    impose some new standard, above and beyond that imposed by Congress in ROSCA, and (2) that

20    statements made by the FTC in the rulemaking context somehow make an act of Congress

21    unconstitutional as applied to Defendants.  Neither argument survives any scrutiny.

22          As to the first argument, Defendants claim the FTC is imposing a novel "dark patterns"

23    theory of liability (Dkt. #171 at 66) or is outlawing certain "design elements" (Dkt. #171 at 66-

---

[33] A Westlaw search within the U.S. Code for "clear! /2 conspicuous!," for example, yields 132 results.  If
Defendants' due-process argument prevails, these provisions would all be on shaky ground.  "Consent," of course, is
a ubiquitous concept.  *See, e.g.*, *supra* pp. 57-60 (discussing meaning of "consent" in contract law).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 71

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

67) or is enforcing specific requirements found in the FTC's new Negative Option Rule (Dkt. #171 at 67-68). This argument is indistinguishable from the motion-to-dismiss argument that the Defendants claim to have abandoned—specifically, that the FTC's "theory" of liability is unconstitutional. Not only has this argument been rejected by the Court (Dkt. #165 at 40-45; Dkt. #180 at 9-10; Dkt. #241 at 13-15), but it is also simply a mischaracterization of the FTC's case. The FTC does not allege that certain design elements are *per se* unlawful. Rather, the FTC argues that, taken as a whole, Prime enrollment does not clearly and conspicuously disclose Prime's material terms or obtain express informed consent, and Prime cancellation is not simple. *Cf. Barrer*, 566 F.3d at 892 (Court "need not promulgate . . . a code of conspicuousness" to evaluate whether disclosures are clear and conspicuous; "[n]o particular kind of formatting is magical").

Second, Defendants continue to rely on various statements by the FTC, made in the rulemaking context, indicating that ROSCA does not "specify" or "provide clarity" regarding how to comply with its terms. As the Court repeatedly has held (Dkt. #180 at 5-6; Dkt. #241 at 14-15), the FTC's *characterizations* of a Congressional statute are irrelevant to whether the *text of the statute* itself provides fair notice or is unconstitutionally vague, which itself is an irrelevant question given that Amazon disclaims any argument that ROSCA is *facially* unconstitutional. Additionally, Defendants continue to mischaracterize the FTC's rulemaking statements. As part of its justification for amending the Negative Option Rule—an FTC rule entirely separate from ROSCA[34]—the FTC made the straightforward observation that ROSCA does not specify *how* to obtain express informed consent or *how* to make a cancellation mechanism simple. *See, e.g.*, Dkt. #87-1 at 4. Providing additional specificity does not somehow render retroactively ROSCA's plain vague; Amazon therefore cannot use the Negative Option Rule as a tool to

---

[34] ROSCA does not authorize rulemaking, and the Negative Option Rule therefore does not implement ROSCA. Rather, the FTC promulgated the Negative Option Rule as an exercise of its general authority to "define with specificity acts or practices which are unfair or deceptive acts or practices." 15 U.S.C. § 57a(a)(1)(B).

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 72

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1  undermine an act of Congress.  In any event, even if ROSCA could in theory be unconstitutional

2  as applied to certain conduct, Amazon's violations are straightforward.

3

4                                   **CONCLUSION**

5          For the foregoing reasons, the FTC respectfully requests the Court enter judgment as to

   liability in favor of the FTC against all Defendants.

6

7                          **LOCAL RULE 7(e) CERTIFICATION**

8          I certify that this memorandum contains 20,809 words, in compliance with the Court's

9  May 22, 2025 Order (Dkt. #300).

10

    Dated: May 27, 2025                    /s/ Evan Mendelson

11
                                           JONATHAN COHEN (DC Bar # 483454)
12                                         EVAN MENDELSON (DC Bar #996765)
                                           OLIVIA JERJIAN (DC Bar #1034299)
13                                         JONATHAN WARE (DC Bar #989414)
                                           ANTHONY SAUNDERS (NJ Bar #008032001)
14                                         SANA CHAUDHRY (NY Bar #5284807)

15                                         Federal Trade Commission
                                           600 Pennsylvania Avenue NW
16                                         Washington DC 20580

17                                         (202) 326-2551 (Cohen); -3320 (Mendelson); -2726
                                           (Ware); 2749 (Jerjian); -2917 (Saunders); -2679
18                                         (Chaudhry)

19                                         JCohen2@ftc.gov; EMendelson@ftc.gov;
                                           JWare1@ftc.gov; OJerjian@ftc.gov;
20                                         ASaunders@ftc.gov; SChaudhry@ftc.gov

21                                         COLIN D. A. MACDONALD (WSBA # 55243)
                                           Federal Trade Commission
22                                         915 Second Ave., Suite 2896
                                           Seattle, WA 98174
23                                         (206) 220-4474; CMacdonald@ftc.gov

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 73

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

RACHEL F. SIFUENTES
(IL Bar #6304016; CA Bar #324403)
Federal Trade Commission
230 S. Dearborn St., Room 3030
Chicago, IL 60604
(312) 960-5617; RSifuentes@ftc.gov

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4303; JTang@ftc.gov


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 74

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320