The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

           Plaintiff,

   v.

AMAZON.COM, INC., *et al.*,

           Defendants.

No. 2:23-cv-0932-JHC

AMAZON.COM, INC.'S MOTION
FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
June 24, 2025

ORAL ARGUMENT REQUESTED

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

                                                                                    **Page**

I.    INTRODUCTION ................................................................................. 1

II.   LEGAL STANDARD ......................................................................... 4

III.  ARGUMENT ..................................................................................... 4

      A.    ROSCA Does Not Apply Because Prime Enrollment Is Not Accomplished
            Through a Negative Option. ................................................... 4

            1.    ROSCA. ....................................................................... 4

            2.    ROSCA Does Not Apply to the Prime Flows. .......................... 5

      B.    Amazon Has Not Violated ROSCA's Clear And Conspicuous Disclosure
            Requirement. ...................................................................... 8

            1.    The Challenged Prime Flows Clearly And Conspicuously Disclose
                  All Material Terms. ......................................................... 9

            2.    The FTC's Critiques Of The Prime Flows Are Legally Baseless. .......... 12

      C.    Amazon obtained express informed consent prior to enrollment. .............. 16

      D.    Amazon's Cancellation Processes Do Not Violate ROSCA's "Simple
            Mechanisms" Requirement. ....................................................... 19

            1.    ROSCA's "Simple Mechanisms" Requirement. ....................... 19

            2.    The Challenged Cancellation Processes Do Not Violate the
                  "Simple Mechanisms" Requirement. .................................... 20

                  a.    The Challenged Cancellation Processes Are "Simple." ............. 20

                  b.    The FTC Cannot Prove that the Challenged Processes Are
                        *Not* "Simple." ..................................................... 22

                  c.    Caselaw Confirms that Amazon Has Not Violated the
                        "Simple Mechanisms" Requirement. .............................. 23

            3.    Amazon Offers Multiple Unchallenged "Simple Mechanisms" for
                  Cancellation. ................................................................ 24

      E.    Enforcing ROSCA Would Violate Due Process And The First
            Amendment. .................................................................... 25

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

F.    The FTC Is Not Entitled To Civil Monetary Penalties. .......................................25

1.    The Penalties Demand Is Time-Barred.................................................26

2.    The Evidence Cannot Support an Award of Civil Monetary Penalties. ...................................................................................28

a.    Amazon Did Not Have Actual Knowledge. ...............................29

b.    The Objective Circumstances Do Not Show Knowledge..........32

3.    The FTC Cannot Seek Redress For Consumer Harm Before June 21, 2020. ....................................................................................34

IV.    CONCLUSION.......................................................................................................34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# I.     INTRODUCTION

The Federal Trade Commission filed this suit nearly two years ago with much fanfare. Its press release accused Amazon of "trick[ing] and trap[ping] people" into subscriptions for Amazon Prime—the immensely popular consumer service with millions of members. Ex. 1.[1] That accusation was tested through a discovery process that included approximately 50 depositions, tens of thousands of documents, and expert analyses on both sides. This extensive discovery has disproven the FTC's accusations. Because there is no evidence upon which a reasonable juror could conclude that Amazon's clear enrollment processes and simple cancellation methods violated the law, Amazon is entitled to summary judgment on all counts of the FTC's complaint.

*First*, the law the FTC invokes, the Restore Online Shoppers Confidence Act ("ROSCA"), does not even apply here. It is now undisputed that customers must take an affirmative step to sign up for Prime. *See* Ex. 2 at 249:4–12. Prime is therefore not one of the "negative options" that ROSCA targeted, where customers are enrolled unknowingly based on silence and inaction.

*Second*, even if ROSCA applies, the FTC lacks evidence sufficient for a reasonable juror to conclude that the challenged enrollment and cancellation processes violate the law.

Enrollment. No reasonable factfinder could conclude that Amazon has violated ROSCA's "clear[] and conspicuous[]" disclosure requirement. 15 U.S.C. § 8403(1). It is now undisputed that, before enrolling customers in Prime, Amazon discloses all material terms: Amazon informs consumers of the price, renewal terms, and cancellation rights in bold text, with links to the full terms and conditions. The FTC's corporate representative and expert admitted this in no uncertain terms. *See, e.g.*, Ex. 2 at 347:17–348:2; Ex. 4 at 105:4–112:23. And they also admitted that Amazon's terms were understandable. *See, e.g.*, Ex. 2 at 170:1–9; Ex. 4 105:4–112:23. These admissions are unsurprising, given that numerous courts have concluded that Amazon's disclosures are clear, and that even less obvious terms are conspicuous. *See, e.g.*, *Daly v. Amazon.com, Inc.*, 718 F. Supp. 3d 1378, 1387 (W.D. Wash. 2024). Without the evidence or law on its side, the FTC resorts to arguing that, under ROSCA, "clearly and conspicuously" can be

---

[1] "Ex." or "Exs." refer to exhibits attached to the Omnibus Declaration of Joseph Reiter unless stated otherwise..

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

defined only by considering dozens of undisclosed factors in "context." Adopting that reading would convert a coherent and objective test into an incoherent and subjective one—under which courts and the FTC are charged with divining and enforcing font-size and color-scheme guidelines for websites from scant statutory text.

The undisputed evidence now also establishes that Amazon "obtains a consumer's express informed consent" prior to enrollment. 15 U.S.C. § 8403(2). The FTC admits that the challenged enrollment flows all require consumers to check a box or click a button to sign up for Prime. *See* Ex. 2 at 249:4–1. And in those flows, text directly above or below the box or button explains that, by clicking, the consumer is enrolling in Prime and will be charged for the subscription. Courts have repeatedly held that similar processes satisfy the express informed consent requirements. And after almost two years of discovery, the FTC has no admissible evidence to support its assertion that reasonable consumers would somehow be tricked into joining Prime.

<u>Cancellation</u>. The evidence also shows that Amazon does not violate ROSCA's requirement to offer "simple mechanisms" for cancelling Prime. 15 U.S.C. § 8403(3). For one, Amazon offers several straightforward ways to cancel, but the FTC has developed evidence challenging only two of those methods—the desktop and mobile cancellation flows. So consumers indisputably have other "simple mechanisms" available (including email, phone, and chat) to cancel Prime. Even the two processes the FTC attempts to challenge are "simple," according to the undisputed evidence developed during discovery: Amazon's expert found that virtually all consumers studied (over 96%) could cancel Prime in less than 90 seconds. The FTC's only counterpoints are anecdotal and unreliable, and no reasonable factfinder could use them to find that the cancellation flows are objectively complicated. On this record, holding Amazon liable for the Prime cancellation processes would require rewriting ROSCA, or stretching it beyond recognition.

*Third*, interpreting ROSCA as the FTC does here would violate the Constitution, for the reasons explained in the Individual Defendants' motion. Individuals' Mot. § IV.C. A person of ordinary intelligence would not know that Amazon's enrollment and cancellation flows—which

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   require affirmative consent, clearly disclose material terms, and provide straightforward

2   cancellation, all using commonplace marketing techniques—could be noncompliant with

3   ROSCA. This lack of fair notice violates the "first essential" element of due process. *Connally v.*

4   *Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). That the FTC seeks to impose liability based on

5   Amazon's truthful speech compounds these problems. Restricting Amazon's ability to provide

6   accurate information—such as whether a customer uses Prime's benefits or the availability of

7   lower-cost alternatives to cancellation—furthers no legitimate government interest. Just the

8   opposite: the restrictions the FTC seeks may harm consumers by forcing them to make decisions

9   about enrolling in and cancelling Prime with less information, and fewer opportunities to save.

10  Because the FTC's sweeping restrictions on speech are not appropriately tailored, interpreting

11  ROSCA as the FTC urges would also run afoul of the First Amendment. These constitutional

12  problems can be avoided only by reading ROSCA to impose objective standards consistent with

13  the law's narrow purpose.

14          *Fourth*, at a minimum, the evidence cannot support an award of punitive civil penalties.

15  Even if ROSCA provides sufficient notice for constitutional purposes, the FTC has no evidence

16  that Amazon had "actual knowledge or knowledge fairly implied" that the Prime flows violated

17  ROSCA. 15 U.S.C. § 45(m)(1)(A). Congress reserved ROSCA's "onerous penalties" for

18  defendants who break the law knowing that what they did "was prohibited." *Jerman v. Carlisle,*

19  *McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010). Amazon did not have that

20  knowledge here, where even the FTC has repeatedly and publicly said that ROSCA is not clear,

21  lacks specificity, and fails to provide the requisite guidance for the industry to ensure compliance.

