The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                Plaintiff,<br><br>   v.<br><br>AMAZON.COM, INC., *et al.*,<br><br>                Defendants. | No. 2:23-cv-0932-JHC<br><br>DEFENDANTS' RULE 702 MOTION TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY<br><br>NOTE ON MOTION CALENDAR: JUNE 24, 2025<br><br>ORAL ARGUMENT REQUESTED |

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ....................................................................................................... 3

    A.   Mahoney's Enrollment Harm Analysis. ......................................................... 3

    B.   Mahoney's Cancellation Harm Analysis. ....................................................... 5

III. ARGUMENT ............................................................................................................. 5

    A.   Mahoney's Opinions Regarding Harm from Unintentional Enrollment in Prime Are Inadmissible ............................................................. 6

    B.   Mahoney's Opinions Regarding Harm from Unsuccessful Cancellations Are Also Inadmissible .............................................................. 10

IV.  CONCLUSION ........................................................................................................ 12

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## I. INTRODUCTION

Rule 702's gatekeeping protections exist precisely for cases like this one. Dr. Neale Mahoney intends to opine that Amazon owes nearly a billion dollars in restitution due to Amazon misleading Prime customers into enrolling or blocking them from cancelling. Mahoney asserts that these damages are warranted despite concluding that only a handful of Amazon Prime members actually signed up unintentionally, and despite admitting that he has no evidence of customers actually being blocked from cancelling. An expert cannot base an opinion on events that he concedes did not happen and injuries that he concedes were not suffered. When stripped of all the jargon, Mahoney's opinions are the epitome of *ipse dixit* outcome-driven "junk science" that has no place in a courtroom and should be excluded.

The flaws in Mahoney's methodology are obvious from the outset. Of the 2.7 million individuals he included in his damages model, Mahoney concludes that just *49* of them—less than 0.002 percent—signed up unintentionally. The other 99.998 percent of customers, according to Mahoney's own modeling, most likely *meant to* subscribe to Prime. Under the preponderance standard the FTC must meet, this concession eliminates causation, liability, and damages for all but an infinitesimal fraction of customers. Mahoney's model should therefore be limited to those 0.002 percent of consumers who purportedly were harmed. It is not, which should end the inquiry.

Undeterred, Mahoney treats this case-ending flaw as a virtue, and goes on to nevertheless calculate harm and damages for the entire pool of consumers based on each person's assigned likelihood of having enrolled unintentionally. This requires multiple leaps of logic, each more problematic than the last. To start, even though he agrees that virtually all of the millions of consumers in his sample *intended* to sign up for Prime, Mahoney nonetheless also assigns to each person a probability of *unintentionally* subscribing. This, in itself, is wildly unreliable. Whether a consumer unintentionally signed up is binary: a coin that lands heads up is not "50 percent tails," a defeated candidate is not "49 percent president," and a person who signs up for Prime *on purpose* cannot also be a "10 percent accidental" subscriber. There is no Schrödinger's Cat

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

exception to causation, nor is there any relevance to an opinion about how, in a parallel universe, millions of people for whom no liability exists might have (but probably would not have) acted differently.

Mahoney next compounds these errors, assuming that unintentional sign-ups are always unlawful, always harmful, and always result in damages. Mahoney effectively posits that, no matter what a jury might find, and even if not a single customer was injured, there are *always* damages—*i.e.*, with a pool of 1,000 out of 1,000 people who intentionally signed up for Prime, Mahoney's model would *still* dictate a damages number reflecting the counterfactual likelihood of these being unintentional subscriptions multiplied by their average subscription fees (*i.e.*, 20% likelihood of unintentional subscription × $100 subscription fees × 1,000 people = $20,000). These assumptions are improper, including because they fail to account for benefits subscribers actually received (such as free shipping and video services). The only correct damages figure where subscribers lack a preponderance of injury is zero dollars. Yet, from those foundations, Mahoney extrapolates to the broader universe of 223 million subscriptions to arrive at an astronomical damages number of nearly $1 billion.

Mahoney's cancellation analysis is no better. Mahoney does not and cannot offer an opinion that *any* particular subscriber was harmed from unsuccessful cancellations. Instead, as he did with his unintentional-subscription model, Mahoney cherry picks data points from customer website activity to conclude that a certain *share* of subscriptions was harmed—without identifying the particular subscriptions—and multiplies that share by *all* payments and by *all* subscribers, including those who are not harmed.

None of this is reliable, relevant, or remotely admissible. An expert cannot opine on the ultimate legal issue of liability. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). Nor can an expert's opinion contradict the relevant legal standard. *Villalpando v. Exel Direct Inc.*, 161 F. Supp. 3d 873, 895 (N.D. Cal. 2016). Mahoney certainly cannot use equations to transform millions of concededly uninjured consumers into fodder for

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

outlandish damages calculations. Such testimony is unhelpful to the trier of fact, and must be excluded.

## II. BACKGROUND

Dr. Neale Mahoney is a Professor of Economics at Stanford University. *See* Ex. 18 ¶ 1.[1] Mahoney was contacted by the FTC in early 2024, *see* Ex. 56 at 17:9-12, shortly after publishing "research on the difficulties consumers have cancelling subscription plans," Ex. 18 ¶ 3 & n.1. Mahoney has never served as an expert witness. Mahoney offers two opinions in this case that Defendants seek to exclude.

### A. Mahoney's Enrollment Harm Analysis

Mahoney opines that 29.8 million Prime customers subscribed unintentionally, and that these unintentional enrollments caused $844 million in harm. These numbers come from Mahoney's "prediction model based on linear regression," that gives, for each subscription in a sample of 2.7 million subscriptions, "an estimate of the probability that [each] subscriber[] would have responded in the affirmative to the DNI question." Ex. 56 at 150:21-151:3, 162:15-18; *see also id*. at 191:11-13 ("A. [T]he prediction score represents the predicted probability that someone would have responded DNI to the survey."). Mahoney simply assumes that answering "DNI" in an exit survey is the same thing as enrolling without consent at the outset. *See id*. 120:5-20. Mahoney estimates that the total "share of unintentional enrollments" across three signup methods (at issue in this case) is 24%, which represents the average of all the predicted probabilities of unintentional enrollment for each of the 2.7 million subscriptions in the sample. *See id*. at 169:7-20.

How Mahoney arrives at this average is critical. Rather than determining how many people were actually harmed, Mahoney assumes that *every* consumer is harmed in a small degree. *See id*. at 174:15-175:3. Thus, *all* subscriptions in the approximately 2.7 million sample contribute to the 24% total share, because *each* subscription has *some* probability of being an

---

[1] "Ex." or "Exs." refer to exhibits attached to the Omnibus Declaration of Joseph Reiter unless stated otherwise.

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

unintentional enrollment in Prime. *See id*. at 169:15-20. For example, even if Mahoney estimates that a subscription has a probability of being an unintentional enrollment in Prime of 1%, that subscription contributes a small amount to Mahoney's estimate of the 24% share of unintentional enrollments, and, stacked together, eventually creates a huge imaginary pool of nonexistent consumers who were purportedly injured and entitled to redress. *See id*. at 169:21-170:4.

From these foundations, Mahoney estimates that the total "count of unintentional enrollments" is 29.8 million. Ex. 18 ¶ 100. But Mahoney does not actually identify any particular customer or subscription within his sample that was an unintentional enrollment or actually harmed. Ex. 56 at 171:8-172:12; *see also id.* at 174:8-175:9. Nor could he. To the contrary, Mahoney concedes that only 49 subscriptions (out of 2.7 million) had a probability of unintentional enrollment over 50%. *See id.* at 190:17-192:2; *see also* Ex. 57. That concession bears repetition—in Mahoney's model, he concludes that nearly all consumers *more likely than not intended to enroll*, yet he still calculates aggregate damages by adding up the odds that each of those intended subscribers might *not* have wanted to enroll. Indeed, Mahoney freely acknowledges that his model assumes that *every* subscription is fractionally harmed by an amount equal to the probability of the subscription being an unintentional enrollment, and he has no way of distinguishing harmed individuals from unharmed ones. Ex. 56 at 172:13-175:9.

To calculate the 29.8 million estimate, the model adds up the predicted probabilities for all 2.7 million subscriptions in the sample and extrapolates the results to a larger population of Prime subscribers. *See id*. at 172:13-18; *see also* Ex. 18 ¶ 99. Of course, extrapolating the results to the entire customer universe would yield only *2,185* subscriptions that meet the preponderance standard for unintentional enrollment *out of 223 million* subscriptions that began after January 1, 2018. *See id*. But in Mahoney's model, which converts millions of low-probability scores for unharmed individuals into fictional subscribers, he concludes that 29.8 million individuals did not mean to subscribe.

Mahoney then estimates that the total "harm from unintentional enrollments" is $844 million. *See* Ex. 18 ¶ 100. This amount is not associated with any particular subscribers (because,

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 4

again, Mahoney does not opine that any particular subscriptions were unintentional). Ex. 56 at 171:21-172:12. Instead, Mahoney multiplies the subscription fees paid by each and every subscriber by the predicted probability of unintentional enrollment that the model associates with that subscription to generate a weighted sum of those fees. *See id*. at 176:6-177:8. Finally, Mahoney extrapolates the estimated harm to the larger population of Prime subscriptions. *See id*. at 176:22-177:8.

### B.    Mahoney's Cancellation Harm Analysis

Mahoney also estimates that Prime subscribers who entered the cancellation flow but did not complete their intended cancellation between July 2019 and March 2023 suffered harm of approximately $124 million in subscription fees (the "Cancellation Harm Analysis"). *See* Ex. 18 ¶ 16.

Mahoney uses a "differences-in-differences" analysis, which compares the Prime benefit usage behavior of different groups of subscribers who entered the cancellation flow and then exited without cancelling. *Id*. Mahoney divides subscribers who entered the cancellation flow but did not cancel into six "action groups." *See id*. ¶¶ 113, 123-124. Mahoney assumes that two groups of subscribers, "No Page" and "Prime Central" subscribers (which he treats as "treatment" groups), likely mistakenly believed they had canceled their subscriptions. *See id*. ¶ 116.

### III.    ARGUMENT

Expert testimony is admissible only if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993). Rule 702 further requires expert testimony to be "the product of reliable principles and methods" and to reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d). Reliability is the lynchpin of Rule 702, and the Ninth Circuit has held that it goes directly to the *admissibility*—not merely the *weight*—of expert testimony. *Cooper v. Brown*, 510 F.3d 870, 880 n.6 (9th Cir 2007).

DEFS.' MOT. TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY (2:23-cv-0932-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

When assessing reliability, courts "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *Hyer v. City of Honolulu*, 118 F.4th 1044, 1058 (9th Cir. 2024) (cleaned up). Additional factors include: (1) whether the expert developed her opinions expressly for the litigation; and (2) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* Fed. R. Evid. 702 Advisory Committee Note (2000).

The proponent of expert testimony has the burden of proving relevance and reliability by a preponderance of the evidence. *See Harris v. Chelan Cnty. Sheriff's Dep't*, 2019 WL 13300179, at *1 (E.D. Wash. Apr. 15, 2019). District courts are required to make express findings that these burdens have been met. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020).

### A. Mahoney's Opinions Regarding Harm from Unintentional Enrollment in Prime Are Inadmissible

Mahoney's Enrollment Harm Analysis is a results-driven attempt to justify the FTC's demand of $1 billion. It is not based on any facts or admissible expert analysis. It does not meet Rule 702 standards for reliability and relevance, and must be excluded.

An expert opinion may not be based on assumptions of fact that contradict the evidence. *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (excluding expert testimony "not sufficiently founded on the facts" of the case). "When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon." *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998); *see also Estate of Gonzales v. Hickman*, 2007 WL 3237727, at *3, n.34 (C.D. Cal. May 30, 2007) (expert "cite[d] no specific facts in the record … which support the opinion, and the only available evidence contradicts it. Consequently, the court concludes the opinion is not admissible."); *Lancaster v. BNSF Railway Co.*, 75 F.4th 967, 970 (8th Cir. 2023) (affirming exclusion because expert offered testimony "contrary to the facts") (internal quotations omitted); *Greenwell v. Boatwright*, 184 F.3d 492, 497

DEFS.' MOT. TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY (2:23-cv-0932-JHC) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

(6th Cir. 1999) ("Expert testimony . . . is inadmissible when the facts upon which the expert bases his testimony contradict the evidence.").

In particular, an expert's methodology must be capable of distinguishing between actions that caused injury and those that did not. *See City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992) (upholding exclusion of damages study where plaintiff "insist[ed] that all of [defendant's] acts contributed to the damage figure, but . . . many of those acts were [deemed] proper."); *see also F.T.C. v. Noland*, 2021 WL 5493443, at *4 (D. Ariz. Nov. 23, 2021) ("The problem with the FTC's damages methodology is that it goes beyond redressing injury to consumers and provides a potential windfall to consumers" for those customers where "there is simply no 'proof of injury'") (cleaned up). While experts can and often do assume liability for purposes of calculating damages, they cannot offer a model for *establishing* liability that simply assumes every consumer suffered harm. "Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994); *see also Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("Simply put, an expert does not assist the trier of fact . . . if he starts his analysis based upon [an] assumption" that is "the very question that he was called upon to resolve").

Here, Mahoney's opinion is fundamentally contrary to the facts. By Mahoney's own admission, there are only 49 individuals who more likely than not did not intend to enroll in Prime—49 out of 2.7 million, which is not even close to an actionable, significant minority. *See* Ex. 56 at 190:17-192:2. Those facts are incompatible with his paradoxical conclusion that millions of subscribers were nonetheless injured. The FTC must prove its case by a preponderance of the evidence. When the FTC's own expert concedes that 99.99 percent of consumers were likely *not* harmed, a model that nevertheless assumes that every single one of those consumers contributes to an overall damages figure is *per se* unreliable and unhelpful. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019) (affirming exclusion of opinion that "failed to incorporate economic realities" and where an "assumption underlying [the] model was insufficiently validated"); *Concord Boat Corp. v. Brunswick Corp.*,

DEFS.' MOT. TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY (2:23-cv-0932-JHC) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

207 F.3d 1039, 1056 (8th Cir. 2000) (holding error to permit expert opinion "not grounded in the economic reality of the [relevant] market"). Mahoney concedes that he cannot identify *any* subscriptions that are unintentional enrollments, nor can he distinguish between harm suffered by theoretical unintentional enrollees and other subscribers. *See* Ex. 56 at 171:21-172:12. Mahoney simply assumes, contrary to fact and logic, that *everyone* was harmed.

Indeed, Mahoney confirmed that, if there were 100 million subscribers, each of whom had a 1% probability of being harmed under the prediction model, his "count" of unintentional enrollments would be 1 million harmed subscriptions. Ex. 56 at 173:10-21. That is nonsensical. In any rational world, the correct count of unintentional enrollments on those facts would be zero. Worse, to reach his dollar figure of damages, Mahoney multiplies *all* of the weighted fees for *all* of those subscriptions together, rather than limiting himself to just those with a greater-than-50-percent chance of injury. *See id*. 176:6-179:15.[2]

Mahoney can only reach that fantastical conclusion through a hypothetical chain of events that is not just unlikely, but outright impossible. *E.g.*, *Banga v. Kanios*, 2023 WL 1934484, at *2 (N.D. Cal. Jan. 24, 2023) (excluding expert testimony as speculative because "there is simply no way to know whether this hypothetical sequence of events would have played out"). Intent to subscribe is a binary choice; a consumer either meant to sign up, or they did not. It cannot be both. An expert cannot reverse engineer liability by multiplying miniscule odds of something that did not happen across millions of people, using a model that assumes that each of those people is *mostly* an intentional subscriber but *partially* not. That is not how subscriptions work, it is not how the law works, and it is not the stuff of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136,146 (1997) (the "*ipse dixit* of the expert" alone is not sufficient to permit the admission of an opinion); *Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 671 (6th Cir. 2010) ("[N]o matter how good experts' credentials may be, they are not permitted to speculate.") (cleaned up).

---

[2] Compounding these problems, Mahoney also fails to account for any of the benefits that consumers gained from having a Prime membership, such as free shipping or video services, further undermining the reliability and relevance of his opinion. *See, e.g.*, *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018-19 (8th Cir. 2001) (affirming exclusion of expert who failed to analyze or consider factors that could impact value).

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 8

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

The problems do not end there. At the root of Mahoney's model is his reliance on Amazon's internal survey that was sent to a subset of those cancelling their memberships. There is no basis for Mahoney's assumption that *all* subscribers who answered that survey by choosing "did not intend (DNI)" are unintentional enrollments. Ex. 56 at 120:5-20; 154:8-155:3. Indeed, Mahoney concedes that his model treats subscribers who selected DNI as harmed even if they signed up for Prime *intentionally*, for example, because they simply forgot or their spouse signed up for them.[3] *See id.* at 120:5-20 ("My analysis treats people who responded 'DNI' . . . as people who actually did not intend to sign up even though there's a possibility that some of them intended [to sign up] . . ."); *see also id.* at 119:13-18. If a subscriber *intended* to sign up for Prime, they plainly did not suffer any harm relevant to the FTC's claims. Mahoney's failure to distinguish between harmed and unharmed individuals renders his opinion unreliable. *City of Vernon*, 955 F.2d at 1373. It also renders his opinion irrelevant—there is no evidentiary value to an opinion that explains how people who were *not* harmed *might* have been harmed in an alternative universe. *See Chung v. Wash. Interscholastic Activities Ass'n*, 2021 WL 1978698, at *3 (W.D. Wash. May 18, 2021) (expert testimony based on "questionable assumption[s]" that "*all* state championship tournaments" would have to be rescheduled "would not assist the trier of fact in understanding the costs associated with accommodating" plaintiffs' request that only some tournaments be rescheduled). The only relevant testimony Mahoney could offer relates to the alleged harm suffered by the 49 individuals he contends were more likely than not to have signed up unintentionally. But Mahoney has specifically disclaimed any ability or intent to do so, rendering his opinions about millions of uninjured consumers unfit for admission. *See Dragos v. Cornea*, 2021 WL 3540601, at *2 (W.D. Wash. July 14, 2021) ("[E]xpert evidence is properly excluded where 'foundational facts demonstrating relevancy . . . are not sufficiently established'") (cleaned up).

---

[3] Other examples of how people might have answered "DNI" despite having signed up on purpose include an intent to sign up for a free trial (not a paid membership), an expectation of a refund based on answering in this manner, or sheer failure to read the sign-up page, survey page, or both.

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 9

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Dr. Mahoney's alternative unintentional-enrollment methods fare no better. These alternative models are not helpful because they likewise do not identify a single subscriber who was harmed from unintentional enrollment. Ex. 18 ¶¶ 103-104. Indeed, Dr. Mahoney's "two alternative methodologies" still assign probabilities of unintentional enrollment to different groups of subscribers that are always less than 50%, *see* Ex. 18 ¶ 104 & Appendix D, but that result is unsurprising given Dr. Mahoney's choice to extrapolate results from a self-selected and non-representative sample of survey respondents to a larger population of Prime members, *see* Ex. 56 at 79:3-17, 101:22-103:22.

### B. Mahoney's Opinions Regarding Harm from Unsuccessful Cancellations Are Also Inadmissible

Mahoney's other model concerns "unsuccessful cancellations," a scenario which he asserts resulted in $124 million in harm. Ex. 18 ¶ 16. This model, too, is unreliable and unhelpful, and must be excluded. Yet again—and fatal to his opinion's admissibility—Mahoney does not and cannot offer an opinion that *any* particular subscriber was harmed from unsuccessful cancellations. Ex. 56 at 249:9-13 (admitting he "cannot opine on the harm for a particular individual subscriber"). Instead, as he did with his unintentional-enrollment model, Mahoney cherry picks data points from customer website activity to conclude that a certain *share* of subscriptions in each treatment group was harmed—without identifying the particular subscriptions—and multiplies that share by *all* payments and by *all* subscribers, including those who were not harmed. Ex. 18 ¶¶ 131-132. This approach again simply invents harm where the evidence establishes none, placing Mahoney's opinion far outside the bounds of expert testimony.[4] *See Guidroz-Brault*, 254 F.3d at 830-31 (excluding expert testimony "not sufficiently founded on facts" of the case); *Noland*, 2021 WL 5493443, at *4 ("The problem with the FTC's

---

[4] Mahoney's methodology is also far outside of the standard methodology used in the relevant field, and is excludable on that basis alone. *See Dragos*, 2021 WL 3540601, at *7 (excluding expert testimony that is not "adequately tested, peer reviewed, or accepted by the relevant scientific community."). Mahoney fails to employ a standard "parallel trends" analysis, which he himself uses in his academic work, to show that his treatment groups ("Prime Central" and "No Page") and control group ("Accept an Offer") are similar but for the treatment he purports to test (unsuccessful attempts at cancellation). *See* Ex. 56 at 235:14-20, 237:9-17.

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

damages methodology is that it goes beyond redressing injury to consumers and provides a potential windfall to consumers" for those customers where "there is simply no 'proof of injury'") (cleaned up).

Mahoney's model is also plainly unreliable. The premise of his unsuccessful cancellation theory is that customers wanted to cancel their Prime subscriptions and incorrectly believed they had done so, leaving those customers to continue paying fees. Ex. 18 ¶¶ 112, 115-117. Yet Mahoney was unable to explain why someone who entered the cancellation flow and believed they had cancelled their Prime membership would nevertheless proceed to visit and use, for example, the Prime Central page (an interface only available to Prime members). Ex. 56 at 223:6-224:2 ("A. My understanding of consumer behavior is that they may click on links without a full understanding of the implications."). Such behavior is incompatible with Mahoney's model, and his inability to account for that behavior and remove it from his damages calculation necessarily makes his model unreliable. *E.g.*, *City of Vernon*, 955 F.2d at 1373. So, too, does Mahoney's inability to account for individuals who *intended* not to cancel—*e.g.*, those who entered the cancellation flow with an aim to receive a credit but exited upon learning they would not be entitled to a credit.[5] And, as with his unintentional-enrollment model, Mahoney's unsuccessful-cancellation model fails to account for the benefits received by customers as a result of not cancelling their Prime memberships.

At bottom, because Mahoney's model fails to identify which incomplete cancellations were "intentional" and which were "unintentional," Ex. 18 ¶ 16, because it fails to "separate lawful from unlawful conduct," *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000), and because it is unreliable and ignores material factors that impact its results, his unsuccessful-cancellation opinions are also inadmissible. *See Noland*, 2021 WL 5493443, at *5

---

[5] There are important differences between those who accept an offer and those who exit the cancellation flow without cancelling. For example, those who accept an offer may be eligible for a discounted membership because they are a student or are on public benefits. Ex. 18, Figure 9. Those in the "No Page" group may do so because they were not eligible for either of those discounted offers. And the difference in benefits usage between the groups may be due to those underlying differences in the subscribers' characteristics, rather than, because "they likely believed, mistakenly, that they had successfully cancelled their subscriptions." Ex. 18 ¶ 118.

DEFS.' MOT. TO EXCLUDE DR.
NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 11

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

("[F]or each consumer on whose behalf a damage award is sought, the FTC must prove why that consumer was harmed and identify the amount of money that is 'necessary to redress' that consumer's injury").

### IV.   CONCLUSION

For the foregoing reasons, this Court should exclude Mahoney's testimony.

DATED this 27th day of May, 2025.

I certify that this memorandum contains 4,173 words, in compliance with the Local Civil Rules.

DAVIS WRIGHT TREMAINE LLP

By s/ *Kenneth E. Payson*
   Kenneth E. Payson, WSBA #26369
   James Howard, WSBA #37259
   920 Fifth Avenue, Suite 3300
   Seattle, WA  98104-1610
   Telephone: (206) 622-3150
   Fax: (206) 757-7700
   E-mail: kenpayson@dwt.com
         jimhoward@dwt.com

COVINGTON & BURLING LLP

   Stephen P. Anthony*
   Laura Flahive Wu*
   Laura M. Kim*
   John D. Graubert*
   850 Tenth Street, NW
   Washington, DC  20001
   Telephone: (206) 662-5105
   E-mail: santhony@cov.com
         lflahivewu@cov.com
         lkim@cov.com
         jgraubert@cov.com

   John E. Hall*
   415 Mission Street, Suite 5400
   San Francisco, CA  94105
   Telephone: (415) 591-6855
   E-mail: jhall@cov.com

   Megan L. Rodgers*
   3000 El Camino Real

DEFS.' MOT. TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY
(2:23-cv-0932-JHC) - 12

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

|   |   |
|---|---|
| 1 | Palo Alto, CA 94306<br>Telephone: (650) 632-4734<br>E-mail: mrodgers@cov.com |
| 2 | |
| 3 | Anders Linderot*<br>620 Eighth Avenue<br>New York, NY 10018<br>Telephone: (212) 841-1000<br>Email: alinderot@cov.com |

Palo Alto, CA 94306
Telephone: (650) 632-4734
E-mail: mrodgers@cov.com

Anders Linderot*
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Email: alinderot@cov.com

HUESTON HENNIGAN LLP

John C. Hueston*
Moez M. Kaba*
Joseph A. Reiter*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
E-mail: jhueston@hueston.com
mkaba@hueston.com
jreiter@hueston.com

*admitted pro hac vice

Attorneys for Defendants AMAZON.COM, INC., NEIL LINDSAY, RUSSELL GRANDINETTI, AND JAMIL GHANI

DEFS.' MOT. TO EXCLUDE DR. NEALE MAHONEY'S TESTIMONY (2:23-cv-0932-JHC) - 13

Davis Wright Tremaine LLP
Law Offices
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax