# Attachment 23

**Expert Report of James C. Cooper**

**CASE:**          ***FTC v. Amazon et. al.*, 23-cv-00932 (W.D. Wash.)**

## TABLE OF CONTENTS

I.      Qualifications ........................................................................................................ 1

II.     Scope of Opinion, Methodology & Information Relied Upon ............................ 3

III.    Summary of Opinions ......................................................................................... 5

        A.      Clear and Conspicuous Disclosures ........................................................ 9

        B.      Consent .................................................................................................... 9

        C.      Cancellation ........................................................................................... 10

        D.      Prime Video ........................................................................................... 11

IV.     Analysis............................................................................................................. 11

        A.      The FTC Act .......................................................................................... 11

        B.      ROSCA ................................................................................................... 12

                1)      ROSCA's Statutory Text .............................................................. 12

                2)      Judicial Guidance Regarding ROSCA.......................................... 13

                3)      FTC Policy Statements Regarding ROSCA ................................. 14

                        i.      Enforcement Policy Statement Regarding Negative
                                Option Marketing................................................................. 14

                        ii.     FTC Business Blog .............................................................. 18

                        iii.    Limitations of FTC Public Statements................................. 18

        C.      ROSCA Enforcement Actions ................................................................ 20

                1)      Data Collection ............................................................................. 21

                2)      Summary ....................................................................................... 23

                3)      Alleged Enrollment Disclosure Deficiencies................................ 24

                4)      Alleged Consent Deficiencies....................................................... 26

                5)      Alleged Cancellation Deficiencies................................................ 26

                6)      Synthesis of ROSCA Guidance .................................................... 27

D.     Non-ROSCA Guidance.................................................................29

       1)    Dot Com Disclosures and Dot Com Disclosures Guidance...................29

       2)    FTC Negative Option Cases Prior to ROSCA Enforcement .................30

       3)    FTC Cases Regarding Online Disclosures Related to Privacy .............31

       4)    FTC Cases Regarding Consent ....................................................32

       5)    FTC Cases Regarding "Dark Patterns"...........................................33

       6)    FTC Cases Regarding the "Significant Minority" Standard..................33

V.     The FTC's Allegations in this Case Are Novel and would not have been
anticipated by a reasonable market participant ...............................................34

     A.     The Complaint's "Dark Patterns" Allegations Represent a Stark
Departure from Prior Guidance Regarding ROSCA's Requirements ...............35

       1)    The Concept of "Dark Patterns" Is Novel and Not Found in
Prior FTC Enforcement Actions ............................................35

       2)    "Dark Patterns" Allegations Concerning "Imbalance" Depart
from Prior Guidance ...........................................................36

       3)    "Dark Patterns" Allegations Concerning Interstitial Offers to
Enroll Depart from Prior Guidance.........................................38

       4)    "Dark Patterns" Allegations Concerning Commercial Speech
Depart from Prior Guidance.................................................39

     B.     The Complaint Sets Unpredictably More Stringent Standards for
Disclosure, Consent, and Cancellation ...............................................41

       1)    Disclosure .........................................................................41

           i.    Format ..................................................................41

       2)    Express Informed Consent....................................................50

       3)    Simple Cancellation ............................................................53

     C.     Prime Video ..............................................................................54

VI.    Conclusion ...................................................................................55

| Tables and Figures | | |
|---|---|---|
| Figure 1 | Alleged Deficiency Categories | Page 24 |
| Figure 2 | Alleged Disclosure Deficiencies | Page 25 |
| Figure 3 | Alleged Consent Deficiencies | Page 26 |
| Figure 4 | Alleged Cancellation Deficiencies | Page 27 |
| Table 1 | Allegations Involving "Imbalance" Between Options to Accept and Decline Enrollment | Page 37 |
| Table 2 | Allegations Involving Interstitial Offers | Pages 38-39 |
| Table 3 | Allegations Targeting Amazon's Commercial Speech | Page 40 |
| Figure 5 | Triangle Media Flow | Page 43 |
| Figure 6 | Apex Capital Group Flow | Page 43 |
| Figure 7 | One Technologies Flow | Page 44 |
| Figure 8 | Urthbox Flow | Page 45 |
| Figure 9 | Bunzai Flow | Page 46 |
| Figure 10 | RagingBull Flow | Page 46 |
| Figure 11 | Nutraclick Flow | Page 47 |
| Figure 12 | Elite IT Flow | Page 48 |
| Figure 13 | Apex Flow (2) | Page 51 |
| Figure 14 | F9 Flow | Page 52 |

# I.    QUALIFICATIONS

1)    I am a professor of law at George Mason University's Antonin Scalia Law School ("ASLS"), where I have taught for 12 years.

2)    I received a PhD in economics from Emory University in 2003. I received my law degree, *magna cum laude*, from ASLS in 2000.

3)    I have published over 31 academic papers in law reviews and peer-reviewed economics journals. I am also the coauthor of a law school casebook used to teach the topic of law and economics to students and federal and state judges.[1] Additionally, I have edited a book on the evolution of Federal Trade Commission ("FTC") consumer protection and competition policy.[2]

4)    My academic work focuses on the legal and economic issues surrounding consumer protection and competition law. Many of my academic articles have examined the FTC, including the proper scope of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58 (the "FTC Act"), and the FTC's rulemaking authority, remedial authority, privacy and data security policy, and competition policy. Much of my work on the FTC has focused on the relevant legal rules that emerge when cases are almost never litigated, including the uncertainty surrounding those rules that can emerge in those circumstances.

5)    In my academic research, one methodology that I have employed is to "code" various attributes of cases, which allows me to employ empirical methods to examine trends and relationships between case outcomes and various factors. I have employed this methodology, for example, to examine trends in claims brought under state consumer protection acts, including the California Consumer Privacy Act, FDA expert committee decisions, and *Daubert* motions in federal court cases.

6)    My academic work has been cited by FTC Commissioners and federal courts.[3] I have participated in several FTC hearings on various consumer protection topics, including informational injuries, advertising to children, and children's privacy. My academic work has been featured at the FTC's "PrivacyCon" and the FTC's conference on Public Policy and Marketing.

7)    At ASLS, I teach the class "Consumer Protection Law," and have done so at least once every academic year since 2020. This class focuses on the FTC as the primary consumer protection agency in the United States. In the class, I provide in-depth instruction on the FTC authority to regulate unfair and deceptive conduct. I also cover in-depth several consumer protection laws that the FTC enforces, including the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-8405 ("ROSCA"). This class spends several hours on FTC disclosure requirements in various legal

---

[1] *Economic Analysis for Lawyers* (Carolina Academic Press, 4th Ed., 2024).

[2] *The Regulatory Revolution at the FTC: A Thirty-Year Perspective on Competition and Consumer Protection* (Oxford University Press, 2013).

[3] *See, e.g.,* Maureen K. Ohlhausen & Alexander P. Okuliar, *Competition, Consumer Protection, and the Right (Approach) to Privacy*, 80 ANTITRUST L. J. 121 (2015); Melissa Holyoak, *Remarks at National Advertising Division Keynote 2024*, A Path Forward on Privacy, Advertising, and AI (September 17, 2024); *Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011); *Conn. Fine Wine v. Comm'r Seagull*, 936 F. 3d 119 (2d Cir. 2019).

contexts, including unfairness and deception under Section 5 of the FTC Act, 15 U.S.C. § 45 ("Section 5") and ROSCA. In the class, I examine disclosures in an online and mobile context, and in particular, what renders a disclosure "clear and conspicuous," and what is sufficient to create a non-deceptive net impression for consumers.

8)    I have also taught "Digital Information Policy Seminar," which involves legal and economic issues surrounding the digital economy. This class also provides in-depth coverage of FTC consumer protection and competition enforcement and policy in the online market. Each semester, I also teach "Economics for Lawyers," which covers the economics of information and introduces consumer protection law. I have also taught upper-level seminars on law and economics.

9)    In addition to being a member of the instructional faculty at ASLS, I am the Director of the Program on Economics & Privacy ("PEP"), a research center housed within the Law & Economics Center at ASLS. PEP fosters original research concerning consumer protection and competition issues related to the digital economy. As the Director of PEP, I regularly select research for funding and organize and run workshops where this research is presented. PEP also provides educational programs to federal and state judges, state attorney generals, and federal and foreign regulators on the economics of information flows, including advertising, privacy, and data security. As the Director of PEP, I regularly organize and teach in such programs.

10)    I regularly teach advanced workshops sponsored by the Law & Economics Center on the economics of information and advertising to federal and state judges, state attorneys general staff, and domestic and foreign regulators.

11)    Before joining the faculty at ASLS, I served in three senior roles at the FTC, including as Deputy (2005-08) and Acting (2008-09) Director of the FTC's Office of Policy Planning and Advisor for Commissioner William E. Kovacic (2009-11). In these roles, I provided legal and economic advice to senior FTC leadership involving both competition and consumer protection matters, including issues involving disclosures.

12)    During the 2018-2019 academic year, I took a leave of absence from ASLS to serve as Deputy Director for Economic Analysis in the FTC's Bureau of Consumer Protection ("BCP"). In this position, I provided economic and legal analysis to the Director of the BCP, to the Chair of the FTC, and to various FTC Commissioners on a variety of enforcement and policy matters, including those involving negative options, advertising, privacy, data security, and remedies.

13)    While I was serving as Deputy Director for Economic Analysis, BCP began investigations and entered into consent negotiations in enforcement matters involving ROSCA claims. In my role as a part of the BCP front office, I regularly reviewed memos, draft complaints, and draft consent packages. I also participated in meetings with BCP staff and the Director of BCP regarding ongoing enforcement matters.

14)    I have worked as an economic consultant in three matters involving FTC enforcement of ROSCA. My assignments involved estimating the impact of allegedly deficient flows on consumer behavior, and my work required understanding the disclosure and cancellation flows alleged by

the FTC to have violated ROSCA, as well as modifications to these flows that would render them compliant with ROSCA.

15)     Prior to joining the FTC I was an associate at Crowell & Moring, LLP, where I practiced antitrust law from 2000 to 2003.

16)     My full CV is attached to this report as Appendix C.

## II.    SCOPE OF OPINION, METHODOLOGY & INFORMATION RELIED UPON

17)     When there is little or no case law interpreting a statute that the FTC enforces, parties look to complaints in other cases and FTC public statements for guidance on what the FTC believes the law requires.[4] I rely on the same materials when teaching consumer protection law. I often assign complaints for various FTC enforcement actions in areas such as privacy, data security, and ROSCA. I use these materials to map out conduct that the FTC has said violates the law, and what actions market participants must take to remedy these charges.[5]

18)     I reviewed complaints and judicial decisions from all ROSCA enforcement actions initiated prior to March 2021, when Amazon.com, Inc. ("Amazon") received a Civil Investigative Demand

---

[4] Transcript of Sep. 10, 2024 Deposition of the Federal Trade Commission ("FTC Dep. 1") at 162-63, 173 (FTC representative testifying that "sources of guidance for a business . . . to determine whether or not they are ROSCA compliant" include "the FTC's business blog," "FTC enforcement actions," "FTC settlements," and "FTC consent decrees"). In other areas the FTC enforces with few litigated cases or judicial decisions clarifying the law, such as privacy, data security, and mergers, private parties look to complaints, consent orders, reports, and policy statements to understand what conduct complies with the law. *See generally* Daniel J. Solove & Woodrow Hartzog, *The FTC and the New Common Law of Privacy*, 114 COLUM. L. REV. 583 (2014) (argues that because privacy law is rarely litigated, FTC settlements and complaints create the "common law" of privacy that is enforced in subsequent FTC actions); Jamie L. Luguri & Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. OF LEGAL ANALYSIS 43, 87 (2021) ("In the absence of judicial decisions, however, consent decrees and other FTC publications have guided companies in interpreting the expected standards of behavior and ensuring their continued compliance with the law."); Ari Ezra Waldman, *Privacy, Practice, and Performance*, 110 CALIF. L. REV. 1221, 1236-38 (2022) (noting that the FTC settles most privacy claims, and consent decrees are used by industry actors to learn what practices are unfair, deceptive, or misleading); Warren S. Grimes, *Transparency in Federal Antitrust Enforcement*, 51 BUFF. L. REV. 937 (2003) (arguing in part that there needs to be increased transparency in pre-merger settlements because agency settlements, not judicial opinions, make most of modern pre-merger enforcement law); Richard A. Epstein, ANTITRUST CONSENT DECREES IN THEORY AND PRACTICE 1 (1st ed. 2007) ("Antitrust decrees have governed—and sometimes restructured—entire industries, often over a period of several decades."); J. Howard Beales, III & Timothy J. Muris, *Choice or Consequences: Protecting Privacy in Commercial Information*, 75 U. CHI. L. REV. 109, 128 (2008) (stating that the FTC's standards for protecting information security have been established solely through consent agreements, as "there have been no litigated cases involving information security issues.").

[5] Consent orders that settle ROSCA actions can provide some information about conduct that the FTC considers legal. At the same time, it is important to note that often, consent requirements set behavioral remedies above the floor of legality as a prophylactic measure to "fence in" parties whom the FTC has already found a reason to believe is violating a law it enforces. See *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the Act, respondents must expect some fencing in." (cleaned up)). For example, nearly all ROSCA consent orders require the settling defendant to provide an email or written letter providing the same information as a required pre-purchase ROSCA disclosure, despite such post-sale communication not being required by ROSCA itself. *See, e.g., FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017), Consent Order at § III.B.2. As such, failure of a party other than the settling defendant to comply with requirements in a ROSCA consent order is not necessarily a violation of ROSCA. Accordingly, I do not consider standards laid out in consent orders in my analysis.

("CID") from the FTC. Using accepted methodology in the field of law & economics, I coded these materials to determine how prevalent certain allegations were in ROSCA enforcement actions.

19)     Specifically, with respect to ROSCA enforcement actions, I extracted information from the complaints and categorized these documents as either containing or not containing certain elements. I coded each field of information with a "1" when a document contained the element and a "0" otherwise. For example, if a complaint included an allegation that required disclosures were behind a hyperlink, it was coded as "1" for that element. Complaints without such allegations would be coded as "0." This type of "case coding" methodology, where information is extracted from legal documents (e.g., opinions, complaints, or other case filings) and recorded numerically, is common in the law & economics field,[6] and I have used this methodology in my own academic work as well.[7] This methodology allows me to calculate the relative frequency with which certain allegations appear, and thus to understand what type of conduct a reasonable market participant would expect to violate ROSCA.

20)     To supplement this methodology, I also examined ROSCA's statutory text and FTC public statements regarding ROSCA. I also reviewed FTC guidance that exists outside the ROSCA context, concerning requirements for disclosures to be "clear and conspicuous" and requirements to obtain "informed consent." Specifically, I reviewed the FTC's Dot Com Disclosures guidance (as updated in 2013), and enforcement actions involving online information flows that the FTC alleged failed to provide clear and conspicuous disclosures, or failure to obtain express informed consent for charges.

21)     From the foregoing analysis, I formed an opinion on the following:

- What a reasonable market participant would have expected, prior to March 2021, was required to comply with ROSCA; and

- The extent to which the FTC's allegations in this case are consistent with such reasonable expectations predating March 2021.

22)     A complete list of materials reviewed is listed in Appendix D.

23)     I am compensated at an hourly rate of $1,000. My compensation does not depend on my opinion or the outcome of this case.

---

[6] *See, e.g.*, Jonah B. Gelbach, *Material Facts in the Debate over Twombly and Iqbal*, 68 STAN. L. REV. 369 (2016); Christina L. Boyd & David A. Hoffman, *Litigating Toward Settlement*, 29 J. L. ECON. & ORG. 898 (2013); William H.J. Hubbard, *Testing for Change in Procedural Standards, with Application to* Bell Atlantic v. Twombly, 42 J. LEG. STUD. 35 (2012); Michael R. Baye & Joshua D. Wright, *Is Antitrust Too Complicated for Generalist Judges? The Impact of Economic Complexity & Judicial Training on Appeals*, 54 J. L. & ECON. 1 (2011).

[7] *See, e.g.*, James C. Cooper & Joseph Golec, *Conflicts of Interests on Committees of Experts: The Case of Food and Drug Administration Drug Advisory Committees*, 62 J. L. & ECON. 321 (2019); James C. Cooper & Joanna Shepherd, *State Unfair and Deceptive Trade Practices Laws: An Economic and Empirical Analysis*, 81 ANTITRUST L. J. 947 (2017); James C. Cooper, *Information and Settlement: Empirical Evidence on* Daubert *Rulings and Settlement Rates*, 51 INT'L REV. L. & ECON. 1 (2017); *Private Litigation Under the California Consumer Protection Act*, Law & Economics Center (2021).

24)    I reserve the right to revise my opinions if I am presented with new relevant information.

## III.    SUMMARY OF OPINIONS

25)    Through enforcement actions and public statements, the FTC provides guidance to market participants on what type of conduct the FTC has reason to believe violates ROSCA.

26)    The FTC's allegations against Amazon in this case lay out a new ROSCA standard that represents an unpredictable departure from the standard prior to March 2021 in two ways. First, the allegations in this case suggest a new requirement to "balance" the options to accept or decline an offer to enroll. This novel standard, grounded in the subjective notion of "dark patterns," is divorced from ROSCA's requirements,[8] and suggests that traditional commercial speech and interstitial offers to enroll violate ROSCA. Second, the Complaint sets out a more stringent standard for clear and conspicuous disclosure, express informed consent, and simple cancellation than a reasonable market participant would have understood ROSCA to require.

27)    As a result, a reasonable market participant would not have believed, prior to March 2021, that the enrollment and cancellation flows alleged in the Complaint violated ROSCA.

***

28)    Congress enacted ROSCA in 2010 to address deceptive conduct involving negative option marketing in e-commerce. The core ROSCA requirements for online sellers that are germane to the FTC's claims in this case are (1) to "clearly and conspicuously" disclose the negative option feature before obtaining the consumer's billing information; (2) to obtain a consumer's "express informed consent" for the transaction; and (3) to provide a "simple" cancellation process.

29)    Without FTC rules or judicial opinions to provide guidance on what ROSCA's requirements mean, covered parties must look to informal guidance from the FTC to form opinions on what types of disclosures and procedures satisfy ROSCA.

30)    In such circumstances, parties typically rely on two primary sources to understand how to comply with the law: (1) FTC guidance through policy statements; and (2) the complaints from settled ROSCA enforcement actions.[9] In addition to these two primary sources, parties may look for guidance from policy statements and enforcement actions in other areas that involve issues similar to ROSCA, such as online advertising and disclosures related to privacy and data security practices.[10]

---

[8] It is unclear from the complaint whether these imbalance allegations are related to a lack of clear and conspicuous disclosure or a lack of express informed consent. To the extent that the allegation applies to the "informed" arm of consent, it overlaps with disclosure requirements. Regardless of which prong of ROSCA they apply to, these allegations represent novel requirements under ROSCA.

[9] As later explained, these settlements do not necessarily reflect what the law requires, but reasonable market participants may treat them as guidance in the absence of other sources.

[10] To illustrate how enforcement actions and policy statements can have the effect of changing the de facto legal standard, the FTC recently used a complaint filed in a settled enforcement action and a policy statement to signal a change in ROSCA's requirements. In *In re Movie Pass et al*, C-4751 (FTC Oct. 5, 2021), for the first time, the FTC alleged that ROSCA's requirement that sellers clearly and conspicuously disclose "all material terms of the

31)    My analysis of all ROSCA complaints filed prior to March 2021 finds:

- The most frequently alleged ROSCA deficiency had to do with disclosure in enrollment flows, followed by consent deficiencies and cancellation deficiencies. Over half (54%) of the cases analyzed alleged problems with all three ROSCA elements, 27% alleged problems with two elements, and 19% alleged problems with only one element (either disclosure or cancellation).

- Over half (54%) of the ROSCA cases analyzed alleged fraudulent conduct.[11]

- For cases alleging a failure to provide clear and conspicuous disclosures for enrollment, the most common allegations are that disclosures are hidden behind hyperlinks and in font size significantly smaller than the triggering enrollment claim, distance between the disclosure and the triggering claim was too far, and that any disclosure is buried in dense terms and conditions (without anything setting them apart from surrounding language, such as bold font). The average number of alleged disclosure deficiencies in these cases is 3.4, the maximum number of deficiencies is 6. There were no cases where the FTC used the term "dark patterns" to describe enrollment deficiencies.

- Every case with alleged consent deficiencies contains either express or implied allegations that disclosure deficiencies nullified consent.[12] Additionally, a quarter of ROSCA actions with alleged consent problems also allege that the action button was deceptively labeled so that consumers did not understand that pressing it would enroll them in a continuity plan. Each of these cases involves fraudulent conduct as defined above.

- For cancellation deficiencies, the most common allegation was failure to honor effective cancellation, followed by long phone wait times and failure to provide an online cancellation method. Allegations involving requirements that the consumer provide extra information or inputs beyond following cancellation procedures (e.g., exit questionnaires, responses to emails) and customer service representatives actively impeding cancellation were also common. The average number of alleged

---

transaction" include terms related to the underlying product or service, not just terms related to the negative option feature. In its 2021 Enforcement Policy Statement Regarding Negative Options, the Commission stated that required disclosures under ROSCA included "material terms related to the underlying product or service that are necessary to prevent deception[.]" *See* Enforcement Policy Statement Regarding Negative Option Marketing ("Negative Option Policy Statement"), 86 Fed. Reg. 60822, 60823 (Nov. 4, 2021). While neither of these actions involved any formal rulemaking or judicial or administrative decisions, they had the effect of providing new law for covered parties as shown by the countless client updates issued by firms in the wake of these two Commission actions.

[11] I define "fraudulent activity" using objective criteria that correlate with purposeful deception on the part of the defendant, such as the FTC seeking an *ex parte* TRO, lifetime bans for defendants, allegations of credit card laundering, high levels of charge backs, active measures to conceal conduct from law enforcement or credit card processors, use of language in the complaint such as "fraud," "scam," or "scheme" to characterize defendants' conduct, or deception surrounding the underlying product being sold.

[12] A consent deficiency is implied by a disclosure deficiency if the complaint alleges a violation of ROSCA's disclosure and consent requirements, but does not provide specific allegations about the lack of express informed consent.

cancellation deficiencies is 3.1, the maximum number of alleged cancellation deficiencies is 5, and every case involving cancellation problems alleges at least 2 cancellation deficiencies.

32)     My analysis indicates that, prior to March 2021, a reasonable market participant offering a negative option feature online would have expected to be in compliance with ROSCA unless one of the following conditions was met.[13]

- The substance of the disclosure was either false or incomplete

- Disclosure was ineffective due to a *combination* of at least two of the following non-mutually exclusive deficiencies:

    o   The negative option feature was not disclosed

    o   Behind a hyperlink

    o   Contained in dense terms and conditions

    o   Font significantly less prominent than surrounding text

    o   Displayed in a color that made it hard to notice

    o   Too distant from more prominent triggering claims that would be false absent effective disclosures (e.g., "Free Trial")

- Cancellation was ineffective due to *a combination of at least two* of the following conditions:

    o   Valid cancellation was not honored or ignored (e.g., the cancellation was not processed, refunds/store credit refused, required paying a restocking fee)

    o   Phone cancellation was understaffed leading to long wait times and high levels of call abandonment

    o   No online cancellation method was offered

    o   Cancellation required high levels of additional consumer input (e.g., completing lengthy exit questionnaires, responding to emails)

    o   Uncooperative customer service representatives actively complicated or frustrated cancellation

---

[13] It is also important to note that a reasonable market participant would consider the entire distribution of allegations in FTC ROSCA cases when forming expectations about what ROSCA requires, not only the small percentage of ROSCA cases that involve two or fewer of these conditions. Almost all (94%) of ROSCA cases involve three or more alleged deficiencies, and over half involve five or more alleged deficiencies.

- o    The cancellation method was difficult to find

- o    The online path was long or contained confusing language

- There are no cases that allege only consent deficiencies

33)    In sum, prior to March 2021, the commonalities in FTC enforcement actions involving ROSCA, along with official guidance regarding what is required to make disclosures "clear and conspicuous" and cancellation methods "simple," provided market participants with information with which they could predict with some certainty whether their information flows are compliant with what ROSCA requires.

34)    Other FTC guidance documents regarding ROSCA, clear and conspicuous disclosures, and express informed consent[14] speak to ROSCA requirements consistently with the requirements from ROSCA enforcement actions.

35)    The FTC's theory of liability in this case sets out an unpredictable departure from reasonable market participants' prior understanding of what was required to comply with ROSCA in two distinct ways.

36)    First, the FTC's First Amended Complaint ("Complaint") purports to map out a new ROSCA requirement focused on "balance" between the options to accept and decline an offer to enroll in a negative option feature. Many of these allegations rest on the highly subjective concept of "dark patterns," which the FTC has defined as "practices that trick or manipulate users into making choices they would not otherwise have made[.]"[15]

37)    Prior to March 2021, FTC guidance on ROSCA's requirements was consistent with the longstanding requirement that the net impression of any claim—both the triggering claim plus the disclosure—must be non-deceptive. The triggering claims are those that highlight the initial discounted price (e.g., "Free Trial"). ROSCA assures that a consumer's net impression is non-deceptive by requiring the seller to "clearly and conspicuously" disclose the full price of the product, when the trial period ends, when they will be billed for the product, and how to cancel.

38)    Neither the plain language of ROSCA nor prior FTC enforcement actions or policy statements that provide guidance to market participants on how to comply with ROSCA include language indicating that ROSCA requires "balance" between the options to accept or decline an offer.

39)    Many of the Complaint's allegations regarding disclosure deficiencies represent a departure from these prior understandings, and likely would not have been anticipated by a reasonable market participant.

40)    Second, apart from the novel dark-patterns-based "balance" requirements between the choices to accept or decline an enrollment offer, the allegations in the Complaint also set out a new, unpredictable departure from the past standards for clear and conspicuous disclosure,

---

[14] See Section IV, infra.
[15] Bringing Dark Patterns to Light, 2 (FTC Sept. 2022).

informed express consent, and simple cancellation as articulated in past ROSCA enforcement actions and relevant guidance documents.

### A.    Clear and Conspicuous Disclosures

41)    In the Complaint, the FTC alleges that the required enrollment disclosures were relatively small and distant from the triggering claim promising a "free trial" of Prime.[16]

42)    These allegations do not fit within the type of facts that the FTC had alleged to violate ROSCA prior to March 2021. In the Complaint, there are no allegations that any of Amazon's enrollment flows lack the necessary disclosures altogether, that they were false or incomplete, that they are available only behind a hyperlink, within dense boilerplate not set apart from surrounding text, or hidden by difficult-to-see font color. Such allegations, which are not found in the Complaint, collectively accounted for 96% of ROSCA cases filed prior to March 2021. In fact, only one such case includes allegations concerning the size of the disclosure and its distance from the qualifying claim without any additional allegations, and unlike the allegations in the Amazon Complaint, it also involved indicia of fraudulent conduct.[17]

43)    While some pre-March 2021 ROSCA cases alleged deficiencies related to the size and the proximity of the required disclosures, no prior ROSCA cases alleged disclosures were deficient where they were on the same computer screen (not requiring scrolling), adjacent to the triggering claim, and not buried in multiple lines of boilerplate text with nothing to set the disclosures apart (e.g. bolding, italicization, or a different color) or hidden by color and extraordinarily small font. Rather, all but one of the cases involving allegedly deficient size or proximity of disclosures contain a combination of multiple enrollment deficiencies, involve a materially greater distance from the triggering claim, and most involve active fraud and deceit. Thus, while allegations in past ROSCA complaints may use language similar to that used in the Amazon Complaint, when the FTC used this language in the past, it was describing wholly different disclosures.

### B.    Consent

44)    The Complaint's consent allegations concern (1) an alleged lack of effective disclosure, rendering consent not informed; and (2) an alleged failure to label the enrollment button in a manner that made clear to consumers that, by pressing the button, they would enroll in Prime.[18]

45)    To the extent the FTC's allegations of deficient consent focus on inadequate disclosures, as discussed above, they set out an unpredictably higher standard than that which a reasonable market participant would have anticipated prior to March 2021.

46)    The allegations concerning express informed consent that revolve around an alleged failure to affirmatively ensure that consumers understand the effect of pressing a button similarly set out an unpredictably higher standard for ROSCA compliance. Past ROSCA cases that allege lack of express informed consent due to lack of consumer understanding of an action button involve fraudulent schemes, purposefully designed to enroll consumers in multiple negative option plans

---

[16] Am. Compl ¶¶ 43, 44f, 45(c).

[17] *FTC v. Hornbeam Special Situations et al.*, 1:17-cv-3094 (N.D. Ga. Aug. 16, 2017).

[18] Am. Compl. ¶ 231(d)(ii).

without their knowledge.[19] In these cases, the action button was expressly labeled as necessary to complete the primary transaction (e.g., "COMPLETE CHECKOUT") even when pressing the button was not, in fact, necessary to complete that transaction. Further, in these cases, the relevant disclosures were either never provided or were provided very distant from the action button and actively hidden behind hyperlinks or in small transparent fonts. Each of these prior cases, moreover, fit into the category of fraud. The blatantly misleading labeling of the action button in conjunction with hidden or non-existent disclosures appears clearly designed to keep consumers from understanding they were enrolling in a second negative option plan, as is evidenced from the fact that each of these cases fall into the category of fraud.

47)    The FTC does not allege similar conduct in this case. In particular, the FTC does not allege that Amazon labels an action button as necessary to complete the primary transaction, that Amazon actively hid mandatory disclosures behind hyperlinks or in small transparent font, or that Amazon engaged in other fraudulent conduct.

### C.    Cancellation

48)    The FTC's alleged cancellation flow deficiencies focus on "imbalance" in the number of clicks between enrollment and cancellation, and alleged attempts to dissuade cancellations by informing consumers about the benefits of Prime, including past savings and offering discounts.

49)    These allegations are markedly different from the type of facts that the FTC has alleged to violate ROSCA prior to March 2021. For example, there are no allegations that Amazon failed to provide an online cancellation method, understaffed customer service phone lines used for cancellation, required additional consumer input (such as an exit survey or email request), or failed to honor valid cancellations, which together appear in the vast majority of all prior ROSCA cases involving deficient cancellation.

50)    Rather, the Complaint alleges an "imbalance" between Prime's enrollment process and Prime's online cancellation path, and Amazon's attempts to retain customers through providing them with information about the benefits of Prime and discounts.

51)    The small number of prior ROSCA cases that concern allegedly deficient online cancellation involve markedly distinct allegations from the allegations in this case. For example, one case involved a nine-page path that never mentioned the word "cancellation," and included multiple options using confusing or ambiguous language.[20] Other cases involved requirements that consumers fill out questionnaires, surveys, or an online cancellation flow that ended in an FAQ page, which then required consumers to email customer service to request a refund.[21] Further, some of these cases involved understaffed phone lines or the inability to cancel over phone or via

---

[19] *See e.g.*, *FTC v. F9 Advertising LLC*, 3:19-cv-1174 (D. P.R. Feb. 28, 2019) (Compl. ¶¶ 20-112); *FTC v. Triangle Media Corp.*, 18-cv-1388 (S.D. Cal. July 3, 2018) (Compl. ¶¶ 14-32); *FTC v. Apex Capital Group*, 2:18-cv-9573 (C.D. Cal. Nov. 28, 2018) (1st Am. Compl. ¶¶ 36-102); *FTC v. Credit Bureau Center*, 17-cv-00194 (N.D. Ill. Jan. 18, 2017) (Compl. ¶¶ 11-35).

[20] *FTC v. Age of Learning, Inc.*, 2:20-cv-07996 (C.D. Cal. Sept. 2, 2020) (Compl. ¶¶ 25-39).

[21] *FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017) (Compl. ¶¶ 19-25); *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020) (2d Am. Compl. ¶¶ 113-119); *FTC v. Match Group, Inc.*, 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019) (Compl. ¶¶ 53-64). Both *AdoreMe* and *Match* also involved longer cancellations flows (6 pages) than alleged in the FTC's complaint against Amazon (4 pages).

email.[22] Two cases also involve allegations of arbitrary reasons to deny cancellation or large undisclosed financial penalties for cancellation.[23] None of these allegations are present in the Amazon complaint.

52)    Further, allegations that it may have been difficult for consumers to discover how to begin the cancellation flow alone have never formed a standalone basis for a ROSCA action based on an allegedly deficient cancellation method. Nor has the FTC provided any guidance on where market participants must include a cancellation flow (other than requiring that it be offered via the same method as enrollment) for it to be "simple" under ROSCA.

### D.    Prime Video

53)    There are no allegations that Amazon failed to sufficiently disclose the relevant terms concerning the price and negative option feature of Prime in the Prime Video flow.

54)    Rather, the FTC's allegations concerning the Prime Video flow center on alleged confusion between Amazon Prime and Prime Video.[24] Thus, the alleged deficiencies are novel, and likely would not have been anticipated by a reasonable party to violate ROSCA given guidance from past FTC enforcement actions and statements.

## IV.    ANALYSIS

### A.    The FTC Act

55)    The FTC Act became law on September 26, 1914, and was later amended by the Wheeler-Lea Act of 1938 to expand the FTC's authority to include consumer protection. It serves as the primary statute of the Federal Trade Commission.[25] This empowers the FTC to "(a) prevent unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce; (b) seek monetary redress and other relief for conduct injurious to consumers; (c) prescribe rules defining with specificity acts or practices that are unfair or deceptive, and establishing requirements designed to prevent such acts or practices; (d) gather and compile information and conduct investigations relating to the organization, business, practices, and management of entities engaged in commerce; and (e) make reports and legislative recommendations to Congress and the public."[26]

56)    Section 5 of the FTC Act is the "core consumer protection statute enforced by the Commission."[27] The consumer protection element of Section 5 broadly prohibits unfair or deceptive acts or practices, 15 U.S.C. 45(a)(1), but contains no specific provisions on the face of the statute outlining requirements that marketers must follow.[28]

---

[22] *Age of Learning, supra*; *AdoreMe*, *supra*.

[23] *Match, supra*; *AdoreMe*, *supra*.

[24] *See, e.g.*, Am. Compl. ¶¶ 110, 121 ("Prime Video on mobile tricked consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option").

[25] *See* Federal Trade Commission Act, available at https://www.ftc.gov/legal-library/browse/statutes/federal-trade-commission-act.

[26] *Id.*

[27] Negative Option Rule ("2023 Proposed Rule"), 88 Fed. Reg. 24716, 24717 (Apr. 24, 2023).

[28] *Id.*

## B.    ROSCA

57)    ROSCA became law on December 29, 2010. Congress designed ROSCA to address "unfair and deceptive internet sales practices" and to ensure that consumers can make informed decisions when signing up for negative option plans.[29]

58)    ROSCA helped fill gaps in the Telemarketing Sales Rule ("TSR"), which did not apply to online sellers if they were not employing telemarketing to sell their negative option plans. ROSCA also addressed the practice of sharing a customer's billing data with a third party (known as "data pass") to enroll the customer into the third party's negative option product, which was not covered by the FTC's preexisting legal authority.[30]

### 1)    ROSCA's Statutory Text

59)    ROSCA contains two main provisions. The first deals with unaffiliated third-party sellers obtaining billing information from the initial merchant for post-transaction sales. In this case, the FTC does not assert any claims premised on ROSCA's first provision.[31]

60)    ROSCA's second provision concerns negative option sales online. This provision requires "any person" charging or attempting to charge a consumer for a good or service on the internet "through a negative option feature" to:

- "provide[] text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information"[32];

- "obtain[] a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction"[33]; and

- "provide[] simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."[34]

---

[29] Statement by FTC Chairman Jon Leibowitz Regarding House and Senate Passage of Legislation to Combat Deceptive Online Sales Tactics (December 15, 2010).

[30] *Id.*

[31] This provision prohibits an "initial merchant" from "disclos[ing] a credit card, debit card, bank account, or other financial account number . . . to any post-transaction third party seller for use in an Internet-based sale of any goods or services,"15 U.S.C. § 8402(b). It also requires a "post-transaction third-party seller" to "clearly and conspicuously disclose[] to the consumer all material terms of the transaction, including . . . a description of the goods or services being offered; . . . the fact that the post-transaction third party seller is not affiliated with the initial merchant, . . . [and] the cost of such goods or services" and "receive[] the express informed consent for the charge from the consumer" by obtaining the consumer's account information, name, and address, and "requiring the consumer to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed." 15 U.S.C. §§ 8402(a)(1)-(2).

[32] 15 U.S.C. § 8403(1).

[33] 15 U.S.C. § 8403(2).

[34] 15 U.S.C. § 8403(3).

61)     Congress did not authorize the FTC to promulgate rules pursuant to ROSCA. Rather, ROSCA provides that a violation of any of its provisions constitutes a violation of a rule under Section 18 of the FTC Act. As the FTC has acknowledged, ROSCA leaves many of its material terms undefined and ambiguous. For example:

62)     The FTC acknowledged that ROSCA "does not define clearly and conspicuously," "does not define express and informed consent," and "does not define simple mechanisms."[35] As the FTC explained recently in its negative option rulemaking, ROSCA "does not prescribe specific steps marketers must follow to comply with [its] provisions."[36]

63)     The FTC acknowledged that with respect to enrollment, ROSCA does not "identify anywhere where the disclosure [of material terms] must be placed to satisfy ROSCA," "say what font size is required for a disclosure to be considered prominent," "say anything about what you would need to look at to determine whether or how prominent a disclosure is," or "tell [market participants] how prominent the decline option needs to be."[37]

64)     The FTC acknowledged that with respect to cancellation, ROSCA "lacks specificity about cancellation procedures and the placement content and timing of cancellation related disclosures," "requires marketers to provide simple mechanisms for the consumer to stop recurring charges without guidance about what is simple," and "does not define a simple mechanism in any respect by reference to number of clicks, number of offers, length of time it takes, etc."[38]

### 2)  Judicial Guidance Regarding ROSCA

65)     The FTC brought its first ROSCA enforcement action in 2014. Since 2014, the FTC has brought 36 ROSCA enforcement actions. Nearly all such enforcement actions have resulted in a settlement between the defendant and the FTC. As a result, between 2014 and March 2021, there was minimal judicial guidance to online sellers on what types of disclosures and cancellation processes satisfy ROSCA.

66)     My research indicates that prior to June 2023, when the FTC filed this lawsuit against Amazon, there were only five reported district court opinions discussing ROSCA claims, each considering summary judgment or Rule 52(c) motions. These opinions provide only minimal information on the type of information flows that satisfy ROSCA's standards. The FTC has acknowledged that, even among these few cases, there is "some variation" on how to interpret ROSCA's requirements.[39]

67)     Three of these cases involve rulings for the FTC as a matter of law based on undisputed facts that paint clearly deficient disclosures or cancellation flows. For example, *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D. Cal. 2021), involved a requirement that consumers use telephone cancellation for online negative option sales, with up to 50% call abandonment rate due to poor staffing and a 6-point retention sales pitch intentionally designed to actively impede

---

[35] Rule 30(b)(6) FTC Dep. (FTC Dep. 1) at 155-56 (Sep. 10, 2024).
[36] 2023 Proposed Rule at 24718; FTC Dep. 1 at 180.
[37] FTC Dep. 1 at 217-21, 400.
[38] FTC Dep. 1 at 181-82, 376.
[39] FTC Dep. 1 at 153.

cancellation. Similarly, *FTC v. Credit Bureau Center, LLC*, 325 F. Supp. 3d 852 (N.D. Ill. 2018), involved a scheme where fake rental property ads were used to drive demand for a negative option credit monitoring plan, where the negative option terms buried in small font terms and conditions at the bottom of payment card page, with no mention of what the negative option service even provides). Likewise, *FTC v. Cardiff*, 2020 WL 6540509 (C.D. Cal. Oct. 9, 2020), concerned undisputed evidence that the negative option plan terms were listed on a separate webpage containing terms and conditions.

68)    The other two opinions merely held that issues of fact prevented judgment for either party. For example, in *FTC v. DIRECTV, Inc.*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018), the court held that evidence of trial offer terms behind hyperlinks, separate tabs, or info hovers presented an issue of fact that precluded ruling that the FTC could not, as a matter of law, prove its ROSCA claim. In *FTC v. Hornbeam Special Solutions, LLC*, 2022 WL 20357002 (N.D. Ga. Mar. 28, 2022), the court seemingly contradicted prior judicial and FTC guidance. Undisputed facts showed that defendants used information from online loan applications to prepopulate orders for a discount club continuity plan on an ordering page designed to look like a continuation of the loan application. In denying summary judgment, the court held that it would be reasonable for a fact finder to make multiple inferences regarding whether consumers consented to a negative option plan when there was a small checkbox with fine print, indicating that by checking the box the consumer was consenting to be enrolled in the discount club.

69)    Relevant to reasonable market participants trying to discern what ROSCA requires, none of these cases identify an information flow that satisfies ROSCA as a matter of law, only those that fail as a matter of law. Additionally, these cases are all district court decisions, and thus are not binding on future courts entertaining ROSCA claims.

### 3)    FTC Policy Statements Regarding ROSCA

70)    With scant judicial guidance and no FTC rules on what ROSCA requires, covered parties must look to informal guidance from the FTC to form opinions on what types of disclosures and procedures are lawful. In such circumstances, parties are likely to rely on two primary sources to understand how to comply with ROSCA: FTC guidance through policy statements, and the complaints from settled ROSCA and/or Section 5 enforcement actions.[40] I discuss FTC policy statements directly addressing ROSCA in this section and discuss ROSCA enforcement actions in the next section.

71)    In 2009, before ROSCA was enacted, the FTC issued a report on negative options, which provided recommendations for sellers offering negative options to comply with Section 5.[41] Since ROSCA's enactment, the FTC has only provided one formal policy statement on ROSCA, the 2021 Enforcement Policy Statement Regarding Negative Options, discussed below.

       i.    Enforcement Policy Statement Regarding Negative Option Marketing

---

[40] See *supra* at 3 n.4.
[41] This report arises from a rise of the fraudulent use of negative option marketing, and helped play a role in shaping ROSCA. *See* 2023 Proposed Rule at 24717.

72)     The FTC provided public guidance specifically concerning ROSCA in its Enforcement Policy Statement Regarding Negative Option Marketing (the "Negative Option Policy Statement"), which the FTC published on November 4, 2021. The Negative Option Policy Statement provides guidance regarding enforcement for negative option practices under ROSCA, Section 5, and other statutes and regulations that the FTC applies to negative option marketing.[42]

73)     The Negative Option Policy Statement discusses disclosure, consent, and cancellation, and represents "the Commission's current views on the application of relevant statutes and regulations to negative option marketing." According to the Commission, the Negative Option Policy Statement "should help marketers in their compliance efforts and better understand how the Commission enforces the law."[43]

74)     The Negative Option Policy Statement states that Section 5 and ROSCA require covered parties to disclose all material terms before collecting billing information. The Negative Option Policy Statement further provides disclosures should contain:

- Material terms related to the underlying product that are necessary to prevent deception;

- That consumers will be charged for the good or service, or that charges will increase after a trial period ends, and, if applicable, that the charges will continue on an ongoing basis unless a consumer takes action to stop such charges;

- The deadlines by which the consumer must act to avoid charges;

- The amount and frequency of charges;

- The date (or dates) of charges; and

- All information necessary to cancel.[44]

75)     Both the requirements related to disclosing material terms related to the underlying product and the requirement to provide "all information necessary to cancel" are novel. As noted, the FTC alleged the former requirement for the first time in *Movie Pass*, and the latter appears to be a new requirement.[45] That the FTC had to promulgate a new rule (Negative Option Rule (Oct. 16, 2024)) to attempt to enforce these disclosure requirements further suggests that they are novel, and that a reasonable market participant would not have found them necessary to comply with ROSCA in March 2021.

---

[42] The FTC notes that its enforcement involving negative option plans "primarily" relies on Section 5, ROSCA, and TSR. Negative Options Policy Statement at 60823; *see also id.* at 60824 ("the Commission now issues the following enforcement guidance based on its enforcement history.").

[43] *Id.* It further reads "This Policy Statement does not confer any rights on any person and does not operate to bind the FTC or the public. In any enforcement action, the Commission must prove the challenged act or practice violates one or more existing statutory or regulatory requirements." *Id.*

[44] *Id.* at 60824-25.

[45] *See, e.g.*, Am. Compl. ¶ 107 (defining the material terms of Prime to include "its price, and the fact that it renews automatically unless the consumer affirmatively cancels").

76)    According to the Negative Option Policy Statement, each of these disclosures must be "clear and conspicuous," and a seller satisfies this standard if its disclosures are "easily noticeable," "difficult to miss," or "unavoidable and easily understandable by ordinary consumers."[46]

77)    The Negative Option Policy Statement states that presence of the following criteria in a disclosure is necessary to meet the "clear and conspicuous" standard:

- "In any communication that is solely visual or solely audible, the disclosure should be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure should be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means."

- "A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, should stand out from any accompanying text or other visual elements so it is easily noticed, read, and understood."

- "In any communication using an interactive electronic medium, such as the internet or software, the disclosure should be unavoidable. A disclosure is not clear and conspicuous if a consumer needs to take any action, such as clicking on a hyperlink or hovering over an icon, to see it."

- "The disclosure should use diction and syntax understandable to ordinary consumers and should appear in each language in which the representation that requires the disclosure appears."

- "The disclosure should not be contradicted or mitigated by, or inconsistent with, anything else in the communication."

- "When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group."

- "Written disclosures, including those on the internet, should:

  o    if related to the negative option feature, appear immediately adjacent to the means of recording the consumer's consent for the negative option feature;

  o    if not related to the negative option feature, appear before consumers make a decision to buy (e.g., before they 'add to shopping cart'); and

  o    not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read and

---

[46] Negative Options Policy Statement at 60824-25.

understand the disclosures, including any information not directly related to the material terms and conditions of any negative option feature."[47]

78)     According to the Negative Option Policy Statement, to obtain express informed consent, a seller should:

- Obtain consent for the negative option feature separately from other parts of the transaction

- Not include any information that "interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers" to provide express informed consent

- Obtain the consumers' "unambiguously affirmative consent to the negative option feature"

- Obtain the consumers' "unambiguously affirmative consent to the entire transaction"

- Be able to verify such consent

- Not utilize prechecked boxes[48]

79)     According to the Negative Option Policy Statement, a cancellation method must be "simple" and "reasonable," with the latter qualifier an additional requirement not found in ROSCA. The Negative Option Policy Statement advises that, to meet this standard, a seller must provide cancellation mechanisms that "are at least as easy to use as the method the consumer used to initiate the negative option feature,"[49] and use the same medium that consumers used to consent to the negative option feature.[50]

80)     Finally, the Negative Option Policy Statement states that for cancellation to be "effective," sellers should not "impede the effective operation of cancellation procedures, and should honor requests that comply with such procedures."[51] It lists the following examples of prohibited impediments: hanging up on consumers, unreasonably long hold times, or lies concerning how to cancel or reasons for delays in cancellation.[52]

81)     The Negative Option Policy Statement does not prohibit a seller of a negative option feature from providing incentives to avoid cancelling, such as an offer or discount. Nonetheless, the Negative Option Policy Statement states that a seller "should not subject consumers to new offers or similar attempts to save the negative option arrangement that impose unreasonable delays on consumers' cancellation efforts," and then further explains that "multiple requests for a

---

[47] *Id*. at 60825.
[48] *Id*. at 60825 n.46
[49] *Id*. at 60825.
[50] *Id*.
[51] *Id.* at 60826.
[52] *Id*.

consumer to listen to additional offers, lengthy pitches, or ignoring a consumer's request to decline further offers could amount to an unreasonable delay."[53]

### ii. FTC Business Blog

82)     As part of the FTC's outreach to the general public, it regularly publishes blog posts to its "Business Blog," which informs the public about FTC consumer protection developments and provides guidance about legal requirements.

83)     The Business Blog also publishes summaries of recent enforcement actions brought by the FTC, which often end with words of advice for industry participants. For example, on July 3, 2018, the FTC published an article discussing the FTC's settlement of purported ROSCA violations with Triangle Media Corporation, a company that failed to disclose its free trial and autorenewal terms of its health products.[54] Using the enforcement action as an example, the FTC advised that industry participants should "[c]learly disclose all material terms and conditions up front and [not] bury key information in hard-to-find or hard-to-read mouse print or behind obscure hyperlinks."

### iii. Limitations of FTC Public Statements

84)     The FTC's public statements constitute non-judicial guidance, which is imperfect. As the FTC acknowledged in 2023 in a Notice of Proposed Rulemaking, "the current framework does not provide clarity about how to avoid deceptive negative option marketing."[55] For example, with respect to cancellation flows, the FTC explained that ROSCA "requires marketers to provide 'simple mechanisms' for the consumer to stop recurring charges without guidance about what is simple."[56]

85)     There is an important difference between judge-made common law arising from the interpretation of ambiguous statutory language from repeated litigation and the non-judicial guidance from FTC complaints and policy statements. The former maps out compliance standards through an objective process of finding certain fact patterns violate the relevant law and others do not. In this manner, judicial decisions based on varied fact patterns generate better and clearer information about the line between legal and illegal behavior.

86)     To know the zone of permissible information flows in the context of online negative option plans, a covered party ideally would know what features of information flows violate ROSCA, as well as what features do not. FTC ROSCA enforcement actions provide parties with some information about features of enrollment and cancellation flows that the FTC has reason to believe violates ROSCA. To date, however, there is no judicial or FTC decision holding a set of facts to not violate ROSCA.

87)     As a result, and as the FTC's lead enforcement attorney responsible for this case, Amanda Basta, has acknowledged, for companies in the marketplace, "there's no checklist of things that

---

[53] *Id*. at n. 48.
[54] Lesley Fair, *Time for a ROSCA recap: FTC says "risk free trial" was risky—and not free* (FTC Business Blog July 3, 2018).
[55] 2023 Proposed Rule at 24718.
[56] *Id*.

one could look at and say . . . as long as you check these boxes you comply with ROSCA," and "[t]he FTC has never put out there some objective list of criteria that one could review and say [']oh, I do all of these things and therefore I comply with ROSCA.[']"[57] "There's no checklist," and "no formula that someone can go look at and say, if I satisfy this formula my disclosures are clear and conspicuous."[58] Neither ROSCA nor the FTC "tell[s] you what things you need to check off to ensure your disclosure is sufficiently prominent."[59] Likewise, there are no "objective quantitative criteria" with which a company "could say [']I've checked these boxes it makes the mechanism simple.[']"[60]

88)    With respect to cancellation, in particular, Ms. Basta acknowledged that there is not "some number that [a company] could look at and say[] [']okay, a cancellation flow that has X steps is simple but a cancellation flow that has X plus 1 step is no longer simple.[']"[61] There is not "anything out there in the world that will tell [a company] a flow that is three clicks is simple but a flow that is more than three clicks is not simple."[62] There is no document "out there that tells business or individuals X number of pages is okay and simple but X plus 1 number of pages to navigate is no longer simple."[63] Regarding "the length of time it takes to cancel," there is not "any guidance on how long is too long in order to comply with ROSCA."[64] According to Ms. Basta, "in some context[s] three click cancellation can be simple and in other context[s] the same three click cancellation would no longer be simple."[65] And the FTC does not "have a definition of how long an unreasonable delay is" in terms of clicks or timing.[66]

89)    This state of affairs leaves parties with only broad set of principles from complaints, policy statements, and other guidance documents from which to discern how to comply with ROSCA.[67] Thus, parties are left with a zone of discretion to develop enrollment and cancellation flows that (1) comply with general principles found in guidance documents; and (2) avoid the precise features that the FTC has found to violate ROSCA in the past.

90)    The upshot is, as Ms. Basta has acknowledged, a firm can never be certain whether it is violating ROSCA because its requirements are not clearly defined: "ROSCA compliance creates

---

[57] FTC Dep. 1 at 162-63.
[58] *Id.* at 214.
[59] *Id.* at 220.
[60] *Id.* at 77.
[61] *Id.* at 357.
[62] *Id.* at 357.
[63] *Id.* at 365.
[64] *Id.* at 363.
[65] *Id.* at 376.
[66] Transcript of Sep. 11, 2024 Deposition of the Federal Trade Commission ("FTC Dep. 2") at 430.
[67] *See, e.g.*, Negative Options Policy Statement at 60823 (stating that with respect to requirements for negative options under Section 5, which are the same as what is required under ROSCA, "[a]lthough these basic guidelines are useful, the legality of a particular negative option depends on an individualized assessment of the advertisement's net impression and the marketer's business practice."); Negative Option Rule, 89 F.R. 90476, 90496 (noting that the purpose of the Negative Option Rule is to "prevent deception by businesses taking advantage of the gray areas in current law"); *id.* 90518 ("The final Rule also provides clarity about how to avoid deceptive negative option disclosures and procedures. For example, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. The final Rule now provides clear standards for sellers about, *inter alia*, the content; and timing of important information disclosures and what constitute 'simple mechanisms' for the consumer to stop recurring charges.").

challenges even for those who are trying to comply with the law," and "even those who would want to comply with ROSCA and intend to comply with ROSCA may find themselves noncompliant."[68]

## C.    **ROSCA Enforcement Actions**

91)    As Ms. Basta has acknowledged, "prior enforcement actions are . . . [a] window into the kind of behaviors that . . . are of concern."[69] Although not as useful as judicial opinions or published guidance, the complaints in enforcement actions provide some information about the type of conduct that the FTC believes violates ROSCA.[70]

92)    Complaints alleging violations of ROSCA identify (1) enrollment flows that the FTC believes fail to "clearly and conspicuously" disclose the necessary information or sufficiently evidence "express informed consent;" and (2) cancellation flows that the FTC contends are not "simple." If market participants are aware of the complaints, they can try to use this information to avoid using such flows themselves.[71]

93)    FTC Chairman Ferguson recently explained how the FTC builds up novel legal theories through settlements, and that it is understandable that parties consider these settlements when making business decisions due to the cost and uncertainty of litigation to test these theories: "[The Commission] develops a novel legal theory to accuse a firm of misconduct; the firm does not resist the accusation, content to settle so that the Commission goes away; the majority then treats the accusation as 'the law'; and the majority enforces the accusation-cum-law in future cases. . . . For most small businesses—and many large ones—a Commission investigation is costly. . . . The mere risk of a Commission investigation is coercive and can be enough to force some businesses to yield. In that sense, the Commission premising its enforcement decisions on untested theories of Section 5 trotted out only in settled cases can have the same coercive effect as a judicial interpretation of Section 5."[72]

94)    As a result, parties are left with a zone of discretion for setting up information flows in enrollment and cancellation paths to comply with ROSCA's broad language. This zone is bound from below by conduct alleged to violate ROSCA (based on ROSCA's plain language and prior enforcement action complaints) and from above by consent order requirements that go beyond

---

[68] FTC Dep. 2 at 502-504.

[69] FTC Dep. 1 at 209.

[70] The FTC standard for allowing staff to file a complaint is that it has "reason to believe" that the defendant is violating the relevant body of law. 15 U.S.C. § 45(b). This standard is lower than the preponderance of the evidence standard that would be required for the FTC to win in court.

[71] It is important to note, however, that these complaints simply list the features that the FTC contends violate ROSCA and do not provide instructions or insight on what a compliant flow would look like.

[72] Concurring Statement of FTC Commissioner Andrew N. Ferguson, *In re Asbury Automotive Group, Inc.*, D-9436 (FTC Aug. 16, 2024).[73] *See* FTCAMZN_0087084 (FTC interrogatory response in *FTC v. Match Group, Inc.*, 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019) (noting that the proposed consent order with Match "*goes beyond* what is strictly required to comply with ROSCA" because "Defendants should not be allowed to do the bare minimum required by ROSCA given their long history of knowingly violating the law") (emphasis added). *See also FTC v. Colgate-Palmolive Co.*, 380 U.S. at 395 ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the Act, respondents must expect some fencing in."). As discussed at page 3 note 5, *supra*, I do not consider consent orders in my analysis for this reason.

what ROSCA requires.[73] Within these parameters, market participants are left with freedom to comply with ROSCA's broad requirements. The FTC has acknowledged as much by explaining that ROSCA does not spell out specific required behavior.[74]

### 1) **Data Collection**

95)    I reviewed the complaints filed in all prior ROSCA enforcement actions prior to March 2021. In doing so, I sorted cases into various non-mutually exclusive categories depending on the conduct alleged to have violated ROSCA.

96)    I limited my analysis to ROSCA cases filed before March 2021, the date Amazon received the first CID from the FTC. This resulted in 26 ROSCA cases filed from October 2014[75] to December 2020.[76] The list of cases analyzed is in Appendix A.

97)    First, I categorized cases based upon which provisions of ROSCA the defendants were alleged to have violated: disclosure requirements, consent requirements, or cancellation requirements. Then, within each of the ROSCA provisions that are alleged to have been violated, I coded the specific conduct alleged to have caused the violation.

98)    For alleged violations of ROSCA's requirement to "provide[] text that clearly and conspicuously discloses all material terms of the transaction," I identified whether one of the following categories of conduct was allegedly present:

- Complete lack of disclosure

- Disclosure included terms that were either false or incomplete

---

[73] *See* FTCAMZN_0087084 (FTC interrogatory response in *FTC v. Match Group, Inc*., 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019) (noting that the proposed consent order with Match "*goes beyond* what is strictly required to comply with ROSCA" because "Defendants should not be allowed to do the bare minimum required by ROSCA given their long history of knowingly violating the law") (emphasis added). *See also FTC v. Colgate-Palmolive Co*., 380 U.S. at 395 ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the Act, respondents must expect some fencing in."). As discussed at page 3 note 5, *supra*, I do not consider consent orders in my analysis for this reason.

[74] *See, e.g.*, Negative Options Policy Statement at 60823 (stating that with respect to requirements for negative options under Section 5, which incorporates ROSCA, "[a]lthough these basic guidelines are useful, the legality of a particular negative option depends on an individualized assessment of the advertisement's net impression and the marketer's business practice."); *see also* FTCAMZN_0087082 (FTC interrogatory response in *Match*) ("there are many ways by which MGI could design a simple cancellation method"); FTCAMZN_0087083 ("ROSCA does not require specific features to comply with the law"). In responses to interrogatories regarding what type of information flows would comply with ROSCA requirement of a "simple" cancellation flow, the FTC responded by referencing guidance from the Negative Option Policy Statement and pointing to conduct the FTC has alleged is not simple. *See* FTCAMZN_0087085. [75] *FTC v. JDI Dating Limited*, 14-cv-8400 (N.D. Ill. Oct. 27, 2014).

[75] *FTC v. JDI Dating Limited*, 14-cv-8400 (N.D. Ill. Oct. 27, 2014).

[76] *See FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020). My analysis of what a reasonable person would believe is required to comply with ROSCA based on FTC enforcement actions is not changed if I use the date of the Complaint (June 2023), which brings five additional cases (*In re Movie Pass et al*, C-4751 (FTC Oct. 5, 2021); *FTC v. Wealthpress Holdings, Inc et al*., 3:23-cv-00046 (M.D. Fla. Jan. 12, 2023); *FTC v. Vonage Holdings et al*., 3:22-cv-6435 (D.N.J. Nov. 3, 2022), *FTC v. Benefytt Technologies, Inc., et al*, 8:22-cv-1794 (M.D. Fla. Aug. 8, 2022)*, and *FTC v. First American Payment Systems*, 4:22-cv-654 (E.D. Tex. July 29, 2022)). See Appendix B.

- Deficient disclosure, which includes:

    ○ Disclosures found after a hyperlink

    ○ Disclosures buried in dense text with other terms and conditions

    ○ Disclosures in font that is significantly smaller than the triggering enrollment claim

    ○ Disclosures in a color that hides their presence

    ○ Disclosures too far from the triggering enrollment claim[77]

- Express allegations that "dark patterns" were present[78]

99)    For alleged violations of ROSCA's requirement to "obtain[] a consumer's express informed consent," I identified whether any one of the following categories of conduct is present:

- A lack of clear and conspicuous disclosure that rendered consent uninformed[79]

- The default was set to opt-in

- The action button was deceptively labeled

- Specific allegations that "dark patterns" impeded consent

100)    For alleged violations of ROSCA's requirement to "provide[] simple mechanisms for a consumer to stop recurring charges," I identified whether any one of the following categories is present:

- Uncooperative customer service representatives actively impeding or complicating cancellation

- Valid cancellation was not honored (e.g., the cancellation was not processed; refunds/store credit refused)

- Cancellation required extra customer input, such as filling out questionnaires or emailing customer service

---

[77] This includes hyperlinks to pages containing disclosures.

[78] For purposes of my analysis, I consider only whether the complaints I reviewed explicitly refer to "dark patterns." I do not further consider whether the FTC's complaints allege design elements that the FTC or others may characterize as "dark patterns."

[79] If the complaint alleged failure to obtain "express informed consent," but (1) did not contain specific factual allegations concerning the lack of express informed consent, and (2) included allegations of deficient disclosures, I coded the reason for lack of consent as owing to deficient disclosures.

- No online method of cancellation was available[80]

- Long hold times for phone cancellation methods

- Confusing or lengthy online path

- The cancellation method was difficult to find

- Specific allegations that "dark patterns" impeded cancellation

101)   I also categorized actions according to whether the conduct was allegedly dishonest or fraudulent,[81] or merely failed to comply with ROSCA's requirements. I defined this category based on objective criteria in the complaint, including:

- Whether the FTC sought an *ex parte* temporary restraining order or preliminary injunction[82]

- Whether the FTC characterized the conduct at issue using words such as "fraud," "scam," or "scheme"

- Whether the defendants took active measures to conceal their conduct from law enforcement or payment processors

- Whether orders resolving FTC charges resulted in a ban from the use of negative option plans

- Whether there were allegations that claims involving the underlying product were deceptive

###     2)    <u>Summary</u>

102)   The most common alleged ROSCA deficiency has to do with disclosure in enrollment flows. Figure 1 shows that 23 (88%) FTC ROSCA cases during the operative period allege disclosure problems with enrollment, 20 (77%) allege consent problems, and 18 (69%) allege cancellation problems. 14 (54%) ROSCA cases allege problems with all three ROSCA elements, 7 (27%) allege problems with two elements, and 5 (19%) alleged problems with only one element (either disclosure or cancellation).

103)   No ROSCA cases during the time period included specific allegations that deficiencies were related to dark patterns.

**Figure 1**

---

[80] This field is coded as applicable when the complaint includes factual allegations that the defendant had no online method of cancellation.

[81] This standard is adopted from Section 19 of the FTC Act, which sets out the conditions under which the FTC can obtain monetary relief after a final administrative action. 15 U.S.C. § 57b(a)(2).

[82] The FTC uses *ex parte* procedures to freeze assets when it is concerned that the defendant is likely to destroy evidence, flee, or hide or spend assets that could be used to compensate consumers.



**Alleged Deficiency Categories**

104)    Over half of all cases (14 or 54%) prior to March 2021 contain indicia of a fraudulent scheme to deceive consumers using definitions described in Paragraph 101, suggesting that much of ROSCA enforcement during the relevant time period was focused on fraudulent conduct involving products for which demand for negative option plans would not exist absent active obfuscation of material terms.[83]

### 3)    Alleged Enrollment Disclosure Deficiencies

105)    In this section, I examine the alleged deficiencies in enrollment flows concerning ROSCA's requirements that a party offering a negative option plan online "clearly and

---

[83] Examples of fraudulent cases include those involving online sales of health supplements, weight loss products, or cosmetics with a deceptive promise of a "free trial," for which consumers were charged and that converted into a negative option plan. *See F9 Advertising* (Compl. ¶¶ 20-69); *FTC v. AH Media Group, LLC*, 3:19-cv-4022 (N.D. Cal. Sept. 6, 2019) (1st Am. Compl. ¶¶ 14-79); *FTC v. Triangle Media Corp.*, 18-cv-1388 (S.D. Cal. July 3, 2018) (1st Am. Compl. ¶¶ 14-36); *FTC v. RevMountain LLC*, 2:17-cv-2000 (D. Nev. Aug. 7, 2017) (Compl. ¶¶ 68-103). In order to trick consumers into believing that the product was free, defendants in these matters appeared to purposefully obfuscate the negative option disclosures by placing them behind hyperlinks, in small font, in hard-to-see colors, or burying them in dense terms and conditions. Many of these products also involved unsubstantiated claims and resulted in numerous consumer complaints and chargebacks. They also all involve allegations of active concealment of sales methods from payment card processors and law enforcement. Further, the FTC sought an *ex parte* TRO in three of these cases.

Other fraud cases involved fraudulent representations or actions to generate consumer demand for the product sold with a negative option. For example, one case involved generating leads for a credit reporting service through fake rental advertisements and fake emails from landlords requesting credit reports. *Credit Bureau Center* (Compl. ¶¶ 11-20).

Other fraud cases involved: a computer repair scam, where the defendants provided technical support to elderly consumers and falsely diagnosed computer problems for which they sold repair services that were not needed (*FTC v. Elite IT Partners*, 2:19-cv-125 (D. Utah March 7, 2019) (Compl. ¶¶ 14-42)); a scam where defendants impersonated government agencies in robocalls, emails, and texts to mislead owners and operators of tractor-trailer trucks into paying fees that Defendants charge consumers when assisting them in filing federal and state motor carrier registrations (*FTC v. DOT Authority*, 0:16-cv-62186 (S.D. Fla. Oct. 17, 2016) (Compl. ¶¶ 16-65)); and scams where Defendants falsely represented to consumers in advertisements that they would make substantial profits by subscribing to Defendants' products on securities trading (*Wealthpress* (Compl. ¶¶ 15-86)).

conspicuously" disclose the material terms of the negative option transaction and obtain consumers' "express informed consent."

106)    Figure 2 shows the percentage of cases alleging a violation of ROSCA's disclosure provisions containing a certain type of deficiency. A complete failure to provide the ROSCA-required disclosures appears in 9 (39%) cases, and disclosures that are either false or incomplete occur in 5 (22%) cases. 91% of cases involve alleged disclosures that are not clear and conspicuous for various reasons (e.g., behind a hyperlink, buried in terms and conditions, hidden color). These categories are not mutually exclusive, so they sum to greater than 100%. For example, a complaint may concern multiple information flows (either for different products or over time for the same flow), which may have different alleged deficiencies.

**Figure 2**

**Alleged Disclosure Deficiencies**



107)    The most common allegations are that disclosures are hidden behind hyperlinks and font size being significantly smaller than the enrollment claim, both appearing in 17 (74%) cases. Allegations that the distance between the disclosure and the triggering claim was too far and that any disclosure is buried in dense terms and conditions each appear in 16 (70%) cases. Less frequently alleged deficiencies include that the disclosure (or the link to the disclosure) is shown in a hard-to-read color, appearing in 8 (35%) cases. The average number of alleged disclosure deficiencies in these cases is 3.4, and the maximum number of such deficiencies is 6. With the exception of two cases that involve only allegations of false or incomplete disclosures, all cases involving lack of clear and conspicuous disclosure include at least two alleged deficiencies.[84]

---

[84] The contempt action against Nutraclick for violating its earlier order rests only on allegations that it lied about when the trial period ended in its disclosures, not on problems with the form of disclosure. *See FTC v. Nutraclick*

Further, of cases with disclosures that are not alleged to be false or incomplete, 67% include four or more alleged deficiencies.

### 4)    Alleged Consent Deficiencies

108)    In this section, I examine the alleged deficiencies in ROSCA's requirements that a party offering a negative option plan online obtain consumers' "express informed consent" before enrolling them for the negative option plan.

**Figure 3**

**Alleged Consent Deficiencies**



109)    As shown in Figure 3, every case with alleged consent deficiencies contains either express or implied allegations that disclosure deficiencies nullified consent. Five cases (25%) of ROSCA actions with alleged consent problems also allege that the action button was deceptively labeled so that consumers did not understand that pressing it would enroll them in a continuity plan. Only one case alleges express consent is nullified by prechecked boxes that automatically opt consumers into the program.

110)    There are no cases that allege only consent deficiencies.

### 5)    Alleged Cancellation Deficiencies

---

*LLC*, 2:16-cv-6819 (C.D. Cal. Sept. 22, 2016) (Compl. ¶ 27). The only disclosure-related allegation in the *MyLife* complaint involve a misleading disclosure that would lead consumers to believe that the six-month subscription fee would be charged on a monthly basis rather than all at once. *United States v. MyLife.com, Inc.*, 20-cv-6692 (C.D. Cal. July 27, 2020) (Compl. ¶¶ 31-32).

111)  In this section, I examine the alleged deficiencies in cancellation flows concerning ROSCA's requirements that a party offering a negative option plan online offer a "simple method" to cancel the negative option plan.

**Figure 4**

**Alleged Cancellation Deficiencies**



112)  Figure 4 shows the relative frequency of different types of alleged cancellation issues that were coded. The most common allegation was failure to honor effective cancellation, appearing in 13 (72%) cases, followed by long phone wait times, which appeared in 11 (61%) cases. Allegations involving cancellation being available only via phone or mail also appeared in 11 (61%) cases. Allegations involving requirements that consumers provide extra information or inputs beyond following cancellation procedures (e.g., exit questionnaires, responses to emails) and customer service representatives actively impeding cancellation each appeared in 6 (33%) cases. Allegations that consumers had difficulty discovering how to cancel appeared in 5 (28%) cases, and allegations that cancellation involved a confusing online path each appeared in only 4 (22%) cases.

113)  The average number of alleged cancellation deficiencies is 3.1, the maximum number of alleged cancellation deficiencies is 5. Every case involving cancellation problems has at least 2 alleged cancellation deficiencies, and 67% have more than 2.

6)    **Synthesis of ROSCA Guidance**

114)    My analysis indicates that, prior to March 2021, a reasonable market participant offering a negative option feature online would have expected to be in compliance with ROSCA unless one of the following conditions was met.[85]

- The substance of the disclosure was either false or incomplete

- Disclosure was ineffective due to a *combination* of at least two of the following non-mutually exclusive deficiencies:

  o    The negative option feature was not disclosed

  o    Behind a hyperlink

  o    Contained in dense terms and conditions

  o    Font significantly less prominent than surrounding text

  o    Displayed in a color that made it hard to notice

  o    Too distant from more prominent triggering claims that would be false absent effective disclosures (e.g., "Free Trial")

- Cancellation was ineffective due to *a combination of at least two* of the following conditions:

  o    Valid cancellation was not honored or ignored (e.g., the cancellation was not processed, refunds/store credit refused, required paying a restocking fee)

  o    Phone cancellation was understaffed leading to long wait times and high levels of call abandonment

  o    No online cancellation method was offered

  o    Cancellation required high levels of additional consumer input (e.g., completing lengthy exit questionnaires, responding to emails)

  o    Uncooperative customer service representatives actively complicated or frustrated cancellation

  o    The cancellation method was difficult to find

  o    The online path was long or contained confusing language

---

[85] It is also important to note that a reasonable market participant would consider the entire distribution of allegations in FTC ROSCA cases when forming expectations about what ROSCA requires, not only the small percentage of ROSCA cases that involve two or fewer of these conditions. Almost all (94%) of ROSCA cases involve three or more alleged deficiencies, and over half involve five or more alleged deficiencies.

- There are no cases that allege only consent deficiencies

### D.    Non-ROSCA Guidance

115)    The FTC enforces statutes other than ROSCA containing requirements regarding clear and conspicuous disclosure and express affirmative consent in the context of negative options and other marketing practices. As such, FTC enforcement and policy statements about these laws can also provide guidance to market participants about what is required to comply with ROSCA.

116)    As discussed below, my review of these additional sources of guidance on the requirements for clear and conspicuous disclosures and express informed consent provides a standard that is consistent with my conclusions regarding pre-March 2021 ROSCA cases.[86]

### 1)    Dot Com Disclosures and Dot Com Disclosures Guidance

117)    In May 2000, the FTC published the Dot Com Disclosures, which provided guidance to businesses seeking to develop online ads.[87] In 2013, the FTC updated this document to adapt to "dramatic changes in the online world" during the intervening time period.[88] This guidance synthesizes FTC policy with respect to what constitutes clear & conspicuous disclosures in online settings and serves as "administrative interpretations of laws administered by the Commission."[89] Although the FTC published this guidance over a decade ago, it has not been withdrawn or modified and thus could still be understood by a reasonable market participant to represent how the FTC views the clear and conspicuous standard for online disclosures.[90]

118)    According to the 2013 Dot Com Disclosures document, disclosures necessary to prevent a "triggering claim" from being deceptive, unfair, or "otherwise violative of a Commission rule," must be "clear and conspicuous."[91] The Dot Com Disclosures document highlights three key parameters to consider when determining whether a disclosure is clear and conspicuous: placement, proximity, and prominence.[92]

119)    Placement and proximity concern where the disclaimer is in relation to the triggering claim. According to the guidance, the disclosure and triggering claim should be on the same page, so that a consumer does not have to scroll to find the disclosure.[93] If the claim cannot be displayed on the same page, there should be prompts so that the disclaimer is unavoidable for consumers.[94] Disclosures related to price should be "immediately adjacent" to the triggering price claim, "and with appropriate prominence."[95]

---

[86] There is no analog to a "simple cancellation requirement" in other areas of FTC enforcement.
[87] Dot Com Disclosures, 1 (March 2013).
[88] *Id.*
[89] 16 C.F.R. § 1.5.
[90] *See, e.g.*, Online Advertising and Marketing, available at https://www.ftc.gov/business-guidance/advertising-marketing/online-advertising-marketing (last updated August 18, 2023) (the FTC listing the Dot Com Disclosures as a "Plain Language Guidance" document).
[91] Dot Com Disclosures, 6, 8.
[92] *Id.* at i.
[93] *Id.* at 8.
[94] *Id.* at 9.
[95] *Id.* at 10.

120)    Prominence concerns the likelihood that consumers notice the disclosure, holding placement and proximity constant. The guidance states that prominence is measured in relation "to the type size of the claim and other text on the screen."[96] Disclosures are more likely to be effective if they "are at least as large as the claim to which they relate."[97] Further, disclosures should be in a color "that contrasts with the background."[98] Disclosures that share the same color or graphic treatment as the claim they modify make it more likely that the consumer will relate the disclosure back to the claim.[99]

121)    Although the guidance emphasizes the importance of "placement, proximity, and prominence" it explains that "[t]he ultimate test is not the size of the font or the location of the disclosure, although they are important considerations; the ultimate test is whether the information intended to be disclosed is actually conveyed to consumers."[100] The guidance also explains that "[a]dvertisers have the flexibility to be creative in designing their ads, as long as necessary information is communicated effectively and the overall message conveyed to consumers is not misleading."[101]

122)    Not surprisingly, this guidance from the Dot Com Disclosures is consonant with that found in ROSCA cases and the Negative Option Policy Statement. Because the .com Disclosures predates FTC's enforcement of ROSCA, its principles of what constitutes clear & conspicuous disclosure in the world of online commerce generally are also applicable to negative options sales.

## 2)    FTC Negative Option Cases Prior to ROSCA Enforcement

123)    I also reviewed cases involving negative option plans that were brought after Congress passed ROSCA, but before the FTC's first enforcement action under ROSCA. Consistent with the ROSCA-specific guidance, these cases find lack of clear and conspicuous disclosure of material terms related to the negative option plans in the following circumstances:

- Terms are never disclosed[102];

- Terms are behind a hyperlink[103];

- Terms are in fine print, lighter-colored font, or buried in terms and conditions[104]; or

---

[96] *Id*. at 17.
[97] *Id*.
[98] *Id*.
[99] *Id*.
[100] *Id*. at 1, 7.
[101] *Id*. at 7.
[102] *FTC v. Moneymaker*, 211-cv-00461 (D. Nev. Apr. 14, 2011) (Compl. ¶¶ 21-24).
[103] *FTC v. Green Millionaire*, LLC, 112-cv-01102 (D. Md. Apr. 16, 2012) (Compl. ¶¶ 19-22); *FTC v. Jesse Willms*, 211-cv-00828 (W.D. Wash. May 17, 2011) (Am. Compl. ¶¶ 49-56); *FTC v. Jeremy Johnson*, 210-cv-02203 (D. Nev. Dec. 22, 2010) (1st Am. Compl. ¶¶ 406-416).
[104] *FTC v. Leanspa, LLC*, 311-cv-01715 (D. Ct. Dec. 1, 2011) (3rd Am. Compl. ¶¶ 42-54); *Green Millionaire*, *supra*; *Willms*, *supra*; *Johnson*, *supra*.

- Terms are distant from action buttons and payment card fields.[105]

### 3)    FTC Cases Regarding Online Disclosures Related to Privacy

124)    Another potential source of guidance on what constitutes clear and conspicuous disclosure online is from the FTC's body of cases applying Section 5 to privacy. Some FTC privacy cases, for example, have involved insufficient disclosure of data practices, which allegedly constitute deception under Section 5 or violate the Gramm-Leach-Bliley Act's Privacy Regulation[106], which the FTC enforces.

125)    For example, in *In re Sears Holding*, the FTC alleged that Sears engaged in deception by relegating disclosures about data collection practices of an application in small point font on the 75th line of a scroll box. The scroll box would only display 10 lines at a time, and Sears permitted customers to check a consent box without scrolling down to view the collection practices.[107]

126)    In *FTC v. Vizio, Inc.*, the FTC alleged that Vizio engaged in a deceptive omission when an installation pop-up screen that timed out within a minute did not provide any information about data collection and provided relevant information about such data collection only in a hyperlink, and the description in the settings menu did not provide any information about data collection.[108]

127)    Similarly, in *United States v. Upromise, Inc.*, the FTC alleged that Upromise violated a consent order—which had required it to disclose data collection practices "clearly and prominently"—by making a disclosure in "footnote"-style text, which began in the second paragraph of the second footnote, in light grey against a white background, and was "written in a style that is difficult for consumers to decipher."[109]

128)    In *In re Paypal, Inc.*, the FTC alleged that Paypal violated the Gramm-Leach-Bliley Act's Privacy Regulation[110], which requires a "clear and conspicuous" privacy notice, when the initial privacy notice was "printed in grey text on a light grey background," did not "call attention to the nature and significance of the information in the notice," and merely provided a hyperlink to the privacy policy, which did not have to be read before signing up.[111]

129)    Similarly, in *FTC v. Lending Club, Inc.*, the FTC alleged that Lending Club violated the Gramm-Leach-Bliley's Privacy Regulation when the only way consumers could access the required privacy notice was behind a hyperlink within defendant's terms and conditions that "did not indicate it was related to privacy, and then further find a link to Defendant's privacy policy within the lengthy document to which the link led."[112]

---

[105] *Leanspa*, *supra*; *Johnson*, *supra*.
[106] 16 C.F.R. § 313.
[107] *In re Sears Holding*, C-4264 (FTC Sept. 9, 2009) (Compl. ¶¶ 8-10).
[108] *FTC v. Vizio, Inc*, 2:17-cv-00758 (D.N.J, Feb. 6, 2017) (Compl. ¶¶ 19-22).
[109] *United States v. Upromise, Inc*., 1:17-cv-10442 (D. Mass. March 17, 2017) (Compl. ¶¶ 19-22).
[110] 16 C.F.R. § 313.
[111] *In re Paypal, Inc*., C-4651 (FTC May 24, 2018) (Compl. ¶¶ 36-38).
[112] *FTC v. Lending Club, Inc.*, 3:18-cv-02454 (N.D. Cal. Apr. 25, 2018) (1st Am. Compl. ¶¶ 49-52).

130)     In sum, the Dot Com Disclosures, pre-ROSCA negative option actions and privacy actions provide guidance on what constitutes clear and conspicuous disclosures that is entirely consistent with that found from analyzing explicit ROSCA guidance and ROSCA enforcement actions.

## 4)     FTC Cases Regarding Consent

131)     It is longstanding FTC law that charging a consumer without express informed consent is an unfair practice.[113] Several classes of cases can provide information on what type of consent mechanism fails to provide express informed consent.

132)     The FTC brought a series of cases against various online app stores for failing to provide adequate notice to parents that children could make unlimited in-app purchases once an app was installed or a parent entered a password. In some cases, the information about the in-app purchase window was not provided at all, or provided only in boilerplate in the terms and conditions. The allegations in these cases centered around the fact that because parents lacked the requisite knowledge about the in-app purchase window, they did not provide express informed consent for app purchases by their children.[114]

133)     In the offline setting, the FTC has found lack of consent when the defendant took affirmative steps to impede consumers from understanding that their accounts will be charged or actively concealing charges from consumers.

134)     For example, *FTC v. FleetCor Technologies, Inc.* involved a fleet fuel card provider that charged customers various fees without their consent. The FTC alleged that this conduct constituted an unfair practice because consumers did not consent to the fees.[115] Specifically, the payment card charges lacked consent because the fees were buried in dense boilerplate and the defendant actively tried to conceal information about the charges from consumers; for example, by not providing only summary invoices that did not include line items for these fees.

135)     In a similar vein, the FTC has brought cases involving "cramming," in which bad actors add charges for unauthorized services to consumers' mobile phone bills without their knowledge or consent. In these cases, the charges lack express informed consent because the consumer never authorized them and consequently has no knowledge of them.

136)     Together, these cases suggest the following guidance with respect to express informed consent to be charged: consumers cannot consent to a charge if they have no *ex ante* knowledge of the charge; a firm must provide notice of charges in something other than boilerplate distant from the action; consumers must take some type of affirmative action to consent to the charge even if they have the requisite knowledge; and a firm cannot actively thwart consumers from

---

[113] FTC Policy Statement on Unfairness, appended to *In re International Harvester Co.*, 104 F.T.C. 949, 1070 (1984); *FTC v. Fleetcor Technologies, Inc.*, 1:19-cv-05727 (N.D. Ga. Dec. 20, 2019).

[114] *See In re Apple, Inc*., C-4444 (FTC March 27, 2014) (The FTC alleged that Apple failed to notify parents that entering their password to install an application would open a 15-minute window in which unlimited charges could be made without authorization); *FTC v. Amazon.com, Inc.*, 2:14-cv-01038 (W.D. Wash. July 10, 2014) (The FTC alleged that Amazon's in-app system allowed children to incur charges on parents' account without informed consent); *In re Google, Inc*., C-4499 (FTC Dec. 5, 2014) (The FTC alleged that Google billed consumers millions of dollars for charges incurred by children using certain applications, without consent from account holders).

[115] *FTC v. FleetCor Technologies, Inc.*, 1:19-cv-05727 (N.D. Ga. Dec. 20, 2019) (Compl. ¶¶ 75-81).

discovering information about the charge. These predicates for finding lack of consent are consistent with those found in my analysis of ROSCA cases.

### 5) FTC Cases Regarding "Dark Patterns"

137)    I am aware that the FTC has stated in this case that there are prior cases in which it "has sued . . . for using Dark Patterns[.]"[116] These cases all either involve deceptive claims or disclosures that are inadequate to cure misleading claims, which is covered by other guidance as discussed above.

138)    Only one case identified by the FTC includes a complaint that expressly uses the term "Dark Patterns" to describe the inadequate disclosures.[117] *Credit Karma* involved allegations that the defendant advertised that customers were pre-approved for various credit cards, when in fact they were not. The disclosure explaining this fact was buried in dense text and required scrolling to discover.

139)    The remaining cases identified by the FTC involve either pure deception,[118] or misleading claims with inadequate disclosures in small font, colors that are hard to see, buried in dense text, or behind hyperlinks or info hovers.[119]

140)    In sum, the cases that the FTC has identified as involving "Dark Patterns" do not provide any additional or inconsistent guidance on what constitute clear and conspicuous disclosures compared to ROSCA enforcement actions and guidance.

### 6) FTC Cases Regarding the "Significant Minority" Standard

141)    A violation of ROSCA is also considered a violation of a rule promulgated under Section 18 of the FTC Act, and is thus an "unfair or deceptive act or practice" under Section 5.[120] In order for the FTC to prove deception under Section 5, it must show that a "significant minority" of reasonable consumers are deceived, meaning that they take away a deceptive or misleading meaning from the claim at issue.[121] Courts calculate the "significant minority" by dividing the total number of consumers deceived by an advertisement, considering the advertisements' overall net impression, by the total number of consumers exposed to an advertisement. I was asked by counsel to render an opinion on the case law regarding the "significant minority" standard and the percentage of consumer confusion that a reasonable market participant, prior to March 2021, would have believed to meet that standard. To do so, I reviewed case law and FTC guidance regarding the "significant minority" standard under the FTC Act.

---

[116] Response to First Interrog., No. 2, at 3-5.

[117] *In re Credit Karma*, C-4781 (FTC Sept. 1, 2022) (Compl. ¶¶ 4-16).

[118] *E.g.*, *FTC v. Effen Ads*, 2:19-cv-00945 (D. Utah Nov. 26, 2019) (Compl. ¶¶ 50-103); *FTC v. Blue Global*, 2:17-cv-02117 (D. Ariz. July 3, 2017) (Compl. ¶¶ 17-46).

[119] *E.g.*, *FTC v. Prog Leasing, LLC*, 1:20-cv-01668 (N.D. Ga. Apr. 20, 2020) (Compl. ¶¶ 15-20); *FTC v. LendingClub Corp.*, 3:18-cv-02454 (N.D.C.A. Apr. 25, 2018) (1st Am. Compl. ¶¶ 12-47).

[120] 15 U.S.C. §§ 57a(d)(3); 8404(a).

[121] *In re Telebrands Corp.*, 140 F.T.C. 278, 291 (2005), *aff'd,* 457 F.3d 354 (4th Cir. 2006).

142)    Traditionally, Courts have held that a consumer deception rate of at least 20% is required to satisfy the "significant minority" standard.[122] Several cases establish this principle within the context of the FTC Act.[123]

143)    Some, but not all, courts have found that a consumer confusion rate between 10-20% can be sufficient to establish a violation of the FTC Act.[124] The FTC itself has acknowledged that 10.5% is the minimum to be considered a "significant minority" of reasonable consumers.[125]

144)    However, Courts have recognized that "[t]he great weight of authority appears to be that '[w]hen the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely.'"[126]

145)    I am not aware of a single case discussing a 10% or lower consumer deception rate in the context of the FTC Act or ROSCA. Accordingly, a reasonable market participant would not have known, prior to March 2021, that a consumer confusion rate of lower than 10% could be alleged to violate ROSCA or Section 5.

## V.    THE FTC'S ALLEGATIONS IN THIS CASE ARE NOVEL AND WOULD NOT HAVE BEEN ANTICIPATED BY A REASONABLE MARKET PARTICIPANT

146)    The Complaint sets out an unpredictable departure from the prior understanding of what was required to comply with ROSCA in two distinct ways.

147)    First, the Complaint sets forth novel theories of ROSCA liability grounded in the subjective concept of "dark patterns," which focus on (1) "imbalance" between the options to accept or

---

[122] *See Fed. Trade Comm'n v. Am. Future Sys., Inc.*, 2024 WL 1376026, at *21 n.76 (E.D. Pa. Mar. 29, 2024) ("While courts have placed different numerical values on what constitutes a 'significant minority', most courts have interpreted the term to mean at least 20% of reasonable consumers in a target audience.").

[123] *See, e.g., In re Intuit Inc.*, 2023 WL 5970801, at *86 (Sept. 6, 2023) (FTC noting that "24.1% . . . represents a significant minority of consumers" and finding that defendant engaged in deceptive advertising in violation of Section 5 of the FTC Act); *ECM BioFilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599, 611 (6th Cir. 2017) (denying defendants' petition for review of Section 5 violation after concluding that the FTC's finding was supported by substantial evidence where two consumer surveys showing that between 20 to 36% of respondents had misconceptions about the biodegradability of defendant's products was a "significant minority" of consumers).

[124] *See, e.g., Firestone Tire & Rubber Co. v. F. T. C.*, 481 F.2d 246, 249 (6th Cir. 1973) (affirming FTC finding of deceptive advertising under 15 U.S.C. § 45(a) of the FTC Act where "15.3% of a scientifically selected sample" of consumers were misled and noting "[w]e find it hard to overturn the deception findings of the Commission if the ad thus misled 15% (or 10%) of the buying public."); *In the Matter of Telebrands Corp., TV Sav., LLC, & Ajit Khubani*, 140 F.T.C. 278, 291, 325 (2005) (concluding that "10.5% to 17.3%" of consumers being misled is a "significant minority" under FTC Act); *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1070 n.88 (C.D. Cal. 2012) (granting FTC's motion for summary judgment that defendant violated section 5 of FTC Act) ("As explained in the FTC's reply brief, the number of respondents who reported the challenged claims were communicated to them exceeds 10.5%. Accordingly, the copy test supports FTC's conclusion.")

[125] *See* "Made in the USA: An FTC Workshop" (Sept. 26, 2019), p. 9, available at https://www.ftc.gov/system/files/documents/public_events/1531858/made_in_the_usa_workshop_slides_9-26-19.pdf ("'Significant minority' = as low as 10.5% of consumers, net of control.")

[126] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:189 at 32–440 (4th ed. 2013)).Although this case alleges a violation of the Lanham Act, "[b]oth the FTC standard and the test for false advertising under the Lanham Act examine, and indeed hinge upon, the same concept, *i.e.*, the deception of consumers." *Rocky Brands, Inc. v. Red Wing Shoe Company, Inc.*, 2009 WL 10679619 at *3 (S.D. Ohio Dec. 9, 2009).

decline enrollment; (2) interstitial pages that present a "forced choice" between enroll and decline options; and (3) the use of "confirmshaming" and other forms of persuasive speech to retain or acquire consumers as Prime members.[127]

148)    The concept of "dark patterns" is inherently subjective and thus unpredictable. As noted, the FTC has defined "dark patterns" as design elements that "trick or manipulate users into making choices they would not otherwise have made[.]"[128] Under this definition, for a reasonable market participant to evaluate whether a particular design element constitutes a "dark pattern," they would need to anticipate for every consumer (1) what the consumer's baseline choice would be had they not encountered a particular design element; (2) whether the consumer's choice would change if they did encounter that same design element; and (3) whether a change in choice is due to the design element providing useful information to assist the consumer's choice, or instead is the product of manipulation away from their preferred option.

149)    The FTC's definition of "dark patterns" offers effectively no guidance to businesses on how to distinguish between design elements that influence consumers' choices by informing, assisting, or persuading (which is the goal of any kind of marketing) and design elements that do so by "manipulating" or "tricking" them (which, according to the FTC's definition, constitute "dark patterns").

150)    Second, apart from the novel "dark patterns"-based theories, the FTC employs liability standards for disclosure, consent, and cancellation that are markedly more stringent than prior guidance. These more stringent standards again would not have been predicted by a reasonable market participant.

### A.    The Complaint's "Dark Patterns" Allegations Represent a Stark Departure from Prior Guidance Regarding ROSCA's Requirements

#### 1)    The Concept of "Dark Patterns" Is Novel and Not Found in Prior FTC Enforcement Actions

151)    Until recently, no FTC guidance or enforcement action had referenced, much less defined, "dark patterns." This changed in September 2022, when the FTC issued a staff report entitled "Bringing Dark Patterns to Light" (the "Dark Patterns Report"). In the Dark Patterns Report, the FTC for the first time defined "dark patterns" as "design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm."[129]

152)    The Dark Patterns Report characterized prior FTC enforcement actions, including ROSCA cases, as targeting the unlawful use of "dark patterns."[130] Although none of the complaints in these cases referred to "dark patterns" by name or previously linked practices to the concept of "dark patterns," the Dark Patterns Report asserted that the cases nevertheless involved the use of what the FTC now describes as "dark patterns."[131]

---

[127] Am. Compl. ¶ 231.
[128] Bringing Dark Patterns to Light ("Dark Patterns Report"), p. 2 (Sept. 2022).
[129] *Id*. at 2.
[130] *Id*. at 2-20.
[131] *Id*.

153)    For example, the Dark Patterns Report explained the concept of "dark patterns" in the negative option context with reference to an experiment where "automatic monthly charge information was included only in small gray font at the bottom of the page."[132] Further, as an example of a dark pattern specifically in the ROSCA context, the Dark Patterns Report summarized the facts of *Health Formulation*, in which ROSCA-required disclosures were "buried in the middle of smaller, dense font."[133] Similarly, in the context of the cancellation flow, the report also refers to *Age of Learning* as using "dark patterns." There, the cancellation process took six to nine pages, each page with multiple links, with confusingly labeled options (e.g., "No Thanks, I'll wait"), without the word "cancel" appearing anywhere on the page.[134]

154)    As used in the Dark Patterns Report, the term "dark patterns" is largely a recharacterization of design elements that were long understood to violate ROSCA. In other words, the FTC did not identify any expansion of ROSCA's requirements, but instead simply restated existing ROSCA requirements with new language.

155)    The allegations in the Complaint, in contrast, represent a stark departure from prior FTC guidance on what constitutes a "dark pattern" in the ROSCA context. As shown in the analysis of prior ROSCA cases in Section IV, these types of alleged deficiencies—disclosures hidden in dense boilerplate or opaque font colors preventing them from being sufficiently clear and conspicuous to render a triggering claim of a "free trial period" non-deceptive,[135] or confusing online cancellation paths—have been present in a large percentage of ROSCA cases since 2014. Thus, as of September 2022 (18 months after Amazon received its first CID and 3 months after its second CID) when the FTC issued its Dark Patterns Report, the FTC had merely relabeled as "dark patterns" the type of enrollment, consent, and cancellation flows and design elements it had routinely alleged as inadequate in prior ROSCA cases. [136] It had not defined "dark patterns" to include the concepts of "imbalance" between enroll or decline options, forced choice from interstitial offers, or the use of "confirmshaming," which are all alleged in the Amazon complaint.

### 2)    "Dark Patterns" Allegations Concerning "Imbalance" Depart from Prior Guidance

156)    The Complaint purports to map out a new ROSCA requirement focused on "balance" between the options to accept or decline enrollment in a negative option enrollment flow. Many of these allegations rest on the novel and subjective concept of "dark patterns," which the FTC has defined as "practices that trick or manipulate users into making choices they would not otherwise have made."[137]

---

[132] *Id*. at 11.

[133] *Id*. at 2, 12 (citing *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020) and *FTC v. Health Formulas, LLC*, 2:14-cv-1649 (D. Nev. Oct. 20, 2014)).

[134] *Id*. at 12-14 (citing *FTC v. Age of Learning, Inc.*, 2:20-cv-07996 (C.D. Cal. Sept. 2, 2020)).

[135] *Id*. at 11-12.

[136] Further, as discussed in more detail below, the type of disclosure deficiencies alleged in *Health Formulation*, *Age of Learning*, and the Dark Patterns Report to be illegal dark patterns are not present in the complaint against Amazon. The Dark Patterns Report also cites *Raging Bull* as an example of a case involving ineffective telephone cancellation, which is not alleged in this case. *Id*. at 15, n.108.

[137] *Id*. at 1.

157) Table 1 lists the allegations that center on purported "imbalance" between the options to accept or decline to enroll in a negative option feature. Many of these allegations explicitly reference the concept of "dark patterns."

### Table 1
### Allegations Involving "Imbalance" Between Options
### to Accept and Decline Enrollment

| Enrollment Flow | Paragraph | Detail |
|---|---|---|
| UPDP | 38 | Prominent enroll button; inconspicuous decline link |
| | 41 | Decline link is in bottom corner of screen and includes asymmetric language |
| | 42 | Visual imbalance between enroll and decline options |
| | 44(e) | Larger orange button vs. smaller blue link |
| | 231(c)(i) | Used "**obstruction**" by making option to decline difficult to locate; difficult to find "the less prominent 'No Thank You' link to decline enrollment" |
| | 231(d)(i) | Used "**misdirection**" "by presenting asymmetric choices that make it easier to enroll in Prime than not" and sometimes offering only "a less prominent" decline option. |
| | 231(f) | Used "confirmshaming" through "emotive wording" around the disfavored option (decline) such as by "requiring consumers who sought to decline Prime to click a link stating 'No thanks, I don't not want fast, free delivery.'" |
| | | |
| SOSP | 50 | Enrollment and decline options were "visually imbalanced" |
| | | |
| SPC | 56 | Emphasized enroll option |
| | | |
| True SPC | 64 | "[M]anipulative designs" |
| | 66 | Large orange enroll button vs. small blue decline link |
| | 74 | "[S]maller white button that declines Prime" |
| | | |
| Mobile | 82 | White decline button below yellow enroll button |
| | 92, 98 | "[M]anipulative designs"; yellow enroll button vs. blue decline link |
| | 99 | Benefits of Prime shown immediately above enrollment button |

158) Congress, however, did not design ROSCA to ensure that the options to accept or decline enrollment in a negative option feature appeared "balanced." Rather, Congress's goal was to help consumers make <u>informed</u> choices between the two options.[138] Consistent with this purpose, ROSCA's requirements—and prior FTC guidance on those requirements—do not focus on

---

[138] *See* 15 U.S.C. § 8401.

"balance," but on disclosures. Specifically, ROSCA requires that a company disclose the material terms of a negative option plan.[139]

159)    In this way, ROSCA's requirements are consistent with FTC Act jurisprudence, pursuant to which the net impression of any claim—the triggering claim plus the disclosure—must not be deceptive. In the ROSCA context, the triggering claims are those that highlight the initial discounted price (e.g., "Free Trial"). ROSCA's statutory requirements are designed to render a consumer's net impression non-deceptive by requiring the seller to "clearly and conspicuously" disclose the material terms of the product, including the full price of the product, when the trial period ends, when consumers will be billed for the product, and how to cancel.

160)    As long as the seller has adequately disclosed the required elements of the negative option plan, however, neither the plain language of ROSCA, nor prior FTC enforcement actions or policy statements that provide guidance to market participants on how to comply with ROSCA, suggest that ROSCA provides any requirement of balance between options to accept or decline an offer to enroll.[140]

161)    Accordingly, the Complaint's allegation that Amazon violated ROSCA by failing to achieve "balance" could not have been anticipated by a reasonable market participant given guidance taken from past enforcement actions and FTC guidance.

### 3)    "Dark Patterns" Allegations Concerning Interstitial Offers to Enroll Depart from Prior Guidance

162)    The Complaint purports to map out a new ROSCA prohibition against interstitial offers to enroll—that is, enrollment offers that are made while a customer is proceeding through a different online flow, like a checkout process, and required the consumer to make a choice before proceeding through the original flow.

163)    Table 2 lists the allegations that center on Amazon's presentation of interstitial offers.

**Table 2**
**Allegations Involving Interstitial Offers**

| Enrollment Flow | Paragraph | Detail |
|---|---|---|
| UPDP | 38 | Interrupts shopping experience; forced selection to continue transaction |
| | 45(d) | Forced decision between enroll and decline |
| | 231(a)(i) | Used "**forced action**" by forcing consumer to choose to enroll or decline |
| | | |
| True SPC | 74 | Forced choice |

---

[139] *See In re Movie Pass* at 4.

[140] The clear & conspicuous standard contemplates context of disclosures relative to the triggering claims. For example, a disclosure may not be "conspicuous" if it is in significantly smaller font or harder to distinguish colors that the triggering claim. *See, e.g.*, Dot Com Disclosures, 17-18. However, this guidance relates to the disclosure *relative to the triggering claim*, not relative to the option to decline the offer.

| Enrollment Flow | Paragraph | Detail |
|---|---|---|
| | | |
| Mobile | 86 | Forced choice between enroll and decline options |

164)    Again, there is nothing in the plain language of ROSCA or prior FTC cases that suggests ROSCA prohibits the use of interstitial offers to enroll. ROSCA requires that disclosures about the material terms of the transaction be clear and conspicuous, and that consumers must provide informed express consent, but other than these core limitations, ROSCA neither proscribes nor prescribes a specific way the choice to enroll should be presented. What is more, as discussed in Section IV, there are no FTC ROSCA cases that allege disclosure or consent was deficient due to pausing a flow to provide consumers a choice to enroll or decline in a negative option plan.[141]

165)    Further, the allegation that "forcing" consumers to select the option to accept or decline an offer to enroll in Prime hinders consumer understanding of Prime's terms or otherwise vitiates informed express consent appears to contradict guidance in the *.com Disclosures*, which states that "[o]ne way to increase the likelihood that consumers have actually read and understood a disclosure [in the context of a negative option trial for a different product or service] is to require consumers to affirmatively acknowledge having seen the disclosure by choosing between multiple answer options, none of which is preselected."[142]

### 4)    "Dark Patterns" Allegations Concerning Commercial Speech Depart from Prior Guidance

166)    The Complaint purports to map out a new ROSCA requirement focused on Amazon's commercial speech, through which Amazon informs customers of Prime's benefits and attempts to persuade consumers to join Prime. For example, the Complaint faults Amazon for designing its online cancellation flow "to inform consumers about a) Prime benefits they would lose by cancelling Prime, and b) alternative payment methods available to them to keep Prime."[143] And the FTC's lead attorney responsive for this case has acknowledged that "for some of what the FTC claims are dark patterns, the issue is the words that Amazon is using," and for others, "the issue the FTC contends is problematic and leads to a dark pattern is a combination of the words Amazon is using and how . . . those words are being presented[.]"[144]

167)    Table 3 lists the specific allegations that center on Amazon's commercial speech in both the enrollment and cancellation flows.

---

[141] A series of cases involving deceptive upsells on the checkout path for a negative option plan perhaps provides the closest analogy, but these cases are readily distinguished. *See F9 Advertising* (Compl. ¶¶ 20-112); *Triangle Media Corp.* (Compl. ¶¶ 14-32); *Apex Capital Group* (1st Am. Compl. ¶¶ 36-102); *AH Media Group* (1st Am. Compl. ¶¶ 14-79); *RevMountain* (Compl. ¶¶ 68-103). They each involved allegations that the negative option plans for the primary product were not adequately disclosed, and there were either no disclosures, disclosures only behind hyperlinks, or in extraordinarily small font greyed out. Further, in these cases, the decline button was typically small, distant from the much larger accept button, and in hard-to-see font. The fact that the upsells interrupted the checkout flow for the first, deceptively procured negative option was never alleged as a fact rendering these flows illegal under ROSCA.
[142] Dot Com Disclosures, 18.
[143] Am. Compl. ¶ 161.
[144] FTC Dep. 1 at 106-07.

**Table 3**
**Allegations Targeting Amazon's Commercial Speech**

| Enrollment Flow | Paragraph | Detail |
|---|---|---|
| UPDP | 231(f) | Used "confirmshaming" through "emotive wording" around the disfavored option (decline) such as by "requiring consumers who sought to decline Prime to click a link stating 'No thanks, I don't not want fast, free delivery.'" |
| | | |
| Mobile | 99 | Benefits of Prime shown immediately above enrollment button |
| | | |
| Cancellation Flow | 231(b)(ii) | Emphasizing options that divert attention |
| | 231(c)(ii) | Forcing consumers to "view marketing and reconsider options other than cancellation" |
| | 231(d)(iii) | "presenting visually appealing options to perform acts other than cancel, such as exploring benefits" |
| | 141 | Displaying "marketing material on Prime services" |
| | 143 | Providing alternative pricing and discounts |
| | 144-45 | Providing information on lost benefits |

168)    There is nothing in the plain language of ROSCA or prior FTC ROSCA cases to suggest that truthful commercial speech that persuades consumers to enroll or dissuades consumers from cancelling violates ROSCA. ROSCA requires only that the seller provide a clear and conspicuous disclosure of the material terms of the transaction, obtain informed express consent, and provide simple cancellation mechanisms. ROSCA's statutory text does not prohibit sellers from touting the relative benefits of enrollment or attempting to persuade customers not to cancel. Further, as discussed in Section IV, there are no FTC cases that find enrollment flows deficient due to use of commercial speech to encourage enrollment.[145]

169)    Thus, the design elements the FTC alleges to be "dark patterns" in this case are novel, and a reasonable market participant utilizing enrollment and cancellation flows like Amazon's would

---

[145] While *Age of Learning*'s cancellation flows involved elements of marketing, its alleged deficiencies stemmed from multiple sources, including the length (6 to 9 pages) and confusing language. *Age of Learning* (Compl. ¶¶ 25-39). Further, unlike the current case against Amazon, there were no allegations in *Age of Learning* that offering discounts or highlighting product features directly contributed to deficiencies in providing a simple cancellation method. *Id.* In *AAFE*, live customer service representatives were alleged to have made "multiple attempts to 'save the sale' by offering free products and discounts and by extending trial periods." *FTC v. AAFE Products*, 3:17-cv-575 (S.D. Cal. Mar. 24, 2017) (Compl. ¶¶ 58-62). However, this was alleged to violate ROSCA's "simple cancellation" requirement because these save attempts "make the process more complex and substantially increase the duration of the call and consumers' cost to cancel." *Id.* (Compl. ¶ 62). In contrast, here, the allegations surrounding Amazon's commercial speech are *not* alleged to have increased the time or complexity of cancellation, but only that they provided information and discount offers to consumers. Adding informational paragraphs about the benefits of the subscription service is not one of the "alleged cancellation deficiencies" that appeared in multiple ROSCA cases. *See* Figure 4, p. 28.

not have anticipated that it was employing design elements (specific "words" and "how those words are presented") that would violate ROSCA.[146]

### B. The Complaint Sets Unpredictably More Stringent Standards for Disclosure, Consent, and Cancellation

170)    The Complaint suggests a new, unpredictable break from the prior standards for clear and conspicuous disclosures, express affirmative consent, and simple cancellation, which I described in Section IV.

### 1) Disclosure

#### i. Format

171)    The allegations concerning the lack of clear and conspicuous disclosure of relevant terms of Prime do not fit within what a reasonable market participant would have believed to violate ROSCA based on prior guidance. Instead, the standards the FTC is asserting in this case for ROSCA compliance mark an unpredictable upward departure from prior standards.

172)    First, there are no allegations that the enrollment flow lacked the necessary disclosures altogether, that they were false or incomplete, or that they suffered from some combination of deficiencies such as: being available only behind a hyperlink, being contained within dense boilerplate,[147] or being concealed in small font or a color that is hard to read. Such claims collectively comprise 96% of the FTC's ROSCA cases prior to March 2021.[148]

173)    Only one class of allegation in the Complaint concerning Prime's enrollment disclosures that somewhat aligns with past guidance: in several instances, the FTC alleges that enrollment disclosures "were in small font and at bottom of page."[149]

---

[146] The FTC identified 28 cases as involving dark patterns. *See* FTC's Supplemental Responses and Objections to Amazon.com, Inc.'s First Set of Interrogatories (Jan. 23, 2024), pp. 5-7. A review of these cases finds no instance of the term "dark pattern," nor any of alleged dark patterns in this case such as "forcing," "confirmshaming," or "misdirection."

[147] The Complaint colorably alleges disclosures in something akin to boilerplate in three instances. *See* Am. Compl. ¶ 50 (disclosure "at the very bottom, in the middle of a block of text in small font"); *id*. ¶ 61("in small font was a block of text"); *id*. ¶ 86 (disclosure in "a block of small print text"). While these allegations may use similar language as those pled in other ROSCA complaints, they describe wholly different disclosures. *See, e.g., Health Formulas* (Am. Compl. ¶ 42) ("The terms and conditions document is typically ten pages long" and relevant disclosures "buried in boxes with other fine print information that is confusing and difficult to read" and not found "until the middle of the paragraph"); *Triangle Media Corp.* (Compl. ¶ 21) (terms "buried in a separate "Terms & Conditions" hyperlink"); *FTC v. Bunzai Media Group*, 2:15-cv-4527 (C.D. Cal. June 25, 2015) (Compl. ¶ 48) (material terms found only "in a separate, multi-page terms and conditions webpage that is accessible by hyperlink"). By contrast, the Amazon disclosures alleged to be deficient in the cited paragraphs are in bold, immediately below the actions buttons, in similarly sized font to the surrounding text, and not in the middle of text concerning non-related issues. *See* Am. Compl. Attach L at 7; Attach H at 6; Attach G at 6.

[148] Only one case includes allegations concerning the size of the disclosure and its distance from the qualifying claim without any additional allegations, and unlike the allegations in the Amazon Complaint, it also involved indicia of fraudulent conduct.  See *FTC v. Hornbeam et al.*, 1:17-cv-3094 (N.D. Ga. Aug. 16, 2017).

[149] *See, e.g.*, Am. Compl. ¶ 43 (price of Prime not adequately disclosed because it "is located in small print at the bottom of the page, along with a link to Prime's terms and conditions"); *id*. ¶ 44f (text concerning price and autorenewal terms are "at the very bottom of the page, in small print"); *id.* ¶ 45(c) (same).

174)    Prior guidance on what constitutes clear and conspicuous disclosure emphasizes that prominence of disclosures should be measured relative to the "claim and other text on the screen," including potentially "distracting factors."[150] What the FTC alleges in the Complaint to be a disclosure that is too distant or too small to comply with ROSCA's clear and conspicuous standard, however, represents an unpredictably more stringent standard than prior guidance.

175)    From my analysis in Section IV, I can identify cases alleging disclosures in "small font" and "distant from the enrollment claim." While the allegations in these complaints may use similar language as used in the Amazon Complaint, Amazon's disclosures alleged to be deficient are materially different from the disclosures described in prior complaints to be in "small font" or "distant from the enrollment claim."

176)    In prior ROSCA cases, the flows that the FTC claims violate ROSCA tend to include multiple factors that contribute to disclosures being difficult to see. For instance, other cases highlight that flows should not use small and lightly colored fonts. In *FTC v. Triangle Media Corp.*, 18-cv-1388 (S.D. Cal. July 3, 2018), the FTC noted that relevant terms were hidden "in barely discernable print far below the colorful graphics and text where consumers input their personal and payment information and continue with their purchase." (Compl. ¶ 21; Figure 5) In Figure 5, these terms are the three lines of light gray text at the bottom of the webpage. Likewise, in *FTC v. Apex Capital Group, LLC*, 2:18-cv-9573 (C.D. Cal. Nov. 28, 2018), the flow in Figure 6 shows that disclosures were in the middle of the page but "in small type and in light gray font against a white background" and "overshadowed by the prominent, bold 'FREE TRIAL' language that is higher up on the webpage." (Compl. ¶ 56.) Notably, the FTC acknowledges that bolding text, like what Amazon does to its disclosures, will make certain words stand out on the page. (Compl. ¶ 52) (describing bold text as "prominent" and "overshadow[ing]" other text).

### *Figure 5 – Triangle Media Flow*

---

[150] Dot Com Disclosures, 17-19.



*Figure 6 – Apex Capital Group Flow*



177)    The FTC has also alleged disclosures are inadequate when contained in font colors that are actively displeasing to the eye. For example, disclosures on the payments page in *FTC v. One Technologies, LP*, 3:14-cv-5066 (N.D. Cal. Nov. 17, 2014), were in a white font on a light gray

background, a color combination that an employee noted "has been known to cause seizures in lab rats." (Compl. ¶ 37; Figure 7) Meanwhile, Amazon's disclosures are in black and bolded font against a white background.

*Figure 7 – One Technologies Flow*



178)    The FTC has also claimed that flows violate ROSCA when made in small font that are not in close enough proximity to the enrollment buttons. For example, in *In re Urthbox, Inc.*, FTC Matter No. C-4676 (April 3, 2019) the FTC noted that the disclosure "was in relatively small font and was not in close proximity to the 'CONTINUE' button." (Compl. ¶ 12; Figure 8) Meanwhile, Amazon's disclosures were in close proximity to the enrollment button.

*Figure 8 – Urthbox Flow*



179)    The amount of text is also an important factor to consider, especially if a party is doing nothing to make material terms stand out from other boilerplate language. In *FTC v. Bunzai Media Group*, 2:15-cv-4527 (C.D. Cal. June 25, 2015), the disclosure was six lines long without any bolding or other indication to emphasize the importance of the terms, with the FTC noting the disclosure "is in a significantly smaller print and is obscured by a variety of graphics and text." (Compl. ¶ 56; Figure 9) In *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020), the disclosures were contained in a text box which contained several pages worth of text that a consumer would have to scroll through to read.[151] (Compl. ¶ 78; Figure 10) Another example is *FTC v. Nutraclick, LLC*, 2:16-cv-6819 (C.D. Cal. Sept. 22, 2016), where the FTC noted relevant terms were contained within the middle of a long terms and conditions paragraph, and that due to the small print and the location of the terms away from the credit card field, consumers' eyes would be drawn to the large "RUSH MY SAMPLE" button rather than dense type. (Compl. ¶ 21; Figure 11)

**Figure 9 – Bunzai Flow**

---

[151] The ROSCA claims in *Raging Bull* only involved a failure to provide a simple cancellation method.



*Figure 10 – RagingBull Flow*



*Figure 11 – Nutraclick Flow*



180)   And in many cases, the FTC has stated that the terms are contained within small print and dense text on entirely different, hyperlinked pages. For example, in *FTC v. Elite IT Partners*, *Inc.*, 2:19-cv-125 (D. Utah March 7, 2019), the FTC noted that none of the material terms (a one year commitment, the auto renewal feature, and the fact that consumers would be charged for an additional second year if they fail to cancel in writing at least 30 days prior to auto-renewal) are contained on the page itself and instead are buried in hyperlinked Terms and Conditions. (Compl. ¶¶ 35, 37; Figure 12) In contrast, Amazon includes a link with more detail about its terms, but the material terms—such as price and autorenewal nature of Prime—are disclosed on the flow itself in bold black font.

*Figure 12 – Elite IT Flow*



181)   The disclosures alleged to be deficient in this case present a marked contrast to those alleged to be deficient due to "small font" and distance from enrollment claims in prior ROSCA cases discussed above. First, Attachments A-E in the complaint show price terms that are at the bottom of the page, but they are clearly visible without scrolling and are immediately adjacent to the enroll button. The relevant terms and conditions for price and cancellation are also in bold font that is only marginally smaller than the font on the enroll button.

182)   Attachments F and G show similar disclosures, with terms immediately adjacent to (below) the action button and in bold font, which is only slightly smaller than the largest font on the page.

183)   Attachments L-O, which illustrate mobile disclosures that the FTC alleges are deficient, also represent marked departures from prior guidance. For example, with respect to current mobile disclosures with "sticky footers," the price is displayed immediately below the "30 Days of Prime for Free" claim it is modifying.[152] Not only are there no prior ROSCA cases finding disclosures like these to be problematic, these disclosures adhere to recommended practices as stated in the Dot Com Disclosures.[153] While the terms and conditions are in a "sticky footer," consumers are prompted to read these terms and conditions. According to the Complaint, visible without scrolling in bold blue text is the following language: "By signing up, you acknowledge that you have read and agreed to Amazon Prime Terms and Conditions – see all."[154] Again, there are no ROSCA cases in the operative time period that find such disclosures to be deficient. In fact, this type of disclosure is recommended in the Dot Com Disclosures, which notes that explicit instructions to "see below for more information" about the relevant disclosure or "text that clearly continues below the screen" both are likely to prompt users to scroll.[155]

---

[152] I understand that a footer that appears on the bottom half of a page of a page in a mobile browser is sometimes known as a "sticky footer." Am. Compl. ¶ 96.

[153] Dot Com Disclosures, 10 (pricing terms should be immediately adjacent to triggering claim).

[154] Am. Compl. ¶ 100.

[155] *See* Dot Com Disclosures at 9.

184)    In sum, comparing the facts alleged in this case (and associated exhibits) with those in other ROSCA cases using the same allegations reveals a new, unpredictably higher disclosure standard for ROSCA compliance than can be found in prior FTC guidance.

b.    Timing

185)    Finally, the FTC's allegations that Amazon failed to provide disclosures before collecting billing information also set out a novel standard that would not be anticipated by a reasonable market participant.[156] This allegation suggests that ROSCA prohibits retailers like Amazon from re-using stored billing information and requires them instead to re-collect the billing information for each new transaction. A reasonable market participant viewing the plain text and legislative history of ROSCA, however, would not anticipate such an interpretation.[157]

186)    As noted, ROSCA requires online retailers using a "negative option" to "disclose[] all material terms before obtaining the customer's billing information."[158] The statute does not expressly address this fact pattern, in which Amazon has an ongoing business relationship with many consumers who have willingly provided billing information to Amazon to enroll in Prime or fulfill orders more easily. These consumers already know that Amazon has their billing information. Nothing in the statute or the FTC's subsequent guidance suggests to a reasonable market participant that ROSCA prohibits retailers from re-using stored billing information from customers who have willingly provided it in these circumstances.[159]

187)    There are key differences between 15 U.S.C. § 8402 (which addresses "post-transaction third-party sellers" that are the focus of ROSCA) and 15 U.S.C. § 8403 (which addresses the use of a "negative option" by "any" seller, such as Amazon), that highlight this point. Both Sections 8402 and 8403 requires the seller to provide disclosures "before obtaining the consumer's billing information."[160] But Section 8402 (applicable to "third-party sellers") specifically requires the seller to have the consumer re-enter their billing information and provide affirmative consent to a subsequent negative option transaction.[161]

188)    Even for "post-transaction third-party sellers"—the focus of the statute—Section 8402 of ROSCA does not prohibit the re-use of stored billing information; it only requires that billing information to be re-entered. Nothing in the text suggests that Section 8403 should be more restrictive than Section 8402. Additionally, Section 8402's specific requirement that the third-party

---

[156] Am. Compl. ¶ 272.

[157] *See F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 252 (3d Cir. 2015) ("Furthermore, courts generally resolve statutory ambiguity by applying traditional methods of construction. Private parties can reliably predict the court's interpretation by applying the same methods.").

[158] 15 U.S.C. § 8403(1).

[159] The closest FTC guidance is in cases involving deceptive upsells to additional negative option plans after illegally collecting a consumer's payment information. *See infra* at ¶¶176-81. As explained below, these cases provide no guidance for Amazon's situation as they involve fraudulently acquired payment information. That is, unlike Amazon, the defendants in those cases never obtained consumers' express informed consent to collect their payment information.

[160] 15 U.S.C. § 8402(1).

[161] 15 U.S.C. § 8402(a)(2) (requiring the "post-transaction third-party seller" to "obtain" the consumer's "full account number," and have the consumer "perform an additional affirmative action, such as clicking on a confirmation button or box that indicates the consumer's consent to be charged the amount disclosed").

seller obtain the consumer's "full account number" does not appear in Section 8403. In other words, Congress explicitly required third-party sellers to obtain the consumer's "full account number" before using the consumer's billing information, but Congress did *not* impose this burden on retailers like Amazon who are re-using previously provided billing information for a second time.

189)    As a result, a reasonable market participant would not anticipate that, if it had provided clear and conspicuous disclosure of the relevant terms of the negative option and acquired informed express consent from the customer to charge the customer's previously stored method of payment, it would be required to recollect billing information the customer had already willingly supplied.

190)    In its newly promulgated rule, the FTC itself clarifies this point, writing that: "where a consumer has previously provided account information to the seller and expressly allowed the seller to store that information, the seller must make the required disclosures prior to obtaining the consumer's consent to use saved account information," but *not* that the information must be recollected.[162]

### 2)    Express Informed Consent

191)    The complaint's consent allegations appear to revolve around (1) lack of effective disclosure, rendering consent uninformed; and (2) failure to accurately label the enrollment button to inform consumers that by pressing it they are enrolling in Prime.[163]

192)    To the extent that the allegations concerning express informed consent revolve around allegedly deficient disclosures in the enrollment flow, as explained above, the facts alleged in the complaint set out an unpredictably higher standard that could not be anticipated by a reasonable market participant.

193)    To the extent that the allegations concerning express informed consent are based on the "dark patterns" concept of "misdirection" involving consumer understanding of what the action button does, they similarly represent an unpredictably more stringent standard that a reasonable market participant could not anticipate.

194)    Only five prior cases have involved allegations that action buttons were mislabeled. Each of these cases involves facts far different from those alleged in the Amazon Complaint. These cases involved fraudulent conduct purposefully designed to conceal from consumers that they were signing up for negative option plans, as evidenced by the FTC seeking *ex parte* TROs or active attempts to conceal the nature of their business from credit card processors.

195)    For example, *Apex* involved allegations of deceptively marketed "upsell" negative option plans after a consumer signed up for the deceptively marketed original negative option plan. As alleged by the FTC, the large "COMPLETE CHECKOUT" button "suggested that that [it] was the final step in completing the purchase of the original . . . purchase," rather than the button to enroll

---

[162] Negative Option Rule, 89 F.R. at 90498.
[163] Am. Compl. ¶ 231(d)(ii).

them in a second negative option."[164] Further, there is no disclosure on the page to explain the terms of the negative option feature, only the deceptive "trial" price of $4.97 (See Figure 13, Apex).

*Figure 13 – Apex Flow (2)*



196)    The FTC alleged that a nearly identical design in *F9 Advertising* involved a button that would add an additional negative option plan to the customer's order labeled "COMPLETE CHECKOUT," appeared to many customers as "reconfirmation of consumers' original order."[165] Again, other than a small, grey hyperlink at the bottom of the page—which led to a pop-up window that required scrolling to find the negative option terms—there was nothing on the page to indicate that the consumer is signing up for a negative option. (See Figure 14, F9) Each of the additional cases involving deceptively labeled action buttons presents nearly identical design elements.[166]

*Figure 14 – F9 Flow*

---

[164] *Apex Capital Group* (1st Am. Compl. ¶ 59).

[165] *F9 Advertising* (Compl. ¶ 54).

[166] *See also RevMountain* (Compl. ¶103) (involving a nearly identical flow and alleging that "[t]he second 'Complete Checkout' button appears to be a reconfirmation of consumers' original order, and nothing on the upsell page alerts consumers that clicking it will initiate a second order."); *Triangle Media Corp.* (Compl. ¶ 26) (same); *AH Media Group* (1st Am. Compl. ¶ 36) ("Defendants' webpage indicates that consumers have not completed their order of the initial product until they click the bright, prominent 'COMPLETE CHECKOUT' button. This does not state that, by clicking 'COMPLETE CHECKOUT,' Defendants will add another item to the consumers' orders.").



197)    The facts alleged in these cases rendering the action button unable to provide consent to the transaction are far different from those alleged in the Amazon Complaint.

198)    For example, the interstitial in Attachment A to the Amazon Complaint, with action button labeled "Get FREE Two-Day Shipping," is immediately above text naming the product: "Enjoy Prime FREE for 30 days." Further, immediately below that text, visible on the same page without any scrolling, is bolded text stating the terms and conditions of "Your Amazon Prime Membership." Immediately above the action button, in bold relatively large text is "Start a 30-day free trial of Amazon Prime."

199)    Similarly, the interstitial in Attachment B to the Amazon Complaint, with action button labeled "Get FREE Two-Day Delivery," is immediately above text naming the product: "Enjoy Prime FREE for 30 days." Further, immediately below that text, visible on the same page without any scrolling, is bolded text stating the terms and conditions of "Your Amazon Prime Membership." What is more, the title of the page states in large font bolded text "We're giving you a 30-day FREE Trial of Prime" and then describes the core benefit of Prime immediately below in bold large font: "No minimum order threshold for FREE Two-Day Delivery," which is the same text as appears on the enroll button.

200)    In sum, there is a stark difference between the labeling of Amazon's action buttons—along with the proximity, conspicuousness, and clarity of relevant explanatory language on the page—

and the facts surrounding action buttons the FTC previously has alleged to deceive consumers discussed above. Accordingly, the allegations against Amazon based on the "dark patterns" concept of "misdirection" represent a new unpredictably more stringent standard that a reasonable market participant could anticipate.

### 3)    Simple Cancellation

201)    The cancellation allegations similarly represent an unpredictable departure from prior FTC guidance. The allegations center on the "imbalance" between Prime's enrollment process and Prime's cancellation process and Amazon's attempt to retain customers through providing them with information and discounts. Specifically, the FTC alleges that Amazon's cancellation flows are unlawful due to:

- Imbalance between the number of clicks between enrollment and cancellation;[167]

- Providing information to consumers about the benefits of Prime, including their past savings;[168]

- Highlighting less expensive billing arrangements to dissuade cancellation.

202)    These allegations do not fit within the type of facts the FTC has in the past alleged to violate ROSCA. As shown in Section IV, allegations concerning failure to honor effective cancellation, understaffed customer service centers that result in long phone wait times, failure to provide an online cancellation method, requiring customer input beyond cancellation request, or customer service reps actively impeding consumer cancellation through a variety of means appear alone or in combination with one another in all ROSCA cases involving deficient cancellation. Yet none of these types of allegations are present in the Amazon complaint.

203)    Notably, the FTC's recent Negative Option Rulemaking illustrates that it did not believe that ROSCA required "balance" between the number of pages or clicks to enroll and cancel.[169] That the FTC must amend the prenotification rule to require sellers to ensure that "[t]he simple mechanism . . . must be at least as easy to use as the method the consumer used to initiate the negative option feature," indicates that not even the FTC believes that a "balance" requirement is part of what ROSCA requires.[170]

204)    Only 4 cases prior to March 2021 involve allegedly unlawful online cancellation paths.[171] Each of these cases involve at least one cancellation deficiency in addition to a long or confusing online cancellation path, including: failure to honor effective cancellation, accepting cancellation via phone only, requirement of additional consumer input (such as filling out a lengthy

---

[167] Am. Compl. ¶ 128 (referencing Amazon's "four-page, six-click" cancellation process).
[168] *Id*. ¶¶ 141,143, 161.
[169] *See* 2023 Proposed Rule at 24735.
[170] *See id*. (proposing Section 425.6(b)).
[171] *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020); *FTC v. Age of Learning, Inc.*, 2:20-cv-07996 (C.D. Cal. Sept. 2, 2020); *FTC v. Match Group, Inc*., 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019); *FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017).

questionnaire or responding to an email asking for additional information), or long phone wait times.

205)    For instance, in *FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017), the online cancellation tool required consumers to complete a five question "Membership Quiz" about the VIP program and then navigate three other webpages promoting the VIP program before the cancellation request would be successful. (Compl. ¶ 22) For consumers that called to cancel, they faced long wait times of over 32 minutes in 2015. (Compl. ¶ 22) Other consumers had cancellation requests arbitrarily denied or representatives refused to refund store credit to customers. (Compl. ¶¶ 23-24)

206)    Likewise, in *FTC v. Match Group*, 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019), after locating the cancellation tab and inputting passwords, consumers would have to either click through a "retention offer" or a "cancel subscription" hyperlink. (Compl. ¶ 55) After that, consumers would have to click through two pages of survey questions where the subscriber's response to one question caused a follow up question to pop up. (Compl. ¶ 56) Failure to complete the survey meant consumers could not actually cancel.

207)    The complaints about Amazon's cancellation process focus on the length of Amazon's flows, alleging it involves four pages and six clicks. There are no allegations that Amazon employed questionnaires or other requirements that impeded consumers from cancellation beyond clicking the required buttons to cancel.

208)    Finally, although there are allegations that it may have been difficult for consumers to discover how to begin the Prime cancellation flow—which have also been present in some prior cases[172]—such allegations alone have never formed a standalone basis for a ROSCA action based on deficient cancellation method. Nor has the FTC provided any guidance on how consumers must discover a cancellation flow for it to be "simple" under ROSCA.

209)    Thus, based on guidance provided by ROSCA actions prior to March 2021, a reasonable market participant would not have expected that a cancellation flow such as the one the FTC alleges Amazon employed would violate ROSCA's requirements.

### C.    Prime Video

210)    There are no allegations that Amazon failed to sufficiently disclose the relevant terms concerning the price and negative option feature of Prime during the Prime Video flow.

211)    Rather, the FTC's allegations concerning the Prime Video flow center on alleged confusion between Amazon Prime and Prime Video.[173] There are no prior cases or guidance that suggests that consumer confusion about the version of the product they are purchasing—particularly faced with accurate disclosures to the contrary—is deficient for ROSCA purposes. Thus, the alleged

---

[172] *Id*. For example, in *Age of Learning*, the cancellation flow was only accessible by clicking on "Membership" and then finding a small, lightly colored link to a "Cancellation Policy." (Compl. ¶ 25).
[173] *See, e.g.*, Am. Compl. ¶¶ 110, 121 ("Prime video on mobile tricked consumers into signing up for Prime instead of Prime Video, which would be a lower-cost option").

deficiencies are novel, and likely would not have been anticipated by a reasonable party to violate ROSCA given guidance taken from past enforcement actions and statements.

## VI.   CONCLUSION

212)   Based on (1) my expertise as an economist and law professor who studies and teaches consumer protection law, including ROSCA, and my experience as a former senior-level employee of the FTC; and (2) my analysis of relevant guidance on how the FTC enforces ROSCA and the complaint in the current case, I have formed the following opinions.

213)   Opinion 1: Prior to March 2021, a reasonable market participant would have expected to be in compliance with ROSCA unless one of the following conditions were met:

- The substance of the disclosure was either false or incomplete

- Disclosure was ineffective due to *a combination* of at least two of the following non-mutually exclusive deficiencies:

  o   The negative option feature was not disclosed

  o   Behind a hyperlink

  o   Contained in dense terms and conditions

  o   Font significantly less prominent than surrounding text

  o   Displayed in a color that made it hard to notice

  o   Too distant from more prominent triggering claims that would be false absent effective disclosures (e.g., "Free Trial")

- Cancellation was ineffective due to *a combination* of at least two the following conditions:

  o   Valid cancellation was not honored or ignored (e.g. the cancellation was not processed; refunds/store credit refused; required paying restocking fee).

  o   Phone cancellation was understaffed leading to long wait times and high levels of call abandonment.

  o   No online cancellation method was offered.

  o   Cancellation required high levels of additional consumer input (e.g., completing lengthy exit questionnaires, responding to emails).

  o   Uncooperative customer service representatives actively complicated or frustrated cancellation.

  o   The cancellation method was difficult to find.

     o     The online path was long or contained confusing language.

214)    Opinion 2: The allegations in the FTC's complaint against Amazon in this case represent an unpredictable departure from this prior guidance in two primary ways. The first departure from prior guidance is the novel theory of liability grounded in the subjective concept of "dark patterns" that would hold Amazon liable for allegedly failing to provide sufficient balance between the "enroll" and "decline" options in the Prime enrollment flow, employing interstitial pages, and engaging in persuasive commercial speech to obtain and retain customers. The second departure from prior guidance is the employment of much more stringent tests for "clear & conspicuous disclosure," "express affirmative consent," and "simple cancellation."

215)    As a result, a reasonable market participant prior to March 2021 would not have anticipated that the facts alleged in the Amazon complaint would violate ROSCA.

Executed on February 21, 2025 in Alexandria, Virginia.

Dated: _2/21/2025_                    _James C. Cooper_
                                          James C. Cooper, Ph.D., J.D.

## Appendix A

## ROSCA Cases Reviewed

- *FTC v. AAFE Products*, 3:17-cv-575 (S.D. Cal. Mar. 24, 2017)

- *FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017)

- *FTC v. Age of Learning, Inc.*, 2:20-cv-07996 (C.D. Cal. Sept. 2, 2020)

- *FTC v. AH Media Group, LLC*, 3:19-cv-4022 (N.D. Cal. Sept. 6, 2019)

- *FTC v. Apex Capital Group*, 2:18-cv-9573 (C.D. Cal. Nov. 28, 2018)

- *FTC v. Benefytt Technologies, Inc., et al*, 8:22-cv-1794 (M.D. Fla. Aug. 8, 2022)

- *FTC v. Bunzai Media Group et al.*, 2:15-cv-4527 (C.D. Cal. June 25, 2015)

- *FTC v. Credit Bureau Center*, 17-cv-00194 (N.D. Ill. Jan. 18, 2017).

- *FTC v. DirecTV*, 3:15-cv-1129 (N.D. Cal. Mar. 11, 2015)

- *FTC v. DOT Authority*, 0:16-cv-62186 (S.D. Fla. Oct. 17, 2016).

- *FTC v. Elite IT Partners*, 2:19-cv-125 (D. Utah March 7, 2019).

- *FTC v. F9 Advertising LLC*, 3:19-cv-1174 (D. P.R. Feb. 28, 2019)

- *FTC v. First American Payment Systems*, 4:22-cv-654 (E.D. Tex. July 29, 2022)

- *FTC v. Health Formulas, LLC*, 2:14-cv-1649 (D. Nev. Oct. 20, 2014)

- *FTC v. Hornbeam et al.*, 1:17-cv-3094 (N.D. Ga. Aug. 16, 2017)

- *FTC v. Jason Cardiff et al.*, 18-cv-2104 (C.D. Cal. Oct. 24, 2018)

- *FTC v. JDI Dating Limited*, 14-cv-8400 (N.D. Ill. Oct. 27, 2014)

- *FTC v. Match Group, Inc.*, 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019)

- *FTC v. Nutraclick LLC*, 2:16-cv-6819 (C.D. Cal. Sept. 22, 2016)

- *FTC v. One Technologies LP et al*, 3:14-cv-5066 (N.D. Cal. Nov. 17, 2014)

- *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020)

- *FTC v. RevMountain LLC*, 2:17-cv-2000 (D. Nev. Aug. 7, 2017)

- *FTC v. Tarr Inc.*, 17-cv-2024 (S.D. Cal. Nov. 15, 2017)

- *FTC v. Triangle Media Corp.*, 18-cv-1388 (S.D. Cal. July 3, 2018)

- *FTC v. Vonage Holdings et al.*, 3:22-cv-6435 (D.N.J. Nov. 3, 2022)

- *FTC v. Wealthpress Holdings, Inc et al.*, 3:23-cv-00046 (M.D. Fla. Jan. 12, 2023).

- *In re Movie Pass et al*, C-4751 (FTC Oct. 5, 2021)

- *In re: UrthBox, Inc.*, FTC Matter No. C-4676 (April 3, 2019)

- *U.S. v MyLife.com, Inc.*, 20-cv-6692 (C.D. Cal. July 27, 2020)

**Appendix B**

**Elements of ROSCA Actions Through Complaint (6/2023)**

***Figure A1***
***Alleged Deficiency Categories (Pre-Complaint)***



***Figure A2***
***Alleged Disclosure Deficiencies (Pre-Complaint)***



***Figure A3***

*Alleged Consent Deficiencies (Pre-Complaint)*



*Figure A4*
*Alleged Cancellation Deficiencies (Pre-Complaint)*



Appendix C

# JAMES CAMPBELL COOPER

571-244-3104
james.cooper103@icloud.com

---

## Employment

**2016 - Present:** Professor of Law and Director, Program on Economics & Privacy, Antonin Scalia Law School, George Mason University, Arlington, VA:

- ❑ Teach Economics for Lawyers, Consumer Protection Law, Economic Foundations for LLM Students, and Digital Information Policy Seminar.

- ❑ Regularly teach on topics related to the economics of consumer protection and competition in educational programs for federal and state judges, federal and international regulators, and state attorney general staff.

- ❑ Publish and present original scholarly research on topics involving privacy, data security, law & economics, consumer protection, and antitrust.

- ❑ Lead academic center devoted to fostering economic analysis of privacy and data security policy, including managing grant program for original economic research, organizing and teaching classes related to the economics of privacy & data security for government officials and law professors, and organizing and participating in large-scale public policy and academic programs.

**2019 – Present:** Academic Affiliate, NERA Economic Consulting

- ❑ Provide economic analysis on liability and damages for clients involved in FTC consumer protection matters, including Section 5 deception and unfairness, TSR, and ROSCA claims.

- ❑ Provide economic analysis for clients concerning competition and consumer protection issues in digital advertising markets

**2018-2019:** Deputy Director for Economic Analysis, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC:

- ❑ Provided legal and economic analysis for the Director of the Bureau of Consumer Protection (BCP) and FTC Chairman on consumer protection cases and broad policy issues surround privacy, data security, remedies, and deception. Directed BCP staff to shape liability and remedy theories for specific cases. Coordinated with Bureau of Economics front office and staff economists on cases and policy issues.

**2011-2016:** Director, Research & Policy, Law and Economics Center, and Lecturer in Law, Antonin Scalia Law School, George Mason University School of Law, Arlington, VA:

- ❑ Created and directed policy initiatives and oversaw large-scale empirical projects for Law & Economics Center. Coordinated and presented original work in academic programs on topics including antitrust, law & economics, privacy, and data security.

- ❑ Instructor for Law & Economics Center educational programs for state and federal judges, competition officials, attorneys general, and law professors. Teaching modules included behavioral economics, antitrust economics, labor economics, risk & uncertainty, economic theory of torts, and economics of information. Taught economic foundations of legal studies to 1Ls.

| 2009-2011: | Advisor for Commissioner William E. Kovacic, Federal Trade Commission, Washington, DC: |
|---|---|

- ❑ Advised Commissioner Kovacic on the legal and economic dimensions of antitrust and consumer protection cases and policy. Coordinated with senior staff from the Bureaus of Competition, Consumer Protection, and Economics, as well as outside parties on various antitrust and consumer protection matters, including mergers, coordinated and unilateral conduct, advertising, fraud, and privacy policy.

| 2003-2009: | Office of Policy Planning, Federal Trade Commission, Washington, DC: |
|---|---|

- ❑ Served as Acting Director (Jan. 2009-May 2009), Deputy Director (2005-2008), Assistant Director (2004-2005), and Attorney Advisor (2003-2004).

- ❑ Primary responsibility for FTC advocacy program, which involved submission of letters, testimony, and amicus briefs at state and federal level setting forth FTC views on competition and consumer protection matters. Primary or major responsibility for several FTC reports, including those on real estate brokerage, postal reform, innovations in healthcare delivery, and the *Noerr-Pennington* doctrine. Routinely spoke on issues involving FTC competition policy before industry groups and members of foreign competition authorities.

| 2000-2003: | Associate, Antitrust Group, Crowell & Moring LLP, Washington, DC: |
|---|---|

- ❑ Counseled clients on antitrust ramifications of business transactions. Represented clients before FTC and DOJ on mergers and other business transactions. Worked with economic experts in complex antitrust cases.

## Published Academic Work

**Books:**

Henry N. Butler, James C. Cooper, Joanna Shepherd, ECONOMIC ANALYSIS FOR LAWYERS, Carolina Academic Press (4th Ed., 2024)

THE REGULATORY REVOLUTION AT THE FTC: A THIRTY-YEAR PERSPECTIVE ON COMPETITION AND CONSUMER PROTECTION (Editor), Oxford University Press (2013)

**Articles:**

*Does Privacy Want to Unravel?*, 37 HARV. J.L. & TECH. 1039 (2024)

*Anonymity and Online Search: Measuring the Privacy Impact of Google's 2012 Privacy Policy Change,* 19 REV. L. & ECON 393(2023)

*Antitrust and Privacy: It's Complicated*, 2022 IL. J.L.TECH. & POLICY 343 (2022) (with John Yun)

*Privacy Rulemaking at the FTC, in* CONCURRENCES, FTC'S RULEMAKING AUTHORITY (2022)

*Unreasonable: A Strict Liability Solution to the FTC's Data Security Problem,* 28 MICH. TECH. L.J. 257 (2022) (with Bruce Kobayashi)

*Equitable Monetary Relief Under the FTC Act: An Opportunity for a Marginal Improvement,* 83 ANTITRUST L.J. 301 (2021) (with Bruce Kobayashi) (*winner, 2021 Antitrust Writing Awards, Best Antitrust Academic Article, Procedure Category*)

*Privacy & Antitrust, in* GLOBAL ANTITRUST INSTITUTE REPORT ON THE DIGITAL ECONOMY (2020)

*Conflicts of Interest on Expert Committees: The Case of FDA Advisory Committees*, 62 J.L & ECON. 321 (2019) (with Joseph Golec)

*A Chip off the Old Block or a New Direction for Payment Card Security: The Law & Economics of the US Transition to EMV,* 2018 MICH. ST. L. REV. 869 (2019) (with Todd Zywicki)

*An Enquiry Meet for Occupational Licensing Boards: Lessons from* Polygram, in DOUGLAS H. GINSBURG: LIBOR AMICORUM (Nicolas Charbit & Elisa Ramundo, eds., 2018)

*The Missing Role of Economics in FTC Privacy Policy*, in CAMBRIDGE HANDBOOK OF CONSUMER PRIVACY (Jules Polonetsky et al. eds., 2018)

*State Consumer Protection Acts: An Economic and Empirical Analysis*, 81 ANTITRUST L.J. 947 (2018) (with Joanna Shepherd)

*Separation Anxiety,* 21 VA. J.L. & TECH. 1 (2017)

*Information & Settlement: Empirical Evidence on* Daubert *Rulings and Case Outcomes,* 51 INT'L REV.L. & ECON. 1 (2017)

*Antitrust Liability for Licensing Boards After* North Carolina Dental*: Antitrust Preemption as a Penalty Default?* 5 J. ANTITRUST ENFORCEMENT 1 (2017)

*The Costs of Regulatory Redundancy: Consumer Protection Oversight of Online Travel Agents*, 17 N.C.J.L. & TECH. 179 (2016)

*The Perils of Excessive Discretion: The Elusive Meaning of Unfairness in Section 5 of the FTC Act*, 4 J. ANTITRUST ENFORCEMENT 1 (2015)

*Antitrust and Privacy: Underpants Gnomes, the First Amendment, and Rent-Seeking*, 20 GEO. MASON L. REV. 1129 (2013)

*Alcohol, Antitrust, and the 21st Amendment: An Empirical Examination of "Post and Hold" Law,* 32 INT'L REV. L. & ECON. 379 (2012)

*Behavioral Economics and its Implications for Antitrust Agency Decision Making*, 8 J.L. ECON. & POLICY 779 (2012) (with William E. Kovacic)

*Behavioral Economics: Implications for Regulatory Behavior*, 41 J. REG. ECON. 41 (2012) (with William E. Kovacic)

*There is a Time to Keep Silent and a Time to Speak, the Hard Part is Knowing Which is Which: Striking the Balance Between Privacy Protection and the Flow of Health Care Information*, 16 MICH. TECH. & TELECOM. L. REV. 279 (2010) (with Daniel Gilman)

*US Convergence with International Competition Norms: Antitrust Law and State Restraints on Competition*, 90 BOSTON UNIV. L. REV. 1555 (2010) (with William E. Kovacic)

*The Pattern Exception to the Noerr-Pennington Doctrine,* in THE NOERR-PENNINGTON DOCTRINE, ABA Section of Antitrust Law Monograph Series (2009)

*The U.S. Federal Trade Commission and Competition Advocacy: Lessons for Latin American Competition Policy*, in LATIN AMERICAN ANTITRUST DEVELOPMENTS (Eleanor M. Fox & D. Daniel Sokol eds., 2009) (with Todd Zywicki)

*Public versus Private Restraints on the Online Distribution of Contact Lenses: A Distinction with a Difference*, 3 J.L. ECON. & POLICY 331 (2007)

*Does Price Discrimination Intensify Competition? Implications for Antitrust*, 72 ANTITRUST L.J. 327 (2005) (with Luke Froeb, Dan O'Brien, & Steven Tschantz)

*Theory and Practice of Competition Advocacy at the FTC*, 72 ANTITRUST L.J. 1091 (2005) (with Paul Pautler and Todd Zywicki)

*Vertical Antitrust Policy as a Problem of Inference*, 23 INT'L J. INDUS. ORG. 639 (2005) (with Luke Froeb, Dan O'Brien, and Mike Vita)

*Vertical Restrictions and Antitrust: What About the Evidence?*, 1 COMP. POL. INT'L 45 (2005) (with Luke Froeb, Dan O'Brien, and Mike Vita)

*A Comparative Study of US and EU Approaches to Vertical Policy*, 13 GEO. MASON L. REV. 289 (2005) (with Luke Froeb, Dan O'Brien, and Mike Vita)

**Reports:**

PRIVATE LITIGATION UNDER THE CALIFORNIA CONSUMER PROTECTION ACT, Law & Economics Center (May 2021)

ELEMENTARY SCHOOL TEACHER USE OF ED TECH, Law & Economics Center (November 2020)

## Education

Ph.D. Economics, Emory University, 2003 (Dissertation Advisor: Paul Rubin)

J.D., *Magna Cum Laude*, George Mason University School of Law, 2000 (*George Mason Law Review*; Levy Fellow)

B.A. International Relations, University of South Carolina, 1990

## Working Papers

*Shambles: Making Sense of the Confused State of* Noerr*'s Sham Exception (*with *Emily Kral)*

*COPPApocalypse Now: Content Subsidization after the YouTube-COPPA Settlement* (with Garrett Johnson & Tesary Lin) (*awarded research grant from University of Pennsylvania Economics of Digital Services Initiative; revise and resubmit at Management Science*)

*Health Privacy & Health Outcomes:  The Impact of Minor Consent Laws on Teen Health Outcomes*

*Measuring Party Selection and Judicial Behavior Effects from Standing Decisions* (with Bruce H. Kobayashi & Sasha Romanosky).

## Presentations/Panels

ABA, Our Curious Amalgam Podcast, What are the Perils of Privacy Law? Evolution of COPPA, Aug. 12, 2024

NAI Forum, December 7, 2021, Fireside Chat with FTC Commissioner Noah Philips (*panelist*)

TPRC 2021, September 22, 2021 (presenting *Antitrust and Privacy: It's Complicated* )

ABA Spring Meeting, Strategies for FTC Commissioner Meetings, March 24, 2021 (panelist)

GMU Federalist Society Panel on Section 230, February18, 2021 (panelist)

LEC Civil Justice Fest, Panel on the California Consumer Privacy Act, Nov. 20, 2020 (panelist)

Global Antitrust Institute Panel on Antitrust & Privacy, July 22, 2020 (panelist)

Federalist Society Teleforum on FTC Rule Making, July 8, 2020 (panelist)

Federalist Society Teleforum on FTC Remedial Authority, June 29, 2020 (panelist)

ABA Virtual Spring Meeting Panel on AI, Privacy, and Competition, June 18, 2020 (panelist)

AALS Annual Meeting, Panel on Economics of Consumer Protection, January 4, 2020 (panelist)

FTC Hearing on COPPA Rule Revision, October 7, 2019 (panelist)

ABA Teleforum on Privacy & Data Security at the FTC, Dec. 17, 2018 (interviewed)

Federalist Society, Big Data & Artificial Intelligence: Navigating the Technology World of the Near Future, Nov. 14, 2018 (panelist)

ABA Antitrust Source Roundtable Discussion, *The Big Picture on Big Data*, Nov. 2, 2018 (panelist)

TPI Roundtable on Privacy, Antitrust, and the FTC, April 17, 2018 (panelist)

FTC Workshop on Pet Meds, March 7, 2018 (presented empirical work on lock-in with contact lenses)

George Mason Law Review Antitrust Symposium, Panel on Occupational Licensing, February 15, 2018 (panelist)

FTC Informational Injury Workshop, Dec. 12, 2017 (panelist)

Privacy & Security Forum, Oct. 4, 2017 (keynote on economics of privacy)

Quinnipiac Law School, Sept. 27, 2017 (talk on occupational licensing and antitrust to Federalist Society chapter)

Federalist Society Teleforum on EU Google Case, Sept. 18, 2017 (panelist)

Federalist Society/ABA Occupational Licensing Program, Aug. 9, 2017 (panelist)

University of Connecticut Law Review Symposium, Jan. 27, 2017, (panelist on economics of commercial privacy regulation)

FTC Privacy Con, Jan 12, 2017, (presenting *Anonymity, Autonomy, and the Collection of Personal Data: Measuring the Privacy Impact Google's 2012 Privacy Policy Change*)

Capital Forum Symposium on Antitrust & Tech Policy, Dec. 16, 2016 (panelist on Google antitrust investigation)

Tech Freedom Capital Hill Panel on FCC Privacy, Oct.  24, 2016 (Panelist on privacy and net neutrality)

R Street – Privacy Policy and the Internet of Things, October 13, 2016 (panelist)

IOT Global Conference, Oct. 7, 2016 (afternoon keynote on economics of privacy)

Heritage Foundation Program on FTC Consumer Protection Policy, June 28, 2016 (panelist)

FTC PrivacyCon , Jan 14, 2016 (discussant)

Future of Privacy Forum Debate On FTC Power, Oct. 2015 (panelist)

Oxford University, Pembroke College, June 26, 2015 (presenting *Antitrust Liability for Licensing Boards After* North Carolina Dental*: Antitrust Preemption as a Penalty Default?*)

National Taxpayers Union FTC Capitol Hill Panel on FTC Reform, June 3, 2015 (panelist)

American University Law Review Symposium, March 20, 2015 (panelist discussing state action doctrine after *North Carolina Dental*)

IAPP World Conference, Mar. 6, 2015 (co-taught panel on economics of privacy)

IAPP Forum, Nov. 3, 2014 (panelist on privacy regulation of big data)

FTC Conference on Veterinarian Meds Pricing, June 12, 2014 (presenting research on contact lens pricing)

George Mason Law Review Symposium, Jan. 17, 2013 (presenting *Antitrust and Privacy:  Underpants Gnomes, the First Amendment, and Rent-Seeking*)

AALS Annual Meeting, Jan. 6, 2012 (presenting  *Behavioral Economics: Implications for Regulatory Behavior*).

Liberty Fund Conference on Behavioral Law & Economics (Feb. 3, 2012) (presenting *Behavioral Economics: Implications for Regulatory Behavior*)

ABA Teleforum on Privacy & Antitrust (2011) (Panelist)

Center for Research in Regulated Industries (CRRI) Annual Conference, June 2011 (presenting *Behavioral Economics: Implications for Regulatory Behavior*)

ABA Antitrust Section ebooks Antitrust Teleforumn, June 11, 2012 (panelist)

Department of Justice, Antitrust Division, (May 2011) (presenting *Alcohol, Antitrust, and the 21st Amendment: An Empirical Examination of "Post and Hold" Law*)

Southern Economic Association Annual Meeting (Nov. 2010) (presenting *Alcohol, Antitrust, and the 21st Amendment: An Empirical Examination of "Post and Hold" Law*)

## Op-Eds, Postings, Podcasts, and Testimony

*Walmart's Lesson for the CFPB,* THE WALL STREET JOURNAL (Dec. 14, 2021)

*Fix the FTC Act by Making Cos. Pay*, REAL CLEAR MARKETS (June 14, 2021)

*Written Testimony on the "State of Competition in the Digital Marketplace", before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law* (Apr. 27, 2020)

*Freedom v. License,* WEEKLY STANDARD PODCAST (Aug.16, 2017)

*Occupational Licensing Hinders the American Dream,* REAL CLEAR POLITICS (July 10, 2017)

*The BROWSER ACT: A Worthy Goal, But There's an Easier Fix to the Net Neutrality Privacy Mess*, FORBES (May 26, 2017)

*Shining a Spotlight on the FTC's Most Important Antitrust Role,* FORBES (Mar. 29, 2017)

*What's in Store of the FTC's Privacy and Data Security Program in 2017*, FORBES (Mar. 8, 2017)

*A Return to Antitrust Populism?* THE ANTITRUST SOURCE (Feb. 2017)

*The WhatsApp Privacy Policy Change: No Cause for Alarm*, FORBES (Sep. 7, 2016)

*Did the FTC Just Rewrite its Statute? What LabMD Means for Data Security Cases Going Forward*, FORBES (Aug. 4, 2016)

*Rational Ignorance and the Privacy Paradox*, FORBES (Jul. 18, 2016)

*Why the Supreme Court Should Side with The Data Brokers,* CHRISTIAN SCIENCE MONITOR (Nov. 2, 2015)

*No-Harm-Big-Foul: The FTC's Latest Overreach in Data Privacy*, THE HILL (July 13, 2015)

*The Obama Administration's New Privacy Bill Would Take the FTC back to the Days of Disco*, MORNING CONSULT (May 12, 2015)

*Does Limiting Conflicts on FDA Advisory Committees Harm Consumers?* FORBES (Feb. 9, 2015)

*Spain's New Copyright Law Hurts Consumers*, LAW360 (Dec. 22, 2014)

*The FTC Deserves Kudos for Clearing the Google-Nest Deal*, MAIN JUSTICE (Feb. 18, 2014)

*Lessons From the 1980s: The FTC and the Role for Economics in Policymaking*, DAILY CALLER (Dec. 5, 2013)

*Identity Theft, Not Big Data, Should be at the Top of the FTC's Priorities*, DAILY CALLER (Sept. 24, 2013)

*Google and the FTC's Investigation: A Cautionary Tale*, FORBES (Nov. 4, 2012)

**Professional Activities and Awards**

FTC Outstanding Scholarship Award, 2005

Referee for: *Antitrust Law Journal*; *Managerial & Decision Economics*; *Supreme Court Economic Review; Journal of Law, Economics, & Policy; Economic Inquiry; International Review of Law & Economics; Journal of Regulatory Economics; Journal of Economics & Management Strategy; Oxford University Press; Review of Law & Economics*

Member Virginia and District of Columbia Bars

Member American Bar Association, Antitrust Section

**References**

Available upon request

## Appendix D

## Materials Reviewed

Case Law/ROSCA Enforcement Actions

- *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013)
- *In re Apple, Inc.*, C-4444 (FTC March 27, 2014)
- *Conn. Fine Wine v. Comm'r Seagull*, 936 F. 3d 119 (2d Cir. 2019)
- *In re Credit Karma*, C-4781 (FTC Sept. 1, 2022)
- *ECM BioFilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599 (6th Cir. 2017)
- *F.T.C. v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)
- *F.T.C. v. Am. Future Sys., Inc.*, 2024 WL 1376026 (E.D. Pa. Mar. 29, 2024)
- *Firestone Tire & Rubber Co. v. F. T. C.*, 481 F.2d 246 (6th Cir. 1973)
- *FTC v. AAFE Products*, 3:17-cv-575 (S.D. Cal. Mar. 24, 2017)
- *FTC v. AdoreMe, Inc.*, 1:17-cv-09083 (S.D.N.Y. Nov. 21, 2017)
- *FTC v. Age of Learning, Inc.*, 2:20-cv-07996 (C.D. Cal. Sept. 2, 2020)
- *FTC v. AH Media Group, LLC*, 3:19-cv-4022 (N.D. Cal. Sept. 6, 2019)
- *FTC v. Amazon.com, Inc.*, 2:14-cv-01038 (W.D. Wash. July 10, 2014)
- *FTC v. Apex Capital Group*, 2:18-cv-9573 (C.D. Cal. Nov. 28, 2018)
- *FTC v. Benefytt Technologies, Inc., et al,* 8:22-cv-1794 (M.D. Fla. Aug. 8, 2022)
- *FTC v. Blue Global*, 2:17-cv-02117 (D. Ariz. July 3, 2017)
- *FTC v. Bunzai Media Group*, 2:15-cv-4527 (C.D. Cal. June 25, 2015)
- *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965)
- *FTC v. Credit Bureau Center*, 17-cv-00194 (N.D. Ill. Jan. 18, 2017)
- *FTC v. DirecTV*, 3:15-cv-1129 (N.D. Cal. Mar. 11, 2015)
- *FTC v. DOT Authority*, 0:16-cv-62186 (S.D. Fla. Oct. 17, 2016)
- *FTC v. Effen Ads*, 2:19-cv-00945 (D. Utah Nov. 26, 2019)
- *FTC v. Elite IT Partners*, 2:19-cv-125 (D. Utah March 7, 2019)
- *FTC v. F9 Advertising LLC*, 3:19-cv-1174 (D. P.R. Feb. 28, 2019)
- *FTC v. First American Payment Systems*, 4:22-cv-654 (E.D. Tex. July 29, 2022)
- *FTC v. Fleetcor Technologies, Inc.*, 1:19-cv-05727 (N.D. Ga. Dec. 20, 2019)
- *FTC v. Green Millionaire, LLC*, 112-cv-01102 (D. Md. Apr. 16, 2012)
- *FTC v. Health Formulas, LLC*, 2:14-cv-1649 (D. Nev. Oct. 20, 2014)
- *FTC v. Hornbeam et al.*, 1:17-cv-3094 (N.D. Ga. Aug. 16, 2017)
- *FTC v. Jason Cardiff et al.*, 18-cv-2104 (C.D. Cal. Oct. 24, 2018)
- *FTC v. JDI Dating Limited*, 14-cv-8400 (N.D. Ill. Oct. 27, 2014)
- *FTC v. Jeremy Johnson*, 210-cv-02203 (D. Nev. Dec. 22, 2010)
- *FTC v. Jesse Willms*, 211-cv-00828 (W.D. Wash. May 17, 2011)
- *FTC v. Leanspa, LLC*, 311-cv-01715 (D. Ct. Dec. 1, 2011)
- *FTC v. Lending Club, Inc.*, 3:18-cv-02454 (N.D. Cal. Apr. 25, 2018)
- *FTC v. Match Group, Inc.*, 3:19-cv-02281 (N.D. Tex. Sept. 25, 2019)
- *FTC v. Moneymaker*, 211-cv-00461 (D. Nev. Apr. 14, 2011)
- *FTC v. Nutraclick LLC*, 2:16-cv-6819 (C.D. Cal. Sept. 22, 2016)

- *FTC v. One Technologies LP et al*, 3:14-cv-5066 (N.D. Cal. Nov. 17, 2014)
- *FTC v. Prog Leasing, LLC*, 1:20-cv-01668 (N.D. Ga. Apr. 20, 2020)
- *FTC v. RagingBull.com, LLC*, 1:20-cv-3538 (D. Md. Dec. 14, 2020)
- *FTC v. RevMountain LLC*, 2:17-cv-2000 (D. Nev. Aug. 7, 2017)
- *FTC v. Tarr Inc.*, 17-cv-2024 (S.D. Cal. Nov. 15, 2017)
- *FTC v. Triangle Media Corp.*, 18-cv-1388 (S.D. Cal. July 3, 2018)
- *FTC v. Vizio, Inc*, 2:17-cv-00758 (D.N.J, Feb. 6, 2017)
- *FTC v. Vonage Holdings et al.*, 3:22-cv-6435 (D.N.J. Nov. 3, 2022)
- *FTC v. Wealthpress Holdings, Inc et al.*, 3:23-cv-00046 (M.D. Fla. Jan. 12, 2023)
- *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 252 (3d Cir. 2015)
- *In re Google, Inc.*, C-4499 (FTC Dec. 5, 2014)
- *In re Movie Pass et al*, C-4751 (FTC Oct. 5, 2021)
- *In re UrthBox, Inc.*, C-4676 (FTC April 3, 2019)
- *In re Intuit Inc.*, 2023 WL 5970801 (Sept. 6, 2023)
- *Kerns v. Albuquerque Police Dep't*, 663 F.3d 1173 (10th Cir. 2011)
- *In re Paypal, Inc.*, C-4651 (FTC May 24, 2018)
- *In re Telebrands Corp.*, 140 F.T.C. 278 (2005), aff'd, 457 F.3d 354 (4th Cir. 2006)
- *United States v. MyLife.com, Inc.*, 20-cv-6692 (C.D. Cal. July 27, 2020)
- *United States v. Upromise, Inc.*, 1:17-cv-10442 (D. Mass. March 17, 2017)
- *In re Sears Holding*, C-4264 (FTC Sept. 9, 2009

<u>Case Materials</u>:

- 1st Amended Complaint in *FTC v. Amazon et. al.*, 23-cv-00932 (W.D. Wash.)
- FTC's Supplemental Responses and Objections to Amazon.com, Inc.'s First Set of Interrogatories (Jan. 23, 2024)
- FTCAMZN_0087082-85
- Rule 30(b)(6) Deposition Transcript of Amanda Basta from September 10-11, 2024

<u>FTC Guidance</u>:

- Dot Com Disclosures (March 2013)
- Bringing Dark Patterns to Light, (Sept. 2022)
- Concurring Statement of FTC Commissioner Andrew N. Ferguson, In re Asbury Automotive Group, Inc., D-9436 (FTC Aug. 16, 2024)
- Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822 (Nov. 4, 2021)
- Lesley Fair, Time for a ROSCA recap: FTC says "risk free trial" was risky—and not free (FTC Business Blog July 3, 2018)
- Made in the USA, An FTC Workshop (Sept. 26, 2019)
- Melissa Holyoak, Remarks at National Advertising Division Keynote 2024, A Path Forward on Privacy, Advertising, and AI (September 17, 2024)
- Negative Options Policy Statement

- Statement by FTC Chairman Jon Leibowitz Regarding House and Senate Passage of Legislation to Combat Deceptive Online Sales Tactics (December 15, 2010)
- Negative Option Rule, 88 Fed. Reg. 24716 (Apr. 24, 2023)
- Negative Option Rule, 89 Fed. Reg. 90476 (Nov. 15, 2024)
- FTC Policy Statement on Unfairness, appended to International Harvester Co., 104 F.T.C. 949, 1070 (1984)

Publications

- Ari Ezra Waldman, *Privacy, Practice, and Performance*, 110 CALIF. L. REV. 1221, 1236-38 (2022)
- Christina L. Loyd & David A. Hoffman, *Litigating Toward Settlement*, 29 J. L. ECON. & ORG. 898 (2013)
- Daniel J. Solove & Woodrow Hartzog, *The FTC and the New Common Law of Privacy*, 114 COLUM. L. REV. 583 (2014)
- Economic Analysis for Lawyers (Carolina Academic Press, 4th Ed. 2024)
- J. Howard Beales & Timothy J. Muris, *Choice or Consequences: Protecting Privacy in Commercial Information*, 75 U. CHICAGO L. REV. 109, 128 (2008)
- James C. Cooper & Joanna Shepherd, *State Unfair and Deceptive Trade Practice Laws: An Economic and Empirical Analysis*, 81 ANTITRUST L. J. 947 (2018)
- James C. Cooper & Joseph Golec, *Conflicts of Interests on Expert Committees: The Case of FDA Advisory Committees*, 62 J. L. & ECON. 321 (2019)
- James C. Cooper, *Information & Settlement: Empirical Evidence on Daubert Rulings and Case Outcomes*, 51 INT'L REV. L. & ECON. 1 (2017)
- Jamie L. Luguri & Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. OF LEGAL ANALYSIS 43, 87 (2021)
- Johan B. Gelbach, *Material Facts in the Debate Over Twombly & Iqbal*, 68 STAN. L. REV. 369 (2015)
- Maureen K. Ohlhausen & Alexander P. Okuliar, *Competition, Consumer Protection, and The Right [Approach] to Privacy*, 80 ANTITRUST L. J. 121 (2015)
- Michael R. Baye & Joshua D. Wright, *Is Antitrust Too Complicated for Generalist Judges? The Impact of Economic Complexity and Judicial Training on Appeals*, 54 J. L. & ECON. 1 (2011)
- Private Litigation Under the California Consumer Protection Act, Law & Economics Center (2021)
- Richard Epstein, ANTITRUST CONSENT DECREES IN THEORY AND PRACTICE 1 (1st ed. 2007)
- The Regulatory Revolution at the FTC: A Thirty-Year Perspective on Competition and Consumer Protection (Oxford University Press, 2013)
- Warren S. Grimes, *Transparency in Federal Antitrust Enforcement*, 51 BUFF. L. REV. 937 (2003)
- *William H.J. Hubbard, Testing for Change in Procedural Standards with Application to Bell Atlantic v. Twombly*, 42 J. LEG. STUD. 35 (2013)

<u>Statutes/Regulations</u>

- 15 U.S.C. § 45
- 15 U.S.C. § 8401 et seq.
- 15 U.S.C. § 57
- 16 C.F.R. § 1.5
- 16 C.F.R. § 313