# Attachment 144

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an
officer of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and
as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an
officer of AMAZON.COM, INC.,

     Defendants.

**Civil Action No. 2:23-cv-0932-JHC**

EXPERT REPORT OF RONALD T. WILCOX, PH.D.

February 24, 2025

CONFIDENTIAL

# Table of Contents

I.    Qualifications ........................................................................................................... 1

II.   Relevant Case Background ...................................................................................... 2

III.  Assignment .............................................................................................................. 5

IV.   Summary of Opinions .............................................................................................. 6

V.    Principles of Survey Design .................................................................................... 7

VI.   Cancellation Survey ................................................................................................ 9

    A.    Objectives ...................................................................................................... 9

    B.    Screening Questions...................................................................................... 10

    C.    Stimulus ........................................................................................................ 12

        1.    Locating the Cancellation Flow ....................................................... 14

        2.    Completing the Cancellation Flow ................................................... 23

    D.    Implementation ............................................................................................. 27

        1.    Pretests ............................................................................................. 27

        2.    Pilot Study ........................................................................................ 27

        3.    Fielding ............................................................................................ 30

    E.    Results .......................................................................................................... 31

        1.    99.8% of Respondents Located the Cancellation Flow and 96.4% of Respondents Paused or Ended Their Prime Membership........................ 31

        2.    Respondents Took 47 Seconds on Average to Locate the Cancellation Flow ................................................................................................... 32

        3.    After Locating the Cancellation Flow, Respondents Took 28 Seconds on Average to Pause or End Their Prime Membership ................................. 33

        4.    Respondents Took 74 Seconds on Average to Locate the Cancellation Flow and to Pause or End Their Prime Membership................................ 34

VII.  Free Trials Survey ................................................................................................... 35

    A.    Objectives ..................................................................................................... 35

    B.    Screening Questions...................................................................................... 36

    C.    Main Questions ............................................................................................. 37

    D.    Implementation ............................................................................................. 40

        1.    Pretests ............................................................................................. 40

        2.    Fielding ............................................................................................ 40

    E.    Results .......................................................................................................... 40

## I.     Qualifications

1.     I am the NewMarket Corporation Professor of Business Administration at the Darden Graduate School of Business Administration, University of Virginia, where I conduct research and teach classes related to marketing, and where I was the Senior Associate Dean for Degree Programs.  I received an Honors Bachelor of Arts degree in Classics and Economics from Xavier University and a Ph.D. in Business Administration (focused on marketing and econometrics) from Washington University in St. Louis.  I have been at Darden since 2001.  Prior to that, I was an Assistant Professor of Industrial Administration at the Graduate School of Industrial Administration (now Tepper School of Business) at Carnegie Mellon University.  I also served as an economist at the U.S. Securities and Exchange Commission from 1999 to 2000.

2.     Marketing is a discipline that is focused on the study of organizations' marketing practices based on conceptual foundations of consumer behavior.  My general areas of expertise within marketing are branding, consumer behavior, surveys, statistical modeling of consumer choice, and the public policy implications of marketing.  I have published several articles on these marketing topics in leading marketing journals such as the *Journal of Marketing Research*, *Marketing Science*, *Management Science*, and the *Journal of Business*.  I have also authored or supervised numerous cases and technical notes, published by Darden Business Publishing and used at other leading business schools, that focus on practical business problems faced by companies, and frameworks and techniques for solving these problems.  A copy of my curriculum vitae that provides a full list of my publications is attached as **Appendix A**.

3.     At Darden, I have taught MBA-level courses in marketing research and marketing intelligence.  In both courses, survey design and analysis were important components of the course.  I currently teach the required marketing course in the MBA and Executive MBA programs as well as the elective course on pricing.

4.     Outside of academic journals, my research and writing have appeared in the *Wall Street Journal*, the *Washington Post*, *BusinessWeek*, *Fortune*, *Forbes*, and the *Weekly Standard*.  I have also co-authored a book, *Marketing Analytics: Essential Tools for Data-Driven Decisions*, published by the University of Virginia Press in 2021, on the use of customer data to improve marketing decisions.  Another one of my books, *Whatever Happened to Thrift? Why Americans*

*Don't Save and What to Do About It*, published by Yale University Press in 2008, was named a "Top 5 Business Book of the Year" by Kiplinger.

5.      I have served as a marketing consultant to multiple organizations, including Sikorsky, Pratt and Whitney, Johnson and Johnson, Visa, Talbots, Logistics Management International, and Illinois Tool Works.

6.      I have also served as an expert witness in cases where I opined on issues relating to marketing, consumer perceptions, expectations, and survey methods.  A list of my testimony in the past four years is attached as **Appendix B**.

## II.      Relevant Case Background

7.      Amazon.com, Inc. ("Amazon") is a global technology company with operations in retail, cloud computing, and advertising services.[1]  Amazon offers a membership known as Amazon Prime ("Prime"), which includes a variety of benefits to its members, such as free delivery and early access to deals.[2]

8.      In its Amended Complaint, the Federal Trade Commission ("FTC") raises allegations about Prime's enrollment disclosures made during the checkout process as well as its online cancellation process.[3]  With respect to the enrollment process, the FTC alleges that Prime does not "clearly and conspicuously" disclose material terms of the Prime membership, including that

---

[1] Amazon.com, Inc., Form 10-K for the fiscal year ended December 31, 2023, filed February 1, 2024, p. 3 ("We serve consumers through our online and physical stores … We serve developers and enterprises of all sizes, including start-ups, government agencies, and academic institutions, through [Amazon Web Services] … We provide advertising services to sellers, vendors, publishers, authors, and others, through programs such as sponsored ads, display, and video advertising.").

[2] "Amazon Store," *Amazon*, https://www.aboutamazon.com/what-we-do/amazon-store ("Prime membership in the U.S. now includes benefits like free one-day delivery, Prime Video, Amazon Music, free two-hour grocery delivery, Prime Reading, Prime Gaming, Amazon Photos, Prime Wardrobe, exclusive savings, early access to deals, and so much more.").

[3] Amended Complaint for Permanent Injunction, Civil Penalties, Monetary Relief, and Other Equitable Relief, *Federal Trade Commission v. Amazon.com, Inc., et al.*, United States District Court for the Western District of Washington at Seattle, Case No. 2:23-cv-0932-JHC, September 20, 2023 ("Amended Complaint"), ¶ 2 ("For years, Defendant Amazon.com, Inc. ('Amazon') and its leadership have knowingly duped millions of consumers into unknowingly enrolling in its Amazon Prime service[.]"), ¶ 7 ("For years, Amazon also knowingly complicated the cancellation process for Prime subscribers who sought to end their membership."), ¶ 107 ("In each pathway (UPDP, SOSP, SPC, TrueSPC, and mobile), Amazon fails to provide clear and conspicuous disclosures regarding the Prime subscription program's material terms: its price, and the fact that it renews automatically unless the consumer affirmatively cancels."), ¶ 272 ("Defendants failed to clearly and conspicuously disclose all material terms of the transaction, including the price of Prime, its auto-renewal provision, and cancellation requirements, before obtaining the consumer's billing information.").

a Prime free trial auto-renews unless cancelled.[4]  With respect to the cancellation process, the FTC alleges that Amazon did not provide a simple cancellation mechanism.[5]  In particular, the FTC alleges that, approximately from 2016 to April 2023,[6] Amazon's "Four-Page, Six-Click, Fifteen-Option" cancellation process,[7] through which Prime members could cancel their Prime membership on Amazon.com, was difficult to locate and to complete,[8] and inhibited consumers who wanted to cancel their Prime membership from doing so.[9]  This cancellation process described by the FTC consists of the Prime Central page, which is the membership management page for Prime members,[10] and three additional pages ("Cancellation Flow").[11]

9.    I understand that there are multiple pathways to cancel Prime, including and in addition to those alleged in the Amended Complaint.  In addition to visiting Prime Central, other pathways include, but are not limited to, the following:

    a.  Using the Amazon.com search bar;[12]

---

[4] Amended Complaint, ¶ 107 ("In each pathway (UPDP, SOSP, SPC, TrueSPC, and mobile), Amazon fails to provide clear and conspicuous disclosures regarding the Prime subscription program's material terms: its price, and the fact that it renews automatically unless the consumer affirmatively cancels."), ¶ 272 ("Defendants failed to clearly and conspicuously disclose all material terms of the transaction, including the price of Prime, its auto-renewal provision, and cancellation requirements, before obtaining the consumer's billing information."); Plaintiff's Opposition to Defendants' Motions to Dismiss Amended Complaint, *Federal Trade Commission v. Amazon.com, Inc., et al.*, United States District Court for the Western District of Washington at Seattle, Case No. 2:23-cv-0932-JHC, November 17, 2023 ("FTC's Opposition to Motion to Dismiss"), p. 31 ("Because the Complaint more than plausibly alleges Amazon did not make clear and conspicuous disclosures … it equally plausibly alleges consumers did not give express informed consent for automatically-renewing Prime subscriptions.").

[5] Amended Complaint, ¶ 162 ("Amazon did not design the Iliad Flow to be simple or easy for consumers. The Iliad Flow inhibits or prevents many consumers who intend to cancel from cancelling their membership."), p. 90 ("Violation of ROSCA—Failure To Provide Simple Cancellation Mechanism."), ¶ 278 ("Defendants fail to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.").

[6] Amended Complaint, ¶ 130 ("Amazon launched the Iliad Flow in 2016, and did not substantially change it in the United States until in or about April 2023.").

[7] Amended Complaint, ¶¶ 127–133, ¶ 128 ("The Iliad Flow required consumers intending to cancel to navigate a four-page, six-click, fifteen-option cancellation process."), ¶ 131 ("Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page.").

[8] Amended Complaint, ¶¶ 131–133 ("To cancel via the Iliad Flow, a consumer had to first locate it, which Amazon made difficult."), ¶ 231.c ("Amazon … mak[es] the ingress to the Iliad Flow difficult for consumers to locate…"), ¶ 140 ("Once consumers reached the Iliad Flow, they had to proceed through its entirety—spanning three pages, each of which presented consumers several options, beyond the Prime Central page—to cancel Prime.").

[9] Amended Complaint, ¶ 162 ("The Iliad Flow inhibits or prevents many consumers who intend to cancel from cancelling their membership."); FTC's Opposition to Motion to Dismiss, p. 36 ("The Iliad Flow not only needlessly and unlawfully complicated consumers' cancellation processes, but also prevented consumers who wanted to cancel, and thought they had cancelled, from actually doing so.").

[10] Amended Complaint, ¶ 139 ("Prime account management page (Prime Central)").

[11] Amended Complaint, ¶ 140 ("Once consumers reached the Iliad Flow, they had to proceed through its entirety—spanning three pages.").

[12] Amended Complaint, ¶ 135 ("Consumers could also reach the Iliad Flow from Amazon.com by typing 'cancel membership' in the search bar."); Attachment T of the Amended Complaint (containing screenshot of cancellation flow using Amazon.com search bar).

    b.  Using an outside search engine (e.g., Google);[13]

    c.  Using the help pages;[14]

    d.  Using Amazon's chatbot feature;[15]

    e.  Contacting Amazon's customer service via call, chat, or social media.[16]

10.  I also understand that there are multiple pathways to reach Prime Central, including and in addition to the pathways described in the Amended Complaint.[17]  Those pathways to Prime Central include, but are not limited to, the following:

    a.  Selecting the "Account & Lists" dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ("Prime Membership");[18]

---

[13] Deposition of Benjamin Goeltz, October 30, 2024 ("Goeltz Deposition"), p. 200:10–17 ("Q. … Can a customer also reach an ingress to the online cancellation flow using a site outside of Amazon.com?  A. To my understanding, yes, they could use, like, a search like Google and look for cancel Amazon Prime and find a link to either membership central or potentially the cancel flow itself.").

[14] "Customer Service," *Amazon*, https://www.amazon.com/hz/contact-us/foresight/hubgateway.

[15] Goeltz Deposition, pp. 82:22–83:9 ("So there are, yeah, a couple ways that a customer can cancel their Prime membership. … So I think there's a couple of different channels that – you know, a customer can contact customer service. I believe there's a chatbot so you can, you know, chat with a bot and I think you can request to cancel Prime via the chatbot").

[16] Goeltz Deposition, pp. 82:22–83:89 ("So there are, yeah, a couple ways that a customer can cancel their Prime membership. … So I think there's a couple of different channels that -- you know, a customer can contact customer service. I believe there's a chatbot so you can, you know, chat with a bot and I think you can request to cancel Prime via the chatbot."), p. 84:19–24 ("[A] customer who contacts customer service and inquires about canceling their Prime membership, the customer service agent would offer the option for a customer to receive a link to the online cancellation flow where the customer could go and self-service their, you know, Prime cancellation needs."); Amended Complaint, ¶ 134 ("Consumers could also reach the Iliad Flow by contacting customer service, asking to cancel, and receiving a link to the Iliad Flow."); William Antonelli, "4 Ways to Contact Amazon Customer Service," *Business Insider*, July 12, 2024, https://www.businessinsider.com/guides/tech/how-to-contact-amazon-customer-service-phone-email-chat; Clare Mulroy, "Trying to Speak to a Human? Here's How to Contact Amazon Customer Service or a Seller," *USA Today*, September 14, 2022, https://www.usatoday.com/story/money/retail/2022/09/14/how-to-contact-amazon-account-inquiries/7867529001/ ("Call Amazon customer service … Try Amazon's online live chat … Contact Amazon via social media.").  A customer who calls to cancel may also have their Prime membership cancelled by the customer service representative.  Amended Complaint, ¶ 129 ("[Consumers] had to use the Iliad Flow or call customer service."); Amazon's Third Response to the Civil Investigatory Demand, Letter from Benjamin Langner, Corporate Counsel, Litigation and Regulatory for Amazon.com, to Katherine Johnson, Attorney, Division of Enforcement for the Federal Trade Commission, "Re: FTC Matter No. 2123050," May 24, 2021, p. 30 ("[C]ustomers also have the option of calling Amazon Customer Service to cancel their Prime memberships").

[17] Amended Complaint, ¶ 131 ("Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page, which consumers could reach by selecting the 'Account & Lists' dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ('Prime Membership').  This took the consumer to the Prime Central Page."), ¶ 137 ("The search bar pathway to the Iliad Flow varied somewhat depending on what search the consumer ran.  For instance, searching 'how to turn off Prime,' or 'cancel prime' (rather than 'how to cancel Prime') took the consumer to a page with a link to Prime Central, from which the consumer had to then locate the path to the Iliad Flow.").

[18] Amended Complaint, ¶ 131 ("Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page, which consumers could reach by selecting the 'Account & Lists' dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ('Prime Membership').  This took the consumer to the Prime Central Page.").

    b.   Using the Amazom.com search bar;[19]

    c.   Visiting amazon.com/prime, also referred to as the "Prime Member Page";[20]

    d.   Using the help pages;[21]

    e.   Using an outside search engine (e.g., Google);[22]

    f.   Using the Your Memberships & Subscriptions page.[23]

## III.    Assignment

11.    I was asked by counsel for Amazon to design and conduct two surveys:

    a.   A survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com as described in the Amended Complaint.

    b.   A survey to assess the experiences of US consumers with free trials of memberships or subscriptions that automatically turn into paid memberships or subscriptions unless cancelled.

12.    In carrying out my assignment, I relied on my training, experience, and expertise in survey methods, marketing, and consumer behavior.  I also examined various materials, including relevant academic literature and case materials.  A complete list of materials I considered in forming my opinions is in **Appendix C**.

13.    I have been assisted in my work on this matter by staff of Cornerstone Research, who worked under my direction.  I am being compensated at my current rate of $1,050 per hour.  I also receive compensation from Cornerstone Research based on its collected staff billings for its

---

[19] Amended Complaint, ¶ 137 ("The search bar pathway to the Iliad Flow varied somewhat depending on what search the consumer ran.  For instance, searching 'how to turn off Prime,' or 'cancel prime' (rather than 'how to cancel Prime') took the consumer to a page with a link to Prime Central, from which the consumer had to then locate the path to the Iliad Flow.").

[20] AMZN_00045965; Goeltz Deposition, pp. 56:21–57:5 ("Q. And how does one get to the Prime Membership Central Page?  A. … You can get there through visiting the Prime Member Page as well.").

[21] Goeltz Deposition, pp. 56:21–57:4 ("Q. And how does one get to the Prime Membership Central Page?  A. … Other ways available to get there are through help pages…").

[22] Goeltz Deposition, p. 200:10–17 ("Q. … Can a customer also reach an ingress to the online cancellation flow using a site outside of Amazon.com?  A. To my understanding, yes, they could use, like, a search like Google and look for cancel Amazon Prime and find a link to either membership central or potentially the cancel flow itself.").

[23] Goeltz Deposition, pp. 89:16–91:4 ("So other ways to get to the membership central page are going through the … My Subscriptions page … Q. How do you access the my subscriptions page that you were referring to earlier?  A. It's a little bit -- it's a little bit fuzzy, but I think you can see it in the second screenshot there, the ingress from account drop-down. There's a memberships and subscriptions immediately above the red box I believe.").

support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

14.    My work on this matter is ongoing and I reserve the right to update and supplement my opinions as additional facts become available.

## IV.    Summary of Opinions

15.    I was asked to design and conduct a survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com.  To that end, I designed and conducted a survey that presented respondents with a simulated portion of the Amazon.com website.  Respondents were instructed to navigate the simulated website as they would if they wanted to cancel their Prime membership.  The results of the survey show that 99.8% of respondents (or 529 out of 530 respondents) located the Cancellation Flow and 96.4% of respondents (or 511 out of 530 respondents) paused or ended their Prime membership.  On average, respondents who located the Cancellation Flow took 47 seconds to locate it, and respondents who paused or ended their Prime membership took 28 seconds to pause or end their Prime membership once they entered the Cancellation Flow.  Overall, respondents who paused or ended their Prime membership took an average of 74 seconds to locate the Cancellation Flow and to pause or end their Prime membership.  These results are inconsistent with the FTC's allegation that the online cancellation process inhibited or prevented Prime members who intended to cancel from being able to do so.

16.    I was also asked to design and conduct a survey to assess the extent to which US consumers have experience with free trials of memberships and subscriptions, particularly those that automatically turn into paid memberships or subscriptions unless cancelled.  The survey found that 92.5% of respondents reported that they currently pay for at least one membership or subscription from the list that was provided, and that 58.0% of respondents reported signing up for one or more free trials of memberships and subscriptions in the past 12 months.  Among respondents who reported signing up for one or more free trials of memberships or subscriptions in the past 12 months, 85.0% indicated that the free trial they had most recently signed up for either automatically turned into a paid membership or subscription at the end of the trial period,

or would have automatically turned into a paid membership or subscription at the end of the trial period had they not cancelled it first.

## V.    Principles of Survey Design

17.    I designed my surveys following generally accepted guidelines, including those set out in commonly referenced sources, such as the *Reference Guide on Survey Research*, and based on my own experience and expertise designing and conducting numerous surveys.  These guidelines include the following:[24]

   a.  A survey should have a specific purpose and should be designed to achieve that purpose.[25]

   b.  The target population should be well-defined, and the survey sample must accurately represent that target population.[26]

   c.  The sponsor and purpose of the survey should be concealed from respondents to avoid nonresponse bias, self-selection bias, or demand effects.[27]

---

[24] Diamond, S. S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Washington, D.C.: The National Academies Press, pp. 359–423 ("Diamond (2011)"); Marcus, S., et al., eds. (2004), *Manual for Complex Litigation*, Fourth Edition, Washington, D.C.: Federal Judicial Center ("Manual for Complex Litigation"), pp. 102–103.

[25] Diamond (2011), p. 373 ("The report describing the results of a survey should include a statement describing the purpose or purposes of the survey.  One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy (e.g., to estimate damages in an antitrust suit or to assess consumer confusion in a trademark case).  … [T]he content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court.").

[26] Diamond (2011), p. 380 ("Identification of a survey population must be followed by selection of a sample that accurately represents that population."), p. 377 ("The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers."); Manual for Complex Litigation, p. 103 ("The sampling methods used must conform to generally recognized statistical standards. Relevant factors include whether the population was properly chosen and defined; the sample chosen was representative of that population…").

[27] Diamond (2011), pp. 410–411 ("To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."), p. 383 ("Even when a sample is drawn randomly from a complete list of elements in the target population, responses or measures may be obtained on only part of the selected sample."), p. 386 ("…potential biases in selection can be reduced by providing appropriate selection instructions…"); Diamond, S. S., and J. B. Swann, eds. (2012), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, First Edition, Chicago, IL: American Bar Association, p. 243 ("Demand effects (also referred to as demand artifacts) are produced when respondents use cues provided by the survey procedures and questions to figure out the purpose of the survey and to identify the 'correct' answers to the questions they are asked.").

    d.   The instructions, questions, and answer options should be clear, precise, and unbiased.[28]

    e.   Filter questions should be used where appropriate, and questions should include answer options such as "Don't know / not sure" or "None of the above" to reduce guessing.[29]

    f.   The order of questions and answer options should be randomized or rotated, when appropriate, to avoid order effects.[30]

    g.   Quality-control measures, such as attention checks, should be included to ensure that respondents are paying attention and providing accurate and reliable responses.[31]

---

[28] Diamond (2011), pp. 387–388 ("Although it seems obvious that questions on a survey should be clear and precise, phrasing questions to reach that goal is often difficult. … When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question."); Manual for Complex Litigation, p. 103 ("In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading…").

[29] Diamond (2011), p. 390 ("[T]he survey can use a quasi-filter question to reduce guessing by providing 'don't know' or 'no opinion' options as part of the question (e.g., 'Did you understand the guarantee offered by Clover to be for more than a year, a year, or less than a year, or don't you have an opinion?').  By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply. … Finally, the survey can include full-filter questions, that is, questions that lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is preparing to ask about (e.g., 'Based on the commercial you just saw, do you have an opinion about how long Clover stated or implied that its guarantee lasts?'). The interviewer then asks the substantive question only of those respondents who have indicated that they have an opinion on the issue."); Iacobucci, D., and G.A. Churchill (2010), *Marketing Research: Methodological Foundations*, Tenth Edition, Mason, OH: South-Western Cengage Learning, p. 209 ("From a different perspective, consider the question, 'How much does your family spend on groceries in a typical week?'  Unless the respondent does the grocery shopping, he or she is unlikely to know.  It might be helpful to begin with 'filter questions' to determine if the individual is indeed likely to know, e.g., 'Who does the grocery shopping in your family?'"); de Vaus, D. (2014), *Surveys in Social Research*, Sixth Edition, New York, NY: Routledge, pp. 108–109 ("Since we do not want respondents to waste time reading questions which are not relevant to them we can use filter or contingency questions … to direct respondents to questions that, given previous responses, are applicable to them.").

[30] Diamond (2011), p. 396 ("The mode of questioning can influence the form that an order effect takes.  When respondents are shown response alternatives visually, as in mail surveys and other self-administered questionnaires or in face-to-face interviews when respondents are shown a card containing response alternatives, they are more likely to select the first choice offered (a primacy effect). … To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level.").

[31] Diamond, S. S., and J. B. Swann, eds. (2022), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Second Edition, Chicago, IL: American Bar Association ("Diamond and Swann (2022)"), pp. 301–302 ("Most online surveys therefore include various measures to ensure or measure participant attention. … One common approach is to include a question that requires a respondent to carefully read the question and provide an unexpected answer…").

h.  Stimuli should be clearly displayed to respondents and should mimic, as closely as possible, what consumers would have seen.[32]

i.  A survey should be pretested to identify potential issues with instructions, questions, or answer options, such as ambiguity or lack of clarity.[33]

j.  The data analysis should follow best practices in statistics.[34]

18.  I took into account each of these guidelines in designing and conducting my surveys and analyzing their data.

## VI.    Cancellation Survey

### A.    Objectives

19.  I was asked to design and conduct a survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com as described by the FTC.  To that end, I designed and conducted the Cancellation Survey, which presented respondents with a simulated portion of the Amazon.com website that included the Prime Central page, the Amazon Landing page, the Your Account page, the Your Memberships & Subscriptions page, and the three pages of the Cancellation Flow described in the Amended Complaint.  Consistent with the FTC's allegations, the target population of the Cancellation Survey was defined as U.S. adults who own a Prime membership or share a Prime membership with a household member.[35]  **Appendix F.1** presents the Cancellation Survey questionnaire and **Appendix F.2** presents screenshots of the Cancellation Survey.

---

[32] Diamond and Swann (2022), p. 312 ("If the primary stimulus is an image or video file, then it is important that the image or video be properly displayed to participants."), p. 313 ("If purchasing occurs online and the consumer will see only a picture of the product, that should be the way the survey respondent sees it.").

[33] Diamond (2011), p. 388 ("Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous…").

[34] Diamond (2011), p. 364 ("For a survey, the question becomes, 'Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?'  This focus on the adequacy of the methodology used in conducting and analyzing results from a survey is also consistent with the Supreme Court's discussion of admissible scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*"); Manual for Complex Litigation, p. 103 ("The sampling methods used must conform to generally recognized statistical standards.  Relevant factors include whether…the data were analyzed in accordance with accepted statistical principles.").

[35] Amended Complaint, ¶ 7 ("…Amazon also knowingly complicated the cancellation process for Prime subscribers who sought to end their membership. … [T]he primary purpose of the Prime cancellation process was not to enable subscribers to cancel, but rather to thwart them."), ¶ 13 ("…Amazon advertised, distributed, or sold a paid subscription service, Prime, that gives subscribers through the United States access to additional services…"); **Appendix F.1**, S30 and S80.

## B.    Screening Questions

20.    When starting the Cancellation Survey, respondents were instructed to take the survey in one session, to answer all questions without consulting other sources of information, and to not guess.[36]  After these instructions, **S1** asked respondents a "CAPTCHA" question designed to prevent robots from taking the survey.[37]  Next, respondents were asked a series of screening questions, which identify respondents who belong to the target population.  I designed these screening questions following best practices in survey design.  In particular, to prevent respondents from guessing the purpose of the Cancellation Survey, the screener moved from broader questions (activities in the last 12 months) to narrower questions (active memberships or subscriptions).  I used decoy answer options and an attention check question to remove inattentive respondents.[38]

21.    I instructed GBK Collective ("GBK"), a survey research company, to use "click-balancing" to collect an inbound sample of respondents representative of the U.S. population in terms of age, gender, and Census Region.[39]  The screening process resulted in a sample of qualified respondents who:

    a.  Were at least 18 years old,

    b.  Resided in the United States,

---

[36] **Appendix F.1**.

[37] **Appendix F.1**.

[38] Inattentive survey respondents may provide responses which introduce noise and/or systematic bias into the data.  *See* Oppenheimer, D., T. Meyvis, and N. Davidenko (2009), "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45, pp. 867–872 ("When participants fail to follow instructions, this increases noise and decrease the validity of [the survey] data… [F]orcing… participants to read instructions more carefully will increase the signal-to-noise ratio, and in turn increase statistical power."); Paas, L., and M. Morren (2018), "Please Do Not Answer If You Are Reading This: Respondent Attention in Online Panels," *Marketing Letters*, 29, 1, pp. 13–21 at pp. 13, 15 ("[O]ur empirical findings show respondent inattentiveness systematically biases survey responses. … [I]nattention...relate[s] to response bias.").  It is therefore good practice to control for participant attention with an attention check question.  *See* Diamond and Swann (2022), p. 301 ("Most online surveys therefore include various measures to ensure or measure participant attention.").

[39] *See* "GBK Collective," *GBK Collective,* https://www.gbkcollective.com/.  Participants were recruited using a panel from Dynata, a leading market research firm.  *See* "About," *Dynata,* https://www.dynata.com/about-us/.  In the Cancellation Survey and Free Trials Survey, I asked respondents their gender and provided them four options: "Male," "Female," "Nonbinary," and "Prefer not to answer."  The 2020 Census asked individuals their sex and provided them two options: "Male" and "Female."  Therefore, there could be very minor differences between the gender distribution in the inbound sample and the U.S. population.  *See* "2020 Census Informational Bilingual Questionnaire," *U.S. Census Bureau,* https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/questionnaires-and-instructions/questionnaires/2020-informational-questionnaire.pdf.  In addition to click-balancing the inbound sample on the U.S. adult population in terms of age, gender, and region, I also instructed GBK (1) to recruit the inbound using a US population online panel, (2) to collect a qualified sample of 500 respondents, (3) to have the survey in English, and (4) to use de-duping technology to ensure unique respondents.

c. Took the survey on a desktop or laptop computer,[40]

d. Did not work or have a household member who worked at a retailer, advertising or public relations company, marketing agency, advertising department of a company, market research firm, or marketing research department of a company,

e. Shopped online in the past 12 months,

f. Owned a Prime membership or shared a Prime membership with a household member.

22. The screening questions of the Cancellation Survey were as follows:

a. **S10** asked respondents the type of device they were using to take the survey.[41] Respondents who did not select a desktop or laptop computer were terminated. Respondents whose self-reported device in this question did not match the device detected by an automated device sniffer were also terminated.

b. **S20** asked respondents whether they or a member of their household worked in certain industries.[42] Respondents who indicated that they or a household member worked at (i) a retailer; (ii) an advertising or public relations company, marketing agency, or advertising department of a company; or (iii) a market research firm or a marketing research department of a company, were terminated.[43]

c. **S30-S50** asked respondents their age, their gender, and the state in which they live.[44] Respondents who were younger than 18 years old, who did not provide their demographic information, or who reported demographic information that did not match the information they reported to the survey panel were terminated.[45]

---

[40] Requiring respondents to take the survey on a desktop or laptop computer was necessary to ensure that the Cancellation Stimulus, which mimics pages of Amazon.com on a desktop or laptop computer, was properly displayed to respondents.

[41] **Appendix F.1**, S10.

[42] **Appendix F.1**, S20.

[43] It is best practice to exclude respondents who may have specialized knowledge about surveys or about the relevant industry. *See* Diamond and Swann (2022), p. 56 ("Screeners are also typically used to exclude respondents who might have specialized knowledge or experience, or suffer an impairment, that would make their responses atypical of ordinary consumers.").

[44] **Appendix F.1**, S30–S50.

[45] The survey panel does not profile nonbinary gender. Respondents who reported nonbinary gender were not terminated.

d.  **S60** asked respondents which activities they have done in the past 12 months and provided them with answer options based on popular online activities.[46] Respondents who did not select "shopped online" were terminated.[47]

e.  **S70** asked respondents which websites they have shopped online in the past 12 months.  Respondents could select answer options based on popular webpages.[48] These answer options included two decoys (i.e., two fictitious webpages), "BoardGameBin.com" and "UrbanOutpost.com."  Respondents who selected these decoy answer options were terminated.[49]

f.  **S80** asked respondents which services they currently have a membership or subscription with and provided them with a list of popular memberships or subscriptions.  Respondents were instructed to include memberships or subscriptions that they currently share with household members.  Respondents who did not indicate that they currently have or share a Prime membership with a household member were terminated.  Respondents who selected the decoy "eBay Premier" answer option were also terminated.[50]

g.  **S90** is an attention check question.  Respondents who answered this question incorrectly were terminated.[51]

## C.    Stimulus

23.    After the screening questions, before proceeding to the stimulus, qualified respondents were told that they would go through a simulated process of cancelling their Amazon Prime membership and that they would begin on the Prime Central page of the simulated Amazon website, where they could manage their Amazon Prime membership settings.  Respondents were instructed to interact with the simulated website as they would if they wanted to cancel their Amazon Prime membership.[52]

---

[46] *See, e.g.*, "Most Popular Reasons for Using the Internet Worldwide as of 2nd Quarter 2024," *Statista*, https://www.statista.com/statistics/1387375/internet-using-global-reasons/.
[47] **Appendix F.1**, S60.
[48] *See, e.g.*, "Market Share of Leading Retail E-Commerce Companies in the United States in 2023," *Statista*, https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/.
[49] **Appendix F.1**, S70.
[50] **Appendix F.1**, S80.
[51] **Appendix F.1**, S90.  *See also* **Appendix E** for accepted misspellings in **S90** of the Cancellation Survey.
[52] **Appendix F.1**, Stimulus.

24.    To make sure respondents reviewed these instructions, respondents were asked an attention check question and had to select "Other, please specify" and type "agree" into the space provided in order to continue.[53]

25.    Respondents who did not answer this question correctly after two attempts were terminated.  Respondents who answered this question correctly were told that they would enter the Prime Central page of the simulated Amazon website where they could manage their Amazon Prime membership settings.  Respondents were instructed to navigate the simulated website as they would if they wanted to cancel their Amazon Prime membership.[54]

26.    After reviewing these instructions, respondents proceeded to the Cancellation Stimulus, which included a mockup of the four-page cancellation process described in the Amended Complaint (the Prime Central page and the three pages of the Cancellation Flow)[55] as well as mockups of the Amazon Landing page, the Your Account page, and the Your Memberships & Subscriptions page.[56]

---

[53] **Appendix F.1**, Stimulus.

[54] **Appendix F.1**, Stimulus.

[55] Amazon Prime members could also cancel their Prime membership by using the Amazon.com search bar, using an outside search engine (e.g., Google), by using the help pages, by using Amazon's chatbot feature, and by contacting Amazon's customer service.  *See* Section II.  The Cancellation Survey focuses on the cancellation process starting from Prime Central due to its prominence in the Amended Complaint and due to the difficulty of simulating in a survey environment other cancellation processes that include features such as search bars, email, and chatbots.  *See* Amended Complaint, ¶ 128 ("The Iliad Flow required consumers intending to cancel to navigate a four-page, six-click, fifteen-option cancellation process."), ¶ 131 ("Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page, which consumers could reach by selecting the 'Account & Lists' dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ('Prime Membership'). This took the consumer to the Prime Central Page."), ¶ 140 ("Once consumers reached the Iliad Flow, they had to proceed through its entirety—spanning three pages…."); FTC's Opposition to Motion to Dismiss, pp. 38–39 ("To find the 'End Membership' button, a consumer first had to navigate to the 'Prime Central' page. … Upon arriving at the Prime Central page, consumers then had to click 'Manage Membership,' which would open a menu that included the 'End Membership' button … Clicking 'End Membership,' however, did not end one's membership, or result in loss of access to Prime benefits, but rather simply started the Iliad Flow.").  Although the Cancellation Stimulus replicated the design and format of the cancellation process from around August 2022 as closely as possible, there may be instances in which the Cancellation Stimulus varies slightly from the real Amazon website due to constraints associated with creating the stimulus.  For example, the Amazon webpage contains multiple images, which were recreated as closely as possible to match those on the actual Amazon webpage, but there could be certain small differences between the images in the stimulus and the images on the Amazon webpage.  To illustrate, on the Prime Central page there is a "Deals and promotions for Prime members" banner that contains a picture of a family.  In the picture, the man's haircut is different between the Cancellation Stimulus and the actual Amazon webpage.  Compare, e.g., **Appendix F.4** and Attachment Q of the Amended Complaint.  Furthermore, several links and buttons in the Cancellation Stimulus that did not have any obvious relationship to the process of cancelling a Prime membership were inactive; nothing would happen if a respondent clicked on them.  Additionally, the search bar on the top banner of each page was also inactive due to the difficulty of programming a search bar, even though it could be utilized to locate the Cancellation Flow.  For a description of the active and inactive links and buttons on each page, *see* **Appendix F.3**.  I relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process in place around August 2022.

[56] The Cancellation Stimulus did not include all the pages on Amazon.com, as recreating the entire Amazon website would be a prohibitively complex and extensive exercise.  Importantly, replicating the entire Amazon website was not

### 1.    Locating the Cancellation Flow

27.    One of the goals of the Cancellation Survey was to assess the extent to which respondents would be able to locate the Cancellation Flow and the time it took them to locate it.

28.    Respondents started the Cancellation Stimulus on the Prime Central page, which is the first page of the four-page desktop cancellation process described in the Amended Complaint.[57] The Prime Central page of the Cancellation Stimulus corresponded to the Prime Central page Amazon customers saw around August 2022.[58] On the Prime Central page, the active links and buttons directed respondents to other pages of the Cancellation Stimulus,[59] kept respondents on the Prime Central page,[60] or directed respondents to additional instructions (described below). Exhibit 1 shows the Prime Central page of the Cancellation Stimulus and the active links and buttons that directed respondents to other pages of the Cancellation Stimulus or kept respondents on the Prime Central page.

---

necessary to achieve the goal of simulating an experience that approximates the experience of an Amazon Prime member who intends to cancel their membership and attempts to do so.  Specifically, on the actual Amazon.com page, customers can click on all links and buttons and be directed to other pages, including pages that are seemingly unrelated to the process of cancelling a Prime membership (e.g., customers could click on "The Housemaid" link and visit the Amazon webpage associated with the book).  Customers can also use their browser's back button to navigate back and forth on pages they clicked on consecutively (e.g., a customer can click on Prime Video while on the Prime Central page, visit that page, and then return to the Prime Central page by clicking their browser's back button).  Due to technical feasibility constraints, the Cancellation Stimulus does not include all pages that are not related to membership cancellation or a functional back button in the simulated portion of the Amazon.com website. In the Cancellation Stimulus, respondents who clicked on links and buttons that would direct them to pages that were seemingly unrelated to the process of cancelling a Prime membership were presented with additional instructions reminding them of their task.  For example, on the Prime Central page, respondents who clicked on the "Shop now" button were presented with additional instructions that indicated that they made a selection that ends the simulation without canceling their Amazon Prime membership in the simulation and that they should navigate the simulated website as they would if they wanted to cancel their Amazon Prime membership.  *See* **Appendix F.1,** A10 and Restart Instructions and Additional Stimulus Pages.

[57] Amended Complaint, ¶¶ 127–163.

[58] The Prime Central page was constructed based on Attachment Q of the Amended Complaint, which shows the Prime Central page from around August 2022; FTCAMZN_0023823–824, which shows the Prime Central page as of August 25, 2022; and the live Prime Central page from May 2024.  **Appendix F.3** includes additional details on how the Prime Central page was constructed.

[59] *See* **Appendix F.3** for more details.

[60] These active links and buttons were identified based on the current Amazon website.  I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process and the active links and buttons in place around August 2022.  *See* **Appendix F.3** Section II for more details.

**Exhibit 1**
**Links and Buttons on the Prime Central Page That Took Respondents to Other Pages of the Cancellation Stimulus or Kept Them on the Prime Central Page**



Source:  *See* **Appendix F.4.**

Note:  This exhibit shows the links and buttons on the Prime Central page of the Cancellation Stimulus that took respondents to other pages of the Cancellation Stimulus or kept them on the Prime Central page.  Panel A presents the "All" side panel menu that appears when respondents click the "All" button on the top banner, Panel B presents the Prime Central page, and Panel C presents the "Account & Lists" dropdown menu that appears when respondents hover over the "Account & Lists" button on the top banner.  Note that clicking on the "Account & Lists" button takes respondents to the Your Account page.  All other buttons and links not indicated by the legend are active and, when clicked on, present respondents with additional instructions, except for the search bar, the "All" button to the left of the search bar, and the magnifying glass button to the right of the search bar, which were not programmed to be active.  The "See more plans" dropdown menu (not shown in this exhibit) contains two buttons that keep respondents on the Prime Central page.  The "Can I get reminded before my next billing date?" option in the "Need Help?" menu contains one link (not shown in this exhibit) that keeps respondents on the Prime Central page.  *See* **Appendix F.3** for additional details.

CONFIDENTIAL

29.    On the Prime Central page of the Cancellation Stimulus, respondents could reach the Cancellation Flow by:[61]

    a.    Clicking on the "Manage Membership" button to deploy a dropdown menu and then clicking on the "End membership" button.

    b.    Selecting the "How do I cancel my Amazon Prime membership and get a refund?" option in the "Need Help?" menu, and then clicking on the "click here" link.

30.    Respondents could also explore the following pages in the Cancellation Stimulus, as they navigated the simulated portion of the Amazon.com website to locate the Cancellation Flow:[62]

    a.    <u>The Amazon Landing Page.</u>[63]  Respondents could access the Amazon Landing page from the Prime Central page by clicking on the "Amazon Prime" button in the top left corner.[64]  On the Amazon Landing page of the Cancellation Stimulus, respondents could click on the links and buttons as if they were on the actual Landing page on Amazon.com.[65]  Exhibit 2 below shows the Amazon Landing page of the Cancellation Stimulus and the active links and buttons that directed respondents to other pages of the Cancellation Stimulus or kept the respondents on the Amazon Landing page.[66]  The remaining active links and buttons directed respondents to additional instructions.[67]

---

[61] *See* **Appendix F.3** for additional details.

[62] *See* **Appendix F.3** for additional details.

[63] The Amazon Landing page was constructed based on a version of the Amazon Landing page from April 2024.  *See* **Appendix F.3** for additional details.

[64] *See* **Appendix F.3** for additional details.

[65] *See* **Appendix F.3** for additional details.

[66] These active links and buttons and the pages those links and buttons lead to were identified based on the current Amazon website.  I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the links and buttons in place around August 2022 related to the cancellation process.  *See* **Appendix F.3** for additional details.

[67] The search bar on the top banner, the "All" button to the left of the search bar on the top banner, and the magnifying glass button to the right of the search bar on the top banner were inactive.  *See* **Appendix F.3** for additional details.

**Exhibit 2**
**Links and Buttons on the Amazon Landing Page That Took Respondents to Other Pages of the Cancellation Stimulus or Kept Them on the Amazon Landing Page**



Source:  *See* **Appendix F.4.**
Note:  This exhibit shows the links and buttons on the Amazon Landing page of the Cancellation Stimulus that took respondents to other pages of the Cancellation Stimulus or kept them on the Amazon Landing page.  Panel A presents the "All" side panel menu that appears when respondents click the "All" button on the top banner, Panel B presents the Amazon Landing page, and Panel C presents the "Account & Lists" dropdown menu that appears when respondents hover over the "Account & Lists" button on the top banner.  Note that clicking on the "Account & Lists" button takes respondents to the Your Account page.  All other buttons and links not indicated by the legend are active and, when clicked on, present respondents with additional instructions, except for the search bar, the "All" button to the left of the search bar, and the magnifying glass button to the right of the search bar, which were not programmed to be active.  This exhibit does not show the full-sized Amazon Landing page in the interest of space.  The active links and buttons on the Amazon Landing page not in the exhibit show additional product information and, when clicked on, present respondents with additional instructions.  *See* **Appendix F.4** for a full-sized image of the Amazon Landing page and *see* **Appendix F.3** for additional details.

b.  <u>The Your Account Page.</u>[68]  Respondents could access the Your Account page from the Prime Central page either by (i) clicking on the "Account & Lists" button, (ii) enabling the "Account & Lists" dropdown menu on the top banner and then clicking on the "Account" link, or (iii) enabling the "All" side panel menu and clicking on the "Hello" button or "Your Account" button.[69]  On the Your Account page of the Cancellation Stimulus, respondents could click on the links and buttons as if they were on the actual Your Account page on Amazon.com.[70] Exhibit 3 below shows the Your Account page of the Cancellation Stimulus and the active links and buttons that directed respondents to other pages in the Cancellation Stimulus or kept the respondents on the Your Account page.[71]  The remaining active links and buttons directed respondents to additional instructions.[72]

---

[68] The Your Account page was constructed based on FTCAMZN_0023769–770, which shows the Your Account page as of July 28, 2022.  I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process and the active links and buttons in place around August 2022.  *See* **Appendix F.3** for additional details.

[69] *See* **Appendix F.3** for additional details.

[70] *See* **Appendix F.3** for additional details.

[71] These active links and buttons were identified based on the current Amazon website.  *See* **Appendix F.3** for additional details.  I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process and the active links and buttons in place around August 2022.

[72] The search bar on the top banner, the "All" button to the left of the search bar on the top banner, and the magnifying glass button to the right of the search bar on the top banner were inactive.  *See* **Appendix F.3** for additional details.

**Exhibit 3**
**Links and Buttons on the Your Account Page That Took Respondents to Other Pages of the Cancellation Stimulus or Kept Them on the Your Account Page**



Source:  *See* **Appendix F.4.**

Note:  This exhibit shows the links and buttons on the Your Account page of the Cancellation Stimulus that took respondents to other pages of the Cancellation Stimulus or kept them on the Your Account page.  Panel A presents the "All" side panel menu that appears when respondents click the "All" button on the top banner, Panel B presents the Your Account page, and Panel C presents the "Account & Lists" dropdown menu that appears when respondents hover over the "Account & Lists" button on the top banner.  Note that clicking on the "Account & Lists" button keeps respondents on the Your Account page.  All other buttons and links not indicated by the legend are active and, when clicked on, present respondents with additional instructions except for the search bar, the "All" button to the left of the search bar, and the magnifying glass button to the right of the search bar, which were not programmed to be active.  *See* **Appendix F.3** for additional details.

c.   <u>Your Memberships & Subscriptions Page.</u>[73]  Respondents could access the Your Memberships & Subscriptions page from the Prime Central page by enabling the "Account & Lists" dropdown and clicking on the "Memberships & Subscriptions" link.[74]  On the Your Memberships & Subscriptions page of the Cancellation Stimulus, respondents could click on the links and buttons as if they were on the actual Your Memberships & Subscriptions page on Amazon.com.[75]  Exhibit 4 below shows the Your Memberships & Subscriptions page of the Cancellation Stimulus and the active links and buttons that directed respondents to other pages in the Cancellation Stimulus or kept the respondents on the Your Memberships & Subscriptions page.[76]  The remaining active links and buttons directed respondents to additional instructions.[77]

---

[73] The Your Memberships & Subscriptions page was constructed based on a live version of the page from May 23, 2024.  *See* **Appendix F.3** for additional details on how the Your Memberships & Subscriptions page was constructed. I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process and the active links and buttons in place around August 2022.

[74] *See* **Appendix F.3** for additional details.

[75] *See* **Appendix F.3** for additional details.

[76] These active links and buttons were identified based on the current Amazon website.  *See* **Appendix F.3** for additional details. I also relied on information from Mr. Benjamin Goeltz, Senior Product Manager at Amazon Prime, regarding the cancellation process and the active links and buttons in place around August 2022.

[77] The search bar on the top banner, the "All" button to the left of the search bar on the top banner, and the magnifying glass button to the right of the search bar on the top banner were inactive.  Furthermore, the search bar on the top right of the Your Memberships & Subscriptions page, the "Go" button near the search bar on the top right of the Your Membership & Subscriptions page, and the "View" and "Sort by" menus on the top left of the Your Memberships & Subscriptions page were inactive.  *See* **Appendix F.3** for additional details.

CONFIDENTIAL

**Exhibit 4**
**Links and Buttons on the Your Memberships & Subscriptions Page That Took Respondents to Other Pages of the Cancellation Stimulus or Kept Them on the Your Memberships & Subscriptions Page**



Source:  *See* **Appendix F.4.**
Note:  This exhibit shows the links and buttons on the Your Memberships & Subscriptions page of the Cancellation Stimulus that took respondents to other pages of the Cancellation Stimulus or kept them on the Your Memberships & Subscriptions page. Panel A presents the "All" side panel menu that appears when respondents click the "All" button on the top banner, Panel B presents the Your Memberships & Subscriptions page, and Panel C presents the "Account & Lists" dropdown menu that appears when respondents hover over the "Account & Lists" button on the top banner.  Note that clicking on the "Account & Lists" button takes respondents to the Your Account page.  All other buttons and links not indicated by the legend are active and, when clicked on, present respondents with additional instructions, except for the search bar on the top banner, the "All" button to the left of the search bar on the top banner, the magnifying glass button to the right of the search bar on the top banner, the search bar on the top right of the Your Memberships & Subscriptions page, the "Go" button next to the search bar on the top right of the Your Memberships & Subscriptions page, and the "View" and "Sort by" dropdown menus, which were not programmed to be active.  *See* **Appendix F.3** for additional details.

31.   As referenced above, respondents who clicked on an active link or button that did not direct them to the Cancellation Flow, the Prime Central page, the Amazon Landing page, the Your Account page, or the Your Memberships & Subscriptions page were given additional instructions ("Additional Instructions").[78]  These Additional Instructions informed respondents that they have made a selection that ended the simulation without canceling their Amazon Prime membership and that they would re-enter the simulation of the Amazon website starting on the last page they visited.  Respondents were also re-instructed to navigate the simulated website as they would if they wanted to cancel their Amazon Prime membership.  These instructions ensured that respondents who were engaging in exploratory behavior (e.g., to satisfy their general curiosity regarding the simulated website environment), who may not have fully understood the initial instructions, or who may be intentionally ignoring the instructions, were reminded about their task.

32.   After reviewing these Additional Instructions, respondents re-entered the Cancellation Stimulus at the last page they visited and could continue to navigate the simulated portion of the Amazon.com website as they liked while looking for the Cancellation Flow.  The survey allowed respondents to re-enter the stimulus an unlimited number of times while searching for the Cancellation Flow within a 10-minute time window to allow for exploratory behavior in the Cancellation Stimulus.[79]  Respondents who did not locate the Cancellation Flow within the 10-minute time window were counted as having failed the task presented in the survey.

33.   I tracked three outcomes relating to respondents' ability to locate the Cancellation Flow: (a) whether respondents located the Cancellation Flow; (b) how long it took respondents to locate the Cancellation Flow, starting from the time they entered the Cancellation Stimulus; and (c) how many times respondents were given Additional Instructions while searching for the Cancellation Flow.

---

[78] *See* **Appendix F.1**, Restart Instructions and Additional Stimulus Pages.
[79] A pilot study was conducted to determine the time limit to locate the Cancellation Flow, as described in Section VI.D.2.

## 2. Completing the Cancellation Flow

34.    For respondents who located the Cancellation Flow, the Cancellation Survey also assessed whether they were able to go through the three pages of the Cancellation Flow and cancel their Prime membership, as well as how long it took respondents to do so.

35.    The Cancellation Flow consisted of the last three pages shown in Attachment Q of the Amended Complaint, which I understand corresponds to the Cancellation Flow around August 2022.[80]  **Appendix F.4** shows screenshots of the three pages of the Cancellation Flow as shown to the respondents.

36.    Exhibit 5 shows the first page of the Cancellation Flow as shown to the respondents.  On this page, respondents could click on buttons and links as if they were on the actual page of the Cancellation Flow on Amazon.com.  Respondents could proceed with the cancellation process by clicking on the "Continue To Cancel" button, which took them to the second page of the Cancellation Flow.[81]

---

[80] The billing cycle in Attachment Q of the Amended Complaint ends on September 2, 2022. Given a monthly billing cycle, it is likely that the document is from around August 2022.  *See* Attachment Q of the Amended Complaint.  **Appendix F.3** includes additional details on how the three pages in the Cancellation Flow were constructed.

[81] *See* **Appendix F.3** for additional details.

**Exhibit 5**
**First Page of the Cancellation Flow in the Cancellation Stimulus**



Source:  *See* **Appendix F.4**.
Note:  *See* **Appendix F.3** for additional details.

37.    Exhibit 6 shows the second page of the Cancellation Flow as shown to respondents.  On this page, respondents could click on buttons and links as if they were on the actual page of the Cancellation Flow on Amazon.com.  Respondents could proceed with the cancellation process by clicking on the "Continue to Cancel" button, which took them to the third and last page of the Cancellation Flow.[82]

---

[82] *See* **Appendix F.3** for additional details.

**Exhibit 6**
**Second Page of the Cancellation Flow in the Cancellation Stimulus**



Source:  *See* **Appendix F.4**.
Note:  *See* **Appendix F.3** for additional details.

38.    Exhibit 7 shows the last page of the Cancellation Flow as shown to respondents.  On this page, respondents could click on buttons and links as if they were on the actual page of the Cancellation Flow on Amazon.com, including the "End Now," "End on [Date]," and "Pause on [Date]" buttons (where "[Date]" is a placeholder, filled in for each respondent as the date corresponding to 15 days after the date they took the survey).[83]

---

[83] *See* **Appendix F.3** for additional details.

**Exhibit 7**
**Third Page of the Cancellation Flow in the Cancellation Stimulus**



Source: *See* **Appendix F.4**.
Note: *See* **Appendix F.3** for additional details.

39.    While inside the Cancellation Flow, respondents who clicked on links and buttons that did not progress the Cancellation Flow or did not pause or end the Prime membership were given Additional Instructions.[84]  These respondents were then redirected to the Cancellation Stimulus at the last page of the Cancellation Flow they visited, which was done at most once.  Doing so allowed for some exploratory behavior within the flow and mimicked the fact that, in the actual Cancellation Flow, Prime members who exited the flow could return to it by clicking on their browser's back button.  Furthermore, as discussed above, I used a 10-minute time limit for time

---

[84] *See* Section VI.C.1.

spent within the Cancellation Flow.[85]  Respondents who could not complete the Cancellation Flow within 10 minutes or who, after being redirected, pressed on links and buttons that did not progress the Cancellation Flow, were counted as having failed the task presented in the survey.

40.    I tracked three outcomes relating to respondents' ability to complete the Cancellation Flow: (a) whether respondents clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons on the last page of the Cancellation Flow;[86] (b) the time it took respondents to click on the "End Now," "End on [Date]," or "Pause on [Date]" buttons since entering the first page of the Cancellation Flow;[87] and (c) whether respondents were given Additional Instructions in the Cancellation Flow.

### D.    Implementation

#### 1.    Pretests

41.    10 pretests were conducted for the Cancellation Survey.[88]  The pretests for the Cancellation Survey indicated that respondents did not have problems understanding the questions and corresponding answer options in the screener as well as the instructions in the survey (e.g., the Prime membership cancellation task) and did not have technical difficulties navigating through the simulated portion of the Amazon.com website or the survey instrument. Therefore, no changes were made to the survey following the pretests.

#### 2.    Pilot Study

42.    The Cancellation Survey included a time limit to locate the Cancellation Flow and another time limit to complete the Cancellation Flow.  These time limits ensured that respondents who were not performing the task to cancel their Prime membership would not be tracked for an indefinite amount of time in the Cancellation Stimulus.

43.    Based on my experience navigating the Cancellation Stimulus and my observations during the pretests, I set both time limits to 10 minutes.  I conducted a pilot study with 51 respondents to

---

[85] The timer started when respondents first reached the Cancellation Flow.  A pilot study was conducted to determine the time limit to complete the Cancellation Flow, as described in Section VI.D.2.

[86] [Date] was shown to respondents as 15 days after the date they took the survey.

[87] [Date] was shown to respondents as 15 days after the date they took the survey.

[88] As I described in Section V, it is best practice to conduct pretests.  **Appendix F.5** shows the questions asked by the pretest moderator.

confirm that both 10-minute time limits allowed respondents to locate and complete the Cancellation Flow without artificially limiting respondents' exploratory behavior in the stimulus, and accommodated respondents with different levels of comfort and ability to navigate the Cancellation Stimulus (e.g., varying reading speeds).

44.    Respondents in the pilot study were presented the same screener questions, instructions, and stimuli as the Cancellation Survey.  The pilot study was fielded on October 9, 2024.  A total of 144 respondents started the pilot study, of whom 51 qualified for and completed it (i.e., succeeded or failed the task in the pilot study).[89]  The distribution of time respondents took to locate the Cancellation Flow in the pilot study is shown in Exhibit 8.  All pilot study respondents could locate the Cancellation Flow in under 10 minutes.

---

[89] **Appendix F.6**.  The inbound sample of respondents who started the pilot study was representative of the U.S. adult population in terms of age, gender, and Census region.  *See* **Appendix F.7**.

**Exhibit 8**
**Time Spent Locating the Cancellation Flow By Pilot Study Respondents**



Source:  Cancellation Survey Pilot Study 10/9/24
Note:  This exhibit displays the number of respondents by the number of seconds they spent searching for the Cancellation Flow.  Each bin represents a 30-second interval.  Data includes all 51 respondents who qualified for and completed the pilot study (i.e., succeeded or failed the task in the pilot study).  The minimum time spent searching for the Cancellation Flow was 6 seconds, and the maximum time spent searching for the Cancellation Flow was 421 seconds (or 7 minutes and 1 second).

45.    The distribution of time respondents spent in the Cancellation Flow in the pilot study is shown in Exhibit 9.  All pilot study respondents spent less than 10 minutes in the Cancellation Flow after locating it.[90]  Therefore, I used these 10-minute time limits in the Cancellation Survey.

---

[90] This includes respondents who paused or ended their Prime membership and respondents who entered the Cancellation Flow, but did not pause or end their Prime membership.

**Exhibit 9**
**Time Spent in the Cancellation Flow Among Pilot Study Respondents Who Located It**



Source:  Cancellation Survey Pilot Study 10/9/24
Note:  This exhibit displays the number of respondents by the number of seconds they spent in the Cancellation Flow.  Each bin represents a 15-second interval.  Data includes the 51 respondents who located the Cancellation Flow.  The minimum time spent in the Cancellation Flow was 8 seconds, and the maximum time spent in the Cancellation Flow was 98 seconds (or 1 minute and 38 seconds).

### 3.    Fielding

46.    GBK programmed the Cancellation Survey and recruited respondents through an online survey panel provided by Dynata.[91]  The survey started fielding on October 10, 2024, and stopped fielding on October 14, 2024.  A total of 1,645 respondents started the Cancellation Survey, of whom 530 qualified for and completed it (i.e., succeeded or failed the task in the survey).[92]  The inbound sample of respondents who started the Cancellation Survey was representative of the U.S. adult population in terms of age, gender, and Census Region.[93]  I also confirmed that the share of Prime members in the inbound sample was consistent with the share of Prime members in the U.S. adult population according to a third-party source.[94]

---

[91] **Appendix D**.
[92] **Appendix F.8**.
[93] **Appendix F.9**.
[94] The share of Prime members in the inbound sample was 72.3%.  I obtained the share of Prime members in the inbound sample by dividing the number of respondents who, in **S80**, indicated that they had or shared a Prime membership with a member of their household by the number of respondents who answered **S80**.  *See* Workpaper 1

E.    Results

1.    99.8% of Respondents Located the Cancellation Flow and 96.4% of Respondents Paused or Ended Their Prime Membership

47.    Exhibit 10 shows that, among the 530 respondents who qualified and completed the survey (i.e., succeeded or failed the task in the survey), 99.8% (i.e., all respondents but one) located the Cancellation Flow and 96.4% (i.e., 511 out of 530 respondents) clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons in the Cancellation Flow.[95, 96] In particular, as Exhibit 10 shows, 77.0% of respondents who entered the stimulus clicked on the "End Now" button, 17.7% clicked on the "End on [Date]" button, and 1.7% clicked on the "Pause on [Date]" button.[97]

---

for additional details.  This share is close to the share of Prime members in the U.S. adult population, which is 64.5% but, as expected, it is higher given that the sample of respondents who answered **S80** had already been filtered down to respondents who indicated that they had shopped online in the last 12 months in **S60**.  I obtained the share of Prime members in the U.S. adult population by dividing the number of Prime members in 2022 by the size of the U.S. adult population in 2022.  The number of Amazon Prime members in 2022 in the United States was 168.3 million. *See* "Number of Amazon Prime Users in the United States from 2017 to 2022 with a Forecast for 2023 and 2024 (in Millions)," *Statista*, https://www.statista.com/statistics/504687/number-of-amazon-prime-subscription-households-usa/.  The estimated resident population age 18 years and older in the United States in July 2022 was 260.8 million. *See* "Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, States, District of Columbia, and Puerto Rico: July 1, 2022," *U.S. Census Bureau*, https://www.census.gov/data/datasets/time-series/demo/popest/2020s-national-detail.html.  Therefore, the share of U.S. adult Prime members is calculated as (168.3)/260.8=64.5%.

[95] ███████████        *See* Amended Complaint, ¶¶ 162–163.  Prime members may exit the Cancellation Flow for various reasons, including because they were reminded of benefits associated with the Prime membership or informed of alternative payment plans.  In contrast, in the Cancellation Survey, respondents were instructed to navigate the simulated website as if they wanted to cancel their Prime membership.  Therefore, it is reasonable to expect that the percentage of respondents who pause or end their Prime membership in the Cancellation Survey (a simulated exercise) would be higher than the percentage of Prime members who enter the Cancellation Flow and cancel their Prime membership.

[96] Among respondents who located the Cancellation Flow, 65.0% did so without receiving Additional Instructions, 17.4% received Additional Instructions once, 10.0% received Additional Instructions twice, and 7.6% received Additional Instructions three or more times.  The maximum number of times these respondents received Additional Instructions was 14.  *See* **Appendix F.10** for additional details.  Among respondents who reached the third page of the Cancellation Flow and clicked on the "End Now," "End on [Date]," and "Pause on [Date]" buttons, 95.9% did so without receiving Additional Instructions in the Cancellation Flow, while 4.1% received Additional Instructions once. *See* **Appendix F.10** for additional details.  **Appendix F.11** displays 95% confidence intervals for these results.

[97] The share of respondents locating the Cancellation Flow and clicking on the "End Now," "End on [Date]," or "Pause on [Date]" buttons may underestimate the share of respondents that would click on these buttons in real-life situation because, in the survey, some respondents may have misunderstood the instructions or failed to follow them.  *See, e.g.,* Diamond and Swann (2022), p. 364 ("[E]ven a perfectly designed and executed survey will generate noise, guessing, lack of understanding, so-called yea-saying, and other responses that are extraneous to what the survey is attempting to test."); Oppenheimer, D., T. Meyvis, and N. Davidenko (2009), "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45, pp. 867–872 at p. 867 ("Most experimenters have dealt with participants who are not as diligent as we would like them to be… Some participants may skim instructions, missing key elements of the task or manipulation, or respond in a haphazard fashion that defies outlier analysis.").

**Exhibit 10**
**Respondents' Interactions with the Cancellation Stimulus[1]**

| Survey Respondents Who… | Number of Respondents | Share of Respondents |
|---|---|---|
| Did Not Reach the Cancellation Flow[2] | 1 | 0.2% |
| Reached the Cancellation Flow | 529 | 99.8% |
| Clicked on "End Now," "End on [Date]," or "Pause on [Date]"[3] | 511 | 96.4% |
| Clicked on "End Now" | 408 | 77.0% |
| Clicked on "End on [Date]" | 94 | 17.7% |
| Clicked on "Pause on [Date]" | 9 | 1.7% |
| **Total Survey Respondents** | **530** | **100.0%** |

Source: Cancellation Survey 10/10/24–10/14/24
Note:
[1] Data are filtered to "Qualified" respondents who completed the survey (i.e., succeeded or failed the task in the survey).
[2] One respondent was not able to locate the Cancellation Flow within the 10-minute time limit.
[3] Respondents who finished the cancellation process by clicking the the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button on the third page of the Cancellation Flow are shown. Note that "[Date]" is a placeholder, filled for each respondent as the date corresponding to 15 days after the date the respondent took the survey. 18 respondents reached the Cancellation Flow but did not click the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button.

### 2.    Respondents Took 47 Seconds on Average to Locate the Cancellation Flow

48.    Exhibit 11 shows the distribution of time it took respondents to locate the Cancellation Flow after entering the stimulus, among the 529 respondents (out of 530) who located the Cancellation Flow. On average, it took these respondents 47 seconds to locate the Cancellation Flow. The results show that 78.3% of respondents located the Cancellation Flow in less than one minute and 92.4% of respondents located the Cancellation Flow in less than two minutes.[98]

---

[98] Workpaper 2.

**Exhibit 11**
**Time Spent Locating the Cancellation Flow By Cancellation Survey Respondents**



Source:  Cancellation Survey 10/10/24–10/14/24
Note:  This exhibit displays the number of respondents by the number of seconds it took them to locate the Cancellation Flow. Each bin represents a 30-second interval.  Data includes all 529 respondents who located the Cancellation Flow.  The values above each bar denote the number and percentage of respondents in each bin among the 529 respondents who located the Cancellation Flow. The minimum time to locate the Cancellation Flow was 5 seconds, and the maximum time to locate the Cancellation Flow was 569 seconds (or 9 minutes and 29 seconds).

### 3. After Locating the Cancellation Flow, Respondents Took 28 Seconds on Average to Pause or End Their Prime Membership

49.   Exhibit 12 shows the distribution of time it took the 511 respondents (out of 530) to click on the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button after locating the Cancellation Flow.  On average, it took these respondents 28 seconds to click on one of those three buttons on the last page of the flow after entering the Cancellation Flow.  The results show that, after entering the Cancellation Flow, 93.7% of respondents reached the last page of the flow and clicked on one of those three buttons in less than one minute, and 99.2% of respondents did the same in less than two minutes.[99]

---

[99] Workpaper 3.

**Exhibit 12**
**Time Spent in the Cancellation Flow Among Cancellation Survey Respondents Who Clicked on "End Now," "End on [Date]," or "Pause on [Date]" Buttons**



Source:  Cancellation Survey 10/10/24–10/14/24
Note:  This exhibit displays the number of respondents by the number of seconds it took them to click the "End Now," "End on [Date]," or "Pause on [Date]" buttons after entering the Cancellation Flow.  Each bin represents a 15-second interval.  Data is limited to 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The values above each bar denote the number and percentage of respondents in each bin among the 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The minimum time spent in the Cancellation Flow was 5 seconds, and the maximum time spent in the Cancellation Flow was 303 seconds (or 5 minutes and 3 seconds).

**4.    Respondents Took 74 Seconds on Average to Locate the Cancellation Flow and to Pause or End Their Prime Membership**

50.    Exhibit 13 shows the distribution of time it took the 511 respondents (out of 530) to click on the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button on the last page of the Cancellation Flow after entering the Cancellation Stimulus.  On average, after entering the Cancellation Stimulus, it took respondents 74 seconds to reach the third page of the Cancellation Flow and to click on one of those three buttons.  The results show that, after entering the Cancellation Stimulus, 53.2% of respondents reached the third page of the Cancellation Flow and clicked on one of those three buttons in less than one minute, and 86.7% of respondents did the same in less than two minutes.[100]

---

[100] Workpaper 4.

**Exhibit 13**
**Total Time Spent in the Cancellation Stimulus Among Respondents Who Clicked on "End Now,"**
**"End on [Date]," or "Pause on [Date]" Buttons**



Source:  Cancellation Survey 10/10/24–10/14/24
Note:  This exhibit displays the number of respondents by the time in seconds it took them to locate and enter the Cancellation Flow and click the "End Now," "End on [Date]," or "Pause on [Date] buttons.  Each bin represents a 30-second interval.  Data is limited to 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The values above each bar denote the number and percentage of respondents in each bin among the 511 respondents who clicked on "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The minimum total time spent in the Cancellation Stimulus was 14 seconds, and the maximum total time spent in the Cancellation Stimulus was 9 minutes and 51 seconds.

## VII.    Free Trials Survey

### A.    Objectives

51.    I was asked to design and conduct a survey to assess the extent to which consumers have experience with free trials of memberships and subscriptions, particularly those that automatically turned into paid memberships or subscriptions unless cancelled.  To that end, I designed and conducted the Free Trials Survey and defined the target population of the Free

Trials Survey as U.S. adults.[101]  **Appendix G.1** presents the Free Trials Survey questionnaire and **Appendix G.2** presents screenshots of the Free Trials Survey.

### B.    Screening Questions

52.    When starting the Free Trials Survey, respondents were instructed to take the survey in one session, to answer all questions without consulting other sources of information, and to not guess.[102]  After these instructions, **S1** asked respondents a "CAPTCHA" question designed to prevent robots from taking the survey.[103]  Next, respondents were asked a series of screening questions, which identified respondents who belong to the target population and removed inattentive respondents.[104]

53.    I instructed GBK to use "click-balancing" to collect an inbound sample of respondents representative of the U.S. population in terms of age, gender, and Census Region.[105]  The screening process resulted in a sample of qualified respondents who:

   a.   Were at least 18 years old,

   b.   Resided in the United States,

   c.   Took the survey on a desktop or laptop computer, a mobile device, or a tablet,

   d.   Did not work or have a household member who worked at a retailer, advertising or public relations company, marketing agency, advertising department of a company, market research firm, or marketing research department of a company.

54.    The screening questions of the Free Trials Survey were as follows:

   a.   **S10** asked respondents the type of device they were using to take the survey.[106]  Respondents who did not select a desktop or laptop computer, a mobile device, or a tablet were terminated.  Respondents whose self-reported device in this question

---

[101] The objective of this survey was to assess the experience with free trials of memberships and subscriptions among all consumers, including those who do not shop online.  The target population was therefore defined broadly as all U.S. adults.

[102] *See* **Appendix G.1**.

[103] *See* **Appendix G.1**.

[104] Inattentive survey respondents may provide responses which introduce noise and/or systematic bias into the data.

[105] Participants were recruited using a panel from Dynata, a leading market research firm.  *See* "About," *Dynata*, https://www.dynata.com/about-us/.

[106] *See* **Appendix G.1**, S10.

did not match the device detected by an automated device sniffer were also terminated.

b. **S20** asked respondents whether they or a member of their household worked in certain industries.[107]  Respondents who indicated that they or a household member worked at (i) a retailer; (ii) an advertising or public relations company, marketing agency, or advertising department of a company; or (iii) a market research firm or a marketing research department of a company, were terminated.[108]

c. **S30-S50** asked respondents their age, their gender, and the state in which they live.[109]  Respondents who were younger than 18 years old, who did not provide their demographic information, or who reported demographic information that did not match the information they reported to the survey panel, were terminated.[110]

d. **S60** is an attention check question.  Respondents who answered this question incorrectly were terminated.[111]

## C.     Main Questions

55.   After the screening questions, qualified respondents were asked questions to assess their familiarity with memberships or subscriptions.[112]  The first question was:

   **Q10.** Which of the following types of memberships / subscriptions, if any, do you currently pay for?[113]

56.   Respondents were asked to select one of "I currently pay for this type of membership / subscription," "I do not currently pay for this type of membership / subscription," or "Don't

---

[107] *See* **Appendix G.1**, S20.

[108] It is best practice to exclude respondents who may have specialized knowledge about surveys or about the relevant industry.  *See* Diamond and Swann (2022), p. 56 ("Screeners are also typically used to exclude respondents who might have specialized knowledge or experience, or suffer an impairment, that would make their responses atypical of ordinary consumers.").

[109] *See* **Appendix G.1**, S30–S50.

[110] The survey panel does not profile nonbinary gender.  Respondents who reported nonbinary gender were not terminated.

[111] *See* **Appendix G.1**, S60.  *See also* **Appendix E** for accepted misspellings in **S60** of the Free Trials Survey.

[112] All questions included a "Don't know / not sure" answer option in order to reduce guessing.  The order of answer options was randomized or reverse-ordered, as appropriate, for each respondent.  Respondents were asked to select one of the answer options.

[113] *See* **Appendix G.1**, Q10.

know / not sure" for each of the following types of memberships and subscriptions, which are popular consumer-facing services based on public press:[114]

    a.   Streaming (for example, Hulu or Netflix)

    b.   Retail (for example, Amazon Prime or Walmart+)

    c.   Music (for example, Spotify Premium or Apple Music)

    d.   Cloud storage (for example, Apple iCloud+ or Google One)

    e.   Gaming (for example, Xbox GamePass or PlayStation Plus)

    f.   Food delivery (for example, DashPass or Grubhub+)

    g.   Home security (for example, Ring Plus or ADT Video & Smart Home)

    h.   Cyber security (for example, Norton 360 with LifeLock Ultimate Plus or Aura)

    i.   Gym (for example, Planet Fitness or Equinox)

    j.   News (for example, The New York Times or The Washington Post)

57.   The order of types of memberships and subscriptions was randomized across respondents, and the order of "I currently pay" and "I do not currently pay" was randomized across respondents.

58.   Next, all respondents were asked about their experience with free trials of memberships or subscriptions in the past 12 months:

> "**Q20**. You will now be asked about activities <u>you</u> have done in the <u>past 12 months</u>.
>
> How many <u>free trials</u> of memberships / subscriptions, if any, have <u>you</u> signed up for in the <u>past 12 months</u>?"[115]

59.   Respondents could select one of the following answer options:

"In the past 12 months…

    a.   I <u>did not</u> sign up for any <u>free trials</u> of memberships / subscriptions

---

[114] *See, e.g.,* surveys conducted by Forbes, Appinio, and LendingTree.  John Egan, "The Digital Subscriptions Americans Are Most and Least Likely to Cut In 2023," *Forbes*, January 12, 2023, https://www.forbes.com/advisor/personal-finance/digital-subcriptions-most-least-likely-to-cut-2023/; "The Subscription Economy: Exploring the World of US Subscription Services," *Appinio*, February 6, 2023, https://www.appinio.com/en/blog/insights/subscription-services-us; Matt Schulz, "3 in 4 Americans Have an Online Subscription, and Video Streaming is King," *LendingTree*, March 25, 2019, https://www.lendingtree.com/credit-cards/study/americans-have-an-online-subscription-and-video-streaming-is-king/.
[115] *See* **Appendix G.1**, Q20.

b.  I signed up for <u>one</u> <u>free trial</u> of a membership / subscription

c.  I signed up for <u>multiple</u> <u>free trials</u> of memberships / subscriptions

d.  Don't know / not sure"[116]

60.    Respondents who indicated that they had signed up for one or more free trials to a membership or subscription in the past 12 months were then asked whether their most recent free trial automatically turned into a paid membership / subscription. Specifically, respondents were asked:

> "**Q30**. You indicated that <u>you</u> signed up for <u>one or more</u> <u>free trials</u> of memberships / subscriptions in the <u>past 12 months</u>.
>
> Please indicate which of the following, if any, applies to the <u>free trial</u> membership / subscription <u>you</u> <u>most recently</u> signed up for."[117]

61.    Respondents could select one of the following answer options:

"The free trial membership / subscription I most recently signed up for…

a.  <u>Did automatically turn into</u> a <u>paid</u> membership / subscription at the end of the trial period

b.  <u>Would have automatically turned into</u> a <u>paid</u> membership / subscription at the end of the trial period, but I cancelled it first

c.  <u>Did not automatically turn into</u> a paid membership / subscription at the end of the trial period

d.  None of the above

e.  Don't know / not sure"[118]

---

[116] Answer options except for the fourth option ("Don't know / not sure") were reverse-ordered across respondents.

[117] *See* **Appendix G.1**, Q30.

[118] The order of answer options except for the "None of the above" and "Don't know / not sure" options was randomized across respondents.  *See* **Appendix G.2** for screenshots of the Free Trials Survey.

### D.      Implementation

#### 1.      Pretests

62.    10 pretests were conducted for the Free Trials Survey.[119]  The pretests for the Free Trials Survey indicated that respondents did not have problems understanding the questions and corresponding answer options and did not have technical difficulties navigating the survey instrument.  Therefore, no changes were made to the survey questionnaire following the pretests.

#### 2.      Fielding

63.    GBK programmed the Free Trials Survey and recruited respondents through an online survey panel provided by Dynata.[120]  The survey started fielding on August 16, 2024, and stopped fielding on August 18, 2024.  A total of 798 respondents started the survey, of whom 505 qualified for and completed it.[121]  The inbound sample of respondents who started the Free Trials survey was representative of the U.S. adult population in terms of age, gender, and Census Region.[122]

### E.      Results

64.    As Exhibit 14 shows, in **Q10**, 92.5% of respondents reported paying for at least one membership or subscription from the list that was provided.  Further, in **Q20**, 58.0% of respondents reported signing up for one or more free trials of memberships / subscriptions in the past 12 months.  Finally, in **Q30**, 85.0% of the respondents who had signed up for one or more free trials in the past 12 months indicated that the free trial they had most recently signed up for either automatically turned into a paid membership or subscription at the end of the trial period, or would have automatically turned into a paid membership or subscription at the end of the trial period, but they cancelled it first.[123]

---

[119] As I described in Section V, it is best practice to conduct pretests.  **Appendix G.3** shows the questions asked by the pretest moderator.
[120] *See* **Appendix D**.
[121] *See* **Appendix G.4**.
[122] *See* **Appendix G.5**.
[123] **Appendix G.6** displays 95% confidence intervals for the results of **Q10**–**Q30**.

**Exhibit 14**
**Summary of Responses to the Free Trials Survey[1]**

| Respondents who… | Number of Respondents | Share of Respondents |
|---|---|---|
| Q10: Currently pay for at least one membership / subscription[2] | 467 | 92.5% |
| Q20: In the past 12 months, signed up for at least one free trial of a membership / subscription[3] | 293 | 58.0% |
| **Total** | **505** | **100.0%** |

| Respondents who, in the past 12 months, signed up for at least one free trial of a membership / subscription, and who… | | |
|---|---|---|
| Q30: Indicated that the free trial they most recently signed up for automatically turned into a paid membership / subscription, or would have automatically turned into a paid membership / subscription unless cancelled.[4] | 249 | 85.0% |
| **Total** | **293** | **100.0%** |

Source:  Free Trials Survey 8/16/24–8/18/24
Note:
[1]  Data are filtered to respondents who completed the survey.
[2]  **Q10** asked "Which of the following types of memberships / subscriptions, if any, do you currently pay for?"  Respondents could select "I currently pay for this type of membership / subscription," "I do not currently pay for this type of membership / subscription," or "Don't know / not sure" to the following categories: "Streaming (for example, Hulu or Netflix)," "Retail (for example, Amazon Prime or Walmart+)," "Music (for example, Spotify Premium or Apple Music)," "Cloud storage (for example, Apple iCloud+ or Google One)," "Gaming (for example, Xbox GamePass or PlayStation Plus)," "Food delivery (for example, DashPass or Grubhub+)," "Home security (for example, Ring Plus or ADT Video & Smart Home)," "Cyber security (for example, Norton 360 with LifeLock Ultimate Plus or Aura)," "Gym (for example, Planet Fitness or Equinox)," and "News (for example, The New York Times or The Washington Post)."  In the table above, I have reported the number and share of respondents who indicated "I currently pay for this type of membership / subscription" for one or more categories.
[3]  **Q20** asked "How many free trials of memberships / subscriptions, if any, have you signed up for in the past 12 months?"  Respondents could select, in the past 12 months, "I did not sign up for any free trials of memberships / subscriptions," "I signed up for one free trial of a membership / subscription," "I signed up for multiple free trials of memberships / subscriptions," or "Don't know / not sure."  In the table above, I have aggregated results from respondents who selected either "I signed up for one free trial of a membership / subscription" or "I signed up for multiple free trials of memberships / subscriptions."
[4]  Respondents who answered "I signed up for one free trial of a membership / subscription" or "I signed up for multiple free trials of memberships / subscriptions" in **Q20** proceeded to **Q30**.  **Q30** asked respondents to "Please indicate which of the following, if any, applies to the free trial membership / subscription you most recently signed up for."  Respondents could answer that the free trial membership / subscription they most recently signed up for "Did automatically turn into a paid membership / subscription at the end of the trial period," "Would have automatically turned into a paid membership / subscription at the end of the trial period, but I cancelled it first," "Did not automatically turn into a paid membership / subscription at the end of the trial period," "None of the above," or "Don't know / not sure."  Results presented above are aggregated from respondents who answered **Q30** who selected either "Did automatically turn into a paid membership / subscription at the end of the trial period" or "Would have automatically turned into a paid membership / subscription at the end of the trial period, but I cancelled it first."

41

Executed this 24th day of February, 2025

_____

Ronald T. Wilcox, Ph.D.