The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

AMAZON.COM, INC., *et al.*,

Defendants.

No. 2:23-cv-0932-JHC

OMNIBUS DECLARATION OF JOSEPH A. REITER IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE PLAINTIFF'S EXPERT TESTIMONY

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**<u>DECLARATION</u>**

I, Joseph A. Reiter, declare as follows:

1.      I am a partner at the law firm Hueston Hennigan LLP, counsel for Defendants Amazon.com, Inc.; Neil Lindsay; Russell Grandinetti; and Jamil Ghani in the above-captioned case. To the best of my knowledge, the matters set forth herein are true and correct and, if called as a witness, I could and would testify competently thereto.

2.      I submit this declaration in support of Defendants' Motions for Summary Judgment and Motions to Exclude Plaintiff's Experts Testimony.

3.      Where applicable, each exhibit introduced hereunder has been excerpted and highlighted in accordance with the Court's Local Civil Rule 10(e)(10).

4.      **Exhibit 1** is a true and correct copy of the FTC press release titled "FTC Takes Action Against Amazon for Enrolling Consumers in Amazon Prime Without Consent and Sabotaging Their Attempts to Cancel," available at https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-takes-action-against-amazon-enrolling-consumers-amazon-prime-without-consent-sabotaging-their. This link was last accessed on May 20, 2025.

5.      **Exhibit 2** is a true and correct excerpted copy of the deposition transcript of the FTC's Rule 30(b)(6) designee, Amanda Basta, taken on September 10, 2024.

6.      **Exhibit 3** is a true and correct excerpted copy of the deposition transcript of the FTC's Rule 30(b)(6) designee, Amanda Basta, taken on September 11, 2024.

7.      **Exhibit 4** is a true and correct excerpted copy of the deposition transcript of Marshini Chetty, taken on April 28, 2025.

8.      **Exhibit 5** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00003614. I understand that Exhibit 5 was produced to the FTC in May 2021 .

9.      **Exhibit 6** is a true and correct excerpted copy of the Expert Report of Donna Hoffman, dated February 24, 2025.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

10.      **Exhibit 7** is a true and correct excerpted copy of the Expert Report of Craig Rosenberg, dated February 24, 2025.

11.      **Exhibit 8** is a true and correct excerpted copy of the Rebuttal Report of Craig Rosenberg, dated March 26, 2025.

12.      **Exhibit 9** is a true and correct excerpted copy of the Rebuttal Report of Donna Hoffman, dated March 26, 2025.

13.      **Exhibit 10** is a true and correct excerpted copy of the Expert Report of Marshini Chetty, dated April 2, 2025.

14.      **Exhibit 11** is a true and correct excerpted copy of the Expert Report of Ran Kivetz, dated February 24, 2025.

15.      **Exhibit 12** is a true and correct copy of a document produced to the FTC by Amazon in June 2022 with beginning Bates number AMZN_00040674.

16.      **Exhibit 13** is a true and correct excerpted copy of portions of the online version of the American Heritage Dictionary of the English Language (5th ed. 2022) and its definitions for the word "mechanism," accessible at https://ahdictionary.com/word/search.html?q=mechanism (last visited May 16, 2025).

17.      **Exhibit 14** is a true and correct excerpted copy of the Senate Committee on Commerce, Science, and Transportation's Staff Report for Chairman Rockefeller on Aggressive Sales Tactics on the Internet and Their Impact on American Consumers, dated November 16, 2009.

18.      **Exhibit 15** is a true and correct excerpted copy of the deposition transcript of the FTC's Rule 30(b)(6) designee, Amanda Basta, taken on May 13, 2025.

19.      **Exhibit 16** is a true and correct copy of the declaration of Miles Hunter, dated May 26, 2025.

20.      **Exhibit 17** is a true and correct excerpted copy of the Expert Report of Ron Wilcox, dated February 24, 2025.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

21.    **Exhibit 18** is a true and correct excerpted copy of the Expert Report of Neale Mahoney, dated March 24, 2025.

22.    **Exhibit 19** is a true and correct excerpted copy of Amazon's third Civil Investigative Demand response to the FTC, dated May 24, 2021.

23.    **Exhibit 20** is a true and correct excerpted copy of the FTC's Second Supplemental Responses and Objections to Amazon's First Set of Interrogatories, dated August 2, 2024.

24.    **Exhibit 21** is a true and correct copy of the FTC's Responses and Objections, dated January 27, 2025, to Defendant Jamil Ghani's Second Set of Interrogatories, dated December 23, 2024.

25.    **Exhibit 22** is a true and correct copy of a document produced to Amazon by the FTC in this matter in December 2023 with beginning Bates number FTCAMZN_0023584.

26.    **Exhibit 23** is a true and correct excerpted copy of the deposition transcript of Katherine Johnson, taken on November 18, 2024.

27.    **Exhibit 24** is a true and correct excerpted copy of the deposition transcript of Adam Rottner, taken on March 27, 2025.

28.    **Exhibit 25** is a true and correct copy of a document produced to Amazon by the FTC in this matter in October 2023 with beginning Bates number AMZN_00003642.

29.    **Exhibit 26** is a true and correct copy of a document produced to the FTC by Amazon in this matter in December 2021 with beginning Bates number AMZN_00022902.

30.    **Exhibit 27** is a true and correct excerpted copy of the deposition transcript of Laura Kim, taken on December 12, 2024.

31.    **Exhibit 28** is a true and correct copy of the FTC's Second Supplemental Expert Witness Disclosure, dated May 24, 2025.

32.    **Exhibit 29** is a true and correct excerpted copy of the deposition transcript of Ben Hills, taken on January 17, 2025.

33.    **Exhibit 30** is a true and correct excerpted copy of the deposition transcript of Jamil Ghani, taken on November 21, 2024.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

34.     **Exhibit 31** is a true and correct excerpted copy of the deposition transcript of Neil Lindsay, taken on November 19, 2024.

35.     **Exhibit 32** is a true and correct excerpted copy of the deposition transcript of Lisa Leung, taken on July 24, 2024.

36.     **Exhibit 33** is a true and correct excerpted copy of the deposition transcript of Caroline Abramowicz, taken on November 7, 2024.

37.     **Exhibit 34** is a true and correct excerpted copy of the deposition transcript of Jenny Blackburn, taken on December 10, 2024.

38.     **Exhibit 35** is a true and correct excerpted copy of the deposition transcript of Miles Hunter, taken on September 18, 2024.

39.     **Exhibit 36** is a true and correct copy of a document produced to the FTC by Amazon in this matter in November 2024 with beginning Bates number AMZN-PRM-FTC-002673016.

40.     **Exhibit 37** is a true and correct excerpted copy of the deposition transcript of Russell Grandinetti, taken on November 13, 2024.

41.     **Exhibit 38** is a true and correct copy of the FTC's Second Amended Initial Disclosures, dated April 25, 2025.

42.     **Exhibit 39** is a true and correct excerpted copy of the FTC investigational hearing transcript of Sharon Chiarella, taken on November 10, 2022.

43.     **Exhibit 40** is a true and correct excerpted copy of the FTC investigational hearing transcript of Cem Sibay, taken on November 29, 2022.

44.     **Exhibit 41** is a true and correct excerpted copy of the deposition transcript of Sanjay Balakrishnan, taken on September 12, 2024.

45.     **Exhibit 42** is a true and correct copy of the FTC's Supplemental Expert Witness Disclosure, dated April 9, 2025.

46.     **Exhibit 43** is a true and correct excerpted copy of the deposition transcript of Mary Pat Gotschall, taken on January 23, 2025.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

47.     **Exhibit 44** is a true and correct excerpted copy of the deposition transcript of Reid Nelson, taken on February 25, 2025.

48.     **Exhibit 45** is a true and correct excerpted copy of the deposition transcript of Reid Nelson, taken on February 27, 2025.

49.     **Exhibit 46** is a true and correct excerpted copy of the Expert Report of William Violette, dated February 24, 2025.

50.     **Exhibit 47** is a true and correct excerpted copy of the deposition transcript of David Edelstein, taken on April 30, 2025.

51.     **Exhibit 48** is a true and correct excerpted copy of the deposition transcript of David Edelstein, taken on May 1, 2025.

52.     **Exhibit 49** is a true and correct excerpted copy of the FTC investigational hearing transcript of Molly O'Donnell, taken on July 19, 2022.

53.     **Exhibit 50** is a true and correct excerpted copy of the FTC investigational hearing transcript of C. R. Brown, taken on November 2, 2022.

54.     **Exhibit 51** is a true and correct excerpted copy of the deposition transcript of C. R. Brown, taken on December 19, 2024.

55.     **Exhibit 52** is a true and correct excerpted copy of the FTC investigational hearing transcript of Gloria Smuda, taken on October 26, 2022.

56.     **Exhibit 53** is a true and correct copy of the declaration of Reid Nelson, dated May 21, 2025.

57.     **Exhibit 54** is a true and correct copy of the declaration of C. R. Brown, dated May 25, 2025.

58.     **Exhibit 55** is a true and correct copy of the Committee on Commerce, Science, and Transportation's Senate Report No. 111-240 of the 111th Congress, 2d Sess., on the Restore Online Shoppers' Confidence Act, dated August 2, 2010.

59.     **Exhibit 56** is a true and correct excerpted copy of the deposition transcript of Neale Mahoney, taken on May 9, 2025.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

60.     **Exhibit 57** is a true and correct copy of Exhibit 13 to the Expert Report of Neale Mahoney, dated March 24, 2025.

61.     **Exhibit 58** is a true and correct copy of Exhibit 33 to the deposition of Katherine Johnson, taken on November 18, 2024.

62.     **Exhibit 59** is a true and correct copy of a document produced to Amazon by the FTC in this matter in May 2024 with beginning Bates number FTCAMZN_0079008.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of May, 2025, in Los Angeles, California.


                                                    *s/ Joseph A. Reiter*
                                                    Joseph A. Reiter

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE
(2:23-cv-0932-JHC) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# EXHIBIT 1

Case 2:23-cv-00932-JHC   Document 343   Filed 06/06/25   Page 9 of 1303



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Takes Action Against Amazon for Enrolling Consumers in Amazon Prime Without Consent and Sabotaging Their Attempts to Cancel

## Complaint outlines details of company's knowing failure to address non-consensual subscriptions and cancellation trickery

June 21, 2023     

**Tags:** Consumer Protection │ Bureau of Consumer Protection │ deceptive/misleading conduct
Technology │ Advertising and Marketing │ Online Advertising and Marketing │
Advertising and Marketing Basics

The Federal Trade Commission is taking action against Amazon.com, Inc. for its years-long effort to enroll consumers into its Prime program without their consent while knowingly making it difficult for consumers to cancel their subscriptions to Prime.

In a complaint filed today, the FTC charges that Amazon has knowingly duped millions of consumers into unknowingly enrolling in Amazon Prime. Specifically, Amazon used manipulative, coercive, or deceptive user-interface designs known as "dark patterns" to trick consumers into enrolling in automatically-renewing Prime subscriptions.

Amazon also knowingly complicated the cancellation process for Prime subscribers who sought to end their membership. The primary purpose of its Prime cancellation process was not to enable subscribers to cancel, but to stop them. Amazon leadership slowed or rejected changes that would have

5/16/25, 3:10 PM    FTC Takes Action Against Amazon for Enrolling Consumers in Amazon Prime Without Consent and Sabotaging Their Attempts to C…

Case 2:23-cv-00932-JHC    Document 343    Filed 06/06/25    Page 10 of 1303

made it easier for users to cancel Prime because those changes adversely affected Amazon's bottom line.

"Amazon tricked and trapped people into recurring subscriptions without their consent, not only frustrating users but also costing them significant money," said FTC Chair Lina M. Khan. "These manipulative tactics harm consumers and law-abiding businesses alike. The FTC will continue to vigorously protect Americans from "dark patterns" and other unfair or deceptive practices in digital markets."

For now, the FTC's complaint is significantly redacted, though the FTC has told the Court it does not find the need for ongoing secrecy compelling. Nevertheless, the complaint contains a number of allegations related to the company's decision not to make changes to prevent nonconsensual enrollment in Prime and the difficulties consumers faced in attempting to unsubscribe from the service. Specifically, the complaint charges that Amazon used so-called "dark patterns" to cause consumers to enroll in Prime without their consent, in violation of the FTC Act, and the Restore Online Shoppers' Confidence Act.

During Amazon's online checkout process, consumers were faced with numerous opportunities to subscribe to Amazon Prime at $14.99/month. In many cases, the option to purchase items on Amazon without subscribing to Prime was more difficult for consumers to locate. In some cases, the button presented to consumers to complete their transaction did not clearly state that in choosing that option they were also agreeing to join Prime for a recurring subscription.

The FTC charges that Amazon put in place a cancellation process designed to deter consumers from successfully unsubscribing from Prime. Previous reporting about the process in the media has noted that Amazon used the term "Iliad" to describe the process, which the reporting cites as an allusion to Homer's epic poem set over twenty-four books and nearly 16,000 lines about the decade-long Trojan War.

Consumers who attempted to cancel Prime were faced with multiple steps to actually accomplish the task of cancelling, according to the complaint. Consumers had to first locate the cancellation flow, which Amazon made difficult. Once they located the cancellation flow, they were redirected to multiple pages that presented several offers to continue the subscription at a discounted price, to simply turn off the auto-renew feature, or to decide not to cancel. Only after clicking through these pages could consumers finally cancel the service.

5/16/25, 3:10 PM    FTC Takes Action Against Amazon for Enrolling Consumers in Amazon Prime Without Consent and Sabotaging Their Attempts to C…

Case 2:23-cv-00932-JHC    Document 343    Filed 06/06/25    Page 11 of 1303

The complaint notes that Amazon was aware of consumers being nonconsensually enrolled and the complex and confusing process to cancel Prime that the company's executives failed to take any meaningful steps to address the issues until they were aware of the FTC investigation. In the complaint, the FTC also alleges that Amazon attempted to delay and hinder the Commission's investigation in multiple instances.

The Commission vote authorizing the staff to file the complaint was 3-0. The complaint was filed in the U.S. District Court for the Western District of Washington.

**NOTE:** The Commission files a complaint when it has "reason to believe" that the named defendants are violating or are about to violate the law and it appears to the Commission that a proceeding is in the public interest. The case will be decided by the court.

The staff attorneys on this matter are Jonathan Cohen, Olivia Jerjian, Max Nardini, and Evan Mendelson of the FTC's Bureau of Consumer Protection.

The Federal Trade Commission works to promote competition and [protect and educate consumers](). The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. Learn more about consumer topics at [consumer.ftc.gov](), or report fraud, scams, and bad business practices at [ReportFraud.ftc.gov](). Follow the [FTC on social media](), read [consumer alerts]() and the [business blog](), and [sign up to get the latest FTC news and alerts]().

# Contact Information

## Media Contact

[Jay Mayfield]()
Office of Public Affairs
202-326-2656

# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                     AT SEATTLE

4     --------------------------

5    FEDERAL TRADE COMMISSION,

6              Plaintiff,

7    V.                           No. 2:23-cv-0932-JHC

8    AMAZON.COM, INC., et al.,

9              Defendant.          VOLUME I

10    --------------------------

11

12    30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                   ON BEHALF OF

14              FEDERAL TRADE COMMISSION

15

16         Tuesday, September 10, 2024

17                   8:51 AM

18

19

20

21   Reported by:  Denise Dobner Vickery, RMR, CRR

22   JOB NO.:  J11644778



```
 1    and I will be joined shortly by Olivia Jerjian also

 2    on behalf of the Federal Trade Commission.

 3                         - - -

 4                     AMANDA BASTA

 5    called for examination, and, after having been duly

 6    sworn, was examined and testified as follows:

 7                         - - -

 8                     EXAMINATION

 9                         - - -

10    BY MR. KABA:

11          Q.    Good morning, Ms. Basta.

12          A.    Good morning.

13          Q.    Could you just state and spell your

14    full name and your title at the Federal Trade

15    Commission?

16          A.    Sure.  Amanda, A-m-a-n-d-a, Basta

17    B-a-s-t-a.  I'm Assistant Director within the

18    Division of Enforcement in the Bureau of Consumer

19    Protection.

20          Q.    Okay.  And for how long have you been

21    the Assistant Director within the Division of

22    Enforcement in the Bureau of Consumer Protection?
```



1    Mr. Aronsohn's e-mail dated September 5, 2024, and

2    he identifies in this e-mail a series of topics.

3         A.    Uh-huh.

4         Q.    Do you see that?

5         A.    Yes.

6         Q.    Okay.  And you understand that with

7    respect to each of these topics -- and we'll talk

8    about them during our time together -- you have been

9    designated by the FTC as the person most

10   knowledgeable to testify about those topics?

11        A.    Yes.

12        Q.    Okay.  Thank you.

13              Okay.

14        A.    Can we take a break for a quick second?

15        Q.    Yes.

16        A.    This will not stick on.

17                    THE VIDEOGRAPHER:  We are off the

18   record at 9:23.

19                    (Recess.)

20                    THE VIDEOGRAPHER:  We are back on

21   the record at 9:26.  At 9:00 -- yeah.

22                    MR. KABA:  We have the microphones



AMANDA BASTA Vol. I 30b6                        September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                   40

```
 1   sorted now, I think.  I hope.

 2   BY MR. KABA:

 3        Q.   Ms. Basta, have you ever been a member

 4   of Prime?

 5        A.   Yes.

 6        Q.   Are you currently?

 7        A.   Yes.

 8        Q.   Do you know when you joined?

 9                  MR. MENDELSON:  Objection.  Scope.

10                  THE WITNESS:  No.  (Laugh).

11   BY MR. KABA:

12        Q.   No?

13        A.   A long time ago.

14        Q.   Do you know how you joined?

15                  MR. MENDELSON:  Objection.  Scope.

16                  THE WITNESS:   I don't remember

17   exactly.  I know it was something that I had thought

18   about and wanted to do.  So I sought out kind of how

19   to enroll and enrolled as its own.  You know, I

20   don't know exactly when, but I know that I was like,

21   oh, I order from Amazon a lot.  I should join Prime.

22   BY MR. KABA:
```



1        Q.   Right.

2             You answered my -- my next question,

3    which was:  You decided to enroll in Prime because

4    you ordered a lot from Amazon; correct?

5        A.   Uh-huh.

6        Q.   Yes?

7        A.   Yes.  Sorry.

8        Q.   I should have also mentioned that, as

9    you know, nods or uh-huhs are -- I may understand

10   them, but we need a clear record for the court.

11       A.   Sure.

12       Q.   And you understand that that is one of

13   the many benefits of Prime is free shipping on a

14   large suite of products; correct?

15                   MR. MENDELSON:  Objection.  Scope.

16                   THE WITNESS:   That was the one I

17   was interested in primarily, yes.

18   BY MR. KABA:

19       Q.   But you are aware that there are also

20   many other benefits of Prime membership; correct?

21                   MR. MENDELSON:  Same objection.

22                   THE WITNESS:   I understand there



1   Enforcement, and they conduct the rest of the

2   investigation.  They will usually take the whole

3   investigation and then, you know, consult with us as

4   needed.

5   BY MR. KABA:

6        Q.   Okay.  Do you recall as of what date

7   the FTC believes Amazon's -- strike that.

8             Let me ask you a different question.

9             The FTC alleges in this case that

10  Amazon's enrollment flows and cancellation flows

11  violate ROSCA; is that right?

12       A.   Yes.

13       Q.   Is there anything else beyond that that

14  the FTC alleges violates ROSCA, that is, beyond the

15  enrollment flows and online cancellation flows?

16       A.   Well -- (pause).  I'm struggling

17  because the cancellation, I think, is broader than

18  just the online flows.  I think there's no simple

19  mechanism regardless of -- of method.  So I think

20  that's -- I would just phrase -- I would just frame

21  it a little bit differently.

22       Q.   Okay.  We'll talk about that in a



 1   minute.

 2          A.    Uh-huh.

 3          Q.    But you do understand that Amazon

 4   provides multiple mechanisms to cancel a Prime

 5   enrollment; correct?

 6          A.    Not really.

 7          Q.    Okay.  So what are the ways that a

 8   consumer can cancel Prime?

 9          A.    So my understanding is that it is

10   almost exclusively through the online flow.

11   Consumers who call Amazon are provided a link to the

12   flow.  So calling doesn't typically result in

13   cancellation directly.  They're still directed back

14   to the online flow.

15               For consumers who have enrolled through

16   a mechanism other than the shopping website, it's

17   unclear whether they are aware of any mechanism.

18   And I think something mentioned e-mail, but it's a

19   very, very small number that's not public -- not

20   kind of -- consumers are not pointed to that on the

21   website.

22               And also I understand there's a very



 1    minuscule number through something called the

 2    chatbot.

 3          Q.    Okay.  So you've introduced lots of

 4    other phrasing --

 5          A.    Uh-huh.

 6          Q.    -- into the mechanisms and about how

 7    many may use it or how many may be aware of it, and

 8    that's not my question.

 9          A.    Uh-huh.

10          Q.    So let me ask you my question again.

11          A.    Uh-huh.

12          Q.    You are aware that there are multiple

13    mechanisms that consumers could use to cancel Prime;

14    correct?

15          A.    I think there are -- to my knowledge,

16    there are basically three.

17          Q.    Okay.  There's the online cancellation

18    flow that consumers can use to cancel Prime;

19    correct?

20          A.    Yes.

21          Q.    Consumers could call in to a toll-free

22    number to cancel Prime; correct?



1        A.    My understanding is that's just loops

2   them back to the online flow.

3        Q.    Okay.  And I'll ask you about that

4   understanding in a second.

5        A.    Uh-huh.

6        Q.    Do you know in every instance that

7   some -- a consumer calls the toll-free number they

8   are looped back into the cancellation flow?  Online,

9   that is?

10        A.    I don't know that every single one, but

11   I know that that was sort of the first line.

12        Q.    Okay.  But you do understand that

13   consumers can call a toll-free number and cancel

14   their Prime subscription by talking to a consumer

15   service agent; correct?

16        A.    I think I've explained my understanding

17   is that they get looped back in.  I'm not sure I

18   know whether or not anyone has been able -- is able

19   to cancel that way.

20        Q.    You are unaware as the person

21   overseeing the investigation, as the person most

22   knowledgeable at the FTC, whether consumers can just



1    Ultimately, the court.

2    BY MR. KABA:

3          Q.    That's fair.

4                But you are the one bringing the claim;

5    right?

6          A.    Yes.

7          Q.    Okay.  So it is the FTC's position that

8    a cancellation mechanism can be simple in one

9    context and not simple in another context, and

10   whoever is deciding on the ROSCA violation would

11   need to consider all sorts of different criteria in

12   order to make that determination; correct?

13                      MR. MENDELSON:  Objection.  Vague.

14                      THE WITNESS:   I mean, if they're

15   applying the same criteria across circumstances, I

16   would imagine those cases would come out very

17   similarly.

18                But I don't think it's like for

19   company A, you look at XYZ.  For company B, you look

20   at 123.  I think you look at the same sets of

21   factors across all of them, and that's going to give

22   you a fairly consistent result.



1    BY MR. KABA:

2         Q.    Right.  I think you think I'm asking

3    you a different question than maybe I'm asking you.

4    That's my fault.

5         A.    Okay.

6         Q.    So let me -- let me try again.

7              It is the FTC's position -- well, I'll

8    ask you more broadly.

9              It is the FTC's position that whether

10   or not a disclosure is clear and conspicuous is

11   context-specific; correct?

12        A.    Absolutely.

13        Q.    It is the FTC's position that whether

14   or not you obtained informed consent is

15   context-specific; correct?

16        A.    Yes.

17        Q.    It is the FTC's position that whether

18   or not a mechanism to cancel is simple is

19   context-specific; correct?

20        A.    Yes.

21        Q.    And so you don't look only at the

22   disclosure or only at the mechanism.



1              You look at all sorts of other criteria

2    to decide whether or not there is a ROSCA violation;

3    correct?

4         A.   I'm struggling with the word

5    "criteria."

6         Q.   Features?

7         A.   Facts.  Do we have evidence that

8    consumers are actually confused when they're

9    presented with it?  You know, some may be features,

10   you know, of the way that it's designed.  Is there,

11   you know, a lot of -- a lot of things distracting

12   the consumer?

13              You know, there's -- so criteria is

14   just the word I'm struggling with, but there's a lot

15   of facts, which is why we conduct a full

16   investigation, right?

17              Because we want to know, you know, what

18   evidence is out there that tells us how consumers

19   are interacting with it and how, you know, what the

20   company understands about consumer's interaction

21   with it.  What facts are there in terms of the

22   design.



 1              There's a lot of elements that do go

 2     into it, but yes, ultimately, it's a

 3     context-specific inquiry for each of the elements of

 4     ROSCA.

 5          Q.   Okay.  And we'll talk about them

 6     individually --

 7          A.   Uh-huh.

 8          Q.   -- in a bit.

 9              So I want to go back to the

10     cancellation mechanism for a moment.

11          A.   Uh-huh.

12          Q.   So you mentioned a few things that you

13     would consider to decide whether or not a mechanism

14     was simple.

15              Do you recall that?

16          A.   Yes.

17          Q.   Okay.  And I believe you've said, but

18     let me make sure I'm clear, that there's nothing

19     independent or inherently prohibited --

20          A.   Uh-huh.

21          Q.   -- about a company providing a save

22     offer to someone who is calling to cancel; correct?



1    FTC communication or instruction or correspondence

2    or message of any kind to Amazon telling Amazon that

3    the FTC believed that Amazon's flows or Prime itself

4    violated ROSCA?

5                        MR. MENDELSON:  Objection.  Scope.

6                        THE WITNESS:   Not Prime itself.

7    I know in 2014, the FTC sued Amazon over failure to

8    provide express informed consent based on some

9    varied disclosures in a different -- in a different

10   mobile flow, and so certainly the idea that that put

11   in terms and conditions in -- in certain contexts

12   could deprive of express informed consent was a

13   concept familiar to Amazon.

14   BY MR. KABA:

15        Q.   Okay.  So you're, again, answering a

16   different question than the one I've asked.

17        A.   Uh-huh.

18        Q.   So I would like you -- it will be

19   helpful, so that I don't have to ask my question

20   multiple times, if you could at least initially just

21   focus on responding to my question.

22        A.   Uh-huh.



1          Q.   And Mr. Mendelson will have an

2     opportunity at the end of the deposition to ask you

3     additional questions that he might have of you to

4     get out additional testimony that you may wish to

5     provide.

6               Do you understand?

7          A.   Yes, but I think I did answer the

8     question.  You asked about messages to Amazon about

9     violations or about --

10         Q.   Why don't I -- why don't I --

11         A.   Yeah, try it again.

12         Q.   -- ask you my question.  Okay?

13         A.   Uh-huh.

14         Q.   Prior to the FTC's investigation

15    launching in February of 2021 --

16         A.   Uh-huh.

17         Q.   -- are you aware of any communication,

18    correspondence, direction from the FTC telling

19    Amazon that Amazon's Prime enrollment flow or

20    cancellation flow violated ROSCA?

21         A.   Not Prime --

22                    MR. MENDELSON:  Same objection.



1                      THE WITNESS:    Not Prime, no.

2    BY MR. KABA:

3         Q.    Okay.  And you contend that in a

4    different context, the FTC had filed suit in 2014

5    with respect to certain disclosures that were in

6    terms and conditions; correct?

7         A.    Yes.

8         Q.    So from that time in 2014 --

9         A.    Uh-huh.

10        Q.    -- even -- even that other action, if

11   we included that.  From 2014 through February 2021

12   when the FTC launched its investigation in this

13   case, that's about seven years; right?

14        A.    Yes.

15        Q.    Are you aware of any correspondence

16   message communication to Amazon that Amazon's

17   enrollment flows or cancellation flows violated

18   ROSCA?

19                      MR. MENDELSON:   Same objection.

20                      THE WITNESS:   No.

21   BY MR. KABA:

22        Q.    Okay.  As of what date does the FTC



1   contend Amazon's enrollment flows violated ROSCA?

2          A.   I'd have to look back at the complaint,

3   but I believe 2018.

4          Q.   And as of what date does the FTC

5   contend Amazon's cancellation flows violated ROSCA?

6          A.   I think, again, I'd have to look at the

7   complaint, but I believe it's approximately the same

8   time period.

9          Q.   Let me see if I can help you.

10          By the way, we talked about Consumer

11   Sentinel complaints, but it wasn't consumer

12   complaints that triggered this investigation to

13   Prime; right?

14          A.   Not initially.  As I said, we looked at

15   them pretty early on.

16          Q.   Right.  So, again, my question.

17          A.   Uh-huh.

18          Q.   I could see you were probably very good

19   questioner at depositions because the way you're

20   responding.

21          My question is:  It was not consumer

22   complaints that launched or triggered the



1        A.    Yes.

2        Q.    And that means that the responses

3   contained in this document are true; correct?

4        A.    Yes.

5        Q.    And Mr. Mendelson is your counsel here

6   and counsel for the FTC in this case; correct?

7        A.    Yes.

8        Q.    Okay.  And if you look at page 53.

9        A.    Uh-huh.

10       Q.    You see it says:

11             "Amazon's Enrollment Flows have

12   violated ROSCA and Section 5 since at least 2014."

13       A.    Uh-huh.

14       Q.    Do you see that?

15       A.    Yes.

16       Q.    "And its Cancellation Flows since at

17   least 2016"; correct?

18       A.    Yes.

19       Q.    Okay.  So it's -- you said you believed

20   it was 2018, but you wanted to refresh your memory.

21       A.    Uh-huh.

22       Q.    Yes?



1          A.    Yes.

2          Q.    Does this refresh your memory that the

3    FTC contends Amazon's enrollment flows have violated

4    ROSCA since at least 2014?

5          A.    Yes.

6          Q.    And that the cancellation flows since

7    at least 2016?

8          A.    Yes.

9          Q.    Okay.  From 2014 up until the

10   investigation and litigation in this case, can you

11   identify a single communication from the FTC telling

12   Amazon that its flows -- its enrollment flows

13   violated ROSCA and Section 5?

14         A.    No.

15               MR. MENDELSON:  Objection.  Scope.

16   BY MR. KABA:

17         Q.    From 2016 up until the time of the

18   investigation and litigation in this case, can you

19   identify a single instance in which the FTC told

20   Amazon that its cancellation flows violated ROSCA

21   and Section 5?

22               MR. MENDELSON:  Objection.  Scope.



```
 1                    THE WITNESS:  No.

 2    BY MR. KABA:

 3         Q.   Amazon's enrollment flows were publicly

 4    available and could be reviewed by anyone since at

 5    least 2014; correct?

 6                    MR. MENDELSON:  Objection.  Vague.

 7                    THE WITNESS:   I don't know that

 8    to be true.

 9    BY MR. KABA:

10         Q.   Why do you not know that to be true?

11         A.   My understanding is Amazon has a number

12    of enrollment flows, that they are dynamic, that

13    they are frequently changing, that which consumers

14    see them depend on a number of factors kind of

15    within Amazon.

16              So to say that anyone has seen any,

17    like, all of the flows, any given flows, I think

18    that's -- that's a challenging statement.

19         Q.   So I didn't ask you whether anyone

20    actually from the FTC saw it.

21         A.   Right.

22         Q.   I'm just asking you --
```



1          Q.   Okay.  Within them, there are multiple

2    different enrollment flows that -- that may be used;

3    correct?

4          A.   Yes.

5          Q.   And over time there have been many,

6    many changes to those flows; correct?

7          A.   Yes.

8          Q.   Okay.  But any flow that is available

9    to consumers to enroll in Prime is and has been

10   publicly available, that is, members of the public

11   would be able to access those flows; correct?

12                    MR. MENDELSON:  Objection.  Vague.

13                    THE WITNESS:   I'm confused by the

14   question.

15   BY MR. KABA:

16         Q.   Okay.  What part of the question

17   confuses you?

18         A.   So not all of the flows are going to be

19   available at all of the times because of the

20   changes, right?  So it's not, like, if there was a

21   flow in 2014, somebody looking at it now would

22   necessarily see it the way that it was presented



1  then.

2          So that's -- when you're asking it kind

3  of lumped together, I'm just having trouble

4  answering it.

5      Q.   Okay.  So I'm not asking you that every

6  flow is publicly available at every time.

7          Does that help clarify for you?

8      A.   Can you ask it again?

9      Q.   Sure.

10         We can do it in reference to --

11     A.   Uh-huh.

12     Q.   -- to the -- to the FTC's verified

13 responses --

14     A.   Sure.

15     Q.   -- to Amazon's interrogatory.

16         The FTC has said that since at least

17 2014 Amazon's enrollment flows have continuously

18 violated ROSCA; correct?

19     A.   Yes.

20     Q.   Okay.  And at least at -- as of the

21 dates those violating allegedly flows existed, they

22 were available to the public; correct?



1          A.   Yes.

2          Q.   Okay.  And so someone could have gone

3    on in 2014 or 2015 or 2016 and seen what the FTC

4    would contend is enrollment flow that violates

5    ROSCA; correct?

6                    MR. MENDELSON:  Objection.  Vague.

7                    THE WITNESS:  Yes.

8    BY MR. KABA:

9          Q.   Okay.  Similar question with respect to

10   the FTC's contention that Amazon's cancellation

11   flows have violated ROSCA since at least 2016.

12   Okay?

13         A.   Uh-huh.

14         Q.   Someone -- sorry.  Strike that.  Let me

15   take one step back.

16              Since at least 2016, Amazon's

17   cancellation flows as they existed as of the

18   relevant time were publicly available; correct?

19         A.   Yes.

20         Q.   So someone could have gone on in 2016

21   or 2017 or 2018 and viewed -- publicly viewed

22   Amazon's cancellation flow as it existed at the time



 1    that the FTC now contends violated ROSCA; correct?

 2             A.    Yes.

 3             Q.    Okay.  Thank you.

 4                   Are you aware of the FTC receiving --

 5    strike that.

 6                   Are you aware of the FTC looking at

 7    consumer complaints or interest group complaints or

 8    public reporting about Amazon's Prime enrollment

 9    flows prior to launching the investigation in

10    February 2021?

11             A.    Can you repeat it?

12             Q.    Sure.

13                   Did the FTC look at consumer complaints

14    or interest group complaints or public reporting

15    about Prime -- Amazon's Prime flows enrollment and

16    cancellation prior to launching the investigation in

17    February 2021?

18                         MR. MENDELSON:  Objection.  Scope.

19                         THE WITNESS:   Not that I'm aware

20    of.

21    BY MR. KABA:

22             Q.    Okay.  When we talk about -- do you



1   think it's fair to characterize the FTC's complaint

2   in this action as concerning Amazon's flows?

3          A.   (Pause).

4          Q.   I just want to get the same --

5          A.   Go on.

6               Well, I was going to say too I think I

7   as me or I as the representative of the Commission?

8          Q.   Well, you as the person most

9   knowledgeable at the Commission --

10         A.   Okay.

11         Q.   -- about the topics that we're here to

12   talk about.

13         A.   Yes.

14         Q.   Do you -- is it fair to characterize

15   the FTC's complaint in this action as concerning

16   Amazon's flows?

17         A.   Yes.

18         Q.   Okay.  And then when we refer to

19   "Amazon's flows," is it fair to say that that

20   pertains to Amazon's enrollment in Prime flow and

21   cancellation of Prime flow -- flows?

22         A.   Yes, with one caveat on the enrollment



 1   Prime enrollment flow, then at least for the purpose

 2   of this litigation, the FTC does not contend that

 3   that version of the flow violates ROSCA; correct?

 4          A.   Correct.

 5          Q.   Okay.  Thank you.

 6               I want to talk to you a little bit

 7   about dark patterns.

 8               Are you familiar with the phrase "dark

 9   patterns"?

10          A.   I am.

11          Q.   Okay.  Can you define what a dark

12   pattern is?

13          A.   A dark pattern is a design element

14   that -- I'd have to look at actually the complaint

15   for the -- for the actual definition of it.

16               But generally speaking, it is a design

17   element that fools, tricks, and misleads consumers

18   into not understanding kind of what they are doing

19   on a particular website.

20          Q.   Okay.  Is there -- is the use of dark

21   patterns prohibited as a matter of law?

22          A.   There is no per se prohibition on the



```
 1   use of dark patterns.

 2           Q.   Can you identify for us any statute or

 3   law that uses the phrase "dark patterns"?

 4                       MR. MENDELSON:  Objection.  Scope.

 5                       THE WITNESS:   Anywhere?

 6   BY MR. KABA:

 7           Q.   In America.

 8           A.   None that -- that the FTC enforces.

 9           Q.   Okay.  Can you -- so you cannot

10   identify any statute or law that the FTC enforces

11   that even uses the phrase "dark patterns"; correct?

12           A.   That uses the phrase, correct.

13           Q.   And can you think of any law or statute

14   in America that uses the phrase "dark patterns,"

15   whether or not the FTC enforces?

16                       MR. MENDELSON:  Objection.  Scope.

17                       THE WITNESS:   I don't know that

18   I've ever looked.

19   BY MR. KABA:

20           Q.   So is the answer you cannot?

21           A.   I -- I can't, but I wouldn't -- there

22   may be.  I just wouldn't know.
```



1          Q.   I'm asking because you -- when I asked

2     you that question, you said "none that the FTC

3     enforces."  So I just want to make sure.

4          A.   Right, because those are the ones I'm

5     familiar with.  That's -- so thinking it through

6     the -- the universe of statutes enforced by the FTC,

7     I am not aware.  Like none of those use the term

8     "dark patterns."

9          Q.   Okay.  So I want to make sure I have a

10    full answer and so because it seemed like you were

11    giving a qualifier.

12         A.   Uh-huh.  Sure.

13         Q.   I want to make sure I have --

14         A.   Uh-huh.

15         Q.   -- a complete record.

16              Whether or not the FTC is in charge of

17    enforcing it --

18         A.   Uh-huh.

19         Q.   -- can you identify any law in America

20    that uses the term "dark patterns"?

21         A.   I don't know whether there are any or

22    aren't.  So I can't identify, no.



1        Q.   Okay.  And you've already agreed with

2   me that there is no law that bars or prohibits the

3   use of dark patterns as a rule; correct?

4        A.   Sure.  There's no per se bar, yes.

5        Q.   Okay.  You keep -- you have said now

6   "per se bar" --

7        A.   Right.

8        Q.   -- a number of times.

9             What does "per se bar" mean?

10       A.   So there's no -- nothing that says you

11  cannot use a dark pattern.  There are, you know, in

12  terms of other laws that exist.  So take the FTC

13  Act, which prohibits deceptive and unfair practices

14  in commerce.

15            If a dark pattern causes something to

16  be deceptive, then that would be a violation of the

17  FTC Act, regardless of whether the FTC Act says

18  "dark patterns" or not.

19            In the ROSCA context, if the use of a

20  dark pattern causes the disclosures not to be clear

21  and conspicuous or a consumer to not be able to give

22  express informed consent, then that would violate



```
 1    ROSCA.

 2              So when I say there's no law -- there's

 3    no law that says dark patterns are illegal; however,

 4    dark patterns can be used in the course of illegal

 5    conduct.

 6              I guess that's the distinction I'm

 7    trying to draw.

 8         Q.   Okay.  So, but ROSCA itself does not

 9    speak to dark patterns; correct?

10         A.   No.  It speaks to clear and conspicuous

11    disclosure and express informed consent.

12         Q.   We keep doing the I ask you "correct,"

13    your answer is "yes, that's correct," but you say

14    "no" and it --

15         A.   Yeah.

16         Q.   So I just want to be --

17         A.   Yeah.

18         Q.   You and I understand what you're saying

19    because we're sitting here talking about it --

20         A.   Uh-huh.  Sure.

21         Q.   -- but the record needs to be clean.

22              ROSCA itself does not speak to dark
```



 1   you.

 2          A.   Sure.

 3          Q.   Look at confirmshaming --

 4          A.   Uh-huh.

 5          Q.   -- on page 38.

 6          A.   Uh-huh.

 7          Q.   Are you there?

 8          A.   Yes.

 9          Q.   So the FTC alleges that Amazon uses

10   confirmshaming as a dark pattern; right?

11          A.   Yes.

12          Q.   And confirmshaming is the "design

13   element that uses emotive wording around the

14   disfavored option to guilt users into selecting the

15   favored option."

16               Do you see that?

17          A.   Yes.

18          Q.   So at least with respect to

19   confirmshaming, part of the issue is actually the

20   words that Amazon is using and presenting to

21   consumers; correct?

22          A.   Yes.  For that one, yes.



1          Q.   And so -- and then some of them are how

2     the words are presented to consumers, that is, some

3     of the dark patterns that the FTC takes issue with

4     here are how the words are presented to consumers;

5     correct?

6          A.   Yes.

7          Q.   Okay.  And then on the whole, the dark

8     patterns that the FTC is taking issue with is -- I

9     think you've described it -- a combination of the

10    words used and the way they are presented; correct?

11         A.   For the ones that are -- for the ones

12    that are defined in combination.  So interface

13    interference, obstruction, misdirection, and I

14    think some of them are more of a feature of the

15    design regardless of the words, like forced action,

16    sneaking, and then some are a function of the words

17    like confirmshaming.

18         Q.   Okay.  So just to get it clear.

19         A.   Uh-huh.

20         Q.   The FTC contends that at least

21    for -- for some of what the FTC claims are dark

22    patterns, the issue is the words that Amazon is



1    using; correct?

2              A.   Yes.

3              Q.   For some it is the -- the issue the FTC

4    contends is problematic and leads to a dark pattern

5    is a combination of the words Amazon is using and

6    how it is -- those words are being presented;

7    correct?

8              A.   Correct.

9                        MR. MENDELSON:  Objection.  Form.

10   BY MR. KABA:

11             Q.   And for some of the dark patterns that

12   the FTC contends is problematic in this case, the

13   FTC takes issue with other design elements; correct?

14             A.   Yes.

15             Q.   Okay.  And you mentioned sneaking was

16   one of them.

17                  That is just a design element dark

18   pattern; right?

19             A.   Yeah.  The way it's -- the way it's

20   defined, yes.

21             Q.   Okay.  And sneaking is an "element that

22   consists of hiding or disguising relevant



1    information, or delaying its disclosure."

2              Do you see that?

3        A.    Yes.

4        Q.    And so here it's someone could be

5    deploying sneaking as a dark pattern not because

6    they didn't share information, but just because they

7    delayed the time at which the consumer saw the

8    information; correct?

9        A.    By definition, yes.

10       Q.    Okay.  And the FTC's contention in this

11   case is the use of these dark patterns in connection

12   with Prime's enrollment flow violates ROSCA;

13   correct?

14       A.    No.

15       Q.    Okay.  What is the relevance of dark

16   patterns to a ROSCA violation in this case?

17                    MR. MENDELSON:  Objection.  Scope.

18                    THE WITNESS:  So they're

19   explanatory in the sense of the allegation is that

20   the enrollment flows do not provide clear and

21   conspicuous disclosure, and the enrollment flows

22   also do not obtain the express informed -- informed



1  ROSCA-related issues in her tenure at the FTC.

2        Q.   Okay.  So do you have any basis to

3  believe Ms. Kim was advising Amazon prior to the

4  investigation?

5        A.   I don't know.  I mean, there's other --

6  there's other reasons to believe that.  We know

7  Amazon was routinely speaking with its attorneys

8  regarding requirements for enrollment and

9  cancellation.  Again, the policy document that I

10  mentioned lays out what's required for an enrollment

11  flow and very closely tracks the language of ROSCA.

12             And so I don't know whether she was

13  particularly, but it seems pretty evident from the

14  documents produced by Amazon that -- that there was

15  such advice.

16        Q.   Okay.  So back to my question.

17        A.   Uh-huh.

18        Q.   Who at Amazon is the in-house counsel

19  that the FTC says has expertise in ROSCA?

20        A.   I can't recall particular names, but I

21  know there were lawyers who were embedded within the

22  Prime Organization.



AMANDA BASTA Vol. I 30b6                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                           133

1           Q.   Okay.  And then it says -- but you

2    can't -- you can't identify any that have expertise

3    in ROSCA; correct?

4           A.   Not per se, no.

5           Q.   Okay.  And then apart from Ms. Kim, can

6    you identify any outside counsel that you contend

7    Amazon consulted with for their flows that had

8    expertise in ROSCA?

9           A.   I don't know whether they consulted

10   with outside counsel regarding the flows.

11          Q.   Okay.  You wouldn't -- is it -- is it

12   fair to say that it is the government's position is

13   not that there's anything improper about consulting

14   with counsel with respect to the compliance?

15          A.   Oh, no.

16          Q.   Right.

17               So the government -- it was perfectly

18   proper for defendants in this case to consult with

19   counsel about the FTC Act, ROSCA, or any other law;

20   right?

21          A.   Yes.

22          Q.   Okay.  You then say:



1                 "Amazon embedded in-house counsel

2       within the Prime Organization and key decisionmakers

3       Defendants Lindsay, Ghani, and Grandinetti routinely

4       confirmed with such in-house counsel, including

5       in-house attorney Praju Tuladhar, T-u-l-a-d-h-a-r,

6       regarding obligations under the FTC Act, ROSCA, and

7       other consumer protection laws and regulations."

8                 Do you see that?

9            A.   Yes.

10           Q.   During what period do you understand

11      that the defendants conferred with in-house counsel

12      regarding ROSCA?

13           A.   I don't know that we have a specific

14      date on it.  Certainly not in the complaint we don't

15      have one.

16           Q.   Okay.  Do you know if the individual

17      defendants -- that is, Mr. Lindsay, Mr. Ghani,

18      Mr. Grandinetti -- had ever read ROSCA, that is, the

19      text of the statute itself?

20           A.   I don't know.

21                    MR. KABA:  Okay.  Let's -- let's

22      mark the actual text of the statute.  So let me mark



1   that as Exhibit 4.

2                    (Document marked for

3   identification as Basta Exhibit 4.)

4   BY MR. KABA:

5        Q.   By the way, when I refer to "the

6   statute," you understand that I'm talking about

7   ROSCA; right?

8        A.   Yes.

9        Q.   Okay.  Okay.  So this is the official

10  record of the -- the actual Act that passed ROSCA

11  which I'm marking as Exhibit 4.

12                  And you go to the third page under

13  Section 4.

14       A.   Uh-huh.

15       Q.   You'll see the reference to "NEGATIVE

16  OPTION MARKETING ON THE INTERNET."

17                  Do you see that?

18       A.   Yes.

19       Q.   And that's the text of ROSCA; correct?

20       A.   Yes.

21       Q.   Okay.

22       A.   Well, the entire statute is the text of



1                          THE WITNESS:  No.  There's lots of

2    case law defining it as -- as terms that would

3    affect a consumer's choice of products or their

4    actions related -- related to a transaction.

5    BY MR. KABA:

6          Q.   Okay.  Can you think of any statute or

7    even rule promulgated by the FTC under ROSCA that

8    defines the material terms --

9                          MR. MENDELSON:  Objection.  Scope.

10   BY MR. KABA:

11         Q.   -- as you've just defined them?

12         A.   (Pause).  It's such an ingrained

13   concept in FTC law what comes from the case law and

14   what comes from the various statutes and rules.

15   It's just -- it's a concept we use every single day.

16         Q.   By "we" you mean the FTC?

17         A.   FTC enforcement, yeah.  I mean, we talk

18   about materiality all the time.

19               So, you know, I know, for example,

20   in -- there's tons of cases that talk about price

21   being a material term.  That talk about the features

22   are the characteristics of a product being a



1    material term.

2                I'm trying to think of whether this

3    statute is in the regulations.

4                I would imagine the regulations do

5    because they may differ -- not may differ, but there

6    may be certain things that for certain rules you

7    want included to make, you know, but none -- none

8    that are coming to the top of my mind.

9         Q.    Okay.  So that's -- that's what I'm --

10   all I can get is the testimony you have here sitting

11   here today as the --

12        A.    Yeah.

13        Q.    Let me finish my question.

14        A.    I'm sorry.

15        Q.    -- as the Assistant Director the person

16   most knowledgeable at the FTC.

17        A.    Uh-huh.

18        Q.    Can you identify for me any statute or

19   rule that defines either clearly and conspicuously,

20   as you have defined them, or material terms, as you

21   have defined them here?

22                     MR. MENDELSON:  Objection.  Scope.



1                         THE WITNESS:    Not off the top of

2      my head, no.

3      BY MR. KABA:

4           Q.    Okay.  You mentioned with respect to

5      conspicuously something about buried in a hyperlink?

6           A.    Uh-huh.

7           Q.    Are you saying that if something -- if

8      there are terms behind a hyperlink that those terms

9      are not conspicuously disclosed?

10          A.    Yes.

11                      MR. MENDELSON:  Objection.  Scope.

12     BY MR. KABA:

13          Q.    Okay.  Okay.  And then it says -- it

14     goes on to say the text "clearly and conspicuously

15     discloses all materials terms of the transaction

16     before obtaining the consumer's billing

17     information."

18                Do you see that?

19          A.    Yes.

20          Q.    What does that part mean "before

21     obtaining the consumer's billing information"?

22                      MR. MENDELSON:  Objection.  Scope.



1                    THE WITNESS:   So, for example, if

2    you have to put in billing information upfront and

3    then you're presented with the negative option

4    offer, it's a sequencing, right?  So the consumer

5    should have to put in the billing information after

6    the offer is made, not before.

7                    So if you have stored payment

8    information from another transaction, presumably the

9    consumer would have to reenter that in order after

10   the offer is made to comply with ROSCA.

11   BY MR. KABA:

12        Q.   You're saying "presumably."

13                  Is there any rule that says that that's

14   the way it has to be done?

15        A.   I mean, that's just the plain language

16   of this.  That the terms of the negative option

17   offer have to be clearly and conspicuously disclosed

18   before obtaining the consumer's information.  If you

19   already have the consumer's information, you by

20   definition can't clearly and conspicuously disclose

21   the terms of the transaction before you get it.

22                  So if it's offered as an add-on, if



1    Q.   And the statute itself does not define

2    "simple mechanisms"; right?

3    A.   Sure.

4    Q.   Okay.  And -- and you would say in

5    order for my -- the business I'm running out of my

6    garage, to understand what these undefined terms

7    mean, I would need to go look at case law; correct?

8    A.   I think it would illuminate it.  I

9    don't know that it's necessary.

10        You started with the -- when we talked

11   about adequate, you started with what's sufficient,

12   and I think the statute itself is sufficient.  For

13   someone who wants to know more, there are certainly

14   other places where you could find how courts

15   interpreted this.

16        How, you know, how does that kind of

17   play out in the marketplace.  What kinds of cases

18   have the FTC brought.  What kind of business

19   practices draw their tension attention.  But I don't

20   know that any of them are necessary to be able to

21   understand what's required under the statute.

22        Q.   So according to you, if you could



1    comply -- all a consumer would need to know about

2    complying with ROSCA is just what the words on the

3    page say, that is, the text of ROSCA?

4            A.    That is -- that is what gives you what

5    you need to do to comply with ROSCA, yes.

6            Q.    Okay.    But then you've also told me

7    that clear and conspicuous is context-specific;

8    right?

9                  That's what you testified to earlier?

10           A.    Correct.

11           Q.    And express informed consent is

12   context-specific; correct?

13           A.    Yes.

14           Q.    And simple mechanisms is

15   context-specific; right?

16           A.    Yes.

17           Q.    So where would I look as a business

18   owner that wants to comply with ROSCA to understand

19   in what context something is clear and conspicuous

20   versus the same disclosure no longer being clear and

21   conspicuous?

22           A.    Again, I think the case law provides a



 1   lot of -- of guidance in that regard.

 2        Q.   Okay.  And that's what I'm trying to

 3   understand.

 4        A.   Uh-huh.  Yeah.

 5        Q.   Like, I want to know what are the

 6   sources of defining these terms to provide me with

 7   notice of what I need to do to comply.

 8             Do you understand?

 9        A.   Yes.

10        Q.   Okay.  And you believe that the primary

11   source to understand what the terms that the statute

12   uses mean is case law?

13        A.   I don't think that's -- I don't think

14   that's what I've said.

15             I think the statute -- it's the statute

16   first and then to understand how courts view it, or

17   not even to understand.  It providers information

18   about how courts view it because of the context

19   specificity.

20             So if I want to have a small print

21   disclosure, you know, that is three paragraphs into

22   text, then I'm going to look for cases where there



 1  delineate context for you; correct?

 2          A.    Correct.  It says what it says.

 3          Q.    Okay.  And is there any FTC guidance

 4  on -- on this context-specific analysis of ROSCA

 5  compliance?

 6                      MR. MENDELSON:  Objection.  Scope.

 7                      THE WITNESS:    I mean, the FTC

 8  certainly provides -- we have a Business Blog that,

 9  again, kind of talks about when we bring a case what

10  things kind of triggered scrutiny or triggered the

11  concerns that are outlined in the complaint, right?

12                      So, but in terms of whether or not

13  something applies is a decision by the court, right?

14  So that's the -- so what the FTC says in some ways

15  doesn't matter.  It's -- it's helpful guidance in

16  terms of if you want to, you know, prevent scrutiny,

17  right?  Because we go by what the courts say.

18                      When we're looking for practices

19  that violate, we're looking at how the practices

20  line up with the statute and line up with our

21  understanding of those terms, but it's

22  not -- there's no magic wand.



1    BY MR. KABA:

2             Q.    Yeah, I understand.

3             There's no -- there's no checklist of

4    things that one could look at and say if you -- as

5    long as you check these boxes, you comply with

6    ROSCA; correct?

7             A.    Correct.

8             Q.    The FTC has never put out there some

9    objective list of criteria that one could review and

10   say, oh, I do all of these things, therefore, I

11   comply with ROSCA; right?

12            A.    Right, and that's because consumers

13   interact with things differently.  So that -- that's

14   why it matters.

15            Q.    Okay.  So some sources of guidance for

16   a business --

17            A.    Uh-huh.

18            Q.    -- to determine whether or not they are

19   ROSCA compliant could then be cases the FTC has

20   brought in the past; right?

21            A.    Certainly.

22            Q.    I think you mentioned the FTC's



1    Business Blog; correct?

2              A.    Sure.

3              Q.    FTC enforcement actions; right?

4              A.    Yes.

5              Q.    FTC settlements that delineate what a

6    business needs to do to comply with ROSCA in the

7    future; right?

8              A.    Yes.

9              Q.    And these are all places that one could

10   look to say, okay, this is the kind of things I need

11   to ensure I'm doing to comply with ROSCA --

12             A.    Sure.

13             Q.     -- right?

14             A.    Correct.

15             Q.    Okay.  On -- on this -- this simple

16   mechanisms for cancellation, you agree you've

17   already told me simple mechanisms isn't defined in

18   the statute; right?

19             A.    Correct.

20             Q.    Can you think of any -- any case where

21   a court has defined "simple mechanisms"?

22             A.    United States versus MyLife.



1    mechanism.

2                      So whether or not there needs to

3    be more than one, I don't think we've taken a

4    position on that in this case.

5    BY MR. KABA:

6          Q.   Okay.  Well, I'm asking you --

7          A.   Right.

8          Q.   -- as the Assistant Director of the

9    Division of Enforcement is -- and you are

10   responsible for enforcing ROSCA; correct?

11         A.   Yes.

12         Q.   In fact, you are -- the Division of

13   Enforcement is the only division within the FTC that

14   you've identified that has responsibility for ROSCA

15   enforcement?

16         A.   Well, that has primary responsibility.

17   As I mentioned, if other -- if a ROSCA claim arises

18   in connection with another investigation, another

19   division may bring -- may bring that claim without

20   having to, like, cleave it off and send it to us.

21         Q.   Okay.  But in terms of the actual

22   allocation of responsibilities, the Division of



1   Enforcement at the FTC, the division which you are

2   the Assistant Director, is the only division that

3   has primary responsibility for enforcing ROSCA?

4          A.   Yes.

5          Q.   Okay.  And considering that --

6          A.   Uh-huh.

7          Q.   -- does this -- does ROSCA require

8   every cancellation mechanism to be simple, or is it

9   sufficient to have one simple mechanism, even if the

10  FTC contends a different one is more complicated

11  than they would like?

12              MR. MENDELSON:  Objection.  Scope.

13  Calls for legal opinion.

14              THE WITNESS:  Again, it's

15  hard -- it's hard to answer that question in a

16  vacuum without the context, but what I would say is,

17  the -- again, what will be simple for one consumer

18  may not be for another.

19              So, for example, if I signed up

20  through my tablet and I couldn't cancel that way, I

21  had to seek out a different mechanism, that might

22  not be simple.



1                      If I can't locate the number to

2    call, that might not be simple, even if once I get

3    on the phone with somebody, like if I'm able to hunt

4    it down and I get on the phone with somebody, that

5    is simple.

6                      It may be that, you know, again,

7    if I don't know that these other mechanisms are

8    available to me, even if the actual execution of the

9    cancellation once you find it is simple, the

10   mechanism overall may not be simple.

11                     So, again, I'd need to know more

12   about the various mechanisms and the context, but I

13   would say --

14   BY MR. KABA:

15        Q.   So my question is:  I grant you that --

16        A.   Uh-huh.

17        Q.   -- your point about context applies to

18   everything.

19        A.   Uh-huh.

20        Q.   My question is a different one.

21        A.   Okay.

22        Q.   Is it the FTC's position --



1   real difficulty negotiating and, you know, where the

2   company is aware of it.  Where they've not changed

3   it despite opportunities to do so.  There's a lot of

4   factors involved and I think, you know, like I said,

5   there's not one across-the-board determination.

6            That's why we do investigations to

7   determine how overall simple or how overall not

8   simple is something before we decide to bring a

9   ROSCA claim.

10           Q.   Another thing you mention in addition

11  to context is that a mechanism for cancellation

12  could be simple for one consumer and not simple for

13  another; right?

14           A.   Sure.

15           Q.   The same is true about clear and

16  conspicuous disclosures; right?  Something can be

17  clear and conspicuous for one consumer but maybe not

18  for another?

19           A.   (Pause).  That seems a little harder to

20  me.

21           Q.   Well, let me ask you your own example.

22           A.   Uh-huh.



1      Q.    You signed up for Prime?

2      A.    Uh-huh.

3      Q.    Right?

4      A.    Uh-huh.

5      Q.    Yes?

6      A.    Yes.

7      Q.    And did you know what you were signing

8   up for when you signed up for it?

9      A.    Yes, because I sought it out.

10      Q.    Right.

11            And you -- you understood, the terms

12   were presented to you when you signed up for it;

13   right?

14                  MR. MENDELSON:  Objection.  Scope.

15                  THE WITNESS:   I don't remember,

16   but I presume they were.

17   BY MR. KABA:

18      Q.    Okay.  And by the way, do you know how

19   many subscribers there are to Prime in America?

20                  MR. MENDELSON:  Objection.  Scope.

21                  THE WITNESS:   Millions upon

22   millions.



1    BY MR. KABA:

2         Q.   Actually, tens of millions upon tens of

3    millions; right?

4         A.   Uh-huh.

5         Q.   Yes?

6         A.   I don't know that independently, but

7    yes.

8         Q.   Okay.  Is it -- is it the FTC's

9    position that not a single one of those consumers

10   got a clear and conspicuous disclosure of the

11   material terms of Prime?

12        A.   I mean, if the flows are not -- do not

13   clearly and conspicuously disclose the terms.  The

14   flows at issue.  There are consumers who, I think,

15   like me may not have gone through those flows in

16   order to enroll, but through the flows.  The people

17   who signed up through the flows at issue, the

18   position is that they did not receive clear and

19   conspicuous disclosure.

20        Q.   So if someone looks at the UPDP flow,

21   that's one of the flows at issue; right?

22        A.   Yes.



1  those things are kind of coming into play.

2  BY MR. KABA:

3      Q.  You would agree with me that ROSCA does

4  not prescribe specific steps marketers must follow

5  to comply with its provisions?

6      A.  Correct.

7      Q.  And you would agree with me that the

8  current framework of ROSCA compliance or enforcement

9  does not provide clarity about how to avoid

10  deceptive negative option disclosures and

11  procedures; correct?

12                  MR. MENDELSON:  Objection.  Scope.

13                  THE WITNESS:   I don't agree with

14  it, no.

15  BY MR. KABA:

16      Q.  Would you agree that the existing

17  patchwork of laws and regulations related to ROSCA

18  do not provide industry and consumers with a

19  consistent legal framework?

20                  MR. MENDELSON:  Objection.  Scope.

21                  THE WITNESS:   No.

22  BY MR. KABA:



1          Q.    You'd disagree with that?

2          A.    Whether or not --

3          Q.    My question is simply:  Do you disagree

4     with that statement?  Yes or no.

5          A.    I do.

6          Q.    Okay.  Do you agree or disagree with

7     the statement that the current framework does not

8     provide clarity about how to avoid deceptive

9     negative option disclosures and procedures?

10                    MR. MENDELSON:  Objection.  Scope.

11    BY MR. KABA:

12         Q.    Agree or disagree, Ms. Basta?

13         A.    I disagree.

14         Q.    Okay.  Do you agree or disagree that

15    ROSCA lacks specificity about cancellation

16    procedures and the placement, content, and timing of

17    cancellation-related disclosures?

18         A.    Specificity.  I would agree with that.

19         Q.    Do you agree or disagree that the

20    statute requires marketers to provide simple

21    mechanisms for the consumer to stop recurring

22    charges without guidance about what is simple?



AMANDA BASTA Vol. I 30b6                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                    182

1                        MR. MENDELSON:  Objection.  Scope.

2                        THE WITNESS:    I mean, the statute

3   says what it says.  So.

4   BY MR. KABA:

5        Q.   Do you -- let me ask you my question,

6   which is do you agree or disagree with the

7   statement.

8                   Do you agree or disagree with the

9   statement that the statute requires marketers to

10  provide simple mechanisms for the consumer to stop

11  recurring charges without guidance about what is

12  simple?

13                       MR. MENDELSON:  Same objection.

14                       THE WITNESS:    I'd agree.

15  BY MR. KABA:

16       Q.   Okay.  You're aware that the FTC is --

17  announced a Proposed Negative Option Rule in April

18  24th of 2023?

19       A.   Yes.

20                       MR. MENDELSON:  Objection.  Scope.

21  BY MR. KABA:

22       Q.   What was -- and the statements I just



1    asked you about, would you have agreed or disagreed

2    with those -- would your answers have changed if we

3    were asking you about it in April of 2023?

4                        MR. MENDELSON:  Objection.  Scope.

5                        THE WITNESS:   My answers would be

6    the same.

7    BY MR. KABA:

8         Q.   Okay.  So it isn't -- it isn't the

9    proposed rule that is providing the clarity,

10   according to you?

11                       MR. MENDELSON:  Objection.  Scope.

12                       THE WITNESS:  Correct.

13   BY MR. KABA:

14        Q.   Okay.  Why -- were you involved in any

15   way in the Proposed Negative Option Rule?

16        A.   I was --

17                       MR. MENDELSON:  Objection.  Scope.

18                       THE WITNESS:   I was involved for

19   a very, very brief period at the beginning of the

20   year.  I was filling in for Ms. Koss for about a

21   six-week period.

22   BY MR. KABA:



1  BY MR. KABA:

2          Q.   So you believe that in order -- do

3  you -- let me ask you about this statement.

4          If 5 percent or fewer customers have

5  reported confusion about -- about certain material

6  terms, is that relevant?

7                    MR. MENDELSON:  Objection.  Vague.

8  Scope.

9                    THE WITNESS:   It could be.

10 Again, it's -- there's not one piece of evidence

11 that we typically rest these claims on.  It's based

12 on an overview of the evidence that we've obtained

13 during the investigation.

14                    And so, again, a number standing

15 alone, I don't know what to make of that without

16 seeing it in the context of the other evidence.  You

17 know, 5 percent may mean nothing.  It may mean a lot

18 of things, but it's just giving me a number picked

19 out of the air.  I can't tell one way or the other.

20 BY MR. KABA:

21         Q.   Does the FTC have a number that it uses

22 to decide whether or not there's sufficient evidence



1  of confusion with respect to the material terms that

2  are being disclosed?

3                    MR. MENDELSON:   Objection.

4  Witness can answer, but I instruct the witness not

5  to reveal any internal deliberative communications

6  in doing so.

7                    THE WITNESS:   No.

8  BY MR. KABA:

9       Q.    It's certainly not your view that the

10  disclosures have to be clear and conspicuous, that

11  is, understandable to every single person that views

12  the disclosures, is it?

13      A.    Sure.   They'll have --

14                    MR. MENDELSON:   Objection.   Vague.

15                    THE WITNESS:    Oh, sorry.

16                    I was going to say, you certainly

17  will have people that no matter how clear something

18  is won't understand it.   I mean, that's the kind of

19  ticky-tack, like I don't think that case would get

20  brought.

21  BY MR. KABA:

22      Q.    Okay.   So let's just -- I think that's



 1  where I was trying to make sure we have that --

 2          A.    Uh-huh.

 3          Q.    -- common understanding.

 4                So you agree that no matter how clear

 5  and conspicuous something is, you will always have

 6  some number of people that don't understand the

 7  disclosure; correct?

 8          A.    Yes.

 9                      MR. MENDELSON:  Objection.  Scope.

10  BY MR. KABA:

11          Q.    And my question then is:  Is there a

12  percentage beyond which you believe it's not just

13  some number of people, but it's now a materially

14  significant number of people that don't understand

15  the disclosure?

16                      MR. MENDELSON:  Objection.  Scope.

17  Same instruction as before.

18                      THE WITNESS:  No.

19  BY MR. KABA:

20          Q.    Okay.  So in some cases, it could be as

21  high as 5 or 8 percent, and in some cases, that may

22  be sufficient --



```
 1   presented to consumers; right?

 2          A.   Yes.

 3          Q.   How consumers are interacting with the

 4   flows; right?

 5          A.   It's one thing we consider.  I

 6   don't -- it may not be necessary in all cases, but

 7   yes, it's one thing we consider.

 8          Q.   And you considered it in this case?

 9          A.   Yes.

10          Q.   What consumers -- some consumers at

11   least are saying about what they understood

12   the messages from Amazon about enrollment to mean?

13                    MR. MENDELSON:  Objection.  Form.

14                    THE WITNESS:   Consider it, yes.

15   BY MR. KABA:

16          Q.   What the case law has said in

17   different -- different contexts in different courts

18   have said about what clear and conspicuous and

19   material mean; right?

20                    MR. MENDELSON:  Objection.  Form.

21                    THE WITNESS:  Correct.

22   BY MR. KABA:
```



1          Q.    What FTC prior enforcement actions have

2     said about those terms; right?

3                      MR. MENDELSON:  Objection.  Form.

4                      THE WITNESS:  Well, I don't know

5     that I would put it exactly that way.

6                      Like I said, the prior orders draw

7     from the case law in the definitions of the terms.

8     So, yes, the prior enforcement actions themselves

9     are more of a window into, like, the kind of

10    behaviors that concern -- that are of concern.

11    BY MR. KABA:

12          Q.    Okay.  So other than the prior court

13    decisions, the language that's being used in the

14    disclosures of material terms, how the material

15    terms are being disclosed, how consumers are

16    interacting with those terms, what consumers are

17    saying about their interaction with those terms,

18    what other relevant context needs to be considered

19    to determine whether or not there's a ROSCA

20    violation?

21          A.    Sure.  For example, what did the

22    company -- how did the company view the



1    information -- the -- the flows.  How did -- what

2    did they know.  What data did they have.  You know,

3    like I said, witness testimony about kind of

4    potential issues.  That's also a piece of it.

5              Q.   Well, that seems to be speaking to

6    knowledge; right?

7              A.   Well, no, it's both.  For example,

8    if -- again, kind of going to -- to some of the

9    facts of this case.

10             Amazon had a policy that terms needed

11   to be clearly and conspicuously disclosed.  They

12   were doing a lot of work around the idea that

13   consumers were not aware of the terms.  I think at

14   one point it was identified as like a top 3 customer

15   frustration, and they were trying to figure out why

16   and part of it was because key information was

17   missing from the enrollment flows.

18             So it's stuff like that.  It goes

19   partially to knowledge, but it also goes partially

20   to whether there's a violation because it was

21   something that was persisting and not being

22   corrected.



```
 1                  I mean, that's -- that's all part of

 2     the soup.

 3          Q.   Right.  So that's what I'm

 4     trying -- I'm trying to understand.  You've used a

 5     good metaphor, actually.

 6                  In order to determine whether or not

 7     there's a ROSCA violation, you need to consider a

 8     soup with lots of different ingredients.  Yes?

 9          A.   Yes.

10          Q.   And I just want to know what those

11     ingredients are, not necessarily specific to this

12     case.  Generally.

13          A.   Sure.

14          Q.   So --

15                  MR. MENDELSON:  Objection.  I'm

16     sorry.  Go ahead.

17     BY MR. KABA:

18          Q.   So the ingredients that we've

19     identified so far are the language used in the

20     disclosures themselves.  Yes?

21          A.   Yes.

22          Q.   Other language used around marketing
```



1   and the context of those disclosures.  Yes?

2          A.   Yes.

3          Q.   The way that that language is being

4   presented.  Yes?

5          A.   Yes.

6          Q.   And the way can include colors used,

7   font size used, location on the page, etc.  Yes?

8          A.   Yes.

9          Q.   How consumers are interacting with that

10  language?

11         A.   Yes.

12         Q.   What consumers report after the fact

13  about how they interacted with the flows; correct?

14         A.   Yes.

15         Q.   And so, again, just generally speaking,

16  what other things does one need to consider as part

17  of this, to use your word, soup of factors that you

18  would look at to determine whether or not there's a

19  ROSCA violation?

20                    MR. MENDELSON:  Objection.  Scope.

21                    THE WITNESS:   Again, evidence

22  from the company regarding what was -- what was



1        Q.   Okay.  And the FTC identified in the

2   Dot Com Disclosures like certain at least features

3   or criteria that one would consider to determine

4   whether or not a disclosure is clear and

5   conspicuous; right?

6                    MR. MENDELSON:  Objection.  Scope.

7                    THE WITNESS:   I haven't looked at

8   them in a long time, but that's my general

9   understanding.

10  BY MR. KABA:

11       Q.   Okay.  Do you believe the Dot Com

12  Disclosures provide guidance to industry about ROSCA

13  compliance?

14                   MR. MENDELSON:  Objection.  Scope.

15                   THE WITNESS:   That's not a topic

16  I was prepared to testify about.  So I would have to

17  look at them.

18  BY MR. KABA:

19       Q.   Okay.  Well, we can take it apart from

20  the Dot Com Disclosure discussion.

21                   One of the thing -- another thing I

22  think you agree you look at in order to determine



1    whether or not disclosures are clear and conspicuous

2    is the prominence of the disclosures; right?

3          A.    Yes.

4          Q.    And that could include font size?

5          A.    Yes.

6          Q.    Does the FTC or ROSCA anywhere say what

7    font size is required for a disclosure to be

8    considered prominent?

9          A.    No, because, again, it's going to

10   depend.  Like if the biggest font on the screen is

11   48 point, would it -- would a 48 point do it.  Would

12   it have to be bigger than 48.  Could it be slightly

13   smaller than.

14          It's just one of those things where

15   until you see what is around it.  If all of the

16   print is a certain size, having something that's

17   larger, you know, might do it.  It might distract.

18   It just, again, depends on the design of the page,

19   and in a vacuum, you can't make that determination.

20         Q.    So even what you just said.

21         A.    Uh-huh.

22         Q.    Like you look at the other fonts on the



1  page, etc.

2              A.    Uh-huh.

3              Q.    Does ROSCA itself say anything about --

4  about what you would need to look at to determine

5  whether or how prominent a disclosure is?

6              A.    No.

7              Q.    Okay.  So that's how I want to go

8  through this.

9              A.    Uh-huh.

10             Q.    So does the FTC or ROSCA say anywhere

11 what the font size needs to be in order for a

12 disclosure to be considered prominent?

13             A.    I don't think there's a one-size-fits

14 answer -- fits-all answer, so no.

15             Q.    Does ROSCA -- I'm sorry.

16             Does the FTC or ROSCA say anywhere what

17 color the disclosure needs to be in order to satisfy

18 the clear and conspicuous standard?

19                   MR. MENDELSON:  Objection.  Scope.

20                   THE WITNESS:   Not that I'm aware

21 of, no.

22 BY MR. KABA:



1        Q.   Okay.  Does ROSCA -- although the

2   prominence of the disclosure is something that one

3   would need to consider to determine whether or not a

4   disclosure is clear and conspicuous, does ROSCA or

5   the FTC actually tell you what things you need to

6   check off to ensure your disclosure is sufficiently

7   prominent?

8                    MR. MENDELSON:  Objection.  Form.

9                    THE WITNESS:  No.  As you said

10  earlier, there's no checklist.

11  BY MR. KABA:

12       Q.   Okay.  Another thing that you might

13  consider in assessing whether or not something is

14  clear and conspicuous is whether there's other

15  messaging -- marketing messaging that might distract

16  attention away from the disclosure of the material

17  terms; is that right?

18       A.   Yes.

19       Q.   And does ROSCA or the FTC anywhere tell

20  industry what is appropriate additional marketing

21  messaging versus inappropriately distracting

22  additional marketing messaging?



1  like, cover all the scenarios.

2  BY MR. KABA:

3       Q.   Okay.  And so when you say consumer

4  confusion or whether consumers understand is the

5  touchstone of this analysis, what percentage of

6  consumers need to report that they understand the

7  disclosures in order for the FTC to say, yes, we

8  believe it's clear and conspicuous?

9                MR. MENDELSON:  Objection.  Scope.

10  Asked and answered.

11                THE WITNESS:   There's -- right.

12  There's not -- there's not a specific percentage,

13  and it doesn't necessarily come from just consumers,

14  right?

15                Like, again, Amazon's internal

16  documents were indicating all kinds of confusion,

17  not -- apart from what came in as a complaint per

18  se.

19                Sometimes consumers don't

20  understand why they're experiencing something.  They

21  just are reporting what they experienced.

22                So would I expect a consumer in a



AMANDA BASTA Vol. I 30b6                September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                226

1   complaint to be able to say, "I saw Amazon's UPDP

2   flow and it forced me to take an action and,

3   therefore, I think I signed up even though I didn't

4   mean to"?  No.  They're just going to say, "I'm

5   getting these charges from Amazon.  I don't know

6   where they're coming from."

7                      That's what I mean by the

8   touchstone.  It's that they're -- and like I said,

9   that was corroborated by the internal data.

10  BY MR. KABA:

11         Q.    Okay.  So I want to go back to my

12  question.

13         A.    Uh-huh.

14         Q.    You say what consumers understand is at

15  the end of the day the touchstone for whether or not

16  disclosures are clear and conspicuous.

17                      Yes, you agree with that?

18         A.    Yes.  I mean, that's the whole reason

19  you require express informed consent.

20         Q.    Okay.  And so I'm asking you.  Without

21  reference to any documents or discovery you've

22  looked at in this case, I'm asking you:  Does the



1    FTC say, okay, X percentage of consumers need to

2    report that they do not understand the disclosures

3    in order for us to conclude there's a ROSCA

4    violation?

5            A.    No.

6            Q.    Okay.    Thank you.

7            A.    If you hit a good stopping point, is it

8    a good time?

9            Q.    Yeah.    I'm happy to -- happy to take a

10   break.

11           A.    Yeah.

12                 THE VIDEOGRAPHER:    We are off the

13   record at 12:33.

14                 (Whereupon, at 12:33 p.m., a

15   luncheon recess was taken.)

16

17

18

19

20

21

22



```
 1                     AFTERNOON SESSION

 2                               (1:37 p.m.)

 3                     AMANDA BASTA

 4    called for continued examination and, having been

 5    previously duly sworn, was examined and testified

 6    further as follows:

 7                     EXAMINATION (CONTINUED)

 8                     THE VIDEOGRAPHER:  We are back on

 9    the record at 1:37.

10    BY MR. KABA:

11         Q.   Ms. Basta, you understand you're still

12    on the record?

13         A.   Yes.

14         Q.   You're still under oath.

15         A.   Yes.

16         Q.   Yes.

17              During the lunch break, did you discuss

18    your testimony with anyone?

19         A.   No.

20         Q.   Okay.  I want to go back to something

21    we talked about earlier today.

22              You said that the FTC interviewed
```



```
 1   days."

 2              So it's not clear to me and, certainly

 3   as we allege in the complaint, not clear to

 4   consumers that by saying "Get FREE Two-Day Shipping"

 5   at that point, which I understand is the point where

 6   they're enrolled even if they subsequently abandon

 7   the transaction, that by assenting to two-day free

 8   shipping is also assenting to Prime.

 9        Q.   Okay.  So maybe I'm not being as clear

10   as I ought to be with my question.

11        A.   Uh-huh.

12        Q.   Even in the example you just gave --

13        A.   Uh-huh.

14        Q.   -- the customer had to take an

15   affirmative step to get enrolled in the program;

16   correct?

17              Here they had to affirmatively click

18   the button for "Get FREE Two-Day Shipping"?

19        A.   Again, how it worked -- whether it

20   worked that way in real life all the time, I don't

21   know, but yes, that's the way that they appear.

22        Q.   Okay.  And that's what I'm asking you
```



1  about in general with respect to the flows alleged

2  in the complaint.

3          A.    Uh-huh.

4          Q.    With respect to every flow alleged in

5  the complaint, a customer has to take some

6  affirmative step, checking a box or clicking a

7  button, before they get enrolled in Prime; correct?

8                      MR. MENDELSON:   Objection.  Asked

9  and answered.

10  BY MR. KABA:

11          Q.    As alleged at least.

12          A.    Yes.

13          Q.    Okay.  And Amazon, for example, at

14  least as alleged in the complaint, does not require

15  a customer to opt out of getting enrolled in Prime

16  as part of its enrollment flows; correct?

17          A.    Correct.  All -- correct.

18          Q.    Okay.  Now, can you identify any, any

19  auto renewal or free-to-paid conversion in the

20  marketplace right now that the FTC contends

21  satisfies ROSCA requirements?

22                      MR. MENDELSON:  Objection.  Scope.



```
 1                    THE WITNESS:   And that's not a
 2   topic that was identified for today.  So I'm not
 3   prepared to testify about it.
 4                    But I -- it does misstate kind of
 5   what the FTC does.
 6   BY MR. KABA:
 7        Q.   Okay.  So I -- the exercise is not
 8   debating the question here today.
 9              My question for you is:  Sitting here
10   today, can you identify any negative option program
11   out there in the marketplace today that satisfies
12   ROSCA's requirements?
13                    MR. MENDELSON:  Objection.  Scope.
14                    THE WITNESS:   I don't know one
15   way or the other whether there are such programs.
16   BY MR. KABA:
17        Q.   Okay.  Thank you.
18              If I presented flows to you from other
19   companies, Ms. Basta, could you tell us whether or
20   not those flows satisfy ROSCA?
21                    MR. MENDELSON:  Objection.  Scope.
22                    THE WITNESS:   Not just looking at
```



1          Q.    And you --

2          A.    -- and certainly where -- where the

3    relative to the things in proximity to it.

4          Q.    So when you say small print, you

5    actually mean smaller print?

6          A.    Yes.

7          Q.    Okay.  So my question still stands.

8                Does the FTC publish a document or is

9    there any statute or rule of law regulation that

10   says what size the print needs to be in order to be

11   appropriately conspicuous?

12                         MR. MENDELSON:  Objection.  Scope.

13                         THE WITNESS:  Again, it's not

14   prescriptive in that way.  It could --

15   BY MR. KABA:

16         Q.    So the answer is no, there is no such

17   document?

18                         MR. MENDELSON:  I'm sorry.  Were

19   you finished answering?

20                         THE WITNESS:  Well, again, there

21   are definitions in various FTC orders that were

22   taken from case law.  I don't know that they



1   prescribe a font size.  Although they may something

2   about relative font size.

3   BY MR. KABA:

4         Q.   Okay.  So my question -- that's fair.

5              My question for you is:  Could you tell

6   us, this roomful of lawyers sitting here, hey, if

7   you go look at this document, it will tell you what

8   font size you need to use in order for your material

9   terms to be clearly and conspicuously disclosed?

10                   MR. MENDELSON:  Objection.  Scope.

11                   THE WITNESS:   Again, because it

12  would be context-specific depending on the way the

13  way the rest of the page looked and the marketing

14  font how -- what's -- what's all going on with the

15  design, that's not something that can be prescribed

16  across the board.

17  BY MR. KABA:

18        Q.   So the answer is:  You could not

19  identify for us a document that we could all go and

20  look at it and it says, hey, use the following font

21  size and you will be ROSCA compliant; correct?

22                   MR. MENDELSON:  Same objection.



1                      THE WITNESS:  Correct.

2    BY MR. KABA:

3         Q.   Okay.  Even with respect to the smaller

4    font size that you have mentioned, you see the sign

5    up for Prime --

6         A.   Uh-huh.

7         Q.   -- language there?

8         A.   Yes.

9         Q.   That's actually about the same font

10   size as the price term above at "$14.99 per month,"

11   isn't it?

12        A.   Highlighted in a yellow button.  So,

13   again, the other design elements matter.

14        Q.   Ms. Basta, you're answering questions

15   I'm not asking you, and I need you to answer

16   questions I am asking you.

17             Otherwise, there's no way I'm going to

18   get done in eight and a half.  I'm not going to get

19   done in eight and a half hours anyway, but certainly

20   is going to be much more difficult if I'm not even

21   getting answers to the questions I'm asking.

22             Fair?



1          A.    Understood.

2                          MR. MENDELSON:   Object.

3     BY MR. KABA:

4          Q.    Okay.   So my question for you.   You

5     made it a point to note the small font size.

6          A.    Yes.

7          Q.    And what I want to just ask you.   It's

8     a yes or a no.

9                The language above:

10               "After your trial, Prime is only $14.99

11    per month."

12               That's in bold.

13               That font size is actually about the

14    same font size as this "Sign up for Prime" call to

15    action button, isn't it?

16         A.    They look about the same.

17         Q.    Okay.   Thank you.

18               So this flow discloses price; correct?

19         A.    Correct.

20         Q.    Auto renewal; correct?

21         A.    Correct.

22         Q.    That you're charged every month; right?



1      A.   The material terms of Prime, not Prime

2   Video, yes.

3      Q.   And the thing that the customer if they

4   click the button on the page would sign up for is --

5   is Prime; correct?

6      A.   Yes.

7      Q.   Okay.  Because as we've established,

8   Prime Video is one of the benefits you could get if

9   you sign up for Prime; correct?

10     A.   Yes, and is also offered as a

11  stand-alone subscription service.

12     Q.   Right.

13          So if -- it's not like a customer would

14  sign up for and pay for Prime and only get Prime

15  Video; correct?

16     A.   That's my understanding, correct.

17     Q.   So for the flows that we looked at, the

18  material terms that are disclosed on the page where

19  the customer has to click to accept are the material

20  terms for the thing the customer is signing up for;

21  correct?

22     A.   As opposed to the thing the customer



1   was intending to sign up for?

2           Q.   Well, I can't divine.

3                Can you divine a customer's intent?

4           A.   Only when they say that that was not

5   their intent.

6           Q.   Right.

7                So that's not divining quite?

8           A.   Right.

9           Q.   Is it?

10          A.   Right.

11          Q.   So you and I or anybody can't look into

12  the minds of every single customer that has signed

13  up for Prime; correct?

14          A.   Correct.

15          Q.   Okay.  So let's put aside what we may

16  speculate a customer had in their mind.

17               For every one of the flows that are at

18  issue in the case, now --

19          A.   Uh-huh.

20          Q.   -- including Prime Video, which we went

21  just went over, Amazon discloses the material terms

22  of Prime on the same page in which the customer is



1    clicking a button to sign up for Prime; correct?

2                A.    They appear there, yes.   Correct.

3                Q.    Thank you.

4                A.    Yeah.

5                Q.    With -- I want to talk to you a bit

6    about cancellation.

7                A.    Sure.

8                Q.    Is whether or not a cancellation flow

9    simple an objective test or a subjective test?

10                        MR. MENDELSON:  Objection.  Scope.

11                        THE WITNESS:   I'd have to look

12   back at the case law.  I don't remember off the top

13   of my head.  I think it -- I don't remember off the

14   top of my head.

15   BY MR. KABA:

16                Q.    Okay.  And you understand the

17   difference between objective and subjective?

18                A.    Yes.

19                Q.    What is the difference?

20                A.    So objective means that someone -- it's

21   not a question of what people think.  It's a

22   reasonable person looking at it can find it to be



 1  the thing.  So in this case, simple.

 2          Q.   Okay.  And the FTC has identified some

 3  20-odd things that one would consider and decide, in

 4  this case at least, in deciding whether or not

 5  something is simple; correct?

 6          Do you want me to help you?

 7          A.   Yes, please.

 8          Q.   Okay.  Let's go to Exhibit 2, please.

 9          A.   Sure.

10          Q.   Which is, again, for purpose of the

11  record, this is a document that the FTC produced in

12  this case --

13          A.   Yes.

14          Q.   -- in response to certain questions

15  we've asked in this litigation; right?

16          A.   Yes.

17          Q.   So go to page 50.

18          You see it says:

19          "Determining whether an online

20  cancellation process is 'simple' is a fact-specific

21  inquiry into that particular process, not

22  necessarily determined solely by the number of



```
 1    clicks to cancel."
 2            A.   Yes.
 3            Q.   And then the FTC lists I think it's
 4    some 20-odd different things that would be
 5    considered to decide whether or not something is
 6    simple; right?
 7                        MR. MENDELSON:  Objection.  Form.
 8                        THE WITNESS:  Yeah.  To the extent
 9    that they're pertinent, yes.
10    BY MR. KABA:
11            Q.   Okay.  And can you identify for us any
12    case, enforcement proceeding, policy document,
13    statute, rule or regulation that lists all of these
14    things as factors that a company must consider in
15    order to determine whether or not its cancellation
16    mechanism is simple?
17                        MR. MENDELSON:  Objection.  Form.
18                        THE WITNESS:  (Reviews document.)
19                        I'm just looking to see whether
20    there was an interrogatory where we identified
21    cases.
22    BY MR. KABA:
```



1         Q.    So what I'm specifically asking about

2    is with respect to the 20 some-odd factors --

3         A.    Uh-huh.

4         Q.    -- listed on page 50, 51, over to 52

5    that the FTC contends are things that would be

6    considered in order to determine whether or not a

7    cancellation mechanism is simple.

8               Are you with me?

9         A.    Yes.

10        Q.    Can you identify for us any case,

11   policy document, rule, regulation, FTC guidance that

12   lists all of these things as the factors that one

13   would need to consider in order to comply with the

14   ROSCA requirement for a simple cancellation

15   mechanism?

16        A.    So not in a single case.  Not in a

17   single case.  So, again, because it's a

18   fact-specific inquiry, you're going to get that from

19   cases alleging cancellation violations.  The

20   business practices that were alleged to be

21   violative.

22               You will get it from some cases like



1  U.S. versus MyLife, which looked, you know, a court

2  looked at one and gleaned some principles, and --

3  but there's not a single document that lists out

4  because of the fact-specific nature of the inquiry.

5      Q.   Okay.  So that's what I wanted.  So

6  that's the part I'd like.  I want to make sure I

7  understand.

8      A.   Uh-huh.

9      Q.   So in this case, in response to a

10  question we asked in this litigation, the FTC

11  identified some 20-odd things that would be

12  considered to decide whether or not a cancellation

13  mechanism is simple; right?

14              MR. MENDELSON:  Objection.  Form.

15              THE WITNESS:  (Pause).

16  BY MR. KABA:

17      Q.   That's what we're looking at in this

18  Exhibit 2; correct?

19      A.   Right.  I'm just looking back at the

20  question to make sure.

21              (Reviews document.)

22              Can you ask the question again?



1          Q.    Yeah.

2                In this case, in response to a question

3     we asked in this litigation, the FTC identified some

4     20-odd things that would be considered to determine

5     whether or not a cancellation mechanism is simple;

6     right?

7          A.    Yes.

8          Q.    And there is not a single document that

9     you could identify for us that lists out all of

10    these criteria; correct?

11         A.    No.

12         Q.    Is that correct?

13         A.    Oh, yes, that's correct.  Sorry.

14         Q.    The FTC has never put out a document or

15    guidance saying that these are the 20 some-odd

16    things you would consider in order to determine

17    whether or not a cancellation mechanism is simple;

18    correct?

19         A.    (Pause).  I don't believe so, but I'm

20    not a hundred percent sure.

21         Q.    Okay.  Let's -- I want to ask you about

22    a couple of these.



1          A.   Sure.

2          Q.   On page 51, it says:

3               "The number of steps a consumer must

4     complete in order to cancel."

5               That's one of the things that is

6     considered in order to assess whether or not a

7     cancellation mechanism is simple; right?

8          A.   Sorry.  Where is?  Which bullet are you

9     looking at?

10         Q.   On page 51.

11         A.   51.  Okay.

12         Q.   Uh-huh.  Yeah.  It's the second bullet

13    from the top.

14         A.   Got it.

15         Q.   So one of the things the FTC identifies

16    as relevant to the inquiry to determine whether or

17    not a cancellation mechanism is simple is "The

18    number of steps a consumer must complete in order to

19    cancel"; right?

20         A.   Yes.

21         Q.   Can you tell us in an objective

22    quantifiable way what number of steps it takes for



1    simple; correct?

2         A.    Sure.

3         Q.    And what I want to know from you is:

4    Is there something out there in the guidance that

5    the FTC has published or anywhere where a business

6    could say, okay, if it takes 20 seconds or 30

7    seconds or 40 seconds or 2 minutes to get through

8    and cancel, that's simple, but if it takes more than

9    that time, it's no longer simple?

10                  MR. MENDELSON:  Objection.  Scope.

11                  THE WITNESS:  Right.  Well,

12   that -- and that's my difficulty because I think you

13   and I are using that term differently.

14                  "The length of time to cancel."

15   The time from a -- the time a consumer begins the

16   effort to cancel until they are actually

17   successfully unsubscribed from that process is what

18   I think gets looked at.

19                  To reduce it down the way the

20   question does to the number of seconds, that

21   presumes that they've already found the place, and I

22   think it's a broader inquiry than that.



1              So, but no, there is -- there is

2    no guidance there.

3    BY MR. KABA:

4         Q.   Okay.

5         A.   I just want to be -- I just want to

6    make sure we're clear.

7         Q.   So even the broader inquiry about the

8    length of time it takes to cancel, is there any

9    guidance on how long is too long in -- in order to

10   comply with ROSCA?

11                   MR. MENDELSON:  Objection.  Scope.

12                   THE WITNESS:  No.

13   BY MR. KABA:

14        Q.   Okay.

15        A.   Again, it's going to be

16   context-specific.

17        Q.   "The number of alternatives to

18   cancellation presented to a consumer seeking to

19   cancel."

20             Do you see that?

21        A.   Yes.

22        Q.   Again, same question.



1                 Is there guidance from the FTC on how

2     many alternatives to cancellation are too many in

3     order to comply with ROSCA?

4            A.   Again --

5                      MR. MENDELSON:  Same objection.

6                      THE WITNESS:  -- you're asking

7     about a single document?

8     BY MR. KABA:

9            Q.   Well, I'm asking if I want to look

10    at -- I want to present alternatives to cancellation

11    to present to a customer.

12           A.   Uh-huh.

13           Q.   Where do I look to see what are too

14    many alternatives to present versus a just right

15    amount?

16                     MR. MENDELSON:  Same objection.

17                     THE WITNESS:  So, again, there's

18    no single document.  However, if you look at the

19    cases that have been brought, the enforcement

20    actions that have been brought, whether by a consent

21    decree or through litigation, then it will outline

22    business practices that were found to violate ROSCA



1    or you enter the flow through a Google Search or an

2    Alexa search, or what have you, it's pretty quick to

3    actually cancel?

4            A.    Now, since the flow has changed in

5    April of 2023.  Again, before then, my understanding

6    is if a consumer was able to complete it at all --

7    and there's some percentage that I think is

8    identified in the complaint of people who kind of go

9    in and don't successfully cancel, but then don't use

10   their Prime benefits for -- any of their Prime

11   benefits for the next 12 months.

12           I don't know how long that took and I

13   don't know how long, you know, how many attempts

14   they needed to make before they were able to

15   successfully cancel.  That would all go into that

16   calculation.

17           Q.    What is the average number of attempts

18   any -- any person who wants to cancel Prime makes in

19   order to cancel?  Do you know?

20           A.    Again, I have not seen all of the

21   Amazon documents.  There's hundreds of thousands.

22           Q.    Okay.



1              A.    To know that.

2              Q.    What is the average amount of time that

3     it takes anyone who wants to cancel Prime through

4     any of the multiple mechanisms available to cancel?

5     Do you know?

6              A.    Can you ask it again?

7              Q.    Sure.

8                    What is the average amount of time that

9     it takes anyone who wants to cancel Prime to get

10    through any of the multiple mechanisms to cancel?

11    Do you know?

12             A.    I don't know what the data shows, no.

13             Q.    Okay.  And you understand that you can

14    also cancel by -- do you know what the average hold

15    time is when you call Amazon customer service if you

16    want to cancel that way?

17             A.    I don't know.

18             Q.    And then we talked about cancel through

19    chat; right?

20             A.    Yes.

21             Q.    And do you know what the average amount

22    of time it is is for someone to cancel when they



1    seek to cancel through chat?

2          A.    No, I do not.

3          Q.    Okay.  And then you also mentioned

4    e-mail; right?

5          A.    My understanding is that, yes, but the

6    e-mail is not located kind of in the same place.

7    So, again, they'd have -- I don't know if it's the

8    time locating the e-mail, you know, with all of

9    that, but I don't know the time from there or from

10   once they've made the e-mail.

11         Q.    The statute itself actually doesn't say

12   anything about how long it needs -- it would -- the

13   statute itself does not define a simple mechanism in

14   any respect by reference to number of clicks, number

15   of offers, length of time it takes, etc.; right?

16         A.    No.  Statute says what it says.

17         Q.    So my statement is right?

18         A.    That is correct.

19         Q.    Okay.  Would you agree with me that in

20   some context 3-click cancellation can be simple and

21   in other context the same 3-click cancellation would

22   no longer be simple?



 1                          MR. MENDELSON:  Objection.  Scope.

 2                          THE WITNESS:  Yes.

 3   BY MR. KABA:

 4          Q.   Okay.

 5          A.    In theory.

 6          Q.   And would you agree that in some

 7   context getting an offer to pause or -- or, you

 8   know, save a save offer is simple -- strike that.

 9   Let me try that again.

10              Would you agree with me that in some

11   context a company making a save offer in the

12   cancellation flow would make their cancellation flow

13   not simple, but in other context it would still be a

14   simple mechanism?

15                          MR. MENDELSON:  Objection.  Scope.

16                          THE WITNESS:   It could be.

17   Again, it depends on the offer.  It depends on where

18   it's presented in the flow.  It depends on what

19   happens if you are accepting the flow.  There's a

20   lot of context-specific factors.

21   BY MR. KABA:

22          Q.   Right.



 1   about --

 2           Q.   Okay.

 3           A.   I answered a different question.

 4   Sorry.

 5           Q.   Yes, you did.

 6                So I'll try -- I'll try it again.

 7           A.   It's late.

 8           Q.   The statute itself does not tell us how

 9   prominent the decline option needs to be; correct?

10           A.   Correct.

11           Q.   Okay.  Look at paragraph 39 of your

12   complaint.

13           A.   Yes.

14           Q.   You talk about get -- it says the

15   UPDP's orange button read "Get FREE Two-Day

16   shipping."  In February 2020, it read "Get FREE

17   Two-Day Delivery."  In some instances, the button

18   reads "Start Your 30-DAY Prime FREE Trial."

19                Right?

20           A.   Yes.

21           Q.   All true statements; correct?

22                     MR. MENDELSON:  Objection.  Form.



```
 1                    THE WITNESS:   Literally true.

 2    BY MR. KABA:

 3          Q.    Okay.

 4          A.    Yes.

 5          Q.    And let me ask you generally.

 6          A.    Uh-huh.

 7          Q.    Of all of the flows and all of the

 8    options here, in any of the enrollment flows, did

 9    Amazon make a false statement about the terms of

10    Prime, the benefits of Prime, etc.?

11          A.    We don't allege that, no.

12          Q.    Okay.  And the same is true with

13    respect to cancellation.  You're not alleging that

14    as part of the cancellation, Amazon is making false

15    statements; correct?

16          A.    (Reviews document.)

17                I'm checking one thing.

18                Ah.  Paragraph 136 of the complaint.

19    It says:

20                "You can end your Prime membership by

21    collecting -- by selecting the End Membership button

22    on this page."
```



1                But what that really did was it took

2     you into the cancellation flow.  So they said you

3     could end by selecting the button, and it did not

4     end it.

5          Q.   Well, it put you into the process to

6     end your membership; right?

7          A.   Yes.

8          Q.   And in fact on that paragraph 136, you

9     see it says on that same page:

10               "To end your Amazon Prime membership:

11    1. Go to your Prime membership. 2. Select Update,

12    Cancel, and more, and follow the on-screen

13    instructions"?

14         A.   Right, but the text says you can end by

15    selecting the "End Membership" button on this page,

16    not going to another page.  So -- so the literal

17    words are that you could click this button and end

18    your membership, and that's not what happens when

19    you click that button.

20         Q.   Okay.  So, but looking at everything

21    that's on this page, it does identify what you would

22    need to do to actually end the membership; correct?



1                    CERTIFICATE OF REPORTER

2     DISTRICT OF COLUMBIA        )

3              I, Denise Dobner Vickery, CRR, RMR and

4     Notary Public, hereby certify the witness, AMANDA

5     BASTA, was by me first duly sworn to testify to the

6     truth; that the said deposition was recorded by me

7     and thereafter reduced to printing under my

8     direction; and that said deposition is a true

9     transcript of my original stenographic notes.

10             I certify the inspection, reading and

11    signing of said deposition were NOT waived by

12    counsel for the respective parties and by the

13    witness; that I am not a relative or employee of any

14    of the parties, or a relative or employee of either

15    counsel, and I am in no way interested directly or

16    indirectly in this action.

17    CERTIFIED TO THIS 20TH DAY OF SEPTEMBER, 2024.

18                    *Denise D. Vickery*

19                    DENISE DOBNER VICKERY, CRR,RMR

20                    Notary Public in and for the
                      District of Columbia

21

22    My Commission expires:  March 14, 2028



# EXHIBIT 3

1            UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                   AT SEATTLE

4     --------------------------

5   FEDERAL TRADE COMMISSION,

6           Plaintiff,

7   V.                          No. 2:23-cv-0932-JHC

8   AMAZON.COM, INC., et al.

9           Defendant.          VOLUME II

10    --------------------------

11

12    30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                 ON BEHALF OF

14            FEDERAL TRADE COMMISSION

15

16         Wednesday, September 11, 2024

17                  8:50 AM

18

19

20

21   Reported by:  Denise Dobner Vickery, CRR, RMR

22   JOB NO.:   J11629623



```
 1                  P R O C E E D I N G S

 2                        - - -

 3              THE VIDEOGRAPHER:  This is a

 4    continuation of the deposition of Amanda Basta.  It

 5    is September 11, 2024 and the time on the monitor is

 6    8:50 AM.

 7                        - - -

 8                    AMANDA BASTA

 9    called for examination, and, having been previously

10    sworn, was examined and testified further as

11    follows:

12                        - - -

13                    EXAMINATION

14                        - - -

15    BY MR. KABA:

16         Q.   Good morning, Ms. Basta.

17         A.   Good morning.

18         Q.   You recognize or you acknowledge that

19    you're still under oath?

20         A.   Yes.

21         Q.   Okay.  Between our break yesterday and

22    our break and reconvening this morning, have you
```



 1   compliant with the law.  And it's a delicate

 2   balance, but we put information out in many, many

 3   ways to help companies do that.

 4   BY MR. KABA:

 5        Q.  So I want to focus on a couple of

 6   things you just said.

 7             You agree the FTC has not put these

 8   factors out in any publication; correct?

 9                  MR. MENDELSON:  Objection.  Scope.

10                  THE WITNESS:   We have policy

11   guidance, and I know in here we reference the

12   negative option marketing guidance regarding simple

13   cancellation mechanisms.  I don't know that we've

14   put all of those in one place in the public.

15   BY MR. KABA:

16        Q.   Okay.  So focus on my question.

17        A.   Uh-huh.

18        Q.   You agree with me --

19        A.   Uh-huh.

20        Q.   -- that the FTC has not published all

21   of these factors in any place that I could go to

22   look today, for example; correct?



1          Q.   -- reflects -- it is -- it is a

2    document issued by the Commission.  Yes?

3          A.   Yes, absolutely.

4          Q.   And it reflects the view of what is the

5    current regulatory framework for ROSCA, for the

6    telemarketing sales rule, etc.; correct?

7          A.   Yes.

8                    MR. MENDELSON:  Objection.  Scope.

9    BY MR. KABA:

10         Q.   And Exhibit 5 likewise is now the

11   Notice of Proposed Rulemaking, and as we see, it

12   also reflects the FTC's views of the current

13   regulatory framework, including with respect to what

14   ROSCA requires; correct?

15         A.   Correct.

16                    MR. MENDELSON:  Same objection.

17   BY MR. KABA:

18         Q.   Okay.  We can put -- we can put those

19   aside.

20         A.   Okay.

21         Q.   I'd like to go back, please, to the

22   FTC's complaint in this action, Exhibit 3.



```
 1          A.    Okay.

 2          Q.    Paragraph 36, please, on page 10.

 3                Are you there?

 4          A.    Yes.

 5          Q.    It says:

 6                "Amazon presents all consumers who are

 7    not Prime subscribers with at least one opportunity

 8    (also known as an 'upsell') -- and often several

 9    opportunities -- to join Prime."

10                Do you see that?

11          A.    Yes.

12          Q.    Now, nothing in ROSCA prohibits

13    presenting consumers with an opportunity or even

14    several opportunities to join a subscription

15    program; correct?

16          A.    As long as -- as long as there's

17    otherwise clear and conspicuous disclosure and

18    express informed consent, no, there's no -- there's

19    no bar.

20          Q.    Okay.  So, again, let me ask my

21    question.

22          A.    Uh-huh.
```



1        Q.    Nothing in ROSCA prohibits a company

2    from presenting an opportunity or even several

3    opportunities for a consumer to join a program like

4    Prime; correct?

5                        MR. MENDELSON:  Objection.  Form.

6                        THE WITNESS:   I would disagree

7    with that.

8    BY MR. KABA:

9        Q.    Okay.  Where in ROSCA does it say that

10   a company may not present marketing opportunities to

11   join Prime or any subscription program?

12                       MR. MENDELSON:  Same objection.

13                       THE WITNESS:   So ROSCA requires

14   clear and conspicuous disclosure of the terms of a

15   negative option program and to obtain express

16   informed consent.  Any mechanism that does not

17   achieve that is prohibited by ROSCA.

18                       So it doesn't mention upsells per

19   se, but to the extent that the upsell would deprive

20   consumers of the clear and conspicuous disclosure

21   and the express informed consent, it would be a

22   prohibited practice.



1        Q.   So my question for you is -- I don't --

2   I don't -- I'm not asking you to recite FTC

3   document.

4            I'm sorry.  I'm not asking you to

5   recite and interpret Amazon documents.  Okay?

6            Are you with me?

7        A.   Yes.

8        Q.   I want the FTC's best testimony on

9   this, and it's okay for you to say:  We don't have a

10  number.  All we have are things that we're looking

11  at in Amazon's documents.

12           But I'm entitled to that testimony.

13  I'm entitled to have a record of whether or not the

14  FTC has a number.

15       A.   And --

16       Q.   Do you -- I haven't asked you that, the

17  substantive question yet.

18           Do you understand that?

19       A.   Yes.

20       Q.   So my question for you, sitting here --

21       A.   Uh-huh.

22       Q.   -- as the FTC's person most



```
 1   knowledgeable is:  In 20 -- let me try -- let me try

 2   it a different way.

 3            The FTC contends that FTC's enrollment

 4   flow began -- I'm sorry -- violated ROSCA as -- at

 5   least as late as 2014; correct?

 6        A.   Correct.

 7        Q.   What percentage of Amazon customers in

 8   2014, that is, Prime members, were unintentional

 9   signups?

10                     MR. MENDELSON:  Objection.  Scope.

11   Same privilege instruction.

12                     THE WITNESS:  Based on the

13   privilege instruction, I cannot answer that.

14   BY MR. KABA:

15        Q.   What percentage of Amazon Prime members

16   in 2015 does the FTC contend were unintentional

17   signups?

18                     MR. MENDELSON:  Objection.  Scope.

19   Same privilege instruction.

20                     THE WITNESS:  Based on the

21   privilege instruction, I cannot answer that.

22   BY MR. KABA:
```



AMANDA BASTA Vol. II 30b6                    September 11, 2024
FTC vs AMAZON.COM, INC., et al.                              459

```
 1            Q.   And would that answer be the same for
 2    every single year up to present?
 3            A.   Yes.
 4                      MR. MENDELSON:   Same objection.
 5    BY MR. KABA:
 6            Q.   Okay.  So you are not going to tell me
 7    for any year from 2014 to present what the FTC
 8    contends is the number of Prime members that were
 9    unintentional signups; correct?
10            A.   I --
11                      MR. MENDELSON:  Objection.  Scope.
12    Asked and answered.  Same privilege instruction.
13                      THE WITNESS:   I cannot do that
14    without revealing privileged information.
15    BY MR. KABA:
16            Q.   Okay.  Same questions on cancellation.
17            The FTC contends that Amazon's Prime's
18    cancellation flow violated ROSCA from 2016 forward;
19    correct?
20            A.   Correct.
21            Q.   What percentage of Prime members found
22    the cancellation flow not simple in 2016?
```



1                       MR. MENDELSON:  Objection.  Scope.

2      Same privilege instruction.

3                       THE WITNESS:   I can't answer that

4      without revealing privileged information.

5      BY MR. KABA:

6           Q.   What percentage of Amazon Prime members

7      found the cancellation flow not simple in 2017?

8                       MR. MENDELSON:  Same objection and

9      instruction.

10                      THE WITNESS:   I can't answer that

11     without revealing privileged information.

12     BY MR. KABA:

13          Q.   And is that answer the same for every

14     year from 2016 all the way to present if I asked you

15     what percentage of Amazon Prime members found the

16     cancellation flow not simple?

17                      MR. MENDELSON:  Same objection and

18     instruction.

19                      THE WITNESS:   I can't answer that

20     without revealing privileged information.

21     BY MR. KABA:

22          Q.   Okay.  I asked you about unintentional



 1  things that you identified would provide notice to

 2  Mr. Lindsay, Mr. Ghani, or Mr. Grandinetti about

 3  that they may be individually liable for ROSCA or

 4  Section 5 violations, are you aware of any evidence

 5  that they read or were even aware of those things?

 6          A.    Not that I'm aware of.

 7          Q.    Okay.  Do you know whether

 8  Mr. Grandinetti, Mr. Ghani, or Mr. Lindsay had even

 9  read the text of ROSCA?

10          A.    Not that I'm aware of.  Like I said,

11  there is a substantial number of documents that were

12  recently produced.  I don't know whether there is

13  anything in there or not.

14          Q.    Okay.  But sitting here today as the

15  person most knowledgeable, are you aware whether any

16  of these individuals had even read the text of

17  ROSCA?

18          A.    Not that I'm aware of.

19          Q.    And indeed, as we've established now,

20  it wasn't until March of 2021 when the FTC first

21  told Amazon that it was even investigating whether

22  there may be a violation of ROSCA; correct?



  
```
 1            A.   Correct.

 2            Q.   And even in March 2021, as you've

 3   established, you didn't tell Amazon or anybody,

 4   Amazon, you are violating ROSCA, you just said,

 5   we're looking into whether or not you are; correct?

 6            A.   Correct.

 7            Q.   Okay.  Have you ever met any of

 8   Mr. Lindsay, Mr. Ghani, or Mr. Grandinetti?

 9            A.   No.  When they came in, I was on leave.

10            Q.   Okay.  Now, you -- the FTC has

11   contended that the flows violated ROSCA for

12   enrollment beginning in 2014; right?

13            A.   Yes.

14            Q.   When -- are you aware of whether any of

15   Mr. Lindsay, Mr. Ghani, or Mr. Grandinetti was

16   involved in the enrollment flows in any way in 2014?

17            A.   I'd have to look at the complaint.

18            Q.   I would like you to.  Why don't you go

19   ahead and look at the complaint with the following

20   question in mind.

21            A.   Sure.

22            Q.   Were Mr. -- was either of Mr. Lindsay,
```



1    Mr. Ghani, or Mr. Grandinetti involved in any way

2    with the enrollment flows in 2014 when the FTC

3    contends they began violating ROSCA?

4            A.    Okay.

5                  (Reviews document.)

6                  So as alleged in the complaint,

7    Mr. Lindsay.  He was senior Amazon executive since

8    2010, but had most responsibility for Prime from

9    February 18 -- February 2018 to November of 2021.

10   So -- and it says from February '18 through November

11   2021.  So that's where the allegations against him

12   begin.

13                  With Mr. Grandinetti, it's January 1,

14   2018, and with Mr. Ghani it is 2019.

15           Q.    So if you go back -- if you go --

16           A.    So not -- not 2014.

17           Q.    All right.  So let me just ask you my

18   question again.

19           A.    Uh-huh.

20           Q.    So I can get my -- get -- get your best

21   response.  And we can break them down one by one.

22           A.    Sure.



1          Q.    Does the FTC have any evidence that

2     Mr. Lindsay was involved in any way with the

3     enrollment flows in 2014 when the FTC contends they

4     began violating ROSCA?  Yes or no.

5          A.    That's not the allegation, no.

6          Q.    Does the FTC have any evidence that

7     Mr. Ghani was involved in any way with the

8     enrollment flows in 2014 when the FTC contends they

9     began violating ROSCA?

10         A.    That's not the allegation against him,

11    no.

12         Q.    Does the FTC have any evidence that

13    Mr. Grandinetti was involved in any way with the

14    enrollment flows in 2014 when the FTC contends they

15    began violating ROSCA?

16         A.    That's not the allegation against him,

17    no.

18         Q.    The FTC contends that the cancellation

19    flows for Prime began violating ROSCA at least as

20    late as 2016; right?

21         A.    Yes.

22         Q.    Does the FTC have any evidence that



1    Mr. Lindsay was involved in any way with the

2    cancellation flows in 2016?

3            A.    That's not the allegation against him,

4    no.

5            Q.    Does the FTC have any evidence that

6    Mr. Ghani was involved in any way with the

7    cancellation flows in 2016?

8            A.    That's not the allegation against him.

9    So, no.

10           Q.    And does the FTC have any evidence that

11   Mr. Grandinetti was involved in any way with the

12   cancellation flows in 2016?

13           A.    That's not the allegation against him.

14           Q.    Okay.

15           A.    No.

16           Q.    Would you agree with me, Ms. Basta,

17   that ROSCA compliance creates challenges even for

18   those who are trying to comply with the law?

19           A.    It can, yes.

20           Q.    And that's partly because the statute

21   just -- the statute is pretty short and doesn't

22   define any of its key terms; right?



1           A.    (Pause).

2           Q.    We talked about that yesterday.

3                      MR. MENDELSON:  Objection.  Form.

4    BY MR. KABA:

5           Q.    I'll break that out for you.

6           You would agree with me that the ROSCA

7    statute uses several key terms; correct?

8           A.    Yes.

9           Q.    "Clear and conspicuous," "material,"

10   "express informed consent," "simple mechanisms," all

11   key terms of ROSCA; correct?

12          A.    Correct.

13          Q.    None of them is defined in the statute;

14   correct?

15          A.    Correct.

16          Q.    And as we've talked about over the

17   course of the day yesterday and this morning, one

18   would have to look at lots of potentially different

19   sources to try to figure out what those terms mean?

20          A.    There are lots of sources available

21   to -- to assist in the understanding, yes.

22          Q.    And so even those who would want to



```
 1    comply with ROSCA and intend to contend with ROSCA
 2    may find themselves noncompliant?
 3                     MR. MENDELSON:  Objection.  Scope.
 4                     THE WITNESS:  Correct.
 5    BY MR. KABA:
 6         Q.   Okay.  Do you think that any provision
 7    of ROSCA needs clearer guardrails for industry in
 8    order to try to ensure compliance?
 9                     MR. MENDELSON:  Objection.  Scope.
10                     THE WITNESS:  No.
11    BY MR. KABA:
12         Q.   Ms. Basta, in Exhibit 2, we talked
13    through 20 some-odd non-exhaustive factors that
14    would be considered for -- to determine whether or
15    not something is a simple cancellation mechanism;
16    right?
17         A.   To help evaluate, yes.
18         Q.   Yeah.
19              Do you know whether any of the
20    individual defendants had knowledge of that the FTC
21    considers these factors to evaluate whether or not a
22    cancellation mechanism is simple?
```



```
 1              A.   I don't know.

 2              Q.   Okay.  We talked -- do you know if

 3    there's any appellate court precedent that defines

 4    the terms used in ROSCA as opposed to just district

 5    court precedent?

 6                   MR. MENDELSON:  Objection.  Scope.

 7                   THE WITNESS:   So I know -- oh,

 8    well, on materiality, there's loads and loads of

 9    case law from the Seventh Circuit in FTC v. Kraft.

10    BY MR. KABA:

11              Q.   Was that a ROSCA case?

12              A.   It was not but, again, materiality

13    is -- is a frequent term in -- in virtually all FTC

14    cases.

15              Q.   Clear and conspicuous is also.

16    Even -- even clear and conspicuous is also a term

17    that courts have interpreted in -- in lots of

18    different contexts; correct?

19              A.   Correct.

20              Q.   With contract enforcement, regulatory

21    guidance, etc.; right?

22              A.   Sure.
```

1          Q.   It's been the basis of your -- much of

2    your testimony over the last day and a half; right?

3          A.   Yes.

4          Q.   And the reason we have that is because

5    Amazon itself decided to -- to direct employees to

6    go and get that information; right?

7          A.   Correct, and claim Mr. Ghani --

8    Mr. Ghani and Mr. Lindsay and Mr. Grandinetti, yes.

9          Q.   Right.

10              In fact, even the individual defendants

11   were telling their teams go and find out what was

12   frustrating customers; correct?

13         A.   Correct.

14         Q.   And even these individual teams were

15   telling their teams, spend more time, get more data,

16   look at how we can do things differently to improve;

17   correct?

18         A.   Correct.

19         Q.   Okay.  And apart from -- well, let me

20   just ask you.

21         A.   Uh-huh.

22         Q.   There's -- there's -- you have made the



1  sort of general statement about Mr. Lindsay had the

2  ability to control Amazon's noncompliance with

3  ROSCA; right?

4        A.   Correct.

5        Q.   Other than that, can you identify

6  specific decisions that he controlled that the FTC

7  contends violate ROSCA or Section 5?

8        A.   (Reviews document.)

9             The actions that are outlined in the

10 complaint at paragraphs -- based on his

11 timing -- 188 through 225, I believe.

12       Q.   Okay.  Is that -- if I asked you that

13 question with respect to Mr. Ghani, can you identify

14 specific decisions that Mr. Ghani controlled that

15 the FTC contends violated ROSCA or Section 5?

16       A.   Again, the -- the allegations in the

17 complaint from -- in paragraphs 188 through 225.

18       Q.   Same question for Mr. Grandinetti.

19            Can you identify specific decisions

20 that Mr. Grandinetti controlled that the FTC

21 contends violated ROSCA or Section 5?

22            A.   I think with respect to



```
1   Mr. Grandinetti, it's the actions identified at
2   paragraphs 202 to 225.
3           Q.   Okay.
4           A.   Actually, 226 for all of those answers.
5   Sorry.
6           Q.   Okay.  Going back to the September 2020
7   flows that were put in place, do you know -- strike
8   that.
9           Is it possible that those September
10  2020 flows actually made Amazon's flows less
11  compliant with ROSCA than more compliant?
12          Do you know one way or the other?
13          A.   I don't know one way or the other.
14          Q.   Okay.  Paragraph 188 there's no
15  reference to any -- to Mr. Lindsay and Mr. Ghani or
16  Mr. Grandinetti in that paragraph; correct?
17          A.   Correct.  It's the beginning of a -- of
18  a section discussing the decisions he was -- that
19  Mr., I believe, Lindsay and Ghani were involved in
20  in 2018.  It's kind of the context for it.
21          Q.   Okay.  So but my -- I didn't ask you --
22          A.   Right.
```



1          Q.    -- about the context.

2                I actually had asked you, what specific

3    decisions does the FTC contend any of the individual

4    defendants controlled that caused ROSCA or Section 5

5    liability, and you identified for me paragraphs 188

6    to 226; correct?

7          A.    Right, because that's the beginning of

8    the section discussing the decisions that were made

9    in 2018.  That's why I started there.

10         Q.    Okay.  But paragraph 188 itself --

11         A.    Uh-huh.

12         Q.    Sorry.  Just -- just to be clear.

13               I asked you what specific decisions

14   does the FTC contend any of the individual

15   defendants controlled that caused ROSCA or Section 5

16   liability, and you identified the FTC's allegations

17   at paragraph 188 to 226 for all -- for both

18   Mr. Lindsay and Mr. Grandinetti -- I'm

19   sorry -- Mr. Lindsay and Mr. Ghani; correct?

20         A.    Correct.

21         Q.    And then for Mr. Grandinetti, when I

22   asked you what specific decisions does the FTC



1        Q.   Okay.  And so you also understand -- I

2   think you've actually identified, including in the

3   paragraph we were just looking at -- that the

4   individual defendants at Amazon were trying to

5   understand whether those anecdotes were a real or

6   widespread issue or if they were isolated or

7   anecdotal pieces of information about customer

8   confusion?

9        A.   I know they were taking actions to

10  study it.  I'm not jumping into their heads and

11  trying to figure out motivation.  That's -- that's

12  the distinction I'm making is.

13       Q.   Okay.  You can't jump into any of the

14  individuals' heads in this case; correct?

15       A.   No.

16       Q.   Is that correct?

17       A.   Oh, yes.  Correct.

18       Q.   Just like you can't jump into the heads

19  of consumers; correct?

20       A.   Correct.

21       Q.   Okay.  It is the FTC's position that by

22  the time Mr. Lindsay, Mr. Ghani, and Mr. Grandinetti



1   got involved in Amazon Prime that the -- both the

2   enrollment and the cancellation flows were already

3   noncompliant with ROSCA; right?

4          A.   Correct.

5          Q.   Do you know if Mr. Lindsay, Mr. Ghani,

6   or Mr. Grandinetti were ever presented with a ROSCA

7   compliant flow and asked to implement that flow?

8          A.   I don't know one way or the other.

9          Q.   Do you know if Mr. Lindsay, Mr. Ghani,

10  or Mr. Grandinetti ever rejected the implementation

11  of a ROSCA compliant flow on enrollment or

12  cancellation?

13         A.   I don't know one way or the other.

14         Q.   Do you know if anyone at Amazon ever

15  was able to come up with a ROSCA compliant flow for

16  enrollment or cancellation?

17         A.   Not to my knowledge.

18         Q.   And we have already established that

19  the FTC, even to this day, has never told Amazon, do

20  the following things and your flow will be ROSCA

21  compliant; correct?

22                    MR. MENDELSON:   Objection.   Scope.



```
 1                    THE WITNESS:  Correct.

 2    BY MR. KABA:

 3          Q.   Okay.  Going back to the complaint

 4    then.

 5               So 192 we referenced Mr. Lindsay, but

 6    that's actually in the context of him trying to get

 7    more information about customer frustrations; right?

 8          A.   Him asking researchers to conduct a

 9    review, correct.

10          Q.   And paragraph 193 does not refer to

11    Mr. Lindsay or Mr. Ghani; right?

12          A.   No, but it's describing the research

13    that was undertaken in response to Mr. Lindsay's

14    request.

15          Q.   Okay.  Paragraph 193 does not refer to

16    Mr. Lindsay or Mr. Ghani; correct?

17          A.   Correct.

18          Q.   Paragraph 194 does not refer to

19    Mr. Ghani, but it does refer to Mr. Lindsay; right?

20          A.   Correct.

21          Q.   It refers to Mr. Lindsay with respect

22    to him receiving a memo; correct?
```



1        Q.   But not with respect to any decision

2   that he made.

3             He's just referenced as somebody who

4   got involved, according to this, in 2019; is that

5   right?

6        A.   Well, both -- both Prime and the

7   Shopping Design Organizations were meeting with

8   Mr. Grandinetti.  My understanding is he kind of sat

9   over, that the meeting was -- was so that he could

10  be presented with -- with the issue.  That it was

11  being escalated to him I think is the term that was

12  used.

13       Q.   Is Mr. Grandinetti responsible

14  for -- in 2019 was Mr. Grandinetti -- did

15  Mr. Grandinetti have authority to make decisions for

16  Prime?

17       A.   Sorry.  I'm looking at the description

18  of his responsibilities.

19             (Reviews document.)

20             I know as part of the Shopping Design

21  Organization -- his responsibilities with respect to

22  the Shopping Design Organization, he controlled



 1  practices relating to checkout, including things

 2  that appeared like within the checkout flow.

 3  Whether that -- whether that gave him authority over

 4  Prime itself or to make decisions relating to

 5  Prime's appearance in the checkout flow, I'm not

 6  sure.

 7          Q.   Okay.  When, if ever, did

 8  Mr. Grandinetti have the authority to make decisions

 9  relating to Prime's appearance in or either on the

10  enrollment flow side or the checkout flow side?

11          A.   My understanding is that that was part

12  of his -- that was part of his responsibilities with

13  respect to the Shopping Design Organization.

14          Q.   When -- so let me try my question

15  again --

16          A.   Uh-huh.

17          Q.   -- which is a temporal question.

18          A.   Uh-huh.

19          Q.   When, if ever, did Mr. Grandinetti have

20  the authority to make decisions regarding either the

21  enrollment flow or the cancellation flow?

22          A.   I don't -- the cancellation flow aside,



1    with respect to the enrollment flow, my

2    understanding would be that he would -- he would

3    have at least some control over that from January

4    2019 when he became in charge of the Shopping Design

5    Organization.

6         Q.   What amount of -- you said "some

7    control."

8              What amount of control is necessary in

9    order to hold an individual liable under ROSCA or

10   the FTC Act?

11        A.   Just --

12                  MR. MENDELSON:  Objection.  Scope.

13                  THE WITNESS:  -- authority to

14   control.

15   BY MR. KABA:

16        Q.   But authority to control a piece?

17   Authority to control all?

18        A.   Authority to control a practice.

19        Q.   But so if -- if the person had the

20   authority to say do this or don't do this, then they

21   could be held liable?

22                  MR. MENDELSON:  Objection.  Scope.



```
 1                    THE WITNESS:  Yes.

 2   BY MR. KABA:

 3        Q.   Okay.  And if they had authority to say

 4   it, but somebody else could veto it, could the

 5   person still be liable?  That is, they don't have

 6   the final authority.  Does that make sense?

 7        A.   Yes.

 8                    MR. MENDELSON:  Objection.  Scope,

 9   but go ahead.

10                    THE WITNESS:   I think it would

11   depend on the facts, but I think they could.

12   BY MR. KABA:

13        Q.   So if somebody had the authority to

14   say, we should do X, and then somebody else says,

15   no, we're not going to do X, even the person who

16   just had the authority to say, we should do X,

17   subject to a veto, could be held liable according to

18   you?

19                    MR. MENDELSON:  Objection.  Scope.

20   Vague.

21                    THE WITNESS:   Again, it depends

22   on the facts, but authority to control is one of the
```



1                    CERTIFICATE OF REPORTER

2     DISTRICT OF COLUMBIA        )

3              I, Denise Dobner Vickery, CRR, RMR and

4     Notary Public, hereby certify the witness, AMANDA

5     BASTA, was by me first duly sworn to testify to the

6     truth; that the said deposition was recorded by me

7     and thereafter reduced to printing under my

8     direction; and that said deposition is a true

9     transcript of my original stenographic notes.

10             I certify the inspection, reading and

11    signing of said deposition were NOT waived by

12    counsel for the respective parties and by the

13    witness; that I am not a relative or employee of any

14    of the parties, or a relative or employee of either

15    counsel, and I am in no way interested directly or

16    indirectly in this action.

17    CERTIFIED TO THIS 23RD DAY OF SEPTEMBER, 2024.

18

19                    _Denise D. Vickery_
                      DENISE DOBNER VICKERY, CRR, RMR
20                    Notary Public in and for the
                      District of Columbia

21

22    My Commission expires:  March 14, 2028



# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF WASHINGTON

 3                      AT SEATTLE

 4  FEDERAL TRADE COMMISSION,

 5                  Plaintiff,

 6  vs.                          No. 2:23-cv-0932-JHC

 7  AMAZON.COM, et al.

 8                  Defendants.

 9  _____/

10

11     The Above-Captioned Video-Recorded Deposition of

12                MARSHINI CHETTY, Ph.D.

13              9:23 a.m. - 6:31 p.m.

14                  April 28, 2025

15

16

17

18

19

20

21

22

23  REPORTED BY:

24  STEVEN POULAKOS, RPR

25  JOB NO:  J12762346
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        5

```
 1                   P R O C E E D I N G S

 2                           - - -

 3              THE VIDEOGRAPHER:  This is tape number one

 4    in the videotaped deposition of Marshini Chetty in the

 5    matter of Federal Trade Commission versus Amazon.com,

 6    Inc., et al. being heard before the United States

 7    District Court, Western District of Washington at

 8    Seattle, Case Number 2:23-CV-0932-JHC.

 9              This deposition is being held at 400

10    Seventh Street, Southwest, Washington, D.C. on April

11    28th, 2025, at 9:23 a.m.  My name is Nathan Kane and

12    I'm the videographer.  The court reporter is Steven

13    Poulakos.

14              Counsel, will you please introduce

15    yourselves and affiliation and the witness will be

16    sworn.

17              MR. KABA:  Moez Kaba, Cassidy O'Sullivan on

18    behalf of the defendants.

19              MS. JERJIAN:  Olivia Jerjian on behalf of

20    plaintiff, the Federal Trade Commission, and I'm here

21    with my paralegal, Johana Mejia-Portillo.

22    Whereupon,

23                   MARSHINI CHETTY, Ph.D,

24    called as a witness, having been first duly sworn to

25    tell the truth, the whole truth, and nothing but the
```



1   truth, was examined and testified as follows:

2              EXAMINATION BY MR. KABA

3        Q     Good morning, Dr. Chetty.

4        A     Good morning.

5        Q     Have you been deposed before?

6        A     No.

7        Q     All right.  So let me -- I'm sure you've

8    gone over some ground rules with counsel here, but let

9    me go over some for you.  We're making a record, so all

10   of your responses need to be audible.  I see you

11   nodding your head.  So that's rule number one.  We need

12   audible responses.

13       A     Okay.

14       Q     If you don't understand a question that I

15   have asked you, you should feel free to ask me to

16   clarify and I'll try to do that.  But if you go ahead

17   and respond to the question, me and everybody that is

18   watching the video or reading the transcript will

19   understand that you understood the question; is that

20   fair?

21       A     That sounds fair.

22       Q     Because we're taking a written record of

23   everything that's being said, it's going to be

24   important that you allow me to finish asking my

25   questions, you allow counsel to finish any objections



 1  offer at trial.  So that's what I'm trying to figure

 2  out.  Do your reports reflect the entirety of the

 3  opinions you intend to offer in this case at trial?

 4          MS. JERJIAN:  Objection, form.

 5          THE WITNESS:  Based on my understanding of

 6  these are the main opinions I'm putting forward, then

 7  I'd say as far as I know, they are, yes.

 8  BY MR. KABA:

 9      Q    Is there some place else I should be

10  looking to find out if you're going to offer some other

11  opinion at trial?

12      A    No.

13      Q    Okay.  So let's -- let me mark your opening

14  report.

15          (Chetty Exhibit MC2 was marked for purposes

16  of identification.)

17  BY MR. KABA:

18      Q    I'll mark as MC2 a document titled expert

19  report of Marshini Chetty, Ph.D. which is a 111-page

20  document.

21          Dr. Chetty, we'll spend some time today

22  going through your report, but I have some high level

23  questions for you first.  Do you see on the first page

24  of MC2, your expert report, you -- you identify the

25  three topics on which you were asked to render an

MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        43

```
1   expert opinion, right?

2       A      I'm just reading.

3              (Reviewing document.)

4              Yes.  I read that.  Is -- your question is

5   these are the three things I was asked to do.

6       Q      Correct.

7       A      Yes.

8       Q      And we've already established that you

9   didn't actually have any consumers go through the

10  Amazon enrollment or cancellation flows, right?

11             MS. JERJIAN:  Objection, form.

12             THE WITNESS:  Again, I believe I answered

13  that I had no users go through the process on the

14  Amazon website on mobile and desktop.

15  BY MR. KABA:

16      Q      So my answer is correct?

17             MS. JERJIAN:  Objection, form.

18             THE WITNESS:  Again, if you're asking me if

19  I had users going through the Amazon Prime enrollment

20  and cancellation on the Amazon website mobile and

21  desktop, then, no.

22  BY MR. KABA:

23      Q      No, you did not?

24             MS. JERJIAN:  Objection, form.

25             THE WITNESS:  No, I did not do what?
```



MARSHINI CHETTY, PH.D.                                        April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        44

1  BY MR. KABA:

2      Q      I said so my answer is correct and then you

3  said no.  So then that confused me, so I don't think

4  that's your intention.

5      A      I'm sorry.  I wasn't -- I said no, I did

6  not conduct any studies of users going through the

7  Amazon Prime enrollment process on the Amazon website

8  and the Amazon Prime cancellation process on the Amazon

9  website, on Amazon website mobile and desk.

10     Q      Mobile or desktop?

11     A      Mobile or desktop.

12     Q      You didn't even present users with the --

13 forget about having them go through it on the website.

14 You didn't conduct any study where you presented users

15 with the actual Amazon flows that are at issue in this

16 case even in kind of a paper or static form, correct?

17             MS. JERJIAN:  Objection, form.

18             THE WITNESS:  If you're asking me if I

19 showed users pictures of the Amazon Prime enrollment

20 process in a paper format, then I would say no.

21 BY MR. KABA:

22     Q      You did not?

23     A      Again, I did not show any users the paper

24 format of the Amazon Prime enrollment process on the

25 Amazon website in a paper format.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        45

1        Q      Okay.  You then describe that you conducted
2    what you call a cognitive walkthrough.  Do you see
3    that?
4        A      Yes.
5        Q      And the cognitive walkthrough you're
6    referring to is your CandyForever experiment; is that
7    right?
8              MS. JERJIAN:  Objection, form.
9              THE WITNESS:  No.
10   BY MR. KABA:
11       Q      Okay.  So what is the cognitive walkthrough
12   you're referring to?
13       A      It is an inspection method.
14       Q      So it's something that you did?
15             MS. JERJIAN:  Objection, form.
16             THE WITNESS:  Yes.
17   BY MR. KABA:
18       Q      So how often have you conducted these
19   quote, unquote cognitive walkthroughs?
20             MS. JERJIAN:  Objection, vague.
21             THE WITNESS:  Like do you mean what time
22   period?
23   BY MR. KABA:
24       Q      No.  Like how many times have you conducted
25   a cognitive walkthrough for purposes of rendering an



 1  few questions at a time.

 2  BY MR. KABA:

 3      Q      I'm asking you when you have done the same

 4  thing you have done in this case as you have identified

 5  as the first thing you did in this case?

 6              MS. JERJIAN:  Objection.

 7              THE WITNESS:  Right.  Well, I have not

 8  conducted the exact cognitive walkthrough of the

 9  enrollment and checkout process on Amazon or

10  cancellation aside from in this case.

11  BY MR. KABA:

12      Q      I'm not asking you only about on Amazon.

13  I'm asking you for any other subscription service.

14      A      Yes.

15      Q      When have you conducted a cognitive

16  walkthrough to evaluate the design of the enrollment

17  points within the checkout process and cancellation

18  interfaces from the viewpoint of a consumer?

19              MS. JERJIAN:  Objection, form.  Are you

20  asking about the checkout process?

21              MR. KABA:  You can state your objection.

22  The witness can -- she's very capable of asking me for

23  clarification.

24              MS. JERJIAN:  Objection.

25              You can answer.



```
 1              MR. KABA:  Your objection was to form and I
 2      have it.
 3              MS. JERJIAN:  Okay.
 4      BY MR. KABA:
 5          Q     Go ahead, Dr. Chetty.
 6          A     Sorry.  So to remind myself of your
 7      question, you're asking me if I've conducted a
 8      cognitive walkthrough of an enrollment process in
 9      another interface aside from Amazon, not in this case
10      and you're asking me when.  Well, one example would be
11      in, let's see, 2023/2024.
12          Q     What -- what was the website that you
13      conduct this cognitive walkthrough to evaluate the
14      design of the enrollment points within a checkout
15      process in 2023 or 2024?
16          A     Well, again, I'm not sure if it's a
17      checkout process, but I looked at the subscription
18      process in Netflix.
19          Q     So Netflix is one example, but you don't
20      even know if that was in a checkout process or not?
21          A     Well, it's in a subscription process which
22      is slightly different than a checkout process.
23          Q     Okay.  So if you want -- let's start by
24      focusing on my question which is dependent on the words
25      that you used on this page.
```



1     A     Okay.

2     Q     I want to know in what other examples you

3   have conducted a -- and we can break it down from

4   enrollment and cancellation.  Okay?  Do you understand?

5     A     Yes.  Okay.  Yes.

6     Q     Okay.  I want to know when have you

7   conducted a cognitive walkthrough to evaluate the

8   design of the enrollment points within a checkout

9   process apart from in this case with Amazon.

10           MS. JERJIAN:  Objection, form.

11           THE WITNESS:  Again, if I'm

12   understanding -- if you're asking me if I went through

13   the exact same process that I did in this case of the

14   Amazon Prime enrollment process and have I done that in

15   another instance in this exact same -- you know, for

16   this reason of checking if the design was confusing or

17   whether it can base information, then I would say I'm

18   not sure.  I don't think I've done this exact same

19   thing.

20   BY MR. KABA:

21     Q     Okay.  So you can't think of another

22   instance in -- at least with respect to enrollment

23   where you have done the same thing that you have done

24   in this case?

25     A     Mimicked an exact checkout process like



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                         55

 1  Amazon Prime and a cognitive walkthrough like that, no.

 2      Q       And you can't think -- can you think of --

 3  even if it wasn't the exact same -- you keep adding

 4  that word.  Can you think of any instance in which you

 5  have performed a cognitive walkthrough to evaluate the

 6  design of the enrollment points within a checkout

 7  process?

 8              MS. JERJIAN:  Objection, vague as to

 9  checkout process.

10              THE WITNESS:  Again, if you're asking me

11  again about -- see, it's hard to say because I'm not

12  sure if you're referring to teaching or whatever.

13  BY MR. KABA:

14      Q       I'm referring to what you did in this case,

15  Dr. Chetty.

16      A       Right.  Right.

17      Q       So let me explain to you why I'm doing this

18  to help you, give you clarity.

19      A       Okay.  Sure.

20      Q       If you have done this -- the thing you are

21  doing here in other context, I'm allowed to know about

22  that.  I'm allowed to ask you about those other things

23  that you have done.  I'm allowed to see whether you

24  applied the same principles in the same way.  That's

25  what -- that's a part of exploring an expert's bias and



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       56

1    expert's replicability of their work, an expert's

2    experience doing the work.  If the answer is I have not

3    done this in a way that I can recall right now, I'm

4    also allowed to know that.  That's why I'm asking you.

5         A       Okay.

6         Q       I'm not asking you have you shown a case

7    study in a classroom, right?  Like that's not you

8    conducting the cognitive walkthrough that you purport

9    to have done in this case.  So I want you to think

10   about the principles, methodology and application of

11   that methodology to this case --

12        A       I see.

13        Q       -- that you have captured in your sentence

14   here that starts with the word first.

15        A       Okay.

16        Q       Okay.  With that, do you understand all of

17   that?

18                MS. JERJIAN:  Objection, form.

19                THE WITNESS:  I think so.

20   BY MR. KABA:

21        Q       Okay.  So what I would like to know is can

22   you name for me even one other instance in which you

23   have conducted a cognitive walkthrough to evaluate the

24   design of the enrollment points within a checkout

25   process?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      57

1           MS. JERJIAN:  Objection, form.

2           THE WITNESS:  Again, based on my

3    recollection if you're asking about research papers or

4    studies -- I'm not sure if you're asking about

5    published studies or not published studies.  I haven't

6    done this exact same cognitive walkthrough of a

7    checkout process like the Amazon Prime checkout

8    process.

9    BY MR. KABA:

10       Q       Have you done a cognitive walkthrough to

11   evaluate the design of the cancellation interfaces in

12   the way that you have done in this case?

13           MS. JERJIAN:  Objection, form.

14           THE WITNESS:  Again, I'm not sure if you're

15   asking about just other than Amazon Prime and for what

16   purpose, but based on my recollection, I haven't done

17   the exact cancellation process like on Amazon for a

18   publication.

19   BY MR. KABA:

20       Q       For any reason?

21       A       To my knowledge, no.

22       Q       Okay.  The same thing.  You added all of

23   these qualifications about enrollment process.  To your

24   knowledge, have you done a cognitive walkthrough to

25   evaluate the design of the enrollment points within a



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        58

1  checkout process for any purpose?

2              MS. JERJIAN:  Objection, form, asked and

3  answered.

4              THE WITNESS:  Again, I mentioned I haven't

5  done that exact checkout process like on Amazon Prime

6  for a study purpose like a research publication or a

7  cancellation process like for a research publication of

8  an exact checkout or cancellation process like Amazon.

9  BY MR. KABA:

10     Q     I'm not -- okay.  Put aside the purpose

11  whether it's a research publication or a study.  Have

12  you done it for any other purpose what you purport to

13  have done in this case?

14              MS. JERJIAN:  Objection, form.

15              THE WITNESS:  Well, sometimes we do it when

16  we're evaluating interfaces we're studying, yes.

17  BY MR. KABA:

18     Q     Okay.  So name for me something that you

19  have done outside of the research study or publication

20  context where you have conducted a cognitive

21  walkthrough to evaluate the design of the enrollment

22  points within a checkout process.

23              MS. JERJIAN:  Objection, form.

24              THE WITNESS:  Well, again, that would -- I

25  have conducted studies like this in the past often in



MARSHINI CHETTY, PH.D.                                        April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                          59

1    preparation for research publications that we're doing.

2    One example, you know, as I mentioned is not quite a

3    checkout process, but I looked at something different,

4    subscription process.

5    BY MR. KABA:

6         Q     So do you remember what my question was?

7         A     No.

8         Q     Okay.  So let's try to focus on -- it's

9    going to be a much longer day -- it's going to be a

10   long day anyway.

11        A     Okay.

12        Q     It's going to feel even longer if you don't

13   try to keep my questions in mind.  So I'll ask you

14   to -- I'll ask you to try to do that.

15        A     Okay.

16        Q     I would like to know if for any purpose

17   whatsoever you have conducted a cognitive walkthrough

18   to evaluate the design of the enrollment points within

19   a checkout process, yes or no?

20              MS. JERJIAN:  Objection, form, asked and

21   answered.

22              THE WITNESS:  Again, I think I mentioned

23   that I haven't done the exact similar thing.

24   BY MR. KABA:

25        Q     You're -- Dr. Chetty, you're adding words



MARSHINI CHETTY, PH.D.                                   April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      60

1    to my question.  Listen to my question, please.  For

2    any purpose whatsoever, have you conducted a cognitive

3    walkthrough to evaluate the design of enrollment points

4    within a checkout process, yes or no?

5                    MS. JERJIAN:  Objection, form, asked and

6    answered.

7                    THE WITNESS:  I did answer this.  I'm going

8    to say no.

9    BY MR. KABA:

10       Q       For any purpose whatsoever, have you

11   conducted a cognitive walkthrough to evaluate the

12   design of cancellation interfaces, yes or no?

13       A       No.

14                   MS. JERJIAN:  Objection, form, asked and

15   answered.

16   BY MR. KABA:

17       Q       Okay.  You then have -- so that was first.

18   Later in that paragraph, you say second I conducted a

19   think aloud study which is an empirical qualitative

20   user study to understand consumers' experiences

21   navigating Prime enrollment within the checkout process

22   and Prime cancellation.  Do you see that?

23       A       Yes.

24       Q       And the think aloud studies are your

25   CandyForever study, correct?



1      A      Correct.

2      Q      You did not actually use the Prime website

3  on desktop or mobile app for the purposes of this

4  study, correct?

5              MS. JERJIAN:  Objection, form.

6              THE WITNESS:  So you're asking me if we

7  used the exact Amazon shopping website itself for the

8  study and I'm saying no.

9  BY MR. KABA:

10     Q      I'm not even asking you about the exact

11  Amazon shopping website.  You didn't use any Amazon

12  shopping website for purposes of your think aloud

13  study, correct?

14     A      Correct.

15     Q      How many times have you conducted a think

16  aloud study to understand consumers' experiences

17  navigating enrollment within a checkout process?

18              MS. JERJIAN:  Objection, form.

19              THE WITNESS:  Again, do you mean consumers

20  experiencing -- I'm assuming you mean not on Prime.

21  BY MR. KABA:

22     Q      Well, this study you conducted wasn't on

23  Prime either, right?

24              MS. JERJIAN:  Objection, form.

25              THE WITNESS:  Again, this study was



 1  process.  Okay?  Listen to my question, please, Dr.

 2  Chetty.

 3       A     Okay.

 4       Q     Have you ever conducted for any purpose a

 5  think aloud study to understand consumers' experiences

 6  navigating a checkout process?

 7             MS. JERJIAN:  Objection, form.

 8             THE WITNESS:  Not to my knowledge have I

 9  conducted something that mimics this exact same thing.

10  BY MR. KABA:

11       Q     You keep adding exact same process and I'm

12  telling you to stop considering my question as about

13  the exact same process.

14       A     Okay.

15       Q     I will try my question now for the third

16  time with that same request.  Okay?

17       A     Okay.

18       Q     Let me try the question one more time.

19       A     Okay.

20       Q     Have you ever conducted a think aloud study

21  to understand consumers' experiences navigating

22  enrollment within a checkout process, yes or no?

23             MS. JERJIAN:  Objection, form, asked and

24  answered.

25             THE WITNESS:  No.



 1   BY MR. KABA:

 2      Q      Have you ever conducted a think aloud study

 3   to understand consumers' experiences navigating

 4   cancellation, yes or no?

 5               MS. JERJIAN:  Objection, form, asked and

 6   answered.

 7               THE WITNESS:  Again, I mentioned it again,

 8   but I'm going to say no.

 9   BY MR. KABA:

10      Q      Okay.  How many consumers -- I'm sorry.

11   How many individuals by the way were a part of your

12   think aloud study?

13               MS. JERJIAN:  Objection, form.

14               THE WITNESS:  I'm assuming you mean how

15   many participated in the think aloud study and I'd say

16   33.

17   BY MR. KABA:

18      Q      Going back up to the cognitive walkthrough,

19   would you agree with me that -- well, the person who

20   did the cognitive walkthrough was you, right?

21      A      Yes.

22      Q      Is it possible that another person who also

23   has expertise in HCI could have conducted that

24   cognitive walkthrough and reached different conclusions

25   than you?



MARSHINI CHETTY, PH.D.                                          April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                          66

1              MS. JERJIAN:  Objection, form, calls for

2    speculation.

3              THE WITNESS:  Well, if you're asking me to

4    speculate whether someone else doing this would reach

5    different conclusions, I would say it's highly

6    unlikely.

7    BY MR. KABA:

8        Q      How -- what percent -- what amount of

9    subjectivity is there in conducting a cognitive

10   walkthrough?

11             MS. JERJIAN:  Objection, vague as to amount

12   of subjectivity.

13             THE WITNESS:  I'm not sure what you mean,

14   but a cognitive walkthrough is usually done by experts

15   and so there's some amount of subjectivity.

16   BY MR. KABA:

17       Q      And so in light of that, there are other

18   experts who could go through the same kind of cognitive

19   walkthrough as you but reach a different conclusion

20   about any particular design element that's present or

21   may not be present, fair?

22             MS. JERJIAN:  Objection, form, asked and

23   answered.

24             THE WITNESS:  As I mentioned before, it's

25   highly unlikely, but possible.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        67

1   BY MR. KABA:

2        Q        Did you consult with any other experts in

3   HCI for purposes of your cognitive walkthrough in this

4   case?

5        A        No.

6                 MS. JERJIAN:  Objection, form.

7   BY MR. KABA:

8        Q        Okay.  You have worked with other academics

9   in the HCI field as part of other publications you've

10  done, right?

11       A        Yes.

12       Q        And as part of the work in those other

13  publications, have you and all of those other experts

14  always agreed that something was or was not a dark

15  pattern, for example?

16                MS. JERJIAN:  Objection, form, vague.

17                THE WITNESS:  I'm not sure exactly what you

18  mean by agreed or not agreed.  Like do you mean in a

19  data analysis?  Do you mean in --

20  BY MR. KABA:

21       Q        Did you guys have -- when you work with

22  other academics including in the field of HCI, do you

23  have differences of opinion?

24       A        Yes.

25       Q        And those differences of opinion can



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      68

1   include things like is this a good design element or a

2   bad design element, correct?

3                  MS. JERJIAN:  Objection, vague.

4                  THE WITNESS:  Yes.

5   BY MR. KABA:

6       Q       And those differences of opinion can

7   include what a -- how a consumer might interact with

8   that design element, correct?

9                  MS. JERJIAN:  Objection, form, vague.

10                 THE WITNESS:  Yes.

11  BY MR. KABA:

12      Q       And those differences of opinion between

13  you and other experts can also include whether certain

14  information that might be presented or certain friction

15  that might be introduced could be a good thing for a

16  consumer versus a not good thing for a consumer,

17  correct?

18                 MS. JERJIAN:  Objection, form.

19                 THE WITNESS:  I'm not sure what you mean by

20  good or not good.  Like from whose perspective?  I

21  mean, I assume, yes, they could have a difference of

22  opinion, but I think it depends on -- it also depends

23  on who's deciding what's good or bad.

24  BY MR. KABA:

25      Q       Right.  I mean, that's a -- a part of



 1   what -- a part of your work that you were doing in this

 2   case was to opine on design elements that are present

 3   in Prime's enrollment and cancellation flows that you

 4   believe are not good design elements, right?

 5             MS. JERJIAN:  Objection, form.

 6             THE WITNESS:  Well, actually, part of my

 7   work in this case was to see if the enrollment and

 8   cancellation processes were simple and easy to follow.

 9   BY MR. KABA:

10       Q      And that was being done from your

11   perspective, correct?

12       A      Yes.

13       Q      And because you didn't actually talk to

14   consumers about their experiences on whether they

15   thought it was simple and easy to follow, correct?

16             MS. JERJIAN:  Objection, form.

17             THE WITNESS:  I'm assuming you mean again

18   Amazon consumers on the Amazon Prime website and asking

19   consumers about their experiences on the Amazon Prime

20   website itself.  And like I said earlier, no.

21   BY MR. KABA:

22       Q      You did not speak to them?

23       A      I did not speak to Amazon Prime -- I did

24   not speak to consumers about their experiences on the

25   actual Amazon Prime website regarding enrollment and



1      Q      Yes.  If the business wanted -- you do --
2  I've heard you now.  You've established that in a
3  majority of cases, the use of even a single dark
4  pattern is unacceptable, correct?
5              MS. JERJIAN:  Objection.
6  BY MR. KABA:
7      Q      According to you?
8              MS. JERJIAN:  Objection, mischaracterizing
9  the testimony.
10             THE WITNESS:  I said in the majority of
11  cases, it's unlikely to be acceptable because dark
12  patterns are coercive, manipulative and deceptive.
13  BY MR. KABA:
14     Q      Okay.  So now you've introduced a new word
15  which is unlikely to be acceptable.  So what makes
16  something unlikely as opposed to just unacceptable?
17             MS. JERJIAN:  Objection, form.
18             THE WITNESS:  Again, do you mean in a
19  particular case or do you mean in general?
20  BY MR. KABA:
21     Q      I mean as you're using the term.
22     A      Well, again, as I mentioned before, I would
23  need to look at exactly which business you're talking
24  about, what dark pattern you're talking about, context
25  of use.



MARSHINI CHETTY, PH.D.                                     April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        84

1        Q       Okay.  Business -- what is the business,

2    what is the dark pattern and what is the context of

3    use, you're saying you would need to look at those

4    three things to determine whether or not the use of

5    even a single dark pattern is acceptable or likely to

6    be acceptable, correct?

7                MS. JERJIAN:  Objection, mischaracterizes

8    the testimony.

9                THE WITNESS:  I -- if I'm understanding you

10   correctly and you're asking me if a dark pattern --

11   yeah, basically correct.

12   BY MR. KABA:

13       Q       Okay.  Thank you.

14               Now, if I'm a business, I can't pay you the

15   $300 an hour to serve as my expert in the case.  Okay?

16   But I'm trying to understand, well, how would Dr.

17   Chetty opine on whether or not my use of a dark pattern

18   is acceptable here.  What would I look at?

19               MS. JERJIAN:  Objection, form, calls for

20   speculation, vague.

21               THE WITNESS:  Again, I'm not sure if you

22   mean like -- what do you mean by what would I look at?

23   BY MR. KABA:

24       Q       As a business.  I want to -- let's say I'm

25   living in the Dr. Chetty world.  Okay?  As a business,



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        85

1  where would I look to see here are dark patterns that

2  Dr. Chetty says may be acceptable to use in this case

3  versus not?

4              MS. JERJIAN:  Objection, form, vague as to

5  Dr. Chetty world.

6              THE WITNESS:  Well, also I didn't say that

7  it may be acceptable.  I said it's highly unlikely to

8  be acceptable because they're deceptive, coercive and

9  manipulative.

10 BY MR. KABA:

11     Q     What's the flip side of highly unlikely?

12 May be acceptable, right?

13             MS. JERJIAN:  Objection, form, vague as to

14 flip side.

15             THE WITNESS:  I'm not sure what you mean by

16 may be acceptable.  Again, it's not quite clear what

17 you mean by acceptable or not.

18 BY MR. KABA:

19     Q     Okay.  Let me --

20     A     But --

21     Q     Sorry.  Go ahead.

22     A     Sorry.  I was going to say your question

23 was -- sorry.  Now I've forgotten your question.  Could

24 you repeat it?

25     Q     Yeah.  I mean, I have to start over with



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        86

1  you because you keep sort of changing the terms of the

2  conversation I think we're having.  I would like a yes

3  or no answer to this question.  Is there ever a

4  scenario in which it is acceptable to you, Dr. Chetty,

5  as an expert for a business to use a dark pattern, yes

6  or no?

7            MS. JERJIAN:  Objection, form, vague.

8  BY MR. KABA:

9      Q     Or may be?

10           MS. JERJIAN:  Same objection.

11           THE WITNESS:  It depends on the context.

12  BY MR. KABA:

13     Q     Okay.  That's fair.  Where would a business

14  that is trying to understand the it depends on the

15  context look to get that information?

16           MS. JERJIAN:  Objection, form, calls for

17  speculation.

18           THE WITNESS:  Again, you're asking me where

19  might they look to find out about dark patterns?

20  BY MR. KABA:

21     Q     No.  Your response to my question was when

22  I asked you is it ever acceptable for a business to use

23  a dark pattern, you said it depends on the context.

24     A     Well, I said it was highly unlikely

25  actually.



MARSHINI CHETTY, PH.D.                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                              87

1      Q      And then you said it depends on the

2   context, correct?

3            MS. JERJIAN:  Objection, mischaracterizes

4   the testimony.

5            THE WITNESS:  I said it was highly

6   unlikely, but it would be useful to know what the

7   context was and what the dark pattern is.

8   BY MR. KABA:

9      Q      Why would that be useful?

10           MS. JERJIAN:  Objection, vague as to it.

11           THE WITNESS:  Well, if --

12           MR. KABA:  I didn't use the word it.

13           MS. JERJIAN:  That.

14           THE WITNESS:  Well, I would want to know

15  which dark pattern you're referring to, which business

16  you're referring to, what's the context to understand

17  more and as I was saying in the majority of cases, it's

18  not going to be acceptable.

19  BY MR. KABA:

20     Q      But in some cases -- even your answer, in

21  some cases, you acknowledge it may be acceptable to use

22  a dark pattern?

23           MS. JERJIAN:  Objection, mischaracterizes

24  testimony, vague as to acceptable.

25           THE WITNESS:  I didn't say it was



1   acceptable.  I just said that it was -- well, I said in

2   the most cases, it's not going to be acceptable.  In

3   some cases, it depends on the context.

4   BY MR. KABA:

5        Q      What -- depends on the context that it may

6   be acceptable?

7               MS. JERJIAN:  Objection.

8   BY MR. KABA:

9        Q      Yes or no?

10              MS. JERJIAN:  Objection, mischaracterizes

11  testimony, form.

12              THE WITNESS:  It would still be

13  manipulative, coercive and deceptive in some form, but

14  I'd need to know more about how it's being used and in

15  what context.

16  BY MR. KABA:

17       Q      Let me try my question again.

18       A      Okay.

19       Q      Is it ever acceptable for a business to use

20  a dark pattern in your opinion, yes, no or maybe?

21              MS. JERJIAN:  Objection, form, vague.

22              THE WITNESS:  In most cases, no.

23  BY MR. KABA:

24       Q      Is it ever acceptable for a business to use

25  a dark pattern, yes, no or maybe?



1          MS. JERJIAN:  Objection, asked and

2    answered, form.

3          THE WITNESS:  I think I just said maybe,

4    but I'll say it again in case the mic didn't pick me

5    up.  Maybe.

6    BY MR. KABA:

7      Q    In order for us to determine whether we fit

8    within the maybe yes or maybe no set, you're saying

9    some of the things you would need to look at were the

10   business, the dark pattern and the context in which it

11   is used, correct?

12         MS. JERJIAN:  Objection, form,

13   mischaracterizes testimony, vague as to time.

14         THE WITNESS:  Well, I think -- are you

15   asking me if the business should do that or are you

16   asking me if I should do that?  I'm not sure.  Could

17   you repeat the question again?

18   BY MR. KABA:

19     Q    I'll ask you the question again.

20     A    Yes.  Thank you.

21     Q    In order for you to determine whether we

22   fit in the maybe yes or the maybe no about the use of

23   the dark pattern --

24     A    Yes.

25     Q    -- you would need to look at the business,



MARSHINI CHETTY, PH.D.                                      April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        90

1  the specific dark pattern or patterns and the context

2  in which they're used, correct?

3                 MS. JERJIAN:  Objection, form.

4                 THE WITNESS:  Amongst other things, yes.

5  BY MR. KABA:

6      Q      What are the other things that you would

7  want to look at in order to determine whether it's

8  maybe yes acceptable to use the dark pattern or

9  patterns versus maybe no?

10                 MS. JERJIAN:  Objection, form.

11                 THE WITNESS:  Well, again, I think you

12  would have to look at the harm that is being caused.

13  BY MR. KABA:

14      Q      The harm to whom?

15      A      To the business's users.

16      Q      So you would actually -- one of the things

17  that you would need to look at is actually the harm

18  being caused to the consumers themselves who are

19  experiencing the business's alleged dark patterns; is

20  that fair?

21                 MS. JERJIAN:  Objection, form,

22  mischaracterizes testimony.

23                 THE WITNESS:  This is a hypothetical, so

24  you're asking me to speculate about this business and

25  that I would need to look at these particular things.



1  And I'd say I need to look at the users and understand

2  who the users are.

3  BY MR. KABA:

4      Q      Okay.  So you need to look at the users and

5  who they are and the harm potentially being caused to

6  those users from experiencing the business's alleged

7  dark patterns?

8              MS. JERJIAN:  Objection, form.

9              THE WITNESS:  It could be to those users.

10  It could be other kinds of harm.

11  BY MR. KABA:

12      Q      Okay.  Is there a check list or anything

13  like that out there somewhere that a business can look

14  to that says here is when it may be acceptable to use a

15  dark pattern versus when it would not be acceptable to

16  use a dark pattern to your knowledge?

17              MS. JERJIAN:  Objection, form, vague as to

18  acceptable, vague as to check list.

19              THE WITNESS:  Well, as I mentioned before,

20  most businesses wouldn't want to use dark patterns

21  because they're deceptive, coercive and manipulative.

22  BY MR. KABA:

23      Q      Dr. Chetty, let me ask you my -- let me

24  focus on my question, please.  Are you aware in all of

25  your research around HCI, on dark patterns, serving as



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      92

1    an expert in this case, are you aware of a check list

2    or anything like that out there where businesses can

3    look to see that it says where a dark pattern may be

4    acceptable to use versus may not be acceptable to use?

5    Are you aware of any, yes or no?

6              MS. JERJIAN:  Objection to form, vague as

7    to check list.

8              THE WITNESS:  Again, I'm not sure what you

9    mean by check list.  To my knowledge, there is no such

10   check list.

11   BY MR. KABA:

12       Q     What do you understand the term check list

13   to mean?

14       A     Well, you were saying is there a check list

15   of acceptable versus not acceptable dark patterns and

16   to my knowledge, there is no such check list.

17       Q     Are you aware of any, even if it's not in

18   the form of a check list, any regulatory guidance in

19   again all of your years working in this field, are you

20   aware of any regulatory let's start first with rules

21   that say when a dark pattern is or is not acceptable

22   for a business to use, yes or no?

23             MS. JERJIAN:  Objection, form.

24             THE WITNESS:  Yes.

25   BY MR. KABA:



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        93

1       Q       And what is that?

2       A       Well, one rule I mentioned before is the

3    California Consumer Privacy Act.

4       Q       Okay.  Let me take it to -- you understand

5    that this is a case about -- brought by the Federal

6    Trade Commission, correct?

7       A       That's correct.

8       Q       Okay.  Are you aware of any federal

9    regulatory guidance based on all of your years working

10   in this space including working with the FTC that lays

11   out when it is acceptable versus not acceptable for a

12   business to use a dark pattern?

13              MS. JERJIAN:  Objection, form, vague.

14              THE WITNESS:  Again, if you're asking

15   about -- I'm not sure.  Are you asking about like

16   regulatory guidelines?  Is that what you're asking

17   about or a check list again?

18   BY MR. KABA:

19      Q       Do you remember what my question was?  It's

20   just a couple of seconds ago.

21      A       I know.  It's -- could you repeat it again?

22      Q       Certainly.

23      A       Thank you.

24      Q       Certainly.  I'll tell you it's only

25   11:15 a.m., so we've only been going for a little less



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       94

1    than two hours, but I will try again.  Are you aware of

2    any federal regulatory guidelines or guidance or rules

3    based on all of your years working on dark patterns

4    including with the FTC that lays out when it is

5    acceptable versus unacceptable for a business to use

6    so-called dark patterns, yes or no?

7              MS. JERJIAN:  Objection, form, vague as to

8    acceptable, vague as to regulatory guidance or

9    guidelines.

10             THE WITNESS:  Well, there's some like

11   documents that are available about dark patterns.  I'm

12   not sure if that is what you are talking about.

13   BY MR. KABA:

14        Q    Do you understand my question?

15        A    Well, are you asking about a regulation or

16   you are asking about like guidelines?

17        Q    I'm asking you about whether based on all

18   of your years working with dark patterns including with

19   the FTC, are you aware of any federal guidelines or

20   guidance regarding when it is acceptable for a business

21   to use dark patterns versus when that use would be

22   unacceptable, yes or no?

23             MS. JERJIAN:  Objection, form, vague as to

24   guidelines or guidance and unacceptable.

25             THE WITNESS:  Sorry.  Not to my knowledge.



1    BY MR. KABA:

2        Q      Okay.   Thank you.

3               Has any business tried to hire you for and

4    ask you to evaluate their subscription program for the

5    presence or absence of dark patterns?

6               MS. JERJIAN:   Objection, form.

7               THE WITNESS:   No.

8    BY MR. KABA:

9        Q      Have you heard of this concept that there

10   is always going to be an irreducible minimum number or

11   percentage of users who don't -- just don't read

12   something on a page and, therefore, claim confusion?

13              MS. JERJIAN:   Objection, form, vague.

14              THE WITNESS:   I'm not sure what context

15   you're talking about and also I'm not sure what you

16   mean by this concept like --

17   BY MR. KABA:

18       Q      Does what I -- does what I just

19   described -- so when you look at people completing

20   surveys or answering questions, have you heard about a

21   concept that there's the literature, the academic

22   literature reflects that there's an irreducible number

23   of people that just don't even read the question?

24              MS. JERJIAN:   Objection.

25   BY MR. KABA:



 1   BY MR. KABA:

 2       Q       And you are not offering an opinion in this

 3   case that a certain percentage of those subscribers to

 4   Prime were unintentionally enrolled, correct?

 5       A       Yes.

 6       Q       So if I asked you what percentage of

 7   Prime -- U.S. Prime subscribers would you claim are

 8   unintentionally enrolled, you would say that's not part

 9   of your expert work in this case, correct?

10           MS. JERJIAN:  Objection, form.

11           THE WITNESS:  Again, if you're asking me

12   whether I know how many Amazon Prime subscribers

13   unintentionally enrolled, then I would say no.

14   BY MR. KABA:

15       Q       And even with respect to any alleged

16   unintentional enrollment, are you able to ascertain

17   what percentage of people, in fact, unintentionally

18   enrolled versus what percentage of people just failed

19   to read the terms and conditions provided on the page?

20           MS. JERJIAN:  Objection, form.

21           THE WITNESS:  Do you mean -- on which page

22   exactly?  Do you mean in my study?  Do you mean on

23   Amazon's website?

24   BY MR. KABA:

25       Q       On Amazon's website.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       101

1      A      Well, I didn't conduct a study on Amazon's

2   exact website and I wouldn't know how many subscribers

3   didn't read the terms and conditions on Amazon's

4   website.

5      Q      Okay.  And then for purposes of your

6   CandyForever study, how many of the 30 -- it was -- it

7   ended up being 30 people that went through the study;

8   is that right?

9             MS. JERJIAN:  Objection, mischaracterizes

10   the testimony.

11             THE WITNESS:  I said 33 in total.  Three

12   were pilots and 30 were in the study.

13   BY MR. KABA:

14      Q      So the answer to my question is I was

15   right, there were 30 people who went through the study,

16   correct?

17      A      Well, again, three people participated in

18   that pilot and 30 participated in the full study.  So

19   the total if you considered the whole unit of study is

20   33.

21      Q      Well, the data that you reported on was

22   ultimately on the 30 that participated in the study,

23   correct?

24      A      Correct.

25      Q      Okay.  We don't have to keep arguing about



1   the number.  We can establish then that when I'm

2   talking about the study, I'm talking about your actual

3   full study for which you're rendering opinions in this

4   case.  Okay?

5        A     Okay.  Thank you for clarifying.

6        Q     And that was 30 people, right?

7        A     Correct.

8        Q     How many of those 30 people just didn't

9   read the terms and conditions?

10            MS. JERJIAN:  Objection, form.

11            THE WITNESS:  May I turn to my report?

12   BY MR. KABA:

13        Q     Sure.

14        A     Okay.  Great.

15        Q     Just let us know.  Talk aloud as to borrow

16   one of your phrases think aloud of where you're going

17   in your report to find the answer.

18        A     Oh, I'm going to my study.

19        Q     Which page and what paragraph?

20            MS. JERJIAN:  Give her a moment to look

21   through the report.

22            THE WITNESS:  I'm looking through it right

23   now and I am going to -- so that I can give you an

24   exact number not just based on my recollection that I'm

25   on page 96 in paragraph 353.  And I'm two sentences



 1   ask you questions that I think can be answered in sort

 2   of a self-contained way.  Okay?

 3       A     Thank you.

 4       Q     In your CandyForever study, you included

 5   terms and conditions, correct?

 6       A     Correct.

 7       Q     And it was on the same page as the

 8   enrollment option, correct?

 9       A     Correct.  Are you talking about the UPDP

10   page?

11       Q     Yes.

12       A     Yes.

13       Q     And the terms and conditions that were on

14   that same page as the enrollment option included the

15   price of what you guys call the premium membership,

16   right?

17             MS. JERJIAN:  Objection, form.

18             THE WITNESS:  Correct.

19   BY MR. KABA:

20       Q     It included the frequency of charge,

21   correct?

22             MS. JERJIAN:  Objection, form.

23   BY MR. KABA:

24       Q     Per month, for example?

25             MS. JERJIAN:  Same objection.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        105

```
 1              THE WITNESS:  On the UPDP page, it included
 2    the price and the per month charge, yes.
 3    BY MR. KABA:
 4        Q      And so if someone were to have read the
 5    terms and conditions, they would, in fact, know the
 6    material terms of the premium membership, correct?
 7              MS. JERJIAN:  Objection, form,
 8    mischaracterizes the testimony.
 9              THE WITNESS:  Well, I'm not sure if you're
10    asking me about comprehension or, you know, are you
11    asking me if they would definitively know it if they
12    read the terms and conditions or not?
13    BY MR. KABA:
14        Q      I guess neither you nor I can tell us what
15    any other person definitively knows, correct?
16              MS. JERJIAN:  Objection, form, vague.
17              THE WITNESS:  Well, that's what I was
18    asking, yes.
19    BY MR. KABA:
20        Q      Okay.  So since neither you nor I can tell
21    what any other person definitively knows, my question
22    is just about if the person had actually just read the
23    terms and conditions on the page, they would at least
24    have been able to see the material terms of the premium
25    offer, correct?
```



MARSHINI CHETTY, PH.D.                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                    106

```
 1                    MS. JERJIAN:  Objection, form, vague as to
 2    terms and conditions.
 3                    THE WITNESS:  So if you're asking me if
 4    they would see or read that information if they were
 5    reading the terms and conditions, they would read over
 6    those terms that were contained in that piece of text,
 7    yes.
 8    BY MR. KABA:
 9        Q       Okay.  Thank you.
10                    And that's the same on the Amazon UPDP
11    terms and conditions for Prime, correct?
12                    MS. JERJIAN:  Objection, form, vague as to
13    the same.
14                    THE WITNESS:  Are you asking me if someone
15    was reading the Amazon terms and conditions -- is that
16    what you're asking me?  Like if they were reading that
17    text, would they read information about Amazon?  Is
18    that what you're asking?
19    BY MR. KABA:
20        Q       So I can do this -- I'll do this with you
21    in more detail later, but on the UPDP enrollment
22    page --
23        A       Which I don't have in front of me, yes.
24        Q       Okay.  On the UPDP enrollment page, there
25    are -- Amazon discloses the material terms of the Prime
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      107

 1  membership, correct?

 2              MS. JERJIAN:  Objection, vague as to

 3  material terms.

 4              THE WITNESS:  Again, what do you mean by

 5  material terms?

 6  BY MR. KABA:

 7       Q      They disclose the price, right?

 8       A      To my recollection, yes.

 9       Q      They disclose the frequency of charge,

10  right?

11       A      In the terms and conditions.

12       Q      Correct?

13       A      To my recollection, yes.

14       Q      They disclose that it is a membership that

15  continues until canceled?

16       A      Which page are you on?

17       Q      We can look at page 38 --

18       A      Okay.

19       Q      -- as one.  Paragraph 112 in your report

20  which reflects --

21       A      Yes.

22       Q      -- the UPDP on a desktop, right?

23       A      Yes, yes.

24       Q      So this is -- unlike your CandyForever,

25  this is actually the Amazon.com UPDP on a desktop for



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                    108

1  the Prime offer, correct?

2       A      This is --

3                MS. JERJIAN:  Objection, form.

4                THE WITNESS:  This is one version, yes.

5  BY MR. KABA:

6       Q      Okay.  And in this version, you see what's

7  disclosed in the terms and conditions.  First the terms

8  and conditions are disclosed on the very same page as

9  the enrollment button, correct?

10                MS. JERJIAN:  Objection, form.

11                THE WITNESS:  So you're meaning below here,

12  below the enrollment button get free same day delivery,

13  yes.

14  BY MR. KABA:

15       Q      So focus on my question.  What we're

16  looking at from your own expert report this screen

17  shot, the terms and conditions are disclosed on that

18  same web page as the enrollment option, correct?

19       A      Yes.

20       Q      And included in the terms and conditions

21  are not -- not behind a hyperlink, but in text on that

22  page, in fact, in bold are the price for membership,

23  correct?

24                MS. JERJIAN:  Objection, form, vague as to

25  terms and condition.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      109

1                      THE WITNESS:  So do you mean 12.99 a month,

2    yes.

3    BY MR. KABA:

4         Q       It includes the fact that it is a monthly

5    charge, correct?

6                      MS. JERJIAN:  Objection, form.

7                      THE WITNESS:  Let me just read the terms

8    and conditions again.

9    BY MR. KABA:

10        Q       It says 12.99 per month, correct?

11        A       Yes.

12        Q       It includes that the membership continues

13   until canceled, correct?

14                     MS. JERJIAN:  Objection, form.

15                     THE WITNESS:  This terms and conditions,

16   yes.

17   BY MR. KABA:

18        Q       And so my question is:  If a user were

19   actually reading all of the text of the page, they

20   would know of these material terms that you and I --

21   well, we've already established neither you and I can

22   definitively know what anybody else definitively knows,

23   but let me try that a different way.

24                     So as you and I just went over, if a user

25   actually read the page, they would at least be able to



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        110

 1  see the material terms right on that same page as the

 2  enrollment option, correct?

 3                MS. JERJIAN:  Objection, form.

 4                THE WITNESS:  Well, if you're asking me --

 5  I'm assuming that you're asking me if a user is reading

 6  every single piece of text on this entire page, would

 7  they have read over these -- including these terms and

 8  conditions, would they have read over these parts of

 9  terms and conditions if they read all of the text on

10  the page.  Then I would say yes.  If they read all the

11  text on the page, they would also read these terms and

12  conditions which include this information.

13  BY MR. KABA:

14      Q      And even if they only read the bolded text

15  on the page, they would be able to see the material

16  terms of the Prime offer, correct?

17                MS. JERJIAN:  Objection, form, vague as to

18  text.

19                THE WITNESS:  Again, if you're asking me to

20  speculate if someone read all the bold text and only

21  the bold text, then --

22  BY MR. KABA:

23      Q      I'm not asking you -- I'm not asking you to

24  speculate.  Focus on my question.

25      A      Okay.



MARSHINI CHETTY, PH.D.                                          April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                           111

1        Q       You're an expert in this case, right?

2        A       Yes.

3        Q       You're purporting to opine on things from

4   the viewpoint of a consumer in this case, aren't you?

5        A       Yes.

6        Q       Okay.  So I want you to take -- wear that

7   same hat, Dr. Chetty, and I would like you to tell me

8   even if a user just read the bold terms on the page of

9   the UPDP, they would be able to see the material terms

10  of the Prime offer, correct?

11               MS. JERJIAN:  Objection, form.  There's a

12  lot of bold text on this page.

13               THE WITNESS:  Again, as I was starting from

14  the beginning of the page, you were asking me if

15  someone was reading all the bold text on the page which

16  starts up at the top, text we're giving you a 30-day

17  free trial of Prime, no minimum order threshold for

18  free one-day delivery --

19  BY MR. KABA:

20       Q       Dr. Chetty.

21       A       I'm going through all the bold text.

22       Q       I'm asking you for a yes or no.  I'm not

23  asking to you read aloud the entire page.

24       A       Okay.

25       Q       I'm asking for a yes or a no.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      112

 1        A        Okay.  So, again --

 2        Q        If -- let me ask you my question.

 3        A        May I finish what I was saying?

 4        Q        Go ahead.

 5        A        So what I was saying was in answer to your

 6   question, you were asking me if someone was reading all

 7   the bold text on the page and so I was starting to read

 8   the bold text which is above and looking down and

 9   saying that, yes, if they read all the bold text on the

10   page, then they would also read this -- and you're

11   assuming that they're also reading the terms and

12   conditions, then they would read over this bold text in

13   terms and conditions in that scenario if you're saying

14   they're reading every single piece of bold text on this

15   page.

16        Q        Okay.  So you're trying to add all sorts of

17   things here.  I want you to focus on my question.  If a

18   consumer were only to read the bold text on the UPDP,

19   among the things they would read would also be the

20   material terms of the Prime offer, correct, yes or no?

21             MS. JERJIAN:  Objection, form, asked and

22   answered.

23             THE WITNESS:  Yes.

24   BY MR. KABA:

25        Q        Thank you.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      113

1      A      I think I have mentioned that, yes.

2      Q      Thank you.

3             Are you aware of any one of Amazon's

4   enrollment flows where the material terms of the offer

5   were not presented to the customer?

6             MS. JERJIAN:  Objection, form, vague as to

7   material terms.

8             THE WITNESS:  Yeah.  And also are you

9   talking about specific pages or are you talking about

10  the whole enrollment process with detours?

11  BY MR. KABA:

12     Q      Are you aware of any instance in the world

13  in which prior to enrolling the customer, the material

14  terms of the offer were not presented?

15            MS. JERJIAN:  Objection, form.

16            THE WITNESS:  Are you meaning on Amazon

17  Prime?

18  BY MR. KABA:

19     Q      Yes.  Yes, ma'am.

20     A      And do you -- and what do you mean by prior

21  to enrolling?

22     Q      That is before the customer is enrolled in

23  Prime, are you aware of a single instance in which the

24  material terms were not presented to the customer?

25            MS. JERJIAN:  Objection, form.



1   online enrollment flow that you believe does not

2   contain any unacceptable dark patterns?

3           MS. JERJIAN:  Objection, form, vague.

4           THE WITNESS:  Well, it sounds like you're

5   asking me to find an enrollment flow or tell you about

6   an enrollment flow that does not contain -- did you say

7   acceptable dark patterns?

8   BY MR. KABA:

9       Q     Unacceptable dark patterns.

10      A     Unacceptable dark patterns.  Off the top of

11  my head, I would have to go and look at all different

12  kinds of enrollment flows to sort of find one.  I

13  haven't reviewed every single enrollment flow of every

14  single website.

15      Q     So I'm not really asking you about that

16  specifically.  Maybe we're talking past each other.

17  Let me try again.  For purpose of your work in this

18  case in evaluating Amazon's enrollment and cancellation

19  flows, did you look at the enrollment and cancellation

20  flows of any other companies?

21          MS. JERJIAN:  Objection, form.

22          THE WITNESS:  So could you clarify?  So for

23  this case only, did I look at other company's

24  enrollment flows?

25  BY MR. KABA:



MARSHINI CHETTY, PH.D.                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                               149

```
 1        Q      I'll ask you again.  I'll re -- I'll have
 2   my question repeated.
 3        A      Okay.  Thank you.
 4        Q      For purpose of your work in this case in
 5   evaluating Amazon's enrollment and cancellation flows,
 6   did you look at or compare the enrollment and
 7   cancellation flows of any other companies?
 8              MS. JERJIAN:  Objection, form.
 9              THE WITNESS:  So you're asking based on my
10   understanding of asking about if I looked at other
11   enrollment flows for this case of other companies, not
12   Amazon, no.
13   BY MR. KABA:
14        Q      Did you look at the cancellation flows of
15   any other companies other than Amazon for purposes of
16   your work in this case?
17              MS. JERJIAN:  Objection, form.
18              THE WITNESS:  So for purposes of work in
19   this case, I did not look at any other cancellation
20   processes from other companies other than Amazon.
21   BY MR. KABA:
22        Q      Okay.  Now, for all of the work that you
23   have done that leads you to be offered as an expert in
24   this case, can you identify any other online enrollment
25   flow that you would say does not use any dark patterns?
```



1          MS. JERJIAN:  Objection, form.

2          THE WITNESS:  So, again, I think I would

3   need time to go and look at a whole bunch of enrollment

4   flows to find you an example of that.  Like off the top

5   of my head, I couldn't tell you about other enrollment

6   flows.  I don't keep a stack of enrollment flow

7   examples.

8   BY MR. KABA:

9      Q    I understand you don't keep a stack of

10  enrollment flow examples, but you -- you're being

11  offered as an expert on human computer interaction; is

12  that right?  You consider yourself an expert on human

13  computer interaction, right?

14          MS. JERJIAN:  Objection, form.

15          THE WITNESS:  I am an expert in human

16  computer interaction, that is correct.

17  BY MR. KABA:

18     Q    And I assume this includes that you

19  consider yourself an expert on the use of dark

20  patterns; is that right?

21          MS. JERJIAN:  Objection, form.

22          THE WITNESS:  I consider myself an expert

23  on the subject matter of dark patterns, yes.

24  BY MR. KABA:

25     Q    And would you consider yourself an expert



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                    151

```
 1  on use dark patterns by online companies?
 2              MS. JERJIAN:  Objection.
 3  BY MR. KABA:
 4      Q      Or Internet companies?
 5              MS. JERJIAN:  Objection, form.
 6              THE WITNESS:  I'm assuming you're asking me
 7  if I know about dark patterns and whether online
 8  companies have used them and I would say yes.
 9  BY MR. KABA:
10      Q      I'm asking if -- do you consider yourself
11  an expert on the use of dark patterns by online
12  companies?
13              MS. JERJIAN:  Objection, form, asked and
14  answered.
15              THE WITNESS:  As I mentioned before, yes.
16  BY MR. KABA:
17      Q      Okay.  In light of that, can you name for
18  me any online enrollment flow that you would say does
19  not use dark patterns?
20              MS. JERJIAN:  Objection, form.
21  BY MR. KABA:
22      Q      Can you name any of them?
23              MS. JERJIAN:  Same objection.
24              THE WITNESS:  Well, again, as I mentioned
25  before, I have not studied every single enrollment flow
```



 1   of every single website.  And so I would have to have

 2   time to go and do these kinds of studies to find you an

 3   example like the one you're asking for.

 4   BY MR. KABA:

 5       Q     So you're not really answering my question

 6   unfortunately, Dr. Chetty.  Sitting here today as an

 7   expert on all of the things that you just testified you

 8   are an expert on, can you name for us just sitting here

 9   today any online enrollment flow that you would say

10   does not use dark patterns?

11           MS. JERJIAN:  Objection, form, asked and

12   answered.

13           THE WITNESS:  So, again, as I mentioned

14   before, I have not studied every single enrollment

15   process of every single website.  And so I'd need more

16   time.  I'd be happy to spend several hours looking for

17   enrollment processes on specific companies if you'd

18   like, but --

19   BY MR. KABA:

20       Q     You're not answering my question.

21       A     I don't have a specific company in mind

22   because I haven't performed that kind of research.

23       Q     Okay.  So let's -- I want to focus on my

24   question.  I'm not asking you to go out and look at

25   every company out there.  Okay?  I'm not asking you to



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      153

1    do that.  Do you understand?

2       A      Okay.

3       Q      I'm asking based on your expert work and

4    based on your purported expertise that you have

5    testified to, can you sitting here today identify a

6    single online company that you would say does not use

7    dark patterns as part of its enrollment flow?  Can you

8    identify any such company sitting here today?

9              MS. JERJIAN:  Objection, form, vague as to

10   dark patterns and enrollment flow.

11             THE WITNESS:  So, again, based on my

12   understanding, I again mentioned that I haven't studied

13   everyone's enrollment processes of every single website

14   and I did not or I do not have an example.  And also it

15   wasn't really relevant to my expert report.

16   BY MR. KABA:

17      Q     Okay.  So do -- can you -- I'll try one

18   more time.  Can you identify for us sitting here today

19   based on all of your expertise a single online company

20   that you would say does not use dark patterns in its

21   enrollment flow?

22             MS. JERJIAN:  Objection, asked and

23   answered, form.

24             THE WITNESS:  I believe -- I believe I've

25   already answered your question which is, again, if you



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        154

1  would like me to spend some time researching and

2  looking at the enrollment processes of other companies

3  to find you an example like the one you're looking for,

4  I'd be happy to do that.  But sitting here right now, I

5  did not examine the enrollment flows of other companies

6  to be able to determine whether or not they do or do

7  not contain dark patterns because that was not relevant

8  in my opinion in this case.

9  BY MR. KABA:

10     Q     Have you looked at the enrollment flows of

11  other companies as part of your research or the work

12  that you've done apart from this case?

13          MS. JERJIAN:  Objection, form.

14          THE WITNESS:  I'm not sure in what context

15  you are asking, but if you're asking if I have ever

16  looked at enrollment flows of other companies, I'm not

17  sure which companies.  Could you specify?

18  BY MR. KABA:

19     Q     I don't know what companies you've looked

20  at, Dr. Chetty.  I'm asking you a question that is a

21  straightforward question.  Have you ever examined the

22  enrollment flows of other companies to assess whether

23  or not they used dark patterns, yes or no?

24          MS. JERJIAN:  Objection, form.

25          THE WITNESS:  Well, actually, I did mention



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        155

1    earlier that I had looked at a subscription process and

2    I'm not sure if that's what you mean by enrollment, but

3    I have looked at Netflix's subscription process.

4    BY MR. KABA:

5         Q      Did Netflix use dark patterns --

6                MS. JERJIAN:  Objection.

7    BY MR. KABA:

8         Q      -- in its subscription process?

9                MS. JERJIAN:  Objection, form.

10                THE WITNESS:  Well, that is not the

11    research question that I was asking.

12    BY MR. KABA:

13        Q      My question to you is:  Did Netflix use

14    dark patterns in its subscription process?  It's a yes

15    or a no.

16                MS. JERJIAN:  Objection, form.

17                THE WITNESS:  Well, I would have to go back

18    and look at my notes and sort of look at that flow.  I

19    don't have it in front of me.  And so you're asking me

20    if they used dark patterns.  There are many dark

21    patterns.  And so I'm not sure which part of the flow

22    you're asking me about.

23    BY MR. KABA:

24        Q      Dr. Chetty.

25        A      Sort of asking me, you know, which dark



1    pattern.   I would need more information and more time.

2       Q     Okay.  I'm going to -- I'm just going to

3    note for the record if the Q and A con -- my question

4    was direct.  Did Netflix use dark patterns in its

5    enrollment flows?  And you're saying I don't know which

6    ones.  I don't know this.  I will go and ask the Court

7    for more time if I'm not getting just direct answers to

8    what I believe are direct questions.  If your answer is

9    I don't know, you can say I don't know.

10              MS. JERJIAN:  Counsel, you're not -- the

11    witness started answering and you cut her off.

12              MR. KABA:  I did not.  I did not cut her

13    off.

14              MS. JERJIAN:  She started saying what the

15    point of her research was.  I don't have the text in

16    front of me, but you cut her off at that point.

17              MR. KABA:  I do and I did not cut her off.

18    All I'm noting for the record so counsel has the

19    benefit of it as well I'm not -- if I ask

20    straightforward questions as I have been and I get

21    responses that are actually not on my question, I will

22    go to the Court and ask for more time.  And you'll

23    reserve your objection to the request for more time,

24    but I am noting it for the record right now.  So if it

25    comes up again later in the day, I'll have already



MARSHINI CHETTY, PH.D.                                   April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      157

1   provided notice.

2               MS. JERJIAN:  I'm noting my dis -- that I

3   disagree with your characterization of your questions

4   and the witness's testimony.

5               MR. KABA:  That's fair.

6   BY MR. KABA:

7       Q     Let me ask you again.  Sitting here today

8   based on your review of Netflix's subscription

9   enrollment process, do you know if Netflix used dark

10  patterns, yes, no or I don't know?

11              MS. JERJIAN:  Objection, form.

12              THE WITNESS:  I don't know.

13  BY MR. KABA:

14      Q     Okay.  Sitting here today, can you identify

15  for us -- I'm not asking you to go study anything.

16  Just on the basis of the expertise and the research you

17  have done today, can you identify for us a single

18  online company that you would say does not use dark

19  patterns in its enrollment process?

20              MS. JERJIAN:  Objection, form.

21              THE WITNESS:  I believe I did mention that

22  I cannot give you that example right now.  So to my

23  knowledge, I can't give you an example.

24  BY MR. KABA:

25      Q     Okay.  Sitting here today, can you identify



1  for us a single company based on all of the expertise

2  that you have and all the research that you've done

3  that you would say does not use dark patterns in its

4  cancellation flow?

5              MS. JERJIAN:  Objection, form.

6              THE WITNESS:  Again, much like with

7  enrollment, I haven't studied every single company's

8  cancellation flow.  I'm not sure which kinds of dark

9  patterns you're specifically talking about, but -- and

10  since I didn't do that, I am unable to give you an

11  example.

12  BY MR. KABA:

13     Q    I'm asking you -- so is the answer to my

14  question, yes, you cannot identify any such company?

15              MS. JERJIAN:  Objection, mischaracterizes

16  the witness's testimony.

17  BY MR. KABA:

18     Q    Let me -- let me try it again.  Based on

19  all of the work and all of your expertise that you have

20  sitting here today, can you identify for us a single

21  company that you would say does not use any dark

22  patterns in its cancellation flow?

23              MS. JERJIAN:  Objection, form.

24  BY MR. KABA:

25     Q    Yes or no?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       159

1              MS. JERJIAN:  Objection, form, asked and

2      answered.

3              THE WITNESS:  No.  As I mentioned before

4      for all the reasons that I elaborated on.

5      BY MR. KABA:

6          Q      So then I am correct that -- by the way,

7      you identified as part of the expert report that you

8      prepared in this case that Amazon's Prime subscription

9      cancellation flows uses dark patterns, correct?

10         A      As part of my analysis, yes.

11         Q      But you can't tell me the names sitting

12     here today of any online company out there that does

13     not use dark patterns in the -- in its enrollment or

14     cancellation flows, correct?

15             MS. JERJIAN:  Objection, form,

16     mischaracterizes the witness's testimony.

17             THE WITNESS:  Again --

18     BY MR. KABA:

19         Q      Is that correct, Dr. Chetty?

20             MS. JERJIAN:  Same objection.

21             THE WITNESS:  As I mentioned before, I

22     haven't studied all the enrollment processes of every

23     single online company, so I don't know whether or not

24     they have any flows that use or don't use dark

25     patterns.



1  BY MR. KABA:

2      Q     Okay.  Put aside the ones that you don't

3  know about.  Just the ones that you are -- you do know

4  about just based on the online enrollment and

5  cancellation flows that you know about based on all of

6  your years of research and interest of this field, can

7  you identify a single online company out there that

8  does not use dark patterns in its enrollment or

9  cancellation flows, yes or no?

10             MS. JERJIAN:  Objection, form.

11             THE WITNESS:  Well, again, I haven't

12  studied the enrollment processes of different online

13  companies and cancellation, so I'd say I'm not able to

14  do that because I don't have that information.

15  BY MR. KABA:

16      Q     Thank you.

17             How many dark patterns are out there

18  recognized in the academic literature?

19             MS. JERJIAN:  Objection, form, overbroad.

20             THE WITNESS:  I'm not sure.  What do you

21  mean by how many?

22  BY MR. KABA:

23      Q     Do you know what the words how many mean?

24      A     Well --

25             MS. JERJIAN:  Objection, argumentative.



1   BY MR. KABA:

2       Q       So do you have my question in mind or did

3   you lose my question?

4       A       I lost your question.  Could you repeat it,

5   please?

6       Q       Absolutely.

7       A       Yes.

8       Q       You in all of the work that you've done in

9   this case have not spoken to a single Amazon Prime user

10  who told you I unintentionally enrolled in Prime, yes

11  or no?

12              MS. JERJIAN:  Objection, form, asked and

13  answered.

14              THE WITNESS:  So I think I mentioned before

15  I have not spoken to any Amazon Prime users about their

16  experiences in Amazon Prime itself with enrollment.

17  BY MR. KABA:

18      Q       So the answer to my question is yes, I have

19  not spoken to a single Amazon Prime subscriber past or

20  present who said to you that you -- that they

21  unintentionally enrolled in Prime, correct?

22              MS. JERJIAN:  Objection, form, asked and

23  answered multiple times at this point.

24              THE WITNESS:  So, again, you mean for the

25  purposes of this case and I did mention again, but,



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      169

1  again, I'll state it again.  I have not spoken to any

2  Amazon Prime users about their experiences of

3  enrollment in the actual Amazon Prime website.

4  BY MR. KABA:

5        Q       Okay.  But your -- you keep answering a

6  different question than I'm asking.  So if the answer

7  to my question is you are correct, I'd appreciate you

8  just saying you are correct.  So let me try my question

9  again.

10       A       Okay.

11       Q       And focus on your use of the word

12  unintentional which you used earlier.

13       A       Yes.

14       Q       For purposes of the work that you did in

15  this case, did you speak to any past or present Amazon

16  Prime subscriber who told you they unintentionally

17  enrolled in Amazon Prime, yes or no?

18              MS. JERJIAN:  Objection, form, asked and

19  answered multiple times at this point.

20              THE WITNESS:  So, again, I said no for the

21  reasons I mentioned.

22  BY MR. KABA:

23       Q       Thank you.

24              Did you speak with any Amazon Prime

25  subscriber who told you that they could not or were



1   unable to or were frustrated even during the

2   cancellation flow on Amazon Prime, yes or no?

3                MS. JERJIAN:  Objection, form, asked and

4   answered.

5                THE WITNESS:  So, again, as I mentioned

6   earlier, I have not spoken to anyone about the

7   cancellation process that they followed in the actual

8   Amazon Prime website for this case.

9   BY MR. KABA:

10      Q      So is the answer to my question correct

11  then?

12               MS. JERJIAN:  Objection, form, asked and

13  answered.

14  BY MR. KABA:

15      Q      I'll try my question again.  I'd like a yes

16  or no to my question.  Did you speak with any Amazon

17  Prime subscriber who told you that they could not, were

18  not or were frustrated in their ability to cancel

19  Prime, yes or no?

20               MS. JERJIAN:  Objection, form, asked and

21  answered multiple times.  Counsel, just because you

22  don't like her answer doesn't mean she's not answering

23  the question.

24               MR. KABA:  Save the commentary, please,

25  counsel.



 1              THE WITNESS:  So I did say before no and

 2    for the reasons I mentioned.

 3    BY MR. KABA:

 4        Q     Thank you.

 5              Okay.  You could have done -- you did this

 6    CandyForever study, but you could have done a study

 7    using the actual Amazon Prime enrollment and

 8    cancellation processes, right?

 9              MS. JERJIAN:  Objection, form.

10              THE WITNESS:  Exactly what do you mean,

11    like use them in what way?

12    BY MR. KABA:

13        Q     Instead of using this fake thing that you

14    created called CandyForever, you actually could have

15    run people through the Amazon Prime enrollment and

16    cancellation flows as Amazon Prime, correct?

17              MS. JERJIAN:  Objection, form.

18              THE WITNESS:  Well, in some manner of

19    speaking if I wanted to, yes, but it would not be as

20    easy.

21    BY MR. KABA:

22        Q     Okay.  But you could have done that.  It

23    may have taken more work, correct?

24              MS. JERJIAN:  Objection, form,

25    mischaracterizes the testimony.



1           MS. JERJIAN:  Objection, mischaracterizes

2    the witness's testimony.

3           THE WITNESS:  Again, I'm not sure which

4    action you're referring to.  Could you be specific?

5    BY MR. KABA:

6       Q     Sure.  So here it would be whatever the

7    countdown is counting down towards, right?

8           MS. JERJIAN:  Same objection.

9           THE WITNESS:  Well, I think I'd need a

10   specific example, but in general, this is a dark

11   pattern.

12   BY MR. KABA:

13      Q     Okay.  And so even if the countdown timer

14   was entirely accurate, so let's say in this

15   hypothetical, there was an offer to buy six pack of

16   water for 50 percent off, but the offer expired within

17   60 minutes.  That would be a countdown timer, correct?

18      A     Let me see if I understand your question

19   again.  So you're asking me about 60-minute timer going

20   off and you're being asked to buy a bottle of water and

21   you're asking me if the countdown timer is a dark

22   pattern option?

23      Q     Yes.

24          MS. JERJIAN:  Objection, form.

25          THE WITNESS:  Well, again, I'd need more



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       180

1  information.  In this article, some countdown timers

2  were more deceptive than others.

3  BY MR. KABA:

4      Q      Right.  So I'm not asking you now about the

5  level of deception yet.  I'm just asking about whether

6  or not you would consider the presence of a countdown

7  timer on an offer to be a dark pattern, yes or no?

8      A      Yes.

9      Q      Okay.  Even if the countdown timer was

10 entirely accurate namely that whatever was being

11 counted down towards would actually expire at the end

12 of the countdown period, would it still be a dark

13 pattern?

14          MS. JERJIAN:  Objection, form.

15          THE WITNESS:  So you're asking me -- could

16 you clarify?  So what do you mean by even if it was

17 accurate?  Do you just mean that accurate as in what

18 way?

19 BY MR. KABA:

20     Q      Well, let me -- you --

21     A      Like does -- does the deal expire?  Does

22 the deal not expire?

23     Q      Okay.  Let me try -- try it using your own

24 words.  You describe a countdown timer as something

25 that, quote, indicates to users that a deal or discount



MARSHINI CHETTY, PH.D.                          April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                  181

1    will expire using a countdown timer, correct?

2        A       Yes.

3        Q       Let me just add the word accurately before

4    indicating.  So something that is accurately truthfully

5    indicating to users that a deal or discount will expire

6    using a countdown timer.  Does that deal make it a dark

7    pattern?

8                MS. JERJIAN:  Objection, form.

9                THE WITNESS:  Yes.  It creates a false

10   sense of urgency as is noted here on this table.

11   BY MR. KABA:

12       Q       Okay.  The same thing indicating to users

13   that a deal or sale will expire -- will expire.  It

14   looks like a typo.  A patient, but indicating to users

15   that a deal or sale will expire soon without specifying

16   a deadline.  Do you see that?

17       A       I do see that, yes.

18       Q       Again, just add the word truthfully, namely

19   truthfully indicating to users that a deal or sale will

20   expire soon without specifying a deadline.  It's still

21   a dark pattern even if it's truthful, correct?

22                MS. JERJIAN:  Objection, form, vague as to

23   truthful.

24                THE WITNESS:  So truthfully you mean the

25   deal will expire?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      182

1   BY MR. KABA:

2        Q        Yes.

3        A        Yes.  It's a dark pattern that creates a

4   false sense of urgency.

5        Q        Okay.  So my -- the point I'm making here

6   using urgency as an example, but we can go through

7   others.  We can look at scarcity.  If you go down the

8   page, you have low stock message indicating to users

9   that limited quantities of a product are available

10  increasing its desirability.  Do you see that?

11       A        I do.

12       Q        Okay.  That's a dark pattern according to

13  you, right?

14       A        Correct.

15       Q        Now let's add the word truthful.

16  Truthfully indicating to users that limited quantities

17  of a product are available increasing its desirability.

18              MS. JERJIAN:  Objection.

19  BY MR. KABA:

20       Q        Does that still render it a dark pattern?

21              MS. JERJIAN:  Objection, form, vague as to

22  truthful.

23              THE WITNESS:  Well, again, I -- you know,

24  I'm assuming truthful means that you're saying the low

25  stock is corresponding exactly to how many items there



MARSHINI CHETTY, PH.D.                                      April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        183

```
 1   are.  I'd say it also with any of these including my

 2   previous answer just to clarify since I misunderstood

 3   before is that it really depends on the case of like

 4   how deceptive or how dark it is, but, yes, it is a dark

 5   pattern.

 6   BY MR. KABA:

 7        Q       Right.  So that's my -- my question right

 8   now is just like even if it is accurately reporting on

 9   limited quantities available, you would say that is

10   still a dark pattern?

11        A       Yes, because it creates a sense of

12   scarcity.

13        Q       Okay.  But it may not just be creating a

14   sense of scarcity.  There may, in fact, be scarcity;

15   isn't that right?

16             MS. JERJIAN:  Objection, form.

17             THE WITNESS:  Well, again, I'm not sure

18   which specific case you're talking about, but in this

19   case, these dark patterns create a sense of scarcity

20   for these.

21   BY MR. KABA:

22        Q       But even if there is actual scarcity, they

23   are still dark patterns according to you?

24             MS. JERJIAN:  Objection, form.

25             You can answer.
```



MARSHINI CHETTY, PH.D.                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                               184

1    BY MR. KABA:

2        Q        Yes or no?

3        A        As I mentioned before, yes, they can still

4    be manipulative because they can create a sense of

5    scarcity.

6        Q        Okay.  But as you've described already to

7    me how manipulative or how deceptive, et cetera would

8    require you to know a lot more about the context?

9        A        That's correct.

10       Q        Okay.  So that -- now let's go back to my

11   original question.  Something can be a dark pattern

12   even if it is entirely truthfully presenting

13   information to the user, correct?

14               MS. JERJIAN:  Objection, form, vague as to

15   something.

16               THE WITNESS:  Again, yeah.  I'm not --

17   could you be specific about what do you mean by

18   something?

19   BY MR. KABA:

20       Q        That is information can be presented to a

21   user that is entirely truthful, but the way that it is

22   being presented can render it a dark pattern, correct?

23       A        Based on my understanding of the question,

24   that is quite possible, yes.

25       Q        Okay.  And thinking through the Amazon



 1   enrollment flows that you have looked at in this case,
 2   can you identify any statement on any one of those
 3   flows that was false?
 4             MS. JERJIAN:  Objection, form, vague as to
 5   enrollment flows.
 6             THE WITNESS:  You mean in the Amazon
 7   enrollment process that I analyzed?
 8   BY MR. KABA:
 9        Q    Yes.
10        A    I don't have any information about the
11   inner workings of Amazon, but to my knowledge, all the
12   information presented on the pages was not false.
13        Q    So stated differently, all of the
14   information -- to your knowledge, all of the
15   information presented on the Amazon enrollment
16   processes that you looked at in this case was truthful,
17   correct?
18             MS. JERJIAN:  Objection, form.
19   BY MR. KABA:
20        Q    It's a yes or a no.
21        A    Well --
22             MS. JERJIAN:  Objection, form,
23   mischaracterizes the witness's testimony.
24             THE WITNESS:  Again, my assumption was that
25   all the information since I don't have the inner



 1  workings of Amazon was that the information presented

 2  was truthful, yes.

 3  BY MR. KABA:

 4      Q     Okay.  I don't want just your assumption.

 5  I want based on the expert work that you have done in

 6  this case.  Can you identify for us a single statement

 7  present in any of the Amazon enrollment processes that

 8  you looked at that was false?

 9            MS. JERJIAN:  Objection.

10  BY MR. KABA:

11      Q     Actually, let me try that a different way.

12      A     Okay.

13      Q     Let me be a little bit cleaner about that.

14      A     Okay.

15      Q     I'm not looking for any assumptions, Dr.

16  Chetty.  Based on your knowledge and the expert work

17  you've done in this case from any of the Amazon

18  enrollment processes that you looked at, can you

19  identify a single statement that was false?

20            MS. JERJIAN:  Objection, form and vague as

21  to false.

22            THE WITNESS:  Again, are you -- if you're

23  asking me if the information considered in those things

24  was truthful, I'm assuming yes.  I don't know -- I

25  don't have any other reason to believe that it was



```
 1   false.

 2   BY MR. KABA:

 3        Q       Right.  So, again, I'm putting aside your

 4   assumption.

 5        A       Right.

 6        Q       Put aside an assumption for a second.

 7   You're an expert in this case, right?

 8        A       Yes, I am.

 9        Q       Okay.  Can you identify a single false

10   statement that was presented to consumers on any of

11   Amazon's enrollment processes, yes or no?  Can you

12   identify one?

13                MS. JERJIAN:  Objection, form, vague as to

14   false.

15                THE WITNESS:  Again, I have no reason to

16   believe that any of the information I reviewed from

17   Amazon's -- the information on the flows that they

18   presented was inaccurate.

19   BY MR. KABA:

20        Q       Okay.  Same with respect to cancellation.

21   Do you have any reason to believe that any of the

22   information presented in Amazon's cancellation flows

23   for Prime was false?

24                MS. JERJIAN:  Objection, form.

25                THE WITNESS:  Again, to my knowledge of all
```



1  information in the cancellation flows and different

2  screens that I reviewed, I am assuming and also to my

3  knowledge, there was no false information.

4  BY MR. KABA:

5       Q     Okay.  So your opinion in this case about

6  dark patterns is not an opinion that anything Amazon

7  said to consumers as part of Prime enrollment or

8  cancellation was false, correct?

9             MS. JERJIAN:  Objection, form, vague as to

10  false.

11            THE WITNESS:  So, again, you're asking me

12  if the information -- are you asking me -- can you --

13  sorry.

14  BY MR. KABA:

15      Q     Don't rephrase the question.

16      A     I'm confused.  I'm confused.  Could you --

17      Q     Let me try -- I'll try it again.

18      A     Yes.  Could you be specific about what

19  you're asking, which information?

20      Q     You are not offering any opinion in this

21  case that any of the information Amazon provided to

22  customers about Prime enrollment or cancellation was

23  false, correct?

24            MS. JERJIAN:  Objection, form, vague as to

25  information.



1  understand how -- how intertwined these two assessments

2  are.  So let's say you have no think aloud study

3  whatsoever in this case.  You didn't do your 30-person

4  CandyForever study.  Okay?

5       A     Okay.

6       Q     What conclusions did you reach in this case

7  based only on the cognitive walkthrough analysis that

8  you personally performed?

9       A     Okay.  So based on -- you know, so you're

10  asking me to pretend like I didn't do the second study,

11  so this is sort of guessing of what I would think.

12      Q     No.  I'm not.  And you're again trying to

13  recharacterize my question.  Ask me -- ask me if you

14  don't understand my question, but we can't go through

15  every time I ask a question --

16      A     Well --

17      Q     Let me finish, please.  Every time I ask a

18  question, then you recharacterize that question.  Then

19  you answer the question that you think I'm asking and

20  then I have to go back to my question.  And we just --

21  we're building in a lot more time that feels

22  unnecessary here.  If I can clarify, I will clarify.

23  What I'm asking you is -- and the answer to this

24  question may be I can't separate the two out and that's

25  perfectly okay.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      201

1        A        Okay.

2        Q        Okay?  So let me just ask you.  If you took

3   outside and said we are going to ignore the think aloud

4   study altogether, were you able to reach any

5   conclusions in this case based solely on the cognitive

6   walkthrough?

7        A        Okay.  Thank you so much for clarifying.

8   I -- I can't separate them out.

9        Q        Okay.  So in order for you to reach the

10  conclusions that you have reached in this case, you

11  need both legs?  You need both the cognitive

12  walkthrough part of your work and the think aloud part

13  of your work, correct?

14              MS. JERJIAN:  Objection, mischaracterizes

15  the witness's testimony.

16              THE WITNESS:  So could you clarify what you

17  mean by I need both?

18  BY MR. KABA:

19        Q        That's fair.  Your conclusions in this case

20  as an expert --

21        A        Yes.

22        Q        -- require both of the evaluations you did

23  together, the cognitive walkthrough and the think aloud

24  parts?

25              MS. JERJIAN:  Objection, form.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      202

```
 1   BY MR. KABA:

 2        Q       Is that correct?

 3                MS. JERJIAN:  Objection, form, vague as to

 4   conclusion.

 5                THE WITNESS:  So if you're asking -- by

 6   conclusions you mean?

 7   BY MR. KABA:

 8        Q       Your expert opinions in this case.

 9        A       Yes.  They are both parts and -- both of

10   them helped me form my conclusions, yes.

11        Q       Right.  I'm just asking about both of them

12   helped you form -- this is what I'm saying.  Let me ask

13   the question and you tell me if you don't understand.

14        A       Okay.

15        Q       The conclusions that you have reached as an

16   expert in this case require you to consider both the

17   cognitive walkthrough and the think aloud part

18   together, correct?

19        A       What do you mean by require?

20        Q       That is you would not have the opinions

21   you've expressed if you took one of those two

22   evaluations out?

23        A       Correct.

24        Q       That's what I mean.

25        A       Yes.
```



MARSHINI CHETTY, PH.D.                                      April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                          203

1          Q        So in light of that, the expert opinions

2    you've reached in this case require consideration of

3    both your cognitive walkthrough and your think aloud

4    study together, correct?

5                   MS. JERJIAN:  Objection, form.

6                   THE WITNESS:  So both of these things

7    allowed me to form my conclusions in the report, the

8    cognitive walkthrough and the think aloud study.

9    BY MR. KABA:

10         Q        And it required you to consider those two

11   things together or in tandem as you described it in

12   order to reach the conclusions?

13                  MS. JERJIAN:  Objection, form, vague as to

14   required.

15                  THE WITNESS:  So, again, I chose these

16   methods and chose to do them and both of these things

17   helped me to form my opinions in the report.

18   BY MR. KABA:

19         Q        Right.  So I guess I'm still having a hard

20   time because I'm trying to figure out can I separate

21   out your opinions and say, well, this opinion can be

22   reached based solely on the cognitive walkthrough and

23   this opinion can be reached based solely on the think

24   aloud or all of your opinions sort of require

25   consideration of both the cognitive walkthrough and the



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        204

1  think aloud part together?

2      A      Both to my knowledge.  Both -- both of

3  these studies helped me to form my opinions.

4      Q      Okay.  So in order for us to get to the

5  opinions you reach in this case, you had to consider

6  both of your evaluations together, correct?

7             MS. JERJIAN:  Objection, form,

8  mischaracterizing the testimony.

9             THE WITNESS:  So, again, I conducted both

10  of these studies and used both of these to help me form

11  the opinions in the report.

12  BY MR. KABA:

13      Q      So we couldn't point to a opinion that you

14  have in this report that was based on solely the think

15  aloud part of your study as an example?

16             MS. JERJIAN:  Objection, form,

17  mischaracterizes the testimony.

18             THE WITNESS:  So, I -- again, I'm not sure

19  which opinions you're referring to, but as I mentioned

20  before, both of these pieces allowed me to form the

21  opinions in the report.

22             MS. JERJIAN:  Counsel, it's been an hour.

23  Can we take a break?

24             MR. KABA:  Sure.

25             THE VIDEOGRAPHER:  We are off the record at



1    2:01.

2                    (Deposition recessed at 2:01 p.m.)

3                    (Deposition resumed at 2:12 p.m.)

4                    THE VIDEOGRAPHER:  We are back on the

5    record at 2:12.

6    BY MR. KABA:

7        Q    Dr. Chetty, do you agree with me that

8    determining whether a dark pattern is deliberately

9    misleading can sometimes be hard to discern?

10                   MS. JERJIAN:  Objection, form, vague as to

11   deliberately misleading.

12                   THE WITNESS:  So you're asking me about --

13   just to clarify, are you asking about particular dark

14   pattern or --

15   BY MR. KABA:

16       Q    Dark patterns generally.  You identified

17   several of them in your paper and my question for

18   you is --

19       A    In which paper?

20       Q    The one that we were looking at which was

21   MC4.

22       A    Okay.  Yes.

23       Q    We were -- just spent quite a bit of time

24   talking about it.

25       A    Oh, yes.  Yes.



1   BY MR. KABA:

2        Q     Okay.  So we've established that the

3   information, the actual text, the words Amazon is using

4   in its enrollment flow and cancellation flow are to the

5   best of your knowledge truthful, correct?

6        A     Yes.

7        Q     And the issue that you are now talking

8   about is the way that those words are presented may be

9   dark patterns, correct?

10       A     They are dark patterns, yes.

11       Q     But it is not the words that are the dark

12  patterns.  It's the way that those words are presented

13  that are the dark -- that is the dark pattern in this

14  case at least, correct?

15       A     Well, that's one of the ways that I

16  mentioned that the -- they are dark patterns, yes.  One

17  of the ways is the way that the words are presented,

18  yes.

19       Q     And one of the ways is even although the

20  words being used are truthful, you take issue with the

21  words themselves, for example, with confirm shaming,

22  correct?

23            MS. JERJIAN:  Objection, form.

24            THE WITNESS:  Can you specify which words

25  you're talking about?



```
 1    BY MR. KABA:

 2         Q      Sure.  So confirm shaming is an example of

 3    the words being used themselves you would say are

 4    manipulative in some way, right?

 5         A      That seems fair, yes.

 6         Q      So even if the words are truthful, they can

 7    still in your opinion be manipulative, correct?

 8         A      Well, it depends on what you mean by

 9    manipulative.  Could you define what you mean by

10    manipulative?

11         Q      How do you understand the word

12    manipulative --

13         A      Well --

14         Q      -- in the context of dark patterns?

15         A      Well, in your specific example, I'm not

16    sure if you're asking me if the words are truthful or

17    not or if the presentation of the words is manipulative

18    or not.

19         Q      I'm saying the words are truthful even --

20    with confirm shaming.  Even the use of truthful words

21    like no thanks, I don't want free shipping is

22    manipulative because of the words that are being used,

23    correct?

24         A      Well, because of the manner in which the

25    decline option is being presented, if you're asking me
```



1  about if that manner is manipulative or not, then I

2  would say yes.

3      Q     So in this case, have you reached or are

4  you here to offer an opinion not just that Amazon is

5  using dark patterns -- I understand.  Let me rephrase

6  that.  You are opining in this case that Amazon has

7  dark patterns in its enrollment and cancellation flows,

8  correct?

9      A     Yes.

10      Q     I'm asking you sort of the second question

11  here.  Are you opining that Amazon's -- that those dark

12  patterns that you believe Amazon is using are

13  deliberately misleading?

14          MS. JERJIAN:  Objection, form.

15          THE WITNESS:  So if by deliberately

16  misleading you're asking me if the way the interface

17  was designed to be manipulative, then I would say yes.

18  BY MR. KABA:

19      Q     Okay.  Which dark patterns that Amazon uses

20  or that are present in Amazon flow are deliberately

21  misleading?

22      A     Well, you mentioned one confirm shaming.

23      Q     And nothing -- what is an example of

24  Amazon -- of confirm shaming on the Amazon enrollment

25  flow?



1       A       Well, it's the one you mentioned.  Sorry.

2   Wrong document.  I'm turning to the page that you had

3   with the UPDP.  So -- oh, that's the -- so on page 38

4   of my expert report, the one that you had just

5   mentioned is called confirm shaming and specifically in

6   this image of UPDP, it says no thanks, I do not want

7   free delivery.

8       Q       And that statement is true.  If you don't

9   accept the free trial of Prime, you would not get free

10  delivery, correct?

11              MS. JERJIAN:  Objection, form.

12              THE WITNESS:  Well, that's not what this

13  statement is saying.  It's not saying I would not get

14  free delivery.  It's saying I do not want free

15  delivery.

16  BY MR. KABA:

17      Q       So my question is:  If somebody clicked the

18  no thanks button here, they would not get free delivery

19  on this product.  Is that true or false?

20      A       Well, if you're just asking if they're not

21  going to get free delivery, then, yes, they won't get

22  free delivery, but that doesn't necessarily mean that

23  they do not want it.

24      Q       Right.  Well, you and I don't know what

25  they want because we haven't spoken to them, correct?



1  BY MR. KABA:

2      Q      Okay.  So here confirm shaming, your issue

3  is not that the words are untrue.  Your issue is you

4  should not use those words because that can be seen as

5  sort of shaming a customer, correct?

6      A      In some manner of speaking as I mentioned,

7  it depends on what you mean by truth because I don't

8  know if someone does not want free delivery, but, yes,

9  the manner in which the words are written is

10 problematic.

11     Q      So it's the words that are being used that

12 are problematic, not necessarily that the words

13 themselves are false; is that fair?

14             MS. JERJIAN:  Objection, form.

15             THE WITNESS:  Well, if you're asking me if

16 these words --

17 BY MR. KABA:

18     Q      Don't -- please don't if you're asking me,

19 Dr. Chetty.

20     A      Right.  Sorry.

21     Q      Let me -- let me try again.

22     A      Okay.  Yes.

23     Q      It is the words that are being used that

24 are problematic, not necessarily that the words

25 themselves are false.  Is that a fair characterization



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      226

1  of your opinion?

2       A      I think that's a fair characterization,

3  yes.

4       Q      Thank you.

5              Let's go back to MC4, that same section

6  6.4.  That's the one right in front of you.

7       A      Yes.

8       Q      You say opinions -- the next sentence --

9  opinions of dark patterns may also vary between and

10 among experts and users.  Do you see that?

11      A      Yes.

12      Q      Do you agree with that statement or

13 disagree?

14      A      I agree.

15      Q      Thank you.

16             Do you know who -- who would you say are

17 the leading experts in the field of dark patterns?

18             MS. JERJIAN:  Objection, form, vague as to

19 leading experts.

20             THE WITNESS:  So myself.

21 BY MR. KABA:

22      Q      I'm glad to hear that.  Who else?

23      A      Colin Grey.

24      Q      Okay.  Anybody else?

25             MS. JERJIAN:  Same objection.



1               THE WITNESS:  Lior Strahilevitz.

2    BY MR. KABA:

3        Q     What about Arunesh Mathur, M-A-T-H-U-R?  Do

4    you think that he's a leading expert on dark patterns?

5               MS. JERJIAN:  Objection, vague as to

6    leading expert.

7               THE WITNESS:  Do you mean -- what do you

8    mean by leading expert?  Does he still publish in this?

9    Is that -- or is he actively working on it?  Is that

10   what you're asking?

11   BY MR. KABA:

12       Q     So I asked you about leading experts maybe

13   60 seconds ago and then you offered me some names.

14       A     Yes.

15       Q     So you had an understanding of the term

16   leading expert at that time.

17       A     I'm trying to clarify.

18       Q     Okay.  Would you consider Arunesh Mathur an

19   expert in the field of dark patterns?

20               MS. JERJIAN:  Same objection.

21               THE WITNESS:  If you're asking me if he has

22   been a leading expert, I would say yes, but he's not

23   actively working on the matter as far as I know.

24   BY MR. KABA:

25       Q     Okay.  What about Jonathan Mayer,



 1   M-A-Y-E-R?

 2              MS. JERJIAN:  Same objection.

 3              THE WITNESS:  Similarly at the time he was

 4   working on this, but I'm not -- I couldn't say if he's

 5   still working on these topics actively.  I'm not sure.

 6   BY MR. KABA:

 7       Q     Okay.  What about Mihir, M-I-H-I-R,

 8   Kshirsagar, K-S-H-I-R-S-A-G-A-R?

 9              MS. JERJIAN:  Same objection.

10              THE WITNESS:  Sorry.  Are you asking about

11   the people in this paper or --

12   BY MR. KABA:

13       Q     I'm asking you about the name.

14       A     Oh, right.  So just to go back, if you're

15   asking me if these people are experts, then I would say

16   yes.

17       Q     Okay.  Thank you.

18       A     Just to clarify.  And now could you repeat

19   who you asked me about?

20       Q     I have -- I have -- I have the answer to my

21   question.  Let me go to -- let's mark tab 9.

22              (Chetty Exhibit MC5 was marked for purposes

23   of identification.)

24   BY MR. KABA:

25       Q     I'm marking as MC5 an article cited in your



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      229

1    report.

2         A       Yes.

3         Q       Do you recognize this, Dr. Chetty, as an

4    article by three Princeton professors or --

5         A       Well, Arunesh was not a Princeton professor

6    and neither was Mihir, but I do recognize this as three

7    authors from Princeton University.

8         Q       Okay.  Sorry.  Thank you for that

9    correction.

10                Do you recognize this as an article by

11   three authors from Princeton University including two

12   of whom were co-authors on your paper and this is

13   titled what makes a dark pattern dark?

14        A       I do.

15        Q       And this -- this was published in January

16   of 2021, correct?

17        A       Correct.

18        Q       And you -- you -- you reviewed this

19   article, in fact, cited --

20        A       I think May of 2021, yes.  I think this is

21   the archive date.

22        Q       Okay.  Sorry.  That's fair.  This was

23   published in May of 2021, right?

24        A       Yes.

25        Q       And you have reviewed this article.  In



MARSHINI CHETTY, PH.D.                                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                                  230

1    fact, you even cite it in your expert report in this

2    case, right?

3         A    Yes.

4         Q    And so in May of 2021 -- I just want you to

5    read the very beginning at the very top of this

6    article.  It's actually saying even as of May of 2021,

7    the current literature lacks a conceptual foundation.

8         A    Which sentence are you?

9         Q    If you look in the very first paragraph

10   towards the end.

11        A    Right.  Yes, I see it.

12        Q    What makes a user interface a dark pattern?

13   Why are certain designs problematic for users or

14   society?  Do you see that?

15        A    I do.

16        Q    Do you agree with those statements?

17             MS. JERJIAN:  Objection, form, compound

18   question.

19             THE WITNESS:  Well, which statement are you

20   talking about specifically?

21   BY MR. KABA:

22        Q    Do you believe that as of May of 2021, the

23   current literature on dark patterns lacked a conceptual

24   foundation what makes a user interface a dark pattern?

25        A    Were you asking specifically about at that



1   time May of 2021 or are you asking about since that

2   time?

3        Q       At that time.

4        A       At that time.  It seems accurate, yes.

5        Q       Okay.  Do you believe today that there's a

6   common shared knowledge now about what makes a user

7   interface a dark pattern?

8                MS. JERJIAN:  Objection, form.

9                THE WITNESS:  Well, there are ontologies

10  like Grey's Ontology which I refer to in my report

11  which does create a shared model for us to reason about

12  and talk about dark patterns, yes.

13  BY MR. KABA:

14       Q       And that Grey's Ontology came out in 2024,

15  right?

16       A       Well, it did, but it's based on many

17  different taxonomies and reports that came out earlier.

18       Q       Right.  So I guess I'm just ask -- my

19  question is really just at what point do you believe

20  there became a shared or common understanding about

21  what makes a user interface a dark pattern?

22                MS. JERJIAN:  Objection, vague as to shared

23  and common understanding.

24                THE WITNESS:  So if I'm to understand your

25  question, you're asking what point in time?  Do you



1  mean any time or could you define which time period

2  you're talking about?

3  BY MR. KABA:

4      Q     So you shared -- you just told me that you

5  agreed with this statement about the current literature

6  lacks a conceptual foundation what makes a user

7  interface a dark pattern.  You agreed with the

8  statement as of at least May of 2021, right?

9      A     Well, if you're asking me if I agree with

10  what the statement says in this paper as it's written,

11  it seems to be a reasonable statement in this paper at

12  that time, yes.

13      Q     So what I want to know is then when was

14  there no longer a lack of a conceptual foundation and a

15  shared or common understanding of what makes a user

16  interface a dark pattern?

17          MS. JERJIAN:  Objection, form.

18          THE WITNESS:  Could you explain what you

19  mean by when was there a conceptual foundation?  What

20  do you mean about a conceptual foundation?  Do you mean

21  like an ontology like Grey's Ontology?

22  BY MR. KABA:

23      Q     I already know when Grey's Ontology came

24  out.  It came out in 2024.

25      A     So I'm trying to clarify as I'm finding it



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       240

1    Do you -- I'm not quite sure.  What do you mean by

2    apply?

3    BY MR. KABA:

4        Q      Have you ever analyzed the use of what you

5    would call dark patterns -- sorry.  Strike that.

6               Have you ever analyzed the use by

7    traditional off-line businesses of what you would call

8    dark patterns?

9        A      Based on my understanding if you're asking

10   if I've conducted -- I mean, I --

11       Q      Please don't -- please don't --

12       A      Okay.  So are you asking -- okay.  Sorry.

13       Q      Don't -- if you don't understand a

14   question --

15       A      I don't understand what you mean by applied

16   my expertise.

17       Q      I didn't use the word applied.

18       A      Sorry.  Sorry.

19       Q      So, again, try to focus on my question.

20   This is like the fifth or sixth time I feel like you

21   are reading a word into my question that I didn't

22   actually ask you.

23       A      Okay.

24       Q      So I'll try my question again.

25       A      I'm so sorry about that.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        241

1          Q       It's okay.  You don't -- you don't have to

2   apologize at all.  I just want to make sure -- I'm

3   entitled on behalf of my clients to get my full

4   question answered.  And if you can't answer the

5   question, you are entitled to say I don't know, I don't

6   understand you, et cetera.

7          A       Okay.

8          Q       Have you ever analyzed the use of what you

9   would call dark patterns by off-line businesses?

10         A       Not to my knowledge.  I don't think so.

11         Q       So would you agree with me then that what

12  you describe as dark patterns for online businesses

13  may, in fact, be considered just traditional marketing

14  techniques that long existed for off-line businesses?

15                 MS. JERJIAN:  Objection, form.

16                 THE WITNESS:  Well, I'm not sure which dark

17  patterns you're referring to specifically.

18  BY MR. KABA:

19         Q       I'm not referring to any specific one.  I'm

20  asking you as a general matter would you agree with me

21  that what you would describe as a dark pattern used by

22  an online business may, in fact, just be considered

23  traditional marketing techniques that have long existed

24  for off-line businesses?

25         A       Well, I'd need to know exactly which



1    traditional techniques you are talking about to know

2    exactly, you know, which one you're trying to say is a

3    traditional marketing practice.  I mean, it certainly

4    seems possible, but I would need more context.

5         Q    Right.  So I'm not asking you about any

6    specific ones.  Just you've identified many dark

7    patterns that exist in online commerce, correct?

8         A    I've identified dark patterns in the

9    context of shopping in this article that we just read

10   together, yes.

11        Q    And what I'm asking you is do you agree or

12   disagree that what you have -- that you may be

13   describing as a dark pattern used by an online business

14   could, in fact, be considered a traditional marketing

15   technique that has long existed for an off-line

16   business?

17        A    Well, again, without knowing the specifics,

18   it sounds like it's possible, but I don't know which

19   marketing tactics you're talking about.  I'm not sure

20   which dark pattern you're referring to specifically.

21   It's certainly within the realm of possibility.

22        Q    Right.  So can you think of anything that

23   you describe as a dark pattern for an online business

24   that, in fact, is just a traditional marketing

25   technique used by off-line businesses?



MARSHINI CHETTY, PH.D.                                        April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        243

1      A      Well, I think I mentioned earlier I'm not

2   really a marketing expert.  So I don't really know what

3   constitutes a traditional marketing technique in

4   marketing.  And so it's hard for me to answer because

5   I'm not quite sure, you know, what you're asking me to

6   compare against.

7      Q      So the answer to my question is:  I don't

8   know?

9      A      I don't know.

10             MS. JERJIAN:  Objection.

11  BY MR. KABA:

12     Q      That's fine.  So that's -- that's a fair

13  answer to give.

14     A      Well, again, I'm missing the context.  You

15  haven't provided me with a specific dark pattern.  You

16  haven't provided me with specific traditional marketing

17  practices.  So I'm saying it's within the realm of

18  possibility, but I don't know specifically which ones

19  you are talking about, so it's hard for me to say.

20     Q      So one of the dark patterns that we talked

21  about earlier, for example, was a low stock message.

22  You said a low stock message is a dark pattern in the

23  online context, right?

24             MS. JERJIAN:  Where are you referring to,

25  counsel?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      244

 1            MR. KABA:  Is that an objection or are you
 2    asking a question?
 3            MS. JERJIAN:  Objection.
 4            MR. KABA:  Can you statement the objection
 5    for the record?
 6            MS. JERJIAN:  It looks like you're reading
 7    from a document.
 8            MR. KABA:  That's not an objection.  What's
 9    the actual objection?
10            MS. JERJIAN:  Identify and move on,
11    counsel.
12            MR. KABA:  Okay.  So please don't try to
13    guide the witness through commentary.
14            MS. JERJIAN:  I'm not trying to guide the
15    witness.
16            MR. KABA:  Counsel, you are.
17    BY MR. KABA:
18       Q    One of the dark patterns that we talked
19    about earlier was what you described as a low stock
20    message, correct?
21            MS. JERJIAN:  Objection, form.
22            THE WITNESS:  So in this particular
23    article, I think we went through the table and
24    mentioned that a low stock message if I remember
25    correctly is a form of -- sorry.  Let me just turn back



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      260

1              THE WITNESS:  -- consumers have been

2    coerced or deceived or manipulated into signing up for

3    Amazon Prime because I don't have access to that data.

4    BY MR. KABA:

5        Q    I'm not asking you about how many.  So,

6    see, you're answering a different question than I asked

7    you.

8              MS. JERJIAN:  She's answering your

9    question, counsel.

10   BY MR. KABA:

11       Q    I'm asking you --

12       A    Yes.

13       Q    -- you do not know if any Amazon Prime

14   subscribers were coerced, deceived or manipulated into

15   signing up for a Prime subscription as a result of the

16   use of dark patterns, correct?

17             MS. JERJIAN:  Objection, form.

18   BY MR. KABA:

19       Q    It's a yes or a no.

20             MS. JERJIAN:  Objection, form, asked and

21   answered, argumentative.  She's already responded.

22             THE WITNESS:  Well, again, I'm not Amazon,

23   so I don't have their information and so I'm unable to

24   answer that question.

25   BY MR. KABA:



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        261

1       Q      So I'm not asking you about Amazon's

2    information.   I'm asking you as an expert in this case.

3    Okay?

4       A      Yes.

5       Q      Are you with me?   You're an expert in this

6    case, right?

7       A      That's correct.

8       Q      You're an expert on dark patterns, correct?

9       A      That's correct.

10      Q      You are opining in this case that Amazon

11   utilizes dark patterns in its enrollment and

12   cancellation flows, correct?

13      A      That is correct.

14      Q      The definition of a dark pattern is a user

15   interface design choice that coerces, deceives or

16   manipulates users into making a decision that if fully

17   informed or otherwise capable of selecting an

18   alternative they would not have made, correct?

19      A      That does sound correct, yes.

20      Q      But sitting here as an expert, you cannot

21   identify a single consumer that was coerced, deceived

22   or manipulated into signing up for Amazon Prime,

23   correct?

24             MS. JERJIAN:   Objection, form, asked and

25   answered, mischaracterizes the witness's testimony.



MARSHINI CHETTY, PH.D.                                          April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                          262

1              THE WITNESS:  Well, as I mentioned before,

2    I don't work for Amazon.  So I don't have access to

3    that kind of data, so I wouldn't be able to answer your

4    question.

5    BY MR. KABA:

6        Q      So the answer to my question is correct.

7    You sitting here today as an expert cannot identify a

8    single consumer that was coerced, deceived or

9    manipulated into signing up for Amazon Prime?

10             MS. JERJIAN:  Objection, asked and answered

11   multiple times.

12             THE WITNESS:  Well, I do believe I have

13   answered that question, but I will repeat it again in

14   case you can't hear me on the mic.  I don't work for

15   Amazon and I don't have their data, so I could not tell

16   you how many consumers have been coerced, deceived or

17   manipulated into signing up for Prime because I don't

18   have access to that data.

19   BY MR. KABA:

20       Q      I'm not asking you about how many.  I'm

21   asking you if you can identify a single one.  Let me

22   ask you -- let me ask you a different way, Dr. Chetty,

23   because you seem to be resisting the way I'm asking you

24   these questions.

25             MS. JERJIAN:  Objection.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      263

1   BY MR. KABA:

2        Q        Can you identify for us a single consumer

3   who was coerced into signing up for Amazon Prime even

4   one?

5        A        Well, again, as I've mentioned before, I

6   don't have access to that data.  So if you're asking me

7   on the Amazon side how many consumers have been

8   coerced, deceived and manipulated into signing up for

9   Prime, I don't have access to that data, so I couldn't

10  tell you.

11       Q        That's not my question.  Do you remember

12  what my question was?

13       A        Could you repeat the question?

14       Q        Okay.  I will repeat the question.

15       A        Okay.  Thank you.

16       Q        Can you identify a single consumer that was

17  coerced into signing up for Amazon Prime, yes or no?

18                MS. JERJIAN:  Objection, form, asked and

19  answered.

20                THE WITNESS:  I believe that I said that I

21  don't have access to that data and so I'm unable to do

22  that.

23  BY MR. KABA:

24       Q        Can you identify a single consumer who was

25  deceived into signing up for Amazon Prime?



MARSHINI CHETTY, PH.D.                                          April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                              264

1       MS. JERJIAN:  Objection.

2       THE WITNESS:  Again, I believe I've

3   answered that question and I said I don't have access

4   to that data and I'm unable to give you an answer.

5   BY MR. KABA:

6       Q     So you cannot -- no, you can give me an

7   answer.  The answer is you cannot identify a single

8   consumer who has been coerced, deceived or manipulated

9   into signing up for Amazon Prime, correct?

10      A     Because I do not have that data.

11      MS. JERJIAN:  Objection, mischaracterizes

12  the witness's testimony.

13  BY MR. KABA:

14      Q     You keep wanting to go back to that data.

15  I understand you have only the things that the FTC gave

16  you to consider in this case, correct?

17      A     That is correct.

18      Q     And the things that the FTC gave you to

19  consider in this case and the documents that they hand

20  picked for you are reflected as the materials you

21  considered in your report, correct?

22      MS. JERJIAN:  Objection to the

23  characterization.

24      THE WITNESS:  Yes.  I do believe we looked

25  at them earlier, yes.



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       265

1  BY MR. KABA:

2      Q     Okay.  So I understand that that's all the

3  materials that you had in this case.  I'm asking you as

4  part of your expert opinions here --

5      A     Yes.

6      Q     -- are you able to identify a single

7  consumer that was coerced, deceived or manipulated into

8  signing up for Amazon Prime, yes or no?

9            MS. JERJIAN:  Objection, asked and answered

10  multiple times.

11            THE WITNESS:  So as I mentioned before, I

12  don't have access to that kind of data and so I'm

13  unable to provide an answer to that question.

14  BY MR. KABA:

15      Q     No.  You keep saying you're unable to

16  provide an answer to the question.  I'm not telling you

17  tell me the name of the consumer.  I'm saying can you

18  even identify a consumer.  So do you see the difference

19  between the questions that I'm asking?

20      A     Not quite.  Could you be more clear?

21      Q     I'm not asking you for any names of anyone.

22  Okay?

23      A     Okay.

24      Q     You've already told me that you could not

25  tell me how many, if any, customers were coerced,



MARSHINI CHETTY, PH.D.                                 April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                    266

1  deceived or manipulated into signing up for Prime,

2  correct?

3            MS. JERJIAN:  Objection, mischaracterizes

4  the testimony.

5            THE WITNESS:  I did say that I don't have

6  access to Amazon's internal data, so I can't tell you

7  how many users have been coerced, deceived or

8  manipulated into signing up for Amazon Prime.

9  BY MR. KABA:

10     Q      And you also established that you could

11  have asked the FTC for that data, but you didn't,

12  right?

13            MS. JERJIAN:  Objection, mischaracterizes

14  the witness's testimony.

15            THE WITNESS:  Well, earlier you asked me if

16  I asked -- you asked me if I had that -- no.  You asked

17  me if I'd asked for that data and I said no.

18  BY MR. KABA:

19     Q      Okay.  But you could have asked for it,

20  correct?

21     A      Theoretically, yes.

22     Q      Okay.  So now I'm asking you something

23  different and this is a yes or no.  This isn't a I

24  can't answer that question.  I think if you're -- I

25  think what you mean by I can't answer that question is



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       267

1    no, I don't know.  So I'll try my question.  Are you

2    able as an expert in this case to identify a single

3    customer who was coerced, deceived or manipulated into

4    signing up for Prime?

5              MS. JERJIAN:  Objection, form, asked and

6    answered.

7              THE WITNESS:  So, again, I don't have

8    access to that kind of data, so I'd say I'm unable to

9    identify any consumer that's been deceived, coerced or

10   manipulated into signing up for Prime because I'm not

11   working at Amazon.

12   BY MR. KABA:

13       Q    Okay.  And are you -- I have the same

14   question on cancellation.  Are you able to identify a

15   single consumer that was coerced, deceived or

16   manipulated into remaining a Prime member as a result

17   of Amazon's cancellation flow?

18              MS. JERJIAN:  Objection, form.

19              THE WITNESS:  Again, I don't have access to

20   that data from Amazon and so to be clear, are you again

21   saying like any consumer outside of any study I

22   conducted?  So --

23   BY MR. KABA:

24       Q    For purposes of your expert work in this

25   case, Dr. Chetty --



1      A      Yes.

2      Q      -- are you able to identify a single

3  consumer who was coerced, deceived or manipulated into

4  remaining a Prime subscriber as a result of the use of

5  what you would call dark patterns in Amazon's

6  cancellation flow?

7              MS. JERJIAN:  Objection, form, asked and

8  answered.

9              THE WITNESS:  So, again, I don't have

10  access to that data and so I'm unable to identify a

11  consumer in that way.

12              MS. JERJIAN:  It's been over an hour.

13              MR. KABA:  Yeah.  I'm happy to take a break

14  whenever you want.

15              THE VIDEOGRAPHER:  We are off the record at

16  3:18.

17              (Deposition recessed at 3:18 p.m.)

18              (Deposition resumed at 3:29 p.m.)

19              THE VIDEOGRAPHER:  We are back on the

20  record at 3:29.

21  BY MR. KABA:

22      Q      Dr. Chetty, on MC2 which is your

23  affirmative report on paragraph 83 on page 29 --

24      A      Paragraph?

25      Q      Eighty-three.



1  a moment, I will look through them.  Are these the ones

2  with corrected references?

3        Q      It's the report that I was given.

4        A      Are these the ones with my corrected

5  references?

6        Q      When did you serve a report with corrected

7  references?

8        A      I believe after I submitted my rebuttal.

9        Q      Presumably.

10       A      So if you look at reference 80.

11       Q      Yes.

12       A      And also 81.  You'll notice that I cite Ben

13 Shneiderman and Ben Shneiderman is the one who designed

14 or came up with eight golden rules of good design.

15       Q      Okay.  So that -- you're applying those

16 eight rules for purpose of your cognitive walkthrough?

17       A      Well, a cognitive walkthrough does many

18 different things which I do explain over here.

19       Q      Do you have my question in mind?

20       A      Yes.  And so I was about to answer your

21 question if you give me a minute.  So right.  So for

22 cognitive walkthrough if you go to page 25 in paragraph

23 65, I'm asking in particular whether the user will

24 achieve the right effect aligned with the intentional

25 interface to notice that a correct action to take is



1    available in the interface.

2             Three, know that the correct action is

3    associated with the effect they're trying to achieve

4    and, four, make progress towards solving their overall

5    task.  For instance, find product on an online checkout

6    flow.  So those were the main things that I was asking

7    during my walkthrough.

8             And in addition, I also looked and took

9    these principles of good design into account as I was

10   evaluating each different screen in these flows

11   answering these questions.

12       Q    So then do you remember what my question

13   was?

14       A    Could you repeat your question?

15       Q    Sure.  You were applying these eight rules

16   for purposes of going through your cognitive

17   walkthrough, yes or no?

18            MS. JERJIAN:  Objection, form, asked and

19   answered.

20            THE WITNESS:  I think I did explain to you

21   that my primary questions I was asking the cognitive

22   walkthrough were these questions that I specified in

23   page 25, paragraph 65.  And in addition, I also used

24   guiding principles of good design to help me in my

25   evaluation.



```
 1    BY MR. KABA:
 2        Q      And those guiding principles included the
 3    eight golden rules?
 4              MS. JERJIAN:  Objection, asked and
 5    answered.
 6              THE WITNESS:  So as I mentioned again, yes.
 7    BY MR. KABA:
 8        Q      Yeah.  The reason I'm asking you is because
 9    you said I used the guiding principles of good design,
10    but on page 29, you have the principles of good design
11    as one thing and then the golden rules as a separate
12    thing.
13        A      Well, again --
14              MS. JERJIAN:  Is that a question,
15    counselor?
16              THE WITNESS:  Right.  Are you asking a
17    question if they're two separate things or --
18    BY MR. KABA:
19        Q      Yeah.  Are they two separate things?
20        A      Well, as I mentioned before earlier on in
21    this report, I have summarized a number of good design
22    principles on page 12 in paragraph 33 including the
23    eight golden rules.
24        Q      Okay.  So the eight golden rules are a part
25    of good design principles then?
```



 1 | article.  So, again, it's difficult to answer your
 2 | question.  On one hand, yes, I've seen work, but, you
 3 | know, this particular article I've mentioned.  But I
 4 | haven't read it, so, you know, I'm not aware of any
 5 | others.
 6 | BY MR. KABA:
 7 |     Q     Okay.  So putting aside what may or may not
 8 | be in this Colin Grey article, are you aware of anybody
 9 | who has conducted a cognitive walkthrough of Amazon's
10 | enrollment or cancellation processes as you have done
11 | in this case?
12 |             MS. JERJIAN:  Objection, form, asked and
13 | answered.
14 |             THE WITNESS:  I think I have answered this
15 | question already and I said not to my knowledge.
16 | BY MR. KABA:
17 |     Q     Okay.  The cognitive -- is it possible that
18 | another expert performing a similar quote, unquote
19 | cognitive walkthrough would come to different
20 | conclusions than you would?
21 |             MS. JERJIAN:  Objection, form.
22 |             THE WITNESS:  Different conclusions about
23 | what?
24 | BY MR. KABA:
25 |     Q     About the questions that you were asked.



```
1                    MS. JERJIAN:  Objection, form.

2                    THE WITNESS:  Which questions?

3    BY MR. KABA:

4         Q       Paragraph 65, your report, the expert

5    should determine whether the user one, two, three,

6    four.  Do you see that?

7         A       I do, yes.

8         Q       Is it possible that a different expert also

9    an expert in the same areas as your expertise would

10   perform the cognitive walkthrough and reach different

11   conclusions than you did in response to the questions

12   you are looking at?

13                   MS. JERJIAN:  Objection, form.

14                   THE WITNESS:  What do you mean by different

15   conclusions?

16   BY MR. KABA:

17        Q       Different determinations.

18                   MS. JERJIAN:  Same objection.

19                   THE WITNESS:  So determinations how?  Like

20   would they -- like I'm still not quite understanding.

21   BY MR. KABA:

22        Q       Do you believe that every other expert who

23   performs the cognitive walkthrough you performed in

24   this case would arrive at the same conclusions that you

25   arrived as a result of that walkthrough?
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        286

1              MS. JERJIAN:  Objection, vague as to

2    expert.

3              THE WITNESS:  Well, assuming that they were

4    trying to the answer same research questions that I was

5    trying to answer which I pointed out on page 1 of my

6    report, it's highly likely that they would arrive at

7    similar conclusions, but quite possible they could

8    arrive and have additional conclusions.

9    BY MR. KABA:

10      Q      And it's possible they could arrive at

11   different conclusions than you, correct?

12             MS. JERJIAN:  Objection, form.

13             THE WITNESS:  Well, what do you mean by

14   different?

15   BY MR. KABA:

16      Q      What do you understand the word different

17   to mean, Dr. Chetty?

18      A      Well, it could mean many things.  It could

19   mean, you know, conclusions that have additional, for

20   example, problematic issues because sometimes when

21   multiple cognitive walkthroughs are performed, they may

22   uncover additional issues.  That's one definition.

23   There are other definitions of different.

24      Q      Is it possible that another expert could do

25   the same cognitive walkthrough as you did and find that



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      287

1  some of the design interfaces being used were not

2  problematic even though you thought they were

3  problematic?

4              MS. JERJIAN:  Objection, form.

5              THE WITNESS:  It's highly unlikely, but

6  theoretically possible.

7  BY MR. KABA:

8      Q     Are you aware of a single court anywhere in

9  the country that has accepted a cognitive walkthrough

10  as an acceptable expert methodology?

11             MS. JERJIAN:  Objection, form, calls for a

12  legal conclusion.

13             THE WITNESS:  I -- I am not a legal expert

14  and so I don't know every single court case and I just

15  don't know the answer to that.

16  BY MR. KABA:

17      Q     So I'm not asking you again about every

18  single court case.  I know you don't know every court

19  case.  Okay?

20      A     Yes.

21      Q     I'm asking for your knowledge.  Are you

22  aware of a single court anywhere in the country that

23  has accepted a cognitive walkthrough as an acceptable

24  expert methodology?

25             MS. JERJIAN:  Objection, asked and



```
 1   answered, form, calls for a legal conclusion.
 2              THE WITNESS:  Again, I'm not a legal expert
 3   and I don't know about every single court case.
 4   BY MR. KABA:
 5       Q     Do you know of any, any court anywhere in
 6   the country that has accepted a quote, unquote
 7   cognitive walkthrough as an acceptable expert
 8   methodology?
 9              MS. JERJIAN:  Objection, form, calls for a
10   legal conclusion, asked and answered.
11              THE WITNESS:  Well, again, I, you know --
12   BY MR. KABA:
13       Q     Are you aware of any?
14       A     I'm not --
15              MS. JERJIAN:  Let the witness finish.
16              THE WITNESS:  I'm not sure of what you mean
17   by any court and like do you mean in the U.S. or I'm
18   not aware of --
19   BY MR. KABA:
20       Q     So my question was any court in the
21   country.  So the country I would generally assume to be
22   the U.S.
23       A     I apologize because sometimes I didn't
24   quite catch all of your question.
25       Q     Okay.
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       302

```
1    question.
2         A      I am misunderstanding.  Are you asking
3    if --
4         Q      Okay.
5         A      Yeah.  Could you -- could you be clear
6    about -- are you asking me about the Prime membership?
7    I'm not quite sure.
8         Q      One of the important pieces of context that
9    you would need to consider to evaluate whether the
10   enrollment or cancellation flows are problematic is
11   actually considering what is the customer being offered
12   as part of the thing to which they are being asked to
13   subscribe, correct?
14              MS. JERJIAN:  Objection, form.
15              THE WITNESS:  So by being offered if you
16   mean like are they being shown information about Amazon
17   Prime, then that sounds correct.
18   BY MR. KABA:
19        Q      Yes.  That is what I'm asking.
20        A      Okay.  Thank you for clarifying.
21        Q      Okay.  Do you agree that with respect to
22   cancellation, companies don't want people to
23   accidentally cancel their account and so some friction
24   in the process is actually good?
25              MS. JERJIAN:  Objection, form.
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        303

```
1                    THE WITNESS:  That sounds reasonable.
2    BY MR. KABA:
3         Q      We talked a little bit about confirm
4    shaming before and we used an example of no thanks, I
5    don't want free shipping.  Do you remember that?
6         A      I do.
7         Q      Do you believe if all it said was no thanks
8    instead of no thanks, I don't want free shipping if the
9    decline option just said no thanks, would that still be
10   confirm shaming?
11                  MS. JERJIAN:  Objection, form.
12                  THE WITNESS:  So I don't have the exact
13   example you're talking about, but I think in many
14   instances, yes.
15   BY MR. KABA:
16        Q      So just -- and that's just the use of the
17   word thanks?
18                  MS. JERJIAN:  Objection, form, asked and
19   answered.
20                  THE WITNESS:  So as I --
21   BY MR. KABA:
22        Q      I haven't even finished my question.
23   That's just the use of the word thanks that is the
24   confirm shaming aspect of that, correct?
25                  MS. JERJIAN:  Objection, form.
```



MARSHINI CHETTY, PH.D.                                   April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      304

1             THE WITNESS:  Well, it's the whole phrasing
2    no thanks.
3    BY MR. KABA:
4        Q      So if it just said no, would that be
5    confirm shaming?
6             MS. JERJIAN:  Objection, form.
7             THE WITNESS:  I don't believe it would be.
8    BY MR. KABA:
9        Q      Okay.  So it's the fact that it says no
10   thanks that makes it confirm shaming?  It's the
11   addition of thanks?
12            MS. JERJIAN:  Objection, form, asked and
13   answered.
14            THE WITNESS:  So as I mentioned before,
15   it's the combination, yes.
16   BY MR. KABA:
17       Q      So just so we're clear, if the decline
18   option just said no, you would say no dark pattern
19   there on confirm shaming?
20            MS. JERJIAN:  Objection.
21            THE WITNESS:  Well, it depends on the
22   context in which you're asking me.  Again, if you're
23   asking me about UPDP or if you're asking me about
24   something specific, it would be easier to answer the
25   question, but I'm not quite certain of the context in



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                     305

 1  which you're asking me.

 2  BY MR. KABA:

 3       Q      I'm asking you about this case.

 4       A      You're asking me about this case?

 5       Q      Yes.  So in this case, your opinion is that

 6  where Amazon -- the Amazon Prime decline option says no

 7  thanks, that's confirm shaming?

 8       A      Well, not quite be -- yes.  I'm sorry.

 9  Yes, it is when it says no thanks, but it's also in

10  conjunction with whatever the accept button is saying

11  as well.

12       Q      Okay.  So I want to focus on the decline

13  option right now.

14       A      Okay.  But they kind of work in tandem.

15       Q      Okay.  But I'm just asking about confirm

16  shaming for the decline option.

17       A      Right.  But what I'm saying is confirm

18  shaming, it's something that you evaluate in context

19  with the accept option and the wording of the accept

20  option in addition.

21       Q      Okay.  I understand.  That's fair.

22       A      Because you kind of have to see what

23  they're both saying to some extent.

24       Q      So let's -- let's do my own version of an

25  AB test right now.  Assume the accept option stays the



 1  study.  How did you recruit participants for that

 2  study?

 3      A      Well, I think I pointed you to this page

 4  before, but --

 5      Q      So, Dr. Chetty, do you remember how I told

 6  you that your expert report is not evidence in the

 7  case?

 8             MS. JERJIAN:  It's an exhibit in this

 9  deposition.

10  BY MR. KABA:

11      Q      Dr. Chetty, do you remember how I told you

12  your expert report is not evidence in this case?

13      A      I do, yes.

14      Q      Right.  So when I'm asking you questions,

15  again, I'm not asking you to -- this is not a memory

16  test.

17      A      Oh, yes, which is why I'm referring you to

18  the report.

19      Q      Right.  So if you need to refer to the

20  report, that's okay.  I presented it to you.

21      A      Yes.

22      Q      But I don't need you to -- I need a -- I

23  need a record where I'm getting your testimony, not

24  just as I pointed you to before in the report.  That's

25  why I'm asking you about these questions with respect



1    to your testimony as the expert in the case.

2        A    Okay.

3        Q    So how did you recruit participants for the

4    CandyForever study?

5        A    Well, as I mentioned in the report, I used

6    a recruiting firm called Focuscope in Chicago.

7        Q    Okay.  And do the participants in the

8    study, the 30 participants in your CandyForever study,

9    is that a accurate cross section of Amazon.com users?

10            MS. JERJIAN:  Objection, form, vague as to

11   cross section.

12            THE WITNESS:  What do you mean by cross

13   section?

14   BY MR. KABA:

15       Q    Sure.  Do the -- are the 30 people who

16   you -- who you considered in your CandyForever study,

17   are they representative in terms of the percentages of

18   people in particular age groups, income levels,

19   education levels, gender, et cetera of Amazon.com

20   shoppers?

21            MS. JERJIAN:  Objection, form.

22            THE WITNESS:  Well, this wasn't an

23   experiment, so they're not representative because that

24   was not one of the things they needed to be.

25   BY MR. KABA:



MARSHINI CHETTY, PH.D.                                  April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                    316

1       Q       This -- your CandyForever study was not an

2   experiment; is that right?

3       A       That's correct.

4       Q       You were not trying to get to statistically

5   significant findings as a result of your CandyForever

6   study, correct?

7       A       That sounds correct, yes.

8       Q       Okay.  You -- you've established a lot

9   multiple times now that when evaluating dark patterns,

10  context matters, right?

11      A       That's correct.

12      Q       Okay.  CandyForever is not a website that

13  any of your 30 participants had ever previously

14  encountered, correct?

15      A       That is correct.

16      Q       Do you know if your participants had ever

17  encountered any website at all whether CandyForever or

18  not where the only thing they could buy on the website

19  was candy?

20              MS. JERJIAN:  Objection, form.

21              THE WITNESS:  I didn't ask them that

22  question, so I don't know.

23  BY MR. KABA:

24      Q       Okay.  On Amazon.com, you can buy

25  everything from A to Z, right?



MARSHINI CHETTY, PH.D.                                      April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        317

1              MS. JERJIAN:  Objection, form.

2              THE WITNESS:  So A to Z as in products or

3    are you --

4    BY MR. KABA:

5        Q     Yeah.  I mean, Amazon has a -- has millions

6    and millions of products not just candy available for

7    sale, correct?

8        A     That is correct.

9        Q     Whereas how many of your 30 participants

10   were familiar with Amazon.com?

11             MS. JERJIAN:  Objection, form, vague as to

12   familiar with.

13             THE WITNESS:  So familiar with, can you

14   specify what that means?

15   BY MR. KABA:

16       Q     How many of your participants had ever used

17   Amazon.com before they participated in your

18   CandyForever exercise?

19             MS. JERJIAN:  Objection, form.

20             THE WITNESS:  Right.  So if I go through

21   here because I need to look at this specifically, I

22   don't have my notes in front of me, but I do believe I

23   do mention that here because I just wanted to make

24   sure.  So right.  So in page 92 on paragraph 334, I do

25   believe I say half of the participants were frequent



 1  Amazon shoppers and listed Amazon as one of their top

 2  three most visited sites.  And the other half were

 3  infrequent Amazon shoppers.  Eight didn't select Amazon

 4  as one of their most frequently visited sites and seven

 5  selected Amazon as one of their most frequently visited

 6  sites, but only shopped online at least once a month.

 7  BY MR. KABA:

 8      Q      So that would suggest all 30 of yours were

 9  Amazon shoppers either frequent or infrequent, correct?

10            MS. JERJIAN:  Objection, form.

11            THE WITNESS:  Well, as I've stated here,

12  yes.  Half were frequent Amazon shoppers and listed

13  Amazon as one of the top three most visited sites and

14  the other half were infrequent Amazon shoppers.  As I

15  mentioned here, seven selected Amazon as one of the

16  most frequently visited sites, but they only shopped

17  online at least once a month and eight didn't select

18  Amazon as one of their most frequently visited sites.

19  BY MR. KABA:

20      Q      I don't need you to read the text back to

21  me.  My question for you is:  All 30 of your

22  CandyForever participants were either frequent or

23  infrequent Amazon shoppers, correct?

24            MS. JERJIAN:  Objection, mischaracterizes

25  the report and testimony.



MARSHINI CHETTY, PH.D.                                        April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        319

```
1              THE WITNESS:  So as I mentioned here and
2    I'll refer you back to that, yes.  Based on what I
3    wrote in this paragraph, yes.
4    BY MR. KABA:
5         Q      And none of them were ever CandyForever
6    shoppers, right?
7         A      No, but that was part of the study.
8         Q      Right.  And CandyForever is not -- from a
9    user's perspective, going to CandyForever.com is not
10   the same as going to Amazon.com, right?
11              MS. JERJIAN:  Objection, form.
12              THE WITNESS:  What do you mean by the same?
13   BY MR. KABA:
14        Q      They couldn't buy the same products on
15   Amazon. -- on CandyForever that they could on
16   Amazon.com, right?
17        A      No.  They could not buy the same
18   products on -- well, they could buy candy which they
19   can also buy on Amazon, but are you asking about all
20   the different products?
21        Q      Users could not buy -- there is not an
22   overlap -- well, strike that.
23              Users cannot buy anything more than just
24   candy on CandyForever, correct?
25        A      Yes.
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      320

1      Q      But on Amazon, they could buy many more

2   things than just candy, correct?

3             MS. JERJIAN:  Objection, form, asked and

4   answered.

5             THE WITNESS:  Yes.

6   BY MR. KABA:

7      Q      You are familiar that Amazon Prime does a

8   lot of marketing about Prime and the benefits of Prime,

9   correct?

10            MS. JERJIAN:  Objection, form.

11            THE WITNESS:  So by marketing, exactly

12   where -- I mean, you mean on the site or --

13   BY MR. KABA:

14      Q      On the site, on advertisements, in

15   commercials, in billboards and other traditional

16   marketing channels, you are aware that Amazon does a

17   lot of marketing around Prime, correct?

18      A      Yes.

19      Q      CandyForever did -- there's no marketing

20   about CandyForever, right?

21      A      No.

22      Q      That is I'm correct?

23      A      Yes.

24      Q      And there is no marketing about what you

25   call CandyForever premium, correct?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      321

1        A        Correct.

2        Q        And to be clear, your exercise since you

3   said it's not a experiment for CandyForever was about

4   offering consumers an option to sign up for -- you

5   called it CandyForever premium, right?

6        A        What do you mean by exercise?

7        Q        This CandyForever, this 30-participant

8   study that you did.

9        A        So if you're referring to the think aloud

10  study I did, you're asking -- could you repeat the

11  question again?

12       Q        Sure.  In the think aloud study you did for

13  CandyForever, you offered the users an option to sign

14  up for what you described as CandyForever premium,

15  correct?

16       A        Correct.

17       Q        Premium is an adjective, right?

18                MS. JERJIAN:  Objection, form.

19                THE WITNESS:  An adjective like

20  describing --

21  BY MR. KABA:

22       Q        Is premium an adjective?

23                MS. JERJIAN:  Objection, form.

24                THE WITNESS:  It could be an adjective,

25  yes.



MARSHINI CHETTY, PH.D.                                           April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                            322

```
1   BY MR. KABA:
2       Q       Yes.  Amazon doesn't call its offer Amazon
3   premium, right?  It calls it Amazon Prime, correct?
4       A       Correct.
5       Q       And Amazon Prime is actually a brand, isn't
6   it?
7               MS. JERJIAN:  Objection, form.
8               THE WITNESS:  Well, Prime is also an
9   adjective.
10  BY MR. KABA:
11      Q       Amazon Prime, the program is actually a
12  brand, isn't it?
13              MS. JERJIAN:  Objection, form.
14              THE WITNESS:  So you're asking me if Amazon
15  Prime is a brand?
16  BY MR. KABA:
17      Q       Yes.
18      A       Yes.
19      Q       Okay.  And it's a brand that has many
20  different benefits included with it in addition to free
21  shipping, correct?
22              MS. JERJIAN:  Objection, form, asked and
23  answered.
24              THE WITNESS:  I believe we did discuss this
25  and yes.
```



MARSHINI CHETTY, PH.D.                                April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                323

1  BY MR. KABA:

2      Q      CandyForever premium on the other hand is

3  not a brand that anybody knows, right?

4      A      Well, it is a brand that we created, but

5  since this was only created for the purpose of the

6  study, nobody else did know about this aside from the

7  participants in the study.

8      Q      Well, the participants who participated in

9  your study actually did not know that CandyForever

10  premium was a brand --

11              MS. JERJIAN:  Objection, form.

12  BY MR. KABA:

13      Q      -- until they got into your study, right?

14              MS. JERJIAN:  Same objection.

15              THE WITNESS:  Well, yes.  Until they got

16  into my study, they didn't know about CandyForever

17  premium, but that was part of the design of the study.

18  BY MR. KABA:

19      Q      So before your participants interacted with

20  CandyForever premium, they had never heard of anything

21  called nor could they have possibly heard of anything

22  called CandyForever premium, correct?

23              MS. JERJIAN:  Objection, form, asked and

24  answered.

25              THE WITNESS:  Correct.  As I mentioned,



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        324

1  that was intentional design as part of the study, yes.

2  BY MR. KABA:

3      Q      And you've also -- we've also established

4  that you -- that Amazon has streaming of music,

5  streaming of videos, grocery delivery and options if

6  you're a member of Prime, right?

7              MS. JERJIAN:  Objection, form, asked and

8  answered.

9              THE WITNESS:  So as we discussed before,

10 yes.

11 BY MR. KABA:

12     Q      And CandyForever premium does not have

13 grocery delivery or video services or anything like

14 that that were being offered, correct?

15             MS. JERJIAN:  Objection, form, asked and

16 answered.

17             THE WITNESS:  Well, I do believe there are

18 other benefits like access to a network of dentists

19 amongst other things.

20 BY MR. KABA:

21     Q      CandyForever did not also offer video,

22 music and grocery services like Prime does, correct?

23             MS. JERJIAN:  Objection, form, asked and

24 answered.

25             THE WITNESS:  So I mentioned it didn't



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                       325

1   offer those specific benefits, but I do believe that we

2   also fabricated some benefits associated with

3   CandyForever including access to a network of dentists.

4   I can't remember all of those things because I haven't

5   got the screen shots in front of me, but that was at

6   least one of the benefits that we also said was

7   included.

8   BY MR. KABA:

9       Q       Right.  And -- but Amazon Prime video

10  itself is not just Prime -- Prime as the free delivery,

11  but Amazon Prime video itself is marketed extensively

12  by Amazon, right?

13                  MS. JERJIAN:  Objection, form.

14                  THE WITNESS:  So marketed in the same way

15  as you asked before?

16  BY MR. KABA:

17      Q       Yes.

18      A       Yes.

19      Q       And CandyForever premium's access to a

20  network of dentists, nobody has ever heard of that

21  before, right?

22                  MS. JERJIAN:  Objection, form, asked and

23  answered.

24                  THE WITNESS:  So as I mentioned before, no.

25  We fabricated this website as part of the study and



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                     326

1   that was intentional that no one had heard of it
2   before.
3   BY MR. KABA:
4        Q     Okay.  And when somebody signs up for
5   Amazon Prime, they've signing up using their own money,
6   right?
7             MS. JERJIAN:  Objection, form.
8             THE WITNESS:  What do you mean by own
9   money?
10  BY MR. KABA:
11       Q     That is if you sign up for an Amazon Prime
12  subscription, it's going to be money that you have to
13  pay or whoever's credit card is on file that is going
14  to be charged to get the benefit of the Amazon Prime
15  service, right?
16            MS. JERJIAN:  Objection, form.
17            THE WITNESS:  Well, I could also use a gift
18  card.
19  BY MR. KABA:
20       Q     Do you know that you -- if you could use a
21  gift card for a recurring Prime membership?  Do you
22  know that?
23            MS. JERJIAN:  Objection, form.
24            THE WITNESS:  To my recollection, I think
25  you can.



1  BY MR. KABA:

2       Q     Okay.  But it is -- why don't I do it --

3  why don't I ask you a different question?  When you

4  sign up for an Amazon Prime subscription, it is real

5  money that is being used to pay your subscription fees,

6  right?

7             MS. JERJIAN:  Objection, form.

8             THE WITNESS:  What do you mean by real

9  money?

10  BY MR. KABA:

11      Q     It's an actual -- it's actual money whether

12  from a credit card or a gift card or some other source,

13  but it is actual money?

14             MS. JERJIAN:  Objection, form.

15             THE WITNESS:  So do you mean that real

16  money is money that's either on a credit card or gift

17  card?  I assume not paper money, but, yes, you are

18  using real money to pay for an Amazon subscription,

19  yes.

20  BY MR. KABA:

21      Q     Whereas for CandyForever premium, no one

22  was going to use any money whatsoever whether they

23  signed up for it or not, right?

24             MS. JERJIAN:  Objection, form,

25  mischaracterizes the report.



1              MS. JERJIAN:  Objection, form,

2    argumentative.

3              THE WITNESS:  Well, yes.

4    BY MR. KABA:

5        Q     Okay.  Is it your testimony that when I --

6    do you plan to testify to the jury in this case that

7    when I say do you believe that this participant took

8    this exercise seriously enough that you don't know what

9    I mean by the word seriously?  Is that -- is that your

10   testimony?

11             MS. JERJIAN:  Objection, form,

12   argumentative.

13             THE WITNESS:  No, that's not what I was

14   saying.  I actually initially when you asked the

15   question, I was trying to clarify what you mean because

16   in that context of you asking the question, it wasn't

17   quite clear because seriously could mean -- because you

18   said how seriously they considered the offer.  So I'm

19   not quite sure what you mean.  It could mean many

20   different things.  It could mean did they sit down and

21   look at all the benefits and then decide on the offer.

22   It could mean many different things, so I was trying to

23   clarify.

24   BY MR. KABA:

25       Q     Let me -- let me try my question for you



1   and if your answer as in the answer you'll give to the

2   jury is I don't know what the word seriously means in

3   that question, then that's fine.  You can say that.

4   Let me try my question again.

5        A        Okay.

6        Q        Do you believe that the fact that your

7   exercise was conducted on a candy website that sold

8   only candy had an influence on how seriously your

9   participants considered the premium offer?

10               MS. JERJIAN:  Objection, form, asked and

11   answered, vague.

12               THE WITNESS:  So, again, I'm not quite sure

13   exactly what you mean, but if you're asking me if it

14   had some effect on what they considered for premium,

15   then I could say, yes, it probably had some effect.

16   BY MR. KABA:

17        Q        Do you believe that the fact that your

18   exercise was conducted on a candy website that sold

19   only candy influenced how relevant your participants

20   considered the offer to be to them?

21               MS. JERJIAN:  Objection, form, vague as to

22   relevant.

23               THE WITNESS:  What do you -- what do you

24   mean by relevant?

25   BY MR. KABA:



MARSHINI CHETTY, PH.D.                                        April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        349

1      Q      Do you -- you don't -- if you can -- if you

2    tell me you don't know how to answer that question,

3    then just say that.

4      A      Sorry.  I don't know how to answer your

5    question because I'm not sure what you mean by relevant

6    to them.

7      Q      That is something that they care about.

8      A      Could you repeat the question again,

9    please?

10      Q      Sure.

11      A      Thank you.

12      Q      Do you believe the fact that your exercise

13    was conducted on a candy website that sold only candy

14    influenced how relevant a person -- a participant in

15    your study believed the premium offer was to them?

16              MS. JERJIAN:  Same objection.

17              THE WITNESS:  If you mean by relevant that

18    participants, you know, may have considered that when

19    they were looking at CandyForever, maybe they liked

20    candy, maybe they didn't like candy so much, then, yes,

21    it probably had some effect.

22    BY MR. KABA:

23      Q      And your participants were told to go onto

24    the CandyForever website and make a purchase, correct?

25              MS. JERJIAN:  Objection, form.



```
 1                  THE WITNESS:  So what do you mean by told?
 2     BY MR. KABA:
 3         Q     That was a part of the direction for them
 4     that go onto this website and make a purchase of a
 5     Ferrero Rocher candy; is that right?
 6                  MS. JERJIAN:  Objection, form.
 7                  THE WITNESS:  Well, not necessarily Ferrero
 8     Rocher candy, but one of the tasks was to purchase a
 9     product, yes.
10     BY MR. KABA:
11         Q     And so the participants in your study had
12     been directed go and purchase a product on
13     CandyForever.  Whether or not they wanted the product,
14     they were supposed to go and purchase a product,
15     correct?
16                  MS. JERJIAN:  Objection, form, asked and
17     answered.
18                  THE WITNESS:  Yes.  As I mentioned before,
19     one of the tasks that they had was to purchase a
20     product in the CandyForever website.
21     BY MR. KABA:
22         Q     Whether or not they wanted a product, they
23     were supposed to go and purchase the product, correct?
24                  MS. JERJIAN:  Objection, form, asked and
25     answered.
```



MARSHINI CHETTY, PH.D.                                     April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                        351

1                    THE WITNESS:  Well, as it turns out, many

2        of the people did want the candies, but, yes.

3        BY MR. KABA:

4            Q      Okay.  My point is as part of the design of

5        your study whether or not a participant actually wanted

6        to purchase candy, they were told the task was go

7        online and purchase candy from this fake website that

8        we've created, correct?

9                    MS. JERJIAN:  Objection, form, asked and

10       answered.

11                   THE WITNESS:  So as I mentioned before,

12       that does sound correct.  I did give them a task to

13       purchase a product on the CandyForever website as part

14       of the think aloud study, yes.

15       BY MR. KABA:

16           Q      Okay.  By contrast, people who are -- go to

17       Amazon.com and go through and purchase or are trying to

18       purchase a product and get a Prime offer are not being

19       as a general matter to your knowledge directed by

20       somebody to go on Amazon.com and just purchase a

21       product, correct?

22                   MS. JERJIAN:  Objection, form.

23                   THE WITNESS:  Again, I can't speak for

24       any -- every case.  I don't know if someone is being

25       told to purchase a product by someone else in their



1  family, for example.  But if you're asking if they are

2  also involved in getting a task in a think aloud study,

3  then I can't say for certain, no.

4  BY MR. KABA:

5      Q      Right.  So to your knowledge, lots and lots

6  of people that actually get the Amazon Prime offer were

7  not directed by somebody else go onto Amazon.com and

8  purchase a product, any product?

9              MS. JERJIAN:  Objection.

10  BY MR. KABA:

11     Q      To your knowledge?

12     A      Well, again, I can't speak for every single

13  person purchasing on Amazon.  I know personally I

14  purchase things sometimes that I'm directed to, but to

15  my knowledge, I am not aware of any consumers being

16  instructed to do a task like this when purchasing a

17  product if that's what you're asking.

18     Q      Yeah.  I'm just trying to point out a

19  distinction between your study and then the kind of the

20  real world experience of getting a Prime offer.  Okay?

21  In your study, participants whether or not they wanted

22  to purchase candy were given a task to purchase candy

23  on CandyForever, right?

24     A      That's correct.

25              MS. JERJIAN:  Objection.



1              THE WITNESS:  I think I mentioned I only

2     conducted the think aloud on the Amazon MPP flow on

3     desktop.

4     BY MR. KABA:

5        Q     So the answer to my question is no, you did

6     not -- did you -- did you attempt to test the mobile

7     flow?

8              MS. JERJIAN:  Objection, form, asked and

9     answered.

10             THE WITNESS:  I did not test the mobile

11    flow.

12    BY MR. KABA:

13       Q     Okay.  Do you believe the 30 -- strike

14    that.

15             What is Max QDA?

16       A     Max QDA is a piece of software for

17    qualitative data analysis.

18       Q     So the results of your -- sorry -- think

19    aloud study, you would agree the results are

20    qualitative, not quantitative, right?

21       A     That is correct.

22       Q     So how many people were involved in coding

23    the participants' kind of thinking aloud responses?

24       A     Two.

25       Q     And did -- were you one of those people?



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      359

```
1        A       Yes.

2        Q       And your graduate assistant was the other

3   one?

4        A       Correct.

5        Q       And did you -- did you both code every

6   single one of the 30 participants or did you split it

7   up?

8        A       We both watched all of these.

9        Q       Did you both code every single one of the

10  participants or did you split it up?

11       A       We -- it depends on what you mean.  Do you

12  mean -- what do you mean by splitting it up?

13       Q       So did one of you code for 15 and the other

14  code for the other 15?

15       A       Each of us coded each one of the

16  transcripts.

17       Q       All 30 of them?

18       A       All 33 of them, yes.

19       Q       Well, 30 for the actual think loud study.

20  Three were the pilot, correct?

21       A       Correct, yes.

22       Q       And did you and your research assistant

23  ever have a disagreement on how a participant should be

24  coded?

25               MS. JERJIAN:  Objection.
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      360

```
 1   BY MR. KABA:
 2        Q      It's just a yes or no for now.
 3        A      Yes.
 4        Q      Do you recall for how many participants you
 5   had disagreements with your colleague about how a
 6   participant should be coded?
 7        A      Not offhand and I would have to review our
 8   privileged communications, so I'm not sure I can answer
 9   that question.
10        Q      Okay.  In the event of a disagreement, did
11   your view govern?
12        A      What do you mean by govern?
13        Q      So each of the participants was coded,
14   right, along various different measures; is that right?
15               MS. JERJIAN:  Objection, form.
16               THE WITNESS:  What do you mean by measures?
17   BY MR. KABA:
18        Q      Sure.  Let's --
19               (Chetty Exhibit MC6 was marked for purposes
20   of identification.)
21   BY MR. KABA:
22        Q      So I'm going to mark as MC6 a document that
23   was produced natively to us as part of your expert
24   report in this case.
25        A      What does produce natively mean?
```



MARSHINI CHETTY, PH.D.                                    April 28, 2025
FTC vs AMAZON.COM, LLC, et al.                                      361

1       Q       I'll explain in a second.

2       A       Okay.

3       Q       A document that was produced to us in

4    electronic form that in order for us to use at this

5    deposition, we had to print out.

6               So I'll represent to you that this was a

7    participant coding spreadsheet that was completed in

8    your expert materials.

9       A       Thank you for clarifying.

10      Q       You're welcome.  So along the left, we see

11   PID which I think means participant ID number and goes

12   from 1 to 33.  One to 3 is shaded which I think is the

13   pilot and then 4 to 33 are your actual study

14   participants, right?

15      A       Based on my recollection, that sounds

16   correct.

17      Q       And then each participant was coded along

18   as we can see in these various columns including

19   whether enrolled in Premium, when enrolled, Premium

20   interest at SOSP, whether read UPDP fine print, whether

21   new premium cost, et cetera, et cetera, right?

22      A       Yes, that looks correct.

23      Q       Okay.  So what I'm asking you is where you

24   and your research assistant disagreed about whether or

25   not someone should be coded in a particular category,



1      Q      If you don't understand my question --

2      A      I don't understand if you're asking me if I

3    asked them to think aloud as part of the think aloud

4    study.  Is that what you're asking?

5      Q      You asked them to think aloud about what

6    was or was not displayed on those pages, correct?

7      A      Well, not quite.  Actually, a think aloud

8    study is asking someone to verbalize what they're

9    thinking as they're navigating through a set of

10   interfaces which may or may not include the information

11   that they're seeing.

12     Q      Okay.  After they had navigated off of the

13   pages, you also asked them about terms of what they had

14   seen or -- I'm sorry -- what they had read, the price

15   term, the cancellation terms, et cetera, correct?

16           MS. JERJIAN:  Objection, form.

17           THE WITNESS:  So I did ask them many

18   questions.  I don't have the list of questions exactly

19   in front of me, but I did generally ask them questions

20   about premium enrollment terms, yes.

21   BY MR. KABA:

22     Q      And they were asked to -- they were

23   recalling what they had supposedly read or not read

24   about the premium enrollment terms, right?

25           MS. JERJIAN:  Objection, form.



```
 1                    THE WITNESS:  Well --

 2                    MS. JERJIAN:  Vague as to recall.

 3                    THE WITNESS:  -- what -- what do you mean

 4    by recall?

 5    BY MR. KABA:

 6        Q     So when you were asking them about the

 7    price terms of premium or the nature of the premium

 8    subscription, et cetera, you were asking them those

 9    questions after they had seen the UPDP offer, not while

10    they were actually looking at the offer, correct?

11                    MS. JERJIAN:  Objection, form.

12                    THE WITNESS:  Well, as part of the study,

13    they reviewed the screens twice before we asked the

14    question about the terms.

15    BY MR. KABA:

16        Q     But you asked them the questions about the

17    terms after they had reviewed the screen, not while

18    they were looking at the screens, correct?

19        A     That is correct.

20        Q     Okay.  As part of determining whether or

21    not your 30 participants could comprehend what they

22    were reading, did you perform any other testing of

23    their reading comprehension skills?

24                    MS. JERJIAN:  Objection, form, asked and

25    answered.
```



1            THE WITNESS:  Well, as I mentioned, testing

2    could take a variety of forms.  Of the things that we

3    did was they were asked to read a consent form and

4    asked whether or not they understood that in order to

5    participate in the study.  And so they read the consent

6    form and did affirm that they wanted to participate in

7    the study.  I did not perform other reading

8    comprehension tests.

9    BY MR. KABA:

10       Q     Did you -- with respect to the consent form

11   that they read that you're now citing as an example of

12   a test, did you ask them about specific elements of the

13   consent that they were offered?

14       A     Yes.

15       Q     Okay.  What did you ask them?

16       A     Well, one of the things I asked was -- not

17   me directly, but one of the things we asked was do you

18   consent to participating in the study.

19       Q     No.  I understand that part, but you said

20   there was a whole set of terms they read to provide

21   their consent.  I'm trying to understand not just did

22   they say yes, I consent to participate in the study,

23   but did they actually understand what that -- your

24   terms were?

25            MS. JERJIAN:  Objection, form.



1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2                I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12                IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 28th day of

14   April 2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21   ------------------------------

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25



# EXHIBIT 5

# Document Produced in Native Format

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00003614

Amazon Confidential

PRIME FREE TRIAL SIGNUP CX

prime

Amazon Confidential

2

# 1. DESKTOP EXPERIENCE

prime

Amazon Confidential

Prime – Desktop Experience

# Prime Homepage Free Trial



**Test, we're giving you a 30-day FREE trial of Prime**

No commitments. Cancel anytime.

✓ Fast, FREE delivery
✓ Award winning movies and TV shows
✓ Ad-free music streaming

START YOUR 30-DAY FREE TRIAL

After your FREE trial, Prime is just $12.99/month (plus any applicable taxes). Cancel anytime.

**Special offer:** You could qualify for 50% off Prime. | Are you a student? | Have an EBT card/receive government assistance?

SEE MORE PLANS

Shopping

Entertainment

Check out what's included with your Prime membership:

**Fast, FREE Delivery**

Enjoy all the fast, convenient delivery options Prime offers

Shop Prime Eligible Items

WantJoin Professional Blender, Countertop Blender ,Blender for

Surface 3 Charger 13W 5.2V 2.5A AC Power Adapter Charger Cord

Sewing Seam Ripper Tool, Stitch Remover and Thread Cutter with

[Premium] 100 Pcs 8 inch Candle Wick, Natural Cotton Low Smoke

Prime – Desktop Experience

# Prime Homepage Free Trial (cont'd)



Amazon Confidential

Prime – Desktop Experience

# Prime Homepage Free Trial (cont'd)



Amazon Confidential

Amazon Confidential

Prime – Desktop Experience

# Checkout: SOSP



Prime- Desktop Experience

# Checkout: SOSP (cont'd)



Amazon Confidential

Prime– Desktop Experience

# Checkout: SOSP (cont'd)

**amazon**.com

SIGN IN    **SHIPPING & PAYMENT**    GIFT OPTIONS    PLACE ORDER

## Choose a billing address

Please select a billing address from your address book (below), or enter a new billing address. Don't worry, you'll only need to do this once for each credit card. If you contact us about your order, we'll reference your account only by the name you provide below.

**Domestic**
515 WESTLAKE AVE N
SEATTLE, WA 98109-4304
United States
Phone: 555-555-5555

[ Use this address ]

## Add a new address

**Country/Region**
United States ▾

**Full name (First and Last name)**
Test Test

**Phone number**                                    Why? ⌄

**Address**
Street address or P.O. Box

Apt, suite, unit, building, floor, etc.

**City**              **State**        **ZIP Code**
                      Select ▾

☐ Make this my default address

**Delivery instructions (optional)**
+ Add preferences, notes, access codes and more

[ Use this address ]

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

8

Amazon Confidential

Prime – Desktop Experience

# Checkout: SOSP (cont'd)

amazon.com

SIGN IN     **SHIPPING & PAYMENT**     GIFT OPTIONS     PLACE ORDER

## Choose your shipping options

### Shipment 1 of 1

**Shipping from Amazon.com**  (Learn more)

Shipping to: Domestic, 515 WESTLAKE AVE N, SEATTLE, WA, 98109-4304 United States

- **All-new Echo Dot (4th Gen, 2020 release) | Smart speaker with Alexa | Charcoal**
  $49.99 · Quantity: 1
  Sold by: Amazon.com Services LLC

Change quantities or delete

### Amazon Locker is available

20 pickup locations near you

**Choose a delivery option:**

**Good news Test, we're giving you a 30-day FREE trial of Prime**  amazonprime

- ● **Today**
  FREE Same-Day Delivery with a free trial of amazonprime
  **Tuesday, May 25**
  **FREE Shipping**
- ○ **Sunday, May 23**
  $7.52 · Shipping
- ○ **Saturday, May 22**
  $10.60 · Shipping
- ○ **Today 2PM – 6PM**
  $12.99 · Fastest Delivery

Continue

Continue

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

10

Prime – Desktop Experience

# Checkout: SOSP (cont'd)

## Select a payment method

Get $50 off    Test, your cost could be **$50.00** instead of $541.39! Get a **$50 Amazon Gift Card** instantly upon approval for the **Amazon Rewards Visa Card**



**Your credit and debit cards**

| | Name on card | Expires on |
|---|---|---|
| ◉ Mastercard ending in 2871 | Test Test | 10/2025 |

Add a credit or debit card

Continue

You can review this order before it's final.

## More payment options

**Credit or debit cards**
Amazon accepts major credit and debit cards.

**Pay with cash at a location near you**
Order ships after you pay

▸ Set up Amazon PayCode

**Gift Cards, Vouchers & Promotional Codes**

▸ Enter a gift card, voucher or promotional code

**Amazon.com Store Card**
Access to exclusive financing offers. No annual fee. Zero fraud liability.

Learn more

**Personal Checking Accounts**
Use your US based personal checking account. Learn more

Add a personal checking account

Continue

You can review this order before it's final.

Do you need help? Explore our Help pages or contact us

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential

11

Prime – Desktop Experience

# Checkout: SOSP (cont'd)

amazon.com

SIGN IN    SHIPPING & PAYMENT    GIFT OPTIONS    PLACE ORDER

## Test, we're giving you a 30-day FREE trial of Prime

### After your FREE trial, Prime is just $12.99/month

Your top Prime eligible item in cart:



Your Prime benefits include:

prime

| Prime Benefits | |
|---|---|
| Fast, FREE delivery on Prime eligible items | Included |
| Prime Music | Included |
| Prime Video | Included |

Enjoy FREE delivery, as fast as today on your Prime eligible items.

☑ Use my gift card balance, when available, to pay for Prime.

**No Thanks**

**Start your Prime FREE trial**

Don't worry, you can cancel anytime.

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your default payment method (MasterCard *****-28771 or another available payment method on file on file after your 30-day free trial. **Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.** For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping Benefits page to check various shipping options.

Having difficulties? Please visit our Help page to learn more about placing an order.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

12

Prime– Desktop Experience

# Checkout: SOSP (cont'd)



amazon.com

SIGN IN    SHIPPING & PAYMENT    GIFT OPTIONS    **PLACE ORDER**

## Review your order

**Shipping address** Change
Domestic
515 WESTLAKE AVE N
SEATTLE, WA 98109-4304
United States
Phone: 555-555-5555
Add delivery instructions

Or try Amazon Locker
20 locations near this address ⌄

**Payment method** Change
💳 ending in 2871

**Billing address** Change
Same as shipping address

Add a gift card, promotion code, or voucher

Enter Code        Apply

**Test Test, congratulations! Your 30-day free trial of Prime has started. You can cancel anytime.**

Prime offers you the best of shopping and entertainment, including:

✓ FREE Delivery, as fast as today
✓ Popular movies and TV shows for free, plus award-winning Originals
✓ Over two million songs on demand and ad-free

Look for an email from us with more information. Welcome to Prime!


prime

**Delivery: May 21, 2021** If you order in the next 12 hours and 45 minutes (Details)

All-new Echo Dot (4th Gen, 2020 release) |
Smart speaker with Alexa | Charcoal
**$49.99** ✓prime & FREE Returns ⌄
Quantity: 1 Change
Sold by: Amazon.com Services LLC
🎁 Add gift options

**Choose your Prime delivery option:**

○ Today 2PM – 6PM
FREE Fastest Delivery

● Friday, May 21
FREE Prime Delivery

○ Saturday, May 22
FREE Prime Delivery

FREE Amazon Day Delivery
Get your orders in fewer boxes. Choose your Amazon Day
Get a $1 reward for select digital items. One reward
per purchase. Details

**Place your order**

By placing your order, you agree to Amazon's privacy notice and conditions of use.

You also agree to all of the terms found here.

**Order Summary**

Items:                        $49.99
Shipping & handling:          $0.00

Total before tax:             $49.99
Estimated tax to be collected: $5.12

**Order total:           $55.11**

How are shipping costs calculated?

Prime shipping benefits have been applied to your order.

Do you need help? Explore our Help pages or contact us

For an item sold by Amazon.com: When you click the "Place your order" button, we'll send you an email message acknowledging receipt of your order. Your contract to purchase an item will not be complete until we send you an email notifying you that the item has been shipped.

Colorado, Louisiana and Puerto Rico Purchasers: Important information regarding sales tax you may owe in your State

Within 30 days of delivery, you may return new, unopened merchandise in its original condition. Exceptions and restrictions apply. See Amazon.com's Returns Policy

Go to the Amazon.com homepage without completing your order.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

Prime – Desktop Experience

# Checkout: UPDP



Prime− Desktop Experience

# Checkout: UPDP (cont'd)



Amazon Confidential

14

Amazon Confidential

15

Prime – Desktop Experience

# Checkout: UPDP (cont'd)

amazon.com

SIGN IN    **SHIPPING & PAYMENT**    GIFT OPTIONS    PLACE ORDER

## Choose a billing address

Please select a billing address from your address book (below), or enter a new billing address. Don't worry, you'll only need to do this once for each credit card. If you contact us about your order, we'll reference your account only by the name you provide below.

**Domestic**
515 WESTLAKE AVE N
SEATTLE, WA 98109-4504
United States
Phone: 555-555-5555

[ Use this address ]

### Add a new address

**Country/Region**

| United States | ▾ |

**Full name (First and Last name)**

| Test Test |

**Phone number**

| | Why? ˅ |

**Address**

| Street address or P.O. Box |

| Apt, suite, unit, building, floor, etc. |

**City**          **State**          **ZIP Code**

| City | | Select | ˅ | | ZIP Code |

☐ Make this my default address

**Delivery instructions (optional)**

▸ Add preferences, notes, access codes and more

[ Use this address ]

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential     16

Prime– Desktop Experience

# Checkout: UPDP (cont'd)

amazon.com

SIGN IN     **SHIPPING & PAYMENT**     GIFT OPTIONS     PLACE ORDER

## Choose your shipping options

### Shipment 1 of 1

**Shipping from Amazon.com** (Learn more)

Shipping to: Domestic, 515 WESTLAKE AVE N, SEATTLE, WA, 98109-4504 United States



- **All-new Echo Dot (4th Gen, 2020 release) | Smart speaker with Alexa | Charcoal**
  $49.99 - Quantity: 1
  Sold by: Amazon.com Services LLC

Change quantities or delete

### Amazon Locker is available

20 pickup locations near you

### Choose a delivery option:

**Good news Test, we're giving you a 30-day FREE trial of Prime** amazon prime

○ **Today**
  FREE Same-Day Delivery with a free trial of amazon prime

○ **Tuesday, May 25**
  **FREE Shipping**
  $7.52 - Shipping

● **Sunday, May 23**

○ **Saturday, May 22**
  $10.60 - Shipping

○ **Today 2PM – 6PM**
  $12.99 - Fastest Delivery

Continue

Continue

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Prime – Desktop Experience

# Checkout: UPDP (cont'd)



amazon.com

SIGN IN   SHIPPING & PAYMENT   GIFT OPTIONS   PLACE ORDER

## Select a payment method

Learn more    Test, your cost could be $0.00 instead of $34.15! Get a $50 Amazon Gift Card instantly upon approval of the Amazon Rewards Visa Card.

### Your credit and debit cards

|  | Name on card | Expires on |
|---|---|---|
| ● Mastercard ending in 2871 | Test Test | 10/2025 |

## More payment options

### Credit or debit cards
Amazon accepts major credit and debit cards.



Add a credit or debit card

### Pay with cash at a location near you
Order ships after you pay

› Set up Amazon PayCode

amazon **PayCode**
WesternUnion/WU

### Gift Cards, Vouchers & Promotional Codes

› Enter a gift card, voucher or promotional code

### Amazon.com Store Card
Access to exclusive financing offers. No annual fee. Zero fraud liability.

Learn more

### Personal Checking Accounts
Use your US based personal checking account. Learn more

Add a personal checking account



Continue

You can review this order before it's final.

Continue

You can review this order before it's final.

Do you need help? Explore our Help pages or contact us

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential

17

Prime– Desktop Experience

# Checkout: UPDP (cont'd)

amazon.com

SIGN IN   **SHIPPING & PAYMENT**   GIFT OPTIONS   PLACE ORDER

## Test, we're giving you a 30-day FREE trial of Prime

**No minimum order threshold for FREE One-Day Delivery**

Your top Prime eligible item in cart:



Your Prime benefits include:

| Delivery Speed | prime |
|---|---|
| Same-Day Delivery (in select cities) | FREE |
| One-Day Delivery | FREE |
| Two-Day Delivery | FREE |

**Save $7.52** on your Prime eligible items with FREE Same-Day Delivery on this order.

**Get FREE Same-Day Delivery**
Enjoy Prime FREE for 30 days

No thanks, I do not want FREE delivery

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your default payment method (MasterCard ****-28711 or another available payment method on file after your 30-day free trial. **Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.** For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping Benefits page to check various shipping options.

Having difficulties? Please visit our Help page to learn more about placing an order.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

18

Amazon Confidential

Prime – Desktop Experience

# Checkout: UPDP (cont'd)

**amazon.com**

SIGN IN    SHIPPING & PAYMENT    GIFT OPTIONS    PLACE ORDER

## Review your order

**Shipping address** Change
Domestic
515 WESTLAKE AVE N
SEATTLE, WA 98109-4504
United States
Phone: 555-555-5555
Add delivery instructions

 Or try Amazon Locker
20 locations near this address ⌄

**Payment method** Change
ending in 2871

**Billing address** Change
Same as shipping address

Add a gift card, promotion code, or voucher

Enter Code    Apply

**Test Test, congratulations! Your 30-day free trial of Prime has started. You can cancel anytime.**
Prime offers you the best of shopping and entertainment, including:
✓ FREE Delivery, as fast as today
✓ Popular movies and TV shows for free, plus award-winning Originals
✓ Over two million songs on demand and ad-free
Look for an email from us with more information. Welcome to Prime!



prime

**Delivery: May 23, 2021** if you order in the next 14 hours and 37 minutes (Details)

**All-new Echo Dot (4th Gen, 2020 release) |**
**Smart speaker with Alexa | Charcoal**
$49.99 ✓prime & FREE Returns ˅
View larger image
**Quantity:** 1 Change
Sold by: Amazon.com Services LLC
☐ Add gift options

Choose your Prime delivery option:
○ **Today 2PM – 6PM**
   FREE Fastest Delivery
◉ **Sunday, May 23**
   FREE Prime Delivery
○ **Monday, May 24**
   FREE Amazon Day Delivery
Get your orders in fewer boxes. Choose your Amazon Day.
Get a $1 reward for select digital items. One reward per purchase. Details

### Place your order

By placing your order, you agree to Amazon's privacy notice and conditions of use.

You also agree to all of the terms found here.

**Order Summary**
Items:                          $49.99
Shipping & handling:            $0.00
                                _____
Total before tax:               $49.99
Estimated tax to be collected:  $5.12

**Order total:**               **$55.11**

How are shipping costs calculated?

Prime shipping benefits have been applied to your order.

Do you need help? Explore our Help pages or contact us

For an item sold by Amazon.com: When you click the "Place your order" button, we'll send you an email message acknowledging receipt of your order. Your contract to purchase an item will not be complete until we send you an email notifying you that the item has been shipped.

Colorado, Louisiana and Puerto Rico Purchasers: Important information regarding sales tax you may owe in your State

Within 30 days of delivery, you may return new, unopened merchandise in its original condition. Exceptions and restrictions apply. See Amazon.com's Returns Policy

Go to the Amazon.com homepage without completing your order.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential    20

Prime – Desktop Experience

# Checkout: UPDP (cont'd)




















Amazon Confidential

Amazon Confidential

Prime – Desktop Experience

# Checkout: SPC (cont'd)



Amazon Confidential

23

Prime – Desktop Experience

# Checkout: SPC (cont'd)



amazon.com

SIGN IN | **SHIPPING & PAYMENT** | GIFT OPTIONS | PLACE ORDER

## Choose a billing address

Please select a billing address from your address book (below), or enter a new billing address. Don't worry, you'll only need to do this once for each credit card. If you contact us about your order, we'll reference your account only by the name you provide below.

**Domestic**
515 WESTLAKE AVE N
SEATTLE, WA 98109-4504
United States
Phone: 555-555-5555

[ Use this address ]

## Add a new address

**Country/Region**
[ United States ▾ ]

**Full name (First and Last name)**
[ Test Test ]

**Phone number**
[ ] Why? ~

**Address**
[ Street address or P.O. Box ]
[ Apt, suite, unit, building, floor, etc. ]

**City**      **State**      **ZIP Code**
[ ]      [ Select ▾ ]      [ ]

☐ Make this my default address

**Delivery instructions (optional)**
+ Add preferences, notes, access codes and more

[ Use this address ]

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential

24

Prime – Desktop Experience

# Checkout: SPC (cont'd)

amazon.com

SIGN IN   **SHIPPING & PAYMENT**   GIFT OPTIONS   PLACE ORDER

## Choose your shipping options

### Shipment 1 of 1

**Shipping from Amazon.com** (Learn more)

Shipping to: Domestic, 515 WESTLAKE AVE N, SEATTLE, WA, 98109-4504 United States



**All-new Echo Dot (4th Gen, 2020 release) | Smart speaker with Alexa | Charcoal**
$49.99 - Quantity: 1
Sold by: Amazon.com Services LLC

Change quantities or delete

---

### Amazon Locker is available

20 pickup locations near you

### Choose a delivery option:

> **Good news Test, we're giving you a 30-day FREE trial of Prime** amazon prime

○ **Today**
FREE Same-Day Delivery with a free trial of amazon prime

○ **Tuesday, May 25**
$7.52 - Shipping
**FREE Shipping**

◉ **Sunday, May 23**

○ **Saturday, May 22**
$10.60 - Shipping

○ **Today 2PM – 6PM**
$12.99 - Fastest Delivery

Continue

---

Continue

Do you have a gift card or promotional code? We'll ask you to enter your claim code when it's time to pay.

Conditions of Use | Privacy Notice © 1996–2020, Amazon.com, Inc.

Amazon Confidential

Prime– Desktop Experience

# Checkout: SPC (cont'd)

amazon.com

SIGN IN    SHIPPING & PAYMENT    GIFT OPTIONS    PLACE ORDER

## Review your order

**Shipping address** Change
Domestic
515 WESTLAKE AVE N
SEATTLE, WA 98109-4504
United States
Phone: 555-555-5555
Add delivery instructions

Or try Amazon Locker
20 locations near this address ⌄

**Payment method** Change
ending in 2871

**Billing address** Change
Same as shipping address



**FREE TRIAL**

**Test, we'd hate for you to miss out on unlimited fast, FREE delivery**
Save $7.52 on eligible items in this order and enjoy unlimited fast, FREE delivery when you try Prime FREE for 30 days.

**Delivery: May 24, 2021** If you order in the next 14 hours and 32 minutes (Details)

All-new Echo Dot (4th Gen, 2020 release) |
Smart speaker with Alexa | Charcoal
**$49.99** & FREE Returns ⌄
Amazon Prime eligible. Join now
View larger image
**Quantity:** 1 Change
Sold by: Amazon.com Services LLC
Add gift options

Choose a delivery option:

○ **Today**
FREE Same-Day Delivery with your free trial of Prime
**Fast, FREE Delivery** prime

○ **Wednesday, May 26**
FREE Shipping

◉ **Monday, May 24**
$7.52 - Shipping

○ **Sunday, May 23**
$10.60 - Shipping

○ **Today 2PM – 6PM**
$12.99 - Fastest Delivery

Add a gift card, promotion code, or voucher

Enter Code    Apply

Try Prime FREE for 30 days ›

No hassle. No commitments. Cancel anytime.

**Place your order**

By placing your order, you agree to Amazon's privacy notice and conditions of use.

You also agree to all of the terms found here.

**Order Summary**
Items: $49.99
Shipping & handling: $7.52

Total before tax: $57.51
Estimated tax to be collected: $5.89

**Order total:** **$63.40**

How are shipping costs calculated?

Do you need help? Explore our Help pages or contact us

For an item sold by Amazon.com: When you click the "Place your order" button, we'll send you an email message acknowledging receipt of your order. Your contract to purchase an item will not be complete until we send you an email notifying you that the item has been shipped.

Colorado, Louisiana and Puerto Rico Purchasers: Important information regarding sales tax you may owe in your State

Within 30 days of delivery, you may return new, unopened merchandise in its original condition. Exceptions and restrictions apply. See Amazon.com's Returns Policy

Go to the Amazon.com homepage without completing your order.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc.

Amazon Confidential

Prime- Desktop Experience

# Checkout: SPC (cont'd)

## amazon.com

SIGN IN   SHIPPING & PAYMENT   GIFT OPTIONS   PLACE ORDER

### Review your order

**Shipping address** Change
See details below.
Add delivery instructions

**Payment method** Change
ending in 2871

**Billing address** Change
Same as shipping address

**A 30-day FREE trial of Amazon Prime has been added to your order. Your order has been upgraded to fast, FREE shipping.**
After your free trial, Prime is just $12.99/month. Cancel anytime.

prime

**Amazon Prime (30-Day Free Trial)**
$0.00
View larger image
Delete
Sold by: Amazon.com Services LLC
Gift options not available.

Your Prime membership will be applied to pass-service+D-1621614358013Wiyd8@email.amazon.com.
Learn more

**Add a gift card, promotion code, or voucher**
Enter Code   [Apply]

**Items shipped from Amazon.com**
Shipping address: Domestic, 515 WESTLAKE AVE N, SEATTLE, WA, 98109-4304 United States Change

**Delivery: May 23, 2021** (if you order in the next 14 hours and 31 minutes) (Details)

All-new Echo Dot (4th Gen, 2020 release) | Smart speaker with Alexa | Charcoal
$49.99 & FREE Returns
View larger image
**Quantity:** 1 Change
Sold by: Amazon.com Services LLC
Add a gift receipt
see and other gift options

**Choose your Prime delivery option:**
○ Today 2PM – 6PM
FREE Fastest Delivery
● Sunday, May 23
FREE Prime Delivery

### Place your order

By placing your order, you agree to Amazon's privacy notice and conditions of use.

You also agree to all of the terms found here.

By placing your order, you agree to Terms and Conditions, and authorize us to change your default payment method or any other payment method on file. Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $12.99/month plus any applicable taxes after your first month, you may cancel anytime by visiting Your Account. For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping Benefits page to check various shipping options.

**Order Summary**
Items (2)                          $49.99
Shipping & handling:                $0.00
Total before tax:                  $49.99
Estimated tax to be collected:*     $5.12

**Order total:**     **$55.11**

How are shipping costs calculated?

Amazon Confidential

27

Prime – Desktop Experience

# Checkout: SPC (cont'd)

**Thank you, your order has been placed.**

Please check your email for order confirmation and detailed delivery information or visit Message Center to review your notifications.

New! Get shipment notifications on your mobile device with the free Amazon app.

**Order Number: 114-1514881-6412232**
White Alexa Dot (4th Gen, 2020 release) | Smart speaker with Alexa | Charcoal will be shipped to Domestic – by Amazon.com.
**Delivery:** May 23, 2021

**Order Number: 114-8517422-0417009**
Amazon Prime (30-Day Free Trial) is applied to your account: pcos-service+b-1621614336071b0q8@email.amazon.com.

Review or edit your recent orders ›

Test, get 5% Back on Amazon purchases
Plus, get a $50 Amazon Gift Card instantly upon approval.

Learn more



## Top picks for you





All New, Made for Amazon Battery Base, in Black for Echo Dot...
★★★★☆ 66
$29.99
Based on your orders

Cocoda Table Holder for Echo Dot 4th Generation, Clever...
★★★★☆ 510
$13.99
Based on your orders

All New, Made for Amazon Outlet Hanger, Black, for Echo Dot...
★★★★☆ 1,270
$16.99
Based on your orders

All New, Made for Amazon Wall Mount, Black, Echo (4th...
★★★★☆ 1,280
$24.99
Based on your orders

## Recommendations for you in Tools & Home Improvement





Sengled Smart Light Bulbs, Alexa Light Bulb Bluetooth Mesh, Smart Bulbs That Work With...
★★★★☆ 3,511
$17.99

Alexa Smart Light Bulbs, Ground 75W Equivalent E26 9W WiFi Led Bulb A19 RGB Color...
★★★★☆ 4,408
$28.04

Smart Light Bulbs 4 Pack, TreatLife 2.4GHz Music Sync Color Changing Light Bulb...
★★★★☆ 8,483
$33.99

## Recommendations for you in Electronics



OHLUX Smart WiFi LED Light Bulbs Compatible with Alexa and Google Home (No Hub...
★★★★☆ 6,103
$27.99

Sengled Smart Light Bulbs, Alexa Light Bulb Bluetooth Mesh, Smart Bulbs That Work With...
★★★★☆ 774
$23.99

Smart Plug Ground Smart WiFi Outlet Works with Alexa and Google Home, 2.4G WiFi Only...
★★★★☆ 27,248
$24.99

Page 1 of 2





All New, Made For Amazon Wall Mount, Black, Echo (4th...
★★★★☆ 1,280
$24.99
Based on your orders

Govee Immersion WiFi TV LED Backlights with Camera, RGBIC...
★★★★☆ 2,586
$79.99
Based on your orders

Smart Outlet, Gosund Wall Outlet Extender (15A/1800W), Multi...
★★★★☆ 6,551
$16.99
Based on your recent views

GGShM D4 Battery Base for Dot 4th Generation, Portable Wireless Dot...
★★★★☆ 32
$29.99
Based on your orders

Ring Alarm Motion Detector (2nd Gen)
★★★★☆ 1,041
$29.99
Based on your orders

Govee Smart LED Strip Lights, 16.4ft WiFi LED Lights Work with Alexa and Google Assistant...
★★★★☆ 40,638
$21.99 √prime

Philips Hue White A19 LED Smart Bulb, Bluetooth & Zigbee Compatible (Hue Hub...
★★★★☆ 12,344
$14.97 √prime





All-new Echo Dot (4th Gen) | Smart speaker with clock and Alexa |...
★★★★☆ 72,651
$59.99
Based on your orders

Ring Alarm Keypad (2nd Gen)
★★★★☆ 4,681
$49.99
Based on your orders

Senglled Smart Light Bulbs, Bluetooth Mesh Alexa Light Bulb, Smart Bulbs That Work with...
★★★★☆ 774
$23.99

Ring Alarm Contact Sensor (2nd Gen)
★★★★☆
Based on your orders





Stream like never before

Pros:

Want to track your order?
Let Amazon Assistant help. Learn More

Install now for Mozilla Firefox

By installing Amazon Assistant you agree to the Conditions of Use.

Early deals for Father's Day





Prime – Desktop Experience

# Prime Video: Storefront

Amazon Confidential

28

Amazon Confidential

29

Prime – Desktop Experience

# Prime Video: Storefront (con'td)


prime

Watch now, cancel anytime
## Start your 30-day free trial

### Confirm your details

| Plan | Prime<br>Enjoy unlimited streaming of thousands of movies and TV shows plus FREE Two-Day Delivery on millions of items.<br>($12.99/month after trial) | Change |
|---|---|---|
| Email | pas-service0-16201505992171Wmea@email.amazon.com | |
| Payment method | Test Test<br>MasterCard ending in 2871<br>10/2025 | Change |
| Billing address | Domestic<br>515 WESTLAKE AVE N<br>SEATTLE<br>WA<br>98109-4504 | Change |

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your preferred card or another available credit card on file after your 30-day free trial. Your Prime membership continues until cancelled. If you don't want to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.

**Start your free trial.**

Change or cancel plan anytime
Pay later

Conditions of Use   Privacy Notice   Send Us Feedback   Help

© 1996-2021, Amazon.com, Inc. or its affiliates

Amazon Confidential

Prime – Desktop Experience

# Prime Video: Storefront (cont'd)



Prime – Desktop Experience

# Prime Video Landing Page



Amazon Confidential

Amazon Confidential

Prime – Desktop Experience

# Prime Video Landing Page



Watch now, cancel anytime
## Start your 30-day free trial

### Confirm your details

| | | |
|---|---|---|
| **Plan** | **Prime**<br>Enjoy unlimited streaming of thousands of movies and TV shows plus FREE Two-Day Delivery on millions of items.<br>($12.99/month after trial) | Change |
| **Email** | peas-service+0-16201505059127-Wmec@email.amazon.com | |
| **Payment method** | Test Test<br>MasterCard ending in 2871<br>10/2025 | Change |
| **Billing address** | Domestic<br>515 WESTLAKE AVE N<br>SEATTLE<br>WA<br>98109-4504 | Change |

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your preferred card or another available credit card on file after your 30-day free trial. **Your Prime membership continues until cancelled. If you don't want to continue for $12.99/month plus any applicable taxes, you may cancel anytime** by visiting Your Account and adjusting your membership settings.

**Start your free trial.**

Change or cancel plan anytime
Pay later

Conditions of Use   Privacy Notice   Send Us Feedback   Help

© 1996–2021, Amazon.com, Inc. or its affiliates

Prime - Desktop Experience

# Prime Video Landing Page



Amazon Confidential

33

Amazon Confidential

34

2. MOBILE EXPERIENCE

prime

Amazon Confidential    35

Prime – Mobile Experience

# Prime Homepage Free Trial



**amazon**

Search Amazon

⊙ Deliver to Domestic - Seattle 98109

DELIVERY    SHOPPING    VIDEO    MUSIC

## Test, we're giving you Prime FREE for 30-days

Prime Membership Benefits



More of what you love, delivered in more ways

**Explore Prime Delivery »**

**Start your 30-day Prime FREE Trial**

After your FREE trial, Amazon Prime is just $12.99/month (plus any applicable taxes). Cancel anytime.

**Are you a student?** ›

**Have an EBT card/receive government assistance?** ›

**Give the gift of Prime** ›

See more plans    ^



**prime**

**Start your 30 day Prime FREE trial today**
After your FREE trial, Prime is just $12.99/month

Get immediate access to these Prime benefits and more:

Unlimited fast, FREE delivery on millions of items.

Amazon Originals, movies, TV shows, and live events.

Custom playlists and millions of songs—all ad-free.

**Are you a student?**
**Have an EBT card/receive government assistance?**

**Payment method**

Mastercard ****2871    ^

**Billing address**

515 WESTLAKE AVE N, SEATTLE, WA, 98109-4504,
555 555-5555    ^

**Start your 30 day free trial**

**No Thanks**

By signing up, you agree to the Amazon Prime Terms and authorize us to charge your default payment method or another payment method on file after your 30 day free trial. **Your Amazon Prime membership continues until cancelled. If you do not wish to continue for** $12.99/month + any taxes, you may cancel any time by visiting Your Account. For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping Benefits page to check various shipping options.



**prime**    .

### Welcome to Amazon Prime

You can now use unlimited free shipping on millions of items, watch exclusive content like Amazon Originals, movies, and TV shows, and stream over two-million songs ad-free, plus use more benefits exclusively for Prime members.

✓ Free delivery
✓ Award-Winning Movies & TV Shows
✓ Over two million songs, ad-free
✓ Books, Magazines & More

**Continue**

Prime — M o b i l e   E x p e r i e n c e

# Checkout: SOSP



Amazon Confidential


















Prime–Mobile Experience
# Checkout: SOSP (cont'd)









Amazon Confidential    37

Prime—Mobile Experience

# Checkout: UPDP





Amazon Confidential

P r i m e — M o b i l e   E x p e r i e n c e

# Checkout: UPDP (cont'd)













Amazon Confidential

39

Prime – Mobile Experience

# Checkout: SPC





Amazon Confidential

Confidential

P r i m e — M o b i l e   E x p e r i e n c e

# Checkout: SPC (cont'd)







Amazon Confidential

42

Prime — Mobile Experience

# Prime Video: Storefront



Amazon Confidential

43

Prime – Mobile Experience

# Prime Video: Storefront (cont'd)



## Confirm your details

| | |
|---|---|
| **Plan** | **Prime**<br>Enjoy unlimited streaming of thousands of movies and TV shows plus FREE Two-Day Delivery on millions of items. ($12.99/month after trial) |
| **Email** | peas-service-0-1620150619491SCGz@email.amazon.com |
| **Payment method** | Test Test<br>MasterCard ending in 2871<br>10/2025 |
| **Billing address** | Domestic<br>515 WESTLAKE AVE N<br>SEATTLE<br>WA<br>98109-4504 |

By joining, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your preferred card or another available credit card on file after your 30-day free trial. **Your Prime membership continues until cancelled. If you don't want to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.**

**Start your free trial.**

Change or cancel plan anytime
Pay later

Conditions of Use   Privacy Notice
Send Us Feedback   Help

© 1996–2021, Amazon.com, Inc. or its affiliates

Amazon Confidential

44

Prime – Mobile Experience

# Prime Video: Storefront (cont'd)



Amazon Confidential

45

Prime– Mobile Experience

# Prime Video Landing Page



Amazon Confidential

Prime – Mobile Experience

# Prime Video Landing Page

 prime

## Confirm your details

| | |
|---|---|
| **Plan** | Prime<br>Enjoy unlimited streaming of thousands of movies and TV shows plus FREE Two-Day Delivery on millions of items.<br>($12.99/month after trial) |
| **Email** | peas-service+0-1620150619491PcGcz@emailamazon.com |
| **Payment method** | Test Test<br>MasterCard ending in 2871<br>10/2025 |
| **Billing address** | Domestic<br>515 WESTLAKE AVE N<br>SEATTLE<br>WA<br>98109-4504 |

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your preferred card or another available credit card on file after your 30-day free trial. Your Prime membership continues until cancelled. If you don't want to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.

**Start your free trial.**

Change or cancel plan anytime
Pay later

Conditions of Use   Privacy Notice
Send Us Feedback   Help

© 1996-2021, Amazon.com, Inc. or its affiliates

Amazon Confidential

47



Prime – Mobile Experience

# Prime Video Landing Page

Amazon Confidential     48

# 3. WELCOME EXPERIENCE



Amazon Confidential

49

## Desktop



Your Amazon Prime membership starts now.

Your Prime | Today's Deals | Prime Insider

### Thank you for joining Prime!

prime

**Get Started**

With Prime you get fast, FREE delivery, exclusive offers and savings on world's largest selection.

Dear Test Test,

Congratulations! Starting now, your Amazon Prime Membership unlocks the best Shopping and Entertainment benefits. As a Prime member, here are just a few of the many great benefits included with your membership:

**Shopping**

Prime members have access to exclusive **Lightning Deals** and coupons. Plus with an Alexa device, you can enjoy hands-free **Voice Shopping** and Prime exclusive Alexa Deals.

**Delivery**

Items are delivered fast with **Prime Delivery** options like FREE Two-Day, FREE Same-day 2-Hour Delivery in select areas.

**Entertainment**

Watch and enjoy thousands of popular movies and TV shows with **Prime Video**. Choose from thousands of digital books, magazines, comics and more with **Prime Reading**.

Listen to ad-free music available on any device with **Prime Music**.

### YOUR MEMBERSHIP

| | |
|---|---|
| Plan Name: | Prime |
| Plan Type: | Annual $79 |
| Upcoming change: | On March 20, 2022 your plan will change to: Annual $119 |
| Payment Method: | Visa****2000 |

To learn more or make changes, **manage your Prime membership**.

Want a reminder before renewing? **Get an email reminder.**

Amazon recommends adding multi-factor authentication to your account to increase account security. **Add a mobile phone number** to your account.

## Mobile



Your Prime | Today's Deals | Prime Insider

### Thank you for joining Prime!

prime

**Let's get started**

With Prime you get fast, FREE delivery, exclusive offers and savings on world's largest selection.

Dear SENSITIVE_DATA,

Congratulations! Starting now, your Amazon Prime Free Trial unlocks the best Shopping and Entertainment benefits. As a Prime member, here are just a few of the many great benefits included with your membership:

**Shopping**

Prime members have access to exclusive **Lightning Deals** and coupons. Plus with an Alexa device, you can enjoy hands-free **Voice Shopping** and Prime exclusive Alexa Deals.

**Delivery**

Items are delivered fast with **Prime Delivery** options like FREE Two-Day, FREE Same-day 2-Hour Delivery in select areas.

**Entertainment**

Watch and enjoy thousands of popular movies and TV shows with **Prime Video**. Choose from thousands of digital books, magazines, comics and more with **Prime Reading**.

Listen to ad-free music available on any device with **Prime Music**.

### YOUR MEMBERSHIP

| | |
|---|---|
| Plan Name: | Prime |
| Plan Type: | Free Trial |
| Current Payment: | $0 |
| Renewal Date: | July 17, 2021 |

Your Prime membership may be subject to applicable tax.

To learn more or make changes, **manage your Prime membership.**

Want a reminder before renewing? **Get an email reminder.**

# Prime - Welcome Experience
# Welcome Email

## Push Notification





# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

AMAZON.COM, INC., a corporation,

     Defendant.

**Case No. 2:23-cv-0932**

EXPERT REPORT OF DONNA L. HOFFMAN, PH.D.

February 24, 2025

CONFIDENTIAL

distinction between the legitimate marketing practices of a business to influence consumers and intentional and deceptive efforts by a business to trick consumers into doing things against their wishes. It is important to remember that in marketing, a primary goal for a business is to identify and satisfy consumers' needs with its product or service offerings, and to attempt to persuade consumers to try, purchase, or use these offerings. Scholars who teach marketing, including myself and others in universities around the world, recognize that customer acquisition and retention activities, including the use of cross-selling (like Amazon cross-selling Amazon Prime to customers during the checkout process) are common, legitimate marketing practices.

c.      Relatedly, the FTC does not consider whether and how (if at all) Amazon's efforts are different from standard marketing practices relating to customer acquisition and retention. Despite using language that repeatedly implies knowledge of what transpires inside the minds of consumers, the FTC's approach makes no direct connection to what consumers actually think, consider, or what motivates them to take certain actions. This omission is significant because, as discussed in Opinion 1, the abundant academic research states consumers do not experience and interact with websites in a vacuum, and what they learn from their previous experiences dictates how they perceive information in subsequent online experiences.

28.    ***Opinion 3: The FTC's Claims Regarding the At-Issue UI Design Elements in Amazon Prime Enrollment and Cancellation Flows Are Unfounded.***

a.      I analyzed each page of the Amazon Prime enrollment flows at issue, specifically: the UPDP page, the SOSP flow, the SPC flow, the TrueSPC flow, and the Prime Video flow. I found that the FTC's allegations regarding deceptive UI design elements show a lack of consideration for standard marketing practices and are inconsistent with the basic tenets of online consumer behavior. Specifically, the FTC's allegations fail to recognize that (i) it is a legitimate marketing practice for companies to use cross-selling, a marketing technique designed to offer existing customers the opportunity to purchase additional products or services that are related to the products they are currently purchasing, (ii) it is a well-studied and legitimate marketing practice for companies to use repetition in their communications, including repetition of the benefits of the product or

the services they offer, to improve persuasiveness of their communication, (iii) using consistent color and visual design schemes on a website creates an online experience consistent with consumers' prior knowledge and prior experience on the website, and (iv) presentation of the relevant information about Prime membership's autorenewal and monthly price, as well as information about the cancellation policy, is consistent with where consumers would typically expect to find that information, located where they accept or confirm their enrollment in the Prime free trial.

b.      I also analyzed each page of the Amazon Prime desktop and mobile cancellation flows to assess the FTC's allegations regarding deceptive UI design elements in the cancellation flows. I find that the FTC's allegations show a lack of consideration for standard marketing practices and well-recognized principles of online consumer behavior. Specifically, the FTC's allegations fail to recognize that (i) reminding consumers of the benefits of the company's services is a legitimate marketing practice, (ii) consumers have different motivations for entering a cancellation process, and consumers who enter the cancellation process may not be completely set on cancelling or may change their minds when presented with relevant information, and (iii) Amazon's cancellation process follows the commonly used principles of progressive disclosure, which is a design technique that gradually allows consumers access to the information they need as they progress throughout the interface while minimizing the mental effort required. Regarding the mobile flows, I also find that the FTC's allegations regarding the mobile pages and flows fail to recognize that (i) many consumers are likely familiar with details being presented over multiple mobile screens or pages that require scrolling to navigate, (ii) Amazon mobile pages and flows follow the commonly used principles of progressive disclosure, and (iii) Amazon accommodates the smaller screen of mobile devices by reorienting the information vertically and by making material terms of the Prime offer visible without the need for scrolling.

c.      Relatedly, to the extent the FTC's allegations imply that the different number of steps between Amazon Prime's enrollment and cancellation processes are problematic, I find that these allegations ignore that consumers have different goals for enrollment and cancellation and that therefore these two processes are aimed at addressing two different

goals. Each process requires responding to different customer motivations and information needs. From a consumer behavior perspective, there is no justification for the two processes to have the same length. The design of both Amazon Prime's enrollment and cancellation processes are consistent with the principles for user-interface design, giving consumers control, freedom, and measures to prevent and recover from errors, while employing progressive disclosure principles to present the right amount of information to consumers while minimizing the mental effort required to navigate the interface.

29.     ***Opinion 4: The At-Issue UI Design Elements Used by Amazon Are Commonly Used Online and Are Likely Familiar to Many Online Consumers.***

a.      To provide context for consumers' online experience in encountering the at-issue UI design elements in Amazon's Prime enrollment and cancellation flows, I performed two analyses.

b.      First, I examined the desktop enrollment and cancellation processes of 48 popular paid digital membership/subscription programs that were not owned by Amazon to assess whether UI design elements at-issue in this matter (or those similar to them) were present. I found that the majority of the UI design elements at-issue (or those similar to them) were commonly used in the desktop enrollment and cancellation processes of these popular paid digital membership/subscription programs. Specifically, of the 8 UI design elements at-issue during enrollment (or those similar to them), all 8 of them were present for more than half of the 48 paid digital membership/subscription programs I analyzed. Similarly, of the 7 UI design elements at-issue for cancellation (or those similar to them), 6 of them were present for more than half of the paid digital membership/subscription programs I analyzed.

c.      Second, I reviewed the top 30 most visited U.S. government websites and the FTC website to assess whether UI design elements at-issue in this matter (or those similar to them) that are applicable to government websites were present. I found that UI design elements at-issue (or those similar to them) that are applicable to government websites were commonly used by the government websites I analyzed.

i.    Consumers can cancel their Prime memberships by conducting a query on an outside search engine (e.g., search "cancel prime" using Google), and clicking on the "Cancel Your Amazon Prime Membership" search result, which would bring them to an "End Your Amazon Prime Membership" page. Clicking the button for "End Your Prime Membership" on this page would bring consumers to the cancellation flow.[50]

j.    Consumers can also cancel their Prime memberships using mobile devices. Consumers can go through a mobile equivalent of the cancelling process discussed above by visiting the Amazon landing page on their device or searching membership cancellation using the search bar.[51]

k.    Prime members can also cancel their Prime memberships through the Amazon mobile app by tapping on the profile icon at the bottom, then tapping on "Your Account," followed by "Memberships and subscriptions." This would lead to a screen with "Prime Membership Settings." Consumers can tap on that, followed by "Manage membership," then tap on "Update, cancel and more," and then click on "End membership," which would bring consumers to the mobile cancellation flow.[52]

37.    Consumers can also cancel their Prime memberships by contacting Amazon customer service, and have four options through which to do so: (1) using Amazon's customer service help page; (2) calling Amazon's customer service phone number, 1-888-280-4331, which is live 24 hours a day, seven days a week; (3) emailing customer service at cs-reply@amazon.com; and (4) using Amazon's live chat.[53]

---

[50] *See* **Appendix C.9**.

[51] *See* Section VIII.E.2.

[52] "How to Cancel Your Amazon Prime Free Trial to Avoid Getting Charged," *Business Insider*, July 20, 2022, https://www.businessinsider.com/guides/tech/how-to-cancel-amazon-prime-free-trial. An article by Yahoo Finance from October 2020 notes similar cancellation steps using the Amazon mobile app. *See* "How to Cancel Your Amazon Prime Account," *Yahoo Finance*, October 9, 2020, https://finance.yahoo.com/news/how-to-cancel-amazon-prime-201436150 html.

[53] FTC Matter No. 2123050, Amazon's Third CID Response, May 24, 2021, p. 30; "4 Ways To Contact Amazon Customer Service," *Business Insider*, July 12, 2024, https://www.businessinsider.com/guides/tech/how-to-contact-amazon-customer-service-phone-email-chat; "Trying to Speak to a Human? Here's How to Contact Amazon Customer Service or a Seller," *USA Today*, September 14, 2022, https://www.usatoday.com/story/money/retail/2022/09/14/how-to-contact-amazon-account-inquiries/7867529001/.

consumers have come to expect during the online shopping experience. Once a consumer finds a product they wish to purchase, they click a buy button to put it in a virtual shopping cart. Some of these commonly used elements online arise from well-known effective web design principles (for example, the use of headlines and bullet points),[61] while others arise from practices that emerge over time and become "baked in" (for example, the use of common labels for primary and secondary action buttons).[62] As consumers engage in repeated interactions online, these features become increasingly familiar and facilitate ease of navigation on new websites. For example, websites typically use colors, underlining, and buttons to indicate the links that are clickable and to distinguish them from static text.[63]

44.    Because free trials are a commonly used feature on websites and online services,[64] many, if not the majority, of consumers are familiar with free trials offered by online businesses when enrolling in paid digital subscription services. According to a survey of U.S. adults conducted by Prof. Ronald T. Wilcox in August 2024 ("Free Trials Survey"), 92.5% of respondents reported that at the time they participated in the survey, they were paying for at least one membership or

---

[61] *See* "7 Tips for Presenting Bulleted Lists in Digital Content," *Nielsen Norman Group*, April 9, 2017, https://www.nngroup.com/articles/presenting-bulleted-lists/ ; "Microcontent: A Few Small Words Have a Mega Impact on Business," *Nielsen Norman Group*, January 29, 2017, https://www.nngroup.com/articles/microcontent-how-to-write-headlines-page-titles-and-subject-lines/.

[62] "Maintain Consistency and Adhere to Standards (Usability Heuristic #4)," *Nielsen Norman Group*, January 10, 2021, https://www.nngroup.com/articles/consistency-and-standards/ ("The fourth of Jakob Nielsen's ten heuristics — consistency and standards — is key to creating applications that make sense for users. Think about the websites and applications you use: they all rely on well-established conventions. Blue underlined text is clickable, the shopping-cart icon shows the items you plan to purchase, the site logo is in the top left corner, a magnifier-glass icon stands for search — these are all examples of conventions that are used all the time in digital products and that make users' lives easier.").

[63] Moran, K. and F. Liu (2018), *How People Read Online: The Eyetracking Evidence*, 2nd ed., Fremont, CA: Nielsen Norman Group ("Moran and Liu (2018)"), p. 313 ("The visual design of a site will impact how its links look, but generally, we recommend at the very least making links a color that is quite different from the body text. Ideally, make the links blue, bold, and underlined (juxtaposed with black or very dark gray body text.) Whatever the presentation, the link should look clickable, be differentiated from body text, and be implemented consistently across the entire site."), pp. 351–353 ("One participant was reading about the Sonos One speaker on Amazon. He saw a three-star review titled, *There are bugs, but it's getting there*. The review was quite long, so Amazon only exposed the first three paragraphs. The participant started scanning the review and was interested, so he clicked *Read more* to expose the rest of the review…Amazon only exposed a few paragraphs of a long review. If the participant wasn't interested in it, he could easily scan to the next one. But he was interested, so he clicked the *Read More* link…After expanding, he scanned the full review."); "A Link Is A Promise," *Nielsen Norman Group*, December 14, 2014, https://www.nngroup.com/articles/link-promise/ ("The best links are salient and descriptive. People should be able to read an expressive link or button term, determine the strength of the information scent, decide if they want to click the link, click it, wait until the next page loads, scan the page when it does, and immediately confirm that they are in the right place. In many cases, websites confirm the user's assumptions and the person confidently continues scanning or reading.").

[64] As discussed in Section IX, I reviewed 48 popular paid digital membership/subscription programs and found 48% of programs offer free trials that automatically renew and charge a payment method on file if not cancelled before the end of the trial period. *See* Exhibit 54.

subscription from a list of ten popular categories of memberships or subscription services that included online services. Further 58% of respondents reported that they signed up for at least one free trial of a membership or subscription in the prior 12 months.[65] In addition, according to an industry study, 84% of Americans have signed up for at least one free trial on a paid digital subscription service, including 49% who signed up for a free trial of membership or subscription programs relating to retail services.[66] Furthermore, the majority of consumers are also familiar with cancelling a paid digital subscription before the free trial ends. According to the same study, 58% of the respondents reported engaging in "trial hopping," i.e., signing up for the same free trial offer multiple times using different email addresses to extend their unpaid access to the offer's benefits.[67] These findings suggest that consumers are generally familiar, if not savvy, with the navigational processes for free trial enrollment and cancellation.

45.    Eye tracking researchers use a technique that records eye movements to investigate how consumers process information during online navigation experiences. Research on eye tracking shows that a typical consumer relies on their prior experiences to form expectations about webpage elements and then applies these expectations from prior experiences as they navigate online. For example, online consumers typically look in areas of the screen where they expect to find the relevant element and information because they have found that element and information in a similar location on webpages they had visited in the past.[68] In addition, a consumer may look first to the top right of a screen to find items such as login, search, and account information

---

[65] Expert Report of Ronald T. Wilcox, February 24, 2025 ("Wilcox Opening Report"). For each of ten categories of popular membership or subscription services (e.g., streaming, retail, and music), respondents were asked whether, at the time, they were paying for a service within that category. Respondents were subsequently asked how many free trials they had signed up for in the prior 12 months across any type of membership or subscription service, not restricting to the ten categories in the prior question. *See* Wilcox Opening Report.

[66] "Survey: How Many Americans Are 'Free Trial Hopping?" *Frontier*, July 30, 2024, https://go.frontier.com/media-center/trial-hopping-survey ("How many times have you signed up for a free trial with your email? 44% [often], 32% [sometimes], 8% [rarely, only if I really need to use the product] … 71% of respondents signed up for a free trial for streaming services, making this category the most popular, followed by retail at 49%, food services at 47%, and software trials at 29%.").

[67] "Survey: How many Americans are 'free trial hopping?" *Frontier*, July 30, 2024, https://go.frontier.com/media-center/trial-hopping-survey ("How often do you create different email addresses to sign up for multiple free trials? 42% [Never], 32% [Sometimes], 26% [Constantly].")., ("… you can sign up for another free trial using a different email address, and then another, and another. This is known as 'trial hopping,' and it's a method some people use to continue enjoying the benefits of a paid subscription service without having to pay for it. … we surveyed 1,000 people (between the ages of 16-54+) using Pollfish to learn about their trial hopping habits … 71% of respondents signed up for a free trial for streaming services, making this category the most popular, followed by retail at 49%, food services at 47%, and software trials at 29%.").

[68] Moran and Liu (2018), p. 28 ("Users look in areas where they expect to find certain elements or information, based on previous experiences. They direct their attention to elements that stand out from the rest of page.").

78.     In marketing, a primary goal for a business is to identify and satisfy consumers' needs at a profit.[138] Scholars who teach marketing, including myself and others in universities around the world, recognize that customer acquisition and retention represent a legitimate marketing and business effort, and such recognition is based on decades of published research on consumer behavior.[139]

79.     The FTC's allegations fail to consider factors that have been shown in the academic literature to influence the consumer experience in online environments. As I explained in Section VI, goals, past experiences, and expectations interact to determine a consumer's contemporaneous online navigation experience and must be accounted for when analyzing any experiences with a given user-interface.[140] Specifically, consumers interpret each screen in the checkout and enrollment flow within (1) the context of the surrounding information on the page, (2) other information the consumer has been exposed to, including in earlier steps in the flow, (3) what, if any, prior knowledge the consumer possesses about the Prime program even before they start the flow, as well as (4) prior knowledge about checkout flows and membership programs offered by websites other than Amazon.

80.     Furthermore, the FTC overlooks the fact that free trial offers are a concept that the majority of consumers are familiar with, as free trials are commonly used in online offers.[141] Many consumers sign up for free trial offers which, like Prime, automatically turn into a paid digital membership/subscription program at the end of the free trial period if the consumer does

---

[138] Kotler and Keller (2016), 15th ed., p. 27 ("Marketing is about identifying and meeting human and social needs. One of the shortest good definitions of marketing is 'meeting needs profitably.'").

[139] Kotler and Keller (2016), 15th ed., pp. 168–173 ("Customer relationship management (CRM) is the process of carefully managing detailed information about individual customers and all customer "touch points" to maximize loyalty. CRM is important because a major driver of company profitability is the aggregate value of the company's customer base. A related concept, customer value management (CVM), describes the company's optimization of the value of its customer base. CVM focuses on the analysis of individual data on prospects and customers to develop marketing strategies to acquire and retain customers and drive customer behavior."); Reinartz, W. et al. (2005), "Balancing Acquisition and Retention Resources to Maximize Customer Profitability," *Journal of Marketing*, 69, 1, 63–79. *See also* descriptions of marketing courses, e.g., "MBA Program Course Descriptions," *The Wharton School*, https://marketing.wharton.upenn.edu/mba-program-course-descriptions/ ("Marketing begins and ends with the customer, from determining customers' needs and wants to providing customer satisfaction and maintaining customer relationships.").

[140] *See* Section VI.

[141] "Ecommerce Insights: Free Trials Aren't Dead," *Sticky.io*, December 2, 2024, https://www.sticky.io/post/ecommerce-insights-free-trials-arent-dead ("More than a quarter of merchants in 2023 use free trials as a conversion tactic, so consider the following reasons free trials can boost ecommerce revenue and create long-term customer relationships.").

not cancel.[142] In fact, according to the August 2024 Free Trials Survey of U.S. adults conducted by Prof. Wilcox, 58% of respondents reported that they signed up for at least one free trial of a membership or subscription in the prior 12 months.[143] Moreover, 85% of respondents who reported to have signed up for at least one free trial in the prior 12 months reported that their most recent free trial either automatically turned into a paid membership or subscription at the end of the trial period, or would have automatically turned into a paid membership or subscription at the end of the trial period, had they not cancelled.[144] In addition, some consumers even sign up for the same free trial offer multiple times using different email addresses to extend their unpaid access to the offer's benefits.[145] As discussed further below in Section IX.A.2, my analysis of paid digital membership/subscription programs found that around half of the programs I analyzed offered a free trial that automatically renewed (i.e., converted into a paid digital membership/subscription program) at the end of the trial, if not canceled before then. Thus, many consumers who purchased products on Amazon website and received the 30-day free trial offer were likely familiar with the concept of free trials and aware that, if they signed up for the free trial, some type of fee would be applicable at the end of the free trial period if they did not cancel before then.

81.     Similarly, the FTC overlooks that Prime is an online membership, and the majority of consumers are familiar with online subscription services: a 2019 survey found that 76% of Americans have at least one online subscription service and half have two or more online subscription services.[146] Similarly, Prof. Wilcox's Free Trials Survey found that 92.5% of

---

[142] A Pollfish survey showed that 44% of respondents signed up for a free trial "[o]ften, whenever trial offers are given to me[.]" 71% of respondents signed up for free trials for streaming services and 49% of respondents signed up for free trials from online retailers. 45% of respondents said they would be "very discouraged" from paying for a service if it did not offer a free trial. *See* "Survey: How Many Americans Are 'Free Trial Hopping?'," *Frontier*, July 30, 2024, https://go frontier.com/media-center/trial-hopping-survey. *See also* Section IX.A.2.

[143] Wilcox Opening Report.

[144] Wilcox Opening Report.

[145] "Survey: How Many Americans Are 'Free Trial Hopping?'," *Frontier*, July 30, 2024, https://go frontier.com/media-center/trial-hopping-survey ("… you can sign up for another free trial using a different email address, and then another, and another. This is known as 'trial hopping,' and it's a method some people use to continue enjoying the benefits of a paid subscription service without having to pay for it. … we surveyed 1,000 people (between the ages of 16-54+) using Pollfish to learn about their trial hopping habits … 71% of respondents signed up for a free trial for streaming services, making this category the most popular, followed by retail at 49%, food services at 47%, and software trials at 29%.").

[146] A 2019 report indicates that 76% of surveyed Americans had at least one online subscription service, with 51% reporting they had two or more subscriptions. Video streaming services were the most popular, with 58% reporting at least one subscription, followed by online shopping at 41%. *See* "3 in 4 Americans Have an Online Subscription,

92.     In addition, while the FTC and Amazon refer to the UPDP page as an "upsell," this type of offer is generally known as a "cross-sell" in the marketing literature and industry best practices.[169] An "upsell" is the practice of offering a more expensive or premium product than the one that consumers are currently purchasing, and a "cross-sell" is the practice of offering a related or complementary product.[170] The Prime free trial offer represents a cross-sell rather than an upsell since it involves offering the consumer an additional service that is complementary to and distinct from what they are currently purchasing.[171] Exhibit 5 illustrates the differences between an upsell and cross-sell. For the sake of clarity, hereinafter, I will refer to the UPDP page as a cross-sell.

| Exhibit 5 | Difference between Upselling and Cross-Selling | |
| --- | --- | --- |
| | **Upselling** | **Cross-Selling** |
| Definition | Selling "more" or upgraded instances of the product or service that could benefit the customer by providing additional value | Selling related or complementary products or services with the existing purchase that could benefit the customer by providing additional value |
| Goal | Increase **volume or price** of product being purchased to increase spend | Increase **number of distinct** products purchased to increase spend |
| Example | "Would you like to upsize those fries for a dollar more?"<br><br>"Would you like to upgrade your phone to the model with more storage?" | "Would you like fries with that?"<br><br>"How about a case to go with your new phone?" |

Source: Adapted from Blattberg, R. C. et al. (2008), "Cross-Selling and Up-Selling," in *Database Marketing*, New York, NY: Springer, 515–547.

93.     In arguing that the UPDP page is problematic to the extent it creates "forced action," the FTC ignores that cross-sells during the checkout process represent a commonly used online

---

[169] I understand Amazon also refers to this type of offer as an "upsell" in its internal documents. *See, e.g.*, "Prime Account CX Satisfaction," March 2021, AMZN_00110901–19 at 01. *See also* Amended Complaint, ¶¶ 36–38 (where the FTC refers to the UPDP page as an "upsell").

[170] Blattberg, R. C. et al. (2008), "Cross-Selling and Up-Selling," in *Database Marketing*, New York, NY: Springer, 515–547.

[171] *See, e.g.*, "What is the Difference Between Upselling and Cross-Selling?," *BigCommerce*, https://www.bigcommerce.com/glossary/upselling-and-cross-selling/.

feature that is consistent with consumers' expectations about online shopping experiences. Cross-selling Prime to Amazon customers during the checkout practice is consistent with legitimate marketing practices and provides benefits to consumers who may be interested in such an offer.

94.     Cross-selling is a marketing technique designed to offer existing customers the opportunity to purchase additional products or services that are related to the product they are currently purchasing.[172] Cross-selling can be beneficial for consumers, and represents a valuable customer relationship management tool that allows companies to offer solutions for additional customer needs after addressing the initial purchase.[173] The cross-selling technique is commonly used across a variety of industries, including financial services, healthcare, insurance, and retail.[174] For example, customers who purchase a new computer are encouraged to purchase computer accessories, bank checking account customers are offered investment opportunities in addition to their regular banking services, and customers who purchase makeup products receive recommendations about makeup application tools such as brushes or eye makeup remover.[175] Industry studies on online advertising also show that, in 2020, 80% of e-commerce businesses in the U.S. reported using cross-selling to increase sales, and cross-selling strategies can increase revenue by up to 30%.[176] Digital consumers are therefore likely to have encountered cross-sells

---

[172] Blattberg, R. C. et al. (2008), "Cross-Selling and Up-Selling," in *Database Marketing*, New York, NY: Springer, 515–547; "Upselling vs. Cross-Selling: The Ultimate Guide," *Shopify*, November 1, 2020, https://www.shopify.com/blog/upselling-and-cross-selling; "What is Cross-Selling? The Ultimate Guide," *Shopify*, September 13, 2022, https://www.shopify.com/blog/what-is-cross-selling.

[173] Kamakura, W. (2007), "Cross-Selling: Offering the Right Product to the Right Customer at the Right Time," in *Profit Maximization Through Customer Relationship Marketing*, New York, NY: Routledge, 41–58 at pp. 43–44 ("Within the context of customer relationship management, cross-selling has become a valuable strategy for customer development, for several reasons. … many customer-focused enterprises are taking advantage of cross-selling as a tool for customer development. … in general, customers' reaction to cross-selling is surprisingly positive. A study conducted in 2005 by Forum Corp., a Boston global leader in workplace learning, with a sample of 1624 consumers around the world (focused on older, more affluent consumers) showed that 88% value service reps who suggest alternative products and services that better meet their needs. … The top factors affecting their willingness to consider purchasing additional products/services were satisfaction with current purchase and how well additional services meet their needs.").

[174] Li, S. et al. (2011), "Cross-Selling the Right Product to the Right Customer at the Right Time," *Journal of Marketing Research*, 48, 4, 683–700 at p. 683 ("[Cross-selling] ranks as a top strategic priority for many industries, including financial services, insurance, health care, accounting, telecommunications, airlines, and retailing.").

[175] "Upselling vs. Cross-Selling: The Ultimate Guide," *Shopify*, November 1, 2020, https://www.shopify.com/blog/upselling-and-cross-selling; "What is Cross-Selling? The Ultimate Guide," *Shopify*, September 13, 2022, https://www.shopify.com/blog/what-is-cross-selling.

[176] "19 Cross Selling Statistics in 2023," *Data Axle USA*, https://www.dataaxleusa.com/blog/cross-selling-statistics/.

104.    The FTC ignores how Amazon uses UI design elements and features on its website as a whole. The use of color on the UPDP page is generally consistent with Amazon's use of these elements on the rest of its website. Many consumers who shop on Amazon are likely to be familiar with UI design elements that are commonly shown on the website, including the use of orange and yellow buttons to indicate actions related to the purchase of products. For example, each product page on Amazon contains a yellow "Add to Cart" button and an orange "Buy Now" button. The page with Past Orders contains a yellow "Buy it again" button to facilitate the easy repurchase of products previously purchased. These UI design elements are shown in Exhibit 8 and Exhibit 9. As I discuss in Section VI, consumers' online experiences are shaped by any relevant prior knowledge they possess about the website, which include the overall visual design scheme.

**Exhibit 8        Example of Interface Element on Amazon Product Page**



Source: Amazon.com, accessed February 15, 2025.

**Exhibit 9        Example of Interface Element on Amazon Orders Page**



Source: Amazon.com, accessed February 15, 2025.

105.    Moreover, the design element that the FTC complains about here (i.e., call-to-action features that have a consistent color scheme) is commonly used in the industry. As discussed in Section IX, 88% of the 48 paid digital membership/subscription programs I analyzed use a call-to-action feature to complete enrollment in a paid digital membership/subscription program (or a

free trial of the program) that has the same color scheme as other call-to-action features encountered by a consumer prior to completing enrollment.[195] This undermines the FTC's conclusion that consumers would be "manipulate[d]" by such UI design elements.

### d. FTC's Claims regarding "Obstruction" and "Misdirection"

106.    The FTC alleges that Amazon uses "obstruction," which it defines in the Amended Complaint as "a design element that involves intentionally complicating a process through unnecessary steps to dissuade consumers from an action," specifically by "making the option to decline enrollment difficult to locate."[196] In particular, the FTC alleges the UPDP page "generally interrupts consumers' online shopping experience by presenting them with a prominent button to enroll in Prime and a comparatively inconspicuous link to decline."[197]

107.    The FTC also alleges that Amazon uses "misdirection," which it defines in the Amended Complaint as "a design element that focuses a consumer's attention on one thing to distract from another."[198] In particular, the FTC alleges, "Amazon uses Misdirection in its Prime checkout enrollment flow by presenting asymmetric choices that make it easier to enroll in Prime than not. Additionally, certain versions of Amazon's checkout enrollment flow offer consumers only a less prominent blue link to decline Prime."[199] Specifically regarding the UPDP page, the FTC says "the contrast between an orange 'double-stacked' button to enroll in Prime and a blue link to decline prioritizes the enrollment option over the decline option and creates a visual imbalance."[200]

108.    The design features that relate to the FTC's allegations, per the Amended Complaint, are highlighted with a red box in Exhibit 10. The UPDP page contains the options to either decline or accept a free trial offer to Prime. The consumer can decline the 30-day free trial offer by clicking the blue hyperlinked text that says "No thanks, I do not want FREE delivery." Alternatively, the consumer can accept the 30-days free trial offer by clicking the orange button

---

[195] *See* Section IX.A.2.a.(7).
[196] Amended Complaint, ¶ 231.c.
[197] Amended Complaint, ¶ 38.
[198] Amended Complaint, ¶ 231.d.
[199] Amended Complaint, ¶ 231.d.i.
[200] Amended Complaint, ¶ 42.

cancelled ...'"251 Elsewhere in the Amended Complaint, the FTC alleges that the visual imbalance "prioritizes" the enrollment option.252

**Exhibit 17     SOSP Flow – Screen 6**



Source: "Prime Free Trial Signup CX," May 23, 2021, AMZN_00003614 at slide 11.

138.    The FTC ignores that the price of the Prime membership is shown on the UPDP page, which is part of the SOSP flow, in bold font type, in the text with the details of the offer. The bold font type provides a contrast to the regular font type that is predominantly used in the rest of

---

251 Amended Complaint, ¶ 50.
252 Amended Complaint, ¶ 42.

the page. Consumers interested in the free trial offer can read this information on the same page as the offer. Moreover, the price is explicitly stated for the consumer, including a specific mention of possible additional taxes and the fact that the price of membership will apply on a recurring monthly basis at the end of the free trial period if the consumer does not cancel.

139.    The FTC also ignores how Amazon uses UI design elements and features on its website as a whole. As I previously discussed, the use of color on the UPDP page is generally consistent with Amazon's use of these elements on the rest of its website. Many consumers who shop on Amazon are likely familiar with UI design elements that are commonly shown on the website, including the use of yellow or orange buttons to indicate actions related to the purchase of products. For example, each product page on Amazon contains a yellow "Add to Cart" button and the page with Past Orders contains a yellow "Buy it again" button to facilitate the easy repurchase of products previously purchased.[253]

140.    The FTC claims the option to accept and decline enrollment are "visually imbalanced,"[254] but the FTC does not consider that, as discussed in Section VIII.B.1.d, using visual differences (e.g., using different colors and shapes) for multiple buttons with different purposes on the same page is a standard practice that helps consumers navigate pages with more ease and follows principles of effective UI design.[255]

### d.  FTC's Claims regarding Screen 7 of the SOSP Flow

141.    The Amended Complaint indicates that the review order page "did not disclose Prime's price, nor did it disclose its monthly auto-renewal."[256] The FTC claims do not consider that the SOSP flow shows autorenewal policy, price, and information on how to cancel at the point of enrollment. This information is displayed on Screen 6 of the SOSP flow (shown in Exhibit 17). After completing the enrollment, Amazon also shows a confirmation message about the

---

[253] *See* Exhibit 8 and Exhibit 9 in Section VIII.B.1.c.

[254] Amended Complaint, ¶ 50.

[255] *See, e.g.*, "5 Principles of Visual Design in UX," *Nielsen Norman Group*, March 1, 2020, https://www.nngroup.com/articles/principles-visual-design/ ("The principle of contrast: The juxtaposition of visually dissimilar elements in order to convey the fact that these elements are different (e.g., belong in different categories, have different functions, behave differently). In other words, contrast provides the eye with a noticeable difference (e.g., in size or color) between two objects (or between two sets of objects) in order to emphasize that they are distinct.").

[256] Amended Complaint, ¶ 52.

cancellation policy. The fact that this page "required consumers to choose" before starting the Prime free trial represents an important step in the enrollment flow.[287]

166.    Furthermore, the FTC's allegation that the UPDP page "interrupts the checkout flow" ignores that some consumers benefit from evaluating the Prime offer information during the checkout process.[288] In fact, consumers might find the Prime offer compelling and decide to enroll into the membership program because of the information presented during the checkout process while they are evaluating shipping options. For example, the UPDP page shows an estimate of how much the consumer would save on shipping for their current order and an overview of the free shipping options for future orders included in a Prime membership. Both of these types of savings could be beneficial to customers who are evaluating shipping options.

167.    The FTC also fails to consider that the Prime offer on the UPDP page constitutes a cross-sell, which is a legitimate marketing practice in both online and offline contexts. As previously discussed in Section VIII.B.1.b, cross-selling is a marketing technique designed to offer existing customers the opportunity to purchase additional products or services that are related to the product they are currently purchasing. The FTC ignores that cross-sells during the checkout process are commonly used online features that are consistent with consumers' expectations about online shopping experiences,[289] and therefore do not constitute an interruption to a typical checkout flow.

168.    The FTC further alleges that, "TrueSPC contains many problematic elements present in the UPDP, SOSP, and SPC—including misleading language and other manipulative designs—which lead consumers to enroll in Prime without consent."[290] However, there are numerous UI design features that can inform the consumer's decision on whether to enroll. For instance, as I have previously discussed in Section VIII.B.1.d, the options to accept and decline the enrollment offer are positioned directly beside each other in a way that is consistent with effective design principles. In addition, as I explain in Section VI, consumers typically look at areas of the screen where they expect to find the relevant information and call-to-action features. It is standard business practice to present customers with a call-to-action that requires a response (e.g., to

---

[287] Amended Complaint, ¶ 50.
[288] Amended Complaint, ¶ 66.
[289] See Section VIII.B.1.b.
[290] Amended Complaint, ¶ 64.

purchase additional products, acquire add-ons, join a membership program, provide feedback about their experience).[291] When presenting consumers with an offer, effective UI design principles recommend placing the "accept" and "decline" options to be adjacent to one another (whether vertically or horizontally), as done in Exhibit 24. Being exposed to consistent design principles across different UIs creates certain expectations for consumers on where items or features that serve similar purposes are located on UIs and what those items look like. The FTC's claims do not consider that these UI design practices are commonly used online, and that many consumers are likely familiar with them.

169.    Furthermore, as I have also previously discussed in Section VIII.B.1.d, use of visual differences (e.g., use of different colors and shapes) for multiple buttons with different purposes on the same page (such as the visual differences between the options to enroll and decline the Prime offer) are standard practice that help consumers navigate pages with more ease and follows principles of effective UI design. Many online consumers are likely familiar with choice options being presented with contrasting or visually different buttons through their experiences across different websites that follow these UI design principles.[292] Indeed, I have presented other examples of this practice on the FTC's website in Exhibit 12 and Exhibit 13.

170.    The FTC also does not consider whether the visual contrasts or differences in the call-to-action features on the UPDP page are consistent with visual contrasts used for similar purposes on other pages on the Amazon website. As previously discussed in Section VIII.B.1.d, many consumers who have previously shopped on Amazon are likely familiar with Amazon's use of these UI design elements from their prior experiences navigating the website. Amazon uses call-to-action features of different color (e.g., yellow or blue), such as the one presented in Exhibit 11 with a yellow button presenting a call-to-action feature and a blue hyperlink presenting an alternative option. The FTC does not consider the role this type of visual differences, which follow the principles of effective UI design, can play in aiding consumers' navigation, nor that consumers are likely to be familiar with their use on the Amazon website.

---

[291] See Section VIII.B.1.d.
[292] *See* Section VIII.B.1.d.

description of the benefits includes the additional benefits of the broader Prime membership, including two-day delivery. Right next to the Plan description is a button allowing consumers to change the plan if they desire to do so. Second, the Prime membership disclosures are presented above the orange button to start the free trial. This disclosure refers to "Amazon Prime Terms and Conditions" and indicates that "Your Prime membership continues until cancelled." Nowhere in the disclosures does it state that the offer is for Prime Video; instead, the offer is explicitly about Prime.

### C.    Analyses of Amazon Prime's At-Issue Desktop Cancellation Flows

186.    The Amended Complaint contains a series of allegations regarding the complexity of the Amazon Prime cancellation process and its implications on consumers' ability to cancel their membership.[312] The FTC's allegations and claims of "dark patterns" in Amazon Prime's cancellation process fail to consider standard marketing practices and well-recognized consumer online behavior.

187.    The FTC's allegations regarding steps consumers must take to find the online cancellation flow fail to take into account that consumers are likely familiar with websites requiring them to navigate through an account management page in order to cancel.[313] As discussed further below, based on my analysis in Section IX of 48 programs from the ten most subscribed categories of paid digital membership/subscription programs, none of these paid digital membership/subscription programs placed a cancellation call-to-action feature on its website's landing page as an ingress to the cancellation flow. In addition, I found that for 45 of the 48 paid digital membership/subscription programs analyzed, consumers can advance to the desktop cancellation flow from the "manage my account" page, and that for the three other remaining companies consumers do not have a way to cancel online. I also understand that there

---

[312] Amended Complaint, ¶ 7 ("For years, Amazon also knowingly complicated the cancellation process for Prime subscribers who sought to end their membership. […] Amazon designed the Iliad cancellation process ('Iliad Flow') to be labyrinthine…"), ¶ 162 ("Amazon did not design the Iliad Flow to be simple or easy for consumers. The Iliad Flow inhibits or prevents many consumers who intend to cancel from cancelling their membership.").
[313] Amended Complaint, ¶¶ 131–139.

are more ways to reach the cancellation flow than those alleged in the Amended Complaint, including those in **Appendices C.1–C.9**.[314]

188.    Regarding the cancellation flow, the FTC's allegations specifically fail to recognize that (i) it is a legitimate marketing practice for companies to remind consumers of the benefits of their services; (ii) consumers have different motivations for entering a cancellation process, and consumers who enter the cancellation process may not be completely set on cancelling or may change their minds when presented with relevant information; and (iii) Amazon's cancellation process follows the commonly used principles of progressive disclosure, a design technique that allows consumers to access important information as they progress throughout the interface in a way that minimizes cognitive load, while still allowing them to access more complex information as needed. Each of these issues will be discussed further below.

189.    First, the FTC fails to consider that reminding consumers of the benefits of a company's services is a legitimate and standard marketing practice. In fact, the practice of offering incentives to consumers, or similarly reminding consumers of the benefits of a company's services, is a standard marketing practice as doing so helps companies retain consumers.[315]

190.    Second, the FTC disregards that consumers have different goals and motivations when entering a cancellation process which will have an impact on whether they complete the cancellation process, delay cancellation, or decide not to cancel altogether. The FTC's allegation that all consumers who locate and enter the cancellation flow "have already expressed an intent to cancel,"[316] is an unsupported assumption. This allegation presumes that consumers always have a specific goal in mind (cancelling), are 100% sure about their goal, and want to complete it immediately (in one step). These contentions are untethered to the principles of consumer decision-making processes that are well-established in the consumer behavior literature.

---

[314] *See* **Appendices C.1–C.9**. *See also* Deposition of Benjamin Goeltz, October 30, 2024 ("Goeltz Deposition"), pp. 89:9–91:15.

[315] *See, e.g.,* White, T. B., et al. (2007), "Customer Retention When the Customer's Future Usage Is Uncertain," *Psychology & Marketing*, 24(10), 849-870 at 864 ("Firms can also increase the likelihood of customer retention by encouraging customers to focus on anticipated drop regret—the loss of a potential gain—either by asking consumers to consider all that they might miss if they dropped the service, or indirectly, via free trial memberships. By reminding the consumer of the benefits previously enjoyed during the trial membership, firms stand to increase the likelihood that consumers will regret not retaining the service.").

[316] Amended Complaint, ¶ 231.c.ii.

### b. FTC's Claims Regarding "Forced Action"

210.    The FTC alleges that Amazon uses "forced action" in the cancellation flow by "forcing the consumer to proceed through multiple screens to cancel their subscription."[338] The FTC's "forced action" allegations refer to the second, third, and fourth screen of the Desktop Prime Central cancellation flow described in Exhibit 34.

211.    The FTC does not explain how proceeding through multiple screens is inherently bad for a consumer who is considering cancelling.[339] The FTC's characterization of this as problematic is based on the premise that inclusion of multiple screens in the cancellation process makes the process complicated.[340] The FTC thereby implies—though never explicitly alleges as I understand their claims—that a single page cancellation flow is better for consumers.

212.    I am not aware of any academic literature or any empirically-based analyses that would support this assumption. Indeed, usability experts argue for the importance of "guard rails" to minimize consumer errors.[341] For example, it is recommended that designers use confirmation dialogs to "[a]sk users whether they are sure that they want to proceed" to prevent and reduce consumer errors.[342] A commonly seen example is an overlay asking consumer, "Are you sure you want to permanently delete this file?" when the consumer gives the command to delete a file.[343] In addition, this assumption that a single page cancellation flow is better for consumers

---

[338] Amended Complaint, ¶ 231.a ("'Forced Action' is a design element that requires users to perform a certain action to complete a process or to access certain functionality. […] Amazon also uses Forced Action in its Iliad Flow by forcing the consumer to proceed through multiple screens to cancel their subscription. The presence of Forced Action complicates the Iliad Flow.").

[339] Amended Complaint, ¶ 231.a.ii.

[340] Amended Complaint, ¶ 231.

[341] "10 Usability Heuristics for User Interface Design," *Nielsen Norman Group*, January 30, 2024, https://www.nngroup.com/articles/ten-usability-heuristics/ ("User control and freedom. Users often perform actions by mistake. […] Show a clear way to exit the current interaction, like a *Cancel* button. […] Error prevention. Good error messages are important, but the best designs carefully prevent problems from occurring in the first place. Either eliminate error-prone conditions, or check for them and present users with a confirmation option before they commit to the action."); "Preventing User Errors: Avoiding Unconscious Slips," *Nielsen Norman Group*, August 23, 2015, https://www.nngroup.com/articles/slips/ ("Strategies for preventing slips are centered around gently guiding users so that they stay on the right path and have fewer chances of slipping. Assist users by providing the needed level of precision, and encourage users to check for errors.").

[342] "Confirmation Dialogs Can Prevent User Errors — If Not Overused," *Nielsen Norman Group*, February 18, 2018, https://www.nngroup.com/articles/confirmation-dialog/.

[343] "Confirmation Dialogs Can Prevent User Errors — If Not Overused," *Nielsen Norman Group*, February 18, 2018, https://www.nngroup.com/articles/confirmation-dialog/.

ignores the progressive disclosure principles I described previously.[344] Each screen contains a discrete amount of information because online consumers would not be able to process all the information if it was presented on a single page. In other words, under progressive disclosure principles, consumers can benefit from information being presented gradually in multiple pages rather than a single page because the gradual introduction of information is easier to process.

213.    Similarly, as I discussed above, different consumers who enter the cancellation process will necessarily have different goals and motivations: while some may be interested in exploring cancellation, not all consumers will have formed an intent to cancel, and will require additional steps in their decision processes before deciding whether to cancel or not.[345] Thus, the cancellation flow is designed to support consumers' heterogeneous needs and empowers consumers in all phases of their decision-making process, depending on their particular objectives.

214.    The FTC also fails to consider that consumers may benefit from information regarding Prime membership and its benefits. For example, a consumer might not be fully aware of Prime benefits, which include free access to streaming services like Prime Video and Prime Music. Knowing this information might change consumers' decision to cancel their Prime membership. As another example, some consumers might not be aware that Prime offers both monthly and yearly plans and additional discounts for students and people receiving benefits from certain government programs, which might also change their cancellation decision. Therefore, information on the cancellation pages helps consumers make informed decisions.

---

[344] Progressive disclosure is a well-known approach to user interface design that attempts to achieve a balance between simplicity (an interface easy to use) and power (the presentation of important content or features that satisfy users' needs). Progressive disclosure is grounded on principles from cognitive psychology and was developed to help users navigate complex user interfaces. *See* "Progressive Disclosure," *Nielsen Norman Group*, December 3, 2006, www.nngroup.com/articles/progressive-disclosure/; Springer, A. and S. Whittaker (2020), "Progressive Disclosure: When, Why, and How Do Users Want Algorithmic Transparency Information?," *ACM Transactions on Interactive Intelligent Systems (TiiS)*, 10, 4, 1–32 ("The original concept involved hiding advanced interface controls: allowing users to make fewer initial errors and learn the system more effectively.").

[345] According to the consumer behavior literature, consumers can be either goal-oriented (utilitarian) or browsing (experiential). A consumer might browse the cancellation page just because they are considering cancelling, and they might decide not to cancel and abandon the process after learning that their membership includes benefits they were not aware of. Another consumer might have a specific goal to cancel because they no longer need the membership and can follow the specific steps on the page to complete their cancellation. *See* Hoffman, D. L. and T. P. Novak (2009), "Flow Online: Lessons Learned and Future Prospects," *Journal of Interactive Marketing*, 23, 1, 23–34 at p. 24 ("online consumer behavior is grounded in both goal-directed and non-directed motivations, and that both need to be studied and modeled for the fullest account.").

215.    Relatedly, the FTC overlooks the fact that having multiple pages can avoid cancellations that occur by mistake, and the possible disruptions caused by an accidental cancellation. The inadvertent cancellation of the Prime membership removes access to the free 1-day shipping option and might cause shipping delays, and loss of access to other benefits like access to books, photo storage, and entertainment. Consumers can and do make mistakes, and including measures to help consumers prevent, recognize, and recover from mistakes are standard recommended practices to improve usability of websites.[346]

### c.    FTC's Claims Regarding "Interface interference"

216.    The FTC alleges that Amazon adopts "interface interference" in the cancellation flow and "emphasiz[es] options that divert the consumer from the flow without cancelling, and by employing warning icons […] which evokes anxiety and fear of loss in consumers."[347] The FTC's "interface interference" allegations refer to the second, third, and fourth screen of the Desktop Prime Central cancellation flow described in Exhibit 34.

217.    First, as I show in Section IX.A.2.b.(12), companies often provide additional options other than cancelling during the cancellation flow, to give consumers alternatives to the immediate cancellation of the membership. Thus, the FTC is complaining about practices that are commonly used for membership programs.

218.    Second, I am not aware of any empirical evidence or academic literature that supports the FTC's allegations that the use of "warning icons" in the context of an online cancellation process evokes anxiety and fear of loss.[348] I understand the FTC refers to the yellow triangular icons with a black exclamation mark in the third and fourth screens of the Prime's Desktop Cancellation flow, as shown in Exhibit 40 (shown below) and Exhibit 39 (shown in Section VIII.C.1.a). The

---

[346] Nielsen, J. (1994), "Enhancing the Explanatory Power of Usability Heuristics," in *Proceedings of the SIGCHI conference on Human Factors in Computing Systems*, 152–158 at p. 152 ("[Based on a dataset of usability problems] a new set of nine heuristics were derived [including] user control and freedom, […] error prevention […] helping users recognize, diagnose, and recover from errors.").

[347] Amended Complaint, ¶ 231.b ("'Interface Interference' is a design element that manipulates the user interface in ways that privilege certain specific information relative to other information. […] Amazon also uses Interface Interference in the Iliad Flow by emphasizing options that divert the consumer from the flow without cancelling and by employing warning icons near the option to cancel, which evokes anxiety and fear of loss in consumers. The presence of Interface Interference complicates the Iliad Flow.").

[348] Amended Complaint, ¶ 231.b.ii.

226.    Moreover, the FTC again *assumes* that showing consumer additional marketing information, such as Prime benefits, during cancellation is problematic.[367] As I explained above, the Amazon cancellation flow is designed around consumers' heterogeneous needs and empowers consumers in their decision process. Amazon does not know what its customers are thinking, nor where they are in their decision-making process when they enter the cancellation flow. Amazon designs the cancellation flow to accommodate the many different needs consumers might have.

227.    Prime members with an intent to cancel may wish to evaluate whether cancelling might be appropriate given their specific motivations. For example, some members might not be sure about how much they are paying and need to be reminded of the monthly charge. Others might not know whether they qualify for any potential discounts and presenting them with discounts available to them may change their intent to cancel. Some consumers may not know what portfolio of benefits Prime offers. As shown in Exhibit 32, the decision process involves an "evaluation" step, and providing additional information during the cancellation flow facilitates the evaluation process for different customers.

228.    A consumer's experience of Amazon's online cancellation process can be compared with the product return process in a physical store. If a consumer is not satisfied with a pair of shoes that they purchased, they assume that they can return the shoes, albeit under certain conditions. As part of the return process, the in-store customer service representative might ask the consumer whether they are looking for a store refund to use immediately to purchase a new product, or a full refund to the credit card. If the consumer would like a different size, the representative might find the desired size and the initially planned "return" becomes an "exchange" because of the options that were described in the return process. Similarly, Prime members can look for assistance by reaching out to Amazon customer service, or by clicking on the "Manage membership" menu on the website. During the cancellation flow, the website interface contains messages similar to the conversation that the customer would experience in the store: "do you want to change plans?," "are you aware of this discount?," "do you want a refund or to stop the membership at the end of the cycle?."[368] Similar to the in-store conversation, the

---

[367] Amended Complaint, ¶ 231.c.
[368] Amended Complaint, Attachment Q.

consumer can continue with the planned "return" or can choose to "exchange" the current Prime plan with a different one.

### e. FTC's Claims regarding "Misdirection"

229.    The FTC alleges that Amazon adopts "misdirection," which it defines in the Amended Complaint as "a design element that focuses a consumer's attention on one thing to distract from another."[369]

230.    The FTC alleges that Amazon uses "misdirection" in two ways: (1) it "present[s] consumers with asymmetric choices [such as] animation, a contrasting color blue, and text to draw consumers' attention to "Remind me later" and "Keep my benefits" options rather than the "Continue to Cancel" option; and (2) it present[s] visually appealing options to perform acts other than cancel, such as exploring the benefits of the subscription service," and therefore exiting the cancellation flow.[370] The FTC claims that Amazon's use of "misdirection" "complicates" the cancellation flow.[371] The FTC's "misdirection" allegations refer to the second, third, and fourth screen of the Desktop Prime Central cancellation flow described in Exhibit 34.

231.    The FTC's allegations that these interfaces represent "misdirection" fail to consider that the interface uses text boxes with additional information to provide the consumer with relevant details to make an informed decision, as shown in Exhibit 43. For example, unlike the "Continue to cancel" option, the "Remind me later" option needs additional details to communicate to the consumer, i.e., when is "later" and what happens in the meantime until Amazon reminds them about cancellation. This information is provided in the blue box beneath the button. Moreover, as discussed in Section VII, customer retention efforts are standard marketing practices and the

---

[369] Amended Complaint, ¶ 231.d.

[370] Amended Complaint, ¶ 231.d ("'Misdirection' is a design element that focuses a consumer's attention on one thing to distract from another. [...] Amazon also uses Misdirection in its Iliad Flow by presenting consumers with asymmetric choices that make it easier to abandon an attempted Prime cancellation than to complete it. In particular, Amazon uses attractors such as animation, a contrasting color blue, and text to draw consumers' attention to 'Remind me later' and 'Keep my benefits' options rather than 'Continue to Cancel.' Amazon further misdirects consumers who have entered the Iliad Flow by presenting visually appealing options to perform acts other than cancel, such as exploring the benefits of the subscription service (thereby exiting the Iliad Flow). The presence of Misdirection complicates the Iliad Flow.").

[371] Amended Complaint, ¶ 231.d.iii.

274.    A detailed description of my methodology and the coding instructions can be found in **Appendices D and D.1.**

## 2. Findings

275.    I summarize my findings for enrollment processes in Exhibit 54 and Exhibit 55 and for cancellation processes in Exhibit 74. Specifically, I found that nearly all of the UI design elements at-issue (or those similar to them) were present in a majority of the enrollment and cancellation processes of the 48 popular paid digital membership/subscription programs I analyzed.[450] The findings suggest that the at-issue UI design elements (or those similar to them) are commonly used online.

### a. Findings from the Desktop Enrollment Flow Review

276.    As shown in Exhibit 54 and Exhibit 55, a majority of the popular paid digital membership/subscription programs I analyzed use UI design elements at-issue (or those similar to them) that the FTC focuses on in its Amended Complaint. Specifically, of the 8 UI design elements at-issue in the enrollment process, all 8 of them (or those similar to them) were present in more than half of the paid digital membership/subscription programs I reviewed.[451] Below, I discuss my findings for each at-issue UI design element for the desktop enrollment flow.

---

[450] Specifically, of the 8 UI design elements at-issue in the enrollment process (or those similar to them), all 8 of them (or those similar to them) were present in more than half of the paid digital membership/subscription programs I reviewed. 6 of the 7 UI design elements at-issue in Amazon's cancellation processes (or those similar to them) were present in the cancellation processes of more than half of the paid digital membership/subscription programs I reviewed.

[451] These 8 UI design elements at-issue for the enrollment process excludes "The company offers a free trial that automatically renews and charges payment method if not cancelled before the end of the trial period." I understand that the FTC does not allege that the free trial that automatically converts to a paid membership if consumers do not cancel before the end of the trial period itself is a "dark pattern."

## Exhibit 55    Desktop Enrollment Flow Comparative Analysis, cont.

| No. | Service | Website Category[2] | Call-to-action feature to decline the offer for the program differs in color and/or size from the call-to-action feature to accept the offer | Information about auto-renewal is disclosed before a consumer completes enrollment in the program | Information about the price of the program is disclosed before a consumer completes enrollment in the program | Benefits of the program are presented using larger or differently colored text or other visual elements compared to other text on the same webpage | Call-to-action feature to complete enrollment in the program is the same color scheme as prior call-to-action features |
|---|---|---|---|---|---|---|---|
| | **Amazon Prime** | | | | | | |
| | UPDP | | ✓ | ✓ | ✓ | ✓ | ✓ |
| | SOSP | | ✓ | ✓ | ✓ | ✓ | ✓ |
| | SPC[1] | | ✓ | ✓ | ✓ | ✓ | ✓ |
| | TrueSPC[1] | | ✓ | ✓ | ✓ | ✓ | ✓ |
| **A** | **Streaming** | | | | | | |
| A.1 | Netflix | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| A.2 | Disney+ | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| A.3 | Max | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| A.4 | Paramount+ | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| A.5 | Hulu | Category 3 | No decline option | ✓ | ✓ | ✓ | X |
| **B** | **Delivery** | | | | | | |
| B.1 | Walmart+ | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ |
| B.2 | Target Circle 360 | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| B.3 | My Best Buy Plus | Category 1 | X | ✓ | ✓ | ✓ | ✓ |
| B.4 | Costco | Category 1 | ✓ | ✓ | ✓ | ✓ | X |
| B.5 | Kroger Boost | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **C** | **Music** | | | | | | |
| C.1 | Spotify Premium | Category 2 | No decline option | ✓ | ✓ | ✓ | X |
| C.2 | Apple Music | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ |
| C.3 | YouTube Music Premium | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ |
| C.4 | SiriusXM | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| C.5 | Pandora | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **D** | **Cloud Storage** | | | | | | |
| D.1 | Google One (for Google Drive) | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| D.2 | Dropbox Plus | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| D.3 | Microsoft 365 (for OneDrive) | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| D.4 | Box | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| D.5 | Mega | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ |
| **E** | **Gaming** | | | | | | |
| E.1 | PlayStation Plus (PS Plus) | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| E.2 | Nintendo Switch Online | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| E.3 | Xbox Game Pass | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| E.4 | NVIDIA GeForce Now | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| E.5 | EA Play | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **F** | **Food Delivery** | | | | | | |
| F.1 | DoorDash DashPass | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ |
| F.2 | Uber One (for Uber Eats) | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| F.3 | Instacart+ | Category 1 | ✓ | ✓ | ✓ | ✓ | X |
| F.4 | 7-Eleven GoldPass | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| F.5 | Hello Fresh | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **G** | **Live TV** | | | | | | |
| G.1 | YouTube TV | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| G.2 | Hulu TV | Category 3 | No decline option | ✓ | ✓ | ✓ | X |
| G.3 | Sling TV | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| G.4 | Fubo TV | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **H** | **Home Security** | | | | | | |
| H.1 | Nest Aware (for Google Nest) | Category 1 | No decline option | ✓ | ✓ | ✓ | ✓ |
| H.2 | Wyze | Category 1 | No decline option | ✓ | ✓ | X | ✓ |
| H.3 | SimpliSafe | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ |
| H.4 | Xfinity | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **I** | **News** | | | | | | |
| I.1 | New York Times | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ |
| I.2 | Wall Street Journal | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| I.3 | Washington Post | Category 2 | No decline option | ✓ | ✓ | ✓ | ✓ |
| I.4 | Gannett/USA Today | Category 2 | No decline option | ✓ | ✓ | X | ✓ |
| I.5 | Substack | Category 2 | No decline option | ✓ | ✓ | ✓ | X |
| **J** | **Cybersecurity** | | | | | | |
| J.1 | McAfee | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| J.2 | Malwarebytes | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ |
| J.3 | Avast | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| J.4 | AVG | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| J.5 | Webroot | Category 3 | No decline option | ✓ | ✓ | ✓ | ✓ |
| **Total Subscription Programs Reviewed [A]** | | | 48 | 48 | 48 | 48 | 48 |
| **# of Programs Not Applicable for Analysis [B]** | | | 37 | 0 | 0 | 0 | 0 |
| **# of Programs Applicable for Analysis [C] = [A] - [B]** | | | 11 | 48 | 48 | 48 | 48 |
| **# of Programs That Are Consistent with Amazon's Practices [D]** | | | 9 | 48 | 48 | 46 | 42 |
| **% of Programs That Are Consistent with Amazon's Practices [E] = [D] / [C]** | | | 82% | 100% | 100% | 96% | 88% |

Source: *See* **Appendix D, Appendix E.**

of the 16 companies that sell products or services other than the paid digital memberships/subscription programs ("Category 1") offered the program or a free trial to it as a cross-sell during the online purchase process, e.g., a free trial for Walmart+ was offered to the consumer when the consumer was checking out to complete a purchase on Walmart.com. I find that among these 16 cross-sell offers for a membership/subscription program or a free trial to it, 9 were made using an overlay and the remaining 7 were embedded in webpages within the purchase flow.[476] These findings are consistent with the scholarly marketing literature and industry reports regarding the common use of cross-sell offers by companies (both online and offline).[477] Thus, cross-sells are likely to be familiar to many consumers, and those prior online experiences would serve to provide additional context for interpreting and understanding encountered UI design elements during a shopping experience on the Amazon website.

### b. Findings from the Desktop Cancellation Flow Review

292.    As shown in Exhibit 74, the vast majority of popular paid digital membership/subscription programs I analyzed use at-issue UI design elements that the FTC focuses on in the Amazon Prime cancellation process in its Amended Complaint. Specifically, 6 of the 7 at-issue UI design elements in Amazon's cancellation processes (or those similar to them) were present in the cancellation processes of more than half of the paid digital membership/subscription programs I reviewed. Below, I discuss my findings for each at-issue UI design element within the cancellation flows of the programs I reviewed.

---

[476] *See* Appendix E, Target Circle 360, Accept 1st Offer, 08 Added to Cart page 01; Costco, Accept 1st Offer, 06 Add Membership 01; Nintendo Switch Online, Accept 1st Offer, 04_Game_20; Uber One, Accept 1st Offer, 09 Cart 02; 711 Gold Pass, Accept 1st Offer, 17 Review Order 01; Nest Aware (Google Nest), Accept 1st Offer, 03 Product 11; Wyze, Accept 1st Offer, 03 WyzeCam 02.
[477] *See* Section VIII.B.1.b.

## Exhibit 74    Desktop Cancellation Flow Comparative Analysis

| No. | Service | Website Category[1] | "Manage my account" webpage includes a feature to advance to the cancellation flow | Website's landing page does does NOT include a feature to start the cancellation flow | Cancellation flow involves navigating multiple webpages | Call to action features for alternatives to immediately cancelling the program are present in cancellation flow | Cancellation flow mentions program's benefits | Cancellation flow includes warning icons | Call to action features for canceling differ in color from call to action feature to remain enrolled |
|---|---|---|---|---|---|---|---|---|---|
| | **Amazon Prime** | | | | | | | | |
| | Cancellation Flow | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **A** | **Streaming** | | | | | | | | |
| A.1 | Netflix | Category 3 | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ | ✗ |
| A.2 | Disney+ | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| A.3 | Max | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| A.4 | Paramount+ | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| A.5 | Hulu | Category 3 | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ |
| **B** | **Delivery** | | | | | | | | |
| B.1 | Walmart+ | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| B.2 | Target Circle 360 | Category 1 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| B.3 | My Best Buy Plus | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| B.4 | Costco | Category 1 | No online cancellation | ✓ | No online cancellation | No online cancellation | No online cancellation | No online cancellation | No online cancellation |
| B.5 | Kroger Boost | Category 1 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| **C** | **Music** | | | | | | | | |
| C.1 | Spotify Premium | Category 2 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| C.2 | Apple Music | Category 2 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| C.3 | YouTube Music Premium | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| C.4 | SiriusXM | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| C.5 | Pandora | Category 2 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| **D** | **Cloud Storage** | | | | | | | | |
| D.1 | Google One (for Google Drive) | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| D.2 | Dropbox Plus | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| D.3 | Microsoft 365 (for OneDrive) | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| D.4 | Box | Category 2 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✓ |
| D.5 | Mega | Category 2 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✓ |
| **E** | **Gaming** | | | | | | | | |
| E.1 | PlayStation Plus (PS Plus) | Category 1 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| E.2 | Nintendo Switch Online | Category 1 | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ |
| E.3 | Xbox Game Pass | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| E.4 | NVIDIA GeForce Now | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| E.5 | EA Play | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| **F** | **Food Delivery** | | | | | | | | |
| F.1 | DoorDash DashPass | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| F.2 | Uber One (for Uber Eats) | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| F.3 | Instacart+ | Category 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| F.4 | 7-Eleven GoldPass | Category 1 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | No decline option |
| F.5 | Hello Fresh | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **G** | **Live TV** | | | | | | | | |
| G.1 | YouTube TV | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| G.2 | Hulu TV | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| G.3 | Sling TV | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| G.4 | Fubo TV | Category 3 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✓ |
| **H** | **Home Security** | | | | | | | | |
| H.1 | Nest Aware (for Google Nest) | Category 1 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✗ |
| H.2 | Wyze | Category 1 | ✓ | ✓ | ✓ | ✗ | ✓ | ✗ | ✓ |
| H.3 | SimpliSafe | Category 1 | No online cancellation | ✓ | No online cancellation | No online cancellation | No online cancellation | No online cancellation | No online cancellation |
| H.4 | Xfinity | Category 3 | No online cancellation | | No online cancellation | No online cancellation | No online cancellation | No online cancellation | No online cancellation |
| **I** | **News** | | | | | | | | |
| I.1 | New York Times | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| I.2 | Wall Street Journal | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | No decline option |
| I.3 | Washington Post | Category 2 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| I.4 | Gannett/USA Today | Category 2 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✓ |
| I.5 | Substack | Category 2 | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | No decline option |
| **J** | **Cybersecurity** | | | | | | | | |
| J.1 | McAfee | Category 3 | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✓ |
| J.2 | Malwarebytes | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ |
| J.3 | Avast | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| J.4 | AVG | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| J.5 | Webroot | Category 3 | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | No decline option |
| | **Total Subscription Programs Reviewed [A]** | | 48 | 48 | 48 | 48 | 48 | 48 | 48 |
| | **# of Programs Not Applicable for Analysis [B]** | | 3 | 0 | 3 | 3 | 3 | 3 | 7 |
| | **# of Programs Applicable for Analysis [C]  [A]-[B]** | | 45 | 48 | 45 | 45 | 45 | 45 | 41 |
| | **# of Programs That Are Consistent with Amazon's Practices [D]** | | 45 | 48 | 44 | 30 | 36 | 7 | 39 |
| | **% of Programs That Are Consistent with Amazon's Practices [E]  [D]/[C]** | | 100% | 100% | 98% | 67% | 80% | 16% | 95% |

Source: *See* **Appendix D, Appendix E.**

Note:

[1] Under "Website Category," the 48 companies whose enrollment flows I analyzed can be divided into three categories based on the types of products/services they offer: (1) companies that also sell products or services other than the paid digital membership/subscription programs (e.g., Walmart, Best Buy) ("Category 1"), (2) companies that use a freemium pricing model (i.e., companies that offer a free version of their product or service alongside paid digital membership/subscription programs for premium content and services (e.g., YouTube Music, Wall Street Journal)) ("Category 2"), and (3) companies that only offer paid digital membership/subscription programs for streaming content or the services they offer (e.g. Netflix, Xfinity) ("Category 3"). *See* **Appendix D** for more details.

[2] Costco, SimpliSafe, and Xfinity do not offer an online option to cancel their paid digital membership/subscription programs even though they each offer an online option to subscribe to their paid digital membership/subscription programs.

[3] Out of the 48 flows reviewed for the metric "The call-to-action feature for canceling the paid digital membership/subscription program (or a free trial of the program) on the final page of the cancellation flow differs in color from the call-to-action feature to remain enrolled in the program," 3 flows (i.e., cancellation flows for Costco, SimpliSafe, and Xfinity) did not offer online cancellation options, and 4 flows (i.e. cancellation flows for 7-Eleven GoldPass, Wall Street Journal, Substack, and Webroot) did not contain a call-to-action feature to remain enrolled in the cancellation flow. For these websites, a call-to-action feature to remain enrolled was not provided, however consumers could choose not to cancel the paid digital membership/subscription program or free trial of the program by actions such as leaving the website or closing the overlay (if applicable) by clicking on the "X" on the top corner of the overlay. Results for this UI design element were calculated based on the 41 flows that did have both call-to-action features to cancel and remain enrolled on the final page of the cancellation flow. *See* **Appendix D, Appendix D.1** for more details.

**(9)     The "manage my account" webpage includes a feature that a consumer can click to advance to the cancellation flow**

293.    The FTC alleges that Amazon uses a "dark pattern" of "obstruction" in the desktop cancellation flow by making the ingress to the flow "difficult for consumers to locate."[478] Counsel asked me to analyze the programs I reviewed to assess whether consumers can advance to the desktop cancellation flow from the "manage my account" page to evaluate the ingress point to desktop cancellation flow, as shown in Exhibit 75.[479]

294.    I reviewed the cancellation processes of 48 popular paid digital membership/subscription programs to assess whether the "manage my account" webpage included a feature that a consumer could click to advance to the cancellation flow. This includes instances where the "manage my account" webpage included a feature to start the cancellation flow immediately or instances where the "manage my account" webpage included features that would advance the consumer to additional webpages through which the consumer can start (or further advance to) the cancellation flow. For example, Spotify Premium, one of the most popular music paid digital membership/subscription programs,[480] required consumers to navigate to a dropdown menu on the top right corner of its website's landing page and select "Account," to take the consumer to a "manage my account" page where the consumer can start the cancellation flow, as shown in Exhibit 76. I identified Spotify Premium as a paid digital membership/subscription program that had a similar at-issue UI design element in its desktop cancellation process as Amazon Prime. I found that all programs with online cancellation (45 programs, 100%) had a "manage my account" page that included a feature that a consumer could click to advance to the cancellation flow.

---

[478] Amended Complaint, ¶ 231.c.ii.
[479] Amended Complaint, ¶¶ 131–133.
[480] *See* **Appendix D**.

**Exhibit 75    Advance to the Cancellation Flow Through Prime Central for Amazon**



Source: Amended Complaint, Attachment Q.

**Exhibit 76    Advance to the Cancellation Flow Through "Manage My Account Page" for Spotify Premium**



Source: Appendix E, Spotify, Cancellation.

**(10)** **The website's landing page does <u>not</u> include a feature the consumer can click to start the cancellation flow**

295.    The FTC alleges that Amazon's cancellation ingress placement on the "manage my account" page is "difficult for consumers to locate."[481] Counsel asked me to analyze the programs I reviewed to assess whether a call-to-action feature that can start the cancellation flow for the paid digital membership/subscription program (or a free trial of the program) was provided on the website's landing page.

296.    I reviewed the cancellation processes of 48 popular paid digital membership/subscription programs to assess whether the website's landing page included a feature the consumer could click to start the cancellation flow. I found that not a single company (0%) in my analysis provided such a feature on its landing page.

**(11)** **The cancellation flow involves navigating multiple webpages**

297.    The FTC further alleges that Amazon "forc[es] the consumer to proceed through multiple screens to cancel their subscription," citing it as evidence of "forced action."[482] Specifically, the FTC alleges that "to complete the Iliad Flow and cancel a Prime membership, the consumer needed to click a minimum of six times from Amazon.com: Prime Central → 'Manage Membership' → 'End Membership' → 'Continue to Cancel' → 'Continue to Cancel' → 'End Now.'"[483] This cancellation flow is shown in Exhibit 77.

298.    I reviewed the cancellation processes of 48 popular paid digital membership/subscription programs to assess whether their desktop cancellation flows[484] involved navigating multiple

---

[481] Amended Complaint, ¶ 231.c.ii.

[482] Amended Complaint, ¶ 231.a.ii

[483] Amended Complaint, ¶ 154.

[484] For the purpose of this analysis, I define the cancellation flow as follows. The cancellation flow begins on the webpage where the consumer is shown the first call-to-action feature to end their enrollment in the program (or a free trial of the program), such as a button or a link that says "Unsubscribe," "Cancel membership," or similar that puts the consumer on a path that allows them to end their membership/subscription program (or a free trial of the program). The cancellation flow ends on the webpage where the consumer clicks on the call-to-action feature that results in the consumer no longer being enrolled in the paid digital membership/subscription program (or a free trial of the program).

webpages.[485] For example, as shown in Exhibit 78, to cancel a free trial of Walmart+, consumers needed to navigate through two webpages: (1) select a "Cancel free trial" link on the "manage membership" webpage (Screen 4); (2) review an overlay where a consumer confirmed that they want to cancel, where the overlay reminded the consumer of the benefits that the consumer would lose, and offered consumer an alternative option to "Remind me later" (Screen 5). Thus, I identified Walmart+ as a paid digital membership/subscription program that had a similar at-issue UI design element in its desktop cancellation process as Amazon Prime. I found that nearly all programs with online cancellation (44 programs, 98%) that I reviewed had a cancellation flow that involved navigating multiple webpages.

---

[485] I use the number of webpages a consumer needs to navigate through as a lower bound for the number of clicks that the FTC complains about, as multiple clicks might be required to go through a webpage.

**Exhibit 77     Prime Cancellation Flow (Prime Central)**



Source: Amended Complaint, Attachment Q.

**Exhibit 78     Walmart+ Free Trial Cancellation Flow**



Source: Appendix E, Walmart+, Cancellation.

> **(12)    Call-to-action features for alternatives to immediately cancelling the paid digital membership/subscription program (or a free trial of the program) are present in the cancellation flow**

299.    The FTC references alternative options to immediately cancelling Prime that Amazon presents to consumers within its desktop cancellation flow as evidence of alleged "obstruction," and states that Amazon "forc[es] consumers who have already expressed an intent to cancel by locating and entering the Iliad Flow to view marketing and reconsider options other than cancellation."[486] For example, the FTC states that on the third page of Amazon's desktop cancellation flow, Amazon "showed consumers five different options, only one of which, 'End Now'—presented last, at the bottom of the page— immediately cancelled a consumer's Prime membership."[487] The alternative options other than cancelling Prime immediately on this page, per the FTC include, but are not limited to, the following call-to-action features: "Remind Me Later," "Pause on [date]," and "End on [date]."[488] These options are shown in Exhibit 79.

300.    I reviewed the cancellation processes of 48 popular paid digital membership/subscription programs to assess whether any of the webpages within the company's desktop cancellation flow presented the consumer with call-to-action features for alternatives other than cancelling immediately. In my evaluation, I excluded call-to-action features for maintaining the status quo before entering the cancellation flow (e.g., remaining a member of the program via call-to-action features to "Keep My Membership," "Keep My Account") from alternative options as they are *not* alternatives to immediately cancelling that the FTC is focused on.[489] Rather, I analyzed the webpages within the cancellation flows for call-to-action features such as those for reviewing the benefits of the paid digital membership/subscription program, receiving a temporary discount to the price of the digital membership/subscription program, switching to a different digital membership/subscription program, pausing the digital membership/subscription program, receiving reminders to cancel the digital membership/subscription program at a later time, or

---

[486] Amended Complaint, ¶ 231.c.ii.

[487] Amended Complaint, ¶ 147.

[488] Amended Complaint, ¶¶ 148–153.

[489] Specifically, this analysis assessed whether any alternative call-to-action features for alternatives to immediately canceling are present on any of the webpages within the cancellation flow that the consumer encounters after the webpage on which they start the cancellation flow. *See* **Appendix D.1**.

canceling the digital membership/subscription program on a specific date in the future. For example, a consumer navigating the desktop cancellation flow of free trial of Walmart+, one of the most popular paid digital membership/subscription delivery programs,[490] was presented with a "Remind me later" call-to-action, one of the options that the FTC identifies as an example of "obstruction" in Amazon's desktop cancellation flow, as shown in Exhibit 80. Thus, I identified Walmart+ as a paid digital membership/subscription program that had a similar at-issue UI design element in its desktop cancellation process as Amazon Prime. I found that majority of the programs that allowed for online cancellation (30 programs, 67%) presented consumers with alternatives to immediately cancelling the program (or the free trial of the program) within the cancellation flow during the desktop cancellation process.

---

[490] *See* **Appendix D**.

**Exhibit 79     Call-to-Action Features in Amazon Cancellation Flow Highlighted by the FTC**



Source: Amended Complaint, Attachment Q, page 5.

Note: Red boxes added for emphasis.

**Exhibit 80    Call-to-Action Features in Walmart+ Cancellation Flow**



Source: Appendix E, Walmart+, Cancellation.

Note: Red box added for emphasis.

**(13)    The cancellation flow mentions benefits of the paid digital membership/subscription program**

301.    The FTC references Amazon's display of Prime membership benefits during its desktop cancellation flow, shown in Exhibit 81, as evidence of alleged "obstruction" and "misdirection."[491] Specifically, the FTC states that "[o]n the first page of the Iliad Flow, Amazon forced consumers to '[t]ake a look back at [their] journey with Prime' and presented them with a summary showing the Prime services they used. Amazon also displayed marketing material on Prime services, such as Prime Delivery, Prime Video, and Amazon Music Prime."[492]

302.    I reviewed the cancellation processes of 48 popular paid digital membership/subscription programs to assess whether the companies mentioned the benefits of their paid digital membership/subscription programs during their desktop cancellation flows, similar to Amazon's

---

[491] Amended Complaint, ¶¶ 231.c.ii, 231.d.iii.
[492] Amended Complaint, ¶ 141.

display of benefits, as depicted in Exhibit 81. For example, Instacart+, one of the most popular food delivery paid digital membership/subscription programs,[493] presented consumers with a webpage that displayed the benefits of the paid digital membership/subscription program (including unlimited free delivery, lower service fees, and credit back on pickup) in its desktop cancellation process for free trial of Instacart+, as shown in Exhibit 82. Similarly, Dropbox Plus, one of the most popular paid digital membership/subscription cloud storage programs, displayed "important features" consumers would lose, including "Mobile offline folders," "Remote device wipe," and "Priority email support" if they continued to cancel the paid digital subscription during its desktop cancellation process, as seen in Exhibit 83. Thus, I identified Instacart+ and Dropbox Plus as paid digital membership/subscription programs that had similar at-issue UI design elements in their cancellation processes as Amazon Prime. I found that most programs that allow for online cancellation (36 programs, 80%) mentioned the benefits of their paid digital membership/subscription program during their desktop cancellation flow.

---

[493] *See* **Appendix D.**

**Exhibit 81     Benefits Mentioned in Prime Cancellation Flow Highlighted by the FTC**



Source: Amended Complaint, Attachment Q, page 4.

Note: Red box added for emphasis.

**Exhibit 82      Benefits Mentioned in Instacart+ Free Trial Cancellation Flow**



Source: Appendix E, Instacart+, Cancellation.

Note: Red box added for emphasis.

**Exhibit 83      Benefits Mentioned in Dropbox Plus Cancellation Flow**



Source: Appendix E, Dropbox Plus, Cancellation.

Note: Red box added for emphasis.

Executed this 24 of February, 2025

_____
                Donna L. Hoffman

# EXHIBIT 7

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | Civil Action No. 2:23-cv-0932-JHC |
| v. | |
| **AMAZON.COM, INC.**, a corporation; | **OPENING EXPERT REPORT OF** |
| **NEIL LINDSAY**, individually and as an officer of AMAZON.COM, INC.; | **CRAIG ROSENBERG, PHD** |
| **RUSSELL GRANDINETTI**, individually and as an officer of AMAZON.COM, INC.; and | |
| **JAMIL GHANI**, individually and as an officer of AMAZON.COM, INC., | |
| Defendants. | |

**CONFIDENTIAL**

same features as manipulative. These variations emphasize the importance of considering cultural and contextual nuances when assessing claims of dark patterns.

52.    For example, in the Amended Complaint, the FTC provides the following as an example of "a design element that manipulates the user interface in ways that privilege certain specific information relative to other information": "Amazon uses Interface Interference in its Prime checkout enrollment flow, most versions of which reveal the terms and conditions of Prime only once during the purchase process, and then only in a small, easy-to-miss font."[33] This screenshot shows an example.[34]



*Figure 1. Terms and conditions.*

53.    Yet, this so-called "manipulation" likely works to the advantage of many customers, especially repeat customers, who prefer that the UX emphasize actional steps to complete their checkout process. These consumers would find the repeated display of detailed terms and conditions a hindrance to their checkout process. It is not a so-called "dark pattern," but a UX designed for efficiency.

---

[33] Amended Complaint, *Federal Trade Commission v. Amazon.com, Inc. et al.*, United States District Court Western District of Washington, Case No. 2:23-cv-0932-JHC, September 20, 2023 ("Amended Complaint"), ¶ 231.

[34] Amended Complaint, Exhibit A.

**CONFIDENTIAL**

## 5.0 Conclusion

121.    The findings of this report underscore the complexities of evaluating user interface (UI) practices in the context of the FTC's allegations against Amazon. While the term "dark patterns" is widely discussed, it remains poorly defined and inconsistently applied. This lack of clarity introduces subjectivity into regulatory assessments and risks conflating legitimate business practices with unethical behavior.

122.    Amazon's user interface design adheres to industry norms and reflects a commitment to balancing clarity, efficiency, and user engagement through iterative improvements. Amazon's extensive efforts, such as Project Lucent and other A/B testing initiatives, demonstrate a proactive approach to addressing customer feedback and improving clarity in the Prime enrollment process. However, objective data from these efforts reveals that clarity-focused changes often yield mixed or unintended outcomes, suggesting that multiple factors beyond interface design influence user behavior. This highlights the challenges of relying on subjective evaluations to assess clarity or to attribute specific outcomes to alleged "dark patterns."

123.    The FTC's claims lack sufficient empirical support and overly rely on anecdotal evidence, failing to account for the diversity and complexity of Amazon's global customer base. Without well-defined and measurable criteria for evaluating user interface concerns, regulatory actions may struggle to align with the realities of design practices, potentially leading to inconsistent and less effective outcomes. Amazon's success as a leader in e-commerce and its high customer retention rates underscore the effectiveness of its user-centric, data-driven approach to design, which prioritizes both business and customer needs.

Name: _____

Craig Rosenberg, Ph.D.


Date: _____
February 24, 2025

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | CIV. NO. 2:23-CV-0932-JHC |
| Plaintiff, | |
| v. | |
| **AMAZON.COM, INC.**, a corporation; | **REBUTTAL EXPERT REPORT OF** |
| **NEIL LINDSAY**, individually and as an officer of AMAZON.COM, INC.; | **CRAIG ROSENBERG, PHD** |
| | March 26, 2025 |
| **RUSSELL GRANDINETTI**, individually and as an officer of AMAZON.COM, INC.; and | |
| **JAMIL GHANI**, individually and as an officer of AMAZON.COM, INC., | |
| Defendants. | |

selected any such exhibits. In addition, I respectfully reserve the right to use animations, demonstratives, enlargements of actual attachments, and other information to convey my opinions. The entirety of my report, including attachments and referenced materials, supplies the basis for my analysis, conclusions and opinions.

### 1.0.3    Summary of Opinions

9.      Based on the research and analysis described in my report, I have formed the following opinions:

      a.    <u>Dr. Chetty's "Cognitive Walkthrough" Opinions</u>:

         i.    Dr. Chetty's evaluation method is more akin to a heuristic evaluation than a cognitive walkthrough (a distinct type of usability analysis with different goals and methods). Heuristic evaluations are inherently subjective.

        ii.    Dr. Chetty's evaluation and resultant opinions are flawed because they are based on Dr. Chetty's own subjective analysis of Amazon's various design elements. Importantly, Dr. Chetty's personal assessment of whether an element *can* cause user confusion does not show whether Amazon users were *actually* confused, nor what the rate and frequency of that confusion would be.

        iii.    The design elements Dr. Chetty criticizes as "dark patterns" in Amazon's checkout and cancellation flows are, in fact, widely used across the industry and are well-accepted design standards. For example, the use of commonly utilized, truthful marketing elements (such as retention offers) does not equate to coercion or deception.

      b.    <u>Dr. Chetty's "Think Aloud User Study" Opinions</u>:

         i.    Dr. Chetty's conclusions from her study of the "CandyForever" candy website relies on subjective analysis and artificial test environments. As such, this study is neither reflective nor predictive of real-world consumer behavior.

6

1.  For example, participants were aware the exercise was not real, leading them to make choices "for fun" and without financial stakes.

2.  Additionally, the small sample size lacks statistical power, and the study's value even as a qualitative study is seriously deficient because it did not benchmark against industry standards or account for key financial incentives that influence actual consumer decision-making.

ii.  Dr. Chetty's conclusions about user confusion lack a proper baseline comparison. For example, users may not read terms and conditions simply because most consumers generally do not, not due to deceptive design – or because the stakes of this simulated exercise were low to non-existent for them. Moreover, Dr. Chetty's study asks users to recall terms and conditions *after* the study's conclusion, which does not measure whether a user actually *read and understood* a term, but rather whether the user has the memory to *recall* the term.

iii.  Dr. Chetty's manual coding of participants' behavior is seriously flawed. For example, for questions about whether participants understood the nature of the Premium subscription, Dr. Chetty coded the answers as binary answers of "Yes" or "No" even though participants' actual understanding likely fell somewhere in between.

91.    Amazon's former UX Researcher Reid Nelson agreed with this statement:[21] "*[A]t three clicks to cancel, the cancel flow is similar in length to other programs and offers customers a chance to switch plans or pause membership before canceling.*"

92.    Providing retention offers before cancellation (sometimes called "save" offers) is standard practice across industries. In fact, consumers sometimes use cancellation as a chance to negotiate for a better deal. This is very common in subscriptions offered for newspapers, magazines, cable providers, cell phone service, internet service, and similar services. It is also my understanding from counsel that the FTC itself has recently recognized that, in the context of "save" offers, truthful marketing communications can benefit consumers by (i) allowing them to "obtain valuable concessions (e.g., lower prices), which they would otherwise want" and (ii) confirming their intent to cancel or "appris[ing] [them] of any negative consequences of cancellation."[22]

93.    By verifying that the customer truly wants to cancel and notifying them of the additional benefits associated with having a Prime membership[23] (free shipping, Prime Video, Amazon Music, Prime Gaming, Amazon Photos, etc.), Amazon is attempting to find a situation where they and the customer will both benefit. Customers are less likely to cancel by mistake and may go away happy with a better deal on Prime via a yearly subscription.

94.    Other organizations have similar practices. See below for examples from the New York Times, Hulu, and Tidal.

---

[21] Deposition of Reid Nelson, February 27, 2025 at p. 234:24-235:1.

[22] "Negative Option Rule," Federal Register, November 15, 2024, https://www.federalregister.gov/documents/2024/11/15/2024-25534/negative-option-rule.

[23] "Amazon Prime," https://www.amazon.com/gp/help/customer/display.html?nodeId=G6LDPN7YJHYKH2J6.

> *choose to move forward with that option, thus discouraging the user from*
> *proceeding. This is an Interface Interference dark pattern.*

106.    This is the equivalent of an "Are you sure?" confirmation button designed to avoid an unintended cancellation or to encourage the member to consider Amazon Prime's value to them and their family. *See also* my examples below of alleged "confirmshaming" on other websites, showing that this is a common practice. In each of these examples, the loss to the customer is emphasized and the decline option is visually de-emphasized.

107.    Dr. Chetty states (at ¶ 223):

> *Second, the Marketing page uses choice overload to lead users to*
> *abandon cancellation. There are two options to abandon the*
> *cancellation flow and stay enrolled and only one option to proceed to*
> *cancel. It is well known that users want to keep the status quo when*
> *presented with a change due to cognitive and behavioral biases. Users*
> *are resistant to change and if they are enrolled in Prime and likely to*
> *remain enrolled to preserve the status quo, so having two options to keep*
> *enrolled in Prime versus one to cancel also plays to this bias and means*
> *users are more likely to choose an option to stay enrolled in Prime.*

108.    However, customers who visit the cancellation page intending to cancel are unwedded to the status quo by definition. It is unclear that having two options to remain with Prime instead of one option to leave Prime would dissuade a customer who has actively navigated to the cancellation page from canceling Amazon Prime. Indeed, websites frequently offer multiple options throughout the cancellation process. This is because some consumers intentionally navigate to a cancellation page to see if there are better deals for their memberships, similar to how consumers might call their cable or internet provider periodically threatening to cancel to obtain a better deal.[26]

---

[26] *See, e.g.,* Ludington, J. (2023), "Always Threaten to Cancel Your Subscriptions," *Medium*, https://medium.com/%40jakeludington/always-threaten-to-cancel-your-subscriptions-bd27423a5bef ("The bottom line here for you as a customer is that it's in your best interest to threaten to cancel. … [M]ore than likely you'll be offered a deal on virtually every subscription product you pay for."; "I clicked the cancel button on my [Evernote] account just to see what might happen. Turns out I'll get a 40% discount if I stay . . . that cancel button is definitely your friend."); Gordon, W. (2011), "When Have You Gotten Discounts for Threatening to Cancel?" https://lifehacker.com/when-have-you-gotten-discounts-for-threatening-to-cance-5863947 ("Threatening to cancel

> *For instance, "Keep My Benefits," as opposed to "Keep My Membership," reminds the user that they may lose benefits by cancelling Prime. The "[Redacted], thank you for being a member with us. Take a look back at your journey with Prime " is also another attempt to convince the user to not cancel their Prime subscription, as it elicits feelings of regret. (¶ 228).*

111.    I disagree. In my opinion, Amazon's language is very mild, and Dr. Chetty offers no empirical evidence that it would dissuade a customer who actually wanted to leave Prime. It is common for a business to use language that emphasizes the benefits of a particular selection. Here are several examples of opt-out options (negative CTAs, or Calls to Action) using stronger language than Amazon:



**Figure 45**: *Example 1 of a Strongly-Worded Negative CTA ("I Don't Want Smarter Email")*



**Figure 46**: *Example 2 of a Strongly-Worded Negative CTA ("No thanks, I like my crappy furniture")*

63

*In lieu of what you ordered, we do have some candy that you can take.*
*So please feel free to take some candy.*

## 5.1 Methodological Flaws

132. Dr. Chetty's think-aloud study exhibited numerous methodological flaws:

a. The study used an **artificial environment** that did not recreate real-world consumer behavior. Chetty says that the point of small qualitative studies is to produce "*in-depth insights and anecdotes of users' lived experiences.*" (¶ 75). However, this "study" that she designed is not based on users' real-life experiences. The participants clearly knew the exercise was fake. The participants repeatedly said they were only selecting options "*for fun*" and were making choices because it wasn't "*real money.*" (*See* ¶ 353(iii) and (iv)).

b. The study features a **limited sample size and between-subjects design** and lacks the statistical power to generalize findings. Dr. Chetty's own report concedes that small qualitative studies do not have statistical significance: "*Qualitative studies, including cognitive walkthroughs and think aloud studies, are generally not meant to generate large quantitative effects or significant statistical measures because they are typically conducted on smaller sample sizes.*" (¶ 75). Despite being aware of the limited explanatory power of small sample sizes in qualitative studies, Dr. Chetty nevertheless designed the usability study with a total number of only 30 participants, which she then *further* divided into three experimental conditions, with only 10 people per experimental condition. (*See* ¶ 293.) A study with only 10 subjects per condition does not have the statistical power to generalize to the actual population of Amazon Prime members. In addition, according to Amazon's own former UX Researcher, small sample sizes introduce the risk of bias[36] and are not

---

[36] Deposition of Reid Nelson, February 27, 2025, at p. 80:11-14.

### 5.2.2    Sample Size and Study Design

150.    Another major flaw in Dr. Chetty's think-aloud study was the small sample size. The study used 30 participants and purportedly is trying to extrapolate its findings to the behavior of tens of millions of Prime customers[57] based on the data from only 30 people. In addition, because Dr. Chetty utilized a between-subjects design, with three experimental conditions, there were only 10 subjects per experimental condition. I will talk more about this below.

151.    Dr. Chetty herself notes (¶ 75):

> *Qualitative studies, including cognitive walkthroughs and think aloud studies, are generally not meant to generate large quantitative effects or significant statistical measures because they are typically conducted on smaller sample sizes.*

152.    One cannot extrapolate results to large populations from very small sample sizes. According to former Amazon UX researcher Miles Hunter in his deposition:[58]

> *[I]f I watch ten people do something and one of them has serious difficulty, that doesn't mean that ten percent of people have serious difficulty, but it means that some will have serious difficulty.*

153.    To extend the analogy to this study, if one person has an issue in the study and there are 10 people that are tested per experimental condition, that is 10% of the study population. If 10% of the study population has a specific issue with a user interface, that does not mean that millions of Prime customers, equaling 10% of the Amazon Prime user base, will have the same issue. Regarding Hunter's perspective that "*some will have a serious difficulty,*" it is important to understand that Amazon must design and optimize its site for its entire customer base. Amazon is designing and creating a single site that must serve the needs of all their customers, rather than designing and creating a site that is just for "some" of their customers. Given the extremely large number of Amazon users, some of them are bound to experience difficulties.

---

[57] Mosby, A. (2025), "Amazon Prime Statistics (Subscribers & Revenue)," *Yaguara.co*, https://www.yaguara.co/amazon-prime-statistics/.

[58] Deposition of Miles Hunter, September 18, 2024 at p. 26:3-6.

Name: _____

Craig Rosenberg, Ph.D.

Date: ___3-26-26___

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

AMAZON.COM, INC., a corporation,

     Defendant.

**Case No. 2:23-cv-0932**

EXPERT REBUTTAL REPORT OF DONNA L. HOFFMAN, PH.D.

March 26, 2025

CONFIDENTIAL

"dark patterns" are treated), nor do they even examine "dark patterns" in contexts that are related to ecommerce (e.g., social networking platforms, or cookie consent notices).

10.    ***Opinion 2: Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of the Amazon Prime Enrollment and Cancellation Processes Are Flawed and Unreliable.***

Prof. Chetty claims that UI design elements in the Amazon enrollment and cancellation processes contain "dark patterns," in part based on her findings from a "cognitive walkthrough" (i.e., her subjective inspection of the interface) of the "Prime enrollment points" within Amazon's online checkout process and two cancellation processes for Amazon Prime. My review of Prof. Chetty's "cognitive walkthrough" reveals that her analyses are susceptible to the following shortcomings, and her conclusions are flawed and contradict established findings from the literature on online consumer behavior and experience.

   a.  Prof. Chetty does not systematically support her conclusions regarding the presence of "dark patterns" and their claimed impact on consumers with evidence. Many of her claims are simply based on her own say-so.

   b.  Prof. Chetty's examination of individual pages in isolation in her "walkthrough" (e.g., the UPDP, the Shipping Option Select Page ("SOSP"), etc.) is flawed and unreliable. Specifically, this approach fails to take into account the way consumers would experience these pages in the real world, i.e., as part of a process that is informed by the information and choices available on other Amazon pages in the enrollment or cancellation process, as well as consumers' goals, motivations, prior experiences, and likely familiarity with the at-issue UI design elements (or those similar to them). By analyzing each page in the flow in a vacuum, Prof. Chetty's analysis is disconnected from the additional factors and context that would likely affect whether or not consumers would be "deceived" or "manipulated" by the at-issue UI design elements as she opines.

      i.  Prof. Chetty does not consider whether consumers are likely to be familiar with the UI design elements used by Amazon in Prime enrollment and cancellation processes (or those similar to them). In addition to making flawed and unreliable claims that Amazon enrollment and cancellation

processes contain "dark patterns," Prof. Chetty also fails to recognize that the UI design elements she takes issue with are actually commonly used in the desktop enrollment and cancellation processes of the 48 popular paid digital membership/subscription programs I reviewed for my comparative analysis in the Hoffman Opening Report. I further expanded this analysis to assess whether the website contains a webpage that is an "interruption" of the consumer's enrollment or purchase process, a design element that is central to Prof. Chetty's claims regarding the presence of alleged "dark patterns" in Amazon's Prime enrollment processes within online checkout. I found that around half of the programs in my analysis contain such webpages, which makes a webpage that is an "interruption" of the consumer's enrollment or purchase process a commonly used UI design element online. This suggests that many consumers are likely to be familiar with such "interruptions."

ii. In addition, Prof. Chetty's claims ignore that Amazon's Prime cancellation processes are consistent with the commonly used principles of progressive disclosure, which aim to present the right amount of information to consumers while minimizing the mental effort required to navigate the interface. The progressive disclosure of information in the cancellation process provides consumers with the benefits and costs associated with Prime membership in a gradual way that is unlikely to overwhelm the consumer, so that they can make an informed choice about canceling. The progressive disclosure makes it easier for consumers to access information they want to learn about and less likely for consumers to make errors (e.g., cancel by mistake or cancel from a lack of understanding).

c. Prof. Chetty does not consider whether the UI design elements used by Amazon in Prime enrollment and cancellation processes, with which she takes issues, are legitimate marketing practices. Specifically,

i. Prof. Chetty's claims relating to Prime enrollment processes fail to recognize that cross-selling (a marketing technique designed to offer

existing customers the opportunity to purchase additional products or services that are related to the products they are currently purchasing), and the use of repetition in marketing communications (including repetition of the benefits of the product or the services offered) to improve persuasiveness of the communication, are legitimate marketing practices that are commonly used by a variety of companies.

ii. Prof. Chetty's claims relating to Prime cancellation processes fail to recognize that reminding consumers of the benefits of the company's products and services, and offering consumers additional information and alternative options other than canceling during the cancellation process are legitimate and commonly used marketing practices, as consumers have different motivations for entering a cancellation process, and not all consumers who enter the cancellation process may be completely set on canceling or may change their minds when presented with relevant information.

d. Prof. Chetty's claim that consumers would be manipulated by the alleged "dark patterns" because they "typically" engage with online interfaces using System 1 thinking (an automatic and intuitive process that quickly guides decisions and behaviors using mental shortcuts and minimal conscious effort) is overly simplistic. Prof. Chetty's claim overlooks established findings from the consumer psychology and online consumer behavior literatures which has established conceptually and empirically that consumers' online navigations may invoke System 2 thinking or alternate between System 1 and System 2 thinking during the same navigation.

e. Prof. Chetty's claims for mobile enrollment and cancellation processes fail to recognize that many consumers are likely familiar with details being presented over multiple mobile screens or pages that require scrolling to navigate, and Amazon mobile pages and processes follow the commonly used principles of progressive disclosure.

### A. Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of the Amazon Prime Enrollment Processes Are Flawed and Unreliable

26.     Prof. Chetty examines individual pages of Amazon Prime enrollment flows, i.e., UPDP page, SOSP page, Single Page Checkout ("SPC") page, and the last page of the True Single Page Checkout ("TrueSPC") flow,[60] in her "cognitive walkthrough" and reaches the conclusion that "the design of the Prime enrollment points…in the [Amazon] online checkout process" on desktop and mobile devices, or what she calls "Prime detours,"[61] are "confusing to some consumers, who, as a result of dark patterns, unintentionally select an option to enroll in Prime when purchasing a product online."[62] In addition, Prof. Chetty concludes that "Prime detours" do not convey "information on Prime's material terms (cost, end of free trial period, and renewal terms) that consumers can comprehend."[63] In this section, using Prof. Chetty's "cognitive walkthrough" of the UPDP page as an illustration (Section IV.A.1), accompanied with a discussion of Prof. Chetty's claims on other Amazon enrollment flows that are different from her claim on the UPDP page (Section IV.A.2), I show that her claims regarding the presence of "dark patterns" in Amazon Prime enrollment processes lack proper basis, do not consider standard marketing practices, are inconsistent with the basic tenets of online consumer behavior and experience, and ignore consumers' likely familiarity with the UI design elements at issue (or those similar to them).

### 1. Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of the UPDP Page Are Flawed and Unreliable

27.     In Exhibit 1 below, I reproduce the desktop UPDP page.[64]

---

[60] I understand that Prof. Chetty calls the last page of the TrueSPC flow "TSPC" in the Chetty Opening Report. *See* Chetty Opening Report, ¶¶ 94, 158.

[61] Chetty Opening Report, p. 1.

[62] Chetty Opening Report, p. 1. *See also* Chetty Opening Report, § VI.f.

[63] Chetty Opening Report, p. 1. *See also* Chetty Opening Report, § VI.f.

[64] Chetty Opening Report, Attachment B, p. 18.

**Exhibit 1    UPDP Page on Desktop**



Source: Chetty Opening Report, Attachment B, p. 18.

28.    Prof. Chetty claims that the UPDP page "interrupts the consumer's shopping process by presenting them with information on a subscription service—Prime—separate from the product they are buying."[65] Prof. Chetty claims that this interruption is an example of "the dark pattern, [n]agging,"[66] which is a "dark pattern" that was not explicitly discussed in the FTC's complaint. Prof. Chetty defines "nagging" as repeated interruptions that request the user "to take an action," and describes that "[n]agging typically occurs to users who are in the midst of completing a primary task."[67] Prof. Chetty claims that the UPDP page contains "nagging" because it is an "interruption" that is "unnecessary to placing an order for a product."[68] However, Prof. Chetty fails to demonstrate that Amazon consumers considered the UPDP page an "interruption" or that their behavior was affected by this UI design feature in the manner she claims.

---

[65] Chetty Opening Report, ¶ 116.
[66] Chetty Opening Report, ¶ 118.
[67] Chetty Opening Report, ¶ 55.(i).a.
[68] Chetty Opening Report, ¶ 118.

29.     Importantly, Prof. Chetty fails to ground her description of "interruption" in any academic literature or theory. Prof. Chetty's description of an "interruption" is an act of "presenting [consumers] with information…separate from the product they are buying," and one that is "unnecessary to placing an order for a product."[69] However, as explained below, not only is this description not grounded in theory, overly broad and vague (and therefore covers commonly used legitimate marketing practices), but even taking this description as given, Prof. Chetty fails to show that the UPDP page is an "interruption."

30.     First, Prof. Chetty's characterization of the UPDP page as an "interruption" is flawed and is based on her claim that "the UPDP is not clearly related to the consumer's primary task of placing an order on Amazon."[70] She fails to consider that the UPDP page provides benefits to consumers who may be interested in such an offer, which is relevant to the item they are purchasing. As discussed in the Hoffman Opening Report, the claim that the UPDP page is an "interruption" fails to account for several key benefits relevant to consumers' purchasing decisions on Amazon, including the free delivery benefit highlighted in the Amazon offer, the 30-day free trial that may be valuable for consumers going through the purchase process, and the potential for consumers to enroll in Prime based on information presented during checkout.[71]

31.     Second, as I discussed in the Hoffman Opening Report, the Prime offer on the UPDP page constitutes a cross-sell, a marketing technique designed to offer existing customers the opportunity to purchase additional products or services that are related to the product they are currently purchasing, which is a legitimate marketing practice in both online and offline contexts.[72] Cross-sells during the online checkout process are also commonly used and therefore are consistent with expectations of many consumers about online shopping experiences. As I have shown in Section IX of the Hoffman Opening Report, of the 16 companies that sell products or services other than the paid digital memberships/subscription programs (i.e., "Category 1" companies in my comparative analysis), all of them offered a paid digital

---

[69] Chetty Opening Report, ¶¶ 116, 118.
[70] Chetty Opening Report, ¶ 117.
[71] Hoffman Opening Report, ¶¶ 95–98.
[72] Hoffman Opening Report, ¶¶ 94, 167.

membership/subscription program or a free trial of the program as a cross-sell during the online checkout process.[73]

32.    Prof. Chetty claims that consumers would be manipulated by "dark patterns" because they "typically" engage with online interfaces using "cognitive and behavioral shortcuts (System 1 thinking)" in their online interactions.[74] System 1 and System 2 represent a framework, pioneered by Seymour Epstein and later popularized in 2011 by Nobel winner Prof. Daniel Kahneman,[75] for understanding humans' dual systems of information processing. Under the label "dual process theory," cognitive and consumer psychologists have been studying these two distinct cognitive systems underlying thinking for over thirty years. According to dual process theory, there are two different types of processes that contribute to decision-making: an intuitive process that provides a fast shortcut to decisions and behaviors (i.e., System 1, according to Kahneman's language) and a reflective process for more careful deliberation before making a choice or engaging in a behavior (i.e., System 2).[76] Dual process models have been applied to the study of shopping behavior, either online or offline.[77] Studies on determinants of consumer

---

[73] Hoffman Opening Report, ¶ 291.

[74] Chetty Opening Report, ¶ 44 ("Dark patterns leverage cognitive and behavioral biases to limit users' autonomy and impact their ability to decide what option to select. Each dark pattern impacts the choices and information presented to users and adds a layer of difficulty to their ability to decide what to do. **Users typically rely on cognitive and behavioral shortcuts (System 1 thinking) as opposed to engaging in rational decision making (System 2 thinking[)], in their online [i]nteractions.**") (emphasis added).

[75] Epstein, S. (1994), "Integration of the Cognitive and the Psychodynamic Unconscious," *American Psychologist*, 49, 8, 709–724; Kahneman, D. (2011), *Thinking, Fast and Slow*, New York, NY: Farrar, Straus and Giroux. The terms "System 1" and "System 2" were coined by Stanovich and West in their article published in 2000 but later popularized by Kahneman. *See* Stanovich, K. E. and R. F. West (2000), "Individual Differences in Reasoning: Implications for the Rationality Debate?" *Behavioral and Brain Sciences*, 23, 5, 645–726.

[76] *See, e.g.,* Kahneman, D. (2003), "A Perspective on Judgment and Choice: Mapping Bounded Rationality," *American Psychologist*, 58, 9, 697–720, p. 698 ("The operations of System 1 are typically fast, automatic, effortless, associative, implicit (not available to introspection), and often emotionally charged; they are also governed by habit and are therefore difficult to control or modify. The operations of System 2 are slower, serial, effortful, more likely to be consciously monitored and deliberately controlled; they are also relatively flexible and potentially rule governed."); Chaiken, S. and Y. Trope (1999), *Dual-Process Theories in Social Psychology*, Guilford Press, p. 42 ("The [Elaboration Likelihood Model] is a dual-route but multiprocess theory ... The dual routes—'central' and 'peripheral'—refer to attitude changes that are based on different degrees of elaborative information-processing activity. Central-route attitude changes are those that are based on relatively extensive and effortful information-processing activity… Peripheral-route attitude changes are based on a variety of attitude change processes that typically require less cognitive effort.").

[77] *See, e.g.,* Strack, F. et al. (2006), "Reflective and Impulsive Determinants of Consumer Behavior," *Journal of Consumer Psychology*, 16, 3, 205–216 ("Strack et al. (2006)"), p. 205 ("This article describes a dual-system model of consumer behavior. This model is based on the assumption that all human behaviors are a joint function of reflective and impulsive mechanisms. Those mechanisms have different principles of operation but contribute to the

behavior discuss the role of both "reflective" (i.e., System 2) and "impulsive" (i.e., System 1) mechanisms in shopping decisions.[78] In my own research on the relevance of the dual process framework to online consumer behavior, I show that online consumers engage in both "rational" (i.e., System 2) and "experiential" (i.e., System 1) activities during their online navigation.[79]

33.    When performing her "cognitive walkthrough" on the UPDP page, Prof. Chetty claims that "[b]ecause the UPDP is not clearly related to the consumer's primary task of placing an order on Amazon, consumers are very likely to rely on quick System 1 thinking and not carefully read [the UPDP] page, especially the terms and conditions, in order to move onto the next step in placing their order."[80] However, Prof. Chetty provides no empirical evidence that Amazon consumers rely on System 1 thinking as they engage with the UPDP page. Additionally, the articles she cites to support her claims are either irrelevant or offer no support. This is because the papers she cites either discuss user choices in contexts other than product purchase, or they have no connection to dual process models, let alone System 1 thinking.[81] Some of these studies stand out for their lack of relevance. For example, Prof. Chetty cites an article about data privacy

---

act of buying."); Petty, R. E. and J. T. Cacioppo (1986), *Communication and Persuasion: Central and Peripheral Routes to Attitude Change*, New York, NY: Springer-Verlag, p. 187 ("Recall that [in the Elaboration Likelihood Model,] under high relevance, attitudes were affected primarily by the issue-relevant arguments presented for the product, but under low relevance attitudes were affected more by peripheral source cues …. [In one study]we exposed subjects to mock magazine advertisements for a disposable razor under conditions of either high or low personal relevance … Importantly, in addition to assessing product attitudes in this study, we also asked subjects to rate how likely they were to purchase the product (behavioral intentions).").

[78] *See, e.g.,* Strack et al. (2006), p. 207 ("[T]he strict distinction between behaviors that are reflectively and impulsively determined must be questioned. For example, even if a purchase decision is driven by impulsive mechanisms, the buyer must go to the cash register and engage in some transaction of money. There is little reason to assume that these components of buying are also driven by pure impulse … Thus, it seems that most behaviors are the result of both reflective and impulsive determinants."); Hoffman, W. et al. (2009), "Impulse and Self-Control From a Dual-Systems Perspective," *Perspectives on Psychological Science*, 4, 2, 162–176, p. 162 ("[W]e outline a dual-systems perspective of impulse and self-control and suggest a framework for the prediction of self-control outcomes.").

[79] Novak, T. P. and D. L. Hoffman (2009), "The Fit of Thinking Style and Situation: New Measures of Situation-Specific Experiential and Rational Cognition," *Journal of Consumer Research*, 35, 1, 56–72, p. 68 ("As consumers think both rationally and experientially in the consumer activities they engage in, we expect our scales to have applicability to a wide range of consumer behaviors, including hedonic and utilitarian choice…").

[80] Chetty Opening Report, ¶ 117.

[81] Chetty Opening Report, ¶¶ 40–44, 117, 181. I am aware that Prof. Chetty cites an article by Kitkowska and coauthors about consumer awareness of terms and conditions during the purchase process, but even this article does not provide support for Prof. Chetty's opinion around System 1 thinking, because the article does not discuss the role of System 1 thinking. *See* Kitkowska, A. et al. (2022), "Online Terms and Conditions: Improving User Engagement, Awareness, and Satisfaction through UI Design," *CHI Conference on Human Factors in Computing Systems*, 624, 1–22.

(i.e., a context different from product purchase) that does not discuss System 1 and System 2 thinking, to support her claim that "[u]sers typically rely on cognitive and behavioral shortcuts (System 1 thinking) as opposed to engaging in rational decisional making (System 2 thinking[)], in their online Interactions."[82]

34.    Prof. Chetty's characterization of System 1 and System 2 thinking is also overly simplistic and inconsistent with insights from decades of research in consumer psychology and cognitive science. For example, research on consumer impulsiveness shows that impulse buying (which is typically associated with System 1 thinking) depends on "personal and contextual circumstances" that include available information and feelings,[83] and whether impulsive buying is perceived as appropriate for a specific shopping context.[84] Academic research finds that consumers can adopt either or both System 1 and System 2 thinking while engaged in the purchase process, including while online shopping.[85] Which system tends to be predominantly involved during any particular shopping process depends on multiple factors, including the consumer, the consumer's goals in the specific shopping session, the items involved, and other

---

[82] Chetty Opening Report, ¶ 44; Waldman, A. E., (2020), "Cognitive Biases, Dark Patterns, and the 'Privacy Paradox,'" *Current Opinion in Psychology*, 31, 105–109.

[83] Strack et al. (2006), p. 205 ("[T]he relative contribution of impulsive and reflective processes depends on personal and contextual circumstances."), p. 210 ("How can reflective decisions be influenced by impulsive processes? The RIM [i.e., Reflective-Impulsive Model] describes several ways in which such an influence can be exerted. The most important is the accessibility of elements in the impulsive system … The impulsive system influences reflection not only through the varying accessibility of concepts but also through feelings.").

[84] Rook, D. W. and R. J. Fisher (1995), "Normative Influences on Impulsive Buying Behavior," *Journal of Consumer Research*, 22, 3, 305–313, p. 311 ("The results from the two studies reported here provide some insights into the social psychology that underlies the trait and behavioral aspects of impulsive buying behavior. Although, as expected, we observed a general tendency for impulsive buyers to make more impulsive purchases, we found that normative evaluations [i.e., judgments about the appropriateness of engaging in impulse buying behavior] moderate the relationship between this trait and subsequent buying behavior.").

[85] Strack et al. (2006), p. 205 ("This article describes a dual-system model of consumer behavior. This model is based on the assumption that all human behaviors are a joint function of reflective and impulsive mechanisms. Those mechanisms have different principles of operation but contribute to the act of buying."); Hoffman, W. et al. (2009), "Impulse and Self-Control From a Dual-Systems Perspective," *Perspectives on Psychological Science*, 4, 2, 162–176, p. 162 ("[W]e outline a dual-systems perspective of impulse and self-control and suggest a framework for the prediction of self-control outcomes."); Sloman, S. A. (1996), "The Empirical Case for Two Systems of Reasoning," *Psychological Bulletin*, 119, 1, 3–22, p. 3 ("The systems serve complementary functions and can simultaneously generate different solutions to a reasoning problem. The rule-based system can suppress the associative system but not completely inhibit it. The article reviews evidence in favor of the distinction and its characterization.").

factors involving demands of the task and situational characteristics.[86] For example, according to the academic literature, a consumer might be more likely to adopt impulsive thinking (i.e., System 1) and use shortcuts when they make their purchase decisions if the purchased product has little importance or is based on habitual purchase (e.g., purchasing the same brand of toothpaste on repeated occasions), among other factors.[87] The same consumer might be more likely to adopt System 2 thinking (e.g., comparing different brands and models, technical specifications, and/or price) when purchasing a new laptop, or when buying products in unfamiliar categories, or when selecting a new brand from a familiar product category. As I show in my research, online consumers' motivations also affect which thinking system consumers may engage in, with a "goal-directed" motivation such as purchasing a product associated with a higher chance of rational (i.e., System 2) thinking,[88] contrary to Prof. Chetty's claims. Similarly, in another study I conducted on online experience, I showed that both goal-directed activities (e.g., planned purchases, more closely aligned with System 2 thinking) and experiential activities (e.g., impulse purchases, more akin to System 1 thinking) are involved in

---

[86] *See, e.g.,* Strack et al. (2006), p. 205 ("[T]he relative contribution of impulsive and reflective processes depends on personal and contextual circumstances."); Rook, D. W. and R. J. Fisher (1995), "Normative Influences on Impulsive Buying Behavior," *Journal of Consumer Research*, 22, 3, 305–313, p. 311 ("The results from the two studies reported here provide some insights into the social psychology that underlies the trait and behavioral aspects of impulsive buying behavior … we found that normative evaluations moderate the relationship between this trait and subsequent buying behavior.").

[87] Researchers analyze the role of habits as repeated purchases that are facilitated because consumers have made the purchase in the past and are familiar with where they can find the desired product. *See, e.g.,* Strack et al. (2006), p. 212 ("[T]he amount of reflection depends on the importance of the target. For example, the purchase of a new house will induce people to think more thoroughly about its utility than the purchase of a new toothpaste … impulsive elements should be strengthened if buying is based on habits ... In a narrow sense, the more often a motor schema is triggered at the exposure to a certain stimulus, the more likely is its elicitation in the future. This mechanism may impulsively contribute to buying behavior by simply causing people to reach out for certain products.").

[88] Novak, T. P. and D. L. Hoffman (2009), "The Fit of Thinking Style and Situation: New Measures of Situation-Specific Experiential and Rational Cognition," *Journal of Consumer Research*, 35, 1, 56–72, pp. 64–65 ("In study 4, to demonstrate applicability of SSTS [i.e., Situation-Specific Thinking Style] scales to consumer activities that are not performance tasks, we consider four consumer Web activities that are either experiential (fun) or rational (goal directed) in nature … and examine the fit of the activity with thinking style in predicting attitudinal outcome measures rather than performance measures … People hold a more favorable attitude toward an activity when their thinking style fits the activity. Rational SSTS has a significant positive correlation with attitude for both rational consumer activities, and experiential SSTS has a significant positive correlation with attitude toward both experiential exploratory consumer activities."), p. 67 ("…the four Web activities in study 4 suggest applicability to goal- directed and experiential consumer behaviors.").

online consumer experience.[89] The same study also shows that the relationship between these two processes depends on various factors, including the consumers' skills and the specific nature of the online task.[90]

35.    Prof. Chetty also invokes consumers' presumed reliance on System 1 thinking as a basis for her opinions on the information on Prime's terms on the UPDP page. While Prof. Chetty acknowledges that "[t]he disclosures about the price and recurring nature of a Prime subscription and the fact that a user is being asked to enroll in a Prime subscription" are on the UPDP page, she claims that these disclosures "are easily missed" because of "consumer's reliance on System 1 thinking" and because this information is presented in small font at the bottom of the page, "buried within other terms and conditions," which consumers "frequently do not read".[91] Prof. Chetty provides no evidence that Amazon users who saw the UPDP page relied on System 1 thinking. Indeed, as discussed in the Hoffman Opening Report, the information regarding the price of the Prime membership, that the offer will auto-renew, and that the consumer can cancel at any time by visiting their account and changing their membership settings are presented in bold font on the UPDP page.[92] Moreover, as discussed above, Prof. Chetty's assumption that consumers relied on System 1 thinking in their Amazon checkout processes ignores the contextual and situational factors identified in the literature that moderate which system a consumer may rely on. In fact, contrary to Prof. Chetty's claims, consumers may be just as likely

---

[89] Novak, T. P. and D. L. Hoffman (2003), "The Influence of Goal-Directed and Experiential Activities on Online Flow Experiences," *Journal of Consumer Psychology*, 13, 1–2, 3–16, p. 4 ("Clearly, consumer researchers have demonstrated the value in considering both goal-directed as well as experiential behavior when evaluating consumer experience in traditional, offline settings. More recently, researchers have begun to turn their attention to an investigation of these behaviors in online environments…"), p. 13 ("[F]low occurs during both goal-directed as well as experiential types of activities. Viewed in the context of dual-process models of consumer information processing, that specify experiential/associative and rational/rule-based processing modes … this suggests that one important future research area is specifying and testing conceptual frameworks that differentiate experiential and task-oriented flow.").

[90] Novak, T. P. and D. L. Hoffman (2003), "The Influence of Goal-Directed and Experiential Activities on Online Flow Experiences," *Journal of Consumer Psychology*, 13, 1–2, 3–16, p. 13 ("The relative importance of antecedents of flow such as skill, challenge, involvement, focused attention, and telepresence may well differ across rational versus experiential processing modes.").

[91] Chetty Opening Report, ¶ 119. *See also* Chetty Opening Report, ¶ 120 ("In some versions of the UPDP, the only location where Amazon discloses the cost and the renewal terms of a Prime subscription is at the bottom of the page in the terms and conditions section, which consumers are known to miss or not read.").

[92] Hoffman Opening Report, ¶¶ 101, 125.

to be engaged and alert (i.e., relying on System 2 thinking) navigating through the Amazon checkout process as when they are making a purchase.

36.    Prof. Chetty takes these claims one step further, and asserts that the UPDP page for a mobile device is "even more manipulative" because "users need to scroll down the page, past all of the information regarding Prime benefits, to see Prime's terms and conditions, where Prime's cost and renewal terms generally are buried."[93] She then concludes that, as with the desktop UPDP page, this information is "easily missed" for mobile version of the UPDP page.[94] Once again, Prof. Chetty's conclusion simply relies on her own say-so. Moreover, as discussed in the Hoffman Opening Report, too much information presented on a single page, especially on the smaller screens of mobile devices (such as a smartphone) might be difficult for consumers to process, and consumers can benefit from a gradual introduction of information.[95] Such interface designs are consistent with the principles of progressive disclosure, a well-known approach to user-interface design that attempts to achieve a balance between simplicity (an easy-to-use interface) and power (the presentation of important content or features that satisfy consumers' needs).[96] Additionally, Prof. Chetty ignores that consumers are familiar with scrolling when using mobile devices as shown by research on consumer experience discussed in the Hoffman Opening Report.[97]

37.    Prof. Chetty further claims that the repetition of the word "free" and its presentation in "all-caps letters, bold font" are a "manipulative technique, known as visual prominence or visual manipulation—an Interface Interference dark pattern."[98] She further claims that the repetition of this word "creates a cognitive dissonance, for the consumer who may subconsciously assume, as a result of this manipulation technique, that they will not be charged for the shipping and may

---

[93] Chetty Opening Report, ¶ 128.

[94] Chetty Opening Report, ¶ 128.

[95] Hoffman Opening Report, ¶ 259.

[96] Hoffman Opening Report, ¶¶ 199, 259; "Progressive Disclosure," *Nielsen Norman Group,* December 3, 2006, www.nngroup.com/articles/progressive-disclosure/.

[97] Hoffman Opening Report, ¶ 259; Kim, J. et al. (2016), "Pagination versus Scrolling in Mobile Web Search," *Proceedings of the 25th ACM International on Conference on Information and Knowledge Management*, 751–760, p. 752 ("Although people are familiar with turning the pages of a book horizontally, and swiping horizontally between screens in weather apps for example, they are used to scrolling with a vertical control type on touch-enabled devices, as this is the only mechanism provided by search engines.").

[98] Chetty Opening Report, ¶ 121.

miss the cost of the subscription."[99] However, while Prof. Chetty speculates that "the consumer…*may* subconsciously assume…that they will not be charged for the shipping and *may* miss the cost of the subscription," she provides no evidence that any Amazon consumer who saw the UPDP page did make such assumptions.[100] She provides no empirical or other form of evidence to support her claim that the frequency of the words or the characteristics of the font used to present the benefits of the Amazon Prime subscription are "manipulative," nor that they create "cognitive dissonance" amongst consumers. Additionally, Prof. Chetty overlooks the fact that many Amazon consumers would be familiar with Amazon's promotion of free shipping benefits of Prime (an actual benefit that Prime provides to members), because these benefits are also highlighted in Prime advertising on other parts of the Amazon website.[101]

38.     Importantly, Prof. Chetty ignores the fact that repetition is a fundamental concept in marketing. As discussed in the Hoffman Opening Report, seminal studies on advertising repetition that date back to the 1960s study the importance of advertising for consumer learning and recalls, and show the importance of repetition to increase persuasiveness of advertising messages and create a lasting impression on consumers.[102] Consumers are also familiar with the marketing practice of repetition as many of the most popular paid digital membership/subscription programs online use repetition on their websites. As illustrated in my comparative analysis in the Hoffman Opening Report, I found that among the 48 popular paid digital membership/subscription programs I reviewed, 44 programs (92%) repeated membership/subscription benefits two or more times on a given webpage of the enrollment process, and 44 programs (92%) repeated membership/subscription benefits across multiple webpages of the enrollment process.[103]

---

[99] Chetty Opening Report, ¶ 121.

[100] Chetty Opening Report, ¶ 121 (emphasis added).

[101] Hoffman Opening Report, ¶ 103, Exhibit 7.

[102] Hoffman Opening Report, ¶ 103; Krugman, H. E. (1965), "The Impact of Television Advertising: Learning Without Involvement," *Public Opinion Quarterly*, 29, 3, 349–356; Krugman, H. E. (1971), "Brain Wave Measures of Media Involvement," *Journal of Advertising Research*, 11, 1, 3–9; Campbell, M. C. and K. L. Keller (2003), "Brand Familiarity and Advertising Repetition Effects," *Journal of Consumer Research*, 30, 2, 292–304; Schmidt, S. and M. Eisend (2015), "Advertising Repetition: A Meta-Analysis on Effective Frequency in Advertising," *Journal of Advertising*, 44, 4, 415–428.

[103] Hoffman Opening Report, ¶ 282, Exhibit 54.

39.    Furthermore, Prof. Chetty claims that "[t]he wording of the decline option elicits negative feelings from consumers…which could lead users to click on the enroll option to avoid feeling shame and the sense that they are not being financially sensible and potentially losing money on shipping."[104] Prof. Chetty does not provide any support that the wording of the decline option would elicit the types of feelings she claims it would evoke or that any such feelings impacted Amazon consumers' decision-making regarding enrolling in Prime when they were exposed to the UPDP page. Prof. Chetty did not use any tools that have been developed by researchers to classify text into lexical categories that evoke specific emotional responses, to demonstrate that the wording of the decline option would evoke feelings of "shame" or feelings of "not being financially sensible" as she claims, or even to demonstrate that the wording of the decline option would evoke any emotion that is different from any other text on the UPDP page or the rest of the Amazon website. Contrary to Prof. Chetty's flawed approach, in the Hoffman Opening Report, I applied one such tool, Stanford University's Empath, on Amazon's decline option on the UPDP page and found that Amazon's message of "No thanks, I do not want fast, free delivery" did not contain any words that appear in Empath's list of "emotive" keywords (both for positive and negative emotions).[105] Further, to the extent the decline option does actually evoke emotions, as discussed in the Hoffman Opening Report, the use of emotions is ubiquitous in standard marketing practices.[106]

40.    Prof. Chetty also claims that "[t]he visual asymmetry between the [enroll and decline] options creates an imbalance that favors the enroll option. Users are therefore naturally more drawn to the visuals of the enroll option than to those of the decline option."[107] Once again, Prof. Chetty provides no evidence that, when exposed to the UPDP page, Amazon consumers favored

---

[104] Chetty Opening Report, ¶ 122. Generally, Prof. Chetty claims that this UI design element contains "confirmshaming." *See* Chetty Opening Report, ¶¶ 55.(v).a, 191.

[105] Hoffman Opening Report, ¶ 119. *See, e.g.,* Fast, E. et al. (2016), "Empath: Understanding Topic Signals in Large-Scale Text," *CHI Conference on Human Factors in Computing Systems* , p. 1 ("Empath draws connotations between words and phrases by deep learning a neural embedding across more than 1.8 billion words of modern fiction … We show that Empath's data-driven, human validated categories are highly correlated (r=0.906) with similar categories in LIWC.").

[106] Hoffman Opening Report, ¶ 118. Bagozzi, R. P. et al. (1999), "The Role of Emotions in Marketing," *Journal of the Academy of Marketing Science*, 27, 2, 184–206, p. 202 ("Emotions are ubiquitous throughout marketing. They influence information processing, mediate responses to persuasive appeals, measure the effects of marketing stimuli, initiate goal setting, enact goal-directed behaviors, and serve as ends and measures of consumer welfare.").

[107] Chetty Opening Report, ¶ 123.

the enroll option over the decline option because of the visual differences between these options (as opposed to say, their decision to enroll or not), nor has Prof. Chetty presented evidence that customers were prevented from understanding the enrollment option even if they were "drawn" to it. Prof. Chetty ignores that many consumers, including Amazon consumers, would likely be familiar with UI designs that she describes as containing visual asymmetry and imbalances. For example, many Amazon consumers would likely be familiar with visual differences between different call-to-action features (e.g., use of the color yellow versus the color blue, use of buttons versus links), as such differences are consistently applied to various call-to-action features throughout the Amazon website, including call-to-action features that are unrelated to Prime.[108] As discussed in the Hoffman Opening Report, such UI design elements that are consistently applied throughout the Amazon website help increase consumers' familiarity with, and help ease consumers' navigation of, the Amazon website.[109] In addition, consumers are likely to be familiar with the use of differences in color and/or size between call-to-action features to accept and decline offers for paid digital membership/subscription programs through their experiences on other websites. For example, in my comparative analysis in the Hoffman Opening Report, I found that among the popular paid digital membership/subscription programs I reviewed that had call-to-action features for both accepting and declining the offer for the program on the same webpage within the enrollment process,[110] most (82%) had call-to-action features for declining the offer that differed in color and/or size from the call-to-action feature for accepting the offer.[111] Similarly, in my review of the most frequently visited government websites, I found that among the government websites that used overlays and included both accept and decline call-to-

---

[108] Hoffman Opening Report, ¶ 111, Exhibit 11.

[109] Hoffman Opening Report, ¶¶ 110–112.

[110] Of the 48 programs I examined, 11 had call-to-action features for both accepting and declining the offer on the same webpage within the enrollment process. Of these 11 websites, 9 had call-to-action features for declining the offer that differed in color and/or size from the call-to-action feature for accepting the offer. Hoffman Opening Report, ¶ 284, Exhibit 55.

[111] Hoffman Opening Report, ¶ 284. The comparative analysis in the Hoffman Opening Report does not count as decline options instances in which the only way to decline is to exit the overlay by clicking "X" at the top corner of the overlay (e.g., Microsoft 365, Accept 2nd Offer, 01 Upgrade Pop-Up 01, USA Today, Accept 2nd Offer, 02 Offer USA Today 1, Xbox Game Pass, Accept 1st Offer, 03 Offer 01) when evaluating whether the call-to-action feature to decline the offer for the paid digital membership/subscription program differs in color and/or size from the call-to-action feature to accept the offer on the same webpage. *See* Hoffman Opening Report, Appendix E.

action features on the overlay,[112] nearly all of them (92%), including the website of the Federal Trade Commission itself, "contained call-to-action features for accepting and declining the proposed action on the overlay that differed in color and/or size.[113]

41.    Prof. Chetty further claims that "Amazon's use of a yellow/orange button located on the right of the screen for the enroll option is *particularly* manipulative given the significance of those visual choices within the context of its online checkout flow. The button that gets users to the next stage of their shopping experience is always a yellow button, often located on the right of the screen."[114] Once again, Prof. Chetty fails to provide any evidence that any Amazon consumers were actually "manipulated" due to Amazon's use of a "yellow/orange button located on the right of the screen" for the option to accept. Prof. Chetty also ignores that websites of popular paid digital membership/subscription programs use consistent color schemes for call-to-action features, including call-to-action features that enroll consumers in the paid digital membership/subscription program, suggesting that many consumers would be familiar with these UI design elements (or those similar to them). In my comparative analysis in the Hoffman Opening Report, I found that among the 48 popular paid digital membership/subscription programs I reviewed, 42 programs (88%) used a call-to-action feature to complete enrollment in the paid digital membership/subscription program or a free trial of the program that was the same color as prior call-to-action features in their desktop enrollment flows.[115]

42.    Prof. Chetty also states that the "fact that the consumer must either accept or decline the Prime subscription (often disguised as 'fast, free shipping') to continue their shopping experience…is, in essence, a Forced Action dark pattern."[116] However, Prof. Chetty does not provide any evidence that Amazon consumers who were exposed to the UPDP page were "swayed by the manipulative elements on the page and miss the cost and recurring charges

---

[112] Among the 31 popular government websites I reviewed, 17 websites used overlays, among which 12 government websites included both accept and decline call-to-action features on the overlay. Of these 12 websites, 11 had call-to-action features for accepting and declining the proposed action on the overlay that differed in color and/or size. There are 5 government websites with overlays but no decline call-to-action feature on the overlay (i.e., MedlinePlus, National Park Service, Medicare.gov, Healthcare.gov, Bureau of Labor Statistics). Consumers need to click "X" at the top corner of the overlay to exit the overlay. Hoffman Opening Report, ¶ 311, Exhibit 88, Appendix F.

[113] Hoffman Opening Report, ¶¶ 315–316, Exhibit 88, Exhibit 92.

[114] Chetty Opening Report, ¶ 125 (emphasis in original).

[115] Hoffman Opening Report, ¶ 290, Exhibit 55.

[116] Chetty Opening Report, ¶ 126.

disclosures and click on the button to enroll in Prime without realizing what the outcome of that action is."[117] As discussed in the Hoffman Opening Report, the definition of "forced action" is broad and descriptive, which makes determining whether a business practice falls within the realm of legitimate marketing efforts versus the alleged "forced action dark patterns" an intractable, subjective exercise.[118] As discussed earlier in this report section and in the Hoffman Opening Report, the UPDP page is an example of a cross-sell, a legitimate marketing technique that is commonly used.[119] In fact, I found that of the 16 companies that sell products or services other than the paid digital memberships/subscription programs (i.e., "Category 1" companies) in my comparative analysis, all of them offered a paid digital membership/subscription program or a free trial of the program as a cross-sell during the online checkout process.[120]

43.    Finally, Prof. Chetty opines that "[t]he design of the UPDP for a mobile device is even more manipulative than the desktop version" because users "need to scroll down the page" to see "buried" information on Prime's price and auto-renewal information and that this information could be "easily missed."[121] Prof. Chetty also claims that the "prominently featured" "double stacked yellow/orange button" for accepting free trial of Prime on top of the "blue hyperlink" for declining "makes it harder for the user to find the decline option," and "[t]he word 'free' is…more emphasized."[122] While Prof. Chetty provides no evidence that any Amazon consumers were affected by these UI design elements on the mobile UPDP page and enrolled in Prime when they did not intend to, her claims ignore consumers' likely familiarity with these types of UI design elements (or those similar to them) based on prior experiences and knowledge. Importantly, Prof. Chetty does not consider that these UI elements are consistent with principles of progressive disclosure and standard marketing practices, as discussed previously. I discussed in the Hoffman Opening Report, it is common and consistent with standard practices for mobile devices to present information on pages that are longer than the size of a mobile screen to require

---

[117] Chetty Opening Report, ¶ 126.
[118] Hoffman Opening Report, ¶ 91.
[119] *See* ¶ 31 above. *See also* Hoffman Opening Report, ¶¶ 92–94, Exhibit 5.
[120] *See* ¶ 31 above. *See also* Hoffman Opening Report, ¶ 291.
[121] Chetty Opening Report, ¶ 128.
[122] Chetty Opening Report, ¶¶ 128–130.

the user to scroll to navigate.[123] Specifically, user experience research shows that, in recent years, it has become increasingly common for user experience designers to create longer pages that might require scrolling.[124] Additionally, studies on online navigation and usability show that consumers spend a large amount of time reading online content that requires scrolling.[125]

### 2. Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of other Amazon Enrollment Pages Are Flawed and Unreliable

44.     I explained in Section IV.A.1 above that Prof. Chetty's claims that certain UI design elements on the UPDP page contain "dark patterns" lack proper basis, do not consider standard marketing practices, are inconsistent with the basic tenets of online consumer behavior and experience, and ignore consumers' likely familiarity with the UI design elements at issue (or those similar to them). To the extent that Prof. Chetty asserts that similar UI design elements on other pages in Amazon's enrollment flows (i.e., SOSP, SOSP PDP,[126] SPC, and last page of the TrueSPC flow) contain the same alleged "dark patterns" as the UPDP page, my analyses and conclusions described in Section IV.A.1 are applicable and demonstrate that her claims are flawed and unreliable. In this section, I evaluate Prof. Chetty's claims regarding these other pages in Amazon's enrollment process, focusing on allegedly problematic UI design elements distinct from those on the UPDP page.

---

[123] Hoffman Opening Report, ¶ 254.

[124] Hoffman Opening Report, ¶ 254. "Scrolling and Attention," *Nielsen Norman Group*, April 15, 2018, https://www nngroup.com/articles/scrolling-and-attention/ ("But one user behavior that did change since the early days of the web is the tendency to scroll. In the beginning, users rarely scrolled vertically; but by 1997, as long pages became common, most people learned to scroll… Since 2010, with the advent of responsive design and minimalism, many designers have turned towards long pages (covering several 'screenfuls') with negative space. It's time to ask, again, whether user behavior has changed due to the popularity of these web-design trends… In 2010, 80% of the viewing time was spent above the fold. Today, that number is only 57% — likely a consequence of the pervasiveness of long pages. What does that mean? First, it could be that, overall, designers are doing a good job of creating signifiers to counteract the illusion of completeness and to invite people to scroll. In other words, they are aware of the disadvantages of the long page and mitigate them to some extent. Second, it could mean that users have become conditioned to scroll — the prevalence of pages requiring scrolling has ingrained that behavior in us.").

[125] Hoffman Opening Report, ¶ 255. "Scrolling and Attention," *Nielsen Norman Group*, April 15, 2018, https://www nngroup.com/articles/scrolling-and-attention/ ("In our most recent study, users spent about 57% of their page-viewing time above the fold. 74% of the viewing time was spent in the first two screenfuls…").

[126] I understand the SOSP PDP page is substantially identical to the UPDP page, which I discussed in Section IV.A.1 above.

45.     Prof. Chetty claims that the Amazon enrollment flow with a SPC overlay, as shown in Exhibit 2, contains "nagging" because Amazon "ask[s] the same thing over and over again, wears the user down to take an action that benefits the service provider."[127] Prof. Chetty provides no evidence that Amazon consumers who were exposed to the SPC flow were "[worn] down" by multiple Prime offers, and this claim suffers from the same shortcomings as Prof. Chetty's claims on the UPDP page as discussed above. Prof. Chetty provides no evidence that this UI design element has any impact whatsoever on consumers' behavior. Moreover, as discussed in the Hoffman Opening Report, repetition of the Prime offer is a standard marketing practice and one that consumers would likely be familiar with.[128] As I discussed in Section IV.A.1, Amazon's repeated mentions of the free shipping benefits of Prime is consistent with its advertising of Prime benefits on other webpages on the Amazon website, as well as marketing practices used by other ecommerce websites. Prof. Chetty fails to explain why Amazon's repetitions of the Prime offer, which is a legitimate advertising practice, is harmful rather than beneficial to consumers who may be interested in the Prime offer.

**Exhibit 2     Amazon Prime Enrollment Flow with SPC Overlay**



Source: Chetty Opening Report, MC10 Prime Signup CX, "Prime Signup CX," pp. 21–27.

---

[127] Chetty Opening Report, ¶ 152.
[128] Hoffman Opening Report, ¶¶ 103, 178.

46.     Prof. Chetty further claims that the "[t]he price and renewal terms are entirely absent from the SOSP,"[129] (SOSP page is reproduced in Exhibit 3), and similarly, "nowhere [on the SPC page] are the cost and renewal terms of Prime disclosed"[130] (SPC page is reproduced in Exhibit 4). However, Prof. Chetty's approach in reaching these conclusions is flawed because she examines these pages and the information on these pages in isolation, which abstracts from the way consumers would experience these pages in the real world, i.e., as part of a process that is informed by the information and choices available on other pages in the process, as well as consumers' prior experiences, goals, motivations, and likely familiarity with the at-issue UI design elements (or those similar to them). Specifically, Prof. Chetty ignores that the information on price and renewal terms is available to consumers within the enrollment flows by the point they make the decision to (or not to) enroll in a free trial of Prime.[131] In other words, consumers cannot sign up for Prime without first seeing the terms of Prime.

---

[129] Chetty Opening Report, ¶¶ 101, 103.
[130] Chetty Opening Report, ¶ 144.
[131] Chetty Opening Report, Attachment B, pp. 11, 26.

**Exhibit 3    SOSP Page**



Source: Chetty Opening Report, Attachement B, p. 9.

**Exhibit 4      SPC Page**



Source: Chetty Opening Report, Attachment B, p. 25.

47.     Prof. Chetty also claims that "the word 'FREE' is emphasized [on SOSP for Prime free trial] and a user may focus on that word and assume there are no costs associated with this deal at the present or at a future time"[132] (SOSP page is reproduced in Exhibit 3). Similarly, Prof. Chetty claims that Amazon's display of "$0.00" as the price of the free trial of Amazon Prime on SPC page is "likely misleading consumers into thinking Prime is not going to cost them anything"[133] (SPC page is reproduced in Exhibit 5). Prof. Chetty provides no evidence that Amazon users who saw this information "assume[d] there [were] no costs associated with [Prime

---

[132] Chetty Opening Report, ¶ 102.
[133] Chetty Opening Report, ¶ 146.

membership] at the present or at a future time" or was "misl[ed] into thinking Prime is not going to cost them anything." Prof. Chetty overlooks that, in both of these flows, the price and auto-renewal information of the free trial of Prime are clearly stated. Specifically, after the SOSP page Prof. Chetty claims includes the "misleading" "FREE" term, consumers are shown a UPDP page with the message in bold, "After your FREE trial, Prime is just $12.99/month." See Exhibit 6. Similarly, on the SPC page in Exhibit 5, above the "$0.00," it is stated in bold that "After your free trial, Prime is just $12.99/month." Additionally, Prof. Chetty ignores that consumers are likely familiar with free trials that auto-renew. Specifically, I found that, of the 48 popular paid digital membership/subscription programs I reviewed, 23 programs offered a free trial and all 23 of these free trials automatically renewed (i.e., converted into a paid digital membership/subscription program) at the end of the trial period, if not canceled before then.[134] Similarly, as discussed in the Hoffman Opening Report, according to a survey of U.S. adults conducted by Prof. Ronald T. Wilcox in August 2024 ("Free Trials Survey"), 85% of U.S. adults who signed up for at least one free trial in the prior 12 months indicated that their most recent free trial did (or would, unless canceled) auto-renew.[135]

---

[134] In the Hoffman Opening Report, as part of my comparative analysis, I developed a metric to evaluate whether the website offered a free trial that automatically renewed and charged applicable payment method if not canceled before the end of the trial period. I did not separately track the incidence of free trials (regardless of autorenewal). Therefore, based on the metric in the Hoffman Opening Report alone, I could not reach conclusions on the prevalence of automatically renewing free trials in situations where free trials were offered. In this report I expanded my analysis to make that determination. I identified, among the 48 popular paid digital membership/subscription programs, all programs that offered a free trial as a new additional metric. I then compared the result for this new metric to the result for the original metric in the Hoffman Opening Report (i.e., the metric that showed whether the company offered a free trial that automatically renewed and charged the applicable payment method if not canceled before the end of the trial period). I found that there were 23 companies that offered free trials, and all of these free trials automatically renewed at the end of the trial period. To evaluate whether a website offered a free trial, I applied the same general methodology as the one I applied for the comparative analysis in the Hoffman Opening Report. Independent coders were trained to review screenshots of the websites of 48 popular paid digital membership/subscription programs, following the coding instructions provided in **Appendix C**. At the end of the coding process, the overall level of agreement between the two coders' assessment of whether the website offered a free trial was 97.9%. To account for the possibility of "chance" as the source of agreement between the two coders, I calculated a reliability coefficient, called Cohen's *kappa*, that adjusts for this likelihood of chance as the source of agreement between coders. The Cohen's *kappa* for the assessment of whether the website offered a free trial was 95.8%. According to academic literature, a Cohen's *kappa* of 0.80 or greater suggests "[a]lmost [p]erfect" agreement. *See* Hoffman Opening Report, ¶ 278, Exhibit 54, Appendix D. S*ee also* **Appendix C**; **Appendix D**; workpaper 1.

[135] Expert Report of Ronald T. Wilcox, Ph. D., February 24, 2025 ("Wilcox Opening Report"), ¶ 64; Hoffman Opening Report, fn 234.

**Exhibit 5    SPC Page**



Source: Chetty Opening Report, Attachment B, p. 26.

**Exhibit 6        UPDP Page in the SOSP Flow**



Source: Chetty Opening Report, Attachement B, p. 11.

48.      Prof. Chetty claims that "[t]he 'delete' option [to remove free trial of Prime] on the SPC is …easily missed by consumers,"[136] (SPC page is shown in Exhibit 5). Similarly, she claims the consumer needs "to change 'Qty' from '1' to '0' on the item 'Amazon Prime (30-day Free Trial)'" to remove the free trial of Prime on the last page of TrueSPC flow, which "is likely to confuse a user"[137] (the last page of the TrueSPC flow is reproduced in Exhibit 7). Prof. Chetty provides no evidence that Amazon consumers who wanted to remove the Prime free trial missed the "delete" option on the SPC page or were confused by the need to change quantity from "1" to "0" on the last page of the TrueSPC flow.

---

[136] Chetty Opening Report, ¶ 149.
[137] Chetty Opening Report, ¶ 175.

## Exhibit 7        Last Page of the TrueSPC Flow



Source: Chetty Opening Report, Attachement E, p. 9.

49.     Lastly, Prof. Chetty claims that the Amazon checkout process contains "Social Engineering"[138] without linking any specific UI design element to this "dark pattern" or properly defining what she means by "Social Engineering."[139] Therefore, it is not possible to evaluate Prof. Chetty's basis for this claim. To the extent Prof. Chetty argues that the Amazon checkout process contains "Social Engineering" because of "confirmshaming,"[140] I have explained above that Prof. Chetty's claims that the UPDP page contains "confirmshaming" are unfounded and flawed. The same reasoning can apply to pages in other Amazon checkout flows for which Prof. Chetty claims contain "confirmshaming."

### B.  Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of the Amazon Prime Cancellation Processes Are Flawed and Unreliable

50.     In her "cognitive walkthrough," Prof. Chetty examines individual pages of two separate sets of Amazon Prime cancellation flows—a cancellation flow before April 2023 (which Prof. Chetty refers to as "Iliad"), and a cancellation flow after April 2023 (which Prof. Chetty refers to as "Iliad 2.0")—and concludes that "the designs of Prime cancellation are confusing to some consumers, who do not successfully cancel online as a result of dark patterns."[141] Prof. Chetty's "cognitive walkthrough" of the Amazon cancellation processes suffers from the same limitations as her "cognitive walkthrough" of the Amazon enrollment processes. Specifically, Prof. Chetty's claims lack a proper basis, do not consider standard marketing practices, are inconsistent with the basic tenets of online consumer behavior and experience, and ignore consumers' likely

---

[138] Chetty Opening Report, ¶ 187.

[139] Prof. Chetty's definition of "Social Engineering" is different than the definition provided in Gray's Ontology. Prof. Chetty defines "Social Engineering" as a UI design feature that "presents options or information to a user such that the user is more likely to take specific action based on their individual or social cognitive biases based on their quick thinking, or System 1, skills." Gray's Ontology's definition of "social engineering" does not mention System 1 thinking, but instead characterizes the "individual and/or social cognitive biases" as due to "a user's desire to follow expected or imposed social norms." Moreover, Prof. Chetty categorized "Social Engineering" as a "high-level" "dark pattern," that includes only "Personalization" as a "meso-level" "dark pattern," and only "confirmshaming" as a "low-level" "dark pattern" subsumed under "Personalization." However, Gray and coauthors use "Social Engineering" as a catch-all term that can comprise a wide variety of activities in addition to "Personalization," including "Scarcity or Popularity Claims," "Social Proof," and "Urgency." See Gray et al. (2024), p. 19; Chetty Opening Report, ¶ 55.(v).

[140] Prof. Chetty defines "confirmshaming" as a UI design element that "shapes 'accept' and 'decline' options through emotional language or imagery to shame or guilt the user into selecting." Chetty Opening Report, ¶ 55.(v).a.

[141] Chetty Opening Report, p. 1.

familiarity with the UI design elements at issue in Amazon's cancellation processes (or those similar to them).

> **1. Prof. Chetty's Conclusions From the "Cognitive Walkthrough" of the Amazon Prime Cancellation Process Before April 2023 Are Flawed and Unreliable**

51.     In Exhibit 8 below I reproduce the Amazon cancellation flow before April 2023 ("Pre-April 2023 Cancellation Flow"), that Prof. Chetty discusses in her report.

**Exhibit 8     Pre-April 2023 Cancellation Flow**



Source: Chetty Opening Report, Attachment L.

52.     In reference to the Pre-April 2023 Cancellation Flow, Prof. Chetty claims that Amazon uses "obstruction" because "the entry point into the cancellation flow from the Prime Central

page is visually not simple to locate"[142] and "all users may not intuitively know that they need to click on 'Manage membership' to access the dropdown menu" (a menu that Prof. Chetty claims was "hidden") in order to "move forward in the cancellation process."[143] She also claims that it is unclear what the word "cancel" refers to.[144] Prof. Chetty fails to explain why she believes it is not intuitive for consumers to expect or know that the ingress to the cancellation flow is located under "Manage Membership," where the call-to-action feature is clearly labeled as "Update, cancel and more" (the Prime Central page is reproduced in Exhibit 9). Importantly, even accepting Prof. Chetty's claims and unsupported speculations at face value, she herself acknowledges that the entry point from Prime Central into the cancellation flow is one of the multiple ways consumers can access the flow.[145] I also described the various ways consumers can cancel a Prime membership in the Hoffman Opening Report.[146] As such, to the extent a consumer could not locate the entry point of the cancellation flow from the Prime Central page, they would have been able to use other options. This includes, as just one example, "typing 'cancel membership' in the search bar [on Amazon.com], which produces an 'Alexa' answer with a 'End Your Amazon Prime Membership' link" as Prof. Chetty acknowledges.[147]

53.    Prof. Chetty also claims that it is not simple to locate the entry point of the Amazon cancellation flow from the Prime Central page (the Prime Central page is reproduced in Exhibit

---

[142] Chetty Opening Report, ¶ 211. The "Prime Central" webpage is the membership management page that contains information about the Prime benefits, plans, monthly or annual fee and their due date. The page contains links to update or cancel the membership, update the payment method and change the membership plan. *See* "Prime Central," *Amazon*, https://www.amazon.com/gp/primecentral; Deposition of Benjamin Goeltz, October 30, 2024, p. 104:13–20 ("Prime Central is a page that Prime members can go to view information about their Prime membership and take actions against it, like switching plans or managing their Prime payment method or carrying on remind me later, canceling, pausing"). *See* Hoffman Opening Report, fn 332.

[143] Chetty Opening Report, ¶¶ 211–213.

[144] Chetty Opening Report, ¶ 211.

[145] Chetty Opening Report, ¶ 204. *See also* Chetty Opening Report, ¶¶ 205–207.

[146] Hoffman Opening Report, ¶ 36. I discussed 13 different ways a consumer can enter the Prime cancellation flow in the Hoffman Opening Report. For example, Prime consumers can enter the Prime cancellation flow by (i) visiting the Amazon landing page, hovering over the "Account & Lists" dropdown menu on the top right, and navigating and clicking on "Account," then "Prime," followed by "Update, cancel and more," and then click on "End membership;" (ii) clicking on the "All" with three bars on the top left of the Amazon landing page, then clicking on "Your Account," then "Prime," followed by "Update, cancel and more," and then clicking on "End membership;" (iii) clicking the "Help" link located toward the bottom of the Amazon landing page, then clicking on "End your Amazon Prime Membership" followed by "End Your Prime Membership;" (iv) searching "cancel membership" in the search bar of the Amazon landing page, then clicking on the link for "End Your Amazon Prime Membership," followed by the button for "End Your Prime Membership."

[147] Chetty Opening Report, ¶ 207.

9) because "most of the visual space on this Prime Central page is focused on Prime benefits" and "the word 'cancel' appears…in the smallest font on the page" and "is sandwiched between 'update' and 'and more.'"[148] She further claims that Amazon included "additional unnecessary steps" for consumers to locate the entry point of the cancellation flow because "after selecting 'Manage membership' in a hidden dropdown menu, a consumer has to sift through multiple options, such as 'Share your benefits' and 'Remind me before renewing,' before reaching 'End Membership,' which is placed at the bottom of the vertical list."[149] The Prime Central page with the dropdown menu for "Management Membership" is reproduced in Exhibit 10. Prof. Chetty provides no evidence that these UI design elements created any issues or barriers for consumers to locate the entry point of Amazon cancellation flow. It is unclear what the basis is for Prof. Chetty's objections that the Prime Central page should not focus on Prime membership benefits, considering that the Prime Central page provides information on topics related to Prime membership. Similarly, it is unclear the basis for Prof. Chetty's objection to Amazon putting "Update, cancel and more" under "Manage Membership" or presenting consumers options other than cancellation when consumers select the "Management membership." Consumers may certainly want to update when managing their membership. As discussed in the Hoffman Opening Report, it is logical to have the cancellation option among other items on a menu of options given that consumers are not necessarily coming to the Prime webpage to cancel; rather, they might be seeking to engage in any number of actions (e.g., update payment method, or review member benefits).[150] Moreover, this practice of presenting a discrete amount of information on each page is consistent with the principles of progressive disclosure discussed in the Hoffman Opening Report.[151] As discussed in the Hoffman Opening Report, the progressive disclosure of information in the cancellation process provides consumers with the benefits and costs associated with Prime membership in a gradual way that is unlikely to overwhelm the consumer, so that they can make an informed choice about canceling.[152] Accordingly, it is not

---

[148] Chetty Opening Report, ¶ 211.
[149] Chetty Opening Report, ¶ 213.
[150] Hoffman Opening Report, ¶ 222.
[151] Hoffman Opening Report, ¶¶ 199–200.
[152] Hoffman Opening Report, ¶ 200.

clear why it would be inappropriate for consumers to be presented with several options, including the option to cancel their membership at this juncture.[153]

**Exhibit 9    Prime Central Page**



Source: Chetty Opening Report, Attachment L, p. 1.

---

[153] Hoffman Opening Report, ¶ 222.

**Exhibit 10    Prime Central Page with Manage Membership Dropdown Menu**



Source: Chetty Opening Report, Attachment L, p. 2.

54.     Prof. Chetty next evaluates each of the three pages of the Pre-April 2023 Cancellation Flow. She refers to the first page of the flow as "Iliad's Marketing Page,"[154] which I reproduce in Exhibit 11. According to Prof. Chetty, the first page of the Pre-April 2023 Cancellation Flow "floods" consumers with information on Prime benefits, "[n]one of [which] is related to cancelling Prime and creates cognitive overload on the consumer," to "distract users from proceeding with their cancellation."[155] Prof. Chetty fails to consider that different consumers enter the cancellation process with different goals and motivations or that consumers may benefit from information regarding Prime membership and its benefits. As discussed in the Hoffman

---

[154] Chetty Opening Report, § VII.a.ii.
[155] Chetty Opening Report, ¶¶ 220–221.

Opening Report, while some consumers may be interested in exploring cancellation, not all consumers will have formed an intent to cancel and will require additional steps in their decision processes before deciding whether to cancel or not. Thus, the information on benefits such as free access to streaming services or additional payment plans might help consumers make informed decisions and therefore are related to the consumer's decision to continue with cancellation.[156] Additionally, Prof. Chetty fails to consider that consumers are familiar with websites presenting the benefits of their paid digital membership/subscription programs in the cancellation flow. As illustrated in my comparative analysis in the Hoffman Opening Report, I found that among the 45 popular paid digital membership/subscription programs I reviewed that allow online cancellation, most programs (36 programs, 80%) mentioned the benefits of their paid digital membership/subscription program during their desktop cancellation flow.[157]

55.    Prof. Chetty further claims that, on the first page of the Pre-April 2023 Cancellation Flow, Amazon uses "choice overload" by offering "two options to abandon the cancellation flow…and only one option to proceed to cancel[lation]" which she claims, "lead users to abandon cancellation."[158] Prof. Chetty provides no evidence that any Amazon consumer abandoned the cancellation flow simply because Amazon presented options other than canceling within the flow.[159] Moreover, she fails to recognize that offering consumers the option to stay enrolled or get reminded later about cancellation can be considered as a customer retention effort. As I discussed in the Hoffman Opening Report, options such as these represent standard customer retention practices, as the academic marketing literature shows that it is more cost-

---

[156] Hoffman Opening Report, ¶¶ 213–214.

[157] Hoffman Opening Report, ¶ 302, Exhibit 74.

[158] Chetty Opening Report, ¶ 223. Relatedly, Prof. Chetty claims that Amazon "does not present users with logical symmetric choices, or clear binary options, to cancel their Prime subscription or abandon cancellation. This creates a cognitive burden, requiring the user to expend additional mental effort to figure out how to interpret the information they are seeing and decide how to act, which can hamper decision-making." Chetty Opening Report, ¶ 225. However, Prof. Chetty provides no evidence that any Amazon consumer spent "additional mental effort" to interpret the "Remind Me Later" option and because of this, failed to continue canceling Prime from this page.

[159] Prof. Chetty fails to recognize that even if it is true that consumers are taken out of the cancellation flow by choosing "Remind Me Later" or "Keep My Benefits," consumers could use the back button on their browsers to go back to the cancellation flow if they desired, and resume progression in the cancellation flow to complete canceling their Prime membership. Alternatively, consumers who intend to cancel after exiting the cancellation flow by clicking call-to-action features that take them out of the flow, can re-enter the flow using the various ways I discussed in this section and in the Hoffman Opening Report. *See, e.g.*, Hoffman Opening Report, ¶ 36.

effective for companies to retain consumers than acquire new ones.[160] Moreover, Prof. Chetty fails to consider that consumers are familiar with being presented with alternatives to immediately canceling as they go through a cancellation process. As illustrated in my comparative analysis in the Hoffman Opening Report, I found that among the 45 popular paid digital membership/subscription programs I reviewed that allow online cancellation, the majority of the programs (30 programs, 67%) presented consumers with alternatives to immediately canceling the program (or the free trial of the program) within the cancellation flow during the desktop cancellation process.[161]

---

[160] Hoffman Opening Report, ¶¶ 57–59, 83, 231, Section VII. Kotler, P. and K. Keller (2016), *Marketing Management*, 15th ed., Hoboken, NJ: Prentice Hall, p. 168 ("Companies are using information about customers to enact precision marketing designed to build strong long-term relationships"); Reinartz, W. et al. (2005), "Balancing Acquisition and Retention Resources to Maximize Customer Profitability," *Journal of Marketing*, 69, 1, 63–79 at p. 65 ("Therefore, the ability to customize the message easily and build personal bonds with customers will eventually lead to greater retention through personal selling…").
[161] Hoffman Opening Report, ¶ 300, Exhibit 74.

Exhibit 12      Second Page of the Pre-April 2023 Cancellation Flow



Source: Chetty Opening Report, Attachment L, p. 4.

59.    Prof. Chetty notes that, on the second page of the Pre-April 2023 Cancellation Flow, the button to remain enrolled, "Keep My Membership," uses different language compared to "Keep My Benefits" on the first page of the cancellation flow.[170] While Prof. Chetty states that this button "improved" on the second page, she claims that "[t]he pattern disruption in this language… can confuse the user, who needs to process new information on the second page."[171] Once again, Prof. Chetty provides no evidence that any Amazon consumers were "confuse[d]" by this change in language and, as a result, failed to cancel Prime. Moreover, Prof. Chetty fails to recognize that the language on each page matched with the information presented on the page. Specifically, Amazon presented Prime benefits on the first page of the cancellation flow and

---

[170] Chetty Opening Report, ¶ 238.
[171] Chetty Opening Report, ¶ 238.

used the language "Keep My Benefits," while presenting additional payment methods or plans for Prime on the second page and used the language "Keep My Membership." Considering the content presented on the page, the different language between the two pages informs consumers how their choices are related to the content presented. Again, this is related to the progressive disclosure principles I discussed above and in the Hoffman Opening Report.[172] The progressive disclosure makes it easier for consumers to learn information and less likely for consumers to make errors (e.g., cancel by mistake or cancel from a lack of understanding).[173] Based on these principles, consumers can benefit from information being presented gradually on multiple pages, and it would make logical sense for the choices presented on each page to be tailored to the information presented on the page.

60.     Prof. Chetty further claims that, on the second page of the Pre-April 2023 Cancellation Flow, "the use of the warning icon with the text '[i]tems tied to your Prime membership will be affected if you cancel your membership' suggests to users that they are on the verge of experiencing a loss that can trigger loss aversion. This is also an instance of Emotional or Sensory Manipulation (Interface Interference.)"[174] While Prof. Chetty provides no empirical evidence that the "warning icon" and the accompanying text would "trigger loss aversion" among Amazon consumers, she fails to consider that the message provides potentially relevant information to support consumers' decisions. As discussed in the Hoffman Opening Report, the use of "warning icons" next to important messages to invite consumers to pay attention, and the presentation of options using different formats (e.g., additional information next to a button), are online features that websites can use that are consistent with effective design principles and consumers' expectations about how content and call-to-action features on a webpage are presented.[175] As explained in the Hoffman Opening Report, in general, "warning icons" are commonly found online, including on the homepage of the FTC website.[176]

---

[172] *See* Section IV.A.1 above; Hoffman Opening Report, ¶¶ 199–200.

[173] "Progressive Disclosure," *Nielsen Norman Group,* December 3, 2006, www.nngroup.com/articles/progressive-disclosure/.

[174] Chetty Opening Report, ¶ 239.

[175] Hoffman Opening Report, ¶ 219; "Confirmation Dialogs Can Prevent User Errors — If Not Overused," *Nielsen Norman Group,* February 18, 2018, https://www.nngroup.com/articles/confirmation-dialog/; "Indicators, Validations, and Notifications: Pick the Correct Communication Option," *Nielsen Norman Group*, January 17, 2024, https://www.nngroup.com/articles/indicators-validations-notifications/.

[176] Hoffman Opening Report, ¶¶ 219–220, Exhibit 41.

62.     Additionally, Prof. Chetty claims that the Pre-April 2023 Cancellation Flow contains "[n]agging" by offering consumers an option to remain subscribed to Prime on the second page of the flow.[179] Additionally, Prof. Chetty claims that "the repetition of the 'Remind Me Later' button throughout the [Pre-April 2023 Cancellation Flow] is a design technique to wear down the user (a Nagging dark pattern)."[180] Furthermore, Prof. Chetty claims that Amazon used "repetitive text" such as presenting "[i]tems tied to your Prime membership will be affected if you cancel your membership" language twice on the third page of the flow to "distract the user."[181] However, Prof. Chetty provides no evidence that Amazon consumers were "[worn] down" or "distract[ed]" by these UI design elements. Importantly, Prof. Chetty fails to recognize that offering an option to remain enrolled can avoid cancellations that occur by mistake or from lack of understanding, along with any possible disruptions caused by an accidental cancellation. Moreover, as described in the Hoffman Opening Report, according to progressive disclosure principles, consumers can benefit from information being presented gradually on multiple pages rather than a single page because the gradual introduction of information is cognitively easier to process.[182] Relatedly, it would make logical sense to offer the consumer the option to remain enrolled or to be reminded later on each page as more information is presented, as different consumers might make different decisions at different stages of the cancellation flow based on the information presented.

63.     Prof. Chetty claims that some of the at-issue UI design elements discussed for the desktop are also present or even more problematic in the mobile cancellation process. For example, Prof. Chetty claims that the "entry point to Iliad from the Prime Central page on a mobile device is even harder on a mobile device than on a desktop" and "the switch in the wording on the buttons 'Keep my membership', 'Continue to cancel', and 'Remind me later' may be less noticeable on the smaller screen."[183] Additionally, Prof. Chetty claims that some at-issue UI design elements are more problematic on mobile devices because consumers need to scroll on the device to "locate the entry point [of the cancellation flow] or "find the 'End now'

---

[179] Chetty Opening Report, ¶ 240.
[180] Chetty Opening Report, ¶ 250.
[181] Chetty Opening Report, ¶ 251.
[182] Hoffman Opening Report, ¶¶ 212, 213, 259.
[183] Chetty Opening Report, ¶¶ 215, 229, 241.

the Post-April 2023 Cancellation Flow contain the same alleged "dark patterns" as in the Pre-April 2023 Cancellation Flow, my analyses and conclusions described in Section IV.B.1 are applicable and demonstrate that her claims are flawed and unreliable. In this section, I evaluate Prof. Chetty's claims regarding pages in the Post-April 2023 Cancellation Flow, focusing on allegedly problematic UI design elements distinct from those in the Pre-April 2023 Cancellation Flow.

CONFIDENTIAL

65.     Prof. Chetty refers to the first page of the Post-April 2023 Cancellation Flow as "Iliad 2.0's Marketing Page,"[188] which I reproduce in Exhibit 15. Prof. Chetty claims that on the first page of the Post-April 2023 Cancellation Flow, "[t]he language for the 'Prime Plan Offers' button is vague and a user may need to click on the button to figure out what it means, distracting them from cancelling their membership."[189] Prof. Chetty does not explain why the language is "vague" and provides no evidence that Amazon consumers were "distract[ed]" by this option, and were prevented from canceling Prime. If anything, the overlay shown after clicking the option of "Prime Plan Offers" presents alternative annual Prime plans, as shown in Exhibit 16, with additional options that contain information for students, and government assistance recipients, which makes the language "Prime Plan Offers" an accurate description of the information presented when chosen. Prof. Chetty also does not consider that consumers might benefit from the information presented on the page once consumers click this option, as consumers might not be fully aware that Prime offers both monthly and yearly plans and additional discounts for students and people receiving benefits from certain government programs, some or all of which might also change their cancellation decision. Furthermore, based on Exhibit 16, even after consumers choose "Prime Plan Offers," they can continue with the cancellation flow by clicking on the "X" at the top right corner to close the overlay. That is, this option does not take consumers out of the cancellation flow; it just offers consumers who are interested in alternative offers a chance to learn about them before making the cancellation decision. As I discussed in the Hoffman Opening Report, the Amazon cancellation flow is designed around consumers' heterogeneous needs and empowers consumers in their decision processes. Amazon does not know what its customers are thinking (e.g., whether they are interested in or would benefit from alternative plans), nor where they are in their decision-making process when they enter the cancellation flow. Amazon designs the cancellation flow to accommodate the many different needs consumers might have.[190]

---

[188] Chetty Opening Report, § VII.b.ii.
[189] Chetty Opening Report, ¶ 266.
[190] Hoffman Opening Report, ¶ 226.

**Exhibit 15       First Page of the Post-April 2023 Cancellation Flow**



Source: Chetty Opening Report, Attachment T, p. 2.

**Exhibit 16       Prime Plan Offers Page**



Source: Chetty Opening Report, Attachment T, p. 3.

66.    Prof. Chetty refers to the second page of the Post-April 2023 Cancellation Flow as "Iliad 2.0's Cancellation Page"[191] which I reproduce in Exhibit 17. Prof. Chetty claims that the second page of the Post-April 2023 Cancellation Flow presents the same three options as on the third page of the Pre-April 2023 Cancellation Flow (shown in Exhibit 13), "but in a format that is more cognitively challenging for the user to understand and subsequently select a cancellation option," because the options at the bottom of the page changes as consumers choose different radio options.[192] Prof. Chetty then concludes that the second page of the Post-April 2023 Cancellation Flow "is still confusing" and "if a user is not paying attention, they may confirm without reading carefully and not cancel their subscription even if they intended to cancel."[193] Prof. Chetty provides no evidence that Amazon consumers found this page "confusing" or any consumer failed to cancel Prime even if they intended to do so. Contrary to Prof. Chetty's claim that the second page of the Post-April 2023 Cancellation Flow is "more cognitively challenging for the user to understand and subsequently select a cancellation option," this page follows the principles of progressive disclosure I described in this report as well as in the Hoffman Opening Report.[194] This page not only presents relevant information for consumers who show interest in certain options (i.e., cancel today, cancel on renewal, pause on renewal), but also allows consumers to consider and compare multiple options if they have not fully decided on which option to select. As discussed in the Hoffman Opening Report, different consumers who enter the cancellation process will necessarily have different goals and motivations: while some may be interested in exploring cancellation, not all consumers will have formed an intent to cancel and may require additional steps in their decision processes before deciding whether to cancel or not.[195] Consistent with this, this page is designed to support consumers' heterogeneous needs and empower consumers in all phases of their decision-making process, depending on their particular objectives. For example, the consumer who enters the cancellation flow with the intent to cancel immediately can just choose "Cancel today ($14.99 refund)," and read the message "Your Prime benefits will end immediately. Your Prime benefits will end immediately and you will be

---

[191] Chetty Opening Report, § VII.b.iii.

[192] Chetty Opening Report, ¶¶ 275, 277.

[193] Chetty Opening Report, ¶ 277.

[194] *See* Sections IV.A.1, IV.B.1. *See also* Hoffman Opening Report, ¶¶ 199–200; Chetty Opening Report, ¶ 275.

[195] Hoffman Opening Report, ¶¶ 213, 226.

refunded $14.99 … By cancelling, you will no longer be eligible for your unclaimed Prime exclusive offers."[196] On the other hand, the consumer unsure about whether she wants to cancel immediately or cancel on the renewal date can explore these two options and review the additional message related to canceling on renewal date which states "Your Prime benefits will end on [Date]. After that date your benefits will end, and you will no longer be charged for your Prime membership … By cancelling, you will no longer be eligible for your unclaimed Prime exclusive offers,"[197] which would help her to make an informed decision.

**Exhibit 17     Second Page of the Post-April 2023 Cancellation Flow**



---

[196] Exhibit 17.
[197] Exhibit 17.

ability to interpret the results.[260] First, Amazon conducted the tests without systematically validating whether the elements that were altered were indeed systematic sources of confusion for consumers.[261] Second, Amazon collected and analyzed only behavioral metrics, and did not measure consumers' cognitive states, which would have been relevant for assessing the impact of the changes on clarity.[262] Third, Amazon had no means of determining whether the observed changes in metrics were driven by additional factors other than changes in confusion.

Executed this 26 of March, 2025

_Donna L Hoffman_ (signature)

_____
                Donna L. Hoffman

---

[260] "Measuring the Customer Impact of Prime Clarity," March 2021, AMZN_00080322–29; "PRIME_153956: US Desktop UPDP FT Monthly - CIA Shadow/No Shadow," undated, AMZN-PRM-FTC-002650117–33; "PRIME_179734: FT UPDP Price Prominence," undated, AMZN-PRM-FTC-002650208–23; "PRIME_255432: UPDP Mobile FT Clarity CTA's," undated, AMZN-PRM-FTC-002650314–31.

[261] Based on the internal documents I reviewed, Amazon did not conduct any systematic preliminary analyses or tests validating what elements were systematic sources of confusion for customers for any of the six Signup Weblabs analyzed by Dr. Violette. According to Amazon's CID response and produced documents, from September 2020 onwards "Amazon began soliciting user input to inform its understanding of issues that are important to its customers, in part, to inform its content experiments" and that these customer experience test typically had between 5 and 12 participants. *See* FTC Matter No. 2123050, Amazon's Fourth CID Response, June 21, 2021, p. 2; FTCAMZN_0016438.

[262] "Measuring the Customer Impact of Prime Clarity," March 2021, AMZN_00080322–29 at 22 ("The objective of this meta-analysis was to measure the impact that these clarity changes had on customer experience, focusing on CS cancellation metrics, benefit usage, and a longer-term 12-month conversion rate.").

# EXHIBIT 10

## EXPERT REPORT OF MARSHINI CHETTY, Ph.D.

I am an Associate Professor at the University of Chicago's Department of Computer Science, with a Ph.D. in computer science  I have twenty years' experience in human-computer interaction ("HCI") and my research and peer-reviewed publications address, among other things, the usability of web interfaces and the presence of manipulative designs (sometimes known as "dark patterns") on websites.

The Federal Trade Commission ("FTC") asked me to render an expert opinion on:
(1) whether the design of how Amazon enrolls consumers in Prime during online checkout confuses consumers;
(2) whether the design of how Amazon enrolls consumers in Prime during online checkout conveys information on Prime's material terms (cost, end of free trial period, and renewal terms) that consumers can comprehend; and
(3) whether the design of the Prime Iliad and Iliad 2.0 cancellation processes confuses consumers.

To provide an opinion, I performed two evaluations that are widely accepted and used in the HCI field. First, I conducted a cognitive walkthrough (which is an inspection method) to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer by studying the design of each interface using foundational principles of good design in HCI.  These principles include ensuring that (1) consumers can discover and know all of their options to select the option that best meets their goal, (2)  consumers know what the consequences of their actions on an interface are, (3) consumers have a sense of control when using the interface and can undo actions with ease, and (4) the design of each interface is consistent so consumers can easily navigate them.  For my cognitive walkthrough, I also applied Colin M. Gray's Dark Pattern Ontology, which contains the most comprehensive, frequently used, and recent taxonomies of dark patterns. Second, I conducted a think-aloud study, which is an empirical, qualitative user study, to understand consumers' experience navigating Prime enrollment within the checkout process and Prime cancellation.

Based on my cognitive walkthrough of the design of the Prime enrollment points ("Prime detours") in the online checkout process and of the Iliad and Iliad 2.0 cancellation processes; the user study I conducted to test these designs; and my personal experience as a HCI researcher and professor, the designs of Prime enrollment within the checkout process are confusing to some consumers, who, as a result of dark patterns, unintentionally select an option to enroll in Prime when purchasing a product online.  Similarly, the designs of Prime cancellation are confusing to some consumers, who do not successfully cancel online as a result of dark patterns.

14. Researchers and regulators in the United States and Europe frequently cite the taxonomy[1] I advanced in my paper, "Dark Patterns at Scale, findings from a Crawl of 11K Shopping Websites," and it is one of the 10 most frequently cited taxonomies on dark patterns [8]. Harry Brignull—the UX researcher who coined the term "dark pattern"—recognized the taxonomy I created as one of the most significant dark pattern taxonomies in his seminal book on dark patterns, *Deceptive Patterns: Exposing the Tricks Tech Companies Use to Control You* [8]. My paper also won the Annual Privacy Papers for Policymakers award. Additionally, I co-authored an article "Dark Patterns, Past, Present, and Future," outlining the history of dark patterns [56].

15. I currently serve as the Papers Co-Chair for the Conference on Human Factors In Computing Systems (or CHI for short), which is the top conference in the field of human-computer interaction. In this role, I am responsible for overseeing the review process for approximately 5,000 research papers and coordinating hundreds of expert reviewers to peer review and select the most rigorously conducted and executed papers to appear in the conference program for the 2025 event.

16. My Ph.D. dissertation is: "Making Infrastructure Visible: A Case Study of Home Networking." My research focused on helping Internet users understand how to better manage their Internet speeds, privacy, and security [15]. As part of the work, I conducted interviews with Internet users who were the first to have multiple computers connected to the Internet in their homes. I then designed, implemented, and tested a system to monitor and control home Internet speeds from a centralized display system on a home router [13]. My research focused on how this system helped people see who was using the most data in their homes and why their Internet speeds may be slow—for example, if there is a heavy Internet user in the home or unauthorized use—to help better manage Internet speeds and costs.

17. My master's dissertation is: "Developing Locally Relevant Applications For Rural South Africa." I worked with a rural clinic and hospital to develop a telemedicine system for communication between the two sites, using a participatory action research design approach over the course of two years [17]. I designed a simple user interface with a technology called Voice over the Internet Protocol, which was not widely in use in the country at the time, to create the system which was an early version of an messaging app similar to Skype, WhatsApp, and Facebook Messenger [12]. When we tested the system with nurses at the rural clinic to see if they could better communicate with the single doctor at the rural hospital nearby about patients, it was found to be helpful for treating patients at the clinic instead of referring everyone to the hospital which was a considerable distance away and hard to get to over

---

[1] A taxonomy is a system used to classify and organize concepts.

### III. Scope and Summary of the Opinion and Materials Considered

25. The FTC engaged me in the matter of *Federal Trade Commission v. Amazon.com, Inc. et al.* The matter concerns the enrollment and cancellation processes for Amazon's Prime subscription program. The FTC asked me to evaluate: (1) whether the design of how Amazon enrolls consumers in Prime during online checkout is likely to confuse consumers, (2) whether the design of how Amazon enrolls consumers in Prime during online checkout conveys information on Prime's material terms (cost, end of the free trial period, and renewal terms) that consumers can comprehend, and (3) whether the design of the Prime Iliad and Iliad 2.0 cancellation processes likely confuses consumers.

26. To answer the FTC's questions, I studied the Prime enrollment and cancellation processes that the FTC provided me. As I explain further below, the FTC provided me with information about the Prime enrollment and cancellation processes at issue, including, among other things, a series of static screenshots from Amazon's online product checkout process on desktop and mobile interfaces, as Prime enrollment processes, labelled "Prime detours" in this report, are located within product checkout, and for the cancellation process on desktop and mobile devices.

27. In forming the opinions expressed in this report, I evaluated the processes' usability and identified features that render the information in the enrollment processes unclear or confusing, or that prevent consumers from comprehending the information presented to them about a Prime subscription, or that complicate the cancellation process, including dark patterns. I explain my methodology in Section V.

28. I also conducted a user study to confirm how people interact with the Prime enrollment processes during online checkout and the Prime cancellation processes. To do so, together with a small team, I built an experimental website modeled as closely as possible to the Prime enrollment process during product checkout and the Prime cancellation process on a desktop device and conducted a user study. The results of the user study allowed me to determine what, if any, aspects of the interfaces pose challenges for obtaining consumers' consent to enroll in Prime, consumers' understanding of Prime's cost and renewal terms, and enabling consumers to cancel Prime.

29. Below is a list of the materials considered:

   (i)    All materials supporting the user study referenced in Section VIII of this report;

   (ii)    All attachments to the Sealed Amended Complaint (Dkt. #69);

   (iii)    Screen captures of undercover Prime enrollment and cancellation

9

"users." [10,23,78]. A central concern of HCI is to design computing technologies (for example, smart watches, computers, e-readers, cellphones, and sensors) that are, in fact, usable. [10,23,78] To design usable computing technologies, designers must understand who the users are—in other words, who are the people who will use the system?— as well as where, when, and how users will interact with the system. [10,23,78] Designers therefore must understand the context in which users will be using the system. For instance, knowing whether users will be engaging in other activities while using the system is important. Designers also typically study what feelings users feel when using a system, such as pleasure, satisfaction, frustration, or confusion. [10,23,78] Equipped with all of this information, designers can create a system with an enhanced user experience.

32.  User experience design ("UX design") is a term that originated after HCI was developed as a field. [27]. It focuses specifically on making a user's experience with a product easy and intuitive [42,61]. Rather than focusing solely on the interaction between a human and a technology, user experience is about understanding and designing the entire experience a user has with a system, from how it integrates into their lives to how to design the system's interface. The term was first popularized in the early nineties and has been used in industry to refer to designers and researchers focused on product design [42,61]. This could entail usability goals, such as making a system easy to learn; easy to remember how to use and; effective, efficient, and safe to use.  It could also entail ensuring that the system has good utility and user experience goals, such as eliciting a range of desired feelings and emotions (i.e., being satisfying, enjoyable, helpful) and limiting undesired feelings (i.e., being frustrating, annoying, or unpleasant.) [78]

**b)  Foundational Principles of Good Design in HCI**

33.  Experts in the field of HCI recognize foundational good design principles from a user's perspective.  These principles are taught in computer science classes and are detailed in textbooks on the subject such as the widely used Sharp et al.'s *Interaction Design: Beyond Human-Computer Interaction* and Dix et al's *Human Computer Interaction* textbooks and HCI introductory classes at Georgia Tech, Stanford, Carnegie Mellon University, and the University of Washington [23,78]. Examples include Don Norman's principles of good design and Jakob Nielsen's ten usability heuristics for user interface design [57,60,80,81,101].  These foundational principles include the following four elements:

(i)  The interface design needs to make it possible for users to discover and know all of their options so they can select the one that meets their goals [57,60,80,81,101]. Interfaces should not contain irrelevant information so as to not diminish the visibility of relevant information [57,60,80,81,101].

likely to interact with cookie consent notices when there were only two options (accept and decline), as opposed to more than two options that were more granular. Users were also more likely to click "Accept" even if there were only two options of "Accept" and "Decline" given if the Accept button was highlighted but the Decline button was not (50.8 % mobile, 26.9 % desktop) than when both were presented as equal options (39.2 % mobile, 21.1 % desktop) [93]. This study also showed that nudging visitors to accept privacy-invasive defaults  (where users have to specifically opt out) were more likely to make consumers consent to accept cookies than opt in notices (where users have to specifically opt in.) [93]

(iii)    Furthermore, another user study had 2,252 participants in the United Kingdom go through an online interaction on a fictitious online trading platform to buy a financial product [100]. The results showed that the use of dark patterns—specifically Visual Interference, False Hierarchy, and Confirmshaming, *see infra*, Section IV(e)—increased the rate at which users unintentionally bought the product. [100]. Moreover, the accumulation of dark patterns in a single screen and in subsequent screens were more effective at getting the users to buy the product, when compared to the control group who was not exposed to dark patterns. [100]. These findings suggest that dark patterns working in concert with each other or over the course of several screens in an interaction hamper the obtention of consumer consent. [100].

(iv)    Several more recent studies have also been undertaken on whether dark patterns affect the decision to purchase a good or obtain a service or what choices to make when signing up for a streaming service [43].

47.    These studies, and others, demonstrate that interface decisions like placement of information and number of choices on a screen as well as whether certain choices are highlighted or selected by default, i.e., dark patterns are manipulative and can steer users into making choices that they may not have otherwise made if fully informed and capable of selecting alternatives [83].

48.    **Dark patterns** are more prevalent and insidious on mobile platforms in apps and on mobile browsers than on desktops [21,33,74]. For instance, a study of 240 of the most popular Android apps found that users cannot easily spot dark patterns on a mobile device and that some users, such as children, are particularly vulnerable to these kinds of dark patterns. [22].

e) **Gray's Dark Pattern Ontology** [6]

49.    Researchers have created ontologies and taxonomies of dark patterns to label

---

[6] An ontology is similar to a taxonomy. The difference is where a taxonomy is used to classify and organize, an ontology is used to model and reason.

and classify manipulative designs in the interfaces of websites, apps, social media, voice user interfaces and other platforms to help identify common tactics that service providers use to manipulate users. [7,8,29,31,49, 51,52] Ontologies and taxonomies for dark patterns allow researchers to utilize a shared language to identify and discuss these dark patterns, organize them into categories, and discuss the harms resulting from each category of dark patterns. [29,31].

50. The ontology laid out by Colin M. Gray (the "Gray Dark Pattern Ontology") consolidates the ten most frequently cited taxonomies that regulators and academics have created—including my own work—into a canonical organization of dark patterns [31].  I used the Gray Dark Pattern Ontology in this report because it is the most comprehensive, frequently used, and recent taxonomy of dark patterns.

51. The Gray Dark Pattern Ontology organized dark patterns in three levels: high-level, meso-level, and low-level. [31]. Table 1 below reflects the dark pattern categories and levels as laid out In Gray's taxonomy. [31].

### Table 1: Relevant Dark Patterns in the Gray Dark Pattern Ontology

| High-Level Dark Pattern | Meso-Level Dark Pattern | Low-Level Dark Pattern |
|---|---|---|
| Forced Action | Nagging | |
| | Forced Continuity | |
| Interface Interference | Manipulating Choice Architecture | False Hierarchy, Visual Prominence |
| | Bad Defaults | |
| | Emotional or Sensory Manipulation | Positive or Negative Framing |
| | Choice Overload | |
| | Hidden Information | |
| Obstruction | Roach Motel | |
| | Creating Barriers | |
| | Adding Steps | |

| Sneaking | Bait and Switch | |
| | Hiding Information | Sneak Into Basket, Hidden Costs |
| Social Engineering | Personalization | Confirmshaming |

52. High-level patterns consist of the most abstract elements of an interface that are manipulative, coercive, or deceptive and limit a person's ability to take an action that is consistent with their intention. [31] These high-level patterns are context-agnostic, which means they are described generally without being tied to a specific context or domain. [31] High-level patterns describe *strategies* of manipulative, coercive, or deceptive elements. [31] Sneaking, Obstruction, Interface Interference, Forced Action, and Social Engineering are examples of high-level patterns. [31]; *see supra*, Table 1.

53. Meso-level patterns, which connect high- and low-level patterns, describe the approach of a dark pattern that limits, impairs, or undermines a user's ability to make an informed decision and take an action that reflects their decision. [31]. These meso-level patterns are either context-agnostic or specific to the context of use or application type (such as shopping). [31]; *see supra*, Table 1. Meso-level patterns describe a dark pattern's *angle of attack*.

54. Low-level patterns identify problematic designs in a specific context that summarize the ways in which visuals or temporal elements on the Interface limit or undermine users' autonomy and decision making. [31]; *see supra*, Table 1. Low-level patterns describe the *means of execution* of a dark pattern.

55. Below, I identify and explain the main high-, meso-, and low-level categories of dark patterns that I observed in both (a) Prime enrollment detours from the checkout process and (b) cancellation processes that the FTC provided me. [31].

(i) **Forced Action** (high-level) is a strategy that requires the user to perform an extra action to complete a process or access (or continue to access) certain functions on the system they are using [31, 29]. For instance, a service provider that requires a user to sign up for an account on a website to view the website's content is using a Forced Action dark pattern. [31].

   a. *Nagging* (meso-level) focuses on resource depletion. [29]. Nagging in the dark pattern contexts reflects the literal meaning of the word: a service provider employs Nagging when it repeatedly interrupts the user with a request to take an action— even when the user has already rejected that request. [31]

19

Nagging typically occurs to users who are in the midst of completing a primary task. [31].For example, Nagging occurs when a service provider that sells products on its website interrupts a user going through the purchasing process by repeatedly presenting the user with an unrelated task, such as enrolling in a subscription.  Nagging depletes the user's time and attention over time and makes them more likely to relent and take an action that does not reflect their intention, such as enrolling in a subscription, so they can quickly resume their primary activity, such as completing their online purchase. [31].

b. ***Forced Continuity*** (meso-level) subverts the user's expectation that a subscription they began will not auto-renew or continue and instead makes it difficult for the user to end the subscription or to become aware that the subscription is still active. [31]

c. Both Nagging and Forced Continuity have been shown to influence user's decisions in signing up for a website service [49] and have also been found in numerous domains including account deletion interfaces and social media more generally [55,75]

(ii)  **Interface Interference** (high-level) is a strategy that where a service manipulates the user interface to make information that is most beneficial to the service provider more visible or accessible to users over other information [29,31].

a. ***Hidden Information***  (meso-level) hides information that is important for a user to make a decision. [31]. For instance, a service provider is using the Hidden Information dark pattern when it hides the cost of a subscription when presenting a user with a subscription offer. [31].

b. ***Bad Defaults*** (meso-level) preselects an option for the user. Preselecting the most expensive plan option is a common example of a Bad Default dark pattern. [31].

c. ***Manipulating the Choice Architecture*** (meso-level) describes where a service provider makes it harder for a user to decline an action rather than to accept it.  This dark pattern occurs where, for instance, a service provider makes it harder to decline enrolling In a subscription than to agree to the enrollment. [31].

• **False Hierarchy** (low-level) gives one or more options more visual prominence over others, particularly when all options should be given the same consideration. [31]. Users may, as a result, make a selection based on

incomplete information. [31]. For example, making the "enroll" button brighter and more visually attractive and graying out the "decline" button to make it less noticeable on a website that offers a subscription is an instance of False Hierarchy.

- **Visual Prominence** (low-level) makes a distracting element more prominent than the element relevant to the user's goal to make the user forget about their original goal. [31].

**d.** ***Emotional or Sensory Manipulation*** (meso-level) uses specific wording to play on a user's emotions. [31]. A service provider uses Emotional Manipulation by using words to make a user feel a sense of loss when the user attempts to cancel a service. [31].

**e.** ***Choice Overload*** (meso-level) confuses a user by overwhelming them with too many options, causing the user to select an option that is not aligned with the user's intentions. [31].

(iii) **Obstruction** (high-level) occurs when a service provider includes unnecessary steps within a process to stop users from taking certain actions or to make it harder than necessary for them to do so. [7,29]. Obstruction patterns include making a service Hard to Cancel. [51]. Obstruction is often found in interfaces where a user is trying to unsubscribe or delete an account. [75,79].

a. ***Roach Motel*** (meso-level) creates a situation that is more difficult for a user to get out of than it was for the user to get into. For instance, the Roach Motel dark pattern exists when a user signs up for a service and finds it more difficult to cancel the service. [31].

b. ***Creating Barriers*** (meso-level) describes a situation where a service provider intentionally creates barriers to cancelling a paid subscription by burying options, adding confusion to the process, or limiting access. [31].

c. ***Adding Steps*** (meso-level) creates additional points of unnecessary but required user interaction to complete a task. [31].

(iv) **Sneaking** (high-level) hides, disguises, or delays giving the user information that is relevant to their decision-making. Sneaking is a tactic that is commonly used to get users in the shopping domain to purchase items or subscriptions. [51].

21

a. ***Hiding Information*** (meso-level) subverts the user's expectation that they will see all relevant information they need to make an informed decision to the user and instead hides or delays the disclosure of information. For example, where a service provider hides language that indicates a user will be enrolling in a subscription, such as a subscription's price and recurring nature. In using this tactic, service providers often focus the user's attention on something that is being given for free so the user could subscribe without realizing it. [51]. A user in this context may not understand that the free trial will auto-renew and that they will be charged periodically once their trial period ends, until they cancel the subscription [7].

- **Hidden Costs** (low-level) hides costs a user may have to pay in a conspicuous manner or only showing them after the user has paid. [31].

- **Sneak into Basket** (low-level) adds items to a user's cart without explicitly disclosing them to the user. [31].

b. ***Bait and Switch*** (meso-level) subverts a user's expectation that their selection will result in their desired outcome and, instead, leads them to an unexpected, undesired outcome. [31].

(v) **Social Engineering** (high-level) presents options or information to a user such that the user is more likely to take specific action based on their individual or social cognitive biases based on their quick thinking, or System 1, skills. [31,102]. Social engineering dark patterns often play on a person's desire to be socially acceptable or follow social norms.

a. ***Personalization*** (meso-level) subverts a user's expectation that the information will be presented to all users in a similar way and, instead, uses "personal data to shape elements of the user experience that manipulate the user's goals while hiding other alternatives."

- **Confirmshaming** (low-level) shapes "accept" and "decline" options through emotional language or imagery to shame or guilt the user into selecting. [31]. Researchers have found confirmshaming in many different domains such as shopping websites, consent notices, social media, and account deletion interfaces. [30,51,62,75,84].

**V. Methodologies Used**

**a) Types of User Studies In HCI**

56. It is typical in HCI to conduct user studies of interfaces to identify usability problems with systems and the user experience of using a system, e.g., whether it is pleasing to use. [23,27,46,78]. This type of user study, known as an "evaluation," focuses on studying users' interaction with a system through a variety of methods to determine whether the system is effective. [23,27,46,78]. User studies for evaluation can identify usability and conceptual problems with a system design which can be rectified or improved upon.

57. Methods include, but are not limited to, observing users' interaction and asking them questions in interviews, conducting surveys, running an experiment and logging users' actions. [23,27,46,78]. For instance, researchers looking to evaluate an online shopping site might create a study where they first ask users how they engage in online shopping and then watch them use an online shopping system before questioning them about it. [23,27,46,78]

58. There are two types of user studies for evaluation in HCI: (1) inspection methods and (2) empirical user studies in controlled or natural settings. [78].

(i) Inspection methods are user studies where an HCI expert identifies usability issues based on their knowledge of usability, what they believe the user's behavior would be, the contexts of the system's use, and the kinds of actions they know a user might take (the user in this case being the end user of the system). [57-59, 101]. While going through interfaces, the researcher uses established guidelines depending on what the researcher is studying. For example, a researcher studying the design of an interface from the perspective of a user will refer to the foundational principles of good design in HCI (*see supra*, Section IV(b)), and the Gray Dark Patterns Ontology (*see supra*, Section IV(e)) to identify any issues with the interface. HCI experts use inspection methods because they can evaluate how well the system performs for various user tasks almost as well as an end-user of the system would. [23,27,46,78]. The researcher analyzes the interface by asking what problems and points of confusion a user may have when using an interface and what aspects of the designs do not follow best practices and principles of good interface design. [23,27,46,78]. Cognitive walkthroughs are one of the most frequently used inspection study methods. [78]. Inspection methods are useful even when a researcher does not have access to a fully functional working version of a system and can be used with screenshots or videos of the system. HCI experts routinely use these techniques in their research to identify dark patterns [21,52,55]. Additionally, it is common to analyze screenshots for the

23

data is coded for input to a thematic analysis, this measure of inter-coder reliability is necessary, and agreement can be reached through regular team discussions and meetings during the coding process. [54]. Team members usually code a subset of the data first to ensure they are in agreement before splitting the coding process into primary and secondary coding responsibilities.

61. Once the data is coded whereby each piece of data is coded primarily by one research team member (primary coder) and then coded again by a second team member (the second coder), the research team then discusses what the most important themes are in the data set. The research team then examines the codes of most interest and creates a summary of the most important themes emerging in each code. The thematic summaries are then used to report on the major themes emerging from the data set as a whole.

62. During the qualitative data process, existing frameworks such as the Gray Dark Patterns Ontology can be used to code the data. A qualitative data analysis process can also support the analysis of the results of expert review or inspection processes such as cognitive walkthroughs or heuristic evaluation.

**i.    Inspection Method: Cognitive Walkthrough**

63. Cognitive walkthroughs using established heuristics are a common inspection method in HCI. [46,57,59,78]. A cognitive walkthrough is an inspection method that is usually used to evaluate how easy (or not) it is for a user to use a system by simulating a user's problem solving process at each point in a set of interaction flows with the system [48,65,85,96]. Specifically, cognitive walkthroughs can indicate how easy it is for a user to learn how to use a system, and it can also uncover general usability issues. [48,65,85,96]

64. To conduct a cognitive walkthrough of an interface, the researcher needs to know 1) who the users are, 2) what sample tasks the user would complete while using the interface, 3) what actions a user needs to take to complete the tasks, and 4) the description or implementation of the interface in some form. [48,65,85,96].

65. The expert should determine, in particular, whether the user will 1) achieve the right effect aligned with their intention on the interface, 2) notice that a correct action to take is available in the interface, 3) know that that correct action is associated with the effect they are trying to achieve, and 4) make progress towards solving their overall task (for instance, buying a product on an online checkout flow) [78].

66. During the walkthrough, the expert can note what they think users need to know to complete the task, design issues, and what needs to happen for a user to complete a task successfully. If the design is appropriate, the cognitive

walkthrough will reveal that a user using the interface will know which option to select on the interface to accomplish their goal and will know that they successfully accomplished their goal, or are headed towards it, through feedback—one of the principles of good design (*see supra*, Section IV(b)). The results of a cognitive walkthrough therefore reveal what problems, if any, exist in the design of an interface where a user is not able to accomplish their goal, or does not know what they accomplished on the interface.

67. An expert can conduct a cognitive walkthrough with screenshots of an interface or videos of the system in lieu of the online working system itself without the need to find actual users of the system to observe what they do at each point in the system. [48,65,85,96]. Many studies of dark patterns have used cognitive walkthroughs to identify dark patterns in an interface such as in social media. [21,38,55].

68. Additionally, a researcher conducting a cognitive walkthrough typically uses established heuristics, which are set of best practices in interface design to identify potential problems users may have with a system. Heuristics are essentially criteria that focus on the aesthetics and the functionality of an interface [57–59]. By using heuristics for good design, a researcher does not have to rely on what they think is good or bad design to evaluate a system, but rather on established rules and guidelines for design. Heuristics include principles such as making designs consistent, using terms users can easily understand, and minimizing cognitive efforts for users during use of the system. Other heuristics include whether the system makes it clear what the status of the system is, how easily the system prevents errors, making the system flexible and easy to use as discussed in Nielsen's 10 Usability Heuristics for User Interface [101].

**ii.    Empirical User Study Method: Think Aloud Study**

69. A think aloud study is a type of user study or a form of observation where a researcher asks a user to talk through what they are doing with a system as the researcher observes. [47].  HCI researchers use think aloud studies to understand how users are thinking about and understanding a system. [1,2,24,48].

70. By asking users to think aloud and verbalize their thought processes as they navigate a website or interface, a researcher can map out their cognitive processes, such as how they are engaging in decision-making and what factors on the interface are affecting their choices and their understanding of the system at any given point in time.  Researchers can therefore pinpoint problems with a system based on data from think aloud studies, specifically on what problems user participants describe. Think aloud studies reveal problems as and when participants go through an interface, rather than relying on them to remember issues that they had in retrospect. Researchers are able to ask follow up questions, too.

determine how a system is used. [23]. Potential disadvantages of these techniques, particularly for observations such as think-aloud studies, are that users can change their behavior because they are being observed. However, adhering to the research guidelines for think-aloud studies minimizes these disadvantages. Asking participants to walk through their task again after they think-aloud can also generate additional data that users can explain and interpret after they complete the test. [23].

**d)  Selection of Methods for User Studies in this Report**

78.  The FTC has asked me to review the online checkout flow and cancellation processes (the interfaces at issue) in this report, it provided me and to opine on them.  I opted to use an inspection method and an empirical study method applying rigorous systematic procedures that are widely accepted in the HCI field. [23,27,46,78,81]. In this report, I used standardized techniques that are best suited for each type of analysis. By using standardized methods and techniques and formal analysis process, I ensured that my opinions have been formulated in the most rigorous manner possible.

79.  First, I began my review with an inspection method technique which is a well-established practice to uncover usability issues in online flows [58]. Researchers, including myself, use established and accepted principles of design to assess the usability of an online interface. [1,2,24,48]. To conduct an inspection of a flow, researchers need only documentation of the system that is being examined, such as screenshots and other documentation of the flow. [1,2,24,48]. A single researcher can perform a heuristic evaluation or a cognitive walkthrough but may not uncover all the problems in an interface. [57,59,78,96].

80.  To analyze whether the Amazon processes that the FTC provided me allowed consumers to make selections on the interface that reflect their intention, I used an inspection method known as a cognitive walkthrough using established heuristics in a systematic manner.  I also used the Gray Dark Pattern Ontology, for reasons I have explained in Section IV(e).

81.  Second, I conducted a user study using a replica of the Amazon enrollment pathways in the product checkout process and the cancellation processes for two primary reasons.  First, conducting a user study ensured that my inspection of the processes uncovered a complete list of usability issues, as I identified additional issues I observed in study participants' real-time interactions with the interfaces at issue. [23,27,46,60,78]. Second, the user study allowed me to verify that the issues I identified in my expert inspection actually affected real-world users in the ways I expected. [57,59,78,103–105].

82.  To render my opinion as laid out in this report, I used two inspection or expert review techniques called cognitive walkthrough and heuristic

28

evaluation.

83. For my cognitive walkthrough, I used a combination of well-established heuristics described above: the principles of good design, the 8 golden rules, and the Gray Dark Pattern Ontology.  I applied these three sets of heuristics to evaluate each screen.  It is well-established that a single expert evaluator cannot uncover all problems with an interface using a heuristic evaluation [58,59,78]. As such, my evaluation may not reveal *all* dark patterns present in the Amazon flows but rather most of them [78].

84. For the empirical user study, I used a think-aloud protocol to understand what users were thinking and their decision-making process while using the system. The think aloud protocol is useful when running a user study.  For this user study, I developed an interactive website that mimicked the Amazon Prime website as closely as possible under the guise of a candy store. This user study provided insights into real-world issues that users may have with Amazon as they are navigating the site. Although I did not study mobile versions of the Amazon enrollment and cancellation processes in the user study, the issues identified are likely to be more pronounced on a mobile device where there is more of need for scrolling, where users may be multi-tasking, and the screen real estate is smaller. *See supra*, Sections VI (enrollment) and VII (cancellation).

**VI. My Cognitive Walkthrough of the Online Checkout Process Shows that the Design of the Prime Detours Can Confuse Consumers into Unintentionally Enrolling in Prime and Does Not Convey Prime's Material Terms Well.**

85. In this section, I discuss how consumers enroll in Prime while going through the online checkout on Amazon, based on information the FTC provided me. I then explain the big picture design issues in these processes that I found during my cognitive walkthrough before providing an in-depth analysis of each page's design.

86. To evaluate the design of the Prime detours in the online checkout process on desktop and mobile devices, I performed a cognitive walkthrough using the foundational HCI design principles and the Gray Dark Pattern Ontology I described in Section V.

87. The information contained in this section regarding how the online checkout process works was provided to me by the FTC.  I also generally confirmed that information by reviewing videos of the Prime product checkout and static images that I understand to have been produced by the Amazon or captured by the FTC from the Amazon website.

88. After a consumer adds an item to their cart on Amazon and proceeds to purchase the item, they go through the online checkout process. During this

29

92. The FTC asked me to assume that the flowchart below illustrates the MPP on a desktop device.  I also confirmed this through reviewing videos of the product checkout provided by the FTC.



Figure 3: MPP Checkout on Desktop

93. The FTC asked me to assume that the flowchart below illustrates the MPP checkout on a mobile device.



Figure 4: MPP Checkout on Mobile

## TrueSPC (Desktop Only)

94. The FTC asked me to assume that a consumer purchasing a product on
Amazon through the TrueSPC checkout on a desktop device can add the
product to their cart by selecting the "Buy Now" or "Add to Cart" and
"Proceed to Checkout" yellow (or orange) buttons.  Consumers with a saved
address and payment selection are directed to the UPDP, then the "TSPC,"
which is the last page in the process where consumers can place their order.
In other words, the TSPC assumes the same role as the SPC in the MPP
checkout. Consumers without saved payment and address information
proceed directly to TSPC after clicking "Buy Now" or "Proceed to
Checkout."

95. The FTC asked me to assume that Attachments E and F reflect TrueSPC
checkout.

96. The FTC asked me to assume that the flowchart below illustrates the
TrueSPC checkout.



Figure 5: TrueSPC Checkout on Desktop

### a) Overview and Cognitive Walkthrough of the SOSP on Desktop and Mobile Devices

97. The FTC provided me with the screen captures for the Shipping Option Select Page (SOSP) on desktop and mobile devices in this section and in **Attachments B (pages 9, 16, and 24 for desktop; pages 36, 38, and 40 for mobile) and C (pages 9, 16, and 24 for desktop; pages 37 and 39 for mobile).** The FTC asked me to assume that Attachment B reflects Prime free trials; Attachment C reflects Prime Hard Offers.

98. The FTC asked me to assume that the SOSP only appears in the MPP process.

99. The screen captures I was provided by the FTC show the following on the SOSP. The SOSP provided consumers with an option to "[c]hoose [their]

shipping options."  On the right side of this page, Amazon provided a list of shipping speed options, including an option (usually the first option in the list) that generally stated "FREE Same-Day Delivery with a free trial of Amazon Prime," with an orange box right above stating "Good news, we're giving you a 30-day FREE trial of Prime."  My understanding is that Amazon has stated that consumers never had the "Prime" option pre-selected. Ultimately, the consumer proceeded through SOSP by choosing a shipping option and then clicking a yellow/orange button.

100. The FTC asked me to assume that the image below reflects a representative image of the SOSP.



Figure 6: SOSP on Desktop

101. The SOSP offers consumers Prime even though it does not present any information on the terms of a Prime subscription.  The price and renewal terms are *entirely* absent from the SOSP.  The only Prime-related information on the SOSP are the orange box above the Prime shipping option that states "Good news [name], we're giving you a 30-day FREE trial of Prime" and the reference to a shipping option associated with Prime free trial, which appears as the first shipping option at the top of the list. A consumer encountering the SOSP therefore has no indication about the terms of a Prime subscription but is still offered to enroll. Additionally, the placement of the Prime shipping

34

option at the first on the list of options makes users more likely to proceed with that option and subsequently enroll in Prime. Even though users who select the Prime free shipping option do not automatically enroll in Prime, consumers may not understand that fact; in other words, consumers may think they have enrolled (or that Amazon has enrolled them—i.e., "given" them Prime) when they choose the Prime shipping option.  Additionally, consumers who see the Prime "offer" without accompanying terms likely believe that there is no cost to the subscription offer or the Prime free shipping offer.

102. The "Good News [Name]…" framing uses Emotional and Sensory Manipulation to make consumers feel more positively inclined towards Prime, as though they are special in getting this deal. Also, the word "FREE" is emphasized and a user may focus on that word and assume there are no costs associated with this deal at the present or at a future time.

103. The SOSP on mobile presents very similar design issues as on desktop. Though there is a reference to "FREE Same-Day Delivery with Amazon Prime," the SOSP on mobile does not display the cost or renewal terms of a Prime subscription. Consumers who therefore select the Prime shipping option are not informed as to the terms of the subscription. The Prime shipping option also appears at the top of the list of shipping options here. This particular design issue is magnified given the smaller screen.

104. The FTC provided me with the following screen capture of the SOSP on a mobile device.

35



Figure 7:
SOSP on
Mobile

105. Though the FTC understands that consumers who select the Prime shipping option on the SOSP are not immediately enrolled in Prime, the SOSP's reference to Prime can already confuse consumers going through the checkout process to purchase a product.

**b) Overview and Cognitive Walkthrough of the UPDP on Desktop and Mobile Devices**

106. The FTC provided me with the screen captures for the UPDP on desktop and mobile devices in this section and in **Attachments B (pages 18 for desktop; pages 39 for mobile) and C (pages 16 for desktop; page 39 for mobile).**

107. The Universal Prime Decision Page (UPDP) appears in the MPP and TrueSPC online checkout flows. Amazon has used various versions of the desktop UPDP. *See*, *e.g.*, **Attachments B, C, H, I, F.**

108. The screen captures and videos the FTC provided me show the following on the UPDP.  Generally, the UPDP includes a message at the top stating that Amazon was "giving" the consumer a free trial of Prime.  The middle of the page often contains graphics or large text promoting the benefits of Prime, such as free shipping and the potential savings on shipping for the

36

consumer's purchase.

109. Consumers who are shown the UPDP are not able to complete their product purchase without clicking one of two options toward the bottom of the UPDP page, which would either accept or decline a Prime subscription. The accept, or enroll, option is a yellow/orange button that reads "Get FREE Same-Day Delivery," or a variant **Attachments B and H**. Clicking the enroll button would immediately enroll the consumer in Prime. The only other way to proceed through UPDP without enrolling in Prime is to click on the decline option, which is usually a blue hyperlink (though it appears occasionally as a button) that reads, for example, "No thanks, I do not want fast, free shipping" or "No thanks." **Attachments B and H**.

110. The FTC asked me to assume that, on some UPDP pages, the fact that a Prime free trial would automatically renew and convert into a paying membership, and the price of that memberships, was only disclosed in small print beneath the enroll and decline options—as shown in **Attachments B, C, and H**. On others, the information was at the top of the page or near the enrollment button.

111. In some versions, once the consumer opts into Prime via the UPDP, the subsequent page in the checkout process—the SPC—displays the text "[Name], congratulations! Your 30-day free trial of Prime has started. You can cancel anytime" appears, along with a list of Prime benefits. **Attachment D**.

112. The FTC provided me the image below which depicts the UPDP on a desktop.



Figure 8: UPDP Free Trial on Desktop

113. The FTC provided me with the following screen capture of a UPDP on a mobile device.



Figure 9: UPDP Free Trial on Desktop

114. The FTC asked me to assume that the UPDP on mobile is similar to the UPDP on desktop, with a vertical layout for the enrollment buttons or decline options.

115. The UPDP has some of the most problematic designs in the online product checkout process. It appears in the middle of the MPP checkout, and it can appear in middle of the TrueSPC checkout as well (for consumers have saved address and billing information). As explained below, the design of the UPDP is particularly manipulative as it contains multiple dark patterns that act in tandem to steer consumers to sign up for Prime without giving them complete information as to the subscription (cost of a subscription and renewal terms, for instance) and often without clearly telling them that they even have the option to enroll in, or decline, a Prime membership.

116. The UPDP essentially interrupts the consumer's shopping process by presenting them with information on a subscription service—Prime— separate from the product they are buying. The only information that appears on the UPDP *and* is salient to a consumer's goal of making a purchase is the "fast, free" shipping that comes with a Prime subscription. The FTC asked me to assume that consumers without a Prime-eligible item in their cart will still see a version of the UPDP (called "order agnostic") that promotes Prime benefits (for example, Prime Video) that are completely unrelated to the product purchase.

39

117. Given its position within the checkout process, users can misunderstand the UPDP, or not pay much attention to it, because the only information that the UPDP offers in connection with the consumer's primary goal—to complete a purchase—is whether the user wants "fast, free" shipping with Prime. Because the UPDP is not clearly related to the consumer's primary task of placing an order on Amazon, consumers are very likely to rely on quick System 1 thinking and not carefully read this page, especially the terms and conditions, in order to move onto the next step in placing their order [6,41,63,69,88].

118. In other words, without the UPDP, the online product checkout flow would still function for users without interrupting them while they are purchasing a product. The other pages in the MPP and TrueSPC flows, by contrast, all advance the user towards their goal of completing their purchase (with the exception of SOSP, which may be a redundant page.) For instance, the other pages collect necessary information for the purchase, such as delivery address, payment information, shipping preferences and methods, and even the amount of product the user wants. The UPDP is therefore unnecessary to placing an order for a product, and the interruption is an example of the dark pattern, Nagging.

119. The disclosures about the price and recurring nature of a Prime subscription and the fact that a user is being asked to enroll in a Prime subscription on the UPDP page are easily missed because this information is included at the bottom of the page in the smallest, least prominent front on the page, buried within other terms and conditions, which consumers frequently do not read. Therefore, even when a consumer realizes that the UPDP accept button would enroll them in a Prime subscription, they would miss the material terms, such as the cost and renewal terms, of the subscription unless, in most cases, they read the small-print terms and conditions below the accept button and decline link.

120. The UPDP capitalizes on the consumer's reliance on System 1 thinking. It does not make the subscription or its terms (cost and renewal terms) easy to notice on the page. In some versions of the UPDP, the only location where Amazon discloses the cost and the renewal terms of a Prime subscription is at the bottom of the page in the terms and conditions section, which consumers are known to miss or not read [6,41,63,69,88]. The terms and conditions are in the smallest front on the page, and a consumer needs to look below the action button ("Get FREE Same-Day Delivery") to even see the terms and conditions section. Some consumers might not even realize that UPDP pertains to Prime. Importantly, the word "Prime" often does not appear in either the accept or the decline options, meaning consumers may not realize that the options even pertain to Prime. Sometimes, Prime is in the accept button, but not in a way that makes clear that clicking the button enrolls in Prime (e.g., "Get Free Two-Day Delivery with Prime.") The visual

40

manipulation is more pronounced on a mobile device where a user has to scroll past the options to accept or decline the Amazon Prime enrollment in order to read over the terms and conditions. *See* **Attachment D**.

121. Another manipulative effect on the UPDP page is the emphasis on the word "free," which Amazon often emphasizes by using all-caps letters, bold font, and repetition. In fact, the word "FREE" can appear at least nine times on the UPDP alone. This manipulative technique, known as visual prominence or visual manipulation—an Interface Interference dark pattern—draws the user's attention to specific elements on the page that the provider wants consumers to see over other information, such as the terms and conditions. Amazon draws on emotional manipulation by constantly using and emphasizing the word "FREE" to make the user feel like they are personally being rewarded with a special deal. The constant repetition of the word "FREE" also creates a cognitive dissonance for the consumer, who may subconsciously assume, as a result of this manipulation technique, that they will not be charged for the shipping and may miss the cost of the subscription.

122. Similarly, the wording of the decline option elicits negative feelings from consumers. For instance, the option to decline Amazon Prime Delivery is often worded as "No thanks" or "No thanks I do not want fast, FREE delivery," which could lead users to click on the enroll option to avoid feeling shame and the sense that they are not being financially sensible and potentially losing money on shipping.

123. Amazon also uses visual manipulation in the design of the options to accept or decline Prime, including the positioning, framing, sizing, and wording of the options. The enroll option always appears in the form of a yellow/orange button, usually with a gray shadow underneath, giving the impression of a double-stacked button. The decline option is often a blue hyperlink with no framing of any kind. The enroll option is visually brighter and more appealing than the decline one. The visual asymmetry between the two options creates an imbalance that favors the enroll option. Users are therefore naturally more drawn to the visuals of the enroll option than to those of the decline option.

124. The double-stacked button for the enroll option can also be confusing to consumers because it looks like the gray button is clickable and presents a third option, though it is not. *See* **Attachment D**.

125. The position of the options also plays an important role. The enroll button on UPDP desktop is located on the right, while the decline option is on the left. Moreover, Amazon's use of a yellow/orange button located on the right of the screen for the enroll option is *particularly* manipulative given the significance of those visual choices within the context of its online checkout

flow. The button that gets users to the next stage of their shopping experience is always a yellow button, often located on the right of the screen. For example, "Add to Cart," "Proceed to Checkout," "Use this address," "Continue," and "Place your order" are all yellow buttons in the checkout mostly located on the right-hand side of the screen. *See* **Attachments B** (MPP Checkout) **and C** (TrueSPC Checkout).

126.    Even more troubling is the fact that the consumer must either accept or decline the Prime subscription (often disguised as "fast, free shipping") to continue their shopping experience. This is, in essence, a Forced Action dark pattern. Given that the consumer's primary goal is to complete their product purchase, they are more likely to be swayed by the manipulative elements on the page and miss the cost and recurring charges disclosures and click on the button to enroll in Prime without realizing what the outcome of that action is. A consumer would likely react differently if they were in a process specifically to enroll in Prime and their primary goal was to enroll in Prime. Even then, the consumer would need to look carefully at the page to find the terms and conditions, which are generally tucked in a small font at the bottom of the page.

127.    The "hard offer" UPDP is even worse because upon selecting the "Get FREE Same-Day Delivery" option that enters the consumer in a Prime subscription, that consumer is immediately enrolled in Prime and *billed* for the subscription without going through anything like what a consumer would expect from an online shopping "checkout" page. **Attachment C (page 18)**. Where the free trial version gives a consumer time to realize they have subscribed in Prime and cancel before being billed, the hard offer has immediate financial consequences.

128.    The design of the UPDP for a mobile device is even more manipulative than the desktop version. Like the desktop UPDP, there is insufficient information with respect to the Prime subscription on the mobile UPDP.  **Attachment B, Mobile UPDP**.  One particularly bad design that hides information from users capitalizes on the fact that users need to scroll down the page, past all of the information regarding Prime benefits, to *see* Prime's terms and conditions, where Prime's cost and renewal terms generally are buried. **Attachment Q**. Figure 9, which the FTC provided me, illustrates this well as it shows the terms and conditions that appear as the user scrolls down the page, even though the enroll and decline options are available without the scrolling. This technique, known as a "sticky footer," therefore hides key information from users using a mobile device.  Therefore, only users who take time to scroll past these buttons are going to notice the terms and conditions in the smallest font on the page. This is easily missed.

129.    The design of the enroll and decline options is also worse on a mobile device to maximize signups regardless of user intent. Specifically, the enroll

option—which sometimes appears as a double-stacked yellow/orange button with a shadow box and sometimes appears without the shadow—is prominently featured above the decline option, which is a blue hyperlink with a smaller font, almost blending in with the terms and conditions. The vertical stacking of the enroll and decline options, using an Interface Interference technique, makes it harder for the user to find the decline option and makes it more likely that the user will select the enroll button without realizing what the consequences of that action are, especially given that the user has to select one of either option.

130. The word "free" is also more emphasized on the mobile UPDP, given the small screen space. For instance, "free" appears four times on Figure 9, often in bold and in all-caps, and the user does not need to scroll at all to see the four instances.

### c) Overview and Cognitive Walkthrough of the Ship Option Select Page Prime Decision Page (SOSP PDP)

131. The FTC asked me to assume that the SOSP PDP page appeared after the SOSP and payment selection page (where a consumer confirmed their payment method for their purchase) for consumers who selected the "Prime" shipping option on SOSP. The SOSP PDP required consumers to choose between the option to "Start your FREE trial" (or other language), which continues to enroll the consumer in Prime if the consumer selected the Prime shipping option in the SOSP, and the option to decline (which avoids a Prime membership).

132. The FTC asked me to assume that the SOSP PDP generally functioned in the same manner as the UPDP, presenting consumers with two options, one of which enrolled them in Prime and the other did not. Consumers had to pick one of the two options to proceed with their product purchase.

133. The FTC asked me to assume that if the consumer selected the Prime option in the UPDP or SOSP PDP, the banner on the final SPC page read "congratulations! Your 30-day free trial of Prime has started. You can cancel anytime," and the consumer was enrolled in a Prime free trial even if they did not complete the checkout process by clicking "Place your order" on the last page.

134. The FTC asked me to assume that the image below reflects a representative image of the SOSP PDP.



Figure 10: SOSP PDP on Desktop

135. The SOSP PDP page is virtually indistinguishable from the UPDP and presents the same issues as the ones laid out in Section VI(X) on both desktop and mobile devices. *Compare* **Attachment B, page 11** (SOSP PDP) with **Attachment B, page 18** (UPDP).

**d) Overview and Cognitive Walkthrough of the Single Page Checkout (SPC)**

136. The FTC provided me with the screen captures for the SPC on desktop and mobile devices in this section and in **Attachments B** (pages 25-26 for desktop; pages 42 for mobile) and **C** (pages 25-27 for desktop; page 41-42 for mobile).

137. The screen captures I was provided by the FTC show the following on the SPC. The SPC is the last page of the MPP checkout flow, where a consumer can place their order on the Amazon website. The SPC on desktop had three sections: 1) the "Review your Order" section, which presented the previously-provided shipping address and payment method and billing address, and a space to enter a gift card, promotion code, or voucher; 2) a Prime free trial box (which Amazon calls the "SPC Stripe"), where a consumer could select "Try Prime FREE for 30 days;" and 3) a delivery option selection, with various shipping options, including one (which Amazon called the "SPC ISOA") for "FREE Same-Day Delivery with your

44

free trial of Prime" with "Fast, FREE Delivery" and Prime's logo.

138. The FTC asked me to assume that the image below reflects a representative image of the SPC.

139. The FTC asked me to assume that if the consumer selected the "Try Prime FREE for 30 days" button in the SPC Stripe, the text in the box would change to read "A 30-day FREE trial of Amazon Prime has been added to your order. Your order has been upgraded to fast, FREE shipping" and the consumer would be enrolled in a Prime free trial once they clicked on "Place your Order."

140. The FTC asked me to assume that if the consumer selected the "FREE Same-Day Delivery with your free trial of Prime" SPC ISOA, the consumer would be enrolled in a Prime free trial once they clicked on "Place your order."

141. The FTC asked me to assume that the image below reflects a representative image of the SPC on a desktop.



Figure 11: SPC on Desktop

45

142. The SPC presents consumers with two Prime detours: (1) the SPC Stripe, which appears as a blue box on desktop, and (2) the delivery (or shipping) options (containing the SPC ISOA).

143. The design of the SPC reflects many of the same techniques used on the UPDP (and SOSP PDP) pages to hide the terms of a Prime subscription from users as much as possible.

144. Specifically, the terms of the Prime subscription are largely missing from at least some versions of the SPC page. The SPC Stripe (the blue box) displays "[Name] we'd hate for you to miss out on unlimited fast, FREE delivery" and includes a button labelled "Try Prime FREE for 30 days" with, underneath it "No hassle. No commitments. Cancel anytime." The SPC Stripe also includes how much the consumer would be saving in shipping costs by electing to "[t]ry Prime." But nowhere are the cost and renewal terms of Prime disclosed. Similarly, the delivery options include a Prime option, listed as the first one, that reads "Free Same-day Delivery with your free trial of Prime." The price, end period of the free trial, and renewal terms of Prime are not visibly displayed near that Prime detour option either, or in the terms and conditions section at the bottom of the screen and near the "Place your order" yellow button. Consumers, therefore, do not have complete information on the basic terms of Prime prior to selecting the "Try Prime FREE for 30 days" button or selecting the Prime shipping option.

145. Similar to the UPDP (and SOSP PDP), the SPC emphasizes the word "free," which appears at least six times in connection to Prime on some versions of the SPC. *See*, *e.g.*, Figure 11. This use of the visual prominence technique draws the user's attention to a benefit of the Prime subscription (free shipping), even though the user cannot see the terms on the page and may not realize that selecting free shipping enrolls them in a Prime subscription. *See supra*, Section VI(b).

146. Amazon does not prominently display the terms and conditions of a Prime subscription even after a consumer selects the Prime button option in the SPC Stripe or the Prime shipping option. Amazon visually emphasizes the Prime benefit—"[a] 30-day FREE trial of Amazon Prime has been added to your order. Our order has been upgraded to fast, FREE shipping"—by using eye-catching blue text on a white background. However, the material terms included in "After your free trial, Prime is just $12.99/month. Cancel anytime" are only disclosed in a smaller font and in black, making them easy to miss. The fact that Amazon displays "$0.00" in the consumer's basket could also confuse consumers because it emphasizes the cost of the free trial—but omits the cost of the Prime subscription *after* the free trial. The Prime free trial therefore appears like a product in the cart with a price tag of

46

$0.00, likely misleading consumers into thinking Prime is not going to cost them anything.

147. Similarly, Amazon buries the material terms of a Prime subscription in the terms and conditions section underneath the "Place your order" button on the top right of the SPC.

148. The FTC provided me with the screen shot below showing what the screen looks like after a user selects a Prime detour on the SPC on a desktop device.



Figure 12: SPC on Desktop after User Enrolls in Prime

149. The SPC becomes further problematic if a user clicks the "Try Prime FREE

47

for 30 days" button or the Prime shipping option, but then wants to reverse course. To remove Prime from their order, the user needs to select the "delete" link that is tucked in between a "View larger image" link and text that reads "Sold by: Amazon.com Services LLC," in the smallest font on the page. The "delete" option on the SPC is therefore easily missed by consumers.

150. Another problematic design of the SPC is that selecting the Prime shipping button automatically removes all of the non-Prime shipping options.  While the user can "undo" that action by selecting the small-font delete link in the SPC Stripe location, there is no option to remove Prime near the delivery options. This adds a burden on the consumer to know where to look to remove Prime from the order.

151. Sometimes, a popover (or pop-up) appears over the SPC after a consumer clicks on the SPC Stripe. My understanding from the FTC is that this is rarer than the versions of SPC described above.  The FTC provided me with a screenshot of this popover below.



Figure 13: SPC Popover on Desktop (MC10)

152. The design of the SPC Popover looks like the UPDP or the SOSP PDP. One design issue with the SPC Popover is that a user might, at this point, be presented with the option to enroll in Prime for the third time during their

48

shopping experience in this checkout flow (first, the SOSP, then the UPDP or SOSP PDP, and then the SPC/SPC Popover.) This manipulative design called nagging, which is to ask the same thing over and over again, wears the user down to take an action that benefits the service provider. The SPC Popover also uses visual manipulation and confirmshaming to emphasize the enroll option—which appears as a yellow button with the words " Join Prime for Fast, FREE Delivery"—and de-emphasize the decline option—which appears as a grey, less eye-catching button with the confirmshaming  "no thanks" button.  Although the "Join Amazon Prime for $12.99/month" is in a larger font than the terms and conditions, which are easy to miss, this is still confusing since the button to enroll emphasizes joining for free. Consumers may still be confused about whether Prime costs money to join and when they will be charged.

153. The design of the SPC on a mobile device is, as for all the mobile screen captures, worse than the desktop, as users cannot easily access the terms of the Prime subscription even though the Prime detours are visually prominent.

154. The design of the SPC on a mobile device after the user selects Prime also does not make it clear what the terms and conditions of a Prime membership are.  **Attachment B, page 41.**

155. Even though Amazon includes the cost and renewal terms of Prime on the SPC mobile after a user has enrolled, the terms are hidden.  In Attachment G, the terms of the Prime subscription are included in the smallest print on the page along with the privacy notice and conditions of use links, making it easy for a user to miss.  They are also included in the box underneath the "Place your Order" button, in small print.

156. A user does not have an intuitive, easy way to remove the Prime subscription on the SPC mobile.  To remove the subscription, the user has to reduce the item quantity by scrolling down on their screen, select the "quantity" dropdown menu underneath "Amazon Prime" and select "0." The information is also confusing since the Amazon Prime subscription is included as shipping an item "Shipment 1 of 2" which again may make a user believe this is akin to a physical product. Finally, the price and recurring charges are again always displayed in a very small font on the page which is harder to notice on a mobile device where the screen is smaller.  There is an on-screen message that "Amazon Prime (30-day Free Trial) is applied to your account" followed by a non-readable code. This could alert the user that some action related to Prime has occurred but it does not tell the user that this is a subscription they are enrolled in and that they will be charged after 30 days and on a monthly basis unless they cancel. In other words, the same dark patterns are being used on mobile and are more likely to result in enrollments that may have been unintentional since users are likely to be paying even less attention on a mobile device [21,33,64,82].

157. The SPC Popover on mobile is also worse than the one on desktop. The terms of a Prime subscription are only included in the smallest font size at the bottom of the screen, so that the user has to scroll down to see them. The enroll button, labelled "Join Prime" and located above the terms and conditions section, is visually emphasized through color and location, while the decline button is gray and appears second.

### e) Overview and Cognitive Walkthrough of the True Single Page Checkout (TSPC)

158. The FTC asked me to assume that the TSPC is the final page of the TrueSPC checkout process. The TSPC contains four vertically stacked "sections" that expand (and minimize) depending on the consumer's interaction with that particular section.

159. The first section is the "shipping address," where the consumer can change their shipping address. The second section is the "payment method," where the consumer can change the payment method and add a gift card, promotion code, or voucher.

160. The third section is the "offers" section, which presents some consumers with a Prime detour. There are various versions of the "Offers" section. See **Attachment E**. In general, that section expands to read: "try Prime FREE for 30 days and save [a certain amount of money] on this order in both shipping and savings. Cancel anytime." Right below, "After your trial, Prime is only $14.99/month" is displayed in smaller print. There is also a summary of Prime benefits in the form of a chart, and two buttons at the bottom of this section reading "Not right now" and "Sign up for Prime." Selecting "Sign-up for Prime" enrolls the consumer in a Prime free trial. My understanding is that consumers sometimes see what Amazon refers to as a "modal" pop-up on TSPC rather than the "Offers" panel. The "modal" pop-up is substantially similar to the "Offers" panel.

161. The fourth and last section of TSPC is the "review items and shipping" section, which contains, among other things, shipping speed options. If the consumer is not a Prime subscriber, the "review items and shipping" section presents them with a Prime detour in a blue banner at the top of the section, which is effectively the same as the "SPC Stripe" described above. The banner contains a button that reads "Get FREE Prime Delivery with Prime," which, if selected, changes to "A 30-day FREE trial of Prime has been added to your order. Your order has been upgraded to fast, FREE shipping" and would enroll the consumer in Prime once they complete their purchase through the online checkout process.

162. The FTC asked me to assume that the shipping speed options also present an opportunity for consumers to enroll in Prime, as one of the shipping options is "FREE Prime Delivery with your free trial" (which is effectively the same as the SPC ISOA described above). If a consumer selects this option, the

screen "updates" to remove all the other shipping options.

163. The FTC asked me to assume that if a consumer adds Prime to their order on the TSPC, the only way for the consumer to complete their purchase without enrolling in Prime free trial would be to change the "quantity" of Prime orders from 1 to 0 where the SPC Stripe was.

164. The TSPC does not exist on a mobile format.

165. The FTC asked me to assume that the image below reflects a representative image of the TSPC's Offer section on desktop.



Figure 14: TSPC "Offers" Section on Desktop

166. The FTC asked me to assume that the image below reflects a representative image of the TSPC's Review Items and Shipping section on desktop.

51



Figure 15: TSPC "Review items and shipping" Section on Desktop

167. The TSPC page still exhibits many of the issues in the SPC page from the MPP flow. For instance, the product page in the TSPC checkout flow still does not give information on the costs or recurring payments required for Amazon Prime or on any of the subsequent pages in the flow prior to the offers being shown in **Attachment E**. Even when the amount that Amazon Prime will cost ($14.99/month) is shown, it is still not disclosed in an adequate manner for a user to be fully informed about the cost or recurring payments after a free trial ends. Also, Amazon Prime is again presented as being associated with fast, free shipping rather than being a subscription package with other benefits which may confuse a user purchasing a product who will be likely be looking for shipping options for their product purchase.

168. The "offers" panel also still exhibits many of the dark patterns that I observed in the other pages with Prime detours. **Attachment E**. For instance, the "offers" section is a Forced Action, as the user has to select either the enroll or decline options in the Offers section before they can place their order. Like the

SPC page, this flow conflates two distinct tasks: buying a product on Amazon (which is the primary goal) and enrolling in Prime, which may confuse users who are operating under System 1 thinking. If the user is paying attention to their purchase, they likely miss the disclosures about the cost and recurring payments associated with a Prime subscription. Importantly, the "Offers" section only puts the price of Prime in small print below the enrollment button and in small print toward the top of the panel, directly below a much more prominent headline "FREE" Prime.  Another example of the conflation of the two tasks is in the TSPC page, in which the "Offers" for Prime are embedded in a page that is otherwise all related to purchasing a product, which again is unrelated to a user's primary goal. **Attachment E**.

169. The TSPC also uses dark patterns, such as Confirmshaming and Nagging with the decline option having the words "Not right now". "Not right know" implies that the consumer can only say no temporarily, not permanently. This button is still not weighted the same as the "sign up for Prime" button. Users more likely to click on brighter yellow button on the right since all the screens prior to this one required a click on a yellow button to advance to the next part of the purchase process.

170. One improvement in TSPC is that the button to enroll in Amazon Prime now has the words "sign up for Prime" which makes it a little bit clearer that by clicking on this button, the user will be signing up for something called Prime even if the user does not specifically understand the terms of the sign up (costs or the recurring payments once the free trial ends). Another improvement is that the Amazon Prime offer is being made under an explicit "Offers" subpage which may help users to understand that the information they are reading here may or may not be related to the product purchase they are making. This is an improvement over the UPDP page.

171. The TSPC still has inadequate disclosures about the cost and renewal terms of Amazon Prime – these terms are placed in smaller font below the big "Try Prime FREE for 30 days and save $5.99 on this order in both shipping and savings. Cancel anytime" headline and therefore this information "After your trial, Prime is $14.99/month" is likely to be ignored by the user even with the bold font since it is smaller text and harder to read. This is the same for the terms and conditions in the offer banners – although the cost of Prime and the renewal terms are listed and in bold, a user is likely to ignore this information since they do not typically read terms and conditions. Prime also still framed very positively as being associated with free shipping and the negative sides such as costs and monthly charges are downplayed in the presentation of information.

172. In the "Review items and shipping" there are similar dark patterns and problems to SPC in the MPP flow. In True SPC the "Review items and shipping" subpage is actually less clear than the SPC banners in MPP since

53

there is less information about cost/renewal terms for Amazon Prime in the new banner. **Attachment E.** It is also unclear what clicking "Get FREE Prime Delivery with Prime" does. The shipping option that enrolls a user in Amazon Prime is also not clear, much like MPP SPC, since it has the words "Free Prime Delivery with your free trial of Prime," so if a user clicks this, they will not know the cost or monthly charges associated with Amazon Prime at this stage (unless they reviewed that information in the "Offers" panel and recognized that it also applied in the "Review items and shipping" panel).

173. The TSPC modal offer has similar issues to MPP—again, the button to "Sign up for Prime" is colored yellow which is usually the option a user should select to advance to the next screen. **Attachment P**. The decline button also invites Nagging because it says  "Not right now" which means a user will be asked again if they want to join Amazon Prime even if they decline on this popover. Also, again, the price information is shown in the smallest font on the page under the "Try Prime FREE for 30 days and save $5.99 on this order in both shipping and savings. Cancel anytime" and again under the buttons to decline or enroll in Prime in terms and conditions fine print that a user is not likely to read. The interface also has a Bad Default in that the option "Use my gift card balance, when available, to pay for Prime" checked, meaning that even if the user's credit card is not charged their gift card balance if it exists will go towards a Prime subscription. This is also easily missed on this popover.

174. Similar to MPP, once a user clicks to enroll in Amazon Prime using the SPC banner in the "Review items and shipping" section, the new informational banner does not make clear the cost or renewal terms due to Interface Interference manipulative designs—that is, the information is presented again in a small bold font, while other words are presented in a more eye catching manner a in blue and green font. **Attachment E.**

175. The TSPC also makes it harder to remove an Amazon Prime subscription than MPP. **Attachment E (page 8).** A user has to use a dropdown to change "Qty" from "1" to "0" on the item "Amazon Prime (30-day Free Trial). This is hard for a user to understand because they must first recognize that a subscription has been added to their cart and then also realize that they must change quantities to remove it. It is also not clear since a user is not likely to ever have multiple Prime subscriptions in the cart, again meaning it requires a lot of mental effort to understand that the item can only be removed by changing the quantity to 0. In some ways, this makes it consistent with how a product is removed from the cart by making the "Qty" 0. However, since an Amazon Prime subscription is fundamentally different from a product, this is likely to confuse a user.

176. Much like in MPP, the terms and conditions which show the cost and recurring charges for Prime are displayed in the terms and conditions under the "Place your order" button (and only if the consumer has clicked an option to try

54

Prime), but they are likely to be missed by the user since this is in a smaller font that users typically ignore.  **Attachment E.**

177. In TSPC, the confirmation message is improved in that it says "Amazon Prime (30-day trial) is applied to your account" with the Prime logo, but this still does not make it clear that there will be recurring charges following the trial. Similarly in TSPC, users may not realize that accepting the offer or clicking on the offer in "Offers" or in the "Items and Shipping" boxes are going to enroll them in a subscription since the feedback on this separate task is all interlaced with information about purchasing a product. TSPC movement of "Offers" into a separate box does more clearly delineate that this is a separate task unrelated to the primary task but the Offers page still does not use font sizes and text sizes for the cost and renewal terms that are clear and conspicuous to the user, much like MPP. **Attachment E (page 6).**

178. Finally, there is an improvement in the confirmation message after the order is placed on TSPC. **Attachment E (page 9).** The TrueSPC adds on screen information that a free trial for Amazon Prime is added in addition to the product being ordered, which is better than MPP which did not include this information. However, the confirmation message still does not make it clear on this page that the user will be charged after the trial is over or offer them to cancel from this page, which would allow them to undo the action if they made a mistake and only realized it once they had placed their order.

**f)  The Prime Enrollment Detours in the Online Checkout Process on Desktop and Mobile Devices Confuse Consumers and Do Not Clearly Convey Prime's Material Terms.**

179. The cognitive walkthrough of the Prime enrollment detours in the online product checkout flows led me to the following conclusions: (1) the design of the enrollment interfaces does not make it clear to consumers that they are enrolling in Prime because consumers' primary task in going through the checkout process is to make a purchase on Amazon, (2) the design of the checkout process does not give adequate information or feedback about Prime at decision points, (3) the design of the checkout process does not convey sufficient information about cost and charges to consumers in a clear manner, (4) the design of the checkout process contains multiple techniques to hinder a user from understanding all of their options, (5) the design of the checkout process is even more problematic on mobile devices, and (6) the dark patterns I identified have a cumulative effect on consumers, which detracts from their ability to understand the disclosures or provide informed consent.

180. First, consumers may not know that they are enrolling in Prime because the Prime enrollment detours in the product checkout process conflate the two tasks of purchasing a product and enrolling in Prime.  As the cognitive walkthrough shows, the Prime detours on desktop and mobile are confusing

because a user's primary task is to purchase a product, not to enroll in a Prime subscription.

181. When navigating a system to achieve their goal, a user is primarily focused on actions to achieve that goal and continuously assesses whether their actions on the interface are getting them closer to their goal [39,60].  A user is likely not paying close attention to  information that is not related to their goal [60]. In fact, when purchasing a product and multi-tasking, a user is likely relying on System 1 thinking [39,92] to make quick decisions based on heuristics instead of using System 2 thinking and carefully processing all information at each step of the checkout process, so that they can quickly and efficiently buy the product they set out to purchase.

182. Here, a consumer's primary goal in using Amazon's online checkout is to make a purchase and place an order.  Enrolling in Prime is not the primary goal of such a user.  By placing these two tasks—placing an online order and enrolling in Prime—in the same process, Amazon's interface is confusing to users as they will not be fully aware that they are also completing a secondary task of enrolling in a subscription.

183. Because users are not necessarily expecting to enroll in a subscription in the checkout process, they are likely not paying close attention to any information that is not related to their purchase, such as enrolling in Prime. Instead, consumers going through the checkout flow are likely paying close attention to the information about the product cost, shipping the product, and completing their product purchase.

184. Second, the design of the checkout process does not give adequate information or feedback about Prime at decision points in the checkout process. From a design heuristics perspective, the checkout interface contains insufficient prominent and conspicuous feedback—that is, visual or audio cues—to indicate to a consumer what action has been taken and what has occurred as a result [60], likely to confuse them. Consequently, consumers may not realize they have enrolled in Prime after selecting the Prime detour options UPDP, SOSP PDP, SPC, and TSPC since this information is not related to their primary task of purchasing a product and this information is not always clear and conspicuous, due to the use of fine print or items that appear to also be products in a cart.  For instance, the buttons to enroll or decline to enroll in Prime in the UPDP or the SOSP PDP pages often do not even contain wording to indicate that they pertain to a Prime subscription enrollment rather than the shipping of a product the user is trying to purchase.  Moreover, throughout the entire product checkout process, the SPC page (in the MPP flow) is the only point at which Amazon tells a user they have enrolled in Prime.  **Attachment G**. Even then, the wording of the disclosures is primarily related to the product purchase and emphasizes fast, free shipping.  As such, a user may not notice that this has enrolled them in

the subscription.

185. Another example is the wording in the TSPC. On that page, a user who has selected Prime is shown: "A 30-day FREE trial of Amazon Prime has been added to your order. Your order has been upgraded to fast, FREE shipping." **Attachment E**. However, the text "After your free trial, Prime is just $14.99 a month" is much less prominent. While this wording is better than on the SPC, a user is still likely to miss it because they are not expecting a subscription to be added to their cart and instead may be focused on the product they are purchasing and the related details, such as the shipping speed and quantity. Also, adding Prime to the cart as an item is confusing since a user may not think of a subscription in the same way as the product they are purchasing, and its value is $0.00, suggesting it is free which, again, may not be adequate to disclose the recurring charges

186. Third, the design of the checkout process does not present sufficient information about the cost or the renewal terms of Prime in areas of the product checkout flow pages where a user is likely to look. The cost of a Prime subscription is typically presented at the bottom of the UPDP or SOSP PDP pages in the terms and conditions section which users rarely read [3,37,41,63,88] or on the SPC page in small terms and conditions below the "Place your order" button, if at all. *See* **Attachment G**. These disclosures are generally in a small font. In fact, the disclosures are typically in the smallest font on the page which means the user is less likely to notice them as compared to any other information on the screen with a larger font size. Similarly, on the TSPC, Amazon only discloses the cost of a Prime subscription in a small font in the "Offers" and the checkout view. *See* **Attachments E, H**. None of the pages relate to the product or the collection of a user's shipping or payment information, nor do they contain any information about the cost or renewal terms for Prime after the 30-day free trial period. Thus, if a user misses the information at the points mentioned above, they may not know the cost, renewal terms of Prime either at the point at which they are at a decision-making point.

187. Fourth, the design of the checkout process makes it difficult for consumers to enroll in Prime with informed consent, as the checkout process is rife with Prime detours that are emphasized through manipulative techniques, or dark patterns, to steer them into enrolling in Prime, even if they do not understand the terms of the subscription. These interfaces do not adhere to fundamental principles of good design, such as providing feedback to users about the consequence of each action they take on the interface, and therefore impair consumers' ability to make informed decisions. The dark patterns used in the checkout process—Social Engineering, Forced Action, Interface Interference, Obstruction, and Sneaking—capitalize on the way people are likely to act or behave when using System 1 quick thinking.

188. The checkout process also uses Forced Action, so that a consumer is forced to decide to enroll or decline Prime on the UPDP or the SOSP PDP before placing their order and completing their purchase. There is no other way to complete the transaction even if a consumer did not want to enroll in Prime in the first place. Again, this means that a user has to take an action that is likely not be related to their primary goal of purchasing a product and, therefore, that consumer is likely paying less attention to  UPDP or SOSP PDP pages. The MPP also uses Nagging in that consumers are presented with several Prime detours within a single checkout flow, i.e., on the SOSP PDP, UPDP, SPC, and TSPC, even if they have already previously declined to enroll in Prime.

189. Additionally, the FTC asked me to assume that if a consumer declines to enroll in Prime during the checkout process, the same Prime detours are displayed *again* when they enter the checkout process to place a new online order. This is also a form of nagging a user across shopping sessions. Nagging is a manipulative technique to wear down consumers so they are more likely to give into enrolling in Prime, rather than intentionally making an informed choice to enroll.

190. The design of the pages within the checkout process themselves also interferes with consumers' ability to understand what a Prime subscription entails. The use of Manipulating Choice Architecture dark patterns makes it easier for a consumer to enroll in Prime than to decline the subscription. The Prime detours use Emotional and Sensory Manipulation by positively framing Prime with the word "free" which is sometimes in capital letters and bolded and is repeated constantly throughout the process. The enroll button is also visually emphasized through its bright yellow or orange color and its position on the right, often in contrast with the muted decline option on the left. The enroll button is also visually presented the same way as other buttons in the checkout process that allow consumers to move along in the process, such as the "Add to Cart, "Proceed to Checkout," and "Place your Order" buttons. This positive framing can distract a consumer from noticing that Prime's cost, renewal terms, or even that Prime is a subscription.

191. The checkout flow uses language that shames consumers into selecting the enroll button. The language in the decline button option connotes a sense of loss ("No thanks, I do not want FREE delivery") while the enroll button ("Get FREE-same day delivery") connotes a sense of gain. **Attachment C** (page 10). This use of Confirmshaming can undermine a user's agency and make them more likely to select the enroll button because it may make them feel as though they are losing money on delivery.

192. Moreover, the information about Prime's cost and renewal terms is often tucked away in the terms and conditions sections so that the consumer is likely to not see them due to their smaller font and placement on the page.

This dark pattern is known as Sneaking.

193. The checkout flow also uses Obstruction, as it is easier to enroll in Prime on UPDP and SOSP PDP than to remove the subscription on the SPC or TSPC. To remove Prime before placing their order (and enrolling in Prime), a consumer needs to recognize that Prime is in their shopping cart and know how to remove it before they click the "Place your order" button. The "remove" option is often hard to find on the page and hidden.

194. Fifth, the Prime disclosures in the checkout process on a mobile device are less noticeable than they are on a desktop. Notably, the issues consumers encounter with Prime detours in the checkout process are more prominent on a mobile device because of the need to scroll down each page to see any disclosures and the use of sticky footers. Users are generally more likely to pay more attention to information at the top of a page on any device and avoid scrolling [64,106,107]. Users are also more likely to pay more attention to the first pages in a flow than the last ones [64,106,107]. Mobile devices exacerbate these issues because the information on the mobile device is presented vertically rather than horizontally, so the options are stacked one on top another. The vertical layout on a mobile device and the smaller size of mobile screens also mean that consumers may need to scroll more to see the options available to them and may not be able to read the information as easily. In fact, not all consumers going through the checkout process on mobile devices know that they have to scroll. They may therefore not see all the options available to them [26]. Users can get lost in long web pages on a mobile device and find it difficult to find information [82]. Users may experience an "illusion of completeness" on a mobile device and may assume they have all the information they need in the viewable area of the device, even though important information they need may be *outside* the viewable area of the device [107]. Additionally, people using a mobile device are more likely to be multi-tasking, and their attention is even more divided than on a desktop device [97]. If they are preoccupied with multiple tasks, they are likely more reliant on their System 1 thinking to make decisions without fully comprehending the information displayed to them [39,92].

195. In fact, dark patterns are notably more effective on a mobile screen where users have to scroll and be subject to animations and user interface dialog boxes which interrupt a user's flow through a task, and hyperlinks that can take a user away from their desired goal to name a few. Research suggests that reading on a screen can create a higher cognitive burden on users and may be less effective on paper [18,35].

196. Sixth, the presence of multiple dark patterns throughout the checkout process are likely to have a cumulative effect on consumers. The presence of multiple dark patterns act in tandem to influence the user. The more aggressively a user is exposed to multiple dark patterns, the more likely it is for them to give

59

into them [50,100]. Given that there are so many dark patterns in the checkout process for the Prime detours, it will also place more of a cognitive burden on consumers [60] and require them to expend more mental effort to consciously find the information on the cost and recurring nature of Prime and intentionally enroll in Prime, given the subscription is not related to their primary goal of purchasing a product.

197. The hard offer Prime detours are even more confusing that the free trial ones. The hard offer Prime detours enroll users into Amazon Prime and charge them a monthly free straight away when they place a product order, or, in the case of UPDP, even *before* they place the product order. *See supra*, Section VI(a). Consumers who unintentionally enroll in Prime through a hard offer do not have a window period (such as the free trial one) to cancel their Prime subscription and avoid incurring financial losses. **Attachment C**.

**VII. The Cognitive Walkthrough of the Iliad and Iliad 2.0 Shows that the Online Cancellation Process Is Difficult to Find, Has Too Many Steps, and Uses Manipulative Designs to Prevent Consumers from Cancelling Prime.**

198. As described below, the information contained in this section regarding how the online Prime cancellation process works was provided to me by the FTC. I also generally confirmed that information by reviewing videos of the Prime product checkout and static images that I understand to have been produced by Amazon or captured by the FTC from the Amazon website.

199. In this section, I discuss the two Prime online cancellation processes—the Iliad and Iliad 2.0—based on information that the FTC provided me. I then explain the big picture design issues in these processes that I found during my cognitive walkthrough before providing an in-depth analysis of each page's design.

200. The FTC asked me to assume that Amazon named its cancellation process "Iliad." I recognize *Iliad* as the title of the ancient Greek epic poem by Homer that is known for being a long and difficult-to-read text.

**a) Overview and Cognitive Walkthrough of the Iliad Cancellation.**

201. The FTC asked me to assume that the first online cancellation process, is known as the "Iliad."

202. The FTC asked me to assume that the flowchart below shows the Iliad process from Prime Central on a desktop device.



Figure 16: Iliad Cancellation

203. The FTC asked me to assume that the flowchart below shows the Iliad process from the Amazon homepage on a mobile device.



Figure 17: Iliad Cancellation on Mobile

### i.    Finding Iliad

204. The FTC asked me to assume that consumers can find Iliad on desktop in a few different ways.

205. One of the ways to access Iliad is from the www.Amazon.com website by navigating to the Prime Central page (also known as the "/Prime" page, which is essentially the landing page for the Prime membership.)

206. Consumers can access the cancellation process through Prime Central by taking the following steps, beginning from the www.Amazon.com home page:

   (i)    Select "Accounts & Lists" to get a dropdown menu

   (ii)   Click on "Prime Membership"

   (iii)  Click on "Manage Membership"

   (iv)   Click on "End Membership"

207. Consumers can also search for Iliad on Amazon.com by typing "cancel membership" in the search bar, which produced an "Alexa" answer with a "End Your Amazon Prime Membership" link. ***See* Attachment M** Clicking the link takes the consumer to another page that states "End Your Amazon Prime Membership" and contains another "End Your Prime Membership" button. ***See* Attachment M**. Clicking that button does not end the consumer's Prime membership; it takes them to the next page in the Iliad

62

process.

208. The steps to reach the cancellation process on a mobile device are similar to the ones on desktop, though lengthier in clicks/taps and more complicated in terms of needing to scroll down the page to proceed.  Consumers can access the cancellation process through Prime Central by taking the following steps:

   (i)    Tap  on "My Account" on the Amazon website to generate a dropdown menu

   (ii)   Scroll down and select "Manage Prime Membership" from the dropdown menu

   (iii)  Select "Manage Membership"

   (iv)   Select "Manage Membership" (again)

   (v)    Select "End Membership"

209. The FTC asked me to assume that typing "cancel membership" in the search bar on a mobile device yields a similar pathway to the cancellation process as on a desktop.

210. The process of finding Iliad violates HCI good design principles and contains dark patterns.

211. First, the entry point into the cancellation flow from the Prime Central page is visually not simple to locate on the screen because it is not clearly labeled and Amazon uses Obstruction dark patterns.  The only location where the word "cancel" appears is in the smallest font on the page, underneath "Manage Membership"—and even then, the word "cancel" is sandwiched between "update" and "and more."   Additionally, it is unclear what "cancel" refers to. It is reasonable for users to believe that "cancel" could refer to cancelling an Amazon order or any of the other membership that Amazon offers, such as Amazon Video or Amazon Music.  Furthermore, most of the visual space on this Prime Central page is focused on Prime benefits, such as "Check out what's included in your Prime membership" and "[e]xclusive deals for Prime members." In fact, the only two yellow buttons displayed on the page—which users are likely to look for given the yellow button typically moves users along on the Amazon website (*see supra*, at Section VI)—are "See all your Prime benefits" and "Shop now."

212. Second, the wording of the links and dropdown menu that a consumer has to click to reach Iliad or Iliad 2.0 are confusing, which makes the cancellation process not simple to find. For instance, all users may not intuitively know that they need to click on "Manage membership" to access the dropdown menu and move forward in the cancellation process—even adding "Update, cancel and more" is not clear for the reasons discussed above. If users are

looking to cancel their subscription—using System 1 quick thinking—or do not understand they have enrolled in Prime, they may not easily find the right entry point to proceed with cancelling Prime. "End Membership" or "Cancel Membership" are clearer options for users. Moreover, the words associated with the "End Membership" option, which are "By ending your membership, you will lose access to your Prime benefits," emphasizes the loss that a user might experience if they choose to move forward with that option, thus discouraging the user from proceeding. This is an Interface Interference dark pattern.

213. Third, Amazon has included additional, unnecessary steps for a consumer to reach the Iliad or Iliad 2.0. For instance, after selecting "Manage membership" in a hidden dropdown menu, a consumer has to sift through multiple options, such as "Share your benefits" and "Remind me before renewing," before reaching "End Membership," which is placed at the bottom of the vertical list. This design choice is known as "creating barriers" and "adding steps," both of which are dark patterns where the service provider—Amazon—includes unnecessary steps to prevent people from easily achieving their goal (such as cancelling Prime) which is detrimental to the service provider, Amazon.

214. The cancellation process is especially difficult for people who did not intend to enroll in Amazon Prime.

215. Finding the entry point to Iliad from the Prime Central page on a mobile device is even harder on a mobile device than on a desktop since it requires consumers to navigate from "Your Account" to "Your Prime Membership" to "Manage Membership" through dropdown (or hamburger) menus before getting to the cancel option. Having more steps on a smaller screen means that a consumer needs to scroll to locate the entry point and is more likely to abandon cancellation simply because they could not find the entry point into the cancellation process.

### ii. Iliad's Marketing Page

216. The FTC asked me to assume that, once consumers locate Iliad, they are directed to the Marketing Page. **Attachment L.** The Marketing Page focuses on the consumer's benefit usage, asking consumers to "[t]ake a look back at [their] journey with Prime". It summarizes the number of days the consumer has before their Prime membership ends and presents a summary showing the Prime services they used. Amazon also displays marketing material on Prime services, such as Prime Delivery, Prime Video, and Amazon Music Prime. Amazon places a link for each service and encouraged consumers to access them immediately, such as by stating "Start shopping today's deals!", "You can start watching videos by clicking here!", and "Start listening now!" Clicking on any of these options takes the consumer out of the Iliad, meaning

that Amazon continues to bill the consumer for Amazon Prime unless they restart and complete the Iliad.

217. At the bottom of the Marketing Page, Amazon presented consumers with three buttons. The "Remind Me Later" button on appeared on the left, below which Amazon mentioned in small print a reminder will be sent three days before the membership renewal.  The "Remind Me Later" button took the consumer out of the Iliad Flow without cancelling Prime.  "Keep My Benefits," on the right, also took the consumer out of the Iliad Flow without cancelling Prime. Finally, "Continue to Cancel," in the middle, also did not cancel Prime but instead proceeded to the second page of the Iliad Flow.

218. The below image is a screenshot of Iliad's Marketing Page on desktop.



Figure 18: Iliad Marketing Page

219. The above image (Figure 17) is a screenshot of Iliad's Marketing Page on mobile.

220. Amazon uses design techniques on this Marketing Page to make it harder than necessary for a user to click on the "Continue to Cancel" button and to distract users from proceeding with their cancellation.

221. First, the Marketing page floods users with information that is nearly exclusively focused on their Prime benefits, including user's "benefit usage," the number of "[p]ackages shipped for free with Prime Delivery" the user has had, the number of "[m]ovies and TV shows watched with Prime Video,"

65

and the number of "[s]ongs listened to with Amazon Music Prime." None of this information is related to cancelling Prime and creates cognitive overload on the consumer, who needs to expend additional mental effort to process additional information to figure out whether these benefits pertain to their goal of cancelling Prime and may become distracted by them. Should the user want to get more information or clarity on the benefits to which Amazon refers and clicks on any of the benefits links, Amazon removes the user from the cancellation process. Furthermore, the only location on this first page that has any connection to cancelling a Prime membership is the yellow button in the middle of the page labelled "Continue to Cancel." The "Continue to Cancel" button is also the only button that, if clicked, would not remove the user from the cancellation flow but rather advance them further in the cancellation process.

222. On at least one version of Iliad on mobile, the focus on benefits is even more pronounced. The header asks the consumer if they "still want to end [their] Prime benefits" instead of their Prime membership. The option to remain in Prime is also framed as "Keep my benefits" and the option to cancel Prime as "Cancel my benefits." Consumers looking to end their Prime subscription may be confused by the use of "benefits" to refer to Prime. **Attachment R**.

223. Second, the Marketing page uses choice overload to lead users to abandon cancellation. There are two options to abandon the cancellation flow and stay enrolled and only one option to proceed to cancel. It is well known that users want to keep the status quo when presented with a change due to cognitive and behavioral biases [92]. Users are resistant to change and if they are enrolled in Prime and likely to remain enrolled to preserve the status quo, so having two options to keep enrolled in Prime versus one to cancel also plays to this bias and means users are more likely to choose an option to stay enrolled in Prime.

224. Third, Amazon manipulates the choice architecture available to users by ordering the three yellow buttons at the bottom of the page, from left to right, "Remind Me Later," "Continue to Cancel," and "Keep My Benefits." Users instinctively tend to select options that appear on the far right because that is typically the location of the button that moves the user further along the process they are trying to complete. *See supra*, Section VI. Amazon even socializes its users to click on buttons located on the right in the online checkout process, where the button on the right gets the user closer to placing an order on Amazon. *See supra*, ¶ 124. Users are therefore required to carefully read their options to proceed with cancellation.

225. Fourth, the design of this page does not present users with logical symmetric choices, or clear binary options, to cancel their Prime subscription or abandon cancellation. This creates a cognitive burden, requiring the user to expend additional mental effort to figure out how to interpret the information

they are seeing and decide how to act, which can hamper decision-making [23,60,78], on a user to determine which of the buttons presented actually allows them to proceed through cancellation as they intended. This is also a Bait and Switch type of Sneaking since a consumer may be trying to cancel and may end up selecting an option that keeps them enrolled instead, such as "Remind Me Later."

226. Fifth, both the "Remind Me Later" and the "Keep My Benefits" use unclear language.  Users may not know what action the "Remind me later" button leads to, based on the language alone.  For example, that button could suggest that the user would receive a cancellation reminder or a reminder to re-join Prime. The additional information in the blue box surrounding the "Remind Me Later" button does not add any clarity beyond the *timing* of the reminder: "Keep my benefits and remind me 3 days before my membership renews."  Nor does the text on the page clarify of what Amazon will remind the consumer—for example, consumers who believe they have completed cancellation may understand the reminder button is tied to Amazon's prominent headline on the page inviting them to "Take a look back at your journey with Prime."  Similarly, "Keep My Benefits" is not clear either, as there is no reference to a membership in the language of the button itself or in the blue box below ("Continue enjoying your delivery benefit, Prime Video and many other benefits").

227. Sixth, Amazon uses Visual Prominence by applying highlights to direct the user to specific options that do not lead to cancelling Prime. For example, both the "Remind Me Later" and the "Keep My Benefits" buttons have an eye-catching blue frame underneath them that draws the user's attention, but the "Continue to Cancel" option does not.

228. Seventh, Amazon uses confirmshaming language to dissuade Amazon from cancelling Prime. For instance, "Keep My Benefits," as opposed to "Keep My Membership," reminds the user that they may lose benefits by cancelling Prime. The "[Redacted], thank you for being a member with us. Take a look back at your journey with Prime" is also another attempt to convince the user to not cancel their Prime subscription, as it elicits feelings of regret. This language in particular can also make a user believe that they are done with the cancellation process and simply revisiting the benefits they used while they were a Prime subscriber.

229. Similarly, a lot more scrolling is also required on the mobile experience to find the right option to cancel. **Attachment S.** The issues are more problematic on a mobile device. Users must consciously think about which option will advance them to continue to cancel since the mobile option to cancel is the middle button on the screen ("Keep my benefits", "Continue to Cancel", and "Remind me later"). Also, the remind me later button has a blue highlight which could draw a consumer's attention.

### iii.    Iliad's Offers Page

230. The FTC asked me to assume that consumers land on the Offers Page if they select "Continue to Cancel" on the Marketing Page. **Attachment L.** On the Offers page, Amazon presents consumers with alternative or discounted pricing, such as the option to switch from monthly to annual payments (and vice-versa), student discounts, and discounts for individuals with EBT cards or who receive government assistance. Amazon emphasized the option to switch from monthly to annual payments by stating the amount a consumer would save at the top of this page in bold. Clicking the orange button ("Switch to annual payments") or the links beneath took the consumer out of the Iliad without cancelling.

231. Right above these alternatives, Amazon states "Items tied to your Prime membership will be affected if you cancel your membership," positioned next to a warning icon. Amazon also warns consumers that "[b]y cancelling, you will no longer be eligible for your unclaimed Prime exclusive offers," and hyperlinked to the Prime exclusive offers. Clicking this link took the consumer out of the Iliad without cancelling.

232. Finally, at the bottom of the Offers page, Amazon presents consumers with buttons offering the same three options as the first page: "Remind Me Later," "Continue to Cancel," and "Keep My Membership" (labelled "Keep My Benefits" on the first page). Once again, consumers could not cancel their Prime subscription on this page of the Iliad. Choosing either "Remind Me Later" or "Keep My Membership" took the consumer out of the Iliad without cancelling. Consumers had to click "Continue to Cancel" to access the next page of the Iliad.

233. The below image is a screenshot of the Offers page of the Iliad.

68



Figure 19: Iliad Offers Page

234. Amazon uses design techniques similar to the Marketing Page to make it harder than necessary for a user to click on the "Continue to Cancel" button and to distract users from proceeding with their cancellation.

235. The Offers Page—like the Marketing page—presents users with information that is nearly exclusively focused on alternative Prime payment plans, such as "annual payment," a "student" plan, and a plan for those with "an EBT card" or who "receive government assistance."  None of this information is related to cancelling Prime and creates cognitive overload on the user. Furthermore, the only location on this page that has any connection to cancelling a Prime subscription is the yellow button in the middle of the page labelled "Continue to Cancel." The "Continue to Cancel" button is also the only button that, if clicked, would not remove the user from the cancellation process but rather advance them further in it.

236. The Offers Page also uses choice overload by presenting users with two options to remain an Amazon Prime subscriber and one to cancel Prime, choice architecture manipulation by using the same confusing order for the three yellow buttons, asymmetrical choices by presenting non-binary options, visual prominence with respect to the buttons, and unclear language for the "Remind Me Later" button. Also, a consumer is forced to go through another

69

set of options that repeats the process they already followed on the Marketing page, which adds an unnecessary Obstruction step and is a Forced Action. This could make more consumers abandon the cancellation process.

237. This Offers Page also uses Interface Interference such as positive and negative framing of options and wording to make users feel a sense of loss. The negative framing emphasizes loss when a user is trying to cancel a Prime subscription because most users are loss averse, that is they want to try to avoid having losses where they can. By inducing loss aversion, this screen's wording manipulates the user to stop on this page in the cancellation process, Framing effects highlight and induce feelings of gain with wording such as e.g., "Redacted, save $40.88 over 12 months by switching to annual payments" and loss via warning icons with ominous text such as "Items tied to your Prime membership will be affected if you cancel your membership" and "By cancelling, you will no longer be eligible for your unclaimed Prime benefits".

238. In addition to using the same designs as in the Marketing Page, the Offers Page presents new-to-the-user manipulative designs to make the cancellation more difficult than necessary. First, the wording of the button that, if selected, would preserve a user's Prime subscription is different on the Offers Page ("Keep My Membership") than on the Marketing Page ("Keep My Benefits"). The pattern disruption in this language, though improved on the Offers Page, can confuse the user, who needs to process new information on the second page. This also occurs on the Offers Page, where "Cancel my Benefits" on the Marketing Page becomes "Keep my Membership" and Cancel my Benefits" becomes "Continue to Cancel."

239. Second, the use of the warning icon with the text "[i]tems tied to your Prime membership will be affected if you cancel your membership" suggests to users that they are on the verge of experiencing a loss that can trigger loss aversion. This is also an instance of Emotional or Sensory Manipulation (Interface Interference.) Here the user is being urged to switch to annual payments to save money or to switch to a student subscription if eligible to "Get all the benefits of Prime for less."

240. By the time the consumer reaches the Offers Page, the cancellation process has exposed them to multiple dark patterns, including Nagging by asking them if they would like to remain subscribed to Prime instead of cancelling. As mentioned earlier in this report, cumulatively these dark patterns and Nagging can make it more likely for a user to abandon cancellation.

241. The issues raised above also occur on mobile and the switch in the wording on the buttons "Keep my membership", "Continue to cancel", and "Remind me later" may be less noticeable on the smaller screen. **Attachment S.** Again, a user will also have to spend more mental effort to choose the middle

button to continue to cancel.

### iv.  Iliad's Cancellation Page

242.  The FTC asked me to assume that, on the next page of the Iliad, Amazon showed consumers five different options, only two of which, "End on [date]" and "End Now"—presented last, and at the bottom of the page—cancelled a consumer's Prime subscription. **Attachment L.**  Pressing any of the first four buttons took the consumer out of the Iliad without immediately cancelling.

243.  The first and second options—"Remind Me Later" and "Keep My Membership"—were substantially identical to the buttons on the Iliad's prior two pages.

244.  The third option, "Pause on [date]," would "pause" or put on hold—but not cancel—a consumer's Prime subscription.  Amazon presented the "pause" option adjacent to a warning icon and text stating that, "[b]y pausing, [consumers] will no longer be eligible for [their] unclaimed Prime exclusive offers," and provided links to "Prime exclusive offers" (which if clicked exit the Iliad without canceling).

245.  The fourth option, "End on [date]," turned off Prime's auto-renew feature, meaning that a consumer's Prime subscription would terminate at the end of their current billing cycle.

246.  The fifth and final option, "End Now," immediately cancelled a consumer's Prime subscription (and Amazon refunded a pro-rated amount for the balance of the billing cycle).



Figure 20: Iliad Cancellation Page

247. The above image is a screenshot of the Cancellation Page of the Iliad.

248. The Cancellation Page uses similar design as the prior pages to make it harder than necessary for a user to finalize their subscription cancellation and to distract users from cancelling.

249. The most prominent design techniques that Amazon uses on the Cancellation page are choice overload and lack of symmetrical choices. Amazon presents users with five button options, from top to bottom: "Remind Me Later," "Keep My Membership," "Pause on [next billing date]," "End on [next billing date]," and "End Now." The buttons are ordered in a hierarchical manner with the buttons that benefit Amazon the most at the top

72

(subscription retention) and the ones that harm Amazon the most at the bottom (subscription cancellation.)  Additionally, Amazon introduces two new buttons that did not appear on any of the previous pages (the pause button and the end at the next billing cycle button), which demand the user to pay more attention to sift through them. The only two options that end a user's membership are the couple last ones at the very bottom of the page. The presence of the three other buttons is distracting to the user from successfully accomplishing their goal and cancelling their subscription. Amazon also distracts the user through the location of its text. The top of the page starts with "[Name], we're sorry to see you go. Please confirm the cancellation of your membership." However, instead of placing the cancellation options underneath, the very next sentence is "You could also consider the following," referring to the "Remind Me Later" and "Keep My Membership" options.

250.  The repetition of the "Remind Me Later" button throughout the three pages is a design technique to wear down the user (a Nagging dark pattern).  The user presumably has already declined to select the "Remind Me later" button at least twice when the user arrives on this last page. There is therefore very little, if any utility, to showing this option to a user again—for a third time—other than creating cognitive overload and adding more steps in the process. There is also a lot of text, particularly in a small font, on this page to "crowd" the physical space on the page. Amazon re-explains each of these two buttons, adding more distracting visual text to the page. Amazon then explains what the pause button is, as well as the two cancellation options at the bottom. When users see a lot of text on a page, they may either feel overwhelmed with the information overload or just gloss over the information to try and find the option they would like quickly.

251.  Amazon also uses repetitive text that also adds barriers to the user's cancellation experience (a Nagging dark pattern designed to wear down the user). The "Items tied to your Prime membership will be affected if you cancel your membership" with the accompanying "1. By canceling, you will no longer be eligible for your unclaimed Prime exclusive offers" appears *twice* on the screen, after already appearing once on the Offers Page. Again, Amazon is crowding the page to distract the user.

252.  Furthermore, Amazon, again, uses positive and negative framing to induce a sense of loss in the user by using warning icons that can make a user worried or concerned about losing items tied to Prime (like in the Offers page) and with the unclear wording "Items tied to your Prime membership will be affected if you cancel your membership." The wording "Redacted, we're sorry to see you go. Please confirm cancellation of your membership" is also framing this process as a loss and toying with the user's emotions.

253.  The Iliad Cancellation page is likely to be more detrimental on a mobile

73

device since there is a lot of scrolling that a user has to do to find the "End now" option which is listed last. Users are more likely to click the first few options which keep them in Amazon Prime instead. In the Iliad flow, the option to continue to cancel is in the middle and the option to remind me later is at the bottom and has a blue highlight" on first page of Iliad. Iliad page 2 is similar – the option to continue to cancel is in the middle, and on Iliad page 3, a user has to scroll all the way to the bottom to "End now" and like desktop, a user has to get past all options to stay enrolled (pause/keep my membership/remind me later/end on specific date) first.

254. Therefore, to successfully cancel a Prime subscription, the consumer needed to find Iliad, find the right button to select on the Marketing Page, find the right button to select on the Offers Page, and find the right button to select in the Cancellation Page—while navigating dark patterns that could confuse them into *not* successfully cancelling.

**b) Overview and Cognitive Walkthrough of the Iliad 2.0 Cancellation**

255. The FTC asked me to assume that after April 2023, Amazon consumers who sought to cancel their Prime subscription would have to go through the Iliad 2.0 cancellation process.

256. The information presented in Iliad 2.0 is nearly identical to that in the Iliad. The key differences are:

    (i)    the Offers Page is consolidated into a pop-up that Amazon displays if the consumer clicks on "Prime Plan Offers" on, and

    (ii)    all of the options presented in the Iliad Cancellation Page  (Remind Me Later, Keep my Membership, Pause on [date], End on [date], and End Now) are presented to the consumer in an interactive way.

257. The FTC asked me to assume that the flowchart below shows the Iliad process from Prime Central on a desktop device.



Figure 20: Iliad 2.0 on Desktop

### i. Finding Iliad 2.0

258. Consumers need to look for Iliad 2.0 in the same, or very similar, way they did the Iliad. *See supra*, Section VII(a)(i). **Attachment T.**

### ii. Iliad 2.0's Marketing Page

259. Similar to the Iliad Marketing Page, Iliad's 2.0 Marketing Page presents marketing information to consumers, i.e., the benefits the consumer would lose by cancelling Prime. **Attachment T.** A recent version of the Marketing Page consists of two rows depicting which Prime benefits the consumer can still "enjoy . . . until the next billing cycle": Prime Delivery, Prime Video, Amazon Music with Prime, Prime Reading, Exclusive Deals, and Prime Gaming.

260. At the bottom of the page, there are three yellow buttons that read, from left to right: "Remind Me Later," "Prime Plan Offers," and "Continue to Cancel." As with the Iliad, the "Remind Me Later" button removes the consumer from

75

the cancellation process. Consumers must select "Continue to cancel" at the bottom right to proceed. Clicking on the "Prime Plan Offers" button yields a pop-up that states "before you go, consider switching to" a different type of plan, i.e., annual to monthly, or monthly to annual, a student plan, or a "government assistance" plan. [See new flow]. The information in this pop-up is very similar to the information in the Iliad Offers Page. The only way for a consumer to proceed with cancelling Prime is to click on "Continue to Cancel."

261. The below screen capture reflects the Cancellation Page of Iliad 2.0.



Figure 21: Iliad 2.0 Marketing Page

262. Though the Iliad 2.0 omits some of the dark patterns used in the Iliad, it still contains problematic design choices that make it more difficult than necessary for users to cancel their subscription.

263. The Iliad 2.0 Marketing page contains elements that are similar to, yet only slightly different from, the Iliad's Marketing page.

264. Like the Iliad's Marketing Page, the Iliad 2.0's Marketing Page contains information that is nearly exclusively focused on Prime benefits. All six images on this page relate to a type of benefit associated with Prime. The only location on this first page that has any connection to cancelling a Prime subscription is the yellow button labelled "Continue to Cancel."

265. This Marketing page also continues to use choice overload, asymmetric choices, and unclear language with respect to the "Remind Me Later" button. When a consumer clicks on that button, a pop-up appears, displaying "A reminder will be sent on [date], 3 days before the renewal date."



Figure 22: Iliad 2.0 Remind Me Later Pop-Up

266. Amazon also replaced the "Keep My Benefits" button with a "Prime Plan Offers" button.  The language for the "Prime Plan Offers" button is vague and a user may need to click on the button to figure out what it means, distracting them from cancelling their membership. The "Prime Plan Offers" button is essentially the Offers Page from the Iliad.



Figure 23: Iliad 2.0 Prime Plan Offers Pop-Up

77

267. There are some improvements from the Iliad. The "Continue to cancel" button has been moved to the right, which is where a user is likely to click to advance to the next set of screens. Moreover, all the buttons are now the same color and size which is better. **Attachment T**. However, even with these changes, a user may still be more likely to exit the cancellation flow than to continue to cancel.

268. The mobile Marketing Page suffers the same issues as the desktop. **Attachments U and V**. The Remind me later, Prime Plan Offers, and all the listed benefits all could distract the user from completing the cancellation process. "Continue to cancel" is listed as the last option a consumer could select.

### iii. Iliad 2.0's Cancellation Page

269. After a consumer selects the "Continue to cancel" button on the Marketing Page, the Cancellation Page appears, presenting the consumer with options that either 1) remove the consumer from the subscription cancellation process, 2) pause the subscription, 3) remind the consumer to cancel at a future time, or 4) cancel the subscription. The top of the page states "Please confirm your Prime membership cancellation" with the consumer's name, plan, and next billing date right below.

270. The page is primarily comprised of a chart that shows different information on the right side of the chart based on the option the consumer selects on the left side of the chart. The buttons at the bottom of the page also change based on the selection in the left-side of the chart. The three options on the left side of the page are: "Cancel today" (with the prorated refund amount), "Cancel on renewal" (with the renewal date), and "Pause on renewal" (with the renewal date).

271. When the consumer selects "Cancel today," the right side of the chart reads: "Your Prime benefits will end immediately" twice, "you will be refunded [the prorated amount]," and "By canceling, you will no longer be eligible for your unclaimed Prime exclusive offers." The buttons at the bottom read: "Keep Membership" and "End Membership Now."

272. When the consumer selects "Cancel on Renewal," the right side of the chart reads: "After that [renewal] date your benefits will end, and you will no longer be charged for your Prime membership." It also contains information on Prime Video Channel subscription continuing until the Prime Membership Ends, other Amazon household members losing access to Prime benefits, and no longer being eligible for unclaimed Prime exclusive offers. The button options at the bottom are "Remind Me Later," "Keep Membership," and "End on [Renewal Date]".

273. When the consumer selects "Pause on Renewal," the right side of the chart

reads the same as the "Cancel on Renewal" text, except that the Prime benefits will be "paused" instead of ending. The buttons at the bottom are identical as well, except for "Pause on [Renewal Date]" replaces "End on [Renewal Date]."

274. Below is a representation of Iliad 2.0's Cancellation Page.



Figure 24: Iliad 2.0 Cancellation Page

275. Iliad 2.0's Cancellation page presents the same three options as in the Iliad's Cancellation Page, but in a format that is more cognitively challenging for the user to understand and subsequently select a cancellation option. Unlike the Iliad flow, Iliad 2.0 offers the user a selection via three radio buttons, one to cancel immediately, one to cancel on renewal, and one to pause on the next renewal. Two of these options require one more billing cycle before cancellation is finalized. Iliad 2.0 is an improvement over the Iliad since it no longer has the warning icon used in the Iliad but rather the dark patterns identified earlier, including obstruction, persist.

276. Another change in Iliad 2.0 is that the first option listed is "Cancel today", which if selected has the buttons "Remind me later", "Keep Membership", and "End Membership Now". The "End Membership Now" button is listed on the far right and is the only yellow button which is an improvement over

Iliad since users are likely to click this option to advance to the next screen. The screen also specifies the refund amount, which is helpful for a user deciding to cancel their subscription.

277. The Cancellation Page in Iliad 2.0 is still confusing and violates principles of good design since the options change if the consumer changes the radio button selection to "Cancel on renewal," "End on [today]" or "Pause on renewal." This also means a user must carefully read the text changes in the box about the Prime benefits since this also changes depending on which radio option is selected – if a user is not paying attention, they may confirm without reading carefully and not cancel their subscription even if they intended to cancel.

278. Also, no matter which radio option is selected, each option still has the "Remind me later" and "keep my membership" buttons in addition to the button to confirm the radio option selection. These options are now not colored yellow so they are less prominent but still provide the user with more options to abandon cancellation than not.

279. Iliad 2.0's Cancellation Page on suffer the same issues that could confuse a user with all the button text changes as a user switches radio buttons on this page. **Attachment U.**

280. The Cancellation Page on mobile has the same information as on desktop, but the format is harder for a consumer to navigate.  The consumer must scroll down to confirm cancellation, past the remind me later and keep membership options. **Attachment V.**

281. Therefore, to successfully cancel a Prime subscription through Iliad 2.0, the consumer needed to find Iliad 2.0, find the right button to select on the Marketing Page and find the right button to select in the Cancellation Page— while still navigating dark patterns that could confuse them into *not* successfully cancelling.

**The Prime Cancellation Process on Desktop and Mobile Devices Is Confusing and Is Not Easy to Find and Complete.**

282. Finding and completing the Iliad violates foundational good design principles, as the process is rife with manipulative designs that make the process longer and more difficult than necessary, cause confusion, and create cognitive overload.

283. To successfully cancel through Iliad, a user is forced to navigate a four-page, six-click, fifteen-option process at minimum. Therefore, it takes more clicks for a user to cancel a Prime subscription than to enroll in one through the online product checkout flow.  Additionally, the user must click on the right buttons to get through the entire Iliad process; if they select the wrong button,

they need to restart Iliad from the beginning.

284. One particularly pervasive problem in the design of the cancellation process is that consumers might abandon Iliad after selecting a button with the word "cancel" in it because they believe that they have successfully cancelled upon selecting that button.  This is especially the case for people who may be seeking to quickly cancel their membership on a mobile device, as those individuals would likely be operating under a System 1-type of thinking.

285. Though the design of Iliad 2.0 is improved over Iliad in certain respects, Iliad 2.0 is still not simple for consumers to find and complete. The entry points are the same as for the Iliad, and, as a result, cause the same challenges for consumers as described in paragraphs 210-215.   Similarly, Iliad 2.0 includes much of the same extraneous information about Prime benefits as Iliad and presents too many options in the Cancellation Page, posing the same difficulties described in Sections VII(a)(ii)-(iv).

286. The dark patterns in cancellation are more prominent on the mobile Iliad and Iliad 2.0, making it even harder for consumers to cancel on a mobile device. Consumers spend more time reading information at the top of the page or screen and are more likely to just choose the first option. Also, the last stage in the cancellation process  requires more scrolling to get to the cancel option which is presented last on the mobile device, again likely to lead to fewer cancellations when users want to preserve the status quo of staying subscribed to Prime. **Attachment S**.

## VIII. Think Aloud User Study Of Amazon Prime Enrollment and Cancellation Screens

287. As I explained in the Methodology section, *see supra*, Section V(d), after identifying the dark patterns and confusing aspects of the interfaces I examined, I gathered empirical evidence through a think aloud study on consumers' interaction with interfaces that are near-identical to the Prime enrollment detours in the checkout process and cancellation processes to verify and elaborate on the results of my cognitive walkthrough study.

288. I conducted this qualitative work with a PhD candidate whom I advise in the Department of Computer Science at the University of Chicago, Brennan Schaffner, and a website builder who is an undergraduate student majoring in Computer Science at the University of Chicago.

289. The goal of this study was to ascertain how susceptible users are to selecting options in the Amazon interfaces that did not correspond with their intent— specifically to determine what points of confusion, if any, consumers encounter when navigating these processes.

### a) Methods for the Think Aloud Study

290. Mr. Schaffner and I ("we") conducted the think aloud user study from April 25 to May 15, 2024, on weekdays between 9am and 6pm. Specifically, we conducted a pilot study on April 25 and 26, 2024 and the main study from May 1 to 15, 2024.

### b) "CandyForever" Website Design and Implementation

291. To ensure that users acted as they would if they were using a real website, we needed to ensure the system looked and behaved like a real-world service. We therefore created a fictional website called CandyForever modeled on the Amazon enrollment detours in its online product checkout and cancellation processes. CandyForever displayed different types of candy as its inventory. We also created a subscription named "Premium," modeled on Prime, which offered shipping benefits akin to Prime.

292. We designed the CandyForever website to match the aesthetics of the Amazon website (including its online checkout and cancellation processes) as closely as possible. We used the same visual styles as seen on the Amazon website and screen captures of the Amazon checkout and cancellation processes that the FTC provided us. The main differences between the CandyForever website and the Amazon website were the color scheme, the sale inventory, the slogans, and logos, which depict a fictional candy store selling a variety of international and domestic candies. We included those differences to avoid confusing consumers who would have recognized the Amazon website.

293. We did not use the live Amazon website to test users' responses because we did not have access to the website backend. Moreover, we wanted to test versions of the online product checkout process with Prime detours, and cancellation processes that were no longer displayed on the Amazon website at the time of our study. We also wanted to control which version a particular user would see during the study. During the study, we ensured that a third of all participants saw each version of the Prime detours in the checkout process we were testing.

294. We conducted the study on a desktop device (as opposed to mobile device). According to many studies of mobile interfaces and interactions, design issues are compounded on mobile devices where users have a smaller screen, are likely to be multi-tasking, and under more cognitive load. [64,82,97]. Thus, to frame the study conservatively and most favorably to Amazon, we conducted the study on a desktop device. This represents a lower bound for uncovering problematic issues, which are likely heightened even further on mobile devices. , which would frame the study in the light most favorable to Amazon. According to many studies of mobile interfaces and interactions, design issues are compounded on mobile devices where users have a smaller

hired us to evaluate their site, 3) participants would receive the candy they purchased by mail, 4) they were enrolled in CandyForever Premium (regardless of whether or not they did so after going through the CandyForever online product checkout flow), 5) they would be billed if they did not cancel within the study session, and 6) they would keep unspent money left over on the giftcard we provided for purchasing candy. At the end of the study, we revealed that CandyForever was not a real business and provided debriefing documentation, which is a sheet explaining the real purpose of the study was to test interaction flows on a shopping website.

305. The CandyForever background was set up to incentivize users to be thrifty so as to maximize their additional monetary compensation from the gift card and make the Premium options more realistic given the promise of free shipping. This helped to create a situation where participants were motivated to shop and to think free shipping could be useful since they could save and reclaim the money remaining on the gift card by lowering their shipping costs—i.e., more akin to what a real shopper on Amazon might consider.

306. The CandyForever background was necessary to allow participants to speak freely about the website design and their experience navigating it and to have a plausible reason as to why we were not able to cancel their subscriptions ourselves (since hired website evaluators would likely not have access to the CandyForever backend system.) In short, CandyForever allowed us to approximate more closely how consumers feel when they go through the enrollment detours and the cancellation processes in the real world.

307. Additionally, we designed the study to create the best-case scenario for participants and an environment with ideal conditions, as compared to real life Amazon consumers. We did not place participants under any time-pressure; we provided them a large screen to look carefully at the flows; and we incentivized them to both purchase an item and cancel a subscription. Participants were also asked to think aloud to reflect on their actions, which gave them more time to look at each page in the interface flows than a consumer in a real-life scenario. Participants were also more likely to complete the tasks they were given, such as cancelling their subscription, since we expressly asked them to do so and they were being compensated to complete the study tasks. This study design therefore reveals fewer issues than what is likely to happen when people use Amazon in their day to day lives where they may be doing many tasks at the same time, where they may be under time pressure, or where they may be on a smaller screen/device. In essence, the study design favors Amazon by providing the most ideal environment of use for a study participant.

308. During the study, we strived to make the participant believe they were really testing CandyForever.  We prepopulated the interface with their information before they arrived, we maintained that we were hired by CandyForever to

85

test the site until the study concluded, and we reiterated that the goal was to evaluate CandyForever throughout the study session. While this cannot precisely mimic a real life scenario of usage, it is as close to using Amazon in the real world as we could have gotten in a study environment. We also implemented our best efforts to ensure that participants believed that they could be sent real invoices and actual candy from CandyForever by entering their mailing address in the CandyForever system, which we recorded from the preceding recruitment process.

309. We provided a gift card to participants to use during the study, instead of their own credit cards, for study realism and user privacy. In particular, each participant used the gift card to enter billing information to complete their purchasing task, so no personal credit card information was disclosed. We preserved study realism by telling participants they could keep any remaining balance on the gift card after their purchase to motivate them to be mindful of price and their purchase.

310. Typically, the number of participants needed in a qualitative study to identify major flaws in design issues is five to twelve [9,46]. In our study, we had 33 participants, including 3 in the pilot.



Figure 25: Overview of Study Protocol

#### d) Study Protocol

311. As is typical for HCI user studies, we created a study protocol, which outlines the plan for the study to ensure all sessions are run consistently [19,46,72,78].

312. The main considerations for creating the study protocol were to answer the following research questions:

(i)    How do users enroll in Amazon Prime via online checkout? This included asking what points of confusion exist in this process, if any.

86

325. The research assistant then revealed that the participants were not ever at risk of receiving a bill for enrolling and that this deception was to help facilitate the study.

326. After participants completed the study, the research assistant debriefed each participant about the deceptions used—explaining that CandyForever was not a real website, that they would not receive any bills or candy in the mail, and that they would get a $15 bonus card instead of the remaining money on the gift card. The $15 was always greater than the amount that would have been remaining on the gift card because the least expensive item on CandyForever cost more than $5. Participants also received a form informing them that this study was for a federal governmental agency and providing them with information on how to opt out of the study. Participants were also offered free candy.

**e) Study Recruiting**

327. We used a recruiting company to ensure that we reached a diverse sample of participants in a reasonable amount of time. Recruiting companies solicit participants from the general population for studies according to specified criteria, handle the compensation for participants, and book the participants for study sessions, thus simplifying the handling of the study logistics which would otherwise have to be performed by a research team [27,46]. Each participant completed a consent form and was compensated either $150 (before 4pm rates) or $125 (after 4pm rates). Rates were set by the recruiting company. In addition to the base compensation, as described above, all participants were given a bonus amount of $15 in lieu of the remaining credit on the gift card they were given during their enrollment tasks.

328. We used a recruiting agency based in Chicago, Focuscope, Inc., to recruit participants from a range of age groups, income ranges, and education levels to match the demographics of Amazon shoppers [108,109]. The agency collected these criteria for screening participants and provided it to us as the study progressed. We also aimed to get a range of users with experiences online shopping matching the US population [87]. We also asked participants to rank which three websites they most frequently visit for online shopping in addition to asking them how often they shop online. We aimed to get a range of users who were familiar and less familiar with shopping on Amazon.

329. During each participant session, we recorded video of their on-screen interactions including audio of their think aloud thoughts and the research assistant's questions. We also logged each click they made on the screen to a Mongo database stored in the cloud and password protected for access by the research team only. The research assistant also took brief notes about each participant. During the study, we ensured that a third of all participants saw each version of the enrollment flows we were testing.

333. In the pilot study, all three participants were male with one being a frequent Amazon user and listing the site as one of their most frequently visited sites. The other two participants were infrequent Amazon users with one selecting Amazon as one of their most frequently visited sites but also reporting that they only shop online once a month or every few months. The remaining participant did not select Amazon as one of their most frequently used sites. Two participants were unemployed and one drives trucks.

334. In the full study, there was an even gender split with 15 male and 15 female participants. The age range of participants was 18-77 with the distribution of participants shown in Table . Half of the participants were frequent Amazon shoppers and listed Amazon as one of their top three most visited sites. The other half were infrequent Amazon shoppers; 8 did not select Amazon as one of their most frequently visited sites and 7 selected Amazon as one of their most frequently visited sites but only shopped online at least once a month. Participant occupations were varied and included office manager, police officer, consultant, customer service, director, clerical, driver, and homemaker. Three participants were retired, 3 were unemployed and 3 did not provide occupational information.

335. Notably, the majority of participants (19/33) commented out loud that the CandyForever website looked like Amazon and participants were eager to receive their candy. In fact, many participants were disappointed when we told them they would not receive their candy. This suggests that the site realistically conveyed the Prime experience to participants.

**g) Pilot Study**

336. Prior to conducting the study, we ran a pilot study to 1) test out the study protocol, 2) ensure participants were able to complete the tasks we set out and understand our instructions, and 3) ensure the data we were collecting answered the research questions we set out. Running pilot studies helps to iron out wording issues, ordering issues, and give a sense of the time needed for running participants in the full study. It is typical to run pilot studies in HCI studies prior to running a full study to ensure that the protocol is sound and to enable a research assistant to practice facilitating sessions [19,27,46,72,78]. It is also common to make adjustments to an interface or study questions along the way depending on how participants are reacting to the study protocol and tasks [19,27,46,72,78].

337. We ran three pilot tests on April 25 and 26, 2024 between 9am and 3pm. Pilot sessions lasted a median time of 24 minutes with a range of 19-40 minutes.

338. During the pilot studies, we noted a few places where links were missing from the CandyForever website and corrected those gaps. Additionally, we tested another version of the deception where for task two (cancellation), the

research assistant left the room to "contact the company" after telling the participant that they were enrolled in Premium to see whether the participant could cancel Premium without assistance.  However, without the research assistant present to ensure that the participants were complying with the think-aloud protocol, participants did not provide as much information about what they were doing on each screen. This therefore limited our ability to determine what participants were thinking as they were navigating the cancellation task. For the full study beginning on May 1, we amended the deception to have the research assistant remain in the room (and not attempt to contact the company regarding the cancellation) and instead use a think-aloud protocol to determine what participants were thinking during their attempts at cancellation. We also amended the protocol to ask about Premium costs, frequency of charges, and what the subscription entailed.

**h)  Data Analysis**

339. To analyze the data, we used a qualitative data analysis tool called MaxQDA. Qualitative data analysis is a systematic way of labelling qualitative data and deriving themes from the data in a principled manner [19,72,78]. First, my research assistant and I transcribed all the video files using MaxQDA's automated transcription tools. I note here that the transcription quality was of high enough standard for analysis and in places where the automated transcription missed words or incorrectly transcribed words, we primarily relied on the video audio to ensure that we were analyzing what each participant said accurately. My research assistant and I then discussed and developed a code book, which is a set of labels for events of interest in the videos and transcripts and points at which participants had misconceptions about what was occurring in the interface.

340. For each code, we watched the participant video, noting movements of the participant's onscreen cursor and what they said (from the audio recording and transcript). We looked for pauses in interactions and speaking and for what participants said to ensure we had sufficient information to apply our coding scheme. We then applied the code where relevant.

341. Once we coded all the data, I performed a thematic analysis of the data. [19,27,46,72,78]. This included creating a summary spreadsheet to track how each code applied to every participant.

342. For instance, we applied the code "Enrolled" for participants that enrolled in Premium using the UPDP page, the SPC stripe, or the SPC shipping options in the checkout processes. We coded all other participants as "Not Enrolled". We also applied a code to say how a participant enrolled—e.g. "UPDP" if they enrolled by selecting the option for Premium on the UPDP page. We coded for "Whether read UPDP fineprint" if they read the UPDP fine print on the bottom of the UPDP page by using heuristics like navigation speed,

visual indicators like highlighting text with their cursor, and audio indicators like reading text out loud when considering when to apply this code to a participant. For instance, e.g., P8 traced their cursor along the fine print at the bottom of the UPDP page and read out loud: *"I authorize you to charge your default payment method on file after your 30 day free trial."* We coded all other participants as "Did not read the fineprint."

343. For "Whether Knew Premium Cost", we applied a code if the participant could state the monthly price of Premium that was advertising during the checkout process. All other participants where coded as "Did not know the cost of Premium". A similar coding process was applied for whether participants knew the benefits of Premium.

344. If a participant had the code "Enrolled" and not any of ("Did Not Know Cost of Premium", "Did Not Know Charge Timeline of Premium", or "Did Not Understand Benefits of Premium"), we applied a code "Informed Enrollment". All other participants who were "Enrolled" were considered "Uninformed Enrollment".

345. If a participant clearly indicated that they did not mean to enroll in Premium, we applied a code "Accidental Enrollment". This is a lower bound for accidental enrollments since we were conservative in labelling these cases.

346. A similar process was used to code the cancellation process for understanding whether the cancellation process was complete, if participants had trouble finding the cancellation options, whether the research assistant had to help participants find cancellation, and if there were additional cancellation issues such as onerous cancellation.

| UPDP Version | Participants | SOSP |
|---|---|---|
| V1 (MC14 Page 14) | P1, P4, P7, P10, P13, P16, P19, P22, P25, P28, P31 | *None* |
| V2 (MC18) | P2, P5, P8, P11, P14, P17, P20, P23, P26, P29, P32 | Yes - (MC 24 Page 5; after shipping and before billing) |
| V3 (MC22) | P3, P6, P9, P12, P15, P18, P21, P24, P26, P30, P33 | *None* |

Table 3: UPDP and SOSP version (if relevant) that each participant was shown

### i) Pilot Study Results

347. At least one of the three pilot participants did not read the Premium terms shown on the bottom of the page matching the UPDP; the other two did.

348. When asked about what Premium was, none of the three pilot participants understood it was a subscription. When they reflected on the first task, none could explain Premium.

349. Two of the three participants accidentally enrolled in Premium. Participant 2 ("P2") chose the Premium shipping option on the SOSP page and the enrollment option on the UPDP page because they did not think they could click on the "No Thanks" link as evidenced by what they said and what they did with their mouse on the screen. P3 talked about not wanting a Premium trial but then accidentally enrolled in Premium in the checkout page via the shipping option during the first task. P3 also did not realize they enrolled in Premium. When asked "did you enroll in Premium," P3 said *"I did not"*. P1 did not enroll in Premium.

350. At least one participant had problems with the cancellation process. This participant, P3, checked their orders first when trying to cancel Premium. This indicates a misconception about the Premium subscription being confused with an order. This participant also required aid from the research assistant to get through the entire cancellation flow. They also stopped too soon in the cancellation flow thinking that they had completed the process. The other two participants completed the cancellation process with limited technical trouble.

### j) User Study Results

351. Participants who enrolled in Premium

    (i)    **Over one-third of participants (12/30) enrolled in Premium**. Of the 12 participants who enrolled in Premium, nine enrolled on the UPDP page. Three enrolled via the SPC shipping option on the checkout page but none of these three subsequently read or noticed the blue box that appeared when Premium was added to their product checkout flow or linked this box to a Premium subscription. No participants used the SPC blue box on the checkout page to enroll in Premium.

    (ii)    **18/30 participants did not enroll in Premium.** Reasons for not enrolling varied. For instance, P6 said they do not usually take up free trials: *"Why did I say no to it? Um… I guess. That didn't appeal to me, I guess. Um. I don't really see to many things with free trials on there."* On the other hand, P31 felt that the subscription was not beneficial since they do not eat that much candy and do not mind waiting for deliveries: *"So now I would probably, since I'm not a hardcore candy person and*

*will assume I will not be back within a month to make use of this premium freeness, I would probably say I can wait till Sunday for my candy. And I would click ahead in that mindset."*

    (iii)    **Participants who enrolled at UPDP did not have an option to remove Premium.** None of the participants who enrolled on the UPDP page unenrolled from Premium since the option to remove Premium is not available after the UPDP page. Of the participants who enrolled via the shipping option in the SPC page, none used the delete option to remove the Premium subscription from their cart.

    (iv)    **Of the 10/30 participants shown the SOSP page, 4/10 selected the shipping option only available with Premium on the SOSP page.** Two of these participants eventually enrolled in Premium, 1 choosing Premium on the UPDP page (P14) and 1 declined Premium on the UPDP page but enrolled in Premium via the SPC shipping options on the checkout page (P29). Two of the participants declined enrollment at the UPDP page and did not enroll in Premium on the checkout page (P20 and P26).

352.  Participants who accidentally enrolled in Premium

    (i)    **Two enrollments in Premium were clearly accidental based on what the participants did on the screen and said verbally during the observations.** P4 stated they did not want a Premium subscription and was confused about the shipping options and clicked the option for free shipping with Premium and was enrolled anyway. They then changed the shipping option after enrolling and did not realize they were still enrolled in Premium. P30 did not choose Premium on UPDP and said he did not want it but then he selected the one-day shipping option at checkout which enrolled him and he said that he did not notice that at the time. He also did not know how much Premium would cost him. In both cases, the visual and auditory evidence suggest these enrollments were accidental.

353.  Participants who enrolled in Premium and did not understand the terms of a Premium subscription presented in the flows.

    (i)    **Most participants did not read the Premium fine print with terms and conditions during the enrollment process when purchasing a product.** This was based on our analysis of what participants said aloud, their actions on the screen, and observations of them as captured by the video and audio transcripts. Participants generally did not notice the Premium fine print terms and conditions or did not to read them during the task. Specifically, 27/30 participants did not read the Premium terms shown on the bottom of the UPDP page when completing their first task of purchasing a product. Only 3/30 read the fine print terms and

conditions of Premium on the bottom of the UPDP page when going through the first task of purchasing a product.

(ii) **Only two of the 12/30 participants who enrolled in Premium did so being fully informed and intentional about their choice.** This means they knew the cost of Premium, when they would be charged, and didn't have fundamental misconceptions about the nature of Premium, and also indicated verbally that they wanted to enroll in Premium. P8, asked about enrolling in Premium for fun as part of the study: *"So for the purposes of the simulation. Should I select this or do you care?"*. When instructed that they could do what was in line with their preferences, they enrolled saying that since they were not using their own credit card it would be safe to enroll: *"I'm assuming that it is billing this card, which is now empty, is going to have no negative consequences. So I'll just go with that."* This participant was fully aware of the cost of Premium and when and how often they would be charged as coded in our data analysis. The other participant who enrolled in Premium intentionally also fully read the terms of the subscription and felt the trial sounded good so chose to enroll (P12).

(iii) **10 of the 12/30 participants who enrolled in Premium were not fully informed about the Premium costs, terms, or nature of the Premium subscription.** Note, if participants gave an answer that was within a $1 of the Premium costs, we considered that correct. For instance, when asked how much Premium cost, P15 said *"What was it, 12 bucks?"* which we considered close enough to be labelled as correct. P17 also correctly recalled the cost and charge timeline of Premium: *"Just, 12.99, I think per month until you cancel. First month is free, first 30 days is free, and there's 12.99 a month"*. 10 of the 12 enrolled participants did not know the costs of Premium. For instance, P22 was asked about the cost of Premium and said *"No, because most websites don't offer a premium. It had one day, two day shipping, you know like that. But it's about the first time I saw Premium"*. The research assistant again asked them how much Premium cost and P22 responded *"No, I say free"*. In another example, P13 decided they wanted the subscription to Premium and got it but they did not know the price of Premium and when asked how much it cost, they said *"Well, free deliveries are free but for Premium was it $9.95?"*. For instance, P13 decided they wanted Premium and enrolled but they did not recall the price of the subscription accurately: *"Well, free deliveries are free, but for Premium, was it 9.95? (..) Was it? (..) I can't quite remember. I'm sorry, a little older"*. In a similar instance, P14 was genuinely interested in a Premium subscription but was also convinced that no price had been shown to them: *"You didn't have it didn't have a price. There was no price there."* P19 similarly enrolled for fun but could not recall the price: *"I mean, I'll*

*click this just for fun, but it's going to charge me. That's the question."*
P30 did not want to enroll in Premium and selected the one-day free
shipping option on the checkout page which he did not notice enrolled
him in Premium but also did not recall the cost of Premium. P29
enrolled in Premium since it was not her *"real money"* and she wanted
one day shipping and enrolled, then unenrolled and then reenrolled on
the checkout page. She could not recall the cost of Premium and said
that she *"could save 6.99 or something like that."*

(iv)    **Four of the 10 participants who were enrolled but uninformed did
       not understand the general terms and nature of a Premium
       subscription.** For instance, P7 enrolled in Premium on the UPDP page
       and did not know the cost of Premium and seem to think that the
       Premium meant they would get a recurring order of their candy order
       shipped to them. When the research assistant asked about seeing the
       terms of Premium, P5, P16, P22 indicated no knowledge of its nature,
       even though they had enrolled.

(v)     **All 10 participants who were uninformed enrollments mentioned a
       desire for free fast shipping without necessarily realizing this was
       tied to Premium.** For instance, P4 did not want to get the Premium
       subscription and was confused about the shipping option and clicked the
       free shipping option which enrolled them in Premium. They changed
       their shipping option after they enrolled but did not realize this option
       kept them enrolled in Premium. P5 said yes in the UPDP page (see
       Table  for which versions of UPDP each participant saw) for free, fast
       shipping but did not associate this with Premium. They were asked if
       they saw options for Candy Premium and said *"No, I don't think I did"*
       and similarly when asked if they saw how much it costs, they said
       *"Didn't actually see that."*. In a similar instance, P7 also enrolled in
       UPDP for free fast shipping but did not know the cost of Premium and
       seemed to think that Premium meant that they were going to get a
       recurring candy shipment for the product they were ordering, saying
       *"I'm thinking about, this free over here. Like, everything. That's what
       I'm thinking about. (..) I can't wait to get it. That's what I'm thinking
       about"*. P22 also enrolled to get free shipping: *"The delivery free.
       Everything's free. (4) Free one day delivery with premium. (..) I want
       that. (..) Yeah."*. Yet they also did not understand the costs: *"No,
       because most websites don't offer a premium. It have one day, two day
       shipping, you know, like that. But it's about the first time I saw
       premium."* And when asked what it costs for Premium they again said it
       was free. They further clarified after being told they enrolled in
       Premium: *"Well, it says it's free. (..) So does that mean that every time
       you go for a premium, is it going to be free? (..) That's the one thing I
       would look out for."* All these examples suggest the visual prominence

of the wording free, fast shipping and Interface Interference do confuse users.

354. Participants who recalled the terms of Premium regardless of whether they enrolled

(i) **After completing the first task and going through a reflection of their actions, only 9/30 participants correctly recalled all of the information about the cost, frequency of charges, and nature of Premium as a subscription.** This suggests that these terms are not prominent and can easily be missed by consumers.

(ii) **18/30 participants had difficulty recalling the cost of Premium even after reflecting on the first task flow and seeing the screens for a second time.** For example, P4 took a guess as *"5.99. I think."*. P28 at first when asked if they remembered seeing the costs of Premium said: *"Premium costs. For the shipping?"*. When the research assistant clarified he was asking about CandyForever Premium and the trial, P28 was still unable to recall the costs: *"Oh, oh I did not. I thought. I didn't because I instantly don't do Premiums like I don't upgrade."*. Some participants thought there was no price shown such as P14: *" You didn't have it didn't have a price. There was no price there."*.

(iii) **1/30 participants had difficulty recalling when they would be charged for Premium even after seeing the enrollment screens a second time**. P25 was only able to respond *"No, I really don't remember…No, I really don't"* when asked about Premium's terms and when they would be charged. Eight participants were not asked explicitly about when they would be charged and so it is unknown if they knew when charges would be incurred and how frequently. These participants were not asked the question during the session because they did not indicate they knew enough about the Premium subscription to be able to answer the question. Also, given that the think-aloud session questions were semi-structured to adapt to each individual participant's session, the research assistant had to determine when to ask each question or not to tailor the session appropriately. Three participants had vague answers and so it was not possible to determine if they knew the timeline for monthly charges or not. For 8 participants, we did not explicitly ask about the charge timeline.

(iv) **9/30 participants had a lack of an understanding of what Premium was more generally.** For example, P15 conflated the benefits of Premium with the premise of CandyForever offering candies from around the world: *"If I were to subscribe from it? Like what? Like what is the only true benefit I would see is probably something that you can get from overseas, something international, you know, because half*

99

*these things that I got, I'm looking at right now, I can get at a local store.".* Some did not know about what Premium was since it did not grab their attention as summarized by P33: " *I don't know. I didn't really pay attention to it.*"

355. Participants who completed the cancellation flow

(i) **13/30 participants were able to complete the cancellation process without needing help to find the cancellation option, without checking orders first, and without stopping too soon in the cancellation process.**

(ii) **The remaining 17/30 participants had trouble completing the cancellation process.** 15/17 participants did eventually complete the cancellation process, many with assistance from the research assistant. For instance, P16 first checked their orders and said on the Orders page: "*Oh so it's a `return to order': that's what I tap? Yeah... Okay... Canceled orders. What do I do now? I don't know.*" They remained confused about the difference between canceling an order and canceling a Premium subscription: *"I'm lost now. I don't know, it said `cancel the order'. I canceled it and said we aren't finding any cancel order. Why it say that?".* 2/17 did not successfully complete the cancellation process.

(iii) **The 2/30 participants who were unable to complete the cancellation process stopped too soon.** Both these participants thought they had completed the process after 1 screen, not knowing they had several more screens to navigate through. P13, who did not check their orders first to find the cancellation option and found the cancellation option without the researcher's aid stopped too soon and said: "*Okay. Continue to cancel. (..) Okay. I think we're successful. What do you think? I think we should be good.".* The second participant P20 was confusing the Premium subscription with their product order and needed the research assistant's help to find the cancellation option. After they stopped too soon in the cancellation process, after the first cancellation page, they said: *"Okay, so I'm not a premium. I mean I canceled it out. It should be canceled. It say `remind me'. (..) Okay, I'm canceled out".* Both participants clearly did not understand that the cancellation flow consisted of many more steps.

356. Participants who talked about the cancellation process as being frustrating

(i) **19/30 participants mentioned that the cancellation screen process was onerous.** In particular, these participants expressed that cancellation had too many steps, or had many options and signposts to try to keep them from cancelling their subscription which was frustrating. Participants also felt that the "remind me later" option would not work for them since they would forget to come back and complete

the process if they used this option. For instance, P8 said of cancellation: "*Man this has more safety guards than launching a nuke. It's pretty... Yeah. Wow*" and later elaborated: "*How many hurdles are you going to put in my way before you allow me to cancel? And you know, there's I think it was three, I want to say. If memory serves. I think it was three. And of course, you know... basic psychology, right? You make the cancellation button. The smallest one, the hardest to find. You know, the one with the sad face by it.*". Similarly, P10 commented: "*I'm looking for the word cancel. So I found it here. Continue to cancel. You know they ought to make it a little bigger but that's fine. Continue to cancel. And that's what I did. Okay. And then and of course they go ahead with other advertising and things like that, but no, I want to cancel. So I click continue to cancel*". Finally, P17, talked about the continue to cancel button placement: "*Well, when I got to this page I'm looking at the options remind me later. Continue to cancel keep my benefits. So I saw the three. The middle one is continue to cancel. Which is a little annoying because it's like you're teasing me. You're like continue to cancel. I should be able to just say cancel. Done. You sure? Yes.*"

(ii)     In a particularly articulate quote, P24 said that they expected there to be another screen to confirm in cancellation but elaborated "*But and I feel like all of that makes sense to like, discourage you from canceling it. But because I was planning to cancel, I just hit continue to cancel. And then I was like, oh, there's another screen. So it's like it all. It shows you like the benefits again, basically, or like switching or switching your, your plan, but you're already going to cancel it and you've already like clicked twice to cancel it. So I think this screen is just a bit redundant because you've already like once you click twice to cancel it, you've already made your mind to cancel it.*".

(iii)    In addition to participants mentioning that cancellation was onerous, several participants also took time to process the options on the cancellation pages. P6 spent over a minute on the second cancellation page, silently reading and thinking for most of the time even with prompts from the research assistant as they continued trying to understand the screen. She incorrectly assumed that she was automatically switched to annual payments and then eventually pressed continue to cancel. She said *"Well, they're switching me to annual payments, but I don't want annual payments"*. P9 also stared at the screen until prompted by the research assistant about what they were thinking about and they said: *"I'm thinking about is this actually canceling or what else do I have to do? No. Okay. I just need to keep going.*"

357.  Other issues

(i) The enrollment process contains inadequate information about Premium costs and monthly charges. Participants generally did not notice the Premium fine print terms and conditions or did not to read them during the task.

(ii) Other enrollment misconceptions and issues. Participants were confused the SOSP page's redundancy with the subsequent UPDP pages. For instance, P26 on the SOSP chose shipping on this page exclaiming: *"The shipping… tomorrow! Okay."* After reviewing her order which indicated a shipping time of several days, she again said *"It'll be here tomorrow,"* remembering her selection of one day shipping on the SOSP. She did not realize to keep the shipping speed she would have had to accept the Premium option on the UPDP page or enroll in Premium on the checkout page to keep it that way. Similarly, another participant, P7, was confused with the SOSP where she chose the shipping option and then entered her card information. She then thought the UPDP page was a confirmation page confirming her order was placed and for her to review. She said: *"That'll be it for me, right? (...) And I say for me, okay, I don't want nothing else."*. The research assistant prompted her that she would have to continue to finish the purchasing process. She then said *"I did. That's just me reviewing it, right? It's just they asked me, did I want to review it, and I see it. Yeah, because I did. I put this in there. Well, no, that's not how it goes?"*

(iii) At least one participant was confused in the UPDP page about how to decline to enroll in Premium and advance to the next screen and had to think carefully to understand how to decline because the "No Thanks" link was not a button but a hyperlink. P2 said *"Oh that's weird. Make this bigger or make this more prominent than I have to, like, click this, get one free shipping. So like, oh, my only option"* and when asked to later reflect on their completion of the purchasing task they said: *"That's the only option was to click that there"* referring to the option to enroll in Premium.

(iv) Other cancellation misconceptions and issues. Some participants were confused about the vagueness of cancellation language around items tied to your subscription may be affected. One wondered aloud if they would not be getting their candy delivery after cancelling. At least two participants felt that having the continue to cancel button in the middle of the other options was confusing and required more effort to find the right button. For instance, P31 said *"Guess in the grand scheme of things, having the continue in the middle felt odd because my assumption would be things would be more skewed to the right. Like, try this, try that. Nope. I'm ready to keep going. So that seemed a little odd that there were sort of like two things on either side, but the continue in the middle, just based on maybe previous experience on other sites."*.

102

P29 similarly said: *"Everything was like right in the middle. So I was I was able to read the options, remind me later because, you know, cancel, keep my benefits and continue to cancel because. Right. I feel like these two were like, trying to stand out for them to try to keep my, to keep the membership, but I continue to cancel."*

### k) Notes On Interpreting Study Findings

358. The study findings must be interpreted knowing the context of real-world shopping is always a challenge to replicate exactly. However, even with approximations of a real-world system, some as simple as a mocked-up paper version of a website, most problems with an interface can still be identified as described in Section **Error! Reference source not found.**. We do believe that people felt that their real credit cards would be charged (the fine print on the UPDP page equivalent in our study did say that if the default payment did not work, another payment method would be charged if available), whether people chose to enroll in Premium merely because they were in a study situation, and whether or not people believed the deception of them being at risk for recurring bills for CandyForever Premium. Our CandyForever website also did not offer as many products as Amazon or have the same level of detail for customer reviews and some pages were not functional. This may have meant our site was not as fully functional as Amazon but it also means our study had fewer distractions for participants than had they been shopping on Amazon itself, more likely leading to more positive results overall. Similarly, we did not test the Amazon Prime Hard Sell offers which offer no window for cancellation, so the study was set up for the best possible outcome for Amazon. Additionally, our study adheres to all the rigorous principles necessary for an HCI study and the results have produced valuable insights into the issues in the current enrollment and cancellation flows on Amazon.

359. Also, participants in our study may have been more inclined to read information on the screen since we controlled the lab environment so that they were not multi-tasking and performing only the tasks for the study. Studies show when information is presented to users by default (such as giving users multiple opportunities in the study to see the screens with information about Amazon Primes cost, monthly fee, and subscription terms), they tend to pay more attention to it [69,88]. Since we used a think-aloud study [1,2,47], participants in our study were instructed to pay attention to their actions and think aloud about and reflect on each of their actions on the screens.  In a real life shopping scenario, users may not be paying as much attention to what information is on each screen since they may be doing multiple tasks at once or focused on their primary task of purchasing an item. In a real-life setting, users would also not be able to go back to

review their actions multiple times as they did in our study.

## IX. Conclusion

360. The user study results confirmed the results of the cognitive walkthrough I conducted of the Prime detours in the checkout process and the cancellation processes. Study participants accidentally enrolled in Prime while navigating the checkout process due to the design issues I had identified in my walkthrough, including, but not limited to, the lack of clarity in the buttons, the forced action of the UPDP. Study participants who knowingly enrolled in Prime did not know the material terms of Prime, including the cost and renewal terms, because they were in the terms and conditions section, in small print. Given the study was conducted in very ideal conditions—participants could take their time going through the flows, they were not engaged in any other tasks while doing the study, and there were no distractions—it is my opinion that the design of the Prime detours in the enrollment flow can confuse consumers and lead them to accidentally enroll in Prime or to enroll in Prime without knowing its material terms. Study participants also did not find the cancellation process easy. Study participants did not finish the cancellation process, and those who did found the process onerous and repetitive, even though they were instructed and incentivized to cancel.

361. In sum, my opinions are:

  (i)   The design of how Amazon enrolls consumers in Prime (the Prime detours) during online checkout can confuse consumers to unintentionally enroll in Prime because it violates good design principles;

  (ii)  The design of how Amazon enrolls consumers in Prime during online checkout does not convey information on Prime's material terms (cost, end of the free trial period (if applicable), and renewal terms) in a way that consumers are likely to comprehend; and

  (iii) The design of the Iliad and Iliad 2.0 cancellation processes can confuse consumers because they contain too many unnecessary steps and use manipulative designs to prevent consumers from cancelling their Prime subscription.

Dated: February 24, 2025

_____

Marshini Chetty, Ph.D

Analysis | Oxford Academic. *Journal of Legal Analysis* 13, 1: 43–109.

50. Jamie Luguri and Lior Jacob Strahilevitz. 2021. Shining a Light on Dark Patterns. *Journal of Legal Analysis* 13, 1: 43–109. https://doi.org/10.1093/jla/laaa006

51. Arunesh Mathur, Gunes Acar, Michael J. Friedman, Elena Lucherini, Jonathan Mayer, Marshini Chetty, and Arvind Narayanan. 2019. Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites. *Proceedings of the ACM on Human-Computer Interaction* 3, CSCW: 1–32. https://doi.org/10.1145/3359183

52. Arunesh Mathur, Mihir Kshirsagar, and Jonathan Mayer. 2021. What Makes a Dark Pattern... Dark?: Design Attributes, Normative Considerations, and Measurement Methods. In *Proceedings of the 2021 CHI Conference on Human Factors in Computing Systems*, 1–18. https://doi.org/10.1145/3411764.3445610

53. Arunesh Mathur, Arvind Narayanan, and Marshini Chetty. 2018. Endorsements on Social Media: An Empirical Study of Affiliate Marketing Disclosures on YouTube and Pinterest. *Proceedings of the ACM on Human-Computer Interaction* 2, CSCW: 1–26. https://doi.org/10.1145/3274388

54. Nora McDonald, Sarita Schoenebeck, and Andrea Forte. 2019. Reliability and Inter-rater Reliability in Qualitative Research: Norms and Guidelines for CSCW and HCI Practice. *Proceedings of the ACM on Human-Computer Interaction* 3, CSCW: 1–23. https://doi.org/10.1145/3359174

55. Thomas Mildner, Merle Freye, Gian-Luca Savino, Philip R. Doyle, Benjamin R. Cowan, and Rainer Malaka. 2023. Defending Against the Dark Arts: Recognising Dark Patterns in Social Media. In *Proceedings of the 2023 ACM Designing Interactive Systems Conference* (DIS '23), 2362–2374. https://doi.org/10.1145/3563657.3595964

56. Arvind Narayanan, Arunesh Mathur, Marshini Chetty, and Mihir Kshirsagar. 2020. Dark Patterns: Past, Present, and Future. *Queue*. https://doi.org/10.1145/3400899.3400901

57. Jakob Nielsen. 1994. Enhancing the explanatory power of usability heuristics. In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (CHI '94), 152–158. https://doi.org/10.1145/191666.191729

58. Jakob Nielsen. 1994. Usability inspection methods. In *Conference companion on Human factors in computing systems*, 413–414.

59. Jakob Nielsen and Rolf Molich. 1990. Heuristic evaluation of user interfaces. In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (CHI '90), 249–256. https://doi.org/10.1145/97243.97281

60. Don Norman. 2013. *The design of everyday things: Revised and expanded edition*. Basic books.

61. Don Norman, Jim Miller, and Austin Henderson. 1995. What you see, some of what's in the future, and how we go about doing it: HI at Apple Computer. In *Conference companion on Human factors in computing systems*, 155.

62. Midas Nouwens, Ilaria Liccardi, Michael Veale, David Karger, and Lalana Kagal. 2020. Dark Patterns after the GDPR: Scraping Consent Pop-ups and Demonstrating their Influence. In *Proceedings of the 2020 CHI Conference on Human Factors in Computing Systems*, 1–13. https://doi.org/10.1145/3313831.3376321

63. Jonathan A. Obar and Anne Oeldorf-Hirsch. 2020. The biggest lie on the Internet: ignoring the privacy policies and terms of service policies of social networking services. *Information, Communication & Society* 23, 1: 128–147. https://doi.org/10.1080/1369118X.2018.1486870

64. Gustav Öquist and Kristin Lundin. 2007. Eye movement study of reading text on a mobile phone using paging, scrolling, leading, and RSVP. In *Proceedings of the 6th International Conference on Mobile and Ubiquitous Multimedia* (MUM '07), 176–183. https://doi.org/10.1145/1329469.1329493

65. Peter G Polson, Clayton Lewis, John Rieman, and Cathleen Wharton. 1992. Cognitive walkthroughs: a method for theory-based evaluation of user interfaces. *International Journal of man-machine studies* 36, 5: 741–773.

66. Erika Shehan Poole, Marshini Chetty, Rebecca E Grinter, and W Keith Edwards. 2008. More than meets the eye: transforming the user experience of home network management. In *Proceedings of*

# EXHIBIT 11

FEDERAL TRADE COMMISSION,

               Plaintiff,

     v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an officer of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an officer of AMAZON.COM, INC.,

               Defendants.

Case No. 2:23-cv-0932-JHC

Honorable John H. Chun

# EXPERT REPORT OF DR. RAN KIVETZ

**CONFIDENTIAL**

enrollment.[14]  I understand that throughout the relevant time period,[15] consumers could contact Amazon's customer service directly to, among many other things, cancel their Prime membership. While customer service agents generally recorded codes (referred to as "SIC codes," or Standard Issue Codes)[16] intended to capture the nature of the complaint or request—including related to potentially unintended enrollment in Prime—I understand that the process of assigning these SIC codes lacked a uniform, consistent, and reliable coding and training procedure.[17]

### Summary of My Key Conclusions in this Matter

22.    Based on the materials on which I have relied, the scientific analyses I have conducted, and my background and expertise, I have reached the following conclusions.

**Opinion A: The FTC's Reliance on the Amazon Cancellation Survey is Flawed and Invalid**

***The Cancellation Survey is a customer satisfaction "exit" interview that cannot be used to reliably assess consumers' state of mind, perceptions, or intentions when they <u>enrolled</u> in Prime.***

- Given its intended objectives, the Cancellation Survey was not designed and conducted in accordance with the set of rigorous, accepted scientific standards and principles that apply to surveys used as evidence in academic research and litigation.

- Because a company's surveys conducted in the ordinary course of business can serve different purposes and functions, the types of inferences and conclusions that can be drawn from a given survey depend heavily on the type of survey.  The Amazon Cancellation Survey is a customer satisfaction (and experiences) exit survey that might be useful internally, for example, to track general trends over time, but this survey is *not* appropriate to quantify the perceptions, intentions, or choices of a customer base.  In particular, the survey—which was administered around the time of cancellation, *not* at the time of enrollment—was neither designed to, nor can it, estimate the true rate of consumers who unintentionally signed up for Prime.

- The Cancellation Survey is also not informative about consumers' *enrollment* decisions and perceptions, as the survey's leading questions (focusing on reasons for *cancellation*) exacerbate the biases from memory limitations.  Responses of "I did not intend to sign up for Prime" ("DNI") depend on consumers' recall of their state of mind (*e.g.*, perception,

---

[14] *See, e.g.*, Amended Complaint, ¶ 181.

[15] That is, May 1, 2017 to June 2023.  *See, e.g.*, September 8, 2023 Plaintiff's Third Set of Requests for Production of Documents (applicable or relevant time period is listed as May 1, 2017 to "to the date of full and complete response."); Amazon's Responses & Objections to FTC's Third Set of RFPs dated October 9, 2023 (Amazon agrees to produce documents and data from May 1, 2017 through June 21, 2023); December 6, 2023 FTC Letter to Amazon re RFP responses (FTC agrees to June 21, 2023 cutoff date).

[16] *See, e.g.*, May 24, 2021 Amazon's CID Response ("May 24, 2021 Response"), p. 39.

[17] *See* discussion in Section D of this *Expert Report*.

awareness, and intentions) when they initially enrolled in Prime—an event that is separated in time (in some instances, by multiple weeks, months, or even years) from when the customer responds to the survey. A voluminous body of academic research on the limitations of human memory, which has found (among other things) that autobiographical memory is often reconstructed or distorted by survey context and leading questions, indicates that respondents are highly likely to have poor, inaccurate, and unreliable recall with respect to their intentions or awareness at the time of an earlier event (in this case, enrolling in Prime). To cope with their lack of recall, some (unknown) proportion of respondents would have made inferences or assumptions, particularly the inference that since they did not remember signing up for Prime, they must not have intended to do so.

### *The Cancellation Survey fails to represent the relevant consumer universe in this litigation.*

- The Cancellation Survey was not designed in accordance with the scientific principles required to construct a representative survey universe with adequate screening procedures. Consequently, the survey's sample is overly narrow (*i.e.*, underinclusive) and grossly unrepresentative of any alleged unintentional enrollment among Prime cancelers, let alone among the relevant universe of *all* consumers (regardless of whether they canceled or not) who encountered an allegedly deceptive Prime enrollment flow.
  - o There was no confirmation or independent verification of who actually completed the survey (*e.g.*, whether the person canceling was also the one who initially enrolled).
  - o The survey was highly susceptible to *non-response* bias (*i.e.*, the fact that many potential respondents choose *not* to take the survey, including because they were satisfied with Prime) and *self-selection* bias (*i.e.*, the fact that certain respondents choose *to* take the survey, which is likely to over-represent cancelers who were dissatisfied with Prime).
  - o Together and alone, these biases lead to *negativity* bias—that is, an overrepresentation of perceived problems and negative responses in customer feedback and responses.
- The survey's unrepresentative sample (relative to the FTC's allegations in this matter) severely overestimates the actual rate of "DNI" responses (and instances of alleged unintentional enrollment) among not only the population of Prime cancelers, but also among the larger population of all consumers who were exposed to at least one Prime enrollment flow (or "upsell").[18]
  - o Because the FTC's allegations pertain to purported consumer confusion *at the time of enrollment* in Prime (due specifically to a Prime enrollment flow), the relevant baseline consists of all consumers who encountered any Prime enrollment flow— that is, consumers who were presented with a Prime upsell and who could be deceived or "confused" in the first place.
  - o For purposes of estimating a rate of alleged unintentional enrollment in Prime, using a "denominator" restricted to only consumers who self-selected into taking the Cancellation Survey, or even only customers who chose to cancel Prime, would

---

[18] A Prime "upsell" is an opportunity or offer presented to customers who are not Prime members within certain Prime enrollment flows (*e.g.*, the shopping checkout process). *See, e.g.*, Amended Complaint, ¶¶ 34, 36, 231.

therefore improperly ignore highly relevant consumer segments, including the many consumers who were exposed to but declined Prime upsells, as well as those who enrolled in Prime but did not cancel.

- Based solely on the failure to represent the relevant consumer universe in this litigation, even if all other aspects of the Cancellation Survey were proper (which they were *not*), the results of this survey *cannot* be used to reliably estimate how many Prime members consisted of unintentional enrollments or to reach any of the FTC's conclusions regarding such enrollments.

***The Cancellation Survey's questions were extremely leading and susceptible to severe demand effects and other response biases.***

- Contrary to well-accepted survey standards, the Cancellation Survey's "reasons for cancellation" questions were leading and gave rise to multiple well-documented survey biases, including demand effects, "focalism," "yea-saying" (acquiescence bias), and order effects.[19]

- The Cancellation Survey relied on leading closed-ended questions[20] with incomplete and biased answer choices, which makes it inappropriate for measuring customers' reasons for cancellation.  More specifically:

    o Despite the fact that the appropriate format for measuring consumers' reasons for cancellation would be to use open-ended questions, the Cancellation Survey relied on *closed-ended questions* to do so.

    o The Cancellation Survey's closed-ended "reasons" questions were leading, conducive to yea-saying (acquiescence bias), and lacked *any* preceding "filter questions" which screen out participants who indicate that they have no perceptions or beliefs in the first place about the specific topics raised (*e.g.*, intending vs. not intending to sign up for Prime).

    o The inclusion and negative framing of the "DNI" option (*i.e.*, "I did *not* intend to sign up for Prime" [italics added]), in conjunction with the fact that the survey never asked about reasons for enrollment, asymmetrically led respondents to search for reasons and/or reconstruct memories involving unintentional, as opposed to intentional, enrollment.

    o The "reasons" questions used an incomplete set of answer choices that omitted multiple relevant responses—including a "Don't know" option as well as other responses (*e.g.*, "I did not intend to sign up for a paid Prime subscription," "I did

---

[19] *Demand effects*, which generate predictable, yet biased, responses, relate to the phenomenon whereby survey participants use cues provided by the survey procedure, stimuli, and/or questions to figure out the purpose of the study and the answers expected by the researcher.  A *"focalism"* bias (or *"focusing illusion"*) occurs when participants are manipulated to focus on specific aspects presented in the survey—and to therefore not focus enough on other information that is made less salient or unavailable—in turn causing specific aspects to receive more attention and weight than they do in reality.  *"Yea-saying"* (or *acquiescence bias*) refers to the tendency of some respondents to agree with any proposition or assertion communicated in a question, regardless of content.  *Order effects* occur when one question influences responses to subsequent questions.  *See* Subsection A.5.1 of this *Expert Report*.

[20] That is, questions that provide the survey respondent with a list of answer choices, as opposed to asking the respondent to answer in their own words.

design issues inherent in the Cancellation Survey that invalidate its use for purposes of estimating the prevalence of a particular perception.

- Overall, it is impossible to reliably determine from the Amazon Cancellation Survey—a survey that was *not* designed to, and cannot, measure the true rate of alleged unintentional enrollment—how many of the "DNI" responses indeed constitute unintentional enrollees. Nor can the Cancellation Survey data provide any scientific, valid, or informative evidence that consumers were purportedly misled into unintentionally enrolling in Prime.

**Opinion C: Behavioral Data from Amazon Customers Further Invalidate the FTC's Reliance on the Amazon Cancellation Survey**

- To assess the extent to which Amazon's allegedly deceptive Prime upsells were likely to result in instances of unintentional enrollment, it is crucial to consider the full customer journey, starting from an upsell being offered to an Amazon customer to that customer potentially taking the Cancellation Survey and selecting "DNI."

  o Any analysis that focuses solely on the "DNI" answers of Cancellation Survey respondents would be based on a highly non-representative, self-selected subset of Amazon customers, as it would ignore: (*i*) Amazon customers who did not accept any upsells; (*ii*) the number of other times a customer may have declined an upsell, even if they did enroll at some point; (*iii*) Prime members who never canceled Prime; and (*iv*) Prime members who canceled but chose not to take the survey.

- Nevertheless, to try and assess whether presenting an Amazon customer with a Prime upsell had a meaningful likelihood of yielding a potentially unintentional enrollment, I drew a random sample of ██████ unique Amazon customers, which allowed me to quantify the upsell *conversion rate* (*i.e.*, the average rate at which customers sign up for Prime after being presented with an upsell, calculated as the ratio of signups to upsells).

  o My upsell analysis indicates that about ██ of sampled customers received at least one upsell during the relevant period; at least ██ canceled Prime at least once; and 1% took at least one Cancellation Survey, of which ██ selected a "DNI" answer choice. Among Prime cancelers invited to take at least one survey, the conversion rate was only ██—meaning that on average, it would take over █ upsells to yield a single Prime signup.

  o Therefore, even assuming for the sake of argument that the ██ "DNI" rate is representative of the rate at which a Prime member unintentionally enrolled (which is inaccurate for all of the reasons explained in Opinions A and B), to estimate the probability that an upsell results in an unintentional enrollment, it would be necessary to multiply this rate by the ██ likelihood of enrolling in Prime after encountering upsells—resulting in only a ██ probability that an upsell could lead to what even arguably might be an unintentional enrollment.

- A customer behavior analysis focused on "DNI" respondents in the Cancellation Survey identified multiple patterns of observed *behaviors* (both alone and in conjunction with survey responses) that invalidate interpretations of a "DNI" survey response as indicating unintentional enrollment.

attempt to use the Cancellation Survey to reliably estimate a rate of alleged unintentional enrollment.

o   Customers' verbatim responses to the Cancellation Survey further support my customer behavior analysis and provide convergent evidence that any approximation of unintentional enrollment—assuming arguendo that it can be derived from the Cancellation Survey—would be very low.

o   The aforementioned ▮▮▮ "remaining DNI" rate[25] is conservative in multiple respects and would likely still be dramatically overstated, as it does not account for: (*i*) the fundamental non-representativeness of the sample (with respect to Amazon customers, Prime members, and Prime cancelers); and (*ii*) the numerous design issues inherent in the Cancellation Survey that invalidate its use for purposes of estimating the prevalence of a particular perception.  Moreover, due to limitations of the available data, my customer behavior analysis would exclude many respondents belonging to segments of intentional Prime enrollees, including but not limited to: (*i*) "trial hoppers" who strategically sign up for repeated free trials under different email addresses or aliases; (*ii*) "account sharers" who canceled Prime because they want to share an account with someone else or because someone in their household accessed their account; and (*iii*) "account protectors" who canceled Prime due to fraud/abuse concerns regarding their account or financial information.

•   When considering the ▮▮▮ rate at which upsells lead to an enrollment in Prime, and the ▮▮▮ rate at which Prime members (*i*) cancel, (*ii*) choose to take the survey, (*iii*) select "DNI," ***and*** (*iv*) do not exhibit behaviors that are inconsistent with unintentional enrollment, the upper bound at which upsells result in potentially unintentional enrollments is ***approximately*** ▮▮▮, meaning that on average, it would take nearly ▮▮▮ upsells to yield a single potentially unintentional Prime signup.

o   This estimate of ▮▮▮ is itself inflated, as it is based on a sample that does not take into account the numerous Amazon customers who: saw one or more Prime upsells but elected to not enroll in Prime during the relevant time period; intentionally enrolled and chose to maintain their membership long-term; or canceled Prime but chose to not take the Cancellation Survey.

o   Nor does this analysis incorporate the fact that any upsell, no matter how clear, will yield some irreducible minimum rate of consumer "confusion" or error.

### Opinion D: Amazon's Customer Service Call Data Cannot be Relied on to Measure the Alleged Unintentional Enrollment

•   Like any customer support department, Amazon's customer service center aimed to resolve consumer complaints, questions, and issues with Amazon products and services during the relevant time period—*not* to generate a research database to accurately track or quantify the rate of intentional versus unintentional enrollments in Prime.

---

[25] That is, the percentage of survey-takers who both selected "DNI" and did not exhibit behaviors inconsistent with unintentional enrollment.

49.     According to internal Amazon documents, Amazon employees recognized and informed executives about the limitations of the Cancellation Survey, including what the survey could or could not be used for.  For example, on February 18, 2020, Ishan Agnihotri, who at the time was the Product Manager on Renewals and the "owner" of the Cancellation Survey,[80] explained in an email that the results should be interpreted as *directional* instead of being taken "at face value":[81]

> Also, my suggestion is that **survey data may not be taken at face value due to biases in response** due to 1) Options given; 2) Member Frustration at time of cancellation (may lead to inaccurate answers) and other factors that influence survey responses.  I recommend to use them as **directional inputs to be tracked monthly to monitor improvements** once standardized.

Similarly, an internal Amazon memo that discussed the Prime membership strategy for 2021 specified that the Cancellation Survey was used for directional analysis to generate hypotheses that would be tested subsequently (*i.e.*, as opposed to being used to establish facts or quantitative estimates, or to test the hypotheses themselves):[82]

> The customer feedback gathered from the survey allowed for reactive and **ad-hoc analysis of various trends to inform hypotheses** and experiments since the launch.

And:[83]

> In addition, as COVID-19 situation arose starting March, we were able to use the survey results and free-text **to identify trends with the cancellation motivation** driven by the pandemic and how it was leading to customers' decision to cancel their membership **anecdotally**.

50.     Deposition testimony from Benjamin Hills, Amazon's general manager for Prime retention and business intelligence services between January 2018 and January 2021, also stressed that the Cancellation Survey data was used "mostly for signals of like ideas and then for

---

[80] AMZN_00040674 at 40677.
[81] *Ibid*. [emphases added].
[82] AMZN_00003654 at 3662 [emphasis added].
[83] *Ibid*. [emphases added]

propensity targeting,"[84] to "look for opportunities to improve,"[85] and "as an input to think about how we could build experiences."[86]  With respect to some Amazon employees' efforts to construct a so-called "clarity score,"[87] Mr. Hills testified that "there is no way to appropriately measure"[88] clarity (itself a concept for which "there was never a fully aligned upon definition")[89] and that such efforts were meant to give "directional inputs and ideas on how to make the experience better."[90]

---

[84] Hills Deposition, p. 53 (noting also that the survey data was not used "as a KPI or a means by which to say for financial forecasting or planning").  *See also id.*, p. 55 ("The attempt was to use the survey data to create propensity scores with as much precision as useful in order to target a solution.").  Mr. Hills testified that "the cancel survey data itself never bore fruit in terms of the targeting"; *id.*, p. 42.

[85] *Id.*, p. 70.

[86] *Id.*, p. 181 ("So we used it as an input to think about how we could build experiences. So, for example, building the benefit engagement widgets correlation to customers saying I'm not using my benefits enough, building of the account reminders, so you can say those that don't remember when their billing dates are or whatever else, so they can create a reminder of when they're billed, creating the different price plan widgets. It's too expensive. So we used all that data to say, okay, what should we actually build. That's the welcome we build. Then we started down the path. We didn't conclude or I don't know how much further around propensity scoring for targeting to set solutions.").

[87] *See, e.g.*, AMZN_00022477 – 9 (Hills Deposition, Exhibit BH-11).

[88] *Id.*, p. 89 ("Q. [...] What were you – what did you mean by there's no way to appropriately measure? A. It's very much what we just talked about.  Q. Okay. No way to – A. Measure clarity, yes, and there's two parts. There's the clarity wasn't defined and then even if you did define it – if you did define it, maybe there would be and then there's certainly no way to measure it.") (citing to AMZN_00022477). *See also id.*, pp. 88 ("Problem two, there's no way to actually measure what [clarity] is, what you actually have to determine what that is to begin with.") & 191 ("THE WITNESS: There's no way to measure intent. That's been the problem the entire time.").

[89] *Id.*, p. 88 ("The biggest problem with this entire project was, and this is the pursuit of clarity in itself, the term was never – there was never a fully aligned upon definition of that.").

[90] *Id.*, p. 183 ("There wasn't a way [to have a number that's very useful to be representative of the base] which is why they kept having a problem. How do you measure clarity and everything else? That should just give you directional inputs and ideas on how to make the experience better. You can do that. How that impacts the whole, you don't know.").  *See also id.*, pp. 186 ("Q. Just to summarize, your effort to quantify the number of customers who self-reported unintentional sign up for Prime first sought to identify the magnitude of that customer issue and second sought to create a benchmark for directional results when your team undertook content testing, correct? A. You got it, yes.") & 92 ("Q. So I take it from your statement you never – Prime organization never developed the clarity score or finished work on the clarity score? [...] THE WITNESS: I don't know where they landed. A little bit goes back to the definition was never really true and then the way to capture that was also – there was no way to capture that.").

51.     An internal Amazon report summarizing results from the Cancellation Survey conducted between November 2019 and February 2020 discussed the potential for biases in measurement while emphasizing that the goal was to focus on changes over time:[91]

> As with any optional survey, we face **selection bias** in that only customers that have pre-maturely cancelled their Prime memberships are shown the survey.  Customers may also exhibit **availability bias**, where more recent experiences influence the feedback they provide and **responses may not match actual behavior**.  We have included a NPS question in the new survey to measure customers' overall satisfaction with Amazon as a whole at the time of cancelling their membership as well as with Prime.  Our goal will be for this **measure to increase over time**, hopefully indicating a higher propensity to rejoin Prime in the future.

52.     Another internal communication thread regarding efforts to test the effect of different checkout flows noted that any statements regarding unintentional signup rates were subject to multiple assumptions, as "the currently available data will not allow us to make a 100% accurate determination at the time of cancellation of whether a specific customer signed up unintentionally, and particularly not at scale."[92]

53.     Further, a July 2019 internal Amazon report cautioned against assuming a single interpretation of the "I did not mean to sign up for Prime" response option used in the Cancellation Survey, instead suggesting multiple explanations or understandings for such an answer:[93]

> ██████ of customers responded that their primary reason for cancelling was that they never intended to sign up for Prime.  However, we are not sure how this mistaken signup occurred, or if the customer meant they never intended to pay for Prime (rather than sign up). In some instances, customers may have been confused by the language or experience when signing up (e.g., order agnostic SPC).  Some people may have turned AC/AR off, and unintentionally turned AR [auto-renew] back on through risk messaging.  Kids may have signed up through Alexa or FireTV without telling their parents.

---

[91] AMZN_00034290 at 34291 [emphases added].  *See also* AMZN_00106463 at 6466 (noting a goal of identifying "key customer pain points across different stages of customer lifecycle" and "aiming to eventually predict how changes in members' perception could impact membership growth").

[92] AMZN_00136625 at 136635 ("I'm afraid we will need to operate with assumptions (e.g. constant measurement error, constant ratio of CS contacts to unintentional signups) if we want to make any statement as I think the currently available data will not allow us to make a 100% accurate determination at the time of cancellation of whether a specific customer signed up unintentionally, and particularly not at scale.").

[93] AMZN_00021537 at 21539.

At his deposition, Mr. Hills likewise acknowledged that the preselected reasons in the Cancellation Survey did not necessarily map onto respondents' actual reasons for cancellation.[94] Based on his observations and review of customer service calls, survey information (including free text verbatim responses), and customer behavior data,[95] Mr. Hills further testified that the "mistaken sign up" (or "DNI") option was susceptible to multiple interpretations and likely reflected a range of different customer experiences unrelated to true unintentional enrollment, such as a customer's child signing them up, only intending to sign up for a free trial, or concerns with fraud.[96]

---

[94] Hills Deposition, pp. 24 – 25 ("Q. Did – do you have any reason to believe that Prime members' self-reported cancel reason doesn't map back to their actual cancel reason?  A. Yes, absolutely.  Q. And what reason is that or what reasons do you have for that belief?  A. Two primary, but there's a long tail of others.  Q. Sure. A. One primary is when observing the free type and then looking at what they actually selected, sometimes they don't map and part of that reason is the preselection didn't cover their reason which means that the preselected probably needed to be better worded or identified.") & 27 – 28 ("Both were signals that the higher – the overarching reason may not actually represent in specifics the reasons why the customers were calling to cancel or why they were online to cancel").

[95] *Id.*, pp. 179 – 180.

[96] *Id.*, pp. 25 ("An example, the mistaken sign up which was one that's obviously covered in a lot of this. There's a pretty big long tail of how to interpret that. So one is the wanted it for the free trial and forgot to call in and cancel. There's the my kid signed me up on Prime video to watch something and I did or did not give them permission which are two different forks in the road as well. I'm not aware that I was signed up. Hence the fraud piece. So there's a lot of like nuance to those. So although you get the coded [*sic*] in the high level cancel self-selected cancel reason, there's a long tail of other stuff needed to be mapped back to which made it harder, more difficult to scale."), 179 ("There's the customer, what they actually say in the free type and through that, there are examples of kids signed me up. I knew I signed up, but I need to cancel it for now. […] Listening to the calls, the biggest concern was, you know, a really sizable percentage of cancels that didn't want to cancel, but beyond that, when you get into the actual anecdotes themselves, then you get into the, oh, wow, there's – they had their credit card compromised. There's a lot of like that going on. So that's why you kind of dig into the details. And then outside of the observable stuff, signals that you don't know what a person is thinking, but after the call when they sign up, so I called. I canceled mistaken and then sign up and start using again like within whatever period after and then the continuous engagement. So there's a lot of like mixed signals happening there. You can't necessarily conclude there's like a one size fits all thing happening."), & 180 ("Q. Based on your review of that information, what types of customer experiences did you identify as associated with customers self-reporting unintentional or mistaken sign up on the cancel survey? […] A. It pretty much ran the entire gamut of self-reporting cancellations. […] I meant to only use the free trial or I wanted to cancel during this period. My children – I told my children they could sign up or my children signed me up and I didn't tell them they could sign me up. There was the fraud related or stuff that were absolutely unrelated altogether. It's the I hate Bezos or just like a whole bunch of random political [*sic*]. It's just all over the place.").

54.    Some Amazon employees—perhaps unaware of or disregarding the invalidity of relying on the Cancellation Survey results at face value—nevertheless used the Cancellation Survey results (alone or with other data) to attempt to extrapolate and quantify the number of unintended signups.[97]  However, the fact that *some* Amazon employees attempted to draw conclusions from the rate of "mistaken signup" responses in the survey does not justify taking the survey results at face value nor scientifically validate extrapolating the survey's results (*e.g.*, to all Prime members).[98]  To the contrary, as demonstrated below, numerous flaws and limitations inherent to the Cancellation Survey's design mean that the survey's results *cannot* be taken at face value; such flaws also preclude any conclusions or generalization about the true rate or absolute number of any alleged unintentional enrollment.

55.    Overall, Amazon's internal discussions of its Cancellation Survey and the content of the survey itself make clear that the survey functioned as a customer satisfaction "exit"

---

[97] *See, e.g.*, AMZN_00014152; AMZN_00029142; AMZN_00091284; AMZN_00091287; *see also* Hills Deposition, p. 47.  Note that even these attempts at extrapolation discuss the difficulty in knowing whether any extrapolated number is correct or even plausible; *see, e.g.*, AMZN_00029142 (raising questions such as "Would customers remember the reason? Could there be any incentive for customers to choose mistaken sign up as a reason  in the survey?"); AMZN_00091287 at 91290 ("We acknowledge that there could be self-selection bias with respect to clarity signals").

[98] Indeed, this point was recognized by Mr. Hills, Amazon's former general manager of Prime retention, who testified that another employee's conclusions regarding the percentage of member-initiated cancellations purportedly due to unintentional enrollment were not justified by the data.  *See* Hills Deposition, pp. 47 – 49 ("Q. And in the second sentence after increasing membership clarity reads we know through survey data that ▉ percent of member initiated cancellations occur because members do not know they were signed up for Prime. CX contact data supports this finding. Did I read that correctly? […]  THE WITNESS: So the – this is a bit broad. So Cami would make pretty assertive statements that weren't grounded in data. So that was part of her feedback during her time there as well. […]  It was general. For example, where it says this statement, we know through customer survey that ▉ percent of member initiated cancels occurred because members do not know. That's simply just not true. I would ask her in one-on-one settings and others how she came to that conclusion before we assumed that it wasn't true and she couldn't explain it. So she recognized that that was probably stated incorrectly. I can't speak for her, but this is just in our conversations.").  *See also id*., pp. 111 – 112 ("Q. […] Then you attribute ▉ percent of these potential ▉▉▉▉▉ mistaken sign ups to the UPDP enrollment page; is that correct? A. Correct. And, again, these are all just taking the observable metrics. We know how many sign ups are UPDP. We know how many cancels or what distribution of sign ups were from check out, et cetera, et cetera. What we don't actually know and didn't do the CID level tracking plus not everyone answers the survey of how many actually coded it if we were to directly map that stuff. So there's crazy mixed shifts across the board that are going to occur there. That's why it's a little bit dangerous to infer any like absolute direction from any of this stuff.").

survey, *not* as a scientific or empirical measurement of consumers' state of mind, intentions, or perceptions at the time of enrollment.  While the Cancellation Survey could impart business insights into general trends over time (*e.g.*, customer pain points and brand attitudes regarding Amazon and Prime), it would be inappropriate to use results from such a survey to attempt to quantify the rate of unintentional enrollment or test whether a given Prime membership was the result of alleged unintentional enrollment.

### A.2.2.  *The Cancellation Survey is Not Informative About Consumers'* <u>*Enrollment*</u> *Decisions and Perceptions Due to the Limitations of Human Memory*

56.    To the extent that the FTC or certain Amazon employees seek (or may have sought) to estimate a rate of unintentional enrollment based on data from the Cancellation Survey, such an extrapolation would *not* be scientifically valid or reliable, because the underlying survey instrument is not scientifically valid or reliable for these purposes.  Consistent with its name, Amazon's Cancellation Survey (including the 2020 Cancellation Survey) was designed to test issues regarding customers' satisfaction and dissatisfaction with Prime ***at the time of cancellation***, *not* their mindsets *at the time of enrollment*—the latter of which would have generally occurred weeks or months earlier (if not longer).   In particular, the Cancellation Survey cannot be used to test whether a Prime member had been aware that they were signing up for Prime when they enrolled.  That could instead be addressed by a well-designed *consumer perception* survey, which is frequently and widely used in litigation to test for (likelihood of)

paid members with tenures between 0 and 15 years)[656] does not support a conclusion that the former group must have unintentionally enrolled in Prime.  As discussed earlier, at least some proportion of the ███ figure would stem from respondents who answered "unsure" or that they were "lapsed" Prime members.  Among the remaining fraction of shorter-tenure Prime customers who incorrectly identified as "never" Prime, there is no way to distinguish whether such misreporting was due to unintentional enrollment, as opposed to a variety of unrelated reasons—including guessing, inattention, and memory limitations or errors.  Indeed, to the extent that the group of paid Prime members with two months or fewer tenure includes a subset of members who had recently converted from a free trial, these customers could have believed they were still in their trial period and hence did not identify as a Prime member.

407.     *Overall*, like the Amazon Cancellation Survey, the Amazon Search Sentiment Survey is fundamentally invalid and unreliable for purposes of quantifying or estimating a true rate of alleged unintentional enrollment in Prime.  Nor does the attempt by *some* Amazon employees to make inferences from this data about potentially unintentional enrollment justify such extrapolations.

408.     I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Expert Report* in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This *Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.

February 24, 2025
_____
Date

_____
Dr. Ran Kivetz, Ph.D.

---

[656] *See* AMZN_00080322, at 80329.

# EXHIBIT 12

| | |
|---|---|
| **From:** | Agnihotri, Ishan [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2AC24EA053D843CAB8A87682FA161447-AGNISHAN] |
| **Sent:** | 5/5/2020 7:57:44 AM |
| **To:** | Schoellhuber, Marlene [smarlene@amazon.de] |
| **CC:** | Bozkurt, Candas [bozkurtc@amazon.co.uk]; Plato, Vanessa [specks@amazon.com]; Hills, Benjamin [bhills@amazon.com]; Remien, Sonja [sonkle@amazon.de]; Sikand, Shaila [shailas@amazon.com]; Van Dorp, Gerard [geradorp@amazon.de]; Kim, Dawn [daeunkim@amazon.com] |
| **Subject:** | RE: DE & AT results of Prime Cancellation Survey |

Hi Marlene, Adding Dawn here who owns the WW rollout as I have transitioned to another team in Prime.
Regards
Ishan

---

**From:** Schoellhuber, Marlene <smarlene@amazon.de>
**Sent:** Tuesday, May 5, 2020 6:33 AM
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>; Van Dorp, Gerard <geradorp@amazon.de>
**Subject:** FW: DE & AT results of Prime Cancellation Survey

HI Ishan,
I hope you're doing well.
Bringing this back up your inbox – have you had a chance to look into this? Would be great if we could get an update and a more granular ETA, now that we're already in the middle of Q2.
Thank you!
Marlene

---

**From:** Schoellhuber, Marlene <smarlene@amazon.de>
**Sent:** Monday, March 23, 2020 2:03 PM
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>; Van Dorp, Gerard <geradorp@amazon.de>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Hi Ishan,
Is there already an update on the rollout plan for AT?
Thanks,
Marlene

---

**From:** Van Dorp, Gerard
**Sent:** Tuesday, February 25, 2020 9:20 AM
**To:** Schoellhuber, Marlene <smarlene@amazon.de>; Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Hi Ishan,

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00040674

The Prime tableau reports with an AT derived country view work on a combination of IP, shipping and billing address, which probably provides the highest accuracy. Anish Kumar (see attached email as well) can help you understand how that works.

Regards,

Gerard

---

**From:** Schoellhuber, Marlene <smarlene@amazon.de>
**Sent:** Tuesday, February 25, 2020 08:59
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Thanks Ishan – I think shipping address should be a good enough proxy for it.

---

**From:** Agnihotri, Ishan
**Sent:** Monday, February 24, 2020 10:39 PM
**To:** Schoellhuber, Marlene <smarlene@amazon.de>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

I will keep this group updated with the rollout plan.
@Marlene, at this point the best solution I can think of, to track AT is by using the shipping/ billing address. I am looking for direction from you in terms of how best to identify AT members once we have the survey capability on PC in DE (we will have the CID).

Another solution I had in mind is that we can add a question in the survey explicitly asking the country of residence. I will work with the DE team to evaluate the pros and cons of such a question. Let me know your thoughts.

Regards
Ishan

---

**From:** Schoellhuber, Marlene <smarlene@amazon.de>
**Sent:** Friday, February 21, 2020 4:45 AM
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Thanks for your quick response, Ishan.
Could you please keep us posted on the below plan and rollout? Is there anything we can help with to start tracking AT responses going forward?
Have a great weekend,
Marlene

AMZN_00040675

**From:** Agnihotri, Ishan
**Sent:** Thursday, February 20, 2020 8:48 PM
**To:** Schoellhuber, Marlene <smarlene@amazon.de>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>; Sikand, Shaila <shailas@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

+ Shaila, to keep me honest in the understanding of how AT Prime Membership works.

@Sonja, PFA the work document. Feel free to ignore the free text responses.

@Marlene, Currently these surveys are sent to members cancelling the Prime Membership in DE. Since AT members are also signed up to the DE plan, they should also be getting the survey. At this point there is no way to connect the responses to CID and therefore no way of knowing if member was from AT or DE (based on shipping or billing address). We have plans to launch the survey on Prime Central for DE in Q2; once that happens we will be able to track the responses by CID and therefore separate the AT results by looking at shipping/ billing address. The biggest challenge with AT is that it is the same as DE plan so billing/ shipping address would be our best way to differentia these members and I am not sure how accurate it is.
Regards
Ishan

---

**From:** Schoellhuber, Marlene <smarlene@amazon.de>
**Sent:** Thursday, February 20, 2020 10:22 AM
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Hills, Benjamin <bhills@amazon.com>; Remien, Sonja <sonkle@amazon.de>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Hi Ishan,
Just to understand that better: does your report include AT customers in the sample and we simply don't know which responses came from them, or were AT customers explicitly excluded from the report?
There are several comments on speed being the reason for cancelation ("Prime is not faster than standard shipping") and I wouldn't be surprised if the lion share came from customers with an AT shipping address.
How can we include/better track AT customers in this survey going forward?
Thanks
Marlene

---

**From:** Remien, Sonja
**Sent:** Wednesday, February 19, 2020 10:05 PM
**To:** Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa <specks@amazon.com>; Schoellhuber, Marlene <smarlene@amazon.de>; Hills, Benjamin <bhills@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Hi Ishan, thanks a lot for the report! Could you please share in Word or Excel?

---

**From:** Agnihotri, Ishan <agnishan@amazon.com>
**Sent:** Tuesday, February 18, 2020 8:27 PM
**To:** Remien, Sonja <sonkle@amazon.de>
**Cc:** Van Dorp, Gerard <geradorp@amazon.de>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Plato, Vanessa

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00040676

<specks@amazon.com>; Schoellhuber, Marlene <smarlene@amazon.de>; Hills, Benjamin <bhills@amazon.com>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

+ Ben for Vis, and moving Bharath to BCC.

AT data is not available.
For DE based on the last 120 days data around 18% signed up by accident. Exact response "Ich habe mich versehentlich bei Amazon Prime angemeldet". DE data for share of reasons for cancellation is attached. You may ignore the free text responses.

None of the survey data is currently available by tenure or any other customer/ member segmentation. We are planning to add survey to the Prime Central by early Q2 which will allow us to directly connect survey responses to CID and therefore give us more insights.

We are in the process of standardizing our surveys WW with flavor of locale questions or answer options. Which means that response share may change in the future and therefore should not be committed to be tracked at any cadence at this point.

Also my suggestion is that survey data may not be taken at the face value due to biases in response due to 1) Options given; 2) Member Frustration at time of cancellation (may lead to inaccurate answers) and other factors that influence survey responses. I recommend to use them as directional inputs to be tracked monthly to monitor improvements once standardized.

Regards
Ishan

**From:** Srinivasan, Bharath <bharaths@amazon.com>
**Sent:** Tuesday, February 18, 2020 8:59 AM
**To:** Remien, Sonja <sonkle@amazon.de>; Agnihotri, Ishan <agnishan@amazon.com>
**Cc:** Bozkurt, Candas <bozkurtc@amazon.co.uk>; Van Dorp, Gerard <geradorp@amazon.de>; Plato, Vanessa <specks@amazon.com>; Schoellhuber, Marlene <smarlene@amazon.de>
**Subject:** RE: DE & AT results of Prime Cancellation Survey

Moving Lee-anne to BCC, as she is a BI leader and not the owner of cancelation survey – likely a miscommunication on our call.
Ishan (PM on Renewals) is the owner of the cancelation survey and can help you with the below.

Thanks
bharath

**From:** Remien, Sonja
**Sent:** Tuesday, February 18, 2020 7:36 AM
**To:** Peters-cole, Lee-anne <leeanp@amazon.com>
**Cc:** Srinivasan, Bharath <bharaths@amazon.com>; Bozkurt, Candas <bozkurtc@amazon.co.uk>; Van Dorp, Gerard <geradorp@amazon.de>; Plato, Vanessa <specks@amazon.com>; Schoellhuber, Marlene <smarlene@amazon.de>
**Subject:** DE & AT results of Prime Cancellation Survey

Hi Lee-Anne,

I heard from Bharath that you will start looking into the **Prime cancellation survey**. We have several questions from DE / AT for up-coming Country Leader Reviews and I wanted to check-in with you if you have the following data available or if not, if you could put an ETA behind it. I heard you just recently joined the team, so not sure if you already started with the analysis.

AMZN_00040677

1)    What is the share of customers cancelling Prime **due to unintended Prime Sign up** for DE&AT, what are the separate values for AT? Is this information available by tenure?

2)    What is the share of customers cancelling Prime for AT due to a lack of speed?

3)    Could you provide the total list and share of reasons for cancelling Prime for DE &AT, and separated for AT?

If anything is unclear or you have need further clarification: happy to jump on a short call!

Sonja

**Sonja Remien**
Sr Program Manager – DE Customer Innovation & Insights.

CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT 13



# HOW TO USE THE DICTIONARY

To look up an entry in *The American Heritage Dictionary of the English Language,* use the search window above. For best results, after typing in the word, click on the "Search" button instead of using the "enter" key.

Some compound words (like *bus rapid transit, dog whistle,* or *identity theft*) don't appear on the drop-down list when you type them in the search bar. For best results with compound words, place a quotation mark before the compound word in the search window.

guide to the dictionary



# THE USAGE PANEL

The Usage Panel is a group of nearly 200 prominent scholars, creative writers, journalists, diplomats, and others in occupations requiring mastery of language. Annual surveys have gauged the acceptability of particular usages and grammatical constructions.

The Panelists



# AMERICAN HERITAGE DICTIONARY APP

The new American Heritage Dictionary app is now available for iOS and Android.



# THE AMERICAN HERITAGE DICTIONARY BLOG

The articles in our blog examine new words, revised definitions, interesting images from the fifth edition, discussions of usage, and more.

**THE 100 WORDS®**

See word lists from the best-selling 100 Words Series!

[Find out more!](#)



## INTERESTED IN DICTIONARIES?

Check out the Dictionary Society of North America at http://www.dictionarysociety.com

**mech·a·nism** 🔊 (mĕk′ə-nĭz′əm)

Share:    Post

*n.*
**1.**
**a.** A machine or mechanical appliance.
**b.** The arrangement of connected parts in a machine.
**2.** A system of parts that operate or interact like those of a machine: *the mechanism of the solar system.*
**3.** An instrument or a process, physical or mental, by which something is done or comes into being: *"The mechanism of oral learning is largely that of continuous repetition" (T.G.E. Powell).*
**4.** A habitual manner of acting to achieve an end.
**5.** *Psychology* A usually unconscious mental and emotional pattern that shapes behavior in a given situation or environment: *a defense mechanism.*
**6.** The sequence of steps in a chemical reaction.
**7.** *Philosophy* The doctrine that all natural phenomena are explicable by material causes and mechanical principles.

[New Latin *mēchanismus*, from Late Latin *mēchanisma*, from Greek *mēkhanē*, machine; see MECHANIC.]

The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2022 by HarperCollins Publishers. All rights reserved.

# Indo-European & Semitic Roots Appendices

Thousands of entries in the dictionary include etymologies that trace their origins back to reconstructed proto-languages. You can obtain more information about these forms in our online appendices:

[Indo-European Roots](#)

[Semitic Roots](#)

The Indo-European appendix covers nearly half of the Indo-European roots that have left their mark on English words. A more complete treatment of Indo-European roots and the English words derived from them is available in our [Dictionary of Indo-European Roots](#).

# American Heritage Dictionary Products

# EXHIBIT 14



# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

OFFICE OF OVERSIGHT AND INVESTIGATIONS

MAJORITY STAFF

# AGGRESSIVE SALES TACTICS ON THE INTERNET AND THEIR IMPACT ON AMERICAN CONSUMERS

**Staff Report for Chairman Rockefeller**
**November 16, 2009**

**Table of Contents**

**Executive Summary**...............................................................................................................i

I.     **Background on Aggressive Online Sales Tactics**............................................1
      a.   Post-Transaction Marketing........................................................................2
      b.   Data Pass and "Preacquired Account" Marketing.......................................3
      c.   "Free-to-Pay Conversions".........................................................................5
      d.   Consumers' Experience of Aggressive Online Sales Tactics......................6

II.     **Background on Affinion, Vertue, and Webloyalty**........................................8
      a.   Affinion/Trilegiant/Cendant/CUC.............................................................9
      b.   MemberWorks/Vertue/Adaptive Marketing.............................................10
      c.   Webloyalty...............................................................................................12

III.     **The Committee's Investigation**...................................................................13

IV.     **Overview of the Online Post-Transaction Sales Industry**.........................13
      a.   Partnership Terms.....................................................................................14
      b.   The Financial Advantages of Data Pass..................................................16

V.     **Evidence of Misleading Offers and Consumer Confusion**.........................17
      a.   Low Levels of Member Awareness..........................................................18
      b.   Employee Training on Cancellations and Member Questions...................20
      c.   High Rates of Cancellations and Low Rates of Usage..............................22

VI.     **Partner Awareness of the Problem**.............................................................24
      a.   "Customer Noise".....................................................................................24
      b.   Concerns Raised by Partners....................................................................26

VII.     **Conclusion**...................................................................................................30

**Exhibits**

Exhibit 1:   Sample Interstitial Pages

Exhibit 2:   Aggressive "Post-Transaction" Sales Tactics in an Online Purchase

Exhibit 3:   Clubs and Services Offered by Affinion, Vertue, and Webloyalty

Exhibit 4:   E-Commerce Partner Income from Post-Transaction Marketing

Exhibit 5:   Length of Consumer Enrollment in Affinion, Vertue, and Webloyalty
               Membership Clubs

Ms. Glennon concluded her letter with the following comment:

> As someone who has been in the professional marketing field for over 16 years, I find it unfortunate that situations like this still arise. Whenever you have a product to market, intangible or otherwise, it should be made clear to the consumer what the process is and what they are purchasing. Anything else creates confusion and situations like the one I am writing in about.[16]

**Chris Steffen**  In April 2007, a frustrated consumer from Los Angeles, California, named Chris Steffen wrote the following complaint to Movietickets.com.

> I'm not sure how or when this happened and I'm sure part of it is oversight or my own fault. But somehow through the purchasing of movie tickets through your site I was signed up for Reservation Rewards and charged 10 dollars a month membership for multiple months. This means that when I ordered tickets through your service, the cost to me was not only the price of the tickets, but the inadvertent cost of being enrolled in a service plan I was not aware of.[17]

Mr. Steffen also wrote a complaint to Webloyalty, the operator of the Reservation Rewards club. Addressing his complaint to "Joni," the Webloyalty representative he had communicated with, Mr. Steffen expressed his frustration.

> Imagine yourself, Joni, getting on a computer to book movie tickets for the next big show and you're in a hurry because you and your friends decided to go at the last minute. You want to make sure you order your seats in time so you can go have dinner before the show. Then, at first glance you get what looks like a coupon for 10 bucks off your next purchase of tickets. You don't read the fine print because you're in a hurry and next thing you know you're signed up for some worthless service.[18]

**David Murray**  In February 2008, a Massachusetts hospital executive named David Murray realized he had been enrolled in Affinion's "LiveWell" membership club while shopping at 1-800-Flowers.com several months earlier. Mr. Murray wrote an e-mail to 1-800-Flowers.com expressing his concerns about the LiveWell enrollment process and asking the company, "Do you really think what you did was morally right?" One of his criticisms focused on the confusion surrounding the origin of the discount offer. He wrote:

> The Order Confirmation states the following: "Your purchase is complete. Click here to claim $15.00 Cash Back on this purchase!" This is not true and is deceitful. You aren't offering $15.00 back unless the client signs up to this company called "LiveWell." And even then, you're not offering it – LiveWell is.

---

[16] *Id.*

[17] E-mail from Chris Steffen to Movietickets.com employee (Apr. 11, 2007) (Webloyalty Doc. 50825-26).

[18] E-mail from Chris Steffen to Webloyalty employee (Apr. 12, 2007) (Webloyalty Doc. 50827).

> Who in the hell is LiveWell?  It doesn't say on the email.  So there is no $15.00 to be had from 1800Flowers at all.[19]

Mr. Murray also complained that the data pass process made it unclear that he was actually making a purchase.

> At no time, during this process, is there an opportunity to keep this from happening.  There is no warning, no interim message telling me what I'm actually about to do.  Had there been that opportunity, I readily concede that it was my fault for clicking.  But there wasn't that opportunity.  As you can see, the consumer (in this case, me) is automatically enrolled and you have to call to cancel within a month of the "free membership" to keep from getting charged $11.99 per month.[20]

Finally, Mr. Murray expressed his anger that 1-800-Flowers.com, a company with which his earlier experiences were "nothing but positive," would allow him to be enrolled in the LiveWell club.

> What I feel terrible about is that your Customer Service is doing this to unsophisticated consumers who don't know what steps they should take when a corporation does that to them, and how many people are signed up to this company and are going to get charged for something they didn't want?  Worse, is this really something 1800Flowers wanted to be associated with?  It was just a mean thing to do to someone.  I have an old saying.  It may be legal, but is it moral?  Well, I don't think it's legal.  And I know it wasn't moral.  Don't be immoral.[21]

## II.    Background on Affinion, Vertrue, and Webloyalty

Affinion, Vertrue, and Webloyalty – the three leading companies engaged in the aggressive online sales tactics described above – are all located in or around Norwalk, Connecticut.  All three companies are managed by executives who started their careers at Comp-U-Card (CUC), a Connecticut company that pioneered the marketing of discount membership clubs.

All three companies have also been the targets of law enforcement investigations and private lawsuits stemming from their use of aggressive marketing practices.  Affinion and Vertrue have used direct mail, telemarketing, and e-commerce channels, while Webloyalty has used only the e-commerce channel, to enroll members and charge their credit cards or checking accounts.  Committee staff has compiled a list of nearly 100 different clubs and services these three companies sell or have sold to consumers (See Exhibit 3).

---

[19] E-mail from David Murray to 1-800-Flowers employee (Feb. 4, 2008) (Affinion Doc. AFSE-4-5078-79).

[20] *Id.*

[21] *Id.*

From January through April 2009, Affinion also tracked "customer contacts with the Affinion Support Desk, which handles customer requests that are not satisfied by the Customer Service Representative (also referred to as the Front Line Agent) and are elevated to a supervisor."[62] The spreadsheet showed that thousands of "customer contacts" could not be handled by "Front Line Agents" because the customers were categorized as "Unaware of Service" or "Disputing Enrollment." While this data is limited to escalated contacts and does not include the millions of consumers who likely canceled their Affinion membership programs once they learned their credit card was being charged, it further suggests that a substantial percentage of Affinion's members are unaware they were enrolled in Affinion's membership programs.

For example, from January through April 2009, Affinion's Support Desk received 7,649 elevated "customer contacts" related to "billing" or "cancellation and suppression requests" from customers of 1-800-Flowers.com, AirTran Airways, Classmates.com, and Priceline who had been enrolled in Great Fun, an Affinion discount program.[63] Of the 7,649 customer contacts, Affinion categorized a large percentage as "Unaware of Service," "Disputing Enrollment," or "Bank Representative Cancelled." Despite placing these "contacts" in categories which suggest customer confusion and frustration, Affinion did not categorize these customer "contacts" as complaints.[64]

**Escalated Customer Contacts with Affinion's "Support Desk" Regarding Its "Great Fun" Discount Club: January – April 2009**

| Affinion Partner | Escalated "Customer Contacts" Regarding "Billing" and "Cancellations and Suppression Requests" |
|---|---|
| 1-800-Flowers.com | 618 |
| AirTran Airways | 838 |
| Classmates.com | 872 |
| Priceline | 5,221 |

### B. Employee Training on Cancellations and Member Questions

When consumers realize they are being charged for a club membership they did not intend to enroll in and do not use, they contact Affinion, Vertrue, and Webloyalty to stop the monthly charges to their credit card or debit card. As a result, the three companies' customer service centers are almost entirely dedicated to handling the large volume of calls from angry and confused consumers requesting cancellations and an explanation for the charge. As a Webloyalty employee recently acknowledged in an internal e-mail, the call center representatives spend most of their time answering calls "from members who are questioning charges or want to cancel their membership."[65] Affinion and Vertrue's internal documents show that most of their

---

[62] Affinion letter, "Affinion Response to Committee Follow-up Questions 1-3" (Oct. 9, 2009) (Affinion Doc. ASFW 06-01).

[63] Affinion spreadsheet, "Reason by Service & Client" (Aug. 21, 2009) (Affinion Doc. ASFE 04-59-82).

[64] *Id.*

[65] Internal Webloyalty employee e-mail (Feb. 16, 2009) (Webloyalty Doc. 88263).

calls are also related to cancellations or members questioning enrollment or the charge on their credit card or bank statement.

In a training manual, Affinion has informed its newly hired call center representatives that during an "8-hour shift" they will take "between 75-100 calls" and that "approximately 80% of these calls will be from members wishing to cancel their membership."[66]  In March 2008, Vertrue employees acknowledged a similar problem in an e-mail regarding a "Call Center Optimization" meeting.[67]  In discussing methods for reducing the cost associated with the call centers, Vertrue employees estimated that it received "7 million customer calls per year" and that "cancellation calls represent approximately 98% of call volume."[68]

In addition to cancellations, the employee manuals and scripts that Affinion, Vertrue, and Webloyalty provide to their call center representatives show that each company dedicates a significant amount of time training their employees on how to respond when members call to ask questions related to how they were enrolled, what the membership program is, or why there is a charge on their credit card or bank account statement.

A "Quick Reference Guide" distributed to Webloyalty employees explained that it was important to ask members why they were canceling their membership for Travel Values Plus, a membership program offered by Webloyalty.  It stated, "[m]any times the reason is that they had no idea what Travel Values Plus was and you will then have the opportunity to explain."[69]  Another page in a Webloyalty manual offered a list of the "Top Ten Reasons a Member Calls" and offered "Cancel my membership" and "What is this charge?" as the top two reasons.[70]  Other Webloyalty manuals provided call center representatives with a process for handling members asking the questions: "what is this charge?" or "who are you?"[71]

The "Great Fun Merged Product Script" that Affinion has provided to its call center representatives also shows they are trained on how to handle members who are calling to question enrollment or the charge on their bank statement.  The second heading in the manual's table of contents refers to a section entitled, "If Questioning the Charge/Enrollment," which instructs call center representatives to answer the member's question by stating, "The charge you see posted on your account is the (Monthly/Annual) membership fee for (Product).  We received a positive response online that activated your membership."[72]

---

[66] Affinion training manual, *Great Fun New Hire Training Manual* (Oct. 2, 2006) (Affinion Doc. AFSE 04-18772).

[67] Internal Vertrue e-mail, "Call Center optimization meeting" (Mar. 20, 2008) (Vertrue Doc. 111093).

[68] Vertrue, "Adaptive Call Center Optimization" (Mar. 18, 2008) (Vertrue Doc. 111095).

[69] Webloyalty document, *Quick Reference Guide: October 2006* (Webloyalty Doc. 26561).

[70] Webloyalty document, *Manual/Introduction – February* 2006 (Webloyalty Doc. 56370).

[71] Webloyalty training manual, "What is this Charge?/Who are you?:" (Webloyalty Doc. 26055).

[72] Affinion document, *Great Fun Merged Product Script:* (Sept. 18, 2006) (Affinion Doc. AFSE 03-1810, 1813).

A manual for Vertrue employees provides instructions remarkably similar to those provided to Affinion and Webloyalty employees. It provides a "Scripted Response" to answer the question, "How Did I Get Signed Up for this???"[73] The provided response states:

> Our records indicate that you agreed to try *[AM PROGRAM NAME]* while visiting the *[Client/Partner name]* website. For the order to be processed, you were required to enter and confirm your e-mail address. Additionally, by accepting the trial membership, you agreed to be enrolled using the billing source that you authorized and that after the 30 day trial membership, you would be billed the program fee.[74]

### C. High Rates of Cancellations and Low Rates of Usage

Affinion, Vertrue, and Webloyalty's internal data on their members' rates of cancellations and their rates of usage of the programs' benefits provide further evidence that online consumers are not aware they have been enrolled in membership clubs offered by the companies. Overwhelmingly, consumers cancel their memberships once they realize they are being charged on a monthly basis and very few consumers use the benefits offered by the membership programs.

Information provided by Affinion, Vertrue, and Webloyalty shows that the majority of the consumers the companies charge for services cancel their membership within five months of receiving the first charge on their credit card or checking account statement. Exhibit 5 to this report shows the number of members who have enrolled in Affinion, Vertrue, or Webloyalty's membership programs and remained members for at least one month, six months, one year, and five years. For the three companies, about a quarter of their members (26.2%) cancel during the free 30-day period, less than a third of their members (29.5%) are still members after six months and only 13.9% remain members for more than one year.

The cancellation pattern observed for these online consumers is similar to the one observed by the Minnesota Attorney General's office during its investigation into a preacquired account marketing campaign. In that case, where hundreds of thousands of bank customers were sold membership clubs or insurance policies through preacquired account marketing, investigators observed that most of these bank customers canceled not in the 30-day free trial period, but in the following months when they started seeing their credit card charges.[75] According to Professor Prentiss Cox, who supervised the Minnesota Attorney General's investigation, this pattern is "consistent with a large majority of the cancelling customers not understanding the solicitation and cancelling only after the charge appears on their accounts."[76]

---

[73] Vertrue document, *Online/Internet Marketing Main Menu* (May 31, 2007) (Vertrue Doc. 82269).

[74] *Id.*

[75] Prentiss Cox, *Invisible Hand of Preacquired Account Marketing*, forthcoming in Harvard Journal on Legislation, Vol. 47, No. 2 (2010). (Available at SSRN: http://ssrn.com/abstract=1460963. He explains, "If all consumers understood the free trial offer…the temporal pattern of cancellations should be heavily weighted toward cancellations during the free trial period.")

[76] *Id.*, at 24.

Information provided to the Committee by Affinion, Vertrue, and Webloyalty also shows that the vast majority of consumers who enroll in their programs never receive the "cash back award" or other incentive promised them in the enrollment offer.  As discussed in Section I above, a prominent feature of the post-transaction offers Affinion, Vertrue, and Webloyalty make to consumers is an up-front gift offer such as "$10 Cash  Back on Your Next Purchase!", which appears to be related to the website where the consumer has just made a purchase.

While the language and appearance of the offer suggests that clicking the "Yes" button automatically gives consumers a discount on their next purchase, the fine print informs consumers that they must take additional steps to receive the benefit.  According to information provided by the three companies, of the 34,262,674 members who were promised automatic cash gifts or other incentives, only 3% actually received the promised enrollment benefit.

Another indication that online consumers are unaware of their Affinion, Vertrue, or Webloyalty club memberships is their failure to log on to the clubs' websites to view and use the purported benefits offered by the clubs.  Evidence currently available to Committee staff suggests that the so-called member "usage rates" for Affinion, Vertrue, and Webloyalty are very low.

For example, Vertrue provided the Committee with the number of members who log in to their membership club websites.  In 2006, 100,091 members logged in to the membership clubs' websites; in 2007, 215,191 members logged in to the membership clubs' websites; and in 2008, 377,428 members logged in to the membership clubs' websites. While Vertrue has not yet explained to Committee staff whether these numbers include consumers attempting to cancel their membership, how many are multiple logins by the same consumer, or how many of these consumers actually received a club service after logging in, these figures, at best, represent only a small percentage (approximately 10-20%) of the total number of Vertrue club "members" in these years.

Information Webloyalty provided to the Committee also suggests its clubs have very low member usage rates.  A February 28, 2005, Webloyalty document titled, "Product Usage Statistics," appears to show that the rate of benefit usage for members enrolled through the data pass process ranged between .2% and 11.4% for a six month period between 2004 and 2005. [77] A "Site Usage" table presented to the Webloyalty Board of Directors in March 2006 reported that between 70% and 80% of Reservation Rewards club "members" enrolled through data pass had either never visited the Reservation Rewards site at all or viewed only the club's home page without ever accessing additional pages.[78]

In his statement to the Commerce Committee, Professor Benjamin Edelman cites publicly available web traffic data to reach a similar conclusion.  He notes that while Webloyalty claims to have more than two million paying club members, none of the company's club web pages rank among the Internet's top 100,000 sites for web traffic.  Professor Edelman concludes that,

---

[77] Webloyalty document, Product Usage Statistics (Feb. 28, 2005) (Webloyalty Doc. 56115).

[78] Webloyalty document, "Reservation Rewards: Member Site Usage" (March 27, 2006) (Webloyalty Doc. 103997).

"this gap between signups and users confirms that Webloyalty's marketing failed to obtain meaningful consent from the users who purportedly 'accepted' Webloyalty's offer."[79]

At this point in the investigation, Affinion, Vertrue, and Webloyalty have not provided the Committee with comprehensive data related to their rates of usage. Committee staff has reason to believe that this information is kept by the companies as a matter of course and that it would not be difficult to provide the information to the Committee. Consumer usage of these services is a key question because a low usage rate "is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances."[80]

## VI.    Partner Awareness of the Problem

Committee staff has spoken to more than a dozen e-commerce partners of Affinion, Vertrue, and Webloyalty and has reviewed thousands of pages of e-mail communications between Affinion, Vertrue, and Webloyalty and their e-commerce partners. The interviews and the e-mail communications provide abundant evidence that the e-commerce partners are aware that their customers are being misled by the enrollment offers from Affinion, Vertrue, and Webloyalty. This evidence also shows that e-commerce partners have repeatedly raised concerns about customer confusion over the data pass process and the enrollment offers. Many partners terminated their relationship because they determined it was not in the best interest of their customers.

### A.    "Customer Noise"

When e-commerce partners enter into financial partnerships with Affinion, Vertrue, and Webloyalty, the three companies promise to handle cancellations, complaints, and other "customer service" issues. As a result of this arrangement, when consumers see a membership club charge on their credit card or bank statements, they are provided only a club name and a toll free number operated by Affinion, Vertrue, and Webloyalty.

The purpose of routing customer service issues through the three Connecticut companies is to prevent what Webloyalty promotional materials call "negative impact on partner brands." Affinion, Webloyalty, and Vertrue handle dissatisfied customers in order to insulate the partners from their own customers' criticism, which is commonly described as "customer noise" by the companies.

For example, in November 2008, 1-800-Flowers.com's Director of Third Party Marketing wrote an e-mail to her Affinion contact complaining that "we have had increasingly more frequent feedback from our own teams that your agents are telling our customers to call us...." She asked for Affinion's help "to determine…how we can reduce the negative comments

---

[79] Prepared Statement of Professor Benjamin Edelman to the U.S. Senate Committee on Commerce, Science, and Transportation (Nov. 2009).

[80] *FTC v. Cyberspace.com*, 453 F.3d 1196, 1201 (9th Cir. 2006).

# EXHIBIT 15

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5   - - - - - - - - - - - - - -x

6   FEDERAL TRADE COMMISSION,     )

7              Plaintiff,         ) No.:  2:23-CV-0932-JHC

8              V.                 )

9   AMAZON.COM, INC., et al.,     )

10             Defendants.        )

11  - - - - - - - - - - - - - -x Pages 580-878

12

13

14     CONTINUED VIDEOTAPED DEPOSITION OF AMANDA BASTA

15               Tuesday, May 13, 2025

16                  Washington, DC

17

18

19  Reported by:  Sherry L. Brooks

20             Certified LiveNote Reporter

21  Job No. J12762460



```
 1                P R O C E E D I N G S

 2                *    *    *    *    *

 3                      AMANDA BASTA

 4   was called for further examination by counsel and,

 5   after having been duly sworn by the Notary, was

 6   examined and testified as follows:

 7            EXAMINATION BY COUNSEL FOR DEFENDANTS     10:10

 8            BY MR. KABA:                              10:10

 9       Q.   Good morning, Ms. Basta.  Just for the   10:10

10   record, could you identify yourself, please?

11       A.   Sure, Amanda Basta, B-A-S-T-A.           10:10

12       Q.   And we'll do this again when the         10:10

13   videographer is here.  But could you identify your

14   position at the FTC?

15            MR. COHEN:  Counsel, before we go, can we 10:10

16   just introduce everybody else in the room?

17            MR. KABA:  Oh, sure.  I thought -- I      10:10

18   thought appearances were noted, but we can go ahead

19   and do that.

20            Go ahead, Counsel, and identify yourself. 10:10

21            MR. COHEN:  Sure.  Jonathan Cohen for the 10:10
```



| | | |
|---|---|---|
| 1 | A. 2024. | 10:14 |
| 2 | Q. And who during that period had the sort of | 10:14 |
| 3 | first-line responsibilities for supervising the | |
| 4 | investigation and litigation? | |
| 5 | A. Sarah Waldrop, W-A-L-D-R-O-P. | 10:15 |
| 6 | Q. Okay. It's now coming back to memory that | 10:15 |
| 7 | I asked you this question before. So thanks for | |
| 8 | entertaining me reasking you those questions. | |
| 9 | Who was the lead attorney responsible for | 10:15 |
| 10 | the investigation in this case; that is, the person | |
| 11 | that reported to you? | |
| 12 | MR. COHEN: Objection. | 10:15 |
| 13 | A. There were three various points in time. | 10:15 |
| 14 | BY MR. KABA: | 10:15 |
| 15 | Q. Okay. Who were they and during what | 10:15 |
| 16 | points in time? | |
| 17 | A. Initially, it was Katherine Johnson. She | 10:15 |
| 18 | ran the investigation from approximately February of | |
| 19 | 2021 until April of 2022. Then Mr. Cohen ran the | |
| 20 | investigation from April of 2022 until sometime in | |
| 21 | the spring of 2023. I'm not sure exactly when we | |



1  transitioned.

2          And then Evan Mendelson ran the                    10:16

3  investigation from sometime in the spring of 2023

4  when he took over from Mr. Cohen until the -- you

5  know, until the filing of the complaint in June of

6  2023.

7      Q.    Okay.  And you mentioned Mr. Cohen.            10:16

8  That's your counsel who is here with you today?

9      A.    Yes.                                            10:16

10      Q.    Okay.  And then from the filing of the         10:16

11  complaint to present who has been sort of the

12  first-line -- not the first-line -- who has been kind

13  of the person overseeing that reports to you?

14      A.    So Mr. Mendelson led the case from when it     10:16

15  was filed first reporting to Ms. Waldrop because she

16  was filling that role at the time and then to me

17  until roughly January or February of this year.

18      Q.    Okay.  And who now is running it?              10:17

19      A.    Mr. Cohen.                                     10:17

20      Q.    So my first question is:  Is there a          10:17

21  particular reason that Ms. Johnson stopped running



1  the investigation in April of 2022?

2      A.    Yes.                                        10:17

3      Q.    What is that reason?                        10:17

4      A.    So like all of the staff in the Division    10:17

5  of Enforcement, Ms. Johnson has a number of

6  responsibilities.  And at that point in time we

7  determined that the needs of this case were not

8  compatible with her other obligations, and so we

9  decided to make a change.

10     Q.    What does that mean, "the needs of this     10:17

11 case were not compatible"?

12     A.    So, sure.  Her workload.  Basically, it     10:18

13 was for workload balance reasons.

14     Q.    Okay.  There was too much for her to do,    10:18

15 essentially, with all of her other work and this case

16 for her to continue also overseeing the investigation

17 of this case?

18     A.    Yes.  Around that time it became clear      10:18

19 that this case was going to need more focused

20 attention.  Mr. Cohen was returning from leave and he

21 would have the bandwidth.



1    Q.    Okay.  And then for -- what was the reason    10:18

2  that it shifted from Mr. Cohen to Mr. Mendelson in

3  the spring of 2023; that is, the oversight of the

4  investigation?

5    A.    Mr. Cohen was about to go out on parental    10:18

6  leave, and so we needed somebody who could take over

7  the day-to-day running of the case.

8    Q.    Okay.  And then coming back to now          10:18

9  oversight of the litigation, what is the reason, if

10 there is one, that it shifted from Mr. Mendelson

11 earlier this year to Mr. Cohen?

12       MR. COHEN:  Objection.                         10:19

13       I'm going to instruct you not to answer.      10:19

14 I think that that is protected information on a

15 number of bases, including the law enforcement

16 privilege, potentially deliberative process

17 privilege.  It's probably work product.

18       I'm not sure if you're going to know the      10:19

19 answer without attorney/client communications.  The

20 principle thing is that that really doesn't have

21 anything to do with the investigation, and I don't



1      A.    Because such information would be both          11:53

2  nonpublic and because it is information I acquired in

3  the context of conversations with my client, I cannot

4  answer that question on the basis of privilege and

5  statutory prohibitions.

6              BY MR. KABA:                                  11:54

7      Q.    So to be clear, you are not answering my        11:54

8  question with respect to cancellation flows either,

9  correct?

10             MR. COHEN:  Argumentative, scope.             11:54

11     A.    Yes, on the basis of privilege and             11:54

12  statutory prohibitions.  Yes.

13             BY MR. KABA:                                  11:54

14     Q.    Okay.  So let's try it a different way.         11:54

15  Has the FTC ever publicly identified any online

16  enrollment flow that complies with ROSCA?

17             MR. COHEN:  Objection.  Scope.  Do you        11:54

18  want to point her to a topic?

19             BY MR. KABA:                                  11:54

20     Q.    You may answer the question.                    11:54

21             MR. KABA:  I'm not looking for your           11:54



1  assistance, Mr. Cohen, and you know better than that.

2          BY MR. KABA:                                    11:54

3      Q.    Do you need my question again?               11:54

4      A.    No.  Not that I'm aware of or not that I     11:55

5  recall at the moment.

6      Q.    Ms. Basta, has the FTC ever publicly         11:55

7  identified any online cancellation flow that complies

8  with ROSCA?

9          MR. COHEN:  Objection.  Scope.                 11:55

10     A.    Again, not that sitting here I can recall.   1:55

11         BY MR. KABA:                                   11:55

12     Q.    Okay.  There are thousands of online         11:55

13  enrollment and cancellation flows for subscription

14  programs, correct?

15         MR. COHEN:  Objection.                         11:55

16     A.    I have no way of knowing how many there      11:55

17  are one way or the other.

18         BY MR. KABA:                                   11:55

19     Q.    There are -- but the FTC has I think in      11:55

20  documents that it's publicized says that there are a

21  lot of online enrollment and cancellation flows that



1  the FTC would say are subject to ROSCA, right?

2          MR. COHEN:  Objection.  Form.                11:55

3      A.    Yes, any -- any online program with a      11:56

4  negative option feature, yes, that's part of the

5  statute.

6          BY MR. KABA:                                 11:56

7      Q.    And the FTC has not pursued claims against 11:56

8  all of those online enrollment and cancellation

9  flows, correct?

10         MR. COHEN:  Objection.  Form.                11:56

11     A.    There would be no way to do that.          11:56

12         BY MR. KABA:                                 11:56

13     Q.    What percentage of the online enrollment   11:56

14 flows that the FTC contends violate ROSCA do you --

15 would you say the FTC has actually pursued claims

16 against?

17         MR. COHEN:  Objection.  Form.                11:56

18         BY MR. KABA:                                 11:56

19     Q.    Less than 1 percent?                       11:56

20     A.    I have --                                  11:56

21         MR. COHEN:  Objection.                       11:56



1        A.    Okay.  So it's an amalgam of the features    13:35

2   that are kind of outlined here.  So it needs to have,

3   you know, how they're presented, where they're

4   presented, the means in which -- the way that they

5   look.  All of those things are features that lend to

6   understandability.

7          And so it is these -- these features in         13:36

8   the aggregate, taking into account kind of that there

9   are different media and different media may have

10  different features that help consumers understand.

11          BY MR. KABA:                                    13:36

12       Q.    And so is that the -- is that your view      13:36

13  based on just what you're reading now or is that the

14  FTC's actual guidance that "easily understandable to

15  ordinary consumers" means these -- this bullet

16  pointed list?

17          MR. COHEN:  Scope.  Objection based on          13:36

18  scope.

19          And, again, answer only if you can answer       13:36

20  without divulging privileged material, deliberative

21  process material, and material protected by statute.



```
 1        A.    What's here is an including list, right?    13:36

 2   So here are some of the considerations.  There could

 3   be others, but at the end of the day, the issue with

 4   respect to a clear and conspicuous disclosure, which

 5   is what we're talking about, is do consumers

 6   understand.  And so these features and any others

 7   that would lend to how well they understand.

 8              BY MR. KABA:                                13:37

 9        Q.    Okay.  So I'll just go back to my          13:37

10   question.  You have described -- well, let me try it

11   a -- let me try a different way.

12              There's a list of one, two, three, four,    13:37

13   five, six, seven, eight bullets under the reference

14   to the disclosures must be clear and conspicuous; is

15   that right?

16        A.    Yes.                                        13:37

17        Q.    Okay.  And if someone complied with this    13:37

18   list of eight bullets, would that mean that their

19   disclosures are clear and conspicuous under ROSCA?

20              MR. COHEN:  Objection.  Scope.  Form.       13:38

21   Compound.
```



1              And, again, answer only to the extent          13:38

2    you're able to respond without divulging privileged

3    information, deliberative process material, and

4    material protected by statute.

5         A.   I mean, not all of the bullets apply to        13:38

6    all offers, right, because some may be in certain

7    media and some may be in others.  But barring that, I

8    think if the disclosures have these features, they

9    are likely to be clear and conspicuous, unavoidable

10   -- well --

11             BY MR. KABA:                                    13:38

12        Q.   Why don't I try it a different way?            13:38

13        A.   I was going to say, it says:  "To meet the     13:38

14   standard, offers" --

15             MR. COHEN:  Let her finish.                    13:38

16        A.   -- "should be difficult to miss, easily        13:38

17   noticeable, or unavoidable" -- so that's kind of one

18   thing -- "and easily understandable by ordinary

19   consumers."

20             So I think to the extent that these            13:39

21   features are present it is more likely to meet that



1    standard.  Could there be evidence of consumers still

2    -- ordinary consumers still being confused in a way

3    that make it obvious that it's not clear and

4    conspicuous?  Sure.

5              But I think as a starting place, as a                13:39

6    touchstone, this is -- these are the kinds of things

7    that in the case law and in the cases -- like

8    concepts you can tease out with respect to what it

9    means to be clear and conspicuous.

10             BY MR. KABA:                                        13:39

11       Q.    Okay.  Let me try to understand something          13:39

12   maybe in a more direct way.  There are -- under this

13   Section 2 that begins at page 3, Principles for

14   Negative Option Marketing, there are bullet points

15   that cover the material terms that need to be

16   disclosed, the disclosure -- the disclosures need to

17   be clear and conspicuous, the bullets concerning

18   express informed consent, and bullets concerning --

19   or text concerning cancellation, which are all -- do

20   you see all of that?

21       A.    Yes.                                                13:40



1      Q.    And those are all of the elements of the      13:40

2  statute in ROSCA, correct?

3           MR. COHEN:  Scope.  Form.                       13:40

4      A.    Clear and conspicuous disclosure, express     13:40

5  informed consent, and simple mechanism to cancel.

6  Those are the elements.

7           BY MR. KABA:                                    13:40

8      Q.    And that's what is covered in this            13:40

9  enforcement policy statement from pages 3 to 5,

10  correct?

11     A.    Yes.                                           13:40

12     Q.    And so my question for you is:  If a          13:40

13  company reviewed this enforcement policy statement

14  and sort of went through these bullets and did the

15  things that these bullets are describing, would that

16  company be compliant with ROSCA, not compliant with

17  ROSCA, or it depends on more information that we

18  don't have?

19          MR. COHEN:  Objection.  Scope.  It calls       13:41

20  for speculation.  It's an incomplete hypothetical.

21  Just form.



1    A.    Yeah.  It depends on information we          13:41

2  certainly don't have here.  What does the flow look

3  like?  How is the information presented?  What kind

4  of -- in context.

5          These are certainly elements that if -- if   13:41

6  you were trying to build a ROSCA-compliant website,

7  these are certainly things you'd want to take into

8  account.  But a lot of it depends on context and

9  consumer understanding.  So you can't -- in an

10  investigation we would want more information.

11          BY MR. KABA:                                 13:42

12    Q.    Okay.  So the point I think you're getting   13:42

13  at is even a company that complies with all of these

14  bullets that are laid out in the text, laid out in

15  this enforcement policy statement, may not comply --

16  may not be found to comply with ROSCA?

17          MR. COHEN:  Objection.  Scope.  Form.        13:42

18  Calls for speculation.

19          BY MR. KABA:                                 13:42

20    Q.    Go ahead, Ms. Basta.                         13:42

21    A.    It's hard to say in a vacuum, but I think    13:42



1  a company who did these things would be likely to

2  comply.

3           Now, could there be evidence that               13:43

4  consumers are still confused?  Could there be

5  evidence internal to the company that they understand

6  that consumers are not finding the mechanism simple

7  or that they're not finding the disclosures clear

8  enough and conspicuous enough?

9           But as a starting place I think a company       13:43

10  that undertakes these efforts are more likely to

11  comply than a company that doesn't.

12      Q.    Yeah.  I understand that.  But do you          13:43

13  remember what my question was, Ms. Basta?

14      A.    I thought I did.                               13:43

15      Q.    Okay.  So my question is not as a starting     13:43

16  point or as likely or unlikely.  My question is a

17  little bit of a more direct question.

18           If a company complied with all of these        13:43

19  bullets that are laid out in this enforcement policy

20  statement in the text, would that company -- could

21  that company still be found to violate ROSCA?



1              MR. COHEN:  Objection.  Again, objection          13:44

2    to the prefatory remark and the characterization of

3    the question is more direct.  Asked and answered.

4    Scope.  Form.

5         A.    Yeah.  It can't be answered in a vacuum.        13:44

6    I think it would be unlikely that a company who did

7    all of these things, assuming that they were

8    actually, you know, done in the way described -- I

9    think it would be unlikely that they would violate.

10             BY MR. KABA:                                     13:44

11        Q.    But still possible with more information?        13:44

12             MR. COHEN:  Objection.  Scope.  Incomplete       13:44

13   hypothetical.

14        A.    You always need the context.                    13:44

15             BY MR. KABA:                                     13:44

16        Q.    I don't know how that -- what does that         13:44

17   mean?

18        A.    So, again, how does the flow look?  What        13:44

19   evidence does the company have relating to how

20   consumers interact with and how they understand the

21   flows?  Is there any external evidence?  Is -- you



1  know, what do consumer complaints look like?

2          All of those things that you'd want to          13:45

3  know before you made a determination, one way or the

4  other.

5      Q.    Okay.  So you're saying that -- I --          13:45

6  that's the context you're referring to?

7      A.    Yeah.                                          13:45

8      Q.    So you're saying even if a company did all    13:45

9  of the things that this document enforcement policy

10  statement that Exhibit 16 describes, they still may

11  not comply with ROSCA depending on what additional

12  context may exist, including the things you

13  described?

14          MR. COHEN:  Objection.  Form.  Scope.           13:45

15      A.    Again, I think it's unlikely that they       13:45

16  would violate under those circumstances, but you'd

17  have to look at the actual circumstances to say for

18  sure one way or the other.

19          BY MR. KABA:                                    13:45

20      Q.    Okay.  I guess let me ask you in a            13:45

21  slightly different way then.  This list is --



 1      Q.    Go ahead.                                    13:58

 2      A.    There's no per se bar, no.                   13:58

 3      Q.    In fact, the FTC has -- has said that a      13:58

 4  request to consider an offer or discount would not

 5  amount to an unreasonable delay for purposes of

 6  evaluating the simplicity of a cancellation

 7  mechanism, correct?

 8            MR. COHEN:   Objection.   Form -- excuse me  13:58

 9  -- objection.   Scope.

10            BY MR. KABA:                                 13:58

11      Q.    Were you aware of that?                      13:58

12      A.    Again, I think it depends on the offer       13:58

13  itself.

14      Q.    What would depend on the offer?              13:59

15      A.    Well, such an offer might not necessarily    13:59

16  unreasonably delay.   You could imagine -- picture an

17  offer that would.   It's that not all will.

18      Q.    Okay.   So sometimes offering the customer   13:59

19  or presenting the customer with an offer or a

20  discount in the cancellation flow is okay and

21  sometimes it may not be okay?



AMANDA BASTA                                        May 13, 2025
FTC V. AMAZON.COM                                            739

```
 1              MR. COHEN:  Objection.  Form.  Scope.        13:59
 2         A.    It depends on the flow overall.  So,        13:59
 3  again, has -- you know, does the -- that offer appear
 4  once?  Does it appear multiple times?  Does the offer
 5  encourage consumers to navigate away from the flow?
 6              Does it interrupt without -- you know,        13:59
 7  whether -- without accepting like does it get them
 8  out of the flow and then, you know, maybe that causes
 9  an unreasonable delay?  Again, it depends on context.
10              BY MR. KABA:                                  14:00
11         Q.    So my question is -- I think then you're     14:00
12  agreeing with my statement, right, which is:
13  Sometimes offering the customer or presenting the
14  customer with an offer or a discount in the
15  cancellation flow is okay and sometimes it's not
16  okay?
17              MR. COHEN:  Objection.  Asked and             14:00
18  answered.  Form.  Scope.
19              BY MR. KABA:                                  14:00
20         Q.    Is that correct?                             14:00
21         A.    It depends on the flow overall, yes.         14:00
```



AMANDA BASTA                                    May 13, 2025
FTC V. AMAZON.COM                                       740

1      Q.    Would you agree with me that some      14:00

2  customers would actually benefit from an offer where

3  they could lower the price of their subscription?

4            MR. COHEN:  Objection.  Scope.         14:01

5      A.    I imagine some would.                  14:01

6            BY MR. KABA:                           14:01

7      Q.    Can you think of any customers who      14:01

8  wouldn't benefit from a lower price subscription?

9            MR. COHEN:  Objection.  Scope.         14:01

10     A.    Consumers who didn't want any subscription  14:01

11  at all.

12           BY MR. KABA:                           14:01

13     Q.    Assuming a consumer wants a subscription  14:01

14  -- by the way, you don't actually know what's --

15  neither you nor anybody at the FTC actually knows

16  what's in the consumer's heads, correct?

17           MR. COHEN:  Objection.                 14:01

18     A.    Not subjectively, no.                  14:01

19           BY MR. KABA:                           14:01

20     Q.    Right.  And so if a consumer had a      14:01

21  subscription, can you think of any that are harmed by



 1  being presented with an offer for a lower cost for

 2  that subscription?

 3          MR. COHEN:  Objection.  Form.  Scope.          14:01

 4      A.   So a consumer who wants to cancel -- I       14:02

 5  just want to make sure I understand the hypothetical.

 6          A consumer who -- who enters a               14:02

 7  cancellation pathway and then is offered within that

 8  pathway a lower price, to the extent that the offer

 9  thwarts their ability to cancel, it could harm them,

10  yes.

11          BY MR. KABA:                                 14:02

12      Q.   Well, I guess you're saying it thwarts      14:02

13  their ability to cancel.  The statute only speaks to

14  a simple cancellation mechanism, correct?

15          MR. COHEN:  Objection.  Form.  Scope.         14:02

16          BY MR. KABA:                                 14:02

17      Q.   Is that correct?                            14:02

18      A.   Yes.                                        14:02

19      Q.   Okay.  And you don't actually know that     14:02

20  every person who enters a cancellation pathway is

21  doing so because they want to cancel, correct?



 1  consistent with providing a simple mechanism for a

 2  consumer to stop recurring charges, right?

 3          MR. COHEN:  Objection.  Scope.          14:12

 4      A.    I think that probably depends.        14:12

 5          BY MR. KABA:                            14:12

 6      Q.    Well, if pausing a membership allows the   14:12

 7  consumer to stop recurring charges, then it would

 8  qualify under this requirement 3?

 9          MR. COHEN:  Objection.  Scope.          14:12

10      A.    I don't -- I don't think there's enough   14:12

11  information to know that in the hypothetical.

12          BY MR. KABA:                            14:12

13      Q.    What more do you need?                14:12

14          MR. COHEN:  Again, scope.               14:12

15      A.    Whether and how the charges would recur,   14:13

16  if it's a permanent stoppage and the consumer has to

17  take an affirmative step to reenact the charges.

18  That's one thing.

19          If it is a temporary pause and then it    14:13

20  kind of kicks back in after a certain amount of time,

21  I don't know whether that would be simple -- or I



1  don't know whether that would be stopping -- sorry,

2  the wrong part of the statute.

3          BY MR. KABA:                                    14:13

4      Q.    Okay.  So the statute itself does not        14:13

5  specifically say it needs to be a simple mechanism to

6  cancel, correct?

7      A.    Correct.                                      14:13

8      Q.    It simply needs to be a simple mechanism     14:13

9  for a consumer to stop recurring charges, correct?

10     A.    Sure.                                         14:13

11     Q.    And a pause could be a way for a consumer     14:13

12 to stop recurring charges, correct?

13          MR. COHEN:  Objection.  Scope.  We have a      14:13

14 scope objection to this whole line of questioning.

15          BY MR. KABA:                                   14:13

16     Q.    Go ahead, Ms. Basta.  It could be?           14:13

17     A.    Could be, not necessarily.                   14:13

18     Q.    Okay.  I'd like you to go to the             14:14

19 enforcement policy statement again, please.  It's

20 Exhibit 16.

21     A.    Yes.                                          14:14



AMANDA BASTA                                    May 13, 2025
FTC V. AMAZON.COM                                      756

```
 1        Q.    Do you -- sorry.                      14:14

 2              Sitting here today, do you know whether if   14:14

 3   a consumer pauses their Prime membership whether that

 4   stops recurring charges?

 5              MR. COHEN:  Objection.  Scope.         14:14

 6        A.    For at least some period of time I believe   14:14

 7   it does.

 8              BY MR. KABA:                           14:14

 9        Q.    Okay.  What is the definition of       14:14

10   recurring?

11              MR. COHEN:  Objection.  Scope.         14:14

12        A.    Repeating charges.                     14:14

13              BY MR. KABA:                           14:14

14        Q.    Repeating monthly or annually?         14:14

15              MR. COHEN:  Objection.  Scope.         14:14

16        A.    On some regular period.                14:14

17              BY MR. KABA:                           14:14

18        Q.    Well, with Prime you know the way that it    14:14

19   repeats is either monthly or annually, correct?

20        A.    Yes.                                   14:14

21        Q.    So in the context of Prime, the case we're   14:14
```



1    here for, recurring charges would mean charges that

2    repeat every month or every year depending on the

3    nature of the subscription?

4            MR. COHEN:  Objection.  Scope.                14:15

5            BY MR. KABA:                                  14:15

6       Q.    Correct?                                     14:15

7       A.    I believe so, yes.                           14:15

8       Q.    So stopping those recurring charges then     14:15

9    would mean the charges are not repeating in -- in

10   that fashion, either monthly or annually?

11           MR. COHEN:  Objection.  Scope.                14:15

12      A.    So, again, where I'm having a problem        14:15

13   making sure we're on the same page with the question

14   is, something could stop for a period of time and

15   then start up again without -- kind of on its own

16   automatically without the consumer taking any

17   intervening action versus stopping and only

18   restarting that recurring pattern when the consumer

19   acts.

20           So saying stopping doesn't really tell the    14:15

21   whole -- it doesn't give the whole picture.



1                    CERTIFICATE OF NOTARY PUBLIC

2              I, SHERRY L. BROOKS, a Notary Public in

3    and for the DISTRICT OF COLUMBIA, before whom the

4    foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn by me; that the

7    testimony of said witness was taken by me in

8    Shorthand at the time and place mentioned in the

9    caption hereof and thereafter transcribed by me; that

10   said deposition is a true record of the testimony

11   given by said witness; that I am neither counsel for,

12   related to, nor employed by any of the parties to the

13   action in which this deposition was taken; and

14   further, that I am not a relative or employee of any

15   counsel or attorney employed by the parties hereto,

16   nor financially or otherwise interested in the

17   outcome of this action.

18                              _Sherry L. Brooks_

19                              SHERRY L. BROOKS
                          Notary Public in and for
20                            DISTRICT OF COLUMBIA

21   My commission expires:  November 30, 2025



# EXHIBIT 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

                Plaintiff,

    v.

AMAZON.COM, INC., *et al.*,

                Defendants.

Case No.: 2:23-cv-0932-JHC

DECLARATION OF NON-
PARTY MILES HUNTER

I, Miles Hunter, declare as follows:

    1.     I have reviewed the Federal Trade Commission's May 24, 2025 Second Supplemental Expert Witness Disclosure related to me (the "Disclosure") in the above-captioned matter.  I understand that the Disclosure is intended to summarize my "opinions and general topics of anticipated testimony," and the "factual bases for opinions and topics of [my] anticipated testimony."

    2.     I was not aware of the FTC's intention to designate me as an "expert" witness and was not contacted by the FTC regarding the Disclosure or its contents.

    3.     The "topics" listed in the Disclosure relate to events that occurred between four and 8 years ago.  Any opinion that I formed on those "topics" were broad and would have been based on information provided by others, much of which I can no longer recall clearly due to the passage of time.  Accordingly, I am not comfortable being designated as an expert witness or providing purported expert testimony in this case.

4.    For the reasons stated in this Declaration, I do not have the personal knowledge required to testify as an expert witness for the Federal Trade Commission on these topics.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 26th day of May, 2025.

By: 

Miles Hunter

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an
officer of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and
as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an
officer of AMAZON.COM, INC.,

      Defendants.

**Civil Action No. 2:23-cv-0932-JHC**

# EXPERT REPORT OF RONALD T. WILCOX, PH.D.

## February 24, 2025

CONFIDENTIAL

support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

14.    My work on this matter is ongoing and I reserve the right to update and supplement my opinions as additional facts become available.

## IV.    Summary of Opinions

15.    I was asked to design and conduct a survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com.  To that end, I designed and conducted a survey that presented respondents with a simulated portion of the Amazon.com website.  Respondents were instructed to navigate the simulated website as they would if they wanted to cancel their Prime membership.  The results of the survey show that 99.8% of respondents (or 529 out of 530 respondents) located the Cancellation Flow and 96.4% of respondents (or 511 out of 530 respondents) paused or ended their Prime membership.  On average, respondents who located the Cancellation Flow took 47 seconds to locate it, and respondents who paused or ended their Prime membership took 28 seconds to pause or end their Prime membership once they entered the Cancellation Flow.  Overall, respondents who paused or ended their Prime membership took an average of 74 seconds to locate the Cancellation Flow and to pause or end their Prime membership.  These results are inconsistent with the FTC's allegation that the online cancellation process inhibited or prevented Prime members who intended to cancel from being able to do so.

16.    I was also asked to design and conduct a survey to assess the extent to which US consumers have experience with free trials of memberships and subscriptions, particularly those that automatically turn into paid memberships or subscriptions unless cancelled.  The survey found that 92.5% of respondents reported that they currently pay for at least one membership or subscription from the list that was provided, and that 58.0% of respondents reported signing up for one or more free trials of memberships and subscriptions in the past 12 months.  Among respondents who reported signing up for one or more free trials of memberships or subscriptions in the past 12 months, 85.0% indicated that the free trial they had most recently signed up for either automatically turned into a paid membership or subscription at the end of the trial period,

h.  Stimuli should be clearly displayed to respondents and should mimic, as closely as possible, what consumers would have seen.[32]

i.  A survey should be pretested to identify potential issues with instructions, questions, or answer options, such as ambiguity or lack of clarity.[33]

j.  The data analysis should follow best practices in statistics.[34]

18.  I took into account each of these guidelines in designing and conducting my surveys and analyzing their data.

## VI.  Cancellation Survey

### A.  Objectives

19.  I was asked to design and conduct a survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com as described by the FTC.  To that end, I designed and conducted the Cancellation Survey, which presented respondents with a simulated portion of the Amazon.com website that included the Prime Central page, the Amazon Landing page, the Your Account page, the Your Memberships & Subscriptions page, and the three pages of the Cancellation Flow described in the Amended Complaint.  Consistent with the FTC's allegations, the target population of the Cancellation Survey was defined as U.S. adults who own a Prime membership or share a Prime membership with a household member.[35]  **Appendix F.1** presents the Cancellation Survey questionnaire and **Appendix F.2** presents screenshots of the Cancellation Survey.

---

[32] Diamond and Swann (2022), p. 312 ("If the primary stimulus is an image or video file, then it is important that the image or video be properly displayed to participants."), p. 313 ("If purchasing occurs online and the consumer will see only a picture of the product, that should be the way the survey respondent sees it.").

[33] Diamond (2011), p. 388 ("Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous…").

[34] Diamond (2011), p. 364 ("For a survey, the question becomes, 'Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?'  This focus on the adequacy of the methodology used in conducting and analyzing results from a survey is also consistent with the Supreme Court's discussion of admissible scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*"); Manual for Complex Litigation, p. 103 ("The sampling methods used must conform to generally recognized statistical standards.  Relevant factors include whether…the data were analyzed in accordance with accepted statistical principles.").

[35] Amended Complaint, ¶ 7 ("…Amazon also knowingly complicated the cancellation process for Prime subscribers who sought to end their membership. … [T]he primary purpose of the Prime cancellation process was not to enable subscribers to cancel, but rather to thwart them."), ¶ 13 ("…Amazon advertised, distributed, or sold a paid subscription service, Prime, that gives subscribers through the United States access to additional services…"); **Appendix F.1**, S30 and S80.

E.    Results

1.    99.8% of Respondents Located the Cancellation Flow and 96.4% of
       Respondents Paused or Ended Their Prime Membership

47.    Exhibit 10 shows that, among the 530 respondents who qualified and completed the survey

(i.e., succeeded or failed the task in the survey), 99.8% (i.e., all respondents but one) located the

Cancellation Flow and 96.4% (i.e., 511 out of 530 respondents) clicked on the "End Now," "End

on [Date]," or "Pause on [Date]" buttons in the Cancellation Flow.[95, 96]  In particular, as Exhibit

10 shows, 77.0% of respondents who entered the stimulus clicked on the "End Now" button,

17.7% clicked on the "End on [Date]" button, and 1.7% clicked on the "Pause on [Date]"

button.[97]

---

for additional details.  This share is close to the share of Prime members in the U.S. adult population, which is 64.5%
but, as expected, it is higher given that the sample of respondents who answered **S80** had already been filtered down
to respondents who indicated that they had shopped online in the last 12 months in **S60**.  I obtained the share of
Prime members in the U.S. adult population by dividing the number of Prime members in 2022 by the size of the U.S.
adult population in 2022.  The number of Amazon Prime members in 2022 in the United States was 168.3 million.
*See* "Number of Amazon Prime Users in the United States from 2017 to 2022 with a Forecast for 2023 and 2024 (in
Millions)," *Statista*, https://www.statista.com/statistics/504687/number-of-amazon-prime-subscription-households-
usa/.  The estimated resident population age 18 years and older in the United States in July 2022 was 260.8 million.
*See* "Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United
States, States, District of Columbia, and Puerto Rico: July 1, 2022," *U.S. Census Bureau*,
https://www.census.gov/data/datasets/time-series/demo/popest/2020s-national-detail.html.  Therefore, the share of
U.S. adult Prime members is calculated as (168.3)/260.8=64.5%.
[95] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   *See* Amended Complaint, ¶¶ 162–163.  Prime members may exit the Cancellation Flow for various
reasons, including because they were reminded of benefits associated with the Prime membership or informed of
alternative payment plans.  In contrast, in the Cancellation Survey, respondents were instructed to navigate the
simulated website as if they wanted to cancel their Prime membership.  Therefore, it is reasonable to expect that the
percentage of respondents who pause or end their Prime membership in the Cancellation Survey (a simulated
exercise) would be higher than the percentage of Prime members who enter the Cancellation Flow and cancel their
Prime membership.
[96] Among respondents who located the Cancellation Flow, 65.0% did so without receiving Additional Instructions,
17.4% received Additional Instructions once, 10.0% received Additional Instructions twice, and 7.6% received
Additional Instructions three or more times.  The maximum number of times these respondents received Additional
Instructions was 14.  *See* **Appendix F.10** for additional details.  Among respondents who reached the third page of
the Cancellation Flow and clicked on the "End Now," "End on [Date]," and "Pause on [Date]" buttons, 95.9% did so
without receiving Additional Instructions in the Cancellation Flow, while 4.1% received Additional Instructions once.
*See* **Appendix F.10** for additional details.  **Appendix F.11** displays 95% confidence intervals for these results.
[97] The share of respondents locating the Cancellation Flow and clicking on the "End Now," "End on [Date]," or "Pause
on [Date]" buttons may underestimate the share of respondents that would click on these buttons in real-life situation
because, in the survey, some respondents may have misunderstood the instructions or failed to follow them.  *See,
e.g.,* Diamond and Swann (2022), p. 364 ("[E]ven a perfectly designed and executed survey will generate noise,
guessing, lack of understanding, so-called yea-saying, and other responses that are extraneous to what the survey is
attempting to test."); Oppenheimer, D., T. Meyvis, and N. Davidenko (2009), "Instructional Manipulation Checks:
Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45, pp. 867–872 at p.
867 ("Most experimenters have dealt with participants who are not as diligent as we would like them to be… Some
participants may skim instructions, missing key elements of the task or manipulation, or respond in a haphazard
fashion that defies outlier analysis.").

**Exhibit 10**
**Respondents' Interactions with the Cancellation Stimulus[1]**

| Survey Respondents Who… | Number of Respondents | Share of Respondents |
|---|---|---|
| Did Not Reach the Cancellation Flow[2] | 1 | 0.2% |
| Reached the Cancellation Flow | 529 | 99.8% |
|    Clicked on "End Now," "End on [Date]," or "Pause on [Date]"[3] | 511 | 96.4% |
|       Clicked on "End Now" | 408 | 77.0% |
|       Clicked on "End on [Date]" | 94 | 17.7% |
|       Clicked on "Pause on [Date]" | 9 | 1.7% |
| **Total Survey Respondents** | **530** | **100.0%** |

Source: Cancellation Survey 10/10/24–10/14/24
Note:
[1] Data are filtered to "Qualified" respondents who completed the survey (i.e., succeeded or failed the task in the survey).
[2] One respondent was not able to locate the Cancellation Flow within the 10-minute time limit.
[3] Respondents who finished the cancellation process by clicking the the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button on the third page of the Cancellation Flow are shown.  Note that "[Date]" is a placeholder, filled for each respondent as the date corresponding to 15 days after the date the respondent took the survey.  18 respondents reached the Cancellation Flow but did not click the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button.

### 2.    Respondents Took 47 Seconds on Average to Locate the Cancellation Flow

48.    Exhibit 11 shows the distribution of time it took respondents to locate the Cancellation Flow after entering the stimulus, among the 529 respondents (out of 530) who located the Cancellation Flow.  On average, it took these respondents 47 seconds to locate the Cancellation Flow.  The results show that 78.3% of respondents located the Cancellation Flow in less than one minute and 92.4% of respondents located the Cancellation Flow in less than two minutes.[98]

---

[98] Workpaper 2.

**Exhibit 11**
**Time Spent Locating the Cancellation Flow By Cancellation Survey Respondents**



Source:  Cancellation Survey 10/10/24–10/14/24
Note:  This exhibit displays the number of respondents by the number of seconds it took them to locate the Cancellation Flow. Each bin represents a 30-second interval.  Data includes all 529 respondents who located the Cancellation Flow.  The values above each bar denote the number and percentage of respondents in each bin among the 529 respondents who located the Cancellation Flow. The minimum time to locate the Cancellation Flow was 5 seconds, and the maximum time to locate the Cancellation Flow was 569 seconds (or 9 minutes and 29 seconds).

### 3.    After Locating the Cancellation Flow, Respondents Took 28 Seconds on Average to Pause or End Their Prime Membership

49.    Exhibit 12 shows the distribution of time it took the 511 respondents (out of 530) to click on the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button after locating the Cancellation Flow.  On average, it took these respondents 28 seconds to click on one of those three buttons on the last page of the flow after entering the Cancellation Flow.  The results show that, after entering the Cancellation Flow, 93.7% of respondents reached the last page of the flow and clicked on one of those three buttons in less than one minute, and 99.2% of respondents did the same in less than two minutes.[99]

---

[99] Workpaper 3.

**Exhibit 12**

**Time Spent in the Cancellation Flow Among Cancellation Survey Respondents Who Clicked on "End Now," "End on [Date]," or "Pause on [Date]" Buttons**



Source:  Cancellation Survey 10/10/24–10/14/24
Note:  This exhibit displays the number of respondents by the number of seconds it took them to click the "End Now," "End on [Date]," or "Pause on [Date]" buttons after entering the Cancellation Flow.  Each bin represents a 15-second interval.  Data is limited to 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The values above each bar denote the number and percentage of respondents in each bin among the 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons.  The minimum time spent in the Cancellation Flow was 5 seconds, and the maximum time spent in the Cancellation Flow was 303 seconds (or 5 minutes and 3 seconds).

### 4.    Respondents Took 74 Seconds on Average to Locate the Cancellation Flow and to Pause or End Their Prime Membership

50.    Exhibit 13 shows the distribution of time it took the 511 respondents (out of 530) to click on the "End Now" button, the "End on [Date]" button, or the "Pause on [Date]" button on the last page of the Cancellation Flow after entering the Cancellation Stimulus.  On average, after entering the Cancellation Stimulus, it took respondents 74 seconds to reach the third page of the Cancellation Flow and to click on one of those three buttons.  The results show that, after entering the Cancellation Stimulus, 53.2% of respondents reached the third page of the Cancellation Flow and clicked on one of those three buttons in less than one minute, and 86.7% of respondents did the same in less than two minutes.[100]

---

[100] Workpaper 4.

**Exhibit 13**
**Total Time Spent in the Cancellation Stimulus Among Respondents Who Clicked on "End Now,"**
**"End on [Date]," or "Pause on [Date]" Buttons**



Source: Cancellation Survey 10/10/24–10/14/24
Note: This exhibit displays the number of respondents by the time in seconds it took them to locate and enter the Cancellation Flow and click the "End Now," "End on [Date]," or "Pause on [Date]" buttons. Each bin represents a 30-second interval. Data is limited to 511 respondents who clicked on the "End Now," "End on [Date]," or "Pause on [Date]" buttons. The values above each bar denote the number and percentage of respondents in each bin among the 511 respondents who clicked on "End Now," "End on [Date]," or "Pause on [Date]" buttons. The minimum total time spent in the Cancellation Stimulus was 14 seconds, and the maximum total time spent in the Cancellation Stimulus was 9 minutes and 51 seconds.

## VII.    Free Trials Survey

### A.    Objectives

51.    I was asked to design and conduct a survey to assess the extent to which consumers have experience with free trials of memberships and subscriptions, particularly those that automatically turned into paid memberships or subscriptions unless cancelled. To that end, I designed and conducted the Free Trials Survey and defined the target population of the Free

Executed this 24th day of February, 2025

_____

Ronald T. Wilcox, Ph.D.

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an officer
of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and
as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an officer
ofAMAZON.COM, INC.,

     Defendants.

Civil Action No. 2:23-cv-0932-JHC

**EXPERT REPORT OF NEALE MAHONEY**

**March 24, 2025**

Confidential

Expert Report of Neale Mahoney

# I. Introduction

## I.A. Experience and qualifications

(1)  I am a Professor of Economics at Stanford University and the Trione Director of the Stanford Institute for Economic Policy Research (SIEPR). I am also a Research Associate at the National Bureau of Economic Research (NBER), and an Affiliated Professor at J-PAL, and the George P. Shultz Fellow at SIEPR. In 2022–2023, I was a Special Policy Advisor for Economic Policy in the White House National Economic Council.

(2)  I received my PhD and MA in Economics from Stanford University in 2011 and my Sc.B in Applied Mathematics-Economics from Brown University, summa cum laude, in 2005. Before joining Stanford, I was Professor of Economics and David G. Booth Faculty Fellow at the University of Chicago Booth School of Business. I was also a Robert Wood Johnson Fellow in health policy research at Harvard University in 2011–2012.

(3)  I have taught courses in Public Economics (PhD level), Industrial Organization (PhD level), Health Economics (PhD level), and Competitive Strategy (MBA level) at Stanford and Chicago Booth. My PhD teaching covers both theoretical and empirical methods (data analysis). I have published extensively in peer-reviewed academic journals on topics concerning public economics, consumer finance, health economics, industrial organization, and behavioral economics. I have served as a Co-Editor of the *American Economic Journal: Applied Economics*. Most relevant to this matter is my recent research on the difficulties consumers have cancelling subscription plans, along with my research on behavioral economics and research that examines product choice and product use in consumer markets.[1]

(4)  I was a member of the Consumer Financial Protection Bureau (CFPB) Academic Research Council and am the Chair of California's Independent Consumer Fuels Advisory Committee. I received the ASHEcon Medal in 2021 (given to an economist age 40 or under who has made the most significant contributions to the field of health economics) and was a Sloan Research Fellow in 2016.

(5)  My curriculum vitae is Appendix A to this report. It contains additional information about my professional experience, including my publications.

---

[1]    Liran Einav, Benjamin Klopack, and Neale Mahoney, "Selling Subscriptions," *National Bureau of Economic Research*, No. w31547, (2023); M. Kate Bundorf, Jonathan Levin, and Neale Mahoney, "Pricing and Welfare in Health Plan Choice," *American Economic Review* 102, no. 7 (2012): 3214–48.

to more than ███████ of harm. I use a prediction model based on a linear regression to estimate a statistical relationship between an indicator of unintentional enrollment and characteristics of a customer's subscription. I then use this model to predict the unintentional enrollment rate among Prime subscriptions that were initiated through the at-issue "upsells" and were later cancelled, and I calculate payments corresponding to these unintentional enrollments. This methodology yields more than ███████ in harm from approximately ███████ unintentional enrollments. As a robustness check, in Appendix D, I present alternative modelling approaches, and find a similar or higher magnitude of harm using these alternatives.

(16)    With respect to unsuccessful cancellations due to Amazon's cancellation interface design, I find that:

- A substantial number of consumers who entered Amazon's cancellation process did not complete their cancellation and continued to pay Prime subscription fees to Amazon. Between July 2019 and March 2023, Prime subscribers entered Amazon's "Iliad" cancellation process approximately ███████ times. Of those entries, approximately ███████ did not result in a completed cancellation. Among those subscribers who entered the Iliad process but did not cancel during their first entry, ██ percent continued to pay Prime subscription fees to Amazon after their first entry into the Iliad process (the remainder cancelled at some point after the date of entry but before the next payment date).

- Prime benefit usage patterns indicate that a substantial number of subscribers exited the cancellation process with the mistaken belief that they successfully cancelled their Prime subscription. Compared to subscribers who exited the cancellation process in a manner that indicated they likely knew they remained subscribers, other groups show a higher likelihood of not using their Prime benefits after they exit the cancellation process. This is consistent with the simple logic that subscribers would not use benefits they think they no longer have.

- Amazon Prime subscribers who mistakenly thought they had cancelled their subscription incurred approximately ███████ of harm. I use a "differences-in-differences" regression approach, common in empirical economics, to quantify economic harm from unsuccessful cancellations where subscribers believed they had cancelled. For the groups I analyze, I measure the change in the percentage of subscribers with no Prime benefit usage before and after cancellation process entry relative to the analogous change for a control group who likely understood that they continued their subscription, controlling for other factors that may affect Prime benefit usage. I estimate that between ██ and ██ percent of subscriptions in these affected groups exhibit behavior consistent with the mistaken belief of successful Prime cancellation, yielding a total of approximately ███████ of harm through this channel. (For context, my estimates of harm are substantially lower than the total amount paid by Prime subscribers—about ███████—who entered the cancellation process and exited without cancelling and without accepting an Amazon offer to remain a Prime subscriber.)

Expert Report of Neale Mahoney

**Figure 9: Screenshot of the Iliad "Offers Page"**



Source: Amended Complaint, Attachment Q at 4.

Expert Report of Neale Mahoney

were made on or before a subscriber first entered a cancellation process (even if they did not successfully cancel), and (3) payments made on or after a cutoff date of December 29, 2018.[94]

(99)    To estimate the regression model, I use the randomly selected "███████" sample (*see* Section II.D). This sample includes ███████ out of ███████ subscriptions that began after January 1, 2018. In the final step I multiply the damages estimate from the ███████ sample by ███████ ÷ ███████ = ██ in order to calculate the corresponding value for the population of unintentional Prime enrollees.

(100)    As shown in Figure 25, across the upsell signup methods, I estimate ███████ unintended subscriptions and $844 million in harm, where I calculate harm as total payments made between the subscription start date and the date of first cancellation process entry for unintended subscriptions.

**Figure 25: Harm estimate for customers' unintentionally enrolled subscriptions via upsell signups**

| Signup method | Share of unintentional enrollments | Count of unintentional enrollments ($M) | Harm from unintentional enrollments ($M)[95] |
|---|---|---|---|
| SOSP | | | |
| SPC | | | |
| UPDP | | | |
| **TOTAL** | | | $844 |

(101)    Appendix D.3 includes charts showing how the predicted proportion of harmed subscriptions varies with (1) the average usage of Prime shipping benefits during a year, (2) the average usage of non-shipping Prime benefits during a year, and (3) the length of a subscription.[96] These show that the regressors included in my model are predictive of the rate of unintentional enrollment. The predicted rate of harmed subscriptions for all three signup methods at issue is higher for shorter subscriptions, as well as for subscriptions with lower usage of Prime shipping benefits and non-shipping Prime benefits.

(102)    Additionally, to assess the reliability of the model at predicting average rates of harmed subscriptions, I compare the predicted share of unintentional enrollments among Survey respondents (computed without accounting for their actual Survey responses) against the actual share of unintentional enrollments among Survey respondents. As Figure 26 shows, actual and predicted shares are closely related, which confirms the reliability of my model.

---

[94]    Estimates of excess payments from unintentional enrollment after other date cutoffs are in Appendix D.4.

[95]    These harm estimates, and all other harm estimates in this report are rounded *down* to the nearest million.

[96]    *See* Appendix D.3.

**Figure 26: Comparison of average predicted harm against average actual harm**



(103)  As a sensitivity check, in Appendix D, I present two other versions of my baseline model for estimating the number of unintentional enrollments and the related estimates of harm from additional Prime monthly payments.

- First, I estimate my baseline model only on subscriptions that ended after the Cancellation Survey began (May 2020), so as to overlap fully with the period in which the Cancellation Survey was conducted. The resulting estimates of the rate of harmed subscriptions across signup methods are ███% of applicable Prime subscriptions, which is similar to the ███% range seen in Figure 25.

- Second, I estimate my baseline model using a logistic regression instead of a linear regression. This is an alternative regression specification that can be used to predict outcomes that are categorical, such as unintentional enrollment versus other enrollment.[97] The resulting estimates of the rate of harmed subscriptions across signup methods for the same subscriptions as my linear regression baseline are ███%, which is also close to the corresponding range in Figure 25.

---

[97]  Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricists Companion* (Princeton, NJ: Princeton University Press, 2009).

(104)   Additionally, in Appendix D, I present two alternative methodologies for estimating the number of unintentional enrollments.

- The first (Alternative method 1) is a more straightforward approach to estimating the total number of unintended subscriptions by applying the proportion of unintended subscriptions in the Cancellation Survey population to the population of Prime subscriptions, subject to the same exclusions as my baseline method, separately for each signup method. This approach assumes that Survey respondents are similar to and reflective of the total population of Prime subscribers for each enrollment channel.

- The second (Alternative method 2) is a more flexible version of this approach that matches subscriptions among Survey respondents who identify as unintentional enrollees to the broader population of Prime subscriptions at a more granular level. By matching like behaviors (e.g., subscription characteristics) between those two groups, one can then make reasonable estimates of other traits, such as "did not intend" rates.

(105)   Applied to the same set of subscriptions, Alternative method 1 yields a higher estimate of harm from additional monthly payments for Prime than my baseline method of $939 million and Alternative method 2 yields a similar estimate to my baseline of $842 million. For each of my three methods, I also include analogous estimates for various alterative cutoff dates in the same appendix.

(106)   Finally, I also include in Appendix D an extrapolation from my baseline method that extends the estimation of harm to cover the period from June 21, 2023, to September 30, 2025. To extrapolate, I estimate the predicted harm by month of subscription cancellation for the last 12 consecutive full months included in my baseline method (June 2022–May 2023). I then average this estimate to obtain an average predicted harm per month and calculate total harm over the extended period from June 21, 2023, to September 30, 2025, assuming harm accrues at the same rate. Across signup methods, the estimated harm during this post-June 21, 2023 period is $475 million.

2023 through June 2023. To the extent Amazon produces additional data covering the period since June 2023, as the FTC has requested, I reserve the right to analyze such data for harm from unsuccessful cancellations and to supplement my estimates.

## IV.A. Many Prime subscribers exit Amazon's online cancellation process without successfully cancelling

(112)    Between July 2019 and March 2023, Prime subscribers entered Amazon's "Iliad" cancellation process approximately ████████ times. Of those entries, approximately ████████ did not result in a completed cancellation. Among the subscribers who entered the Iliad process but did not cancel during their first entry, ██% percent continued to pay Prime subscription fees to Amazon after their first entry into the Iliad process (the remainder cancelled at some point after the date of entry but before the next payment date).[100]

(113)    As described in Section II.C, a Prime subscriber can take several actions during the cancellation process that result in exiting the Iliad process. On the one hand, if a Prime subscriber reaches the final page of the Iliad process and selects the option to cancel their subscription, the result is a successful cancellation. Any other action leads to an incomplete cancellation, whether intentional or not. Based on my analysis of Amazon's data covering subscribers who reached the three-page portion of the Iliad process between July 2019 and March 2023, and the subsequent actions such subscribers took, I group actions that result in incomplete cancellations into the following categories:

- ■ "Accept an Offer"—Clicking on a button on the Offer Page to accept an offer presented by Amazon as an incentive to continue as a Prime subscriber.

- ■ "Keep My Benefits/Keep My Membership"—Clicking on the Keep My Benefits button on the Marketing Page, or the Keep My Membership button on either the Offer Page or the Cancellation Page.

- ■ "Remind Me Later"—Clicking on the Remind Me Later button on the Marketing, Offer, or Cancellation pages.

- ■ "No Page"—Navigating away from the Iliad process, e.g., by going to a non-Amazon website or closing the browser, or taking no action on any page of the Iliad process for at least 2 hours.[101]

---

[100] *See* Figure 32 and Appendix E.3 for details on the composition of users who enter the Iliad cancellation process, some of whom I conclude were harmed through unsuccessful cancellations.

[101] I categorize a subscriber's action as "No Page" if the last action that subscriber took in the Iliad process did not lead to a successful cancellation and no further action was recorded in the data.

- ■ "Prime Central"—Clicking on a link or feature in the Iliad process that returns the subscriber to the Prime Central Page (other than clicking on the Keep My Benefits/Keep My Membership or Remind Me Later buttons).

- ■ "Other"—Taking any other action that leads to exiting the Iliad process without completing cancellation.

(114)  Figure 27 illustrates the count and share of subscriptions by action group for Iliad entries.

Figure 27: Actions by subscribers who enter the Iliad process but do not pause or cancel



| Action | Count of subscriptions (thousands) | Share of subscriptions |
|---|---|---|
| Accept an Offer | | |
| No Page | | |
| Prime Central | | |
| Remind me Later | | |
| Keep My Benefits/Keep My Membership | | |
| Other | | |

## IV.B. Subscribers who do not successfully cancel use fewer Prime benefits on average

(115)  One lesson from the behavioral economics literature, which I discussed in Section II.E, is that a proliferation of options, as well as the "choice architecture" of how those options are presented, can cause consumers to make choices that do not reflect their underlying intentions. In the present context, this implies that some subscribers who took an action other than "Accept an Offer" in the Iliad process may have exited with the belief that they successfully cancelled their Prime subscription when in fact they did not.

(116)  For example, subscribers may click on the Continue To Cancel button twice in the Iliad process— once on the Marketing Page and then on the Offer Page—and, consequently, conclude that their membership is cancelled. However, these two clicks would only get the subscribers to the Iliad Cancellation Page, which still requires another confirmation of intent to cancel. Navigating away from Amazon at this point or closing their browsers would place these subscribers in the "No Page" group, opening up the possibility that some of them may have mistakenly believed that they successfully cancelled their subscription. Similarly, some consumers who navigated to the Prime Central Page, and are grouped in the "Prime Central" category, may have mistakenly believed they had successfully cancelled their subscription.

Expert Report of Neale Mahoney

(117)    Subscribers who clicked Remind Me Later may have had an intent to cancel in the future but may have been unsuccessful in doing so. Subscribers who clicked the Keep My Benefits/Keep My Membership buttons on the Marketing Page or Offer Page may have mistakenly believed that these choices allow them to retain their Prime *benefits* without incurring ongoing *subscription* charges. Moreover, as I also discussed in Section II.E, research supports the possibility that such people may have become overwhelmed and acted in ways that do not reflect their original intent. For example, Schwartz (2004) studies how complex choices can lead to decision fatigue, errors, or inaction.[102] Mathur, Acar, and Friedman, M., et al. (2019) examine how websites use deceptive techniques to retain users or manipulate their choices.[103]

(118)    In this section, I establish that the usage behavior of some subscribers who left the Iliad process through an action other than "Accept an Offer" indicates that they likely believed, mistakenly, that they had successfully cancelled their subscription. The key logic is that subscribers who mistakenly thought they had cancelled would not actively use their Prime benefits or would use them to a lesser extent than those in the Accept an Offer group.[104]

(119)    To analyze economic harm from unsuccessful cancellations by users who likely thought they had cancelled, I start with a sample of about ▮▮▮▮▮ unique subscriptions among about ▮▮▮▮▮ Prime subscribers who entered the Iliad process and exited it without cancelling or pausing their membership during their first entry to the process. These are subscribers from the ▮▮▮▮▮ sample, described in Section II.D, who entered the Iliad process between July 2019 and June 2023.[105] I define the *pre-entry* window as the period that starts 90 days before the subscriber enters the Marketing Page of the Iliad process (or the day after enrollment if that occurs within 90 days) and continues to 5 days prior to first entry into the Iliad process. I define the *post-entry* window as the period that starts 5 days after the subscriber enters the Iliad process and ends 90 days after they entered the process or when they next enter the Iliad process (if that occurs within 90 days). The 90-day window is chosen to balance the objectives of having long enough pre- and post-periods to meaningfully measure activity but short enough periods to measure activity in the vicinity of Iliad entry.[106] In my baseline analysis, I

---

[102]    Barry Schwartz, *The Paradox of Choice: Why More Is Less* (New York: HarperCollins, 2004).

[103]    A. Mathur, G. Acar, M. Friedman, E. Lucherini, J. Mayer, M. Chetty, and A. Narayanan, "Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites," in *Proceedings of the 2019 CHI Conference on Human Factors in Computing Systems* (New York: Association for Computing Machinery, 2019): 1–14.

[104]    As explained in Section II.A, it is possible for subscribers to have some Prime benefit use without realizing that they are still subscribed to Prime.

[105]    Amazon provided data on all Iliad process entries between July 2019 and June 2023 ("cancellation process" data). I match the subscriber identification numbers in the ▮▮▮▮▮ sample data to the cancellation process data and obtain a sample of subscribers who entered the Iliad process for whom the ▮▮▮▮▮ sample data provide information on benefit use.

[106]    This restriction does not necessarily equalize the number of days pre- and post-Iliad entry for each subscription period, but it ensures that subscription days more than 90 days away from Iliad process entry are removed from the data. For example, if two subscribers were both in Prime for 120 days before starting the cancellation process for the first time and subscriber A successfully cancelled (thereby ending their subscription) 20 days after entering the Iliad process while

---

Even so, some of these users may have been harmed because they expressed an intent to cancel and never accepted an offer from Amazon, yet continued paying for a Prime subscription. Indeed, as I show above, these groups also show post-entry increases in the proportion of subscriptions with no usage of Prime benefits.[109]

(124)    In the first subsection below, I use a difference-in-differences regression in which subscribers who accepted an offer in the Iliad process are the "control" and subscribers who fall in the "No Page" group are the "treatment" to estimate the share of subscribers in the "No Page" group who exited the Iliad process with the mistaken belief that they cancelled their subscription. I run the same regression for the "Prime Central" action group (but, as described above, not for the "Remind Me Later" or "Keep My Benefits/Keep My Membership" groups). The results are statistically significant and establish economic harm from unsuccessful cancellations where customers believed they had cancelled. In the second subsection, I use the results of this analysis to estimate the number of harmed subscribers in the broader population due to unsuccessful cancellations and the dollar value of harm stemming from their additional Prime monthly fees payments.

### IV.C.1. Subscribers' benefit usage after unsuccessful cancellations can be used to estimate harm

(125)    As explained above, I view subscription periods with zero Prime benefit usage after an incomplete cancellation as an indicator of subscribers who intended to cancel. A mistaken belief that a subscription had been cancelled is one reason usage might fall to zero after entering and leaving the cancellation process. However, it is also possible that consumers who leave the Iliad process subsequently have zero Prime benefit usage for other reasons, such as shopping in-person or travel. Therefore, to estimate the share of subscribers who mistakenly believe they have cancelled Prime, I use a difference-in-differences regression analysis to measure the increase in the percentage of subscriptions with zero Prime benefit usage in the "No Page" group over and above the corresponding increase among subscribers who accepted an offer, while controlling for other factors that may affect Prime benefit usage. I conduct the same analysis for the "Prime Central" action group.

(126)    Difference-in-differences regressions are a standard statistical analysis for establishing the impact of an event (in this context, unsuccessful cancellation) on an outcome (Prime benefit usage) and for

---

[109] As an illustration, consider a subscriber who would like to cancel because they do not expect to use Prime benefits in the future. The subscriber enters the cancellation process, becomes frustrated or overwhelmed, selects Remind Me Later or Keep My Benefits, and then forgets or does not notice the reminder email from Amazon and so continues paying for Prime. Because this type of subscriber did not expect to use Prime benefits moving forward, they would have been more likely to have zero usage after entering the Iliad process even if knew they had not successfully cancelled. (As Figure 27 shows, more users exit via Remind Me Later rather than Keep My Benefits/Keep My Membership, with the former accounting for ■ % of subscription periods among subscribers who enter the Iliad process but do not cancel and the latter accounting for ■ %.)

**Figure 29: Difference-in-differences estimates of the increase in zero benefit usage for the No Page and Prime Central action groups**

| Treatment group | Coefficient |
|---|---|
| No Page | |
| Prime Central | |

Note. Results are based on usage in up to 90-day windows around the date of cancellation process entry, with the 5 days pre- and post-entry excluded.

## IV.C.2. Estimating harm, in the form of additional Prime fee payments, from unsuccessful cancellations of Prime subscriptions

(130)     In this section, I calculate the economic harm sustained by Prime subscribers who exited the Iliad process with the mistaken belief that they cancelled their memberships. The difference-in-differences regression results provide an estimate of the share of subscriptions in each action group that were harmed by an unsuccessful cancellation where they believed they had cancelled. These unsuccessful cancellations will result in subscribers continuing to pay Prime fees for benefits they believed they no longer had access to.

(131)     Amazon's customer data provide the amounts that each subscriber paid in Prime fees during a subscription period. To calculate the economic harm to subscribers who continued to pay for benefits they did not intend to retain, I calculate the total payments by subscribers in each treatment group starting one day after the date of their entry into the Iliad process. This date restriction ensures that harm from unintentional enrollment is not double counted with harm from unsuccessful cancellation.[112] I also exclude all payments a subscriber makes after entry into the Iliad process for a second time, since a cancellation attempt may indicate awareness that the subscriber's Prime membership was not cancelled. This approach is conservative in that customers who enter the Iliad process a second time may experience similarly difficulty cancelling their subscriptions and would continue to be harmed by the Iliad process. In the same vein, as discussed above, the harm calculations are conservative in that they do not include additional Prime fees paid by subscribers who desired to cancel but had difficulty locating the Iliad process or exited the process in frustration. Insofar as subscribers in other action groups similarly exited the Iliad process with a mistaken belief that they had cancelled, the resulting Prime payments are also not included in these calculations.

(132)     Calculating total payments by subscribers in the No Page and Prime Central action groups, multiplying this sum by each group's corresponding difference-in-differences regression coefficient, and extrapolating this sum to the full population of Prime subscribers yields the estimated dollar harm for each group. See Figure 30. As reported in the first row, the ▮% of subscribers in the No Page group with unsuccessful cancellations (relative to the control group) had $101 million in Prime fee

---

[112]   Harm for unintentional enrollment includes payments made until and including the day they entered the Iliad process.

payments after their entry into the Iliad process (subject to the data exclusion conditions described above). The corresponding estimate for the Prime Central group is $23.0 million.[113]

**Figure 30: Harm estimates for unsuccessful cancellers, No Page and Prime Central action groups**

| Action group | Additional Prime fee payments after unsuccessful cancellation ($M) |
|---|---|
| No Page | $101 |
| Prime Central | $23 |

Note. Results are based on the product of total Prime payments and the difference-in-differences estimates in Figure 29 for each group. Payments are limited to those made after December 29, 2018, and exclude fees after subsequent cancellation process entry.

## IV.C.3. Additional requested calculations related to cancellation process entries and payments

(133)    As noted above, the preceding calculations exclude all payments subscribers make after entry into the Iliad process for a second time, on the grounds that a second entry into the cancellation process may have indicated awareness at that point that the subscriber's Prime membership was not cancelled. The FTC has indicated that, as a legal matter, it may be appropriate to measure harm on the basis of all Prime fees paid by these subscribers after the date on which they first entered the Iliad process, meaning to calculate the dollar harm from additional Prime fees without excluding payments after subscribers' second entry (and all subsequent entries) into the Iliad process.[114] The calculations are otherwise identical to the preceding calculations. The results are in Figure 31.

**Figure 31: Harm estimate for unsuccessful cancellers, without excluding Prime fees after subsequent cancellation process entry, No Page and Prime Central action groups**

| Action group | Additional Prime fee payments after unsuccessful cancellation ($M) |
|---|---|
| No Page | $116 |
| Prime Central | $26 |

Note. Results are based on usage in up to 90-day windows around the date of cancellation process entry, with the 5 days pre- and post-entry excluded. Limited to payment made after December 29, 2018.

(134)    The FTC has also requested that I provide the following additional calculations:

---

[113] Appendix E.2 contains the corresponding figures based on alternative cutoff dates and limiting to cancellation entry dates after the cutoff date.

[114] Appendix E.3 contains the corresponding figures based on alternative cutoff dates and limiting to cancellation entry dates after the cutoff date.

Expert Report of Neale Mahoney

_____          March 24, 2025
_____
Dr. Neale Mahoney                                Date

Expert Report of Neale Mahoney

# Appendix D. Alternative methods to estimate unintended Prime subscription payments

## D.1. Alternative method 1 (unintentional enrollment analysis)

(172)    An intuitive and straightforward approach to estimate the total number of unintended enrollments is to apply the proportion of unintended enrollments in the Survey population for each enrollment channel to the population of Prime subscriptions for that enrollment channel and the payments made therein. Doing so, while limiting the subscriptions in the same manner as my baseline model, provides an alternative estimate of the number of unintentional enrollments and the harm.[154] This approach assumes that Survey respondents are similar to and reflective of the total population of Prime subscribers for each enrollment channel. Under this method, for signups on or after January 1, 2018 and payments made on or after a cutoff date of December 29, 2018, I estimate a total of ▮▮▮ ▮▮▮▮ unintentional enrollments and $939 million of harm for the signup methods at issue. The figures below show these values along with analogous estimates for various alternative samples of subscriptions and associated payments, based on payment date and subscription start date respectively.

---

[154]   *See* Section III.B for a description of the limitations I apply to the subscriptions that I include in these calculations.

Expert Report of Neale Mahoney

**Figure 46: Alternative method 1 harm estimates, for cutoff dates applied to payments**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

**Figure 47: Alternative method 1 harm estimates, for cutoff dates applied to subscription start dates**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

## D.2. Alternative method 2 (unintentional enrollment analysis)

(173)    My next approach to estimate the extent of unintentional enrollment is a more flexible version of Alternative method 1 that matches Survey respondents who identify as unintentional enrollees to the broader population of Prime subscribers at a more granular level. Specifically, in addition to matching based on signup method, I also match members of the population to Cancellation Survey respondents based on Prime subscription length and usage of Prime shipping benefits. As I show in Section III.A, benefits usage is correlated with Survey responses and matching on this characteristic allows for better predictions of unintentional enrollment.

(174)   Figure 48 and Figure 49 below show that Survey respondents and the random sample of the Prime population have similar distributions of subscription length. Survey respondents tend to have somewhat higher Prime shipping benefit usage but nonetheless overlap substantially with the population.

**Figure 48: Distribution of subscription length**



Expert Report of Neale Mahoney

**Figure 49: Distribution of Prime shipping benefit use**



(175)    In this refinement, I estimate rates of unintentional enrollment among the Prime population based on the responses of Cancellation Survey respondents who are similar to them. This will allow for better prediction of rates of unintentional enrollment because, as shown in Figure 24, Prime shipping benefit usage is correlated with Survey responses (and, specifically, with "did not intend" responses). I implement the methodology, separately for subscriptions initiated through each signup method and limited in the same manner as my baseline method:

1.    Split the population of Survey respondents into 16 groups defined by the full interaction of quartiles of membership duration and quartiles of Prime shipping benefit usage for each enrollment channel.[155]

2.    Calculate, separately for each of these 16 groups, the percentage of subscriptions for which the customer indicated no intent to sign up for Prime.

3.    Divide a random sample of the broader population into the corresponding 16 groups based on quartiles of membership duration and shipping benefit usage, limiting to subscriptions that cancelled at some point in time. Apply the group-specific proportions from the second step to estimate the number of unintentional signups in the overall population.

---

[155]    *See* Section III.B for a description of the limitations I apply to the subscriptions that I include in these calculations.

Expert Report of Neale Mahoney

(176)    Under this method, for signups on or after January 1, 2018 and payments made on or after a cutoff
date of December 29, 2018, I estimate a total of ████████ unintentional enrollments and $842
million in harm for the signup methods at issue. In addition, Figure 50 and Figure 51 includes
estimates for various alternative groups of subscriptions and associated payments based on the
payment dates and subscription start dates.

**Figure 50: Alternative method 2 harm estimates, for cutoff dates applied to payments**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

Expert Report of Neale Mahoney

**Figure 51: Alternative method 2 harm estimates, for cutoff dates applied to subscription start dates**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

## D.3. Baseline model predictions (unintentional enrollment analysis)

(177)    The figures below display how the predicted proportion of harmed subscriptions varies with the characteristics used in the predictive model; namely, the average usage of Prime shipping benefits during a year, the average usage of non-shipping Prime benefits during a year, and the length of a subscription. Specifically, the figures show the mean predicted harm for subscriptions when they are divided into two groups based on whether a given characteristic is above or below the corresponding median value. The figures show that, across the three enrollment channels, the predicted proportion of harmed subscriptions is higher among customers with lower usage and shorter subscriptions.

Expert Report of Neale Mahoney

**Figure 52: Predicted proportion of harmed subscriptions, for subscriptions with above- versus below-median Prime shipping benefits usage per year**



Expert Report of Neale Mahoney

**Figure 53: Predicted proportion of harmed subscriptions, for subscriptions with above- versus below-median Prime non-shipping benefits usage per year**



**Figure 54: Predicted proportion of harmed subscriptions, for subscriptions with above- versus below-median subscription length**



## D.4. Baseline method sensitivities and variations

### D.4.a.  Sensitivities for alternative time periods

(178)    Figure 55 and Figure 56 show estimates of harm using my baseline method limited to alternative time periods based on the start date for counting payments or subscriptions. As with my baseline estimates, I also limit these estimates to subscriptions that were (1) were cancelled before June 21, 2023 (as is also the case for Cancellation Survey respondents' subscriptions), (2) consisted wholly or partly of monthly plans, and (3) were initiated via the UPDP, SOSP, and SPC signup methods.[156] Further, the estimate of excess payments that were made as a result of unintentional enrollments is additionally limited to (1) payments for monthly plans and (2) payments that were made on or before a subscriber first entered a cancellation process (even if they did not successfully cancel).[157]

---

[156]    *See* Section III.B.

[157]    *See* Section III.B.

Expert Report of Neale Mahoney

(179)  Figure 57 and Figure 58 show additional sensitivities in which I estimate the rate of harm only among subscriptions that were cancelled after the Cancellation Survey was initiated, so as to apply the Survey only to Prime subscribers who cancelled contemporaneously. I retain the restrictions described above.

**Figure 55: Baseline method harm estimates, for subscriptions initiated on or after January 1, 2018, and payments after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

**Note**: Results for the cutoff date of 12/29/2018 may be found in the main text.

Expert Report of Neale Mahoney

**Figure 56: Baseline method harm estimates, for subscriptions initiated on or after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments | Count of unintentional enrollments (M) | Harm from unintentional enrollments ($M) |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

Expert Report of Neale Mahoney

**Figure 57: Baseline method harm estimates, restricted to subscriptions that were cancelled after the Cancellation Survey was initiated (May 2020), for subscriptions initiated on or after January 1, 2018, and payments after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments |
|---|---|---|
| SOSP | 6/21/2018 | |
| SPC | 6/21/2018 | |
| UPDP | 6/21/2018 | |
| **TOTAL** | **6/21/2018** | |
| SOSP | 12/29/2018 | |
| SPC | 12/29/2018 | |
| UPDP | 12/29/2018 | |
| **TOTAL** | **12/29/2018** | |
| SOSP | 7/20/2019 | |
| SPC | 7/20/2019 | |
| UPDP | 7/20/2019 | |
| **TOTAL** | **7/20/2019** | |
| SOSP | 1/19/2020 | |
| SPC | 1/19/2020 | |
| UPDP | 1/19/2020 | |
| **TOTAL** | **1/19/2020** | |
| SOSP | 6/21/2020 | |
| SPC | 6/21/2020 | |
| UPDP | 6/21/2020 | |
| **TOTAL** | **6/21/2020** | |
| SOSP | 9/20/2020 | |
| SPC | 9/20/2020 | |
| UPDP | 9/20/2020 | |
| **TOTAL** | **9/20/2020** | |

Expert Report of Neale Mahoney

**Figure 58: Baseline method harm estimates, restricted to subscriptions that were cancelled after the Cancellation Survey was initiated (May 2020), for subscriptions initiated on or after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments |
|---|---|---|
| SOSP | 6/21/2018 | |
| SPC | 6/21/2018 | |
| UPDP | 6/21/2018 | |
| **TOTAL** | **6/21/2018** | |
| SOSP | 12/29/2018 | |
| SPC | 12/29/2018 | |
| UPDP | 12/29/2018 | |
| **TOTAL** | **12/29/2018** | |
| SOSP | 7/20/2019 | |
| SPC | 7/20/2019 | |
| UPDP | 7/20/2019 | |
| **TOTAL** | **7/20/2019** | |
| SOSP | 1/19/2020 | |
| SPC | 1/19/2020 | |
| UPDP | 1/19/2020 | |
| **TOTAL** | **1/19/2020** | |
| SOSP | 6/21/2020 | |
| SPC | 6/21/2020 | |
| UPDP | 6/21/2020 | |
| **TOTAL** | **6/21/2020** | |
| SOSP | 9/20/2020 | |
| SPC | 9/20/2020 | |
| UPDP | 9/20/2020 | |
| **TOTAL** | **9/20/2020** | |

## D.4.b. Alternative implementation using logistic regression

(180)    Figure 59 and Figure 60 show the rate of unintentional enrollment predicted by the baseline method implemented using a logistic regression (i.e., a logit model). The values shown for a cutoff date of December 29, 2018 in Figure 59 apply the same limitations as my baseline estimate in Figure 25. For other values, Figure 59 uses subscriptions and payments subject to the same limitations as Figure 55, while Figure 60 parallels the limitations used in Figure 56.

Expert Report of Neale Mahoney

**Figure 59: Baseline method implemented using a Logistic regression, for subscriptions initiated on or after January 1, 2018, and payments after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments |
|---|---|---|
| SOSP | 6/21/2018 | |
| SPC | 6/21/2018 | |
| UPDP | 6/21/2018 | |
| **TOTAL** | **6/21/2018** | |
| SOSP | 12/29/2018 | |
| SPC | 12/29/2018 | |
| UPDP | 12/29/2018 | |
| **TOTAL** | **12/29/2018** | |
| SOSP | 7/20/2019 | |
| SPC | 7/20/2019 | |
| UPDP | 7/20/2019 | |
| **TOTAL** | **7/20/2019** | |
| SOSP | 1/19/2020 | |
| SPC | 1/19/2020 | |
| UPDP | 1/19/2020 | |
| **TOTAL** | **1/19/2020** | |
| SOSP | 6/21/2020 | |
| SPC | 6/21/2020 | |
| UPDP | 6/21/2020 | |
| **TOTAL** | **6/21/2020** | |
| SOSP | 9/20/2020 | |
| SPC | 9/20/2020 | |
| UPDP | 9/20/2020 | |
| **TOTAL** | **9/20/2020** | |

Expert Report of Neale Mahoney

**Figure 60: Baseline method implemented using a logistic regression, for subscriptions initiated on or after cutoff date**

| Signup method | Cutoff date | Share of unintentional enrollments |
|---|---|---|
| SOSP | 6/21/2018 | |
| SPC | 6/21/2018 | |
| UPDP | 6/21/2018 | |
| **TOTAL** | **6/21/2018** | |
| SOSP | 12/29/2018 | |
| SPC | 12/29/2018 | |
| UPDP | 12/29/2018 | |
| **TOTAL** | **12/29/2018** | |
| SOSP | 7/20/2019 | |
| SPC | 7/20/2019 | |
| UPDP | 7/20/2019 | |
| **TOTAL** | **7/20/2019** | |
| SOSP | 1/19/2020 | |
| SPC | 1/19/2020 | |
| UPDP | 1/19/2020 | |
| **TOTAL** | **1/19/2020** | |
| SOSP | 6/21/2020 | |
| SPC | 6/21/2020 | |
| UPDP | 6/21/2020 | |
| **TOTAL** | **6/21/2020** | |
| SOSP | 9/20/2020 | |
| SPC | 9/20/2020 | |
| UPDP | 9/20/2020 | |
| **TOTAL** | **9/20/2020** | |

### D.4.c. Extension of estimated harm from baseline method to September 2025

(181)    For each set of cutoff dates, and signup methods, I extrapolate estimated harm from the baseline method to September 2025 as follows.

1.   Limit to subscriptions that (1) began on or after January 1, 2018, (2) were cancelled before June 21, 2023, (3) consisted wholly or partly of monthly plans, and (4) were initiated via the UPDP, SOSP, and SPC signup methods. Estimate the baseline model.

Expert Report of Neale Mahoney

2. Calculate the predicted payments associated with (1) unintentional enrollments for monthly plans, (2) payments that were made on or before a subscriber first entered a cancellation process (even if they did not successfully cancel), and (3) each pair of signup method and cutoff date.

3. Estimate the total predicted harm by month of subscription cancellation for the last 12 consecutive full months (June 2022–May 2023) in the data. Average this estimate to obtain an average predicted harm per month, for each pair of signup method and cutoff date.

4. Extrapolate this estimate of average harm per month from June 21, 2023, to September 30, 2025.

The figures below show the extrapolated estimates for various time periods based on the start date for counting payments or subscriptions.

**Figure 61: Harm estimates from baseline method, extrapolated to September 2025, for subscriptions initiated on or after January 1, 2018, and payments after cutoff date**

| Signup method | Cutoff date | Unintentional enrollment harm until June 21, 2023 ($M) | Additional unintentional enrollment harm, June 21, 2023 to September 30, 2025 ($M) | Total harm from unintentional enrollments |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| TOTAL | 6/21/2018 | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| TOTAL | 12/29/2018 | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| TOTAL | 7/20/2019 | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| TOTAL | 1/19/2020 | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| TOTAL | 6/21/2020 | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| TOTAL | 9/20/2020 | | | |

Expert Report of Neale Mahoney

**Figure 62: Harm estimates from baseline method, extrapolated to September 2025, for subscriptions initiated on or after cutoff date**

| Signup method | Date cutoff | Unintentional enrollment harm until June 21, 2023 ($M) | Additional unintentional enrollment harm, June 21, 2023 to September 30, 2025 ($M) | Total harm from unintentional enrollments |
|---|---|---|---|---|
| SOSP | 6/21/2018 | | | |
| SPC | 6/21/2018 | | | |
| UPDP | 6/21/2018 | | | |
| **TOTAL** | **6/21/2018** | | | |
| SOSP | 12/29/2018 | | | |
| SPC | 12/29/2018 | | | |
| UPDP | 12/29/2018 | | | |
| **TOTAL** | **12/29/2018** | | | |
| SOSP | 7/20/2019 | | | |
| SPC | 7/20/2019 | | | |
| UPDP | 7/20/2019 | | | |
| **TOTAL** | **7/20/2019** | | | |
| SOSP | 1/19/2020 | | | |
| SPC | 1/19/2020 | | | |
| UPDP | 1/19/2020 | | | |
| **TOTAL** | **1/19/2020** | | | |
| SOSP | 6/21/2020 | | | |
| SPC | 6/21/2020 | | | |
| UPDP | 6/21/2020 | | | |
| **TOTAL** | **6/21/2020** | | | |
| SOSP | 9/20/2020 | | | |
| SPC | 9/20/2020 | | | |
| UPDP | 9/20/2020 | | | |
| **TOTAL** | **9/20/2020** | | | |

# EXHIBIT 19



| Benjamin Langner | Mailing Address: |
|---|---|
| Corporate Counsel | P.O. Box 81226 |
| Litigation & Regulatory | Seattle, WA 98108-1266 |
| Amazon.com, Inc. | Courier Delivery Address: |
| Direct Dial: 206-266-1842 | 2021 7th Avenue |
| Email: langnerb@amazon.com | Seattle, WA 98121 |

**CONFIDENTIAL TREATMENT REQUESTED**

May 24, 2021

<u>Via Email</u>

Katherine Johnson
Attorney, Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

Re:    <u>FTC Matter No. 2123050</u>

Dear Katherine,

Amazon.com, Inc. ("Amazon") writes in response to the Federal Trade Commission's ("FTC") March 16, 2021 Civil Investigative Demand ("CID") regarding FTC Matter No. 2123050. This letter constitutes Amazon's response to Interrogatories 1, 2, 3, 4, 5, 11, and Amazon's supplemental responses to Interrogatories 9 and 13. Additionally, this letter reflects Amazon's response to Document Requests 1 and 10, initial response to Document Requests 6, 7, 8, and 9; a supplemental production to Document Request 4; and an initial production of responsive email communications. Amazon submits this response without waiving any objections to the CID.[1]

We would be happy to address any questions you may have about the topics raised below, along with our prior responses to the CID.

*    *    *

As noted in our initial response, Amazon Prime ("Prime") offers members significant benefits, including free and fast shipping on over 100 million eligible items, unlimited photo storage, access to exclusive shopping deals, the ability to watch thousands of movies and television shows through Prime Video and to listen to over two million songs through Amazon Music Prime,

---

[1] Not mentioning one of the general objections in any of the specific responses set forth below shall not be deemed to limit or waive any subject objection. Amazon reserves the right to supplement or amend its responses as appropriate to reflect information uncovered in connection with its ongoing efforts. Amazon's use of the capitalized terms "Amazon Prime," "Enroll," and "Unsubscribe" are consistent with the Definition section of the CID.

CONFIDENTIAL TREATMENT REQUESTED

access to video games offered through Prime Gaming, and the ability to borrow books and magazines through Prime Reading, among other benefits.

Amazon provides access to these Prime benefits through an enrollment experience that is transparent and clearly discloses the material terms to customers, including the length of any applicable free trial, the ongoing price of Prime membership, the frequency with which the member will be billed, and how a member can cancel. Moreover, Amazon values the trust that customers place in Amazon and respects this trust by requiring a customer's express consent before enrolling in Prime. Additionally, to confirm for all new Prime members that they have joined, Amazon displays a membership confirmation screen and sends a welcome email that again confirms the customer's enrollment in a new Prime membership. Amazon believes in the value that Prime benefits provide to members. Accordingly, Amazon provides customers with information about Prime benefits during the enrollment process. Prime members understand and appreciate the value of membership: more than 70% of current Prime members have been members for over a year.

Although Amazon provides clear disclosures and requires affirmative consent to enroll in Prime, Amazon also understands that some members might enroll but later decide to cancel their membership for any number of reasons. As explained in our April 22 production, Amazon provides Prime members with a simple mechanism to cancel their membership if they choose to do so.

## RESPONSES TO INTERROGATORIES

Interrogatory 1:

Describe fully and in detail each step customers must take to Enroll in Amazon Prime, including any variations in steps due to alternative purchasing offers presented during the Enrollment process, or due to different products, time periods, or programs. If these steps differ depending on the platform or device through which the customer is exercising the option to Enroll, e.g., mobile devices or desktop applications, describe the steps for each platform and device separately.

Response to Interrogatory 1:

Amazon offers customers a straightforward process to enroll in Prime. As described above, Prime offers a broad array of benefits to its members, including fast and free shipping and the ability to watch movies and television shows through Prime Video. Customers can start the enrollment process through a variety of channels, such as on the Amazon Prime homepage, while purchasing a product for delivery, or while viewing Prime Video content.

The majority of customers enroll in Prime through one of three enrollment channels: (1) from the Amazon Prime homepage; (2) within the checkout process, including through the Ship Option Select Page ("SOSP"), the Universal Prime Decision Page ("UPDP"), or Single Page Checkout ("SPC"); or (3) through Prime Video. Together, these enrollment channels comprise approximately 80% of enrollments since 2018. Consistent with our prior agreement with you, this response is limited to enrollment through these channels.

CONFIDENTIAL TREATMENT REQUESTED

immediately the member would prefer a reminder in advance of membership renewal, or that the member would prefer a change in membership plan or other alternative offer. Options such as pausing a membership or requesting a notification prior to their next renewal are designed to help customers exercise their preferred choice regarding a Prime membership. In the first quarter of 2021, of Prime members who started the cancellation process but who ultimately decided not to cancel, approximately 40% of them made an affirmative selection to remain Prime members.

Finally, customers also have the option of calling Amazon Customer Service to cancel their Prime memberships. The data associated with customers who abandoned the online cancellation process shows, however, that in the week after abandonment, fewer than 2% call Customer Service to request cancellation. This further demonstrates the simplicity of Amazon's online cancellation process because Prime members interested in cancellation need not call customer service to complete cancellation and can instead utilize Amazon's simple and accessible online process.

Interrogatory 11:

If you contend the process for Unsubscribing from Amazon Prime is as simple as the process to Enroll in Amazon Prime, describe fully and in detail all facts that support Your contention. If not, explain why.

Reponses to Interrogatory 11:

Amazon does not contend that the Prime cancellation process is or is not as simple as the enrollment process. Consistent with the Restore Online Shoppers' Confidence Act's ("ROSCA's") requirements, 15 U.S.C. § 8403(3), Amazon offers members a simple mechanism to cancel their Prime membership online with just a few clicks. In addition, customers can cancel their membership by calling customer service. Amazon does not make or seek to make any comparative contention, but rather simply seeks to ensure that customers have a simple and effective mechanism for cancellation. ROSCA requires that companies provide simple mechanisms for cancellation, and does not require that the mechanism be as simple as the process for enrollment.

Here, although both are simple, the enrollment and cancellation processes serve different goals and present different information to Amazon's customers. The enrollment process provides customers with information about the terms of Prime membership so that they may provide their consent to join. By contrast, the cancellation process provides helpful information to customers, including benefits they would lose by cancelling. For instance, a Prime member who has stored photos using Prime's unlimited photo storage benefit would lose access to those photos by cancelling their Prime membership. Because customers enrolling in Prime have not stored any such data with Amazon, the Prime enrollment process does not need to address this issue. Although Amazon's enrollment and cancellation processes both provide helpful information to facilitate the customer's decision-making process, each of these decisions involves different considerations and is informed by different purposes. Comparing the relative simplicity of the enrollment process to the cancellation process, particularly where both are objectively simple, ignores these distinctions and is not legally relevant. Amazon Prime's cancellation process provides a simple mechanism to stop recurring charges — irrespective of how it might compare to the Prime enrollment process.

**CONFIDENTIAL TREATMENT REQUESTED**

\* \* \*

The responses in this letter are made only on behalf of Amazon and only for the purposes of this CID.  Amazon considers this letter, the accompanying documents, and any information derived therefrom (collectively, the "Confidential Information") to be confidential and exempt from disclosure under the Freedom of Information Act ("FOIA"), the Federal Trade Commission Act ("FTC Act") Sections 6(f) and 21, 16 C.F.R. § 4.10, and any other applicable statute or regulation.  The Confidential Information contains sensitive and proprietary practices, policies, and data, including trade secrets and commercial or financial information.  Disclosure of the Confidential Information may cause substantial harm to Amazon's competitive position.  Accordingly, Amazon requests notice and an opportunity to seek protection prior to any disclosure of the Confidential Information by the FTC.  Amazon is providing the Confidential Information on the basis that all such information will receive the full range of confidentiality protection available under FOIA, the FTC Act, the Commission's Rules of Practice, and any other applicable statutes, regulations, and rules.  For that reason, Amazon has marked this letter with the header "Confidential Treatment Requested."

This request for confidentiality is not to be construed as a waiver of any protection from disclosure or confidential treatment accorded by law, including, but not limited to, the attorney-client privilege or the work-product doctrine.  Amazon reserves the right to rely on and invoke any such protection as appropriate.

Sincerely,

/s/

Benjamin Langner
Corporate Counsel, Litigation & Regulatory
Amazon.com

# EXHIBIT 20

The Honorable John H. Chun

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | No. 2:23-cv-0932-JHC |
| Plaintiff, | |
| v. | **FEDERAL TRADE COMMISSION'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO AMAZON.COM, INC.'S FIRST SET OF INTERROGATORIES** |
| AMAZON.COM, INC., et al., | |
| Defendants. | |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Federal Trade Commission ("FTC") hereby objects and responds to Defendant Amazon.com, Inc.'s First Set of Interrogatories ("Interrogatories"). These Second Supplemental Responses supersede the FTC's previous responses and objections, dated October 2, 2023 and January 23, 2024.

### GENERAL RESPONSES AND OBJECTIONS

1.      Discovery has not concluded in this litigation. Accordingly, the FTC's responses and objections are based upon the information available to the FTC at this stage in the litigation and presently known by the FTC. The FTC reserves the right to supplement, revise, modify, or

otherwise change or amend these responses in light of any information that it subsequently may

obtain or discover, consistent with Federal Rule of Civil Procedure 26(e).  The FTC does not

waive its right to rely upon information that is not being disclosed at this time, including but not

limited to information that the FTC has requested or will request through its own discovery

propounded on Amazon.com, Inc. ("Amazon"), the individual defendants (Neil Lindsay, Russell

Grandinetti, and Jamil Ghani), and third parties.  Objections made by the FTC are made without

prejudice to the FTC's right to assert additional objections in the event that additional grounds

for objections are discovered by the FTC subsequent to this response.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:  Identify all FTC Documents and Communications, including
but not limited to publications, guidance, policy statements, workshops, speeches,
conferences, and rulemaking efforts Relating to Dark Patterns or Negative Options, and all
drafts thereof.**

**RESPONSE:**  In the initial Interrogatory Responses, the FTC objected to this

Interrogatory as overly broad and unduly burdensome because it seeks the identification of FTC

guidance, communications, and other documents unrelated to the Action or Investigation and

without temporal limitation.  The FTC also objected that the Interrogatory is beyond the

permissible scope of discovery because it seeks information that is irrelevant to any party's claim

or defense or, even if relevant, is disproportional to the needs of the case.  *See* Fed. R. Civ. P.

26(b)(1).  In particular, the Interrogatory asks the FTC to log or produce every single document

and communication it possesses that relates in any way to Dark Patterns or Negative Options.

Almost all of those documents are irrelevant to whether Amazon violated ROSCA or the FTC

Act, and therefore are irrelevant to any claim or defense in this litigation.

2

Amazon used such confirmshaming despite internal analyses questioning the propriety of this wording.  Amazon's most recent TrueSPC enrollment pathway continues to use a form of confirmshaming when it claims:  "we'd hate for you to miss out on unlimited fast, FREE delivery."

**INTERROGATORY NO. 8:**  **Identify each iteration and feature of the Prime Online Cancellation Flow that You contend contains a Dark Pattern, violates ROSCA, or violates Section 5, and state the complete factual basis for Your contention.**

**RESPONSE:**  The FTC objects to this Interrogatory on the grounds that "iteration" and "feature" are vague.  The FTC also objects to this Interrogatory as unduly burdensome, as Amazon is in possession of "each iteration and feature of the Prime Online Cancellation Flow" and did not produce them all to the FTC in response to the Civil Investigative Demands, nor did Amazon produce the alternative flows the FTC suggested.  *See* June 14, 2022 Letter from Jonathan Cohen to Laura Kim at 4.  The FTC further objects to this Interrogatory on the grounds that it is premature, given that discovery is ongoing and Amazon has not produced all "iterations" of the Prime Online Cancellation Flow.  The FTC will provide relevant expert evaluations, surveys, or studies relating to consumer reaction or perception, if any, by the date set in the Scheduling Order.

Subject to and without waiving those objections, the FTC refers to Paragraphs 127 through 163 and 231 of the Amended Complaint and the Attachments thereto, which identify Dark Patterns in the Prime Online Cancellation Flows and describe the manner in which the Prime Online Cancellation Flows violated ROSCA and Section 5.  Among other issues described more fully in those paragraphs, Amazon employs the "Interface Interference" Dark Pattern by emphasizing options to divert consumers from cancelling their subscription, *i.e.*, by using

warning icons to evoke fear and loss in consumers.  The "Obstruction" Dark Pattern in the Cancellation Flows makes it hard for consumers to locate the Cancellation Flows and force consumers who have already expressed an intent to cancel to locate and view marketing and reconsider options multiple times before successfully cancelling.  Amazon also includes "Misdirection" Dark Patterns by presenting consumers with asymmetric options to emphasize options that do not result in a subscription cancellation, *i.e.*, "Remind Me Later" and "Keep my Benefits."

The FTC further responds to Interrogatory No. 8 as follows.  Under substantial pressure from the Commission, Amazon changed its Iliad cancellation process in or about April 2023, shortly before the filing of the Complaint.  Prior to that point, there were only two ways to cancel a Prime subscription through Amazon:  a) through the online labyrinthine cancellation flow known as the "Iliad Flow" on desktop and mobile devices; or b) by contacting customer service.

Amazon complicated its online cancellation process by (1) making it difficult for consumers to find the starting point for the Iliad Flow and falsely labeling that starting point "End Membership," (2) forcing consumers to request cancellation four times before honoring the request, and (3) repeatedly providing links, buttons, and other distracting information designed to derail customers before they completed the process.

In particular, the Iliad Flow required consumers intending to cancel to navigate a four-page, six-click, fifteen-option cancellation process.  In contrast, customers could enroll in Prime with one or two clicks.  Although consumers may have enrolled in Prime through devices other than computers and smartphones, such as through the Prime Video application on the Amazon FireStick and Fire TV, they could not cancel via these same technologies.  Instead, they had to

use the Iliad Flow or call customer service.  Amazon launched the Iliad Flow in 2016 and did not substantially change it in the United States until in or about April 2023.

To cancel via the Iliad Flow, a consumer had to first locate it, which Amazon made difficult.  Consumers could access the Iliad Flow from Amazon.com by navigating to the Prime Central page, which consumers could reach by selecting the "Account & Lists" dropdown menu, reviewing the third column of dropdown links Amazon presented, and selecting the eleventh option in the third column ("Prime Membership").  This took the consumer to the Prime Central Page.

Once the consumer reached Prime Central, the consumer had to click on the "Manage Membership" button to access the dropdown menu.  That revealed three options.  The first two were "Share your benefits" (to add household members to Prime) and "Remind me before renewing" (Amazon then sent the consumer an email reminder before the next charge).  *See* Attachment Q, at 1-2.  The last option was "End Membership."  The "End Membership" button did not end membership.  Rather, it took the consumer to the Iliad Flow.  *See* Attachment Q, at 2-3.  It was impossible to reach the Iliad Flow from Amazon.com in fewer than two clicks.

Consumers could also reach the Iliad Flow by contacting customer service, asking to cancel, and receiving a link to the Iliad Flow.  Amazon required customer service representatives to encourage consumers seeking to cancel to do so via the Iliad Flow.  Consumers could also reach the Iliad Flow from Amazon.com by typing "cancel membership" in the search bar.  This produced an "Alexa" answer that included an "End Your Amazon Prime Membership" link.  *See* Attachment T, at 2.

Clicking the link did not end Prime membership.  Instead, it took the consumer to another page with a heading that read "End Your Amazon Prime Membership."  The page contained a

button labelled "End Your Prime Membership."  Pressing the button did not end Prime Membership.  Instead, it took the consumer to the Iliad Flow.  *See* Attachment T, at 3-4.

The search bar pathway to the Iliad Flow varied somewhat depending on what search the consumer ran.  For instance, searching "how to turn off Prime," or "cancel Prime" (rather than "how to cancel Prime") took the consumer to a page with a link to Prime Central, from which the consumer had to then locate the path to the Iliad Flow.  Searching "End Membership" took the consumer to a page with three blue links under the heading "Closing your Amazon account," and a subheading "Get information on how to close your Amazon account."  The middle link was "cancel membership."  Clicking "cancel membership" did not cancel membership.  Instead, it took the consumer to the Iliad Flow.  Typing "cancel membership" in the search bar on a mobile device brought the consumer to the Iliad Flow through similar steps.  *See* Attachment S.

Thus, to reach the Iliad Flow, consumers had to do one of the following:  1) contact customer service and inform a customer service agent that they wanted to cancel and click the cancellation link the customer service agent provides; 2) navigate from Amazon.com to the Prime account management page (Prime Central), locate the "manage membership" dropdown, and press a button labelled "End Membership"; or 3) search "How to cancel membership" in the Amazon search bar, then move through subsequent steps to reach the Iliad Flow—frequently, selecting a link reading "End Your Amazon Prime Membership" and then pressing a button reading "End Your Prime Membership."

Once consumers reached the Iliad Flow, they had to proceed through its entirety—spanning three pages, each of which presented consumers several options, beyond the Prime Central page—to cancel Prime.  *See* Attachment Q.  In other words, after entering the Iliad Flow, consumers had to request cancellation three additional times.

42

On the first page of the Iliad Flow, Amazon forced consumers to "[t]ake a look back at [their] journey with Prime" and presented them with a summary showing the Prime services they used. Amazon also displayed marketing material on Prime services, such as Prime Delivery, Prime Video, and Amazon Music Prime. Amazon placed a link for each service and encouraged consumers to access them immediately, *i.e.*, "Start shopping today's deals!", "You can start watching videos by clicking here!", and "Start listening now!" *See* Attachment Q, at 3. Clicking on any of these options took the consumer out of the Iliad Flow without cancelling Prime.

Also, on page one of the Iliad Flow, Amazon presented consumers with three buttons at the bottom. "Remind Me Later," the button on the left, sent the consumer a reminder three days before their Prime membership renewed (an option Amazon had already presented the consumer once before, in the "Manage Membership" pull-down menu through which the consumer entered the Iliad Flow). The "Remind Me Later" button took the consumer out of the Iliad Flow without cancelling Prime. "Keep My Benefits," on the right, also took the consumer out of the Iliad Flow without cancelling Prime. Finally, "Continue to Cancel," in the middle, also did not cancel Prime but instead proceeded to the second page of the Iliad Flow. *See* Attachment Q, at 3. Therefore, consumers could not cancel their Prime subscription on the first page of the Iliad Flow.

On the second page of the Iliad Flow, Amazon presented consumers with alternative or discounted pricing, such as the option to switch from monthly to annual payments (and vice versa), student discounts, and discounts for individuals with EBT cards or who receive government assistance. Amazon emphasized the option to switch from monthly to annual payments by stating the amount a consumer would save at the top of this page in bold. Clicking the orange button ("Switch to annual payments") or the links beneath took the consumer out of

the Iliad Flow without cancelling.  *See* Attachment Q, at 4.  Right above these alternatives,

Amazon stated "Items tied to your Prime membership will be affected if you cancel your

membership," positioned next to a warning icon.  *See* Attachment Q, at 4.  Amazon also warned

consumers that "[b]y cancelling, you will no longer be eligible for your unclaimed Prime

exclusive offers," and hyperlinked to the Prime exclusive offers.  *See* Attachment Q, at 4.

Clicking this link took the consumer out of the Iliad Flow without cancelling.  Finally, at the

bottom of Iliad Flow page two, Amazon presented consumers with buttons offering the same

three options as the first page: "Remind Me Later," "Continue to Cancel," and "Keep My

Membership" (labelled "Keep My Benefits" on the first page).  *See* Attachment Q, at 4.  Once

again, consumers could not cancel their Prime subscription on the second page of the Iliad Flow.

Choosing either "Remind Me Later" or "Keep My Membership" took the consumer out of the

Iliad Flow without cancelling.  Consumers had to click "Continue to Cancel" to access the third

page of the Iliad Flow.

On the third page of the Iliad Flow, Amazon showed consumers five different options,

only one of which, "End Now"—presented last, at the bottom of the page— immediately

cancelled a consumer's Prime membership.  *See* Attachment Q.  Pressing any of the first four

buttons took the consumer out of the Iliad Flow without immediately cancelling.

On the third page of the Iliad Flow, the first and second options—"Remind Me Later"

and "Keep My Membership"—were substantially identical to the buttons on the Iliad Flow's first

two pages.  Therefore, Amazon forced consumers who reach the Iliad Flow's last page to view

the "Remind Me Later" option four times (including once to enter the Iliad Flow) and the "Keep

My Membership" option three times.  *See* Attachment Q, at 5.

The third option, "Pause on [date]," would "pause" or put on hold—but not cancel—a consumer's Prime membership.  Amazon did not charge "paused" members for Prime but made it simple for "paused" members to re-join Prime through a single "quick-resume" click.  Amazon presented the "pause" option adjacent to a warning icon and text stating that, "[b]y pausing, [consumers] will no longer be eligible for [their] unclaimed Prime exclusive offers," and provided links to "Prime exclusive offers" (which if clicked exit the Iliad Flow without canceling).  *See* Attachment Q, at 5.  Amazon regularly sent promotional materials to "paused" members to encourage them to un-pause Prime with a single click.

Above the fourth and fifth options—the "End on [date]" and "End Now" options—Amazon also added a warning icon and text that states "[b]y cancelling, [consumers] will no longer be eligible for [their] unclaimed Prime exclusive offers."  *See* Attachment Q, at 5.

The fourth option, "End on [date]," turned off Prime's auto-renew feature.  It did not immediately cancel the consumer's membership.  Instead, the membership would end when the current billing cycle concluded, and the consumer would not receive a refund.  *See* Attachment Q, at 5.

The fifth and final option, "End Now," immediately cancelled a consumer's Prime membership (and Amazon refunded a pro-rated amount for the balance of the billing cycle).  Thus, only one of the five options presented immediately cancelled a consumer's Prime membership.  *See* Attachment Q, at 5.

Therefore, to complete the Iliad Flow and cancel a Prime membership, the consumer needed to click a minimum of six times from Amazon.com:  Prime Central →"Manage Membership"→"End Membership"→"Continue to Cancel"→"Continue to Cancel"→"End Now."  *See* Attachment Q.

45

The Iliad Flow was also accessible through a mobile device. Similar to the Iliad Flow on desktop, the Iliad Flow on mobile was difficult for consumers to locate and presented a complex array of options across multiple pages. Cancelling via the Iliad Flow on a mobile device was an eight-page, eight-click minimum process.

On a mobile device, a consumer entered the Iliad Flow by 1) tapping on "My Account," 2) selecting "Manage Prime Membership" from a dropdown menu on the second page, 3) selecting "Manage membership" on the third page, 4) selecting "Manage membership" on the fourth page, and 5) selecting "End my Membership" on the fifth page. *See* Attachment R, at 1-5.

On the sixth page, the consumer seeking to cancel began the mobile equivalent of the Iliad Flow. Specifically, on this page, Amazon presented benefits information similar to the desktop Iliad Flow, and stated at the top of the page "[Name], thank you for being a member with us. Take a look back at your journey with Prime." *See* Attachment R, at 6. Amazon included the same three options—"Keep My Benefits," "Continue to Cancel," and "Remind Me Later"—although consumers had to scroll down to view them. None of these options ended the Prime membership. Consumers who selected "Continue to Cancel" proceeded to a seventh page. *See* Attachment R, at 6.

On the seventh page, Amazon presented alternate payment options similar to those in the desktop Iliad Flow: Amazon placed the three options at the bottom of the page in the same order. *See* Attachment R, at 7. Pressing "Continue to Cancel" did not end the membership. It took the consumer to an eighth and final page. *See* Attachment R, at 7.

On the eighth and final page, Amazon presented five buttons. The first three were "Pause on [date]," "Keep My Membership," and "Remind Me Later." The consumer had to scroll down to view the fourth and fifth. The fourth ("End on [date]") turned off auto-renew, but did not

immediately cancel, and consumers who chose this option did not receive a refund. Only the fifth and final button ("End Now") immediately cancelled the membership. Amazon refunded consumers who pressed this button a pro-rated amount for the balance of the monthly billing cycle. *See* Attachment R, at 8.

Amazon designed the Iliad Flow (both desktop and mobile) to inform consumers about a) Prime benefits they would lose by cancelling Prime, and b) alternative payment methods available to them to keep Prime. Amazon did not design the Iliad Flow to be simple or easy for consumers. The Iliad Flow inhibits or prevents many consumers who intend to cancel from cancelling their membership.

Finally, the cancellation process as updated in April 2023 still contains problematic elements. In particular, the cancellation process remains difficult to locate on both desktop and mobile. Amazon still requires five clicks on desktop and six on mobile for consumers to cancel from Amazon.com. Moreover, both desktop and mobile cancellation still require consumers to proceed through extraneous information unnecessary to the cancellation process and presented solely to discourage cancellation.

## **Manipulative Designs in Prime Cancellation**

The manipulative designs (sometimes called Dark Patterns) Amazon uses, or has used, in its Prime cancellation flow include the following elements:

Forced Action. "Forced Action" is a design element that requires users to perform a certain action to complete a process or to access certain functionality. Amazon uses Forced Action in its Iliad Flow by forcing the consumer to proceed through multiple screens to cancel their subscription. The presence of Forced Action complicates the Iliad Flow.

- Whether the consumer is presented with distracting information while attempting to cancel.

- Whether the consumer is presented with extraneous information while attempting to cancel.

- Whether a consumer who attempts to cancel via one medium is redirected to cancel via a different medium (e.g., whether a consumer who tries to cancel via telephone is redirected to cancel online).

**INTERROGATORY NO. 10:**  **State the complete factual basis for Your contention that Amazon is "about to violate" the "laws enforced by the Commission" as You contend in paragraph 242 of the Complaint.**

**RESPONSE:**  The FTC objects that the Interrogatory misstates the FTC's allegations.  In particular, the FTC alleged that it "has *reason to believe* that [Amazon] is violating, and is about to violate, laws enforced by the Commission because Defendant has engaged in ROSCA violations repeatedly and knowingly for years.  Those violations are ongoing.  Even if Amazon halts or has halted some problematic conduct, Amazon has consistently pressured its employees to maintain Prime subscription numbers, meaning the incentive for enrollment and cancellation process violations remains."  Compl. ¶ 242 (emphasis added).

The FTC further objects that the Interrogatory seeks information that is irrelevant to any party's claim or defense or, even if relevant, is disproportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1).  Specifically, the question whether the FTC has "reason to believe" that a defendant is violating or is about to violate the law (under 15 U.S.C. § 53(b)) is non-justiciable. *See, e.g.*, *FTC v. Nat'l Urological Group, Inc.*, 2006 WL 8431977, at *3 (N.D. Ga. Jan. 9, 2006) ("reason to believe" language does not provide meaningful standard for judicial review); *Boise*

*Cascade Corp. v. FTC*, 498 F. Supp. 772, 779 (D. Del. 1980) ("The only means of [reviewing the Commission's 'reason to believe'] is to probe their mental processes, a practice condemned by the Supreme Court . . . ."). The FTC also objects that this Interrogatory seeks information protected by the deliberative process privilege. *See id.*

The FTC further objects that this request is overly broad and unduly burdensome in that it seeks the "complete factual basis" for the allegations in paragraph 242.

The FTC refers Amazon to Paragraphs 2 through 258 of the Amended Complaint. Among other facts described in this paragraphs, Amazon's Enrollment Flows have violated ROSCA and Section 5 since at least 2014, and its Cancellation Flows since at least 2016, when the Iliad Flow was implemented. Amazon frequently changes its Enrollment and Cancellation Flows to test which versions yield the highest number of Prime subscribers, which it then implements on its website at large. In fact, Amazon implemented clarity changes to its Enrollment Flows in 2020, which it then undid because the number of Prime sign-ups decreased as a result. Given that Amazon currently is violating ROSA and Section 5 and, in any event, can undo recent changes to its Enrollment or Cancellation Flows at any time, the FTC has reason to believe that Amazon is violating or about to violate ROSCA and Section 5.

**INTERROGATORY NO. 11:** **Identify the total number of "Nonconsensual Enrollees," as that term is defined in paragraph 2 of the Complaint and used throughout the Complaint, that You contend suffered consumer harm for which You now seek relief in the Complaint, and Describe the methodology You used to determine each such instance of "Nonconsensual Enrollment."**

**RESPONSE:** The FTC objects that this Interrogatory is premature as discovery is ongoing and Amazon has not produced documents and data that would inform the FTC's

the Nonconsensual Enrollment of consumers from at least 2014 through the present, and (2) Amazon failed to offer consumers a simple mechanism to cancel their Prime subscription from the time it start using its Iliad cancellation flow (which the FTC currently believes was in 2016) through the present.

Dated: August 2, 2024        /s/ Thomas Maxwell Nardini
EVAN MENDELSON (DC Bar #996765)
OLIVIA JERJIAN (DC Bar #1034299)
THOMAS MAXWELL NARDINI
(IL Bar # 6330190)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2749; ojerjian@ftc.gov (Jerjian)
(202) 326-2812; tnardini@ftc.gov (Nardini)

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

<u>**VERIFICATION**</u>

I am authorized to verify Plaintiff's Second Supplemental Responses and Objections to Amazon.com, Inc.'s First Set of Interrogatories on behalf of the Federal Trade Commission, and I declare under penalty of perjury that the foregoing responses are true and correct to the best of my knowledge.

Executed on August 2, 2024                    /s/ Evan Mendelson

                                             Evan Mendelson

# EXHIBIT 21

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

FEDERAL TRADE COMMISSION,

               Plaintiff,

    v.

AMAZON.COM, INC., et al.,

              Defendants.

No. 2:23-cv-0932-JHC

**PLAINTIFF FEDERAL TRADE COMMISSION'S RESPONSES AND OBJECTIONS TO DEFENDANT JAMIL GHANI'S SECOND SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Federal Trade Commission ("FTC") hereby objects and responds to Defendant Jamil Ghani's Second Set of Interrogatories ("Interrogatories").

**GENERAL RESPONSES AND OBJECTIONS**

1.     Discovery has not concluded in this litigation.  Accordingly, the FTC's responses and objections are based upon the information available to the FTC at this stage in the litigation and presently known by the FTC.  The FTC reserves the right to supplement, revise, modify, or otherwise change or amend these responses in light of any information that it subsequently may

1    obtain or discover, consistent with Federal Rule of Civil Procedure 26(e).  The FTC does not

2    waive its right to rely upon information that is not being disclosed at this time, including but not

3    limited to information that the FTC has requested or will request through its own discovery

4    propounded on Amazon.com, Inc. ("Amazon"), the individual defendants (Neil Lindsay, Russell

5    Grandinetti, and Jamil Ghani), and third parties.  Objections made by the FTC are made without

6    prejudice to the FTC's right to assert additional objections in the event that additional grounds

7    for objections are discovered by the FTC subsequent to this response.

8                          **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

9            **INTERROGATORY NO. 6:**  Describe the complete factual basis for Your contention

10   that Amazon "delayed the Commission's investigation" during the period April 15, 2021 to

11   March 14, 2022, as alleged in Paragraph 254 of the Amended Complaint, including by

12   Identifying with specificity any actions or steps You would have taken, and the date or dates on

13   which You would have taken such actions or steps, if not for the alleged delay.

14           **RESPONSE:**  The FTC objects to the Interrogatory's use of the word "Describe," as

15   Ghani defines that term, insofar as the definition is overly broad and imposes an undue burden

16   by requiring the FTC to identify all "Communications and/or Documents" in any way "relevant"

17   to the Interrogatory.  The FTC also objects as unduly burdensome and overly broad to the

18   Interrogatory's request for the "complete factual basis" for the FTC's claim.  *See, e.g.*, *Haggarty*

19   *v. Wells Fargo Bank, N.A.*, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While

20   contention interrogatories are permitted, they are often unduly broad and unduly burdensome

21   when they require a party to state every fact or all facts supporting identified allegations or

22   defenses.") (cleaned up).

23           The FTC also objects that Defendants, who share counsel, are evading the 25-

                                                    2

interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual

Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam*

*Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

expressed a belief that in some instances nominally separate parties should be considered one

party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

      Based on the foregoing objections, the FTC will not respond to the Interrogatory.

      **INTERROGATORY NO. 7:**  Describe the complete factual basis for Your contention

that Amazon "delayed the Commission's investigation" during the period August 5, 2022 to

September 21, 2022, as alleged in Paragraph 255 of the Amended Complaint, including by

Identifying with specificity what any actions or steps You would have taken, and the date or

dates on which You would have taken such actions or steps, if not for the alleged delay

      **RESPONSE:**  The FTC objects to the Interrogatory's use of the word "Describe," as

Ghani defines that term, insofar as the definition is overly broad and imposes an undue burden

by requiring the FTC to identify all "Communications and/or Documents" in any way "relevant"

to the Interrogatory.  The FTC also objects as unduly burdensome and overly broad to the

Interrogatory's request for the "complete factual basis" for the FTC's claim.  *See, e.g.*, *Haggarty*

*v. Wells Fargo Bank, N.A.*, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While

contention interrogatories are permitted, they are often unduly broad and unduly burdensome

when they require a party to state every fact or all facts supporting identified allegations or

defenses.") (cleaned up).

The FTC also objects that Defendants, who share counsel, are evading the 25-interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather than issues related to the liability of the Individual Defendants. *See, e.g.*, *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have expressed a belief that in some instances nominally separate parties should be considered one party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)). In this instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not respond to the Interrogatory.

**INTERROGATORY NO. 8:** Describe the complete factual basis for Your contention that Amazon "affirmatively concealed the causes of action asserted herein during the Subject Period," as alleged in Paragraph 252 of the Amended Complaint, including by Identifying any specific facts You contend were concealed and the date or dates on which you first became aware of such facts.

**RESPONSE:** The FTC objects to the Interrogatory's use of the word "Describe," as Ghani defines that term, insofar as the definition is overly broad and imposes an undue burden by requiring the FTC to identify all "Communications and/or Documents" in any way "relevant" to the Interrogatory. The FTC also objects as unduly burdensome and overly broad to the Interrogatory's request for the "complete factual basis" for the FTC's claim. *See, e.g.*, *Haggarty v. Wells Fargo Bank, N.A.*, 2012 WL 4113341, at *2 (N.D. Cal. Sept. 18, 2012) ("While

4

contention interrogatories are permitted, they are often unduly broad and unduly burdensome when they require a party to state every fact or all facts supporting identified allegations or defenses.") (cleaned up).

The FTC also objects that Defendants, who share counsel, are evading the 25-interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather than issues related to the liability of the Individual Defendants. *See, e.g.*, *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have expressed a belief that in some instances nominally separate parties should be considered one party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not respond to the Interrogatory.

**INTERROGATORY NO. 9:**  Identify the date on which You first became aware of "Nonconsensual Enrollment," as that term is defined in Paragraph 2 of the Amended Complaint and used throughout the Amended Complaint.

**RESPONSE:**  The FTC objects that the Interrogatory is argumentative because it assumes that there is a single date on which the FTC as a whole became "aware" of Nonconsensual Enrollment.  Throughout the FTC's investigation, it gathered facts and evidence that led to the Commission's decision to file the Complaint; there is no date on which the Commission became "aware" of Nonconsensual Enrollment.  For similar reasons, the FTC objects that the request for a date on which it became "aware" of Nonconsensual Enrollment is

5

vague and ambiguous.  The FTC also objects on the basis that the Interrogatory is cumulative of

Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts about the Prime

enrollment and cancellation flows.  Similarly, the FTC objects on the basis that Amazon knows,

based on its investigation productions and the FTC's litigation productions, when the FTC

gathered evidence regarding the Prime enrollment and cancellation flows.  Any additional

information is unnecessary and would likely invade attorney work product, deliberative process

privilege, and the attorney-client privilege.

The FTC also objects that Defendants, who share counsel, are evading the 25-

interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual

Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam

Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

expressed a belief that in some instances nominally separate parties should be considered one

party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to

Interrogatory No. 9.

**INTERROGATORY NO. 10:**  Identify the date on which You became aware that the

Prime Online Cancellation Flow "inhibits or prevents many consumers who intend to cancel

from cancelling their membership," as alleged in Paragraph 162 of the Amended Complaint.

**RESPONSE:** The FTC objects that the Interrogatory is argumentative because it

6

1    assumes that there is a single date on which the FTC as a whole became "aware" that the Prime

2    Online Cancellation Flow "inhibits or prevents many consumers who intend to cancel from

3    cancelling their membership."  Throughout the FTC's investigation, it gathered facts and

4    evidence that led to the Commission's decision to file the Complaint; there is no date on which

5    the Commission became "aware" that the Prime Online Cancellation Flow "inhibits or prevents

6    many consumers who intend to cancel from cancelling their membership."  For similar reasons,

7    the FTC objects that the request for a date on which it became "aware" of the facts alleged in

8    Paragraph 162 is vague and ambiguous.  The FTC also objects on the basis that the Interrogatory

9    is cumulative of Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts

10   about the Prime enrollment and cancellation flows.  Similarly, the FTC objects on the basis that

11   Amazon knows, based on its investigation productions and the FTC's litigation productions,

12   when the FTC gathered evidence regarding the Prime enrollment and cancellation flows.  Any

13   additional information is unnecessary and would likely invade attorney work product,

14   deliberative process privilege, and the attorney-client privilege.

15         The FTC also objects that Defendants, who share counsel, are evading the 25-

16   interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual

17   Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

18   than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam*

19   *Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

20   co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

21   expressed a belief that in some instances nominally separate parties should be considered one

22   party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

23   instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

7

statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to Interrogatory No. 10.

**INTERROGATORY NO. 11:** Identify the date or dates on which You first became aware that the Prime Enrollment Flow contains each of the "manipulative designs" described in Paragraph 231 of the Amended Complaint.

**RESPONSE:** The FTC objects that the Interrogatory is argumentative because it assumes that there is a single date on which the FTC as a whole became "aware" that the Prime Enrollment Flow contains each "manipulative design" described in Paragraph 231. Throughout the FTC's investigation, it gathered facts and evidence that led to the Commission's decision to file the Complaint; there is no date on which the Commission became "aware" of each "manipulative design" in the Prime Enrollment Flow. For similar reasons, the FTC objects that the request for a date on which it became "aware" of each "manipulative design" is vague and ambiguous. The FTC also objects on the basis that the Interrogatory is cumulative of Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts about the Prime enrollment and cancellation flows. Similarly, the FTC objects on the basis that Amazon knows, based on its investigation productions and the FTC's litigation productions, when the FTC gathered evidence regarding the Prime enrollment and cancellation flows. Any additional information is unnecessary and would likely invade attorney work product, deliberative process privilege, and the attorney-client privilege.

The FTC also objects that Defendants, who share counsel, are evading the 25-interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam*

*Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

expressed a belief that in some instances nominally separate parties should be considered one

party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to

Interrogatory No. 11.

**INTERROGATORY NO. 12**:  Identify the date or dates on which You first became

aware that the Prime Online Cancellation Flow contains each of the "manipulative designs"

described in Paragraph 231 of the Amended Complaint.

**RESPONSE:**  The FTC objects that the Interrogatory is argumentative because it

assumes that there is a single date on which the FTC as a whole became "aware" that the Prime

Online Cancellation Flow contains each "manipulative design" described in Paragraph 231.

Throughout the FTC's investigation, it gathered facts and evidence that led to the Commission's

decision to file the Complaint; there is no date on which the Commission became "aware" of

each "manipulative design" in the Prime Online Cancellation Flow.  For similar reasons, the FTC

objects that the request for a date on which it became "aware" of each "manipulative design" is

vague and ambiguous.  The FTC also objects on the basis that the Interrogatory is cumulative of

Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts about the Prime

enrollment and cancellation flows.  Similarly, the FTC objects on the basis that Amazon knows,

based on its investigation productions and the FTC's litigation productions, when the FTC

gathered evidence regarding the Prime enrollment and cancellation flows.  Any additional

information is unnecessary and would likely invade attorney work product, deliberative process

privilege, and the attorney-client privilege.

The FTC also objects that Defendants, who share counsel, are evading the 25-

interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual

Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam

Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

expressed a belief that in some instances nominally separate parties should be considered one

party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to

Interrogatory No. 12.

**INTERROGATORY NO. 13**:  Identify the date on which You first became aware that

the Prime Enrollment Flow does not "clearly and conspicuously disclose[] all material terms"

under ROSCA.

**RESPONSE:** The FTC objects that the Interrogatory is argumentative because it

assumes that there is a single date on which the FTC as a whole became "aware" that the Prime

Enrollment Flow does not "clearly and conspicuously disclose[] all material terms" under

ROSCA.  Throughout the FTC's investigation, it gathered facts and evidence that led to the

Commission's decision to file the Complaint; there is no date on which the Commission became

10

"aware" that the Prime Enrollment Flow does not "clearly and conspicuously disclose[] all material terms."  For similar reasons, the FTC objects that the request for a date on which it became "aware" of the Prime Enrollment Flow's unlawfulness is vague and ambiguous.  The FTC also objects on the basis that the Interrogatory is cumulative of Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts about the Prime enrollment and cancellation flows.  Similarly, the FTC objects on the basis that Amazon knows, based on its investigation productions and the FTC's litigation productions, when the FTC gathered evidence regarding the Prime enrollment and cancellation flows.  Any additional information is unnecessary and would likely invade attorney work product, deliberative process privilege, and the attorney-client privilege.

The FTC also objects that Defendants, who share counsel, are evading the 25-interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have expressed a belief that in some instances nominally separate parties should be considered one party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to Interrogatory No. 13.

**INTERROGATORY NO. 14**: Identify the date on which You first became aware that

the Prime Enrollment Flow does not "obtain[] a consumer's expressed informed consent" under

ROSCA.

**RESPONSE:**  The FTC objects that the Interrogatory is argumentative because it

assumes that there is a single date on which the FTC as a whole became "aware" that the Prime

Enrollment Flow does not "obtain[] a consumer's express informed consent" under ROSCA.

Throughout the FTC's investigation, it gathered facts and evidence that led to the Commission's

decision to file the Complaint; there is no date on which the Commission became "aware" that

the Prime Enrollment Flow does not "obtain[] a consumer's express informed consent."  For

similar reasons, the FTC objects that the request for a date on which it became "aware" of the

Prime Enrollment Flow's unlawfulness is vague and ambiguous.  The FTC also objects on the

basis that the Interrogatory is cumulative of Rule 30(b)(6) Topics 59-60, which covered when the

FTC learned certain facts about the Prime enrollment and cancellation flows.  Similarly, the FTC

objects on the basis that Amazon knows, based on its investigation productions and the FTC's

litigation productions, when the FTC gathered evidence regarding the Prime enrollment and

cancellation flows.  Any additional information is unnecessary and would likely invade attorney

work product, deliberative process privilege, and the attorney-client privilege.

The FTC also objects that Defendants, who share counsel, are evading the 25-

interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual

Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather

than issues related to the liability of the Individual Defendants.  *See, e.g.*, *Vinton v. Adam*

*Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit

co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have

expressed a belief that in some instances nominally separate parties should be considered one

1  party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)).  In this

2  instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any

3  statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

4        Based on the foregoing objections, the FTC will not provide any further response to

5  Interrogatory No. 14.

6        **INTERROGATORY NO. 15**:  Identify the date on which You first became aware that

7  the Prime Online Cancellation Flow is not a "simple mechanism[] for a consumer to stop

8  recurring charges" under ROSCA.

9        **RESPONSE:**  The FTC objects that the Interrogatory is argumentative because it

10  assumes that there is a single date on which the FTC as a whole became "aware" that the Prime

11  Online Cancellation Flow is not a "simple mechanism[] for a consumer to stop recurring

12  charges" under ROSCA.  Throughout the FTC's investigation, it gathered facts and evidence that

13  led to the Commission's decision to file the Complaint; there is no date on which the

14  Commission became "aware" that the Prime Online Cancellation Flow is not a "simple

15  mechanism[] for a consumer to stop recurring charges."  For similar reasons, the FTC objects

16  that the request for a date on which it became "aware" of the Prime Online Cancellation Flow's

17  unlawfulness is vague and ambiguous.  The FTC also objects on the basis that the Interrogatory

18  is cumulative of Rule 30(b)(6) Topics 59-60, which covered when the FTC learned certain facts

19  about the Prime enrollment and cancellation flows.  Similarly, the FTC objects on the basis that

20  Amazon knows, based on its investigation productions and the FTC's litigation productions,

21  when the FTC gathered evidence regarding the Prime enrollment and cancellation flows.  Any

22  additional information is unnecessary and would likely invade attorney work product,

23  deliberative process privilege, and the attorney-client privilege.

13

The FTC also objects that Defendants, who share counsel, are evading the 25-interrogatory-per-party rule by effectively pooling their interrogatories and using the Individual Defendants' interrogatories to probe the basis for Amazon's underlying corporate liability rather than issues related to the liability of the Individual Defendants. *See, e.g.*, *Vinton v. Adam Aircraft Indus., Inc.*, 232 F.R.D. 650, 664 (D. Colo. 2005) (affirming magistrate decision to limit co-defendants to 25 interrogatories in total and explaining that "commentators on Rule 33 have expressed a belief that in some instances nominally separate parties should be considered one party for purposes of the 25-interrogatory limitation" (internal quotation marks omitted)). In this instance, the Interrogatory is particularly objectionable because the FTC is not asserting that any statute of limitations as to Defendant Ghani (as opposed to Defendant Amazon) should be tolled.

Based on the foregoing objections, the FTC will not provide any further response to Interrogatory No. 15.


Dated: January 27, 2025                    /s/ Evan Mendelson
                                           JONATHAN COHEN (DC Bar #483454)
                                           EVAN MENDELSON (DC Bar #996765)
                                           OLIVIA JERJIAN (DC Bar #1034299)
                                           THOMAS MAXWELL NARDINI
                                           (IL Bar #6330190)
                                           SANA CHAUDHRY (NY Bar #5284807)
                                           ANTHONY SAUNDERS (NJ Bar #008032001)
                                           Federal Trade Commission
                                           600 Pennsylvania Avenue NW
                                           Washington DC 20580
                                           (202) 326-2551; jcohen2@ftc.gov (Cohen)
                                           (202) 326-3320; emendelson@ftc.gov (Mendelson)
                                           (202) 326-2749; ojerjian@ftc.gov (Jerjian)
                                           (202) 326-2812; tnardini@ftc.gov (Nardini)
                                           (202) 326-2679; schaudhry@ftc.gov (Chaudhry)
                                           (202) 326-2917; asaunders@ftc.gov (Saunders)

                                           COLIN D. A. MACDONALD (WSBA # 55243)
                                           Federal Trade Commission

14

915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

15

## **<u>VERIFICATION</u>**

I am authorized to verify Plaintiff's Responses and Objections to Defendant Jamil Ghani's Second Set of Interrogatories on behalf of the Federal Trade Commission, and I declare under penalty of perjury that the foregoing responses are true and correct to the best of my knowledge.

Executed on January 27, 2025          <u>/s/ Evan Mendelson</u>

                                              Evan Mendelson

# EXHIBIT 22

Document Produced in Native

FTCAMZN_0023584

| Complaint Date | Complaint Info Comments |
|---|---|
| 1/6/2014 | This web site has try prime for FREE and you have to use a credit card, but when you cancel it or forget to it never tells you that your FREE time is up and you are going to be charged $79.00; they just secretly charge you. I apparently signed up for free and on Jan 4, 2013 I was told by my 26 year old daughter that I had prime and she was signed into mine and was watching it. I signed in and I was charged for it. They should have told me once the months free time was up which they never did and I got busy and forgot to cancel. This is a gimmick that they use to trick people into being charged. There should be laws that force them to email me and tell me that the free trail is over and I must cancel or else be charged. I never got any email. I canceled it as soon as I realized that I was charged and I never consented to having it for longer than a free trial which I never used. They should also be forced by law to offer corporate and toll free numbers for customer service since they do business with the public and they take people&#8393;s money. They have all of that gone from their web site or clearly hidden, but I have a bachelors degree and I am computer savvy but I could not locate it. This is a trap to entrap people into having prime. I did buy movies and music from them and I have ordered a lot of merchandise but they have lost my business FOREVER over the prime entrapment. They should be forced by law to remind me of the prime free that I signed up for because I have 2 autistic children and I am busy. They could have seen that I never used it. I would have never known about it if my daughter did not log into my account to watch the movies that I bought. She found it and started watching things thinking that I knew that I had it.Product_Or_Service: Prime video streaming --- Additional Comments: DesiredSettlementID: RefundRefund for months not used and refund from day of cancellation of Jan, 4, 2013 for entrapment. I will never use their services now because they were so sneaking and secretly trying to get me. They should have been made by law to remind me of being charged if I did not cancel then I would have cancelled, but I never used it. If I ever want movies in the future I will remember this and not buy from them when I have spent so much business from them; they cheated their selves when they robbed me. |

# EXHIBIT 23

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4   FEDERAL TRADE COMMISSION,

5                 Plaintiff,

6   vs.                          No. 2:23-cv-0932-JHC

7   AMAZON.COM, et al.

8                 Defendants.

9   _____/

10

11     The Above-Captioned Video-Recorded Deposition of

12                  KATHERINE JOHNSON

13                10:07 a.m. - 7:29 p.m.

14                 November 18, 2024

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J11949754



1                    KATHERINE JOHNSON,

2    called as a witness, having been first duly sworn to

3    tell the truth, the whole truth, and nothing but the

4    truth, was examined and testified as follows:

5                    EXAMINATION BY MR. REITER

6         Q     Good morning, Ms. Johnson.

7         A     Good morning.

8         Q     Have you been deposed before?

9         A     No.

10        Q     Given that you're an attorney, I assume

11   you've been involved in depositions previously?

12        A     Yes.

13        Q     And you're generally familiar with the

14   rules of depositions?

15        A     Yes.

16        Q     Do you have counsel representing you here

17   today?

18        A     I do.

19        Q     Who's your counsel?

20        A     Jonathan Cohen.

21        Q     What did you do to prepare for your

22   deposition?

23        A     I met with Mr. Cohen several times.

24        Q     How many times did you meet with Mr. Cohen?

25        A     I'm not sure exactly.



1    Q      And it says, dear, Katherine, on behalf of

2    Amazon.com, please see the attached second response to

3    the FTC CID, right?

4    A      Yes.

5    Q      And then you see it mentions a document

6    production Amazon had made, correct?

7    A      Yes.

8    Q      Do you recalling Amazon making this

9    document production on April 22nd, 2021?

10   A      Not specifically, no.

11   Q      Any reason to doubt that it did?

12   A      No.

13   Q      So let's turn the page and you see that

14   this is a CID response letter from Amazon to you,

15   right?

16   A      Yes.

17   Q      Just looking at the second sentence, it

18   says this letter constitutes Amazon's response to

19   Interrogatory 6, 7, 8, and 10 and Amazon's initial

20   response to Interrogatory 13 and document request 1 and

21   4 regarding cancellation.

22          Do you see that?

23   A      I do.

24   Q      And it says in addition, this letter

25   responds to your supplemental request for



1    organizational charts, right?

2         A      That's what it states, yes.

3         Q      So now having seen that, does that refresh

4    your recollection that Amazon cooperated with your

5    request for organizational charts?

6              MR. COHEN:  Objection to form.

7              THE WITNESS:  I still don't have any

8    specific recollection of receiving them.  So I can't

9    say.

10   BY MR. REITER:

11        Q      Did you review the documents that Amazon

12   produced?

13        A      Yes.

14        Q      All of them?

15        A      I don't remember if I reviewed all of them.

16        Q      Do you know how many documents Amazon

17   produced in response to the CID?

18        A      I do not.

19        Q      Do you know how many documents you

20   reviewed?

21        A      I do not.

22        Q      Are you aware of documents that you did not

23   review?

24        A      That's an impossible question to answer.

25        Q      Are you aware of documents that Amazon



1    produced that you did not review?

2        A       I don't know.  I don't -- if I did review

3    them, how would I be aware that I didn't -- I guess I

4    don't understand the question.

5        Q       Well, Amazon would have produced documents

6    that would have been uploaded.  You would have known

7    how many documents were in the database.  Are you aware

8    of documents that you did not review?

9        A       Not specifically, no, but I don't know that

10   I've reviewed every -- I can't -- I wouldn't say that I

11   reviewed every document or didn't.  I really don't

12   remember if I looked at every one.

13       Q       Is it possible you did not review all the

14   documents Amazon produced in response to the CID during

15   the time when you were the lead FTC staff attorney?

16       A       Yes.

17       Q       You have no reason to believe that Amazon

18   did not produce the organizational charts as it's

19   stated here in the letter, right?

20       A       I have no reason to believe that, no.

21       Q       So just to summarize here, this is

22   April 22nd, 2021.  Within six weeks after receiving the

23   CID, Amazon had responded to six interrogatories and it

24   had made a production of documents, right?

25             MR. COHEN:  Objection to form.



1              THE WITNESS:  So it was received on the

2     23rd, but I don't know how many weeks it is.  I'd have

3     to look at a calendar.

4     BY MR. REITER:

5         Q     I'll represent to you that the amount of

6     time between March 16th, 2021, and April 22 or 23rd of

7     2021, is a little more than five weeks.  Does that

8     sound right?

9         A     It sounds right, yes.

10        Q     Okay.  So within six weeks or a little more

11    than five weeks after receiving the CID, Amazon had

12    responded to six interrogatories and had made a

13    production of documents, right, Ms. Johnson?

14             MR. COHEN:  Objection, form.

15             THE WITNESS:  I'd have to count.  I'd have

16    to count.

17    BY MR. REITER:

18        Q     Go ahead and count.

19        A     I see one, two, three, four

20    interrogatories, one response to and five

21    interrogatories and two document requests plus whatever

22    was in their April 15th production which I don't

23    remember.

24        Q     You recall the April 15 production was

25    Amazon's response to interrogatories 9 and 14, right?



1        A        No.

2        Q        Can you tell me what the subject matter of

3   those documents would have been?

4        A        No.

5        Q        Are these Amazon internal documents?

6        A        I believe so.

7        Q        Do you -- can you tell me what kind of

8   information those documents contained?

9        A        I don't remember now sitting here.  At some

10  point, I probably did know.

11       Q        Do you see in paragraph 245 it alleges that

12  Amazon also failed to identify as custodians

13  individuals the Business Insider article named as key

14  decision makers regarding the nonconsensual enrollment

15  problem in the Illiad flow?

16       A        I'm sorry.  Where are you looking?

17       Q        Paragraph 245 of the FTC's amended

18  complaint.

19               MR. COHEN:  Sorry.  Can you read back the

20  question?

21  BY MR. REITER:

22       Q        Sure.  So let's just focus -- let's go to

23  page 82 of the FTC's amended complaint.  Ms. Johnson,

24  are you with me?

25       A        Yes.  I'm just trying to like remember.



1  Sorry.  I apologize.  I'm -- go ahead.  What was the

2  question?  Amazon --

3          Q      So looking at page 82, the last sentence,

4  the FTC alleges that Amazon failed to identify as

5  custodians key individuals who communicated extensively

6  about the Prime enrollment and cancellation processes

7  including the most knowledgeable employees on these

8  subjects.

9              Do you see that?

10     A      I do.

11         Q      And then it alleges that Amazon also failed

12  to identify as custodians individuals the Business

13  Insider article named as key decision makers regarding

14  the nonconsensual enrollment problem and the Illiad

15  flow.

16             Do you see that?

17     A      I do.

18         Q      And can you tell me who any of these

19  individuals are that the FTC alleges Amazon failed to

20  identify as custodians?

21     A      No.

22         Q      Because you don't know or you won't tell

23  me?

24     A      Because I don't know.

25             MR. COHEN:  Objection.



1  BY MR. REITER:

2      Q      You don't know who any -- you're not aware

3  of any specific custodians that Amazon did not disclose

4  during the investigation that you believe should have

5  been disclosed, right?

6      A      I can't identify any specific individuals,

7  no.

8              MR. REITER:  Why don't you give us five

9  minutes?  We'll go off the record, please.

10             THE VIDEOGRAPHER:  Off the record at 6:49.

11             (Deposition recessed at 6:49 p.m.)

12             (Deposition resumed at 6:55 p.m.)

13             THE VIDEOGRAPHER:  Back on the record at

14  6:55.

15  BY MR. REITER:

16     Q      Ms. Johnson, during the break, did you

17  discuss the substance of your testimony with counsel?

18     A      Yes.

19     Q      Ms. Johnson, did you tell anyone at the FTC

20  that you had applied to work at Amazon?

21     A      Yes.

22     Q      When was the first time you told someone at

23  the FTC that you had applied to work at Amazon?

24     A      I don't remember.

25     Q      Do you remember approximately?



 1  had applied?

 2              MR. COHEN:  I'm going -- I'm going to

 3  instruct her not to answer on the grounds of

 4  attorney-client privilege and work product.

 5              MR. REITER:  I disagree with that.  I don't

 6  see how Ms. Johnson's application to work at Amazon

 7  implicates attorney-client privilege or work product.

 8  BY MR. REITER:

 9      Q     Ms. Johnson --

10              MR. COHEN:  You know what?  If you want --

11  to your point, if you want just a yes or no on did she

12  tell anyone else, that's okay.  I'll allow it, but the

13  question that's not going to be allowed is going to be

14  sort of any sort of content of these communications.

15  So if you want to go ahead and ask her did she tell

16  another person.

17  BY MR. REITER:

18      Q     Did you tell anybody besides Mr. Cohen that

19  you had applied to work at Amazon during the time when

20  you were in the application process?

21      A     Yes.  Well, yes.

22      Q     Who were those individuals?

23      A     I don't remember the specific names.

24      Q     Let's go to -- back to Exhibit 33, page

25  2 -- sorry -- I mean, page 3, subheading 5.  Let me go



```
 1   back to the statement.  You wrote I love Amazon.  I

 2   think the company is truly amazing in how it has

 3   transformed the consumer experience and as a consumer,

 4   I appreciate all the flexibility, convenience and

 5   choice it has given me.

 6            Do you see that?

 7       A    I do.

 8       Q    Are you an Amazon customer?

 9       A    I am.

10       Q    Are you an Amazon Prime member?

11       A    I am.

12       Q    How long have you been an Amazon Prime

13   member?

14       A    I'm not sure.

15       Q    Can you give me an estimate?

16       A    No.

17       Q    Has it been more than a year?

18       A    Yes.

19       Q    More than two years?

20       A    Yes.

21       Q    More than five years?

22       A    Yes.

23       Q    More than ten years?

24       A    I'm not sure about that.

25       Q    More than seven years?
```



1        A       Maybe.   Probably.

2        Q       Why have you chosen to remain an Amazon

3    Prime customer for more than seven years?

4        A       Because I appreciate all the flexibility,

5    convenience and choice it has given me.

6                MR. REITER:   I have no further questions at

7    this time.

8                MR. COHEN:   Just a few things, Ms. Johnson.

9    Thank you so much for persevering.   I know it's late.

10               And to the reporter and videographer as

11   well.  And thank you, Ryan and Elena.

12               EXAMINATION BY MR. COHEN

13       Q       Just very briefly to sort of clean up or

14   address a couple of things.  Obviously there's a lot

15   that we could go over.  I'm just going to do a very few

16   things.  You testified earlier, did you not, Ms.

17   Johnson, that there was a point in time in 2022 when

18   you applied for a position at Amazon, correct?

19       A       Yes.

20       Q       And did that -- what was the result?  How

21   did that application sort of come to a conclusion?

22       A       I withdrew my application.

23       Q       Roughly speaking, I know you're not going

24   to remember exactly, but roughly speaking when did

25   that -- when was the application withdrawn?



1    A    June maybe or July, I don't remember, of

2    2022.

3    Q    There was a period of time then in mid 2022

4    when that application was pending, right?

5    A    Yes.

6    Q    During that period of time when that

7    application was pending, did you have any substantive

8    communication with me or anyone else about the Amazon

9    matter?

10   A    No.

11   Q    Let me switch gears for a moment.  And if I

12   can direct you to what counsel marked as I think it's

13   -- I think it's 21, Exhibit 21.  If I'm wrong, I

14   apologize.  I'm wrong a lot.  I'm not wrong.  I'm not

15   wrong.  And so what this is -- what's been marked as

16   Exhibit 21 just to make sure, Ms. Johnson, that we're

17   on the same page is that it's Bates number ending in

18   735.

19        Do you recall -- I'm just paraphrasing.  I

20   won't get it exactly right -- that you were asked a

21   series of questions by Amazon's counsel about whether

22   you had in effect received the things that you had

23   wanted to receive from the company?

24        MR. REITER:  Objection, leading.

25        MR. COHEN:  I'm just trying to move it



```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2              I, Steven Poulakos, registered

 3   Professional Reporter, the officer before whom the

 4   foregoing proceedings were taken, do hereby certify

 5   that the foregoing transcript is a true and correct

 6   record of the proceedings; that said proceedings were

 7   taken by me stenographically and thereafter reduced to

 8   typewriting under my supervision; and that I am neither

 9   counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12              IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 18th day of

14   November 2024.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25
```





# EXHIBIT 24

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4    FEDERAL TRADE COMMISSION,

5                  Plaintiff,

6    vs.                          No. 2:23-cv-0932-JHC

7    AMAZON.COM., et al.

8                  Defendants.

9    _____/

10

11      The Above-Captioned Video-Recorded Deposition of

12                  ADAM M. ROTTNER

13              9:14 a.m. – 6:20 p.m.

14                  March 27, 2025

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12387745



ADAM M. ROTTNER                                      March 27, 2025
FTC vs AMAZON.COM                                                8

1              THE VIDEOGRAPHER:  Thank you very much.

2              Will the court reporter please swear in the

3    witness.

4    Whereupon,

5                   ADAM M. ROTTNER,

6    called as a witness, having been first duly sworn to

7    tell the truth, the whole truth, and nothing but the

8    truth, was examined and testified as follows:

9              EXAMINATION BY MR. REITER

10       Q     Good morning, Mr. Rottner.

11       A     Good morning.

12       Q     Could you please state your full name for

13   the record?

14       A     Adam Michael Rottner.

15       Q     Mr. Rottner, you understand that you are

16   testifying under oath today?

17       A     Yes.

18       Q     Is there any reason why you cannot provide

19   complete and truthful testimony here today?

20       A     No.

21       Q     Mr. Rottner, what did you do to prepare for

22   your deposition?

23       A     I reviewed the undercover purchases and

24   cancellations that I created in this matter, reviewed

25   the file, reviewed the complaint that we submitted and



ADAM M. ROTTNER                                    March 27, 2025
FTC vs AMAZON.COM                                             30

 1   weeks.
 2       Q       Okay.  So during the FTC's investigation,
 3   you didn't review any of the documents that Amazon
 4   produced; is that right?
 5       A       I don't believe so, no.
 6       Q       Going back to my question.  Do you know if
 7   anyone at the FTC reviewed the documents reflected in
 8   this chart during the period of time that the FTC was
 9   conducting its investigation?
10               MR. SAUNDERS:  Objection to form.  If the
11   witness knows, he can answer.
12               THE WITNESS:  Can you repeat the question,
13   please?
14   BY MR. REITER:
15       Q       Yes.  Do you know if anyone at the FTC
16   reviewed the documents reflected in this chart during
17   the period of time that the FTC was conducting its
18   investigation?
19       A       Yes.
20       Q       Do you know if individuals at the FTC
21   reviewed each and every document reflected in this
22   chart during the period of time that the FTC was
23   conducting its investigation?
24               MR. SAUNDERS:  Same objection.  The witness
25   can answer if he knows.



1           MR. SAUNDERS:  Objection, calls for
2    speculation.
3           THE WITNESS:  Could you repeat that
4    question again, please?
5    BY MR. REITER:
6       Q     Yeah.  Do you see any similarities between
7    the language we're looking at in Exhibit 13 and the
8    language we're looking at in Mr. Lindsay's email?
9       A     Some, yes.
10      Q     What are the similarities that you see?
11      A     They both refer to a hot topic and both
12   relate to mistaken sign-ups.
13      Q     And you see that Exhibit 13 was produced to
14   the FTC on December 23rd, 2021, right?
15      A     Correct.
16      Q     I'm going to switch gears a little bit.
17   Give me one moment.  So you testified earlier that part
18   of your work on the Amazon Rosca investigation involved
19   you creating fake identities to enroll in and cancel a
20   Prime membership, right?
21      A     That is correct.
22      Q     When was the first time that you personally
23   viewed a Prime enrollment portal?
24      A     That -- let me refer to my chart.
25   February 1st, 2021.



ADAM M. ROTTNER
FTC vs AMAZON.COM

March 27, 2025
199

```
 1      Q       So before that date, you had never
 2   personally viewed a Prime enrollment flow?
 3      A       Perhaps when I personally signed up for
 4   Prime, but I don't recall when that was.
 5      Q       That was going to be my next question.  So
 6   are you a Prime member?
 7      A       Yes.
 8      Q       How long have you been a Prime member?
 9      A       That I don't know.
10      Q       More than five years?
11      A       Yes.
12      Q       More than ten years?
13      A       Yes.
14      Q       And when you enrolled in Prime, you did so
15   intentionally; is that right?
16      A       That is correct.
17      Q       You were not unintentionally enrolled in
18   Prime without your consent, right?
19      A       I was not, no.
20      Q       You were not tricked by Amazon in enrolling
21   in Prime, right?
22              MR. SAUNDERS:  Objection, asked and
23   answered.  Object to the use of the word tricked.
24              MR. REITER:  I'll use the language from
25   your complaint if you like.
```



```
 1   BY MR. REITER:
 2       Q      Mr. Rottner, you were not duped into
 3   enrolling in Amazon Prime, right?
 4              MR. SAUNDERS:  Objection, asked and
 5   answered.
 6              THE WITNESS:  No.
 7   BY MR. REITER:
 8       Q      Have you ever personally canceled -- before
 9   I go there, do you have any recollection of how you
10   enrolled in Prime?
11              MR. SAUNDERS:  Objection, vague.  Are you
12   talking personally or professionally?
13   BY MR. REITER:
14       Q      I'm talking about when you enrolled over
15   ten years ago.
16       A      I don't recall the circumstances of it.
17       Q      Do you recall if you were using a computer?
18       A      Given the timeframe, it's likely, but I'm
19   not sure.
20       Q      Have you -- why have you chosen to remain a
21   Prime member for more than ten years?
22       A      It has its conveniences.
23       Q      What are those conveniences?
24       A      Watching movies.  I can ship products to
25   family members if they need it.
```



1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 27th day of

14   March 2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20   _____

21

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25



# EXHIBIT 25

1 **Cancellation Survey Summary – US/UK/DE/FR/IT/ES** *(Last updated: 3/11/2018)*

2

3 **Survey Objective**

4 The goal of the cancellation survey is to gather feedback from customers on reasons why they are cancelling their Prime membership. Data and insights we
5 gather from this survey will help inform programs and projects in improving the over-all customer experience of Amazon Prime members. This document will
6 show results of the survey that ran from November 1 -February 28, 2019 in US, UK, DE, FR, IT and ES.

7 **Methodology**

8 This survey was sent out through a link in the cancellation confirmation email after a customer completes membership cancellation. After clicking the link, a
9 Qualtrics survey will show on the browser. Survey answers are anonymous and not associated to individual customer ID.

10 **Results**

11 We gathered responses from ▮ customers in US, UK, DE, FR, IT and ES who cancelled between November 1 – February 28, 2019 and results below will show
12 reasons for cancellation, reasons why members have not used their benefits enough, and information on what contributed to bad customer experiences that led
13 to cancellation. Note that some questions allow members to select multiple answers therefore % represents # of customer response over total base and
14 therefore total can be >100%. Potential biases include email opt out bias and response bias (those willing to participate and complete the survey).

15 ***Which of the following are your reason(s) why you canceled or did not renew your Amazon Prime membership?***

16 ***Cancellation Reason WW by Month - Actuals***

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | | ▮ | ▮ | ▮ | ▮ |
| I did not mean to sign up for Amazon Prime | | ▮ | ▮ | ▮ | ▮ |
| It's too expensive/ I cannot afford it at this time | | ▮ | ▮ | ▮ | ▮ |
| I had a bad experience with Amazon Prime (service quality) | | ▮ | ▮ | ▮ | ▮ |
| They charged the wrong card (billing related issue) | | ▮ | | | ▮ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | | ▮ | ▮ | ▮ | ▮ |
| Total Base | ▮ | ▮ | ▮ | ▮ | ▮ |

17 ***Cancellation Reason WW by Month %***

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | | ▮ | ▮ | ▮ | ▮ |
| I did not mean to sign up for Amazon Prime | | ▮ | ▮ | ▮ | ▮ |
| It's too expensive/ I cannot afford it at this time | | ▮ | ▮ | ▮ | ▮ |
| I had a bad experience with Amazon Prime (service quality) | | ▮ | ▮ | ▮ | ▮ |
| They charged the wrong card (billing related issue) | | ▮ | ▮ | ▮ | ▮ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | | ▮ | ▮ | ▮ | ▮ |
| Total Base | ▮ | ▮ | ▮ | ▮ | ▮ |

AMZN_00003642

18

19 *Cancellation Reason by Locale*

20 *US*

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | ■ | ■ | ■ | ■ | ■ |
| I did not mean to sign up for Amazon Prime | ■ | ■ | ■ | ■ | ■ |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ | ■ |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | ■ | ■ | ■ |
| They charged the wrong card (billing related issue) | ■ | ■ | ■ | ■ | ■ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ■ | ■ | ■ | ■ | ■ |

21

22 *UK*

| Reason for cancellation | December | January | February | Total |
|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | ■ | ■ | ■ | ■ |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | | ■ |
| They charged the wrong card (billing related issue) | ■ | ■ | ■ | ■ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ■ | ■ | ■ | ■ |

23

24 *DE*

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | ■ | ■ | ■ | ■ | ■ |
| I did not mean to sign up for Amazon Prime | ■ | ■ | ■ | ■ | ■ |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ | ■ |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | ■ | ■ | ■ |
| They charged the wrong card (billing related issue) | ■ | ■ | ■ | | ■ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ■ | ■ | ■ | ■ | ■ |

25

26

AMZN_00003643

27    *FR*

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | ■ | ■ | ■ | ■ | ■ |
| I did not mean to sign up for Amazon Prime | ■ | ■ | ■ | ■ | ■ |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ | ■ |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | ■ | ■ | ■ |

28

29    *IT*

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | | | | | |
| I did not mean to sign up for Amazon Prime | ■ | ■ | ■ | ■ | |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ | |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | ■ | ■ | |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ■ | ■ | ■ | ■ | ■ |

30

31    *ES*

| Reason for cancellation | November | December | January | February | Total |
|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | | | | | |
| I did not mean to sign up for Amazon Prime | ■ | ■ | ■ | ■ | ■ |
| It's too expensive/ I cannot afford it at this time | ■ | ■ | ■ | ■ | ■ |
| I had a bad experience with Amazon Prime (service quality) | ■ | ■ | ■ | ■ | |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ■ | ■ | ■ | ■ | ■ |

32

33

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00003644

34  *In US, we were able to target survey link by specific segments. Results are below:*

35  ***US Cancellation Reason by Segment***

| | <1 year | 1-4 years | 5-9 years | 10+ years | Student | Any | Total |
|---|---|---|---|---|---|---|---|
| I did not use Amazon Prime benefits enough | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ ▮ |
| I did not mean to sign up for Amazon Prime | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ |
| It's too expensive/ I cannot afford it at this time | ▮ ▮ | ▮ ▮ | *51%* | *47%* | ▮ ▮ | ▮ ▮ | ▮ ▮ |
| I had a bad experience with Amazon Prime (service quality) | ▮ ▮ | ▮ ▮ | ▮ | ▮ | ▮ ▮ | ▮ ▮ | ▮ |
| They charged the wrong card (billing related issue) | ▮ | ▮ ▮ | ▮ | | ▮ | ▮ ▮ | ▮ ▮ |
| I already have access to Amazon Prime (multiple accounts/ access through another member) | ▮ | ▮ ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Total Base | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ | ▮ ▮ ▮ |

36

37  Key take away:

38  • ▮ reasons why customers are cancelling are 'I did not use Amazon Prime benefits enough' (▮), 'It's too expensive/ I cannot afford it at this time'
39    (▮), and 'I did not mean to sign up for Amazon Prime' ▮
40  • No/low usage ▮ is ▮ reason for members who are less than 1 year as members.
41  • ▮ reason among members who are more than a year as Prime cancelled due to price (range between ▮).
42  • Tenured members who have been with Prime for 10+ years cancelled their membership due to Price ▮) to they already have access through multiple
43    accounts  or another member ▮
44  • Student members' ▮ cancellation reasons are 'It's too expensive ▮)' ▮ 'I did not use Amazon Prime benefits enough ▮.

45

46

AMZN_00003645

47  **Which of the following explain(s) why you did not use your Amazon Prime benefits enough?**

48  **US Reason why customers are not using benefits enough - by Segment**

| | 0-11 months | | 1-4 years | | 5-9 years | | 10+ years | | Students | | Any | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I did not buy enough on Amazon | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | 75% | ■ | 69% | ■ | 68% |
| I did not need fast shipping | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ |
| I did not need Prime Video | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ |
| I did not need Prime Music | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ |
| There's not enough Prime exclusive deals and discounts to make it worthwhile | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ |
| Total Base | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ |

49

50  *Key takeaway:* Of those who responded 'I did not use Amazon Prime benefits enough', shopping on Amazon ■ ) is the top reason across all segments followed

51  by not using Prime Music ■ and Prime Video ■ .

52  **Which of the following explain(s) why your expectations were not met by Amazon Prime?**

53  **US Details on bad experience/ expectations not met that lead to cancels – by Segment**

| | <1 year | | 1-4 years | | 5-9years | | 10+ years | | Student | | Any | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product Selection | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | ■ | ■ | ■ | |
| Product Quality | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ | ■ | |
| Product Prices | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ | ■ | |
| Delivery Speed | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | 6 | ■ | ■ | ■ | |
| Prime Video selection or quality | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ | ■ | |
| Prime Music selection or quality | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ | ■ | |
| Prime Reading selection or quality | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ | ■ | |
| Total base | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | ■ | | |

54

55  Key takeaway: Most common bad experience of members who cancelled is related to delivery speed ■ ), Prime video selection ■ and Product Prices

56  ■ ).

57

AMZN_00003646

58    **Appendix A: US Anecdotes from 10+years members**

- Been a customer since 2002.  There has been a significant decline in customer service, and then combine that with the increase in Prime pricing.. it's ridiculous. Not all Prime services are available in my area anyway.  I've been shopping thru Walmart, 2-day shipping with no membership fee, and the selection is the same, prices are the same, not much difference in service quality but my items actually arrive on time.

- When I canceled Prime and asked only for a refund for the future months I won't use (Dec-Apr 2019), I was at first told no because I used it over 200 times (the rep was very kind and just relaying that info from the 'leadership team').  Interesting perspective because I see it as, I spent money thru Amazon over 200 times and the free 2-day shipping didn't happen about 25% of the time.  I wasn't even concerned about the times Amazon failed.  I just didn't want to pay for future months I won't use.  This is an example of the decline in service.  I will take my 'over 200 times' and give that to another business.

- there is no reason that the membership has to be that high

- Amazon needs to loosen its gift card restrictions to be more in line with its major competitors.  Walmart would never tell a customer that a gift card cannot be used like cash to apply to a down payment on an installment contract.  A gift card should spend like cash, period.

- I live in Austin, Texas which is a "Prime City" but the service out here since moving the past two and a half months was significantly worse than living in Suburban Connecticut since Prime's inception.  I couldn't be more dissatisfied than I am.

- i rejoined...all good!

- Not notified of annual Prime renewal (didn't realize notification was a setting rather than a normal procedure before charging my card). Now I have over-drawn amount my on account. Ugh! I would have switched payment accounts before the charge if I had known. Tried canceling membership to avoid this, but of course your cash management department sits on the refund transaction for a few days. I am one PISSED 20year Amazon customer.

- Love prime. Husband has prIme.

- Now we have one prime!

- I won't renew with the exorbitant cost as shipping was my only used benefit. The music and movie portion is just not worth the premium. I'll now be using Wal-Mart for most of my online shopping needs.

- There should be another screen appear when ordering. Also make it easier to cancel. I will never watch another video on Kindle Fire again. What a horrible way to run a business.

- Way too expensive.  And stuff frequently comes later than 2 days.

- The reason I got charged is I went to watch a movie and for some reason I was charged with signing up for a membership and I am already a member through my son's account.  Why can't I watch a movie without being charged again?  I am a senior and appreciate my son's kindness in paying for this privilege.

- Stop automatically signing me up for prime and charging my credit card.

- Membership is ridiculously high. Poor customer service as of lately. Received opened packages. Issues with refunds

- The only benefit I use is the two-day shipping, yet it's super expensive. When I started with Prime, it was half the current price. You should offer different levels depending on the services needed. I've been a loyal customer for years but can no longer afford it.

- Your drivers are atrocious; things were arriving late or not arriving, and Amazin support lying scumbag sellers, and don't care about their buyers.

- I was bumped off a family Prime membership for no apparent reason.  Amazon rep. required the family member to re invite me to be a Prime member. This has been an inconvenience to all.

93    • I did use my prime benefits enough and I did buy enough but I only selected those answers because NONE of these answers fit the reason why I canceled
94    at this time. I am very pleased with Amazon, especially their customer service. I am also very pleased with Prime. My issue is with the fraudulent items
95    that somehow make it into the Amazon pipeline. I buy a lot of health supplements for me and my pets and since I never know when I am getting a
96    knock-off product or the real product, I am just too spooked to put anything into my body or my pets' bodies, that came from Amazon. It is very
97    unfortunate that people are dishonest and greedy and take advantage of Amazon and ruin it for the rest of us. I may still purchase some items on
98    Amazon and I might renew my Prime for benefits other than 2-day shipping, but Amazon is no longer my go-to place for the health needs of me and my
99    pets unless there is some way that Amazon can guarantee that items come from the real manufacturers through Amazon and onto me. Thank you.

100   • I loved most of the time I used Prime.   However, since .mx I thought my account would be used indistinctly.   I do not want Prime in Mexico, you sell
101   different stuff with much different prices.

102   • Prime is a convenience for me. It just got to be too expensive to justify continuing it.

103   • I did not cancel my Amazon Prime.

104   • I tried using the Amazon Channel last night, thinking I could use it with my existing account, which was gifted to me many years ago. I didn't even watch
105   anything! Much to my horror, I received an email from Amazon welcoming me to a new (another) Amazon Account. After an hour on the phone, I was
106   told to re-open my old account, the person who had added me to one of her five Amazon Prime gift accounts. At that time, there were no restrictions on
107   household membership, and it was free. Being physically and totally disabled, I depend on my old account. This is turning into a nightmare. Your agent,
108   Louis, was very kind and helpful. He was very supportive. It is the cancelation of my long-standing account that is just not good or person-friendly. Bad
109   policy? Extremely upsetting...

110   • It was impossible to find a phone number to call Amazon on the Amazon site. I had to google to find it. Very disappointing.

111   • ive been a prime member as part of my moms account for a very long time. why am i being charged now all of a sudden?  why is there no records of the
112   past 3 months of charges, and why was this even triggered?

113   • I tried reaching out to customer service several times and experienced constantly busy lines. Also constantly experienced late delivery of packages. I
114   would receive a notice that it was delivered but wouldnt see it for several days later. Not worth the money if this is the level of service..

115   • Local delivery service has gone from bad to worst!

116   • I changed my card preference & it was not honored. I was forced to cancel my 20 membership to avoid bank charges because I have been laid off my
117   construction job. I'm disappointed.

118

119   • Yes ridiculous can't get amazon prime reinstated after an error adding student prime. Horrible customer service!!!!

120   • Last night I set up my fire stick and logged in with my Amazon account info. Today there is a pending charge for $13.77. I was under the impression if I
121   had prime I could watch movies and whatnot from the fire stick. But instead there is a monthly charge for it. So I cancelled because I can't afford $13 a
122   month for something like that.

123   • My sister, Tammy Berry, was the primary prime member and I was just a secondary member. I received a Roku for Christmas and my grandson was
124   installing it on my tv and signed me up for Prime Video which we thought would allow me to watch movies for FREE, but when I read the details, it costs
125   me $12.99 per month plus the cost of the movie that I wanted to watch. The purpose in buying thr Roku was to get free movies. I subscribed to Netflix
126   trial for $7.99 to see if I liked that first. Now I guess I no longer have Amazon Prime access at all and that was not what we intended to do. We had a guy
127   on the phone that we could not understand so we did not understand clearly understand what was going to happen. I used Amazon a lot. I hate this.

AMZN_00003648

128 • Team Amazon is the best even when we the customer encounters troubles like I did today.

129 • I have no idea how I got signed up for Amazon Prime. Very concerning that this can happen "accidentally."

130 • Thank you for making it easy to rectify my mistake of joining when I was already a member through my husband's account.

131 • I am already included on my wife's Prime membership. I was trying to activate a television, and used my amazon account thinking it would activate it
132   under my wife's membership instead of making a new membership under my amazon account.

133 • Thank you for the help in canceling we didn't know when or how we ordered it.

134 • I already have Prime shipping through my father's Prime Account. I was on my Roku TV and there was a Prime Video app. When I went to see if I could
135   use it, it just automatically signed me up for my own Amazon Prime account which I did not want. This should be way more clear on the app and you
136   should have the chance to sign in with the account you already have!

137 • I have no idea how I signed up as I am a secondary prime member already.

138 • I was installing Roku and thought I was just using my existing Prime benefits through my husband.

139 • Did not specifically subscribe to Amazon Prime. All I wanted was to subscribe to Sundance for a 7-day free trial. Somehow I was subscribed to Amazon
140   Prime. I don't know how. Not at all happy with Amazon, seems like a trick to sign up unsuspecting users.

141 **Appendix B: US Anecdotes from Students**

142 • prefer to shop locally

143 • I did not like that you are automatically charged for the next month after your free trial ends. I did not know I had an account and therefore did not use
144   it, all the while being charged automatically for it.

145 • Not enough time to peruse and consume all the included perks like free books and videos.

146 • My expectations were met. It's just I don't order a lot on amazon anymore.

147 • Just didn't want it anymore.

148 • I expexted that my prime account will be suspended by default if no payment option was selected. And I did not receine any mail stating that my debit
149   card  was charged.

150 • no idea I had been passively enrolled

151 • Poor internet connection

152 • Just did not use it

153 • Prime itself, please read feedback.

154 • No need

155 • 0 results on all the searches

156 • Because amazon is a problematic and shitty company

157 • Really it's on me. Amazon Prime is good overall but my lifestyle doesn't support it.

158 • Too expensive

159 • I just don't buy a lot online

160 • Do not use frequently enough

161 • I don't watch videos and I don't need music. Just didn't order enough to cover the cost savings

162 • I do not use the service. I signed up basically accidentally and it has been sapping money ever since.

CONFIDENTIAL TREATMENT REQUESTED

163 • Overdraft my account
164 • didn't use it
165 • No reason, can just get same products from Walmart with 2 day shipping for free without a membership
166 • I used Prime mainly for decent delivery time. I use Netflix/Pandora for movies or shows and music.
167 • delivery driver and your AI customer service is more responsive than your foreign customer representative. It's ridiculous
168 • Paying for a service to guarantee delivery of the items purchased and amazon failing to deliver
169 • Account was flagged with no reason that I can see
170 • The show that I watched on Prime would often fail to load, even though other video streaming sites work just fine on the same internet & computer,
171 implying that it is an amazon server problem, not a problem on my end. Also, why call it 2 day shipping if it never gets here in 2 days? Finally, sometimes
172 things would not arrive at all, but would be returned and take months to get me a refund. Overall it was very poor quality and I can't figure out why
173 people like it so much.
174 • They guaranteed next day and wouldnt get items till following day.Feel like why should I have prime then
175 • honestly, it wasn't anything to do with amazon prime specifically, it was with amazon in general. i dont feel like there is any consitncy when pruchasing
176 through amazon, with delivery times, or quality of service.
177 • Prime Video quit working on 1/3/19, Network error, try againlater
178 • Terrible service
179 • Customer service
180 • Never needed to be a member
181 • Billing and charges are inconsistent and underhanded
182 • Delivery quality. I had consistent issues of missing deliveries.
183 • I didn't get my package but amazon refuse to get me refund.
184 • My package was delayed, but marked as "delivered" and when I received the package, the box was completely ripped open, not taped and not secure,
185 so can't really ensure the safety and authenticity of the product.
186 • Membership changed from student membership to regular membership automatically without a notification

187 **Appendix C: US Anecdotes from <1 year Prime members**

188 • Didn't work. I just didn't need to order every month. Why there's No 800 number on the bank statement.
189 • I am at this holiday season, and I cannot afford to have such a large amount taken out of my disability benefits.  I am already a Amazon unlimited
190 customer.  I used the prime for an order last month.
191 • Expectations were met...Didn't know I had signed up .
192 • I did not watch any videos or listen to any music or read any books just order to costumes and car seat cover in the last 30 days
193 • I returned two items and was never notified about the refund.
194 • Did not authorize amazon to start Prime Membership
195 • Just dont order much.
196 • need to make it easier to cancel Prime
197 • Outrageous fee.

AMZN_00003650

| | |
|---|---|
| 198 | • I did NOT sign up for Amazone Prime. Amazon wrongfully charged my card. |
| 199 | • Rarely buy over internet |
| 200 | • It's nice if you can afford it that monthly fee, I can't |
| 201 | • I did not request or want Amazon Prime.  Somehow I got it. |
| 202 | • Didn't buy enough to justify |
| 203 | • I felt like the sign up was made by someone else..If I sgned up, I did not understand or remember |
| 204 | • did not request this membership |
| 205 | • Don't use listed above. |
| 206 | • Not using anything but shipping |
| 207 | • I dont like how I have to keep a check on my bank statements because I keep getting signed up for this and I did not request it!!! Today makes the 3rd |
| 208 | time I have found out that ya'll have done this. I have never had any problems with Amazon but this puts a bad taste in my mouth, if it happens again I |
| 209 | will not shop again on Amazon!!!!! |
| 210 | • Charged for somethong I did not request or authorize |
| 211 | • website to purchase was difficult to work thru |
| 212 | • I already had prime account in amazon.ca. I was paying for both amazon. Con and . Ca |
| 213 | • I do not order from Amazon often enough to need Prime, and am quite satisfied with service without it |
| 214 | • I was unaware of what was available. I'm curbing my spending to save money.I |
| 215 | • i am not "shopping" person |
| 216 | • Just cant afford it. sorry |
| 217 | • I did not need it enough, did not intentionally start the free trial, and am FUCKING LIVID that all my money is now in a holding pattern because I got |
| 218 | billed for it without being informed, and will have to wait however long to get my money back. |
| 219 | • Did not purchase often |
| 220 | • Free Trial |
| 221 | • Not able to contact anyone for help |
| 222 | • too expensive due to current circumstances |
| 223 | • I sent a return and they said it did not arrive |
| 224 | • my use doesn't justify the cost |
| 225 | • difficulty in registering my TV. |
| 226 | • Just don't use Amazon |
| 227 | • Couldn't get into account,  email address was changed and not by me. My card was charged but I had no access to the benefits |
| 228 | • I don't have any complaint other than monthly charge. |
| 229 | • I didn't know I was signed up for it!  How did that happen? |
| 230 | • didn't find what I was looking for |
| 231 | • Never could figure out how to connect with Prime video |
| 232 | • many or almost all of the prime videos stated " the video is not available at your region"!!! |
| 233 | • The item arrived later than promised. |

CONFIDENTIAL TREATMENT REQUESTED

234 • I am just not interested in paying money each month, just to have the privilge of buy things from y'all.

235 • See Comments Below

236 • One of my orders (a very small wallet sized itm) was dropped in the bottom of a large box which was being shippped at the sane time I had openned
237   without being notified theybwere being shipped to me.  I almost threw out the box without noticing the small order which had been dropped (with no
238   notice to me) in the bottom of a different order from a different company.

239 • Infrequent use

240 • I don't shop as often as I should to avail of the service.

241 • I never signed up

242 • Did. Not use Prime.

243 • Didn't need what Prime offered

244 • again monthly charge

245 • It was accidentally accessed!!!!

CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT 26

1  **Prime Framework for Clarity – PreReview for 7/24**
2
3  **Overview:**
4  The Prime team is responsible for high visibility locations throughout Amazon that provide information about joining Prime to Non
5  Prime Amazon (NPA) customers, and about managing and enjoying Prime memberships to Prime members. As evidenced by
6  customer responses to the Prime cancellation survey, ▇ open customer frustrations tickets, and a high volume of CS cancellation
7  contacts related to clarity ▇ % of WW Prime related CS contacts), customers are frustrated and confused by some of these
8  experiences. This lack of clarity leads to wrong outcomes for customers in the form of mistaken signups and unwanted charges, and
9  negatively impacts Amazon as it leads to an erosion of member trust and Prime's brand equity. Although this issue is not new, it has
10 been challenging to implement sustainable solutions as increasing clarity often has a high, negative impact on metrics such as Prime
11 signups, leading to an immediate or gradual reversal of clarity enhancing actions. Therefore, in spite of good intentions and a
12 number of actions we have taken over time, we have not made sustained progress in improving clarity. To make meaningful
13 progress on the topic, we need a cohesive framework to define and measure clarity that enables us to i) operationalize it into our
14 business inputs at scale; and ii)  iterate on the specific problems we are solving as we uncover new defects . In this document, we
15 will review the learnings we have gathered to date, present our forward looking mental model on clarity and seek feedback on the
16 immediate next steps we have planned.
17
18 **Section 1: Insights from actions so far**
19
20   **1.1  We have clear opportunities to raise the bar in current Prime CX –**  The top issues that surfaced through channels such as
21        Customer Contacts, Customer Frustrations, User Studies, and social media are that customers are not always aware that
22        they are signing up for Prime, and they find it difficult to get information and proceed with membership cancellation, if they
23        wish to do so. ▇% of respondents of the Prime cancel survey for H1 2020 indicated "I didn't mean to sign up for Prime" and
24        ▇ of the ▇ Prime customer frustrations are related to unintended Prime signups (See Appendix A and B). Based on these
25        learnings, the CX areas we are prioritizing for improvement in H2 2020 and beyond are the i) checkout signup process,
26        specifically the pop-up interstitial (Universal Prime Decision Page – UPDP), ii. providing relevant and timely information to
27        customers immediately post signup and , iii) improving access to and reducing the steps in the Prime cancellation process.
28   **1.2  To date, our approach to clarity has focused on short term impact, not on long term member trust and value creation.**
29        Many previous clarity experiments were launched with a hypothesis that clarity enhancing improvements would reduce
30        upfront signups but have a flat or increased benefit usage and member yield due to aware and engaged members.
31        However, from WW clarity experiments dating back to 2018, we have consistently not found this to be the case (Appendix
32        C). While clarity enhancements reduce signups, we have not observed a corresponding increase in member yield or
33        increased benefit usage that can offset the impact (See Appendix D for details). We hypothesize that these results are
34        partially due to our timeframe of analysis, and examining clarity experimentation on a longer time horizon (▇ or
35        more) reduces the impact due to convergence over time. For instance, an experiment with Auto Remind Me Later (RML)
36        emails that are sent to remind members of upcoming membership renewal had an estimated ▇ WW annualized
37        impact when looking at 30 Day Auto Renew-On (AR-On) results, which reduced to ▇ when looking at 120 day impact.
38   **1.3  Our approach to clarity has been ad hoc and focused on single initiatives vs a holistic approach.** So far, all initiatives to
39        improve and experiment for clarity have been focusing on isolated elements of the CX. Project Lucent was entirely focused
40        on content updates and ASINization was a single product improvement - both initiatives were not fully rolled out due to the
41        high short-term impact on signups without any measurable improvements in awareness, engagement or yield for long term
42        members. A customer has various touch points with our CX, changing one element and leaving the rest as is will cause any
43        clarity improvement to quickly fade out in customer perception. While we continue to make location and placement
44        specific enhancements, we are reviewing clarity as a holistic journey which includes ingress to a specific location and
45        information provided to customers along the entire journey leading up to and following the desired action.
46   **1.4  Our understanding of clarity does not always match customers' perception.** Some of the hypothesis developed internally
47        to improve clarity have turned out not to be fully correct. For instance, hypothesis behind our push for Prime ASINization
48        was that by adding Prime as ASIN to the shopping cart on SPC, we can increase visibility into the purchase and provide
49        customers an additional option to remove the subscription. However, in customer research studies, we found that
50        customers didn't notice the added ASIN as part of their order. Even if they noticed Prime in the overview they didn't realize
51        that they have the option to remove the ASIN. A common issue on Prime upsell interstitial in checkout is that the negative
52        CTA (Decline option) is not as prominent as the positive CTA. In DE, we developed a treatment where we added a box
53        around the decline option to make it more prominent. However, user testing revealed that, in fact, even more customers
54        had trouble identifying the decline option with this treatment (Appendix E). Therefore, we cannot rely on internal
55        perspectives alone to develop and implement clarity improvements and moving forward, we are actively soliciting and
56        incorporating user feedback in developing and validating experiment hypotheses.

CONFIDENTIAL TREATMENT REQUESTED                                                            AMZN_00022902

**1.5 Our remediation approach must be methodical and automated** – Even small changes in the CX changes can have a significant impact to Prime member balance (overview in Appendix D). In the past, this immediate impact to Prime signups had prevented us from dialing up clarity improvements globally. In addition, global content teams run ▇▇▇ of content experiments annually – in the absence of an automated mechanism to enforce standards, incremental changes that do not appear egregious in isolation can create a poor overall CX. In 2020, we will implement clarity updates in a phased manner in order to understand and manage the impact to the business. Each marketplace will prioritize clarity enhancements by location, quantify impact and gradually roll out enhancements that will become the new baseline. In addition, we are developing automated solutions that will help us enforce required standards across thousands of Prime templates and ensure that optimization algorithms include CS contacts, GCCP, and same day churn as guardrails.

**1.6 Taking bolder and more risky approaches might open new opportunities.** Until now, we have been working under the assumption that UPDP is our most important acquisition location (driving ▇% of WW signups). In an experiment in UK on mobile Free-Trial we tested the impact of removing UPDP entirely from the checkout flow. The results of impact on Prime signups by ▇% to ▇% (with ▇% on OPS) suggest that UPDP cannibalizes all other checkout locations, and as such the standard metrics over-state the real incrementality of UPDP. This is also means that we have the opportunity to consider reducing the usage or even eliminating UPDP altogether as source of the most customer frustrations, as past attempts to improve clarity for UPDP have had a larger business impact than the initial suppression results demonstrate. Additional experiments will be planned to confirm these results. As part of 2021 OP1, we are also proposing a redesign for Prime upsells in checkout and will set up a separate session to review that proposal in detail.

## Section 2: Approach to clarity moving forward

**2.1 – Vision:** Moving forward, we define clarity as a holistic CX where customers feel informed about and are aware of their membership status. Our North Star is to have 100% of our member base be aware of their membership status ("I know I have joined Prime, a paid subscription program and am aware how much I'm paying and when"). We aspire to achieve this vision through proactive guidelines and tenets coupled with a clear measurement framework.

**2.2 Tenets for Clarity (unless you know better):**
1. We are proud of the Prime CX. We believe in Prime's value proposition, and will communicate all aspects of the membership clearly to customers.
2. We optimize for aggregate measures, but don't allow that to explain away segment-specific defects. When there is a conflict between aggregated metrics and anecdotes, we prioritize customer anecdotes to understand and mitigate concerns for specific groups of customers.
3. We will not trade-off long term improvements for short-term results. We work relentlessly to identify root causes and are empowered to test and implement remediation even at a significant short term cost (e.g., to member balance).
4. We will meet business goals while minimizing long term reputational risk. While initial results may be negative, we do not accept these as a given and will find ways to mitigate negative impact to business goals.
5. Clarity is contextual and we do not force a one size fits all approach globally. We will partner teams globally to build localized guidelines and solutions where relevant, empowering them to identify the unique clarity and business considerations in each locale.
6. We do not view clarity as a one-time exercise. We view this as a core pillar of member trust and will develop mechanisms to continually monitor and improve clarity. We also want to be sure to identify long term changes in customer understanding of what is a clear experience and what is not.

**2.3 Measurement and enforcement:** To measure long term progress on clarity, we will use a combination of metrics like Prime-related customer service contacts, Prime cancellation survey response rates for "I didn't mean to sign up for Prime", same day member churn, early Prime cancels, % of Prime members with 0 and 1 benefit usage, and TTM inactive customers. While none of these metrics are sufficient measures of clarity in isolation, by looking at these in aggregate we will track clarity improvements over time. We are developing a dashboard that tracks these metrics for Prime WW and for each locale and expect to have a first version by the end of August. We are also evaluating the creation of a "clarity score", which will indicate how confident we are that members are aware of their membership status. Akin to how we manage Risk, we will create a set of CX interventions (reminders, re-confirm requests) for members who appear to be at low levels of clarity. We will track and reduce inactive members over time, and report the clarity score as a DPMO metric. Another blocker in implementing clarity enhancements in the past has been that currently, we blend many member cohorts into our success metrics. By refining our member base into sub-cohorts (e.g. Shoppers, Streamers, High Risk, Unaware etc) we will reorient S Team and CLT mental models and focus leadership attention on the 'good' parts of our member balance (which we seek to grow), and the 'undesirable' parts of our balance (which we seek to reduce). As a

CONFIDENTIAL TREATMENT REQUESTED                                                                    AMZN_00022903

112 part of OP1 2021, we have proposed investment in tech solutions that will enable us to better parse out and identify members who
113 lack clarity (pre and post sign-up).

114

115 To ensure we are making progress on clarity, we have defined a set of clarity guidelines to be applied to all new content
116 experiments. Please find the complete list of guardrails in Appendix F. These guidelines will be enforced through an automated QA
117 process which will flag treatments that lack clarity guardrails such as price prominence, decline buttons, or Prime logos. (Phase 1
118 launch 9/30). We will continually vet and refine these guardrails based on customer feedback from User Testing - an online portal
119 in which testers can provide feedback on existing or proposed experiences. Additionally we will work with GPX and Brand teams to
120 codify UX building blocks for content locations in Content Catalog, which would mean that marketers no longer have the ability to
121 change a button into a link, or include four buttons on one page. We have also instituted a monthly global WTS series where we
122 audit recent content and product winners to ensure we are protecting the CX. In addition, we are starting a monthly clarity working
123 group (first occurrence is 8/10) as a forum for Prime leadership to discuss clarity metrics, review recent clarity experiment results
124 and make dial up decisions.

125

126 **2.4 Planned Actions for HY2 and 2021**

127

128 Pre Sign Up

129    i.   Content Updates: (Scope: Global, Estimated Impact: ▨▨▨ ETA: 8/1 for initial implementation in US): The checkout
130         interstitial upsell (UPDP) is our first priority given its prominence in checkout; it drives ▨▨▨ mistaken signups than SPC
131         and ▨▨▨ than SOSP, and has low yield (▨▨% of signups vs ▨% of members). UPDP has been a target of scrutiny in the UK
132         due to customer complaints claiming that they had opted into Prime accidentally through the free trial offer. To address
133         these concerns, we will start by updating CTAs to ensure customers feel informed, confident and comfortable about
134         starting or declining a Prime membership. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
135         ▨▨▨▨▨▨▨▨▨▨▨ Based on previous experiments in the US (see Appendix D), we estimate the annualized paid
136         member impact of these changes to be ▨▨▨ WW. Additionally, we are partnering with other Amazon teams to address
137         these known sign up frustrations; Prime brainstormed a number of clarity solves with the Shopper Frustration team on
138         6/17, which will become part of a broader proposal to address clarity across all Amazon subscription programs, and we are
139         closely working with the CPX team to dial up a desktop True Single Page Checkout flow in the US, measuring impact to GCCP
140         and Prime signups when we reduce Prime checkout upsells to SPC stripe (8/15).
141    ii.   Checkout ASINization in JP (Scope: JP, Estimated Impact: ▨▨▨, ETA: 7/30 for test launch): Checkout ASINization was
142         intended to improve clarity by 1) displaying the Prime plan as an ASIN on Single Page Checkout (SPC), 2) enabling undo
143         functionality in that customers can delete the Prime ASIN, and 3) delaying sign up until order is placed (unlike in digital
144         pipeline, where signup is immediate). In previous US testing we found that Checkout ASINization was a blunt instrument,
145         leading to large drops in settled paid members (▨▨% to ▨▨%) on UPDP, without significant, measurable
146         improvements in customer engagement or activity, and UX studies found customers still unclear they had signed up for
147         Prime. Our analysis showed the drop in signups was driven mainly by customers who do not place their order. JP team
148         thinks this is the proper CX (e.g. abandoned orders should not lead to a Prime signup), and we are preparing to test Free
149         Trial ASINization across all checkout locations in JP, with a Prime ASIN that persists in cart if an order is abandoned to
150         mitigate this effect.

151

152     Post Sign Up

153    iii.   Content Updates (Scope: Global, Estimated Impact: ▨▨▨, ETA: 8/15 for welcome email launch): After signup, we want
154         customers to be able to easily undo their subscription if they signed up by accident and we are providing changes to our
155         activation and cancellation experiences to simplify this process for customers. Within the Prime activation experience, we
156         plan to add links to "Manage Your Membership" on signup confirmation pages such as WLP Thank You Page, SPC
157         Confirmation Stripe, and Checkout Thank You Page (ETA – 9/15, estimated WW impact ▨▨▨ members). We are enhancing
158         the membership summary widget within the Prime Welcome Email, and plan to test extending that widget to these onsite
159         activation locations ( ETA – 8/15 for welcome email, estimated WW impact ▨▨▨ members) (see Appendix G for mocks).
160    iv.   Confirmation CX (Scope: Global, Estimated impact: ▨▨▨ to ▨▨▨, DFAD 7/22): A key challenge we need to overcome is
161         capturing signals that let us know if members realize they have joined (or are still in) Prime. We are evaluating a couple of
162         initiatives for 'Confirmation CX' which include: 1) A CX which will allow members to let us know that they realize they are
163         Prime (or not), which can then feed our inspection metrics and ML models to inform further content refinements and seek
164         additional confirmation from 'at risk' members. This will involve logging member interactions with our current messages,
165         ingress points, tracing back the CX experienced by contacting customers, as well creating new ingresses. We expect to
166         embed this into our key engagement locations and email communications. 2) A CX which will highlight to a customer
167         whether they are a Prime member or not, located on the gateway (see Appendix H for mock).

CONFIDENTIAL TREATMENT REQUESTED                  AMZN_00022904

168   v.   Cancel Flow Simplification (Scope: Global, Estimated Impact: ███, ETA – 7/22): Within the cancel flow, we are
169         experimenting with treatments to bring the cancel buttons above the fold (Appendix I, launching 7/22), and are also
170         examining unique customer cancellation journeys based on tenure and Prime experiences. In addition to making the three
171         page cancellation flow less confusing for customers, we are identifying ways to surface additional cancellation flow ingress
172         points to customers who are likely to cancel their membership, as identified by an ML model based on Ret score (see
173         Appendix J).
174   vi.  Auto Remind-Me-Later (RML) Emails (Scope: Global, Estimated impact: ███ to ███, DFAD: 7/27): In May 2019, an
175         experiment was launched to send Auto RML emails to FT members with 0 or 1 (if shipping or video) benefit usage at the
176         25th day after signup. Based on 14 day test result, we found that AR-on rate delta between treatment and control
177         improved overtime (███ WW for 30 Day AR-on data and ███ WW for 120 Day AR-on data) and also resulted in
178         annualized US CS contacts reduction, saving ███ WW CS variable cost. While this experiment was not dialed up to 100%
179         (the project was put on hold pending outcomes from the Project Phoenix work-stream) at that time, we are evaluating
180         options to dial this up now. We are also evaluating using the related tech to test a few other options which can help
181         increase membership clarity. These options include: 1) sending 'unaware' customers RML emails two months in a row; 2)
182         giving customers the option to select 'recurring' reminders rather than just one. The potential annualized impact to
183         Membership Balance for these initiatives is approximately ███ to ███ WW (based on 120-Day AR-on data)

184

185   Clawback (Scope: Global, Estimated Impact: ███, ETA: TBD): We are also developing initiatives that will help us recover some
186   of the member balance gap created by clarity enhancements, with some initial ideas listed below (overview in Appendix L):
187   a.   SMS expansion: until March, we were not using SMS to communicate transactional notifications to customers.
188        Expanding SMS to the BPS Day 3 communication resulted in a ███ US annualized impact. We estimate that
189        adding SMS to other transactional Prime communication channels such as welcome emails in 2020 will result in a
190        ███ US annualized impact, or a ███ WW impact.
191        ████████████████████████████████████
192        We are working on scoping this work with acquisition PM and tech teams.
193   b.   Clarity enhancements with positive member balance impacts: Some experiments intending to drive clarity have
194        also led to significant incremental paid members, such as SPC confirmation stripe (███k US annualized), limiting
195        the use of the word "trial" (███ US annualized), and adding "cancel anytime" to SPC HO ███ US annualized
196        impact). See Appendix M for details.
197   c.   Content Redesign Experiments: in addition to incremental experimentation, the US is planning significant redesigns
198        that we believe will drive paid members, including a mobile /prime redesign (est. ███ US annualized impact),
199        redesigning PPU creative (est. ███ impact).

200
201

202   **Section 3: Hotly Debated Topics**

203
204

205   **3.1  How quickly should we implement clarity initiatives?**
206   As demonstrated by clarity experiments highlighted throughout this document, small changes in the Prime CX have a significant
207   impact on business metrics. The framework in this document propose a methodical approach to assess impact by location and
208   marketplace and incrementally implement changes. However, we can argue that we should move immediately to improve this CX
209   and reset the baseline, which we can then improve through continuous content experiments and other initiatives.  We bias in favor
210   of the slow rollout to avoid a large impact to business metrics, which may lead to a knee-jerk reaction to quickly reverse.

211
212   **3.3 Should we implement a backstop CX as a mechanism to measure and improve inactive members?**
213   Today, we proactively cancel membership of all annual members if they do not use the Prime Membership for a year. We can also
214   evaluate pausing or cancelling memberships after 12 months of inactivity for monthly members (who make up ███% of all members).
215   This proposed initiative is based on the assumption that if a customer has not used any Prime Benefits in the last 12 months, they
216   may not be aware of their Prime Membership and introducing this for monthly members will ensure parity between annual and
217   monthly members. The estimated annualized impact to membership balance for this initiative is ███ customers WW (███████ in
218   sub revenue).

219
220

221

Amazon.com confidential                                                                                           4

222    **Section 4: Appendix:**

223

224

225    **Appendix A: Prime Cancellation Survey Data (H1 2020)**

226    ███████ US survey respondees between 1/1/20 – 6/27/20 marked "I didn't mean to sign up for Prime" as their primary reason for
227    ending their membership. This is ███% of the total responses received, and received almost ███ as many responses as "I experienced a
228    problem with Prime (e.g. delivery issue, customer service problem, etc)."

229



230
231

| | Date | Q8 - Is there anything else you'd like to share about Prime or why you canceled? |
|---|---|---|
| 1 | 7/9/2020 11:01 | "I'll report Amazon to the BBB I didn't sign up for prime or authorized payments, it has been a mess to cancel this prime i had to confirm 3 times the cancelation for something I didn't authorize. I will stop buying from you guys sadly is after my last purchase that accidentally amazon added this prime order without my signature." |
| 2 | 7/9/2020 10:29 | "I have no idea how it got on, I never used Prime, I never wanted it." |
| 3 | 7/9/2020 10:16 | "I diden`t order primer, yet i`m being billed for some of it`s benefits." |
| 4 | 7/9/2020 9:58 | "I thought I cancelled Prime over a month ago and I still see I am being billed. Not Happy." |
| 5 | 7/9/2020 9:58 | "got the trial and canceled. I canceled before the membership was up and i think its a complete joke that you have to confirm FOUR TIMES that you want to cancel. Your cancellation process is stupid." |
| 6 | 7/9/2020 9:52 | "You were fucking charging me without my knowledge. Fucking scammers." |
| 7 | 7/9/2020 9:40 | " I don't understand how it was turned back on. I had cancelled it before. That is irritating" |
| 8 | 7/9/2020 9:35 | "I was very careful not to choose Prime when ordering because I don't order often enough but somehow I got signed up for a free month which I just cancelled. Ordering should be made easier and more obvious." |
| 9 | 7/9/2020 9:34 | "it just added itself it was not done by me" |
| 10 | 7/9/2020 9:21 | "Stop putting that option EVERY time I make a purchase on Amazon. I accidentally click the wrong button and have my card charged. I don't like it." |
| 11 | 7/9/2020 9:00 | "You trick people into buying prime, your a fuking scam" |
| 12 | 7/9/2020 8:22 | "I cancelled my auto renew and you billed me anyways. Thanks for the 35USD overdraft fee morons." |
| 13 | 7/9/2020 8:21 | "We were not aware that we enrolled with Prime with one of our purchases. We noticed it with our credit card billing." |
| 14 | 7/9/2020 8:14 | "I did not sign on for this Prime account and request a full refund. Also, where is the customer service phone number." |
| 15 | 7/9/2020 8:07 | "I was not aware of being charged monthly for my membership until I checked my card transactions 4 months later." |

232

233    **Appendix B: Prime Customer Frustrations tickets in Checkout Flow:**
234        • **Customer frustrations related to clarity of Prime offers:**

Amazon.com confidential                                                                    5

- o **IT-2170**: Customers had difficulty discovering the less prominent 'No Thank You' link on the Prime offer checkout intercept - Universal Prime Decision Page (UPDP)
- o **IT-2964**: Customers were frustrated / confused by Prime Offer opt-out links that put words in their mouth, e.g., "No thanks, I don't want free shipping."
- o **IT-774**: Prime offer popover at checkout is overloaded with multi-colored text, making it difficult for customers to quickly parse.
- o **IT-2168**: Within an offer, shoppers could not always discern how much Prime costs, how long the trial was, and how charges/cancellations worked. Did not feel confident signing up as a result, or signed up without knowing about auto-renew.
- o **IT-2171**: Customers did not understand the impact of their choice on Prime Offer Pages when clicking on buttons titled "Get started", "Continue with FREE 1-day shipping", "Get free two day shipping", "Proceed to next (Try)", "Continue with free premium delivery"
- o **IT-4266**: Customers misinterpreted the free shipping Prime benefit messaging to "Save [local currency amount] on this order" as a product purchase discount and expected to see savings applied to their purchase at checkout.
- o **IT-2965**: Shoppers interpreted the double-stack (bunk-bed) Prime sign up button as two distinct click targets (a Yes and a No).
- **Prime offers causing friction for customers:**
  - o **IT-1993**: Customers encountered multiple Prime offers throughout the shopping journey, even if they opted out recently (e.g. BBOP, SBBOP, SOSP, UPDP, SPC). This slowed them down and sometimes derailed purchase. Especially problematic for newer customers
  - o **IT-4518**: Customers felt that Amazon was intentionally degrading their shopping experience to optimize for business gain (e.g., by over-indexing on profit-driving features like Ads, Subscription Programs, etc.)
  - o **IT-2129**: Cross-border shoppers hitting Amazon.com from another country received Prime offers at checkout, despite Prime benefits not serving their locale
  - o **IT-4595**: Customers frustrated when encountering a CX that is not tailored to their location, in some cases resulting in lost trust (e.g., infeasible offers, inaccurate delivery messaging, confusing Prime Offers, and more)
  - o **IT-3502**: Customers were confused when exposed to region-specific Prime benefits that were not part of the region they were shopping from (e.g., Same-Day benefits that didn't apply to the customer's city or country.

**Appendix C: Overview of Previous Clarity Experiments**

**Lucent content clarity 2018 results summary**
In 2018, we increased focus on messaging clarity in the US and planned to extend learnings to other locales based on the results. Examples of changes made include adding the Prime logo to UPDP, simplifying the UPDP template so critical information is more prominent, removing the text "continue to checkout" from under positive CTA on student templates and adding more context to the "Get FREE two-day shipping" CTA so that the linkage to Prime is stronger.

The impact of changing the positive CTAs on UPDP from "Get FREE two-day shipping" to "Start your 30-day FREE Trial" was ▮ % sign ups, flat conversion and ▮% CS cancels per signup (from ▮% to ▮%). Overall dialing up the treatment is estimated to lead to -▮% CPLF from impacted customers. Changing the negative CTA from "Continue without fast free shipping" to "No Thanks" had among the largest impact on sign ups (▮% to ▮%), while adding Prime prominence had the lowest impact on sign ups (▮%). The 90-day conversion did not change significantly for any of the treatments and was unable to offset the impact of drop in sign-ups. In terms of the metric paid member lost per CS cancel (CSC) the addition of Prime in the header performed the best. All treatments are however expected to be CPLF negative.

None of the hypothesis met our success criteria based on positive CPLF, but we know based on customer anecdotes that the messaging needs to be clearer. We therefore implemented 'add with Amazon Prime' on the FT UPDP Desktop template because it was the best performing treatment on members lost per CS cancels reduced and had highest annualized transactional OPS lift in weblab (▮▮▮▮). The estimated annualized impact of this is ▮▮ annualized paid members. Going forward, based on customer anecdotes, we believe it is important to increase the clarity/prominence of the negative CTA (previously "Continue without fast free shipping"), with the least negative impact coming from a "No Thanks" link vs. a "No Thanks" button.

CONFIDENTIAL TREATMENT REQUESTED                                                                    AMZN_00022907

**Appendix D: 2020 US UPDP Clarity Experiment Results**

Clarity Treatment:                                                    Control:



**US 2020 UPDP Clarity Experiment Impact**

| Treatment Group | Treatment Groups @ 100% Allocation | CS Contacts | Prime Cancellations | 30 Paid Day Yield | 30 Paid Day Member Loss | Annualized 30 Paid Day Member Loss | Annualized US Paid member impact | Annualized WW paid member impact |
|---|---|---|---|---|---|---|---|---|
| C | | | | | | | | |
| T2 | | | | | | | | |

**Financial Calculation for Value to Signup loss:**

| | Treatment Group | Customer Count | 30 Paid Day Yield | 30 Day Yield | 1+ Benefit Used Days (First 60 Days) | Active Member Conversion | Change in Economic Value | Value Change | Signup Change | Value to Signup Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | C | | | | | | | | | |
| 2 | T2 | | | | | | | | | |

**Appendix E: User Testing Insights from first DE experiment:**

Best Performer:                                    Clarity Treatment:



CONFIDENTIAL TREATMENT REQUESTED                                    AMZN_00022908

| | Current Best Performer | | Treatment | |
|---|---|---|---|---|
| | Results | Comments | Results | Comments |
| # of Participants | | | | |
| Would you have aborted checkout | | | | |
| Unsure whether or not they joined Prime | | | | |
| Had troubles declining the Prime offer | | | | |
| Had an incorrect understanding of the price of Prime | | | | |
| Didn't know when they will be charged | | | | |

**Appendix F: Clarity Guardrails**

Encoded Minimum Clarity Bar:

**1. Positive and negative CTA's must clearly indicate what action a customer can expect to happen when clicking. CTA's will not include marketing language or value propositions**

    1. Upsells must include "Prime" inside the CTA button, or mention the obligation to pay (EU5)

    2. Decline CTA's should not start with the word 'Continue' which historically has mapped to an increase in contacts, as customers read it as a logical next step in the flow, not a decline option

    3. Upsells will not shame customers, or include personal statements that make assumptions on customer states. Don't say 'No, I don't want free shipping' or 'No, I don't like Prime'

**2. We use Amazon standard UI buttons in all Prime locations**

    1. Decline CTAs must receive equal weight as the option to join Prime

    2. Adhering to site wide Amazon UI button standards, we use only 1 color per button, removing the Shadow CTA which is known to confuse customers who see the shadow area as a decline button or toggle option.

    3. In the cancel flow, the blue "Explore my Benefits" button is not an approved Amazon standard UI format

**3. Templates meet Accessibility standards and Legal requirements**

    1. Color contrast between text and background must be at least ▮▮▮

    2. Do all images have alt text?

    3. All legally required disclosures are present on Prime upsells

**4. All CTAs must be above the fold**

    1. Upsells must be clear and concise enough that all information can fit on one page

    2. In the cancellation flow, we can't hide or bury the cancel membership buttons by forcing members to scroll down

Clarity Guardrails:

**5. Eliminate redundancies**

    1. For upsells, do not repeat the same content (No minimum order threshold, Save $5.99 on this order) multiple times, as it increase customers' cognitive load. We should work towards having the minimum amount of text necessary on a location.

    2. On the cancellation pages, do not surface the same images or links on multiple pages of the flow

**6. For upsells, the obligation to pay is prominent**

    1. "After your paid trial, Prime is $12.99/month" must exist outside of the terms and conditions (doesn't need to be as large as a subheader)

    2. Price of Prime must be listed on all pages, regardless of possible future steps or confirmations

**7. Include the Prime logo in every upsell location**

**8. For the cancellation flow, do not make customers think something is wrong or broken**

    1. Red warning messaging, and Maslow principles like loss aversion, can give the impression that something unintended has gone wrong. These customers navigated to the Iliad flow and are choosing to cancel, so we should display the benefits they'll lose without relying on error messaging that looks like something unexpected is broken.

**9. All transactional Welcome emails must include the order summary widget and link to Prime Central**

Amazon.com confidential        8

CONFIDENTIAL TREATMENT REQUESTED        AMZN_00022909

374  **Appendix G: Enhancing member trust through Welcome Email**
375  The subscription summary widget is featured above the fold, at the top of the email (before the benefits), and is not hidden within
376  the footer (grey area). The widget has also been redesigned to be easier for customers to understand.
377
378        **T1**                                           Control



379
380

Amazon.com confidential                                                                                                    9

381
382

**Appendix H: Gateway signup Prime confirmation mock**



383
384
385

386  **Appendix I: Iliad Marketing Page**
387  Reducing text and simplifying button experience, adding progress bar, focusing on one Prime benefit
388  T1:



389
390
391  Control
392



393
394
395
396
397
398
399

Amazon.com confidential                                                                          10

CONFIDENTIAL TREATMENT REQUESTED                                          AMZN_00022911

400

401 **Appendix J: Ava 2.0 Screenshots and Results**

402 On 4/14, we launched an experiment in US offering a self-service membership management CX w/ engagement messaging on
403 gateway (blackjack and Prime tool tip widgets) to members who have a high propensity to cancel (via CS or Iliad). We are leveraging
404 two ML models to target these members: (a) model to determine propensity for a member to call CS and cancel; and (b) The already
405 existing RET score models, where we had a ceiling on members with RET Score ▮▮. These models were tested in separate
406 treatment cohorts. Note that the CX is shown to members within ▮▮ days from sign up and ▮▮ days from their renewal or
407 conversion date as a starting business rule to be optimized over time. With 30 days weblab results, we estimate 651K incremental
408 member saves in US, and ▮▮ CS cancelation contacts reduction. This is based on the winning treatment cohort using RET score,
409 which we dialed up to ▮▮% in US on 5/28. However, we also saw a similar positive annualized impact with CS cancelation
410 propensity model treatment cohort (▮▮▮ members saves and ▮▮▮ CS cancelation contact reductions).

411

412 Mobile gateway - blackjack widget

 

413
414
415
416
417 **Appendix K: Summary of 2020 Prime Clarity Initiatives and Impact**

| 2020 Prime Clarity Initiatives | | |
|---|---|---|
| **Content** | | |
| Swimlane | Initiative | WW Annualized Paid Member Impact |
| Acquisition | UPDP Decline Button and Clear CTA Copy | |
| Retention | Member Accretive Clarity Experimentation | |
| Activation | Clawback: SMS Expansion | |
| Acquisition | Clawback: Mobile /prime redesign | |
| Activation | Clawback: First PPU Optimization in US and EU | |
| **Product** | | |
| Swimlane | Initiative | WW Annualized Paid Member Impact |
| Renewals | Subscription Summary Widget Expansion | |
| Renewals | Auto Remind-Me-Later (RML) Emails | |
| Renewals | Confirmation CX | |
| Renewals | Backstop CX (On Hold) | |
| Renewals | 'Undo' Signup in Checkout (Currently on HOLD): | |
| Renewals | Checkout ASINization in JP | |
| | Net WW Content Impact: | |
| | Net WW Product Impact (excludes On Hold): | |
| | Total: | |

418
419
420
421
422
423
424
425

Amazon.com confidential                                                                11

CONFIDENTIAL TREATMENT REQUESTED                                                    AMZN_00022912

**Appendix L: US Clarity Experiments with Member-Accretive Results**

1. SPC Confirmation Stripe:

███ annualized members, ██ annualized Customer Contacts

Winning Treatment:                                        Previous Best Performer:

                                      

2. UPDP Mobile Order Agnostic Hard Offer

██ annualized members

Winning Treatment:                                        Previous Best Performer:

                                      

3.  Desktop UPDP Free Trial – Order Agnostic

██ annualized members

Winning Treatment                                         Previous Best Performer:

CONFIDENTIAL TREATMENT REQUESTED                          AMZN_00022913



447
448
449
450
451
452

CONFIDENTIAL TREATMENT REQUESTED                                                                 AMZN_00022914

# EXHIBIT 27

```
                  CONFIDENTIAL - ATTORNEYS' EYES ONLY
 1                   UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF WASHINGTON

 3                            AT SEATTLE

 4     FEDERAL TRADE COMMISSION,

 5                    Plaintiff,

 6     vs.                              No. 2:23-cv-0932-JHC

 7     AMAZON.COM., et al.

 8                    Defendants.

 9     _____/

10

11             CONFIDENTIAL - ATTORNEYS' EYES ONLY

12             The Deposition of LAURA KIM

13                  December 12, 2024

14               CONFIDENTIAL DESIGNATIONS

15     108:9 - 110:22    162:19 - 23

16     111:6 - 10        168:3 - 173:24

17     112:20 - 127:21   190:13 - 229:1

18     128:19 - 129:19   231:10 - 243:2

19     130:8 - 133:23    243:16 - 296:5

20     144:23 - 154:12   297:12 - 307:19

21                       312:23 - 313:11

22

23     REPORTED BY:

24     STEVEN POULAKOS, RPR

25     JOB NO:  J12058678
```



```
1                       P R O C E E D I N G S

2                              - - -

3

4    Whereupon,

5                          LAURA KIM,

6    called as a witness, having been first duly sworn to

7    tell the truth, the whole truth, and nothing but the

8    truth, was examined and testified as follows:

9                    EXAMINATION BY MR. COHEN

10        Q     Good morning, Ms. Kim.

11        A     Good morning.

12        Q     My name is Jonathan Cohen and I represent

13   the Federal Trade Commission in this matter.  With me

14   on my side of the table today is Mr. Zwonik who is a

15   paralegal on the matter, my co-counsel, Olivia Jerjian,

16   and Hanna St. Marie who's not participating.  She's

17   just observing.

18             If we could now have your counsel introduce

19   themselves.

20             MR. ANTHONY:  I'm Stephen Anthony,

21   Covington & Burling, LLP on behalf of all defendants

22   and the witness.

23             MR. KELLY:  Kevin Kelly of Covington &

24   Burling also on behalf of Amazon, the witness and all

25   defendants.
```



1  find each other at work happy hours and sometimes

2  one-on-one and sometimes in groups, but talk about

3  personal things, right?

4       A    I have been to work happy hours with

5  Katherine, with Ms. Johnson, yes.

6       Q    And the subjects you would discuss wouldn't

7  be just limited to the cases you were working on,

8  right?

9       A    Correct.

10       Q    So there would be some personal components

11  to those as well?

12       A    Yes.

13       Q    During this period, did you think of

14  yourself as Ms. Johnson's friend?

15       A    Yes.

16       Q    During the period when you served as Ms.

17  Johnson's direct supervisor, did you develop an opinion

18  of her character?

19            MR. ANTHONY:  Object to form.

20            THE WITNESS:  Yes.

21  BY MR. COHEN:

22       Q    What was that opinion?

23       A    I had a high opinion of Katherine.  I

24  respected her.

25       Q    A high opinion of her character in



1    particular?

2        A      Yes.

3        Q      You mentioned before, and I told you I

4    would come back to it, that there were instances where

5    in the course of your dealings, and we're going to talk

6    about the sort of dealings in the course of this

7    investigation, but before I lose sight of what I said I

8    would do, you said there were instances during the

9    course of the investigation where you felt that she had

10   shared too much.  Did I understand that testimony

11   correctly or was too forthcoming perhaps?

12       A      I think I said that she was forthcoming and

13   I was surprised.

14       Q      Well, on what matters was she forthcoming

15   in ways that surprised you?

16       A      Well, I remember a conversation in February

17   of 2022 when I had not spoken to Katherine or heard

18   from her about the investigation for several months, I

19   think since October, and we had a phone call because I

20   was reaching out to try to set up a meeting to talk to

21   her about the status of the investigation and follow-up

22   on some items that I thought would be of interest to

23   her.

24              And she was very forthcoming in telling me

25   that -- that she was slammed with other matters, that



LAURA KIM  Confidential - AEO                    December 12, 2024
FTC vs AMAZON                                                        169

1    she was working on summary judgment and preparations

2    for trial, that she was the only one working on this

3    investigation at the time.  And so I was surprised that

4    she volunteered that we could meet as I had suggested,

5    but that she wouldn't have the capacity to devote much

6    time and attention to the matter even if we did meet at

7    that time.

8        Q    Why were you surprised by this forthcoming

9    remark by Ms. Johnson?

10       A    I found it surprising that she was so open

11   about the fact that she didn't have capacity to focus

12   more on this investigation because I wouldn't have -- I

13   wouldn't have known what she was doing, whether she was

14   reviewing our productions.  We had produced a lot of

15   material.  I wouldn't have necessarily known.

16       Q    She didn't have to share that, but she did,

17   right?

18       A    She did share that, yes.

19       Q    And you from your perspective considered

20   that to be an example of candor on her part?

21       A    Yes.  I felt that that was forthcoming and

22   not -- yes.

23       Q    Were there other instances where you

24   thought that she had been forthcoming in a way that you

25   found surprising and I'm talking about during the



 1  course of the investigation?  Excuse me.  Let me

 2  withdraw the question.

 3          Was there anything else you remember about

 4  that call?

 5      A    I remember Katherine being -- Ms. Johnson

 6  being -- her tone was apologetic that she wasn't more

 7  available to meet with us and move the matter forward

 8  productively toward a resolution.

 9      Q    You again felt that was candid and honest?

10          MR. ANTHONY:  Had you finished your answer?

11  BY MR. COHEN:

12      Q    I'm sorry.  I thought you were finished.

13      A    I thought the tone was surprising.

14      Q    That she was again with respect to this

15  additional information being candid and honest?

16      A    What's the question?

17      Q    So you just explained that she said that

18  she was -- didn't have enough time to devote to these

19  things and I'm asking you whether you viewed that as

20  another instance in which she was being candid and

21  honest with you?

22      A    I thought she was being very forthcoming in

23  that instance.

24      Q    And by forthcoming, you mean honest?  She

25  wasn't volunteering -- I don't want to make light of



```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2                  I, Steven Poulakos, registered
 3   Professional Reporter, the officer before whom the
 4   foregoing proceedings were taken, do hereby certify
 5   that the foregoing transcript is a true and correct
 6   record of the proceedings; that said proceedings were
 7   taken by me stenographically and thereafter reduced to
 8   typewriting under my supervision; and that I am neither
 9   counsel for, related to, nor employed by any of the
10   parties to this case and have no interest, financial or
11   otherwise, in its outcome.
12                  IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 12th day of
14   December 2024.
15   My commission expires:
16   August 14, 2029
17
18
19        _____
20
21        _____
22   NOTARY PUBLIC IN AND FOR
23   THE DISTRICT OF COLUMBIA
24
25
```

# EXHIBIT 28

The Honorable John H. Chun

1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8    **AT SEATTLE**

9

FEDERAL TRADE COMMISSION,               No. 2:23-cv-0932-JHC
10
            Plaintiff,
11                                          **PLAINTIFF'S SECOND**
        v.                                  **SUPPLEMENTAL EXPERT**
12                                          **WITNESS DISCLOSURE**
AMAZON.COM, INC., *et al.*,
13
            Defendants.
14

15

16    <u>**PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT WITNESS DISCLOSURE**</u>

17          Pursuant to the November 8, 2024 Minute Order Setting Trial Date and Related Dates

18    (Dkt. #199), Plaintiff Federal Trade Commission provides the below list of expert witnesses

19    Plaintiff may call live at trial in this matter. Plaintiff reserves the right:

20          A.  To call any fact witness at trial who appears on Defendants' final witness list;

21

22

23

B.  To call the custodian of records of any party or non-party from whom documents or records have been obtained to the extent necessary to demonstrate the authenticity or admissibility of documents, in the event a stipulation cannot be reached;

C.  To amend or supplement this list in light of any discovery that has not yet been completed including, in particular, the depositions of non-retained experts;

D.  To supplement this list in accordance with the Stipulated Order to Extend Certain Expert Disclosure Deadlines (Dkt. #235);

E.  To question the persons listed about any topics that are the subjects of testimony by witnesses called by Defendants;

F.  Not to call at trial any of the persons listed below, as circumstances may warrant;

G.  To question the persons listed about any other topics that the person testified about in his or her deposition or investigational hearing, or any matter that is discussed in documents to which the person had access, and which have not been produced; and

H.  To call any of these individuals or any other person for rebuttal testimony.

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

2

| Witness | Summary of opinions and general topics of anticipated testimony | Summary of factual bases for opinions and general topics of anticipated testimony |
|---|---|---|
| C.R. Brown | We anticipate that Mr. Brown will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning the Iliad cancellation process. For instance, and among other related opinions, Mr. Brown will opine that the design elements of the cancel CTAs in the Iliad cancellation process are confusing to customers, and that the Iliad cancellation process is not simple. Likewise, Mr. Brown will opine that some users of the Iliad cancellation process found it to be confusing because it contained repetitive information. He will also opine that some users found the Iliad cancellation process difficult to find and navigate. He will opine that some users thought that clicking an 'End Membership' CTA in the ingress to Iliad, ended their Prime membership, when in fact they were still members. Mr. Brown will also opine that placing the cancellation CTA at the top of the page would add some clarity to the Iliad cancellation process. Mr. Brown will also opine that it was easier to enroll in Prime during checkout than to cancel Prime online.  He will also the Iliad cancellation process was less simple than the Iliad 2.0 redesigned cancellation process and that Iliad required more clicks to cancel Prime than Iliad 2.0. He will further opine that a purpose of the cancellation flow was to communicate what benefits consumers would lose should they cancel their Prime subscription. He will also opine that the only information that Amazon needs from a consumer to cancel their Prime subscription is (1) the consumer has a Prime subscription; (2) the consumer wants to cancel their Prime subscription; (3) the date the consumer wants the cancellation to be effective for pro-rata refund purposes; | - Mr. Brown's educational background, knowledge and conduct of user experience design, research and usability testing. <br> - Mr. Brown's approximately seven years of experience at Amazon in the field of user experience design, including the Prime organization. <br> - Mr. Brown's experience as the lead designer of the redesign of the online Amazon Prime cancellation process (a/k/a Iliad 2.0 or Project Café) <br> - Mr. Brown's usability research and heuristic review of the Iliad cancellation process. |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

3

| | | |
|---|---|---|
| | and (4) data about the consumer such as their name and Prime plan. He will also opine that Iliad was a "horrible" name for the Prime cancellation experience, in contrast to his "Hypertube" cancellation CX proposed redesign. Mr. Brown will also opine that customer frustrations (or "anecdotes") are helpful points of data that inform the "why or the what" is specifically clear for consumers. | |
| Marshini Chetty, Ph.D. | See report for opinions. | See report for factual support. |
| David Edelstein | We anticipate that Mr. Edelstein will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Edelstein will opine as to how some Amazon customers were given incomplete information about Prime in the checkout flow, thus impairing their ability to make informed decisions about enrolling in Prime. He will opine that users skip over or skim things like 'Terms and Conditions' to move forward in the checkout flow. Similarly, Mr. Edelstein will opine that some customers did not notice the 'Terms and Conditions,' even if it was on the same page. He will opine that interstitials such as the UPDP can cause users to take actions with consequences they do not intend, such as nonconsensual enrollment. Similarly, he will opine that interstitials, like the UPDP, can distract users from completing the purchase and cause nonconsensual enrollments in Prime. Mr. Edelstein will also opine that some users who clicked, 'Yes, I would like free shipping,' were actually signing up for Prime. He will opine about how some users mistakenly signed up for Prime or almost signed up for Prime. Mr. Edelstein will also opine that the use of multiple colors, different font sizes, and graphical elements | - Mr. Edelstein's degree in graphic design from Lane Community College.<br>- Mr. Edelstein's participation in dozens of cognitive psychology and design ethics seminars and courses during his tenure at Microsoft and Amazon.<br>- Mr. Edelstein's knowledge and understanding of user experience ("UX") research (qualitative and quantitative) over the past 20 to 30 years.<br>- Mr. Edelstein's experience in UX design and research at Microsoft.<br>- Mr. Edelstein's knowledge and understanding of accepted design practices and user testing.<br>- Mr. Edelstein's knowledge and understanding of attitudinal and behavioral research in the context of UX design and research through the course of his career.<br>- Mr. Edelstein's review of user research videos.<br>- Mr. Edelstein's participation in and analysis of 'Think Aloud' studies during his tenure at Amazon.<br>- Mr. Edelstein's knowledge and experience gained as the user experience manager of the GPX team from July 2019 to October 2021.<br>- Mr. Edelstein's knowledge and |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

4

can reduce clarity in the UPDP. He will opine that making the UPDP clearer resulted in a decrease in Prime enrollments. Mr. Edelstein will opine that 'cognitive noise,' like multiple pages of advertising information, tend to frustrate customers' efforts to cancel their Prime memberships. He will also opine that before the implementation of the Iliad cancellation process, the cancellation process was less confusing to users. Mr. Edelstein will opine that clarifying the UPDP resulted in a decrease in signups by as much as 20%. He will also opine that Amazon's use of dark patterns in the design of the checkout and cancellation processes was unethical. Also, Mr. Edelstein will opine that dark patterns will continue to beleaguer the customer experience if the design strategy continues to hinge upon aggressive income and Prime signup goals. He will opine that Prime members that do not use their Prime benefits, were likely unaware that they were Prime members, and thus entitled to Prime benefits. Mr. Edelstein will opine that when evaluating the effectiveness of clarity treatments' impact on reducing customer confusion, the 12-month paid conversion rate is a better metric than the 90-day paid conversion rate. He will also opine that taking a customer out of the flow using interstitials is problematic because it diverts the customer's attention from their task and, as a result, the customer will click through the interstitial quickly, just to complete the task. Mr. Edelstein will opine that even when customers understand they are signing up for a subscription trial, not all are doing so with the understanding that these trials will automatically renew. He will opine that, during his tenure at Amazon, self-service cancellation was difficult for customers to find because the ingress is not surfaced

experience gained by conducting field work, i.e., interviewing customers in their homes and observing them navigate the Amazon check out process.
- Mr. Edelstein's participation in, conduct of, review of, and understanding of cognitive walkthrough tests of the Prime enrollment process during his time on the GPX team.
- Mr. Edelstein's conduct of heuristic evaluations of the Prime enrollment process while on the GPX team.
- Mr. Edelstein's conduct and analysis of surveys with respect to Prime enrollment and cancellation.
- Mr. Edelstein's work on the Subscription Clarity Project that started around June of 2020 and continued through the end of 2020.
- Mr. Edelstein's knowledge of, understanding of, and analysis of user studies pertaining to Prime conducted by Amazon and collected in the customer frustrations database.
- Mr. Edelstein's professional interactions and communications with Reid Nelson and others in the Consumer Shopping Organization.
- Mr. Edelstein's professional interactions and communications with Nikki Baidwan of the Content Testing team.
- Mr. Edelstein's knowledge of, understanding of, and analysis of customer sentiment derived from summaries of customer support call data and survey data regarding the Prime cancellation process.
- Mr. Edelstein's knowledge of, understanding of, and review of A/B test results pertaining to the Prime

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

5

| | | |
|---|---|---|
| | prominently in all expected locations and because it uses an unintuitive label and it was hard to navigate. Mr. Edelstein will opine that the burden the customer faces in canceling their membership should not be more than it takes to signup. He will opine that compressing the Iliad cancellation flow from three pages to one page would make it simple. | enrollment process.<br>- Mr. Edelstein's knowledge and understanding of how frequently customers click the 'Terms and Conditions' link when navigating the checkout process.<br>- Mr. Edelstein's understanding and knowledge of the NPA/NAC research Amazon conducted in Germany and Austria, as well as other similar research. *See* AMZN-PRM-FTC-002727709 and AMZN_00117929.<br>- Mr. Edelstein's knowledge and understanding of dark patterns gained during his tenure at Amazon.<br>- Mr. Edelstein's knowledge and understanding of whole systems design and large-scale systems gained over 20 to 30 years. |
| Miles Hunter | We anticipate that Mr. Hunter will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Hunter will opine about the generalizable nature of human behavior and the usefulness of usability testing in identifying potentially problematic user experiences. He will also opine that the UPDP, SOSP Prime Decision Page, and SPC page contained many design elements that resulted (1) in the disclosures of Prime's material terms being neither clear nor conspicuous and (2) in Amazon shoppers inadvertently enrolling in Prime or doing so without understanding Prime's material terms. Mr. Hunter will also opine that 'Get Free Two-Day Shipping,' and other similar button labels, are misleading when used to label a button that enrolls consumers in Amazon Prime. Moreover, he will opine that users rarely read button labels and instead | - Mr. Hunter's degree in Computer Science and Business from the University of York and courses in human- computer interaction.<br>- Mr. Hunter's knowledge of user experience research for almost 25 years.<br>- Mr. Hunter's insights gained from teaching courses in the field of human-computer interaction at the University of Washington.<br>- Mr. Hunter's conduct of hundreds, if not thousands, of individual user experience interviews or research sessions over the course of his career, including his tenure at Amazon.<br>- Mr. Hunter's experiences as a founding contributor to Amazon's Customer Frustrations database.<br>- Mr. Hunter's experience and understanding gained as Amazon's preeminent expert on the user research video workflow and the use of video to encourage user experience changes. |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

6

| | | |
|---|---|---|
| | instinctively click on buttons based on familiar color schemes. Mr. Hunter will opine that customers who enrolled in Prime on UPDP but did not finish their underlying product transaction may assume they had not completed their Prime enrollment. Finally, he will further opine that when details like price and auto-renewal are included in fine print 'Terms and Conditions,' consumers often will not notice them. | - Mr. Hunter's conduct of approximately 100 user testing studies or projects during his tenure at Amazon.<br>- Mr. Hunter's experiences as a member of the Shopping Design team. |
| Gloria Smuda (formerly Gloria Jensen) | We anticipate that Ms. Smuda will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Ms. Smuda will opine about (1) the impact of different colored buttons for the affirmative CTA in the UPDP, (2) the effect of 'double stacked' buttons in the UPDP, (3) the use of user experience design principles to either improve or decrease clarity in the UPDP, and (4) the positive impact of a negative CTA button on clarity in the UPDP. For instance, Ms. Smuda will opine that the UPDP would be less likely to cause nonconsensual enrollment if a different color button (*i.e.*, not a yellow button) were used for the affirmative CTA that signs a user up for Prime. In addition, she will opine as to why the UPDP affirmative CTA 'double stacked' button is unclear. She will also opine on how the positioning of important Prime subscription information in the 'Terms and Conditions' section reduces clarity in the UPDP. Similarly, we further expect Ms. Smuda to opine on how the application of certain user experience design principles like, 'visual hierarchy,' reduces clarity in the UPDP. Ms. Smuda will opine that the mocks she developed in December 2020 to simplify | - Ms. Smuda's degree in Visual Communication Design.<br>- Ms. Smuda's knowledge and understanding in the field of user experience design, including in the Prime organization.<br>- Ms. Smuda's knowledge of user experience research and usability testing during her tenure at Amazon.<br>- The clarity recommendations Ms. Smuda made in the Subscription Clarity Mocks in December 2020 on Prime enrollment and cancellation.<br>- Ms. Smuda's work and interaction with the Clarity Working Group.<br>- Ms. Smuda's understanding and knowledge of the basic principles of user experience design and best practices. |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

7

| | | |
|---|---|---|
| | the Iliad cancellation process were effective. Similarly, she will opine that the other mocks she developed in December 2020 to would have decreased nonconsensual enrollments. Furthermore, Ms. Smuda will opine that the mocks she made were expected to have a negative financial impact on enrollment and cancellation. She will opine that the UPDP would be clearer if the 'Sign-up' button was updated to include auto-renew pricing and is a different color than standard flow or purchase buttons. Ms. Smuda will opine that the UPDP would be clearer if the 'No Thanks' button was equally prominent as the others. | |
| Reid Nelson | We anticipate that Mr. Nelson will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Nelson will opine about how some customers inadvertently enroll in Prime, as well the problems' scope. Specifically, Mr. Nelson will opine about how UPDP clarity experiments resulted in a decrease in nonconsensual enrollments. He will also opine that some visual and content design patterns in the enrollment flow may impair some users' ability to make informed decisions, thus increasing the risk of nonconsensual enrollments or missing important information about Prime. Likewise, Mr. Nelson will opine that certain visual and content design patterns in the cancellation flow may cause some users to select an action without having enough information to make an informed decision or abandon the cancellation flow prematurely. Specifically, he will opine about how forced interstitials, like the UPDP, in the middle of checkout process can be problematic visual design elements. Mr. Nelson will also opine | - Mr. Nelson's Master's degree in experimental psychology from Western Washington University.<br>- Mr. Nelson's certificate in User-Centered Design from the University of Washington.<br>- Mr. Nelson's knowledge and experience as a user researcher, including naturalistic shopping qualitative research, and a core member of the Shopping team at Amazon.<br>- Mr. Nelson's review and understanding of weblab experiments related to the Prime enrollment and cancellation processes during his tenure at Amazon.<br>- Mr. Nelson's review and understanding of the quantitative results and analyses stemming from weblab and other experiments during his tenure at Amazon.<br>- Mr. Nelson's review and understanding of the quantitative results of surveys Amazon conducted during his tenure at Amazon.<br>- Mr. Nelson's review, understanding of, and conduct of cognitive walkthrough testing evaluation based |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

that certain design elements cause nonconsensual enrollment. For example, he will opine about how the button labels for the positive and negative CTAs in the UPDP can cause user confusion and even nonconsensual enrollments. He will opine about how some users had trouble finding and navigating the Iliad cancellation process. Mr. Nelson will also opine as to why and how a clearer UPDP design reduces nonconsensual enrollments by 35% to 39%. He will opine that unclear button architectures in the Prime upsell experience during checkout and difficult to find 'Terms and Conditions' can lead to nonconsensual enrollments. Mr. Nelson will opine on the reasons why he believes that the UPDP Clarity experiments, conducted by the Retail Analytics team, resulted in significant improvements in the reduction of CS cancellations for nonconsensual enrollment and the Iliad cancellation process. He will further opine that a proportion of paying Prime members who have been enrolled for at least 10 months, but have not used their Prime benefits, are likely unintentional enrollees in Prime. He will also opine on the root causes of unintentional signups and signups that happened with low awareness and the impact on users. Mr. Nelson will opine that certain clearer treatments were not launched because of the negative impact to signups. He will also opine that the 90-day conversion rate is not a good metric by which to measure clarity improvements because many consumers whom Amazon nonconsensually enrolls remain unaware of their Prime membership status after ninety days. He will also opine that longer-term metrics, such as the one-year conversion rate, benefit usage, or other criteria measured after one year show that various treatments Amazon considered would have reduced

on Nielsen principles, as well as other heuristic evaluations Mr. Nelson conducted.
- Mr. Nelson's review of, understanding of, and conduct of naturalistic research while at Amazon.
- Mr. Nelson's review of, conduct of, and understanding of usability testing and user experience research during his tenure at Amazon.
- Mr. Nelson's conduct and understanding of naturalistic shopping studies / observational shopping studies during his tenure at Amazon.
- Mr. Nelson's knowledge and understanding of, and analysis of, customer service contacts.
- Mr. Nelson's knowledge and understanding of the experiments conducted by the Retail Analytics team concerning UPDP clarity, CS cancellations for nonconsensual enrollment, and the Iliad cancellation process.
- Mr. Nelson's qualitative observation of customers shopping and his understanding of various indicators in behavioral data, as well as his knowledge of customer service contacts.
- Mr. Nelson's work for and interactions with the shopper frustration program, including the Shopper Frustrations database.
- Mr. Nelson's understanding, observation, and review of videos including those he testified about in his deposition, as well as other similar recordings. *See* AMZN-PRM-FTC-000347607; AMZN-PRM-FTC-000347187; and AMZN-PRM-FTC-000347190.
- Mr. Nelson's interactions and

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

9

| | | |
|---|---|---|
| | nonconsensual enrollment. He will also opine about how some users express frustration and confusion about the number of clicks they need to perform in the Iliad cancellation flow to cancel their Prime membership. We further anticipate that Mr. Nelson will opine that the Iliad cancellation process is not simple. | communications with members of the Prime Team. <br> - Mr. Nelson's work with customer focus groups. |
| Molly O'Donnell | We anticipate that Ms. O'Donnell will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process.  For example, and among other related opinions, Ms. O'Donnell will opine on how the Prime enrollment process can led to unintended enrollments. Relatedly, Ms. O'Donnell will opine that cognitive exhaustion or overload in the enrollment process contributes to nonconsensual enrollment. She will also opine that the UPDP affirmative CTA 'double stacked' button is a cause of nonconsensual enrollment. Ms. O'Donnell will opine that the use of a link rather than a button was a cause of nonconsensual enrollment. She will also opine that the use of visual asymmetry was a cause of nonconsensual enrollment. Ms. O'Donnell will opine that the absence of a logical binary | - Ms. O'Donnell's Undergraduate degree in Communications from Loyola University in Chicago and her Master's in Communications and Digital Media from the University of Washington. <br> - Ms. O'Donnell's knowledge of user experience research, usability testing, and surveys at Amazon. <br> - Ms. O'Donnell's work on Amazon's Customer Experience Outcome Initiative. <br> - Ms. O'Donnell's work in the GPX team during her tenure at Amazon. <br> - Ms. O'Donnell's conduct of enrollment-related video studies during her tenure at Amazon. |

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

10

| | | |
|---|---|---|
| | pattern in the UPDP can cause nonconsensual enrollment. She will opine that the location of the price of a Prime subscription could cause nonconsensual enrollment. Ms. O'Donnell will also opine that the placement of the membership Terms and Conditions can cause nonconsensual enrollment. She will opine that a significant number of users who tried to cancel their Prime membership were diverted from the Iliad cancellation process. Ms. O'Donnell will opine that the Iliad cancellation process has multiple steps that can be confusing to some users and cause them not to cancel their memberships. She will opine that the inclusion of unnecessary clicks exacerbated the complexity of the Iliad cancellation process. Ms. O'Donnell will also opine that most users do not read the Terms and Conditions. Finally, Ms. O'Donnell will opine that the Iliad cancellation process is not simple. We will supplement this disclosure, if necessary, after Ms. O'Donnell is deposed. | |
| William J. Violette, Ph.D. | See report for opinions. | See report for factual support. |

Dated:  May 24, 2025

/s/ Anthony R. Saunders

JONATHAN COHEN (DC Bar #483454)
OLIVIA JERJIAN (DC Bar #1034299)
EVAN MENDELSON (DC Bar #996765)
SANA CHAUDHRY (NY Bar #5284807)
ANTHONY SAUNDERS (NJ Bar #008032001)
JONATHAN WARE (DC Bar #989414)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580
(202) 326-2551; jcohen2@ftc.gov (Cohen)
(202) 326-3320; emendelson@ftc.gov (Mendelson)

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

11

1
2
3

(202) 326-2749; ojerjian@ftc.gov (Jerjian)
(202) 326-2679; schaudhry@ftc.gov (Chaudhry)
(202) 326-2917; asaunders@ftc.gov (Saunders)
(202) 326-2726; jware1@ftc.gov (Ware)

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

RACHEL F. SIFUENTES
(IL Bar #6304016; CA Bar #324403)
Federal Trade Commission
230 S. Dearborn St., Room 3030
Chicago, IL 60604
(312) 960-5617; RSifuentes@ftc.gov

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4303; JTang@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

PLAINTIFF'S SECOND SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

12

# EXHIBIT 29

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4    FEDERAL TRADE COMMISSION,

5                  Plaintiff,

6    vs.                          No. 2:23-cv-0932-JHC

7    AMAZON.COM., et al.

8                  Defendants.

9    _____/

10

11           The Deposition of BENJAMIN HILLS

12               9:00 a.m. - 2:16 p.m.

13                 January 17, 2025

14

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12123049



```
 1                    P R O C E E D I N G S

 2                         - - -

 3

 4   Whereupon,

 5                    BENJAMIN HILLS,

 6   called as a witness, having been first duly sworn to

 7   tell the truth, the whole truth, and nothing but the

 8   truth, was examined and testified as follows:

 9                EXAMINATION BY MR. MENDELSON

10       Q     Good morning, Mr. Hills.  My name is Evan

11   Mendelson and I'm an attorney at the Federal Trade

12   Commission.  I represent the FTC in the FTC versus

13   Amazon matter, and I'm joined by my colleagues,

14   paralegals, Ryan Zwonik and Yara Awad.

15               Can your counsel introduce themselves,

16   please?

17               MS. WU:  Good morning.  Laura Flahive Wu of

18   Covington & Burling, counsel for Amazon and the

19   witness.  With me today are my colleagues, Kevin Kelly

20   and Travis Cabell also of Covington & Burling.  On the

21   line is Laura Craig, in-house counsel at Amazon.

22   BY MR. MENDELSON:

23       Q     Mr. Hills, you gave testimony at an FTC

24   investigational hearing once before; is that correct?

25       A        Correct.
```



1   retention which we spend our time including with the

2   product and partnering with the content team.  So in

3   the content team like the Nikki world, they have a

4   pretty rigorous process or had a pretty rigorous

5   process of what's approved to be tested or not across

6   all variations.

7            MR. MENDELSON:  I have no further

8   questions.

9            MS. WU:  Mr. Hills, I'm going to have a few

10  questions for you following up on topics that counsel

11  for the FTC questioned you on during your deposition

12  today.  I apologize that some of this will be

13  repetitive of the topics, but that is intentional.

14            EXAMINATION BY MS. WU

15    Q    Mr. Hills, how long did you work at Amazon

16  in total?

17    A    About six and a half years.

18    Q    While you worked at Amazon, you had

19  responsibility for Prime acquisition work, correct?

20    A    For a portion of the time.

21    Q    What portion of time did you have that

22  responsibility?

23    A    Roughly half a year.

24    Q    When was that half a year?

25    A    Based on my LinkedIn profile, it was around



BENJAMIN HILLS                                         January 17, 2025
FTC vs AMAZON.COM, INC., et al.                                    163

1  Q4 is when I began to pay attention to it.  I forget.

2  2020-ish, so it was about seven months or so.

3       Q       During your tenure at Amazon, you also had

4  responsibilities for Prime retention, correct?

5       A       Correct, yes.

6       Q       We'll go through your background in a few

7  minutes.  Again, you can use Exhibit 1 marked by the

8  FTC which is your LinkedIn profile to the extent

9  helpful, but first I want to ask some questions about

10 your overall experience with Amazon.

11      A       Sure.

12      Q       So today you had a chance to talk about

13 your work with regard to Prime acquisition and

14 retention.  Did you ever think in the context of your

15 work at Amazon that Prime's enrollment flow broke the

16 law?

17      A       No.

18      Q       In the context of your work at Amazon, did

19 you ever believe that Prime's cancellation flows broke

20 the law?

21      A       No.

22      Q       In your experience, did you understand that

23 most customers of Amazon understood the enrollment flow

24 for Prime?

25      A       Yes.



1    Q      In your experience based on your

2    experience, did you understand that most customers

3    understood the cancellation process to end or terminate

4    a Prime membership?

5    A      Yes.

6    Q      Are you proud of the work that you did

7    during your time at Amazon?

8    A      Absolutely.

9    Q      Why?

10    A      I mean, who's not a Prime member?  Like at

11    the -- the fact that Amazon was able to with my help

12    but mostly just some of the parts continue to invent

13    ways to pay for on behalf of the customers free

14    shipping and make it faster.  When I joined, a very

15    small subset of items were even available for Prime.

16    When I left, it was practically everything and then you

17    add video, live stream and sports like everything else,

18    it was pretty incredible.

19    Q      How would you describe the Prime membership

20    in terms of value to Amazon customers?

21    A      I mean, the -- which I really appreciated.

22    It's a long-term investment in the customers and

23    oftentimes isn't very profitable out of the gate and

24    for a long time for the company to just provide crazy

25    amount of value.  And that was the whole point to it to



1    Prime?

2                MR. MENDELSON:  Objection, foundation,

3    calls for speculation.

4                THE WITNESS:  Yes.  I don't know whether or

5    not they understood, but my hypothesis is they have

6    given the magnitude of those that are in Prime and

7    engaged with Prime.

8    BY MS. WU:

9        Q    Based on your review of the data and the

10   data signals that you've discussed during your

11   deposition today, how would you estimate the size of

12   the population of Amazon customers who failed to

13   understand that they have signed up for Prime after

14   enrolling in the program?

15               MR. MENDELSON:  Same objections.

16               THE WITNESS:  There's no way to measure the

17   intent.  That's been the problem the entire time.

18               MS. WU:  Thank you, Mr. Hills.  I have no

19   further questions.

20               MR. MENDELSON:  I have just what I think is

21   minute of follow-up.

22               FURTHER EXAMINATION BY MR. MENDELSON

23       Q    Mr. Hills, you testified in response to

24   questioning by Amazon counsel that you didn't believe

25   Prime enrollment process broke the law during your time



1  at Amazon; is that correct?

2      A      Correct.

3      Q      Are you familiar with or were you familiar

4  during your time at Amazon with laws governing Prime

5  enrollment?

6      A      So --

7             MS. WU:  Objection.  I'm going to object

8  that the question as posed by FTC counsel calls for a

9  legal conclusion and also caution the witness not to

10  share any attorney-client privileged information.

11            THE WITNESS:  I'm not a lawyer.  However,

12  we had some and so the -- we had counsel at Amazon to

13  guide decisions.  So the -- all changes in stuff that

14  were made in the context of the cancel flow went under

15  review, a lot of review from a lot of different sources

16  including legal sign off.  And so we never put anything

17  out that we thought -- that was deemed would not be.

18  So that's where I drew to that conclusion.

19  BY MR. MENDELSON:

20      Q      Okay.  Is the same true with respect to

21  your testimony that Prime cancellation did not break

22  the law during your time at Amazon?

23            MS. WU:  I'll assert the same objection

24  that the FTC's question calls for a legal conclusion

25  and also caution the witness not to share any



1   attorney-client privileged information.

2            THE WITNESS:  Same answer.

3            MR. MENDELSON:  No further questions.

4            (Deposition was concluded at 2:16 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 17th day of

14   January 2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21   ------------------------------

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25



# EXHIBIT 30

```
 1                UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON

 3                        AT SEATTLE

 4

 5   FEDERAL TRADE COMMISSION,            )
                                          )
 6                    Plaintiff,          )
                                          )
 7               vs.                      ) No. 2:23-cv-0932-JHC
                                          )
 8   AMAZON.COM, INC., et al.,            )
                                          )
 9                    Defendant.          )
                                          )
10                                        )

11

12                DEPOSITION OF JAMIL GHANI

13                    November 21, 2024

14

15                  Seattle, Washington

16

17             ***** Confidential *****

18

19

20

21

22

23

24

25   Reporter: Teri Simons, CCR, RMR, CRR
```



```
 1                    BE IT REMEMBERED that on Thursday,
 2     November 21, 2024, at 8:36 a.m., before Terilynn Simons,
 3     Certified Court Reporter, CCR, RMR, CRR, CLR, appeared
 4     JAMIL GHANI, the witness herein;
 5                    WHEREUPON, the following proceedings
 6     were had, to wit:
 7                       <<<<<< >>>>>>
 8     JAMIL GHANI,           having been first duly sworn
 9                            by the Certified Court Reporter,
10                            testified as follows:
11                       EXAMINATION
12     BY MR. MENDELSON:
13  Q  Good morning, Mr. Ghani.
14  A  Good morning.
15  Q  If I could just ask your counsel, Mr. Kaba, to introduce
16     the folks on your side of the table over there.
17                    MR. KABA:  Yeah.  Moez Kaba of Hueston
18     Hennigan for Defendants.
19        I am also going to be joined shortly by Cassidy
20     O'Sullivan, also of Hueston Hennigan and also on behalf
21     of the defendants.
22        I am also joined by Richard Donoghue on behalf of
23     the witness.
24        Ben Langner is also here in-person, who is in-house
25     counsel at Amazon.
```



1          You can take a minute to flip through it.

2          There's a bunch of screenshots and details of a web

3     lab that take on most of it.

4          I don't plan on asking about the specifics of those,

5     but if you want to take just a minute to flip through and

6     see what this is, you should go ahead.

7          Have you had a minute to review or at least flip

8     through the document?

9  A  I have.

10 Q  All right.  On the first page of Exhibit JG-1, at the

11    bottom, there is an e-mail from Monique Mascio.

12         Do you see that?

13 A  I do.

14 Q  Okay.  And the subject line reads, "[Launch -

15    acquisition] a web lab US desktop UPDP FT-UPDP clarity

16    CTA."

17         Do you see that?

18 A  Yes.

19 Q  A web lab at Amazon is-- is that generally referred to as

20    an AB test?

21 A  It refers to an experiment where we can expose one

22    population to a control, a/k/a oftentimes a preexisting

23    experience, versus any number of treatments, which are

24    the alternatives, so it's not always AB.  It could be AB

25    versus C versus D--



1  Q   Sure.

2  A   So it is an experiment technology for us to expose new

3      customer experiences at scale to customers.

4  Q   Okay.  In the web lab that's described in Exhibit JG-1,

5      Ms. Mascio states that she's testing CX changes to

6      existing desktop UPDP templates to improve customer

7      clarity and trust.

8          Do you see that?

9  A   I do see that.

10 Q   And then Mr. Davidai forwards the e-mail to you in the

11     next e-mail up; is that right?

12 A   He does.

13 Q   At this time though, in January of 2020, Mr. Davidai was

14     your direct report; is that correct?

15 A   He was.

16 Q   And Mr. Davidai writes, in part, to you, "First of more

17     to come."

18          Do you see that?

19 A   I do see that.

20 Q   Is it your understanding that Mr. Davidai was saying

21     there was going to be additional clarity-related web labs

22     upcoming?

23                    MR. KABA:  Objection; misstates the

24     document.

25                    THE WITNESS:  I am not Nahshon, so I



1     don't know exactly what he meant when he said that, but I

2     do know that at this time, before this time, and since

3     this time we were doing ███████ of experiments

4     throughout the Amazon Prime customer experience,

5     including hypotheses we had about addressing the small

6     minority of customers that then went on and indicated

7     they had issues with the signup experience.

8          So this experiment is one of several that were done

9     in this time period, before this, and after this, and so

10    Nahshon was communicating that there was a roadmap of

11    additional experiments coming, which I knew.

12  Q  (By Mr. Mendelson)  Okay.  You responded to Mr. Davidai,

13     at the top of Exhibit JG-1, "Thanks.  Just subscribed."

14          Do you see that?

15  A  I do.

16  Q  Is that an indication that you've subscribed to the

17     core-WW-Prime-test-opt@Amazon.com e-mail list?

18  A  Sitting here today, I can't be sure exactly which

19     distribution list this refers to, but in scanning the CC

20     line, the only distribution list indicated is that one,

21     and so-- well, there are two.  There is either the

22     core-WW or the partner-WW, so I can't be actually sure

23     which one was the one that I subscribed to.

24  Q  All right.  Do you know whether you're currently

25     subscribed to either or both of those distribution lists?



```
 1  A   Unfortunately, sitting here today, I do not know.

 2  Q   We can set Exhibit JG-1 aside.

 3  A   Should I give these back to you, sir?

 4              MR. KABA:  Just hold them there.  The

 5      court reporter will take them at the end.

 6              THE WITNESS:  Great.  Thank you.

 7  Q   (By Mr. Mendelson)  I should state for the record Exhibit

 8      JG-1 is Bates No. AMZN-PRF-FTC-0002644375.

 9              MR. KABA:  Through 383.

10              MR. MENDELSON:  I will take your word

11      for it.

12                  (Exhibit JG-2 marked

13                     for identification.)

14  Q   (By Mr. Mendelson)  Mr. Ghani, I am handing you exhibit

15      JG-2.

16          I am going to start just by asking questions about

17      the cover page of Exhibit JG-2, so the e-mail.

18          And this goes all day, if there's a time I ask you a

19      question, and you think you need to-- I might point you

20      to certain parts of the document, ask you to read them

21      and ask you a question.

22          If you think when I've asked you a question, you

23      need to look at other parts to answer it, you can do so.

24          I just like to take it question by question, to the

25      extent we can, if that makes sense.
```



1     explain about the Prime program is given the number of

2     countries in which we operate and the matrix of partners

3     with which we work, one thing I have led over the last

4     several years is having changes in reporting structure

5     between hard line and dotted line.

6         Sitting here today, I can't exactly remember who of

7     this group reported to me hard line and who reported to

8     me dotted line.

9   Q  (By Mr. Mendelson)  Why don't we go back to the

10    attachment within Exhibit JG-2, and we are still on Page

11    1 of that attachment.

12        Go ahead and read the first paragraph under

13    "Background."

14        Again, I will ask a question there after that, and

15    if you feel you need to read more, let me know.

16  A  I have read the first paragraph.

17  Q  Okay.  I am going to read to you the first half of the

18    first sentence of Lines 9 to 11.

19        It says, "At a high level we know that a portion of

20    Prime members were not aware when they signed up for

21    Prime.

22        "'I didn't know I signed up for Prime' was the

23    option that 14 percent of cancel survey responders from

24    4/27/20 through 5/8/20 marked as the reason for ending

25    their membership (Appendix A)."



1           Did I read that correctly?

2    A   You did read it correctly.

3    Q   The "cancel survey" being referenced here, that's a

4        survey that Amazon customers have an opportunity to take

5        after they cancel a Prime membership; is that correct?

6    A   It is an optional survey served up to a small percentage

7        of all canceling members, and so inherently it has the

8        biases that any survey methodology has, and what we found

9        is that because of the limited number of options, which,

10       again, we don't want to overwhelm the customer with

11       choices, this option oftentimes represents a whole range

12       of reasons for why a member is choosing to cancel.

13           It's important information, but it is directional at

14       best.

15   Q   We'll come back to that.

16           I think you got a little ahead of me and my

17       question.

18           The question is whether the survey being referenced

19       here is a survey that's given to Amazon customers or

20       offered to Amazon customers, a subset of Amazon

21       customers, after they've canceled a Prime membership; is

22       that right?

23   A   Yes, it is a survey offered up to a subset of canceling

24       Prime members.

25   Q   Prior to June 2020-- prior to June 3rd, 2020, were you



1       aware of, at any given point in time, the percentage of

2       people who were indicating in the cancel survey that they

3       didn't know they signed up for Prime?

4    A  I have been aware, since I started at Amazon Prime, that

5       a small number of customers go on to later report that

6       they had an issue with the signup experience, and we have

7       worked on that the entire time I have been there, seeking

8       to take that number as close to zero as possible.

9          I have also understood-- we serve a large and

10      diverse membership and customer base, and as I was

11      explaining earlier, this cancel survey has inherent bias

12      in it in terms of who actually responds.

13         There's also a well-known phenomenon that with

14      Amazon customers, Prime members, that based on the

15      selection that they might make or indicate to a CS agent,

16      there is a higher likelihood that they would get a refund

17      or some sort of-- a refund for their membership.

18         I have been aware of the survey.  I've been aware of

19      this as a valuable piece of VOC, but we take it in

20      context against this effort that we've had for years to

21      reduce that small percentage to make it as small as

22      possible.

23   Q  Again, I think you got a little ahead of me, so there is

24      some stuff I want to get to and follow up on.

25         Am I correct that you've generally been-- I think



1    you said this, you've generally been aware that there is

2    a percentage, I think you said a small percentage, of

3    people throughout your time at Prime that indicate in the

4    cancel survey that they didn't know they signed up for

5    Prime.

6        Is that fair?

7  A  Yes.

8  Q  Okay.  During your answer I believe you said it's well

9    known that some people-- some customers will tell

10   customer service agents certain information with the

11   hopes they'll get a refund for certain Prime membership

12   fees.

13       Is that a fair representation of what you said?

14            MR. KABA:  Objection; incomplete.

15   You can respond.

16            THE WITNESS:  What I said was-- what I

17   was trying to explain was the basis and utility of the

18   cancellation survey, how I think about the cancellation

19   survey, is that I value all forms of customer feedback,

20   but what we do is put that up against all other data we

21   can get.

22       I just wanted to simply state that the cancellation

23   survey has to be taken with a certain amount of, you

24   know, context to it, which is this is folks that have

25   gone through, canceled their membership for some reason,



1      and then have been prompted to respond to a survey.

2          We have kind of corroborating evidence that what

3      members indicate on a survey or what they tell a customer

4      service associate often doesn't match their actual

5      experience using Prime, and so I have to take the survey

6      sort of with-- in context with everything else I know

7      about the membership or individual members even.

8   Q   (By Mr. Mendelson)  Could you describe the corroborating

9       evidence you referenced in that prior answer?

10  A   This goes to the heart of this topic, which is we have

11      been working on this matter of understanding how many

12      customers actually sign up unintentionally, and every

13      which way we have looked through it, in all the data

14      available to us, it is a small percentage of the total

15      membership.

16          It starts with the fact that we have a large and

17      diverse customer base, literally tens of millions of

18      individuals signing up for any number of reasons.

19          Each of those members goes through a signup

20      experience where the information necessary for them to

21      make fully informed choices is clear and simple, they

22      make an active choice.

23          We then have any number of touch points, including a

24      welcome e-mail that goes out immediately, constant

25      reminders in e-mail, in push, on-site, that they have



1    Prime, that they have benefits, that there's new things

2    for them to check out.

3         I understand that the number of customers that later

4    go on and report that they had an issue signing up is

5    small.  We have worked to make that even smaller.

6         When I see a cancellation survey cited in isolation,

7    it doesn't match with all the data I have looked at to

8    understand truly if this is the scope of the challenge.

9         If 14 percent of Prime members were, in fact,

10   unaware, we would hear about it in social, we would hear

11   about it through customer service, we would-- we would

12   fundamentally not have the program we have now, which

13   resoundingly customers tell us that they love the

14   program, they get a ton of value.

15        Nevertheless, we have worked to reduce that number

16   for years.

17        I just think it's important to put in context the

18   cancellation survey specifically.

19        I would additionally say that I didn't write this

20   document, and some of what the manner in which it is

21   written is not consistent with how I see this particular

22   population.

23  Q  To your knowledge, has anyone at Amazon studied the

24   extent to which people who take the cancellation survey

25   are representative of all Amazon customers who cancel



1     were with counsel.

2   Q   (By Mr. Mendelson)  Okay.  Do you see there's-- one of

3       the rows is labeled, "Clear and conspicuous disclosure."

4         Do you see that?

5   A   I do see that.

6   Q   Have you ever had any understanding as to whether Amazon

7       was required to clearly and conspicuously disclose the

8       material terms of a Prime membership before billing

9       consumers for the membership?

10                    MR. KABA:  It's the same objection.

11        If your understanding comes from Amazon's counsel,

12      you can so identify, but I don't want you to disclose any

13      discussions you've had with counsel.

14        Is that--

15                    THE WITNESS:  It's clear.

16        I would answer your question and say I have a Prime

17      legal team, and I trust them.  They are very competent,

18      have always been very competent, so I trust them to guide

19      us on these matters.

20   Q   (By Mr. Mendelson)  Okay.  As a general high level, and I

21      don't want to know about the specific conversations, but

22      did you-- do you consult with the Amazon legal team about

23      any legal requirements associated with enrolling in or

24      canceling Amazon Prime memberships?

25                    MR. KABA:  You are getting very close



1    to seeking the substance of privileged testimony, of

2    privileged conversations.

3         Implicit in the question is the substance of the

4    testimony, so do you want to try it again?

5                    MR. MENDELSON:  I will try it again.

6         I am trying to keep it around privileged log level,

7    but--

8                    MR. KABA:  Why don't you try the

9    question-- why don't you try the question again.

10                   MR. MENDELSON:  Sure.

11   Q    (By Mr. Mendelson)  Mr. Ghani, during your time working

12        on Amazon Prime, have you consulted with lawyers, Amazon

13        lawyers, in general about the requirements for signing--

14        the legal requirements that Amazon must follow when

15        enrolling consumers in Amazon Prime?

16                   MR. KABA:  I will let the witness

17        answer "yes" or "no" to that question, provided you are

18        not going to argue it's some sort of waiver.

19                   MR. MENDELSON:  Sure.

20                   MR. KABA:  You can answer "yes" or

21        "no."

22                   THE WITNESS:  Yes.

23   Q    (By Mr. Mendelson)  Just a timing question, so, again,

24        "yes" or "no," did those conversations occur throughout

25        your time at Amazon Prime or did they-- well, let me stop



```
 1       the question there.
 2                        MR. KABA:  I will let the witness
 3       answer "yes" or "no" again, provided that you don't claim
 4       it's a waiver of some kind.
 5                        MR. MENDELSON:  Yes, agreed.
 6                        THE WITNESS:  Yes.
 7   Q   (By Mr. Mendelson)  Okay.  Same two questions, I think,
 8       but I will start with one for cancellation:
 9            During your time at Amazon Prime did you consult
10       with Amazon lawyers about any legal requirements relating
11       to the cancellation process for Amazon Prime?
12                        MR. KABA:  Once again, I will allow
13       the witness to answer just "yes" or "no" to that,
14       provided that you agree it is not a waiver.
15                        MR. MENDELSON:  Agreed.
16                        THE WITNESS:  Yes.
17   Q   (By Mr. Mendelson)  And did those conversations generally
18       occur through your time at Amazon Prime?
19                        MR. KABA:  Same-- I will allow the
20       witness to answer "yes" or "no" provided you agree it is
21       not a waiver of any kind.
22                        MR. MENDELSON:  Same agreement.
23                        THE WITNESS:  Yes.
24   Q   (By Mr. Mendelson)  You can put aside JG-2, for now, but
25       we might come back to it later.
```



```
 1                        (Exhibit JG-4 marked

 2                         for identification.)

 3   Q   (By Mr. Mendelson)  Mr. Ghani, I am handing you Exhibit

 4       JG-4.

 5           I will represent to you that Exhibit JG-4, in the

 6       metadata produced to us by Amazon, Jack Sallay is

 7       identified as the author.

 8           Exhibit JG-4 is AMZN-PRM-FTC-002565482.  It goes

 9       through 87.

10           I believe this is all one document.  It looks like

11       it might be two separate ones, with the separate one

12       starting with 86, but I believe it is all one document.

13           The title of Exhibit JG-4 is "Content clarity

14       outline"; is that correct?

15   A   It appears to be the title, yes.

16   Q   Why don't you read the top of Page 3, the section that

17       says, "Clarity document for signups 6/3," and then it

18       says, "Meeting notes and feedback" beneath that.

19           Why don't you read that and let me know when you're

20       finished.

21   A   Okay.

22   Q   You have had a chance to read that section identified?

23   A   I have.

24   Q   Based on the title, "Clarity document for signups 6/3,"

25       do these appear to be somebody's notes from the clarity
```



1     It states, "UPDP has been a target of scrutiny in

2     the UK due to customer complaints claiming that they had

3     opted into Prime accidentally through the free trial

4     offer.  The UK Advertising Standards Authority asserted

5     that customers were opting into Prime accidentally

6     through the UPDP free trial template because of the

7     wording and presentation of both the negative

8     call-to-action (CTA) (i.e., continue and don't gain

9     Amazon Prime benefits); and the positive CTA, (i.e. order

10    now with Prime)."

11        Did I read that correctly?

12  A  You did.

13  Q  Do you know what the UK Advertising Standards Authority

14     is?

15  A  I am aware, in the course of my work, on what this body

16     is and does.

17  Q  From what you have learned in the course of your work,

18     what is your understanding of what the Advertising

19     Standards Authority is and does?

20  A  In my own words, it is a group that assesses companies'

21     marketing and then provides feedback on that or brings

22     forward concerns they might have, and it works with

23     companies to address those concerns.

24        It is often based, in my experience, in as few as

25     one or two customers complaints.



1   Q   Okay.

2   A   And so we seek to partner with this organization and

3       organizations like it to improve the membership

4       experience.

5   Q   Okay.  I guess throughout your time in the Prime

6       organization, UK Prime has been within your-- within the

7       body of what you oversee; is that accurate?

8   A   Could you be more specific?

9   Q   Sure.

10          I think-- prior to October 2019 I think you were in

11      your role of VP of International Prime; is that correct?

12  A   That was my role, yes.

13  Q   The UK, correct, UK Prime?

14  A   It did include the UK.

15  Q   And then in October of 2019 you transitioned to a role--

16      did your title become VP of Prime?

17  A   I have worldwide responsibility.

18  Q   Okay.  So your responsibilities still include the UK,

19      correct?

20  A   They do.  I am responsible for the program globally.

21  Q   Okay.  In 2019-- at some point the Advertising Standards

22      Authority expressed concerns to Amazon about the UPDP

23      page in the UK; is that correct?

24  A   Could you be more specific?

25  Q   Sure.



1        You can reference the document, of course, but I'm

2        trying to ask about your memory outside of the document.

3    A   Okay.

4    Q   Do you remember whether in or around 2019 the Advertising

5        Standards Authority expressed concerns to Amazon about

6        the UK UPDP page?

7    A   I cannot, sitting here today, recall the timing of those

8        discussions, but I do recall the UK ASA bringing to us

9        some opportunities to, in their mind, improve the UPDP.

10   Q   And then there was, I think, a year's long back and forth

11       with the ASA about the UPDP; is that correct?

12                   MR. KABA:  Objection; vague.

13                   THE WITNESS:  Yeah, I don't understand

14       "back and forth."

15       Could you be more clear?

16   Q   (By Mr. Mendelson)  Okay.  Was there a period of more

17       than one year during which Amazon's lawyers and the ASA

18       exchanged written correspondence about the UK UPDP?

19                   MR. KABA:  Objection; speculation.

20       I don't want you to get into anything that you have

21       heard-- you heard from Amazon's counsel.

22                   THE WITNESS:  Sitting here today, I

23       don't recall the first contact, and so I can't say what

24       engagement happened between the lawyers.

25   Q   (By Mr. Mendelson)  Okay.  Were you involved at all in



1      document Bates stamped AMZN_00059691 through 701.

2          Do you have that document in front of you?

3   A  I do.

4   Q  Again, we will start with the first page of the document,

5      which, again, the bottom two-thirds reflect a calendar

6      invite; is that correct?

7   A  It does.

8   Q  Okay.  And the calendar invite was sent by Ms. Moeller to

9      yourself, Mr. Lindsay, and several other people; is that

10     correct?

11  A  That is correct.

12  Q  And it's setting a meeting for July 24th, 2020, correct?

13  A  That is correct.

14  Q  The subject line is "Privileged and confidential: Prime

15     clarity and member trust review"; is that correct?

16  A  That is correct.

17  Q  And then the e-mail at the top of Exhibit JG-7 is an

18     e-mail from Ms. Moeller, dated July 24th, 2020, correct?

19  A  That is correct.

20  Q  And then the first two recipients are Mr. Lindsay and

21     yourself, correct?

22  A  That is correct.

23  Q  And then Ms. Moeller writes, "Please find attached the

24     document for today's discussion"; is that right?

25  A  That is correct.



```
 1   Q   Is it your understanding that-- well, I will represent to
 2       you that the document starting at 93 of Exhibit No. JG-7
 3       is the attachment to the e-mail we were just looking at.
 4           Is it your understanding that this document is the
 5       final version of the document presented to Mr. Lindsay on
 6       July 24th, 2020?
 7                       MR. KABA:  Objection; speculation.
 8                       THE WITNESS:  There's no way for me to
 9       know if this is the final document or not.
10   Q   (By Mr. Mendelson)  Okay.  Did you attend the July 24th,
11       2020 review with Mr. Lindsay regarding Prime clarity and
12       member trust?
13   A   Sitting here today, I don't recall four and a half years
14       ago whether I attended or not.
15   Q   Okay.  Please read Section No. 3 of the document.
16           It starts on Line No. 171 and goes through Line
17       No. 190, and let me know when you finish reading that
18       section.
19   A   I have read that section.
20   Q   I am going to read starting on Line No. 175 of the
21       document, towards the end of Line No. 175.
22           It says, "While we will not know the precise impact
23       of each change before we start experimenting in each
24       marketplace, we estimate a 2020 impact of ██████████
25       members based on our prioritized initiatives (see
```



1        Appendix G for annualized estimates)."

2            Did I read that correctly?

3    A   You did.

4    Q   I should add, ███████ you understand that to mean

5        ████████ correct?

6    A   I do.

7    Q   Is it your understanding, based on this document, that

8        there were-- that there were certain changes being

9        suggested to the Prime CX that were estimated-- that

10       were-- let me start over.

11           Is it your understanding that there were certain

12       changes being proposed to the Prime CX that the team

13       preparing this estimated would lead to a ████ of about

14       ███████ Prime members in 2020?

15                   MR. KABA:  Objection; vague.

16           You may answer.

17                   THE WITNESS:  We had been working on--

18       by the time we got to this meeting and this document, we

19       had been working on this topic of reducing the small

20       number of members that then later report that they had

21       some issue in the signup experience as low as possible.

22           What the team is articulating here is that based on

23       the learnings of all the previous hypotheses that we had

24       tested, that any change, as well-founded and our best

25       ideas about helping that small audience, they had impact



1    on all members because we can't-- we don't know those

2    members a priori.  We have to change the experience for

3    all members.

4        As a result, all of our previous testing at this

5    point had resulted in degradation of signups while not

6    indicating the thing which we were seeking, which was

7    some indication that we had improved the experience of

8    that small minority, as measured by higher yield overall,

9    higher engagement, or lower CS contacts.

10       We can't know what is in any customer's head, and we

11   serve a diverse and heterogenous and very large customer

12   base.

13       We ultimately have to make changes that impact

14   everyone.

15       The math had repeatedly shown that despite our best

16   hypotheses about what could help that small population,

17   what we ended up seeing was a big hit to the business

18   without the commensurate improvement in, quote, unquote,

19   "clarity for the audience."

20       Here the team is saying, "Based on these past

21   experiments, here is what the changes we were planning on

22   testing into, in the second half of the year of 2020,

23   would likely result in, in terms of membership."

24   Q   (By Mr. Mendelson)  So the "this," you're referring to

25   the estimated ███████ member loss, correct?



JAMIL GHANI  Confidential                          November 21, 2024
FTC vs AMAZON.COM, INC., et al.                                    57

1    A    Yes.

2         It was a forecast of even if we did our best work

3    with the best hypotheses on how to serve that small

4    audience that later goes on and reports that they had an

5    issue with the signup, it was going to have an impact on

6    all members because all members will see these changes,

7    and that's what past experimentation had shown us.

8    Q    Okay.  Line-- I am going to read from Line No. 177 to

9    179.

10        It says, "We plan to take a cautious approach to

11   these changes where each initiative will be first shared

12   with customers for feedback and confirmation that it

13   enhances clarity, then launch as an experiment to measure

14   the impact in each locale before being dialled up as the

15   new baseline."

16        Did I read that correctly?

17   A    You did.

18   Q    Is it your understanding that the team who prepared this

19   document was suggesting they would first get customer

20   feedback and confirmation from customers that the changes

21   they were making actually improved clarity?

22              MR. KABA:  Objection; misstates the

23   document, calls for speculation.

24        You may respond.

25              THE WITNESS:  The team is



1    articulating, based on the sentences they wrote, their

2    approach for seeking customer feedback.

3        What we have learned, however, is that that first

4    step, which, in this case and in general, has been based

5    on a very small number of customers, often less than ▮

6    customers, is not predictive of the actual experience of

7    customers when tested at scale.

8        The only true valid data that's representative of

9    what customers experience is when we launch this behind a

10    web lab to actual customers in the Amazon experience.

11        We have learned that what the team recommends in

12    here is actually not helpful to get to the thing that

13    we've been working on and we remain focused on, which is

14    serving the needs of that small percentage of customers

15    that later report having a challenge with the signup

16    experience.

17        As indicated in other parts of the document, what

18    was validated with customers ends up not being actually,

19    quote, unquote, "clear."

20        On Page 1, for example, asinization, which was a

21    major initiative at great resource costs that we built,

22    actually was deemed to be less clear.  It was more

23    confusing to customers, really underscoring the diversity

24    of members, the diversity of expectations customers have.

25        That's why the gold standard for us is launching



1     these experiments into production and getting kind of

2     real-scaled data to understand what's going on, and

3     that's what I refer to when I say, "We've done those

4     hypotheses for years, are very committed to this topic,"

5     and every time we have launched experiments, what we have

6     learned is that we have disrupted the experience for the

7     majority of customers just trying to avail themselves of

8     the benefits of Prime and have not resulted in

9     improvements for the small percentage that later report

10    that they had an issue with the signup.

11         So we are disadvantaging most customers in an

12    attempt to help the small set of customers that report

13    having this issue.

14         That hasn't deterred us.  We have continued working

15    on this problem, even since the meeting that we are

16    talking about in this document.

17              MR. KABA:  We can take a break

18    whenever you want.

19  Q  (By Mr. Mendelson)  The data you were referring-- so I

20    think you referred to sometimes there will be some

21    limited, less than ten-person user testing, of potential

22    clarity improvements before those are tested at a greater

23    scale; is that correct?

24  A  We use usability testing or user studies to help inform

25    our ongoing development on a whole set of matters, but



1    the point I was making is that it is valuable data, but

2    it has to be taken with the proper context, which is it

3    is a small number of customers oftentimes in a very--

4    I'll use the word "contrived environment," where they're

5    getting paid to do a study and follow specific

6    instructions.

7        That's why the scaled actual production data is the

8    gold standard.

9  Q  The scaled actual production data you are referring to,

10    is that generally web lab data?

11 A  Typically we will launch changes behind what we call--

12    what we call behind a web lab, so that we can compare and

13    contrast between control and the various treatments that

14    we have.

15 Q  Okay.  Do you know what an NVA calculation is?

16 A  Are you asking in reference to something in the document

17    or in general?

18 Q  In general do you know what an NVA calculation is?

19 A  I do.

20        At various times at Amazon we have sought to

21    quantify what is called a negative value action, some

22    experience that a customer has that results in downstream

23    disengagement with Amazon, as measured by how frequently

24    they shop or how much they shop or cancelling Prime or

25    something of that nature.



1          MR. MENDELSON:  All right.  Why don't

2    we take a break.

3                        (Recess 10:21 to 10:36 a.m.)

4                      (Exhibit JG-8 marked

5                        for identification.)

6    Q  (By Mr. Mendelson)  Mr. Ghani, I am going to mark Exhibit

7       JG-8.

8          Exhibit JG-8 is Bates stamped AMZN_00022871 through

9       72.

10         Mr. Ghani, why don't you just go ahead and read the

11      e-mail chain and let me know when you're done.

12   A  I have read the e-mails.

13   Q  Thank you.

14         Either by referencing the e-mail or not, is it your

15      understanding that on September 17th, 2020 there were

16      certain changes made to the UPDP enrollment offers for

17      Prime?

18   A  Yes.  In September 2020 we re-enabled shipping upsells on

19      the UPDP after working through the delivery network

20      issues brought on by COVID, and we took the occasion also

21      to include our hypotheses on changes to the UPDP that

22      might help the small population of customers that later

23      go on and indicate that they had an issue with the signup

24      experience.

25   Q  Okay.  And the latter part of the answer, the changes



1    that you hypothesized might help those consumers, those

2    are described in the paragraph that starts,

3    "Additionally" under "What has changed," in Exhibit JG-8;

4    is that correct?

5  A  Based on my recollection, sitting here today, yes, that

6    summarizes the changes.

7  Q  Stepping back, as a general matter, when you are

8    attempting to make changes that, I think in your-- well,

9    attempting to make changes that will reduce the number of

10    people indicating they signed up mistakenly, is one of

11    the things you try to do is make it more clear that

12    someone is signing up for Prime when they click a button

13    on the UPDP page?

14  A  I'm sorry, you are going to need to be more specific with

15    your question.  Thank you.

16  Q  Fair enough.

17         One of the goals, when-- well, Amazon sets out

18    periodically to try to attempt to improve the clarity of

19    the UPDP enrollment page, correct?

20  A  We have been working, since I arrived at Amazon Prime in

21    2017, on improving the member experience for all members.

22         Part of that has been trying to improve the

23    experience of that small percentage of customers that

24    later report having an issue with the signup experience.

25    We have been working on that consistently since I came to



1    Prime in 2017.

2  Q   Including in connection with the UPDP page, correct?

3  A   Sitting here today, I can't recall the substance of each

4      of those efforts and which particular CXs they worked on,

5      but UPDP has generally been involved, per my earlier

6      answer that-- it is one of the primary ways that members

7      learn about Prime, learn about the terms of the

8      membership, what they are committing to, what they will

9      get, and then make a decision to join Prime or not join

10     Prime.

11         Yes, we have often included, but I can't speak that

12     it's been a part of all of those efforts.

13  Q   In some of those efforts one of the goals is to make

14     clearer that someone is enrolling in Prime when they

15     click a certain button, for example; is that correct?

16                   MR. KABA:  Objection; foundation,

17     vague as to "make clearer."

18         You may respond if you understand.

19                   THE WITNESS:  Could you restate your

20     question, please?

21  Q   (By Mr. Mendelson)  Sure.

22         When Amazon is testing certain clarity improvements,

23     one of the goals is to make sure people understand they

24     are signing up for Prime; is that correct?

25                   MR. KABA:  Objection; foundation.



1      Go ahead.

2                   THE WITNESS:  The goal is-- the

3      standard is to have every member aware that they are

4      signing up, and that's what I believe we do and have

5      always done.

6           We have a clear, very straightforward articulation

7      of the critical terms of what you're signing up for, what

8      benefits do you get, how much do you pay, the fact that

9      it's a recurring membership, the fact that you have the

10     option to decline it and still shop as what we call a

11     non-Prime Amazon customer.

12          So that's always been the standard.

13          There's no-- there's no debate on that.

14  Q  (By Mr. Mendelson)  Okay.  Another goal is to make sure

15     every member understands that Prime automatically renews

16     at the end of either a monthly or annual period; is that

17     correct?

18  A  You are using the word "goal," and I tend to interpret

19     this in a different way.

20          The standard is that every member makes a fully

21     knowledgeable decision about whether Prime is right for

22     them or not.

23          I think it's really important to establish that I,

24     and the Prime business, have zero interest in members

25     that are not engaged in using their membership.



1          Our business and long-term customer trust is

2     predicated on, dependent on members, you know, choosing

3     to become Prime members, having gotten all the relevant

4     information to that decision, and then going on and

5     actually using their membership.  That's what we really

6     care about, active, paid, engaged members for long term,

7     hopefully years.

8          The standard is that we present the option to join

9     Prime, we present all the relevant information we feel

10    and customers tell us they need to make an informed

11    choice.

12         They make an active choice, and we follow up

13    immediately telling them, "Hey, welcome to Prime.  You

14    are in Prime.  Here are all the things you get," and all

15    these other things throughout the duration of their

16    membership, whether it's just a free trial or in some

17    instances years and years.

18         I would not refer to that as a goal.  It's a

19    standard, and we have always had a simple really

20    straightforward way to sign up that is super clear, and

21    then members tell us in the millions that they start

22    using Prime and they enjoy the program.

23  Q  And part of the standard is ensuring that individuals

24    understand that Prime automatically renews, that the

25    membership continues at the end of either a monthly or



1      annual period?

2   A   What I can't know for sure is what is going on for any

3       customer sitting at the board.

4          The standard is that we present all of that

5       information.

6          We make it clear.  We lay it out in a clear way so

7       that members, you know, have the information and then

8       make an informed choice.

9          Like I've said before, we have a really diverse,

10      really heterogeneous customer base, and I can't know for

11      any one customer what's going on in their head or what

12      experience they're having.

13         The standard is very clear that we have all that

14      information, and we present it to the customer, but, you

15      know, I don't know if they read it.  I don't know if they

16      were distracted and said, "I know everything about Prime"

17      and then signed up.

18         They are making the choice that we presented them,

19      but we present and the standard we hold is all of that

20      information is available and very clear and in simple

21      language.

22                              (Exhibit JG-9 marked

23                                  for identification.)

24   Q   (By Mr. Mendelson)  Set Exhibit JG-8 to the side, and I

25      am handing you Exhibit JG-9.



1        Exhibit JG-9 is Bates stamped AMZN_00058438 through

2    43.

3        Mr. Ghani, why don't you read-- so it is a long

4    e-mail chain.

5        Go to the third page, and you will see at the bottom

6    there's an e-mail from Rex Morey that starts at the

7    bottom of the third page.

8        Do you see where--

9    A    I see where you're pointing me to.

10   Q    If you want to read-- well, why don't you read everything

11       through the headline "Headwinds and options" paragraph at

12       the start of the next page and jump down to "Clarity

13       messaging" and read that and the sub-bullets too.

14       Let me know when you're done with that, and I'll

15       have some questions.

16                    MR. KABA:  This choose-your-own-

17       adventure way of reading is probably not the way to go

18       about it.

19       Read what you think you need, and I'm sure Counsel

20       will ask questions and context.

21   Q    (By Mr. Mendelson)  Let me ask some questions then, and

22       then you tell me if you need to stop and read to answer

23       them.

24       Let's look at Mr. Morey's e-mail starting at the

25       bottom of Page 3, the page ending in 440.



1        e-mail, "Jediah and I have had some initial conversations

2        with the shopping design team to sync on the document we

3        are preparing for the 2/11 review."

4            Did I read that correctly?

5   A    You did.

6   Q    You understand this e-mail chain to generally be a

7        discussion regarding a document that was being prepared

8        for the C-team review referenced in Exhibit JG-16?

9   A    My understanding, based on the dates Nikki is citing, is

10       that it is the work towards the meeting we discussed

11       earlier.

12  Q    Okay.  Next to No. 1 you wrote-- the last sentence of

13       what you wrote, so the last sentence in green says,

14       "Also, let's make sure we have other Amazon subscriptions

15       and outside benchmarks as well."

16           Did I read that correctly?

17  A    You did read it correctly.

18  Q    What are "outside benchmarks," as you've used the phrase

19       here?

20  A    Sitting here, nearly four years later, I can't precisely

21       remember what might have been going through my head at

22       the time, but if I step back, there are-- "large" would

23       be an understatement, but a large number of subscription

24       businesses and options available to customers, and so my

25       point here is we should be informing ourselves of the



1    customer experiences, that some set of those are offering

2    to customers because the same customers are also

3    experiencing those, and so as good stewards of customer

4    service, we want to be informed of what are expectations

5    of customers, what are they seeing, what can we learn,

6    what can we be inspired by.

7  Q    Is one of your goals as VP of Prime to make sure that the

8    Prime program is generally complying to any applicable

9    law or regulation?

10                   MR. KABA:  Objection; vague,

11    overbroad.

12        I don't want you to disclose communications that you

13    may have had with counsel on this topic, but you can

14    respond to that question.

15                   THE WITNESS:  My responsibility, as

16    the leader of the Amazon Prime program, is to absolutely

17    make sure that we adhere-- comply-- a better word-- I am

18    not a lawyer, so comply with all rules and regulations

19    that apply to the program.

20        Any time we are aware of specific requirements, we

21    comply with them.

22  Q    (By Mr. Mendelson)  Do you, you personally, ever use

23    outside benchmarks to inform any opinion you have as to

24    whether Amazon is complying with laws and regulations?

25                   MR. KABA:  Objection; vague,



1    overbroad.

2               THE WITNESS:  Could you be more

3    specific?

4  Q  (By Mr. Mendelson)  Have you ever looked to the customer

5    experiences of other subscription programs with the goal

6    of informing your own view as to whether the Prime

7    program is complying with applicable laws and

8    regulations?

9               MR. KABA:  Objection; vague as to

10   "applicable laws and regulations," and incomplete.  It

11   calls for a legal conclusion as well.

12              THE WITNESS:  I am not a lawyer, so I

13   do not look at other subscription experiences through

14   that lens.

15       I have a team of lawyers who I trust, and they

16   manage kind of that matter, as trained lawyers.

17       My point on pulling in outside benchmarks was to

18   understand customer experience.  That's what my expertise

19   is.

20  Q  (By Mr. Mendelson)  Understood.

21       Okay.  Going to Page 2 of Exhibit JG-17, you see

22   there's a bolded header that starts, "Proposed document

23   structure"?

24  A  I do see that.

25  Q  And underneath that is a lot of green text, correct?



JAMIL GHANI  Confidential                    November 21, 2024
FTC vs AMAZON.COM, INC., et al.                            135

```
 1   A   Yes.

 2   Q   So it's your understanding that text was added by you,

 3       correct?

 4   A   Yes.

 5   Q   You wrote-- there's a sentence on the second line of that

 6       paragraph that-- starting on the second line of that

 7       paragraph that reads, "My sense is that they will be of

 8       the mind that getting a customer to try Prime is a

 9       greater priority than avoiding mistaken signups

10       altogether."

11           Did I read that correctly?

12   A   You did.

13   Q   Did you mean your sense is that-- well, let me step back.

14           Is the "they" in that sentence referencing the

15       C-team?

16   A   Yes, sitting here today that is my understanding of what

17       I was referring to.

18   Q   What did you mean when you said your sense is that this

19       C-team will be of the mind that getting a customer to try

20       Prime is a greater priority than to avoid mistaken

21       signups altogether?

22   A   As I have tried to explain today, by every effort we have

23       taken over several years, there is a small minority, a

24       small percentage, of customers who later report that they

25       had an issue with the signup, including signing up
```



JAMIL GHANI  Confidential                                    November 21, 2024
FTC vs AMAZON.COM, INC., et al.                                          136

1    mistakenly.

2         What I'm trying to communicate here is that given

3    the choice of doing everything possible to get that

4    number to zero, we will not choose that because that's

5    impossible.

6         We have tested and continued working at this effort,

7    and what we have found out is that that is a small-- I

8    might even use the word "irreducible minority" because

9    our membership base and our customer base is so diverse

10   with tens of millions of members signing up and canceling

11   every single year, such that getting that number to zero

12   is virtually impossible.

13        We have kept trying at it, but it's impossible, and

14   so what I'm stating in this statement is if the choice is

15   to make it incredibly hard for all members to join Prime

16   in an effort to get that number to zero, that's not what

17   the C-team will ask us to do.

18   Q  Do you believe that any of the September 2020

19      hypothesized clarity improvements made it incredibly hard

20      for people to join Prime?

21   A  When we tested those in January and when we made those

22      decisions in July and then we rolled them out in

23      September, they were, at that time, our best hypotheses

24      to address that ongoing challenge of that small minority

25      of customers that report an issue with signup.



1        What we saw in the data is that it resulted in a

2     disproportionate impact to signups across all members

3     without-- I am going back to the January data, which

4     showed this, without an improvement in yield, which is an

5     indicator, along with benefit usage and fewer CS

6     contacts, that would give us confidence that the

7     hypothesis was true.

8        We disproved that hypothesis, and still, knowing it

9     was going to be a headwind to the business, we proceeded

10    in September hoping that we could still kind of work on

11    that challenge that we'd been working on for a long time.

12                    MR. MENDELSON:  Would you mind

13    repeating my last question, please?

14                         (Section(s) designated were

15                          read by the reporter.)

16                    MR. KABA:  Objection; asked and

17    answered.

18        You may respond again.

19                    THE WITNESS:  As I said a moment ago,

20    in retrospect, with the benefit of actual production

21    data, it did make it hard for members, that otherwise

22    would have joined, to join the program, and it did not

23    result in the improvement in, quote, unquote, "clarity,"

24    per the metrics we used to assess that.

25  Q   (By Mr. Mendelson)  Would you mind pulling out Exhibit



C E R T I F I C A T E

```
STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )
```

        I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State of
Washington, do hereby certify:  That the foregoing
deposition of the witness named herein was taken
stenographically before me and reduced to a typed format
under my direction;

        That, according to CR 30(e), the witness was
given the opportunity to examine, read, and sign the
deposition after same was transcribed, unless indicated in
the record that the review was waived;

        That I am not a relative or employee of any
attorney or counsel of participant and that I am not
financially or otherwise interested in the action or the
outcome herein;

        That the deposition as transcribed is a full,
true and correct transcript of the testimony, including
questions and answers and all objections, motions, and
examinations, and said transcript was prepared pursuant to
the Washington Administrative Code 308-14-135 preparation
guidelines.



/S/TERILYNN SIMONS, CCR, RPR, RMR, CRR
State of Washington CCR #2047
My CCR certification expires on 7/7/25



# EXHIBIT 31

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


FEDERAL TRADE COMMISSION,           )
                                    )
                  Plaintiff,        )
                                    )
            vs.                     ) No. 2:23-cv-0932-JHC
                                    )
AMAZON.COM, INC., et al.,           )
                                    )
                  Defendant.        )
                                    )
                                    )


DEPOSITION OF NEIL LINDSAY


November 19, 2024


Seattle, Washington


***** Confidential *****


Reporter: Teri Simons, CCR, RMR, CRR



```
 1              BE IT REMEMBERED that on Tuesday,
 2    November 19, 2024, at 8:32 a.m., before Terilynn Simons,
 3    Certified Court Reporter, CCR, RMR, CRR, CLR, appeared
 4    NEIL LINDSAY, the witness herein;
 5                   WHEREUPON, the following proceedings
 6    were had, to wit:
 7                   <<<<<< >>>>>>
 8    NEIL LINDSAY,           having been first duly sworn
 9                            by the Certified Court Reporter,
10                            testified as follows:
11                   EXAMINATION
12    BY MS. JERJIAN:                                    08:32:42
13 Q  Good morning.  Please state your full name.       08:32:42
14 A  Neil Robert Lindsay.                               08:32:46
15 Q  My name is Olivia Jerjian and I am here with my    08:32:48
16    colleague, Evan Mendelson, and we are both attorneys with  08:32:51
17    the Federal Trade Commission, and on the phone are also    08:32:54
18    my colleagues, Max Nardini and Anthony Saunders.   08:32:57
19       I see you are represented by counsel here today.  08:32:59
20                   MS. JERJIAN:  Could you please      08:33:01
21    introduce yourself?                                08:33:02
22                   MR. KABA:  Yes, I will enter        08:33:03
23    appearances.                                       08:33:04
24       Moez Kaba of Hueston Hennigan on behalf of the  08:33:05
25    defendants.  I am joined by Joseph Aronsohn, also of  08:33:10
```



| | | |
|---|---|---|
| 1 | investigational hearings a number of times, but let's | 08:36:01 |
| 2 | just go over some of the rules to make sure we are all on | 08:36:04 |
| 3 | the same page. | 08:36:07 |
| 4 | As you can see, I'll be asking you a series of | 08:36:07 |
| 5 | questions today, to which you are required under oath to | 08:36:10 |
| 6 | provide full and complete answers to. | 08:36:14 |
| 7 | Do you understand this? | 08:36:16 |
| 8 | A   Yes. | 08:36:16 |
| 9 | Q   Okay.  If you don't understand a question or if you're | 08:36:17 |
| 10 | confused, let me know, and I will do my best to rephrase | 08:36:20 |
| 11 | the question or explain it. | 08:36:24 |
| 12 | Do you understand? | 08:36:25 |
| 13 | A   Yes. | 08:36:26 |
| 14 | Q   The court reporter is taking down everything we're saying | 08:36:27 |
| 15 | here today, so we should both strive to speak slowly and | 08:36:32 |
| 16 | clearly and not speak one over another. | 08:36:35 |
| 17 | So I will do my best to let you finish what you're | 08:36:38 |
| 18 | saying, and make sure that you let me ask my full | 08:36:41 |
| 19 | question before you start responding. | 08:36:44 |
| 20 | Do you understand that? | 08:36:45 |
| 21 | A   Yes. | 08:36:46 |
| 22 | Q   Okay.  Also, please answer every question with a verbal | 08:36:47 |
| 23 | response, such as a "yes" or a "no" versus nodding your | 08:36:52 |
| 24 | head, for instance. | 08:36:55 |
| 25 | We will be taking break s today. | 08:36:57 |



| | | |
|---|---|---|
| 1 | If you need a break, let me know, and I will do my | 08:36:58 |
| 2 | best to accommodate you, just as long as there isn't a | 08:37:01 |
| 3 | question pending. | 08:37:06 |
| 4 | Do you understand that? | 08:37:06 |
| 5 | A  Yes. | 08:37:07 |
| 6 | Q  Okay.  Mr. Lindsay, you still work at Amazon today, | 08:37:07 |
| 7 | correct? | 08:37:12 |
| 8 | A  Yes. | 08:37:12 |
| 9 | Q  What is your current title? | 08:37:15 |
| 10 | A  I'm the senior vice president for Amazon Health Services. | 08:37:17 |
| 11 | Q  How long have you had that title? | 08:37:21 |
| 12 | A  Approximately three years. | 08:37:25 |
| 13 | Q  So you started in November 2021 as a senior vice | 08:37:30 |
| 14 | president for Amazon Health Services, "yes" or "no"? | 08:37:36 |
| 15 | A  Yes, around then. | 08:37:39 |
| 16 | Q  What are your responsibilities in your current role? | 08:37:40 |
| 17 | A  I lead our efforts to make it easier for patients and | 08:37:47 |
| 18 | customers to access a certain set of health services, | 08:37:54 |
| 19 | including Amazon pharmacy and primary care services and | 08:37:58 |
| 20 | urgent care services. | 08:38:03 |
| 21 | Q  How many direct reports do you have? | 08:38:04 |
| 22 | A  Approximately seven. | 08:38:07 |
| 23 | Q  Can you list them? | 08:38:14 |
| 24 | A  Yeah.  I have a VP of Amazon pharmacy.  I have a vice | 08:38:18 |
| 25 | president of One Medical who is also the CEO of One | 08:38:26 |



| | | | |
|---|---|---|---|
| 1 | | Medical.  I have a vice president of what's called | 08:38:32 |
| 2 | | storefront and tech-- | 08:38:36 |
| 3 | Q | I am going to interrupt you. | 08:38:37 |
| 4 | | Can you give me the names of these individuals as | 08:38:38 |
| 5 | | well, please? | 08:38:40 |
| 6 | A | Okay.  John Love is the vice president of Amazon | 08:38:42 |
| 7 | | pharmacy.  Trent Green is the vice president of and CEO | 08:38:47 |
| 8 | | of One Medical. | 08:38:51 |
| 9 | | MR. KABA:  Just to help the court | 08:38:53 |
| 10 | | reporter, if you spell the last names as you're going. | 08:38:56 |
| 11 | | MS. JERJIAN:  We can do that during a | 08:38:59 |
| 12 | | break, I think. | 08:39:01 |
| 13 | | THE WITNESS:  I lost my track. | 08:39:03 |
| 14 | | Aaron Martin is the vice president of partnerships | 08:39:05 |
| 15 | | and marketing. | 08:39:11 |
| 16 | | Who do I have left?  Prakash Bulusu, B-U-L-U-S-U, | 08:39:14 |
| 17 | | he's the vice president of storefront and tech.  Kim | 08:39:21 |
| 18 | | Otte, O-T-T-E, is the director of compliance. | 08:39:28 |
| 19 | | Then I have Nicole Hart who is my executive | 08:39:37 |
| 20 | | assistant. | 08:39:41 |
| 21 | | That may not be seven. | 08:39:44 |
| 22 | Q | (By Ms. Jerjian)  Fair enough. | 08:39:46 |
| 23 | | How long has Nicole Hart been your executive | 08:39:47 |
| 24 | | assistant for? | 08:39:50 |
| 25 | A | Almost all of my time at Amazon, so almost 14 years. | 08:39:51 |



1  Q   And you are currently also on the S team, correct?    08:39:56

2  A   That's right.                                          08:40:04

3  Q   What is the S team?                                    08:40:05

4  A   The S team is a team of, I guess, senior leaders at    08:40:07

5      Amazon that meet regularly to review goals and other   08:40:15

6      topics.  They look across the business.                08:40:20

7  Q   As an S team member, do you look at goals or topics that  08:40:28

8      pertain to areas other than Amazon Health Services?    08:40:32

9           MR. KABA:  Objection; vague, "look               08:40:35

10     at."                                                    08:40:39

11          THE WITNESS:  Can you perhaps                     08:40:40

12     elaborate on what you mean?                             08:40:41

13  Q  (By Ms. Jerjian)  Sure.                                 08:40:44

14     Do you review documents and make decisions or debate   08:40:44

15     issues that pertain outside of Amazon Health Services?  08:40:48

16          MR. KABA:  Objection; compound, "look            08:40:51

17     at documents," "make decisions," "debate issues"-- are  08:40:57

18     you asking about all of them or one of them?            08:41:00

19          MS. JERJIAN:  Counsel, can you limit             08:41:02

20     your objections to speaking objections?                 08:41:03

21          MR. KABA:  I am going to make the same           08:41:05

22     type of objections that the FTC was making itself       08:41:11

23     yesterday at the deposition.                            08:41:15

24     It is an appropriate objection, and it is an           08:41:16

25     objection that the question is compound because it asks  08:41:18



| | | |
|---|---|---|
| 1 | three separate questions. | 08:41:21 |
| 2 | Q  (By Ms. Jerjian)  You can answer my question. | 08:41:23 |
| 3 | A  Which aspects-- sorry, can you just repeat the question? | 08:41:33 |
| 4 | Q  I will rephrase the question. | 08:41:35 |
| 5 | Do you review documents, as part of the S team, that | 08:41:37 |
| 6 | pertain to Amazon Prime? | 08:41:39 |
| 7 | A  Sometimes, not necessarily frequently. | 08:41:41 |
| 8 | Q  Since your departure from Amazon Prime in November 2021, | 08:41:46 |
| 9 | what topics have you discussed, as part of the S team, | 08:42:00 |
| 10 | that pertain to Amazon Prime? | 08:42:04 |
| 11 | A  It's difficult to recall. | 08:42:08 |
| 12 | I actually don't know if I have been in any S team | 08:42:15 |
| 13 | meetings, since I left the role, for documents with | 08:42:18 |
| 14 | regard to Prime. | 08:42:25 |
| 15 | Not all team members need to attend all meetings. | 08:42:26 |
| 16 | Q  Have you attended any meetings-- strike that. | 08:42:29 |
| 17 | Have you attended any S team meetings with respect | 08:42:34 |
| 18 | to Amazon Prime since you left your role at Amazon Prime? | 08:42:38 |
| 19 | A  Amazon Prime has been a topic in meetings but not | 08:42:43 |
| 20 | necessarily the topic of the meeting I've attended. | 08:42:47 |
| 21 | Q  How has Amazon Prime been a topic? | 08:42:51 |
| 22 | A  For example, when we do S team goals, Prime might be one | 08:42:55 |
| 23 | of hundreds or a few of hundreds of goals that we review. | 08:43:03 |
| 24 | Q  Were you a part of any S team meetings with respect to | 08:43:12 |
| 25 | the change in pricing of Prime after your departure from | 08:43:19 |



NEIL LINDSAY  Confidential                    November 19, 2024
FTC vs AMAZON.COM                                          15

| | | | |
|---|---|---|---|
| 1 | | Amazon Prime? | 08:43:23 |
| 2 | A | I don't recall attending a Prime meeting on pricing since | 08:43:23 |
| 3 | | I left the Prime role, but-- I just don't recall. | 08:43:31 |
| 4 | Q | But you know what I'm referring to when I say "the change | 08:43:35 |
| 5 | | in Amazon pricing-- in Amazon Prime pricing"? | 08:43:38 |
| 6 | A | Yes. | 08:43:42 |
| 7 | | I don't believe I attended that meeting. | 08:43:44 |
| 8 | Q | Okay.  Why did you move to Amazon Health Services? | 08:43:50 |
| 9 | A | I was looking for a change in role for just personal | 08:43:55 |
| 10 | | growth. | 08:44:08 |
| 11 | Q | Prior to becoming the SVP for Amazon Health Services, you | 08:44:13 |
| 12 | | were the senior vice president for Prime and marketing | 08:44:22 |
| 13 | | for consumers, correct? | 08:44:25 |
| 14 | A | I was the-- at the end of my tenure I was the-- sorry, I | 08:44:27 |
| 15 | | was the VP, for most of that period, of Prime and | 08:44:33 |
| 16 | | marketing globally for worldwide consumers, yes. | 08:44:39 |
| 17 | Q | During which timeframe were you the vice president for | 08:44:44 |
| 18 | | Prime and marketing? | 08:44:47 |
| 19 | A | I believe it was early 2019, and I left the role, as | 08:44:48 |
| 20 | | identified earlier, November 2021, and the last few | 08:44:56 |
| 21 | | months of that I was the SVP. | 08:45:04 |
| 22 | Q | Let me make this a little bit easier. | 08:45:08 |
| 23 | | (Exhibit No. NL-01 marked | 08:45:08 |
| 24 | | for identification.) | 08:45:22 |
| 25 | Q | (By Ms. Jerjian)  Mr. Lindsay, I am showing you what I've | 08:45:22 |



| | | |
|---|---|---|
| 1 | marked as Exhibit No. NL-01. | 08:45:24 |
| 2 | Is this an accurate depiction of your LinkedIn | 08:45:33 |
| 3 | profile? | 08:45:37 |
| 4 | A  Yes, it appears so. | 08:45:37 |
| 5 | Q  Okay.  Now that you have this in front of you, would you | 08:45:40 |
| 6 | agree that you started as vice president of Prime and | 08:45:44 |
| 7 | marketing in February 2018? | 08:45:48 |
| 8 | A  That's correct.  Sorry, my apologies. | 08:45:49 |
| 9 | Q  No worries. | 08:45:53 |
| 10 | A  I'm not great with dates. | 08:45:54 |
| 11 | Q  Okay.  And just to make sure, is there anything in this | 08:45:55 |
| 12 | document, Exhibit NL-01, on the first page, that is not | 08:46:01 |
| 13 | accurate? | 08:46:05 |
| 14 | A  It appears generally accurate, recognizing, again, that | 08:46:05 |
| 15 | precise dates when things happen sometimes are less | 08:46:28 |
| 16 | precise than they may appear. | 08:46:35 |
| 17 | Q  Are you saying that the dates on the first page of | 08:46:37 |
| 18 | Exhibit NL-01 may not be accurate? | 08:46:40 |
| 19 | A  I believe they're generally accurate. | 08:46:42 |
| 20 | The reality is when you make a change within a | 08:46:45 |
| 21 | company, you tend to have a window where you're doing | 08:46:48 |
| 22 | both jobs, so a precise month versus a month on either | 08:46:51 |
| 23 | side is-- you know, may be variant. | 08:46:55 |
| 24 | Q  I see. | 08:47:00 |
| 25 | So there might be a discrepancy in terms of one or | 08:47:01 |



| | | |
|---|---|---|
| 1 | | two months, but generally this is an accurate chronology | 08:47:04 |
| 2 | | of your time at Amazon since January 2017, correct? | 08:47:06 |
| 3 | A | Generally, yes. | 08:47:11 |
| 4 | Q | Okay.  What is the difference between-- strike that. | 08:47:12 |
| 5 | | What is the difference-- strike that too. | 08:47:21 |
| 6 | | What were your responsibilities as vice president of | 08:47:23 |
| 7 | | Prime and marketing? | 08:47:27 |
| 8 | A | As vice president of Prime and marketing, I had a wide | 08:47:28 |
| 9 | | range of responsibilities. | 08:47:35 |
| 10 | | The Prime organization has responsibility for | 08:47:37 |
| 11 | | launching new benefits in new countries and working with | 08:47:43 |
| 12 | | benefit teams to consider what benefits should be | 08:47:47 |
| 13 | | included in each country, to understanding the-- how to | 08:47:51 |
| 14 | | utilize our subscription revenue to invest in building | 08:47:57 |
| 15 | | benefits, in pricing the program, in working through how | 08:48:01 |
| 16 | | to attract and retain customers together with all of our | 08:48:09 |
| 17 | | other benefit teams. | 08:48:13 |
| 18 | | The marketing responsibility-- and in Prime, part of | 08:48:14 |
| 19 | | the Prime responsibility is also the marketing of the | 08:48:20 |
| 20 | | program and, of course, leading the team and developing | 08:48:23 |
| 21 | | technologies and so forth. | 08:48:28 |
| 22 | | In the marketing organization, it was a global | 08:48:31 |
| 23 | | responsibility, so it was positioning the brand, buying | 08:48:35 |
| 24 | | advertising, creating advertising, considering new brands | 08:48:40 |
| 25 | | as new teams formed, and a wide range of other | 08:48:46 |



| 1 | responsibilities as well as leading those teams. | 08:48:50 |
| 2 | I guess that's a general description of some of the | 08:48:55 |
| 3 | responsibilities. | 08:48:58 |
| 4 | Q   So you had a lot of responsibilities as vice president of | 08:48:59 |
| 5 | Prime and marketing, correct? | 08:49:03 |
| 6 | A   Yes.  It was a very broad responsibility. | 08:49:04 |
| 7 | Q   Who did you report to as vice president of Prime? | 08:49:07 |
| 8 | MR. KABA:  Objection; overbroad as to | 08:49:23 |
| 9 | time. | 08:49:25 |
| 10 | THE WITNESS:  The different people I | 08:49:26 |
| 11 | reported to? | 08:49:30 |
| 12 | Is there a specific period? | 08:49:31 |
| 13 | Q   (By Ms. Jerjian)  Sure, let's break it down. | 08:49:33 |
| 14 | When you began in February of 2018, who did you | 08:49:35 |
| 15 | report? | 08:49:37 |
| 16 | A   So I reported to Jeff Wilke, who was the CEO of the | 08:49:38 |
| 17 | consumer business. | 08:49:42 |
| 18 | Q   How long did you report to Jeff Wilke for? | 08:49:43 |
| 19 | A   I am not exactly sure. | 08:49:46 |
| 20 | I suspect it was around mid 2021, perhaps earlier. | 08:49:51 |
| 21 | Q   After Jeff Wilke, who did you report to? | 08:50:01 |
| 22 | A   I reported to Dave Clark who at the time was the SVP of | 08:50:04 |
| 23 | operations but became the CEO of consumer. | 08:50:10 |
| 24 | Q   And Jeff Wilke was also CEO of consumer when you reported | 08:50:22 |
| 25 | to him? | 08:50:27 |



| | | | |
|---|---|---|---|
| 1 | A | When I reported to Jeff Wilke, yes, he was the CEO of | 08:50:28 |
| 2 | | consumer, now called "stores." | 08:50:33 |
| 3 | Q | Is "CWG" another term for the consumer organization? | 08:50:37 |
| 4 | A | No.  "CWG" is a term for the "consumer working group," | 08:50:44 |
| 5 | | which was a collection of leaders in the consumer | 08:50:48 |
| 6 | | organization that would meet to review strategic topics. | 08:50:52 |
| 7 | Q | Were you one of the leaders in CWG? | 08:50:59 |
| 8 | A | Yes. | 08:51:04 |
| 9 | Q | How long-- strike that. | 08:51:05 |
| 10 | | Until when did you report to Dave Clark? | 08:51:15 |
| 11 | A | Until Dave Clark left the company, and I'm not sure when | 08:51:18 |
| 12 | | that was. | 08:51:26 |
| 13 | Q | And after Dave Clark, who did you report to, while you | 08:51:26 |
| 14 | | were in Prime? | 08:51:33 |
| 15 | A | Actually, I left Prime before Dave Clark left the | 08:51:34 |
| 16 | | company, so I only reported to Jeff Wilke and Dave Clark | 08:51:40 |
| 17 | | during my Prime role. | 08:51:45 |
| 18 | Q | Okay.  Who do you report to now? | 08:51:46 |
| 19 | A | I report to Doug Herrington, the CEO of worldwide stores. | 08:51:49 |
| 20 | Q | And Mr. Herrington took over that role from Mr. Clark; is | 08:52:00 |
| 21 | | that correct? | 08:52:04 |
| 22 | A | Yes, that's correct. | 08:52:04 |
| 23 | Q | When did you join CWG? | 08:52:07 |
| 24 | A | I'm not sure because CWG-- I am not sure when that | 08:52:14 |
| 25 | | formed, if it was in existence when I first took on Prime | 08:52:24 |



| | | |
|---|---|---|
| 1 | A | Again, to make sure it's clear, it was a lesser formal | 09:01:09 |
| 2 | | organization than it was this group of people would meet | 09:01:22 |
| 3 | | occasionally as needed when it seemed that it was | 09:01:25 |
| 4 | | valuable to get the team together. | 09:01:30 |
| 5 | | It wasn't necessarily a decision organization or a | 09:01:33 |
| 6 | | structured agenda organization. | 09:01:37 |
| 7 | | It was these are leaders of the consumer | 09:01:39 |
| 8 | | organization who it's valuable to have connect | 09:01:44 |
| 9 | | occasionally, and sometimes it might be for a specific | 09:01:48 |
| 10 | | topic, sometimes it might be for a general topic. | 09:01:52 |
| 11 | Q | Did you, while you were at Prime, request to meet with | 09:01:55 |
| 12 | | the CWG group? | 09:01:59 |
| 13 | A | I don't recall. | 09:02:02 |
| 14 | | Most of my requests for meetings would be with | 09:02:03 |
| 15 | | invites to people who I felt needed to be there or-- | 09:02:08 |
| 16 | | versus, again, formally inviting an informal group. | 09:02:13 |
| 17 | Q | When did you become a member of the S team? | 09:02:18 |
| 18 | A | I believe that was July 2021, around then. | 09:02:40 |
| 19 | Q | So you became a member of the S team approximately around | 09:02:51 |
| 20 | | the time you became an SVP; is that correct? | 09:03:02 |
| 21 | A | Oh, correction.  No.  Sorry, I was looking for a reminder | 09:03:05 |
| 22 | | at the LinkedIn page you gave me. | 09:03:14 |
| 23 | | I became a member of the S team before I became an | 09:03:15 |
| 24 | | SVP, and so I don't recall exactly when I became a member | 09:03:20 |
| 25 | | of the S team, but it was a few months before becoming an | 09:03:26 |



| | | | |
|---|---|---|---|
| 1 | | SVP. | 09:03:32 |
| 2 | Q | What responsibilities did you have as SVP of Prime that | 09:03:32 |
| 3 | | you didn't already have as VP of Prime? | 09:03:43 |
| 4 | A | My responsibilities didn't change when I became an SVP. | 09:03:46 |
| 5 | Q | So when you became SVP, was the only material change your | 09:03:53 |
| 6 | | title change? | 09:03:59 |
| 7 | A | Yes, that, and having joined the S team a few months | 09:04:02 |
| 8 | | earlier. | 09:04:06 |
| 9 | Q | Did your remuneration change in any way? | 09:04:06 |
| 10 | A | Eventually. | 09:04:17 |
| 11 | Q | When? | 09:04:18 |
| 12 | A | I believe towards the end of 2021. | 09:04:23 |
| 13 | Q | I am assuming your remuneration increased, correct? | 09:04:34 |
| 14 | A | Yes. | 09:04:51 |
| 15 | Q | By how much? | 09:04:52 |
| 16 | A | Remuneration is issued in units of RSUs, so it's | 09:04:53 |
| 17 | | difficult to answer that question. | 09:05:07 |
| 18 | | The RSUs are-- the restricted stock units are issued | 09:05:15 |
| 19 | | in the future at a price that you don't know where it's | 09:05:21 |
| 20 | | going to be, so it's difficult to give an accurate | 09:05:23 |
| 21 | | estimate. | 09:05:28 |
| 22 | Q | When you started as vice president of Prime, who were | 09:05:29 |
| 23 | | your direct reports? | 09:05:42 |
| 24 | | Let's start with maybe 2018. | 09:05:45 |
| 25 | A | I'm going to struggle to remember all of them. | 09:05:47 |



| | | | |
|--|--|--|--|
| 1 | | cancellation flow while he was VP of Prime International? | 09:16:03 |
| 2 | A | Not directly, I don't believe, but we all, as a | 09:16:10 |
| 3 | | leadership team, are engaged in any aspect of the | 09:16:18 |
| 4 | | cancellation process. | 09:16:27 |
| 5 | Q | Who was responsible for the online cancellation flow for | 09:16:29 |
| 6 | | Prime during that time period then, if not Mr. Ghani? | 09:16:33 |
| 7 | A | Again, the responsibility is distributed in some ways, | 09:16:37 |
| 8 | | but in terms of the technical aspects of cancellation | 09:16:44 |
| 9 | | flows, I believe, and I may be wrong, but I believe it | 09:16:53 |
| 10 | | was in James Sibay's organization. | 09:16:57 |
| 11 | Q | And did Mr. Ghani have any responsibility over the Prime | 09:17:04 |
| 12 | | enrollment opportunities in the online checkout flow | 09:17:14 |
| 13 | | while he was vice president of Prime International? | 09:17:20 |
| 14 | | MR. KABA:  Objection; overbroad, | 09:17:25 |
| 15 | | vague. | 09:17:27 |
| 16 | | THE WITNESS:  Again, it's not like the | 09:17:27 |
| 17 | | responsibility sat in one place. | 09:17:33 |
| 18 | | We work as a team. | 09:17:36 |
| 19 | | Some teams build components. | 09:17:41 |
| 20 | | As a leadership team we had-- there's CX teams, or | 09:17:44 |
| 21 | | customer experience teams, that work on what the | 09:17:51 |
| 22 | | experience might be, and there are multiple teams. | 09:17:54 |
| 23 | | He had some responsibility in the sense of-- as part | 09:17:57 |
| 24 | | of the Prime leadership team, but not, I wouldn't say, an | 09:18:02 |
| 25 | | entire responsibility. | 09:18:07 |



| | | | |
|---|---|---|---|
| 1 | Q | (By Ms. Jerjian)  Did Mr. Sibay share some of that | 09:18:09 |
| 2 | | responsibility, as you indicated, also as to Prime | 09:18:12 |
| 3 | | cancellations earlier? | 09:18:18 |
| 4 | A | Yes, he had some aspects of that responsibility. | 09:18:19 |
| 5 | Q | Okay.  After Mr. Ghani obtained this consolidated Prime | 09:18:23 |
| 6 | | business role, did he have responsibility over the online | 09:18:29 |
| 7 | | cancellation flow for Prime? | 09:18:35 |
| 8 | A | Again, he had some responsibility for the tech teams that | 09:18:37 |
| 9 | | built those capabilities, but keep in mind that Prime, | 09:18:50 |
| 10 | | again, touches every part of the company, and so there | 09:18:55 |
| 11 | | are many people involved in the process of cancellation | 09:19:00 |
| 12 | | flows and-- so yes, some responsibility. | 09:19:05 |
| 13 | Q | Was he the most senior person with responsibility over | 09:19:10 |
| 14 | | the Prime cancellation flow? | 09:19:16 |
| 15 | | MR. KABA:  Objection; vague, | 09:19:20 |
| 16 | | overbroad. | 09:19:26 |
| 17 | | THE WITNESS:  It's difficult. | 09:19:26 |
| 18 | | We work collaboratively as an organization, perhaps | 09:19:30 |
| 19 | | almost more so in Prime than in any part of the company, | 09:19:36 |
| 20 | | because it is so-- has such a-- it's important to every | 09:19:42 |
| 21 | | part of Amazon, so it is difficult to identify the most | 09:19:47 |
| 22 | | senior person responsible. | 09:19:53 |
| 23 | | He had some responsibility for those flows. | 09:20:00 |
| 24 | Q | (By Ms. Jerjian)  Well, during your tenure at Prime, did | 09:20:05 |
| 25 | | you have any responsibility over the online cancellation | 09:20:07 |



| | | | |
|---|---|---|---|
| 1 | | flow for Prime? | 09:20:10 |
| 2 | A | Again, we work collaboratively. | 09:20:11 |
| 3 | | I would say I had some responsibility for those | 09:20:16 |
| 4 | | cancellation flows, but there are aspects of flows that | 09:20:18 |
| 5 | | can be decided independently by a small team.  There are | 09:20:24 |
| 6 | | aspects that require more involvement of other teams, so | 09:20:28 |
| 7 | | pretty much in Prime it's difficult to identify this one | 09:20:35 |
| 8 | | team, this one person had 100 percent responsibility. | 09:20:44 |
| 9 | Q | So you had some responsibility over the Prime | 09:20:48 |
| 10 | | cancellation flow-- online Prime cancellation flow during | 09:20:59 |
| 11 | | your tenure at Prime, correct? | 09:21:03 |
| 12 | | MR. KABA:  Objection; asked and | 09:21:05 |
| 13 | | answered. | 09:21:07 |
| 14 | | THE WITNESS:  I have some | 09:21:07 |
| 15 | | responsibility for many things related to Prime. | 09:21:08 |
| 16 | Q | (By Ms. Jerjian)  Including the online cancellation flow, | 09:21:13 |
| 17 | | correct? | 09:21:15 |
| 18 | | MR. KABA:  Objection; asked and | 09:21:15 |
| 19 | | answered. | 09:21:16 |
| 20 | | THE WITNESS:  The online cancellation | 09:21:17 |
| 21 | | flow is-- some aspects of that are part of my | 09:21:18 |
| 22 | | responsibility, but also other people are involved. | 09:21:24 |
| 23 | Q | (By Ms. Jerjian)  When you say "other people are | 09:21:30 |
| 24 | | involved," who are you referring to? | 09:21:32 |
| 25 | A | As I mentioned, Prime is important to our entertainment | 09:21:33 |



| | | |
|---|---|---|
| 1 | | business, to our gaming business, to our delivery | 09:21:43 |
| 2 | | business, to many, many aspects of our business, | 09:21:46 |
| 3 | | including multiple countries, so there are many | 09:21:49 |
| 4 | | stakeholders in Prime. | 09:21:54 |
| 5 | Q | So the entertainment business had authority over the | 09:21:59 |
| 6 | | prime online cancellation flow? | 09:22:02 |
| 7 | A | I wouldn't say they had authority over it, but I would | 09:22:04 |
| 8 | | say they are a stakeholder, and any decisions we make | 09:22:11 |
| 9 | | about any aspect of our flows would sometimes need to | 09:22:20 |
| 10 | | involve other stakeholders. | 09:22:23 |
| 11 | Q | During your tenure at Prime, did you have authority over | 09:22:25 |
| 12 | | the Prime cancellation flow? | 09:22:31 |
| 13 | A | Well, again-- | 09:22:33 |
| 14 | | MR. KABA:  Objection; vague as to | 09:22:34 |
| 15 | | "authority." | 09:22:38 |
| 16 | | THE WITNESS:  Again, the authority is | 09:22:40 |
| 17 | | distributed in Amazon, in that we don't make-- | 09:22:46 |
| 18 | | particularly for a program that touches so many aspects | 09:22:50 |
| 19 | | of Amazon, it's difficult to say any one person had all | 09:22:52 |
| 20 | | authority overflows. | 09:22:58 |
| 21 | Q | (By Ms. Jerjian)  Would you give the same answer with | 09:23:04 |
| 22 | | respect to Prime upsells in the online checkout flow? | 09:23:06 |
| 23 | | MR. KABA:  Objection; form. | 09:23:17 |
| 24 | | THE WITNESS:  So by the same answer, I | 09:23:18 |
| 25 | | would say that the upsell checkout flows, like all flows, | 09:23:22 |



| 1 | THE WITNESS:  I don't know what three | 09:41:49 |
| 2 | are being referred to here, and I will need to take a | 09:41:54 |
| 3 | moment-- I wasn't looking at the doc for that context | 09:41:57 |
| 4 | earlier. | 09:41:59 |
| 5 Q | (By Ms. Jerjian)  Sure. | 09:42:03 |
| 6 | Just so you know, I am going to be asking you a few | 09:42:04 |
| 7 | questions about the first half of the third page. | 09:42:07 |
| 8 A | Okay. | 09:42:13 |
| 9 | MR. JERJIAN:  I am going to note for | 09:44:13 |
| 10 | the record that it's been a couple minutes. | 09:44:14 |
| 11 | MR. KABA:  No, it hasn't. | 09:44:17 |
| 12 | THE WITNESS:  Okay. | 09:44:48 |
| 13 Q | (By Ms. Jerjian)  These are notes taken from the meeting | 09:44:49 |
| 14 | on April 19th, correct? | 09:44:50 |
| 15 | MR. KABA:  Objection; calls for | 09:44:54 |
| 16 | speculation. | 09:44:56 |
| 17 | THE WITNESS:  It appears so. | 09:44:56 |
| 18 | They are very bulleted. | 09:45:00 |
| 19 | They also referred to a-- versions of appendices, so | 09:45:01 |
| 20 | these are not necessarily the complete notes. | 09:45:09 |
| 21 Q | (By Ms. Jerjian)  But they are notes from that meeting, | 09:45:11 |
| 22 | correct? | 09:45:13 |
| 23 | MR. KABA:  Objection; speculation. | 09:45:13 |
| 24 | THE WITNESS:  I can only say what it | 09:45:22 |
| 25 | is from the subject, so I think so. | 09:45:24 |



| 1 | Q | (By Ms. Jerjian)  Okay.  For top frustrations listed in | 09:45:26 |
| 2 | | the first bullet under "Program mechanism" on the bottom | 09:45:33 |
| 3 | | of the second page, do you understand that to refer to | 09:45:36 |
| 4 | | the three frustrations listed on the third page? | 09:45:41 |
| 5 | | I will help you out, Prime signup frustration, not | 09:45:44 |
| 6 | | receiving free shipping, and finding lowest item price, | 09:45:47 |
| 7 | | correct? | 09:45:50 |
| 8 | | MR. KABA:  Objection; calls for | 09:45:53 |
| 9 | | speculation. | 09:45:54 |
| 10 | | THE WITNESS:  I can't tell what the | 09:45:55 |
| 11 | | author intended. | 09:45:57 |
| 12 | | Again, bulleted notes are notoriously incomplete. | 09:46:01 |
| 13 | Q | (By Ms. Jerjian)  Are you aware of the Prime signup | 09:46:07 |
| 14 | | frustration, as referred to on Page 3 of this document? | 09:46:09 |
| 15 | A | Again, this is-- "Prime signup frustration" is a very | 09:46:13 |
| 16 | | vague term. | 09:46:22 |
| 17 | Q | Okay.  Setting aside this document, during your tenure at | 09:46:24 |
| 18 | | Prime, had you heard of any Prime signup frustrations? | 09:46:27 |
| 19 | A | During my tenure I had heard of anecdotes of | 09:46:31 |
| 20 | | frustrations, and we spent a great deal of time trying to | 09:46:44 |
| 21 | | understand them better, yes. | 09:46:48 |
| 22 | Q | What are the anecdotes you are referring to? | 09:46:51 |
| 23 | A | It's difficult to be precise. | 09:46:54 |
| 24 | | You know, anecdotes are varied, but in general, as | 09:47:00 |
| 25 | | we look at many frustrations across the company, we had a | 09:47:08 |



| | | | |
|---|---|---|---|
| 1 | | small number of anecdotes reporting that-- the potential | 09:47:17 |
| 2 | | confusion that among many millions of people who have | 09:47:25 |
| 3 | | successfully signed up and declined, there was a small | 09:47:30 |
| 4 | | number who had expressed some confusion about the signup | 09:47:34 |
| 5 | | process. | 09:47:38 |
| 6 | Q | What do you mean by "confusion about the signup process"? | 09:47:39 |
| 7 | A | Again, we would have to talk specifically about specific | 09:47:45 |
| 8 | | anecdotes, which I believe there may be-- if you have a | 09:47:49 |
| 9 | | document for me to refer to, I can speak to those | 09:47:54 |
| 10 | | specifics, but there were different anecdotes. | 09:47:58 |
| 11 | Q | Were you referring to anything specific when you said | 09:48:04 |
| 12 | | that there were anecdotes of potential confusion about | 09:48:11 |
| 13 | | the signup process? | 09:48:17 |
| 14 | A | There was a-- we had some feedback that there was | 09:48:18 |
| 15 | | customers who had indicated they did not intend to sign | 09:48:25 |
| 16 | | up, and we investigated it very aggressively because we | 09:48:30 |
| 17 | | don't want to sign up members who don't intend to sign up | 09:48:34 |
| 18 | | and who don't intend to engage in the program. | 09:48:39 |
| 19 | Q | And what did you do to investigate aggressively? | 09:48:41 |
| 20 | A | Over a period of time we tried to understand the source | 09:48:50 |
| 21 | | of that small number of subjective anecdotes, as teams | 09:49:00 |
| 22 | | had given us this feedback, and to see if this was a | 09:49:07 |
| 23 | | broader concern or not. | 09:49:16 |
| 24 | Q | Was it a broader concern? | 09:49:17 |
| 25 | A | No. | 09:49:23 |



1  Q   Why do you say "no"?

2  A   We spent a great deal of time, of years, trying to

3      understand the extent, and there are ██████ people

4      who sign up or decline Prime membership not every day but

5      perhaps every month, but we take every feedback of a

6      concern very, very seriously and are interested in

7      understanding whether we can minimize any frustration.

8  Q   What specifically did you do to understand the source of

9      these anecdotes?

10 A   We team-shared those anecdotes with us, many of which

11     were-- most of which were from a designer sitting with a

12     customer observing their behavior in a relatively

13     unnatural setting and providing feedback to us that there

14     was-- that some-- a very small number of individuals in

15     those experiences indicated concern about the signup

16     process being confusing.

17 Q   Aside from teams sharing anecdotes, did you do anything

18     else specifically to understand the customer frustrations

19     with respect to Prime signups?

20 A   Yes.  We spent time with teams understanding whether

21     there's-- you know, what might be the source of the

22     frustration and whether this was a-- recognizing that in

23     any experience or signup process, there will always be

24     some confusion, you can never get 100 percent of people

25     who find an experience perfect for them, that we were



| | | |
|---|---|---|
| 1 | trying to understand whether this was a natural variance, | 09:51:38 |
| 2 | I guess, in how people respond to signup flows or | 09:51:47 |
| 3 | something more. | 09:51:53 |
| 4 | Q  Did you ever uncover what might be the source of the | 09:51:53 |
| 5 | frustration? | 09:52:12 |
| 6 | You said you spent time with teams to understand | 09:52:13 |
| 7 | what might be the source of the frustration. | 09:52:19 |
| 8 | Were you successful? | 09:52:21 |
| 9 | MR. KABA:  Objection; compound. | 09:52:23 |
| 10 | You can answer. | 09:52:26 |
| 11 | THE WITNESS:  No, not really, because | 09:52:27 |
| 12 | the reality is that in any experience, in any signup | 09:52:35 |
| 13 | experience, you have people who like it one way and | 09:52:42 |
| 14 | others who like it another way and who might find | 09:52:49 |
| 15 | something-- a small group might find something | 09:52:52 |
| 16 | frustrating when the vast majority find it not | 09:52:55 |
| 17 | frustrating, so we spent a great deal of energy trying to | 09:52:58 |
| 18 | understand-- because we take frustrations very seriously. | 09:53:05 |
| 19 | We don't want frustrated customers. | 09:53:11 |
| 20 | No, we did not find a specific reason for the | 09:53:13 |
| 21 | frustration. | 09:53:17 |
| 22 | Q  (By Ms. Jerjian)  How do you know that it was a small | 09:53:19 |
| 23 | group that were the source of the frustrations for Prime | 09:53:21 |
| 24 | signup? | 09:53:26 |
| 25 | A  Well, the source of the frustrations that were reported | 09:53:26 |



| | | |
|---|---|---|
| 1 | to us were primarily anecdotal from customer experience | 09:53:31 |
| 2 | research, which is literally sitting with a single-digit | 09:53:36 |
| 3 | number of customers and watching them use screens and | 09:53:42 |
| 4 | providing feedback as they go along. | 09:53:51 |
| 5 | Q  Turning to the last page of Exhibit No. NL-02-- | 09:53:53 |
| 6 | MR. KABA:  The second-to-last page? | 09:54:13 |
| 7 | MS. JERJIAN:  Correct. | 09:54:15 |
| 8 | THE WITNESS:  7377? | 09:54:16 |
| 9 | MS. JERJIAN:  Mm-hm. | 09:54:19 |
| 10 | Q  (By Ms. Jerjian)  Does this refresh your recollection as | 09:54:27 |
| 11 | to whether you attended the meeting, specifically the | 09:54:28 |
| 12 | agenda? | 09:54:34 |
| 13 | A  I don't recall attending the meeting. | 09:54:34 |
| 14 | Q  And turning back to the prior page ending in 76, the | 09:54:36 |
| 15 | third bullet point states, quote, "Neil Lindsay would | 09:54:48 |
| 16 | like the frustrations program to input into new customer | 09:54:52 |
| 17 | lifecycle team," and it goes on. | 09:54:55 |
| 18 | What did you mean by this request? | 09:54:57 |
| 19 | MR. KABA:  Objection; speculation, | 09:55:07 |
| 20 | lacks foundation. | 09:55:10 |
| 21 | Go ahead. | 09:55:12 |
| 22 | THE WITNESS:  Again, I don't know what | 09:55:12 |
| 23 | the author of this meant, but I can share with you that I | 09:55:17 |
| 24 | had established a customer lifecycle team, which was | 09:55:21 |
| 25 | about understanding the segments of our customers. | 09:55:26 |



| | | | |
|---|---|---|---|
| 1 | | I likely read the narrative. | 10:50:36 |
| 2 | Q | Do you recall anything about the June 17th, 2019 meeting? | 10:50:38 |
| 3 | A | Not specifically, but perhaps if I look at this doc, I | 10:50:43 |
| 4 | | may. | 10:50:51 |
| 5 | Q | Looking specifically at Line No. 30 through 33, where it | 10:50:59 |
| 6 | | says, quote, "Customers may sign up for Prime without | 10:51:10 |
| 7 | | understanding that the interstitial is a Prime upsell, | 10:51:13 |
| 8 | | and when they click the signup button, they sign up for | 10:51:16 |
| 9 | | Prime," does "interstitial" here refer to something that | 10:51:19 |
| 10 | | is known as UPDP, "universal Prime division page"? | 10:51:24 |
| 11 | A | I don't know.  I need to read some of this document to | 10:51:29 |
| 12 | | get more context. | 10:51:33 |
| 13 | |         MS. JERJIAN:  For the record, it is | 10:51:49 |
| 14 | | 10:51 a.m. | 10:51:50 |
| 15 | | Let me know when you have read sufficiently to | 10:51:51 |
| 16 | | respond to the question. | 10:51:53 |
| 17 | |         MR. KABA:  For the record, you have | 10:51:54 |
| 18 | | put in front of the witness an over four-page | 10:51:55 |
| 19 | | single-spaced document. | 10:52:00 |
| 20 | |         MS. JERJIAN:  I asked him specifically | 10:52:00 |
| 21 | | whether UPDP is an interstitial-- | 10:52:02 |
| 22 | |         MR. KABA:  That's not what you | 10:52:06 |
| 23 | | actually asked him. | 10:52:07 |
| 24 | | What you asked him is whether the "interstitial" | 10:52:09 |
| 25 | | reference in a specific portion of this document refers | 10:52:12 |



| | | | |
|---|---|---|---|
| 1 | | to something that you are saying it refers to. | 10:52:14 |
| 2 | | If you would like to ask a different question, you | 10:52:16 |
| 3 | | can do that. | 10:52:19 |
| 4 | Q | (By Ms. Jerjian)  I see you have moved on to the second | 10:54:13 |
| 5 | | page, Mr. Lindsay. | 10:54:15 |
| 6 | | Are you able to respond to my question that focused | 10:54:16 |
| 7 | | on the Line No. 30? | 10:54:18 |
| 8 | A | Can you ask the question again? | 10:54:23 |
| 9 | Q | Sure. | 10:54:25 |
| 10 | | Does the "interstitial" on Line No. 30 refer to the | 10:54:29 |
| 11 | | UPDP, which is also known as the "universal Prime | 10:54:33 |
| 12 | | decision page"? | 10:54:38 |
| 13 | | MR. KABA:  Objection; calls for | 10:54:39 |
| 14 | | speculation. | 10:54:40 |
| 15 | | THE WITNESS:  This document refers to | 10:54:50 |
| 16 | | three "interstitials," so I'm not sure if it's referring | 10:54:51 |
| 17 | | to that one specifically. | 10:54:54 |
| 18 | Q | (By Ms. Jerjian)  Do you agree with the statement that | 10:54:58 |
| 19 | | was made here and that I read out loud a little earlier, | 10:55:04 |
| 20 | | "Customers may sign up for Prime without understanding | 10:55:08 |
| 21 | | that the interstitial is a Prime upsell, and when they | 10:55:11 |
| 22 | | click the signup button, they sign up for Prime"? | 10:55:15 |
| 23 | A | No, I don't agree with that. | 10:55:18 |
| 24 | Q | And why not? | 10:55:19 |
| 25 | A | Because our disclosures are clear, and many people | 10:55:20 |



| | | | |
|---|---|---|---|
| 1 | | successfully sign up or decline the signup every day. | 10:55:24 |
| 2 | Q | How do you know the disclosures are clear? | 10:55:31 |
| 3 | A | Many people successfully sign up or decline signup every | 10:55:33 |
| 4 | | day. | 10:55:37 |
| 5 | | In fact, this is based on, if I look at the next | 10:55:37 |
| 6 | | page, very specific user studies where actually the | 10:55:42 |
| 7 | | moderator is questioning and discussing the experience | 10:55:48 |
| 8 | | the individual is having, which is a very unnatural | 10:55:56 |
| 9 | | experience. | 10:55:58 |
| 10 | Q | Is there any other reason that you believe the | 10:55:59 |
| 11 | | disclosures are clear? | 10:56:03 |
| 12 | A | Because we provide the information that is necessary to | 10:56:04 |
| 13 | | make a decision, and informed consent is taken. | 10:56:14 |
| 14 | Q | What information is necessary to make a decision to | 10:56:24 |
| 15 | | enroll in Prime? | 10:56:31 |
| 16 | | MR. KABA:  Objection to the extent it | 10:56:32 |
| 17 | | calls for a legal conclusion. | 10:56:35 |
| 18 | | You may respond. | 10:56:39 |
| 19 | | THE WITNESS:  I am not a lawyer, so I | 10:56:41 |
| 20 | | would have the advice of counsel to advise me on what | 10:56:46 |
| 21 | | is-- | 10:56:51 |
| 22 | | MR. KABA:  I don't want you to get | 10:56:51 |
| 23 | | into anything your lawyers may have said to you. | 10:56:53 |
| 24 | Q | (By Ms. Jerjian)  Without revealing privileged | 10:57:03 |
| 25 | | information, can you tell me, how do you know what | 10:57:05 |



| | | |
|---|---|---|
| 1 | information is necessary for a customer to make a | 10:57:06 |
| 2 | decision to enroll in Prime or not? | 10:57:09 |
| 3 | MR. KABA:  So take-- don't relay any | 10:57:14 |
| 4 | information you learned about from counsel. | 10:57:17 |
| 5 | If you can answer apart from that, you may. | 10:57:21 |
| 6 | THE WITNESS:  I believe what is | 10:57:23 |
| 7 | required is what I learned from counsel, so I can't | 10:57:32 |
| 8 | answer that question. | 10:57:35 |
| 9 | Q  (By Ms. Jerjian)  When did you learn that information? | 10:57:35 |
| 10 | MR. KABA:  Objection; vague as to | 10:58:02 |
| 11 | "that information." | 10:58:04 |
| 12 | Q  (By Ms. Jerjian)  Sure. | 10:58:05 |
| 13 | When did you learn that the information necessary to | 10:58:06 |
| 14 | make a decision to enroll in Prime was there? | 10:58:11 |
| 15 | A  I don't know. | 10:58:16 |
| 16 | Remember, these enrollment flows have existed for a | 10:58:21 |
| 17 | long time before I even was in Prime, and so it wasn't | 10:58:24 |
| 18 | essential for me to necessarily audit. | 10:58:33 |
| 19 | Q  During your tenure in Prime, was there-- are you aware if | 10:58:40 |
| 20 | there was a time where there was not the necessary | 10:58:44 |
| 21 | information to make a decision as to whether or not to | 10:58:47 |
| 22 | enroll in Prime? | 10:58:51 |
| 23 | A  No, I am not aware of a time. | 10:58:52 |
| 24 | Q  You referred to "informed consent" earlier, correct? | 10:58:58 |
| 25 | A  I mentioned "informed consent." | 10:59:09 |



1  Q   What did you mean by "informed consent"?                    10:59:13

2                   MR. KABA:  Objection to the extent it          10:59:19

3      calls for a legal conclusion, but you can-- again, I        10:59:21

4      don't want you to relay anything you've learned from        10:59:24

5      counsel, but apart from that, you may respond.              10:59:27

6                   THE WITNESS:  I believe what I would           10:59:30

7      have learned about informed consent is from counsel, so I   10:59:37

8      will leave it at that.  I can't respond.                    10:59:42

9  Q   (By Ms. Jerjian)  Going back to the document, which is      10:59:56

10     Exhibit NL-7, the second point on Line No. 31, quote,       11:00:02

11     "There is no 'back button' after a customer signs up for    11:00:09

12     Prime to undo their action," do you agree with that?        11:00:13

13 A   There is no back button because back buttons are not used   11:00:19

14     within experiences almost anywhere.                         11:00:27

15        A back button is a browser concept not a concept         11:00:30

16     that is used in a customer purchase experience.             11:00:37

17 Q   So do you agree or disagree with that statement?            11:00:42

18                  MR. KABA:  Objection; asked and                11:00:45

19     answered.                                                   11:00:46

20 Q   (By Ms. Jerjian)  I don't believe you responded to the     11:00:50

21     question I asked.                                           11:00:52

22                  MR. KABA:  That's your view, but the           11:00:53

23     witness has asked and answered.                             11:00:54

24                  THE WITNESS:  I indicated that there           11:00:55

25     is no back button.                                          11:00:56



1        I agree there's no back button because there is no        11:00:57

2    back button concept that would make sense in a user          11:01:00

3    experience.  The back button concept is a browser            11:01:06

4    experience.                                                  11:01:10

5  Q  (By Ms. Jerjian)  On Line No. 32, and I believe this is     11:01:13

6    supposed to be the third point, it says, "Customers may      11:01:18

7    not always discern the price or auto renew information of     11:01:21

8    Prime."                                                      11:01:24

9        Do you agree with that statement?                        11:01:25

10  A  Not generally, although I agree in this particular          11:01:26

11    anecdote there is-- there may be some individuals who        11:01:36

12    express that, but remember our millions and millions of      11:01:44

13    customers are not homogeneous.                               11:01:49

14        It is not uncommon to find a small segment of any        11:01:52

15    population who don't perhaps even read the details in a      11:01:56

16    purchase flow.  We know that is the case.                    11:02:02

17        I don't agree that this is a generalized reality.        11:02:07

18  Q  Is it your position that customers don't discern-- strike   11:02:15

19    that.                                                        11:02:19

20        Is it your position that customers may not always        11:02:20

21    discern the price or auto renew information of Prime         11:02:22

22    because they don't read the disclosures?                     11:02:26

23  A  No, it's not my-- my assertion is that there might be       11:02:28

24    many reasons why someone or some small number of people     11:02:35

25    may not discern the price or auto renew information, and     11:02:41



| | | | |
|---|---|---|---|
| 1 | | I can't speculate as to the full range of those, but I am | 11:02:46 |
| 2 | | saying that is not a common problem. | 11:02:54 |
| 3 | Q | While you were at Prime, did Prime investigate the | 11:02:56 |
| 4 | | reasons why customers did not always discern the price or | 11:03:01 |
| 5 | | auto renew information from Prime? | 11:03:07 |
| 6 | A | Yes.  You can see in this document that the topic is | 11:03:10 |
| 7 | | being brought to our attention, and we worked, as you | 11:03:15 |
| 8 | | know, with-- over a period of time to understand | 11:03:19 |
| 9 | | frustrations. | 11:03:24 |
| 10 | | We don't want any customer to be frustrated, even | 11:03:25 |
| 11 | | though it's unrealistic to have zero frustrations. | 11:03:30 |
| 12 | Q | As a result of your investigation of the reasons for | 11:03:35 |
| 13 | | which customers may not always discern the price or auto | 11:03:39 |
| 14 | | renew information of Prime, what did you uncover? | 11:03:44 |
| 15 | | MR. KABA:  Objection; misstates his | 11:03:47 |
| 16 | | testimony, vague, lacks foundation as to the use of | 11:03:50 |
| 17 | | "investigation." | 11:03:55 |
| 18 | | THE WITNESS:  It is important to note | 11:03:59 |
| 19 | | that the customer experience and improving customer | 11:04:04 |
| 20 | | experience is continuous. | 11:04:07 |
| 21 | | It is not a start, stop, done. | 11:04:09 |
| 22 | | There are-- as you have already identified, we pay a | 11:04:11 |
| 23 | | lot of attention every day to listening for and looking | 11:04:18 |
| 24 | | for anything that might frustrate customers and to | 11:04:22 |
| 25 | | minimize those frustrations. | 11:04:24 |



| | | | |
|---|---|---|---|
| 1 | | However, we will never mitigate or eliminate all | 11:04:25 |
| 2 | | frustrations in-- across our experiences, including | 11:04:32 |
| 3 | | Prime. | 11:04:37 |
| 4 | Q | (By Ms. Jerjian)  And then the fourth section reads, on | 11:04:42 |
| 5 | | Line No. 32 and 33, "The Prime signup decision is final, | 11:04:45 |
| 6 | | even if they abandon checkout." | 11:04:50 |
| 7 | | Were you aware of this? | 11:04:52 |
| 8 | A | At this time are you asking? | 11:04:53 |
| 9 | Q | Yes. | 11:04:58 |
| 10 | A | I don't recall specifically, but I-- yes, I am generally | 11:05:05 |
| 11 | | aware that when you purchase Prime, it's a separate | 11:05:09 |
| 12 | | decision from your purchase of another product in | 11:05:12 |
| 13 | | checkout. | 11:05:17 |
| 14 | Q | When you read this at the time, did it concern you that | 11:05:26 |
| 15 | | that was the case? | 11:05:31 |
| 16 | | MR. KABA:  Objection; speculation, | 11:05:32 |
| 17 | | assumes facts not in evidence, lacks foundation. | 11:05:36 |
| 18 | | THE WITNESS:  I don't recall | 11:05:44 |
| 19 | | specifically, but obviously we engage and are concerned | 11:05:45 |
| 20 | | with frustrations. | 11:05:49 |
| 21 | | Remember, we only have a successful program if our | 11:05:50 |
| 22 | | members are satisfied and engaged, and we invest a great | 11:05:54 |
| 23 | | deal of energy to minimize frustrations, recognizing that | 11:05:59 |
| 24 | | we would never have zero percent frustrations, and nor | 11:06:02 |
| 25 | | will any business, or any regulative body or government | 11:06:09 |



| | | |
|---|---|---|
| 1 | body. | 11:06:13 |
| 2 | There will always be some customers who have some | 11:06:14 |
| 3 | frustration because the world and our audience, our | 11:06:17 |
| 4 | customer base, is very large and very diverse. | 11:06:20 |
| 5 | Q   (By Ms. Jerjian)  What, if anything, did Prime do, under | 11:06:27 |
| 6 | your tenure, to minimize the frustration of the Prime | 11:06:30 |
| 7 | signup decision is final even if they abandon checkout? | 11:06:33 |
| 8 | A   We did a number of experiments. | 11:06:37 |
| 9 | I believe we had experiments with logo placement, | 11:06:41 |
| 10 | with language, with shadows and buttons. | 11:06:46 |
| 11 | Remember though, even separate of this particular | 11:06:49 |
| 12 | topic there is always many experiments going on to | 11:06:54 |
| 13 | improve the customer experience and to simplify it for | 11:06:59 |
| 14 | our customers. | 11:07:02 |
| 15 | I am only-- I am not necessarily aware of everything | 11:07:04 |
| 16 | that was going on. | 11:07:09 |
| 17 | Many teams worked on many aspects of our customer | 11:07:10 |
| 18 | experience every day. | 11:07:14 |
| 19 | Q   And what, if anything, did Prime do under your tenure to | 11:07:17 |
| 20 | address the customer frustration that customers may not | 11:07:28 |
| 21 | always discern the price or auto renew information of | 11:07:32 |
| 22 | Prime? | 11:07:37 |
| 23 | A   I don't recall specifically, but I believe the teams | 11:07:38 |
| 24 | experimented with different things. | 11:07:44 |
| 25 | Again, I want to emphasize, the vast majority of | 11:07:45 |



```
 1        people did not have any confusion or frustration, and
 2        ███████████ people declined this offer over months,
 3        perhaps even weeks, so it was-- and this reporting is
 4        from anecdotal customer experience where someone is
 5        sitting behind someone else dealing with a computer.
 6        It's not a quantitative assessment.
 7   Q    Aside from the fact that I think in your words millions
 8        of customers clicked on the "decline" button, is there
 9        any other basis for your statement that the vast majority
10        of individuals didn't have these customer frustrations
11        while signing up for Prime or while being in a checkout
12        flow?
13                        MR. KABA:  Objection to the form;
14        compound, vague.
15                        THE WITNESS:  Could you repeat that
16        question?
17   Q    (By Ms. Jerjian)  Sure.
18            Aside from the fact that millions of people, I think
19        in your words, clicked on the "decline" option for Prime
20        while in the online checkout flow, is there any other
21        basis for your statement that the vast majority of people
22        didn't have customer frustrations when it came to Prime
23        signups in the Prime checkout flow?
24                        MR. KABA:  Same objections.
25                        THE WITNESS:  Firstly, I don't believe
```



1    I said "click on a decline button."                    11:09:23

2         I said, "successfully decline."                   11:09:25

3         To the second part of your question, which I'm    11:09:29

4    sorry, because it was compound, I've forgotten-- can you  11:09:33

5    perhaps tell me the second part of the question?       11:09:36

6                     MS. JERJIAN:  Can you please read my  11:09:40

7    question?                                              11:09:42

8                          (Section(s) designated were      11:09:42

9                          read by the reporter.)           11:10:11

10                    MR. KABA:  Same objections.            11:10:11

11                    THE WITNESS:  The fact that there are  11:10:13

12   millions of people who successfully decline and we have  11:10:20

13   anecdotal feedback of what is stated here as perhaps not  11:10:23

14   understanding-- discerning-- not always discerning the  11:10:35

15   price or auto renew information, is to me not an        11:10:38

16   indicator that there were necessarily many.            11:10:46

17        We didn't have any indication that it was many.   11:10:49

18   Q   (By Ms. Jerjian)  I'm sorry, I lost the train of your--  11:10:55

19   what are you referring to by "many"?                   11:10:57

20   A   You are asking me if I have any other indication that it  11:11:01

21   was a small group.                                     11:11:07

22        I am saying I have no indication that it was a large  11:11:07

23   group.                                                 11:11:09

24   Q   That wasn't my question.                           11:11:10

25        My question was:                                  11:11:12



| | | | |
|---|---|---|---|
| 1 | | You said that the vast majority of people didn't | 11:11:13 |
| 2 | | have customer frustrations when it came to Prime signups | 11:11:15 |
| 3 | | in the checkout flow, correct? | 11:11:19 |
| 4 | A | Correct. | 11:11:20 |
| 5 | Q | Okay.  One of your bases for saying that, and correct me | 11:11:21 |
| 6 | | if I'm wrong, is that a lot of people declined the Prime | 11:11:27 |
| 7 | | signup option in the checkout flow, correct? | 11:11:33 |
| 8 | A | Correct. | 11:11:35 |
| 9 | Q | Is there any other basis for you saying that the vast | 11:11:36 |
| 10 | | majority of people didn't have customer frustrations, | 11:11:42 |
| 11 | | aside from that-- the one that you just agreed to? | 11:11:45 |
| 12 | | MR. KABA:  Objection; asked and | 11:11:49 |
| 13 | | answered. | 11:11:50 |
| 14 | | THE WITNESS:  That, to me, is a pretty | 11:11:51 |
| 15 | | strong basis, millions versus one or two anecdotes. | 11:11:57 |
| 16 | Q | (By Ms. Jerjian)  I am not implying one way or the other. | 11:12:00 |
| 17 | | I am just trying to understand what you're basing | 11:12:02 |
| 18 | | your answer on. | 11:12:05 |
| 19 | | Is there any other basis for your response or-- | 11:12:06 |
| 20 | | MR. KABA:  Objection; asked and | 11:12:08 |
| 21 | | answered. | 11:12:12 |
| 22 | | THE WITNESS:  I don't know how to | 11:12:12 |
| 23 | | answer that question differently. | 11:12:13 |
| 24 | Q | (By Ms. Jerjian)  Okay.  Let me rephrase. | 11:12:14 |
| 25 | | Aside from the fact that a lot of people clicked on | 11:12:15 |



| | | |
|---|---|---|
| 1 | | the decline option, is there any other reason that you | 11:12:17 |
| 2 | | know of that the vast majority of people didn't have | 11:12:23 |
| 3 | | customer frustrations with Prime signups? | 11:12:27 |
| 4 | | MR. KABA:  Objection; vague, asked and | 11:12:29 |
| 5 | | answered. | 11:12:31 |
| 6 | | THE WITNESS:  Again, I have answered | 11:12:31 |
| 7 | | that question as the only other reason is we didn't have | 11:12:34 |
| 8 | | a lot of other indicators that there was a high number of | 11:12:40 |
| 9 | | frustrations. | 11:12:44 |
| 10 | Q | (By Ms. Jerjian)  Okay.  Is qualitative data valuable, in | 11:12:44 |
| 11 | | your view? | 11:12:56 |
| 12 | | MR. KABA:  Objection; overbroad, | 11:12:56 |
| 13 | | vague. | 11:12:58 |
| 14 | | THE WITNESS:  Some qualitative data | 11:12:59 |
| 15 | | can be valuable, yes, but only in the context of not in | 11:13:06 |
| 16 | | isolation. | 11:13:12 |
| 17 | | It's rarely valuable in isolation. | 11:13:13 |
| 18 | Q | (By Ms. Jerjian)  What do you mean it's only valuable in | 11:13:16 |
| 19 | | isolation? | 11:13:18 |
| 20 | A | It's rarely-- | 11:13:19 |
| 21 | Q | "Rarely," thank you. | 11:13:20 |
| 22 | | When is qualitative data valuable? | 11:13:23 |
| 23 | A | Anecdotes help us decide whether there's something to the | 11:13:31 |
| 24 | | look at more deeply, but opinions vary a great deal, so | 11:13:42 |
| 25 | | anecdotes can be-- you can ask someone the same question, | 11:13:50 |



| | | | |
|---|---|---|---|
| 1 | | the team? | 11:34:33 |
| 2 | A | In reference to which decision are you talking about? | 11:34:34 |
| 3 | Q | The decision to not cancel monthly members' | 11:34:38 |
| 4 | | subscriptions. | 11:34:46 |
| 5 | A | My team worked on a recommendation, and we reviewed it | 11:34:46 |
| 6 | | with some subset of Jeff Wilke and his leadership team, I | 11:34:49 |
| 7 | | believe. | 11:34:57 |
| 8 | Q | And by "my team," are you referring to Prime? | 11:34:58 |
| 9 | A | Yes, I'm referring to-- and I may have actually included | 11:35:04 |
| 10 | | some of my marketing leaders in that decision. | 11:35:08 |
| 11 | | I don't recall precisely, but it's a collaborative | 11:35:11 |
| 12 | | process. | 11:35:14 |
| 13 | Q | Was Dave Clark a part of that meeting with Mr. Wilke when | 11:35:15 |
| 14 | | reviewing this issue of canceling monthly subscribers' | 11:35:26 |
| 15 | | Prime memberships? | 11:35:30 |
| 16 | A | I don't recall precisely who, but I believe he was part | 11:35:31 |
| 17 | | of that meeting. | 11:35:35 |
| 18 | Q | Was Jamil Ghani there as well? | 11:35:36 |
| 19 | A | I believe so. | 11:35:42 |
| 20 | Q | Was Mr. Grandinetti? | 11:35:43 |
| 21 | A | I don't recall whether he was or not.  He may have been. | 11:35:49 |
| 22 | Q | Aside from the example you just gave me of canceling | 11:35:54 |
| 23 | | annual members' subscriptions when they haven't used | 11:36:15 |
| 24 | | their membership benefits for a year, is there any other | 11:36:18 |
| 25 | | example you can think of where you improved the customer | 11:36:20 |



| | | | |
|---|---|---|---|
| 1 | | experience and it ended up costing Prime members-- ended | 11:36:25 |
| 2 | | up costing Amazon some Prime members? | 11:36:33 |
| 3 | A | Let me think. | 11:36:36 |
| 4 | | I don't recall a specific example, but to be clear, | 11:36:47 |
| 5 | | there is no line of we cannot cost Prime members. | 11:36:50 |
| 6 | | We often make decisions as a company that are right | 11:36:58 |
| 7 | | for our customers and that aren't necessarily the | 11:37:02 |
| 8 | | short-term benefit to the business. | 11:37:06 |
| 9 | | It's-- you know, it's-- we are always trying to do | 11:37:07 |
| 10 | | what we can to minimize frustrations and maximize | 11:37:16 |
| 11 | | satisfaction, while obviously growing an effective | 11:37:20 |
| 12 | | business. | 11:37:24 |
| 13 | | (Exhibit No. NL-09 marked | 11:37:24 |
| 14 | | for identification.) | 11:37:24 |
| 15 | Q | (By Ms. Jerjian)  Okay.  Mr. Lindsay, I am showing you | 11:37:24 |
| 16 | | what I've marked as NL-09, Bates No. AMZN 45969. | 11:37:27 |
| 17 | | This is an e-mail from Ms. Henry, dated June 20th, | 11:38:01 |
| 18 | | 2019, to a number of individuals, including yourself, | 11:38:08 |
| 19 | | Mr. Lindsay. | 11:38:11 |
| 20 | | Do you agree that this e-mail appears to be notes | 11:38:12 |
| 21 | | from the June 17th, 2019 meeting? | 11:38:26 |
| 22 | | MR. KABA:  Objection; calls for | 11:38:29 |
| 23 | | speculation. | 11:38:31 |
| 24 | | THE WITNESS:  I see it's notes to a | 11:38:32 |
| 25 | | meeting. | 11:38:36 |



| | | |
|---|---|---|
| 1 | It doesn't reference specifically which meeting. | 11:38:36 |
| 2 | Q  (By Ms. Jerjian)  Did you often have meetings with-- | 11:38:39 |
| 3 | strike that. | 11:38:42 |
| 4 | Does this document refresh your recollection as to a | 11:38:43 |
| 5 | meeting you attended in June 2019 with Mr. Grandinetti | 11:39:08 |
| 6 | and Ms. Henry? | 11:39:14 |
| 7 | A  Let me take a moment to-- | 11:39:15 |
| 8 | Q  Sure. | 11:39:17 |
| 9 | A  I don't recall specifically, but I see the notes. | 11:39:48 |
| 10 | Q  Under "Action items," the last bullet point states, | 11:39:50 |
| 11 | "Report back on resolution status for Prime frustrations | 11:39:58 |
| 12 | to Russ/Neil in quarterly customer frustration flash." | 11:40:01 |
| 13 | Was this done? | 11:40:08 |
| 14 | A  I don't recall. | 11:40:12 |
| 15 | Remember, just as a reminder, I have, in this | 11:40:15 |
| 16 | responsibility, global marketing, 22 Prime countries, | 11:40:23 |
| 17 | many benefits, and we receive a lot of flashes, so I | 11:40:26 |
| 18 | don't recall specifically whether this was done. | 11:40:29 |
| 19 | Q  Why was Mr. Grandinetti involved in a meeting where | 11:40:32 |
| 20 | customer frustrations, with respect to Prime, were | 11:40:40 |
| 21 | discussed? | 11:40:44 |
| 22 | MR. KABA:  Objection; overbroad, | 11:40:48 |
| 23 | vague. | 11:40:54 |
| 24 | THE WITNESS:  So you're referring to a | 11:40:54 |
| 25 | meeting like this specifically? | 11:40:56 |



NEIL LINDSAY  Confidential                    November 19, 2024
FTC vs AMAZON.COM                                        102

| | | | |
|---|---|---|---|
| 1 | Q | (By Ms. Jerjian)  Sure. | 11:40:58 |
| 2 | | My understanding is that Mr. Grandinetti was not-- | 11:40:59 |
| 3 | | did not have authority over the Prime organization, | 11:41:03 |
| 4 | | correct? | 11:41:06 |
| 5 | A | At that time Prime did not report to Russ directly. | 11:41:06 |
| 6 | Q | What is your-- strike that. | 11:41:18 |
| 7 | | Why-- strike that. | 11:41:21 |
| 8 | | If he-- if Prime did not report to Mr. Grandinetti, | 11:41:24 |
| 9 | | why was Mr. Grandinetti in a meeting where Prime customer | 11:41:29 |
| 10 | | frustrations were discussed? | 11:41:35 |
| 11 | A | At the time there was a team, I think, and I can't | 11:41:36 |
| 12 | | remember what it was called, but it was something like | 11:41:44 |
| 13 | | the customer frustrations team that reported, via some | 11:41:46 |
| 14 | | other management, into Mr. Grandinetti's organization, I | 11:41:51 |
| 15 | | believe. | 11:41:55 |
| 16 | Q | And was Mr. Grandinetti involved in trying to resolve | 11:41:55 |
| 17 | | these customer frustrations with respect to Prime? | 11:42:07 |
| 18 | | MR. KABA:  Objection; vague. | 11:42:12 |
| 19 | | THE WITNESS:  As I mentioned earlier, | 11:42:13 |
| 20 | | as a leadership team where everyone is somewhat involved | 11:42:17 |
| 21 | | in Prime and interested, he's-- the frustrations team | 11:42:22 |
| 22 | | that reported to him, I believe, reported out these | 11:42:26 |
| 23 | | frustrations, so he took an interest. | 11:42:31 |
| 24 | Q | (By Ms. Jerjian)  At the time of this e-mail, what was | 11:42:32 |
| 25 | | your L level? | 11:42:36 |



```
 1  A   I was an L-10 in 2019.                              11:42:37

 2  Q   Was Mr. Grandinetti also an L-10 at the time of this   11:42:42

 3      e-mail?                                            11:42:51

 4  A   I believe he's an L-11.                            11:42:52

 5  Q   So Mr. Grandinetti was the most senior person in this  11:42:55

 6      meeting?                                           11:43:03

 7              MR. KABA:  Objection; lacks               11:43:07

 8      foundation, vague.                                 11:43:09

 9              THE WITNESS:  Well, to be clear, at        11:43:10

10      Amazon we proudly try to avoid levels defining who is   11:43:12

11      most senior in the room, but obviously he was the most  11:43:19

12      senior between-- he's more senior than me, in terms of  11:43:22

13      levels, but we operate in a room without levels being the  11:43:28

14      driver of how people participate.                  11:43:36

15  Q   (By Ms. Jerjian)  Looking at the second bullet point  11:43:38

16      under "Key discussion points," where it says, "In some  11:43:49

17      cases Prime upsells may still feel like 'click bait,'" do  11:43:53

18      you recall discussing that?                        11:43:58

19  A   I don't recall discussing that specifically.       11:44:05

20  Q   Do you agree that Prime upsells at the time may have   11:44:08

21      still felt like click bait?                        11:44:12

22  A   No.                                                11:44:13

23  Q   Why not?                                           11:44:14

24  A   We used very common signup flows that people are very  11:44:14

25      used to in terms of how you sign up for a membership or a  11:44:27
```



1  Q   (By Ms. Jerjian)  What did you understand by, quote, "We        13:10:14

2      content tested our way back to negative seven percent"?       13:10:17

3  A   We are always testing content that helps us improve our       13:10:20

4      results and address headwinds, so, you know, again, we        13:10:32

5      are-- as I've said before, we are always testing our          13:10:37

6      experience and trying new things for various outcomes,        13:10:45

7      whether it be customer experience or business outcomes.       13:10:48

8          I can't read from this exactly what it's referring        13:10:52

9      to.                                                            13:10:56

10 Q   And then the entry time stamped 11:43:09 where you wrote,     13:10:56

11     "The directive required we be clearer that they are           13:11:05

12     signing up for subscription generally," what did you mean     13:11:07

13     by that?                                                       13:11:16

14 A   I don't know.                                                  13:11:16

15         Then I ask, "Or something more specific," and this        13:11:19

16     is the problem with Chime chats, honestly, is they're         13:11:23

17     kind of like Morse code in the middle of the night.           13:11:27

18         We are moving fast, and obviously this was me just        13:11:32

19     trying to get a general sense on the topic as opposed to      13:11:40

20     the specifics.                                                 13:11:43

21 Q   But this chat wasn't in the middle of the night, just to     13:11:43

22     be clear, right?                                               13:11:46

23 A   Nor was it Morse code, but yes, you get my point.             13:11:47

24 Q   Okay.  Did Amazon Prime implement the, quote, "signup        13:11:50

25     clarity improvements" referred to in your chat in Germany     13:12:02



NEIL LINDSAY  Confidential                              November 19, 2024
FTC vs AMAZON.COM                                                    124

```
 1      and the United States?                              13:12:05

 2   A  I don't know.                                       13:12:06

 3         As I mentioned, I'm not sure I recall what the   13:12:10

 4      changes were that were mandated in Germany.         13:12:13

 5         I don't know if we implemented them in the U.S.  13:12:16

 6         I would be-- I do want to make it clear that if the  13:12:22

 7      FTC gave us clear instructions as to what we are expected  13:12:25

 8      to do, which they have never done, we would have done  13:12:32

 9      them.                                               13:12:38

10   Q  Based on your chat time stamped 11:43:09, is it accurate  13:12:39

11      to state that the directive to implement the signup  13:12:54

12      clarity improvements in Germany made the signup clearer  13:13:00

13      for subscribers signing up for Prime?               13:13:11

14              MR. KABA:  Objection; misstates the         13:13:17

15      document and lacks foundation, calls for speculation.  13:13:18

16         Go ahead, if you have the question in mind.      13:13:25

17              THE WITNESS:  I'm sorry, you have to         13:13:29

18      replay the question.                                13:13:31

19   Q  (By Ms. Jerjian)  Did you forget my question because of  13:13:32

20      your counsel's objections--                         13:13:34

21              MR. KABA:  Please don't comment on my        13:13:36

22      objections, Counsel.  That is entirely inappropriate.  13:13:38

23      You know that.                                      13:13:41

24   Q  (By Ms. Jerjian)  I will repeat my question.        13:13:42

25         Is it accurate to state that the signup clarity  13:13:44
```



| | | |
|---|---|---|
| 1 | improvements implemented in Germany made it clear to | 13:13:52 |
| 2 | subscribers that they're signing up for a subscription | 13:13:57 |
| 3 | specifically with respect to Prime? | 13:14:00 |
| 4 | MR. KABA:  Objection; lacks foundation | 13:14:03 |
| 5 | and calls for speculation. | 13:14:05 |
| 6 | THE WITNESS:  I don't know, and I | 13:14:06 |
| 7 | doubt it. | 13:14:09 |
| 8 | Our signup process is always clear. | 13:14:11 |
| 9 | The only difference is we have clear instructions as | 13:14:13 |
| 10 | to what is required, not just of us but of other people | 13:14:17 |
| 11 | on subscription programs. | 13:14:21 |
| 12 | If there are regulatory instructions or instructions | 13:14:23 |
| 13 | that are made clear to those selling subscriptions, we | 13:14:32 |
| 14 | will follow them, and I sometimes wish the FTC was clear | 13:14:35 |
| 15 | with us as to what their expectations were, and they | 13:14:40 |
| 16 | never have been. | 13:14:42 |
| 17 | I don't know whether it made it clearer.  I just | 13:14:43 |
| 18 | know that we are happy to comply when there is a | 13:14:47 |
| 19 | directive to do so. | 13:14:51 |
| 20 | Q   (By Ms. Jerjian)  Is it your position that the regulatory | 13:14:53 |
| 21 | instructions that you are referring to did not make it | 13:14:56 |
| 22 | clearer that customers are signing up for a Prime | 13:15:00 |
| 23 | subscription? | 13:15:04 |
| 24 | MR. KABA:  Objection; misstates | 13:15:05 |
| 25 | testimony. | 13:15:07 |



| | |
|---|---|
| 1 | THE WITNESS:  Again, that's not what I | 13:15:07 |
| 2 | said. | 13:15:09 |
| 3 | What I'm saying is I don't know, and I wouldn't | 13:15:10 |
| 4 | assume that it does make it clearer. | 13:15:14 |
| 5 | Q  (By Ms. Jerjian)  To your knowledge, did Amazon | 13:15:17 |
| 6 | investigate whether or not the signup clarity | 13:15:30 |
| 7 | improvements in Germany made the Prime signup process in | 13:15:33 |
| 8 | checkout clearer for customers? | 13:15:43 |
| 9 | MR. KABA:  Objection; lacks | 13:15:46 |
| 10 | foundation. | 13:15:51 |
| 11 | THE WITNESS:  I didn't state that they | 13:15:51 |
| 12 | were clarity improvements. | 13:15:55 |
| 13 | They were directives, compliance to directives. | 13:15:56 |
| 14 | Q  (By Ms. Jerjian)  You refer to them though as "signup | 13:16:01 |
| 15 | clarity improvements" in your chat, didn't you? | 13:16:04 |
| 16 | A  Let me re-read. | 13:16:06 |
| 17 | I did refer to them as that, but, again, these chats | 13:16:07 |
| 18 | are notoriously poorly written. | 13:16:17 |
| 19 | I don't know what I'm referring to there at all, | 13:16:21 |
| 20 | whether I-- I don't think I'm making declarative | 13:16:26 |
| 21 | statements that I knew that these were signup clarity | 13:16:31 |
| 22 | improvements as much as they may have just been changes | 13:16:34 |
| 23 | in the experience, is my intention. | 13:16:45 |
| 24 | Q  If you didn't view them as signup clarity improvements, | 13:16:46 |
| 25 | why did you refer to them as such in your chat entry? | 13:16:49 |



 1  Q   (By Ms. Jerjian)  And sitting here today, do you think it          13:21:55

 2      would be acceptable to have people mistakenly or                   13:21:58

 3      accidentally sign up for Prime but then discover the              13:22:02

 4      Prime benefits and decide to remain members-- do you             13:22:07

 5      think, sitting here today, that's an issue?                        13:22:12

 6                      MR. KABA:  Objection; vague, lacks                 13:22:15

 7      foundation.                                                        13:22:18

 8                      THE WITNESS:  Can you restate the                  13:22:21

 9      question?                                                          13:22:27

10                      MR. KABA:  Objection.  "Issue"--                   13:22:30

11  Q   (By Ms. Jerjian)  Can I restate the question?                     13:22:30

12  A   Yes, my question is the same:                                     13:22:32

13          What do you mean by "the issue," "is it an issue?"           13:22:34

14  Q   Let me restate it.                                                13:22:39

15          Do you think that's a problem?                               13:22:41

16                      MR. KABA:  Objection; vague as to                  13:22:44

17      "that's a problem."                                               13:22:49

18                      THE WITNESS:  What I can tell you is              13:23:06

19      sometimes people sign up for a trial and sometimes               13:23:07

20      convert to paid.                                                  13:23:10

21          They may decide that they may not have wanted to             13:23:11

22      convert to paid and forgotten to cancel and have chosen          13:23:14

23      afterwards to use the benefit or during that trial               13:23:22

24      enjoyed the benefits, which might have been one of the           13:23:26

25      reasons they forgot to cancel, and have gone on to be            13:23:29



```
 1   happy customers.                                      13:23:32
 2       That's very different to accidentally signing up and   13:23:33
 3   going on as a member.                                 13:23:38
 4       If someone doesn't intend to sign up, they are not    13:23:40
 5   going to use the program.                             13:23:43
 6       If they're not going to use the program, they can't   13:23:44
 7   become happy customers, so there's no logic in any    13:23:46
 8   suggestion that I would want our customers to sign up   13:23:49
 9   unintentionally because they won't become happy       13:23:54
10   customers.                                            13:23:57
11       I have very frequently often said to teams, "Prime   13:23:58
12   is not a breakage program," meaning we are not interested   13:24:03
13   in members joining and just collecting a subscription   13:24:07
14   fee.                                                  13:24:10
15       You see that in many of our documents and all of   13:24:10
16   this discussion.                                      13:24:13
17       In fact, I initiated the whole lifecycle engagement   13:24:14
18   program to ensure that every customer is actively engaged   13:24:19
19   as much as we possibly could encourage them to do so   13:24:23
20   because the only customers that are happy customers are   13:24:26
21   engaged customers.                                    13:24:28
22       The idea that I would suggest that people go on, you   13:24:30
23   know, accidentally sign them up, and I'm happy about it   13:24:33
24   is the antithesis of what I stand for as a leader or what   13:24:37
25   Amazon stands for in terms of wanting to help customers.   13:24:43
```



| | | |
|---|---|---|
| 1 | It's a ridiculous assertion. | 13:24:46 |
| 2 | Q   (By Ms. Jerjian)   Is it your position that every | 13:24:48 |
| 3 | subscriber in Prime, who is a monthly subscriber, | 13:24:53 |
| 4 | knowingly enrolled in Prime? | 13:25:01 |
| 5 | A   It is my position that I don't know, right? | 13:25:02 |
| 6 | I don't know, but-- one interesting fact is when you | 13:25:13 |
| 7 | look at third-party data, they report more people | 13:25:16 |
| 8 | individually report as members of Prime than actually are | 13:25:20 |
| 9 | members of Prime. | 13:25:24 |
| 10 | So in the population, when you see third-party | 13:25:24 |
| 11 | reports of how many members of Prime there are, it's | 13:25:28 |
| 12 | greater than the actual number, so there are many people | 13:25:32 |
| 13 | who believe they're members of Prime who aren't members | 13:25:34 |
| 14 | of Prime, according to the data we see. | 13:25:37 |
| 15 | My assertion is that people, when they sign up for | 13:25:39 |
| 16 | Prime, they do so knowingly. | 13:25:46 |
| 17 | If they choose not to continue to sign up for Prime, | 13:25:49 |
| 18 | they have easy ways to do so, and they successfully-- | 13:25:52 |
| 19 | many millions successfully don't sign up for Prime. | 13:25:56 |
| 20 | While I can't talk in absolutes, it's certainly not | 13:26:00 |
| 21 | a pervasive concern that, you know, I'm not-- I don't | 13:26:06 |
| 22 | believe there's a lot of people walking around who have | 13:26:13 |
| 23 | signed up for Prime unknowingly. | 13:26:15 |
| 24 | Q   What is the data that you are referring to indicating | 13:26:19 |
| 25 | that people-- that there are customers who think they're | 13:26:23 |



| | | |
|--|--|--|
| 1 | | document and where were you reading from? | 13:57:06 |
| 2 | A | It's the-- | 13:57:08 |
| 3 | Q | Which lines? | 13:57:09 |
| 4 | A | It's the whole document, but you can look at, if you'd | 13:57:10 |
| 5 | | like, Section No. 2, "Our vision, our north star, is to | 13:57:13 |
| 6 | | have 100 percent of our member base feel informed about | 13:57:17 |
| 7 | | and be aware of their membership status." | 13:57:23 |
| 8 | | I note that a vision is rarely completely realistic, | 13:57:26 |
| 9 | | but it helps you strive in a direction. | 13:57:33 |
| 10 | | Our tenets on Line No. 88 very clearly state that we | 13:57:35 |
| 11 | | pay attention to customer level defects, we don't | 13:57:41 |
| 12 | | trade-off long term for short term, and we don't view | 13:57:44 |
| 13 | | clarity as a one-time exercise. | 13:57:47 |
| 14 | | My point is this document, if anything, illustrates | 13:57:49 |
| 15 | | how seriously we take customer frustrations and how | 13:57:56 |
| 16 | | determined we are to try to minimize those frustrations. | 13:58:08 |
| 17 | | Remembering that if I didn't want to spend time on | 13:58:15 |
| 18 | | this, I could easily shut down many of the documents and | 13:58:18 |
| 19 | | activities and deep dives. | 13:58:23 |
| 20 | | In fact, I ask for the deep dives.  I reviewed these | 13:58:26 |
| 21 | | documents, as you pointed out, and our team has worked | 13:58:28 |
| 22 | | hard minimize frustrations by a variety of actions. | 13:58:33 |
| 23 | Q | When you say you could have shut down the experiments, | 13:58:43 |
| 24 | | what do you mean? | 13:58:46 |
| 25 | A | I wouldn't ask for a deep dive if I didn't want people to | 13:58:47 |



| | | | |
|---|---|---|---|
| 1 | | study the situation. | 13:58:52 |
| 2 | | I wouldn't be encouraging these meetings and | 13:58:53 |
| 3 | | follow-ups or supporting this mental model on this | 13:58:57 |
| 4 | | document if I felt that this was not an issue worth | 13:59:01 |
| 5 | | pursuing and if I just wanted to ignore frustrations. | 13:59:06 |
| 6 | Q | When you're referring to a deep dive, are you referring | 13:59:15 |
| 7 | | to a deep dive that was referred to in one of the | 13:59:18 |
| 8 | | documents we reviewed today? | 13:59:21 |
| 9 | A | Yes.  You mentioned I asked for a deep dive, and I am | 13:59:22 |
| 10 | | recalling that. | 13:59:27 |
| 11 | | While I haven't recalled every meeting, I do recall | 13:59:27 |
| 12 | | this period and how much energy my team and I invested to | 13:59:31 |
| 13 | | sincerely address frustrations from a small number of | 13:59:36 |
| 14 | | anecdotes, in spite of the fact that we know the vast | 13:59:40 |
| 15 | | majority of people purchasing Prime are satisfied with | 13:59:48 |
| 16 | | that purchasing experience, and that millions decline | 13:59:52 |
| 17 | | successfully or cancel successfully. | 13:59:58 |
| 18 | | However, despite that, I spent, and my team spent, | 14:00:02 |
| 19 | | an enormous amount of time with that vision and with | 14:00:04 |
| 20 | | those tenets to try to address customer frustrations. | 14:00:08 |
| 21 | Q | If you could look on Page 1, Line No. 55, 56, the two | 14:00:28 |
| 22 | | last lines, there is a reference to examining clarity | 14:00:33 |
| 23 | | experimentation on a longer time horizon, "(Six months or | 14:00:38 |
| 24 | | more) reduces the impact due to convergence over time." | 14:00:44 |
| 25 | | Do you understand what that means? | 14:00:48 |



| | | | |
|---|---|---|---|
| 1 | A | My understanding, from this whole paragraph, is that the | 14:00:50 |
| 2 | | team is suggesting we might need longer timeframes to | 14:01:04 |
| 3 | | test, and, in fact, if I recall correctly, we continued | 14:01:07 |
| 4 | | testing with a longer view. | 14:01:14 |
| 5 | Q | You continued-- strike that. | 14:01:16 |
| 6 | | Were there tests that were done on the longer-time | 14:01:19 |
| 7 | | horizon, six months or more, with respect to Prime | 14:01:25 |
| 8 | | enrollment clarity? | 14:01:32 |
| 9 | A | Sorry, is the question did we-- I don't understand the | 14:01:33 |
| 10 | | question. | 14:01:36 |
| 11 | Q | I am trying to understand whether or not this last-- the | 14:01:36 |
| 12 | | idea expressed in Lines 55, 56 was actually implemented. | 14:01:42 |
| 13 | | My question is: | 14:01:46 |
| 14 | | Do you know whether Amazon Prime examined clarity | 14:01:47 |
| 15 | | experimentation on a longer-time horizon, six months or | 14:01:51 |
| 16 | | more, with respect to clarity as to enrollment? | 14:01:54 |
| 17 | A | I don't know-- | 14:01:58 |
| 18 | | MR. KABA:  Objection; vague, form. | 14:01:59 |
| 19 | | Go ahead. | 14:02:01 |
| 20 | | THE WITNESS:  I don't know | 14:02:02 |
| 21 | | specifically because it's-- again, we are testing always, | 14:02:02 |
| 22 | | and we are always looking at data in different ways to | 14:02:06 |
| 23 | | understand the implication, so I don't know. | 14:02:10 |
| 24 | Q | (By Ms. Jerjian)  Turning your attention to Page 4, | 14:02:23 |
| 25 | | Section No. 3, do you see that at the top of the page? | 14:02:25 |



| | | |
|---|---|---|
| 1 | | MR. KABA:  Objection to the form of | 16:56:20 |
| 2 | the question. | 16:56:22 |
| 3 | | THE WITNESS:  Can you ask-- | 16:56:25 |
| 4 | | MR. KABA:  Foundation of the | 16:56:26 |
| 5 | question-- you are referring to a chat session in a | 16:56:28 |
| 6 | meeting.  It's just-- it's getting late.  I object to the | 16:56:33 |
| 7 | form of the question. | 16:56:37 |
| 8 | | You might want to try that again. | 16:56:38 |
| 9 | | THE WITNESS:  Can you ask the question | 16:56:39 |
| 10 | again, please? | 16:56:40 |
| 11 | Q | (By Ms. Jerjian)  Do you not understand my question? | 16:56:41 |
| 12 | A | No. | 16:56:43 |
| 13 | Q | Do you have any reason to doubt that the meeting that was | 16:56:43 |
| 14 | held on May 4th, reflected in Exhibit NL-36, was a | 16:56:48 |
| 15 | preparation session for a meeting reflected in Exhibit | 16:56:57 |
| 16 | NL-38 on May 6th, 2021? | 16:57:01 |
| 17 | | MR. KABA:  Objection; speculation. | 16:57:05 |
| 18 | | THE WITNESS:  I don't know, but the | 16:57:06 |
| 19 | NL-36 refers to a "touch base," so I-- it isn't clear to | 16:57:09 |
| 20 | me that it was in preparation for the meeting in NL-38. | 16:57:17 |
| 21 | Q | (By Ms. Jerjian)  The document that was shared on | 16:57:24 |
| 22 | May 4th, 2021, in Exhibit 36, was entitled, quote, "Prime | 16:57:29 |
| 23 | account CX satisfaction (privileged and confidential)," | 16:57:41 |
| 24 | end quote, correct? | 16:57:47 |
| 25 | A | Yes. | 16:57:48 |



| | | | |
|---|---|---|---|
| 1 | Q | And the meeting on May 6th, 2021, reflected in Exhibit | 16:57:48 |
| 2 | | NL-38, is also partially entitled, "Prime account CX | 16:57:59 |
| 3 | | satisfaction (privileged and confidential)," correct? | 16:58:06 |
| 4 | A | Yes, I see that. | 16:58:11 |
| 5 | Q | Mr. Lindsay, did you do anything-- strike that. | 16:58:13 |
| 6 | | What, if anything, did you do to prepare for today's | 16:58:16 |
| 7 | | deposition? | 16:58:20 |
| 8 | A | I met with counsel. | 16:58:20 |
| 9 | Q | Aside from meeting with counsel, did you do anything else | 16:58:26 |
| 10 | | to prepare for today's deposition? | 16:58:28 |
| 11 | A | Got a good night's sleep. | 16:58:30 |
| 12 | Q | Are you aware of what ROSCA is? | 16:58:38 |
| 13 | A | I am generally aware of the term. | 16:58:42 |
| 14 | Q | When did you become aware of ROSCA? | 16:58:47 |
| 15 | A | I don't know. | 16:58:50 |
| 16 | Q | Are you aware-- well, strike that. | 16:58:57 |
| 17 | | Were you aware, during your tenure in Prime, that | 16:58:59 |
| 18 | | there was a U.S. federal statute regarding online | 16:59:03 |
| 19 | | subscription service programs? | 16:59:08 |
| 20 | | MR. KABA:  It's just a "yes" or a | 16:59:10 |
| 21 | | "no," Mr. Lindsay, if you recall. | 16:59:12 |
| 22 | | THE WITNESS:  Can you ask again, just | 16:59:14 |
| 23 | | so I answer it-- | 16:59:15 |
| 24 | Q | (By Ms. Jerjian)  Sure. | 16:59:17 |
| 25 | | Are you-- strike that. | 16:59:17 |



| | | |
|---|---|---|
| 1 | During your tenure at Prime, were you aware that | 16:59:18 |
| 2 | there was a U.S. federal statute regarding online | 16:59:21 |
| 3 | subscription service programs? | 16:59:24 |
| 4 | MR. KABA:  Objection; vague, | 16:59:28 |
| 5 | purports-- calls for a legal conclusion regarding what | 16:59:32 |
| 6 | the statute is. | 16:59:34 |
| 7 | You described it as online subscription programs. | 16:59:38 |
| 8 | THE WITNESS:  Are you referring to | 16:59:42 |
| 9 | ROSCA? | 16:59:46 |
| 10 | I am-- | 16:59:48 |
| 11 | Q  (By Ms. Jerjian)  Do you think I'm referring to ROSCA, | 16:59:50 |
| 12 | "yes" or "no"? | 16:59:53 |
| 13 | MR. KABA:  Objection; argumentative. | 16:59:54 |
| 14 | You don't have to speculate on what Counsel is | 16:59:57 |
| 15 | referring to, Mr. Lindsay. | 17:00:00 |
| 16 | Q  (By Ms. Jerjian)  My question remains. | 17:00:03 |
| 17 | MR. KABA:  Your question is whether he | 17:00:05 |
| 18 | knows what you're referring to or what he thinks he knows | 17:00:07 |
| 19 | what you're referring to? | 17:00:12 |
| 20 | MS. JERJIAN:  Can you repeat my | 17:00:14 |
| 21 | question, please? | 17:00:15 |
| 22 | (Section(s) designated were | 17:00:15 |
| 23 | read by the reporter.) | 17:00:25 |
| 24 | MR. KABA:  Same objections. | 17:00:25 |
| 25 | THE WITNESS:  Again, I can't answer | 17:00:32 |



```
                     C E R T I F I C A T E
STATE OF WASHINGTON )
                    )  ss.
COUNTY OF KING      )
          I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State of
Washington, do hereby certify:  That the foregoing
deposition of the witness named herein was taken
stenographically before me and reduced to a typed format
under my direction;
          That, according to CR 30(e), the witness was
given the opportunity to examine, read, and sign the
deposition after same was transcribed, unless indicated in
the record that the review was waived;
          That I am not a relative or employee of any
attorney or counsel of participant and that I am not
financially or otherwise interested in the action or the
outcome herein;
          That the deposition as transcribed is a full,
true and correct transcript of the testimony, including
questions and answers and all objections, motions, and
examinations, and said transcript was prepared pursuant to
the Washington Administrative Code 308-14-135 preparation
guidelines.
                    /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR
                    State of Washington CCR #2047
                    My CCR certification expires on 7/7/25
```



# EXHIBIT 32

1                 UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WASHINGTON
2                          AT SEATTLE

3     _____

4    FEDERAL TRADE COMMISSION,

5

6               Plaintiff,

7        vs.                 Civil Action No. 2:23-cv-0932-JHC

8

9    AMAZON.COM, INC.,
     et al.,
10

11              Defendants.

12   _____

13             **TRANSCRIPT MARKED CONFIDENTIAL**

14             DEPOSITION UPON ORAL EXAMINATION

15                          OF

16                     LISA LEUNG

17   _____

18

19

20

21

22

23   DATE:  July 24, 2024

24   REPORTED BY:  Holly J. Buckmaster, CSR

25                CSR No. 2859



```
 1                SEATTLE, WASHINGTON; WEDNESDAY, JULY 24, 2024

 2                             8:30 A.M.

 3                             --oOo--

 4

 5     LISA LEUNG, being first duly sworn by a certified shorthand

 6     reporter testified as follows:

 7

 8

 9                     E X A M I N A T I O N

10     BY MS. JERJIAN:

11     Q.    (BY MS. JERJIAN) Good morning, Ms. Leung.  My name is

12           Olivia Jerjian, I'm an attorney with the Federal Trade

13           Commission, and I'm joined here today by my colleagues

14           Evan Mendelson, Elena Hubble, Ronald Miyoge, and on

15           the phone Anthony Saunders and Johanna Mejia-Portello.

16           I would now invite -- your counsel to introduce

17           themselves.

18                    MR. HUESTON:  John Hueston and Melanie Hess

19           on -- from Hueston Hennigan here on behalf of Amazon.

20                    MS. CRAIG:  Laura Craig from Amazon legal.

21                    MS. JERJIAN:  Could everyone introduce

22           themselves, I just want to make sure we have all the

23           names.

24                    MR. HUESTON:  No, I introduced Melanie.

25                    MS. JERJIAN:  Oh, you did, okay.  And is
```



1           always been clear to customers.

2    Q.     What are you basing your answer on?

3    A.     Can you elaborate on the time that you're

4           referencing?

5    Q.     The time of this chat.  You just told me that --

6           actually always, you told me your enrollment flow has

7           always been clear, how do you know that?

8    A.     Once again, what time period?  Because I'll -- I'll

9           respond with the data and how we know, but I want to

10          be specific, so what time period are you referring to?

11   Q.     Well, let's start with the time period of this chat,

12          which is 2020.

13   A.     Okay.  Yeah, so in 2020, as I mentioned, we look at a

14          variety of metrics to inform whether or not we believe

15          our sign-up experience is clear for customers and the

16          metrics that we had collected informed us that

17          customers were aware of what they were signing up for

18          in the sign-up experience.

19   Q.     There wasn't any metrics that indicated that

20          customers did not know what they were signing up for

21          when they went through the Prime enrollment

22          experience?

23                MR. HUESTON:  Objection; vague.

24                THE WITNESS:  Yeah, what time period are you

25          referring to?



1  Q.    (BY MS. JERJIAN) Yeah, all of this is the time of the

2        chat, 2020.

3  A.    As I mentioned previously, we look at lots of metrics

4        together to inform whether or not an experience is

5        clear and so we can find a customer anecdote or one

6        particular number, but what we looked at is the entire

7        body for us to determine if the experience was clear

8        enough.

9  Q.    At any point in your tenure at Prime in your opinion

10       has there been a lack of clarity in the Prime

11       enrollment experience?

12              MR. HUESTON:  Objection; vague.

13              THE WITNESS:  I'm not clear what you mean by

14       "lack of clarity."

15 Q.    (BY MS. JERJIAN) Sure.  Earlier you told me that you

16       believe that the Prime flow, enrollment flow has

17       always been clear, correct?

18 A.    I want to be -- I want to be actually specific.  What

19       we're discussing in all of this is not about whether

20       or not it was clear from a legal definition.  My sense

21       and all of the sense of the Prime team was that our

22       sign-up experience was clear from legal regulatory

23       view.  What we're discussing here is how do we

24       continue to be better than that.  We held ourselves to

25       a much higher bar than what a law would define.



1    Q.    I'm not using clarity in any -- in any legal sense,

2          I'm using it as used -- as you've used it here in this

3          chat, back to clarity.  You told me that you've always

4          known the Prime enrollment flow to be clear, I just

5          want to understand what you're basing that response

6          on, are there specific metrics?

7    A.    I -- yeah, I've answered previously that we look at a

8          variety of metrics to determine if the experience is

9          clear.

10   Q.    So none of the metrics indicate that there was a lack

11         of clarity in the enrollment flow, correct?

12   A.    Correct.

13   Q.    The entry below states, "Or do you mean hopping to

14         single CTA now?"  You wrote that, correct?

15   A.    Can you point to the line?

16   Q.    Right underneath the message we just discussed.

17   A.    That's what's written here, yes.

18   Q.    What did you mean by that?

19   A.    I was asking Nahshon what change he was referring to,

20         so that's me asking a clarifying question to Nahshon.

21   Q.    What does "hopping to single CTA" mean?

22   A.    I meant hopping in the sense of not measuring but

23         just making the change.

24   Q.    What does "single CTA" refer to?

25   A.    It would likely be referring to the confirmation call



1                  C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         ) ss.
3    COUNTY OF KING      )

4        I, the undersigned Washington Certified Court Reporter,
     pursuant to RCW 5.28.010 authorized to administer oaths and
5    affirmations in and for the State of Washington, do hereby
     certify:
6
         That the annexed and foregoing deposition transcript of
7    the witness named herein was taken Stenographically before
     me and reduced to a typed format under my direction; that
8    the transcript is a full, true and complete transcript of
     the proceedings, including all questions, objections,
9    motions and exceptions of counsel, made and taken at the
     time of the foregoing proceedings, to the best of my
10   abilities;

11       That I am not a relative, employee, attorney or counsel
     of any party to this action or relative or employee of any
12   such attorney or counsel, and that I am not financially
     interested in the said action or the outcome thereof;
13
         That the witness, before examination, was by me duly
14   sworn, and the transcript was made available to the witness
     for reading and signing upon completion of transcription,
15   unless indicated herein the waiving of signature;

16       I further certify that I am sealing the deposition in
     an envelope with the title of the above cause and the name
17   of the witness visible, and I am delivering the same to the
     appropriate authority;
18
         I further advise you that as a matter of firm policy,
19   the Stenographic notes of this transcript will be destroyed
     three years from the date appearing on this Certificate
20   unless notice is received otherwise from any party or
     counsel hereto on or before said date;
21
         IN WITNESS WHEREOF, I have hereunto set my hand on this
22   2nd day of August, 2024, at Mountlake Terrace, Washington.

23

24   _____

25        Holly J. Buckmaster, CCR # 2859.



# EXHIBIT 33

1                IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4    FEDERAL TRADE COMMISSION,            )
                                          )
5                    Plaintiff,           )
                                          )   Case No.
6         vs.                             )   2:23-cv-0932-JHC
                                          )
7    AMAZON.COM, INC., et al.,            )
                                          )
8                    Defendants.          )
     ─────────────────────────────────── )

9

10

11

12

13

14

15              DEPOSITION OF CAROLINE ABRAMOWICZ

16                 VIA ZOOM VIDEOCONFERENCE

17               THURSDAY, NOVEMBER 7, 2024

18

19

20

21   REPORTED BY:

22   LISA MOSKOWITZ

23   CA-CSR 10816, RPR, CRR, CLR

24   WASHINGTON CCR 21001437, NEVADA CCR 991

25   ILLINOIS CSR 084.004982



```
 1                   THURSDAY, NOVEMBER 7, 2024

 2                   VIA ZOOM VIDEOCONFERENCE

 3                        8:35 A.M.

 4

 5         THE CERTIFIED STENOGRAPHER:  We are now on the

 6    record.  It is now 8:35 a.m.  My name is Lisa Moskowitz.

 7    I am a California certified stenographic reporter.  My

 8    CSR license number is 10816.  All appearances will be

 9    noted on the stenographic record.

10                                                         08:35

11                   CAROLINE ABRAMOWICZ,

12                   called as a witness,

13         was examined and testified as follows:

14

15                        EXAMINATION                     08:35

16    BY ATTORNEY MENDELSON:

17         Q.  Good morning, Ms. Abramowicz.  My name is Evan

18    Mendelson.  I'm an attorney representing the Federal

19    Trade Commission.

20              Can you hear me all right?                08:35

21         A.  Yes.

22         Q.  And did I pronounce your last name correctly,

23    Abramowicz?

24         A.  Yes.

25         Q.  Have you -- actually, before we do that,     08:36
```



1  of a U.S. team.  We were focused on experimenting within

2  the U.S., but we were also embedded in just kind of the

3  general member growth section of Prime.

4         So we kind of were a little bit of a central

5  team as well.  The other content-testing teams were          10:34

6  embedded within the country leadership structures, and

7  so they reported in to various, like, Canada type of

8  leadership or EU leadership.

9         So that is what that is talking about, other

10  countries outside of the U.S. like Japan.                    10:34

11      Q.  Got it.  The next sentence, starting on line

12  28, says or starts:  The U.S. plans to implement the

13  minimum content Clarity bar (defined as clear sign-up

14  CTA language and having a decline button) in checkout as

15  we return to BAU messaging (ETA: June, pending a Jamil       10:35

16  review on 6/3).

17         Did I read that correctly?

18      A.  Yes.

19      Q.  BAU is business as usual; is that right?

20      A.  Yes.  Yes.                                           10:35

21      Q.  Okay.  What does the reference to returning to

22  business as usual messaging mean here?

23      A.  That was the -- the templates we were using in

24  our upsells prior to the changes we had made post COVID.

25      Q.  Okay.  So non- -- so turning off the Weblab         10:36



1  that was causing Order Agnostic templates to be

2  displayed; is that right?

3      A.  Yes, yes.

4      Q.  The phrase "minimum content clarity bar" in the

5  sentence we were just looking at, what does that mean?   10:36

6      A.  That was -- well, everything with Clarity was

7  very subjective, and all of our conversations with legal

8  had assured us that we were --

9      Q.  Don't --

10     A.  Sorry.                                           10:36

11     Q.  If you say "conversations with legal," I will

12  stop you.

13         ATTORNEY HUESTON:  You shouldn't --

14  BY ATTORNEY MENDELSON:

15     Q.  I'm sorry.  Maybe I shouldn't have stopped you.  10:37

16         ATTORNEY HUESTON:  Let me just do an

17  instruction.  I think -- you don't want to state what

18  legal said.  You can give your understanding --

19         THE WITNESS:  Okay.

20         ATTORNEY HUESTON:  -- of what this bar is        10:37

21  vis- -vis, I think with the distinction you were

22  attempting to make with legal.

23         THE WITNESS:  Okay.  So my understanding of the

24  current state of the Prime upsell experience and

25  cancellation experience based on conversations with      10:37



1   legal was that everything was completely fine from a

2   legal perspective.

3          So this minimum content clarity bar here is

4   referring to kind of what I mentioned previously, that

5   we were looking for ways to further improve the customer          10:37

6   experience.

7          And so recognizing that we had some of these

8   customer frustration anecdotes, we felt like we could

9   establish improvement on what we were communicating to

10  customers.                                                        10:37

11         So that minimum clarity bar would be like new

12  changes above what we were currently doing --

13  BY ATTORNEY MENDELSON:

14      Q.   Okay.

15      A.   -- to raise the bar for those customers.                 10:38

16      Q.   The reference to decline button, does that

17  refer to changing the decline CTA on UPDP from a link to

18  a button?

19      A.   Yes.

20      Q.   All right.  And then on line 30, starting on            10:38

21  line 30, the document states:  We believe the minus

22  21 percent sign-up impact from this clarity bar will be

23  offset by increased site traffic and still allow the US

24  to beat OP2 for 2020.

25          Do you see that?                                          10:38



1      A.  Yes.

2      Q.  So the estimate at this time was that -- am I

3  understanding correctly that the estimate at this time

4  is that going to this minimum content clarity bar was

5  going to lead to a 21 percent decrease in Prime signups?   10:39

6      A.  Yes.

7      Q.  The reference to OP2, is that referring to

8  Prime membership goals in OP2 document?

9      A.  Yes.  OP2 is like the financial plan for the

10  year.                                                       10:39

11      Q.  Got it.  On the next page of the document --

12  actually, do you see on line 28 the sentence we looked

13  at earlier about aligning with GPX and content teams

14  references to define minimum requirements references

15  Appendix A?                                                 10:40

16      A.  Yes.

17      Q.  And then on the next page of the document,

18  which is, I believe, CA9, but my screen went blank,

19  that's where Appendix A is?

20      A.  Yes.                                                10:40

21      Q.  I'm sorry.  On page 2 of the attachment in

22  Exhibit CA9?

23      A.  Yes.

24      Q.  And in Appendix A, there's -- some rows are

25  labeled:  Minimum Clarity Bar.                              10:40



1      A.  Yes.

2      Q.  And June 3 was the date -- you can look back

3  and see Exhibit CA5 if you need to, but June 3 was the

4  date of the meeting with Mr. Ghani with the memo we were

5  just looking at in Exhibit CA5.                          11:36

6          Is that right?

7      A.  Yes.

8      Q.  Next to number 1 here, under Meeting Notes, it

9  said, quote:  This is an unspoken cancer within Prime

10  that we are unwinding.  This is a symptom of the past.    11:37

11  Need to correct now.

12          Do you see that?

13      A.  Yes.

14      Q.  Do you remember anyone at the June 3 meeting

15  referring to Clarity issues as an unspoken cancer within  11:37

16  Prime?

17      A.  I don't remember that specifically.

18      Q.  Okay.  Do you remember anyone expressing the

19  view that Clarity issues need to be corrected now?

20      A.  I think that was a view of some of the folks on  11:37

21  the review, yes.

22      Q.  Which folks, do you remember?

23      A.  I don't remember, exactly.  There were probably

24  close to 20 people in that meeting.

25      Q.  Okay.  Was it your view at the time that the     11:37



1  Clarity issues should be corrected now?

2      A.  Yes, it was my view at the time that we should

3  take some actions to improve Clarity.

4      Q.  Okay.  Do you remember whether Mr. Ghani

5  expressed any views at the June 3 meeting about whether    11:38

6  action should be taken to address Clarity?

7      A.  I remember that he was supportive of actions

8  being taken to address Clarity.

9      Q.  When I asked about unspoken cancer, I think --

10  the unspoken cancer line here, I think you said you        11:38

11  don't remember anyone saying that specifically.

12         Do you remember anyone saying anything along

13  those lines about an unspoken cancer within Prime?

14     A.  No, I don't remember that phrase being used or

15  who would have said that.                                  11:38

16     Q.  Okay.  All right.  We can put that aside.

17     A.  I remember a lot, but it's been over four

18  years.

19     Q.  I understand.  All you can do is answer my

20  questions to the best of your memory.  You can put aside   11:39

21  Exhibit CA10.

22         And if you-all wouldn't mind pulling envelope

23  26.  And if it helps, the next one will be 31 and 33

24  after that.  But for now, Envelope 26.

25         For the record, Exhibit CA11 is a document that    11:40



1  starts with Bates number AMZN-PRM-FTC-002558764.

2          (Exhibit Number CA11 was marked for

3       identification.)

4  BY ATTORNEY MENDELSON:

5       Q.  Ms. Abramowicz, do you have that document in       11:40

6  front of you?

7       A.  Yes.

8       Q.  Okay.  The first -- on the first page of this

9  document, there's a email, a June 16, 2020, email from

10 yourself to you Erik Schmitz, Nahshon Davidaiai, Nikki       11:40

11 Baidwan, and Lisa Leung; is that right?

12      A.  Yes.

13      Q.  And you write at the top of that email:  Thanks

14 for all the time this morning.

15      A.  Yes.                                                11:41

16      Q.  Do you see that?  Okay.

17          Does the rest of this email appear to be your

18 notes from a June 16, 2020, Clarity-related meeting?

19      A.  Yes.

20      Q.  The second bullet point says:  Keep the            11:41

21 existing 7/24 Neil review.

22          Do you see that?

23      A.  Yes.

24      Q.  Does that reflect there was a Clarity-related

25 meeting with Neil Lindsay scheduled for July 24?             11:41



1          THE WITNESS:  I was never a part of any

2     conversation or even email, I think, with Russ.

3     BY ATTORNEY MENDELSON:

4          Q.  Okay.  Did anyone ever tell you about any email

5     or discussion with Russ about Clarity-related issues?     01:39

6          ATTORNEY HUESTON:  Objection.  Vague.

7          THE WITNESS:  I don't remember specific times

8     that that was mentioned.

9     BY ATTORNEY MENDELSON:

10         Q.  Okay.  And then a couple lines down, Mr. Nelson   01:39

11    writes:  Lots of comments like "this is clickbait...

12    don't do clickbait... but still hit your numbers."

13         Do you see that?

14         A.  Yes.

15         Q.  And then a couple lines below that, you reply     01:40

16    to that message:  Yep... business goals need to

17    incentivize us to make clarity changes, not make it a

18    yearlong battle to change a single element.

19         Did I read that correctly?

20         A.  Yes.                                              01:40

21         Q.  What did you mean by "business goals need to

22    incentivize us to make clarity changes"?

23         A.  I was talking about the fact that, at the time,

24    our business goals were -- for my team, they were just

25    related to driving incremental members, and so that had   01:40



1  led to a bit of a stalemate when we wanted to make some

2  of these customer Clarity enhancements that had a

3  negative impact.

4          And so it just kind of made the conversation a

5  lot more difficult.  And we did have specific goals that    01:41

6  would have incentivized us to make these changes.  We

7  had been previously looking at it in just one lens of

8  one goal.

9      Q.  And then the rest of that line referencing a

10  year-long battle to change a single element, is that --    01:41

11  is that there -- are you referencing the 2020 timeline

12  that we've been going through?

13      A.  Yes.

14      Q.  I'm sorry.  You said yes?

15      A.  Yes.                                                01:41

16      Q.  And then on the next page, ending 81, around

17  the middle of the page, you say:  Yeah, I'm really happy

18  with the alignment and support we've gotten this year.

19          Do you see that?

20      A.  Yes.                                                01:42

21      Q.  And then Mr. Nelson -- does that refer to --

22  well, who -- what are you referring to "with the

23  alignment and support we've gotten this year"?

24      A.  There were a number of people involved in the

25  changes that we made both leadership and just other        01:42



CAROLINE ABRAMOWICZ                              November 07, 2024
FTC vs AMAZON.COM, INC., et al.                              142

1  product managers and things within Prime.

2          So alignment, I think, is talking about both

3  within Prime and then also with the shopper -- or

4  customer frustration team, kind of getting both teams on

5  the same page that we felt like we had a common vision     01:43

6  that we were working backwards from.

7          And then support is, yeah, just of

8  encouragement from Jamil and Neil to, like, keep

9  pursuing this and keep making progress on it.

10      Q.  The next line says -- Mr. Nelson writes:  It     01:43

11  was way too adversarial with past teams.

12          Do you understand him to be referring to the

13  relationship between shopper frustrations or customer

14  frustrations and the Prime organization?

15      A.  Yes.                                              01:43

16      Q.  And then next he writes:  The Pranav era was a

17  rough one.

18          Who -- do you know who Pranav is?

19      A.  He led the content testing team before Nikki

20  took it over.                                             01:44

21      Q.  Okay.  Was his last name Mittal, M-i-t-t-a-l,

22  or was that someone -- or how do you pronounce his last

23  name?

24      A.  I believe so.

25      Q.  And then two lines down you write:  Ha-ha, I've  01:44



1   heard.

2          What had you heard about the Pranav era being

3   rough?

4      A.   I had heard -- I never met him or worked with

5   him directly, but I had heard that he tended to have          01:44

6   adversarial relationships with many teams and people,

7   not limited to the shopper frustration team.

8      Q.   Okay.  The line above that one we just looked

9   at, you write:  Constant escalations are no fun for

10  anyone.                                                        01:44

11         Do you see that?

12     A.   Yes.

13     Q.   What are escalations?

14     A.   Escalations are a term used within Amazon that

15  typically refers to some director or VP or SVP                01:45

16  encountering something on Amazon's site or experience

17  that they don't like for any number of reasons.

18         So then they will kind of capture that in an

19  email or screenshot and forward it to the corresponding

20  VP, who then has his team kind of come together and           01:45

21  figure out what happened, is that a one-off issue?  Is

22  that something that's just kind of standard for us?  Do

23  we stand by it?  Should we make any changes to it?

24         It typically just involves like a lot of --

25  they kind of come out of nowhere and require a lot of         01:45



CAROLINE ABRAMOWICZ                           November 07, 2024
FTC vs AMAZON.COM, INC., et al.                          216

```
 1   the "We have been deliberatively confusing" quote
 2   Ms. Ikeda-Flowers includes in the chat?
 3        A.  Yeah, that's what I was saying.  I mean, I had
 4   no knowledge, but that quote seemed to be similar
 5   language that I had heard from those teams in the past.   04:32
 6        Q.  Okay.  I take it you never found out who
 7   actually talked to Business Insider; is that correct?
 8        A.  No, I don't know who that was.
 9        Q.  Okay.  All right.  I have -- I don't have any
10   more questions right now.  It sounds like John has some   04:33
11   questions for you.  There's a chance after he's done I
12   might have a few follow-ups on that, but otherwise, I'm
13   done.
14             ATTORNEY HUESTON:  Okay.  Let's just take a
15   five-minute break, and then we'll come back.             04:33
16             ATTORNEY MENDELSON:  Okay.
17             (Recess taken from 4:33 p.m. to
18        4:39 p.m.)
19
20                      EXAMINATION                           04:39
21   BY ATTORNEY HUESTON:
22        Q.  I'd like to put in front of you Exhibit 12,
23   which I'll hand you because in your stack, I don't think
24   it's numbered.
25             And Exhibit 12 is an email from yourself at the  04:40
```



1  top, sent July 24, 2020, to a number of people at

2  Amazon, and you were questioned about this by the FTC

3  counsel.

4         What I want to do is turn your attention to

5  Appendix F at Bates stamp number 59700.  Again, you were    04:40

6  asked a number of questions about Appendix F, which is

7  entitled Clarity Guardrails.

8         Do you see that?

9     A.  Yes.

10    Q.  And below it, it says:  Encoded Minimum Clarity    04:40

11  bar; right?

12    A.  Yes.

13    Q.  And you were asked about underneath that

14  section, stating Minimum Clarity Bar, a number of

15  enumerated factors that you were describing as part of    04:41

16  this defined Minimum Clarity Bar.

17         Do you remember that?

18    A.  Yes.

19    Q.  I just want to make clear for the record,

20  Minimum Clarity Bar, was it your understanding that the    04:41

21  Minimum Clarity Bar referred to legal requirements?

22    A.  My understanding is that we all -- we were

23  already meeting the legal requirements for the upsells,

24  and so this Minimum Clarity Bar is referencing

25  improvements we wanted to make to the customer    04:41



CAROLINE ABRAMOWICZ                              November 07, 2024
FTC vs AMAZON.COM, INC., et al.                              218

1   experience, above and beyond those guidelines.

2       Q.  So when you used the word "minimum," it means

3   what your group aspirationally was trying to do to

4   elevate what Amazon was attempting, beyond what you

5   understood to be legal requirements.                    04:42

6           Is that a fair statement?

7       A.  Yes.

8       Q.  Okay.  You can put that aside.

9           Let's go to Exhibit 14.  As that's being put in

10  front of you, I'll just identify it for the record.     04:42

11  That is an email from yourself to Reid Nelson and

12  others, dated August 12, 2020.

13          I want to direct your attention to the first

14  page of this exhibit in that email, in the second

15  paragraph.  You write, about halfway down:  As I        04:42

16  mentioned last week, the blocker in Prime has not been

17  testing clarity initiatives but rather getting buy-in to

18  make dial-up decisions across all templates/locations

19  with a significant impact to pay members; 2) getting

20  confirmation that these changes actually improve         04:42

21  clarity.

22          And then it continues:  Implementing these

23  changes consistently.

24          Do you see that language?

25      A.  Yes.                                             04:43



1    Q.  I know in number 2, you write:  Getting

2    confirmation that these changes, and then you put in

3    italics, "actually," improved clarity.

4         Were you trying to emphasize the word

5    "actually"?                                          04:43

6    A.  Yes.

7    Q.  What was the point of you emphasizing "actually

8    improve clarity"?

9    A.  At that point, a number of different

10   experiments and changes had been tested, and there was   04:43

11   inconsistency in the results, in terms of when we were

12   looking at the data, felt like we had actually improved

13   clarity.

14        Sometimes this was referencing quantitative

15   metrics, like did we see a reduction in customer         04:43

16   contacts or people canceling Prime within a certain time

17   frame, and sometimes it referenced when we reviewed

18   those new experiences with customers, but through user

19   testing or user research, did they feel like those

20   changes were clear or better than what was there         04:44

21   previously.

22   Q.  Okay.  And, again, to be clear here, did you

23   find at times that anecdotal testing, testing with a

24   handful of subjects, customers, might suggest a possible

25   clarity improvement that, in fact, did not turn out to   04:44



1          Do you see that language?

2     A.   Yes.

3     Q.   You weren't asked this question directly; so

4  I'm going to ask you:  Did you believe that Amazon was

5  knowingly tricking people into signing up for Prime          05:08

6  subscriptions?

7     A.   No.

8     Q.   It's true you were aware -- if I understand

9  your earlier testimony, you were aware some people in

10 the shopper frustration team may have made statements         05:09

11 like this; right?

12    A.   Yes.

13    Q.   And they may have made statements like that

14 when their recommendations for change, based on, for

15 instance, anecdotal evidence wasn't implemented or            05:09

16 wasn't implemented as fast as they liked.

17          Is that an example?

18    A.   I think in my view, if Amazon had been tricking

19 customers, it would have made up a much larger portion

20 of the member balance.  But as I said, my understanding       05:09

21 was that this was limited to 1 percent of customers,

22 which is very difficult at Amazon scale to have an

23 experience that is 100 percent perfect for every single

24 person that sees it or interacts with it.

25          So I was aware there was some confusion, but I       05:10



CAROLINE ABRAMOWICZ                              November 07, 2024
FTC vs AMAZON.COM, INC., et al.                           237

1   didn't see it that the experience Amazon had was

2   knowingly tricking customers across the board to sign up

3   for Prime.  But I think people on the customer -- at the

4   shopper frustrations team that, again, were really close

5   to the anecdotes and close to the individual customers        05:10

6   may have felt differently.

7        Q.   Great.  I have no more questions at this time.

8             ATTORNEY MENDELSON:  I said I just have a few

9   follow-ups on Mr. Hueston's questions, and I'll try to

10   make this very quick.                                         05:10

11

12                  FURTHER EXAMINATION

13   BY ATTORNEY MENDELSON:

14        Q.   I think you told Mr. Hueston that Amazon always

15   met the legal requirements for Prime enrollment.             05:11

16             Is that correct, in your view?

17        A.   That was my understanding, yes, that we were

18   always meeting the legal requirements.

19        Q.   What was that understanding based on?

20        A.   There were a number of meetings or -- yeah,        05:11

21   mostly meetings with various legal counterparts where we

22   would show them our experience, maybe review some

23   proposed changes to that experience.  And this was also

24   outside of just the Clarity workstream in particular.

25             So just, in general, different changes that we     05:11



 1  were making.  And the repeated feedback was -- and we

 2  have everything --

 3        ATTORNEY HUESTON:  Let's -- you can't get into

 4  the specific conversations.

 5        ATTORNEY MENDELSON:  Okay.                      05:11

 6  BY ATTORNEY MENDELSON:

 7     Q.  I think you also told Mr. Hueston that there

 8  was inconsistent data surrounding Clarity changes.

 9        Do you recall that?

10     A.  Yes.                                           05:12

11     Q.  What data, in particular, was kind of showing

12  you consistent results relating to Clarity?

13     A.  Well, for example, in some experiments, the

14  hypothesis was, okay, we'll make these changes.  We'll

15  see fewer people signing up.  We'll see slightly fewer  05:12

16  people becoming paid members.  But of the people who do

17  stay paid members, we'll see them engage more with their

18  benefits or not go to cancel or not contact customer

19  service, things like that.

20        And there were a number of different            05:12

21  experiments.  Some experiments did show improvements in

22  some metrics, some didn't.  But across the board, there

23  wasn't consistency in the fact that every time we

24  thought we had identified the problem, thought we had

25  proposed a good solution, we didn't always see the      05:13



```
 1                     REPORTER'S CERTIFICATE

 2

 3          I, LISA MOSKOWITZ, a Certified Shorthand

 4    Reporter, licensed in the states of California, Nevada,

 5    Illinois, and Washington, do hereby certify that

 6    CAROLINE ABRAMOWICZ was by me duly sworn or affirmed;

 7    that said deposition was reported stenographically by me

 8    at the time and place herein named;

 9          That the deposition is a true record of all

10    testimony as reported stenographically by me and was

11    thereafter transcribed under my direction; that if this

12    is a Federal case, a request [ ] was [X] was not made to

13    read and correct said deposition; that the dismantling

14    of the original transcript will void the reporter's

15    certificate.

16          I further declare that I have no interest in

17    the outcome of said action nor am I related to any of

18    the parties or counsel in said action.

19          IN WITNESS WHEREOF, I have subscribed my name

20    this 18th day of November, 2025.

21

22

23    _____

      LISA MOSKOWITZ
24    California CSR 10816, RPR, CRR, CLR
      Washington CCR 21001437, Nevada CCR 991,
25    Illinois CSR 084.004982
```



# EXHIBIT 34

1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4

5    FEDERAL TRADE COMMISSION,

6

7                    Plaintiff,

8

9    vs.                        Case No. 2:23-cv-0932

10

11   AMAZON, INC.,

12

13             Defendant.

14

15

16       VIDEOTAPED DEPOSITION OF JENNY BLACKBURN

17            TUESDAY, DECEMBER 10, 2024

18                  2:00 p.m.

19

20

21

22

23

24

25



1       behalf of defendant, and with me is

2       Stephanie Colorado.

3               MR. NARDINI:  And good

4       afternoon.  Max Nardini, joined along

5       with my colleague Evan Mendelson, on

6       behalf of the Federal Trade

7       Commission.

8               THE VIDEOGRAPHER:  Thank you,

9       very much.

10              Madam court reporter, would you

11      kindly swear in our witness.

12

13              JENNY BLACKBURN,

14   was thereupon produced as a witness and,

15   after having been sworn on oath, was examined

16   and testified as follows:

17

18                  EXAMINATION

19   BY MR. REITER:

20      Q.    Good afternoon, Ms. Blackburn.

21   Thank you for being here today.

22              Could you start by stating your

23   full name for the record, please?

24      A.    Jenny Blackburn.

25      Q.    Ms. Blackburn, what is your



```
 1  into creating better user experiences for
 2  customers.
 3              I then moved into a couple of
 4  different roles as leading design and then
 5  also leading product and engineering.
 6              And then I wrapped up my tenure
 7  at Amazon back in shopping design, leading
 8  the user experience team that worked on the
 9  shopping experience worldwide.
10        Q.    Okay.  When did your employment
11  at Amazon end?
12        A.    It was 2020.
13        Q.    Okay.  And where are you
14  currently employed?
15        A.    I am currently the vice
16  president of user experience, working on
17  Google Gemini and Alphabet.
18        Q.    So is it fair to say that your
19  entire professional career has been focused
20  on user experience design and research?
21              MR. NARDINI:  Object to form.
22        You can answer.
23              THE WITNESS:  Yes.
24  BY MR. REITER:
25        Q.    So I want to discuss your time
```



 1  working on user experience and research at

 2  Amazon.  And I think you touched on this

 3  earlier.

 4              But are you familiar with

 5  Amazon's User Research Program?

 6       A.    I am familiar with it.  I built

 7  it up.

 8              MR. NARDINI:  Counsel, I'm

 9         sorry to interrupt you.  It's coming

10         through a little scratchy on my end.

11              (Discussion off the record.)

12              THE VIDEOGRAPHER:  Off the

13         record at 2:15 p.m.

14              (Discussion off the record.)

15              THE VIDEOGRAPHER:  On the

16         record at 2:12 p.m. Pacific time.

17  BY MR. REITER:

18       Q.    Ms. Blackburn, are you familiar

19  with Amazon's User Research Program?

20       A.    I am.

21       Q.    And how are you familiar with

22  the program?

23       A.    I built the program from three

24  people to a large initiative over the time

25  that I was focused on that at Amazon.



1          And then manage user research

2    is part of my remit in my time there.

3          Q.    What period of time were you

4    building Amazon's User Research Program?

5          A.    It was about from the time I

6    started in November of 2009 through when I

7    moved to Amazon Fresh in 2015.

8          Q.    Based on your experience, what

9    is the purpose of Amazon's User Research

10   Program?

11         A.    It's really to make a better

12   experience for customers, to improve the

13   quality of design, and to make sure that the

14   shopping experience is clear, simple and

15   delightful.

16         Q.    In your experience, was Amazon

17   supportive of the research -- User Research

18   Program that you built?

19              MR. NARDINI:  Objection.

20         Vague.  You can answer.

21              THE WITNESS:  They were

22         supportive in that they gave me head

23         count to hire more user researchers,

24         funded the research that we were

25         doing, and were open and responsive to



1          issues identified in usability

2          studies.

3     BY MR. REITER:

4          Q.    So you testified that the

5     purpose of Amazon's User Research Program was

6     to make a better experience for customers.

7                Could you explain that a bit?

8          A.    Yeah.  One of the unique values

9     that user research can provide is the deep

10    insight into the people that use the product.

11               Amazon and other companies have

12    a lot of data, like, large logged data about

13    how people are traversing through the

14    website.

15               But the people who are involved

16    in building and making decisions on a daily

17    basis about what to launch for customers,

18    have the potential to kind of lose sight of

19    the people who use the product.

20               People who tend to work in tech

21    are very technical.  They know a lot more

22    about how things work than the average

23    customer.

24               So it's really valuable to get

25    real people in front of these builders, so



1           powerful.  And it reinforced customer
2           obsession.
3                    And then, you know, in
4           addition, understanding how these
5           customers would think about things,
6           what their preferences were could be
7           very useful in uncovering opportunity
8           areas that we weren't aware of, where
9           maybe the user experience could be
10          improved.  And we wouldn't have, you
11          know, known about that if we hadn't
12          stumbled on it in one of these
13          usability tests.
14                    So it both developed more
15          empathy amongst Amazonians, but also
16          concretely led to improved experience
17          for customers.
18     BY MR. REITER:
19           Q.     You mentioned usability
20     testing.  Is that one of the kinds of testing
21     that Amazon's User Research Program
22     conducted?
23           A.     Yeah.  The User Research
24     Program, when I was there, was predominantly
25     usability testing.  There are either types of



JENNY BLACKBURN                          December 10, 2024
FTC vs AMAZON                                              20

1  usability, such as field research, which we
2  did occasionally, but less often.
3          Q.     Okay.  Are you familiar with
4  Amazon's Shopper Frustration Program?
5          A.     I am.
6          Q.     How are you familiar with the
7  Shopper Frustration's program?
8          A.     It was under my leadership that
9  the team drafted the plan to create a Shopper
10  Frustration's Program.  I was also aware of
11  it as an Amazonian, as the program was
12  launched and had a lot of impact.
13                And then in my last role at
14  Amazon, when I was leading shopping design,
15  the Shopper Frustration Program reported into
16  me.
17          Q.     And what is Amazon's Shopper
18  Frustration's program?
19                MR. NARDINI:  Objection.  Vague
20          as to time period.
21                THE WITNESS:  The Shopper
22          Frustration Program was a repository
23          of the insights that user research had
24          gathered when they were doing these
25          usability tests.



1                    And when they would watch

2           customers use the Amazon website for a

3           variety of ends, they would often see

4           things that could be improved, and

5           they would catalog these in the

6           Shopper Frustration database.

7                    And then the program was

8           designed to not just make sure that

9           these things were in the database, but

10          that they were getting visibility and

11          being shared with the builder teams,

12          who could potentially go improve those

13          areas.

14   BY MR. REITER:

15          Q.    So why was the Shopper

16   Frustration Program developed at Amazon?

17          A.    It was really developed to

18   drive greater -- to improve the customer

19   experience, and to ensure that these insights

20   that happened in the course of the user

21   research session were making it in front of

22   the people who could potentially take action

23   on them.

24                    You know, it's commonly the

25   case in user research that researchers do a



```
 1              reason to believe that.
 2    BY MR. REITER:
 3         Q.    Do you have any reason to
 4    believe that Amazon or those three
 5    individuals intentionally enrolled customers
 6    in Prime without their consent?
 7                   MR. NARDINI:  Objection to
 8              form.  Foundation.  Compound.  And
 9              calls for a legal conclusion.
10                   THE WITNESS:  I don't think
11              that they were intentionally trying to
12              get customers to accidently sign up
13              for things they didn't want.
14    BY MR. REITER:
15         Q.    And do you have any reason to
16    believe that Amazon or those three
17    individuals intentionally made it difficult
18    to cancel Prime subscriptions?
19                   MR. NARDINI:  Objection.  Form.
20              Foundation.  Compound.  Calls for
21              legal conclusion:
22                   You can answer.
23                   THE WITNESS:  I mean, those
24              individuals were not designing the
25              user experience.  And I don't think
```



JENNY BLACKBURN                          December 10, 2024
FTC vs AMAZON                                        101

```
 1              that they were directing anyone to
 2              design it to be a bad user experience.
 3    BY MR. REITER:
 4         Q.    Ms. Blackburn, even if we were
 5    to assume that Prime's enrollment or
 6    cancellation processes could have been
 7    improved, are you aware of anything that you
 8    have reason to believe is unlawful about
 9    those Prime flows?
10              MR. NARDINI:  Objection.  Form.
11              Foundation.  Calls for a legal
12              conclusion.  Calls for speculation.
13              THE WITNESS:  No.
14    BY MR. REITER:
15         Q.    Ms. Blackburn, we spoke earlier
16    today about Amazon's User Research Program
17    and the customer frustrations that were
18    observed, right?
19         A.    Yes.
20         Q.    The FTC in this lawsuit has
21    pointed to those customer frustrations as
22    evidence that Amazon and the three individual
23    defendants have violated federal law.
24              What's your reaction to that?
25              MR. NARDINI:  Objection to
```



```
 1   form.  Foundation.

 2         You can answer.

 3         THE WITNESS:  I am horrified by

 4   this.  I think that user research is a

 5   optional activity that Amazon invested

 6   in, in order to drive better customer

 7   experience.

 8         The Shopper Frustration Program

 9   is something that Amazon created to

10   try to drive more of that activity

11   across all of the builder teams.

12         Leaders at Amazon routinely

13   gave space to learn about these issues

14   and drive action on these issues.

15         And I feel that a lot of this

16   is being explicitly taken out of

17   context in a way that was never

18   intended and isn't reliable for.

19         Every company, every experience

20   has issues.  It's impossible to make

21   an experience perfect.

22         But in my experience, Amazon

23   stands out as a company that really

24   cared and really tried to drive

25   improvement and did drive improvement
```



1          Foundation.

2                    THE WITNESS:  In the time I was

3          working in shopping, so in the last

4          four years I haven't been working in

5          shopping.  And user experience design

6          is continually evolving.

7                    But at that time, this was

8          certainly common.

9   BY MR. REITER:

10          Q.    And you testified that it's

11   actually helpful for consumers to have an

12   enrollment button that is more prominent than

13   the decline option.

14                    Did I hear you correctly?

15          A.    That's correct.  When

16   everything looks the same, it requires more

17   cognitive attention and very close attention

18   to detail for the user to figure out which is

19   the one they want, versus when there is a

20   hierarchy applied it's easier to scan and

21   find what they really want.

22                    That's why we typically have

23   different UX patterns for, you know, primary,

24   secondary, tertiary treatments.

25          Q.    Ms. Blackburn, are you familiar



```
1    with the phrase "dark patterns"?

2            A.     I am.

3            Q.      Do you see any dark patterns in

4    this Prime enrollment flow we're looking at?

5                    MR. NARDINI:   Objection.

6    Foundation.

7                    THE WITNESS:   I do not.

8    BY MR. REITER:

9            Q.     The FTC -- I'll give you one

10   example.

11                   The FTC has alleged that the

12   language in the decline option that says

13   quote, "No thanks, I do not want free

14   delivery," is a dark pattern.

15                   What's your reaction to that?

16                   MR. NARDINI:   Objection.

17           Foundation.

18                   THE WITNESS:   I would say that

19           a dark pattern would be using language

20           that obscured what the link would do.

21                   This link, I really like

22           because it's very specific.   It leads

23           with a "no thanks," which the user can

24           scan for and find.   And then it

25           declines the value proposition for the
```



1          upsell.  So it's -- this is a -- this

2          is a strong example that I think would

3          be straightforward.

4  BY MR. REITER:

5          Q.     And based on your many years of

6  working at Amazon, are you aware of Amazon

7  ever using a dark pattern for any Prime

8  enrollment or cancellation flow?

9          MR. NARDINI:  Objection.

10         Foundation.  Compound.

11         THE WITNESS:  I think dark

12         pattern is, like, a trend, that, you

13         know, that everybody thinks -- thinks

14         it means something different.

15         My interpretation of it is sort

16         of like knowingly using user

17         experience elements in such a way that

18         intentionally confuses users to do

19         something that isn't what they want to

20         do.

21         That is certainly not what any

22         user experience team that I worked

23         with was motivated by or trying to

24         accomplish.

25  BY MR. REITER:



1                          CERTIFICATE

2

3          I, Mary C. Soldati, Registered Professional

4    reporter, Oregon and Washington Certified Shorthand

5    Reporter, hereby certify that at said time and place, I

6    reported in stenotype all testimony adduced and other

7    oral proceedings had in the foregoing matter; that

8    thereafter my notes were transcribed through

9    computer-aided transcription by me to the best of my

10   ability; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced

12   and oral proceedings had, and of the whole thereof.

13          In witness whereof, I have hereunto set my hand

14   this 20th day of December, 2024.

15

16

17                      Mary C. Soldati, RPR

18                      CSR-WA No. 3406

19                      Expires April 20, 2025

20                      CSR-OR No. 19-0457

21                      Expires September 30, 2025

22

23

24

25



# EXHIBIT 35

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3    _____

4
     FEDERAL TRADE COMMISSION,              )
5                                           )
                                            )
6                    Plaintiff,             )    Case No.
                                            )
7              vs.                          )    2:23-cv-00932-JHC
                                            )
8    AMAZON.COM, INC., et al.,              )
                                            )
9                                           )
                                            )
10                   Defendants.            )
                                            )
11                                          )

12   _____

13

14                 DEPOSITION OF MILES HUNTER

15       * * * CONFIDENTIAL PORTIONS - PAGES 32:5-275:19 * * *

16                     September 18, 2024

17                    Seattle, Washington

18

19

20

21

22   Reported by:
     Connie Recob, CCR, RMR, CRR
23   Washington CCR No. 2631
     Oregon CCR No. 15-0436
24   Utah CCR No. 1133171-7801
     Idaho CCR No. SRL-1220
25   Job No. J11584584



```
 1                    BE IT REMEMBERED that on Wednesday,
 2   September 18, 2024, at Seattle, Washington, at 8:39 a.m.
 3   before Connie Recob, CCR, RMR, CRR, appeared MILES HUNTER,
 4   the witness herein;
 5                    WHEREUPON, the following proceedings were
 6   had, to wit:
 7
 8                    <<<<<<  >>>>>>
 9
10   MILES HUNTER,            having been first duly sworn,
11                            deposed and testified as
12                            follows:
13
14                    MR. MENDELSON:  Good morning, Mr. Hunter.
15   My name is Evan Mendelson.  I'm an attorney representing the
16   Federal Trade Commission.  I'm joined on the phone by Olivia
17   Jerjian and Thomas Maxwell Nardini, also from the Federal
18   Trade Commission.
19        Does -- why don't we -- we already have appearances, so
20   we won't go through the trouble of having everyone introduce
21   themselves.  But I know that Melanie Hess from Hueston
22   Hennigan is also on the phone line.
23        Is there anyone else on the phone line?
24        Okay.  All right.
25        And the witness has been sworn, correct?
```



```
 1       thing to do, so it doesn't always work out that way.
 2            Let me see.  If I ever ask you a question and you're
 3       not clear what I'm asking, please just let me know, and I'll
 4       attempt to rephrase, because it's important that we're all on
 5       the same page in terms of you answering what I'm actually
 6       asking.
 7            If I ask you something at some point and you don't know
 8       or can't remember, you should of course tell me that.  If you
 9       give me an answer or you don't know at a time and later in
10       the deposition you happen to remember, please let me know,
11       and I'll give you a chance to add to what you said before.
12  A.   Uh-huh.
13  Q.   Whenever you need a break, we can take a break.
14  A.   Sure.
15  Q.   The only -- generally, the only thing I ask there is that we
16       only take a break if there's not a question pending.  So if
17       I've asked you a question, you can answer it, and then we can
18       take a break, although, as your counsel might have told you,
19       if you have concerns about attorney-client privilege, you can
20       always ask to talk to him off the record before answering.
21            Does all of that make sense to you?
22  A.   Yes, it does.
23  Q.   Okay.  Have you taken any medication, drugs, et cetera, that
24       would affect your ability to testify truthfully today?
25  A.   No.
```



```
1   Q.  All right.  I want to start just by getting some biographical
2       details.
3               Where did you get your undergraduate degree?
4   A.  At the University of York.
5   Q.  And that's in the UK?
6   A.  Correct.
7   Q.  What was your major or concentration?
8   A.  It was a computer science and business degree.
9   Q.  Okay.  Did you take any courses or have any focus in user
10      experience research or design?
11  A.  Yes.  I took human computer interaction courses there.
12  Q.  And what are human computer interaction courses?
13  A.  It was one course, and it was entitled "Human Computer
14      Interaction," and it was about the psychology and science
15      behind people using technology and the history of technology.
16  Q.  Do you have any graduate degrees?
17  A.  No.
18  Q.  I think -- let's see if I remember right -- you graduated
19      from York in 1999?
20  A.  Uh-huh, that's correct.
21  Q.  All right.  So we are going to pivot to work experience.
22  A.  Sure.
23  Q.  I've got what I hope will be an aid to help us through that.
24              I'm marking as -- marking MH1.  I'll give it to you and
25      hand out copies, and then we will talk about it.
```



```
 1  A.  Sure.

 2                      (Exhibit No. 1 marked

 3                       for identification.)

 4                  THE WITNESS:  Thank you.

 5  BY MR. MENDELSON:

 6  Q.  Okay.  Mr. Hunter, I'll represent to you that MH1 or -- yeah,

 7      MH1 is -- well, I'll have you confirm this, but it is

 8      something I pulled, actually, a couple months ago now in July

 9      from what I believe to be your LinkedIn profile.  So it's

10      just the experience section.

11  A.  Yep.

12  Q.  If you could just review MH1 and confirm that it does -- it

13      is your LinkedIn profile or an excerpt from your LinkedIn

14      profile?

15  A.  Yes, I can confirm that.

16  Q.  Okay.  Is there anything in there as you look quickly that is

17      inaccurate?

18  A.  No.  No, it's accurate.

19  Q.  All right.  And like I said, I printed this a couple of

20      months ago, but you are still working at Chewy, correct?

21  A.  That's correct.

22  Q.  Okay.  All right.  So starting from the bottom up, in July --

23      it looks like in July 1999 you started work at a company

24      called TW2.COM LIMITED; is that right?

25  A.  Yes, that's right.  That was my first job.
```



1      kind of testing for them?

2   A. Yes.

3   Q. And I'm skipping ahead a little bit, but Amazon, during your

4      time there, would also sometimes contract with similar

5      companies to help with user testing?

6   A. Like external companies?

7   Q. Yes.

8   A. As a company as a whole, yes, they did do that.

9   Q. Okay.  Did you -- going back to User Metrics, what role did

10     you have in the user testing that was being conducted by or

11     those being commissioned by the outside companies?

12  A. I did all of the research, and towards the end, we had hired

13     a couple people, so I think I was training them up on

14     overseeing that.  I did the research.

15  Q. You did the research, meaning you were in the room with

16     people --

17  A. Yes.

18  Q. -- doing the testing?

19  A. Yes.

20  Q. Okay.

21  A. That's correct.

22  Q. About -- let's start with projects.  About how many projects

23     were you personally -- let me step back.

24         I'm going to use "projects" to refer to like a single

25     engagement from a particular client --



1   A.  Right.

2   Q.  -- as opposed to an individual interview as part of that

3       engagement.

4           So about how many projects did you conduct or oversee

5       during your time at User Metrics?

6   A.  I mean, I don't have records of that.  If I was to guess, at

7       least 50.

8                       MR. HUESTON:  Objection.

9   BY MR. MENDELSON:

10  Q.  And approximately, again your best recollection, on average

11      how many interviews or observations of particular consumers

12      would you do per each project?

13  A.  I'd say no less than six, and depending on the -- how

14      homogenous the audience was, maybe 24 would be on the big

15      side.

16  Q.  So is it fair to say you conducted hundreds of user testing

17      sessions during your time at User Metrics?

18  A.  Yes.

19  Q.  Did you -- either during your time at User Metrics or TW2.COM

20      LIMITED, did you do any additional formal training or

21      coursework or anything like that in user experience?

22  A.  I attended some conferences, but I'm largely self-taught.

23  Q.  And I think you said you were -- you also were training

24      others at User Metrics?

25  A.  That's true.



1   Q.  About how many people do you -- did you train there?

2   A.  Maybe two or three.

3   Q.  And then it looks like you left User Metrics in May 2006 and

4       started at Getty Images in June 2006?

5   A.  Yes.

6   Q.  And your first title at Getty Images was senior usability

7       engineer for Europe -- or in Europe; is that right?

8   A.  Yes.  Yes.  Though -- yes.

9   Q.  And you list your responsibilities, again on Exhibit MH1, in

10      that time period as conducting and commissioning user

11      research for the world's leading creator and distributor of

12      visual content.

13  A.  Uh-huh.

14  Q.  Could you explain what that means?

15  A.  So I ran user research and -- the others had requested and

16      also design studies that needed to happen.  And I was doing

17      that research with people who were Getty Images' end users,

18      so these are people who search for and download imagery as

19      part of their job.

20  Q.  And so you were working with those users to make sure they

21      were having a satisfactory experience using Getty Images?  Is

22      that --

23  A.  It was a mixture of in-lab research and in-office research.

24      I think the goals of the research were often to help the

25      design team understand who they were designing for and



 1   A.  I was on the team when it was created and was one of the
 2       first people to actively use it to store observations from
 3       research and helped populate it from empty.
 4   Q.  Who else was on the team at the time of the creation, if you
 5       remember?
 6   A.  Jake Burghardt led the process.  There would have been Reid
 7       Nelson, Mary Pat Gotschall.  I can't remember who else was on
 8       the team at that point.  There was a bit of turnover.
 9   Q.  Yeah.  Fair enough.  Let me just ask a few names.  Tell me if
10       you can remember if they were there at that point.
11           Tracy McNulty?
12   A.  That was later.
13   Q.  Linnea Hagen?
14   A.  That was later.  Nick Koveshnikov might have been there.
15   Q.  Okay.  Anyone else you remember?
16   A.  Not off the top of my head, but I can circle back to it if it
17       occurs to me later on.
18   Q.  Okay.  And then in the last paragraph, under Amazon, you
19       describe yourself as, quote, "Amazon's go-to expert on the
20       user research video workflow and the use of video to inspire
21       UX changes and customer obsession."
22           Do you see that?
23   A.  Yes.
24   Q.  What did you mean -- what do you mean by what you wrote
25       there?



```
 1   A.   Video is a common output for somebody who does user research

 2        as a job.  I believed that it was a very powerful medium, and

 3        so I invested a lot of time in learning how to do it well,

 4        and consequently, I helped other researchers who wanted to

 5        improve their skills in that regard and taught a course on it

 6        and helped increase Amazon's capability to record in decent

 7        quality customers using things and then edit that and store

 8        that and share that out.

 9   Q.   "Taught a course," you said.  Was that internal to Amazon or

10        external?

11   A.   That was external.

12   Q.   So you -- talk about that, that course.

13   A.   It was a course that I put together after I left Stripe with

14        somebody who I had worked with at Stripe who runs a training

15        company, and it was a sort of remotely delivered and recorded

16        course that talked about techniques, tips, recommendations on

17        how to do things and not do things.

18   Q.   Okay.  Is that a course you still -- well, I mean, is that a

19        live course or recorded course?  How --

20   A.   I mean, it was recorded, but it isn't -- it isn't a big

21        seller, but I have been asked to give that talk at the

22        University of Washington Human-Computer Interaction school

23        recently.

24   Q.   Okay.  So you taught it at least once.  It was recorded.  And

25        you separately have been asked to present it at the
```



1        University of Washington?

2   A.   Yes, I have done that.  Yes.

3   Q.   Okay.  Like I said, we'll go into the Amazon time more

4        shortly, but before I forget, about how many user testing

5        projects, so not specific interviews but user studies

6        generally, did you personally conduct during your roughly

7        11 years at Amazon?

8   A.   If I work off, let's say one a month, 12 a year, 12 a year

9        times ten and then subtract a bit, let's say 100.

10  Q.   And those are projects, not individual interviews?

11  A.   Correct, yeah.

12  Q.   So same question as before, on average about how many

13       interviews or user sessions in each of those projects?

14  A.   Let's say ten as an average.

15  Q.   All right.  In mid -- mid 2021 you left Amazon to go to

16       Stripe, correct?

17  A.   Correct.

18  Q.   And you were at Stripe for almost two years, until

19       April 2023?

20  A.   Uh-huh, yes.

21  Q.   Your title there was staff UX researcher?

22  A.   That's correct.

23  Q.   What were your responsibilities at Stripe?

24  A.   I worked on a product called Stripe checkout, which is

25       something that businesses who don't want to build their own



1    checkout would make use of.  And my role there was a mixture

2    of testing features that would be in the checkout that a

3    customer would use and also doing research with business

4    people and startups who select what they want to do with

5    regards to a checkout in order to understand product market

6    fit and what features and capabilities it would need to have

7    in order for them to select it.

8  Q.  And did this -- apologies.  This was covered in the answer

9    you just gave.  Did your job here include the same kind of

10    user testing or user interviews as at previous jobs?

11  A.  It did include that.  There was maybe less observation of

12    people using things and more depth interviews to uncover

13    motivations and concerns, but similar.

14  Q.  Okay.  So taking the first kind of work, the actual

15    observation of someone using a product, about how many --

16    let's go with interviews or individual sessions would you say

17    you conducted at Stripe?

18  A.  Not that many for a variety of reasons.  I mean, say 30.

19  Q.  And then the other type of work you mentioned, am I

20    understanding correctly that would be interviewing people

21    about -- not watching them use the service, but interviewing

22    them about their -- their needs or their prior experience

23    using Stripe?

24  A.  That's correct.

25  Q.  And about how many of those interviews?



1  A.  There were differences.

2  Q.  Were there similarities?

3  A.  There were more similarities than differences.

4  Q.  What types of differences were there?

5                  MR. HUESTON:  Objection.  Vague.

6                  THE WITNESS:  Typically there would be

7      differences in payment methods and delivery methods, so you

8      would often see those reflected in the checkout.  There would

9      be different options shown to somebody in a country that had

10     a method that we didn't.

11     BY MR. MENDELSON:

12  Q.  Any other differences in general between the nonU.S. locales

13     and the U.S.?

14                  MR. HUESTON:  Objection.  Vague.

15                  THE WITNESS:  The way that the search

16     engine worked would respond differently to, for example, long

17     compound German words or Japanese queries with no spaces in

18     them.  So I can't speak to the algorithm and the way it

19     responded to it, but in terms of the presentation of the way

20     things worked, other than it being in a different language,

21     they were more similar than different.

22     BY MR. MENDELSON:

23  Q.  In the product checkout/product purchase experience, nonPrime

24     Amazon customers sometimes get offers to join Prime; is that

25     correct?



```
 1   A.  Correct.
 2   Q.  To what extent -- based on your work and the work of your
 3       colleagues, to what extent did those offers differ between
 4       nonU.S. locales and the U.S.?
 5                       MR. HUESTON:  Objection.  Compound.
 6       Foundation.
 7                       THE WITNESS:  I can't give you a
 8       definitive answer because it was a long time ago, and I'm not
 9       even sure I could have answered it comprehensively when I
10       worked at Amazon.  I can say that I have seen Prime upsells
11       in nonU.S. locales that looked to my eyes to be similar other
12       than language or currency and price and benefits.  But there
13       are others in the organization who can give a more fulsome
14       answer on that.
15   BY MR. MENDELSON:
16   Q.  Who do you think those others might be?
17   A.  The Prime UX team would know better because they designed
18       those experiences and would have had to account for the
19       international differences, so they could speak to that.
20   Q.  And is that the team that we were talking about earlier that
21       David Edelstein might have been on?
22   A.  Correct.
23   Q.  Are you familiar -- well, during your time at Amazon, did you
24       have any familiarity with the product checkout Prime offers
25       in the United States?
```



1   A.   Can you explain what you mean by the Prime offers?

2   Q.   Sure.  Are you -- let me step back.

3            In the United States specifically, when nonPrime Amazon

4        people were -- so nonPrime members were shopping on Amazon

5        and were checking out with a product, they would get offers

6        to join Prime; is that right?

7   A.   That's correct.

8   Q.   Okay.  How do you know that?

9   A.   I observed that happening in a comparatively small number of

10       sessions that I moderated over the years in the U.S.

11  Q.   Okay.  Was one of the -- are you familiar with the term

12       "UPDP"?

13  A.   Yes.

14  Q.   That stands for universal Prime decision page?

15  A.   I believe so.

16  Q.   Is that -- do you understand that to be a Prime offer that a

17       nonPrime shopper might receive in product checkout?

18  A.   Yes, although I'm not familiar with the logic that determined

19       who got it.

20  Q.   Did you observe U.S. shoppers in any of your U.S. studies

21       interacting with the UPDP?

22  A.   Yes.

23  Q.   In any nonU.S. studies you worked on, did you observe

24       nonPrime Amazon shoppers interacting with the UPDP?

25  A.   Yes.



1      access to.

2   Q.  I see.

3   A.  Other teams did.

4   Q.  What other teams did, if you know?

5   A.  I think teams that contracted with an external supplier made

6       use of it.

7   Q.  What did you mean by this kind of naturalistic shopping is

8       the polar opposite of a user testing.com study?

9   A.  I am saying that the method that we employed in the example I

10      gave was open-ended and driven by the actual interests of the

11      participant rather than us asking them to pretend to do a

12      thing.

13  Q.  Okay.  Do you have an opinion as to whether one form of

14      research is more valuable than the other?

15  A.  It depends on the situation.  They both have value.

16  Q.  In what situations would, in your view, the naturalistic

17      shopping study be more valuable?

18  A.  It's helpful in spaces where you're not totally confident and

19      have great data on exactly what people are doing because it

20      uncovers what is actually going on, so when you're trying to

21      get a broad understanding of something, rather than narrowly

22      issuing that people use a certain thing in a certain way.

23  Q.  Did your team, the shopping design research team, at some

24      point start doing work with the user testing.com

25  A.  Yes.



1  Q.  Did you personally ever do any user testing --

2  A.  Yes.

3  Q.  -- .com studies?

4  A.  Yes.

5  Q.  Did any of those studies involve people going through the

6      product -- involve nonPrime members going through the product

7      checkout process?

8  A.  I don't recall completing a research product on that, but I

9      know there was one under discussion.

10 Q.  What do you recall about the one that was under discussion?

11 A.  I recall laying out how I would use user testing.com to test

12     the design of the checkout and Prime upsell, but I don't

13     recall if I did the research.  I don't think I did.

14 Q.  And I'm sorry; I might have missed this.  Do you know whether

15     someone else did the -- ever did the research that you're

16     talking about?

17 A.  I don't, but the prototype I was working on continued after I

18     left, so I don't know who was working on it or what they did.

19 Q.  What project was that?

20 A.  This was the migration of the Amazon checkout from an old

21     tech stack called Gurupa to a new tech stack.

22 Q.  And so if I understand correctly, there was some discussion

23     in that as that work was underway about possibly doing user

24     testing.com studies?

25 A.  Yes -- yes.



1  Q.  But you just don't know whether those studies happened?

2  A.  Correct.

3  Q.  The studies that you were discussing, what would have been --

4      what purposes were discussed for that research?

5                      MR. HUESTON:  Objection.  Compound.

6                      THE WITNESS:  I can't recall in detail,

7      but it would have been to get eyes on the experience of a

8      nonPrime shopper going through a checkout, being presented

9      with some kind of Prime upsell offer in order to understand

10     how they were responding to that in a new redesigned version

11     of checkout.

12     BY MR. MENDELSON:

13 Q.  What do you mean by "how they were responding to that"?

14 A.  We would have been looking for problems that we could

15     identify and then address in the design.

16 Q.  Okay.  All right.  Let's go to Slide 32.  It spans two pages.

17     It's right after where we just were.  And Slide 32 at the top

18     has a header that says "Don't Ignore Small Data."

19         Do you see that?

20 A.  I do.

21 Q.  And there's a quote from Jeff Wilke above that header?

22 A.  Correct.

23 Q.  Who is Jeff Wilke?

24 A.  At that time, I think he may have been the CEO of Amazon

25     retail, and if not, he was an SVP of something.



1  Q.  FR is France?

2  A.  Yes.

3  Q.  And ES is Spain?

4  A.  Yes, it is.

5  Q.  Okay.  Then in the global -- well, in the CFEP priority

6      column --

7  A.  Uh-huh, yes.

8  Q.  -- this frustration is labeled as critical.

9          Do you see that?  IT2171 is labeled "Critical"?

10  A.  Yes.

11  Q.  What does that mean?

12  A.  We had developed a rubric for conveying our opinion of

13     relative severity of issues because there were at this time

14     several thousands of things in that database.  I can't recall

15     in detail the factors that we used, but it looks like there's

16     a link here to it at the bottom in Footnote 13 where I seem

17     to recall we listed out exactly the criteria that we used to

18     decide if something was low, medium, high, critical or trust

19     busters or a number of other terms that we used.

20  Q.  Okay.  Do you recall whether critical was the highest

21     priority level in the scale?

22  A.  No.

23  Q.  You don't recall one way or the other or you think there was

24     a higher one?

25  A.  There could have been -- there could have been a higher one.



1     I think trust buster may have been a priority, but I would --

2     it's been many years since I looked at that, and I would

3     defer to the documentation about that.

4   Q.  Got it.

5          So it was the user -- the user experience research team

6     that you were on that was assigning these CFEP priority

7     levels?

8   A.  That's correct, using that rubric.

9   Q.  Got it.

10         Do you personally agree that as of at least 2018,

11    IT-2171 was a critical or should have been -- was a critical

12    CFEP priority?

13  A.  At the time that I wrote this document, yes.

14  Q.  In your -- through the rest of your time at Amazon, so going

15    forward to 2021, did that priority ever become less critical,

16    in your view?

17                     MR. HUESTON:  Objection.  Vague.

18    Foundation.

19                     THE WITNESS:  I didn't stay very close to

20    this issue, and I wasn't the subject matter expert within the

21    team.  So at the time that I wrote this, I felt that to be

22    true.  But I certainly wasn't aware of, you know, how that

23    page changed and evolved.

24    BY MR. MENDELSON:

25  Q.  I see.



MILES HUNTER  Confidential                      September 18, 2024
FTC vs AMAZON.COM                                              83

1   A.  So I can't really say whether or not when I left it was as

2       critical or not.

3   Q.  Was Reid Nelson the subject matter expert within the team?

4   A.  Yes.

5   Q.  Were there any others who -- any others within your team that

6       you would consider experts on the Prime signup confusion

7       theme?

8   A.  Within the research team specifically?

9   Q.  Yes.  We'll start there.

10  A.  So definitely Reid was the subject matter expert.  I think

11      several of us had seen examples of it and contributed

12      evidence of it to the database, but, for example, I did.  I

13      believe Linnea Hagen did.  I'm pretty sure Tracy McNulty did

14      and others did, but I don't think any of us knew as much

15      about that page as Reid did.

16  Q.  That page being UPDP?

17  A.  Correct.

18  Q.  Outside -- let's go to the UX design part of shopping design

19      now.

20          Within UX design, are there any people that you

21      consider to have expertise related to this Prime signup

22      confusion theme?

23  A.  Yes.

24  Q.  Who would those people be?

25  A.  The designers who worked on the overall checkout process



1       spent a lot more time in this area of the site than I did.
2       So, for example, I can name -- Ryan Ogborn was a designer,
3       Danielle Teska, who was a design manager.  I would consider
4       those two people to be more knowledgeable than me about --
5       really about checkout.
6    Q.  Outside of shopping design, so, for example, in the Prime
7       design team or any other team at Amazon, are there UX
8       designers or researchers that you consider as having some
9       expertise around the Prime signup confusion theme you've
10      identified here?
11   A.  I didn't have much insight into what exactly the Prime UX
12      team did, but I would assume that they would know more about
13      this, given that they were presumably more focused on the
14      Prime aspect of the experience.
15          So I'm talking about David Edelstein's team.  Outside
16      of that, there were product -- program managers and technical
17      program managers who worked on checkout.  Kristen, with a K,
18      and I don't recall her last name, was somebody who was very
19      smart about checkout.  And --
20   Q.  Could it be Miller, Kristen Miller?
21   A.  Yes, that was her.
22   Q.  Sorry.  I think you were going to -- do you have someone else
23      in mind?
24   A.  She would be the top of the list.  There were other people
25      who, you know, worked on checkout related stuff, for example,



1       the migration.  Liz Green was one.  Sara, without an H, Mead

2       was one.  I think -- and then a different team that I would

3       consider knowledgeable about this, although I am unable to

4       say whether they existed in 2018 or shortly thereafter, is

5       something that was referred to as NPX, nonPrime experience,

6       which was a small team whose job was to advocate for and help

7       optimize the experience for people who were not Prime

8       members.  And two people I know worked there were Janelle

9       Bracken.  And then there was somebody else that she worked

10      with who was more junior who was knowledgeable called Jon,

11      without an H, Ragins, double G.

12  Q.  Ragins, you said?

13  A.  Yes.  I would consider him to be knowledgeable about that.

14      That's all that's coming to mind.

15  Q.  Okay.  Going back to Appendix B, there are two other

16      frustrations ticket numbers under Prime signup confusion that

17      are identified as critical.

18          Do you see that?

19  A.  I do.

20  Q.  One of them is IT-2964, which reads, "Trust buster customers

21      had difficulty understanding the universal Prime decision

22      page UPDP choice labeled 'No thanks.  I don't want free

23      shipping.'"

24          Do you see that?

25  A.  I do.



1   A.  Yeah, if we can take a break, that would be great.

2                       MR. MENDELSON:  Sure.  Let's go off the

3       record.

4                       (Recess 11:02-11:17.)

5

6                       EXAMINATION (Continuing)

7       BY MR. MENDELSON:

8   Q.  Mr. Hunter, outside of the 2018 Japan study we were just

9       talking about, did you personally work on any user testing in

10      which you witnessed a consumer accidentally enroll in Prime?

11  A.  Let me think about that for a second.

12          Are we scoping this to the U.S. only?

13  Q.  No.

14  A.  And I'm assuming that me watching video of it happening

15      elsewhere but not when I was running the research doesn't

16      count?

17  Q.  Good clarification.  Okay.  Let me start over.

18          Let's -- for this question or these next few questions,

19      let's focus on studies that you were running or had a --

20      well, general -- let me step back again.

21          When your team, the user experience research team

22      within shopping design, was working on user testing studies,

23      was there generally one researcher who was kind of the point

24      person for a particular study?

25  A.  For things done in the U.S., yes.  Sometimes with

1    international studies there were two.

2  Q.  Okay.  For -- let's take the U.S. first.

3        For any U.S. user testing study where you were the

4    point person from your team, do you recall whether you

5    witnessed any user unintentionally enroll in Amazon Prime?

6  A.  Let me think.  It was a long time ago.

7        I can recall studies where it could have happened, but

8    I can't, as I sit here now, recall an instance of it.

9  Q.  Okay.  So you don't remember a specific time, but you think

10    it could have happened in your studies?

11  A.  Correct.

12  Q.  Are there any particular studies you're thinking of?

13  A.  Yes.  2017 I ran a study that we referred to as other side of

14    the fence, I think, which was focused on customers who were

15    not active members of Amazon Prime and that involved in-home

16    research in Atlanta and Minneapolis.

17        And I think there was a precursor to that.  I think I

18    ran a remote version of it, so that is where I was, you know,

19    talking to the people, and it was done over not Zoom, but

20    something similar.  I did that in 2015.  I think they called

21    that one the other side of the fence.  And the other one was

22    other side of the fence two, I think.

23  Q.  Other than those studies, are there any U.S. studies where

24    you think that you were the point person on where you think

25    someone might have unintentionally enrolled in Prime?



MILES HUNTER  Confidential                                    September 18, 2024
FTC vs AMAZON.COM                                                          89

 1  A.  Let me think.  Not that I recall.

 2  Q.  Would all of the U.S. studies that you were point person on

 3      have presented -- well, let me ask this -- or let me start

 4      over.

 5          Were all of those studies on nonPrime Amazon members or

 6      would some of them have been on existing Prime members?

 7  A.  The majority were probably with Prime members, because the

 8      majority of, I guess, customers were in the U.S.

 9      specifically.

10  Q.  And the majority of people in the U.S. are Prime members; is

11      that right?

12  A.  I don't know numbers.  I know that if I was to recruit ten

13      people who said they shop on Amazon, more than five of them

14      would be like, I'm an active member of Prime.

15  Q.  And of course someone who's already a member of Prime, you

16      wouldn't be able to witness them enroll in Prime again?

17  A.  Correct.

18  Q.  All right.  We've been talking U.S. studies.

19          NonU.S. studies where you were either the point person

20      or one of two point people, do you recall witnessing other,

21      than Japan 2018, anyone non -- or unintentionally enrolled in

22      Prime?

23  A.  So not Japan.  There was a study in Germany which I was sort

24      of the backup person for.

25  Q.  Okay.



1      that.  I did not have, you know, oversight of their roadmap,

2      and so I don't know, you know, what they did and didn't do.

3           I think reading between the lines here he is possibly a

4      little skeptical about how they are going about that, and he

5      is saying that he'd like me to have a look at it.

6                         MR. HUESTON:  I move to strike everything

7      after "I would guess."

8      BY MR. MENDELSON:

9   Q. And just to make sure I understand, you don't remember

10     whether you ever looked at a user testing plan for a study

11     referenced here?

12  A. I don't remember seeing somebody else's plan, but I vaguely

13     recall sketching out a sort of how I would do it plan.

14  Q. Okay.  We might have covered this before.  The minimum CX bar

15     item that was referenced on Page 2, which again is referenced

16     on Page 1 in the next bullet point down from what we were

17     just looking at, do you remember if there was ever a final

18     set of minimum CX bar guidelines that was put together?

19  A. I don't think there was.  It was more a term to describe, you

20     know, what we collectively felt was okay.  It wasn't a set of

21     standards that was written down that I recall.

22  Q. Okay.  The very top bullet on the first page of MH6 reads,

23     "It would be good for us to capture plans for Prime retention

24     CX Ilyiad, not just Prime acquisition."

25          Do you see that?



```
 1   A.  Yes.

 2   Q.  You understand Ilyiad to refer to the process by which

 3       consumers can cancel their Prime membership on line?

 4   A.  Only by reading about that in newspapers after I left Amazon.

 5       I didn't know we used that term when I was at Amazon.

 6   Q.  Okay.  Did you ever do any work on the Prime online

 7       cancellation flow?

 8   A.  Not directly.  It may have come up if I -- you know, if I

 9       imagine if a customer had accidentally signed up, we would

10       probably, as a matter of protocol have insisted that we

11       cancel if they didn't want it.  And I guess we might have

12       seen that as part of a session, so it could exist as an

13       observation, but I don't recall that happening.  But I

14       definitely didn't -- I do not recall doing a study focused on

15       that flow because it was not something that was, you know,

16       owned by the team that I worked on.  That would be the Prime

17       team, if anybody ever did work on that.

18   Q.  Okay.  So am I correct that you don't remember anyone -- any

19       user experience researcher on your team in the shopping

20       design team doing research directed towards the Prime

21       cancellation flow as opposed to it might have come up in a

22       study?

23   A.  Correct.  I don't recall that existing as a study.

24   Q.  Okay.

25                   MR. MENDELSON:  Oh, we're past
```



1    12 o'clock, and I'm done with this exhibit, so why don't we

2    take a lunch break.

3                         (Recess 12:09-1:02.)

4

5                    EXAMINATION (Continuing)

6    BY MR. MENDELSON:

7    Q.  Mr. Hunter, I'm handing you what I've marked as Exhibit MH7.

8                         (Exhibit No. 7 marked

9                          for identification.)

10                   MR. HUESTON:  This is marked as?

11                   MR. MENDELSON:  MH7.

12   BY MR. MENDELSON:

13   Q.  For the record, MH7 is AMZN_00102109.  And let's start on the

14   bottom e-mail on the first page of MH7, and this is an e-mail

15   authored by Reid Nelson, correct?

16   A.  Correct.

17   Q.  Sent to you and it looks like others on your team?

18   A.  Yes.  Some of those people were not on my team.

19   Q.  Okay.  And it's dated May 29th, 2020, correct?

20   A.  Yes.

21   Q.  And Mr. Nelson writes, "We're approaching a deadline for a

22   cross org design brainstorm on subscription clarity happening

23   June 5th."

24        Do you see that?

25   A.  Yes.



```
 1                          EXAMINATION
 2       BY MR. HUESTON:
 3   Q.  Good afternoon, Mr. Hunter.
 4   A.  Hello.
 5   Q.  You've been asked many questions relating to the customer
 6       frustrations elimination program.  To be clear, the customer
 7       frustrations your team collected was not limited to Prime,
 8       right?
 9   A.  Very much so.
10   Q.  And it wasn't limited to Prime signup or cancellation, right?
11   A.  Correct.
12   Q.  It spanned all areas of Amazon, right?
13   A.  And beyond.
14   Q.  And beyond.  And similarly, your role at Amazon wasn't
15       limited to Prime?
16   A.  Correct.
17   Q.  What did you -- in your word, what did you focus in on in
18       your work at Amazon?
19   A.  What did I focus in on?
20   Q.  Yes.  What was your focus?  If you could kind of describe
21       overall the focus of your work.
22   A.  What was the focus of my work?  That's a very difficult
23       question to answer, because I had an extremely broad surface
24       area over the ten and a half years, so I don't really know
25       how to answer that.
```



```
 1   Q.  All right.  Well, I'll take that as an answer, and let me
 2       just follow up with a different question.
 3             The customer experience in signing up to Prime would
 4       have represented a small part of your overall work, right?
 5   A.  That's accurate.
 6   Q.  And in fact, the majority or even vast majority of your time
 7       and effort was focused on researching issues other than those
 8       related to Prime signup; is that right?
 9   A.  That's accurate.
10   Q.  Okay.  And is it also accurate that because you weren't
11       focused in your work on the Prime signup experience in
12       general, you did not personally closely track changes that
13       were being tested and made by the Prime teams?
14   A.  Totally correct.
15   Q.  What about the Prime cancellation experience?  Was that a
16       focus, a main focus of your work at Amazon?
17   A.  No, even less so than the signup.
18   Q.  Okay.  Did you personally do any research regarding the Prime
19       cancellation as well?
20   A.  I never directly researched it, but it may have came up in
21       some research I did, but evidently not much or I'd remember
22       it.
23   Q.  Okay.  And just like I asked about signup, is it fair to say
24       because you weren't focused on the Prime cancellation
25       experience, you weren't closely tracking whatever changes may
```



1    have been made or not made to the cancellation code that were

2    being tested by the Prime team?

3  A.  True.

4  Q.  Okay.  So we've talked about the customer frustrations

5    elimination program, but there hasn't been much testimony as

6    to what is a customer frustration.

7        So customer frustrations can mean a broad number of

8    things at Amazon, correct?

9  A.  That is correct.

10 Q.  It could include bugs to pain points to various ways the

11   customer experience could be improved?

12 A.  Yes.  But more than that, it could include delighters.  It

13   could include observations of how people are using a

14   competitor system.  It could include translation quirks.  It

15   could include unmet needs that could be resolved by maybe a

16   new feature or business unit.

17       I was not a fan of the term "frustration" because I

18   thought it was needlessly specific.

19 Q.  I see.

20       And when you say "delighters," what do you mean by

21   that?

22 A.  Yes.  We define a delighter as when somebody, a research

23   participant is evidently pleased, surprised, delighted by

24   something they're experiencing and that they express that of

25   their own volition, not being asked, did you like that?



1    right?

2  A.  Yes.  I think specifically it's coming from Reid and I think

3       maybe Mary Pat.

4  Q.  Okay.  And bar raising, that is reflecting trying to set a

5       higher bar for the group than it already has, right?

6  A.  Yes, that's Amazon jargon for doing better.

7  Q.  Doing better.  That is not saying we need to do better to

8       meet the standards of the law, right, sir?

9  A.  I agree.  It's agnostic of that.

10 Q.  So for instance, and counsel pointed this one out to you --

11      if we go to Page 3 of this document, he brought you to the

12      third box that had the tenet, "The opt out must be as

13      visually prominent as the opt in."

14 A.  Uh-huh.

15 Q.  And I think you actually disagreed with that as written,

16      right?

17 A.  I did.  I felt that that was written more strongly than I

18      would feel comfortable with.

19 Q.  Right.  And you don't recognize that tenet or opt out must be

20      as visually prominent as the opt in as what the law requires,

21      right?

22                     MR. MENDELSON:  Objection.  Foundation.

23                     THE WITNESS:  Correct.  I would add that

24      when tenet is being used here, it is not being used in the

25      same way as in the team document.  These -- I believe these



1    may be proposed.  I don't know who signed off on them.  I

2    don't think they are the same thing as the tenets that you

3    pointed out for the shopping design which were thoroughly

4    vetted and approved by our leadership and they agreed.  Yes,

5    that is correct.

6    BY MR. HUESTON:

7  Q.  Okay.  Great.

8         You just mentioned that what we were referencing --

9    well, let me just -- let me just back up a little bit here.

10        There's been some references to discussions about

11    clarity, right?

12 A.  Uh-huh, yeah.

13 Q.  Okay.  And those discussions that you have been referencing

14    today, those discussions, to your recollection, were not

15    connected with any sort of legal standard of clarity, right?

16 A.  I am not aware of what the legal standard of clarity is, so I

17    think I agree with what you're saying.

18 Q.  Okay.  Put differently, during those discussions, you were

19    not discussing clarity in terms of we better do this because

20    Amazon's in violation of the law?

21 A.  No, I was not.  I was not.  I don't know if anyone was, but I

22    was not.

23 Q.  Fair to say those discussions about clarity were about

24    improving the customer experience because you believed it

25    could be better, right?



1   A.  That is very true.

2   Q.  And not because you believe that Amazon was violating any

3       sort of law, right?

4   A.  Right.  I was not aware of any laws that spoke to that.

5   Q.  Okay.  Let's go to Tab 12.

6                           (Exhibit No. 29 marked

7                             for identification.)

8       BY MR. HUESTON:

9   Q.  This will be MH29.  And MH29, for the record, is entitled

10      "Draft Outline for the October 2020 E-mail Newsletter."

11          And, Mr. Hunter, do you recognize this as appearing to

12      have been prepared by the shopping design research team?

13  A.  It looks like a familiar format, yes.

14  Q.  Do you remember the team generally sending out newsletters

15      like this, periodic newsletters?

16  A.  Periodically, yes.

17  Q.  Okay.  Let's turn to Page 2 of this document where there's a

18      heading "Shopper Frustration Virus."

19          Do you see that?

20  A.  I do, yeah.

21  Q.  And under that heading, the document reads, "We want to give

22      a shout out to the nonPrime experience program for working

23      backwards from our team's insight database,

24      research.Amazon.com."

25          Do you see that?



```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, CONNIE A. RECOB, the undersigned Certified Court

 4   Reporter, authorized to administer oaths and affirmations in

 5   and for the States of Washington, Oregon, Utah and Idaho, do

 6   hereby certify that the sworn testimony and/or proceedings, a

 7   transcript of which is attached, was given before me at the

 8   time and place stated therein; that any and/or all

 9   witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19        WITNESS MY HAND and SIGNATURE this 27th day of

20   September, 2025.

21

22        _____

23        /s/CONNIE A. RECOB, RMR, CRR
          Washington CCR No. 2631
24        Oregon CCR No. 15-0436
          Utah CCR No. 1133171-7801
25        Idaho CCR No. SRL-1220
```



# EXHIBIT 36

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

1  **Purpose and Background:**
2  The purpose of this document and discussion is to align on 1) our mental model and approach for Prime upsell and cancellation
3  experiences, 2) the role these experiences play in overall program satisfaction, and 3) potential short and long term changes to
4  these experiences.  In addition to focusing on customer obsession, this work is being done at the request of counsel to address the
5  current regulatory environment we are in. In the US and EU, Prime's upsell and cancellation experiences are under active
6  investigation for unfair and deceptive consumer practices.[1] Lawmakers and regulators are under political pressure to go after
7  allegedly abusive and deceptive practices by companies with respect to these types of online experiences.  Following a January
8  2021 consumer study out of Norway focusing on "dark patterns" (manipulative design techniques)[2], we saw a flurry of press
9  coverage regarding Prime[3] followed by the regulatory contacts. Although all of our current experiences have been evaluated and
10 designed to comply with applicable law, Amazon is a desirable target for novel and aggressive enforcement and legislation. We've
11 always focused on the customer, but the legal standards for sign-up and cancellation do have room for interpretation (e.g., "clear
12 and conspicuous" disclosures, "a simple mechanism" to cancel). In light of all of this, we must consider and evaluate "Ideal CX"
13 options (ones we believe best serve the customer, business and uniqueness of Prime), as well as "Mitigated CX" options (ones we
14 believe may mitigate regulatory/legislative action) and "Imposed CX" options (ones we think could be imposed on us through
15 enforcement or legislation even if they degrade the CX). As we engage with regulators, we are advocating for and contextualizing
16 our current and Ideal CX proposals as much as possible, but we expect that they may look for blunt force CX changes to show
17 "improvement" either through negotiation or enforcement. We have indications that the Prime cancellation flow is of more
18 interest to the regulators than the sign-up flow right now, but both are at issue. We also know that the regulators are in contact
19 with each other. Given the current state, we believe we may be able to avoid enforcement action in the EU by offering up changes
20 to the cancel flow in Q2. In the US, we believe we will have until Q3 to begin negotiations on proposed changes to our CX if
21 deemed problematic by the regulator. Of course we can't predict how things will progress with a regulator, or when it might be a
22 strategic advantage to offer-up or implement a particular CX change in a jurisdiction. We must keep in mind as we evaluate points
23 (1), (2) and (3) above that we are seeking leadership input on, there is now an interplay between any of our desired changes to the
24 CX, what a regulator might want to see changed, and the timing and geographic deployment of those based on the evolving
25 situations on the ground.
26
27 **Introduction:**
28 Prime's vision is to become the world's most engaging, satisfying, and loved membership program that delivers growth and
29 profitability by driving the Amazon flywheel.  As of March 2021, engagement with all major benefits has increased YoY (WW
30 shipping engagement is ▇▇ bps YoY, Prime Video ▇▇ bps YoY and Prime Gaming is ▇▇ bps YoY), ▇% of 60+ paid day
31 members WW renewed their membership (▇▇ bps YoY) and the Q4 Retail-Prime brand tracker indicates that Net Promoter Score
32 for Prime is among the top 2 in all countries surveyed. Member responses to "I love this membership program" are stable or
33 improving across all countries. In 8 out of 9 surveyed countries, Amazon Prime is among the top 2 most loved membership
34 programs (see Appendix A). These quantitative and qualitative indicators lead us to believe that a vast majority of our members
35 are engaged with the program, satisfied with the value it adds to their lives and that Prime is a loved membership.
36
37 We realize that members experience Prime across several touchpoints and each of these experiences contribute to overall
38 member engagement, satisfaction and love for the program. The online account management CX, including the signup and
39 cancellation experiences, while transactional in nature, contribute to member perceptions and satisfaction by providing a means
40 for customers to understand Prime and take informed actions regarding their membership. We currently do not have a way to
41 measure the impact these transactional experiences have on members' perceptions about Prime and Amazon in the short and long
42 term. In developing these critical ingress and exit points for Prime, we therefore need to make high judgement calls to create a CX
43 that provides the right balance of information and interaction for customers to join and stay Prime, or leave if they choose to do

---

[1] In the US, the Federal Trade Commission (FTC) issued a formal Civil Investigative Demand on March 16, 2021 regarding our practices. We have negotiated two initial responses to the FTC already, and anticipate completing our final responses by August 2021. In the EU, after a meeting with the EU Commission on April 13, 2021, we have agreed to have informal discussions with them regarding our practices to avoid a formal investigation at this point. We believe the regulators around the world are in touch regarding their activity with Amazon.

[2] On January 14, 2021, the Norwegian Consumer Council (NCC, a government funded organization that represents consumer interests) issued the "You Can Log Out, But You Can Never Leave: How Amazon manipulates consumers to keep them subscribed to Amazon Prime" study.  The study spurred a flurry of complaints around the world and increased pressure on regulators and legislatures to act.

[3] The week of the NCC study being published, PR tracked ▇▇ pieces of coverage, including in Bloomberg, New York Times, Fortune and BBC News. Coverage was primarily negative to neutral in tone, highlighting the false claim that steps to cancel Prime "are designed to unfairly and deceptively undermine the will of the consumer."

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**

Prime Account CX Satisfaction

44  so. To date, we have biased our CX decisions towards making it easy for all customers to join and experience Prime and then make
45  informed decisions about continuing their membership. However, through UX research, customer service calls, and responses to
46  the Prime cancel survey some customers have indicated that aspects of the Prime account flow CX are confusing to navigate,
47  specifically the Prime upsell flow in checkout and the cancellation experience.
48
49  We have launched initiatives to address these customer frustrations and have some encouraging results in the cancel flow,
50  however our efforts to modify checkout upsells to date have resulted in significant headwinds to the business in terms of signups
51  without an objective way to measure commensurate improvement in member satisfaction. Based on our experiments, we believe
52  these issues disproportionately impact a portion of our customers and our broad and untargeted corrective measures have been
53  too blunt an instrument with which to solve these customer concerns. Moving forward, in order to create our Ideal CX, we are
54  investing in improved segmentation and measurements of impact to improve member satisfaction with these transactions. Our
55  approach is to work backwards from the problematic outcomes (e.g. unintentional renewal charges), and prevent these by
56  creating structured interventions throughout the customer journey, including but not limited to, confirmation of signup and
57  reminders before renewal. To inform where we set these dials, we have examined the signup and cancel experiences across some
58  of the largest subscriptions programs in the US and EU across a mix of programs that require a subscription to access (e.g. ▮▮▮▮
59  ▮▮▮▮▮▮▮▮▮▮) and others that align more directly with the Prime experience, where a subscription upgrades the
60  experience beyond the core retail offering (▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
61
62  In this document, we will share top customer concerns, how Amazon compares to competitors in terms of relevant account flows,
63  and our approach towards resolving these concerns for the customers they affect. Given these are high judgement decisions, we
64  seek feedback on CX changes and how we're making decisions to dial-up experiments. In light of the current regulatory
65  environment, we also seek feedback on strategically implementing Mitigated CXs to avoid potentially Imposed CXs, as well as
66  timing (although the latter may be impacted by regulatory developments).
67
68  **Sign-up to Upsells at Checkout**
69  One issue surfaced through the Prime cancellation survey and tracked customer frustrations is that some customers are
70  communicating confusion to the fact that they are signing up for Prime. In 2020, there were ▮▮▮▮▮ Prime sign-ups in the US, and
71  of these, an estimated ▮▮▮▮▮▮▮ self-reported themselves as "mistakenly signed up" in the Prime cancel survey when they
72  cancelled their membership within 60 days post signup. In addition, ▮ of the ▮▮▮ open Prime customer frustrations are related to
73  unintended Prime signups. (Appendix B)
74
75  Based on anecdotes shared by the Shopper Frustrations team, the primary contributing issues for these mistaken signups are
76  unclear Calls to Action (CTAs) on specific locations and details of the membership (price, renewal terms) only being clearly
77  displayed in the signup terms (i.e. the non-marketing disclosures all customers see at signup). For example, customers have clicked
78  on the signup button on the Prime interstitial in checkout (UPDP) that says "Get FREE one-day delivery", not realizing that this
79  signs them up for a Prime membership or they have missed the "No thanks" option when it is presented as a link rather than a
80  button (see addendum for screenshots of current Prime experiences). Please see verbatim from one customer below and more
81  details and anecdotes demonstrating these shopper frustration themes, including video clips and screenshots in Appendix C.
82
83  *"This is something that has never happened to me before! I fell for it! (The sign up button) has to be obvious and not like you're falling into a trap.*
84  *But no, the way it is now, it's so well-placed, it's going to get clicked...people will click on it unconsciously. I'm furious. I'll have to rethink if I'm*
85  *shopping on Amazon. Before (on the detail page) it said 'Free shipping', so I didn't expect that consequence from the (sign-up) button. I'm*
86  *frustrated that they set a trap that they work with such methods."*
87  ▮▮▮▮▮ *from Vienna, September 2019*
88
89  <u>*Benchmark comparison(s)*</u>
90  We compared the Prime upsell experience in checkout to the upsell experience for programs like ▮▮▮▮▮ in the US and
91  ▮▮▮▮▮▮ in the EU as comparable services where the subscription offers an upgrade from the core retail journey. The
92  addendum features a more complete benchmarking assessment against additional digital subscription services while Table 1 below
93  focuses on services that offer an upsell during onsite shopping. Where relevant, we noted related customer frustration tickets. As
94  the table shows, Prime is similar to competitors in some aspects like providing a clear decline option but our positive CTA (on UPDP
95  specifically) does not mention that customers will be starting a Free Trial and we feature renewal terms and price only in the T&Cs
96  (see addendum document for screen shot comparisons across these programs).
97

CONFIDENTIAL

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

98

Table 1: Checkout upsell comparison

| | # of Upsells in Checkout | Details provided | Price Included Outside T&Cs? | Renewal Terms Outside T&Cs? | Positive CTA | Mention 'Trial' in Accept CTA? | Negative CTA | Concise 'No Thanks' CTA? | 'No Thanks' CTA (Button vs. Text) |
|---|---|---|---|---|---|---|---|---|---|
| Related Frustrations | | | IT-4653 | IT-2168 | | IT-2171 | | IT-2964 | IT-2170 |
| Prime | | | | | | | | | |

99
100
101

_Testing and Learnings_

102
103  We have experimented extensively in order to address customer frustrations with the checkout sign-up process. In addition to the
104  impact to paid member balance, we also assess signing up, Prime benefit engagement, as well as CS contact reduction for reasons
105  code "unintended sign-ups" as proxy measures of satisfaction. We note that these measures are only a proxy for customer
106  satisfaction, and reliance on these proxies must be limited and scrutinized because they do not reflect actual customer sentiment.
107

108  We have experimented across the US and EU by updating CTAs on UPDP including making it a button vs. a link, and also tested
109  including language that customers would begin their Prime trial. These experiments have not been dialed up due to mixed results.
110  Such UPDP experiments in the US from 2018 to Jan 2020 resulted in test groups having reduced rates of CS cancellations with
111  reason code "unintended signup" (reductions from ██% to ██% ), and customers who did signup on these treatments stayed with
112  Prime ████ ████ to ██% increases in customers staying Prime after 365 days).  Despite these positive indicators,  benefit
113  engagement results were mixed (shipping benefit usage ranges from ██% to ██% and digital benefit usage increased ██% to
114  ██%), and signup rates declined (██% to ██%) leading to a decline in the net number of 365 day Prime members.
115  Comparing the number of presumed unintended signups (measured by CS cancellations codes) we prevented to the loss in
116  presumed intended 365 day paid members (active paid members 12 months after signup), we could lose up to ██ 365 day paid
117  members for every  unintended signup we prevent.  Please see Appendix E for a subset of design variations tested on UPDP.
118

119  In addition to the CTA experiments which explicitly address the feedback from the Customer Frustrations team, we have made
120  other changes over the years that help customers understand that they are signing up for a Prime membership, including
121  prominent Prime branding on checkout upsells and 'Cancel anytime' copy on key locations. We also focus on post-sign-up
122  education with measures including: 1) all customers who sign up for Prime in checkout see a stripe on the final checkout page
123  which confirms Prime membership activation, 2) immediately after signing up, customers receive a welcome email which features
124  details of their membership, 3) on desktop only - customers see a confirmation message on checkout thank you page and an
125  activation Tooltip (i.e., no hovering required) automatically expands near "Prime" in the navigation bar on Gateway when
126  customers return to Amazon after signing up for Prime and 4) on desktop, a drop down (flyout) with Prime messaging appears
127  when members hover over "Prime" in the navigation bar. We are also testing new confirmation options post signup to ensure
128  members are aware of their Prime trial or subscription (see Appendix D for screenshots of current confirmation CX and mocks for
129  upcoming test).
130
131
132

AMZN-PRM-FTC-002673016_002

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

133 *Planned approach moving forward*
134 The changes we have attempted with updated CTAs and prominent membership information force customers to make a choice at
135 a point of transaction (e.g. "should I pay for shipping on this order") but prevent the behavior change of never having to worry
136 about shipping costs again nor the value added by other Prime benefits. Therefore, we hypothesize they could be leading
137 customers who would benefit from and enjoy Prime after they experience the membership to miss out on doing so.
138 Accordingly, our mental model for Prime upsells has been to make it easy for customers to join and start experiencing Prime,
139 provide clear indicators of membership status and offer a path to leave Prime for those not satisfied with the value they receive.
140
141 Focusing on the best customer outcomes, we have debated if our current checkout upsell experience properly balances the
142 reduction in friction to sign-up for Prime with the considerations of joining Prime (e.g., payment and renewal), leading to
143 unintended signups. We do not currently have a reliable methodology to proactively isolate these customers who would benefit
144 from more prominent membership related information at the point of signup. Our primary mechanism to address this is an ML
145 initiative focused on predictive cancel intent (Nostradamus). Nostradamus is rolling out in phases over Q2/Q3, with phase 1 being
146 launch of a member level cancel intent model that provides 10 different cancel reasons for high cancel intent customers. As part of
147 this initiative, we will work backwards from the customers who self-report as unintended signups on the Prime cancel survey and
148 identify the patterns and journeys these customer follow through the Prime CX so we can develop targeted intervention, such as
149 additional confirmation options and billing reminders, to communicate appropriate information at relevant points in their
150 customer journey. Additionally, we are working on a proposal for a scalable measure of "satisfaction" with regard to the Prime
151 experience inclusive of the account management flows experiences to baseline our current experiences and improve over time.
152 We are in the early stages of this discussion with CBA team and Prime teams worldwide.
153
154 Lastly, Prime co-owns an S-Team goal with the Shopping Foundations team to deprecate Gurupa by 10/31/21 (Kingpin 296437)
155 due to concerns with the long term security of the service. As part of this migration, we will be deprecating the desktop Multi-page
156 Pipeline in checkout favor of True Single Page Checkout. This will require a redesign of the Prime upsell experience in checkout on
157 Desktop, and as part of this redesign we will look for opportunities to converge the two projects where possible to reduce impacts
158 and leverage design choices.
159
160 *Seeking leadership alignment*
161 While the approach outlined above is our preferred approach and Ideal CX to resolving these customer frustrations, we recognize
162 it is a gradual methodology. Due to regulatory scrutiny on the Prime upsell experience, we may be required to make more
163 immediate changes, most likely to the UPDP CX given its prominence and presentation (regulators may also raise issues with
164 elements of other sign up locations, which we would need to consider in due course if and when issues are raised). We have
165 outlined a range of potential Mitigated CX options below along with estimated impact based on previous tests. These changes
166 focus on modifying CTAs and information presented outside of Terms and Conditions on UPDP. While we believe all of these
167 options comply with applicable law, we believe an Imposed CX will be close to Option 3 outlined below (although there is still a lot
168 of uncertainty as to where any discussions with regulators will lead to and the timing of those). With this in mind, we seek
169 alignment on the options we may want to pursue and whether such changes should be adopted globally. The estimates below are
170 based on experiments and changes we made to UPDP in Jan and Sep 2020 – these changes were close to Option 3 and resulted in
171 an impact of an estimated ▆▆▆ paid members annualized WW. Estimates of smaller changes have been made working backwards
172 from that observed result.
173

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

174
175

1. **Control [Best Result] :** Customers indicate confusion with CTAs (1 & 2)  and not finding subscription price and renewal terms outside T&Cs (3)





176
177

178
179

2. **Option 1 (Mitigated CX) –** i) Add **auto renewal information near positive CTA** and ii) **simplify negative CTA language**, keeping as link per standard benchmarking. Estimated Impact: ▇▇▇▇ to ▇▇▇▇ estimated paid members annualized worldwide[4].





180
181
182

---

[4] Please note T&Cs are cropped out in options presented as they are unchanged.

Amazon Privileged & Confidential 5

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**

Prime Account CX Satisfaction

183    3.  **Option 2 ( Mitigated CX)** – All changes in Option 1 and **Update positive CTA** to further emphasize that customers are signing up Prime
184       trial.  Estimated Impact: █████ to █████ estimated paid members annualized worldwide.
185



186

187    4.  **Option 3 (Imposed CX)** – All changes in options 1 & 2 and **update negative CTA to a button** to provide equal prominence. Estimated
188       Impact: █████ estimated paid members annualized worldwide
189



190
191

192    **Cancel Flow:**

193    There were █████ WW member cancel initiations in 2020 WW, of which █████% are online and █████% through CS. █% 
194    of members who enter the online cancelation flow end up staying with Prime █████. The online cancellation process features a
195    flow that presents pertinent information to members such as alternate plan types or options (e.g. monthly vs annual, or pausing
196    the membership instead of canceling) and additional information relevant to the customer's membership (e.g. Prime benefits, next
197    billing date, billing reminders). Customers enter the cancelation flow by clicking on Prime in 'Your account' on the Gateway Nav,
198    and proceeding to 'manage membership' (see screenshot in the next section). Through CS contact mining, cancel survey free form

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**

Prime Account CX Satisfaction

199    text, and customer studies, we are aware that some customers find the online cancelation flow hard to find and navigate. Further,
200    customers in focus groups and UX studies have expressed frustration at the number of clicks they need to perform in the cancel
201    flow, to be able to cancel their Prime membership. The regulatory complaints in the EU and US also identify with these pain points.
202
203    As ▇ (Munich, 2019) stated, "*Amazon makes it extremely difficult to make the cancellation final, because of the many steps we have just*
204    *taken...As a customer I expect a certain degree of appreciation...that I can do things efficiently. I had to tell them several times that I absolutely*
205    *wanted to cancel it...I can imagine that many people would not finish the cancellation, because of these many steps.*"
206
207    Similar to the upsell flow, we believe the frustration in completing the experience is applicable to a segment of customers as the
208    data from the cancel flow (Appendix F) shows that ▇% of those that enter the flow (for US, UK, DE, and FR in FY 2020) complete
209    it up to the last page. Of those that enter the flow and decide not to cancel Prime, ▇% subsequently call CS to cancel in the next 30
210    days, and ▇% use benefits within the next 30 days (▇bps vs average Prime member base over a comparable 30 day time
211    frame). Additionally, ▇% of customers who choose to stay Prime after entering the cancelation flow remain Prime after 90 days
212    (consistent with ▇pd program renewal rate of ▇%), indicating that our efforts to educate customers about their benefits in the
213    cancel flow are not short lived.
214
215    *Benchmark comparison(s)*
216    We compared the Prime cancellation experience across the upsell programs used in the sign-up experience as well as other well-
217    known digital subscriptions (▇▇▇▇▇▇▇▇, and ▇▇▇▇). Comparing CX for these programs
218    across the top customer frustrations, Amazon is slightly better than the average in 1) steps to find cancel from the home page, and
219    2) steps to cancel once entering the flow. (See Table 2 below). Within the cancel flow, most programs remind customers of the
220    benefits they will lose by cancelling and provide options to switch plans, where applicable. ▇▇▇ requires customers to specify
221    a reason before they can cancel and others like ▇▇ offer a 1 question survey post cancellation. The Prime cancelation flow
222    takes three clicks to complete, and as Amazon offers several services and memberships, finding the ingress into Prime cancelation
223    might be confusing for customers despite the Prime membership page ingress being located within Account & Lists from the
224    gateway. At a flow length of three clicks from ingress, the cancel flow is similar in length to other programs and offers customers a
225    chance to switch plans or pause membership before cancelling.
226
227    Table 2: Cancel flow comparison

| | Online Cancel Available? | # Steps to Reach Cancel Flow | # Steps to Cancel | Alernative Payment Options/Plans | Option to Pause Membership | Renewal Reminder Opt In | Cancel survey | Benefits that will be lost w/ Cancellation | Benefits extended through end of billing/trial cycle | Special Offers in Cancel Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| Related Frustrations | | IT-3138 | IT-3144 | | | | | | | |
| Prime | | | | | | | | | | |

228
229
230
231
232    *Testing and Learnings*

CONFIDENTIAL

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

233 Our successful experiments and learnings on the cancel flow have been organized into three hypotheses. First, we wanted to test
234 whether certain customers benefit from easier access to the cancel flow. Towards this, in 2020 we experimented with improved
235 accessibility to 'end membership', for groups of customers we identified as 'low propensity to remain Prime'. For these customers,
236 we increased visibility of Prime membership management options on high traffic Prime locations and have found that these
237 initiatives were highly beneficial to customers (███ CS contacts ███ Additionally, they were also member accretive,
238 indicating to us that when membership management is made accessible to targeted sets of customers, they end up engaging with
239 the membership. Second, we wanted to test whether customers value the opportunity to make more informed decisions at the
240 time of canceling Prime. Towards this, in 1H 2020 we enhanced the customer service cancel experience - by enabling customer
241 service agents WW to direct customers contacting CS with intent to cancel, to the online cancelation flow. In doing so, we realized
242 about ███ member renewals annually via the mix shift (███ bps in 2021Q1 vs 2019Q1), as our online cancelation flow
243 provides pertinent information – alternate plans, offers and benefits info. Lastly, we wanted to also validate whether we can make
244 simplifications in the cancellation flow, while yielding accretive business outcomes. Towards this, we unified 'Cancel Prime' and
245 'Pause my membership' options into a single 'stop billing' CTA: we were able to accomplish the cognitive load reduction with a
246 ███ outcome in the US, in Q1 2021 (███ members retained incrementally annualized, on account of members returning
247 to the program at a ███ rate). In Q3 2020, we tried generic messaging in the flow on the cancel flow to prompt members with
248 no music streaming history to use music, resulting in poor adoption. We subsequently dialed down, with the learning that our
249 customers' bar for relevance is much higher, and that they do not value overly generic information.
250
251 _Planned approach moving forward_
252 We are aware of two distinct issues some customers face with our cancel flow today. (1)  an easier way to find Prime cancellation
253 options - at present, this could be challenging depending on other Amazon programs each customer is part of; and (2) once
254 customers find the flow, the number of clicks to cancelation may present unnecessary friction. Blunt force instruments to shorten
255 the flow, or increase visibility to cancel flow may impact these numbers drastically. Acknowledging the concerns while aiming to
256 solve them for customers, our mental model for the Prime cancelation experience is threefold. **First**, we are working on
257 redesigning our cancel flow starting from Prime Central (Prime Management page) with a goal to have a single page account
258 management workflow including cancelation as well as payment / plan updates, and benefit discovery in 2021. We believe this will
259 entail a simplification of the entire CX – i.e. locations like Prime Central and our targeted communications to customers on higher
260 traffic locations like Gateway, to be much more targeted and relevant to customer cancel intent. We are testing this simplification
261 initiative (named Café) in Q2 and Q3 – starting with deprecating lower performing widgets/content in the current flow, and
262 marginally increasing personalization of customer metadata (e.g. a 'days left to experience benefits' experiment yielded ███
263 members in Q1/Q2 WW). **Second**, in parallel, we are working to improve accessibility of the flow to subsets of customers. We have
264 a named initiative today WW (Ava2.0) that high cancel intent customer see on Gateway, proactively prompting them to manage
265 their membership instead of needing to navigate to the account & settings menu. In 2021 Q2 and Q3, we will expand the targeting
266 for this initiative to all high cancel probability customers, and also try new CX variations to prompt discovery along the way. Our
267 aim here is to get ahead of members' explicitly entering the cancel flow. We know that ██% of customers who cancel via CS do not
268 come to Amazon, but rather search via Google to cancel Prime. We are prioritizing SEM/SEO initiatives to get ahead of members
269 dialing CS. **Lastly**, we want to de-aggregate reasons why customers cancel (e.g. service defects), and engage with them upstream,
270 thereby reducing intent to enter cancelation flow, or search for cancelation. As our predictive cancel intent project (Nostradamus)
271 rolls out a member level cancel intent model, we will test into various interventions upstream of cancelation flow, using member
272 level predictive intent scores to (e.g. prominently highlight monthly plan switch, for annual customers who are likely to cancel due
273 to the desire for shorter duration plans).
274
275 _Seeking Leadership Alignment_
276 As with the upsell flows, our preferred option is to focus on the above, however due to regulatory scrutiny on the Prime cancel
277 experience, we may be required to make more immediate changes, specifically to the cancel flow. We've outlined the below
278 mitigation options that range in change and impact for discussion. See present (Control) experience below, starting from the
279 member clicking on "End Membership" in Prime Central Account Management page. Path to cancelation outlined in red border.
280 Customers have expressed frustration and confusion regarding the number of times they need to express that they want to cancel
281 Prime/end membership, before cancelation is effective.
282
283

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**

Prime Account CX Satisfaction



284

Amazon Privileged & Confidential 9

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

285 **Option 1 (Mitigated CX)**: We see an opportunity to alleviate the customer pain point around difficulty canceling, by simplifying
286 button CTAs, and changing the flow from a linear workflow to a decision tree. To be specific, we will be able to alleviate customer
287 confusions by making the following simplifications: Changing 'end membership' verbiage on Prime Central Account Management
288 to 'Manage Prime Plan' as 'end membership' likely sets the expectation that the CTA is not a flow but an action, and similarly
289 changing button CTAs on pages 1 and 2 respectively. Secondly, by converting the flow into a decision tree, we will be able to offer
290 customers who choose "End my Membership" in page 1 a straight path to the final page (bypassing page 2 – plan alternatives).
291 Moving away from a linear workflow will also allow us to remove progress bars and further reduce cognitive load on users. We
292 foresee a worst case impact of ███████ to ███████ members lost annualized by making these changes. Proposed changes included
293 below.
294



295
296
297
298
299
300
301
302
303

Amazon Privileged & Confidential **10**

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

304  **Option 2 (Mitigated CX/Imposed CX):** An aggressive option, in addition to button CTA simplifications outlined in option 1, is to
305  collapse the first two pages in the cancelation flow (pages 1 and 2) altogether, and straightaway take customers who click on "End
306  my membership" to the last page. Doing so without the necessary upstream interventions and testing on proactive retention
307  experiences will result in an additional ███████ members lost annualized. Early indications from the EU Commission are that they
308  think the current cancellation flow is too long.  Depending on the timeline of our engagement with them, we may need to pursue
309  Option 2 prior to being able to pursue our preferred option or test into Option 1. Example of shortened cancelation flow below,
310  and path to cancelation outlined in red border.
311



312
313
314
315
316
317
318

Amazon Privileged & Confidential  11

                                                                 AMZN-PRM-FTC-002673016_010

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

319    **Appendix A: Q4 2020 Brand Tracker WW – Prime Membership Program Scorecard (Responses from Prime Members)**



Questions: Q34, Q36, Q37, Q41b, Q40 (For detailed text refer Appendix J). Source: WW Brand Tracker. n/a - not available.
Shading indicates difference shown are statistically significant. Darker indicates statistically higher than other period for same country for the shown data. Lighter indicates lower.

320



321
322

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

323 **Appendix B: Prime Customer Frustrations tickets in Checkout Flow:**
324 • **Customer frustrations related to clarity of Prime offers:**
325     ○ IT-2170: Customers had difficulty discovering the less prominent 'No Thank You' link on the Prime offer checkout
326       intercept - Universal Prime Decision Page (UPDP)
327     ○ IT-2964: Customers were frustrated / confused by Prime Offer opt-out links that put words in their mouth, e.g.,
328       "No thanks, I don't want free shipping."
329     ○ IT-774: Prime offer popover at checkout is overloaded with multi-colored text, making it difficult for customers to
330       quickly parse.
331     ○ IT-2168: Within an offer, shoppers could not always discern how much Prime costs, how long the trial was, and
332       how charges/cancellations worked. Did not feel confident signing up as a result, or signed up without knowing
333       about auto-renew.
334     ○ IT-2171: Customers did not understand the impact of their choice on Prime Offer Pages when clicking on buttons
335       titled "Get started", "Continue with FREE 1-day shipping", "Get free two day shipping", "Proceed to next (Try)",
336       "Continue with free premium delivery"
337     ○ IT-4266: Customers misinterpreted the free shipping Prime benefit messaging to "Save [local currency amount]
338       on this order" as a product purchase discount and expected to see savings applied to their purchase at checkout.
339     ○ IT-2965: Shoppers interpreted the double-stack (bunk-bed) Prime sign up button as two distinct click targets (a
340       Yes and a No).
341 • **Prime offers causing friction for customers:**
342     ○ IT-1993: Customers encountered multiple Prime offers throughout the shopping journey, even if they opted out
343       recently (e.g. BBOP, SBBOP, SOSP, UPDP, SPC). This slowed them down and sometimes derailed purchase.
344       Especially problematic for newer customers
345     ○ IT-4518: Customers felt that Amazon was intentionally degrading their shopping experience to optimize for
346       business gain (e.g., by over-indexing on profit-driving features like Ads, Subscription Programs, etc.)
347     ○ IT-2129: Cross-border shoppers hitting Amazon.com from another country received Prime offers at checkout,
348       despite Prime benefits not serving their locale
349     ○ IT-4595: Customers frustrated when encountering a CX that is not tailored to their location, in some cases
350       resulting in lost trust (e.g., infeasible offers, inaccurate delivery messaging, confusing Prime Offers, and more)
351     ○ IT-3502: Customers were confused when exposed to region-specific Prime benefits that were not part of the
352       region they were shopping from (e.g., Same-Day benefits that didn't apply to the customer's city or country.
353

354 **Appendix C: Shopper frustrations tagged to theme 'Prime Account CX Satisfaction**
355 **Theme: Confusing Calls to Actions (CTAs)**
356 CTAs provide customers with "critical path" buttons or links to move through and make key decisions in a subscription flow.
357 Customers sometimes click on these buttons not reading or understanding their labels and/or have trouble discovering the CTA to
358 opt out of a subscription.



*"Honestly I'm indifferent to the 3 euro shipping cost. So, No...(clicks)...Oh wait I clicked the wrong one (Sighs).* **Usually the button that is marked in yellow is the one to continue without doing anything else. But in this case it was to continue AND make you Prime. And the 'No Thank You' was not highlighted.** *You should highlight both, because they're equally important. It's like I fell into a trap for stupid people, because I hadn't read it. I was just clicking it thinking it was the way to continue." -* ▮ Madrid, 2016, **Video**

364 **Theme: Difficulty discovering renewal terms & financial obligations**
365 Even when customers understand they're signing up for a subscription trial, not all are doing so with the understanding that these
366 trials will automatically renew. This is because key details are presented in legal T&Cs, typically at the bottom of a page in small
367 print. Customers, moving quickly, frequently overlook or ignore those T&Cs (or if they have Accessibility/zoom settings enabled,
368 this information can show up outside of their viewport).

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction



*"I didn't have any idea (there was a cost for) Prime. I didn't read this well. This small print really bothers me. **It should be clearer in saying 'You are using the Prime Service, and if you don't cancel in a month, they'll charge you 500 pesos.'** Not everyone is going to read this condition, that's the truth. They just say 'Yes, I want it, I accept, I accept, I accept'."* -█████, Mexico City, 2017, **Video**

374  **Theme: Confusing/misleading marketing copy**
375  Customers are sometimes confused by phrases in Prime upsells like *"Why pay for shipping?" or "No thanks, I don't want free*
376  *shipping"*. These can make customers incorrectly conclude that they must be Prime to get free shipping (when they can already get
377  core free shipping as a non-Prime customer with a minimum order threshold).
378



*"They keep telling me and telling me (to get Prime)! **And this tiny link, 'No thanks, I don't want free shipping', Ayyy! (Rolls eyes)**"* –█████ Mexico City, **Video**

384  **Theme: Not feeling in control of the renewal**
385  Unwanted auto-renewals is a common frustration for any subscription service (not just Amazon subscriptions). Customers like to
386  be in control over their decisions, and are frustrated when they don't receive proactive renewal reminders and/or when it's
387  difficult to disable auto-renew. The fear of forgetting to cancel can sometimes lead prospective customers to avoid signing up to
388  begin with.
389



*"That's how Amazon links you in to their service, you know. You get a free 30 days. What happens? Most people forget the 30 days. I'm one of those people, if I don't write it down - it's forgotten. **The 30 days passes, two months go by and you look at your credit card and you say 'What am I being charged for?'** I ain't going to remember something 30 days from now ."* -█████ Atlanta, 2017, **Video**

395  **Theme: Difficulty undoing or cancelling a subscription**
396  Customers are frustrated when they cannot instantly "undo" an unwanted membership sign up within the context of that sign up.
397  These customers must go through self-service cancellation, but this is sometimes difficult for them to find. For example, there is no
398  path to self-service cancellation when customers click on "Prime" within the mobile hamburger menu. Customers must instead
399  open Your Account > Manage Prime membership (or by searching for "Cancel Prime" in a product search). Once they find their way
400  to the Manage Prime Membership page, the cancellation option is hidden behind a "Manage membership" drop down.



*"Let's have a look under 'My Prime'...(Scrolling through benefits)...blah blah blah...**There it is, 'Manage my Membership'. You [Amazon] put that at the very bottom of the screen.** That was already clear to me, you rascals...It's very time-consuming, you have to go all the way down first (to find the ingress)"* -█████
Munich, 2019, **Video** (starts at 2min 0sec)

406  **Theme: Difficulty finishing the cancellation workflow**
407  Customers are frustrated by the number of steps involved in cancellation, and the clarity of whether they've finished the process
408  or not. We have observed some customers click "End membership", and then abandon the flow prematurely, not realizing there
409  are additional steps to finalize the cancellation.
410



*"That's not great, that was misleading. You click on 'Cancel' and I assume it's cancelled. Then I must confirm it again and this ad appears again. You think it is cancelled, but they're actually offering to extend it."* -█████
Vienna, 2019, **Video** (Note: the moderator had to prompt him to finish the cancel flow as he incorrectly concluded he was done halfway through)

                                                                                   AMZN-PRM-FTC-002673016_013

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

416    **Theme: Frustration related to partial refunds**
417    Partial refunds are especially frustrating when the customer did not want a subscription to begin with.
418



*"I already cancelled it. But it got cancelled with a charge that is weird. They say that they are going to refund me just a part of the money, but not all of it. **They said that they were going to refund 10 dollars, and that's a little less, it's not the whole amount ($12.99 x 3). And that's just bad!** Because...it's simply something that I didn't want."* -⬛ Santiago de Chile, 2018, **Video**

424    **Theme: Negative downstream impacts on brand & trust**
425    Unexpected sign ups / renewals can erode customer trust, making customers re-evaluate their relationship with Amazon.
426    Frustration is exacerbated when customers go through multiple billing cycles before discovering there is a problem.
427

*"So it's saying they are charging me $12.99/month for Prime. I didn't notice this (on my credit card bill) because it's such a small amount of money. If you didn't tell me about this (I would have never known). **We're looking at an infringement from Amazon. I think it's serious because they charge you without letting you know**....I'm disappointed. I would expect something different from Amazon."* - ⬛ Santiago de Chile, 2018, **Video**

433    **Theme: Even when customers avoid an unintended sign up, these marketing tactics can still leave a negative impression**



**A customer email to Jeff Bezos, July 2020, US marketplace**
*Subject: The Amazon Shopping Experience*

437

*Hi, Recently I made a purchase and it struck me how far the process has fallen short of the shopping experience I had during the earlier years of being an Amazon customer...Prime is advertised everywhere. Most annoyingly, it*
438    *infects every stage of the buying process. I don't want Prime, it offers nothing I want, yet when I buy some items it*
439    *incurs a gigantic "You can have a free trial of Prime!" with about 4% of the page, in tiny text to the left of center, to*
440    *be clicked if I just want to buy my items. **It's not helpful as a non-Prime customer to have such a tiny option hidden***
441    ***away there, clearly in the hope I will mis-click and sign up for a prime trial. Getting the feeling that a store hopes***
442    ***you will be tricked into something is not a positive feeling as a customer and along with that, it just feels really***
443    ***tacky.** Like a cheap TV store trying to pressure-sell you with endless badgering. Not really the impression I had of*
444    *Amazon in terms of its profile to customers in the past.*
445
446    *Many thanks,*
447    ⬛

448    **See this Quip for additional customer voices extracted from social media posts, product/app reviews, and JeffB emails**

449

CONFIDENTIAL                                                                                           AMZN-PRM-FTC-002673016_014

**PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT WORK PRODUCT**
Prime Account CX Satisfaction

450   **Appendix D: Confirmation CX for Prime signups**
451   SPC Stripe confirmation on Desktop after signing up on UPDP
452



453
454   FT signup welcome email



455
456

**Push Notification for new Prime signup**                    **First browse tooltip confirmation CX ( to be tested on 5/14)**

                    

457

Amazon Privileged & Confidential **16**

Prime Account CX Satisfaction - Privileged & Confidential

## Appendix E: Account CX Satisfaction Experiments and Performance

**i) US | Jan 2020 | WW annualized impact: est. ▇ 60 paid day members annualized in the US**

In January 2020, we launched a US experiment to measure impact of CX improvements that addressed a variety of critical shopper frustrations including clearer CTAs in two UPDP use cases, adding a decline CTA button, increasing price prominence, and removing the grey shadow below the positive CTA. From this experiment, a treatment featuring a clearer positive CTA drove a ▇% decrease in signups or a ▇% decrease in paid members along with a ▇% decline in Prime cancellations, and a ▇% decrease in CS contacts. Overall, the experiment was projected to drive an annualized paid member impact of ▇ paid members in the US and was not dialed up.

US Mobile FT UPDP experiment testing variations of the CTA treatments, adding Price prominence (selected treatments below)

| Control | 1)Positive CTA string changed to "Start my Prime FREE Trial" 2)Removed Shadow CTA | 1) Changed Positive CTA string to "Start my Prime FREE Trial" 2) Removed shadow CTA 3) Changed decline CTA to "No thanks" | 1) Changed Positive CTA string to "Start my Prime FREE Trial" 2) Removed shadow CTA 3) Changed decline CTA to "No thanks" Button | 1) Changed Positive CTA string to "Start my Prime FREE Trial" 2) Removed shadow CTA 3) Changed decline CTA to "No thanks" Button 5) Added sub-text under CTA's including price savings 6)Added Price Prominence |



Amazon Privileged & Confidential 17

AMZN-PRM-FTC-002673016_016

Prime Account CX Satisfaction - Privileged & Confidential

**ii) US | Sep 2020 | US annualized impact: est ▓▓▓ annualized paid members**

UPDP changes based on feedback received through long standing customer frustrations (IT-2171, IT-2168, IT-2170, IT-2964), standard Amazon Usability signposts, and UX guidance. Changes include: (1) No Thanks button for the decline CTA, (2) price of Prime outside the Ts & Cs, and (3) "Prime" or "Free Trial" in the accept CTA.

Control



Treatment



Amazon Privileged & Confidential 18

AMZN-PRM-FTC-0026573016_017

469
470
471
472
473
474

Prime Account CX Satisfaction - Privileged & Confidential

iii) In Q3 2020, the EUS Shared Services team tested over ▮ iterations of the UPDP CTAs, changing both copies and button design. Impact to signups has varied significantly by country, ranging from ▮% ( ▮ annualized paid members, in UK) to ▮% ( ▮ annualized paid members, in DE). Some examples are below

UK | Oct 2020 | UK annualized impact: est. ▮ annualized paid members (Treatment 1); est. ▮ annualized paid members (Treatment 2)

Experiment for Free Trial on Desktop UPDP testing removal of grey clickable "shadow" surrounding the positive CTA and adding a prominent grey Decline button.

Amazon Privileged & Confidential 19

AMZN-PRM-FTC-002673016_018

Prime Account CX Satisfaction - Privileged & Confidential

**DE | Sep 2020 DE | DE annualized impact: est. [ ] annualized paid members**

Experiment for Free Trial on Desktop UDPP testing prominent yellow button for the decline CTA and a blue tooltip that appears upon scrolling for additional info.



Amazon Privileged & Confidential 20

AMZN-PRM-FTC-0026730116_019

CONFIDENTIAL

481
482
483
484

Prime Account CX Satisfaction - Privileged & Confidential

**FR | Sep 2020 | FR annualized impact: est. est. ▮ annualized paid members**

Experiment for Free Trial on Desktop UPDP testing prominent grey decline button and blue tooltip that appears upon scrolling for additional info.

485
486

**ES | Sep 2020 | ES annualized impact: est. est. ▮ annualized paid members**

Experiment for Free Trial on Desktop UPDP testing prominent grey decline button.

487
488
489
490



Amazon Privileged & Confidential 21

491

AMZN-PRM-FTC-002673016_020

## Prime Account CX Satisfaction - Privileged & Confidential

| id | Description | Webits Name | Treatment | Triggered CIDs | Signup rate | 90d active paid | 12m active paid | 12m active (pair of Triggered CID's [e*p] | CS Cancellation Rate (reason unintended signup) | CS Cancellation Rate (reason all) | d31-90 shipping ingress uses | d31-90 digital ingress uses | d31-90 shipping avg uses of triggered CID's [f*p*n] | d31-90 digital CID's [f*e*m] ingress or triggered | 365 day paid member declare to decline in unintentional signup |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | US 2018, CTA treatments and price | PRIME_146575 | C | | | | | | | | | | | | |
| 2 | promtence | PRIME_146575 | T6 | | | | | | | | | | | | |
| 3 | | | T v C | | | | | | | | | | | | |
| 4 | US 2018, Desktop CTA Shadows No | PRIME_153956 | C | | | | | | | | | | | | |
| 5 | Shadow | PRIME_153956 | T2 | | | | | | | | | | | | |
| 6 | | | T v C | | | | | | | | | | | | |
| 7 | US 2018, 'No thanks' links and button | PRIME_CTA_REDESIG | C | | | | | | | | | | | | |
| 8 | | PRIME_CTA_REDESIG | T2 | | | | | | | | | | | | |
| 9 | | | T v C | | | | | | | | | | | | |
| 10 | CA 2018, Price Promtience above CTA | PRIME_179734 | C | | | | | | | | | | | | |
| 11 | | PRIME_179734 | T1 | | | | | | | | | | | | |
| 12 | | | T v C | | | | | | | | | | | | |
| 13 | US 2020, CTA iterations (removed | PRIME_252596 | C | | | | | | | | | | | | |
| 14 | shadow CTA, decline Button) on | PRIME_252596 | T5 | | | | | | | | | | | | |
| 15 | Desktop | | T v C | | | | | | | | | | | | |
| 16 | US 2020, CTA iterations o Mobile | PRIME_255432 | C | | | | | | | | | | | | |
| 17 | | PRIME_255432 | T6 | | | | | | | | | | | | |
| 18 | | | T v C | | | | | | | | | | | | |

### New Designs for UPDP tested in March 2021

Simplified version of UPDP Desktop Free Trial, developed with input from Shopping Design Teams

| Control | Treatment |
|---|---|
|  |  |

492
493
494
495
496
497
498
499
500

CONFIDENTIAL

AMZN-PRM-FTC-0026730016_021

Amazon Privileged & Confidential 22

Prime Account CX Satisfaction - Privileged & Confidential

**Appendix F: Prime Cancelation Data Appendix – FY 2020, for US, UK, DE and FR**

| | | US | UK | DE | FR |
|---|---|---|---|---|---|
| | **Prime Cancellation Mix (data from 2020)** | | | | |
| 1 | % of Cancellations from Online Flow (aka Iliad) | | | | |
| 2 | % of Cancellations from CS | | | | |
| 3 | **Iliad Visitors (data from 2020)** | | | | |
| 4 | # of Visitors to Online Flow (aka Iliad) (MM) | | | | |
| 5 | % of Visitors Completing Iliad Flow (making it to final page of flow) | | | | |
| 6 | % of Visitors Remaining Prime after Iliad Visit (aka Iliad Saves) | | | | |
| 7 | % of Iliad Saves using Benefits After Visiting Iliad | | | | |
| 7.1 | % of Prime Members using Benefits | | | | |
| 8 | % of Visitors NOT Remaining Prime after Iliad Visit (aka Iliad Cancels) | | | | |
| 9 | % of Iliad Saves Who Subsequently Contact CS to Cancel Prime w/in 2 Days of Visit | | | | |
| 10 | % of Iliad Saves Who Subsequently Contact CS to Cancel Prime w/in 7 Days of Visit | | | | |
| 11 | % of Iliad Saves Who Subsequently Contact CS to Cancel Prime w/in 35 Days of Visit | | | | |
| 12 | % of Iliad Saves Who Accept Offer (e.g., Change Plan) in Iliad | | | | |
| 13 | % of Iliad Saves Who Click "Keep Membership" in Iliad | | | | |
| 14 | % of Iliad Saves Who Click "Remind Me Later" in Iliad | | | | |
| 15 | % of Iliad Saves Who Exit (e.g., Navigate Away) from Iliad | | | | |

*Notes:*

16
- Row 7: data based on sample of ▮ Iliad visitors who visited Iliad in Wk39 2020 and used a Prime benefit between the day they visited Iliad and Dec 31, 2020
- Row 7.1: data based on sample of ▮ Prime members who had an active membership in Wk39 2020 and used a Prime benefit between Wk39 and Dec 31, 2020
- Rows 9-11: data based on sample of ▮ Iliad visitors who visited Iliad in Wk39 2020 and contacted CS to cancel Prime within 2/7/35 days of Iliad visit

Amazon Privileged & Confidential 23

AMZN-PRM-FTC-002673016_022

# EXHIBIT 37

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3

4   FEDERAL TRADE COMMISSION,      )
                                   )
5                   Plaintiff,     ) Case No.
                                   ) 2:23-cv-00932-JHC
6              vs.                 )
                                   )
7   AMAZON.COM, INC., et al.,      )
                                   )
8              Defendants.         )
    ---------------------------)

9

10

11

12

13

14      DEPOSITION OF RUSSELL CHRISTOPHER GRANDINETTI

15              New York, New York

16          Wednesday, November 13, 2024

17

18

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. J11924621



```
 1   R U S S E L L   C H R I S T O P H E R
 2   G R A N D I N E T T I,
 3        called as a witness, having been duly sworn
 4        by a Notary Public, was examined and
 5        testified as follows:
 6   EXAMINATION BY
 7   MR. NARDINI:
 8        Q.   Good morning.  Could you, please, state
 9   your full name for the record.
10        A.   Sure.  Russell Christopher Grandinetti.
11        Q.   Good morning, Mr. Grandinetti.  My name
12   is Max Nardini.  I'm an attorney with the Federal
13   Trade Commission.  I am joined today by my
14   colleague, Anthony Saunders.
15             You are represented by counsel here
16   today; correct?
17        A.   I am.
18             MR. NARDINI:  Could your counsel,
19        please, introduce themselves for the record.
20             MR. HUESTON:  John Hueston and Karen
21        Ding on behalf of Amazon.
22             MR. NARDINI:  And there are others, but
23        I think we have --
24             THE COURT REPORTER:  Yes.
25             MR. NARDINI:  Great.  Okay.
```



1      Q.   So Mr. Grandinetti, just a few ground

2  rules.  I will be asking you a series of

3  questions, which you understand you are under oath

4  to provide truthful answers.  Do you understand

5  that?

6      A.   I do.

7      Q.   If you don't understand a question,

8  please let me know before you respond.  I will do

9  my best to clarify, but you still must answer my

10  question to the extent you are able.  Do you

11  understand that?

12      A.   I do, yes.  Thank you.

13      Q.   The court reporter is taking down

14  everything we say here today, so please make sure

15  to respond to each question with a clear verbal

16  answer:  Yes, no, I don't know or so forth.  Does

17  that make sense?

18      A.   It does.

19      Q.   Obviously our court reporter can only

20  take down one thing at a time, so we should both

21  endeavor not to speak over one another, to speak

22  clearly and slowly.  Does that sound fair?

23      A.   It does.

24      Q.   From time to time, your counsel may

25  object.  Once your counsel finishes the objection,



1   you must still answer my question unless your

2   counsel instructs you not to.  Do you understand?

3        A.    I do.

4        Q.    I will endeavor to take breaks with a

5   regular cadence, but if you need a break, just let

6   me know and I will do my best to accommodate that.

7   My only request is that we not take a break when a

8   question is pending unless you need to confer with

9   your counsel on a question of attorney/client

10  privilege or another privilege.  Does that make

11  sense?

12       A.    It does.

13       Q.    Okay.  All right.  Mr. Grandinetti,

14  what's your current role at Amazon?

15       A.    My role is senior vice president,

16  international stores, and that role is largely

17  focused on managing Amazon's e-commerce business

18  in all the countries of the world where we operate

19  outside the U.S. and Canada.  It also includes

20  management of a number of central functions,

21  payments, Prime, books, marketing, Amazon

22  Business, and maybe one or two others I'm not

23  remembering in this moment.

24       Q.    Some of the examples you listed,

25  payments, Prime, books, Amazon Business and so



 1 | forth, would you call those organizations within
 2 | Amazon?
 3 |         MR. HUESTON:  Objection.  Vague.
 4 |     A.    Often, I think, teams like that that
 5 | might work on a function that serves the business
 6 | globally as a central team.
 7 |         MR. NARDINI:  Did someone just join the
 8 |     line?  Is someone on the conference line?  I
 9 |     think it just bleeped.
10 |     Q.    I'm sorry.  Mr. Grandinetti, you were
11 | saying a central team is how you would
12 | characterize --
13 |     A.    That's often the word that can be used
14 | for teams like that.
15 |     Q.    Just to ensure we have a common way of
16 | speaking about these things.  Okay.
17 |         And when did -- how long have you been
18 | in the role of senior vice president for
19 | international stores?
20 |     A.    Since the first part of 2016.
21 |     Q.    And just briefly, what was your role
22 | before becoming senior vice president of
23 | international stores?
24 |     A.    I managed the Kindle business, the part
25 | of the Kindle business that focused on books and



 1  were using for the e-commerce organization.

 2       Q.    And have you reported to Mr. Wilke for

 3  the entirety of your time as SVP of international

 4  stores?

 5       A.    No.

 6       Q.    When did that change?

 7       A.    Four or five years ago Jeff left the

 8  company and Dave Clark became the new CEO for the

 9  stores business.  I reported to him.

10       Q.    For approximately what period of time

11  did you report to Mr. Clark?

12       A.    There was a little bit of time between

13  when Jeff announced he was leaving and then when

14  Dave took over, but my recollection was roughly 18

15  months until -- I am just trying to get the year

16  right in my mind.  Maybe 2021.  I know I worked

17  for Dave for roughly 18 months.

18       Q.    Was that ending in 2021 or beginning in

19  2021?

20       A.    I think ending in 2021, if memory

21  serves.

22       Q.    And Mr. Clark is no longer with Amazon;

23  correct?

24       A.    He is not.

25       Q.    And so then when Mr. Clark left Amazon,



RUSSELL C. GRANDINETTI                          November 13, 2024
FTC vs AMAZON.COM                                              17

```
 1    you reported to someone else; correct?

 2           A.    That's correct.

 3           Q.    And that was Mr. Herrington?

 4           A.    Yes, Doug Herrington.

 5           Q.    And do you still report to

 6    Mr. Herrington?

 7           A.    I do.

 8           Q.    When you reported to Mr. Wilke, did

 9    Mr. Wilke report to Mr. Bezos?

10           A.    Yes.

11           Q.    And when you reported to Mr. Clark,

12    Mr. Clark reported to Mr. Bezos; correct?

13           A.    Yes.

14           Q.    And when you began reporting to

15    Mr. Herrington, Mr. Herrington reported to

16    Mr. Bezos; correct?

17           A.    No.  At some point Mr. Bezos left and

18    Mr. Jassy took over.

19           Q.    So in the time -- in the entirety of

20    the time you reported to Mr. Herrington,

21    Mr. Herrington has reported to Mr. Jassy as CEO;

22    is that correct?

23           A.    I believe so, yes.

24           Q.    When you began in 2016 in the role of

25    SVP international stores, did you have any people
```



1    who reported directly to you?

2         A.    Yes, of course.

3         Q.    Approximately how many people?

4         A.    I'd guess seven or eight, but I'm not

5    sure.

6         Q.    And when you began as SVP international

7    stores, not just direct reports, approximately how

8    many people were under the umbrella of your role?

9         A.    Again, I'm not -- I'm not entirely

10   sure.  I'd guess ███████, but that's a very rough

11   guess.  Organizations have moved in and out at

12   different times, so when the sum totaled something

13   more or less than that, I can't say for sure.

14        Q.    Is that ███████ number approximately

15   correct today?

16        A.    No, it's grown quite a bit in the eight

17   years.

18        Q.    Approximately today how many people

19   fall under the umbrella of your role?

20        A.    I think something on the order of

21   ███████.  Perhaps more.

22        Q.    And today, approximately how many

23   people report directly to you?

24        A.    I'd guess eight to ten, but I'm not

25   certain.



1      Q.    Does Mr. Jamil Ghani report directly to
2    you?
3      A.    He does.
4      Q.    When did that start?
5      A.    I believe Jamil moved to work for me
6    around November of 2021.
7            (Mr. Mendelson enters via telephone.)
8            MR. NARDINI:  Did someone just join the
9    call?
10           MR. MENDELSON:  Evan Mendelson from the
11   FTC.
12     Q.    So before November of 2021, Mr. Ghani
13   did not report directly to you; is that correct?
14     A.    He did not.
15     Q.    Does Mr. Neil Lindsay report directly
16   to you?
17     A.    He does not.
18     Q.    Has he at any point in your time at
19   Amazon?
20     A.    He has not.
21     Q.    Prior to November of 2021, did
22   Mr. Ghani report indirectly to you?
23     A.    I'm sorry.  What do you mean by
24   indirectly?
25     Q.    In any way.



1              MR. HUESTON:  Objection.  Vague.

2        A.    No, he was never in an organization

3  that rolled up to where I am.

4        Q.    What do you mean by organization that

5  rolled up to where you are?

6        A.    As in reported to someone who reported

7  to someone who reported to me or any level below

8  my direct reports.

9        Q.    Since Mr. Ghani became a direct report

10  of yours, have you written a performance review

11  for him?

12        A.    I have done.

13        Q.    You have; is that correct?

14        A.    I have done, yes.

15        Q.    You have done.  Thank you.  Okay.

16              What's your professional opinion of

17  Mr. Ghani?

18              MR. HUESTON:  Objection.  Vague.

19        A.    I like Jamil.  I think he is smart,

20  hard working.

21        Q.    How would you assess the quality of his

22  work?

23        A.    I think his work is good.

24        Q.    Are you able to expand on what you mean

25  by good?



1      A.    Well, he cares about his team.  He

2   cares about building a great customer experience.

3   He cares about working well with his colleagues.

4   You know, one challenge of the business that we

5   work on is it's global, so finding a way to be

6   organized to work well with people both in

7   different functions and very different parts of

8   the world takes energy and Jamil has a lot of it.

9      Q.    In your experience with Mr. Ghani as a

10  direct report since approximately November of

11  2021, have you generally found his work to be

12  accurate?

13          MR. HUESTON:  Objection.  Vague.

14     A.    Yes, I think Jamil endeavors to do

15  good, accurate work and I believe that, in

16  general, he does.

17     Q.    Have you during that time period found

18  his work to be thorough?

19     A.    Yes.

20     Q.    Have you ever known him to misrepresent

21  something you said in communications with other

22  members of Amazon?

23     A.    That has not been my experience.

24     Q.    Nor, based on your opinion of him,

25  would you expect him to misrepresent something



1    that you said to others at Amazon; correct?

2         A.    I would be surprised by that.

3         Q.    Mr. Ghani became your direct report in

4    November of 2021 because at that point you assumed

5    direct authority over Prime as a central team; is

6    that correct?

7         A.    That's correct.

8         Q.    What led to that transition?

9              MR. HUESTON:  Objection.  Foundation.

10        A.    I don't know all the details, because I

11   didn't manage it before that and I wasn't part of

12   the organizational discussions or any other

13   alternatives.  One thing I know is that Neil --

14   Jamil used to report to Neil Lindsay and Neil

15   moved to a different role within Amazon.

16        Q.    That role was with Amazon Health; is

17   that correct?

18        A.    I believe so, yes.

19        Q.    Did that occur approximately in

20   November of 2021?

21        A.    I think so.

22        Q.    Do you know why Prime was brought under

23   your purview when Mr. Lindsay left for Amazon

24   Health?

25        A.    As I said, I wasn't privy to



1  conversations about other alternatives or why me

2  versus someone else.  What I do know is I was

3  asked, I think, by Dave, I can't remember who

4  might have introduced it, if I would be willing to

5  work with that team and, as is true with the other

6  central teams I have, I -- I am happy to do my

7  best as a good manager.

8      Q.    Prime is a very important subscription

9  program to Amazon; is that fair?

10     A.    Yes, I think Prime is an important part

11 of the business.

12     Q.    Your assuming direct authority over

13 Prime was a show of confidence from your

14 supervisors at Amazon; correct?

15     A.    Of course.  I think it's true that any

16 of the responsibilities that I've been given are a

17 sign of confidence of sorts, yes.

18     Q.    And oversight over Prime is a

19 particularly big responsibility at Amazon;

20 correct?

21          MR. HUESTON:  Objection.  Vague.

22     A.    It's hard to rank.  You know, I

23 consider all the teams within my work important

24 parts of the business.

25     Q.    And you would agree that Prime is a



1  relationship of teams internally at Amazon.

2       Q.    Prior to November of 2021, what regular

3  meetings did you have with Mr. Ghani?

4       A.    The kind of meeting that comes to mind

5  right now is -- would be a review annually about

6  our plans for Prime in Europe or Japan.  Often as

7  part of the annual review process we might sit

8  down and talk about our work to go Prime in those

9  countries.

10      Q.    To make sure I heard it correctly, you

11 said Japan and which other country?

12      A.    I said Europe and Japan as examples of

13 regions, but I believe that to be true for all the

14 regions that I managed.

15      Q.    And that's because you were managing

16 Prime in certain international regions; is that

17 correct?

18      A.    That's not correct.

19      Q.    What was -- before Mr. Ghani became

20 your direct report in November of 2021, what was

21 your relationship with respect to international

22 Prime programs?

23      A.    Right.  I managed the business in those

24 countries, which included a wide variety of

25 functions not provided or managed by my team.  So,



1  for example, we would run a business in Japan

2  where we would make a promise to a customer about

3  how fast a package might get to their house.  My

4  colleagues in operations would fulfill that, but

5  at one level we are on part of the same team and

6  that's a part of the service that I feel like I am

7  responsible for in the sense of working together

8  to make it a good customer experience.

9      Q.    What do you mean by manage the business

10 in those countries?

11     A.    To think about the customer experience

12 and ask, you know, the different questions, I

13 think, that allow us to be relevant to a wider

14 group and then try to organize the activity across

15 all of the teams at Amazon that help provide a

16 good service.  So, for example, we frequently ask

17 the question do we have the selection a customer

18 wants.  Are prices as good and as competitive as

19 we would like.  Are we able to get orders to

20 customers as fast or faster than their other

21 choices.  And so in Japan and Europe and India

22 and all the other places, our team tries to

23 think about how competitive the total offer and

24 whether -- in some cases some of my teams directly

25 might do work that improve that, and then in many



1  cases it's colleagues who work on making that

2  piece of the business as high performing as we can

3  make it.

4       Q.    And to make sure I'm clear, when you

5  say manage the business in those countries, you

6  mean the Amazon business, not just the Prime

7  business; correct?

8       A.    The broad e-commerce business, whether

9  the customers happen to be Prime subscribers or

10  not.

11       Q.    And has that been the case since you

12  began as the SVP of international stores?

13       A.    For those countries outside the U.S.

14  and Canada, yes, that has been the case.

15       Q.    And that continues to this day;

16  correct?

17       A.    That continues to this day, that's

18  correct.

19       Q.    So your direct oversight of Prime was

20  in addition to those other responsibilities;

21  correct?

22       A.    Correct, as well as the other central

23  teams that I've managed that had been part of my

24  responsibility.

25       Q.    Understood.  Fair to say that Prime is



1    that team?

2         A.    We have a lot of acronyms, but that one

3    is not ringing a bell for me.

4         Q.    So is it fair to say, considering you

5    and Mr. Lindsay were on the same leadership team,

6    that you have met with him frequently over the

7    years?

8         A.    I've seen him in lots of contexts, yes.

9         Q.    Lots of contexts in which important

10   issues for Amazon were discussed; correct?

11        A.    Naturally.

12        Q.    Have you ever written a performance

13   review for Mr. Lindsay?

14        A.    I don't believe that I have.

15        Q.    Have you ever written a peer review as

16   part of a peer feedback process for Mr. Lindsay?

17        A.    I don't recall.  It's possible, but I

18   don't recall that I have done.

19        Q.    What is your professional opinion of

20   Mr. Lindsay?

21        A.    I like Neil.  I think he is smart.  I

22   think he is thoughtful.

23        Q.    You would expect his work to be

24   accurate and thorough; correct?

25        A.    Well, we all make mistakes, but in



 1  general, yes, I do.
 2       Q.    And you would expect him to accurately
 3  convey your remarks to others at Amazon; correct?
 4       A.    I would.
 5       Q.    And in general, you would expect him to
 6  accurately convey information he learned from
 7  others at Amazon; correct?
 8       A.    That would be my expectation, yes.
 9       Q.    And you have no specific reason to
10  doubt that he would, in fact, do that; correct?
11       A.    No, I can't think of any reason.
12       Q.    Mr. Grandinetti, you are on the S team;
13  correct?
14       A.    That's correct.
15       Q.    And what is the S team?
16       A.    It's a collection of senior leaders
17  across all the organizations or most of the
18  organizations of Amazon.
19       Q.    Today is Mr. Ghani on the S team?
20       A.    No, he is not.
21       Q.    To your knowledge, Mr. Ghani has never
22  been an official member of the S team; is that
23  correct?
24       A.    I don't believe so.
25       Q.    But he has participated in S team



1   meetings before; correct?

2          A.    Yes, I believe he has.

3          Q.    To provide updates regarding Prime;

4   correct?

5          A.    I expect in his role, yes, that would

6   be natural.

7          Q.    And progress toward S team goals

8   related to Prime sign-ups; correct?

9               MR. HUESTON:  Objection.  Foundation.

10         A.    I don't know if that's the case.

11         Q.    You are aware, though, that there are

12  S team goals with respect to Prime sign-up

13  numbers; correct?

14         A.    I am aware of that.

15         Q.    And S team goals -- progress toward

16  S team goals are discussed at S team meetings;

17  correct?

18         A.    There can be a wide variety of S team

19  meetings, most of them are not about goals, but

20  there is a regular process of reviewing goals,

21  S team goals, with the S team a couple of times a

22  year.

23         Q.    And as you said, some of those goals

24  are with respect to increasing the sign-up rates

25  for Prime; correct?



```
 1              MR. HUESTON:  Objection.  Misstates the
 2         testimony.
 3         A.    Could you, please, repeat the question.
 4         Q.    Sure.  It is, in fact, the case that
 5    some S team goals are goals to increase Prime
 6    sign-ups; correct?
 7         A.    I wouldn't -- I wouldn't say it that
 8    way.  I believe the goals are about Prime
 9    membership total.
10         Q.    Prime membership.  Got it.
11              What S team meeting conversations
12    regarding Prime membership do you recall as you
13    sit here today?
14              MR. HUESTON:  Objection.  Vague.  Calls
15         for a narrative.
16         A.    Could you repeat the question, please.
17         Q.    Sure.  What conversations regarding
18    achievement toward Prime member balance-related
19    S team goals do you recall from S team meetings?
20              MR. HUESTON:  Objection.  Vague.  Calls
21         for a narrative.
22         A.    Well, we have hundreds of S team goals,
23    of which these are part, and we have a couple of
24    times a year where we review either the goals we
25    are setting or the status of how we are performing
```



RUSSELL C. GRANDINETTI                    November 13, 2024
FTC vs AMAZON.COM                                        38

1    against those goals.

2        Q.    Do you recall any specific

3    conversations as you sit here today?

4        A.    Well, naturally the status of goals is

5    discussed.  It's -- it's less a conversational

6    meeting and more we typically read the status of

7    the several hundred goals and we might open up the

8    opportunity for people to ask questions should

9    they have them.

10       Q.    Since you became SVP of international

11   stores, were you regularly kept up to date on the

12   Prime member balance?

13       A.    Well, the current balance of Prime

14   members in any country would -- yes is the answer

15   to the question.

16       Q.    And were you regularly kept up to date

17   on the U.S. Prime member balance?

18       A.    I'm sure I saw the -- I apologize.

19   Could you clarify what time period you are asking

20   the question about?

21       Q.    Sure.  Since starting as SVP of

22   international stores.

23       A.    Okay.  Thank you.  Yes, I would -- I

24   mean, generally I found it useful to track lots of

25   different things about how the U.S. or Canada



 1  business was doing even if I wasn't working on

 2  those things directly, partly out of interest,

 3  partly out of sometimes it could be context and

 4  useful in trying to lead the business outside the

 5  U.S. and Canada.

 6       Q.    Is that because there are parallels

 7  between the U.S., Canada business and other

 8  international aspects of the business?

 9       A.    It's both true that lots of things vary

10  between regions and lots of things are common.

11       Q.    You would agree that there are

12  commonalities across the Amazon business

13  irrespective of markets; correct?

14            MR. HUESTON:   Objection.   Vague.

15       A.    Yeah, I think, for example, do we have

16  what customers want to buy is a question we would

17  ask in all those places.

18       Q.    And there are commonalities with

19  respect to the Prime subscription program that are

20  common across markets, whether U.S., Canada or

21  other international; correct?

22       A.    Yes.   As I said, I think it also

23  applies to Prime that there are any number of

24  things that are common and any number of things

25  that are different.



1 | did not; correct?

2 |      A.    I don't recall participating in

3 | discussions around cancellation work flow in India

4 | at this time.

5 |      Q.    Understanding you don't recall specific

6 | discussions, are those discussions you would have

7 | been a part of given your role in 2017?

8 |      A.    Probably not.

9 |      Q.    And why is that?

10 |      A.    The work on the cancellation work flow,

11 | I think, in many places was managed by the Prime

12 | team, which wasn't reporting to me at this time.

13 |      Q.    Do you recall providing input on the

14 | decision to launch the Iliad cancellation work

15 | flow in any international market, not just India?

16 |           MR. HUESTON:   Objection.   Vague.

17 |      A.    I don't recall it in detail.

18 |      Q.    What do you recall?

19 |      A.    I don't recall being directly involved

20 | in work related to the cancellation flow.

21 |      Q.    And you said you don't recall in

22 | detail.   So what do you recall generally?

23 |      A.    I recall having heard this project

24 | name.   I recall at various times as part of larger

25 | business reviews summaries of Prime work might



RUSSELL C. GRANDINETTI                                   November 13, 2024
FTC vs AMAZON.COM                                                      76

1  talk about changes they have made, just like this

2  one, but beyond that I don't recall participating

3  in discussions of the topic or meetings on the

4  topic might be a better way to say that.

5        Q.    Understanding you don't recall the

6  discussions, do you recall the subject of the

7  Iliad cancellation work flow that you were aware

8  of as relating to the U.S. as well as non-U.S.

9  markets?

10       A.    I don't.  I don't recall.

11       Q.    Do you know who did make the decision

12  to dial up the Iliad cancellation work flow as

13  reflected in this weekly business review?

14       A.    I do not.

15       Q.    Do you know who did make the decision

16  to launch Prime sign-up via voice with Alexa as

17  reflected in this weekly business review?

18       A.    I do not.

19       Q.    What is your understanding of the Iliad

20  cancellation work flow?

21       A.    I knew it was the name of work related

22  to how we evolved the ability for customers to

23  cancel Prime.

24       Q.    What else do you know about Iliad?

25            MR. HUESTON:  Objection.  Vague.  Calls



RUSSELL C. GRANDINETTI                     November 13, 2024
FTC vs AMAZON.COM                                          77

```
1        for a narrative.
2        A.    Not too much beyond that.
3        Q.    What else stands out?
4              MR. HUESTON:  Objection.  Vague.
5        A.    Nothing in particular stands out.
6        Q.    Do you know who led the work stream to
7    develop Iliad?
8        A.    I do not.
9        Q.    Do you know why the work stream was
10   called Iliad?
11       A.    I do not.
12       Q.    Do you know who named the work stream?
13       A.    I do not.
14       Q.    The fact that these call-outs that we
15   have just been discussing, the two bullet points,
16   are included in an e-mail to you and two other
17   high-level executives would indicate some
18   relevance to your function; is that fair?
19             MR. HUESTON:  Objection.  Foundation.
20       A.    Could you repeat the question, please.
21             (Record read.)
22             MR. HUESTON:  Objection.  Foundation.
23       A.    Well, I didn't put together these
24   updates.  I don't even recall having asked for
25   them or specified what the contents should
```



1   include.  Naturally I think some portions of this
2   could be relevant at some level even if
3   indirectly.
4        Q.    How would the update on Prime sign-up
5   via voice with Alexa be relevant, even if
6   indirectly?
7        A.    It's possible if there are methods to
8   grow Prime that we launch in the U.S., you know, I
9   could ask if we plan to do that somewhere else.
10        Q.    You might ask that, for example, if it
11   seems like a good idea; correct?
12        A.    A lot of the time when I review updates
13   of the business I will ask questions, you know,
14   where -- if I think it's a good idea or my
15   curiosity takes me there or maybe I just don't
16   know anything about it and I'd like to learn more.
17        Q.    If you could turn the page just one
18   more.  The chart is at the bottom there.  The
19   Bates number is 9301.  There is a bullet point
20   that is the second to last not-filled-in bullet on
21   the page that starts UPDP Redesign.  Do you see
22   that?
23        A.    You say it's the bullet with the title
24   UPDP Redesign?
25        Q.    Right.  Do you see that?  It sounds



1        then take a lunch break.  Does that work for
2        you all?
3               MR. HUESTON:  Can we try to go to maybe
4        12:15?  I am just trying to -- can we do
5        closer to 90 minutes, just so we don't have
6        most of the day after the lunch break?
7               MR. NARDINI:  If that's fine with
8        Mr. Grandinetti, that's fine with me.
9               THE WITNESS:  That's okay with me.
10              MR. NARDINI:  Okay.  So we will go
11       until 12:15 or so.
12              THE WITNESS:  May I ask what time it is
13       now?
14              MR. HUESTON:  It is 11:40.  Is that all
15       right?
16              THE WITNESS:  Yes, it is.  Thank you.
17  BY MR. NARDINI:
18       Q.   Mr. Grandinetti, when do you recall
19  first learning of consumer complaints regarding
20  mistaken Prime sign-ups?
21       A.   It might have been in early 2019.  It's
22  possible I heard it mentioned earlier, but I -- I
23  believe it was in early 2019.
24       Q.   When you say it's possible it might
25  have been earlier, why do you think it's possible



1    it might have been earlier?

2         A.    Well, I don't recall, but I assume it's

3    possible.

4         Q.    And why do you assume it's possible?

5         A.    I don't trust my memory all the time.

6         Q.    What do you recall hearing about

7    mistaken -- consumer complaints of mistaken Prime

8    sign-ups in early 2019?

9         A.    I don't know if it was consumer

10   complaints per se, but I recall hearing from the

11   frustrations team they had a hypothesis and were

12   worried there was some customer confusion about

13   Prime sign-up.

14        Q.    So that was in the context of the

15   customer frustrations team; correct?

16        A.    They certainly developed some

17   hypotheses about that being an area for us to look

18   at.

19        Q.    Other than the customer frustrations

20   team, do you recall hearing about consumer

21   complaints of mistaken -- having mistakenly signed

22   up for Prime from any other sources around that

23   time?

24        A.    I don't recall.

25        Q.    How about not just around that time of



1  early 2019, but any point?

2       A.    It's a little bit hard to say in part

3  because, you know, many times customers would --

4  might ask us about an issue that they thought was

5  sign-up but was something different or vice versa,

6  but I don't recall a lot on that topic before

7  2019.

8       Q.    Do you recall anything on that topic,

9  2019 onward coming from sources other than the

10  customer frustrations team?

11      A.    I know I've seen at times e-mails from

12  customers or other questions or frustrations

13  related to Prime, but whether it was specifically

14  sign-up or something else about the program it's

15  hard for me to parse in this moment.

16      Q.    What is Project Lucent?

17      A.    I have heard the name, but I do not

18  have a clear recollection of what the project is.

19      Q.    Were you involved in the project?

20      A.    I don't believe I was involved in the

21  project.

22      Q.    What was the time frame in which the

23  project occurred?

24      A.    I don't know.

25      Q.    What do you remember about the purpose



1   talks about reasons for phone contacts.

2        Q.    And the reason -- just to make it

3   clear, the reason for the contact being complaints

4   of unintentional sign-ups of Prime; correct?

5        A.    It looks like it's saying it was

6   identified as the highest reason in whatever

7   sample of contacts this is.  It looks like the --

8   it's specifying a kind of contact, a cancel Prime

9   contact as written here.  What falls under that

10  I'm a little bit unsure.

11       Q.    And the bullet is called -- begins with

12  "Unintended Prime Sign-Ups"; correct?

13       A.    That's what it says here.

14       Q.    Looking at the -- just to flip back

15  over to the second page, Bates number ending 1761,

16  if you don't mind just turning the page there.  So

17  the first full sentence, I will just read it, of

18  that page, I will just read it:  "While our

19  intention has never been to trick the customer

20  into joining Prime, we are conscious that the

21  current CX of some of our Prime upsell messaging

22  could be misleading."  Did I read that correctly?

23       A.    You did read that correctly.

24       Q.    What do you recall being discussed at

25  the meeting regarding the subject matter of that



1  sentence?

2      A.    I just don't recall this particular

3  discussion with any clarity.

4      Q.    Do you recall this meeting at all, not

5  just this particular bullet, not just the subject

6  matter of this particular bullet?

7      A.    Understood.  I don't recall this

8  meeting in any detail.

9      Q.    Even if you don't recall the meeting,

10 do you agree in 2018 that the current CX of

11 some of Amazon's Prime up-sell messaging could

12 have been misleading to consumers?

13     A.    It was never my belief that the Prime

14 sign-up process was misleading.  I think in lots

15 of processes at Amazon I think we maintain a very

16 high bar for the quality of customer experience we

17 offer, including Prime, and I would applaud

18 efforts by teams like this to figure out how to

19 keep making it better.

20     Q.    How do you square that belief with

21 these customer complaints?

22          MR. HUESTON:  Objection.

23     Argumentative.

24          You can answer.

25     A.    As I said, I think the survey results



1   reported here beg a lot of questions and I don't

2   remember who at the meeting asked which questions,

3   I don't remember the details, for example, of the

4   survey method or sample or other things, but I

5   think it's an area where I'm glad the team was

6   focused and working and would be important to keep

7   looking for ways to make our process as clear for

8   customers as we could.

9        Q.    Because you don't remember the

10  specifics of this meeting, would you agree that

11  the best reflection of what was discussed at the

12  meeting is what's contained in the meeting notes

13  themselves?

14       A.    That's hard for me to say.  We just

15  looked at another statement about a hypothesis

16  that I'm not sure I agree with either.

17       Q.    You are not sure you agree with it, but

18  is it fair -- you don't doubt that that -- if

19  that's listed under discussion notes, you have no

20  specific reason to doubt that that topic was

21  discussed; correct?

22       A.    I don't recall it, but it's very

23  possible it was discussed.

24       Q.    And because you don't recall the

25  content of this meeting, you have no reason to



1    doubt that the content of the meeting is

2    accurately reflected in the notes; correct?

3              MR. HUESTON:  Objection.  Asked and

4         answered.

5         A.    Again, I didn't write the summary, I

6    didn't write the notes.  I am reluctant to answer

7    your question affirmatively in part because we

8    just read another section of the document where

9    I'm not sure I would have written the same thing.

10        Q.    Presumably at least someone in the

11   meeting discussed the subject matter of the first

12   line under discussion notes, even if you didn't

13   agree with it, correct, starting "when scoping

14   initiatives"?

15             MR. HUESTON:  Objection.  Foundation.

16        Asked and answered.  Calls for speculation.

17        A.    I didn't write this, so how they

18   summarized the meeting, I can't say.

19        Q.    With respect to the Unintended Prime

20   Sign-Ups section, do you have any reason to doubt

21   that that fairly summarizes the contents of the

22   discussion in this meeting on that topic?

23             MR. HUESTON:  Objection.  Asked and

24        answered.  Otherwise calling for speculation.

25        A.    Again, I assume someone did their best



 1   what way, quality of what is a better way to ask

 2   the question?

 3        A.    Well, I think that's a good question,

 4   because one of my recollections of this meeting is

 5   a lot of the debate was to try to establish how to

 6   best measure quality.

 7        Q.    Quality would include someone having

 8   signed up for Prime intentionally; correct?

 9        A.    It could include that.

10        Q.    And, indeed, here it did include that;

11   correct?

12        A.    Is there a specific line you are asking

13   me to confirm?

14        Q.    You have read the section and feel free

15   to revisit, but is that your understanding of the

16   use -- I don't want to put words in your mouth --

17   understanding of the use of that term here?

18             MR. HUESTON:  Objection.  Vague.

19        A.    I just want to -- I would love it if

20   you could reread the question so I understand it

21   clearly.

22        Q.    Let me -- that's fine.

23        A.    I'm not trying to --

24        Q.    Understood.  I will withdraw and

25   reframe.



1          So if you look at line 117, it says:

2     "Within that reduction in memberships, we do not

3     know what percentage would have been mistaken

4     signups (low PQS)," and then there is some

5     additional text, so there is a link there between

6     a low quality and mistaken sign-up; correct?

7          A.    I read this sentence to mean a

8     mistake -- mistaken sign-up would be low quality

9     and I would agree with that.

10         Q.    And why?

11         A.    We have no interest in customers

12    signing up for Prime mistakenly.

13         Q.    If we look back at Exhibit 1, and maybe

14    your counsel can put that back in front of you

15    just for a moment, RG-1, if we just look back at

16    the US Prime Key Metrics chart, and that first row

17    we were discussing, Paid Member Balance, someone

18    could be a paid member reflected here but have

19    also been a mistaken sign-up; correct?

20         A.    It's possible.

21         Q.    And these are tracking metrics to --

22    Exhibit RG-1 reflects tracking metrics to gauge

23    the success of U.S. Prime; correct?

24         A.    It is some measurements that are about

25    the performance of U.S. Prime, I believe.



1    Q.    But there paid member balance could

2    include individuals who are paid members but are

3    unaware that they have signed up; correct?

4    A.    Again, if a mistaken sign-up occurred,

5    it would be included in this balance if they were

6    still signed up at the time.

7    Q.    If the paid member balance on one of

8    these reports suddenly declined, what would have

9    been your reaction?

10         MR. HUESTON:  Objection.  Incomplete

11    hypothetical.  Calls for speculation.

12    A.    I would have to know a lot more to

13    better answer your question.

14    Q.    You would seek to understand why the

15    numbers had fallen; correct?

16         MR. HUESTON:  Objection.  Incomplete

17    hypothetical.

18    A.    Not necessarily.

19    Q.    What about in your current role now

20    that Prime is under your direct authority, if the

21    Prime paid member balance suddenly decreased, you

22    would seek to understand why that was the case;

23    correct?

24         MR. HUESTON:  Objection.  Incomplete

25    hypothetical.



 1  | other metrics could we consider to best understand
 2  | the issue with greater confidence.
 3  |      Q.    So if someone within Prime were using
 4  | 60-day or 90-day settled rates as the sole measure
 5  | of a Prime sign-up quality, you would disagree
 6  | with the use of that metric in isolation, is that
 7  | a fair characterization?
 8  |          MR. HUESTON:  Objection.  Vague.
 9  |      A.    I don't think it is.
10  |      Q.    So what are the circumstances in which
11  | you think the 60-day or 90-day settled rate would
12  | be sort of an appropriate sole measure of Prime
13  | sign-up quality?
14  |      A.    I view these things as somewhat
15  | independent.  If -- I don't know the
16  | circumstances, but hypothetically if we couldn't
17  | come up with measurements beyond these two, they
18  | might have some value, though I recall the
19  | discussion we had being it would be really nice to
20  | have more and we should try to consider if there
21  | are others that we can add to supplement, and I --
22  | my recollection is that opinion was shared by many
23  | of the people in the room, including folks on the
24  | Prime team.
25  |      Q.    And why would it be nice to have more



 1  than just the 60-day, 90-day metric?

 2      A.   Well, with complex issues and

 3  measurements like this area, the more we can

 4  supplement and triangulate, or triangulate means

 5  three, but, you know, add more axes, add more

 6  measurements, add more dimensions, the more it

 7  might help us improve our understanding of what's

 8  happening and that can provide a basis for then

 9  developing solutions that improve things for

10  customers.

11      Q.   Do you recall anyone ever suggesting to

12  you that 60-day or 90-day settled rates was a

13  sufficient metric to determine whether Prime

14  sign-ups were clear to customers?

15      A.   I can't recall if someone said that in

16  specific.

17      Q.   Do you think that that is true?

18           MR. HUESTON:   Objection.   Vague.

19      A.   I haven't thought about the question

20  of is it okay, not okay to rely only on that.  My

21  thinking was entirely focused on turning this area

22  over in my mind and asking myself if there are

23  other ways we could add measurement to improve our

24  understanding.

25      Q.   Looking down at the third -- fourth



 1   bullet point, the last line of that bullet point
 2   ends with what's described as, quote, a potential
 3   tenet, and then in quotes:  "It's as easy for
 4   customers to say No as it is to say Yes."  Do you
 5   see that?
 6        A.    Yeah, but may I have a moment just to
 7   read the bullet in full?
 8        Q.    Sure.
 9              (Document review.)
10        A.    I see the bullet.
11        Q.    And you see the bullet is referencing
12   wanting customers to feel good while signing up
13   for Prime; correct?
14        A.    There is a sentence that says:  "We
15   want customers to feel good while signing up."
16        Q.    Do you agree with the potential tenet
17   that it's as easy for customers to say no as it is
18   to say yes?
19        A.    I haven't thought about it much before
20   and I would probably need to ask a lot of
21   questions before I could understand what's even
22   intended here.
23        Q.    To round that out then, have you
24   thought about this potential tenet in the context
25   of signing up for or declining a Prime sign-up?



1        A.    I'm sorry.  Could you repeat the
2   question, please.
3             (Record read.)
4        A.    I don't remember the discussion about
5   this tenet, so I don't recall having thought about
6   it.
7             MR. NARDINI:   Okay.  We can set RG-8
8        aside, please.
9             Let's mark as RG-9 the following
10       document.
11            (Exhibit 9, e-mail dated 7-16-2019,
12       Bates stamped AMZN_00028275 and
13       AMZN_00028276, marked for identification.)
14       Q.    So Mr. Grandinetti, RG-9, and feel free
15   to look at it, but you will see is the same chain
16   as we were looking at in RG-8, except there is one
17   more e-mail at the top and it's an e-mail from
18   you.  The Bates number here ends in 00028275.
19            (Document review.)
20       A.    I apologize.  Could you repeat the
21   question, please.
22       Q.    Oh, you know, I actually hadn't asked
23   one yet.
24       A.    Oh, okay.
25       Q.    I take it you're ready, so I'll go for



1    it.

2              So Mr. Grandinetti, to just sort of

3    walk through your short response at the top of

4    this e-mail, you write:  "Thanks for this," and

5    then you are quoting:  "Overall, the goal of both

6    product initiatives and content testing is to

7    improve messaging clarity while not hurting

8    signups and conversion rates to 90-day paid

9    members."  Did I read that correctly?

10        A.    You read it correctly, although I would

11   add I may -- I believe I copied and pasted this

12   sentence rather than wrote it myself.

13        Q.    Copied and pasted it out of a document

14   that was attached to the prior e-mail from

15   Mr. Kalim; correct?

16        A.    That sounds right.

17        Q.    And he says in his prior e-mail "I

18   am" -- just down the page -- "I am therefore

19   sharing a doc which lists such experiments and

20   their results.  Please find it enclosed."  Do you

21   see that?

22        A.    I see where it says that.

23        Q.    So you took a snip out of that document

24   and pasted it in and that's the information in

25   quotes; correct?



1      A.    That's my recollection.

2      Q.    And then you wrote, and this is your

3  words now:  "Agreed.  Let's keep pushing for

4  both."  Did I read that correctly?

5      A.    Yes.

6      Q.    So the concepts here are improve

7  message clarity while not hurting sign-ups and

8  conversion rates to 90-day paid members; correct?

9            MR. HUESTON:   Objection.   Compound.

10     A.    The quote talks about our goal.

11     Q.    I guess what I am trying to understand

12  is the meaning of the word "both" here.  What are

13  the two things?

14     A.    I think "both" applies to the broad

15  topic of product initiatives and separately the

16  broad topic of content testing.

17     Q.    The goal of both product initiatives

18  and content testing is to -- strike that.  So

19  there is a goal -- so to be clear -- let me see if

20  I have this correctly.

21            My reading of what you are saying here

22  is let's keep pushing for both improving messaging

23  clarity and not hurting sign-ups and conversion

24  rates.  Is that correct?

25     A.    I was, I believe, attempting to agree



1    with the goal that whoever wrote this articulated.

2        Q.    Do you recall -- following the June

3    17th, 2019, meeting, do you recall any

4    conversations with anyone at Amazon about whether

5    the goal of improving message clarity and not

6    hurting sign-ups were opposed to one another?

7        A.    I do not.

8        Q.    Do you recall asking anyone if those

9    were opposing goals?

10              MR. HUESTON:  Objection.  Vague.

11       A.    I don't recall.

12       Q.    Do you recall thinking that they could

13   be opposing goals?

14       A.    Could you repeat the question.

15             (Record read.)

16       A.    I think of them distinctly and

17   separately.

18       Q.    So it sounds like the answer to my

19   question is no; correct?

20             MR. HUESTON:  Objection.  Asked and

21       answered.

22       A.    I would like to answer your question as

23   best I can.  Maybe you could restate the question

24   or read back the question so I can --

25       Q.    Sure.  We talked about conversations



1   you had or questions you asked, but I was asking
2   specifically about your thought process, your
3   thinking.
4           Do you recall thinking following the
5   June 17, 2019, meeting that the goals of improving
6   messaging clarity and not hurting sign-ups were
7   opposed to one another?
8           MR. HUESTON:  Objection.  Asked and
9       answered.
10      A.   No, I don't recall thinking about it
11  that way.
12          MR. NARDINI:  We can set this document
13      aside.  We have been going for about an hour
14      and a half.  Why don't we go off the record
15      and take a ten-minute break.
16          MR. HUESTON:  Okay.  That's fine.
17          (Recess was taken from 2:32 to 2:49.)
18  BY MR. NARDINI:
19      Q.   Mr. Grandinetti, setting aside any
20  conversations with counsel, did you speak to
21  anyone regarding the substance of your testimony
22  during the break?
23      A.   I did not.
24      Q.   Mr. Grandinetti, are you familiar with
25  the term "interstitial"?



1   different in the sense that the teams were

2   interested in finding a way to do that sensibly

3   and were going to go work on that.

4        Q.   Did you make the decision that the team

5   would do that?

6        A.   I don't recall making that decision.

7        Q.   Did you participate in the decision

8   that the team would do that?

9        A.   I participated in the meeting.

10        Q.   Did you participate in the decision,

11   though?

12        A.   Again, I don't recall the meeting that

13   clearly.  It's a meeting that appears to include

14   members of the benchmarking team, of the Japan

15   team, of the Prime team.  I was certainly glad to

16   know that we would go work on these areas, but how

17   the action was proposed or how it was followed up,

18   I don't recall clearly.

19        Q.   Looking at bullet 5 there under Action

20   Items, so we are still in that section, the last

21   sentence reads:  "Need to challenge ourselves to

22   the point where we feel uncomfortable with the

23   proposal," and then there is some additional text.

24   Did I read that correctly?

25        A.   Yes.



1    Q.    What did you say in the meeting about

2  challenging the team to address mistaken sign-ups

3  to the point where the team felt uncomfortable?

4    A.    There is a sentence later in this

5  document that says "Russ worried we're letting

6  impact on Prime growth limit us from doing the

7  right thing," and this strikes me like a context

8  where it would be useful, and I think I did

9  encourage the team not to worry if member growth

10  declined if we really thought we were making the

11  experience better for customers.

12    Q.    How did you tell the team to evaluate

13  whether you were really making the experience

14  better for customers?

15    A.    It's not clear to me if we established

16  how in the meeting.

17    Q.    Would it have given the team sufficient

18  direction if the how to determine whether the

19  experience was really better for customers hadn't

20  been established?

21    A.    I'm not sure I followed the question.

22  Would you mind reading or --

23    Q.    Sure.  If you said to the team don't

24  worry about reducing sign-ups if we are really

25  making the experience better for customers, but



 1 | there is not a sense of how to evaluate whether
 2 | the experience is better for customers, what's
 3 | sort of the weight or thrust of telling the team
 4 | to not worry about Prime numbers going down?
 5 |             MR. HUESTON:   Objection.   Incomplete
 6 |    hypothetical.
 7 |       A.    I think it's helpful to make clear that
 8 | if we thought we made the experience better for
 9 | customers that happened to reduce member sign-ups,
10 | that would be fine.
11 |       Q.    In the context of Prime, did you ever
12 | make a decision that would reduce member sign-ups
13 | but that you felt improved the experience for
14 | customers?
15 |       A.    I can't remember if I did.
16 |       Q.    Do you recall if your team made such a
17 | change?
18 |       A.    It would have been unusual, because at
19 | this time the Prime team did not report to me, so
20 | I wasn't in a position to decide for the Prime
21 | team how they would do things.  I felt it was my
22 | responsibility to, like with any other team, offer
23 | my perspective on how we might consider such work,
24 | but it would have been not our practice for me to
25 | direct the work of the Prime team.



1          Mischaracterizes the document, and otherwise

2          the question lacks foundation and is

3          otherwise asked and answered.

4          A.    I probably have to ask Jamil more about

5    what he intended here for me to understand it

6    better.

7          Q.    Your team -- strike that.

8                This e-mail says that you encouraged

9    improvements to the CX; correct?

10               MR. HUESTON:  Objection.  Foundation.

11          Misstates the document.

12          A.    It references my encouragement, but

13   it's hard to know what context.

14          Q.    It follows:  "The ongoing push to

15   improve CX (his team leading for Consumer, with

16   Russ's encouragement)," and then it goes on;

17   correct?

18          A.    I agree that's what it says.

19          Q.    At this time, it's January 2021, were

20   you, in fact, encouraging improvements to the

21   Prime CX?

22               MR. HUESTON:  Objection.  Vague.

23          A.    Even this parenthetical seems to be

24   about my encouragement of the consumer team in

25   some context.



1    Q.    Stepping back from the language from

2    the words on the page of the documents, in January

3    of 2021, did you encourage Prime to improve the

4    Prime customer experience?

5              MR. HUESTON:   Objection.   Vague.

6    A.    I feel like I constantly ask all the

7    teams I work with to improve the customer

8    experience.

9    Q.    So you have no reason to doubt that

10   Mr. Ghani's characterization here is accurate; is

11   that fair?

12             MR. HUESTON:   Objection.   Foundation

13        and asked and answered.

14   A.    I feel like to understand what's

15   written here better, I would need to ask Jamil for

16   a number of details.

17   Q.    So setting aside such a conversation,

18   you are not sure what this means; correct?

19             MR. HUESTON:   Objection.   Misstates his

20        testimony.   Otherwise asked and answered.

21   A.    I stand by my prior answers.

22   Q.    I think what I am asking is slightly

23   different.   I want -- do you have an understanding

24   independent from the words on the page of the

25   document what the sentence "he and I agreed" and



 1  then ending with "headwind to growth" means?

 2          MR. HUESTON:  Objection.  That is

 3      asking the exact same question yet again, so

 4      I am going to object.  It is argumentative

 5      and bordering on harassment.

 6      Q.    You can answer, Mr. Grandinetti.

 7      A.    I prefer not to speculate.

 8          MR. HUESTON:  Okay.  Let's move on.

 9      Let's move on.

10      Q.    I want to make sure I understand your

11  interpretation of this document.  I don't think I

12  have actually gotten an answer on that question.

13  So outside of the --

14          MR. HUESTON:  Well --

15          MR. NARDINI:  Counsel, let's not

16      interrupt each other.  I promise I will give

17      you a chance to respond.

18          MR. HUESTON:  Go ahead.

19          MR. NARDINI:  Of course.

20      Q.    Outside of the words of this sentence,

21  do you have any understanding of what that

22  sentence means?

23          MR. HUESTON:  Okay.  I am going to

24      object, because you have asked him, I think,

25      now over ten times what his understanding of



```
 1   delayed; correct?
 2        A.    I don't know.
 3        Q.    Do you have any understanding of what
 4   that bullet means?
 5        A.    Just what it says at face value.  So it
 6   talks about being delayed to flex resources to
 7   other initiatives.
 8        Q.    And those initiatives being TrueSPC and
 9   Google, as written here; correct?
10        A.    That's what it says.
11        Q.    Do you know why it was necessary to
12   flex resources to TrueSPC and Google and delay CX
13   satisfaction sign-up?
14        A.    In general, it's not uncommon for teams
15   like this to have a wide variety of different
16   projects in flight and then as time goes on make
17   decisions about maybe the order of operation or
18   the requirements may change or how long it takes
19   to do something may change, so it seems like
20   something in that area, but I'm unsure.
21        Q.    And what about the bullet below, I will
22   just read that:  "CX Satisfaction Cancel - on
23   track to launch in US in Q1 if not sooner."  Did I
24   read that correctly?
25        A.    I believe you did.
```



1        Q.    CX satisfaction cancel, that refers to

2    the shortening of the Iliad cancellation flow;

3    correct?

4        A.    I don't know.

5        Q.    Are you aware of changes to the Iliad

6    cancellation flow that occurred in the first

7    quarter of 2023?

8        A.    I'm not sure.

9        Q.    And I think I know the answer, but just

10   to round it out, did you participate in the

11   decision to make -- to shorten the cancellation

12   flow in the U.S. launched in the first quarter of

13   2023?

14       A.    I don't believe I did.

15       Q.    Are you familiar with CX satisfaction

16   changes to Prime sign-ups that occurred in 2022?

17       A.    Outside of I assume the Prime team

18   would always be working on customer experience

19   satisfaction improvement in sign-up, I don't know

20   the details of what might have happened in 2022.

21       Q.    So did you -- to round that out, did

22   you participate in any decisions to implement CX

23   satisfaction changes to Prime sign-ups in 2022?

24       A.    I don't recall having done so.

25       Q.    Mr. Grandinetti, as SVP international



1   consumer, you keep yourself sufficiently apprised

2   of the regulatory environments in which --

3   relevant to the purview of your responsibilities;

4   correct?

5          MR. HUESTON:  Objection.  Vague.

6       A.    The number of countries and areas my

7   team spans is wide.  I can't say with confidence

8   that regulatory changes across those areas are

9   things I always know about.

10      Q.    Understanding I don't want to know

11  anything about conversations with counsel, what

12  steps do you take to make sure you are

13  sufficiently apprised of the relevant regulatory

14  markets in which Amazon operates?

15         MR. HUESTON:   Objection.  Vague.

16      A.    More commonly, if there are changes in

17  the regulatory environment, teams might reach out

18  to me if it's relevant.

19      Q.    So you would more expect teams to reach

20  out to you if relevant as opposed to you seeking

21  out that information; is that correct?

22         MR. HUESTON:  Well, objection.

23      Incomplete hypothetical.

24      A.    It can depend on a lot of factors.

25      Q.    What are some of those factors?



1              MR. HUESTON:  Objection.  Vague.  Calls

2        for a narrative.

3        A.    Awareness about regulatory changes can

4   come from a wide variety of directions.

5        Q.    Since you assumed authority over the

6   Prime organization, have you taken steps to -- you

7   have taken steps to familiarize yourself with the

8   regulatory environment relevant to Prime; correct?

9              MR. HUESTON:  Objection.  Vague.

10        A.    Again, often when there are changes in

11   the regulatory environment at Prime or any other

12   team, I think it's far more common that teams

13   might apprise me of such changes if useful.

14        Q.    You currently live in London; correct?

15        A.    I do live in London.

16        Q.    Are you familiar with the United

17   Kingdom's Advertising Standards Authority?

18        A.    I'm not familiar with them.

19        Q.    Sometimes abbreviated ASA, does that

20   ring a bell?

21        A.    That acronym does not ring a bell with

22   me.

23        Q.    To round that out, are you aware of

24   whether the Advertising Standards Authority found

25   the Prime UPDP to be deceptive at any point?



1        A.    I'm not aware of that.

2        Q.    Are you aware that there are laws in

3    the United States regarding online subscription

4    service programs?

5              MR. HUESTON:    Objection.    Vague.    And

6        otherwise calling for a legal conclusion.

7        A.    Would you mind repeating the question,

8    please.

9              (Record read.)

10             MR. HUESTON:    Objection.    Vague.

11       Otherwise calls for a legal conclusion.

12       A.    I wouldn't want to speculate.

13       Q.    Does that mean you are not aware one

14   way or the other whether such laws exist?

15             MR. HUESTON:    Objection.    Vague as to

16       laws.

17       A.    I imagine there are laws in this area

18   generally, but I'm not a lawyer.

19       Q.    Are you aware that there are U.S. laws

20   prohibiting someone from -- from billing someone

21   for an online subscription service program without

22   their consent?

23             MR. HUESTON:    Objection.    Vague.    Calls

24       for a legal conclusion.

25       A.    I'm not sure.



1        Q.     Are you aware there are laws requiring

2   an online subscription service program to provide

3   simple mechanisms to cancel a subscription?

4               MR. HUESTON:   Objection.   Vague.   Calls

5        for a legal conclusion.

6        A.     I'm not sure.

7        Q.     Are you aware of the Restore Online

8   Shoppers' Confidence Act, sometimes called ROSCA?

9               MR. HUESTON:   Today or do you have a

10       time reference?

11       Q.     Let's start with at any point.

12       A.     I've heard that acronym before, yes.

13       Q.     Okay.   I'm looking just for the timing.

14   When did you first hear that acronym, just the

15   timing of when?

16       A.     I don't recall when I first heard it.

17       Q.     Was it before or after the FTC filed

18   this litigation?

19       A.     It's possible I've heard the acronym or

20   something before, but I don't recall if I did.

21       Q.     Prior to the FTC's filing of this

22   litigation, you don't recall if you knew what

23   ROSCA was; correct?

24               MR. HUESTON:   Objection.   Misstates his

25       testimony.



1          A.    I understood your question to mean had

2    I heard the word ROSCA or the acronym ROSCA before

3    and I can't remember when I first heard it.

4          Q.    Do you recall one way or another

5    whether you had heard of ROSCA in 2016?

6          A.    I can't recall.

7          Q.    Do you recall one way or another

8    whether you had heard it in 2017?

9          A.    I tried to answer your question about

10   when I first heard it and I'm just unsure.

11              (Continued on next page to include

12         jurat.)

13

14

15

16

17

18

19

20

21

22

23

24

25



1      Q.    Your answer would be the same for any

2   year if I were to list them out; correct?

3      A.    Because I'm not sure, I believe it

4   would be.

5              MR. NARDINI:  All right.  I think we

6         are done on our end.  Mr. Hueston, I will

7         pass it over to you.

8              MR. HUESTON:  Nothing.  Well, let me

9         take a brief break.

10             MR. NARDINI:  Sure.

11             (Time noted:  5:35 p.m.)

12

13

14              ------------------------------

15              RUSSELL CHRISTOPHER GRANDINETTI

16

17   Subscribed and sworn to before me

18   this       day of              2024.

19

20   ---------------------------------------

21

22

23

24

25



1                    C E R T I F I C A T E

2

3   STATE OF NEW YORK    )

4                        ) ss.:

5   COUNTY OF NASSAU     )

6              I, KRISTIN KOCH, a Notary Public

7         within and for the State of New York, do

8         hereby certify:

9              That RUSSELL CHRISTOPHER GRANDINETTI,

10        the witness whose deposition is

11        hereinbefore set forth, was duly sworn by

12        me and that such deposition is a true

13        record of the testimony given by such

14        witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage; and that I am

18        in no way interested in the outcome of this

19        matter.

20             IN WITNESS WHEREOF, I have hereunto

21        set my hand this 17 day of November, 2024.

22

23

24        ------------------------------

25             KRISTIN KOCH, RPR, RMR, CRR



# EXHIBIT 38

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

     Plaintiff,

   v.

AMAZON.COM, INC., *et al.*,

     Defendants.

**Case No. 2:23-cv-0932-JHC**

**PLAINTIFF'S SECOND AMENDED INITIAL DISCLOSURES**

Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), hereby submits its Second Amended Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving any privileges or protections, including but not limited to attorney-client privilege, the attorney work-product doctrine, the government deliberative process privilege, the law enforcement privilege, and the informant's privilege, and without prejudicing the FTC's ability to supplement this disclosure as additional information becomes available, the FTC submits the following information.

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

1. **Names and, if known, the addresses and telephone numbers of individuals likely to have discoverable information, along with the subjects of that information – Fed. R. Civ. P 26(a)(1)(A)(i):**

   a. Defendant Amazon.com, Inc. ("Amazon") is likely to have information regarding each of the FTC's allegations and Defendant's responses thereto.

   b. Amazon's current and former employees, officers, directors, independent contractors, and agents, each of whom Amazon can more readily identify than the FTC. The information available to these individuals includes information about: Defendant Amazon's business practices, management, and operations, including its websites, negative option offerings, enrollment and cancellation flows and processes for negative option offerings, marketing strategies, revenues, processing of online orders, communications with customers, customer complaints, complaint responses, and the identity of victims. Amazon is most knowledgeable about these individuals' contact information. The following is a list of potentially knowledgeable current and former employees of which the FTC is aware. The FTC has included contact information for former employees for whom the FTC possesses such information:

- Aaron Bloom
- Abhishek Bathla
- Abhishek Gudihal
- Ahmed Makhloud
- Alexandre Naud
- Alez Borowiecki
- Alexander Armann
- Amy Leigh Morgan
- Ana Piedra
- Anant Handi
- Anand Mishra
- Andrea Cordani
- Andrew Hamel
- Andrew Jassy
- Andrew Pope
- Andrew Varney
- Andre Taegder
- Andy Langenfield
- Ankitha Bharadwaj
- Anthony Boulis
- Antonio Nurra
- Apoorva Sapalok
- Arun Gundimeda
- Ashish Lal

- Ashley Woodruff
- Austin Masterson
- Avais Chishti
- Bharath Srinivasan
- Benjamin Goeltz
- Ben Graeff
- Benjamin Hills
- Bolong Li
- Brenda Spoonemore
- Brennan Earley
- Buck Andrews
- Caitlin Cunningham
- Calvin Kwok
- Cami Smith
- Candas Bozkurt
- Caroline Moeller
- Carlos Lolatto
- Cem Sibay
- Charles Mario
- Chee Chew
- Christopher "C.R." Brown
- Claudia Alva
- Coen De Heus
- Colin Hulmes

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

- Dan Daly
- Daniel Vega Simoes
- Danielle Paulet
- Dave Carrel
- Dave Clark
- David Edelstein (represented by Thomas Bienert)
- David Guetierrez Perez
- David Tang
- Dawn Kim
- Dharmesh Mehta
- Dhaval Parmar
- Dilip Sivasankar
- Divesh Chandiramani
- Doug Herrington
- Eduardo Botti
- Elisa Marshall
- Elizabeth Hoyt-Ansley
- Emily Ikeda-Flowers
- Emily Tajuddin
- Enrique Gonzales
- Erik Grant
- Erik Schmitz
- Erikka Arone
- Erin O'Boyle
- Erina Kim
- Etienne Gandillot
- Fang Qiao
- Farhad Merchant
- Federica Ferreto
- Federico Maceratesi
- Fernando Mendoza
- Gary Allen
- George Hatoun
- Gloria Smuda
- Grace Zhou
- Greg Greeley
- Gregoire Hirtz
- Hiro Matsuzawa
- Ishan Agnihotri
- Ivy Cunningham
- Katey Muus

- Jack Sallay
- Jackie Shiu
- Jake Burghardt
- James Morgan
- Janet Galore
- Jason Brightman
- Jediah Hankin
- Jeffrey Bezos
- Jeffrey Wilke
- Jeff Gelfuso
- Jeff Hull
- Jeff Perry
- Jennifer Heard
- Jenny Blackburn
- Jessica Meyer
- Jodi Flannery
- Joe Qiao
- John Pond
- Jon Christopher
- Jonathan Atkins
- Jonathan Basamanowicz
- Jonathan Stringfellow
- Jose Uzcategui
- Julian Smyth
- Jun Wakabayashi
- Justin Bell
- Jill Randel
- Ishan Agnihotri
- Karkthik Gupta
- Karthik Selvarajan
- Katey Muus
- Katie Crimmins
- Kathleen Policarpio
- Kayla Gherkin
- Kazuho Tsuyuki
- Kelley Hekert
- Keisuke Takagi
- Killol Bhuta
- Kristen Joy
- Kristen Miller
- Lakshmi Narayanee Balasubramanian

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

3

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

- Laslo Ekart
- Laure Gallagher
- Lauren Englund
- Lee Thompson
- Lena Zak
- Linda Cheng
- Linnea Hagen
- Linn Wotka
- Lisa Leung
- Lisa Henke
- Lisa Nghiem
- Liz Green
- Llew Mason
- Marco Fago
- Maria Robert Gallegos
- Mark England
- Marla Dunn
- Mary-Pat Gotshall
- Masuma Henry (represented by Thomas Bienert)
- Matt May
- Matt Bell
- Matthias Hubert
- Maxime Hervet
- Melisa Rodriguez
- Miles Hunter (represented by Thomas Bienert)
- Mike Browne
- Mindy Constant
- Molly O'Donnell (represented by Thomas Bienert)
- Monique Mascio (represented by Anthony Pacheco)
- Nahshon Davidai
- Nario Natale
- Nathan Morganson
- Neel Malhotra
- Nick Koveshnik
- Nicole Kuhn
- Nikki Baidwan
- Nina Getzner
- Noah Borun

- Numair Chowdhuri
- Omar Kalim
- Onyi Odueze
- Orna Shalev
- Patrick Supanc
- Paul Anheier
- Paul Mannino
- Paula Battle
- Prabhat Sharma
- Pranav Mittal
- Praju Tuladhar
- Preeti Shrivastav
- Priyata Sinha
- Rachel Green (represented by Thomas Bienert)
- Rachel Graham
- Raffaela Monachese
- Ramya Srinivasan
- Ramon Lopez Narvaez
- Regan Fry
- Reid Nelson (represented by Laura Riposo VanDruff – lvandruff@kelleydrye.com; 202-342-8435)
- Rekha Lakshammon
- Rex Morey
- Rey Urip
- Richa Mangal
- Robert Masterson
- Roger Sambrook
- Rohit Saxena
- Roy Woolman
- Ryan Ogborn
- Ryu Iwasare
- Sandy Udumala
- Sanjay Balakrishnan
- Sara Klainer (sklainer@gmail.com; 617-538-6288)
- Sarah Jane Gunter
- Sarah Massey
- Sasanka Rajaram

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

4

- Saugata Halder
- Scott Shapiro
- Sean Kim
- Sebastian Gunningham
- Sebastian Koch
- Sergio Surijon
- Sid Maheshwari
- Shakeb Sagheer
- Sharon Chiarella
- Shay Dvir
- Shivakumar Menon
- Shreya Chakrabarti
- Simone LaHood
- Sonja Remien
- Sridhar Iyer
- Srikanth Thirumalai
- Stella Wu
- Stephen Newman
- Subbi Palaniappan
- Sumit Kapoor
- Susan Kremer
- Sushant Majithia
- Swami Sundaram
- Taft Coleman
- Talita Taliberti
- Tamima Hamadeh
- Tegi Kaleka
- Terence Hagans
- Terry Hanold
- Thomas Muller
- Thomasz Madelski
- Tomomi Fukamachi

- Tim Chow
- Tracy McNulty
- Tyler Dimicco
- Tyler Robinson
- Ulrich Hendel
- Varun Nair
- Venkatesh Mohan
- Vivek Vidyanathan
- Wenjun Zeng
- Will Hallock
- Woo Kim
- Yanina Levitskaia
- Yuan Lin
- Yuntian Wan
- Current and former employees on the "Anecdotes" team
- Current and former employees on the "Clarity Trust" team
- Current and former employees on the "Iliad" team
- Current and former employees on the "Member Trust" team
- Current and former employees on the "Nostradamus" team
- Current and former employees on the "Project Ava" team
- Current and former employees on the "Retention" team
- Current and former employees on the "Renewal" team
- Current and former employees on the "Project Café" team

c. Vendors used by Defendant Amazon for document preservation and discovery, including Concilio, and those vendors' employees and contractors, including Robert Stangler.

d. Vendors used by Defendant Amazon with respect to any aspect of Prime's online enrollment or cancellation flow and processes, including any and all testing on those flows and processes. These vendors include Qualtrics and UserTesting.

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

5

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

e.  Consumers who Amazon enrolled into a Prime subscription without consent or who were unable to successfully cancel, or faced difficulty successfully cancelling, their Prime subscription (or other Amazon negative option offering), including such consumers who submitted complaints to Amazon, government agencies, or other parties, including but not limited to: (1) the FTC; (2) state Attorneys General; (3) state and local consumer protection agencies; (4) Better Business Bureaus throughout the United States; and (5) other federal and state law enforcement agencies.   The FTC will provide contact information for any consumer on whom it may rely; such contact information is usually contained within the consumer complaints the FTC produced to Amazon from its Consumer Sentinel database.

The FTC currently intends to rely on the following consumer witnesses:

Lois Berkowitz (renascen@att.net)
Debbie Doyle (Ddoyle48girl@yahoo.com)
Ann Everett (Annmaryeverett@gmail.com)
Thomas Gorman (Tom.gorman2178@gmail.com)
Brian Smith (bmsmith1997@gmail.com)
Christy Hudson (christyjoycehudson@gmail.com)
Todd Mitchell (todd@mitchellcreativegroup.com; 508-494-8182)
Katherine Holmes (katholmes122106@gmail.com; 336-257-8045)
Matthew Bergey (mbergey1460@gmail.com; 267-644-7040)
Rondal Herring (520-886-2791)
Michael Babcock (936-697-4183)
Lena McDonald (lsmcdonald1950@gmail.com; 804-513-6278)
Zachery Cardoso (zacherycardoso@gmail.com; 209-648-5348)

f.  FTC staff, some of whom possess i) information about Defendants' business practices, websites, and consumer complaints stored in the FTC's Consumer Sentinel database, or ii) information about the investigation.  *Defendants may contact FTC employees only through FTC's counsel of record.*

i.  Adam Rottner, Investigator
ii.  Katherine Johnson, Staff Attorney
iii.  Jonathan Cohen, Staff Attorney
iv.  Evan Mendelson, Staff Attorney
v.  Olivia Jerjian, Staff Attorney
vi.  Thomas Maxwell Nardini, Staff Attorney
vii.  William Violette, Economist
viii.  Margaret Cole, Paralegal
ix.  Elena Hoffman, Paralegal
x.  Jacob Frech, Paralegal
xi.  Ryan Zwonik, Paralegal
xii.  Amanda Basta, Assistance Director, Division of Enforcement

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

6

g. Attorneys at Covington & Burling LLP and Williams & Connolly LLP who worked on the FTC investigation leading to this matter.

h. Any expert witnesses retained by any party. The FTC will disclose any experts at the time required by Rule 26(a)(2)(D) or any scheduling order entered by the Court.

i. Other witnesses identified by Defendants in their initial disclosures or supplements or in discovery, who may possess information the FTC will use to support its claims.

j. As the FTC stated in a December 11, 2024 to Defendants' counsel, the FTC does not presently intend to rely on testimony from any of the following individuals during its case-in-chief: Jonathan Cohen, Evan Mendelson, Olivia Jerjian, Max Nardini, Margaret Cole, Elena Hoffman, Jacob Frech, and Ryan Zwonik. It is possible, however, that any of the non-attorneys on that list, or other FTC personnel, may testify as a document custodian (to authenticate documents), as a summary witness, or in some other similar capacity. For example, especially given the voluminous data at issue, it is possible that an FTC employee will present a Rule 1006 summary, at trial, of data provided by Amazon. We would disclose that witness and the summary in the manner required by the Federal Rules of Civil Procedure and Federal Rules of Evidence.

**2. Copies—or a description by category and location—of all documents, electronically stored information, and tangible things that the FTC has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment – Fed. R. Civ. P 26(a)(1)(A)(ii):**

a. Documents, electronically stored information, and/or tangible things attached to FTC filings submitted to date in this matter.

b. Transcripts of Investigational Hearings of the individuals and entities listed below, obtained through the FTC's Civil Investigative Demands ("CIDs"), and all exhibits thereto.

- Defendant Amazon
- Defendant Russell Grandinetti
- Defendant Neil Lindsay
- Defendant Jamil Ghani
- Andrew Jassy
- Benjamin Hills
- Cem Sibay
- Christopher "C.R." Brown
- Dave Clark

- David Edelstein
- Dharmesh Mehta
- Doug Herrington
- Gloria Smuda
- Greg Greeley
- Katey Muus
- Jeffrey Bezos
- Jeffrey Wilke
- Llew Mason
- Masuma Henry

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

7

- Molly O'Donnell
- Monique Mascio
- Nahshon Davidai
- Nikki Baidwan
- Omar Kalim
- Reid Nelson

- Sara Klainer
- Sebastian Gunningham
- Sharon Chiarella
- Simone LaHood
- Sridhar Iyer

b. Defendant's responses to the Interrogatories and Document Requests issued in the FTC's CIDs dated March 16, 2021 and June 30, 2022.

c. Third-party responses to FTC CID Interrogatories and Document Requests from the following individuals:

- Andrew Jassy
- Benjamin Hills
- Cem Sibay
- Christopher "C.R." Brown
- Dave Clark
- Dharmesh Mehta
- Doug Herrington
- Gloria Smuda
- Greg Greeley
- Katey Muus
- Jeffrey Bezos

- Jeffrey Wilke
- Lisa Leung
- Llew Mason
- Nahshon Davidai
- Nikki Baidwan
- Omar Kalim
- Sebastian Gunningham
- Sharon Chiarella
- Simone LaHood
- Sridhar Iyer

d. Third-party responses to FTC CID Document Requests from the following individuals:

- Monique Mascio
- Molly O'Donnell
- Masuma Henry
- David Edelstein

e. Defendant Amazon's responses to CIDs issued in other FTC investigations.

f. Consumer complaints stored within the FTC Consumer Sentinel database.

g. Consumer complaints submitted to: (1) the FTC; (2) state Attorneys General; (3) state and local consumer protection agencies; (4) Better Business Bureaus throughout the United States; and (5) other federal and state law enforcement agencies.

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

8

h.  Documents, electronically stored information, and/or tangible things gathered during the FTC's investigation of Defendant, including website captures from undercover purchases.

i.  Documents, electronically stored information, and/or tangible things obtained from publicly available sources, such as the internet.

j.  Any documents identified by the Defendant in its disclosures and in any other discovery responses.

**3.  A computation of each category of damages claimed by the FTC – Fed. R. Civ. P. 26(a)(1)(A)(iii):**

a.  The FTC seeks monetary relief pursuant to Section 19 of the FTC Act for Defendant's violations of ROSCA.  For the harm caused, prior to the filing of the FTC's Complaint (June 21, 2023), by Amazon's unlawful Prime-enrollment practices, the FTC seeks $844 million in Section 19 monetary relief.  This is a reasonable estimate of the amount of money paid by Prime subscribers—on or after December 29, 2018 and before entering a Prime cancellation process for the first time—who unintentionally enrolled in Amazon Prime on or after January 1, 2018.  *See* Mahoney Expert Report at 46-51 (and Appendices cited therein).  The Appendices to the Expert Report of Neale Mahoney contain alternative calculations based on start dates of July 20, 2019 ($721 million), January 19, 2020 ($601 million), June 21, 2020 ($504 million), and September 20, 2020 ($453 million).  *See* Mahoney Expert Report at D-11.  As to the Individual Defendants, the FTC seeks $504 million or $453 million in enrollment-related monetary relief.  The Appendices to Dr. Mahoney's Report contain further alternative estimates, including estimates that are limited to payments made by consumers who *enrolled* after the dates listed herein rather than those that were *charged* after those dates.  *See* Figures 55, 56, 61, 62.

For the harm caused (or likely to be caused) by Amazon's unlawful enrollment practices between the filing of the FTC's Complaint and September 30, 2025, the FTC seeks $475 million in monetary relief against all Defendants.  *See* Mahoney Expert Report at 51.

For the harm caused, prior to the filing of the FTC's Complaint (June 21, 2023), by Amazon's unlawful Prime-cancellation practices (but limited to the three-page portion of Amazon's "Iliad" cancellation process), the FTC seeks up to $1.259 billion in Section 19 monetary relief.  As stated in the Expert Report of Neale Mahoney, this is the amount of Prime subscription fees paid by subscribers who entered but did not complete the final three-page part of the Iliad cancellation process.  *See* Mahoney Expert Report at 62 (Figure 32, Scenario 1).  In the alternative, the FTC may seek $476 million, which is the amount of Prime subscription fees paid by subscribers who entered but did not complete the final three pages of the Iliad cancellation process and subsequently had flat or decreased Prime benefit usage.  *See id.* (Figure 32, Scenario

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

9

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

2).  As another alternative, the FTC may seek $267 million, which—as described in greater detail in the Expert Report of Neale Mahoney—reflects the subscription fees paid by Prime members based on a difference-in-difference analysis comparing all Prime subscribers who did not complete the final three pages of the Iliad process (other than those who accepted an offer within the cancellation process) with Prime members who exited the final three pages of the Iliad process by accepting an offer from Amazon.  *See id.* (Figure 32, Scenario 3).  As another alternative, the FTC may seek $142 million, which—as described in greater detail in the Expert Report of Neale Mahoney—reflects the subscription fees paid by Prime subscribers based on a difference-in-difference analysis comparing all Prime subscribers who did not complete the final three pages of the Iliad process and exited through going to "No Page" or "Prime Central," with Prime subscribers who exited those three pages by accepting an offer from Amazon.  *See* Expert Report of Neale Mahoney at 61 (Figure 31).  As another alternative, the FTC may seek $124 million, which is the amount paid by the population described in the immediately preceding sentence, except that this calculation cuts off subscription fees paid when the Prime subscriber next entered the Iliad cancellation process, rather than when the subscriber eventually canceled.  *See id.* (Figure 30).

Figures 67-74 to the Expert Report of Neale Mahoney contain alternative calculations based on different date cutoffs for entry into the final three pages of the Iliad cancellation process and subscription fee payments.

Against the Individual Defendants, the FTC seeks the amounts reported in Figure 68 under Scenario 1 ($1.138 billion) or, in the alternative, Scenario 2 ($433.6 million) or Scenario 3 ($247.2 million).  Alternatively, the FTC may seek from the Individual Defendants $115 million.  *See* Figure 65 (June 21, 2020 cutoff).  Figures 65, 69, 73, and 74 provide additional alternative monetary relief calculations applicable to the Individual Defendants based on different date cutoffs (June 21, 2020 or September 20, 2020) for entry into the final three pages of the Iliad cancellation process and subscription fee payments.

The Individual Defendants' liability for Section 19 monetary relief is joint and several with that of Amazon.

The FTC reserves the right to supplement these responses upon receipt of additional data from Amazon, including data relating to Amazon's Iliad 2.0 cancellation process.

b.  The FTC also seeks civil penalties for Defendants' violations of ROSCA.  The FTC previously stated that it did not have a computation of the civil penalties it was seeking, but that it would "supplement this response after further discovery."  Because, however, civil penalties are not "damages," the FTC need not provide a "computation" of civil penalties.  *See, e.g.*, *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 590-91 (9th Cir. 2022).  The Individual Defendants' liability for any civil

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

10

penalty is *not* joint and several with that of Amazon, and the FTC also intends to argue that the Individual Defendants cannot be indemnified for any civil penalty entered against them.

4. **Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment -- Fed. R. Civ. P. 26(a)(1)(A)(iv):**

The FTC is not aware of any such agreements, and the Defendants have not identified any pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iv).

Dated: April 25, 2025                    /s/ Evan Mendelson

JONATHAN COHEN (DC Bar # 483454)
EVAN MENDELSON (DC Bar #996765)
OLIVIA JERJIAN (DC Bar #1034299)
JONATHAN WARE (DC Bar #989414)
ANTHONY SAUNDERS (NJ Bar #008032001)
SANA CHAUDHRY (NY Bar #5284807)

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580

(202) 326-2551 (Cohen); -3320 (Mendelson); -2726 (Ware); 2749 (Jerjian); -2917 (Saunders); -2679 (Chaudhry)

JCohen2@ftc.gov; EMendelson@ftc.gov; JWare1@ftc.gov; OJerjian@ftc.gov; ASaunders@ftc.gov; SChaudhry@ftc.gov

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; CMacdonald@ftc.gov

RACHEL F. SIFUENTES
(IL Bar #6304016; CA Bar #324403)
Federal Trade Commission
230 S. Dearborn St., Room 3030
Chicago, IL 60604
(312) 960-5617; RSifuentes@ftc.gov

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

11

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4303; JTang@ftc.gov


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S SECOND AMENDED
INITIAL DISCLOSURES
Case No. 2:23-cv-0932-JHC

12

Federal Trade Commission
600 Pennsylvania Avenue N.W.
Washington, DC 20580
(202) 326-3320

# EXHIBIT 39

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:            )
     AMAZON.COM, INC.             ) No. 2123050
 4                                )

 5                                )

 6

 7                  Investigational Hearing

 8                     SHARON CHIARELLA

 9

10

                     Federal Trade Commission
11           Henry M. Jackson Federal Building
                 915 Second Avenue, Suite 2896
12                    Seattle, Washington

13

14

15

16

17

18

19

20

21

22   DATE:  November 10, 2022

23   REPORTED BY:  Wade J. Johnson, RPR

24            CCR No.:  2574

25
```

6

Chiarella

Amazon.com, Inc.                                                        11/10/2022

```
 1    ///
 2    ///
 3    SHARON CHIARELLA,       deponent herein, having been
 4                            first duly sworn on oath, was
 5                            examined and testified as
 6                            follows:
 7
 8                    E X A M I N A T I O N
 9    BY MS. JERJIAN:
10        Q.  Ms. Chiarella, you are here today in response
11    to the Civil Investigative Demand that you received,
12    correct?
13        A.  Yes.
14        Q.  I'm introducing what has been marked as
15    Exhibit 1.
16                        (Exhibit 1 marked for
17                        identification.)
18                    MS. RODGERS:  Thank you.
19        Q.  Ms. Chiarella, do you recognize this document?
20        A.  Yes.
21        Q.  It's a copy of the Civil Investigative Demand
22    that you received?
23        A.  Mm-hmm.
24        Q.  And you've read this CID carefully?
25        A.  Yes.
```

FTCAMZN_0000591

157
Chiarella
Amazon.com, Inc.                                          11/10/2022

1     Q.  Sure.  Would your L level determine --
2  withdrawn.
3         Would the L level of an individual impact that
4  person's ability to decide the course of action?
5              MS. RODGERS:  Objection to form.
6     A.  Certainly, it's a factor.  I think good ideas
7  and good plans of action can come from anywhere.  I
8  think, generally, having discussions with a broad set
9  of leaders helps inform those original proposals and
10 make them better, kind of highlight any concerns.
11        Certainly, an agreement where -- or a course
12 of action where -- multiple senior leaders agree to it,
13 that drives momentum, sure.
14    Q.  Is it your understanding that the S Team
15 member under which Prime was located would be the
16 person to decide the course of action for issues
17 impacting Prime?
18             MS. RODGERS:  Objection to form and
19 foundation.
20    A.  I'm not sure I'm the best person to answer
21 that.  I don't know how Neil Lindsay ran his
22 organization.
23    Q.  If there's a disagreement between
24 Mr. Grandenetti and Mr. Neil Lindsay on an issue that
25 impacted Prime, who do you understand the person to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

158

Chiarella

Amazon.com, Inc.                                    11/10/2022

1    decide the, quote, course of action?

2                MS. RODGERS:  Objection to form and

3    foundation.

4        A.  I would expect it to be Neil.

5        Q.  And why is that?

6        A.  Because Neil was directly responsible for the

7    Prime organization.

8        Q.  So Mr. Grandinetti had no authority over the

9    Prime organization?

10               MS. RODGERS:  Objection to form.

11       A.  Not that I'm aware of.

12       Q.  Was Mr. Grandenetti concerned with resolving

13   customer frustration issues?

14               MS. RODGERS:  Objection.  Foundation and

15   form.

16       A.  I think, in my experience, Russ is

17   customer-obsessed, which is one of the Amazon

18   leadership principles, so I would say yes.

19       Q.  When you say customer-obsessed, what does that

20   mean?

21       A.  It means working from the customer backwards

22   to solve the customer problem.

23       Q.  Who would decide a course of action if

24   Mr. Grandenetti was trying to resolve a customer

25   frustrations issue and Mr. Lindsay disagreed with him

FTCAMZN_0000743

159

Chiarella

Amazon.com, Inc.                                        11/10/2022

1    and the customer frustrations issue had to do with

2    Prime?

3              MS. RODGERS:  Objection to form and

4    foundation.  Calls for speculation.

5         A.  I don't know how that would get resolved to.

6         Q.  Are you aware of any issues being escalated to

7    the S Team due to disagreements between SVPs?

8              MS. RODGERS:  Object to the form.

9         A.  I'm not.

10        Q.  So, sitting here today, you don't recall any

11   disagreements between SVPs that had to be escalated to

12   members of the S Team.  Is that correct?

13        A.  That's correct.

14             MS. RODGERS:  Object to the form.

15        Q.  I believe you mentioned earlier that you were

16   in meetings with Mr. Lindsay.  Is that correct?

17        A.  I was in several meetings about Prime Day and

18   deals.

19        Q.  Were signups discussed during any of these

20   meetings?

21        A.  No.

22        Q.  Why were you included in the Prime Day

23   meeting?

24        A.  Because deals is a key part of Prime Day.

25        Q.  And deals was your direct responsibility?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0000744

Chiarella

Amazon.com, Inc.                                           11/10/2022

```
 1                 MS. RODGERS:  Objection.  Foundation.
 2         A.  Yep, it looks like it.
 3         Q.  And what do you understand this snippet to
 4    mean?
 5                 MS. RODGERS:  Objection.  Foundation.
 6         A.  Well, I don't know exactly what a 90-day paid
 7    member is.  I don't know what the -- clearly, it's some
 8    sort of timestamp.  I don't know when the 90-day clock
 9    starts, et cetera.  But I can generally infer.  If you
10    want me to speculate, I can do that.
11         Q.  What do you understand by hurting signups?
12                 MS. RODGERS:  Objection.  Foundation.
13         A.  I would assume it would be having a negative
14    impact on signups.
15         Q.  And that would have impacted Prime's revenue,
16    correct?
17                 MS. RODGERS:  Objection.  Foundation.
18         A.  I don't know the exact translation of signups
19    versus cancelations, long-term versus short-term, but,
20    presumably, it would have had an impact on the Prime
21    business.
22         Q.  Why did Mr. Grandenetti respond to an email
23    that pertained to Prime, when it wasn't his
24    organization?
25                 MS. RODGERS:  Objection.  Foundation
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0000757

173

Chiarella

Amazon.com, Inc.                                                11/10/2022

1    because he's pushing the team to not accept an

2    either/or trade-off.

3        Q.  But it's not his team, correct?

4        A.  Correct.

5        Q.  Does he have authority over the Prime team?

6            MS. RODGERS:  Objection.  Form.

7    Foundation.

8        A.  No.  But he's a leader at Amazon.

9        Q.  So how is he pushing for there not to be a

10   trade-off, if he doesn't have authority over Prime?

11           MS. RODGERS:  Objection.  Form and

12   foundation.

13       A.  It's not a dictatorship.  I mean, he's a

14   leader of the company.  He's respected by the people on

15   this email chain.  So he's providing his point of view,

16   which has sway, but no direct authority.

17       Q.  But his point of view has influence, correct?

18           MS. RODGERS:  Object to form.

19   Foundation.

20       A.  Yeah.

21       Q.  So Mr. Grandenetti can impact actions that the

22   Prime team takes, is that not correct?

23           MS. RODGERS:  Object to the form and

24   foundation.

25       A.  He has influence.  He doesn't necessarily have

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0000758

174
Chiarella
Amazon.com, Inc.                                          11/10/2022

1    control.

2        Q.  Sure.  Influence and control are different

3    things, correct?

4            MS. RODGERS:  Objection to form.

5        A.  Right.

6        Q.  But he can definitely influence decisions that

7    the Prime team engages in, correct?

8            MS. RODGERS:  Objection to form and

9    foundation.

10       A.  I don't know.  I can't say that I have a

11   specific example of when he's done that.

12       Q.  How do you know he has influence over a team

13   that does not belong to him?

14           MS. RODGERS:  Objection to form.

15       A.  I don't.  I am speculating.

16       Q.  How long did you work with Mr. Grandinetti?

17       A.  Maybe four years.

18       Q.  And in the four years, you don't know the

19   extent of his influence on Amazon?

20           MS. RODGERS:  Objection to form.

21       A.  I believe you asked me specifically about the

22   Prime team.

23       Q.  Sorry?

24       A.  I believe you asked me about his influence,

25   specifically, on the Prime team.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0000759

```
 1                   C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                         )   ss
 3    COUNTY OF KING     )

 4

 5          I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to
 6    administer oaths and affirmations in and for the State
      of Washington, do hereby certify:  That the foregoing
 7    Investigational Hearing of the witness named herein was
      taken stenographically before me and reduced to a typed
 8    format under my direction;

 9          That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or
      the outcome herein;
11
            That the Investigational Hearing, as
12    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers and all
13    objections, motions and examinations and said
      transcript was prepared pursuant to the Washington
14    Administrative Code 308-14-135 preparation guidelines.

15

16                   Wade J. Johnson, Certified Court
                     Reporter 2574 for the State of
17                   Washington residing at Seattle,
                     Washington.
18                   My CCR certification expires on
                     09/18/23.
19

20

21

22

23

24

25
```

FTCAMZN_0000858

# EXHIBIT 40

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:              )

 4   AMAZON.COM, INC.               )  No. 2123050

 5

 6

 7                   Investigational Hearing

 8                        CEM SIBAY

 9

10
                     Federal Trade Commission
11              Henry M. Jackson Federal Building
                   915 Second Avenue, Suite 2896
12                     Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  November 29, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                      CCR No.:  2574
25
```

FTCAMZN_0002819

Sibay

Amazon.com, Inc.                                    11/29/2022

```
 1                MS. JERJIAN:  Could you please swear
 2    the --
 3                THE REPORTER:  Would you like the witness
 4    sworn at this time?
 5                MS. JERJIAN:  Yes, please.
 6
 7    CEM SIBAY,        deponent herein, having been
 8                      first duly sworn on oath, was
 9                      examined and testified as
10                      follows:
11
12                E X A M I N A T I O N
13    BY MS. JERJIAN:
14        Q.  Mr. Sibay, you're here today in compliance
15    with a Civil Investigative Demand that you received,
16    correct?
17        A.  That's correct.
18                      (Exhibit 1 marked for
19                       identification.)
20        Q.  I'm showing you what's been marked as
21    Exhibit 1.
22                MS. RODGERS:  Thank you.
23        Q.  Is this a copy of the CID you received?
24        A.  I believe so.  It seems similar to it.
25        Q.  Do you have any reason to doubt that it's not
```

FTCAMZN_0002824

238

Sibay

Amazon.com, Inc.                                    11/29/2022

 1   don't recall any specific decision that Russ would have
 2   made.
 3        Q.  Is it fair to say the decision wasn't
 4   consequential because you don't remember it?
 5             MS. RODGERS:  Objection to form.
 6        A.  If I'm reminded by it, it may strike a memory.
 7   I don't specifically remember this meeting.  So I don't
 8   recall there being a decision from Russ that made me
 9   think about something differently.
10                       (Exhibit 17 marked for
11                        identification.)
12        Q.  I'm showing you what has been marked as
13   Exhibit 17.  This is an email chain that starts with
14   Ms. Henry on June 20th, 2019, and ends with
15   Mr. Grandenetti on July 16, 2019, and the subject line
16   reads, "Privileged and confidential.  Customer
17   frustrations follow-up Prime frustrations."
18             Does Mr. Grandenetti's email at the top
19   refresh your recollection as to the decision he may
20   have made, either at the meeting or subsequent to the
21   meeting, on the topic of this Prime frustration clarity
22   issue?
23             MS. RODGERS:  Object to the form.
24        A.  I'm a little lost here.  So you were -- where
25   is the directive?  Is it in the notes here?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0003056

239

Sibay

Amazon.com, Inc.                                        11/29/2022

```
 1      Q.  Mr. Grandenetti's email, which is the last one
 2  under the email chain.
 3      A.  "Thanks for this.  Overall the goal of both
 4  product initiatives and content testing is to improve
 5  messaging and clarity while not hurting signups and
 6  conversion rates to 90-day paid members.  Agreed.
 7  Let's keep pushing for both."
 8      Q.  Yes.  Does this email refresh your
 9  recollection as to what Mr. Grandenetti may have
10  decided at the meeting or subsequent to this meeting?
11              MS. RODGERS:  Objection to form.
12      A.  I'm reading this as Russ agreeing with what
13  our objectives were.  I actually I don't read this as a
14  directive from Russ.
15      Q.  Do you remember this email from when you
16  received it?
17      A.  I vaguely remember that Russ was essentially
18  aligned with the way that I was thinking about it.
19      Q.  How do you remember that part?
20              MS. RODGERS:  Objection to form.
21      A.  Well, in that I don't think there was any
22  disagreement.  Like I don't recall, again, sort of
23  specific conversations, but I don't remember there
24  being any sort of type of tension between Russ and I or
25  debates as to what we were trying to achieve.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

240

Sibay

Amazon.com, Inc.                                    11/29/2022

1        Q.  Do you remember any tension or disagreements,
2   however you want to phrase it, between Mr. Grandenetti
3   and customer frustrations?
4        A.  I don't really recall it as being a
5   contentious meeting, and these notes don't necessarily
6   suggest that it was either.
7        Q.  What do you remember about this meeting, now
8   having reviewed these exhibits?
9        A.  I don't.  I still don't.  All I'm remembering
10  is, if I, you know, like, as far as this topic around
11  clarity and Project Lucent, I don't recall there
12  being -- with Russ, and this sort of confirms it.
13          I think if I had had a dispute or disagreement
14  with Russ, that actually probably would have been
15  something I would be more likely to remember now.  The
16  fact that we sort of saw this eye to eye, he was
17  agreeing with what my team was trying to achieve,
18  probably made this less memorable for me.
19       Q.  But do you recall any -- whether customer
20  frustrations was aligned with Mr. Grandinetti?
21       A.  I don't recall this meeting.
22       Q.  So the only thing you recall is that
23  Mr. Grandenetti and yourself and your team were
24  aligned, correct?
25          MS. RODGERS:  Objection to form.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0003058

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         )   ss
3    COUNTY OF KING      )

4

5            I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
6    administer oaths and affirmations in and for the State
     of Washington, do hereby certify:  That the foregoing
7    Investigational Hearing of the witness named herein was
     taken stenographically before me and reduced to a typed
8    format under my direction;

9            That I am not a relative or employee of any
     attorney or counsel or participant and that I am not
10   financially or otherwise interested in the action or
     the outcome herein;

11

12           That the Investigational Hearing, as
     transcribed, is a full, true and correct transcript of
     the testimony, including questions and answers and all
13   objections, motions and examinations and said
     transcript was prepared pursuant to the Washington
14   Administrative Code 308-14-135 preparation guidelines.

15                        Wade C. Johnson

16                   Wade J. Johnson, Certified Court
                     Reporter 2574 for the State of
17                   Washington residing at Seattle,
                     Washington.
18                   My CCR certification expires on
                     09/18/23.

19

20

21

22

23

24

25

# EXHIBIT 41

1           IN THE UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    FEDERAL TRADE COMMISSION,

4         Plaintiff,          Case No.

5             vs.                    2:23-CV-0932

6    AMAZON.COM,

7         Defendant.

8    _____/

9

10

11                 Remote Deposition of

12                 SANJAY BALAKRISHNAN

13            Thursday, September 12, 2024

14              11:56 a.m. BST (GMT+1)

15

16

17                *CONFIDENTIAL PAGES*

18       Page 13 Line 23 through Page 305 Line 4

19

20

21

22   Reported Stenographically by:

23   Gail L. Inghram,

24   BA, RDR, CRR, RSA, CA-CSR No. 8635

25



 1  discloses communications with counsel.

 2            THE WITNESS:  Sure, sure.

 3       A.    The German -- and Germany has

 4  multiple regulators.  But one of the regulators

 5  in Germany required a standardized cancellation

 6  experience across all businesses that offered

 7  subscription programs in Germany.  With -- we

 8  can -- I think it's called a two-button cancel

 9  experience.  So I think we were executing a

10  project in compliance with that law change.

11  BY ATTORNEY JERJIAN:

12       Q.    And just to make sure that we're on

13  the same page, does two-button cancel imply that

14  a Prime member can cancel their Prime membership

15  with two clicks?

16       A.    I believe that was the intent of

17  the law, that any subscription -- any member of

18  a subscription should be able to cancel a

19  subscription within two steps, or they must have

20  the option to cancel in two steps, yeah.

21       Q.    Okay.  You can set the document

22  aside, Mr. Balakrishnan.  I just have a few more

23  questions, and we'll wrap up.  Thank you for your

24  patience today.

25            Did you, in your capacity as



SANJAY BALAKRISHNAN  Confidential                September 12, 2024
FTC vs AMAZON.COM                                              292

```
 1  director at Prime worldwide, did you have
 2  meetings on Prime retention with
 3  Mr. Grandinetti?
 4       A.    I do not recall.  I would consider
 5  it unlikely.
 6       Q.    Why would you consider it unlikely?
 7       A.    Russ Grandinetti was not directly
 8  involved in the details of the Prime experience
 9  at the time when I was working there.  Like, he
10  was not in my -- he was not my manager or my
11  manager's manager.  And so they weren't -- there
12  wasn't a logical reason for us to interact on
13  such topics.
14       Q.    Did you prepare for your deposition
15  today?
16       A.    Could you be specific about what
17  "prepare" means.
18       Q.    Did you -- well, let's start with
19  this.
20             Did you meet with your attorneys
21  ahead of today's deposition?
22       A.    I did.
23       Q.    Besides counsel present today, did
24  you meet with any other attorneys?
25       A.    I'm trying to remember if we had
```



1  any other members of the legal team join any of

2  our calls.

3           I don't recall the specifics.

4  But I know that Vicki and Stephanie are the

5  people who I met with for sure.

6       Q.    So just to be clear, you don't

7  remember if you met with anyone else, besides

8  counsel present with you today, to prepare for

9  today's deposition; correct?

10      A.    That's right.

11      Q.    How many times did you meet with

12  your counsel?

13      A.    Approximately -- I think two --

14  two to four.  So around three times, I would

15  say, give or take.

16      Q.    When did the first meeting occur?

17      A.    I'll have to look at the calendar

18  specifically.  Like -- I don't remember the

19  exact dates, but I can -- I can look it up.

20      Q.    Approximately.  Was it like a month

21  ago? two weeks ago? last week?

22           ATTORNEY CHOU:  We are out of

23  time, Counsel.

24           ATTORNEY JERJIAN:  I'm just going

25  to finish my line of questioning.  I think, you



1

2                   CERTIFICATE OF SHORTHAND REPORTER

3

4

5                        I, Gail Inghram, Registered

6      Diplomate Reporter, Certified Realtime Reporter,

7      Realtime Systems Administrator, CA-Certified

8      Shorthand Reporter No. 8635, and Notary Public,

9      the officer before whom the foregoing

10     proceedings were taken, do hereby certify that

11     the foregoing transcript is a true and correct

12     record of the proceedings; that said proceedings

13     were taken by me stenographically and thereafter

14     reduced to typewriting under my supervision; and

15     that I am neither counsel for, related to, nor

16     employed by any of the parties to this case and

17     have no interest, financial or otherwise, in its

18     outcome.

19

20     *Gail Inghram*

21     _____

22     Gail Inghram,
       BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25



# EXHIBIT 42

1

2

3

4

5

6

The Honorable John H. Chun

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

10

11

12

13

14

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

AMAZON.COM, INC., *et al.*,

     Defendants.

No. 2:23-cv-0932-JHC

**PLAINTIFF'S SUPPLEMENTAL
EXPERT WITNESS DISCLOSURE**

15

16

**PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS DISCLOSURE**

17

18

19

20

Pursuant to the November 8, 2024 Minute Order Setting Trial Date and Related Dates (Dkt. #199), Plaintiff Federal Trade Commission provides the below list of expert witnesses Plaintiff may call live at trial in this matter. Plaintiff reserves the right:

    A. To call any fact witness at trial who appears on Defendants' final witness list;

21

22

23

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

1

B.  To call the custodian of records of any party or non-party from whom documents or records have been obtained to the extent necessary to demonstrate the authenticity or admissibility of documents, in the event a stipulation cannot be reached;

C.  To amend or supplement this list in light of any discovery that has not yet been completed including, in particular, the depositions of non-retained experts;

D.  To supplement this list in accordance with the Stipulated Order to Extend Certain Expert Disclosure Deadlines (Dkt. #235);

E.  To question the persons listed about any topics that are the subjects of testimony by witnesses called by Defendants;

F.  Not to call at trial any of the persons listed below, as circumstances may warrant;

G.  To question the persons listed about any other topics that the person testified about in his or her deposition or investigational hearing, or any matter that is discussed in documents to which the person had access, and which have not been produced; and

H.  To call any of these individuals or any other person for rebuttal testimony.

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

2

| Witness | Summary of opinions and general topics of anticipated testimony | Summary of factual bases for opinions and general topics of anticipated testimony |
|---------|------------------------------------------------------------------|-----------------------------------------------------------------------------------|
| C.R. Brown | We anticipate that Mr. Brown will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning the Iliad cancellation process. For instance, and among other related opinions, Mr. Brown will opine that the design elements of the cancel CTAs in the Iliad cancellation process are confusing to customers, and that the Iliad cancellation process is not simple. Likewise, Mr. Brown will opine that some users of the Iliad cancellation process found it to be confusing because it contained repetitive information. He will also opine that some users found the Iliad cancellation process difficult to find and navigate. He will opine that some users thought that clicking an 'End Membership' CTA in the ingress to Iliad, ended their Prime membership, when in fact they were still members. Mr. Brown will also opine that placing the cancellation CTA at the top of the page would add some clarity to the Iliad cancellation process. Mr. Brown will also opine that it was easier to enroll in Prime during checkout than to cancel Prime online. He will also the Iliad cancellation process was less simple than the Iliad 2.0 redesigned cancellation process and that Iliad required more clicks to cancel Prime than Iliad 2.0. He will further opine that a purpose of the cancellation flow was to communicate what benefits consumers would lose should they cancel their Prime subscription. He will also opine that the only information that Amazon needs from a consumer to cancel their Prime subscription is (1) the consumer has a Prime subscription; (2) the consumer wants to cancel their Prime subscription; (3) the date the consumer wants the cancellation to be effective for pro-rata refund purposes; | - Mr. Brown's educational background, knowledge and conduct of user experience design, research and usability testing.<br>- Mr. Brown's approximately seven years of experience at Amazon in the field of user experience design, including the Prime organization.<br>- Mr. Brown's experience as the lead designer of the redesign of the online Amazon Prime cancellation process (a/k/a Iliad 2.0 or Project Café)<br>- Mr. Brown's usability research and heuristic review of the Iliad cancellation process. |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

3

| | | |
|---|---|---|
| | and (4) data about the consumer such as their name and Prime plan. He will also opine that Iliad was a "horrible" name for the Prime cancellation experience, in contrast to his "Hypertube" cancellation CX proposed redesign.  Mr. Brown will opine that customer frustrations (or "anecdotes") are helpful points of data that inform the "why or the what" is specifically clear for consumers. | |
| Marshini Chetty, Ph.D. | See report for opinions. | See report for factual support. |
| David Edelstein | We anticipate that Mr. Edelstein will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Edelstein will opine as to how some Amazon customers were given incomplete information about Prime in the checkout flow, thus impairing their ability to make informed decisions about enrolling in Prime. Likewise, he will opine that users skip over things like 'Terms and Conditions' to move forward in the checkout flow. He will opine that interstitials such as the UPDP can cause users to take actions with consequences they do not intend, such as nonconsensual enrollment. Similarly, he will opine that | - Mr. Edelstein's educational background, knowledge of user experience research over the past 20 years.<br>- Mr. Edelstein's knowledge and understanding of accepted design practices and user testing.<br>- Mr. Edelstein's review of user research videos.<br>- Mr. Edelstein's knowledge and experience gained as the user experience manager of the GPX team from July 2019 to October 2021.<br>- Mr. Edelstein's work on the Subscription Clarity Project that started around June of 2020 and continued through the end of 2020. |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

4

| | | |
|---|---|---|
| | interstitials, like the UPDP, can distract users from completing the purchase and cause nonconsensual enrollments in Prime. Mr. Edelstein will also opine that some users who clicked, 'Yes, I would like free shipping,' were actually signing up for Prime. He will opine about how some users mistakenly signed up for Prime or almost signed up for Prime. Mr. Edelstein will also opine that the use of multiple colors, different font sizes, and graphical elements can reduce clarity in the UPDP. He will opine that making the UPDP clearer resulted in a decrease in Prime enrollments. He will also opine that before the implementation of the Iliad cancellation process, the cancellation process was less confusing to users. Mr. Edelstein will opine that clarifying the UPDP resulted in a decrease ███ ████████████. We will supplement this disclosure, if necessary, after Mr. Edelstein is deposed. | |
| Miles Hunter | We anticipate that Mr. Hunter will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Hunter will opine about the generalizable nature of human behavior and the usefulness of usability testing in identifying potentially problematic user experiences. He will also opine that the UPDP, SOSP Prime Decision Page, and SPC page contained many design elements that resulted (1) in the disclosures of Prime's material terms being neither clear nor conspicuous and (2) in Amazon shoppers inadvertently enrolling in Prime or doing so without understanding Prime's material terms. Mr. Hunter will also opine that 'Get Free Two-Day Shipping,' and other similar button labels, are misleading when used to | - Mr. Hunter's degree in Computer Science and Business from the University of York and courses in human-computer interaction. <br> - Mr. Hunter's knowledge of user experience research for almost 25 years. <br> - Mr. Hunter's insights gained from teaching courses in the field of human-computer interaction at the University of Washington. <br> - Mr. Hunter's conduct of hundreds, if not thousands, of individual user experience interviews or research sessions over the course of his career, including his tenure at Amazon. <br> - Mr. Hunter's experiences as a founding contributor to Amazon's Customer Frustrations database. <br> - Mr. Hunter's experience and understanding gained as Amazon's |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

5

| | | |
|---|---|---|
| | label a button that enrolls consumers in Amazon Prime. Moreover, he will opine that users rarely read button labels and instead instinctively click on buttons based on familiar color schemes. Mr. Hunter will opine that customers who enrolled in Prime on UPDP but did not finish their underlying product transaction may assume they had not completed their Prime enrollment. Finally, he will further opine that when details like price and auto-renewal are included in fine print 'Terms and Conditions,' consumers often will not notice them. | preeminent expert on the user research video workflow and the use of video to encourage user experience changes.<br>- Mr. Hunter's conduct of approximately 100 user testing studies or projects during his tenure at Amazon.<br>- Mr. Hunter's experiences as a member of the Shopping Design team. |
| Gloria Smuda (formerly Gloria Jensen) | We anticipate that Ms. Smuda will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Ms. Smuda will opine about (1) the impact of different colored buttons for the affirmative CTA in the UPDP, (2) the effect of 'double stacked' buttons in the UDDP, (3) the use of user experience design principles to either improve or decrease clarity in the UPDP, and (4) the positive impact of a negative CTA button on clarity in the UPDP. For instance, Ms. Smuda will opine that the UPDP would be less likely to cause nonconsensual enrollment if a different color button (*i.e.*, not a yellow button) were used for the affirmative CTA that signs a user up for Prime. In addition, she will opine as to why the UPDP affirmative CTA 'double stacked' button is unclear. She will also opine on how the positioning of important Prime subscription information in the 'Terms and Conditions' section reduces clarity in the UPDP. Similarly, we further expect Ms. Smuda to opine on how the application of certain user experience design principles like, 'visual hierarchy,' reduces clarity in the UPDP. Ms. Smuda will opine that the mocks | - Ms. Smuda's degree in Visual Communication Design.<br>- Ms. Smuda's knowledge and understanding in the field of user experience design, including in the Prime organization.<br>- Ms. Smuda's knowledge of user experience research and usability testing during her tenure at Amazon.<br>- The clarity recommendations Ms. Smuda made in the Subscription Clarity Mocks in December 2020 on Prime enrollment and cancellation.<br>- Ms. Smuda's work and interaction with the Clarity Working Group.<br>- Ms. Smuda's understanding and knowledge of the basic principles of user experience design and best practices. |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

6

| | | she developed in December 2020 to simplify the Iliad cancellation process were effective. Similarly, she will opine that the other mocks she developed in December 2020 to would have decreased nonconsensual enrollments. Furthermore, Ms. Smuda will opine that the mocks she made were expected to have a negative financial impact on enrollment and cancellation. She will opine that the UPDP would be clearer if the 'Sign-up' button was updated to include auto-renew pricing and is a different color than standard flow or purchase buttons. Ms. Smuda will opine that the UPDP would be clearer if the 'No Thanks' button was equally prominent as the others. | |
|---|---|---|---|
| Reid Nelson | | We anticipate that Mr. Nelson will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process. For example, and among other related opinions, Mr. Nelson will opine about how some customers inadvertently enroll in Prime, as well the problems' scope. Specifically, Mr. Nelson will opine about how UPDP clarity experiments resulted in a decrease in nonconsensual enrollments. He will also opine that some visual and content design patterns in the enrollment flow may impair some users' ability to make informed decisions, thus increasing the risk of nonconsensual enrollments or missing important information about Prime. Likewise, Mr. Nelson will opine that certain visual and content design patterns in the cancellation flow may cause some users to select an action without having enough information to make an informed decision or abandon the cancellation flow prematurely. Specifically, he will opine about how forced interstitials, like the UPDP, in the middle of checkout process can be problematic visual | - Mr. Nelson's Master's degree in experimental psychology from Western Washington University.<br>- Mr. Nelson's certificate in User-Centered Design from the University of Washington.<br>- Mr. Nelson's knowledge and experience as a user researcher, including naturalistic shopping qualitative research, and a core member of the Shopping team at Amazon.<br>- Mr. Nelson's review and understanding of weblab experiments related to the Prime enrollment and cancellation processes during his tenure at Amazon.<br>- Mr. Nelson's review and understanding of the quantitative results and analyses stemming from weblab and other experiments during his tenure at Amazon.<br>- Mr. Nelson's review and understanding of the quantitative results of surveys Amazon conducted during his tenure at Amazon.<br>- Mr. Nelson's review, understanding of, and conduct of cognitive |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

7

design elements. Mr. Nelson will also opine that certain design elements cause nonconsensual enrollment. For example, he will opine about how the button labels for the positive and negative CTAs in the UPDP can cause user confusion and even nonconsensual enrollments. He will opine about how some users had trouble finding and navigating the Iliad cancellation process. Mr. Nelson will also opine as to why and how a clearer UPDP design reduces nonconsensual enrollments ███████ He will opine that unclear button architectures in the Prime upsell experience during checkout and difficult to find 'Terms and Conditions' can lead to nonconsensual enrollments. Mr. Nelson will opine on the reasons why he believes that the UPDP Clarity experiments, conducted by the Retail Analytics team, resulted in significant improvements in the reduction of CS cancellations for nonconsensual enrollment and the Iliad cancellation process. He will further opine that a proportion of paying Prime members who have been enrolled for at least 10 months, but have not used their Prime benefits, are likely unintentional enrollees in Prime. He will also opine on the root causes of unintentional signups and signups that happened with low awareness and the impact on users. Mr. Nelson will opine that certain clearer treatments were not launched because of the negative impact to signups. He will also opine that the 90-day conversion rate is not a good metric by which to measure clarity improvements because many consumers whom Amazon nonconsensually enrolls remain unaware of their Prime membership status after ninety days. He will also opine that longer-term metrics, such as the one-year conversion rate, benefit usage, or other criteria measured after one year show that various treatments

walkthrough testing evaluation based on Nielsen principles, as well as other heuristic evaluations Mr. Nelson conducted.
- Mr. Nelson's review of, understanding of, and conduct of naturalistic research while at Amazon.
- Mr. Nelson's review of, conduct of, and understanding of usability testing and user experience research during his tenure at Amazon.
- Mr. Nelson's conduct and understanding of naturalistic shopping studies / observational shopping studies during his tenure at Amazon.
- Mr. Nelson's knowledge and understanding of, and analysis of, customer service contacts.
- Mr. Nelson's knowledge and understanding of the experiments conducted by the Retail Analytics team concerning UPDP clarity, CS cancellations for nonconsensual enrollment, and the Iliad cancellation process.
- Mr. Nelson's qualitative observation of customers shopping and his understanding of various indicators in behavioral data, as well as his knowledge of customer service contacts.
- Mr. Nelson's work for and interactions with the shopper frustration program, including the Shopper Frustrations database.
- Mr. Nelson's understanding, observation, and review of videos including those he testified about in his deposition, as well as other similar recordings. *See* AMZN-PRM-FTC-000347607; AMZN-PRM-FTC-000347187; and AMZN-PRM-FTC-000347190.

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

8

| | | |
|---|---|---|
| | Amazon considered would have reduced nonconsensual enrollment. He will also opine about how some users express frustration and confusion about the number of clicks they need to perform in the Iliad cancellation flow to cancel their Prime membership. We further anticipate that Mr. Nelson will opine that the Iliad cancellation process is not simple. | - Mr. Nelson's interactions and communications with members of the Prime Team.<br>- Mr. Nelson's work with customer focus groups. |
| Molly O'Donnell | We anticipate that Ms. O'Donnell will opine on topics relevant to the Amended Complaint and Answer. These will include opinions concerning both nonconsensual enrollment and the Iliad cancellation process.  For example, and among other related opinions, Ms. O'Donnell will opine on how the Prime enrollment process can led to unintended enrollments. Relatedly, Ms. O'Donnell will opine that cognitive exhaustion or overload in the enrollment process contributes to nonconsensual enrollment. She will also opine that the UPDP affirmative CTA 'double stacked' button is a cause of nonconsensual enrollment. Ms. O'Donnell will opine that the use of a link rather than a button was a cause of nonconsensual enrollment. She will also opine that the use of visual asymmetry was a cause of nonconsensual enrollment. Ms. O'Donnell will opine that the absence of a logical binary | - Ms. O'Donnell's Undergraduate degree in Communications from Loyola University in Chicago and her Master's in Communications and Digital Media from the University of Washington.<br>- Ms. O'Donnell's knowledge of user experience research, usability testing, and surveys at Amazon.<br>- Ms. O'Donnell's work on Amazon's Customer Experience Outcome Initiative.<br>- Ms. O'Donnell's work in the GPX team during her tenure at Amazon.<br>- Ms. O'Donnell's conduct of enrollment-related video studies during her tenure at Amazon. |

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

9

| | | pattern in the UPDP can cause nonconsensual enrollment. She will opine that the location of the price of a Prime subscription could cause nonconsensual enrollment. Ms. O'Donnell will also opine that the placement of the membership Terms and Conditions can cause nonconsensual enrollment. She will opine that a significant number of users who tried to cancel their Prime membership were diverted from the Iliad cancellation process. Ms. O'Donnell will opine that the Iliad cancellation process has multiple steps that can be confusing to some users and cause them not to cancel their memberships. She will opine that the inclusion of unnecessary clicks exacerbated the complexity of the Iliad cancellation process. Ms. O'Donnell will also opine that most users do not read the Terms and Conditions. Finally, Ms. O'Donnell will opine that the Iliad cancellation process is not simple. We will supplement this disclosure, if necessary, after Ms. O'Donnell is deposed. | |
|---|---|---|---|
| William J. Violette, Ph.D. | See report for opinions. | | See report for factual support. |

Dated:  April 9, 2025

/s/ Anthony R. Saunders

JONATHAN COHEN (DC Bar #483454)
OLIVIA JERJIAN (DC Bar #1034299)
EVAN MENDELSON (DC Bar #996765)
SANA CHAUDHRY (NY Bar #5284807)
ANTHONY SAUNDERS (NJ Bar #008032001)
JONATHAN WARE (DC Bar #989414)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580
(202) 326-2551; jcohen2@ftc.gov (Cohen)
(202) 326-3320; emendelson@ftc.gov (Mendelson)

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

10

(202) 326-2749; ojerjian@ftc.gov (Jerjian)
(202) 326-2679; schaudhry@ftc.gov (Chaudhry)
(202) 326-2917; asaunders@ftc.gov (Saunders)
(202) 326-2726; jware1@ftc.gov (Ware)

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; cmacdonald@ftc.gov (MacDonald)

RACHEL F. SIFUENTES
(IL Bar #6304016; CA Bar #324403)
Federal Trade Commission
230 S. Dearborn St., Room 3030
Chicago, IL 60604
(312) 960-5617; RSifuentes@ftc.gov

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4303; JTang@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S SUPPLEMENTAL EXPERT
WITNESS DISCLOSURE
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2917

11

# EXHIBIT 43

```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   FEDERAL TRADE COMMISSION,          )
                                        )
 4              Plaintiff,              )
                                        )
 5              vs.                     )   CASE NO. 2:23-cv-0932
                                        )
 6   AMAZON.COM,                        )
                                        )
 7              Defendant.              )

 8

 9

10         REMOTE DEPOSITION UPON ORAL EXAMINATION OF

11                   MARY PAT GOTSCHALL

12

13              THURSDAY, JANUARY 23, 2025
                       9:01 A.M.

14

15         (All participants appeared remotely)

16

17         TAKEN AT THE INSTANCE OF THE PLAINTIFF

18

19

20

21

22

23

24   REPORTED BY:
     MONNA J. NICKESON, RPR, CRR, CCR, CSR CA 14430
25   JOB:  J12123051
```



```
 1              BE IT REMEMBERED that on THURSDAY,
 2         JANUARY 23, 2025, at 9:01 A.M., the remote
 3         deposition of MARY PAT GOTSCHALL was taken
 4         before Monna J. Nickeson, Certified Realtime
 5         Reporter, Registered Professional Reporter,
 6         Certified LiveNote Reporter, Certified Court
 7         Reporter (WA 3322), Certified Shorthand Reporter
 8         (ID 1045), (OR 16-0441), (CA 14430), the
 9         following proceedings took place:
10                        * * * * *
11              THE COURT REPORTER:  We're on the record.   09:01
12              MR. NARDINI:  If you could please swear     09:01
13         in the witness.                                 09:01
14                   MARY PAT GOTSCHALL                     09:01
15    Having been first duly sworn, was examined and       09:01
16    testified as follows:                                09:02
17                      EXAMINATION                         09:02
18    BY MR. NARDINI:                                       09:02
19         Q.    Good morning.  Could you please state      09:02
20    your full name for the record?                       09:02
21         A.    Mary Pat Gotschall.                        09:02
22         Q.    Good morning, Ms. Gotschall.  My name is   09:02
23    Max Nardini.  I'm an attorney with the Federal Trade 09:02
24    Commission.  I'm joined by a couple colleagues also  09:02
25    from the Federal Trade Commission, Jonathan Ware,    09:02
```



1    delivery experience; is that correct?                    09:20

2        A.    That is correct.                               09:20

3        Q.    How did your role change when you became       09:20

4    senior manager UX design and research for delivery       09:20

5    experience?                                              09:20

6        A.    I mean, one, delivery experience was a         09:20

7    different organization within Amazon.  And I went        09:20

8    specifically to go work on a new initiative within       09:20

9    Amazon.                                                  09:20

10       Q.    And what initiative was that?                  09:20

11       A.    Specifically -- I mean, primarily,             09:20

12   because -- it was incorporating ultra fast delivery      09:21

13   on Amazon.                                               09:21

14       Q.    Was that the primary focus of your work        09:21

15   while you were senior manager UX design and research     09:21

16   between January 2019 and December of 2019?               09:21

17       A.    That was one of the biggest initiatives        09:21

18   that the company was -- or that the organization was     09:21

19   working on, yes.                                         09:21

20       Q.    Were there other major initiatives that        09:21

21   you were working on while you held that role?            09:21

22       A.    I honestly don't recall.  That one was         09:21

23   the -- it was outsized.                                  09:21

24       Q.    And who did you report to--                    09:21

25       A.    I --                                           09:21



1      Q.     I'm sorry.                                    09:21

2      A.     It was where I was spending the bulk of       09:21

3   my time because we were moving fast to launch by        09:21

4   September.  I do remember that.  My memory is not       09:21

5   always great, but I do remember that because it was a   09:21

6   big push.                                               09:22

7           Sorry, what was your question?                 09:22

8      Q.     Sure.  No, that's fine.                       09:22

9           Who did you report to when you were            09:22

10  senior manager UX design and research?                  09:22

11     A.     I reported to Jenny Blackburn.                09:22

12     Q.     For the entirety of that approximately        09:22

13  year-long period?                                       09:22

14     A.     Approximately.  I think that's correct.       09:22

15  I think I worked for someone else at the end because    09:22

16  she went -- she left the organization and went to       09:22

17  shopping design.                                        09:22

18     Q.     The job description on your LinkedIn          09:22

19  profile says, "Senior manager UX design and             09:22

20  research."                                              09:22

21          What is UX design?                             09:22

22     A.     UX design is the experiences that users      09:22

23  experience when they're working -- when they use        09:23

24  products.                                               09:23

25     Q.     As senior manager for delivery               09:23



 1 | experience, were you doing both user experience          09:23
 2 | design and research?                                     09:23
 3 |     A.    I wasn't specifically doing either.            09:23
 4 |     Q.    What were you doing with respect to user       09:23
 5 | experience design?                                       09:23
 6 |     A.    Overseeing a team of designers.                09:23
 7 |     Q.    And, likewise, what were you doing with        09:23
 8 | respect to UX research during your time at delivery      09:23
 9 | experience?                                              09:23
10 |     A.    Overseeing a researcher, I think.              09:23
11 |     Q.    To backtrack, while you were senior            09:23
12 | manager of user research for global shopping             09:24
13 | experience, did you manage user research studies that    09:24
14 | involved Prime upsells?                                  09:24
15 |     A.    We -- the team was never specifically          09:24
16 | looking at specific features, especially if we didn't    09:24
17 | own them.  So, again, we were -- we -- you know, we      09:24
18 | weren't on the Prime team, so we weren't looking at      09:24
19 | specific upsells.                                        09:24
20 |     Q.    And to make sure we're on the same page,       09:24
21 | what is a Prime upsell?                                  09:24
22 |     A.    You know, honestly, I can't -- I guess,        09:24
23 | maybe what do you mean by that question, what is a       09:24
24 | Prime upsell?                                            09:24
25 |     Q.    Well, just to the best of your                 09:24



```
1               C E R T I F I C A T E

2

3        I, MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR,

4    the undersigned Certified Court Reporter, authorized

5    to administer oaths and affirmations in and for the

6    states of Washington (3322), Oregon (16-0441), Idaho

7    (1045), and California (14430), do hereby certify:

8             That the sworn testimony and/or

9    proceedings, a transcript of which is attached, was

10   given before me at the time and place stated therein;

11   that the witness was duly sworn or affirmed to

12   testify to the truth; that the testimony and/or

13   proceedings were stenographically recorded by me and

14   transcribed under my supervision.  That the foregoing

15   transcript contains a full, true, and accurate record

16   of all the testimony and/or proceedings occurring at

17   the time and place stated in the transcript.

18             That I am in no way related to any party to

19   the matter, nor to any counsel, nor do I have any

20   financial interest in the event of the cause.

21   IN WITNESS WHEREOF I have set my hand on

22   February 3, 2025

23   _____

24   MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR

25
```

# EXHIBIT 44

1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3    _____

4
     FEDERAL TRADE COMMISSION,            )
5                                         )
                                          )
6                   Plaintiff,            )    Case No.
                                          )
7              vs.                        )    2:23-cv-00932-JHC
                                          )
8    AMAZON.COM, INC., et al.,            )
                                          )
9                                         )
                                          )
10                  Defendants.           )
                                          )
11                                        )

12   _____

13

14             DEPOSITION OF REID NELSON

15                 February 25, 2025

16        Witness Location:  Seattle, Washington

17

18

19

20

21   Reported by:
     Connie Recob, CCR, RMR, CRR
22   Washington CCR No. 2631
     Oregon CCR No. 15-0436
23   Utah CCR No. 1133171-7801
     Idaho CCR No. SRL-1220
24   Job No. J12198686

25



 1        followup Prime frustrations.  Hard copies will be available
 2        in the meeting room."
 3             Did I read that correctly?
 4   A.  You did.
 5   Q.  You attended this meeting, right?
 6   A.  I did.
 7   Q.  Did Mr. Tuladhar or any other attorney attend?
 8                   MS. VANDRUFF:  And before you answer,
 9        Mr. Nelson, he's asked a yes-or-no question.  And I just
10        caution you not to reveal the contents of the communication.
11                   THE WITNESS:  I don't completely recall
12        who from legal was in that room.
13        BY MR. COHEN:
14   Q.  The -- there's a line there that says, "hard copies will be
15        available in the room."
16             What's your understanding of why -- well, were hard
17        copies available in the room?
18   A.  As I recall, yes.
19   Q.  And why was that, if you know?
20   A.  That was standard Amazon practice.
21   Q.  Was it also standard Amazon practice for everyone in the room
22        to read those hard copies before the discussion portion of
23        the meeting commenced?
24   A.  Yes.
25   Q.  And that practice, to what extent, in your experience, was



1      that practice followed?

2   A.  Fairly consistently.

3   Q.  So Mr. Grandinetti would have read the memo?

4                      MR. HUESTON:  Objection.  Foundation.

5                      MS. VANDRUFF:  Join.

6   BY MR. COHEN:

7   Q.  I'll ask you this.

8   A.  Are you asking me did he read the memo?

9   Q.  Well, he was in the room, and it was the practice for him

10      to -- for people in the room to read the memo, right?

11                     MR. HUESTON:  Objection.  Compound.

12      Foundation.

13                     MS. VANDRUFF:  Objection.  Foundation.

14                     THE WITNESS:  He was in the room, yes.

15  BY MR. COHEN:

16  Q.  And it was the practice -- go ahead.

17  A.  People were reading the documents, and that was a general

18      practice.

19  Q.  And so that would have applied to Mr. Lindsay as well?

20  A.  Yes.

21  Q.  Am I correct that you were the most junior person at this

22      meeting?  I'm referring, actually, to -- I think this is

23      clear, but --

24                     MR. HUESTON:  Objection.  Foundation.

25  BY MR. COHEN:



1  Q.  -- to corporate hierarchy, not age or something.

2  A.  No.

3  Q.  Who was more junior than you?

4  A.  Well, I don't think that -- I don't think I was the only L7

5      in the room, so...

6  Q.  Good point.

7          Was there anyone who was more junior than you in the

8      room?

9  A.  I don't recall if others were more junior to me.

10 Q.  Do you know -- let me put it to you this way:  At the time,

11     June 2019, who was your direct report?

12 A.  I didn't have a direct report.

13 Q.  To whom did you report to?

14 A.  I was reporting to Mary Pat Gotschall at that time, I

15     believe.

16 Q.  What was your understanding as to who Ms. Gotschall reported

17     to?

18 A.  I believe at that time we had moved to report into the

19     delivery experience organization and that Mary Pat was

20     reporting to Jenny Blackburn.

21 Q.  And then to whom did Ms. Blackburn report?

22 A.  Devraj.

23 Q.  And to whom did Devraj report?

24 A.  I don't know if he went to Dave Clark.  I can't remember.  I

25     can't remember.



REID NELSON                                                February 25, 2025
FTC vs AMAZON.COM, INC., et al.                                        201

```
1   Q.  What's your understanding, if you have one, as to what the

2       S-team was?

3   A.  The S-team?

4   Q.  Uh-huh.

5   A.  It was a team of SVP, typically SVP level, maybe a few VPs

6       that were part of that group.

7   Q.  Mr. -- was Mr. Grandinetti -- did you understand

8       Mr. Grandinetti to be part of the S-team?

9   A.  Yes.

10  Q.  At this point in time -- was there anyone else at the meeting

11      who was part of the S-team at this time?

12  A.  I am not sure.

13  Q.  Below VP are director level employees, right?

14  A.  Yes.

15  Q.  Do you recognize anyone in the meeting as a director level

16      employee?

17  A.  Yes.

18  Q.  Who are the director level employees that attended?

19  A.  Nahshon Davidai, Masuma Henry.

20  Q.  Any others?

21  A.  I think that is it.

22  Q.  And Mr. Lindsay would have been a VP?

23  A.  I can't recall if he was VP or SVP.

24  Q.  What about Ms. Chiarella?

25  A.  As I recall, she was a VP.
```



1  Q.  So there are -- I wasn't completely counting, but there were
2      at least five or so directors, VPs and SVPs, correct?
3  A.  At least, yes.
4  Q.  Where was the meeting physically held?
5  A.  At Amazon in Seattle.
6  Q.  So just sort of a few blocks from where we are now?  Well,
7      approximately a few blocks.  Within a mile?
8  A.  Within a mile.
9  Q.  And in a conference room?
10 A.  Yes.
11 Q.  The -- where did Mr. Grandinetti sit at the conference
12     room -- in the conference room?  Was he in the middle of the
13     table, the end of the table?
14 A.  Middle.
15 Q.  When you say "middle," do you mean the end in the sense of
16     the court reporter is in the middle or do you mean more like
17     where Mr. Hueston is?
18 A.  Just to cut to the chase, to be clear --
19 Q.  Please.
20 A.  -- I was sitting almost exactly where I am here now, the
21     equivalent of that.
22 Q.  You're at the corner.
23 A.  I'm at the corner, this corner.  And the meeting table is
24     about this size, and Russ is about where John is.
25 Q.  Okay.  So Mr. Grandinetti would have been sitting



1                    REPORTER'S CERTIFICATE

2

3         I, CONNIE A. RECOB, the undersigned Certified Court

4    Reporter, authorized to administer oaths and affirmations in

5    and for the States of Washington, Oregon, Utah and Idaho, do

6    hereby certify that the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given before me at the

8    time and place stated therein; that any and/or all

9    witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19        WITNESS MY HAND and SIGNATURE this 7th day of March,

20   2025.

21

22

23   /s/CONNIE A. RECOB, RMR, CRR
     Washington CCR No. 2631
24   Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801
25   Idaho CCR No. SRL-1220



# EXHIBIT 45

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3    _____

4
     FEDERAL TRADE COMMISSION,          )
5                                       )
                                        )
6          Plaintiff,        )   Case No.
                             )
7      vs.                   )   2:23-cv-00932-JHC
                             )
8    AMAZON.COM, INC., et al.,         )
                                       )
9                            )
                             )
10         Defendants.       )
                             )
11                           )

12   _____

13

14         VIDEOTAPED DEPOSITION OF REID NELSON

15                February 27, 2025

16   Location:  920 Fifth Avenue, Suite 3300, Seattle, Washington

17

18

19

20   Reported by:
     Connie Recob, CCR, RMR, CRR
21   Washington CCR No. 2631
     Oregon CCR No. 15-0436
22   Utah CCR No. 1133171-7801
     Idaho CCR No. SRL-1220
23   Job No. J12198790

24

25

1    first part into the record, "Today Amazon teams lack an

2    adequate tool kit to analyze Weblab's immediate and delayed

3    impacts on NPX customers."

4        Let me just pause there.  What did you understand that

5    statement to mean, "Amazon teams lack an adequate tool kit to

6    analyze Weblab's immediate and delayed impacts"?

7                MS. VANDRUFF:  Objection.  Vague as to

8    time.  Lacks foundation.

9                THE WITNESS:  That teams across Amazon

10   involved in shipping -- designing and shipping, customer

11   facing shopping experiences, did not have easily accessible,

12   easily deployable analytic techniques and metrics to

13   understand the impact a given experiment might have on the

14   cohort of nonPrime and nonAmazon shoppers.

15   BY MR. HUESTON:

16   Q.  Okay.  And the quote continues -- or the passage continues,

17   "Unlike auto-generated metrics presented at the all customer

18   level, understanding a Weblab's impact on NPX customers

19   requires multiple steps, including running individual Weblab

20   or locale date combination and aggregating the results by

21   hand," and it continues, and it says, quote, "which is error

22   prone and prohibitive -- prohibitively inefficient for even

23   the most highly motivated teams."

24        Do you see that?

25                MS. VANDRUFF:  Counsel, we did skip some

1    text here.

2                    MR. HUESTON:  We did skip some text.

3                    MS. VANDRUFF:  Okay.  I just wanted to

4    acknowledge that for the record.

5                    MR. HUESTON:  That's why I said "and

6    it --" I'm sorry.  Absolutely.

7                    MS. VANDRUFF:  And that happened earlier

8    when there was another section.

9                    MR. HUESTON:  Yes.

10                   MS. VANDRUFF:  But okay.

11                   MR. HUESTON:  Right.

12   BY MR. HUESTON:

13   Q.  And so, Mr. Nelson, did you at that time have an

14   understanding about what it means here when it says "which is

15   error prone and prohibitively inefficient"?

16   A.  I don't have an understanding -- a clear understanding of

17   error prone, but I have a general understanding of

18   prohibitively inefficient.

19   Q.  Okay.  Just give me your best general -- or do you have any

20   understanding at all as to what that reference is to "which

21   is error prone" even at a very high level?

22   A.  I have a speculation.

23   Q.  I'll take your speculation.

24   A.  Okay.

25                   MS. VANDRUFF:  Objection.  Speculation.

1   BY MR. HUESTON:

2   Q.  Here we go.

3            MR. COHEN:  Join.

4            THE WITNESS:  I'm gathering that the

5   nonPrime experience team was concerned that to measure at

6   scale for a given experiment, the impact to nonPrime

7   customers, it would require significant manual calculations

8   and accessing dat -- data tables in an inefficient and

9   time-consuming manner.

10  BY MR. HUESTON:

11  Q.  Okay.  And then so prohibitively inefficient, I think you're

12     kind of incorporating some of that.  What does that mean?

13  A.  That the amount of effort it would take to calculate all the

14     different facets of things that could be measured in that

15     cohort of users at an experiment level granularity, without

16     having standardized metrics that were auto calculated, it

17     would be very time-consuming, manual in nature.

18  Q.  Okay.  Just stepping back a bit, maybe you can help me a

19     little bit here.

20         Why was it a challenge for an Amazon team to analyze

21     the impact of a Weblab on nonPrime customers?

22  A.  I don't feel that I am qualified to answer that, being that I

23     am not a data scientist or a product manager.

24  Q.  That's fair.

25  A.  Okay.

1    Q.  I'm not asking you in terms of as an expert, just whatever

2    you may have recalled at the time, even if you heard it from

3    somebody else as to why -- why was there, you know, an issue

4    with respect -- that needed to be addressed with respect to

5    Weblabs and nonPrime customers?

6              MS. VANDRUFF:  Objection.  Asked and

7    answered.

8              MR. COHEN:  Objection.  Foundation.

9              THE WITNESS:  My general understanding

10   from conversations is that when metrics were not automatable

11   and had to be calculated through manual data pulls, manual

12   analyses, it made it more difficult for teams to do that

13   level of inspection or truth seeking for a given experiment.

14   BY MR. HUESTON:

15   Q.  For Prime customers, were all the metrics automatable, in

16   contrast?

17   A.  I don't know.

18   Q.  Okay.  Let's briefly go to page -- just a little further down

19   here, the next full paragraph says, "Furthermore, our current

20   downstream expectations DSE model for forecasting the delayed

21   impact of a Weblab has limitations that can make it

22   unreliable for measuring NPX customers."

23        I'll just pause there.  Did you have any understanding

24   about what this issue was?

25   A.  Yes.

1  Q.  What was your understanding?

2  A.  That the data sciences -- data science teams' downstream

3      expectation model did not have adequate inputs that would

4      help measure and illustrate the unique impact an experiment

5      might have on a nonPrime experience user cohort.

6  Q.  Did any of the issues you just described apply also to Prime

7      customers?

8  A.  The statement I just made was about nonPrime customers.

9  Q.  Right.  Would that apply at all to Prime -- to Prime

10     customers?

11 A.  Oh, okay.  Sure.  I couldn't say.

12 Q.  Okay.

13 A.  It's possible.

14 Q.  You just don't know one way or the other?

15 A.  Yeah.

16 Q.  Okay.  Fair enough.  We can put that aside.

17 A.  Okay.

18 Q.  I think you testified a little bit about this on Tuesday,

19     that the UPDP page at one point offered users a choice

20     between an enrollment button and a no thanks link.

21         You recall that, right?

22 A.  I recall that.

23 Q.  Okay.  And would you characterize the Prime no thanks link as

24     an anti-pattern?

25 A.  Being a link rather than an equivalent button?

1   A.  I don't think so.

2   Q.  No?  Were there customer surveys involved in determining

3       whether they, in fact, did an unintended signup?

4   A.  Yes.

5   Q.  Okay.  And can you tell me the exact language of the survey

6       answer that the customer selected that according to this

7       chart indicated that they were unintended signups?

8   A.  According to this chart, right?  I need to review the

9       document.

10  Q.  Sure.

11  A.  Thank you.

12          Okay.  Go back to the question.  Can you restate it,

13      please?

14  Q.  Sure.  Will you tell me the exact language of the survey

15      answer that the customer selected that according to this

16      chart indicated that they were unintended signups?

17  A.  I didn't state that the CS cancellation reason code was

18      determined based on self-report survey.

19  Q.  What was it determined on?

20  A.  My understanding, my recollection -- this is 2025 -- is that

21      that was based on a customer service associate assigning the

22      reason that the user contacted.

23  Q.  Okay.  And staying on CS cancellations for signup, I notice

24      there are four NAs in the first four entries and only two of

25      the rows were populated, right?

REID NELSON                                          February 27, 2025
FTC vs AMAZON.COM                                                  197

1  A.  Yes.

2  Q.  And can you explain why there's no available data for the

3      first four listed experimental treatments with respect to CS

4      cancellation signup?

5  A.  I don't remember the specifics for why.

6  Q.  Do you remember generally why?

7  A.  I don't remember.

8  Q.  Okay.  All right.  And I just want to ask a few other

9      questions on this chart.

10          So I want to walk through briefly each one of these

11     experimental treatments.  So the first one listed as Prime

12     CTA redesign 135644.

13          Do you see that?

14 A.  Yes.

15 Q.  Okay.  How many subjects were involved in that experimental

16     treatment?

17 A.  I do not see subjects listed in the referenced document.

18 Q.  Okay.  Do you have a recollection outside of the document?

19 A.  No.

20 Q.  Okay.  Same question for Prime 146575.  How many subjects

21     were involved in that experimental treatment?

22 A.  Don't know.

23 Q.  Same question for Prime 153956.  How many subjects were

24     involved in that experimental treatment?

25 A.  Don't know.

REID NELSON                                              February 27, 2025
FTC vs AMAZON.COM                                                      198

1  Q.  For the next three, Prime 179734, Prime 252596 and Prime

2      255432, I take it you also do not know how many subjects were

3      involved in each of those experimental treatments?

4  A.  I do not.

5  Q.  Okay.  How were the subjects for each of these six

6      experimental treatments selected?

7                  MS. VANDRUFF:  Objection.  Compound.

8                  MR. COHEN:  Objection.

9  BY MR. HUESTON:

10 Q.  We can start one by one.  We'll start at a general level just

11     to save time if your answer is, "I don't know."

12         Do you know how the subjects were selected for any of

13     these six experimental treatments?

14 A.  Generally, yes.

15 Q.  Specifically?

16 A.  Specifically how a Weblab works for customer assignment?

17 Q.  Okay.  We're going to go one by one.  Let's go to Prime CTA

18     redesign 135644.  How were the subjects selected for that

19     experimental treatment?

20 A.  As I recall, and I don't know the exact specifics and my

21     recollection could be incomplete, this was a 50/50 Weblab

22     done in the United States.  50 percent of customers eligible

23     to receive the experiment treatment would have -- would have

24     been randomly assigned to that treatment.  50 percent would

25     have been held into a control group of whatever eligibility

REID NELSON                                          February 27, 2025
FTC vs AMAZON.COM                                                 199

1    is defined as for that experiment.

2    Q.  Okay.  Next one, Prime 146575, how were the subjects selected

3       for that experimental treatment?

4    A.  It would have been the same, per my limited memory and

5       understanding of how that Weblab was set up.

6    Q.  And do you have the same answer with the next four?

7    A.  I'm -- no.

8    Q.  Okay.  Let's go through them.

9    A.  Okay.

10   Q.  Thank you for that.

11   A.  Yeah.

12   Q.  So Prime 153956, how were the subjects for that experimental

13      treatment selected?

14   A.  My understanding, similarly, would have been a 50/50 Weblab.

15      Again, that understanding is based on memory and could be

16      incorrect.

17   Q.  All right.  Next one, Prime 179734, how were the subjects for

18      that experimental treatment selected?

19   A.  Similarly, I would expect that to be a 50/50 Weblab.  I'm not

20      sure if that's true.

21   Q.  When you say you would expect it, is that because this is

22      just your recollection generally of custom and practice of

23      Weblabs or are you specifically remembering how the subjects

24      were chosen for that particular experimental treatment?

25   A.  I thought that those were 50/50 Weblabs.  And that is -- was

REID NELSON                                                    February 27, 2025
FTC vs AMAZON.COM                                                            200

1    a common practice at Amazon, but I don't know and I don't

2    remember for certain.

3  Q.  Okay.  That's fair.

4  A.  Yeah.

5  Q.  And then for Prime 252596, how were the subjects selected for

6    that experimental treatment?

7  A.  I don't know.  But based on the document we reviewed earlier,

8    it sounded like that was released to 100 percent of users.

9  Q.  Okay.

10  A.  But I don't know.

11  Q.  All right.  And then for Prime 255432, how were the subjects

12    selected for that experimental treatment?

13  A.  Again, same answer.  Based on the previous document we

14    reviewed about the 2020 experiments, it sounded like those

15    were released to 100 percent of users, but I don't know.

16  Q.  Okay.  I just want to direct your attention to the percentage

17    figures that populate the rest of the chart.

18        Do you see them there?

19  A.  Yes.

20  Q.  I'm just -- yeah, I'm just directing you --

21  A.  Yeah, yeah.

22  Q.  -- to them broadly.

23  A.  Got it.

24  Q.  Can you tell me, sitting here today, whether any of those

25    percentages are statistically significant?

1   A.  I can't remember if these are or are not.

2   Q.  Okay.

3   A.  Okay.

4   Q.  We can put that aside.  Let's go to Tab 15 -- let's go to

5       Exhibit 56.

6                       (Exhibit No. 56 marked

7                         for identification.)

8                   MR. COHEN:  This is 56.

9                   MR. HUESTON:  56.

10      BY MR. HUESTON:

11  Q.  And Exhibit 56 begins with a two-chain e-mail.  It's from

12      Benjamin Hills to yourself and others, with an embedded

13      e-mail from yourself.  And the embedded e-mail from you,

14      which I'm going to ask you about, is dated May 21st, 2020.

15          Do you see that?

16  A.  I do.

17  Q.  Okay.  And in the first paragraph, after, "Hi, Ben, Omar,"

18      you write that you were, quote, "Kicking off a work

19      stream --" I'm reading portions of this, "-- to brainstorm

20      solutions for subscription clarity, customers unknowingly

21      signing up for or having trouble canceling a recurring

22      subscription like Amazon Prime."

23          Do you see that?

24  A.  Uh-huh.

25  Q.  Sorry.

REID NELSON                                    February 27, 2025
FTC vs AMAZON.COM                                           271

1              REPORTER'S CERTIFICATE

2

3      I, CONNIE A. RECOB, the undersigned Certified Court

4  Reporter, authorized to administer oaths and affirmations in

5  and for the States of Washington, Oregon, Utah and Idaho, do

6  hereby certify that the sworn testimony and/or proceedings, a

7  transcript of which is attached, was given before me at the

8  time and place stated therein; that any and/or all

9  witness(es) were duly sworn to testify to the truth; that the

10  sworn testimony and/or proceedings were by me

11  stenographically recorded and transcribed under my

12  supervision, to the best of my ability; that the foregoing

13  transcript contains a full, true, and accurate record of all

14  the sworn testimony and/or proceedings given and occurring at

15  the time and place stated in the transcript; that a review of

16  which was requested; that I am in no way related to any party

17  to the matter, nor to any counsel, nor do I have any

18  financial interest in the event of the cause.

19      WITNESS MY HAND and SIGNATURE this 11th day of March,

20  2025.

21

22

   _____
23    /s/CONNIE A. RECOB, RMR, CRR
     Washington CCR No. 2631
24     Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801
25     Idaho CCR No. SRL-1220

# EXHIBIT 46

**EXPERT REPORT OF WILLIAM J. VIOLETTE, Ph.D**

1. I am William J. Violette.  I am an economist in the Consumer Protection Division of the Bureau of

   Economics at the Federal Trade Commission ("FTC"), where I have worked since 2018.  I have

   experience and training in the evaluation of economic field experiments and surveys, similar to those

   referenced in this report, and which are areas of my expertise.  Other areas of my expertise include

   applied microeconomics, industrial organization, and development economics.  My business address

   is 600 Pennsylvania Avenue, NW, Washington, DC 20580.

**Assignment**

2. I have been asked to provide an expert opinion in *FTC v. Amazon*, *Inc.*, Case No. 2:23-cv-0932-JHC

   (W.D. Wash.).  Specifically, as it relates to Amazon's Prime subscription service, the FTC case team

   asked me to (1) review and evaluate six "weblab" tests Amazon conducted on modifying the Prime

   signup processes (the "Signup Weblabs"); and (2) review and evaluate a consumer survey Amazon

   conducted in 2020 (the "Search Sentiment Survey" or "Survey"), which asked whether people

   shopping for products on Amazon subscribe to Prime.

**Qualifications**

3. I hold a PhD and a M.A. in Economics from Brown University.  My primary field during my PhD was

   development economics, which included coursework, seminars, and training in the design and

   evaluation of economic experiments conducted in the field.  My experience and training included

   economic field experiments and surveys similar to those referenced in this report.

4. At the FTC, my duties include conducting economic and statistical analysis pertinent to FTC

   investigations, litigation, and projects, as well as independent economic research on topics related to

   the FTC's mission.

5. I am a full-time, salaried employee of the FTC, and I do not anticipate receiving any additional

   compensation for my work on this matter.  My compensation is not affected by the opinions I may

   offer in this case.

difference in two variable averages by the level of variation in these variables.  Since the data include a small sample of only ▮▮ respondents who were unaware of their Prime subscriptions, I also calculated Welch's p-values using Welch's t-test.  Welch's t-test is an alternative approach to constructing p-values that are well suited to situations where the sample size of one group is much different from the other group as well as where the sample sizes are small.[64]

73. Table 4 includes standard p-values in Column E and Welch's p-values in Column F.

74. According to both standard p-values and Welch's p-values, differences in average characteristics are statistically significantly different from zero at least at the 0.1% level, except for those of SPC and SOSP upsells.[65]

75. Differences in average upsells for SPC and for SOSP are not statistically different from zero.

**Conclusions**

76. Based on my review as discussed in this report, it is my opinion that Amazon's Signup Weblabs and its Survey meet relevant standards that are generally accepted in the field of economic field experiments and surveys.  Accordingly, it is my opinion they provide valid and reliable data regarding relevant consumers' decision-making and the impact of various changes to the Prime enrollment offers made in the product checkout process.

Dated: February 24, 2025

_William J. Violette_
William J. Violette, Ph.D

---

[64] *See* Robert M. West, "Best practice in statistics: Use the Welch t-test when testing the difference between two groups," *Annals of Clinical Biochemistry*, 58(4) (2021): 267-269.

[65] A p-value of 0.1% or less is generally accepted to indicate a high degree of statistical significance.  *See* Chen, Roles, challenges, and merits of the p value.  Amazon uses a p-value of 5% to determine statistical significance, which is less conservative than a p-value of 0.1%.  *See* AMZN-PRM-FTC-000060868.

# EXHIBIT 47

1                UNITED STATES DISTRICT COURT

2               WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4    _____

5    FEDERAL TRADE COMMISSION,            )
                                          )
6    Plaintiff,                           )
                                          )
7            vs.                          )No. 2:23-cv-0932-JHC
                                          )
8    AMAZON.COM, LLC, et al.,             )
                                          )
9    Defendants.                          )

10   _____

11          Deposition Upon Oral Examination Of

12                    DAVID EDELSTEIN

13   _____

14

15

16

17                      10:05 a.m.

18                    April 30, 2025

19                   920 Fifth Avenue

20                  Seattle, Washington

21

22

23

24

25   REPORTED BY:  Yvonne A. Gillette, RPR, CCR No. 2129.



```
 1                      Wednesday, April 30, 2025
 2                           10:05 a.m.
 3                             ******
 4   DAVID EDELSTEIN,               called as a witness in the
 5                                  above-entitled cause, being
 6                                  first duly sworn, testified
 7                                  as follows:
 8
 9          (Exhibit DE-1 marked for identification.)
10                           EXAMINATION
11   BY MR. COHEN:
12   Q       Good morning, Mr. Edelstein.  How are you?
13   A       Well.  How are you?
14   Q       So, as you know, my name is Jonathan Cohen.
15   I'm an attorney at the Federal Trade Commission.  With
16   me today is my co-counsel Colin MacDonald.  We also
17   have Federal Trade Commission paralegal Elena Hoffman
18   in the room and some others, I think, from both sides
19   listening on the line who will be identified on the
20   record.
21          If I could ask your counsel and then counsel
22   for the defendants to please identify themselves for
23   the record.
24          MR. BIENERT:  My name is Thomas Bienert,
25   along with Carlos Nevarez and Antoinette Thomas on
```



1   of questions we should be asking and reviewing the

2   results of those studies.

3   Q        With respect to the researchers, did you

4   also work with them with respect to the design of

5   their research?

6   A        Somewhat.  The researchers that we had in

7   Prime were all very high-level, experienced

8   researchers, so they did not need my advice mostly.

9   Q        When they -- there were some occasions

10  though when they did seek out your advice?

11  A        Yes.

12  Q        And you would give it to them?

13  A        Yes.

14  Q        This is all part of what Amazon was paying

15  you to do?

16  A        Yes.

17  Q        And, you know, I almost want to apologize

18  for the next series of questions that this is the kind

19  of thing that lawyers ask.  So another way to put

20  this -- let me know if you disagree -- is that, with

21  respect to the design work that you oversaw at GPX, it

22  was all part of the usual course of business, correct?

23  A        Correct.

24           MR. HUESTON:  Objection.  Vague.

25  Q        And the same question with respect to



1    research you oversaw at GPX.  That was all part of the

2    usual course of business at Amazon?

3              MR. HUESTON:  Objection.  Vague.

4    Mischaracterizes the testimony.

5    A          Yes.

6    Q          And to what extent, if at all, did you form

7    opinions about various issues as a result of the

8    research you oversaw concerning -- let me take the

9    step back.  Some of the research you oversaw -- to

10   what extent, if at all, did the research you oversaw

11   concern either Prime enrollment or cancellation?

12             MR. HUESTON:  Objection.  Foundation and

13   vague.

14   A          I would say directly about 20 to 25 percent.

15   Q          And what about design work?  To what extent,

16   if at all, was some of the design work you oversaw

17   concerned with prime enrollment and cancellation?

18   A          Less than that.  Probably 10 to 15 percent.

19   Q          But and all of this was done -- I'm

20   referring to both the design and the research

21   concerning enrollment and cancellation.  All of it was

22   done in the usual course of business at Amazon,

23   correct?

24   A          Yes.

25   Q          This might seem like a weird question.



```
 1   Again, I'm apologizing in advance.  But was any of
 2   this done for litigation purposes?
 3   A         No.
 4   Q         To what extent, if at all, did you form
 5   opinions about various issues as a result of the
 6   research you oversaw concerning Prime enrollment and
 7   cancellation?
 8             MR. HUESTON:  Objection.  Vague.
 9   A         It's my job to form opinions about the
10   research.  So every piece of research informed my
11   opinions.
12   Q         Those opinions grew naturally and directly
13   out of the research that your team conducted, right?
14   A         Yes.
15   Q         And then same questions with respect to
16   design.  You formed opinions about various issues as a
17   result of the design work you oversaw concerning Prime
18   enrollment and cancellation, correct?
19   A         No.  The design was an outcome of those
20   opinions.
21   Q         Explain to me what you mean by that.
22   A         So the design work was in order to address
23   the customer problems that we saw from the research.
24   Q         Did you form opinions as to whether the
25   design work would or would not address the problems
```



1   Q        This is a series of emails.  And I'll direct

2   you, Mr. Edelstein, to the one -- the very last one,

3   which was the one that we were reading earlier.  Do

4   you recall that?

5   A        Yes.

6   Q        And then you wrote -- you wrote back.  You

7   wrote back.  This is the third paragraph on the page

8   ending in 4722.  You wrote back, I think, four

9   paragraphs down.  You wrote back to Mr. Nelson, "The

10  good news is that we've been working with Nikki

11  Baidwan's content testing team since July, although,

12  realistically less locked arms and more across the

13  table.  They have given us a bunch of signals that

14  they are interested in working together but have

15  resisted the mechanisms we've tried, to be fair,

16  partly because they are up against incredibly tough

17  metrics."  Did I read that correctly?

18  A        Yes.

19  Q        What did you mean by "less locked arms and

20  more across the table"?

21  A        That we -- although Ms. Baidwan and I were

22  aligned in wanting to make changes, we were not

23  necessarily aligned on how to make those changes.

24  Q        What were some of the differences in terms

25  of how the changes were -- in terms of how to make the



1    changes?

2    A          Primarily that, because GPX was not

3    responsible for the same numbers that Ms. Baidwan was,

4    we were proposing more radical changes than she was

5    necessarily comfortable with.

6    Q          Let me just break that down a bit.  The

7    radical changes would be increases in clarity?

8    A          Complete clarity.

9    Q          And the -- your view was that complete

10   clarity would result in a significant decline in

11   subscriptions?

12              MR. HUESTON:  Objection.  Leading and

13   foundation.  Also vague as to terms.

14   A          Our knowledge from their previous tests was

15   that it would, that their previous tests on clarity

16   had reduced sign-ups.

17   Q          And their previous tests, you're referring

18   to the tests that Ms. Baidwan's content testing team

19   had conducted?

20   A          Yes.

21   Q          Did Ms. Baidwan express to you any reason to

22   doubt the results of those tests?

23   A          No.

24   Q          Just again, to wrap this up, she did not

25   suggest at all that somehow the tests were not



```
 1   likely -- were either methodologically flawed or had

 2   other -- I'll stop there.  Did she ever suggest to you

 3   that the tests were methodologically flawed?

 4           MR. HUESTON:  Objection.  Compound and

 5   leading.

 6   A       No.

 7   Q       Did she ever suggest to you that there was

 8   any reason to think the tests -- the treatment

 9   conditions in the tests if implemented in large

10   wouldn't have the effect of reducing subscriptions

11   significantly?

12           MR. HUESTON:  Objection.  Vague and leading

13   and foundation.

14   A       No.  It was an experiment.

15   Q       But, again, the point that I think I'm

16   trying to get at, there was no indication at all that

17   these experiments were not -- to what extent, if at

18   all, was there any indication from Ms. Baidwan that

19   these experiments were not reliable bases upon which

20   Amazon could make decisions?

21           MR. HUESTON:  Objection.  Vague and

22   foundation.

23   A       No.

24   Q       You mentioned in your email the -- that

25   Ms. Baidwan's content testing team was up against some
```

1                    C E R T I F I C A T E

2    State of Washington    )

3                           )  ss.

4    County of King         )

5

6            I, the undersigned Registered Professional
     Reporter and Washington Certified Court Reporter, hereby
     certify that the foregoing deposition upon Oral examination
7    of DAVID EDELSTEIN was taken before me on April 30, 2025 and
     transcribed under my direction;

8            That the witness was duly sworn by me pursuant to
9    RCW 5.28.010 to testify truthfully; that the transcript of
     the deposition is a full, true, and correct transcript to
10   the best of my ability; that I am neither attorney for, nor
     a relative or employee of, any of the parties to the action
11   or any attorney or counsel employed by the parties hereto,
     nor financially interested in its outcome.

12

13           I further certify that in accordance with CR
     30(e), the witness was given the opportunity to examine,
     read, and sign the deposition, within 30 days, upon its
14   completion and submission, unless waiver of signature was
     indicated in the record.

15
             IN WITNESS WHEREOF, I have hereunto set my hand
16   and seal this date, May 6, 2025:

17

18

19

                                    _____
20                                  Yvonne A. Gillette

21                                  Washington Certified Court Reporter

22                                  License No. 2129

23

24

25



# EXHIBIT 48

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

FEDERAL TRADE COMMISSION,              )
                                       )
                    Plaintiff,         )
                                       )
        v.                             ) No. 2:23-cv-0932-JHC
                                       )
AMAZON.COM, INC., et al.,              )
                                       )
                    Defendants.        )
                                       )
                                       )
_____

    VIDEO-RECORDED DEPOSITION OF DAVID ADAM EDELSTEIN

                    May 1, 2025

                Seattle, Washington

    Reporter:  John M. S. Botelho, CCR, RPR



```
 1                    MR. BIENERT:  Thomas H. Bienert,
 2      Jr., for Mr. Edelstein, and I'm with Carlos Nevarez
 3      with my law firm.
 4                    MR. HUESTON:  Great.  Good morning,
 5      Mr. Edelstein.
 6                    THE WITNESS:  I think I need to get
 7      sworn in first.
 8                    THE REPORTER:  Yes.
 9                    MR. HUESTON:  Right.
10                    THE REPORTER:  Quick oath.
11                    MR. HUESTON:  Here we go.
12
13      DAVID ADAM EDELSTEIN,      having been first duly sworn
14                                 by the Certified Court
15                                 Reporter, deposed and
16                                 testified as follows:
17
18                         EXAMINATION
19      BY MR. HUESTON:
20  Q  All right.  Now I can say good morning, Mr. Edelstein.
21  A  Good morning.
22  Q  Do you have in mind the deposition guidelines the
23      government provided you yesterday?
24  A  Yes.
25  Q  All right.  And just as a reminder, any time you need a
```



1            Enrique Gonzalez, who was managing UX designers.

2            Molly O'Donnell, who was managing researchers.

3            AmyLeigh Morgan, who was our UX -- senior UX

4     writer and who was managing one or two contractors at a

5     time.

6            C.R. Brown, who was senior UX designer.

7            Torsten Overgaard, who was our UX PM.

8            And Gloria Jensen during her time on our team, who

9     was a senior UX designer.

10  Q  Okay.  You also described yesterday that you reviewed

11     customer service surveys and data on cancellation in

12     the aggregate.

13  A  Yes.

14  Q  You remember that?

15            And what did you mean by "in the aggregate"?

16  A  There's an enormous amount of data that comes from

17     customer service.  So I would look at their summaries

18     of reason codes, customer service's summary of customer

19     sentiment, were people generally angry or happy.  Those

20     sorts of things.  So I was not reviewing many

21     individual customer service cases.

22  Q  Okay.  And just so I'm clear:  Your own GPX team did

23     not construct surveys for cancellation?

24  A  Not specifically on cancellation, no.

25  Q  Okay.



1  A  They did address cancellation.

2  Q  Sure.  I understand that.

3        And you were not involved in the creation of the

4     surveys that were done by customer service, right?

5  A  I was not.

6  Q  Okay.  And I think this is obvious, but just bear with

7     me.

8        You were not involved in personally collecting the

9     data for those customer service surveys, right?

10  A  I was not.

11  Q  All right.  And you said you may have once in a while

12     reviewed a specific complaint?

13  A  We participated in listening sessions that customer

14     service would run periodically, where they would --

15     either we would listen live to customer service calls,

16     or they would collate what they thought were

17     particularly interesting customer service calls, and we

18     would listen to them to get a deeper sense of the

19     customer sentiment and the questions they were asking.

20  Q  Okay.  Some additional questions here in this area.

21        Did you personally conduct any user studies while

22     on the GPX team?

23  A  I did not.

24  Q  Did you personally conduct any A/B testing while on the

25     GPX team?



1    A   I did not.

2    Q   Okay.  You testified yesterday your team ran user

3        studies that contacted customers who had contacted

4        customer service to cancel and asking them if they

5        would be willing to describe their experience to us.

6    A   Yes.

7    Q   Similar question.

8            Did you personally conduct any customer research

9        to understand why the customers were confused?

10   A   I did not.

11   Q   Okay.  While on the GPX team, did you ever speak

12       directly to any customers?

13   A   Only anecdotally.

14   Q   Okay.  And explain the occasion -- explain -- sorry.

15       Let me try the question again.

16   A   Mm-hmm.

17   Q   Describe to me when that would happen.  When did it

18       happen that you would anecdotally talk to a customer?

19   A   I would meet people at social events or on airplanes or

20       other things, and they would say, "Oh, you work for

21       Prime.  Let me tell you about my experience with

22       Prime," or they would say, "I love Prime," or whatever

23       else.

24   Q   So happenchance encounters?

25   A   Exactly.



1  Q  Okay.  Shifting a little bit here.

2      Do you recall just roughly how many members Prime

3      had in the 2019-2020 period?

4  A  ███████████████████████████████, I think.

5  Q  And what about worldwide?

6  A  I don't remember exactly.

7  Q  ██████████████████████████?

8  A  My memory is that it was ████████████████████

9      ██████

10 Q  Okay.  So during this time, if we talk about worldwide,

11     to your best recollection, it might be ████████████

   ███████████████████████

13 Q  Okay.  Great.  Fine.  Thank you.

14     And let me ask you this question.

15     Would you agree that when you're talking ███████

   ██████████████████████████, that there will always be

17     some fraction of the customers experiencing frustration

18     or confusion no matter how clear you attempt to make a

19     stream?

20 A  Yes, I would.

21 Q  All right.  And why is that?

22 A  A lot of reasons, ranging from individual customers who

23     are more or less literate in the language that they're

24     using on the site, individual customers who are

25     frustrated by a specific policy that they think should



1   customer goal is the much smaller -- much less visually

2   prominent button.

3 Q Is there any other reason why that factor renders this

4   last offer if I'm -- this offer a dark pattern?

5 A In isolation, no.

6 Q Okay.  Sitting here today, can you name a single

7   company that offers subscription services that you

8   would say does not use any dark patterns at all in its

9   cancellation process?

10 A None that I'm familiar with.

11 Q Okay.  We can put these aside.

12      Before I go on, let me ask you that same question

13   except with respect to enrollment.

14 A None that I'm familiar with.

15 Q Okay.

16      Okay.  Let me ask you, again back -- I'm

17   specifically back to your time as UX manager at Amazon.

18      Well, this is more about your background, so

19   scratch that.

20      I think if I followed the questioning yesterday

21   about your background -- I'm not going to try to repeat

22   everything, but I take it you've never published a

23   peer-reviewed article on dark patterns, correct?

24 A Correct.

25 Q And you've not published any academic work on UX



```
 1      design; is that right?

 2  A   That's correct.

 3  Q   You mention that from time to time you read blog posts,

 4      right?

 5  A   Yes.

 6  Q   Have you ever written a blog post opining on dark

 7      patterns yourself?

 8  A   I don't think so, no.

 9  Q   Have you ever -- I just want to make sure I cover --

10      can you think of anything else that you've written for

11      public consumption on dark patterns?

12  A   No.

13  Q   Okay.  And you've not been retained as an expert

14      witness in litigation?

15  A   I have not.

16  Q   And you've never provided testimony under oath or

17      otherwise about UX practices before this matter, right?

18  A   I have not, no.

19  Q   And you do not have a degree in human-computer

20      interaction, right?

21  A   I do not.

22  Q   And you don't have a degree in human factors, right?

23  A   I do not.

24  Q   You do not have a degree in psychology?

25  A   I do not.
```



1   Q  Or certifications in consumer psychology or cognitive

2      psychology, correct?

3   A  I do not.

4   Q  Okay.  And you don't have a degree in marketing, right?

5   A  I do not.

6   Q  Okay.  And you are not certified by any professional

7      organization related to UX design or usability, right?

8   A  I'm not.

9   Q  Okay.  And I asked whether you had published a paper,

10     but let me ask another related question.

11         You haven't conducted formal academic research

12     into dark patterns, correct?

13  A  I have not.

14  Q  And you've never presented at a conference as an

15     authority on dark patterns, have you?

16  A  I have not.

17  Q  Yesterday you talked about doing what you called

18     cognitive walk-throughs.

19  A  Yes.

20  Q  And I think you said you participated in roughly five

21     cognitive walk-throughs?

22  A  For various aspects of the Prime membership process,

23     yes.

24  Q  Okay.  Great.

25         And I think you said that you oversaw roughly four



```
 1       agree with you that what they were doing was either

 2       dumb or anti-customer?

 3   A   I am not saying that.

 4   Q   Okay.  'Cause --

 5   A   I -- I would say that --

 6   Q   -- not everybody would have felt that way, right?

 7   A   Right.

 8   Q   Okay.

 9   A   I would say that they would agree that they were not

10       based on any kind of strategic question, because they

11       had not been asked to do that.

12   Q   Yeah, I want to follow up on that:  They hadn't been

13       asked to do that.

14           I mean, their group had a different focus than

15       your group, right?

16   A   Yes.

17   Q   And how was their group differently focused?

18   A   They were entirely focused on sign-up numbers.

19   Q   Okay.  And do you think that was wrong or improper of

20       Amazon to have a group that focused on that?

21   A   I would say it was shortsighted.

22   Q   Did you express that opinion to anyone in Amazon

23       leadership?

24   A   Yes.

25   Q   Who?
```



DAVID A. EDELSTEIN                              May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                            153

```
 1  A  Jamil Ghani, Nahshon Davidai, my management, Sarah Jane
 2     Gunter.  Yeah.
 3  Q  And when do you recall telling Jamil Ghani that it was
 4     shortsighted to have this group focused on what you
 5     describe as sign-up numbers?
 6  A  I don't remember the exact time, but it would have been
 7     within the first six months of my time there.
 8  Q  Okay.  Was it a meeting?
 9  A  No.  It was a hallway conversation.
10  Q  Okay.  What do you recall saying?
11  A  Something to the effect of, I think that content
12     testing is looking at the wrong numbers.
13  Q  Okay.  And how did he respond?
14  A  He didn't disagree with me.  I don't remember exactly
15     what he said.
16  Q  He didn't get mad, right?
17  A  He didn't get mad.
18  Q  He didn't express some sort of hostility that you were
19     bringing up this point, right?
20  A  He did not.
21  Q  In fact, you felt comfortable talking to Mr. Ghani
22     about concerns and issues, right?
23  A  Yes, I did.
24  Q  Okay.  And I think that you've described the CE&O team
25     as responsible for the language and fundamentally the
```



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                 154

1    design of all the pages where one might sign up for

2    Prime and places on pages all through the checkout

3    process?

4  A  Yes.

5  Q  Okay.  So fair to say the CE&O team had more authority

6     than the GPX team over the design of the sign-up and

7     checkout pages?

8  A  They had more power over it.

9  Q  Okay.  You do understand that your view was that their

10    ideas were dumb or anti-customer.  But did Mr. Ghani,

11    to your understanding, think their ideas were dumb and

12    anti-customer?

13                    MR. COHEN:  Objection.

14                    MR. HUESTON:  If you knew.

15                    THE WITNESS:  I did not know

16    specifically.

17 Q  (By Mr. Hueston)  Okay.  You do know that CE&O did from

18    time to time present their ideas to senior leadership?

19                    MR. COHEN:  Objection.  Foundation.

20                    THE WITNESS:  I know that they

21    presented their results.

22 Q  (By Mr. Hueston)  Okay.  I think you've testified the

23    normal process is that they would have presented to

24    Jamil, and then if Jamil thought it was a good idea,

25    they would have presented it to Neil.



DAVID A. EDELSTEIN                                       May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                    155

1              Does that sound about right?

2   A  Yes, but not the tests.

3   Q  Okay.  Fair enough.

4              The results?

5   A  The results and the initiatives.

6   Q  Okay.  How often did the GPX team present to senior

7      leadership --

8                         MR. COHEN:  Objection.

9   Q  (Continuing by Mr. Hueston)  -- during your time as

10     manager of GPX?

11                        MR. COHEN:  What senior leadership?

12                        MR. HUESTON:  Well, you can answer,

13     if you can.

14                        THE WITNESS:  I would consider Jamil

15     Ghani and Neil Lindsay to be senior leadership --

16                        MR. HUESTON:  Okay.

17                        THE WITNESS:  -- in the context of

18     this question.

19             No less than quarterly and usually monthly.

20  Q  (By Mr. Hueston)  Okay.  And were you always part of

21     those presentations?

22  A  Nearly all of them.

23  Q  Okay.

24  A  I may have been on vacation for one or two.

25  Q  Sure.



DAVID A. EDELSTEIN                           May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        213

1  Q  Okay.  And others had different opinions from you on

2     that --

3  A  Yeah.

4  Q  -- obviously, right?  Okay.

5        And the people who disagree with you, you didn't

6     perceive any of those people as disagreeing in bad

7     faith, right?

8  A  No.

9  Q  Okay.  I mean, they thought this might be something

10    that would work and be helpful, right?

11                    MR. COHEN:  Objection.

12 Q  (By Mr. Hueston)  To your recollection?

13 A  To my recollection, yes.

14                    MR. COHEN:  Objection.

15                    MR. HUESTON:  All right.  We've been

16    going over an hour, so why don't we take a break here

17    for ten minutes.

18                    THE VIDEOGRAPHER:  Going off record.

19    Time now is 2:52 p.m.

20                         (Pause in proceedings.)

21

22                    THE VIDEOGRAPHER:  Back on record.

23    Time now is 3:06 p.m.

24 Q  (By Mr. Hueston)  Mr. Edelstein, I think yesterday you

25    testified that there were clarity changes you recall



1    that were implemented around September of 2020, and

2    your recollection is that those changes were rolled

3    back in around September 2020 -- I'm sorry -- December

4    2020?

5  A  Yes.  Something like that.

6                        (Clarification by reporter.)

7

8  Q  (By Mr. Hueston)  Okay.  And I think you said -- well,

9    let me just ask you rather than try to frame it.

10         And what is your recollection as to why those

11    changes were rolled back?

12  A  I was not at the meeting, but what I was told was that

13    they were presented at a S team meeting, and the

14    declines in sign-ups were significant enough that the S

15    team made the decision to roll them back.

16  Q  Okay.  And I appreciate you started with, "I was not at

17    the meeting."  That's what I wanted to establish.

18         You weren't at that meeting?

19  A  I was not.

20  Q  And what you heard about it was secondhand through

21    others that talk to you afterwards, right?

22  A  Yes.

23  Q  Okay.  No one in leadership had a direct discussion

24    with you, saying that was the reason the changes were

25    rolled back, right?



DAVID A. EDELSTEIN                              May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                            215

```
 1                    MR. COHEN:  Objection.
 2  Q  (By Mr. Hueston)  Right?
 3  A  Yes.
 4  Q  Okay.  Okay.
 5         Okay.  See if you can recall this.  If not, on a
 6    break, I can go find it.
 7         But there was an exhibit you were shown yesterday.
 8    There weren't that many exhibits.  I'll describe it.
 9         This was an e-mail from December 16th, 2019, that
10    had a section that said, A playbook with examples of
11    dos and don'ts would be really helpful here.  E.g., use
12    equally prominent buttons for the yes and no.  Don't
13    confirmshame customers.  Price and auto renew must
14    always be next to the sign-up CTA.  The CTA must
15    clearly indicate that you're signing up for Prime.
16                    MR. COHEN:  Objection.  I'm
17    objecting to you questioning him on a document that's
18    not in front of him.
19                    MR. HUESTON:  Well --
20                    MR. COHEN:  Would you like me to --
21    I think we could get the document for you, if you want
22    it.
23  Q  (By Mr. Hueston)  Well, let me ask you first:  Do you
24    recall this?
25  A  I do recall it.
```



```
 1                    MR. HUESTON:  Okay.  Let me see what
 2     I can do with the questions.
 3                    MR. COHEN:  Well, the record just
 4     reflects that there's no document in front of the
 5     witness.
 6                    MR. HUESTON:  The record has clearly
 7     reflected that.
 8  Q  (By Mr. Hueston)  And equally prominent buttons for the
 9     yes and no.
10        That was a concern of yours, right?
11  A  Yes.
12  Q  No confirmshaming.
13        I think you've described that was a concern,
14     right?
15  A  Yes.
16  Q  Price and auto renewal needs to be next to the sign-up
17     CTA.
18        That was --
19  A  Yes.
20  Q  -- something you wished, right?
21  A  Yes.
22  Q  And the CTA must indicate a sign-up with Prime?
23  A  Yes.
24  Q  Okay.  So then let's go to a different document.  This
25     will be Tab 3.
```



DAVID A. EDELSTEIN                                May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        308

```
 1   STATE OF WASHINGTON )     I, John M. S. Botelho, CCR, RPR,
                         ) ss  a certified court reporter
 2   County of Pierce    )     in the State of Washington, do
                               hereby certify:
 3

 4
         That the foregoing deposition of DAVID ADAM EDELSTEIN
 5   was taken before me and completed on May 1, 2025, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8       That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
         That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13       IN WITNESS WHEREOF, I have hereunto set my hand
     this 6th day of May, 2025.
14

15

16

17                         John M.S. Botelho
                          _____
18                         John M. S. Botelho, CCR, RPR
                           Certified Court Reporter No. 2976
19                         (Certification expires 5/26/2025.)

20

21

22

23

24

25
```



# EXHIBIT 49

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:                )
                                      ) File No. 2123050
4    Amazon.com, Inc.                 )
     ─────────────────────────────────)
5
                                      Tuesday, July 19, 2022
6
                                      Held at:
7                                     Federal Trade Commission
                                      915 Second Avenue
8                                     Suite 2896
                                      Seattle, Washington 98174
9

10           The above-entitled matter came on for
     investigational hearing, pursuant to subpoena, at 9:34 a.m.
11   Pacific Time.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FTCAMZN_0014244

6

O'Donnell

Amazon.com, Inc.                                        7/19/2022

1        Q.   So there are some really basic rules, and we'll --
2    we'll work at this together, but a couple things to keep in
3    mind are that if you don't understand one of my questions,
4    which can happen because I ask a lot of bad questions, but
5    if you don't understand one of my questions, you'll let me
6    know.  And I need you to also answer orally so that the
7    court reporter -- as opposed to nodding, so that she can
8    take down your answer.
9        A.   Got it.
10       Q.   And if you need a break, you'll let me know.
11       A.   Will do.
12       Q.   So I am going to now show you what's been
13   previously marked as -- or what I just marked as
14   Exhibit MO1.
15                     (Exhibit No. MO1 marked for
16                      identification.)
17   BY MR. COHEN:
18       Q.   And can you take a look at that, please, ma'am.
19   Have you seen that document before?
20       A.   Yes, I have.
21       Q.   And it's your understanding that that is a civil
22   investigative demand?
23       A.   Yes.
24       Q.   And you are here today in compliance with the
25   civil investigative demand?

FTCAMZN_0014249

7

O'Donnell

Amazon.com, Inc.                                          7/19/2022

    1        A.    Yes.
    2        Q.    You can go ahead, and you can, if you want, flip
    3    it over and set it aside and the reporter will take it or
    4    take it after, today.
    5        A.    Yeah.
    6        Q.    So let's start off with talking a little bit, just
    7    in a very basic way, about your background and your work
    8    experience.  I'm correct that you had a degree in
    9    communications from Loyola University in Chicago?
   10        A.    Correct.
   11        Q.    And that was 2005?
   12        A.    Yes, that's correct.
   13        Q.    Okay.  And a master's in communication and digital
   14    media from University of Washington?
   15        A.    Yes.
   16        Q.    2014?
   17        A.    Yes.
   18        Q.    Just in a very general way, can you just explain
   19    the substance of what the field of communication and digital
   20    media is?
   21        A.    So the goal of the program -- or my goals for the
   22    program, because there were kind of multiple tracks, was to
   23    learn more about digital storytelling.  And so at the time
   24    we were focused a lot on authenticity and different mediums
   25    and how to tell a compelling story, things like that.  So

FTCAMZN_0014250

8

O'Donnell

Amazon.com, Inc.                                    7/19/2022

1     that was kind of really -- at a really high level that I was

2     going back for.

3          Q.   What do you mean by "digital storytelling"?

4          A.   Video storytelling, in my -- from my perspective.

5     I started out on a track to want to be a documentary

6     filmmaker, and through my career as a researcher, I felt

7     like I had kind of drifted into being an applied

8     anthropologist, essentially, and sort of had drifted away

9     from my storytelling roots and so wanted to kind of up my

10    game in the video storytelling capacity.

11         Q.   You received that degree while you were employed

12    at Microsoft?

13         A.   Correct.

14         Q.   And you worked at Microsoft from -- was it

15    September of 2012 through approximately March of 2019?

16         A.   Correct.

17         Q.   Your function there was a senior researcher --

18    senior user researcher?

19         A.   Yeah.  I started out as a user -- I guess it's a

20    User Researcher II is what they called it, and I was

21    promoted over time to senior user researcher.

22         Q.   Just in a general way, what are the job

23    responsibilities of a user researcher and senior user

24    researcher at Microsoft?

25         A.   It's about -- and from the studies that I ran, I

FTCAMZN_0014251

9

O'Donnell

Amazon.com, Inc.                                              7/19/2022

1    was running studies on -- usually qualitative studies like

2    consumer journeys, end-to-end experiences for devices and

3    software.  So that entails recruiting external customers,

4    external to Microsoft or external to the company;

5    oftentimes, putting devices and experiences in front of them

6    to have them evaluate the usability and value prop of those

7    experiences.

8         Q.   A couple things that you said there I think are

9    really important.  By "value prop," what do you mean?

10        A.   The value proposition, which is essentially like,

11   is it delivering something that is fulfilling user need and

12   successfully allowing users to achieve user outcomes.

13        Q.   We've also talked about -- strike that.

14             You characterized the work as qualitative.  What

15   do you mean by qualitative, as opposed to quantitative

16   research?

17        A.   So most of the work that I do is qualitative,

18   which means that it's small sample, which means it doesn't

19   typically achieve what we call statistical significance.  So

20   like, you can say this set of participants experienced a bad

21   user experience, whereas when you're doing something like a

22   survey which has 400 participants in it, for example, you

23   can achieve more statistical significance than, say, like, a

24   customer sort of, like, population is experiencing a

25   widespread issue.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0014252

37

O'Donnell

Amazon.com, Inc.                                               7/19/2022

1   on the team or for a presentation that maybe David was doing
2   or something like that.
3           And I would say for a lot of them, I was kind of
4   just a reviewer and editor.  Like, our team produced a lot
5   of these video clips, and so a lot of them I would review
6   just to see if they -- if I could provide any feedback about
7   where to edit things or maybe how the video related to the
8   email we were sending out or the document we were writing,
9   things like that.
10      Q.   How did you decide what attributes to test to have
11  the participant experience?
12      A.   That was really dependent on the study.  So like,
13  for example, Prime Day is really broad.  Like, we had some
14  specific things that we knew we wanted people to look out --
15  to evaluate.  So we kind of hang back and let people shop as
16  they naturally would, but like, at some point I would steer
17  people to look at, like, the Prime Day event page, if they
18  didn't go and check it out.  There was like a live stream
19  that people are always real interested in finding out about.
20  So I would point them to that and have them kind of look at
21  and evaluate that.  And then if it was a usability test, it
22  was dependent on, like, what assets we were given by either
23  design or the PM's that we were working with, so . . .
24      Q.   Some of the work you did, some of the video
25  studies you did involved enrollment and cancellation issues?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0014280

38

O'Donnell

Amazon.com, Inc.                                              7/19/2022

1       A.    Correct.

2       Q.    Approximately how many pertained to enrollment,

3  just ballpark?

4       A.    Not -- not that many because so much research had

5  already been done.  Like, there is an internal customer

6  frustrations database and frustrations with sign-up was

7  already in there and so a lot of the things, a lot of the

8  issues with sign-up were well-known, so I didn't actually

9  want to spend a lot of time on it.  So I would say maybe

10 five, like if that's -- that's the max probably that we

11 spent working on that.

12      Q.    And on the cancellation side?

13      A.    I personally didn't do a ton on cancellation.  I

14 may have run a remote unmoderated study on a platform called

15 Usertesting.com where we would ask people to go through the

16 cancellation experience, but that -- I didn't really spend a

17 lot of time there either.  Lisa Nghiem, I think, actually

18 spent the most time on the cancellation.

19      Q.    With respect to the cancellation and enrollment

20 work, you did do some of it?

21      A.    Uh-huh.

22      Q.    What and -- well, why did you do the studies that

23 you did?

24      A.    It was probably to kind of bring up the issues

25 that were in the customer frustrations database again.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTCAMZN_0014281

39

O'Donnell

Amazon.com, Inc.                                      7/19/2022

1    Probably the first reason was to tell -- to have qualitative

2    research and have video of customers going through this

3    experience and talking about how satisfied or dissatisfied

4    they were with the experience.

5         There was also -- part of this was related to the

6    customer experience outcome initiatives.  We wanted to have

7    qualitative feedback, customer quotes, along with the

8    quantitative data there, and we were pushing for more

9    clarity.  There were just well-known issues with that

10   enrollment experience that we were trying to establish these

11   CX guardrails for.

12        Q.   So when you say "we" in that answer, you're

13   referring to your organization that's GPX?

14        A.   Correct.

15        Q.   And was it someone on GPX or someone else who

16   directed you to run the enrollment-related video studies?

17        A.   I don't remember.  It was probably a little bit of

18   both.  I probably took the initiative myself on some of

19   them, and some were probably directed.

20        Q.   And that would have been the same thing with

21   respect to the one remote cancellation study?

22        A.   That one was probably just me.

23        Q.   What motivated you to do that one?

24        A.   Well, seeing people cancel just sort of on a whim

25   is rare -- like just recruiting -- if I recruited you, it

FTCAMZN_0014282

Page 260

1    STATE OF WASHINGTON, to wit:

2            I, April D. Biedermann, before whom the foregoing

3    deposition was taken, do hereby certify that the

4    within-named witness personally appeared before me at the

5    time and place herein set out, and after having been duly

6    sworn by me, according to law, was examined by counsel.

7            I further certify that the examination was

8    recorded stenographically by me and this transcript is a

9    true record of the proceedings.

10           I further certify that I am not of counsel to any

11   party, nor an employee of counsel, nor related to any party,

12   nor in any way interested in the outcome of this action.

13           As witness my hand this 8th day of August, 2022.

14

15

16   _____
     April D. Biedermann, CCR, RSR
17   Washington State Certified
     Court Reporter
18   License No. 21028823

19

20

21

22

23

24

25

# EXHIBIT 50

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:            )
                                  ) No. 2123050
4    AMAZON.COM, INC.             )
                                  )
5                                 )

6

7                    Investigational Hearing

8                     CHRISTOPHER R. BROWN

9

10

                     Federal Trade Commission
11          Henry M. Jackson Federal Building
              915 Second Avenue, Suite 2896
12                  Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  November 2, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                   CCR No.:  2574
25

12

Brown

Amazon.com, Inc.                                    11/2/2022

1    done with respect to Prime retention?

2        A.  Redesigned the Prime member -- I'm sorry, the

3    Prime Central page, which is the management page, where

4    you would go to manage your account, change the plan

5    that you're on, change your payment method, cancel,

6    giving direction on content on that page, to, most

7    recently, redesigning the cancelation experience.

8        Q.  So you've worked on the cancelation flow for

9    Prime?

10       A.  Mm-hmm.

11       Q.  Yes?

12       A.  Yes.  Sorry.

13       Q.  And are you housed within a group that's

14   called GPX?

15       A.  Technically, yes, but the name has changed.

16   It's Prime UX now.  At the time, it was called Global

17   Prime Experience.  Same team, just changed the name.

18       Q.  Okay.  And who do you currently report to?

19       A.  Danielle Paulet.

20       Q.  And how long have you been reporting to

21   Danielle Paulet?

22       A.  About a year, if not less.

23       Q.  And before then?

24       A.  Before that, it was Vivek Vaidyanathan.

25       Q.  How long did you report to Vivek?

13

Brown

Amazon.com, Inc.                                        11/2/2022

```
 1        A.  A year and a half or so.
 2        Q.  And before Vivek, did you report to anyone?
 3        A.  Enrique Gonzales and, slash, David Edelstein.
 4   Mostly reporting to David Edelstein.  For a short time,
 5   Enrique.  And Enrique reported to David.
 6        Q.  Understood.
 7            Do you remember the dates when you reported to
 8   David Edelstein?
 9        A.  2019, 2020.  I'm thinking 2021.  I'm not sure
10   of the --
11        Q.  And above David Edelstein, who did you report
12   to?
13        A.  Roger Sambrook.
14        Q.  Okay.  And do you have any direct reports,
15   Mr. Brown?
16        A.  No.
17        Q.  And how long have you been, just generally, in
18   UX design?
19        A.  I guess, specifically, calling myself a UX
20   designer, seven years.  I'm sorry, 12 years.
21        Q.  Twelve years?
22        A.  Yeah.
23        Q.  So a significant period of time?
24        A.  Yeah.  Yeah.
25        Q.  And what were you doing before that?
```

14

Brown

Amazon.com, Inc.                                    11/2/2022

```
 1        A.  It wasn't called UX design, but doing that.
 2    I've been in design for 22 years.
 3        Q.  Twenty-two years?
 4        A.  Front-end design, graphic, visual, branding,
 5    and all that's part of UX design.
 6        Q.  So you're a very experienced UX designer at
 7    this point?
 8        A.  Yeah.
 9        Q.  And where did you go to school, Mr. Brown?
10        A.  I did not, for design.
11        Q.  But did you go to school for something else?
12        A.  No.
13        Q.  So you mentioned that you worked on
14    cancelation flow.  Correct?
15        A.  Mm-hmm.
16        Q.  Are you familiar with Iliad?
17        A.  Yes.
18        Q.  What is Iliad?
19        A.  It's the name, internal name, of the
20    cancelation experience.
21        Q.  Has that name changed during your tenure at
22    Amazon Prime?
23        A.  No.
24        Q.  What's the goal of Iliad?
25        A.  It's the cancelation experience, for you as a
```

15

Brown

Amazon.com, Inc.                                              11/2/2022

 1    member, to cancel your Prime member.

 2        Q.  Is that the only goal, for the customer to be

 3    able to cancel their membership?

 4        A.  Goal for who?

 5        Q.  Based on your understanding.

 6            MR. GRAUBERT:  Objection.

 7        A.  For the customer goal, the goal is to cancel

 8    their membership.

 9        Q.  How about for Amazon?

10        A.  To help them cancel their membership or to

11    understand the value of their membership that they

12    might not understand.

13        Q.  When you say understand the value of the

14    membership, what do you mean by that?

15        A.  Customers are paying a certain amount of money

16    for Prime, and one of the things we want to make sure

17    they understand is how much value they will get out of

18    their membership.  If they are paying an "X" amount of

19    money, we want to make sure they are achieving that.

20        Q.  Based on your understanding and experience at

21    Prime, why are there differing goals for the

22    cancelation flow for a customer and for Amazon?

23        A.  Two different entities.

24        Q.  Can you explain?

25        A.  Well, one is a customer, one is a business.

16

Brown

Amazon.com, Inc.                                           11/2/2022

1      They inherently -- sometimes the same goals, and

2      sometimes different goals.

3          Q.  Okay.  Is one of Amazon's goals to retain as

4      many Prime enrollees as possible?

5          A.  I believe so.

6          Q.  Do you know who named Iliad?

7          A.  I do not.

8          Q.  Do you know who started Iliad?

9          A.  I do not.

10         Q.  And the Iliad flow applies to U.S. customers,

11     correct?

12         A.  It's just the cancelation flow, no matter

13     where it's at.

14         Q.  Worldwide?

15         A.  Yeah.

16         Q.  And what work have you done with respect to

17     Iliad?

18         A.  I have redesigned the experience.

19         Q.  What does redesign the experience mean, for

20     lay people who don't understand what that means?

21         A.  I took the current experience, took the

22     customer goals and the business goals for the

23     experience, and designed a new one, hopefully, trying

24     to meet both of those goals.

25         Q.  You mentioned business goals.  What are the

322

Brown

Amazon.com, Inc.                                            11/2/2022

```
 1                 C E R T I F I C A T E
 2    STATE OF WASHINGTON )
                          )  ss
 3    COUNTY OF KING      )
 4
 5           I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to
 6    administer oaths and affirmations in and for the State
      of Washington, do hereby certify:  That the foregoing
 7    Investigational Hearing of the witness named herein was
      taken stenographically before me and reduced to a typed
 8    format under my direction;
 9           That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or
      the outcome herein;
11
             That the Investigational Hearing, as
12    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers and all
13    objections, motions and examinations and said
      transcript was prepared pursuant to the Washington
14    Administrative Code 308-14-135 preparation guidelines.
15                         s/Wade J. Johnson
16                         Wade J. Johnson, Certified Court
                           Reporter 2574 for the State of
17                         Washington residing at Seattle,
                           Washington.
18                         My CCR certification expires on
                           09/18/23.
19
20
21
22
23
24
25
```

# EXHIBIT 51

1               UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2

3
   FEDERAL TRADE COMMISSION,      )
4                                 )
              Plaintiff,          )
5                                 )Case No.
        v.                        )
6                                 )2:23-cv-0932
   AMAZON.COM,                    )
7                                 )
              Defendant.          )
8

9

10      ***CONFIDENTIAL PORTIONS - PAGES 26:9-277:7***

11

12          REMOTE DEPOSITION OF CHRISTOPHER BROWN

13              Thursday, December 19, 2024

14                  Chicago, Illinois

15

16

17

18

19

20

21

22   Reported By:  TRICIA J. LATHOURIS, CSR, RPR

23   JOB NO. J12058679

24



1        THE REPORTER:  Do all counsel agree to the

2    today videoconference deposition proceeding with the

3    court reporter being remote from the witness to

4    administer the oath today?

5        MS. JERJIAN:  Yes.

6        MR. ANTHONY:  Yes.

7            C H R I S T O P H E R     B R O W N,

8    called as a witness, having been first duly sworn by

9    a Notary Public, was examined and testified as

10   follows:

11                       EXAMINATION

12   BY MS. JERJIAN:

13       Q    Good morning, Mr. Brown.

14            Can you see and hear me?

15       A    Yes, I can.

16       Q    Please state your full name.

17       A    My name is Christopher Randall Brown.

18       Q    And you go by CR?

19       A    CR or Chris is good.

20       Q    Okay.  Good morning, Mr. Brown.  My name is

21   Olivia Jerjian.  I'm an attorney with the Federal

22   Trade Commission, and I am joined here today by my

23   colleague, Thomas Maxwell Nardini, also an attorney

24   at the FTC, and my other college, Evan Mendelson,



1      Q    What was the reason for the lateral move to
2  UX design manager?
3      MR. ANTHONY:  Objection.  Vague.  Calls for
4  speculation.
5      A    My goal was to expand my career, move up in
6  the company, gain more skills.
7  BY MS. JERJIAN:
8      Q    Did the fact that you became a UX design
9  manager, was that, at least in part, based on good
10  performance -- your good performance as a UX design
11  lead up until then?
12      MR. ANTHONY:  Objection.  Calls for
13  speculation.
14      A    My taking in beyond wanting to grow, the
15  opportunity was there because the team itself was
16  growing.  We just needed more people to be able to
17  help the junior designers, help with hiring and
18  that, and so we were kind of growing the team at
19  this point.
20  BY MS. JERJIAN:
21      Q    Okay.  Just a few more questions on this
22  topic.
23          As the UX design lead at Amazon Prime, you
24  were involved in UX testing and research; correct?



1      A    Yes, I was.

2      Q    How many UX tests did you conduct in that

3  specific role?

4      A    More than a dozen.  Maybe less than two

5  dozen.

6      Q    Okay.  And you were also involved in UX

7  research in that specific role; correct?

8      A    Correct.  At that point in time I don't

9  believe we had UX research -- researchers themselves

10  within the team.  We ended up hiring them in 2019, I

11  believe, where they became a core part of the team.

12          Before that I would engage with, again,

13  Blink or other third parties to do that.  I do not

14  have the expertise in UX research that Roger -- you

15  know, Dr. Roger Sambrook had or other researchers in

16  analysis, you know, the math around research that I

17  just don't have, and so my experience was really

18  gaining the practical, tactical user research.

19      Q    When you say "practical user research," can

20  you help me understand what you mean by that?

21      A    Usability testing, not doing like market

22  research or, you know, longitudinal study or things

23  like that.  More the practical, direct UX design

24  research requests.



 1      Q   Thank you.  That is helpful.

 2          And as UX design manager, subsequently,

 3   still at Amazon Prime, were you involved in any UX

 4   testing?

 5      A   I'm sorry.  Could you say that again?

 6      Q   Sure.

 7          We covered UX -- experience in UX research.

 8          When you were a UX design lead -- when you

 9   were a UX design manager, did you engage in any user

10   -- in any UX research?

11      A   Yes.  Yes, I did.

12      Q   Did you gain any experience with UX testing

13   as UX design manager?

14      A   Yes, I did.

15      Q   So is it fair -- and correct me if I'm

16   wrong here -- is it fair to say you have

17   approximately 14 years of experience in UX design?

18      MR. ANTHONY:  Objection.  To the purported

19   characterization of the witness's testimony, which

20   speaks for itself.  You may answer.

21      A   Yes, I would say that's fair.

22   BY MS. JERJIAN:

23      Q   Have you done any coursework related to UX

24   design?



1        One of the things that we heard from

2   customers that did cancel is that just were not

3   getting enough usage out of it.  They would just use

4   maybe one of the benefits.

5        So our goal was to let them know about the

6   totality of Prime so they could be aware of what the

7   true value that they're paying for if they did not

8   know about those other benefits.

9   BY MS. JERJIAN:

10      Q    And when you were working at Amazon Prime,

11  was one of the goals for Amazon Prime to have as

12  many Prime members as possible?

13      MR. ANTHONY:  Again, objection.  Calls for the

14  witness to speculate about Amazon's goal.

15      A    Our goal was to grow the Prime membership

16  worldwide.

17  BY MS. JERJIAN:

18      Q    And when you say "grow Prime membership,"

19  does that mean grow the number of Prime members

20  worldwide?

21      A    Correct.  And hopefully to expand to other

22  countries, to bring Prime to other locales.  And

23  hopefully more customers.

24      Q    Isn't it also fair to say that Amazon's



1  goal was to grow Prime membership in specific

2  locales, too, such as the US?

3      MR. ANTHONY:  Objection.  Calls for

4  speculation.

5      A   Correct.  That's what I would assume.

6  BY MS. JERJIAN:

7      Q   At some point, the online cancellation flow

8  for Prime in the United States changed from a

9  three-page flow to a two-page flow; is that correct?

10     A   That is correct.

11     Q   And that changed occurred on March 30,

12  2023; is that correct?

13     A   I don't remember the date.  But I believe

14  we launched either 2022 and then 2023.  But we

15  launched in several locales across a period of time.

16     Q   Do you recall when the -- when you launched

17  this new two-page flow in the US?

18     MR. ANTHONY:  Objection.  Foundation.

19     A   I do not recall specifically.  It was

20  either in -- likely in 2023.  Or 2024.

21  BY MS. JERJIAN:

22     Q   You worked on this cancellation flow

23  redesign at Prime; correct?

24     A   Yes, I did.



1        Q    We're going to get into this, I'm sure,

2    later.

3            But what work did you do on this Prime

4    cancellation flow redesign?

5        A    I was the lead designer.  The concept of

6    the design was mine, working with the product

7    owners, product managers, the technical team to,

8    then, make sure that the designs were implementable,

9    creating implementation guides, working with the

10   marketing team in different locales to update the

11   marketing for the primary page, or the first page in

12   the cancellation flow.

13       Q    Did you do any research for the

14   cancellation for redesign?

15       MR. ANTHONY:  Objection.  Vague.

16       A    Yes, I did.

17   BY MS. JERJIAN:

18       Q    What research did you do?

19       A    Essentially a usability -- usability study

20   showing the previous experience with the new

21   redesigned experience to users and getting their

22   feedback on the experience.

23       Q    When did you conduct this usability study?

24       A    It was either 2020 or 2021.  Late 2020 or



1   early to mid-2021.

2        Q    So, if I'm understanding correctly, that

3   would have been in the early stages of the online

4   cancellation flow redesign; correct?

5        A    Correct.

6        Q    What kind of usability study was this?  Did

7   you interact with customers directly?

8        MR. ANTHONY:  Objection.  Compound.  Vague.

9        A    No.  This was what we call an unmoderated

10  study.  This was using a third-party tool, I

11  believe, inVision, where we would create a

12  prototype, create a task list for the customer, for

13  the users.  They would use this platform to see the

14  test and enter in comments that they would -- that

15  they want to provide around the CX.

16  BY MS. JERJIAN:

17       Q    And was this usability study conducted on

18  the Iliad three-page flow, which was the version

19  that was live at that time?

20       A    We showed the Iliad three-page version and

21  the two-page cancellation version -- or a two-page

22  cancellation version.

23       Q    And the two-page cancellation version was a

24  prototype at the time; correct?



CHRISTOPHER BROWN  Confidential
FTC V. AMAZON.COM

December 19, 2024
47

1        A    Correct.

2        Q    As a result of this usability study, what

3    did you uncover about the three-page Iliad

4    cancellation flow?

5        MR. ANTHONY:  Object to the form.  Vague.

6        A    The greatest takeaway for me, based off

7    what I heard from the customers, is that they may

8    not have enjoyed the three-page cancellation flow,

9    but they were able to navigate through it and

10   eventually cancel.

11            The users liked the two-page cancel better

12   for a couple of reasons.  The designs in -- that I

13   would say would be in the first and second page flow

14   -- or the first and second pages in the three-page

15   flow, I had redesigned, making them more readable

16   working on the language, visuals a little bit, from

17   there.

18   BY MS. JERJIAN:

19       Q    Who else worked -- well, strike that.

20            Who else, if anyone, worked on the

21   usability study?

22       A    I believe at the time I asked one of the UX

23   researchers to verify my transcript or my task list

24   and goals for the project.  I do not recall at the



```
 1   time who that -- who that specifically was.  It was
 2   more of a check-in to say --
 3       MS. JERJIAN:  You froze.  You're freezing.
 4       THE REPORTER:  You froze up, sir.
 5   BY MS. JERJIAN:
 6       Q   Would You mind repeating the last part of
 7   your response so the court reporter can get it and I
 8   can hear it?
 9       A   We did not have a UX researcher assigned to
10   this -- to this project.  I consulted with them to
11   verify the work that I was doing, verifying the task
12   list that we were giving the users, the users that I
13   was targeting for this, and just an overall another
14   set of eyes.
15   BY MS. JERJIAN:
16       Q   At some point you worked with Mr. Benjamin
17   Goeltz of the redesign of the cancellation flow;
18   correct?
19       A   Yes, I did.
20       Q   Was Mr. Goeltz involved in this usability
21   study that you're referring to?
22       A   I do not -- I do not recall whether he was
23   involved in the study itself.  He was definitely --
24   he would have been involved in seeing the results of
```



1   that would lead you to the next page; correct?

2       A   Correct.  On page 1, that is the button

3   that moves you forward.

4       Q   And just to make sure this is clear.

5           It's the third CTA listed on that page, on

6   page 1; correct?

7       A   Correct.  Third CTA, or second orange

8   button.

9       Q   And looking at page 2, the CTA that would

10  allow you to proceed to the next page of the

11  cancellation flow is the continue to cancel CTA at

12  the bottom of page 2; correct?

13      A   That is correct.

14      Q   Is the -- strike that.

15          Would you agree that the cancel -- strike

16  that.

17          Would you agree that the cancel my benefits

18  and continue to cancel language on these two CTAs is

19  inconsistent?

20      MR. ANTHONY:  Objection.  Vague and

21  argumentative.

22      A   I would say rather than inconsistent,

23  because we're only talking about two things, that

24  these two buttons are not -- don't have the same



1    language.

2    BY MS. JERJIAN:

3        Q    And looking at page 3 of the cancellation

4    page, the button that would terminate a user's Prime

5    membership is the one that reads "End on October 19,

6    2021," at the bottom of page 3; is that correct?

7        A    Yes.  I believe that's the final button.

8        Q    And the language of that CTA is different

9    from the cancellation CTA button -- cancellation

10   CTAs on page 1 and 2 of the Iliad flow; correct?

11       A    The language on that button is different

12   from the other two, and the language in all three

13   are all different.

14       Q    Is the use of different language throughout

15   the flow to cancel Prime membership confusing to

16   Amazon customers?

17       MR. ANTHONY:  Objection.  Calls for

18   speculation.  Vague.

19       A    Is it?  We would have to test to find out

20   and find out how many think it's confusing and then

21   what the repercussions of that would be, whether

22   that's a stopper or whether it's just confusing but

23   they can work their way through it.

24   BY MS. JERJIAN:



1    Q   Given that one of the changes to the Iliad

2  flow was to make the CTA language for the continue

3  to cancel CTAs consistent, was it Amazon's -- or,

4  rather, was it your view that this lack of

5  consistency could confuse customers?

6    MR. ANTHONY:  Objection.  The question is

7  unclear.

8    A   Was it, or is it my view that inconsistency

9  can cause confusion?  Yes.  Yes, it can.

10  BY MS. JERJIAN:

11    Q   And the Project Cafe team wouldn't have

12  made this specific change if it didn't think that,

13  in fact, it was confusing customers; correct?

14    MR. ANTHONY:  Objection.  Argumentative.  Calls

15  for speculation on Project Cafe team's mindset.

16    A   I don't agree I think we would make changes

17  for -- we would make changes whether or not there

18  was a specific issue with them.  We might find other

19  areas where we might want to make changes.  So just

20  because we make a change does not mean it's a

21  specific issue with that thing.  I hope that answers

22  what you were...

23  BY MS. JERJIAN:

24    Q   So what you're saying is the simple fact of



1  making a change doesn't indicate that there was a

2  problem with -- with the prior version; is that what

3  you're saying?

4      A    What I'm saying is just because we make a

5  change doesn't mean that there's a specific problem

6  identified with that change.  We might make a change

7  for esthetic value, or we might wordsmith something

8  in a button or in the language.

9          Because we do that does not mean there is a

10  specific problem that we're trying to solve that has

11  been identified previously, but that we just want to

12  continue to make changes as we're looking at the doc

13  -- or looking at the page.  We don't focus in on

14  just this one design and do a redesign.  We don't

15  focus on just this button or that button.  We look

16  at the totality of the design and what other changes

17  -- what might we want to -- or could make during the

18  process.

19      Q    Was the making the continue to cancel CTA

20  consistent -- was that change made to resolve an

21  existing pain point with the then current cancel

22  flow?  And you can turn to Appendix C if that helps,

23  lines 123 through 128.

24      MR. ANTHONY:  Objection.  Cumulative.  And



1  argumentative.

2      A    I believe so.  We did make the change

3  because we identified that as an opportunity.

4  BY MS. JERJIAN:

5      Q    And, I think, earlier you mentioned that

6  the order of the buttons was also not consistent

7  throughout the cancellation flow that was in the

8  Iliad version; is that correct?

9      MR. ANTHONY:  Object to the form.

10     A    I believe I did say that.

11 BY MS. JERJIAN:

12     Q    And looking at the image underneath

13 Appendix G, the image reflects that; correct?

14     A    I'm sorry.  You broke up.  Which image?

15     Q    Looking at the image in Appendix G, the

16 image reflects the change in ordering of the CTA

17 buttons; correct?

18     A    Yes.  I'm seeing a different order in these

19 two images.

20     Q    Can the different ordering across the pages

21 lead to confusion for customers who were trying to

22 end their membership?

23     MR. ANTHONY:  Objection.  Calls for

24 speculation.



```
 1              I further certify that this certificate

 2      applies to the original signed and certified

 3      transcripts only.  I assume no responsibility for

 4      the accuracy of any reproduced copies not made under

 5      my control or direction.

 6

 7      _____

 8              TRICIA J. LATHOURIS, CSR, RPR

 9

10      My Commission Expires:

11      November 10, 2026

12

13

14

15

16

17

18

19

20

21

22

23

24
```



# EXHIBIT 52

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )
                                    ) No. 2123050
4    AMAZON.COM, INC.               )
                                    )
5                                   )

6

7                    Investigational Hearing

8                      GLORIA J. SMUDA

9

10

                     Federal Trade Commission
11            Henry M. Jackson Federal Building
               915 Second Avenue, Suite 2896
12                  Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  October 26, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                   CCR No.:  2574
25

10

Smuda

Amazon.com, Inc.                                    10/26/2022

1        A.   My primary role was UX lead for Prime Day.
2   So, as you now know, Prime Day for 2020 happened in
3   October.  So I was a part of shadowing.  And then I
4   wrote the retrospective for that Prime Day.  And then I
5   was responsible for the UX for Prime Day 2021, which,
6   as you know, launched in June of 2021.
7        Q.   Can you break that down a little bit for me.
8             What's shadowing?
9        A.   There was another UX designer who had done the
10  UX work for Prime Day 2020 prior to me joining the
11  team.  So she was, as a new person on the team, showing
12  me the work she had done, onboarding me, bringing me up
13  to speed, so that way I could do my role.
14       Q.   And who was that individual?
15       A.   Her name was Christine Cho.
16       Q.   To sort of orient me, where does GPX live
17  within Amazon as a whole?
18            MR. KELLY:  Object to form.
19       A.   The GPX team, in the org chart, as I think
20  you're asking, is within the Prime organization.
21       Q.   And there are other teams within the Prime
22  organization, as well.  Is that right?
23       A.   Yes, I believe so.
24       Q.   What are some examples of those?
25       A.   Like I said, my role, I worked with Prime Day.

Smuda

Amazon.com, Inc.                                    10/26/2022

1    So the team I worked with, that I believe, if I recall
2    correctly, was the high velocity events team, and I do
3    believe they were also in the Prime org.  There were
4    other teams, but I didn't work with them, so I don't
5    recall the specifics of their names.
6        Q.  What's your L level?
7        A.  I am L6.
8        Q.  And has that been the case since you began
9    with Amazon?
10       A.  No.  I was hired as an L5, and I was promoted
11   to L6 in -- it would have been effective October 2018.
12       Q.  And at some point in the past at Amazon, you
13   went by Ms. Jensen.  Is that correct?
14       A.  That is correct.
15       Q.  And when did you, just approximately, change
16   your name to Ms. Smuda?
17       A.  I legally changed my name last summer,
18   approximately between -- I started the process in July,
19   and I think I completed it around September, since it's
20   a lengthy process.
21       Q.  I understand.  Just to make sure I --
22       A.  And that's last -- that would be 2021, just to
23   clarify the year.
24       Q.  2021.  I understand.
25           And are you still with Global Prime

12

Smuda

Amazon.com, Inc.                                                      10/26/2022

```
 1   Experience?
 2        A.  No.
 3        Q.  When did you transition out of Global Prime
 4   Experience?
 5        A.  I believe it was April of 2021.
 6        Q.  And did you -- where did you transition to?
 7        A.  I transitioned to the F3 grocery team.
 8        Q.  Did you request that transfer?
 9        A.  Yes.
10        Q.  What was the basis for your requesting that
11   transfer?
12        A.  As the UX lead for Prime Day, we were
13   short-staffed.  I found myself taking on product
14   management, in addition to design responsibilities,
15   which were leading me toward very long hours.  And so I
16   desired to look for another role within the company
17   that was going to give me better work-life balance as
18   well as be a design-focused role.
19        Q.  And you felt then that you did not have a
20   sufficiently design-focused role in your position with
21   GPX.  Is that correct?
22             MR. KELLY:  Object to form.
23        A.  Let me clarify.
24             So, on the Prime Day team, as I mentioned, we
25   were -- our product manager had left the team, so we
```

13

Smuda

Amazon.com, Inc.                                     10/26/2022

1    were without a product manager, and so I had to resume,
2    like assume, those responsibilities, and so I was
3    having to do product management work in addition to
4    design work.
5        Q.  And just, again, to make sure I'm clear on the
6    terms, what's the distinction between product
7    management work and design work?
8        A.  The product manager was someone that had to,
9    for example, in this specific instance, had to go to
10   different teams at Amazon and coordinate which
11   businesses got which slots on the page, as opposed to a
12   designer, who designs, like, this is roughly the
13   template, this is where the slots are, this is how I
14   want to design, like, a page.  But I'm not necessarily
15   negotiating the business side of which team gets into
16   which slot, based on a whole assortment of
17   considerations that really require a business degree
18   and not a design degree.
19       Q.  So you wanted to refocus back to design work,
20   sort of, primarily.  Is that correct?
21       A.  That is correct.
22       Q.  Would it be fair to say that design is your
23   passion?
24           MR. KELLY:  Object to form.
25       A.  Yes, I would say that I -- I'm a designer at

14

Smuda

Amazon.com, Inc.                                     10/26/2022

1   heart, and I have a real -- I would agree with that
2   term, I have a passion for design.
3        Q.  To make sure I understood the dates correctly,
4   could you just give me the range of time that you were
5   with Global Prime Experience?
6        A.  Yes.  It was very short.  It was from
7   September 2021 -- sorry -- September 2020 through April
8   2021.
9        Q.  Oh, and before we go there, I should just ask,
10  did anyone encourage you to leave GPX in April of 2021
11  or before then?
12            MR. KELLY:  Object to form.
13       A.  No.  They were very sad to see me go, but were
14  supportive.
15       Q.  So no one indicated that you wouldn't have
16  further advancement at GPX, essentially forcing to
17  leave.  Is that right?
18            MR. KELLY:  Object to form.  Foundation.
19       A.  The conversations I had with my manager and my
20  skip level were, they were sad, as I stated, that I was
21  leaving the team, but they were supportive of the
22  reasons why I was leaving and that I was still staying
23  with the company.
24       Q.  And so you were with GPX from September 2020
25  to April 2021.  Who brought you -- strike that.

Smuda

Amazon.com, Inc.                                                10/26/2022

 1   subscribing to Prime.  Is that correct?

 2       A.  Correct.  You would continue your checkout, in

 3   this case, with your 5.99 shipping.

 4       Q.  Okay.  We can set that document to the side

 5   for a moment.  We will probably return to it.

 6           So, Ms. Smuda, are you familiar with the term

 7   "confirm shaming"?

 8       A.  I am not.

 9       Q.  Are you familiar, from a UX design

10   perspective, with the concept of visual hierarchy?

11       A.  Yes.

12       Q.  What's visual hierarchy?

13       A.  Visual hierarchy is a principle where you make

14   certain elements have more prominence and have

15   essentially a headline and subheadline and body copy,

16   that would be three different treatments of text, to

17   give structure to a page and to help organize the

18   content that someone would read.

19       Q.  So, of headline, subheadline, and body, as you

20   just described, is the concept that, within visual

21   hierarchy, the reader would process information in a

22   certain order?

23           MR. KELLY:  Object to form.

24       A.  Yes.  I believe that the principle assumes

25   that a -- that the person viewing that could read or

52

Smuda

Amazon.com, Inc.                                              10/26/2022

1    would read things in a certain order, yes.

2        Q.  Put another way, the hierarchy gives certain

3    text more prominence on a page over other text.  Is

4    that correct?

5            MR. KELLY:  Object to form.

6        A.  I would say it's correct that there could

7    be -- there would be -- we're talking about visual

8    hierarchy, so one has a higher hierarchy than another

9    element.

10       Q.  Right.  As the name implies?

11       A.  As the name implies.

12       Q.  Are you familiar with the term "interstitial"?

13       A.  Yes.

14       Q.  What's an interstitial?

15       A.  Another term that can be used would be like a

16   pop-up or something that appears on the page that you

17   are, but, like I said, a pop-up or a screen that's on

18   that page.

19       Q.  And what's the purpose of employing

20   interstitials in user experience design?

21           MR. KELLY:  Object to form.  Foundation.

22       A.  It depends on the usage of why it might be.

23   It could provide a customer more information.  It could

24   be part of a flow where you want to still keep context.

25   It really depends on the situation.

53

Smuda

Amazon.com, Inc.                                    10/26/2022

1      Q.  Is the UPDP an interstitial?

2           MR. KELLY:  Objection.  Foundation.

3      A.  I believe so, but, as not the designer of the

4  UPDP, I have less familiarity about how it's been

5  described or the specifics, but I believe I had heard

6  them refer to it as an interstitial.

7      Q.  And as the senior UX designer for GPX and the

8  person who prepared the mocks we've been describing,

9  you are quite familiar with the Prime enrollment flow.

10  Is that correct?

11          MR. KELLY:  Object to form.

12     A.  I would not characterize my knowledge as

13  quite -- could you say the word -- you said quite

14  informed?  Can you confirm that's what you said?

15     Q.  I'll rephrase.

16          As the designer of the mocks and as the senior

17  UX designer for GPX, you have a clear understanding of

18  how the Prime enrollment flow works, correct?

19          MR. KELLY:  Object to form.

20     A.  I would say, as a person who is brand-new on

21  that team, I gathered screenshots and had a -- I had

22  knowledge, but I would not characterize it as robust or

23  that I really understood it.  Again, I had only been on

24  the team at that point -- when I started, I had only

25  been on a few weeks.  And so I think there were

Smuda

Amazon.com, Inc.                                      10/26/2022

1    elements that I did not know or understand, but I

2    understood what was being asked of me in these mocks

3    and what screens to update.

4        Q.  And so you were aware of the steps as laid out

5    in the mocks that you prepared, correct?

6        A.  I'm aware of the steps and the flow, although,

7    even as we're looking at it now, I had to take a pause

8    as to making sure that what I was saying was accurate,

9    if you tap the screen, this is what would appear.

10       Q.  Okay.  Are you familiar with the term "dark

11   pattern"?

12              MR. KELLY:  Object to form.

13       A.  I heard of the term "dark pattern" during my

14   time in Prime.

15       Q.  Had you heard the term before then?

16       A.  I do not recall hearing that.

17       Q.  You don't recall -- just to be clear, you

18   don't recall hearing the term "dark pattern" at any

19   point before you joined GPX in December of 2020?

20       A.  Correct.  It's not a term that I am very

21   familiar with, and I don't recall having heard it

22   before, but I do recall colleagues of mine using that

23   term.

24       Q.  What's your understanding of what a dark

25   pattern is?

55

Smuda

Amazon.com, Inc.                                          10/26/2022

1       A.   As I mentioned, it's not a term I'm very
2  familiar with or have ever really seen a definition of.
3  So I really -- I really don't -- I can't give you a
4  definition, the same way like I have given you other
5  definitions, like visual hierarchy.  I'm just not
6  familiar with it.
7       Q.   So your testimony is you are able to give no
8  definition whatsoever about what a dark pattern is.  Is
9  that correct?
10           MR. KELLY:  Object to form.
11  Mischaracterizes the testimony.
12      A.   I'll try to clarify.  It's not a term that I'm
13  familiar with or know the definition of.  So I don't
14  feel comfortable under oath giving you a definition,
15  as, myself, as a designer, it's not something that I am
16  familiar with.
17      Q.   How have you heard the term used in Prime?
18      A.   I heard colleagues use the term, and it was --
19  I have a very vague memory of just, obviously,
20  something that wasn't good, but, beyond that, the
21  specifics, I just remember hearing it, but I just don't
22  recall.
23      Q.   You said something not good.  What did you
24  hear wasn't good about dark patterns?
25           MR. KELLY:  Objection.  Form.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

73

Smuda

Amazon.com, Inc.                                    10/26/2022

1        A.   That's correct.

2        Q.   And by UPDP, you understand that I mean

3   Universal Prime Decision Page.  Is that correct?

4             MR. KELLY:  Object to form.

5        A.   That is my understanding.

6        Q.   I actually don't think I went through that

7   before.

8             So can you talk me through the clarifying

9   elements that have occurred between the current and the

10  proposed of this mock?

11       A.   Yes.  Bullet A, which we spoke about earlier,

12  is that the signup button is updated to include auto

13  renew pricing and is a different color than other

14  buttons.

15       Q.   I see.  So you're directing to the purple

16  button, where it reads, "Start your 30-day free trial,"

17  and then beneath it, "Auto renews at 12.99 a month"?

18            Did I read that correctly?

19       A.   Yes, that is correct.

20       Q.   And what is significant about that change?

21            MR. KELLY:  Object to form.

22       Q.   Strike that.

23            What improves clarity about that change?

24            MR. KELLY:  Object to form.  Foundation.

25       A.   Sorry, I was looking at the page while you

74

Smuda

Amazon.com, Inc.                                                    10/26/2022

1   stated your question.  Could you state your question
2   again?
3       Q.  No problem.
4           So I see, in the current version of the UPDP
5   on the right, there's a double stacked button, yellow
6   and gray, that says, "Get free one-day delivery, "and
7   beneath it, "Enjoy Prime free for 30 days."
8           Did I read that correctly?
9       A.  Yes.
10      Q.  And then in the proposed version of the UPDP,
11  that yellow and gray button on the right has been
12  replaced with a purple button on the left.  Is that
13  correct?
14          MR. KELLY:  Object to the form.
15      A.  That is correct.
16      Q.  And, in addition, there's different text on
17  the purple button, which reads, "Start your 30-day free
18  trial.  Auto renews at 12.99 a month."
19          Did I read that correctly?
20      A.  That's correct.
21      Q.  So, in this change, what is the clarity
22  improvement or improvements that's reflected?
23          MR. KELLY:  Object to form.  Foundation.
24      A.  So, by making the button a different color
25  than they would have seen throughout the checkout

75

Smuda

Amazon.com, Inc.                                    10/26/2022

1   flow -- which, in this instance, it would be a yellow
2   button, as you see in the current -- so, by making it
3   purple, it provides something different to indicate
4   that this is going to be subscription signup, not just
5   specifically buying -- it looks like you're buying a
6   Throw Throw Burrito game.
7           And then there's updated language that aims to
8   more specifically talk about it being a 30-day free
9   trial versus a delivery message and having the auto
10  renew text in the button in addition to when it's there
11  above on the page.
12          That appears to be the specific changes
13  proposed here, as it relates to that button.
14      Q.  Thank you.
15          And I see that the start your 30-day free
16  trial button has been positioned on the left; whereas,
17  in the current, the button that would have started the
18  Prime signup is positioned on the right.
19          What accounts for that change in position?
20              MR. KELLY:  Objection.  Foundation.
21      A.  This is a pattern that I thought could be
22  interesting to test, of whether the placement of the
23  buttons would have any impact to customer clarity.  So
24  I explored it here of swapping it.
25      Q.  And what was the basis of your understanding

76

Smuda

Amazon.com, Inc.                                    10/26/2022

1    that swapping the positioning of the buttons would
2    potentially increase clarity?
3         A.  I had a wondering if -- I have seen in other
4    designs where, essentially, a continue button or
5    something that just sort of lets you stay in the same
6    state you're in but continue through the flow, is often
7    on the right instead of the left.  So I thought it was
8    an interesting idea, again, to possibly explore as an
9    idea.  Whether it would work, I have no idea.
10        Q.  Thank you for that.
11             And you noted previously that this was or was
12   close to the version of the mocks that was presented at
13   the December 16, 2020, meeting, correct?
14        A.  This was the version that was presented in
15   that meeting.
16        Q.  So this is the final version for the meeting,
17   if not close to the final.  Am I understanding
18   correctly?
19             MR. KELLY:  Object to form.
20        A.  Yes, this is -- this is the version that was
21   presented in that meeting.
22        Q.  And in the version presented in that meeting,
23   you wouldn't include a design element that you merely
24   had a wondering about, right?  This was a meeting with
25   VPs.

77

Smuda

Amazon.com, Inc.                                          10/26/2022

1                    MR. KELLY:  Object to form.

2          Q.  Strike that.  I'll rephrase that.

3                    You wouldn't haven't included a design element

4     that you had a mere wondering in but rather were

5     confident in, right?

6                    MR. KELLY:  Object to form.

7          A.  Well, I'd like to point out that Letter B,

8     which is the thing that is called out here, is that the

9     no thanks button is equally prominent.  I don't make

10    any mention in the things that I called out here

11    specifically changing the ordering.  So that is

12    something that I did, but it wasn't something that was

13    expressly conveyed as a proposed change.

14         Q.  But you wouldn't have included a proposed

15    change that you weren't confident in, in a document to

16    be sent up to -- for VP review, would you?

17                   MR. KELLY:  Object to form.

18         A.  I felt it was ready for a VP to review it.

19         Q.  So what's the -- strike that.

20                   And you felt it was ready presumably because

21    you had put a lot of thought and effort into the deck

22    by this point, right?

23                   MR. KELLY:  Object to form.

24         A.  I would like to clarify.  I know we started at

25    the beginning of my testimony, but I'll bring it back.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

78

Smuda

Amazon.com, Inc.                                          10/26/2022

1   This was not my full-time job.  This was -- like, my

2   full-time was working on Prime Day.  So this was

3   something that I was working on only a few hours a

4   week.  So I wouldn't characterize it as I had put a lot

5   of thought into it.  I did complete it, but a lot of

6   thought that I did in my job at this time was on Prime

7   Day, and this is something that I also completed.

8        Q.  And you had began on this project in

9   September 2020.  Is that right?

10       A.  No.  I started on the team in September 2020,

11  and, I believe, what I recall is, I started working on

12  this in October.

13       Q.  Fair.

14           And this, the date of this document, is now

15  mid-December, correct?

16       A.  That is correct.

17       Q.  And you had by this point, multiple meetings

18  during which this document was reviewed and discussed,

19  as you previously testified, correct?

20           MR. KELLY:  Object to form.

21       A.  There were two meetings that it was reviewed,

22  and there were other, like informal reviews that had

23  happened along the way, yes.

24       Q.  Sort of going off of what we were just

25  discussing, I also note that, as you directed me to,

79

Smuda

Amazon.com, Inc.                                              10/26/2022

1    there is now on the proposed version a no thanks,

2    continue checkout without Prime button.

3            Did I describe that correctly?

4        A.  That is correct.

5        Q.  And I see in the current version on the right

6    that, instead of a button, there is text on the left of

7    that screen that reads, "No thanks, I do not want free

8    delivery," presumably a link.  Is that correct?

9        A.  That is correct.

10       Q.  So what's the clarity improvement that you're

11   showing here between, in the current iteration, a link

12   with certain language and, in the proposed, a button

13   with different language?

14           MR. KELLY:  Object to form.  Foundation.

15       A.  As it is stated here, the goal was to make the

16   no thanks button as equally prominent and with a

17   similar treatment as the signup button.  So you see

18   that they are, while not the same width, they are the

19   same height, and with the same text treatment of bolder

20   text on top and a smaller text below.

21       Q.  And that's because, as a general matter,

22   buttons are clearer than links.  Is that correct?

23           MR. KELLY:  Object to form.  Foundation.

24       A.  That would be hard for me to make a

25   generalization across all design of all time of link

80

Smuda

Amazon.com, Inc.                                      10/26/2022

1    versus button.

2        Q.  That is a fair point.  I will bring it down

3    to --

4        A.  But, if you could --

5        Q.  In the context of the current example -- thank

6    you -- would you agree that the link is less prominent

7    than the button?

8                MR. KELLY:  Object to form.  Foundation.

9        A.  Yes.  By turning it into a button and making

10   it look -- have equal size, weight, et cetera, it will

11   become more prominent than a link.  That was the

12   hypothesis of that change.

13       Q.  And as ultimately was presented in this draft

14   of the mocks for Amazon VP review, correct?

15               MR. KELLY:  Object to form.

16       A.  This was the deck that was presented in the

17   December VP review.

18               MR. NARDINI:  I'll just pause for a

19   moment while the witness has a drink.

20       Q.  So one other distinction I note between the

21   current and proposed versions of the UPDP is, toward

22   the top of the proposed version, it reads, "Enjoy 30

23   days free, comma, then 12.99 a month.  Cancel anytime."

24           Did I read that correctly?

25       A.  I see that in the proposed mock.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Smuda

Amazon.com, Inc.                                              10/26/2022

1    ones annotated by the letters, correct?

2         A.  Correct.

3         Q.  Got it.

4         A.  That I can speak confidently to.

5         Q.  Got it.  Thank you.

6             Well, just to round it out, what other

7    elements did you increase the clarity on for this page?

8                  MR. KELLY:  Object to form.

9         A.  So, if we go through -- oh, I think we stopped

10   at B.  So C is the text that now appears below the

11   purple button, and there is a note about receiving an

12   email reminder before your trial ends.  That would be a

13   new feature that was being proposed.

14            D has to do with some changes around how

15   core -- Prime's core benefits, so trying to be a little

16   bit more broad and comprehensive of what Prime has to

17   offer versus the current one, which is only speaking to

18   delivery.

19            And then E is talking about what the delivery

20   options are without Prime.

21            And F is that shadow button, CTA style that

22   you see in the current, where it says, "Enjoy Prime

23   free for 30 days."  We spoke previously about that.  So

24   that has been removed from the proposal.  So there's no

25   button with gradiated gray boxes with text below it

84

Smuda

Amazon.com, Inc.                                    10/26/2022

1    anymore.

2            Q.   Thank you for that.

3                 And what is written after F is, "The shadow

4    button CTA style, which was confused as a yes and no,

5    was removed."  Did I read that correctly?

6            A.   That is correct.

7            Q.   And CTA is call to action?

8            A.   That is correct.

9            Q.   And what's that?

10           A.   Call to actions are another term for a button.

11           Q.   So would it be any button that appears on the

12   page, or is it buttons with specific functions

13   depending on the context of the page?

14           A.   Are those different?

15           Q.   Strike that.

16                I guess what I mean to say is, would both the

17   purple button and the gray button in the proposed slide

18   be calls to action?

19           A.   Yes.  They are different calls to action.  One

20   starts your free trial, and one is a no thanks.

21           Q.   Thank you.

22                And the remainder of that text, regarding the

23   shadow button, which was confused as a yes and no, was

24   removed, what does that mean?

25                MR. KELLY:  Objection.  Foundation.

85

Smuda

Amazon.com, Inc.                                    10/26/2022

1        A.  At the time, I think there was context and

2    probably a data point that I had been given, and now I

3    don't recall what that is.  So I will just trust what I

4    wrote here, that the shadow and the current CX shadow

5    button CTA style was confused as a yes and no.

6        Q.  As you look at it now, does it make sense to

7    you that that could be a point of confusion?

8                MR. KELLY:  Object to form.  Foundation.

9        A.  When I look at it today, it looks like an

10   element that could be improved, as I do not understand

11   why there is a gray gradient behind it.  And I don't

12   know -- I don't have any additional knowledge as to how

13   customers perceive, that I recall to this date.  As I

14   mentioned, I believe, at the time, I had more context,

15   but, today, I don't remember what that context was.

16               MR. NARDINI:  Who just joined?

17               MS. NOBLE:  This is Zaria Noble, from

18   Covington.

19               MR. NARDINI:  Welcome.  Thank you.

20       Q.  Ms. Smuda, if I could direct you back to a

21   page we were looking at before, page 13, Bates number

22   ending 3762.

23       A.  Page 13.  Okay.

24       Q.  This is an example of the Iliad cancelation

25   flow.  Is that correct?

86

Smuda

Amazon.com, Inc.                                          10/26/2022

1                    MR. KELLY:  Object to form.  Foundation.

2          A.  I am not familiar with the term "Iliad," but

3    my understanding, this is the current cancelation flow,

4    which I screenshotted for the purposes of this mock

5    deck.

6          Q.  Just to be clear, have you ever heard the term

7    "Iliad" used in reference to the Prime cancelation

8    flow?

9          A.  I've heard the term "Iliad," but I don't know

10   in reference to what or what it was or is.

11         Q.  So you've heard the term "Iliad" used at

12   Prime, but not what it was.  Is that correct?

13         A.  Correct.  I do not know what it is.

14                   MR. KELLY:  Object to form.

15         Q.  I'll just read, under Prime cancelation, this

16   reads, "Currently, the cancelation flow is difficult to

17   find and takes three additional steps to complete."

18              Did I read that correctly?

19         A.  Yes.

20         Q.  And I know that we were counting steps before,

21   and am I understanding correctly that each blue dot on

22   this page indicates where the user would click to

23   proceed through the cancelation flow?

24                   MR. KELLY:  Object to form.

25         A.  That is correct.  The blue dots are indicative

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Smuda
Amazon.com, Inc.                                          10/26/2022

1    of, you tap that, and then the next screen you would

2    see would be from tapping the one before.  And that's

3    how you would get through to the last screen where you

4    are canceling.

5        Q.  Got it.

6            And just to make sure I understand the

7    interface here, I see that the fourth column, there's

8    sort of a diagonal cut through it toward the bottom.

9            Do you see that?

10       A.  Yes.

11       Q.  Does that represent where what would have been

12   blocked and would require you to scroll down the screen

13   in order to see?

14            MR. KELLY:  Object to form.

15       A.  This is a technique used in design when you

16   have especially long screens.  And I was confined on

17   the space of the page here.  So that just indicates

18   there's content you're not seeing that -- because I

19   wanted to include at the bottom where the yellow

20   buttons are and not -- there's content in between here.

21   And you can see like the start of a Prime Video, and

22   then it looks like there's some more content here.

23            So it was my way of shortening the screen to

24   get all of the pieces, but yet indicate to the viewer

25   that there is a portion of the screen that's missing.

Smuda

Amazon.com, Inc.                                              10/26/2022

```
 1    expressed the concern regarding the color.  Am I
 2    understanding that correctly?
 3              MR. KELLY:  Object to form.
 4         Q.  Well, strike that.  I'll ask it in the
 5    affirmative.  Did Mr. Ghani express concern regarding
 6    the color?
 7         A.  I do not recall Mr. Ghani specifically.  I do
 8    not recall.  He could have, but I do not recall, or he
 9    could not have, and I don't recall.
10         Q.  Do you recall the name of anyone else
11    specifically who expressed concern?
12         A.  I remember the other designers specifically.
13    I believe there was some folks, who I'm going to group
14    together, but they were on the Shopping team, so I
15    don't recall specifically who but that I associated
16    with the Shopping team.  And possibly the designer from
17    Music.  But it's a little fuzzy of the who
18    specifically.
19              I just collectively know the feedback was
20    pretty consistent, with those who saw these mocks.
21    That purple was okay to be presented as a placeholder
22    color, with the expectation that there would be a
23    conversation about the actual color.
24         Q.  Okay.  So that's helpful.
25              So there may have been concern about the
```

123

Smuda

Amazon.com, Inc.                                            10/26/2022

1    choice of purple specifically, but what, if any,

2    concerns were expressed -- strike that -- what feedback

3    was given about the more general concept of using a

4    color for Prime signup that is different than the

5    standard flow or purchase buttons color?

6        A.  I recall that being supported, that people

7    were generally supportive of using and selecting a

8    different color than the yellow or blue, which is

9    currently used in these primary, like, checkout flows

10   or other flows that you might see.

11       Q.  And so I understand, the significance of

12   choosing a color other than one within the normal

13   palette of other buttons is that it stands out

14   uniquely, correct?

15           MR. KELLY:  Object to form.  Foundation.

16       A.  The goal of using purple is to have it stand

17   out and look different than buttons they may be seeing.

18       Q.  So that it pops out more for the user,

19   correct?

20           MR. KELLY:  Object to form.

21       A.  It's that it stands out more.

22       Q.  Stands out more.  Fair.

23           And you noted that people were generally

24   supportive of that concept.  Who do you recall

25   expressing support?

Smuda

Amazon.com, Inc.                                      10/26/2022

```
 1              MR. KELLY:  Object to form.  Foundation.
 2      A.  I remember Reid was supportive.  He was
 3  someone that I sought feedback from.  I remember the
 4  other designers were supportive, but I don't recall --
 5  I believe it would be -- that it was likely the Music
 6  designer, since, at that point, he had joined the
 7  working group, as I previously stated.  So he was
 8  reviewing this.  I do not believe the designers from
 9  Kindle saw this version.  I don't recall sharing it.  I
10  might have, I just don't recall.  So I don't recall
11  getting feedback specifically from them.
12          And then, as I have previously stated, I
13  recall getting feedback from members of the Shopping
14  team, but, as I sit here almost two years later,
15  they've kind of all blended together as people on the
16  Shopping team, and I don't recall specific individuals.
17      Q.  To your knowledge, was a Prime signup button
18  in a color other than a color used in the standard flow
19  or purchase buttons ever implemented on a live UPDP?
20              MR. KELLY:  Object to form.
21      A.  I do not know.
22      Q.  To your knowledge, were any of the changes
23  proposed within the mocks that you prepared implemented
24  live on Amazon's website?
25              MR. KELLY:  Object to form.
```

Smuda

Amazon.com, Inc.                                    10/26/2022

1          A.  I do not know if any of these that you see
2      here in this Exhibit 2 were implemented.  At the time
3      that I was working on it, my involvement, for the most
4      part, ended after the December meeting.  And then, as I
5      stated earlier, I left the team in April of 2021.  And
6      so I don't -- I do not know what happened after my
7      involvement or even after being on the team.
8          Q.  I'll note that the mock document, in total, is
9      20 pages.  And feel free to flip through.
10          But, to your knowledge, by the time you left
11      GPX or anytime after, were any of the changes that you
12      had proposed in this document implemented on Amazon's
13      website?
14              MR. KELLY:   Object to form.   Foundation.
15          A.  I was not aware of any of them being made.  I
16      did not have visibility if they were made.
17          Q.  Do you know why that would be the case?
18              MR. KELLY:   Object to form.
19          A.  I do not know.
20          Q.  Did you ever discuss with anyone at Amazon --
21      strike that -- did you ever discuss with anyone why
22      that would be the case?
23              MR. KELLY:   Object to form.
24          A.  The only discussion I had, that I recall,
25      after the December meeting, was with my manager.  And

126

Smuda

Amazon.com, Inc.                                                    10/26/2022

1    he thanked me for my work, because, as I had stated, I

2    had, to his acting, stepped in to do this mock.  And

3    that was -- at the time, I don't recall any action

4    items related to implementation.

5              So, as I have also stated, my primary role was

6    on Prime Day.  So I was already doing a lot of Prime

7    Day work, and I switched over exclusively to work on

8    Prime Day, starting this meeting.  So I do not know,

9    and I do not know why.

10        Q.  And your manager there is Mr. Edelstein,

11   right?

12        A.  Yes, Mr. Edelstein.

13        Q.  When you spoke with him, did he express any

14   frustration or concern that he had basically allowed a

15   member of his team to be allocated to a project that it

16   then didn't appear any of the changes that the project

17   had proposed were actually being implemented?

18              MR. KELLY:  Object to form.  Assumes

19   facts not in evidence.

20        A.  I do not recall David appearing frustrated in

21   the conversation I had with him.

22        Q.  Did he raise the point that I just described

23   at all?

24              MR. KELLY:  Object to form.

25        A.  Could you clarify?  Could you restate, just so

Smuda

Amazon.com, Inc.                                          10/26/2022

1   I'm clear of what point you're talking about?

2        Q.   Sure.  Did he sort of state in any way the

3   fact that a not insignificant portion of your time had

4   been allocated to this project and yet the deliverable

5   that you had proposed had not been implemented or acted

6   upon?

7             MR. KELLY:   Object to form.   Assumes

8   facts not in evidence.

9        A.   My recollection was him approaching me as my

10  manager.  So I don't recall specific emotions.   He

11  didn't convey specific emotions to me, since he was

12  there to support me, and he wanted to let me know that

13  I had done a good job on the project.

14             And I remember there was general frustration

15  on the GPX team about it, but, as you kind of

16  characterized it, I can't say that's what happened.   I

17  can say that I felt, when he spoke to me, he was trying

18  to be very supportive to me, saying like -- assuming

19  that I could be frustrated by this, so let me reassure

20  you that, you know, I feel the design work you did was

21  really well, and we appreciate it.

22             And then it was going to be taken from there.

23  But that's the point where I don't have really any

24  visibility into what happened or conversations that

25  happened and that he might have had.   I just do not

Smuda

Amazon.com, Inc.                                                    10/26/2022

```
 1   know.
 2        Q.  Were you frustrated by the lack of progress?
 3             MR. KELLY:  Object to form.
 4        A.  I was -- I'm trying to quantify the emotion I
 5   had at the time, which was like a mix of -- there was a
 6   bit of frustration, there was a bit of disappointment,
 7   but also an understanding I had that this was a complex
 8   problem and this is -- I have experienced this in my
 9   past as a designer, where not everything you present is
10   immediately taken.
11             And so speaking to my manager did help me feel
12   affirmed that I did a good job in my role on it and
13   that I needed to pivot and -- you know, there was a lot
14   of responsibilities I had to do for Prime Day.  And so
15   I sort of moved on and turned my attention to what was
16   my primary role on the team.
17        Q.  Right.  It wasn't within your authority to
18   implement these changes, correct?
19             MR. KELLY:  Object to form.
20        A.  It was not in my authority.
21        Q.  Whose authority would it have been in to
22   implement these changes?
23             MR. KELLY:  Objection.  Foundation.
24        A.  It's unclear to me who or if it was even a
25   singular who or if there would have been multiple
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

130

Smuda

Amazon.com, Inc.                                    10/26/2022

1    cause of that disappointment, in part, that you agree

2    with at least some of the clarity changes within this

3    document and yet they were not being implemented?

4              MR. KELLY:  Object to form.  Assumes

5    facts not in evidence.

6        A.  I was -- I felt the work that I had put in

7    here was good design work that needed to be tested,

8    needed a lot of like details worked out.  And so to

9    sort of leave something and not even be sure --

10   because, again, I don't really -- I don't know what

11   happened, but there wasn't a -- I don't recall any

12   clear next step related to the mocks coming out of

13   that.

14             So, as a designer, there is that feeling.  As

15   I say, it's not an uncommon feeling.  It can happen for

16   a variety of, like, things that don't move forward or

17   ship or get paused or -- like, things take time.

18       Q.  Right.  You were pulled off of some of your

19   Prime Day responsibilities, which it sounds like was

20   quite a heavy lift, in order to spend some percentage

21   of your time on this.  And then four months after you

22   had had this presented up to the VP level, nothing

23   substantively had happened regarding it, correct?

24             MR. KELLY:  Object to form.

25   Mischaracterizes the testimony.

131

Smuda

Amazon.com, Inc.                                               10/26/2022

1        Q.  I'll withdraw.

2        A.  Okay.

3        Q.  As a designer, do you agree that the changes

4    within these mocks would improve clarity?

5               MR. KELLY:  Object to form.  Foundation.

6        A.  I believe that the changes that I proposed

7    here have the possibility of improving clarity, and

8    they should be tested to be validated, which is a step

9    that didn't happen.  But I feel confident that they are

10   concepts that could and should be tested.

11       Q.  I want to ask you about the testing -- and

12   thank you for bringing me to that, but, before we do --

13   what gives you the sort of confidence, the degree of

14   confidence such that you believe they should be tested?

15       A.  I feel the changes I have outlined throughout

16   this are -- they address specific points at, like a

17   strategic level of -- and the visual, like,

18   implementation of it, I think, is, you know, generally,

19   a design that I would stand behind.  I put my name on

20   this and accept this as my work.  And so I have a

21   really high bar for the work I put out.  And so I feel

22   the work in here does meet the bar for my design.  And

23   so, for that, I would say my recommendation would be to

24   do testing.

25       Q.  And what would the testing entail?

132

Smuda

Amazon.com, Inc.                                              10/26/2022

```
1        A.   There could be a variety of types of testing.
2   You could do user research, like user studies.  That
3   could be with real customers, internal customers.  You
4   could do A/B testing, which is a common practice at
5   Amazon, for anything that gets launched, you have to do
6   an A/B test.
7        Q.   What other testing could you do?  And we'll
8   tick through these in more detail, but just to get the
9   list, what other types of testing?
10        A.   Those would be the two primary ones that I
11   would recommend, a research study and/or A/B testing.
12        Q.   And, there, is research study the same as user
13   study?
14        A.   Yes, I mean the same.
15        Q.   And what is that?
16        A.   That is a study that we conduct where we could
17   show these mock-ups, in the form of a flow, to a
18   participant and have them walk through it, and we would
19   ask specific questions to gauge their feedback.
20   Oftentimes, it is accompanied with some kind scoring.
21   So you could actually have a number of how easy was it,
22   how intuitive was it, things like that.  And those are
23   usually run by UX researchers and sometimes by
24   designers.
25        Q.   And to your knowledge, was a user study or
```

133

Smuda

Amazon.com, Inc.                                    10/26/2022

1    research study run for any of the mocks that you
2    compiled for the December 16, 2020, meeting?
3                MR. KELLY:   Objection.   Foundation.
4        A.   Not to my knowledge.
5        Q.   Whether prepared specifically for the
6    December 16, 2020, meeting or not, were there any mocks
7    that you worked on while with GPX for which user
8    studies or research studies were conducted?
9                MR. KELLY:   Objection.   Foundation.
10       A.   Not for this project, but for my work on Prime
11   Day, there were.
12       Q.   Were there any mocks regarding signup or
13   cancelation for Prime or other subscription services
14   that you had prepared, the user studies or research
15   studies were completed on?
16               MR. KELLY:   Objection.   Foundation.
17       A.   Not to my knowledge or that I can recall any
18   that were mocks that I prepared specifically for
19   subscription that was used in a user study.
20       Q.   And is that still the case to this day?
21               MR. KELLY:   Objection.   Foundation.
22       A.   I do not know, since I left the team in April
23   of 2021.
24       Q.   Considering the work that you had put in,
25   wouldn't it be likely that, had that testing been done,

Smuda

Amazon.com, Inc.                                    10/26/2022

 1    that it would have been brought to your attention?

 2                MR. KELLY:  Objection.  Form.

 3    Foundation.

 4        A.  I do not know.  I can only speak to the fact

 5    that I was not informed, and I don't have any knowledge

 6    of that.

 7        Q.  A/B testing -- what's that?

 8        A.  So A/B testing is where you've actually coded

 9    it and you put it live on the site, but only a portion

10    of customers see that version, and you test that

11    against the current version.

12        Q.  In an A/B test, how do you evaluate the

13    success of the proposed version versus the current

14    version?

15                MR. KELLY:  Object to form.

16        A.  So, in my experience, when we have done A/B

17    testing on previous projects, there are a set of

18    metrics that are decided upon before the A/B test is

19    conducted.

20        Q.  What are just some examples from your past

21    experience of the types of metrics that you're

22    referring to?

23        A.  From previous work, it could be click-through

24    rate, would be an example.

25        Q.  What would be some other examples?

135

Smuda

Amazon.com, Inc.                                               10/26/2022

1       A.  On eReader -- I worked on eReader while I was

2  in Kindle -- we looked at average reading use, so to

3  see if you made a change and whether that -- which is a

4  little different than a click.

5       Q.  Are you familiar with any A/B testing that has

6  been run on the Prime or other Amazon subscription

7  service enrollment or cancelation flows?

8       A.  I am not familiar or aware, that I can recall.

9       Q.  Are you aware of any of the metrics that might

10  have been employed to evaluate the success of current

11  and proposed options for any of those programs with

12  respect to enrollment and cancelation flows?

13            MR. KELLY:  Objection.  Foundation.

14  Form.

15       A.  I do not know.

16       Q.  And so then, on the basis of your answer, I

17  surmise, but I'll ask:  To your knowledge, no A/B

18  testing was performed on the proposed flows that you

19  had prepared during your time with GPX, correct?

20            MR. KELLY:  Objection.  Foundation.

21  Form.

22       A.  I do not know.

23       Q.  Nor, to your knowledge, has any A/B testing

24  been performed on flows developed in your mocks to this

25  day?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

136

Smuda

Amazon.com, Inc.                                    10/26/2022

1          MR. KELLY:  Object to form.  Foundation.

2      A.  I do not know.

3      Q.  So was a source of your disappointment that,

4  not only were the mocks not being implemented, but also

5  there was no even testing being put forth to see if

6  these would be more preferable flows for users?

7          MR. KELLY:  Object to form.

8  Mischaracterizes prior testimony.

9      A.  No.  I believe I testified earlier about the

10 source of my disappointment being tied to, that, after

11 the December meeting, there was no particular action

12 items, and I had to -- I know there was -- I had some

13 visibility into just knowing that there was additional

14 steps that were going to happen after that meeting,

15 but, as I said, I wasn't going to be working on those,

16 and, essentially, this was sort of the end that I

17 worked on this.

18     Q.  Just a few more questions on this document.

19         You mentioned that, I recall, Reid Nelson

20 provided some of the inputs into this document.  Is

21 that correct?

22     A.  Could you clarify which specifically you're

23 talking about?

24     Q.  And I don't want to misstate your testimony.

25     A.  Mm-hmm.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

137

Smuda

Amazon.com, Inc.                                    10/26/2022

1        Q.   So tell me if this is wrong.

2             The clarity improvements that were recommended

3    in this document, did Reid Nelson provide you with any?

4        A.   Which page are you looking at?

5        Q.   It could be any page, but why don't we go back

6    to page 4.

7        A.   I just want to make sure I'm following where

8    you're looking.

9        Q.   Absolutely.  I'd say the question applies to

10   the whole document.

11       A.   Okay.

12       Q.   But I'll ask it again just for the record.

13            Were some of the clarity improvements included

14   in these mocks proposed or provided to you by

15   Mr. Nelson?

16       A.   I got you.  Thank you for clarifying.

17            Yes.  These are ideas that were provided to

18   me.  My understanding is there was a brainstorming

19   session that happened the summer prior when I was not

20   on the team, and so he had provided me the list of

21   ideas, and so those ideas are in this doc.

22       Q.   I see.  That resulted from the brainstorming

23   session that occurred, you said back in the summer of

24   2020?

25       A.   That is my understanding, is that there was a

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

138

Smuda

Amazon.com, Inc.                                    10/26/2022

1    brainstorming session that had happened in the summer
2    of 2020.
3         Q.  Do you know who attended that brainstorming
4    session?
5         A.  I do not.  I do not recall whether it was
6    shared with me or whether I saw who attended.  I
7    believe Reid had attended.  And beyond that, I do not
8    know, and I don't recall.
9         Q.  But, obviously, more than one person, as it
10   was a brainstorming session, right?
11              MR. KELLY:  Object to form.
12        A.  Correct.  My understanding is that there were
13   multiple people, but I just don't remember or even know
14   if I had ever seen a list, like an attendee list of who
15   was at the brainstorm.  And I don't recall asking who
16   was there.  I was -- what I remember is being more
17   concerned about getting the information of what those
18   ideas were and less about, like, who was there.
19        Q.  How were the ideas that you then incorporated
20   into these mocks communicated to you?
21        A.  They would have been communicated -- I don't
22   fully recall.  I believe it was a combination of email,
23   meeting with him, and him -- him being Reid.  And Reid
24   walked through, and we talked through it, because I
25   wanted to make sure we understood.  That was the

Smuda

Amazon.com, Inc.                                           10/26/2022

```
 1   primary way, but I don't fully recall if there were
 2   other ways that I had received it.
 3        Q.  We can set this document aside for a moment.
 4            Just more generally, Ms. Smuda, we talked
 5   about certain design elements, and there were a couple
 6   more I wanted to ask you about.  Are you familiar with
 7   the concept of proximity in design?
 8                MR. KELLY:  Object to form.  Foundation.
 9        A.  Yes.
10        Q.  What's your understanding of that term in the
11   context of design principles?
12        A.  My understanding of proximity is how near or
13   far one element is to another element.
14        Q.  And what's the significance of proximity in
15   the context of design?
16                MR. KELLY:  Object to form.  Foundation.
17        A.  There could be a number of elements, ranging
18   from composition -- so you can use proximity to create
19   compositions.  There's information how, like a piece of
20   information could be close to, say, an accompanying
21   icon.  You see that a lot in web design or mobile
22   design.
23        Q.  So users would expect to see common
24   information grouped together.  Is that fair?
25                MR. KELLY:  Objection.  Foundation.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                          )   ss
3    COUNTY OF KING       )

4

5            I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
6    administer oaths and affirmations in and for the State
     of Washington, do hereby certify:  That the foregoing
7    Investigational Hearing of the witness named herein was
     taken stenographically before me and reduced to a typed
8    format under my direction;

9            That I am not a relative or employee of any
     attorney or counsel or participant and that I am not
10   financially or otherwise interested in the action or
     the outcome herein;

11

12           That the Investigational Hearing, as
     transcribed, is a full, true and correct transcript of
13   the testimony, including questions and answers and all
     objections, motions and examinations and said
14   transcript was prepared pursuant to the Washington
     Administrative Code 308-14-135 preparation guidelines.

15                    _Wade J. Johnson_

16                    Wade J. Johnson, Certified Court
                      Reporter 2574 for the State of
17                    Washington residing at Seattle,
                      Washington.
18                    My CCR certification expires on
                      09/18/23.

19

20

21

22

23

24

25

# EXHIBIT 53

The Honorable John H. Chun

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8 **AT SEATTLE**

9

FEDERAL TRADE COMMISSION,

10

Plaintiff,

11

Case No.:  2:23-cv-0932-JHC

v.

12

DECLARATION OF NON-
PARTY REID NELSON

AMAZON.COM, INC., *et al.*,

13

Defendants.

14

15

16        I, Reid Nelson, declare as follows:

17        1.        I have reviewed the Federal Trade Commission's April 9, 2025 Supplemental

18 Expert Witness Disclosure related to me (the "Disclosure") in the above-captioned matter.  I

19 understand that the Disclosure is intended to summarize my "opinions and general topics of

20 anticipated testimony," and the "factual bases for opinions and topics of [my] anticipated

21 testimony."

22        2.        The "topics" listed in the Disclosure relate to events that occurred over three years

23 ago.  In the intervening years, I stopped working for Amazon.  Opinions I formed on the identified

24 topics were based on then-current facts, about some of which my recollection has faded over time.

25        3.        In addition, the Disclosure identifies certain "weblab experiments" as a factual

26 basis for certain of my identified opinions.  I did not personally design or conduct any of these

27 weblab experiments.  When forming opinions based on the results of weblab experiments, I relied

28 on information and data provided by others, and on calculations performed by others.  I cannot

1  testify under oath that the information and data provided by others and calculations performed by

2  others were accurate.

3       4.     The Disclosure lists at least one opinion with which I do not agree.  Specifically, it

4  states that I "will opine on the reasons why [I] believe[] that the UPDP Clarity experiments,

5  conducted by the Retail Analytics team, resulted in significant improvements in the reduction of

6  CS cancellations for nonconsensual enrollment and the Iliad cancellation process."  This does not

7  accurately describe my opinion.

8       5.     For the reasons stated in this Declaration, I do not wish to testify as an expert

9  witness for the Federal Trade Commission.

10

11       I declare under penalty of perjury that the foregoing is true and correct to the best of my

12  knowledge.

13

14       Executed on this 21st day of May, 2025.

15

16                         By: _____

17                             Reid Nelson

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 54

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

    v.

AMAZON.COM, INC., *et al.*,

                  Defendants.

Case No.: 2:23-cv-0932-JHC

DECLARATION OF NON-PARTY CHRISTOPHER R. BROWN

I, Christopher ("C.R.") Brown, declare as follows:

1.      I have reviewed the Federal Trade Commission's April 9, 2025 Supplemental Expert Witness Disclosure related to me (the "Disclosure") in the above-captioned matter.  I understand that the Disclosure is intended to summarize my "opinions and general topics of anticipated testimony," and the "factual bases for opinions and topics of [my] anticipated testimony."

2.      I was not aware of the FTC's intention to designate me as an "expert" witness and was not contacted by the FTC regarding the Disclosure or its contents.

3.      The Disclosure lists several "factual bases" for my opinions with which I disagree.  First, I do not have an educational background in user experience design, research, or usability testing.  Nor do I consider myself an "expert" in user research and usability testing as my experience in conducting usability studies is from practical training rather than formal training.  Second, my usability research on the Iliad cancellation process consisted of only one usability

1    study which compared the cancellation flow at the time to a prototype I created of a redesigned

2    flow.  I have not conducted any usability tests or seen the results of usability tests comparing the

3    Iliad cancellation flow to the redesigned cancellation flow launched to consumers, i.e., Iliad 2.0.

4          4.      The Disclosure also lists opinions for which I do not have the personal knowledge

5    to testify reliably.

6          5.      The Disclosure states that I will opine that the design elements of the cancel Calls-

7    to-Action ("CTAs") in the Iliad cancellation process are confusing to customers, and that the

8    process is not simple.  But I have not conducted usability tests on the CTAs in the Iliad

9    cancellation process nor have I personally seen the results of such tests.  I also have not conducted

10   usability tests on whether the Iliad flow is "simple."  Thus, I do not have the personal knowledge

11   necessary to testify as an expert about this topic.

12         6.      The Disclosure further states that I will opine that users found the Iliad cancellation

13   process difficult to find and navigate, and that they found certain design elements confusing or

14   unclear.  However, I have not conducted usability tests on these issues or personally seen the

15   results of such tests.  Therefore, I do not have the personal knowledge necessary to testify as an

16   expert about these topics.

17         7.      The Disclosure also states that I will opine that the Iliad cancellation process was

18   less simple than the Iliad 2.0 redesigned cancellation process and that the latter required less clicks

19   to cancel than the former.  I have not conducted usability tests on the "simplicity" of the Iliad

20   cancellation process or the Iliad 2.0 cancellation process, nor whether the number of clicks is an

21   appropriate proxy for "simplicity."  Indeed, I do not believe "simplicity" is a valid metric for a

22   usability test and do not have knowledge of Amazon conducting usability tests for such a metric.  I

23   also have not conducted usability tests to determine the average number of clicks users performed

24   to cancel between the two cancellation flows, nor am I aware of results for such tests.  Thus, I do

25   not have the personal knowledge necessary to testify as an expert about these topics.

26         8.      Lastly, the Disclosure states that I will opine that four limited categories of

27   information constitute "the only information Amazon needs from a consumer to cancel their Prime

28   subscription."  That statement in the Disclosure is incomplete and does not represent my views

NON-PARTY CHRISTOPHER R. BROWN'S          2
DECLARATION (2:23-cv-0932-JHC)

Docusign Envelope ID: 5D7298B5-5041-4C11-A904-3C321AE66974

insofar as it implies that the online Prime cancellation flow's only purpose is to provide a means for customers to cancel their Prime membership.  For instance, I believe it is important to provide consumers with information regarding the Prime membership benefits that the consumer would lose by canceling Prime so that the consumer can make an informed decision about keeping, canceling, or otherwise managing their membership.

      9.      For the reasons stated in this Declaration, I do not have the personal knowledge required to testify as an expert witness for the Federal Trade Commission on these topics.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

      Executed on this 25th day of May, 2025.

By: _C.R. Brown_____

Christopher R. Brown

# EXHIBIT 55

Case 2:23-cv-00932-JHC    Document 343    Filed 06/06/25    Page 1223 of 1303


**CONGRESS.GOV**

---

## S. Rept. 111-240 - RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

111th Congress (2009-2010)

| | |
|---|---|
| **Report Type:** | Senate Report |
| **Accompanies:** | S.3386 |
| **Committees:** | Senate Commerce, Science, and Transportation Committee |

---

☰  🔊 Listen  ▶

---

**Report text available as:**  TXT  |  PDF (4MB)  (PDF provides a complete and accurate display of this text.) ?

---

```
111th Congress
 2d Session              SENATE                  Report
                                                 111-240
```

---

```
                                      Calendar No. 500


          RESTORE ONLINE SHOPPERS' CONFIDENCE ACT


                        _____


                    R E P O R T

                       OF THE

       COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

                         on

                     S. 3386




            August 2, 2010.--Ordered to be printed
      SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION
               one hundred eleventh congress
                     second session


          JOHN D. ROCKEFELLER IV, West Virginia, Chairman
DANIEL K. INOUYE, Hawaii            KAY BAILEY HUTCHISON, Texas
JOHN F. KERRY, Massachusetts        OLYMPIA J. SNOWE, Maine
BYRON L. DORGAN, North Dakota       JOHN ENSIGN, Nevada
BARBARA BOXER, California           JIM DeMINT, South Carolina
BILL NELSON, Florida                JOHN THUNE, South Dakota
MARIA CANTWELL, Washington          ROGER F. WICKER, Mississippi
FRANK R. LAUTENBERG, New Jersey     GEORGE S. LeMIEUX, Florida
MARK PRYOR, Arkansas                JOHNNY ISAKSON, Georgia
CLAIRE McCASKILL, Missouri          DAVID VITTER, Louisiana
AMY KLOBUCHAR, Minnesota            SAM BROWNBACK, Kansas
TOM UDALL, New Mexico               MIKE JOHANNS, Nebraska
MARK WARNER, Virginia
MARK BEGICH, Alaska
              Ellen Doneski, Staff Director
          James Reid, Deputy Staff Director
             Bruce Andrews, General Counsel
          Ann Begeman, Republican Staff Director
        Brian Hendricks, Republican General Counsel
          Todd Bertoson, Republican Senior Counsel
```

111th Congress
               SENATE

Calendar No. 500
       Report

2d Session
                              111-240

===========================================================

RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

_____

August 2, 2010.--Ordered to be printed

_____

Mr. Rockefeller, from the Committee on Commerce, Science, and
Transportation, submitted the following

REPORT

[To accompany S. 3386]

The Committee on Commerce, Science, and Transportation, to
which was referred the bill (S. 3386) to protect consumers from
certain aggressive sales tactics on the Internet, having
considered the same, reports favorably thereon with an
amendment (in the nature of a substitute) and recommends that
the bill (as amended) do pass.

### Purpose of the Bill

S. 3386, as amended, would protect online consumers from
unfair and deceptive sales tactics on the Internet by (1)
requiring e-commerce companies that advertise on other
companies' websites to meet certain requirements before
charging consumers' financial accounts, (2) prohibiting e-
commerce companies from transferring their customers' billing
information to the e-commerce companies that are advertising on
their websites, and (3) requiring e-commerce companies that use
``negative options'' to meet certain minimum requirements.

### Background and Needs

In the past 15 years, the Internet has rapidly grown from an
entertaining diversion to an integral part of the daily life of
millions of Americans. According to research done by the Pew
Internet and American Life Project, over half of all American
adults had either made an online purchase or an online travel
reservation by 2008. Yet large percentages of online consumers
continue to report that they feel frustrated, overwhelmed, or
confused by online shopping.
A key factor contributing to consumers' lingering unease
about online shopping is the aggressive sales tactics that many
companies have used against their customers. In response, in
May 2009, the Committee opened an investigation into a set of
online sales tactics that many consumers, law enforcement
officials, and consumer advocates described as misleading and
deceptive. The year-long investigation found that hundreds of
legitimate, respected websites had shared their customers'
billing information through a ``data pass'' process with other
companies (defined as ``post-transaction third party sellers''
in S. 3386). These post-transaction third party sellers then
enrolled online consumers in their membership programs more
than 35 million times, charging them over $1.4 billion in fees
for benefits and services they were often unaware they had
purchased.
The post-transaction third party sellers and the websites
they partnered with used a combination of three aggressive
sales tactics to enroll consumers in their membership clubs and
discount programs: post-transaction marketing, data pass, and

negative options.

Post-Transaction Marketing: Offers for membership clubs were presented to online consumers as they were completing their purchases on familiar retailers' websites. After consumers entered their billing information into a ``check out'' purchase page on familiar e-retailers' sites, but before they completed confirmation of the transaction, the unfamiliar post-transaction third party sellers interrupted the process and attempted to enroll consumers in membership clubs.

Data Pass: Consumers were not required to enter their billing information to be enrolled in the membership clubs offered by the post-transaction third party sellers. The websites on which the consumers had already made purchases were willing to share their customers' billing information with the post-transaction third party sellers. Collectively, hundreds of well-known, reputable websites earned hundreds of millions of dollars by passing their customers' billing information, including credit and debit card numbers, to third party sellers.

Negative Options: Consumers enrolled in the membership clubs were automatically charged a recurring, monthly fee until they contacted the post-transaction third party seller to cancel the membership. Post-transaction third party sellers' use of negative options cost American consumers hundreds of millions of dollars because they were enrolled in and charged for the membership clubs indefinitely, until they realized there was an unfamiliar charge on their credit card or debit card statements.

Attached to this report are two Committee staff investigative reports which document how extensive the injuries to consumers were and how pervasive the tactics were on the Internet. The evidence obtained by the Committee demonstrated overwhelmingly that most consumers were unaware they were enrolled in the membership programs.

During interviews with Committee staff and in Committee testimony, many affected consumers stated repeatedly that they were not aware they were consenting to allow a website to transfer their billing information to a post-transaction third party seller by simply clicking a button and providing their e-mail address. Many online consumers informed Committee staff that they had mistakenly believed it was illegal for e-commerce companies to transfer their billing information to another company.

Evidence obtained through the Committee's investigation showed that the companies engaged in the practice were well aware that consumers did not understand this process. The companies exploited consumer confusion by using practices that caused consumers to unwittingly enroll in the companies' services and programs. Annually, the post-transaction third party sellers received millions of calls from angry, frustrated consumers cancelling their memberships or asking questions about the charges to their credit or debit cards. When the companies tracked the reasons for these angry calls, the evidence overwhelmingly showed that consumers were being enrolled in the membership programs without their express informed consent. An employee of one company commented candidly in an internal e-mail that ``at least 90% of our members don't know anything about the membership.''

Summary of Provisions

To ensure online consumers are no longer taken advantage of by these questionable sales tactics, S. 3386 would create new rules for companies using post-transaction marketing and negative options. It would also prohibit e-commerce companies from using the so-called data pass process to pass their customers' billing information to e-commerce companies engaging in post-transaction marketing on their websites.

Post-transaction third party sellers would be required to meet certain requirements before charging a consumer for a good or service. The bill would require post-transaction third party sellers to disclose the material terms of the transaction and obtain the consumer's express informed consent. The disclosure requirements include:

          a description of the goods or services being offered;
          the fact that the post-transaction third

party is not affiliated with the initial merchant; and
    the cost of such goods or services.

    For a post-transaction third party seller to obtain
consumers' express informed consent, consumers would need to
provide their full sixteen digit credit card or debit card
number, their name and address, and a means to contact them.
The purpose of this provision is to require post-transaction
third party sellers to go through the same process to charge
consumers as initial merchants do. Evidence obtained through
the Committee's investigation shows that online consumers
understand that they are making a purchase when they go through
this process. The bill would also prohibit initial merchants
from transferring their customers' billing information to post-
transaction third party sellers because initial merchants, like
post-transaction third party sellers, should be held liable if
they participate in a data pass process prohibited by the bill.

    The bill's ``negative option'' provision would establish
clear standards of disclosure and consent for sales that
involve recurring charges. The practices outlined in this
provision are already used by most legitimate e-commerce
companies selling goods and services through negative option
sales. All companies would be required to make certain
disclosures, obtain consumers' express informed consent and
provide the consumers with simple, convenient ways to cancel
the ``negative options'' via the Internet or through e-mail.
The disclosure requirements include:
        the name and entity offering the goods or
    services;
        a description of the goods or services;
        the cost of such goods or services;
        notice of when billing will begin and at
    what intervals the charges will occur;
        the length of any trial period; and
        instructions for stopping the recurring
    charges.

    The bill would provide the Federal Trade Commission with
enforcement authority and the State Attorneys General with the
power to seek injunctive relief in Federal court.


                        Legislative History


    Senator Rockefeller introduced S. 3386 on May 19, 2010, and
it was referred to the Committee on Commerce, Science, and
Transportation. The bill was co-sponsored by Senators Pryor,
Nelson, Klobuchar, McCaskill, and LeMieux. The bill was
introduced following a November 17, 2009, investigative hearing
entitled ``Aggressive Sales Tactics on the Internet and Their
Impact on American Consumers'' and the release of two Committee
staff reports on the subject. Each staff report is attached. On
June 9, 2010, the Committee considered the bill during an open
executive session and adopted it by voice vote.


                        Estimated Costs


    In accordance with paragraph 11(a) of rule XXVI of the
Standing Rules of the Senate and section 403 of the
Congressional Budget Act of 1974, the Committee provides the
following cost estimate, prepared by the Congressional Budget
Office:

                                            July 14, 2010.
Hon. John D. Rockefeller IV,
Chairman, Committee on Commerce, Science, and Transportation,
U.S. Senate, Washington, DC.
    Dear Mr. Chairman: The Congressional Budget Office has
prepared the enclosed cost estimate for S. 3386, the Restore
Online Shoppers' Confidence Act.
    If you wish further details on this estimate, we will be
pleased to provide them. The CBO staff contacts are Alan Eder
and Susan Willie.
            Sincerely,
                        Douglas W. Elmendorf.
    Enclosure.


S. 3386--Restore Online Shoppers' Confidence Act

Impact on the Federal Budget: S. 3386 would make it unlawful for any third-party seller to charge a consumer's financial account after the sale of any good or service over the Internet unless certain requirements are met. The bill would define third-party sellers as vendors that offer a good or service to a consumer after the consumer has completed a transaction with a different Internet merchant.

Additionally, S. 3386 would make it unlawful for a person who has directly obtained a consumer's billing information through an online transaction to disclose it to any third-party seller. Finally, the bill would require the Federal Trade Commission (FTC) to develop regulations necessary to enforce the new requirements and make any person who violates those regulations subject to penalty.

Based on information provided by the FTC, CBO estimates that developing and enforcing the new regulations would have a minor cost. Therefore, CBO estimates that implementing the provisions of S. 3386 would not significantly increase spending subject to appropriation.

Enacting S. 3386 could increase revenues from the collection of civil penalties; therefore, pay-as-you-go procedures would apply. However, CBO estimates that revenue collections from those penalties would be negligible in each year.

Intergovernmental and private-sector impact: S. 3386 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would not affect the budgets of state, local, or tribal governments.

S. 3386 would impose private-sector mandates, as defined in UMRA, on sellers that use ``negative-option'' features in selling goods or services on the Internet and on Internet sellers that engage in the sale of consumer financial information for the purpose of marketing or sales.

Internet sellers frequently use a negative-option feature wherein consumers who do not wish to buy a good or service being offered at the time of another purchase must opt out of the offer. The bill would require that new and more detailed information be provided to consumers when a negative-option plan is in use, including the means by which consumers can avoid charges after any trial period.

Internet sellers sometimes increase sales and revenues by partnering with one another and sharing the financial information of consumers without the consumers' knowledge or consent. As a result of those partnerships, consumers may be enrolled in programs and billed, often on a recurring basis, without their knowledge. The majority of those consumers cancel once they discover they have been enrolled. The sellers that obtain consumer financial information directly would be prohibited from disclosing the financial information of their customers to any third party. Third-party Internet sellers would be prohibited from charging or attempting to charge consumers for their goods or services unless they have obtained the financial information directly from the consumers and received their express informed consent.

The cost of the mandate would be the forgone revenue from the sale of products and services which have been sold in this manner. Because of the number of consumers being billed for those types of goods and services and the average monthly cost per consumer, CBO estimates that the aggregate cost of the mandates would be above the annual threshold for private-sector mandates ($141 million in 2010, adjusted annually for inflation).

Estimate prepared by: Federal costs: Alan Eder and Susan Willie; Impact on state, local, and tribal governments: Elizabeth Cover Delisle; Impact on the private sector: Marin Randall.

Estimate approved by: Peter H. Fontaine, Assistant Director for Budget Analysis.


                    Regulatory Impact Statement


In accordance with paragraph 11(b) of rule XXVI of the Standing Rules of the Senate, the Committee provides the following evaluation of the regulatory impact of the legislation, as reported:

NUMBER OF PERSONS COVERED

S. 3386 would cover all e-commerce companies whose practices meet the definition of a post-transaction third party seller, all Internet merchants that would otherwise share consumers' billing information with post-transaction third party sellers, and all marketers of negative option programs offered through the Internet.

ECONOMIC IMPACT

S. 3386 would not have an adverse impact on the nation's economy. The legislation is expected to reduce the number of consumers who are subject to fraudulent online sales practices, and would therefore save consumers millions of dollars every year in unauthorized charges.

PRIVACY

S. 3386 would increase the personal privacy of consumers making purchases on the Internet by prohibiting online retailers from passing consumers' billing information to post-transaction third party sellers.

PAPERWORK

S. 3386 would not increase paperwork requirements for individuals and businesses.

Congressionally Directed Spending

In compliance with paragraph 4(b) of rule XLIV of the Standing Rules of the Senate, the Committee provides that no provisions contained in the bill, as reported, meet the definition of congressionally directed spending items under the rule.

Section-by-Section Analysis

Section 1. Short Title.

This section would provide that the Act may be cited as the Restore Online Shoppers' Confidence Act.

Section 2. Findings; Declaration of Policy.

Section 2 sets out the bill's findings, which are based in large part on the Committee's year-long investigation into aggressive online sales tactics.

Section 3. Prohibitions Against Certain Unfair and Deceptive Internet Sales Practices.

Section 3(a) would prohibit an online post-transaction third party seller from charging a consumer unless the post-transaction third party seller has clearly disclosed the terms of an Internet purchase to the consumer and has obtained the consumer's express informed consent to the purchase. The consumer signifies express informed consent by submitting his or her billing information, including the full credit or debit card number, to the post-transaction third party seller and by performing an additional affirmative action.

Section 3(b) would prohibit Internet retailers and other commercial websites (``initial merchants'') from transferring a consumer's billing information to post-transaction third party sellers.

Section 3(c) would establish rules under which Internet retailers may periodically charge consumers for goods or services until the consumer cancels the arrangement (``negative option feature''). It would prohibit a seller from charging a consumer through a negative option feature unless: 1) the seller has clearly disclosed the terms of the plan to the consumer; 2) the seller has obtained the consumer's express informed consent to the plan; and 3) the seller provides the consumer simple, convenient ways to cancel the negative option

plan.

   Section 3(d) would define the terms initial merchant, negative option, and post-transaction third party seller.


Section 4. Enforcement by Federal Trade Commission.


   Section 4 would give the Federal Trade Commission the authority to enforce the prohibitions in section 3 and to write regulations furthering enforcement of the prohibitions in section 3.


Section 5. Enforcement by State Attorneys General.


   Section 5 would give State Attorneys General the authority to use injunctive relief in Federal court to stop entities from violating the prohibitions in section 3.


Changes in Existing Law


   In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, the Committee states that the bill as reported would make no change to existing law.


&#9633;

# EXHIBIT 56

```
 1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
 2                    AT SEATTLE
       - - - - - - - - - - - - - - - x
 3    FEDERAL TRADE COMMISSION,      :

 4            Plaintiff,             :
                                         Civil Action No.
 5       v.                          :

 6    AMAZON.COM, INC., et al,       :    2:23-cv-0932-JHC

 7            Defendants.            :
       - - - - - - - - - - - - - - - x
 8

 9            Oral videotaped deposition of NEALE

10    MAHONEY, taken on behalf of the Defendant's,

11    beginning at 9:13 a.m., on Friday, May 9th,

12    2025, at Covington & Burling, LLP, One

13    CityCenter, 850 Tenth Street, NW, Washington,

14    DC 20001, before Okeemah S. Henderson, RRP,

15    CaseViewNet Realtime Reporter, and Notary

16    Public for the District of Columbia.

17    (REPORTER'S NOTE: All quotations from exhibits

18    are reflected in the manner in which they were

19    read into the record and do not necessarily

20    denote an exact quote from the document.)

21

22    Reported by: Okeemah S. Henderson, RPR
```



1                    NEALE MAHONEY,

2     was called as a witness, and having been first

3     duly sworn, was examined and testified as

4     follows:

5                    EXAMINATION

6     BY MS. WU:

7              Q.   Good morning, Doctor.  Thank

8     you for being here today.  As you heard, my

9     name is Laura Wu, and I represent the

10    defendants in this litigation.  We appreciate

11    your time for your deposition today.  I'm going

12    to start with just a few preliminary matters to

13    make sure the day goes in an orderly fashion.

14         Doctor, have you ever been deposed

15    before?

16              A.   I have not.

17              Q.   Have you ever testified at

18    trial previously?

19              A.   I have not.

20              Q.   Given that you have haven't

21    been deposed before, I'm just going to set

22    forth a few ground rules.  First of all, your



1           Q.    What is your understanding of

2      the claims alleged by the FTC?

3           A.    Would you like me to state my

4      understanding of the claims?

5           Q.    Yes, please.

6           A.    Oh.  My understanding is that

7      FTC is claiming that Amazon, I think I'm

8      quoting the correct word, duped customers into

9      subscribing for Prime and in contrast to their

10     intentions and made it difficult for customers

11     to cancel their subscriptions when they wanted

12     to.

13          Q.    When did you first become aware

14     of this litigation?

15          A.    I don't remember the date.

16          Q.    Did you first become aware of

17     the FTC's allegations prior to filing complaint

18     in June, 2023?

19          A.    No.

20          Q.    Can you approximate when you

21     first became aware of the litigation?

22          A.    Yes.  I believe I first became



 1  aware through media coverage of the complaint,

 2  and given you told me the date that the

 3  complaint was filed I would approximate that it

 4  was June of 2023.

 5          Q.   You first became aware of this

 6  litigation through public sources such as the

 7  media, correct?

 8          A.   Correct.

 9          Q.   When did the FTC first reach

10  out to you to engage you as an expert in

11  connection with this litigation?

12          A.   In winter 2024.

13          Q.   Who from the FTC contacted you?

14          A.   Evan Mendelson.

15          Q.   When were you formally engaged

16  as an expert for the FTC in connection with

17  this litigation?

18          A.   I believe it was in spring,

19  2024.

20          Q.   Doctor, a short while ago you

21  mentioned that you worked with staff from Bates

22  White in connection with your expert work for



1   this litigation, correct?

2           A.   Correct.

3           Q.   How did you come to partner

4   with Bates White in order to generate work

5   product for this litigation?

6           A.   After discussions with Evan

7   about my suitability as an expert on this case,

8   I brought the matter to a number of economic

9   consulting firms for a conflict check and spoke

10  with colleagues of -- for their guidance on

11  what economic consulting firms had a strong

12  reputation.  It was through that process that I

13  came to work with Bates White.

14          Q.   You mentioned that you have a

15  contractual relationship with Bates White for

16  work in this case, correct?

17          A.   Correct.

18          Q.   Pursuant to that contractual

19  arrangement, do you obtain fees for hours

20  worked by Bates White staff?

21          A.   I do.

22          Q.   What proportion of the Bates



1  when conducting and analyzing surveys.

2          Q.   Doctor, I would like to ask you

3  to turn to page 362 of the Diamond publication,

4  and I would like to call your attention to the

5  second full paragraph on page 362 of Diamond.

6  Please let me know you're there.

7          A.   I'm there.

8          Q.   It reads [As read] "The

9  questions listed in this reference guide are

10  intended the assist judges in identifying,

11  narrowing and addressing issues bearing on the

12  adequacy of surveys either offered as evidence

13  or proposed as a method for developing

14  information." Correct?

15          A.   Correct.

16          Q.   As explained in the portion of

17  Diamond we've just read into the record, the

18  questions identified under section 3 are listed

19  in the guide to assist judges in identifying,

20  narrowing and addressing issues bearing on the

21  adequacy of surveys either offered as evidence

22  or proposed as a method for developing



NEALE MAHONEY                                      May 09, 2025
FTC vs AMAZON.COM, INC., et al.                              79

```
 1   information, correct?

 2              A.   Correct.

 3              Q.   Dr. Mahoney, based on your work

 4   with surveys, you understand that there are

 5   various forms of bias that can affect the

 6   adequacy of a survey, correct?

 7              A.   Yes, correct.

 8              Q.   Self-selection bias refers to

 9   respondents who choose to start a survey,

10   correct?

11              A.   Yes.

12              Q.   Respondents who self-select

13   into a survey are different from respondents

14   who decline to start a survey, correct?

15              A.   They may or may not be

16   different, and any such differences may or may

17   not affect the downstream analysis.

18              MS. WU:   Doctor, I'm handing you a

19   document which has been marked as deposition

20   Exhibit 6.

21      (Exhibit 6 was marked for identification.)

22   BY MS. WU:
```



1          Q.   As you take a moment to review

2     it I'll identify it for the record.  It's a

3     publication offered by Stefanie Stantcheva

4     titled "How to run Surveys: A Guide to Creating

5     Your Own Identifying Variation and Revealing

6     the Invisible," and it was published in the

7     Annual Review of Economics.

8          This is an article cited in Appendix B

9     to your expert report, which is identified as

10    deposition Exhibit 1, correct

11         A.   Just confirming it.  Yes.  This

12    is the same paper by Stefanie Stantcheva.

13         Q.   You cited the paper by Stefanie

14    Stantcheva identified as Exhibit 6 in the

15    report that you have offered in this

16    litigation, correct?

17         A.   Yes, that is correct.

18         Q.   You cited Stantcheva's

19    publication identified as Exhibit 6 because you

20    assess it to be a reliable academic

21    publication, correct?

22         A.   Yes, that's correct.



1    Diamond?

2              A.   Yes.  I agree.

3              Q.   It's your opinion as set forth

4    in your report, it's paragraph 60 on page 34,

5    that surveys can, quote, "raise unique issues

6    such as whether respondents are appropriately

7    paying attention to the survey questions and

8    whether respondents tend to accurately recall

9    past attitudes or behaviors."

10        Correct?

11             A.   Yes, that is correct.

12             Q.   There will always be at least

13   some survey respondents who are confused by the

14   survey questions, correct?

15             A.   Well, there may or may not be

16   generically.

17             Q.   Are you aware of any survey in

18   which -- for which all survey respondents had

19   full understanding of the survey questions?

20             A.   I cannot think of the specific

21   one, but it seems plausible.

22             Q.   You can't identify any survey



1   in support of that proposition, but it's

2   possible?

3            A.   I cannot think of a specific

4   survey at this moment.

5            Q.   So I would like you to have at

6   hand your report, which is marked as Exhibit 1

7   to this deposition.  In your report served in

8   connection with this case you address the

9   cancellation survey administered for Amazon

10  Prime, correct?

11           A.   Yes, that is correct.

12           Q.   The cancellation survey

13  discussed in your report asked survey

14  respondents about their reasons for canceling

15  their Prime memberships, correct?

16           A.   Yes, that is correct.

17           Q.   The cancellation survey was

18  designed for business rather than litigation

19  purposes, correct?

20           A.   Yes.  That was correct.  That

21  is correct.

22           Q.   The cancellation survey



1  discussed in your report was presented to

2  certain Prime members at the time of

3  cancellation, correct?

4           A.   Yes, that is correct.

5           Q.   The cancellation survey cited

6  in your report was not presented to Prime

7  members at the time of their enrollment,

8  correct?

9           A.   Yes, that is correct.

10          Q.   The cancellation survey cited

11 in your report but offered to approximately ▮

▮▮▮▮▮▮ of Prime members who executed

13 cancellation of their Prime subscriptions

14 online, correct?

15          A.   Yes, that is correct.

16          Q.   Not all Prime members who

17 cancel their Prime subscriptions are presented

18 with the option to take the cancel survey

19 discussed in your report, correct?

20          A.   Yes, that is correct.

21          Q.   Not all Prime members who are

22 presented with the option to take the cancel



1   survey complete that survey, correct?

2          A.   Yes, that is correct.

3          Q.   The cancel survey referenced in

4   your report has a low response rate, correct?

5          A.   No.  "Low" is a term that is --

6   should be viewed in context.

7          Q.   Let me see if we can short

8   circuit this.  We'll use you, not Professor

9   Diamond this time.  Let's go to your report,

10  Exhibit 1, and look at paragraph 52.

11         A.   Okay.

12         Q.   Okay.  As set forth in your

13  report, paragraph 52, [As read] "Between May

14  2020 and June 2023, Amazon prompted ███

    ████████  Prime customers who canceled online to

16  complete the survey."

17      Correct?

18         A.   Correct.

19         Q.   Of these customers about █

20  percent completed some or all of the survey,

21  correct?

22         A.   Yes.  That's correct.



```
 1                  Q.   The cancellation survey

 2     discussed in your report did not include any

 3     filter questions, correct?

 4                  A.   Yes, that is correct.

 5                  Q.   The cancellation survey

 6     discussed in your report did not include any

 7     "Do not know" or "No opinion" option in

 8     response to the survey questions, correct?

 9                  A.   You're correct.  It did not

10     include a "Did not know" or "No opinion"

11     response, but it did -- many of questions

12     included another category, which is, in my

13     professional judgment, similar.

14                  Q.   The cancellation survey

15     discussed in your report did not include any

16     "Do not know" or "No opinion" options in

17     response to the survey questions, posed,

18     correct?

19                  MR. WARE:  Objection.  Asked and

20     answered.

21                  A.   I have nothing to add to my

22     previous response.
```



1          Q.   You don't know whether any

2    particular customer who selected a DNI response

3    in the cancellation survey actually enrolled in

4    Prime intentionally, correct?

5          A.   Yes, that is correct.  My

6    analysis does not examine behavior at an

7    individual level.

8          Q.   Instead, you assume for

9    purposes of your analysis that if a customer

10   selected DNI in response to question 3 or 4 on

11   the cancellation survey that the customer

12   reported accurately that they unintentionally

13   enrolled in Prime, correct?

14         A.   No.  I do not make that

15   assumption.

16         Q.   I'd ask you to pull out your

17   report, which is Exhibit 1, and turn to

18   paragraph 73, which is on page 40.  I'm going

19   to call you to the second sentence.  It reads

20   [As read] "I consider individuals as

21   unintentional enrollees if they responded that

22   they did not intend to sign up to either the



1   third or fourth question," correct?

2          A.   Yes, that is correct.

3          Q.   Yet you agree, Dr. Mahoney,

4   that some customers who fill out the

5   cancellation survey may not respond entirely

6   accurately, either intentionally or by

7   accident, correct?

8          A.   I agree that is a possibility.

9          Q.   And you write that in paragraph

10  75 of your report, correct?  Those are your

11  words?

12         A.   Yes.  Those are my words.

13         Q.   Dr. Mahoney, that means, as

14  summarized in paragraph 75 of your report, that

15  there are some customers by your assessment who

16  select DNI even though they enrolled in Prime

17  intentionally, correct?

18         A.   It is a possibility.

19         Q.   Yet your analyses as set forth

20  in your report marked as Exhibit 1 treat all

21  DNI responses as unintentional enrollees,

22  correct?



1          A.    For the objective of estimating

2    the total number of people who did not intend

3    to sign up, it treats DNI responses as

4    accurate.

5          Q.    So you acknowledge that your

6    regression model treats everyone who selected

7    DNI as a response to questions 3 and 4 to the

8    cancel survey even though some of those

9    responses may have intentionally enrolled in

10   Prime, correct?

11          MR. WARE:    Objection.    Asked and

12   answered.

13          A.    Yes.    My analysis treats people

14   who responded "DNI" as -- as people who

15   actually did not intend to sign up even though

16   there's a possibility that some of them

17   intended, and treats people who stated that --

18   who didn't respond "DNI," as people who

19   intended to sign up even though some of them

20   may have not intended to sign up.

21   BY MS. WU:

22          Q.    For purposes of the regression



1  models reported in your expert report, you also

2  assume that there are Prime members who

3  enrolled in Prime unintentionally but have not

4  yet canceled their Prime memberships, correct?

5          A.   I believe I state this is a

6  possibility.

7          Q.   Dr. Mahoney, I'm going to call

8  you to paragraph 94 of your report.  Paragraph

9  94 of your report confirms that you have in

10  fact assumed that there are Prime members who

11  enrolled in Prime unintentionally who have not

12  yet canceled their Prime memberships, correct?

13          A.   I will reread the paragraph.

14      Can you just restate the question so I

15  can make sure I'm answering it properly now

16  that I have digested this paragraph.

17          Q.   Paragraph 94 of your report

18  confirms that you have in fact assumed that

19  there are Prime members who enrolled in Prime

20  unintentionally who have not yet canceled their

21  Prime memberships, correct?

22          A.   I use the term "likely."  There



 1  considered, correct?

 2          A.   That is correct.  Can we break

 3  for lunch when -- you can ask a couple more

 4  questions.

 5          MS. WU:  Sure.  No, that's fine.  I'm

 6  happy to break now.  Why don't we go off the

 7  record.

 8          THE VIDEOGRAPHER:  We are off the

 9  record at 1:09 p.m.

10          We are back on the record at 1:49.

11  BY MS. WU:

12          Q.   Dr. Mahoney, we just took a

13  break for lunch.  Are you ready to resume?

14          A.   Yes, I am ready to resume.

15          Q.   I would like to switch topics

16  and start to talk about your predictive model,

17  and to assist us, I'm going to ask you to take

18  out your report which is Exhibit 1 and turn to

19  paragraph 95 just so you have it in case you

20  want to reference.

21          Dr. Mahoney, as set forth in paragraph

22  95 of your report, to estimate the rate of harm



1    subscriptions you use the prediction model

2    based on linear regression, correct?

3              A.    Yes.

4              Q.    As set forth in paragraph 96 of

5    your report, your goal in using that model is

6    to predict the probability of an unintentional

7    sign up, correct?

8              A.    The ultimate goal is to predict

9    the share of unintentional sign up.  An

10   intermediate step is to project predicted

11   possibilities.

12             Q.    As stated in paragraph 96 of

13   your report marked as Exhibit 1, your goal was

14   to drive the prediction of the probability of

15   an unintentional sign up, correct?

16             A.    Yes, that's correct.

17             Q.    Looking back to paragraph 95 of

18   your report, you set forth that your regression

19   model uses the population of cancel survey

20   respondents to estimate the statistical

21   relationship between first an indicator of

22   whether a survey respondent did not intend to



1    sign up; and second, certain characteristics of

2    the customer subscription, correct?

3              A.    Correct.

4              Q.    I would like to start with the

5    first of those which is the population of

6    survey respondents.    Okay?

7              A.    Yes.

8              Q.    The population of survey

9    respondents referenced in your paragraph 94 is

10    subscribers who responded to the Amazon cancel

11    survey as of May, 2022 sorry, May, 2020,

12    correct?

13              A.    Yes.    It is the population

14    starting with people who responded in May,

15    2020.

16              Q.    You produced a dataset in

17    connection with your report in this case which

18    includes data for the subscribers in the

19    population of survey respondents you just

20    identified, correct?

21              A.    Yes.

22              Q.    And that data file has the



```
 1   title, estimation_data_monthly.dta, correct?
 2              A.   I do not recall the name of the
 3   data file.
 4              Q.   Do you have any reason to doubt
 5   that's the name of the data file?
 6              A.   I have no reason to doubt that
 7   is the name of the data file.
 8              Q.   That data file, which includes
 9   data for the population of survey respondents
10   used for your analysis, contains about ████
     ███████████    subscribers, correct?
12              A.   Yes, that number sounds
13   correct.
14              Q.   Now, let's move to the second
15   item.  The indicator of whether a survey
16   respondent did not intend to sign up, as
17   referenced in paragraph 95, is whether a survey
18   respondent answered, "I did not intend to sign
19   up for Prime" when asked why they were
20   canceling on the cancel survey, correct?
21              A.   Yes, that is correct.
22              Q.   Doctor, earlier today in
```



1    connection with your discussion of Exhibit 8,

2    we reviewed a number of customer experiences

3    that could be associated with a DNI response to

4    the cancel survey, correct?

5              A.    Yes.  We reviewed instances

6    that could be associated with responses to the

7    cancellation survey.

8              Q.    Your model treats all DNI

9    responses as unintentional enrollments in

10   Prime, correct?

11             A.    Yes.

12             Q.    You acknowledge that a DNI

13   response could include customers who

14   intentionally signed up for a Prime free trial

15   but did not intend to pay for Prime, correct?

16             A.    Yes, that is a possibility.

17             Q.    So if a survey respondent

18   answered, "did not intend to sign up" in

19   response to questions three or four of the

20   cancel survey, you assume for purposes of your

21   model that they are an intentional -- an

22   unintentional enrollee, correct?



1          A.    Yes, for the purposes of my

2    model, I assumed they were an unintentional

3    enrollee.

4          Q.    In the data file that you

5    produced in connection with your opinions and

6    report in this case, you indicate that these

7    customers are harmed in a column labeled,

8    harmed, correct?

9          A.    I would need to review the file

10   to confirm that labeling.

11         Q.    I'm going to mark as Exhibit 9

12   a printout from the data file produced in

13   connection with Dr. Mahoney,'s report.  The

14   data file is named estimation_data_monthly?

15     (Exhibit 9 was marked for identification.)

16         MR. WARE:  Dr. Mahoney, what I've

17   just handed to you as Exhibit 9 is a static

18   printout of data included in your data file

19   estimation_data_monthly and for purposes of

20   printing out, we have included just rows 1

21   through 10.

22         THE WITNESS:  I can see this exhibit.



1    you could find it in your data file which was

2    also produced in connection with your work

3    papers in this case, correct?

4              A.    Correct.

5              Q.    Just so we have clarity in the

6    record, I'm marking as Exhibit 10 a static

7    printout of a component of your data file

8    produced in this case in order to allow you to

9    confirm that your sample was reduced to ██

     ███████████ subscriptions; is that right?

11             A.    Yes, I can see that.

12     (Exhibit 10 was marked for identification.)

13   BY MS. WU:

14             Q.    And you see that in the right

15   segment under observations, correct?

16             A.    Correct.

17             Q.    After filtering the relevant

18   subscription, you then apply your linear

19   regression mode, correct?

20             A.    Yes, that's correct.

21             Q.    That means that you went on to

22   generate predicted values for all of the ███



1    ██████  different subscriptions in the █

     ████████  customer sample, correct?

3           A.    Yes.  As an intermediate step

4    of my analysis, I produced predicted values.

5           Q.    Those predicted values are the

6    models predictions for the outcome variable of

7    the model, correct?

8           A.    Yes.  Those predicted values

9    are the model predictions for the outcome

10   variable of the model.

11          Q.    Your model predicts for all

12   subscriptions in the ████████  observation

13   dataset how the subscribers would have

14   responded in the cancellation survey, correct?

15          A.    The model produces an estimate

16   of the probability that subscribers would have

17   responded in the affirmative to the DNI

18   question.

19          Q.    The model that you used is a

20   prediction model, correct?

21          A.    Yes.  I use a prediction model

22   base.  Yes.



1          Q.   Bear with me, we've got to get

2     some big paper now.

3          Dr. Mahoney, I'm marking as Exhibit 11,

4     a publication titled Introduction to

5     Statistical Learning With Application and R

6     Second Edition.  This is one of the authorities

7     cited in Appendix B to your report.  Do you

8     have that in front of you?

9          A.   I do have it in front of me.

10         MS. WU:  I am also going to mark as

11    Exhibit 12 an excerpted version of the full

12    publication.  Please feel free to reference

13    either.  This is only meant to assist your

14    navigation of the very large publication during

15    your deposition today.

16   (Exhibit 11-12 were marked for identification.)

17    BY MS. WU:

18         Q.   Do you have both Exhibit 11 and

19    the excerpt of Exhibit 11 that is marked as

20    Exhibit 12 in front you, Dr. Mahoney?

21         A.   Yes, I do.

22    BY MS. WU:



1  from method one but have also conducted

2  robustness analysis using a prediction model in

3  paragraph 103 of my report.

4         Q.   The harm analysis which is set

5  forth in your report marked as Exhibit 1 in

6  paragraph 100 in figure 25 is based on a

7  prediction model, correct?

8         A.   The harm analysis -- say that

9  again because I want to cite the paragraph.

10        Q.   The harm analysis which is set

11  forth in your report marked as Exhibit 1 in

12  paragraph 100 in figure 25 is based on a

13  prediction model, correct?

14        A.   The specific harm analysis

15  referred to in paragraph 100 is based upon a

16  prediction model.

17        Q.   Doctor, you refer to some other

18  analyses a few moments ago.  You're referring

19  to your sensitivity analyses correct?

20        A.   Yes, I was referring to the

21  sensitivity analysis described in paragraph

22  103.



1          Q.   So I would like to call your

2    attention or keep your attention at paragraph

3    100 in figure 25 in your report which sets

4    forth the harm analysis in your prediction

5    model.  Are you there, Doctor?

6          A.   Yes.

7          Q.   Looking at figure 25 and at the

8    ██ percent reported in the total line of figure

9    25, we see that number represents the average

10   or mean of all the predicted probabilities of

11   unintentional enrollment for the ████████

12   subscriptions in your observation sample,

13   correct?

14         A.   Yes, that is correct.

15         Q.   So all subscriptions in the ██

███████████ observation sample contribute to the ██

17   percent value for share of unintentional

18   enrollments reported in your figure 25,

19   correct?

20         A.   Yes.

21         Q.   So even if a subscription has a

22   predicted probability of being an unintentional



1    enrollment for Prime of 1 percent, that

2    subscription contributes a small amount to the

3    average reported as ▮ percent, correct?

4            A.   Yes.

5            Q.   Your prediction model treats

6    all ▬▬▬▬▬ subscriptions in the

7    observation sample which sits within the ▮

▬▬▬▬▬▬ customer sample as having some

9    probability of being unintentional enrollments

10   for Prime, correct?

11           A.   Yes, if we define some

12   probability as including probabilities of zero.

13           Q.   Did your model assign a

14   probability of zero to any customer within your

15   ▬▬▬▬▬ observation sample?

16           A.   I'm not sure.

17           Q.   You assigned a probability of

18   greater than zero to every customer within your

19   ▬▬▬▬▬ observation sample, correct?

20           A.   I'm not sure.  A linear

21   probability model assigns probabilities on the

22   real number line.



```
1              Q.   As you sit here now, you don't
2    know if any customer within your ████████
3    observation sample was assigned a probability
4    of zero with regard to potential --
5    unintentional enrollment for Prime, correct?
6              A.   I don't know if they were or if
7    they were not.
8              Q.   Now, let's continue to look at
9    figure 25 in your report in tandem with
10   paragraph 100.  The count of unintentional
11   enrollments in the total row is reported at
12   ████████, correct?
13             A.   Yes, that is correct.
14             Q.   According to your report, you
15   estimate that there are ████████ unintended
16   subscriptions for Prime, correct?
17             A.   I estimate there are ████
18   ████████ unintended subscriptions for Prime
19   through -- in the time period and enrollment
20   samples that I analyzed.
21             Q.   Dr. Mahoney, you don't identify
22   in your report or the companying work papers
```



1    the 29.8 million subscriptions that you

2    identify as unintentional enrollments, correct?

3              A.   No.   My assignment was to

4    estimate the share and the count of

5    individuals.

6              Q.   So you don't identify any

7    particular customer within your estimate of

8    29.8 million subscriptions that were

9    unintentional enrollments according to your

10   figure 25, correct?

11             A.   Yes, I don't identify a

12   particular customer.

13             Q.   To generate the 29.8 million

14   estimate included in your figure 25, you sum

15   over the predicted probabilities for all 2.7

16   million subscriptions in your observation

17   sample and then multiply by 44.6, correct?

18             A.   Yes, that is correct.

19             Q.   Using this methodology that you

20   have just described for me, if you had 100

21   million subscriptions each of which had a 1

22   percent probability of being harmed under your



1    prediction model, your count of unintentional

2    enrollments would generate a count of 1 million

3    harmed subscriptions, correct?

4              MR. WARE:  Objection.  Incomplete

5    hypothetical.

6              A.   In the hypothetical that you

7    lay out -- can you restate the hypothetical so.

8    BY MS. WU:

9              Q.   I will aim to do that.

10             If we take your methodology and apply

11   it to a situation in which you have 100 million

12   subscriptions for which you assign each

13   subscription a 1 percent probability of being

14   harmed, your count of unintentional enrollments

15   would generate a count of 1 million harmed

16   subscriptions -- and here, I'll help with the

17   math.  That's because one percent added 100

18   hundred million times is 1 million.

19             A.   Yes, in the hypothetical you

20   lay out, I would estimate that 1 million

21   person's were harmed.

22             Q.   So looking back at your figure



1    25, to calculate the count of unintentional

2    enrollments in your figure 25, you did not look

3    at any individual subscriptions to determine

4    that any of those subscribing customers were

5    harmed, correct?

6             A.    Can you clarify what you mean

7    by looked at individual subscriptions?

8             Q.    The count of unintentional

9    enrollments set forth in figure 25 is based on

10   probabilities rather than actual subscriber

11   analysis, correct?

12            A.    The analysis is based upon a

13   linear prediction model that assigns the

14   probability of the DNI to each individual.

15            Q.    By using a model which assigns

16   a probability of DNI or unintentional

17   enrollment to each individual, you have not

18   tried to predict whether any particular

19   customer in your sample in fact was an

20   unintentional enrollee for Prime, correct?

21            MR. WARE:    Objection.    Asked and

22   answered.



1          A.    Yes.  I did not try and predict

2    whether a specific individual was an

3    unintentional enrollee.

4    BY MS. WU:

5          Q.    Instead, what you did was

6    predict a numerical value for each subscription

7    within the observation sample of ███████████

8    customers; correct?

9          A.    Correct.

10          Q.    So I now want to move to the

11    next column here.  I'm still looking at figure

12    25 and I'm looking at the last column which is

13    labeled harm for unintentional enrollments

14    which is in -- with the parenthetical SM.

15        Do you see that?

16          A.    Yes, I do.

17          Q.    What's SM as reflected in this

18    column?

19          A.    It's not an S, it's a dollar

20    sign.

21          Q.    Thank you.  I told my team

22    earlier I definitely need glasses.  There we



1    go.  Looking in figure 25, you set forth your

2    opinion that there was $844 million dollars in

3    harm for unintended signups, correct?

4              A.    Yes, that is my baseline

5    estimate.

6              Q.    Your baseline estimate of $844

7    million in harm from unintentional signups is

8    calculated using a number of steps and I'm

9    going to walk through them if you'll indulge

10   me.  So first, to calculate that $844 million

11   in harm, you took all of the subscription fees

12   paid between the start date for the subscriber

13   and the time at which that subscriber entered

14   the cancel process, correct?

15             A.    Yes.

16             Q.    You then went on to multiply

17   the fees for each subscription by the predicted

18   probability associated with that subscription

19   as predicted by your predictive model to get a

20   weighted sum of those fees, correct?

21             A.    Correct.

22             Q.    Last, you multiplied the



1    weighted sum by 44.6 to rescale from the sample

2    to the population, correct?

3              A.    Correct.

4              Q.    That means that you're scaling

5    from your study sample to the full population

6    during the study period, correct?

7              A.    Yes.  I'm rescaling from my

8    random study sample to the full population.

9              Q.    If we assume that within your

10   observation sample you have two subscriptions,

11   both of which your model assigns a 20 percent

12   probability of being harmed; so two

13   subscriptions each have a 20 percent

14   probability of being harmed.

15         If we suppose that one of the

16   subscriptions A had fees, net of refunds and

17   charge backs of 100, $100.00, then that

18   subscriptions would contribute $20.00 to your

19   harm analysis, right?

20             MR. WARE:  Objection.  Incomplete

21   hypothetical.

22             A.    Yes, and the hypothetical that



1    you lay out, my understanding is that

2    individual would contribute $20.00 to the harm

3    analysis.

4    BY MS. WU:

5              Q.    And that's because 20 percent

6    of $100.00 is $20.00, right?

7              A.    Yes.

8              Q.    So let's go to our next

9    hypothetical subscriber and the data which is

10   subscriber B.  Let's assume subscriber B had

11   fees net of refunds and charge backs of

12   $200.00, this second subscriber, subscriber B

13   would contribute $40.00 to your harm model, and

14   I'll go straight to the math, and that's

15   because 20 percent of $200.00 is $40.00,

16   correct?

17             MR. WARE:   Objection.  Incomplete

18   hypothetical.

19             A.    Yes.  In this hypothetical that

20   you laid out, that individual would contribute

21   $40.00 to the harm analysis.

22   BY MS. WU:



```
 1              Q.   So in the hypothetical I've set

 2   forth, the two subscriptions we have talked

 3   about A and B, if they were all that existed in

 4   our sample of two, your estimated damages for

 5   subscribers A and B would be $60.00, correct?

 6              A.   Correct.

 7              Q.   And subscribers A and B, under

 8   your method of analysis, contribute $60.00 to

 9   your harm estimate even though neither

10   subscription had an estimated probability of

11   being an unintentional signup of greater than

12   20 percent, correct?

13              A.   Yes, those subscribers

14   contribute an estimated $60.00 to the harm

15   analysis.

16              Q.   So in connection with your

17   report and work papers in this case, you did

18   not produce the predicted probabilities for

19   each subscriptions in the filtered ████████

20   sample, correct; you didn't provide that?

21              MR. WARE:  Objection.  Asked and

22   answered.
```



1          A.    Can you clarify what you mean

2     by produced?

3     BY MS. WU:

4          Q.    Sure.  Let me try this a

5     simpler way.  Did you provide any work papers

6     generated in connection with the opinions

7     you've put forward in your report marked as

8     Exhibit 1 which include the list of predicted

9     probabilities for each of the subscriptions

10    included in the filter █████ sample that

11    you use for your prediction?

12          MR. WARE:  Objection.  Asked and

13    answered.

14          A.    No, I did not.

15    BY MS. WU:

16          Q.    You could have produced a work

17    paper which includes the predictive

18    probabilities for each of the subscribers in

19    your filtered █████ sample but elected not

20    to provide that in your work papers, correct?

21          A.    Yes, I could have but I didn't

22    think that it was relevant for my assignment of



1    prediction that is generated by your model for

2    your [REDACTED] subscriber sample, correct?

3            A.    Based on how you've described

4    this table and how you've described it's been

5    sorted, that would be the highest predicted

6    value, yes.

7            Q.    Now, if we go to the next row,

8    row 3 and we follow over to column BF to look

9    at the prediction score, we see a prediction

10   value of [REDACTED].

11       Do you see that?

12           A.    Yes.

13           Q.    Carrying down the table, we

14   have successively lower values of prediction

15   all the way to the bottom.

16       Do you see that?

17           A.    I have not independently

18   verified the ordering, but based on your

19   description that the data has been sorted

20   strikes me as correct.

21           Q.    If we can look at row 51 and

22   again reference column BF which is the



1    prediction output from your model, you observe

2    there's a predictive value of █████ -- let me

3    try that again.  A predictive value of

4    ████████.

5         Do you see that?

6              A.   Yes.  You're excluding the last

7    one.  971.

8              Q.   Let me try that one more time

9    for clarity.  Thank you.  In row 51 we have a

10   value based on the output of your model in

11   column BF the prediction of ███████.

12        Do you see that?

13             A.   Yes, I see that.

14             Q.   Because this file set forth in

15   Exhibit 13 is sorted by the prediction score,

16   we have values above ██ percent in the first 49

17   rows and values below -- which fall below that

18   in the exhibit, correct?

19             A.   What row is this?

20             Q.   We were looking at row 51.

21             A.   So restate your question.

22             Q.   Because this file set forth in



1    Exhibit 13 is sorted by prediction score, we

2    have prediction values above ▓ percent in the

3    first 49 rows and values below ▓ percent in

4    the following rows on Exhibit 13?

5              A.    That is correct up to a one

6    difference in rows.

7              Q.    Sorry.  Let me try that again.

8    Because this file set forth in Exhibit 13 is

9    sorted by prediction score, we have prediction

10   values above 50 percent in the first 50 rows,

11   correct?

12             A.    Yes, that is correct.

13             Q.    And below row 50 we see

14   customers for which there's a prediction score

15   below ▓ percent, correct?

16             A.    Yes.

17             Q.    So the output of your

18   prediction model as printed out in Exhibit 13

19   shows that of the ▓▓▓▓▓▓▓ subscribers in

20   your observation sample, ▓ of those had a

21   prediction value that predicted value of

22   unintentional signup for Prime of greater than



1  ██ percent, correct?

2        MR. WARE:  Objection to form.

3        A.   Yes, that is correct.

4  BY MS. WU:

5        Q.   Just to confirm, the prediction

6  score reflects the predicted probability of

7  being unintentionally enrolled for Prime using

8  your predictive model, correct?

9        MR. WARE:  Objection.  Asked and

10 answered.

11       A.   Yes, the prediction score

12 represents the predicted probability that

13 someone would have responded DNI to the survey.

14 BY MS. WU:

15       Q.   So in your sample of ██████

16 subscribers referenced in your report and used

17 for your model, there were only ██

18 subscriptions with a probability of

19 unintentional enrollment above ██ percent,

20 correct?

21       MR. WARE:  Object to form.

22       A.   Yes.  As the model that was



1   used with an input to my methodology, that

2   statement is correct.

3   BY MS. WU:

4            Q.    So up until now, we've been

5   talking about the regression model which is

6   referenced in figure 25 of your expert report,

7   correct?

8            MR. WARE:   Objection to form.

9            A.    Yes.   We are referencing the

10  regression model that was an input in producing

11  the values in figure 25.

12  BY MS. WU:

13           Q.    In addition to the predictive

14  model used for the opinions set forth in figure

15  25, you also conducted a version of your

16  analysis using a logistic regression model,

17  correct?

18           A.    Yes, that is correct.

19           Q.    The output of that model is

20  summarized in paragraph 103 of your report,

21  correct?

22           A.    Yes, that is correct.



1        Q.    Apart from substituting

2   logistic regression for a linear regression, at

3   the regression estimation stage of your work,

4   all other aspects of your methodology for the

5   logistic regression were identical to that used

6   in your linear regression model, correct?

7        A.    Yes, that is correct.

8        Q.    In addition to the regression

9   models we have identified so far, you describe

10  two alternative analysis methods in paragraph

11  104 of your report, correct?

12       A.    Yes.

13       Q.    In paragraph 104 of your

14  report, alternative method one refers to

15  applying the proportion of unintended

16  subscriptions in the cancellation survey

17  population to the population of Prime

18  subscriptions, correct?

19       A.    Yes, that is a general overview

20  of that method.

21       Q.    The second alternative method

22  identified in paragraph 104 of your report



1              A.    No, that is incorrect.

2              Q.    Why is that incorrect?

3              A.    My estimates reflect the share

4    of people who enter the flow who exit through

5    No Page and Prime Central above and beyond of

6    the fraction who would exit through active

7    choice which I use the control group to

8    identify.

9              Q.    Well, let's talk about some of

10   the treatment groups you just identified,

11   Doctor.  You mentioned Prime Central, correct?

12             A.    Yes, that is correct.

13             Q.    Prime Central means that the

14   subscriber clicked the link that goes back to

15   the Prime Central page, correct?

16             A.    Yes, that is correct.

17             Q.    That means that that had the

18   effect of leaving the cancel flow and leaving

19   the subscription unchanged, correct?

20             A.    Yes, that is my understanding.

21             Q.    It is your opinion that

22   subscribers who exit the cancel flow by



NEALE MAHONEY                                   May 09, 2025
FTC vs AMAZON.COM, INC., et al.                          223

1   visiting Prime Central are unintentional,

2   incomplete cancellations, correct?

3         A.   No.  It's my opinion that some

4   of those customers are unintentional,

5   incomplete cancellations.

6         Q.   Doctor, why would a subscriber

7   go to Prime Central if she wanted to cancel her

8   membership?

9         A.   A subscriber may go to Prime

10  Central because they thought they had

11  successfully canceled their membership but has

12  not.

13        Q.   Dr. Mahoney, you understand

14  that Prime Central is an aspect of the Amazon

15  platform which is offered to Prime members,

16  correct?

17        A.   Yes.

18        Q.   So it follows that someone who

19  has canceled her membership would not be

20  checking her benefit status, correct?

21        A.   My understanding of consumer

22  behavior is that they may click on links



1    without a full understanding of the

2    implications.

3            Q.    How did you account for the

4    fact that consumers may click on links without

5    a full understanding of implications in your

6    cancellation model?

7            A.    I use data on Prime use before

8    and after cancellation entry to help me learn

9    about consumer intentions.

10            Q.    What data helped you learn

11    about consumer intentions?

12            A.    I use data on the use of Prime

13    benefits to learn about consumer intent under

14    the assumption that a consumer who thought they

15    had canceled their Prime subscription might not

16    use the service.

17            Q.    So you just assumed that a

18    consumer who thought he had canceled their

19    Prime subscriptions might not use the service,

20    correct?

21            A.    Yes.  I thought that based upon

22    my experience that a consumer who thought they



1  didn't have Prime would be less likely to try

2  to use Prime benefits.

3          Q.   What's the data that you

4  referenced earlier that supports that opinion?

5          A.   Can you clarify what you mean

6  by "that opinion"?

7          Q.   You just offered the opinion

8  that a consumer who thought they did not have

9  Prime would be less likely to try to use Prime

10  benefits.  What's the basis for your statement?

11         A.   That would be supported by a

12  basic principle of economics, that is, if you

13  thought that a service was free, you would be

14  more likely to use it.

15         Q.   How does that relate to the

16  opinion that you just stated now that a

17  customer who thought she didn't have Prime

18  would be less likely to use the benefits?

19         A.   If you thought it was free you

20  would be more likely to use it, that statement

21  also applies that if you thought you didn't

22  have the benefit, you would be less likely to



1    group would have evolved in parallel, correct?

2              A.    Yes, that is the idea.

3              Q.    In your academic work, such as

4    the article identified as Exhibit 14, you have

5    used a difference-in-differences methodology

6    and put forward a parallel trends analysis in

7    connection with your work, correct?

8              A.    Can you clarify what you mean

9    by parallel trends analysis?

10             Q.    We just reviewed text which you

11   coauthored on pages -- journal pages 2378 and

12   2379 of the article identified as Exhibit 14,

13   correct?

14             A.    Correct.  If you repeat your

15   question, I will endeavor to answer it.

16             Q.    That portion of Exhibit 14 sets

17   forth a parallel trends analysis for the

18   difference-in-differences model reported in the

19   article identified as Exhibit 14, correct?

20             A.    I write in this paper that to

21   provide support for the parallel trends

22   assumption which shows that the path of



1   outcomes for treated mutual individuals are

2   virtually identical in the preflag removal

3   period.

4        Q.   Now, if we look at figure 2 in

5   this report, it's on journal page 2395, you

6   have put forward a graphical analysis -- a

7   graphical representation of that analysis,

8   correct?

9        A.   Yes, that's correct.

10        Q.   If we look at figure 3, we see

11   another graphical representation of your

12   analysis, correct?

13        A.   Yes, that is correct.

14        Q.   In these figures to the article

15   identified as Exhibit 14, you have shown

16   parallel trends between the red line for the

17   treatment in this article and the blue line for

18   your control, correct?

19        A.   Yes.  In this report, I show

20   parallel trends in the pretreatment period.

21        Q.   You have never published a peer

22   reviewed paper using a



1  difference-in-differences analysis that did not

2  show parallel trends for the pretreatment

3  period, correct?

4         A.   No.  Based on my recollection,

5  that is incorrect.

6         Q.   In what peer reviewed

7  publication have you included a

8  difference-in-differences model without putting

9  forward a parallel trends analysis?

10         A.   I believe that one example of

11  this would be my paper titled, Do Expiring

12  Budgets Lead to Wasteful Year in Spending,

13  Evidence From Federal Procurement which is

14  coauthored with Jeffrey B. Wayman in the

15  American Economic Review and listed on page 8-4

16  of my appendix.

17         Q.   Thank you, Doctor.  I will

18  return to that after I pull that article.  The

19  parallel trends analysis cited in Exhibit 14,

20  your coauthored article, is typical for

21  difference-in-differences analysis, correct?

22         A.   It is sometimes used in



1   difference-in-differences analysis and

2   sometimes not.

3           Q.    It's used as a way to validate

4   the difference-in-differences analysis,

5   correct?

6           A.    It is used as a -- as one

7   approach to provide support for the

8   methodology.

9           Q.    You did not include a parallel

10  trends analysis in your report in this case for

11  your cancel analysis, correct?

12          A.    Yes, that is correct.

13          Q.    And to confirm, your cancel

14  analysis uses a difference-in-differences

15  model, correct?

16          A.    Yes.  My cancellation analysis

17  uses a difference-in-differences model.

18          Q.    Professor, you testified

19  earlier that you had reviewed the expert report

20  of Professor Justin McCrary, correct?

21          A.    Yes.

22          Q.    I'm going to mark as Exhibit 15



1  a copy of the expert report of Professor

2  McCrary?

3   (Exhibit 15 was marked for identification.)

4          THE WITNESS:  Can I pause and ask

5  when we came back from our previous break?

6          MS. WU:  Do you want a break?

7          THE WITNESS:  I would like to space

8  the breaks evenly so --

9          MS. WU:  That's fine.  We can --

10          THE WITNESS:  I haven't been paying

11  attention to the time.

12          MS. WU:  No problem.  Why don't we

13  take 5 minutes.  I'm sorry.  I wasn't watching

14  the clock.

15          THE WITNESS:  Neither am I.  All

16  good.

17          THE VIDEOGRAPHER:  We are off the

18  record at 4:20.

19      (A break was taken at 4:21 p.m.)

20          THE VIDEOGRAPHER:  We are back on the

21  record at 4:39.

22  BY MS. WU:



1   page of the Iliad process.  Do you see that,

2   Doctor?

3          A.    Yes, I do.

4          Q.    So in paragraph 119 of your

5   report you define your own pre-entry window,

6   correct?

7          A.    I define the window that I use

8   to describe the presubscription period.  I call

9   that the pre-entry window.

10         Q.    In order to conduct the trends

11  analysis set forth in Exhibit 9, Dr. McCrary

12  having used your data, used the pre-entry

13  window defined in your paragraph 119, correct?

14         A.    Correct.

15         Q.    So he used the pre-entry window

16  that you selected for your

17  difference-in-differences analysis, correct?

18         A.    He used the period that I

19  defined for the pre-period for his analysis.

20         Q.    Thank you, Doctor.  I'd like to

21  ask you to turn to page 60 of your report and

22  we'll focus on figure 29.



1              Are you there, Doctor?

2                   A.   Yes, I am.

3                   Q.   Looking at figure 29, the

4    coefficients for No Page and Prime central

5    correspond to the percentage point

6    difference-in-differences generated by your

7    model, correct?

8                   A.   Yes, that is correct.

9                   Q.   Based on this data, you are

10   unable to offer an opinion that any particular

11   subscriber in your example was harmed, correct?

12                  A.   Yes, I cannot opine on the harm

13   for a particular individual subscriber.

14                  Q.   I would like you to look back

15   at paragraph 119 of your report which is an

16   aspect of your harm analysis.

17              Are you there, Doctor?

18                  A.   Yes, I'm there.

19                  Q.   In connection with your cancel

20   analysis, when you determine whether a

21   subscription used zero benefits for purposes of

22   your analysis, you ignore any benefit used by a



```
 1   subscriber five days before and after that

 2   subscriber entered the cancel flow, correct?

 3            A.   Yes, I make that restriction in

 4   my baseline analysis but not in a robustness

 5   check.

 6            Q.   Your baseline analysis is the

 7   primary analysis upon which you've set forth

 8   opinions in your expert report identified as

 9   Exhibit 1, correct?

10            A.   My opinions are based on the

11   baseline analysis and the robustness checks

12   which gave me confidence in those analysis.

13            Q.   In connection with this

14   restriction you say, you "Exclude activity in

15   the five day window around the first Iliad

16   entry because of subscribers activity near the

17   time of entry into the Iliad process may differ

18   from typical Prime utilization," correct?

19            A.   Yes, that is correct.

20            Q.   How did you select five days as

21   the restriction cut off for your analysis?

22            A.   I selected it based upon my
```



1                        CERTIFICATE

2

3          I, Okeemah S. Henderson, RPR, the officer before

4    whom the foregoing deposition was taken, do hereby certify

5    that the foregoing transcript is a true and correct record

6    of the testimony given; that said testimony was taken by me

7    stenographically and thereafter reduced to typewriting

8    under my direction; that reading and signing was not

9    requested; and that I am neither counsel for, related to,

10   nor employed by any of the parties to this case and have no

11   interest, financial or otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 14th day of May, 2025.

14   My commission expires:

15   September 30, 2029

16

17

18                    Okeemah S. Henderson, RPR

19                    Official Court Reporter

20

21

22



# EXHIBIT 57





# EXHIBIT 58

# amazon

**Thank you for your interest in working at Amazon!**
**This questionnaire will help us better understand your career history, your aspirations, and other**
**matters. Any information provided will be held in the strictest of confidence.**
**Please complete and return via email at least 24 hours before your scheduled phone interview.**

**Name:**     Katherine Johnson
**Date:**      **May 31, 2022**
**Phone:**     ███████████
**Email:**     ███████████

<u>Part A</u>

1.    **Please summarize your professional career thus far and explain the reason behind each**
      **progression or job change.**

My career has always involved some aspect of bankruptcy law, but over the past decade, I have
shifted my practice to primarily consumer protection law. My bankruptcy law focus began while
in law school. During my final year of law school, to further my understanding and knowledge of
bankruptcy law, I completed an unpaid clerkship with the U.S. Bankruptcy Court, District of
Maryland, Greenbelt Division, which led to a paid federal clerkship in the Baltimore Division
after I graduated from GW Law School in 2004.

In 2005, I continued my bankruptcy law focus, taking a position as junior counsel with a small
firm in Washington, DC called Swidler Berlin, LLP. The firm dissolved shortly after I started, but
the bankruptcy practice collectively moved to Orrick, Herrington, & Sutcliffe, LLP, where I
worked for about 4 years before leaving for another, smaller firm, where I continued practicing
bankruptcy law as well as commercial law.

Swidler had a very niche practice representing future claimants' representatives in asbestos-
related cases, which they brought over to Orrick. In 2008 it became obvious to me the practice
was struggling; most of our asbestos-related bankruptcy cases were either ending or over and
billable work was diminishing. I decided it was an opportune time to transition to the next
phase of my career, my goal being to broaden my skills and knowledge beyond the narrow
sphere of niche bankruptcy practice areas (in addition to my asbestos-related work, I also
specialized in chapter 9 municipality cases and chapter 15 foreign ancillary proceedings).

Federal service is important to me—I have prior military experience, two federal clerkships, and
a prior internship with the Federal Trade Commission [FTC])—so I applied for a staff attorney
position with the FTC's Division of Enforcement. The Division was hiring staff attorneys with
bankruptcy litigation experience to handle order enforcement. It was already an area I had
familiarity and interest. During law school, I studied administrative law and consumer
protection law, and completed an internship with the FTC at the encouragement of my
consumer protection law professor, who was a prior Deputy Director of the FTC's Bureau of
Consumer Protection (BCP). I received my highest law school grade in her class (A+) for a paper I
wrote concerning the need for fewer disclosures and more federal oversight and regulation in
consumer finance and lending—challenging the idea of the laissez-faire approach that dictates
much of our present-day marketplace. I was (and still am) passionate about consumers' rights; I
knew it was a position that I would be well-suited for and successful at. Unfortunately, I was not


**EXHIBIT**
**33**

                                                      AMZN-PRM-FTC-002653247

**amazon**

offered a position with the FTC at that time, but I received a very gracious call from the head of the Division (my now current boss) informing me I was their second choice, and encouraging me to reapply when the agency reposted the position; all I needed was a little more litigation experience.

In April 2009, I ultimately took a mid-level attorney position with Dickstein Shapiro and left Orrick, hoping the smaller firm experience would give me more hands-on litigation experience. And it did. During my time there, in addition to extensive pre-litigation commercial law practice, I was able to handle a pro bono matter and conduct trial as lead counsel, which also helped me develop my litigation skills. A little over a year after taking this position, while on maternity leave with my first son, the head of the Enforcement Division, Jim Kohm (my current Division boss) inviting me to reapply for the position I now hold and join the group. Even though I was conflicted about switching jobs so soon after starting at Dickstein, I decided taking a government position (although a substantial decrease in salary) would afford me the flexibility I needed to raise my son. I was (and still am) very grateful to have been given the opportunity to work at the FTC.

2.     **How long have you been in your current position, and why are you now seeking a new job?**

I have held the position of staff attorney with the Division of Enforcement for almost 12 years, since September of 2010. I am seeking a new job for several reasons. First, although I love my job and mostly importantly the mission of the agency—protecting America's consumers—I am searching for new, more impactful ways to achieve this goal. Amazon is one of the largest retail organizations in the world. It has tremendous market power and the opportunity for further growth. With that comes also tremendous influence. As Amazon prides itself as being "Earth's most customer-centric company," it seems natural to me that it would also want to have a strong position on protecting its customers' rights. I can think of no better way to help America's consumers (and consumers in general) than to work for one of the most influential companies in the world, helping it to continue to live up to its "customer-centric" promise.

Second, I am looking for growth, both personally and professionally. I need new challenges, new experiences, and a new environment to foster continued growth. Although I have developed extensive experience in regulatory compliance and consumer protection and truly value this experience, I have worked with many of the same colleagues and under the same leadership for over a decade. Without new voices and new perspectives, there can be little growth. Amazon is a truly innovative company that respects diversity and difference, and I know I could contribute to the many perspectives that help make the company great.

Lastly, despite my love for the FTC's mission, the agency takes a narrow, and cynical, view of the role of large companies in the marketplace. I find myself increasingly at odds with the agency's approach. I see this as an opportunity to help temper the agency's overreach, while still ensuring the important work of a fair, consumer-oriented marketplace stays intact.

3.     **In your current role, approximately how many projects do you work on at any given time? How do you prioritize your work?**

As a staff attorney in the Division of Enforcement, I manage approximately 15-20 active compliance cases. These are orders entered against various defendants, which we review

CONFIDENTIAL

AMZN-PRM-FTC-002653248

# amazon

periodically for each defendant's order compliance (most cases have multiple defendants). Additionally, I typically have one or two active investigations and an active litigation matter. The litigation matter can be a bankruptcy case, or a consumer protection case that has proceeded to active litigation after investigation.

I prioritize my matters primarily based on deadlines. Active litigation typically has a scheduling order in place that requires completion of discovery or motions practice by specific dates, and I use these dates, and the approximate amount of time I anticipate it will take to complete the work, to structure my schedule. Occasionally, I am given specific deadlines for completing a task in a matter, but this is less common. If those tasks take precedence over other deadlines, I will rearrange my schedule accordingly or notify management of the conflicting deadlines.

If none of my present matters has a deadline (for example, for an open investigation), I usually will discuss the priority goals with management to determine whether they have a specific timeframe in mind for resolving a matter, or receiving written work product or progress notes related to a case. I remain in continuous contact with management throughout these cases to ensure I am meeting all expectations and internally set deadlines.

4.   **What aspects of your current employment do you like and/or find satisfying?  What aspects do you dislike and/or find frustrating?**

As I mentioned above, I find the mission of the agency deeply satisfying. Protecting consumers against deceptive and fraudulent conduct in the marketplace is truly rewarding work. However, I find it frustrating that this mission is so challenging to achieve, at least in a meaningful and impactful way. For example, I recently completed a case, successfully obtaining a judgment against several related companies that disseminated deceptive shipment time claims during the Pandemic, two years after they engaged in the conduct and after the Pandemic is all but essentially over (hopefully). While the companies' conduct was particularly egregious and I am grateful we were able to stop it, it is unclear what the ultimate deterrent effect will be. It is frustrating to expend so much time and resources and to have such little impact on market behavior.

Also, my views on consumer protection are diverging from the agency, such that I no longer feel confident in how we execute our mission. For example, the two-year long case should and could have been settled early in the case, and those resources and taxpayer money placed in cases with more meaningful outcomes. Yet, the agency takes hardline positions (and often overreaches in ways I think do not serve the public), creating little room for negotiated resolutions.

5.   **Why are you interested in working at Amazon, joining Amazon Legal, and becoming part of Amazon's Government & Regulatory Litigation team?**

First—I love Amazon. I think the company is truly amazing in how it has transformed the consumer experience, and as a consumer, I appreciate all the flexibility, convenience, and choice it has given me. Second, as I mentioned previously, I want to protect consumers from deception and fraud, and I find it frustrating that it is so difficult to make meaningful change on a case-by-case, ad hoc basis. Working for Amazon presents a tremendous opportunity to continue to serve the American public, while also protecting the company from government overreach. I

AMZN-PRM-FTC-002653249

**amazon**

see this as an opportunity to help guide the company in fulfilling its "customer-centric" promise in a way that avoids regulatory scrutiny and oversight.

6. **What aspects of the job description do you find most interesting? Are there any that raise concerns?**

None raise concerns. Even for the aspects of the position for which I do not have direct experience, I am confident I can execute these with success. I am a quick study, able to learn and master complex, technical concepts rapidly. Indeed, I am most excited and interested in the aspects of the position for which I do not have direct or substantial experience, for example, working on international and criminal law matters.

<u>Part B</u>

7. **Please specify the experience you have with each of the following. (If you don't have any experience for a particular category, please so indicate.)**

   a. **handling, managing, or supervising domestic or international disputes or regulatory engagements;**

   I have some minor experience in international disputes, drafting and researching legal issues in the context of chapter 15 foreign ancillary proceeding years ago as part of my bankruptcy practice.

   I routinely manage and handle domestic regulatory matters, appearing in federal district courts throughout the U.S. on behalf of the FTC. I also have participated in the Rule making process for the last iteration of the FTC's Green Guides (i.e., regulatory engagement), providing input and recommendations regarding consumer understanding of the claim "biodegradable."

   b. **directing overall case and matter strategy;**

   I have directed overall case and matter strategy on dozens of matters (if not hundreds). As part of my regulatory, order compliance work, I regularly develop strategy for conducting the investigation, defining the relevant legal issues that warrant further examination, and framing the legal issues for presentation to the Commission and ultimately to the courts. I make recommendations for litigation strategy, and have managed several cases ultimately brought to trial.

   c. **overseeing the work of lawyers, paralegals, or others;**

   As lead counsel in several matters, I have overseen the work of other lawyers, paralegals, data analysts, and investigators. I have also interviewed and selected expert witnesses for several cases, working closely with the experts in developing and finalizing reports.

CONFIDENTIAL

# amazon

d.  **interacting directly with domestic or international government officials, including regulators or law enforcement officials;**

I have never interacted with international government officials. However, we regularly coordinate with other government agencies in conducting investigations. For instance, I coordinated with officials at the FDA and USPIS in my most-recent litigation. I have also worked with officials at EPA and various DOJ and US AG offices, usually soliciting advice, obtaining information, or coordinating investigations.

e.  **interacting with or advising business leaders;**

The FTC routinely makes itself available to the public, including business, to provide information about claim interpretation and other regulatory guidance. As part of this, I have personally met with business leaders or given public presentations on a variety of issues, including the Green Guides (environmental benefit claims), and general claim interpretation issues.

f.  **making or responding to discovery requests;**

I have significant experience drafting discovery requests, preparing discovery responses, and litigating and responding to discovery disputes. I have argued several motions to compel in my most recent litigation matter, but have been involved in all phases of the discovery process throughout my legal career.

g.  **making or responding to law enforcement information requests, such as subpoenas and search warrants;**

I have drafted and issued numerous voluntary access requests and CIDs (i.e., a civil investigative demand, which is like a subpoena). I have never prepared or responded to a search warrant.

h.  **prosecutorial or other regulatory experience (i.e., government service other than judicial clerkships);**

I have almost 12 years' experience investigating and litigating on behalf of the federal government.

i.  **preparing for trial (please specify each case and describe your responsibilities – e.g., drafted trial-related motions, prepared witnesses, argued motions); and**

AMZN-PRM-FTC-002653251

**amazon**

*In the Matter of ECM Biofilms* (administrative litigation before the FTC's Administrative Law Judge).  Lead counsel.

- Prepared administrative complaint;
- Drafted the proposed order;
- Interviewed, selected, and prepared expert witnesses;
- Prepared fact witnesses;
- Conducted and defended numerous depositions;
- Supervised numerous attorneys who assisted in conducting additional depositions, drafting motions or oppositions, and examining witnesses;
- Argued discovery motions.

*FTC v. Innovative Designs, Inc.* (W.D. Pa.).  Second chair.

- Prepared written motions and oppositions;
- Prepared expert witness;
- Deposed defendant's expert witnesses;
- Assisted with trial logistics.

*FTC v. QYK Brands, LLC, et al.* (C.D. Cal.).  Lead counsel.

- Investigated and developed case for litigation;
- Prepared complaint and amended complaint;
- Drafted and filed TRO and preliminary injunction request, including developing and identifying all supporting evidence;
- Supervised attorney, two paralegals, data analyst, forensic accountant, and two investigators;
- Conducted all aspects of discovery, including drafting or supervising the drafting of discovery requests; conducting depositions; defending deposition of data analyst; and drafting and arguing discovery-related motions and oppositions;
- Conducted settlement negotiations and mediation;
- Drafted dispositive motions and oppositions to dispositive motions;
- Reviewed and developed evidence for use in summary judgment and exhibits for trial;
- Drafted post-summary judgment briefs opposing stay pending appeal.

I have also participated in numerous matters that have resulted in consent agreements, and thus are neither "trial" nor "pretrial" but still involve various aspects of litigation including the drafting of complaints and proposed orders, negotiating settlements, collecting and reviewing evidence in support of the FTC's claims, and preparing recommendations based on the evidentiary support and risk analysis.

CONFIDENTIAL

**amazon**

In addition, I have appeared in dozens of bankruptcy cases on matters ranging from simply filing a proof of claim on behalf of the agency to filing summary judgment motions to protect litigated judgments. Many of these matters require extensive motions practice and argument before the bankruptcy courts.

j.   participating in trial (**please specify each case and describe your responsibilities** – e.g., **conducted direct examinations, performed cross-examinations, argued motions, delivered jury addresses**).

*In the Matter of ECM Biofilms* (administrative litigation before the FTC's ALJ). Lead counsel.

- Prepared and delivered opening and closing statements;
- Conducted the direct examination of expert witnesses;
- Conducted the direct examination of fact witnesses;
- Conducted cross-examination of fact witnesses;
- Argued the appeal of the case before the Commission.

*FTC v. Innovative Designs, Inc.* (W.D. Pa.). Second chair.

- Prepared and delivered opening statement.
- Conducted direct examination of expert witness.
- Tenaciously argued in opposition to Defendant's ambush *Daubert* motion at trial, laying a strong foundation for subsequent motions practice.

8.   **Please summarize the experience you have with the following subjects: consumer protection, criminal law, data privacy and security, environmental law, government access to data, government bid protests, international trade, law enforcement, operations/transportation, tax, and First Amendment and content regulation. (If you don't have any experience with a particular subject, please so indicate.)**

- consumer protection,
  - Extensive experience analyzing applicable law, and preparing recommendations based on deep understanding of various aspects of consumer protection regulations including the FTC Act, Section 13(b), Section 5, Section 19, Section 12, R-value Rule, Merchandise Order Rule, and the Green Guides, among others.
- criminal law,
  - Minor experience in the context of unpaid internship with the DOJ during law school.
- data privacy and security,
  - Experience reviewing and assessing compliance with data privacy and security orders entered by FTC against various defendants.

AMZN-PRM-FTC-002653253

**amazon**

- environmental law,
  - o Minor experience in the context of understanding environmental law as relevant to bankruptcy matters, *e.g.*, analyzing when a claim arises under CERCLA.
- government access to data,
  - o Minor experience in the context of understanding the implications of ECPA on requesting, via CID or subpoena, subscriber data and information from electronic communication service or remote computing service providers.
- government bid protests,
  - o No relevant experience.
- international trade,
  - o No relevant experience.
- law enforcement,
  - o Extensive experience in enforcing the FTC Act and related consumer protection laws on behalf of the FTC.
- operations/transportation,
  - o No relevant experience.
- tax, and
  - o No relevant experience.
- First Amendment and content regulation.
  - o Minor experience in the context of understanding the limitations of injunctions that may interfere with commercial speech.

9. **Please describe the most difficult and/or intellectually challenging case you have worked thus far. Why was it hard, what was the outcome, what was your role, and what were your responsibilities?**

Within the first few years at the FTC, I was tasked with an investigation that led to the filing of an administrative complaint against a company making deceptive biodegradable claims. There were two initial challenges. First, the revised guidance on consumer understanding of "biodegradable" claims was in its nascency. In its most-recent revision to the Green Guides, the Commission adopted the definition that an unqualified "biodegradable" claim means fully decompose, after customary disposal, in a reasonably short period of time, typically less than one year. This definition had not been tested in the courts and was primarily based on the Commission's expertise and a prior consumer perception study.

Second, no one in BCP had litigated a case before the ALJ in several years, so there was no recent experience to draw from on how to conduct this particular (and peculiar) type of litigation. I was assigned the role of lead counsel. We were successful in proving the express claims were deceptive, but the ALJ disagreed with how consumers understood the unqualified "biodegradable" claim, and thus did not find the alleged implied claims were deceptive; the case was appealed by both sides. On appeal, we argued the ALJ overlooked evidence showing that the implied claim was complete breakdown after customary disposal in one or five years, rather than meaning merely being capable of degradation by biological means. The Commission agreed that we alleged and proved that this was the implied claim. The case was ultimately

AMZN-PRM-FTC-002653254

**amazon**

appealed to the Sixth Circuit, which upheld the Commission's reversal and adoption of the consumer understanding we promoted at trial.

This case had two important outcomes: one public, one professional. The first is that we developed case law establishing the interpretation of an unqualified biodegradable claim may vary with the product at issue. Here, the product was primarily plastic water bottles. Consumers naturally understood that it takes a plastic water bottle longer to breakdown than, for instance, a paper bag. Thus, while the typical guidance for unqualified biodegradable claims is complete breakdown within one year after customary disposal, for plastic claims marketers must show complete decomposition within five years or less after customary disposal.

The second outcome was that I developed subject matter expertise on FTC administrative litigation and played an important role in developing written guidance for the agency on how to conduct such matters. Further, I still have the BCP's most recent trial; frequently I am consulted by teams throughout BCP when deciding whether to recommend pursuing administrative litigation for a matter. I also developed agency subject matter expertise on biodegradable claims and have spoken publicly on behalf of the agency on the Green Guides, and routinely handle public inquiries about biodegradable claims.

<u>Part C</u>

**10.    What will be the most important factor to you achieving happiness in this role?**

The most important factor to my achieving happiness in this role is camaraderie. I already know that I enjoy regulatory compliance and consumer protection law, so the work will be interesting and challenging regardless. But the quality of the work is second to the quality of the people I work with on a day-to-day basis. No matter how interesting, fulfilling, and challenging the work, if my colleagues and I do not genuinely appreciate one another, do not respect each other's opinion and work product, and do not feel valued by one another, workplace happiness is unachievable.

**11.    Are you detail-oriented, a big-picture thinker, or both?**

My job requires me to be both, and I am skilled at both. However, if I had to choose one that I am more naturally inclined toward, I would say I am more detail oriented. Details are extremely important—they can make or break a case. One of my favorite parts of litigating is poring over the record and marshalling all the specific, detailed facts that support my case. Of course, the big-picture thinker in me knows I also need to understand the facts that don't support my case, and be prepared with responses as to why those particular facts do not affect the outcome I am hoping to achieve.

**12.    Do you prefer to work by yourself or as part of a group?  Why?**

Again, my job requires that I do both. I often work independently on investigations, but work collaboratively as part of a team while in active litigation. Although I successfully manage cases in both environments, my preference is to work as part of a team or group. Collaboration brings out the best ideas. A single mind is rarely as effective, efficient, or talented as the collective. Hearing different ideas and perspectives often sparks new, creative approaches that I may not

AMZN-PRM-FTC-002653255

**amazon**

have come to on my own without the input and feedback of colleagues. Where the goal is to deliver the best work product possible, working as a group is a must.

13.     **Speed matters in business, and Amazon is a fast-paced company. Moreover, this role (like other Amazon Legal jobs) involves a substantial time commitment and requires being responsive outside of regular business hours. Do you have concerns in this regard?**

No concerns. I frequently work and respond to matters outside of regular business hours. I see that as part of being a professional. However, it is my position that if the job requires the flexibility of being responsive whenever duty calls (which I absolutely have no problem with), I expect there to be a reciprocal professional courtesy in allowing me flexibility during regular business hours to accommodate personal matters on occasion, as needed.

14.     **The location for this role is Arlington, Virginia. If you are not currently living in or near Arlington, do you have any concerns about relocating to this general area?**

Not applicable. I live in the area.

15.     **If you obtain the position, you might be required to travel regularly. Do you have concerns in this regard?**

No. I would welcome regular travel, so long as I have some minimal advance notice to make child-care arrangements.

16.     **This is _not_ a remote position. Do you have concerns in this regard?**

No. But I assume this non-remote position allows for at least some telework (either periodically, on an as-needed basis, or as part of a regular schedule).

17.     **This position will be directly supervised by a manager who is based in Seattle. Do you have any concerns in this regard?**

No. I have managed cases all throughout the United States. I recently concluded litigation pending in the Central District of California, which regularly required filings, court appearances, and telephonic conferences with opposing counsel on Pacific time. Again, I understand and respect the need to be available flexibly throughout the day, even after so-called regular business hours. The professional workspace is changing, allowing greater flexibility in schedules and workplace arrangements, but with that flexibility also comes the need to be available when and as needed.

18.     **Is there anything else you would like us to know about you or about your candidacy that isn't reflected in your resume or in other answers to this questionnaire?**

I am an extremely hard-working, devoted, and loyal employee. Aside from work, I enjoy my many home-improvement projects and CrossFit.

# EXHIBIT 59

| From: | Rottner, Adam <arottner@ftc.gov> |
|---|---|
| Sent: | Thursday, September 9, 2021 1:26 PM |
| To: | Johnson, Katherine <kjohnson3@ftc.gov> |
| Subject: | RE: Confidential - CID re Amazon Prime (No. 2123050) |

I was able to extract them and they can be found here:  \\trade.ftc.gov\WorkProd\BCP\1142DENF\Cases\Amazon Prime ROSCA_2123050\Investigation\CID Productions\6.21.2021\Appendices

**From:** Johnson, Katherine <kjohnson3@ftc.gov>
**Sent:** Thursday, September 9, 2021 1:21 PM
**To:** Rottner, Adam <arottner@ftc.gov>
**Subject:** FW: Confidential - CID re Amazon Prime (No. 2123050)

Can you try to extract these?

_____

Katherine Johnson
Federal Trade Commission
Attorney, Division of Enforcement
600 Pennsylvania Ave., NW, CC-9528
Washington, DC 20580
(202) 326-2185 (Direct Dial)
(202) 326-3197 (Fax)

**From:** Siegel, Andrew <ASiegel@cov.com>
**Sent:** Monday, June 21, 2021 10:20 PM
**To:** Johnson, Katherine <kjohnson3@ftc.gov>
**Cc:** Langner, Ben <langnerb@amazon.com>; Kim, Laura <LKim@cov.com>; Graubert, John <jgraubert@cov.com>
**Subject:** [WARNING : MESSAGE ENCRYPTED] Confidential - CID re Amazon Prime (No. 2123050)

Confidential Treatment Requested

Dear Katherine,

On behalf of Amazon.com, please see the attached fourth response to the FTC's CID.

Earlier today, we uploaded production AMZN_004 to the FTC's secure FTP site.  We will send the password for that production and the attached appendices in a separate email.

Best,
Andrew


**Andrew E. Siegel**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5021 | asiegel@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.