1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

FEDERAL TRADE COMMISSION,

     Plaintiff,

    v.

AMAZON.COM, INC., *et al*.

     Defendants.

Case No. **2:23-cv-0932-JHC**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

NOTED ON MOTION CALENDAR:
Tuesday, June 24, 2025

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ........................................................................................................ 1

3

LEGAL STANDARD ................................................................................................. 1

ARGUMENT ............................................................................................................. 1

4

I.    ROSCA APPLIES TO PRIME BECAUSE AMAZON SELLS PRIME THROUGH

5        A NEGATIVE OPTION FEATURE. ................................................................... 1

6        A.    Defendants' Argument Is Irreconcilable with ROSCA's Plain Text. ..................... 2

         B.    Defendants' Interpretation of ROSCA Is Inconsistent with Its Structure. .............. 4

7        C.    ROSCA's Legislative History Confirms Congress's Concern with Practices

8              Like Amazon's. ........................................................................................ 6

II.    AMAZON'S "CHECKOUT" PRIME ENROLLMENT FLOWS VIOLATE ROSCA. ..... 8

9        A.    Amazon Does Not Clearly and Conspicuously Disclose Prime's Material

10             Terms. ..................................................................................................... 8

11             1.    The Prime Enrollment Pages Do Not Provide Clear and Conspicuous

                    Disclosures, and No Court Has Held Otherwise. ....................................... 9

12             2.    The FTC's Identification of Myriad Flaws in the Enrollment Pages

                    Is Not "Legally Baseless." ................................................................. 13

13       B.    Amazon Does Not Obtain Express Informed Consent to Prime Enrollment. ........ 16

III.   PRIME CANCELLATION IS NOT SIMPLE. ................................................... 21

14

IV.    THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR AMAZON'S ROSCA

15           VIOLATIONS AND RESULTING COMPENSATORY RELIEF. ............................ 26

16       A.    Defendant Grandinetti Is Liable for Amazon's ROSCA Violations. ................... 27

         B.    Defendants Ghani, Lindsay, and Grandinetti Are All Jointly and Severally

17             Liable with Amazon for Compensatory Monetary Relief. ............................... 29

V.    DEFENDANTS' DUE PROCESS AND FIRST AMENDMENT DEFENSES ARE

18           MERITLESS. ........................................................................................... 32

19       A.    Congress Provided Defendants with Fair Notice of the Conduct Prohibited

               by ROSCA. .............................................................................................. 32

20             1.    Defendants Waived Their Facial Challenges to ROSCA by Omitting

                    Them From Their Answer. ................................................................. 33

21             2.    Defendants Cannot Lodge a Facial Challenge to ROSCA. ......................... 33

               3.    Defendants' As-Applied ROSCA Challenges Are Meritless. .................... 33

22       B.    ROSCA Does Not Violate the First Amendment. ...................................... 35

23

VI.    THE FTC OFFERS MORE THAN SUFFICIENT EVIDENCE TO JUSTIFY

         CIVIL PENALTIES. ................................................................................... 37

A.   Amazon Is Liable for Civil Penalties. ................................................... 37

B.   The Individual Defendants Are Liable for Civil Penalties. ................................. 41

VII.   THERE ARE GENUINE DISPUTES OF MATERIAL FACT AS TO THE CUTOFF
DATE FOR THE COURT'S ABILITY TO REDRESS CONSUMER HARM. ............. 43

A.   Amazon Delayed the FTC's Investigation. ............................................. 44

1.   Amazon Steered the Commission Away from Key Documents and
Witnesses. ........................................................... 44

2.   Without Disclosing That It Was Doing So, Amazon Delayed
Producing Anything Marked "Privileged" and Then Wrongfully
Withheld Several Thousand Non-Privileged Documents. ...................... 49

B.   Amazon's Delays, Coupled with Its False Assurances of Cooperation and
Assistance, Partially Estop Amazon from Asserting a Statute of Limitations
Defense. ............................................................... 51

1.   Amazon Knew the True Facts. ............................................. 52

2.   Amazon Intended for the FTC to Rely on Its Document Productions
and Selection of Search Terms and Custodians. ............................ 53

3.   The FTC Was Largely Unaware of the True Facts. ........................... 53

4.   The FTC Relied on Amazon to Its Detriment. ............................. 54

C.   The FTC Need Not Establish "Diligence," but, at a Minimum, There Is a
Triable Issue of Fact as to the FTC's Investigatory Diligence. ......................... 54

VIII.   THE FTC'S CLAIM FOR CIVIL PENALTIES IS NOT TIME-BARRED. .................. 56

A.   Defendants Have Committed a Series of Repeated ROSCA Violations,
Rather Than a Single Continuing Violation. ............................................ 57

B.   The Manner in Which Defendants Violate ROSCA Has Changed over Time. ..... 59

CONCLUSION ................................................................ 60

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - ii

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3  *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784 (9th Cir. 2006)................................................ 1

4  *Adams v. Amazon.com, Inc.*, 2023 WL 4002534 (W.D. Va. June 14, 2023).............................. 18

5  *Aguiar v. Experian Info. Sols., Inc.*, 2025 WL 1531433 (E.D. Cal. May 29, 2025).................... 14

6  *B&L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024)........................................................ 35

7  *Becker v. TIG Insurance Co.*, 649 F. Supp. 3d 1065 (W.D. Wash. 2022)............................. 1, 51

8  *Bianco v. Warner*, 562 F. Supp. 3d 526 (C.D. Cal. 2021) ......................................................... 51

9  *Birkelbach v. SEC*, 751 F.3d 472 (7th Cir. 2014) ....................................................................... 57

   *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003).................................................................. 40
10
   *Bolt v. United States*, 944 F.2d 603 (9th Cir. 1991).................................................................... 51
11
   *Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025)...................................................... 14
12
   *Conmar Corp. v. Mitsui & Co. (USA)*, 858 F.2d 499 (9th Cir. 1988) ......................................... 54
13
   *Daly v. Amazon.com, Inc.*, 718 F. Supp. 3d 1378 (W.D. Wash. 2024) ........................................ 9
14
   *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) ................................................. 12, 13
15
   *Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) ............................................................................. 34
16
   *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172 (W.D. Wash. 2014)..................................... 18
17
   *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,880 F.3d 450 (9th Cir. 2018)..... 36
18
   *Estate of Amaro v. City of Oakland*, 653 F.3d 808 (9th Cir. 2011) ....................................... 51, 54
19
   *FCC v. Fox Television Stations*, 567 U.S. 239 (2012)................................................................. 33
20
   *FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .......................................................... 29
21
   *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) .................................................... 26
22
   *FTC v. Day Pacer LLC*, 125 F.4th 791 (7th Cir. 2025)............................................................... 40
23
   *FTC v. Doxo, Inc.*, 2025 WL 887311 (W.D. Wash. Mar. 21, 2025) ............................................. 4

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ....................................................... 29

*FTC v. Loewen*, 2013 WL 5816420 (W.D. Wash. Oct., 29, 2013) ............................................... 27

*FTC v. Moses*, 913 F.3d 297 (2d Cir. 2019) ............................................................................... 27

*FTC v. World Media Brokers Inc.*, 2004 WL 432475 (N.D. Ill. Mar. 2, 2004) ........................... 27

*Gandy v. Sullivan County, Tenn.*, 24 F.3d 861 (6th Cir. 1994) .................................................... 58

*Heinz v. Amazon.com, Inc.*, 2023 WL 4466904 (E.D. Cal. July 11, 2023) ................................. 13

*Hoffman v. Cap. Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) .............................................. 36

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ........................................................ 1

*Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015) ........................................ 35

*IQVIA Inc. v. MedImpact Healthcare Sys., Inc.*, 2022 WL 6258369 (S.D. Cal. Oct. 7, 2022) .... 54

*Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d 1218 (W.D. Wash. 2014) ............................. 51

*Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005 (9th Cir. 2024) ............................. 12, 13, 14

*Kennedy v. Applause, Inc.*, 90 F.3d 1477 (9th Cir. 1996) ........................................................... 31

*Kimble v. Marvel Entm't, LLC*, 576 U.S. 446 (2015) ................................................................. 34

*KST Data v. DXC Tech. Co.*, 980 F.3d 709 (9th Cir. 2020) ........................................................ 32

*Mainstream Mktg. Servs. Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004) ..................................... 36

*Monster Energy Co. v. Vital Pharmaceuticals, Inc.*,
    2025 WL 1111495 (9th Cir. Apr. 15, 2025) ............................................................................ 19

*Murray v. Cingular*, 523 F.3d 719 (7th Cir. 2008) ...................................................................... 39

*Nat'l Parks Cons. Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007) ................................................... 58

*Nicholas v. Amazon.com, Inc.*, 740 F. Supp. 3d 1099 (W.D. Wash. 2024) ................................ 12

*Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254 (E.D.N.Y. 2019) ......................................... 13

*Norcia v. Samsung Telecoms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017) ...................................... 3

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505 (9th Cir. 2023) ............................................... 12

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) ................................................................... 39

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - iv

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999)..............................................20

*SEC v. Kokesh*, 884 F.3d 979 (10th Cir. 2018)...................................................................57

*Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1 (Cal. Ct. App. 2021)..................10, 15

*Sierra Club v. Okla. Gas & Elec Co.*, 816 F.3d 666 (10th Cir. 2016)...................56, 57

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...............................................................35

*UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465 (9th Cir. 1994) .....................53

*United States v. Adobe, Inc.*, 2025 WL 1303419 (N.D. Cal. May 2, 2025) ...................4

*United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007)........................................3

*United States v. Boyd*, 991 F.3d 1077 (9th Cir. 2021) ....................................................35

*United States v. DeBorba*, 713 F. Supp. 3d 1042 (W.D. Wash. 2024).........................33

*United States v. Dish Network, LLC*, 954 F.3d 970 (7th Cir. 2020)................37, 38, 42

*United States v. MyLife.com*, 499 F. Supp. 3d 757 (C.D. Cal. 2020) .............................4

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996)..............36, 38, 42

*United States v. Ramirez-Sanchez*, 338 F.3d 977 (9th Cir. 2003) ..................................3

*URI Student Senate v. Town of Narragansett*, 631 F.3d 1(1st Cir. 2011) ...................34

*Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002).........................31, 40

*Viveros v. Audible, Inc.*, 2023 WL 4466904 (W.D. Wash. Oct. 20, 2023)...................10

*William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255 (9th Cir. 1995) ........................22

**Statutes**

15 U.S.C. § 45....................................................................................................................29

15 U.S.C. § 45(m)(1)(A)...................................................................................................36

15 U.S.C. § 57b(a)(1).........................................................................................................43

15 U.S.C. § 57b(d) ......................................................................................................43, 50

15 U.S.C. § 57b-1(c)(11) ...................................................................................................50

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - v

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

15 U.S.C. § 8401 ............................................................................................. 2, 5

15 U.S.C. § 8402 ................................................................................................. 5

15 U.S.C. § 8403 ........................................................................................... passim

15 U.S.C. § 8404 ............................................................................................... 29

28 U.S.C. 2462 .................................................................................................. 55

**Regulations**

16 C.F.R. § 310.2(w) ...................................................................................... 2, 3

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - vi

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

## INTRODUCTION

The FTC's Motion for Partial Summary Judgment (Dkt. # 314 (sealed), 315 (redacted)) describes the undisputed facts proving Defendants violated the Restore Online Shoppers' Confidence Act ("ROSCA").  Given the overwhelming, undisputed evidence in the FTC's Motion, it is unsurprising that Defendants' cross-motions for summary judgment (Dkt. #316, 319) fall well short of exonerating them.  Likely recognizing their inability to escape findings of liability, Defendants resort to trying to chip away at the FTC's case by attacking the FTC's civil penalty claims or attempting to limit the time period over which the FTC can obtain compensatory monetary relief.  Even those more limited strategies, however, crumble in the face of the overwhelming evidence against Defendants.  Finally, Defendants attempt to distort various statutory or Constitutional provisions to get out of the case by, for example, arguing for the first time that ROSCA does not apply at all.  None of Defendants' legal arguments, however, have any merit.  In sum, Defendants' motions do not dent the FTC's case for summary judgment as to liability, and Defendants' efforts to otherwise pare back the FTC's case are meritless.

## LEGAL STANDARD

Defendants may obtain summary judgment by proving "that there is an absence of evidence to support [the FTC's] case." *Becker v. TIG Insurance Co.*, 649 F. Supp. 3d 1065, 1074 (W.D. Wash. 2022) (Chun, J.) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).  The FTC then "bears the burden of designating 'specific facts demonstrating the existence of genuine issues for trial.'"  *Id.* (quoting *Oracle*, 627 F.3d at 387).  When the parties have cross-moved for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."  *Id.* at 1073 (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)).

## ARGUMENT

**I.    ROSCA APPLIES TO PRIME BECAUSE AMAZON SELLS PRIME THROUGH A NEGATIVE OPTION FEATURE.**

ROSCA, incorporating the FTC's Telemarketing Sales Rule, defines a "negative option

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 1

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

feature" as "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  15 U.S.C. § 8401 (incorporating 16 C.F.R. § 310.2(w)).  As the FTC explained in its Motion, Prime meets this definition because, each month or year, Amazon interprets a Prime subscriber's failure to cancel their Prime subscription agreement as acceptance of the offer to remain a Prime subscriber and to be charged a certain amount yearly or monthly.  *See* Dkt. #315 at 52-53.

When Defendants filed their motions to dismiss (Dkt. #83, 84), they chose not to challenge this straightforward application of ROSCA, even though prevailing on the argument would have ended, or substantially narrowed, the case and avoided expensive and time-consuming discovery.  With the litigation walls closing in, Defendants now argue, for the first time, that Prime is not governed by ROSCA at all because Prime is not sold through a "negative option feature."  Dkt. #319 at 7-11.  Defendants' argument is contrary to ROSCA's plain text, structure, and legislative history.[1]

## A.    Defendants' Argument Is Irreconcilable with ROSCA's Plain Text.

Defendants argue that because a consumer's acceptance of the initial Prime enrollment offer "is manifested not by 'silence' or a 'failure to . . . reject . . . or cancel' the service, . . . but by affirmative conduct," Prime is not sold through a negative option feature.  Dkt. #319 at 8 (ellipses in original).  In other words, Defendants argue that because consumers must do *something* to enroll in Prime—even if that "something" is clicking on a mislabeled button— Prime enrollment is not achieved through "silence," and ROSCA does not apply.

Defendants' argument—and, in particular, Defendants' exclusive focus on the moment of formation of the Prime subscription agreement—is impossible to square with ROSCA's text. Specifically, ROSCA assumes the *pre*-existence of an agreement under which consumers are

---

[1] Regardless of how the Court handles the remainder of the parties' cross-motions for summary judgment, the question whether Prime is sold through a "negative option feature" is ripe for decision now.  The facts relevant to this issue are undisputed.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 2

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

periodically charged if they fail to cancel.  For example, ROSCA says a good or service is sold

through a negative option feature if a business treats the consumer's "failure to . . . cancel *the*

*agreement*" as "acceptance of the offer."  16 C.F.R. § 310.2(w).  If Amazon's interpretation is

correct—that is, if one looks to the moment of initial enrollment—then there would be no

existing agreement to cancel.  Similarly, ROSCA defines a negative option feature as a provision

"in an offer *or agreement*."  *Id.*  Again, under Amazon's view, there *is* no agreement, rendering

this language meaningless.  *See United States v. Ramirez-Sanchez*, 338 F.3d 977, 979 (9th Cir.

2003) ("As a rule, statutory language should not be read in such a way as to render words or

phrases mere surplusage.").

There is a second, related problem with Amazon's position: it would result in *nothing*

being covered by ROSCA.  Absent very limited exceptions not applicable in the ROSCA

context, a contract or agreement can *never* be formed by silence.  *See, e.g.*, *Norcia v. Samsung*

*Telecoms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) ("As a general rule, silence or inaction

does not constitute acceptance of an offer.") (cleaned up).  Therefore, if, as Defendants claim,

ROSCA only applied where the acceptance of an *initial* offer—*i.e.*, the formation of a contract—

occurred by silence, it would never apply.  Not only is that an absurd result, but it would also

render ROSCA's negative option provision (15 U.S.C. § 8403) a nullity, and therefore cannot be

correct.  *See United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (cautioning

against "textually dubious construction that threatens to render [an] entire provision a nullity").[2]

Defendants, apparently recognizing this problem, argue that ROSCA would still apply in

cases of "hidden enrollment," without explaining what that means or how it differs from what the

FTC alleges Amazon did here.  Dkt. #319 at 9.  Even "hidden enrollment," at least as Defendants

---

[2] In effect, Defendants' argument is that the "offer" referenced by ROSCA in the phrase "acceptance of the offer" refers exclusively to a formal, initial contract offer.  Given the absurd result that this would produce—by leaving 15 U.S.C. § 8403 to cover nothing at all—the only plausible reading is that "offer" refers to the offer to *remain* a Prime member in exchange for a monthly or annual charge.  Prime meets that definition because a consumer accepts that offer, and remains enrolled in Prime, by staying silent.  This reading is also the only one that is consistent with ROSCA's structure and purpose.  *See infra* pp. 4-8.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 3

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

appear to use the term, is not enrollment by pure silence and therefore would not be covered by Defendants' cramped reading of ROSCA. The example they cite is instructive. *See id.* Defendants, referencing ROSCA's legislative history, describe a consumer buying flowers from 1-800-Flowers.com and then "encountering a pop-up offer for $15.00 cash back that, *if accepted*, enrolled the consumer in an unrelated recurring membership called LiveWell." *Id.* (emphasis added). Because, however, the consumer must affirmatively *accept* that pop-up "LiveWell" offer, it too would be excluded from Defendants' own interpretation of ROSCA because the consumer would have engaged in some "affirmative conduct" to accept the enrollment offer.

Given these fatal flaws, it is unsurprising that, as Defendants acknowledge (*id.* at 10-11), all three courts to have addressed Defendants' precise argument have rejected it, holding that automatically renewing subscriptions, like Prime, are covered by ROSCA. *See FTC v. Doxo, Inc.*, 2025 WL 887311, at *10 (W.D. Wash. Mar. 21, 2025) ("The statutory definition [of 'negative option feature'] is not as narrow as Defendants argue, and courts have applied it broadly to renewal subscriptions."); *United States v. MyLife.com*, 499 F. Supp. 3d 757, 762 (C.D. Cal. 2020) (referring to recurring subscriptions as "textbook example[s] of a negative option feature"); *United States v. Adobe, Inc.*, 2025 WL 1303419, at *9 (N.D. Cal. May 2, 2025) ("The Court agrees with the government and finds that Adobe offers subscriptions . . . as free-to-pay conversion plans thus making them negative option features.").

## B. Defendants' Interpretation of ROSCA Is Inconsistent with Its Structure.

Defendants are correct that ROSCA's legislative history focuses on an early e-commerce practice in which consumers bought products from a known merchant's website and, in the process, were enrolled in a third-party merchant's automatically renewing "membership club." *See* Dkt. #319 at 7. Those membership club enrollments were accomplished in part through a "data pass," in which the original merchant "passed" consumers' data to the third-party membership-club seller, which then could enroll consumers without needing to collect billing information directly from them. *See* 15 U.S.C. § 8401(4)-(7). What Defendants miss is that

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 4

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4

Congress plainly chose to address this problem through *two separate provisions*, only the first of which (*id.* § 8402) is limited to the "data pass" problem. The second provision (*id.* § 8403), which the FTC enforces here, relates to *all* "membership clubs," and other automatically renewing subscriptions.

5
6
7
8

Specifically, Section 8402, which is not at issue in this case, bars merchants from passing consumers' billing information to third-party sellers and, even if third-party sellers manage to obtain the information, provides certain rules regarding how those sellers can use it. *Id.* §§ 8402(a)-(b). Those rules apply regardless of whether the third-party sellers are offering membership programs. *Id.*

9
10
11
12
13
14
15
16
17
18
19
20
21

If, as Amazon contends, Congress *only* intended ROSCA to apply to third-party sellers and these "data pass" transactions, it could have stopped there. It did not. Instead, Congress enacted Section 8403, which governs *all* automatically recurring subscriptions (or goods and services sold through "negative option features"), not merely those that occur through a data pass to a third-party seller. The legislative history makes clear this was a conscious decision. In particular, Congress identified a "combination of three aggressive sales tactics" it was targeting. Dkt. #343 at 1224. The first two are covered by Section 8402: "post-transaction marketing" and "data pass." *Id.* at 1225. The third, covered only by Section 8403, was "negative options." *Id.* As Congress explained, the membership clubs it was targeting "cost American consumers hundreds of millions of dollars because they were enrolled in and charged for the membership clubs indefinitely, until they realized there was an unfamiliar charge on their credit card or debit card statements." *Id.*; *see also* 15 U.S.C. § 8401(8) (Congress finding that use of "free-to-pay conversion" and "negative option sales" "took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period").

22
23

To address this problem, ROSCA's "negative option" provision "establish[ed] clear standards of disclosure and consent for sales that *involve recurring charges. . . . All* companies

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 5

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4

[not merely third-party sellers] would be required to make certain disclosures, obtain consumers' express informed consent and provide consumers with simple, convenient ways to cancel the 'negative options.'" Dkt. #343 at 1226 (emphasis added). Reading ROSCA to exclude "membership clubs" with indefinitely recurring charges, like Prime, would eviscerate the protection Congress provided.

5
6

### C.     ROSCA's Legislative History Confirms Congress's Concern with Practices Like Amazon's.

7
8
9

Setting aside ROSCA's text and structure, Defendants also claim Prime is "nothing like [the] deceptive memberships" Congress intended to address when it enacted ROSCA. Dkt. #319 at 9. This could not be further from the truth. In fact, ROSCA's legislative history is replete with descriptions of deceptive practices that read like a how-to guide employed by Amazon:

10
11
12
13
14
15
16
17

- For example, Congress was concerned that, as here, "[o]ffers for membership clubs were presented to online consumers as they were completing their purchases on familiar retailers' websites." Dkt. #343 at 1225. Congress explained that "[a]fter consumers entered their billing information into a 'check out' purchase page on familiar e-retailers' sites, but before they completed confirmation of the transaction, the unfamiliar post-transaction third party sellers"—here, Amazon Prime, as opposed to a strictly unaffiliated "third party"—"interrupted the [checkout] process and attempted to enroll consumers in membership clubs." *Id.*; *see also* Dkt. #315 at 9-21 (describing Amazon's practices).

18
19
20
21
22
23

- Again, as here, Congress explained that "[c]onsumers were not required to enter their billing information to be enrolled in the membership clubs." Rather, the "websites on which the consumers had already made purchases"—like Amazon.com—"were willing to share their customers' billing information with the post-transaction third-party sellers"—here, Amazon Prime. Dkt. #343 at 1225. As here, this practice tricked consumers, while "earning" the membership clubs "hundreds of millions of dollars." *Id.*; *see also* Dkt. #315 at 9-21

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 6

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

(describing Amazon's practices).

- Congress also focused on "free-to-pay conversions"—like Prime's free trials that convert to paying memberships.  In fact, as described above, Congress expressly found such tactics "took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period."  15 U.S.C. § 8401(8).

- In a Senate Committee Hearing regarding ROSCA, Committee Chairman Senator John Rockefeller lamented consumers being "ripped off," especially at the holiday season, in language that would be echoed by Amazon employees almost a decade later.  *Compare* Att.[3] 189 at 102-103 ("I worry about this, frankly, because the holiday shopping season is just beginning, and all over this country people who are in economic distress will be spending what few dollars they have on holiday shopping because they have children or grandchildren and that's what parents and grandparents tend to do . . . . It maybe $10 or $20 a month, but [it's] a wrongful $10 or $20 and it's not fair to do that to the American people under any circumstances, and we have to do stop it."), *with* Att. 94 at 4 (Prime Content Testing team member:  "An unknown $12.99 charge could mean grocery money for a family, gas to fill up a car, or just the last bit of money to make rent.") & Att. 60 at 4 (Amazon Shopping Design team member urging Prime to "clarify" Prime enrollment before December due to "the influx of season/holiday shoppers and the heightened risk of consumer harm").

- Finally, even some of the granular layout techniques used by the membership

[3] All "Attachment" cites starting from Attachment 152 reference attachments to the Declaration of Evan Mendelson, filed concurrently herewith.  All Attachment cites between Attachments 1-151 reference attachments to the previously filed Declaration of Evan Mendelson and are available at Docket Nos. 317, 318, and 320 (sealed versions) and Docket Nos. 330, 336, and 338 (public versions).  Unless noted otherwise, all page number cites for Attachments and docket entries refer to the ECF header information at the top of the page.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 7

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5

clubs that attracted Congress's attention are an eerie match to Amazon's practices. A Senate Committee Report, for example, lamented that, "[f]or customers to reach the [product-checkout] confirmation page, they must either accept the offer to join a membership club . . . by clicking a large, colorful 'Yes' button[] or click a much less conspicuous 'No Thank You' hyperlink."   Att. 190 at 9; *see also Dkt.* #315 at 9-21, 56-59 (describing Amazon's practices).

6
7
8

In short, Defendants' arguments that the FTC is stretching ROSCA beyond its original purpose are contradicted not only by ROSCA's text and structure—as every Court to examine the issue has found—but also by the stated intent of its drafters.

9

## II.    AMAZON'S "CHECKOUT" PRIME ENROLLMENT FLOWS VIOLATE ROSCA.

10
11
12
13

For the reasons explained in detail in the FTC's Motion, Dkt. #315 at 9-37, 53-63, Amazon's product-checkout Prime enrollment methods violate ROSCA by failing to clearly and conspicuously disclose Prime's material terms and failing to obtain consumers' express informed consent to Prime enrollment.  *Id.* at 53-63.  The FTC will not repeat those arguments here. Instead, the FTC addresses below Amazon's counterarguments.

14
15

### A.    Amazon Does Not Clearly and Conspicuously Disclose Prime's Material Terms.

16
17
18
19
20
21
22

The parties agree on the meaning of ROSCA's "clear and conspicuous" requirement.  In particular, as Defendants state, "'clear' means 'reasonably understandable,' while 'conspicuous' means '*readily* noticeable to the consumer.'"  Dkt. #319 at 11 (cleaned up) (emphasis added). From here, however, Defendants' analysis goes wrong.  Defendants appear to make two primary arguments:  (1) that the challenged Prime enrollment pages facially satisfy ROSCA and, in any event, are comparable to other enrollment pages approved by courts, and (2) that the FTC's arguments regarding the enrollment pages are "legally baseless."  *Id.* at 12-19.  Both arguments fail.

23

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 8

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

**1.** **The Prime Enrollment Pages Do Not Provide Clear and Conspicuous Disclosures, and No Court Has Held Otherwise.**

2

3        Defendants' primary argument is that Prime's material terms are located at least

4    somewhere on the enrollment pages at issue. Dkt. #319 at 12 ("There is no dispute that Amazon

5    discloses [material terms]."). Even if it were true, this is obviously not enough. ROSCA

6    requires not just *any* disclosure, but a "clear and conspicuous" disclosure. 15 U.S.C. § 8403.

7    Defendants' argument is also not even accurate. As the FTC explained, Dkt. #315 at 16-19, on

8    some mobile UPDP enrollment pages, Prime's material terms are not present in any form unless

9    the consumer takes some action (like clicking "See all") to reveal them. On SPC, the terms are

10    present when the consumer clicks the button (labeled "Place your order") that actually enrolls

11    them in Prime, but are nowhere to be found when consumers make the decision to join Prime by

12    clicking the "Try Prime FREE" button. *Id.* at 21-23.[4]

13        Defendants proceed to argue that the enrollment pages at issue here are substantially

14    similar to enrollment pages approved by courts under states' negative-option statutes. Amazon's

15    presentation of the facts, both of this case and of the cases to which it cites, is misleading.

16    Amazon starts by arguing the fine-print "disclosures"—but not the full enrollment page—at issue

17    here are "nearly identical to" the disclosures in another case from this District. *See* Dkt. #319 at

18    13-15 (citing *Daly v. Amazon.com, Inc.*, 718 F. Supp. 3d 1378, 1387 (W.D. Wash. 2024)). *Daly*,

19    however, presents an entirely different set of facts. In this case, the FTC challenges Prime's

20    enrollment of consumers while they are attempting to complete product purchases. In *Daly*, by

21    contrast, the plaintiffs challenged an enrollment page that consumers arrived at *deliberately*, with

22    the intent to enroll in Prime. *Daly*, Case No. 22-cv-00910-RSM, Dkt. #14 ¶¶ 66, 68 (W.D.

---

[4] Defendants tout the purported "admissions" of two FTC witnesses, testifying from memory, that Prime's material terms are all present somewhere on the enrollment pages. Dkt. #319 at 12-13. But it makes no sense to rely on deponents' recall, while facing live deposition questioning, for the content of the enrollment pages, when the Court can simply look at the pages. The "admissions," moreover, are not as clear as Defendants claim; many, for example, are qualified by the statement that the witness is testifying to best of her recollection. *See, e.g.*, Dkt. #343 at 188.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 9

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Wash.).[5]  Of course, what might be clear and conspicuous to a consumer trying to enroll in Prime is far different from what might be clear and conspicuous to a consumer simply trying to buy a product or get "free shipping" on that product.  *See, e.g.*, *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 26 (Cal. Ct. App. 2021) ("consumer that does not expect to be bound by contractual terms is less likely to be looking for them").  Beyond that, even focusing solely on visual display elements and ignoring context, the enrollment page at issue in *Daly* is different (not "substantially similar" or even "essentially the same," as Defendants claim, Dkt. #319 at 13, 15) from the pages at issue here.  For example, the *Daly* page obtains consumers' billing information just above where the consumers click to enroll in Prime, and the *Daly* page does not contain marketing graphics that take up most of the page.  *Id.* at 13.[6]

Next, Defendants discuss *Viveros*, in which Judge Rothbart found Amazon's Audible enrollment page did not violate state auto-renewal statutes.  *See Viveros v. Audible, Inc.*, 2023 WL 4466904, at *7-8 (W.D. Wash. Oct. 20, 2023).  Defendants, comparing the enrollment pages from *Viveros* and this case, make the baffling "observation" that the page layouts are only "slightly different" (before later saying that they are actually "essentially the same")—a claim that is directly refuted by the image below from Defendants' own motion, comparing the *Viveros* page with a Prime "SPC" enrollment page.  Dkt. #319 at 14-15.  Defendants follow this bizarre claim with the observation that the literal "text" of the disclosures on both pages is "nearly identical."  *Id.* at 14.  This is inconsequential:  the fact that the disclosure *text* on the SPC page is "nearly identical" to the text on the *Viveros* enrollment pages says nothing about whether that text is conspicuously displayed.

---

[5] Defendants previously attempted to rebut this point by arguing that one of the *Daly* plaintiffs enrolled in a *Kindle Unlimited* subscription accidentally while purchasing a Kindle device.  Dkt. #152 at 6.  Defendants nowhere explain what relevance that allegation has to Prime enrollment or Defendants' *Daly* arguments.  The *Daly* court, in any event, conducted no analysis of the Kindle Unlimited enrollment flow.

[6] Notably, Defendants also select one of their less egregiously unclear enrollment pages for comparison purposes. *Compare* Dkt. #319 at 14 (Defendants' selection), *with* Dkt. #315 at 12-21 (containing other, less clear UPDP enrollment pages).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 10

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Defendants then, without citation, claim that the courts in both *Viveros* and *Daly* "rejected the idea that any . . . 'context' could demonstrate [that] . . . the flows [did not] clearly and conspicuously disclose all material terms." *Id.* at 15. In fact, the cases contain no discussion of context. That is likely because, in those cases, taking context into account would only *harm* the plaintiffs' arguments because, unlike here, the plaintiffs deliberately started the subscription-enrollment process, as opposed to stumbling upon an enrollment offer while buying a product. Defendants' conclusion—that there are "no material factual differences that could warrant a different result here as in *Daly* and *Viveros*" (*id.*)—is, for the reasons described above, wholly incorrect.

Defendants briefly reference a series of other cases that, they claim, also support entry of judgment in their favor. *See id.* at 13, 15. The cases, like *Daly* and *Viveros*, are distinguishable on several bases. As an initial matter, they are almost all contract cases that discuss the viability

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 11

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    of forum-selection or arbitration clauses.[7]  Amazon's description of these cases as relating to

2    "compl[iance] with laws requiring conspicuous disclosure" (Dkt. #319 at 15) is therefore

3    misleading.  There were no "laws" at issue in the cases other than the common law of contracts.

4    That common law, moreover, is substantially different from ROSCA.  Specifically, courts

5    generally find an enforceable contract wherever a website "provides *reasonably conspicuous*

6    *notice*"—often in the form of a hyperlink—"of the terms which the consumer will be bound."

7    *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (emphasis added); *see also*

8    *Keebaugh*[8] *v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (same).  That rule is

9    based on the principle that contracts, such as Terms of Use, found on websites are enforceable if

10   the website puts a reasonable consumer on "inquiry notice of the agreement's existence and

11   contents."  *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (cleaned up).  This

12   standard—whether a *hyperlink* is *sufficiently conspicuous* to put consumers on *inquiry notice* of

13   a contract's contents—is, of course, far less demanding than ROSCA's requirement of *clear and*

14   *conspicuous* disclosure of an agreement's actual *terms*.  *See* 15 U.S.C. § 8403(1) (requiring

15   "text"—not hyperlink to text—that "clearly and conspicuous disclosures all materials terms of

16   the transaction").  The cases cited by Amazon therefore do nothing more than identify certain

17   circumstances in which an online merchant has taken sufficient steps to put consumers on

---

[7] Defendants do cite one other state auto-renewal-law case:  *Nicholas v. Amazon.com, Inc.*, 740 F. Supp. 3d 1099 (W.D. Wash. 2024).  In that case, the court, without much elaboration (*id.* at 1103), stated that Amazon.com subscribe-and-save enrollment was substantially similar to *Viveros* Audible enrollment, which is already addressed above.

[8] The FTC's Motion cited the district court's *Keebaugh* decision, but omitted the fact that the district court's opinion was reversed by the Ninth Circuit.  Dkt. #314 at 57.  We apologize for the oversight.  The proposition for which the FTC cited the district court opinion—that courts properly examine the "full context of the transaction . . . to determin[e] whether a given textual notice is sufficient" (*id.*)—nevertheless remains noncontroversial.  In fact, the Ninth Circuit reaffirmed that principle even while overturning the district court's application of it in *Keebaugh*.  100 F.4th at 1019-20 ("[W]e must look both to the context of the transaction and the placement of the notice when conducting review . . . .") (cleaned up).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 12

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1  inquiry notice that they would be bound by forum-selection and arbitration clauses in a

2  hyperlinked agreement.[9]

3         Beyond that, Defendants here likely could not even clear the relatively low contract-law

4  bar because, especially in the context in which they appear (*see* Dkt. #315 at 56-60), Defendants'

5  disclosures are less conspicuous than the hyperlinks described in the cited cases.  *See Heinz v.*

6  *Amazon.com, Inc.*, 2023 WL 4466904, at *1-2 (E.D. Cal. July 11, 2023) (hyperlink to Terms and

7  Conditions was "directly below" button and thus "sufficiently conspicuous" to enforce forum-

8  selection clause therein); *Dohrmann v. Intuit, Inc.*, 823 F. App'x at 484 (disclosure was "directly

9  under" the button and was the only emphasized text on the "relatively uncluttered" page);

10  *Keebaugh*, 100 F.4th at 1009-11, 1020 (as pictured in the Ninth Circuit's opinion, disclosure was

11  "[d]irectly beneath" the "operative" button and page "lack[ed] clutter").  Unlike in *Heinz*,

12  *Dohrmann*, and *Keebaugh*, Amazon's purported disclosures generally were not *directly* below

13  the enrollment button, and the marketing and other product-order-related content on the pages

14  generally overshadowed the disclosures.  Dkt. #315 at 12-23.

### 2.     The FTC's Identification of Myriad Flaws in the Enrollment Pages Is Not "Legally Baseless."

       Next, Defendants claim the FTC is "accusing Amazon of violating ROSCA based on

design choices or cross-sell offers that the law undisputedly does not prohibit."  Dkt. #319 at 16.

As the FTC explained in its Motion and in numerous prior filings, the FTC is not alleging that

particular "design choices" or "cross-sell offers" are *per se* unlawful.  Dkt. #315 at 83-84; *see*

*also* Dkt. #125 at 51-52; Dkt. #148 at 9; Dkt. #220 at 20-22.  Rather, the FTC alleges that taken

---

[9] Defendants also, for the second time, misleadingly cite a case for the notion that "ordinary internet users" "know there are terms and conditions attached when they . . . order merchandise on Amazon . . . because it would be difficult to exist in our technological society without some generalized awareness of the fact.'"  Dkt. #319 at 11-12 (quoting *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020)).  Defendants again fail to tell the Court this quote is from a discussion of what that court thought the law *ought* to be, not what the law actually is.  *Nicosia*, 384 F. Supp. 3d at 278-79; *see also* Dkt. #125 at 11 n.2 (addressing Defendants' prior *Nicosia* cite).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 13

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

as a whole—and performing the required analysis of both context and visual elements—the Prime material-term disclosures are not clear and conspicuous.

Defendants also appear to argue that the required wholistic examination of both the context and visual elements of enrollment pages results in a "subjective" test. *See* Dkt. #319 at 17 (referencing "subjective" context). But a test is not "subjective" merely because it requires the application of law to facts—even if there are a lot of facts—and the objective, reasonable consumer test works exactly in the manner in which the FTC applies it. *See, e.g.*, *Keebaugh*, 100 F.4th at 1018 (applying "objective-reasonableness standard" and explaining that courts "must look to both the *context of the transaction* and the placement of the notice") (cleaned up) (emphasis added); *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025) (contract-law test of "reasonable conspicuousness" has "always been context- and fact-specific"). The fact that the test is "objective" rather than "subjective" means only that an individual consumer cannot prevail by claiming they themselves did not actually see or understand the disclosures, even if the disclosures were *objectively* conspicuous. *See, e.g.*, *Aguiar v. Experian Info. Sols., Inc.*, 2025 WL 1531433, at *6 (E.D. Cal. May 29, 2025) ("The existence of assent is determined by objective rather than subjective criteria . . . . Therefore, Plaintiff's claim that he did not subjectively assent to arbitration is irrelevant.").

Amazon next argues the "design elements" in the Prime enrollment pages are "commonplace, such that consumers are likely to be familiar with and understand them." Dkt. #319 at 16. This argument relies exclusively on two Amazon expert reports, both of which the FTC moved to exclude. *Id.* (citing reports of Dr. Donna Hoffman and Dr. Craig Rosenberg); Dkt. #312 (Rosenberg motion); Dkt. #321 (Hoffman motion). These expert arguments are either contradicted by the undisputed facts or simply do not make sense when applied to them. For example, Defendants claim the Prime material-term disclosures are located "consistent with where consumers would typically expect to find that information, . . . where they accept or confirm their enrollment in the Prime free trial." Dkt. #319 at 16. Setting aside that the expert

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 14

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

provides no support for this statement in the cited paragraph, fine-print disclosures do not become clear and conspicuous simply because other sellers are also using them. Beyond that, consumers could only possibly "expect" to find information about a Prime membership in the fine print if they understood that clicking buttons like "Get FREE Two-Day Shipping" or "Place your order" would enroll them in Prime. Otherwise, they have no reason to even look for the disclosures. *See Sellers*, 289 Cal. Rptr. 3d at 25 ("consumer that does not expect to be bound by contractual terms is less likely to be looking for them"). Similarly, Defendants claim the Prime enrollment pages "use different colors or sizes when distinguishing between call-to-action features that decline rather than accept an offer," which, Defendants claim, will "help consumers navigate pages with more ease." Dkt. #319 at 16. But, again, that only even potentially makes sense if a consumer knows they have been presented an offer—*i.e.*, if they know to look for a "decline" option at all. Lastly, Amazon claims the UPDP design actually "works to the advantage of many customers, . . . who prefer that the [user experience] emphasize actional steps to complete their *checkout process*." *Id.* at 17 (emphasis added). *This is the entire problem*. Amazon emphasizes a single "actional step" that looks like it will complete the *product-checkout process*, but that step actually *enrolls the consumer in Prime*. Amazon de-emphasizes the other "actional step"—the blue "no thanks" hyperlink—that could continue the checkout process *without* enrolling the consumer in Prime.

Next, Defendants argue the context of Prime enrollment—*i.e.*, the fact that it occurs as a consumer is attempting to buy a product—is not problematic because, in its expert's opinion, "cross-sells during the checkout process" are a "commonly used online feature that is consistent with consumers' expectations about online shopping experiences." Dkt. #319 at 17. Again, however, the problem with Prime enrollment is not the mere fact that Amazon is "cross-selling," or upselling, Prime, but rather that it does so in confusing ways. In fact, Amazon *knew* that Prime lagged far beyond other subscription programs in terms of enrollment clarity, including when cross-selling or upselling. *See, e.g.*, Dkt. #288-26 at 3 (meeting notes: "On signups, we

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 15

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

were not close to the middle of the pack amongst shopping and streaming programs."). Specifically, before the FTC filed this case and Amazon hired experts willing to claim otherwise, an Amazon employee conducted a "benchmarking" analysis to compare Prime enrollment to eight non-Amazon subscription programs' enrollment processes, including three involving product-checkout upsells or "cross-sells." *See* Dkt. #218-2 at 177-78, 183-84, 186-88.  Amazon determined that out of all the examined subscriptions, including the "cross-sellers," Prime was the *only* program that included both price and auto-renewal only in "t&cs"—*i.e.*, fine-print "terms and conditions"—and the *only* one that did not mention the "trial" on the enrollment button itself.  *Id.* at 178.  Additionally, none of the "cross-sell" examples included a full-page upsell, like UPDP, that blocks the checkout process until the consumer clicks through it.  *Id.* at 183-88.

Finally, Amazon criticizes the FTC's expert witness in human-computer interaction, Dr. Marshini Chetty.  Dkt. #319 at 18.  Although the FTC need not rely on Dr. Chetty to prevail on its Motion for Partial Summary Judgment or to defeat Defendants' cross-motions, her report provides yet another basis for denying Amazon's motion for the reasons explained in the FTC's concurrently filed opposition to Defendants' motion to exclude Dr. Chetty's testimony.

###    B.    Amazon Does Not Obtain Express Informed Consent to Prime Enrollment.

Again, on the issue of express informed consent, the FTC and Amazon largely agree on the legal standard.  As Amazon says, a consumer can only "consent" to Prime enrollment if the consumer takes "some action, such as clicking a button, after being informed of the material terms and told that taking that action will trigger the transaction."  Dkt. #319 at 19 (cleaned up). Once again, however, Defendants veer off course with their misleading presentation of the facts. As before, the FTC will not repeat the extensive evidence and case law supporting the conclusion that Amazon does not obtain express informed consent to Prime enrollment.  *See* Dkt. #315 at 9-37, 63-68.  Rather, the FTC simply responds to Defendants' arguments.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 16

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

    Defendants' primary argument—which relies on the text of its enrollment buttons—completely ignores Amazon's eight-year-and-counting effort to use enrollment buttons that highlight shipping fees and speeds and therefore lead consumers to believe they are simply opting for free shipping rather than Prime enrollment.  *See* Dkt. #319 at 19 (Defendants quoting enrollment buttons with language other than "Get FREE Two-Day [or One-Day] [or Same-Day] Shipping").  Shockingly, especially given Amazon leadership's insistence on maintaining these misleading buttons, Amazon calls the shipping-speed buttons "outliers."  Dkt. #319 at 20 n.7.[10] That is simply incorrect.  *See* Dkt. #315 at 11-21 (describing, *inter alia*, history of UPDP enrollment button text).

    The example enrollment buttons Defendants instead rely on—which generally say something like "[s]tart your free trial"—are from Amazon's relatively rarely used "order agnostic" (non-shipping-based) Prime upsells or its similarly rare SOSP PDP page.  *See* Dkt. #315 at 14-15 (order agnostic), 21 (SOSP PDP); Att. 203 at 2 (███████████████ ███████████████████████████); Dkt #217-1 at 180 (SOSP, when it still existed, accounted for ████████ of Prime signups).  Additionally, although these enrollment buttons at least convey that clicking them will start a free trial—perhaps even a *Prime* free trial—they still fall short of obtaining express informed consent for the reasons outlined in the FTC's Motion.  Dkt. #315 at 58-59.  Among other problems, many consumers likely do not understand how to finish their product purchase without clicking the enrollment button or may be moving too quickly with their product purchase to notice the enrollment button is not merely a button to continue with their product purchase.  Additionally, even if Amazon obtained some form of consent with the "trial" enrollment buttons, it is not *express informed* consent because Amazon does not clearly and conspicuously disclose either that clicking the button will enroll the consumer in an automatically renewing Prime membership or the price of that membership.  *See id.* at 66-68.

---

[10] It is possible Defendants intended to call the entire UPDP enrollment process an "outlier."  That too would be wrong.  Approximately ████████ of *all* Prime enrollment occurs through UPDP.  Dkt. #217-1 at 180.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 17

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Next, Defendants argue consumers would understand that a yellow/orange button on Amazon is "likely to indicate a purchase." Dkt. #319 at 20. Again, however, *that is the entire problem*. As explained in the FTC's Motion, Amazon repeatedly prompts consumers in the product-checkout purchase to click a yellow/orange button to continue with their purchase, before switching the yellow/orange button to a Prime enrollment button rather than a "continue" button. *See* Dkt. #315 at 57. Therefore, consumers are likely to "understand" that the yellow/orange button indicates a *product* purchase, not Prime enrollment. Even Defendants admit Amazon uses "orange and yellow buttons to indicate actions related to the *purchase of products.*" Dkt. #319 at 20 (emphasis added).

Defendants also cite two cases in which, they claim, courts found Amazon to have obtained consent to contract terms in situations "similar" to those at issue here. *See* Dkt. #320 at 20-21 (citing *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172 (W.D. Wash. 2014); *Adams v. Amazon.com, Inc.*, 2023 WL 4002534 (W.D. Va. June 14, 2023)). The first case (*Ekin*), however, is not a consent case at all, despite Defendants' mashing together—using an inaccurate "because" conjunction—quotations from different parts of the opinion to make it look like one. *See* Dkt. #319 at 19 (citing, but misrepresenting, *Ekin*, 84 F. Supp. 3d at 1173, 1177). Rather, in *Ekin*, plaintiffs challenged the validity of an arbitration agreement on the basis that "Amazon expressly reserves the right to change, without notice, consent, or a refund, its Prime T&Cs and general [Conditions of Use]." *Id.* at 1175. This reservation of rights, plaintiffs argued, rendered the contract "unenforceable due to unconscionability." *Id.* The *Ekin* plaintiffs, in fact, "[did] *not* dispute that they accepted the arbitration agreement," *id.* at 1175 n.5 (emphasis added), instead apparently only disputing whether they had consented to *ex post* changes to that contract, *id.* at 1177. Additionally, Defendants' Western District of Virginia case (*Adams*) is distinguishable on its facts. There, unlike here, Amazon used a "Continue" button and "[i]mmediately underneath that button," added a note explaining the consequences of pressing "Continue." *Compare* 2023 WL 4002534, at *1, *with* Dkt. #315 at 12-23.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 18

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2    Finally, Amazon makes the unfounded claim that "the FTC does not have evidence

3    sufficient to create a material factual dispute" as to whether Defendants obtain express informed

4    consent. Dkt. #319 at 21. The FTC's Motion, however, discusses voluminous evidence,

5    including numerous Amazon internal documents, establishing Amazon not only did not obtain

6    consent from millions of Prime subscribers, but also *knew* it failed to do so. *See* Dkt. #315 at 25-

7    37. Defendants may intend "evidence" to refer only large-scale statistical data. Even on those

8    improperly narrow terms, however, Defendants are wrong. The cancellation survey Defendants

9    attempt to disown—in which significant percentages of former Prime subscribers said, "*I did not

10   intend to sign up for Prime,*" in response to a question from Amazon about their main reason for

11   cancelling Prime (*id.* at 35-37 (emphasis added))—is admissible for at least two reasons.

        First, contrary to Defendants' claim that the FTC has "no evidence" of the survey's

12   "principles, design, or methodology" (Dkt. #319 at 21), the FTC has presented a detailed expert

13   report explaining the survey is reliable and conforms to generally accepted survey principles.

14   Att. 72 at 36-46. The FTC's expert based that opinion on the survey itself, consumer responses

15   to the survey, Amazon's data related to the survey, Amazon's own documents describing how it

16   conducted the survey, and an independent expert analysis of the data generated by the survey as

17   to its reliability. *Id.* Defendants also argue the survey was "prone to multiple biases" (Dkt. #319

18   at 21), but as the primary case they cite makes clear, "methodological concerns with a survey go

19   to weight rather than admissibility." *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, 2025

20   WL 1111495, at *1 (9th Cir. Apr. 15, 2025);[11] *see also Keith v. Volpe*, 858 F.2d 467, 480 (9th

21   Cir. 1988) ("[t]echnical inadequacies in the survey, including the format of the questions or the

22   manner in which it was taken, bear on the weight of the evidence, not its admissibility").

        Second, the cancellation survey is admissible for the independent reason that Amazon

---

[11] There are other bases for distinguishing *Monster Energy*. There, unlike here, the party offering the survey only possessed "a set of slides summarizing the survey results," rather than the actual survey response data. 2025 WL 1111695, at *2. The party also offered no witness who "could testify about the surveys' principles, design, or methodology." *Id.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 19

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

employees repeatedly "manifested a belief in [its] trustworthiness." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 239 (2d Cir. 1999). In *Schering*—a leading case on the admissibility of survey evidence—then-Judge Sotomayor reversed a district court's exclusion of a survey conducted by the Defendant (Pfizer) in part because an internal analysis of the survey by an employee on Pfizer's market research team "required reliance on the trustworthiness of the . . . survey methodology itself." *Id.* at 239. Justice Sotomayor cited the principle that a "party admission containing hearsay is admissible where . . . the admission draws inferences from the underlying hearsay and thus manifest[s] an adoption or belief in its truth." *Id.* (cleaned up).

Here, Amazon manifested its belief in the survey's trustworthiness by repeatedly relying on it to make important business decisions affecting millions of dollars. *See, e.g.*, Att. 152 at 2 ("By launching the cancellation survey [worldwide], we can collect valuable insights and trends . . . on why members have decided to cancel and what problems they experienced . . . ."); Att. 153 at 2 (Ghani asking direct report how the company could use "Cancellation Survey 2.0" "outside cancellation"—*i.e.*, apply it for purposes beyond understanding why consumers cancel); Att. 154 at 2 (announcing launch of feature in response to survey data showing "███ of member initiated cancelations occur because Members did not know they were signed up for Prime"); Att. 155 at 2-3 (announcing launch of new Prime feature in response to "[c]ancellation survey results"); Att. 156 at 2-3 (announcing launch of another feature in response to "cancellation survey results" regarding "reasons why customers cancel their membership"). In fact, Amazon used the cancellation survey in the same way as the FTC: to estimate the extent of Prime nonconsensual enrollment, further manifesting Amazon's belief in the survey's reliability. *See, e.g.*, Dkt. #314 at 37 (citing Atts. 102, 132, 135); Att. 172 at 2, 4-6.

In any event, the FTC's empirical evidence is not limited to the cancellation survey. For example, an Amazon economist relied on an entirely different survey (the "Search Sentiment Survey") to estimate that approximately ███ of Prime free-trial sign-ups are unintentional. Att. 193 at 5, 8. Similarly, an Amazon "meta" analysis of nine of its own experiments to make the

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 20

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

UPDP signup process clearer to consumers (*i.e.*, "more CX friendly"), found that doing so "can reduce unintentional signups by as much as ███." *Id.*

## III.    PRIME CANCELLATION IS NOT SIMPLE.

Defendants argue (1) that the Iliad cancellation process is "simple" as a matter of law and (2) that even if Iliad—through which ██████ of Prime members cancel (Dkt. #314 at 71-72)—is not simple, other rarely used cancellation methods are.  Dkt. #319 at 22.  Both arguments are wrong on the facts and law.

### A.    The Iliad Is Not Simple.

Amazon asserts that, under ROSCA, a "simple cancellation method" is one that is "readily understood or performed."  Dkt. #319 at 22.  This is functionally the same as the FTC's definition of "simple" as "easy."  *See* Dkt. #315 at 68.  Under either definition, Amazon is wrong that the FTC "has no evidence that could reasonably support" the conclusion that the Iliad is not a "simple" cancellation mechanism.  Dkt. #319 at 25.  Below, the FTC only summarizes the voluminous evidence described in its own Motion.  *See* Dkt. #314 at 37-50.

First, a facial analysis of Iliad is evidence of its complexity.  *See id.* at 37-46.  Even locating Iliad is itself a multistep process that generally results in a consumer reaching a button labeled "End Membership" that does not end membership, despite accompanying text indicating that it would do exactly that.  *Id.* at 38-40.  On the first page of Iliad, consumers are led to believe they have already completed the process.  *Id.* at 41-44.  For most of the relevant time period, even consumers who did not think they were finished upon reaching the first page could reasonably—but incorrectly—think they were finished when they clicked a button on the first page labeled "End My Benefits" or "Cancel My Benefits" on that page.  *Id.*  Beyond that, Iliad requires the consumer to express their cancellation intent four times, all while dodging buttons and links designed to remove them from the cancellation process.  *Id.* at 41-46.

Second, there is substantial evidence that Amazon's express goal in implementing and maintaining Iliad was to *prevent* cancellation, rather than to facilitate it.  *See, e.g.*, Att. 109 at 12

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 21

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

("When a member enters the [pre-Iliad version of the Prime cancellation flow], they are presented with a series of options *designed to prevent them from canceling their membership*. The goal of project Iliad is to *expand* our retention messaging capabilities and enable the launch of *more* retention offers.") (emphasis added); *see also* Att. 89 at 2 ("The goal of project Iliad was to improve [Prime's] ability to retain members . . . ."). The Court may consider that intent as evidence of Iliad's complexity. *Cf. William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258-59 (9th Cir. 1995) (when a defendant "intentionally attempt[s] to deceive," courts "presume consumers were in fact deceived" and shift the burden to the defendant to prove otherwise).

Third, and relatedly, Amazon employees tasked with evaluating and suggesting changes to the Prime cancellation process repeatedly criticized Iliad for its complexity. *See, e.g.*, Dkt. #255-11 at 13 (Amazon Benchmarking team flagging that interview participants who "wish[ed] to cancel their Prime membership" were "unsure about the process"; team's "firsthand analysis" also "showed a minimum of 12 actions were required from the Amazon homepage to cancel Prime membership"); Att. 87 at 5 (Prime GPX team member: "The reason people are confused by the Iliad flow is that it's confusing and a UX anti-pattern. . . ."); Att. 93 at 5, 7-8 (Amazon Shopping Design team: "[s]elf-service cancellation can be difficult for customers to find"; "customers in UX research misunderstand their progress during self-service cancellation, sometimes abandoning the flow early thinking they had finished it"); Att. 111 at 7-8 ("Through [customer service] contact mining, cancel survey free form text, and customer studies, we are aware that some customers find the online cancellation flow hard to find and navigate"; also, "end membership" buttons "likely sets the expectation that [it] is not a flow but an action").

Fourth, changes that made the Iliad more confusing—such as changing a "Continue to Cancel" to a false "End my Benefits" button—resulted in hundreds of thousands of additional Prime subscribers failing to complete Iliad. Dkt. #314 at 43. The opposite was also true: when Amazon, in response to regulatory scrutiny, reverted the button to "Continue to Cancel," more people were able to finish Iliad. *Id*.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 22

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Fifth, every consumer who enters Iliad has expressed the intent to "end [their] membership," by clicking a button labeled as such, yet ███████ of those people do not finish Iliad, and the ██████████████ does not affirmatively take *any* step signaling an intent to retain Prime, instead simply closing their browser or otherwise navigating away from Amazon. *Id.* at 49-50.  Amazon itself recognized this same data as evidence that "customers may think they have successfully canceled their membership . . . when in fact, they have to confirm on the last confirmation page."  Att. 130 at 4-5.

Sixth, actual Amazon customers observed by Amazon employees struggled with the Iliad.  For example, the customer pictured below (Att. 202)—with Amazon-created subtitles translating the customer's words—thought he had finished cancellation because the buttons to continue the process were not visible on the page until he scrolled down.  Att. 159.  The customer needed to be prompted by the study's moderator to realize he was not finished.  *Id.*  Amazon argues that anything other than large-scale data is merely "anecdotal," but that argument at best goes to the weight of the evidence, not to whether it is admissible and probative.



PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 23

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Seventh, an expert in human-computer interaction, and professor at the University of Chicago, Dr. Marshini Chetty, reviewed Iliad and concluded it is "rife with manipulative designs that make the process longer and more difficult than necessary, cause confusion, and create cognitive overload." Dkt. #343 at 512 (¶ 282). Amazon critiques the expert's analysis, but those critiques cannot prove the absence of a genuine dispute of material fact or otherwise justify summary judgment for Defendants. (The FTC does not need to rely on Dr. Chetty's report to support its own summary judgment motion.)

Aside from its incorrect claims that the FTC lacks evidence, Defendants also argue that a "multistep process" must be permitted under ROSCA because Congress's use of the term "mechanism" necessarily allows for a system of "connected parts." Dkt. #319 at 26. This is beside the point. The FTC is not arguing that all multistep cancellation processes are illegal; the question here is whether *Prime's* five- or six-step process, which includes multiple fake endings and other traps, is "simple." Defendants also have strategically focused on a definition of "mechanism" that almost certainly is not the one Congress intended. It is far more likely that Congress intended "mechanism" to mean "[a]n instrument or a process, physical or mental, by which something [here, cancellation] is done" rather than "[a] system of parts that operate or

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 24

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    interact like those of a machine."  Dkt. #343 at 554.

2         Finally, Amazon relies on one proffered expert's cancellation "simulation" and another
3    proffered expert's "industry comparison" as evidence that Prime cancellation is simple.  Dkt.
4    #319 at 23-25.  If necessary, the FTC will address these experts in its Reply in support of its own
     Motion.  *See also* Dkt. #310 (motion to exclude "simulation"); Dkt. #321 (motion to exclude
5    "industry comparison").  For purposes of this Opposition, the expert opinions are insufficient to
6    demonstrate the absence of any genuine dispute of material fact (instead, at most, *creating* such a
7    dispute), and therefore insufficient to justify summary judgment for the Defendants.

8         **B.    Other, Rarely Used Prime Cancellation Methods Do Not Save Amazon.**

9         In the alternative, Amazon argues that its other, non-Iliad methods of cancellation
10   (phone, chat, and email) save it from liability.  Dkt. #319 at 27-28.  Amazon's argument fails for
11   two related reasons.

12        First, the email, phone, and chat cancellation mechanisms Amazon touts are not simple.
13   Chat cancellation, in fact, appears literally nonexistent, and Defendants, confusingly, cite no
14   contrary proof.[12]  Amazon, in fact, admitted its "customer service chatbot cannot complete
     cancellation" and instead simply "sends the customer a link to [the Iliad]."  Att. 121 at 30.  Email
15   and phone cancellation are possible, but are not methods Amazon advertises; rather, they are
16   unadvertised ways to *contact* Amazon.  Declaration of Adam Rottner ("Rottner Decl.") ¶¶ 16-32.
17   If a consumer contacts Amazon, they can then proactively ask to cancel their membership.
18   Amazon, however, does not provide an email address at which consumers can contact it, and
19   instead simply accepts cancellation requests by enterprising consumers in response to unrelated
20   emails from customer service.  Att. 121 at 26-27.  Unsurprisingly, this very rarely happens.  Dkt.
     #314 at 71-72.  Additionally, Amazon does not make its phone number readily available to

21

22   _____
     [12] The two sources Amazon cites do not prove chat cancellation exists.  Dkt. #319 at 28.  One (Defendants' Ex. 19 at
     30) does not mention chat cancellation at all, and the other (Defendants' Ex. 6 ¶ 37) is an Amazon expert report,
23   which, in turn, cites hearsay *USA Today* and *Business Insider* articles, which themselves do not establish chat
     cancellation exists.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'                    Federal Trade Commission
MOTIONS FOR SUMMARY JUDGMENT                            600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 25                              Washington, DC 20580
                                                              (202) 326-3320

consumers, Rottner Decl. ¶¶ 16-28, and consumers who nevertheless figure out how to call Amazon and ask to cancel are generally redirected to Iliad, Dkt. #315 at 51. If the caller is not redirected to Iliad, it generally requires a nine-minute phone call, Att. 124 at 2, which is not simple. Again, unsurprisingly, phone cancellation is relatively rare. Dkt. #314 at 71-72.

Second, Amazon's proposed reading of ROSCA—in which rarely used and unadvertised "simple" cancellation methods can save a company from liability—defies the statute's plain text, purpose, and common sense. Amazon admitted, in an early response to the FTC's investigation, that "[a]lthough Prime members may cancel their Prime membership by speaking with a customer service representative, the ███████ of members who decide to cancel do so online," through Iliad. *See* Att. 113 at 4. In fact, ██████ of cancellations occur via Iliad. Dkt. #314 at 71-72. ROSCA cannot allow a defendant to skirt liability for a non-simple cancellation mechanism that it directed its customers to use and that nearly all customers did use (Iliad) merely because customers theoretically could track down other ways to contact Amazon, in response to which Amazon might allow them to cancel, but might instead send them to Iliad.

## IV.    THE INDIVIDUAL DEFENDANTS ARE LIABLE FOR AMAZON'S ROSCA VIOLATIONS AND RESULTING COMPENSATORY RELIEF.

Defendants Ghani and Lindsay do not seek summary judgment as to all claims against them; rather, they only challenge the FTC's ability to obtain *compensatory monetary relief* (in addition to civil penalties, *see infra* pp. 36-43). In other words, Ghani and Lindsay do not seek summary judgment on their *liability* for Amazon's ROSCA and FTC Act violations, assuming the existence of Amazon's violations.[13] Grandinetti, by contrast, challenges both his liability and the FTC's ability to obtain compensatory monetary relief. Individual Defendants' arguments fail because there is extensive evidence—much of which is already summarized in the FTC's Motion

---

[13] Although Defendants' IV.B section header claims to cover an argument that all Individual Defendants are not "liable," the Section IV.B.1 and IV.B.2 subheaders—and the arguments contained in each subsection—make clear that Ghani and Lindsay's sole challenge is to monetary relief, not liability for ROSCA and FTC Act violations. *See* Dkt. #316 at 10-13.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 26

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1  (Dkt. #315 at 25-37, 72-74)—establishing their authority to control, participation in, and

2  knowledge of Amazon's misconduct.

3      **A.      Defendant Grandinetti Is Liable for Amazon's ROSCA Violations.**

4      As Grandinetti previously conceded, he is liable for violating ROSCA and the FTC Act if

5  he "participated directly in, *or* had the authority to control, the unlawful acts or practices at

6  issue." Dkt. #83 at 15 (emphasis added) (quoting *FTC v. Commerce Planet, Inc.*, 815 F.3d 593,

7  600 (9th Cir. 2016)).  To prevail on the authority-to-control prong, the FTC need not establish

8  *sole* authority to control.  *See, e.g.*, *FTC v. World Media Brokers Inc.*, 2004 WL 432475, at *9

9  (N.D. Ill. Mar. 2, 2004) (finding individual liability even where executive "did not have sole

10  control").  Additionally, an individual can be held liable based on authority to control even if

11  they did not "exercise" that authority.  *FTC v. Loewen*, 2013 WL 5816420, at *7 (W.D. Wash.

12  Oct., 29, 2013); *see also FTC v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019) (same).

13      Grandinetti claims he cannot be liable because the FTC "impermissibly proceed[s] . . .

14  based on his status as a corporate officer, standing alone." Dkt. #316 at 13 (cleaned up).  That is

15  simply not true, as the FTC made clear in its own Motion and as described further below.

16      Grandinetti officially assumed his role atop the Prime chain of command in November

17  2021.  Dkt. #171 at 6 ("The Prime organization began reporting to Mr. Grandinetti in November

18  2021.").  Even before then, however, he participated in, and at least at times had *de facto*

19  authority to control, Prime's enrollment and cancellation practices.  This was true because

20  Grandinetti served as Senior Vice President of Amazon's International "Consumer" business

21  (Att. 28 at 18:23-19:6).  The Consumer business at Amazon substantially overlaps with the

22  Prime business, given Amazon's desire to turn Amazon shoppers into Prime subscribers.  *See,*

23  *e.g.*, Att. 201 at 9:20-10:2 (Grandinetti:  "Naturally, Prime is a subscription that is relevant to

anybody in the consumer-facing Amazon business.").  In fact, Grandinetti himself wrote that,

"*Prime is the backbone of the Consumer business.*"  Att. 65.

Given the relationship between Grandinetti's "Consumer" responsibilities and Prime, it is

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 27

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

unsurprising that Grandinetti played a key role in the company's decision not to improve

enrollment clarity in 2019 if doing so would result in fewer Prime subscribers.  *See* Dkt. No. 314

at 28-29.  In fact, even though Grandinetti was not *formally* in charge of the Prime organization,

Prime employees understood they had to follow his instructions after a June 2019 clarity-related

meeting.  *See* Att. 68 at 52:16-19 ("Q.  Was it your understanding that both teams [Prime and

Shopping Design] had to follow Mr. Grandinetti's guidance after the meeting?  A.  Yes."); *id.* at

53:23-25 ("I mean, we [the Prime organization] took that as, you know, the outcome of the

meeting, like once [Grandinetti] said that, we took that away as the outcome.").[14]  There are

numerous other examples of Grandinetti's involvement in key Prime enrollment and cancellation

decisions *prior* to November 2021.  *See, e.g.*, Att. 183 at 2 (describing "Russ's" participation in a

late 2019 meeting focused on potentially "abolish[ing]" all "interstitials," including the UPDP

Prime enrollment page); Att. 184 at 2 (2020 chat referencing "Russ[-]level discussions" on the

topic of "UPDP and clarity"); Att. 186 at 2 (April 2020 email referencing "meeting to align on

how we should communicate our clarity strategy to Llew/Russ"); Att. 80 at 3 (Lindsay, in

January 2021, proposing to Ghani that they discuss clarity concerns with "Russ"); Att. 88 (May

2021 chat referencing sending enrollment- and cancellation[15]-related "CX satisfaction"

memorandum to "Russ").

     Unsurprisingly, Grandinetti's authority over, and direct participation in, Prime enrollment

and cancellation continued after he assumed his official role atop Prime in November 2021.  *See,*

*e.g.*, Att. 125 at 2 (Ghani updating Grandinetti on "purpose[ful]" "delay" in implementing Prime

enrollment, or "CX Satisfaction Signup," improvements); Att. 129 at 2 (Grandinetti received

private briefing from Benchmarking organization regarding enrollment-clarity concerns); Dkt.

---

[14] Defendants are wrong to suggest Grandinetti was merely quoting "someone else's goal" when he directed the Prime organization not to "hurt signups."  *See* Dkt. 316 at 15.  In fact, it was Grandinetti who *originally* gave that instruction at the June 2019 meeting.  *See* Att. 68 at 52:16-19, 53:23-25.

[15] Defendants are also wrong that there is no evidence of "involvement by Grandinetti as to the cancellation flows."  In addition to Grandinetti's involvement in preparation for the May 2021 meeting, the Benchmarking team flagged cancellation issues for Grandinetti and others two years earlier.  Dkt. #254-11 at 3, 9.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 28

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

#255-18 (lengthy discussion between Benchmarking and Prime regarding what to tell Grandinetti).  More generally, Grandinetti pressured his Prime organization to "adopt a tone of hunger for growth and dissatisfaction for our current projected growth rates."  Att. 65.

Grandinetti nevertheless argues that he cannot be liable because he was not involved in the original "adoption" of the challenged Prime enrollment and cancellation processes.  Dkt. #316 at 14.  The case Grandinetti cites does not support his argument.  Instead, it stands only for the point that an individual *can* be held liable when he "controlled [the scheme] at the time [it] was organized, and directly participated in establishing the scheme."  *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1103 (9th Cir. 2014).  The case later declines to hold a defendant liable where he did not control the scheme at the time of its development *and* did not "directly participate[]" in it *at any point*.  *Id.* at 1104.  *Grant Connect* simply does not say what Grandinetti needs it to say, which is that *only* a scheme's originators can be liable.

## B.    Defendants Ghani, Lindsay, and Grandinetti Are Jointly and Severally Liable with Amazon for Compensatory Monetary Relief.

The FTC seeks both compensatory monetary relief and civil penalties from the Individual Defendants.  (Civil penalties are covered *infra* pp. 36-43.)  To obtain compensatory relief against the Individuals, the FTC must prove their knowledge of Amazon's unlawful practices.[16]  This form of "knowledge" requires lesser proof than the "knowledge" necessary to obtain civil penalties because it does not permit a mistake-of-law defense, instead requiring only knowledge of the acts in question.  *See infra* pp. 36-37 (discussing civil-penalty standard).  In particular, as Amazon concedes, the FTC can obtain compensatory monetary relief from the Individual Defendants by proving their actual knowledge of, or reckless or deliberate indifference to,

---

[16] The FTC never argued, as Defendants claim (Dkt. #316 at 11 n.2), that a knowledge requirement applies only to its request for civil penalties.  Rather, the FTC said proof of knowledge is "necessary to obtain equitable monetary relief from individuals."  *See* Dkt. #126 at 49.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 29

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   Amazon's unlawful practices.[17]  The requisite knowledge can be established by the "extent of an

2   individual's involvement in a fraudulent scheme alone."  *FTC v. Affordable Media*, 179 F.3d

3   1228, 1234-35 (9th Cir. 1999).

4          The extensive evidence of Defendants' knowledge of, or reckless or deliberate

5   indifference to, Amazon's wrongdoing is discussed at length in the FTC's Motion.  *See* Dkt.

6   #315 at 25-37, 72-74.  For example, Lindsay knew, as of early 2018, that making the UPDP

7   enrollment button clearer substantially reduced overall enrollment, which realistically could only

8   be because it also substantially reduced *nonconsensual* enrollment.  Dkt. #314 at 26.  Later in

9   2018, the Shopping Design team showed Lindsay a video reel of consumers signing up for Prime

10  unintentionally and labeled it a "top 3" problem, which Lindsay acknowledged.  *Id.* at 27.  The

11  Shopping Design organization explained the enrollment-clarity issues to Grandinetti twice in

12  2019.  *Id.* at 28-29.  Later that same year, the Amazon Benchmarking team told all three

13  Individual Defendants about problems with Prime enrollment and cancellation.  Dkt. #254-11 at

14  2-3, 8-9.  In June 2020, a Prime Content Testing team memorandum explained to Ghani "we

15  *know* that a portion of Prime members were not aware when they signed up for Prime."  Att. 36

16  at 2 (emphasis added).  In July 2020, a related memorandum explained to Lindsay that Prime had

17  "accumulated a significant clarity debt that we need to start paying down."  Att. 38 at 3.  Ghani

18  and Lindsay then green-lit clarity improvements they knew resulted in decreased enrollment (and

19  decreased nonconsensual enrollment), but that they reversed for precisely that reason.  Dkt. #314

20  at 31-32.  In May 2021, all three Individual Defendants received copies of a memorandum,

21  which reported extensively on enrollment and cancellation issues.  Att. 111.  In 2022, the

---

[17] The Individual Defendants appear to argue the FTC must also prove knowledge of "deceptive" practices, not merely knowledge of the unlawful practices at issue.  Dkt. #316 at 10-13.  That is not a requirement.  Rather, because the cases cited by Defendants tend to be cases based on material misrepresentations—*i.e.*, "deceptive acts or practices," 15 U.S.C. § 45(a)—the cases reference knowledge of "deception."  Here, deception is not an element of the FTC's claims, so *knowledge* of deception cannot be necessary.  In any event, Defendants' conduct *is* deceptive, and Congress declared ROSCA violations, as a matter of law, to be "unfair or *deceptive* acts or practices" (emphasis added)).  15 U.S.C. § 8404(a).

Amazon Benchmarking team returned to tell Grandinetti that the clarity issues with Prime

enrollment were *still* not resolved.  Dkt. #315 at 34-35.

The Individual Defendants' apparent strategy for dealing with this mountain of evidence

is to claim it represents merely "isolated frustrations" and that any consumer confusion is

"unreasonable."  Dkt. #316 at 13.  They also claim the percentage of consumers "report[ing]

difficulties" represented an "irreducible minority" of consumers—an unsupportable assertion

given Defendants' repeated successes at both increasing and decreasing consumer confusion.

Dkt. #315 at 25-37, 43-44.  Defendants then go even further, claiming that, in fact, the evidence

of their knowledge is really just evidence of Amazon holding itself to a "high bar."  Dkt. #316 at

13.  This rosy spin could have been true if, once Defendants learned of their wrongdoing, they

promptly and durably corrected the problems—but they instead did the opposite, delaying

improvements that helped consumers and even reversing them once they proved unprofitable.

Tellingly, the only evidence Defendants cite in their knowledge argument is their own

self-serving deposition testimony, unsupported by any documentary evidence.  Dkt. #316 at 11-

13.  This is the quintessential example of "uncorroborated and self-serving" testimony that courts

refuse to consider on summary judgment, even where—unlike here—it is being relied upon by

the party *opposing* entry of judgment.  *See Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).

Finally, there is substantial evidence of reckless or deliberate indifference by Defendants

to Amazon's unlawful practices.  In particular, it is clear the only reason Amazon did not leave

more of a paper trail to the Individual Defendants is because of a deliberate strategy to avoid

doing so and destroy evidence that might do so.  In one instance, for example, Amazon's

Benchmarking team did not send a clarity-related email to Jamil Ghani to "avoid further share

out of this topic hitting Jamil's inbox."  Att. 129 at 3.  In another, an economist who had

extensively studied nonconsensual enrollment in the US and elsewhere wrote in a draft

memorandum that he "estimate[d] that ~ ▮▮▮ of Free Trial signups are unintentional."  Att. 193

1

2

at 5, 8.  The economist added that "more CX friendly UPDP designs . . . can reduce unintentional signups by as much as ███." *Id.*  He then highlighted this entire paragraph and asked his

3

4

colleague:  "Do you think we're likely to get a P&C violation slap on this one?  If yes, *will not state explicit results*." *Id.* (emphasis added; referencing Amazon's use of "privileged and

5

6

confidential" as shorthand for efforts to hide unfavorable documents and information).  The paragraph appears to have subsequently been deleted in its entirety. *Id.* at 8.  In yet another

7

8

example, then-Prime VP Cem Sibay wrote that it was "not appropriate to have this [clarity-related] conversation over email, and increasingly a mass one at that (just adding P&C does

9

10

little)."  Dkt. #90-2 at 233.  More generally, one document containing Amazon "[n]ote taking instructions" describes Amazon's apparent policy of (1) assigning a single note taker at each

11

12

meeting, and not permitting others to take notes; (2) marking all meeting notes "Privileged & Confidential," regardless of whether that is true; (3) not "quot[ing] any individual directly" in meeting notes; and (4) "*delet[ing]/shred[ding]*" "raw notes" after the sanitized versions are circulated.  Att. 218 at 5-6 (emphasis added).

13

14

## V.    DEFENDANTS' DUE PROCESS AND FIRST AMENDMENT DEFENSES ARE MERITLESS.

### A.    Congress Provided Defendants with Fair Notice of the Conduct Prohibited by ROSCA.

15

16

Defendants' due process defenses continue to change in increasingly confusing ways.  In their motions to dismiss, Defendants admitted ROSCA is a "clear statute," Dkt. #84 at 31, but

17

18

argued the FTC's *theory of liability* was unconstitutionally vague and the FTC had not provided "fair notice" of that theory to Defendants.  The Court rejected those arguments.  Dkt. #165 at 40-

19

20

45.  Next, Defendants answered the FTC's Amended Complaint and claimed to be making a "traditional as-applied" challenge to ROSCA.  Dkt. #214 at 17; *see also* Dkt. #171 at 65-69.

21

Now, for the first time, they challenge ROSCA "both facially and as applied."  Dkt. #316 at 14

22

23

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 32

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    n.3.  These due process arguments fail for several reasons, described below.[18]

2            **1.**     **Defendants Waived Their Facial Challenges to ROSCA by Omitting Them From Their Answer.**

3         "Generally, an affirmative defense that is not asserted in an answer to the complaint is

4    waived or forfeited by the defendant."  *KST Data v. DXC Tech. Co.*, 980 F.3d 709, 714 (9th Cir.

5    2020).  Here, Defendants stated in their answer that their vagueness defense is an "as applied"

6    challenge to ROSCA.  Dkt. #171 at 65 (line 8).  Similarly, Defendants' fair notice defense

7    focused exclusively on the FTC's application of ROSCA to this case (Dkt. #171 at 66-69), and

8    Defendants later confirmed that this defense was an "as-applied" challenge only.  Dkt. #214 at

9    17.  Defendants did not assert a *facial* challenge to ROSCA until they filed for summary

10   judgment.  Therefore, they waived the argument.

11           **2.**     **Defendants Cannot Lodge a Facial Challenge to ROSCA.**

12        Even had they not waived it, a "facial challenge" to ROSCA would be unavailable to

13   Defendants because, in the absence of "exceptional circumstances," "vagueness challenges to

14   statutes that do not involve First Amendment violations must be examined as applied to the

15   defendant."  *United States v. DeBorba*, 713 F. Supp. 3d 1042, 1064-65 (W.D. Wash. 2024).  This

16   case does not involve First Amendment violations for the reasons explained *infra* pp. 35-36.

17   Therefore, Defendants' facial challenge must fail.

18           **3.**     **Defendants' As-Applied ROSCA Challenges Are Meritless.**

19        Defendants' due process challenges also fail for all of the reasons stated in the FTC's

20   Motion.  Dkt. #315 at 77-80.  Below, the FTC briefly responds to arguments made in

21   Defendants' motions.

22        The relevant question for Defendants' as-applied challenge is whether, "as applied to

23   [this] specific factual scenario, a reasonable person of average intelligence in [Defendants']

position would be on notice that their conduct was legally prohibited."  *DeBorba*, 713 F. Supp.

---

[18] Defendants' due process arguments do not reach ROSCA's requirement to obtain "express informed consent" to Prime enrollment.  Dkt. #316 at 16-20.  That requirement's validity is therefore undisputed.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 33

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

3d at 1066.  Defendants frame the test in essentially the same way, stating a statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Dkt. #316 at 16 (quoting *FCC v. Fox Television Stations*, 567 U.S. 239, 254 (2012)).

Defendants cannot satisfy this standard for several reasons, including that, as described above, the legal standards applied by Defendants and the FTC to the relevant ROSCA questions are *essentially the same.  See supra* pp. 8, 16, 21 (FTC and Defendants apply same meaning to "clear and conspicuous," "express informed consent," and "simple").  For example, Defendants claim their interpretation of "simple mechanisms" is objective, whereas the FTC's "sweeping view" is "entirely subjective," but the FTC and Defendants *apply the same standard.  See supra* p. 21 (FTC's definition of "simple" to mean "easy" is the same as Defendants' definition of "simple" as "readily performed and understood").  Defendants, in fact, describe their definition of "simple" as "readily understood or performed" as the "*ordinary meaning*" of the term, effectively conceding that the term has an "ordinary meaning" that a "person of ordinary intelligence" could understand.  Dkt. #319 at 22 (emphasis added).  The parties simply ask the Court to reach different results upon *applying* that undisputed definition to the facts of the case.

Defendants are also wrong that the FTC is urging an "entirely subjective" test.  Dkt. #316 at 16.  A test is not subjective, as Defendants suggest, merely because it turns "on a lot of facts" or because a court may look to evidence of how consumers actually act to determine how a "reasonable" or "ordinary" consumer would act.  *See supra* p. 14.  Likewise, Defendants once again falsely accuse the FTC of advancing *per se* bans on "save offers" and "cancellation mechanisms more complex than sign up."  Dkt. #316 at 18.  The FTC seeks no such bans here.

Defendants then resort to their familiar standby argument:  that ROSCA must be impermissibly vague because the FTC has observed that the text of ROSCA does not specify, or "provide clarity," as to exactly *how* to achieve ROSCA compliance.  Dkt. #319 at 36-37.  At

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 34

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    bottom, what Defendants are actually complaining about is a lack of "semantic certainty" as to

2    how to comply with ROSCA. *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016). Such certainty is

3    impossible. "Because words are rough-hewn tools, not surgically precise instruments, some

4    degree of inexactitude is acceptable in statutory language." *Id.* (cleaned up) (quoting *URI*

5    *Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011)). Contrary to

6    Defendants' argument that neither the FTC nor Congress provided a ROSCA compliance

7    "checklist" (Dkt. #316 at 17), due process does not demand a "how-to guide" for compliance,

8    and, if it did, "swaths of the United States Code, to say nothing of state statute books, would be

9    vulnerable." *Draper*, 827 F.3d at 4 (cleaned up); *cf. Kimble v. Marvel Entm't, LLC*, 576 U.S.

10   446, 460 (2015) (in non-due process case, explaining Congress intended the Sherman Act's

11   "reference to restraint of trade to have changing content, and authorized courts to oversee term's

12   dynamic potential") (cleaned up). For the same reason, it does not matter that some defendants

13   who, at some level of generality, want to comply with ROSCA may fail to achieve compliance;

14   that is the inevitable result of a lack of "semantic certainty."[19] It also is not what happened here;

15   Amazon's violations were knowing and deliberate.

### B.    ROSCA Does Not Violate the First Amendment.

Defendants' First Amendment arguments (Dkt. #316 at 18-20) fail because (1) ROSCA

does not regulate speech at all and (2) even if the Court found it did, ROSCA would regulate

commercial speech, which is subject either to no protection at all (as here) or limited protection.

First, the First Amendment is not implicated at all. Defendants bear the burden "to

demonstrate that the First Amendment even applies." *B&L Prods., Inc. v. Newsom*, 104 F.4th

108, 112 (9th Cir. 2024) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293

n.5 (1984))). "The First Amendment only applies when 'conduct with a significant expressive

---

[19] The fact that the FTC seeks to impose liability on the Individual Defendants does not, as Defendants argue (Dkt. #316 at 20-21), change this analysis. The primary case cited by Defendants turned on the fact that the Ninth Circuit "strictly construes *tax penalty provisions*," not that the defendant was a natural person. *United States v. Boyd*, 991 F.3d 1077, 1085-86 (9th Cir. 2021) (emphasis added).

element dr[aws] the legal remedy or the [statute] has the inevitable effect of singling out those

engaged in an expressive activity.'" *Id.* (quoting *Int'l Franchise Ass'n v. City of Seattle*, 803

F.3d 389, 408 (9th Cir. 2015)) (cleaned up). "[R]estrictions on protected expression are distinct

from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v.*

*IMS Health Inc.*, 564 U.S. 552, 567 (2011). For these reasons, it also is not sufficient for

Defendants to argue that because their violations involved "words," the First Amendment is

necessarily implicated. Dkt. #316 at 19. The conduct regulated by ROSCA—Prime enrollment

and cancellation—contains no "significant expressive element" and therefore does not implicate

the First Amendment. Defendants' primary contrary argument is that the FTC says Amazon

cannot "attempt[] to persuade customers to remain enrolled in Prime using save offers and

reminders about the benefits of Prime." Dkt. #316 at 19. That is simply not true; the FTC is not

applying such a *per se* ban.

Second, even if there were any regulation of speech here, it is commercial speech, as

Amazon concedes. Dkt. #316 at 19 (accusing FTC of reading ROSCA to "prohibit truthful

*commercial* speech") (emphasis added). Commercial speech that is "[f]alse or misleading," it is

"not protected" at all. *Hoffman v. Cap. Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001).

As explained herein and in the FTC's Motion, Amazon's Prime enrollment practices mislead

consumers into inadvertently signing up for Prime, and the Iliad contains a number of misleading

tactics that prevent cancellation.[20] Even if that is not correct—*i.e.*, even if Amazon's commercial

speech is entitled to some protection—ROSCA does not violate the First Amendment. ROSCA

plainly advances government interests, which include "preventing abusive and coercive sales

practices." *Mainstream Mktg. Servs. Inc. v. FTC*, 358 F.3d 1228, 1238 (10th Cir. 2004).

ROSCA's "tailoring" therefore need not be "necessarily perfect, but reasonable." *Erotic Serv.*

---

[20] Amazon's citation to a single deposition answer from the FTC's corporate representative about whether the FTC alleged in its Complaint that Amazon makes "false" statements is beside the point. *See* Dkt. #319 at 19 (citing Defendants' Ex. 2 at 402:7-11). Defendants ignore the many examples of false or misleading statements identified by the FTC in response to an Amazon interrogatory. Att. 194 at 3-9.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 36

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    *Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 461 (9th Cir. 2018).  ROSCA's

2    requirement of clear and conspicuous disclosures, simple cancellation mechanisms, and express

3    informed consent are all reasonable means of advancing the government's interests.

4    ## VI.    THE FTC OFFERS MORE THAN SUFFICIENT EVIDENCE TO JUSTIFY CIVIL PENALTIES.

5            To obtain civil penalties, the FTC must prove, at trial, that Defendants violated ROSCA

6    "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that

7    such act is unfair or deceptive and is prohibited by such rule."  15 U.S.C. § 45(m)(1)(A).  The

8    FTC may prevail by proving *either* that Defendants were actually aware of ROSCA's existence

9    and that they were violating it, *or* that a "reasonable person under the circumstances would have

10   known of the existence of [ROSCA] and that the action[s] charged violated [ROSCA]."  *United*

11   *States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996).  Stated differently, defendants

12   face penalty liability if they "either knew that the act was unlawful or if [they] should have

13   known the act was unlawful ('knowledge fairly implied')."  *United States v. Dish Network, LLC*,

14   954 F.3d 970, 978 (7th Cir. 2020).  For the reasons explained below, there is more than enough

15   evidence to create a triable issue of fact as to whether the Defendants (1) knew or should have

16   known of ROSCA's requirements and (2) knew or should have known that they were not

17   complying with those requirements.

18           ### A.    Amazon Is Liable for Civil Penalties.

19           First, there is substantial evidence that Amazon knew ROSCA's requirements.  To be

20   sure, Amazon certainly knew of ROSCA no later than March 2021, when the FTC told Amazon

21   it was under investigation for possible ROSCA violations.  Dkt. #90-2 at 79.  Unsurprisingly,

22   given that Prime is the largest subscription program in the United States, there is also evidence of

23   Amazon's pre-2021 knowledge of ROSCA, the federal statute governing automatically renewing

subscriptions.  Specifically, among other evidence, one of Amazon's early submissions to the

FTC touted the company's pre-existing "policies" for "clearly and conspicuously disclos[ing] the

material terms of a Prime membership."  Att. 114 at 29.  Those "policies," in turn, closely track

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 37

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

ROSCA's requirements—creating a clear inference that Amazon was aware of those requirements.  Amazon's "Automatic Renewal Sign-Up Requirements," for example, mirror ROSCA by imposing a requirement to "display the Required Disclosures clearly and conspicuously."  Att. 3 at 2.  A separate "Worldwide Prime Sign-Up Requirements" policy again references the "clear and conspicuous disclosure" requirement while adding a consent-related requirement that the Prime sign-up button "clearly describe the action the customer is taking by clicking."  Att. 221 at 2.  Another document, apparently referencing ROSCA's "simple" cancellation requirement, includes a "Cancellation requirement[]" that Amazon "provide customers with a way to cancel their subscription" and allow consumers "to proceed to cancellation without significant effort."  Att. 220 at 2.

At an absolute minimum, Amazon had "knowledge fairly implied" of ROSCA's requirements because a "reasonable [company] under the circumstances would have known of the existence of [ROSCA]."  *Nat'l Fin. Servs.*, 98 F.3d at 139.  In particular, Amazon is a sophisticated company with virtually unlimited access to sophisticated in-house and outside counsel; it is simply implausible that Amazon would be completely unaware of ROSCA.  *See, e.g.*, *Dish Network*, 954 F.3d at 978 (assessing "knowledge" requirement for civil penalties in part by considering fact that defendant was "large national corporation with the ability to hire sophisticated counsel").  Defendant Ghani, moreover, confirmed that throughout his time as VP of Prime, he consulted with lawyers regarding "the legal requirements that Amazon must follow when enrolling consumers in Amazon Prime" and when consumers attempted to cancel Prime.  Dkt. #343 at 774-75.  Other witnesses provided similar testimony regarding counsel's role in Prime enrollment and cancellation.  *Id.* at 757, 885-86.  From this testimony, it is reasonable to infer that Amazon knew of ROSCA's requirements.

Given the evidence that Amazon knew or should have known of ROSCA's requirements, the proof that it was *violating* those requirements is straightforward.  In particular, ROSCA requires "consent," but years of documents and other evidence confirm Amazon *knew* millions of

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 38

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   customers were enrolling in Prime unintentionally—*i.e.*, without consenting.  Dkt. #315 at 25-37.

2   Similarly, ROSCA requires "conspicuous" disclosures of Prime's material terms, but the same

3   documents and evidence demonstrate Amazon knew a substantial number of consumers not only

4   did not understand that they were enrolling in Prime at all, but also that Prime auto-renewed at a

5   certain price per month.  Finally, ROSCA requires "simple" cancellation, but the evidence

6   confirms Amazon knew consumers were confused or frustrated by Prime cancellation.  Dkt.

    #315 at 46-50.

7            Amazon attempts to complicate the penalty analysis by once again imagining the FTC

8   has asked the Court to adopt some new "interpretation" of ROSCA of which Amazon could not

9   have been aware.  For the reasons explained above, that is false, and the FTC's and Defendants'

10  *interpretations* of ROSCA are actually the same.  *See supra* pp. 8, 16, 21.  The parties simply

11  disagree on the *application* of the undisputed meaning of ROSCA to the facts of this case.[21]  On

    that application question, Amazon's arguments do not hold water because, for example, Amazon

12  plainly knew it was not obtaining consent to Prime enrollment from millions of Prime

13  subscribers.  The same problem dooms Amazon's argument that if a statute "is not clear on its

14  face, a defendants' legal misunderstanding prevents an award of civil penalties."  Dkt. #319 at

15  35.  ROSCA *is* clear on its face; that is why the parties agree on its meaning.  It also why

16  Amazon previously admitted ROSCA is a "clear statute."  Dkt. #84 at 24.

17           The cases cited by Amazon are inapplicable for the same reason.  Specifically, Amazon

18  says penalties cannot be assessed where a statute allows for "more than one reasonable

    interpretation."  Dkt. #319 at 34 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20

19  (2007)).  *Safeco*, however, involved a disputed legal question of statutory interpretation:  whether

20

21
    ───────────────────
    [21] Similarly, the Individual Defendants' argument that ROSCA "does not clearly support the FTC's interpretation on
22  its face" (Dkt. #316 at 23) cannot be right because *Defendants' interpretation is the same as the FTC's*.  Defendants
    nevertheless complain that they could not have known about the purported "soup" or multi-factor balancing tests the
23  FTC "is privately relying on."  Dkt. #316 at 23.  But it does not matter what factors the FTC considers in evaluating
    whether to bring suit because the FTC does not decide whether Defendants violated ROSCA; the Court does.

    PLAINTIFF'S OPPOSITION TO DEFENDANTS'                        Federal Trade Commission
    MOTIONS FOR SUMMARY JUDGMENT                                 600 Pennsylvania Avenue NW
    Case No. 2:23-cv-0932-JHC - 39                               Washington, DC 20580
                                                                 (202) 326-3320

the Fair Credit Reporting Act's reference to an "increase in any charge for . . . any insurance" can apply to the initial rate for a new insurance policy.  *Id.* at 60-61.  The Court disagreed with defendant Safeco's answer to this question, but found Safeco's reading "was not objectively unreasonable" and therefore that Safeco's violation was not "reckless."  *Id.* at 70.  Here, Defendants offer no alternative interpretation of ROSCA, much less one that they relied upon while engaging in their unlawful practices.  Amazon's reliance on *Murray v. Cingular*, 523 F.3d 719 (7th Cir. 2008) is similarly misplaced.  Dkt. #319 at 36.  That case too involved a defendant adopting a statutory interpretation with which the Court disagreed, but which the Court found was not reckless.  *See Murray*, 523 F.3d at 726-27.

Defendants also point to conclusory, uncorroborated statements by their own employees that, at some level of generality, they did not believe they were violating the law.  Dkt. #319 at 33.  For several reasons, those statements do not support entry of judgment for Defendants. First, these statements do not relate to any argument that Defendants *should* have known—*i.e.*, had knowledge fairly implied—that they were violating the law.  Stated differently, even an honest belief that one is not violating the law cannot defeat penalty liability when the belief "is not objectively reasonable. . . . Ignorance of the law's reach is not a defense." *FTC v. Day Pacer LLC*, 125 F.4th 791, 802 (7th Cir. 2025).

Second, the evidence cited by Amazon also cannot even disprove actual knowledge. Rather, it is uncorroborated testimony from Defendants for which there is no documentary support.  *Villarimo*, 281 F.3d at 1061.  In addition, it is too general to be meaningful; a statement that Defendants did not believe they were violating the law, in some abstract sense, cannot absolve them where they *actually knew* millions of consumers had enrolled in Prime *non*consensually.  Third, Defendants' witnesses repeatedly testified that the basis for their high-level belief in Amazon's legal advice was advice of counsel.  *See* Dkt. #343 at 757, 774-75, 885-86.  Defendants, however, have refused to reveal that advice.  This therefore presents the archetypical situation in which a party impermissibly is attempting to use the attorney-client

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 40

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   privilege as both a shield and a sword; Amazon's hiding of the legal advice that purportedly

2   informed witnesses' belief in the legality of their actions leaves the FTC unable to challenge the

3   authenticity of those beliefs.  *See, e.g.*, *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003)

4   ("[P]arties in litigation may not abuse the privilege by asserting claims the opposing party cannot

5   adequately dispute unless it has access to the privileged materials.").  The FTC, in fact, made this

6   same point to Defendants just before they filed their summary judgment motion.  Att. 192 at 3

    (referencing Att. 191 at 9).

7          Finally, Amazon's oft-repeated references to the FTC's characterizations of ROSCA as

8   not providing "clarity" or "specificity" (Dkt. #319 at 36-37) change nothing.  Congress was not

9   obligated to tell Amazon, for example, exactly how to obtain "consent" to Prime enrollment;

10  what matters is that Amazon knew it was not doing so.  Amazon nevertheless suggests it could

11  not have known it was violating ROSCA "in the face of the FTC's comments about ROSCA's

12  ambiguity."  Dkt. #319 at 36.  Indeed, if Amazon actually decided it could use the FTC's

13  observations about ROSCA as some sort of safe harbor to avoid penalty liability even for clear

14  ROSCA violations,[22] that is evidence of bad faith, not good faith.

           **B.     The Individual Defendants Are Liable for Civil Penalties.**

15         In an apparent effort to shock the Court into granting their motion, the Individual

16  Defendants twice claim that the FTC is seeking over $1 billion in penalties from them.  *See* Dkt.

17  #316 at 3, 6.  This is a fabrication; the Individual Defendants simply made it up.  The only

18  citations they provide are to paragraph 271 of the FTC's Amended Complaint (Dkt. #67), which

19  merely states the maximum permittable penalty per violation, and to Defendants' Exhibit 38

20  (Dkt. #343 at 1036-37 (paragraph "b")), in which the FTC expressly said it was *not*, at that time,

    disclosing the penalties it would seek.[23]  (Nor could the FTC do so; the FTC currently possesses

21

22  [22] Notably, Defendants never claim they *actually relied on*, or even saw, the FTC's rulemaking statements.

23  [23] In the same document, the FTC disclosed it might seek more than $1 billion in *compensatory* relief (not civil penalties) from the Individual Defendants.  That liability is joint-and-several with any amount owed by Amazon, meaning, in practice, that the Individual Defendants will not pay anything.

virtually no information about the Individual Defendants' ability to pay a penalty, which is one of the penalty factors.  *See* Dkt. #274 at 2-3.)

In any event, on the merits, the Individual Defendants' argument suffers from a fatal flaw:  although Defendants acknowledge they face penalties if they had "knowledge fairly implied" of Amazon's ROSCA violations even in the absence of proof of actual knowledge (Dkt. #316 at 21), their entire argument is built around the FTC's purported inability to prove actual knowledge.  For example, Individual Defendants fault the FTC's reliance on what a "reasonable executive" would have known and claim (falsely) that the FTC has no evidence that any Individual Defendants "*in fact knew* of a ROSCA violation."  Dkt. #316 at 22; *see also* Dkt. #316 at 23 ("The FTC developed no evidence that Grandinetti, who is not a lawyer, *knew* that ROSCA existed in the relevant period."); *id.* at 24 ("Similarly, there is no evidence that Ghani, also a non-lawyer, knew of ROSCA or what it prohibited."); *id.* ("Finally, there is no evidence that Lindsay, another non-lawyer, knew of ROSCA or what it prohibited at the relevant time.").  But it is undisputed that the FTC can obtain penalties even if the Individual Defendants did *not* "in fact" know about ROSCA, as long as a "reasonable person under the circumstances"—*i.e.,* a reasonable executive—"would have known of the existence of [ROSCA] and that the action[s] charged violated [ROSCA]."  *Nat'l Fin Servs.*, 98 F.3d at 141.

Moreover, there is substantial evidence the Individual Defendants likely *did* have actual knowledge of ROSCA's requirements.  Like Amazon, the Individual Defendants almost certainly knew of ROSCA no later than when the FTC served its civil investigative demand ("CID") on Amazon.  The CID quickly became a key factor in the May 6, 2021 meeting at which Amazon leaders (including Ghani and Lindsay) discussed the "clarity" of Prime enrollment and cancellation.  *See* Dkt. #315 at 33-34.  (Grandinetti received a copy of the memorandum for this meeting.  Att. 88 at 2; Dkt. #218-2 at 117, 119.)  Ghani received a memorandum, moreover, that included a description of the Amazon policies, described implementing ROSCA's "clear and conspicuous" requirement and a requirement that the "sign-up button" "clearly describe the

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 42

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4

action the customer is taking by clicking." Att. 36 at 18.  Finally, Grandinetti and Ghani, at the absolute latest, learned of ROSCA in mid-2022 when the FTC served them individually with CIDs stating the FTC was investigating Amazon for potential ROSCA violations.  Atts. 196, 197, 198.[24]

5
6
7
8
9
10

At a minimum, reasonable people in Defendants' positions—as executives in charge of the largest subscription program in the United States—would know about a Congressional statute governing automatically renewing online subscriptions or, more generally, that there were laws requiring them to obtain consent before charging people for Prime.  *Cf. Dish Network*, 954 F.3d at 978 (defendant was "large national corporation with the ability to hire sophisticated counsel").  Ghani, for example, admitted he routinely conferred with in-house counsel about the legal requirements for Prime cancellation and enrollment.  *See* Dkt. #343 at 774-75.

11
12
13
14
15
16

Given Individual Defendants' knowledge, or knowledge fairly implied, of ROSCA's requirements, it is once again straightforward to prove they knew they were violating ROSCA.  The same facts, described above, justifying the FTC's ability to obtain compensatory monetary relief from the Individual Defendants and civil penalties from Amazon also support a finding that they knew, or reasonably should have known, they were not complying with ROSCA.  *See supra* pp. 29-32.  In fact, the Individual Defendants were repeatedly informed of nonconsensual enrollment in Prime and consumers' difficulty cancelling Prime.  Dkt. #315 at 25-37.

17

## VII.   THERE ARE GENUINE DISPUTES OF MATERIAL FACT AS TO THE CUTOFF DATE FOR THE COURT'S ABILITY TO REDRESS CONSUMER HARM.

18
19
20
21

In addition to civil monetary penalties, the FTC also seeks compensatory monetary relief to remedy consumer harm resulting from Defendants' ROSCA violations, pursuant to 15 U.S.C. § 57b(a)(1).  Defendants are correct that there is a three-year statute of limitations on the FTC's ability to obtain this compensatory relief.  *See* Dkt. #319 at 37 (citing 15 U.S.C. § 57b(d)).

22
23

---

[24] Lindsay also received an individual CID invoking ROSCA, but he had left the Prime organization by that point.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 43

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3

Based on that statutory provision, Defendants ask the Court to impose a June 21, 2020 cutoff

date—three years before the FTC's June 21, 2023 Complaint—on the FTC's ability to seek

redress for consumer harm.  *Id.*

4
5
6

Amazon[25] is not entitled to the relief it seeks because, for the reasons explained below,

Amazon's efforts to delay the FTC's investigation toll the limitations period for a length of time

to be determined at trial.  Below, the FTC first summarizes Amazon's efforts to delay and derail

the FTC's investigation and then explains why those facts justify tolling the limitations period.

7

### A.    Amazon Delayed the FTC's Investigation.

8
9
10
11
12
13
14
15
16
17
18

On March 16, 2021, the FTC served a CID on Amazon.  Dkt. #90-2 at 74-88.  Among

other things, the CID requested "All Documents" relating to "consumer perception or

understanding" of Prime enrollment or cancellation and "All Documents" relating to whether

Amazon provided clear and conspicuous disclosures of Prime's material terms, obtained express

informed consent to Prime enrollment, and offered a simple mechanism to cancel Prime.  *Id.* at

81-82.  Amazon received the CID after (1) spending the several preceding years reviewing the

clarity problem in depth, including in documented meetings with executives (Dkt. #315 at 25-

37), (2) spending much of the prior year working up toward launching clarity improvements to

Prime enrollment, only to reverse those improvements in the face of enrollment declines (*id.* at

29-32), and (3) receiving a detailed memorandum from its own Shopping Design team just three

months earlier, urging the company to fix Prime enrollment and cancellation (*id.* at 47-48 (citing

Att. 93)).  Nevertheless, as described below, Amazon steered the FTC away from key documents

relating to those, and related, analyses and events.

19

### 1.    Amazon Steered the Commission Away from Key Documents and Witnesses.

20
21

When the FTC issued its March 2021 CID, the only FTC staff attorney working on the

matter was Katherine Johnson.  Att. 161 at 35:12-24, 40:4-8.  Amazon quickly retained Laura

22
23

---

[25] The FTC does not intend to seek compensatory relief from the *Individual* Defendants for any consumer harm
incurred prior to June 21, 2020.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 44

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4

Kim of Covington & Burling to represent the company.  Att. 164 at 10-11.  Kim had previously worked for 12 years at the FTC and, in fact, had supervised Johnson.  Att. 162 at 22:2-14, 59:4-6, 160:19-22.  The two attorneys were friends and spoke socially in the office.  *Id.* at 162:24-167:5; Att. 161 at 141:14-23, 239:19-240:3, 283:8-22, 285:20-286:5.  Kim had even attended a party at Johnson's house.  Att. 163 at 329:11-333:8.

5
6
7
8
9
10
11

Johnson and Kim first discussed the CID on March 29, at which time Kim asked whether there were certain categories of responsive documents that Amazon should prioritize for production.  Att. 166 at 8-10.  The next day, Johnson identified the priority items, including "internal communications regarding enrolling and unsubscribing from Amazon Prime."  Att. 164 at 10.  When Amazon expressed concern about reviewing internal communications in a timely manner, Johnson asked Amazon to at least "identify the [document] custodians for each category of documents and their roles," so that the FTC would be in a position to discuss with Amazon "which custodians' communications to prioritize."  *Id.* at 2.

12
13
14
15
16
17

On April 15, Kim told Johnson over the phone that she would provide the names of witnesses who had "visibility" into Prime enrollment and cancellation.  Att. 165 at 5.  Later that day, however, Amazon identified just three such employees—Jamil Ghani, Neil Lindsay, and Cem Sibay.  Dkt. #338-2 at 3.  The next day, Johnson told Kim that this was a "woefully inadequate response."  Att. 165 at 5.  In response, Amazon disclosed just five additional potential custodians, two of whom had only "software development" roles.  Att. 180 at 5.

18
19
20
21
22
23

On April 26, still without any CID extension or document production schedule in place, the FTC, through Johnson, threatened to initiate federal court CID enforcement proceedings if Amazon could not commit to "solidifying a timeline and process . . . for production of . . . internal communications."  Att. 166 at 10.  Kim understood the letter was a threat.  Att. 162. at 203:22-204:1.  Amazon, through Kim, responded with a formal letter sent to Johnson just after midnight on the morning of April 29.  Kim stated she understood the FTC "wanted to propose initial search terms" and that, as a result, Amazon could not provide a definitive completion date

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 45

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

for its productions at that point.  Att. 177 at 12.

Just four minutes later—and still in the middle of the night less than three days after the threat to litigate—Kim removed her colleague John Graubert and Amazon in-house counsel Benjamin Langner from the email chain that she had used to deliver the formal response letter to Johnson, and sent an email to Johnson alone.  Att. 178 at 2.  That second email asked for a call later that day so the two friends and former colleagues could "connect for a few minutes one on one."  *Id.*  Johnson obliged, and the one-on-one call occurred that afternoon.  Att. 167 at 2 (Monday, May 3 email referencing "Thursday" call).  On the call, Kim proposed, and Johnson concurred, that Amazon would initially move forward with reviewing documents from the three custodians (Ghani, Lindsay, and Sibay) it had initially proposed, but "rather than [the FTC] providing [Amazon] with search terms, we [Amazon] will apply search terms to a reasonable universe of internal communications."  *Id.* at 2-3.  Amazon said that it would complete the resulting production by June 21, 2021.  *Id.*

Both Johnson and Kim understood the FTC was relying on Amazon to identify and produce this initial set of documents, so that the FTC could then determine what more to request.  Kim, for example, recalls Johnson deferred to her on the choice of initial search terms because Kim "kn[e]w the business better than [Johnson did]."  Att. 162 at 241:42-14; *see also id.* at 121:19-122:6 (in general, Kim wants FTC staff "to rely on my operating in good faith in the same way that they might want me to rely on their operating in good faith").  Kim also understood Johnson would review "the documents that were the result of those search term hits and then evaluate" next steps.  Att. 162 at 241:15-20.  More generally, Kim understood "Commission staff [was] reserving its right to ask for additional information to complete its investigation.  So it's not a one and done scenario."  *Id.* at 231:25-232:9.  Kim also told Johnson at several points during the investigation that Amazon would cooperate with the FTC's investigation.  Att. 162 at 192:12-18.

Johnson, for her part, recalls Kim "reassur[ing] [her] repeatedly that she would work with

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 46

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

me to get me what I needed." Att. 161 at 141:14-142:8; *id.* at 143:16-144:5 ("[M]y overall recollection of the tenor of the conversations was that she reassured me that she would get me what I needed in order to move the investigation forward . . . ."); Att. 164 at 5 (Amazon stating it intended to "provid[e] you with the information you need to complete your investigation"). Johnson added that she trusted Kim "was going to deal with me in good faith and provide me the information I needed." Att. 161 at 280:16-281:2.

Ultimately, Amazon searched its original three custodians (Ghani, Lindsay, and Sibay) using only the following search string:  "Prime w/5 (enroll* OR sign* OR register* OR join* OR cancel* OR unsubscribe*)."  Att. 168 at 8.  Amazon knew at the time that its custodians and search terms were woefully underinclusive.  With respect to custodians, Amazon omitted Prime Content Testing team member Caroline Abramowicz (née Moeller) and her direct supervisor and Content Testing team lead, Nikki Baidwan, notwithstanding that Moeller had spent the prior year leading a "clarity workstream" relating to Prime enrollment.  Dkt. #140-2 at 127-28.  Amazon, in fact, offered no Content Testing team custodians.  *See* Att. 180 at 5 (identifying custodians' job titles).  Amazon also omitted Reid Nelson, a user experience researcher on Amazon's Shopping Design team, who, by this point, had spent over four years trying to convince the Prime organization to fix Prime enrollment and cancellation.  *See, e.g.*, Att. 24.  Further, Amazon omitted David Edelstein, who led the Prime "GPX" team of user experience researchers and designers that had, among other relevant projects, worked with the Content Testing team to develop clarity guidelines.  *See, e.g.* Dkt. #315 at 30.  In fact, Amazon offered no GPX team members as custodians at all.  *See* Att. 180 at 5.

With respect to search terms, Amazon omitted certain terms that were obviously necessary.  For example, Amazon did not propose—either as standalone terms or in combination with other terms—Iliad (the name of the Prime cancellation flow), clarity (the long-time name for the work that had been to "clarify" Prime enrollment and cancellation), "cx satisfaction" (the then-new name for clarity work), or UPDP (an enrollment page that for years had drawn scrutiny

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 47

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1   within Amazon).  *See* Att. 168 at 8.  At the time, the FTC did not know, and could not have

2   known, the significance of these witnesses and terms.  Indeed, this is precisely what Kim had

3   urged Johnson to rely on her for:  Kim knew the business, and promised to get the FTC what it

4   needed for its investigation.

        After reviewing the June 21 production,[26] the FTC followed up with Amazon to request

5   additional terms and custodians based on its initial review of this and prior productions.

6   Specifically, on August 10, the FTC asked Amazon to add additional custodians, including

7   certain members of the Prime Content Testing team, and search terms, including terms

8   incorporating "clarity" and "Iliad."  Att. 170 at 8-9.  Kim admits Amazon simply did not do what

9   Johnson asked.  Att. 162 at 261:1-21.  Instead, Amazon "move[d] forward with reviewing and

10  producing responsive non-privileged emails and documents collected from five additional

11  custodians"—direct reports of Jamil Ghani, some of whom had very little to do with the relevant

12  issues—that Amazon had first identified five months prior, in its April 17 letter.  Att. 171 at 3;

13  Att. 180 at 5.  Again, this group omitted Moeller, Baidwan, Nelson, and Edelstein, among others.

14  Notwithstanding Johnson's request for the inclusion of new terms—including "clarity" and

15  Iliad"—Amazon simply used the same narrow terms it had previously used for the first three

16  custodians.  Att. 171 at 3.  From this point, Amazon slowly rolled out a series of small

17  productions—using only the eight custodians and narrow set of search terms it had selected—

18  through February 2022.  *See, e.g.*, Dkt. #288-18 at 4 (production dates).

        It was not until *Business Insider* published an article regarding Amazon's Prime

19  enrollment and cancellation practices (Dkt. 90-2 at 90) that Johnson or the FTC realized the

20  extent to which Amazon had hidden important documents and information.  The article was

---

[26] Amazon, twisting a September 2021 FTC internal email, implies the FTC did not review the June 21, 2021 production prior to September.  Dkt. #319 at 31 (citing Defendants' Ex. 59, Dkt. #343 at 1303).  In the email Amazon cites, however, Johnson ask for assistance extracting from a .zip file certain "appendices" Amazon sent on June 21, 2021, which was separate from the document production it provided on the same date.  Att. 179.  In fact, Johnson, on July 16, 2021, asked Amazon questions regarding documents in the June 2021 production, meaning that she had reviewed the documents by that point.  *See* Rottner Decl. ¶ 3 (citing Att. 169).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'                                  Federal Trade Commission
MOTIONS FOR SUMMARY JUDGMENT                                        600 Pennsylvania Avenue NW
Case No. 2:23-cv-0932-JHC - 48                                              Washington, DC 20580
                                                                                (202) 326-3320

1  headlined: "Internal documents show Amazon has for year knowingly tricked people into

2  signing up for Prime subscriptions. 'We have been deliberately confusing,' former employee

3  says." *Id.* The article then described the years-long unsuccessful effort by Amazon employees

   to convince the company to change its Prime enrollment and cancellation practices. Upon

4  learning of the article, Johnson felt "betrayed" and "misled." Att. 161 at 136:1-138:7.

5              **2.      Without Disclosing That It Was Doing So, Amazon Delayed
                         Producing Anything Marked "Privileged" and Then Wrongfully**
6                        **Withheld Several Thousand Non-Privileged Documents.**

7          The Court is now familiar with Amazon's in-house practice of labeling all documents

8  having to do with Prime cancellation and enrollment as "p&c" or "privileged and confidential."

9  *See*, *e.g.*, Dkt. #90-2 at 7-10, Dkt. #140-1 at 3-4; Dkt. #217 at 1-2; Dkt. #286 at 11-12. Similarly,

   the Court is aware that Amazon wrongfully withheld tens of thousands of these documents

10 throughout the FTC's investigation and this litigation. *See generally* Dkt. #286, 302, 334. The

11 FTC will not repeat that entire history here. Instead, the FTC highlights below two discrete ways

12 in which Amazon's privilege practices delayed the FTC during the first year of its investigation.

13         First, without disclosing this fact to the FTC, Amazon withheld, from its June 21, 2021

14 production of custodial documents (*see supra* pp. 46-47), *all* documents that were in any way

15 labeled "privileged" or "p&c," apparently without even checking whether they were in fact

16 privileged, even under Amazon's impossibly broad view of the privilege. In particular, Amazon,

17 prior to December 2021, produced *no* documents containing, in the file name or email subject

   line, the word "privileged" or the phrase "P&C." *See* Rottner Decl. ¶¶ 5-7. Then, on December

18 23, 2021, Amazon produced approximately *100* documents with those labels, all of which should

19 have been produced by June 2021. *Id.* ¶ 8. For the first time, Amazon's December 23

20 production cover letter also included a note that "some documents that Amazon is producing

21 today contain markings reflecting assertions of attorney-client privilege and/or work product

22 protection." Att. 174 at 4. Amazon added that it was producing the documents because it had

23 "not identified a basis for the assertion of such privileges." *Id.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 49

                                          Federal Trade Commission
                                          600 Pennsylvania Avenue NW
                                          Washington, DC 20580
                                          (202) 326-3320

This undisclosed delay in producing *anything* including even a false privilege marking led to several key omissions.  Among them, it was not until Amazon's December 2021 production that the FTC had any way of knowing of Amazon's extensive work, in early 2021 (just before the FTC issued its CID), toward preparing for the key clarity-related meeting with Amazon leaders that ultimately occurred on May 6, 2021.  *See* Rottner Decl. ¶ 9; Dkt. #218-1 at 5-9 (discussing meeting).  Similarly, December 2021 was the first time that Amazon produced even a draft version of a critical document from the 2020 clarity-related work:  a memo prepared by the Prime team, including Defendant Ghani, outlining for Defendant Lindsay the later-aborted plan to improve enrollment clarity.  *See* Rottner Decl. ¶ 9.  This is the exact type of information that the FTC was supposed to receive in June 2021 so that it could decide how to proceed with its investigation.

Second, even after Amazon belatedly produced some documents falsely marked privileged, it continued to withhold far more on the base on false, and often entirely unsupportable, claims that the documents were privileged.  *See generally* Dkt. #286, 334.  For example, as of April 1, 2022, Amazon had produced approximately 8,800 documents in total Dkt. #186 ¶ 4, but had wrongfully withheld almost as many documents (over 6,700) that it then did not produce until the last few months, Rottner Decl. ¶¶ 11-15.  Notwithstanding Kim's effort to steer the FTC away from critical documents, almost 3,000 of these documents were within the initial review set that should have been produced in June 2021 even under Kim's bad-faith approach to search terms and custodians.  *See* Rottner Decl. ¶¶ 11-15.  Put differently, no matter what occurred between Kim and Johnson, at least these nearly 3,000 documents should have been available to the FTC as it proceeded through its investigation.

Despite Amazon's then-ongoing wrongful withholding of privileged materials, Amazon in-house counsel Benjamin Langner, who was responsible for Amazon's privilege assertions (Dkt. #334 at 5-6), certified on October 7, 2022 that Amazon's responses to the March 15, 2021 CID (including its privilege assertions) were "complete and true and correct to the best of my

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 50

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1
2
3
4
5

knowledge, information, and belief," under penalty of perjury.  *See* Dkt. #288-18.  That certification was not only false—based on the wrongfully withheld privileged documents, Amazon's response was not "complete"—but was also *538 days late*.  *See* Dkt. #90-2 at 76 (CID response deadline of April 15, 2021); 15 U.S.C. § 57b-1(c)(11) (CID response requires sworn certification);  Att. 162 at 243:6-244:12; 246:20-249:3 (Amazon did not receive extension in manner required by law).

6
7

**B.      Amazon's Delays, Coupled with Its False Assurances of Cooperation and Assistance, Partially Estop Amazon from Asserting a Statute of Limitations Defense.**

8
9
10
11
12

Like all statutes of limitations, other than the rare "jurisdictional" statute of limitations, the FTC Act's three-year limitation on compensatory relief (15 U.S.C. § 57b(d)) is subject to the doctrine of equitable tolling.  *See, e.g.*, *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1034-35 (9th Cir. 2013) (recognizing "rebuttable presumption" in favor of equitable tolling's availability).  A statute of limitations is only "jurisdictional" and therefore exempt from equitable tolling where, unlike here, Congress "clearly states" it is jurisdictional.  *Id.* at 1036 (cleaned up).

13
14
15
16
17
18
19
20
21

The doctrine of equitable estoppel tolls the running of the statute of limitations period when the plaintiff proves "(1) knowledge of the true facts by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in that intent; (3) ignorance of the true facts by the relying party; and (4) detrimental reliance."  *Estate of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) (quoting *Bolt v. United States*, 944 F.2d 603, 609 (9th Cir. 1991)).  Equitable estoppel "focuses primarily on actions taken by the defendant in preventing a plaintiff from filing suit."  *Id.*  "Estoppel may be appropriate in the statute of limitations context where the defendant's act or omission reasonably induced the plaintiff to refrain from filing a timely suit."  *Bianco v. Warner*, 562 F. Supp. 3d 526, 533 (C.D. Cal. 2021) (cleaned up; applying California law).

22
23

Here, Defendants said almost nothing about the FTC's tolling arguments in their motions for summary judgment.  *See* Dkt. #319 at 19-21, 37.  In response, to advance this argument at

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 51

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

this stage, the FTC need only "designat[e] 'specific facts demonstrating the existence of genuine issues for trial.'" *Becker*, 649 F. Supp. 3d at 1074 (quoting *In re Oracle*, 627 F.3d at 387). The FTC easily clears this bar. In their Reply, Defendants cannot inject new facts—to which the FTC would have no opportunity to respond—but rather are limited to arguing that the facts (disputed or not) described above are insufficient to create a trial issue of fact. *See, e.g.*, *Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d 1218, 1226 (W.D. Wash. 2014) ("As a general rule, a movant may not raise new facts or arguments in his reply brief.") (cleaned up). Defendants cannot succeed because the FTC has offered significant evidence on each element of equitable estoppel.

### 1. Amazon Knew the True Facts.

Amazon plainly was aware of several facts from the outset of the FTC's investigation. First, Amazon knew of several Amazon employees likely to possess unique, responsive information and documents, in addition to several search terms that would have returned unique, responsive information and documents. For example, in addition to the custodians and search terms already identified above, Amazon knew its Shopping Design organization had worked for years on nonconsensual enrollment in particular. *See, e.g.*, Att. 24. Amazon also knew Prime's in-house UX team (Prime GPX) had worked on these same issues. *See, e.g.*, Dkt. #315 at 30. Yet Amazon offered *no* custodians from each of these teams, and refused the FTC's August 2021 request to search some of them. *See supra* 47-48. Amazon also knew, for example, that "clarity," and then "CX Satisfaction," were the shorthand terms used within Amazon for efforts to improve enrollment and cancellation and that "Iliad" was the name of the Prime cancellation flow, yet Amazon ignored all three terms, again even after the FTC followed-up to request them. *See id.*

Perhaps most glaringly, Amazon *knew* that it had instructed employees to mark (almost always falsely) all documents relating to Prime enrollment and cancellation "privileged" or "p&c" and that, without telling the FTC, Amazon was simply setting aside all such documents

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 52

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

aside for at least six months.  *See supra* pp. 49-50.  Finally, Amazon knew that, even when it

finally produced *some* documents falsely labeled privileged, it was continuing to wrongfully

withhold thousands more.  *Id.*

> **2.      Amazon Intended for the FTC to Rely on Its Document Productions and Selection of Search Terms and Custodians.**

This second estoppel element—intent to induce reliance—is met either if Amazon

intended to induce reliance by the FTC or if Amazon acted in such a way that the FTC had a

right to believe Amazon intended to induce reliance.  *See Watkins v. United States*, 875 F.2d 699,

710 (9th Cir. 1989).  The FTC easily satisfies this element because the parties openly discussed

that the purpose of Amazon, in the first instance, selecting custodian and search terms—and

supposedly producing all non-privileged responsive results—was for the FTC initially to rely on

Amazon's superior knowledge of its own business before following up to request additional

documents and information.  Both Johnson and Kim, in fact, confirmed the FTC was relying on

Amazon for these purposes.  *See supra* p. 46.

> **3.      The FTC Was Largely Unaware of the True Facts.**

Importantly, a plaintiff can satisfy the third estoppel element—ignorance of the true

facts—even when it "know[s], or suspect[s], that [it] has a cause of action."  *Amaro*, 653 F.3d at

813.  That is true because the focus of this element "is not whether the plaintiff *knew* she had a

cause of action—or even pursued some other form of litigation based on that knowledge—but

whether the defendant's fraudulent concealment or misrepresentation deprived the plaintiff of a

*full understanding* of the true facts, and thus, dissuaded the plaintiff from filing the claim at issue

within the limitations period."  *Id.*  Stated differently, "[w]here a plaintiff suspects the truth but

investigates unsuccessfully, fraudulent concealment will toll the statute."  *UA Local 343 v. Nor-*

*Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994).

Especially given this case law, there can be little doubt Amazon's conduct denied the

FTC a "full understanding of the true facts."  Prior to Amazon's December 2021 production, for

example, and despite the fact that related documents hit on the initial (under-inclusive) search

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 53

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    terms and custodians, Amazon had produced no copies of a critical July 2020 clarity

2    memorandum, and no evidence at all of critical clarity-related meeting (ultimately occurring on

3    May 6, 2021) that Amazon had been planning for two months prior to the FTC's CID.  *See supra*

4    pp. 49-50.

### 4.    The FTC Relied on Amazon to Its Detriment.

5        Once again, at an absolute minimum, there is a genuine dispute of material fact as to

6    whether the FTC can satisfy the fourth estoppel element:  that it relied on Amazon to its

7    detriment.  As discussed above, FTC counsel has confirmed its reliance on Amazon to select

8    reasonable custodians and search terms—and to actually produce the resulting documents.  For

9    the reasons already explained, that reliance was clearly detrimental.  It resulted in the FTC being

10   deprived of key evidence—including evidence that would have shaped and accelerated its

11   investigation—for months and sometimes years.  The extent to which Amazon's conduct delayed

12   the filing of this litigation is an issue to be determined at trial, but the fact that it clearly resulted

     in *some* delay is sufficient to deny summary judgment.

### C.    The FTC Need Not Establish "Diligence," but, at a Minimum, There Is a Triable Issue of Fact as to the FTC's Investigatory Diligence.

13       Defendants address some of the FTC's tolling-related arguments in their argument that

14   the FTC's claim for *penalties*, as opposed to compensatory relief, is time-barred.  Dkt. #319 at

15   29-31.  There, Defendants anticipate the FTC asserting a right to "fraudulent concealment"

16   tolling—which is related to equitable estoppel and which, in some formulations, requires the

17   plaintiff to show "diligence in trying to uncover [the concealed] facts."  *Id.* at 30 (citing *Conmar*

18   *Corp. v. Mitsui & Co. (USA)*, 858 F.2d 499, 502 (9th Cir. 1988)).  The doctrines, however, are

19   not the same, and "the elements to support equitable estoppel are distinct from fraudulent

20   concealment."  *See IQVIA Inc. v. MedImpact Healthcare Sys., Inc.*, 2022 WL 6258369, at *5-6

21   (S.D. Cal. Oct. 7, 2022).  Diligence is not an element of equitable estoppel.  *Id.*; *see also Amaro*,

22   653 F.3d at 813.

23

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 54

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1      In any event, the facts outlined above would easily create a triable issue of fact as to the

2  FTC's diligence.  Among other things, when Amazon initially dragged its feet on producing

3  documents, or even agreeing to a production schedule, the FTC quickly threatened an

4  enforcement action.  And when Amazon produced documents, the FTC reviewed them and then

   promptly followed up with additional questions and requests.  *See supra* pp. 45-48.

5      The facts Defendants claim demonstrate a lack of diligence (Dkt. #319 at 30-31) are

6  disputed or irrelevant, and, even if true, would fall well short of conclusively resolving this issue.

7  First, Amazon argues that the FTC received consumer complaints for years prior to the start of

8  its investigation.  *Id.* at 30.  This is immaterial; obviously, law enforcement agencies cannot

9  immediately launch investigations in response to all complaints they receive.  (In 2024 alone, the

   FTC received 6.5 million consumer complaints.[27])  Second, Amazon argues that FTC staff

10 enrolled in Prime.  *Id.*  This is misleading in addition to immaterial.  There is no evidence that

11 FTC staff enrolled through the challenged product-checkout enrollment pages, and even if they

12 had, law enforcement officers have no obligation to walk through the world, in their personal

13 capacities, looking for potential investigations to launch, especially at the risk of prejudicing

14 their employer's legal argument if they do not do so.  Third, Amazon notes that the FTC

15 investigator assigned to this matter "didn't review any of the documents that Amazon produced,"

16 but that was not his job in this case (Rottner Decl. ¶ 2), and Johnson indisputably reviewed

   Amazon's document productions.  Fourth, Amazon asserts Johnson told Kim she lacked

17 "capacity to devote much time and attention to the matter" (Dkt. #310 at 31), but this remark, in

18 Kim's retelling, related at the most to a period of time starting in October 2021 (Dkt. #343 at

19 733-34).  Fifth, Amazon claims the FTC waited months "before even opening Amazon's

20 productions," but Amazon is simply wrong about the lone example it cites.  *See supra* note p. 48

21 n.26.  Finally, it is facially absurd to claim Johnson's failure to review "*all* of the documents that

22

23 [27] *See* FTC, *Consumer Sentinel Network: Data Book 2024*, at 5-6, https://www.ftc.gov/system/files/ftc_gov/pdf/csn-annual-data-book-2024.pdf.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 55

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

Amazon produced" (Dkt. #319 at 31 (emphasis added)) somehow means the FTC did not act

2

diligently.

3

    At trial, the Court or jury can, and should, weigh the conflicting evidence to determine

4

the extent to which Amazon delayed the FTC's filing of this case and whether that delay justifies

tolling the limitations period.

5

## VIII.    THE FTC'S CLAIM FOR CIVIL PENALTIES IS NOT TIME-BARRED.

6

    Government enforcement actions seeking civil penalties must be "commenced within five

7

years form the date when the claim first accrued." 28 U.S.C. § 2462. Consistent with this

8

requirement, the FTC only seeks civil penalties for Defendants' ROSCA violations dating back

9

five years from the FTC's Complaint, plus any period of time the Court estops Defendants from

10

asserting a limitations defense. ROSCA, in turn, is clear that a separate ROSCA violation occurs

11

*not* each time Amazon deploys a specific enrollment or cancellation method, but rather whenever

12

Amazon "charge[s] or attempt[s] to charge any consumer" for Prime, without having clearly and

conspicuously disclosed Prime's material terms, obtained express informed consent, or provided

13

simple cancellation mechanisms. 15 U.S.C. § 8403. Therefore, the FTC seeks penalties relating

14

to each time Amazon charged a consumer in violation of ROSCA, starting from five years, plus

15

any tolling period, prior to the filing of the Complaint.

16

    Rejecting this straightforward application of 28 U.S.C. § 2462, Defendants assert the

17

FTC can obtain *no* civil penalties at all, even for violations occurring within the five years

18

predating the Complaint, because the FTC alleged, in interrogatory responses, that certain Prime

enrollment practices had violated ROSCA since 2014, and certain cancellation practices had

19

done so since 2016. Dkt. #319 at 29. This argument fails for two reasons. First, it depends on

20

Defendants mischaracterizing their serial ROSCA violations as a *single* continuing violation that

21

has been ongoing for up to 11 years. Second, it ignores that the exact manner in which

Defendants have violated ROSCA has varied over time.

22

23

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 56

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

## A.    Defendants Have Committed a Series of Repeated ROSCA Violations, Rather Than a Single Continuing Violation.

2

Defendants' penalties-limitation argument (Dkt. #319 at 29) is based almost exclusively

3

on a single Tenth Circuit case:  *Sierra Club v. Okla. Gas & Elec Co.*, 816 F.3d 666, 671-73 (10th

4

Cir. 2016).  That case, however, does not apply here because it involved a single, continuing

5

violation—in response to which the Tenth Circuit held that the limitation period ran from the

*start* of the single violation—rather than, as here, a series of discrete, repeated violations.

6

Specifically, in *Sierra Club*, the Sierra Club accused an Oklahoma power company of

7

violating a law providing that "[n]o person shall cause or allow the construction nor

8

modification" of certain facilities without obtaining certain environmental permitting.  816 F.3d

9

at 669-70.  The power company began unpermitted modifications in March 2008 and completed

10

those modifications in April 2008.  *Id.* at 670.  Then, in 2013, the parties entered into an

11

agreement to toll the limitations period as of April 1, *2013*—more than five years after the

unpermitted construction projected *started*, but less than five years after it *ended*.  *Id.*  When the

12

Sierra Club later filed its lawsuit, the Tenth Circuit held that the suit was time-barred because the

13

Sierra Club's claim "first accrued" when the construction projected started.  *See id.* at 671-75.

14

To the extent construction continued after April 1, 2008, that construction was "best

15

characterized as a continuing violation rather than a series of repeated violations" because the

16

statute's use of the word "construct" referred to a single "ongoing project."  *Id.* at 672.

17

*Sierra Club* simply does not apply here.  Defendants have not engaged in a single,

ongoing violation of ROSCA since 2014.  Rather, because ROSCA bars Defendants from

18

charging "*any* consumer" for Prime without having obtained the consumer's express informed

19

consent (or complied with ROSCA's other provisions), *see* 15 U.S.C. § 8403, each individual

20

charge of each individual consumer is its own violation.  Many courts, including the Tenth

21

Circuit itself (post-*Sierra Club*), have made clear that cases like this one involve a series of

22

discrete violations rather than a single, ongoing violation.

23

In *SEC v. Kokesh*, 884 F.3d 979 (10th Cir. 2018), the Tenth Circuit discussed, and

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 57

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

distinguished, *Sierra Club*.  The *Kokesh* defendant, over the course of 11 years, "misappropriated over $34.9 million" from several clients.  *Id.* at 980-81.  The court "readily conclude[d]" that those misappropriations "are properly viewed as discrete violations" in part because, as here, they "constituted a series of repeated violations of an identical nature, with each lawful taking being actionable for five years after its occurrence."  *Id.* at 985 (cleaned up).  The Court added that a holding that "Defendant's misappropriations constituted only one continuing violation" would go well beyond "provid[ing] repose for ancient misdeeds" and would instead "confer immunity for ongoing repeated misconduct."  *Id.*

Similarly, in *Birkelbach v. SEC*, 751 F.3d 472 (7th Cir. 2014), the defendant failed to properly supervise an investment broker over a period of time that started before the limitations period.  *Id.* at 478.  The Seventh Circuit, applying the same statute of limitations as here, rejected the petitioner's argument that the "failure to supervise is a single indivisible act which begins on the first day of unethical supervision."  *Id.* at 479.  The court instead held that "any violative conduct that falls within the statute of limitations is independently sanctionable, regardless of whether there was additional violative conduct which occurred before that time."  *Id.*  To hold otherwise, the court explained, would create the "absurd" result—also advocated by Defendants here—that once a defendant "avoid[ed] detection for five years, he could continue his unethical behavior *forever*" without facing any discipline.  *Id.*

Finally, in an Equal Pay Act sex-discrimination case, the Sixth Circuit explained that "a plaintiff's action will not be time-barred as along as at least one forbidden discriminatory act occurs within the relevant limitations period," even though the "employer has committed identical illegal actions prior to the limitations period."  *Gandy v. Sullivan County, Tenn.*, 24 F.3d 861, 864 (6th Cir. 1994).  Specifically, even though an employer had started underpaying a female employee, relative to her male predecessor, well before the limitations period, each discrete underpayment that occurred within the limitations period was actionable.  *Id.* at 863-64.  Additionally, the Court rejected the idea that the "continuing violation" doctrine had anything to

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 58

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1  do with its decision:  "discriminatory acts were committed within the limitations period, and

2  Gandy did not request damages for conduct outside the limitations period."  *Id.* at 864.

3  "Although 'continuing in nature,' invocation of the continuing violations doctrine is not

4  necessary since plaintiffs . . . are not attempting to file an otherwise untimely action and are not

   attempting collection of damages for conduct outside the limitations period."  *Id.*

5          Here, as in all of these cases, the FTC is seeking to recover for discrete violations—that

6  is, discrete, unlawful Prime charges—that occurred within the limitations period.  As is clear

7  from the case law, the Court's analysis must begin "with a careful examination of the specific

8  conduct prohibited by the statute at issue."  *Nat'l Parks Cons. Ass'n v. TVA*, 480 F.3d 410, 418

9  (6th Cir. 2007).  ROSCA is clear that the "specific conduct" it prohibits is "charg[ing] or

10 attempt[ing] to charge" "any consumer" without having previously clearly and conspicuously

11 disclosed Prime's material terms (before obtaining billing information), obtained express

12 informed consent, or provided simple cancellation mechanisms.  15 U.S.C. § 8403.  Therefore, a

13 ROSCA claim accrues anew each time Amazon *charges*, or attempts to charge, certain Prime

14 subscribers.  Amazon's argument—that the FTC's claim first accrued in 2014 or 2016—could

15 only even possibly be correct if ROSCA defined the violation as *maintaining a website* that

16 offers a membership program that enrolls people without their consent or fails to provide simple

   cancellation.  Because, however, the violation is the charge, not the existence of the website, the

17 FTC can recover all charges within the limitations period.

18         **B.      The Manner in Which Defendants Violate ROSCA Has Changed over Time.**

           There is a second, independent reason Defendants' argument fails:  their enrollment and

19 cancellation processes have, to varying degrees, changed over time.  For example, the FTC's

20 Motion describes the evolution of Amazon's "UPDP" and "SPC" enrollment pages over time.

21 Dkt. #315 at 11-23.  Similarly, although the Iliad remained relatively constant (until it was

22 shortened to two pages in March 2023), it too has changed in important ways, including by

23 changing the "Continue to Cancel" button to a more confusing, and false, "End My Benefits"

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 59

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

2

3

button. *Id.* at 43-44. It cannot be the case that once Defendants initially set up *any* form of enrollment or cancellation that do not meet ROSCA's requirements, they are immunized from liability for all future versions of those processes that result in ROSCA violations.

## CONCLUSION

4

5

For the foregoing reasons, the FTC respectfully requests the Court deny Defendants' motions for summary judgment.

6

## LOCAL RULE 7(e) CERTIFICATION

7

8

I certify that this memorandum contains 20,992 words, in compliance with the Local Civil Rules.

9

Dated: June 17, 2025                /s/ Evan Mendelson

10

11

12

13

JONATHAN COHEN (DC Bar # 483454)
EVAN MENDELSON (DC Bar #996765)
OLIVIA JERJIAN (DC Bar #1034299)
JONATHAN WARE (DC Bar #989414)
ANTHONY SAUNDERS (NJ Bar #008032001)
SANA CHAUDHRY (NY Bar #5284807)

14

15

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington DC 20580

16

17

(202) 326-2551 (Cohen); -3320 (Mendelson); -2726
(Ware); -2749 (Jerjian); -2917 (Saunders); -2679
(Chaudhry)

18

19

JCohen2@ftc.gov; EMendelson@ftc.gov;
JWare1@ftc.gov; OJerjian@ftc.gov;
ASaunders@ftc.gov; SChaudhry@ftc.gov

20

21

COLIN D. A. MACDONALD (WSBA # 55243)
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, WA 98174
(206) 220-4474; CMacdonald@ftc.gov

22

23

RACHEL F. SIFUENTES
(IL Bar #6304016; CA Bar #324403)

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 60

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Federal Trade Commission
230 S. Dearborn St., Room 3030
Chicago, IL 60604
(312) 960-5617; RSifuentes@ftc.gov

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4303; JTang@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
Case No. 2:23-cv-0932-JHC - 61

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320