The Honorable John H. Chun

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9    FEDERAL TRADE COMMISSION,

No. 2:23-cv-0932-JHC

10                        Plaintiff,

OMNIBUS DECLARATION OF
JOSEPH A. REITER IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
FTC'S MOTIONS FOR SUMMARY
JUDGMENT AND TO EXCLUDE
CERTAIN EXPERT WITNESS
TESTIMONY

11          v.

12    AMAZON.COM, INC. *et al.*,

13                        Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

## DECLARATION

2     I, Joseph A. Reiter, declare as follows:

3     1.    I am a partner at the law firm Hueston Hennigan LLP, counsel for Defendants

4 Amazon.com, Inc.; Neil Lindsay; Russell Grandinetti; and Jamil Ghani in the above-captioned

5 case. To the best of my knowledge, the matters set forth herein are true and correct and, if called

6 as a witness, I could and would testify competently thereto.

7     2.    I submit this declaration in support of Defendants' Opposition to Plaintiff's

8 Motion for Summary Judgment and Motions to Exclude the Expert Testimony of Donna L.

9 Hoffman, Ph.D., Ronald T. Wilcox, Ph.D., Craig Rosenberg, Ph.D., and James C. Cooper, Ph.D.

10    3.    Where applicable, each exhibit introduced hereunder has been excerpted and

11 highlighted in accordance with the Court's Local Civil Rule 10(e)(10).

12    4.    **Exhibit 60** is a true and correct copy of the Statement of Commissioner Rohit

13 Chopra, dated September 2, 2020, available at

14 https://www.ftc.gov/system/files/documents/public_statements/1579927/172_3086_abcmouse_-

15 _rchopra_statement.pdf.

16    5.    **Exhibit 61** is a true and correct excerpted copy of the Expert Report of Ran

17 Kivetz, Ph.D., dated February 24, 2025.

18    6.    **Exhibit 62** is a true and correct excerpted copy of the deposition transcript of

19 Ronald T. Wilcox, Ph.D., taken on May 9, 2025.

20    7.    **Exhibit 63** is a true and correct excerpted copy of the Expert Report of Marshini

21 Chetty, Ph.D., dated February 24, 2025, as corrected on April 2, 2025.

22    8.    **Exhibit 64** is a true and correct excerpted copy of the deposition transcript of the

23 FTC's Rule 30(b)(6) designee, Amanda Basta, taken on September 10, 2024.

24    9.    **Exhibit 65** is a true and correct excerpted copy of the deposition transcript of the

25 FTC's Rule 30(b)(6) designee, Amanda Basta, taken on May 13, 2025.

26    10.    **Exhibit 66** is a true and correct excerpted copy of the deposition transcript of

27 Russell Grandinetti, taken on November 13, 2024.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 2

11. **Exhibit 67** is a true and correct excerpted copy of the deposition transcript of Neil Lindsay, taken on November 19, 2024.

12. **Exhibit 68** is a true and correct excerpted copy of the deposition transcript of Jamil Ghani, taken on November 21, 2024.

13. **Exhibit 69** is a true and correct excerpted copy of the deposition transcript of Ann Everett, taken on December 3, 2024.

14. **Exhibit 70** is a true and correct excerpted copy of the deposition transcript of Lois Berkowitz, taken on December 9, 2024.

15. **Exhibit 71** is a true and correct excerpted copy of the deposition transcript of Brian Smith, taken on December 17, 2024.

16. **Exhibit 72** is a true and correct excerpted copy of the deposition transcript of Tyranny Osborne, taken on January 28, 2025.

17. **Exhibit 73** is a true and correct excerpted copy of the deposition transcript of Llew Mason, taken on August 23, 2024.

18. **Exhibit 74** is a true and correct excerpted copy of the deposition transcript of James C. Cooper, Ph.D., taken on April 25, 2025.

19. **Exhibit 75** is a true and correct excerpted copy of the deposition transcript of Craig Rosenberg, Ph.D., taken on April 29, 2025.

20. **Exhibit 76** is a true and correct excerpted copy of the FTC's Responses and Objections to Amazon's Fourth Set of Requests for Admission, dated January 27, 2025.

21. **Exhibit 77** is a true and correct excerpted copy of the FTC investigational hearing transcript of David Clark, taken on November 18, 2022.

22. **Exhibit 78** is a true and correct copy of Amazon's third Civil Investigative Demand response to the FTC, dated May 24, 2021.

23. **Exhibit 79** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00034290.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

24.    **Exhibit 80** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00021537.

25.    **Exhibit 81** is a true and correct excerpted copy of the Expert Report of Dr. Tulin Erdem, *FTC v. DirecTV*, 4:15-cv-01129-HSG (N.D. Cal. Sept. 14, 2016) (Dkt. 277-12).

26.    **Exhibit 82** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00027881.

27.    **Exhibit 83** is a true and correct excerpted copy of Diamond, S. S., and J. B. Swann, eds. (2022), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 2d ed., Chicago, IL: American Bar Association.

28.    **Exhibit 84** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN-PRM-FTC-002381012.

29.    **Exhibit 85** is a true and correct copy Zoe Caplan, "U.S. Older Population Grew From 2010 to 2020 at Fastest Rate Since 1880 to 1890, Census (May 25, 2023), available at https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html.

30.    **Exhibit 86** is a true and correct copy of a screen capture from Amazon's website titled, "What is Two-Step Verification?", available at https://www.amazon.com/gp/help/customer/display.html?nodeId=G3PWZPU52FKN7PW4.

31.    **Exhibit 87** is a true and correct copy of Research Now Group LLC, Bloomberg, available at https://www.bloomberg.com/profile/company/3431331Z:US.

32.    **Exhibit 88** is a true and correct excerpted copy of Appendix F.1 to the Expert Report of Ronald T. Wilcox, Ph.D., dated February 24, 2025.

33.    **Exhibit 89** is a true and correct excerpted copy of the deposition transcript of the FTC's Rule 30(b)(6) designee, Amanda Basta, taken on September 11, 2024.

34.    **Exhibit 90** is a true and correct excerpted copy of the deposition transcript of Andy Ramirez, taken on December 18, 2024.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

35.     **Exhibit 91** is a true and correct excerpted copy of the deposition transcript of Benjamin Hills, taken on January 17, 2025.

36.     **Exhibit 92** is a true and correct excerpted copy of the deposition transcript of Benjamin Goeltz, taken on October 30, 2024.

37.     **Exhibit 93** is a true and correct excerpted copy of the deposition transcript of Caroline Abramowicz, taken on November 7, 2024.

38.     **Exhibit 94** is a true and correct excerpted copy of the deposition transcript of David Edelstein, taken on May 1, 2025.

39.     **Exhibit 95** is a true and correct copy of Exhibit 24 to the deposition of David Edelstein, taken on May 1, 2025.

40.     **Exhibit 96** is a true and correct excerpted copy of the deposition transcript of Jenny Blackburn, taken on December 10, 2024.

41.     **Exhibit 97** is a true and correct excerpted copy of the deposition transcript of Lisa Leung, taken on July 24, 2024.

42.     **Exhibit 98** is a true and correct excerpted copy of the deposition transcript of Lisa Leung, taken on May 5, 2025.

43.     **Exhibit 99** is a true and correct excerpted copy of the deposition transcript of Lisa Leung, taken on May 6, 2025.

44.     **Exhibit 100** is a true and correct excerpted copy of the deposition transcript of Marshini Chetty, Ph.D., taken on April 28, 2025.

45.     **Exhibit 101** is a true and correct excerpted copy of the deposition transcript of Monique Mascio, taken on March 20, 2025.

46.     **Exhibit 102** is a true and correct excerpted copy of the deposition transcript of Rachel Green, taken on May 19, 2025.

47.     **Exhibit 103** is a true and correct excerpted copy of the deposition transcript of Reid Nelson, taken on February 27, 2025.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    48.    **Exhibit 104** is a true and correct excerpted copy of the deposition transcript of

2    Rex Morey, taken on July 25, 2024.

3    49.    **Exhibit 105** is a true and correct excerpted copy of the deposition transcript of

4    Sanjay Balakrishnan, taken on September 12, 2024.

5    50.    **Exhibit 106** is a true and correct excerpted copy of the deposition transcript of

6    William Violette. Ph.D., taken on May 7, 2025.

7    51.    **Exhibit 107** is a true and correct excerpted copy of the FTC investigational

8    hearing transcript of Christopher "C.R." Brown, taken on November 2, 2022.

9    52.    **Exhibit 108** is a true and correct excerpted copy of the FTC investigational

10    hearing transcript of Cem Sibay, taken on November 29, 2022.

11    53.    **Exhibit 109** is a true and correct excerpted copy of the FTC investigational

12    hearing transcript of Greg Greeley, taken on November 9, 2022.

13    54.    **Exhibit 110** is a true and correct excerpted copy of the FTC investigational

14    hearing transcript of Gregory Fuller, taken on January 12, 2023.

15    55.    **Exhibit 111** is a true and correct excerpted copy of the 2023 FTC investigational

16    hearing transcript of Jamil Ghani, taken on January 11, 2023.

17    56.    **Exhibit 112** is a true and correct excerpted copy of the FTC investigational

18    hearing transcript of Jamil Ghani, taken on November 16, 2023.

19    57.    **Exhibit 113** is a true and correct excerpted copy of the FTC investigational

20    hearing transcript of Katey Muus, taken on October 25, 2022.

21    58.    **Exhibit 114** is a true and correct excerpted copy of the FTC investigational

22    hearing transcript of Lisa Leung, taken on January 20, 2023.

23    59.    **Exhibit 115** is a true and correct excerpted copy of the FTC investigational

24    hearing transcript of Masuma Henry, taken on August 23, 2022.

25    60.    **Exhibit 116** is a true and correct excerpted copy of the FTC investigational

26    hearing transcript of Nahshon Davidai, taken on November 30, 2022.

27

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

61.     **Exhibit 117** is a true and correct excerpted copy of the FTC investigational hearing transcript of Reid Nelson, taken on August 16, 2022.

62.     **Exhibit 118** is a true and correct excerpted copy of the FTC investigational hearing transcript of Sebastian Gunningham, taken on January 19, 2023.

63.     **Exhibit 119** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00028478.

64.     **Exhibit 120** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00059244.

65.     **Exhibit 121** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00100862.

66.     **Exhibit 122** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00101499.

67.     **Exhibit 123** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00101500.

68.     **Exhibit 124** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00102512.

69.     **Exhibit 125** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN_00113643.

70.     **Exhibit 126** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN-PRM-FTC-002620178.

71.     **Exhibit 127** is a true and correct excerpted copy of the deposition transcript of Ran Kivetz, Ph.D., taken on May 20, 2025.

72.     **Exhibit 128** is a true and correct copy of a document produced to the FTC by Amazon with beginning Bates number AMZN-PRM-FTC-001684333.

73.     **Exhibit 129** is a true and correct copy of a document produced to the FTC by Amazon with the beginning Bates number AMZN_00037197.

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

74.     **Exhibit 130** is a true and correct copy of Exhibit EI-14 to the deposition of Emily Ikeda, taken on May 1, 2025.

75.     **Exhibit 131** is a true and correct copy of Exhibit EI-17 to the deposition of Emily Ikeda, taken on May 1, 2025.

76.     **Exhibit 132** is a true and correct excerpted copy of the deposition transcript of Neale Mahoney, taken on May 9, 2025.

77.     **Exhibit 133** is a true and correct excerpted copy of the deposition transcript of Emily Ikeda, taken on February 20, 2025.

78.     **Exhibit 134** is a true and correct excerpted copy of the Rebuttal Expert Report of Ran Kivetz, Ph.D., dated April 28, 2025.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 17th day of June, 2025, in Newport Beach, California.


*s/ Joseph A. Reiter*
Joseph A. Reiter

OMNIBUS DECLARATION OF JOSEPH A. REITER ISO DEFS.'
OPP. TO FTC'S MOTS. FOR SUMMARY JUDGMENT AND
TO EXCLUDE TESTIMONY
(2:23-cv-0932-JHC) - 8

# EXHIBIT 60



UNITED STATES OF AMERICA
Federal Trade Commission

Office of Commissioner
Rohit Chopra

# STATEMENT OF
# COMMISSIONER ROHIT CHOPRA

*Regarding Dark Patterns in the Matter of Age of Learning, Inc.*
*Commission File Number 1723186*
*September 2, 2020*

Today, the Commission finalizes an important action against Age of Learning, which operates the ABCmouse subscription service for young children's educational content. At a time when many parents are looking for more opportunities for educational enrichment online, it is disappointing that services like ABCmouse have scammed millions of dollars from families through dark patterns, as alleged in the Commission's complaint. By making it extremely difficult to cancel recurring subscription fees, ABCmouse engaged in conduct that was not only unethical, but also illegal.

## Dark Patterns Trick and Trap Users by Design

Dark patterns are design features used to deceive, steer, or manipulate users into behavior that is profitable for an online service, but often harmful to users or contrary to their intent. Since Harry Brignull first coined the phrase in 2010, researchers have identified a wide variety of dark patterns – each one aimed at a nefarious outcome that almost certainly could not be achieved without deception.[1]

Dark patterns are the online successor to decades of dirty dealing in direct mail marketing.[2] Scams by mail have never gone away, but they have been eclipsed by digital deception, often using dark patterns. But, because dark patterns are not limited by physical constraints and costs, these digital tricks and traps pose an even bigger menace than their paper precursors.

Typically, digital tricks and traps work in concert, and dark patterns often employ a wide array of both. Dark pattern tricks involve an online sleight of hand using visual misdirection, confusing language, hidden alternatives, or fake urgency to steer people toward or away from certain choices. This could include using buttons with the same style but different language, a checkbox with double negative language, disguised ads, or time pressure designed to dupe users into clicking, subscribing, consenting, or buying.

---

[1] The Nerdwriter produced a helpful video highlighting Brignull's work and showing examples of dark patterns used by Amazon.com, LinkedIn, Booking.com, and other companies. Nerdwriter1, *How Dark Patterns Trick You Online*, YOUTUBE (Mar. 28, 2018), https://www.youtube.com/watch?v=kxkrdLI6e6M.

[2] For example, for many years, record labels relied on often deceptive negative option marketing to sell music, a precursor to digital scams. *See* Tien Tzuo, *Columbia House of Horrors: How Not to Run a Subscription Business*, VOX (Apr. 7, 2016), https://www.vox.com/2016/4/7/11585924/columbia-house-of-horrors-how-not-to-run-a-subscription-business.

Dark pattern traps use technology and design to create a situation Brignull has described as a "roach motel," where it is easy to get in, but almost impossible to escape. These digital traps can come in the form of forced continuity programs that make it difficult to cancel charges, trick questions to frustrate user choice, or through free trials that automatically convert into paid memberships.

**The ABCmouse Roach Motel**

ABCmouse was undoubtedly a roach motel. Through the dark patterns detailed in the FTC's complaint, ABCmouse deployed tricks to lure families into signing up for its service, and traps to prevent them from cancelling. First, ABCmouse tricked consumers with a "12-month" membership offer, without disclosing that this membership would automatically renew. Instead, the company buried this information in its "Terms and Conditions," which were accessible only if users clicked a hyperlink. Even those families that did click the link would have struggled to learn the truth, which was concealed in small, dense text. Unsurprisingly, these problematic practices prompted tens of thousands of families to file complaints.[3]

Instead of fixing the user experience, ABCmouse doubled down on deception by deploying a host of mazes and obstacles to prevent families from cancelling their membership. As detailed in the Commission's complaint, the company made it difficult for families to know where to start the process by deeply burying the link to the cancellation path, and by frequently refusing to honor cancellation requests initiated through their Customer Support portal or over the phone.[4] Then, families who tried to cancel through the website were forced to click through a labyrinth of pages urging them not to cancel. In addition to wasting families' time, these pages were riddled with traps – ambiguous menu options that in some cases *re-enrolled* members if they clicked the wrong button.[5]

When families complained, ABCmouse responded by making the site even more deceptive. For example, the Commission's complaint details how in 2017, ABCmouse changed its site to make the already-buried "Cancellation Policy" link less prominent. The trick worked, with the company's Senior Design Director reporting that more families were abandoning their efforts to cancel.[6]

ABCmouse's tactics are not unique. Dark patterns exist across the internet. Online services employ user experience designers who optimize design to ensure that sign-up flows are easy. But, the seedier side of the user experience designer's job is to frustrate users when it comes to ending a subscription or deleting an account, or by deceiving users directly.

For example, Uber reportedly used "ghost cars" to give customers the false impression that they would not need to wait long for an available ride – harming both their riders and their competitors.[7] Companies have also used dark patterns to manipulate users about privacy settings.

---

[3] Compl. ¶¶ 9-19.
[4] Compl. ¶¶ 21-26.
[5] Compl. ¶¶ 27-39.
[6] Compl. ¶¶ 42-44. This followed earlier efforts to add *additional* steps to the already labyrinthine cancellation process. *Id.*
[7] *See* Kate Knibbs, *Uber Is Faking Us Out With "Ghost Cabs" on Its Passenger Map*, GIZMODO (Jul. 28, 2015), https://gizmodo.com/uber-is-faking-us-out-with-ghost-cabs-on-its-passenge-1720576619.

Analyses by the Norwegian Consumer Council and Consumer Reports put a spotlight on dark patterns used by Microsoft, Google, and Facebook that appear to trick users into sharing more of their personal data.[8] Researchers have even identified a set of players that offer dark patterns as a turnkey solution to online operators.[9]

**Combatting Unlawful Dark Patterns**

While you may not have heard of ABCmouse before, we've all been subject to companies deploying dark patterns to dupe us. From making ads look like organic search results to creating a maze of "privacy" settings so complex that their own engineers and employees can't crack the code, these companies know that dark patterns can drive profit. In a culture that responds to systemic failures with "buyer beware," it's no surprise that searches for "accidental sign up" uncover scores of people asking for help after being forced into a premium product they did not want. We must change this calculation.

The Federal Trade Commission has numerous tools to root out the kinds of tricks and traps we saw in this matter. For example, the Restore Online Shoppers' Confidence Act requires clear and conspicuous disclosures of key terms and "simple mechanisms" to stop recurring charges – requirements that, in my view, ABCmouse clearly violated.[10] Similarly, the CAN-SPAM Act prohibits deceptive header information, and requires marketers to provide email recipients a simple way to opt out of future emails.[11] Additionally, the FTC Act itself prohibits unfair and deceptive practices, and vests the Commission with authority to analyze emerging practices and define which practices are unlawful.

Digital deception should not be a viable American business model. If the Federal Trade Commission aspires to be a credible watchdog of digital markets, the agency must deploy these tools to go after large firms that make millions, or even billions, through tricking and trapping users through dark patterns. We cannot replicate the whack-a-mole strategy that we have pursued on pressing issues like fake reviews, digital disinformation, and data protection.[12] Instead, we need to methodically use all of our tools to shine a light on unlawful digital dark patterns, and we need to contain the spread of this popular, profitable, and problematic business practice.

---

[8] *See* Katie McInnis & Gabrielle Rothschild, *CU Letter to FTC on Norwegian Consumer Council Report "Deceived by Design" and CU Research on Facebook and Google Sign-Up*, CONSUMER REPORTS (Jun. 27, 2018), https://advocacy.consumerreports.org/research/letter-to-ftc-norwegian-consumer-council-report-deceived-by-design/.

[9] *See* Arunesh Mathur et al., DARK PATTERNS AT SCALE: FINDINGS FROM A CRAWL OF 11K SHOPPING WEBSITES, PROC. ACM HUM.-COMPUT. INTERACT., VOL. 3, NO. CSCW, ARTICLE 81 (Sep. 20, 2019), https://arxiv.org/pdf/1907.07032.pdf.

[10] 15 U.S.C. §§ 8401–05.

[11] 15 U.S.C. § 7704(a).

[12] *See, e.g.,* Rohit Chopra, Commissioner, Fed. Trade Comm'n, Statement of Commissioner Rohit Chopra Joined by Commissioner Rebecca Kelly Slaughter In the Matter of Sunday Riley, Fed. Trade Comm'n File No. 1923008 (Oct. 21, 2019), https://www.ftc.gov/public-statements/2019/10/statement-commissioner-chopra-joined-commissioner-slaughter-regarding.

# EXHIBIT 61

<table>
<tr><td>

FEDERAL TRADE COMMISSION,

              Plaintiff,

    v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an officer of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an officer of AMAZON.COM, INC.,

              Defendants.

</td><td>

Case No. 2:23-cv-0932-JHC

Honorable John H. Chun

</td></tr>
</table>

## EXPERT REPORT OF DR. RAN KIVETZ

**CONFIDENTIAL**

possibility that the individual canceling the Prime account and taking the Cancellation Survey was not the original enrollee cannot be ruled out, even if it cannot be quantified.

71.    Nor did the survey employ any standard respondent screening and qualification procedures intended to verify that the survey participants qualify for participation and represent the "population whose perceptions and state of mind are relevant to the issues in the case."[123] The lack of such measures mean that respondents completing the survey may not always be the same persons who had interacted with the challenged Prime enrollment flow.

72.    *Second*, a major threat to the representativeness of a sample is the combination of *non-response bias* (*i.e.*, the fact that some potential respondents choose *not to* participate) and *self-selection* (*i.e.*, the fact that certain respondents or types of respondents choose *to* participate). Because the likelihood that someone who is invited to take the Cancellation Survey ends up completing the survey is frequently influenced by the person's prior attitudes, experiences, or behaviors, the result is a non-representative sample that will yield distorted results due to non-response and selection biases.[124]    These biases typically do not equally affect survey results in both directions, but instead tend to lead to a "*negativity bias*,"[125] that is, an overrepresentation of

---

[123] *McCarthy* (2007), §32:159; *see also Manual for Complex Litigation* (2004), p. 103.

[124] *See, e.g.*, Malhotra, Naresh K. (2012), *Basic Marketing Research* (4th ed.), Upper Saddle River, NJ: Prentice Hall, pp. 194 – 195.

[125] According to the academic literature on the negativity effect or negativity bias, negative aspects or values (such as performance levels below expectations) tend to receive greater weight in consumers' product evaluations and reviews; *see, e.g.*, Skowronski, John J. and Donald E. Carlston (1989), "Negativity and Extremity Biases in Impression Formation: A Review of Explanations," *Psychological Bulletin*, 105(1), 131 – 142; Ofir, Chezy and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," *Journal of Marketing Research*, 38(2), 170 – 182.  Nobel Prize-winning research has shown that product disadvantages loom larger than do product advantages, a phenomenon termed "loss aversion"; *see* Kahneman, Daniel and Amos Tversky (1991), "Loss Aversion in Riskless Choice: A Reference-Dependent Model," *Quarterly Journal of Economics*, 106(4), 1039 – 1061.  There is also a general agreement in the marketing literature that dissatisfied customers communicate with others more than do satisfied customers.  *See, e.g.*, Sweeney, Jillian C., Geoffrey N. Soutar, and Tim Mazzarol (2005), "The Difference Between Positive and Negative Word-of-Mouth—Emotion as a Differentiator," *Proceedings of the ANZMAC 2005 Conference*, Perth, Australia: University of Western Australia; Mizerski, Richard W. (1982), "An Attribution Explanation of the Disproportionate Influence of Unfavorable Information," *Journal of Consumer Research*, 9(3), 301 – 310.  Research has also highlighted how negative product-related information is conveyed through electronic means such as the Internet.  *See, e.g.*, Ward, James C. and Amy L. Ostrom (2006), "Complaining to the Masses: The Role of Protest in Customer-Created Complaint Web Sites," *Journal of Consumer Research,* 33(2), 220 – 230.

perceived problems and negative responses in customer feedback and survey responses.[126]  Such overrepresentation is likely to be more pronounced in surveys directly asking participants for their input regarding the performance of companies, products, or services, in which survey participants often (reasonably) assume that their role is to provide negative feedback.[127]

73.    ***Third***, that respondents are told the purpose of the survey (to understand cancellation) and the sponsor (Amazon) of the Cancellation Survey introduces bias.  To reduce the potential for nonresponse and self-selection biases, it is standard practice when designing surveys used in litigation to minimize information about the sponsor or purpose of a survey.[128]  For example, the surveys that I design typically include, when relevant, an introduction like:

> Hello, I'm_____ from [NAME OF THIRD-PARTY RESEARCH ORGANIZATION], a nationwide market research organization.  We're conducting a survey and I'd like to ask you a few brief questions.  Let me assure you we are doing this for research purposes only and are not selling anything.  There are no right or wrong answers.  We are only interested in your opinions, which will be kept anonymous and strictly confidential.

Such an introduction adheres to the double-blind principle, which (as discussed in Subsection A.4.4) does *not* identify the survey's sponsor and does *not* suggest the purpose of the survey or lead the respondents to any "expected" answers.  Even in situations in which disclosing the survey's sponsor is necessary, such disclosure must be done in a subtle manner, without flaunting the sponsor's identity or focusing the respondents on the survey's purpose or hypotheses.  For example, if identifying the sponsor (Amazon) was necessary, a proper introduction could have read:

> Hello, this survey is being conducted by _____, a nationwide market research organization.  We conduct routine surveys about various consumer issues for many reputable organizations, including Fortune 500 companies, government agencies, and academic institutions.  You've been selected to participate in a routine survey in which Amazon is interested in learning about consumer experiences with various companies and services.  We are not selling anything and there are no right or wrong

---

[126] *See* Ofir and Simonson (2001); Sweeney, Soutar, and Mazzarol (2005); Ward and Ostrom (2006).
[127] *See, e.g.*, Ofir, Chezy, Itamar Simonson, and Song-Oh Yoon (2009), "The Robustness of the Effects of Consumers' Participation in Market Research: The Case of Service Quality Evaluations," *Journal of Marketing*, 73(6), 105 – 114.
[128] *See, e.g.*, Diamond (2011), pp. 410 – 411; Jay (2013), p. 1157.

**A.4.    The Cancellation Survey's Questions Were Extremely Leading and Susceptible to Severe Demand Effects and Other Response Biases**

80.    Another reason why the Amazon Cancellation Survey cannot be relied on to estimate the rate of alleged unintentional enrollment (based on selections of the "DNI" answer choice) is the fact that the survey's closed-ended questions were highly leading and gave rise to multiple severe biases, including demand effects, focalism, and yea-saying (acquiescence bias), and order effects.[137]  As I detail in the subsections below, the Cancellation Survey: (*i*) should, if it were to be used to estimate unintentional enrollment, have used non-leading survey questions in order to avoid generating severely biased results in the form of "yea-saying", demand effects, and focalism; (*ii*) instead inappropriately relied on leading closed-ended questions (unpreceded by any filter questions) with incomplete and biased answer choices; (*iii*) used follow-up questions that were excessive and leading; (*iv*) failed to use a double-blind procedure, exacerbating demand effects and other motivational and response biases; and (*v*) induced order effects by asking the initial satisfaction questions prior to the "reasons for cancellation" questions.

**A.4.1.    *The Importance of Asking Non-Leading Questions and Avoiding Severe Demand Effects, Focalism, "Yea-Saying," and Order Biases***

81.    As Professor McCarthy notes,[138] a properly designed survey must use non-leading and unbiased survey questions, including, when appropriate, filter questions.  Doing so is necessary to avoid severe biases in the form of demand effects, focalism, and "yea-saying," which, individually and combined, create artificially inflated estimates of alleged deception or other measures of interest.  I review each of these separate but related sources of bias below.

82.    ***Leading questions***.  A *leading* question or survey procedure suggests to participants particular answers, creating a bias and producing invalid results.  Seminal research shows that people's survey responses are often distorted based on the survey context and on

---

[137] Such flaws and biases violate fundamental survey principles, including those overviewed in Subsection A.1 (*e.g.*, that the questions asked should be clear and non-leading, and that the survey and its reporting be conducted to ensure objectivity).  *See, e.g.*, *Manual for Complex Litigation* (2004), p. 103.
[138] McCarthy (2007), §32:172; *see also Manual for Complex Litigation* (2004), p. 103.

leading phrases and questions.[139]  Participants' reactions to leading survey questions about decontextualized information can reflect a number of factors and biases (*e.g.*, social desirability concerns,[140] guessing, justification and need for consistency, conversational norms), whereas it is often difficult for survey participants to accurately identify, remember, and verbalize their true perceptions, preferences, intentions, and awareness.[141]

83.    A specific form of response bias in surveys with leading questions consists of "*yea-saying*," or *acquiescence bias*, defined as follows:[142]

> A **leading question** is one that clues the respondent to what the answer should be. Some respondents have a tendency to agree with whatever way the question is leading them to answer.  This tendency is known as *yea-saying* and results in **acquiescence bias**.  [Emphases in the original]

84.    Yea-saying frequently arises when participants are asked closed-ended "yes/no"-type questions.  As recognized by survey authorities, *closed-ended* questions have disadvantages (compared to open-ended questions) when participants' spontaneous perceptions or responses are at issue, because closed-ended questions give participants hints about answers that are expected

---

[139] Kahneman, Daniel and Amos Tversky (1981), "The Framing of Decisions and the Psychology of Choice," *Science*, 211(4481), 453 – 458; Loftus and Zanni (1975); Weinberg, Wadsworth, and Baron (1983); Loftus, Altman, and Geballe (1975); Loftus (1975); Loftus, Elizabeth and John C. Palmer (1974), "Reconstruction of Automobile Destruction: An Example of the Interaction between Language and Memory," *Journal of Verbal Learning and Verbal Behaviour*, 13, 585 – 589; Burt, Christopher D. and Jennifer S. Popple (1996) "Effects of Implied Action Speed on Estimation of Event Duration," *Applied Cognitive Psychology*, 10(1), 53 – 63.  For example, Professor Loftus and her colleagues studied the impact of question wording on subsequent eyewitness testimony, finding that asking an eyewitness "How fast were the cars going when they smashed?", as opposed to "How fast were the cars going when they contacted?", produced higher speed estimates; Loftus, Altman, and Geballe (1975).  In another study, observers estimated the duration of an event they had themselves experienced two weeks earlier (a person disrupting a university class).  Participants asked to estimate how long it took the person to *walk* through the class as opposed to *run* through the class gave longer duration estimates.  *See* Burt and Popple (1996).
[140] *E.g.*, Fiske, Susan T. and Shelley E. Taylor (1991), *Social Cognition* (2nd ed.), NY, NY: McGraw-Hill.
[141] *E.g.*, Nisbett, Richard E. and Timothy D. Wilson (1977), "Telling More Than We Can Know: Verbal Reports on Mental Processes," *Psychological Review*, 84(3), 231 – 259; Wilson, Timothy D. and Daniel T. Gilbert (2003), "Affective Forecasting," in *Advances in Experimental Social Psychology Vol. 35*, Zanna, Mark P. (ed.), San Diego, CA: Elsevier, pp. 345 – 411; Wilson, Timothy D. and Jonathan W. Schooler (1991), "Thinking Too Much: Introspection Can Reduce the Quality of Preferences and Decisions," *Journal of Personality and Social Psychology*, 60(2), 181 – 192; Loftus (1975); Anderson (1985).
[142] Malhotra (2012), p. 313.

or preferred.[143]  The answer choices provided in a closed-ended question can steer participants toward a particular answer and away from (or preclude entirely) other answers, and can prompt participants to *report* perceptions or reasons/explanations (offered as answer choices) that do *not* actually apply to consumers in the real world.[144]  Professor Diamond discusses the following weakness of closed-ended questions:[145]

> […] the survey can ask all respondents to answer the question (e.g., "Did you understand the guarantee offered by Clover to be a 1-year guarantee, a 60-day guarantee, or a 30-day guarantee?").  **Faced with a direct question, particularly [a closed-ended] one that provides response alternatives, the respondent obligingly may supply an answer even if (in this example) the respondent did not notice the guarantee** […].  Such answers will reflect only what the respondent can glean from the question, or they may reflect pure guessing.

The results attained from closed-ended questions can be further misleading and biased if the list of answer choices provided to participants is incomplete,[146] including if the answer choices do not include a "don't know" option.  As a result, closed-ended and open-ended questions can give rise to very different responses.[147]

---

[143] *See, e.g.*, Diamond (2011), pp. 391 – 394; Schwarz, Nobert and Hans-Jurden Hippler (1991), "Response Alternatives, The Impact of their Choice and Ordering," *Measurement Error in Surveys*, Chichester: Wiley, pp. 43 – 45.

[144] *See, e.g.*, Diamond (2011), p. 392 ("Open-ended and closed-ended questions may elicit very different responses. Most responses are less likely to be volunteered by respondents who are asked an open-ended question than they are to be chosen by respondents who are presented with a closed-ended question. The **response alternatives in a closed-ended question may remind respondents of options that they would not otherwise consider or which simply do not come to mind as easily**.  The advantage of open-ended questions is that they give the respondent fewer hints about expected or preferred answers.  **Precoded responses on a closed-ended question, in addition to reminding respondents of options that they might not otherwise consider, may direct the respondent away from or toward a particular response**" [emphases added; FNs omitted]).

[145] *Id.*, pp. 389 – 390 [emphasis added].

[146] *Id.*, p. 393.

[147] *E.g., id.*, p. 392; Schwarz and Hippler (1991); Schwarz, Norbert, Hans-J. Hippler, and Elisabeth Noelle-Neumann (1994), "Retrospective Reports: The Impact of Response Formats," in *Autobiographical Memory and the Validity of Retrospective Reports*, New York, NY: Springer, pp. 187 – 199.  As I have shown in my own peer-reviewed research, giving people a closed-ended question can cause them to select factors or attributes that in the real world or in an open-ended question they would not; Rottenstreich, Yuval and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74 – 88.

85.    Closed-ended "yes/no"-type questions are "seriously problematic" due to the potential for yea-saying:[148]

> One form of closed-ended question format that typically produces some distortion is the popular agree/disagree, true/false, or yes/no question. Although this format is appealing because it is easy to write and score these questions and their responses, the format is also **seriously problematic**. With its simplicity comes acquiescence, "[T]he tendency to endorse any assertion made in a question, regardless of its content," is **a systematic source of bias that has produced an inflation effect of 10% across a number of studies**. Only when control groups or control questions are added to the survey design can this question format provide reasonable response estimates.

86.    Closed-ended questions, particularly when participants can select multiple answer choices, are essentially a set of (potentially highly leading) "yes/no" questions.[149] For example, in the Amazon Cancellation Survey, offering the "DNI" answer choice (in multiple closed-ended questions) is largely equivalent to asking the participant "Is one of the reasons that you canceled Prime because you did not intend to sign up for Prime?" Such a question, from a survey design perspective, would generally be considered leading, as it inserts a particular reason into the participant's mind that may not have been their reason or the way they would have characterized their reason.

87.    A large literature has identified yea-saying or acquiescence bias as a serious threat to the validity of survey responses.[150] When confronted with a "yes/no" question, the participant may feel obligated to answer in the affirmative as long as they can identify *some* interpretation of the question that they can "agree" with or some recalled attitude that justifies agreement, even if such agreement does not accord with reality. Acquiescence bias has been documented in a wide

---

[148] Diamond (2011), p. 394.
[149] Schwarz and Hippler (1991), p. 51.
[150] *See, e.g.*, Baumgartner, Hans, and Jan-Benedict EM Steenkamp (2001), "Response Styles in Marketing Research: A Cross-National Investigation," *Journal of Marketing Research*, 38(2), 143 – 156; Goldsmith, Ronald E. (1987), "Two Studies of Yeasaying," *Psychological Reports*, 60(1), 239 – 244; Netemeyer, Richard G., William O. Bearden, and Subhash Sharma (2003), *Scaling Procedures: Issues and Applications*, Thousand Oaks, CA: Sage Publications; Ray, John J. (1983), "Reviving the Problem of Acquiescent Response Bias," *The Journal of Social Psychology* 121(1), 81 – 96; Schuman and Presser (1981), Chapter 8. *See also* https://www.ipsos.com/en/ipsos-encyclopedia-acquiescence-bias-aka-yea-saying-or-friendliness-effect.

range of areas, including when measuring consumer attitudes,[151] managers' judgments,[152] valuations of public works projects,[153] and consumers' reports of their prior consumption.[154]

88.     ***Demand effects.***   A fundamental survey principle is that a survey must avoid creating strong "*demand effects*" (also referred to as "demand characteristics"), whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and the answers they think the researcher expects.[155]   Demand effects are particularly problematic when a survey's design, questions, answer choices, and/or stimuli presentation: (*i*) suggest the expected answer; and/or (*ii*) cause participants to consider or ignore possibilities, perceptions, and other aspects that they would not have considered or would have ignored outside the context of the study.   The participants then tend to provide (what they perceive as) the expected answers, to make sure that the results "come out right."

89.     ***Focalism.***   Seminal research in psychology indicates that when a survey's phrasing, questions, or answer choices focus participants on specific aspects, those aspects receive more attention and weight than they do (or did) in the real world.   Diverse lines of research have provided evidence for such a "*focusing illusion*" or "*focalism*" bias, which causes survey participants to focus too much on the information that is presented to them (*e.g.*, in a pre-selected set of answer choices) and not enough on the effects of other information, which the

---

[151] Baumgartner and Steenkamp (2001).
[152] Arndt, Johan and Edgar Crane (1975), "Response Bias, Yea-Saying, and the Double Negative," *Journal of Marketing Research*, 12(2), 218 – 220.
[153] Blamey, Russell K., Jeff W. Bennett, and Mark D. Morrison (1999), "Yea-Saying in Contingent Valuation Surveys," *Land Economics*, 126 – 141.
[154] Van Soest, Arthur and Michael Hurd (2008), "A Test for Anchoring and Yea-Saying in Experimental Consumption Data," *Journal of the American Statistical Association*, 103(481), 126 – 136.
[155] *See, e.g.*, Orne, Martin T. (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243 – 259.

researcher makes less salient or unavailable.[156]  As I later explain, this "focalism" bias was exacerbated by the Cancellation Survey's leading questions and demand effects.

90.     ***Order effects.***  Research on conversational norms (*i.e.*, how people interpret and respond to information)[157] and order effects[158] (*e.g.*, how one question influences responses to subsequent questions) suggests that the order in which the Cancellation Survey's questions were presented biased participants answers.  Order effects in survey research have been documented extensively,[159] with question order influencing survey-based estimates of the frequency of weight loss attempts[160] and past physical activity,[161] the prevalence of bullying,[162] and past tobacco usage.[163]  They have been shown to be especially pronounced under conditions like those that existed in the Amazon Cancellation Survey—namely, when the participants are aware

---

[156] *See, e.g.*, Schkade, David and Daniel Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, 9(5), 340 – 346; Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science*, 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (This article was a finalist for the 2005 *O'Dell Award* for the article that has had the greatest impact on the marketing field in the previous five years).

[157] *See, e.g.*, Grice, H. Paul (1975), "Logic and Conversation," in *Syntax and Semantics 3: Speech Acts*, Cole, Peter and Jerry L. Morgan (eds.), New York, NY: Academic Press, pp. 41 – 58; Schwarz, Norbert (1994), "Judgment in Social Context: Biases, Shortcomings, and the Logic of Conversation," *Advances in Experimental Social Psychology*, 26, 123 – 162.

[158] *See, e.g.*, Strack, Fritz (1992), "Order Effects in Survey Research: Activation and Information Functions of Preceding Questions," in *Context Effects on Social and Psychological Research*, Schwarz, Norbert and Seymour Sudman (eds.), New York, NY: Springer-Verlag.

[159] *Ibid*.  *See also* Tourangeau, Rips, and Rasinski (2000), pp. 206 – 207; Schuman and Presser (1981), Chapter 2.

[160] Serdula, Mary K., Ali H. Mokdad, Elsie R. Pamuk, David F. Williamson, and Tim Byers (1995), "Effects of Question Order on Estimates of the Prevalence of Attempted Weight Loss," *American Journal of Epidemiology*, 142(1), 64 – 67.

[161] Hanley, Christine, Mitch J. Duncan, and W. Kerry Mummery (2013), "The Effect of Changes to Question Order on the Prevalence of 'Sufficient' Physical Activity in an Australian Population Survey," *Journal of Physical Activity and Health*, 10(3), 390 – 396.

[162] Huang, Francis L. and Dewey G. Cornell (2015), "The Impact of Definition and Question Order on the Prevalence of Bullying Victimization Using Student Self-Reports," *Psychological Assessment*, 27(4), (2015), 1484 – 1493.

[163] Johnson, Amanda L., Andrea C. Villanti, Allison M. Glasser, Jennifer L. Pearson, and Cristine D. Delnevo (1992), "Impact of Question Type and Question Order on Tobacco Prevalence Estimates in US Young Adults: A Randomized Experiment," *Nicotine and Tobacco Research*, 21(8), 1144 – 1146.

of the preceding questions when answering the subsequent questions, and when participants perceive the questions as related.[164]

91.    Next, I discuss how the above biases in survey response apply specifically to the Amazon Cancellation Survey.

### A.4.2.  *The Cancellation Survey Inappropriately Relied on Leading Closed-Ended Questions (Unpreceded by Any Filter Questions) with Incomplete and Biased Answer Choices*

92.    Setting aside the fact that the Amazon Cancellation Survey was not designed as a survey about consumers' state of mind (*e.g.*, perceptions, awareness, or intentions) when enrolling in Prime, the survey would still fail to accurately measure consumers' reasons for canceling Prime due, at least in part, to its reliance on leading *closed-ended* questions.[165]  Specifically, the Amazon Cancellation Survey's key "cancellation reason" questions (Q.3 and Q.4) relied on by the FTC were *closed-ended* questions that were *not* preceded by any instructions to avoid guessing, by any general open-ended questions, or by any filter questions.  A third question (Q.7, which asked about any "problems" experienced with Prime) in which respondents could again select "DNI" was likewise closed-ended.  These questions, as explained below, induced severe demand, focalism, and order biases, as well as guessing behavior, which operated in the direction of inflating responses of "DNI."

#### A.4.2.1.  *Open-ended questions—and not closed-ended questions—are the appropriate format to measure consumers' reasons for cancellation*

93.    As survey treatises and authorities explain, open-ended (vs. closed-ended) questions are standard, appropriate, informative, and typically preferred (including by many courts) when eliciting consumers' reasoning and/or perceptions.[166]

---

[164] Strack (1992).

[165] One of the questions that appeared toward the very end of the Cancellation Survey, Question 8, was an optional open-ended question that asked: "Is there anything else you'd like to share about Prime or why you canceled?"; *see, e.g.*, AMZN-PRM-FTC-002704633; AMZN-PRM-FTC-002704671.  As I also discuss in Subsection C.4.7, this question, while open-ended, was very broad (*i.e.*, did not directly ask respondents about their reasons for enrolling in Prime, let alone reasons for canceling Prime), was optional, and was placed toward the end of the survey—once respondents had *already been repeatedly prompted with* the "DNI" answer choice.

[166] *See, e.g.*, Jay (2013); Diamond (2011); Diamond and Swann (2012, 2022); Swann, Jerre B. (2012), "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*,

---

94.    I and other scholars routinely employ open-ended questions to elicit and measure consumers' awareness, perceptions, or reasons (*e.g.*, for their purchase decisions, for their beliefs, or for other responses) in litigation, industry, and academic research.[167]  In her widely-cited *Trademark Reporter* article on perception surveys in false advertising matters, Dr. Deborah Jay discusses examples in which federal courts have found "the open-ended questions in a survey to be more reliable (or less leading) than the closed-ended questions."[168]  Indeed, the survey that I

---

Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association. *See also, e.g., Anne de LaCour et al. v. Colgate-Palmolive Co. and Tom's of Maine, Inc.*, 16-CV-8364 (KMW) (S.D.N.Y. Jan. 2024).

[167] In academic research, I and other scholars have published numerous scholarly articles (in leading peer-reviewed journals in the field) that employ open-ended questions to assess consumers' reasons for purposes of quantitative analysis of consumers' preferences and perceptions.  As just a few examples, *see, e.g.*, Krishna, Aradhna (2011), "Can Supporting a Cause Decrease Donations and Happiness? The Cause Marketing Paradox," *Journal of Consumer Psychology*, 21(3), 338 – 345; Kivetz and Simonson (2002b); Keinan, Anat, and Ran Kivetz (2008), "Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," *Journal of Marketing Research* 45(6), 676 – 689.

[168] Jay (2013), pp. 1134 – 1135 & FN 80 ("*Johnson & Johnson-Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.* 960 F.2d 294, 300 (2d Cir. 1992) ('In her view, the responses to questions 8a and 8b, which elicited only nine anti-aluminum reactions from the 300 people surveyed, were "the most persuasive evidence of the message communicated by 'Ingredients-Revised.'" She attributed this to the fact that questions 8a and 8b were **"open-ended," and, therefore, more objective**."'); *L&F Products*, 845 F. Supp. at 998 ('The court gives **much more weight to the results of the open ended questions** than it gives to the results of the closed ended question. **Closed ended questions narrow the universe of possible responses**. In doing so, closed ended questions have the potential to divert the respondents' (and the court's) attention away from the primary message of a commercial.'), *aff'd*, 45 F.3d 709 (2d Cir. 1995); and Coors Brewing Co. v. Anheuser-Busch Cos., Inc. 802 F. Supp. 965, 973 (S.D.N.Y. 1992) ('By contrast, I find that the survey's **open-ended questions, 2a and 2b, were generally reliable**.')" [Emphases added]).  *See also, e.g., Pep Boys Manny, Moe & Jack of California v. Goodyear Tire & Rubber Co.*, No. 01-CV-5614 (E.D. Pa. 2002) (rejecting a likelihood of confusion survey for, inter alia, failing "to ask respondents why they answered as they did," and finding that "**because the respondents were not asked the reason for their answers**, there is no indication how much influence was exercised by the choice of stimuli over the respondents' perception and thus the survey data are infirmed" [emphasis added]; p. 18); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, *573 – 576 (E.D. N.Y. 1999) (in which the Court found likelihood of confusion surveys submitted on behalf of the plaintiff to be unreliable, unpersuasive, and entitled to little weight because, inter alia, **the Court's analysis of participants' reasons—which were not analyzed by the survey expert—revealed that the reported confusion estimates were inflated**; *e.g.*, "In short, **based on a study of the reasons the respondents gave for this choices**, at most nine of 117 people confused NutraSweet with NatraTaste for reasons related to trade dress" [*576]) [emphasis added]; *In Re: KIND LLC "Healthy and All Natural Litigation,"* 15-md-02645 (NRB) (S.D.N.Y. Sep. 2022).

---

conducted on behalf of the FTC relied primarily on open-ended questions to assess participants' experiences, outcomes, and explanations in connection with their interaction with Home Assure.[169]

95.    On a fundamental level, a survey inquiring about an individual's reason(s) for canceling or terminating a membership or subscription is a *perception* or *belief* survey, one that concerns consumers' perceptions, beliefs, or opinions regarding a personal decision or behavior. Here, the focal behavior (canceling a Prime membership) is one that does *not* involve a well-defined, limited set of reasons that is relevant to everyone, but instead involves a range of different—including idiosyncratic—reasons for cancellation.  As I elaborate in Subsection A.4.2.3, the verbatim responses that participants typed into the "Other" fields in the Amazon Cancellation Survey reveal a wide and diverse array of reasons that were *not* offered as answer choices; such reasons cannot be adequately or comprehensively represented in a closed-ended question.[170]  Therefore, the appropriate format for quantifying consumers' reasons for cancellation is through open-ended, rather than closed-ended, survey questions.

A.4.2.2.  *The Cancellation Survey's closed-ended "reasons" questions were leading and lacked **any** filter questions, thereby generating yea-saying, encouraging guessing, and inflating "DNI" selections*

96.    Again, the Cancellation Survey's closed-ended "reasons" questions distill to a set of "yes/no" questions, each corresponding to a proffered answer choice (*e.g.*, "Yes or no, is one of the reasons that you canceled Prime because you did not intend to sign up for Prime?").  As I noted earlier, such a question structure is inherently slanted and conducive to yea-saying, as it jumps directly to concepts or reasons that may otherwise never have occurred to participants.  The closed-ended questions Q.3 and Q.4 dissuaded respondents from expressing their beliefs and

---

[169] *Federal Trade Commission v. Home Assure, LLC et al.*, No. 8:09-cv-547-T-23 TBM (M.D. Fla. July 29, 2010).  Note that in that matter, because customer satisfaction was directly relevant to the research question, I included closed-ended questions that asked participants to rate their satisfaction with Home Assure.

[170] *See, e.g.*, AMZN_00090749; AMZN_00090749; "SV_0OInYvHGGzsKsBf US+Prime+Cancellation+Survey+2020_February+5,+2024_16.13 .csv."

reasoning, while inducing respondents to choose (or guess) answers from a set of leading and repetitive questions and answer choices. As Professor Diamond explains:[171]

> The advantage of open-ended questions is that they give the respondent fewer hints about expected or preferred answers. Precoded responses on a closed-ended question, in addition to reminding respondents of options that they might not otherwise consider, may direct the respondents away from or toward a particular response.

97.    The fact that open-ended questions generate less impetus for participants to speculate or guess confers an important advantage.[172] It is precisely the lower level of guessing elicited by open-ended questions that is a key reason why they are typically preferred over closed-ended questions when participants' spontaneous beliefs, perceptions, or other such responses are involved. Additionally, had the Cancellation Survey's questions been open-ended, there would have been a chance that at least some of the participants would have clarified or indicated the assumptions they made to select their answers.

98.    Relatedly, the Cancellation Survey's "reasons" questions, which abruptly introduced a set of specific reasons for cancellation, were not preceded by any necessary filter questions. As Professor Diamond and others explain, filter questions reduce participant guessing and yea-saying,[173] and assess whether participants have any opinions, perceptions, or beliefs *in the first place* about the specific topics raised in a question (*e.g.*, their reasons for cancellation, their recollections of enrolling, or whether or not they intended to enroll).[174] For example, survey participants may not have any opinions or memories regarding an issue; may not have perceived certain messages from a relevant stimulus; and/or may not understand a question asked of them. Including a filter question prior to the key opinion or belief questions ensures that such substantive questions (*e.g.*, from which a survey's perception, opinion, or "deception" estimates are derived) are asked only of those participants who actually have perceptions, opinions, or

---

[171] Diamond (2011), p. 392.

[172] *See, e.g.*, Krosnick, Jon A. and Stanley Presser (2010), "Question and Questionnaire Design," in *Handbook of Survey Research (2nd ed.)*, Wright, James D. and Peter V. Marsden (eds.), West Yorkshire, England: Emerald Group, p. 267.

[173] Diamond (2011), pp. 389 – 391. *See also, e.g.*, Keller, Bruce (2012), "Survey Evidence in False Advertising Cases," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. & Jerre Swann (eds.), Chicago, IL: American Bar Association, p. 188.

[174] *See, e.g., ibid.*

memories about the issues being investigated.   Hence, for example, the standard methodology of most perception/belief surveys is to start with general questions about perceptions/beliefs, and only then proceed with gradually more pointed open-ended and non-leading questions that inform the researcher about consumers' perceptions or beliefs with regard to the issues being investigated.  Critically, such pointed, open-ended questions *must* be preceded by appropriate filter questions.[175]

99.    Asking direct questions (particularly closed-ended questions) about participants' opinions, beliefs, or perceptions can lead participants to guess and to answer based on what they can glean from the direct (closed-ended) questions and accompanying answer choices. Participants may select answers that appear to confirm the researcher's hypotheses, even when in the actual marketplace consumers do not have the purported perceptions, beliefs, or recollections highlighted by the survey's closed-ended question and answer choices.  As Dr. Jay states, "Failing to pose a full-filter question or asking the wrong filter question before querying respondents about a particular topic may undermine the probative value of a survey."[176]

100.    The Cancellation Survey failed to use *any* filter questions to assess, for example, whether participants even had any opinion about their reasons for cancellation, or importantly, even had any belief or recollection about their enrollment.  In particular, the Cancellation Survey never asked respondents whether they had a specific reason for cancellation, or anything related to whether, when, and how they had signed up for Prime.  By failing to use filter questions, the survey induced respondents to guess and answer based on the survey's leading cues and various biases (discussed in the next subsections), which artificially inflated selections of "DNI."  This was especially likely given that the Cancellation Survey never asked respondents why they *enrolled* in Prime, and instead asked only why they *canceled* Prime.  The inclusion and negative framing of the "DNI" answer choice in the "cancellation reasons" questions (Q.3 & Q.4)—

---

[175] *See, e.g.*, Keller (2012), p. 188 ("Filter questions are used to screen out respondents who do not have an opinion on the questions posed by the survey; guessers; and 'yea-sayers' who will give an answer that they believe the interviewer is seeking.  After asking questions such as, 'What was the main message of the commercial?' and 'What other messages does the commercial communicate?,' a commonly used filter question is 'Did the commercial communicate anything to you about [x]?'" […] [FNs omitted]).
[176] Jay (2013), pp. 1130 – 1131 [FNs omitted].

namely, "I did *not* intend to sign up for Prime" (italics added)—is therefore highly biased, asymmetrically leading respondents to search for and construct memories related to unintentional enrollment, as opposed to reasons or memories related to intentional enrollment.

101.    Finally, concerns regarding closed-ended questions are particularly relevant when the survey does not include an adequate (external) control stimulus or (internal) control question(s) that can be used as a benchmark for evaluating the obtained estimates and for accounting for the biases inherent in the survey's methodology.  As explained in Subsection A.8, the Amazon Cancellation Survey did *not* include any such control.

### A.4.2.3.  *The Cancellation Survey's closed-ended "reasons" questions used an incomplete set of answer choices that omitted multiple relevant responses*

102.    Because of the potential for severe bias, it is crucial for a closed-ended question to include a complete and comprehensive set of potential responses.  As described in a marketing research textbook, which cautions that "[t]he list of options itself also introduces bias":[177]

> Multiple-choice questions should include choices that cover the full range of possible alternatives.  The alternatives should be mutually exclusive and collectively exhaustive.

Closed-ended questions that omit relevant answer choices or response options are likely to be biased.[178]  Professor Diamond explains the necessity of an exhaustive list of answer choices:[179]

> If the list of possible choices is incomplete, a respondent may be forced to choose one that does not express his or her opinion.  Moreover, if respondents are told explicitly that they are not limited to the choices presented, most respondents nevertheless will select an answer from among the listed ones.

In their treatise chapter, Bernstein and Keller discuss the risk that when there is an incomplete set of response options to closed-ended questions, "respondents will resort to picking the best available option even though it does not represent their true opinion."[180]

---

[177] Malhotra (2012), p. 309.
[178] Krosnick and Presser (2010), p. 267.
[179] Diamond (2011), pp. 393 – 394.
[180] Bernstein, David H. and Bruce P. Keller (2022), "Survey Evidence in False Advertising Cases," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design (2ⁿᵈ ed.)*, Diamond, Shari S. and Jerre B. Swann (eds.), Chicago, IL: American Bar Association, p. 226.

103.    The potential bias induced by an incomplete set of response options cannot be corrected by including an "Other (please specify)" option.  This is because people are likely to underreport responses that do not appear among the answer choices, even when an "other" option is available.[181]  Such underreporting can occur even when some respondents do select the "Other" response option.  In fact, high rates of selecting an "Other" response option can be an indication that the set of answer choices is incomplete.[182]

104.    In the 2020 Cancellation Survey data, a considerable proportion (▮▮▮▮) of respondents selected the "Other" option in Questions 3 or 4.[183]  Consider, for example, the "main reason" question (Q.3):[184]

Q.3    What was your main reason for canceling Prime?
- o  The Prime membership fee was too expensive
- o  I was not making enough purchases on Amazon for it to be worthwhile
- o  I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)
- o  I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)
- o  I did not intend to sign up for Prime
- o  Other (please specify)

The five substantive answer choices in Question 3 (*i.e.*, excluding the "Other" option) are *not* comprehensive or exhaustive with respect to customers' reasons for wanting to cancel their Prime subscription.  Omitted plausible reasons and responses include, but are not limited to:[185]

- I don't remember signing up for Prime, and I don't want Prime.

- I am not the one who signed up for Prime (*e.g.*, a family member or other user of my account signed up for Prime), and I don't want Prime.

- I only intended to sign up for a free trial and I am canceling before being charged.

---

[181] Schwarz and Hippler (1991), p. 43.
[182] Malhotra (2012), p. 309.
[183] "SV_0OInYvHGGzsKsBf US+Prime+Cancellation+Survey+2020_February+5,+2024_16.13 .csv."
[184] AMZN-PRM-FTC-002704619.
[185] The list below is intended to illustrate a few examples of relevant omissions, not to provide an exhaustive tabulation or to endorse the inclusion of every response as an answer choice in this survey question.  The fact that there exist numerous potential responses to the question of why a Prime member may have canceled their subscription—thereby rendering an exhaustive listing infeasible—is one reason why it was *inappropriate* to rely on a *closed-ended* question to elicit consumers' reasons for cancellation.

- I only intended to sign up for a free trial and I forgot to cancel before being charged.

- I am concerned about fraud related to my Amazon account, and so am canceling my accounts (including Prime) as a precaution.

- Another person in my household already has a Prime membership.

- I already have multiple Amazon Prime accounts and would like to consolidate my account.[186]

- I do not anticipate using or needing Prime in the near future.

- I did not intend to renew Prime (*e.g.*, I thought I had turned Auto-Renew off).

- I was trying to pause (not cancel) my membership.

- I'm cleaning up all of my subscriptions (including non-Prime subscriptions).

- The quality or content of Amazon products/services is no longer attractive to me.

- I do not or no longer support Amazon's corporate practices or policies (*e.g.*, social and political stances, etc.).

105.    According to a June 11, 2020 Amazon summary report of the Cancellation Survey responses, the participants' comments when selecting the "Other" option reveals many reasons for cancellation that were missing from the Cancellation Survey's closed-ended list and are not included in the non-exhaustive list outlined above.[187]  Such reasons include a large variety of political or ideological objections to Amazon policies or practices, opinions regarding executive chairman and then-CEO Jeff Bezos, perceived mistreatment of Amazon employees, having to pay for Prime videos, consolidating multiple accounts, concern with fraud (*e.g.*, a hacked account), the Prime member's current financial circumstances, and living outside the U.S.[188]

106.    In addition to the omitted substantive responses listed above, the Cancellation Survey's "reasons" questions failed to include a "Don't know" or "No opinion" option.  Some

---

[186] *See, e.g.*, AMZN_00089841, "Trust" tab, Row 9 (noting the existence of customers who end up with unwanted multiple Prime membership accounts).
[187] AMZN_00090749.
[188] *Ibid*.

respondents may in fact not know their precise reason for cancellation; for example, they may have canceled on a whim, or may have canceled due to a general sense of dissatisfaction with Prime that is not attributable to specific reasons. The lack of a "Don't know" option is therefore a critical omission, one that courts have criticized.[189] Further, the inclusion of a "Don't know" response option is a crucial aspect in reducing the likelihood of respondent guessing behavior.[190]

107.    While Amazon may have had its own internal reasons for wanting to limit the number of answer choices, or for removing or adding different answer choices at different times, the incomplete set of answer choices provided in the "reasons" questions renders the Cancellation Survey unreliable for purposes of drawing conclusions about the "true" rate of alleged unintentional enrollment in Prime.

A.4.2.4.    *The Cancellation Survey's closed-ended "reasons" questions used a slanted and biased set of answer choices*

108.    Notably, the four substantive answer choices other than "DNI" were much more specific than this response. Two of the response options (*i.e.*, "The Prime membership fee was too expensive" and "I was not making enough purchases on Amazon for it to be worthwhile") are specific to the value proposition—the ratio of benefits received to the cost of membership— perceived by the respondent. Two other response options (*i.e.*, "I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)" and "I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)") listed specific examples, focusing respondents on particular instances and likely leading respondents to interpret the questions

---

[189] *See, e.g.*, Bernstein and Keller (2022), pp. 220.
[190] *See, e.g.*, *id.*, p. 220.

narrowly.[191]  In their survey research handbook, Alreck and Settle (2004) caution against what they refer to as "example containment":[192]

> When the question contains an example that consists of a response alternative or identifies a class or type of response alternatives, it's likely to interject bias.  Many respondents may choose or include the example but fail to include others because the example brings that particular response or type of response to mind.  […] It's important to identify the entire class of alternatives and avoid examples that are among the possible choices for the respondents.

109.    Thus, because of the narrow and specific framing of the other substantive response options, the "DNI" answer was likely to be perceived by respondents as the most general, "catch-all" option—that is, as the only option capturing some form of a failure of their intentions regarding their Prime enrollment and membership, including because there was no comprehensive list of possible response options.  As a consequence, some respondents whose answers did not clearly "match" any of the other answer choices were likely to select the "DNI" answer choice, particularly given the lack of any "Don't know" option.

### A.4.3.  *The Cancellation Survey's Follow-Up Closed-Ended Questions Were Repetitive and Leading, and Generated Demand and Order Effects*

110.    The Amazon Cancellation Survey asked a series of three highly repetitive, suggestive, closed-ended questions that included the "DNI" answer choice.  In addition to the single-response "main reason" question (Q.3), all respondents were then asked to specify "additional reasons" from the same list of closed-ended responses:[193]

Q.4    Are there additional reasons why you canceled your Prime membership? What are the other reasons? (select all that apply)

☐ No, there were no other reasons
☐ The Prime membership fee was too expensive

---

[191] Research on part-set cuing, including in survey responding, has found that providing examples (*i.e.*, in a non-exhaustive list) increases recall of the example cues but can reduce recall of non-listed events.  *See* Pepe, Nicholas W., Anne Moyer, Tori Peña, and Suparna Rajaram (2023), "Deceitful Hints: A Meta-Analytic Review of the Part-List Cuing Impairment in Recall," *Psychonomic Bulletin & Review*, 30(4), 1243 – 1272; Phillips, Joan M. (2021)," Using Examples to Increase Recall in Self-Administered Questionnaires," *International Journal of Market Research*, 63(6), 738 – 753; Silberstein, Adriana R. (1993), "Part-Set Cuing in Diary Surveys," in *American Statistical Association Proceedings of the Section on Survey Research Methods*, pp. 398 – 403
[192] Alreck and Settle (2004), p. 96.
[193] AMZN-PRM-FTC-002704624.

☐   I was not making enough purchases on Amazon for it to be worthwhile
☐   I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)
☐   I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)
☐   I did not intend to sign up for Prime
☐   Other (please specify)

As with the prior question, Question 4 was *not* preceded by any filter question or instruction to not guess, there was no "Don't know" option, and the "DNI" answer choice was explicitly proffered to respondents (unless it was previously selected in Question 3).

111.    Those respondents who selected "I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)" in either Question 3 or 4 were then asked a follow-up question in which they were asked to specify the "problem(s)" from the following closed-ended list:[194]

Q.7    What problem(s) did you experience with Prime? (select all that apply)
☐   Deliveries were not made on time (after the date it was promised)
☐   I needed deliveries to arrive sooner than the promised date shown
☐   Delivers were often stolen
☐   Order arrived broken
☐   Prime membership fee was charged to the wrong credit card
☐   Customer service was not able to resolve a problem with an order
☐   I did not intend to sign up for Prime
☐   Other (please specify)

The above answer choices were far from exhaustive, included an incomplete list of overly specific response options, failed to include any "Don't know" option, and, again, explicitly offered respondents the "DNI" answer choice.

112.    The question asking about problems with Prime (Q.7) presented the "DNI" option to at least some participants for a *third* time, despite the fact that these respondents had already had two opportunities (in Q.3 and Q.4) to select this answer choice. No other answer choice in Questions 3 and 4 appeared again as an answer choice in a follow-up question. In fact, Questions

---

[194] AMZN-PRM-FTC-002704632.

3 and 4 presented the "problem" answer choice as an alternative to, and therefore presumably distinct from,[195] the "DNI" option.

113.    This repeated and confusing probing questioning sequence was leading and generated a demand effect.  The repetition highlighted the survey's purpose, and repeating the "DNI" option provided cues that encouraged participants to select it as a guess, by mistake, or because the repeated probing caused them to reinterpret the response option.  As a chapter on survey design states:[196]

> [P]ersistent probing by asking for further responses to the same questions may lead the respondent to believe that the interviewer is looking for a "correct" answer that the respondents has not yet given and even an open-ended question may provide cues as to what the "correct" answer may be.

Relatedly, an academic article on the formation of false memories found evidence that "people will create false recalls of childhood experiences in response to misleading information and the social demands inherent in repeated interviews."[197]

114.    Consistent with research on conversational norms and order effects,[198] the repetitive questioning in the subsequent "cancellation reasons" questions likely prompted participants to conclude that the "expected" answers are that some Prime members were signed up without intending to.  Participants who are asked multiple times about not intending to sign up would be led to assume that such issues or outcomes must be factual (and even common) or the question-writer would not have included it as an answer choice.  Respondents would then be more likely to interpret any lack of recollection of the exact circumstances under which they signed up as affirmative evidence for a lack of intention to enroll in Prime.  As I discussed in Subsection A.4, the memory biases at play that invalidate the Cancellation Survey as a test of consumers' state of mind (perception, awareness, intentions) during enrollment.

---

[195] Note that this was a violation of the general survey design principle that closed-ended response options should be *mutually exclusive*; *see, e.g.*, Malhotra (2012), p. 309 ("The alternatives should be mutually exclusive and collectively exhaustive").
[196] Keller (2012), p. 189 [FNs omitted].
[197] Loftus, Elizabeth F. and Jacqueline E. Pickrell (1995), "The Formation of False Memories," *Psychiatric Annals*, 25(12), 720 – 725, p. 725.
[198] *See, e.g.*, Grice (1975); Strack (1992).

115.    Even when guessing the precise study or research hypothesis may be difficult, survey participants are likely to have general notions about what their task entails.  For example, consumers who are shown an advertisement for a product or service may assume that they are expected to respond favorably to the advertised product or service.  Such expectations are consistent with the well-established notion that people often try to act in accordance with their perceived roles.[199]  Likewise, consumers who have just canceled a membership or subscription and who then *agree* to take an exit interview may hold certain expectations regarding the interview and how their answers may be used (*see also* Subsection A.3).

116.    ***In summary***, the Cancellation Survey's closed-ended questions that included the "DNI" answer choice were leading, repetitive, and induced severe demand, focalism, and order biases.  By repeatedly asking questions with the same "DNI" response option, the survey led respondents to select that answer.  Critically, all of these one-sided biases inflated the percentage of respondents selecting the "DNI" option in at least one of the three closed-ended questions.

### A.4.4.  *The Lack of a Double-Blind Procedure Contributed to Demand Effects and Other Motivational and Response Biases*

117.    In a *double-blind* interview or procedure, both the sponsor of the survey and its purpose are not revealed to reduce response biases:[200]

> When neither the respondents nor the interviewers are aware of the purpose of the survey or its sponsor, the survey is referred to as "double-blind."  Double-blind designs help to eliminate any possible biases from clues that might affect how the questions are posed and answered.

As Professor Diamond explains, due to the risks to objectivity, respondents should not be aware of the sponsor of a survey:[201]

> To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose.  Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses.

---

[199] For a detailed discussion and review of Role Theory, *see* Biddle, Bruce J. and Edwin H. Thomas (1966), *Role Theory: Concepts and Research*, New York, NY: John Wiley.
[200] Bernstein and Keller (2022), p. 212 [FN omitted].
[201] Diamond (2011), pp. 410 – 411.

118.    The Amazon Cancellation Survey was *not* double-blind, as both the sponsor and purpose of the survey were known and even explicitly highlighted to potential respondents.  It was clear to potential respondents that: (*i*) the survey was sponsored by Amazon, and (*ii*) the purpose of the survey was to collect information from the respondent *precisely because* they had just canceled their Prime membership.

119.    As Figure 1 shows, the pop-up invitation used to recruit respondents for the 2020 Cancellation Survey appeared directly on the Amazon website upon Prime membership cancellation and carried a distinctive Amazon "look and feel" with respect to the fonts, colors, and design—making it obvious to respondents that Amazon was the sponsor of the survey. Further, the invitation labeled the survey as a "Cancellation Survey" and stated: "We are sorry to see you go."  This presentation of a marketing communication with a retention message, while logical given Amazon's general customer satisfaction goals, is incompatible with standard practices for achieving objectivity in a survey.  Importantly, the invitation also presents participation in the survey as an opportunity to "[h]elp us improve our services."  The conveyed motivation—that is, to take the survey so as to *influence* Amazon's practices—is appropriate for conducting an exit-interview survey with the goals of managing consumer dissatisfaction, providing directional guidance, or tracking potential "pain points" for existing members,[202] but it is completely incompatible with conducting an objective survey to collect unbiased information about unintentional enrollment.

120.    Because (*i*) respondents knew the survey was for Amazon, (*ii*) the invitation conveyed Amazon's regrets about their cancellation, and (*iii*) the invitation provided a motivation to answer the survey so as to influence Amazon practices, the survey gave rise to severe demand effects and other motivational and response biases.[203]  These aspects of the

---

[202] *See, e.g.*, AMZN_00106463 at 6466 (noting a goal of identifying "key customer pain points across different stages of customer lifecycle").

[203] See, *e.g.*, Orne (1962); Darley and Lim (1993); Simonson and Kivetz (2012); Fiske and Taylor (1991).

survey invitation provided strong cues as to the purpose of the study and what kinds of answers would be expected.[204]

121.    When survey respondents feel that they have an incentive to provide a particular response, they will be more likely to provide that response, even if it means failing to accurately represent their true beliefs or intentions.  For example, when potential survey takers were told that only people who *had received* an influenza vaccination would qualify for a paid survey, they reported higher rates of having received the vaccination than when they were told that only people who *had not received* an influenza vaccination could take the paid survey.[205]  Across different versions of the study, between 10.5% and 22.8% of ineligible participants falsely claimed eligibility.[206]

122.    In the case of the Amazon Cancellation Survey, some respondents may have believed that Amazon would review and respond to their survey answers as the basis for receiving recompense.  At least some consumers are likely to be familiar with or to even anticipate the possibility of receiving a refund from companies when an action or purchase was made in error or when blame can be deflected away from themselves (*e.g.*, when indicating that an Uber driver did not arrive on time, or when a shopper returns an item that does not match what they ordered).  Multiple social media posts and online consumer guides/articles discuss (and promote) canceling subscriptions, threatening cancellation, or complaining to customer

---

[204] I understand that an earlier version of the Amazon Cancellation Survey, which used an email invitation instead of a pop-up, had included some language regarding anonymity that was missing from the 2020 survey: "To help us improve our services, tell us what made you cancel your Prime membership by taking a quick survey. This survey is hosted by an external party (Qualtrics), so the survey link does not lead to our website. Survey responses are anonymous and subject to Amazon's Privacy Notice."  *See, e.g.*, *See, e.g.*, AMZN_00037417, Appendix A.  However, this version also does not eliminate or sufficiently address demand effects or motivational biases, as, for example, it still (*i*) revealed Amazon to be the survey sponsor, (*ii*) revealed the purpose of the survey, (*iii*) did not make clear to respondents that their answers would not influence any interaction or outcomes with Amazon.

[205] Lynch, Holly Fernandez, Steven Joffe, Harsha Thirumurthy, Dawei Xie, and Emily A. Largent (2019), "Association Between Financial Incentives and Participant Deception About Study Eligibility," *JAMA Network Open*, 2(1), e187355.

[206] *Ibid.*

service—including for Amazon Prime—to reap price savings or other benefits.[207]  Hence, consistent with the academic research on how perceived incentives and motivated reasoning affect survey responses, any belief (even if inaccurate) that selecting "DNI" may be more likely to result in a refund or some other form of compensation would result in inflated rates of selecting this answer choice.  As I discuss subsequently, the "DNI" option was likely to asymmetrically appeal to respondents as an attractive, "easy" answer choice compared to others offered in the survey.

---

[207] *See, e.g.*, https://www.reddit.com/r/UnethicalLifeProTips/comments/8vr70w/ulpt_if_you_have_a_one_month_free _trial_amazon/ (a 2018 post on the social forum Reddit.com with 8,700 "upvotes" and 191 comments, noting, for example: "If you have a one month free trial Amazon Prime membership, you can turn it into a 2 month free trial by choosing the option to cancel your membership, meaning amazon will give you another month as a last attempt at begging to keep you as a customer"; "As a broke student, this has saved me so much money, when the two months ends, you can just create a new account as long as you remember to disable the trial 1-2 days before the payment kicks in"; other popular posts in this thread include: "If you're a student, you should have 6 months free. My university lets you set alias emails so you can just keep making new accounts although its best to have multiple credit and debit cards to add to the account" [1,300 upvotes]; "Also when you order stuff and it turns up late **complain to customer services and they tend to offer you a month free of prime.** A friend of mine got like 5 months free doing it that way. [...]" [emphasis added] [688 upvotes]);
https://www.reddit.com/r/UnethicalLifeProTips/comments/6u4ho1/ulpt_you_can_get_free_amazon_prim e_forever_by/ ("You can get Free Amazon Prime forever by using the Amazon Family free 30-day trial of Prime. It can be tedious because you have to use new email accounts each month BUT you can use the SAME billing info over and over"; "Everybody knows about Amazon Prime's free 30 day trial and most Amazon shoppers have probably used theirs already. Many have tried to use this trial multiple times with different email addresses, however Amazon recognizes the similar billing info and this eventually will not work as they only allow so many free trial to each person. Although you may be able to squeeze a few months out of it by doing this, you will eventually have to pay. However if you start your 30-Day free trial of Amazon Prime by going through Amazon Family you can keep getting free amazon prime, month after month with the SAME billing information (as long as you keep creating new emails each time) [...]" [1,300 upvotes]); Gordon, Whitson (2011), "The Best Services That Give You Discounts for Cancelling," *Llifehacker*, https://lifehacker.com/the-best-services-that-give-you-discounts-for-cancellin-5864343 (*e.g.*, "Quite a few of you noted that these three services [Netflix, Hulu Plus, and Blockbuster] would offer you discounts as soon as you cancelled"; "'GameFly offered me a month for $11.95 (normally $22.95) when I was about to cancel. I canceled again after that month and got an email a couple weeks later offering a month for only $1.00! I'll cancel again after that, so who knows what I'll get offered next'"); Newman, Jared (2023), "Cancel Your Streaming Services Now, You Might Score Deals Later," *TechHive*, https://www.techhive.com/article/2084118/cancel-your-streaming-services-now-you-might-score-deals- later.html (*e.g.*, "Hulu, Peacock, Paramount+, and other streaming services often provide deep discounts during the holiday shopping season, with a catch: They're only available to new and returning subscribers. Hulu even requires subscribers to be inactive for a least a month before they're eligible for a comeback deal.").

123.    In addition, according to a large body of scientific literature on social desirability, self-presentation, and impression management, individuals have a pervasive desire to appear reasonable (among other self-enhancement motives), even in private settings and online surveys that use anonymous modes of data collection.[208]  These motives have been shown to, in some circumstances, lead to untruthful survey responses.[209]  Voluminous research in social cognition and human decision making has demonstrated that people typically attempt to justify and rationalize their own choices and behaviors,[210] and that decision makers tend to construct (and seek) reasons to justify a given choice.[211]  Relatedly, seminal research on cognitive dissonance has shown that people are motivated to reduce inconsistencies between their behaviors, outcomes, attitudes, and beliefs.[212]

---

[208] *See, e.g.*, Fiske and Taylor (1991); *see also, e.g.*, Dhar, Ravi and Klaus Wertenbroch (2012), "Self-Signaling and the Cost and Benefits of Temptation in Consumer Choice," *Journal of Marketing Research*, 49(1), 15 – 25; Gneezy, Ayelet, Uri Gneezy, Gerhard Riener, and Leif D. Nelson (2012), "Pay-What-You-Want, Identity, and Self-Signaling in Markets," *Proceedings of the National Academy of Sciences*, 109(19), 7236 – 7240; McManus, T. Clay and Justin M. Rao (2015), "Signaling Smarts? Revealed Preferences for Self and Social Perceptions of Intelligence," *Journal of Economic Behavior & Organization*, 110, 106 – 118; Bodner, Ronit and Drazen Prelec (1996), "The Emergence of Private Rules in a Self-Signaling Model," *International Journal of Psychology*, 31(3-4), 3652 – 3653; Touré-Tillery, Maferima and Ayelet Fishbach (2015), "It Was(n't) Me: Exercising Restraint When Choices Appear Self-Diagnostic," *Journal of Personality and Social Psychology*, 109(6), 1117 – 1131.

[209] *See, e.g.*, Cannell, Charles and Ramon Henson (1974), "Incentives, Motives, and Response Bias," in *Annals of Economic and Social Measurement*, 3(2), pp. 307 – 317; Preisendörfer, Peter and Felix Wolter (2014), "Who is Telling the Truth? A Validation Study on Determinants of Response Behavior in Surveys," *Public Opinion Quarterly*, 78(1), 126 – 146.

[210] Kivetz and Simonson (2000); Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing* Research, 48(2), 308 – 326 (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*); Kunda, Ziva (1990), "The Case for Motivated Reasoning," *Psychological Bulletin,* 108(3), 480 – 498; Lord, Charles G., Lee Ross, and Mark R. Lepper (1979), "Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence," *Journal of Personality and Social Psychology*, 37(11), 2098 – 2109; Montgomery, Henry (1983), "Decision Rules and the Search for a Dominance Structure: Towards a Process Model of Decision Making," *Advances in Psychology*, 14, 343 – 369.

[211] *See, e.g.*, Shafir, Eldar, Itamar Simonson, and Amos Tversky (1993), "Reason-Based Choice," *Cognition*, 49(1-2), 11 – 36; Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249 – 266.

[212] Festinger, Leon (1957), *A Theory of Cognitive Dissonance*, Stanford, CA: Stanford University Press. For example, in one of the earliest studies of cognitive dissonance, Festinger and his colleagues found that after a cult's doomsday prophecy was proven wrong, the cult members nevertheless expressed strengthened convictions in their beliefs; Festinger, Leon, Riecken, Henry W., and Stanley Schachter (1956), *When Prophecy Fails: A Social and Psychological Study of a Modern Group that Predicted the Destruction of the World*, University of Minnesota Press.

124.    The general tendency to justify one's action and to blame external factors for product/service disappointment is also consistent with the above-cited research on self-presentation and impression management concerns.[213]    To justify the past purchase of a product/service that does not meet their expectations, consumers may blame the product/service or its provider, instead of blaming themselves for an inappropriate purchase decision or inadequate usage.  Such dissonance reduction is exemplified in Aesop's fable about the fox and the grapes,[214] in which the fox fails to reach the grapes it initially desires, and thus, to reduce its dissonance, criticizes the grapes as being sour.

125.    By prominently starting the invitation with "We are sorry to see you go," the Amazon Cancellation Survey created a situation in which respondents would be more likely to feel the need to justify their cancellation and give those answers that they feel make it easier to justify their decision to cancel while presenting themselves in the best light.  Two of the answer choices to the main and follow-up "reasons" questions (Q.3 and Q.4) placed responsibility, at least in part, on the respondent: "*I was not making enough purchases* on Amazon for it to be worthwhile" and "*I was not using the Prime benefits enough* (e.g. Prime Video, Amazon Fresh, etc.)" (emphases added).[215]    Selecting either of these options essentially involves admitting that signing up for Prime was the respondent's own mistake and accepting blame for that mistake.  A third response option, "The Prime membership fee was too expensive," is likely to be perceived by some respondents as essentially an admission that they can no longer afford to pay for Prime, which may be perceived to reflect poorly on themselves or their financial situation.[216]    Choosing such answer choices would directly conflict with respondents' self-presentation and impression management motives.

---

[213] *See, e.g.*, Fiske and Taylor (1991).
[214] *See, e.g.*, https://fablesofaesop.com/the-fox-and-the-grapes.html.
[215] This reflects a limitation in the survey design: Both questions could have been phrased differently to consistently place responsibility on Amazon, not the respondent, to avoid this issue.  For example: "Amazon does not cover enough of my purchasing for Prime to be worthwhile" and "The Prime benefits (e.g. Prime Video, Amazon Fresh, etc.) did not provide enough value to me."
[216] Likewise, this response option could have been phrased in a way that instead places the responsibility more on Amazon, such as: "Amazon charges too high a price for Prime membership."

126.    Out of the five substantive answer choices to Questions 3 and 4, only two absolved the respondent of responsibility: "I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)" and "I did not intend to sign up for Prime."  These two options would likely have been over-selected due to respondents' social desirability, self-presentation, and impression management motives.  Moreover, compared to the "DNI" answer choice, the "problem with Prime" answer choice not only identified specific types of "problems" (which may not have matched those experienced by the respondent) but may even have suggested to some respondents that they will need to expend effort by elaborating, in subsequent questions, on the problem(s) they experienced.  Even if the respondent selected "I experienced a problem with Prime […]" and not the "DNI" response, they were asked *again* (in Q.7) whether they agreed with the statement: "I did not intend to sign up for Prime."  To a respondent looking for a way to justify their cancellation, it would seem that Amazon is providing a way out, giving them chance after chance to choose "DNI" and absolve themselves of blame, even for an enrollment decision that they actually had (intentionally) made and now regret.

### A.4.5.  *Including the Initial Satisfaction Questions in the Cancellation Survey Likely Induced Order Effects*

127.    Recall that the Amazon Cancellation Survey begins by asking respondents a pair of satisfaction questions regarding their (dis)satisfaction with Amazon (Q.1), followed by their (dis)satisfaction with Prime (Q.2), which respondents just canceled.  As a result, respondents are likely to associate their answers to the subsequent questions with their satisfaction (or lack thereof) with Prime and would answer those questions, at least in part, based on the thoughts and attitudes they had while answering the satisfaction questions.[217]

128.    Asking the two satisfaction questions first prompts respondents to attempt to give answers to the "cancellation reasons" questions (Q.3 and Q.4) that are consistent with their responses to the satisfaction questions.  In particular, compared to most other answer choices, selecting the "DNI" option after having just expressed low satisfaction with Amazon and/or

---

[217] *See, e.g.*, Grice (1975); Strack (1992).

Prime is more consistent and self-enhancing, as it allows the respondent to deflect any blame or responsibility to Amazon. Moreover, respondents who gave a low satisfaction rating, particularly on the "satisfaction with Prime" question (Q.2), would be likely to feel that their responses to Questions 3 and 4 needed to *justify* their previous low satisfaction rating, motivating them to select more reasons. As a result, some respondents who were uncertain about whether the "DNI" choice option applied to them may have been motivated to select it in Questions 3 or 4, due to the need to appear consistent and/or to justify their prior satisfaction answers (*see* discussion in Subsection A.5.4).

129. While asking customers about their general satisfaction with a product or service is appropriate for a customer satisfaction "exit" survey for purposes of gauging general sentiment, the fact that these questions always preceded the key "cancellation reason" questions means that the data from the latter questions cannot be used to draw reliable, scientific, or valid estimates of the percentage of consumers who were unintentionally and unknowingly enrolled in Amazon Prime.

**A.5.    The Cancellation Survey's Questions Were Overly Broad, Confusing, and Ambiguous**

130. A key criterion for designing an informative, scientifically valid survey, particularly in the context of litigation, is that the questions must be phrased in a clear and unambiguous manner. This design requirement has been recognized by multiple survey authorities and texts:[218]

> Survey designers don't need to be reminded that the wording of the questions has an important impact on the results. Respondents can misinterpret even well-formulated questions, and when that happens, the question the respondent answers may not be the one the researcher intended to ask.

That requirement may sound simple but is actually a complex task:[219]

> Translating the information needed into clearly worded questions that are easily understood is the most difficult aspect of questionnaire development. Poorly worded questions can confuse or mislead respondents, leading to nonresponse or response error […]. If respondents interpret questions differently than intended by the researcher, serious bias can occur, leading to response error.

---

[218] Tourangeau, Rips, and Rasinski (2000), p. 23. For a full discussion, *see id.*, Chapter 2.
[219] Malhotra (2012), p. 311.

131.    In her survey treatise, Professor Diamond writes:[220]

> When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question.  If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.

Likewise, the Federal Judicial Center's *Manual for Complex Litigation* specifies that it is necessary in a properly conducted survey that "the questions [be] clear and not leading."[221]

132.    Confusing questions (or answer choices) that participants do not fully understand is one of the primary causes of guessing behavior.[222]  Accordingly, the survey's questions and answers should have the same meaning across respondents (*i.e.*, the survey instrument should be standardized across respondents):[223]

> When selecting words for a questionnaire, the questionnaire designer should choose words with only one meaning.  This is not an easy task given that a number of words that appear unambiguous can have different meanings to different people.

And:[224]

> The meaning of the question must be completely clear to all respondents. Clarity demands that virtually everyone interprets the question in exactly the same way. […]

> To avoid such ambiguity, virtually every questionable word or phrase must be checked carefully to be sure that it has a common meaning for everyone in the survey sample.

---

[220] Diamond (2011), p. 388.

[221] *Manual for Complex Litigation* (2004), p. 103.

[222] When a survey question is unclear or ambiguous, it can induce greater guessing behavior (*e.g.*, a participant may not fully understand the question but nevertheless volunteer their "best guess") and give rise to different interpretations across participants that reflect their idiosyncratic beliefs, attitudes, or background knowledge pertaining to the subject or topic at issue.  Such heterogeneity (variation) across participants in how they interpret or understand the question elevates survey error or "noise" (*i.e.*, random error affecting the measurement of a variable of interest).  Survey noise can arise from guessing behavior, participants' background knowledge and prior experiences, "yea-saying," and/or any flaws inherent in a survey's methodology and questions.  *See, e.g.*, Jay (2013); Rappeport, Mike (2012), "Design Issues for Controls," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association.

[223] Malhotra (2012), p. 312; see Malhotra, Naresh K. (2006), *Marketing Research: an Applied Approach*, 5th Edition, Pearson Prentice Hall, Upper Saddle River, NJ ("The words used in a questionnaire should have a single meaning that is known to the respondents.").

[224] Alreck and Settle (2004), pp. 91 & 99.

133.    As discussed in the prior subsections, the Amazon Cancellation Survey included the "DNI" answer choice as a purported reason for cancellation (in Q.3 and Q.4) and/or as a supposed "problem" experienced with Prime (Q.7).  According to the FTC, selection of this answer choice corresponds to a specific, single interpretation—unintentional sign-ups.[225] However, contrary to an assumption that the "DNI" answer choice has a sole and unambiguous meaning, this response option is overly broad and ambiguous, and is likely to be interpreted inconsistently across respondents.

134.    *First*, the context of the "cancellation reasons" question would not call to mind the specific challenged Prime enrollment processes.  Specifically, with the Cancellation Survey, Prime members do not have information about their enrollment process at hand, yet they are being asked questions referring to that process.

135.    To understand why respondents were particularly likely to be confused by the Cancellation Survey's "DNI" answer choice, it is useful to consider the role of context in affecting how survey respondents answer such questions (considering the relevant event at issue, such as enrollment).  Academic research indicates that consumers' decision processes involve several distinct mental processes: interpreting relevant information to which they are exposed, recalling product knowledge from memory, and integrating both remembered and interpreted information to form an overall assessment of a product under consideration.[226]  In the process of interpreting relevant information, consumers determine the subjective meanings of such information and develop their own personal beliefs about products, services, or stimuli.[227]

---

[225] Amended Complaint, ¶¶ 3 & 177.
[226] Peter, J. Paul and Jerry C. Olson (2008), *Consumer Behavior and Marketing Strategy* (8th ed.), Boston, MA: McGraw-Hill/Irwin, pp. 48 – 50 (*e.g.*, "Consumers must interpret or make sense of information in the environment around them.  In the process, they create new knowledge, meanings and beliefs about the environment and their places in it.  **Interpretation processes** require exposure to information and involve two related cognitive processes: attention and comprehension.  **Attention** governs how consumers select which information to interpret and which information to ignore.  **Comprehension** refers to how consumers determine the subjective meanings of information and thus create personal knowledge and beliefs" [emphases in the original]).
[227] *Id*., pp. 48 – 50, 109 – 110, and 119 – 120.

136.    By repeatedly referring to enrollment intentions without any reference to the actual enrollment process or the enrollment stimuli, the Amazon Cancellation Survey relied on respondents' comprehension and interpretation of what "intend to sign up" meant, in whatever idiosyncratic context that came to their minds (*i.e.*, not necessarily the context and time of the challenged enrollment process).[228]    Overall, there is *no* doubt that the Amazon Cancellation Survey failed to represent or even specify the marketplace conditions that consumers would typically encounter when enrolling (or deciding whether to enroll) in Amazon Prime.    Instead, the survey left the meaning of the "DNI" answer choice open to whatever interpretation a given respondent brought to the closed-ended questions.

137.    ***Second***, absent the specific context of the enrollment process, respondents were likely to have multiple different, and potentially inconsistent, interpretations of the "DNI" option.    In Subsection A.5.2.3, I listed several examples of omitted responses from the "reasons" closed-ended questions, including multiple answer choices that fit alternative (and varying) interpretations of "DNI" ("I did not intend to sign up for Prime"):

- I don't remember signing up for Prime.
- I am not the one who signed up for Prime (*e.g.*, a family member or other user of my account signed up for Prime).
- I only intended to sign up for a free trial and I am canceling before being charged.
- I only intended to sign up for a free trial and I forgot to cancel before being charged.
- I did not intend to renew Prime (*e.g.*, I thought I had turned Auto-Renew off).
- I did not intend to sign up for Prime with the payment method that I used.
- I did not intend to sign up for this version of Prime (*e.g.*, annual vs. monthly; Student vs. Access).

---

[228] Academic research indicates that human perception is dependent on the *general context* provided by words and/or visual stimuli, which drive people's interpretations; *see, e.g.*, Anderson (1985).

- I did not intend to sign up for Prime for as long as I did (*e.g.*, I signed up only to watch a TV series or to do holiday shopping).

138.    For example, because the "reasons" questions fail to define what exactly is meant by "Prime," they cannot distinguish between intentions to sign up for a *free trial* of Prime versus for a *paid* Prime subscription.  That is, respondents may have reasonably interpreted "Prime" in the answer choice "I did not intend to sign up for Prime" to mean a *paid* Prime membership (assuming that only when they have passed the free trial are they officially a Prime member). Under such an interpretation, selecting "DNI" would be entirely consistent with *intentional enrollment* into a free trial of Prime without any intent to let the free trial convert into (or forgetting to prevent the free trial from converting into) a paid Prime membership.

139.    As another example, the "I did not intend to sign up for Prime" answer choice—which uses the first-person pronoun "I"—could also capture situations where someone else in the household, other than the person completing the survey, had signed up for Prime.  If it was another individual, such as a family member, who had previously enrolled in Prime using an account shared with the respondent, then it would indeed be the case that the respondent had not intended to sign up for Prime, despite enrollment having potentially been intentional.

140.    Further, the overly broad "DNI" answer choice could also be perceived by some respondents as referring to their intentions *prior* to enrollment.  A respondent may select this answer choice to convey that they had not initially intended to join Prime at one point in time, but were later persuaded to join by an attractive offer, intentionally enrolled in Prime, and then reconsidered and decided to cancel for any number of other reasons.

141.    ***Third***, consistent with the above discussion, Amazon employees recognized that responses to the Cancellation Survey may not be interpretable in a straightforward manner, and repeatedly cautioned against a literal or definite conclusion based on these responses.  An internal Amazon report warned about inaccurate responses, and recommended against taking the Cancellation Survey results "at face value," in part due to the response options given and

"Member Frustration at time of cancellation."[229]  As discussed earlier in Subsection A.2.1, others at Amazon cautioned that customers may have interpreted the preselected "DNI" option to mean a number of different things, from not intending to *pay* for Prime to not having signed up *themselves* for Prime.[230]

142.    **Fourth**, my review of respondents' verbatim responses (written in the survey's open-ended text boxes) demonstrates that the "DNI" answer choice—interpreted by the FTC as representing unintentional enrollment—was indeed overly broad and ambiguous.  That is, respondents interpreted the answer choice to mean, among other things, not intending to sign up for *paid* Prime, not intending to remain a Prime member after a specific shopping period, not being the one to sign up in the first place because another household member signed up, not intending to use Prime on a particular card or account, and only intending to sign up for a temporary account (*e.g.*, because they want to buy holiday gifts).  For example, some customers who selected "DNI" also provided open-ended responses such as:

- "It was an accident by child purchase"[231]
- "My youngest daughter bought my membership by accident"[232] [translated from Spanish]
- "My husband already has prime but I needed it for the holidays to order gifts for him. If I used his account, he would have seen what I got."[233]
- "I have a family account I just need an account for the holidays so no one can see the gifts I ordered"[234]
- "Free trial thru the holidays and just forgot to cancel"[235]

---

[229] *Ibid*. [emphasis added].
[230] *See* AMZN_00021537 at 21539 ("we are not sure […] if the customer meant they never intended to pay for Prime (rather than sign up)"; "[k]ids may have signed up through Alexa or FireTV without telling their parents."); Hills Deposition, pp. 25 & 179 – 180.
[231] User ID: R_26hjHdck426s5Cz.
[232] User ID: R_7NW724nrdl8ZNRv.
[233] User ID: R_25zIcAs1pHI0Cop.
[234] User ID: R_3KTH5F27dMrUAQl.
[235] User ID: R_1nZsTPjLvZin7fe.

- "My wife has prime"[236]
- "I had it on the wrong account"[237]
- "Used wrong card"[238]
- "I have two accounts and have Prime for one and use this one for my published book orders. I don't get Prime membership free shipping so there is no reason to purchase Prime membership again."[239]

143.    *In summary*, multiple different interpretations of the Cancellation Survey's overly broad and confusing questions could have led respondents who were *not* unintentionally enrolled to nevertheless select the vague "DNI" answer choice, based on their own idiosyncratic understanding of what that language meant.  Therefore, selection of the "DNI" answer choice cannot be taken at face value as evidence of unintentional enrollment.

### A.6.    The Cancellation Survey Failed to Minimize or Reduce Respondent Guessing

144.    As discussed above, guessing is a well-known source of bias in survey responses that any well-designed survey needs to address.  Respondents who are confused, distracted, or lack the information needed to answer a question—particularly a closed-ended one—are likely to guess a response (*i.e.*, to choose options at random or to selectively choose the option(s) that seem "expected" or the best "fit").[240]  For example, in one study, 75% of participants who were asked their opinion about the "National Bureau of Consumer Complaints" did provide an opinion, despite the fact that no such entity exists; such participants could not have had an actual opinion and must therefore have guessed.[241]  Another article noted a similar tendency:[242]

---

[236] User ID: R_7TxrKsxN4HGhWyB.
[237] User ID: R_3r0wTy9Ee5f1vNS.
[238] User ID: R_vZDcPjCxecOrdex.
[239] User ID: R_1N5npEmrwru1gKl.
[240] *See, e.g.*, Malhotra (2012), pp. 304 – 305; Edwards, G. Kip and J. David Mayberry (2022), "The *Daubert* Revolution and Lanham Act Surveys," in Diamond, Shari S. and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys*, Chicago, IL: American Bar Association, p. 364.
[241] Malhotra (2012), pp. 304 – 305, citing Hawkins, Del I. and Kenneth A. Coney (1981), "Uninformed Response Error in Survey Research," *Journal of Marketing Research*, 18(3), 370 – 374.
[242] Kalton, Graham and Howard Schuman (1982), "The Effect of the Question on Survey Responses: A Review," *Journal of the Royal Statistical Society Series A: Statistics in Society*, 145(1), 42 – 57.

Two examples given by Schuman and Presser (1980) illustrate that many respondents will indeed choose one of the alternatives offered for an opinion question even though they do not know about the issue involved. In both examples, respondents were asked about their views about proposed legislation which few, if any, would be aware of, and yet 30 per cent expressed opinions. Bishop et al. (1980b) report similar findings about a wholly fictional issue.

145.    Guessing is a potential source of bias when surveys "fail to properly account for certain inherent limitations in the human mind":[243]

Even if respondents pay careful attention, they may not always be willing to admit they do not know the answer to a question, lack an opinion, or do not recall the relevant information required to respond. In such circumstances, some respondents may be inclined simply to guess, which can lead to biased estimates of a given answer.

Professor Diamond specifically discusses the potential for guessing to produce *systematic* errors:[244]

This form of guessing can appropriately be characterized as "guided guessing." It occurs if questions or response choices contain cues that suggest a particular response. The extreme form of suggestion is the familiar leading question that makes it clear that a particular response is expected or preferred.

146.    Accordingly, it is a standard procedure in scientific surveys (including those used as evidence in litigation) to explicitly instruct participants *not* to guess; such an explicit admonition decreases, albeit does not necessarily eliminate, guessing behavior:[245]

Guessing can be reduced or eliminated by affirmatively instructing respondents that it is acceptable not to have an opinion or know the answer to a question and that, in such circumstances, they should not guess. Such an instruction should typically be delivered as part of general survey instructions (e.g., after qualifying for the survey) so that respondents know this applies to all key answers in the survey.

For questions where it is plausible that some meaningful subset of respondents might lack an opinion or knowledge to answer, it is also generally advisable to explicitly note this in the question itself (e.g., include "if you know," "if you have an opinion," or "if you remember") and/or in the response options (e.g., include a "don't know," "no opinion," or "don't recall" response option).

---

[243] Neal (2022), p. 276.
[244] Diamond, Shari (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds.), Chicago, IL: American Bar Association, p. 243.
[245] Neal (2022), pp. 276 – 277.

147.    In the consumer surveys that I design, I typically include the following instruction: "For each of my questions, if you don't know or don't have an answer, please don't guess.  Just tell me you 'don't know' or 'don't have an answer' and we'll go on to the next question."  However, the Amazon Cancellation Survey did *not* instruct respondents to avoid guessing, either in an introduction (there was no introduction in the Cancellation Survey) or in the text of the questions themselves.  Consequently, Amazon Cancellation Survey respondents likely would have selected a response option—based on their guesses—even when they did not know the actual answer or could not recall whether or not they engaged in some past behavior.[246]

148.    As discussed in Subsection A.4.2, another standard approach for reducing participant guessing is to include filter questions.[247]  The absence of any filter questions in the Cancellation Survey (*e.g.*, to assess whether participants even had any opinion about their reasons for cancellation or about their enrollment) increased respondents' guessing behavior, leading them to answer instead based on what they could glean from the survey's context and leading cues.  Therefore, any reliance on responses of "DNI" in the Cancellation Survey generates inflated estimates of alleged unintentional enrollment and is unscientific and invalid.

149.    Guessing in closed-ended questions can also be reduced to some degree (albeit not eliminated) by the inclusion of a "Don't Know" (or equivalent) response option.[248]  By contrast, omitting an option to select "Don't Know" or "No Opinion" conveys to the participant the unrealistic expectation that the participant *should* be able to answer the question.  The importance of offering survey participants an explicit "Don't Know" or "No Opinion" answer choice is prescribed in a chapter on survey design:[249]

> Offering respondents a "don't know" or "no opinion" answer, along with "yes" or "no", reduces guessing and identifies respondents with no opinion at all.  In *Scotts Co. v. United Industries Corp.*, the court of appeals rejected a survey that "effectively required the respondents to express a specific opinion, even if they did not have an opinion, by specifically *not* offering the respondents the opportunity to give 'not sure' as a response."

---

[246] *E.g.*, Diamond (2011), pp. 389 – 391.
[247] *See, e.g., ibid.*; Keller (2012), p. 188.
[248] Neal (2022); Diamond (2011); Diamond (2022).
[249] Keller (2012), p. 188 [FNs omitted].

150.    In general, survey participants tend to avoid answers like "Don't Know," and they are particularly unlikely to volunteer such answers when "Don't Know" is not explicitly offered (or shown) as a possible and legitimate answer choice.[250]  Further, survey participants literally cannot provide "Don't Know" responses when they are asked leading, repetitive, and closed-ended questions (as they were asked in the Amazon Cancellation Survey) where neither the questions nor the answer choices offer a "Don't Know," "Not Sure," or "No Opinion" option in the first place. Indeed, as Professor Diamond remarks,[251] failing to explicitly offer to participants "Don't Know/No Opinion" as an answer choice has been shown to significantly decrease the proportion of participants providing such an answer:[252]

> By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply.  Respondents are more likely to choose a "no opinion" option if it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent spontaneously offers it as a response.  The consequence of this change in format is substantial.  Studies indicate that, although the relative distribution of the respondents selecting the *listed* choices is unlikely to change dramatically, presentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20% to 25% increase in the proportion of respondents selecting that response.

151.    It is important to note that, in the context of the Cancellation Survey, it was necessary *but not sufficient* to give the respondent an opportunity to volunteer or select a "Don't Know" response.[253]  Even when an "Other" option is offered in the same question (one that allows participants to specify their opinions in an open-ended format), many participants are still unlikely to select this option, instead opting for one of the "substantive" (closed-ended) answer choices. Not only does selecting a substantive answer choice in a closed-ended question allow respondents to avoid the additional effort and time required to verbalize their own reasoning, but also, consistent with research on "conversational norms," respondents typically want to be perceived as

---

[250] *See, e.g.*, Diamond (2011), p. 390; Schuman and Presser (1981).
[251] Diamond (2011), p. 390.
[252] Schuman and Presser (1981).
[253] For example, by selecting "Other (specify)" and then typing "Don't Know".

helpful and knowledgeable; they therefore tend to try to select the "expected" answer(s) from among the proffered options.[254]

152.    Contrary to standard practice in perception surveys relied upon in litigation, *none* of the closed-ended questions in the Amazon Cancellation Survey included an explicit "Don't Know/Not Sure" answer choice.[255]  In particular, in the "main reason" for cancellation question (Q.3), participants were prompted to choose between the following answer choices, *without* any "Don't Know" option:[256]

Q.3    What was your main reason for canceling Prime?
- The Prime membership fee was too expensive
- I was not making enough purchases on Amazon for it to be worthwhile
- I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)
- I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)
- I did not intend to sign up for Prime
- Other (please specify)

153.    The lack of a "Don't Know" option motivated guessing by conveying to respondents the completely unrealistic expectation that they *should* be able to remember and identify not only their reasons for cancellation, but also, given the answer choices, their state of mind when they *enrolled* in Prime, even if enrollment occurred months or years ago.  For example, participants who could no longer remember the details of having enrolled in Prime would be more likely to guess (including by selecting the "DNI" answer choice) in the absence of instructions to avoid guessing, in a survey without any proper filter questions, and in questions that failed to offer a "Don't Know" answer choice.

154.    Finally, recall that Amazon customers who were randomly selected to be invited to the Cancellation Survey received their invitation (primarily) through a link in a pop-up window on the Amazon website, one that advertised a "quick 2-minute survey."[257]  Such an informal approach

---

[254] For research on conversational norms, *see*, *e.g.*, Grice (1975); Schwarz (1994).
[255] *See, e.g.*, AMZN-PRM-FTC-002704613 – 36.
[256] AMZN-PRM-FTC-002704619.  Q.4 also included the same response options, again without a "Don't Know" option; AMZN-PRM-FTC-002704624.
[257] *See* AMZN-PRM-FTC-00265032, p. 15.

differs considerably from the way in which potential research participants and online survey panelists are typically recruited into academic or litigation surveys.[258]  Nor did the Amazon Cancellation Survey ever (to the best of my knowledge) use any quality assurance mechanisms, such as attention checks and real-time validation against respondent demographics, that serve as best practices to filter out inattentive (or guessing) participants or bad actors.[259]  As a result, many respondents were unlikely to approach the Cancellation Survey with the same seriousness or attention as they otherwise might for a research study.  The manner and context in which respondents were sampled thus further increased the frequency of guessing behavior, inattentiveness, and response error.

155.    The combined impact of relying on a leading, repetitive, overly broad set of closed-ended questions (with incomplete and biased answer choices), while *simultaneously* failing to instruct respondents to avoid guessing, omitting a necessary "Don't Know" (or "No Opinion") answer choice, and dissuading participants from volunteering "Don't Know" answers is severe and cannot be quantified or corrected.  This combination of survey biases induced respondents to guess, which undermines the validity and credibility of the survey's results.  Further, guessing behavior in the Amazon Cancellation Survey would be biased by prompting respondents to indicate that they had not intended to sign up for Prime (the answer choice interpreted by the FTC

---

[258] *See, e.g.*, McCarthy (2007), §32:159 (noting that a critical criterion in survey design consists of a properly constructed and representative consumer universe); Diamond (2011), p. 379 (discussing the problems associated with underinclusive and overinclusive universes); Barber, William G. and Guilio E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: ABA, pp. 54 – 56 (discussing the sampling and screening processes to adequately represent the relevant consumer universe).

[259] *See, e.g.*, Neal (2022), pp. 281 – 283.  Quality assurance mechanisms are especially relevant for online surveys, particularly when the data from such surveys cannot be corroborated with other data sources.  In the surveys that I design and conduct for litigation or adversarial proceedings, I use numerous quality assurance measures, including a bot check (*i.e.*, a sequence of CATPCHAs), multiple attention checks (*e.g.*, instructing participants to type a specific word into an "Other" text box), "speed bumps" (*e.g.*, ensuring that participants are not guessing answers and are sufficiently exposed to information for a minimum amount of time), real-time panel validation (*e.g.*, participants are terminated from the survey in real-time if the panel detects a discrepancy between a reported demographic, such as age, and that participant's recently-collected demographic data), length of interview restrictions (*e.g.*, excluding participants from the data if they took too little or too much time to complete the survey), open-ended checks (*e.g.*, excluding participants if their verbatims are "gibberish" or indicate extreme inattention), and other quality control questions (*e.g.*, asking participants to indicate whether they were or were not able to view a stimulus clearly, and whether or not they complied with the survey instructions).

as evincing unintentional enrollment), even when the respondent had in fact intentionally enrolled but guessed the "DNI" answer.

**A.7.    The Cancellation Survey Failed to Include Any Survey Control and Therefore Cannot "Net" Out Survey "Noise" or Establish a Baseline of an Irreducible Minimum Level of Consumer Confusion**

**A.7.1.    *The Need for a Control in Surveys Relied Upon to Measure Consumer Perceptions, Awareness, Intentions, or State of Mind***

156.    A fundamental principle of survey design is that a study relied upon to measure the endorsement of a particular perception, intention, or state of mind ***must include a proper control***.[260]  A *control* is used to measure the extent of "noise" or "error" in the survey. Accordingly, (external) control groups and, when appropriate, (internal) control questions are a standard and accepted methodology for consumer surveys.[261]  Without a proper control, there is no benchmark for evaluating whether the estimate derived from the survey is reliable or rather results from "noise."  Such "noise" can arise from guessing behavior, leading survey questions and answer choices, yea-saying, participants' prior knowledge and experiences, and/or any other flaws inherent in the survey's methodology and (closed-ended) questions.[262]

157.    An estimate of a particular perception, opinion, belief, or intention (after accounting for "noise") can be derived by subtracting the "control" estimate from the corresponding estimate in the "test" group or "test" question.  Two general types of control methodology involve using either a control group (an "external control") or one or more control questions (an "internal control").[263]  The control stimulus (or question) should be as similar as possible to the test stimulus (or question) *but for* the aspect being tested.[264]

---

[260] *See, e.g.*, Diamond (2011), pp. 397 – 401.
[261] *See, e.g., ibid.*; Diamond (2022); Keller (2012); Jacoby, Jacob (2013), *Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1)*, Jacoby, Jacob (ed.), Chicago, IL: American Bar Association; Jay (2013); Rappeport (2012); Swann, Jerre B. (2012), "Survey Critiques," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds.), Chicago, IL: American Bar Association.
[262] *See, e.g.*, Diamond (2022); Jay (2013).
[263] Diamond (2011), pp. 398.
[264] *See, e.g.*, Diamond (2022), p. 248 ("The general principle for choosing an appropriate control is easily stated: It should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.").  *See also* Jacoby, Jacob (2013),

158.    Survey treatises and authorities have provided extensive commentary on the necessity of survey controls in consumer perception or opinion surveys, while cautioning against survey designs that lack, or use inadequate, controls.[265]  For example, in her *Reference Guide on Survey Research*, Professor Diamond emphasizes the importance of a survey control:[266]

> Every measure of opinion or belief in a survey reflects some degree of error. Control groups and, as a second choice, control questions are **the most reliable means for assessing response levels against the baseline level of error associated with a particular question.**

And:[267]

> Controls play a central role in enabling a survey to rule out threats to valid causal inference.  **A control group design that includes an appropriate control is the best way to ensure that noise from preexisting beliefs, yea-saying, and guessing (both random and biased) cannot explain away or undermine evidence of confusion or deception** reflected in the responses of survey participants.  […] Designing an appropriate control is thus an analytic rather than a mechanical task, one that is crucial in a valid trademark or deceptive advertising survey.

159.    Thus, in any survey intended (or relied upon) to test for the effect of a variable on consumers' perceptions, reasoning, awareness, or intentions the choice of a proper control is critical.[268]  In both litigation and academic contexts, consumer perception or opinion studies that fail to employ adequate controls are often rejected or excluded for that reason alone.  One treatise author, Jerre Swann, characterizes a "survey without a control cell or with a fundamentally

---

"Settings, Stimuli, and Tasks," in *Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1)*, Jacoby, Jacob (ed.), Chicago, IL: American Bar Association, p. 506 ("Strong controls are those that maximize the similarity between the control stimulus and the test stimulus").

[265] In the interest of brevity, I reference, rather than discuss in greater detail, these sources below: *see, e.g.*, Swann (2012); Diamond (2011); Diamond (2022); Jacoby (2013); Jay (2013); Keller (2012).

[266] Diamond (2011), p. 401 [emphasis added].  *See also* Diamond (2022), p. 247 ("Fortunately, surveys in trademark and deceptive advertising litigation never need to rely on the weak preexperimental designs described above in order to test the relevant causal questions that arise in these cases.  The **primary solution is an experimental design in which survey respondents are randomly assigned either to the test cell or to a control cell** (or one of a number of control cells).  […]  By subjecting one group to a treatment (the test cell) and the other(s) to no treatment or to different treatments (the control cell(s)), the only explanation for any difference observed between the groups on the post-test measure would be the treatment.  **The design rules out the possibility that, for example, preexisting attitudes or beliefs or differences in the composition of various [sets of people] could be responsible**, because the groups on average (before treatment) were equivalent as a result of the random assignment to the test and control conditions" [emphases added; FNs omitted]).

[267] Diamond (2022), p. 254 – 255 [emphases added].

[268] *See, e.g.*, Diamond (2011), pp. 397 – 401.

inadequate control stimulus" as one of two "[…] flaws that should lead to survey exclusion without extensive analysis or data."[269]

160.    The *absence of controls altogether* in a consumer perception or opinion survey—when submitted on behalf of a plaintiff seeking to demonstrate or quantify deception—is particularly egregious:[270]

> A **plaintiff who tenders a consumer perception survey without a control mechanism** may not be able to demonstrate that false beliefs about a product are attributable to the challenged advertisement.

> Federal courts have found the failure of a plaintiff to include a control mechanism in a consumer perception survey "a **marked departure from accepted marketing techniques**" and have determined that such surveys "**lack scientific validity**."

161.    In fact, the FTC itself has "long recognized that **a control of some kind is necessary for closed-ended questions**, and has noted, for example, that there is a potential for yea-saying inherent in the closed-ended question format."[271]

### A.7.2.  *The Cancellation Survey Completely Lacked <u>Any</u> Survey Control*

162.    Considering the widely-accepted requirement and criteria for a proper survey control, as I explain next, the Cancellation Survey's complete lack of any (external *or* internal) control renders it fundamentally invalid for deriving conclusions or quantitative estimates regarding unintentional enrollment.  As recognized by survey treatises and authorities, the purpose of a (proper) survey control is to protect against threats to validity, which can lead to erroneously assuming that respondents were unintentionally enrolled when their responses instead were attributable to other factors such as yea-saying, random guessing, and systematic error (*e.g.*, due to leading questions and ambiguous answer choices).[272]

---

[269] Swann (2012), pp. 373 – 374.
[270] Jay (2013), pp. 1145 – 1146 [emphases added; FNs omitted]; *see also id.*, FN 124 ("Control groups and control questions not only isolate the effect of an advertisement but also they guard against the effect of testing or 'demand effects' (Itamar Simonson & Ran Kivetz, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions in* Diamond & Swann, *Trademark and Deceptive Advertising Surveys*, *supra* note 19, at 243)").
[271] *In re Stouffer Foods Corp.*, 118 F.T.C. at 808 (1994).  Emphasis added.
[272] *See, e.g.*, Diamond (2012).

163.    **First,** the Cancellation Survey did not include any *"external"* control, in which separate groups of participants are randomly assigned to either a "test" condition or a "control" condition.[273]  The control condition would be designed to capture "noise," such as by replacing the "DNI" answer choice with a similarly worded response option (*e.g.*, one that also refers to intentions) but that could not be true for any respondent.[274]  Because such a survey would *randomly assign* participants to either a test or control group, any baseline guessing, confusion, or "noise" would be assumed to be present at *statistically equivalent* levels across the test and control groups.[275]  Such a design—which holds constant all other aspects between the two groups except for the focal aspect at issue—could provide a baseline that enables a more accurate interpretation of the measured rate in the test condition—that is, of "DNI" responses. Therefore, the function of an external control, in the Amazon Cancellation Survey, would be to help isolate the rate of "DNI" responses *above and beyond* selections of that option due to "noise."

164.    **Second,** the Cancellation Survey also did not include any *"internal"* control as an alternative to an "external" control.  "Internal" controls appear in the form of control questions or control answer choices included within a single survey, which all participants see in addition to the corresponding test questions or test answer choices:[276]

> Rather than surveying two groups of respondents, a consumer perception survey may include only one group of respondents and show all of them the challenged advertisement.  After viewing the challenged advertisement, respondents are asked questions relating to the allegations in the case (the "test questions") and a "control question" about a fictitious topic (something not in the advertisement).  Unlike a control group (which is an external control), a control question is a "built-in" or

---

[273] *See, e.g.*, Jay (2013), pp. 1140 – 1143.

[274] For example, such an option could refer to not intending to sign up for a fictitious service that was never offered by Amazon.

[275] *See also, e.g.*, Diamond (2011), p. 398 & FN 175 ("[…] When respondents are assigned randomly to different treatment groups (e.g., respondents in each group watch a different commercial), the procedure ensures that within the limits of sampling error the two groups of respondents will be equivalent except for the different treatments they receive. […]").

[276] Jay (2013), pp. 1143 – 1144 [FN omitted].  *See also, e.g.*, Jacoby (2013), pp. 227 & 530 – 531 (citing to *Gillette v. Wilkinson Sword*, 1991, U.S. Dist. LEXIS 21006, *21-*22 (S.D.N.Y. Jan. 1991)).

"internal" control.  Usually consumer perception surveys include a single control question (rather than a control question for each test question).

A control question may be used to assess the amount of guessing in a survey and/or the extent to which respondents are inclined to answer affirmatively (called "yea-saying").

165.    In the present matter, internal control questions, for example, could include "phantom" (fictitious) answer choices that could *not* serve as actual reasons for cancellation,[277] such that any selections of that option must capture "noise."  I and other scholars/experts in the field routinely design and conduct surveys that use internal controls, including in the survey that I designed and conducted on behalf of the FTC in the *Home Assure* case.[278]

166.    ***Third,*** a proper control was all the more necessary because the Amazon Cancellation Survey relied on highly leading, closed-ended questions (*see* Subsection A.5) and placed unrealistic memory demands on the respondents (*see* Subsection A.4).  This is because a control condition or control question serves to account for not only participants' guessing behavior, inattention, and background knowledge, but also for flaws in the survey itself, such as the leading nature of the closed-ended questions asked (a flaw that is exacerbated by respondents' inability to remember).  As a chapter on survey controls (published in the widely-cited text, *Trademark and Deceptive Advertising Surveys*) explains, one reason why a survey control is necessary is to account for a question's leading nature:[279]

When used in the context of survey research, "leading" is usually defined as a question that leads the respondent to select a 'specific' answer.  **This commonly**

---

[277] For example, including an answer choice that references a service that is *not* available for Prime members or was never offered by Amazon (*e.g.*, Spotify benefits that are unlocked only with a Prime subscription—which, to my knowledge, does not exist).

[278] *Federal Trade Commission v. Home Assure, LLC et al.*, No. 8:09-cv-547-T-23 TBM (M.D. Fla. July 29, 2010).  *See also, e.g., Beef Products, Inc., et al. v. American Broadcasting Companies, Inc., et al.*, No. 12 - 292 (S.D. Circuit Court First Judicial Circuit 2017).  In that litigation, in which I testified on behalf of the Plaintiff, I conducted four separate consumer perception surveys using internal control questions and analyzed a news campaign.

[279] Rappeport (2012) [emphases added; FN omitted].  *See also* Jacoby, Jacob (2013), "The Fundamental of Scientific Research," Ch. 4, in *Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1)*, Jacoby, Jacob (ed.), Chicago, IL: American Bar Association, p. 221 ("[C]ontrol questions typically are comparable in form to test questions and designed to provide direct comparisons between the respondents [*sic*] answers to the test question and his or her answers to the control question.  Controls are what enable us to estimate error rates, a requirement of *Daubert*.").

**occurs because, intentionally or otherwise, the desired answer is included or implied either in the question itself, or in the possible answers.**

167.     The respondents to the Amazon Cancellation Survey were assigned to the same survey questionnaire, with neither an "external" control nor any control question or control answer choice. As a result, it is not possible to measure, or account for, the effect of extraneous factors (confounds) or survey "noise" (*e.g.*, due to demand effects, guessing, yea-saying, misremembering, order effects, and other biases) that affected responses to the survey's leading closed-ended questions. Because the survey lacks any form of control, there is no *benchmark* against which to compare the rate of respondents selecting "DNI," so selections of "DNI" *cannot* be distinguished from random error or systematic bias.

168.     ***Fourth,*** to appreciate the necessity of a proper control in using the Cancellation Survey to assess the FTC's allegations, it is useful to consider a scenario in which *no* Amazon Prime members were unintentionally enrolled (that is, in which all Prime members intentionally and knowingly enrolled). A large academic literature has documented the prevalence of guessing, mistaken responding, and relying on heuristics when answering questions and making decisions, particularly when people are confused or lack full information.[280] For example, research co-authored by Professor Richard Thaler, Nobel Prize Winner in Economics, has documented a phenomenon referred to as the "diversification heuristic" or the "1/$n$ rule"—that is, the tendency of people to allocate their retirement funds evenly across the options, regardless of what the investment options are.[281] The same is true for survey responses. When individuals do not know what the "right" choice is, it is likely, either due to guessing randomly, evenly

---

[280] Hawkins and Coney (1981); Beach, Daniel A (1989), "Identifying the Random Responder," *The Journal of Psychology*, 123(1), 101 – 103; Curran, Paul G. (2016), "Methods for the Detection of Carelessly Invalid Responses in Survey Data," *Journal of Experimental Social Psychology*, 66, 4 – 19; Ward, M. K. and Adam W. Meade (2023), "Dealing with Careless Responding in Survey Data: Prevention, Identification, and Recommended Best Practices," *Annual Review of Psychology*, 74, 577 – 596.

[281] Benartzi, Shlomo and Richard H. Thaler (2001), "Naive Diversification Strategies in Defined Contribution Saving Plans," *American Economic Review*, 91(1), 79 – 98; Benartzi, Shlomo and Richard H. Thaler (2007), "Heuristics and Biases in Retirement Savings Behavior," *Journal of Economic Perspectives*, 21(3), 81 – 104.

allocating their responses, or yea-saying, that *every option, no matter how unrealistic or invalid, will be chosen by at least some respondents*.

169.   One implication of the "1/*n*" heuristic described above is that the number of answer choices offered in a closed-ended question is critical and can even potentially determine the proportion selecting a given response.  For example, a multiple-choice question that offers participants only four response options, rather than ten options, will tend to generate a higher proportion selecting a particular option merely due to *chance (random guessing) alone*.  Research has found that choices are affected by expanding or contracting the set (or subset) of options or alternatives.[282]  In fact, the concerns regarding the "1/*n*" heuristic are exacerbated for the follow-up "reasons" question (Q.4) in the Cancellation Survey, which suppressed the answer choice that was already selected in the preceding question (Q.3).  Hence, if a respondent did not select "DNI" in Question 3 (as their "main reason" for canceling Prime) but did select one of the other substantive answer choices (*e.g.*, "The Prime membership fee was too expensive"), then that respondent would see *only four (instead of five) substantive answer choices* in Question 4, one of which would be, again, the "DNI" option.

170.   For all of the above reasons, *some* respondents to the Cancellation Survey would choose "DNI" even if they had in fact *intentionally* enrolled in Prime.  Treating all of those mistaken responses as unintentional enrollees would be scientifically invalid.  A survey like the Cancellation Survey can only potentially be informative as to the existence or prevalence of an intention or behavior represented by a closed-ended response option when an appropriate benchmark exists to separate out "noise."

---

[282] For example, physician's choices of a treatment in a clinical vignette depended on whether that treatment was a stand-alone option or included in a broader set of options; Tannenbaum, David, Jason N. Doctor, Stephen D. Persell, Mark W. Friedberg, Daniella Meeker, Elisha M. Friesema, Noah J. Goldstein, Jeffrey A. Linder, and Craig R. Fox (2015), "Nudging Physician Prescription Decisions by Partitioning the Order Set: Results of a Vignette-Based Study," *Journal of General Internal Medicine*, 30, 298 – 304. *See also* Tversky Amos and Derek J. Koehler (1994), "Support Theory: A Nonextensional Representation of Subjective Probability," *Psychological Review*, 101(4), 547 – 567; Fox, Craig R., Rebecca K. Ratner, and Daniel J. Lieb (2005), "How Subjective Grouping of Options Influences Choice and Allocation: Diversification Bias and the Phenomenon of Partition Dependence," *Journal of Experimental Psychology: General*, 134(4), 538 – 551.

### A.7.3. *The Amazon Cancellation Survey Cannot Show Unintentional Enrollment Above an Irreducible Baseline Rate of Consumer Error*

171.    Not only does the Amazon Cancellation Survey fail to include any survey control, but also the FTC does not compare the survey-derived estimates of supposed unintentional enrollment with any sort of industry average or other relevant benchmark.  Because the FTC cannot show that the Cancellation Survey demonstrates alleged unintentional enrollment that exceeds an irreducible baseline of intentional enrollment due to consumer error, the FTC cannot prove that customers unintentionally enrolled in Prime due to Amazon's allegedly deceptive enrollment flows.

172.    In general, there typically exists an irreducible minimum percentage of consumers who are "confused" by even *non*-deceptive communications and stimuli.[283]  In industries where retailers offer customer membership programs—including subscription-based services—some baseline level of accidental or mistaken sign-ups are to be expected despite any measures implemented by the service providers to combat such mistakes.  Extrapolating from selections of "DNI" answer choices in the Cancellation Survey into estimates of alleged unintentional enrollment attributable to challenged Amazon practices requires accounting for the rate of unintentional enrollment that would occur regardless of those challenged practices.

173.    As one Court noted in the context of consumer confusion:[284]

Is 25 percent large or small?  Compared to what?  Befuddlement is part of the human condition.  No matter how clear the markings, no matter how different the names, no matter how distinctive the bottles, some confusion is inevitable.

In other words, to properly assess the level of consumer confusion or deception, it is necessary to employ some control that would allow for estimating a "net" level of confusion.

---

[283] *See also, e.g.*, Hummel, Chad, Ben Mundel, and Jerry Wind (2023), "Implications of the Consumer Journey to Traditional Consumer Surveys for Litigation," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), Cambridge, UK: Cambridge University Press, pp. 56 – 57 ("For example, if the study showed the 20 percent of respondents in the BAU [Business-As-Usual stimulus group] were incorrect about the terms of a product but that 20 percent were similarly wrong in the modified/control group, that would suggest there is 0 net deception. Studies have shown that **it is impossible to get 100 percent informed rates, even with crystal-clear disclosures**" [emphasis added]).
[284] *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.39 909, 912 (7th Cir. 1996).

174.    Consider, in this case, the ▮▮▮ rate of selecting the "DNI" answer choice in the Amazon 2020 Cancellation Survey.[285]  Even setting aside the fact that the various flaws and leading aspects of the survey discussed above led to an inflated percentage of respondents who clicked on "DNI," the proper benchmark against which to compare this ▮▮▮ rate is certainly not 0% (*i.e.*, representing a counterfactual world in which no customer ever, for any reason, mistakenly signed up for Prime).

175.    Academic research has shown that a substantial, sometimes double-digit, percentages of consumers will inadvertently fail to follow even clear instructions as a result of inattention, absentmindedness, or carelessness, resulting in mistaken survey responses that are not informative.  In a series of studies on inattentiveness, Oppenheimer and colleagues (2009)[286] found that ***between 14.0% to 28.7% of participants fail to follow basic, clearly visible instructions*** like: "[S]imply click on the title at the top of this screen (i.e., 'sports participation') to proceed to the next screen."  Another article found that in two studies, approximately one third of respondents failed an attention check that instructed them to skip the question.[287]  Other researchers have documented high rates of careless responding, with survey respondents agreeing with statements that are impossible (or virtually impossible) to be true, such as "I sleep less than one hour per night" (10%), "I do not understand a word of English" (asked in English; 10%), and "I am paid biweekly by leprechauns" (20%).[288]

---

[285] More precisely, ▮▮▮, calculated as ▮▮▮ respondents out of a total of ▮▮▮ respondents who took the survey between May 8, 2020 (the earliest recorded survey) and June 21, 2023 (the end date of the relevant period).  Analysis based on "SV_0OInYvHGGzsKsBf US+Prime+Cancellation+Survey+2020_February+5,+2024_16.13.csv."

[286] Oppenheimer, Daniel M., Tom Meyvis, and Nicolas Davidenko (2009), "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45(4), 867 – 872.

[287] Pass, Leonard J. and Meike Morren (2018), "Please Do Not Answer if You Are Reading This: Respondent Attention in Online Panels," *Marketing Letters*, 29, 13 – 21.

[288] Meade, Adam W. and S. Bartholomew Craig (2012), "Identifying Careless Responses in Survey Data," *Psychological Methods*, 17(3), 437 – 455.  *See also, e.g.*, Arias, Víctor B., Luis Eduardo Garrido, Cristina Jenaro, Agustín Martínez-Molina, and Benito Arias (2020), "A Little Garbage in, Lots of Garbage Out: Assessing the Impact of Careless Responding in Personality Survey Data," *Behavior Research Methods*, 52, 2489 – 2505 (estimating careless responding rates between 4.4% and 10%); Curran (2016) (estimating careless responding at approximately 10%), DeSimone, Justin A. and P. D. Harms (2018), "Dirty Data: The Effects of Screening Respondents Who Provide Low-Quality Data in

176.    Further, research across different domains has documented that some proportion of survey respondents will provide false or inaccurate information.  For example, studies contrasting factual data about survey respondents from external, objective sources with their reported survey responses have observed inaccurate responses regarding a wide range of labor-related phenomena (*e.g.*, reasons for retirement; wages; earnings),[289] employment benefits,[290] and legal proceedings.[291]  Multiple studies on "spurious response error" have also shown that consumers sometimes report being supposedly aware of or familiar with nonexistent (or "bogus") consumer products, brands, or trademarks.[292]  Indeed, as one author summarized:[293]

> Consumers frequently provide researchers with biased perceptions and inaccurate assessments of past and future behavior.
>
> […] ["Spurious response error"] occurs when survey respondents "recognize" advertisements that they cannot possibly have seen, claim awareness or consumption of brands that do not exist, claim readership of nonexistent magazines, etc.  For example, according to recent articles in *Forbes* (Goydon, 1984) and the *Wall Street Journal* (September 13, 1984), significant numbers of surveyed consumers claimed to recognize the brand names "Dentu-Tight" (16%), "Four O'Clock" Tea (8%), "Leone Pasta" (16%), and "Mrs. Smith's Cake Mix" (31%)— all names of brands that do not exist.

And:[294]

> Peterson (1982, p. 231) refers to the fact that **any questionnaire item will receive some responses, regardless of its relevance**, as "ballot bias."  Several other reported studies confirm that a substantial minority of survey respondents will

---

Survey Research," *Journal of Business and Psychology*, 33, 559 – 577 (finding that 7.5% of respondents choose impossible answers).

[289] Bound, John, Charles Brown, and Nancy Mathiowetz (2001), "Measurement Error in Survey Data," in *Handbook of Econometrics (Vol. 5)*, Elsevier, pp. 3705 – 3843; Moore, Jeffrey C., Linda L. Stinson, and Edward J. Welniak (2000), "Income Measurement Error in Surveys: A Review," *Journal of Official Statistics-Stockholm*, 16(4), 331 – 362.

[290] Duncan, Greg J. and Daniel H. Hill (1985), "An Investigation of the Extent and Consequences of Measurement Error in Labor-Economic Survey Data," *Journal of Labor Economics*, 3(4), 508 – 532.

[291] Mitchell, Colter (2010), "Are Divorce Studies Trustworthy? The Effects of Survey Nonresponse and Response Errors," *Journal of Marriage and Family*, 72(4), 893 – 905 (finding that approximately one-third of survey respondents misreported the date of their divorce by more than 6 months).

[292] Goldsmith, Ronald E. (1988), "Spurious Response Error in a New Product Survey," *Journal of Business Research*, 17(3), 271 – 281 (*e.g.*, finding that 17% of survey respondents claimed to be aware of both of the two "bogus" brands included in the study; *see id.*, p. 275).  *See also* Goldsmith, Ronald E. (1989), "Reducing Spurious Response in a Field Survey," *The Journal of Social Psychology*, 129(2), 201 – 212.

[293] Goldsmith (1988), pp. 271 – 272.

[294] *Id.*, p. 272.

> express an opinion of some issue or current event they know nothing about (Bishop et al., 1980; Hawkins and Coney, 1981; Schneider, 1985; Schuman and Presser, 1980). [Emphasis added]

177.    With respect to self-reports of past events or behavior, a large body of academic literature has found evidence for the malleability and reconstructive nature of human memory, including the generation of false memories among some participants (*e.g.*, about events that never occurred) in response to the introduction of leading (and/or misleading) information.[295]  In an article about individuals' susceptibility to false memories, Kaplan and colleagues (2016) remark:[296]

> Researchers have instilled memories for entire events that never happened using techniques such as increasing their plausibility (e.g., Hart & Schooler, 2006), repeated questioning (e.g., Loftus & Pickrell, 1995), repeated imagination of events (e.g., Sharman & Scoboria, 2009), and guided imagery (e.g., Hyman & Pentland, 1996). […] Memories may include errors concerning what happened, when an event happened, where it happened, and who was involved, or memories may be entirely fabricated.

178.    The potential for everyday mistakes extends beyond a survey setting to a broad range of interactions in the marketplace.  A large literature in psychology has studied the prevalence of unintentional error, including "action slips," a common occurrence in which cognitive control fails to execute intentional actions and prevent unintended actions.[297]  One study found that healthy individuals reported 6.4 such mistaken actions per week on average.[298]  In another study, experienced drivers reported an average of six driving errors per month, such as running a red light or almost turning into oncoming traffic—errors that predominantly occur in familiar circumstances.[299]

---

[295] *See, e.g.*, Loftus, Altman, and Geballe (1975); Loftus and Zanni (1975); Weinberg, Wadsworth, and Baron (1983); Loftus, Elizabeth F. (1997), "Creating False Memories," *Scientific American*, 277(3), 70 – 75.  *See also* Subsection A.4.2 for further discussion on the limitations of human memory.

[296] Kaplan, Robin L., Ilse Van Damme, Linda J. Levine, and Elizabeth F. Loftus (2016), "Emotion and False Memory," *Emotion Review*, 8(1), 8 – 13, p. 9.

[297] Mylopoulos, Myrto (2022) "Oops! I Did It Again: The Psychology of Everyday Action Slips," *Topics in Cognitive Science*, 14(2), 282 – 294.

[298] Jónsdóttir, María K., Steinunn Adólfsdóttir, Rúna Dögg Cortez, María Gunnarsdóttir, and Ágústa Hlín Gústafsdóttir (2007), "A Diary Study of Action Slips in Healthy Individuals," *The Clinical Neuropsychologist*, 21(6), 875 – 883.

[299] Kruysse, Herman W. (1992), "How Slips Result in Traffic Conflicts and Accidents," *Applied Cognitive Psychology*, 6(7), 607 – 618.

179.    The propensity for error is general and can be exacerbated by a variety of factors external to the specific situation, including hurried decision-making,[300] fatigue,[301] inattention or misdirected attention,[302] distraction and competing goals during decision-making,[303] and the over-generalization of prior habitual behaviors to a new situation.[304]  In particular, these kinds of errors can occur in the context of technology use,[305] particularly when habitual behaviors in prior technology use are misapplied to a novel situation.[306]  When such errors happen and the decision-makers recognize their errors, they are likely to view their own erroneous behavior to be unintentional:[307]

> […] true slips tend to be disavowed as soon as they are detected, **as if people attributed their flawed action to some agency other than themselves** […]  Given this concept, we can define slips operationally as "actions that people quickly recognize as **unintended**, once they become aware of them."  [Emphasis added]

180.    Research on errors in decision-making shows that whenever consumers face any uncertainty, it is inevitable that some consumers will make errors,[308] some of which will be

---

[300] Betsch, Tilmann, Susanne Haberstroh, Beate Molter, and Andreas Glöckner (2004), "Oops, I Did It Again—Relapse Errors in Routinized Decision Making," *Organizational Behavior and Human Decision Processes*, 93(1), 62 – 74; Buabang, Eike K., Massimo Köster, Yannick Boddez, Pieter Van Dessel, Jan De Houwer, and Agnes Moors (2023), "A Goal-Directed Account of Action Slips: The Reliance on Old Contingencies," *Journal of Experimental Psychology: General*, 152(2), 496 – 508.

[301] Wallace, J. C., Vodanovich, S. J., & Restino, B. M. (2003), "Predicting Cognitive Failures from Boredom Proneness and Daytime Sleepiness Scores: An Investigation Within Military and Undergraduate Samples," *Personality and Individual Differences*, 34, 635 – 644.

[302] Day, Rong-Fuh, Feng-Yang Kuo, and Yu-Feng Huang (2021), "Influence of Self-Efficacy on Execution Discrepancy and Decision Performance," *Information & Management,* 58(5), 103470; Norman, Donald A. (1981), "Categorization of Action Slips," *Psychological Review*, 88 (1), 36 – 48; Reason, James T. (1992), "Cognitive Underspecification: Its Variety and Consequences," in *Experimental Slips and Human Error: Exploring the Architecture of Volition*, Baars, Bernard J. (ed.), Boston, MA: Springer Science & Business Media, pp. 71 – 91; Mylopoulos (2022).

[303] Botvinick, Matthew M. and Lauren M. Bylsma (2005), "Distraction and Action Slips in an Everyday Task: Evidence for a Dynamic Representation of Task Context," *Psychonomic Bulletin & Review*, 12(6), 1011 – 1017; Baars, Bernard J. (2013) *Experimental Slips and Human Error: Exploring the Architecture of Volition*, Boston, MA: Springer Science & Business Media.

[304] Betsch et al. (2004); Buabang et al. (2023).

[305] Day, Kuo, and Hong (2021); Norman (1981); Polites, Greta L. and Elena Karahanna (2013), "The Embeddedness of Information Systems Habits in Organizational and Individual Level Routines: Development and Disruption," *MIS Quarterly*, 221 – 246.

[306] Polites and Karahana (2013).

[307] Baars (2013).

[308] Hammond, Kenneth R. (1996) *Human Judgment and Social Policy: Irreducible Uncertainty, Inevitable Error, Unavoidable Injustice*, New York, NY: Oxford University Press.

revealed to the consumer when they have more information (like getting a subsequent subscription confirmation email). But the uncertainty often cannot be eliminated by providing more information. Because information is costly to process, the level of information that would need to be understood by consumers to eliminate virtually all uncertainty (and therefore eliminate virtually all errors) would present a cost that many consumers would avoid, preserving uncertainty and error in practice. Importantly, the issue is not a cost to the provider of information, but a cost borne by the consumer making the decision. For example, even if a manufacturer adds more and larger warning labels about how to safely use a product, some customers will nevertheless disregard that information and commit error. As a result, in practice, some baseline level of error is inevitable in any sufficiently complex interaction.

181.    The prevalence of some baseline level of error in everyday human decision-making, even in the absence of any deception or intention to confuse people, has been widely recognized in the literature on decision making. For example, one research team concluded:[309]

> Making the bed, taking a shower, getting dressed… From the moment we wake up each day, a large portion of our time is occupied with familiar, goal-oriented routines. For the most part, such tasks are completed with ease and according to plan, a testimony to the robustness and flexibility of human information processing. Nevertheless, even in the most familiar of tasks, errors or slips of action do occur at nontrivial rates.

Errors are a persistent problem, even in the high-stakes context of aviation:[310]

> There is no efficient, quick road to understanding human error [...]. Similarly, there is no quick safety fix for systems that pursue multiple competing goals in a resource-constrained, uncertain world.

Likewise, errors are inevitable in healthcare and medicine:[311]

> Errors are inevitable, and attempting to eliminate human imperfections in healthcare or any other industry is a futile goal.

---

[309] Botvinick and Bylsma (2005).
[310] Dekker, Sidney W.A. (2001) "The Re-Invention of Human Error," *Human Factors and Aerospace Safety*, 1(3), 247 – 265.
[311] Russ, Alissa L., Rollin J. Fairbanks, Ben-Tzion Karsh, Laura G. Militello, Jason J. Saleem, and Robert L. Wears. "The science of human factors: Separating fact from fiction." *BMJ Quality & Safety* 22(10), 802 – 808. [FN omitted]

182.    The likelihood and incidence of mistaken actions are further compounded by failures of motor control that can commonly occur in technological interactions, such as when consumers use electronic devices.  For example, so-called "fat finger" problems have led to accidental clicking on touchscreen devices.[312]  As a result, people can and do accidentally select unintended options when interacting with technology.  For example, consumers often unintentionally click on mobile advertising.[313]  Wrong-item errors in the medical field, in which workers select incorrect menu items on their computers, have been recognized as a serious issue.[314]  One annual study reported that data entry (or "computer entry") was the "fourth-leading cause of errors, accounting for 13% (27,711) of the medication errors reported in 2003."[315]  Blunders of this type have also been documented in finance, where individuals have erroneously input the wrong number or inadvertently added an extra "0" to a large trade order.[316]  An academic article on the effect of human data entry methods on accuracy[317] found that "visual checking [*e.g.*, one person enters data and visually compares that data against the original paper sheets] resulted in 2958%

[312] Benko, Hrvoje, and Daniel Wigdor (2010), "Imprecision, Inaccuracy, and Frustration: The Tale of Touch Input," *Tabletops-Horizontal Interactive Displays*, 249 – 275; Vogel, D., Baudisch, P. (2007), "Shift: A Technique for Operating Pen-Based Interfaces Using Touch," *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, New York, NY: Association for Computing Machinery, pp. 657– 666; Zuo, Yanling, Jingjing Cao, and Jia Zhou (2024), "Optimization of Touch Active Area Size Based on Click Position Bias in Older Adults' Touchscreen Interaction," in *International Conference on Human-Computer Interaction*, Cham, Switzerland: Springer Nature, pp. 192 – 209.

[313] Fulgoni, Gian M. and Andrew Lipsman (2017), "Are You Using the Right Mobile Advertising Metrics?: How Relevant Mobile Measures Change the Cross-Platform Advertising Equation," *Journal of Advertising Research*, 57(3), 245 – 249; *see also* Swant, Marty (2016), "Do You Accidentally Thumb Over Ads All the Time? Google's Working on That," *ADWEEK*, May 6th, https://www.adweek.com/performance-marketing/do-you-accidentally-thumb-over-ads-all-time-googles-working-171314/.

[314] Taieb-Maimon, Meirav, Catherine Plaisant, A. Zachary Hettinger, and Ben Shneiderman (2018), "Increasing Recognition of Wrong-Patient Errors Through Improved Interface Design of a Computerized Provider Order Entry System," *International Journal of Human–Computer Interaction*, 34(5), 383 – 398.

[315] American Medical News (2005), "Data Entry is a Top Cause of Medication Errors," https://amednews.com/article/20050124/profession/301249959/4/.

[316] *See, e.g.,* Jones, Rupert (2022), "Flash Crash Set Off by 'Fat-Fingered' Citigroup Trader Could Cost $50m," *Guardian*, https://www.theguardian.com/business/2022/jun/03/flash-crash-set-off-by-fat-fingered-citigroup-trader-could-cost-50m; Yonkil, Ahn (2021), "The Economic Cost of a Fat Finger Mistake: A Comparative Case Study from Samsung Securities's Ghost Stock Blunder," *Journal of Operational Risk*, 16(2), 49 – 60; Jin, Miao, Yu-Jane Liu, and Juanjuan Meng (2019), "Fat-Finger Event and Risk-Taking Behavior," *Journal of Empirical Finance*, 53, 126 – 143.

[317] Barchard, Kimberly A. and Larry A. Pace (2011), "Preventing Human Error: The Impact of Data Entry Methods on Data Accuracy and Statistical Results," *Computers in Human Behavior*, 27(5), 1834 – 1839.

more errors than double entry [*e.g.*, one person enters the data twice], and was not significantly better than single entry [*i.e.*, one person enters the data]."[318]  Indeed, the notion of a "trembling hand perfect equilibrium" in economics—a modified version of Nash equilibrium in game theory—directly accounts for the possibility of individuals (or "players") choosing unintended strategies, in recognition of the existence of irreducible errors in decision making.[319]

183.    Overall, research on human error across multiple contexts indicates that there invariably exists some (potentially substantial) proportion of individuals who simply make mistakes not because the information presented is unclear, confusing, or deceptive but rather because they either fail to (accurately) process such information in the first place or because they execute an unintended action (even if they do accurately process the information).

184.    I do *not* offer opinions on what specific threshold would, as a legal matter, constitute actionable levels of a likelihood of consumer deception, confusion, or alleged unintentional enrollment in this litigation.  However, I understand that, consistent with the academic research cited in the prior paragraph, courts and the *NAD* have often found *net* (*i.e.*, test minus control) deception rates in excess of 20% to be adequate to establish evidence of consumer deception.[320]

---

[318] *Id.*, p. 1834.  The authors found that 77.4% of participants in the double entry condition had "perfect accuracy," whereas only 17.1% and 5.5% did in the visual checking and single entry conditions, respectively; *id.*, p. 1836.

[319] Selten, Reinhard (1975), "Reexamination of the Perfectness Concept for Equilibrium Points in Extensive Games," *International Journal of Game Theory*, 4, 25 – 55.

[320] *See, e.g.*, *The Procter & Gamble Company (Olay® Ultra Moisture Beauty Bar)*, Report #5830, *NAD/CARU Case Reports* (April 2015) ("NAD is cognizant of the fact that there is no hard and fast rule as to the percentage necessary to prove consumer confusion in a consumer perception test, and that both the courts and NAD have held that, approximately 20% or above has been consistently considered 'adequate' with 15% being more the exception rather than the rule."); McCarthy, J. Thomas (2024), *McCarthy on Trademarks and Unfair Competition* (5th ed.), §32:193 ("The Third Circuit held that a survey showing that 7.5% were deceived or misled by an advertisement was not sufficient to constitute the required 'substantial portion of the intended audience.' Courts have found survey figures to be sufficient when they revealed that 15%, 20%, 21%, 34%, 'over 25%,' and 33% of respondents received a misleading message from the ad. In one case, the court found that survey responses that showed over 50% of respondents perceived a message found to be misleading supports a finding of false advertising, but the court cautioned that: '[T]he survey is evidence of the tendency of the ad to deceive. The pertinent issue is not the specific percentage of deception revealed in the survey, but rather the tendency to deceive.'" [FNs omitted]); Jay (2013), pp. 1163 ("[S]everal federal courts have characterized a confusion rate of 20% or higher in a properly conducted survey to be evidence of a 'substantial,' 'appreciable,' or 'statistically valid' number of consumers being misled" [FNs omitted]) & 1164 ("Although in a properly conducted survey percentages between 10% and

185.    In my own empirical surveys in which I have found a significant and meaningful likelihood of consumer deception, I have always employed a relevant, *non*-deceptive control that has nevertheless captured *some* (positive) rate of responses supposedly indicating deception or "noise."  For example, in *Dyson, Inc. v. Bissell Homecare, Inc.*,[321] where the court upheld my survey's methodology, questions, and coding, I found a highly statistically significant and meaningful 27% *net* (difference) between the test and control groups (*i.e.*, 40% − 13%), with the (external) control capturing 13% "noise."

186.    Overall, given the Amazon Cancellation Survey's lack of any control (thereby precluding the calculation of a "net" confusion rate) as well as the fact that the FTC has not provided any evidence that the rates of "DNI" responses in the Cancellation Survey differ materially from other relevant benchmarks, it would be invalid and unscientific to draw any conclusions regarding the levels of unintentional enrollment.  Because the FTC cannot show that the "DNI" rate in the Amazon Cancellation Survey exceeds a relevant benchmark of consumer error, this survey cannot be used to show that customers unintentionally enrolled in Prime due to Amazon's allegedly deceptive enrollment flows.

**A.8.    Evaluation of the Amazon Cancellation Survey: Conclusion**

187.    Based on my analyses and my experience as a researcher, and having conducted, supervised, and evaluated thousands of marketing research surveys, it is my professional opinion that any reliance on the Amazon Cancellation Survey in this litigation to estimate unintentional enrollment in Prime is flawed and scientifically invalid.  This is because, among other reasons, the Cancellation Survey: (*i*) fails to represent the relevant consumer universe in this litigation; (*ii*) is a customer satisfaction "exit" interview that is *not* a valid scientific basis for drawing

---

14% often are probative of deception, rates of this magnitude may not always suffice to demonstrate that a 'substantial' number of consumers are likely to be misled by an advertisement" [FN omitted].  *See also, e.g.*, *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Co.*, 19 F.3d 125 (3d Cir. 1994), at *134, FN 14 ("With regard to what constitutes a substantial or significant number of consumers who are misled, **the court cited to several cases which suggest that 20% would be sufficient**" [emphasis added]).

[321] *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp.2d 1009, 1019 (N.D. Illinois, 2013).  *See also* Jay (2013), pp. 1129 & FN 61, 1133 & FN 75, 1138 & FN 97, 1152 & FN 153, 1155 & FN 164, 1156 & FN 167, 1160 & FN 186 (citing favorably to my survey methodology).

conclusions regarding consumers' state of mind at the *time of their enrollment in Prime*; (*iii*) used questions that were extremely leading and susceptible to severe demand effects and other response biases; (*iv*) used questions that were overly broad, confusing, and ambiguous; (*v*) failed to minimize or reduce respondent guessing behavior; and (*vi*) did not include any survey control that would allow for "netting" out survey "noise" and accounting for an irreducible minimum level of consumer confusion.  Given these flaws, which individually and collectively bias the results in the direction of the FTC's position, the Amazon Cancellation Survey ***does not and cannot provide any scientific, reliable, or valid estimate*** of the rate of alleged unintentional enrollment in Prime.

**B.    THE RESULTS OF THE AMAZON CANCELLATION SURVEY FURTHER INVALIDATE THE FTC'S RELIANCE ON THIS SURVEY FOR PURPOSES OF DRAWING CONCLUSIONS ABOUT UNINTENTIONAL ENROLLMENT**

188.    The 2020 Amazon Cancellation Survey[322] was launched in the spring of 2020. Between May 8, 2020 (the first recorded response) and June 21, 2023 (the end of the relevant time period), a total of ▮▮▮▮ consumers responded to this survey.[323]  In November 2022,[324] two additional questions about rejoining Prime were added toward the end of the Cancellation Survey; the survey has remained essentially unchanged since then (through June 21, 2023),[325] and approximately ▮▮▮▮ consumers took (*i.e.*, started) this version of the survey.

189.    My analysis in this section[326] uses the data from the subsample of ▮▮▮▮ respondents who elected to take the 2020 Cancellation Survey between November 8, 2022 and June 21, 2023, *and* who responded to Question 2 (*i.e.*, "How satisfied are you with Prime?") and

---

[322] *See* AMZN-PRM-FTC-002704613 – 72; Exhibit G to August 6, 2021 Response.
[323] *See* "SV_0OInYvHGGzsKsBfUS+Prime+Cancellation+Survey+2020_February+5,+2024_16.13.csv." Note that a total of ▮▮▮▮ consumers took the Cancellation Survey between May 8, 2020 and February 5, 2024.
[324] The earliest recorded value for Q.10 is November 8, 2022 at 19:44:18.  A total of ▮▮▮▮ consumers took the survey between November 8, 2022 and February 5, 2024.  *Ibid*.
[325] *See also* discussion regarding survey versions over time in "Overview of the Amazon Cancellation Survey."
[326] My analyses of the Cancellation Survey data in Section B of this *Expert Report* used STATA, a statistical software.  *See* Exhibit D.1 for the documentation and code.

Question 10 (*i.e.*, "When are you most likely to rejoin Prime?"),[327] in addition to the key "cancellation reasons" questions (Q.3 and Q.4).[328]  The key findings from my analysis of the survey's results remain the same when I analyze an extended sample consisting of the set of ███████ respondents who took the survey between May 8, 2020 and June 21, 2023 (and who responded to Q.2, Q.3, and Q.4).[329]

190.    Among the sample of ██████ respondents that is the focus of my analysis, ██████ of the respondents chose the "I did not intend to sign up for Prime" ("DNI") answer choice in at least one of the multiple closed-ended survey questions in which such a response was proffered (*i.e.*, Q3, Q4, or Q7).  However, does this result mean that ██████ of respondents must therefore have been *unintentionally enrolled*?  In order to appropriately contextualize this █████ figure, I report, in the next two subsections, findings from two sets of analyses.  ***First***, I examine whether the observed rate of "DNI" selections would be inflated due to random guessing.  ***Second***, I identify patterns of responses across the Cancellation Survey's questions that point to apparent inconsistencies in the data relative to the FTC's interpretation of "DNI" as representing unintentional enrollment.  As I later explain, the high rate of such questionable response patterns further invalidates any attempt to use the Cancellation Survey for purposes of reliably estimating the rate of alleged unintentional enrollment.

---

[327] Both Q.2 and Q.10 were optional, meaning that participants could leave these blank.

[328] Both Q.3 and Q.4 were required or "forced response," meaning that participants must answer these questions in order to proceed to the next question.  Therefore, all respondents who answered Q.10 would also have answered Q.3 and Q.4.  I use this subsample (*i.e.*, of ██████ respondents who *answered* each of Q.2, Q.10, Q.3, and Q.4) because my primary analysis will take the answers to Q.2 and Q.10 into account when interpreting the responses to Q.3 and Q.4.  Because Q.10 was introduced in the survey only in November 8, 2022 (and did not appear prior to that date), it was necessary to limit the observational window from November 8, 2022 to June 21, 2023.  This data includes ████ surveys (less than ████ of the total sample) that were matched with customer IDs that I understand represent "non-core" Prime members (*i.e.*, customers who had certain "'non-core' Prime plans including standalone Prime Video, standalone Amazon Fresh, Amazon Business, and Prime MOM") or non-U.S. members (*i.e.*, customers who "enrolled in Prime outside of the US marketplace").  *See* Exhibits B and C to February 19, 2025 Amazon's Amended Objections and Responses.  Excluding these ████ surveys does not make a difference for any of the findings.

[329] *See* Exhibit D.2 for the documentation and code corresponding to this analysis, showing a similar pattern of results on multiple key metrics that could be compared across the two samples, including "DNI" rates.  Hence, the subsample of ██████ respondents whose data I analyze in Section B is adequately representative of a broader sample of respondents who took the 2020 Cancellation Survey during the relevant period.

responses provided by respondents who selected this answer choice. In a reliable survey, with unambiguous questions that are answered accurately by the respondents and appropriately interpreted, the answers by a given respondent across questions should be highly logically consistent, with a low rate of internally conflicting responses. When a survey exhibits a high rate of responses that represent attitudes that are (or appear to be) inconsistent with each other, the validity of the survey for purposes of drawing conclusions about the prevalence of a particular perception is undermined.[348]

209.    Below, I discuss four categories of such apparent inconsistencies—that is, patterns of behavior that do not appear internally coherent if, per the FTC's interpretation, responses of "DNI" are treated as instances of true deception or unintentional enrollment. Specifically, an analysis of the Cancellation Survey's data reveals considerable proportions of participants who, *according to the FTC's interpretation of "DNI,"* engaged in the following sequence of behaviors: were "tricked" or "deceived" into enrolling in Prime unintentionally; later canceled their Prime subscription purportedly ***because*** they were "deceptively" and unintentionally enrolled in Prime;[349] chose to take the Cancellation Survey; selected the "DNI" answer choice and interpreted this answer as referring to being unintentionally enrolled in Prime; *and* simultaneously indicated in the Cancellation Survey that: (*i*) they were nevertheless *very satisfied* with Prime; (*ii*) they intended to rejoin Prime in the near future; (*iii*) the *main* reason they canceled Prime was due to some reason *other* than "DNI"; or (*iv*) they canceled Prime because they "only needed to make purchases for certain holidays, occasions, or events" or because the Prime membership fee was "charged to the wrong credit card."

---

[348] *See also, e.g.*, Wood, Dustin, Peter D. Harms, Graham H. Lowman, and Justin A. DeSimone (2017), "Response Speed and Response Consistency as Mutually Validating Indicators of Data Quality in Online Samples," *Social Psychological and Personality Science*, 8(4), 454 – 464; Arias et al. (2020).

[349] Note that the "DNI" responses to the Cancellation Survey appeared in questions that asked specifically about the respondent's reasons for cancellation, whereas *none* of the survey questions asked about the respondent's circumstances or perception of enrollment. For this reason, if a selection of a "DNI" response indicates true unintentional enrollment (which, in my opinion, *cannot* be assumed), then that means that the respondent is reporting that they are canceling (at least in part) *because of* unintentional enrollment. If a respondent provides other answers that are incompatible or inconsistent with canceling because of unintentional enrollment, then that suggests that an assumed equivalence between "DNI" responses and unintentional enrollment is erroneous.

### B.2.1. *Category 1: "DNI" Respondents Who Reported Being Very Satisfied with Prime*

210.    Consumers who discovered that they had been unintentionally or deceptively enrolled in Prime, and then subsequently *canceled* their unwanted subscription because of this, would be expected to be dissatisfied—or, at the very least, to not be highly satisfied. The FTC itself alleges that unintentional enrollment caused customers to lose trust in Amazon, inflicting "substantial injury" to consumers.[350] If the FTC is correct, that is a clear example of an action that should induce customer dissatisfaction.[351]

211.    However, despite the expected negative impact of unintentional enrollment on customer satisfaction, ▮▮▮ of respondents who selected the "DNI" response option also indicated, in Question 2 (which asked: "How satisfied are you with **Prime**?" and included five "satisfaction" levels from "very satisfied" to "not satisfied at all") that they were *very satisfied with Prime*. This pattern of responses is inconsistent with the FTC's interpretation of "DNI" as unintentional enrollment. If these customers were in fact unintentionally enrolled into an unwanted Prime subscription, they would have to have realized this mistake (or deception), then have objected sufficiently to the unintentional enrollment to cancel their Prime subscription, to have selected "DNI" as a reason for cancellation, and would be expected to express dissatisfaction with Prime. "Very satisfied" would not be an expected response.

212.    It is more plausible that the "DNI" responses among "very satisfied" consumers are likely to represent either guessing or different interpretations of the "DNI" option (*e.g.*, as not intending to sign up for *paid* Prime or an *ongoing* Prime subscription) rather than alleged unintentional enrollment.[352] Regardless of how the "DNI" answer choice may have been interpreted by respondents, someone who has just expressed high satisfaction with Prime cannot be

---

[350] Amended Complaint, ¶ 193; *id.*, ¶ 264.

[351] *See, e.g.*, Assael, Henry (2004), *Consumer Behavior: A Strategic Approach*, Boston, MA: Houghton-Mifflin Company, p. 45; Grewal, Dhruv and Michael Levy (2020), *Marketing*, New York, NY: McGraw-Hill Education, pp. 187 – 188 & 616; Hoyer, Wayne B., Deborah J. MacInnis, and Rik Pieters (2013), *Consumer Behaviour*, Mason, OH: South-Westerns Cengage Learning, p. 273 – 280; Kotler and Keller (2009), pp. 13 – 14.

[352] It is noteworthy that this high rate of inconsistency between the Q.2 satisfaction question and the subsequent questions (Q.3, Q.4 & Q.7) occurs even though the survey design induces an order effect by measuring satisfaction first, which tends to motivate consistent responses to the following questions (as discussed in Subsection A.4.5).

simply assumed to be an instance of unintentional enrollment (*i.e.*, of having been "tricked" into enrolling in Prime) when selecting the "DNI" response option as a cancellation reason.  The prevalence of such response combinations therefore raises serious doubts about the FTC's interpretation of "DNI" as evidence of alleged unintentional enrollment.

**B.2.2.  *Category 2: "DNI" Respondents Who Reported an Intention to Rejoin Prime***

213.    Recall that Question 10 was a closed-ended question that asked respondents, who had just canceled their Prime membership, "When are you most likely to rejoin Prime?" and provided the following answer choices: "within the next month"; "within the next 3 months"; "within the next 6 months"; "within the next 24 months"; "within the next 24 months"; and "never."[353]

214.    According to the FTC's apparent interpretation, respondents who chose "DNI" as a reason for canceling Prime represent Amazon customers who (*i*) did not want to enroll in Prime, (*ii*) nevertheless were "tricked"[354] or "misled"[355] by Amazon into enrolling in Prime, (*iii*) then discovered this unintentional enrollment, (*iv*) proceeded to cancel because of such an unintentional enrollment, and (*v*) interpreted "DNI" as capturing their unintentional enrollment. Such customers, however, would be unlikely to trust Amazon or Prime sufficiently to at that time be planning to re-enroll in Prime in the future.  Instead, an Amazon customer who had no intention to enroll in Prime and has had their trust broken by being deceived into unintentionally enrolling would be highly likely to indicate a lack of interest in enrolling in Prime again (and to therefore select "Never" in Q.10).

215.    My analysis reveals that of the survey respondents who selected "DNI," ██████ indicated *they would rejoin Prime* sometime in the near future (*i.e.*, between the next month and the next 24 months).  The high rate of this combination of responses is inconsistent with the FTC's interpretation of "DNI" responses, given that a "tricked" or "misled" consumer would presumably have lost trust in Prime and would not express an intention of rejoining the very same subscription

---

[353] *See* AMZN-PRM-FTC-002704635.
[354] Amended Complaint, ¶¶ 2, 4, 5, 8, 109, 121, 172, 185, & 232.
[355] *Id.*, ¶¶ 4, 54, 64, 92, 185, & 193.

that they had been (purportedly) unwillingly signed up for—and that they just canceled (for that same supposed reason).  A more plausible explanation is that respondents were either guessing (or led to guess) "DNI" or had some other interpretation of what "DNI" meant (to them) in the survey—such as not intending to sign up for a *paid* or *ongoing* Prime subscription—that would be consistent with rejoining Prime sometime in the future.

### B.2.3.  *Category 3: "DNI" Respondents Who Did Not Select "DNI" as the <u>Main</u> Reason for Cancellation*

216.    To the extent that some Amazon customers were "unintentionally enrolled" in Prime and then canceled to rectify the situation when they discovered this fact, those customers would be expected to answer that such unintentional enrollment was their primary or main reason for canceling Prime.  The wording of Question 3 specifically asks participants to choose the main reason for canceling Prime, and did not allow respondents to select more than one option.[356] Although the Cancellation Survey did ask subsequently ask about "additional" cancellation reasons, respondents did not know *when they answered Question 3* (which appeared by itself on its own page)[357] that they would later be able to provide additional reasons.  Nor did the survey at any point inform or suggest to participants that they would be probed about additional reasons for cancellation.  Thus, if Amazon customers had indeed canceled their Prime membership *because* they were (or believed themselves to have been) unintentionally ("deceptively") enrolled, then the logical course of action would be to choose "DNI" (as opposed to some other answer choice) when asked in Question 3 for their "**main** reason for canceling Prime."

217.    As previously reported, ▮▮▮▮ of the respondents in the subsample I analyzed selected "DNI" in response to at least one of the three questions that presented "DNI" as an option (*i.e.*, Q.3, Q.4, & Q.7).  However, *substantially fewer* respondents ▮▮▮▮ chose the "DNI" response as their "**main** reason" in Question 3 (*see* Table B2 below).

---

[356] "What was your **main** reason for canceling Prime?" (emphasis in the original).  *See, e.g.*, AMZN-PRM-FTC-002704619.
[357] *See, e.g.*, AMZN-PRM-FTC-002704619 & AMZN-PRM-FTC-002704624.

251.    Exhibit F.1 further describes the methodology and procedure of obtaining and analyzing the random, representative sample of over ▮▮▮ "DNI" respondents[409] that I used for my customer behavior analysis.  Exhibit F.2 attaches the corresponding hashed customer IDs (CIDs) for this random sample.  Exhibits F.3 through F.7 document the procedure, underlying computer code, and additional data files used to conduct the customer behavior analysis, including the multiple stages of queries and analyses necessary to extract, integrate, process or organize, and output the relevant data.[410]

### C.3.    Summary of Key Findings Based on Analyses of Customer Behavior Data

252.    My customer behavior analysis provides convergent evidence that customers who gave a "DNI" answer in the Cancellation Survey cannot be presumed to have enrolled in Prime unintentionally.  Complementary to my analysis in Section B, which was conducted on respondents' *survey* responses, my customer behavior analysis identified multiple patterns in the Amazon customer database (both in terms of behavior alone and in conjunction with survey responses) that raise serious doubts regarding any interpretation of a "DNI" survey response as indicating unintentional enrollment.  To the extent that anyone were to try to estimate the rate of unintentional enrollment from the Cancellation Survey responses (which would be invalid for all

---

[409] By "representative" in this context, I mean that the "base" sample I used is representative with respect to "DNI" respondents in the Cancellation Survey (which I validated through routine robustness checks in the course of processing and analyzing the data).  As I discussed in Subsection C.1 of this *Expert Report*, such a sample is *not* representative (and is in fact biased against Amazon and in favor of the FTC) when considering the broader context of (*i*) all Amazon customers who were exposed to an allegedly deceptive Prime upsell; (*ii*) all Amazon customers who never enrolled in Prime; (*iii*) all Amazon customers who enrolled in Prime but never canceled; and (*iv*) All Amazon customers who canceled Prime and were offered a link to the Cancellation Survey but declined to take it.

[410] The Amazon customer behavior data that I analyzed consist of longitudinal datasets (or database tables) containing over ▮▮▮ total customer records, some of which span as early as April 2009 and with most ending in June 2023.  These records cover a range of Amazon Prime members' activities and interactions with Amazon over time during the relevant time period, including their history of: Prime memberships or subscriptions, usage of Prime benefits, visits to certain webpages (*e.g.*, Prime Central), interactions with the Prime Welcome Email, signup actions and records, cancellation actions and records, other interactions with Amazon, and more.  As detailed in Exhibit F.1, I used a combination of SQL (Structured Query Language) on Amazon Athena and Microsoft Excel in conjunction with Visual Basic for Applications (VBA) to generate relevant data tables for the "DNI" respondents in my sample, to derive membership-related variables (*e.g.*, the start date, cancellation date, and last Prime benefit availability date for each distinct Prime membership), and to classify customers into segments.

the reasons explained earlier), customers who displayed these behaviors should not count toward, and should therefore be "deducted" from, the observed ████ rate of respondents who answered "DNI" in the Cancellation Survey.

253.    The available data on customers' interactions with Amazon make clear that a "DNI" survey response cannot be taken at face value; instead, such data reveal a rich set of nuanced behaviors that comport with and in fact are predicted by academic theory and literature on consumer behavior and psychology.  In particular, the data support the existence of at least the following groups, or segments, of customers whose behaviors are entirely consistent with having *intentionally* signed up for Prime notwithstanding their "DNI" survey response:

(*i*)    ***Non-Paying Free Trial Enrollees***: Customers who enrolled in a free trial, canceled before that free trial converted to a paid membership, and exhibited additional behaviors that are inconsistent with alleged unintentional enrollment and are instead consistent with having *intentionally* enrolled in Prime;

(*ii*)    ***Lapsed Free Trial Enrollees***: Customers who enrolled in a free trial, canceled after their free trial converted to a paid membership, and exhibited additional behaviors that are inconsistent with alleged unintentional enrollment and are instead consistent with having *intentionally* enrolled in Prime;

(*iii*)    ***"Pay as You Go" Enrollees***: Customers who entered and exited Prime memberships in a manner inconsistent with alleged unintentional enrollment and are instead consistent with having *intentionally* enrolled in Prime according to their own targeted needs or preferences;

(*iv*)    ***Special Registration Enrollees***: Customers who enrolled in a special Prime membership plan requiring verification (Prime Student) or enrolled through certain signup locations that signal special registration (Prime homepage); and

(*v*)    ***Unreliable or Inconsistent "Recallers"***: Customers who: (*i*) used Prime benefits but who took the Cancellation Survey much later (at least a year) after signing up, or (*ii*) provided survey responses that are inconsistent with their actual behavior,

rendering their "DNI" responses and memory of their enrollment in Prime unreliable for purposes of inferring alleged unintentional enrollment.

254.    With the exception of "Non-Paying Free Trial Enrollees" and "Lapsed Free Trial Enrollees," the five segments defined above are not mutually exclusive—that is, customers may belong to multiple segments (and multiple categories within a given segment) depending on their pattern of behavior.  If a customer was classified into at least one of the categories, then they were "removed" (or deducted) from the ▆▆▆ observed rate of "DNI" responses in the Cancellation Survey.  Customers who were classified into more than one category were only counted once in the removal process.

255.    Tables 1 through 5 of Exhibit E summarize the results of my customer behavior analysis (*i.e.*, with respect to the proportions of respondents classified into each segment and sub-category within each segment).  Taken together, ▆▆▆ of "DNI" respondents exhibited behaviors that are inconsistent with alleged unintentional enrollment and instead suggest intentional enrollment.  Deducting this percentage of respondents from the observed ▆▆▆ "DNI" rate[411] among all survey respondents leaves, at most, ▆▆▆ of all customers who both chose a "DNI" answer choice in the Cancellation Survey and whose behavior did not refute an "unintentional enrollment" interpretation of their "DNI" selection.[412]

256.    The ▆▆▆ obtained from my customer behavior analysis provides convergent validity for my analysis set forth in Section B, which found—based on individuals' survey responses alone—a ▆▆▆ rate of "DNI" responses that *could* potentially be consistent with unintentional enrollment.  Moreover, customers' verbatim responses to the Cancellation Survey further support my customer behavior analysis and provide additional convergent evidence that any approximation of unintentional enrollment—assuming arguendo that it can be derived from the Cancellation Survey—would be very low.  Overall, the high rate of response patterns—whether based on only the cancellation survey or also on customers' observed behaviors—that cast serious

---

[411] Note, again, that the observed rate of "DNI" responses ▆▆▆ does not mean that all such responses reflect an instance of unintentional enrollment.
[412] That is, ▆▆▆▆▆▆▆▆▆▆▆▆

doubt on the validity of an "unintentional" interpretation of respondents' "DNI" answers empirically invalidates any attempt to use the Cancellation Survey to reliably estimate a rate of alleged unintentional enrollment.

257.    It is important to note that my customer behavior analysis, taken by itself, is highly conservative and is likely to dramatically overstate the remaining "DNI" rate in multiple ways. *First*, because the customer data made available to me does not permit capturing additional segments of consumers who were likely to have intentionally enrolled in Prime, my analysis understates the percentage of customers who should be deducted from the Cancellation Survey's ▮▮▮▮ observed "DNI" rate; therefore, my analysis is conservative in that it favors the FTC's position in this litigation.  The types of *intentional* enrollees who select the overly broad "DNI" answer choice for multiple plausible reasons, but whom my analysis cannot capture due to the limitations of the available data, include, but are not limited to: (*i*) "trial hoppers" who strategically sign up for repeated free trials under different email addresses or aliases; (*ii*) "account sharers" who canceled Prime because they want to share an account with someone else or because someone in their household accessed their account; and (*iii*) "account protectors" who canceled Prime due to fraud or abuse concerns regarding their account or financial information.

258.    *Second*, and critically, my customer behavior analysis, when placed in the proper context and in light of the FTC's allegations, indicates that the upper bound for the likelihood of a Prime "upsell" leading to an unintentional enrollment is *approximately* ▮▮▮▮ an estimate that is itself inflated.[413]

259.    ==Overall, the very low likelihood of an upsell resulting in what could possibly be an unintentional enrollment is incompatible with the FTC's theory that these upsells were "deceptive" and misled consumers into signing up for Prime.==

---

[413] *See* Subsection C.5.  This estimate is highly conservative and is based on a non-representative sample biased in the FTC's favor, in that it does not even take into account, for example, the numerous Amazon customers who: saw one or more Prime upsells but elected to not enroll in Prime during the relevant time period; who intentionally enrolled and chose to maintain their membership long-term; and who canceled Prime but chose to not take the Cancellation Survey.  Nor does this analysis take into account the fact that any upsell, no matter how clear, will yield some irreducible, non-zero minimum rate of consumer "confusion."

**C.4.** **Customer Segments and Behaviors that are Inconsistent with Unintentional Enrollment and/or Suggest Intentional Enrollment**

260.    In this subsection, I describe and substantiate each of the five customer behavior segments and patterns that were used in my customer behavior analysis.

**C.4.1.** *Segment 1: Non-Paying Free Trial Enrollees*

261.    Segment 1 consists of customers who intended to sign up for a free trial of Prime and canceled *before* that free trial converted to a paid membership.  I first discuss academic and industry research that predicts and substantiates the existence of such a customer segment; I then detail the specific categories or types of "Non-Paying Free Trial Enrollees" whose behavioral patterns and interactions with Amazon are likely to indicate intentional enrollment in Prime.

**C.4.1.1.**  Academic and Industry Research Predict the Existence of Segment 1

262.    The motivation to seek and/or enjoy offers or benefits like free trials is well-established and has been studied extensively in the academic literature.  Such research has found that many consumers are drawn to promotions and deals, are opportunistic with savings, and are averse to spending.  Industry research has also documented these behaviors across a wide range of industries and consumer behaviors, involving such domains as e-commerce, loyalty programs, and banking.  Moreover, individuals' propensity to take advantage of free trials can be directly observed through posts on social media platforms and has been the subject of discussion in the press and news media.

263.    As substantiated by scholarly research related to *smart shopper feelings*, many consumers are savvy, actively look for and take advantage of deals, compare prices and alternatives before committing to a purchase, and gain satisfaction from maximizing the value of their purchases as well as "beating the market."[414]  Research on *mental accounting* has also found

---

[414] *See, e.g.*, Schindler, Robert M. (1998), "Consequences of Perceiving Oneself as Responsible for Obtaining a Discount: Evidence for Smart-Shopper Feelings," *Journal of Consumer Psychology*, 7(4), 371 – 392; Thaler, Richard H. (1985), "Mental Accounting and Consumer Choice," *Marketing Science*, 4(3), 199 – 214; Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691 – 705; Kivetz, Ran and Itamar Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454 – 467; Kivetz, Ran and Yuhuang Zheng (2017), "The Effects of Promotions on Hedonic Versus Utilitarian Purchases," *Journal of Consumer*

that in addition to the utility associated with the costs and benefits of acquiring a product or service, consumers are motivated by *transaction utility*—the perceived value of a deal.[415]  That is, consumers are frequently influenced by the amount of potential savings they can obtain compared to the full cost of purchase.[416]  Consumers' attraction to deals is reflected in behaviors such as investing considerable effort to clip coupons for even small amounts of savings; in such instances, the pleasure of finding a good deal—above and beyond any economic savings—is what motivates consumers to search for discounts.[417]  One study estimated the percentage of deal-prone households to range between 20.5% and 34.4%.[418]

264.     My own peer-reviewed research has shown that deal-prone consumers' perceptions of what constitutes an attractive deal depend on how much value they believe they can extract over and above the marketer's intentions.[419]  Discounts that are unintended, such as offers not explicitly targeted to an individual (but which are instead targeted to the average person), are often perceived as better deals compared to targeted offers.[420]  Extracting more value than the marketer has intended is hence one impetus for exiting a free trial before it converts or signing up for multiple free trials.

---

*Psychology*, 27(1), 59 – 68.  Advances in technology and the rise of online tools have played an important role in enabling smart shopper behavior.  In the current digital marketplace, the modern consumer can access a large volume of content, including pricing and promotional information, that enable them to easily make comparisons both within and across retailers and brands.  In their book, Simonson and Rosen state that consumers nowadays have "nearly perfect information" about products and services; Simonson, Itamar and Emanuel Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

[415] Thaler (1985); Thaler, Richard H. (1999), "Mental Accounting Matters," *Journal of Behavioral Decision Making*, 12(3), 183 – 206.  *See also, e.g.*, Kivetz (1999).

[416] Thaler (1999).

[417] Schindler (1998).

[418] Blattberg, Robert, Thomas Buesing, Peter Peacock, and Subrata Sen (1978), "Identifying the Deal Prone Segment," *Journal of Marketing Research*, 15(3), 369 – 377 (*e.g.*, "Of the households that owned a car and home, 34.4% were deal prone.").

[419] Sela, Simonson, and Kivetz (2013).

[420] Whereas some consumers may question the value of a deal that is intentionally targeted or tailored for them, an offer that is more general or non-targeted can reinforce perceptions of "beating the market" (or marketer).  *See, e.g., ibid*.

265.    Behaviorally, deal-prone consumers overlap with a segment of the population known as brand switchers.[421]  In contrast to brand loyal customers, brand switchers are highly motivated by deals and hence frequently change brands depending on the level of incentives.[422] When the value of an existing option is exhausted, brand switchers choose options with better (perceived) value.  In the context of subscriptions, these consumers may prefer to sign up for multiple free trials whenever they are available, or even may opt to exit free trials before converting to a paying customer and wait until a new trial is open before switching back to the service.

266.    As I noted in Section A, consumers routinely and repeatedly sign up for and cancel (or "churn" in and out of) services, subscriptions, and offerings, including specifically because they are primarily interested in acquiring free trials, discounts, signup bonuses/rewards, and other deals—a practice that companies are aware of and in some cases attempt to mitigate.[423]  For example, as financial institutions have recognized, and as I have taught my MBA and Executive MBA students at Columbia University Business School,[424] there exists a segment of consumers

---

[421] *See, e.g.*, Grover, Rajiv, and V. Srinivasan (1992), "Evaluating the Multiple Effects of Retail Promotions on Brand Loyal and Brand Switching Segments," *Journal of Marketing Research*, 29(1), 76-89.

[422] *See, e.g.*, Webster Jr., Frederick E. (1965), "The 'Deal-Prone' Consumer," *Journal of Marketing Research*, 2(2), 186-189.

[423] *See, e.g.*, Bureau of Consumer Financial Protection (2021), "The Consumer Credit Card Market," https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf (*e.g.*, "Among cardholders who opened a new card, the three most-cited reasons for doing so were attractive rewards, benefits, and sign-up offers"); Johnson, Holly and Evan Zimmer (2024), "Credit Card Churning May Offer High Rewards – But It's Also High Risk," *CNET*, https://www.cnet.com/personal-finance/credit-cards/advice/credit-card-churning/ (noting examples of policies implemented by credit card companies to prevent or mitigate customer churn); Westcott, Kevin et al. (2022), "2022 Digital Media Trends, 16th Edition: Toward the Metaverse," *Deloitte*, https://www2.deloitte.com/us/en/insights/industry/technology/digital-media-trends-consumption-habits-survey/summary.html (noting a consistent churn rate, since 2020, of approximately 37% in the U.S. across all paid streaming video services, and that 25% of U.S. consumers have canceled a streaming video service in the past 12 months *and* resubscribed to the same service, with younger generations being even more likely to return).

[424] For example, I regularly teach a case study on Chase Sapphire, in which my students are asked to, among other things, conduct a customer segmentation and customer lifetime value analysis regarding the Chase Sapphire Reserve credit card.  Launched in August 2016, the Chase Sapphire Reserve Card offered consumers a 100,000-point sign-on bonus and surpassed the annual sales target in two weeks.  A credit card psychographic segmentation framework reveals that 18% of consumers fell into a "Deal chasers" category, characterized by a motivation to "obtain the most advantageous rates and points" and "manage

who apply for multiple credit cards in order to cycle through signup bonuses.[425]  Once they have fulfilled the requirements to attain the signup bonuses, these deal-prone consumers apply for another bank's credit card to obtain additional bonuses.[426]  This segment of consumers is so impactful that companies have responded by imposing restrictions on how many sign-ups and sign-up bonuses can be gained within a certain time period.[427]  As a *Forbes* article commented:[428]

> The 5/24 rule states that if you have been approved for five or more credit cards in the last 24 months, you will automatically be denied for any Chase credit card products.  This is to **prevent consumers from applying to credit cards solely for the welcome bonus and closing the account before the annual fee comes due.** […]
>
> **Consumers who regularly earn welcome offers then cancel the cards are informally known as 'churners'** and can cost credit card companies millions of dollars.  Churners are aptly famous for **applying for a credit card, earning the welcome bonus, then no longer using the card.**  [Emphases added]

Similarly, trial-seeking behavior has led some companies—including Netflix, Hulu, Disney+, and other video streaming providers—to discontinue offering free trials altogether.[429]

---

their usage to obtain the best deals"; Santana, Shelle, Jill Avery, and Christine Snively (2018), "Chase Sapphire: Creating a Millenial Cult Brand," *Harvard Business School*.

[425] *See, e.g.*, Pokora, Becky and Caroline Lupini (2023), "The Chase 5/24 Rule: How Opening and Closing Credit Cards Can Backfire," *Forbes*, https://www.forbes.com/advisor/credit-cards/chase-5-24/; Johnson and Zimmer (2024); Lieber, Ron (2017), "How to Pounce on Best Credit Card Offers (Before Banks Pull Them)," *New York Times*, https://www.nytimes.com/2017/01/06/your-money/how-to-pounce-on-best-credit-card-offers-before-banks-pull-them.html.

[426] *See, e.g.*, Pokora and Lupini (2023); Morrell, Alex (2016), "Credit-Card Super Users are Searching for Answers Amid a String of Shutdowns from Chase, as Billions in Costs on Lavish Rewards Pile Up," *Business Insider*, https://www.businessinsider.com/chase-credit-cards-suddenly-shut-down-2018-7.

[427] *See, e.g., ibid.*

[428] Pokora and Lupini (2023).

[429] *See, e.g.,* Blasi, Weston (2024), "The End of the Free Trial? Why a Once-Popular Marketing Tactic is Now Rarely Offered," *MarketWatch*, https://www.marketwatch.com/story/the-end-of-the-free-trial-why-a-once-popular-marketing-tactic-is-now-rarely-offered-a9009c28 (*e.g.*, "For most streaming companies, 'free trials have not been effective,' Jim Willcox, senior electronics editor at Consumer Reports, told MarketWatch. '**Longer free trials allow people to watch all the stuff they want to watch, and then cancel.** If they were effective they would have kept them.' Willcox believes that **some customers in the past would rotate through streaming services with the intent to basically watch a series for free.** 'If you give somebody a 30-day trial, within a month a lot of people can binge-watch all the stuff they want to see,' Jim Willcox said. 'Making shorter trials makes a lot of sense.'" [Emphasis added]); Spencer, Samuel (2021), "Why Netflix No Longer Offers a Free Trial to New Subscribers," *Newsweek*, https://www.newsweek.com/netflix-free-trial-30-days-ended-1562623 ("When Disney+ released Hamilton onto its service, as well as Pixar movie Soul, these were major releases that would bring millions to the service, but **they would also bring a significant audience of people who would watch these films on a free trial and then cancel their subscription.**").

267.    In a 2021 Frontier industry survey that examined consumers' "trial hopping" habits (*i.e.*, the practice of repeatedly signing up for free trials with different email addresses), nearly half (44%) of participants answered, in response to the question "How many times have you signed up for a free trial with your email?", that they do so "[o]ften, whenever trial offers are given to me."[430]

268.    Not all consumers who desire and seek free trials may end up using benefits during the trial period. For example, as I discuss further in Subsection C.4.6.4, consumers may derive *subjective utility* or value from enrolling in a free trial that grants them access, options, and the flexibility of using or not using the offerings at a later time. Indeed, in a 2024 survey of 1,106 Americans with active paid subscriptions, 26.8% of participants cited that the "[f]ree trial ran out" as a reason for canceling their *unused* subscriptions.[431]

269.    The strategic behaviors of deal-prone, brand switching (or churning) consumers can also be observed on social media platforms, where many users broadcast and share strategies to maximize subscription (including specifically Amazon Prime) benefits without paying. For example, in a 2020 thread titled "YSK [You Should Know]: If you attempt to cancel your Amazon Prime free trial, you'll be offered an extra 30 days for free," users exchanged their experiences with and advice for extending the duration of a Prime free trial.[432] In another thread (in 2018),[433] users discussed a variety of strategies to extend free trials, ranging from using different email addresses to sign up for multiple Prime trials[434] to complaining to customer service:[435]

---

[430] Quach, Karen (2021) "Survey: How Many Americans are 'Free Trial Hopping?'," *Frontier*, https://go.frontier.com/media-center/trial-hopping-survey.

[431] Self Financial (2024), "The Cost of Unused Subscriptions 2024," https://www.self.inc/info/cost-of-unused-paid-subscriptions/.

[432] https://www.reddit.com/r/YouShouldKnow/comments/ka4cfh/ysk_if_you_attempt_to_cancel_your_amazon_prime/.

[433] https://www.reddit.com/r/UnethicalLifeProTips/comments/8vr70w/ulpt_if_you_have_a_one_month_free_trial_amazon/

[434] *Ibid.* ("If you're a student, you should have 6 months free. My university lets you set alias emails so you can just keep making new accounts although its best to have multiple credit and debit cards to add to the account.").

[435] *Ibid.*

Also when you order stuff and it turns up **late complain to customer services and they tend to offer you a month free of prime.**  A friend of mine got like 5 months free doing it that way. Students can also got [*sic*] 6 months free then pay half price for subscription when it expires.  [Emphasis added]

270.    Similarly, news articles have not only commented on but have also encouraged consumers to engage in such strategic behaviors.  In a 2024 article titled "Overwhelmed by Subscriptions? Here Are 8 Tips to Save Money," the *Washington Post* writes about negotiating for more benefits by threatening to cancel one's subscriptions.[436]  The same approach was advocated by a *Lifehacker* article.[437]  A 2024 *CNBC* article, titled "Amazon's Prime Big Deal Days Sale is Coming Up— Here's How to Get a Prime Membership for Free," discusses (among other methods) setting a notification to sign up for new Prime trials every 12 months.[438]

271.    Overall, the notion that a meaningful proportion of Amazon customers would intentionally (and strategically) enroll in Prime due to their desire to obtain or use a free trial is well supported and predicted by academic literature and industry sources.

C.4.1.2.   Respondents' Behavioral Patterns Support the Existence of Segment 1

272.    Table C1 below summarizes the results of my analysis, which identified several behavioral patterns among "Non-Paying Free Trial Enrollees" that are inconsistent with alleged unintentional enrollment (and instead are consistent with intentional enrollment).  The "DNI" selections of respondents who exhibited one or more of these behavioral patterns do *not* provide

---

[436] Kelly, Heather (2024), "Overwhelmed by Subscriptions? Here Are 8 Tips to Save Money," *Washington Post*, https://www.washingtonpost.com/technology/2023/06/22/organize-subscriptions/ ("Keeping or canceling aren't your only options for saving money on things such as subscriptions. A surprising number of payments are negotiable, most notably cable and cellphone service fees, which can usually be lowered with a phone call and a threat to switch to another company. Car insurance and credit card interest rates can also be haggled down. The best time to bargain is after your initial contract is up.").
[437] Peterson, Jake (2023), "Threaten to Cancel Every Single Subscription," *Lifehacker*, https://lifehacker.com/threaten-to-cancel-every-single-subscription-1850283968 (*e.g.*, "Other companies might give you just one offer before letting you cancel. Adobe is infamous for slicing the cost of its subscription in half as soon as you threaten to cancel. On the flip side, Hulu used to offer a free month when you tried to cancel, but the company offered one Redditor six months of service for $2.99 a year ago.").
[438] Wolfson, Lily (2024), "Amazon's Prime Big Deal Days Sale is Coming Up—Here's How to Get a Prime Membership for Free," *CNBC Select*, https://www.cnbc.com/select/how-to-get-amazon-prime-membership-for-free/ ("Those new to Amazon Prime membership, or **anyone who hasn't been a member in the last 12 months, are eligible for a 30-day trial.**  Be sure to set a reminder for when your trial ends so you can **cancel before it's up and you're charged for more time.**  [Emphases added]").

reliable evidence of unintentional enrollment, because—in addition to various leading aspects of the Cancellation Survey and respondents' own motivational biases—a simple alternative explanation is that "Non-Paying Free Trial Enrollees" interpreted the vaguely worded "DNI" answer choice as referring to a *paid* (or full-price) or ongoing Prime membership or subscription. In other words, when selecting the "DNI" option, respondents could very well have meant that they did not intend to sign up for a *paid* or *ongoing* subscription.

*(Continues on next page)*

**Table C1: Categories of Behavior that are Inconsistent with Unintentional Enrollment (and Instead Suggest Intentional Enrollment) Among Non-Paying Free Trial Enrollees (Segment 1)** [439]

| Segment 1: Free Trial Enrollees | | |
| --- | --- | --- |
| *Intentional Prime enrollees who signed up for a free trial in the test membership and canceled that free trial before it converted to paid* | | |
| **Category** | **Description of Behavior** | **Frequency** |
| *1a: Serial Free Trial Seekers* | Enrolled in a Prime free trial in the test membership,[440] AND used a Prime benefit[441] during that free trial, AND canceled that free trial before it converted to paid, AND also had either a *most recent* (*i.e.*, immediately preceding) prior Prime membership in the past 4 years[442] and/or a *next* (*i.e.*, immediately succeeding) subsequent Prime membership[443] which: (*i*) started as a free trial, (*ii*) ended before it converted to paid, *and* (*iii*) in which a Prime benefit was used | ██████ |

---

[439] In this and subsequent tables, the percentages and numbers in parentheses denote the percentages and number of customers ("DNI" respondents in the "base" sample of ████), respectively, who exhibited a given behavior. With the exception of "Non-Paying Free Trial Enrollees" (Segment 1) and "Lapsed Free Trial Enrollees" (Segment 2), the five segments defined in my customer behavior analysis are not mutually exclusive—that is, customers may belong to multiple segments (and multiple categories within a given segment) depending on their pattern of behavior.

[440] In this and subsequent tables, references to the "test" membership denote the current membership whose cancellation triggered the Cancellation Survey that is the subject of analysis in the sample of ████ respondents.

[441] In this and subsequent tables, unless otherwise specified, usage of Prime benefits refers to a customer having used a Prime benefit that: (*i*) is available *only* to Prime members and not to non-Prime members (*i.e.*, that is tagged as "PRIME" as opposed to "NON-PRIME" in the Benefits Usage data table); and (*ii*) was used by the customer at some point during the entire benefits-eligibility period associated with an applicable (test, prior, or subsequent) membership (as opposed to only being used up to the date at which the customer cancelled that membership). For example, if a customer signed up for a one-month free trial in the test membership, canceled by turning off auto-renew a week into the free trial (thereby retaining access to benefits for the duration of the trial), and then used a Prime benefit, that customer would be counted as having used a Prime benefit during their trial membership. I understand that the benefits labelled as "SNS ORDERS" and "PANTRY ORDERS" in the Benefits Usage data table were tagged as "PRIME" despite the fact that "some instances of engagement with 'SNS ORDERS' and 'PANTRY ORDERS' reflect engagement with those benefits in a way that was available to non-Prime members"; February 19, 2025 Amazon's Amended Objections and Responses, Response to Topic 4(a), FN 2. I therefore excluded "SNS ORDERS" and "PANTRY ORDERS" from any calculation related to Prime benefit usage in my customer behavior analysis.

[442] In this and subsequent tables, references to the "past" or to a "prior membership" denote a membership that *preceded* the test membership and, unless indicated otherwise, is conservatively limited to a maximum time window of four years before a given respondent's test membership.

[443] In this and subsequent tables, references to the "future" or "subsequent membership" denote a membership that *succeeded* the test membership. Note that the scope of the available customer data was truncated at June 21, 2023, and the end date of the test period used for analysis was set as July 21, 2021. Hence, a subsequent membership could (hypothetically) occur at most approximately two years after a test membership.

**Segment 1: Free Trial Enrollees**
*Intentional Prime enrollees who signed up for a free trial in the test membership and canceled that free trial before it converted to paid*

| Category | Description of Behavior | Frequency |
|---|---|---|
| *1b: Repeat Free Trial Enrollees* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit during that free trial, AND canceled that free trial before it converted to paid, AND in the past 4 years and/or future had at least 2 other Prime memberships that started as a free trial AND had over half of all Prime memberships start as a free trial | ███████ |
| *1c: Free Trial Benefit Users* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit (outside the day of signup)[444] during that free trial, AND canceled that free trial before it converted to paid, AND either in the past 4 years and/or future had at least one Prime membership that *both* started as a free trial *and* in which a Prime benefit was used (outside the day of signup), AND had over half of all Prime memberships start as a free trial | ███████ |
| *1d: On-Notice Late Canceling Free Trial Seekers* | Enrolled in a Prime free trial in the test membership, AND either interacted with the Prime Welcome Email or visited Prime Central during the free trial, AND canceled the free trial before it converted to paid *both* 3+ weeks after enrollment *and* more than 7 days after either interacting with the Prime Welcome Email or visiting Prime Central, AND did not have any cancellation attempts[445] prior to the cancellation date[446] of the test membership, AND had at least one prior Prime membership in the past 4 years in which a Prime benefit was used | ███████ |
| *1e: Free Trial Targeted-Users* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit during that free trial, AND canceled that free trial before it converted to paid, AND in the Cancellation Survey selected "I only needed to make purchases for certain holidays, occasions, or events" (in Q.5) | ███████ |
| *1f: Free Trial Immediate Cancelers* | Enrolled in a Prime free trial in the test membership, AND canceled that free trial within two calendar days of enrollment, AND in the Cancellation Survey did *not* choose "DNI" as the *main reason* for cancellation (in Q.3) (and did *not* both select "Other" in Q.3 and *only* "DNI" in Q.4) | ███████ |
| *NET: % Belonging to Segment 1 (Categories 1a – 1f)* | | ███████ |

273.    Overall, my analysis of Prime member behavior uncovered a meaningful segment of "Non-Paying Free Trial Enrollees," accounting for █████ of sampled "DNI" respondents,

---

[444] In this and subsequent tables, references to "day of signup" or "signup day" denote the date on which a customer was recorded to have signed up or enrolled in the test membership. I use "enrollment" and "signup" interchangeably.

[445] In this and subsequent tables, references to "cancellation attempts" refers to entering the Cancellation Flow without a resulting cancellation.

[446] "Cancellation date" denotes the date on which a customer was recorded to have canceled the Prime membership (whether canceling directly or by turning off auto-renew) in the Cancellation Flow.

whose behaviors—individually as well as combined with their survey responses—are highly consistent with intentionally entering (and exiting) Prime free trials.  Next, I discuss each of the above categories within Segment 1 in turn.

*Category 1a: Serial Free Trial Seekers*

274.    My analysis found that ███ of the sample are "Serial Free Trial Seekers," defined as customers who not only canceled their test membership (a Prime free trial) before it converted to a paid membership and used a Prime benefit during that free trial, but who also had either: a *most recent* (*i.e.*, immediately preceding) prior Prime membership within the past four years and/or a *next* (*i.e.*, immediately succeeding) subsequent Prime membership that: (*i*) started as a free trial, (*ii*) ended before it converted to paid, and (*iii*) in which a Prime benefit was used. That is, these customers signed up for multiple free trials of Prime (one of which falls in the test membership), used at least one Prime benefit during each of these trials, and exited each free trial before it auto-converted to paid.  The fact that their *immediately preceding or immediately succeeding* Prime membership consisted of a free trial that did *not* convert to paid (and in which a Prime benefit was used) indicates a *pattern* of behavior—that is, a repeated propensity to *both* enroll in free trials of Prime, use Prime benefits, and to cancel these same trials before subscription fees are activated.  Moreover, as I understand, customers are typically restricted in the number of consecutive free trials they can join in a given time period (*e.g.*, 12 months);[447] hence, the fact that a customer in Category 1a *could* have enrolled in, but in fact did *not* enroll in, a *paid* membership during the intervening period between any two trials further suggests strategic,  intentional trial-seeking behavior.

275.    Such a sequence of signing up and exiting consecutive free trials prior to conversion, while simultaneously making use of Prime benefits during each (consecutive) trial, is entirely consistent with what would be expected of "serial" free trial enrollees who not only seek opportunities to take advantage of recurring free trials but who also understand how to exit the free trial on time and avoid being charged for a paid subscription.  When a free-trial-seeking

---

[447] That is, customers generally may enroll in a Prime free trial approximately every 12 months (unless they did not use any Prime benefits during their first trial).

customer cancels their free trial test membership and is then presented in the Cancellation Survey with a list of options for why they canceled Prime, the list provided would not contain their actual reason (*e.g.*, to avoid converting to a *paid* Prime membership). Consequently, such customers would be likely to interpret the overly broad "DNI" answer choice ("I did not intend to sign up for Prime") as referring to a *paid* subscription to Prime—something that they in fact did *not* intend to sign up for and even actively avoided. Rather than representing unintentional enrollment in an unwanted trial of Prime, a pattern of repeatedly (and consecutively) enrolling in such free trials *and* canceling these same free trials is consistent with Amazon customers who willingly opt into free trials, use Prime benefits, and who strategically and deliberately exit them before they are charged for a paid Prime membership.

*Category 1b: Repeat Free Trial Enrollees*

276.    My analysis found that ▋▋▋ of the sample are "Repeat Free Trial Enrollees," defined as customers who not only canceled their test membership (a Prime free trial) before it converted to a paid membership *and* used a Prime benefit during that free trial, but who also: (*i*) had, within the past four years and/or in the future, at least *two other* Prime memberships that started as a free trial, *and* (*ii*) *over half* of all their Prime memberships start as a free trial. That is, these customers enrolled in multiple—at least *three*—free trials (including in their test membership); in fact, ▋▋▋▋▋▋▋▋ of their Prime memberships consisted specifically of free trials (as opposed to paid memberships), which calls into question the notion that these individuals happen to be "tricked" into joining Prime primarily when the upsell offer is for a free trial. Overall, the indicators exhibited by customers in Category 1b cannot be treated as evidence of alleged unintentional enrollment and instead reveal a *pattern* of behavior consistent with what would be expected by customers who repeatedly seek, and deliberately enroll in, free trials.

*Category 1c: Free Trial Benefit Users*

277.    While some consumers sign up for services and programs that they never end up using for numerous reasons (including due to various cognitive/motivational reasons, biases, and planning failures), others sign up for services and programs because they plan to make use of

certain benefits.  My analysis found that ▮▮▮▮ of the sample are "Free Trial Benefit Users," defined as customers who canceled their free trial of Prime before it converted to paid, used a Prime benefit during that free trial *outside* the day of signup,[448] had within the past four years or in the future another Prime membership that *both* started as a free trial *and* in which they used a Prime benefit (outside the day of signup), *and* had over half of all of their Prime memberships start as free trials.  That is, these Amazon customers displayed a *pattern* of repeatedly enrolling in free Prime trials (so much so that ▮▮▮▮▮▮▮▮ their memberships consisted of free trials) as well as repeatedly using Prime benefits outside the day of signup during these same trials (including on their test membership)—a pattern that signals active usage of free trials and memberships.  Engaging in such behaviors is inconsistent with the alleged unintentional enrollment and instead is consistent with *intentional* enrollment in Prime.

*Category 1d: On-Notice Late Canceling Free Trial Seekers*

278.    My analysis found that ▮▮▮▮ of the sample are "On-Notice Late Canceling Free Trial Seekers," defined as customers who enrolled in a Prime free trial in their test membership, either interacted with the Prime Welcome Email or visited Prime Central during that free trial, canceled that free trial before it converted to paid *both* at least three weeks after enrollment and more than seven days after either interacting with the Welcome Email[449] or visiting Prime Central, *and* (within the past four years) had a prior Prime membership in which they used a Prime benefit.

---

[448] Using a criterion of Prime benefit usage outside the day of signup is conservative (erring in the FTC's favor), as it would exclude customers who *only* used benefits on the day they enrolled—despite the fact that they may have enrolled precisely to receive an immediate Prime benefit (*e.g.*, free two-day shipping on an item that they need immediately).  These intentional enrollees would not be accounted for in my analysis.

[449] I understand that an "interaction" with the Welcome Email refers to either *opening* the email or *clicking* on a link in the email (not merely *receiving* the email) based on the available data.  Opening the email is observed from the variable "total_mails_opened" in the Welcome Email data table, and clicking on a link in the email is observed from the variable "total_mails_clicked"; *see* Exhibit A to February 13, 2025 Amazon Letter, Dictionary (Fields).  I understand that the Welcome Email data table does not reflect a comprehensive record of individuals' complete interactions with the Welcome Email, because instances in which a customer in this data table is recorded as neither opening nor clicking on the email (*i.e.*, recorded as "0") "reflect that the customer engaged with a welcome email in some way other than opening the email or clicking a link within it."  *See ibid*.  My analysis of Welcome Emails is therefore conservative, given that the data exclude cases in which a customer interacted with the email in some other way that is not captured in the Welcome Email data table.

That is, the behaviors of these customers indicate that they were put "on notice" (during the test membership) about their enrollment in a Prime free trial—whether by interacting with an email from Amazon or by visiting Prime Central themselves, both of which, as explained below, would have informed an individual about their Prime membership status.

279.    ***Prime Welcome Email.***  I understand that for the duration of the relevant period (between May 1, 2017 and July 21, 2023), Amazon sent an automated welcome email (the "Welcome Email") to customers welcoming them to Prime shortly after enrollment into a free trial or a paid membership.[450]  Figure C5 below reproduces an exemplar of the Prime Welcome Email (targeted for free trial enrollees) during the relevant time period.[451]  As this example shows, for customers who joined a free trial of Prime, the accompanying Welcome Email confirmed the Prime membership to the customer, as well as disclosed to the customer when the trial would convert to a paid Prime membership and at what rate.

*(Continues on next page)*

---

[450] *See, e.g.*, AMZN-PRM-FTC-000159401 (July 27, 2017 email noting "We are pleased to announce the launch of the Prime Welcome email tone and simplified version test"); AMZN-PRM-FTC-000063924 (May 2017 email referencing different types of welcome emails); AMZN-PRM-FTC-001673982 (January 19, 2018 email noting "The Welcome Email is sent to ███████████████ within ████████████████"); AMZN-PRM-FTC-002606965 (January 26, 2021 memo noting that "Today, we send ███████████ a welcome email ██████████████████"); AMZN-PRM-FTC-000159402 (noting "███████████████████████████████████, a member (free trial or paid) receives an automated Welcome email").
[451] *See also, e.g.*, AMZN-PRM-FTC-000168730 (showing an example of a Welcome Email from 2017).

**Figure C5: Exemplar Welcome Email for Free Trial Signup (2021)** [452]

prime DEALS TIPS ACCOUNT HELP

Shop Now | Watch now

Dear Test,

Congratulations! Starting now, your Amazon Prime FREE trial instantly unlocks exciting **shopping and entertainment benefits**. Here are just a few of the many great benefits included with your membership:

**Shopping and delivery**

**Prime Delivery** offers fast, free, and convenient ways to get what you need, when you need it. Shop with **FREE Two-Day Delivery**, **FREE Same-Day Delivery**, **FREE One-Day Delivery** and **FREE 2-Hour Delivery** in select areas. Plus, shop throughout the week with **Amazon Day Delivery** to receive orders on the day you choose.

**Prime Video**

Your Prime membership gives you access to popular movies, TV shows, live sports and Amazon Originals like **The Marvelous Mrs. Maisel**, **Tom Clancy's Jack Ryan**, **Good Omens**, and **The Boys** which you can watch at no additional cost to your Prime membership.
Start watching at home or on the go — learn more **here**.

**More entertainment benefits**

Listen to ad-free music available on any compatible device with **Prime Music**. Choose from thousands of digital books, magazines, comics, and more, with **Prime Reading**.

**YOUR MEMBERSHIP**

| | |
|---|---|
| **Plan Name:** | Prime |
| **Plan Type:** | Free Trial |
| **Current Payment:** | $0 |
| **Upcoming change:** | On October 20, 2021 your promotional offer will end and your plan will automatically change to $12.99/month |

Your Prime membership may be subject to applicable tax.

To learn more or make changes, manage your Prime membership.

Want a reminder before renewing? Get an email reminder.

[452] September 30, 2021 Amazon Letter in Response to the FTC's March 16, 2021 CID ("September 30, 2021 Amazon Response"), p. 6.

**Figure C5 (cont.): Exemplar Welcome Email for Free Trial Signup (2021)**



## We'd love to hear from you!

Was this email helpful? Click here to fill out a quick
survey and let us know!

This message was sent to the following: test@amazon.com
Your Amazon Prime membership will continue after your 30-day Free Trial until canceled. If you do not
wish to continue your membership for $12.99/month plus any applicable taxes, you may cancel
anytime. If you cancel within 3 business days of converting to a paid membership, we will refund your
full membership fee, less the value of Prime benefits used during this period. If you cancel at any other
time, we will refund your full membership fee only if you and your account did not use any Prime
benefits since your latest Prime membership charge.
For more details, read our Amazon Prime Terms & Conditions.
©2021 Amazon.com, Inc. or its affiliates. All rights reserved. Amazon, Amazon.com, Prime, 1-Click,
the smile logo and all other related logos are trademarks of Amazon.com, Inc. or its affiliates.
Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210.

An October 2020 Amazon Legal document titled "Self-Audit Toolkit for Subscription Services at Amazon" outlines a set of guidelines for information that should be included in Welcome email communications, stating:[453]

> **Customer communications: Welcome emails and renewal notices.**    Once subscribed, we send a confirmation or welcome e-mail that includes the information described in items (1) [the amount of the charge], (2) [that the subscription will continue until cancelled], and (3) [how to cancel the subscription] above and a link to the terms and conditions of the subscription or program (if they exist).  […]

280.    *Prime Central.*  I understand that "*Prime Central*" is an Amazon internal name referring to the "centralized hub for Prime membership management,"[454] accessible through a specific webpage on Amazon.com[455] where customers can manage, learn about, and cancel their Prime membership or subscription.  I understand that during the applicable time period, Prime Central also served as the ingress to the online Cancellation Flow, the completion of which triggered an invitation to the Cancellation Survey for approximately ███ of cancelers.[456]  Figure C6a below reproduces an exemplar screenshot of the Prime Central webpage that Amazon visitors encountered (in 2021), and Figure C6b shows a sample first page when entering the Cancellation Flow.

(*Continues on next page*)

---

[453] AMZN_00003627 (emphasis in the original).  *See also* May 24, 2021 Amazon Letter in Response to FTC's March 16, 2021 CID ("May 24, 2021 Amazon Response"), p. 5 ("After signing up for Prime, Amazon presents the customer with a confirmation welcome page, making it clear to customers that they have signed up for a Prime membership. Amazon also sends the customer a welcome email and a push notification to customers using a mobile device if they have chosen to receive push notifications from the Amazon app. These notifications provide additional confirmation that the customer has successfully enrolled in Prime, as well as information about the terms of membership, Prime benefits, and how to cancel.").

[454] May 24, 2021 Amazon Response, p. 38.

[455] https://www.amazon.com/gp/primecentral.

[456] *See, e.g.*, AMZN_00021537, at 34291 (noting that from November 2019 to February 2020, "███ of members are shown a pop-up with a link at the end of the Iliad cancellation flow asking them to voluntarily complete a survey on why they decided to cancel their Prime membership.").

**Figure C6a: Exemplar Prime Central Webpage (2021)** [457]



**Figure C6b: Exemplar Prime Central Cancellation Flow Page (2021)** [458]



---

[457] AMZN_00000003.

[458] AMZN_00000004. *See* AMZN_00000005 – 6 for the second and third pages of the Cancellation Flow.

281.    As Figures C5 and C6a show, both the Prime Welcome Email and the Prime Central homepage make extremely salient the fact that an individual is enrolled in Prime, making any email interactions and visits to this webpage a strong indicator of awareness of one's membership status.  That is, customers who enrolled in a free trial of Prime and subsequently either (*i*) interacted with the Welcome Email,[459] which confirmed to them that they had enrolled in Prime (as well as provided other information) or (*ii*) visited the Prime Central homepage have effectively been put "on notice" regarding their Prime membership status and would have been aware of their enrollment in a free trial of Prime.  This awareness notwithstanding, they chose to *not* cancel Prime until more than a week had elapsed since interacting with the email or visiting Prime Central and until at least *three weeks* had elapsed since enrollment.  Nor did these customers even enter the Cancellation Flow without canceling.[460]

282.    The above sequence of actions is *not* consistent with those expected of Amazon customers who discovered that they had been unintentionally enrolled into a Prime trial they did not ask for or want, because such customers should have been motivated to cancel Prime immediately or soon after learning of their unintentional enrollment.  Instead, the behaviors exhibited by "On-Notice Late Canceling Free Trial Seekers" are completely consistent with those of consumers who intentionally signed up for a free trial of Prime, intentionally planned to exit before the trial expires, and intentionally opted to wait toward the end of the free trial before canceling.  In other words, these customers are likely to have sought and received exactly what they wanted: a free trial of Prime.

283.    Moreover, to the extent that they have had, within the past four years, a Prime membership in which they *also* used a Prime benefit (outside the day of signup),[461] such customers

---

[459] That is, as noted previously, either opened the Welcome Email or clicked on a link in the Welcome Email.

[460] This is particularly relevant for customers who visited Prime Central at least once during their free trial, given that Prime Central serves as the ingress to the Cancellation Flow.  Further, to qualify for Category 1b, the first Prime Central visit must have taken place *before* the day of cancellation and *before* receiving a Cancellation Survey invitation or taking the survey—meaning that these customers did *not* visit Prime Central only once, on the day that they canceled Prime.

[461] Using a criterion of Prime benefit usage outside the day of signup is conservative (erring in the FTC's favor), as it would exclude customers who *only* used benefits on the day they enrolled—despite the fact

are not newcomers and would instead likely be familiar or even experienced with Prime.  By contrast, it is unlikely that a customer who discovers (through the Welcome Email or by visiting Prime Central) that they were "tricked" (deceived) or unintentionally enrolled into a Prime trial, and who had already been a Prime benefit-using member in the past, would nevertheless decide to wait at least three weeks before canceling and "try out" Prime benefits in the meantime.  Indeed, as I discuss later in Subsection C.4.7, the open-ended verbatim responses to the Cancellation Survey do *not* support such a conjecture.  It is much more likely that a true unintentional enrollee would, upon learning of their unintended signup, promptly cut ties with Prime.

> *Category 1e: Free Trial Targeted-Users*

284.    My analysis found that ▮▮ of the sample are "Free Trial Targeted-Users," defined as customers who enrolled in a Prime free trial in their test membership, canceled that free trial before it converted to paid, used a Prime benefit during that trial (including potentially on the day of signup), *and* who selected the answer choice "I only needed to make purchases for certain holidays, occasions, or events" (in Q.5) in the Cancellation Survey.[462]

285.    This category of customers captures Amazon users who intentionally signed up for a free trial of Prime for a targeted usage—in particular, by their own admission in the Cancellation Survey, in order to purchase for a specific occasion.  Such a response, particularly when combined with having actually used a Prime benefit during the free trial, is inconsistent with alleged unintentional enrollment and instead indicates a likely intentional enrollment. Because they "only needed to make purchases for certain holidays, occasions, or events," a very plausible explanation that cannot be ruled out is that these "Free Trial Targeted-Users" signed up for a Prime free trial, made a free-shipping purchase using Prime during that trial, made sure to cancel their trial before it converted to a paid subscription, and selected "DNI" in the Cancellation Survey because they indeed did *not* intend to sign up for a *paid* Prime membership.

---

that they may have enrolled precisely to receive an immediate benefit (*e.g.*, free two-day shipping on an item that they need immediately).  These intentional enrollees would not be accounted for in this analysis.
[462] Respondents received Question 5 if they selected, in either Question 3 or Question 4, the answer choice "I was not making enough purchases on Amazon to be worthwhile."  *See, e.g.*, AMZN-PRM-FTC-002704627.

*Category 1f: Free Trial Immediate Cancelers*

286.    My analysis found that ███ of the sample are "Free Trial Immediate Cancelers," defined as customers who enrolled in a Prime free trial in their test membership, canceled that free trial within two calendar days of enrollment—approximating a same-day cancellation[463]—but who in the Cancellation Survey did *not* select "DNI" as their "main reason" for canceling Prime (and did not select both "Other" in Q.3 and *only* "DNI" in Q.4).

287.    Importantly, to the extent that such immediate cancelers were true unintentional enrollees, then in the Cancellation Survey they should have either selected "DNI" when asked for their main reason for canceling Prime in the Cancellation Survey (Q.3), or they should have selected "Other" in Q.3 and *only* "DNI" in the subsequent "additional reasons" question (Q.4). Recall that when survey respondents were confronted with Question 3 ("What was your **main** reason for canceling Prime?"), they ***did not know that they would be probed further in subsequent questions on their reason(s) for canceling Prime***. Hence, providing an answer *other* than "DNI" in the first "cancellation reason" question (Q.3) is inconsistent with the notion that customers— particularly those for whom cancellation occurred at most two calendar days after the moment of enrollment—were "tricked" (deceived) or unintentionally enrolled in Prime. Instead, the immediate cancelers in this category likely meant to sign up for a free trial but, due to any number of reasons, either decided against using the trial, used the intended benefit within two calendar days before canceling,[464] or simply "canceled" the membership soon after enrolling (in order to avoid being automatically charged for an auto-converting Prime membership) but retained all the benefits of the trial until it expired.[465]

---

[463] I derived this variable based on the difference between the cancellation date and the signup date.
[464] Of the ███ customers in this category, ███████████████████████ used benefits during the membership, with ███████ customers) using benefits on the day of signup and ███████ customers) using benefits after the day of signup.
[465] I understand that customers who wanted to cancel a Prime *free trial* were not presented with a choice between immediate cancellation versus canceling by turning off auto-renew. Instead, these customers could simply select a "Cancel Membership" button, which would end their membership after the free trial expired. Note that such a cancellation action is functionally equivalent to turning off auto-renew, as customers would retain access to Prime benefits for the remainder of their trial period. *See, e.g.*, AMZN_00045178 (video screen capture).

288.    ***In summary***, ███ of sampled "DNI" respondents exhibited behaviors consistent with "Non-Paying Free Trial Enrollees" who intentionally enter (and exit) Prime free trials.  Indeed, the existence of such a segment is also borne out by the verbatim responses volunteered by respondents who selected "DNI" in the Cancellation Survey.[466]  Overall, the "DNI" responses of these free trial seekers and/or free trial benefit users do *not* provide reliable evidence of alleged unintentional enrollment and instead are consistent with intentional enrollment.

### C.4.2.    *Segment 2: Lapsed Free Trial Enrollees*

289.    Whereas Segment 1 represents customers who intentionally enrolled in a free Prime trial and canceled that trial before it converted to a paid subscription, Segment 2 consists of Amazon customers who similarly intended to enroll in only a free trial, but who nevertheless "lapsed"—that is, who did not cancel Prime until after their free trial ended.  As with Segment 1, I first review the scientific research underpinning this group of "lapsed" customers; I then discuss the various behavioral patterns observable in the available data that characterize and distinguish such a group.

---

[466] *E.g.*: Hashed Customer ID (CID) #2ad616e5cefa436e3956d3c7ba0fb129 (Q.8: "Didn't want to forget my trial"); CID #2e3b25b0f4df2a532f3a048e2cd05bcb (Q.8: "I was only interested due to the free month trial"); CID #ae22d605fcc066fb91f9e22b96d986f2 (Q.8: "So convenient, I'll look for another deal on subscription in the future."); CID #ba5421c81f8ab82cf7364094088c669f (Q.3 "Other": "And I wanted to cancel before the trial expired and no extra money in house hold to pay a monthly fee."; Q.8: "Household did not benefit due to other issues."); CID #c88d8abb096040268f028d394a16134f (Q.8: "I love amazon. My wife just doesn't wasn't to spend money"); CID #ca783c608e4684a80166870fbbd428e0 (Q.8: "I thought I would get quicker delivery than an eleven day window."); CID #dd80ea114b9c60e29ff1cad32af959de (Q.3 "Other": "I was simply trying out the trial"; Q.8: "Nope, prime is cool, I just wasn't using it really and was trying out the trial"); CID #ee91b85af41a1e56e8c04de9b116a3c6 (Q.8: "it just did not work for me at all , I can go to E-Bay and get the items cheaper and free shipping. thanks for letting me try it."); CID #f45a9c0823c50f08513fb7a521a3b9f3 (Q.8: "Thank you for the free trial. It was worth it but due to COVID 19 I don[']t want to have any extra expenses at the moment."); CID #f9e490ab087dcaf23f9c6eedf0180305 (Q.4 "Other": "I'm on a fixed income and I'm not able to order enough at this time ."; Q.8: "I don't think I'm ready for prime yet.").  *See* Exhibit G.1 for the verbatim responses of all respondents in the sample.  In this and subsequent quotes of respondents' verbatim responses, all spelling, grammar, and formatting (including typos) have been preserved as recorded in the Cancellation Survey.

### C.4.2.1.  Academic and Industry Research Predicts the Existence of Segment 2

290.    Although many customers may initially intend to sign up for *only* a free trial period of Prime—that is, with the intention of canceling before converting to a paid membership—some consumers inevitably forget or fail to do so.  I discuss below two broad groups with distinct motivations that nevertheless lead to the same outcome.

291.    ***Inattentive Customers.***  Due to the fallibility of human memory and to inattention, some customers are likely to simply forget to cancel on time (*i.e.*, before the free trial expires and auto-converts to a paid subscription), and even to forget that they had signed up in the first place.  A voluminous body of literature on memory has found not only that consumers have difficulties remembering information, but also that forgetfulness increases when dealing with recurring and low-involvement (compared to singular and high-involvement) decisions.[467]

292.    Research on memory distinguishes between remembering content and remembering intention.  One article poses the following scenario:[468]

> A friend telephones you and asks you to give your spouse a message.  You agree to do so.  You have now committed yourself not just to one but to two memory tasks: you must not only remember the content of the message, but you must also remember to deliver it.  And it is this last thing that you very often fail to remember, not the former.

Remembering intentions, which is the process of recalling at the appropriate time that one has decided to carry out a particular action at some point in time, is both a distinct process from remembering content and prone to failure.[469]

293.    Moreover, forgetting the intention to carry out an action can occur rapidly, particularly in settings where an individual is preoccupied or distracted with other events.  In an experiment where respondents were given an instruction and then interrupted with a brief distraction task, which prevented them from carrying out the instruction immediately, 24% of

---

[467] *See, e.g.*, Anderson (1985); Schwarz and Oyserman (1992); MacInnis, Deborah J. and Bernard J. Jaworski (1989), "Information Processing from Advertisements: Toward an Integrative Framework," *Journal of Marketing,* 53(4), 1 – 23.
[468] Kvavilashvili, Lia (1992), "Remembering Intentions: A Critical Review of Existing Experimental Paradigms," *Applied Cognitive Psychology*, 6(6), 507-524.
[469] *Ibid.*

respondents subsequently forgot to act on the initial instructions altogether.[470]  Even when the interruption was brief and regardless of whether it lasted for 5 seconds, 15 seconds, or 40 seconds, similarly high proportions of respondents forgot about their past intentions.[471]

294.    The tendency of inattentive free trial seekers to forget to cancel on time is exacerbated by the fact that enrolling in free trials is a relatively low-involvement decision that requires no monetary cost or substantial deliberation.[472]  In a classic study on shopping behavior, researchers found that consumers purchasing small-ticket products at the supermarket forget basic product information almost immediately.[473]  When approached seconds after placing an item in their shopping basket, more than half of respondents could not recall the price of the product they had just added to their cart.[474]

295.    Relatedly, as discussed in Subsection A.2.2, autobiographical memories are particularly likely to be hampered and inaccurate when the behavior is recurring and consists of instances of similar behaviors (*e.g.*, other uses of Amazon, or enrolling in memberships or subscription programs with other online services)—including specifically in online contexts[475] and in circumstances involving consent and signing in.[476]  Further, the finding that consumers typically

---

[470] Einstein, Gilles O., Mark A. McDaniel, Carrie L. Williford, Jason L. Pagan, and R. Key Dismukes (2003), "Forgetting of Intentions in Demanding Situations is Rapid," *Journal of Experimental Psychology: Applied*, 9(3), 147 – 162.

[471] *Ibid*.

[472] *See, e.g.*, Laurent, Gilles and Jean-Noël Kapferer (1985), "Measuring Consumer Involvement Profiles," *Journal of Marketing Research*, 22(1), 41 – 53.

[473] Dickson and Sawyer (1990).

[474] *Ibid*.

[475] Schwarz and Oyserman (1992).  *See also, e.g.*, Danaher and Mullarkey (2003); Murphy and Chen (2016); Araujo et al. (2017).

[476] That is, people often fail to recall the circumstances under which they had previously provided consent.  Some medical patients who went through an informed consent procedure regarding the use of their tissue in scientific research failed to recall six weeks later the information they had been presented (44.7%), the consent procedure they experienced (37.5%), having even been asked to decide (22.7%), and even whether they had given their permission to use their tissue (11.9%). *See* Rebers et al. (2019); *see also* Ulfsdotter Gunnarsson et al. (2024).

subscribe to *multiple* retailers or services at any given point in time exacerbates the memory issues associated with recalling subscription-related behaviors that pertain to a specific service.[477]

296.    Industry research further indicates that consumers are susceptible to memory limitations specifically in the context of subscription services.  A 2021 Frontier survey found that 42% of "trial hoppers" (consumers who repeatedly sign up for free trials using different email addresses) admitted that they nevertheless "often" end up being "charged for the full service once the trial expires" because they "lose track of what [they've] signed up for."[478]  According to another survey, conducted by YouGov, nearly half (48%) of U.S. adults "have signed up for a free trial of a paid subscription and then forgotten to cancel it,"[479] with 19% admitting that they had done so multiple times a year.[480]  A 2022 consumer survey conducted by C+R Research found that 74% of respondents indicated it was easy to forget about their recurring monthly subscription service charges.[481]  Moreover, 42% of respondents indicated they forgot about a recurring monthly subscription they were still paying but no longer use;[482] in fact, Amazon Prime was ranked as the fourth-most "forgotten" type of subscription.[483]

297.    Overall, both scholarly and industry research substantiate the fact that at least some consumers who deliberately enrolled, intending to cancel Prime before the free trial expired, may have failed to do so simply because they did not remember to follow through on their intention to cancel or may have even forgotten that they signed up in the first place.

---

[477] *See, e.g.*, Statista (2024), "Number of Paid Media and Entertainment Subscriptions Among Consumers in the United States as of January 2020, By Generation" (documenting an overall average of 12 subscriptions per consumer as of 2020, with millennials subscribing to 17 subscriptions on average).
[478] Quach (2021).
[479] Wolney, Nick (2024), "'Subscription Creep' Costs US Consumers More Than $1,000 Each Year, CNET Survey Finds," *CNET*, https://www.cnet.com/personal-finance/subscription-creep-costs-us-consumers-more-than-1000-a-year-cnet-survey-finds/.  "E-commerce sites (Amazon Prime, etc.)" accounted for the second most popular type of paid subscription among survey participants (37%), after "Streaming/Video" (60%).
[480] *Ibid.* ("Millennials and Gen Z adults were the most forgetful, with 65% and 59% of respondents, respectively, saying they had forgotten to cancel a trial at least once.").
[481] CR Research (2022), "Subscription Service Statistics and Costs 2022," *C+R Research*, https://www.crresearch.com/blog/subscription-service-statistics-and-costs/
[482] *Ibid.*
[483] *Ibid.* (other frequently-forgotten subscription types included mobile phone, Internet, and TV/Movie streaming).

298.     ___Reluctant-to-Cancel Customers.___  Another group of customers may have failed to cancel their free trial on time not due to inattentiveness/forgetfulness but rather due to procrastination or an aversion to cancelling.  Even if a customer realizes that their free trial of Prime already lapsed or will soon lapse, for a variety of different reasons, they may not immediately act on their initial intention to cancel on time.

299.     _First_, some Prime enrollees may allow their free trial to convert or lapse into a paid membership simply due to procrastination.[484]  Procrastination is a nearly ubiquitous behavior that affects most individuals at some point.[485]  Despite recognizing the negative consequences of procrastinating, consumers routinely struggle to complete tasks and make decisions on time, including in consumption-related contexts.[486]  For example, in a 2014 survey, 65% of consumers admitted to procrastinating on purchasing Christmas gifts.[487]  To cancel a subscription, consumers must not only form the intention to cancel, but also subsequently act upon their intention.  The tendency to (passively or actively) procrastinate means that some

---

[484] _See, e.g._, O'Donoghue, Ted and Matthew Rabin (1999), "Doing it Now or Later," _American Economic Review_, 89(1), 103 – 124; Steel, Piers (2007), "The Nature of Procrastination: A Meta-Analytic and Theoretical Review of Quintessential Self-Regulatory Failure," _Psychological Bulletin_, 133(1), 65 – 94; Akerlof, George (1991), "Procrastination and Obedience," _American Economic Review_, 81(2), 1 – 19. Individuals may procrastinate for a range of reasons, including because they are susceptible to the _planning fallacy_, causing them to underestimate how much time it will take to complete a plan or task. _See, e.g._, Buehler, Roger, Dale Griffin and Michael Ross (2002), "Inside the Planning Fallacy: The Causes and Consequences of Optimistic Time Predictions," in _Heuristics and Biases: The Psychology of Intuitive Judgment_, Cambridge, UK: Cambridge University Press, pp. 250 – 270; Fischhoff, Baruch, Paul Slovic, and Sarah Lichtenstein (1977), "Knowing with Certainty: The Appropriateness of Extreme Confidence," _Journal of Experimental Psychology: Human Perception and Performance,_ 3(4), 552-564.
[485] _See, e.g._, Steel (2007); Robinson, Bryan (2024), "Why 78% Of Workers Procrastinate Even Though It Makes Them Anxious," _Forbes_, https://www.forbes.com/sites/bryanrobinson/2024/06/02/why-workers-procrastinate-even-though-it-makes-them-anxious/ (_e.g._, "Overall, 99% of Americans admit to procrastinating tasks"; "In fact, evidence suggests that 20% of adults are chronic procrastinators").
[486] _See also, e.g._, Schrift, Netzer, and Kivetz (2011); Schrift, Rom Y., Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," _Journal of Experimental Psychology: General_, 145(7), 807 – 829.
[487] Business Wire (2014), "The Majority of Holiday Shoppers (65 Percent) are Procrastinators, but Great Deals are Still Ahead," _Business Wire_, https://www.businesswire.com/news/home/20141215005120/en/Majority-Holiday-Shoppers-65-Percent-Procrastinators-Great.

---

consumers who deliberately enrolled with the intention to participate only during the free trial will delay acting on their original intentions to cancel immediately before the free trial expires.

300.    ***Second***, seminal literature on loss aversion, whereby people tend to psychologically weigh losses more than equivalent gains,[488] suggests that once a consumer enrolls in a Prime free trial, losing the Prime benefits associated with that trial by canceling is likely to be perceived as more aversive than the positive utility from gaining access to these benefits.  Loss aversion is one explanation for the existence of *endowment effects* in the marketplace, a well-documented phenomenon in which simply *owning* a good or item leads consumers to value (or overvalue) that good or item.[489]  Moreover, research has found that such ownership effects extend to intangible goods such as subscriptions[490] and are driven by subjective feelings of ownership, or psychological ownership,[491] which become stronger with duration.[492]  In the context of Prime, some consumers who sign up for a free trial of Prime may view themselves as owners of a subscription, increasing their hesitance to cancel immediately once the trial is over.[493]

301.    Relatedly, some new Prime enrollees who initially joined and planned to cancel before their free trial converted may have changed their mind after learning more about Prime or using its benefits, choosing to only cancel later (potentially considerably later) once they no longer

---

[488] Kahneman, Daniel and Amos Tversky (1979), "Prospect Theory: An Analysis of Decision under Risk," *Econometrica,* 47(2), 363 – 391.  *See also, e.g.*, Simonson, Itamar and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth—A Comment on Gal & Rucker's Rejection of 'Losses Loom Larger Than Gains,'" *Journal of Consumer Psychology*, 28(3), 517 – 522.

[489] *See, e.g.*, Kahneman, Daniel, Jack L. Knetsch, and Richard H. Thaler (1990), "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy*, 98(6), 1325 – 1348.

[490] *See, e.g.*, Colucci, Domenico, Chiara Franco, and Vincenzo Valori (2024), "The Endowment Effect with Different Possession Times and Types of Items," *Journal of Behavioral and Experimental Economics*, 110, 102216.

[491] *See, e.g.*, Shu, Suzanne B. and Joann Peck (2011), "Psychological Ownership and Affective Reaction: Emotional Attachment Process Variables and the Endowment Effects," *Journal of Consumer Psychology*, 21(4), 439 – 452; Reb, Jochen and Terry Connolly (2007), "Possession, Feelings of Ownership and the Endowment Effect," *Judgment and Decision Making*, 2(2), 107 – 114; Morewedge, Carey K. (2021), "Psychological Ownership: Implicit and Explicit," *Current Opinion in Psychology,* 39, 125 – 132.

[492] Bagga, Charan K., Neil Bendle, and June Cotte (2019), "Object Valuation and Non-Ownership Possession: How Renting and Borrowing Impact Willingness-to-Pay," *Journal of the Academy of Marketing Science*, 47(1), 97 – 117.

[493] *See also, e.g.*, Weiss, Liad and Ran Kivetz (2019), "Opportunity Cost Overestimation," *Journal of Marketing Research*, 56(3), 518 – 533.

---

wish to keep the subscription.  When these enrollees eventually cancel, selecting the "DNI" option in the Cancellation Survey may very well align with their *initial* intentions (*i.e.*, they did not intentionally intend to sign up for a paid or ongoing subscription to Prime.)  In fact, a central—if not *the* central—purpose or goal of offering free trials, product samples, and limited-time offers is precisely to allow prospective customers an opportunity to experience a product or service without an initial commitment, so that some portion of these consumers will come to appreciate the benefits of the product/service and therefore choose to stay as longer-term customers.

302.    ***Third***, research on waste aversion demonstrates that many consumers often experience a strong aversion to unused utility—that is, the utility associated with a product or service that will go unconsumed or unused.[494]  To the extent that some customers may perceive that they will lose or waste benefits by canceling before the end of the trial period, they may elect to hold off on cancellation, thereby increasing the likelihood of overshooting the date at which the trial converts or auto-renews.

303.    In summary, the above discussion indicates that even if consumers may have originally intended to follow through with their plans to enroll in Prime only for the duration of the free trial (or for a short duration in general), there will inevitably be some subset of consumers who do not end up canceling on time, whether due to inattention and memory limitations, or due to a change of mind or a reluctance to promptly terminate their membership. For this group of "lapsed" free trial enrollees, their "DNI" answers to the Cancellation Survey can be explained by, among other things, the fact that they indeed did not intend to sign up for a *paid* Prime subscription (because they did not intend to convert to becoming a paying customer).

C.4.2.2.  <u>Respondents' Behavioral Patterns Support the Existence of Segment 2</u>

304.    Table C2 below summarizes the results of my analysis as applied to Segment 2, which identified multiple distinct patterns of behavior among "Lapsed Free Trial Enrollees" that

---

[494] *See, e.g.,* Arkes, Hal R. (1996), "The Psychology of Waste," *Journal of Behavioral Decision Making*, 9(3), 213-224; Bolton, Lisa E. and Joseph W. Alba (2012), "When Less is More: Consumer Aversion to Unused Utility," *Journal of Consumer Psychology,* 22(3), 369-383.

are inconsistent with alleged unintentional enrollment and instead are consistent with intentional enrollment.  All of the customers in this segment are "lapsed" in the sense that, for a variety of plausible reasons as discussed previously, they canceled their test membership—which started as a free Prime trial—only after this trial expired and auto-converted to a paid Prime membership. These customers exhibited additional behaviors before, during, and/or after their test membership that call into question any interpretation of their "DNI" survey response as indicating alleged intentional enrollment.  Similar to their counterparts in Segment 1 ("Non-Paying Free Trial Enrollees"), individuals belonging to Segment 2 likely intentionally signed up for a free trial and selected "DNI" as an answer in the Cancellation Survey—either due to the survey's inherent leading nature, their own motivational biases (*e.g.*, because they hope to receive a refund or recompense from Amazon), or because they indeed did not intend to sign up for a *paid or ongoing* Prime subscription.

(*Continues on next page*)

**Table C2: Categories of Behavior Inconsistent with Unintentional Enrollment Among Lapsed Free Trial Enrollees (Segment 2)**

**Segment 2: Lapsed Free Trial Enrollees**
*Intentional Prime enrollees who signed up for a free trial in the test membership and converted to paid before canceling*

| Category | Description of Behavior | Frequency |
|---|---|---|
| *2a: Lapsed Serial Free Trial Seekers* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit during the test membership, AND canceled the test membership after it converted to paid, AND either in the past 4 years and/or future had a membership that *both* started as a free trial *and* in which a Prime benefit was used, AND had over half of all Prime memberships as ones that started as a free trial | ▇▇▇▇▇ |
| *2b: Lapsed Repeat Free Trial Enrollees* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit during the test membership, AND canceled the test membership after it converted to paid, AND either in the past 4 years and/or future had at least 2 other Prime memberships that started as a free trial, AND had over half of all Prime memberships as ones that started as a free trial | ▇▇▇▇▇ |
| *2c: On-Notice Late Canceling Lapsed Enrollees* | Enrolled in a Prime free trial in the test membership, AND either interacted with the Prime Welcome Email or visited Prime Central during the test membership within 30 days of enrollment, AND canceled the test membership after it converted to paid *both* 3+ weeks after enrollment *and* more than 7 days after either interacting with the Prime Welcome Email or visiting Prime Central, AND did not have any cancellation attempts prior to the cancellation date of the test membership, AND had a prior membership (in the past 4 years) in which a Prime benefit was used | ▇▇▇▇ |
| *2d: Lapsed Targeted-Users* | Enrolled in a Prime free trial in the test membership, AND used a Prime benefit during the test membership, AND canceled the test membership after it converted to paid and within 90 days of enrollment, AND in the Cancellation Survey selected "I only needed to make purchases for certain holidays, occasions, or events" in Q.5 | ▇▇▇▇▇ |
| *NET:  % Belonging to Segment 2 (Categories 2a – 2d)* | | ▇▇▇▇▇ |

305.     Overall, my analysis of Prime members' behavior reveals a second meaningful segment, consisting of "Lapsed Free Trial Enrollees"; this customer segment accounts for ▇▇▇ of the sampled "DNI" respondents and exhibited behaviors consistent with intentionally joining a Prime free trial that then happened to convert to a paid membership.  Next, I discuss each of the above categories within Segment 2 in turn.

*Category 2a: Repeat Lapsed Enrollees*

306.    My analysis found that ▮▮▮▮ of the sample are "Repeat Lapsed Enrollees," defined as customers who enrolled in a Prime free trial, canceled their test membership after it already converted to a paid Prime membership, who used a Prime benefit during the test membership, and who either in the past four years and/or future had another Prime membership that both: (*i*) started as a free trial and (*ii*) in which Prime benefit was used.  Moreover, ▮▮▮▮▮▮▮▮▮▮ of these customers' Prime memberships started as free trials.

307.    Category 2a thus represents "lapsed" free trial enrollees who not only used a Prime benefit at least once in their test memberships (a free trial), but who also exhibit a *pattern* of both enrolling in free trials and using Prime benefits during those free trials.  The conjunction of these behaviors renders it unlikely that such lapsed customers were unintentionally enrolled in Prime; instead, it is more plausible—for the reasons reviewed in the previous subsection—that these customers deliberately joined Prime and either did not intend for their free trial to continue (but forgot to cancel) or chose to extend their membership until they eventually exited altogether.

*Category 2b: Lapsed Repeat Free Trial Enrollees*

308.    My analysis found that ▮▮▮▮ of the sample are "Lapsed Repeat Free Trial Enrollees," defined as customers who enrolled in a Prime free trial during their test membership, used a Prime benefit during that membership, canceled the membership after it converted to paid, *and* who also both: (*i*) had, within the past four years and/or future, at least *two other* Prime memberships that started as free trials; and (*ii*) had over half of their Prime memberships start as free trials.

309.    That is, like their counterparts in Category 1b, these customers signed up for *at least three* Prime memberships (including the test membership, in which they used a benefit), all of which started as a free trial and with the majority in fact consisting of free trials.  Such customers display behaviors consistent with "serial free trial seekers" who have a *pattern* of repeatedly signing up for free trials when they are available—a pattern that is at odds with alleged unintentional enrollment.  However, due to multiple plausible explanations that are unrelated to unintentional enrollment—including memory limitations (*e.g.*, customers simply forgetting to

cancel), procrastination, or other motivational aspects discussed previously—these "Lapsed Repeat Free Trial Enrollees" did not cancel on time in their test membership.  For such customers, the "DNI" answer choice in the Cancellation Survey accurately describes their reason for canceling Prime: They did not intend to sign up for *paid* Prime or to continue with Prime for as long as they did.

*Category 2c: On-Notice Late Canceling Lapsed Enrollees*

310.    My analysis found that ▮▮▮▮ of the sample are "On-Notice Late Canceling Lapsed Enrollees," defined as customers who enrolled in a free trial test membership, interacted with the Prime Welcome Email or visited Prime Central during their test membership within 30 days after enrollment, canceled their now-converted (paid) membership at least three weeks after enrollment and more than seven days after either interacting with the Welcome Email or visiting Prime Central, had (within the past four years) another Prime membership in which they used a Prime benefit, and did not have any cancellation attempts (that did not result in a successful cancellation) prior to the cancellation date of the test membership.  As with those in Category 1b, these customers—who have used Prime benefits in at least one prior Prime membership—were aware of their free trial enrollment by the time they interacted with the Welcome Email or visited Prime Central, prior to the free trial converting to a paid membership.  The fact that they nevertheless did not cancel Prime until more than a week after these actions is not consistent with behaviors that would be expected of unintentional enrollees.  Instead, such "On-Notice Late Canceling Lapsed Enrollees" likely represent exactly that: Consumers who intentionally signed up for a free trial of Prime, either intentionally or unintentionally lapsed into a paid membership, and waited to cancel their now-paid subscription until circumstances suited them.

*Category 2d: Lapsed Targeted-Users*

311.    My analysis found that ▮▮▮▮ of the sample are "Lapsed Targeted-Users," defined as customers who enrolled in a Prime free trial during their test membership, canceled the membership after it converted to paid, used a Prime benefit during that membership (including potentially on the day of signup), canceled the converted-to paid membership within 90 days of

enrollment, *and* selected the answer choice "I only needed to make purchases for certain holidays, occasions, or events" (in Q.5) in the Cancellation Survey.[495]  Similar to Category 1e, this category of respondents captures Amazon users who intentionally signed up for a free trial of Prime for a targeted, specific usage occasion (or occasions), by their own admission; however, customers in this subsegment allowed their free trial to convert to a paid membership before ultimately deciding to cancel, either because they simply forgot to cancel or because their intended usage occasion(s) extended into the paid period.

312.    ***In summary***, ▮▮▮ of sampled "DNI" respondents exhibited behaviors consistent with those of "Lapsed Free Trial Enrollees"—customers who intentionally joined a Prime free trial that then happened to convert to a paid membership.  The existence of this second segment is also borne out by the verbatim responses volunteered by "DNI" respondents in the Cancellation Survey, some of whom directly admitted to forgetting to cancel their free trial.[496]  As with Segment 1, the "DNI" responses of these "Lapsed Free Trial Enrollees" cannot be treated as evidence of alleged unintentional enrollment.

### C.4.3.  *Segment 3: Pay as You Go Enrollees*

313.    The existence of Amazon customers that can be characterized as "Pay as You Go Enrollees" is consistent with scientific research that points to a segment of value-maximizing

---

[495] As I noted earlier, respondents received Question 5 if they selected, in either Question 3 or Question 4, the answer choice "I was not making enough purchases on Amazon to be worthwhile."

[496] *E.g.*: CID #1b1e40de12640c60f37591c91ba5d7dc (Q.4: "forgot to cancel before my free trial ended"; Q.8: "No"); CID #988527bb5311b8d03fad0cda69634bcf (Q.8: "Forgot I had it and when I actually purchase things I don't think Prime was involved with any of those because I didn't get any faster shipment or any discount or anyting so it's not worth paying for it for me if it's not doing anything for me"); CID #b41d894d3bba993c21533dfa57b7709f (Q.8: "I never meant to continue the membership"); CID #c0a03752eaec7a966bb6b000c1a6cdfe (Q.8: "I got 1 month free. didn't sign to keep watching."); CID #c0f051e3d9458b59063d23f13c9cb65e (Q.6: "It's nothing I needed, so why would I care?"; Q.8: "Kind of annoyed I forgot to cancel it last month, tbh"); CID #c46f20bceae6bcd85c9a96e43b9e7555 (Q.8: "Porque vas a empezar a cobrar por la suscripciÃ³n" [Trans: "Because you are going to start charging for the subscription"); CID #e62aaeca643061eecaccdd1cc151f85b (Q.6 "Other": "Forgot I had it"; Q.8: "No thank you"); CID #ebe923b7c364691ec084e03cf8acc95e (Q.4: "Prime encourages me to shop more than I should."; Q.6: "I try to limit my online time"; Q.8: "I don't like the automatic bill after the free trial is over. There should be a couple day warning that trial is ending."); CID #f5d94b392e529a3a14827b01b8cf6824 (Q.6 "Other": "Bad internet, can't use streaming well"; Q.8: "Didnt mean to continue, forgot to cancel").  *See* Exhibit G.1 for the verbatim responses of all respondents in the sample.  All verbatim responses reflect the original spelling, formatting, and grammar as recorded in the Cancellation Survey.

consumers who would recognize that they only need Prime benefits periodically, who prefer to maximize the dollar value of their memberships, and who prefer to avoid continuous, longer-term subscriptions.  As I detail below, these consumers are likely to enter and exit short-term memberships on a periodic, as-needed basis and to concentrate their usage of (and any payment for) Prime membership during specific occasions or windows of time.

### C.4.3.1.   Academic and Industry Research Predicts the Existence of Segment 3

314.    The notion that not all consumers want to enroll in a continuous, recurring membership or subscription is substantiated by, among other sources, the literature on rational choice and financial decision making.  One stream of research has classified consumers along a continuum between "satisficers" on one end and "maximizers" on another end.[497]  Whereas satisficers tend to choose options that are good enough, to save time and effort,[498] maximizers are willing to expend time and energy to find the best option.[499]  For maximizers who realize that they do not need Prime benefits throughout the entire year, activating Prime membership only during desired or needed times is more economical than continuously subscribing year-round.  Not only could canceling Prime during periods of inactivity be perceived by such consumers as less wasteful,[500] but doing so may also mitigate the *pain of payment* experienced when consumers spend money and view recurring expenses on their credit card bills, without sufficient benefits accruing to offset such pain of payment.[501]

315.    Industry research and marketplace phenomena likewise support the existence of a segment of consumers who prefer a "pay as you go" transaction model, and who therefore opt to activate and cancel their subscriptions as needed in order to maximize benefits received and

---

[497] *See, e.g.,* Schwartz, Barry, Andrew Ward, John Monterosso, Sonja Lyubomirsky, Katherine White, and Darrin R. Lehman (2002), "Maximizing versus Satisficing: Happiness is a Matter of Choice," *Journal of Personality and Social Psychology*, 83(5), 1178-1197.

[498] Simon, Herbert A. (1955), "A Behavioral Model of Rational Choice," *Quarterly Journal of Economics*, 59, 99–118; Simon, Herbert A. (1956), "Rational Choice and the Structure of the Environment," *Psychological Review*, 63, 129–138.

[499] Diab, Dalia L., Michael A. Gillespie, and Scott Highhouse (2008), "Are Maximizers Really Unhappy? The Measurement of Maximizing Tendency," *Judgment and Decision Making,* 3(5), 364-370.

[500] *See, e.g.,* Arkes (1996).

[501] Prelec, Drazen and George Loewenstein (1998), "The Red and the Black: Mental Accounting of Savings and Debt," *Marketing Science*, 17(1), 4-28.  *See also* Kivetz (1999).

minimize perceived waste.  In recent years, businesses have increasingly begun offering subscription models for a wide range of products and services,[502] from streaming and media (*e.g.*, Amazon Prime Video, Netflix, Spotify) to commodities like razors (*e.g.*, Dollar Shave Club) to meal-kits and food delivery (*e.g.*, Blue Apron, HelloFresh, Instacart).  In a 2018 McKinsey survey, over 5,000 U.S. consumers of e-commerce subscription services were asked a series of questions regarding their motivations in continuing versus canceling subscriptions for consumer goods.[503] The findings reveal that getting "value for the money" is a major reason for both continuing and canceling one's subscription.  When enough value is delivered, respondents indicated they would continue subscribing, but when respondents felt they could not use enough of the services, they were inclined to cancel.  As the report elaborates:[504]

> Finally, consumers are quick to cancel services that don't deliver a superior experience—for example, because of poor product quality, dissatisfaction with the assortment, or a lack of perceived value. Curation and **access subscribers also cancel when they don't feel that they are getting value for the money**, probably because these services offer more discretionary products.  [Emphasis added]

And:[505]

> Overall, we found that nearly 40 percent of e-commerce subscribers have canceled their subscriptions.  These rates are similar across replenishment, curation, and access subscription services.  […]

> More than one-third of consumers who sign up for a subscription service cancel in less than three months, and over half cancel within six.  […]

---

[502] *See, e.g.*, Friedman, Wayne (2021), "Streaming TV Leads All Consumer Subscription Businesses," *MediaPost*, https://www.mediapost.com/publications/article/360596/streaming-tv-leads-all-consumer-subscription-busin.html ("A new survey says 98% of U.S. consumers now subscribe to at least one streaming media service -- 75% subscribe to two or more services, according to Brightback, a consumer retention software company. After premium streaming services come mobile app subscriptions, at 53%; followed by news subscriptions, at 39%; curated box subscriptions, 37%; health/fitness, 34%; and food subscriptions, 31%.").

[503] Chen, Tony, Ken Fenyo, Sylvia Yang, and Jessica Zhang (2018), "Thinking Inside the Subscription Box: New Research on e-Commerce Consumers," *McKinsey & Company*, https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.

[504] *Id*., p. 5.  Note that "curation" subscriptions are those that provide the user with "new items or highly personalized experiences in categories such as apparel, beauty, and food," while "access" subscriptions (such as Amazon Subscribe & Save, as well as Prime) involve paying "a monthly fee to obtain lower prices or members-only perks"; *id*., p. 3.

[505] *Id*., p. 7.

316.    A 2024 survey of over 2,300 U.S. adults found that "three in five consumers said they proactively manage their subscription costs," with the top strategies consisting of: "I look out for deals or cheaper alternatives" (31%), followed by "**I rotate my subscriptions regularly (e.g., I cancel and resubscribe to subscriptions depending on my needs**" (24%).[506] Another 2024 survey, conducted on over 1,000 Americans with active paid subscriptions, documented the most commonly cited reasons for canceling unused subscriptions as including: finding a "better alternative" (42.2%), price considerations (*e.g.*, "Price has increased too much"; 29.4%), and **only needing the subscription for a "limited time" (27.1%)**.[507]  In addition, according to a 2022 Deloitte digital media trends survey of over 2,000 U.S. consumers, 33% of participants indicated that they both added and canceled a paid streaming video service during the last six months, and 25% have canceled a streaming video service within the past 12 months *and* resubscribed to the same service (*i.e.*, exhibiting "churn and return" behavior).[508]

317.    A 2024 *New York Times* article discussed a segment of what it calls "nomadic subscribers," who "are taking advantage of how easy it is, with a monthly contract and simple click of a button, to hopscotch from one service to the next."[509]  The article goes on to observe:[510]

> Indeed, these users can be fickle — a third of them resubscribe to the canceled service within six months, according to Antenna's research. […]
>
> Last year, these "serial churners," as Antenna calls them, accounted for roughly 40 percent of all new subscriptions and cancellations, Mr. Carson said.  The companies "clearly can't ignore them because it's such a big, active part of the market," he said.

In response to the article, one commenter noted, in a top-rated post: "The combination of lower cost and not having the annoyance that came with every new and changed bill in the cable days is

---

[506] Wolney (2024).  Emphasis added.
[507] Self Financial (2024).
[508] Westcott, Kevin, Jana Arbanas, Chris Arkenberg, and Brooke Auxler (2022), "2022 Digital Media Trends, 16th Edition: Toward the Metaverse," *Deloitte Insights*, https://www2.deloitte.com/us/en/insights/industry/technology/digital-media-trends-consumption-habits-survey/summary.html.  The article further notes: "Around a quarter of people across the countries we surveyed admit they routinely cancel and resubscribe to manage costs."
[509] Koblin, John (2024), "Americans' New TV Habit: Subscribe. Watch. Cancel. Repeat.," *New York Times*, https://www.nytimes.com/2024/04/20/business/media/streaming-subscription-jumping.html.
[510] *Ibid.*

well worth a little picking and choosing (and cancelling),"[511] while another wrote: "I'm on a strict budget so of course I've been doing this forever […]."[512]  Yet another added: "People are not being 'increasingly impulsive' about hitting the cancellation button. As the examples themselves show, they are being economically efficient in paying for what they actually use."[513]

318.    Consumers may also prefer "pay as you go" consumption mechanisms for a range of reasons stemming from psychological and tangible motivations beyond maximizing dollar value, including but not limited to, a desire to enact or maintain greater self-control over their spending and an aversion to longer-term financial commitments (including "subscription fatigue").

319.    Some customers pay for memberships only on an as-needed basis to avoid a longer-term financial commitment and to curb "subscription fatigue."  According to a 2022 survey conducted by C+R Research, consumers on average spend $219 per month on subscription services.[514]  Another 2022 industry survey noted that more than half of respondents wanted to spend less than $50 per month on subscriptions, and "[f]orty percent of consumers think they have too many subscriptions."[515]  For many consumers, subscribing to another service is not only costly, but can also be tedious to manage and track over time.  As noted above, consumers often forget about their subscriptions.[516]  To alleviate subscription fatigue, consumers

---

[511] *Ibid.* (The full post reads: "I'm not sure that switching streaming services regularly is any more complicated or less efficient than the 'old days' having to call the cable company every other month to challenge the latest increase, promotion expiration, fee change, etc. And I have yet to have one of the services suddenly drop a channel right before an NFL game, World Cup etc because the regional company was blackmailing them for increased rates. The combination of lower cost and not having the annoyance that came with every new and changed bill in the cable days is well worth a little picking and choosing (and cancelling). It is not 'impulsive', it is cheaper and easier and far less maddening.").

[512] *Ibid.* (The full post reads: "I'm on a strict budget so of course I've been doing this forever. If I hear about a show I think I'll enjoy (Derry Girls, Reservation Dogs, Schitt$ Creek, Ted Lasso etc), I'll join that streaming service to try the show out. If I like it, I'll stay as long as the series lasts, or binge watch past episodes. And then cancel When the next season comes out, I'll join again just for the duration of the season. I do it to save money of course. But also, there's just not enough on any one streaming service that I want to watch. Why pay if I'm not going to watch?").

[513] *Ibid.*

[514] CR Research (2022), "Subscription Service Statistics and Costs 2022," *C+R Research*, https://www.crresearch.com/blog/subscription-service-statistics-and-costs/.

[515] Portell, Greg and Katie Thomas (2022), "Climbing Up the Subscription Ladder: from Black Hole to Blue Skies," *Kearney Consumer Institute*, https://www.kearney.com/industry/consumer-retail/article/-/insights/the-subscription-apocalypse.

[516] CR Research (2022).

can opt to pay for subscriptions only when they need them in order to reduce the mental resources required to remember and monitor multiple ongoing subscriptions.

320.    To summarize, for consumers who seek to maximize their dollar value, to limit their spending, and to consciously weigh the costs and benefits of maintaining a subscription, the ability to activate or suspend/cancel a subscription according to their own anticipated needs provides an attractive alternative to a continuous, longer-term recurring subscription.  Such consumers are likely to adopt a "pay as you go" model—for example, in which a user activates a Prime membership (whether free or paid) only periodically or during specific months of anticipated needs or usage occasions.

C.4.3.2.   Respondents' Behavioral Patterns Support the Existence of Segment 3

321.    Table C3 below summarizes the results of my analysis as applied to Segment 3, that is "Pay as You Go Enrollees" whose behavioral patterns, like those in the previous segments, are inconsistent with alleged unintentional enrollment and are consistent with intentional enrollment. Unlike those in the preceding two segments, the customers here did not necessarily enter a free Prime trial in their test membership.  Regardless of what type of plan they joined, these customers exhibited a set of behaviors during, prior, and/or subsequent to their test membership that either support an intention to use Prime on a shorter-term, "pay as you go" basis or that call into question any interpretation of their "DNI" response as indicating alleged unintentional enrollment.  Indeed, these "Pay as You Go Enrollees" likely selected "DNI" in the Cancellation Survey for a number of reasons unrelated to unintentional enrollment, including not only the survey's leading questions and other inherent biases, but also because these customers in fact did not intend to sign up for a continuous, longer-term Prime *subscription*.

(*Continues on next page*)

**Table C3: Categories of Behavior Inconsistent with Unintentional Enrollment – "Pay as You Go" Enrollees (Segment 3)**

| Segment 3: "Pay as You Go" Enrollees | | |
|---|---|---|
| **Category** | **Description of Behavior** | **Frequency** |
| *3a: "Pay as You Go" Repeat AR-Off Enrollees* | Enrolled in a paid membership or a free trial that converted to paid in the test membership, AND used a Prime benefit (outside the day of signup) during the test membership, AND canceled the test membership by turning off auto-renew, AND either in the past 4 years and/or future had another membership that: was a paid membership or a free trial that converted to paid, *and* was canceled by turning off auto-renew, *and* in which a Prime benefit was used (outside the day of signup) | ▇▇▇▇ |
| *3b: Targeted-Users* | Enrolled in a paid Prime test membership, AND used a Prime benefit during the test membership, AND canceled the test membership within 60 days of enrollment, AND in the Cancellation Survey selected "I only needed to make purchases for certain holidays, occasions, or events" in Q.5 | ▇▇▇▇ |
| *3c: Paid Membership Immediate Cancelers* | Enrolled in a paid Prime test membership, AND used a Prime benefit on the day of signup, AND canceled the test membership within two calendar days of enrollment, AND in the Cancellation Survey did *not* choose "DNI" as the *main reason* for cancellation (in Q.3) (and did *not* select "Other" in Q.3 and *only* "DNI" in Q.4) | ▇▇▇▇ |
| *3d: Very Satisfied Re-Enrollees* | Enrolled in Prime in the test membership, AND used a Prime benefit during the test membership, AND canceled the test membership, AND indicated they were "very satisfied" with Prime in the Cancellation Survey, AND re-enrolled in Prime within 90 days after cancellation | ▇▇▇▇ |
| *NET: % Belonging to Segment 3 (Categories 3a – 3d)* | | ▇▇▇▇ |

322.    Overall, my analysis of Prime members' behavior revealed a third meaningful segment, consisting of "Pay as You Go Enrollees" that accounts for ▇▇▇ of the sampled "DNI" respondents.  Next, I discuss each of the categories within Segment 3 in turn.

*Category 3a: "Pay as You Go" Repeat Enrollees*

323.    In Subsection C.4.3.1, I outlined multiple reasons why some consumers may avoid continuous subscriptions in favor of entering and exiting shorter-term memberships according to their own timing preferences and needs.  In the context of Prime, shorter-term (or "pay as you go" type) memberships allow consumers the flexibility to subscribe only (or mostly) when they need or think they need the subscription benefits.  One indication of "Pay as You Go"

behavior, as I discuss below, is a pattern of *both* using Prime benefits while enrolled as well as canceling Prime by specifically turning auto-renew off.

324.    My analysis found that ▮▮▮ of the sample are "Pay as You Go Repeat Enrollees," defined as customers who enrolled in the test membership in either a free trial of Prime that converted to paid or that started as a paid membership, used a Prime benefit during their test membership (outside the day of signup), canceled that membership by turning off auto-renew,[517] and who either in the past four years and/or in the future had another Prime membership: (*i*) that was either a free trial that converted to paid or that started as a paid membership (*ii*) that they also canceled by turning off auto-renew, *and* (*iii*) in which they also used a Prime benefit (outside the day of signup).  That is, these customers have repeatedly managed their Prime memberships by specifically turning off auto-renew, while also repeatedly using Prime benefits during these same memberships.

325.    When canceling a Prime membership that is paid or that converted to paid from a free trial, the decision to switch auto-renew ("AR") off provides some insight into a customer's preferences or motivations.  I understand that during the applicable period, customers who wished to cancel a *paid* Prime membership (as opposed to a free trial) could choose between immediately terminating that membership or turning off auto-renew,[518] both of which would

---

[517] Note that in the case of a free trial, where customers are not presented with any choice between cancellation options, canceling that membership is equivalent to turning off auto-renew, as cancellation does not immediately end the customer's access to Prime benefits for the remainder of the trial period, and no refunds are provided for a free trial.  *See, e.g.*, AMZN_00045178.

[518] By default, like many popular subscription programs, Prime memberships are set (and were set during the applicable period) to renew automatically (*i.e.*, "auto-renew") on either a monthly or annual basis if no action from the customer is taken at the end of their billing period (*e.g.*, a month or year).  For examples of subscription programs that renew automatically by default, *see, e.g.*, Netflix (https://help.netflix.com/en/node/41049); Hulu (https://www.hulu.com/subscriber_agreement); Disney+ (https://help.disneyplus.com/article/disneyplus-automatic-payments); Walmart+ (https://www.walmart.com/help/article/walmart-terms-of-use/de696dfa1dd4423bb1005668dd19b845); Dropbox (https://help.dropbox.com/plans/downgrade-dropbox-individual-plans); Spotify Premium (https://www.spotify.com/us/legal/end-user-agreement/); New York Times (https://help.nytimes.com/hc/en-us/articles/115014893968-Terms-of-Sale); Peloton (https://support.onepeloton.com/s/article/11666782708756-Annual-Subscription-to-the-Peloton-App?language=en_US).

trigger an invitation to the Cancellation Survey to selected customers.[519]  If a Prime member canceled a paid Prime membership by turning off auto-renew, they would no longer be billed in the next billing cycle (or future ones), but they retained access to their Prime benefits in the interim.  Unlike an immediate cancellation, turning off auto-renew would not qualify customers for refunds based on unused Prime benefits.[520]  I understand that throughout the relevant time period, Prime members with a paid Prime membership could turn off auto-renew by entering the Cancellation Flow from Prime Central and clicking on a button "End on [date]," which allows them to continue their benefits until a particular date, after which they will no longer be charged (*see, e.g.*, Figure C7 below).[521]

(*Continues on next page*)

---

[519] *See, e.g.*, Goeltz Deposition, pp. 199 – 200.  Starting in approximately June of 2020, approximately 30% of customers who canceled their Prime membership via the Cancellation Flow were randomly selected to be shown a pop-up window, which appeared on the same webpage and includes a link to take the Cancellation Survey.  *See, e.g.*, AMZN_00001517; AMZN_00003654 at 3662; AMZN_00009360; AMZN_00021537, at 34291.
[520] *See, e.g.*, Amended Complaint, ¶ 152 (citing to Attachment Q, at 5).
[521] *See, e.g.*, AMZN_00000001 – 8.

**Figure C7: Sample Screenshot Showing the Option to Cancel a Paid Membership by Turning Off Auto-Renew in the Online Cancellation Flow (2021)** [522]



326.    Although "AR-off" customers could have immediately and fully terminated their relationship with Prime during the test membership (which qualifies them for applicable refunds on unused benefits), they instead opted to preserve access to Prime benefits for the duration of the current billing cycle.  This alone did not qualify an individual into Category 3a; instead, "Pay as You Go Repeat AR-Off Enrollees" additionally (*i*) made use of at least one Prime benefit

---

[522] AMZN_00000006.  I added a red rectangle to highlight the auto-renew off option.

(outside the day of signup) during both the test membership *and* in another (prior or future) paid or free-to-paid membership; and (*ii*) canceled another (prior or future) paid or free-to-paid membership specifically by turning off auto-renew.  Such a combination of behaviors are not what would be expected from customers who unintentionally enrolled in Prime.

327.    Moreover, as I noted previously, a customer who turned off auto-renew—an option available as part of Amazon's online Cancellation Flow—triggered an automatic cancellation of their current Prime membership, and if selected in Amazon's internal Weblab system, would receive a pop-up invitation to take the Cancellation Survey at that time.  This means that at least some customers who chose to switch off auto-renew still had time left during the current billing cycle when they participated in the survey.  In fact, among all respondents in the sample whose test membership either started as paid or as a free trial that converted into a paid membership, those who canceled Prime by turning off auto-renew had a mean and median of at least ▌ days remaining in their membership (or current billing cycle).[523]  Importantly, the Cancellation Survey asked respondents for (among other things) their reasons for *canceling Prime*, and did not ask any questions or provide any answer choices that relate to auto-renewal.  Hence, "Pay as You Go Repeat AR-Off Enrollees" may have reasonably interpreted the question as asking why they turned off auto-renew, to which the "DNI" answer choice provides a fitting response: They did not intend to sign up for a *continuous*, *auto-renewing* month over month subscription to Prime (but they did intentionally signup for a specific or targeted period).

*Category 3b: Targeted-Users*

328.    My analysis found that ▌ of the sample are "Targeted-Users," defined as customers who enrolled in a paid Prime test membership, used a Prime benefit during that membership, canceled that membership within 60 days,[524] *and* who selected the answer choice "I only needed to make purchases for certain holidays, occasions, or events" (in Q.5, which came

---

[523] Among respondents whose test membership started as paid, both the average and median number of days remaining in the membership after turning AR-off was ▌ days.  Among respondents whose test membership started as a free trial and converted to paid, the average and median number of days remaining in the membership after turning AR-off was ▌ and ▌ days, respectively.

[524] I used 60 days (two months) as a criterion because some customers may reasonably join a paid Prime membership in the month preceding a special holiday, occasion, event, or anticipated transaction.

*after* they were already exposed to the "DNI" answer choice in Q.3 and possibly Q.4) in the Cancellation Survey.[525]  Similar to Categories 1e and 2d, this category of respondents captures Amazon users who intentionally signed up for Prime—by their own direct admission—for a targeted, specific usage occasion.  Again, a very plausible explanation is that because they "only needed to make purchases for certain holidays, occasions, or events," these "Targeted-Users" signed up for Prime, made a free-shipping purchase using Prime (or made use of some other Prime benefit), left the membership within two months, and selected "DNI" in the Cancellation Survey because they indeed did *not* intend to sign up for a longer-term, continuous Prime membership.

*Category 3c: Paid Membership Immediate Cancelers*

329.    My analysis found that ▮▮▮ of the sample are "Paid Membership Immediate Cancelers," defined as customers enrolled in a paid Prime test membership, who used a Prime benefit on the day of signup, and who canceled that membership *within two calendar days* of enrollment—but who did *not* select "DNI" as the "main reason" (in Q.3) for canceling Prime in the Cancellation Survey (and who did *not* select both "Other" in Q.3 and *only* "DNI" in Q.4).  As with Category 1f ("Free Trial Immediate Cancelers"), providing a *non*-"DNI" answer as the *main* reason for cancellation—particularly after only having enrolled in Prime for a maximum of two calendar days—is inconsistent with having discovered that one has been "tricked" (deceived) or unintentionally enrolled in Prime.  Instead, it is far more plausible that the immediate cancelers in this category intended to sign up—and pay for—Prime for only a short duration in order to use a benefit, make a time-sensitive purchase, or otherwise solve an immediate need (*e.g.*, to purchase an item with guaranteed expedited delivery).  For these customers, the "DNI" answer choice would, out of the available answer choices, most closely capture their situation: They did *not* intend to sign up for Prime as a recurring, longer-term subscriber.

---

[525] Q.5 ("What are some reasons why you were making fewer purchases on Amazon?") was asked of those respondents who selected "I was not making enough purchases on Amazon for it to be worthwhile" in either Q.3 ("What was your main reason for canceling Prime?") or Q.4 ("Are there additional reasons why you canceled your Prime membership?  What are the other reasons?").

*Category 3d: Very Satisfied Re-Enrollees*

330.    My analysis found that ▮▮▮ of the sample are "Very Satisfied Re-Enrollees,"
defined as customers ("DNI" respondents) who canceled their test membership (whether a free
trial or paid membership) and who both indicated that they were "very satisfied" with Prime, *and*
who re-enrolled in Prime within 90 days.  In particular, recall that Question 2 of the Cancellation
Survey (an optional question that respondents could leave blank) asked:[526]

Q.2    How satisfied are you with **Prime**?
  o   Very satisfied
  o   Somewhat satisfied
  o   Neither satisfied nor dissatisfied
  o   Somewhat dissatisfied
  o   Not satisfied at all

Hence, the customers in Category 3e selected the "top box"—"Very satisfied"—out of five
possible responses ("boxes").

331.    As I discussed in Subsection B.2.1, respondents who answered "DNI" in the
Cancellation Survey but also expressed high satisfaction with Prime—in fact, the highest
satisfaction rating possible in the survey—cannot be assumed to have been unintentionally
enrolled.  Customers who canceled Prime because they discovered they were in fact
unintentionally enrolled or "tricked" (deceived) into an unwanted and unexpected Prime
membership would be expected to be dissatisfied—or, at the very least, would *not* be expected to
be "*very satisfied*" with a service they never wanted in the first place.[527]  It is even more
implausible that true unintentional enrollees would not only express high satisfaction with the
service in which they were allegedly unintentionally enrolled, but then go on to *re-enroll* in that
same service (according to the FTC, fall into the same "trap") within only three months.

---

[526] *See, e.g.*, AMZN-PRM-FTC-002704614.  Emphasis in the original.  Question 2 was optional; *see*
AMZN-PRM-FTC-002704651
[527] As noted previously, the FTC's Amended Complaint cites to Amazon internal documents that describe
unintended signups in Prime as purportedly being a "top three 'frustration'" and a "trustbuster"; *see*
Amended Complaint, ¶ 193.  Moreover, the notion that a "trustbusting" experience would lead consumers
to react negatively and to promptly disengage from a firm's services is supported by considerable research
in marketing and psychology on the role of consumer trust in commercial or interpersonal relationships,
including in e-commerce and online settings.  *See, e.g.*, Reichheld and Schefter (2000); Urban, Sultan, and
Qualls (2000); Delgado-Ballester and Munuera-Alemán (2001); Sirdeshmukh, Singh, and Sabol (2002);
Koehler and Gershoff (2003); Grégoire, Tripp, and Legoux (2009); Johnson, Matear, and Thomson (2011).

332.    Instead, it is far more likely that such customers were intentional enrollees who chose to join Prime, were very satisfied with their Prime experience, chose to cancel their membership for any number of reasons unrelated to unintentional enrollment, interpreted the vague and overly broad "DNI" answer choice as something that does *not* refer to unintentional enrollment (but rather instead as referring to an intention to, for example, not sign up for a continuous, long-term Prime subscription, no longer be a Prime member, or not be a Prime member for now), and subsequently opted to once again become a Prime member when circumstances changed or a need arose.

333.    ***In summary***, ███ of the sampled "DNI" respondents exhibited behaviors consistent with "Pay as You Go Enrollees."  Such customers' interactions with Amazon—coupled in some cases with their Cancellation Survey responses, and as also separately observed through open-ended verbatim responses[528]—are consistent with intentional, periodic, short-term enrollment in Prime rather than alleged unintentional enrollment.

### C.4.4.  *Segment 4: Special Registration Enrollees*

334.    My review of available evidence in this litigation and publicly available sources indicate that certain Amazon Prime membership plans or "signup locations" (*i.e.*, enrollment pathways or "channels") require the user to take more active steps in order to obtain the desired

---

[528] *E.g.*: CID #18759843769f5aaea43f870bfb42b3f4 (Q.4 "Other": "I didn't need anything else"; Q.8: "Prime is great. I just don't need it right now"); CID #486f1faed344da607d4dc4a07bbab807 (Q.5 "Other": "I try to keep to a budget"; Q.8: "I like Prime. It it ads up since I also have Netflix I otherwise look for free shipping when ordering online"); CID #59329702d2b670977db28710dae1edbc (Q.3 "Other": "Can't afford any type of subscription at the moment. In the future I might consider coming back. THANKS FOR EVERYTHING"; Q.8: "I really like it but it wasn't in my plans to subscribe again due to not being able to afford any type of subscription right now. But thanks."); CID #5a248e5cab1abcfb24cd55aabd66c181 (Q.8: "Nothing really, but prime was really nice and I got my item a day before it was supposed to get here, so if I bought more items more frequently it would've been worth it"); CID #7b86c413a1e3c53e58926d65039b6a12 (Q.4 "Other": "Used for the holidays"); CID #84e17a8e3307363bdc84f6cdcc3b5a23 (Q.8: "No, it[']s fine just wanted to know what it was and now I know"); CID #9bfa499bf2be298cc74c52ac636ade21 (Q.8: "Just not needed and my children signed up so they could watch a specific movie, LOL"); CID #d3ed3a989324696886fd16494a6e9f09 (Q.5: "I'm trying to save money right now"; Q.8: "Nope great service just can't right now"); CID #d9f7abcff549d0fffd5092e410e18e4a (Q.8: "I plan to use later when I can afford it on a regular basis. Unable to due so due to the pandemic."); CID #f89371c669a4dfbaeba7bb13e0679c32 (Q.4 "Other": "I'm trying not to spend so much money shopping").  *See* Exhibit G.1 for the verbatim responses of all respondents in the sample.

---

==Prime membership.  Table C4 below summarizes two such categories of "Special Registration Enrollees"; I exclude from this segment additional membership types or signup locations that similarly indicate or suggest intentional enrollment, but which either do not appear in the sampled data[529] or whose exact enrollment pathways were not completely clear or defined.[530]==

**Table C4: Categories of Behavior Inconsistent with Unintentional Enrollment – Special Registration Enrollees (Segment 4)**

| Segment 4: Special Registration Enrollees | | |
|---|---|---|
| *4a: Prime Student Enrollees* | Signed up for the test membership under a Prime Student plan | ███████ |
| *4b: "Slashprime" Enrollees* | Signed up for the test membership through the Prime Homepage | ███████ |
| *NET: % Belonging to Segment 4 (Categories 4a – 4b)* | | ███████ |

335.    In addition to the multiple aspects of the Cancellation Survey that artificially highlighted the "DNI" answer choice (as set forth in Section A), the overly broad and ambiguous wording of this response option could have led "Special Registration Enrollees" to select it because, among other things, they did not view themselves as *intending to continue to subscribe* to Prime.  This could be, for example, because they no longer needed or wanted a Prime membership or were no longer eligible for the discounted membership (in the case of Prime Student enrollees).

336.    As explained below, I counted any observations of test membership signups that require special registration or a more involved signup process—namely, those listed in Table C4 above, accounting for ██████ of the sample—as indicating intentional enrollment in Prime.

---

[529] I understand that Prime Access is another special discounted membership plan offered (since 2017) to low-income individuals who qualify for government assistance programs such as SNAP (Supplemental Nutrition Assistance Program), Medicaid, or others.  *See, e.g.*, https://www.amazon.com/58f8026f-0658-47d0-9752-f6fa2c69b2e2/qualify; https://www.geekwire.com/2022/amazon-renames-discounted-tier-of-prime-to-prime-access/.  Because no respondents in the "base" sample were coded in the data as having an Access Account, I do not discuss this membership plan further.

[530] For example, signup locations such as "Prime," "Prime Central," "Prime_Exclusives," Primeacquisition," "Primeup-Slash-Qualify," "Primedaywidget," "Primeday2019," "Primeday2020," "Primeknightoobe," "Primereading," and "Slashprimeday" suggest an enrollment flow in which Prime would likely be highly salient to customers, similar to the Amazon Prime homepage ("Slashprime").

*Category 4a: Prime Student Enrollees*

337.     My analysis found that ▮▮▮▮ of the sample are "Prime Student Enrollees," defined as customers who joined a test membership under a Prime Student plan.

338.     *Prime Student* is a special discounted Prime membership plan for college-enrolled students[531] that offers a six-month free trial of Prime, after which the membership converts to a regular Prime membership at a 50% reduced-fee rate (along with access to various other discounts) for four years or upon graduation.[532]  To join Prime Student, an Amazon customer must meet eligibility requirements by providing "student status verification," which includes using a valid email address ending in the suffix ".edu" for verification purposes or, alternatively, submitting proof of enrollment in a college or university (*e.g.*, via a student ID, transcript, course list, tuition bill).[533]  Figure C8 below reproduces the verification procedure in place as of October 2024.[534]  I understand that these verification steps or some level of verification existed for any customer enrolling in Prime Student during the relevant time period (*i.e.*, between May 1, 2017 and June 21, 2023).[535]

---

[531] I understand that Amazon's Prime Student program has expanded to include young adults (aged 18-24) who may not be enrolled in a college or university but who must submit proof of their age in order to enroll.  *See, e.g.*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GAHEWLGGJTWD9NK5; https://www.amazon.com/amazonprime?primeCampaignId=studentWlpPrimeRedir ("All 18-24 year-olds and students welcome").

[532] *See, e.g.*, https://www.amazon.com/Amazon-Student/b?ie=UTF8&node=668781011; https://www.amazon.com/gp/help/customer/display.html?nodeId=GAHEWLGGJTWD9NK5.  After the earliest of either four years or the student's graduation, the Prime Student membership automatically converts to a regular Prime membership at the full-cost rate.  I understand that Prime Access is another special discounted membership plan offered (since approximately 2017) to low-income individuals who qualify for government assistance programs such as SNAP (Supplemental Nutrition Assistance Program), Medicaid, or others.  *See, e.g.*, https://www.businesswire.com/news/home/20170606005643/en/Amazon-Introduces-Discounted-Monthly-Prime-Offer-for-Customers-Receiving-Government-Assistance; https://www.amazon.com/58f8026f-0658-47d0-9752-f6fa2c69b2e2/qualify.  Because no respondents in the "base" sample were coded in the data as having an Access Account, I do not discuss this membership plan further.

[533] *See, e.g.*, https://www.amazon.com/b?ie=UTF8&node=23984694011 (outlining steps required to enroll in Prime Student without a .edu email address).

[534] *See, e.g.*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GWMNXPTL3482JPHC.

[535] *See, e.g.*, AMZN-PRM-FTC-000719090; AMZN_00104044.

**Figure C8: Set Up Process for Registering for a Prime Student Membership (Amazon FAQ)** [536]

# Join Prime Student

As a Prime Student member, you receive a six-month trial that includes FREE Two-Day Shipping on eligible purchases.

To join Prime Student:

1. Go to Prime Student sign-up.
2. Choose the verification method that best suits you (age verification or student status verification).
   - For age verification, you only need to submit proof of your age, such as your passport, driving license or identity card.
   - For student status verification, you have a few options, including a) complete and submit the sign-up form; b) use your .edu email address, or c) submit proof of enrollment such as your student ID, your transcript or class list for the current term, your tuition bill for the current term, or an official acceptance letter for the upcoming term.

339.    Signing up—or rather, registering—for Prime Student speaks directly to a customer's state of mind at the time of enrollment in Prime, as the enrollee must not only intend to register but also actively request the membership.  Accordingly, customers who signed up for a Prime Student plan in their test membership are highly unlikely to have unintentionally enrolled. Moreover, given that many students likely joined Prime Student in the first place to take advantage of a longer free trial followed by a discounted membership, an answer of "DNI" in the Cancellation Survey is completely consistent with a former Prime Student enrollee communicating the fact that they did not intend to become a *full-cost* Prime member.

*Category 4b: "Slashprime" Enrollees*

340.    My analysis found that ▮▮▮▮ of the sample are "Slashprime Enrollees," defined as customers who signed up for their test membership through the Amazon Prime Homepage (www.amazon.com/prime). [537]  A May 24, 2021 letter from Amazon in response to the FTC's Interrogatory 1 identified the Amazon Prime Homepage as one of ▮▮▮▮▮▮▮ "enrollment

---

[536] *See, e.g.*, https://www.amazon.com/gp/help/customer/display.html?nodeId=GWMNXPTL3482JPHC.

[537] The Amazon Prime homepage, or the "Prime landing page on www.amazon.com/prime" is referred to as "slashprime" in the signup_location variable.  *See* Exhibit A to February 13, 2025 Amazon Letter, Dictionary (Field Values).

channels," described as a "centralized webpage that provides information about Prime, including how to enroll."[538]  Figures C9a through C9b below reproduce screenshots for the enrollment process with a free trial offer (or upsell), showing: (*i*) the landing page (www.amazon.com/prime), where customers would click on, for example, a "Start your 30-day free trial" button to enter the enrollment flow (Figure C9a); (*ii*) the enrollment page, which provides more information about Prime, including key benefits and terms (*e.g.*, how long the free trial is, how much they will pay after the trial is over, that the membership continues until canceled), as well as other confirmations (Figure C9b); and (*iii*) the confirmation page, which welcomes the customer to Prime (Figure C9c).

**Figure C9a: Amazon Prime Homepage Enrollment Flow – Free Trial (Landing Page)** [539]



---

[538] May 24, 2021 Amazon Response, p. 3.
[539] AMZN_00003614, p. 3.

**Figure C9b: Amazon Prime Homepage Enrollment Flow – Free Trial (Enrollment Page)** [540]



---

[540] *Id.*, p. 4.  Screenshot cropped for readability.

**Figure C9c: Amazon Prime Homepage Enrollment Flow – Free Trial (Confirmation Page)**
541



341.    Figures C9d through C9f below reproduce screenshots for the enrollment process into a direct paid Prime membership, showing: (*i*) the landing page (www.amazon.com/prime), where customers would click on, for example, a "Get Started" button to enter the enrollment flow (Figure C9d); (*ii*) the enrollment page, which provides more information about Prime, including key benefits and terms (*e.g.*, the monthly payment and auto-renewal until cancellation) (Figure C9e); and (*iii*) the confirmation page, which welcomes the customer to Prime (Figure C9f).

---

541 *Id.*, p. 5.  Screenshot cropped for readability.

**Figure C9d: Amazon Prime Homepage Enrollment Flow – Paid Prime (Landing Page)** [542]



Check out what's included with your Prime membership:

---

**Figure C9e: Amazon Prime Homepage Enrollment Flow – Paid Membership (Enrollment Page)** [543]



[543] *Id*., p. 4.  Screenshot cropped for readability.

**Figure C9f: Amazon Prime Homepage Enrollment Flow – Paid Membership (Confirmation Page)** [544]



342.      As Figures C9a through C9f show, the enrollment flow that customers must go through in order to join Prime specifically from the Amazon Prime Homepage does not fit the FTC's allegations of a "one-click" process that a user would inadvertently stumble on and unwittingly find themselves signed up.  To the contrary, this enrollment flow involves multiple steps and requires active initiation on the user's part, beginning with a separate Prime-specific URL (www.amazon.com/prime) and landing page, continuing through an intermediate page that explains to the customer what they are enrolling in, and ending with a welcome screen that makes it clear that the customer has indeed just signed up for Prime.  Therefore, it is exceedingly unlikely that a customer who has enrolled in this manner would have done so unintentionally.

---

[544] *Id.*, p. 5.  Screenshot cropped for readability.

**C.4.5.  *Segment 5: Unreliable or Inconsistent "Recallers"***

C.4.5.1.   Academic Research and the Cancellation Survey's Susceptibility to Severe Response Biases Predict the Existence of Segment 5

343.    In Subsection A.2.2, I discussed why the Cancellation Survey is fundamentally inadequate for drawing conclusions about a customer's perceptions and state of mind at the earlier time, in the moment of *enrolling* in Prime.  The Cancellation Survey was *not* a survey about enrollment into Prime and was *not* conducted at the time of enrollment, but was instead an "exit survey" about reasons for cancellation, conducted at the time of cancellation.  As such, the survey was not designed to and cannot assess whether or not a customer was aware when they enrolled that they were signing up for Prime, let alone the extent to which they understood at the time of enrollment the terms and conditions of Prime.[545]  Respondents' inaccurate recall of their intentions, perceptions, understanding, or awareness when enrolling in Prime likely led at least some respondents to infer or assume that because they could not remember signing up for Prime, they might not have intended to do so.

344.    Although all selections of "DNI" in the Cancellation Survey therefore suffer from the basic gap and misalignment between enrollment and cancellation, "DNI" responses recorded after a considerable amount of time has elapsed since enrollment are particularly suspect.  The tendency of consumers to engage in "reconstructive memory"[546] (*e.g.*, by mistaking the inability to retrieve a memory of signing up for Prime with a lack of intention/awareness in signing up) is exacerbated by the passage of time.  That is, the longer the interval between a customer's enrollment date and survey date, the less reliable is that customer's survey responses pertaining to events at the moment of enrollment, and the more these answers are likely to be biased by the leading survey questions.

---

[545] As detailed previously, the accuracy of such autobiographical memories is limited, systematically and precipitously decreases with time, and is further compromised when the behavior in question is recurring, habitual, or encompasses instances of similar actions (*e.g.*, other uses of Amazon, enrolling in other trials and subscriptions).  *See, e.g.*, Anderson (1985); Schwarz and Oyserman (1992).

[546] *See, e.g.*, Loftus, Altman, and Geballe (1975); Loftus and Zanni (1975); Loftus (1975); Loftus (1997); Weinberg, Wadsworth, and Baron (1983).

345.     Relatedly, one cannot take at face value the "DNI" responses of consumers whose observed, actual *behaviors* contradict or are inconsistent with their *reported* behaviors in the survey.  As is well-documented in academic literature, discrepancies between what people *think* (or say) they did and what they *actually* did frequently arise in retrospective self-reports, whether due to memory errors/distortions, cognitive and motivational biases, and/or the question framing itself.[547]  If individuals' objective behaviors contradict their subjective accounts of these behaviors—suggesting that the respondent is guessing or otherwise providing inaccurate data in the survey—then the survey responses cannot be used to reliably form conclusions about any given behavior or intention, let alone one as specific as having intentionally or unintentionally signed up for Prime.

### C.4.5.2.  Internal Inconsistencies Between Respondents' Behaviors and Reported Survey Responses Invalidate Any Reliance on Many Selections of "DNI"

346.     Table C5 below summarizes the results of my analysis as applied to Segment 5, a group of "DNI" respondents" (accounting for ▮▮▮▮ of the sampled "DNI" respondents) whose behaviors and survey responses qualify them as "Unreliable or Inconsistent Recallers."  As I discuss next, the "DNI" answers of customers belonging to this segment cannot be reliably counted as instances of unintentional enrollment.

*(Continues on next page)*

---

[547] *See, e.g.*, Bernard, H. Russell, Peter Killworth, David Kronenfeld, and Lee Sailer (1984), "The Problem of Informant Accuracy: The Validity of Retrospective Data," *Annual Review of Anthropology*, 13, 496 – 517; Tourangeau, Roger (1999), "Remembering What Happened: Memory Errors and Survey Reports," in *The Science of Self-Report: Implications for Research and Practice*, Stone, Arthur A. et al. (eds.), Psychology Press, pp. 41 – 60; Nisbett and Wilson (1977).

**Table C5: Categories of Behavior Inconsistent with Unintentional Enrollment – Unreliable or Inconsistent "Recallers" (Segment 5)**

| Segment 5: Unreliable or Inconsistent "Recallers" | | |
|---|---|---|
| **Category** | **Description of Behavior** | **Frequency** |
| *5a: Unreliable "Recallers"* | Enrolled in Prime (either free trial or paid) in the test membership, AND used a Prime benefit (outside the day of signup) during the test membership, AND took the Cancellation Survey a year or more after enrollment | ████ |
| *5b: Inconsistent "Recallers" (Benefit Users)* | Enrolled in Prime (either free trial or paid) in the test membership, AND selected "I didn't know of any benefits other than shipping" *or* "I didn't know how to use or access [Prime benefits]" in the Cancellation Survey (in Q.6), AND used non-shipping benefits (outside the day of signup) during *either* the test membership *or* a prior membership (within the past 4 years) | ████ |
| *5c: Implausible "Recallers" (Immediate Cancelers)* | Enrolled in Prime (either free trial or paid) in the test membership, AND canceled the test membership within two calendar days of enrollment, AND in the Cancellation Survey selected: <br> (*i*) "I was not using the Prime benefits enough" or "I was not making enough purchases on Amazon for it to be worthwhile" (in Q.3/Q.4), *or* <br> (*ii*) "Deliveries were often stolen" (in Q.7) | ████ |
| *NET: % Belonging to Segment 5 (Categories 5a – 5c)* | | ████ |

*Category 5a: Unreliable "Recallers"*

347.    My analysis found that ████ of the sample are "Unreliable Recallers," defined as customers who signed up for their test Prime membership (either free or paid) and used Prime benefits *outside* the day of signup during that membership, but who took the Cancellation Survey a year or more after they had initially enrolled.

348.    It is my professional opinion that, due to the combination of memory distortions and response biases induced by the Cancellation Survey, the "DNI" answers of customers who used Prime benefits outside the day of signup, canceled the Prime subscription, *and took the Cancellation Survey a full year after they enrolled* are scientifically and fundamentally

unreliable.[548]  The customers who exhibit such behaviors cannot be used to support alleged unintentional enrollment.

*Category 5b: Inconsistent "Recallers" (Benefit Users)*

349.    In addition to the passage of time, inconsistencies between *stated* behaviors on the one hand versus *observed* behaviors on the other also render a respondent's "DNI" selection unreliable.  Consider, for example, Question 6 in the Cancellation Survey, which was asked of respondents who selected, in either Question 3 or Question 4, the answer choice "I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)":[549]

Q.6    What are some reasons why you weren't using Prime benefits?
(select all that apply)

☐ I didn't know of any benefits other than shipping
☐ I didn't know how to use or access them
☐ Prime Video didn't have enough shows or movies that I want to watch
☐ Amazon Music didn't have enough songs that I like
☐ Amazon Fresh didn't have enough selection or delivery times
☐ Prime Reading didn't have enough books, magazines, or audible narrations that I like
☐ I wasn't using the game bonuses or channel subscription enough on Twitch Prime
☐ Other (please specify) _____

350.    Of particular interest for my analysis is respondents' answers to the first two answer choices: "I didn't know of any benefits other than shipping" and "I didn't know how to use or access [Prime benefits]."  Specifically, I compared respondents' actual behaviors (as observed in their customer data) to selections of these two response options.  The data reveal that ▮▮▮ of respondents in the sample claimed, in the Cancellation Survey, that either they "didn't know of any benefits other than shipping" or they "didn't know how to use or access [Prime benefits]" *but they*

---

[548] To be conservative (*i.e.*, erring in favor of the FTC) in operationalizing what "long after" means, I applied a criterion of at least one year.  *See* Subsection A.2.2 for discussion and references regarding the limitations of human memory.

[549] *See, e.g.*, AMZN-PRM-FTC-002704630; AMZN-PRM-FTC-002704665.  The order of the first two and last answer choices was fixed, while the order of the third to seventh answer choices was randomized, and respondents could select multiple answers.  *See* AMZN-PRM-FTC-002704664; AMZN-PRM-FTC-002704666.

in fact *did* use non-shipping benefits (outside the day of signup) during either the test membership and/or a past membership.[550]

351.    For these customers, the inconsistencies between their stated survey responses (what they *said*) and their actual observed behaviors (what they actually *did*) cast serious doubts on their survey responses, including the reliability and meaning of their "DNI" selections.

*Category 5c: Implausible "Recallers" (Immediate Cancelers)*

352.    My analysis found that ▮▮▮▮ of the sample are "Implausible Recallers (Immediate Cancelers)," defined as customers who enrolled in a Prime (either free trial or paid) test membership and who canceled that trial or membership within two calendar days of enrollment (*i.e.*, approximating a same-day cancellation)—*but* who selected "I was not using the Prime benefits enough" (in Q.3/Q.4), "I was not making enough purchases on Amazon for it [Prime] to be worthwhile" (in Q.3/Q.4), or "Deliveries were often stolen" (in Q.7).

353.    Canceling their Prime membership after at most two calendar days, these respondents did *not* have adequate time to reasonably conclude anything about insufficient benefit usage, insufficient purchase frequency, or having deliveries be "often" stolen.[551]  Thus, these customers' implausible and nonsensical survey responses cast serious doubts on all of their answers in the Cancellation Survey, including the reliability and validity of their "DNI" choices.

---

[550] To calculate usage of non-shipping benefits, I excluded from my calculation the following Prime benefit usage categories or "engagement_names," which I understand relate specifically to Prime *shipping* benefits: "prime now – 1hr," "prime now – 2hr," "same-day," "1-day," "2-day," "3-5 day," "5-8 day," "10+ days," "6-10 days," "no rush," "non physical," and "unknown."  *See* February 19, 2025 Amazon's Amended Objections and Responses, Response to Topic 4(a).  In addition, I excluded categories or engagement names reflecting benefits that were discontinued prior to or during the relevant time period (*i.e.*, "Pantry orders", "Dash Button", "Sample box", "Cloud drive", "Cloud drive app") as well as benefits whose definition was unclear or that were at times available to non-Prime members (*i.e.*, "SNS ORDERS").  *See ibid*. (FN 2).

[551] Using two calendar days after enrollment as a criterion is conservative (in the FTC's favor), as even longer periods (*e.g.*, a week or even a month) would not provide a customer with enough time to have formed such judgments.

**C.4.6.** ***My Customer Behavior Analysis Conservatively Does Not Systematically Account for Additional Groups of Intentional Enrollees Whose Behaviors Cannot Be Observed Given the Available Data***

354.    The customer behavior analysis reported in the preceding subsections—which identified five segments of customers whose "DNI" responses cannot be treated as evidence of unintentional enrollment—is conservative (*i.e.*, errs in favor of the FTC's position in this litigation).  This is because it is not possible, based on the available customer data, to identify and quantify additional segments of consumers who likely intentionally enrolled in Prime.  By not capturing these additional segments, my analysis understates the percentage of customers who should be deducted from the ███ observed "DNI" rate in the Cancellation Survey.  Next, I describe a few such groups of intentional enrollees that my analysis could not capture based on the type of data produced in this litigation.[552]

### C.4.6.1.  *Trial Hoppers*

355.    My customer behavior analysis does not take into account arguably one of the most strategic of all consumer segments: Amazon customers who intentionally sign up for multiple free trials by opening new *Amazon* accounts using different emails, addresses, and even payment information in order to circumvent Amazon's limitations on the number of free trial enrollments permitted per year.[553]  I understand that customers who engage in such "trial hopping" would *not* be discernable in Amazon's database, as opening a new Amazon account (under a new alias, contact information, and financial credentials) would result in the customer being assigned a different customer ID.  When these "trial hoppers" are then asked in the Cancellation Survey why they canceled Prime, they may interpret the overly broad "DNI" answer choice as referring to paid Prime (*i.e.*, they did not intend to sign up for Prime past the free trial), or they may use the "DNI" answer choice as a way to deflect attention from themselves and their circumvention of the limits on free trials.

---

[552] The segments I discuss below are by no means exhaustive but are only intended to highlight a few examples.

[553] As noted previously, customers are typically restricted from enrolling in another Prime free trial for a period of time (*e.g.*, 12 months) unless they did not use any Prime benefits during their first trial.

356.     The notion that some consumers will seek to take advantage of free trials by setting up separate alias accounts is not merely hypothetical.  In a 2021 industry survey conducted by Frontier, 1,000 participants were asked a series of questions regarding "trial hopping," which refers to "a method some people use to continue enjoying the benefits of a paid subscription service without having to pay for it. As soon as the trial period ends, they create a new email and sign up for a new free trial."[554]  In response to the question "How often do you create different email addresses to sign up for multiple free trials?", 26% of participants openly admitted that "[c]onstantly, I create new email accounts just for free trials," with another 32% admitting that they do so "[s]ometimes, if I don't have any email accounts to use."  When probed on why they trial hopped, participants provided a range of answers consistent with strategically seeking or using free trials.  Specifically, when asked "What option best describes why you sign up for free trials with different email addresses?", 36% of participants indicated "I was trying to save money"; another 24% answered "I wanted to use it for one specific reason and wasn't looking for long-term commitment"; and 6% selected "I just didn't want to pay."  In fact, participants admitted to "using different emails to sign up for free trials" for specifically retail services that include Amazon Prime (*see* Figure C10 below).

*(Continues on next page)*

---

[554] Quach (2021).  I added a red rectangle for emphasis.

**Figure C10: 2021 Frontier Survey ("What are Some Companies Where You Have Used Different Emails to Sign Up for Free Trials?")**



357.    Evidence of trial hopping can also be observed on social media, where some consumers openly admit to creating multiple accounts, including specifically to cycle through or extend Prime free trials.  As an example, in one thread, users discussed using different emails connected to Amazon Family as a way of prolonging their free Prime trial without being detected by Amazon.[555]  Commenters in this thread shared other methods, such as using different email aliases if someone has a school email address.[556]  News media have likewise acknowledged the different methods of getting free Prime trials through multiple accounts.  As one example, a 2020 article titled "All the Ways to Get Amazon Prime for Free" discusses similar strategies for specifically Amazon Prime:[557]

---

[555] https://www.reddit.com/r/UnethicalLifeProTips/comments/6u4ho1/ulpt_you_can_get_free_amazon_prime_forever_by/ ("Everybody knows about Amazon Prime's free 30 day trial and most Amazon shoppers have probably used theirs already. Many have tried to use this trial multiple times with different email addresses, however Amazon recognizes the similar billing info and this eventually will not work as they only allow so many free trial to each person. Although you may be able to squeeze a few months out of it by doing this, you will eventually have to pay. However **if you start your 30-Day free trial of Amazon Prime by going through Amazon Family you can keep getting free amazon prime, month after month with the SAME billing information (as long as you keep creating new emails each time)**." [Emphasis added]).

[556] *Ibid*. ("If you work for a university you can probably ask them to keep giving you .edu email aliases so you can continue that as long as your [*sic*] are employed there.").

[557] Wong, Kristin and Emily Long (2020), "All the Ways to Get Amazon Prime for Free," *Lifehacker*, https://lifehacker.com/all-the-ways-amazon-offers-prime-for-free-1789710361

This means that **you can take advantage of the free trial endlessly as long as you're OK churning through emails**. An Amazon customer service rep confirmed to us that a new email is all you need to qualify for the promotional period.  If you're a student, the free trial lasts for six months.  Since you have to have a .edu email to take advantage of a student membership, you probably can't keep this hack up for years.  **But some schools allow you to create alias accounts or simply assign you multiple user names—if that's the case, you can sign up for the free trial multiple times.**  [Emphases added]

358.    Given that repeatedly creating accounts to enroll in free trials has been documented in the marketplace, it is highly likely that Amazon's data (and my random sample) included such "trial hoppers," but that they could not be detected.  In this respect, my customer behavior analysis is conservative, as it would not distinguish and capture many of these intentional enrollees whose "DNI" responses cannot be treated as instances of alleged unintentional enrollment.

### C.4.6.2.  *Account Sharers*

359.    A second segment of intentional enrollees that my customer behavior analysis does not (and cannot) explicitly incorporate consists of "Account Sharers"—that is, Amazon customers who canceled Prime because they wanted to share another account or membership or because someone in their household had access to their account (*e.g.*, their login credentials).  Indeed, as supported by multiple verbatim responses from respondents to the Amazon Cancellation Survey,[558] some customers may choose to cancel their own Prime membership because a family member or friend (*e.g.*, partner, roommate, relative) already has a membership; others may cancel a Prime

---

[558] *E.g.*: CID #6931db6be7c6b7c5e55484024935b533 (Q.4 "Other": "I recently got msrried and my wife has a Prime account we can share."); CID #b06ad32d2b9573335916e9741313bcc0 (Q.8: "I found out my husband has an account"); CID #9dde90db825926a75e773fa735d2eb8e (Q.4 "Other": "My wife has a prime membership and I am going to add myself to her account"; Q.8: "I did not intend to join since my wife has an account and we will share"); CID #9000c23d3a1f3aaec3a29576df201feb (Q.8: "My wife is the primary prime account holder.  We do not need two accounts"); CID #0d6cab0f3ec0658025810fbd9c8d3e0d (Q.3 "Other": "I[']m already under a Prime Houslehold member account"; Q.8: "I was originally under a prime household account and then tried to switch accounts to attach another one to the household.  It didn[']t work and I had to revert to my original account but now it doesn[']t function the way it used to for Prime video where we can see both household members on the screen"); CID #12cff2d3b409f1567e1e6fbc98de0318 (Q.3 "Other": "Not authorized by me but my 15 yrs old"); CID #29b7fa30751d114daabf24bf479c9a3a (Q.3 "Other": "A visitor wanted to see Epix on TV and I wasn't aware they signed up for Prime to do that"); CID  #2f24fc9e25d6a03249385fbed7fa3383 (Q.4 "Other": "My 9 year old downloaded prime with out permission"); CID #9e8c54031a43952e93f4b212b8db6957 (Q.3 "Other": "roommate accidentally started my membership on shared roku device"; Q.8: "it was my roommates fault").  *See* Exhibit I.2 for more examples of respondents' verbatim responses.

membership that someone else—for example, their child—had enrolled in using their Amazon account.

360.    Account sharing—where multiple individuals use the same credentials to access a service or retailer site—is a pervasive and well-documented consumer behavior for subscription-related services.  According to a Country Financial industry study of American consumers, three quarters (74%) of the respondents reported that they share streaming, shopping, mobile phone plans, and accounts such as Amazon Prime, Netflix, Hulu, Uber, Spotify, and Airbnb with their family, friends, and even exes.[559]  In a 2014 Consumer Reports study, 46% of respondents indicated that they shared log-in credentials with people living outside of their homes, which could include kids living at college, other family friends, and friends.[560]  Another survey, conducted in 2020, found that 42% of U.S. adults admitted that "they have used someone else's account to access a subscription service," with 56% of subscribers having "lent their account information or passwords to someone else."[561]  Nearly two-thirds (62.8%) of participants in a Self Financial survey reported currently sharing subscriptions with three or four people,[562] and the vast majority (82.6%) admitted that they shared their logins or were recipients of shared logins for paid subscriptions with people outside of their household.[563]  Account sharing has become so prevalent that, in recent years, businesses have begun restricting the practice.  In 2023, at a time when it had 230 million subscribers worldwide,[564] Netflix estimated that more than 100 million households

---

[559] Dickler, Jessica (2018), "3 out of 4 Americans Share Netflix, Amazon and Uber Accounts," *CNBC*, https://www.cnbc.com/2018/10/04/3-out-of-4-americans-share-netflix-amazon-and-uber-accounts.html. Note that this same study was cited in an Amazon internal document on account sharing; AMZN_00094793, at 94804.

[560] Consumer Reports (2014), "Is it Okay to Share Log-Ins for Amazon Prime, HBO Go, Hulu Plus, or Netflix?", *Consumer Reports*, https://www.consumerreports.org/cro/magazine/2015/01/share-logins-streaming-services/index.htm

[561] Little, Kendall (2020), "Survey: 56 Percent of Americans Have Shared Subscription Account Information," *Bankrate*, https://www.bankrate.com/credit-cards/news/subscription-services-survey/?tpt=a.

[562] Self Financial (2024), "The Cost of Unused Subscriptions 2024," https://www.self.inc/info/cost-of-unused-paid-subscriptions/.

[563] *Ibid*.

[564] Stoll, Julia (2024), "Number of Netflix Paid Subscribers Worldwide from 1st Quarter 2013 to 2nd Quarter 2024," *Statista*, https://www.statista.com/statistics/250934/quarterly-number-of-netflix-streaming-subscribers-worldwide/

were sharing Netflix accounts,[565] to which the company responded by announcing that it would introduce fees for account sharing.[566]

361.    Account sharing has also been documented specifically for Amazon Prime.  In the 2014 Consumer Reports study, 29% of Prime subscribers indicated that they share their account with someone outside their household.[567]  The results are consistent with an internal Amazon document (attached to a 2019 email thread) noting that an "account sharing classification model" identified ▆ million Prime accounts in the U.S.—approximately ▆ of all Prime accounts at the time—as being shared.[568]  This same document further observed:[569]

> We recognize that account sharing is a well-established shopping behavior and we anticipate that the actual number of shared accounts, particularly Prime accounts where the benefits of sharing are more tangible, is substantially higher.  Our qualitative assessment of current Amazon customers in the U.S. living with at least one other Amazon user in their home indicated that ▆ of Prime customers share an account (▆ of non-Prime customers).

The authors noted that although they "do not have a good assessment of how many actual customers shared accounts represent,"[570] under certain assumptions about customer units and an estimated range of ▆ of active accounts that are shared by ▆ adults per a consumer unit, we estimate that we currently serve between ▆ of active customers in the U.S., suggesting that ▆% of active accounts are shared."[571]

---

[565] Netflix (2023), "An Update on Sharing," *Netflix*, https://about.netflix.com/en/news/an-update-on-sharing
[566] *Ibid*.  The policy change came after Netflix reported its first subscriber loss in 10 years, leading the company to look for ways to increase revenue, including adding a cheaper ad tier and cracking down on password sharing among households.  Sperling, Nicole (2023), "Netflix Starts to Crack Down on Password Sharing," *New York Times*, https://www.nytimes.com/2023/05/27/business/media/netflix-streaming-password.html.  I routinely use Netflix as a case study when teaching Marketing Strategy to MBAs and executive MBAs at Columbia University Business School.
[567] Consumer Reports (2014), "Is it Okay to Share Log-Ins for Amazon Prime, HBO Go, Hulu Plus, or Netflix?", *Consumer Reports*, https://www.consumerreports.org/cro/magazine/2015/01/share-logins-streaming-services/index.htm
[568] AMZN_00094793, at 94804.
[569] *Ibid*.  The "qualitative assessment" references a "Shared Account" September 2016 "online survey of ▆ customers in the U.S. (▆ Prime members) who self-reported as having placed a purchase in past 6 months and more than one user of Amazon in the household."
[570] *Ibid*.
[571] *Ibid*.

362.    More broadly, my conceptualization of "Account Sharers" includes not only individuals who share (or want to share) a single account login to access Prime but also customers who have created (or intend to create) an Amazon Household account—a feature that allows users to share Prime benefits and digital content with another adult, up to four teens, and/or up to four children.[572]  Creating a Household account is an action that signals not only intentional awareness of Prime (given that one of the primary purposes of a Household account is to share Prime benefits) but also likely intentional enrollment in Prime in the first place.

363.    The available customer behavior data produced by Amazon in this litigation does not directly indicate whether a given customer set up a Household account, but instead includes records of "household member type"[573] for customers who either used a given Prime benefit themselves or whose registered Household members used a Prime benefit.  That is, information related to a Household membership status is recorded only when a registered member of the Household *used* a Prime benefit, but is not recorded if benefits were *not* used.  Because the available data do not allow for an accurate and reliable identification of when a customer created a Household account, despite the fact that such a behavior likely signals intentional enrollment in Prime, I did not incorporate in my consumer behavior analysis a customer's Household member type.

364.    Respondents who canceled their own Prime membership because they shared, or planned to share, someone else's Prime membership could have selected "DNI" in the Cancellation Survey because, among other reasons, they did not intend to *continue* with their own Prime membership or because they did not intend to sign up for a Prime membership that they perceive as being duplicative or redundant with that of another individual.  Likewise,

---

[572] *See, e.g.*, https://www.amazon.com/myh/households; https://www.amazon.com/gp/help/customer/display.html?ref_=hp_left_v4_sib&nodeId=GYLAACCNR8 G3VVRM.
[573] The variable "household_member_type," which indicates "the household type of the customer who used the benefit" and appears only in the Benefits Usage data table, consists of either a "Non Household Prime Member" (which accounts for most customers) or one of five Household member types: "Primary Prime Member", "Dependent Teen Prime Member", "Single Prime Member", "Dependent Prime Member", and "Non Shareable Prime Member."  *See, e.g.*, Exhibit A to February 13, 2025 Amazon Letter (Appendix.Household tab).

considering the prevalence of account sharing, one cannot rule out the possibility that the customer who cancelled the Prime account and completed the Cancellation Survey was not the original enrollee, and thus would accurately respond that *they themselves* did not intend to sign up for Prime (because someone else had signed up).

365.    The "DNI" responses of such account-sharing customers, therefore, cannot be relied on for purposes of identifying or quantifying the alleged unintentional enrollment. However, because "Account Sharers" cannot be identified given the nature of the produced data, many of these customers are likely to go undetected in my customer behavior analysis. Consequently, my analysis is conservative and underestimates the proportion of intentional enrollees.

### C.4.6.3.  *Account Protectors*

366.    Another segment that my consumer behavior analysis conservatively excludes consists of "Account Protectors," who intentionally enrolled in Prime but later canceled their Prime membership due to fraud or abuse concerns—regarding either their Amazon account or more generally their financial accounts and payment methods.  For example, the verbatim responses of some Cancellation Survey respondents[574] indicate that these customers believed that unauthorized individuals gained access to or otherwise compromised their Prime account, their Amazon account, or their credit/debit card.  Under such circumstances, an Amazon customer may elect to cancel any subscriptions they have, including their Prime membership.  When asked in the Cancellation Survey why they canceled Prime, these customers may select "DNI" for a number of reasons, including the survey's leading questions, their own motivational biases, or because none of the other options fit their situation.

---

[574] *E.g.*: CID #35f97913fb46c53afe8e6325dcc6ffd5 (Q.3 "Other": "I got email and messages stating that I had $500 purchases for a iPhone going someplace in California and I did not make these purchases so I wish to cancel my subscription and erase my credit card"); CID #bb2a147f7785cf5977dde95326b61c25 (Q.3 "Other": 'Account hacked and utilized by another"; Q.8: "Great service and sorry to see go."); CID #f780bd24f2bbf35cb54bbe54af0ac132 (Q.3 "Other": "Someone hacked my account and started making purchases and bought prime all on my card .δ"); CID #95e16510e05b31216cf11b5fdd0b9a0e (Q.8: "my account was hacked"); CID #daf7cdbd5141458a632250a9dd035518 (Q.4 "Other": "account hacked"; Q.8: "I found two unauthorized purchases on Amazon 6/23/20 - My account was apparently hacked").

367.    Consumer concerns about fraud are increasingly common given increasing information security threats in the digital age, including identity theft and data breaches.[575]  In a 2024 survey commissioned by Forbes Advisor, 46% of respondents admitted to having their password stolen in the past year;[576] moreover, 30% believed their password was hacked due to repeatedly using the same password on multiple accounts, and 68% had to change their password across multiple accounts after their password was compromised.[577]

368.    A particularly malicious form of fraud is known as account takeover fraud, which occurs "when a fraudulent actor assumes control of the account of a legitimate customer in order to extract account information or withdraw money."[578]  According to a 2021 report by Aite Group:[579]

> [A]lmost half (47%) of U.S. consumers surveyed experienced identity theft; well over one-third (37%) experienced application fraud (i.e., the unauthorized use of one's identity to apply for an account), and over **one-third (38%) of consumers experienced account takeover over (i.e., unauthorized access to a consumer's existing account) over the past two years.**  [Emphasis added]

---

[575] For example, in 2017, hackers gained access to Equifax data, compromising sensitive information including Social Security numbers and driver's license numbers for 143 million American consumers. *See* Bernard, Tara Siegel et al. (2017), "Equifax Says Cyberattack May Have Affected 143 Million in the U.S.," *New York Times*, https://www.nytimes.com/2017/09/07/business/equifax-cyberattack.html.  *See also, e.g.*, Goel, Vindu and Nicole Perlroth (2016), "Yahoo Says 1 Billion User Accounts Were Hacked," *New York Times*, https://www.nytimes.com/2016/12/14/technology/yahoo-hack.html (noting that Yahoo disclosed that more than 1 billion accounts were hacked in 2013, compromising "sensitive user information, including names, telephone numbers, dates of birth, encrypted passwords, and unencrypted security questions that could be used to reset a password").

[576] Haan, Katherine and Rob Watts (2024), "America's Password Habits: 46% Report Having their Password Stolen Over the Last Year," *Forbes Advisor*, https://www.forbes.com/advisor/business/software/american-password-habits/.

[577] *Ibid*.

[578] Stripe (2023), "Account Takeover Fraud Explained: What It Is and How Businesses Can Prevent It," *Stripe*, https://stripe.com/en-sg/resources/more/account-takeover-fraud-explained ("Account takeover fraud, also known as account compromise, happens when a fraudulent actor assumes control of the account of a legitimate customer in order to extract account information or withdraw money. This can pertain to any type of online account, from bank accounts to accounts with food delivery businesses. Depending on the type of account that's compromised, the fraudulent actor can use the extracted information to impersonate the customer and open a new bank account, order a new credit card, redeem rewards points, or **place orders on shopping or restaurant delivery sites.** They can also use the information they obtain to access other accounts or sell the account information to nefarious parties." [Emphasis added]).

[579] PM Newswire (2021), "Identity Theft Impacts Nearly Half of U.S. Consumers, Aite Group Report Finds," *PM Newswire*, https://www.prnewswire.com/news-releases/identity-theft-impacts-nearly-half-of-us-consumers-aite-group-report-finds-301243214.html.

According to one industry source, hackers conduct account takeovers for multiple reasons, including extracting "information to impersonate the customer and open a new bank account, order[ing] a new credit card, redeem[ing] rewards points, or plac[ing] orders on shopping or restaurant delivery sites."[580]   Amazon internal documents indicate that the issue of account fraud and abuse (*e.g.*, to capitalize on free trials or redeem rewards) was a known issue.[581]

369.    In response to the rise of data breaches, fraud, and bad actors, consumers have become more vigilant in protecting themselves online.  In a 2023 Deloitte survey, participants were asked a series of questions about, among other things, proactive security measures they have taken.[582]  The results indicate that 20% of participants "stopped using an app because of security/privacy concerns" and 14% "deleted an account other than social media" to address such concerns.[583]  Thus, for the segment of consumers concerned about fraud, deleting one's account is one method of preventing or addressing account takeover.  Similarly, users can cancel or unsubscribe from an online service in order to limit the amount of potential harm if they suspect their accounts or financial information were compromised.

370.    Although a segment of "Account Protectors" is highly likely to exist among Prime member cancellers, these customers cannot be reliably discerned given the limitations of the available data.  Thus, my customer behavior analysis is conservative in excluding these intentional enrollees who selected "DNI" in the Amazon Cancellation Survey.

---

[580] Stripe (2023), "Account Takeover Fraud Explained: What It Is and How Businesses Can Prevent It," *Stripe*, https://stripe.com/en-sg/resources/more/account-takeover-fraud-explained.

[581] *See, e.g.*, AMZN-PRM-FTC-002636911 (June 2018 memo noting that "Prime continues to observe fraud stemming from credit card generators that are being used by actors to game access to Prime and Twitch loot. The card generators create a mix of fake and real (stolen) card numbers that pass Prime sign up checks."); AMZN_00096503, at 96513 (2019 document noting that "[o]ur reputation is increasingly exposed to fraud risk: Recent instances of credit card fraud in order to claim Twitch Loot have exposed the fact that our bad actor detection mechanisms are increasingly inadequate to protect customers and Amazon's reputation."); AMZN-PRM-FTC-002241364 (July 2018 thread noting that Amazon encountered credit card fraud in relation to billing issues with free trials via a Twitch Fortnite 2.0 promotion); AMZN_00031990 (June 2018 thread on "Direct Debit Fraud," discussing how "fraudsters" and scammers were generating credit cards to obtain Twitch Prime loot).

[582] Arbanas, Jana et al. (2023), " Balancing Act: Seeking Just the Right Amount of Digital for a Happy, Healthy Connected Life," *Deloitte*, https://www2.deloitte.com/us/en/insights/industry/telecommunications/connectivity-mobile-trends-survey.html#explore.

[583] *Ibid*.

C.4.6.4. *Other <u>Intentional</u> Enrollees that My Customer Behavior Analysis Conservatively Did Not Account For*

371.   Beyond the segments described above, multiple other types of customers were not defined in my customer behavior analysis despite the fact that they likely intentionally enrolled in Prime.  In the interest of brevity, I list below a few such examples, including (but not limited to):[584]

- customers who intentionally enrolled in Prime but canceled because they encountered a financial shock or other budget constraints, such as an income decrease or cost/expense increase (*e.g.*, "I lost my job can['t] add more expenses to my budget");[585]

- customers who intentionally enrolled in Prime but canceled because they did not anticipate using it in the future (*e.g.*, "I don't plan on shopping too much in the future.");[586]

- customers who intentionally enrolled in Prime but canceled because they realized afterward that they already have a Prime membership under another account (*e.g.*, "I opened another account with a different email so I took prime with my new email");[587]

---

[584] *See* Exhibit I.2 for more examples.

[585] CID #095cc025c2f434ae2b276f8b44ad71c4 (Q.3 "Other": "I lost my job can add more expenses to my budget"; Q.8: "no").  *See also, e.g.*: CID #169ecef171e8db89cd7d4880c4576ed3 (Q.5 "Other": "I just finished my money on my gift card and was not on planning to purchase more items"; Q.8: "It's a very good deal to have but i'm not make money right now so i wont be buying anymore things and see no reason to keep the prime membership"); CID #28b36b1297f97dce1c66c2019074465e (Q.8: "I keep forgetting to cancel subscriptions, and money keeps getting taken  out when I need the money"); CID #3fde3f86bb4e3aa7ee2d735d032468d2 (Q.8: "I cant afford it at this time. Due to the pandemic."); CID #42836502c66c1904605b1fdb304e1526 (Q.8: "No just not in my budget every month").

[586] CID #e5314aca4bf01f4f8118479433f2e492 (Q.8: "I don't plan on shopping too much in the future."). *See also, e.g.*: CID #0b6bae64214d5214ad49d965273c4341 (Q.8: "I wont be buying stuffs for awhile"); CID #992d4f65569477fd8d6eb7283c5799e6 (Q.5 "Other": "I buy directly from several sites. Prime cost to much for likely future use."); CID #c893014ff7b01d59589046ea57a76070 (Q.6 "Other": "I only used prime for shipping in US once for someone. Do not need it again"; Q.8: "I was charged today and cancelled immediately". Would hope to get my full refund if possible please. Thanks").

[587] CID #5a94ab3f891387535c61627c4d907c87 (Q.8: "I opened another account with a different email so I took prime with my new email").  *See also, e.g.*: CID #9e559c26ec6534cb1e8b4db142dce179 (Q.4 "Other": "I already have Prime on another account"; Q.8: "No"); CID #5bd1cf8c1c02ee9cbc6902360fa2d227 (Q.6 "Other": "I have a different account"); CID # 78d1bb023f1c0b621a89013863f408b6 (Q.4 "Other": "I didn't mean to sign up i am already a member

answers.[605]  Doing so yielded a "remaining DNI" rate of at most ███—that is, representing the percentage of respondents whose behaviors and survey responses are *potentially* consistent with the alleged unintentional enrollment—and does not change the conclusions from my customer behavior analysis.

**C.5.    My Customer Behavior Analysis Indicates that the Upper Bound for the Likelihood of a Prime Upsell Leading to a Potentially Unintentional Enrollment is Approximately ███**

381.    It is important to emphasize that the remaining, or "corrected," "DNI" rates of ███ (based on my customer behavior analysis) and the ███ (after conservatively adjusting my customer behavior analysis based on respondents' verbatim responses)[606] are exaggerated and cannot be taken as evidence of, or used to extrapolate, the true rate of alleged unintentional enrollment in this matter.  Even assuming for the sake of argument that the Cancellation Survey was appropriate for purposes of estimating what proportion of Prime-canceling respondents could have potentially been unintentionally enrolled (which it was *not*, for all of the reasons set forth in Sections A and B), taking observed "DNI" rates at face value would still dramatically overstate the likelihood that a given *Prime upsell* would result in an instance of unintentional enrollment.

382.    To more accurately provide a ***highly conservative upper bound*** on the likelihood that a Prime upsell leads to a potentially unintentional enrollment, I combined the results of my customer behavior analysis with Amazon upsell data specific to the sample of the ███ respondents I studied.[607]  Recall that in Subsection C.1, I discussed the fact that—even setting

---

[605] Specifically: (*i*) I counted any respondent who provided a verbatim response coded as "UE" (*i.e.*, consistent with potentially unintentional enrollment) as a potential unintentional enrollee in my customer behavior analysis (*i.e.*, even if this respondent was classified into one of the five segments in my customer behavior analysis to be "deducted" from the ███ "DNI" rate); and (*ii*) I counted any respondent who provided a verbatim response coded as "IE" (*i.e.*, inconsistent with potentially unintentional enrollment or consistent with intentional enrollment) as a potential *intentional* enrollee in my customer behavior analysis (*i.e.*, qualifying them to be deducted from the ███ "DNI" rate, regardless of how that respondent was classified in my customer behavior analysis).

[606] As explained in the preceding subsection, such an adjustment would be unnecessary and overly conservative, considering the fact that in this case the verbatim analysis is inherently limited and skewed against Amazon due to the nature of the questions asked and various survey-induced response biases.

[607] The unavailability of data pertaining to conversion probabilities at each step of the consumer journey (such as the probability that a customer who receives an upsell will ever enroll, or the probability that a customer who does enroll will remain a Prime member long-term), mean that the true probability of a

---

aside the fundamental non-representativeness of Prime cancelers (let alone of survey-takers) with respect to the population of Amazon customers exposed to an upsell—factoring in the ▮▮▮ conversion rate among customers presented with a survey link yields a ***less than*** ▮▮ (*i.e.,* ▮▮▮) probability that an upsell could generate a potentially unintentional enrollment.  That upsell analysis was conducted on a separate, random sample of ▮▮▮ Amazon customers and unrealistically assumed that 100% of survey-takers who selected "DNI" had in fact unintentionally enrolled.

383.    The results of my customer behavior analysis (*see* Subsection C.4), conducted on a random sample of over ▮▮▮ "DNI" respondents indicate that the ▮▮▮▮▮▮—of these respondents exhibited behaviors that are *inconsistent* with an interpretation of their "DNI" answer as representing true unintentional enrollment.  This means that even assuming that "DNI" respondents were representative of all Amazon customers (which they are *not*), the ▮▮▮ probability of an upsell converting to a potentially unintentional enrollment (as calculated in Subsection C.1) would need to be further multiplied by ▮▮ (*i.e.,* ▮▮▮▮▮)—yielding an ***approximately*** ▮▮▮ probability of an upsell converting to what could possibly be an unintentional enrollment.[608]

384.    Therefore, my analysis above indicates that, on average, approximately ▮▮▮▮ ▮▮▮ ***upsells*** could have resulted in a potentially unintentional enrollment.  In other words, it would take on average nearly ▮▮▮ upsells to yield a single potentially unintentional Prime signup.[609]  This is an extremely low rate (less than ▮▮▮), one that is inconsistent with the FTC's

___

given upsell leading to an unintentional enrollment cannot be fully quantified.  As I explained in Subsection C.1, the inclusion of such factors would further reduce the estimate of the probability of a given upsell leading to an unintentional enrollment.

[608] The ▮▮▮ rate obtained from the upsell analysis in Subsection C.1 (among the sample of ▮▮▮ customers) was calculated by multiplying a ▮▮▮ conversion rate (observed among customers who received a Cancellation Survey link) and ▮▮▮ (the rate of selecting "DNI" in the survey among customers who chose to take the Cancellation Survey).  Because the observed "DNI" rate among the sample of over ▮▮▮ customers in my customer behavior analysis was ▮▮▮, an alternative analysis is to apply the ▮▮▮ conversion rate to the product of ▮▮▮ and ▮▮▮ (*i.e.,* to ▮▮▮, the proportion of all Cancellation Survey respondents who could be potentially unintentional enrollees), yielding an equivalent rate of approximately ▮▮▮ (*i.e.,* ▮▮▮).

[609] In Exhibit H.2, I report an additional analysis of upsell data that uses the conversion rate of ▮▮▮, found specifically among the subset of the ▮▮▮ of "DNI" respondents in my customer behavior analysis

allegation that Amazon's Prime upsells deceived or misled customers into enrolling in Prime. Instead, this extremely low rate (*i.e.*, of upsells leading to a potentially unintentional enrollment) is consistent with the fundamental principle that, as corroborated by academic literature, survey authorities, and other sources (*see* Subsection A.7), any offer or communication, no matter how transparent and well-designed, will almost always lead to some non-zero, irreducible minimum rate of mistakes or error (here, unintended signups).[610]

385.    It is important to reiterate that my analysis of customer upsell data combined with my customer behavior analysis—which yields an approximately ███ likelihood of an upsell resulting in an unintentional enrollment—is ***highly conservative and overstated***. Notably, for the reasons explained previously in Subsection C.1 and as summarized in Figure C11 below, this analysis does *not* use a representative sample of Amazon customers who received upsell offers, because my (and any) sample of the Cancellation Survey respondent can only include customers who have: (*i*) enrolled in Prime, (*ii*) cancelled Prime, *and* (*iii*) elected to take the survey—a survey whose methodological issues, as discussed in Section A, render it fundamentally invalid

---

whose behaviors did not refute an "unintentional enrollment" interpretation of their "DNI" selection. Applying this ███ conversion rate to the sample of over ███ "DNI" respondents in my customer behavior analysis yields an even lower—███—probability of an upsell converting to a potentially unintentional enrollment. This ███ probability means that it would require about ███ upsells, on average, to yield a single potentially unintentional Prime signup. *See* Exhibit H.1 for the list of CIDs and documentation/code corresponding to this additional analysis. As I note in Exhibit H.2, I also conducted a robustness check in which I analyzed a *separate* random sample of ███ Cancellation Survey respondents who did *not* select the "DNI" answer choice (the CIDs of whom are attached in Exhibit H.1). The conversion rate among these non-"DNI" respondents was ███, similar to (and, if anything, slightly higher than) the overall ███ rate observed in the sample of "DNI" respondents used in my customer behavior analysis (*see* Exhibit H.2). This indicates that "DNI" respondents were *not* systematically more likely to "convert" to Prime (via an upsell) than their "non-DNI" counterparts. Such a pattern is inconsistent with an "unintentional enrollment" interpretation of the "DNI" answer choice in the Cancellation Survey (*i.e.*, the notion that "DNI" respondents represent inexperienced customers who were easily "tricked" by the upsells they encountered), the "DNI" respondents were just as likely to decline Prime upsells as the non-"DNI" respondents.

[610] In Subsection A.7.3, I discussed the fact that there typically exists an irreducible minimum percentage of consumers who are "confused" by even *non*-deceptive communications and stimuli. Some baseline level of accidental or mistaken sign-ups are to be expected despite, and irrespective of, any measures implemented by the service provider to combat such mistakes. Extrapolating from selections of "DNI" answer choices in the Cancellation Survey into estimates of alleged unintentional enrollment attributable to challenged Amazon practices requires accounting for the rate of unintentional enrollment that would occur regardless of those challenged practices.

and unreliable for purposes of measuring or extrapolating any rate of alleged unintentional enrollment. The limitations of the available data skew the sample against Amazon and in favor of the FTC, as it excludes from the relevant base, or "denominator," considerably many (*i.e.*, millions of) customers who either could not have, or were highly unlikely to have, been "deceived" by the accused Prime upsells and enrollment flows.

**Figure C11: The Lack of Representativeness of Cancellation Survey Respondents in the Context of the Customer Journey**



386.    Overall, my evaluation of the Amazon Cancellation Survey's methodology (Section A) and data (Section B), as well as my analyses of Amazon's customer behavior data (Section C), demonstrate that the survey does not and cannot provide any valid or reliable evidence that consumers were purportedly misled into unintentionally enrolling in Prime.

paid members with tenures between 0 and 15 years)[656] does not support a conclusion that the former group must have unintentionally enrolled in Prime.  As discussed earlier, at least some proportion of the ███ figure would stem from respondents who answered "unsure" or that they were "lapsed" Prime members.  Among the remaining fraction of shorter-tenure Prime customers who incorrectly identified as "never" Prime, there is no way to distinguish whether such misreporting was due to unintentional enrollment, as opposed to a variety of unrelated reasons—including guessing, inattention, and memory limitations or errors.  Indeed, to the extent that the group of paid Prime members with two months or fewer tenure includes a subset of members who had recently converted from a free trial, these customers could have believed they were still in their trial period and hence did not identify as a Prime member.

407.    ***Overall***, like the Amazon Cancellation Survey, the Amazon Search Sentiment Survey is fundamentally invalid and unreliable for purposes of quantifying or estimating a true rate of alleged unintentional enrollment in Prime.  Nor does the attempt by *some* Amazon employees to make inferences from this data about potentially unintentional enrollment justify such extrapolations.

408.    I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Expert Report* in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This *Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.

February 24, 2025
_____
Date

_____
Dr. Ran Kivetz, Ph.D.

---

[656] *See* AMZN_00080322, at 80329.

# EXHIBIT 62

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                       AT SEATTLE

4    FEDERAL TRADE COMMISSION,

5              Plaintiff,

6    vs.                        No. 2:23-cv-0932-JHC

7    AMAZON.COM, et al.

8              Defendants.

9    _____/

10

11      The Deposition of RONALD T. WILCOX, Ph.D.

12              9:07 a.m. - 6:17 p.m.

13                 May 9, 2025

14

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12740843



```
 1                    P R O C E E D I N G S

 2                          - - -

 3   Whereupon,

 4                    RONALD T. WILCOX, Ph.D.,

 5   called as a witness, having been first duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth, was examined and testified as follows:

 8                  EXAMINATION BY MR. COHEN

 9       Q     Good morning, Professor Wilcox.  My name is

10   Jonathan Cohen.  I represent the government in this

11   litigation.  With me today is Johana.

12                  MR. COHEN:  Introduce yourself.

13                  MS. MEGIA-PORTILLO:  Sure.  My name Johana

14   Mejia-Portillo.

15                  MR. COHEN:  Then we have Olivia Jerjian, my

16   co-counsel, another co-counsel, Rachel Sifiuentes, then

17   Jewels Aboti (ph) with our Bureau of Economics.

18                  On your side?

19                  MR. REITER:  Joseph Reiter and Stephanie

20   Colorado for defendants and the witness and we have --

21                  THE WITNESS:  Ron Wilcox.

22                  MR. REITER:  -- Professor Wilcox.

23                  MR. COHEN:  And anyone listening on the

24   phone or by some other remote technology?

25                  MR. REITER:  Not currently.
```



```
 1   any opinion there's a flaw in the cognitive walkthrough
 2   that Professor Chetty conducted, correct?
 3        A     I don't think I specifically reference the
 4   cognitive walkthrough.  I certainly reference the speak
 5   aloud study.
 6        Q     The think aloud?
 7        A     Yes.
 8        Q     Did you have sort of general references to
 9   the cognitive walkthrough?
10        A     Nothing -- nothing that's coming to mind.
11        Q     You're not giving any opinion there's any
12   flaw in any heuristic analysis that Professor Chetty
13   may have conducted, correct?
14        A     I don't believe -- heuristic is a very
15   broad term.  I don't believe I comment specifically on
16   her heuristic analysis.
17        Q     Was there general commentary on heuristic
18   analysis?
19        A     Not that I remember.
20        Q     You're not giving any opinion there's any
21   flaw in any aspect of the cancellation analysis
22   Professor Mahoney presented other than flaws in his
23   difference and difference analysis?
24        A     Yes.  There were multiple flaws in his
25   difference and difference analysis and that is the
```



RONALD T. WILCOX, PH.D.                                  May 09, 2025
FTC vs AMAZON.COM, et al.                                          66

1  focus of my testimony.

2       Q     But you're not giving any opinions about

3  any other things that he may have said related to

4  cancellation?

5       A     I don't believe so.

6       Q     You're not giving any opinion related in

7  any way to the Prime mobile cancellation experience,

8  are you?

9       A     No.  I didn't do any analysis of the mobile

10  cancellation experience.

11      Q     You're not offering any empirical evidence

12  of Professor Mahoney's work that purports to show that

13  his results are biased, correct?

14      A     I didn't do any empirical work relative to

15  the data that he used, that is correct.

16      Q     Similarly you're not offering any empirical

17  analysis of Professor Mahoney's work that purports to

18  show the extent of any bias in his work?

19      A     No. I comment on the sources of bias, but I

20  don't do empirical work related to that.

21      Q     And so you don't do empirical work that

22  purports to show the extent of any bias?

23      A     I think that's a fair comment.

24      Q     You're not giving any opinion that any

25  specific portion of Amazon Prime members would have



1   known the subscription would convert from a free trial

2   to a paid subscription regardless of whether that term

3   was adequately disclosed?

4        A    I certainly develop generally metrics

5   around people's familiarity with trial memberships that

6   convert to paid memberships in one of -- my second

7   survey.  I don't specifically relate that to the

8   specifics of the Amazon website in the way that you

9   just described.

10       Q    So I want to make sure that the answer to

11  my question is yes with the proposition you're correct.

12  I think that's what you told me, but I want to be sure.

13  You're not giving any opinion that any specific

14  proportion or portion of Amazon Prime members would

15  have known the subscription would convert from a free

16  trial to a paid subscription regardless of whether that

17  term was adequately disclosed, correct?

18       A    I think that's a fair characterization.  I

19  do develop general evidence that individuals are

20  familiar with this situation.

21       Q    You're not giving an opinion that any

22  specific portion of subscribers to online subscription

23  services with a free to paid conversion feature know

24  that their subscriptions will convert from a free to a

25  paid subscription regardless of whether that term is



RONALD T. WILCOX, PH.D.                          May 09, 2025
FTC vs AMAZON.COM, et al.                                  252

 1        Q      Let me direct you to your -- I think it's

 2  your opening report and that is -- and specifically

 3  pages 12 and 13.  And I'll direct you to show you the

 4  specific attention check questions.

 5        A      Um-hmm.

 6        Q      So on page 12, S70 under E has an attention

 7  check and then S80 has an attention check.  That's a I

 8  think decoy subscription like eBay Premier.  S90 is an

 9  attention check.  I think that's typing survey as a

10  response, but I know that from the backup information

11  you provided.  And on the following page 24 would be

12  the fourth one.  I think it's typing agree.

13             I am going to ask you to accept my either

14  representation or my assumption that I have the numbers

15  extracted correctly from the --

16        A      Okay.

17        Q      -- from the underlying data you provided me

18  and that would be 1,176 subjects reached the first

19  attention check.  Twenty-three failed the first one.

20  Twenty-three failed the second.  Four hundred

21  forty-four failed the third and 76 failed the fourth

22  leaving 610 or about half the sample.  Why did you do

23  four attention checks?

24        A      To -- and I always do multiple attention

25  checks.  So the best way to answer that is I want to



RONALD T. WILCOX, PH.D.                                    May 09, 2025
FTC vs AMAZON.COM, et al.                                          253

1  make sure that people are paying attention to the task

2  at hand.  And I understand that's a little bit circular

3  logic given that they're called attention check

4  questions, but I always do it.  I always do multiple

5  ones.  I actually do pretty hard ones and that's the

6  best practice.

7      Q    In what respects were the ones -- and we

8  talked about what they were in your report.  I don't

9  disagree with you, but why were these a little harder

10 than sort of the bare minimum attention check?

11     A    I always do harder ones because I want to

12 get a sample that I'm confident is paying attention to

13 the task at hand.  I mean, some of them aren't

14 particularly hard.  I think, you know, the -- that 70

15 game board bin and urban outpost.  There are particular

16 reasons you do different types of attention checks.

17 That one is because some people might come into the

18 survey thinking, well, I'm only going to continue in

19 the survey if I say that I'm going to do -- did this or

20 shop at this place and they'll pick things that don't

21 even exist, but this is just standard for me.

22     Q    Standard for you, but it is true, is it

23 not, that multiple attention checks are not a generally

24 accepted practice when you are studying a trait like

25 cancellation proficiency that could be correlated with



1  cognitive ability, correct?

2      A      I don't know what you're referring to.  I

3  don't think any of these attention checks are related

4  to someone's not in any obvious way cognitive ability.

5  I mean, if you say you shop at board game bin and it

6  doesn't exist, you're just catching people that are

7  trying to game the system or urban outpost.

8      Q      Well, typing the wrong word as a response

9  might just be somebody who's not paying too close

10 attention, right?

11     A      Sure.

12     Q      Or who checks the box for something that

13 doesn't exist, right, just not paying that much

14 attention?

15     A      Well, to the extent that they're not paying

16 attention, I think that including them in the survey

17 would produce, you know, unreliable results, so --

18     Q      Do you know one way or the other whether

19 someone's attention level is correlated to their

20 susceptibility to manipulative designs online?

21     A      I've never studied that.

22            MR. COHEN:  Let's mark as 7 -- this is

23 called -- you may have seen this before, maybe not --

24 separating the shirkers from the workers, making sure

25 respondents pay attention on self-administered surveys



RONALD T. WILCOX, PH.D.                                     May 09, 2025
FTC vs AMAZON.COM, et al.                                        300

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 9th day of May

14   2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21   _____

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25

# EXHIBIT 63

## EXPERT REPORT OF MARSHINI CHETTY, Ph.D.

I am an Associate Professor at the University of Chicago's Department of Computer Science, with a Ph.D. in computer science  I have twenty years' experience in human-computer interaction ("HCI") and my research and peer-reviewed publications address, among other things, the usability of web interfaces and the presence of manipulative designs (sometimes known as "dark patterns") on websites.

The Federal Trade Commission ("FTC") asked me to render an expert opinion on:
(1) whether the design of how Amazon enrolls consumers in Prime during online checkout confuses consumers;
(2) whether the design of how Amazon enrolls consumers in Prime during online checkout conveys information on Prime's material terms (cost, end of free trial period, and renewal terms) that consumers can comprehend; and
(3) whether the design of the Prime Iliad and Iliad 2.0 cancellation processes confuses consumers.

To provide an opinion, I performed two evaluations that are widely accepted and used in the HCI field. First, I conducted a cognitive walkthrough (which is an inspection method) to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer by studying the design of each interface using foundational principles of good design in HCI.  These principles include ensuring that (1) consumers can discover and know all of their options to select the option that best meets their goal, (2)  consumers know what the consequences of their actions on an interface are, (3) consumers have a sense of control when using the interface and can undo actions with ease, and (4) the design of each interface is consistent so consumers can easily navigate them.  For my cognitive walkthrough, I also applied Colin M. Gray's Dark Pattern Ontology, which contains the most comprehensive, frequently used, and recent taxonomies of dark patterns. Second, I conducted a think-aloud study, which is an empirical, qualitative user study, to understand consumers' experience navigating Prime enrollment within the checkout process and Prime cancellation.

Based on my cognitive walkthrough of the design of the Prime enrollment points ("Prime detours") in the online checkout process and of the Iliad and Iliad 2.0 cancellation processes; the user study I conducted to test these designs; and my personal experience as a HCI researcher and professor, the designs of Prime enrollment within the checkout process are confusing to some consumers, who, as a result of dark patterns, unintentionally select an option to enroll in Prime when purchasing a product online.  Similarly, the designs of Prime cancellation are confusing to some consumers, who do not successfully cancel online as a result of dark patterns.

# Table of Contents

I. Credentials and Qualifications ............................................................................................. 4

   a)   Research ............................................................................................................................ 4

   b)   Publications ...................................................................................................................... 6

   c)   Awards and Honors .......................................................................................................... 8

II. Required Statements and Disclosures ................................................................................. 8

III. Scope and Summary of the Opinion and Materials Considered ........................................ 9

IV. Human Computer Interaction and Dark Patterns ............................................................. 11

   a)   Human Computer Interaction ("HCI") ........................................................................ 11

   b)   Foundational Principles of Good Design in HCI ......................................................... 12

   c)   Dark Patterns ................................................................................................................. 14

   d)   The Manipulative Effects of Dark Patterns .................................................................. 15

   e)   Gray's Dark Pattern Ontology ...................................................................................... 17

V. Methodologies Used ......................................................................................................... 23

   a)   Types of User Studies In HCI ...................................................................................... 23

   b)   Reviewing Data Collected via User Studies in HCI .................................................... 24

      i.   Inspection Method: Cognitive Walkthrough ....................................................... 25

      ii.   Empirical User Study Method: Think Aloud Study ............................................. 26

   c)   Interpreting Qualitative Study Results .......................................................................... 27

   d)   Selection of Methods for User Studies in this Report ................................................... 28

VI. My Cognitive Walkthrough of the Online Checkout Process Shows that the Design of the Prime Detours Can Confuse Consumers into Unintentionally Enrolling in Prime and Does Not Convey Prime's Material Terms Well. ............................................................................................. 29

   a)   Overview and Cognitive Walkthrough of the SOSP on Desktop and Mobile Devices ............... 33

   b)   Overview and Cognitive Walkthrough of the UPDP on Desktop and Mobile Devices ............... 36

   c)   Overview and Cognitive Walkthrough of the Ship Option Select Page Prime Decision Page (SOSP PDP) ................................................................................................................................ 43

   d)   Overview and Cognitive Walkthrough of the Single Page Checkout (SPC) ................ 44

   e)   Overview and Cognitive Walkthrough of the True Single Page Checkout (TSPC) ..................... 50

   f)   The Prime Enrollment Detours in the Online Checkout Process on Desktop and Mobile Devices Confuse Consumers and Do Not Clearly Convey Prime's Material Terms. ................................ 55

VII. The Cognitive Walkthrough of the Iliad and Iliad 2.0 Shows that the Online Cancellation Process Is Difficult to Find, Has Too Many Steps, and Uses Manipulative Designs to Prevent Consumers from Cancelling Prime. ............................................................................................................................ 60

   a)   Overview and Cognitive Walkthrough of the Iliad Cancellation ................................. 60

      i.   Finding Iliad ....................................................................................................... 62

      ii.   Iliad's Marketing Page ........................................................................................ 64

      iii.   Iliad's Offers Page .............................................................................................. 68

2

    iv.    Iliad's Cancellation Page ...................................................................................71

  b)    Overview and Cognitive Walkthrough of the Iliad 2.0 Cancellation................................74

    i.    Finding Iliad 2.0 ...........................................................................................75

    ii.    Iliad 2.0's Marketing Page ...........................................................................75

    iii.    Iliad 2.0's Cancellation Page ........................................................................78

VIII. Think Aloud User Study Of Amazon Prime Enrollment and Cancellation Screens.........................81

  a)    Methods for the Think Aloud Study ...............................................................................82

  b)    "CandyForever" Website Design and Implementation...................................................82

  c)    Considerations to Achieve Study Realism and Mitigate Limitations .............................84

  d)    Study Protocol.................................................................................................................86

  e)    Study Recruiting .............................................................................................................90

  f)    Participant Demographics ...............................................................................................91

  g)    Pilot Study......................................................................................................................92

  h)    Data Analysis .................................................................................................................93

  i)    Pilot Study Results .........................................................................................................95

  j)    User Study Results .........................................................................................................95

  k)    Notes On Interpreting Study Findings .........................................................................103

IX. Conclusion .........................................................................................................................104

## I. Credentials and Qualifications

1.  I am an Associate Professor at the University of Chicago's Department of Computer Science, where I have served on the faculty since 2019. I am an expert in human-computer interaction (also known as "HCI"), usable privacy and security, and ubiquitous computing. I am the director of the Amyoli Internet Research Laboratory (known as the "AIR Lab"), which is part of the Department of Computer Science.

2.  Prior to my employment at the University of Chicago, I was a Research Scholar at Princeton University's Department of Computer Science, where I served on the faculty from 2016 to 2019 and founded and directed the Princeton Human Computer Interaction Laboratory.

3.  I was also an Assistant Professor at the University of Maryland, College Park, where I served on the faculty of the College of Information Studies from 2013 to 2016. During my time at the University of Maryland, I directed the NetCHI HCI research laboratory.

4.  I received my Ph.D. in Human-Centered Computing from Georgia Institute of Technology in 2011.  I also received my Master's of Science degree in Computer Science, awarded with distinction, from the University of Cape Town in South Africa in 2005. I received a Bachelor's of Science (Honors) in Computer Science, awarded first class honors, in 2002 and a Bachelor's of Science in Computer Science with distinction—as well as subject distinctions in my two majors, Computer Science and Psychology— in 2001 from the University of Cape Town in South Africa.

### a)  Research

5.  I am a leading expert in the area of dark patterns and have conducted significant research in this field.  As explained below in Sections IV(c)-(d), dark patterns are misleading user interfaces designed to steer users to make a decision misaligned with their intention and that they may not have made if they had the information they needed to make that decision [8,29,50–52].

6.  I have dedicated my career to studying how people have used the Internet over time, from when people first had just one or two computers connected together and to the Internet to the present day. Among other things, I have studied misleading interfaces in contexts such as online shopping, streaming services (like Netflix) and social media.

7.  Specifically, I conduct studies of the ways people use different kinds of technologies (such as apps, websites, devices, etc.) and the problems or challenges they face online.  After identifying problematic interfaces in these technologies—such as those with dark patterns—I create and test new interfaces or systems to provide solutions. Often the studies I conduct result

4

in publicly available datasets for other researchers [51,53,73]. I use these studies to inform and test the design of both proof-of-concept prototypes and fully functional systems. The goal is to make research contributions regarding how to improve people's Internet use, and particularly to ensure they can use the Internet in a way that meets their expectations and which preserves privacy and security [14,89].

8.  I have conducted many research studies on dark patterns.  I have studied disguised advertisements on social media platforms, when influencers (*i.e.,* those who have the power to affect the purchasing decisions of others through social media) do not tell users that they are being paid to sell products online, creating a tool to detect and flag these disguised advertisements on YouTube [53,89]. I have also studied dark patterns when people are trying to delete their social media accounts [74] and in streaming video platforms such as Netflix [76]. I have also done a study on how websites comply with California Consumer Privacy Act (CCPA) regulations for privacy and their use of dark patterns [91].

9.  I conducted one of the first large scale studies to measure how common dark patterns are in 11,000 of the most popular shopping websites globally [51]. Regulators have cited this study to refine their consumer protection regulations regarding manipulative and deceptive interface designs that hamper consumers' decision-making processes and providing informed consent [8,31].

10.  As the director of AIR Lab, I supervise, mentor, and fund PhD, master's, and undergraduate students to conduct research on a variety of projects using different techniques. AIR Lab projects have included studies on content moderation on social media, dark patterns on shopping websites, and the use of voice-assistant based wellness interventions for marginalized older adults. I have advised approximately ninety-five Ph.D., master's, and undergraduate students at the University of Chicago and other institutions, including the University of Maryland, College Park, Georgia Institute of Technology, and Princeton University. AIR Lab students have gone on to undergraduate and graduate studies at top institutions in computer science, such as the University of Washington, Princeton University, and Columbia University. Many now work at top technology companies, such as Uber, Microsoft, and Meta, and in government positions such as positions with the Competitions and Markets Authority in the United Kingdom (an entity which strengthens business competition and prevents anti-competitive practices).

11.  My research has helped advance our understanding about the way people think about how the Internet works which is helpful for creating systems that people can use effectively. These contributions include providing insights into conceptual models of the Internet; in other words, my research enables me to explain how  people think the Internet works [45]. My work has also

documented how people use the Internet in their day-to-day lives from which I developed new ideas for designing technologies and user interfaces on the Internet. For instance, I conducted empirical studies demonstrating people often do not realize that influencers on social media may be paid to include links to websites for the products on their social media feeds in a process called affiliate marketing [53]. I then created and evaluated a publicly available tool for Internet browsers (Chrome and Firefox) called AdIntuition that shows users when YouTubers have affiliate links in their YouTube video descriptions so that they know when they are watching product endorsements [89]. Finally, my work has real world impacts on global companies, the research community, Internet policy, and public awareness. For example, I have discussed my research results directly with organizations including Tor [98] in the past and worked with Tor to change the wording and text in their materials to help people better understand how to use Tor's browser. (Tor is a browser that helps users circumvent censorship and be anonymous online). In the research community, my work spurred the creation of an annual interdisciplinary symposium to discuss privacy and security issues with researchers from many fields (e.g., computer science, policy, and information studies) around the world. This symposium, called the Applications of Contextual Integrity, is now in its seventh year.

12. In my research, I use established qualitative methods generally accepted in my field such as interviews, surveys, or lab-based experiments to understand how people think; their "mental models" of privacy, security, content on the Internet; and Internet costs. In my research, I also utilize quantitative methods such as network measurements or web scraping to gather empirical evidence about how people use the Internet [11,16,32,44,66–68,70]. I work with everyday people to test my prototypes to ensure that the interventions I design work in the real world. In many cases, this means I partner with outside entities for my research projects, including elementary schools, medical clinics, national laboratories, and private companies to gain deeper insights into user needs and broaden the impact and reach of the research I conduct [94].

**b) Publications**

13. I have authored and co-authored at least 51 publications in peer-reviewed publications in computer science in HCI and usable privacy and security at the highest ranked publication venues in these areas. I regularly publish in top-tier Association for Computing Machinery (ACM) sponsored HCI and usable security conferences and journals including the conference on Human Factors in Computing (CHI), Computer Supported Collaborative Work (CSCW), Transactions on Human Computer Interaction (TOCHI), the Symposium on Usable Privacy and Security (SOUPS) and top tier security conferences including USENIX Security and IEEE Security and Privacy.

6

24. AMZN-PRM-FTC-000345892 - AMZN-PRM-FTC-000345893;

25. AMZN_00046108;

26. AMZN_00046374;

27. AMZN_00046683;

28. AMZN_00037202;

29. AMZN-PRM-FTC-00034;

30. AMZN_00046276;

31. AMZN_00003614;

32. AMZN_00046351;

33. AMZN_00046640;

34. AMZN-PRM-FTC-000345897 - AMZN-PRM-FTC-00034;

35. AMZN_00046881;

36. AMZN_00037188;

37. AMZN-PRM-FTC-000345894 - AMZN-PRM-FTC-00034;

38. AMZN_00000001;

39. AMZN_00040704;

40. AMZN_00156681;

41. AMZN_00080154; and

42. Amazon's Supplemental Responses and Objections, pages 1 through 30.

## IV. Human Computer Interaction and Dark Patterns

### a) Human Computer Interaction ("HCI")

30. Human-computer interaction is a well-established multidisciplinary field spanning computer science, psychology, sociology, and design that focuses on the interaction between people and computer technologies[23,27,46,78,81]. The purpose of HCI is, in part, to determine whether the design of a computing technology, such as a website or a smartphone app, allows people to achieve their goals on that interface [78].

31. In the HCI field, the people using a computing technology are known as

"users." [10,23,78]. A central concern of HCI is to design computing technologies (for example, smart watches, computers, e-readers, cellphones, and sensors) that are, in fact, usable. [10,23,78] To design usable computing technologies, designers must understand who the users are—in other words, who are the people who will use the system?— as well as where, when, and how users will interact with the system. [10,23,78] Designers therefore must understand the context in which users will be using the system. For instance, knowing whether users will be engaging in other activities while using the system is important. Designers also typically study what feelings users feel when using a system, such as pleasure, satisfaction, frustration, or confusion. [10,23,78] Equipped with all of this information, designers can create a system with an enhanced user experience.

32. User experience design ("UX design") is a term that originated after HCI was developed as a field. [27]. It focuses specifically on making a user's experience with a product easy and intuitive [42,61]. Rather than focusing solely on the interaction between a human and a technology, user experience is about understanding and designing the entire experience a user has with a system, from how it integrates into their lives to how to design the system's interface. The term was first popularized in the early nineties and has been used in industry to refer to designers and researchers focused on product design [42,61]. This could entail usability goals, such as making a system easy to learn; easy to remember how to use and; effective, efficient, and safe to use.  It could also entail ensuring that the system has good utility and user experience goals, such as eliciting a range of desired feelings and emotions (i.e., being satisfying, enjoyable, helpful) and limiting undesired feelings (i.e., being frustrating, annoying, or unpleasant.) [78]

### b) Foundational Principles of Good Design in HCI

33. Experts in the field of HCI recognize foundational good design principles from a user's perspective.  These principles are taught in computer science classes and are detailed in textbooks on the subject such as the widely used Sharp et al.'s *Interaction Design: Beyond Human-Computer Interaction* and Dix et al's *Human Computer Interaction* textbooks and HCI introductory classes at Georgia Tech, Stanford, Carnegie Mellon University, and the University of Washington [23,78]. Examples include Don Norman's principles of good design and Jakob Nielsen's ten usability heuristics for user interface design [57,60,80,81,101].  These foundational principles include the following four elements:

(i)    The interface design needs to make it possible for users to discover and know all of their options so they can select the one that meets their goals [57,60,80,81,101]. Interfaces should not contain irrelevant information so as to not diminish the visibility of relevant information [57,60,80,81,101].

(ii)   The interface design needs to provide feedback to the user by clearly communicating the consequence(s) of the action(s) they took on an interface [57,60,80,81,101].

(iii)  The interface design needs to provide the user with a sense of control over their actions on the interface  [57,60,80,81,101], including allowing a user to undo an action or back out of a process without going through another extended process  [57,60,80,81,101].

(iv)   The design of interfaces that are part of the same system should be consistent with each other, i.e., positioning, colors, icons, etc., so the user can easily navigate the interfaces and does not need to process large amounts of new information  [57,60,80,81,101].

34.  Manipulative design choices often violate foundational  HCI principles of good user experience and interface design [22,38,55,70, 81] because they can interfere with a user's understanding of the interface and the full universe of their options, their knowledge of the consequences of their actions on the interface, and their sense of control of the interface  [57,60,80,81,101].

35.  In *The Design of Everyday Things*, Don Norman—an established leader in HCI who coined the term "user experience"—developed  principles of good design based on the "human action cycle," which is a psychological model describing the steps that people take when interacting with computer systems [60]. Specifically, the human action cycle describes "stages of action" in the process during which users form goals when interacting with computer systems, develop a series of actions to achieve that goal on the system, and then execute those actions [60].  Understanding the human action cycle is key for interface designers [60]. Norman further breaks down the "stages of action" into questions researchers should ask from the perspective of a user, such as "what do I want to accomplish?", "what are the alternative action sequences?", "what action can I do now?", "how do I do it?", "what happened?", "what does it mean?", and "have I accomplished my goal?". These questions are based on good design principles, such as making it easy for a user to determine what actions are possible in a system. When there is misalignment between a user's mental model, their goals, and the system design, a user can do something they did not intend to or misunderstand how to use a system [60].



Figure 1: Norman's Seven Stages of Action

### c)  Dark Patterns

36.  First coined in 2010, the term "dark patterns" describes tricks used in web-based apps, websites, and social media to make users do something they did not intend to do, such as purchasing a product or service, allowing access to their private data, signing up for a subscription, or keeping an online account open [7].  Specifically, "dark patterns" describe a set of interface choices and designs that affect a user's decisions through the design of the "choice architecture" (i.e. how and what choices and information is presented to a user) on a service provider (i.e., an app, website, or social media site) at a particular point in time [7,29,49, 51, 52]. In other words, dark patterns are user interface design choices that coerce, deceive, or manipulate users into making a decision that, if fully informed or otherwise capable of selecting an alternative, they would not have made.  In fact, "dark patterns" are commonly referred to as "deceptive patterns," "deceptive designs," or "manipulative designs." [7,29,50-52].  "Dark pattern" design choices often violate the very basic HCI principles of good user experience and interface design [23, 46, 60, 78, 81].

37.  Typically, the decisions that users select as a result of dark patterns' presence benefit the service provider operating the app, website, or social media site [29,31,49,51,52]. For instance, a user may select an option to allow the collection of their user data or enroll in a subscription program even though they would not have done so had they been fully informed of the consequences of their action [29,31,49,51,52].

38.  User studies of people's reactions to dark patterns show that dark patterns

14

steer users into making decisions that are inconsistent with their intentions [21,49]. Dark patterns are so pervasive that, according to some research, they even manipulate users who are *aware* of the dark patterns [5]. Those users who are tricked by dark patterns despite being aware of them also suffer the negative effects of the dark patterns, as they are also prone to unintentionally selecting options that cause them to spend money, give up their online privacy, start a subscription, or keep an account open [5,31]. A study I helped conduct also shows that even when a user has an explicit goal to protect their privacy, dark patterns can still be effective at getting them to choose less privacy-preserving choices when signing up for a video-streaming service [43].

### d) The Manipulative Effects of Dark Patterns

39. This section discusses the ways in which dark patterns—including the ones I reference in Section IV(e)—impact a consumer's ability to make an informed decision in an online interaction that is aligned with their intention.

40. Dark patterns are effective at manipulating users because they affect how users act on information they see on interfaces. Generally, people have two ways to process information they receive, known as "System 1" and "System 2" thinking [102].

41. System 1 thinking is a mode of cognitive processing that is quick, automatic, and instinctive, requiring little to no effort [39,92,95]. System 1 thinking is not under voluntary, deliberative control, as the body knows what to do [39,92,95]. Examples of System 1 thinking are riding a bicycle, absentmindedly reading text on a billboard or computer screen, tying shoelaces, and dodging a tennis ball.

42. System 2 thinking is a mode of cognitive processing that is deliberative, conscious, and requires mental attention [39,92,95]. A person's sense of agency, choice, and concentration's affect their System 2 thinking [39]. Examples of System 2 thinking are deciding what to eat for lunch, deciding on a bike ride path, calculating a tip, and writing an email.

43. People generally use cognitive shortcuts when they engage in System 1 thinking, as it enables them to get through everyday activities without having to sit and concentrate on every single task set before them [39,92,95]. Dark patterns work well in user interfaces because users are often less engaged in deliberative, effortful mental processing every time they navigate from a screen to the next [95]. I describe below some of the cognitive shortcuts that underpin the dark patterns I noted and cause users to miss important information and make unintended choices.

44. Dark patterns leverage cognitive and behavioral biases to limit users' autonomy and impact their ability to decide what option to select. Each dark

15

pattern impacts the choices and information presented to users and adds a layer of difficulty to their ability to decide what to do [39,40,90]. Users typically rely on cognitive and behavioral shortcuts (System 1 thinking) as opposed to engaging in rational decisional making (System 2 thinking, in their online Interactions [95]. As explained above, these cognitive shortcuts help users process information.

45. Dark patterns modify the choice architecture available to users in two ways. They either modify the decision space that users see (so, for example, users do not see all the information relevant to their decision-making), or they manipulate the information flow presented to users (so, for example, users are pushed to select one option over others.) [52].

46. Multiple large- and small-scale user studies show that dark patterns effectively manipulate users to select choices that benefit the service provider. [28,34,43,49,62,84].

(i) In particular, a seminal user study in 2021 asked a census-weighted sample[3] of 1,962 users to opt into a negative option plan[4] for free data monitoring and credit protection while exposing them to 1) no dark patterns (the control group), 2) mild dark patters, and 3) aggressive, compounded dark patterns. The dark patterns included confirmshaming (*see infra*, ¶ 55), adding text such as "Recommended" to options presented to users to create a false hierarchy of information, and setting the default to the opt-in option [50]. The rates of acceptance of the protection plan in the control group were very low (~11%). However, the acceptance rates of the plan doubled in the mild dark patterns group and increased to 41.9% in the aggressive dark patterns group. This study also provided evidence that marking "Accept" as the default option for users or indicating that it would be more difficult to decline a plan than to accept it led to higher opt-in rates.

(ii) Another user study on cookie consent notices[5] in 2019 also shows the extent to which dark patterns manipulate users [93]. This study, conducted in the European Union with nearly 82,000 users of a German e-commerce website, showed that the position of the cookie consent notice on the screen influenced whether users clicked on it. For example, cookie consent notices that appeared as bars at the top of the screen had the lowest interaction rates. Additionally, users were more

---

[3] Census weighting is a process that adjusts sample data to make it more representative of the entire population.

[4] A negative option plan is a contract where a consumer's silence or inaction can be interpreted as accepting an offer.

[5] A cookie consent notice is a notification that informs visitors of a website about the types of cookies that the website uses, how the website may collect and use personal data, and who has access to this data.

likely to interact with cookie consent notices when there were only two options (accept and decline), as opposed to more than two options that were more granular. Users were also more likely to click "Accept" even if there were only two options of "Accept" and "Decline" given if the Accept button was highlighted but the Decline button was not (50.8 % mobile, 26.9 % desktop) than when both were presented as equal options (39.2 % mobile, 21.1 % desktop) [93]. This study also showed that nudging visitors to accept privacy-invasive defaults  (where users have to specifically opt out) were more likely to make consumers consent to accept cookies than opt in notices (where users have to specifically opt in.) [93]

(iii)    Furthermore, another user study had 2,252 participants in the United Kingdom go through an online interaction on a fictitious online trading platform to buy a financial product [100]. The results showed that the use of dark patterns—specifically Visual Interference, False Hierarchy, and Confirmshaming, *see infra*, Section IV(e)—increased the rate at which users unintentionally bought the product. [100]  Moreover, the accumulation of dark patterns in a single screen and in subsequent screens were more effective at getting the users to buy the product, when compared to the control group who was not exposed to dark patterns. [100]. These findings suggest that dark patterns working in concert with each other or over the course of several screens in an interaction hamper the obtention of consumer consent. [100].

(iv)    Several more recent studies have also been undertaken on whether dark patterns affect the decision to purchase a good or obtain a service or what choices to make when signing up for a streaming service [43].

47.    These studies, and others, demonstrate that interface decisions like placement of information and number of choices on a screen as well as whether certain choices are highlighted or selected by default, i.e., dark patterns are manipulative and can steer users into making choices that they may not have otherwise made if fully informed and capable of selecting alternatives [83].

48.    **Dark patterns** are more prevalent and insidious on mobile platforms in apps and on mobile browsers than on desktops [21,33,74]. For instance, a study of 240 of the most popular Android apps found that users cannot easily spot dark patterns on a mobile device and that some users, such as children, are particularly vulnerable to these kinds of dark patterns. [22].

**e)    Gray's Dark Pattern Ontology[6]**

49.    Researchers have created ontologies and taxonomies of dark patterns to label

---

[6] An ontology is similar to a taxonomy. The difference is where a taxonomy is used to classify and organize, an ontology is used to model and reason.

and classify manipulative designs in the interfaces of websites, apps, social media, voice user interfaces and other platforms to help identify common tactics that service providers use to manipulate users. [7,8,29,31,49, 51,52] Ontologies and taxonomies for dark patterns allow researchers to utilize a shared language to identify and discuss these dark patterns, organize them into categories, and discuss the harms resulting from each category of dark patterns. [29,31].

50. The ontology laid out by Colin M. Gray (the "Gray Dark Pattern Ontology") consolidates the ten most frequently cited taxonomies that regulators and academics have created—including my own work—into a canonical organization of dark patterns [31].  I used the Gray Dark Pattern Ontology in this report because it is the most comprehensive, frequently used, and recent taxonomy of dark patterns.

51. The Gray Dark Pattern Ontology organized dark patterns in three levels: high-level, meso-level, and low-level. [31]. Table 1 below reflects the dark pattern categories and levels as laid out In Gray's taxonomy. [31].

### Table 1: Relevant Dark Patterns in the Gray Dark Pattern Ontology

| High-Level Dark Pattern | Meso-Level Dark Pattern | Low-Level Dark Pattern |
|---|---|---|
| Forced Action | Nagging | |
| | Forced Continuity | |
| Interface Interference | Manipulating Choice Architecture | False Hierarchy, Visual Prominence |
| | Bad Defaults | |
| | Emotional or Sensory Manipulation | Positive or Negative Framing |
| | Choice Overload | |
| | Hidden Information | |
| Obstruction | Roach Motel | |
| | Creating Barriers | |
| | Adding Steps | |

| Sneaking | Bait and Switch | |
| | Hiding Information | Sneak Into Basket, Hidden Costs |
| Social Engineering | Personalization | Confirmshaming |

52. High-level patterns consist of the most abstract elements of an interface that are manipulative, coercive, or deceptive and limit a person's ability to take an action that is consistent with their intention. [31] These high-level patterns are context-agnostic, which means they are described generally without being tied to a specific context or domain.  [31] High-level patterns describe *strategies* of manipulative, coercive, or deceptive elements. [31] Sneaking, Obstruction, Interface Interference, Forced Action, and Social Engineering are examples of high-level patterns. [31]; *see supra*, Table 1.

53. Meso-level patterns, which connect high- and low-level patterns, describe the approach of a dark pattern that limits, impairs, or undermines a user's ability to make an informed decision and take an action that reflects their decision. [31]  These meso-level patterns are either context-agnostic or specific to the context of use or application type (such as shopping). [31]; *see supra*, Table 1. Meso-level patterns describe a dark pattern's *angle of attack*.

54. Low-level patterns identify problematic designs in a specific context that summarize the ways in which visuals or temporal elements on the Interface limit or undermine users' autonomy and decision making. [31]; *see supra*, Table 1. Low-level patterns describe the *means of execution* of a dark pattern.

55. Below, I identify and explain the main high-, meso-, and low-level categories of dark patterns that I observed in both (a) Prime enrollment detours from the checkout process and (b) cancellation processes that the FTC provided me. [31].

(i)  **Forced Action** (high-level) is a strategy that requires the user to perform an extra action to complete a process or access (or continue to access) certain functions on the system they are using [31, 29]. For instance, a service provider that requires a user to sign up for an account on a website to view the website's content is using a Forced Action dark pattern. [31].

   a. *Nagging* (meso-level) focuses on resource depletion. [29]. Nagging in the dark pattern contexts reflects the literal meaning of the word: a service provider employs Nagging when it repeatedly interrupts the user with a request to take an action—even when the user has already rejected that request. [31]

320. The first task was designed to answer questions on whether participants understood whether they enrolled in a CandyForever subscription and, if yes, whether participants were aware of the cost of CandyForever and when and how often they would be charged for their subscription. To answer these questions, we asked participants to buy up to $20 of candy and think-aloud on each screen as they did so.

321. At the end of the first task, the research assistant revisited the online checkout with the participant and asked them to explain what they were thinking for each screen. Participants were also asked to recall the terms of the Premium subscription, i.e., the cost of Premium, when and how often they would be charged for Premium, and the fact that Premium was a subscription service. They were also asked if their enrollment choice for Premium matched what they had intended to happen during the task.

322. The second task in our study protocol was designed to see if participants encountered any problems when trying to cancel a CandyForever subscription. This made it necessary to ensure all participants were enrolled in CandyForever Premium at the end of the first task to achieve our deception that they may be charged for a CandyForever Premium subscription fee if they did not cancel their subscription before leaving the study room. Therefore, after the first task was completed, our system automatically enrolled the participant in Premium, even if they did not choose to enroll, so that we could initiate our deception protocol for the cancellation task. In a few cases, the system did not automatically enroll the participant and in those cases, the research assistant took control of the participant's screen, hid the screen, and enrolled them into CandyForever manually before unhiding the screen and returning it to the participant's control. This ensured that the participant was enrolled in Premium for the deception.

323. After participants completed the first task and the review, the research assistant then began the deception protocol for the second task to tell the participant that they had enrolled in Premium (regardless of whether they had done so or not). The research assistant emphasized that CandyForever would start billing them if they did not cancel their subscription during the session. In cases where the participant insisted that they did not enroll in Premium, the research assistant said that the site may be buggy to keep up the deception. The research assistant also mentioned that they would not be able to access the CandyForever website from home to cancel the subscription at a later stage.

324. If the participant had any problems during the process, the research assistant encouraged them to keep going with minimal assistance. After the cancellation was complete or not, the research assistant reviewed the screens with the participant to ask about whether the choices they made aligned with their intentions.

325. The research assistant then revealed that the participants were not ever at risk of receiving a bill for enrolling and that this deception was to help facilitate the study.

326. After participants completed the study, the research assistant debriefed each participant about the deceptions used—explaining that CandyForever was not a real website, that they would not receive any bills or candy in the mail, and that they would get a $15 bonus card instead of the remaining money on the gift card. The $15 was always greater than the amount that would have been remaining on the gift card because the least expensive item on CandyForever cost more than $5. Participants also received a form informing them that this study was for a federal governmental agency and providing them with information on how to opt out of the study. Participants were also offered free candy.

**e) Study Recruiting**

327. We used a recruiting company to ensure that we reached a diverse sample of participants in a reasonable amount of time. Recruiting companies solicit participants from the general population for studies according to specified criteria, handle the compensation for participants, and book the participants for study sessions, thus simplifying the handling of the study logistics which would otherwise have to be performed by a research team [27,46]. Each participant completed a consent form and was compensated either $150 (before 4pm rates) or $125 (after 4pm rates). Rates were set by the recruiting company. In addition to the base compensation, as described above, all participants were given a bonus amount of $15 in lieu of the remaining credit on the gift card they were given during their enrollment tasks.

328. We used a recruiting agency based in Chicago, Focuscope, Inc., to recruit participants from a range of age groups, income ranges, and education levels to match the demographics of Amazon shoppers [108,109]. The agency collected these criteria for screening participants and provided it to us as the study progressed. We also aimed to get a range of users with experiences online shopping matching the US population [87]. We also asked participants to rank which three websites they most frequently visit for online shopping in addition to asking them how often they shop online. We aimed to get a range of users who were familiar and less familiar with shopping on Amazon.

329. During each participant session, we recorded video of their on-screen interactions including audio of their think aloud thoughts and the research assistant's questions. We also logged each click they made on the screen to a Mongo database stored in the cloud and password protected for access by the research team only. The research assistant also took brief notes about each participant. During the study, we ensured that a third of all participants saw each version of the enrollment flows we were testing.

**f)  Participant Demographics**

330. The participant demographics are key to understanding the context of a HCI qualitative study. It is therefore typical in HCI studies of all kinds including qualitative studies to collect demographic information about the people who take part in a study [19,27,46,72,78]. This allows researchers to understand the effects of individual characteristics on the study, the potential limitations of the study, and how to interpret the results given who participated [19,27,46,72,78].

331. Thirty-three participants took part in the study, including the three pilot participants as shown in Table .

332. As explained in Section V(c), a qualitative data analysis is not meant to produce statistically significant results, but it is common to report the number of participants who talked about or encompassed a certain theme to give an indication of the prevalence of that theme. The numbers reported are given to show how themes were spread across the data.

| Age Range | Pilot # of Participants | Study # of Participants |
|---|---|---|
| 18-26 | 1 | 6 |
| 27-42 | 1 | 8 |
| 43-58 | 1 | 10 |
| 59-77 | 0 | 6 |
| **Income Level** | | |
| < 50 K | 0 | 12 |
| K | 1 | 13 |
| >100 K | 2 | 5 |
| **Education Level** | | |
| High School Graduate | 1 | 5 |
| Some College | 1 | 11 |
| College Graduate | 1 | 10 |
| Advanced College Degree | 0 | 4 |
| **Frequency of Online Shopping** | | |
| Once or twice a week | 0 | 8 |
| Once every two weeks | 2 | 10 |
| Once a month or every few months | 1 | 9 |
| Less than every few months | 0 | 3 |

Table 2: Participant demographics and online shopping habits

333. In the pilot study, all three participants were male with one being a frequent Amazon user and listing the site as one of their most frequently visited sites. The other two participants were infrequent Amazon users with one selecting Amazon as one of their most frequently visited sites but also reporting that they only shop online once a month or every few months. The remaining participant did not select Amazon as one of their most frequently used sites. Two participants were unemployed and one drives trucks.

334. In the full study, there was an even gender split with 15 male and 15 female participants. The age range of participants was 18-77 with the distribution of participants shown in Table . Half of the participants were frequent Amazon shoppers and listed Amazon as one of their top three most visited sites. The other half were infrequent Amazon shoppers; 8 did not select Amazon as one of their most frequently visited sites and 7 selected Amazon as one of their most frequently visited sites but only shopped online at least once a month. Participant occupations were varied and included office manager, police officer, consultant, customer service, director, clerical, driver, and homemaker. Three participants were retired, 3 were unemployed and 3 did not provide occupational information.

335. Notably, the majority of participants (19/33) commented out loud that the CandyForever website looked like Amazon and participants were eager to receive their candy. In fact, many participants were disappointed when we told them they would not receive their candy. This suggests that the site realistically conveyed the Prime experience to participants.

**g) Pilot Study**

336. Prior to conducting the study, we ran a pilot study to 1) test out the study protocol, 2) ensure participants were able to complete the tasks we set out and understand our instructions, and 3) ensure the data we were collecting answered the research questions we set out. Running pilot studies helps to iron out wording issues, ordering issues, and give a sense of the time needed for running participants in the full study. It is typical to run pilot studies in HCI studies prior to running a full study to ensure that the protocol is sound and to enable a research assistant to practice facilitating sessions [19,27,46,72,78]. It is also common to make adjustments to an interface or study questions along the way depending on how participants are reacting to the study protocol and tasks [19,27,46,72,78].

337. We ran three pilot tests on April 25 and 26, 2024 between 9am and 3pm. Pilot sessions lasted a median time of 24 minutes with a range of 19-40 minutes.

338. During the pilot studies, we noted a few places where links were missing from the CandyForever website and corrected those gaps. Additionally, we tested another version of the deception where for task two (cancellation), the

research assistant left the room to "contact the company" after telling the participant that they were enrolled in Premium to see whether the participant could cancel Premium without assistance. However, without the research assistant present to ensure that the participants were complying with the think-aloud protocol, participants did not provide as much information about what they were doing on each screen. This therefore limited our ability to determine what participants were thinking as they were navigating the cancellation task. For the full study beginning on May 1, we amended the deception to have the research assistant remain in the room (and not attempt to contact the company regarding the cancellation) and instead use a think-aloud protocol to determine what participants were thinking during their attempts at cancellation. We also amended the protocol to ask about Premium costs, frequency of charges, and what the subscription entailed.

**h) Data Analysis**

339. To analyze the data, we used a qualitative data analysis tool called MaxQDA. Qualitative data analysis is a systematic way of labelling qualitative data and deriving themes from the data in a principled manner [19,72,78]. First, my research assistant and I transcribed all the video files using MaxQDA's automated transcription tools. I note here that the transcription quality was of high enough standard for analysis and in places where the automated transcription missed words or incorrectly transcribed words, we primarily relied on the video audio to ensure that we were analyzing what each participant said accurately. My research assistant and I then discussed and developed a code book, which is a set of labels for events of interest in the videos and transcripts and points at which participants had misconceptions about what was occurring in the interface.

340. For each code, we watched the participant video, noting movements of the participant's onscreen cursor and what they said (from the audio recording and transcript). We looked for pauses in interactions and speaking and for what participants said to ensure we had sufficient information to apply our coding scheme. We then applied the code where relevant.

341. Once we coded all the data, I performed a thematic analysis of the data. [19,27,46,72,78]. This included creating a summary spreadsheet to track how each code applied to every participant.

342. For instance, we applied the code "Enrolled" for participants that enrolled in Premium using the UPDP page, the SPC stripe, or the SPC shipping options in the checkout processes. We coded all other participants as "Not Enrolled". We also applied a code to say how a participant enrolled—e.g. "UPDP" if they enrolled by selecting the option for Premium on the UPDP page. We coded for "Whether read UPDP fineprint" if they read the UPDP fine print on the bottom of the UPDP page by using heuristics like navigation speed,

review their actions multiple times as they did in our study.

## IX. Conclusion

360. The user study results confirmed the results of the cognitive walkthrough I conducted of the Prime detours in the checkout process and the cancellation processes. Study participants accidentally enrolled in Prime while navigating the checkout process due to the design issues I had identified in my walkthrough, including, but not limited to, the lack of clarity in the buttons, the forced action of the UPDP.  Study participants who knowingly enrolled in Prime did not know the material terms of Prime, including the cost and renewal terms, because they were in the terms and conditions section, in small print. Given the study was conducted in very ideal conditions—participants could take their time going through the flows, they were not engaged in any other tasks while doing the study, and there were no distractions—it is my opinion that the design of the Prime detours in the enrollment flow can confuse consumers and lead them to accidentally enroll in Prime or to enroll in Prime without knowing its material terms. Study participants also did not find the cancellation process easy. Study participants did not finish the cancellation process, and those who did found the process onerous and repetitive, even though they were instructed and incentivized to cancel.

361. In sum, my opinions are:

   (i)    The design of how Amazon enrolls consumers in Prime (the Prime detours) during online checkout can confuse consumers to unintentionally enroll in Prime because it violates good design principles;

   (ii)   The design of how Amazon enrolls consumers in Prime during online checkout does not convey information on Prime's material terms (cost, end of the free trial period (if applicable), and renewal terms) in a way that consumers are likely to comprehend; and

   (iii)  The design of the Iliad and Iliad 2.0 cancellation processes can confuse consumers because they contain too many unnecessary steps and use manipulative designs to prevent consumers from cancelling their Prime subscription.

Dated: February 24, 2025

_____

Marshini Chetty, Ph.D

# EXHIBIT 64

1                UNITED STATES DISTRICT COURT

2               WESTERN DISTRICT OF WASHINGTON

3                       AT SEATTLE

4       ---------------------------

5    FEDERAL TRADE COMMISSION,

6            Plaintiff,

7    V.                          No. 2:23-cv-0932-JHC

8    AMAZON.COM, INC., et al.,

9            Defendant.          VOLUME I

10      ---------------------------

11

12    30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                     ON BEHALF OF

14              FEDERAL TRADE COMMISSION

15

16            Tuesday, September 10, 2024

17                     8:51 AM

18

19

20

21   Reported by:  Denise Dobner Vickery, RMR, CRR

22   JOB NO.:  J11644778



 1  and I will be joined shortly by Olivia Jerjian also

 2  on behalf of the Federal Trade Commission.

 3                        - - -

 4                   AMANDA BASTA

 5  called for examination, and, after having been duly

 6  sworn, was examined and testified as follows:

 7                        - - -

 8                   EXAMINATION

 9                        - - -

10  BY MR. KABA:

11       Q.   Good morning, Ms. Basta.

12       A.   Good morning.

13       Q.   Could you just state and spell your

14  full name and your title at the Federal Trade

15  Commission?

16       A.   Sure.  Amanda, A-m-a-n-d-a, Basta

17  B-a-s-t-a.  I'm Assistant Director within the

18  Division of Enforcement in the Bureau of Consumer

19  Protection.

20       Q.   Okay.  And for how long have you been

21  the Assistant Director within the Division of

22  Enforcement in the Bureau of Consumer Protection?



 1  are other benefits.  I don't know that I know all of

 2  them.

 3  BY MR. KABA:

 4        Q.   Okay.  Well, you're overseeing the

 5  litigation in this case.  Yes?

 6        A.   Yes.

 7        Q.   You oversaw the investigation in this

 8  case.  Yes?

 9        A.   Yes.

10        Q.   Can you identify for me what are the

11  benefits of a Prime membership?

12                    MR. MENDELSON:  Objection.  Scope.

13                    THE WITNESS:   I know the one

14  that's primarily emphasized in the marketing is, is

15  the free delivery or free shipping.  I know being

16  able to access Prime Video is another.  I

17  don't -- oh.

18                    I don't know that I recall off the

19  top of my head the others.

20  BY MR. KABA:

21        Q.   Okay.  Are you aware that getting

22  access to Amazon Music is another benefit that Prime



AMANDA BASTA Vol. I 30b6                          September 10, 2024
FTC vs AMAZON.COM, INC., et al.                                    43

```
 1   members receive?

 2                  MR. MENDELSON:  Objection.  Scope.

 3   BY MR. KABA:

 4        Q.   Did you know that?

 5        A.   I think I did, yes.

 6        Q.   Okay.  Prior to the FTC's

 7   investigation, which began in February of 2021, had

 8   you ever seen Prime's online cancellation flow?

 9        A.   No.

10        Q.   Okay.  You had, however, seen the

11   online enrollment flow for Prime because you

12   enrolled; correct?

13                  MR. MENDELSON:  Objection.  Scope.

14   Well --

15                  THE WITNESS:   I was going to say,

16   I saw a flow.  I don't know which one I saw.  I

17   don't know.  I know there are multiple.  So I

18   certainly hadn't seen many, if not most, of them.

19   BY MR. KABA:

20        Q.   Okay.  So you -- you know that there

21   are multiple enrollment flows for Prime; correct?

22        A.   Yes.
```



1      Q.    Okay.  And you had seen one of them at

2   least prior to the investigation since you joined

3   Prime through one of those flows.  Yes?

4      A.    Yes.

5      Q.    Okay.  Prior to the FTC's investigation

6   of Prime in February 2021, had the FTC received

7   complaints from consumers that the Prime flows

8   were -- enrollment flows were confusing?

9      A.    Not in those words.  So I know that

10  early in the investigation we looked at consumer

11  complaints, and certainly there were complaints that

12  involved consumers who had -- were complaining that

13  they had enrolled in Prime and did not know how or

14  had not wished to be enrolled in Prime and so that

15  was, you know, one of the -- one of the things

16  consumers were complaining about.

17     Q.    Okay.  I want to break that down a

18  little bit.

19     A.    Uh-huh.

20     Q.    You said you had -- after the

21  investigation was launched, you went back and looked

22  at consumer complaints; correct?



1          A.   Yes.

2          Q.   And where -- where are these consumer

3  complaints?

4          A.   So we have a consumer complaint

5  database, Consumer Sentinel.  Consumers can submit

6  complaints directly on the FTC website.  Other.

7  Some Better Business Bureaus, some law enforcement,

8  also complaints they receive are -- are fed into

9  Sentinel as well.

10         Q.   Okay.  And the FTC Division of

11  Enforcement has full access to this Consumer

12  Sentinel database.  Yes?

13         A.   Yes.

14         Q.   How many complaints, roughly, come in

15  every day across all different inputs into Sentinel?

16         A.   That I do not know.

17         Q.   Is it hundreds?  Thousands?

18         A.   I couldn't even start to guess.

19         Q.   Do you know today if you went into the

20  Consumer Sentinel database how many complaints are

21  housed in there?

22              MR. MENDELSON:  Objection.  Scope.



1                      THE WITNESS:    Millions.

2    BY MR. KABA:

3          Q.    Millions.   Okay.

4               And you'd agree that complaints by

5    definition that are going into Consumer Sentinel are

6    people that are unhappy with an experience rather

7    than writing in to say, "I love how clear it was to

8    enroll in Prime," for example?

9          A.    Generally speaking, yes.

10         Q.    Okay.  And within what you just

11   referenced earlier was that when you went back,

12   after the investigation had launched, to look at

13   consumer complaints, you saw that -- I asked you if

14   you saw complaints where consumers said they were

15   confused about enrolling in Prime, and you said not

16   in those words; correct?

17         A.    I think your question was about

18   enrollment flows particularly, and I think most

19   consumers wouldn't -- wouldn't mention a flow

20   particularly.  They just complained that they were

21   enrolled in Prime and either didn't want to be or

22   didn't know how they were enrolled.



1        Q.    Okay.  So, and that's the part I want

2    to break up a little bit.

3        A.    Uh-huh.

4        Q.    So there may be consumers who said, "I

5    don't know how I got enrolled in Prime."

6        A.    Uh-huh.

7        Q.    That's the "didn't know how"?

8        A.    Uh-huh.

9        Q.    Yes?

10       A.    Yes.

11       Q.    Now, consumers that say, "I don't want

12   to be enrolled in Prime," those could be people that

13   knew that they were enrolling in Prime and then

14   decided they no longer want to be enrolled in Prime?

15       A.    Well, that was a separate set -- that

16   was a separate issue that was raised in the

17   complaints.  People who wanted to cancel believed

18   they had canceled and either did not successfully

19   cancel or could not figure out how to cancel.

20            But when I'm talking about

21   didn't -- didn't intend to enroll and didn't want to

22   be enrolled, I'm talking about just talking about



 1  minute.

 2          A.    Uh-huh.

 3          Q.    But you do understand that Amazon

 4  provides multiple mechanisms to cancel a Prime

 5  enrollment; correct?

 6          A.    Not really.

 7          Q.    Okay.  So what are the ways that a

 8  consumer can cancel Prime?

 9          A.    So my understanding is that it is

10  almost exclusively through the online flow.

11  Consumers who call Amazon are provided a link to the

12  flow.  So calling doesn't typically result in

13  cancellation directly.  They're still directed back

14  to the online flow.

15              For consumers who have enrolled through

16  a mechanism other than the shopping website, it's

17  unclear whether they are aware of any mechanism.

18  And I think something mentioned e-mail, but it's a

19  very, very small number that's not public -- not

20  kind of -- consumers are not pointed to that on the

21  website.

22              And also I understand there's a very



 1  minuscule number through something called the

 2  chatbot.

 3          Q.   Okay.  So you've introduced lots of

 4  other phrasing --

 5          A.   Uh-huh.

 6          Q.   -- into the mechanisms and about how

 7  many may use it or how many may be aware of it, and

 8  that's not my question.

 9          A.   Uh-huh.

10          Q.   So let me ask you my question again.

11          A.   Uh-huh.

12          Q.   You are aware that there are multiple

13  mechanisms that consumers could use to cancel Prime;

14  correct?

15          A.   I think there are -- to my knowledge,

16  there are basically three.

17          Q.   Okay.  There's the online cancellation

18  flow that consumers can use to cancel Prime;

19  correct?

20          A.   Yes.

21          Q.   Consumers could call in to a toll-free

22  number to cancel Prime; correct?



1      A.    My understanding is that's just loops

2   them back to the online flow.

3      Q.    Okay.  And I'll ask you about that

4   understanding in a second.

5      A.    Uh-huh.

6      Q.    Do you know in every instance that

7   some -- a consumer calls the toll-free number they

8   are looped back into the cancellation flow?  Online,

9   that is?

10      A.    I don't know that every single one, but

11   I know that that was sort of the first line.

12      Q.    Okay.  But you do understand that

13   consumers can call a toll-free number and cancel

14   their Prime subscription by talking to a consumer

15   service agent; correct?

16      A.    I think I've explained my understanding

17   is that they get looped back in.  I'm not sure I

18   know whether or not anyone has been able -- is able

19   to cancel that way.

20      Q.    You are unaware as the person

21   overseeing the investigation, as the person most

22   knowledgeable at the FTC, whether consumers can just



1    call a toll-free number and actually cancel that

2    way?

3           A.   My --

4                     MR. MENDELSON:  Objection.  Asked

5    and answered.

6                     THE WITNESS:   My understanding is

7    that when they call that toll-free number, they are

8    not canceled on the phone, that they are provided a

9    link to the online cancellation flow.

10   BY MR. KABA:

11          Q.   Okay.  And if we could identify for you

12   consumers who call the toll-free number and cancel

13   through that, would you then be willing to

14   acknowledge that consumers can also call a toll-free

15   number and cancel their Prime subscription?

16          A.   Yes.

17          Q.   Okay.  And then a third mechanism

18   available for some consumers -- strike that.

19                     A third mechanism available for

20   consumers to cancel Prime is through a chatbot on

21   Amazon.

22                     They could type into a chatbot, "I wish



1    to cancel Prime"; correct?

2          A.    Yes.

3          Q.    A fourth mechanism available for

4    consumers to cancel Prime is by e-mailing an e-mail

5    address saying, "I want to cancel my Prime

6    subscription"; correct?

7          A.    Yes, although I don't think that e-mail

8    address is made readily available to consumers.

9          Q.    So you're answering a different

10   question than the one I asked.

11               I didn't ask you about whether or not

12   you believe the e-mail address is readily available.

13   Okay?

14         A.    Uh-huh.

15         Q.    You understand?

16         A.    Yes.

17         Q.    My question for you is:  A fourth

18   mechanism available to consumers to cancel Prime is

19   that they could send an e-mail saying, "I want to

20   cancel my Prime subscription"; correct?

21         A.    Yes.

22         Q.    Okay.  Would you agree with me that



1    calling a toll-free number, speaking to a human and

2    saying, "I wish to cancel my subscription," is a

3    simple mechanism --

4                        MR. MENDELSON:  Objection.

5    BY MR. KABA:

6         Q.   -- to cancel?

7                        MR. MENDELSON:  Objection.  Calls

8    for opinion.  Vague.

9                        THE WITNESS:   I mean, it depends

10   on the context, right?  If the consumer has to -- I

11   mean, how long is the phone call?  Are there save

12   offers?  Are there impediments?

13                        All of this is contextual.  So it

14   may be a simple mechanism in some cases.  It may not

15   in others.  And certainly if they call asking to

16   cancel and are directed to an online flow that is

17   itself complicated and not simple, that's not

18   simple.

19   BY MR. KABA:

20        Q.   Okay.  So I want to go through this.

21        A.   Uh-huh.

22        Q.   I want you to be for now --



```
 1   simple?

 2            A.    Sure.

 3            Q.    Do you know what the average hold time

 4   is for a consumer once they call Amazon's toll-free

 5   number to cancel Prime?

 6            A.    No.

 7            Q.    Okay.  And with respect to this notion

 8   of whether or not something is simple, are there

 9   quantitative measures that the FTC would look at to

10   say, well, if it takes over one minute, it's no

11   longer simple, but if it takes over -- if it takes

12   less than 45 seconds, it is simple?

13                      MR. MENDELSON:  Objection.  Scope.

14                      THE WITNESS:  No.  Again, it's

15   going to depend on the context.  What's happening in

16   that minute.  What's happening in those 45 seconds.

17   I mean, you can imagine a very short process.

18                      Like to take it to the online

19   context.  You can have a one-click cancellation

20   button that is as simple as can be, but if consumers

21   can't find it, it's not simple.  You know what I

22   mean?  That's -- so that's the problem is without
```



```
 1   knowing exactly what's happening in those time

 2   periods, analyzing it in a vacuum just doesn't work.

 3   BY MR. KABA:

 4         Q.   Okay.  So then just to be clear, with

 5   respect to figuring out whether a cancellation

 6   mechanism is simple, you couldn't identify sort of

 7   objective quantitative criteria that you could say,

 8   I've checked these boxes.  It makes the mechanism

 9   simple.

10         Is that fair?

11         A.   Yes.

12         Q.   Instead you would need to look at, as

13   we've now talked about many times, context-specific

14   interactions, you know, specific other features of

15   the mechanism to decide whether or not it is simple;

16   correct?

17               MR. MENDELSON:  Objection.  Scope.

18   Vague.

19               THE WITNESS:  Yes.

20   BY MR. KABA:

21         Q.   Okay.  Prior to the FTC's investigation

22   launching in February of 2021, are you aware of any
```



1    FTC communication or instruction or correspondence

2    or message of any kind to Amazon telling Amazon that

3    the FTC believed that Amazon's flows or Prime itself

4    violated ROSCA?

5                         MR. MENDELSON:  Objection.  Scope.

6                         THE WITNESS:   Not Prime itself.

7    I know in 2014, the FTC sued Amazon over failure to

8    provide express informed consent based on some

9    varied disclosures in a different -- in a different

10   mobile flow, and so certainly the idea that that put

11   in terms and conditions in -- in certain contexts

12   could deprive of express informed consent was a

13   concept familiar to Amazon.

14   BY MR. KABA:

15        Q.   Okay.  So you're, again, answering a

16   different question than the one I've asked.

17        A.   Uh-huh.

18        Q.   So I would like you -- it will be

19   helpful, so that I don't have to ask my question

20   multiple times, if you could at least initially just

21   focus on responding to my question.

22        A.   Uh-huh.



```
 1          Q.    And Mr. Mendelson will have an
 2   opportunity at the end of the deposition to ask you
 3   additional questions that he might have of you to
 4   get out additional testimony that you may wish to
 5   provide.
 6                Do you understand?
 7          A.    Yes, but I think I did answer the
 8   question.  You asked about messages to Amazon about
 9   violations or about --
10          Q.    Why don't I -- why don't I --
11          A.    Yeah, try it again.
12          Q.    -- ask you my question.  Okay?
13          A.    Uh-huh.
14          Q.    Prior to the FTC's investigation
15   launching in February of 2021 --
16          A.    Uh-huh.
17          Q.    -- are you aware of any communication,
18   correspondence, direction from the FTC telling
19   Amazon that Amazon's Prime enrollment flow or
20   cancellation flow violated ROSCA?
21          A.    Not Prime --
22                MR. MENDELSON:  Same objection.
```



1              THE WITNESS:   Not Prime, no.

2    BY MR. KABA:

3         Q.   Okay.  And you contend that in a

4    different context, the FTC had filed suit in 2014

5    with respect to certain disclosures that were in

6    terms and conditions; correct?

7         A.   Yes.

8         Q.   So from that time in 2014 --

9         A.   Uh-huh.

10        Q.   -- even -- even that other action, if

11   we included that.  From 2014 through February 2021

12   when the FTC launched its investigation in this

13   case, that's about seven years; right?

14        A.   Yes.

15        Q.   Are you aware of any correspondence

16   message communication to Amazon that Amazon's

17   enrollment flows or cancellation flows violated

18   ROSCA?

19              MR. MENDELSON:  Same objection.

20              THE WITNESS:  No.

21   BY MR. KABA:

22        Q.   Okay.  As of what date does the FTC



```
 1   contend Amazon's enrollment flows violated ROSCA?
 2          A.    I'd have to look back at the complaint,
 3   but I believe 2018.
 4          Q.    And as of what date does the FTC
 5   contend Amazon's cancellation flows violated ROSCA?
 6          A.    I think, again, I'd have to look at the
 7   complaint, but I believe it's approximately the same
 8   time period.
 9          Q.    Let me see if I can help you.
10               By the way, we talked about Consumer
11   Sentinel complaints, but it wasn't consumer
12   complaints that triggered this investigation to
13   Prime; right?
14          A.    Not initially.  As I said, we looked at
15   them pretty early on.
16          Q.    Right.  So, again, my question.
17          A.    Uh-huh.
18          Q.    I could see you were probably very good
19   questioner at depositions because the way you're
20   responding.
21               My question is:  It was not consumer
22   complaints that launched or triggered the
```



 1          Q.    I got a -- I'll make it even a more

 2    readily perhaps available hypothetical.

 3              I've got a business I run out of my

 4    garage that ships small boxes of games for kids to

 5    play.

 6          A.    Sure.

 7          Q.    And you can go on my website and you

 8    can sign up to get a box every month --

 9          A.    Uh-huh.

10          Q.    -- basically and the first box is free.

11              You're with me?

12          A.    Yes.

13          Q.    You would contend that that kind of

14    subscription program is subject to ROSCA; correct?

15          A.    It should be, yes.

16          Q.    Okay.  Where do I as --

17          A.    Uh-huh.

18          Q.    -- my -- my -- my small business owner

19    that's sending out these subscription boxes, where

20    would I look to determine whether or not my

21    disclosures and my flows, and whatever it may be,

22    complies with ROSCA?



```
 1                      MR. MENDELSON:  Objection.  Vague.

 2                      THE WITNESS:   So with respect to

 3    what ROSCA requires, you look at ROSCA.  To the

 4    extent that what you're trying to understand is what

 5    the, you know, whether there's understandings of

 6    what the terms in ROSCA mean, there's lots of case

 7    law, lots of FTC case law regarding clear and

 8    conspicuous, material terms, those types of things.

 9                      If you're interested in what kind

10    of conduct the FTC might be interested in, there's

11    prior enforcement actions both, you know, those

12    specifically under ROSCA and those alleging lack of

13    express informed consent under Section 5 because

14    they're related.

15                      And so -- and I know we've

16    provided those in -- in the interrogatory responses,

17    at least the cases the FTC has brought.  The case

18    law is just too wide to -- to cite all the examples,

19    but those are the places.  Like, but in terms of

20    what the statute itself requires, it's the statute.

21    BY MR. KABA:

22                      Q.   Okay.  So other than -- so you've
```



1   identified if I as a business wanted to know, well,

2   what -- how do I comply with ROSCA given its terms,

3   I would -- you're saying the only place I would look

4   is the text of ROSCA itself.  Yes?

5           A.   Yes.

6           Q.   And then you're saying I can look at

7   other things to help define what some of these terms

8   mean in -- used within ROSCA; right?

9           A.   How courts have understood them, yes.

10          Q.   Right.

11          A.   And tend to interpret them.

12          Q.   Okay.  And -- and so the only place I

13  would look to ascertain what "clearly and

14  conspicuously" means or "all material terms" means,

15  for example, are court decisions?

16          A.   Primarily, yes.

17          Q.   Okay.  You say "primarily."

18               Where else could I look to see what

19  does "clearly and conspicuously" and "material

20  terms" mean?

21          A.   I mean, for example, clearly and

22  conspicuously is a term that's often defined in FTC



1          I mean, that's -- that's all part of

2     the soup.

3          Q.   Right.  So that's what I'm

4     trying -- I'm trying to understand.  You've used a

5     good metaphor, actually.

6               In order to determine whether or not

7     there's a ROSCA violation, you need to consider a

8     soup with lots of different ingredients.  Yes?

9          A.   Yes.

10         Q.   And I just want to know what those

11    ingredients are, not necessarily specific to this

12    case.  Generally.

13         A.   Sure.

14         Q.   So --

15               MR. MENDELSON:  Objection.  I'm

16    sorry.  Go ahead.

17    BY MR. KABA:

18         Q.   So the ingredients that we've

19    identified so far are the language used in the

20    disclosures themselves.  Yes?

21         A.   Yes.

22         Q.   Other language used around marketing



1   and the context of those disclosures.  Yes?

2            A.    Yes.

3            Q.    The way that that language is being

4   presented.  Yes?

5            A.    Yes.

6            Q.    And the way can include colors used,

7   font size used, location on the page, etc.  Yes?

8            A.    Yes.

9            Q.    How consumers are interacting with that

10  language?

11           A.    Yes.

12           Q.    What consumers report after the fact

13  about how they interacted with the flows; correct?

14           A.    Yes.

15           Q.    And so, again, just generally speaking,

16  what other things does one need to consider as part

17  of this, to use your word, soup of factors that you

18  would look at to determine whether or not there's a

19  ROSCA violation?

20                 MR. MENDELSON:  Objection.  Scope.

21                 THE WITNESS:  Again, evidence

22  from the company regarding what was -- what was



1   happening around those flows, around those

2   processes.  That's -- you know, like I said,

3   testimony of witnesses who were involved in design

4   and changes and, you know, again, it will vary some

5   case to case based on what's available and -- but

6   those are all things that go into it in any given

7   case.

8   BY MR. KABA:

9        Q.   Okay.  You would agree with me that

10  there is no formula that we can look at to determine

11  what is a clear and conspicuous disclosure; right?

12       A.   I don't --

13            MR. MENDELSON:  Objection.  Scope.

14            THE WITNESS:  -- agree with that

15  at all.

16  BY MR. KABA:

17       Q.   You think there is a formula?

18       A.   I think if you look at the case law and

19  tease out the principles that that gives you a

20  pretty good roadmap for how to comply with ROSCA.

21       Q.   Okay.  Let me -- just tell me agree or

22  disagree --



1          A.    Uh-huh.

2          Q.    -- with the following statement:

3                There is no set formula for a clear and

4    conspicuous disclosure.

5                      MR. MENDELSON:    Objection.    Scope.

6    BY MR. KABA:

7          Q.    Agree or disagree?

8          A.    Agree because it's context-specific.

9          Q.    Okay.    That's my question.

10         A.    Okay.

11         Q.    You would agree that there is no

12   formula that someone can go look at and say, if I

13   satisfy this formula, my disclosures are clear and

14   conspicuous; correct?

15         A.    Right.    There's no --

16                     MR. MENDELSON:    Same objection.

17                     THE WITNESS:    There's no

18   checklist, to use a term used earlier.    Correct.

19   BY MR. KABA:

20         Q.    And so things that we've talked about

21   that the FTC may consider include things like where

22   the disclosure is placed of the material terms;



1  right?

2          A.    Correct.

3          Q.    And if I put the material terms -- does

4  the FTC identify anywhere or does ROSCA identify

5  anywhere where the disclosure must be placed to

6  satisfy ROSCA?

7                    MR. MENDELSON:  Objection.  Scope.

8                    THE WITNESS:  No.

9  BY MR. KABA:

10         Q.    Okay.  Another thing that you might

11  consider is the prominence of the disclosure;

12  correct?

13         A.    Yes.

14         Q.    And that the prominence means what

15  here?

16         A.    Could mean font size.  It could mean

17  whether -- it could mean font color.  It could mean

18  placement.  It could mean whether a consumer has to

19  acknowledge that they've seen the disclosure before

20  they take the, you know, operative action.

21                    Again, it could be something like

22  making the consumer re-input their billing



 1    information specifically to engage in a transaction.

 2    That would be a good way, you know, to figure out

 3    whether they intended to or whether they understood

 4    what they were doing.  You know, there's a lot of

 5    different ways again.

 6            Q.   Context-specific.

 7            A.   Well, context-specific, but also, you

 8    know, it may depend.  I mean, context-specific.  It

 9    depends on people's creativity.  It depends on

10    people's understanding.  It depends on what -- you

11    know, there may be something that on the surface you

12    might not recognize as clear and conspicuous, but

13    data might show that it's clear and conspicuous.

14            Q.   Okay.  So --

15            A.   You know.  So there's a lot of

16    different ways to determine it, but at the end of

17    the day, you got to make sure that consumers are

18    understanding that's the touchstone.

19            Q.   Okay.  So, but in order for -- the FTC

20    has said that -- you're familiar with the Dot Com

21    Disclosures?

22            A.   Yes.



1      Q.   Okay.  And the FTC identified in the

2   Dot Com Disclosures like certain at least features

3   or criteria that one would consider to determine

4   whether or not a disclosure is clear and

5   conspicuous; right?

6                    MR. MENDELSON:  Objection.  Scope.

7                    THE WITNESS:   I haven't looked at

8   them in a long time, but that's my general

9   understanding.

10   BY MR. KABA:

11      Q.   Okay.  Do you believe the Dot Com

12   Disclosures provide guidance to industry about ROSCA

13   compliance?

14                    MR. MENDELSON:  Objection.  Scope.

15                    THE WITNESS:   That's not a topic

16   I was prepared to testify about.  So I would have to

17   look at them.

18   BY MR. KABA:

19      Q.   Okay.  Well, we can take it apart from

20   the Dot Com Disclosure discussion.

21                    One of the thing -- another thing I

22   think you agree you look at in order to determine



AMANDA BASTA Vol. I 30b6                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                              259

1        A.    Yes.

2        Q.    Has the FTC identified for Amazon how

3   to solve those problems?

4        A.    That may differ.  Depending on the

5   problem, that may differ.  I mean, we --

6        Q.    So my question is not that.

7        A.    Right.

8        Q.    It's a yes or a no question in there.

9        A.    Right.

10       Q.    I feel like I'm asking you yes or no

11  questions and I'm getting sort of monologues in

12  response.

13            So there's no question pending.  Let me

14  ask my question, please.

15            My question, yes or no:  To your

16  knowledge, has the FTC identified what Amazon must

17  do to solve the problems the FTC believes exists

18  with the flows?

19       A.    I just gave two solutions, but no,

20  not -- not a list of all of the things that can be

21  done to correct all of the problems.

22       Q.    Okay.  So let me get that.



1          So the FTC has not identified to Amazon

2     a list of all the things Amazon can do to resolve or

3     to come into compliance, according to the FTC, with

4     ROSCA; correct?

5                    MR. MENDELSON:  Objection.  Asked

6     and answered.

7                    THE WITNESS:  Correct.

8     BY MR. KABA:

9          Q.   Okay.  And even you, sitting here

10    today, are not prepared to provide a list of all of

11    the things Amazon could do to come into compliance,

12    according to the FTC, with ROSCA; correct?

13         A.   I don't have the technical knowledge of

14    Amazon's systems to be able to do that.

15         Q.   Okay.  You said one of the things that

16    maybe could happen is a big button --

17         A.   Uh-huh.

18         Q.   -- on every Amazon page that says "End

19    membership."

20              Do you recall that?

21         A.   "End membership in Prime," yes.

22         Q.   Okay.  So what would the words have to



1  say to -- what would the words on this big button

2  that you propose as a solution here have to say in

3  order to comply with ROSCA?

4          A.   It --

5                    MR. MENDELSON:  Objection.  Form.

6                    THE WITNESS:   Again, there's many

7  things it could say, but "End membership in Prime by

8  clicking here" would be one.

9  BY MR. KABA:

10         Q.   Okay.  And how big would it have to be

11  on the page, that is, what font size would have to

12  be used to comply with ROSCA?

13                    MR. MENDELSON:  Objection.  Vague.

14                    THE WITNESS:   Those are technical

15  requirements that I'm not qualified to talk about.

16  BY MR. KABA:

17         Q.   Okay.  Would the button --

18         A.   It would just have to be unavoidable

19  basically so that a consumer who's looking for it

20  can't miss it.

21         Q.   Okay.  So -- but you'd agree that some

22  consumers can miss things that other consumers don't



1      A.    It's a little more than that.  It was
2   that it's not just on a page.  It's not in the
3   middle of a transaction.  It's a stand-alone button
4   that you go in, you see the terms, and you have to
5   re-input your billing information.  Because that
6   would be one indication that people understood what
7   they were signing up for.
8      Q.    Okay.  So you -- and you think if
9   Amazon did that, that would comply with ROSCA?
10      A.    That could be a solution to the -- to
11   the disclosure on the consent problems, yes.
12      Q.    Okay.  So I'm not asking if it could
13   be.  I'm asking if it would be.
14         Do you understand the distinction
15   between those two, Ms. Basta?
16      A.    Yes.  Again, could -- could there be
17   data that a third of people who see that also are
18   still confused?  Yeah, but in theory -- because
19   that's all we can talk about here because we don't
20   have it -- that would be a solution.
21      Q.    Okay.  Can you identify
22   for -- how -- let's -- let's pick a name for this



1  solution.

2          It's an independent sign-up page --

3     A.   Uh-huh.

4     Q.   -- for Amazon Prime.

5          Is that a fair way to characterize --

6     A.   Sure.

7     Q.   -- this solution?

8     A.   Sure.

9     Q.   And are you aware of any company that

10  allegedly uses a negative option feature anywhere on

11  the marketplace that employs this independent

12  sign-up feature, as you have described it?

13               MR. MENDELSON:  Objection.  Scope.

14               THE WITNESS:   I don't know one

15  way or the other.

16  BY MR. KABA:

17     Q.   Okay.  Has the -- apart from what

18  you've just told me in the course of this

19  deposition, has the FTC since it -- since 2014 for

20  enrollment or 2016 for cancellation provided Amazon

21  with a list of the changes that Amazon would need to

22  make to comply with ROSCA?



1                    MR. MENDELSON:  Objection.  Asked

2   and answered.

3                    THE WITNESS:  Yeah.  I already

4   answered it.

5                    We haven't had that conversation.

6   BY MR. KABA:

7        Q.  Okay.  Given that the FTC alleges that

8   Amazon's flows have violated ROSCA from 2014 to

9   present on enrollment or 2016 to present on

10   cancellation, why did it take until 2021 to launch

11   an investigation?

12                    MR. MENDELSON:  Objection.  Scope.

13   And the witness can answer, but please be cautioned

14   not to reveal any internal deliberative

15   communications in doing so.

16                    THE WITNESS:  I don't have an

17   answer that would not implicate privileged

18   information.

19   BY MR. KABA:

20        Q.  Okay.  Was there anything that

21   prevented the FTC from investigating the flows at

22   the time that the FTC contends they violated ROSCA,



 1   that is, in 2014 and 2016 --

 2                      MR. MENDELSON:  Objection.

 3   BY MR. KABA:

 4        Q.   -- to your knowledge?

 5                      MR. MENDELSON:  Sorry.  Objection.

 6   Scope.  Objection.  Scope.

 7   BY MR. KABA:

 8        Q.   Why don't I ask you that question again

 9   and I'll -- I'll pause and Mr. Mendelson can get in

10   his objection just so it's clean.

11             To your knowledge, was there anything

12   that prevented the FTC from investigating the flows

13   at the time the FTC contends they violated ROSCA,

14   that is, in 2014 and 2016?

15                      MR. MENDELSON:  Objection.  Scope.

16                      THE WITNESS:   (Pause).  I'm

17   trying to think of whether I can answer that in a

18   way that doesn't implicate privileged information.

19   That's why I'm hesitating.

20             I don't think I have an answer

21   that wouldn't reveal privileged information.

22   BY MR. KABA:



1        Q.    And you're saying that it's privileged

2   even the sort of counterfactual world that we're in;

3   right?

4              The FTC did not launch an investigation

5   of Amazon's enrollment flows in 2014 when the FTC

6   contends that those flows began violating ROSCA;

7   correct?

8        A.    Say that again.

9        Q.    Maybe I could break it up.

10             FTC contends that Amazon's enrollment

11   flows violated ROSCA at least as early as 2014;

12   correct?

13        A.    Yes.

14        Q.    The FTC did not launch any

15   investigation or file any litigation with respect to

16   those flows in 2014; correct?

17        A.    (Pause).   Yes.

18        Q.    Same is true in 2015; correct?

19        A.    Yes.

20        Q.    Same is true in 2016; correct?

21        A.    Yes.

22        Q.    Same is true for every year up until



1    February of 2021 when you launched the investigation

2    that resulted in this litigation; correct?

3           A.    Yes.

4           Q.    Okay.    The FTC contends that Amazon's

5    cancellation flows began violating ROSCA at least as

6    late as 2016; correct?

7           A.    Yes.

8           Q.    FTC did not launch investigation or

9    initiate litigation with respect to the cancellation

10   flows in 2016; correct?

11          A.    Yes.

12          Q.    And did not do so in 2017; correct?

13          A.    Yes.

14          Q.    Did not do so in 2018; correct?

15          A.    Yes.

16          Q.    Same is true for every year up until

17   February 2021; correct?

18          A.    Yes.

19          Q.    Okay.    And my question is:    Can you

20   tell us why -- I guess without revealing privilege,

21   can you tell us why the FTC did not launch an

22   investigation into these flows that the FTC now



 1  claims violate ROSCA until five and seven years

 2  after the FTC claims that they had been violating

 3  ROSCA?

 4          A.   Not without revealing privileged

 5  information.

 6          Q.   Okay.  Do you recall having discussions

 7  back in 2014, 2015, 2016, or 2017 about Amazon's

 8  enrollment flows or cancellation flows?

 9          A.   I would not have been privy to those.

10  I wasn't a manager at the time.

11          Q.   Okay.  You were a manager starting in

12  2018?

13          A.   Yes.

14          Q.   Do you recall having discussions in

15  2018 about Amazon's enrollment flows or cancellation

16  flows?

17                  MR. MENDELSON:  I'm going to

18  object and, just to avoid a privilege issue,

19  instruct the answer -- the witness to answer yes or

20  no.

21                  MR. KABA:  Yeah, and to be clear

22  I'm only asking for a yes or a no.



1       Q.    Right.

2             So not everyone who's going to -- who

3   wants to comply with ROSCA has the benefit of the

4   FTC filing a lawsuit against them; right?   Or the

5   burden.

6                   MR. MENDELSON:  Objection.  Scope.

7   BY MR. KABA:

8       Q.   You'd agree that there are lots of

9   people who violate ROSCA that the FTC never brings

10  an action against; right?

11                  MR. MENDELSON:  Objection.  Scope.

12                  THE WITNESS:   I don't know one

13  way or the other.

14  BY MR. KABA:

15      Q.   Do you believe that there are people in

16  the marketplace today that are violating ROSCA that

17  the FTC has not brought an action against?

18                  MR. MENDELSON:  Objection.  Scope.

19                  THE WITNESS:   Possibly but --

20  BY MR. KABA:

21      Q.   You haven't looked into it?

22      A.   -- I don't know one way or the other.



1        Q.    Okay.  So what I'm asking you is,

2   again, as a business that's looking to figure out

3   how I can comply with ROSCA.

4        A.    Uh-huh.

5        Q.    Is there some number that I could look

6   at and says, okay, a cancellation flow that has X

7   steps is simple, but a cancellation flow that has X

8   plus 1 step is no longer simple?

9        A.    No, because there's -- it's not

10  formulaic.  It depends on the context of the flow.

11       Q.    Okay.  The same question about, you

12  guys have listed both the number of steps and the

13  number of clicks.

14            That the number of steps is one

15  criteria.  Number of clicks is another criteria.

16  Yes?

17       A.    Yes.

18       Q.    Is there anything out there in the

19  world that will tell me a flow that is 3 clicks is

20  simple, but a flow that is more than 3 clicks is not

21  simple?

22                    MR. MENDELSON:  Objection.  Scope.



AMANDA BASTA Vol. I 30b6                     September 10, 2024
FTC vs AMAZON.COM, INC., et al.                              358

 1                        THE WITNESS:   Not -- no, because,
 2     again, you could have one click that's very, very
 3     simple, but if it is buried behind links that do not
 4     clearly indicate where you're going, it's not
 5     simple.
 6     BY MR. KABA:
 7            Q.   Right.
 8            A.   Because consumer can't find it.
 9                 So -- so if you reduce it to a formula
10     like that, you're not going to actually solve the
11     problem.   It has to be context-specific.
12            Q.   Right.
13                 You've established that every one of
14     these things requires a lot of consideration of a
15     soup of things, other things; right?
16            A.   Uh-huh.
17                        MR. MENDELSON:   Objection.   Form.
18                        THE WITNESS:   A number of pieces
19     of evidence regarding how consumers interact with
20     it, yes.
21     BY MR. KABA:
22            Q.   Okay.   So just focus on my questions.



AMANDA BASTA Vol. I 30b6                    September 10, 2024
FTC vs AMAZON.COM, INC., et al.                          359

1          A.    Uh-huh.

2          Q.    My question is:  Is there some

3    document, something that the FTC is willing to say

4    that tells people X number of clicks is okay, but X

5    plus 1 number of clicks now makes the cancellation

6    process no longer simple?

7                    MR. MENDELSON:  Objection.  I'm

8    sorry.

9    BY MR. KABA:

10         Q.    Yes or no.

11         A.    No.

12                    MR. MENDELSON:  Objection.  Scope.

13   BY MR. KABA:

14         Q.    The next thing.  "The number of pages a

15   consumer must navigate to cancel."

16                That's another criteria; correct?

17         A.    Yes.

18         Q.    Same question.

19                Is there a document guidance, something

20   out there that tells business or individuals X

21   number of pages is okay and simple, but X plus 1

22   number of pages to navigate is no longer simple?



 1    Yes or no.

 2                    MR. MENDELSON:  Same objection.

 3                    THE WITNESS:  Because there's no

 4    single answer to that, no.

 5    BY MR. KABA:

 6        Q.   Okay.  Then you have "The length of

 7    time to cancel."

 8             Do you see that?

 9        A.   Yes.

10        Q.   Same question.

11             Is there a guideline, information out

12    there that says X number of seconds to get through

13    cancellation is simple, but X plus 1 number of

14    seconds to get through cancellation is no longer

15    simple?

16                    MR. MENDELSON:  Same objection.

17                    THE WITNESS:  Well, one

18    clarification.  Are you talking about the time --

19    including the time it takes the consumer to find the

20    cancellation mechanism or just once they've found

21    it?

22    BY MR. KABA:



1                 CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA        )

3               I, Denise Dobner Vickery, CRR, RMR and

4    Notary Public, hereby certify the witness, AMANDA

5    BASTA, was by me first duly sworn to testify to the

6    truth; that the said deposition was recorded by me

7    and thereafter reduced to printing under my

8    direction; and that said deposition is a true

9    transcript of my original stenographic notes.

10              I certify the inspection, reading and

11   signing of said deposition were NOT waived by

12   counsel for the respective parties and by the

13   witness; that I am not a relative or employee of any

14   of the parties, or a relative or employee of either

15   counsel, and I am in no way interested directly or

16   indirectly in this action.

17   CERTIFIED TO THIS 20TH DAY OF SEPTEMBER, 2024.

18                    _Denise D. Vickery_

19                    DENISE DOBNER VICKERY, CRR,RMR
                      Notary Public in and for the
20                    District of Columbia

21

22   My Commission expires:  March 14, 2028



# EXHIBIT 65

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5    - - - - - - - - - - - - - - -x

6    FEDERAL TRADE COMMISSION,      )

7              Plaintiff,           ) No.:  2:23-CV-0932-JHC

8              V.                   )

9    AMAZON.COM, INC., et al.,      )

10             Defendants.          )

11   - - - - - - - - - - - - - - -x Pages 580-878

12

13

14     CONTINUED VIDEOTAPED DEPOSITION OF AMANDA BASTA

15                Tuesday, May 13, 2025

16                   Washington, DC

17

18

19   Reported by:  Sherry L. Brooks

20             Certified LiveNote Reporter

21   Job No. J12762460



```
1              P R O C E E D I N G S

2              *       *       *       *       *

3                     AMANDA BASTA

4    was called for further examination by counsel and,

5    after having been duly sworn by the Notary, was

6    examined and testified as follows:

7              EXAMINATION BY COUNSEL FOR DEFENDANTS    10:10

8              BY MR. KABA:                             10:10

9        Q.    Good morning, Ms. Basta.  Just for the   10:10

10   record, could you identify yourself, please?

11       A.    Sure, Amanda Basta, B-A-S-T-A.           10:10

12       Q.    And we'll do this again when the         10:10

13   videographer is here.  But could you identify your

14   position at the FTC?

15             MR. COHEN:  Counsel, before we go, can we  10:10

16   just introduce everybody else in the room?

17             MR. KABA:  Oh, sure.  I thought -- I       10:10

18   thought appearances were noted, but we can go ahead

19   and do that.

20             Go ahead, Counsel, and identify yourself.  10:10

21             MR. COHEN:  Sure.  Jonathan Cohen for the  10:10
```



AMANDA BASTA                                           May 13, 2025
FTC V. AMAZON.COM                                           638

1    A.    That's not totally consistent with my          11:27

2  understanding.

3    Q.    Do you know one way or another whether a       11:27

4  customer that is a Prime subscriber can call Amazon's

5  customer service and cancel their Prime?

6          MR. COHEN:  Scope.  Objection.  Scope.         11:27

7    A.    My understanding is in the first instance      11:27

8  when a customer called they were directed to the

9  online flow.

10         BY MR. KABA:                                    11:27

11   Q.    Okay.  That's not an answer to my              11:27

12 question.  Do you have my question in mind?

13   A.    Yes.                                            11:28

14   Q.    Okay.  Are you aware that -- yes or no --      11:28

15 whether a customer who subscribes to Amazon Prime can

16 call Amazon's customer service and cancel their

17 subscription?  It's a yes or no.

18         MR. COHEN:  Objection.  Scope.                 11:28

19   A.    Not under all circumstance.                    11:28

20         BY MR. KABA:                                    11:28

21   Q.    Can a customer under any circumstances         11:28



AMANDA BASTA                                                   May 13, 2025
FTC V. AMAZON.COM                                                      639

```
 1   call Amazon's customer service and cancel their

 2   subscription?

 3            MR. COHEN:  Objection.  Scope.              11:28

 4        A.    My understanding is there are some.       11:28

 5            BY MR. KABA:                                 11:28

 6        Q.    Okay.  Your complaint doesn't actually    11:28

 7   address calls to Amazon's customer service as a

 8   cancellation mechanism, correct?

 9            MR. COHEN:  Objection.                       11:28

10        A.    That's not true.                          11:28

11            BY MR. KABA:                                 11:28

12        Q.    Okay.  Can you point to me where you      11:28

13   believe in your complaint you allege that Amazon's

14   telephonic customer service cancellation option is

15   not simple?

16        A.    Sorry.  That's a slightly different       11:28

17   question, I think.

18        Q.    Okay.  So let's focus on my question.  Can  11:28

19   you point to me anywhere in your complaint where the

20   FTC alleges that Amazon's telephonic customer service

21   cancellation option is not simple?
```



AMANDA BASTA                                        May 13, 2025
FTC V. AMAZON.COM                                              640

| | | |
|---|---|---|
| 1 | MR. COHEN:  Objection.  Scope. | 11:29 |
| 2 | A.    No. | 11:29 |
| 3 | BY MR. KABA: | 11:29 |
| 4 | Q.    Okay.  Can you go to paragraph 127 of the | 11:29 |
| 5 | complaint, please? | |
| 6 | A.    Yes. | 11:29 |
| 7 | Q.    That's on page 47. | 11:29 |
| 8 | Do you see it? | 11:29 |
| 9 | A.    Yes. | 11:29 |
| 10 | Q.    This is the beginning of the section where | 11:29 |
| 11 | the FTC lays out its factual allegations with respect | |
| 12 | to Amazon's cancellation mechanism. | |
| 13 | A.    Yes. | 11:29 |
| 14 | Q.    Do you see that the heading of this | 11:29 |
| 15 | section is all about the Iliad Flow, I-L-I-A-D? | |
| 16 | A.    Yes. | 11:29 |
| 17 | Q.    And you understand that the Iliad Flow is | 11:30 |
| 18 | Amazon's online cancellation mechanism, correct? | |
| 19 | A.    Yes. | 11:30 |
| 20 | MR. COHEN:  Objection.  It's vague as to | 11:30 |
| 21 | "Iliad." | |



AMANDA BASTA                                    May 13, 2025
FTC V. AMAZON.COM                                        641

```
 1              BY MR. KABA:                            11:30

 2      Q.    Okay.  The term "Iliad," you understand  11:30

 3 that the term "Iliad" is actually in the complaint

 4 the FTC used, right?

 5      A.    Yes.                                      11:30

 6      Q.    Okay.  So I'd like you to take a look at  11:30

 7 paragraph 162, please.  It says:  "Amazon did not

 8 design the Iliad Flow to be simple or easy for

 9 consumers."

10              Do you see that?                        11:30

11      A.    Yes.                                      11:30

12      Q.    Okay.  And throughout this section about  11:30

13 cancellation that forms the basis of the FTC's

14 allegations in this complaint there are no

15 allegations that Amazon's telephonic cancellation

16 mechanism is not simple, correct?

17              MR. COHEN:  Objection.  Scope.          11:30

18      A.    I don't believe so, no, but I would need  11:31

19 to confirm that with our interrogatory responses.

20              BY MR. KABA:                            11:31

21      Q.    Okay.  So I said correct, and then you    11:31
```



```
 1   material that's confidential by statute.

 2            BY MR. KABA:                                    14:20

 3       Q.    Would it be helpful to give you -- why          14:20

 4   don't I mark it as an exhibit, Ms. Basta, so the

 5   record has what you're looking at.

 6            While we're doing that, can you remind me,       14:20

 7   when did you join the FTC?

 8       A.    September of 2008.                              14:20

 9            MR. KABA:  Okay.  So Basta Exhibit 18 I'll       14:20

10   hand to the witness and counsel, and then I'll -- Ms.

11   Basta, when you have a chance, take a look at it.

12   I'll have you identify it for the record.

13            (Exhibit Number 18 was marked for               14:20

14   identification and was attached to the deposition.)

15            MR. COHEN:  You said 18?                         14:21

16            MR. KABA:  Yes.                                  14:21

17            BY MR. KABA:                                     14:21

18       Q.    Ms. Basta, could you just identify Exhibit      14:21

19   18 for the record, please?

20       A.    It is a copy of the Dot Com Disclosures,       14:21

21   How to Make Effective Disclosures in Digital
```



AMANDA BASTA                                        May 13, 2025
FTC V. AMAZON.COM                                              763

1   Advertising, Federal Trade commission, March 2013.

2       Q.    So this is -- these Dot Com Disclosures,      14:21

3   just so I have it right, were issued three years

4   after ROSCA?

5       A.    Yeah.                                          14:21

6       Q.    Okay.  Now, the FTC identified the Dot Com     14:22

7   Disclosures also as providing guidance to -- relating

8   to negative option features, right?

9           MR. COHEN:  Objection.  Form.                    14:22

10          BY MR. KABA:                                     14:22

11      Q.    Why don't I ask you instead of -- instead     14:22

12  of putting words in your mouth.

13          What is the relevance of the Dot Com            14:22

14  Disclosures to this case?

15          MR. COHEN:  Objection.  I think you can         14:22

16  answer that.  But just, again, be cautious not to

17  disclose any privileged information, deliberative

18  process, or material protected by statute or any

19  attorney and mental impressions as well that are your

20  mental impressions.

21      A.    Sure.  I mean, this is part of the            14:22



AMANDA BASTA                                        May 13, 2025
FTC V. AMAZON.COM                                              764

1  universe of information that was in the world based

2  on relevant concepts in the case law and in the

3  commission's kind of enforcement history with various

4  statutes that provide guidance to industry.

5          BY MR. KABA:                                    14:23

6      Q.    On how to comply with what the law            14:23

7  requires of industry with respect to online

8  advertising and disclosures, correct?

9      A.    Just -- I'm looking for one thing.  Yeah.     14:23

10  This is broader because it doesn't apply just to, for

11  example, the negative option marketing but to, I

12  would say, a broader set of principles that apply to

13  online advertising, but yes.

14      Q.    That's fair.  So this document is actually    14:24

15  even broader than what industry -- or businesses

16  would necessarily need to know for purposes of

17  complying with ROSCA?

18          MR. COHEN:  Objection.  Form.                  14:24

19      A.    Not exactly.                                 14:24

20          BY MR. KABA:                                   14:24

21      Q.    Okay.  Let me ask you based on the           14:24



1  document.  Why don't I do it this way.

2     A.    Yes.                                        14:24

3     Q.    The Dot Com Disclosures -- one of the      14:24

4  purposes for the Dot Com Disclosures was to provide

5  guidance to businesses on a set of principles that

6  should be used with respect to, for example, clear

7  and conspicuous disclosures, correct?

8          MR. COHEN:  Objection.  Form.               14:24

9          And as with many of these, I'll instruct    14:24

10  you not to answer to the extent the only source of

11  your information may be privileged, deliberative

12  process, material protected by statute.  If you can

13  answer from the document or some other non-protected

14  source, please do.

15     A.    Yes.  So as it says on page 1, it's staff  14:25

16  guidance relating to clear and conspicuous online

17  disclosures pursuant to various laws that the FTC

18  enforces.

19          BY MR. KABA:                                14:25

20     Q.    And is clear and conspicuous disclosure in  14:25

21  the context of the Dot Com Disclosures different than



AMANDA BASTA                                May 13, 2025
FTC V. AMAZON.COM                                    766

1  clear and conspicuous disclosure in the context of

2  ROSCA?

3      A.    No.                                        14:25

4      Q.    Okay.  Okay.  Lets's just go to the        14:25

5  appendix and there are some examples.

6          Do you see that?                             14:25

7      A.    Yes.                                       14:25

8      Q.    Okay.  Just to be clear, the FTC's         14:25

9  enforcement policy statement did not include actual

10 real-world examples, correct?

11         MR. COHEN:  Objection.  Scope.  Form.        14:25

12     A.    I don't know that these are real-world     14:26

13 examples either.

14         BY MR. KABA:                                 14:26

15     Q.    Okay.  Well, these -- that's -- that's     14:26

16 fair.

17         The Dot Com Disclosures included specific    14:26

18 examples of -- of how information can be presented

19 online, correct?

20     A.    Again, not exactly.                        14:26

21     Q.    Okay.  Tell me -- tell me what is the      14:26



 1  purpose of these examples.

 2          MR. COHEN:  Sorry.  The purpose is where        14:26

 3  the issue is.  To the extent that you're able to

 4  answer without disclosing attorney/client privileged

 5  information, deliberative process, or material

 6  protected by statute, please do.

 7      A.   So some of the examples do show what an        14:26

 8  appropriate disclosure would look like.  Some of them

 9  specifically call out what inappropriate disclosures

10  look like.  So it's kind of both.

11          BY MR. KABA:                                    14:26

12      Q.   I understand.  And I'm sorry that I            14:26

13  painted with too broad a brush.  That wasn't my

14  intent.  The examples provided in 2013 with respect

15  to the Dot Com Disclosures show what appropriate or

16  an inappropriate presentation of information online

17  could look like?

18      A.   Yes, and the examples kind of explain what     14:27

19  and why.

20      Q.   Okay.  The FTC's enforcement policy            14:27

21  statement with respect to negative option marketing



1                    CERTIFICATE OF NOTARY PUBLIC

2             I, SHERRY L. BROOKS, a Notary Public in

3    and for the DISTRICT OF COLUMBIA, before whom the

4    foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn by me; that the

7    testimony of said witness was taken by me in

8    Shorthand at the time and place mentioned in the

9    caption hereof and thereafter transcribed by me; that

10   said deposition is a true record of the testimony

11   given by said witness; that I am neither counsel for,

12   related to, nor employed by any of the parties to the

13   action in which this deposition was taken; and

14   further, that I am not a relative or employee of any

15   counsel or attorney employed by the parties hereto,

16   nor financially or otherwise interested in the

17   outcome of this action.

18                              _Sherry L. Brooks_

19                              SHERRY L. BROOKS
                           Notary Public in and for
20                             DISTRICT OF COLUMBIA

21   My commission expires:  November 30, 2025



# EXHIBIT 66

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF WASHINGTON

3

4   FEDERAL TRADE COMMISSION,      )
                                   )
5                 Plaintiff,       ) Case No.
                                   ) 2:23-cv-00932-JHC
6              vs.                 )
                                   )
7   AMAZON.COM, INC., et al.,      )
                                   )
8                 Defendants.      )
    ---------------------------)

9

10

11

12         * CONTAINS CONFIDENTIAL PORTIONS *

13            (Pages 7:12 through 228:5)

14

15

16   DEPOSITION OF RUSSELL CHRISTOPHER GRANDINETTI

17                 New York, New York

18            Wednesday, November 13, 2024

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. J11924621



```
 1   R U S S E L L   C H R I S T O P H E R
 2   G R A N D I N E T T I,
 3        called as a witness, having been duly sworn
 4        by a Notary Public, was examined and
 5        testified as follows:
 6   EXAMINATION BY
 7   MR. NARDINI:
 8        Q.    Good morning.  Could you, please, state
 9   your full name for the record.
10        A.    Sure.  Russell Christopher Grandinetti.
11        Q.    Good morning, Mr. Grandinetti.  My name
12   is Max Nardini.  I'm an attorney with the Federal
13   Trade Commission.  I am joined today by my
14   colleague, Anthony Saunders.
15             You are represented by counsel here
16   today; correct?
17        A.    I am.
18             MR. NARDINI:  Could your counsel,
19        please, introduce themselves for the record.
20             MR. HUESTON:  John Hueston and Karen
21        Ding on behalf of Amazon.
22             MR. NARDINI:  And there are others, but
23        I think we have --
24             THE COURT REPORTER:  Yes.
25             MR. NARDINI:  Great.  Okay.
```



1     incomplete hypothetical.

2          A.    I would need to understand more about

3     your question to do a good job answering it.

4                MR. NARDINI:  We can set this aside.

5                Let's mark as RG-15 the following chat.

6                (Exhibit RG-15, Chat with "Meeting

7                (Bot)", Bates stamped Amazon-FTC-CID_09814266

8                through Amazon-FTC-CID_09814269, marked for

9                identification.)

10         Q.    There are redactions that were applied

11    to this document that were added before production

12    to the FTC, and I will just read the Bates number

13    is Amazon-FTC-CID_09814266.

14               So Mr. Grandinetti, the substance of

15    this is redacted, but you can see that this is a

16    Chime meeting; correct?  Strike that.  It's a

17    Chime chat; correct?

18         A.    It looks like the log of some kind of

19    Chime chat.

20         Q.    And it's dated May 6th, 2021; correct?

21         A.    That's correct.

22         Q.    And if you look down to like the last

23    fourth of the page, you will see just --

24         A.    Of the first page?

25         Q.    Yes, and actually I realize we can do



1   this looking at the top as well, if you just look

2   to the top of the page under Chat with "Meeting

3   (Bot)," there is text that reads:  "Clark review:

4   Prime Account CX Satisfaction," and then there is

5   some additional text.  Do you see that?

6        A.   I see that it says:  "Clark Review:

7   Prime Account CX Satisfaction."

8        Q.   And you see that you are included on

9   this chat fourth from the bottom?

10       A.   I see that I am one of the parties

11  listed here.

12       Q.   Listed there, right.

13            And if you turn the page to the second

14  page of the document, you see like six people down

15  it says "Grandinetti, Russell," your e-mail, and

16  "MEMBER ADD"; correct?

17       A.   Are you talking about on the second

18  page?

19       Q.   Uh-huh.

20       A.   Oh, okay.  I see my name there now,

21  yes.

22       Q.   Do you know if you attended this

23  meeting?

24       A.   I do not.

25       Q.   If you were going to determine whether



1   you attended this meeting, how would you go about

2   that?

3        A.    I'm not sure.

4        Q.    Would that be information that your

5   administrative assistant would have?

6        A.    I don't know.

7        Q.    Does your administrative assistant

8   track the meetings you do or do not attend?

9        A.    I don't know.

10       Q.    Have you ever discussed that subject

11  with your administrative assistant, whether or not

12  they track the meetings you do or do not attend?

13       A.    Could you clarify what you mean by

14  "track"?

15       Q.    Sure.  Like a logbook or something like

16  that.

17       A.    I'm not aware -- we have never

18  discussed it.

19       Q.    Okay.  You never discussed it, you are

20  not aware of the existence of like a log of your

21  meetings you have attended kept by your

22  administrative assistant; correct?

23       A.    I'm not aware of one.

24       Q.    But it's possible that exists, you just

25  don't know either way; correct?



```
 1                C E R T I F I C A T E

 2

 3   STATE OF NEW YORK     )

 4                         ) ss.:

 5   COUNTY OF NASSAU      )

 6            I, KRISTIN KOCH, a Notary Public

 7       within and for the State of New York, do

 8       hereby certify:

 9            That RUSSELL CHRISTOPHER GRANDINETTI,

10       the witness whose deposition is

11       hereinbefore set forth, was duly sworn by

12       me and that such deposition is a true

13       record of the testimony given by such

14       witness.

15            I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage; and that I am

18       in no way interested in the outcome of this

19       matter.

20            IN WITNESS WHEREOF, I have hereunto

21       set my hand this 17 day of November, 2024.

22

23

24       _____

25            KRISTIN KOCH, RPR, RMR, CRR
```



# EXHIBIT 67

```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON

                        AT SEATTLE


FEDERAL TRADE COMMISSION,           )
                                    )
                  Plaintiff,        )
                                    )
             vs.                    ) No. 2:23-cv-0932-JHC
                                    )
AMAZON.COM, INC., et al.,           )
                                    )
                  Defendant.        )
                                    )
                                    )


              DEPOSITION OF NEIL LINDSAY


               November 19, 2024


               Seattle, Washington


          ***** Confidential *****
```

Reporter: Teri Simons, CCR, RMR, CRR



| | |
|---|---|
| 1 | BE IT REMEMBERED that on Tuesday, |
| 2 | November 19, 2024, at 8:32 a.m., before Terilynn Simons, |
| 3 | Certified Court Reporter, CCR, RMR, CRR, CLR, appeared |
| 4 | NEIL LINDSAY, the witness herein; |
| 5 | WHEREUPON, the following proceedings |
| 6 | were had, to wit: |
| 7 | <<<<<< >>>>>> |
| 8 | NEIL LINDSAY,            having been first duly sworn |
| 9 | by the Certified Court Reporter, |
| 10 | testified as follows: |
| 11 | EXAMINATION |
| 12 | BY MS. JERJIAN:                                      08:32:42 |
| 13 | Q  Good morning.  Please state your full name.      08:32:42 |
| 14 | A  Neil Robert Lindsay.                              08:32:46 |
| 15 | Q  My name is Olivia Jerjian and I am here with my   08:32:48 |
| 16 | colleague, Evan Mendelson, and we are both attorneys with  08:32:51 |
| 17 | the Federal Trade Commission, and on the phone are also  08:32:54 |
| 18 | my colleagues, Max Nardini and Anthony Saunders.    08:32:57 |
| 19 | I see you are represented by counsel here today.  08:32:59 |
| 20 | MS. JERJIAN:  Could you please        08:33:01 |
| 21 | introduce yourself?                                 08:33:02 |
| 22 | MR. KABA:  Yes, I will enter          08:33:03 |
| 23 | appearances.                                        08:33:04 |
| 24 | Moez Kaba of Hueston Hennigan on behalf of the    08:33:05 |
| 25 | defendants.  I am joined by Joseph Aronsohn, also of  08:33:10 |



NEIL LINDSAY  Confidential                      November 19, 2024
FTC vs AMAZON.COM                                             31

| | | | |
|---|---|---|---|
| 1 | | enrollment when he was vice president of Prime | 09:14:13 |
| 2 | | International? | 09:14:20 |
| 3 | A | Prime enrollment is complicated in the sense that people | 09:14:20 |
| 4 | | sign up sometimes through Prime Video or through-- or | 09:14:24 |
| 5 | | when they're in the store purchasing an item or when they | 09:14:33 |
| 6 | | come to a detail page, so some aspects of Prime | 09:14:35 |
| 7 | | enrollment were Mr. Ghani's responsibility, but other | 09:14:42 |
| 8 | | teams also had responsibility for Prime enrollment. | 09:14:45 |
| 9 | Q | Did Mr. Ghani have responsibility for-- over Prime | 09:14:49 |
| 10 | | cancellation, while he was VP of Prime International? | 09:14:57 |
| 11 | | MR. KABA:  Objection; overbroad. | 09:15:04 |
| 12 | | Go ahead. | 09:15:05 |
| 13 | | THE WITNESS:  Less so, to some | 09:15:06 |
| 14 | | extent-- again, Prime cancellation can happen a number of | 09:15:12 |
| 15 | | different ways. | 09:15:15 |
| 16 | | There is a-- you can make a call to our Care | 09:15:16 |
| 17 | | organization, which-- and then there's services, | 09:15:22 |
| 18 | | technology services, that are built that may have been | 09:15:30 |
| 19 | | built by Mr. Sibay's team to help with the cancellation | 09:15:32 |
| 20 | | flows. | 09:15:39 |
| 21 | | Then there are, again, other benefit teams where | 09:15:41 |
| 22 | | there are pathways, I guess, to cancellation. | 09:15:44 |
| 23 | Q | (By Ms. Jerjian)  Maybe to narrow it down a bit, did | 09:15:54 |
| 24 | | Mr. Ghani have-- strike that. | 09:15:57 |
| 25 | | Was Mr. Ghani responsible for the online Prime | 09:16:00 |



NEIL LINDSAY  Confidential                    November 19, 2024
FTC vs AMAZON.COM                                            32

| | | | |
|---|---|---|---|
| 1 | | cancellation flow while he was VP of Prime International? | 09:16:03 |
| 2 | A | Not directly, I don't believe, but we all, as a | 09:16:10 |
| 3 | | leadership team, are engaged in any aspect of the | 09:16:18 |
| 4 | | cancellation process. | 09:16:27 |
| 5 | Q | Who was responsible for the online cancellation flow for | 09:16:29 |
| 6 | | Prime during that time period then, if not Mr. Ghani? | 09:16:33 |
| 7 | A | Again, the responsibility is distributed in some ways, | 09:16:37 |
| 8 | | but in terms of the technical aspects of cancellation | 09:16:44 |
| 9 | | flows, I believe, and I may be wrong, but I believe it | 09:16:53 |
| 10 | | was in James Sibay's organization. | 09:16:57 |
| 11 | Q | And did Mr. Ghani have any responsibility over the Prime | 09:17:04 |
| 12 | | enrollment opportunities in the online checkout flow | 09:17:14 |
| 13 | | while he was vice president of Prime International? | 09:17:20 |
| 14 | | MR. KABA:  Objection; overbroad, | 09:17:25 |
| 15 | | vague. | 09:17:27 |
| 16 | | THE WITNESS:  Again, it's not like the | 09:17:27 |
| 17 | | responsibility sat in one place. | 09:17:33 |
| 18 | | We work as a team. | 09:17:36 |
| 19 | | Some teams build components. | 09:17:41 |
| 20 | | As a leadership team we had-- there's CX teams, or | 09:17:44 |
| 21 | | customer experience teams, that work on what the | 09:17:51 |
| 22 | | experience might be, and there are multiple teams. | 09:17:54 |
| 23 | | He had some responsibility in the sense of-- as part | 09:17:57 |
| 24 | | of the Prime leadership team, but not, I wouldn't say, an | 09:18:02 |
| 25 | | entire responsibility. | 09:18:07 |



NEIL LINDSAY  Confidential                    November 19, 2024
FTC vs AMAZON.COM                                          33

| | | | |
|---|---|---|---|
| 1 | Q | (By Ms. Jerjian)  Did Mr. Sibay share some of that | 09:18:09 |
| 2 | | responsibility, as you indicated, also as to Prime | 09:18:12 |
| 3 | | cancellations earlier? | 09:18:18 |
| 4 | A | Yes, he had some aspects of that responsibility. | 09:18:19 |
| 5 | Q | Okay.  After Mr. Ghani obtained this consolidated Prime | 09:18:23 |
| 6 | | business role, did he have responsibility over the online | 09:18:29 |
| 7 | | cancellation flow for Prime? | 09:18:35 |
| 8 | A | Again, he had some responsibility for the tech teams that | 09:18:37 |
| 9 | | built those capabilities, but keep in mind that Prime, | 09:18:50 |
| 10 | | again, touches every part of the company, and so there | 09:18:55 |
| 11 | | are many people involved in the process of cancellation | 09:19:00 |
| 12 | | flows and-- so yes, some responsibility. | 09:19:05 |
| 13 | Q | Was he the most senior person with responsibility over | 09:19:10 |
| 14 | | the Prime cancellation flow? | 09:19:16 |
| 15 | | MR. KABA:  Objection; vague, | 09:19:20 |
| 16 | | overbroad. | 09:19:26 |
| 17 | | THE WITNESS:  It's difficult. | 09:19:26 |
| 18 | | We work collaboratively as an organization, perhaps | 09:19:30 |
| 19 | | almost more so in Prime than in any part of the company, | 09:19:36 |
| 20 | | because it is so-- has such a-- it's important to every | 09:19:42 |
| 21 | | part of Amazon, so it is difficult to identify the most | 09:19:47 |
| 22 | | senior person responsible. | 09:19:53 |
| 23 | | He had some responsibility for those flows. | 09:20:00 |
| 24 | Q | (By Ms. Jerjian)  Well, during your tenure at Prime, did | 09:20:05 |
| 25 | | you have any responsibility over the online cancellation | 09:20:07 |



NEIL LINDSAY  Confidential                    November 19, 2024
FTC vs AMAZON.COM                                          34

| | | | |
|---|---|---|---|
| 1 | | flow for Prime? | 09:20:10 |
| 2 | A | Again, we work collaboratively. | 09:20:11 |
| 3 | | I would say I had some responsibility for those | 09:20:16 |
| 4 | | cancellation flows, but there are aspects of flows that | 09:20:18 |
| 5 | | can be decided independently by a small team.  There are | 09:20:24 |
| 6 | | aspects that require more involvement of other teams, so | 09:20:28 |
| 7 | | pretty much in Prime it's difficult to identify this one | 09:20:35 |
| 8 | | team, this one person had 100 percent responsibility. | 09:20:44 |
| 9 | Q | So you had some responsibility over the Prime | 09:20:48 |
| 10 | | cancellation flow-- online Prime cancellation flow during | 09:20:59 |
| 11 | | your tenure at Prime, correct? | 09:21:03 |
| 12 | | MR. KABA:  Objection; asked and | 09:21:05 |
| 13 | | answered. | 09:21:07 |
| 14 | | THE WITNESS:  I have some | 09:21:07 |
| 15 | | responsibility for many things related to Prime. | 09:21:08 |
| 16 | Q | (By Ms. Jerjian)  Including the online cancellation flow, | 09:21:13 |
| 17 | | correct? | 09:21:15 |
| 18 | | MR. KABA:  Objection; asked and | 09:21:15 |
| 19 | | answered. | 09:21:16 |
| 20 | | THE WITNESS:  The online cancellation | 09:21:17 |
| 21 | | flow is-- some aspects of that are part of my | 09:21:18 |
| 22 | | responsibility, but also other people are involved. | 09:21:24 |
| 23 | Q | (By Ms. Jerjian)  When you say "other people are | 09:21:30 |
| 24 | | involved," who are you referring to? | 09:21:32 |
| 25 | A | As I mentioned, Prime is important to our entertainment | 09:21:33 |



| | | |
|---|---|---|
| 1 | business, to our gaming business, to our delivery | 09:21:43 |
| 2 | business, to many, many aspects of our business, | 09:21:46 |
| 3 | including multiple countries, so there are many | 09:21:49 |
| 4 | stakeholders in Prime. | 09:21:54 |
| 5 | Q  So the entertainment business had authority over the | 09:21:59 |
| 6 | prime online cancellation flow? | 09:22:02 |
| 7 | A  I wouldn't say they had authority over it, but I would | 09:22:04 |
| 8 | say they are a stakeholder, and any decisions we make | 09:22:11 |
| 9 | about any aspect of our flows would sometimes need to | 09:22:20 |
| 10 | involve other stakeholders. | 09:22:23 |
| 11 | Q  During your tenure at Prime, did you have authority over | 09:22:25 |
| 12 | the Prime cancellation flow? | 09:22:31 |
| 13 | A  Well, again-- | 09:22:33 |
| 14 | MR. KABA:  Objection; vague as to | 09:22:34 |
| 15 | "authority." | 09:22:38 |
| 16 | THE WITNESS:  Again, the authority is | 09:22:40 |
| 17 | distributed in Amazon, in that we don't make-- | 09:22:46 |
| 18 | particularly for a program that touches so many aspects | 09:22:50 |
| 19 | of Amazon, it's difficult to say any one person had all | 09:22:52 |
| 20 | authority overflows. | 09:22:58 |
| 21 | Q  (By Ms. Jerjian)  Would you give the same answer with | 09:23:04 |
| 22 | respect to Prime upsells in the online checkout flow? | 09:23:06 |
| 23 | MR. KABA:  Objection; form. | 09:23:17 |
| 24 | THE WITNESS:  So by the same answer, I | 09:23:18 |
| 25 | would say that the upsell checkout flows, like all flows, | 09:23:22 |



| | | |
|---|---|---|
| 1 | have some aspects that individual teams can, you know, | 09:23:30 |
| 2 | experiment independently, and there are other aspects | 09:23:41 |
| 3 | that will involve many stakeholders, depending on the | 09:23:43 |
| 4 | scale and implications of the change. | 09:23:52 |
| 5 | Q   (By Ms. Jerjian)  So earlier when I asked you whether the | 09:23:57 |
| 6 | entertainment business had authority over the Prime | 09:23:59 |
| 7 | cancellation flow, you distinguished stakeholders and | 09:24:02 |
| 8 | authority. | 09:24:06 |
| 9 | How do you understand-- what do you understand | 09:24:06 |
| 10 | "authority" to mean? | 09:24:09 |
| 11 | MR. KABA:  Objection to the form of | 09:24:14 |
| 12 | the question.  Objection so far as it calls for a legal | 09:24:15 |
| 13 | conclusion. | 09:24:19 |
| 14 | THE WITNESS:  It is a good question | 09:24:20 |
| 15 | because it could mean many different things to many | 09:24:30 |
| 16 | different people. | 09:24:32 |
| 17 | Q   (By Ms. Jerjian)  What did you understand it to mean when | 09:24:33 |
| 18 | you distinguished "authority holders" from | 09:24:34 |
| 19 | "stakeholders"? | 09:24:37 |
| 20 | MR. KABA:  Objection; misstates the | 09:24:40 |
| 21 | testimony. | 09:24:41 |
| 22 | THE WITNESS:  Can you repeat the | 09:24:43 |
| 23 | question? | 09:24:45 |
| 24 | MR. KABA:  Objection to the extent it | 09:24:45 |
| 25 | calls for a legal conclusion. | 09:24:47 |



| | | |
|---|---|---|
| 1 | Q    (By Ms. Jerjian)  Earlier I asked you if the | 09:24:49 |
| 2 | entertainment business had authority over the online | 09:24:50 |
| 3 | cancellation flow, and you said they were stakeholders, | 09:24:54 |
| 4 | they didn't necessarily have authority. | 09:24:58 |
| 5 | I might be paraphrasing it, but I'm interested in | 09:25:00 |
| 6 | understanding what you mean when you distinguish | 09:25:03 |
| 7 | "stakeholder" from "authority." | 09:25:05 |
| 8 | What do you understand by "authority"? | 09:25:10 |
| 9 | MR. KABA:  Objection to the form of | 09:25:13 |
| 10 | the question.  It is compound.  It is vague, and I object | 09:25:15 |
| 11 | to the extent it calls for a legal conclusion. | 09:25:22 |
| 12 | THE WITNESS:  I am struggling with the | 09:25:25 |
| 13 | question also because I guess I'm-- what I would say is | 09:25:27 |
| 14 | those two things are intwined. | 09:25:34 |
| 15 | Stakeholders have influence, and "authority" to me | 09:25:37 |
| 16 | implies an individual-- an independent responsibility for | 09:25:47 |
| 17 | decision. | 09:25:53 |
| 18 | In Amazon we are very collaborative, particularly in | 09:25:56 |
| 19 | businesses like Prime, and we work together to make | 09:26:00 |
| 20 | decisions. | 09:26:04 |
| 21 | Can I grab some more water? | 09:26:23 |
| 22 | MS. JERJIAN:  Can we go off the | 09:26:25 |
| 23 | record? | 09:26:26 |
| 24 | MR. KABA:  No.  We will grab him | 09:26:26 |
| 25 | water.  Let's keep it going.  Thank you. | 09:26:29 |



| | | | |
|---|---|---|---|
| 1 | | MS. JERJIAN:  Okay. | 09:26:32 |
| 2 | Q | (By Ms. Jerjian)  Did you report to Mr. Grandinetti in | 09:26:47 |
| 3 | | any way? | 09:26:50 |
| 4 | A | No, I have not formally reported to Mr. Grandinetti. | 09:26:50 |
| 5 | Q | Informally? | 09:26:57 |
| 6 | A | As I mentioned earlier, it's a very collaborative | 09:26:58 |
| 7 | | environment. | 09:27:05 |
| 8 | | He is a long tenured Amazonian, senior Amazonian, | 09:27:05 |
| 9 | | and I have considered him a mentor and advisor and an | 09:27:11 |
| 10 | | important stakeholder. | 09:27:19 |
| 11 | Q | Is he a stakeholder for Amazon Prime, during your tenure | 09:27:23 |
| 12 | | at Prime? | 09:27:29 |
| 13 | A | He and many other leaders. | 09:27:30 |
| 14 | | Many, many other leaders are stakeholders for Prime, | 09:27:36 |
| 15 | | but I didn't informally or formally report to | 09:27:39 |
| 16 | | Mr. Grandinetti. | 09:27:42 |
| 17 | Q | What do you mean by "stakeholder"? | 09:27:45 |
| 18 | A | Someone who has an interest in the business and the | 09:27:47 |
| 19 | | actions we take, considering we all care about the | 09:27:59 |
| 20 | | customer experience and business performance. | 09:28:08 |
| 21 | Q | Did you review the transcript of your investigational | 09:28:10 |
| 22 | | hearing in this matter in October of 2022? | 09:28:46 |
| 23 | | MR. KABA:  I am going to instruct you | 09:28:51 |
| 24 | | not to answer insofar as that calls for attorney-client | 09:28:53 |
| 25 | | privilege and attorney work product communications. | 09:28:57 |



```
 1  Q   (By Ms. Jerjian)  Are you going to follow your counsel's      09:29:00

 2      instruction not to respond?                                    09:29:03

 3  A   Yes.                                                           09:29:04

 4                          (Exhibit No. NL-02 marked                  09:29:04

 5                          for identification.)                       09:29:29

 6  Q   (By Ms. Jerjian)  Mr. Lindsay, I am showing you what I've      09:29:29

 7      marked as NL-02, which has Bates Nos. AMZN_00097374.           09:29:32

 8          This is an e-mail from Jake Burghardt to a number of       09:29:56

 9      individuals, including yourself.                               09:30:00

10          Mr. Lindsay, were you a part of the April 19th            09:30:22

11      meeting that is referred to in the first line of this         09:30:24

12      e-mail?                                                        09:30:26

13  A   Let me take a moment to review.                               09:30:27

14  Q   Just to make sure, you can't answer my question without       09:30:33

15      reviewing the e-mail?                                         09:30:35

16                      MR. KABA:  He can review the e-mail if         09:30:39

17      you put it in front of him.                                   09:30:41

18  Q   (By Ms. Jerjian)  "Yes" or "no"?                              09:30:43

19                      MR. KABA:  He is allowed to review the         09:30:44

20      e-mail, Counsel.                                              09:30:45

21          If you wanted to ask him a question without the           09:30:47

22      e-mail, that's what you should have done.                     09:30:51

23                      THE WITNESS:  Can you ask the question        09:31:44

24      again?                                                         09:31:46

25  Q   (By Ms. Jerjian)  Did you have to review the entirety of      09:31:50
```



| | | |
|---|---|---|
| 1 | As far as I know, this is the complete chat. | 13:02:55 |
| 2 | A  I see. | 13:02:57 |
| 3 | I may have chats-- for example, if I'm having a chat | 13:02:58 |
| 4 | with Jamil that was a week ago, it would still be in that | 13:03:02 |
| 5 | thread, so I may have-- it appears I initiated this chat. | 13:03:06 |
| 6 | Q  Fair enough. | 13:03:10 |
| 7 | You quote, "BTW, why have we only implemented signup | 13:03:11 |
| 8 | clarity improvements in DE"? | 13:03:18 |
| 9 | Is "DE" referring to "Germany"? | 13:03:23 |
| 10 | A  I'm referring to Germany, yes. | 13:03:25 |
| 11 | Q  Are you referring specifically to Germany Prime or | 13:03:27 |
| 12 | something else? | 13:03:30 |
| 13 | A  I suspect the reference to "clarity improvements" refers | 13:03:30 |
| 14 | to Prime. | 13:03:38 |
| 15 | Q  What did you mean when you wrote "clarity improvements"? | 13:03:40 |
| 16 | A  I don't know. | 13:03:43 |
| 17 | Because I started this with "by the way," I suspect | 13:03:47 |
| 18 | it's a continuation of a conversation because I wouldn't | 13:03:51 |
| 19 | have started that out of thin air. | 13:03:54 |
| 20 | I think-- I don't know precisely what I was | 13:04:00 |
| 21 | referring to.  It was the general topic, I think. | 13:04:05 |
| 22 | Q  The general topic of clarity improvements? | 13:04:09 |
| 23 | A  Yes, I imagine the general topic of clarity improvements. | 13:04:13 |
| 24 | Q  And just to make sure I'm following correctly, did you | 13:04:18 |
| 25 | have responsibilities, as VP or SVP at Prime, over the | 13:04:34 |



| | | | |
|---|---|---|---|
| 1 | | Prime organizations in other locales outside of the U.S.? | 13:04:40 |
| 2 | A | We are no longer looking at this doc, right? | 13:04:45 |
| 3 | Q | No, yeah. | 13:04:50 |
| 4 | A | Yes, I had responsibility for-- some responsibility for | 13:04:52 |
| 5 | | our Prime program. | 13:04:58 |
| 6 | | Remember that the country management, regional | 13:05:00 |
| 7 | | leadership, others are all-- not just major stakeholders | 13:05:03 |
| 8 | | but also have the responsibility of performance for Prime | 13:05:09 |
| 9 | | in those countries, as well as benefit teams. | 13:05:12 |
| 10 | Q | And Mr. Ghani responded to your message, and he wrote, | 13:05:14 |
| 11 | | "In 2017 there was a final judgment from consumer rights | 13:05:19 |
| 12 | | directive that mandated signup button clarity," end | 13:05:22 |
| 13 | | quote. | 13:05:30 |
| 14 | A | May I just read the rest of this?  It's not long.  I want | 13:05:32 |
| 15 | | to just get the context. | 13:05:35 |
| 16 | | What is the question? | 13:06:09 |
| 17 | Q | I read the first sentence in Mr. Ghani's first chat, and | 13:06:10 |
| 18 | | I was going to ask you, is it accurate that signup | 13:06:15 |
| 19 | | clarity improvements were implemented in Germany because | 13:06:20 |
| 20 | | of the consumer rights directive that mandates signup | 13:06:24 |
| 21 | | button clarity? | 13:06:29 |
| 22 | A | I don't remember the timing, but there was some changes | 13:06:30 |
| 23 | | made in response to a directive, which is a clear | 13:06:39 |
| 24 | | indication that when we have clear instructions from a | 13:06:44 |
| 25 | | regulatory body or anything else, we will follow those | 13:06:47 |



| | | |
|---|---|---|
| 1 | instructions, and in Germany they gave us very specific | 13:06:50 |
| 2 | instructions as to how things should work. | 13:06:56 |
| 3 | Q   Did those changes that were implemented in Germany | 13:06:58 |
| 4 |     improve clarity in the signup flow for Prime? | 13:07:03 |
| 5 |                    MR. KABA:  Objection; speculation. | 13:07:08 |
| 6 |                    THE WITNESS:  I don't know. | 13:07:09 |
| 7 |          Remember, we are responding to instructions as to | 13:07:16 |
| 8 |     how things-- how we are told things should work, and so | 13:07:18 |
| 9 |     there's less about whether it was achieving clarity than | 13:07:26 |
| 10 |     complying with clear and specific instructions, which we | 13:07:32 |
| 11 |     have not had in the U.S. | 13:07:36 |
| 12 | Q   (By Ms. Jerjian)  Was it your understanding that those | 13:07:39 |
| 13 |     instructions were mandated to improve clarity in the | 13:07:43 |
| 14 |     Prime enrollment flow in Germany? | 13:07:51 |
| 15 |                    MR. KABA:  Objection; calls for | 13:07:55 |
| 16 |     speculation and lacks foundation. | 13:07:58 |
| 17 |                    THE WITNESS:  I actually-- can you | 13:08:01 |
| 18 |     repeat the question?  I just want to make sure I answer | 13:08:04 |
| 19 |     the right question. | 13:08:07 |
| 20 |                    MS. JERJIAN:  You can read back my | 13:08:08 |
| 21 |     question. | 13:08:09 |
| 22 |                         (Section(s) designated were | 13:08:09 |
| 23 |                          read by the reporter.) | 13:08:24 |
| 24 |                    THE WITNESS:  I don't recall any. | 13:08:24 |
| 25 |          In fact, this thread makes it clear that I'm not | 13:08:25 |



```
 1      clear on what the driver was exactly or what those        13:08:31

 2      instructions were specifically.                           13:08:34

 3   Q  (By Ms. Jerjian)  Can you point to me where it makes it   13:08:35

 4      clear that you're not clear?                              13:08:40

 5   A  The question in the first section, "Was the issue bigger  13:08:42

 6      there"-- because I wasn't clear on the motivation, and I  13:08:53

 7      don't recall remembering the specifics of the mandate.    13:08:55

 8   Q  And when you wrote, "Was the issue bigger there," were    13:09:01

 9      you comparing it to the United States?                    13:09:04

10   A  I don't know specifically, but perhaps.                   13:09:06

11          Again, this starts with "by the way," so there might  13:09:15

12      have been more to this thread, so I don't know if the     13:09:18

13      context before this was about another country.            13:09:21

14          It's probably reasonable that I may be comparing it   13:09:24

15      to the U.S.                                               13:09:30

16   Q  Looking at Mr. Ghani's chat where he writes, in response  13:09:31

17      to your first entry, quote, "Unmitigated, it was negative 13:09:35

18      40 percent plus headwind," what does "headwind" refer to  13:09:42

19      here?                                                     13:09:47

20   A  It refers to some negative impact on the business, I      13:09:47

21      believe.                                                  13:09:59

22   Q  Do you know what specifically about the business?         13:09:59

23          Is it number of enrollees or something else?          13:10:07

24                    MR. KABA:  Objection; speculation.          13:10:10

25                    THE WITNESS:  I can't tell from this.       13:10:12
```



NEIL LINDSAY  Confidential                     November 19, 2024
FTC vs AMAZON.COM                                            124

```
 1     and the United States?                        13:12:05

 2  A  I don't know.                                 13:12:06

 3        As I mentioned, I'm not sure I recall what the  13:12:10

 4     changes were that were mandated in Germany.   13:12:13

 5        I don't know if we implemented them in the U.S.  13:12:16

 6        I would be-- I do want to make it clear that if the  13:12:22

 7     FTC gave us clear instructions as to what we are expected  13:12:25

 8     to do, which they have never done, we would have done  13:12:32

 9     them.                                         13:12:38

10  Q  Based on your chat time stamped 11:43:09, is it accurate  13:12:39

11     to state that the directive to implement the signup  13:12:54

12     clarity improvements in Germany made the signup clearer  13:13:00

13     for subscribers signing up for Prime?         13:13:11

14              MR. KABA:  Objection; misstates the   13:13:17

15     document and lacks foundation, calls for speculation.  13:13:18

16        Go ahead, if you have the question in mind.  13:13:25

17              THE WITNESS:  I'm sorry, you have to   13:13:29

18     replay the question.                          13:13:31

19  Q  (By Ms. Jerjian)  Did you forget my question because of  13:13:32

20     your counsel's objections--                   13:13:34

21              MR. KABA:  Please don't comment on my  13:13:36

22     objections, Counsel.  That is entirely inappropriate.  13:13:38

23     You know that.                                13:13:41

24  Q  (By Ms. Jerjian)  I will repeat my question.  13:13:42

25        Is it accurate to state that the signup clarity  13:13:44
```



| | | |
|---|---|---|
| 1 | improvements implemented in Germany made it clear to | 13:13:52 |
| 2 | subscribers that they're signing up for a subscription | 13:13:57 |
| 3 | specifically with respect to Prime? | 13:14:00 |
| 4 | MR. KABA:  Objection; lacks foundation | 13:14:03 |
| 5 | and calls for speculation. | 13:14:05 |
| 6 | THE WITNESS:  I don't know, and I | 13:14:06 |
| 7 | doubt it. | 13:14:09 |
| 8 | Our signup process is always clear. | 13:14:11 |
| 9 | The only difference is we have clear instructions as | 13:14:13 |
| 10 | to what is required, not just of us but of other people | 13:14:17 |
| 11 | on subscription programs. | 13:14:21 |
| 12 | If there are regulatory instructions or instructions | 13:14:23 |
| 13 | that are made clear to those selling subscriptions, we | 13:14:32 |
| 14 | will follow them, and I sometimes wish the FTC was clear | 13:14:35 |
| 15 | with us as to what their expectations were, and they | 13:14:40 |
| 16 | never have been. | 13:14:42 |
| 17 | I don't know whether it made it clearer.  I just | 13:14:43 |
| 18 | know that we are happy to comply when there is a | 13:14:47 |
| 19 | directive to do so. | 13:14:51 |
| 20 | Q  (By Ms. Jerjian)  Is it your position that the regulatory | 13:14:53 |
| 21 | instructions that you are referring to did not make it | 13:14:56 |
| 22 | clearer that customers are signing up for a Prime | 13:15:00 |
| 23 | subscription? | 13:15:04 |
| 24 | MR. KABA:  Objection; misstates | 13:15:05 |
| 25 | testimony. | 13:15:07 |



1              THE WITNESS:  Again, that's not what I        13:15:07

2     said.                                                   13:15:09

3         What I'm saying is I don't know, and I wouldn't    13:15:10

4     assume that it does make it clearer.                   13:15:14

5  Q  (By Ms. Jerjian)  To your knowledge, did Amazon        13:15:17

6     investigate whether or not the signup clarity          13:15:30

7     improvements in Germany made the Prime signup process in 13:15:33

8     checkout clearer for customers?                        13:15:43

9              MR. KABA:  Objection; lacks                   13:15:46

10    foundation.                                            13:15:51

11             THE WITNESS:  I didn't state that they        13:15:51

12    were clarity improvements.                             13:15:55

13        They were directives, compliance to directives.   13:15:56

14 Q  (By Ms. Jerjian)  You refer to them though as "signup  13:16:01

15    clarity improvements" in your chat, didn't you?        13:16:04

16 A  Let me re-read.                                        13:16:06

17        I did refer to them as that, but, again, these chats 13:16:07

18    are notoriously poorly written.                        13:16:17

19        I don't know what I'm referring to there at all,   13:16:21

20    whether I-- I don't think I'm making declarative       13:16:26

21    statements that I knew that these were signup clarity  13:16:31

22    improvements as much as they may have just been changes 13:16:34

23    in the experience, is my intention.                    13:16:45

24 Q  If you didn't view them as signup clarity improvements, 13:16:46

25    why did you refer to them as such in your chat entry?  13:16:49



| | | |
|---|---|---|
| 1 | It's a ridiculous assertion. | 13:24:46 |
| 2 | Q  (By Ms. Jerjian)  Is it your position that every | 13:24:48 |
| 3 | subscriber in Prime, who is a monthly subscriber, | 13:24:53 |
| 4 | knowingly enrolled in Prime? | 13:25:01 |
| 5 | A  It is my position that I don't know, right? | 13:25:02 |
| 6 | I don't know, but-- one interesting fact is when you | 13:25:13 |
| 7 | look at third-party data, they report more people | 13:25:16 |
| 8 | individually report as members of Prime than actually are | 13:25:20 |
| 9 | members of Prime. | 13:25:24 |
| 10 | So in the population, when you see third-party | 13:25:24 |
| 11 | reports of how many members of Prime there are, it's | 13:25:28 |
| 12 | greater than the actual number, so there are many people | 13:25:32 |
| 13 | who believe they're members of Prime who aren't members | 13:25:34 |
| 14 | of Prime, according to the data we see. | 13:25:37 |
| 15 | My assertion is that people, when they sign up for | 13:25:39 |
| 16 | Prime, they do so knowingly. | 13:25:46 |
| 17 | If they choose not to continue to sign up for Prime, | 13:25:49 |
| 18 | they have easy ways to do so, and they successfully-- | 13:25:52 |
| 19 | many millions successfully don't sign up for Prime. | 13:25:56 |
| 20 | While I can't talk in absolutes, it's certainly not | 13:26:00 |
| 21 | a pervasive concern that, you know, I'm not-- I don't | 13:26:06 |
| 22 | believe there's a lot of people walking around who have | 13:26:13 |
| 23 | signed up for Prime unknowingly. | 13:26:15 |
| 24 | Q  What is the data that you are referring to indicating | 13:26:19 |
| 25 | that people-- that there are customers who think they're | 13:26:23 |



| | | | |
|---|---|---|---|
| 1 | | Prime but they're not, in fact, Prime? | 13:26:26 |
| 2 | A | Again, I don't have data that says there are a lot of | 13:26:29 |
| 3 | | customers-- oh, I'm sorry, who think they're Prime but | 13:26:37 |
| 4 | | not-- sorry, I have to get the-- I've seen articles | 13:26:41 |
| 5 | | where-- if you do a search for Prime membership, you will | 13:26:44 |
| 6 | | see articles that report that by research it suggests a | 13:26:49 |
| 7 | | much larger percentage of the U.S. population believe | 13:26:54 |
| 8 | | they are Prime members than are actually Prime members. | 13:26:56 |
| 9 | | In some ways there's some people perhaps that even | 13:27:00 |
| 10 | | have pride in being a member even if they're not using it | 13:27:06 |
| 11 | | very much. | 13:27:09 |
| 12 | | I don't know the specifics of that data, but I'm | 13:27:13 |
| 13 | | regularly surprised when I see that, as to how many | 13:27:15 |
| 14 | | people believe they are Prime members when our numbers | 13:27:19 |
| 15 | | show a smaller number. | 13:27:23 |
| 16 | Q | So just to be clear, the data you're referring to was not | 13:27:24 |
| 17 | | collected by Amazon, correct? | 13:27:27 |
| 18 | | MR. KABA:  Objection; vague. | 13:27:29 |
| 19 | | THE WITNESS:  I'm referring to general | 13:27:35 |
| 20 | | data I've seen in press reports, not necessarily | 13:27:37 |
| 21 | | collected by Amazon. | 13:27:43 |
| 22 | | Some of the data, of course-- we know how many Prime | 13:27:44 |
| 23 | | members we have. | 13:27:49 |
| 24 | Q | (By Ms. Jerjian)  But does Amazon have data on people who | 13:27:51 |
| 25 | | believe they are Prime members who are not Prime members? | 13:27:57 |



| | | |
|---|---|---|
| 1 | I believe your testimony said, "no," but I want to | 13:28:00 |
| 2 | make sure that's the case. | 13:28:03 |
| 3 | MR. KABA:  It's vague as to "does | 13:28:04 |
| 4 | Amazon have data." | 13:28:06 |
| 5 | Go ahead, you can answer. | 13:28:09 |
| 6 | THE WITNESS:  I don't know.  I don't | 13:28:10 |
| 7 | know if we've got a survey that has asked that question. | 13:28:12 |
| 8 | (Exhibit No. NL-15 marked | 13:28:12 |
| 9 | for identification.) | 13:28:16 |
| 10 | Q  (By Ms. Jerjian)  Mr. Lindsay, I am showing you what I've | 13:28:16 |
| 11 | marked as Exhibit No. NL-16. | 13:29:06 |
| 12 | MR. KABA:  Are you skipping 15? | 13:29:23 |
| 13 | MS. JERJIAN:  I believe Molly | 13:29:25 |
| 14 | O'Donnell's testimony was 15. | 13:29:26 |
| 15 | MR. KABA:  I have that as 14. | 13:29:29 |
| 16 | MS. JERJIAN:  So this is Exhibit | 13:29:44 |
| 17 | No. 15. | 13:29:48 |
| 18 | This is Bates No. AMZN-- | 13:30:00 |
| 19 | MR. KABA:  What was handed to us is | 13:30:11 |
| 20 | AMZN 60306. | 13:30:14 |
| 21 | MS. JERJIAN:  Got it.  Thank you. | 13:30:58 |
| 22 | Q  (By Ms. Jerjian)  NL-15 is AMZN 60306. | 13:30:59 |
| 23 | This is an e-mail from Caroline Moeller to a number | 13:31:05 |
| 24 | of individuals, including yourself, dated July 28th, | 13:31:10 |
| 25 | 2020. | 13:31:13 |



| | | |
|---|---|---|
| 1 | A | I don't recall. | 13:32:53 |
| 2 | Q | Do you know what the content testing team is? | 13:32:57 |
| 3 | A | The intent of this e-mail seems like it's clear in the | 13:32:59 |
| 4 | | name, and I know we had a content testing team, but so do | 13:33:07 |
| 5 | | many organizations have content testing teams. | 13:33:11 |
| 6 | Q | What did the content testing team in Prime do? | 13:33:13 |
| 7 | A | I am not incredibly close to them, but my understanding | 13:33:16 |
| 8 | | is that they would test different content, to be | 13:33:24 |
| 9 | | experimenting with different content to achieve our | 13:33:27 |
| 10 | | objectives. | 13:33:32 |
| 11 | Q | Do they test content through web labs? | 13:33:33 |
| 12 | A | I believe so. | 13:33:44 |
| 13 | Q | Did you attend a meeting with Mr. Ghani, Mr. Davidai | 13:33:45 |
| 14 | | Nahshon in July 2020 to discuss whether or not to task | 13:34:05 |
| 15 | | certain clarity initiatives in Prime? | 13:34:11 |
| 16 | A | Again, I don't recall the specific meetings I did or | 13:34:14 |
| 17 | | didn't attend. | 13:34:23 |
| 18 | | If I take a look at this doc, it might refresh my | 13:34:23 |
| 19 | | memory, but I don't recall a specific meeting. | 13:34:27 |
| 20 | Q | Does the content testing team need to run by-- strike | 13:34:30 |
| 21 | | that. | 13:34:41 |
| 22 | | Does the content testing team need to get | 13:34:41 |
| 23 | | authorization to test certain content on the Amazon | 13:34:45 |
| 24 | | website? | 13:34:55 |
| 25 | | MR. KABA:  Objection; vague, | 13:35:00 |



| | | |
|---|---|---|
| 1 | speculation, but go ahead. | 13:35:02 |
| 2 | THE WITNESS:  Not necessarily, no. | 13:35:03 |
| 3 | It depends on what they're testing. | 13:35:06 |
| 4 | Q  (By Ms. Jerjian)  What do you mean that it depends on | 13:35:11 |
| 5 | what they're testing or-- what they're testing? | 13:35:12 |
| 6 | A  Again, you would probably have to ask someone closer to | 13:35:15 |
| 7 | that team as to what they escalated, for broader input. | 13:35:18 |
| 8 | Remember, there are, I believe-- I don't think I'm | 13:35:24 |
| 9 | exaggerating, but thousands of tests are going on a day | 13:35:29 |
| 10 | across Amazon in web labs, so-- and the team is empowered | 13:35:32 |
| 11 | to test as they need. | 13:35:38 |
| 12 | Q  Do you understand the "Neil" referred to in this document | 13:35:43 |
| 13 | refers to you? | 13:35:47 |
| 14 | A  I assume so.  There's not many Neils in the company | 13:35:48 |
| 15 | actually-- there probably is-- | 13:35:52 |
| 16 | Q  In the second bullet point under "Takeaways," Ms. Moeller | 13:35:56 |
| 17 | wrote, "Neil agreed that driving clarity improvements is | 13:36:00 |
| 18 | a priority." | 13:36:03 |
| 19 | Is that accurate? | 13:36:04 |
| 20 | MR. KABA:  Objection. | 13:36:10 |
| 21 | Can you recite the entire sentence? | 13:36:11 |
| 22 | THE WITNESS:  "Clarity improvements," | 13:36:20 |
| 23 | it is important to note, has become a bit of a shorthand | 13:36:22 |
| 24 | here for all sorts of things. | 13:36:25 |
| 25 | But it was always a priority for us to try to, as | 13:36:27 |



| | | |
|---|---|---|
| 1 | | I've said before, minimize frustrations, so you can tell | 13:36:33 |
| 2 | | from reviewing these documents that we spend a lot of | 13:36:38 |
| 3 | | energy trying to make sure that we are improving the | 13:36:44 |
| 4 | | experience in any way we can for customers in reducing | 13:36:47 |
| 5 | | frustrations wherever we can, knowing, again, that our | 13:36:50 |
| 6 | | customer base is very large, very diverse, and that we'll | 13:36:53 |
| 7 | | never reduce frustrations to zero. | 13:36:56 |

8   Q   (By Ms. Jerjian)  When you say that clarity is a          13:37:04
9       shorthand for a number of experiments-- I think that's    13:37:06
10      what you said.                                            13:37:09
11          Is that right?                                        13:37:10
12   A  What I meant by that is that it's-- you know, I think we   13:37:11
13      are reading as always one direction, but "clarity" is     13:37:15
14      about how do we reduce frustrations in a measurable way,   13:37:21
15      so there's many things in that.                           13:37:29
16   Q  And "clarity" specifically refers to reducing             13:37:30
17      frustrations in the Prime signup and cancellations        13:37:39
18      processes, right?                                         13:37:43
19                  MR. KABA:  Objection; misstates               13:37:44
20      testimony.                                                13:37:45
21                  THE WITNESS:  It refers to improving          13:37:46
22      frustrations or reducing frustrations but doing so in a   13:37:51
23      way that we can demonstrate it's actually working.        13:37:54
24          Remember, you know, it's not a matter of simply       13:37:57
25      making a change we believe is right.  It's making a       13:38:02



| | | |
|---|---|---|
| 1 | | change and actually seeing data that demonstrates that it | 13:38:05 |
| 2 | | actually does have an impact on reducing frustrations. | 13:38:08 |
| 3 | | Those two things go hand in hand very much. | 13:38:12 |
| 4 | Q | (By Ms. Jerjian)  Is it fair to say that there are | 13:38:16 |
| 5 | | customer frustrations in Amazon that don't pertain to the | 13:38:24 |
| 6 | | Prime program? | 13:38:28 |
| 7 | A | Yes.  There's always going to be frustrations. | 13:38:28 |
| 8 | | By the way, something that was yesterday's new | 13:38:33 |
| 9 | | invention that everybody loves will be tomorrow's new | 13:38:36 |
| 10 | | normal, and they'll be frustrated with it, which is | 13:38:39 |
| 11 | | wonderful. | 13:38:41 |
| 12 | Q | So when you're referring to "clarity" as shorthand for | 13:38:42 |
| 13 | | ways to reduce customer frustrations, you are referring | 13:38:46 |
| 14 | | specifically to customer frustrations with respect to | 13:38:53 |
| 15 | | Prime enrolling and cancellation; is that right? | 13:38:55 |
| 16 | A | I believe so, in this context. | 13:38:58 |
| 17 | Q | Ms. Moeller went on to write, "And encouraged us"-- I | 13:39:00 |
| 18 | | will read the whole sentence, "Neil agreed that driving | 13:39:12 |
| 19 | | clarity improvements is a priority and encouraged us to | 13:39:15 |
| 20 | | make the suggested improvements, taking advantage of the | 13:39:19 |
| 21 | | unique 2020 situation to reset our clarity baseline, | 13:39:22 |
| 22 | | while being thoughtful in our approach." | 13:39:25 |
| 23 | | Do you agree that you encouraged Ms. Moeller and | 13:39:27 |
| 24 | | other individuals to make suggested improvements and to | 13:39:32 |
| 25 | | take advantage of the 2020 situation to reset the clarity | 13:39:41 |



| | | |
|---|---|---|
| 1 | A    I have lost track of timing. | 16:00:01 |
| 2 | I may have. | 16:00:03 |
| 3 | I don't know if this was-- I think so. | 16:00:03 |
| 4 | You may have to look back at our prior notes. | 16:00:08 |
| 5 | Q    You testified earlier that Mr. Herrington was responsible | 16:00:11 |
| 6 | for the U.S. business. | 16:00:14 |
| 7 | I think I got that right, but correct me if I'm | 16:00:20 |
| 8 | wrong. | 16:00:22 |
| 9 | A    Yes.  He was responsible for North America. | 16:00:22 |
| 10 | Q    "North America," thank you. | 16:00:25 |
| 11 | So I understand why you wanted to bring this hotly | 16:00:27 |
| 12 | debated topic to their attention. | 16:00:32 |
| 13 | Why did you also want to bring this hotly debated | 16:00:35 |
| 14 | topic to Mr. Grandinetti's attention, given you did not | 16:00:39 |
| 15 | report to him and he was not in charge of North America | 16:00:42 |
| 16 | business? | 16:00:47 |
| 17 | MR. KABA:  Objection; asked and | 16:00:49 |
| 18 | answered. | 16:00:50 |
| 19 | THE WITNESS:  As I've said before, | 16:00:50 |
| 20 | Mr. Grandinetti had-- Llew Mason reported to him.  This | 16:00:53 |
| 21 | topic related to Llew's team. | 16:00:58 |
| 22 | He also is a stakeholder in our Prime business. | 16:01:00 |
| 23 | Q    (By Ms. Jerjian)  Were you escalating the hotly debated | 16:01:04 |
| 24 | topic to Mr. Herrington, Mr. Grandinetti, and Mr. Clark? | 16:01:11 |
| 25 | MR. KABA:  Objection; vague as to | 16:01:18 |



| | | |
|---|---|---|
| 1 | "escalated." | 16:01:20 |
| 2 | THE WITNESS:  What do you mean by | 16:01:22 |
| 3 | "escalated"? | 16:01:23 |
| 4 | Q  (By Ms. Jerjian)  Did you want to bring this hotly | 16:01:24 |
| 5 | debated topic to their attention so they could make a | 16:01:28 |
| 6 | decision as to how to resolve the hotly debated topic? | 16:01:31 |
| 7 | A  I brought it to them because I wanted them to: A, be | 16:01:35 |
| 8 | aware of the situation; and to contribute to the | 16:01:42 |
| 9 | decisions we needed to make. | 16:01:46 |
| 10 | Q  Why did you want them to be aware of the decision? | 16:01:47 |
| 11 | A  As I've mentioned already, Prime is central to many of | 16:01:52 |
| 12 | our businesses. | 16:02:00 |
| 13 | I believe also Mr. Grandinetti had European | 16:02:01 |
| 14 | responsibility at this time.  I don't recall exactly, | 16:02:04 |
| 15 | but-- and Mr. Clark had all of our operations, which is | 16:02:09 |
| 16 | affected by our Prime membership, so all of them are | 16:02:14 |
| 17 | major stakeholders in Prime performance. | 16:02:18 |
| 18 | Q  You also wrote in this e-mail, and it's kind of a long | 16:02:24 |
| 19 | sentence, "You should have someone write a doc that | 16:02:30 |
| 20 | summarizes the customer frustrations and sources of the | 16:02:43 |
| 21 | concern and level of concern, the actions and tests we've | 16:02:46 |
| 22 | taken, and the results, the alternative positions we | 16:02:51 |
| 23 | could take, arguing pros and cons with data (if we have | 16:02:54 |
| 24 | it) on how many people we suspect ultimately sign up | 16:02:59 |
| 25 | accidently but that remain and are happy versus not, | 16:03:02 |



NEIL LINDSAY  Confidential                        November 19, 2024
FTC vs AMAZON.COM                                              201

| | | |
|---|---|---|
| 1 | etc." | 16:03:06 |
| 2 | Then "Let's get guidance," that's the whole | 16:03:06 |
| 3 | sentence, correct? | 16:03:11 |
| 4 | A   Yes. | 16:03:11 |
| 5 | It's a poorly written sentence. | 16:03:12 |
| 6 | It is words I would write differently. | 16:03:17 |
| 7 | Q   What did you mean by "How many people we suspect | 16:03:19 |
| 8 | ultimately sign up accidentally, but that remain and are | 16:03:23 |
| 9 | happy versus not"? | 16:03:27 |
| 10 | A   What I meant to say is people we suspect perhaps | 16:03:28 |
| 11 | converted unintentionally to paid but remain happy versus | 16:03:39 |
| 12 | not, because obviously an accidental signup would be an | 16:03:45 |
| 13 | unaware signup, that would not have any way of becoming | 16:03:49 |
| 14 | happy. | 16:03:53 |
| 15 | What I am referring to here is the fact that for | 16:03:55 |
| 16 | some people who sign up for a trial, not just on Prime | 16:04:00 |
| 17 | but on other trials, who maybe intended to try the | 16:04:03 |
| 18 | product and cancel before the trial was over but actually | 16:04:08 |
| 19 | converted to paid, perhaps not intending to convert to | 16:04:14 |
| 20 | paid, and then actually using the benefits, remained | 16:04:18 |
| 21 | happy, and stayed with us, noting that if they weren't | 16:04:24 |
| 22 | happy and they called us or indicated that they didn't | 16:04:26 |
| 23 | intend to convert to paid, we have generous refund | 16:04:31 |
| 24 | policies and would refund them. | 16:04:35 |
| 25 | This is not well written because "accidental | 16:04:39 |



```
          C E R T I F I C A T E
STATE OF WASHINGTON )
                    )  ss.
COUNTY OF KING      )
         I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State of
Washington, do hereby certify:  That the foregoing
deposition of the witness named herein was taken
stenographically before me and reduced to a typed format
under my direction;
         That, according to CR 30(e), the witness was
given the opportunity to examine, read, and sign the
deposition after same was transcribed, unless indicated in
the record that the review was waived;
         That I am not a relative or employee of any
attorney or counsel of participant and that I am not
financially or otherwise interested in the action or the
outcome herein;
         That the deposition as transcribed is a full,
true and correct transcript of the testimony, including
questions and answers and all objections, motions, and
examinations, and said transcript was prepared pursuant to
the Washington Administrative Code 308-14-135 preparation
guidelines.
                    /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR
                    State of Washington CCR #2047
                    My CCR certification expires on 7/7/25
```



# EXHIBIT 68

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


FEDERAL TRADE COMMISSION,              )
                                       )
                    Plaintiff,         )
                                       )
                    vs.                ) No. 2:23-cv-0932-JHC
                                       )
AMAZON.COM, INC., et al.,              )
                                       )
                    Defendant.         )
                                       )
                                       )


DEPOSITION OF JAMIL GHANI

November 21, 2024

Seattle, Washington


***** Confidential *****

Pages 9:10-27:3


Reporter: Teri Simons, CCR, RMR, CRR



1               BE IT REMEMBERED that on Thursday,

2       November 21, 2024, at 8:36 a.m., before Terilynn Simons,

3       Certified Court Reporter, CCR, RMR, CRR, CLR, appeared

4       JAMIL GHANI, the witness herein;

5                       WHEREUPON, the following proceedings

6       were had, to wit:

7                           <<<<<< >>>>>>

8       JAMIL GHANI,            having been first duly sworn

9                               by the Certified Court Reporter,

10                              testified as follows:

11                          EXAMINATION

12      BY MR. MENDELSON:

13   Q  Good morning, Mr. Ghani.

14   A  Good morning.

15   Q  If I could just ask your counsel, Mr. Kaba, to introduce

16      the folks on your side of the table over there.

17                      MR. KABA:  Yeah.  Moez Kaba of Hueston

18      Hennigan for Defendants.

19          I am also going to be joined shortly by Cassidy

20      O'Sullivan, also of Hueston Hennigan and also on behalf

21      of the defendants.

22          I am also joined by Richard Donoghue on behalf of

23      the witness.

24          Ben Langner is also here in-person, who is in-house

25      counsel at Amazon.



1    Prime, that they have benefits, that there's new things

2    for them to check out.

3        I understand that the number of customers that later

4    go on and report that they had an issue signing up is

5    small.  We have worked to make that even smaller.

6        When I see a cancellation survey cited in isolation,

7    it doesn't match with all the data I have looked at to

8    understand truly if this is the scope of the challenge.

9        If 14 percent of Prime members were, in fact,

10   unaware, we would hear about it in social, we would hear

11   about it through customer service, we would-- we would

12   fundamentally not have the program we have now, which

13   resoundingly customers tell us that they love the

14   program, they get a ton of value.

15       Nevertheless, we have worked to reduce that number

16   for years.

17       I just think it's important to put in context the

18   cancellation survey specifically.

19       I would additionally say that I didn't write this

20   document, and some of what the manner in which it is

21   written is not consistent with how I see this particular

22   population.

23  Q  To your knowledge, has anyone at Amazon studied the

24   extent to which people who take the cancellation survey

25   are representative of all Amazon customers who cancel



1    Amazon Prime?

2  A   We have inspected the cancellation survey and have shown

3      that it is not representative of all cancelling members,

4      for-- I don't want to say "obvious," but for good reasons

5      that are understood.

6        I am not an expert on survey methodology, but I know

7      enough to say that those that decide to sign that--

8      there's no way for us to make that a representative

9      sample of the entire membership base, let alone even the

10      cancelling membership base.

11        It is-- by survey techniques, this is as bias as it

12      gets because we have no way to normalize it to other

13      things.

14        Getting aside from the survey methodology, which is

15      not my area of expertise, we see members indicating, for

16      example, "I didn't get enough value," and then we see the

17      actual usage behavior being not on the low end but medium

18      or high levels but still indicating, "I didn't get enough

19      value."

20        I think-- the way I think about this is that it's an

21      important signal for us to continue making the program

22      better, make it better for all members, earn their

23      business, but I can't take this in isolation to be

24      indicative of some challenge with a signup experience

25      because other corroborating data does not support the



```
 1        claim in this survey.

 2   Q    Who conducted the analysis of-- yeah, if it's many

 3        people, tell me, "Many people," but who conducted the

 4        analysis of whether people who take the Prime survey--

 5        cancellation survey, are representative of all people who

 6        cancel Prime?

 7   A    We have worked to improve the cancellation survey over

 8        years, so there's been many individuals that have worked

 9        on it.

10   Q    Can you name any of them that you remember?

11   A    Two in particular come to mind.  They are actually on

12        the-- both of them are in the meeting invite: Ben Hills,

13        who had responsibility for retention for several years,

14        and Nikki Baidwan on his team.

15   Q    Do you remember seeing any written documents, either

16        e-mails or memos, or anything else, reflecting the

17        results of an analysis of the representativeness of Prime

18        cancellation survey respondents?

19   A    Sitting here today, I can't recall a specific document

20        with that information.

21   Q    Okay.  If you could flip all the way to Appendix G in the

22        attachment within Exhibit JG-2, it is labeled Page 17.

23            You can read through Appendix G, and let me know

24        when you're finished.

25   A    Okay.  I have read it.
```



JAMIL GHANI  Confidential
FTC vs AMAZON.COM

November 21, 2024
100

1  Q  (By Mr. Mendelson)  Mr. Ghani, I am handing you Exhibit
2     JG-13.
3         JG-13 is a transcript from an investigational
4     hearing you gave before the FTC on November 16th, 2022.
5         I am going to direct your attention to Page 210 of
6     the transcript.
7                    MR. KABA:  I will note for the record
8     that the transcript appears to be 295 pages long.
9  Q  (By Mr. Mendelson)  Mr. Ghani, I am first going to read
10    starting on 210, Line No. 6.
11        It says, "Question: I'm a little confused about a
12    couple things here.  That decision occurred at the
13    meeting discussing the December 3rd, 2020 memorandum?"
14        "Answer: I honestly can't remember if we precisely
15    decided in that meeting or thereabouts.  It was in the
16    month of December we decided to roll back those changes
17    because we were not having the intended impact of
18    improving the members' satisfaction with the signup
19    experience, and so we rolled back those changes and
20    circled our wagons and came up with other approaches
21    starting at the beginning of 2021."
22        Did I read that correctly?
23  A  You did.
24  Q  Okay.  Setting that aside for a second, I want to make
25    sure I have your best understanding today of why the



1      September 2020 clarity changes were rolled back.

2          I think-- before we went to this document, I think

3      you told me the reason was there was a lot of confounding

4      variables at play.

5          Am I representing that answer correctly?

6                      MR. KABA:  Objection.  It is

7      incomplete, misstates the witness's testimony, as far as

8      it's purporting to say that that was the exhaustive list.

9                      THE WITNESS:  Could you restate the

10     question?

11  Q  (By Mr. Mendelson)  I might ask a slightly different

12     question.

13         As of today, what is your best understanding or best

14     recollection of why the September 2020 hypothesized

15     clarity improvements were undone?

16  A  So sitting here now four years later and two years after

17     this testimony, my best recollection is that we had a

18     measurable underperformance in the U.S. Prime program.

19     We had a series of hypotheses for why that was happening.

20         One of them was the changes we had made to the UPDP

21     template.

22         Those were confounded with other hypotheses,

23     including the launch of Walmart+, which we believed would

24     be-- would show up on the acquisition side of our

25     business, per the Chime that we were looking at earlier,



JAMIL GHANI  Confidential                         November 21, 2024
FTC vs AMAZON.COM                                              102

1    and the shipping changes.

2        Taking all of that into consideration, we stepped

3    back and said, "We remain committed to making

4    improvements for that small cohort of customers that

5    later report having an issue with the signup.  Let's come

6    back in January and continue on that effort," which we

7    did, "And let's get clean on the data on what's going on

8    amongst those reasons so that we can, you know, make the

9    right business decisions as a result."

10       Reading what you are sharing here is I know, as I

11   mentioned in my response, that we get immediate data from

12   all experiments, and I recall that even in the early data

13   we were not seeing improvements in benefit engagement or

14   yield, but my point of how I answered previously is that

15   I did not want to look at one-day yield or three-day

16   yield or seven-day yield.

17       I explicitly was committed to these efforts and

18   wanted to move forward.

19       The challenge was that we were making, you know,

20   efforts on our best hypotheses amongst a lot of other

21   things going on.

22       The point of the change was to "Hey, let's get data

23   clean that we then know what's actually going on for each

24   of those factors, including the UPDP changes."

25 Q  So sitting here today, as far as you can tell, I



1    haven't-- I haven't shown you any documents purporting--

2    let me withdraw that.

3        Do you remember specifically--

4                    MR. KABA:  Let's go on break when

5    you're ready.

6  Q  (By Mr. Mendelson)  Do you remember receiving any

7    documents, in or around late November, early

8    December 2020, reporting on yield rate data, benefit

9    engagement data, or customer service data relating to the

10   September 2020 hypothesized clarity improvements?

11 A  Sitting here today, four years later, I do not recall

12   what I received during that period.

13                   MR. MENDELSON:  Okay.  We can take a

14   break.

15                   THE WITNESS:  Thank you.

16                   (Lunch recess 12:04 to 12:50 p.m.)

17                   (Exhibit JG-14 marked

18                       for identification.)

19 Q  (By Mr. Mendelson)  Mr. Ghani, I am handing you Exhibit

20   JG-14.

21       You can take time to read JG-14 while I identify it.

22       Exhibit JG-14 has Bates No. AMZN-PRM-FTC-001002123,

23   and it's just a one-page document.

24       Have you had a chance to read JG-14?

25 A  I have.



1  e-mail, "Jediah and I have had some initial conversations

2  with the shopping design team to sync on the document we

3  are preparing for the 2/11 review."

4      Did I read that correctly?

5  A  You did.

6  Q  You understand this e-mail chain to generally be a

7  discussion regarding a document that was being prepared

8  for the C-team review referenced in Exhibit JG-16?

9  A  My understanding, based on the dates Nikki is citing, is

10  that it is the work towards the meeting we discussed

11  earlier.

12  Q  Okay.  Next to No. 1 you wrote-- the last sentence of

13  what you wrote, so the last sentence in green says,

14  "Also, let's make sure we have other Amazon subscriptions

15  and outside benchmarks as well."

16      Did I read that correctly?

17  A  You did read it correctly.

18  Q  What are "outside benchmarks," as you've used the phrase

19  here?

20  A  Sitting here, nearly four years later, I can't precisely

21  remember what might have been going through my head at

22  the time, but if I step back, there are-- "large" would

23  be an understatement, but a large number of subscription

24  businesses and options available to customers, and so my

25  point here is we should be informing ourselves of the



1   customer experiences, that some set of those are offering

2   to customers because the same customers are also

3   experiencing those, and so as good stewards of customer

4   service, we want to be informed of what are expectations

5   of customers, what are they seeing, what can we learn,

6   what can we be inspired by.

7   Q   Is one of your goals as VP of Prime to make sure that the

8       Prime program is generally complying to any applicable

9       law or regulation?

10                  MR. KABA:  Objection; vague,

11      overbroad.

12          I don't want you to disclose communications that you

13      may have had with counsel on this topic, but you can

14      respond to that question.

15                  THE WITNESS:  My responsibility, as

16      the leader of the Amazon Prime program, is to absolutely

17      make sure that we adhere-- comply-- a better word-- I am

18      not a lawyer, so comply with all rules and regulations

19      that apply to the program.

20          Any time we are aware of specific requirements, we

21      comply with them.

22   Q   (By Mr. Mendelson)  Do you, you personally, ever use

23      outside benchmarks to inform any opinion you have as to

24      whether Amazon is complying with laws and regulations?

25                  MR. KABA:  Objection; vague,



1    overbroad.

2                        THE WITNESS:  Could you be more

3    specific?

4    Q   (By Mr. Mendelson)  Have you ever looked to the customer

5        experiences of other subscription programs with the goal

6        of informing your own view as to whether the Prime

7        program is complying with applicable laws and

8        regulations?

9                        MR. KABA:  Objection; vague as to

10   "applicable laws and regulations," and incomplete.  It

11   calls for a legal conclusion as well.

12                        THE WITNESS:  I am not a lawyer, so I

13   do not look at other subscription experiences through

14   that lens.

15       I have a team of lawyers who I trust, and they

16   manage kind of that matter, as trained lawyers.

17       My point on pulling in outside benchmarks was to

18   understand customer experience.  That's what my expertise

19   is.

20   Q   (By Mr. Mendelson)  Understood.

21       Okay.  Going to Page 2 of Exhibit JG-17, you see

22   there's a bolded header that starts, "Proposed document

23   structure"?

24   A   I do see that.

25   Q   And underneath that is a lot of green text, correct?



JAMIL GHANI  Confidential                    November 21, 2024
FTC vs AMAZON.COM                                         218

# C E R T I F I C A T E

STATE OF WASHINGTON )
                    )  ss.
COUNTY OF KING      )


        I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State of
Washington, do hereby certify:  That the foregoing
deposition of the witness named herein was taken
stenographically before me and reduced to a typed format
under my direction;

        That, according to CR 30(e), the witness was
given the opportunity to examine, read, and sign the
deposition after same was transcribed, unless indicated in
the record that the review was waived;

        That I am not a relative or employee of any
attorney or counsel of participant and that I am not
financially or otherwise interested in the action or the
outcome herein;

        That the deposition as transcribed is a full,
true and correct transcript of the testimony, including
questions and answers and all objections, motions, and
examinations, and said transcript was prepared pursuant to
the Washington Administrative Code 308-14-135 preparation
guidelines.




        /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR
        State of Washington CCR #2047
        My CCR certification expires on 7/7/25




# EXHIBIT 69

1               UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5   FEDERAL TRADE COMMISSION,

6         Plaintiff,

7         v.                    No. 2:23-cv-0932-JHC

8   AMAZON.COM, INC. et al.,

9         Defendants.

10

11

12      VIDEOCONFERENCE DEPOSITION OF ANN EVERETT

13                  December 3, 2024

14                     8:00 a.m.

15

16

17

18

19

20   Stenographically Reported by:

21   Bonnie Pruszynski, RMR, CA CSR No. 13064
     Job No. J12059808
22

23

24

25



```
 1              (Witness sworn.)
 2   ANN EVERETT,
 3           called as a witness, having been first
 4           duly sworn, was examined and testified
 5           as follows:
 6   EXAMINATION
 7   BY MR. REITER:
 8      Q.    Good morning, Ms. Everett.
 9      A.    Good morning.
10      Q.    So, as I told you before we started, my name
11   is Joe Reiter, and I represent Amazon and the other
12   defendants in this case.  Thank you very much for
13   being here today and making yourself available.
14      A.    Sure.
15      Q.    Can we start with having you state your full
16   name for the record?
17      A.    Sure.  My full name is Ann Mary Everett.
18   It's A-N-N, M-A-R-Y, E-V-E-R-E-T-T.
19      Q.    Ms. Everett, where are you located today?
20      A.    I'm located in Mocksville, North Carolina.
21      Q.    Are you in your home?
22      A.    I am.
23      Q.    Do you have an attorney representing you
24   today?
25      A.    I do not.
```



ANN EVERETT                                    December 03, 2024
FTC vs AMAZON.COM, INC., et al.                            67

 1  date.

 2  BY MR. REITER:

 3      Q.    Ms. Everett, do you see that you received

 4  the Prime welcome e-mail on 8:58 a.m. on

 5  December 31st, 2022?

 6      A.    Um-hum.

 7      Q.    Okay.  Now, let's scroll down to the

 8  cancellation e-mail.  Do you see that you received

 9  confirmation that you had canceled your Prime

10  membership at 9:23 a.m. on December 31st, 2022?

11      A.    Yes, I do.

12      Q.    Okay.  So, in fewer than 30 minutes after

13  you received the initial e-mail from Amazon Prime

14  informing you that you had been enrolled in Prime, you

15  were able to successfully cancel that membership; is

16  that right?

17          MR. NARDINI:  Objection.  The documents

18  speak for themselves.

19          You can answer.

20          THE WITNESS:  Yes.  Clearly I called very

21  quickly after receiving that e-mail, so, I obviously

22  did see that e-mail that had told me I was enrolled

23  and called immediately.

24  BY MR. REITER:

25      Q.    When you called, customer service went ahead



ANN EVERETT                                    December 03, 2024
FTC vs AMAZON.COM, INC., et al.                            68

1  and canceled your Prime membership; right?

2      A.    That's what it appears to be, yes.

3      Q.    And you don't recall having any difficulties

4  obtaining that cancellation; correct?

5      A.    I don't believe so, but I don't recall the

6  conversation.  I would have been more concerned as to

7  why I got enrolled into the trial.

8      Q.    You don't have any reason to believe that

9  canceling was not simple; correct?

10          MR. NARDINI:  Objection to form.  Asked and

11  answered.

12          THE WITNESS:  No.  It appeared that the call

13  went well.

14  BY MR. REITER:

15      Q.    It appeared that the call went well and it

16  was simple for you to cancel your Prime membership;

17  correct?

18          MR. NARDINI:  Objection.  Asked and

19  answered.

20          THE WITNESS:  Yes.

21          Are you waiting for me?

22  BY MR. REITER:

23      Q.    No.  I'm just looking at my notes.

24      A.    I'm just making sure.

25      Q.    It won't be the only time when there is a



```
 1   little pause.
 2            I just want to try to recap here.  You
 3   enrolled -- you were enrolled in a Prime free trial on
 4   December 31st, 2022; correct?
 5       A.    Without my knowledge, yes.
 6       Q.    And you received an e-mail the same day
 7   informing you you had been enrolled in the Prime
 8   membership; correct?
 9       A.    Correct.
10       Q.    You opened and read that welcome e-mail;
11   correct?
12            MR. NARDINI:  Objection.  Misstates prior
13   testimony.
14            You can answer.
15            THE WITNESS:  I believe I must have clicked
16   on it and saw that I was now suddenly, without my
17   knowledge, part of Prime, and it caused me to make
18   that phone call.
19   BY MR. REITER:
20       Q.    You made that phone call to customer
21   service; correct?
22       A.    Yes.
23       Q.    You -- customer service canceled your
24   membership; correct?
25       A.    Yes.
```



```
 1              C E R T I F I C A T E

 2                   I, Bonnie Pruszynski, RPR, RMR, do

 3     hereby certify that on December 3, 2024.

 4     appeared before me, ANN EVERETT.

 5                   I further certify that the said

 6     witness was first duly sworn to testify to the truth

 7     in the cause aforesaid.

 8                   I further certify that the signature

 9     of the witness to the foregoing deposition was not

10     specified by counsel.

11                   I further certify that I am not

12     counsel for nor in any way related to any of the

13     parties to this suit, nor financially interested in

14     the action.

15              IN WITNESS WHEREOF, I have hereunto

16         set my hand this 12th   of December, 2024.

17                        Bonnie Pruszynski

18                   _____

19                        Bonnie Pruszynski

20

21

22

23

24

25
```



# EXHIBIT 70

```
 1            UNITED STATES DISTRICT COURT

 2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3

 4   FEDERAL TRADE COMMISSION,      )   Case No.

 5            Plaintiff,            )   2:23-cv-0932-

 6            V.                    )   JHC

 7   AMAZON.COM, INC. Et al.,       )   Volume 1

 8            Defendants.           )   Page 1-201

 9                                  )

10

11

12

13

14

15      REMOTE VIDEOTAPED DEPOSITION OF LOIS BERKOWITZ

16                     TAKEN ON

17            MONDAY, DECEMBER 9, 2024

18

19

20

21

22   Reported by:

23   BRENDA R. COUNTZ, RPR-CRR

24   CSR NO. 12563

25   Job No. J12059806
```



 1  Olivia Jerjian, also an attorney at the FTC, and

 2  our paralegal Johana Mejia-Portillo, also of the

 3  FTC.

 4          THE WITNESS:  I have no motion video at

 5  all since the last few people were turned on the      10:11:28AM

 6  video.  You can see my right hand.  I can't.

 7

 8                  LOIS BERKOWITZ,

 9          having been first duly sworn, was

10          examined and testified as follows:             10:11:31AM

11

12                  EXAMINATION

13  BY MR. TODISCO:

14      Q.   Good morning, Ms. Berkowitz, how are

15  you?                                                   10:11:56AM

16      A.   I'm a little confused with this user

17  interface but...

18      Q.   Is there anything in particular that

19  you are confused about?

20      A.   There's no motion.  I had been able to        10:12:08AM

21  see myself in a video and it was playing.  I just

22  have little tiny squares of just a few people;

23  nothing on the right side of the screen.

24      Q.   All right, I think the space on the

25  right side of the screen is deliberate.  That's        10:12:29AM



1    Q.   Taking a step back, when you received

2    the confirmation e-mails about your purchase, you

3    did understand that you had been enrolled in

4    Prime, correct?

5    A.   Well, that was what the receipt said,          12:36:36PM

6    which is why -- I mean I looked at something the

7    other night and from the time that I received the

8    receipt for my purchase, the e-mailed

9    acknowledgement of my purchase, to the time that

10   I received the cancellation I think was 40          12:36:58PM

11   minutes, during which I had to find how to

12   contact someone at Amazon, talk to the first

13   person who said oh yes, we will cancel the

14   membership.

15       I said no, no, no, I'm not just trying          12:37:15PM

16   to cancel the trial membership, I'm trying to get

17   it expunged from my record.  And then wait and

18   escalate it to a supervisor and then receive this

19   e-mail saying your membership has been cancelled.

20   Q.   Okay, I'm going to see if I can break          12:37:35PM

21   that down into a few different steps.

22       Within 40 minutes when you saw that you

23   had been enrolled in a Prime membership, you

24   received this e-mail confirming that your Prime

25   membership had been cancelled, correct?            12:37:54PM



LOIS BERKOWITZ Vol. 1                    December 09, 2024
FTC V. AMAZON.COM                                      100

```
 1        A.   Correct.  Correct.
 2        Q.   And you were able to successfully
 3   cancel your Prime membership by calling Amazon's
 4   customers service, correct?
 5        A.   There are other ways I could have          12:38:19PM
 6   cancelled it.  I didn't have to have 40 minutes
 7   of my life trying to find someone to get it
 8   expunged from my record.
 9             I didn't call for them to cancel it, I
10   called to get it expunged from my record.          12:38:34PM
11        Q.   I understand that.  My question is a
12   little bit different and I think similar, which
13   is you were able to cancel your Prime membership
14   through a call to Amazon's customer service,
15   correct?                                            12:38:56PM
16        A.   Yes.
17        Q.   And because you cancelled your Prime
18   membership within 40 minutes of realizing that
19   you had been enrolled, you were never charged for
20   the Amazon Prime membership, correct?              12:39:13PM
21        A.   I had never agreed to sign up for an
22   Amazon Prime membership so if they had charged
23   me, it would have been fabricated.
24        Q.   And my question is just, because you
25   cancelled the Prime membership within 40 minutes   12:39:45PM
```



```
 1    of noticing that you were enrolled, there was

 2    never a charge on your credit card associated

 3    with Amazon Prime; is that correct?

 4         A.    Correct.

 5         Q.    More generally about your declaration,      12:40:05PM

 6    is there anything that you reviewed in the

 7    declaration when preparing for your deposition

 8    that you want to correct?

 9         A.    No.

10         Q.    Is there anything --                        12:40:24PM

11              MR. TODISCO:  Let me actually ask the

12    court reporter.  The notes on the Zoom that we

13    are off the record down at the bottom, has anyone

14    else seen that?  Can we go off the record?

15              MR. SAUNDERS:  Actually, counselor, I'm     12:40:38PM

16    seeing the same thing.  It is at the top of my

17    monitor, "Off the record, not recording."  I'm

18    not sure what that is about.

19              I'll also mention that we've been going

20    at it for an hour and 20 minutes.  I'm not sure      12:40:52PM

21    when is a good time for you to break but whenever

22    that moment comes --

23              MR. TODISCO:  Yes, let's go off the

24    record and we can go to a break.

25              MR. SAUNDERS:  Great.  And perhaps we        12:41:01PM
```



```
 1              But Ms. Berkowitz, you can answer if

 2    you can.

 3              MR. TODISCO:  Again, she already did.

 4              THE WITNESS:  You are talking                  03:22:17PM

 5    about -- hold on.  That is the exhibit that's in

 6    tab 68.

 7              MR. TODISCO:  That's Exhibit 16 that we

 8    just marked.

 9              Can you rotate it, please?

10              (Berkowitz Exhibit 16, Document              03:22:26PM

11              Entitled  Test, we re giving you a

12              30-day free trial of Prime , was

13              marked for identification.)

14    BY MR. TODISCO:

15        Q.   What has been marked as Exhibit 16 is a       03:22:40PM

16    document, Ms. Berkowitz, that you had as tab 66.

17    And you will see a pop-up window that is titled

18    "Test, we're giving you a 30-day free trial of

19    Prime."

20              Are you with me?                              03:23:01PM

21        A.   Well, it's my tab 68.

22        Q.   Yes, I'm sorry.  I'll restate that.  I

23    was confused with the prior tab for a second.

24              So Exhibit 16 is what was your tab 68

25    and it shows a pop-up window where the top line      03:23:17PM
```



1    is, "Test, we are giving you a 30-day free trial

2    of Prime."

3             Do you see that?

4        A.   Yes.

5        Q.   And then beneath that there's a          03:23:27PM

6    statement that the Prime auto renews at 14.99 a

7    month plus taxes.

8             Do you see that?

9        A.   Yes.

10       Q.   And then three blue check mark bullets    03:23:44PM

11   listing some of the benefits of Prime.

12            Do you see that?

13       A.   Yes.

14       Q.   And if you did not want to enroll in

15   Prime, Ms. Berkowitz, would you have clicked the   03:23:53PM

16   yellow, start your free trial of Prime button?

17       A.   I would have gone directly to no thanks

18   without reading the rest of the page.

19       Q.   You would have gone directly to no

20   thanks because you understood that no thanks is    03:24:07PM

21   how you say no to this offer?

22       A.   Yes.

23       Q.   And earlier before you said I wouldn't

24   have even got to this part because I would have

25   known.                                             03:24:21PM



1          Can you tell me where in this window

2     you would have known to choose no thanks if you

3     didn't want to be enrolled in Prime?

4          A.   As soon as I saw the yellow start your

5     free trial of Prime and looked to the left and            03:24:34PM

6     saw no thanks, I wouldn't even have read the

7     page.  I just would have clicked no thanks.

8          Q.   You see below the yellow button there

9     is a second disclosure of the bolded text similar

10    to what we've seen earlier which says, "Your          03:24:58PM

11    Amazon Prime membership continues until

12    cancelled.  If do you not wish to continue for

13    14.99 a month plus any taxes, you may cancel at

14    any time by visiting your account."

15         Do you see that?                                03:25:13PM

16         A.   Yes.

17         Q.   So on this pop-up window there are two

18    disclosures, both above and below the call to

19    action buttons, explaining that Prime will auto

20    renew after the free trial at 14.99 a month,          03:25:28PM

21    correct?

22         A.   Correct.

23         MR. TODISCO:  Okay, we can be done with

24    that exhibit.  We are nearing the finish line,

25    Ms. Berkowitz and Mr. Saunders.                       03:26:03PM



1  STATE OF CALIFORNIA     )  SS

2  COUNTY OF LOS ANGELES   )

3         I, BRENDA R. COUNTZ, Certified Shorthand

4  Reporter No. 12563 for the State of California,

5  do hereby certify:

6         That prior to being examined, the

7  witness named in the foregoing deposition was

8  duly sworn to testify the truth, the whole truth,

9  and nothing but the truth;

10         That said deposition was taken down by

11  me in shorthand at the time and place therein

12  named and thereafter transcribed and that the

13  same is a true, correct, and complete transcript

14  of said proceedings.

15         Before completion of the deposition,

16  review of the transcript [  ] was [  ] was not

17  requested.  If requested, any changes made by the

18  deponent during the period allowed are appended.

19         I further certify that I am not

20  interested in the outcome of the action.

21  Witness my hand this 14th day of December, 2024.

22

23                    *Brenda R. Countz*

24         _____

25             Brenda R. Countz, CSR No. 12563



# EXHIBIT 71

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON

3                   AT SEATTLE

4    FEDERAL TRADE COMMISSION,

5              Plaintiff,

6    vs.                        No. 2:23-cv-0932-JHC

7    AMAZON.COM, et al.,

8              Defendants.

9    _____/

10

11      The Zoom Deposition of BRIAN M. SMITH

12              11:07 a.m. - 4:10

13              December 17, 2024

14

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12154772



```
 1              P R O C E E D I N G S

 2                      - - -

 3   Whereupon,

 4                    BRIAN M. SMITH,

 5   called as a witness, having been first duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth, was examined and testified as follows:

 8              EXAMINATION BY MR. ARONSOHN

 9       Q      Good morning again.

10       A      Good morning.

11       Q      My name is Joseph Aronsohn and I represent

12   Amazon.com.  Thank you for making yourself available

13   today.

14       A      Of course, yes.

15       Q      Can you please state and spell your full

16   name for the record?  I don't think it's coming

17   through.

18       A      Okay.  I can hear you.  Do you mind saying

19   that again?

20       Q      Sure.  Can you please state and spell your

21   full name for the record?

22       A      My name is Brian Monroe Smith.  That's

23   B-R-I-A-N, middle name M. Smith, S-M-I-T-H, suffix is

24   II.

25       Q      And have you ever gone by any other names,
```



```
 1    the document.

 2              You can answer.

 3              THE WITNESS:  I'd say not the full scale of

 4    it, but it gives a price.

 5    BY MR. ARONSOHN:

 6       Q     It tells you what the monthly price of

 7    Prime is, right?

 8              MR. NARDINI:  Objection to form.

 9              THE WITNESS:  At that time.  I believe it's

10    actually a lot more now.

11    BY MR. ARONSOHN:

12       Q     Right.  But just focusing in on this

13    document.  It tells you what the price of Prime is,

14    right?

15              MR. NARDINI:  Objection to form.

16    BY MR. ARONSOHN:

17       Q     Whether or not that accurately reflects

18    what the price of Prime is sitting here today --

19       A     Right.

20              MR. NARDINI:  Objection.

21    BY MR. ARONSOHN:

22       Q     -- the price of Prime is 12.99 a month,

23    right?

24              MR. NARDINI:  I apologize for the

25    interruption, counsel.  Objection to form.
```



BRIAN M. SMITH                                    December 17, 2024
FTC vs AMAZON.COM                                              69

```
 1                You can answer.

 2                THE WITNESS:  Yes.

 3   BY MR. ARONSOHN:

 4      Q       Sitting here today and looking at this

 5   document, are you able to determine where on this page

 6   you could press to enroll in a Prime membership?

 7                MR. NARDINI:  Objection to form,

 8   foundation.

 9                You can answer.

10                THE WITNESS:  The yellow button get free

11   two day shipping.

12   BY MR. ARONSOHN:

13      Q       And sitting here today, are you able to

14   determine where on this page you could press to decline

15   to enroll in Prime?

16                MR. NARDINI:  Objection to form,

17   foundation.

18                You can answer.

19                THE WITNESS:  No thank you, I do not want

20   free two day shipping.

21                MR. ARONSOHN:  We can take this document

22   down.  Can we open back up tab 4 which was previously

23   entered as Exhibit 4 and, Avery, if you can open up the

24   native of that and share it?

25   BY MR. ARONSOHN:
```



```
 1      Q      Mr. Smith, just to orient you, this is one
 2  of the spreadsheets of Amazon internal data that we
 3  already looked at.  And, again, all of the data in this
 4  spreadsheet corresponds to the customer ID for your
 5  Amazon account.
 6             MR. ARONSOHN:  Let's go to tab 11 labeled
 7  welcome email, please.  Can we zoom in a little bit?
 8  BY MR. ARONSOHN:
 9      Q      Mr. Smith, I understand you may not be
10  familiar with this data.  I'm going to represent to you
11  that this shows that you received a welcome email from
12  Amazon on April 24th, 2019.  Okay?
13             MR. NARDINI:  Objection.
14             THE WITNESS:  Okay.
15  BY MR. ARONSOHN:
16      Q      Now, in columns C and D of this
17  spreadsheet, you can see that the date reflected here
18  is April 24th, 2019, correct?
19      A      Correct.
20      Q      And that was the day after you enrolled in
21  Prime, right?
22             MR. NARDINI:  Objection to form,
23  foundation.
24             You can answer.
25             THE WITNESS:  Yes.
```



BRIAN M. SMITH                                December 17, 2024
FTC vs AMAZON.COM                                          154

1    Q      So even though you don't remember seeing
2    anything about signing up for Prime, it's possible you
3    saw that information at the time, right?
4              MR. NARDINI:  Objection to form,
5    foundation, calls for speculation.
6              THE WITNESS:  It is possible, but I would
7    have no need for Prime due to how little I use Amazon.
8    BY MR. ARONSOHN:
9    Q      I'm sorry.  I just need a yes or no for a
10   clean record.  Even though you don't remember seeing
11   anything about signing up for Prime, it is possible
12   that at the time you enrolled, you did see information
13   about signing up for Prime, right?
14             MR. NARDINI:  Objection, form, foundation,
15   calls for speculation and the witness is not required
16   to give yes or no if his response requires he say more
17   than yes or no.
18             You can answer if you can.
19             MR. ARONSOHN:  Please limit the speaking
20   objections.  Let me ask my question again.
21   BY MR. ARONSOHN:
22   Q      Even though you don't remember seeing
23   anything about signing up for Prime, it is possible
24   that at the time you enrolled, you did see information
25   about signing up for Prime, correct?



1              MR. NARDINI:  Same objections.

2              THE WITNESS:  It is possible that I saw it,

3     but I would not have wanted it.  I would have ignored

4     it.  I see Prime all the time through commercials,

5     through offers.  It's all over their website.  So of

6     course seeing Prime as an option is automatically going

7     to be there when I don't have Prime.  So of course I

8     would have -- I could have possibly seen it.  Would I

9     have wanted it, no.

10    BY MR. ARONSOHN:

11         Q     Further down in paragraph 2, you write,

12    quote, I do not remember any terms or conditions --

13    sorry.  Let me ask that again.  I do not remember any

14    terms and conditions or pricing information relating to

15    Prime.  Do you see that?

16         A     Yes.

17         Q     Now, earlier today, we looked at an example

18    of a Prime enrollment page.  Do you recall that?

19         A     Yes.

20         Q     And when we looked at that page, you

21    testified that the page showed terms and conditions

22    relating to Prime, right?

23              MR. NARDINI:  Objection, misstates prior

24    testimony.

25              You can answer.



BRIAN M. SMITH                                    December 17, 2024
FTC vs AMAZON.COM                                            156

```
 1              THE WITNESS:  Yes.  The portal to bring us
 2    to terms and condition, not the actual terms and
 3    condition.
 4    BY MR. ARONSOHN:
 5       Q     Well, you testified that that page showed
 6    Prime's price, right?
 7              MR. NARDINI:  Objection, misstates prior
 8    testimony.
 9              THE WITNESS:  Yes, of 12.99 and it rose for
10    14.99 which it did not state.
11    BY MR. ARONSOHN:
12       Q     You would agree with me that that page
13    which we looked at as you testified included pricing
14    information relating to Prime, right?
15              MR. NARDINI:  Objection, misstates prior
16    testimony.
17              THE WITNESS:  It showed a piece of it.
18    BY MR. ARONSOHN:
19       Q     Let's look at paragraph 3.  I want to focus
20    on the last sentence in paragraph 3.  You write, quote,
21    I was surprised that I haven't received any emails
22    notifying me that I had been enrolled in Prime, right?
23       A     Correct.
24       Q     Earlier today, Mr. Smith, you testified
25    that you actually went back and reviewed a number of
```



 1   order confirmations from Amazon, right?

 2              MR. NARDINI:  Objection, misstates prior

 3   testimony.

 4              THE WITNESS:  This is a statement that I

 5   gave during the time of me finding out all of this

 6   information.  So this was of my current knowledge of

 7   not seeing a clear email saying Amazon Prime.  After

 8   reviewing, I was able to find it, but it was until I

 9   actually put in the time to go and look through

10   everything is when I was -- found all of that.

11   BY MR. ARONSOHN:

12       Q     So just to be clear, despite what you

13   thought at the time, the truth is that you had received

14   emails notifying you that you had been enrolled in

15   Prime, correct?

16              MR. NARDINI:  Objection, misstates prior

17   testimony.

18              THE WITNESS:  Yes.  That appears to be the

19   truth now.  I did not realize that I was receiving

20   Amazon Prime emails and that's what that statement is

21   supposed to be referring is of the time of all of that.

22   I did not see or realize I was receiving any of that

23   information.

24   BY MR. ARONSOHN:

25       Q     Let's look at paragraph 4 and I want to



BRIAN M. SMITH                                December 17, 2024
FTC vs AMAZON.COM                                          158

 1  start by focusing on the first sentence.  You write,

 2  quote, after realizing I was enrolled in Prime, I

 3  navigated to Amazon's website and canceled the

 4  membership.  Do you see that?

 5       A     Yes.

 6       Q     You canceled your Prime membership online,

 7  right?

 8       A     Correct.

 9       Q     You didn't encounter any difficulties

10  canceling Prime online, correct?

11            MR. NARDINI:  Objection to form.

12            THE WITNESS:  No.  It was very

13  straightforward and easy to accomplish.

14  BY MR. ARONSOHN:

15       Q     Would you agree the cancellation process

16  online was simple?

17            MR. NARDINI:  Objection to form.

18            THE WITNESS:  Like I said, it was very

19  straightforward.

20  BY MR. ARONSOHN:

21       Q     Is that a yes?

22            MR. NARDINI:  Objection to form, asked and

23  answered, argumentative.

24            THE WITNESS:  Yes.

25  BY MR. ARONSOHN:



BRIAN M. SMITH                                    December 17, 2024
FTC vs AMAZON.COM                                            159

```
 1        Q      In the second sentence, you write, quote,
 2   after canceling, I started to search for Amazon's
 3   customer service telephone number.  I had difficulty
 4   locating the number, but eventually found it and called
 5   customer service.  Do you see that?
 6        A      Correct.
 7        Q      As you testified earlier, it's actually
 8   easy to find Amazon's customer service telephone
 9   number, right?
10              MR. NARDINI:  Objection, misstates prior
11   testimony.
12              THE WITNESS:  That is through Google.  It
13   is a lot easier to search it through Google because it
14   gives a more direct answer of what I'm looking for.
15   This was through the Amazon account.  I did not have a
16   very easy time tracking that down.
17   BY MR. ARONSOHN:
18        Q      Answer my question, Mr. Smith.  It is easy
19   to find Amazon's customer service telephone number,
20   right?
21              MR. NARDINI:  Objection to form, asked and
22   answered, argumentative.
23              THE WITNESS:  Yes.  It is easy on Google,
24   the search engine on the website.  Amazon it is not.
25   It took me to some time to be able to track that down
```



BRIAN M. SMITH                                    December 17, 2024
FTC vs AMAZON.COM                                              160

```
 1   because I did not save Amazon -- the support in my own
 2   cellular device.
 3   BY MR. ARONSOHN:
 4        Q     You have successfully located Amazon's
 5   customer service telephone number multiple times,
 6   right?
 7             MR. NARDINI:  Objection to form.
 8             THE WITNESS:  Correct, through Google.
 9   BY MR. ARONSOHN:
10        Q     Let's look at the seventh line down the
11   sentence beginning the representative informed me that
12   Amazon.  Let me know when you're there.
13             MR. NARDINI:  Counsel, seventh line down in
14   the fourth paragraph, correct?
15             MR. ARONSOHN:  Correct.
16             MR. NARDINI:  Thank you.
17   BY MR. ARONSOHN:
18        Q     You wrote here, quote, the representative
19   informed me that Amazon could not refund the full
20   amount.  It offered me an Amazon credit for $44.97
21   which equaled the amount I was charged for the prior
22   three months.  This was $316.77 less than the total I
23   had thought I had been charged based on the date given
24   to me by the representative.  Do you see that?
25        A     Yes.
```



```
 1        CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2               I, Steven Poulakos, registered Professional

 3    Reporter, the officer before whom the foregoing

 4    proceedings were taken, do hereby certify that the

 5    foregoing transcript is a true and correct record of

 6    the proceedings; that said proceedings were taken by me

 7    stenographically and thereafter reduced to typewriting

 8    under my supervision; and that I am neither counsel

 9    for, related to, nor employed by any of the parties to

10    this case and have no interest, financial or otherwise,

11    in its outcome.

12               IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 17th day of

14    December 2024.

15    My commission expires:

16    August 20, 2027

17

18

19

20    -------------------------------

21    NOTARY PUBLIC IN AND FOR

22    THE STATE OF MARYLAND

23

24

25
```



# EXHIBIT 72

09:49

1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    FEDERAL TRADE COMMISSION,          )
                                        )
4               Plaintiff,              )
                                        )
5               vs.                     )   CASE NO. 2:23-cv-0932
                                        )
6    AMAZON.COM,                        )
                                        )
7               Defendant.             )

8

9

10        REMOTE DEPOSITION UPON ORAL EXAMINATION OF

11                   TYRANNY OSBORNE

12

13             TUESDAY, JANUARY 28, 2025
                    9:02 A.M.

14

15         (All participants appeared remotely)

16

17        TAKEN AT THE INSTANCE OF THE DEFENDANT

18

19

20

21

22

23

24    REPORTED BY:
      MONNA J. NICKESON, RPR, CRR, CCR, CSR CA 14430
25    JOB:  J12277268



```
 1              BE IT REMEMBERED that on TUESDAY, JANUARY
 2      28, 2025, at 9:02 a.m., the remote deposition of
 3      TYRANNY OSBORNE was taken before Monna J.
 4      Nickeson, Certified Realtime Reporter,
 5      Registered Professional Reporter, Certified
 6      LiveNote Reporter, Certified Court Reporter
 7      (WA 3322), Certified Shorthand Reporter
 8      (ID 1045), (OR 16-0441), (CA 14430), the
 9      following proceedings took place:
10                      * * * * *                          10:03
11              THE COURT REPORTER:  We're on the record   10:03
12      at 9 o'clock.  I need to swear in the witness.     10:03
13              Ms. Osborne, please raise your right       10:03
14      hand.                                              10:03
15                      TYRANNY OSBORNE                     10:03
16  Having been first duly sworn, was examined and         10:03
17  testified as follows:                                  10:04
18                      EXAMINATION                         10:04
19  BY MR. ARONSOHN:                                        10:04
20      Q.    Good morning, Ms. Osborne.  My name is       10:04
21  Joseph Aronsohn.  I represent Amazon.com, and I just   10:04
22  want to thank you for being here today.                10:04
23              Can you please state and spell your full   10:04
24  name for the record.                                   10:04
25      A.    Yeah.  My name is Tyranny Osborne,           10:04
```



| | | |
|---|---|---|
| 1 | listed under that column, right? | 11:21 |
| 2 | A.    Yes. | 11:21 |
| 3 | Q.    Now, does this refresh your recollection | 11:21 |
| 4 | that you began a Prime membership on each of these | 11:21 |
| 5 | dates? | 11:22 |
| 6 | A.    Sure, yeah. | 11:22 |
| 7 | Q.    And now if you could look over to the | 11:22 |
| 8 | left at column D, this lists six dates on which you | 11:22 |
| 9 | canceled your Prime membership. | 11:22 |
| 10 | Do you see that? | 11:22 |
| 11 | A.    I'm having a hard time actually seeing | 11:22 |
| 12 | the dates clearly, but I can see it, yes. | 11:22 |
| 13 | MR. SAUNDERS:  Let's zoom in, if we could | 11:22 |
| 14 | a bit, Stephanie. | 11:22 |
| 15 | THE WITNESS:  Thank you.  I can see them | 11:22 |
| 16 | better now, yeah. | 11:22 |
| 17 | BY MR. ARONSOHN: | 11:22 |
| 18 | Q.    Of course. | 11:22 |
| 19 | Do the dates here in column D, do these | 11:22 |
| 20 | refresh your recollection that you canceled your | 11:22 |
| 21 | Prime membership on each of these dates? | 11:22 |
| 22 | A.    Yes.  There should be more dates there, | 11:22 |
| 23 | but. | 11:22 |
| 24 | Q.    So other than the -- well, let's | 11:22 |
| 25 | just stick to -- we'll get to that.  Let's just stick | 11:22 |



```
 1   with what's in the spreadsheet for a moment.        11:22

 2            So between April 2018 and June 2023, you    11:22

 3   signed up for Prime at least six different times; is 11:23

 4   that right?                                          11:23

 5        A.    Uh-huh, yeah.                             11:23

 6            MR. SAUNDERS:  Objection.  Misstates        11:23

 7        witness' prior testimony.                       11:23

 8   BY MR. ARONSOHN:                                     11:23

 9        Q.    And in that same period, between April    11:23

10   2018 and June of 2023, you successfully canceled     11:23

11   Prime six different times, correct?                  11:23

12        A.    Yes.                                      11:23

13        Q.    Now, what leads you to believe that there 11:23

14   were more instances other than the ones listed here  11:23

15   on which you signed up for and canceled Prime?       11:23

16        A.    So I had successfully canceled on June    11:23

17   28th, I believe, but prior to that, had attempted to 11:23

18   cancel multiple times, and was charged on my card for 11:23

19   different times and was unsuccessful in canceling    11:23

20   until that date on the bottom.                       11:23

21        Q.    Okay.  Understood.  And we'll certainly   11:23

22   get to that in a bit.  Right now, I just want to     11:23

23   focus on the times that you actually signed up for   11:24

24   and your Prime membership was canceled.  So I guess I 11:24

25   should phrase it that way.                           11:24
```



```
 1        A.     Yes.                                    11:24

 2        Q.     Okay.  Are you aware -- between April   11:24

 3   2018 and June 2023, are you aware of any other dates 11:24

 4   other than the ones that are listed here on which you 11:24

 5   began a Prime membership?                            11:24

 6        A.     No.                                      11:24

 7        Q.     Okay.  Now, looking at column F of this 11:24

 8   spreadsheet, this identifies the way that you        11:24

 9   canceled Prime on each of those six dates.           11:24

10            Do you see that?                            11:24

11            MR. SAUNDERS:  Objection to the use of     11:24

12        the term "the way you canceled your Prime."  The 11:24

13        title of that -- of column F is "Out Reason,"  11:24

14        not necessarily the way she canceled her Prime 11:24

15        membership.  If you could clarify, I would     11:24

16        really appreciate it.                           11:25

17            MR. ARONSOHN:  Sure.                        11:25

18   BY MR. ARONSOHN:                                     11:25

19        Q.     Do you see the title of column F,       11:25

20   Ms. Osborne?                                         11:25

21        A.     Yes.                                     11:25

22        Q.     I will represent to you that the        11:25

23   information in this column F reflects the way in     11:25

24   which you canceled your Prime membership on each of  11:25

25   these dates, okay?                                   11:25
```



| | | |
|---|---|---|
| 1 | A.    Okay. | 11:25 |
| 2 | Q.    For the first two cancellations dated | 11:25 |
| 3 | April 15th, 2018 and March 14th, 2019, the data | 11:25 |
| 4 | indicates that you canceled due to auto renew off; do | 11:25 |
| 5 | you see that? | 11:25 |
| 6 | A.    Yes. | 11:25 |
| 7 | Q.    You're aware that, as a Prime member, you | 11:25 |
| 8 | were able to set your Prime membership to stop | 11:25 |
| 9 | automatically from renewing, right? | 11:25 |
| 10 | MR. SAUNDERS:  Objection.  Leading. | 11:25 |
| 11 | Vague.  Lacks foundation. | 11:25 |
| 12 | THE WITNESS:  I don't remember all of the | 11:25 |
| 13 | Amazon data, honestly. | 11:25 |
| 14 | BY MR. ARONSOHN: | 11:25 |
| 15 | Q.    Well, if I asked you to change the | 11:25 |
| 16 | settings in a Prime membership so that it would not | 11:25 |
| 17 | automatically renew, do you think you could figure | 11:26 |
| 18 | out how to do that? | 11:26 |
| 19 | MR. SAUNDERS:  Objection.  Vague.  Lacks | 11:26 |
| 20 | foundation. | 11:26 |
| 21 | THE WITNESS:  Yeah.  So in the previous | 11:26 |
| 22 | dates where I was able to successfully do that, | 11:26 |
| 23 | that was the way that I did it. | 11:26 |
| 24 | BY MR. ARONSOHN: | 11:26 |
| 25 | Q.    Okay.  So on at least these two occasions | 11:26 |



1    on April 25th, 2018 and March 14th, 2019, you were        11:26

2    successfully able to figure out how to turn auto           11:26

3    renew off and cancel your Prime membership that way,       11:26

4    correct?                                                    11:26

5        A.      Yes.                                            11:26

6        Q.      For the next cancellation, which is dated       11:26

7    August 10th, 2020, the data indicates that you,            11:26

8    quote, "Contacted CS to cancel subscription."              11:26

9           Do you see that?                                     11:26

10       A.      Yes.                                            11:26

11       Q.      Now, you're aware that you can cancel a         11:26

12   Prime membership by contacting Amazon customer             11:26

13   service, right?                                             11:26

14       A.      Yeah.                                           11:26

15           MR. SAUNDERS:  Objection.  Leading.                 11:26

16       Misstates prior testimony.  You may answer.            11:26

17   BY MR. ARONSOHN:                                           11:26

18       Q.      , in fact,, that's exactly what you did        11:27

19   on August 10th, 2020, correct?                             11:27

20       A.      Correct.                                        11:27

21       Q.      Now, for the next cancellation, which is        11:27

22   dated November 30th, 2020, the data indicates that         11:27

23   you initiated cancellation at, quote, "Prime               11:27

24   Central."                                                  11:27

25           Do you see that?                                    11:27



| | | |
|---|---|---|
| 1 | A.      Yes. | 11:27 |
| 2 | Q.      Now, you're aware that you can cancel a | 11:27 |
| 3 | Prime membership on the Amazon website, right? | 11:27 |
| 4 | MR. SAUNDERS:  Objection.  Misstates | 11:27 |
| 5 | prior testimony.  Leading. | 11:27 |
| 6 | THE WITNESS:  Yes. | 11:27 |
| 7 | BY MR. ARONSOHN: | 11:27 |
| 8 | Q.      And,, in fact,, that's exactly what you | 11:27 |
| 9 | did on November 30th, 2020, right? | 11:27 |
| 10 | A.      What? | 11:27 |
| 11 | Q.      On November 30th, 2020, you canceled your | 11:27 |
| 12 | Prime membership on the Amazon website; correct? | 11:27 |
| 13 | A.      Oh, yeah.  Sorry.  I was looking at the | 11:27 |
| 14 | wrong date.  Yeah. | 11:27 |
| 15 | Q.      Okay.  For the next cancellation, which | 11:27 |
| 16 | is dated September 16th, 2021, the data again | 11:28 |
| 17 | indicates that you canceled your membership using | 11:28 |
| 18 | Prime Central, correct? | 11:28 |
| 19 | A.      Yes. | 11:28 |
| 20 | Q.      Now, you're aware that you can cancel a | 11:28 |
| 21 | Prime membership inside the Amazon app, right? | 11:28 |
| 22 | MR. SAUNDERS:  Objection.  Leading | 11:28 |
| 23 | misstates prior testimony.  Vague. | 11:28 |
| 24 | THE WITNESS:  Yes, I'm aware, which is | 11:28 |
| 25 | indicated in the previous dates that I'm aware. | 11:28 |



TYRANNY OSBORNE                        January 28, 2025
FTC V. AMAZON.COM                                    68

| | | |
|---|---|---|
| 1 | But, for some reason, things started to get | 11:28 |
| 2 | weird and I wasn't able to cancel the way that I | 11:28 |
| 3 | normally had canceled previously.  So I had to | 11:28 |
| 4 | go about it in different ways, which is why | 11:28 |
| 5 | there's so many different routes to canceling. | 11:28 |
| 6 | BY MR. ARONSOHN: | 11:28 |
| 7 | Q.    Sure.  Of course.  And we'll get to 2023, | 11:28 |
| 8 | I promise.  Right now, I just want to ask about what | 11:28 |
| 9 | happened on September 16th, 2021. | 11:28 |
| 10 | What happened on that date was that you | 11:28 |
| 11 | canceled your Prime membership in the Amazon app, | 11:28 |
| 12 | right? | 11:28 |
| 13 | MR. SAUNDERS:  Objection.  Asked and | 11:29 |
| 14 | answered.  You may answer. | 11:29 |
| 15 | THE WITNESS:  Yes. | 11:29 |
| 16 | BY MR. ARONSOHN: | 11:29 |
| 17 | Q.    For the last cancellation, which is dated | 11:29 |
| 18 | June 28th, 2023, the data indicates that you, again, | 11:29 |
| 19 | canceled by contacting Amazon customer service; do | 11:29 |
| 20 | you see that? | 11:29 |
| 21 | A.    Yes. | 11:29 |
| 22 | Q.    So in total, between April 2018 and June | 11:29 |
| 23 | 2023, you successfully canceled your Prime membership | 11:29 |
| 24 | six different times, right? | 11:29 |
| 25 | A.    Yes. | 11:29 |



1    Q.    And you actually used multiple different    11:29

2  cancellation methods to successfully cancel your    11:29

3  Prime membership, right?                            11:29

4    A.    Yes.                                         11:29

5    Q.    On two occasions, you successfully          11:29

6  canceled by contacting Amazon customer service,     11:29

7  correct?                                            11:29

8    A.    Yes.                                         11:29

9          MR. SAUNDERS:  Objection.  Asked and        11:29

10      answered.  You may answer.                      11:29

11          THE WITNESS:  Yes.                          11:29

12  BY MR. ARONSOHN:                                    11:29

13    Q.    On one occasion --                          11:29

14          (The Court Reporter requested              11:29

15      clarification.)                                 11:29

16  BY MR. ARONSOHN:                                    11:29

17    Q.    On one occasion, you successfully          11:30

18  canceled in the Amazon app, correct?               11:30

19          MR. SAUNDERS:  Objection.  Asked and        11:30

20      answered.                                      11:30

21          THE WITNESS:  Yes.                          11:30

22  BY MR. ARONSOHN:                                    11:30

23    Q.    And on one occasion, you successfully       11:30

24  canceled on the Amazon website, correct?           11:30

25          MR. SAUNDERS:  Objection.  Asked and        11:30



| | |
|---|---|
| 1 | answered. |
| 2 | THE WITNESS:  Yes. |
| 3 | BY MR. ARONSOHN: |
| 4 | Q.    In your experience -- strike that. |
| 5 | Are you familiar with the benefits that |
| 6 | come with being a Prime member? |
| 7 | MR. SAUNDERS:  Objection.  Lacks |
| 8 | foundation. |
| 9 | THE WITNESS:  Yes. |
| 10 | BY MR. ARONSOHN: |
| 11 | Q.    What are those benefits? |
| 12 | A.    The benefits were the free shipping, |
| 13 | two-day delivery, TV, some other stuff that I never |
| 14 | really used, so I didn't really consider it a |
| 15 | benefit. |
| 16 | Q.    Okay.  Let's just talk about the benefits |
| 17 | that you used. |
| 18 | So one of the benefits you mentioned is |
| 19 | that you get fast, free shipping if you're a Prime |
| 20 | member, right? |
| 21 | A.    Yeah. |
| 22 | MR. SAUNDERS:  Objection.  Misstates |
| 23 | prior testimony. |
| 24 | BY MR. ARONSOHN: |
| 25 | Q.    As you've testified earlier, you've taken |

Timestamps (right margin): 11:30 (lines 1–18), 11:31 (lines 19–25)



| | |
|---|---|
| 1 | advantage of Prime shipping benefits on at least | 11:31 |
| 2 | hundreds of occasions, right? | 11:31 |
| 3 | MR. SAUNDERS:  Objection.  Misstates | 11:31 |
| 4 | prior testimony.  Leading. | 11:31 |
| 5 | THE WITNESS:  Thousands of occasions, | 11:31 |
| 6 | yes. | 11:31 |
| 7 | BY MR. ARONSOHN: | 11:31 |
| 8 | Q.    And another one of the benefits of being | 11:31 |
| 9 | a Prime member is you get access to Prime Video, | 11:31 |
| 10 | right? | 11:31 |
| 11 | MR. SAUNDERS:  Objection.  Misstates | 11:31 |
| 12 | prior testimony.  Leading. | 11:31 |
| 13 | THE WITNESS:  Yes. | 11:31 |
| 14 | BY MR. ARONSOHN: | 11:31 |
| 15 | Q.    What is Prime Video? | 11:31 |
| 16 | A.    It's a TV subscription where you can | 11:31 |
| 17 | watch different movies. | 11:31 |
| 18 | Q.    And you've used Prime Video yourself, | 11:31 |
| 19 | haven't you? | 11:31 |
| 20 | MR. SAUNDERS:  Objection.  Misstates | 11:31 |
| 21 | prior testimony. | 11:31 |
| 22 | THE WITNESS:  Yes. | 11:31 |
| 23 | BY MR. ARONSOHN: | 11:31 |
| 24 | Q.    And I believe you testified your mom has | 11:31 |
| 25 | also used your Prime membership to watch television | 11:31 |



1                C E R T I F I C A T E

2

3        I, MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR,

4   the undersigned Certified Court Reporter, authorized

5   to administer oaths and affirmations in and for the

6   states of Washington (3322), Oregon (16-0441), Idaho

7   (1045), and California (14430), do hereby certify:

8            That the sworn testimony and/or

9   proceedings, a transcript of which is attached, was

10  given before me at the time and place stated therein;

11  that the witness was duly sworn or affirmed to

12  testify to the truth; that the testimony and/or

13  proceedings were stenographically recorded by me and

14  transcribed under my supervision.  That the foregoing

15  transcript contains a full, true, and accurate record

16  of all the testimony and/or proceedings occurring at

17  the time and place stated in the transcript.

18           That I am in no way related to any party to

19  the matter, nor to any counsel, nor do I have any

20  financial interest in the event of the cause.

21  IN WITNESS WHEREOF I have set my hand on

22  February 3, 2025

23  

24  MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR

25

# EXHIBIT 73

1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4    FEDERAL TRADE COMMISSION,          )
                                        )
5    Plaintiff,                         )
                                        )
6            vs.                        )No. 2:23-cv-0932
                                        )
7    AMAZON.COM,                        )
                                        )
8    Defendant.                         )

9    _____

10          Deposition Upon Oral Examination Of

11                      LLEW MASON

12   _____

13                     8:25 a.m.

14                  August 23, 2024

15                 915 Second Avenue

16                Seattle, Washington

17   _____

18

19           *** CONFIDENTIAL PORTIONS ***

20

21        Page 14, Line 23 - Page 240, Line 24

22        Page 241, Line 10 - Page 253, Line 16

23

24

25   REPORTED BY:  Yvonne A. Gillette, RPR, CCR No. 2129.



```
 1                    Friday, August 23, 2024

 2                         8:25 a.m.

 3                          ******

 4   LLEW MASON,                called as a witness in the

 5                             above-entitled cause, being

 6                             first duly sworn, testified

 7                             as follows:

 8

 9                       EXAMINATION

10   BY MS. JERJIAN:

11   Q        Mr. Mason, can you please state your name

12   and spell your name for the record?

13   A        Llew Mason.  L-L-E-W, M-A-S-O-N.

14   Q        Good morning, Mr. Mason.  My name is Olivia

15   Jerjian.  I'm an attorney with the Federal Trade

16   Commission.  I'm here today with my colleague,

17   Jennifer Fingles, a legal administrative specialist at

18   the FTC.  And on the phone is my colleague Anthony

19   Saunders, also an attorney with the FTC.

20            Mr. Mason, you are represented by counsel

21   here today, correct?

22   A        Correct.

23            MS. JERJIAN:  Counsel, could you please

24   state and spell your name for the record?

25            MR. KABA:  Moez Kaba, M-O-E-Z, K-A-B-A, of
```



 1  bit more of that horizontal scenario, but the vertical

 2  piece they owned was really -- they had primary

 3  ownership for the checkout workflow and user

 4  experience for checkout.

 5          To the question of how that worked with

 6  Prime and the Prime team, many teams actually needed

 7  to do things within the checkout flow.  And so Prime

 8  was one of them because we had Prime marketing within

 9  the checkout flow.  Other examples would be the

10  delivery experience organization that owned delivery

11  promises that we give to customers.  And they owned

12  the shipping methods that get shown.  So they did a

13  lot of work in checkout as well, because obviously

14  part of checkout is determining how you want to get

15  your order and what day it's going to get delivered.

16          So we had a very federated model where, in

17  many cases, checkout in particular owned pieces of the

18  real estate themselves and also essentially federated

19  out pieces of the real estate, where another team

20  would essentially own that component within checkout.

21  And so there would be a fix.  And some of those, it

22  would be ones where it was sort of a hands off

23  involvement.  Other ones, it would be more of an

24  interaction in terms of trying to align all the teams

25  that were interested.  And there were a lot of teams



1  that -- you know, literally probably more than 50

2  teams that would have involvement in checkout for

3  various different reasons.  So Prime was one of those

4  ones that would interact in that way.

5  Q        Makes sense.  What is the purpose of

6  Consumer Engagement, the team?

7  A        At the highest level, it was to help

8  customers shop on Amazon.

9  Q        So you supervise a lot of teams from what

10  you just told me.  Let's narrow down on the user

11  experience and Design teams and the Customer

12  Frustration team.  Who did you -- who was your direct

13  report on the Customer Frustrations team?

14  A        Sharon Chiarella.  And this was in March

15  2019.  Sharon Chiarella was the VP under me under

16  which the Design team fell, which is where the

17  Customer Frustrations was.

18  Q        How long did you supervise Ms. Chiarella

19  for?

20  A        Until her departure from the company.

21  Q        Do you remember when that was?

22  A        I'm not going to be able to give you an

23  exact date on when she departed.  It was several

24  years.

25  Q        Who replaced Ms. Chiarella?



1  A          I actually made some changes at that point

2  and reorganized, so we didn't have a direct backfill

3  for Sharon.

4  Q          Who took over her responsibilities with

5  respect to the customer frustrations team?

6  A          That stayed with the Design team, so the

7  Shopping Design team.  And at that time, Katey Muus

8  was the leader for Shopping Design, and so she

9  retained those responsibilities and ended up working

10  for me directly.

11  Q          So you supervised Ms. Muus directly?

12  A          Yes.

13  Q          And just going back to the numerous teams

14  that you supervised in 2019, would your answer be

15  substantially similar for 2020?

16          MR. KABA:  Objection.  Vague.  What

17  question?  Going back to which question about --

18  Q          I asked him what teams you -- let me

19  rephrase.  When I asked you what teams you supervised,

20  you enumerated many teams including home page,

21  navigation, project detail, customer frustrations for

22  2019.  Is your answer -- would your answer be

23  substantially different for teams you supervised in

24  2020?

25  A          Firstly, let me just correct one thing.



1              MR. KABA:  Objection.  Speculation.  Sorry.

2    A       Are you asking what I understand it to mean?

3    Q       Yes.

4    A       Thank you.  I think it is referring to

5    the -- the Hotly Debated Topic No. 1.

6    Q       And just to be clear, that's on page 3 of

7    this exhibit, correct?

8    A       Correct.

9    Q       And then moving down further along this

10   first page, line 30 -- let's start with 29, beginning

11   the sentence:  While minimizing friction the design

12   creates for customer experience issues, one, customers

13   may sign up for Prime without understanding that the

14   interstitial is a Prime upsell, and when they click

15   the sign-up button, they sign up for Prime.

16              Were you concerned -- assuming this is true,

17   were you concerned by this happening?

18              MR. KABA:  Objection.  Incomplete

19   hypothetical.  Lacks foundation.  Vague.

20   A       Am I concerned in general about any customer

21   that signs up for Prime without understanding that

22   they signed up for Prime?  Yes.  Absolutely, I'm

23   concerned about that.

24   Q       Were you concerned at the time of this

25   meeting when you were reading this memo?



1    A          This sentence -- the sentence -- the

2    sentence says when they click the sign-up button, that

3    they -- they do not understand that they signed up.

4    It's -- it would be strange if a customer that clicked

5    a sign-up button didn't understand that they signed up

6    literally as written.  The interstitial was certainly

7    clear in terms of outlining the membership program,

8    the terms of the membership program, what would happen

9    if you signed up.  There will always be some small

10   number of customers that don't read all of the text on

11   any particular screen that we show them.  I would like

12   to minimize that number by trying to make the page as

13   clear as possible.

14          There is also a group of customers here that

15   there's a -- there's a problem of not all accidental

16   or unintentional Prime sign-ups happen because of

17   anything we showed them.  So, for example, if a

18   customer took over their account and then signed up

19   for Prime -- and there's a bunch of fraud scenarios

20   where that's something that would be useful to a bad

21   actor.  The person who actually signed up was not the

22   customer.  So the set of customers that are signed up

23   without knowing includes that set of people.  There's

24   also a set of people that have a family member sign up

25   because they're sharing an account.  Those people,



1   again, aren't aware that they were signed up to Prime

2   because they weren't the actual person that signed up.

3            So this sentence is mixing a bunch of

4   scenarios.  It's also implying that definitively that

5   the current design creates these customer experience

6   issues.  It doesn't matter how much text we put in

7   front of a customer, there'll always be customers that

8   don't read the text in front of them.  And so, as much

9   as we want to minimize it, we can never make it zero.

10  Q        So aside from customers who don't read,

11  family members who sign up for Prime, and fraudulent

12  instances, are there any other instances leading to

13  unintentional sign-ups?

14           MR. KABA:  Objection.  Lacks foundation with

15  respect to unintentional sign-ups.  Vague.  You may

16  answer if you understand.

17  A        Yeah.  Maybe you can define unintentional in

18  the sense you're asking that question.

19  Q        You used the term "unintentional sign-ups"

20  when you were just responding, so that's what I'm

21  referring to.

22  A        Okay.  I'm trying to think of other

23  situations that could cause customers to

24  unintentionally be signed up.  Those are the ones that

25  occur to me at the moment.



1    A          There likely were other meetings.  Whether

2    they were meetings I was even at -- because our teams

3    were meeting throughout that period as well.  I don't

4    know how many of those I was at.  But without some

5    other way to recollect a specific meeting, I don't

6    have any other specific meetings that I can recall.

7    Q          Fair enough.  I'm trying to understand what

8    you meant by series of meetings.

9    A          Yeah, yeah.

10   Q          You're not thinking of any other meetings

11   that we didn't discuss today, correct?

12   A          No.

13   Q          Okay.  Your last sentence in this email,

14   reads, quote:  I really do want to improve and clarify

15   this experience for customers.  What did you mean by

16   clarify?

17   A          I think that for -- for every experience,

18   not just this particular one, we're always trying to

19   improve the experience.  And I think in the case of --

20   in the case of the Prime sign-up experience, there --

21   there is always opportunity.  You know, we'd seen

22   individual anecdotes, and we talked about some of them

23   in previous documents here.  We had seen previous

24   anecdotes of individual users' experiences where they

25   missed details and were confused about state on



1   occasion that they were in.  And so I continuously

2   want to improve those experiences for the customers.

3   And so what I meant by clarify here was, can we

4   actually make aspects of the flow clearer for

5   customers?

6   Q          Were there any specific aspects that you

7   were referring to?

8   A          No.  I think -- probably can we make changes

9   where we see metrics that demonstrate clarity, which

10  is obviously hard to measure.  Can we -- can we --

11  changes that specifically would move those metrics in

12  the right direction in terms of making them better.

13  And while we think it's, you know, overwhelmingly

14  clear for the vast majority of customers, there will

15  always be customers that don't read very closely or

16  skip details or -- you know, trying to help them make

17  sure they're exposed to everything in the clearest way

18  possible is always something we're interested in.

19  Q          Did you meet with Mr. Ghani to discuss

20  clarifying the experience for customers?

21  A          Clarifying what experience for customers?

22  Q          I was just reading your email, clarifying, I

23  suppose, the interstitial Prime sign-up experience.

24  A          Did I meet individually with him or in other

25  meetings?  Can you be more specific?



1   Q        Sure.  Because you were referring to, I

2   haven't heard anything on discussions with -- I

3   suppose let's back up.  Were you attempting to meet

4   with Mr. Lindsay by sending this email -- I mean

5   Mr. Ghani by sending this email?

6   A        Thank you.  That helps.  I was not.  I was

7   simply looking for an email update of where things

8   were between the work that our two teams had been

9   doing.

10  Q        And besides just generally getting an

11  update, was there any other purpose for you to -- for

12  you when you followed up with Mr. Ghani in this email?

13  A        No.  Generally -- generally, I have got a

14  lot of different things going on.  And I'll have my

15  attention on certain things, and then it will move to

16  something else that's more urgent or temporarily more

17  important.  And so I generally have things that I will

18  check in on occasion.  This was one where I knew our

19  teams were working together to try and make

20  improvements.  And so I was just -- I was just

21  checking in because I hadn't heard anything recently.

22  And I even say in this note that my team probably had

23  been trying to spare me the details unnecessarily.

24  And so I was just trying to get the quick status of

25  where we were.



1    A          Correct.

2    Q          So these two meetings were happening -- or

3    these two chats, rather, were happening at the same

4    time?

5    A          This chat was happening -- parts of this

6    chat -- because obviously this goes over an extended

7    period of time, parts of this chat were happening at

8    the same time that this meeting was running.

9    Q          Okay.  I'm showing you what I've marked as

10   Exhibit LM 24.

11              (Exhibit No. 24 marked for identification.)

12   Q          And just briefly, this is a document Bates

13   numbered AMZN-PRM-FTC 22492 ending in 295.  Do you

14   recall this email chain?  Specifically the second

15   email on page -- the substance of the second email on

16   page 1?

17              MR. KABA:  Just for the record, are you

18   asking him if he recalls an email that he's not on?

19   Unless you gave me a different document than you meant

20   to.

21   Q          No.  The substance of the email by -- from

22   Jamil Ghani to Nikki Baidwan, specifically the

23   paragraph that starts with "one note".

24   A          This is a conversation that Jamil and I had

25   had many times over the -- over an extended period of



LLEW MASON  Confidential                                    August 23, 2024
FTC V. AMAZON.COM                                                      209

1   time.  And so I recall -- I may not recall the exact

2   email back and forth chain on this particular note,

3   but it's in line with conversations that Jamil and I

4   had had.

5   Q          And that makes sense.  You're not on this

6   email chain.  Just for the record, I want to make that

7   clear.  What do you recall about these conversations

8   with Mr. Ghani?

9   A          That all along, I was both super supportive

10  of trying to improve the clarity of our already clear

11  subscription flow.  But at the same time, we had not

12  run any experiments that had actually shown that the

13  metrics you would expect to improve with improved

14  clarity actually did improve.  All of the experiments

15  we ran related to the changes we've talked about in

16  multiple documents here.  All of those resulted in

17  essentially either no impact or actually negative

18  impact to metrics like the settlement rate.

19          And so it wasn't clear that the changes that

20  we tried to improve the clarity for customers had

21  actually improved the clarity.  So all along

22  throughout this whole journey, I was continually

23  pushing that we want to keep trying to figure out how

24  we can make it even clearer for customers, but we also

25  need to measure that the changes we make are actually



1    making it clearer.  And we didn't have that evidence

2    from the experiments we had run.

3              So I kept pushing on that.  I would love to

4    keep trying different experiments and having these

5    debates of saying we should make these changes because

6    they clearly improved clarity, except for the fact

7    that the words "clearly improved clarity" had not been

8    proven by anyone.  In fact, the only data we had said

9    that those changes had not improved clarity, at least

10   using the proxy metrics that we had.

11             So that was sort of the whole scenario of

12   trying to find what proxy metrics we could be using

13   beyond the ones we had because the ones we had, we

14   were not showing the impact that we wanted.  And it

15   just made no sense to make those changes that we knew

16   were going to reduce Prime sign-ups because they were

17   changing the flow.  And in some cases, some of those

18   changes for clarity were also removing benefits from

19   Prime.  And so customers -- it may have been less

20   clear what they would get with Prime.  And so in some

21   sense, it could have worse clarity, trading off --

22   maybe there was clarity about the choose the yes

23   option, but maybe there was less clarity about

24   choosing the no option.

25             So through this whole period, I was



 1  continually pushing to Jamil on I want to help you

 2  improve clarity of the sign-up flow.  But without us

 3  showing that we're improving the clarity, we shouldn't

 4  be taking a hit on membership numbers because --

 5  because we're not getting the benefit for customers

 6  that we actually set out to.  It would have been a

 7  very different conversation throughout this whole

 8  journey if we had clear metrics that said we actually

 9  improved clarity and reduced mistaken sign-ups.  That

10  would have been a completely different conversation

11  than every one of the conversations we've talked about

12  today.

13  Q        How would it have been different?

14  A        If we had clear metrics showing that we had

15  really improved clarity for customers, and the people

16  that were not signing up for Prime that would have

17  under the old flow, if those people that were choosing

18  not to sign-up, if they did not want to be Prime

19  members, and they were accidentally signing up, we

20  would have been happy for them to have not signed up

21  because we want long-term engaged Prime members.  We

22  don't want Prime members that join and then decide,

23  oh, I don't want this anymore because I'm not using

24  it.  We don't want Prime members that accidentally

25  sign up and didn't realize.  We don't want any of



```
 1  anecdotes to drive customer obsession and

 2  improvements.  What did that mean?

 3  A        It meant that they were -- they were focused

 4  on the individual examples from primarily user

 5  research studies as being their -- their way to drive

 6  customer obsession and improvements.  Showing those

 7  anecdotes to people gave the -- gave the individual

 8  teams examples to drill into and understand what

 9  happened and whether we can make it better.

10  Q        And in your -- in the reference in Mason

11  Exhibit 24, in your testimony, you talked about the

12  need to keep experimenting.  Do you recall that?

13  A        Just finding 24.

14  Q        I'll just ask you generally.  Do you recall

15  testifying about your desire to keep experimenting

16  with changes?

17  A        Yeah.  I found 24 too.

18  Q        And in your view, were anecdotes sufficient

19  to make changes?

20  A        No.  Experiments -- experiments were

21  conducted using with real customers at scale.  And so

22  that was our process for collecting data to validate

23  changes.  Anecdotes could inspire changes, but you

24  couldn't validate any individual change based on an

25  anecdote.  It was a single event for a single person.
```



```
 1   Q        My final couple of questions for you are
 2   with respect to, earlier, you testified about a list
 3   of -- strike that.
 4            You were asked some questions with respect
 5   to unintended sign-ups and different ways that people
 6   might assert or get into that categorization.  Do you
 7   recall that testimony?
 8   A        Yes.
 9   Q        Mr.~Mason, if somebody claims on a CS
10   contact or through some other means -- or I think you
11   mentioned Twitter and other places -- that there was
12   an unintended sign-up, in your experience, does that
13   mean that it was in fact an unintended sign-up?
14   A        Not necessarily.
15   Q        Explain that.
16   A        A customer that's calling customer service
17   that would like a refund for their Prime membership,
18   probably the easiest thing for them to say in terms of
19   the reason for why they're canceling would be that I
20   didn't mean to sign-up.  And that would be very likely
21   for them to get a refund on the cost of that Prime
22   membership, for example.
23   Q        Are there any other examples you can think
24   of of how someone saying that they didn't intend to
25   sign up may not necessarily mean that they in fact
```



1  didn't intend to sign up beyond what you've otherwise

2  testified to as well today?

3  A          A customer could -- a customer could have

4  completely intended to sign up, for example, for a

5  free trial and then intended to not keep the

6  subscription beyond the free trial period because they

7  wanted to use the -- use the subscription during the

8  free trial period because it was free.  And at the end

9  of the period, they intended to unsubscribe.  And so

10  they could easily say that they did not intend to pay

11  for their Prime membership, but it doesn't mean that

12  they didn't intend to; sign up in the first place.

13  Q          Okay.  And these are additional -- these

14  examples are in addition to the list that you were --

15  you provided earlier?

16  A          Correct.

17          (End of confidential designation.)

18          MR. KABA:  Okay.  No further questions.

19  Thank you.

20          MS. JERJIAN:  I have no further questions.

21          THE COURT REPORTER:  Counsel, are you

22  ordering the transcript?

23          MS. JERJIAN:  Just normally, yeah.

24          THE COURT REPORTER:  And would you like a

25  copy?



1    MR. KABA:  Yes, please.

2    (Deposition adjourned at 5:27 p.m.)

3    (Signature was reserved.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                C E R T I F I C A T E

 2   State of Washington    )

 3                          )  ss.

 4   County of King         )

 5

 6           I, the undersigned Registered Professional
     Reporter and Washington Certified Court Reporter, hereby
     certify that the foregoing deposition upon Oral examination
 7   of LLEW MASON was taken before me on August 23, 2024 and
     transcribed under my direction;
 8
             That the witness was duly sworn by me pursuant to
 9   RCW 5.28.010 to testify truthfully; that the transcript of
     the deposition is a full, true, and correct transcript to
10   the best of my ability; that I am neither attorney for, nor
     a relative or employee of, any of the parties to the action
11   or any attorney or counsel employed by the parties hereto,
     nor financially interested in its outcome.
12
             I further certify that in accordance with CR
13   30(e), the witness was given the opportunity to examine,
     read, and sign the deposition, within 30 days, upon its
14   completion and submission, unless waiver of signature was
     indicated in the record.
15
             IN WITNESS WHEREOF, I have hereunto set my hand
16   and seal this date, September 6, 2024:

17

18

19                      /s/Yvonne A. Gillette

20                      _____
                        Yvonne A. Gillette

21                      Washington Certified Court Reporter

22                      License No. 2129

23

24

25
```



# EXHIBIT 74

```
 1              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
 2                    AT SEATTLE
        - - - - - - - - - - - - - - - - x
 3    FEDERAL TRADE COMMISSION,      :

 4           Plaintiff,              :

 5       vs.                         :

 6    AMAZON.COM, INC., a            :
      corporation;
 7                                   :
      NEIL LINDSAY, individually        Civil Action No.
 8    and as an officer of          :
      AMAZON.COM, INC.;
 9                                   :    2:23-cv-0932-JHC
      RUSSELL GRANDINETTI,
10    individually and as an        :
      officer of AMAZON.COM,
11    INC.; and                     :

12    JAMIL GHANI, individually     :
      and as an officer of
13    AMAZON.COM, INC.,             :

14           Defendants.           :
        - - - - - - - - - - - - - - - - x
15
             Oral deposition of JAMES CAMPBELL
16    COOPER, taken on behalf of the Plaintiffs,
      beginning at 9:22 a.m., on Friday, April 25,
17    2025, at Constitution Center, 400 7th Street,
      SW, Washington, DC, 20024, before Okeemah S.
18    Henderson, RRP, CaseViewNet Realtime Reporter,
      and Notary Public of the District of Columbia.
19
      (REPORTER'S NOTE: All quotations from exhibits
20    are reflected in the manner in which they were
      read into the record and do not necessarily
21    denote an exact quote from the document.)

22     Reported by: Okeemah S. Henderson, RPR
```



JAMES CAMPBELL COOPER                                    April 25, 2025
FTC vs AMAZON.COM, INC.                                              4

```
 1              P R O C E E D I N G S
 2              JAMES CAMPBELL COOPER,
 3   was called as a witness, and having been first
 4   duly sworn, was examined and testified as
 5   follows:
 6                   EXAMINATION
 7   BY MR. TANG:
 8              Q.   My name is Jeffrey Tang, an
 9     attorney with the Federal Trade Commission.
10     I'm being assisted by our paralegal Johana
11     Mejia-Portillo.
12          Counsel, do you guys want to make your
13     appearance?
14          MR. ARONSOHN:  Sure.  Joseph
15     Aronsohn appearing for the witness on behalf
16     of defendants Amazon.com, Incorporated Neil
17     Lindsay, Russell Grandinetti and Jamil Ghani,
18     appearing with me is Nicholas Kellum.
19   BY MR. TANG:
20          Q.   Professor Cooper, have you
21     been deposed before?
22          A.   No.
```



```
 1   recognize this document?

 2              A.    Yes.

 3              Q.    What is this document?

 4              A.    It's my CV.

 5              Q.    And by CV, you mean your

 6   curriculum vitae?

 7              A.    Yes.

 8              Q.    Is this a document that you

 9   prepared?

10              A.    Yes.

11              Q.    Take a look through it.  Is

12   it -- does it appear complete and accurate?

13              A.    Yes, I did add one thing and

14   that's under education.  I also have a

15   Master's in economics from South Carolina.

16   It must have gotten squeezed off when I

17   prepared this and often I don't.  So that

18   would be in 1991.

19              Q.    And you're referring

20   to Page 4 --

21              A.    Page 4 under education, there

22   should be something in between JD and BA and
```



JAMES CAMPBELL COOPER                          April 25, 2025
FTC vs AMAZON.COM, INC.                                    14

```
1   it should say MA economics, University of

2   South Carolina 1991.

3            Q.    Other than that, does

4   everything else appear to be accurate?

5            A.    Yes.

6            Q.    What is your current

7   employment?

8            A.    I'm a law professor at George

9   Mason Antonin Scalia Law School.

10           Q.    What do you do in your current

11  employment?

12           A.    I teach law classes and

13  research and also run certain academic

14  programs for my -- for the program and

15  economics on privacy.

16           Q.    In terms of law classes, what

17  kind of law classes do you teach?

18           A.    I teach -- over the last

19  several years, my teaching load has been

20  called economics for -- and another class

21  called consumer protection law.

22           Q.    Do you teach any other classes
```



```
 1   besides those two?
 2            A.   Not as part of the JD
 3   curriculum and not since -- I have taught
 4   other classes but not since 2020, that's been
 5   my primary teaching, economics for lawyers
 6   and consumer protection law.
 7            Q.   So economics for lawyers, can
 8   you describe what that class entails?
 9            A.   It is an introduction to
10   economic analysis for first-year law
11   students.
12            Q.   When you refer to "economic
13   analysis," can you describe a little bit more
14   about what you mean by that?
15            A.   Sure.  So, for instance, we
16   assume that students know nothing about
17   economics when they come into the class, so
18   we begin teaching supply, demand, market,
19   equilibrium, price ceilings, price floors, a
20   whole host of things that someone would
21   receive broadly in a first-year might be an
22   interim in an undergraduate microeconomics
```



JAMES CAMPBELL COOPER                                   April 25, 2025
FTC vs AMAZON.COM, INC.                                              16

 1  class, and then apply some of those concepts

 2  to various areas of the law.  Discipline

 3  known as law and economics.

 4            Q.   How long have you been

 5  teaching that class?

 6            A.   I have taught one version of

 7  that class or another, because its gone under

 8  different names, since fall of 2012.

 9            Q.   When you say it has gone under

10  different names, can you tell me some of

11  those names?

12            A.   Currently it's economics for

13  lawyers.  At one time it was economic

14  analysis for lawyers.  Another time it was

15  called economic foundations for law students.

16  It's a marketing exercise.

17            Q.   How often do you teach that

18  class?

19            A.   I've taught it every year

20  since 2012.

21            Q.   Do you teach that class every

22  semester or just once a year?



1    A.    It's a fall class for first

2    years, so it is in the fall, every fall since

3    2012.

4    Q.    And the consumer protection

5    law class, can you tell me a little about

6    that?

7    A.    That class involves examining

8    various areas of consumer protection law.  It

9    focuses heavily on the Federal Trade

10    Commission as well as some financial consumer

11    protection such as FCRA, TELA, Equal Credit

12    Opportunity Act.  We speak a little bit about

13    the CFPB and the role they have and then a

14    little about state -- state consumer

15    protection law and also privacy and data as

16    well.

17    Q.    How often do you teach that

18    class?

19    A.    It is offered once a year.  I

20    typically also lately have been teaching it

21    in the fall with the same time as the law and

22    economics class, but it has been offered in



JAMES CAMPBELL COOPER                              April 25, 2025
FTC vs AMAZON.COM, INC.                                        18

1     the spring before as well.  I believe in 2020

2     I taught both in the spring and the fall but

3     for the last couple of years it's been a fall

4     class.

5                    Q.   So normally it would be once a

6     year?

7                    A.   Normally it's offered once a

8     year, yes.

9                    Q.   And is spring 2020 the first

10    time you taught that class or how long ago

11    did you teach that class?

12                   A.   Yes.  Spring 2020 would have

13    been the first time I taught the class.

14                   Q.   In your consumer protection

15    law class, do you teach about ROSCA or the

16    Restore Online Shoppers Confidence Act?

17                   A.   Yes, I do.

18                   Q.   As part of that class on

19    consumer protection law, what portion does

20    ROSCA make of that class?

21                   A.   When you say what portion --

22                   Q.   Let me rephrase that.  Scalia



JAMES CAMPBELL COOPER                              April 25, 2025
FTC vs AMAZON.COM, INC.                                        19

1    Laws is on a semester system?

2              A.    That's correct.

3              Q.    How much weeks is in a

4    semester?

5              A.    I believe -- I should know.

6    14.

7              Q.    So for the consumer protection

8    law class would be there be 14 weeks of

9    instruction?

10             A.    There would be.

11             Q.    Of those 14 weeks, how many

12   weeks does ROSCA make of that syllabus or

13   that course instruction?

14             A.    Well, out of 14 weeks, there

15   would be two, hour and 25 -- each of those 14

16   weeks there would be -- with the exception of

17   a holiday, there would be two hour and 20

18   minute classes or an hour and 25 minute

19   classes.

20        So we would -- and I -- this is general.

21   I would have to go back and look at my

22   syllabus and look at my class and figure out



JAMES CAMPBELL COOPER                          April 25, 2025
FTC vs AMAZON.COM, INC.                                    20

1    to remember exactly how much, but I would say

2    roughly probably one class is devoted -- one

3    class out of the semester is probably devoted

4    in large part to ROSCA.

5              Q.    When you say "in large part,"

6    what do you mean by that?

7              A.    So for an hour and 25 minute

8    class, let's say -- and again, this is just

9    an estimate, I don't time myself and

10   sometimes you're talking about ROSCA and

11   you're talking about other things as well,

12   but I would say, let's say 45 minute.

13             Q.    So for that semester class, 45

14   minutes would be devoted to ROSCA?

15             A.    I would say that we would

16   touch on -- yes, but again, this is an

17   estimate.  I have no idea.  Also add that we

18   also discuss a lot of the underlying, some of

19   the concepts that are related to ROSCA

20   throughout the semester.

21             Q.    What do you mean by  some of

22   the underlying concepts related to ROSCA.



JAMES CAMPBELL COOPER                       April 25, 2025
FTC vs AMAZON.COM, INC.                                   21

```
1              A.   Just the general -- the clear

2    and conspicuous.

3              Q.   Any other concepts?

4              A.   I think that's the one that

5    comes to mind.

6              Q.   When you teach about ROSCA,

7    are you teaching that along with any other

8    topics for that week?

9              A.   I would have to go back and

10   look at my -- I don't have my syllabus in

11   front of me.

12             Q.   Okay.  And when you teach your

13   class on consumer protection law, do you give

14   your students materials for them to review

15   for the topic that week whatever it may be?

16             A.   I don't give them to them but

17   I assign materials.

18             Q.   What kind of materials would

19   you assign them?

20             A.   We have a -- I have a course

21   pack which is an excerpt that they purchase

22   from the bookstore which is an excerpt from I
```



1   believe three different consumer protection

2   law textbooks.

3            Q.   Do you ever give your students

4   complaints to read as part of the class

5   syllabus?

6            A.   I do.

7            Q.   Did you give your students the

8   Amazon complaint as part of the class

9   syllabus for consumer protection law?

10           A.   Yes.

11           Q.   When was that?

12           A.   Perhaps in fall of 2023 that

13   would have been the first time.  I can't --

14   I'll be honest, I can't recall if I assigned

15   it for that class, but I would have assigned

16   it for the fall of 2024.

17           Q.   When you gave your students

18   the Amazon complaint to read as -- sorry.

19   Let me take that back.  Did you assign them

20   the Amazon compliant as part of the topic or

21   unit on ROSCA for consumer protection class?

22           THE COURT REPORTER:  I'm sorry.



1  something that I have not read.

2            Q.   In this case, for fall of 2024

3  when you assigned the Amazon complaint as

4  part of the course syllabus, did you read the

5  Amazon complaint prior to August of 2024?

6            A.   Yes.

7            Q.   Did you form an opinion about

8  the Amazon ROSCA complaint around that time?

9            MR. ARONSOHN:  Objection.  I think

10  that falls outside the scope of the parties'

11  expert stipulation which places off limits

12  any draft reports or opinions.

13            A.   So could you repeat?

14            MR. ARONSOHN:  Hold on.  Do you

15  disagree that that's within the scope of the

16  parties' expert stipulation?

17            MR. TANG:  Can I just have a

18  moment.

19            (Off record discussion.)

20            MR. TANG:  I can move on to a

21  different course, line of questioning for

22  now.



JAMES CAMPBELL COOPER                                    April 25, 2025
FTC vs AMAZON.COM, INC.                                               30

```
 1   BY MR. TANG:

 2                 Q.   So you say you normally teach

 3        the consumer protection law class every year;

 4        is that correct?

 5                 A.   Since 2020.  And in 2020 I

 6        taught it twice; spring and fall.

 7                 Q.   Are there any years where you

 8        would not teach that class?

 9                 A.   Since 2020 I have taught it

10        every year at least once.

11                 Q.   Did you teach that class in

12        2022?

13                 A.   Yes.

14                 Q.   In the year 2022, would it be

15        in the fall, the semester that you taught the

16        consumer protection law class?

17                 A.   To be honest, I don't recall

18        100 percent but I think it was the fall.

19                 Q.   How long have you been

20        teaching at Scalia Law?

21                 A.   As I said, I believe my first

22        class -- I'd have to go back and check
```



1  100 percent but I believe my first class, I

2  went there in 2011 and I think I taught my

3  first class which was some version of

4  economics for lawyers in fall of 2012 would

5  have been my first time teaching at Scalia

6  Law, to the best of my recollection.

7           Q.   And you mentioned that you're

8  also a director of Scalia law; is that

9  correct?

10          A.   No.  No.  I -- I'm a tenured

11 full professor.  Maybe -- I'm not a director.

12 I don't --

13          Q.   We can go back to I believe

14 it's labeled as JC 02, your CV.  So for the

15 first line under employment it says professor

16 of law and director?

17          A.   Oh, I'm sorry.  Yes.  Director

18 of the program on economics and privacy.

19 Sorry.  I wasn't sure what you were referring

20 to.

21          Q.   Can you tell me a little about

22 what that entails?



```
 1   for instance, a competition claim and the --

 2   one of the claims, for instance, would be

 3   tying, you would want to do economic analysis

 4   to determine whether or not those two

 5   products are actually two products or one

 6   product.  Whether -- so you would perhaps

 7   perform some economic analysis.  That's

 8   something that comes to mind as the type of

 9   economic analysis with respect to

10   competition.

11            Q.   So would that tie into

12   liability then or into damages?

13            MR. ARONSOHN:  Objection.  Calls

14   for a legal conclusion.

15            A.   Would that -- again, all of

16   the work that I'm referring here in NERA,

17   this is -- I'm working as a Ph.D. economist,

18   and I'm part of an antitrust law to make out

19   claims, there's economic analysis that goes

20   behind those claims.  And so none of these --

21   none of these cases was I involved providing

22   any legal opinions.
```



```
1            They were only involved in doing

2     statistical analysis that would show the

3     presence or absence of some fact that would

4     then perhaps be plugged in by the attorneys as

5     part of liability or damages.  But my role was

6     only sort of a bean counter -- I mean

7     glorified bean counter but running statistical

8     analysis to -- for these claims.

9     BY MR. TANG:

10            Q.   And it also mentions here as

11     part of your work as an academic affiliate

12     for NERA you provided these economic analysis

13     for clients involved in FTC consumer

14     protection matters including Section 5

15     deception and unfairness, TSR, and ROSCA

16     claims; is that accurate?

17            A.   Yes, that's correct.

18            Q.   And you mentioned you estimate

19     that you worked on three matters involving

20     consumer protection law; is that correct?

21            A.   To the best of my

22     recollection, yeah.
```



JAMES CAMPBELL COOPER                          April 25, 2025
FTC vs AMAZON.COM, INC.                                    42

1          Q.    And of those three matters

2    that involve consumer protection laws, how

3    many of them involve ROSCA?

4          A.    All three.

5          Q.    How many of them involve the

6    TSR?

7          A.    Two.

8          Q.    And this -- sorry.  For a

9    little bit of clarification, the TSR refers

10   to the telemarketing sales rule, correct?

11         A.    That is correct.

12         Q.    How many of them involve

13   Section 5, deception and unfairness?

14         A.    Again, I would have to go back

15   but I believe all three.  Maybe all three

16   didn't have unfairness.  I'd have to go back

17   and check.

18         MR. ARONSOHN:  And just to be

19   clear, Counsel, you're asking about what was

20   alleged, right; not whether, in fact, the

21   case is involved unfairness or deception.

22         MR. TANG:  I'm doing it based on



```
 1    his description of his CV.

 2              A.   Yes.  Well, let me clarify the

 3    record.  This was -- again, in all of these

 4    cases, I was hired as an economic consultant

 5    and these were -- these were all allegations.

 6    I made no conclusions whether or not the -- I

 7    had no conclusions solved by the underlying

 8    allegations whether they were correct or not

 9    correct.  I was just performing statistical

10    and economic analysis for the client.

11    BY MR. TANG:

12              Q.   And how do you go about

13    providing these statistical analysis for the

14    clients?

15              A.   Without, again, breaching

16    confidentiality agreements, broadly you would

17    want to find you would hopefully be able to

18    find what is commonly referred to as a

19    natural experiment to test whether one set of

20    facts is more true than say another set of

21    facts and -- from the data.

22          And you would run statistical analysis
```



1          Q.   So is there a case listed on

2    Appendix A that's not part of your analysis

3    in your data analysis in your Excel

4    worksheet?

5          A.   Is there a case listed in

6    Appendix A.

7          MR. ARONSOHN:  Objection.  Asked

8    and answered.

9    BY MR. TANG:

10          Q.   Is there a case in Appendix A

11    that was filed prior to March 2021 that's not

12    part of your analysis in your Excel

13    worksheet?

14          A.   Not -- I would have to match

15    them up completely, but not -- looking at

16    this right now, I don't believe so.

17          Q.   And for the ROSCA cases that

18    you reviewed in Appendix A, that's prior to

19    March -- that was filed prior to March of

20    2021, did you review just the complaint or

21    did you review any other associated materials

22    with those cases?



JAMES CAMPBELL COOPER
FTC vs AMAZON.COM, INC.

April 25, 2025
152

```
 1              MR. ARONSOHN:  Objection.  Vague.

 2              THE WITNESS:  What would be the

 3    associated material?

 4    BY MR. TANG:

 5              Q.   Okay.  Did you review any of

 6    the orders for these cases?

 7              A.   Yes.

 8              Q.   Were they part of your

 9    analysis?

10              A.   No.

11              Q.   Why not?

12              A.   Well, as I explain in my

13    analysis that I believe that consent --

14    consent orders because they are a private

15    agreement between the FTC and the defendant,

16    they don't provide information with respect

17    to reasonable market participant as to -- or

18    limited information as to what compliance

19    with ROSCA, what a reasonable market

20    participant would believe they needed to do

21    to comply with ROSCA.

22              Q.   So you mentioned two things,
```



1  one that it provided no information or that

2  it provided limited information.  Which one

3  is it?

4              MR. ARONSOHN:  Objection.

5  Mischaracterizes prior testimony.

6              A.   It was -- it limited --

7  limited information.

8  BY MR. TANG:

9              Q.   So it provides some

10  information?

11             A.   I think I said it provided

12  limited information.

13             Q.   And you didn't consider any of

14  the stipulated orders as part of your

15  analysis?

16             A.   I did not.

17             Q.   But you reviewed the

18  stipulated orders in the scope of your

19  assignment?

20             A.   I did review the orders.  Yes.

21             Q.   For all the cases listed in

22  Appendix A of your report?



```
 1   portion that are in footnote 5 that you're

 2   referring to?

 3           A.   Referring to for what

 4   proposition?

 5           Q.   That you reviewed all the

 6   orders listed in Appendix A?

 7           MR. ARONSOHN:  Objection.

 8   Mischaracterizes prior testimony.

 9           A.   Footnote, you asked where in

10   my report I discuss -- here, I don't -- it

11   doesn't expressly say, but I describe consent

12   orders, and I provide -- provide an example

13   from one consent order that contains fencing

14   in relief and note that "For example, nearly

15   all ROSCA consent orders require the settling

16   defendant to provide an e-mail or written

17   letter providing the same information that

18   was required pre-ROSCA purchase -- as a

19   required pre-ROSCA purchase disclosure

20   despite such post-sale communication not

21   being required by ROSCA itself."

22   BY MR. TANG:
```



JAMES CAMPBELL COOPER                          April 25, 2025
FTC vs AMAZON.COM, INC.                                     158

```
1              Q.   And so at the beginning of

2    that footnote you note that [As read]

3    "Consent orders that settle ROSCA actions can

4    provide some information about conduct that

5    the FTC considers legal."

6              A.   That's true.

7              Q.   And in this matter you did

8    review the settlement orders associated with

9    the ROSCA cases where the complaint was filed

10   prior to March of 2021?

11             A.   Yes, that's true.

12             Q.   But you did not review these

13   orders in -- whether or not to see what

14   fencing in relief they contained?

15             MR. ARONSOHN:   Objection.   Vague.

16             A.   That's -- I think I said that

17   before is that I didn't expressly review the

18   orders with the goal of finding fencing in

19   relief, but I did review the orders.

20        And as I note in footnote 5 that nearly

21   all of the ROSCA consent orders contain an

22   example fencing in relief, which is an
```



JAMES CAMPBELL COOPER                       April 25, 2025
FTC vs AMAZON.COM, INC.                             159

1    e-mail.

2    BY MR. TANG:

3              Q.   You say "nearly all," so that

4    means not all?

5              A.   I would have to go back and

6    review all of the consent orders to surely

7    say whether it was nearly all or all.  There

8    may have been one that did not -- but I

9    cannot -- sitting here right now, I cannot

10   say whether -- the extent to which all of

11   them or nearly all of them did not require

12   this.

13             Q.   And we're going to get into

14   this little bit later, but did you perform a

15   data analysis as to these settlement orders

16   in the same manner that you did the ROSCA

17   complaints?

18             A.   I did not.

19             Q.   And so you did not consider

20   the settlement orders as part of your data

21   analysis of ROSCA complaints?

22             A.   No, I did not.



JAMES CAMPBELL COOPER                               April 25, 2025
FTC vs AMAZON.COM, INC.                                        160

1          Q.   And you used that data

2     analysis to form your opinion that you

3     ultimately state in paragraph 213 of your

4     report?

5               A.   That's correct.

6               Q.   Would your opinion change at

7     all if you considered the settlement orders

8     of ROSCA cases prior to March of 2021?

9               MR. ARONSOHN:   Objection.

10    Incomplete hypothetical.

11              A.   I -- I mean, I -- I mean,

12    that's not what my analysis is.  I didn't --

13    I can't -- I mean, that's a -- again, it

14    would be a hypothetical for me to go back and

15    perform a data analysis.  I made the decision

16    that ROSCA settlement orders, because they

17    contained fencing in relief, I did not -- and

18    they -- that they would not be informative,

19    so I decided not to perform that analysis.

20    BY MR. TANG:

21              Q.   If you did perform that

22    analysis, do you believe your opinion would



```
 1   change or not?

 2            MR. ARONSOHN:  Same objection.

 3            A.   Again, it's hypothetical, and

 4   I can't opine on analysis that I didn't

 5   perform and what the results of that analysis

 6   would be.

 7   BY MR. TANG:

 8            Q.   In reviewing these 26 or I

 9   guess 27 ROSCA cases prior to March of 2021,

10   how did you go about reviewing these cases?

11            A.   I read -- when you say how --

12   I'm sorry.  How did I go about...

13            Q.   So what did you do when you

14   reviewed these cases?  Did you just read the

15   complaint?  Did you have any particular

16   process that you go about when you're

17   reviewing these complaints?

18            A.   I read the complaints.

19            Q.   How did that translate to your

20   data analysis?

21            A.   I read the complaints and then

22   coded them, as I lay out in my report, coded
```



```
 1   that were produced to you once you'd

 2   identified the cases, correct?

 3            A.    That is correct, yes.

 4            Q.    So were there cases where you

 5   reviewed the initial and the amended

 6   complaint?

 7            A.    If there was an amended

 8   complaint I would have reviewed both.   I

 9   can't, sitting here right now, recall which

10   cases those were.

11            Q.    And how did you go about

12   identifying which cases had amended

13   complaints?

14            A.    I would look on the FTC

15   website.

16            Q.    Can you tell me a little bit

17   about this coding method that you used for

18   reviewing those cases?

19            A.    That's a pretty open-ended

20   question, shall we say.   What would you like

21   to know?

22            Q.    What does coding in your words
```



JAMES CAMPBELL COOPER                                    April 25, 2025
FTC vs AMAZON.COM, INC.                                          164

```
 1   entail?

 2              A.    Coding would be at the highest

 3   level translating words into data, words into

 4   data that then can be analyzed.

 5              Q.    And in the context of

 6   reviewing complaints, how do you code?

 7              A.    You read the complaint, and

 8   you would see if there were a certain -- with

 9   respect to the analysis that I performed

10   here, if there's a certain type of

11   allegation, and if that type of allegation

12   was present, I would code it as a one, and if

13   it were not present it would be coded as a

14   zero?

15              Q.    And what's the -- does this

16   methodology have a name?

17              A.    This is a common methodology

18   in empirical work where you -- it would be --

19   I have heard it referred to as case coding.

20   It's a very common methodology in law -- in

21   the field of law and economics.

22              Q.    As I understand correctly, it
```



 1    could also be could case coding, and it's

 2    used in the field of law and economics?

 3            A.    It's used not solely in the

 4    field of economics, but it is used in -- for

 5    analysis of when there are -- when there is

 6    something that's nondigital and you need to

 7    make it digital, that is a type coding

 8    analysis.

 9         If your unit of analysis or what

10    you're interested in is written but you want

11    to perform some type of rigorous analysis,

12    then you convert that into a digital format

13    that you can then use to conduct that rigorous

14    analysis

15            Q.    I'm a little bit confused by

16    this.  You mention that your methodology is

17    kind of premised around the idea of turning

18    something nondigital to digital; is that

19    correct?

20            MR. ARONSOHN:  Objection.

21    Argumentative.

22            A.    I believe that's what you



1   that prior to March of 2021 a reasonable

2   market participant would have expected to be

3   in compliance with ROSCA unless one of the

4   following conditions were met, and there are

5   three main conditions that are listed; is

6   that correct?

7          A.   When you say, "main," what are

8   you referring to?

9          Q.   So when you say, "one of the

10  following conditions," what conditions are

11  you referring to in your report?

12         A.   I just wanted to make sure

13  you're referring to the outer bullet points,

14  right, the bold outer bullet points.

15         Q.   Is that what you meant when

16  you formatted your report in this matter?

17         A.   Yes.

18         Q.   And so those three outer

19  bullet points, the first one says, [As read]

20  "The substance of the disclosure was either

21  false or incomplete."

22         A.   Yes.



JAMES CAMPBELL COOPER                              April 25, 2025
FTC vs AMAZON.COM, INC.                                      180

1          Q.    And you quoted ROSCA cases

2    according to that condition?

3          A.    That's correct.

4          Q.    Who determined that condition

5    of the substance of the disclosure was either

6    false or incomplete?

7          A.    I did.

8          Q.    And what was that based on?

9          A.    But let me clarify that.  When

10   I say, "the substance of the disclosure was

11   either false or incomplete," I'm reading and

12   I'm looking for the factual allegations.

13        I'm making no -- there's certainly no

14   legal determination there that it was legally

15   false or legally incomplete.

16        It's just is there an allegation in the

17   complaint or is there a factual allegation

18   from the FTC that it was false or incomplete.

19        I'm not deciding whether the

20   allegation was false or incomplete.  I'm

21   merely reading what the FTC alleged in coding

22   it, 1, if it were there, and, 0, if it's not



JAMES CAMPBELL COOPER                    April 25, 2025
FTC vs AMAZON.COM, INC.                           181

1    there.

2            Q.    So for that condition that you

3    tagged as to whether or not a complaint

4    alleges that you determined that condition --

5    or you determined whether or not the code

6    cases on that condition?

7            A.    I did make the coding

8    determination, yes.  I made no determination

9    as to whether the underlying facts as alleged

10   were true or false or any conclusion as to

11   just reading the words in the complaint.

12           Q.    Then to your second order

13   bullet point, where it says, [As read] "A

14   disclosure was ineffective due to a

15   combination of at least two of the following

16   non-mutually exclusive deficiencies."

17           Did you make that coding

18   determination?

19           A.    Yes.

20           Q.    And what was that based on?

21           A.    As we discussed earlier,

22   reading the words and reviewing any exhibits



1    or attachments that were associated with the

2    complaint.

3            Q.   So what's the difference

4    between outer bullet point 1 regarding, [As

5    read] "The substance of the disclosures was

6    either false or incomplete," and the outer

7    bullet point 2, [As read] "Disclosure was

8    ineffective due to a combination of at least

9    two of the following non-mutually exclusive

10   deficiencies"?

11           A.   Well, bullet point 1 had to do

12   with allegations that the disclosure -- the

13   allegedly deficient ROSCA disclosure in this

14   case would have included either false

15   information or incomplete information.

16       Alleged by the FTC.  I want to make that

17   again clear, that the FTC was alleging that

18   the disclosure was either false or

19   incomplete.

20           Q.   How is that different from the

21   coding determination as to the disclosure was

22   ineffective?



1            MR. ARONSOHN:  Objection.  Asked

2      and answered.

3            A.    The ineffective is distinct

4      from -- as I said, false or incomplete means

5      the required disclosure was either not

6      telling the truth or lacked necessary

7      information.

8         Ineffective disclosure did not have to

9      do with allegations concerning whether the

10     substance was false or incomplete, it had to

11     do with how the disclosure was displayed.

12  BY MR. TANG:

13            Q.    So for how disclosures were

14     displayed, as to that second outer bullet

15     point, you coded whether or not they were

16     ineffective due to the combination of at

17     least two to the following non-mutually

18     exclusive deficiencies.  And you listed what

19     appears to be six I guess we'll call them sub

20     categories.

21            A.    Say the first part of your

22     question again because I think that



1   mischaracterizes.

2              Q.   Okay.  So one of the

3   conditions that you listed was whether a

4   disclosure was ineffective due to a

5   combination of at least two of the following

6   non-mutually exclusive deficiencies, and it's

7   colon and then after that there are six

8   bullet points presumably listing six types of

9   deficiencies".

10             A.   Yes.

11             Q.   Why did you chose these six

12  categories or sub categories?

13             A.   From my knowledge of ROSCA and

14  from reading the complaints as part of my

15  analysis.

16             Q.   What's your knowledge of

17  ROSCA?

18             MR. ARONSOHN:  Objection.  Vague.

19             A.   When you say knowledge, I

20  mean, can you be more precise?

21  BY MR. TANG:

22             Q.   In your testimony just right



JAMES CAMPBELL COOPER                        April 25, 2025
FTC vs AMAZON.COM, INC.                               185

1    now you said you determined the six sub

2    categories based in part on your knowledge of

3    ROSCA.

4           What did you mean when you said

5    "knowledge of ROSCA"?

6           A.    I'm familiar with the text of

7    the statute and what the statute requires and

8    the clear and conspicuous disclosure, express

9    affirmative consent, and simple cancellation

10   methods.

11          And then reading the cases and seeing

12   patterns in the cases and commonalities in

13   the complaints, I should say common factual

14   allegations in the complaint allowed me to

15   come up with these categories.

16          Q.    And you determined those sub

17   categories, correct?

18          A.    I did, yes.

19          Q.    What are those six sub

20   categories?

21          A.    Do you want me to read them?

22          Q.    Yes.



```
 1              A.   [As read] "The negative option

 2      feature was not disclosed; behind a

 3      hyperlink; contained and dense terms and

 4      conditions; font significantly less prominent

 5      than surrounding text; displayed in the color

 6      that made it hard to notice; too distant from

 7      more prominent triggering claims that would

 8      be false, absent, effective disclosure;

 9      parenthesis, EG, free trial, end

10      parenthesis".

11              Q.   And you determined these six

12      sub categories, correct?

13              A.   I just said that, yes.

14              Q.   If a disclosure was behind a

15      hyperlink would you have coded it in one or

16      multiple deficiencies as listed here?

17              A.   The fact that a disclosure was

18      behind as I said as I note it says

19      "non-mutually exclusive."  The fact that a

20      disclosure was behind a hyperlink, just that

21      fact alone would be coded a 1 if that were an

22      allegation in the complaint.
```



JAMES CAMPBELL COOPER                                    April 25, 2025
FTC vs AMAZON.COM, INC.                                          300

1                           CERTIFICATE

2           I, Okeemah S. Henderson, RPR, the officer before

3    whom the foregoing deposition was taken, do hereby certify

4    that the foregoing transcript is a true and correct record

5    of the testimony given; that said testimony was taken by me

6    stenographically and thereafter reduced to typewriting

7    under my direction; that reading and signing was not

8    requested; and that I am neither counsel for, related to,

9    nor employed by any of the parties to this case and have no

10   interest, financial or otherwise, in its outcome.

11          IN WITNESS WHEREOF, I have hereunto set my hand

12   and affixed my notarial seal this 10th day of May, 2025.

13   My commission expires:

14   September 30, 2029

15

16

17

18                  Okeemah S. Henderson, RPR

19                  Official Court Reporter

20

21

22



# EXHIBIT 75

```
 1                UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON

 3                        AT SEATTLE

 4    _____

 5    FEDERAL TRADE COMMISSION,            )
                                           )
 6                        Plaintiff,       )
                                           )
 7         v.                              ) No. 2:23-cv-0932-JHC
                                           )
 8    AMAZON.COM, INC., et al.             )
                                           )
 9                        Defendants.      )
                                           )
10                                         )
      _____

11           DEPOSITION OF CRAIG ROSENBERG, PH.D.

12                      April 29, 2025

13                    Seattle, Washington

14

15

16

17

18

19

20

21

22

23

24

25       Reporter:  John M. S. Botelho, CCR, RPR
```



1                          BE IT REMEMBERED that on Tuesday,

2       April 29, 2025, at 920 Fifth Avenue, Suite 3300,

3       Conference Room 100, Seattle, Washington, at

4       9:43 a.m., before JOHN M. S. BOTELHO, Certified Court

5       Reporter, appeared CRAIG ROSENBERG, PH.D., the

6       witness herein;

7                          WHEREUPON, the following

8       proceedings were had, to wit:

9

10                         <<<<<< >>>>>>

11

12      CRAIG ROSENBERG, PH.D.,    having been first duly sworn

13                                 by the Certified Court

14                                 Reporter, deposed and

15                                 testified as follows:

16

17                         EXAMINATION

18      BY MR. COHEN:

19   Q   Good morning, Mr. Rosenberg.

20   A   Good morning.

21   Q   My name is Jonathan Cohen.  I'm an attorney for the

22      Federal Trade Commission.  With me today is my

23      cocounsel Colin MacDonald and a paralegal on our

24      team, Elena Hoffman.

25                         MR. COHEN:  If the counsel for the



1       paid expert have involved allegations about a

2       subscription service of any sort?

3    A  I don't -- I don't know the answer to that either.  I

4       think that...

5    Q  How many matter --

6    A  Yeah, I can't even recall if the -- the previous FTC

7       vs. Amazon case that had to do with the Fire tablet,

8       if there was a subscription component to that.

9    Q  How many matters in which you've been hired as a paid

10      expert involved allegations about an online

11      subscription service of any sort?

12          I assume the same answer:  You can't recall?

13   A  That's right.

14   Q  How many matters in which you've been hired as a paid

15      expert involved a consumer product of any sort?

16   A  Oh, I would think quite a few.

17   Q  How many?

18   A  I don't know.  You're really asking me to recall the

19      details of 150 cases over the last 15 years.

20   Q  Estimate, please.

21          Was it all 150?

22   A  Oh, no.

23   Q  Okay.  Was it more than a dozen?

24   A  Yes.

25   Q  Was it more than 20?



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        29

```
 1   A   That would be my guess, yes.

 2   Q   Was it more than 30?

 3   A   You're getting into -- I don't know if you want me to

 4       speculate.  But I would -- I would guess -- the

 5       question is how many cases had to do with consumer

 6       products?

 7   Q   How many matters in which you've been hired as a paid

 8       expert involved allegations about a consumer product

 9       of any sort?

10   A   I would guess 35, 40 percent.  When you say

11       "product," is that -- does that not mean, like, a

12       service?  A product --

13   Q   It includes service.

14   A   Product or service.

15                       (Clarification by reporter.)

16

17                       MR. COHEN:  It includes service.

18                       THE WITNESS:  Okay.  Then maybe the

19       majority.

20   Q   (By Mr. Cohen)  How many matters in which you've been

21       hired as a paid expert involved allegations about an

22       online interface marketed to consumers?

23   A   Probably the majority.  The majority.  I'm hired for

24       my expertise in user interface design, and the

25       majority of these cases are products or services, so
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        30

```
 1        it's user interface design for products and services.
 2        Oftentimes it's mobile.  Oftentimes it's Web.
 3   Q    And those were all cases in which there was -- they
 4        involve allegations about an online interface that
 5        was presented to consumers for their use?
 6   A    Well, when you say "online," like, does that include
 7        apps that have connectivity?  Online apps?
 8   Q    Yes.
 9   A    Yeah, I would say the majority.
10   Q    How many matters in which you've been hired as a paid
11        expert involve allegations about a user interface of
12        an online subscription service marketed to consumers?
13   A    You've -- I think you asked that earlier in the
14        deposition, like, if I could recall other cases
15        involving subscriptions.
16            And I answered that I wasn't even sure if the FTC
17        vs. Amazon case that had to do with the Kindle Fire,
18        if that had a subscription component or not.
19            So I don't -- it wouldn't -- it wouldn't be many,
20        but I couldn't tell you the number.
21   Q    You don't consider yourself an expert in psychology,
22        do you?
23   A    I don't have a degree in psychology, but human
24        factors is right at the intersection of psychology
25        and computer science.
```



CRAIG ROSENBERG, PH.D.                                          April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                            31

1    Q   Let's focus in on psychology, though.  Please just
2        make sure you listen to my question.  I'll ask you
3        about human factors.
4            But you don't consider yourself an expert in
5        psychology, do you?
6                          MS. DING:  Objection.  Asked and
7        answered.
8                          THE WITNESS:  I don't put myself
9        out there as an expert in psychology, but I had
10       training in psychology as part of my human factors
11       degrees.
12   Q   (By Mr. Cohen)  So you took some courses in
13       psychology, correct?
14   A   That's correct.
15   Q   As a student?
16   A   As a student and grad student, yes.
17   Q   And that was in the mid '80s?
18   A   That was in -- from 1984 through 1994.
19   Q   But you don't hold a degree in psychology, right?
20   A   I do not.
21   Q   You've never published any papers in peer-reviewed
22       journals in psychology, have you?
23   A   No.
24   Q   You've never published any papers in psychology at
25       all, right?



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        32

1  A  Not specifically psychology.  But human factors is --

2     is the intersection between psychology and computer

3     science.

4  Q  You've never published any books or book chapters in

5     psychology, have you?

6  A  Not in psychology specifically.

7  Q  You're not a member of any professional associations

8     in psychology?

9  A  Correct.

10 Q  You don't hold a degree -- you don't consider

11    yourself an expert in cognitive science, do you?

12                     MS. DING:  Objection.  Vague.

13                     THE WITNESS:  Same answer as the

14    cognitive science is even closer to human factors

15    than psychology.

16 Q  (By Mr. Cohen)  But you don't hold yourself out as an

17    expert in cognitive science, do you?

18 A  I don't position myself as an expert in that area.

19 Q  You don't hold a degree in cognitive science?

20 A  That is correct.

21 Q  Have you taken any courses in cognitive science?

22 A  Yes.

23 Q  Any beyond your studies in the 1980s?

24 A  Through -- I graduated with my Ph.D. in '94, so...

25 Q  Any beyond that?



```
1    A    No.

2    Q    You never taught a course in cognitive science, have

3         you?

4    A    I've taught classes in human factors, which involve

5         cognitive science, but not a course specifically in

6         cognitive science.

7    Q    Again, I really want you to just make sure you give

8         me the precise answer to the question, please.

9    A    Mm-hmm.

10   Q    You've never taught a course in psychology, right?

11                  MS. DING:  Objection.  Well, asked

12        and answered, but also I think your earlier question

13        was about cognitive science.

14                  THE WITNESS:  I want to be as

15        complete in my answers, and I could go back and look

16        through my lectures.  And there are multiple modules

17        on cognitive science in my human factors class that I

18        taught.  But the class was not called cognitive

19        science, so if that's -- if that helps add some

20        clarity.

21                  MR. COHEN:  It doesn't,

22        Dr. Rosenberg.  You answered Ms. Ding's question.

23   Q    (By Mr. Cohen)  My question was:  You've never taught

24        a course in psychology, correct?

25                  MS. DING:  Objection.  Asked and
```



```
 1        answered.
 2                        THE WITNESS:  I haven't taught a
 3        course in psychology.  I agree.
 4    Q   (By Mr. Cohen)  You've never published any papers in
 5        peer-reviewed journals in cognitive science, have
 6        you?
 7    A   No.
 8    Q   You've never published any papers of any sort in
 9        cognitive science, have you?
10    A   I have not.
11    Q   You've never published any books or book chapters in
12        cognitive science, have you?
13    A   No, I have not.
14    Q   You're not a member of any professional associations
15        in cognitive science, are you?
16    A   No, I'm not.
17    Q   You don't hold yourself out as an expert in consumer
18        behavior, do you?
19                        MS. DING:  Objection.  Vague.
20                        THE WITNESS:  I do not.
21    Q   (By Mr. Cohen)  And you don't hold a degree in
22        consumer behavior?
23    A   No.  My degrees are in human factors and user
24        interface.
25    Q   Have you taken any courses in consumer behavior?
```



1       online user interface design.

2   Q   You've never published any books or book chapters

3       concerning online user interface design, correct?

4   A   I'm thinking of -- perhaps I've been thinking about

5       this in the context of -- of e-commerce when you say

6       "online."

7           Is that what you mean?  Or just more general, a

8       computing system that's hooked to a network such that

9       you've got multiple computers talking over a network?

10      Or were the last set of questions related -- were

11      to -- when you say "online," are you saying

12      e-commerce, or are you just saying networked computer

13      systems?

14  Q   E-commerce, not networked, purely network computer

15      systems --

16  A   Okay.

17  Q   -- where just two computers are talking to each

18      other.  I mean e-commerce.

19          So same question:  You've never published any

20      books or book chapters about online user interface

21      design, right?

22  A   Correct.

23  Q   And you're not a member of any professional

24      associations that concern themselves with online user

25      interface design, correct?



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                            48

1   A   Correct.  But as I testified before, the same

2       principles for user interface apply whether it's

3       e-commerce or -- or otherwise.

4   Q   You're not currently a member of any faculty of any

5       university, are you?

6   A   I'm not.

7   Q   Have you ever been?

8   A   I -- I was an assistant professor at the University

9       of Washington for a year.

10  Q   And that would have been in 1986?

11  A   1994, I believe.

12  Q   And that was as an associate assistant human factors

13      professor?

14  A   I think so.

15  Q   You testified earlier that your bachelor's is in

16      industrial engineering, correct?

17  A   That's correct.

18  Q   You received that in 1988?

19  A   Correct.

20  Q   And I just want to make sure I that understand this.

21  A   Mm-hmm.

22  Q   Let me know if this is right.

23          Industrial engineering is concerned with the

24      design, improvement, and installation of integrated

25      systems of people, materials, information, equipment,



| 1 | | and energy? |
|---|---|---|
| 2 | A | Yes.  I studied it because that's where artificial |
| 3 | | intelligence -- the hotbed of AI was in industrial |
| 4 | | engineering for programming robots to be very smart, |
| 5 | | so I being a programmer wanted to study artificial |
| 6 | | intelligence, and that was the place to do it. |
| 7 | Q | Again, I appreciate you telling me that, but I didn't |
| 8 | | ask you why. |
| 9 | A | Mm-hmm. |
| 10 | Q | I'm just trying to understand the parameters of |
| 11 | | industrial engineering, so I guess it's helpful in |
| 12 | | that regard, but I really want you -- |
| 13 | A | Mm-hmm. |
| 14 | Q | -- Dr. Rosenberg, just to listen to the question and |
| 15 | | answer only the question that's asked. |
| 16 | | The transition from craft-based manufacturing to |
| 17 | | mass manufacturing would be an example -- |
| 18 | A | Did you say "craft"? |
| 19 | Q | Yeah, I said "craft."  I'll say it and see if I can |
| 20 | | say it a little bit better. |
| 21 | A | Okay. |
| 22 | Q | Trying to get my head around what industrial |
| 23 | | engineering concerns itself with. |
| 24 | A | Sure. |
| 25 | Q | I understand that there's some breadth to it. |



```
 1   A   Yes, I would agree with that.

 2   Q   And then there was a transition, not complete, but in

 3       general, towards mass manufacturing as opposed to

 4       craft-based manufacturing, right?

 5   A   Well, I'm sure craft-based manufacturing still

 6       exists.  But some companies wanted to increase their

 7       production rate, and they could employ principles of

 8       industrial engineering to assist with having more

 9       product per day, if you will.

10   Q   Let's try a more concrete example.

11           Henry Ford's introduction of the assembly line at

12       his automotive factories.

13   A   Mm-hmm.

14   Q   That would be an example of industrial engineering,

15       right?

16   A   Yes.  Industrial engineering principles for a moving

17       assembly line.

18   Q   Industrial engineers play an important role in the

19       defense industry, right?

20   A   In many industries.  Anything that involves

21       manufacturing.

22   Q   So the aeronautics industry?

23   A   Yes.

24   Q   And you've worked in the aeronautics industry

25       yourself, right?
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        52

1   A   I have.  Not as an industrial engineer, but I have.

2   Q   But you are a consultant for Boeing?

3   A   Yes, for 15 years.

4   Q   And in the aeronautics industry, industrial engineers

5       create production systems that enable the fabrication

6       and assembly of products, right?

7   A   Yes.  And, again, I wasn't working as an industrial

8       engineer.  I was working as a human factors engineer

9       for Boeing.  But I would agree with your

10      characterization of what industrial engineers do.

11  Q   So your field is human factors, correct?

12  A   Correct.

13  Q   And you are holding yourself out for purposes of this

14      matter as an expert in human factors, correct?

15  A   Correct.

16  Q   Are you holding yourself out as an expert in any

17      other field?

18  A   Well, I would say user interface design is the

19      principal part of human factors that I study.  So

20      if -- I wouldn't want someone to characterize user

21      interface design as separate from human factors.

22      Human factors, I guess you could say, is the

23      superset, and user interface design is the -- the

24      specialty within that.

25  Q   You have other specialties within human factors, do



CRAIG ROSENBERG, PH.D.                          April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                              53

1      you not?

2   A   Yeah, there are other specialties.

3   Q   No.

4          You have other specialties within human factors,

5      don't you?

6   A   I primarily focus on user interface design actually.

7   Q   User interface design means the way that people or

8      users interact with machines or computers, correct?

9   A   I'd say at a high level that's a general way.  How to

10     design a user interface to take advantage of the

11     capabilities and limitations of the -- the users of

12     that system.

13  Q   You don't consider yourself an expert in online

14     e-commerce user interface design in particular, do

15     you?

16  A   Well, I've been involved with a -- I've programmed

17     e-commerce systems.  I've managed a team that was

18     building an e-commerce system.  All the principles

19     around user interface design in general apply -- also

20     apply to e-commerce, so...

21  Q   You said that you programmed --

22                  MS. DING:  Sorry.  The witness

23     wasn't complete with his answer.

24         Please finish your answer, Dr. Rosenberg.

25                  THE WITNESS:  Actually, I may have



CRAIG ROSENBERG, PH.D.                                   April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       54

1        been done with the answer.

2                        MS. DING:  Okay.

3                        THE WITNESS:  Yes.

4    Q    (By Mr. Cohen)  You said you prepared an e-commerce

5        system?

6    A    Yes.  I was tapped to be involved with a start-up.

7        The start-up was called PlaceFull.  And we were

8        building essentially what would be very similar to

9        Airbnb, but it was for business day rentals.  So if a

10       business wanted to rent a conference room like this

11       or a mom wanted to rent a place for their child's

12       party.  A day rental.  It was an e-commerce system

13       where you could browse, you could search for

14       different kinds of facilities, different kinds of

15       rooms or environments, and book those, book that.

16       It's basically Airbnb for day rentals.

17   Q    What became of that business?

18   A    It's still going.

19   Q    Have you designed any other e-commerce systems?

20   A    Have I designed any other e-commerce systems?  None

21       that come to mind.

22   Q    You also testified that you manage a team designing

23       an e-commerce system?

24   A    That would be the same.  I was the -- the initial

25       programmer, and then we hired some programmers where



CRAIG ROSENBERG, PH.D.                                       April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                         55

```
 1        I managed them.

 2   Q    So other than your experience with PlaceFull, you

 3        haven't prepared or designed or managed a team

 4        designing an e-commerce system, correct?

 5   A    Well, actually, that's -- that's not quite true.  So

 6        it depends on how broad you call e-commerce.

 7            So I mention I've been involved with several

 8        start-ups.  Two start-ups I'm working in now.  I'm

 9        cofounder of those start-ups.  I'm CTO of both

10        start-ups.

11            One's in the telehealth space, and we're selling

12        telemedicine subscriptions.  The company's called

13        StratoScientific.  And you can -- you can find it

14        there on the Web.  You can find it, StethIO -- like

15        "Stethoscope" -- StethIO.com.

16            Essentially we built a stethoscope that turns

17        your smartphone -- it plugs into a smartphone and

18        allows you to have a telemedicine visit with a

19        stethoscope for heart and lung sounds, so a much more

20        efficacious visit than -- than just a Zoom call.

21            And as part of that is a Web-based front, you

22        know, forward-facing way where you can browse the

23        subscriptions and sign up to be a member of Steth IO.

24   Q    I move to strike that answer on the record as

25        nonresponsive, and I'm going to direct you again,
```



1    Dr. Rosenberg, to keep your answers concise and

2    limited to the question that I'm asking.

3        If we get to a situation where we continue to

4    have long colloquy, then we're going to want

5    additional time beyond the seven hours, and nobody

6    really would like to be in that situation.  Please

7    try hard, Dr. Rosenberg.

8                    MS. DING:  And I'll just put on the

9    record that we would object to any request for

10   additional time, but let's proceed.

11                    MR. COHEN:  I'm going to try to

12   give you a really precise question.  And hopefully

13   Dr. Rosenberg can give me a really short answer.

14   Q   (By Mr. Cohen)  So other than your work for PlaceFull

15   and work that you've done for companies, start-ups,

16   that you own, you have not designed or managed a team

17   designing an online e-commerce system, correct?

18   A   That's correct.  But why is it that I'm a part-owner

19   of it?  Why does that diminish?  It's still an

20   e-commerce system.  And I didn't even tell you about

21   the other start-up too that has an e-commerce

22   component.

23       But to be efficient, when you say other than the

24   companies that I'm a part-owner, that would be

25   correct.  But you're excluding work that I've done in



CRAIG ROSENBERG, PH.D.                                        April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                          63

```
 1         perception.
 2    Q    This was related to the study that you did in human
 3         factors engineering in the late '80s and early '90s?
 4    A    I'm just saying that I've published multiple papers
 5         on user interfaces that employ stereoscopic displays,
 6         so a more advanced form of a display than a
 7         monoscopic display.
 8    Q    And those publications were publications in the
 9         subfield of human factors engineering?
10    A    They were, yes.
11    Q    And you also did research into something called
12         advanced visualization?
13    A    Yes.  Probably referring there to augmented reality
14         and virtual reality.
15    Q    That was also a part of a work that you did before
16         2000 in human factors engineering?
17    A    Yes.
18    Q    And you invented one of the first spatial musical
19         instruments, did you not, called the MIDIBird?
20    A    That's correct.
21    Q    What's a spatial musical instrument?
22    A    It's a musical instrument that is attune to how it's
23         held.  There's something called a six-degree-of-
24         freedom tracker.  So x, y, z; yaw, pitch, roll.
25         Those are the six degrees of freedom.  And then
```



CRAIG ROSENBERG, PH.D.                          April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                           64

```
 1        you -- you map that to MIDI notes to change volume,
 2        change pitch, change effects levels, change -- you
 3        can change six degrees of freedom by moving them
 4        around.
 5             These spacial trackers are usually put on the
 6        back of your hand so the computer system knows where
 7        your hands are, or they're put on top of your head.
 8        So it's virtual reality technology that I've
 9        employed, that I did employ to make a creative
10        musical instrument.
11   Q    Developing a spatial musical instrument is an example
12        of human factors engineering?
13   A    Certainly there's human factors concerns, because
14        whenever you -- you build a computer system, you --
15        there's user interfaces, yeah.  It was a computer
16        science project and -- that I did.
17   Q    You've done work on missile defense as a consultant
18        for Boeing?
19   A    I have.
20   Q    You've also -- well, just in general, what work did
21        you do as a consultant on missile defense for Boeing?
22   A    What work?
23   Q    Just in general.
24   A    Yeah.
25   Q    A single sentence.
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       65

1   A   Designed a laser-based system that would shoot down,

2       it's called MANPADS, man-portable air-defense system.

3       So it's shooting -- shooting down missiles with

4       high-energy weapons.

5   Q   That would be an example of human factors

6       engineering?

7   A   Yes.  Because I worked on the user interface design

8       for that system.

9   Q   And that would also be an example of something where

10      the users would be very highly specialized

11      individuals.  That's not something that would be made

12      available to the general public, right?

13  A   Yes, typically soldiers operate that, so the soldiers

14      do have some training.

15  Q   Not even every soldier.  Special soldiers.

16          Soldiers with specialized training would operate

17      this, correct?

18  A   For that system, yes.

19  Q   You did work as a consultant for Boeing on homeland

20      security?

21  A   I did.

22  Q   Just in general, single sentence:  What work?

23  A   This was work on models and simulations for terrorist

24      tracking.

25  Q   And those models and simulations would have been



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        66

```
 1        directed to a highly specialized audience?

 2   A    For -- for that system, it would be directed -- it

 3        was really -- yes, when deployed.  But -- sorry.  But

 4        the work that -- that I did was more related to Monte

 5        Carlo simulations to design the system to be as

 6        efficacious as possible.

 7   Q    So is that an example of human factors engineering?

 8   A    That would be -- that was more in the domain of

 9        modeling and simulation.

10   Q    So just not -- a different field?

11   A    Modeling and simulation, yes.

12   Q    And battle command management.  Is that the same

13        project?

14   A    Different project.

15   Q    Just in a single sentence:  What did you do for

16        Boeing in terms of battle command management?

17   A    Designing user interfaces for something called blue

18        force tracking so the -- the Army knew where its

19        soldiers and assets were located to avoid friendly

20        fire incidents.

21   Q    It was designed for use by certain specialists in the

22        Army?

23   A    Yes.  Yeah.  You're pointing out -- there's many

24        other systems that were for the general population,

25        but these systems that you're pointing out are
```



```
 1        specialized systems for trained individuals.
 2   Q    You did work with respect -- for Boeing with respect
 3        to air traffic controller workstations?
 4   A    I did.
 5   Q    And obviously -- actually, let's just mark -- and I'm
 6        trying to understand what this kind of thing looks
 7        like.  Let's mark as CR 2 -- this is just, in
 8        essence, I'll represent to you, sort of a stock photo
 9        of something that we thought was an air traffic
10        controller workstation, but I don't know.  You tell
11        me.
12                            (Exhibit No. CR 2 marked for
13                              identification.)
14
15   Q    (By Mr. Cohen)  You worked on something like this?
16   A    This is called -- this is a control -- I know you
17        don't want me to go into much detail here.
18                            (Clarification by reporter
19                              due to simultaneous
20                              crosstalk.)
21
22   Q    (By Mr. Cohen)  Is this approximately what an air
23        traffic controller workstation of the sort -- from a
24        lay perspective, is this roughly what sorts of things
25        you were working on, or is it radically different
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                      68

```
 1      than this?
 2   A  It's not --
 3                    MS. DING:  Objection.  Vague.
 4                    THE WITNESS:  I'm sorry to --
 5                    MS. DING:  It's all right.
 6                    THE WITNESS:  -- speak too quickly.
 7      Not radically different, but different.
 8   Q  (By Mr. Cohen)  You've done work on pagers, right?
 9   A  I have.
10   Q  What work?
11   A  I designed AT&T's first two-way e-mail pager.
12   Q  Did that pager have a name?
13   A  The name was -- well, the name that -- I don't know
14      if they call it a code name, or -- the project name
15      was called Natasha.
16   Q  Was it ever released to the public?
17   A  It was.
18   Q  And what was it called when it was released to the
19      public?
20   A  That I don't know.  It's whatever AT&T's first
21      two-way pager was.  I don't know the name that they
22      marketed it as.
23   Q  Approximately what year was this?
24   A  I did that work in '95, '96, or '95 through early
25      '97.
```



CRAIG ROSENBERG, PH.D.                                      April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        69

```
 1   Q   That would be an example of human factors

 2       engineering, the work that you did developing the

 3       pager?

 4   A   Yes.  The user interface specifically for it, for

 5       that pager, not the electronics.

 6   Q   The user interface for the pager, what sort of screen

 7       did it have?

 8   A   It had an LCD display.

 9   Q   And that would have been a black-and-white display?

10   A   I think technically green and white.

11   Q   I stand corrected.

12           And how many characters could it display?

13   A   I don't recall.  Maybe five or six rows by 30 or 40

14       characters.

15   Q   There were also some buttons on the side of the

16       pager?

17   A   There were.  I think six or -- six or seven buttons,

18       a rocker switch, and a few other interface controls.

19   Q   Let's shift from human factors engineering to human

20       factors psychology.

21                   MS. DING:  Jonathan, if you're

22       about to switch, is now a good time for a break?

23                   MR. COHEN:  Yes.

24                   MS. DING:  Off the record?

25                   MR. COHEN:  Yeah, let's go off the
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       70

```
 1        record.
 2                              (Pause in proceedings from
 3                               11:05 a.m. to 11:25 a.m.)
 4
 5   Q    (By Mr. Cohen)  Dr. Rosenberg, as I mentioned before
 6        the break, we'll shift away a little bit from the
 7        subfield of human factors engineering and focus just
 8        for a moment or two on human factors psychology.
 9        Okay?
10   A    Okay.
11   Q    And human factors psychology focuses on humans'
12        interaction with machines or computers, correct?
13   A    So does human factors engineering.
14   Q    What are the principal differences between human
15        factors engineering and human factors psychology?
16   A    As I mentioned before, human factors is the study of
17        how humans interact with systems, whether they be
18        computer systems or not.  So you're studying humans,
19        and you're studying the systems.
20            Computer science, 'cause I focus on user
21        interface, is the system side.  And the users are
22        humans.  So the human factors psychology is focusing
23        on things like sensation perception, cognition,
24        memory, processing, motor output.  Everything that
25        the human can do.  Their capabilities, their
```



```
 1      Society.

 2  Q   All right.  Both of those memberships are current?

 3  A   They are.

 4  Q   Are you a member of any other professional

 5      associations concerning human-computer interaction?

 6  A   I don't think so.

 7  Q   We talked about the -- you testified about a pager

 8      that you worked on for AT&T?

 9  A   I recall.

10  Q   What's an example of work that you did in the field

11      of human-computer interaction?

12  A   That's one example.

13  Q   Is there -- am I right that we're using

14      interchangeably "user interface design" and "user

15      experience design"?

16  A   I would say user experience design is a superset and

17      user interface design is the subset.  But they're --

18      they're both related.

19  Q   And user experience design is sometimes called "UX

20      design"?

21  A   Yes.

22  Q   UX design originated after human-computer interaction

23      was developed as a field, correct?

24  A   Well, that term -- these terms came later, but the

25      principles were -- were well-known since the
```



 1      beginning of computing at least with digital display,

 2      so the '60s, '70s.  So for quite a long time.

 3  Q   Rather than focusing solely on the interaction

 4      between a human and the technology, UX is about

 5      understanding and designing the entire experience a

 6      user has with an interface, right?

 7  A   I would say so.  That's why I called it a superset.

 8  Q   What work have you done, if any, for UX design

 9      concerning online e-commerce systems?

10  A   I pointed out the -- the work that I did for

11      PlaceFull.

12  Q   Anything else?

13  A   I started talking about the work that I did for

14      StratoScientific.

15  Q   Anything beyond that?

16  A   Yes.  There's another start-up called Warm Caller, as

17      opposed to, like, cold caller.  Cold calling.  It's

18      warm calling.  So there's a Web-based UI associated

19      with Warm Caller as well.

20  Q   That's a company you have an interest in?

21  A   Yes, it is.

22  Q   A company you own?

23  A   Well, not entirely.  I'm part-owner.

24  Q   Any others?

25  A   Any other companies that I've done UX design that



```
 1        have to do with e-commerce systems?
 2   Q    Correct.
 3   A    None that come to mind.
 4   Q    When did the PlaceFull engagement take place?
 5   A    I believe that was somewhere around 2005 through
 6        2010, would be my best recollection.
 7   Q    Have you done any work for PlaceFull since then?
 8   A    No.
 9   Q    Your work for the two entities that you partly own,
10        that work is ongoing, though, is it?
11   A    It is.
12   Q    An empirical HCI user study is a test or experiment
13        to identify possible problems with the user
14        experience of using a system, correct?
15   A    I would say that's one way to characterize it.
16   Q    Have you ever conducted an empirical HCI user study
17        of an online e-commerce interface?
18   A    Outside of the context of litigation?
19   Q    Let's start there.  Outside of the context of
20        litigation.
21   A    Not that I can recall.
22   Q    What about for litigation purposes?
23   A    Yes.  Although I'm not sure if the FTC vs. Amazon
24        case that had to do with the -- the Fire controller,
25        the Kindle, et cetera, had a -- had a subscription
```



1    component, you know, or not.

2  Q  Other than any work that you did for the other case

3     in which you were engaged by Amazon against the FTC,

4     have you ever conducted an empirical HCI user study

5     of an online e-commerce interface for litigation

6     purposes?

7  A  I don't believe so.

8  Q  Have you ever conducted an empirical HCI user study

9     of a online -- we'll strike that.

10        Well, figure out how to put this.

11        Whatever you may think of Professor Chetty's

12     work, you would agree with me, wouldn't you, that she

13     conducted an empirical HCI user study to identify

14     possible problems with the user experience of

15     enrolling and canceling Amazon Prime, right?

16  A  I would say that she conducted a heuristic

17     evaluation -- are you talking about the think-aloud

18     study, or are you talking about her heuristic

19     evaluation?

20  Q  I actually thought you were going to answer with

21     respect to the think-aloud, but the question

22     encompassed the whole report.

23        You're familiar with the report, right?

24  A  I am.

25  Q  So I'll try again.  And, again, I'm not asking for,



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        98

```
 1          You're not offering any opinion that any design
 2     elements in the cancellation process do or do not
 3     make that cancellation process less than simple,
 4     right?
 5                    MS. DING:  Objection.  Vague.
 6                    THE WITNESS:  I don't understand
 7     the question.
 8                    (Clarification by reporter.)
 9
10                    MS. DING:  Objection.  Vague.  And
11     calls for a legal conclusion.
12  Q  (By Mr. Cohen)  You're not offering an opinion that
13     any particular design elements in the cancellation
14     process render that process simple, right?
15                    MS. DING:  Same objections.
16                    THE WITNESS:  Render it simple.
17     Well, I believe that it's simple.
18  Q  (By Mr. Cohen)  Okay.  Well, let's talk about that.
19          So you believe that it's simple, but --
20  A  Yes.
21  Q  -- let's set aside that for just a moment.  Let me go
22     at it this way.
23          What's the basis for your belief that it is
24     simple?
25  A  That the options are presented to the user in a clear
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        99

1       and concise way.

2   Q   Do you have any other bases for your view that it is

3       simple?

4   A   I think that's definitely sufficient.  That's what I

5       would call almost a definition of simple.

6   Q   So the definition of simple that you're using to

7       reach your conclusion is that if options are

8       presented in a clear and concise way, then that

9       renders the process simple?

10  A   I think -- yes, I think that's a big component of it.

11  Q   Are there other components?

12  A   I guess that one can -- can find the cancellation

13      flow without undue effort.

14  Q   Are there any others?

15  A   Those are the ones that come to mind at the moment.

16  Q   How do you determine whether or not there was

17      undue -- the effort to find the cancellation flow

18      ingress is undue?

19  A   Is undue.  Well, I'm aware of multiple ways in which

20      one can find the cancellation flow.  So it seems that

21      there's multiple ways in which a user could find the

22      flow to cancel.  And it's a judgment call how -- how

23      difficult it is.  If there's only one way and you

24      have to search for a very specific term.  And that

25      could be undue.



CRAIG ROSENBERG, PH.D.                          April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                              100

1          There's no empirical equation that you calculate

2     and if it's a positive number, it's undue, and if

3     it's a negative number, it's not.  This is a human

4     factors evaluation of that cancellation flow.

5  Q  So if it's -- the process is clear and concise and

6     there are multiple pathways to the process, those are

7     the factors that cause you to conclude that it is

8     simple?

9  A  "Clear and concise" encompasses the user interface

10    design.  Right.  That's what I mean by "clear and

11    concise."  So, yes, I would agree with that.  Those

12    are the factors that come to mind right now.

13 Q  What's the basis for your opinion that those factors

14    render the cancellation process simple?

15 A  I guess my experience, education, and training.

16 Q  Well, let's just talk about that for a moment.

17         You consider your experience, education, and

18    training to be sufficient to reach that conclusion?

19 A  I do.  Because as I said before, human factors is the

20    study of user interface design, and it's -- and

21    online, as you say, which is really e-commerce, user

22    interface design is -- is the same.

23 Q  Was there a specific component of your experience

24    that led you to include -- to conclude that these

25    considerations are what renders the Prime



1    The previous paragraph has Footnote 7, and that is

2    probably -- that is the nearest footnote if you're

3    just talking about proximity.

4  Q  And is it your position that if I wanted to know the

5    support that you have for Paragraph 30, what I needed

6    to do was review Footnote 7 and then ascertain

7    whether the Gray citation supports Paragraph 30?

8  A  It's my position that a experienced, qualified user

9    interface engineer doesn't need a footnote on every

10   sentence.  You're asking for the basis of each and

11   every sentence.  Obviously there's far more sentences

12   than there are footnotes in this.

13 Q  There are.

14 A  Right.

15       So experts often opine, present evidence, present

16   opinions, present analysis based on their education,

17   training, experience.  They don't need to go and find

18   a third-party authoritative source for every single

19   thing they say.

20 Q  So going back, I'll direct you again to Footnote 30.

21       Sitting here today --

22                    MS. DING:  Paragraph 30, you mean.

23                    MR. COHEN:  Paragraph 30.  Thank

24   you, Ms. Ding.

25                    THE WITNESS:  Mm-hmm.



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                        159

```
 1   Q   (By Mr. Cohen)  Do you know whether or not -- I'll
 2       put it this way.  Strike that.
 3           For Paragraph 30, what is the authority for
 4       Paragraph 30?  Is it Footnote 7, your experience,
 5       both, or something else?
 6   A   Well, I agree with -- I'll wait till you're done.
 7   Q   Go ahead.  I didn't mean to -- go ahead.
 8   A   I agree with this from my user -- from my experience.
 9       Whether or not Footnote 7 also speaks specifically to
10       the content in 30 would require a review of Gray,
11       "The Dark (Patterns) Side of UX Design."
12   Q   I'll direct you to Paragraph 72 and 73.  Actually,
13       start 71 through 73.
14           So 71 through 73, which are on Page 28 and 29 of
15       what's been marked as Rosenberg 3, you would agree
16       with me, Dr. Rosenberg, there's no footnotes in there
17       at all, right?
18   A   No.  But I think this is referring to the five
19       usability elements that I list on Page 27 -- well,
20       starting on 26.  26, 27, and 28.  And there's
21       footnotes for all of those.
22   Q   So Paragraph 73, which begins -- Paragraph 73 begins,
23       "There are several reasons why consistency matters."
24           Did I read that correctly?
25   A   Yes.
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       160

1  Q  And there's no footnote there, right?

2  A  There's no footnote, but it's just well-known -- I

3     mean, consistency is one of the major tenets of the

4     Norman Nielsen ten usability heuristics.  To say that

5     an expert in user interface can't quote that

6     consistency matters without putting another source, I

7     think is flawed.

8  Q  So in this instance, you're drawing -- for the

9     proposition that there are several reasons why

10     consistency matters, you're drawing from Norman

11     Nielsen rather than what might or might not be in

12     some preceding footnote?

13  A  I use Norman Nielsen as an example on drawing from my

14     extensive experience, education, and training in user

15     interface design as well as articles that I've read

16     that back up my understanding and belief that

17     consistency is one of the most important things that

18     one can do for users.

19         And also, probably, if I were a betting person,

20     that the footnotes that are in Footnotes 59 -- well,

21     let's go all the way back to 55, 'cause that's where

22     I talk about these.  55 through 63 very likely talk

23     about consistency as well.

24  Q  Okay.  So what I needed to do or one needed to do

25     from the FTC's perspective, if we wanted to learn in



1   preparation for this deposition what the support was

2   going to be for the sentence that, "There are several

3   reasons why consistency matters," we would have

4   needed to review those footnotes that are located

5   attached to other sentences earlier on and ascertain

6   the relationship between the cited sources and the

7   sentence in Paragraph 73, correct?

8  A   I think your question assumes that each and every

9   sentence requires a footnote.  And as I said before,

10  I don't believe that's true.

11 Q   No.

12      But some of them are supported by authority,

13  right?

14 A   Some I explicitly cite an authority, if you will, or

15  a reference, an article, a website, something, to

16  bolster my opinion.  And other things that I don't

17  feel like it's even needed.  It's just too basic.

18 Q   But it's not necessarily the case that the absence of

19  a footnote at the end of the sentence means you're

20  relying exclusively on your experience, because you

21  might also be relying on an authority that was cited

22  previously -- correct? -- or cited later?

23 A   I think it's very common that these papers cover many

24  different aspects.  They're not so single focus.

25  There's lots of interrelated concepts that all work



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       180

1    A   Yes, all search results are according to whatever

2        algorithm Google is running.

3    Q   Do you have any basis for your opinion -- or I should

4        put it this way:

5            What is the basis for your opinion that a link is

6        a more clear way to present a decline CTA than --

7    A   Can you show me where I say that specifically?  I'd

8        like to look at it --

9    Q   Sure.

10   A   -- and then --

11   Q   Paragraph 44.

12   A   -- answer your question.

13   Q   On 17.

14   A   Mm-hmm.

15   Q   "For example, Jenny Blackburn testified in her

16       deposition that consumers find it more" -- and "more"

17       is emphasized by you -- "more clear to have a

18       prominent enrollment button that supersedes the

19       decline option, in part because users consistently

20       see 'no thanks' as a link across many other

21       websites."

22           We've been talking about the many other websites

23       and Ms. Blackburn.

24           Do you have any other basis for your view that a

25       link is a more clear way to present a decline CTA



1       other than what we've already discussed?

2                       MS. DING:  Objection.  Misstates

3       the document.

4                       THE WITNESS:  Well, there's a

5       footnote there which is a cite from Jenny Blackburn's

6       deposition transcript where she's voicing that

7       opinion.  And I -- I spoke about consistency before,

8       and the best way to learn a website is to have your

9       website be similar to other websites that users

10      already use.

11          So if to create something that is similar to what

12      users have experienced previously is going to cause

13      the least amount of cognitive dissonance and the

14      greatest efficiencies and the reduced -- reduce

15      errors.

16  Q   (By Mr. Cohen)  That opinion is based -- or that

17      facet of the opinion is based on your personal

18      experience, training, and education?

19                      MS. DING:  Objection.  Vague as to

20      the opinion.

21                      THE WITNESS:  Yes.  And also

22      it's -- it's -- consistency is one of the primary

23      benefits that UI designers can give to their users.

24      It's one of the ten usability heuristics that Norman

25      Nielsen discuss.



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       182

```
 1   Q    (By Mr. Cohen)  Let's go to Page 17, Paragraph 44
 2        where we are, the last sentence on the page.
 3            "But, like many hypotheses about what constitutes
 4        clarity for customers, the 'equally prominent
 5        buttons' hypothesis was disproven, as later Amazon
 6        experiments showed that customers actually had more
 7        trouble identifying the decline option when a box was
 8        put around it to make it more prominent."
 9            Did I read that correctly?
10   A    I think you did.
11   Q    That's your opinion?
12   A    Well, I'm citing from this Amazon document with the
13        Bates 59693.
14   Q    So you're relying on Amazon for that conclusion?
15                       MS. DING:  Objection.  Misstates
16        testimony.
17                       THE WITNESS:  I think it's directly
18        in line to what we've just been talking about.  If
19        you don't provide a graphical treatment where the
20        "no, thanks" link -- the "no, thanks" option is a
21        link, but instead is a equally prominent button, then
22        that is inconsistent.  It's not consistent with
23        previous websites that users have experience with.
24            So it's the other side of the exact same coin.
25        So if you don't do that and you instead put a box
```



1         around the decline option and make it far more

2         similar to the enroll option, yes, one would -- one

3         would have -- users, in general, would have more

4         problems using it because it's not as consistent to

5         what they're used to, and it sounds like Amazon's own

6         experiments bore this out as well.

7    Q   (By Mr. Cohen)  And that last piece is something you

8         know from reading documents that Amazon's attorneys

9         provided to you, correct?

10                   MS. DING:  Objection.  Misstates

11        testimony.

12                   THE WITNESS:  Well, in fairness,

13        all documents -- all Amazon internal documents would

14        need to be -- these things you don't just find on the

15        Web.  They're provided by -- by counsel.

16   Q   (By Mr. Cohen)  Do you know whether counsel provided

17        you all documents that were relevant to this issue,

18        the issue specifically being the box?

19   A   I -- no, I don't know.

20   Q   But if you learned more information about the box

21        experiment, you might change your mind?

22   A   It's certainly possible.  Yeah, I would never

23        position myself as so closed-minded that new

24        evidence -- that I would never consider.

25   Q   It is the case, because you used a couple words in



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                      184

```
 1        there I was a little confused -- that a box around a
 2        link is not the same as a button, is it?
 3   A    Well, from a user experience point -- a button has a
 4        typical connotation.  It could be either way.  It
 5        could be either way.  You could have a link, and then
 6        you could just have a graphical treatment around it
 7        and you still have to click on the link, itself, as
 8        opposed to anywhere within the box.
 9            A button is implemented such that anywhere within
10        the confines, the border of the button, will invoke
11        the action as opposed to a link, you have to actually
12        click on the link, itself.
13            So -- so you could implement something that looks
14        like a button that's not a button, or you could
15        implement something that actually is a button with a
16        label.
17   Q    Do you know which one of those things Amazon did?
18   A    I don't know which of the two they did.  But from a
19        user's point of view, they would be extremely
20        similar.
21   Q    So your testimony, just so I have it clear, is that
22        there's not a difference between a link with a line
23        around it, a box line around it, and a button?
24                        MS. DING:  Objection.  Misstates
25        testimony.
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                    258

1    the experience level of the users, the level of trust

2    that the user has in the system, the amount of

3    cognitive load that the user needs to -- how much --

4    how hard they have to think to use that.

5         All of these one would expect a user --

6    experienced user interface designer would know that,

7    when across users, you're -- no aspect is going to be

8    the same.  So these are just three different aspects

9    that will vary across user populations.

10   Q   So if I understand your testimony correctly, any

11       different aspect of the user experience is going to

12       vary across different user populations.

13           That's your view?

14   A   Yes.  'Cause it's accurate.  And it's true.

15   Q   Okay.  Can you give me some support for that view?

16   A   I keep pointing to -- to the same -- the same

17       issue -- the same evidence, which is my experience,

18       education, training, my work in the field.  The

19       Norman Nielsen ten usability heuristics speaks to

20       this as well, about differences and user populations.

21       It's -- it's -- in the fact that all users aren't the

22       same and that they can vary across age, cognition,

23       experience level.  Just -- it's -- it's -- it's just

24       very well-known.  It's taught in human factors.

25           And I think that's my -- my best answer.



CRAIG ROSENBERG, PH.D.                                      April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                          259

1    There's -- there's papers that one can find that I
2    didn't feel that it was necessary to -- to prove
3    something that's so well understood across -- across
4    the human factors engineers.  Dr. Chetty would agree
5    to that.

6        This isn't a position or a viewpoint that's a
7    fringe viewpoint at all.  It's a very common and
8    understood viewpoint that users differ quite a bit.
9    And that's what makes the user interface design,
10   especially for a situation like Amazon, more of a
11   challenge.

12 Q  Okay.  I don't want to interrupt, but you've been
13   talking for a while.  Let's try and keep everything
14   real brief.

15       Have you ever taken a course in dark patterns?

16 A  I have not.

17 Q  Have you ever published a paper on dark patterns?

18 A  No, I have not.

19 Q  Have you ever taught a course on dark patterns?

20 A  No, I have not.

21 Q  Have you ever given a lecture on dark patterns?

22 A  No.

23 Q  Have you ever done any work related to dark patterns

24   at all other than this particular expert engagement?

25 A  I have, yes.



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                      260

1    Q    What is that?

2    A    I believe there is allegations of dark patterns in

3         the FTC vs. Amazon case that we're speaking of

4         earlier that had to do with the Kindle Fire.  And

5         that was around in-app purchases and what was

6         disclosed in the -- the three different interfaces

7         that Amazon had over time.

8             I did a -- worked on another case, District of

9         Columbia vs. Instacart.  I was working for Instacart

10        where District of Columbia allocate -- or alleged

11        that Instacart was using dark patterns around

12        disclosures around tipping and service fees and how

13        much of that would go to your personal shopper,

14        slash, delivery person versus going to the company,

15        itself.

16   Q    Any others?

17   A    This case would be the third one.

18   Q    So other than the three matters in which you've

19        represented a client as a paid expert, two of which

20        were Amazon and one of which was Instacart, you have

21        not done any work in dark patterns at all, correct?

22   A    I haven't explicitly -- when you say do work in, I

23        assume that means, like, research or -- I mean, you

24        see my opinions, which is I think that dark patterns

25        are -- are very difficult to -- even the experts



CRAIG ROSENBERG, PH.D.                                          April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                             261

1    don't seem to have a good consensus on what's a dark

2    pattern or what's not, so I'm of that opinion as

3    well.

4   Q   Okay.  Please, again, keep your answers short, but

5       listen to the question, and try to answer the

6       question the best you can.

7   A   Will do.

8   Q   Okay.  Other than two paid expert engagements for

9       Amazon, both against the FTC, and one paid expert

10      engagement for Instacart, you have not done any work

11      related to dark patterns, have you?

12                     MS. DING:  Objection.  Vague as to

13      "work."

14                     THE WITNESS:  I was just thinking

15      the exact same thing.

16          When you say -- I've analyzed user interfaces.

17      And some people may say that -- that a decline link

18      is a dark pattern.  So I've designed interfaces with

19      decline links.  So would that satisfy, yes, I'm doing

20      work that has a dark pattern because I've designed an

21      interface that has a decline link versus an

22      equally -- a button?  You see what -- I think you see

23      what I mean here.  The word "work" is so ambiguous,

24      is what that means.

25  Q   (By Mr. Cohen)  Let's try a different word.



1      disclosure that was provided beyond sufficient.

2    Q   Okay.  Again, assume -- let's assume that there's an

3        adequate disclosure, because that was --

4    A   Inadequate or adequate?

5    Q   Adequate.

6           To be clear, the assumption you brought to light

7        was that this is -- we're talking about a situation

8        where there's an adequate disclosure, a sufficient

9        disclosure.

10          I understand if there's an insufficient

11       disclosure, then people are not likely to be

12       frustrated by having to confirm something, right?

13   A   If the disclosure was inadequate, which I don't

14       believe is the case in this case, then the

15       confirmation step would provide users with a greater

16       certainty as to what they've selected.

17   Q   Therefore, they wouldn't likely be frustrated by it?

18   A   I agree with that.

19   Q   Okay.  But so let's operate in the world where we're

20       talking about a adequate disclosure.

21          So given an adequate disclosure, it is your

22       opinion that adding extra confirmation steps would

23       frustrate experienced users, right?

24   A   Yes.

25                      MS. DING:  Objection.  Misstates



CRAIG ROSENBERG, PH.D.                                      April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                          270

```
 1        the document.
 2   Q    (By Mr. Cohen)  What's the basis for that opinion?
 3   A    Same answer as before.  My education, experience, my
 4        training, my work in user interface design over the
 5        last 30 years.
 6            I cite several different articles here as well.
 7        The Footnote 59 and Footnote 60.  I think that those
 8        may talk about -- have -- they may have some relevant
 9        details in those if we want to review those.
10   Q    So a reader of your report should look at the
11        Footnote 59, which is at the end of a quote in the
12        first sentence, and Footnote 60, which is the end of
13        the paragraph, and assume that that was where we
14        could find support for the second sentence that we've
15        been discussing?
16   A    I'd have to review.  But in addition to any support
17        in those two footnotes would be my education,
18        experience, training, and work in user interface
19        design and evaluation over the last 30 years.
20   Q    Is there something specific about that education,
21        experience, and training that you apply to this
22        situation to reach this opinion?
23   A    So many user interface design projects that I was
24        involved -- that I am and was involved with where
25        counting the number of clicks is a -- is an important
```



1      metric for the efficiency of that user interface.

2   Q  And just in general, the more clicks there are, the

3      less efficient it is?

4   A  Well, usually the more time it takes.  But all user

5      interface design is tradeoff.  You can't just -- you

6      could, but it wouldn't be wise to just maximize one

7      variable and not care about any of the others.

8      That's the point of this whole section here.

9   Q  But just as a general matter --

10  A  Mm-hmm.

11  Q  -- more -- why is it the case that more clicks

12     suggests more complexity or less efficiency?

13  A  Well, I would say the greater number of clicks

14     represent -- each click usually corresponds with a

15     new screen, new information to consume, more time

16     to -- to understand and parse that information, and

17     to ultimately accomplish the task at hand.

18  Q  So that's the reason why more clicks tend to be less

19     efficient and more complex -- strike that.

20        That's the reason why more clicks tends to be

21     less efficient, more complex?

22                    MS. DING:  Objection.  Misstates

23     testimony.

24                    THE WITNESS:  But, again, as we've

25     been discussing, some of the times there's a benefit



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                      301

```
 1                          EXAMINATION
 2       BY MS. DING:
 3   Q   Just a couple of questions, Dr. Rosenberg, just to
 4       clarify.
 5            Do you remember being asked some questions early
 6       in the deposition about what opinions you were
 7       offering and the scope of your opinions in this case?
 8   A   I do.
 9                                  (Instruction by reporter.)
10                                  (Discussion off the record.)
11
12   Q   (By Ms. Ding)  Just to be clear:  You did not intend
13       to limit or change the scope of the opinions you have
14       expressed in your reports by your testimony today,
15       correct?
16   A   I did not intend to change my opinion, no.
17   Q   And that includes opinions you have offered about the
18       presence or nonpresence of alleged dark patterns
19       identified by Dr. Chetty in Amazon's enrollment and
20       cancellation flows, correct?
21   A   Yes, that includes that.
22   Q   Do you also remember using a term earlier today when
23       you were going back and forth with counsel for the
24       FTC about heuristic evaluations when you said that
25       you had done a lightweight heuristic evaluation?
```



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                      302

1           Do you remember that?

2    A    I do, yes.

3    Q    And I noted you kind of hesitated at the time.

4           What did you mean when you said, used that term

5         "lightweight heuristic evaluation"?

6    A    Well, Dr. Chetty offered an analysis of Amazon's

7         flows, user interfaces.  I offer my opinions on

8         Amazon flows, and my opinions were primarily -- I

9         think it's inartfully said, "lightweight."  It's

10        lightweight in -- I shouldn't have used the term

11        "lightweight," but it's -- it's -- what I meant by

12        that, it was responsive to Dr. Chetty's opinions as

13        opposed to a brand-new study and completely

14        independent of Dr. Chetty's analysis.

15   Q    And did you mean to suggest that Dr. Chetty's

16        evaluation was somehow more rigorous or more

17        intensive than your evaluation?

18   A    No, not at all.  Yeah, I did not.  Matter of fact,

19        I -- I used examples from e-commerce websites to back

20        up my opinion, which I don't believe Dr. Chetty did.

21        And I've cited research papers as well to back up my

22        opinion.  So I think in that -- those respects, it's

23        stronger than Dr. Chetty's.

24   Q    Do you also remember being asked questions about

25        whether you had or hadn't conducted studies in your



CRAIG ROSENBERG, PH.D.                                    April 29, 2025
FTC vs AMAZON.COM, LLC, et al.                                       303

1          past publications earlier?

2     A    In general, can you be more specific?

3     Q    Just the general line of questioning about what kinds

4          of studies you had done in your prior research.

5               Do you remember that line of questioning?

6     A    Vaguely.

7     Q    Just simple question.

8     A    Mm-hmm.

9     Q    At the time when you're being asked those questions,

10         you weren't consulting your CV and your report,

11         correct?

12    A    No, I was not.

13    Q    And so you may not have had a perfect memory of all

14         of the work that you have done in your prior life in

15         your research, correct?

16    A    Absolutely.

17    Q    Okay.  Finally, I just want to ask you about --

18         actually, no.  Sorry.  Strike that.

19                        MS. DING:  No further questions.

20

21                        FURTHER EXAMINATION

22    BY MR. COHEN:

23    Q    Dr. Rosenberg, is there any testimony that you gave

24         today that the FTC cannot rely upon?

25    A    There's -- we spoke about that word "rely upon,"



CRAIG ROSENBERG, PH.D.
FTC vs AMAZON.COM, LLC, et al.

April 29, 2025
311

```
 1   STATE OF WASHINGTON )     I, John M. S. Botelho, CCR, RPR,
                         ) ss  a certified court reporter
 2   County of Pierce    )     in the State of Washington, do
                               hereby certify:
 3

 4

          That the foregoing deposition of CRAIG ROSENBERG,
 5   PH.D., was taken before me and completed on April 29, 2025,
     and thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;

 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        IN WITNESS WHEREOF, I have hereunto set my hand
     this 7th day of May, 2025.
14

15

16

17                        _____
                          John M. S. Botelho, CCR, RPR
18                        Certified Court Reporter No. 2976
                          (Certification expires 5/26/2025.)
19

20

21

22

23

24

25
```



# EXHIBIT 76

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC., *et al.*,<br><br>    Defendants. | Case No. 2:23-cv-0932-JHC<br><br>**PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT AMAZON'S FOURTH SET OF REQUESTS FOR ADMISSION** |

Pursuant to Federal Rules of Civil Procedure 26 and 36, Plaintiff Federal Trade Commission ("FTC") hereby submits its responses and objections to Defendant Amazon's Fourth Set of Requests for Admission ("Amazon's RFAs").

**GENERAL RESPONSES AND OBJECTIONS**

1.      The FTC's responses and objections are based upon the information available at this stage in the litigation and presently known by the FTC.  They are made without prejudice to the FTC's right to assert additional objections in the event that additional grounds for objections should be discovered subsequent to this response.  That the FTC has responded to a particular

PLAINTIFF'S RESPONSES & OBJECTIONS TO
DEFENDANT AMAZON'S FOURTH SET OF RFAS
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1

1  request is not a waiver by it of any presently stated, or subsequently asserted, objection. The

2  FTC reserves the right to supplement, modify, or otherwise change or amend these responses and

3  objections in light of any information it may subsequently obtain or discover.

4       2.    The FTC does not waive its right to rely upon or use documents, witnesses, or

5  other information it does not have at this time. The FTC also reserves the right to rely upon any

6  facts, documents, or other evidence that may develop or come to its attention subsequent to this

7  response, and to supplement its response to the extent required by Federal Rule of Civil

8  Procedure 26(e).

9            **OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS**

10  **REQUEST FOR ADMISSION NO. 168:**

11       Admit that in no version of the Prime Enrollment Flow does Amazon interpret a

12  customer's silence or failure to take an affirmative action as acceptance of the offer of a Prime

13  membership.

14       **RESPONSE:**  The FTC objects that this Request is vague and ambiguous in that it does

15  not specify the time at which Amazon interprets a customer's silence or failure to take an

16  affirmative action as acceptance of the offer of a Prime membership.

17       Without waiving that objection, the FTC denies the Request because most, if not all,

18  versions of the Prime Enrollment Flow, at the end of every trial or billing period, treat the

19  customer's silence or failure to take an affirmative action as acceptance of the offer of a Prime

20  membership for the following billing period.

21  **REQUEST FOR ADMISSION NO. 169:**

22       Admit that the FTC did not provide prior notice to Amazon of the Investigational

23

PLAINTIFF'S RESPONSES & OBJECTIONS TO
DEFENDANT AMAZON'S FOURTH SET OF RFAS
Case No. 2:23-cv-0932-JHC
         2

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

Hearings of Monique Mascio, Molly O'Donnell, David Edelstein, Masuma Henry, or Sara Klainer during the Investigation.

**RESPONSE:**  Admitted.

**REQUEST FOR ADMISSION NO. 170:**

Admit that the FTC did not permit Amazon or its counsel to attend the Investigational Hearing of Reid Nelson.

**RESPONSE:**  Admitted.

**REQUEST FOR ADMISSION NO. 171:**

Admit that the FTC refused to allow Amazon's in-house counsel to attend the Investigational Hearings of witnesses who were current Amazon employees during the Investigation.

**RESPONSE:**  Admitted.

**REQUEST FOR ADMISSION NO. 172:**

Admit that the FTC had received consumer complaints regarding difficulty cancelling Prime by February 2019.

**RESPONSE:**  The FTC admits that it had received at least two consumer complaints regarding difficulty cancelling Prime by February 2019.

**REQUEST FOR ADMISSION NO. 173:**

Admit that the FTC had received consumer complaints regarding "Nonconsensual Enrollment," as that term is defined in Paragraph 2 of the Amended Complaint and used throughout the Amended Complaint by March 2019.

**RESPONSE:**  The FTC admits that it had received at least two consumer complaints

PLAINTIFF'S RESPONSES & OBJECTIONS TO
DEFENDANT AMAZON'S FOURTH SET OF RFAS
Case No. 2:23-cv-0932-JHC

3

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

1    regarding Nonconsensual Enrollment by March 2019.

2    **REQUEST FOR ADMISSION NO. 174:**

3         Admit that the design elements referenced in paragraphs 34 – 126 of the Amended

4    Complaint were publicly available on Amazon's website in 2016.

5         **RESPONSE:**  The FTC objects that the term "design elements" is vague and ambiguous.

6    The FTC further objects that the term "publicly available" is vague and ambiguous because,

7    among other reasons, Amazon does not specify whether it means members of the public could

8    see whichever design elements they chose to see or, alternatively, only the elements Amazon

9    chose to show them on a particular site visit.

10        Without waiving those objections, the FTC denies that all of the design elements

11   referenced in paragraphs 34 – 126 of the Amended Complaint were publicly available on

12   Amazon's website in 2016.

13   **REQUEST FOR ADMISSION NO. 175:**

14        Admit that the design elements referenced in paragraphs 127 – 163 of the Amended

15   Complaint were publicly available on Amazon's website in 2014.

16        **RESPONSE:**  The FTC objects that the term "design elements" is vague and ambiguous.

17   The FTC further objects that the term "publicly available" is vague and ambiguous because,

18   among other reasons, Amazon does not specify whether it means members of the public could

19   see whichever design elements they chose to see or, alternatively, only the elements Amazon

20   chose to show them on a particular visit.

21        Without waiving those objections, the FTC denies that all of the design elements

22   referenced in paragraphs 127 – 163 of the Amended Complaint were publicly available on

23

PLAINTIFF'S RESPONSES & OBJECTIONS TO
DEFENDANT AMAZON'S FOURTH SET OF RFAS
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

4

1    Amazon's website in 2014.

2    **REQUEST FOR ADMISSION NO. 176:**

3         Admit that prior to 2023, You did not state publicly that any of the design elements

4    referenced in paragraphs 34 – 163 of the Amended Complaint violated ROSCA.

5         **RESPONSE:**  The FTC objects that the term "design elements" is vague and ambiguous,

6    as is the Request for an admission that certain "design elements" "violate[] ROSCA."  The FTC

7    further objects that the Request is argumentative and based on a false premise.  The FTC does

8    not contend that particular "design elements" always violate ROSCA, but rather that Amazon

9    violates ROSCA by failing to obtain express informed consent to Prime enrollment, to disclose

10   Prime's material terms clearly and conspicuously prior to obtaining consumers' billing

11   information, and to offer simple cancellation mechanisms.  On that basis, the FTC admits that it

12   did not state publicly that any of the "design elements" referenced in paragraphs 34 – 163 violate

13   ROSCA.

14   **REQUEST FOR ADMISSION NO. 177:**

15        Admit that prior to 2023, You did not communicate to Defendants that any of the design

16   elements referenced in paragraphs 34 – 163 of the Amended Complaint violated ROSCA.

17        **RESPONSE:**  The FTC objects that the term "design elements" is vague and ambiguous,

18   as is the Request for an admission that certain "design elements" "violate[] ROSCA."  The FTC

19   does not contend that particular "design elements" always violate ROSCA, but rather that

20   Amazon violates ROSCA by failing to obtain express informed consent to Prime enrollment, to

21   disclose Prime's material terms clearly and conspicuously prior to obtaining consumers' billing

22   information, and to offer simple cancellation mechanisms.  On that basis, the FTC admits that it

23

PLAINTIFF'S RESPONSES & OBJECTIONS TO
DEFENDANT AMAZON'S FOURTH SET OF RFAS
Case No. 2:23-cv-0932-JHC

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3320

5

1    on this case.  The FTC also notes that "[c]ommission staff may disclose the existence of an

2    investigation to potential witnesses or other third parties to the extent necessary to advance the

3    investigation."  16 C.F.R. § 2.6.

4

5    Dated:  January 27, 2025                          /s/ Evan Mendelson

6                                                      JONATHAN COHEN (DC Bar #483454)
                                                       EVAN MENDELSON (DC Bar #996765)

7                                                      OLIVIA JERJIAN (DC Bar #1034299)
                                                       THOMAS MAXWELL NARDINI

8                                                      (IL Bar #6330190)
                                                       SANA CHAUDHRY (NY Bar #5284807)

9                                                      ANTHONY SAUNDERS (NJ Bar #008032001)
                                                       Federal Trade Commission

10                                                     600 Pennsylvania Avenue NW
                                                       Washington DC 20580

11                                                     (202) 326-2551; jcohen2@ftc.gov (Cohen)
                                                       (202) 326-3320; emendelson@ftc.gov (Mendelson)

12                                                     (202) 326-2749; ojerjian@ftc.gov (Jerjian)
                                                       (202) 326-2812; tnardini@ftc.gov (Nardini)

13                                                     (202) 326-2679; schaudhry@ftc.gov (Chaudhry)
                                                       (202) 326-2917; asaunders@ftc.gov (Saunders)

14                                                     COLIN D. A. MACDONALD (WSBA # 55243)

15                                                     Federal Trade Commission
                                                       915 Second Ave., Suite 2896

16                                                     Seattle, WA 98174
                                                       (206) 220-4474; cmacdonald@ftc.gov (MacDonald)

17                                                     Attorneys for Plaintiff

18                                                     FEDERAL TRADE COMMISSION

19

20

21

22

23

# EXHIBIT 77

1                    FEDERAL TRADE COMMISSION

2    In the Matter of:          )
                                )
3    AMAZON.COM, INC.,          ) File No. 2123050
                                )
4            a Corporation.     )

5

6    * * * * * * * * * * * * * * * * * * * * * * * * *

7    INVESTIGATIVE HEARING, SWORN TESTIMONY OF DAVID CLARK
                     November 18, 2022
8
     * * * * * * * * * * * * * * * * * * * * * * * * *
9

10       INVESTIGATIVE HEARING, SWORN TESTIMONY OF DAVID

11   CLARK, produced as a witness and duly sworn, was taken

12   in the above-styled and numbered cause on November 18,

13   2022, from 8:46 a.m. until 5:03 p.m., before Suzanne

14   Kelly, Registered Professional Reporter, Certified

15   Realtime Reporter, reported by stenographic method at

16   the Federal Trade offices located at 1999 Bryan

17   Street, Suite 2150, Dallas, Texas.

18

19

20   Reported by:  Suzanne Kelly, CSR, RDR, CRR

21   Job:  58300

22

23

24

25

6

Clark

Amazon.com, Inc.                                            11/18/2022

```
 1              P R O C E E D I N G S
 2                  THE COURT REPORTER:  If you would
 3     please raise your right hand, I'll administer the
 4     witness's oath to you.
 5                  Do you solemnly swear or affirm
 6     that the testimony which you give in this case
 7     will be the truth, the whole truth and nothing
 8     but the truth, so help you God?
 9                  THE WITNESS:  I do.
10                  THE COURT REPORTER:  Thank you.
11                  DAVID CLARK,
12     having sworn to testify the truth, the whole
13     truth, and nothing but the truth testifies upon
14     his oath as follows:
15                  EXAMINATION
16     BY MS. JERJIAN:
17         Q.  Good morning, Mr. Clark.
18         A.  Good morning.
19         Q.  My name is Olivia Jerjian.  I am
20     attorney with the Federal Trade Commission and
21     I'm here today with my co-counsel Jonathan Cohen
22     and our paralegal, Jacob Frech.
23                  I'll now allow everyone else to
24     introduce themselves.
25                  MS. MONTROSE:  Megan Montrose with
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

15

Clark

Amazon.com, Inc.                                    11/18/2022

```
 1    of CEO Worldwide Consumer, did you have authority
 2    to make decisions for the Prime program?
 3                      MS. RODGERS:  Object to the form.
 4                      THE WITNESS:  The Prime program
 5    typically, because it touches so many parts of
 6    the -- the business --
 7    BY MS. JERJIAN:
 8         Q.  Uh-huh.
 9         A.  -- overall.  The Prime program lives in
10    the Consumer Business, but typically on
11    decisions, those things are made collectively as
12    a group, for large decisions particularly.
13                      So, it really would depend on the
14    type of decision.
15         Q.  When you say "collectively," who is
16    included in that collective?
17         A.  Typically that would be -- who are the
18    people who would be included would be members of
19    the Consumer Leadership Team, members of the
20    Devices Team and members of the Entertainment
21    and -- groups were really the big -- the Prime
22    teams and Advertising at times.
23         Q.  Were your direct reports included in
24    the -- in this group?
25                      MS. RODGERS:  Object to the form.
```

16

Clark

Amazon.com, Inc.                                      11/18/2022

```
 1   BY MS. JERJIAN:
 2        Q.  The ones that you've listed?
 3        A.  Yes.  Some of them.
 4        Q.  Which ones?
 5        A.  Doug Herrington, Russ Grandinetti and
 6   Neil Lindsay.
 7        Q.  Okay.  And when you said it depends on
 8   the type of decision, what do you mean by that?
 9                 MS. RODGERS:  Object to the form.
10                 THE WITNESS:  You can imagine there
11   are some various minor decisions and tweaks to
12   things and there are larger decisions like
13   pricing or marketing strategies, those types of
14   decisions.
15                 And depending on the scale, would
16   determine how inclusive the decision making group
17   would be in the process.
18   BY MS. JERJIAN:
19        Q.  Okay.  So it would fair to say the more
20   important the decision, the more likely it was
21   that the decision would have been made by people
22   in the group that you listed your direct reports?
23                 MS. RODGERS:  Object to form.
24                 THE WITNESS:  I'm not sure if
25   "important" is the right word but the broader the
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

17

Clark

Amazon.com, Inc.                                    11/18/2022

 1    impact, perhaps of the decision.
 2    BY MS. JERJIAN:
 3        Q.  When you say "impact," can you tell me
 4    what you mean by that?
 5        A.  Yeah.  Maybe "visibility" is a better
 6    word.  The broader, the -- the more customers,
 7    the -- you might see or be part of a change or
 8    might experience the change or the more, the
 9    broader it hit different programs in the Prime
10    process.
11        Q.  Okay.  Would -- withdrawn.
12            Would impact to revenue or profits
13    be another instance where that would determine
14    how broad the impact is?
15            I think you mentioned "broad
16    impact."  I'm just trying understand if revenue
17    and profit played a role in that.
18            MS. RODGERS:  Object to the form.
19            THE WITNESS:  I can't think of an
20    example where that played a role, you know, if I
21    can think back to where that was the decider of
22    getting a group together.
23            We would on Prime pricing, as an
24    example, meet as a group to discuss any changes
25    there.

18

Clark

Amazon.com, Inc.                                    11/18/2022

```
1                 But I can't think of an example
2      where revenue was the thing that brought everyone
3      together.
4      BY MS. JERJIAN:
5           Q.  You can't think of a single example
6      where revenue was the topic that was discussed
7      with respect to Prime or a change that was made
8      to Prime?
9                     MS. JERJIAN:  Object to form.
10                    THE WITNESS:  If I understood your
11     question correctly.
12     BY MS. JERJIAN:
13          Q.  Sure.
14          A.  You were asking where it was we brought
15     together all of the teams --
16          Q.  Uh-huh.
17          A.  -- from across the company to discuss.
18          Q.  Okay.
19          A.  And I can't recall a time where we
20     brought -- where we assembled all of the elements
21     of the teams that supported Prime.
22          Q.  Okay.
23          A.  To -- to cover revenue.
24          Q.  How about -- why don't we just focus
25     specifically on the individuals you've listed as
```

29

Clark

Amazon.com, Inc.                                    11/18/2022

```
 1    to me.
 2              And so, it was the group I
 3    described earlier, Doug Herrington, Russ
 4    Grandinetti, Neil Lindsay, Jeff Wilke would
 5    participate up until the time he left the
 6    company.  And would be the -- the people from
 7    Consumer Business
 8         Q.   Okay.  So Mr. Lindsay was essentially
 9    running the Prime business while you were SVP.
10    Correct?
11              MS. RODGERS:  Object to form.
12              THE WITNESS:  Yes.
13    BY MS. JERJIAN:
14         Q.   Okay.  And Mr. Grandinetti was running
15    in his capacity as managing an International
16    section.  Correct?
17              MS. RODGERS:  Object to form.
18    BY MS. JERJIAN:
19         Q.   Correct?
20         A.   That's not quite correct.
21         Q.   Okay.
22         A.   So the -- Russ ran the International
23    business.
24         Q.   Uh-huh.
25         A.   Which was a consumer of the Prime
```

30

Clark

Amazon.com, Inc.                                              11/18/2022

1    program, and he -- he participated in the

2    development and the evaluation of the Prime

3    program.

4              He did while I was CEO of Consumer

5    take over the Prime program when Neil

6    transitioned to run the healthcare group.

7              So Jamil from -- who was leading

8    the Prime Team for Neil moved to Russ.

9        Q.   Okay.  And do you remember when that

10   was?

11       A.   It was sometime in early '22, I believe.

12       Q.   Okay.  So in that capacity, did

13   Mr. Grandinetti have the ability to influence the

14   Prime program or make decisions for the Prime

15   program?

16             MS. RODGERS:  Objection to form and

17   foundation.

18             THE WITNESS:  I think he had the

19   ability to influence the program as others did

20   throughout in his tenure.  He took over reporting

21   responsibility and ownership of the program and

22   took over the role.  Again, the -- the

23   decision making is broad in Prime.

24             So, he made decisions at least to

25   my understanding and made decisions with the

Clark

Amazon.com, Inc.                                    11/18/2022

1   program in the same way Neil did, which was
2   the -- the broader the impact, the broader the
3   inclusivity with decision making.
4   BY MS. JERJIAN:
5       Q.  Sure.  So he did participate in
6   decision making with other people?  Is that what
7   you're saying?
8                   MS. RODGERS:  Objection to form and
9   foundation.
10                  THE WITNESS:  Again, I would say,
11  depending on the size and scope of the decision,
12  I'm sure there were some decisions that Russ and
13  the team made, themselves, and there were other
14  decisions that they included broader groups of
15  people on.
16  BY MS. JERJIAN:
17      Q.  Okay.  Do you recall an instance where
18  there was a broader group decision with respect
19  to Prime for a decision that the group had to
20  make?
21                  MS. RODGERS:  Objection to form.
22                  THE WITNESS:  I can -- there
23  were -- the broadest decision that I recall was
24  the pricing conversation which included, you
25  know, a larger segment of S Team and -- and the

32

Clark

Amazon.com, Inc.                                              11/18/2022

```
1    CEO and CFO of the company.
2                 THE COURT REPORTER:  I'm sorry.  Of
3    the company?
4                 THE WITNESS:  Of the company, yeah.
5    Of Amazon.
6    BY MS. JERJIAN:
7        Q.  When was this pricing conversation?
8        A.  It was sometime in the first quarter of
9    2022 in terms of me -- in terms of Russell's
10   participation in it.  I think that was the --
11   that was the one.  I think he was only Prime when
12   they had that meeting.
13       Q.  Okay.  When you say, "he," who are you
14   referring to?
15       A.  Russell.
16       Q.  Who was at the meeting?
17                MS. RODGERS:  Objection to form.
18                THE WITNESS:  I don't recall all
19   the participants.  But it would have been Doug
20   Herrington, Russ Grandinetti, Neil Lindsay and
21   myself and Brian Osofsky and Andy Jassy and David
22   Zapolsky, some of the consumer Legal Team and --
23   and a number of Finance participants.
24   BY MS. JERJIAN:
25       Q.  Okay.  Was there debate at this meeting?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

344

1                    REPORTER'S CERTIFICATE

2

3        I, Suzanne Kelly, Registered Diplomate Reporter,

4   hereby certify that the above and foregoing pages

5   numbered 1 through 342 constitute a full, true and

6   correct transcription of the proceedings in the

7   above-referenced matter, reported on November 18,

8   2022.

9        Signed by me this  7th  day of December, 2022.

10

11

12

13   _____
     Suzanne Kelly
14   Registered Diplomate Reporter
     Certified Realtime Reporter
15   Realtime Systems Administrator

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 78



| | |
|---|---|
| Benjamin Langner | Mailing Address: |
| Corporate Counsel | P.O. Box 81226 |
| Litigation & Regulatory | Seattle, WA 98108-1266 |
| Amazon.com, Inc. | Courier Delivery Address: |
| Direct Dial: 206-266-1842 | 2021 7th Avenue |
| Email: langnerb@amazon.com | Seattle, WA 98121 |

**CONFIDENTIAL TREATMENT REQUESTED**

May 24, 2021

<u>Via Email</u>

Katherine Johnson
Attorney, Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., N.W., Suite CC-9528
Washington, D.C. 20580

Re:    <u>FTC Matter No. 2123050</u>

Dear Katherine,

Amazon.com, Inc. ("Amazon") writes in response to the Federal Trade Commission's ("FTC") March 16, 2021 Civil Investigative Demand ("CID") regarding FTC Matter No. 2123050. This letter constitutes Amazon's response to Interrogatories 1, 2, 3, 4, 5, 11, and Amazon's supplemental responses to Interrogatories 9 and 13.  Additionally, this letter reflects Amazon's response to Document Requests 1 and 10, initial response to Document Requests 6, 7, 8, and 9; a supplemental production to Document Request 4; and an initial production of responsive email communications.  Amazon submits this response without waiving any objections to the CID.[1]

We would be happy to address any questions you may have about the topics raised below, along with our prior responses to the CID.

\*        \*        \*

As noted in our initial response, Amazon Prime ("Prime") offers members significant benefits, including free and fast shipping on over 100 million eligible items, unlimited photo storage, access to exclusive shopping deals, the ability to watch thousands of movies and television shows through Prime Video and to listen to over two million songs through Amazon Music Prime,

---

[1] Not mentioning one of the general objections in any of the specific responses set forth below shall not be deemed to limit or waive any subject objection.  Amazon reserves the right to supplement or amend its responses as appropriate to reflect information uncovered in connection with its ongoing efforts.  Amazon's use of the capitalized terms "Amazon Prime," "Enroll," and "Unsubscribe" are consistent with the Definition section of the CID.

1

**CONFIDENTIAL TREATMENT REQUESTED**

access to video games offered through Prime Gaming, and the ability to borrow books and magazines through Prime Reading, among other benefits.

Amazon provides access to these Prime benefits through an enrollment experience that is transparent and clearly discloses the material terms to customers, including the length of any applicable free trial, the ongoing price of Prime membership, the frequency with which the member will be billed, and how a member can cancel. Moreover, Amazon values the trust that customers place in Amazon and respects this trust by requiring a customer's express consent before enrolling in Prime. Additionally, to confirm for all new Prime members that they have joined, Amazon displays a membership confirmation screen and sends a welcome email that again confirms the customer's enrollment in a new Prime membership. Amazon believes in the value that Prime benefits provide to members. Accordingly, Amazon provides customers with information about Prime benefits during the enrollment process. Prime members understand and appreciate the value of membership: more than 70% of current Prime members have been members for over a year.

Although Amazon provides clear disclosures and requires affirmative consent to enroll in Prime, Amazon also understands that some members might enroll but later decide to cancel their membership for any number of reasons. As explained in our April 22 production, Amazon provides Prime members with a simple mechanism to cancel their membership if they choose to do so.

## RESPONSES TO INTERROGATORIES

Interrogatory 1:

Describe fully and in detail each step customers must take to Enroll in Amazon Prime, including any variations in steps due to alternative purchasing offers presented during the Enrollment process, or due to different products, time periods, or programs. If these steps differ depending on the platform or device through which the customer is exercising the option to Enroll, e.g., mobile devices or desktop applications, describe the steps for each platform and device separately.

Response to Interrogatory 1:

Amazon offers customers a straightforward process to enroll in Prime. As described above, Prime offers a broad array of benefits to its members, including fast and free shipping and the ability to watch movies and television shows through Prime Video. Customers can start the enrollment process through a variety of channels, such as on the Amazon Prime homepage, while purchasing a product for delivery, or while viewing Prime Video content.

The majority of customers enroll in Prime through one of three enrollment channels: (1) from the Amazon Prime homepage; (2) within the checkout process, including through the Ship Option Select Page ("SOSP"), the Universal Prime Decision Page ("UPDP"), or Single Page Checkout ("SPC"); or (3) through Prime Video. Together, these enrollment channels comprise approximately 80% of enrollments since 2018. Consistent with our prior agreement with you, this response is limited to enrollment through these channels.

2

CONFIDENTIAL TREATMENT REQUESTED

As described further below, customers might experience variations during the enrollment process.  Some of these variations depend on the enrollment channel the customer uses; others might depend on the customer's prior interactions with Amazon; and still others might depend on the customer's eligibility for a paid or free trial, the items in the customer's shopping cart, or other special offers, such as a student membership.  Regardless of such variations, however, each of these enrollment channels provides customers with clear and conspicuous disclosures of the material terms of membership, and requires their express consent before enrollment.

In all cases, Amazon discloses the material terms of Prime membership: the price, type of plan (*i.e.*, monthly or annual), whether there is a free trial or paid trial, the fact that the membership continues until cancelled, and when, where and how to cancel Prime.  For instance, in the case of a free trial followed by a monthly membership, Amazon informs customers of the length of the trial period and the price they will be charged at the conclusion of their free trial — for example, "Your membership continues until cancelled.  If you do not wish to continue for $12.99/month, you may cancel at any time by visiting Your Account."  As described below, Amazon displays these disclosures prominently within the enrollment process and prior to the customer consenting to become a Prime member.  Below, we describe the desktop experience through each of these channels for customers who are offered a 30-day free trial of Prime.  Amazon's response to Interrogatory 3 below identifies additional variations of the Prime enrollment process, such as the mobile enrollment experience or the experience of customers who do not receive a free trial.

### 1.  <u>Amazon Prime Homepage (www.amazon.com/prime)</u>

Amazon provides customers with an easy-to-access, centralized webpage that provides information about Prime, including how to enroll.  Customers begin the enrollment process through this channel from the Prime homepage.  On this page, Amazon describes the key terms of Prime membership, including the length of the free trial period and the price following the free trial.  Amazon also provides information about any alternative membership plans that might be available, such as plans for students or individuals receiving government assistance.  Customers who want to enroll in Prime may select the "Start your 30-day free trial" link to begin the enrollment process.

**CONFIDENTIAL TREATMENT REQUESTED**



After a customer indicates interest in Prime membership, Amazon reiterates the key terms of the Prime membership and provides additional information about Prime. Amazon restates the length of the free trial period and the price of membership after the free trial.

On this same page, Amazon next requires the customer to choose their preferred payment method and billing information by providing this information to Amazon. Alternatively, for customers who have previously added this information to their Amazon account, Amazon allows them to provide this information by informing Amazon of their choice to use existing payment or billing information. In either instance, Amazon requires the customer to inform Amazon about the payment method they would like to use to pay for Prime membership.

Immediately adjacent to the button customers must click to enroll in Prime, Amazon provides additional information about Prime membership, including that membership continues

---

[2] Full screen images are produced at AMZN_00003614 - AMZN_00003615.

**CONFIDENTIAL TREATMENT REQUESTED**

until cancelled and that Prime members may cancel at any time by visiting their account. Customers can then provide their consent to Prime membership enrollment by electing to "Start your 30 day free trial."



After signing up for Prime, Amazon presents the customer with a confirmation welcome page, making it clear to customers that they have signed up for a Prime membership. Amazon also sends the customer a welcome email and a push notification to customers using a mobile device if they have chosen to receive push notifications from the Amazon app. These notifications provide additional confirmation that the customer has successfully enrolled in Prime, as well as information about the terms of membership, Prime benefits, and how to cancel.

**CONFIDENTIAL TREATMENT REQUESTED**

Prime Confirmation Welcome Screen



**CONFIDENTIAL TREATMENT REQUESTED**

<u>Prime Confirmation Mobile Notification</u>



**CONFIDENTIAL TREATMENT REQUESTED**

<u>Prime Welcome Email</u>



CONFIDENTIAL TREATMENT REQUESTED

## 2. Checkout Channels

The most popular benefit of Amazon Prime is fast and free shipping available on millions of products offered through Amazon's store. Recognizing the benefits that Prime could provide to non-Prime members who purchase products in Amazon's store, Amazon allows customers to enroll in Prime during the checkout process. These options allow customers to take immediate advantage of Prime benefits, such as free or faster shipping, for a product they already intend to purchase with slower delivery or a delivery charge. These checkout channels, described further below, are the Ship Option Select Page, Universal Prime Decision Page, and Single Page Checkout.

### a)     Checkout: Ship Option Select Page (SOSP)

Amazon provides customers with an option to enroll in Prime when they decide the speed with which they would like a particular item shipped to them through the SOSP. By selecting this option during the checkout process, customers can take immediate advantage of Prime's shipping benefits without paying a fee for faster shipping.

Customers begin the SOSP enrollment process on the shipping options page. Amazon's shipping options page requires customers to choose their preferred shipping speed. Customers can choose from a variety of shipping options, including Prime's free and fast shipping option by enrolling in Prime. An orange banner reads "we're giving you a 30-day FREE trial of Prime" to emphasize to the customer that they are enrolling in Prime by selecting the Prime shipping option. To select this option and begin the Prime enrollment process, the customer selects the shipping option associated with a free trial of Prime and selects "Continue." Customers who select this option immediately receive Prime shipping on the item they are purchasing. Customers who do not wish to enroll in Prime can select a non-Prime shipping option and proceed to checkout by clicking "Continue" as well.

**CONFIDENTIAL TREATMENT REQUESTED**



After choosing a shipping speed, customers must select their preferred payment method for the items purchased, including payment for Prime membership fees charged after a free trial. Customers have the opportunity to enter payment information or, for customers who already have a relationship with Amazon, Amazon allows them to select a payment method they have previously saved to their account. Customers who would like to continue to purchase their items, including Prime membership, must select "Continue."

**CONFIDENTIAL TREATMENT REQUESTED**



     For those customers who have selected a Prime shipping option, Amazon next provides a page detailing the key terms of the Prime membership offer. Amazon provides customers with all of the material terms of Prime membership on one page. These terms include:

- The length of a free trial for eligible customers (*e.g.*, "a 30-day FREE trial of Prime");

- The fact that the free trial converts into a paid membership ("After your FREE trial, Prime is just $12.99/month");

- The price of Prime membership ("continue for $12.99/month plus any applicable

taxes");

- The fact that the membership continues until cancelled ("Amazon Prime membership continues until cancelled"); and

- Detailed cancellation information, including when the customer may cancel, where to go to cancel, and how ("you may cancel anytime by visiting Your Account and adjusting your membership settings").

Amazon highlights the price, subscription term, the fact that the membership continues until cancelled, and cancellation information in bold font.

After they are presented with this information, customers must choose "Start your Prime FREE Trial" to complete enrollment in Prime. If the customer would prefer not to enroll in Prime, the customer can easily select the clearly labeled "No Thanks" button instead.

**CONFIDENTIAL TREATMENT REQUESTED**



   For customers who elect to enroll in Prime, Amazon provides confirmation on the very next page, stating in bold text in the center of the page: "Your 30-day free trial of Prime has started." To provide further information and confirmation to new Prime members, Amazon also informs them that they should "look out for an email from us with more information."

**CONFIDENTIAL TREATMENT REQUESTED**



### b) Checkout: Universal Prime Decision Page (UPDP)

If a customer does not enroll in Prime through SOSP, Amazon might present non-Prime members with a one-page display at a later stage of the checkout process asking if they would like to become a Prime member and take immediate advantage of the benefits of Prime membership, such as free, fast shipping. To arrive at this page, customers first place items in their shopping cart, proceed to the checkout process, and enter their shipping and billing information for the products they intend to purchase. AMZN_00003614 at 13-17. After providing this information, the UPDP provides eligible customers with information about Prime memberships. For example, if a product

14

CONFIDENTIAL TREATMENT REQUESTED

that the customer is interested in purchasing is eligible for Prime shipping benefits, Amazon will provide that information to the customer on the UPDP so that the customer knows whether the benefit will apply to that item if they join Prime.  Amazon also summarizes additional shipping benefits that Prime membership would provide, including same-day delivery in select cities, one-day delivery, and two-day delivery.

Amazon provides customers with all of the material terms of Prime membership on one page, including the length of the free trial, the price of the Prime membership, the fact that the membership continues until cancelled, and detailed cancellation information, including when the customer may cancel, where to cancel, and how.  This information is included in bold type for ease of identification.

Contemporaneous with these disclosures, Amazon requires action from customers to start a new Prime membership by pressing a button.  Just below this button, Amazon expressly discloses that "by signing up" customers authorize Amazon to charge their credit card for membership fees.  Because customers have provided their billing information on the immediately preceding page in order to facilitate their purchase of products from Amazon, Amazon does not require them to enter those same billing details again so that they can also become a Prime member.  For customers who wish to continue their purchase without enrolling in Prime, customers simply need to select the option labeled "No thanks" to decline this offer and proceed with their order.

**CONFIDENTIAL TREATMENT REQUESTED**



For customers who enroll in Prime, Amazon provides confirmation on the very next page, stating in bold text in the center of the page: "Your 30-day free trial of Prime has started." To provide further information and confirmation to new Prime members, Amazon also informs them that they should "look out for an email from us with more information" about Prime membership.

**CONFIDENTIAL TREATMENT REQUESTED**



### c)    <u>Checkout: Single Page Checkout (SPC)</u>

Amazon also provides customers with an order summary page from which they may enroll in Prime through the SPC option.  The SPC enrollment channel appears immediately before a customer places their order for any products in their shopping cart.  On the order summary page, Amazon presents customers with information about their order, including their shipping address, payment method, and details about the product they are purchasing.  Here, Amazon also provides information about Prime shipping benefits and an option to enroll in Prime.  The customer can choose to begin the enrollment process by selecting the option to "Try Prime FREE for 30 days."

17

**CONFIDENTIAL TREATMENT REQUESTED**



　　　For customers who indicate their interest in trying Prime, a Prime membership is added to the customer's shopping cart and the page is updated with the material terms of Prime membership. In a prominent box in a bright blue font, bolded, and in the center of the page, Amazon informs customers that Prime has been added to their order, and by completing their order, they will be enrolled.  Specifically, this disclosure says:  "A 30-day FREE trial of Amazon Prime has been added to your order."  In order to complete the enrollment process, customers must click on the "Place your Order" button, immediately adjacent to which Amazon informs customers of the price of Prime membership, the billing frequency, that the membership renews automatically and continues until cancelled, and how to cancel the membership.  Amazon presents this information in a prominent location so the customer is not required to scroll to review this information. Alternatively, for customers who change their minds, Amazon provides the option for customers to remove the Prime membership from their cart before placing their order by clicking "Delete."

**CONFIDENTIAL TREATMENT REQUESTED**



After the customer completes the purchase, including enrolling in the Prime free trial, Amazon immediately displays a screen that confirms that the member has enrolled in Prime, together with the items in the customer's order.

CONFIDENTIAL TREATMENT REQUESTED



### 3. **Prime Video**

      Amazon Prime Video, which is one of many benefits included in a Prime membership, offers on-demand access to thousands of television shows and movies. Accordingly, Amazon provides opportunities for interested customers to enroll in Prime through the Prime Video homepage or when viewing details about a television show or movie on Prime Video. By doing so, Prime members receive access to Prime Video.

      On the Prime Video homepage, customers may click a banner link to obtain additional information about Prime membership and begin the Prime enrollment process.

      Alternatively, customers may obtain additional information about enrolling in Prime while viewing information about a particular television show or movie, where customers are invited to enter the Prime enrollment process by selecting an option to "Watch with Prime Start your 30-day free trial."

**CONFIDENTIAL TREATMENT REQUESTED**



For customers who indicate their interest in learning more about Prime membership from Prime Video or who select the option to start a 30-day free trial, Amazon then provides those customers with additional information about the terms of Prime membership including:

- The length of a free trial ("Start your 30-day free trial");

- The price of membership ("$12.99/month after trial");

- That the Prime membership renews automatically ("Prime membership continues until cancelled"); and

- Detailed cancellation information, including when the customer may cancel, where to cancel, and how ("you may cancel anytime by visiting Your Account and adjusting your membership settings").

Amazon provides key information in bold type for ease of identification by the customer, including that the membership renews until cancelled, the price and subscription term, and how to cancel to avoid receiving a charge.

On that same page, customers are required to confirm their payment method and billing address, either by providing it to Amazon or confirming that they would like to use a payment method or billing address saved to their Amazon account. After customers review this information about a Prime membership, they must indicate their consent by selecting the button labeled "Start your free trial." After selecting this button, customers are enrolled in a Prime membership. Customers who enroll in a Prime membership through Prime Video receive an email confirming that they have enrolled in Prime and providing additional information about Prime benefits.

**CONFIDENTIAL TREATMENT REQUESTED**



<u>Interrogatory 2</u>:

For each step listed in response to Interrogatory No. 1, explain (1) the benefit of such step to the consumer and to the Company; (2) whether such step is necessary to achieve Enrollment and if so, why; and (3) if not necessary, whether You contend it is reasonable to require such step as a prerequisite to Enrolling, and the basis for that contention.

CONFIDENTIAL TREATMENT REQUESTED

Response to Interrogatory 2:

Each of the five enrollment channels described in response to Interrogatory 1 involves the same steps for a customer to enroll in Prime: disclosure of the material terms about the Prime membership offer; provision of billing and payment information; consent to Prime enrollment; and confirmation of Prime enrollment.

As an initial step in the process, Amazon presents the customer with the material terms of Prime membership so that the customer is able to make an informed decision about whether to enroll in Prime:

- Price and type of membership plan (monthly or annual). Customers see a disclosure of the price of Prime, for example, "$12.99/month." AMZN_00003614 at 3, 4, 11, 18, 29, 31, 32, 35, 37, 39, 41, 43, 46; AMZN_00003615 at 3, 4, 11, 18, 26, 30, 32, 33, 36, 38, 40, 41, 44, 47.

- Free trial period and conversion to paid membership. If the offer presented to the customer starts with a free trial, Amazon discloses the length of the free trial, typically 30 days, and the fact that the free trial will convert into a paid membership at the conclusion of the free trial period. *See* AMZN_00003614 at 3, 4, 11, 26, 29, 32, 35, 37, 39, 43, 46.

- Prime benefits. Amazon summarizes key Prime benefits that may be of particular interest to that customer. For example, if the customer entered the enrollment flow during the checkout process, this summary may include a description of Amazon's free and fast shipping benefits. *See* AMZN_00003614 at 3, 4, 12, 18, 19, 32, 35, 37, 39, 43; AMZN_00003615 at 3, 4, 11, 18, 26, 30, 33, 38, 40, 41, 44, 47.

- Cancellation instructions. Amazon provides detailed information about cancelling a Prime membership, including when the customer may cancel, where to cancel, and how. Specifically, Amazon tells customers during the enrollment process: "you may cancel anytime by visiting Your Account and adjusting your membership settings." *See* AMZN_00003614 at 4, 26, 29, 32, 35, 37, 39, 41, 43, 46; AMZN_00003615 at 4, 11, 18, 26, 30, 32, 36, 38, 40, 41, 44, 47.

Amazon also requires customers to provide or confirm their billing address and payment information as part of the enrollment process, which allows the customer to indicate their preferred billing information for Prime, and reminds them that Prime memberships are available for a monthly or annual fee, following any free trial. As described above, when customers enroll in Prime from the Prime homepage or through SOSP, Amazon requests a customer's billing information after providing all of the material disclosures about membership. *See* AMZN_00003614 at 6-27, 36-41; AMZN_00003615 at 6-28, 37-42. Alternatively, if a customer seeks to enroll in Prime through the UPDP or SPC experiences, the customer has already made decisions about purchasing a product before taking steps to enroll in Prime, including their preferred payment method. *See* AMZN_00003614 at 13-27, 38-41; AMZN_00003615 at 13-28, 39-42. Amazon requires a customer's billing information to purchase an item from its store irrespective of the customer's decision to join Prime, and Amazon collects that information as part

CONFIDENTIAL TREATMENT REQUESTED

of the typical online checkout flow.  Because customers provide that information earlier in the checkout process, Amazon does not require customers to enter this same information again.  Furthermore, as with the Prime homepage and SOSP, customers may have previously provided their billing details to Amazon as part of a prior purchase.  *See* AMZN_00003614 at 13-27, 38-41; AMZN_00003615 at 13-28, 39-42.  Amazon allows these customers to select this information for convenience so that they are not required to enter it a second time.  Amazon does not enroll customers in Prime, however, without confirmation of the customer's preferred billing information.

Next, through each enrollment channel, after receiving the material disclosures and providing their preferred billing information, consumers must consent to enroll in Prime by clicking a clearly labeled button.  Amazon only wants to enroll those customers who want to join Prime, and therefore has designed its enrollment button to enable customers to provide a clear indication of their consent to enroll in Prime.  If a customer who is purchasing a product does not want to enroll in Prime, the customer can simply decline to enroll in Prime and can complete their purchase without a Prime membership.

Finally, after a customer enrolls in Prime, Amazon provides the customer with a confirmation of their Prime enrollment.  For instance, customers who enroll in Prime through the Prime homepage or checkout options will see a confirmation screen.  Amazon also sends an email welcoming the new Prime member, and provides a push notification on mobile devices for customers who have enabled a push notification in the Amazon app.  *See* AMZN_00003614 at 49; AMZN_00003615 at 50.  This information benefits customers by providing confirmation that they have enrolled in Prime.  *See* AMZN_00003614 at 49; AMZN_00003615 at 50.  This information also benefits customers by providing a convenient link to access Prime benefits so that customers understand how to use their benefits, as well as links to the Prime homepage.  Because Amazon believes in the value of Prime for members, Amazon provides this information about the benefits of Prime so that customers are able to maximize their use of these benefits.  As mentioned above, Prime members understand and appreciate the value of membership: more than 70% of current Prime members have been members for over a year.

Interrogatory 3:

For each variation listed in response to Interrogatory No. 1 explain (1) the benefit of such variation to the consumer and to the Company; and (2) whether such variation is necessary to achieve Enrollment, and if so, why the variation is necessary; and (3) if not necessary to achieve Enrollment, whether You contend that it is reasonable to require such variation as a prerequisite to Enrollment, and the basis for that contention.

Reponses to Interrogatory 3:

Amazon provides a clear and consistent experience through which customers can enroll in Prime.  As described in response to Interrogatory 1, each of the primary channels through which customers enroll in Prime provides customers with the same clear disclosures of the material terms of the Prime offer and requires that customers expressly consent to enrolling in Prime.  As discussed above, these terms include the price of Prime membership, the duration of the Prime membership plan, that the membership continues until cancelled, and where and how to cancel.  *See* AMZN_00003616 - AMZN_00003617.  In fact, Amazon's policies require that this information is provided to customers at the time of enrollment.  *See* AMZN_00003616 -

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00003617.

Amazon strives to make each customer's enrollment experience a positive one. To do so, the enrollment process incorporates multiple possible variations to provide the customer with an experience that will benefit them and provide them with the information they need. Additionally, Amazon strives to make the process easy to understand by minimizing the presentation of information that might not be applicable to a particular enrollment channel, option, or customer. Within each of the channels described in response to Interrogatory 1, the Prime enrollment experience can vary in four significant respects, depending on: (1) the customer's method of accessing the Prime enrollment experience; (2) the offers available to the customer; (3) what information may be most useful to the customer; and (4) whether the customer previously provided billing and payment information to Amazon.

## 1. Access Method Variations

Customers who seek to enroll in Prime do so using a variety of electronic devices, including desktop computers and mobile devices. Amazon has refined the process to enroll in Prime to address the inherent differences between different devices. For instance, mobile devices have smaller screens and, frequently, a different orientation than desktop monitors. For customers who use such devices, Amazon reorients the information vertically, so that the customers need only scroll up and down, rather than scrolling left to right, to accommodate the size of mobile screens. *Compare* AMZN_00003614 - AMZN_00003615 (desktop), *with* AMZN_00003614 - AMZN_00003615 (mobile). By narrowing the width of the information displayed, Amazon presents the material terms of the Prime offer in a clear and conspicuous manner for both desktop and mobile devices across each of the enrollment channels described in response to Interrogatory 1. *See* AMZN_00003614 - AMZN_00003615.

Understanding that customers may not always scroll from the very top to the very bottom of each page, Amazon provides important information to customers using a "sticky footer," which makes the information visible to the customer, regardless of how far up or down the customer has scrolled on their mobile screen. Because of the challenges that can result from conveying information to customers on a smaller mobile screen, Amazon has adopted policies that information presented on mobile devices or other small screens should always include the price and duration of the plan "above the fold" so that the customer can easily review them at the time the customer is asked to make a decision. AMZN_00003616 - AMZN_00003619. These differences between the desktop and mobile experience help facilitate the clear and conspicuous disclosure of all material terms to customers who elect to use mobile devices.

Additionally, regardless of the device that a customer uses to enroll in Prime, Amazon presents material disclosures in a way that makes them easy for customers to see and review. For instance, Amazon's policies require that the material disclosures must be proximately placed near the enrollment button so that the "distance . . . to the button cannot be greater than the distance between the nearest element (e.g., text, graphic) and the button." AMZN_00003616 - AMZN_00003619. The description of the auto-renewing mechanism must be in bold as well. *See* AMZN_00003616 - AMZN_00003619. The mobile user experience reflects these policies. Disclosures about price, term, and auto-renewal are all prominently displayed even on the smaller screen of a mobile device. *See* AMZN_00003614 at 34-47; AMZN_00003615 at 35-48.

CONFIDENTIAL TREATMENT REQUESTED

### 2. Availability of Customer Offers

Amazon offers customers multiple membership plans, including different membership terms and discounted rates for eligible members.  To help customers understand the specific plan in which they are enrolling, Amazon tailors the enrollment experience so that customers see information that applies to them.  Instead of presenting a customer with every option for which they might be eligible, Amazon provides customers in a particular enrollment experience with the specific Prime offer for which they are signing up to minimize customer confusion.

### a. Free Trial Period Eligibility

Amazon tailors the customer experience so that customers see the specific free trial period for which they would be eligible if they sign up for Prime.  The majority of customers who become new Prime members do so by enrolling in a Prime 30-day free trial offer, though some customers are not eligible for a free trial, and may sign up for a paid membership or, if eligible, for a paid trial.  When customers are not eligible for a free trial, Amazon identifies the ongoing, monthly cost of Prime membership without reference to a free trial — for example, "12.99/month."  *Compare* AMZN_00003615, *with* AMZN_00003614.  Specifically, the language on the button presented to customers to enroll in Prime conveys to the customer that they will be charged immediately for a Prime membership upon enrollment.  *See* AMZN_00003615.

Additionally, in the SPC enrollment channel, when customers eligible for a free trial click on the Prime banner or select Prime shipping, the material disclosures related to Prime appear directly beneath the "Place your order" button.  For customers who are not eligible for a free trial, when customers start the enrollment process by clicking the Prime banner or select Prime shipping, they receive an interstitial notice that provides material disclosures related to Prime.

Nonetheless, whether or not a customer is eligible for a free trial, the material terms of the offer — such as price of the membership, the length of the membership term, and detailed information about how to cancel — are clearly and conspicuously provided to the customer.  *See* AMZN_00003615.

### b. Membership Options

Because Amazon offers both monthly and annual membership options, the enrollment experience varies depending on whether a member receives an offer to enroll on a monthly or an annual basis.  For example, the monthly membership option will convey the price that the customer is charged monthly, while a customer who is signing up for the annual option will receive disclosures regarding the annual price of Prime.  By providing customers with information that is specific to the plan for which they are enrolling, Amazon helps customers understand the amount they will be billed for their Prime membership.  Regardless of whether the customer signs up for a monthly or annual Prime offer, Amazon provides clear and conspicuous disclosures of the price that member will pay.

Similarly, Amazon offers different membership plans that may provide a discount depending on the customer's individual circumstances.  Students and individuals receiving

CONFIDENTIAL TREATMENT REQUESTED

qualifying government assistance, for example, are entitled to a reduced membership price. Although the membership price might be different depending on the membership plan, Amazon's enrollment channels each describe the applicable price for that membership and any qualification requirements.  To learn more about these alternative membership plans, a customer can select the links within the enrollment process, such as "Are you a student?" and "Have an EBT card/receive government assistance?"  These variations benefit customers by presenting them with a membership plan that best serves their needs, such as the ability to access Prime benefits for a reduced price.  In short, although there are variations in membership plans and options, Amazon consistently provides material disclosures of key terms, adjusted for these various membership plans, in each enrollment channel.

### 3. Prime Benefits Variations

To assist customers in deciding whether to become Prime members, Amazon provides information about the benefits that a Prime member receives.  These benefits might include two-day shipping, one-day shipping, same day delivery in select cities, access to Prime Video, access to Amazon Music Prime, and many others.  In order to avoid overwhelming customers, Amazon presents to customers a limited subset of the many benefits that they receive if they enroll in Prime. Amazon presents this information based on its assessment of which benefits would be most valuable to that customer.  For instance, customers in a checkout channel might receive information about shipping benefits, whereas customers enrolling in Prime from the Prime Video homepage might instead receive information about the thousands of movies and TV shows available on Prime Video.  *See, e.g.*, AMZN_00003614 at 29, 32, 44, 46.  Because different benefits are appealing to different customers or may benefit them differently depending on what items are in their shopping cart, these variations help ensure that customers learn about the Prime benefits that are most important to them.

### 4. Payment Information

Amazon requires that all customers provide their payment information before enrolling in Prime, and provides the convenience of allowing members to use existing payment information if they have already provided that information to Amazon.  Non-Prime customers can authorize Amazon to store their billing information so that they can more easily purchase items from Amazon's store.  For such customers who have previously authorized Amazon to store their payment information, Amazon allows those customers to choose to use that same information to sign up for Prime.  This variation reduces the burden on customers, as it alleviates the need to reenter information customers have already provided.  The ability to reference their previously entered payment information is a feature that benefits customers, and it also allows Amazon to confirm with the customer their preferred payment method for the Prime membership.

<u>Interrogatory 4</u>:

List every circumstance in which a consumer may be Enrolled in Amazon Prime with a Negative Option Feature.

CONFIDENTIAL TREATMENT REQUESTED

Reponses to Interrogatory 4:

Amazon Prime is a recurring membership program that customers must cancel if they no longer want to be members.[3]  As described in detail in Interrogatory 1, in each Prime enrollment channel Amazon discloses to customers that Prime is a recurring membership program and obtains their consent to enrollment in Prime.

Interrogatory 5:

For each Enrollment using a Negative Option Feature listed in response to Interrogatory 4:

a. Describe the Company's notifications and disclosures to consumers relating to all material terms of the offer or arrangement; and
b. State how and when the Company obtained from the consumer their express informed consent to participate or be Enrolled in Amazon Prime.

Reponses to Interrogatory 5:

Each Prime enrollment channel described in response to Interrogatory 1 clearly and conspicuously discloses the material terms of Prime membership.  These disclosures are required by Amazon's policies and reflected in the enrollment channels described above.  Amazon's policies also mandate that these disclosures be placed "immediately adjacent" to the sign-up button.  AMZN_00003620 - AMZN_00003623.  As discussed in further detail in Interrogatories 1 and 2, these disclosures include the length of any free trial period, the price of membership and the length of the membership period, that the membership automatically renews, and cancellation instructions.

Amazon requires express consent from customers prior to enrolling them in Prime.  Amazon obtains this consent by providing the customer with the material disclosures and a button to enroll in Prime.  Although the presentation of this button varies as described above, for instance based on the enrollment channel or the device that a customer is using, Amazon consistently provides this button on the same page as the material disclosures about Prime to ensure the customer has the necessary information to make an informed decision when providing their consent to enroll in Prime.

Although the language on the enrollment button may vary depending on the specific experience, the request for consent is clearly labeled to convey to the customer that clicking will enroll them in Prime.  As required by Amazon's internal policies, the button must "clearly describe the action the customer is taking by clicking."  AMZN_00003616 - AMZN_00003619.  For example, if the customer seeks to sign up for a monthly or annual Prime membership that begins with a free trial, the customer must provide their consent to "Start your 30-day free trial." AMZN_00003614 at 4.  If a customer will immediately begin a paid Prime membership, they

_____

[3] Amazon also offers a limited number of eligible customers a Prime Surprise or Gift of Prime membership.  Prime Surprise and Gift of Prime are limited-term membership programs that do not renew automatically.  Instead, the member must affirmatively consent to enroll in Prime at the conclusion of the membership term.

CONFIDENTIAL TREATMENT REQUESTED

instead consent, for example, to "Get FREE Same-Day Delivery."  AMZN_00003614 at 18.  In each of these circumstances, the customer must take an action by clicking on a link that reflects their consent to join Prime.

Interrogatory 9:

State whether the Company maintains or has access to metrics or other data regarding how many consumers Enrolled in Amazon Prime attempt to Unsubscribe but do not complete the process, or choose other alternatives offered by the Company during the Unsubscribe process, such as pausing, converting a monthly membership to an annual membership, or switching to a Prime Video only membership.  If so, describe all such metrics and provide all such data.

Response to Interrogatory 9:

As described in our prior responses, Amazon maintains certain data regarding how many customers attempt to cancel Prime and are successful.  We are supplementing our prior response to Interrogatory 9 with this data related to Prime cancellations.

Prime members who initiate Amazon's simple, online cancellation process are successful in canceling their memberships.  As described in response to Interrogatory 6, Amazon's cancellation process provides customers with information about Prime benefits they would lose by cancelling their membership, alternative offers for which they are eligible, and the ability to cancel their membership.  Of those Prime members who enter Amazon's simple, online cancellation process, the vast majority cancel their memberships.  In 2018, 72% of Prime members who started the cancellation process cancelled their membership.  In 2019, that increased to 73%.  It increased further to 80% in 2020.  Through the first quarter of 2021, that figure remained around 77%.  This data clearly demonstrates the simplicity of the cancellation process.

During the cancellation process, Prime members are reminded of certain benefits of membership, such as free and fast shipping, access to Prime Video, and photo storage.  After being reminded of this information, some Prime members decide to keep their memberships.  Members who initiate the cancellation process online but ultimately decide to retain their Prime memberships on average take greater advantage of their Prime benefits as compared to members who did not initiate the process.  Specifically, Amazon identified a randomized sample of 5,000 Prime members who started to cancel during a one–week period but ultimately retained their memberships.[4] Compared with a similar sample of 5,000 Prime members who did not initiate the cancellation process, the members who started the cancellation process, on average, used more Prime benefits over the following three months than the sample of users who did not initiate the cancellation process.

Additionally, many of the members who start the cancellation process but do not cancel their memberships affirmatively decide to take a different action.  These decisions include expressly indicating that the member wants to retain Prime membership, that instead of cancelling

---

[4] Although Amazon maintains data regarding the entire population of Prime members who initiate the cancellation process, Amazon has analyzed a sample of that data from week 39 of the year because of the extremely large volume of data related to the entire population.

**CONFIDENTIAL TREATMENT REQUESTED**

immediately the member would prefer a reminder in advance of membership renewal, or that the member would prefer a change in membership plan or other alternative offer.  Options such as pausing a membership or requesting a notification prior to their next renewal are designed to help customers exercise their preferred choice regarding a Prime membership.  In the first quarter of 2021, of Prime members who started the cancellation process but who ultimately decided not to cancel, approximately 40% of them made an affirmative selection to remain Prime members.

Finally, customers also have the option of calling Amazon Customer Service to cancel their Prime memberships.  The data associated with customers who abandoned the online cancellation process shows, however, that in the week after abandonment, fewer than 2% call Customer Service to request cancellation.  This further demonstrates the simplicity of Amazon's online cancellation process because Prime members interested in cancellation need not call customer service to complete cancellation and can instead utilize Amazon's simple and accessible online process.

Interrogatory 11:

If you contend the process for Unsubscribing from Amazon Prime is as simple as the process to Enroll in Amazon Prime, describe fully and in detail all facts that support Your contention.  If not, explain why.

Reponses to Interrogatory 11:

Amazon does not contend that the Prime cancellation process is or is not as simple as the enrollment process.  Consistent with the Restore Online Shoppers' Confidence Act's ("ROSCA's") requirements, 15 U.S.C. § 8403(3), Amazon offers members a simple mechanism to cancel their Prime membership online with just a few clicks.  In addition, customers can cancel their membership by calling customer service.  Amazon does not make or seek to make any comparative contention, but rather simply seeks to ensure that customers have a simple and effective mechanism for cancellation.  ROSCA requires that companies provide simple mechanisms for cancellation, and does not require that the mechanism be as simple as the process for enrollment.

Here, although both are simple, the enrollment and cancellation processes serve different goals and present different information to Amazon's customers.  The enrollment process provides customers with information about the terms of Prime membership so that they may provide their consent to join.  By contrast, the cancellation process provides helpful information to customers, including benefits they would lose by cancelling.  For instance, a Prime member who has stored photos using Prime's unlimited photo storage benefit would lose access to those photos by cancelling their Prime membership.  Because customers enrolling in Prime have not stored any such data with Amazon, the Prime enrollment process does not need to address this issue.  Although Amazon's enrollment and cancellation processes both provide helpful information to facilitate the customer's decision-making process, each of these decisions involves different considerations and is informed by different purposes.  Comparing the relative simplicity of the enrollment process to the cancellation process, particularly where both are objectively simple, ignores these distinctions and is not legally relevant.  Amazon Prime's cancellation process provides a simple mechanism to stop recurring charges — irrespective of how it might compare to the Prime enrollment process.

**CONFIDENTIAL TREATMENT REQUESTED**

Interrogatory 13:

Describe the Company's policies, practices, and procedures relating to Enrolling in or Unsubscribing from Amazon Prime, including, but not limited to, handling of complaints concerning Enrolling in or Unsubscribing from Amazon Prime, and any material limitations concerning how and when consumers may Enroll in or Unsubscribe from Amazon Prime.

Supplemental Response to Interrogatory 13:

Consistent with our prior agreement with you, Amazon is providing a supplemental response to Interrogatory 13 describing certain policies and procedures relating to the Prime enrollment and cancellation processes. Amazon maintains multiple policies to promote clear and informed enrollment processes and simple cancellation, which are described below.

Automatic Renewal Sign-Up Requirements

Amazon has developed a checklist of requirements relating to auto-renewal sign-up processes for Prime and all Amazon auto-renewals. The checklist provides guidance concerning required disclosures, presentation of disclosures, and consent requirements to promote a clear and informed enrollment process. This checklist outlines seven required disclosures that must be presented to customers in a clear and conspicuous manner and in close proximity to any Prime membership offer so that the customer is able to make an informed decision:

- Price for the membership, or price that will be charged for the subscription or membership when the free trial ends;
- Charge and backup payment method (*e.g.,* "or any other payment method on file") authorization;
- Auto-renewal term (*e.g.*, "continues until cancelled");
- Term (*e.g.*, monthly or annual);
- Cancellation policy (*e.g.*, "cancel anytime"); and
- A link to the applicable terms (*e.g.*, Amazon Prime Terms, or the Amazon Conditions of Use).
- For free trials that convert into paid memberships, required disclosures include the price that will be charged after the trial ends and how to cancel without being charged (*e.g.*, "cancel any time by visiting Your Account"). *See* AMZN_00003624 - AMZN_00003626.

This checklist also provides guidance on the presentation of disclosures, requiring that they are in a font size "at least as large" as the smallest font on the page, in bold, adjacent to the enrollment choice, and above the fold. *See* AMZN_00003625.

With respect to cancellation, Amazon requires an easy way to cancel Prime membership, which includes always providing customers with an electronic means of cancelling their memberships. Amazon's policies require that the cancellation terms must be provided to users along with information about how to cancel. *See* AMZN_00003624 - AMZN_00003628. For example: "You may cancel any time by visiting Your Account." *See* AMZN_00003620. These policies are implemented through the cancellation process described in response to Interrogatory 6.

CONFIDENTIAL TREATMENT REQUESTED

Sign-Up Requirements US

Amazon's "Sign-Up Requirements US" policy sets forth the specific language that must be included as part of the Prime enrollment process for different variations, as well as the manner in which this information should be presented to the customer.  For example, where a customer receives an offer to enroll in a monthly paid subscription for Prime, the policy requires that the following language is included:  "By signing up, you agree to the Amazon Prime Terms (https://www.amazon.com/gp/help/customer/display.html/ref=short_url?nodeId=G2B9L3YR7LR8J4XP) and authorize us to charge your default payment method or another payment method on file.  Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $12.99/month + any taxes, you may cancel any time by visiting Your Account."  *See* AMZN_00003620 - AMZN_00003623.

This policy also dictates the presentation of this information to the customer to ensure that it is sufficiently clear and conspicuous.  Specifically, the disclosure that memberships continue until cancelled, price and subscription terms, and instructions about how to cancel must be provided in bold text.  *See* AMZN_00003620 - AMZN_00003623.  Moreover, required disclosures must be presented "immediately adjacent to the sign-up button."  *See* AMZN_00003620.

Subscription Services at Amazon

Amazon's "Subscription Services at Amazon" policy sets forth certain requirements related to Amazon's auto-renewing subscriptions.  First, this policy requires that customers are informed of: (1) the amount of the charge, (2) that the subscription will continue until cancelled, and (3) how to cancel the subscription in close proximity to the sign-up button. *See* AMZN_00003627 - AMZN_00003628.  Second, the policy requires a welcome email or similar confirmation that reiterates the material terms of the subscription service.  *See* AMZN_00003627.  Lastly, Amazon requires that customers are provided with an "easy way to cancel their subscription" for all subscriptions.  *See* AMZN_00003627.

Worldwide Prime Acquisition Requirements

Amazon's "Worldwide Prime Acquisition Requirements" policy provides further specificity regarding the required legal disclosures that must accompany a call to action that enrolls a customer in Prime.  First, this policy requires that disclosures provide material information about the membership, including the price, duration of the Prime plan, the automatically renewing mechanism, payment methods, cancellation policy and options, and terms and conditions.  The policy also links to approved disclosures.  Relatedly, the policy dictates that this information must be presented to the customer in a clear and conspicuous manner, which the policy states is a font size "no smaller than the smallest marketing copy on the page" and with disclosures located adjacent to the button.  The terms regarding the auto-renewal mechanism must be presented in bold type.  Additionally, the button by which customers indicate their consent must "clearly describe the action the customer is taking by clicking" the button.  *See* AMZN_00003616 - AMZN_00003619.

**CONFIDENTIAL TREATMENT REQUESTED**

Document Request 1:

Documents sufficient to show each page of the Enrollment and Unsubscribe processes for Prime for all platforms, applications, and devices, and for each set of materially different steps (including any variations to any of these over the Applicable Time Period), including but not limited to real-time recording of the processes using Camtasia or similar software that records on-screen activity.

Supplemental Response to Document Request 1:

As agreed, Amazon is today producing documents containing visual representations of the desktop and mobile enrollment processes for the three primary channels described in Interrogatory 1 — (1) Prime Homepage; (2) checkout, including SOSP, UPDP, and SPC; and (3) Prime Video. These documents are Bates-labeled AMZN_00003614.

To illustrate the variation that occurs when a customer does not receive a free trial offer, Amazon is also producing a visual representation of the user enrollment experience for users who immediately enroll in a paid Prime membership.  These documents are Bates-labeled AMZN_00003615.

Document Request 3:

All Documents (including but not limited to analyses, copy tests, emails, memoranda, reports, research, studies, or surveys) relating to any internal research, report, data evaluation, third-party consultation, in-house presentation, or any other communication or form of investigation relating to, concerning, informing, or bearing upon the process to Enroll in or Unsubscribe from Amazon Prime, including the traits, behaviors, characteristics, demographics, or usage patterns of consumers who Enroll in or Unsubscribe or fail to Enroll in or Unsubscribe from membership in Amazon Prime.

Supplemental Response to Document Request 3:

Amazon conducts tests, studies, and other research as part of a process of continuous evaluation and improvement of the Prime member experience.  These projects are conducted by a variety of different organizations within the Company, including at the direction of lawyers and for the purpose of obtaining legal advice.  As agreed, Amazon is making an initial production of non-privileged studies or tests sufficient to show such tests, studies, or research, which the Company has identified pursuant to a reasonable search of repositories likely to contain responsive documents.

Project Ava.  In early 2019, Amazon conducted a test to standardize the information that customers who wanted to cancel a Prime membership received.  Recognizing that members who contemplate cancelling an Amazon Prime membership might not be aware that they would lose certain Prime benefits by cancelling their membership, Amazon performed a test in early 2019 to facilitate access to Amazon's simple online cancellation flow when customers called customer service to discuss cancellation of their membership.  Once directed to the online cancellation flow, the member received information about Prime benefits and alternative membership plans.  As

CONFIDENTIAL TREATMENT REQUESTED

described previously, if the member decided to cancel, they could do so with a few clicks online. Project Ava focused on providing customers with more information about Prime through the online cancellation process in an effort to better inform customer's decision to cancel. Amazon is today producing a summary document describing this project, which is Bates-labeled AMZN_00003629 - AMZN_00003641.

Cancellation Survey. In an effort to improve the customer experience for Prime members, Amazon conducted a survey of customers who cancelled their Prime memberships in late 2018 and early 2019. The survey, conducted after customer had cancelled their memberships, found that most Prime members who cancelled their memberships did so due to a lack of use (37%) or a change in personal circumstances (33%) — not because members had any confusion with or frustration about the enrollment process. Although some customers reported being dissatisfied with their Prime membership, Amazon designs the enrollment process to enroll only those customers who wish to do so, and Amazon provides a simple cancellation process for those customers who would prefer to no longer remain Prime members. Amazon is today producing a summary document describing this survey, which is Bates-labeled AMZN_00003642 - AMZN_00003652.

In addition, as agreed, Amazon is producing today communications that relate to various tests, studies, and research.[5] These documents reflect a search of responsive, non-privileged emails of Neil Lindsay, Jamil Ghani, and Cem Sibay during the relevant time period. Amazon identified these communications by conducting a broad search for emails in an effort to identify internal collections that might relate to cancellation or enrollment in Amazon Prime. Specifically, Amazon reviewed emails containing the following terms: Prime w/5 (enroll* OR sign* OR register* OR join* OR cancel* OR unsubscribe*). Amazon has withheld from this production certain documents that are subject to the attorney-client privilege and/or work product protection. Amazon is today making an initial production of responsive, non-privileged documents that it has identified in its review of email communications as responsive to the Document Requests 2, 3, 4, and 5 in the CID. *See* AMZN_00000015 - AMZN_00002447. Amazon will supplement its production of responsive, non-privileged documents pursuant to this review of email communications.

Document Request 4:

Documents sufficient to show the Company's policies, procedures, and practices, including, but not limited to, any internal correspondence referring or relating to the creation or modification of such policies, procedures, or practices, relating to the processes for Enrolling in or Unsubscribing from Amazon Prime, including how, when, and where consumers may Enroll in or Unsubscribe from Amazon Prime and how Enrollment and Unsubscribing is confirmed.

Supplemental Response to Document Request 4:

As agreed, Amazon is today producing policies and procedures relating to enrolling in and cancelling Prime memberships, as described in response to Interrogatory 13. These documents are

---

[5] Amazon's responses are made pursuant to the CID modifications discussed by the parties and memorialized in an email from Laura Kim to Katherine Johnson on May 3, 2021, as well as the email from Katherine Johnson to Laura Kim on May 10, 2021.

CONFIDENTIAL TREATMENT REQUESTED

Bates-labeled AMZN_00003616 - AMZN_00003628.

In addition, Amazon is producing today communications relating to the creation or modification of such policies, procedures, or practices.  As explained above, pursuant to the modifications agreed upon by the parties, these documents reflect a search of responsive, non-privileged emails of the three custodians during the relevant time period using broad search terms.  Amazon is today making an initial production of responsive, non-privileged documents that it has identified in its review of email communications.

Document Request 5:

All documents (including but not limited to analyses, copy tests, emails, memoranda, reports, research, studies, or surveys) relating to the creation, development, design, or implementation of the processes for Enrolling in or Unsubscribing from Amazon Prime.

Supplemental Response to Document Request 5:

Amazon is today producing a document reflecting research relating to efforts to improve the enrollment process, including through studies, initiatives, and internal best practices to promote straightforward processes for customers.  As noted above, Amazon wants to enroll only those customers who intend to enroll.  To achieve this objective, Amazon has undertaken research to understand how to ensure that customers understand, for instance, the price of Prime and their ability to cancel.  AMZN_00003653.

Amazon is also producing a report relating to improvements to the Prime sign-up process.  As part of Amazon's continuous efforts to improve the enrollment process, in September 2019, Amazon studied whether identifying Prime as an item in the customer's cart after the customer had added Prime would improve customer understanding of the enrollment process.  With Prime added as an item in the customer's cart, the customer could delete Prime from their shopping cart if they decided not to enroll.  The study provided recommendations about how to make disclosures related to this proposed checkout process clear to customers, such as by including a delete or trash icon to indicate to the customer that they could easily discontinue the enrollment process during checkout.

In addition, Amazon is producing today communications that relate to the creation, development, design, or implementation of the processes for enrolling in or cancelling Amazon Prime memberships.  As explained above, pursuant to the modifications agreed upon by the parties, these documents reflect a search of responsive, non-privileged emails of the three custodians during the relevant time period using broad search terms.  Amazon is today producing responsive, non-privileged documents that it has identified in its review of email communications.

Document Request 6:

All Documents relating to whether the Company has clearly and conspicuously disclosed all material terms of the transaction before the Company obtained the billing information of consumers who have participated or have been Enrolled in Amazon Prime, including Documents that disprove or tend to call into question whether the Company has provided such disclosures.

CONFIDENTIAL TREATMENT REQUESTED

Initial Response to Document Request 6:

Amazon clearly and conspicuously discloses all materials terms of Prime to customers before they enroll.  As agreed, Amazon is producing documents sufficient to show that it has clearly and conspicuously disclosed material terms of Prime membership to customers.  As discussed in the preceding responses and demonstrated in the accompanying documents depicting the enrollment process, Amazon provides clear and conspicuous disclosures of the material terms of the Prime offer to customers during the enrollment process.  Specifically, through each of the enrollment channels described above, Amazon presents a customer who seeks to enroll in Amazon Prime with the following terms of the Prime membership offer prior to enrollment:

- Price.  *See* AMZN_00003614 at 3, 4, 11, 18, 26, 29, 31, 32, 35, 37, 39, 41, 43, 46; AMZN_00003615 at 4, 11, 18, 26, 30, 32, 33, 36, 38, 40, 41, 44, 47.
- Membership term (*e.g.*, monthly, annual).  *See* AMZN_00003614 at 3, 4, 11, 18, 26, 29, 31, 32, 35, 37, 39, 41, 43, 46; AMZN_00003615 at 4, 11, 18, 26, 30, 32, 33, 36, 38, 40, 41, 44, 47.
- Free trial period length and the fact that the free trial converts to a paid membership ("After your FREE trial, Prime is just $12.99/month.").  *See* AMZN_00003614 at 3, 4, 11, 26, 29, 31, 35, 37, 39, 43, 46.
- Select Prime benefits, such as access to Prime Video, free fast shipping, and access to Amazon Music Prime.  *See* AMZN_00003614 at 3, 4, 5, 11, 18, 25, 29, 32, 35, 37, 40, 32, 36; AMZN_00003615 at 3, 4, 5, 11, 18, 26, 31, 33, 36, 39, 41, 44, 47.
- Automatically renewing nature of the membership ("Your Amazon Prime membership continues until cancelled.").  *See* AMZN_00003614 at 4, 18, 26, 29, 32, 37, 39, 43, 46; AMZN_00003615 at 4, 11, 18, 26, 30, 33, 37, 38, 40, 41, 44, 47.
- Cancellation instructions ("you may cancel anytime by visiting Your Account and adjusting your membership settings.").  *See* AMZN_00003614 at 4, 18, 26, 29, 32, 37, 39, 43, 46; AMZN_00003615 at 4, 11, 18, 26, 30, 33, 36, 38, 40, 41, 44, 47.

As demonstrated by these documents, Amazon clearly and conspicuously discloses to customers, prior to enrollment in Amazon Prime, information about how much and when they will be charged, that the membership will renew until they cancel it, and how to cancel it if they decide to do so.

Amazon provides these disclosures of material terms as the initial step in many customer experiences, such as enrollments from the Prime Video Homepage – *see* AMZN_00003614; AMZN_00003615 – and Amazon Homepage – *see* AMZN_00003614; AMZN_00003615.  With respect to the checkout experiences, customers might enter or select their billing information before being presented with the Prime enrollment terms because the customer had not yet indicated they wanted to enroll in Prime.  *See* AMZN_00003614; AMZN_00003615.  The checkout experiences facilitate the customer's purchase, and accordingly, the collection of billing information comes first as a critical part of that process.  Additionally, billing information might appear first because the customer has not yet started the enrollment process.  Some checkout experiences ask customers if they would like to enroll in Prime several steps into the checkout process.  As a result, Amazon would have collected shipping information, billing information, and other details as it ordinarily would for a checkout experience, even before the customer starts the enrollment process.  For example, with the UPDP experience, the customer has provided their shipping and billing

36

CONFIDENTIAL TREATMENT REQUESTED

information as part of the checkout process before they indicate their choice to begin the enrollment process. *See* AMZN_00003614; AMZN_00003615. Where Amazon collects billing information prior to presenting the customer with disclosures, this is a result of the nature of the checkout process and when the customer indicates that they would like to enroll in Prime as part of this process.

Additionally, as a convenience to its customers and with their consent, Amazon stores its customers' billing information so that they do not need to retype credit card information every time they make a new purchase from Amazon. Likewise, when a customer who has already provided billing information to Amazon wishes to enroll in Amazon Prime, Amazon permits them to bill any membership fees to a credit card that they have already registered with Amazon. As a result, Amazon has technically collected billing information (for a different purpose) prior to presenting the customer with material disclosures as a customer-focused feature for convenience. Nevertheless, as described in detail above, Amazon presents customers with the material terms of the Prime membership, confirms the customer's billing information for Prime, and obtains their consent before enrolling them in Prime.

Document Request 7:

All Documents relating to whether the Company has obtained from consumers who have participated or have been Enrolled in Amazon Prime their express informed consent to be charged before the Company charged them, including Documents that disprove or tend to call into question whether the Company has obtained such express informed consent.

Initial Response to Document Request 7:

Through each of the channels described in response to Interrogatory 1, Amazon obtains customers' consent prior to enrollment in Prime. As agreed, Amazon is providing an initial response to Document Request 7 with documents sufficient to show whether Amazon obtained express informed consent to be charged from Prime members before Amazon charged them. In each enrollment channel described above, prior to enrollment in Prime, Amazon requires customers to consent to enroll in Prime by clicking a clearly labeled button that is displayed next to the material terms of Prime membership. In every instance, the text on the button and its presentation clearly communicate to the customer that, by clicking the button, they are providing their consent to enroll in Prime and receive Prime benefits. *E.g.*, AMZN_00003614 (Prime Homepage Free Trial: "Start your 30 day free trial"); AMZN_00003615 (Prime Homepage Hard Offer: "Sign up now").

Document Request 8:

All Documents relating to whether the Company has provided a simple mechanism to stop recurring charges for consumers who have participated or have been Enrolled in Amazon Prime, including Documents that disprove or tend to call into question whether the Company has provided such simple mechanism.

**CONFIDENTIAL TREATMENT REQUESTED**

Initial Response to Document Request 8:

Amazon provides simple mechanisms for customers to cancel their Prime membership by using Amazon's online cancellation process or speaking with a customer service representative. The vast majority of Prime members use the online cancellation process to cancel their membership, and this process is simple to locate and use.  As agreed, Amazon is providing an initial response to Document Request 8 with documents sufficient to show whether Amazon provided Prime members simple mechanisms to cancel their membership.

Members can access the online cancellation process from a number of locations, including the centralized hub for Prime membership management, "Prime Central."  AMZN_00000001 - AMZN_00000008.  With a few simple clicks, the member can cancel their Prime membership through this process.  During the online cancellation process, Amazon provides the member with information about their benefits to help members understand Prime and their decision to cancel. AMZN_00000001 - AMZN_00000008.  The cancellation process also provides eligible customers with options to switch to a different type of plan, such as a monthly plan or a student plan, or to pause their membership if they choose to do so.  AMZN_00000001 - AMZN_00000008.  The online cancellation process provides customers with helpful information to inform their decision about whether they want to cancel their membership, and if they do, it provides simple steps with clear language that directs them how to do so.

As described in response to Interrogatory 9, the data confirms the simplicity of the cancellation process — approximately 75% of Prime members who initiate the cancellation process online complete the process and cancel their memberships.  By contrast, the minority of Prime members who start but do not complete the online cancellation process and ultimately decide to retain their Prime memberships on average take greater advantage of their Prime benefits as compared to members who did not initiate the cancellation process.  Thus, Amazon's cancellation data reflects that members who want to cancel their memberships are able to do so easily online, while on average members who abandon the cancellation process go on to take advantage of benefits they would have lost had they cancelled their memberships.

Amazon Prime customers use electronic devices, including computers and mobile devices, to access the wide variety of benefits that Amazon Prime offers, and the online cancellation process is the primary method by which customers cancel Prime memberships.  Nonetheless, Amazon recognizes that some customers may instead want to cancel over the telephone and Amazon offers this option as well.

Document Request 9:

All Documents relating or referring to any complaints involving Enrolling in or Unsubscribing from Amazon Prime, including internal correspondence relating to such complaints.

Initial Response to Document Request 9:

As agreed, Amazon is providing an initial response to Document Request 9 by producing complaints related to the Prime enrollment and cancellation processes identified from among a sample of Amazon customer service contacts.  These documents include transcripts of email

CONFIDENTIAL TREATMENT REQUESTED

communications, chat messages, and telephone calls, with the latter reflecting computer-generated transcripts that are an approximate representation of the conversation.

These documents reflect communications identified from among a sample of 2,000 customer service contacts from February 2021. As previously discussed, because customer service contacts include a significant volume of communications about issues unrelated to Prime enrollment or cancellation, Amazon identified certain Standard Issue Codes ("SIC codes") that are more likely to identify customer complaints about the Amazon enrollment or cancellation process:

- Prime Membership Cancellation Inquiry:  Bad Customer Experience
- Prime Membership Cancellation Inquiry:  Did Not Use Benefits
- Prime Membership Cancellation Inquiry:  Free Shipping Threshold Change
- Prime Membership Cancellation Inquiry:  Joined a Household
- Prime Membership Cancellation Inquiry:  Membership Is Too Expensive
- Prime Membership Cancellation Inquiry:  Mistaken Membership Sign Up
- Prime Membership Cancellation Inquiry:  Multiple Prime Accounts
- Prime Membership Cancellation Inquiry:  No Reason Given
- Prime Membership Charge Inquiry:  Charge Amount Not As Expected
- Prime Membership Charge Inquiry:  Charge On Separate Amazon Account
- Prime Membership Charge Inquiry:  Unexpected Benefit Subscription Charge
- Prime Membership Prime Refund Inquiry:  How Much Is My Prime Refund?
- Prime Membership Prime Refund Inquiry:  Prime Cancellation Refund Not As Expected
- Prime Membership Prime Refund Inquiry:  When Will I Receive My Prime Cancellation Refund
- Prime Membership Renewal Inquiry:  Change Auto-Renew Settings

Amazon reviewed transcripts of the random sample of 2,000 customer contacts from February 2021 from the above SIC codes, and identified a subset of documents from each SIC code that reflected substantive discussions with customer service regarding an Enrollment or Cancellation-related issue, even if such discussion does not necessarily suggest the customer was complaining. Accordingly, Amazon's production of documents in response to this Document Request is over inclusive. These documents are Bates-labeled AMZN_00002448 - AMZN_00003484.

Document Request 10:

All Documents relating to any communications between the Company (or any affiliated person or entity) and any local, state, or federal government or industry regulatory body, including but not limited to the National Advertising Divisions of the Council of Better Business Bureau or the Electronic Retailing Self-Regulation Program, concerning Unsubscribing from Amazon Prime.

Initial Response to Document Request 10:

After conducting a reasonable search of its records, Amazon has not identified documents responsive to this Document Request 10. Amazon will update this response if it identifies responsive documents in connection with its ongoing efforts.

**CONFIDENTIAL TREATMENT REQUESTED**

\* \* \*

The responses in this letter are made only on behalf of Amazon and only for the purposes of this CID. Amazon considers this letter, the accompanying documents, and any information derived therefrom (collectively, the "Confidential Information") to be confidential and exempt from disclosure under the Freedom of Information Act ("FOIA"), the Federal Trade Commission Act ("FTC Act") Sections 6(f) and 21, 16 C.F.R. § 4.10, and any other applicable statute or regulation. The Confidential Information contains sensitive and proprietary practices, policies, and data, including trade secrets and commercial or financial information. Disclosure of the Confidential Information may cause substantial harm to Amazon's competitive position. Accordingly, Amazon requests notice and an opportunity to seek protection prior to any disclosure of the Confidential Information by the FTC. Amazon is providing the Confidential Information on the basis that all such information will receive the full range of confidentiality protection available under FOIA, the FTC Act, the Commission's Rules of Practice, and any other applicable statutes, regulations, and rules. For that reason, Amazon has marked this letter with the header "Confidential Treatment Requested."

This request for confidentiality is not to be construed as a waiver of any protection from disclosure or confidential treatment accorded by law, including, but not limited to, the attorney-client privilege or the work-product doctrine. Amazon reserves the right to rely on and invoke any such protection as appropriate.

Sincerely,

/s/

Benjamin Langner
Corporate Counsel, Litigation & Regulatory
Amazon.com

# EXHIBIT 79

**Overview**

The purpose of this document is to share the early thinking on 1) short and long-term vision of the cancellation survey data usability, and 2) receive feedback and alignment on 2H 2020 approach.

Prime cancellation survey initially launched in October 2018 in select locales gathering valuable data leading to experiments and initiatives such as Value Tracker, Ava Phase 2 (using cancellation propensity), and clarity initiatives based on mistaken signups. Since then, we saw the need to revise the survey questions to implement it WW to gather insights and benchmark globally. We worked in partnership with GPX team in Q1 '20 to overhaul the questionnaire and since Q2 '20, we have launched the new cancellation survey in US, EU5, CA, JP, AU, BR, SG, and UAE. Through the survey, we have the mechanism to gather customer feedback on why members cancel Prime, but due to challenges with using an external 3P host, we are unable to proactively build solutions for customers using the data. The long-term goal and vision of the survey is to use the customer generated feedback and insights that are now available in most locales to improve our ability to map problems and solutions at scale moving forward.

**Cancellation survey current state**

From January '20 to June '20, total member initiated churn globally was ▉▉▉▉ Of these members, ▉▉▉▉ were refund ineligible, meaning they were still active Prime members until churning out completely (Appendix A). Cancellation survey gives us a direct insight into these member cohorts on why they are cancelling and the pain points or the experience they are lacking that led them to cancellation. By using Qualtrics (3P host) to collect survey results, we have a mechanism in place to understand the cancellation reasons and trends, but we are not able to 1) identify from the survey results what causes churn to fix those defects to reduce customer contacts and dissatisfaction leading to cancellation, 2) tie the survey feedback into solutions for at-risk members with high propensity to cancel or in AR-off and early cancel state to win them back, and 3) use the results to predictively target members (predictive solution targeting their motivation to leave).

**1. Identifying what causes churn**

In order to identify different trends and variances from the survey results, we need an in-house reporting capabilities. Our focus in 2H of 2020 is to work with Prime Data Engineering team to bring the survey data into Data Warehouse at the CID level and create a Query and excel report that will map to each question and dimensions for WW PMs to be able to self-service. Big part of this work is to also onboard free text responses to create text mine opportunities for any PMs and marketer to be able to run a sentiment analysis through key words/search terms and pull different trends and themes to inform their hypothesis and experiments. The vision is to also fold survey data into Janet variance analyzer for PMs to be alerted on MoM/YoY variances across different survey inputs and trends.

**2. Optimizing ML model to identify members at risk with proactive solutions**

Each survey response is tied to encrypted Customer ID that allows us to filter down to specific customer attributes. By using the survey results and optimizing the ML model, we can enhance the predictability and proactively target various cohorts based on the known motivation to leave and bring solutions to members before they enter AR-off. We also have the opportunity to pair these insights to flip the funnel to infer various churn reasons and target those defects. We plan to leverage proof of concepts by creating targeted solutions for cohorts through existing channels for members from Tooltip down to Prime Central/Iliad and through targeted locations (e.g. risk messaging, acquisition upsell) for winback with the purpose of retention and member engagement.

<u>Proof of concept #2.1:</u> One way do this is by creating a ML model that predicts a customer's likelihood to dispute their Prime membership charge by working backwards from CS data and survey data that includes customers stating they '*did not mean to sign up for Prime*'. With this model we can create different acquisition experiences for high risk members as well as create new risk states post-signup to drive clarity and awareness.

<u>Proof of concept #2.2:</u> "*I did not need Prime right now.*" Most members who are in this churn reason cancel because they are not aware of the Pause/Resume option and instead cancel and rejoin. We can use ML model with the existing survey data to predictively target certain cohorts that are likely to cancel due to this reason to test out bringing forth the pause option in Iliad before the cancel option and observe resume rate.

**3. AR-off to AR-on**

In Q1 2020, ▉▉▉▉ of the members in AR-off state actively shopped with benefits in the last 30 days before they churned out (Appendix B). By using the survey results and what this member cohort is telling us are paint points and CX dissatisfaction for leaving, we can meet them with the solutions while they are still active Prime members in AR-off state.

<u>Proof of concept #3.1:</u> "*Membership fee is too expensive.*" We know from Nov. '19 through Feb. '20 data that this was the #1 reason why members were leaving. For this cohort, we can reach out retroactively with options on Student and UP program eligibility or Household membership as many of the members are not aware of their eligibility for these programs. We can also test out bringing

CONFIDENTIAL TREATMENT REQUESTED                                                                    AMZN_00034290

56 unused benefits widget/benefits tracker via email and other locations to this cohort to present the benefits they have used and not
57 used that they will lose to reinforce the value of Prime membership/cost.
58 Proof of concept #3.2: *"I did not buy enough on Amazon to make it worthwhile."* We can target this member cohort with specific
59 Prime Exclusive deals and ASIN recommendation based on their shopping behavior and/or use rewards to incentivize rejoining by
60 presenting them with other shopping benefits (e.g. "Try shopping items at Whole Foods/Amazon Fresh with $X off when you
61 rejoin").
62
63 **FAQ**
64 **1. What is the current experience for Prime cancellation survey, and when is it shown to customers?**
65 30% of members are shown a pop-up with a link at the end of the Iliad cancellation flow asking them to voluntarily complete a
66 survey on why they decided to cancel their Prime membership. In the cancellation survey, we ask former Prime members why they
67 cancelled their Prime membership and how satisfied they were with the Prime program. In addition, we ask questions related to any
68 issues they may have had, and what their favorite categories or genres are for online shopping, video and music.
69
70 **2. What are the top themes coming out of the cancellation results, both positive and negative?**
71 *What is the primary reason you cancelled or did not renew your membership? (Nov. 2019 to Feb. 2020, pre-COVID impact)*

| Reason for cancellation | Nov. '19 | Dec. '19 | Jan. '20 | Feb. '20 | Total |
|---|---|---|---|---|---|
| Membership fee is too expensive | | | | | |
| I did not need Prime right now | | | | | |
| I did not buy enough on Amazon to make it worthwhile | | | | | |
| I did not mean to sign up for Amazon Prime | | | | | |
| I already have access to Prime through another account or another Prime member | | | | | |
| I experienced a problem with Amazon Prime | | | | | |
| I did not use Prime Video enough | | | | | |
| I did not need fast shipping | | | | | |
| I did not use Prime Music enough | | | | | |
| Total base | | | | | |

72
73 **3. What are the challenges with using Qualtrics for reporting?**
74 Qualtrics poses a couple challenges to the reporting capabilities we need: 1) due to privacy issues, we cannot store the survey results
75 in Qualtrics indefinitely and have to download and delete periodically, 2) because we have to encrypt CIDs in Qualtrics, we cannot
76 analyze the data at customer and cohort level and target accordingly, and 3) we can't use other services to enable proactive
77 solutions from the results.
78
79 **4. What can we do with free text responses?**
80 Free text responses are valuable anecdotes and insights from customers that we have not been able to utilize other than manual
81 search. The free texts help us understand and supplement certain trends and problem statements we see, but manual search comes
82 with selection bias and that is not scalable WW. By bringing these responses in house and creating a sentiment analysis, we enable
83 PMs and marketers to be able to create/search for themes and trends based on keywords that will inform experiments decisions and
84 further innovations.
85
86 **5. How do we intend to measure progress or improvement through this survey?**
87 As with any optional survey, we face selection bias in that only customers that have pre-maturely cancelled their Prime
88 memberships are shown the survey. Customers may also exhibit availability bias, where more recent experiences influence the
89 feedback they provide and responses may not match actual behavior. We have included a NPS question in the new survey to
90 measure customers' overall satisfaction with Amazon as a whole at the time of cancelling their membership as well as with Prime.
91 Our goal will be for this measure to increase over time, hopefully indicating a higher propensity to rejoin Prime in the future.
92
93 **6. Do we have a resource commitment from Data Engineer/BI team for this work and what is the WB timeline overall?**
94 We have a request submitted to Data Engineering team to help with bringing the survey data into Redshift, but do not have resource
95 commitment yet as this is a net new ask. We will be working with the team to scope and prioritize this work as bringing the data into
96 the warehouse is the first step in being able to automate any reporting or enabling targeting and analysis at scale.
97
98 Cancellation Survey timelines:

| Workstream | Task | ETA (DFAD) | Comments |
|---|---|---|---|
| DE | Bring the data into Redshift and align on regular | 9/1 | |

CONFIDENTIAL TREATMENT REQUESTED                                                   AMZN_00034291

| | | | |
|---|---|---|---|
| | migration mechanism | | |
| DE/BI | Create a query and reporting | 9/15 | |
| DE/ML | Sentiment analysis | 9/30 | |
| ML | Cluster analysis for segment targeting | 9/30 | |
| ML | Create a new ML model | 10/15 | Start with predictability for members with likelihood to dispute their membership charge |
| Tech | Test proof of concepts | 10/30 | Start with 1-2 solutions targeted to known segments based on cancel reasons |
| BI | Fold into Janet alerts | 11/15 | MoM/YoY variance on cancel trends and inputs |

99
100
101 **Appendix A: Member Initiated Churn breakdown**
102

| Churn funnel | January | February | March | April | May | June | Funnel Total |
|---|---|---|---|---|---|---|---|
| Early cancel on PC (refund eligible) | | | | | | | |
| Early cancel on CS (refund eligible) | | | | | | | |
| Auto-Renew off (refund ineligible) | | | | | | | |
| Total | | | | | | | |

103
104 **Appendix B: Members who shopped with benefits in the last 30 days before expiry and rejoined in 60 days**
105

| funnel_type | Q1 aroff_cancels | rejoined_within_60days | shopped_30days_before_expiry | % |
|---|---|---|---|---|
| PAID OUTS | | | | |
| FT OUTS | | | | |

106
107 **Appendix C: Reporting Requirements**
108

| Use Case | | Priority | Notes | Team |
|---|---|---|---|---|
| **Reports:** | | | | Prime DE/BI |
| | 1. Bring cancellation survey data into Prime Data Warehouse and align on regular migration schedule | P0 | | |
| | 2. Create a Query and excel report that can map to each question and dimension | P0 | | |
| | 3. Fold data into existing ML model to enhance the ability to identify members at risk | P0 | Use decrypted CID to work w/ existing applications such as Hermes, Diego, Bullseye, etc. | ML |
| | 4. Complete a sentiment analysis from free text responses. Present top words, themes present in free form responses. | P0.5/P1 | Allow PMs to be able to filter free text responses through search terms to see top trends. | DE & ML |
| | 5. Fold data into Janet alerts for cancellations, sign-ups, BPS, etc. | P0.5/P1 | | |
| **Segments:** | | | | Prime DE/BI |
| | 1. Allow cuts by: tenure, plan type, first benefit usage, signup channel | P0 | Use decrypted customer ID and marketplace to identify. | |
| | 2. Allow cut by CS contact and concession given Y/N | P0/P1 | Use decrypted customer ID and marketplace to identify. | |
| **Features:** | | | | Prime DE/BI |
| | 1. Data imported from Qualtrics and refreshed weekly and 1st of month | P0 | | |
| | 2. Allow user to choose time parameter: weekly, monthly, quarterly | P0 | Show X weeks, X months, X quarters | |
| | 3. Filter time range | P0 | | |
| | 4. Filter marketplace (multi-choice) | P0 | | |
| | 5. Filter by plan type, plan class, etc. (multi-choice) | P0 | Use decrypted CID and marketplace to identify. | |
| | 6. Allow WoW, MoM, YoY views | P0 | | |

AMAZON CONFIDENTIAL

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00034292