109

AMAZON CONFIDENTIAL

4

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00034293

# EXHIBIT 80

**Cancellation Intent – Prime Retention**

Last Edited: 7/19/19 by @elimarsh

**Purpose**

This document aims to provide guidance on how cancellation survey data will be used to identify member-initiated cancellation reasons and help predict a given Prime member's likelihood of attrition in advance. By predicting cancellation intent, we plan to [save X members] through product and marketing enhancements driven by machine learning input and analysis.

**Background**

Historically, Prime has been focused on driving higher engagement and preventing system-initiated cancellations (related to payments, etc.). Outside of Customer Service (CS) which is limited to SIC codes and makes up ███ % of cancellations, we have not collected a lot of data or insights on member-initiated cancellations. This makes it difficult to determine why customers are leaving and what we can do to improve the Prime program to retain more members.

To get more insight on why people are leaving Prime, we started including a link to a cancellation survey on the Iliad cancellation flow and on the cancellation emails so that customers can provide candid feedback. The cancellation survey was re-launched in the US on May 15, 2019 with new questions and features, enabling us to tie the survey responses to customers. We received ███ responses in the first 30 days of the survey. The top three cancellation reasons provided in this time period were: 'I did not buy enough to make it worth it' (███ %), 'The membership fee is too expensive' (███ %), and 'I do not need Prime right now' (███ %).

By comparing customer and usage data to the cancellation survey responses, we hope to determine a customer's likelihood of cancelling in advance and why they are likely to cancel. With this knowledge, we intend to course-correct the customer through personalized engagement and risk reduction strategies.

To be successful, we must:
1. Identify who is at risk for a given cancellation reason, and why:
   a. 'I did not buy enough to make it worth it' (███ %)
   b. 'The membership fee is too expensive' (███ %)
   c. 'I do not need Prime right now' (███ %)
   d. 'I did not mean to sign up for Prime' (███ %)
2. Update eligibility for prioritized initiatives (PPU, Leprechaun, MOOSE plan transitions, FT Extension/PT) as needed to ensure coverage for Prime members at risk for a given cancellation reason
3. Create Member States for given cancellation reason (e.g. high risk → medium risk → low risk of cancelling because 'Prime is too expensive'), with those use cases as Actions (Present plan transition, Present dynamic ship savings, Present stacking offer)
4. Update/Re-train ranking logic for Member States

**Cancellation Prediction Requirements**

**1. [P0]** - Identify patterns and customer profiles of those who say they 'do not buy enough'. Determine who is at risk of cancelling because they are not shopping, and why they are no longer shopping. Give ideas to alter the member's likelihood to cancel.

<u>Explanation:</u> ███ % of people who cancelled stated that the primary reason they were cancelling their Prime membership was because they did not buy enough to make Prime worth it. With the advent of the monthly plan, some customers may be seasonal Prime members. Some customers may be disappointed in price, selection, quality or convenience. Some members might not know about other Prime benefits that are not shopping/shipping-related.

<u>Characteristics to consider:</u> Customer survey responses, tenure, plan type, signup channel, benefit usage (video, music, twitch, shipping, shopping), # orders and units (frequency), Retail vs FBA vs 3P, GLs (consumables, softlines, hardlines, media, etc.), OPS, seasonality (holidays)

**Comment [R1]:** Hi – we should ██████████

The purpose of this project is to enable cancelation prediction using ML at scale. An indicator (there could be several other, e.g. CS contacts) at present that we use is survey data, ██████████

Also state: ML applications of cancelation prediction span x out of y total Retention swim lanes, and projects that will benefit from this will retain x additional members in 2019 and y in 2020 (see Appendix for OP1 projects).

**Comment [R2]:** I also recommend a section on the actual output itself: how often do we want it updated (weekly is P0?), how we will actually consume it, etc.

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00021537

**Cancellation Intent – Prime Retention**

Proposed use case(s) for Member States:
- (a) PPU / Leprechaun:
  - Use a new/additional benefit(s) – Video, Music, Kindle
  - Shop in specific GLs
  - Sequence of PPU journeys
- (b) Prime deals—optimize recommendations based on impact to spend and retention

Output: customerID, risk level (H/M/L) for cancellation reason, rank best use cases based on pattern/profile for risk level

> **Comment [R3]:** Can you state more crisply the opportunity for all of the 'applications'. 2019 impact total (just do ballpark, low precision is fin) and 2020 impact, OR just do annualized.
>
> Also worth doing a 'risk of not having ML' for all of these asks.

43

**2. [P0]** Determine who is likely to cancel because Prime is too expensive. Determine if there is a better alternative Prime plan or offer for that customer than the one they are currently on.

Explanation: ▇% of people who cancelled stated that the primary reason they were cancelling their Prime membership was because it is too expensive. Personal circumstances may have changed for the Prime member (lost job, unplanned expenses, etc.) allowing for less discretionary spending, or people might be price sensitive—toward a Prime price increase, or toward shopping (view Amazon retail prices as too expensive).

Features to consider: customer survey responses, tenure, plan type/class, address, payment methods (type, #), benefit usage (video, music, twitch, shipping), # orders and units (frequency), GLs (consumables, softlines, hardlines, media, etc.), events (Prime price changes), health of US/WW economy, time of year (holidays, back to school)

Proposed use case(s) for Member States:
- (a) MOOSE: Present plan transition to the customer for a plan that is more suitable to their budget or circumstance.
- (b) Show Dynamic Delivery Savings (Prime Savings Widget) to the customer if the shipping savings is greater than the cost of the plan.
- (c) Present PPU journeys or Leprechaun as an 'offset' to the cost.
- (d) Present Credit Rewards Summary widget. (Oct '19, ▇ members saved)

Output: customerID, risk level (H/M/L) for cancellation reason, rank best use cases based on pattern/profile for risk level

44

**3. [P0]** Look at customer behavior, identify patterns and customer profiles of those who say they 'don't need Prime right now'. Predict who might cancel because they don't need Prime, and determine why they no longer need it. Give ideas for tests to alter the member's likelihood to cancel.

Explanation: ▇% of people who cancelled said they did not need Prime right now. New customers may not have had time to grasp all of the value they get by Prime. Alternatively, with the advent of the monthly plan, some customers may be seasonal or binge Prime members that choose to pay for Prime in short stints. We hope to give these customers an easier path to returning to Prime, and, over time, convert them to continuous Prime members.

Features to consider: Customer survey responses, tenure, plan type, signup channel, benefit usage (video, music, twitch, shipping), # orders and units (frequency), Retail vs FBA vs 3P, GLs (consumables, softlines, hardlines, media, etc.), OPS, seasonality (holidays)

Proposed use case(s) for Member States:
- (a) MOOSE: Free Trial Extension, Paid Trial for early tenure
- (b) PPU / Leprechaun:
  - Use a new/additional benefit(s) – Video, Music, Kindle
  - Shop in specific GLs
- (c) Credit Rewards Summary Widget (Oct '19, ▇ members saved)

Output: customerID, risk level (H/M/L) for cancellation reason, rank best use cases based on pattern/profile for risk level

45

**4. [P1]** Identify the probability that a customer mistakenly signed up for Prime, why the customer considers it mistaken, and what is the best course of action to take with that customer.

CONFIDENTIAL TREATMENT REQUESTED                                                        AMZN_00021538

**Cancellation Intent – Prime Retention**

| |
|---|
| <u>Explanation:</u> ■% of customers responded that their primary reason for cancelling was that they never intended to sign up for Prime. However, we are not sure how this mistaken signup occurred, or if the customer meant they never intended to pay for Prime (rather than sign up). In some instances, customers may have been confused by the language or experience when signing up (e.g. order agnostic SPC). Some people may have turned AC/AR off, and unintentionally turned AR back on through risk messaging. Kids may have signed up through Alexa or FireTV without telling their parents. |
| <u>Characteristics to consider:</u> customer survey data, Signup channel, tenure, plan type and class, benefit usage (video, music, twitch, shipping), visit days, devices/channels, transitions or plan changes (FT to paid, student to monthly, promo code to Prime, etc.), Iliad visits, risk messaging responses/clicks, CS data |
| <u>Proposed use case(s) for Member States:</u><br>(a)  Turn on risk messaging or send communication about upcoming conversion / renewal charge for the customer.<br>(b)  Turn AR off for the customer, and allow them to turn AR back on through risk messaging.<br>(c)  [NOT CURRENTLY PRIORITIZED] Determine if we should present an additional requirement to sign up for Prime (e.g. enter CVC to complete) |
| <u>Output:</u> customerID, likelihood (H/M/L) of mistaken signup |

46

| |
|---|
| **5. [P1]** Identify customer profiles or patterns in people who report liking specific benefits, shopping categories or genres of video or music in the cancellation survey. Rank content or deals for similar Prime member's profile. |
| <u>Explanation:</u> Right now, content in the Prime Central widgets is not personalized; without specific customer input (personal viewing history, selected preferences), we need to use information we gain from like customers to better rank and present information to Prime members. |
| <u>Features to consider:</u> Customer survey responses, tenure, signup channel, plan type, benefit usage (video, music, twitch, shipping), GLs (consumables, softlines, hardlines, media, etc.), previously streamed ASINs, location/marketplace, language preferences |
| <u>Proposed use case(s) for Member States:</u><br>(a)  Improve ranking and recommendations in the Prime Central widgets for Prime exclusive deals and video/music content. (Prime On, ■ Members Saved) |
| <u>Output:</u> |

47
48  **Use Cases**
49
50  **Prime Power Up (PPU)** ■ member saved 2019 annualized)
51  Through PPU, we intend to drive a first (or one-plus) shopping purchase among new-to-Prime members to increase yield. For
52  digital intent members, yield improves ■ bps (non-shoppers) to ■ bps (shoppers) when they shop. Two PPU journeys
53  are currently live that are primarily shopping-focused— (1) download the mShop and receive a $10 shopping credit, and (2)
54  purchase a Prime shipping-eligible item and receive $5/$10 when the item ships. The mShop journey is live in EU5, UK, CA
55  and MX, while the shopping journey is eligible in the US and planned to expand to EU5 in August '19.  We will soon be able to
56  offer PPU journeys for specific GLs to drive shopping in new categories and encourage higher frequency purchasing.
57
58  For customers that are already shopping, we hope to encourage them to try additional benefits. For shopping intent
59  members, yield improves ■ bps (non-shoppers) to ■ bps (shoppers) with use of a second benefit. By Q3/4 2019 we will
60  have new PPU journeys available in the US for: streaming Prime Video, making a Prime reading borrow, and streaming music.
61  Pending results in the US, these journeys will be rolled out WW in 2020.
62
63  As more PPU journeys become available, we intend to use ML to <mark>stack rank the customer's available journeys, optimizing on</mark>
64  <mark>RET score.</mark> Currently, these journeys are targeted at new to Prime customers (first 30 days of membership, regardless of FT or
65  HO). We do not intend to change the bullseyes for the existing PPU journeys in 2019, but anticipate that the overlap will be
66  high between the existing PPU bullseye segmentation and customers who are at risk of cancelling for the above survey
67  reasons. ■% of member-initiated cancellations (self-cancel, CS, AR off) occur during the free trial stage, and another ■% of
68  member-initiated cancellations occur during paid days 0-30.

**Comment [R4]:** This "which journey to offer which member, through which incentive" is a separate project. This piece I advocate moving to a separate section (Appendix?)

The part of PPU that we can weave into member states (and cancelation prediction) is 'which member to target with a ppu journey'. That is a member states problem, some of which is addressable in cancelation prediction (e.g. PPU to reduce the "I never use benefits" customers).

**Cancellation Intent – Prime Retention**

69
70  **Leprechaun** ▮▮▮ member saved 2019 annualized)
71  Leprechaun is a surprise and delight experience that gives customers a prize/gift card balance when they use their mobile
72  phone camera to scan an image. While we do not have any Leprechaun experiences live currently, this is seen as a low-effort
73  way to test various engagement offers provided we can get funding (1 week of marketing work, 1 week of tech work). With
74  previous leprechaun journeys, we have seen mixed results for retention and will need to be smart in how we target
75  customers.
76
77  **Prime Savings Widget (Dynamic Delivery Savings)**
78  The Prime Savings widget will show shipping savings of customers as a blue strip banner on emails when their savings is
79  greater than the cost of Prime. The widget is currently live in the UK and is planned to launch in the US (Aug) and WW (Sep).
80  We hope that the widget will communicate the convenience and value of being Prime, and improve retention.
81
82  **Credit Rewards Summary Widget**
83  The credit summary widget is launching in October 2019, and will display what rewards are available to earn for a customer,
84  how much earning is in progress (for incomplete journeys), and how much rewards are available to spend. Similar to the
85  dynamic delivery savings value, this widget can be used to display the value a customer gets by being a Prime member, and
86  what they will be sacrificing by cancelling their Prime membership. (Annualized members saved ▮▮▮)
87
88  **MOOSE / Plan Transitions**
89  In cases where customers perceive that the price of Prime is too expensive, we may want to present an alternative plan type
90  or offer to the customer. We would like to determine if there is a more optimal plan for the customer than the one they are
91  on, and present an offer via email or onsite to the customer *before* they try to cancel, pause, or resume their membership. In
92  addition, we can use this information to rank what offer to present the customer during the Iliad cancellation flow.
93
94  We may choose to offer:
95  - A monthly plan to annual members (less money upfront)
96  - An annual plan to monthly members (greater value if committed to Prime)
97  - UP to any member (high probability that they qualify)
98  - A self-purchase non-refundable stack at a discounted price (e.g. $99 instead of $119)
99  - Paid trial (on-ramp for newer members)
100 - Free trial extension (on-ramp for newer members)
101 - Pause membership (no plan is best for the customer)
102
103 In Q3/4 2019, we are building the 'Right Plan' widget for Prime Central and Gateway ▮▮▮ members saved annualized) and
104 are onboarding a location on Iliad for MOOSE. However, this work does not include re-training the models for existing Prime
105 members. We will need to prioritize this to be able to make intelligent recommendations.
106
107 **Next Steps**
108    1)  Start exploration of cancellation survey data; determine what cancellation reasons we are able to predict in advance
109 As needed:
110    2)  Build member states for cancellation reasons, and onboard available actions
111    3)  Prioritize re-training MOOSE models for existing Prime members
112    4)  Create new actions (where we have poor coverage for a member state)
113
114

CONFIDENTIAL TREATMENT REQUESTED                                                          AMZN_00021540

**Cancellation Intent – Prime Retention**

**Appendix A: Cancellations by Tenure**

| Tenure (Months Paid, Floor) | 4/30/2019 | 5/31/2019 | 6/30/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 | Grand Total |
|---|---|---|---|---|---|---|---|
| FT | | | | | | | |
| 0 | | | | | | | |
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13+ | | | | | | | |
| Grand Total | | | | | | | |

Amazon.com Confidential

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00021541

**Cancellation Intent – Prime Retention**
119  **Appendix B:** Other Use Cases to Prevent Cancellations (not prioritized in 2019)

| |
|---|
| **P1.** Determine who is likely to cancel based on poor delivery experiences. Determine how much each additional DEA miss affects a customer's likelihood to cancel their Prime membership. |
| Explanation: ■% of people who cancelled because they had a bad experience with Amazon stated that they had delivery issues. Some of the most common delivery issues are: DEA (package arrived late), item was lost in transit, item arrived damaged, and wrong item shipped. All of these issues are preventable by Amazon, and are seen as a loss of customer trust. Currently, the customer must contact Amazon to address the delivery issue. At our discretion, we may refund any money paid for shipping, offer a $5 gc to the customer, and/or offer to ship a replacement item when they contact us. |
| Characteristics to consider: type of delivery issue (DEA, damaged, etc.), # and recency of delivery issues, Address (urban/ suburban/ rural, house/apartment), tenure, benefit usage (video, music, twitch, shipping), # orders and units (frequency), GLs (consumables, softlines, hardlines, media, etc.), paid vs. free shipping, shipping speed, our price, gift wrap, seasonality (holidays), add-ons (fresh, Prime now), hazmat, heavy-bulky, HIPRAK (non-48) |
| Proposed business solution(s):<br>   (a)  Proactively offer the customer a concession (where it makes sense, customized to customer) to make things right and regain trust. Dollar value or type of concession can be different (e.g. movie rental vs. GC, $5 vs. $10).<br>   (b)  Share insights with Ops / SCOT where we see gaps in coverage or service quality. |
| Output: |

120

| |
|---|
| **2.**  **P0.** [ANALYSIS] Identify who is at risk for cancelling because the 'wrong' card would be charged for their Prime membership fee. Identify what characteristics can we use to identify people who are at high risk for charging the wrong card. |
| Explanation: When the Prime membership charge fails using the preferred payment method (soft or hard decline), we attempt to complete the charge using other cards in the Prime member's Amazon wallet. If the Prime member shares their account with family members or friends, it is possible that a non-primary could be charged; there is no logic to the order in which we attempt cards (e.g. looking for same name or address). Amazon Prime cannot reverse the charge and use a different card if this happens; the Prime member must cancel their account and sign up again. |
| Characteristics to consider: customer survey results, Household accounts, plan type, # addresses and/or names under account, # cards in wallet, type of card (debit, credit), one-click purchase default (vs. Prime membership default), previous CS contacts, refunds and/or cancellations |
| Proposed business solution(s):<br>   (a)  Alter the payment re-drive logic or do not attempt payment re-drive for certain segments of Prime members that are at high risk of having the wrong card charged.<br>   (b)  Proactively message the primary customer to update their Prime payment method. |
| Output: proposal for re-drive segments; dataset that includes customer_id, marketplace_id, risk level, segment for re-drive logic |

> **Comment [ME5]:** More analysis than ML

121

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00021542

# EXHIBIT 81

# EXHIBIT C
## to the Declaration of "Várk/Gtf go

# REDACTED VERSION OF
# DOCUMENT(S) SOUGHT TO BE SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

---

**FEDERAL TRADE COMMISSION,**
     Plaintiff;

  v.

**DIRECTV,**
    a corporation,

and

**DIRECTV, LLC,**
    a limited liability company,

     Defendants.

Case No. 3:15-cv-01129

---

**EXPERT REPORT OF TÜLIN ERDEM, PH.D.**

**September 14, 2016**

CONFIDENTIAL

I.    **INTRODUCTION**.................................................................................................. **3**

    A.   Qualifications................................................................................................ 3

    B.   Background................................................................................................... 5

    C.   Assignment .................................................................................................. 8

II.   **SUMMARY OF OPINIONS** ...................................................................... **9**

III. **UNDERSTANDING THE CONSUMER BUYING PROCESS** ................................. **12**

    A.   The consumer buying process depends on the information available and how this information is processed ............................................................................. 12

    B.   Surveys may be used to understand how consumers evaluate information in the buying process ................................................................................................ 15

IV. **DIRECTV'S WEBSITE AND ADVERTISING MATERIALS DO NOT SUFFICIENTLY DISCLOSE THE TERMS AND PRICE INCREASES RELATED TO DIRECTV'S PREMIUM CHANNEL OFFERING** ............................................... **23**

    A.   DIRECTV's original website and advertising materials do not sufficiently convey key characteristics of the premium channels offer to consumers ............................. 25

    B.   DIRECTV's original website and advertising materials do not sufficiently convey to consumers that they will be automatically charged for premium channels after the free three-month period unless they actively cancel these channels ......................... 26

    C.   DIRECTV's original website does not sufficiently convey to consumers that by submitting their order online, they agree to be automatically charged an additional monthly fee for the premium channels after the free three-month period, unless they actively cancel these channels ................................................................................... 31

    D.   DIRECTV's original website and advertising materials severely impair consumers' ability to notice or understand that the price of premium channels jumps to $47 per month after the free three-month period ................................................................... 33

V.   **DIRECTV'S WEBSITE AND ADVERTISING MATERIALS DO NOT SUFFICIENTLY DISCLOSE THE MONTHLY PRICE AND CANCELLATION TERMS ASSOCIATED WITH A TWO-YEAR DIRECTV CONTRACT** ............. **35**

    A.   DIRECTV's original website and advertising materials do not sufficiently convey key characteristics of the monthly price and two-year contract associated with DIRECTV's subscription service ............................................................................ 37

    B.   DIRECTV's original website and advertising materials do not sufficiently convey the duration of a DIRECTV contract to consumers .................................................. 39

CONFIDENTIAL

C.   DIRECTV's original website and advertising materials do not sufficiently convey the consequences of cancelling a DIRECTV subscription early ............................... 43

D.   DIRECTV's original website and advertising materials do not sufficiently convey the price increase in the second year ........................................................................ 49

VI.  **MY RESULTS ARE FURTHER SUPPORTED BY SELECTED FINDINGS IN THE ACADEMIC LITERATURE AND DIRECTV'S OWN RESEARCH ............ 56**

2

CONFIDENTIAL

# I.    INTRODUCTION

## A.   Qualifications

1.    I am the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University. I previously served as the Co-Director of the Center for Digital Economy Research and the Director of NYU's Stern Center for Measurable Marketing.

2.    Before joining the Stern School of Business in 2006, I was the E.T. Grether Professor of Business Administration and Marketing at the Haas School of Business, University of California at Berkeley. I joined the Haas School of Business in 1993 where I served as the Associate Dean for Academic Affairs, Marketing Group Chair, and the Ph.D. Director. I was also the Chair of the campus-wide Committee on Research (COR) and the University of California, Berkeley representative of the University of California system-wide Committee on Research.

3.    I hold a B.A. from Boğaziçi University in Turkey and an M.A. in Economics and a Ph.D. in Business Administration from the University of Alberta in Canada, with a major in marketing and minors in economics and statistics. My research interests include consumer behavior and choice, consumer decision-making under uncertainty, advertising, brand management and equity, econometric modeling, empirical modeling and quantitative analysis, marketing mix effectiveness, marketing research and pricing. I have published several papers in top journals in my field and have received best paper awards, as well as major research grants, including two major National Science Foundation (NSF) grants.

CONFIDENTIAL

4.    I served as the editor-in-chief of the *Journal of Marketing Research*, the preeminent academic journal of the American Marketing Association, which publishes work on consumer behavior, marketing science models, marketing strategy and marketing research methodologies. I also served as an Area Editor at a top-tier journal called *Marketing Science* and as Associate Editor for Quantitative Marketing and Economics at the *Journal of Consumer Research*. I serve as an editorial board member of many scholarly journals, including *Marketing Science*, *Journal of the Academy of Marketing Science*, *Marketing Letters*, and *International Journal of Research in Marketing*.

5.    I have more than 20 years of teaching experience, during which I have taught empirical market research, branding, brand and product management, marketing management and international marketing in undergraduate, MBA and executive education programs. I also have taught doctoral seminars on consumer choice and various aspects of marketing modeling. A complete list of my publications, honors, awards, and professional activities is provided in my CV, attached in Appendix A.

6.    From 2008 to 2012, I was an Academic Partner at Prophet, a branding and marketing consultancy firm. In this role, I helped Prophet to run several marketing research and consumer decision-making studies for Prophet's clients.

7.    I have served as an expert witness in several cases, on matters relating to marketing, consumer behavior, brand positioning, and brand equity. I have conducted, analyzed, and evaluated consumer surveys in these roles. My testimony has never been excluded from litigation due to any issue involving my qualifications or expertise. The list of cases where I submitted my testimony is available in Appendix B.

4

CONFIDENTIAL

8.    I am compensated at my standard rate of $950 per hour, plus expenses, for my work
in this case. In addition, I receive compensation based on the professional fees of
Analysis Group, Inc., a financial and economic consulting firm, which has provided
research support under my direction and supervision. My compensation is not
contingent on my findings or on the outcome of this case. The opinions I express in
no way are contingent on the compensation I will receive.

**B.    Background**

9.    Based on my review of the complaint in this matter ("Complaint"),[1] it is my
understanding that the U.S. Federal Trade Commission ("FTC") alleges that
DIRECTV has engaged in deceptive acts and practices related to the marketing and
advertising of its direct-to-home digital television services. The subscription services
were allegedly marketed and promoted in a way that made it difficult for consumers
to understand the costs associated with a two-year service contract. Specifically, that
"DIRECTV sought to lock customers into longer and more expensive contracts and
premium packages that were not adequately disclosed."[2]

*i.    Claims Relevant to My Opinions*

10.    I understand that the FTC alleges that DIRECTV acts or practices have violated
Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C.
§ 8403 in connection with the advertising, marketing, and sale of DIRECTV's multi-

---

[1]    Complaint for Permanent Injunction and Equitable Relief, *Federal Trade Commission v. DIRECTV and DIRECTV, LLC,* No. 15-cv-01229, United States District Court of Northern California, San Francisco Division, March 11, 2015 ("Complaint").

[2]    Chairwoman Edith Ramirez cited in Federal Trade Commission, "FTC Charges DIRECTV with Deceptively Advertising the Cost of Its Satellite Television Service," Press Release, March 11, 2015, https://www.ftc.gov/news-events/press-releases/2015/03/ftc-charges-directv-deceptively-advertising-cost-its-satellite, accessed August 24, 2016.

CONFIDENTIAL

channel video programming subscription service.[3] I understand that two specific practices are at issue in this matter: the advertisement, marketing, and sale of premium channels without appropriate disclosure of contract details to consumers, and the advertisement of base monthly prices without appropriate disclosure of contract details to consumers.

11.    <u>Premium Channels:</u> DIRECTV has represented to consumers that with the purchase of their programming package, premium channels (such as HBO, Cinemax, and Showtime) can be obtained for free for three months. However, according to the Complaint, DIRECTV failed to disclose or to adequately disclose to consumers certain conditions and costs of the offer, including:

    *a.*    "That Defendants automatically enroll consumers in a negative option continuity plan with significant charges;

    *b.*    That consumers must affirmatively cancel the negative option continuity plan before the end of the trial period to avoid charges;

    *c.*    That Defendants use consumers' credit or debit card information to charge consumers for the negative option continuity plan; and

    *d.*    The costs associated with the negative option continuity plan."[4]

12.    <u>Base Monthly Price:</u> DIRECTV has represented to consumers that their programming packages can be purchased for a twelve-month period for the advertised monthly prices. However, according to the Complaint, DIRECTV failed

---

[3]    Complaint, ¶¶30, 42.

[4]    Complaint, ¶¶31-32.

6

CONFIDENTIAL

to disclose or to adequately disclose to consumers certain conditions of the offer,

including:

    *a.* "The mandatory two-year agreement period, which carries an early

       cancellation fee, for the subscription service; and

    *b.* The significantly higher price for programming packages, typically $25 to $45

       per month higher, during the mandatory second year of the consumer's

       agreement."[5]

###     *ii.*  *Parties Involved*

13.    The FTC is an independent U.S. federal government agency that "enforces Section

    5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or

    practices in or affecting commerce" and "ROSCA, 15 U.S.C. §§ 8401 et seq., which

    prohibits certain methods of negative option marketing on the Internet."[6] The FTC

    can initiate federal district court proceedings to address violations of the FTC Act

    and ROSCA.[7]

14.    DIRECTV is "the largest provider of direct-to-home digital television service and the

    second largest provider in the multi-channel video programming distribution industry

    in the United States" and had approximately 20.3 million U.S. subscribers as of

    December 31, 2013.[8] DIRECTV has "engaged in acquiring, promoting, selling and

---

[5]    Complaint, ¶¶28-29.

[6]    Complaint, ¶5.

[7]    Complaint, ¶6.

[8]    Complaint, ¶10.

CONFIDENTIAL

distributing digital entertainment programming primarily via satellite to residential and commercial subscribers."[9]

### C. Assignment

15.    The FTC retained me in this matter, and asked me to evaluate whether:

    *a.*  DIRECTV's website and print advertisements clearly and conspicuously disclose that consumers will be automatically charged monthly fees for premium channels after the free three-month period unless consumers affirmatively cancel these channels;

    *b.*  DIRECTV's website clearly and conspicuously discloses that, by consumers submitting their order online, they agree to be automatically charged an additional monthly fee for the premium channels after the free three-month period, unless they affirmatively cancel these channels;

    *c.*  DIRECTV's website and print advertisements clearly and conspicuously disclose that DIRECTV contracts are two years in length;

    *d.*  DIRECTV's website and print advertisements clearly and conspicuously disclose that there is a cancellation fee by cancelling a DIRECTV subscription early; and,

    *e.*  DIRECTV's website and print advertisements clearly and conspicuously disclose the price consumers will pay for the advertised programming package(s) in the second year of a 24-month subscription agreement.

---

[9]    DIRECTV Form 10-K for Fiscal Year 2014, p. 2.

CONFIDENTIAL

16. I determined that two separate studies would be required to answer these questions. In this report, I present the results of these studies. The first study addresses DIRECTV's premium channel offer; the second study addresses the monthly price and contract terms associated with a DIRECTV subscription agreement.

17. In preparing this report, I have relied on information from a variety of sources, including, among others: my study results, academic literature, and selected depositions and other materials produced in this case. A list of materials that I relied upon in reaching my conclusions is provided in Appendix C.

18. In the event I am provided with additional relevant materials, I reserve the right to supplement this declaration with additional conclusions, bases, and/or supporting material.

## II.    SUMMARY OF OPINIONS

19. My opinion is based on (i) my expertise in marketing, consumer behavior and decision-making, and marketing research, (ii) materials I have reviewed in conjunction with this matter, and particularly, (iii) the results I obtained through the two studies I designed, conducted, and analyzed.

20. My studies test the effect of DIRECTV's own disclosures in their marketing materials and website against more clearly outlined disclosures on consumer recognition and understanding. Specifically, my studies test whether and to what extent consumers recognize, understand, or are confused by the price and related contract terms of a DIRECTV subscription (i.e., premium channels, monthly price, and other terms). My opinions are as follows:

CONFIDENTIAL

a. My results demonstrate that only one-fifth of respondents who viewed DIRECTV's original website understood the negative option plan and that the rate of understanding more than doubled when I amended the website to include clearer and more conspicuous disclosures. Similarly, my results show that the level of understanding increased when I amended DIRECTV's original print advertisement to include clearer and more conspicuous disclosures. Therefore, DIRECTV's original website and advertising materials do not sufficiently convey to consumers that they will be automatically charged for premium channels after the free three-month period unless they actively cancel these channels.

b. My results demonstrate that less than one-fifth of respondents understood that they were agreeing to be automatically charged when submitting an order online and that the rate of understanding more than doubled when I amended the original website to include clearer and more conspicuous disclosures. Therefore, DIRECTV's original website does not sufficiently convey to consumers that by submitting their order online, they agree to be automatically charged an additional monthly fee for the premium channels after the free three-month period, unless they actively cancel these channels.

c. My results demonstrate that an extremely small fraction (one-fortieth) of respondents who viewed DIRECTV's original website understood that the price of premium channels jumps to $47 per month after an initial free period and that the rate of understanding increased by a factor of more than 10 when I amended the website to include clearer and more conspicuous disclosures.

10

CONFIDENTIAL

or temporally distant from the base price, as marketers sometimes do, but may also occur when it is presented near the base price."[129]

110.　Taken together, the academic literature provides convincing evidence that disclosures must be designed within the limitations of consumer processing in order to enable sufficient understanding. In my surveys, I included clearer and more conspicuous disclosures to inform consumers about the required 24-month agreement and the increased second-year base monthly price immediately adjacent to the advertised first year base monthly price. I tested these amended disclosures against DIRECTV's less clear and less conspicuous original disclosures and found that my studies and the academic literature on information disclosures arrive at similar conclusions.

Tülin Erdem

September 14, 2016

---

[129]　Morwitz, Vicki G., Eric A. Greenleaf and Eric J. Johnson, "Divide and Prosper: Consumers' Reactions to Partitioned Prices," *Journal of Marketing Research,* Vol. 35, No. 4, 1998, pp. 453-463, at p. 455.

CONFIDENTIAL

# APPENDIX E
# SURVEY IMPLEMENTATION AND ADMINISTRATION

CONFIDENTIAL

**APPENDIX E.1**
**SURVEY IMPLEMENTATION AND ADMINISTRATION**
**PREMIUM CHANNELS STUDY**

*E-2*

CONFIDENTIAL

## I.  Premium Channels Study Implementation

1.  My Premium Channels Study examines consumers' understanding of certain elements of the "offer of free premium channels"[1] included as part of a DIRECTV subscription agreement. Both the Premium Channels Website Survey and the Premium Channel Print Survey components of my Premium Channels Study use an experimental design to assess whether and to what extent certain amendments to DIRECTV's marketing materials and original website make it easier for consumers to process the additional information provided and understand the terms related to premium channels associated with a DIRECTV subscription agreement.

### A. Premium Channels Website Survey Implementation

2.  Following my experimental design, respondents recruited to the Premium Channels Website Survey were randomly assigned to one of two subgroups: in one subgroup, respondents saw DIRECTV's original website ("Original Group")[2] and in the other, respondents saw an amended version of DIRECTV's website ("Treatment Group").[3] I made one minor change to the websites presented to both the Original and Treatment Groups, modifying all year references from "2013" to "2016" in order to present all respondents with a current decision-making scenario.

3.  I amended the website viewed by the Treatment Group with several clear and noticeable disclosures. I kept the main content and formatting of the DIRECTV website intact to preserve the external validity of the study, but I included additional clarifying information related to the FTC's allegations, and adjusted the color and

---

[1]   Complaint, ¶19, 23, 24.

[2]   See Exhibit E.1.

[3]   See Exhibit E.2.

CONFIDENTIAL

placement of certain disclosures. See Appendix F.1 for a side-by side comparison of the two websites, with changes to the treatment website circled.

4.      All respondents (both Original and Treatment groups) answered the same survey. Programmer instructions for the Premium Channels Website Survey are presented in Appendix H.1.

### B. Premium Channels Print Survey Implementation

5.      Respondents recruited to the Premium Channels Print Survey were randomly assigned to one of two subgroups: in one subgroup, respondents saw DIRECTV's original print advertisement ("Original Group")[4] and in the other, respondents saw an amended version of DIRECTV's print advertisement ("Treatment Group"). I made one minor change to the print advertisements presented to both the Original and Treatment Groups, modifying all year references from "2013" to "2016" in order to present all respondents with a current decision-making scenario.

6.      I amended the advertisement viewed by the Treatment Group with several clear and noticeable disclosures. I kept the main content and formatting of the DIRECTV print advertisement intact to preserve the external validity of the study, but I included additional clarifying information related to the FTC's allegations, and adjusted the color and placement of certain disclosures. See Appendix F.2 for a side-by side comparison of the two advertisements, with changes to the treatment advertisement circled.

---

[4]    See FTC-KERN-002907.

CONFIDENTIAL

7.      All respondents (both Original and Treatment groups) answered the same survey, which asked identical questions about the print advertisement they were exposed to.[5] Programmer instructions for the Premium Channels Print Survey are presented in Appendix H.2.

**II.      Premium Channels Study Administration**

8.      Under my direction, Survey Sampling International ("SSI") pretested the Premium Channels Website and Print Surveys on July 29, August 1, and August 2.[6] Over the course of these three days, blind-to-the-purpose interviewers called and interviewed a total 35 pre-screened respondents.[7] The interviewers directed the respondents to the survey instrument (provided as a link via an email invitation) and instructed them to "think out loud" if they desired and to be thorough in their responses. After completing the survey, respondents were asked a series of seven follow-up questions to determine whether the respondents faced any problems or difficulties, found any of the questions or answer options unclear, or could guess the purpose of the survey.[8] After a careful review of the answers to the seven follow-up questions, a minor

---

[5]     The Premium Channels Print Survey instrument was identical to the Premium Channels Website Survey instrument, except that the Premium Channels Print Survey did not ask Question Q10, which asked, "By clicking 'Submit My Order,' are you or are you not agreeing to be automatically charged an additional monthly fee for premium channels after the initial free period, unless you cancel your premium channel subscription?". See Appendices H.1 and H.2.

[6]     Pretests were also conducted on the Monthly Price Website Survey at the same time.

[7]     These 35 respondents were split among the three pretested surveys.

[8]     See Appendix D for the complete pretest moderator script.

CONFIDENTIAL

change was made to the instructions; no changes were made to the screener questions or main questionnaire.[9]

9.     To administer the Premium Channel Website Survey and the Premium Channel Print Survey, I worked with California Survey Research Services, Inc. ("CSRS") for programming and hosting of the survey instruments. Good Research, a specialist in online research, programmed and hosted the website stimuli for the Premium Channels Website Survey. Panel provider Research Now Group, Inc. ("Research Now") recruited respondents through its online panel.[10] For all four of my surveys, Research Now recruited respondents from its panel via an email invitation.[11] Research Now ensured that the incoming sample was balanced to be representative of the U.S. adult population in terms of age, gender, and region.

10. Upon clicking the survey link, respondents were given instructions and directed to the screener questions. The screener questions limited respondents to those who fit the target population, which consisted of anyone who:

    a.    Was considering subscribing to cable or satellite TV, or was considering changing their existing subscription to cable or satellite TV[12];

---

[9]  On the first night of pretests, two respondents reported slight difficulty clicking through the website stimuli. Based on this feedback, I adjusted the instructions, which made it easier for respondents to navigate the website. In the two remaining nights, respondents did not report any further difficulties navigating the updated website.

[10]  Research Now is a reputable panel company with "one of the world's largest and most diversely represented global panels." See "Audiences and Data Collection," *Research Now*, https://www.researchnow.com/audiences-data-collection/.

[11]  See Appendix G for a standard Research Now survey invitation. The topic was "Study about consumers." The incentive was "$4 in e-Rewards currency." The length was "15 minutes."

[12]  See Screener Question S6 of the Programmer Instructions for the Premium Channels Website Survey (Appendix H.1) and Screener Question S6 of the Programmer Instructions for the Premium Channels Print Survey (Appendix H.2).

CONFIDENTIAL

      b.    Would be substantially or primarily involved in the decision-making process when selecting the new TV service[13]; and

      c.    Did not have any prior opinions or specialized knowledge on the topic of interest.[14]

11.    After the screener section of each survey, qualified respondents proceeded to the main questionnaire. Screenshots of the Premium Channels Website Survey, as experienced by respondents, are presented in Appendix I.1. Similarly, screenshots of the Premium Channels Print Survey, as experienced by respondents, are presented in Appendix I.2.

---

[13]   See Screener Question S7 of the Programmer Instructions for the Premium Channels Website Survey (Appendix H.1) and Screener Question S7 of the Programmer Instructions for the Premium Channels Print Survey (Appendix H.2).

[14]   See Screener Question S5 of the Programmer Instructions for the Premium Channels Website Survey (Appendix H.1) and Screener Question S5 of the Programmer Instructions for the Premium Channels Print Survey (Appendix H.2).

CONFIDENTIAL

# APPENDIX E.2
# SURVEY IMPLEMENTATION AND ADMINISTRATION
# MONTHLY PRICE STUDY

*E-8*

CONFIDENTIAL

# I.    Monthly Price Study Implementation

1.    My Monthly Price Study examines consumers' understanding of disclosed details of a DirecTV contract. Both the Monthly Price Website Survey and the Monthly Price Print Survey components of the Monthly Price Study use an experimental design to assess whether and to what extent certain amendments to DirecTV's marketing materials and original website make it easier for consumers to process the additional information provided and understand the terms related to a DirecTV contract.

### A. Monthly Price Website Survey Implementation

2.    Following my experimental design, respondents recruited to the Monthly Price Website Survey were randomly assigned to one of two subgroups: in one subgroup, respondents saw DirecTV's original website ("Original Group")[1], and in the other, respondents saw an amended version of DIRECTV's website ("Treatment Group").[2] I made one minor change to the websites presented to both the Original and Treatment Groups, modifying all year references from "2013" to "2016" in order to present all respondents with a current decision-making scenario.

3.    I amended the website viewed by the Treatment Group with several clear and noticeable disclosures. I kept the main content and formatting of the DIRECTV website intact to preserve the external validity of the study, but I included additional clarifying information related to the FTC's allegations, and adjusted the color and placement of certain disclosures. See Appendix F.1 for a side-by side comparison of the two websites, with changes to the treatment website circled.

---

[1]    See Exhibit E.1.

[2]    See Exhibit E.2.

CONFIDENTIAL

4.      All respondents (both Original and Treatment groups) answered the same survey. Programmer instructions for the Monthly Price Website Survey are presented in Appendix H.3.

**B. Monthly Price Print Survey Implementaiton**

5.      Respondents recruited to the Monthly Price Print Survey were randomly assigned to one of two subgroups: in one subgroup, respondents saw DIRECTV's original print advertisement ("Original Group")[3] and in the other, respondents saw an amended version of DIRECTV's print advertisement ("Treatment Group"). I made one minor change to the print advertisements presented to both the Original and Treatment Groups, modifying all year references from "2013" to "2016" in order to present all respondents with a current decision-making scenario.

6.      I amended the advertisement viewed by the Treatment Group with several clear and noticeable disclosures. I kept the main content and formatting of the DIRECTV print advertisement intact to preserve the external validity of the study, but I included additional clarifying information related to the FTC's allegations, and adjusted the color and placement of certain disclosures. See Appendix F.2 for a side-by side comparison of the two advertisements, with changes to the treatment advertisement circled.

7.      All respondents (both Original and Treatment groups) answered the same survey, which asked identical questions about the print advertisement they were exposed to. Programmer instructions for the Monthly Price Print Survey are presented in Appendix H.4.

---

[3]    See FTC-KERN-002907.

CONFIDENTIAL

## II.    Monthly Price Study Administration

8.    Under my direction, Survey Sampling International ("SSI") pretested the Monthly Price Website Survey on July 29th, August 1st, and August 2nd.[4] Over the course of these three days, blind-to-the-purpose interviewers called and interviewed a total 35 pre-screened respondents.[5] The interviewers directed the respondents to the survey instrument (provided as a link via an email invitation) and instructed them to "think out loud" if they desired and to be thorough in their responses. After completing the survey, respondents were asked a series of seven follow-up questions to determine whether the respondents faced any problems or difficulties, found any of the questions or answer options unclear, or could guess the purpose of the survey.[6] After a careful review of the answers to the seven follow-up questions, a minor change was made to the instructions; no changes were made to the screener questions or main questionnaire.[7]

9.    To administer the Monthly Price Website Survey and the Monthly Price Print Survey, I worked with California Survey Research Services, Inc. ("CSRS") for programming and hosting of the survey instruments. Good Research, a specialist in online research, programmed and hosted the website stimuli for the Monthly Price Website Survey. Panel Provider Research Now Group, Inc. ("Research Now")

---

[4]    Pretests were also conducted on the Premium Channels Website and Print Surveys at the same time.

[5]    These 35 respondents were split among the three pretested surveys.

[6]    See Appendix D for the complete pretest moderator script.

[7]    On the first night of pretests, two respondents reported slight difficulty clicking through the website stimuli. Based on this feedback, I adjusted the instructions, which made it easier for respondents to navigate the website. In the two remaining nights, respondents did not report any further difficulties navigating the updated website.

CONFIDENTIAL

recruited respondents through its online panel.[8] For all four of my surveys, Research Now recruited respondents from its panel via an email invitation.[9] Research Now ensured that the incoming sample was balanced to be representative of the U.S. adult population in terms of age, gender, and region.

10.      Upon clicking the survey link, respondents were given instructions and directed to the screener questions. The screener questions limited respondents to those who fit the target population, which consisted of anyone who:

     a.      Was considering subscribing to cable or satellite TV, or was considering changing their existing subscription to cable or satellite TV[10];

     b.      Would be substantially or primarily involved in the decision-making process when selecting the new TV service[11]; and

     c.      Did not have any prior opinions or specialized knowledge on the topic of interest.[12]

11.      After the screener section of each survey, qualified respondents proceeded to the main questionnaire. Screenshots of the Monthly Price Website Survey, as experienced by respondents, are presented in Appendix I.3. Similarly, screenshots of

---

[8]      Research Now is a reputable panel company with "one of the world's largest and most diversely represented global panels. See "Audiences and Data Collection," *Research Now*, https://www.researchnow.com/audiences-data-collection/.

[9]      See Appendix G for a standard Research Now survey invitation. The topic was "Study about consumers." The incentive was "$4 in e-Rewards currency." The length was "15 minutes."

[10]      See Screener Question S6 of the Programmer Instructions for the Monthly Price Website Survey (Appendix H.3) and Screener Question S6 of the Programmer Instructions for the Monthly Price Print Survey (Appendix H.4).

[11]      See Screener Question S7 of the Programmer Instructions for the Monthly Price Website Survey (Appendix H.3) and Screener Question S7 of the Programmer Insturctions for the Monthly Price Print Survey (Appendix H.4).

[10]      See Screener Question S5 of the Programmer Instructions for the Monthly Price Website Survey (Appendix H.3) and Screener Question S5 of the Programmer Instructions for the Monthly Price Print Survey (Appendix H.4).

CONFIDENTIAL

the Monthly Price Print Survey, as experienced by respondents, are presented in Appendix I.4.

CONFIDENTIAL

# EXHIBIT 82

Clarity in Prime Subscription communications – Privileged & Confidential

1   1. **Introduction & Overview**
2   Prime's mission is to be the Earth's largest and most loved membership program. We are proud of the value and experience
3   Prime delivers to our members and of the trust that customers place in Prime to deliver disproportionate value to their lives. In
4   2020, the Prime member base grew ▮▮▮▮ YoY to ▮▮▮▮ members WW, 60 paid day member yield increased ▮▮▮▮ to
5   ▮▮, paid member churn was down ~50bps YoY and engagement with all major benefits grew YoY (from ▮▮▮▮ for shipping
6   to ▮▮▮▮▮ for Prime Video). However, based on customer sentiment as captured in CS contacts, Prime cancellation survey
7   responses and customer research studies, we are aware that a segment of customers are confused when interacting with
8   Prime's onsite CX – leading to negative outcomes including mistaken sign-ups, unexpected renewal/charges, and/or difficulty
9   cancelling a Prime membership. Prime has launched initiatives to reduce these unintended signups, keep members informed of
10  their membership status and to simplify the cancellation process but have not scaled these up globally since these initiatives
11  negatively impact member growth without an objective way to quantify commensurate customer clarity gains.
12
13  We believe that these frustrations disproportionately impact specific customer segments, but we do not have signals along the
14  entire customer journey that enable us to isolate these customers and create customized solutions for their needs. Therefore,
15  in an attempt to address these frustrations to date, we have had to launch untargeted clarity initiatives which impact the entire
16  customer pool/member base and have created large headwinds (▮▮▮▮ annualized paid member impact from signup clarity
17  initiatives) without a measurable improvement in clarity for customers/members. When we add friction to the signup process,
18  for instance, we force all customers to pause before signing up for Prime, including those who want to try and will go on to
19  become satisfied Prime members.
20
21  We firmly believe it is in our customers' best interests to experience Prime and realize the full range of benefits and value it
22  adds. With shipping, for instance, while the value to the current transaction is clear (save $x if you are Prime), the longer-term
23  value of never having to worry about shipping is not. Our current CX and business baseline, are optimized towards making it
24  frictionless to join Prime and convenient to exit Prime, especially for members dissatisfied with Prime. While we believe the
25  vast majority of our customer base interacts with the Prime CX with convenience, we are appropriately concerned about
26  customer frustrations and have developed proposals that put us on a path to resolve these. The purpose of today's meeting is
27  to align on a mental model that enables us to set the right balance between business growth and clarity improvements going
28  forward. Specifically, we seek alignment on the following three questions:
29      i)    How much friction should we add to the signup process knowing that these initiatives comes at a cost in terms of
30            signups and member balance?
31      ii)   How easy should we make it to cancel Prime?
32      iii)  Are we focusing on the right areas in our forward-looking clarity initiatives?
33
34  2. **Mental Model for clarity**
35  Our North Star for clarity is to have 100% of the Amazon customer base experience the value of Prime and feel informed about
36  their membership status: "I know I have joined Prime, a paid subscription program, am aware how much and when I'm paying,
37  I'm excited to be a Prime member and I can easily cancel if I want to." Working backwards from this vision, we firmly believe it
38  is in our customers' best interests to experience Prime and we will create means to entitle as many customers as possible to try
39  Prime, to focus on increasing member engagement and awareness throughout the customer journey and to provide
40  customized and convenient exit ramps for members who wish to leave Prime.
41
42  Moving forward, we want to align on our mental model that clarity is a continuous, holistic effort covering the entire customer
43  journey from ingress to the desired end point. We will deploy a segmented approach where members will receive targeted
44  clarity-focused communications based on our signals about them. Since our signals improve as member's tenure and
45  engagement with Prime increase, we will bias towards a broad approach in the beginning, creating a low friction signup
46  experience, and will increase awareness and engagement related communications as we learn more about members. We will
47  invest in improving our signals and mechanisms to identify clarity related issues, iterate on solutions and scale globally. Our
48  intent is to create an 'as automated as possible' approach to clarity measurement and enforcement, grounded in common
49  tenets, that will be scaled WW.
50

CONFIDENTIAL TREATMENT REQUESTED                                                              AMZN_00027881

Clarity in Prime Subscription communications – Privileged & Confidential

**3.  Tenets for Clarity in Prime Subscription Communications (unless you know better):**

1.  **We are proud of the Prime value proposition.** We believe in and are proud of Prime's value proposition, and believe it is in our customers' best interests to experience Prime in a seamless manner while engaging with Amazon.
2.  **We believe in the AND – growth and clarity.** We set a high bar for ourselves to continue to drive business growth while ensuring members feel informed about all aspects of their subscription. We view clarity as an operational dial and we will weigh all factors to make the right calls for the long-term health of the business.
3.  **Clarity needs to be assessed in the context of an overall journey, not as a single transaction.** We view clarity as an end goal that we will accomplish across the course of a customer's entire journey with Prime.
4.  **The assessment of 'what's clear' varies by customer, and so must our approach to driving clarity.** We will not default to or mandate a generic, global approach to the problem. We will develop signals and solutions that address the needs of the smallest customer cohorts possible and will develop localized guidelines and solutions where relevant.
5.  **We will make improvements to clarity without perfect measures in place:** When making changes related to clarity, we strive to create fine grained metrics to detect impact of changes and improvements in CX. We will continually improve our metrics but we won't wait until we have those perfect to make improvements

**4.  Discussion Topics / Questions for alignment**

    **A.  How much friction should we add to the signup process knowing that these initiatives comes at a cost in terms of signups and member balance?**

One of the top issues that has surfaced through the Prime cancellation survey, CS contacts and customer frustrations is that segments of customers are not always aware that they are signing up for Prime and even those who do sign up knowingly are not aware of the terms of renewal or the ongoing financial obligations of the subscription. In 2020, there were ▮▮▮▮ Prime sign-ups in the US, and of these, ▮▮▮▮ (▮▮▮) proceed to cancel, self-reporting themselves as "mistakenly signed up" in the cancel survey, representing ▮▮ of self-reported cancel reasons.

However, the issue continues to surface in customer frustrations - 24 of the 130 open Prime customer frustrations are related to unintended Prime signups and Customer Service estimates that we receive ▮▮▮ annual contacts regarding mistaken sign up or unexpected renewal charges (▮▮ of total Prime cancellation contacts, ▮▮▮ of total Prime contacts). The primary contributing issues to these frustrations are unclear CTAs and details of the membership (price, renewal terms) being confined to the Terms & Conditions. For example, customers have clicked on the sign-up button on the Prime interstitial in checkout (UPDP) that says "Get FREE one-day delivery", not realizing this signs them up for a Prime membership or they have missed the "No thanks" option when it is presented as a link rather than a button. Please see verbatim from one customer below and more details and anecdotes demonstrating shopper frustration themes, including video clips and screenshots, under Appendix A.

*"This is something that has never happened to me before! I fell for it! (The sign up button) has to be obvious and not like you're falling into a trap. But no, the way it is now, it's so well-placed, it's going to get clicked…people will click on it unconsciously. I'm furious. I'll have to rethink if I'm shopping on Amazon. Before (on the detail page) it said 'Free shipping', so I didn't expect that consequence from the (sign-up) button. I'm frustrated that they set a trap, that they work with such methods."*

We have made attempts to address these specific frustrations through CX changes and product initiatives (see FAQ 1), with the hypothesis that these clarity-enhancing improvements would reduce upfront signups, but we would see increased benefit usage and member yield due to more aware and engaged members. However, clarity enhancements in checkout have consistently resulted in a negative membership impact (▮▮▮▮▮▮ estimated annualized global impact from updates to Prime checkout interstitial) without an objective indication that we have significantly improved clarity for our member base.  For example, in Sep 2020, we introduced a set of clarity updates to UPDP in the US. The changes include updating the decline option from a link to a "No Thanks" button, ensuring the price of Prime was visible outside the T&Cs, and ensuring the accept CTA included "Prime" or "Free Trial". Each change was tied to a longstanding customer frustration ticket (Appendix E). We conducted user testing with a panel of 6 customers before implementing these changes; all users indicated that they preferred the new CX and found it to be more clear and less confusing than the original. However, these changes led to a ▮▮ decline in signup rates, and were estimated to have an annualized global impact of ▮▮▮ paid members. We did not observe a significant change in CS contacts (Free Trial templates saw a ▮▮ reduction in CS contacts, other templates saw slight increases in contact rates of ▮▮▮) or benefit engagement (increased ▮▮▮ for hard offer signups from ▮▮ to ▮▮, but declined ▮▮▮ for free trial signups).

Based on results from our experiments, we believe tightening clarity at a single transaction at signup is not the right approach and that such highly impactful changes to the CX should not be introduced abruptly given the shock to business performance.

CONFIDENTIAL TREATMENT REQUESTED                                                      AMZN_00027882

Clarity in Prime Subscription communications – Privileged & Confidential

105    Instead, per our mental model, we will drive clarity as a continuum of ongoing initiatives, opting for a lenient approach in the
106    beginning and increasing clarity-focused communications as we get more information about member's actions. For instance,
107    we will test a confirmation CX for new Prime members (ETA - 2/26, see Appendix D for mocks), and pending those results, will
108    test an automatic reminder email to customers who have not used a benefit on the 27th day of their free trial (DFAD 3/10).
109    This approach leaves an undesirable gap in our signup CX that continues to surface in customer feedback and is also viewed as
110    a trustbusting defect by internal partner teams, who recommend we fix these issues immediately. We seek alignment on
111    whether we can accept the current CX while we test solutions that improve CX clarity over a longer period of time. If not, are
112    we willing to absorb a hit to business performance and how much?

113

114        **B.  How easy should we make it to cancel Prime?**

115    The online cancelation flow is three pages long, and contains information pertinent to the customer's membership (alternate
116    plan types, Prime benefits). Customers enter the cancelation flow by clicking on 'end my membership' within the Prime
117    management page. We know through CS contact mining, cancel survey free form text, and customer studies that a certain
118    segment of customers finds the online cancelation flow hard to find and navigate. Further, some customers don't realize that
119    there are multiple steps, and may abandon the flow prematurely on the incorrect assumption that they finished. As Kevin
120    (Munich, 2019) stated, "*Amazon makes it extremely difficult to make the cancellation final, because of the many steps we have just
121    taken...As a customer I expect a certain degree of appreciation...that I can do things efficiently. I had to tell them several times that I
122    absolutely wanted to cancel it...I can imagine that many people would not finish the cancellation, because of these many steps.*" Recent
123    customer complaints in the EU and US[1] are consistent with these customer pain points.
124    However, data from the cancel flow (Appendix C) suggest that the vast majority of users achieve their objectives. ▇ of those
125    that enter the flow make it through to the last page. Of those that enter the flow and choose not to cancel, only ▇ choose to
126    subsequently call CS and cancel. Over ▇ of those that choose not to cancel also use benefits within the next 30 days
127    (▇▇▇▇▇ vs average Prime member base), indicating high degree of intentional behavior.
128    Prime invests heavily in the cancel flow because it is currently disproportionately easy to cancel via CS. Over ▇ of
129    cancelations that happen via CS happen without any prior engagement on Amazon (in the trailing 48 hours leading up to
130    cancelation), likely via Google search, and CS cancelations are quick/instantaneous even when members are on the fence about
131    canceling their membership (this is because CS goals are around call handle time, and positive feedback scores). Based on
132    customer pain points, we adopted an approach of segmentation and personalization for groups of customers that need drastic
133    simplifications to their cancelation process. We started increasing the visibility of Prime membership management flows on
134    high traffic Prime locations, to certain sets of customers (i.e. low propensity to remain Prime, high propensity to cancel via CS).
135    Surprisingly, these initiatives were highly member accretive ▇▇ members retained WW), along with ▇▇ reductions in CS
136    contacts, indicating that when membership management is made highly accessible to certain targeted sets of customers, they
137    end up engaging with the membership. Over 2019 and 2020, Prime has succeeded in channeling over ▇▇ of share of
138    cancels from CS to Prime (resulting in over ▇ member renewals annually) via targeting selective members more actively
139    with easier links into the online cancel flow.
140    In 2021, our objectives are twofold. One, we want to simplify the cancel flow by improving accessibility and personalization,
141    and potentially revising the flow to be shorter. We have a named initiative (project Café), that is aiming to move at least two
142    pieces of the cancel workflow to the upstream membership management page (Prime Central) in 1H 2021, thereby shortening
143    the flow. Second, we want to make it easier for certain customers to access the online cancelation flow, by potentially
144    elevating visibility to it. We believe this is a segmentation and targeting problem, primarily: our challenge is to identify
145    customers that are otherwise likely to cancel via CS, or cancel with distress, and offer them an easier ingress into our online
146    flow. We have already found success with this approach in 2020 and in Q1, we are iterating on two potentially highly frustrated
147    populations: mistaken signups (where we are building a confirmation CX ahead of renewal) and high engagement with CS
148    (where we plan to offer links to member management/cancelation flow).
149    Our approach is to create targeted options for customers to exit Prime, selectively bringing cancel options forward for some
150    segments, while taking others through a longer path, communicating the benefits of a membership and persuading them to
151    stay Prime. However, we realize that Prime has a large and diverse customer base and complaints from even a small segment
152    of customers can be corrosive to the long term health of the Prime and Amazon brand. We seek alignment on whether our
153    current approach of segmenting our customer base and creating targeted cancellation solutions is the right approach. If not,
154    should we lean in towards a strategy that simplifies cancelation across the board, including enabling a one click cancellation for
155    all customers or auto cancelling all customers that have not used benefits for a specific period?
156

---

[1] The Prime cancel flow is the subject of a complaint made to Norway's Consumer Council (NCC) citing a report ("You can log out but you can never leave") as
well as an FTC complaint in the US.

Amazon Privileged & Confidential                                                                                                         3

Clarity in Prime Subscription communications – Privileged & Confidential

157      **C.   Are we focusing on the right areas in our forward-looking clarity initiatives?**

158 Moving forward, we view clarity as an ongoing work stream across multiple teams in Prime. Our initiatives are focused on
159 improving our signals and measurement, standardizing and enforcing design best practices and guidelines and driving CX
160 improvements and experiments on Prime-owned locations
161    a.   ***We will improve our mechanisms and metrics for tracking clarity improvements:*** In our efforts to date, we have been
162      hampered by the subjective nature of assessing clarity and the lack of a defined framework for measuring clarity-related
163      improvements and tradeoffs. To date, we have tracked benefit usage and engagement as post experiment metrics,
164      checking performance to measure the efficacy of clarity experiments. However, we do know that awareness improves with
165      benefit engagement[2] and based on this insight, we will start with benefit engagement as an indicator of member
166      awareness and work backwards to drive up benefit usage with targeted strategies. Benefit engagement will be tracked as a
167      key metric along with paid members, for each marketplace and as a dial up criteria for each product launch and content
168      experiment. With ▮▮▮▮▮ (▮▮▮▮) of Paid Prime Members not using a Prime benefit, this aligns clarity measures with
169      Prime activation activities and provides an opportunity to create segment specific tactics that improve overall member
170      engagement.
171      We are also developing a predictive, ML driven approach (Project Nostradamus) to determine unaware members and drive
172      remediation actions for them. We will leverage the Prime cancel survey to isolate the segment of customers who report
173      being unintended signups, identify patterns of behavior/customer journeys that could be leading to unaware members
174      and create remediation actions to continually decrease this segment of customers.
175    b.   ***We will leverage automation to reduce subjectivity in assessing clarity:*** In the absence of clarity frameworks and metrics,
176      we rely on subjective assessments from marketers and customers in determining what is clear. In some cases, internal
177      assessments of clarity do not match customer perceptions. For example, in one experiment UPDP decline CTA copy that
178      says "Continue without fast, free delivery" was considered to be a 'clear' improvement, yet we saw a statistically
179      significant uptick in CS contacts with concessions (▮▮▮▮ lift), as some customers didn't immediately recognize it as a
180      decline option. We are now leveraging User Testing, a tool that enables rapid customer feedback on CX, to get feedback on
181      new treatments and experiments. However, feedback is limited to < 6 customers at a time and may not capture the
182      diverse user base we serve. To safeguard from regressions within the Prime CX, we have partnered with internal design
183      teams to develop a set of clarity guidelines that will be applied to new content experiments and enforced through our
184      automated content QA process (Project Snare). We will continually vet and refine these guardrails based on customer
185      feedback to validate that these changes are improving our experience for customers. From this set of guidelines, we will
186      build localized guidelines and solutions that allows for customization based on individual locale conditions.
187    c.   **CX enhancements:** As described earlier in this document, we will prioritize initial clarity efforts on improving the discovery
188      and ease of cancellation, test a post-signup confirmation CX and reminders. We are also exploring an option to show Prime
189      subscription fees as part of the "Your Order" page to raise visibility of the Prime charge for new signups and for tenured
190      members (pending prioritization by the Your Orders team). Further, we will partner with Shopping Design to brainstorm
191      and iterate on signup experiences that raise the bar on clarity while staying net neutral or positive on member impact.
192
193 We seek input if we are focused on the right actions to drive a clearer CX. Should we explore bolder ideas, such as a different
194 GW or site experience for Prime members that makes their status very clear?
195

196
197 **FAQ**
198
199      **1.   What are the clarity experiments we have run to date?**
200 Since 2018, Prime has run 45+ content experiments exploring combinations of clarity elements to enhance the customer
201 experience (See Appendix E for screenshots and results). Content experiments covered three general themes: high traffic
202 location CTAs, alternative Checkout experiences, and post signup enhancements.
203 **Prime checkout content updates :**
204      •   In January 2020, we launched a US clarity experiment to measure impact of CX improvements that addressed a variety
205         of critical shopper frustrations including clearer CTAs in two UPDP use cases, adding a decline CTA button, increasing

---

[2] *In 2019 the Prime France Retention team surveyed 9+ month paid Prime members ▮▮▮▮ asking whether they were Prime or not (Yes/No), and analyzed the accuracy of their responses. The team found that over a third incorrectly reported that they were not Prime, and that many of these customers still had used benefits. For example, when customers made 2-4 Prime free shipping orders in 10 months, ▮▮▮▮ incorrectly reported that they were not Prime. By contrast, when customers used multiple Prime benefits (shipping and digital), and used them frequently, only ▮▮▮▮ incorrectly reported their Prime status.*

Amazon Privileged & Confidential                4

Clarity in Prime Subscription communications – Privileged & Confidential

206      price prominence, and removing the grey shadow below the positive CTA. From this experiment, a treatment
207      featuring a clearer positive CTA drove a ▮ decrease in signups or a ▮ decline in paid members along with a ▮
208      decline in Prime cancellations, and a ▮ decrease in CS contacts. Overall, the experiment was projected to drive an
209      annualized paid member impact of ▮ paid members in the US and was not dialed up.
210   • In Q3 2020, the EU5 Shared Services team tested over 20 iterations of the UPDP CTAs, changing both copies and
211      button design. Impact to signups has varied significantly by country, ranging from ▮ ▮ annualized paid
212      members, in UK) to ▮ (▮ annualized paid members, in DE).
213   • In UK, we experimented with suppressing UPDP altogether in Q3 2020 to assess (i) checkout locations saturation, and
214      (ii) cannibalization of checkout locations. The Mobile treatment limited signup impact to ▮ ▮ estimated
215      annualized UK paid members) but the Desktop treatment drove a ▮ signup impact (▮ estimated annualized UK
216      paid members). Prime cancellations, CS contacts, conversion rate and benefits usage analysis has not shown clear
217      indications of improved customer clarity. The team continues to gather additional learnings from suppression.
218   • Project Lucent in 2018 was a collection of experiments addressing clarity-related issues, including changes to CTAs and
219      pricing display. Impact to signups were significant and negative across 5 variations tested, ranging from ▮ (▮
220      annualized paid members, in US) to ▮ ▮ annualized paid members, in US). Customer Service cancellation
221      rates improved (ranging from ▮ to ▮ across treatments) but the analysis indicated the signup rate decline was not
222      mitigated by paid member conversion improvements and the team did not launch as it showed to be net negative
223      impact (between 6.1 to 9.3 paid members lost per reduced CS cancel).

224 **ASINization:** ASINization adds Prime to a customer's shopping cart similar to a product ASIN and the subscription does not
225 begin until a customer completes checkout. This feature was launched in 2019 in the US, and launched in JP in Q3 2020. In the
226 US, UX studies showed that customers were still unclear they had signed up for Prime. We saw drops in signup rates (▮ to -
227 ▮), leading to an estimated impact between ▮ and ▮ annualized paid members, without significant,
228 measurable improvements in customer engagement. JP launched ASINization in Q4 and while the team anticipated and
229 planned for a negative impact of ▮, they saw a larger impact of ▮ paid members annualized and had to dial the
230 experience down to ▮ allocation from ▮. The reduced allocation will remain for the next 6 month (▮ annualized), as
231 we identify the impact over time is offset with upside from the new persisting ASIN in cart and customers signing up through
232 other upsells. There are encouraging indicators from CS contacts (▮ reduction in CS contacts, est ▮ fewer annualized).
233 **Post signup enhancements:** We have seen higher success in identifying member accretive elements in combination with clarity
234 enhancements that mitigate the impact to Prime member balance in post signup enhancements.
235 On Single Page Checkout (SPC) Confirmation (displayed on the last page of checkout when a customer signed up for Prime in
236 the checkout flow), we increased the saliency of the Prime branding by adding the Prime logo, and reduced the copy so it was
237 easier for customers to read (▮ annualized US paid member; ▮ annual CS contacts).
238 In Q4 2020, we added plan details (plan type, billing amount, payment method, membership renewal reminder CTA) above the
239 fold for US Prime welcome emails. We received positive feedback from customers through User Testing, and we saw an
240 increase in self-cancellations (resulting in a total US annualized impact of ▮ paid members) while CS cancellations and CS
241 contacts were flat.

242

243      **2. What have we learnt from internal and external benchmarking on subscription communications?**
244 We examined CX across some of the largest subscriptions programs in the US and EU including a mix of programs that require a
245 subscription to access (Netflix, Hulu, and HBO Max) and others where a subscription upgrades the experience beyond the core
246 offering (Walmart+, Youtube Premium, and Spotify). In addition, we reviewed internal, external shipping and
247 digital/entertainment programs to understand how subscription workflows differ. Overall, there are wide ranging differences,
248 pre- and post- signup, confirmation, and cancellation flows without a standard CX bar across subscription programs. Below
249 focusses on learnings from upgraded subscription programs. See <mark>Addendum document</mark> for screenshots of subscription
250 communications.
251   • Pre signup: Upsells across programs have clear sign-up CTA (*Start 15-day free trial, Try for free now*) with upfront
252      details of the membership (*$12.95/month after trial, Try it now for 30 days then pay only €15 per year*). In contrast,
253      Prime signup CTAs focus on the benefit (*Get FREE One-Day Delivery*) and details of the membership are displayed in
254      the T&Cs. Similar to Prime, programs present the "No thanks" option as text links (*Maybe later, No thanks*).
255   • Post signup: After signup, programs provide signup confirmation within the CX and then send a welcome email with
256      varying levels of plan details. Walmart includes trial expiration date, plan duration, and payment due date above the
257      fold. Spotify sends a receipt with renewal details within a T&Cs footer and Zolando informs customers they
258      will receive a renewal reminder email 5 days before their first payment. Prime has similar confirmation touchpoints
259      including confirmation at signup and welcome email. There are additional Desktop touchpoints including Checkout
260      thank you page and multiple auto expanded tooltips. Internally, Audible is the only program that proactively reminds

CONFIDENTIAL TREATMENT REQUESTED      AMZN_00027885

Clarity in Prime Subscription communications – Privileged & Confidential

261  members via email that a trial is about to renew. All other internal programs require customers to manually opt into
262  these reminders. See Slide 10 in the Addendum for internal program audit findings.
263 • <u>Cancellation:</u> Cancellation flows vary between 1-3 pages to complete upon clicking a cancel/change membership link.
264  Prime cancellation flow is three pages long. Zolando was the easiest program to cancel with 3 clicks to navigate to the
265  cancel flow from Gateway and a single cancel interstitial to confirm. YouTube Premium was the most difficult to
266  complete with 4 clicks just to navigate to the cancel flow from Gateway, unintuitive CTA language (*deactivate*), 3 page
267  cancel flow, and no final confirmation messaging at the end of the flow. Walmart+ took fewer clicks to navigate to the
268  cancellation flow from Gateway (3 clicks) but required customers to fill out a survey before confirming cancellation.
269

270  **3. What other indicators have we checked to monitor customer trust?**
271 We checked the Retail Brand Tracker, which provides a topline view of Amazon's and Prime's long-term brand health along
272 with guidance on headwinds being faced. Based on the 2020 Q4 report, there are strong headwinds reported in the Prime
273 segment with NPS declining in four of 10 countries[10] and brand perceptions are at a three-year low. Perceptions are most
274 impacted along 'Trust' and 'Value & Price' which declined in seven of 10 countries among Prime Members. Looking at customer
275 verbatims, we did not see any concerns reported with the Prime CX. The leading factors are employee working condition, tax
276 issues, environmental impact, fake reviews, and poor quality/counterfeit products. We will continue to monitor the retail
277 brand tracker for any future mentions of CX factors.
278

279  **4. What are the drivers of mistaken signups beyond checkout?**
280 We have observed that bad actors attempting card testing (resulting in customers' seeing unrecognized charges) is a big driver
281 of mistaken signup issues. In 1H 2019, we observed over ▮▮ of our cancelation survey respondents stating that they were
282 unaware of having signed up for Prime. In Q3 2019, when we dialed up Fraud rules to make it harder for bots to card test and
283 enter the program, this number dropped to ▮▮ and now ▮▮. Despite our continued efforts, roughly ▮▮ accounts are
284 identified in the Paid member balance are classified as "risk" and subsequently removed. This underscores the impact of bad
285 actor prevention as a key clarity initiative. To continue driving down fraudulent signups, we are partnering with Consumer
286 Payments (CP) to launch CVV enforcement across all WW Prime signup pipelines by 06/30, which we believe will bring about a
287 step change reduction to unrecognized Prime charges, CS Contacts, and chargebacks.
288
289

290

---

[10] Amazon NPS among Prime Members declined in CA (69 to 60), DE (64 to 58), UK (65 to 60) and MX (88 to 84) which Amazon
and Prime have strong correlations. Prime NPS declined in CA (46 to 41) and DE (49 to 42) but are stable in other countries.

CONFIDENTIAL TREATMENT REQUESTED     AMZN_00027886

Clarity in Prime Subscription communications – Privileged & Confidential

291 **Appendix A: Shopper frustrations tagged to theme 'Prime Subscription Clarity'**
292 **Theme: Clarity issues with Calls to Actions (CTAs)**
293 CTAs provide customers with "critical path" buttons or links to move through and make key decisions in a subscription flow.
294 Customers sometimes click on these buttons not reading or understanding their labels and/or have trouble discovering the CTA
295 to opt out of a subscription.

296



"This is something that has never happened to me before! I fell for it! (The sign up button) has to be obvious and not like you're falling into a trap. But no, **the way it is now, it's so well-placed, it's gonna get clicked…people will click on it unconsciously. I'm furious.** I'll have to rethink if I'm shopping on Amazon. Before (on the detail page) it said 'Free shipping', so I didn't expect that consequence from the (sign-up) button. I'm frustrated that they set a trap, that they work with such methods." - Vienna, 2019, **Video** (starts at 7min 10sec)

| Frustration Tickets | Summary |
|---|---|
| IT-2323 | Customers clicked on yellow buttons expecting to simply move forward in a flow (e.g., the Prime Sign Up button in UPDP). Not reading their labels, they were frustrated when they later found out that the buttons were adding "something special." |
| IT-3828 | Customers accidentally signed up for Prime when logging into the Amazon app for the first time, setting up a new Kindle Fire, etc - through campaigns code-named FTUE, First-Time-User-Experience. |
| IT-2171 | Customers did not understand the impact of their choice on Prime Upsell Pages when clicking on buttons titled "Continue with FREE 1-day shipping", "Get free two day shipping", "Proceed to next (Try)", "Continue with free premium delivery" |
| IT-2170 | Customers had difficulty discovering the less prominent 'No Thank You' link on the Prime upsell checkout intercept - Universal Prime Decision Page (UPDP) |
| IT-2965 | Shoppers interpreted the double-stacked / "shadowed" Prime sign up button as two distinct click targets, a Yes and a No. |

304
305 **Theme: Difficulty comprehending that this is a paid, auto-renewing subscription**
306 Even when customers understand they're signing up for a subscription trial, not all are doing so with the understanding that
307 these trials will automatically renew. This is because key details are presented in legal T&Cs, typically at the bottom of a page in
308 small print. Customers, moving quickly, frequently overlook or ignore those T&Cs (or if they have Accessibility/zoom settings
309 enabled, this information can show up outside of their viewport).



"I didn't have any idea of what Prime was. I didn't read this well. I'm going through the order process, and then there's a surprise 500 pesos at the end of the month. Or something that I wasn't aware of, that I wasn't asking for. This small print really bothers me. **It should be clearer in saying 'You are using the Prime Service, and if you don't cancel in a month, they'll charge you 500 pesos.'** Not everyone is going to read this condition, that's the truth. They just say 'Yes, I want it, I accept, I accept, I accept'." - , Mexico City, 2017, **Video**

| Frustration Tickets | Summary |
|---|---|
| IT-2168 | Within an upsell, shoppers could not always tell how much Prime costs, how long the trial was, and how charges/cancellations worked. They did not feel confident signing up as a result, or signed up without knowing about auto-renew. |
| IT-4653 | Customers signed up for Prime without awareness of what they were doing, because terms and conditions related to pricing and auto-renew were entirely absent from UPDP |
| IT-3417 | Customers had trouble finding/reading important T&Cs in retention offers like the trial extension (i.e., that there would be an auto-renewing charge) |
| IT-3458 | Latency: Shoppers attempted to sign up for Prime (through UPDP) before the Prime logo image had loaded & appeared. This image was the only thing above-the-fold conveying that the customer was signing up for Prime |

317
318 **Theme: Issues related to confusing and/or misleading language in marketing content**
319 Customers are sometimes confused by phrases in Prime upsells like *"Why pay for shipping?" or "No thanks, I don't want free*
320 *shipping"*. These can make customers incorrectly conclude that they must be Prime to get free shipping (when they can already

Amazon Privileged & Confidential                                                                                              7

Clarity in Prime Subscription communications – Privileged & Confidential

321  get core free shipping as a non-Prime customer with a minimum order threshold).

322

 "They keep telling me and telling me (to get Prime)! **And this tiny link, 'No thanks, I don't want free shipping', Ayyy! (Rolls eyes)**" – ⬛ Mexico City, [Video](#)

| Frustration Tickets | Summary |
|---|---|
| [IT-3145](#) | Customers were perplexed when they encountered UPDP messaging that said "Why pay for shipping?", despite purchasing an item above the core free shipping threshold |
| [IT-2964](#) | Customers were frustrated / confused by Prime Upsell opt-out links that put words in their mouth, e.g., "No thanks, I don't want free shipping" |
| [IT-2172](#) | Customers read the BBOP and Ship Options upsells "FREE 2-day shipping with Prime", not realizing this required a subscription. Result: Confusion when later discovering there is an unexpected financial obligation. |
| [IT-1111](#) | Prime Upsells like BBOP, SOSP and UPDP caused non-Prime shoppers to incorrectly conclude they will only receive free shipping with Prime |

325

326  **Theme: Issues with confirmation messages and emails**

327  Customers sometimes overlook or misinterpret subscription confirmations, like 'Welcome to Prime' messages in checkout, post-sign-up emails., etc.

328

 "[Reading welcome e-mail after an unintentional sign up] So...'your 30-day trial'...'try Amazon benefits for 30 days'...'free delivery'...So I think you can get those benefits starting now, if you just subscribe now...(Moderator: Did you already sign up?)...No, I don't think so" - ⬛ Toulouse, 2016, [Video](#) (starts at 53sec)

| Frustration Tickets | Summary |
|---|---|
| [IT-3866](#) | Customers signed up for Prime during checkout, then subsequently abandoned the product purchase. Result: Unknowingly becoming an auto-renewing Prime member, because the sign up was still activated despite order abandonment. |
| [IT-3732](#) | Customers didn't notice or read the 'Welcome to Prime' text on SPC, which was critical for helping them recover from accidental sign ups on the previous page. This happened pre- and post-ASINization. |
| [IT-4672](#) | Customers were confused/frustrated when 'Welcome to Prime' email did not arrive in a timely fashion |
| [IT-2199](#) | The Prime welcome email does not make it clear to shoppers that they have signed up for an auto-renewing paid subscription |

334

335  **Theme: Customers not feeling in control of their renewal**

336  Unwanted auto-renewals is a common frustration for any subscription service (not just Amazon subscriptions). Customers like
337  to be in control over their decisions, and are frustrated when they don't receive proactive renewal reminders and/or when it's
338  difficult to disable auto-renew. The fear of forgetting to cancel can sometimes lead prospective customers to avoid signing up
339  to begin with.

 "That's how Amazon links you in to their service, you know. You get a free 30 days. What happens? Most people forget the 30 days. I'm one of those people, if I don't write it down - it's forgotten. The 30 days passes, two months go by and you look at your credit card and you say 'What am I being charged for?' You call Amazon and they say 'oh you had the free 30 days and it expired 3 months ago. I ain't going to remember something 30 days from now ." - ⬛ Atlanta, 2017, [Video](#)

| Frustration Tickets | Summary |
|---|---|
| [IT-2961](#) | Customers were concerned about forgetting to cancel an auto-renewing subscription, and getting charged without their final say (and often, they did forget) |
| [IT-2963](#) | Shoppers were frustrated they didn't have enough control over reminders for Prime's renewal/cancellation (e.g., they were only given an email reminder option, rather than SMS) |

CONFIDENTIAL TREATMENT REQUESTED                                                              AMZN_00027888

Clarity in Prime Subscription communications – Privileged & Confidential

| - | Shoppers were frustrated when friends/family members on their shared account signed up for a subscription, but they did not have an opportunity to confirm that decision. |
|---|---|

346 **Theme: Difficulty finding a way to undo or cancel a subscription**
347 Customers are frustrated when they cannot instantly "undo" an unwanted membership sign up within the context of that sign
348 up. These customers must go through self-service cancellation, but this is sometimes difficult for them to find. For example,
349 there is no path to self-service cancellation when customers click on "Prime" within the mobile hamburger menu. Customers
350 must instead open Your Account > Manage Prime membership (or by searching for "Cancel Prime" in a product search). Once
351 they find their way to the Manage Prime Membership page, the cancellation option is hidden behind a "Manage membership"
352 drop down.



"Let's have a look under 'My Prime'...(Scrolling through benefits)...blah blah blah...(Scrolls to footer)...There it is, 'Manage my Membership'. You [Amazon] put that at the very bottom of the screen. That was already clear to me, you rascals...It's very time-consuming, you have to go all the way down first (to find the ingress)" - ▮▮▮▮, Munich, 2019, **Video** (starts at 2min 0sec)

| Frustration Tickets | Summary |
|---|---|
| IT-2173 | Shoppers were derailed when they tried to go back to previously viewed Prime upsell pages that were not stored in history (e.g., when attempting to "undo" a mistaken sign up) |
| IT-2186 | Customers who signed up for Prime were frustrated when they could not immediately undo that action (i.e., they have to go into their prime settings and wait for a credit card check to 'activate' their membership) |
| IT-3138 | Shoppers had difficulty finding the ingress/link to cancel their Prime membership, due to its lack of prominence on the page or unintuitive location |
| IT-2829 | Shoppers had trouble cancelling Prime due to the unintuitive language of the cancellation ingress. They looked for familiar phrases like "Cancel" rather than "Do not continue", "End membership", "Manage membership", "Update settings", etc |

358
359 **Theme: Difficulties finishing the cancellation workflow**
360 Customers are frustrated by the number of steps involved in cancellation, and the clarity of whether they've finished the
361 process or not. We have observed some customers click "End membership", and then abandon the flow prematurely, not
362 realizing there are additional steps to finalize the cancellation.

"That's not great, that was misleading. You click on 'Cancel' and I assume it's cancelled. Then I must confirm it again and this ad appears again. Then you think it is cancelled and they offer to extend it." - ▮▮▮▮ Vienna, 2019, **Video**

| Frustration Tickets | Summary |
|---|---|
| IT-3144 | Customers had difficulty completing the Prime cancellation process due to 1) the number of steps/pages involved in cancellation, and 2) a lack of clear progress indication leading customers to assume they had completed the flow when they hadn't |
| IT-4690 | Customers were frustrated by button labels for cancelling their Prime membership (e.g., "I renounce my benefits", rather than "Cancel membership") |

367 **Theme: Frustration related to partial refunds**
368 Partial refunds are especially frustrating when the customer did not want a subscription to begin with.

"I already cancelled it. But it got cancelled with a charge that is weird. They say that they are going to refund me just a part of the money, but not all of it. They said that they were going to refund 10 dollars, and that's a little less, it's not the whole amount ($12.99 x 3). And that's just bad! Because...it's simply something that I didn't want." - ▮▮▮▮ Santiago de Chile, 2018, **Video**

| Frustration Tickets | Summary |
|---|---|
| IT-3830 | Customers were frustrated when offered only a partial refund for Prime charges (via self-service and CS), despite unknowingly signing up and not using any benefits over an extended period of time. |

CONFIDENTIAL TREATMENT REQUESTED                                                        AMZN_00027889

Clarity in Prime Subscription communications – Privileged & Confidential

374
375 **Theme: Negative downstream impacts caused by subscription clarity issues**
376 Unexpected sign ups / renewals can erode customer trust, making customers re-evaluate their relationship with Amazon.
377 Frustration is exacerbated when customers go through multiple billing cycles before discovering there is a problem.
378

"So it's saying they are charging me $12.99/month for Prime. I didn't notice this (on my credit card bill) because it's such a small amount of money. If you didn't tell me about this (I would have never known). We're looking at an infringement from Amazon. I think it's serious because they charge you without letting you know....I'm disappointed. I would expect something different from Amazon." - ▮▮▮ Santiago de Chile, 2018, Video

| Frustration Tickets | Summary |
|---|---|
| IT-3829 | Customers unknowingly became "settled" Prime members for multiple months, because 1) they signed up accidentally and/or didn't see auto-renewal terms, 2) we didn't send them reminders / charge communications, and 3) they didn't check their card activity. |
| IT-2277 | Customers frustrated by unexpected 1 dollar charge on credit card after signing up for Free Prime Trial, unaware that this is a credit card authorization. |
| IT-2240 | Shoppers who have previously signed up for a Prime membership without realizing it become skeptical of Prime marketing and Amazon in general. |
| IT-4518 | Customers felt Amazon designed a CX that did not have their best interests at heart. They were frustrated by paid shipping defaults, confusing/disruptive Prime marketing, a high density of Ads/Sponsored Products, refunds defaulting to gift cards, etc. |

384
385 **Appendix B**

Table 1 – Prime Awareness by self-claimed Prime status and # respondents



386
387

Table 2 – Prime Awareness by Actual Prime Status

388
389

Table 3 – Prime Awareness by Actual Prime Status – TRIAL/PAID breakdown

390
391

Amazon Privileged & Confidential

CONFIDENTIAL TREATMENT REQUESTED                                    AMZN_00027890

Clarity in Prime Subscription communications – Privileged & Confidential



392
393
394

**Appendix C: Prime global cancel flow data**



395
396
397

**Appendix D: First browse tooltip confirmation CX (launching US 2/26/21)**



398
399
400

CONFIDENTIAL TREATMENT REQUESTED                                                                AMZN_00027891

Clarity in Prime Subscription communications – Privileged & Confidential

**Appendix E: Clarity Experiments and Performance**

**i) US | Sep 2020 | WW annualized impact: est███ paid members**

UPDP clarity changes based on feedback received through long standing customer frustrations ([IT-2171](#), [IT-2168](#), [IT-2170](#), [IT-2964](#)), standard Amazon Usability signposts, and UX guidance. Changes include: (1) No Thanks button for the decline CTA, (2) price of Prime outside the Ts & Cs, and (3) "Prime" or "Free Trial" in the accept CTA.





**ii) US | Jan 2020 | WW annualized impact: est███ paid members**

UPDP clarity experiment testing an updated CTA that reads "Start my Prime FREE Trial" instead of "Get FREE Prime Delivery".

Amazon Privileged & Confidential

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00027892

401
402
403
404
405
406
407
408
409

CONFIDENTIAL TREATMENT REQUESTED

Clarity in Prime Subscription communications – Privileged & Confidential

**iij UK | Oct 2020 | UK annualized impact: est. ▮ paid members (Treatment 1); est. ▮ paid members (Treatment 2)**
Experiment for Free Trial on Desktop UPDP testing removal of grey clickable "shadow" surrounding the positive CTA and adding a prominent grey Decline button.



AMZN_00027893

13

Clarity in Prime Subscription communications – Privileged & Confidential

**iv) DE | Sep 2020 DE | DE annualized impact: est. ▓ paid members**
Experiment for Free Trial on Desktop UPDP testing prominent yellow button for the decline CTA and a blue tooltip that appears upon scrolling for additional info.



**v) FR | Sep 2020 | FR annualized impact: est. ▓ paid members**
Experiment for Free Trial on Desktop UPDP testing prominent grey decline button and blue tooltip that appears upon scrolling for additional info.



Amazon Privileged & Confidential

14

AMZN_00027894

CONFIDENTIAL TREATMENT REQUESTED

418
419
420
421
422
423
424

Clarity in Prime Subscription communications – Privileged & Confidential

**vi) ES | Sep 2020 | ES annualized impact: est. est. ▮ paid members**
Experiment for Free Trial on Desktop UPDP testing prominent grey decline button.

425
426

| Control | Treatment |
| --- | --- |

**Control**

Obtén acceso prioritario a las Ofertas flash y más ventajas con el periodo de prueba GRATIS de 30 días de Amazon Prime
Puedes cancelar en cualquier momento.

| | amazon prime | SIN PRIME |
| --- | --- | --- |
| Envío 1 día | EUR 0,00 | EUR 5,99 |
| Envío 2 días | EUR 0,00 | EUR 4,99 |
| Envío 3 días | EUR 0,00 | EUR 3,95 |

✓ Acceso a las ofertas flash, **20 minutos antes de su inicio**
✓ Envíos rápidos y gratis en millones de productos
✓ Streaming de películas y series

**Seguir con Envío rápido y GRATIS**
Empezar mi periodo de prueba gratis y pagar más tarde

Seguir sin gozar las ventajas de Amazon Prime

Al hacer clic en el botón, confirmas que has leído y aceptas las Condiciones Generales de Amazon Prime y que nos autorizas a realizar el cargo de la suscripción a Amazon Prime en el método de pago que hayas seleccionado como preferido a menos que vivas una vez registrado en tu cuenta una vez finalizado el periodo de prueba gratis. Tu suscripción de renovará automáticamente a EUR 3,00/mes. Puedes cancelar tu suscripción a Amazon Prime en cualquier momento a través de tu cuenta, en la sección de Prime.

**Treatment**

Obtén acceso prioritario a las Ofertas flash y más ventajas con el periodo de prueba GRATIS de 30 días de Amazon Prime
Puedes cancelar en cualquier momento.

| | amazon prime | SIN PRIME |
| --- | --- | --- |
| Envío en 1 día | EUR 0 | DESDE EUR 3,99 |
| Envío en 2 días | EUR 0 | DESDE EUR 3,99 |
| Envío en 3 días | EUR 0 | DESDE EUR 2,99 |

Seguir sin probar las ventajas de Amazon Prime

✓ Acceso a las ofertas flash, **30 minutos antes de su inicio**
✓ Envíos rápidos y gratis en millones de productos
✓ Streaming de películas y series

**Seguir con Envío rápido y GRATIS**
Empezar mi periodo de prueba gratis y pagar más tarde

Al hacer clic en el botón, confirmas que has leído y aceptas las Condiciones Generales de Amazon Prime y que nos autorizas a realizar el cargo de la suscripción a Amazon Prime en el método de pago que hayas seleccionado como preferido a menos que vivas una vez registrado en tu cuenta una vez finalizado el periodo de prueba gratis. Tu suscripción de renovará automáticamente a EUR 3,00/mes. Puedes cancelar tu suscripción a Amazon Prime en cualquier momento a través de tu cuenta, en la sección de Prime.

427
428
429

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00027895

Clarity in Prime Subscription communications – Privileged & Confidential

**vii) UK | Jun – Aug 2020 | UK annualized impact: Desktop est. -5k paid members; Mobile est. ▮ paid members**
Customers are presented with the Prime Interstitial Page (UPDP) before reaching the final checkout page (SPC). This experiment suppressed UPDP to understand location saturation and cannibalization of other locations. When UPDP is suppressed, customers are directed straight to the final Checkout page (SPC).

| | UPDP | SPC |
|---|---|---|
| **Control** |  |  |
| **Treatment 1** | UPDP suppressed |  |
| **Treatment 2** | UPDP suppressed |  |

Amazon Privileged & Confidential

AMZN_00027896

CONFIDENTIAL TREATMENT REQUESTED

430
431
432
433

Clarity in Prime Subscription communications – Privileged & Confidential

**viii) US | Feb - Mar 2020 | US annualized impact: est. ▇ paid members | US CS Contact impact: est. -6k CS contacts**

Post signup experiment testing increased saliency of the Prime branding with added Prime blue and Prime logo, personalizing with customer name, and reducing the copy to make easier to read.



**ix) US | Dec 2020 | US annualized impact: est ▇ paid members | US CS Contact impact: flat**

Post-checkout, we tested adding the subscription confirmation widget, with a description of the Prime plan type, billing date, payment method, and links to manage the membership or receive a reminder before the next billing date.



Amazon Privileged & Confidential                                                    17

# EXHIBIT 83

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

SECOND EDITION

## Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors

AMERICAN**BAR**ASSOCIATION
Intellectual Property
Law Section

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

### SECOND EDITION

## Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors



AMERICAN**BAR**ASSOCIATION

Cover design by Jill Tedhams/ABA Design

The materials contained herein represent the opinions of the authors and/or the editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2022 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, complete the request form at www.american bar.org/reprint or email ABA Publishing at copyright@americanbar.org.

Printed in the United States of America.

26 25 24 23        5 4 3 2

A catalog record for this book is available from the Library of Congress.

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

follow in the main questionnaire. For example, the parties' names or marks typically should not be mentioned to respondents during the screener.[125]

Screeners are also typically used to exclude respondents who might have specialized knowledge or experience, or suffer an impairment, that would make their responses atypical of ordinary consumers. For example, screeners in Lanham Act surveys frequently exclude individuals who (1) are employed in the same industry as one of the parties or by a market research, advertising, or public relations firm; (2) have recently participated in a market research survey; or (3) normally wear eyeglasses or contacts when shopping but are not wearing them at the time of survey.[126]

Finally, the screening process can be used to implement any quotas that may be established by the survey expert. Particularly when nonprobability sampling is utilized, it may be desirable to set quotas (e.g., by gender, age, income, geography, etc.) so that the demographics of the sample surveyed correspond to the relevant universe as a whole.[127] In such situations, the survey interviewers can be instructed to screen respondents so that each quota is satisfied.


## CONCLUSION

One of the very first—and most critical—steps in designing a survey for Lanham Act cases is selecting the proper universe. Any misstep at this early stage of the process can potentially render all future work on the survey meaningless, as courts frequently discount, disregard, or even exclude surveys using flawed universes. To select the proper universe, survey designers must have a thorough understanding of the legal issue or issues to be tested, and then carefully select the population of consumers whose mental impressions are relevant to that issue. Only then will the survey have a chance to have the desired impact in court.

---

got the right consumers" for upscale handbags where many of the malls utilized were not "upscale" and respondents were required only to have been likely to purchase a handbag costing at least $100; "a $100 handbag is 'hardly an indicia of prestige").

125. On occasion, the survey expert may need to use a postinterview screener when a qualifying question may signal information that is likely to bias responses and cannot be effectively disguised in the initial screener.

126. *See, e.g.*, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., No. 07-CV-03752, 2008 WL 4614660, at *2 n.6 (N.D. Cal. Oct. 16, 2008); Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 779 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007); Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1273 (S.D.N.Y. 1990). *But see* Calista Enters. Ltd. v. Tenza Trading Ltd., 43 F. Supp. 3d 1099, 1113 (D. Or. 2014) (where relevant universe comprised those who "visit an adult-entertainment website four or more times per month," criticism that survey proponent failed to exclude respondents that work in the adult-entertainment industry went to the survey's weight, not admissibility, despite proponent's failure to respond to that criticism).

127. *See, e.g.*, Pharmacia Corp. v. Alcon Labs., Inc., 201 F. Supp. 2d 335, 363 (D.N.J. 2002) (criticizing plaintiff's survey for "failing to take any steps to ensure that the sample drawn . . . was . . . representative of the marketplace of ophthalmologists," such as, screening for respondents' years of experience or size of practice); *cf. Am. Home Prods.*, 656 F. Supp. at 1070 (skewed geographic distribution of respondents "underscore[d] the absence of probability sampling in the survey").

system is foolproof and there may be ways around even combinations of duplication checks, evading this sort of digital fingerprinting would likely require effort greatly disproportionate to the possible reward.

Since digital fingerprinting is largely in the hands of the panel provider, the survey researcher's role is, first, ensuring the panel provider performs these checks and, second, making sure the provider has access to whatever information from the survey itself that they might need to complete the analysis. While none of these three methods will confirm that the survey respondent is being attentive to the task at hand, methods such as these can help ensure that (a) a person is taking the survey, (b) that person is the same individual who opted in to the panel in the first place, and (c) that person has not previously taken the same or similar survey.[30]

## Attention within the Survey

A common early criticism of online surveys (as compared to mall-intercept methodologies) was that the surveyor could not ensure the respondent was paying attention to the questions or the stimuli. For example, when a respondent takes a survey in a mall in a private room or area in the presence of a surveyor, attentiveness can be more readily assessed than when the survey is taken without oversight. Relatedly, individuals taking a survey on a computer or a mobile device while at home may be distracted by their survey-taking environment, which could include people, sounds, traffic, television, pets, or the like.

Those taking online surveys should, of course, be instructed to avoid distractions. A common beginning of survey prompt might tell participants to (1) take the survey in one sitting, (2) avoid distractions while taking this short survey, (3) avoid looking at any other websites or research while completing the survey, and (4) wear their glasses if they normally do so. Such instructions may help—and their omission will draw criticism—but ultimately a researcher should rely on verification rather than trust when trying to ensure participants are paying attention.

### Attention-Checking Questions

Most online surveys therefore include various measures to ensure or measure participant attention. When reviewing these measures, it is important to remember that all these checks are imperfect and that extremely demanding checks, such has embedding critical instructions in large blocks of text, may trick even relatively attentive participants.[31] Also, the mere presence of an attention check may cause participants to

---

30. Courtney Kennedy et al., *Evaluating Online Nonprobability Surveys*, PEW RES. CTR. 36 (May 2, 2016), https://www.pewresearch.org/wp-content/uploads/2016/04/Nonprobability-report-May-2016 -FINAL.pdf ("Most panels are double opt-in, meaning potential panelists first enter an email address and then respond to an email sent from the panel provider in order to confirm the email account. Depending on the vendor, other quality control features include IP address validation and digital fingerprinting, which guards against a single person having multiple accounts in a given panel.").

31. Keith Phillips, *Data Use: An Evaluation of Quality-Control Questions*, QUIRK'S MEDIA (Dec. 2013). https://www.quirks.com/articles/data-use-an-evaluation-of-quality-control-questions. The Phillips study, also circulated as an SSI whitepaper for many years, reported on how differing exclusion criteria affected

subsequently relax—feeling they have survived the check—or modify their behavior since they now feel they are being watched.[32]

One common approach is to include a question that requires a respondent to carefully read the question and provide an unexpected answer, as in the example below:

Q. We have one more question, just to ensure you are paying attention. Please type the word "survey" into the blank next to the word "Other":

A.  Strongly agree
B.  Agree
C.  Neutral
D.  Disagree
E.  Strongly disagree
F.  Other: _____

Participants can also be instructed to simply select "strongly agree" on a similar scale, but this of course introduces the possibility that some proportion of respondents who are guessing or not paying close attention may pass through the attention check undetected. Participants who fail to mark the right answer or write the required word should be eliminated. The goal when writing these questions is to make sure that an "attentive" participant will catch the critical instruction. Do not write an attention check that is more challenging to complete than the other survey questions.

Another common approach to assessing respondent attentiveness is to review responses to open-ended questions to identify "gibberish" entries. For example, a respondent in an Eveready likelihood-of-confusion survey is asked to identify the company or brand making or putting out the product or service depicted or described in the stimulus. Often, the survey will also include a follow-up question such as "why do you say that?" or "please explain why you think X makes or put out the product we showed you?" Attentive survey takers will write an intelligible name for the company or brand and take the time to respond with a word, phrase, or sentence that provides some relevant response to the follow-up question.[33] Survey experts should review

---

the results of a broad survey study and the apparent efficacy of each of 15 checks in excluding apparently "bad" participants without also catching an undue number of "good" participants. The "instruction hidden in large text block" question was apparently the most difficult of the various attention checks, excluding many participants who otherwise appeared attentive. *See also* Dave Vannette, *Using Attention Checks in Your Surveys May Harm Data Quality*, Qualtrics Blog (June 28, 2017), https://www.qualtrics.com/blog/using-attention-checks-in-your-surveys-may-harm-data-quality/ (commenting on research showing that use of attention checks may affect later respondent behavior).

32. Scott Clifford & Jennifer Jerit, *Do Attempts to Improve Respondent Attention Increase Social Desirability Bias?*, 79 Pub. Op. Q. 790 (2015).

33. Open-ended "why do you say that" questions are not (or at least *should not be*) coded for the purpose of scientifically or quantitatively measuring likely confusion, because "[p]eople often cannot report accurately on the effects of particular stimuli on the higher order, inference-based responses." Richard E. Nisbett & Timothy D. Wilson, *Telling More Than We Can Know: Verbal Reports on Mental Processes*, 84 Psych. Rev. 231, 233 (1977). "It therefore would be quite impossible for them to describe accurately the role played by these stimuli in influencing their responses; and any subsequent verbal report by subjects about the cause of their responses would be at least partially in error." *Id.* at 240; *see also* Timothy D. Wilson & Jonathan W. Schooler, *Thinking Too Much: Introspection Can Reduce the Quality of Preferences*

phones were excluded by many pollsters, and this led to systematic sample bias.[61] We should not repeat the same mistake in the trademark context.

If the researcher does decide to allow the use of mobile devices, the researcher should make sure that the survey works appropriately on those devices. Some survey software and question formats translate well to mobile, and some do not. Brevity in both question and response wording may be particularly incentivized in this context. It is also likely worth examining one's results to see if they differ between mobile device users, on the one hand, and computer users on the other. If such a difference is detected, one must then ask whether this difference represents a real market effect or is a survey production error.

## Presentation of Particular Stimuli

If the primary stimulus is an image or video file, then it is important that the image or video be properly displayed to participants. Similarly, if the primary stimulus is an audio file, then it is important that the audio be properly played for participants. Proper presentation can be ensured in several ways. The simplest approach is to have a distractor object displayed or distractor voice played before the target one. No deception is necessary here. On a page early in the survey, inform participants that this survey involves viewing an image or listening to an audio track and that, before they begin, you wish to confirm that their system is working properly. Then display an image or play an audio track and ask a simple question about it: "What word did the voice say?" or "What shape was displayed?"

Particularly if an image is being shown, it will be important to make sure the distractor does not prime any feature or concept relevant to the study. For example, "diagonal lines" would be a bad test image for Adidas, whereas a "blue square" would not be. If the nature of the stimulus makes it hard to choose a good distractor, one always has the option of putting this display question at the end of the study. If the critical question is whether X color on Y device signals a brand, for example, a researcher could end the survey by having the respondent correctly identify the colors displayed in 3 images. This would make it clear that the survey had been about the object's color, but the participant would realize this only after having already answered the main survey questions. This kind of post-test may be particularly appropriate if the researcher is concerned about participants' ability to see fine-grained differences in shade; that level of precision in a pretest might prime the idea of "color" and skew the results.

Displaying pictures raises several other questions, however. For one, how long should an image be displayed? The wonder of online surveys is that the researcher can

---

61. *See* Tom Rosentiel, *How Serious is Polling's Cell-Only Problem?*, PEW RES. CTR. (June 19, 2007), https://www.pewresearch.org/2007/06/19/how-serious-is-pollings-cellonly-problem/ (previewing the issue); Brian Stryker, *Can We Trust Polls Without Cellphones Anymore?*, HUFFPOST (last updated Dec. 6, 2017), https://www.huffpost.com/entry/can-we-trust-polls-withou_b_4880127 (describing demographic and political differences between cellphone-only and non-cellphone-only people); Claudia Deane et al., *Flashpoints in Polling*, PEW RES. CTR. (Aug. 1, 2016), https://www.pewresearch.org/methods/2016/08/01/flashpoints-in-polling/ (describing polling changes in response to the rise of cellphones).

program their answer and have it flawlessly administered. Want it to be shown for at least 15 seconds, no more than 15 seconds, or exactly 15 seconds? The software will be able to accommodate. Want to allow for easy magnification? Present front, back, and side images? Create a 3D rotatable model that participants can click and drag? Forget the idea of a single image entirely and create a video that slowly rotates the product? All are possible with current online survey technology.

When debating all of these possibilities, the researcher should strive to replicate market conditions. If the product involved is the kind that people will take off the shelf and handle, then multiple images may be appropriate. If purchasing occurs online and the consumer will see only a picture of the product, that should be the way the survey respondent sees it. If the shape of the product is at issue, then the shape must be clear to participants. And, as mentioned earlier, it generally makes sense to require some minimum amount of time examining the object to ensure attention.

As with pictures, researchers should consider and avoid introducing bias when presenting words to respondents in online surveys. For example, in a Teflon Survey evaluating whether certain terms are common names or brand names, it would be improper to capitalize certain terms and leave others in lowercase letters, because inconsistent capitalization could lead respondents to believe capitalization indicates a brand name. Researchers typically avoid this by presenting all of the terms in all-caps or initial-caps format. If either an all-caps or initial-caps format would be biasing in a particular case, multiple presentation formats should be used to see if there is a legally significant difference between the results.[62]

In attempting to replicate market conditions or in cases involving certain types of trademarks or trade dress, it may be impossible to carry out a valid survey online using present-day technology, and it may be necessary to use a traditional in-person method (e.g., mall intercept).[63] Consider a survey seeking to measure the secondary meaning of Hasbro's Playdough "scent" mark consisting of "a scent of a sweet, slightly musky, vanilla fragrance, with slight overtones of cherry, combined with the smell of a salted, wheat-based dough."[64] Or, perhaps, a survey seeking to assess likely confusion between two sandals where the asserted mark is Sandal Island's mark consisting

---

62. This consideration can be further complicated when the term being tested is an acronym and thus, in its brand-name form, is always presented in all caps (e.g., GEICO, which stands for Government Employee Insurance Company, or PODS, which stands for Portable On-Demand Storage). Arguments concerning bias could be lodged whether those terms appear in initial caps (Geico or Pods), all caps (GEICO or PODS), or all lowercase (geico or pods), because in each scenario one could envision a respondent being influenced to "lean toward" brand name or common name based on the capitalization. At least one solution to this approach has historically been to avoid online surveys with visual presentation and instead use either a telephone survey or a mall-intercept methodology but require researchers to *read* the terms aloud to respondents rather than display them visually.

63. *See, e.g.*, Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc., 703 F. Supp. 2d 671, 694 (W.D. Ky. 2010) (holding that online presentation of stimuli "created an environment that was dissimilar to that in which a typical consumer would encounter" the parties' liquors), *aff'd*, 679 F.3d 410 (6th Cir. 2012).

64. NON-VISUAL PLAY-DOH SCENT MARK, Registration No. 5,467,089.

put it charitably, was "misinformed."[144] To put it differently, even a perfectly designed and executed survey will generate noise, guessing, lack of understanding, so-called yea-saying, and other responses that are extraneous to what the survey is attempting to test. This problem can be exacerbated in surveys that use closed-end questions, such as the so-called *Squirt* format for confusion, where respondents are given two or three choices plus a "Don't know" option and, fearful of appearing uninformed, choose one of the substantive choices (e.g., "same company" or "different company"). The use of controls may lessen or eliminate the effect of leading questions, assuming the same questions are asked to both the test and control cells.[145] For these reasons, confusion survey evidence produced from a survey that does not have some control mechanism is increasingly viewed as suspect by the courts.[146]

Despite the well-recognized need for controls in surveys, surveys without controls are still conducted, and opinions based upon them are offered into evidence. The *Daubert* motion has proved very useful in challenging survey evidence produced without some control mechanism. It has also been useful in challenging the more difficult problem where a survey uses a control but the control selected is believed to be defective.

The easier cases are those involving surveys without controls. For example, in the NFL case, discussed earlier in connection with survey questions, the use of the survey to prove confusion was excluded.[147] Without conducting a new survey, the plaintiff's survey expert sought to use the survey data to prove dilution.[148] After having shown respondents several of the defendants' products, the survey asked, "What, if anything, do you think of when you see this shirt?"

The survey was excluded. The court found that the "main problem" with the survey was that it asked only a single question, without any further probing and without showing respondents any control shirt or asking any control questions. The court cited a number of cases and secondary authorities establishing the need for controls,[149] but

---

144. For example, in a survey with which the first author was involved where respondents were asked about the source of two obviously different wines and said they came from the same company, the response to the "Why do you say that?" question was that "all wines in the U.S. are made by the same company."

145. *Novartis Consumer Health*, 129 F. Supp. 2d at 365 ("[B]ias that may have resulted from any leading questions was eliminated by use of the control group." (citing Volkswagen Aktiengesellschaft v. Uptown Motors, No. 91 CIV. 3447(DLC), 1995 U.S. Dist. LEXIS 13869, at *16 (S.D.N.Y. May 11, 1995)). Note that the Third Circuit refrained from adopting this position in the context of the false advertising survey at issue "because we are uncertain whether the effects of asking leading questions without proper filtering may be greater on the MNTS test cell than the control cell." *Novartis Consumer Health*, 290 F.3d at 593 n.10.

146. As Professor McCarthy puts it, the use of controls in surveys "serves much the same purpose . . . as use of a placebo does in drug testing and putting the suspect in a lineup of others does in criminal detection." McCarthy, *supra* note 62, § 32:187, at 32-398 (citing Michael Rappeport, *Litigation Surveys-Social "Science" as Evidence*, 92 Trademark Rep. 957, 986 (2002)); *see also* Diamond, *supra* note 65, at 397–401. For an article on the selection of controls, see Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 Trademark Rep. 890 (2002).

147. *See supra* p. 357.

148. Nat'l Football League Props., Inc. v. ProStyle, Inc., 57 F. Supp. 2d 665 (E.D. Wis. 1999).

149. McCarthy, *supra* note 62, § 32:187; Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd., 817 F. Supp. 1103, 1123–24 (S.D.N.Y. 1993), *vacated by settlement*, 859 F. Supp. 80

# EXHIBIT 84

# Chat with "Gotschall, Mary Pat <marypat@amazon.com> on October 7, 2019

marypat@amazon.com & reidn@amazon.com
Earliest item: 2019-10-07 09:29:09
Latest item: 2019-10-07 13:52:02
All Parties:

**Nelson, Reid <reidn@amazon.com>**

Gotschall, Mary Pat <marypat@amazon.com>

**Monday 07 October 2019**

**Gotschall, Mary Pat <marypat@amazon.com>**
Hi! did you have sessions today? If so, how'd it go?

09:29:09

**Nelson, Reid <reidn@amazon.com>**
Really well!!!

09:30:08

**Nelson, Reid <reidn@amazon.com>**
I have not one but two moderators

09:30:20

**Gotschall, Mary Pat <marypat@amazon.com>**
Great! did they give you grief about recording a purchase?

09:33:44

**Nelson, Reid <reidn@amazon.com>**
They didn't!

09:35:54

**Nelson, Reid <reidn@amazon.com>**
We recorded the whole thing. Shitty UPDP and all

09:36:21

**Nelson, Reid <reidn@amazon.com>**
The UPDP experience is even worse now

09:36:31

**Nelson, Reid <reidn@amazon.com>**
There is literally zero reference to free 30-day trial on there

09:36:42

**Nelson, Reid <reidn@amazon.com>**
I've just about had it

09:36:50

**Nelson, Reid <reidn@amazon.com>**
Big yellow button "Proceed now with free premium shipping"

09:37:10

**Nelson, Reid <reidn@amazon.com>**
Tiny blue button "Proceed without Prime benefits"

09:37:23

**Nelson, Reid <reidn@amazon.com>**
There's no T&Cs as far as I can tell (if there was, it was below the fold), and there was no price mentioned anywhere on the screen

09:37:56

**Nelson, Reid <reidn@amazon.com>**
Anyway, I'm very happy with my moderator. We'll see how the other one does (she's a little more junior, but seems sharp and receptive to feedback). It'll be good to actually have two for this study, as they can distribute the load for diary study management

09:39:28

**Gotschall, Mary Pat <marypat@amazon.com>**
Oh no, so bad!

09:41:54

**Gotschall, Mary Pat <marypat@amazon.com>**

Meaning UPDP. Isn't the new leader more open to feedback?

09:42:25

**Nelson, Reid <reidn@amazon.com>**

I was pretty underwhelmed by him

09:42:42

**Nelson, Reid <reidn@amazon.com>**

He's a Cem high fiver

09:42:50

**Gotschall, Mary Pat <marypat@amazon.com>**

oh no

09:43:04

**Nelson, Reid <reidn@amazon.com>**

I saw him having oysters at flying fish with Dave Carrell the other day too

09:43:19

**Gotschall, Mary Pat <marypat@amazon.com>**

was anyone there from the german office watching?

09:43:23

**Nelson, Reid <reidn@amazon.com>**

I think they're all a bunch of dbags

09:43:26

**Gotschall, Mary Pat <marypat@amazon.com>**

yes agreed to dbags

09:43:37

**Nelson, Reid <reidn@amazon.com>**

Total tools

09:43:42

**Nelson, Reid <reidn@amazon.com>**

Sitting in meetings with them is pretty challenging honestly

09:43:52

**Nelson, Reid <reidn@amazon.com>**

The new guy made it sound (initially) like he was committed to this problem. But subsequent behavior has suggested otherwise

09:44:36

**Nelson, Reid <reidn@amazon.com>**

For example, Russ and Neil made it clear that we needed subjective, not just objective, guardrails to prevent clickbait CX. But Nahshon wanted us to strike some of this language from the meeting notes that I was asked to synthesize

09:45:55

**Nelson, Reid <reidn@amazon.com>**

He didn't want to admit to the current CX being clickbait, and didn't want to committ to subjective guardrails

09:46:18

**Gotschall, Mary Pat <marypat@amazon.com>**

That's not ok

09:46:21

**Nelson, Reid <reidn@amazon.com>**

No it's not

09:46:31

**Gotschall, Mary Pat <marypat@amazon.com>**

let's sync to see if we can figure out another approach. Rather than you send an email - maybe I can set up time to discuss with some peeps?

09:48:08

**Nelson, Reid <reidn@amazon.com>**

I'm not sending any more emailss on thi

09:48:21

**Nelson, Reid <reidn@amazon.com>**

*on this

09:48:25

**Nelson, Reid <reidn@amazon.com>**

It's fruitless

09:48:28

**Gotschall, Mary Pat <marypat@amazon.com>**

yeah - it seems like it's a black hole.

CONFIDENTIAL

09:48:36

**Gotschall, Mary Pat <marypat@amazon.com>**

their content testing - it's like they need a content testing bar raising program or something like it.

09:49:04

**Nelson, Reid <reidn@amazon.com>**

100%

09:50:05

**Nelson, Reid <reidn@amazon.com>**

All of Amazon needs a Customer Obsession Bar Raising Program with Guardrails for dark patterns

09:50:32

**Nelson, Reid <reidn@amazon.com>**

COBR

09:51:01

**Nelson, Reid <reidn@amazon.com>**

We have "Do No Harm" OPS and CCP guardrail mechanisms for weblab (e.g., if it's negative for the business on key metrics, we don't roll out an experiment). But that's effectively "Do no harm to the business". We need mechanisms for "Do no harm to the customer".

09:52:50

**Nelson, Reid <reidn@amazon.com>**

And at some point, we have to accept that subjective judgment will be a necessary part of defining those guardrails. Contacts and returns and even our best negative DSI measures will ALWAYS be dwarfed by CCP/OPS.

09:54:23

**Nelson, Reid <reidn@amazon.com>**

It's simply not possible to measure how negative a crappy CX is

09:54:44

**Nelson, Reid <reidn@amazon.com>**

Data-driven leaders won't like that. But a customer-obsessed leader (like Sebastian) will get it. Some things are just "wrong", period.

09:55:28

**Gotschall, Mary Pat <marypat@amazon.com>**

100% agree. per our text, let's plan on partnering on a paper - and work with design, CXBR, etc to figure out/have them own a plan to solve.

10:05:49

**Nelson, Reid <reidn@amazon.com>**

I'm so down

10:06:05

**Nelson, Reid <reidn@amazon.com>**

JAW as our ultimate reviewer….maybe Jeff

10:06:30

**Gotschall, Mary Pat <marypat@amazon.com>**

agree

10:06:36

**Nelson, Reid <reidn@amazon.com>**

I don't want to play in Russ' sandbox anymore

10:06:38

**Nelson, Reid <reidn@amazon.com>**

I want to get Jake involved on the Alexa side of things as well

10:06:50

**Nelson, Reid <reidn@amazon.com>**

I want all the dark patterns included

10:06:54

**Gotschall, Mary Pat <marypat@amazon.com>**

Yes - this needs to be Amazon all up, not just shopping

10:07:08

**Nelson, Reid <reidn@amazon.com>**

Yup

10:07:14

**Nelson, Reid <reidn@amazon.com>**

We can get the data from the Connections team on their "Customer Trust vs. Data" question as well

10:07:27

**Nelson, Reid <reidn@amazon.com>**

CONFIDENTIAL

10:07:33

**Nelson, Reid <reidn@amazon.com>**
Will be a fun doc to write. Next step is to get Jenny and Llew onboard.
I do think we should highlight that poor Returns CX to Maria in some form or another, sooner rather than later. If not an email, something else

10:15:13

**Nelson, Reid <reidn@amazon.com>**
I don't want that one to wait for a whole All-Up doc on customer obsession @ Amazon. The other issues have already been reviewed with VPs. This is just another one that needs to be highlighted, as a one-off. Perhaps we can let her know we're planning to write a larger synthesis on dark patterns @ Amazon, and this experiment will be featured in that document.

10:16:18

**Nelson, Reid <reidn@amazon.com>**

11:41:22

**Gotschall, Mary Pat <marypat@amazon.com>**
Cool set up

12:31:57

**Nelson, Reid <reidn@amazon.com>**
The Miles / Reid setup is going strong!

12:32:49

**Nelson, Reid <reidn@amazon.com>**
Yet another vendor, mesmerized by it

12:33:20

**Nelson, Reid <reidn@amazon.com>**
It's a sign that we did something right if we're ahead of Consultancies on this stuff :)

12:34:06

**Gotschall, Mary Pat <marypat@amazon.com>**
Yes!!

12:34:19

**Nelson, Reid <reidn@amazon.com>**
Would be cool if Miles doubled down on it for the rest of the 100+ researchers at Amazon

12:34:52

**Nelson, Reid <reidn@amazon.com>**
Could be an impact story, maybe? Raising the bar on research recordings / video across the company?

12:36:16

**Gotschall, Mary Pat <marypat@amazon.com>**
Agreed - but he has to be willing to own and drive ( which has been an issue in the past)

12:38:31

**Nelson, Reid <reidn@amazon.com>**
Totes

12:39:58

**Nelson, Reid <reidn@amazon.com>**
Maybe he'll have renewed inspiration with the gang (eventually) getting back together

12:40:19

**Gotschall, Mary Pat <marypat@amazon.com>**
I sure hope so. He has so much goodness to share with others that can have huge impact.

12:41:02

**Nelson, Reid <reidn@amazon.com>**
SO much goodness!! I've learned so much from him.
Also, I see a huge opportunity for compelling video storytelling in this upcoming "We've lost our customer obsession" doc. I bet he'd want to drive there.

12:42:01

**Gotschall, Mary Pat <marypat@amazon.com>**
oh yes, great idea!

12:45:19

**Gotschall, Mary Pat <marypat@amazon.com>**
i'll give him a heads up…!

12:45:35

**Nelson, Reid <reidn@amazon.com>**
Also…We might consider running a bunch of NAC/NPA shopping sessions

12:46:18

**Nelson, Reid <reidn@amazon.com>**
in the US specifically

12:46:21

**Nelson, Reid <reidn@amazon.com>**
Since that's often a sticking point, "but where's your US data"

12:46:38

**Gotschall, Mary Pat <marypat@amazon.com>**
hmmm - but we a bunch don't we?

12:46:40

**Nelson, Reid <reidn@amazon.com>**
Keep running them until we get a magical clip

12:46:47

**Gotschall, Mary Pat <marypat@amazon.com>**
Ah, got it

12:46:53

**Nelson, Reid <reidn@amazon.com>**
At this point, it's usability theater, but I think it would be helpful

12:46:58

**Nelson, Reid <reidn@amazon.com>**
Maybe even user testing

12:47:06

**Nelson, Reid <reidn@amazon.com>**
Just crank through them until we get what we need

12:47:13

**Nelson, Reid <reidn@amazon.com>**
With the CX as tricky as it is, I bet we could easily snag a few golden ones through a barrage of remote unmoderated testing…then follow up with the participants to ask "How did that make you feel", and get them to send us a video selfie response

12:49:05

**Nelson, Reid <reidn@amazon.com>**
Anyway…it's totally something Miles would be awesome at

12:49:15

                                                                 AMZN-PRM-FTC-002381016

**Gotschall, Mary Pat <marypat@amazon.com>**
yes, i totally agree!

12:50:00

**Nelson, Reid <reidn@amazon.com>**
The last meeting, Cem was just like "But this is 2016 in Spain…"

12:50:15

**Gotschall, Mary Pat <marypat@amazon.com>**
Isn't it quitting time over there - or WAY past it? Shouldn't you be drinking beer at Oktoberfest?

12:50:22

**Nelson, Reid <reidn@amazon.com>**
I did Oktoberfest well!!

12:50:44

**Nelson, Reid <reidn@amazon.com>**
Three days in a row

12:50:51

**Gotschall, Mary Pat <marypat@amazon.com>**
you could say, this was 2016 in Spain and this is 2019 in Germany. and it's gotten WORSE!

12:50:54

**Nelson, Reid <reidn@amazon.com>**
EXACTLY!

12:51:02

**Gotschall, Mary Pat <marypat@amazon.com>**
oh good - glad to hear you are having some fun

12:51:02

**Nelson, Reid <reidn@amazon.com>**
I've been sick the whole time, but making the best of it

12:51:27

**Gotschall, Mary Pat <marypat@amazon.com>**
oh no, a cold or ?

12:51:42

**Nelson, Reid <reidn@amazon.com>**
That late night 6-pager race to the finish, with the two red eye flights (SEA to NY, then NY to Lisbon), Then 22 hour crash course adventure in Lisbon, THEN 3 days of Oktoberfest

12:52:09

**Nelson, Reid <reidn@amazon.com>**
It was bound to happen…

12:52:15

**Nelson, Reid <reidn@amazon.com>**
Too much stress on the body, too much exposure to germs…not enough sleep

12:52:26

**Nelson, Reid <reidn@amazon.com>**
Yup, cold…I'm hanging in here

12:52:45

**Gotschall, Mary Pat <marypat@amazon.com>**
totally makes sense. try and rest up!

12:52:52

**Nelson, Reid <reidn@amazon.com>**
I've got meds and vitamins and the excitement of research

12:52:55

**Nelson, Reid <reidn@amazon.com>**
Just hanging in the hotel taking it easy tonight :)

12:53:02

**Gotschall, Mary Pat <marypat@amazon.com>**
good - you should go do that now!

12:53:19

**Gotschall, Mary Pat <marypat@amazon.com>**
it's 10pm right?

12:53:25

**Nelson, Reid <reidn@amazon.com>**
Oh yeah, I am, don't worry!

12:53:38

AMZN-PRM-FTC-002381017

**Nelson, Reid <reidn@amazon.com>**
Just had the laptop open passively… It's nice to chat with you though. We don't get many chances ;)

12:54:00

**Nelson, Reid <reidn@amazon.com>**
Plus it gets lonely being solo on the road. Good to stay in contact with Ground Control

12:54:35

**Gotschall, Mary Pat <marypat@amazon.com>**
:) Doesn't sound like you've had a minute to be lonely! but yes - I am here and always happy to chat! Sleep well and keep us posted on how the study is going (no pressure on nuggets tho - just was curious to hear how it was going!)

12:56:03

**Nelson, Reid <reidn@amazon.com>**
Yeah, I'll probably steer clear of nuggets honestly

12:56:28

**Gotschall, Mary Pat <marypat@amazon.com>**
totes fine!

12:56:36

**Nelson, Reid <reidn@amazon.com>**
We'll see :)

12:56:41

**Nelson, Reid <reidn@amazon.com>**
Have a great day!

12:57:32

**Gotschall, Mary Pat <marypat@amazon.com>**
you too (night!)

12:57:44

**Nelson, Reid <reidn@amazon.com>**
Hey! I can't remember…did you send me my final L7 promo doc (with peer feedback removed)? Elisa Chan from the Amazon Music team is asking if I could share with her…she's gunning for L7…

13:27:16

**Gotschall, Mary Pat <marypat@amazon.com>**
Not sure but can do. I'm in an OP1 review but will send later

13:32:39

**Nelson, Reid <reidn@amazon.com>**
Sweet

13:32:48

**Nelson, Reid <reidn@amazon.com>**
Is this the Dev review?

13:32:58

**Gotschall, Mary Pat <marypat@amazon.com>**
no this is for AD

13:34:13

**Nelson, Reid <reidn@amazon.com>**
Eww

13:34:21

**Gotschall, Mary Pat <marypat@amazon.com>**
the Dev review keeps getting rescheduled

13:34:28

**Nelson, Reid <reidn@amazon.com>**
Ugh… What a shit show. Thanks for protecting all of us… Well, as best you can that is

13:34:52

**Gotschall, Mary Pat <marypat@amazon.com>**
it is a shit show! Paul isn't protected so i'm not doing the greatest job there. this place is hard to make sure the pile of shit doesn't fall on us

13:36:47

**Nelson, Reid <reidn@amazon.com>**
Light at the end of the tunnel

13:37:10

**Nelson, Reid <reidn@amazon.com>**
We'll get through it together…Always have

13:37:24

**Gotschall, Mary Pat <marypat@amazon.com>**

CONFIDENTIAL

L7 Promo example.docx - This file type is not supported for embedded threading. See attached child.

13:45:01

**Nelson, Reid <reidn@amazon.com>**

Thank you!

13:52:02

**End Thread**

**Thread Statistics**

Instant Message Count 122

AMZN-PRM-FTC-002381019

# EXHIBIT 85

Page Vault

| | |
|---|---|
| Document title: | 2020 Census: 1 in 6 People in the United States Were 65 and Over |
| Capture URL: | https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html |
| Page loaded at (UTC): | Sun, 15 Jun 2025 04:14:25 GMT |
| Capture timestamp (UTC): | Sun, 15 Jun 2025 04:15:18 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 8 |
| Capture ID: | wbTGS5vyoqqtPG1vkD6cfc |
| Display Name: | xcarter |

An official website of the United States government   Here's how you know ⌄

# United States Census Bureau

Partners    Researchers    Educators    Survey Respondents    News    NAICS Codes    Jobs    About Us    Contact Us    Help

**Topics**    **Data & Maps**    **Surveys & Programs**    **Resource Library**

Search data, events, resources, an... 🔍



## 2020 Census: 1 in 6 People in the United States Were 65 and Over

// Census.gov  ›  Library  ›  America Counts: Stories  ›  2020 Census: 1 in 6 People in the United States Were 65 and Over

# U.S. Older Population Grew From 2010 to 2020 at Fastest Rate Since 1880 to 1890

May 25, 2023
**Written by:** Zoe Caplan

The U.S. population age 65 and over grew nearly five times faster than the total population over the 100 years from 1920 to 2020, according to the 2020 Census.

The older population reached 55.8 million or 16.8% of the population of the United States in 2020.

Share     Facebook     X (Twitter)     LinkedIn



Figure 1.
**Population 65 Years and Over by Size and Percentage of Total Population: 1920 to 2020**

## Related America Counts Stories



America Counts Story

**An Aging U.S. Population With Fewer Children in**

---



Note: For information on data collection, confidentiality protection, nonsampling error, and definitions, refer to <https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/demographic-and-housing-characteristics-file-and-demographic-profile/2020census-demographic-and-housing-characteristics-file-and-demographic-profile-techdoc.pdf>.
Source: U.S. Census Bureau, Decennial Census of Population, 1900 to 2000; 2010 Census Summary File 1, and 2020 Census Demographic and Housing Characteristics File (DHC).

Figure 1 shows the number and percentage of people age 65 and over in decennial censuses since 1920.

> **In 2020, about 1 in 6 people in the United States were age 65 and over. In 1920, this proportion was less than 1 in 20.**

The older population increased by 50.9 million, from 4.9 million (or 4.7% of the total U.S. population) in 1920 to 55.8 million (16.8%) in 2020. This represents a growth rate of about 1,000%, almost five times that of the total population (about 200%).

In 2020, about 1 in 6 people in the United States were age 65 and over. In 1920, this proportion was less than 1 in 20.

## Growth in Older Population Spiked 2010-2020

The older population has been growing for the past 100 years but the decade before 2020 saw its fastest increase since 1880 to 1890. From 2010 to 2020, the 65-plus population experienced its:

- Largest-ever 10-year numeric gain — an increase of 15.5 million people. The next largest 10-year numeric increase, 5.7 million between 1980 and 1990, was less than half that size.
- Largest-ever percentage-point increase, from 13.0% to 16.8% of the total population. Before 2010, it took 50 years — from 1960 to 2010 — for the older population's share of the total population to grow by the same number of percentage points.
- Fastest growth rate, 38.6% from 40.3 million to 55.8 million. This was the fastest growth rate of any decade since 1880 to 1890 (40.3%) and more than twice as fast as the previous decade (15.1% from 2000 to 2010). The older population also grew five times faster than the total population, which grew by 7.4%.

## The Baby Boomers Factor

The rapid growth was largely driven by aging baby boomers (born between 1946 and 1964) who began turning 65 in 2011.



Figure 2.
**Population by Sex and Age: 2010 and 2020**



America Counts Story

**An Aging U.S. Population With Fewer Children in 2020**

May 25, 2023

The age profiles of states and communities don't always mirror the national picture.



America Counts Story

**Family Households Still the Majority**

May 25, 2023

One-person households increased but family households remained two-thirds of all households in 2020.





America Counts Story

**Share of U.S. Coupled Households Declined in 2020**

May 25, 2023

Coupled households still made up more than half of all U.S. households but their share dropped since 2000.


Top



May 20, 2020

Coupled households still made up more than half of all U.S. households but their share dropped since 2000.



Figure 2.
**Population by Sex and Age: 2010 and 2020**



Note: While generally accurate (refer to "2020 Census Data Quality" at <www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/process/data-quality.html>), there was notable age heaping in the 2020 Census. This has been previously identified by demographers at the Census Bureau (<www.census.gov/newsroom/blogs/random-samplings/2022/04/population-estimates-covid-19-impacts.html>) and more recently <www.census.gov/newsroom/blogs/random-samplings/2023/05/age-heaping-2020-census-dhc.html>) and work is under way to investigate modifying future products based on the 2020 Census to address this phenomenon. For information on data collection, confidentiality protection, nonsampling error, and definitions, refer to <https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/demographic-and-housing-characteristics-file-and-demographic-profile/2020census-demographic-and-housing-characteristics-file-and-demographic-profile-techdoc.pdf>.
Source: U.S. Census Bureau, 2010 Census Summary File 1 and 2020 Census Demographic and Housing Characteristics File (DHC).

Superimposed 2010 and 2020 age-sex pyramids show how the aging of the baby boomer generation affected the age distribution of the United States (Figure 2).

In 2010, the baby boom population appears as a bulge in the middle of the pyramid at ages 46 to 64. In 2020, the bulge is higher, when boomers were ages 56 to 74 and nearly half were over 64.

By 2030, all baby boomers will be age 65 and over and the growth in the older population is projected to start slowing.

Figure 3.
**Population Size of Older Age Groups: 2010 and 2020**
(In millions)



Document title: 2020 Census: 1 in 6 People in the United States Were 65 and Over
Capture URL: https://www.census.gov/library/stories/2023/05/2020-census-united-states-older-population-grew.html
Capture timestamp (UTC): Sun, 15 Jun 2025 04:15:18 GMT

13.1

5.7

5.1

0.4    0.6

65 to 74 years    75 to 84 years    85 to 94 years    95 and over

Note: For information on data collection, confidentiality protection, nonsampling error, and definitions, refer to <https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/demographic-and-housing-characteristics-file-and-demographic-profile/2020census-demographic-and-housing-characteristics-file-and-demographic-profile-techdoc.pdf>.
Source: U.S. Census Bureau, 2020 Census Demographic and Housing Characteristics File (DHC).

## Growth Varies by Age Groups

While the older population grew from 2010 to 2020, the size and rate varied for older age groups (Figure 3).

In 2020, the 65-74 age group:

- Was the largest of the older age groups with 33.1 million people, representing over half of the 65-and-over population.
- Represented 1 in 10 Americans in 2020.
- Experienced the largest growth of any older age group the previous decade. Its numbers grew by 11.4 million or 52.5%, increasing from 21.7 million in 2010 to 33.1 million in 2020.

Other findings:

- The 75-to-84 age group grew at about half that rate (25.1%) but is expected to pick up the pace in the next decade as baby boomers age into this group.
- The 85-to-94 age group experienced relatively slower growth (12.6%) than other older age groups, increasing from 5.1 million to 5.7 million.
- The population 95 years and over also experienced a large growth rate (48.6%), increasing from about 425,000 in 2010 to 631,000 in 2020.

## United States is Getting Older, But Still Younger Than Many

While the share of the U.S. population age 65 and over grew, the nation remained relatively young compared to many of its peer nations in 2020 (Figure 4).

Japan had the largest share (28.5%) of older residents. The United States ranked 34th (16.8%) among these places. Many European countries, along with Canada and Hong Kong, had higher shares of older residents than the United States.

Among countries with at least 15% of their population age 65 and over, New Zealand, Russia and Cuba had the smallest proportions of older residents.



Figure 4.
**Countries or Areas With Largest Percentage Age 65 and Over: 2020**

| Country | Percentage |
|---|---|
| Japan | 28.5 |
| Italy | 22.6 |
| Greece | 22.4 |
| Germany | 22.3 |
| Puerto Rico | 22.3 |
| Finland | 22.3 |
| Slovenia | 21.2 |
| Croatia | 21.1 |
| Romania | 21.0 |
| Estonia | 20.9 |
| Portugal | 20.9 |
| Hungary | 20.6 |
| France | 20.5 |
| Latvia | 20.4 |
| Lithuania | 20.4 |
| Sweden | 20.3 |
| Czechia | 20.2 |
| Bulgaria | 20.0 |
| Denmark | 19.9 |
| Austria | 19.8 |
| Netherlands | 19.8 |



Top



Note: Figure excludes countries and areas with less than 1,000,000 total population. For information on data collection, confidentiality protection, nonsampling error, and definitions, refer to <https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/demographic-and-housing-characteristics-file-and-demographic-profile/2020census-demographic-and-housing-characteristics-file-and-demographic-profile-techdoc.pdf>.
Source: U.S. Census Bureau, 2020 Census Demographic and Housing Characteristics File (DHC) and International Database, accessed February 3, 2023.

The Older Population: 2020 provides more information about the nation's 65-plus population.

Use the interactive data visualizations to explore data for the older population at lower levels of geography.

## Data Visualizations

How Has Our Nation's Population Changed?
Exploring Age Groups in the 2020 Census

*Zoe Caplan is a statistician demographer in the Census Bureau's Sex and Age Statistics Branch.*

# Additional Resource

View this short Data Gem video to learn how to use the interactive data visualizations to access more information about the growth of the older population.





Top



!  This video is private

This article was filed under:

 Age    Older and Aging    Population    Sex

## Related Statistics

Stats for Stories

## Older Americans Month: May 2023

May 2023

The 2021 American Community Survey estimated there were 55,892,014 people aged 65 and over in the U.S. out of a total population of 331,893,745, or 16.8%.



# Subscribe

Our email newsletter is sent out on the day we publish a story. Get an alert directly in your inbox to read, share and blog about our newest stories.

SIGN UP TODAY

Contact our Public Information Office for media inquiries or interviews.

# More stories

America Counts: Stories 



Housing

**Property Insurance Costs Can be High in Every U.S.**



Emergency Preparedness

**Preparing for the 2025 Hurricane Season**



Population

**How Native North American Language Use**



Population

**Puerto Rico Community Survey Offers Detailed**

˄
Top



**Housing**

### Property Insurance Costs Can be High in Every U.S. Region

June 10, 2025

American Community Survey data show the price of property insurance varied widely across the nation, but every region had pockets of high cost.





**Emergency Preparedness**

### Preparing for the 2025 Hurricane Season

June 05, 2025

Hurricane season began June 1 and we highlight Census Bureau tools available to help communities prepare for, respond to and recover from natural disasters.





**Population**

### How Native North American Language Use Changed in the United States

June 03, 2025

An updated table package reveals how over 500 languages spoken at home changed from 2013 to 2021.





**Population**

### Puerto Rico Community Survey Offers Detailed Look at Island Population

May 28, 2025

The 2019-2023 and most recent American Community Survey includes Puerto Rico Community Survey data on 78 municipios down to census tracts and block groups.

---

Page Last Revised - May 25, 2023

Some content on this site is available in several different electronic formats. Some of the files may require a plug-in or additional software to view.

The content on this page includes a link to a non-government website. Our linking to these sites does not constitute an endorsement of any products, services or the information found on them. Once you link to another site you are subject to the policies of the new site.

## Receive Updates

To sign up for updates please enter your email address.

Enter your email address        **SUBSCRIBE**

## Stay Current

America Counts
Director's Blog
Deputy Director's Blog
Random Samplings
Research Matters

## Stay Connected

Contact
Support
Jobs

## Follow

Information Quality | Data Linkage Infrastructure | Data Protection and Privacy Policy | Accessibility | FOIA | Inspector General | No FEAR Act | U.S. Department of Commerce | USA.gov

⌃
Top

**Measuring America's People and Economy**

# EXHIBIT 86

Page Vault

| | |
|---|---|
| Document title: | What is Two-Step Verification? - Amazon Customer Service |
| Capture URL: | https://www.amazon.com/gp/help/customer/display.html?nodeId=G3PWZPU52FKN7PW4 |
| Page loaded at (UTC): | Sat, 14 Jun 2025 22:54:59 GMT |
| Capture timestamp (UTC): | Sat, 14 Jun 2025 22:57:47 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 3 |
| Capture ID: | rNGhaVtgHMHWnhrkEXe9dE |
| Display Name: | xcarter |

Case 3:21-cv-00932-JHC    Document 361-1    Filed 06/11/25    Page 84 of 193

Deliver to
Los Angeles 90044

Hello, sign in
Account & Lists

Returns
& Orders

0
Cart

EN

≡ All   Amazon Haul   Medical Care ▾   Saks   Best Sellers   Amazon Basics   New Releases   Registry   Groceries ▾   Today's Deals   Music   Gift Cards ▾   Smart Home

# Help & Customer Service

## ‹ All Help Topics

## Account Settings

Change Your Account Settings

Change Your Language Preference

About the Spanish Language Experience

Reset Your Password

Change Your Password

Why Can't I Sign into My Account?

Unsubscribe from Amazon Marketing

Change Your Subscription Email Preferences

**What is Two-Step Verification?**

Recover Your Account after Two-Step Verification Fails

Manage an 'E-mail address already in use' Error

Manage a 'Multiple accounts use the same email' Error

What Is a Teen Login?

Set Order Approvals for a Teen Login

Removing a Teen Login from an Amazon Household

Approve a Teen's Order

## Quick solutions


**Your Orders**
Track or cancel orders


**Returns & Refunds**
Exchange or return items


**Manage Prime**
Cancel or view benefits


**Payment Settings**
Add or edit payment methods


**Carrier Info**
Shipping carrier information

**Account Settings**
Change email or password

---

### Find more solutions

🔍

Managing Your Account  ›  Account Settings  ›

## What is Two-Step Verification?

Two-Step Verification is a feature that adds an extra layer of security to your account log-in.

When you try to log in, Two-Step Verification sends you a unique security code. When you sign up for Two-Step Verification, you can choose to receive the security code by text message or authenticator app.

You need to enter both the code and your password to log in.

To enable two-step verification, go to

**Your Account**

### To enable Two-Step2-Step Verification:

1. In **Your Account**, select Login & security.
2. Select **Get Started**.
3. Follow the on-screen instructions.

### To disable Two-Step Verification:

1. In **Your Account**, select Login & security.
2. Select **Disable** beside **Two-Step Verification**.
3. Enter the code sent to your phone number, or generated through the authenticator app.
4. Select **Verify code**.

### Related links

Manage Your Account

Recover Your Account after Two-Step Verification Fails

Was this information helpful?

Yes    No

Back to top

---





Manage Prime
Cancel or view
benefits

Payment
Settings
Add or edit
payment methods

Carrier Info
Shipping carrier
information

Account Settings
Change email or
password

Was this information helpful?
Yes   No

Back to top

**Get to Know Us**
Careers
Amazon Newsletter
About Amazon
Accessibility
Sustainability
Press Center
Investor Relations
Amazon Devices
Amazon Science

**Make Money with Us**
Sell on Amazon
Sell apps on Amazon
Supply to Amazon
Protect & Build Your Brand
Become an Affiliate
Become a Delivery Driver
Start a Package Delivery Business
Advertise Your Products
Self-Publish with Us
Become an Amazon Hub Partner
› See More Ways to Make Money

**Amazon Payment Products**
Amazon Visa
Amazon Store Card
Amazon Secured Card
Amazon Business Card
Shop with Points
Credit Card Marketplace
Reload Your Balance
Gift Cards
Amazon Currency Converter

**Let Us Help You**
Your Account
Your Orders
Shipping Rates & Policies
Amazon Prime
Returns & Replacements
Manage Your Content and Devices
Recalls and Product Safety Alerts
Registry & Gift List
Help

English     United States

Amazon Music
Stream millions
of songs

Amazon Ads
Reach customers
wherever they
spend their time

6pm
Score deals
on fashion
brands

AbeBooks
Books, art
& collectibles

ACX
Audiobook
Publishing
Made Easy

Sell on Amazon
Start a Selling
Account

Veeqo
Shipping
Software
Inventory
Management

Amazon
Business
Everything For
Your Business

Amazon Fresh
Groceries & More
Right To Your
Door

AmazonGlobal
Ship Orders
Internationally

Home Services
Experienced Pros
Happiness
Guarantee

Amazon Web
Services
Scalable Cloud
Computing
Services

Audible
Listen to Books
& Original
Audio
Performances

Box Office Mojo
Find Movie
Box Office Data

Goodreads
Book reviews
&
recommendations

IMDb
Movies, TV
& Celebrities

IMDbPro
Get Info
Entertainment
Professionals
Need

Kindle Direct
Publishing
Indie Digital &
Print Publishing
Made Easy

Amazon Photos
Unlimited Photo
Storage
Free With Prime

Prime Video
Direct
Video
Distribution
Made Easy

Shopbop
Designer
Fashion Brands

Amazon Resale
Great Deals on
Quality Used
Products

Whole Foods
Market
America's
Healthiest
Grocery Store

Woot!
Deals and
Shenanigans

Zappos
Shoes &
Clothing

Ring
Smart Home
Security Systems

eero WiFi
Stream 4K Video
in Every Room

Blink
Smart Security
for Every Home

Neighbors App
Real-Time Crime
& Safety Alerts

Amazon
Subscription
Boxes
Top subscription
boxes – right to
your door

PillPack
Pharmacy
Simplified

Amazon
Renewed
Like-new
products
you can trust

Conditions of Use    Privacy Notice    Consumer Health Data Privacy Disclosure    Your Ads Privacy Choices
© 1996-2025, Amazon.com, Inc. or its affiliates

# EXHIBIT 87

# Web Data Collection Report

**Page Title**

Research Now Group LLC - Company Profile and News - Bloomberg Markets

**URL**

https://www.bloomberg.com/profile/company/3431331Z:US

**Collection Date**

Sat Jun 14 2025 22:40:44 GMT-0700 (Pacific Daylight Time)

**Collected by**

hh.paralegals@hueston.com (hh.paralegals@hueston.com)

**IP Address**

68.5.31.170

**Browser Information**

Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36

**Digital Signature (SHA256 / PKCS#1v1.5)**

775a1617ac4bd13ec2d795cb24c2edf8c7d47704bb7ea1864eb3bb64997a55703d17fbb60
2a68e54822c0677f2d50c96c120b2252cc5750437918ac0cf3288d58b6bd216b748396ebf
5d5768f481c02c1ac1cd7754058ee30190b09a8ffc2bbe2d8f4292ba01fd3a33fb7e7b9e7
8be7f2ad5937dcee414711de330c1525c099c0a13ff936d4f08b648744d78c02da3b86200
5ccfd313e9fa34c48820442c0a70423eec96f99a75c0d4be2ac9a835e7c34eef52392566
30f6d7b63d2b824bf88c4c192115bf480cd57f5052d11cbf47a796a5f76b8ca635518f4c5
e07b8b997dd7c0766b20c9b3b8cb1b4ea4dd25acfe902c80959df6b861d4264acfebed8
ca81

# File Signatures

## SCREEN CAPTURE

### MHTML

**File Name**

https-www.bloomberg.com-profile-company-3431331Z-US-Jun-14-25-22-40-44-GMT-0700-(PDT).mhtml

**Hash (SHA256)**

2bf17b55ebb261666a229773cb3a9314bd6c0c2fe1fd39cf61eaaf5489a0fa7c

**Signature (PKCS#1v1.5)**

7d444c5f26dd9334fde0d1a16f3760985b5ba8eee94c2f910086f5c706b3f3bc3736ef6b6
2a9c51056692d49c74377373247973300edc7f31a23503f4197d4f05fef9c2f9bc5500352
a4821aa8d140d657c3dcd245afb22064e1cc955c1239ceff69fc4c269422dbef862ecc0ff
654b3fe38331642c89ac8c910a98dd11ef30e030fba6bc768787899fc7ae09a31562500de
d3caf83cbea69ee00b2f1a377f10678c21f60c561cd4d46831ba0774445a4d2ed8b915b56
8f0b28a453be571c47978f28b638b6370583150feca43874dc1f5cc1fd05cdbc1e1586da3
2d49e0099330a538f2a2b025cb4c25fca3e5cd3b4900d83ed11a4802ddf972417a1896d9
1b





**File Name**
https-www.bloomberg.com-profile-company-3431331Z-US-Jun-14-25-22-40-44-GMT-0700-(PDT)_0.jpg

**Hash (SHA256)**
70e6e23107da58b1589558fb9c7088d9c927c9896dca5f4198eb16385667e7e6

**Signature (PKCS#1v1.5)**
2e38b5f40f54fe34255dbbec5ca39e9efb922d78ffce679a63ecdb38bc998e36cc8c363baa4a2db2e
e6f53e41330734cb17a6f4c5c006a73e9741395ff26b3c680597d9b50cacfdcd28cce17168c16961a4
6cc1f11fbc1b1b395205edfe2021900feb664042db4e564d0b5b3b30d4af453d78b1f8e3100c6063a7
9ceffb14d23bcce78920fc8093a390f5244ca6ce3a5512f7b527d72ae2ddeb3b4d28d2ca6bf92e891
d30634566777be15037008d02131ba7b60f7f5a504c19b2af6832c95755eaf7ea8c1e8cf146a2f9c
483070811371658151738d3d7809a74f008ee8a18d80e347dcc656ecbdf55d0d57e359e1b4c008909
309a40bec294afc17e51452d

**URL**
https://www.bloomberg.com/profile/company/3431331Z:US

**Timestamp**
Sat Jun 14 2025 22:40:44 GMT-0700 (Pacific Daylight Time)

# Research Now Group LLC

Research Now Group LLC, doing business as Dynata, provides online market research services. The Company offers online customer database integration, survey creation, tracker, custom profiling, and digital data collection services. Dynata serves banking, healthcare, media and advertising, market research agencies, and technology industries worldwide.

| SECTOR | INDUSTRY | SUB-INDUSTRY | INCORPORATED |
|---|---|---|---|
| Communications | Media | Internet Media & Services | 04/01/1999 |

| ADDRESS | WEBSITE | NO. OF EMPLOYEES |
|---|---|---|
| 06484 United States | | |

Trade brilliantly with Schwab.     charles SCHWAB

## Executives

| NAME/TITLE | |
|---|---|
| **John Rothwell** | 3/2016-PRESENT |
| President/COO | |
| **Tiama Hanson-Drury** | 1/2019-PRESENT |
| Exec VP.Product Development | |
| **Kathy Rowley** | 2/2015-PRESENT |
| Chief Human Resource Officer | |

## Board Members

| NAME/COMPANY |
|---|
| **Geoff Westmore** |
| **John A Deighton** |
| **J Braxton Carter** |

VIEW MORE ⌄

## Most Popular

| APPLE INC | TESLA INC | BLUE FILM PRODUCTIONS SAS | BOEING CO/THE | CIRCLE INTERNET |
|---|---|---|---|---|
| 196.45 | 325.31 | Private Company | 200.32 | 133.56 |
| ▼ -2.75 -1.38% | ▲ +6.20 +1.94% | | ▼ -3.43 -1.68% | ▲ +27.02 +25.36% |

### People Also Search For

| | |
|---|---|
| CL1:COM | |
| WTI Crude | |
| 72.98 USD/bbl ▲ +4.94 +7.26% | |
| INDU:IND | |
| DJIA | |
| 42,197.79 USD ▼ -769.83 -1.79% | |
| SPX:IND | |
| S&P 500 | |
| 5,976.97 USD ▼ -68.29 -1.13% | |
| ES1:IND | |
| Generic 1st 'ES' Future | |
| 6,031.50 USD ▼ -71.50 -1.17% | |
| DM1:IND | |
| Generic 1st 'DM' Future | |
| 42,523.00 USD ▼ -793.00 -1.83% | |

## More from Bloomberg

**File Name**
https-www.bloomberg.com-profile-company-3431331Z-US-Jun-14-25-22-40-44-GMT-0700-(PDT)_1.jpg

**URL**
https://www.bloomberg.com/profile/company/3431331Z:US

**Hash (SHA256)**
4ee534470655cb1f23956184e6072098642dc2f2c97e2d33761b4c4a78974e5b

**Timestamp**
Sat Jun 14 2025 22:40:44 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
0b6388e83ffc4cc0406286b54ae7e5faa8255f7c1cb23743904decf3bc06ea15c88158b8943b8a33a
e535b98099d6851340539da0c618462bbcf633c950e5ea4243d368756de3da9dbfe874c37e8fdfae6
b08d3dabc6a1498e00621a5a556c08d08116fca8861938e46f54f9cf72d2e3f37d4721e8b86fd1a25
2ab43a55789252415a8bfa101310839a43caa85f19746f013c4e8f87ee95756c0b314ed720bf889b7
90e72bb3b1e9250cf01218554cb6bad87fc080d524904a06217d0d0b587c573069eee9de59bd074a
92f79cb30678094888e2f78ef50f9c4621f563f5166072bdb2dbd0a2fa83d0f29a317a82341a632057
c69d0e5cef29c841056f61d5e6



6,031.50 USD ▼ -71.50 -1.17%

DM.IND
Generic 1st 'DM' Future
42,523.00 USD ▼ -793.00 -1.83%

## More from Bloomberg



**Manhunt Is On for Suspected Killer of Democrats in Minnesota**



**Iran Conflict Ensnares Energy as Israel Hits Giant Gas Field**



**Airbus Says Air India Accident Is Learning Moment for Industry**



**Trump Administration Orders 500,000 Immigrants to Leave US**

## Bloomberg

Terms of Service    Do Not Sell or Share My Personal Information    Careers    Made in NYC    Advertise    Ad Choices ▷    Help

Trademarks    Privacy Policy    ©2025 Bloomberg L.P. All Rights Reserved.

**File Name**
https-www.bloomberg-com-profile-company-3431331Z-US-Jun-14-25-22-40-44-GMT-0700-(PDT)_2.jpg

**URL**
https://www.bloomberg.com/profile/company/3431331Z:US

**Hash (SHA256)**
75be71d0388b636d50044f514e1a344348bd31c1511ce736ecd9efe623f833ba

**Timestamp**
Sat Jun 14 2025 22:40:44 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
804a8f0db06e4d4100c2d4031115ea56e1c8fb0f4304a77a216e6889145ce2b27d13db2c74630d370c
a2ea492f878fcedcf73b3ed2312f11685629201a0f2621b2118c22f6f3c88c7bbfed5c75451a26b71
1ec8f75b4b316bdb9c66efe283f2acfc8240a62539ca9b85f1d2a6b9e4b7fa1d06a4f5f0b78084afb
6946a07ec03b35be88b7f2c090dbfd10aef6abaca8425b935b425598218f0a4522863205e473ec12
f81161890535ea3f7cff72414d75ab3528c2b9387cc25e5b90902c36d8aabf21823edda922e0ddfa5
e19bd3f68825972f461a0100958014166766c8f058b6dab9983e208c597d60d6b2768a91c0768fd4
80707473781e8e2d0cc53dc155

# EXHIBIT 88

**Appendix F.1**

# Cancellation Survey
# Questionnaire

[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]
*Notes to respondents in italics.*

**[PROGRAMMER: PLACE DEVICE SNIFFER AT BEGINNING OF SURVEY. ASK RESPONDENTS TO RETURN IF NOT ON A QUALIFIED DEVICE. QUALIFIED DEVICES DEFINED IN S10.]**

## Introduction

Thank you for agreeing to participate in this survey. Please take a few moments to answer our questions.

This survey will take approximately 10 minutes to complete. Please take the survey in one session without interruption. While taking the survey, please answer all questions on your own without consulting any other source of information (including websites, books, or another person).

If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.

For each question, if you don't know or if you don't have an answer, please don't guess. Just select the "Don't know / not sure" option and click "Next" to proceed.

Your responses will be treated confidentially and will not be used to sell you anything.

**[NEXT PAGE]**

**S1.**  To confirm that you are a person, please enter the code exactly as it appears in the image below, and then click the "Next" button.

Please do not include any spaces.

**[PROGRAMMER: PIPE IN ONE RANDOM CODE. CONFIRM THAT WHAT THE RESPONDENT TYPES MATCHES THE CODE.]**
TEXT BOX: _____

**[PROGRAMMER: TERMINATE IF THE CODE DOES NOT MATCH AFTER THE THIRD TRY.]**

**[NEXT PAGE]**

First, please answer a few short questions to determine whether you qualify for the survey.

**[NEXT PAGE]**

**Appendix F.1**

**S60.** You will now be asked some questions about the activities that you have done in the past 12 months.

Which of the following activities, if any, have you done in the past 12 months?

*Select all that apply.*

**[PROGRAMMER: RANDOMIZE ANSWER OPTIONS EXCEPT 5 ("None of the above") AND 6 ("Don't know / not sure"). ALLOW MULTIPLE SELECTIONS.**
**TERMINATE IF RESPONDENT DOES NOT SELECT 1 ("Shopped online"). ALL OTHERS GO TO S70.]**

1. Shopped online
2. Read news online
3. Used an online social network
4. Used online banking
5. None of the above **[SINGLE PUNCH]**
6. Don't know / not sure **[SINGLE PUNCH]**

**[NEXT PAGE]**

**S70.** You indicated that you have shopped online in the past 12 months.

Which of the following websites, if any, have you shopped on in the past 12 months?

*Select one answer for each row.*

**[PROGRAMMER: RANDOMIZE ORDER OF ROWS. RANDOMIZE ORDER OF COLUMNS 2 ("Shopped on this website") AND 3 ("Did not shop on this website"). REQUIRE EXACTLY ONE SELECTION PER ROW.**
**TERMINATE IF RESPONDENT SELECTS "Shopped on this website" FOR "BoardGameBin.com" OR "UrbanOutpost.com." ALL OTHERS GO TO S80.]**

|  | Shopped on this website | Did not shop on this website | Don't know / not sure |
|---|---|---|---|
| Amazon.com |  |  |  |
| Walmart.com |  |  |  |
| Target.com |  |  |  |
| HomeDepot.com |  |  |  |
| BestBuy.com |  |  |  |
| Kroger.com |  |  |  |
| Ebay.com |  |  |  |
| DisneyStore.com |  |  |  |
| BoardGameBin.com |  |  |  |
| UrbanOutpost.com |  |  |  |

**[NEXT PAGE]**

# Appendix F.1

**S80.** Which of the following services, if any, do you <u>currently</u> have a membership / subscription with?

Please <u>include</u> memberships / subscriptions that you <u>currently own</u>, and memberships / subscriptions that you <u>currently share</u> with members of your household.

*Select one answer for each row.*

**[PROGRAMMER: RANDOMIZE ORDER OF ROWS. ORDER OF COLUMN 2 ("Currently have this membership / subscription") CORRESPONDS TO ORDER OF COLUMN 2 ("Shopped on this website") IN S70. ORDER OF COLUMN 3 ("<u>Do not</u> currently have this membership / subscription") CORRESPONDS TO ORDER OF COLUMN 3 ("<u>Did not</u> shop on this website") IN S70. REQUIRE EXACTLY ONE SELECTION PER ROW.**
**TERMINATE IF RESPONDENT DOES NOT SELECT "Currently have this membership / subscription" FOR "Amazon Prime." TERMINATE IF RESPONDENT SELECTS "Currently have this membership / subscription" FOR "eBay Premier." ALL OTHERS GO TO S90.]**

|  | Currently have this membership / subscription | <u>Do not</u> currently have this membership / subscription | Don't know / not sure |
|---|---|---|---|
| **Amazon Prime** |  |  |  |
| **Walmart+** |  |  |  |
| **Sam's Club** |  |  |  |
| **My Best Buy Plus** |  |  |  |
| **Kroger Boost** |  |  |  |
| **eBay Premier** |  |  |  |
| **Netflix** |  |  |  |
| **Disney+** |  |  |  |
| **Uber One** |  |  |  |
| **YouTube Premium** |  |  |  |
| **Apple TV+** |  |  |  |
| **Spotify Premium** |  |  |  |
| **New York Times** |  |  |  |
| **Wall Street Journal** |  |  |  |

**[NEXT PAGE]**

# Appendix F.1

**S90.** For quality control purposes, please select the "Other, please specify" option below and type the word "survey" into the space provided.

*Select only one.*

**[PROGRAMMER: REVERSE ORDER 1 ("Strongly agree") THROUGH 5 ("Strongly disagree") ACROSS RESPONDENTS. ALLOW ONLY ONE SELECTION.**
**TERMINATE IF RESPONDENT DOES NOT SELECT 6 ("Other, please specify") AND DOES NOT ENTER "survey" INTO TEXT BOX (NOT CASE SENSITIVE). ALLOW CLOSE MISSPELLINGS LISTED IN APPENDIX E. ALL OTHERS GO TO STIMULUS_INTRO.]**

1. Strongly agree
2. Agree
3. Neither agree nor disagree
4. Disagree
5. Strongly disagree
6. Other, please specify: **[TEXT BOX; DO NOT FORCE RESPONSE IF SELECTED]**

# Appendix F.1

**Stimulus**

**STIMULUS_INTRO.** You have qualified to take this survey.

**[PROGRAMMER: ALL GO TO A_INTRO.]**

**[NEXT PAGE]**

**A_INTRO.** In what follows, we will ask you to go through a simulated process of cancelling your Amazon Prime membership.

You will begin on the Prime Central page of the simulated Amazon website where you can manage your Amazon Prime membership settings.

Please interact with the simulated website as you would if you wanted to <u>cancel</u> your Amazon Prime membership.

When you complete the simulation, you will be asked some questions about your experience.

Please note that this is only a simulation. Your real Amazon Prime membership will not be affected by your choices in this survey. You will not be asked to input any personal information.

The "Next" button will appear in 5 seconds.

If you have read these instructions, please select the "Other, please specify" option below and type "agree" into the space provided.

Please select one:

**[PROGRAMMER: RANDOMIZE 1 ("I have read the instructions") AND 2 ("I have <u>not read</u> the instructions") ACROSS RESPONDENTS. ALLOW ONLY ONE SELECTION. DISPLAY THE "NEXT" BUTTON AFTER 5 SECONDS.**
**IF RESPONDENT DOES NOT SELECT 3 ("Other, please specify") AND DOES NOT ENTER "agree" INTO THE "Other, please specify" BOX (NOT CASE SENSITIVE, ALLOWING CLOSE MISSPELLINGS LISTED IN APPENDIX E), THEN DISPLAY ERROR MESSAGE "Please re-read the instructions and try to answer again." AFTER TWO INCORRECT SUBMISSIONS, TERMINATE RESPONDENT. ALL OTHERS GO TO B_INTRO.]**

1. I have read the instructions
2. I have <u>not read</u> the instructions
3. Other, please specify: **[TEXT BOX; DO NOT FORCE RESPONSE IF SELECTED]**

**[NEXT PAGE]**

# Appendix F.1

**B_INTRO.** Next, you will enter the Prime Central page of the simulated Amazon website where you can manage your Amazon Prime membership settings. Please navigate the simulated website as you would if you wanted to <u>cancel</u> your Amazon Prime membership.

Remember that that this is only a simulation. Your real Amazon Prime membership will not be affected by your choices in this survey. You will not be asked to input any personal information.

When you are ready to begin, click the "Next" button to launch the simulated website and go to the Prime Central page.

**[PROGRAMMER:**

**DEFINE VARIABLE "Pre_flow_time_spent," WHICH TRACKS HOW LONG RESPONDENT SPENDS IN A10, A20, A30, AND A40. IF "Pre_flow_time_spent" > 10 MINUTES, THEN RESPONDENT GOES TO E10. START "Pre_flow_time_spent" WHEN RESPONDENT SELECTS "Next" ON THIS PAGE.**

**DEFINE VARIABLE "Within_flow_time_spent," WHICH TRACKS HOW LONG RESPONDENT SPENDS IN A50, A60, A70, B50, B60, AND B70. IF "Within_flow_time_spent" > 10 MINUTES, THEN RESPONDENT GOES TO E10.**

**ALL GO TO A10.]**

**[NEXT PAGE]**

**Appendix F.1**

**A10. [PROGRAMMER: DEFINE VARIABLE "RENEWAL_DATE" = FIXED DATE 15 DAYS FROM THE DATE THE RESPONDENT TAKES THE SURVEY.**

**ENABLE THE FOLLOWING ELEMENTS ON THE WEBPAGE BELOW THAT DIRECT RESPONDENT TO DIFFERENT PARTS OF THE SURVEY:**

1. The "End membership" button within the "Update, cancel and more" dropdown menu.
2. The "click here" link within the "How do I cancel my Amazon Prime membership and get a refund?" option in the "Need Help?" menu.
3. The "Account & Lists" button.
4. The "Account" link within the "Account & Lists" dropdown menu.
5. The "Hello" button within the "All" side panel menu.
6. The "Your Account" button within the "All" side panel menu.
7. The "Prime Membership" link within the "Account & Lists" dropdown menu.
8. The "Manage Your Prime membership" link within the "How do I cancel my Amazon Prime membership and get a refund?" option in the "Need Help?" menu.
9. The "Manage Your Prime membership" link within the "Can I get reminded before my next billing date?" option in the "Need Help?" menu.
10. The "Amazon Prime" button in the top banner.
11. The "Memberships & Subscriptions" link within the "Account & Lists" dropdown menu.
12. Other elements that can be clicked on and would direct respondent to a different page outside of the simulation.

**IF RESPONDENT SELECTS 1 ("End Membership") OR 2 ("click here"), THEN RESPONDENT GOES TO A50, SET VARIABLE "Entered_flow" = 1, STOP "Pre_flow_time_spent," AND START "Within_flow_time_spent."**

**IF RESPONDENT SELECTS 3 ("Account & Lists"), 4 ("Account"), 5 ("Hello"), OR 6 ("Your Account"), THEN RESPONDENT GOES TO A30.**

**IF RESPONDENT SELECTS 7 ("Prime Membership"), 8 ("Manage Your Prime membership"), OR 9 ("Manage Your Prime membership"), THEN RELOAD A10.**

**IF RESPONDENT SELECTS 10 ("Amazon Prime"), THEN RESPONDENT GOES TO A20.**

**IF RESPONDENT SELECTS 11 ("Memberships & Subscriptions"), THEN RESPONDENT GOES TO A40.**

**IF RESPONDENT SELECTS ANY OTHER ELEMENT, THEN RESPONDENT GOES TO RESTART_INTRO AND STOP "Pre_flow_time_spent."]**

# EXHIBIT 89

1                UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4      --------------------------

5    FEDERAL TRADE COMMISSION,

6              Plaintiff,

7    V.                          No. 2:23-cv-0932-JHC

8    AMAZON.COM, INC., et al.

9              Defendant.         VOLUME II

10     --------------------------

11

12    30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                    ON BEHALF OF

14              FEDERAL TRADE COMMISSION

15

16           Wednesday, September 11, 2024

17                   8:50 AM

18

19

20

21   Reported by:  Denise Dobner Vickery, CRR, RMR

22   JOB NO.:   J11629623



AMANDA BASTA Vol. II 30b6                          September 11, 2024
FTC vs AMAZON.COM, INC., et al.                              417

```
 1                    P R O C E E D I N G S

 2                          - - -

 3             THE VIDEOGRAPHER:  This is a

 4   continuation of the deposition of Amanda Basta.  It

 5   is September 11, 2024 and the time on the monitor is

 6   8:50 AM.

 7                          - - -

 8                    AMANDA BASTA

 9   called for examination, and, having been previously

10   sworn, was examined and testified further as

11   follows:

12                          - - -

13                    EXAMINATION

14                          - - -

15   BY MR. KABA:

16        Q.   Good morning, Ms. Basta.

17        A.   Good morning.

18        Q.   You recognize or you acknowledge that

19   you're still under oath?

20        A.   Yes.

21        Q.   Okay.  Between our break yesterday and

22   our break and reconvening this morning, have you
```



1          Q.    Does the FTC have any evidence that

2     Mr. Lindsay was involved in any way with the

3     enrollment flows in 2014 when the FTC contends they

4     began violating ROSCA?  Yes or no.

5          A.    That's not the allegation, no.

6          Q.    Does the FTC have any evidence that

7     Mr. Ghani was involved in any way with the

8     enrollment flows in 2014 when the FTC contends they

9     began violating ROSCA?

10         A.    That's not the allegation against him,

11    no.

12         Q.    Does the FTC have any evidence that

13    Mr. Grandinetti was involved in any way with the

14    enrollment flows in 2014 when the FTC contends they

15    began violating ROSCA?

16         A.    That's not the allegation against him,

17    no.

18         Q.    The FTC contends that the cancellation

19    flows for Prime began violating ROSCA at least as

20    late as 2016; right?

21         A.    Yes.

22         Q.    Does the FTC have any evidence that



1    Mr. Lindsay was involved in any way with the

2    cancellation flows in 2016?

3             A.    That's not the allegation against him,

4    no.

5             Q.    Does the FTC have any evidence that

6    Mr. Ghani was involved in any way with the

7    cancellation flows in 2016?

8             A.    That's not the allegation against him.

9    So, no.

10            Q.    And does the FTC have any evidence that

11   Mr. Grandinetti was involved in any way with the

12   cancellation flows in 2016?

13            A.    That's not the allegation against him.

14            Q.    Okay.

15            A.    No.

16            Q.    Would you agree with me, Ms. Basta,

17   that ROSCA compliance creates challenges even for

18   those who are trying to comply with the law?

19            A.    It can, yes.

20            Q.    And that's partly because the statute

21   just -- the statute is pretty short and doesn't

22   define any of its key terms; right?



1          A.    (Pause).

2          Q.    We talked about that yesterday.

3                    MR. MENDELSON:  Objection.  Form.

4    BY MR. KABA:

5          Q.    I'll break that out for you.

6               You would agree with me that the ROSCA

7    statute uses several key terms; correct?

8          A.    Yes.

9          Q.    "Clear and conspicuous," "material,"

10   "express informed consent," "simple mechanisms," all

11   key terms of ROSCA; correct?

12         A.    Correct.

13         Q.    None of them is defined in the statute;

14   correct?

15         A.    Correct.

16         Q.    And as we've talked about over the

17   course of the day yesterday and this morning, one

18   would have to look at lots of potentially different

19   sources to try to figure out what those terms mean?

20         A.    There are lots of sources available

21   to -- to assist in the understanding, yes.

22         Q.    And so even those who would want to



 1  all the allegations that the FTC has made in this

 2  case, I want to know with respect to Mr. Lindsay

 3  what the FTC contends that was unlawful under ROSCA

 4  or Section 5 that Mr. Lindsay controlled.

 5            And let me ask you that question in a

 6  clearer way.

 7            What does the FTC allege that Amazon

 8  did wrongly under ROSCA or Section 5 which

 9  Mr. Lindsay controlled?

10       A.    (Reviews document.)

11            So one of them was in September of

12  2020 --

13       Q.   Can you cite to the paragraph you're

14  looking at?

15       A.    Sorry.  Paragraphs 216 and 217, which

16  were that when in September 2020 Amazon made certain

17  changes to the enrollment flow to increase clarity,

18  and within a few months when they assessed the

19  impact, they found out that signups went down by

20  300,000 to 500,000.  And then defendants Lindsay and

21  Ghani jointly decided to roll back the changes and

22  make that rollback permanent.



 1          Q.    Okay.  So let's start there.

 2          A.    Uh-huh.

 3          Q.    You said, in September 2020 Amazon

 4   decided to make changes to increase clarity.

 5               Is that what you said?

 6          A.    Correct.

 7          Q.    And you understand that those were

 8   changes made in attempt to improve clarity; correct?

 9          A.    Yes.

10          Q.    We don't actually know if those changes

11   did, in fact, improve clarity, do we?

12          A.    I don't know one way or the other.

13          Q.    Okay.  So just to put a finer point on

14   it, Ms. Basta, if Amazon just had those September

15   2020 flows that you claim Mr. Lindsay and Mr. Ghani

16   decided to roll back --

17          A.    Uh-huh.

18          Q.    -- in place, would the FTC say that

19   those flows are compliant with ROSCA?

20                    MR. MENDELSON:  Objection.  Scope.

21   Vague.

22                    THE WITNESS:  I don't know that



1    I've seen the flows and I don't -- so I don't know

2    one way or the other.

3    BY MR. KABA:

4            Q.    Okay.  So just so -- just so we're all

5    clear.

6            A.    Uh-huh.  Uh-huh.

7            Q.    The thing you claim Mr. Lindsay or

8    Mr. Ghani controlled was a decision to roll back

9    certain changes that had been made in September

10    2020; right?

11           A.    Correct.

12           Q.    You don't know whether those changes

13    actually improved clarity; correct?

14           A.    I don't.

15           Q.    And you don't know whether even those

16    changed flows would have been ROSCA compliant,

17    according to the many factors that you've

18    identified; correct?

19           A.    Without --

20                    MR. MENDELSON:  Objection.  Scope.

21                    THE WITNESS:  Without seeing them,

22    it would be a guess.



1    BY MR. KABA:

2            Q.    Okay.  So --

3            A.    They might be, they might not be.

4            Q.    Right.

5                  So my question for you is:  The FTC

6    does not allege that those September 2020 flows were

7    ROSCA compliant; correct?

8            A.    Correct.  But they reverted ones that

9    Mr. Ghani and Mr. Lindsay knew were causing customer

10   confusion.

11           Q.    So my question --

12           A.    Uh-huh.

13           Q.    -- is:  The FTC does not allege that

14   even those September 2020 flows were ROSCA

15   compliant; correct?

16           A.    Correct.

17           Q.    And so Mr. Ghani and Mr. Lindsay may

18   have, had they kept the September 2020 flows, the

19   FTC still may have said those flows are noncompliant

20   with ROSCA; correct?

21                     MR. MENDELSON:  Objection.  Scope.

22                     THE WITNESS:   I don't know one



1    way or the other what would have happened had

2    they -- had they been maintained.

3    BY MR. KABA:

4         Q.    Okay.  Well, you -- Amazon has produced

5    documents showing what those September 2020 flows

6    look like; right?

7         A.    Correct.

8         Q.    Okay.  And you've looked at a lot of

9    documents to prepare for your deposition today?

10        A.    Correct.

11        Q.    And can you tell us whether those

12   September 2020 flows were ROSCA compliant or not?

13        A.    I just -- I don't remember --

14                   MR. MENDELSON:  Objection.  Scope.

15                   THE WITNESS:  -- those off the top

16   of my head.

17   BY MR. KABA:

18        Q.    But I think you told me yesterday, you

19   can't just look at the flows themselves and say they

20   are or are not ROSCA compliant; right?

21        A.    Typically, no.

22        Q.    Right.



1           Typically, you need a lot more

2    information: context, consumer feedback, how people

3    are interacting with the flows, etc.; right?

4           A.   Correct.

5           Q.   And in -- it is, again, just to be very

6    clear, the decision that you're saying Mr. Ghani and

7    Mr. Lindsay made in December of 2020 was to not keep

8    in place the September 2020 changes to the

9    enrollment flows; right?

10          A.   Correct.

11          Q.   But we don't know if even those

12   September 2020 changes would have satisfied the

13   FTC's concerns about Amazon's ROSCA compliance;

14   right?

15                    MR. MENDELSON:  Objection.  Asked

16   and answered.

17                    THE WITNESS:   I don't know.

18   BY MR. KABA:

19          Q.   Okay.  So that's one decision we can --

20   we've addressed.

21               What's -- what's the next

22   decision -- I'm sorry -- the next unlawful act that



1                    CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA         )

3              I, Denise Dobner Vickery, CRR, RMR and

4    Notary Public, hereby certify the witness, AMANDA

5    BASTA, was by me first duly sworn to testify to the

6    truth; that the said deposition was recorded by me

7    and thereafter reduced to printing under my

8    direction; and that said deposition is a true

9    transcript of my original stenographic notes.

10             I certify the inspection, reading and

11   signing of said deposition were NOT waived by

12   counsel for the respective parties and by the

13   witness; that I am not a relative or employee of any

14   of the parties, or a relative or employee of either

15   counsel, and I am in no way interested directly or

16   indirectly in this action.

17   CERTIFIED TO THIS 23RD DAY OF SEPTEMBER, 2024.

18

19                *Denise D. Vickery*
                  DENISE DOBNER VICKERY, CRR, RMR
20                Notary Public in and for the
                  District of Columbia

21

22   My Commission expires:  March 14, 2028



# EXHIBIT 90

ANDY RAMIREZ                                    December 18, 2024
FTC vs AMAZON.COM                                              1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF WASHINGTON

 3    _____

 4
      FEDERAL TRADE COMMISSION,          )
 5                                       )
                                         )
 6                 Plaintiff,            )    Case No.
                                         )
 7            vs.                        )    2:23-cv-00932-JHC
                                         )
 8    AMAZON.COM, INC., et al.,          )
                                         )
 9                                       )
                                         )
10                 Defendants.           )
                                         )
11                                       )

12    _____

13

14           REMOTE DEPOSITION OF ANDY RAMIREZ

15                  December 18, 2024

16        Witness Location:  Seattle, Washington

17

18

19

20

21    Reported by:
      Connie Recob, CCR, RMR, CRR
22    Washington CCR No. 2631
      Oregon CCR No. 15-0436
23    Utah CCR No. 1133171-7801
      Idaho CCR No. SRL-1220
24    Job No. J12123048

25
```



```
 1                    BE IT REMEMBERED that on Wednesday,
 2      December 18, 2024, at Seattle, Washington, at 8:31 a.m.
 3      before Connie Recob, CCR, RMR, CRR, remotely appeared ANDY
 4      RAMIREZ, the witness herein;
 5                         WHEREUPON, the following proceedings were
 6      had, to wit:
 7
 8                         <<<<<<  >>>>>>
 9
10      ANDY RAMIREZ,                having been first duly sworn,
11                                   deposed and testified as
12                                   follows:
13
14                         EXAMINATION
15      BY MR. MENDELSON:
16  Q.  Good morning, Mr. Ramirez.  My name is Evan Mendelson.  I'm
17      an attorney for the Federal Trade Commission.
18           Can you hear me all right?
19  A.  I can.  Good morning.
20  Q.  Good morning.
21           Could you please state your full name for the record?
22  A.  My name is Andy Jose Ramirez.
23  Q.  And in what city and state do you live?
24  A.  I live in Kenmore, Washington.
25  Q.  And have you ever been deposed before?
```



1  unintentionally signing up for Amazon Prime?

2                    MS. FLAHIVE WU:  Objection to form.

3  Vague.

4                    THE WITNESS:  Yes, that came up in

5  different ways at different times.  I just never went to a

6  meeting explicitly and only about that.

7  BY MR. MENDELSON:

8  Q.  Who do you remember the topic of unintentional signups in

9  Amazon Prime -- well, who, if anyone, do you remember

10  discussing the topic of unintentional signups at Amazon Prime

11  with?

12                    MS. FLAHIVE WU:  Objection to form.

13  Vague.  Lacks foundation.

14                    THE WITNESS:  I don't have any specific

15  recollections.  I just have a memory that that came up,

16  right, but I'm not thinking of any specific people or

17  meetings in saying that.

18  BY MR. MENDELSON:

19  Q.  When you say that that came up, you're referring to

20  unintentional signups in Prime; is that correct?

21                    MS. FLAHIVE WU:  Objection to form.

22  Vague.

23                    THE WITNESS:  That is correct.

24  BY MR. MENDELSON:

25  Q.  And what do you understand that to mean, unintentional



1      signups, in the context of Amazon Prime?

2                      MS. FLAHIVE WU:  Objection to form.

3      Vague.

4                      THE WITNESS:  That could mean a lot, if

5      I'm being honest.  One version of it is a customer who signed

6      up and did not want to sign up and didn't realize that's what

7      they were doing.

8           Another version which also happened very often is

9      customers who signed up and then decided they didn't want it

10     after the fact so they say they didn't mean to.

11     BY MR. MENDELSON:

12  Q.  On the latter point, what's -- well, let me make sure I'm

13     understanding.

14          Are you saying it's your belief that some customers

15     sign up for Prime intentionally and then later report that

16     they did not intend to sign up for Prime?

17                     MS. FLAHIVE WU:  Objection to form.

18     Vague.

19                     THE WITNESS:  Yes, that is my belief.

20     BY MR. MENDELSON:

21  Q.  What is that belief based on?

22                     MS. FLAHIVE WU:  Objection to form.

23     Vague.

24                     THE WITNESS:  One thing I remember, for

25     example, is as a gamer.  I remember when we launched a gaming



1    benefit at Prime and there was a reward you could get in a

2    video game if you signed up for Amazon Prime.  And we had, I

3    want to say close to tens of thousands of gamers who signed

4    up, got the reward and then immediately canceled their

5    account to game us as part of that.

6         So that's where it might show up in our data somewhere

7    or in some customer contact somewhere as an unintentional

8    signup, but I know from friends who did it that it was far

9    from unintentional.

10   BY MR. MENDELSON:

11   Q.  Any other bases for your belief that some consumers sign up

12   intentionally for Amazon Prime and later say they did not

13   intend to sign up?

14                    MS. FLAHIVE WU:  Objection to form.

15   Asked and answered.

16                    THE WITNESS:  One thing I'll add is, from

17   my experience having done this at various companies for many,

18   many years, that's a common occurrence at every company.

19   BY MR. MENDELSON:

20   Q.  How do you know that?

21                    MS. FLAHIVE WU:  Objection to form.

22   Vague.

23                    THE WITNESS:  It's -- I've run

24   experiments.  I've run digital marketing teams.  I've run

25   programs where you have trials and you have products you can



1    purchase online, and you always get people that take

2    advantage of those systems and then return the items or

3    dispute the items or whatever it is to try to monetarily

4    gain.

5    BY MR. MENDELSON:

6    Q.  During your time at Amazon, are you aware of anyone at Amazon

7        attempting to quantify the amount of people who intentionally

8        signed up for Prime and later reported that they did not

9        intend to sign up?

10                        MS. FLAHIVE WU:  Objection to form.

11   Vague.  Lacks foundation.

12                        THE WITNESS:  No.  I'm not aware of

13   anyone trying to do that.  I think it would have been near

14   impossible to quantify that.

15   BY MR. MENDELSON:

16   Q.  Okay.  All right.  If you could pull -- if you wouldn't mind

17       keeping Exhibit AR-4 close by, but while you do that, if you

18       could pull envelope 13.

19   A.  I'm sorry.  You said hold onto it?  You broke up a little.

20   Q.  Yeah.  Sorry.  I think I covered my mic.

21       Yeah, if you could hold on, I might come back to

22   Exhibit AR-4, but if you could also open envelope 13.  And I

23   will mark -- while you do that, I'll mark Exhibit AR-5.

24                        (Exhibit No. AR-5 marked

25                         for identification.)



1      BY MR. MENDELSON:

2   Q. And while you look through Exhibit AR-5, Mr. Ramirez, while

3      you do that, I'll state that Exhibit AR-5 is a document Bates

4      stamped AMZN-PRM-FTC-000773471.

5           Let me know when you've had a chance to read through

6      this, Mr. Ramirez.

7   A. Almost there.

8           Okay.

9   Q. Before I ask anything about Exhibit AR-5, do you still have

10      Exhibit AR-4 close to you?

11  A. I do.

12  Q. Ms. Smith's e-mail in the first page of Exhibit AR-4 is

13      setting a meeting for Monday, September 25th; is that right?

14  A. That is correct.

15  Q. And that -- just to be clear, that meeting is -- the date for

16      that meeting is under the subject line that references Prime

17      member contact review unintentional signups; is that right?

18  A. That's right.

19  Q. Okay.  Now, going to -- flipping back to Exhibit AR-5, the

20      one you just opened, on the bottom e-mail in Exhibit AR-5,

21      the last e-mail on Page 2 is from David Carrel; is that

22      right?

23  A. That is right.

24  Q. And Mr. Carrel is the individual who you reported to at this

25      time, as of October 2017; is that right?



1                    REPORTER'S CERTIFICATE

2

3         I, CONNIE A. RECOB, the undersigned Certified Court

4    Reporter, authorized to administer oaths and affirmations in

5    and for the States of Washington, Oregon, Utah and Idaho, do

6    hereby certify that the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given before me at the

8    time and place stated therein; that any and/or all

9    witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19        WITNESS MY HAND and SIGNATURE this 31st day of

20   December, 2024.

21

22   _____

23   /s/CONNIE A. RECOB, RMR, CRR
     Washington CCR No. 2631
24   Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801
25   Idaho CCR No. SRL-1220



# EXHIBIT 91

1              UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON

3                     AT SEATTLE

4   FEDERAL TRADE COMMISSION,

5               Plaintiff,

6   vs.                       No. 2:23-cv-0932-JHC

7   AMAZON.COM., et al.

8               Defendants.

9   _____/

10

11         The Deposition of BENJAMIN HILLS

12             9:00 a.m. - 2:16 p.m.

13              January 17, 2025

14

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12123049



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                  P R O C E E D I N G S

 2                         - - -

 3

 4   Whereupon,

 5                    BENJAMIN HILLS,

 6   called as a witness, having been first duly sworn to

 7   tell the truth, the whole truth, and nothing but the

 8   truth, was examined and testified as follows:

 9              EXAMINATION BY MR. MENDELSON

10       Q     Good morning, Mr. Hills.  My name is Evan

11   Mendelson and I'm an attorney at the Federal Trade

12   Commission.  I represent the FTC in the FTC versus

13   Amazon matter, and I'm joined by my colleagues,

14   paralegals, Ryan Zwonik and Yara Awad.

15              Can your counsel introduce themselves,

16   please?

17              MS. WU:  Good morning.  Laura Flahive Wu of

18   Covington & Burling, counsel for Amazon and the

19   witness.  With me today are my colleagues, Kevin Kelly

20   and Travis Cabell also of Covington & Burling.  On the

21   line is Laura Craig, in-house counsel at Amazon.

22   BY MR. MENDELSON:

23       Q     Mr. Hills, you gave testimony at an FTC

24   investigational hearing once before; is that correct?

25       A     Correct.
```



1    Q      In the -- do you see the first full
2    paragraph is under the header what is the background on
3    the cancellation survey?  Do you see that paragraph?
4    A      Yes, I do.
5    Q      And in the second sentence there in that
6    paragraph -- well, I'll just read the second sentence
7    states this project aimed at, one, implementing the
8    cancellation survey WW with a revised set of questions
9    reducing ambiguous and nonactionable inputs and, two,
10   launching the survey on Prime central as a pop up
11   experience for members.  Did I read that correctly?
12   A      Yes.
13   Q      Do you know what the ambiguous or
14   nonactionable inputs referenced here were?
15          MS. WU:  Objection to form, lacks
16   foundation.
17          THE WITNESS:  I don't recall what this
18   meant, but in general since my time there --
19   BY MR. MENDELSON:
20   Q      Sure.
21   A      -- the different teams within Amazon and
22   Amazon Prime would continue to try different questions
23   in the survey and also add a free type, free type
24   basically meaning the customer cannot just choose what
25   preselected or pre-offered reasons to cancel were, but



1    also share any other insights by typing it out.  So

2    those were iterations.  I believe they changed often

3    and then they also changed by different international

4    local and the country leads chose what to put in there.

5    BY MR. MENDELSON:

6        Q        Do you recall having any concerns that the

7    initial Prime cancellation survey or anything that came

8    before Prime cancellation survey 2.0 was providing

9    ambiguous or nonactionable inputs?

10               MS. WU:  Objection to form, vague, lacks

11   foundation and compound.

12               THE WITNESS:  In my time there before and

13   after I had retention, anything that a customer gives

14   you is hard to -- generally is ambiguous unless you

15   actually have a conversation with them.  So the

16   continuous journey to revise the questions and make

17   them more actionable is a snapshot in time, but

18   something that always evolves.

19   BY MR. MENDELSON:

20       Q        One of the goals for the cancellation

21   survey was to get actionable inputs from individuals

22   who had canceled their Prime memberships; is that

23   correct?

24               MS. WU:  Objection to form, vague and lacks

25   foundation.



1          THE WITNESS:  Yes.  The goal of collecting

2     customer data is to gain insights to create -- to

3     improve the experience.

4     BY MR. MENDELSON:

5          Q     I think you mentioned that in the

6     cancellation survey, there was an opportunity for

7     consumers to provide free text responses; is that

8     correct?

9          A     Yes.

10          Q     Did -- during your time with responsibility

11     for Prime retention, how if at all did -- did your

12     organization attempt to analyze free text responses?

13          MS. WU:  Objection to form, vague.

14          THE WITNESS:  How did we attempt to analyze

15     them?

16     BY MR. MENDELSON:

17          Q     Yes.

18          A     Myself personally and my team would read

19     them and there was a lot.  And then we would get

20     together as a group and discuss them.

21          Q     Did you -- am I correct in assuming you did

22     not read all of the free text responses to the

23     cancellation survey?

24          MS. WU:  Objection to form.

25          THE WITNESS:  Depending on the timeframe,



 1   a Prime member.  Did I read that correctly?

 2        A      Yes.

 3        Q      WW stands for worldwide, correct?

 4        A      Correct.

 5        Q      And do you agree that the cancellation

 6   survey collects valuable insights and trends on why

 7   members have decided to cancel Amazon Prime?

 8        A      Yes.

 9        Q      Do you agree that the cancellation survey

10   provides valuable insights and trends on what problems

11   individuals experienced as Prime members?

12        A      Yes.

13        Q      Skipping -- I'm going to skip the next

14   sentence that starts we are also and look at the

15   sentence that starts beyond the trends.  And I'll just

16   read that sentence as well.

17              Beyond the trends, survey responses are

18   directly tied to customer IDs which gives us

19   opportunities to proactively identify members by

20   various cancel reasons and action against them.  Did I

21   read that correctly?

22        A      Yes.

23        Q      Do you recall whether prior to Prime

24   cancellation survey 2.0 cancel survey responses were

25   tied to customer IDs?



BENJAMIN HILLS                                    January 17, 2025
FTC vs AMAZON.COM, INC., et al.                            24

```
1              MS. WU:  Objection to form, lacks
2    foundation.
3              THE WITNESS:  I don't recall.  The intent
4    of -- as I remember this project, the intent was to get
5    more responses to try to identify customer segments.
6    BY MR. MENDELSON:
7         Q    Do you agree that the ability to tie survey
8    responses to customer IDs gave Amazon opportunities to
9    proactively identify members by various cancel reasons
10   and action against them?
11             MS. WU:  Objection to form, vague and
12   compound.
13             THE WITNESS:  One nuance to that.  It's
14   written here, but it allows you just to be super
15   specific, identify members by specific self-selected
16   cancel reasons to proactive identify them with the
17   caveat that that presumes that that cancel reason maps
18   back to the true cancel reason.
19   BY MR. MENDELSON:
20        Q    Did -- do you have any reason to believe
21   that Prime members' self-reported cancel reason doesn't
22   map back to their actual cancel reason?
23        A    Yes, absolutely.
24        Q    And what reason is that or what reasons do
25   you have for that belief?
```



BENJAMIN HILLS                                      January 17, 2025
FTC vs AMAZON.COM, INC., et al.                                   25

1      A       Two primary, but there's a long tail of

2   others.

3      Q       Sure.

4      A       One primary is when observing the free type

5   and then looking at what they actually selected,

6   sometimes they don't map and part of that reason is the

7   preselection didn't cover their reason which means that

8   the preselected probably needed to be better worded or

9   identified.

10             An example, the mistaken sign up which was

11  one that's obviously covered in a lot of this.  There's

12  a pretty big long tail of how to interpret that.  So

13  one is the wanted it for the free trial and forgot to

14  call in and cancel.  There's the my kid signed me up on

15  Prime video to watch something and I did or did not

16  give them permission which are two different forks in

17  the road as well.

18             I'm not aware that I was signed up.  Hence

19  the fraud piece.  So there's a lot of like nuance to

20  those.  So although you get the coded in the high level

21  cancel self-selected cancel reason, there's a long tail

22  of other stuff that needed to be mapped back to which

23  made it harder, more difficult to scale.

24  BY MR. MENDELSON:

25      Q      Towards the beginning of that answer, I



1  just want to make sure I heard a word correctly or

2  phrase.  I think you said preselected; is that right?

3      A    Yes.

4      Q    You mean selected by the consumer prior to

5  providing the free text?

6      A    When I say preselected, so Amazon, we --

7  our team at the time selected the options, so they had

8  choices that they could select from something that was

9  prefilled out.

10     Q    But Amazon selected the kind of multiple

11 choice, the potential multiple choice responses to the

12 why did you cancel question?

13     A    Correct.  There's that and also the order.

14 So order can also mean a lot as well because

15 oftentimes -- and the other thing I was going to tell

16 you was the agent coding is choosing whichever reason

17 just to get to the free type and not necessarily

18 reading through the choices, just going for the first

19 choice and moving on.

20     Q    On that last point, other than your review

21 of free text of survey responses, do you have any

22 reason to believe that people were just choosing an

23 option to get to the free text response?

24     A    So this goes a little bit into the agent's

25 observations.  So there's the online cancel survey and



1  Prime?

2          MR. MENDELSON:  Objection, foundation,

3  calls for speculation.

4          THE WITNESS:  Yes.  I don't know whether or

5  not they understood, but my hypothesis is they have

6  given the magnitude of those that are in Prime and

7  engaged with Prime.

8  BY MS. WU:

9      Q    Based on your review of the data and the

10  data signals that you've discussed during your

11  deposition today, how would you estimate the size of

12  the population of Amazon customers who failed to

13  understand that they have signed up for Prime after

14  enrolling in the program?

15          MR. MENDELSON:  Same objections.

16          THE WITNESS:  There's no way to measure the

17  intent.  That's been the problem the entire time.

18          MS. WU:  Thank you, Mr. Hills.  I have no

19  further questions.

20          MR. MENDELSON:  I have just what I think is

21  minute of follow-up.

22          FURTHER EXAMINATION BY MR. MENDELSON

23      Q    Mr. Hills, you testified in response to

24  questioning by Amazon counsel that you didn't believe

25  Prime enrollment process broke the law during your time



BENJAMIN HILLS                                      January 17, 2025
FTC vs AMAZON.COM, INC., et al.                              192

```
 1   at Amazon; is that correct?

 2        A      Correct.

 3        Q      Are you familiar with or were you familiar

 4   during your time at Amazon with laws governing Prime

 5   enrollment?

 6        A      So --

 7              MS. WU:  Objection.  I'm going to object

 8   that the question as posed by FTC counsel calls for a

 9   legal conclusion and also caution the witness not to

10   share any attorney-client privileged information.

11              THE WITNESS:  I'm not a lawyer.  However,

12   we had some and so the -- we had counsel at Amazon to

13   guide decisions.  So the -- all changes in stuff that

14   were made in the context of the cancel flow went under

15   review, a lot of review from a lot of different sources

16   including legal sign off.  And so we never put anything

17   out that we thought -- that was deemed would not be.

18   So that's where I drew to that conclusion.

19   BY MR. MENDELSON:

20        Q      Okay.  Is the same true with respect to

21   your testimony that Prime cancellation did not break

22   the law during your time at Amazon?

23              MS. WU:  I'll assert the same objection

24   that the FTC's question calls for a legal conclusion

25   and also caution the witness not to share any
```



```
 1   attorney-client privileged information.
 2              THE WITNESS:  Same answer.
 3              MR. MENDELSON:  No further questions.
 4              (Deposition was concluded at 2:16 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 17th day of

14   January 2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20   

21   ------------------------------

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25

# EXHIBIT 92

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF WASHINGTON

 3    _____

 4
      FEDERAL TRADE COMMISSION,          )
 5                                       )
                                         )
 6                 Plaintiff,            )    Case No.
                                         )
 7           vs.                         )    2:23-cv-00932-JHC
                                         )
 8    AMAZON.COM, INC., et al.,          )
                                         )
 9                                       )
                                         )
10                 Defendants.           )
                                         )
11                                       )

12    _____

13

14            REMOTE DEPOSITION OF BENJAMIN GOELTZ

15      * * * CONFIDENTIAL PORTIONS - PAGES 11:14-205:22 * * *

16                      October 30, 2024

17         Witness Location:  Seattle, Washington

18

19

20

21

22    Reported by:
      Connie Recob, CCR, RMR, CRR
23    Washington CCR No. 2631
      Oregon CCR No. 15-0436
24    Utah CCR No. 1133171-7801
      Idaho CCR No. SRL-1220
25    Job No. J11860291
```



```
 1                        BE IT REMEMBERED that on Wednesday,

 2      October 30, 2024, at Seattle, Washington, at 8:39 a.m.

 3      before Connie Recob, CCR, RMR, CRR, remotely appeared

 4      BENJAMIN GOELTZ, the witness herein;

 5                        WHEREUPON, the following proceedings were

 6      had, to wit:

 7

 8                        <<<<<<  >>>>>>

 9

10      BENJAMIN GOELTZ,            having been first duly sworn,

11                                  deposed and testified as

12                                  follows:

13

14                        EXAMINATION

15      BY MS. JERJIAN:

16  Q.  Good morning, Mr. Goeltz.  Am I pronouncing your name

17      correctly?

18  A.  Yes.

19  Q.  My name is Olivia Jerjian.  I'm an attorney with the Federal

20      Trade Commission.  I'm joined today by my colleague Thomas

21      Max Nardini, another attorney at the Federal Trade

22      Commission.  And I see you are represented by counsel here

23      today.

24                        MS. JERJIAN:  Counsel, if you wouldn't

25      mind introducing your side.
```



```
 1                     EXAMINATION (Continuing)
 2      BY MS. JERJIAN:
 3   Q.  Mr. Goeltz, did you talk about the substance of your
 4       testimony during any of the breaks today?
 5   A.  No.
 6   Q.  Earlier you testified that project Caf? led to certain
 7       changes in the cancellation flow on the Amazon online
 8       cancellation -- sorry.  Strike that.
 9            Earlier you testified that project Caf? led to changes
10       to the online cancellation flow, correct?
11   A.  That is correct.
12   Q.  What metrics were used to evaluate the success of project
13       Caf??
14                     MR. ANTHONY:  Objection.  Vague.
15                     THE WITNESS:  So I think we primarily
16       looked at changes to auto renew rates for customers.  That
17       was -- that was a primary metric that we looked at.
18       BY MS. JERJIAN:
19   Q.  How did you use -- well, strike that.
20            The auto renew is known as A/R off, correct?
21   A.  That's -- that is correct.  A/R in this context would refer
22       to auto renew.
23   Q.  Okay.  How did you use A/R off as a metric to evaluate the
24       success of project Caf??
25   A.  So we would look at auto renew on rates in particular to see
```



1    whether the information, you know, we were displaying was --

2    was accurate, and I guess not so much accurate but more

3    useful and informative and relevant for customers.

4  Q.  So just to make sure I'm understanding, was it that the more

5    relevant and useful the information you're presenting in the

6    cancellation flow was, the higher the A/R on rate would be

7    for customers, correct?

8  A.  Yes, that's -- that's correct.  We understand that not all

9    customers will understand what's included within their Prime

10   membership so providing further information about that can

11   lead to customers, you know, better understanding Prime

12   membership and, you know, taking a -- taking a decision to

13   keep Prime.

14 Q.  Okay.  Aside from AR rates, did you look at any other metrics

15   to evaluate the success of project Caf??

16 A.  That was certainly the main one.  I can't recall if we also

17   looked at other metrics.  The auto renew metric was -- was

18   certainly the main one.

19 Q.  Earlier you said something along the lines of project Caf?

20   also looked to make the cancellation flow more simple for

21   customers.

22        Did I understand that correctly?

23 A.  Yeah, there were two primary goals of Caf?.  One was to

24   ensure to improve on the relevance and -- of the information

25   within the -- within the cancellation flow and then to



```
 1        further simplify the cancellation flow.  Those are the two
 2        main goals of Caf?.
 3   Q.   What metrics did you use to evaluate the second goal to
 4        simplify the cancellation flow?
 5                           MR. ANTHONY:  Object to the
 6        characterization of his testimony.
 7             You may answer.
 8                           THE WITNESS:  So I think one thing we
 9        looked at was shortening of the flow in terms of the number
10        of pages.
11   BY MS. JERJIAN:
12   Q.   Was the presumption that the shorter the flow was, the more
13        simple it was?
14   A.   I think the number of pages is one element that is --
15        influences how simple something is.  So that was, you know,
16        why we looked at length of flow.
17   Q.   How does the number of pages influence how simple the flow
18        is?
19   A.   So general concept being that, you know, the flow should be
20        something that a customer can, you know, easily get through
21        and, you know, that the number of pages within the flow kind
22        of influences that kind of ease of completion.
23   Q.   So the shorter the flow, the more simple the flow is?
24                           MR. ANTHONY:  Objection to the
25        characterization of the witness's testimony.
```



```
 1        You may answer.
 2                    THE WITNESS:  I -- I think that would be
 3     a bit too simple of a way to put it.  I think, you know,
 4     shorter flows doesn't always mean that it's simple.  Other
 5     elements can, you know, you can have a single page, you know,
 6     flow that's complicated based on, you know, what information
 7     is displayed on that single page.  So length of flow is
 8     one -- I guess one of many things that can influence
 9     simplicity of a flow in my point of view.
10     BY MS. JERJIAN:
11  Q. Okay.  So aside from length of flow, what other metrics did
12     you use to measure the simplicity of the cancellation flow as
13     part of project Caf??
14  A. So I think in terms of metrics, the other thing we looked at
15     was kind of the usability studies that we had talked
16     previously about to understand that the information we were
17     presenting and the way that we were presenting it was clear
18     to a customer and, you know, leading them to interpret the
19     flow as being simple or simpler to ensuring that it was,
20     like -- you know, maintained its kind of ease of completion
21     and, yeah, that was -- we used the user studies or usability
22     studies to help us ensure that.
23  Q. And you're referring to usability studies you were discussing
24     earlier, the more recent one and then the one earlier, at an
25     earlier point in time, correct?
```



```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, CONNIE A. RECOB, the undersigned Certified Court

 4   Reporter, authorized to administer oaths and affirmations in

 5   and for the States of Washington, Oregon, Utah and Idaho, do

 6   hereby certify that the sworn testimony and/or proceedings, a

 7   transcript of which is attached, was given before me at the

 8   time and place stated therein; that any and/or all

 9   witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19        WITNESS MY HAND and SIGNATURE this 11th day of

20   November, 2025.

21

22
```



```
23   _____
     /s/CONNIE A. RECOB, RMR, CRR
     Washington CCR No. 2631
24   Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801
25   Idaho CCR No. SRL-1220
```



# EXHIBIT 93

1              IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4   FEDERAL TRADE COMMISSION,          )
                                       )
5                  Plaintiff,          )
                                       )   Case No.
6        vs.                           )   2:23-cv-0932-JHC
                                       )
7   AMAZON.COM, INC., et al.,          )
                                       )
8                  Defendants.         )
    _____)

9

10

11              ** Confidential Portions  **

12        Page 17, line 7 through page 240, line 11

13

14

15         DEPOSITION OF CAROLINE ABRAMOWICZ

16              VIA ZOOM VIDEOCONFERENCE

17            THURSDAY, NOVEMBER 7, 2024

18

19

20

21   REPORTED BY:

22   LISA MOSKOWITZ

23   CA-CSR 10816, RPR, CRR, CLR

24   WASHINGTON CCR 21001437, NEVADA CCR 991

25   ILLINOIS CSR 084.004982



```
 1                  THURSDAY, NOVEMBER 7, 2024
 2                  VIA ZOOM VIDEOCONFERENCE
 3                       8:35 A.M.
 4
 5         THE CERTIFIED STENOGRAPHER:  We are now on the
 6    record.  It is now 8:35 a.m.  My name is Lisa Moskowitz.
 7    I am a California certified stenographic reporter.  My
 8    CSR license number is 10816.  All appearances will be
 9    noted on the stenographic record.
10                                                            08:35
11                  CAROLINE ABRAMOWICZ,
12                  called as a witness,
13            was examined and testified as follows:
14
15                       EXAMINATION                          08:35
16    BY ATTORNEY MENDELSON:
17       Q.  Good morning, Ms. Abramowicz.  My name is Evan
18    Mendelson.  I'm an attorney representing the Federal
19    Trade Commission.
20            Can you hear me all right?                      08:35
21       A.  Yes.
22       Q.  And did I pronounce your last name correctly,
23    Abramowicz?
24       A.  Yes.
25       Q.  Have you -- actually, before we do that,         08:36
```



1      A.  Yes.  We wanted to minimize the potential for

2  anyone to sign up for Prime and not realize they had

3  done so.

4      Q.  Okay.  The -- did you or, to your knowledge,

5  anyone else in the Prime organization ever analyze the          03:04

6  extent to which the decrease in signups that followed

7  the September 2020 Clarity changes was a result of there

8  being less mistaken signups?

9      A.  Could you say that again?

10     Q.  Sure.                                                    03:04

11         Did you, or anyone else in the Prime

12  organization, to your knowledge, ever analyze the extent

13  to which the decrease in signups that followed the

14  September 2020 Clarity changes reflected a decrease in

15  mistaken signups?                                               03:05

16     A.  I don't know if it was anyone within Prime, but

17  I do remember Reid and some folks on the customer

18  journey side trying to quantify if those changes had

19  actually reduced mistaken signups.

20         The challenge with that was those changes were        03:05

21  just implemented across the board.  They weren't run as

22  a specific experiment; so I think it was -- I don't

23  remember any conclusive takeaway from that because there

24  wasn't really clean experiment data for them to look at.

25     Q.  Are you -- what -- are you aware of what -- or          03:05



1    do you have any opinion on what could have lowered the

2    sign-up rate after Clarity changes, other than a

3    decrease in mistaken signups?

4            ATTORNEY HUESTON:  Objection.  Foundation.

5            THE WITNESS:  Yeah.  I mean, I think all of the        03:06

6    changes are small UX tweaks that can have a very big

7    impact on user behavior.  And so that was what I think

8    we were consistently seeing, is that the number of

9    people that suddenly weren't signing up for Prime based

10   on these changes was not equal to the number of people     03:06

11   that were signing up and weren't realizing that they

12   were signing up for Prime.

13            There was a big gap there, and that was what

14   was difficult to solve for, from a business perspective.

15   Because the amount of people we were hypothesizing were     03:07

16   mistakenly signing up was very small, like maybe a

17   percent or two total Prime members.  And clearly the

18   amount of people that, with these changes, were kind of

19   influenced or did not think that the upsell was

20   compelling enough anymore to sign up had, you know,         03:07

21   significant impacts on the Prime member balance moving

22   forward.

23   BY ATTORNEY MENDELSON:

24        Q.  I want to talk a little bit about the percent

25   or two number you just gave.  If we could go to Envelope    03:07



1    57.

2          I've marked as Exhibit CA24 a document

3    Bates-stamped AMZN_00136982.

4          (Exhibit Number CA24 was marked for

5       identification.)                                03:08

6    BY ATTORNEY MENDELSON:

7       Q.  The top of Exhibit CA24 is a January 27, 2021,

8    email from you, Ms. Abramowicz.

9          Do you have that in front of you?

10      A.  Yes.                                         03:08

11      Q.  Okay.  Why don't you read that top email in

12   Exhibit CA24.

13      A.  Okay.

14      Q.  In the top email in Exhibit CA24, you're

15   writing about the January 2020 UPDP Clarity experiments   03:09

16   we started the day talking about; is that right?

17      A.  Yes.

18      Q.  Okay.  And then in the third paragraph, you

19   say:  Overall, we saw very slight improvements in yield

20   (T2-20.94 percent sign-up loss versus minus            03:10

21   18.66 percent after 90 days).

22          Do you see that?

23      A.  Yes.

24      Q.  So in the treatment in that experiment, there

25   was a 21 percent decrease or 20.94 percent decrease in    03:10



1          Do you see that language?

2      A.  Yes.

3      Q.  You weren't asked this question directly; so

4  I'm going to ask you:  Did you believe that Amazon was

5  knowingly tricking people into signing up for Prime          05:08

6  subscriptions?

7      A.  No.

8      Q.  It's true you were aware -- if I understand

9  your earlier testimony, you were aware some people in

10 the shopper frustration team may have made statements        05:09

11 like this; right?

12     A.  Yes.

13     Q.  And they may have made statements like that

14 when their recommendations for change, based on, for

15 instance, anecdotal evidence wasn't implemented or           05:09

16 wasn't implemented as fast as they liked.

17          Is that an example?

18     A.  I think in my view, if Amazon had been tricking

19 customers, it would have made up a much larger portion

20 of the member balance.  But as I said, my understanding      05:09

21 was that this was limited to 1 percent of customers,

22 which is very difficult at Amazon scale to have an

23 experience that is 100 percent perfect for every single

24 person that sees it or interacts with it.

25          So I was aware there was some confusion, but I      05:10



 1  didn't see it that the experience Amazon had was

 2  knowingly tricking customers across the board to sign up

 3  for Prime.  But I think people on the customer -- at the

 4  shopper frustrations team that, again, were really close

 5  to the anecdotes and close to the individual customers        05:10

 6  may have felt differently.

 7      Q.  Great.  I have no more questions at this time.

 8          ATTORNEY MENDELSON:  I said I just have a few

 9  follow-ups on Mr. Hueston's questions, and I'll try to

10  make this very quick.                                         05:10

11

12                    FURTHER EXAMINATION

13  BY ATTORNEY MENDELSON:

14      Q.  I think you told Mr. Hueston that Amazon always

15  met the legal requirements for Prime enrollment.              05:11

16          Is that correct, in your view?

17      A.  That was my understanding, yes, that we were

18  always meeting the legal requirements.

19      Q.  What was that understanding based on?

20      A.  There were a number of meetings or -- yeah,           05:11

21  mostly meetings with various legal counterparts where we

22  would show them our experience, maybe review some

23  proposed changes to that experience.  And this was also

24  outside of just the Clarity workstream in particular.

25          So just, in general, different changes that we        05:11



1  were making.  And the repeated feedback was -- and we

2  have everything --

3       ATTORNEY HUESTON:  Let's -- you can't get into

4  the specific conversations.

5       ATTORNEY MENDELSON:  Okay.                          05:11

6  BY ATTORNEY MENDELSON:

7     Q.  I think you also told Mr. Hueston that there

8  was inconsistent data surrounding Clarity changes.

9       Do you recall that?

10    A.  Yes.                                               05:12

11    Q.  What data, in particular, was kind of showing

12  you consistent results relating to Clarity?

13    A.  Well, for example, in some experiments, the

14  hypothesis was, okay, we'll make these changes.  We'll

15  see fewer people signing up.  We'll see slightly fewer   05:12

16  people becoming paid members.  But of the people who do

17  stay paid members, we'll see them engage more with their

18  benefits or not go to cancel or not contact customer

19  service, things like that.

20      And there were a number of different             05:12

21  experiments.  Some experiments did show improvements in

22  some metrics, some didn't.  But across the board, there

23  wasn't consistency in the fact that every time we

24  thought we had identified the problem, thought we had

25  proposed a good solution, we didn't always see the       05:13



 1    metrics behave in the way we had expected them to if we

 2    were reducing the mistaken signups like we were

 3    expecting.

 4        Q.   I think you also told Mr. Hueston that leaders

 5    at the company wanted to validate Clarity changes to     05:13

 6    make sure they were actually improving Clarity; is that

 7    correct?

 8            ATTORNEY HUESTON:  Objection.  I think that

 9    misstates my question.

10            But you can answer if you can.                    05:13

11            THE WITNESS:  It wasn't limited to leaders.  I

12    would say a number of different people across Amazon

13    wanted assurance that these changes that we were making

14    that would have negative impacts to Prime member balance

15    would actually be addressing mistaken signups and        05:13

16    customer comprehension.

17            ATTORNEY MENDELSON:  I have no further

18    questions.

19            ATTORNEY HUESTON:  Okay.  I just need to put on

20    the record I've been informed -- what exhibit is this?   05:14

21    Exhibit 9, on page 1 of the exhibit under Q2 QBR, the

22    section that you reviewed:  Counsel, development of WW

23    Content Clarity Bar, we're going to have to redact for

24    privileged purposes a portion of the first sentence.

25            We're fine with:  We are in the process of        05:14



1   lining with legal GPX and WW content team.

2          But we need to redact:  To define minimum

3   requirements on longer term visions for our upsells.

4          You had highlighted earlier we might have an

5   issue there.  I didn't want to interrupt your              05:14

6   questioning, and now I've confirmed that we need to

7   redact that portion of that one sentence for the record.

8          ATTORNEY MENDELSON:  Okay.  We'll deal with

9   that through the stipulated order on how to handle

10  privileged materials.  So we'll respond in writing after  05:15

11  we've gotten the notice from you.

12         ATTORNEY HUESTON:  Okay.  Great.  Thank you.

13  Nothing further.

14         ATTORNEY MENDELSON:  Thanks.  Thank you very

15  much for your time, Ms. Abramowicz.  We can go off the    05:15

16  record.

17         THE CERTIFIED STENOGRAPHER:  Before you leave,

18  do either of you need to order a rough draft?

19         ATTORNEY HESS:  Yes, please.  It's Melanie

20  Hess.  If you could send it to my email.  It's            05:16

21  mhess@hueston.com.

22         ATTORNEY MENDELSON:  FTC does not need a rough

23  draft.

24         THE CERTIFIED STENOGRAPHER:  Are you-all okay

25  for me to take us off the record officially?



```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, LISA MOSKOWITZ, a Certified Shorthand

 4   Reporter, licensed in the states of California, Nevada,

 5   Illinois, and Washington, do hereby certify that

 6   CAROLINE ABRAMOWICZ was by me duly sworn or affirmed;

 7   that said deposition was reported stenographically by me

 8   at the time and place herein named;

 9         That the deposition is a true record of all

10   testimony as reported stenographically by me and was

11   thereafter transcribed under my direction; that if this

12   is a Federal case, a request [ ] was [X] was not made to

13   read and correct said deposition; that the dismantling

14   of the original transcript will void the reporter's

15   certificate.

16         I further declare that I have no interest in

17   the outcome of said action nor am I related to any of

18   the parties or counsel in said action.

19         IN WITNESS WHEREOF, I have subscribed my name

20   this 18th day of November, 2025.

21

22

23   _____

     LISA MOSKOWITZ
24   California CSR 10816, RPR, CRR, CLR
     Washington CCR 21001437, Nevada CCR 991,
25   Illinois CSR 084.004982
```



# EXHIBIT 94

DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                  1

```
              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON


                       AT SEATTLE


_____

FEDERAL TRADE COMMISSION,           )
                                    )
                   Plaintiff,       )
                                    )
        v.                          ) No. 2:23-cv-0932-JHC
                                    )
AMAZON.COM, INC., et al.,           )
                                    )
                   Defendants.      )
                                    )
                                    )
_____

     VIDEO-RECORDED DEPOSITION OF DAVID ADAM EDELSTEIN

                    May 1, 2025

                 Seattle, Washington
```


Reporter:  John M. S. Botelho, CCR, RPR



```
 1                      MR. BIENERT:  Thomas H. Bienert,
 2      Jr., for Mr. Edelstein, and I'm with Carlos Nevarez
 3      with my law firm.
 4                      MR. HUESTON:  Great.  Good morning,
 5      Mr. Edelstein.
 6                      THE WITNESS:  I think I need to get
 7      sworn in first.
 8                      THE REPORTER:  Yes.
 9                      MR. HUESTON:  Right.
10                      THE REPORTER:  Quick oath.
11                      MR. HUESTON:  Here we go.
12
13      DAVID ADAM EDELSTEIN,        having been first duly sworn
14                                   by the Certified Court
15                                   Reporter, deposed and
16                                   testified as follows:
17
18                              EXAMINATION
19      BY MR. HUESTON:
20   Q  All right.  Now I can say good morning, Mr. Edelstein.
21   A  Good morning.
22   Q  Do you have in mind the deposition guidelines the
23      government provided you yesterday?
24   A  Yes.
25   Q  All right.  And just as a reminder, any time you need a
```



DAVID A. EDELSTEIN                                         May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                        87

```
 1      the gray section possibly was leading to confusion,
 2      right?
 3   A  That's what it says.
 4   Q  All right.  You had a different view?
 5   A  This is a cleaned-up version of our feedback.
 6   Q  Okay.  A cleaned-up version that didn't reflect your
 7      personal view, I suppose?
 8   A  That didn't reflect our team views or professional
 9      views, yes.
10   Q  Okay.  Who cleaned up this version?
11   A  Caroline.
12   Q  And so is your testimony that she changed this from,
13      "Gray section leads to confusion," to just "possibly"?
14   A  Yes.
15   Q  And how do you know that?
16   A  Because that is not what was said in the meeting.
17   Q  Did you talk to her about that?
18   A  No.
19   Q  Why not?
20   A  There was a lot going on.
21   Q  Okay.
22   A  We were all busy.
23   Q  So you never confirmed that, in fact, your assumption
24      that she change that language?
25   A  I did not confirm with her, no.
```



DAVID A. EDELSTEIN                          May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        88

1   Q   Okay.  And the document says, and quote/unquote, "Avoid
2       dark patterns," right?
3   A   Yes.
4   Q   But this document at least doesn't define what dark
5       patterns are, right?
6   A   Not that I see, no.
7   Q   Okay.  We can put that aside.
8           I want to go back to a question and answer you
9       gave earlier.  I asked you whether dark patterns are
10      commonplace.  You indicated yes.
11          Can you give me some examples of dark patterns or
12      anti-patterns that you feel were fairly common in the
13      industry during the time you were working at Amazon?
14  A   Sure.
15          Definitely the pattern of having the action that
16      the company wants the customer to make as a button and
17      the action that the company doesn't want the customer
18      to make to be a small link hidden somewhere else is
19      relatively common.
20          Also the practice of what we call confirshaming is
21      fairly common where the "no" button in an experience
22      says something like Prime would regularly do:  "No,
23      thanks.  I don't want fast free shipping, you idiot,"
24      was the implication.
25  Q   It's kind of like when I -- every time I try to buy an



```
 1     airline ticket and there's something that comes up with
 2     insurance.
 3  A  Right.
 4  Q  And I'm forced to check, No, I don't want to --
 5  A  Protect my flight, or whatever the language is, yes.
 6  Q  Pretty commonplace, right?
 7  A  It is.
 8  Q  What else?  What else do you recall?
 9  A  Generally the pattern of the sort of more general case
10     of the button and link making the action that the
11     company does not want the customer to take being harder
12     to find.
13          Using color and pattern to try to encourage the
14     customer to continue clicking to get through the
15     process in a way that the company wants the customer to
16     fear missing out; that if the customer does not make
17     the choice that the company wants them to, then they
18     would be missing on some opportunity or some benefit
19     that other people are going to get.
20  Q  Including -- can I just ask you a little more about
21     that?
22          Including this offer is available for the next two
23     minutes?
24  A  Exactly.
25  Q  Okay.  Any other examples of FOMO that come to mind
```



```
 1   A  It is rarely true, certainly in Amazon's case, that
 2      there are only five of a specific thing left.
 3   Q  Okay.
 4   A  There may be, you know, at Amazon with the large
 5      third-party seller community, that particular seller
 6      may only have a few left, but there may be a hundred
 7      other sellers with stock.
 8   Q  Okay.  Outside Amazon, though, if let's just say -- and
 9      this is a hypothetical -- that there's a website and it
10      says five left.  I take it your skepticism will be
11      there's not really five left, but let's assume that
12      there really were five left.
13   A  Mm-hmm.
14   Q  Would you conclude that the company was still employing
15      a dark pattern there to put pressure on the consumer?
16   A  If they were rare handmade items, I would not conclude
17      that that's a dark pattern.
18          If they were regular consumers items -- we only
19      have five of these shelving units in stock -- the
20      presumption is they will come back into stock.
21   Q  At some point?
22   A  At some point.  And if -- it is creating a false
23      urgency with the customer.
24   Q  Okay.  Even if they only had five of those shelving
25      units currently in stock?
```



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                  92

```
 1   A   Yes.

 2   Q   All right.  Okay.  Other than FOMO, what are some other

 3       categories?

 4   A   Certainly the -- the Instagram and TikTok algorithms --

 5   Q   Sure.

 6   A   -- that are very, very good at figuring out what it is

 7       that someone wants to see, whether they feel like they

 8       want to see that or not.

 9           That's a good set.

10   Q   Okay.  Let me just ask you:  Likewise, did you feel

11       while you were at Amazon, it was fairly common in the

12       industry to have some visual asymmetry between an

13       enrollment option as compared to a decline option?

14                       MR. COHEN:  Objection.

15                       THE WITNESS:  Yes.

16   Q   (By Mr. Hueston)  And same time period:  Did you find

17       it was fairly common in the industry for companies to

18       use interstitials or pop-ups during a browsing

19       experience or checkout to offer a premium service or a

20       subscription service?

21                       MR. COHEN:  Objection.

22                       THE WITNESS:  Not in my experience.

23   Q   (By Mr. Hueston)  Okay.  Today do you find that to be

24       unusual or fairly common, that there are companies

25       using interstitials or pop-ups during a browsing
```



DAVID A. EDELSTEIN                          May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        93

```
 1    experience to offer a premium service or a subscription
 2    service?
 3                      MR. COHEN:  Objection.
 4                      THE WITNESS:  Not in my experience.
 5  Q  (By Mr. Hueston)  Okay.  Do you believe that it is
 6    fairly common for marketing to use the word "free" in
 7    connection with a shipping or delivery service?
 8                      MR. COHEN:  Objection.
 9                      THE WITNESS:  Yes.
10  Q  (By Mr. Hueston)  Including subscription services?
11                      MR. COHEN:  Objection.
12                      THE WITNESS:  Yes.
13  Q  (By Mr. Hueston)  Okay.  Can you think of any other
14    common dark patterns or anti-patterns you have seen in
15    advertisements for subscription programs in particular?
16                      MR. COHEN:  Objection.  I just want
17    to get that in.
18                      MR. HUESTON:  You can go.
19                      THE WITNESS:  Only the -- the same
20    ones that --
21                      MR. HUESTON:  Okay.
22                      THE WITNESS:  -- Amazon uses.
23  Q  (By Mr. Hueston)  Okay.  And let's -- how about -- I
24    want to turn your attention to cancellation flows.
25    Same sorts of questions.
```



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                              94

1       Is it fairly common in the industry to have entry

2    of a cancellation ingress through an account setting or

3    an account management menu?

4  A  Yes.

5  Q  And is this, in fact, commonly a drop-down menu in the

6     top right-hand side of a screen, in your experience?

7  A  Account settings often are, yes.

8  Q  Okay.  And is that also a common way to enter into

9     cancellation or account deletion flows for social media

10    sites, in your experience?

11                    MR. COHEN:  Objection.

12                    MR. HUESTON:  Like LinkedIn, for

13    instance.

14                    THE WITNESS:  Not that I can recall,

15    no.

16  Q  (By Mr. Hueston)  I mean, I'll just ask.  I left that

17    earlier.

18       Are you particularly active, yourself, on social

19    media sites?

20                    MR. COHEN:  Objection.

21                    THE WITNESS:  I am.

22  Q  (By Mr. Hueston)  Okay.  What are some of the sites

23    that you're active on other than LinkedIn?

24  A  Instagram, Bluesky, Foto.

25  Q  Okay.  And in your experience, is it fairly common for



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                    95

1      users to be informed of the consequences of canceling

2      during a cancellation flow?

3   A  Yes.

4   Q  To include, for instance, being told about loss of

5      certain benefits, right?

6   A  Yes.

7   Q  And possible deletion or permanent deletion of data if

8      they fully cancel?

9   A  Yes.

10  Q  Okay.  Would you agree that it can be useful to a

11     customer to be told about the consequences of making

12     sure their decision is informed?

13  A  Yes.

14  Q  Is it common in your experience for users to be shown

15     some alternatives to a media cancellation during the

16     cancellation flow, such as a pausing of the

17     cancellation or a discount?

18                     MR. COHEN:  Objection.

19                     THE WITNESS:  Yes.

20  Q  (By Mr. Hueston)  And you would agree, at least for

21     some customers, the ability to pause or to get a

22     discount could be a benefit, right?

23  A  Yes.

24  Q  All right.  And are you aware that what I just

25     described are often called save offers or retention



1    background.

2  Q  That's a recommendation?

3  A  It is a recommendation.

4  Q  You're not aware of any legal requirement?

5  A  I am not aware of any legal requirement.

6  Q  Okay.  And looking at this, can you determine -- I

7     realize it's just a snapshot on paper -- whether this

8     is above or below 3.5-to-1?

9  A  I would -- without saying it on -- seeing it on an

10    actual screen, I can't say.  But I would say that much

11    of it is barely above 3.5-to-1.

12 Q  Okay.  And I interrupted you as you were going through

13    this.

14        Anything else on this that you would identify as a

15    dark pattern?

16 A  Yes.

17        There is no apparent way to get past this screen

18    without signing in or signing up.

19 Q  How about the fact that "Try It Free" is mentioned

20    multiple times?

21        Is that a dark pattern?

22 A  Not in this case.

23 Q  Okay.  Why not?

24 A  Because a -- a free trial for video services is a

25    common pattern, and the costs of the subscriptions are



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                              115

1    shown clearly.

2    Q  Okay.  And it doesn't -- you don't view it as a dark

3       pattern, the fact that "Try It Free" is in all caps, in

4       bold, and in a larger font than the pricing information

5       on this page?

6    A  I do not.

7    Q  Okay.

8          Okay.  We can put that aside.  I'll give you

9       another example.

10                          (Exhibit No. 19 marked for

11                           identification.)

12

13   Q  (By Mr. Hueston)  And I placed before you Exhibit 19,

14      which I'll represent to you is a snapshot from an

15      Instacart page.

16                     MR. COHEN:  Same objections on

17      context.

18   Q  (By Mr. Hueston)  And have you ever used Instacart?

19   A  I have not.

20   Q  You're familiar with Instacart?

21   A  I am.

22   Q  All right.  And here, the page reflects a pop-up.

23          Do you see that?

24   A  I do.

25   Q  And could this pop-up be described as an interstitial



DAVID A. EDELSTEIN                          May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        116

1   upsell advertisement for a two-week free trial of

2   Instacart+?

3  A  Sure.

4  Q  Is there anything here in this Instacart UX that you

5     think is dark pattern?

6  A  In this case, the "no" choice is smaller and less

7     visually contrasting to the background than "Try free

8     for 2 weeks."

9  Q  Is that a dark pattern?

10  A  Yes.

11  Q  Can I just have you pause on that for a moment?

12  A  Sure.

13  Q  'Cause I'm trying to distinguish how the other one was

14     okay and this one's not.

15         So the other one, I thought, also had smaller font

16     for "No Thanks" and was not as visually highlighted,

17     right?

18  A  Which one is the other one you're referring to?

19  Q  Well, okay.  You know what?  We've gone through a lot.

20         So just -- let's just focus on this.

21         Tell me why you --

22  A  All right.

23  Q  -- think this one's a dark pattern on that.

24  A  Because it is the -- it is a choice between two options

25     as opposed to informational --



DAVID A. EDELSTEIN                                        May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                    117

1  Q  Okay.

2  A  -- about how you would cancel later.

3  Q  And your belief is, if there's a choice between two

4     options, they need to be equally emphasized to not be a

5     dark pattern?

6  A  Yes.

7  Q  Okay.  And if there's any asymmetry in emphasis, that

8     would be a dark pattern --

9  A  Yes.

10 Q  -- if it's between two choices.

11        Yes?

12 A  Not in the sense of the Wayfair one, where one button

13    is the common choice and the second button is their

14    secondary button style, which is a pattern across their

15    entire website.

16 Q  Okay.

17 A  But in this case, where one is a button and one is a

18    link that also does not have underlines, which we have

19    learned mean links on the Web, it is not clear that

20    that's clickable.

21 Q  And in the Wayfair instance, if I'm following you,

22    because it's a pattern across their entire website, the

23    assumption is consumers are going to be familiar with

24    that pattern and be less likely to be deceived, right?

25 A  Yes.



1  Q  (By Mr. Hueston)  And you don't feel -- when you look

2     at these confirmshaming things, I mean, are you ever

3     shamed into clicking because of those?

4  A  They make me think for a second every single time.

5  Q  Right.

6        They make you think for a second.  But can you

7     recall clicking one and going, "I wouldn't have clicked

8     that except that I felt shamed into doing so"?

9                    MR. COHEN:  Objection.

10                    THE WITNESS:  I can't think of a

11    specific time.

12 Q  (By Mr. Hueston)  Okay.  And the fact that what we've

13    described as confirmshaming makes one think for a

14    moment, that in and of itself is not an issue --

15    right? -- in advertising?

16 A  Not that it makes you think for a second, no.

17 Q  Okay.  And I think I've covered this.  But looking at

18    this here where we have the decline link as opposed to

19    a button for "Try It Free," in your experience is that

20    fairly common practice in the industry?

21                    MR. COHEN:  Objection.

22                    THE WITNESS:  Yes, it is common

23    practice.

24 Q  (By Mr. Hueston)  By the way, with respect to the

25    pop-up, would you describe this pop-up as a forced



```
 1    action?

 2                        MR. COHEN:  Objection.

 3                        THE WITNESS:  Yes, in that the

 4    customer has to figure out how to dismiss it to

 5    continue with their task.

 6  Q  (By Mr. Hueston)  And is it your view that forced

 7    actions are dark patterns?

 8  A  Not inherently.

 9  Q  Okay.  When do they move into the category of dark

10    pattern?

11  A  When they are trying to create a behavior in the

12    customer that the customer may not want or is not in

13    the customer's best interests but is in the company's

14    financial interests.

15  Q  Sure.

16        And then following that, what you've just said

17    there, pop-ups or -- I'm sorry.  Let me change -- start

18    the question over.

19        Pop-ups or interstitials, they are relatively

20    common ways to promote productions or subscription

21    services, in your experience, right?

22  A  Yes, they are.

23                        MR. COHEN:  Objection.

24                        MR. HUESTON:  Okay.  We can put that

25    aside.
```



DAVID A. EDELSTEIN                                      May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                              121

```
1          Okay.  Let's go to another example.
2                          (Exhibit No. 20 marked for
3                           identification.)
4
5   Q  (By Mr. Hueston)  Handing you what's been marked as
6      Exhibit 20, which I'll represent to you is a snapshot
7      of an Apple Music offer.
8                     MR. COHEN:  Same objections on
9      context.
10  Q  (By Mr. Hueston)  All right.  Take a moment to look at
11     this.  And I'll ask you if you can identify any dark
12     patterns here.
13                    MR. COHEN:  Just to clarify, is that
14     blue dot on the original snapshot?  That's part of the
15     original snapshot, that blue dot on "Try" --
16                    MR. HUESTON:  No, it's not.  So
17     that -- you can ignore that.  Ignore the purple circle.
18                    MR. COHEN:  Are there any other
19     parts that weren't on the original?
20                    MR. HUESTON:  That's it.  That's it.
21                    THE WITNESS:  Well, given that I'm
22     not sure how this pop-up came up in the context of the
23     Apple Music Web experience, that may be one.  But also
24     this implies that your two choices are to try Apple
25     Music or you're already trying Apple Music.
```



DAVID A. EDELSTEIN                                        May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                      122

```
 1   Q   (By Mr. Hueston)  Okay.  What about -- thank you.
 2           What about the fact that the "Try It Free" button
 3       is more emphasized than the "Already a subscriber"?
 4           Is that a dark pattern in this instance?
 5   A   Not in this instance.
 6   Q   Okay.  And then let's assume for purposes of this that
 7       the consumer was not asking about getting a month of
 8       free music or a subscriber service.  This pop-up comes
 9       up.
10           Is that a dark pattern?
11   A   In the sense that it's interrupting whatever the
12       customer's task was, yes.
13   Q   Okay.  Again, that's fairly common across subscription
14       services, right?
15   A   It is.
16                       MR. COHEN:  Objection.
17                       MR. HUESTON:  Okay.  Thank you.
18           Okay.  Let's go to the next example.
19                           (Exhibit No. 21 marked for
20                            identification.)
21
22   Q   (By Mr. Hueston)  Okay.  Exhibit 21, put before you,
23       I'll represent is a snapshot of a UX page taken from
24       YouTube TV.
25                       MR. COHEN:  Same objections on
```



DAVID A. EDELSTEIN                                      May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                               123

 1   context.

 2        And can you just clarify whether it's -- the

 3   purple blob --

 4                    MR. HUESTON:  The purple dot.  Yeah,

 5   ignore.  That should not be there.

 6                    MR. COHEN:  But there's no other

 7   changes?

 8                    MR. HUESTON:  Correct.

 9   Q  (By Mr. Hueston)  You're familiar with YouTube TV?

10   A  I am familiar with it, yes.

11   Q  Okay.  Are you aware that it is a paid subscription

12   service?

13   A  I am.

14   Q  Okay.  Would you describe this interstitial pop-up ad

15   as a dark pattern?

16   A  I probably would not.

17   Q  You said you probably wouldn't.

18        Sounds like something's borderline for you?

19   A  Only that I know that YouTube TV pops up advertisements

20   to sign up constantly.

21   Q  How does that make a difference in your analysis?

22   A  That the repeated -- frequently repeated advertisements

23   to the service are designed, in my estimation, to wear

24   down the customer over time.

25   Q  Okay.  If that's what the purpose is, then how is that



DAVID A. EDELSTEIN                                          May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                        124

 1    not a dark pattern?

 2  A  Oh.  That's what I'm saying.

 3  Q  Oh.  Okay.

 4  A  That -- that part is --

 5  Q  I must have misinterpreted you.

 6  A  That part is a dark pattern.

 7  Q  Okay.

 8  A  This as one thing on its own is not much of a dark

 9    pattern.

10  Q  Okay.  Let me explore a little bit the frequency of

11    pop-up that you brought up.

12        Again, when is too frequent?

13  A  That, again, is not a hard line.

14  Q  It depends?

15  A  It depends.

16  Q  And are you aware of any laws or regulations that

17    inform when a pop-up is too much?

18  A  I do not.

19  Q  Okay.  It says in that little offer -- I just want to

20    focus here -- it's an offer to preview YouTube TV for

21    20 minutes or start a free trial.

22        Is that what it appears to say?

23  A  Yes.

24  Q  Is there anything about that wording of that offer that

25    you would see as a dark pattern?



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                              165

1  Q  Okay.  Do you remember him expressing that sentiment to
2     you outside of this meeting?
3  A  No.
4  Q  Okay.  But that sort of concern could slow things down,
5     right?
6  A  Yes.
7  Q  All right.  And the concern from Nahshon, as far as you
8     could tell, was a good-faith concern, right?
9  A  Yes.
10 Q  And then below "Nahshon," it says "Jamil," right?
11 A  Yep.
12 Q  That's Jamil Ghani, correct?
13 A  Yes.
14 Q  And he said, quote, "Good to spend some time sketching
15     out in broad strokes what we want to achieve with
16     Prime, what we want the CX to be, what we want Prime to
17     stand for, which we don't spend enough time doing,"
18     right?
19 A  Yes.
20 Q  And here, Jamil is promoting thinking about changing
21     the customer experience, right?
22 A  He is.
23 Q  If we go to Page 3, in the middle of the page, there's
24     an entry for Jamil.  And it says, quote, "How do we
25     really boost Prime's trust in corporate citizenship



DAVID A. EDELSTEIN                                May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                            166

```
 1     profile?  This is one of the much longer term things.
 2     But super important."
 3          Do you see that?
 4  A  Yes, I do.
 5  Q  And Jamil here is actively involved in making
 6     improvements to boost customer trust in Prime, right?
 7  A  Yes.
 8  Q  And he also wanted very clear CX tenets.
 9          Do you recall that?
10  A  I do.
11  Q  In fact, if you go back to the first page, I think
12     Subpoint b, it's written there:  "Need very clear CX
13     tenets," right?
14  A  Yes.
15  Q  Okay.
16          Okay.  We can put that aside.
17          Go to the next exhibit, which will be marked as
18     30.
19                          (Exhibit No. 30 marked for
20                           identification.)
21
22  Q  (By Mr. Hueston)  All right.  We'll just identify this
23     first.  It's from AmyLeigh Morgan to yourself and
24     others, dated December 23rd, 2020?
25  A  Yes.
```



DAVID A. EDELSTEIN                           May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                        167

1  Q  And right down below the header, it says, "Jun, thank

2      you for the thoughtful recap.  You're right -- I wasn't

3      sure how to assess the success of that meeting!"

4          And take a moment to look at this.

5          Do you recall what this is referring to?

6  A  I do.

7  Q  What is this?

8  A  This was the feedback -- this was the response to the

9      subscription clarity working group's presentation on

10     proposals.

11 Q  Okay.  And drawing your attention to the third

12     paragraph of the first embedded e-mail from

13     Wakabayashi, it starts with, "Overall I thought the

14     meeting went very [sic] well."

15         Do you see that?

16 A  I do.

17 Q  And he writes, kind of in the middle of the paragraph,

18     "It is perfectly normal for senior leader to challenge

19     anecdotes listed in a doc with their own anecdotes."

20     Let me just pause there.

21         Was that something that you thought as well or

22     agreed with?

23 A  Yes.

24 Q  All right.  And then he writes, "They are senior

25     leaders who have seen things from a different lens, and



```
 1                        MR. HUESTON:  Okay.  That's -- thank

 2     you for clarifying that.

 3  Q  (By Mr. Hueston)  During your time managing UX

 4     researchers, your standard of what is clear was

 5     intentionally high to beat entry standards, right?

 6  A  Absolutely.

 7                        MR. COHEN:  Objection.

 8  Q  (By Mr. Hueston)  You said "absolutely," right?

 9  A  Yes.

10  Q  Okay.  Let's go to what we'll mark as Tab 16.

11                            (Discussion off the record.)

12                            (Exhibit No. 50 marked for

13                              identification.)

14

15  Q  (By Mr. Hueston)  And Exhibit 50, for the record, is

16     entitled "Improving the clarity of Amazon's

17     subscription programs V3 (Amazon Privileged &

18     Confidential) Document Locked, No Further Edits."

19         Do you see that?

20  A  I do.

21  Q  And do you recognize this document?

22  A  Vaguely, yes.

23  Q  Okay.  Let's go to Page 2.

24         Sorry.  End of Page 1 says "Proposal 1:  Adopt

25     Clarity Tenets for Subscription Programs."
```



DAVID A. EDELSTEIN                                May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                              289

```
 1          Do you see that?
 2   A  I do.
 3   Q  And do you remember an effort to adopt clarity tenets
 4      for subscription programs?
 5   A  Yes.  I mean, I think these came primarily out of the
 6      subscription clarity working group.
 7   Q  Okay.  And they were shared with you, right?
 8   A  Yes.
 9   Q  Okay.  And if we go to No. 6, listed on that next page,
10      it says, "We raise the bar on subscription clarity
11      across the industry."
12          Do you see that?
13   A  I do.
14   Q  And you agreed with that, right?
15   A  Yes.
16   Q  And it says, "We go beyond compliance requirements, or
17      what our competitors are doing, to deliver a best-in-
18      class customer experience."
19          That was true, correct?
20   A  Yes.
21   Q  And you testified in your IH that the idea of clarity
22      bar raisers came out of your team.
23          Do you remember that?
24   A  I do.
25   Q  Okay.  And what are clarity bar raisers?
```



DAVID A. EDELSTEIN                                    May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                 290

```
 1  A  Clarity bar raisers were an idea that came out of the
 2     subscription clarity team that were based on an
 3     informal understanding of what bar raiser programs at
 4     Amazon were.  The idea was that we would have people
 5     trained to analyze and make recommendations on clarity
 6     for projects across the company.
 7  Q  Okay.  And let's go back to the first page of this
 8     document.
 9         And there's a section that says "Proposals for
10     raising the bar on subscription clarity across Amazon."
11         Do you see that?
12  A  I do.
13  Q  And it says, in the second sentence there, "In-progress
14     efforts include 1) establishing worldwide Prime content
15     testing guidelines with automated enforcement," right?
16  A  Yes.
17  Q  And then it continues, "Conducting monthly clarity
18     reviews," et cetera.
19         I want to focus on that No. 1.
20         Your team's goals included establishing this
21     clarity bar across Prime worldwide, right?
22  A  Yes.
23  Q  And would you agree that different countries might have
24     different clarity standards, depending on cultural
25     differences or understanding of certain online retail
```



```
 1    experiences?

 2  A  Yes.

 3                    MR. COHEN:  Objection.

 4  Q  (By Mr. Hueston)  And are you aware that different

 5    countries also have different legal standards regarding

 6    what may be required of certain online retail

 7    experiences?

 8  A  Yes.

 9  Q  Okay.  So the goal here is not about compliance with

10    different countries' laws, right?

11  A  Correct.

12  Q  Okay.  The goal here is about elevating the customer

13    experience regardless of what any particular set of

14    laws required, right?

15  A  Yes.

16  Q  Okay.  And the Prime member growth team was setting

17    this clarity bar and rethinking clarity metrics at the

18    end of 2020, right?

19  A  Yes.

20  Q  Okay.  And so this reflects -- because it says, under

21    "Proposals for raising the bar on subscription

22    clarity":  "The Prime member growth team has

23    prioritized clarity and member trust as an ongoing

24    global stream in '20 and 2021."

25        You recall that then as of December of 2020,
```



DAVID A. EDELSTEIN                                May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                           292

1    moving into 2021, Amazon was still attempting or trying
2    to figure out how to best measure clarity improvements?
3  A  Yes.
4  Q  There was ongoing debate and discussion as to how to
5    set a high clarity bar, right?
6  A  Yes.
7  Q  And there was ongoing debate and discussion for what
8    metrics would best test those clarity changes, right?
9  A  Yes.
10 Q  And discussions about which metrics to use, as far as
11   you understood it, was not related to any legal
12   standard, right?
13 A  Yes.
14 Q  Okay.
15                    MR. HUESTON:  Okay.  I want to take
16   a quick break and do a time check.  I have a few final
17   documents I'm going to try to squeeze in on remaining
18   minutes.
19        Let's go off the record.
20                    THE VIDEOGRAPHER:  Going off record.
21   Time now is 5:19 p.m.
22                        (Pause in proceedings.)
23
24                    THE VIDEOGRAPHER:  Back on record.
25   Time now is 5:25 p.m.



```
 1                         MR. HUESTON:  Okay.  And I'm handing
 2    out, yeah, copies of Exhibit 3 from yesterday's
 3    deposition.
 4                              (Discussion off the record.)
 5                              (Exhibit No. 51 marked for
 6                               identification.)
 7
 8  Q  (By Mr. Hueston)  Okay.  Mr. Edelstein, I want to draw
 9    your attention to, if you can kind of flip the pages to
10    the Bates Stamp 573.  It's an e-mail chain starting
11    with Sara Mead at the top?
12  A  Yes.
13  Q  Okay.  And down under "High level take-aways," there's
14    a reference to "Agreement to overarching goal of zero
15    impact to Prime member balance."
16        I think you testified about that a bit, right?
17  A  Yes.
18  Q  Okay.  At Amazon, it was common to try to establish
19    goals -- right? -- for different groups?
20  A  Yes.
21  Q  And those goals were aspirational, right?
22  A  Aspirational in the sense that they might be hard to
23    achieve, yes.
24  Q  Right.
25        It did not say that there must be zero impact.
```



DAVID A. EDELSTEIN                                          May 01, 2025
FTC vs AMAZON.COM, LLC, et al.                                        308

```
 1   STATE OF WASHINGTON )     I, John M. S. Botelho, CCR, RPR,
                         ) ss  a certified court reporter
 2   County of Pierce    )     in the State of Washington, do
                               hereby certify:
 3

 4
          That the foregoing deposition of DAVID ADAM EDELSTEIN
 5   was taken before me and completed on May 1, 2025, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;
13        IN WITNESS WHEREOF, I have hereunto set my hand
     this 6th day of May, 2025.
14

15

16

17                              John M.S. Botelho
18                              John M. S. Botelho, CCR, RPR
                                Certified Court Reporter No. 2976
19                              (Certification expires 5/26/2025.)
20

21

22

23

24

25
```



# EXHIBIT 95



EXHIBIT
5/1/25
24
Edelstein
PENGAD 800-631-6989

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

Enforcement ∨    Policy ∨    Advice and Guidance ∨    News and Events ∨    About the FTC ∨    Q

Home / News and Events / Events

# Bringing Dark Patte ...rkshop



### The FTC welcomes your feedback.

Would you take a brief survey so we can learn about your experience on FTC.gov?

**Yes, I'll give feedback**

No, thanks

Powered by Verint Experience Cloud



## Bringing **Darl**

Thursday, April 29, 2021 | 10:30AM

**Tags:** Consumer Protection   Advertising and M
Credit and Finance   Payments and Billing   Pri
Artificial Intelligence

## Event Description

The Federal Trade Commission hosted a virtual workshop on April 29, 2021 to examine digital "dark patterns," a term that has been used to describe a range of potentially manipulative user interface designs used on websites and mobile apps.

**Related Releases**

FTC Seeks Public Comment on Dark Patterns Topics ahead of Workshop

FTC to Hold Virtual Workshop Exploring Digital "Dark Patterns"

FTC to Host Virtual Workshop to Examine Digital Dark Patterns

FTC Releases Final Agenda for Dark Patterns Workshop on April 29

**Related Blog Posts**

Bringing Dark Patterns to Light

# EXHIBIT 96

1                UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4

5    FEDERAL TRADE COMMISSION,

6

7                      Plaintiff,

8

9    vs.                            Case No. 2:23-cv-0932

10

11   AMAZON, INC.,

12

13              Defendant.

14

15

16        VIDEOTAPED DEPOSITION OF JENNY BLACKBURN

17             TUESDAY, DECEMBER 10, 2024

18                    2:00 p.m.

19

20

21

22

23

24

25



1        behalf of defendant, and with me is

2        Stephanie Colorado.

3              MR. NARDINI:  And good

4        afternoon.  Max Nardini, joined along

5        with my colleague Evan Mendelson, on

6        behalf of the Federal Trade

7        Commission.

8              THE VIDEOGRAPHER:  Thank you,

9        very much.

10             Madam court reporter, would you

11       kindly swear in our witness.

12

13             JENNY BLACKBURN,

14   was thereupon produced as a witness and,

15   after having been sworn on oath, was examined

16   and testified as follows:

17

18                    EXAMINATION

19   BY MR. REITER:

20       Q.    Good afternoon, Ms. Blackburn.

21   Thank you for being here today.

22             Could you start by stating your

23   full name for the record, please?

24       A.    Jenny Blackburn.

25       Q.    Ms. Blackburn, what is your



1    usability, such as field research, which we

2    did occasionally, but less often.

3         Q.    Okay.  Are you familiar with

4    Amazon's Shopper Frustration Program?

5         A.    I am.

6         Q.    How are you familiar with the

7    Shopper Frustration's program?

8         A.    It was under my leadership that

9    the team drafted the plan to create a Shopper

10   Frustration's Program.  I was also aware of

11   it as an Amazonian, as the program was

12   launched and had a lot of impact.

13             And then in my last role at

14   Amazon, when I was leading shopping design,

15   the Shopper Frustration Program reported into

16   me.

17        Q.    And what is Amazon's Shopper

18   Frustration's program?

19             MR. NARDINI:  Objection.  Vague

20        as to time period.

21             THE WITNESS:  The Shopper

22        Frustration Program was a repository

23        of the insights that user research had

24        gathered when they were doing these

25        usability tests.



1              And when they would watch

2         customers use the Amazon website for a

3         variety of ends, they would often see

4         things that could be improved, and

5         they would catalog these in the

6         Shopper Frustration database.

7              And then the program was

8         designed to not just make sure that

9         these things were in the database, but

10        that they were getting visibility and

11        being shared with the builder teams,

12        who could potentially go improve those

13        areas.

14   BY MR. REITER:

15        Q.     So why was the Shopper

16   Frustration Program developed at Amazon?

17        A.     It was really developed to

18   drive greater -- to improve the customer

19   experience, and to ensure that these insights

20   that happened in the course of the user

21   research session were making it in front of

22   the people who could potentially take action

23   on them.

24              You know, it's commonly the

25   case in user research that researchers do a