22  Whenever a law carries the threat of monetary fines (let alone the particularly onerous penalties at

23  issue here), scienter requirements must be strictly enforced. Here, there is no evidence that could

24  support the conclusion that Amazon somehow had the required knowledge that it was violating

25  ROSCA years before even the FTC purportedly made such a determination (under an undisclosed

26  multipart balancing test). And in all events, the demand for civil monetary penalties is plainly

27  time barred.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    For these reasons, the Court should grant Amazon summary judgment on all claims.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    ARGUMENT

### A.    ROSCA Does Not Apply Because Prime Enrollment Is Not Accomplished Through a Negative Option.

#### 1.    ROSCA.

Congress enacted ROSCA in 2010 to address a specific problem: "fraudulent" online "transactions … where a consumer intentionally purchases products or services from one company and ends up unknowingly purchasing products or services from a different, unrelated company." 156 Cong. Rec. S8053 (2010) (statement of Sen. John D. Rockefeller IV); *see also* 15 U.S.C. § 8401(3)–(8); *see also* Ex. 55 at 2 (discussing the "three aggressive sales tactics" Congress targeted). These third-party sellers bought customers' billing information from retailers in exchange for "bounties." 15 U.S.C. § 8401(4). The third-party sellers "in turn" (1) misled consumers into joining memberships during checkout on other retailers' websites, *id.* § 8401(5), and (2) charged those consumers on a recurring basis, "without ever obtaining consumers' billing information" directly, *id.* § 8401(6)–(8); *see also Gundy v. United States*, 588 U.S. 128, 142 (2019) (plurality) (statutory statement of purpose "is an appropriate guide to the meaning of the statute's operative provisions" (cleaned up)). As a result, before ROSCA, millions of consumers were unknowingly enrolled in memberships "they did not want." 15 U.S.C. § 8401(4).

With the intent to curb these specific practices, Congress passed the statute at issue here, which covers online sellers that employ "a negative option feature." 15 U.S.C. § 8403. Here, a negative option feature "means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

offer." 16 C.F.R. § 310.2(w). Under ROSCA, negative option sellers must (1) "clearly and conspicuously disclose[] all material terms of the transaction;" (2) obtain "express informed consent" before charging the consumer; and (3) provide "simple mechanisms" for cancelling recurring charges. 15 U.S.C. § 8403.

### 2. ROSCA Does Not Apply to the Prime Flows.

Amazon is entitled to summary judgment because ROSCA does not apply here.

ROSCA covers only "transaction[s] effected … through a negative option feature," *id.*, and Prime enrollment does not qualify. It is undisputed that, when Amazon extends an offer to enroll in Prime, the consumer's "acceptance of the offer" is manifested not by "silence" or a "failure to … reject … or cancel" the service, 16 C.F.R. § 310.2(w), but by affirmative conduct: clicking the sign-up button, Ex. 2. at 249:4–12; *see also infra* § III.C. Affirmative assent is the opposite of "silence" or "failure to … reject." 16 C.F.R. § 310.2(w).

It does not matter that a Prime member incurs recurring charges after accepting Amazon's offer. "Acceptance" of an offer is "manifestation of assent to" all "the terms thereof." Restatement (Second) of Contracts § 50(a) & cmt. A (1981); *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) ("[I]n construing the term *offer*, we must consider its meaning in the law of contracts."). Here, the terms of Amazon's *offer* include that a Prime member will be charged after the free-trial period (if any) and then periodically, unless the consumer cancels. *See, e.g.*, Dkt. 69 ("Am. Compl.") Att. A. In other words, the Prime enrollment offer itself includes an agreement to pay recurring charges. "[A] contract for a year's service is not split into 12 contracts by a provision that the employee is entitled to his or her pay in monthly installments." 15 Williston on Contracts § 45:1 (4th ed. May 2025). So too, Amazon's single offer to enroll in Prime does not transform into multiple offers to which the member silently assents, just because the Prime membership requires recurring payments. Once a consumer accepts Amazon's offer to enroll in Prime, there is no additional "offer" from Amazon that the customer could "accep[t]" by "silence." Thus, there is no negative option here.

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    The FTC's recent rulemaking further demonstrates that Prime is not a negative option

2    covered by ROSCA's terms. In that rulemaking, the FTC expanded the definition of "negative

3    option" to encompass programs in which "silence or failure to take affirmative action" is

4    interpreted as "*continuing acceptance* of the offer." 16 C.F.R. § 425.2 (emphasis added). Prime

5    could potentially constitute a negative option under this expanded definition, because a Prime

6    subscription continues until the member cancels it. But critically, that definition did not become

7    effective until January 14, 2025—well after the FTC filed this action; and in this action, "the FTC

8    is enforcing ROSCA (not the rule)." Dkt. 220 at 6. The only definition of "negative option" that

9    applies here is the language in 16 C.F.R. § 310.2(w), which still does not refer to continuing

10   acceptance, and cannot be fairly interpreted to mean something identical to the FTC's new

11   definition.[2] *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1200 n.3 (11th Cir. 2021) ("When

12   regulations use different words and phrases, they don't mean the same thing; they have different

13   meanings."). Accordingly, ROSCA should not be interpreted to apply to enrollment flows just

14   because they involve recurring charges.

15   What ROSCA's text says is confirmed by its purpose: eliminating hidden enrollment in

16   third-party subscription programs. Congress enacted ROSCA in response to the specific,

17   pernicious sales tactics of third-party sellers discussed above. Congress highlighted examples,

18   including consumers purchasing flowers at 1-800-Flowers.com who, after checking out,

19   encountered a pop-up offer for $15.00 cash back that, if accepted, enrolled the consumer in an

20   unrelated recurring membership, called LiveWell. Ex. 14 at 7–8. Consumers "complained that the

21   data pass process made it unclear that [they] were actually" joining LiveWell, which charged

22   consumers $11.99 per month until they "call[ed] to cancel." *Id*. Prime is nothing like these

23   deceptive memberships and their "negative option features." For one, Prime transactions involve

24   a single merchant (Amazon) and a well-known consumer membership (Prime), not a third-party

25

26   _____

     [2] Nor could the prior Negative Option Rule definition have applied to Prime, as that definition applies only to
     "product-of-the-month clubs" in which "sellers provide periodic notices offering goods to participating consumers

27   and then send—and charge for—those goods only if the consumers take no action to decline the offer." *See* 88 Fed
     Reg. 24716 at 24717.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

seller hawking an unfamiliar subscription (like LiveWell). Moreover, joining Prime requires active consent: Amazon states the terms of the Prime subscription, including that the subscription requires recurring payments. And consumers—who have given their billing information directly to Amazon—must affirmatively click to accept those terms and to sign up. Prime enrollment thus bears no resemblance to the misleading, post-transaction upsells for third-party memberships (charged to billing information obtained through "data pass") that ROSCA aimed to stamp out. The Court should not stretch the statutory text to cover a circumstance so far beyond "the primary mischief" ROSCA "was designed to counteract." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 649 (2013).

Decisions concluding that ROSCA applies to all recurring subscriptions on the Internet are mistaken. *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d. 757, 762 (C.D. Cal. 2020), held that "automatic renewal default for … subscriptions is a textbook example of a negative option feature," but it merely assumed that all monthly renewals constitute new offers and new acceptances—an assumption that is false, at least here. *See FTC v. Doxo, Inc.*, 2025 WL 887311, at *10 (W.D. Wash. Mar. 21, 2025) (making the same assumption). *MyLife* was also wrong to take the mention of "recurring charges" in the "simple mechanisms" requirement, 15 U.S.C. § 8403(3), as evidence that a "subscription or program that renews automatically" necessarily constitutes a negative option, *MyLife.com*, 499 F. Supp. at 762. That mention of "recurring charges" shows only that Congress expected some "transaction[s] effected on the Internet through a negative option feature" to involve a recurring charge, 15 U.S.C. § 8403; it does not show that recurring charges are sufficient to create a negative option.

The logic of *United States v. Adobe, Inc.*, 2025 WL 1303419 (N.D. Cal. May 2, 2025), is equally faulty. *Adobe* reasoned that consumers did not affirmatively consent to the terms of Adobe's annual, paid monthly subscription at the time they purchased that subscription because "[t]he relevant time for consumer action is not at the time of purchase but at the time of renewal." *Id*. at *8. But that is not what the relevant text says. The plain definition of a negative option feature looks to how the consumer "accept[s]" the seller's "*offer*." 16 C.F.R. § 310.2(w)

(emphasis added). And, as explained, under basic principles of contract law, periodic payments for an ongoing service do not constitute separate offers. Thus, consumers affirmatively accept Amazon's single "offer" to join Prime at the time of purchase. Because Prime does not use a negative option feature, Amazon is entitled to summary judgment.

### B. Amazon Has Not Violated ROSCA's Clear And Conspicuous Disclosure Requirement.

Even if ROSCA applies here, summary judgment for Amazon is warranted on all Counts, because the FTC cannot show that Amazon has violated any of ROSCA's requirements for negative-option sellers.[3]

ROSCA requires first that companies "clearly and conspicuously disclose[] all material terms of the transaction." 15 U.S.C. § 8403(1). ROSCA itself does not define "clear and conspicuous." But cases interpreting other consumer statutes hold that "[c]lear means 'reasonably understandable,'" while "[c]onspicuous means 'readily noticeable to the consumer.'" *Gilberg v. Cal. Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir. 2019) (quoting *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010)).

Under this standard, the adequacy of a disclosure must be "judged objectively, not subjectively." *Hrdina v. World Sav. Bank*, FSB, 2013 WL 12172993, at *3 (N.D. Cal. Apr. 29, 2013). "[A] subjective inquiry ... has no place in the analysis." *Smith v. Jenkins*, 718 F. Supp. 2d 155, 167–68 (D. Mass. 2010). In addition, "the focus is on 'the typical buyer exercising ordinary caution,' not 'the most obtuse consumer.'" *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (citations omitted). And here, the ordinary consumer is someone familiar with e-commerce. *See Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. June 24, 2019), *aff'd*, 815 F. Appx. 612 (2d Cir. 2020) (ordinary internet users "know that there are terms and conditions attached when they ... order merchandise on Amazon … not because a loud, brightly-colored notice on the screen tells them so, but because it would be

---

[3] Because the lone claim under the FTC Act borrows part of ROSCA's substantive standard and adds no additional basis of liability, the FTC Act claim (Count I) is analyzed concurrently with the equivalent ROSCA claim (Count III). So Count I falls with Count III.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

difficult to exist in our technological society without some generalized awareness of the fact"). The FTC has no evidence upon which a reasonable juror could conclude that the Prime enrollment flows would not be reasonably understandable to the ordinary online consumer. Amazon is therefore entitled to summary judgment on Count II.

### 1. The Challenged Prime Flows Clearly And Conspicuously Disclose All Material Terms.

There is no dispute that Amazon discloses the price of a Prime membership, that the free trial converted into a paid membership, and that consumers were enrolling in Prime—the only material terms of Prime enrollment that the FTC has ever identified. *See* Dkt. 165 at 21.

Each of the challenged flows discloses in bold font that "Your Amazon Prime membership continues until cancelled," followed by the price of a Prime membership. *See, e.g.*, Am. Compl. Atts. A-F, G-6, H-6, I-3, J-6, K-4, L-7, M, N-8, O-5, P-2.[4] Each flow also includes at least one page stating that the user "authorize[s] [Amazon] to charge" the user's payment method "after [the user's] 30-day free trial." *Id*. And although those disclosures alone were more than sufficient to identify the material terms, each of those pages also provides a hyperlink to the Amazon Prime Terms and Conditions that describe the program's terms in more detail. *Id*. Again, the FTC does not—and cannot—dispute any of the foregoing facts.

To the contrary, the FTC's corporate representative, Amanda Basta, *admitted* that the flows disclose all material terms. Ex. 2 at 347:17-348:2 (Q. "For every one of the flows that are at issue in the case, now …, Amazon discloses the material terms of Prime on the same page in which the customer is clicking a button to sign up for Prime; correct? A. They appear there, yes. Correct."). She *admitted* that none of the enrollment flows makes any false statement about the Prime terms. *Id*. 402:7–11. And she *admitted* that she understood the Prime terms. *Id*. 170:1–9 (acknowledging that the witness signed up for Prime and understood she was signing up for it when she did so). Likewise, the FTC's liability expert *admitted* that the flows disclose all material terms, *admitted* that the enrollment flows do not contain a single false statement, and *admitted*

---

[4] The Prime Video flow omits the word "Amazon" but otherwise contains the same language.

that any user who read the text on the page—or even only the bolded text—would see the

material terms. Ex. 4 at 105:4–112:23, 187:9–18.

Multiple courts (including in this District) have held that nearly these exact disclosures for

Amazon programs are clear and conspicuous. *Heinz v. Amazon.com, Inc.*, 2023 WL 4466904, at

*2 (E.D. Cal. July 11, 2023) (Amazon's terms were "conspicuous" where they were "contained in

language directly below" action buttons); *Viveros v. Audible, Inc.*, 2023 WL 6960281, at *7–8

(W.D. Wash. Oct. 20, 2023) (holding Audible disclosures were clear and conspicuous); *Nicholas

v. Amazon.com, Inc.*, 740 F. Supp. 3d 1099, 1103 (W.D. Wash. 2024) (dismissing claim that

Amazon failed to clearly and conspicuously disclose automatic renewal terms for Subscribe &

Save program); *Daly*, 718 F. Supp. 3d at 1387 (concluding that "Amazon's subscription and

cancellation terms are sufficient under" California and Oregon autorenewal laws). To find

otherwise, this Court would have to disagree with the well-reasoned opinions of multiple other

courts.

Most striking, the disclosures in the challenged enrollment page in *Daly* are nearly

identical to the disclosures in the challenged flows in this case, and even the design is strikingly

similar, as shown below:

### *Amazon Prime Checkout Page – Free Trial Subscription*



AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax



*Daly*, Am. Compl. ¶ 69 (redactions and red box added for purposes of complaint); Ex. 5 at slide 11 (SOSP Flow). Similarly, although the layouts at issue in *Viveros* were slightly different, the text of the disclosures—explaining the price of the subscription, that the membership would continue, and that the user can cancel any time—is nearly identical, as shown below:



*Viveros*, Compl. ¶ 41; Am. Compl., Att. I-5 (TrueSPC flow). Presented with essentially the same flows at issue here, the courts in *Daly* and *Viveros* granted Amazon's motions to dismiss on the ground that the disclosures were sufficient. In doing so, the courts rejected the idea that any discovery or "context" could demonstrate the opposite of what they could observe themselves: the flows clearly and conspicuously disclose all material terms. Any holding to the contrary in this case would be an unjustified departure: there are no material factual differences that could warrant a different result here and in *Daly* and *Viveros* (or any of the other cases just cited).

What is more, courts have held that flows with terms that are even less conspicuous— including where terms are disclosed only behind a hyperlink, rather than visible on the same page—comply with laws requiring conspicuous disclosure. In *Keebaugh v. Warner Brothers Entertainment Inc*., 100 F.4th 1005, 1021 (9th Cir. 2024), for instance, the Ninth Circuit held that providing hyperlinked terms of use on the same page where the consumer manifests assent constitutes an objectively conspicuous disclosure. *See Dohrmann v. Intuit, Inc*., 823 F. Appx. 482, 484 (9th Cir. 2020) (material terms accessible only by hyperlink were conspicuous, even when the hyperlink was the lightest font on the screen and was clicked by less than .55% of users); *Arena v. Intuit Inc*., 444 F. Supp. 3d 1086, 1092–93 (N.D. Cal. Mar. 12, 2020) (describing disclosures that the Ninth Circuit deemed conspicuous in *Dohrmann*), *rev'd,* 823 F. Appx. 482 (9th Cir. 2020). The Prime flows at issue here disclose the material terms on the same page as the offer (even in bold text); plus, those flows provide a hyperlink to the full Prime Terms and Conditions. If the latter alone is sufficient, as the Ninth Circuit has held, then the combination of both certainly passes muster. Against this backdrop, there is no question that the Prime flows clearly and conspicuously disclose all material terms, as numerous courts have held. There is nothing in the discovery that contradicts these objective facts.

### 2.    The FTC's Critiques Of The Prime Flows Are Legally Baseless.

The FTC and its expert criticize the Prime enrollment flows based on design choices— such as font size or color—that are nowhere prohibited by ROSCA. For example, the FTC says the disclosures' font size is too small. But the FTC's corporate representative admitted that

ROSCA does not require a particular font size, and that she was unaware of any document identifying what font size is required to be compliant with ROSCA. Ex. 2 at 218:6–10, 319:18–320:1. Likewise, the FTC takes issue with the Prime enrollment flows' color schemes. But the FTC's corporate representative admitted that ROSCA does not require that disclosures be made in any particular color. *Id.* at 219:16–21. The FTC also accuses Amazon of using "dark patterns" through its word and design choices, *id.* at 106:18–107:20, while admitting that the FTC is not aware of any statute or law that so much as uses the phrase "dark patterns" and "[t]here is no per se prohibition on the use of dark patterns," however they might be defined, *id*. at 96:20–99:4. In short, the FTC is accusing Amazon of violating ROSCA based on design choices or cross-sell offers that the law undisputably does not prohibit.

This is not to say that every font size and color is consistent with the law. But where, as here, there is no dispute that the disclosures were made and that the FTC's corporate representative and expert could read and understand them, the FTC must come forward with actual evidence that the disclosures are likely to be missed—for example, because of unusually small font size, or text that blends in with the background. No such evidence exists here.

Far from tricking consumers (as the FTC asserts), the design elements in the Prime enrollment flows are commonplace, such that consumers are likely to be familiar with and understand them. Ex. 6 ¶ 276. For example, the autorenewal and pricing disclosures are "in bold font type," which "provides a contrast to the regular font type that is predominantly used in the rest of the page." *Id.* ¶ 138; *see also Capps v. JPMorgan Chase Bank, N.A.*, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023). The flows present these disclosures "consistent with where consumers would typically expect to find that information, located where they accept or confirm their enrollment in the Prime free trial." Ex. 6 ¶ 28(c). And, like many websites, the flows use different colors and sizes when distinguishing between call-to-action features that decline rather than accept an offer, to "help[] consumers navigate pages with more ease," by using "visual differences (e.g., using different colors and shapes) for multiple buttons with different purposes on the same page." *Id.* ¶ 140; *see* Ex. 6 at Ex. 55 (comparing Prime enrollment flows to other

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 13

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

enrollment flows); *see also* Ex. 7 ¶ 53 (user interface design expert opining that Amazon's enrollment flow design "likely works to the advantage of many customers, especially repeat customers, who prefer that the [user experience] emphasize actional steps to complete their checkout process").

The FTC's second key critique is about the "context" of the enrollment processes. The FTC claims that Amazon unlawfully interrupts a consumer's shopping experience with a Prime membership upsell or cross-sell, while admitting that "there's no bar" on presenting such offers. Ex. 3 at 443:5–19. Nor has the FTC developed any evidence to support its context argument. To the contrary, the evidence shows that "cross-sells during the checkout process" are "a commonly used online feature that is consistent with consumers' expectations about online shopping experiences." Ex. 6 ¶ 93; *see also Id.* ¶ 168 ("It is standard business practice to present customers with a call-to-action that requires a response (e.g., to purchase additional products, acquire add-ons, join a membership program, provide feedback about their experience)."). And those cross-sells are often free trial offers. Because "free trials" like these "are a commonly used feature on websites and online services," "many, if not the majority, of consumers are familiar with free trials offered by online businesses" and "with cancelling a paid digital subscription before the free trial ends." *Id.* ¶ 44. "Thus, many consumers who purchased products on Amazon['s] website and received the 30-day free trial offer were likely familiar with the concept of free trials and aware that, if they signed up for the free trial, some type of fee would be applicable at the end of the free trial period if they did not cancel before then." *Id.* ¶ 80.[5]

In short, the Court should decline the FTC's invitation to wade into disputes about font size, color schemes, and subjective context. As the FTC admits, those requirements are found nowhere in the law. Nor are they consistent with the objective inquiry that this Court must apply. *See Hrdina*, 2013 WL 12172993, at *3.

---

[5] In deciding Amazon's motion to dismiss, the Court credited the FTC's argument that the context weighed against adequate disclosure. *See FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1318 (W.D. Wash. 2024). However, the Court did not have the benefit of this evidentiary record demonstrating that consumers often encounter similar offers and are adept at dealing with them. The FTC has no evidence to the contrary.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

The FTC's expert analysis also provides no basis to overcome summary judgment. Dr. Chetty's "cognitive walkthrough" opinion is nothing more than one person's subjective and unsupported opinion about the Prime enrollment flows, *see* Ex. 8 ¶ 9; Ex. 9 ¶ 10; *see also id*. at ¶¶ 26-49 (describing Chetty's failure to provide evidentiary support for opinion), and Amazon has moved to exclude it for that reason. One person's subjective opinion is not sufficient to overcome a motion for summary judgment, as "a subjective inquiry ... has no place in the analysis." *Smith*, 718 F. Supp. 2d at 167–68.

Dr. Chetty's "think-aloud study" suffers from the same flaw (among others). That study observed a handful of participants as they narrated their interactions with a fantastical subscription candy service called CandyForever, supposedly modeled on Prime. Ex. 10 ¶ 292. Through this "think-aloud," Dr. Chetty essentially collected a handful of additional subjective opinions and presented them as evidence. *See* Ex. 8 ¶ 132. Adding a few subjective opinions together does not make them objective—particularly where Dr. Chetty assigned only 10 subjects per condition and created an artificial environment on a made-up website for a dissimilar service, rather than allowing the subjects to review the actual flows at issue. *See id.* "[T]he plural of 'anecdotes' is not 'data,'" particularly where the anecdotes are not even about the flows in dispute. *Garcia v. Veneman*, 224 F.R.D. 8, 9 (D.D.C. 2004). Such anecdotal evidence is insufficient to overcome summary judgment. *See In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 498 (E.D. Pa. 2016) (granting summary judgment where plaintiffs presented only anecdotal evidence).

Finally, adopting the FTC's view of the law—which rests on indeterminate and arbitrary prohibitions on words, color, or font sizes that morph depending on the circumstances—would violate due process and the First Amendment. *See infra* § III.E; *cf. Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail."). The Court should grant

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 15

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   Amazon's motion for summary judgment on Count II and hold that Amazon clearly and

2   conspicuously disclosed Prime's material terms.

3       **C.      Amazon obtained express informed consent prior to enrollment.**

4           The Court should also grant summary judgment in Amazon's favor on Counts I and III,

5   which allege a violation of ROSCA's "express informed consent" requirement. 15 U.S.C. §

6   8403(2). A consumer provides express informed consent if "the consumer takes some action, such

7   as clicking a button," after being informed of the material terms and told that taking that action

8   will trigger the transaction. *Keebaugh*, 100 F.4th at 1014 (quoting *Berman v. Freedom Fin.*

9   *Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)).

10          As explained above, every enrollment flow adequately discloses the material terms of the

11  transaction. *See supra* § III.B. And every enrollment flow requires the user to affirmatively click

12  a button to enroll. For example:

13  - "Start your Prime FREE trial" (SOSP). Ex. 5 at slide 11.

14  - "Place your order"—where the user added a free Prime trial to the order, as shown on the
        same checkout page, which states: "A 30-day FREE trial of Amazon Prime has been
15      added to your order." (SPC, TrueSPC). *Id.* at slide 26; Am. Compl. Att. J-7.

16  - "Get FREE Prime Delivery with Prime" (TrueSPC). Am. Compl. Att. J-7.

17  - "Sign up for Prime" (TrueSPC). Am. Compl. Att. J-7.

18  - "Start your free trial" (Prime Video). Ex. 5 at slide 29.

19
20          What is more, other language on the page, in addition to the text of the button itself,

21  confirms and elaborates on the effect of clicking the button. Depending on the flow, text directly

22  above or below the call-to-action button states either:

23  - "By signing up, you acknowledge that you have read and agree to the Amazon Prime
        Terms and Conditions and authorize us to charge your default payment method ... or
24      another available payment method on file after your 30-day free trial," or

25  - "By placing your order, you agree to Terms and Conditions, and authorize us to charge
        your default payment method or any other payment method on file."

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    This text makes it even more clear to a reasonable consumer that by clicking the action button—

2    for example, to "Sign up for Prime," "Place your order," or "Start your free trial"—the consumer

3    is enrolling in Prime and will be charged for that subscription.[6] The act of clicking the button

4    therefore demonstrates the user's express informed consent.

5          Other elements of the design—including the positioning, size, and color of the enrollment

6    button—further put consumers on notice that clicking the enrollment button provides their

7    consent. For example, "Amazon uses call-to-action features of different color (e.g., yellow or

8    blue) ... with a yellow button presenting a call-to-action feature and a blue hyperlink presenting

9    an alternative option." Ex. 6 ¶ 170; *see also id*. ¶¶ 104–05 (explaining that Amazon often uses

10   "orange and yellow buttons to indicate actions related to the purchase of products"). A reasonable

11   consumer would readily understand that a yellow (or orange) button on Amazon.com is likely to

12   indicate a purchase. Similarly, it is common in effective UI design for "the 'accept' and 'decline'

13   options to be adjacent to one another." *Id*. ¶ 168. The Prime enrollment flows do exactly that. So

14   when a reasonable consumer sees a blue or gray "No thanks" link next to an orange or yellow

15   "Start your Prime FREE trial" button, they are likely to understand that clicking the button

16   triggers a Prime purchase.[7]

17         Just as courts have held that flows similar to the flows challenged here clearly and

18   conspicuously disclose material terms, so have courts held that similar flows obtain express

19   informed consent. *See Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1173, 1177 (W.D.

20   Wash. Dec. 10, 2014) (finding Amazon had "secure[d] meaningful consent" to the Prime terms

21   and conditions because the plaintiff "click[ed] a button next to text that state[d] 'you

22

23   _____

     [6] Additionally, expert analysis shows that unintentional enrollment in Prime is rare. *See* Ex. 11 at 18.

24   [7] The enrollment button in the UPDP flow on which the Court focused in its motion to dismiss order said "Get FREE Same-Day Delivery," attached to a grey box stating "Enjoy Prime FREE for 30 days," and followed by text

25   confirming that the user has "read and agree[d] to the Amazon Prime Terms and Conditions." Ex. 5 at slide 18. The Court held that such disclosures were insufficient at the motion to dismiss stage, *Amazon.com*, 735 F. Supp. 3d at 1322, but subsequent evidentiary development—including, for example, expert reports—demonstrates that a

26   reasonable consumer would have understood clicking the button to demonstrate consent. But even if it were not, the enrollment button in the UPDP flow is an outlier, in that other enrollment buttons are more explicit in describing that

27   clicking the button initiates a Prime subscription. At a minimum, the Court should grant Amazon's motion for summary judgment on the other flows, which would significantly narrow the case for trial. *See* Fed. R. Civ. P. 56(a).

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 17

acknowledge that you have read and agree to the *Amazon Prime Terms and Conditions*"); *Adams v. Amazon.com, Inc.*, 2023 WL 4002534, at *1 (W.D. Va. June 14, 2023) (finding that user "agreed to Amazon's Conditions of Use" "by clicking on the continue button" to sign-in to Prime, when "underneath that button" the page disclosed that "By continuing, you agree to Amazon's Conditions of Use"). This Court should reach the same result.

Again, the FTC does not have evidence sufficient to create a material factual dispute. The FTC relied heavily on an internal Amazon survey of a subset of cancelling Prime members to attempt to show that customers sign up unintentionally. But discovery has disproven the accuracy of that survey and shown that the survey cannot be used for the FTC's purpose. The FTC bears the burden to show that the survey is admissible by proving that it was "conducted according to generally accepted [survey] principles." *Monster Energy Co. v. Vital Pharms., Inc.*, 2025 WL 1111495, at *1–2 (9th Cir. Apr. 15, 2025) (affirming exclusion of internal survey because proponent failed to carry that burden). The FTC has no evidence, for example, of the survey's "principles, design, or methodology." *Id.* at *2. To the contrary, the only record evidence demonstrates that the survey was *not* structured in a way to "provide any scientific, valid, or informative evidence that consumers were purportedly misled into unintentionally enrolling in Prime." Ex. 11 at 16. The survey was a customer satisfaction "exit" interview of a small subset of cancelling users who chose to respond to a survey. Because the respondents were not a representative sample of Amazon's larger subscriber base, the results were intended to be directional and track changes over time. *See id.* ¶¶ 49-55; Ex. 12 at 40677. The results are also prone to multiple biases, including non-response bias, self-selection bias, and negativity bias. Ex. 11 at 9. That is particularly true given the leading nature of the survey questions, which likely introduced additional response biases, such as demand effects, focalism, acquiescence bias, and order effects. *Id.* at 10. Because the FTC cannot carry its burden to demonstrate that the internal survey is admissible, and "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment," *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Cv. P. 56(e)), the survey does not constitute evidence sufficient to overcome

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 18

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Amazon's motion for summary judgment. The Court should grant summary judgment in

Amazon's favor on Counts I and III.

### D. Amazon's Cancellation Processes Do Not Violate ROSCA's "Simple Mechanisms" Requirement.

If ROSCA applies here, then Amazon must "provide[] simple mechanisms for a consumer

to stop recurring charges." 15 U.S.C. § 8403. To win under this standard, the FTC must show that

Amazon's cancellation processes cannot be readily understood and performed by reasonable

consumers. Because the FTC's evidence does not clear that bar, Amazon is entitled to summary

judgment on Count IV. Alternatively, that Count fails as a matter of law because Amazon

provides at least three "simple" cancellation "mechanisms" other than the two that the FTC has

challenged in this suit.[8] And that is all that ROSCA requires.

### 1. ROSCA's "Simple Mechanisms" Requirement.

ROSCA nowhere defines the phrase "simple mechanisms," so the Court must apply the

phrase's "plain meaning at the time of enactment."[9] *Tanzin v. Tanvir*, 592 U.S. 43, 46–48 (2020).

The ordinary meaning of "simple" is "readily understood or performed." Merriam Webster's

College Dictionary (11 ed. 2011). And a "mechanism" is a "process … by which something is

done," *id.*, or "[a] system of parts that operate or interact like those of a machine," Ex. 13. Putting

these definitions together, ROSCA requires cancellation "processes" that are "readily understood

or performed." But critically, ROSCA's plain terms nowhere require that *every* cancellation

method a company offers be "simple." Nor does the law forbid non-simple methods of

cancellation (so long as there are "simple mechanisms").

Congress made clear in enacting ROSCA that the "mechanisms" ROSCA requires are

those "already used by most legitimate e-commerce companies selling goods and services

---

[8] Indeed, it may be undisputed that Amazon offers more than three mechanisms. The FTC's corporate representative acknowledged that "a mechanism to pause" enrollment in a negative option "[c]ould be" a "way for a consumer to stop recurring [] charges" and further testified that "[f]or at least some period of time," pausing a "Prime membership ... stops recurring charges." Ex. 15 at 755:4–17, 756:1–7. And it is undisputed that Amazon allows consumers to pause their Prime memberships during the cancellation flows at issue.

[9] This Court has not already definitively interpreted the "simple mechanisms" standard. *See Amazon.com*, 735 F. Supp. 3d at 1323 (deciding motion to dismiss without parsing the statute's text).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

through negative option sales." Ex. 55 at 4. At a time when some e-commerce companies offered only onerous phone or in-person cancellation options, *see* Ex. 14 at 20–24, ROSCA merely aimed to level the playing field, by requiring "[*a*]*ll* companies" to "provide the consumers with simple, convenient ways to cancel … via the Internet or through e-mail," Ex. 55 at 4 (emphasis added).

Finally, as the FTC admits, ROSCA's standard is also objective: It asks about the "ordinary" or "reasonable consumer." *See* Ex. 15 at 718:12–720:9; 86 Fed. Reg. at 60825 (applying an "ordinary consume[r]" standard under ROSCA); *see also Amazon, Inc*., 735 F. Supp. 3d at 1315 (this Court acknowledging that a "reasonable consumer" standard applies to ROSCA's "clear and conspicuous" disclosure requirement). And under this "reasonable consumer" standard, it is not enough for the FTC to show that a handful of consumers did not readily understand or complete a cancellation process, or even that a small percentage of hypothetical reasonable consumers would not readily understand or complete the process. *See Tavernaro v. Pioneer Credit Recovery, Inc*., 43 F.4th 1062, 1068 (10th Cir. 2022) (explaining the "reasonable consumer" standard under the FTC Act).

### 2. The Challenged Cancellation Processes Do Not Violate the "Simple Mechanisms" Requirement.

The FTC has no evidence that would allow a reasonable juror to conclude that the Prime cancellation methods at issue are *not* "simple." To the contrary, undisputed evidence demonstrates that reasonable consumers can readily understand and complete both the desktop and mobile cancellation processes.

#### a. The Challenged Cancellation Processes Are "Simple."

Survey evidence and expert analysis demonstrate that the cancellation processes the FTC challenges are "simple."

*Survey evidence*. Using generally accepted survey techniques, Amazon's expert, Dr. Ronald Wilcox, presented actual Prime members with a simulated portion of the Amazon.com website and found that the participants could readily locate, understand, and complete the desktop versions of the Prime cancellation processes. Ex. 17 ¶¶ 15, 19. In that survey, 99.8% of the 530

respondents located the cancellation processes starting from the Prime Central webpage, and 96.4% paused or ended their Prime membership. *Id.* ¶¶ 15, 47; *id.* at Ex. 10. And they performed these tasks quickly, taking 47 seconds on average to locate the cancellation flow and, once inside the flow, taking 28 seconds on average to pause or end their memberships. *Id.* ¶¶ 15, 48; *id.* at Ex. 11, 15, 49; *id.* at Ex. 12. In total, respondents spent an average of just 74 seconds cancelling. *Id.* ¶ 50; *id.* at Ex. 13. Any reasonable factfinder would conclude that a cancellation process that over 96% of real users could complete in less than 80 seconds is "simple." And, as discussed further below, during discovery, the FTC developed no contrary testimony.[10]

    *Industry comparison*. Although Amazon's survey evidence should be definitive, the analysis by Amazon's marketing expert, Dr. Donna Hoffman, proves the same point. That empirical analysis demonstrates that the Prime cancellation processes are on par with those offered by 48 other popular digital membership services. Those services' cancellation processes have many of the same features that the FTC objects to here. *See* Ex. 6 ¶ 292; *id.* at Ex. 74. For example:

- *Cancellation flow entry point*. Every other service put the entry point to its online cancellation flow on a "manage my account" page. *Id.* ¶ 294; *id.* at Exs. 75–76. None of the services placed a cancellation call-to-action feature on its landing page. *Id.* ¶¶ 187, 294–296.

- *Multiple pages*. Cancelling 98% of the comparable services online involved navigating to multiple web pages. Ex. 6 ¶ 298; *id.* at Exs. 77–78. The industry's near-universal use of multiple pages is unsurprising: studies show that spreading information across multiple pages benefits consumers by reducing consumer error and allowing them to better process information. *Id.* ¶¶ 212–15.

- *Alternatives and benefits of the program*. A supermajority of the membership programs presented consumers with alternatives to immediately cancelling, *id.* ¶ 300; *id.* at Ex. 79–80, and 80% mentioned the benefits of their programs during the cancellation process, *id.* ¶ 302; *id.* at Ex. 81, 83. These practices, too, benefit consumers by providing them with information relevant to the decision to cancel. *Id.* ¶¶ 188–90. In fact, the FTC's corporate representative agreed that presenting a "customer with an offer or a discount in the cancellation flow is [sometimes] okay" and that some "customers would actually benefit

---

[10] The FTC cannot create a genuine dispute about this survey evidence by pointing to subscribers who entered the cancellation flow but did not cancel. *See, e.g.*, Ex. 18 ¶ 112. Prime members may exit the cancellation process for many reasons, including because they are informed about Prime's benefits or accept a more favorable payment plan. Ex. 17 ¶ 47 n.95. The relevant question under ROSCA is whether the cancellation process is "simple" for those who *actually want* to cancel their memberships. To answer that question, Dr. Wilcox told survey participants to navigate the simulated website "as if they wanted to cancel their Prime membership." *Id.* ¶ 47 n.95.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

from an offer where they could lower the price of their subscription." Ex. 15 at 739:11–740:5.

The FTC objects to these features of the Prime online cancellation processes as confusing and unreasonably burdensome, but Dr. Hoffman's unrebutted empirical analysis establishes that these features are familiar (and thus understandable) to consumers and standard among "legitimate e-commerce companies." Ex. 55 at 4. Dr. Hoffman presents compelling evidence—beyond Amazon's definitive survey—that the cancellation processes at issue are "simple."

### b.    The FTC Cannot Prove that the Challenged Processes Are *Not* "Simple."

After two years of discovery, the FTC has no evidence that could reasonably support the opposite conclusion. The FTC attempts to show lack of simplicity using Dr. Chetty's expert report, but Dr. Chetty merely offers anecdotes and her own subjective views—when she is not applying the wrong legal standard. That is not enough to overcome summary judgment.

Dr. Chetty's "cognitive walkthrough" of two of the challenged cancellation flows is entirely subjective opinion, without systematic evidentiary support. For example, although Dr. Chetty concludes that the cancellation flows "are confusing to some consumers," Ex. 10 at 1, at no point during her "walkthrough" does Dr. Chetty offer evidence that any design element actually "confused," "distracted," or "[wore] down" any consumer, *e.g.*, *id.* ¶¶ 222, 250; *see also* Ex. 9 ¶¶ 10, 52–53, 55, 59, 62, 65–66. The FTC cannot sustain its case based on Dr. Chetty's say-so. *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("[A]n expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment."); *see also Textron Inc. ex rel. Homelite Div. v. Barber-Colman Co.*, 903 F. Supp. 1546, 1552–53 (W.D.N.C. 1995) ("[A]n expert's subjective opinion is insufficient to withstand a motion for summary judgment because '[the court is] unprepared to agree that 'it is so if an expert says it is so.'" (quoting *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993)).

Dr. Chetty's anecdotal "think-aloud study" of 30 participants is no better. Dr. Chetty claims that two participants had trouble cancelling, Ex. 10 ¶ 355, and that others expressed feeling "frustrat[ed]," *id.* ¶ 356, because "cancellation had too many steps" and "many options and signposts," *id.* ¶ 356(i). But the difficulties of two individuals and the feelings of a few others are not evidence; they are anecdotes, and anecdotal evidence cannot create a dispute of material fact and overcome summary judgment. *Garcia*, 224 F.R.D. at 9; *In re Zoloft*, 176 F. Supp. 3d at 498.

Moreover, as a matter of law, Amazon's use of a multistep process that incorporates save offers and warnings does not violate ROSCA. By choosing the word "mechanism[]," 15 U.S.C. § 8403, Congress authorized companies to provide cancellation processes that have multiple, "connected parts," Ex. 13 ("A system of parts that operate or interact like those of a machine."); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Congress' choice of words is presumed to be deliberate."). So nothing in the term "mechanisms," nor in any other term in ROSCA, prohibits a multistep process. What is more, alternative options and warnings are commonplace in cancellation processes. *See e.g.*, Ex. 6 ¶ 217 ("[T]he FTC is complaining about practices that are commonly used for membership programs."); *Id.* ¶¶ 226–28; Ex. 8 ¶¶ 9(a)(iii), 92 (save offers), 106 (warnings), 111 (emphasizing benefits). And, as discussed, Congress had no intention of banning industry-standard practices when it enacted ROSCA. The Court should reject the FTC's effort to add extratextual requirements to ROSCA.

### c.    Caselaw Confirms that Amazon Has Not Violated the "Simple Mechanisms" Requirement.

Finally, the limited caselaw on the "simple mechanisms" standard confirms that Amazon is entitled to summary judgment. Those cases found violations of ROSCA where the cancellation mechanisms were in fact inaccessible to consumers. *See* Compl. ¶ 50, *FTC v. Cardiff*, No. 18-cv-2104 (C.D. Cal. Oct. 10, 2018) (alleging that consumers could not reach the defendants); *United States v. MyLife.com*, 567 F. Supp. 3d 1152, 1160 (C.D. Cal. 2021) (finding that "even when customers attempted to contact MyLife by telephone, customers frequently did not reach or speak

to an agent," leading as many as 50% of customers to abandon their attempts to cancel); *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16 (D. Nev. May 16, 2015) (explaining that defendants failed to communicate any mechanism for cancelling). Even after extensive discovery, the FTC has zero evidence that the Prime cancellation processes are inaccessible. If anything, these cases highlight the simplicity of the Prime processes and confirm that Amazon is entitled to summary judgment on Count IV.

### 3. Amazon Offers Multiple Unchallenged "Simple Mechanisms" for Cancellation.

Summary judgment for Amazon on Count IV is warranted for another, independent reason: Amazon offers at least two simple methods of cancellation not challenged by the FTC. That satisfies ROSCA.

The plain language of ROSCA only demands that negative-option sellers "provide[] simple mechanisms" for cancellation. 15 U.S.C. § 8403(3). That is all. ROSCA does not demand that every cancellation method a company offers be "simple." Nor does it prohibit non-simple methods of cancellation, if there are other "simple mechanisms." ROSCA also nowhere forbids a company from voluntarily providing an extra cancellation method that is not "simple." For example, a company could offer consumers the option to cancel in person. That option might not be "simple" for the ordinary consumer. But a company's decision to offer in-person cancellation—*in addition to* other "simple mechanisms" for cancellation—would not give rise to a ROSCA violation. Rather, the plain language of the statute requires either that the "mechanisms" that comprise the company's single method of cancellation to cancel be "simple" or that the company have one or more "simple mechanisms" for cancellation.

Reading ROSCA otherwise would "produce an absurd ... result which Congress could not have intended." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982). It cannot be that a company that "provides" five "simple mechanisms" for cancellation violates ROSCA if it offers a sixth method (e.g., in-person cancellation) that the FTC claims is insufficiently "simple." But meanwhile, the company complies with ROSCA if it never offers a sixth method. After all,

Congress's aim in enacting the law was to give consumers "convenient ways to cancel." Ex. 55 at 4.

Here, it is undisputed that Amazon offers at least three methods—phone, email, and chat—for consumers to cancel their Prime subscriptions, beyond the desktop and mobile cancellation processes that the FTC challenges. *See* Ex. 19 at 30; Ex. 6 ¶ 37. The FTC does not dispute that these other methods exist. *See* Ex. 2 at 56:22–57:2. Nor has the FTC developed any evidence that these methods are not "simple." *See, e.g.*, Ex. 2 at 375:8–376:10 (FTC's corporate representative acknowledging that the FTC does not know how long these methods take). Because there is no dispute that at least three of the methods of Prime cancellation are "simple," summary judgment for Amazon on Count IV is warranted.

**E.    Enforcing ROSCA Would Violate Due Process And The First Amendment.**

Amazon is also entitled to summary judgment because enforcing ROSCA here would be unconstitutional. For the reasons outlined in the Individual Defendants' motion, ROSCA's "simple mechanism" requirement is unconstitutionally vague, both facially and as applied. *See* Individuals' Mot. § IV.C. ROSCA's "clear and conspicuous" disclosure requirement is likewise so standardless on its face as to violate due process. *Id*. And as further explained in the Individuals' motion, both provisions—at least as the FTC asks the Court to apply them here— violate the First Amendment by overly restricting protected speech without any countervailing substantial government interest. *Id*. Amazon joins the Individual Defendants' constitutional arguments. All of these concerns counsel the adoption of the objective and narrow reading of ROSCA advanced in Amazon's motion. *See United States v. Hansen*, 599 U.S. 762, 781 (2023). And Amazon has not violated ROSCA under that reading, for the reasons already outlined.

**F.    The FTC Is Not Entitled To Civil Monetary Penalties.**

At a minimum, summary judgment is warranted for Amazon on the FTC's demand for civil monetary penalties. There is no view of the evidence that could support such an award. And, in all events, the demand for civil monetary penalties is time-barred, because the FTC failed to bring it within five years of accrual of its claims, and tolling is not available.

### 1.    The Penalties Demand Is Time-Barred.

A demand for civil penalties is barred when not brought "within five years from the date when the claim first accrued." 28 U.S.C. § 2462; *see also FTC v. Braun*, 2024 WL 449288, at *10 (S.D.N.Y. Feb. 6, 2024). Here, the underlying claims accrued no later than 2014 and 2016, because the FTC alleges that the Prime enrollment and cancellation flows were violating ROSCA and the FTC Act as of these dates. Ex. 3 at 458:3–6, 459:17–20; Ex. 20 at ROG 10 ("Amazon's Enrollment Flows have violated ROSCA and Section 5 since at least 2014, and its Cancellation Flows since at least 2016."); *id.* at ROG 8 ("Amazon launched the Iliad [cancellation] Flow in 2016 and did not substantially change it in the United States until in or about April 2023."). Accordingly, the FTC only had until 2019 and 2021 to seek penalties for claims based on the Prime enrollment and cancellation flows, respectively. *See* 28 U.S.C. § 2462. Because the FTC did not file this lawsuit until 2023, its penalties demand is untimely.

The FTC cannot argue for later accrual dates, because the relevant limitations periods began on the dates of "*first* accru[al]." 28 U.S.C. § 2462 (emphasis added). That language does not allow for a "continuing violation" theory. *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671–73 (10th Cir. 2016) (a "violation first accrue[s] when [it] commence[s]," and even if "some form of violation exists beyond the first day," accrual does not "reset").[11] Nor does it permit a plaintiff to delay accrual under the discovery rule. *See Gabelli v. SEC*, 568 U.S. 442, 452 (2013) (holding that the discovery rule does not apply to § 2462); *Clarke v. Pac. Gas & Elec. Co.*, 501 F. Supp. 3d 774, 786 (N.D. Cal. 2020) ("The date when the claim first accrues under section 2462 is the date of the underlying violation, not the date of discovery.").

The FTC appears to seek tolling on the basis that Amazon somehow "concealed the causes of action" during the FTC's pre-suit investigation. FAC ¶¶ 239-55. But this theory could not permit the FTC to pursue penalties for violations involving the enrollment flows, as any right to seek such penalties expired in 2019, years before the FTC's pre-suit investigation. And regardless, the FTC

---

[11] *See also HEAL Utah v. PacifiCorp*, 375 F. Supp. 3d 1231, 1250 (D. Utah 2019) (holding a "continuous violation" "does not "reset" § 2462's statutory clock"); *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) ("We generally adopt the construction that starts the time limit running when the cause of action accrues." (cleaned up)) *Clarke v. Pac. Gas & Elec. Co.*, 501 F. Supp. 3d 774, 788 (N.D. Cal. 2020) (similar).

1  cannot demonstrate an entitlement to "fraudulent concealment" tolling, which would require it to

2  prove that Amazon "affirmatively misled it, and that [the FTC] had neither actual nor constructive

3  knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts."

4  *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988); *see also SEC v. Jones*,

5  476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007) (applying similar elements to claim governed by § 2462).

6       *First*, the FTC cannot demonstrate that it lacked "constructive" knowledge of its claims,

7  which are based on Prime's *public* enrollment and cancellation flows. Ex. 2 at 89:20–90:1

8  (acknowledging that those flows have always been "available to the public"). As the FTC's 30(b)(6)

9  witness agreed, "someone could have gone on [the Amazon website] in 2014 or 2015 or 2016 and

10  seen what the FTC would contend is [an] enrollment flow that violates ROSCA" and "someone

11  could have gone on in 2016 or 2017 or 2018 and ... publicly viewed Amazon's cancellation flow

12  as it existed at the time that the FTC now contends violated ROSCA." *Id.* at 90:2–91:2. Nor can the

13  FTC dispute its "actual" knowledge, because it has refused to disclose the dates on which it learned

14  relevant facts. *See* Ex. 21 at ROG Nos. 9-15; *Doe v. Willets Unified Sch. Dist.*, 2010 WL 2524587

15  (N.D. Cal. June 23, 2010) ("[P]laintiff cannot use at trial any evidence that she does not allow

16  defendants to discover.").

17       *Second*, the FTC cannot prove that it was diligent and misled. For years prior to the

18  investigation, the FTC received customer complaints that it now alleges show a ROSCA

19  violation. *E.g.*, Ex. 22. But the FTC ignored these complaints, even as lawyers on its investigation

20  team were themselves enrolling in Prime. *See* Ex. 23 at 274:10–275:1 (the only FTC attorney

21  initially assigned to the pre-suit investigation signed up for Prime "[p]robably" "[m]ore than

22  seven years" ago (i.e., 2017); Ex. 24 at 199:1-13 (the only FTC investigator assigned to the pre-

23  suit investigation testifying that he has been a Prime member for over 10 years).

24       After the investigation began, Amazon promptly produced documents disclosing the very

25  information the FTC now says proves its case, including a survey indicating that certain

26  customers reported having mistakenly signed up for Prime, Ex. 25 (produced in May 2021), and

27  customer complaints reporting difficulty cancelling Prime, Ex. 26 (produced in December

2021).[12] Yet the sole FTC investigator assigned to the matter "didn't review any of the documents that Amazon produced." Ex. 24 at 30:2–5. The only other FTC attorney on the investigation until April 2022, Katherine Johnson, acknowledged that "she wouldn't have the capacity to devote much time and attention to the matter," Ex. 27 at 168:16–169:7, waited months before even opening Amazon's productions, Ex. 59, cannot recall if she ever reviewed all the documents that Amazon produced, Ex. 23 at 130:11–131:16, and was removed because "the needs of this case were not compatible with her other obligations," Ex. 15 at 592:20–593:21.[13]

In sum, the FTC's claims accrued in 2014 and 2016, any right to demand civil penalties expired in 2019 and 2021, and the FTC is not entitled to toll the limitations period as to any claim. Accordingly, the FTC's demand for civil penalties is time-barred.

### 2. The Evidence Cannot Support an Award of Civil Monetary Penalties.

The FTC has no evidence from which a reasonable factfinder could conclude that the FTC proved the factual prerequisites for an award of civil monetary penalties. Congress reserved these "onerous penalties"—up to $50,000 per violation—for defendants who break the law knowing that what they did "was prohibited" by the law. *Jerman*, 559 U.S. at 583–84. The FTC can recover civil monetary penalties only when a defendant violates a rule "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); *see also id.* § 8404(b). This language provides a "mistake-of-law defense." *Jerman*, 559 at 584; *id.* at 630 (Kennedy, J., dissenting) ("[T]here is no doubt that § 45(m)(1)(A) permits a mistake-of-law defense."); *United States v. Dish Network LLC*, 954 F.3d 970, 978 (7th Cir. 2020) ("[Section] 45(m)(1)(A) includes a variation on an ignorance-of-the-law defense.").

At the motion to dismiss stage, the Court allowed the FTC to proceed with its claim for civil monetary penalties based on the more relaxed standard for pleading knowledge. *FTC v.*

---

[12] Even if the FTC's "concealment" allegations were true (they are not), they would not amount to anything more than "unwillingness to divulge [the] allegedly wrongful activity," which is insufficient for tolling. *See SEC v. Wyly*, 950 F. Supp. 2d 547, 557 (S.D.N.Y. 2013) (denying tolling of an SEC enforcement action under § 2462).

[13] Johnson then applied to work *at Amazon*, explaining in her employment application that she wanted to help protect the company from "[the FTC's] overreach." Ex. 58 at 3.

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 28

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   *Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1333 (W.D. Wash. 2024) ("[O]n a motion to dismiss …

2   'Plaintiff need only plausibly state Defendants had knowledge or were on notice that the

3   [applicable law] applied." (citing *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080,

4   1100 (S.D. Cal. 2024)); *see also Stratics Networks*, 721 F. Supp. 3d at 1100 ("In the pleading

5   context, '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

6   generally.'"). But this is summary judgment, and after more than two years of discovery and

7   dozens of depositions, the FTC still has no evidence from which a reasonable juror could

8   conclude that Amazon had either (1) "actual knowledge" that its conduct was prohibited by

9   ROSCA or (2) knowledge "fairly implied" by "objective circumstances" that its business

10  practices were prohibited by ROSCA. 15 U.S.C. § 45(m)(1)(A); *see also id.* § 8404(b).

11                   **a.    Amazon Did Not Have Actual Knowledge.**

12          First, there is no evidence that Amazon had "actual knowledge" that its conduct violated

13  ROSCA. In order "to have 'actual knowledge' of a piece of information, one must in fact be

14  aware of it." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020); *see Unicolors,*

15  *Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 184-85 (2022) (a defendant with a mistaken

16  understanding of the law does not have actual knowledge that it is violating the law). To begin,

17  the FTC never took any actions that put Amazon on notice that its conduct violated the law. It

18  provided no formal statement or guidance telling Amazon its conduct was unlawful. Although the

19  FTC is alleging that Amazon's public flows violated ROSCA from 2014 on, the FTC admittedly

20  did not advise Amazon at any point "from 2014 through" filing the complaint in this action on

21  June 21, 2023, "that Amazon's enrollment flow or cancellation flow violated ROSCA." Ex. 2 at

22  79:14–80:20. The FTC's corporate representative could not "identify a single communication"

23  through which the FTC told Amazon, prior to this litigation, that the Prime flows violated

24  ROSCA. *Id.* at 84:2-8. This is true even though the Prime flows have always been "available to

25  the public," *id.* at 89:20–90:1, and members of the FTC's litigation team personally signed up for

26  Prime, *id.* at 40:3–13. In other words, the FTC itself did not know, from its own interactions with

27

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 29

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Amazon's public flows, that those flows violated ROSCA. There is no evidence Amazon knew as much, years before the FTC.

There is no evidence that Amazon was otherwise "in fact aware" that its conduct violated ROSCA. Amazon witnesses repeatedly testified that they believed Amazon's flows complied with the law and that Amazon acted lawfully at all times. *See, e.g.*, Ex. 29 at 163:12–21, 192:16–18 ("[W]e never put anything out that we thought … would not be [compliant]."); Ex. 30 at 133:15–21 ("Any time we are aware of specific requirements, we comply with them."); Ex. 31 at 124:25–125:19 ("If there are regulatory instructions or instructions that are made clear … , we will follow them."); Ex. 32 at 149:20–23 ("My sense and all of the sense of the Prime team was that our sign-up experience was clear from [a] legal regulatory view"); Ex. 33 at 67:23–68:2 ("[M]y understanding … was that everything was completely fine from a legal perspective"), 217:19–218:7, 237:14–18; *see also* Ex. 34 at 101:4–13; Ex. 35 at 214:18–22.

The documents also show that Amazon believed its practices were consistent with the law. *See* Ex. 36 (explaining that while "the legal standards for sign-ups and cancellation do have room for interpretation" Amazon's flows "have been evaluated and designed to comply with applicable law"). The FTC apparently wants to rely on documents, including a handful of customer complaints, that the FTC believes show that Amazon knew that certain flows were deceptive. The documents do not show even that. At most, they show that Amazon holds itself to a "high bar" and that, because a very small proportion of consumers were confused by Amazon's enrollment and cancellation flows, Amazon was "looking for ways to make [its] process as clear for customers as [it] could." Ex. 37 at 101:13–102:8; *see also* Ex. 30 at 54:22–59:16, 135:5–17, 136:6–8 (explaining documents actually reflect that an "irreducible minority" of Amazon's large and diverse customer base report difficulties with sign up and cancellation regardless of steps Amazon takes to increase clarity); *id*. at 23:3–26:7, 58:3–7; Ex. 31 at 46:26–47:5, 48:8–16; *see also id*. at 49:11–21. Amazon had "no interest in customers signing up for Prime mistakenly" and worked to address the small number of consumer frustrations of which it was aware. Ex. 37 at 130:11–12. *See also id*. at 144:19–24.

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 30

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

But even if the documents could show that Amazon had knowledge that its flows were misunderstood by some customers, that alone could not support an award of civil monetary penalties. The plain language of Section 5(m)(1)(A) requires that the FTC establish *both* knowledge that an act "is unfair or deceptive" *and* knowledge that the act "is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A) ("with actual knowledge or knowledge fairly implied … that such act is unfair or deceptive *and* is prohibited by such rule") (emphasis added); *Rehaif v. United States*, 588 U.S. 225, 230 (2019) ("[W]e normally read the statutory term 'knowingly' as applying to all the subsequently listed elements."). If knowledge that an act was unfair or deceptive alone were sufficient, Congress would not have included the separate, additional requirement that the defendant must have acted with knowledge that the act violated the law. This "statutory language is not superfluous." *McDonnell v. United States*, 579 U.S. 550, 569 (2016); *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004) (reiterating the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

It is not enough to show actual knowledge, at summary judgment, that Amazon is a big company that has lawyers. Certainly that cannot be enough when, at a minimum, there are reasonable views of the law that are inconsistent with the FTC's expansive (and unannounced) position. "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing … violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n. 20 (2007). The FTC cannot link the premise—that Amazon has lawyers—to any *evidence* of actual knowledge of ROSCA violations. The FTC's corporate representative could not say whether anyone in the Prime organization was knowledgeable about ROSCA. Ex. 2 at 133:1–4, 134:16–20. The evidence thus "fall[s] well short of actual knowledge." *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 395–96 (S.D.N.Y. 2023) (evidence that defendant knew of contracts stating that corporation complied with a law "f[e]ll

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 31

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    short" of showing actual knowledge, "as it d[id] not definitively establish that [he] knew of the …
2    Act and its statutory commands").

3                      **b.      The Objective Circumstances Do Not Show Knowledge**

4            There is also no evidence of "objective circumstances" from which Amazon "should have
5    known [any] act was unlawful." *Dish Network*, 954 F.3d at 978. The "knowledge fairly implied"
6    standard is high one. *See CFTB v. CashCall, Inc.*, 2018 WL 485963, at *14 (C.D. Cal. Jan. 19,
7    2018) (explaining that "knowledge fairly implied on the basis of objective circumstances" is a
8    higher standard than "recklessness"), *rev'd in part on other grounds*, 35 F.4th 734 (9th Cir.
9    2022).

10           As the Seventh Circuit indicated in *Dish Network*, if a rule is not clear on its face, a
11   defendant's legal misunderstanding prevents an award of civil monetary penalties. 954 F.3d at
12   979. It is not clear at all that ROSCA could prohibit the commonplace practices the FTC now
13   says ROSCA bars. The FTC acknowledges that ROSCA is devoid of "details" or "clarity" needed
14   to alert businesses of the broad scope the FTC reads into the law. *See* Individuals Mot. § IV.C.
15   State attorneys general also struggled to make sense of ROSCA and reported to the FTC that they
16   needed additional clarity to effectively enforce it. 88 Fed. Reg. 24716, 24723 (Apr. 24, 2023).
17   ROSCA itself "lacks specificity as to how informed consent should be obtained or how clear and
18   conspicuous disclosures should be made," reported state attorneys general, and "new regulatory
19   provisions [we]re necessary to establish specific, clear rules to help businesses' compliance
20   efforts" and so that states could "identify nonconforming practices." *Id*. at 24723. No reasonable
21   factfinder could fairly infer knowledge that Amazon's practices were unlawful from the law
22   itself.

23           Nor has the FTC provided clarity from which knowledge could be fairly inferred. To this
24   day—*11 years* after the beginning of Amazon's supposed ROSCA violation—the FTC has not
25   identified any changes that it believes Amazon must make to bring the Prime flows into
26   compliance with ROSCA. This is despite repeated requests throughout discovery for this
27   information. Nor has the FTC, or any court of which Amazon is aware, publicly identified an

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 32

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

example of a ROSCA-compliant enrollment or cancellation flow. Ex. 15 at 662:6–10. The FTC has suggested that guidance is not even possible, because "whether or not a disclosure is clear and conspicuous," "whether or not you obtained informed consent," and "whether or not a mechanism to cancel is simple" require "context-specific" evaluations. Ex. 2 at 71:9–20; *see also id.* at 211:1–2 (likening ROSCA to a "soup" with untold numbers of ingredients); Ex. 15 at 723:15–724:9 (admitting it is still possible to violate ROSCA even when complying with FTC guidance). With respect to cancellation, the FTC privately applies a 20-plus factor test with no standard for how to balance or weigh factors, *see id.* at Ex. 2 at 349:17–350:9; 363:1–2, which is not in the statute and has never been disclosed to the public in any FTC document, *id.* at 353:8–20.

No reasonable factfinder could conclude that Amazon should have known, in the face of the FTC's comments about ROSCA's ambiguity, *see* Individuals' Mot. § IV.C, lack of clarifying guidance, *see id.*, and long silence about Amazon's well-known public practices, that ROSCA barred Amazon's practices, *see United States v. Protocol*, 4:96-cv-00703, Dkt. 155 (D. Minn. May 21, 1997) (granting motion for summary judgment that civil monetary penalties were not available when the FTC had previously investigated the defendant for compliance without taking any action). Indeed, when considering other statutes enforced by the FTC, the courts have concluded that defendants did not act *recklessly*—a less stringent *mens rea*—when "no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC." *Safeco Ins.*, 552 U.S. at 70 (addressing Fair Credit Reporting Act); *see Murray v. Cingular*, 523 F.3d 719, 726 (7th Cir. 2008) (concluding company did not "recklessly" violate Fair Credit Reporting Act where "the statute does not define 'conspicuous,'" "the FTC had not issued its guidance," and court decisions were conflicting); *cf. Bondi v. VanDerStok*, 145 S. Ct. 857, 877 (2025) (Kavanaugh, J., concurring) (explaining that "if the Government were to charge a [criminal] violation against an individual who was unaware that he was violating the law, that defendant might have a due process argument based on lack of fair notice").

Because ROSCA "does not provide clarity about how to avoid deceptive negative option disclosures and procedures," as understood by the FTC, 88 Fed. Reg. at 24718, and the FTC had

not issued "controlling regulations or policy statements that reflect an official, prior interpretation of ROSCA," as the Court has noted, *Amazon.com Inc*., 735 F. Supp. 3d at 1330, a reasonable jury could not conclude that Amazon acted even recklessly, let alone with "knowledge fairly implied on the basis of objective circumstances," 15 U.S.C. § 45(m)(1)(A). None of the "objective circumstances" should have alerted Amazon that it was not compliant with ROSCA.

In short, there is no basis for a reasonable factfinder to conclude that Amazon knew or, based on objective facts, should have known that it was violating ROSCA, and the Court should grant summary judgment that civil monetary penalties are not available.

### 3. The FTC Cannot Seek Redress For Consumer Harm Before June 21, 2020.

Section 57b(d), which empowers the FTC to seek redress for consumer harm, provides "[n]o action may be brought by the Commission under this section more than 3 years after the rule violation to which an action under subsection (a)(1) relates." 15 U.S.C. § 57b(d). The FTC is therefore barred from recovering consumer redress for any claims pre-dating June 21, 2020—three years before the Complaint was filed on June 21, 2023. *See, e.g.*, *MyLife.com*, 567 F. Supp. 3d at 1162 (granting motion for partial summary judgment, and explaining that consumer redress claims for conduct from August 2016 in a complaint filed on July 27, 2020 would be time-barred); *see also* Dkt. 2 at 3 n.2 (FTC conceding that "consumers falling outside the limitations period[] [are] foreclos[ed] … from potential redress").

## IV.    CONCLUSION

The Court should grant summary judgment for Amazon on all counts and dismiss the case with prejudice.

DATED this 27th day of May, 2025.

I certify that this memorandum contains 12,560 words, in compliance with the Local Civil Rules.

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 34

DAVIS WRIGHT TREMAINE LLP

By s/ *Kenneth E. Payson*
    Kenneth E. Payson, WSBA #26369
    James Howard, WSBA #37259
    920 Fifth Avenue, Suite 3300
    Seattle, WA  98104-1610
    Telephone: (206) 622-3150
    Fax: (206) 757-7700
    E-mail: kenpayson@dwt.com
        jimhoward@dwt.com

COVINGTON & BURLING LLP

    Stephen P. Anthony*
    Laura Flahive Wu*
    Laura M. Kim*
    John D. Graubert*
    850 Tenth Street, NW
    Washington, DC  20001
    Telephone: (206) 662-5105
    E-mail: santhony@cov.com
        lflahivewu@cov.com
        lkim@cov.com
        jgraubert@cov.com

    John E. Hall*
    415 Mission Street, Suite 5400
    San Francisco, CA  94105
    Telephone: (415) 591-6855
    E-mail: jhall@cov.com

    Megan L. Rodgers*
    3000 El Camino Real
    Palo Alto, CA  94306
    Telephone: (650) 632-4734
    E-mail: mrodgers@cov.com

    Anders Linderot*
    620 Eighth Avenue
    New York, NY 10018
    Telephone: (212) 841-1000
    Email: alinderot@cov.com

HUESTON HENNIGAN LLP

    John C. Hueston*
    Moez M. Kaba*
    Joseph A. Reiter*
    523 West 6th Street, Suite 400
    Los Angeles, CA  90014
    Telephone: (213) 788-4340
    E-mail: jhueston@hueston.com
        mkaba@hueston.com

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 35

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

jreiter@hueston.com

*admitted pro hac vice*

Attorneys for Defendants AMAZON.COM, INC.,
NEIL LINDSAY, RUSSELL GRANDINETTI,
AND JAMIL GHANI

AMAZON'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 36

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax