1  research study.  They write a report, and

2  that report may or may not be seen by the

3  people who are actually making decisions.

4              And so this program was really

5  designed to ensure that those issues were

6  getting more visibility and could be acted

7  on.

8         Q.    Is the Shopper Frustration

9  Program another reflection of Amazon's

10  customer obsession principle?

11              MR. NARDINI:  Objection.  Vague

12         as to time period.

13              THE WITNESS:  I definitely see

14         it as a reflection of Amazon's

15         customer obsession.

16              It's not uncommon for companies

17         to have research repositories.  But

18         the difference is that in a lot of

19         companies, the research repository,

20         their end user that they're targeting

21         is other researchers.

22              It's really a tool for

23         researchers to keep track of the

24         things that they've identified, so

25         that they can go back and -- on it



1  document titled Shopper Frustrations Research

2  Program Update.

3              Do you see that?

4        A.    I do.

5        Q.    Looking at the second sentence

6  of your email you wrote:

7              "Good feedback and enthusiastic

8        discussion.  These are programs our

9        leaders hear a lot about."

10             Do you see that?

11       A.    I do.

12       Q.    And what did you mean when you

13  wrote, "these are programs our leaders hear a

14  lot about"?

15       A.    I think that, you know, this

16  meeting was with Llew Mason's leadership

17  team, which is very -- it is the senior

18  leaders, who are responsible for the core

19  result shopping experience.

20             And, you know, both the fact

21  that they spent dedicated time focused on

22  shopper frustrations, understanding what some

23  of the themes were, and really rigorously

24  discussing how to improve the customer

25  experience was, you know, worth sharing with



 1  the team as something, I think, is really

 2  inspiring, and not always the case at

 3  companies that leaders at this level would

 4  always be engaged with this kind of data.

 5       Q.    So in your experience, was

 6  Amazon's leadership supportive of the Shopper

 7  Frustration Program?

 8       A.    They were.

 9            MR. NARDINI:  Objection.  Form

10       and foundation.  You can answer.

11            THE WITNESS:  They were.

12  BY MR. REITER:

13       Q.    Okay.  Let's go to the

14  attachment to your email.

15            Do you see there's a background

16  section in the second paragraph?

17       A.    I'm still seeing the same page.

18  Okay.  What page?

19       Q.    It's page 3.  It's the first

20  page of the attachment.

21            MR. NARDINI:  And, Mr. Reiter,

22       I think if you hit direct to page, it

23       will also take us where you are.

24            THE WITNESS:  Yes.

25  BY MR. REITER:



1     Q.    Okay.  So looking at the

2   background section, it states:

3            "The Shopper Frustration

4          Program started in 2014, has been a

5          consumer-wide initiative to drive

6          continual customer experience

7          improvements owned by the shopping

8          design team within consumer

9          engagement.

10           Through its insights

11         repository, researchers log customer

12         insights observed firsthand through

13         user experience research.

14           The program partners with

15         design products and engineering

16         stakeholders and shopping teams across

17         the company to work backwards from the

18         insights and address customer needs

19         and pain points."

20           Is that an accurate description

21         of the Shopper Frustration Program

22         we've been discussing.

23   A.    It is.

24           MR. NARDINI:  Objection.

25         Compound.



```
 1                  THE WITNESS:  It is.
 2   BY MR. REITER:
 3        Q.    Looking at the last sentence in
 4   that background section.  It says:
 5                "To date, shopping teams across
 6           the company have leveraged the team's
 7           research insights to partially and/or
 8           fully resolve 694 customer-facing
 9           production-level issues.  We have also
10           prevented 413 prototype issues from
11           reaching production."
12                Do you see that?
13        A.    I do.
14        Q.    In your experience, Ms.
15   Blackburn, was the Shopping Frustration
16   program successful at driving customer
17   experience improvements at Amazon?
18                MR. NARDINI:  Objection.
19           Vague.
20                THE WITNESS:  I think it was
21           very successful, yeah.  I think that,
22           you know, this data base started
23           because there were, you know, what
24           seemed like a large number of
25           insights, you know, 400.
```



1           And then, you know, after a

2       few nears, 694 issues had been

3       corrected.  You know, that's -- that's

4       outstanding impact for user research.

5    BY MR. REITER:

6           Q.    So just to break that down a

7    bit.

8              The middle of the paragraph

9    that we're looking at says that quote, "The

10   original intent of the program was to close

11   the loop on the 400-plus usability issues

12   stored in the database at that time."

13             Do you see that?

14         A.    I do.

15         Q.    And did the Shopper Frustration

16   Program meet its goal of closing the loop on

17   400-plus usability issues?

18         A.    Well, what I've seen is the

19   goal is aspirational.  So the goal was to

20   make as much progress as possible in the

21   customer experience.

22             I think, you know, in the

23   beginning when we launched this program, if

24   you had said we could resolve 694 issues and

25   we had identified 400, we would have said



```
 1  that was just, you know, probably
 2  unrealistic.
 3             So looking backwards at it,
 4  it's very successful and I would say we
 5  exceeded our goals.
 6       Q.    Let's go to the next page.  And
 7  there is subheading there titled,
 8  "Subscription Clarity."
 9             Do you see that?
10       A.    I do.
11       Q.    And it says:
12             "We will invent new design
13       patterns that improve the clarity for
14       member acquisition and retention CX
15       for paid subscription programs, such
16       as Prime, Music Unlimited, Kindle
17       Unlimited, Audible."
18             Do you see that?
19       A.    I do.
20       Q.    At this time, were you aware of
21  shopper frustrations related to subscription
22  clarity?
23       A.    I was.
24       Q.    And how were those shopper
25  frustrations observed?
```



1        A.       So my user experience team was

2    focused on the core shopping experience.  And

3    the core shopping experience starts from

4    Amazon home page and goes through detail page

5    cart and checkout.

6                So when we were evaluating the

7    shopping experience, we would ask customers

8    to do things that spanned across these pages.

9                And as a byproduct of that, the

10   user researchers would sometimes identify

11   confusion that the customer, in that study,

12   had with aspects of those pages that related

13   to Prime signup.

14               My team did not specifically

15   focus on Prime signup.  And so these issues

16   were coming up in that broader context and

17   being added to the Shopper Frustration

18   database when they were observed.

19        Q.       So were these shopper

20   frustrations relating to subscription clarity

21   observed during the kind of usability studies

22   that you mentioned earlier?

23               MR. NARDINI:  Objection to

24        form.  Vague.

25               THE WITNESS:  I believe, yes.



1          Because the majority of the issues in
2          this database were coming from those
3          types of usability studies.
4    BY MR. REITER:
5          Q.     So let me just ask you about
6    those usability studies for a moment.
7                 How large were those usability
8    studies?
9          A.     Usability studies are
10   qualitative.  So by nature they're a small
11   sample.  They range from, on the small side,
12   like, four to six people.  And then on the
13   large side, maybe 30-ish people.
14         Q.     Okay.  So between four to six,
15   and a max of 30 people might participate in
16   these usability studies?
17         A.     That would be typical, yeah.
18         Q.     All right.  And by contrast,
19   how many customers does Amazon have?
20         A.     I don't know the precise number
21   of customers that Amazon has.  I think it's
22   in the hundreds of millions.  It's hard to
23   find someone who isn't an Amazon customer.
24         Q.     You've mentioned several times
25   that these studies are qualitative.  What do



 1 | you mean by that?

 2 |        A.      There's two types of research:

 3 | Qualitative and quantitative.  Qualitative

 4 | research really relates to the how and why.

 5 | So how people perceive things, how they feel

 6 | about things, why they think something -- why

 7 | they prefer something, why they don't prefer

 8 | something.

 9 |                Quantitative research relates

10 | to numbers.  So how big something is, how

11 | many people something impacts, et cetera.

12 |                Generally, qualitative studies

13 | are small sample because they're not relating

14 | to numbers and they're not being

15 | extrapolated.

16 |                Quantitative research is large

17 | numbers because it uses statistics to

18 | generalize to the larger population.

19 |        Q.      Okay.  So is it fair to say

20 | that the shopper frustrations observed during

21 | these usability studies were qualitative,

22 | anecdotal reports from a relatively small

23 | number of shoppers?

24 |        A.      Yes.

25 |                MR. NARDINI:  Objection to



```
 1              form.  Vague.  You can answer.
 2                   THE WITNESS:  Yes.
 3   BY MR. REITER:
 4         Q.    And do those anecdotal reports
 5   from a small number of shoppers provides any
 6   reliable data about Amazon's customers as a
 7   whole?
 8                   MR. NARDINI:  Objection to
 9         form.  Vague.  And foundation.
10                   THE WITNESS:  No.  The -- what
11         you can say from a small sample
12         qualitative study is what those
13         specific customers in that study
14         experienced.  It's explicitly not to
15         be extrapolated to a larger
16         population.  Um, yeah.
17   BY MR. REITER:
18         Q.    So do those usability studies
19   that we've been discussing, do they provide
20   any information that can be extrapolated
21   beyond the smaller number of shoppers who
22   participated in the study?
23                   MR. NARDINI:  Objection to
24         form.  Vague.
25                   THE WITNESS:  They provide
```



1        information that you can use to create

2        hypotheses.  And then you can use

3        quantitative measures to validate or

4        invalidate or size.

5               So they're a useful input, but

6        on their own, they don't tell you

7        anything about the large population.

8    BY MR. REITER:

9        Q.    Okay.  You would have to do

10   further studies and gather quantitative data

11   in order to make a finding that applied to a

12   larger population; is that right?

13               MR. NARDINI:  Objection to

14        form.

15               THE WITNESS:  That's right.  In

16        fact, a lot of what the team was doing

17        with the Shopper Frustration Program

18        is working with partner teams to

19        create hypotheses, and then go test

20        those, using multivariant testing,

21        which by its nature is quantitative

22        and has statistical significance, in

23        order to bear out whether that

24        hypothesis was true and what

25        improvement would actually move the



```
 1          needle on it.
 2    BY MR. REITER:
 3          Q.    Okay.  You testified that these
 4    shopper frustrations were observed in a lab
 5    setting; is that right?
 6          A.    That was typically the case.
 7    There were some usability studies that were
 8    done like this session; remotely, where the
 9    participant might be in their home.
10          Q.    Can being in a lab setting
11    affect the results of user research?
12                MR. NARDINI:  Objection.
13          Vague.
14                THE WITNESS:  Yes.  In fact, I
15          would say being in a study, full stop,
16          can impact how people behave.
17                Simply because when you know
18          you're being watched by multiple
19          people, and when you're in an
20          artificial setting, you know, it
21          changes your motivations, what you pay
22          attention to, what you don't pay
23          attention to.
24                And so again, you had to take
25          with a grain of salt what would come
```



1              should be either, or ideally both,

2              validated with quantitative data.  And

3              there should be experiments run, in

4              order to identify the best -- best

5              path forward.

6      BY MR. REITER:

7              Q.     In your experience, is it

8      common to develop a hypothesis, based on

9      qualitative insights, like shopper

10     frustrations better than proven wrong when

11     you've done the work to look at the

12     quantitative data or run experiments?

13                    MR. NARDINI:  Objection.  Form

14             vague.

15                    THE WITNESS:  Yes.  It's

16             definitely the case that you can start

17             with a qualitative insight, develop a

18             hypothesis, and then do an experiment

19             and have that experiment not bear out

20             what you hoped would happen.

21                    And it can be for a variety of

22             reasons.  It can be because your

23             hypothesis was wrong to begin with.

24             It can also be because the things that

25             you thought would solve the issue



 1          doesn't solve the issue, sometimes
 2          creates different issues.
 3               So user experience design is
 4          very complex.  And there's multiple
 5          the factors.  And so, you know, it's
 6          rarely the case that exactly what we
 7          think is going to make it better is
 8          exactly the thing that makes it
 9          better.  It's an irritative process.
10   BY MR. REITER:
11          Q.    So given the problems we've
12   discussed with the shopper frustrations how
13   they're anecdotal, qualitative insights, how
14   they're limited to a small number of
15   customers that cannot be extrapolated, given
16   all that, why would Amazon try to resolve
17   those customer frustrations?
18               MR. NARDINI:  Objection.
19          Vague.  Compound.
20               THE WITNESS:  Amazon, in my
21          experience, is really customer
22          obsessed.
23               And part of that customer
24          obsession is treating anecdotes
25          seriously, and looking for every



JENNY BLACKBURN                     December 10, 2024
FTC vs AMAZON                                          48

1          possible opportunity to improve the

2          customer experience.

3                    You know, I think you could

4          have leaders spending time arguing

5          that things aren't important, but

6          instead at Amazon, they would

7          typically focus on:  How do we make it

8          better?

9                    And so I -- I think the fact

10         that Amazon invested in user research

11         and this program are -- at the end of

12         the day, really ladder up to that

13         customer obsession leadership

14         principle, and the belief that

15         investing in high trust, simple, clear

16         user experiences will pay off for

17         Amazon.

18    BY MR. REITER:

19         Q.    If you look at the next tenet

20    that's listed in this document, it says:

21              "We close the loop.  We

22    relentlessly follow up on customer issues

23    we've identified until they're fixed."

24              Could you please explain what

25    that means?



1          MR. NARDINI:  Objection.

2   Vague.  Foundation.

3          THE WITNESS:  Yeah.  This tenet

4   was really intended to drive ownership

5   and follow-up mindset amongst the user

6   researchers.

7          You know, my belief is that at

8   the end of the day, the value of a

9   user research organization is actually

10  improving the user experience, not

11  just, you know, reporting things.

12         But it's commonly the case that

13  user researchers will spend all of

14  their time doing research, and they

15  aren't spending the time to make sure

16  that the things that they've

17  identified are getting to the right

18  people.

19         So I really wanted the research

20  team to feel ownership and be really

21  relentless about making sure that the

22  things that they observed, and, you

23  know, these moments with customers

24  were getting in front of the people

25  who actually could do something about



1  generate a considerable amount of emails and

2  other documents?

3              MR. NARDINI:  Objection.

4              THE WITNESS:  It did.  Yeah.

5         And Amazon is a very much document

6         culture as well.  So we -- and

7         researchers are very prolific

8         documenters.  So there was definitely

9         lots of emails, lots of documents,

10        lots of meetings talking about shopper

11        frustrations.

12 BY MR. REITER:

13        Q.    And based on your experience,

14 is that large body of documents talking about

15 shopper frustrations, is that evidence that

16 Amazon had a serious problem with

17 subscription clarity?

18              MR. NARDINI:  Objection.

19        Foundation.  Vague as to "serious

20        problem."

21              THE WITNESS:  In my experience,

22        the fact that there was so much

23        discussion, you know, and

24        consideration of the shopper

25        frustrations at many levels in the



1           company is a statement of how much

2           Amazon employees cared about the

3           customer experience.

4                And it also is a direct output

5           of how much the user research team was

6           passionate about getting these issues

7           in front of people.

8                It was never designed, nor

9           should it be used to paint a picture

10          of anything other than that.

11          Q.      Anything other than trying to

12    fix --

13          A.      Yeah.  This was Amazon

14    employees, leaders paying attention to

15    customer anecdotes, in order to figure out

16    how they can make the experience better for

17    customers.

18          Q.      In your experience, Ms.

19    Blackburn, were the user experience

20    researchers and designers that you worked

21    with, were they always able to put these

22    shopper frustrations that they witnessed in

23    context and treat them as the type of

24    anecdotal reports of their work?

25                MR. NARDINI:  Objection.



1  Vague.  Compound.

2        THE WITNESS:  No.  I mean, that

3  wasn't their job.  So the user

4  researchers -- I mean, I think the

5  context is important.

6        You know, they would spend a

7  significant part of their work week

8  sitting one-on-one with customers and

9  listening to customers share, you

10  know, their hopes and aspirations and

11  thoughts.

12        And so because of that, that's

13  very emotionally resonant when you

14  have that one-on-one interaction with

15  a person.  And so that made these

16  researchers very, very attuned to the

17  things that they had heard from these

18  people.

19        And, you know, I think that --

20  they weren't even aware, in many

21  cases, of the broader business

22  considerations, of the broader road

23  maps that teams had of sort of like

24  how prioritization happens.

25        They really just were very



JENNY BLACKBURN                                December 10, 2024
FTC vs AMAZON                                                58

1            or hyperbole when talking about that,

2            in their desire and attempt to get --

3            to close the loop to get teams to take

4            action.

5    BY MR. REITER:

6            Q.    So I want to ask you about one

7    of the user experience researchers we've

8    heard about in this case.  His name is Reid

9    Nelson.

10            Do you know Mr. Nelson?

11            A.    I do know Mr. Nelson.  I hired

12    him at Amazon and he worked on my team, a

13    couple different teams when I was there.

14            Q.    How would you describe your

15    experience working with Mr. Nelson?

16            A.    He -- so I would say, you know,

17    we talked about that close-the-loop tenet.

18    He sort of like took that and 10xed it.

19            He really, really passionately

20    felt like it was his mission to make sure

21    that the issues that he'd identified got

22    fixed.  And so I appreciated that.

23            Like, he would never let

24    something go, which I appreciated.  He also,

25    you know, didn't have a -- he had a very



1    narrow perspective and was not super adept at

2    how to influence at Amazon.  And so sometimes

3    his tactics would -- were pretty brute force.

4    And that was something that we would coach

5    him on.

6         Q.    You said Mr. Nelson was

7    passionate about fixing the shopper

8    frustration issues he observed.

9              Did you see him use passionate

10   language in his emails and other

11   communications?

12             MR. NARDINI:  Objection.

13         Vague.

14             THE WITNESS:  He used very

15         strong language.  And it was both

16         issues from the Shopper Frustration

17         database and also personal anecdotes

18         of things that he had found confusing.

19             He didn't really differentiate.

20         Any issue that he observed, whether it

21         was one person or five, he would

22         really, really try to drive action on

23         by using sort of, like, increasingly

24         strong and sometimes hyperbolic

25         language when talking about it.



1    BY MR. REITER:

2         Q.    So we talked about how the

3    shopper frustrations were anecdotal reports.

4              Did Mr. Nelson, in your

5    experience, treat them as anecdotal reports?

6              MR. NARDINI:  Objection.

7         Vague.  Foundation.

8              THE WITNESS:  You know, he

9         would talk about them as shopper

10        frustrations and he was clear on,

11        like, the number of people that

12        experienced the issue.  So in that

13        regard, yes.

14             But I think that where he

15        sometimes crossed the sort of line of

16        accuracy in his attempts to close the

17        loop is by sort of overstating what

18        that means for Amazon.

19             So, you know, it's accurate

20        that, like, these three people or

21        these ten people had this issue and

22        it's in the database.  But then he

23        would want to sort of extrapolate

24        that, in order to drive action on it.

25        And that was not really appropriate



1              And at that time, there was a

2         decision that Amazon got to make about

3         whether to show the negative customer

4         reviews in the same prominence and in

5         the same light as positive customer

6         reviews.

7              Obviously, negative customer

8         reviews are going to be bad for sales.

9         And the decision was although in the

10        short-term you may have a customer

11        come to buy something and leave

12        because they see a negative customer

13        review, the loyalty that you gain from

14        that customer from helping them to

15        make a better buying decision is worth

16        that negative impact.

17              I always loved that example

18        because it then set the precedent.

19        And now, you know, everywhere you see

20        customer reviews, you see that

21        balanced view.

22   BY MR. REITER:

23        Q.    So you testified earlier today

24   about Amazon's customer obsession principle.

25              In your interactions with Mr.



1    Ghani, did you see him adhere to Amazon's
2    customer obsession principle?
3              MR. NARDINI:  Objection.  Form
4         and foundation.
5              THE WITNESS:  I did.  I did.  I
6         found him to be very thoughtful,
7         empathetic and wanting to do the right
8         thing for customers.
9    BY MR. REITER:
10        Q.    How about Neil Lindsay?  Do you
11   know Mr. Lindsay?
12        A.    I do know Mr. Lindsay.  I was
13   in meetings with him.
14        Q.    In those meetings and other
15   interactions with Mr. Lindsay, did you
16   observe him adhering to Amazon's customer
17   obsession principle?
18              MR. NARDINI:  Objection to
19         form.  Vague.
20              THE WITNESS:  I did I found
21         that Neil was always very rigorous in
22         encouraging teams to make their
23         experiences more clear, more simple
24         and do the right thing for customers.
25   BY MR. REITER:



JENNY BLACKBURN                          December 10, 2024
FTC vs AMAZON                                              97

1    Q.    And how did about Russ

2  Granzinetti?  Do you know Mr. Granzinetti?

3    A.    I do know Mr. Granzinetti.

4    Q.    In your interactions with Mr.

5  Granzinetti, did you observe him adhere to

6  Amazon's customer obsession principle?

7         MR. NARDINI:  Objection to

8    form.  Foundation.

9         You can answer.

10        THE WITNESS:  I did.  He could

11   be kind of brutal in his approach and

12   teams didn't always appreciate it.

13        But he was always, you know,

14   pushing for more clarity, better

15   customer experience and, you know,

16   wanting teams to be sharper in how

17   they were driving good experiences for

18   their customers.

19 BY MR. REITER:

20   Q.    Ms. Blackburn, are you aware

21 that the fist FTC sued Mr. Ghani, Mr. Lindsay

22 and Mr. Granzinetti personally?

23   A.    I am.

24        MR. NARDINI:  Objection.

25   Compound.



```
 1  BY MR. REITER:
 2        Q.     What was your reaction when you
 3  learned that?
 4        A.     I was horrified by that.  I
 5  think that these are three leaders who
 6  repeatedly gave air time and took seriously
 7  shopper frustrations, customer anecdotes and
 8  challenged their teams to do better for
 9  customers.
10               And I think the fact that
11  they're being negatively personally impacted
12  for those activities and that the things that
13  they were doing to try to improve the
14  customer experience being used against them
15  is un -- I don't know how to say that word,
16  but it's very poor.
17        Q.     Unconscionable?
18        A.     Unconscionable.
19        Q.     Ms. Blackburn, based on your
20  decade of working at Amazon, do you have any
21  reason to believe that Amazon or the three
22  individual defendants we discussed did
23  anything to harm consumers?
24               MR. NARDINI:  Objection.  Form.
25        Foundation.  Compound.  And vague.
```



 1  wanted to enroll in Prime?

 2          A.      To enroll in Prime --

 3                  MR. NARDINI:  Objection to

 4          form.  Foundation.

 5                  THE WITNESS:  -- the yellow

 6          button that says, "free same-day

 7          delivery."

 8  BY MR. REITER:

 9          Q.      And does the page disclose the

10  terms of a Prime membership if a consumer

11  chose to click on that orange button?

12                  MR. NARDINI:  Objection.

13          Foundation.  Calls for a legal

14          conclusion.

15                  THE WITNESS:  Below --

16          immediately below the button, it lists

17          the terms and conditions, including

18          the fact that the membership will

19          renew and the monthly price of the

20          membership, the fact that the customer

21          can cancel at any time.

22                  So it seems pretty

23          straightforward to me.

24  BY MR. REITER:

25          Q.      And where does the customer



```
 1   click if they do not want to enroll in Prime?
 2              MR. NARDINI:  Objection.  Form.
 3         Foundation.
 4              THE WITNESS:  The they would
 5         click on "no thanks."
 6   BY MR. REITER:
 7         Q.    The FTC has alleged in this
 8   case that the "no thanks" link is not as
 9   conspicuous as the enrollment button.
10              From -- based on your
11   experience as a user experience designer,
12   what's your reaction to that?
13              MR. NARDINI:  Objection to
14         form.  Foundation.
15              THE WITNESS:  With respect to
16         the FTC, you know, I think based on my
17         experience as a user experience
18         designer, what's really important here
19         is a couple of things.
20              One, that the signup and the
21         decline to sign up option are right
22         next to each other, so that it's easy
23         for the user to pick the one they
24         want.
25              Second, the fact that it uses
```



JENNY BLACKBURN
FTC vs AMAZON

December 10, 2024
109

```
 1          plain language.  In particular, I
 2          would call out the fact that the link
 3          starts with "no thanks," which is a
 4          really common pattern across upsells.
 5                  And then it is not uncommon
 6          that the button that is associated
 7          with the upsell has more prominence.
 8          That actually is helpful to a user, as
 9          they scan the page.
10                  And it's often the case that
11          the "no thanks" link is treated with
12          the blue hyperlink treatment.
13                  Again, like, if you were to
14          squint and look at this page, a lot of
15          consumers would say that the blue link
16          is the "no thanks," because that's a
17          common best practice across these
18          types of interstitials.
19      BY MR. REITER:
20          Q.    So I want to break that down a
21      little bit.
22                  Based on your experience, it's
23      common for companies to have a decline option
24      that is a "no thanks" link?
25                  MR. NARDINI:  Objection.
```



1   Foundation.

2           THE WITNESS:  In the time I was

3   working in shopping, so in the last

4   four years I haven't been working in

5   shopping.  And user experience design

6   is continually evolving.

7           But at that time, this was

8   certainly common.

9   BY MR. REITER:

10      Q.    And you testified that it's

11  actually helpful for consumers to have an

12  enrollment button that is more prominent than

13  the decline option.

14          Did I hear you correctly?

15      A.    That's correct.  When

16  everything looks the same, it requires more

17  cognitive attention and very close attention

18  to detail for the user to figure out which is

19  the one they want, versus when there is a

20  hierarchy applied it's easier to scan and

21  find what they really want.

22          That's why we typically have

23  different UX patterns for, you know, primary,

24  secondary, tertiary treatments.

25      Q.    Ms. Blackburn, are you familiar



 1   with the phrase "dark patterns"?

 2          A.     I am.

 3          Q.     Do you see any dark patterns in

 4   this Prime enrollment flow we're looking at?

 5                 MR. NARDINI:  Objection.

 6          Foundation.

 7                 THE WITNESS:  I do not.

 8   BY MR. REITER:

 9          Q.     The FTC -- I'll give you one

10   example.

11                 The FTC has alleged that the

12   language in the decline option that says

13   quote, "No thanks, I do not want free

14   delivery," is a dark pattern.

15                 What's your reaction to that?

16                 MR. NARDINI:  Objection.

17          Foundation.

18                 THE WITNESS:  I would say that

19          a dark pattern would be using language

20          that obscured what the link would do.

21                 This link, I really like

22          because it's very specific.  It leads

23          with a "no thanks," which the user can

24          scan for and find.  And then it

25          declines the value proposition for the



1                          CERTIFICATE

2

3          I, Mary C. Soldati, Registered Professional

4     reporter, Oregon and Washington Certified Shorthand

5     Reporter, hereby certify that at said time and place, I

6     reported in stenotype all testimony adduced and other

7     oral proceedings had in the foregoing matter; that

8     thereafter my notes were transcribed through

9     computer-aided transcription by me to the best of my

10    ability; and that the foregoing pages constitute a full,

11    true and accurate record of all such testimony adduced

12    and oral proceedings had, and of the whole thereof.

13         In witness whereof, I have hereunto set my hand

14    this 20th day of December, 2024.

15                              

16

17                          Mary C. Soldati, RPR

18                          CSR-WA No. 3406

19                          Expires April 20, 2025

20                          CSR-OR No. 19-0457

21                          Expires September 30, 2025

22

23

24

25



# EXHIBIT 97

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WASHINGTON
 2                         AT SEATTLE

 3     _____

 4   FEDERAL TRADE COMMISSION,

 5

 6              Plaintiff,

 7       vs.              Civil Action No. 2:23-cv-00932-JHC

 8

 9   AMAZON.COM, INC.,
     et al.,
10

11              Defendants.

12     _____

13          **CONFIDENTIAL PORTIONS - 23:17-246:24**

14            DEPOSITION UPON ORAL EXAMINATION

15                        OF

16                    LISA LEUNG

17     _____

18

19

20

21

22

23   DATE:  July 24, 2024

24   REPORTED BY:  Holly J. Buckmaster, CSR

25             CSR No. 2859
```



```
 1              SEATTLE, WASHINGTON; WEDNESDAY, JULY 24, 2024

 2                          8:30 A.M.

 3                          --oOo--

 4

 5    LISA LEUNG, being first duly sworn by a certified shorthand

 6    reporter testified as follows:

 7

 8

 9                  E X A M I N A T I O N

10    BY MS. JERJIAN:

11    Q.    (BY MS. JERJIAN) Good morning, Ms. Leung.  My name is

12          Olivia Jerjian, I'm an attorney with the Federal Trade

13          Commission, and I'm joined here today by my colleagues

14          Evan Mendelson, Elena Hubble, Ronald Miyoge, and on

15          the phone Anthony Saunders and Johanna Mejia-Portello.

16          I would now invite -- your counsel to introduce

17          themselves.

18                  MR. HUESTON:  John Hueston and Melanie Hess

19          on -- from Hueston Hennigan here on behalf of Amazon.

20                  MS. CRAIG:  Laura Craig from Amazon legal.

21                  MS. JERJIAN:  Could everyone introduce

22          themselves, I just want to make sure we have all the

23          names.

24                  MR. HUESTON:  No, I introduced Melanie.

25                  MS. JERJIAN:  Oh, you did, okay.  And is
```



1    Q.     Yes.

2    A.     The buttons here that are presented in the

3           cancellation flow are presented clearly to the

4           customer.

5    Q.     And they're all equally accessible to the customer?

6    A.     It's hard for me to state weight of accessibility of

7           the buttons.

8    Q.     Why is it hard?

9    A.     Because you're asking me to make an inference on

10          every customer.  We want to make sure that the options

11          presented in the cancellation flow are clear for

12          customers and we believe that it is.

13   Q.     Right.  I'm trying to ask you if it -- to compare the

14          placement of the remind me later button with the end

15          membership button.  Do you think it's -- they are both

16          equally accessible or one is more accessible than the

17          other?

18   A.     It's really hard to say because it depends on how

19          customers process the page.  Some customers skip

20          all -- skip everything and go straight to the bottom

21          of the page, some customers read top all the way down.

22          It's really hard to say.

23   Q.     So you can't say?

24              MR. HUESTON:  Objection; asked and answered.

25              THE WITNESS:  Yeah, it's hard for me to



LISA LEUNG  Confidential                                   July 24, 2024
FTC vs AMAZON.COM, INC., et al.                                      91

1          answer that question for all customers.
2   Q.     (BY MS. JERJIAN) You testified that the online
3          cancellation experience in the United States has gone
4          from three pages to two pages, correct?
5   A.     Yes.
6   Q.     Has the mobile cancellation experience in the United
7          States also gone from three pages to two pages?
8   A.     That's my recollection, yes.
9   Q.     When did that change occur?
10  A.     It's hard for me to be specific because we have
11         tested the changes for a long period of time and so as
12         a part of testing, we rolled it out to different
13         exposures of customers, so it's hard for me to be
14         specific as to the time frame the change was made.
15  Q.     What is the exposure level of the two-page mobile
16         online cancellation flow today?
17  A.     My recollection is that it's every customer should be
18         seeing the two-page flow.
19  Q.     When did that 100 percent exposure of the two-page
20         online cancellation flow for mobile take place?
21  A.     I don't recall the exact date.
22  Q.     Do you remember the year?
23  A.     It would have been since I've been in this role, so
24         since 2022.  Sometime then.
25  Q.     Was it at the same time as the desktop change?



 1  A.    It's hard for me to say exactly if it's the same

 2        time.  It would be approximately the same time.

 3  Q.    Were any other changes made to the online

 4        cancellation -- no, strike that.

 5               Were there any other changes, aside from the

 6        number of pages, made to the mobile cancellation flow?

 7               MR. HUESTON:  Objection; vague.

 8               THE WITNESS:  Over what time period?

 9  Q.    (BY MS. JERJIAN) In 2022.

10  A.    As I mentioned before, we continually make changes to

11        the cancellation flow.

12               MS. JERJIAN:  Can you repeat my last

13        question, please.

14                     (Question read.)

15  Q.    (BY MS. JERJIAN) Specifically any changes made as

16        part of Project Cafe?

17  A.    Over what time period?

18  Q.    In 2022, aside from the number of pages, were there

19        any other changes made to the mobile cancellation flow

20        as part of Project Cafe?

21  A.    Project Cafe is a name referring to changes to the

22        cancellation flow.  It includes changes to buttons,

23        text, imagery, the entire experience.

24  Q.    Does the current online cancellation flow vary

25        greatly from the mobile online cancellation flow



1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         ) ss.
3    COUNTY OF KING      )

4        I, the undersigned Washington Certified Court Reporter,
     pursuant to RCW 5.28.010 authorized to administer oaths and
5    affirmations in and for the State of Washington, do hereby
     certify:
6
         That the annexed and foregoing deposition transcript of
7    the witness named herein was taken Stenographically before
     me and reduced to a typed format under my direction; that
8    the transcript is a full, true and complete transcript of
     the proceedings, including all questions, objections,
9    motions and exceptions of counsel, made and taken at the
     time of the foregoing proceedings, to the best of my
10   abilities;

11       That I am not a relative, employee, attorney or counsel
     of any party to this action or relative or employee of any
12   such attorney or counsel, and that I am not financially
     interested in the said action or the outcome thereof;
13
         That the witness, before examination, was by me duly
14   sworn, and the transcript was made available to the witness
     for reading and signing upon completion of transcription,
15   unless indicated herein the waiving of signature;

16       I further certify that I am sealing the deposition in
     an envelope with the title of the above cause and the name
17   of the witness visible, and I am delivering the same to the
     appropriate authority;
18
         I further advise you that as a matter of firm policy,
19   the Stenographic notes of this transcript will be destroyed
     three years from the date appearing on this Certificate
20   unless notice is received otherwise from any party or
     counsel hereto on or before said date;
21
         IN WITNESS WHEREOF, I have hereunto set my hand on this
22   2nd day of August, 2024, at Mountlake Terrace, Washington.

23

24   _____

25                Holly J. Buckmaster, CCR # 2859.



# EXHIBIT 98

1                UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4

5   FEDERAL TRADE COMMISSION,              )
                                           )
6                        Plaintiff,        )
                                           )
7                   vs.                    ) No. 2:23-cv-0932-JHC
                                           )
8   AMAZON.COM, INC., et al.,              )
                                           )
9                        Defendant.        )
                                           )
10                                         )

11

12          30(b)(6) DEPOSITION OF LISA LEUNG, VOLUME I

13                       May 5, 2025

14

15                    Seattle, Washington

16

17               ***** Confidential *****

18

19

20

21

22

23

24

25   Reporter: Teri Simons, CCR, RMR, CRR



```
 1                     BE IT REMEMBERED that on Monday,

 2    May 5, 2025, at 9:27 a.m., before Terilynn Simons,

 3    Certified Court Reporter, CCR, RMR, CRR, CLR, appeared

 4    LISA LEUNG, the witness herein;

 5                     WHEREUPON, the following proceedings

 6    were had, to wit:

 7                         <<<<<< >>>>>>

 8    LISA LEUNG,              having been first duly sworn

 9                             by the Certified Court Reporter,

10                             testified as follows:

11                         EXAMINATION

12    BY MR. MENDELSON:

13  Q  Good morning, Ms. Leung.  My name is Evan Mendelson.  I

14     am an attorney for the Federal Trade Commission

15     representing the Federal Trade Commission in this case.

16     I am joined by my colleague, Colin MacDonald, also an

17     attorney for the Federal Trade Commission.

18        If I can just have your counsel introduce

19     themselves.

20                     MS. CHOU:  Vicki Chou and Karen Ding

21     from Hueston Hennigan representing the witness.

22  Q  (By Mr. Mendelson)  Ms. Leung, could you state your full

23     name for the record, please?

24  A  Yes.  Full name is Lisa, L-I-S-A, Leung, L-E-U-N-G.

25  Q  And in what city and state do you live?
```



1     participants for the version of the Prime cancellation

2     survey that's described in Exhibit No. 13?

3  A  Yes, I do know.

4  Q  Okay.  And how did Amazon select participants for this

5     version of the survey?

6  A  The survey was sent out in the confirmation e-mail of the

7     fact that they had cancelled, so it was sent to all

8     customers that got the cancellation confirmation.

9  Q  Okay.  I think I didn't ask this before, and you might

10    have answered it, but I missed it:

11        For the versions of the cancellation survey where

12    people were invited to answer by e-mail, did they go out

13    to 100 percent of cancelling customers or a smaller

14    percentage or a randomly selected percentage?

15 A  My understanding is 100 percent.

16 Q  And what you are not sure-- you are not sure though

17    whether different survey IDs were used to track different

18    cohorts of participants?

19 A  Correct.

20 Q  Okay.  And so is it correct that you are not sure whether

21    Exhibit No. 13 corresponds to one or more survey IDs?

22 A  I don't know which survey ID this particular exhibit

23    pertains to.

24 Q  Okay.  Is it possible it corresponds to more than one

25    survey ID?



1    A    Yes.

2    Q    If we could flip back to Exhibit No. 11-- setting aside

3         Exhibit No. 11.

4              In all versions of the cancellation survey, were

5         answer options, the order in which multiple choice

6         questions were presented, randomized?

7    A    Which survey are you-- can you repeat your question?

8    Q    Sure.

9              Each version of-- I'll withdraw the question.

10                        MR. MENDELSON:  Is now a good time for

11        a break?

12                        MS. CHOU:  Sure.

13                        THE WITNESS:  Sure.

14                        MR. MENDELSON:  Let's go off.

15                        (Recess 2:39 to 2:53 p.m.)

16   Q    (By Mr. Mendelson)  Continuing on with testimony on Topic

17        A, has Amazon made any efforts to study whether the

18        population of people who take the 2020 cancellation

19        survey are representative of all Prime members that

20        cancel their Prime memberships?

21                        MS. CHOU:  This was a written

22        objection.  I will just pose again that this is not an

23        appropriate topic for the corporate representative.

24                        THE WITNESS:  I am not a survey

25        expert, but the Prime cancellation survey isn't meant to



1    be representative of customers-- all customers that

2    cancel.

3  Q    (By Mr. Mendelson)  Okay.  Setting aside whether it's

4      meant to be representative, has Amazon, separate from any

5      work done for this case-- well, separate from any expert

6      work done for this case, analyzed the extent to which

7      members who cancel their-- I'm sorry, people who take the

8      2020 cancellation survey are representative of all

9      customers who cancel their Prime memberships?

10                     MS. CHOU:  Same objection.

11                     THE WITNESS:  What was the first part

12      of your question?

13                          (Section(s) designated were

14                           read by the reporter.)

15                     THE WITNESS:  We've not done-- we

16      haven't done surveys to analyze the-- how representative

17      it is if customers cancel because we don't believe it's

18      representative of customers that cancel.

19                          (Exhibit No. AMZN-14 marked

20                           for identification.)

21  Q    (By Mr. Mendelson)  I am going to mark as Exhibit No. 14

22      an excerpt from the deposition of Jamil Ghani.

23        Exhibit No. 14 contains Pages-- Transcript Pages 27

24      through 30 of Mr. Ghani's deposition transcript in this

25      case.



 1          I will state for the record, and I don't think it

 2     matters for my questions, but since it did not include

 3     the errata sheet, I should note that there was one errata

 4     from these pages.  It was Page 28, Line No. 7, I believe.

 5     Instead of the word "sign," it should say, "take."

 6          With that noted, looking at-- within Exhibit No. 14,

 7     Transcript Page 28, Lines 2 to 5, Mr. Ghani states, "We

 8     have inspected the cancellation survey and have shown

 9     that it is not representative of all cancelling members

10     for-- I don't want to say 'obvious,' but for good reasons

11     that are understood."

12          Did I read that correctly?

13  A  Yes.

14  Q  Are you aware of anyone in the Prime organization

15     inspecting the cancellation survey and showing that it's

16     not representative of all cancelling members?

17  A  We know it's not representative of all cancelling

18     members.

19  Q  Are you aware of anyone inspecting the cancellation

20     survey to reach that conclusion?

21  A  It's difficult for me to say "inspected."

22          Everyone that worked on the survey and has looked at

23     the data of the survey within the Prime team knows that

24     it's not representative of all cancelling members because

25     of the survey design.



```
 1                 C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         )  ss.
 3   COUNTY OF KING      )

 4

            I, the undersigned Washington Certified Court
 5   Reporter, pursuant to RCW 5.28.010, authorized to
     administer oaths and affirmations in and for the State of
 6   Washington, do hereby certify:  That the foregoing
     deposition of the witness named herein was taken
 7   stenographically before me and reduced to a typed format
     under my direction;

 8
            That, according to CR 30(e), the witness was
 9   given the opportunity to examine, read, and sign the
     deposition after same was transcribed, unless indicated in
10   the record that the review was waived;

11          That I am not a relative or employee of any
     attorney or counsel of participant and that I am not
12   financially or otherwise interested in the action or the
     outcome herein;

13
            That the deposition as transcribed is a full,
14   true and correct transcript of the testimony, including
     questions and answers and all objections, motions, and
15   examinations, and said transcript was prepared pursuant to

16   the Washington Administrative Code 308-14-135 preparation

17   guidelines.

18

19

20

21

22

23          /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR

24          State of Washington CCR #2047

25          My CCR certification expires on 7/7/25
```



# EXHIBIT 99

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4

5    FEDERAL TRADE COMMISSION,              )
                                            )
6                      Plaintiff,           )
                                            )
7              vs.                          ) No. 2:23-cv-0932-JHC
                                            )
8    AMAZON.COM, INC., et al.,              )
                                            )
9                      Defendant.           )
                                            )
10                                          )

11

           30(B)(6) DEPOSITION OF LISA LEUNG, VOLUME II
12

13                      May 6, 2025

14

                      Seattle, Washington
15

16

                  ***** Confidential *****
17

18

19

20

21

22

23

24

25    Reporter: Teri Simons, CCR, RMR, CRR



1   so--

2                       MR. MENDELSON:  It will be Colin

3   today, but before that, do you know if the Topic C

4   related documents that are privileged are on the logs?

5                       MS. CHOU:  That is a good question.  I

6   don't know.

7                       MR. MENDELSON:  Okay.

8                       THE WITNESS:  So I wanted to make a

9   clarification as well to what I testified to yesterday.

10      I mentioned yesterday that the guidelines we

11  discussed covered interpretations of the law.

12      I also wanted to emphasize that it also included

13  best practices, and the intent of it was to go above and

14  beyond what was the bare minimum of laws and statutes but

15  also just the best practices for the customer experience.

16      Another clarification, near the end of my testimony

17  yesterday I mentioned that Amazon does not set goals for

18  customer service contacts.  I want to clarify that Prime

19  does not set goals for customer service contacts.

20      Amazon and the customer service team definitely sets

21  goals for customer service contacts.

22  /////

23  LISA LEUNG,              having been previously sworn

24                           by the Certified Court Reporter,

25                           testified as follows:



1   Q    Okay.  And it is that associate's interpretation that is

2        used to determine whether the customer gets a refund in

3        line with the policy?

4   A    Incorrect.

5   Q    Okay.  So how does the customer service associate factor

6        in to whether or not a consumer who cancelled by phone

7        gets a refund?

8   A    The customer service associate doesn't factor in, in the

9        application of the refund policy.

10            Every customer that cancels goes through the refund

11       policy rules to determine how much of a refund they get.

12            A customer service associate has their own

13       discretion to apply an even more generous refund on top

14       of the refund policy.

15  Q    Okay.  How much more generous can that refund from the

16       customer service associate be?

17  A    It varies.

18  Q    Okay.  Is there a cap on how much a first line customer

19       service associate can offer as a refund?

20  A    There is a cap based on the first line versus a higher-up

21       manager for a customer service associate.

22  Q    Okay.  And are those caps documented anywhere?

23  A    They are documented, and to clarify, if a customer

24       service associate meets that cap, they just say, "I need

25       to verify"-- with their leadership.



1    Q    So is that cap documented in the same document as

2         documents the policy for consumers who get a refund

3         automatically under the policy?

4    A    No, it wouldn't be the same document.

5    Q    Okay.

6    A    What I'm speaking about is customer service associates

7         have their own rules to concession amounts a customer

8         service associate can offer.  That's for all Amazon

9         concessions, including Prime, those limits apply.

10             Then we have a Prime refund policy.

11   Q    Okay.  And so those limits, are those per consumer or in

12        aggregate or both?

13   A    Per consumer is what I'm aware of.

14   Q    Okay.

15   A    Maybe the customer service associate probably has a cap

16        per customer service associate.  I am not sure, but

17        it's-- the cap I am speaking to is per consumer.

18   Q    So in what kinds of circumstances would Amazon offer a

19        consumer-- well, let me rephrase.

20             We talked about consumers who get refunds

21        automatically according to the policy.

22             Who decides whether to give a consumer a refund

23        outside of the policy?

24   A    As I mentioned before, every customer gets a refund

25        relative to the refund policy.



LISA LEUNG Vol. II 30(b)(6), Confidential                    May 06, 2025
FTC vs AMAZON.COM, INC., et al.                                      307

1          Any refund above and beyond that is entirely up to

2     the discretion of the customer service associate.

3    Q   Okay.  Does Amazon have any policies in place to

4     standardize how those customer service associates handle

5     refund requests?

6    A   I can't speak to customer service associates' guidance

7     for all Amazon, but for Prime, not that I'm aware of.

8          The customer service associate is responsible and

9     measured on customer satisfaction.

10   Q   And are there any guidelines given for how to determine

11    how much to give above and beyond policy?

12   A   Not that I'm aware of.

13        It's up to the customer service associates'

14    discretion.

15   Q   Okay.

16   A   There may be best practices.

17   Q   And if Amazon offers a refund beyond what policy

18    requires, is the reason for that additional refund

19    documented anywhere?

20   A   Subject to the same-- as to what I testified earlier as

21    to SIC codes, it would be classified as a SIC code.

22   Q   Okay.  And so Amazon would use the SIC codes to determine

23    for what reason a refund was given?

24   A   Correct.

25   Q   All right.  We will go back to the document I started



1    asking about before and pivoted away from.

2        We are going to be talking about Testimonial Topic

3    E, prior Topic No. 16, and I previously gave you-- I want

4    to say I marked it as 28, but it might have been 27.

5  A  28.

6  Q  It looks like this.

7  A  Yes, 28.

8  Q  Great.

9        I believe you testified before, but let me know if I

10    have this incorrect, that you are familiar with this

11    document.

12  A  Yes, I am.

13  Q  And you reviewed this document in preparation for today's

14    hearing; is that correct?

15  A  Yes.

16  Q  Just to orient us because we don't have the luxury of

17    that realtime, I am going to ask you to once again

18    summarize this, and I won't hold you to it if you have a

19    slight difference between this and what you described

20    earlier--

21  A  What are you asking me to summarize?

22  Q  Summarize the study that this document describes.

23  A  This document summarizes a "Study of an unmoderated user

24    test with 16 active Prime members in the US, in order to

25    gather more customer feedback for both the old three-page



```
 1                 C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         )  ss.
 3   COUNTY OF KING      )

 4

             I, the undersigned Washington Certified Court
 5   Reporter, pursuant to RCW 5.28.010, authorized to
     administer oaths and affirmations in and for the State of
 6   Washington, do hereby certify:  That the foregoing
     deposition of the witness named herein was taken
 7   stenographically before me and reduced to a typed format
     under my direction;

 8
             That, according to CR 30(e), the witness was
 9   given the opportunity to examine, read, and sign the
     deposition after same was transcribed, unless indicated in
10   the record that the review was waived;

11           That I am not a relative or employee of any
     attorney or counsel of participant and that I am not
12   financially or otherwise interested in the action or the
     outcome herein;

13
             That the deposition as transcribed is a full,
14   true and correct transcript of the testimony, including
     questions and answers and all objections, motions, and
15   examinations, and said transcript was prepared pursuant to

16   the Washington Administrative Code 308-14-135 preparation

17   guidelines.

18

19

20

21

22

23           /S/TERILYNN SIMONS, CCR, RPR, RMR, CRR

24           State of Washington CCR #2047

25           My CCR certification expires on 7/7/25
```



# EXHIBIT 100

1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                     AT SEATTLE

4    FEDERAL TRADE COMMISSION,

5                 Plaintiff,

6    vs.                          No. 2:23-cv-0932-JHC

7    AMAZON.COM, et al.

8                 Defendants.

9    _____/

10

11       The Above-Captioned Video-Recorded Deposition of

12              MARSHINI CHETTY, Ph.D.

13              9:23 a.m. - 6:31 p.m.

14                 April 28, 2025

15

16

17       CONFIDENTIAL DESIGNATION  20:1-423:6

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12762346



```
 1                    P R O C E E D I N G S
 2                            - - -
 3            THE VIDEOGRAPHER:  This is tape number one
 4    in the videotaped deposition of Marshini Chetty in the
 5    matter of Federal Trade Commission versus Amazon.com,
 6    Inc., et al. being heard before the United States
 7    District Court, Western District of Washington at
 8    Seattle, Case Number 2:23-CV-0932-JHC.
 9            This deposition is being held at 400
10    Seventh Street, Southwest, Washington, D.C. on April
11    28th, 2025, at 9:23 a.m.  My name is Nathan Kane and
12    I'm the videographer.  The court reporter is Steven
13    Poulakos.
14            Counsel, will you please introduce
15    yourselves and affiliation and the witness will be
16    sworn.
17            MR. KABA:  Moez Kaba, Cassidy O'Sullivan on
18    behalf of the defendants.
19            MS. JERJIAN:  Olivia Jerjian on behalf of
20    plaintiff, the Federal Trade Commission, and I'm here
21    with my paralegal, Johana Mejia-Portillo.
22    Whereupon,
23                    MARSHINI CHETTY, Ph.D,
24    called as a witness, having been first duly sworn to
25    tell the truth, the whole truth, and nothing but the
```



1  truth, was examined and testified as follows:

2              EXAMINATION BY MR. KABA

3      Q      Good morning, Dr. Chetty.

4      A      Good morning.

5      Q      Have you been deposed before?

6      A      No.

7      Q      All right.  So let me -- I'm sure you've

8  gone over some ground rules with counsel here, but let

9  me go over some for you.  We're making a record, so all

10 of your responses need to be audible.  I see you

11 nodding your head.  So that's rule number one.  We need

12 audible responses.

13     A      Okay.

14     Q      If you don't understand a question that I

15 have asked you, you should feel free to ask me to

16 clarify and I'll try to do that.  But if you go ahead

17 and respond to the question, me and everybody that is

18 watching the video or reading the transcript will

19 understand that you understood the question; is that

20 fair?

21     A      That sounds fair.

22     Q      Because we're taking a written record of

23 everything that's being said, it's going to be

24 important that you allow me to finish asking my

25 questions, you allow counsel to finish any objections



 1  listed here?

 2       A     Not to my knowledge, no.

 3       Q     Dr. Chetty, if your business -- is there

 4  some place the business can look to determine which

 5  dark patterns or so-called dark patterns are okay to

 6  implement in your view versus not okay to implement?

 7              MS. JERJIAN:  Objection, form, vague, calls

 8  for a legal conclusion.

 9              THE WITNESS:  You're asking me to speculate

10  if I'm a business.  What kind of business?

11  BY MR. KABA:

12       Q     I'm not asking you to speculate if you are

13  a business.

14       A     Oh.

15       Q     I'm saying from the perspective of a

16  business, is there a place that they could look to

17  determine which dark patterns are okay to use versus

18  not okay?

19              MS. JERJIAN:  Objection, form, calls for

20  speculation, calls for a legal conclusion.

21              THE WITNESS:  Well, I would think it's

22  probably not okay to use dark patterns given that they

23  coerce, deceive and manipulate people.

24  BY MR. KABA:

25       Q     So in your view, a business is not allowed



1  to even use a single thing that you would characterize

2  as dark pattern; is that right?

3              MS. JERJIAN:  Objection, mischaracterizes

4  the testimony, form.

5              THE WITNESS:  I didn't say that.  I just

6  said -- you asked me where a business could look if

7  they should use a dark pattern or not and I said,

8  well --

9  BY MR. KABA:

10     Q     No.  Sorry.  I may have not asked you a

11  clear question.  Let me try my question again.

12     A     Okay.

13     Q     It is quite prevalent in online commerce

14  that companies are using what you would characterize as

15  dark patterns, correct?

16              MS. JERJIAN:  Objection, form, vague as to

17  prevalence, vague as to dark patterns.

18              THE WITNESS:  You're asking me if online

19  shopping commerce sites use dark patterns and I said

20  yes.

21  BY MR. KABA:

22     Q     And, in fact, you've even done some

23  analyses of how prevalent the use of dark patterns in

24  online commerce is, correct?

25              MS. JERJIAN:  Objection, form.



1         THE WITNESS:  If you're asking me if I've

2   written a research paper about that topic of prevalence

3   of dark patterns in online shopping websites, then,

4   yes.

5   BY MR. KABA:

6     Q      And my question for you is:  Is it okay for

7   businesses to use any dark patterns?

8         MS. JERJIAN:  Objection, form, vague as to

9   okay.

10         THE WITNESS:  I'm not sure what you mean by

11   okay and I'm also not sure which dark patterns you're

12   specifically asking about.

13   BY MR. KABA:

14     Q      I'm asking about any.  Anything that you

15   would characterize as a dark pattern, do you -- would

16   you find it acceptable for a business to use it?

17         MS. JERJIAN:  Objection, vague as to

18   acceptable, form.

19         THE WITNESS:  Okay.  So you're asking me if

20   a business should use a dark pattern and, again, I'd

21   say I'm not sure which dark patterns you're talking

22   about, but dark patterns are generally deceptive or

23   coercing or manipulative.  And so I guess my question

24   would depend on which dark pattern you're talking

25   about, which business you're talking about, what the



 1  context of use is.

 2  BY MR. KABA:

 3       Q      Right.  Okay.  So in order to assess

 4  whether it is acceptable in your expert opinion for a

 5  business to use a dark pattern, you would want -- you

 6  would look at what is the dark pattern, what is the

 7  business, what is the context of use, correct?

 8              MS. JERJIAN:  Objection, form,

 9  mischaracterizes the testimony.

10              THE WITNESS:  Well, again, you're asking me

11  if a business should use a dark pattern or not or if

12  it's okay.  I'm not sure what you mean by okay, like --

13  BY MR. KABA:

14       Q      I didn't -- my question did not even use

15  the word okay, Dr. Chetty.  So let me ask you my

16  question again.  I really, really appreciate it if you

17  could focus on my question.  Okay?  Now I did use the

18  word okay.  Okay?

19       A      Okay.

20       Q      In order to assess whether it is acceptable

21  in your expert opinion for a business to use a dark

22  pattern or what you would characterize as a dark

23  pattern, what are the different factors that you would

24  consider?

25              MS. JERJIAN:  Objection, form, vague.



```
1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 28th day of

14   April 2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21   _____

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25
```

# EXHIBIT 101



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

FEDERAL TRADE COMMISSION,

        Plaintiff,

    vs.            Civil Action No. 2:23-cv-00932-JHC

AMAZON.COM, INC.,
 et al.,

        Defendants.

_____

        **CONFIDENTIAL TRANSCRIPT**

     DEPOSITION UPON ORAL EXAMINATION

            VIA ZOOM OF

          MONIQUE MASCIO

_____

DATE:  March 20, 2025

REPORTED BY:  Holly J. Buckmaster, CSR

        CSR No. 2859

1          LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 20, 2025

2                        9:00 A.M.

3                        --oOo--

4

5    MONIQUE MASCIO, being first duly sworn by a certified

6    shorthand reporter testified as follows:

7

8

9          MR. HUESTON:  I guess we will make our

10   appearances.  It is John Hueston and Karen Ding of

11   Hueston Hennigan on behalf of Amazon, Neal Lindsay,

12   Jamil Ghani and Russell Grandinetti.

13         MR. PACHECO:  Good morning, this is Anthony

14   Pacheco with Spertus, Landes & Josephs on behalf of the

15   third party witness, Monique Mascio.

16         MS. JERJIAN:  Good morning, this is Olivia

17   Jerjian with the Federal Trade Commission and I'm here

18   with our paralegal, Elena Hofmann.

19         MR. HUESTON:  Okay.  Great.  Let's proceed.

20

21              E X A M I N A T I O N

22   BY MR. HUESTON:

23   Q.  (BY MR. HUESTON) Good morning, Ms. Mascio.  Did I

24      pronounce your name correctly?

25   A.  Yes.

1  ride-alongs.  Did you ever go on a ride-along?

2  A.  No.  But they had them at times inside of the Amazon

3     office, so it was an option to -- to view it live or

4     view it from another room and watch it on camera.

5  Q.  Okay.  But just so I have some clear questions and

6     answers, you did not ever go on a ride-along yourself,

7     correct?

8  A.  No.

9  Q.  No, you did not?

10  A.  Huh-uh.

11  Q.  I just have to -- we don't have a clear transcript.

12     It's correct that you never personally went on a

13     ride-along?

14         MS. JERJIAN:  Objection; vague.

15         THE WITNESS:  No, I did not go on a

16     ride-along.

17  Q.  (BY MR. HUESTON)  Okay.  Thank you.

18         And then you said there may have been

19     recordings of ride-alongs; is that right?

20  A.  There were, yes.

21  Q.  And how many of those recordings did you personally

22     review?

23  A.  I want to say five.

24  Q.  Okay.  Okay.  You also mentioned customer frustration

25     tickets, correct?

MONIQUE MASCIO  Confidential                    March 20, 2025
FTC vs AMAZON.COM, INC., et al.                            77

1   A.  Correct.

2   Q.  And how many of the customer frustrations' tickets do

3       you recall personally reviewing?

4   A.  Ten.

5   Q.  Okay.

6   A.  Ten or more.

7   Q.  Ten or more but let's -- I'll try to -- ten to maybe 20;

8       is that fair?

9   A.  Correct.

10  Q.  All right.  Would you agree that there will always be

11      some fraction of customers having some confusion no

12      matter how clear something is in marketing?

13          MS. JERJIAN:  Objection; argumentative.

14          THE WITNESS:  No.

15  Q.  (BY MR. HUESTON) In your view, it is -- is it possible

16      when you have hundreds of millions of customers to

17      create a website where not one customer could wind up

18      being confused in terms of enrolling or cancelling, is

19      that your view?

20          MS. JERJIAN:  Objection; form, improper

21      hypothetical.

22          THE WITNESS:  No, that's not my view.

23  Q.  (BY MR. HUESTON) That's because no matter how much of an

24      effort one makes to make a website clear, there is

25      always going to be some customers who will be confused,

1    right?

2          MS. JERJIAN:  Objection; form, argumentative,

3    improper hypothetical.

4    Q.  (BY MR. HUESTON) You can answer.

5    A.  There's fundamental components of Clarity that when

6    incorporated mitigate confusion.

7    Q.  Right.  But that's not what I asked.  I understand there

8    are efforts and one can attempt to mitigate confusion,

9    but there are no number of components of Clarity that

10   can be incorporated to fully eliminate confusion, you

11   would agree with that, right?

12         MS. JERJIAN:  Objection; form, leading

13   question, argumentative, improper hypothetical.

14   Q.  (BY MR. HUESTON) You can answer.

15   A.  Within an experience, there's multiple aspects of what

16   could be confusing.  I -- I don't necessarily -- I don't

17   agree with that statement, no.

18   Q.  (BY MR. HUESTON) Okay.  So again, so I'm clear, in your

19   view, with Amazon Prime, with hundreds of millions of

20   consumers, your view is that implementation of Clarity

21   procedures should, if done properly, eliminate all

22   confusion for all customers; is that right?

23         MS. JERJIAN:  Objection; form, leading

24   question, compound, argumentative, improper

25   hypothetical.

MONIQUE MASCIO  Confidential                      March 20, 2025
FTC vs AMAZON.COM, INC., et al.                              277

1              C E R T I F I C A T E

2   STATE OF WASHINGTON )
                        )
3   COUNTY OF KING        )ss:

4       I, the undersigned Washington Certified Court Reporter,
    pursuant to RCW 5.28.010 authorized to administer oaths and
5   affirmations in and for the State of Washington, do hereby
    certify:
6
        That the annexed and foregoing deposition transcript of
7   the witness named herein was taken Stenographically before
    me and reduced to a typed format under my direction; that
8   the transcript is a full, true and complete transcript of
    the proceedings, including all questions, objections,
9   motions and exceptions of counsel, made and taken at the
    time of the foregoing proceedings, to the best of my
10  abilities;

11      That I am not a relative, employee, attorney or counsel
    of any party to this action or relative or employee of any
12  such attorney or counsel, and that I am not financially
    interested in the said action or the outcome thereof;
13
        That the witness, before examination, was by me duly
14  sworn, and the transcript was made available to the witness
    for reading and signing upon completion of transcription,
15  unless indicated herein the waiving of signature;

16      I further certify that I am sealing the deposition in
    an envelope with the title of the above cause and the name
17  of the witness visible, and I am delivering the same to the
    appropriate authority;
18
        I further advise you that as a matter of firm policy,
19  the Stenographic notes of this transcript will be destroyed
    three years from the date appearing on this Certificate
20  unless notice is received otherwise from any party or
    counsel hereto on or before said date;
21
        IN WITNESS WHEREOF, I have hereunto set my hand on this
22  31st day of March, 2025, at Mountlake Terrace, Washington.

23

24      _____

25          Holly J. Buckmaster, CCR # 2859

# EXHIBIT 102

# In the Matter Of:

## FTC vs AMAZON.COM, INC., et al.

2:23-cv-00932-JHC

## RACHEL K. GREEN

*May 19, 2025*

RACHEL K. GREEN                                           May 19, 2025
FTC vs AMAZON.COM, INC., et al.                                     1



1                 UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3    _____

4    FEDERAL TRADE COMMISSION,          )
                                        )
5               Plaintiff,        )
                                        )
6        v.                       ) Civil Action No.
                                   ) 2:23-cv-00932-JHC
7    AMAZON.COM, INC., et al.,           )
                                        )
8               Defendants.        )
                                        )
9                                  )
10   _____

               DEPOSITION OF RACHEL K. GREEN
11
                     May 19, 2025
12
                   Seattle, Washington
13

14

15

16

17

18

19

20

21

22

23

24

25       Reporter:  John M.S. Botelho, CCR, RPR

1          BE IT REMEMBERED that on Monday,

2     May 19, 2025, at 920 Fifth Avenue, Suite 3300,

3     Conference Room 101, Seattle, Washington, at

4     11:10 a.m., before JOHN M.S. BOTELHO, Certified Court

5     Reporter, appeared RACHEL K. GREEN, the witness

6     herein;

7          WHEREUPON, the following

8     proceedings were had, to wit:

9

10          <<<<<< >>>>>>

11

12     RACHEL K. GREEN,        having been first duly sworn

13                 by the Certified Court

14                 Reporter, deposed and

15                 testified as follows:

16

17          EXAMINATION

18     BY MS. SIFUENTES:

19   Q   Ms. Green, could you please state your full name for

20     the record.

21   A   Rachel Kathleen Green.

22   Q   Have you ever been deposed before?

23   A   No.

24   Q   Okay.  Your attorney's probably gone over some ground

25     rules.  I'll just try and help with some procedural

1   A   Yes.  Thank you for getting that.

2   Q   Yes, I did get it.  I think that generation maybe

3       gets it.

4           And then underneath, there's two choices:  "Yes"

5       or "no."

6           Is that right?

7   A   Yes.

8   Q   And so "yes" states, "Watch the Prime Listening

9       Session video," and there's a link to a video?

10  A   It looks like it, yes.

11  Q   And "no," it says, "No, I don't care about our

12      customers"?

13  A   Yes.

14  Q   Okay.  And then in response to this e-mail, Caroline

15      Moeller sends a message to you, saying, "This seems

16      like 'customer shaming' -- what happened to our No

17      Thanks decline option!" -- winky face -- "just

18      kidding."

19          Is that right?

20  A   That's correct.

21  Q   Okay.  So what was your understanding of what

22      Caroline was referring to in her response e-mail to

23      you sending out the newsletter?

24  A   Mm-hmm.

25                  MR. ARONSOHN:  Objection.

1    Speculation.

2              THE WITNESS:  So this was about a

3    previous pattern that has -- had been done with the

4    Prime sign-up.  It's like -- like UPDP, I think is

5    what it's called.  And I can't remember exactly what

6    it stands for.  But that's about when you say, Would

7    you like, you know, to sign up for Prime?  And then

8    you say, like, yes or no, right?  You would think for

9    the options.

10        So previously the "no" option said, "No, I don't

11        want free shipping."  And so that is a dark pattern.

12        It's called confirmshaming.  A lot of websites use

13        this.  They say -- you know, so I was trying to be

14        funny.  Again, this is my part of the website or part

15        of the newsletter that I try to be funny and get

16        people's attention.  So I was just using that dark

17        pattern as a joke, and that's what she's referring

18        to.

19   Q   (By Ms. Sifuentes)  So UPDP, you said you don't

20        remember exactly what it stands for.

21        Does it help if I tell you, does it stand for

22   "universal Prime decision page"?

23   A   That sounds like it could be right.

24   Q   Does it help jog your recollection basically?

25   A   I always just called it the UPDP.

1    Q    Okay.  And so you were making a joke about a dark

2         pattern that Amazon used on UPDP?

3                        MR. ARONSOHN:  Objection.

4         Mischaracterizes testimony.

5                        THE WITNESS:  No.  I was -- it was

6         a joke about confirm- -- customer shaming, and it was

7         to see -- it was, you know, to see if people would

8         get the joke and then understand, like, why this is a

9         bad pattern to use.

10             And the reason Caroline knows about it is because

11        we've talked, or my team -- not me personally, but my

12        team -- spoke with her team about confirmshaming and

13        that we -- you know, not that they were doing that,

14        but just, like, that's one thing we shouldn't do.

15        And so she understood the concept of customer

16        confirmshaming, so...

17   Q    (By Ms. Sifuentes)  She also makes a reference in her

18        reply e-mail to "our No Thanks decline option."

19             What did you understand that to be referring to?

20   A    So instead of saying, "No, I don't care about our

21        customers" -- that's the shaming part -- you would

22        just say "No Thanks."

23   Q    And is the "No Thanks" decline option also something

24        that was instituted on the UPDP?

25                        MR. ARONSOHN:  Objection.  Lack of

1   Q   Well, something that's clear to one person who's more

2       neurotypical might be less clear to someone who has

3       autism.

4           Is that a fair statement?

5   A   I don't think I can speak to that.  I think that --

6       feeling like that's kind of an ableist comment to

7       make.

8   Q   Okay.  Can you please turn back to Page 2, in the

9       third full paragraph.

10          And the paragraph I'm looking at is the one that

11      starts, "This research study took place."

12          If you could let me know when you're there.

13  A   Yeah, I'm there.

14  Q   You write, quote, "This research study took place in

15      2018, and Content Experimentation has since updated

16      the templates for Prime upsell in checkout for

17      increased clarity."

18          Do you see that?

19  A   Yes.

20  Q   So the customer's experience we saw on Page 1 of this

21      document, that took place in 2018, right?

22  A   It looks like that was the customer experience in

23      2018, yes.

24  Q   Okay.  And as you write here after 2018, Amazon made

25      changes to address that customer's issue; is that

RACHEL K. GREEN                                    May 19, 2025
FTC vs AMAZON.COM, INC., et al.                              155

1    right?

2  A   That's what it looks like I said, yes.

3  Q   So between 2018 and 2021 when you sent this e-mail,

4    Amazon updated the templates for Prime upsell in

5    checkout for increased clarity; is that right?

6  A   That looks to be the case.

7  Q   And Amazon in that time period changed the

8    call-to-action buttons to ensure that they weren't

9    confirmshaming, right?

10  A   That's what it says here.

11  Q   Would you agree that this is an example of Amazon

12    doing the right thing by customers?

13  A   Yes.

14  Q   And do you know one way or the other, is that sort of

15    change something that would require sign-off from

16    leadership?

17  A   I don't know one way or the other.

18  Q   Okay.  During your time at Amazon, can you recall

19    Amazon making any other clarity improvements like

20    this one?

21  A   I can't recall anything.

22  Q   Okay.  I'm going to show you now another document,

23    which is going to be marked Exhibit 7.

24                    (Exhibit No. 7 marked for

25                      identification.)

1  Q   (By Mr. Aronsohn)  And just let me know when you have

2       that in front of you, Ms. Green.

3                       (Discussion off the record.)

4

5                       MR. NEVAREZ:  I'll give Rachel the

6       marked one.

7                       THE WITNESS:  Okay.

8  Q   (By Mr. Aronsohn)  Just let me know when you're

9       ready, Ms. Green.

10 A   Is there a specific part of this you'd like to draw

11      my attention to?

12 Q   Sure.  Yeah.  If you could start by just looking at

13      the top of the first page.

14      This is an e-mail thread between you, Molly

15      O'Donnell, Lisa Nghiem -- I apologize if I'm saying

16      her last name incorrectly -- and AmyLeigh Morgan; is

17      that right?

18 A   Yes.

19 Q   Okay.  Now, if you could please turn to the second

20      page of the document, at the bottom.  There's an

21      e-mail from you, dated June 8th, 2021.

22      Do you see that?

23 A   Yes.

24 Q   Do you recall sending this e-mail?

25 A   Not really, no.

RACHEL K. GREEN                                          May 19, 2025
FTC vs AMAZON.COM, INC., et al.                                  178

1   STATE OF WASHINGTON )    I, John M. S. Botelho, CCR, RPR,
                        ) ss  a certified court reporter
2   County of Pierce    )    in the State of Washington, do
                             hereby certify:

3

4

        That the foregoing deposition of RACHEL K. GREEN was
5   taken before me and completed on May 19, 2025, and
    thereafter was transcribed under my direction; that the
6   deposition is a full, true and complete transcript of the
    testimony of said witness, including all questions, answers,
7   objections, motions and exceptions;

8       That the witness, before examination, was by me duly
    sworn to testify the truth, the whole truth, and nothing but
9   the truth, and that the witness reserved the right of
    signature;

10

        That I am not a relative, employee, attorney or counsel
11  of any party to this action or relative or employee of any
    such attorney or counsel and that I am not financially
12  interested in the said action or the outcome thereof;

13      IN WITNESS WHEREOF, I have hereunto set my hand
    this 22nd day of May, 2025.

14

15

16

17
                    _____
18                   John M. S. Botelho, CCR, RPR
                     Certified Court Reporter No. 2976
19                   (Certification expires 5/26/2026.)

20

21

22

23

24

25

# EXHIBIT 103

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3    _____

4

    FEDERAL TRADE COMMISSION,          )
5                                      )
                                       )
6          Plaintiff,          )    Case No.
                                       )
7          vs.                  )    2:23-cv-00932-JHC
                                       )
8    AMAZON.COM, INC., et al.,          )
                                       )
9                                      )
                                       )
10          Defendants.          )
                                       )
11                                      )

12    _____

13

14          VIDEOTAPED DEPOSITION OF REID NELSON

15                February 27, 2025

16    Location:  920 Fifth Avenue, Suite 3300, Seattle, Washington

17

18

19

20    Reported by:
    Connie Recob, CCR, RMR, CRR
21    Washington CCR No. 2631
    Oregon CCR No. 15-0436
22    Utah CCR No. 1133171-7801
    Idaho CCR No. SRL-1220
23    Job No. J12198790

24

25

1              MS. VANDRUFF:  Good morning.  I'm Laura

2      Vandruff representing nonparty Mr. Nelson.  I've been

3      admitted pro hac vice in this matter to defend Mr. Nelson's

4      deposition.

5          Mr. Nelson is appearing pursuant to Amazon's

6      January 21st subpoena.  We understand that this deposition,

7      taken under Rule 30 of the Federal Rules of Civil Procedure,

8      will conclude today within the time period provided by the

9      rule.

10          Mr. Nelson intends to read and sign the transcript, and

11     I'm reiterating the request I made to our court reporter

12     earlier for a copy of the transcript.

13          Joined with me today is Cristina Ferretti of Kelley

14     Drye.

15              MR. COHEN:  Good morning.  Jonathan Cohen

16     for the government.  With me today as well is my colleague

17     Colin MacDonald.

18              THE VIDEOGRAPHER:  Thank you.  Would the

19     court reporter please swear in the witness.

20

21     REID NELSON,            having been first duly sworn,

22                     deposed and testified as

23                     follows:

24

25              THE VIDEOGRAPHER:  You may proceed.

1  Q.  What was your understanding?

2  A.  That the data sciences -- data science teams' downstream

3     expectation model did not have adequate inputs that would

4     help measure and illustrate the unique impact an experiment

5     might have on a nonPrime experience user cohort.

6  Q.  Did any of the issues you just described apply also to Prime

7     customers?

8  A.  The statement I just made was about nonPrime customers.

9  Q.  Right.  Would that apply at all to Prime -- to Prime

10    customers?

11  A.  Oh, okay.  Sure.  I couldn't say.

12  Q.  Okay.

13  A.  It's possible.

14  Q.  You just don't know one way or the other?

15  A.  Yeah.

16  Q.  Okay.  Fair enough.  We can put that aside.

17  A.  Okay.

18  Q.  I think you testified a little bit about this on Tuesday,

19    that the UPDP page at one point offered users a choice

20    between an enrollment button and a no thanks link.

21       You recall that, right?

22  A.  I recall that.

23  Q.  Okay.  And would you characterize the Prime no thanks link as

24    an anti-pattern?

25  A.  Being a link rather than an equivalent button?

REID NELSON                                        February 27, 2025
FTC vs AMAZON.COM                                                113

1  Q.  Sure.

2  A.  Yes, I would.

3  Q.  Okay.  And in your view -- well, in your experience, is

4     having a no thanks link as opposed to a button, is that a

5     fairly common marketing practice in the industry?

6              MR. COHEN:  Objection.

7              THE WITNESS:  Yes.

8     BY MR. HUESTON:

9  Q.  Could you name any other anti-patterns that you believe are

10    common marketing practices in the industry?

11             MR. COHEN:  Objection.  Vague as to

12    industry.

13             THE WITNESS:  Can you define industry and

14    what common means?

15    BY MR. HUESTON:

16 Q.  Well, you were able to answer when I asked you, "In your

17    experience, is -- having a no thanks link as opposed to a

18    button, is that a fairly common marketing practice in the

19    industry?"  You said, "Yes."

20        Are there any others other than that that you would

21    feel is fairly common in the industry?

22             MR. COHEN:  Objection to form, "common in

23    the industry."

24             THE WITNESS:  Industry being

25    consumer-facing interstitials?

REID NELSON
FTC vs AMAZON.COM

1    BY MR. HUESTON:

2    Q.  Sure.

3    A.  Okay.  Interstitials?

4    Q.  Yes.

5    A.  Okay.  Other common interstitial marketing patterns --

6        anti-patterns.

7            Could include -- and I'm speaking to the time that I

8        was employed at Amazon, not today.

9    Q.  Let's start there, your time employed at Amazon.

10   A.  All right.  Using content language labels in buttons that may

11       not be entirely clear as to the action the user is taking, or

12       the alternative, using language that shames the user into not

13       taking a negative option for fear of missing out, or any

14       number of manipulation -- manipulative phrasing, just to name

15       a couple that come to mind.

16   Q.  Take a moment, but I would appreciate any others that you

17       might be able to dig out of your memory.

18   A.  Defaulting users to an option that has a financial

19       consequence or some other consequence of importance to them,

20       privacy or otherwise, which can include having to untick a

21       check box that's been default ticked, displaying financial

22       consequences or other important consequences the user would

23       want to consider to make an informed decision in fine print

24       somewhere on the page that is difficult to read or that the

25       user must scroll to to display or find.

1                    REPORTER'S CERTIFICATE

2

3         I, CONNIE A. RECOB, the undersigned Certified Court

4    Reporter, authorized to administer oaths and affirmations in

5    and for the States of Washington, Oregon, Utah and Idaho, do

6    hereby certify that the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given before me at the

8    time and place stated therein; that any and/or all

9    witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19         WITNESS MY HAND and SIGNATURE this 11th day of March,

20   2025.

21

22

     _____
23         /s/CONNIE A. RECOB, RMR, CRR
         Washington CCR No. 2631
24         Oregon CCR No. 15-0436
         Utah CCR No. 1133171-7801
25         Idaho CCR No. SRL-1220

# EXHIBIT 104

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
2
                    AT SEATTLE
3

4
FEDERAL TRADE COMMISSION,           )
5                                   )
               Plaintiff,           )
6                                   )
           vs.              ) No. 2:23-cv-0932-JHC
7                                   )
AMAZON.COM, INC., et al.,           )
8                                   )
               Defendant.           )
9                                   )
                                    )
10

11         DEPOSITION OF REX MOREY

12
               July 25, 2024
13

14            Seattle, Washington

15

16         ***** Confidential *****

17

18

19

20

21

22

23

24

25  Reporter: Teri Simons, CCR, RMR, CRR

1          BE IT REMEMBERED that on Thursday,

2     July 25, 2024, at 8:33 a.m., before Terilynn Simons,

3     Certified Court Reporter, CCR, RMR, CRR, CLR, appeared

4     REX MOREY, the witness herein;

5              WHEREUPON, the following proceedings

6     were had, to wit:

7              <<<<<< >>>>>>

8     REX MOREY,          having been first duly sworn

9              by the Certified Court Reporter,

10              testified as follows:

11              EXAMINATION

12    BY MR. NARDINI:

13    Q   Good morning.  Could you please state your name for the

14    record?

15    A   Rex Morey.

16    Q   Good morning, Mr. Morey.  My name is Max Nardini.  I am

17    an attorney with the Federal Trade Commission.

18        I'm joined here today with my co-counsel Olivia

19    Jerjian and Evan Mendelson, and also paralegal team

20    member Elena Hubbell.

21              MR. NARDINI:  And is there anyone else

22    from the FTC on the line?

23              (No response.)

24    Q   (By Mr. Nardini)  Mr. Morey, you are represented by

25    counsel here today, correct?

REX MOREY  Confidential                                    July 25, 2024
FTC vs AMAZON.COM, INC., et al.                                     160

1        There's no specificity.  Like "Common issue across

2     countries," it's very vague.

3   Q   What is your understanding of what you wrote?

4   A   My understanding is that across countries there can be

5     people who have indicated that they might have mistakenly

6     signed up.

7   Q   Do you recall writing this?

8   A   I don't remember this message, no.

9   Q   So when you said that it was written imprecisely, that is

10     your commentary as of reviewing it today, not what you

11     thought at the time necessarily, correct?

12   A   It's not clear to me if I mean "common"-- I think I mean

13     "common" meaning like this potential issue is in other--

14     comes across in other countries, not that it was common,

15     like a big issue, but that the same potential issue has

16     been raised in other countries, across countries.

17        That's how I read it right now.

18   Q   That's how you read it right now, and you have no

19     specific recollection of when you wrote it, correct?

20   A   I don't remember this discussion, no.

21   Q   And then "Nikki Baidwan"-- I should say I am continuing

22     on with what you wrote here.

23        "Nikki Baidwan and her team are working on an effort

24     to improve clarity."

25        Did I read that correctly?

1    A    Yes.

2    Q    And do you recall what you meant by that statement?

3    A    Nikki was a leader on the content experimentation team,

4         so I assume that this means that her team had a project

5         related to clarity.

6    Q    You assume, but you don't recall specifically.

7         That's your interpretation now; is that correct?

8    A    I believe that-- I do know that there were efforts within

9         content experimentation to improve our entire flow for

10        signups and for retention.

11   Q    And with respect to the term "clarity" specifically, what

12        are you familiar with Nikki Baidwan's team and Nikki

13        Baidwan working on?

14   A    So clarity, again, to me, is the entire flow, so it's

15        clear to people, when they sign up for Prime, the

16        benefits they're receiving from Prime, and then clear--

17        if they're going to cancel, that they understand the

18        benefits they get from Prime, so clearly understand the

19        benefits of Prime.

20   Q    Is that-- I understand you're speaking to that as an

21        aspect of clarity, but is that your understanding of what

22        Ms. Baidwan's team was working on?

23   A    I honestly don't remember specifically what project she

24        was working on in 2020.

25   Q    You don't remember either way, correct?

1   A   I don't remember her plans or her like-- like what her

2       team was specifically working on in 2020.

3   Q   Okay.  Setting this document to the side, do you recall

4       discussing the issue of mistaken signups with Mr. Ghani

5       in 2020?

6                   MS. DING:  Objection; asked and

7       answered.

8                   THE WITNESS:  I don't have a specific

9       memory of talking about mistaken signups with Jamil in

10      2020.

11  Q   (By Mr. Nardini)  Do you have a specific recollection of

12      discussing Ms. Baidwan's or the content testing team's

13      work with respect to clarity with Mr. Ghani?

14  A   I don't remember speaking with Jamil about this in 2020.

15  Q   And is the same true for Mr. Lindsay?

16  A   Yeah.

17  Q   And is the same true for Mr. Grandinetti?

18  A   Yeah-- yes.

19  Q   What interactions would you have had with

20      Mr. Grandinetti?

21  A   Very few.

22          He would be in meetings that I would attend.

23          I wouldn't usually speak in any of those meetings.

24      I was there either because I was part of the team or

25      helped contribute to a quarterly business review or

1                C E R T I F I C A T E

STATE OF WASHINGTON )

2                       ) ss.

COUNTY OF KING        )

3          I, the undersigned Washington Certified Court

Reporter, pursuant to RCW 5.28.010, authorized to

4   administer oaths and affirmations in and for the State of

5   Washington, do hereby certify:  That the foregoing

6   deposition of the witness named herein was taken

7   stenographically before me and reduced to a typed format

8   under my direction;

9          That, according to CR 30(e), the witness was

10   given the opportunity to examine, read, and sign the

11   deposition after same was transcribed, unless indicated in

12   the record that the review was waived;

13          That I am not a relative or employee of any

14   attorney or counsel of participant and that I am not

15   financially or otherwise interested in the action or the

16   outcome herein;

17          That the deposition as transcribed is a full,

18   true and correct transcript of the testimony, including

19   questions and answers and all objections, motions, and

20   examinations, and said transcript was prepared pursuant to

21   the Washington Administrative Code 308-14-135 preparation

22   guidelines.

23                TERILYNN SIMONS, CCR, RPR, RMR, CRR

24                State of Washington CCR #2047

25                My CCR certification expires on 7/7/25

# EXHIBIT 105

1          IN THE UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   FEDERAL TRADE COMMISSION,

4       Plaintiff,          Case No.

5           vs.             2:23-CV-0932

6   AMAZON.COM,

7       Defendant.

8   _____/

9

10

11           Remote Deposition of

12          SANJAY BALAKRISHNAN

13        Thursday, September 12, 2024

14           11:56 a.m. BST (GMT+1)

15

16

17          *CONFIDENTIAL PAGES*

18      Page 13 Line 23 through Page 305 Line 4

19

20

21

22   Reported Stenographically by:

23   Gail L. Inghram,

24   BA, RDR, CRR, RSA, CA-CSR No. 8635

25

1              - - -

2          P R O C E E D I N G S

3              - - -

4   BY ATTORNEY JERJIAN:

5      Q.      Please state your full name for the

6   record.

7      A.      I am Sanjay Balakrishnan.

8      Q.      Good afternoon, Mr. Balakrishnan.

9   My name is Olivia Jerjian.  I'm an attorney with

10  the Federal Trade Commission, and I'm joined here

11  today by my colleague Max Nardini.

12             You are represented by counsel

13  here today; correct?

14     A.      Correct.

15             ATTORNEY JERJIAN:  Counsel, please

16  state your name.

17             ATTORNEY CHOU:  Vicki Chou and

18  Stephanie Colorado from Hueston Hennigan.

19  BY ATTORNEY JERJIAN:

20     Q.      Okay.  So today's deposition is

21  virtual, so I just want to make sure you can see

22  me and hear me.  Correct?

23     A.      We can.

24     Q.      As a procedural matter, I will be

25  showing you some documents today and asking you

1              Member renewal rates was an

2     overall metric that we looked at, which was

3     what percentage of members completed each

4     billing cycle.  And that can be expressed in

5     different ways.  Renewal rate is the percentage

6     of members who renewed.  You'll see churn is

7     used as the inverse of that metric, which is

8     what percentage of members chose to leave.

9     And, again, within that, you have lots of

10    different types of -- subtypes of cancellations

11    and so on.

12             So primarily, engagement was a

13    really important metric.  Payment success was a

14    really important metric, and renewal rates,

15    whether you already heard about customer

16    contacts.

17             We looked at refund rates, like,

18    how many refunds we were issuing.

19        Q.    Thank you.

20             Any other metrics that you

21    remember that you haven't told me about just

22    now?

23        A.    I will share if more come to mind.

24    For that -- this is it for now.  Thank you.

25        Q.    Okay.

1              I'm just looking still at page 1

2    of Exhibit SJ-02, under Key Takeaways, the first

3    sentence of that first bullet point,

4    "Experimental data shows that millions of NAC

5    and NPA customers will experience unintended

6    Prime sign-ups in 2019 if CX improvements are

7    not launched," and then it goes on.

8              Do you -- strike that.

9              Do you understand what "unintended

10   Prime sign-ups" refer to?

11             ATTORNEY CHOU:  Objection; lacks

12   and calls for speculation.  He already testified

13   he doesn't recall this email.

14             You can answer.

15        A.    Of course I cannot speak for the

16   ways in which the author was presenting it.

17             But I can tell you that -- that

18   across this email, you will see some

19   fundamental mischaracterizations of data.

20             So in the first bullet point,

21   there is an implicit assumption that when you

22   test Customer Experience A and Customer

23   Experience B, and in the second customer

24   experience fewer customers sign up, that that

25   automatically means that any customer who did

1    not sign up was an unintended Prime sign-up.

2              So I think the author has somehow

3    leapt to the conclusion that any customer

4    experience that makes -- that helps more

5    customers sign up is somehow leading to more

6    unintended customers signing up.  And I think

7    that's -- that is, I think, a logical fallacy

8    in that first bullet point.

9              And so I think the author has

10   infused the metric of Prime sign-up rate with,

11   you know, there's value judgment of

12   intentionality, which I think is fundamentally

13   incorrect.

14   BY ATTORNEY JERJIAN:

15        Q.    I don't think that was responsive

16   to my question.  I asked you if you had an

17   understanding of what "unintended Prime sign-ups"

18   was referring to.

19              It sounds like you don't; correct?

20        A.    Yeah, I couldn't say for sure

21   exactly what the author intended.

22        Q.    And the opinion you just rendered

23   is based on your reading the document, the email,

24   sitting here today; correct?

25        A.    Correct.  And also sort of my

1    understanding of how to interpret metrics.

2         Q.     Stepping aside from this document

3    for a second, do you know what a conversion rate

4    is?

5         A.     It -- you have -- it varies by

6    context.  So in some contexts it might mean

7    the --

8         Q.     My question was broad.  Let me

9    rephrase.

10        A.     Yeah.

11        Q.     Do you know what a "settled member

12   impact rate" refers to in the context of your job

13   as Prime director at Prime?

14        A.     Thank you for that clarification.

15               So the conversion rate in that

16   context generally refers to the proportion of

17   people who started a journey and who completed

18   the journey.  So, for example, free-trial-to-

19   paid-member conversion would be the percentage

20   of members who started a free trial who ended

21   up transitioning into paid membership.

22               And, again, you'll see it used in

23   different contexts with 60 days of paid

24   membership, 90 days of paid membership,

25   et cetera, because -- you know, you can pick

1  you know, believe that a lot of the figures that

2  we use are overstated.

3           So first, we will look at SJ-7.

4  BY ATTORNEY JERJIAN:

5       Q.    Okay.

6       A.    Let me know once you have it.

7           SJ-7, page 2, document number it

8  ends in AMZN_00007140.  You can see that

9  3.7 percent of this 15 percent comes from

10  customers who immediately cancel Prime after

11  conversion without using any benefits.  These

12  are customers who most likely did not mean to

13  be Prime and only realize it once they get

14  their credit card bill.

15           So that gives you a sense of one

16  proxy, which is members who can cancel Prime

17  membership after conversion, around 3.7 percent

18  of members.

19           Then when you come to the first

20  page of SJ-7, second paragraph, the first

21  email, you'll see me say, "The number from

22  below pertinent to the use case, unintended, is

23  the 3.7 percent month one exits.  Metrics are

24  also clouded by lots of other things like" --

25  ///

1           (Interruption by the court reporter

2           to clarify the record.)

3      A.     Sorry.  I will start again.  So

4    this is paragraph 2.  I'll start from the second

5    line:

6           "Those metrics are also clouded by

7        lots of other things like Twitch soft

8        decline BPS, paid trials, et cetera,

9        which we are working to tease apart."

10          So what this is trying to say is

11   even the ██ percent itself includes all kinds

12   of other situations like abuse on a gaming

13   platform called Twitch.

14          And then if you go to SJ-9,

15   Table 1, may I draw your attention to the

16   third -- the third row in that table called

17   "Mistaken sign-ups per 1,000 sign-ups."  In

18   reality it should say "Mistaken sign-up

19   contacts for 1,000 sign-ups," which is a

20   measure of all sign-ups, what proportion

21   contact us saying they had made a mistake.

22          And the year-to-date number in

23   this document, as of May 2019, is ██, which

24   is basically saying ██ members out of ██

25   members who started the program contacted us

1  saying they had made -- they had a mistaken

2  sign-up.  That number in percentage terms is

3  under █ percent.  And, again, this includes

4  unknown charge contacts, people saying, "Hey, I

5  see a charge on my card I do not recognize."

6            So the reason I'm calling out

7  these numbers is, for the -- these are

8  relatively small numbers.  And once you, again,

9  start taking out customers not remembering that

10  they have a paid date coming up and you start

11  taking into account fraud and abuse of the

12  program, these numbers become really, really

13  small.  Like, really small.

14            So generally, the internal data

15  that Prime has, which has all these data

16  points, is not available to most teams.

17            And so most teams do not have

18  access to this information.  We tend to -- and

19  even these are not perfect proxies, but these

20  tend to give us better signals than most teams

21  would have about what -- how many people might

22  be having mistaken sign-ups.  And our signal

23  suggests that this number is really small, and,

24  hence, my assumption that numbers coming from

25  other teams are likely to be inflated.

1              ATTORNEY JERJIAN:  Okay.  Let's

2    move to another document.  Why don't you pull up

3    Envelope 49.  I believe we're at SJ-17 but given

4    my track record, please correct me if I'm wrong.

5              (Whereupon, Balakrishnan Exhibit

6              Number 17 was marked for

7              identification and is attached

8              hereto.)

9    BY ATTORNEY CHOU:

10        Q.    So this is a chat between you and

11   Nahshon Davidai on May 27, 2020; correct?

12        A.    It appears so, yeah.

13        Q.    Do you recall this chat

14   conversation?

15        A.    I do not.

16        Q.    What did you mean by the first

17   message you wrote in this chat?

18        A.    I don't have enough context.

19   Would you by any chance happen to have the chat

20   just preceding this?  Or this is the only thing

21   we have?

22        Q.    This is all I have and all I can

23   show you.

24        A.    Sorry.

25              Let me take a minute to see if it

1

2                    CERTIFICATE OF SHORTHAND REPORTER

3

4

5                        I, Gail Inghram, Registered

6        Diplomate Reporter, Certified Realtime Reporter,

7        Realtime Systems Administrator, CA-Certified

8        Shorthand Reporter No. 8635, and Notary Public,

9        the officer before whom the foregoing

10        proceedings were taken, do hereby certify that

11        the foregoing transcript is a true and correct

12        record of the proceedings; that said proceedings

13        were taken by me stenographically and thereafter

14        reduced to typewriting under my supervision; and

15        that I am neither counsel for, related to, nor

16        employed by any of the parties to this case and

17        have no interest, financial or otherwise, in its

18        outcome.

19

20

21        _____

22        Gail Inghram,
          BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25

# EXHIBIT 106

1    WESTERN DISTRICT OF WASHINGTON

2              AT SEATTLE

3  FEDERAL TRADE COMMISSION,

4         Plaintiff,

5  vs.                    No. 2:23-cv-0932-JHC

6  AMAZON.COM, et al.

7         Defendants.

8  _____/

9

10   The Above-Captioned Video-Recorded Deposition of

11        WILLIAM J. VIOLETTE, Ph.D.

12         9:00 a.m. - 3:44 p.m.

13          May 7, 2025

14

15

16

17

18

19

20

21

22

23  REPORTED BY:

24  STEVEN POULAKOS, RPR

25  JOB NO:  J12762350

1   Ashley Nevarez Gali, and Phoebe Taylor.

2          THE VIDEOGRAPHER:  The court reporter today

3   is Steven Poulakos.  He also represents Esquire

4   Deposition Solutions.  Will be the court reporter

5   please swear in the witness.

6   Whereupon,

7            WILLIAM J.VIOLETTE, Ph.D,

8   called as a witness, having been first duly sworn to

9   tell the truth, the whole truth, and nothing but the

10  truth, was examined and testified as follows:

11          EXAMINATION BY MR. HUESTON

12     Q     Could you please state your full name for

13  the record?

14     A     My name is William J. Violette.

15     Q     And you understand you're testifying under

16  oath today?

17     A     Yes.

18     Q     Have you taken any medications or any other

19  substances that might affect your ability to give your

20  best testimony today?

21     A     No.

22     Q     Is there any reason at all why you cannot

23  provide complete and truthful testimony today?

24     A     No.

25     Q     Have you had your deposition taken before?

 1    target population.

 2         A      I'm aware of differences looking at

 3    differences between those groups, yes.

 4         Q      Okay.  So I'm going to ask you some

 5    questions using the term coverage error as I just

 6    defined it.  Okay?

 7         A      Can you define it one more time, please?

 8         Q      Sure.  I'm defining it as the difference

 9    between the potential pool of respondents and the

10    target population.

11         A      Okay.  I'm not sure I understand exactly

12    what you mean by potential.

13         Q      Well, let me give you an example.  So in

14    online surveys, you're not able to sample people who

15    are not online, right?

16         A      Generally, yes.

17         Q      Right.  Even though they're part of the

18    target population because if they're not online,

19    they're not going to be in the potential pool of

20    respondents, right?

21         A      It depends on what your target population

22    is.

23         Q      Okay.  Well, let's -- so let's try some

24    questions here.  Do you know if the people who designed

25    the search sentiment survey took any precautions to

1    prevent coverage error?

2        A    I'm still not clear on what you mean by

3    potential population.  Do you mean respondents who had

4    the opportunity to take the survey but didn't or do you

5    mean respondents who never had the opportunity to take

6    the survey even though the person designing the survey

7    was interested in their responses?

8        Q    Yes.  It could be all of those.  It's the

9    potential pool of respondents who did not, in fact,

10   participate.

11       A    And by potential, you mean respondents a

12   researcher was hoping to learn about or all Amazon

13   customers that there are?

14       Q    It would be part of the target population.

15   So, again, using that same example with an online

16   survey, there could be folks that are requested to

17   respond, but if they're not online, they can't respond?

18       A    Yes.  If the researcher is only interested

19   in people online, that's not a problem.

20       Q    Okay.  In this instance with either search

21   survey or the cancellation survey, do you know whether

22   the researchers were only interested in people online?

23       A    No.

24       Q    Okay.  Are you familiar with the concept of

25   nonresponse error?

WILLIAM J. VIOLETTE, PH.D.                    May 07, 2025
FTC vs AMAZON.COM                                        79

1    A    Yes.

2    Q    What is that?

3    A    When a researcher is interested in learning

4    about a population and they issue a survey to a subset

5    of that population and not all people in that subset

6    respond to the survey.

7    Q    Okay.

8    A    And the error aspect comes from that

9    causing some sort of bias in what the researcher was

10   hoping to learn about that subpopulation for that

11   sample.

12   Q    And do you know whether there was any

13   nonresponse error in the search sentiment survey?

14   A    No.

15   Q    Do you know whether there was any

16   nonresponse error in the cancellation survey?

17   A    No.

18   Q    Did you conduct any analysis to determine

19   whether the results of either survey was biased by

20   nonresponse error?

21   A    No.

22   Q    Do you know if customers who took part in

23   either survey were aware that Amazon was the surveyor?

24   A    I know that respondents were likely to

25   assume Amazon was the surveyor because the pop up

WILLIAM J. VIOLETTE, PH.D.                    May 07, 2025
FTC vs AMAZON.COM                                          80

1  appeared after they canceled Amazon.

2      Q     That's cancellation?

3      A     Yes.

4      Q     What about the search survey?

5      A     I don't know.

6      Q     Do you know if an invitation to complete

7  the search sentiment survey came from an Amazon.com

8  email address?

9      A     I don't know.

10     Q     Do you know if an invitation to complete

11  the cancellation survey came from an Amazon.com email

12  address?

13     A     I don't know.

14     Q     Do you know if an invitation to complete

15  the search sentiment survey was displayed on the Amazon

16  website?

17     A     I don't know.

18     Q     Do you know if an invitation to complete

19  the cancellation survey was displayed on the Amazon

20  website?

21     A     Yes.

22     Q     And how do you know that?

23     A     My understanding is that the pop up

24  appeared after people finished canceling which would be

25  an invitation to take the survey.

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12              IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 7th day of May

14   2025.

15   My commission expires:

16   August 14, 2029

17

18

19

20

21   -------------------------

22   NOTARY PUBLIC IN AND FOR

23   THE DISTRICT OF COLUMBIA

24

25

# EXHIBIT 107

1                    FEDERAL TRADE COMMISSION

2

3   In the Matter of:            )
                                 ) No. 2123050
4   AMAZON.COM, INC.             )
                                 )
5                                )

6

7                    Investigational Hearing

8                    CHRISTOPHER R. BROWN

9

10

                     Federal Trade Commission
11           Henry M. Jackson Federal Building
                915 Second Avenue, Suite 2896
12                  Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  November 2, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                   CCR No.:  2574
25

5

Brown

Amazon.com, Inc.                                          11/2/2022

```
 1          SEATTLE, WASHINGTON; WEDNESDAY, NOVEMBER 2, 2022
 2                          8:36 A.M.
 3                          --oOo--
 4
 5   CHRISTOPHER R. BROWN,   deponent herein, having been
 6                           first duly sworn on oath, was
 7                           examined and testified as
 8                           follows:
 9
10                  E X A M I N A T I O N
11   BY MS. JERJIAN:
12       Q.  Good morning, Mr. Brown.
13       A.  Good morning.  How are you?
14       Q.  Good, thanks.  How about you?
15       A.  Good.
16       Q.  My name is Olivia Jerjian.  I'm an attorney
17   with the Federal Trade Commission, and I'm also the
18   hearing officer for today's investigational hearing.
19           I'm joined today by my co-counsel, Jonathan
20   Cohen, also with the Federal Trade Commission.
21           And I'll allow your counsel to introduce
22   themselves at this point.
23               MR. GRAUBERT:  John Graubert, for the
24   witness.
25               MS. LEDAIN:  Lelia Ledain, for the
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

51

Brown

Amazon.com, Inc.                                                    11/2/2022

1        A.  Because they launched it in the U.S.

2        Q.  Okay.  Based on your understanding, why would

3   customers want to pause instead of cancel?

4        A.  Can you say that again?

5        Q.  Sure.  What is the benefit to the customer to

6   pause their membership instead of canceling their

7   membership?

8        A.  It potentially can be easier for them to

9   restart their membership if they're in a pause rather

10   than canceling, would be a reason.

11        Q.  Any other reasons?

12        A.  I would have to speculate.

13        Q.  Well, go ahead and speculate.

14              MR. GRAUBERT:  No.  No.  No.  You can't

15   ask any witness to speculate.  He's not going to answer

16   any questions like that.  Please move on to your next

17   question.

18              MS. JERJIAN:  Mr. Graubert, I think the

19   only instruction you can give not to answer is based on

20   privilege.  Are you instructing your witness not to

21   respond based on a privilege objection?

22              MR. GRAUBERT:  I'm not instructing the

23   witness anything.  I'm telling you that that's an

24   improper question.

25        Q.  (By Ms. Jerjian)  Go ahead and respond.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

52

Brown

Amazon.com, Inc.                                    11/2/2022

1        A.  To why a customer might choose to pause?

2        Q.  To any other reasons besides that it can be

3    easier to restart a membership.

4        A.  I'm currently unfamiliar with the -- what is

5    available to you as a Prime member when you pause.  I

6    think you are available to, I think, access those

7    credits that I mentioned earlier while you are in a

8    pause state.  So I think there's some reason -- some

9    things that you can use as a Prime member or as a

10   paused Prime member that you wouldn't if you canceled.

11       Q.  Okay.  And does a customer pay a subscription

12   fee while they're in a paused state?

13       A.  No.

14       Q.  So what benefits does a customer no longer

15   have access to under in a paused state?

16       A.  I think it's the majority primary benefits

17   that you would get.

18       Q.  And when you said that it might be easier for

19   a customer to restart a membership if they're in a

20   paused state rather than canceling and then rejoining,

21   is it hard to sign up for Amazon Prime?

22       A.  It's not hard.  It should be easier than going

23   through the cancelation experience, or, if you are a

24   cancelled member, to rejoin.

25       Q.  How is it easier?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

53

Brown

Amazon.com, Inc.                                      11/2/2022

1        A.  Depending on why you cancelled or how you got
2    cancelled, if you had a payment method, you may have to
3    fix that up.  When you join Prime, you have to verify
4    your shipping address, your billing address, your
5    payment method.  You have to go through all of that
6    again.  If you're paused, you don't.  You're just
7    turning the -- you're, basically, turning a switch that
8    says your membership is now back on.
9        Q.  Mm-hmm.
10       A.  And you would have to find the acquisition
11   state.  The reacquisition of Prime members isn't as
12   messaged as much.  So it's just easier for you to find
13   and rejoin from that paused state.
14       Q.  Is it necessary -- strike that.
15           Is a pause option necessary to allow a
16   customer to complete a cancelation?
17       A.  No.
18       Q.  So did you report to Simone Lahood while
19   working on Project Iceman?
20       A.  No.
21       Q.  Who did you report to?
22       A.  David Edelstein.
23       Q.  So how did you work with Simone Lahood?
24       A.  She was the product owner.  I'm a peer in the
25   project.

321

Brown

Amazon.com, Inc.                                                    11/2/2022

```
 1                    A F F I D A V I T

 2

 3

 4

 5          I, CHRISTOPHER R. BROWN, hereby declare under

 6   penalty of perjury that I have read the foregoing

 7   Investigational Hearing and that the testimony

 8   contained herein is a true and correct transcript of my

 9   testimony, noting the corrections attached.

10

11

12

13

14

15                          Signature:

16

17

18

19

20   Date:

21

22

23

24

25
```

322

Brown

Amazon.com, Inc.                                                        11/2/2022

```
 1                    C E R T I F I C A T E
 2    STATE OF WASHINGTON )
                          )  ss
 3    COUNTY OF KING      )
 4
 5            I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to
 6    administer oaths and affirmations in and for the State
      of Washington, do hereby certify:  That the foregoing
 7    Investigational Hearing of the witness named herein was
      taken stenographically before me and reduced to a typed
 8    format under my direction;
 9            That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or
      the outcome herein;
11
              That the Investigational Hearing, as
12    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers and all
13    objections, motions and examinations and said
      transcript was prepared pursuant to the Washington
14    Administrative Code 308-14-135 preparation guidelines.
15                          s/Wade J. Johnson
16                          Wade J. Johnson, Certified Court
                            Reporter 2574 for the State of
17                          Washington residing at Seattle,
                            Washington.
18                          My CCR certification expires on
                            09/18/23.
19
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# EXHIBIT 108

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    AMAZON.COM, INC.               ) No. 2123050

5

6

7                 Investigational Hearing

8                       CEM SIBAY

9

10

                     Federal Trade Commission
11        Henry M. Jackson Federal Building
               915 Second Avenue, Suite 2896
12                 Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  November 29, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                    CCR No.:  2574
25

6

Sibay

```
 1                    MS. JERJIAN:  Could you please swear
 2    the --
 3                    THE REPORTER:  Would you like the witness
 4    sworn at this time?
 5                    MS. JERJIAN:  Yes, please.
 6
 7    CEM SIBAY,        deponent herein, having been
 8                      first duly sworn on oath, was
 9                      examined and testified as
10                      follows:
11
12                 E X A M I N A T I O N
13    BY MS. JERJIAN:
14        Q.  Mr. Sibay, you're here today in compliance
15    with a Civil Investigative Demand that you received,
16    correct?
17        A.  That's correct.
18                         (Exhibit 1 marked for
19                          identification.)
20        Q.  I'm showing you what's been marked as
21    Exhibit 1.
22                    MS. RODGERS:  Thank you.
23        Q.  Is this a copy of the CID you received?
24        A.  I believe so.  It seems similar to it.
25        Q.  Do you have any reason to doubt that it's not
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

68

Sibay

Amazon.com, Inc.                                    11/29/2022

```
 1        A.   You just asked me if it was possible.  And I'm
 2   also reading this document here, where we talk about
 3   customer service exceptions, where, in those cases,
 4   when customers have expressed that to us, we have
 5   refunded them, for multiple months, versus just their
 6   last billing cycle.
 7        Q.   Okay.  Can you set the document aside.
 8        A.   Sorry.
 9        Q.   I'm not asking you to look at this specific
10   document.  So I just want to make sure -- is your
11   answer based on this document specifically when I asked
12   you, how do you know this?
13             MS. RODGERS:  Objection to form.
14        A.   Sorry.  Yes, I was reading the notes, and you
15   were asking me to describe it, and that's my
16   understanding of the notes as I was reading them.
17        Q.   I was asking you, how do you know that
18   customers can sign up for Prime and not realize it for
19   multiple billing cycles?
20             MS. RODGERS:  Objection to form.
21             You had asked him if it was possible, not
22   if it happened.
23             MS. JERJIAN:  Yeah.  And he said it is
24   possible, and I'm asking how he knows that.  Can he
25   please answer my question.
```

69

Sibay

Amazon.com, Inc.                                          11/29/2022

1            MS. RODGERS:  Objection to form.

2       A.  Oh, I don't recall this specific anecdote.

3            It seems like that's what's being captured

4    here, that customers have contacted us and said that

5    they had unintentionally signed up and had been billed

6    multiple times.

7       Q.  Okay.  Aside from this document, from this

8    email, is there any other basis for -- based on what

9    you know -- that it's possible for customers to

10   inadvertently sign up for Prime and not realize it for

11   multiple billing cycles?

12           MS. RODGERS:  Objection to form.

13      A.  I can only tell you what we've heard from a

14   customer anecdote perspective.  We can't really go into

15   their minds and truly understand if it was

16   unintentional or not.  But we have typically leaned

17   into solving the problem for the customer if they have

18   expressed that they were worried that this was the

19   case.

20      Q.  So you're referring to the customer service

21   contacts calls?

22      A.  Yes.  We had a very generous refund policy, as

23   this note reminds me.

24      Q.  I'm not asking about the refund policy.  I'm

25   asking how you know people signed up without realizing

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

70

Sibay

Amazon.com, Inc.                                      11/29/2022

1    they signed up.  So set the document aside.  I'm not

2    asking you a question about the document anymore.

3         A.  Yeah.  It's, again, going back to, I guess the

4    earlier response, which is, we primarily -- or I

5    primarily recall that -- from customer anecdotes

6    expressing that they had unintentionally signed up for

7    a number of different reasons and based on surveys.

8         Q.  Are there any documents that would refresh

9    your recollection as to the reasons for which customers

10   would inadvertently sign up for Prime?

11        A.  I don't know.  That's a very broad question.

12   That's hard for me to know if something would refresh

13   my memory until I read it and whether it actually

14   refreshed it or whether it was something that was

15   familiar to me upon reading it.

16        Q.  Sitting here today, do you know of any

17   documents that would refresh your recollection?

18        A.  Not that I could refer to.

19        Q.  How about generally even?

20             MS. RODGERS:  Objection to form.  Asked

21   and answered.

22        A.  I read probably between, on average, five to

23   ten documents a day at Amazon.  All of our meetings

24   have documents.  The more senior you get, the more your

25   role becomes to read and give feedback to documents

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

97

Sibay

Amazon.com, Inc.                                    11/29/2022

1    cancel Prime benefits because they likely did not mean
2    to be in Prime?
3              MS. RODGERS:  Objection to form.
4         A.  I believe it actually says 3.7 of the
5    15 percent.
6         Q.  Yes.
7         A.  So it's a much smaller percentage of total
8    signups, is the way that I read that.  And, yes, any
9    customer that believes they have unintentionally signed
10   up for Prime would have a frustrating -- or could have
11   a frustrating -- experience if they were surprised by
12   it.
13        Q.  Would you think that number is alarming or
14   not --
15             MS. RODGERS:  Objection.
16        Q.  -- or concerning, is the word I originally
17   used?
18             MS. RODGERS:  Objection to form.
19        A.  I think even one customer who has told us that
20   they are frustrated because they unintentionally signed
21   up would be concerning.
22        Q.  What steps did Prime take to address this
23   concern --
24             MS. RODGERS:  Objection.
25        Q.  -- during your tenure on Prime?

98

Sibay

Amazon.com, Inc.                                                    11/29/2022

1              MS. RODGERS:   Objection.

2        A.   So there were a number of different ways that

3    we tried to address this sort of pain point that

4    customers have expressed to us.   One was making sure

5    that our CS policies, in this case, were very generous,

6    quick, and resolving in favor of the customer.

7              And we also regularly checked all the

8    notifications, including emails that we sent customers,

9    to make sure that they were clear and understood and

10   being, ideally, also read by customers, by looking at

11   open rates.   And then through, also, review of our

12   acquisition locations.

13             But, unfortunately, as I said, customers have

14   expressed many, many different reasons as to why they

15   believed they had unintentionally signed up.   Some of

16   those are more easily addressed than others because

17   they involve distractions or unexpected signups from

18   members of their household or other visitors and such,

19   as well.

20        Q.   When were the CS policies changed to be more

21   generous about refunds?

22              MS. RODGERS:   Object to the form.

23        A.   As far as I know, they were always very

24   generous.   I don't recall any meeting where we said,

25   let's make it more generous or less generous.   I think

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sibay

Amazon.com, Inc.                                           11/29/2022

1    it's just part of Amazon's DNA and philosophy.

2        Q.  How about a notification to the customers,

3    when did you -- strike that.

4            When did Prime implement the notification to

5    customers?

6                MS. RODGERS:  Objection to form.

7        A.  I don't know when.  It was certainly in

8    existence when I took on my role.

9        Q.  And what was the review of acquisition

10   locations?  What does that mean?

11       A.  Those would be meetings with our Content

12   Testing team.

13       Q.  Did you attend those?

14       A.  I don't know if I attended every single one of

15   them, but I did attend at least some of those meetings.

16       Q.  Who were the other attendees of those

17   meetings?

18                MS. RODGERS:  Objection to form.

19       A.  I don't recall the list of actual people that

20   attended.

21       Q.  Did you ask questions?

22                MS. RODGERS:  Objection to form.

23       A.  I don't recall whether I did or not.  I would

24   expect so, but, again, I'm speculating.

25       Q.  Were you more of an active participant in

Sibay

Amazon.com, Inc.                                                    11/29/2022

1    these meetings, or was it purely informational, in

2    terms of the team would present to you?

3              MS. RODGERS:  Objection to form.

4         A.   I mean, active -- so, when you say a team

5    presenting, we don't have sort of PowerPoint style

6    presentations or people sort of walking us through

7    presentations or documents.  There will be a discussion

8    section post everyone affirming that they have read the

9    document.

10             And there will be some meetings where I'm more

11   active than others.  And that will depend on whether I

12   feel that the material is well covered by other members

13   of my team or because it's a topic that is of interest

14   or because I feel like I can add more direct value by

15   participating more than I otherwise would.

16        Q.   Did Mr. Davidai attend those meetings?

17             MS. RODGERS:  Objection.  Foundation and

18   form.

19        A.   So I believe at some point, the Content

20   Testing team reported to Nahshon.  So I would have

21   expected him, but I don't recall specific meetings or

22   whether he was in them or not.

23        Q.   Did you hire Nahshon Davidai to join Prime?

24        A.   I did indeed.

25        Q.   When did you do that?

123

Sibay

Amazon.com, Inc.                                    11/29/2022

1    balance declined by any customer that said they

2    unintentionally signed up, I would have been

3    100 percent okay with that.

4         Q.  So, in other words, the number of Prime

5    memberships that were being lost to the implementation

6    of making the Prime signup process clearer, the Prime

7    membership loss wouldn't have mattered to you?

8              MS. RODGERS:  Objection to form.

9         A.  The way I would phrase that is -- and I was

10   going ahead a little bit further, sorry, in looking at

11   the last bullet here is, what this actually data

12   suggests to me is that we were not only losing or maybe

13   not even losing unintended signups at all, that we were

14   losing also members that were otherwise intentionally

15   signing up.  And so that would be something that's

16   concerning.

17             There's the point here about the data that

18   doesn't fit the hypothesis, which talks about a settled

19   conversion rate.  If, indeed, clarity had had the

20   impact of reducing or removing anyone that was

21   unintentionally signing up, we should have seen a

22   higher conversion rate from free trial to paid Prime

23   membership.

24             But the first sentence here says that it has

25   not changed as a result of Project Lucent's clarity

124

Sibay

Amazon.com, Inc.                                          11/29/2022

1    experiments, which is an outcome I now recall, having

2    read this document.

3        Q.   What else do you recall, having read this

4    document, about Project Lucent?

5        A.   That is what just came to mind, was that a lot

6    of the testing that certain individuals may have

7    thought increased clarity was actually also impacting,

8    at a bare minimum, customers that intentionally were

9    trying to sign up for the Prime program.

10       Q.   How do you know that customers that were

11   intentionally trying to sign up were being deterred

12   from signing up for Prime?

13            MS. RODGERS:   Objection to form.

14       A.   This conversion rate reference -- and that's

15   why the bullet is titled, "The data that does not fit

16   the hypothesis," which I'm assuming is referring to

17   their own hypothesis here.

18            If we were able to reduce or remove all

19   customers that otherwise would have unintentionally

20   signed up, the remaining customers would have been

21   customers that had a clear intent to sign up.  And,

22   thus, by removing what I would consider a customer base

23   that would be less likely to convert and be settled

24   over time because they had unintentionally signed up,

25   we should have a higher conversion rate left, just by

125

Sibay

Amazon.com, Inc.                                    11/29/2022

1    the selection of customers that were still remaining as
2    Prime members.
3            And so what I'm reading from this document is
4    that there was data that suggested we may not have
5    actually improved clarity and reduced unintentional
6    signups, we may actually be actually impacting
7    otherwise intentful customers from signing up to Prime,
8    as well.
9        Q.  Did you discuss this with anyone at Prime?
10           MS. RODGERS:  Objection to form.
11       A.  This concept is coming back to me as I'm
12   reading this document.  So I would imagine that there
13   was discussion about it, but I don't recall the
14   specific meeting.
15       Q.  Did you discuss this with Neil Lindsay?
16       A.  I don't -- I don't recall if I specifically
17   discussed it with him or not.
18       Q.  Do you remember -- what more do you remember,
19   beyond this document, about this concept?
20           MS. RODGERS:  Objection to form.
21       A.  Well, I'm remembering again how difficult a
22   challenge it is to reduce unintended signups.
23       Q.  Who presented the finding to you?
24           MS. RODGERS:  Objection to form.
25       A.  I don't recall the specific meeting.  It could

Sibay

Amazon.com, Inc.                                          11/29/2022

1    have been one of these meetings.  It could have been
2    the meeting with my Content Testing team.
3         Q.  But you recall a meeting where this was
4    discussed, correct?
5         A.  I recall this concept.  And so as I read this
6    bullet here, it reminded me how difficult a challenge
7    it is, just based on the myriad list of reasons that
8    customers say they unintentionally signed up.
9         Q.  Right.  You remembered this concept just now.
10   I'm trying to assess how much you remember of it.  How
11   did you become aware of this concept?  Do you remember
12   that?
13            MS. RODGERS:  Objection to form.
14        A.  I don't.
15        Q.  So you don't remember anything about the
16   concept beyond just what's in the email, correct?
17        A.  I could read more of either of these
18   documents, and more may come to me, but --
19        Q.  But nothing beyond the document is coming back
20   to you, correct?
21        A.  Yeah.  The document is what's sparking -- the
22   sections I'm reading is sort of what's -- having me
23   recollect some of this.
24        Q.  Do you remember the circumstances in which you
25   either discussed or learned about this concept?

211

Sibay

Amazon.com, Inc.                                    11/29/2022

1      Q.  Would you have expressed this view at this
2  meeting?
3           MS. RODGERS:  Objection to form.
4      A.  I don't know because I don't recall this
5  meeting, but I'm just telling you how I'm thinking
6  about it today when I read this.
7      Q.  Did you think similarly when you were at Prime
8  back in 2019?
9      A.  I felt -- I do recall -- I felt rather
10  strongly that unintentional signups was not a desired
11  outcome, and it was not something that, if we could
12  make it go away, we wouldn't make it go away.  What we
13  were most interested in was signing up customers that
14  were engaging with their benefits and with as many
15  benefits as they thought were interesting to them.  So
16  that point of view, for me, I don't think has changed
17  over the years.
18      Q.  When you say, if we could make it go away, if
19  we could make unintended signups go away, we would
20  have, is it that you couldn't get rid of unintended
21  signups?
22           MS. RODGERS:  Objection to form.
23      A.  Unfortunately, I just don't think there was
24  any magic wand that could make every customer read
25  everything that was presented to them in our

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Sibay

Amazon.com, Inc.                                    11/29/2022

1   acquisition flows, as clear as it was.  I think people

2   are just human.  And as I said, there were lots of

3   different reasons why customers reported unintended

4   signups.  Some of it was because of acquisition

5   locations, but there was many other reasons, as well.

6           And so we focus on trying to make it as clear

7   as possible, as far as what the benefits were, how the

8   program worked.  We had a very generous rebate policy,

9   refund policy, if customers felt afterwards that they

10  hadn't quite understood the terms and conditions.  And

11  we continue to work to make sure that our signup

12  locations were clear, as far as what the terms and

13  conditions were.

14          MS. RODGERS:  I think we've been going

15  for a little over an hour, Olivia.  Whenever you're

16  ready for a break.

17          MS. JERJIAN:  I just have a few more

18  questions.

19    Q.  Do you think that the signup flow, as it was

20  at the time, was as clear as it could have possibly

21  been?

22          MS. RODGERS:  Object to the form.

23      A.  I do think our checkout process was clear and

24  had all the information for customers laid out in front

25  of them.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

213

Sibay

Amazon.com, Inc.                                    11/29/2022

1      Q.  Could it have been clearer?

2              MS. RODGERS:  Object to the form.

3      A.  Well, that was something that we regularly

4  tested.  It was very hard to know ahead of time whether

5  something would actually increase clarity or

6  potentially decrease clarity.  There were many, many

7  occasions where my intuition, as far as what a small

8  change, the impact that it would have, was completely

9  wrong or off base.  It's one of the reasons why we just

10  vigorously tested everything that we would put in front

11  of customers before settling in on one option or

12  another.

13      Q.  So you actually don't think there was a

14  trade-off between selling Prime and adding clarity.

15  You disagree with the statement, correct?

16      A.  I think that we strove to make sure that our

17  marketing messages were very clear to customers and

18  they understood the terms and conditions.

19      Q.  So you don't believe there was a trade-off,

20  correct?

21              MS. RODGERS:  Object to the form.

22      A.  Again, I think we could do both.  I don't

23  think it's -- I don't think, by being unclear, we could

24  effectively sell more Prime memberships, if customers

25  didn't understand what they were signing up for.

```
 1                   C E R T I F I C A T E

 2     STATE OF WASHINGTON )
                           )   ss
 3     COUNTY OF KING      )

 4


 5           I, the undersigned Washington Certified Court
       Reporter, pursuant to RCW 5.28.010, authorized to
 6     administer oaths and affirmations in and for the State
       of Washington, do hereby certify:  That the foregoing
 7     Investigational Hearing of the witness named herein was
       taken stenographically before me and reduced to a typed
 8     format under my direction;

 9           That I am not a relative or employee of any
       attorney or counsel or participant and that I am not
10     financially or otherwise interested in the action or
       the outcome herein;

11
             That the Investigational Hearing, as
12     transcribed, is a full, true and correct transcript of
       the testimony, including questions and answers and all
13     objections, motions and examinations and said
       transcript was prepared pursuant to the Washington
14     Administrative Code 308-14-135 preparation guidelines.

15
                          Wade C Johnson
16                        Wade J. Johnson, Certified Court
                          Reporter 2574 for the State of
17                        Washington residing at Seattle,
                          Washington.
18                        My CCR certification expires on
                          09/18/23.
19

20

21

22

23

24

25
```

# EXHIBIT 109

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    AMAZON.COM, INC.               ) No. 2123050

5

                     Investigational Hearing
6                        GREG GREELEY

7

8

9                    Federal Trade Commission

10            Henry M. Jackson Federal Building

11              915 Second Avenue, Suite 2896

12                    Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23    DATE:  November 9, 2022

24    REPORTED BY:  Wade J. Johnson, RPR
                    CCR No.:  2574
25

4

Greeley

Amazon.com                                           11/9/2022

```
1
2        SEATTLE, WASHINGTON; WEDNESDAY, NOVEMBER 9, 2022
3                       8:27 A.M.
4                       --oOo--
5
6                  (Witness sworn.)
7
8              MR. NARDINI:  Good morning, Mr. Greeley.
9    My name is Max Nardini with the FTC.  I'm joined today
10   with my co-counsel Olivia Jerjian.
11              I think there are additional FTC members
12   on the phones.  Could you please announce yourselves,
13   FTC members on the dial in.
14              MR. FRECH:  Jake Frech.
15              MR. NARDINI:  Anyone else from the FTC?
16              Okay.
17              And I see you're here joined by counsel
18   today.
19              THE WITNESS:  Correct.
20              MR. NARDINI:  If you could introduce
21   yourselves for the record, please.
22              MS. FLAHIVE WU:  Good morning.  Laura
23   Flahive Wu, of Covington & Burling, here for the
24   witness.
25              MR. CAPUANO:  Hi.  Mark Capuano, of
```

48

Greeley

Amazon.com                                                          11/9/2022

```
 1                      (The previous question was
 2                       read back.)
 3           A.   The team had a charter for continuous
 4      improvement.  So they would have been doing dry user
 5      tests, as we introduced new benefits, making sure that
 6      those flows -- or new pipelines -- that those flows
 7      were working properly, that the engineering behind that
 8      was scaling as the program grew.  Those would be the
 9      kind of improvements they would do.
10           Q.   Did you set those charters for improvements?
11           A.   The charters for improvement would evolve.  It
12      was significant experimentation.  Yes, I set the
13      charter that every group needed to continue to improve
14      the customer experience across every team I managed at
15      Amazon.
16           Q.   What specifics do you recall about the charter
17      for improvements for the cancelation team?
18                      MS. FLAHIVE WU:  Objection to form and
19      scope.
20           A.   During my -- during March of 2018, I don't
21      recall anything specific.  At times before March of
22      2018, I likely engaged them on making sure -- ensuring
23      that the cancelation flow was simple but also that
24      people understood the benefits that they were not
25      getting, that they were not getting.
```

49

Greeley

Amazon.com                                              11/9/2022

        1        Q.   Okay.   So why was it important to you that the
        2    cancelation process be simple?
        3                  MS. FLAHIVE WU:   Objection to form and
        4    scope.
        5        A.   During my time in Prime in March of 2018, that
        6    discussion didn't come up, to the best of my knowledge.
        7    But during my period, my tenure from 2013 to 2018, it
        8    was a design standard across all of our systems and
        9    tools that we make our -- the interfaces as simple as
       10    possible and informative as possible.
       11        Q.   Does simple there mean as few clicks as
       12    possible?
       13        A.   No.
       14                  MS. FLAHIVE WU:   Objection to form.
       15        Q.   What does simple mean there?
       16                  MS. FLAHIVE WU:   Objection to form.
       17        A.   During my time in 2018, I would have engaged
       18    in that topic, but simple would mean a customer
       19    experience that people understood, that was smooth, and
       20    worked as expected.
       21        Q.   How did you communicate the importance of a
       22    simple design process to the design team responsible
       23    for the cancelation flow you were overseeing?
       24                  MS. FLAHIVE WU:   Objection.   Scope.
       25        A.   During my time in 2018, I did not, I did not

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Greeley

Amazon.com                                      11/9/2022

1    have those conversations.  Between 2013 and 2017, I

2    frequently asked them to benchmark and make sure,

3    relative to other companies, we were, what I would call

4    best in class, from a trusted customer experience.

5         Q.   Did that best-in-class assessment include a

6    comparison of the number of clicks to cancel for Prime

7    versus subscription services of other companies?

8                   MS. FLAHIVE WU:  Objection to form and

9    scope.

10        A.   No, not to my recollection.

11        Q.   Why not?

12        A.   I don't think clicks is an indicator of

13   simplicity and a great customer experience.  What I did

14   do is, I said frequently, don't be Comcast, don't be

15   like your mobile phone operator.  We needed to create a

16   really rich, trusted experience.

17        Q.   Was a goal of the cancelation flow to reduce

18   the number of cancelations?

19                   MS. FLAHIVE WU:  Objection to form and

20   scope.

21        A.   No.

22        Q.   So it was not a goal to reduce the number of

23   cancelations?

24        A.   Correct.  The goal would have been to make

25   sure people had an informed and smooth cancelation

51

Greeley

11/9/2022

1    experience.

2        Q.  Wasn't a way in which though that you would

3    track whether people were having an informed experience

4    by tracking how many people completed the cancelation

5    flow versus being diverted to one of the other options

6    it presented?

7              MS. FLAHIVE WU:  Objection to form and

8    scope.

9        A.  The objective of the cancelation team was to

10   it -- excuse me, the customer cancelation user team --

11   was to make sure that the experience worked, that it

12   was rich, informed, and helped measure what

13   customers -- that customer flow.

14       Q.  Right.  So was a metric that they used the

15   number of people who canceled upon completing the flow

16   versus not?

17             MS. FLAHIVE WU:  Objection to form and

18   scope.

19       A.  We definitely measured the number of

20   cancelations, and we measured the -- we looked to try

21   to understand why.  One of the objectives, to

22   understand why there were cancelations.  And then to

23   help make sure people understood the mechanics of the

24   cancelation.

25       Q.  How would you look to understand why people

188

Greeley

Amazon.com                                                        11/9/2022

1       A.   For my team, between 2013 and 2017, we would
2    tackle it in different ways.  Because the data would
3    sit in our experimental design, sometimes we'd be
4    sitting in, and I would just say can you just log up
5    and pull the data, and we'll inspect it together.  That
6    was a fairly typical way.
7            If we were -- if somebody was bragging about
8    an improvement that they made where they saw better
9    Prime engagement or better Prime signups, we would
10   always ask, well, let's make sure we get through at
11   least the next five weeks so we can get these other
12   data points and the full 13 months so we can see how
13   many people canceled and what the reason they gave for
14   why they canceled.
15           So, given the long-term nature of those
16   particular measurements and the fact that it was
17   generally such a very small number compared to how many
18   people were actually signing up and engaging very
19   actively, we did it -- we didn't have a, quote,
20   periodic review of that.  It was an on going review.
21   It wasn't a, quote, meeting, to review it.  It was an
22   ongoing, just part of our design process.
23       Q.   Got it.  And so was all this data collected in
24   one database, or were there different databases where
25   you would get different data?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Greeley
Amazon.com                                                    11/9/2022

 1                 MS. FLAHIVE WU:  Objection to form and
 2       scope.
 3            A.  Between 2013 and 2017 and while I was managing
 4       Prime, I don't think I know where the data was stored.
 5       It would have been somebody junior to me that would
 6       have -- I just don't know.
 7            Q.  What was the percentage of unintended signups,
 8       to the best of your understanding, during your tenure
 9       as VP of Prime?
10                 MS. FLAHIVE WU:  Objection to form and
11       scope.
12            A.  Between 2013 and 2017, the unintended signups
13       is -- it was not specifically defined, to the best of
14       my knowledge.  All of those parameters I mentioned were
15       indicators, but we didn't know if they were intended or
16       not.  So I don't think we ever created a true metric,
17       as you're describing it.  But it was -- and I don't
18       remember -- for that very reason.  I just know it was a
19       very small decimal percentage of our membership base.
20            Q.  But how do you know that it was a very small
21       percentage if the data was never fully tabulated?
22                 MS. FLAHIVE WU:  Objection to form,
23       scope, and asked and answered.
24            A.  Yeah, I think it's two thousand -- I do think
25       I already provided that.  There was -- each one of

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Greeley
Amazon.com                                                    11/9/2022

```
 1    those was a very, very small number.  Even if you added
 2    them all up, it was still a small number.  But some of
 3    those are -- themselves relied on anecdotal data.
 4            And I do recall us trying to benchmark
 5    ourselves against other subscription programs -- that
 6    was another indicator -- and finding that we were much
 7    better than other subscription programs that we were
 8    aware of, using credit card information as an example.
 9    Q.  So you mentioned that not using Prime benefits
10    could be an indicator of an unintentional signup,
11    correct?
12            MS. FLAHIVE WU:  Objection to form,
13    scope, and misstates testimony.
14    A.  Yeah, I mentioned that was something we looked
15    at, just to see if any experiment had created a
16    difference, a shift.  And a shift in the amount of
17    Prime usage could be an indicator, but we also had a
18    situation where new customers were in a very different
19    demographic.  So you had to be even careful to try to
20    normalize for the data we saw in 2013 versus the data
21    we saw in 2016.  So I just -- I wish it was that clean,
22    but it's very much a kind of softer -- and you're
23    constantly trying to improve.  So you're just looking
24    for any signal you can about how to make it better, and
25    that would be one of them.
```

Greeley
Amazon.com                                                    11/9/2022

1        Q.  So do you recall, from your tenure at Prime,
2    what percentage of Prime members were recorded as not
3    having used their benefits?
4                MS. FLAHIVE WU:  Objection to form and
5    scope.
6        A.  I don't.
7        Q.  Do you know if it was greater than 10 percent?
8                MS. FLAHIVE WU:  Objection to form and
9    scope.
10       A.  To the best of my knowledge, it would have
11   been less than 10 percent, but I shouldn't speculate.
12   I don't know.
13       Q.  Was it less than 5 percent?
14               MS. FLAHIVE WU:  Objection to form and
15   scope.  Asked and answered, Counsel.
16       A.  Yeah, I think I really -- I'm sorry, it was
17   more than five years ago, I just don't recall.
18       Q.  Okay.  Yeah, if the answer is don't recall --
19               And as you sit here now -- understanding that
20   you don't recall -- as you sit here now, do you have
21   any sort of perspective on what you think that number
22   would be?
23               MS. FLAHIVE WU:  Objection to form and
24   scope.  Asked and answered.
25       A.  Yeah, I really don't recall.  Yeah, there was

Greeley
Amazon.com                                                    11/9/2022

1     Q.  And it sounds like -- so then the improvement
2  related, was it changing the wording on the fast, free
3  shipping to something else?
4              MS. FLAHIVE WU:  Objection to form and
5  scope.
6     A.  Between 2013 and 2017, with that design --
7  again, we have hundreds of different experiments trying
8  to get to the perfect experience.  And so sometimes you
9  change language in the yellow signup for Prime button,
10 sometimes you change language in -- fortunately, we got
11 to do this over ten different countries.
12            In the, no thank, I don't want to join a Prime
13 membership, sometimes it would be, you really are
14 getting free two-day shipping by joining Prime.  It was
15 very much around the language, the color, the imagery
16 that would be exposed for what we would iterate on to
17 try to do that, with the intention of how do you keep
18 decreasing immediate cancelations and chargebacks.
19    Q.  And do you recall specific examples of those
20 different versions that you implemented?
21            MS. FLAHIVE WU:  Objection to form and
22 scope.
23    A.  Between 2013 to 2017, there were -- again,
24 there were, not just dozens, there were hundreds of
25 experiments running live to try to drive to that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Greeley
Amazon.com                                           11/9/2022

```
 1    improvement.  So I definitely remember instances of
 2    changing the wording on the website, the wording on
 3    buttons, repositioning the buttons, repositioning where
 4    the disclosures were, making sure that the confirmation
 5    page -- one of the things was, if somebody has
 6    accidentally signed up without reading it, making sure
 7    the confirmation page is really clear after you just
 8    signed up for Prime.  Making sure the email that we
 9    sent immediately was clear about, hey, you just signed
10    up for Prime.
11            So we would try to -- again, it was such a
12    long tail of the small percentage of people where this
13    would come up.  We knew we weren't going to be able to
14    design a perfect, crash-free car, but we then wanted to
15    say, well, what safety mechanisms do we have for when
16    that does happen.
17       Q.  Do you recall any specific examples of
18    improvements to the enrollment flow you were just
19    referring to that you essentially dialed up to
20    100 percent of Prime users?
21            MS. FLAHIVE WU:  Objection to form and
22    scope.
23       A.  In my time, it would be rare that we dialed up
24    anything to 100 percent without a very long-term study.
25       Q.  What about 95 percent?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

203

Greeley

11/9/2022

1                    MS. FLAHIVE WU:  Objection to form.

2          A.  95 percent still sounds very high.  I mean --

3          Q.  Is the reason it's high is because you're

4    always iterating different versions, so there's always

5    some percentage different for each user?

6                    MS. FLAHIVE WU:  Objection to form.

7          A.  Yes.  Between 2013 and 2017, that's right.

8          Q.  Yeah.

9          A.  The context of we're seeking the perfect flow

10   that informs customers, simple, and we know that the

11   demographic of our customer is evolving, their use of

12   computers.  So it is a constant journey.  And so you

13   want to make sure all those improvements are in fact

14   improvement and not creating harm, which is why you

15   would never flip to 100 percent or even 90 percent of a

16   single one.  But, certainly, if you've got indications

17   that you have an improved flow, you could go quite

18   high, more than 50 percent.

19         Q.  More than 50 percent.

20                   So were there any sort of the improvements to

21   the enrollment flow we were discussing were tested,

22   were any of those dialed up over 50 percent, to your

23   recollection?

24                   MS. FLAHIVE WU:  Objection to form and

25   scope.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

```
 1                 C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                          )  ss
 3    COUNTY OF KING      )

 4


 5          I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to
 6    administer oaths and affirmations in and for the State
      of Washington, do hereby certify:  That the foregoing
 7    Investigational Hearing of the witness named herein was
      taken stenographically before me and reduced to a typed
 8    format under my direction;

 9          That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or
      the outcome herein;

11          That the Investigational Hearing, as
12    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers and all
13    objections, motions and examinations and said
      transcript was prepared pursuant to the Washington
14    Administrative Code 308-14-135 preparation guidelines.

15

16                      Wade J. Johnson, Certified Court
                        Reporter 2574 for the State of
17                      Washington residing at Seattle,
                        Washington.
18                      My CCR certification expires on
                        09/18/23.

19

20

21

22

23

24

25
```

# EXHIBIT 110

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   In the Matter of:              )

 4                                  ) No. 2123050

 5   AMAZON.COM, INC.               )
                                    )
 6                                  )

 7              2.7(h) Investigational Hearing

 8                 AMAZON.COM, INCORPORATED

 9                    GREGORY FULLER

10

11

12              Federal Trade Commission

13          Henry M. Jackson Federal Building
               915 Second Avenue, Suite 2896
14                 Seattle, Washington

15

16

17

18

19

20

21

22

23   DATE:  January 12, 2023

24   REPORTED BY:  Wade J. Johnson, RPR

25              CCR No.:  2574
```

4

Fuller

Amazon.com, Inc.                                              1/12/2023

1

2

3

4

5          SEATTLE, WASHINGTON; THURSDAY, JANUARY 12, 2023

6                          10:47 A.M.

7                          --oOo--

8

9     GREGORY FULLER,    deponent herein, having been

10                       first duly sworn on oath, was

11                       examined and testified as

12                       follows:

13

14                 E X A M I N A T I O N

15    BY MR. NARDINI:

16         Q.  Good morning.

17         A.  Good morning.

18         Q.  Could you please state your name and title for

19    the record.

20         A.  Greg Fuller, global head of Owned and Operated

21    Marketing, Amazon Music.

22         Q.  Good morning, Mr. Fuller.  My name is Max

23    Nardini.  I'm an attorney with the Federal Trade

24    Commission and the hearing officer for today's

25    investigational hearing.  As you know, I'll be asking

Fuller

Amazon.com, Inc.                                      1/12/2023

1                    THE REPORTER:  Would you repeat the
2      percent.
3                    THE WITNESS:  Nought point four.
4                    MR. ANTHONY:  And that's British English
5      for zero?
6                    THE WITNESS:  That's British English for
7      zero.
8                    MR. NARDINI:  So stipulated.
9                    THE WITNESS:  Well, actually, just
10     English, but, yeah.
11                   MR. ANTHONY:  Zing.
12          Q.  Okay.  But you're not sure, within the
13     400,000, what subset relate to mistaken or accidental
14     signups, right?
15                   MR. ANTHONY:  Same objections.
16          A.  We don't know because we can't get in the
17     customer's head around whether they accidentally signed
18     up or not.  They report a number of things.  I don't
19     know the specific subsection of which they would report
20     as accidental.  No, we don't have that.  It's just a
21     number of reasons for cancelation.  And some of them
22     might be, for example, they couldn't find the
23     cancelation flow, for example.
24          Q.  I want to make sure I understand.  Within the
25     customer service contact to sort of code the nature of

9
Fuller

Amazon.com, Inc.                                                        1/12/2023

1    consumer complaints, is there not one for accidental or

2    mistaken signups?

3                    MR. ANTHONY:  Objection.  Scope.

4         A.  I don't know if it's categorized as

5    accidental.  I know there's a number of categories.  I

6    don't know if it's actually categorized as accidental.

7         Q.  Mm-hmm.

8         A.  Yeah.

9         Q.  Are you aware of any consumer complaints

10   regarding Amazon Music Unlimited and that the

11   individual mistakenly signed up or accidentally signed

12   up for the program?

13                   MR. ANTHONY:  Objection.  Scope and form.

14        A.  In terms of accidental signups, as I was

15   saying, there's a number of reasons why people want to

16   cancel.  We get quarterly feedback from customer

17   service, of which we get anecdotes from customers, some

18   of which state they accidentally signed up, but, like I

19   said, there's a number of reasons, but I am aware that

20   there would be some anecdotes within those reports.

21        Q.  And do you have any sense of the volume or

22   quantity of those types of reports?

23                   MR. ANTHONY:  Objection.  Scope.

24        A.  Only, like I said, that it's a small percent

25   overall of the customer base and, within that, a

Fuller

Amazon.com, Inc.                                    1/12/2023

1    smaller percent deemed accidental.  I don't know the
2    exact amount.
3        Q.  Have you studied the percentage or volume of
4    members who sign up but never use a benefit?
5            MR. ANTHONY:  Objection.  Scope.
6        A.  We, from time to time, look at reports that
7    would show inactivity rate, yeah.
8        Q.  And what have those reports shown?
9            MR. ANTHONY:  Objection.  Scope.
10       A.  They would show the percentage of customers
11   that haven't used the service within a period of time.
12       Q.  What increments do the reports measure?
13           MR. ANTHONY:  Objection.  Scope and form.
14       A.  You can pull the data on a number of different
15   increments, yeah.
16       Q.  Has that data created any concerns within
17   Amazon Music Unlimited?
18           MR. ANTHONY:  Objection.  Scope and form.
19       A.  I would say we pull the data and monitor that,
20   along with a number of other metrics and, yeah, take
21   actions to improve the customer experience generally,
22   yeah.
23       Q.  Do you consider a lack of usage to be a
24   potential sign that an individual signed up by mistake
25   or without realizing it?

11

Fuller

Amazon.com, Inc.                                        1/12/2023

1            MR. ANTHONY:  Objection.  Scope.
2       A.  We monitor activity usage of the service in
3   terms of monthly active users and inactive users.  So
4   it would be one of, yeah, a number of data points
5   around whether or not customers were enjoying the
6   service, taking advantage of it.
7       Q.  If you see that a percentage of users has been
8   inactive, what are the reasons you would consider for
9   that inactivity?
10      A.  It could be a number of reasons for the
11  inactivity.  We don't have the data specifically on
12  what those reasons would be.  But we do look at a
13  period of time and then make recommendations on how we
14  could deal with that customer experience.
15      Q.  And has Amazon Music Unlimited ever discussed
16  that one reason for a lack of usage could be mistaken
17  signups, who didn't realize they were indeed enrolled,
18  therefore did not make use of the benefit?
19           MR. ANTHONY:  Objection.  Scope and form.
20      A.  I haven't been involved in any of those
21  specific conversations.  That could be one reason,
22  yeah.
23      Q.  But it sounds like that hasn't been -- your
24  testimony in your capacity as the Amazon corporate
25  witness on the subject -- that hasn't been a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

C E R T I F I C A T E

STATE OF WASHINGTON )
                    )  ss
COUNTY OF KING      )


        I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State
of Washington, do hereby certify:  That the foregoing
Investigational Hearing of the witness named herein was
taken stenographically before me and reduced to a typed
format under my direction;

        That I am not a relative or employee of any
attorney or counsel or participant and that I am not
financially or otherwise interested in the action or
the outcome herein;

        That the Investigational Hearing, as
transcribed, is a full, true and correct transcript of
the testimony, including questions and answers and all
objections, motions and examinations and said
transcript was prepared pursuant to the Washington
Administrative Code 308-14-135 preparation guidelines.


                    _____
                    Wade J. Johnson, Certified Court
                    Reporter 2574 for the State of
                    Washington residing at Seattle,
                    Washington.
                    My CCR certification expires on
                    09/18/23.

# EXHIBIT 111

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:            )
                                  ) No. 2123050
4    AMAZON.COM, INC.             )
                                  )
5                                 )

6

7              2.7(h) Investigational Hearing

8                 AMAZON.COM, INCORPORATED

9                    JAMIL A. GHANI

10

11

                    Federal Trade Commission
12          Henry M. Jackson Federal Building
              915 Second Avenue, Suite 2896
13                 Seattle, Washington

14

15

16

17

18

19

20

21

22

23   DATE:  January 11, 2023

24   REPORTED BY:  Wade J. Johnson, RPR
                   CCR No.:  2574
25

Ghani

Amazon.com, Inc.                                                    1/11/2023

```
 1      SEATTLE, WASHINGTON; WEDNESDAY, JANUARY 11, 2023
 2                         8:34 A.M.
 3                         --oOo--
 4
 5  JAMIL A. GHANI,   deponent herein, having been
 6                    first duly sworn on oath, was
 7                    examined and testified as
 8                    follows:
 9
10                  E X A M I N A T I O N
11  BY MS. JERJIAN:
12      Q.  Good morning, Mr. Ghani.
13      A.  Good morning.
14      Q.  Can you state your name for the record.
15      A.  It's Jamil Asad Ghani.
16      Q.  And you hold the same position at Amazon as
17  you did since November 2022?
18      A.  I do, yes.
19      Q.  And you're here on behalf of Amazon, correct?
20      A.  I am.
21              MR. HALL:  Olivia, do you want to do
22  appearances?
23              MS. JERJIAN:  Yes.  Thank you.
24              I'm Olivia Jerjian.  I'm here on behalf
25  of the Federal Trade Commission, and I'm here joined by
```

Ghani

Amazon.com, Inc.                                              1/11/2023

1    my colleagues, Max Nardini and Jonathan Cohen, as well

2    as Maggie Cole and Ryan Zwonik, honors paralegals.

3                   And I'll let Mr. Hall introduce his side.

4                   MR. HALL:  Thank you.

5                   John Hall, Covington & Burling.  With me

6    are my colleagues, Kevin Kelly and Haley Johnson in the

7    room and, on the telephone, Eli Jacobs.  We represent

8    the company, Amazon.com, Inc., as well as Mr. Ghani,

9    whom the company has designated to testify on the

10   topics that you're covering today.

11                  MS. JERJIAN:  Great.

12       Q.  Mr. Ghani, can you list the ways in which a

13   customer can cancel their Prime subscription.

14       A.  There are two primary methods by which a

15   member can cancel their subscription.  It's either

16   employing the online cancelation flow or calling

17   customer service.

18       Q.  You said primary ways.  Are there any other

19   ways besides the two that you just listed?

20       A.  Those are the two ways.

21       Q.  And when you're referring to the cancelation

22   flow, is that the Iliad flow?

23       A.  I refer to it as the cancelation flow.  The

24   project name was Project Iliad, historically.

25       Q.  Who named the Iliad Project, Iliad?

7

Ghani

Amazon.com, Inc.                                      1/11/2023

1      A.  The name was in place when I came into my

2  current role and even my previous role.  So it was -- I

3  believe it was a product manager on the retention or

4  cancelation team, but that predates me.

5      Q.  But, as a corporate representative of Amazon,

6  do you not -- can you not tell me who named the Iliad

7  flow, who gave the Iliad flow its name?

8              MR. HALL:  Objection.  It's beyond the

9  scope of the time period set for the deposition today.

10  Obviously, any testimony he would give would be in his

11  personal capacity, not on behalf of the company.

12      A.  So, I -- in order to prepare for today -- I

13  did extensive work, including talking to an individual

14  who was involved with the cancelation flow even before

15  I was and also reviewed all of the documents that were

16  provided through discovery, and I was not able to

17  determine who the named individual is.  It was someone

18  on the retention, slash, cancelation team, but it

19  predates myself and another individual who predates me.

20      Q.  Who is this other individual?

21      A.  Benjamin Hills.

22      Q.  And so neither you nor Ben Hills were able --

23  know who named the Iliad flow, correct?

24              MR. HALL:  Same objection.

25      A.  Despite my best efforts to determine who named

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

10

Ghani

Amazon.com, Inc.                                                    1/11/2023

1          We both agreed, at the time, based on our best
2     knowledge, there were a series of projects, as I
3     indicated, Project Odyssey, Project Odysseus, Project
4     Iliad, that were all named in this thematic grouping.
5          And so that's my understanding, the company's
6     understanding, of why it was named that way.
7          Q.  Did Project Odyssey and Project Odysseus
8     pertain to the cancelation flow?
9          A.  Ultimately, no.  Odyssey did not.  Odyssey was
10    a project that ultimately was in the payments space.
11    And then Odysseus was another project that ultimately
12    did not move forward as such.  The ideas were
13    incorporated into other efforts with the cancelation
14    flow.  And it pertained to putting more relevant
15    information forward for members in their kind of entire
16    retention journey.
17         Q.  So Project Odysseus did pertain to the
18    cancelation flow, yes?
19              MR. HALL:  Object to the form.
20         A.  As far as -- I tend to think about the
21    retention experience as inclusive of the cancelation
22    flow, but extending into the day-to-day usage of the
23    Prime membership well before cancelation, as well.
24         Q.  And when was the Iliad flow created?
25         A.  Again, the cancelation flow -- I don't refer

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

11

Ghani

Amazon.com, Inc.                                              1/11/2023

1    to it as the Iliad flow -- it was put in place -- the
2    three-step process was put in place sometime in 2016.
3        Q.   I'm sorry, can you just explain to me what
4    distinction you're making between cancelation flow and
5    Iliad flow.
6        A.   Yes.  Iliad was the name of the project.
7    You'll find documents where the team shorthands.  This
8    is common, where the team has worked on something or
9    came to know it through the project, then continues
10   referring to the project.  I generally dissuade teams
11   from doing that because it makes the actual thing we're
12   talking about opaque to those who were not involved.
13   It's not very inclusive language.
14            So we systematically try to, once a project is
15   launched and completed, to move on and just call the
16   thing the thing, which is, it is the cancelation flow.
17   So that's how I tend to describe it and talk about it
18   and refer to it with the team.
19       Q.   So the cancelation flow dates back to 2016.
20   Is that correct?
21       A.   The cancelation flow, as it exists with three
22   elements, dates back to 2016, yes.
23       Q.   What was the goal of the Iliad project when it
24   was created?
25                   MR. HALL:   Objection.  Beyond the time

12

Ghani

Amazon.com, Inc.                                              1/11/2023

1    period of the CID.

2         A.    In 2016, best as my research has indicated,

3    the team that was operating Prime at the time, well

4    before my time at the company and in this role, was --

5    needed to implement a cancelation flow.    Previously,

6    there was, best as I understand it, a less organized

7    approach to cancelation.    It was principally through

8    customer service.

9              And so the team adopted the -- in large

10   measure -- what Audible was doing at the time and had a

11   robust online cancelation flow and which allowed

12   members to cancel simply.    And so the team adopted much

13   of what Audible was doing.    Had to create completely

14   new technology, but in terms of practice, adopted what

15   Audible had in place at the time.

16             And that became the cancelation flow for Prime

17   and has remained the cancelation flow for Prime since

18   then.

19        Q.    Is it fair to say that one of the goals of the

20   Iliad project was to divert cancelations through

21   customer service and redirect them through an online

22   cancelation flow?

23             MR. HALL:    Same objection.

24        A.    No.    Project Iliad's purpose was to create a

25   simple online cancelation process for members that

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ghani

Amazon.com, Inc.                                        1/11/2023

1    additionally provided them the necessary information in
2    order to make an informed choice.  What we have found
3    then and have found since is that members were having a
4    very inconsistent experience through the customer
5    service channel.
6            For example, one study indicated that up to
7    30 percent of members were erroneously canceled.
8    Customer service is incented to minimize call handling
9    time, and despite that, calls are, on average length,
10   5-plus minutes, sometimes 8 minutes long.  And so it
11   was creating an inconsistent experience for our members
12   and also a pretty laborious process if someone wanted
13   to, simply, on their own terms, cancel quickly.
14           And so we thought we could do much better with
15   an online cancelation flow, which we have, and today
16   and since 2016 have had, a very simple online mechanism
17   that allows members to cancel and provide relevant
18   information for them to have informed choice.
19       Q.  Can you explain what you mean by informed
20   choice.
21       A.  Prime is a multi-benefit program that we
22   believe delivers disproportionate value.  Research has
23   shown that members are often unaware of their benefits,
24   unaware of how to take advantage of their benefits.
25   And so throughout the entire experience, we work really

Ghani

Amazon.com, Inc.                                        1/11/2023

1        But we respect the decision they make in that

2   online cancelation flow, cancel, pause, or any of the

3   other options we've been discussing this morning.  But

4   then we recognize that the majority of them, the vast

5   majority of them, go on to shop on Amazon.com.

6        And so we still offer a valuable program, and

7   we want them to know that.  Not to sound too romantic

8   about it, but we're here for them if they want to

9   re-subscribe.

10        And so I think those two ideas are consistent.

11   This is a point decision in an online cancelation flow.

12   We make that simple for them.  And then -- but we also

13   recognize that the vast majority of customers go on and

14   have a relationship with Amazon, and many of them go on

15   and have a relationship with -- a membership with

16   Prime.

17        Sorry for all the romantic language.  I don't

18   mean to be romantic.  I'm just trying to describe how I

19   think about it.

20    Q.  Has Amazon received complaints about customers

21   who go through the cancelation flow, select to pause,

22   but then are charged for the subsequent billing cycle?

23    A.  I'm not aware of any such complaints.  Because

24   the pause functionality pauses the membership and stops

25   future billing cycles.

Ghani

Amazon.com, Inc.                                           1/11/2023

1        Q.   So you're not aware of any instances where
2   someone clicks pause and then is charged for next
3   month?
4        A.   In my preparation and also in my leadership of
5   the program, I am not aware of such complaints.
6        Q.   Okay.  What is Project Ice Person?
7        A.   Project Ice Person was the project to build
8   the functionality to pause.
9        Q.   Who created this project?
10       A.   It was led by the Prime team, of course, and
11   it was specifically initiated by the team, generally,
12   membership retention, cancelation, that space.
13       Q.   Who is the owner of this project?
14       A.   The managerial leader over the project was Ben
15   Hills.  And then there was -- there was a product
16   manager and software manager and what have you.  But
17   Ben Hills had managerial responsibility for it.
18       Q.   Was Simone LaHood the project manager?
19       A.   She was.  Thank you.  Simone was the product
20   manager for the delivery of the project.  I believe
21   there may have been another product manager for a short
22   period at the beginning.  But Simone, for all intents
23   and purposes, led the project, delivered the project.
24       Q.   Okay.  When did this project begin?
25       A.   Like I said, the project launched in the U.S.

117

Ghani

Amazon.com, Inc.                                                    1/11/2023

1    in 2019, I believe, and I believe it was initiated in

2    2018.  This project was very complicated, and so it was

3    a longer project than many.  And I took over

4    responsibility for the Prime program as the project was

5    rolling out and then was involved in a lot of the

6    retrospectives on the project.

7        Q.  When you say the project launched in 2019 in

8    the U.S., that means that it became effective on the

9    website at large, correct?

10       A.  Pause functionality was rolled out to

11   customers, yes.

12       Q.  Is information with respect to refunds

13   presented in the cancelation flow?

14       A.  Yes, it is.

15       Q.  Tell me what's presented with respect to

16   refunds.

17       A.  On the cancelation flow confirmation page, the

18   last page of the cancelation, the member, if eligible

19   for a refund, is presented with the amount of that

20   refund.

21       Q.  How can a customer be eligible for a refund?

22   Are there different reasons?

23       A.  It's based on usage of the membership in the

24   relevant billing period.

25       Q.  What do you mean by it's based on the usage of

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

118

Ghani

Amazon.com, Inc.                                                    1/11/2023

1    membership?

2         A.  If the member has not used their benefit at

3    all, they are eligible for a full refund.  If they have

4    used benefits below a certain threshold, for which

5    there's a logic, the member will then be offered up a

6    partial refund, a pro rata refund.  And then, if they

7    have used their benefits above that threshold, they

8    will not be eligible for a refund.

9         Q.  Is the refund automatically provided to the

10   customer, or does the customer have to request it or

11   press a button in any way in a cancelation flow to

12   obtain it?

13        A.  The customer is offered, if relevant as it

14   pertains to cancelation, the option to cancel

15   immediately, which would then trigger the logic that I

16   just walked through.  If they instead choose to

17   maintain their membership through the end of the

18   billing period, then they can select that option, and

19   then there is no refund associated with that option.

20        Q.  And when you say if relevant, you mean if the

21   customer either did not use their membership or used it

22   below the threshold.  Is that what that means?

23        A.  Let me attempt to explain it a different way.

24        Q.  Sure.

25        A.  So let's say I'm a monthly member.  I signed

159
Ghani
Amazon.com, Inc.                                    1/11/2023

1              But they are, for all intents and purposes,
2       out of the membership.  They are not getting billed.
3       They are not counted in any of the membership counts.
4       So they are out of the membership.
5              Q.  Do customers in a paused state get Prime
6       upsells, or see Prime upsells when they use Amazon?
7                       MR. HALL:  Objection.  Beyond the scope.
8              A.  Prime members who are in a paused state
9       receive offers to resume their membership.  That is the
10      specific language we use.  And, yes, they do get
11      opportunities to do that at various points in their
12      experience.
13             Q.  In their shopping experience?
14                      MR. HALL:  Objection.  Beyond the scope.
15             A.  Yes, their shopping experience.
16             Q.  Do customers in a paused state get more
17      upsells to rejoin Prime than a non-Prime customer gets
18      to sign up for Prime?
19                      MR. HALL:  Same objection, beyond the
20      scope of the notice topics.
21             A.  I do not know precisely the count of
22      non-member upsells -- let's call them that -- and the
23      precise number of paused member resume upsells.  But
24      given the locations and templates that have been
25      created in the experience to enable resumption of a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Ghani
Amazon.com, Inc.                                               1/11/2023

1   paused membership, that is far fewer than the number of

2   upsell experiences we've built over time.

3          So, while I don't know the precise number,

4   directionally, non-members have more opportunities and

5   locations where they could sign up for Prime -- from

6   non-Prime to Prime -- than a paused member could go

7   from paused to unpaused.

8          Q.  So is what happens is that a paused member can

9   just stay paused forever?

10             MR. HALL:  Same objection.

11         A.  A paused member is out of the membership, so,

12   yes, they could stay paused indefinitely.

13         Q.  Going back to Exhibit 4.

14         A.  Yes, ma'am.

15         Q.  On the second page, Interrogatory 6, you

16   respond to Interrogatory 6 -- I'm just going to read a

17   section of it.  It starts at the very bottom of page 2.

18   "Indeed, as noted above, approximately ■ percent of

19   Prime members who initiate the cancelation process

20   online complete the process and cancel their

21   membership."  That's what you were referring to earlier

22   in your testimony, correct?

23         A.  Yes.  I believe it was Exhibit 2, where we

24   reviewed line 7.

25         Q.  That's a good memory.

Ghani

Amazon.com, Inc.                                              1/11/2023

1          And it goes on to say "And members who

2     initiate the cancelation process online but ultimately

3     decide to retain their Prime memberships on average

4     take greater advantage of their Prime benefits as

5     compared to members who did not initiate the process."

6     I'm not going to read the rest of it, but did I read

7     that clause correctly?

8          A.   You did.

9          Q.   How many individuals who initiate the

10    cancelation process ultimately decide to retain their

11    Prime membership but then go on not to use their Prime

12    benefits?  How many customers are in that situation on

13    average?

14               MR. HALL:   Object to the form.

15          A.   I do not have that specific metric on the top

16    of my mind, but, per Exhibit 2 table, anywhere between

17    20 to 28 percent over the 2018 to 2021 period leave the

18    cancelation flow and do not cancel.  Of those, as it

19    cites here, on average, they use their benefits more

20    than a like-for-like kind of cohort analysis of folks

21    that did not, otherwise similar customers, except for

22    having not visited the cancelation flow.

23          And, additionally, 70 percent of members who

24    visit the cancelation flow use their benefits in the

25    next 30 days.

C E R T I F I C A T E

STATE OF WASHINGTON )
                     )  ss
COUNTY OF KING       )


        I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State
of Washington, do hereby certify:  That the foregoing
Investigational Hearing of the witness named herein was
taken stenographically before me and reduced to a typed
format under my direction;

        That I am not a relative or employee of any
attorney or counsel or participant and that I am not
financially or otherwise interested in the action or
the outcome herein;

        That the Investigational Hearing, as
transcribed, is a full, true and correct transcript of
the testimony, including questions and answers and all
objections, motions and examinations and said
transcript was prepared pursuant to the Washington
Administrative Code 308-14-135 preparation guidelines.


                    _____
                    Wade J. Johnson, Certified Court
                    Reporter 2574 for the State of
                    Washington residing at Seattle,
                    Washington.
                    My CCR certification expires on
                    09/18/23.

# EXHIBIT 112

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    AMAZON.COM, INC.               ) No. 2123050

5

6

7                    Investigational Hearing

8                        JAMIL A. GHANI

9

10

                      Federal Trade Commission
11             Henry M. Jackson Federal Building
                915 Second Avenue, Suite 2896
12                   Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23    DATE:  November 16, 2022

24    REPORTED BY:  Wade J. Johnson, RPR
                       CCR No.:  2574
25

Ghani

Amazon.com, Inc.                                              11/16/2022

```
 1        SEATTLE, WASHINGTON; WEDNESDAY, NOVEMBER 16, 2022
 2                        8:38 A.M.
 3                        --oOo--
 4
 5              MR. COHEN:  Let's go on the record.
 6              Good morning, Mr. Ghani.
 7              THE WITNESS:  Good morning.
 8              MR. COHEN:  My name is Jonathan Cohen.  I
 9   am an attorney with the Federal Trade Commission and
10   the hearing official in the capacity of this
11   investigational hearing.
12              Before we proceed, I'm going to ask you
13   your name, we're going to introduce everybody, get
14   their names on the record, and we'll swear you in.
15              And you are, sir?
16              THE WITNESS:  I am Jamil Asad Ghani.
17              MR. COHEN:  As I mentioned, I am Jonathan
18   Cohen.  With me today is my co-counsel, Max Nardini.
19   We have also in the room with us Elena Hoffman, a
20   paralegal, and then we have Jake Frech and Ryan Zwonik
21   on the phone.
22              Mr. Hall?
23              MR. HALL:  John Hall, Covington &
24   Burling, for the witness, Mr. Ghani.  With me from my
25   firm, in the room, Lelia Ledain, Mark Capuano, and, on
```

6

Ghani

Amazon.com, Inc.                                              11/16/2022

1   the telephone, Jayne Ponder.

2                   MR. COHEN:  Mr. Hall, you'll comply with

3   the Commission's order with respect to today's

4   proceedings?

5                   MR. HALL:  I will comply with my

6   professional obligations and the agency's rules as

7   ordered by the Commission.

8                   I trust you will, too.

9                   MR. COHEN:  Yes.

10                  If you would swear the witness, please.

11

12  JAMIL A. GHANI,        deponent herein, having been

13                         first duly sworn on oath, was

14                         examined and testified as

15                         follows:

16

17                  E X A M I N A T I O N

18  BY MR. COHEN:

19      Q.  Good morning again, Mr. Ghani.  Have you been

20  deposed before?

21      A.  I was deposed once before.

22      Q.  And that was in a different FTC matter?

23      A.  Yes, it was.

24      Q.  You probably sort of generally understand the

25  rules.  I'll just make a couple of points, and you let

267

Ghani

Amazon.com, Inc.                                                11/16/2022

1    day, and that has been true the entire time I've been

2    at Prime.

3         Q.   And so it was true, the entire time you've

4    been at Prime, that you could have simplified the flow,

5    but it wasn't being done before, and now it is being

6    done, correct?

7                   MR. HALL:  Object to form.

8         A.   Like all the other experiences that we offer

9    our members, we're constantly improving them, so --

10   those improvements are not predicated on a named

11   project.

12        Q.   Why was this not made a priority earlier?  Why

13   was Project Café-type changes, why were they not made a

14   priority earlier?

15        A.   I believe I just said that improving the

16   cancelation flow has been a priority throughout my

17   entire time.  We are constantly making improvements to

18   the cancelation flow.

19        Q.   Why wasn't this project instituted or incepted

20   in, let's say 2020, so that it would have already been

21   completed?

22                   MR. HALL:  Object to form.

23        A.   The team was working on a variety of topics

24   across all of Prime, Prime's business, including the

25   cancelation flow.  As I said before, changes were being

Ghani

Amazon.com, Inc.                                          11/16/2022

1    made.  This particular named project and the technical

2    resources necessary to get those changes made were

3    first pulled together, I believe in late 2020.

4        Q.  And why were they not pulled together earlier?

5    That's what I'm asking.

6        A.  Well, one explanation is I only took over the

7    role at the end of 2019.  And so, in 2020, we also

8    faced a global pandemic, and so we were dealing with a

9    lot of things.  And so we started work, I believe in

10   late 2020, and then started working -- these are not

11   insubstantial changes to make around the world in a

12   core experience.

13       Q.  I'll direct you to line 141 on this page,

14   which is 8121.  "These changes represent a significant

15   step towards our strategy, and we expect them to reduce

16   customer frustrations and address complaints submitted

17   to regulators, which seem to be primarily concerned

18   with the number of steps/clicks to cancel."

19       Did I read that correctly?

20       A.  You did read it correctly.

21       Q.  Part of the purpose of Project Café is to

22   address complaints submitted to regulators, correct?

23       A.  I think the sentence says, "We expect them to

24   reduce customer frustrations."  That was the primary

25   focus, improving the experience.  And, additionally,

Ghani

Amazon.com, Inc.                                              11/16/2022

1    the team -- I didn't write this document -- is stating

2    that it also addresses the concerns that had been

3    raised by regulators.

4         Q.  So part of -- I'll just leave it at that.

5             Let's go on to this document, which has been

6    marked as 19?

7                        (Exhibit 19 marked for

8                         identification.)

9             MR. COHEN:  Here's your copy, Mr. Hall.

10            MR. HALL:  Thank you.

11        Q.  You wrote at the top, on the first email,

12   "Maintaining P&C," correct?

13        A.  I did, yes.

14        Q.  What does that mean?

15        A.  Maintaining privileged and confidentiality or

16   confidential.

17        Q.  What does maintaining privileged and

18   confidential mean?

19        A.  That I wanted to make sure that there was no

20   ambiguity that this correspondence was seeking the

21   input of Praju Tuladhar, my lawyer.

22        Q.  So, when you wrote, "Here are my notes.

23   Hopefully, you can see them, created with PDF Expert,"

24   and then went on from that, "Happy to" -- you went on

25   from that, you were seeking Mr. Tuladhar's input into

```
 1              C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         )  ss
 3   COUNTY OF KING      )

 4

 5           I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
 6   administer oaths and affirmations in and for the State
     of Washington, do hereby certify:  That the foregoing
 7   Investigational Hearing of the witness named herein was
     taken stenographically before me and reduced to a typed
 8   format under my direction;

 9           That I am not a relative or employee of any
     attorney or counsel or participant and that I am not
10   financially or otherwise interested in the action or
     the outcome herein;

11
             That the Investigational Hearing, as
12   transcribed, is a full, true and correct transcript of
     the testimony, including questions and answers and all
13   objections, motions and examinations and said
     transcript was prepared pursuant to the Washington
14   Administrative Code 308-14-135 preparation guidelines.

15

16                   Wade J. Johnson, Certified Court
                     Reporter 2574 for the State of
17                   Washington residing at Seattle,
                     Washington.
18                   My CCR certification expires on
                     09/18/23.

19

20

21

22

23

24

25
```

# EXHIBIT 113

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:            )
                                  ) No. 2123050
4    AMAZON.COM, INC.             )
                                  )
5                                 )

6

7                    Investigational Hearing

8                         KATEY MUUS

9

10

                     Federal Trade Commission
11            Henry M. Jackson Federal Building
                915 Second Avenue, Suite 2896
12                   Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23    DATE:  October 25, 2022

24    REPORTED BY:  Wade J. Johnson, RPR
                     CCR No.:  2574
25

6

Muus

Amazon.com, Inc.                                          10/25/2022

```
1          SEATTLE, WASHINGTON; TUESDAY, OCTOBER 25, 2022
2                          8:28 A.M.
3                          --oOo--
4
5               MR. COHEN:  Let's go on the record.
6               Good morning.  Could you please state
7     your name for the record?
8               THE WITNESS:  Yes.  Katey Muus.
9               MR. COHEN:  Ms. Muus, before we continue,
10    I'm going to have counsel introduce themselves just for
11    the record.
12              My name is Jonathan Cohen, and I'm an
13    attorney with the Federal Trade Commission and Division
14    of Enforcement.  I'm also acting as the hearing
15    official on today's proceeding.
16              With me today is my co-counsel, Max
17    Nardini.
18              And, Counsel?
19              MR. ANTHONY:  Stephen Anthony, of the law
20    firm of Covington & Burling.  I'm here on behalf of the
21    witness.
22              MS. RUTHERFORD:  Amanda Rutherford, also
23    from Covington.
24              MR. COHEN:  Also on behalf of the
25    witness?
```

7

Muus

Amazon.com, Inc.                                              10/25/2022

```
1                    MS. RUTHERFORD:  Also on behalf of the
2       witness.
3                    MR. COHEN:  And, Marc, on the phone?
4                    MR. CAPUANO:  Yeah.  This is Marc
5       Capuano, from Covington, on behalf of the witness.
6                    MR. COHEN:  Sir, could you please swear
7       the witness.
8
9       KATEY MUUS,        deponent herein, having been
10                         first duly sworn on oath, was
11                         examined and testified as
12                         follows:
13
14                    E X A M I N A T I O N
15      BY MR. COHEN:
16          Q.  Good morning.  Again, just with some basics.
17      Have you ever been -- I assume the answer is no to
18      this -- but have you ever been interviewed or examined
19      as part of a government investigation previously?
20          A.  No, I have not.
21          Q.  Have you ever been deposed previously?
22          A.  No.
23          Q.  I'm going to ask you some questions and just
24      there's two things that I want you to focus on.
25      There's lots of things to focus on, but there's two in
```

Muus

Amazon.com, Inc.                                          10/25/2022

1    I was in this role on this subject.

2        Q.  You testified previously though that the only

3    evidence of nonconsensual enrollment is anecdotal.  Did

4    I understand that correctly, or I misunderstood?

5            MR. ANTHONY:  Objection.  The witness's

6    testimony speaks for itself.

7        A.  That's what I recall.  It's anecdotal data.

8        Q.  So you don't know, one way or the other,

9    whether there was data that was not anecdotal data?

10       A.  Not that I recall.

11       Q.  Do you recall reviewing or -- reviewing data

12   having to do usage patterns?

13       A.  No, I do not recall, having to do with usage

14   patterns.

15       Q.  Do you recall data having to do with reports

16   to customer service?

17       A.  I have seen data about customer service

18   reports.  I don't recall that off the top of my head.

19       Q.  In your view, just sitting here today, as

20   someone with a significant experience in UX design, is

21   the Prime cancelation flow simple?

22           MR. ANTHONY:  Objection.  That question

23   calls for a legal conclusion.

24           You may answer.

25       A.  In reviewing -- I haven't looked at it in at

33

Muus

Amazon.com, Inc.                                      10/25/2022

```
 1    least over a year, but the last audit that I reviewed,
 2    that was a competitive analysis, showed that our
 3    cancelation flow had less steps than competitors.
 4              MR. COHEN:  I'm going to move to strike
 5    that answer as nonresponsive.
 6              Mr. Reporter, could you please read back
 7    the question.
 8                   (The previous question was
 9                    read back.)
10              MR. ANTHONY:  Object to the question.
11    The witness has already answered.
12              If you have anything to add, you may.
13       A.  Well, I think I had testified earlier really,
14    if I recall correctly, that I haven't -- I haven't made
15    recommendations on the cancelation flow.  So I'm not
16    intimately familiar with the details of the cancelation
17    flow.  I have looked at competitive analysis of it, and
18    the determination I made from that was that it was
19    simple.
20       Q.  So you did make that determination at the time
21    you reviewed the competitive analysis?
22       A.  That it was simple in comparison to
23    competitors.
24       Q.  It was simple in comparison to competitors.
25       A.  Yes.
```

Muus

Amazon.com, Inc.                                                    10/25/2022

```
 1        Q.   That wasn't my question.   Did you determine
 2   that it was simple?
 3                  MR. ANTHONY:   Objection.   The question is
 4   argumentative.
 5                  You may answer.
 6        A.   Again, I viewed it in the context of
 7   competitor analysis.
 8        Q.   But you did, at that point in time, reach a
 9   conclusion.   When I say point in time, when you
10   reviewed the comparative analysis.   And that conclusion
11   was that it was simple in comparison to competitors?
12        A.   That is correct.
13        Q.   Did you record that conclusion anywhere?
14        A.   Not that I recall.
15        Q.   That was just a conclusion that was in your
16   mind?
17        A.   That's what I recall.
18        Q.   In what respects was it simpler than
19   competitors?
20        A.   My recollection is that it has less steps and
21   that the wording was more clear.   That's my
22   recollection.
23        Q.   What were the competitors if you recall?
24        A.   I know Walmart was one.   Jet.com was one.   I
25   believe there were others, but I don't remember.
```

35

Muus

Amazon.com, Inc.                                                    10/25/2022

1        Q.  Was there ever a point in time when anyone
2    expressed in any way concern to you that the
3    cancelation flow was not simple?
4        A.  There were members of the research team, one
5    in particular, who was concerned that the cancelation
6    flow was not simple enough.
7        Q.  One of those members was Mr. Nelson?
8        A.  That is correct.
9        Q.  Were there any others?
10       A.  His manager, Mary Pat Gtoschall.
11       Q.  Were there others?
12       A.  Not that I recall.
13       Q.  If you recall, what were Ms. Gtoschall's
14    reasons for her concerns that the cancelation flow was
15    not simple?
16                MR. ANTHONY:  Objection to the form.
17       A.  I don't recall what Mary Pat's reasoning was.
18                MR. COHEN:  Let's mark as KM-1 -- and I'm
19    providing a copy to counsel -- a document Bates No.
20    98548.
21                        (Exhibit KM-1 marked for
22                         identification.)
23       Q.  Ma'am, I direct you to the very first line.  I
24    apologize if I mispronounce this individual's name,
25    "Hi, Vignesh."  And it looks like that's Vignesh,

42

Muus

Amazon.com, Inc.                                        10/25/2022

  1     Q.  But you don't recall anything else about the
  2  Subscription Clarity Initiative?
  3     A.  No.
  4     Q.  It certainly wasn't something that was a focus
  5  of your tenure to date or has been a focus of your
  6  tenure to date?
  7     A.  Not at all.
  8         MR. ANTHONY:  Object to the form.
  9     A.  No.
10     Q.  Not at all, was your answer?
11     A.  Mm-hmm.
12     Q.  This is not something that was a priority for
13  you?
14         MR. ANTHONY:  Object to the form.
15     A.  I wouldn't state it that way.  It's not a
16  prioritization issue, it's an ownership issue.  I don't
17  own Prime signup flow.
18     Q.  Well, Mr. Nelson and his colleagues are on
19  your team, right?
20         MR. ANTHONY:  Object to the form.
21     A.  Mr. Nelson was -- he was a skip level report
22  of mine.
23     Q.  So he was an indirect report?
24     A.  Correct.
25     Q.  Because he reported to Mary Pat Gtoschall?

43

Muus

Amazon.com, Inc.                                                    10/25/2022

```
 1        A.  That's correct.

 2        Q.  And Mary Pat Gtoschall reported to you?

 3        A.  That's correct.

 4        Q.  And both Mr. Nelson and Ms. Gtoschall were

 5  working hard on issues related to subscription clarity,

 6  weren't they?

 7              MR. ANTHONY:  Object to the form.

 8        A.  They were working on it.

 9        Q.  Were you pleased with their work?

10        A.  I was concerned that the way they were

11  approaching work was not getting any traction.

12        Q.  Why did you have that concern?

13        A.  The data that was being brought up by Reid,

14  because it was so anecdotal, and the hyperbolic way in

15  which he expressed it to other teams that he wanted to

16  do the things that he recommended, was not impactful or

17  effective.

18        Q.  So, if I understand your testimony correctly,

19  you were dissatisfied with their work because of the

20  way they were presenting their recommendation?

21              MR. ANTHONY:  Object to the form.  The

22  testimony speaks for itself.

23        A.  Yeah, I wouldn't say dissatisfied.  It just

24  wasn't effective.  And it was unclear whether the

25  hypotheses that they had were actually the right things
```

44

Muus

Amazon.com, Inc.                                        10/25/2022

1    to do.

2        Q.  Why was it unclear to you whether the

3    hypotheses that they had were actually the right things

4    to do?

5        A.  So everything we do with design at Amazon is

6    an experiment, right?  We're constantly experimenting

7    to learn what is the best thing for customers.  And

8    what may be good today may be different tomorrow.  And

9    that's why we're constantly experimenting with new

10   designs.

11           And the tone that I recall from the

12   correspondence from Reid was somewhat of an outlier

13   opinion that there was a simple or singular way that we

14   could do something that would fix what he perceived to

15   be problems.  And that -- there was no evidence that

16   that was correct.

17       Q.  You testified -- what did you understand the

18   problem that he was identifying for which you have just

19   testified there was no evidence of?

20           MR. ANTHONY:  Objection to the form.

21           You may answer.

22       Q.  I'll ask it a different way.  He was proposing

23   some changes, right?

24       A.  He had some strong opinions about changes that

25   should be made.

Muus

Amazon.com, Inc.                                                10/25/2022

```
 1        Q.  And you, I think, testified that there was no
 2   evidence that those changes would be effective?
 3              MR. ANTHONY:  Object to the
 4   characterization of her testimony.
 5              You may respond.
 6        A.  Can you ask again?
 7        Q.  From your perspective, was there evidence the
 8   changes he was proposing would be effective?
 9        A.  I wouldn't know that without running any
10   experiments.
11        Q.  And so you believed that -- at least sitting
12   here today -- you're not aware of any evidence that
13   those changes that Mr. Nelson was proposing would have
14   been effective?
15        A.  No, I'm not.
16        Q.  Let's stay on the paragraph, the top paragraph
17   on the page that's 99490.  The second sentence
18   Mr. Nelson writes, "The goal of this initiative is to
19   drive cross-company adaptation of high-clarity CX
20   patterns that ensure customers are in control of key
21   membership actions, such as signup, cancelation, and
22   renewal."  Did I read that correctly?
23        A.  That is what this says.
24        Q.  Given that you're not familiar with the
25   Subscription Clarity Initiative, you have no view one
```

185

Muus

Amazon.com, Inc.                                           10/25/2022

1       A.   That is how I would interpret these blue dots.

2       Q.   The description here is that, in the lower

3   left, "Currently, it takes multiple taps to find the

4   cancelation flow and three additional steps to complete

5   it, leaving customers feeling frustrated by how

6   complicated it is."  Did I read that correctly?

7       A.   That is what it says.

8       Q.   That's a critique that you've heard before at

9   Prime -- excuse me -- that you've heard before at

10  Amazon?

11      A.   What is it you're asking me if I've heard

12  before?

13      Q.   The critique in the lower left, the critique

14  is -- critique is not fair -- there's a statement in

15  the lower left, "Currently, it takes multiple taps to

16  find the cancelation flow and three additional steps to

17  complete it, leaving customers feeling frustrated by

18  how complicated it is."

19              MR. ANTHONY:  And the question is whether

20  that's an observation she's heard before?

21      Q.   Yes.  Is that an observation you have heard

22  before at Amazon, or is this the first time you're

23  seeing this?

24      A.   I have heard this conclusion be drawn before.

25  The first half of this is a factual statement, and the

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

186

Muus

Amazon.com, Inc.                                    10/25/2022

1  second half is a conclusion that's being drawn from it,

2  and I've heard that being drawn before.

3      Q.  And from whom have you heard that?

4      A.  Reid Nelson and Mary Pat Gotschall.

5      Q.  Have you been -- in any of the three meetings

6  that we've mentioned, has that opinion been expressed,

7  that customers feel frustrated by how complicated it

8  is?

9      A.  I don't recall.

10      Q.  In any of the three meetings that we've

11  discussed, has anyone discussed the number of taps that

12  it takes to complete the cancelation process?

13      A.  There was a discussion of the number of taps

14  in comparison to competitors.

15      Q.  Any other discussion?

16      A.  Not that I recall.

17      Q.  What was the conclusion of the discussion in

18  terms of the comparison?  What was the conclusion of

19  the discussion in terms of the comparison?

20      A.  That the Prime flow was superior.

21      Q.  Superior defined how?

22      A.  Number of clicks and clarity of instructions.

23      Q.  Are there any other metrics besides click

24  number and instruction clarity that, in your opinion,

25  from a perspective of a UX designer, are important in

187

Muus

Amazon.com, Inc.                                          10/25/2022

1   determining the simplicity or complexity of a flow like

2   this one?

3            MR. ANTHONY:  Object to the form.

4        A.  There are a number of different metrics that

5   you could potentially apply here.  One would be timing,

6   doing a time on task study, to see how long it takes a

7   customer -- to do a think aloud study, where customers

8   tell you whether they understand what's going on.

9   There's multiple different ways that you could kind of

10  test that out.  I'm sure that there are quantitative

11  measures you could take in a WebLab format, as well.

12       Q.  Time on task would not be a quantitative

13  measure?

14       A.  So time on task would be a quantitative

15  measure.  Thank you for that, allowing me to clarify

16  that.  It would be probably not something we would get

17  statistical significance on, the way we would in a

18  WebLab, a WebLab being an A/B test that Amazon does.

19       Q.  Do you know whether time on task studies done

20  with respect -- were time on task studies done with

21  respect to the flow that we're looking at here?

22       A.  Not that I'm aware of.

23       Q.  What about with respect to other Prime

24  cancelation flows, such as desktop?

25       A.  Not that I'm aware of.

1                  C E R T I F I C A T E

2   STATE OF WASHINGTON )
                        )   ss
3   COUNTY OF KING      )

4

5           I, the undersigned Washington Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
6   administer oaths and affirmations in and for the State
    of Washington, do hereby certify:  That the foregoing
7   Investigational Hearing of the witness named herein was
    taken stenographically before me and reduced to a typed
8   format under my direction;

9           That I am not a relative or employee of any
    attorney or counsel or participant and that I am not
10  financially or otherwise interested in the action or
    the outcome herein;

11
            That the Investigational Hearing, as
12  transcribed, is a full, true and correct transcript of
    the testimony, including questions and answers and all
13  objections, motions and examinations and said
    transcript was prepared pursuant to the Washington
14  Administrative Code 308-14-135 preparation guidelines.

15

16                  Wade J. Johnson, Certified Court
                    Reporter 2574 for the State of
17                  Washington residing at Seattle,
                    Washington.
18                  My CCR certification expires on
                    09/18/23.

19

20

21

22

23

24

25

# EXHIBIT 114

# In the Matter of:

## Amazon.com, Inc.

*January 20, 2023*
*Lisa Leung*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

```
 1              FEDERAL TRADE COMMISSION
 2
 3   In the Matter of:          )
 4   AMAZON.COM, INC.,          ) File No. 212-3050
 5            a corporation. )
 6   -----------------------------)
 7                    Friday, January 20, 2023
 8
 9                    Room 10102
10                    Federal Trade Commission
11                    Constitution Center
12                    400 7th Street, S.W.
13                    Washington, D.C.  20024
14
15        The above-entitled matter came on for
16   investigational hearing, pursuant to
17   civil investigative demand, at 9:37 a.m.
18
19
20
21
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4        JONATHAN COHEN, ESQ.
 5        MAX NARDINI, ESQ.
 6        OLIVIA JERJIAN, ESQ. (p.m. session)
 7        U.S. Federal Trade Commission
 8        Bureau of Consumer Protection
 9        Enforcement Division
10        600 Pennsylvania Avenue, N.W.
11        Washington, D.C.  20580
12        (202) 326-2551
13        jcohen2@ftc.gov
14
15   ON BEHALF OF AMAZON.COM, INC. AND THE WITNESS:
16        LAURA FLAHIVE WU, ESQ.
17        MARC P. CAPUANO, ESQ.
18        ELI JACOBS, ESQ. (via phone)
19        ANDREW SIEGEL, ESQ. (via phone)
20        Covington & Burling LLP
21        One CityCenter
22        850 Tenth Street, N.W.
23        Washington, D.C.  20001-4956
24        (202) 662-5982
25        lflahivewu@cov.com
```

**3**

```
 1   APPEARANCES: (continued)
 2
 3
 4   ALSO PRESENT:
 5        MARGARET COLE, Honors Paralegal - FTC
 6        JACOB FRECH, Honors Paralegal - FTC
 7        ELENA HOFFMAN, Honors Paralegal - FTC
 8        MICHAEL MACKO, ESQ. - Amazon
 9        WILLIAM J. VIOLETTE, Economist - FTC
10        RYAN ZWONIK, Honors Paralegal - FTC
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1              FEDERAL TRADE COMMISSION
 2                    I N D E X
 3
 4   WITNESS:       EXAMINATION:          PAGE
 5   LISA LEUNG      BY MR. COHEN            8
 6
 7
 8              EXHIBITS MARKED
 9   EXHIBIT    DESCRIPTION           FOR ID
10   Number1    Selected Amazon CID      10
             Responses FTC
11           Matter 2125030
12   Number2    Appendix A to January 5, 10
             2023 Production Letter FTC
13           Matter 2125030
14   Number3    AMZN_00099853-00099857,  28
             1-29-2019 email from
15           Cem Sibay to Pranav Mittal,
             et al.
16
17   Number4    AMZN_00045461-00045469,  37
             1-5-2020 email from
18           Nikki Baidwan to
             Benjamin Hills, et al.
             w/attachment
19
     Number5    AMZN_00099747-00099748,  40
20           5-18-2020 email from
             Erik Schmitz to
21           Reid Nelson, et al.
22   Number6    AMZN_00022492-00022495, 121
             2-6-2021 email from
23           Nikki Baidwan to
             Jamil Ghani
24
25
```

Leung

Amazon.com, Inc.                                                    1/20/2023

---

5

| | EXHIBIT | DESCRIPTION | FOR ID |
|---|---|---|---|
| 1 | | | |
| 2 | Number7 | AMZN_00028275-00028276, | 127 |
| | | 7-16-2019 email from | |
| 3 | | Russell Grandinetti to | |
| | | Omar Kalim, et al. | |
| 4 | | | |
| 5 | Number8 | AMZN_00096140-00096163, | 213 |
| | | 9-28-2018 email from | |
| | | Jake Burghardt to | |
| 6 | | Chee Chew, et al. | |
| | | w/attachments | |
| 7 | | | |
| 8 | Number9 | AMZN_00095830-00095843, | 248 |
| | | 6-17-2019 email from | |
| | | Masuma Henry to | |
| 9 | | Russell Grandinetti, et al. | |
| | | w/attachments | |
| 10 | | | |
| | Number10 | AMZN_00028277-00028285, | 270 |
| 11 | | 7-15-2019 email from | |
| | | Omar Kalim to Masuma Henry | |
| 12 | | w/attachment | |
| 13 | Number11 | AMZN_00059691-00059701, | 297 |
| | | 7-24-2020 email from | |
| 14 | | Caroline Moeller to | |
| | | Neil Lindsay, et al. | |
| 15 | | w/attachment | |
| 16 | Number12 | AMZN_00091284-00091292, | 313 |
| | | 10-27-2020 email from | |
| 17 | | Sanjay Balakrishnan to | |
| | | Nahshon Davidai, et al. | |
| 18 | | w/attachment | |
| 19 | Number13 | AMZN_00022861-00022870, | 332 |
| | | 12-3-2020 email from | |
| 20 | | Rex Morey to Jamil Ghani, | |
| | | et al. w/attachment | |
| 21 | | | |
| | Number14 | AMZN_00058595-00058607, | 342 |
| 22 | | 12-16-2020 email from | |
| | | Reid Nelson to Katey Muus, | |
| 23 | | et al. w/attachment | |
| 24 | | | |
| 25 | | | |

---

6

| | EXHIBIT | DESCRIPTION | FOR ID |
|---|---|---|---|
| 1 | | | |
| 2 | Number15 | AMZN-MGM-2R-003149387 | 372 |
| | | through | |
| 3 | | AMZN-MGM-2R-003149394 | |
| | | (clawed back) | |
| 4 | Number16 | 12-23-2022 letter to | 399 |
| | | Jonathan Cohen from | |
| 5 | | Benjamin Langner | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

---

7

              P R O C E E D I N G S
1
2                 -  -  -  -  -
3          MR. COHEN:  Good morning.
4          MS. LEUNG:  Good morning.
5          MR. COHEN:  If you could state your name for
6     the record, and then I'm going to ask Madam Reporter to
7     swear you in.
8          MS. LEUNG:  Yes.
9          My name for the record is Lisa Leung.
10                -  -  -  -  -
11    Whereupon --
12                 LISA LEUNG
13    a witness, called for examination, having been first
14    duly sworn, was examined and testified as follows:
15         MR. COHEN:  Thank you.
16         And my name is Jonathan Cohen.  I'm an
17    attorney with the Federal Trade Commission in the
18    Division of Enforcement, and I'm also serving as the
19    hearing officer in today's investigational hearing.
20         On my side of the table is my co-counsel,
21    Max Nardini, as well as some honors paralegals from our
22    office -- I think we have actually the whole crew
23    here -- Maggie Cole, Ryan Zwonik, Jacob Frech and
24    Elena Hoffman.
25         Also listening on the phone from our

---

8

1     Bureau of Economics is Will Violette.
2          Do you want to go ahead?
3          MS. WU:  Sure.
4          Good morning.
5          Laura Flahive Wu of Covington & Burling for the
6     witness and Amazon.
7          With me today in the room is Marc Capuano, also
8     of Covington & Burling, and in-house counsel from
9     Amazon, Mike Macko.
10         On the line we also have two colleagues from
11    Covington, Eli Jacobs and Andrew Siegel.
12         MR. COHEN:  Thank you.
13                -  -  -  -  -
14               EXAMINATION
15    BY MR. COHEN:
16    Q.  I'm going to get going with some sort of
17    preliminary things, and just let me just ask right off
18    the top, have you ever been deposed before?
19    A.  No, I have not.
20    Q.  Okay.  There's a first time for everything.
21         I'm going to give you a couple of kind of basic
22    rules and the -- you know, we're -- this is a little
23    bit of a different situation because I suspect you
24    understand and I'm like going to ask you that you're
25    testifying on behalf of the company today.  Let's start

---

2 (Pages 5 to 8)

Leung

Amazon.com, Inc.                                                    1/20/2023

---

113

1          BY MR. COHEN:
2          Q. What about an instance in which there was a
3    discussion and Mr. Grandinetti gave a direction that
4    was consistent with that discussion?  Would you
5    consider -- would the company consider Mr. Grandinetti
6    to have participated in the decision?
7          MS. WU:  Objection to form.
8          THE WITNESS:  That's an unusual
9    characterization.  I generally don't think of -- we
10   don't at Amazon generally classify someone as the
11   decision maker.  We really do have it be a group
12   discussion, and we arrive sometimes, not always, on a
13   path forward.  We generally don't characterize someone
14   as the decision maker.
15         BY MR. COHEN:
16         Q. You don't consider Mr. Bezos to be a decision
17   maker?
18         MS. WU:  Objection to form and scope.
19         Is this with regard to Prime enrollment,
20   Counsel?
21         THE WITNESS:  Can you be more specific?  I
22   can't opine on every -- every discussion that
23   Jeff Bezos has.
24         BY MR. COHEN:
25         Q. Just in your personal capacity, do you consider

---

114

1    Mr. Bezos to be a decision maker at Amazon?
2          MS. WU:  Objection to form and scope.
3          THE WITNESS:  In my personal capacity, I can't
4    say that Jeff Bezos is the decision maker in every
5    case.  I genuine -- we genuinely have these discussions
6    where teams present their viewpoints, and Jeff may
7    agree or disagree.
8          BY MR. COHEN:
9          Q. So Jeff Bezos is a decision maker in some
10   cases, in your personal experience.
11         MS. WU:  Objection to form and scope.
12         With regard to what topics, Counsel?
13         THE WITNESS:  Can you be more specific?
14         BY MR. COHEN:
15         Q. With regard to any topics, is it your view that
16   Jeff Bezos is a decision maker with respect to no
17   topics or that he is a decision maker with respect to
18   at least some topics?
19         MS. WU:  Objection to form and scope.
20         THE WITNESS:  Once again, it's difficult -- we
21   don't classify someone as a decision maker.  It's -- we
22   really don't go into meetings and say this person is
23   the decision maker.  We go into the discussion with a
24   recommendation from the team as to how to proceed and
25   we have that discussion, and so the decision is made by

---

115

1    the group and by the process of the discussion.
2          BY MR. COHEN:
3          Q. You're aware, are you not, that -- of something
4    called Project Lucent?
5          MS. WU:  Objection to form.
6          THE WITNESS:  Yes, I am.
7          BY MR. COHEN:
8          Q. Okay.  Just in general, what was
9    Project Lucent?
10         MS. WU:  Objection to form.
11         THE WITNESS:  Project Lucent is a code name, a
12   team name, a project name, that refers to multiple
13   content experimentations on our enrollment flow.
14         BY MR. COHEN:
15         Q. And there were certain potential revisions or
16   changes to the enrollment flow that were proposed as a
17   result of Project Lucent; correct?
18         MS. WU:  Objection to form.
19         THE WITNESS:  Correct.
20         BY MR. COHEN:
21         Q. Okay.  And those were not implemented in --
22   well, I'll stop there.  I'll make it -- withdraw the
23   question.
24         Those were not implemented; correct?
25         MS. WU:  Objection to form.

---

116

1          Could you clarify the time period, Counsel.
2          BY MR. COHEN:
3          Q. Were those ever implemented?
4          A. So, yeah, can you clarify the time period?
5          Q. Ever.
6          A. The -- Project Lucent included multiple changes
7    to the enrollment period.  Some of those changes in
8    similar forms were tested during the time period of
9    Project Lucent, they were also tested prior to
10   Project Lucent, as well as after.
11         Q. But not all of the changes that Project Lucent
12   put forth were implemented, let's say, in 2018;
13   correct?
14         MS. WU:  Objection to form.
15         THE WITNESS:  As I mentioned before,
16   Project Lucent covers multiple changes to the
17   enrollment flow.  Those changes we have made similar
18   changes before and also have made similar changes after
19   that as well.
20         BY MR. COHEN:
21         Q. So -- okay.  Let's stick with the fact that
22   some changes were made.
23         Can you give me an example of a particular
24   change that Project Lucent considered that was
25   ultimately made?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Leung

Amazon.com, Inc.                                                    1/20/2023

117

1       MS. WU:  Objection to form.
2       THE WITNESS:  Project Lucent included multiple
3   changes to the enrollment flow, and some of those
4   changes were made afterwards as well.
5       BY MR. COHEN:
6       Q.  Can you give me an example of a change that
7   Project Lucent considered that was ultimately made?
8       MS. WU:  Objection to form.
9       THE WITNESS:  Project Lucent included changes
10  to the positive call to action, the CTA, and some of
11  those changes are present in the experience today.
12      BY MR. COHEN:
13      Q.  Okay.  Who at Amazon decided to make those
14  changes, the one that you just identified or ones that
15  you just identified?
16      MS. WU:  Objection to form.
17      THE WITNESS:  In the example that I just
18  identified, which is changes to the positive call to
19  action on the enrollment experience, that decision
20  would have been made by the Prime team.
21      BY MR. COHEN:
22      Q.  The Prime team.
23      It wasn't made by anybody in particular on the
24  Prime team?
25      MS. WU:  Objection to form.

118

1       THE WITNESS:  On the changes to the positive
2   CTA -- so I'm trying to be very specific here -- they
3   would have been made by the Prime team, not any one
4   person in particular.
5       BY MR. COHEN:
6       Q.  The company would then agree with me that
7   everyone on the Prime team has responsibility for that
8   decision; correct?
9       MS. WU:  Objection to form.
10      THE WITNESS:  That is incorrect.  We wouldn't
11  assume -- the Prime team has hundreds of individuals.
12  Some work on the signup experience.  Some don't work on
13  the signup experience.  And employees that don't work
14  on the signup experience would not be responsible for
15  the signup experience.
16      BY MR. COHEN:
17      Q.  So employees on the Prime team who work on the
18  signup experience were responsible for the decision
19  that we're discussing; is that correct?
20      MS. WU:  Objection to form.
21      THE WITNESS:  The part of the Prime team that
22  work on the signup experience would be responsible for
23  the signup experience.  Correct.
24      BY MR. COHEN:
25      Q.  And that includes responsible for decisions

119

1   made with respect to that experience; correct?
2       MS. WU:  Objection to form.
3       THE WITNESS:  Correct.
4       BY MR. COHEN:
5       Q.  Let's mark as 6 -- actually, before we do that,
6   I have a kind of a general question about how Amazon
7   thinks about whether to change -- make changes to
8   Prime -- the Prime enrollment experience.
9       It is true, is it not, that at least sort of as
10  a general matter, Amazon would like that experience to
11  be as clear and consumer friendly as possible?
12      MS. WU:  Objection to form and compound.
13      THE WITNESS:  We would like to offer the best
14  possible experience to customers.
15      BY MR. COHEN:
16      Q.  And that includes the clearest possible
17  experience; right?
18      MS. WU:  Objection to form.
19      THE WITNESS:  Yes.
20      BY MR. COHEN:
21      Q.  And it's also the case -- and I don't mean this
22  in the slightest bit in a pejorative way -- Amazon
23  would like to make money; right?  It's a for-profit
24  business; correct?
25      MS. WU:  Objection to form.

120

1       THE WITNESS:  Correct.
2       BY MR. COHEN:
3       Q.  Okay.  So how does Amazon balance instances
4   where maximizing clarity runs contrary to business
5   interests?
6       MS. WU:  Objection to form.  Lacks foundation.
7       THE WITNESS:  Our main priority on the Prime
8   team and more broadly for Amazon is for us to have
9   long-term and engaged and happy Prime members.
10      BY MR. COHEN:
11      Q.  So the way that Amazon balances business
12  interests and clarity is to choose the pathway that
13  will -- is most likely to create long-term engaged
14  members?
15      MS. WU:  Objection to form.
16      THE WITNESS:  That is correct.
17      MR. COHEN:  Let's mark as Exhibit 6 what's been
18  labeled 22492 -- excuse me -- Amazon 00022492.  And
19  Ms. Cole is helping pass that out, and I'll give you
20  your copy, ma'am.
21      THE WITNESS:  Thank you.
22      MR. COHEN:  I think that was 6; is that
23  right?
24      MS. WU:  Yes.
25      MR. COHEN:  Okay.

30 (Pages 117 to 120)

Amazon.com, Inc.                                                    1/20/2023

289

1    flow.
2        BY MR. COHEN:
3        **Q. Is it important to the company to understand**
4    **why it is that the signup rate differed in the**
5    **treatment?**
6        MS. WU: Objection to form.
7        THE WITNESS: It is important. And the reason
8    that the signup rate is different is because of this
9    change. That's the purpose of these experiments.
10       BY MR. COHEN:
11       **Q. This change wasn't immediately implemented, was**
12   **it?**
13       MS. WU: Objection to form.
14       THE WITNESS: This change was not implemented
15   in the few weeks following this experiment. But as I
16   mentioned before, when a treatment is not implemented,
17   it doesn't mean that it will never be implemented. It
18   just means that at that time we decided not to.
19       We have since then iterated on this signup
20   button in other locations and in other times since
21   then. This is a snapshot in time of a decision about
22   the signup and negative CTA.
23       BY MR. COHEN:
24       **Q. What do you mean by the estimate of time that**
25   **you provided me that this treatment wasn't implemented**

290

1    **in the few weeks following the experiment?**
2        MS. WU: Objection to form.
3        THE WITNESS: When this experiment was run in
4    2018-2019, we did not, after this experiment was run,
5    roll out this change more broadly.
6        But to answer your question around a button as
7    a negative CTA, that is currently the customer
8    experience on our mobile signup experience. It also is
9    the experience today. The decline option in our
10   checkout flow is a button.
11       So my point is that while we didn't roll out
12   this change at this time, we just revisited it later.
13       BY MR. COHEN:
14       **Q. A few weeks later?**
15       MS. WU: Objection to form. Asked and
16   answered.
17       THE WITNESS: Once again, it is -- it varies by
18   signup location. Our mobile signup experience has had
19   a button for quite a while. It's difficult for me to
20   say since when, but for many years. And we have made
21   changes to the Prime signup experience many times
22   before and after this particular experiment.
23       BY MR. COHEN:
24       **Q. Yeah, but -- but do you -- at any -- anywhere**
25   **in Prime enrollment, was this change made within a few**

291

1    **weeks of the experiment at any point within Prime**
2    **enrollment in any aspect of the Prime enrollment**
3    **process?**
4        MS. WU: Objection to form. Asked and
5    answered.
6        THE WITNESS: As I stated before, this
7    particular treatment was tested as a part of attempts
8    to improve clarity. We collected data as a result of
9    this experiment over a period of time. It didn't
10   support the hypothesis that it actually improved
11   clarity, and so we tried other things.
12       And we also revisited testing a button, so
13   leading us to today, we have a button that we have
14   today in our signup experience.
15       BY MR. COHEN:
16       **Q. I'm sorry that I'm really stuck on this, but**
17   **you're testifying for the company, and the testimony**
18   **you gave me now a few minutes ago was that the change**
19   **wasn't made for a few weeks.**
20       **Do you -- can you give me some, maybe a little**
21   **bit better perspective on how much time elapsed between**
22   **when this experiment occurred and when the first time**
23   **this type of change was implemented?**
24       MS. WU: Objection to form. Asked and
25   answered.

292

1        The witness has actually already testified
2    about different locations that have implemented the
3    button at various points in time, Counsel.
4        THE WITNESS: As I -- sorry to be repetitive.
5    As I mentioned, we tested in this experiment a button
6    for the negative CTA. We looked at the results.
7    What's outlined here is a subset of the results at a
8    snapshot in time. We looked at broader metrics over a
9    longer period of time, which led us to believe that
10   these weren't actually as effective improving clarity
11   as they could, so we dialed down this particular
12   treatment. And afterwards, we tried other things.
13       And we continue to iterate and in other
14   locations we continue to iterate, to the point where
15   our mobile signup experience has a negative button CTA
16   and our desktop experience in checkout also has a
17   negative CTA button today.
18       BY MR. COHEN:
19       **Q. Can you give me an increment of time between**
20   **when the T2 test was run and the first time this test was**
21   **implemented? Just an increment of time is the answer**
22   **that I'm looking for, an increment of time.**
23       MS. WU: Objection to form. Asked and
24   answered.
25       THE WITNESS: We have tested this in 2018. We

73 (Pages 289 to 292)

Amazon.com, Inc.                                                                    1/20/2023

293

1  have tested a button in 2020.  We've tested it in 2021,
2  and it also is the current experience today.  And I'm
3  speaking on behalf of desktop.
4          On our mobile signup experience we've had a
5  negative CTA button for many years now.  I can't speak
6  to the exact time.
7          BY MR. COHEN:
8      Q.  And so at least on the desktop, this test was
9  performed in 2018, and then it was rolled out fully
10  four years later?
11         MS. WU:  Objection to form.  Mischaracterizes
12  testimony.
13         THE WITNESS:  Once again, I agree -- I disagree
14  with the "rolled out fully."  Just to be clear -- and I
15  can be more specific -- we make changes and we test --
16  we continually test to make changes to improve the
17  customer experience.
18         We ran this test in 2018 to test a button
19  versus a link.  At that point in time, we collected
20  data, longer term as well, and we decided to not to
21  roll out the button treatment more broadly.
22         We revisited and tested this again in 2020 and
23  later as well.  There are other times that we may have
24  tested it during that time, but for certain in 2020 and
25  2021.

294

1          So I -- I don't agree with the characterization
2  of rolled out X years later.  We continued to iterate
3  on this negative decline option before and after this
4  particular experiment was run.
5          BY MR. COHEN:
6      Q.  Let me direct you to line -- to T3.
7          The change that's been -- that's made in
8  T3 relative to the control is that the words
9  "with Amazon Prime" have been added to the heading;
10  correct?
11     A.  Correct.
12     Q.  And the result was a 9.4 percent fall in the
13  signup rate?
14     A.  Correct.
15     Q.  And if I understand the theme of your
16  testimony, the company has no opinion as to why the
17  change adding "with Amazon Prime" would cause signup
18  rate to fall.
19         MS. WU:  Objection to form.
20         THE WITNESS:  We can opine on how customers
21  feel when presented with this.  What this particular
22  treatment tells us is that this change in isolation
23  resulted in a decrease in signups.
24         BY MR. COHEN:
25     Q.  And so did Amazon consider whether adding

295

1  "with Amazon Prime" made it more clear to consumers
2  that the effect of the positive CTA was to enroll in
3  Prime?
4          MS. WU:  Objection to form.
5          THE WITNESS:  Once again, it's difficult for me
6  to infer how a customer felt.  We believe that the
7  control as well as treatment is clear.
8          What we tried to test and what we tested here,
9  rather, is putting Amazon Prime in the headline.  Is
10  that more or less clear than the Prime iconography
11  below?  It's difficult for us to say.  We just look at
12  the data that we're able to collect from the
13  treatments.
14         BY MR. COHEN:
15     Q.  What would be a reason why signups would have
16  fallen if adding "with Prime" does not enhance clarity?
17         MS. WU:  Objection to form.  Calls for
18  speculation.  Scope.
19         THE WITNESS:  Once again, I can't infer as to
20  what customers were feeling, but we have run other
21  experiments where when we add additional text and
22  language and make the page longer to read that fewer
23  customers sign up.
24         BY MR. COHEN:
25     Q.  So -- well, this is a little bit different than

296

1  the answers that you provided with respect to the first
2  two treatments.  You are giving me a reason why it
3  might be the case that the addition of the words
4  "with Amazon" affect consumer decision making.
5      A.  Once again, in all -- in these experiments and
6  with other experiments, we can't infer how customers
7  are feeling.  What I'm stating is that we have other
8  weblabs and experiments that show us when we add
9  additional text, signups can decrease, so that can be
10  one of the -- that can be one of the factors.
11     Q.  So Amazon did consider that it might not be the
12  fact that consumers are more likely to understand the
13  import of the positive CTA, it might be the addition of
14  additional text that is causing the reduction in
15  signups.
16         MS. WU:  Objection to form.
17         BY MR. COHEN:
18     Q.  Amazon considered that?
19         MS. WU:  Objection to form.
20         THE WITNESS:  Once again, we don't infer how
21  customers feel when presented with a signup experience.
22  What we do know is that by adding "with Amazon Prime"
23  signups decreased.  And what I'm saying is that we have
24  other experiments where we add text where signups have
25  also decreased.

Leung

Amazon.com, Inc.                                                    1/20/2023

369

1   multipage checkout to the Java-based system, we decided
2   that with the migration of Amazon's checkout flow we
3   would jump to single-page checkout.  It saved a lot of
4   development and engineering time.
5           BY MR. COHEN:
6       Q.  So the purpose of TrueSPC was to save
7   development and engineering time, not improve clarity?
8           MS. WU:  Objection to form.
9           THE WITNESS:  The primary intent of TrueSPC was
10  to reduce engineering time as a part of Amazon's
11  migration from Gurupa to the Java-based system.
12          BY MR. COHEN:
13      Q.  It's the company's position, is it not, that
14  although TrueSPC didn't make clarity worse, TrueSPC
15  didn't improve clarity; right?
16          MS. WU:  Objection to form.
17          THE WITNESS:  We didn't look at TrueSPC as a
18  clarity measure.  It was a change that was required by
19  other reasons, and we decided to make changes to the
20  checkout experience.
21          BY MR. COHEN:
22      Q.  And those changes to the checkout experience
23  were not intended to correct any clarity issues
24  associated with the preceding experience; right?
25          MS. WU:  Objection to form and scope.

370

1           THE WITNESS:  We believe our signup experience
2   was clear and legally compliant before as we do after
3   TrueSPC.
4           BY MR. COHEN:
5       Q.  And just --
6       A.  There's no issue to correct.  That's what I'm
7   responding to.
8       Q.  Okay.  So the -- that's helpful.
9           Some -- after May 6, 2021, it remained the case
10  or -- that Amazon has not made the decline CTA a button
11  in all aspects of Prime enrollment.
12          MS. WU:  Objection to form.
13          THE WITNESS:  Sorry.  Can you repeat the
14  question?
15          BY MR. COHEN:
16      Q.  I can ask it a little bit better.
17          So there's various pathways in which
18  individuals can enroll in Prime; correct?
19      A.  Correct.
20      Q.  And as we sit here today, some of those still
21  involve situations in which the decline CTA is not a
22  button but is rather a link; correct?
23          MS. WU:  Objection to form.
24          THE WITNESS:  Can you be more specific as to
25  the location?

371

1           BY MR. COHEN:
2       Q.  For instance, in the Prime checkout enrollment
3   flow.
4           MS. WU:  Objection to form.
5           THE WITNESS:  Can you also be more specific?
6   It varies by desktop versus mobile.
7           BY MR. COHEN:
8       Q.  Well, actually, maybe you could be more
9   specific.
10          Is there any point in the Prime checkout
11  enrollment flow where the decline CTA is still a link
12  rather than a button?
13          MS. WU:  Objection to form.
14          THE WITNESS:  With the change of TrueSPC we
15  are rolling out those changes, and so over a period of
16  time we would have rolled out those changes.  As a part
17  of TrueSPC, the negative CTA was also changed to a
18  button.
19          BY MR. COHEN:
20      Q.  So it is no longer the case that anywhere in
21  the Prime enrollment process the decline CTA is a link
22  rather than a button?
23          MS. WU:  Objection to form.
24          THE WITNESS:  I'm pausing in my response
25  because it's hard for me to say in every single use

372

1   case that we've captured every single one.  For our
2   main use case, which is the Prime enrollment flow, it
3   is now a button.
4           BY MR. COHEN:
5       Q.  When did that become the case?
6       A.  Again, we've tested iterations to the Prime
7   positive CTA over many years and over different
8   iterations.  We've tested it, as we've discussed, in
9   buttons in multiple iterations, so it's hard for me to
10  say the exact times that the signup CTA has been a
11  button.
12          MR. COHEN:  Okay.  Let's mark as Exhibit 15 --
13  there's two Bates numbers here, so I'll read the first
14  one, which is AMZN-MGM-2R-003149387.
15          And I'm providing a copy to the witness, and
16  I'm going to direct you to the page of the memorandum
17  marked 4 and specifically line 104.
18          (Exhibit Number 15, AMZN-MGM-2R-003149387
19  through AMZN-MGM-2R-003149394, was marked for
20  identification.)
21          THE WITNESS:  I'm sorry.  Page?
22          BY MR. COHEN:
23      Q.  I think it's page 4.  The top Bates number ends
24  9390, and I'm directing you to line 104.
25      A.  Okay.

93 (Pages 369 to 372)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Amazon.com, Inc.                                                      1/20/2023

---

373

1    I'm on line 104, yes.
2    **Q.  So what changes -- line 104 reads, "**
3    **                                          "**
4    A.  That's what's stated in that line, correct.
5    **Q.**
6
7                                                          f
8
9
10                                                         y
11
12
13
14
15
16    **And then it goes on.**
17    **Did I read that portion correctly?**
18    A.  Yes, you have.
19    MS. WU:  Counsel, I'm sorry to interject.
20   Could I ask for a break so that I can assess a matter
21   of privilege?
22   Just for the record, we're looking at a
23   document that was produced to the FTC by Amazon in the
24   context of a different investigation, and it is labeled
25   Privileged and Confidential.

---

374

1    I will be brief, but I just want to look into
2    it.
3    MR. COHEN:  Take your time.
4    MS. WU:  Thank you.
5    MR. COHEN:  We'll excuse ourselves.
6    (Recess)
7    MR. COHEN:  And before I do anything else, I
8    will turn it over to Ms. Wu to say some stuff.
9    MS. WU:  Well, first of all, Counsel, thank you
10   for the break.
11   We have ascertained that the document marked as
12   Exhibit 15, which was produced in the retail
13   investigation and the MGM investigation, is an
14   inadvertent production.  This document is privileged
15   and has been treated as such in the context of this
16   investigation.
17   We will follow up, consistent with our
18   conversation off the record, with a formal clawback
19   request.  We understand that the parties are reserving
20   their positions with regard to this document, and we
21   appreciate that you won't question the witness with
22   regard to the context of this -- the contents of this
23   document during the balance of the IH today.
24   MR. COHEN:  Let me respond with a couple of
25   agreements and clarifications.

---

375

1    Number one, we agree that all parties are
2    reserving their rights.
3    Number two, we did propose off the record that
4    you permit us to question the witness with respect to
5    this document and with -- under a full reservation of
6    rights, including the ability to claw back any portion
7    of the transcript that relates to the document if this
8    is ultimately ascertained to be privileged.  We did
9    make that request, and that proposal or that offer was
10   declined.
11   Additionally, I did indicate -- and I'm not
12   sure that you intended to be precluding this, but I did
13   indicate and I am going to ask one, possibly two
14   additional questions that I can do without actually
15   looking at the document, in order to obtain
16   instructions, simply to make a record and preserve the
17   commission's rights in that regard.
18   So I'm going to go forward and do that, and if
19   you want to go off the record briefly and talk with
20   your client about that --
21   MS. WU:  No.  That's fine, Counsel.
22   What I'm going to do, and just for clarity of
23   the record, I am taking the privileged document from
24   the witness so she does not have it in front of her as
25   she's being asked these questions, and I will provide

---

376

1    the instruction.
2    Thank you, Counsel.
3    MR. COHEN:  Okay.  All right.  Well, we'll
4    start with that.
5    Ma'am, I would ask that you return the document
6    to the witness for the purpose of me asking her
7    questions in order to be able to obtain an
8    instruction.
9    It's not a waiver for her to see it.
10   MS. WU:  I believe it's improper to ask a
11   question based on a document which has been clawed
12   back, although provisionally, and for that reason we
13   decline to have the witness offer testimony when
14   consulting the privileged material.
15   BY MR. COHEN:
16   **Q.  Are you going to follow your attorney's**
17   **instruction and not refer to Exhibit 15?**
18   A.  Yes.
19   MR. COHEN:  Okay.  And I'll ask a couple more
20   questions.  I just want to make absolutely sure the
21   best I can because we're going to get into some
22   fistfight over who's holding the document.
23   Counsel, are you waiving any right that you may
24   otherwise have that I have failed to make a sufficient
25   record of an attempt to question the witness regarding

---

94 (Pages 373 to 376)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Amazon.com, Inc.                                                              1/20/2023

401

1    experience and a non-modal experience?
2        MS. WU:  Objection to form.
3        THE WITNESS:  Modal is a -- similar to the word
4    "mode," so in that customer's -- in that customer
5    context -- so the customer context is they have not --
6    they do not have a default billing address -- billing
7    information, so payment instrument.  They also don't
8    have a default shipping information.  On the TrueSPC,
9    on the final page of checkout, the only page of
10   checkout, we give the customer the option to select
11   their billing method, their shipping address, and then
12   we present the Prime signup experience.
13       BY MR. COHEN:
14       Q.  So there were four videos that the FTC was
15   provided -- and I'll save the time of marking all of
16   the images -- about the TrueSPC experience, and two of
17   those involved the UPDP.  That's the first paragraph
18   here.  And then two of those involved TrueSPC.
19       So do I understand correctly that UPDP is just
20   a different mode?
21       A.  Yeah.  I can clarify the distinction between
22   these two paragraphs.  The distinction is the customer
23   state.
24       If the customer state is that we already have
25   default billing information and default shipping

402

1    information, we don't need to ask for that on the final
2    page, and so when the customer is checking out, we show
3    them UPDP.
4        For customers that do need to provide that
5    information, we don't show them UPDP, and we instead
6    take them to directly to TrueSPC, where we give the
7    customer the option to select payment instrument and
8    shipping information.
9        Q.  Okay.  So I don't need to understand the word
10   "modal" to understand the response.
11       If I understand it correctly -- well, I mean,
12   but let me know if I don't have this -- is it that
13   consumers who have already put in all of their defaults
14   get the UPDP and consumers that have not put in all of
15   their defaults get TrueSPC?
16       MS. WU:  Objection to form.
17       THE WITNESS:  Correct.
18       BY MR. COHEN:
19       Q.  When was TrueSPC -- when was this state of
20   affairs that's described in this interrogatory
21   response -- when did that become the state of affairs
22   in the United States?
23       MS. WU:  Objection to form.
24       THE WITNESS:  The extent of the dial-up of this
25   experience will have varied, but it would have been

403

1    between October and November of 2022 time frame.
2        BY MR. COHEN:
3        Q.  And is there anyone -- am I correct that by
4    some point in November -- can you be more specific in
5    November?
6        MS. WU:  Objection to form.
7        THE WITNESS:  It would have been within the
8    first two weeks of November.
9        BY MR. COHEN:
10       Q.  So by at the latest November 14 everyone in the
11   United States would have seen either what was occurring
12   in the first -- what's described in the first paragraph
13   under C or what's described in the second paragraph
14   under C; correct?
15       MS. WU:  Objection to form.
16       THE WITNESS:  Correct.
17       BY MR. COHEN:
18       Q.  At some point in time Amazon stopped SOSP;
19   correct?
20       A.  Correct.
21       Q.  Why did Amazon do that?
22       A.  It was a part of this migration, part of this
23   TrueSPC.  SOSP was one of the steps in the checkout
24   process.  And in order to move towards a true
25   single-page checkout, we then instead got rid of -- we

404

1    got rid of SOSP, the ship option selection page, and
2    instead moved that to the checkout page.
3        Q.  Okay.
4        Were there any other reasons why SOSP was shut
5    down?
6        MS. WU:  Objection to form and scope.
7        THE WITNESS:  The main motivation was because
8    of the move to TrueSPC.  We were shortening -- we were
9    reducing the multipage experience before to just a
10   page.
11       BY MR. COHEN:
12       Q.  You've testified as to the main motivation, but
13   what, if any, secondary motivation was there?
14       MS. WU:  Objection.  Form.  Scope.  Asked and
15   answered.
16       THE WITNESS:  I can't state any -- every
17   possible motivation.  From my understanding, the main
18   motivation is the move to TrueSPC.  We went from
19   multiple pages to one page.
20       BY MR. COHEN:
21       Q.  Okay.  Can you state any other reason for the
22   termination of SOSP beyond what you have testified to
23   today?
24       MS. WU:  Objection.  Form.  Scope.  Asked and
25   answered.

101 (Pages 401 to 404)

Amazon.com, Inc.                                                        1/20/2023

---

405

1        THE WITNESS:  No.
2        MR. COHEN:  Let's go off the record.
3        (Discussion off the record.)
4        MR. COHEN:  We are holding today's
5    investigational hearing open.  That is over the
6    objection of counsel for the company.  Their objection
7    is noted and preserved.
8        Additionally, counsel for the company has
9    requested a copy of the transcript of today's
10   proceedings.  We have declined that request at this
11   time.  How -- nevertheless, their request is noted, and
12   counsel is encouraged to follow up with an email,
13   although, nevertheless, it is definitely noted.
14       Third, counsel for the company has requested a
15   copy of today's exhibits, and we are providing those
16   exhibits subject to the agreement of the company that
17   the provision of those agreements [sic] is without
18   prejudice to any argument the FTC might make.
19       The final point, which is just a little
20   additional add-on, there was some colloquy earlier,
21   both some on the record and more off the record,
22   regarding time that may have been consumed or may not
23   have been consumed through speaking objections.  The
24   parties reached an agreement that we would extend the
25   portion of the examination that is occurring today by

---

407

1    DISTRICT OF COLUMBIA, to wit:
2        I, Josett F. Whalen, before whom the foregoing
3    deposition was taken, do hereby certify that the
4    within-named witness personally appeared before me at
5    the time and place herein set out, and after having
6    been duly sworn by me, according to law, was examined
7    by counsel.
8        I further certify that the examination was
9    recorded stenographically by me and this transcript is
10   a true record of the proceedings.
11       I further certify that I am not of counsel to
12   any party, nor an employee of counsel, nor related to
13   any party, nor in any way interested in the outcome of
14   this action.
15       As witness my hand and notarial seal
16   this 3rd day of February 2023.
17
18
19            S/Josett F. Whalen
20            JOSETT F. WHALEN
21            Notary Public
22   MY COMMISSION EXPIRES:  9-14-2025
23
24
25

---

406

1    five minutes, and that did occur, so it went
2    approximately seven hours and five minutes rather than
3    seven hours.
4        That is without prejudice to any side's
5    arguments on any issue.  And again, we -- you know, we
6    reserve our rights and are holding this open over the
7    objection of counsel for the defendant -- counsel for
8    the company.  Nevertheless, we note that we did reach
9    an accord on that issue to go an additional five
10   minutes.
11       MS. WU:  Thank you, Counsel.
12       MR. COHEN:  All right.  Let's go off the
13   record.
14       (Whereupon, the foregoing investigational
15   hearing was concluded at 7:33 p.m.)
16
17
18
19
20
21
22
23
24
25

---

408

1              CERTIFICATE OF DEPONENT
2
3
4        I hereby certify that I have read and examined
     the foregoing transcript, and the same is a true and
     accurate record of the testimony given by me.
5
6
7        Any additions or corrections that I feel are
     necessary I will attach on a separate sheet of paper to
     the original transcript.
8
9
10       I hereby certify, under penalty of perjury,
     that I have affixed my signature hereto on the date so
     indicated.
11
12
13       DATED:
14
              LISA LEUNG
15
16
17
18
19
20
21
22
23
24
25

---

102 (Pages 405 to 408)

# EXHIBIT 115

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:                )

4    AMAZON.COM, INC.                 )   No. 2123050

5    --------------------------------)

6

7                         August 23, 2022

8

9                    Investigational Hearing

10                   MASUMA WALJI HENRY

11

12                   Federal Trade Commission

13               Henry M. Jackson Federal Building

14                915 Second Avenue, Suite 2896

15                     Seattle, Washington

16

17

18

19

20

21

22

23

24   REPORTED BY:  Wade J. Johnson, RPR

25               CCR No.:  2574

5

Henry

Amazon.com, Inc.                                                          8/23/2022

```
 1              SEATTLE, WASHINGTON; TUESDAY, AUGUST 23, 2022
 2                          8:34 A.M.
 3                          --oOo--
 4
 5              MR. NARDINI:  We are on the record.
 6
 7  MASUMA WALJI HENRY,     witness herein, having been
 8                          first duly sworn on oath, was
 9                          examined and testified as
10                          follows:
11
12                    E X A M I N A T I O N
13  BY MR. NARDINI:
14       Q.   Could you please state your full name.
15       A.   Masuma Walji Henry.
16       Q.   Good morning, Ms. Henry.  My name is Max Nardini,
17  and I'm here today with my co-counsel, Jonathan Cohen.  We
18  are attorneys representing the Federal Trade Commission in
19  this investigational hearing, FTC Matter No. 2123050,
20  regarding Amazon, Inc.
21                          (Exhibit MH-1 marked for
22                           identification.)
23       Q.   I'm showing you now what has been marked as
24  Exhibit 1 -- pardon me, strike that -- MH-1, which is the
25  Civil Investigative Demand the FTC issued you, which I will
```

94

Henry

Amazon.com, Inc.                                              8/23/2022

1          A.    That's right.

2          Q.    -- call to action?

3          A.    Yes.

4          Q.    And as you point out, there are notes on this image

5     indicating dark patterns that could create lack of clarity

6     within this design.  Is that right?

7          A.    Yes.  With the caveat that, again, I'm not sure all

8     of them were intentional dark pattern, but, if you really

9     wanted to give the user clarity that what they're signing up

10    for is something that is paid and they have the equal choice

11    not to sign up, you would design this page very differently.

12         Q.    And so, presumably, the attendees at this meeting

13    would have been well aware of, that elements on the UPDP

14    could contribute to a lack of clarity on that page.  Is that

15    right?

16         A.    Yes.  This is very elementary knowledge.  Yeah.

17         Q.    And would Amazon leadership have been aware of that

18    fact, as well?

19         A.    Yes.

20         Q.    And, certainly, the VPs who were on the email, who

21    you described, such as Neil Lindsay.  Is that correct?

22         A.    Yes.

23         Q.    And, presumably, Jamil Ghani, who is a VP, as well.

24    Is that correct?

25               Strike that.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

95

Henry

Amazon.com, Inc.                                        8/23/2022

1          And Neil Ghani was included on the email that

2   transmitted this document, correct?

3          A.   Jamil Ghani.

4          Q.   Jamil Ghani.  Yes.  Thank you.

5          A.   Yes.

6          Q.   Would you consider interstitials themselves to be a

7   form of dark patterns?

8          A.   Again, it depends on the definition of a dark

9   pattern, but it's analogous -- an interstitial is analogous

10  to putting chocolate bars and celebrity magazines near the

11  checkout line when you go to the grocery store.  That's

12  exactly the same, right?  It's like encouragement to take

13  your attention over to something else and make a purchase.

14  That's the point of an interstitial.

15          So all of those are tactics to change behavior,

16  right, whether it's digital or not.  And I think the word

17  "dark patterns" sounds more nefarious than that, but it is a

18  common consumer -- like common practice in whatever

19  consumer-based industry you are in.  It doesn't necessarily

20  make it right.  I'm just saying I don't think that it's so

21  different from that shopping store example.

22          Q.   And would that concept that you've just described

23  be familiar to, say, Mr. Lindsay --

24          A.   Yes.

25          Q.   -- regarding interstitials?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

96

Henry

Amazon.com, Inc.                                              8/23/2022

```
 1        A.   Yes.

 2        Q.   And how would you know that?

 3        A.   Anyone who works in software knows this.  Yeah.

 4        Q.   Because it's this elemental concept of software

 5   design or UX design?

 6        A.   Yes.  Yes.  Even if you're not from UX, you know

 7   this, because your whole life you've been looking at how

 8   people do or don't click on things.  And even if you didn't

 9   know that because you were some kind of like infrastructure

10   or operations engineer by training, you would learn that

11   quickly because you would see the data that shows that, when

12   you put design elements on it, make it color, make it

13   button-like, it's going to garner more attention.

14        Q.   Did you ever hear the term "clown barf" used while

15   at Amazon?

16        A.   No.

17        Q.   Sort of anything could get a user's attention, even

18   if it comes out looking like clown barf?

19        A.   It sounds like a software term that would be used

20   facetiously, yeah.

21        Q.   Did you ever have any conversations with

22   Mr. Lindsay regarding dark patterns or the layout of the

23   UPDP?

24        A.   Not me personally.  But, of course, I would read

25   all papers coming from my team, knowing if he was going to be
```

1                        C E R T I F I C A T E

2     STATE OF WASHINGTON )
                          )   ss
3     COUNTY OF KING      )

4

5              I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to administer
6     oaths and affirmations in and for the State of Washington, do
      hereby certify:  That the foregoing Investigational Hearing
7     of the witness named herein was taken stenographically before
      me and reduced to a typed format under my direction;

8

9              That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or the
      outcome herein;

11             That the Investigational Hearing, as transcribed,
      is a full, true and correct transcript of the testimony,
12    including questions and answers and all objections, motions
      and examinations and said transcript was prepared pursuant to
13    the Washington Administrative Code 308-14-135 preparation
      guidelines.

14

15                        _Wade C. Johnson_

16                        Wade J. Johnson, Certified Court
                          Reporter 2574 for the State of Washington
                          residing at Seattle, Washington.
17                        My CCR certification expires on 09/18/22.

18

19

20

21

22

23

24

25

# EXHIBIT 116

1                    FEDERAL TRADE COMMISSION

2

3    In the Matter of:              )

4    AMAZON.COM, INC.               ) No. 2123050

5

6

7                  Investigational Hearing

8                     NAHSHON DAVIDAI

9

10

                    Federal Trade Commission
11           Henry M. Jackson Federal Building
               915 Second Avenue, Suite 2896
12                  Seattle, Washington

13

14

15

16

17

18

19

20

21

22

23   DATE:  November 30, 2022

24   REPORTED BY:  Wade J. Johnson, RPR
                  CCR No.:  2574
25

Davidai

Amazon.com, Inc.                                        11/30/2022

```
 1        SEATTLE, WASHINGTON; WEDNESDAY, NOVEMBER 30, 2022

 2                         8:03 A.M.

 3                          --oOo--

 4

 5                     (Witness sworn.)

 6

 7           MR. NARDINI:  We're on the record.

 8

 9    NAHSHON DAVIDAI,      deponent herein, having been

10                          first duly sworn on oath, was

11                          examined and testified as

12                          follows:

13

14               E X A M I N A T I O N

15    BY MR. NARDINI:

16        Q.  Could you please state your full name for the

17    record.

18        A.  Nahshon Davidai.

19        Q.  Good morning, Mr. Davidai.

20             My name is Max Nardini.  I am an attorney with

21    the Federal Trade Commission.  I am also the hearing

22    officer for today's investigational hearing.  I'm

23    joined here with my co-counsel, Ms. Olivia Jerjian,

24    also an attorney with the Federal Trade Commission.

25             Have you ever had your deposition taken
```

Davidai
Amazon.com, Inc.                                          11/30/2022

```
1    response from Mr. Grandenetti.

2             Do you see that there at the top?

3        A.  I do.

4        Q.  And he quotes some language, "Overall the goal

5    of both product initiatives and product testing is to

6    improve messaging clarity while not hurting signups and

7    conversion rates to 90-day paid members."

8             Did I read that correctly?

9        A.  You did.

10       Q.  Then he writes, "Agreed.  Let's keep pushing

11   for both."  Correct?

12       A.  Yes.

13       Q.  So, coming out of this meeting with

14   Mr. Grandenetti, there was not a decision to prioritize

15   one over the other, correct?

16            MR. ANTHONY:  Objection.  Foundation.

17       A.  Reading through the action items, I do not see

18   a decision to prioritize one over the other.

19       Q.  Indeed, his quote there and his agreement

20   seems to align with the aspiration of finding a way to

21   hit growth goals and prevent false positives.

22            Is that fair?

23            MR. ANTHONY:  Object to form.

24   Foundation.

25       A.  I can't speak to his intents.  I can't speak
```

187

Davidai

Amazon.com, Inc.                                          11/30/2022

1    to his intents.  But the aspiration and the action
2    items I think are clear, and they speak for themselves.
3        Q.  Following the meeting with Mr. Grandenetti, do
4    you recall any clarity improvements that were
5    implemented to the Prime enrollment flow?
6        A.  Going back through the recurring theme here,
7    one of the main -- maybe the main -- challenge, was
8    figuring out what is a clarity improvement.  So, to
9    answer this definitively without knowing what does and
10   does not improve clarity, is hard.
11           As an example that we've discussed,
12   ASINization was viewed as a clarity improvement or a
13   potential clarity improvement.  Based on the test that
14   we ran, if I recall correctly, in Japan, we did not
15   find that it improved clarity.
16       Q.  Well, how about this:  Coming out as a result
17   of the meeting with Mr. Grandenetti, to your knowledge,
18   were any changes made to the Prime enrollment flow?
19       A.  Changes were made, were they directly linked
20   to coming out of this meeting or not.  If I remember
21   correctly, we had a -- which I think there's an action
22   items on, develop a series of tests and a framework
23   through which those tests would be analyzed.  If I
24   remember correctly, that has been developed, but I
25   can't remember the specifics of saying, by date X, test

Davidai

Amazon.com, Inc.                                          11/30/2022

 1    Y did that, did this.

 2         Q.   I understand testing may have been initiated,

 3    but what I'm really just trying to understand is, as a

 4    result of this meeting, were there any permanent

 5    changes made to the enrollment flow dialed up to live

 6    and remaining there?

 7              MR. ANTHONY:  Object to the form.

 8         A.   To me, the challenge is the permit.  Changes

 9    were made, are being made, I would imagine would

10    continue to be made in a test environment.  I think we

11    talked before about changes to the actual benefits or

12    to a customer's context or to regulatory environment.

13    So the permanency is a challenging one.

14              Two, the action items here, as described,

15    mostly talk about building a foundation through which

16    measurement could be done in a better way going

17    forward, much less so about any direction, thou shall

18    to X or Y.

19         Q.   And it sounds like you didn't take any

20    direction, thou shall to X or Y, coming out of this

21    meeting, correct?

22         A.   I do not remember any direction that was

23    specific to changes to be made to the flow one way or

24    the other, yeah.

25              MR. NARDINI:  Okay.  Let's go off the

```
 1                    C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                          )   ss
 3    COUNTY OF KING      )

 4


 5              I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010, authorized to
 6    administer oaths and affirmations in and for the State
      of Washington, do hereby certify:  That the foregoing
 7    Investigational Hearing of the witness named herein was
      taken stenographically before me and reduced to a typed
 8    format under my direction;

 9              That I am not a relative or employee of any
      attorney or counsel or participant and that I am not
10    financially or otherwise interested in the action or
      the outcome herein;

11
                That the Investigational Hearing, as
12    transcribed, is a full, true and correct transcript of
      the testimony, including questions and answers and all
13    objections, motions and examinations and said
      transcript was prepared pursuant to the Washington
14    Administrative Code 308-14-135 preparation guidelines.

15
                            Wade J Johnson
16                      Wade J. Johnson, Certified Court
                        Reporter 2574 for the State of
17                      Washington residing at Seattle,
                        Washington.
18                      My CCR certification expires on
                        09/18/23.

19

20

21

22

23

24

25
```

# EXHIBIT 117

1                        FEDERAL TRADE COMMISSION

2

3    In the Matter of:                )

4    AMAZON.COM, INC.                 )   No. 2123050

5    --------------------------------)

6

7                            August 16, 2022

8

9                        Investigational Hearing

10                           REID NELSON

11

12                      Federal Trade Commission

13                Henry M. Jackson Federal Building

14                 915 Second Avenue, Suite 2896

15                        Seattle, Washington

16

17

18

19

20

21

22

23

24    REPORTED BY:  Wade J. Johnson, RPR

25                 CCR No.:  2574

Nelson

Amazon.com, Inc.                                          8/16/2022

```
 1    directing the use of compulsory process in a nonpublic
 2    investigation of unauthorized charges to consumers' accounts.
 3
 4                             (Exhibit RN-1 marked for
 5                              identification.)
 6
 7    REID NELSON,              witness herein, having been
 8                              first duly sworn on oath, was
 9                              examined and testified as
10                              follows:
11
12                  E X A M I N A T I O N
13    BY MR. COHEN:
14        Q.   Mr. Nelson, I'm placing in front of you what's been
15    previously marked as Exhibit RN-1.  Can you just take a quick
16    look at that document, please, and just look up at me when
17    you're finished.
18                  MR. COHEN:  Laura, I have one for you if you
19    want one.
20                  MS. VANDRUFF:  Thank you.
21        Q.   Have you seen that document before?
22        A.   Yes.
23        Q.   And you are here today in compliance with this
24    Civil Investigative Demand, correct?
25        A.   Yes.
```

Nelson

Amazon.com, Inc.                                                    8/16/2022

1        Q.    Then also under Experience, you have a current
2    position where you identify your role as a principal UX
3    researcher?
4        A.    Principal, yeah.
5        Q.    Principal.  So that's a typo?
6        A.    Oh, I thought you said principled, like an
7    adjective.  Is there a typo in there?  Oh, I see, yeah.
8    Yeah, that's a typo.  It's supposed to say -- but I'm also
9    principled, I suppose.
10       Q.    Well, that's mostly what I was wondering.
11       A.    Sorry.
12       Q.    I said I didn't want to spend a lot of time on that
13    before.
14       A.    Yeah.
15       Q.    But background for a second.  I couldn't resist the
16    opportunity to ask you that.
17       A.    Yeah.
18       Q.    For how many years were you at Amazon?  It's fine
19    if you want to look at that to refresh your recollection.
20       A.    How many years was I at Amazon?
21       Q.    Yes.
22       A.    Ten years.
23       Q.    The LinkedIn profile is correct, isn't it, that you
24    were a Senior User Experience Researcher from January of 2012
25    to October of 2018?

Nelson

Amazon.com, Inc.                                          8/16/2022

1      A.    That's not completely correct.  I started as a User
2    Experiencer Researcher II from 2012 to 2014, and so then I
3    was promoted to senior.  So it just seemed, when I updated my
4    title, LinkedIn did some weird tracking with the position
5    change.  But the overarching job, UX researcher, was correct.
6    I just wasn't senior from 2012 to 2018.
7      Q.    And then you were promoted a second time, correct?
8      A.    Correct.
9      Q.    To principal user experience researcher?
10     A.    2018.
11     Q.    Amazon uses a system called L levels to classify
12   different employees?
13     A.    Correct.
14     Q.    What was the L level that you had when you started?
15     A.    L5.
16     Q.    And then you became an L6 subsequently?
17     A.    In 2014.
18     Q.    And then when you became a principal user
19   experience UX researcher, you were an L7?
20     A.    Correct.
21     Q.    Generally, as a principal user experience
22   researcher, just give me a nutshell version of what your
23   responsibilities were.
24     A.    It's basically what I described earlier.  Our
25   primary goal is to get close to users and to observe their

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                              8/16/2022

1  behavior in a naturalistic setting, often qualitative way in

2  nature, meaning we're doing studies on a small sample of

3  customers or non-customers and watching them in a one-on-one

4  interview setting interact with -- in my case, I was focused

5  on shopping for pretty much the entirety of the ten years.

6          So I'd watch them use some naturalistic shopping,

7  maybe on any website, make a purchase, depending on the

8  study, and sort of try to understand where and how their

9  experience could be improved upon, what their delighters

10  were, what their pain points or frustrations were.

11          I did that both in the context of the existing

12  Amazon website and experience that was live and facing the

13  mass -- the general population, as well as with sort of in

14  flight design prototype ideation concepts to try to sort of

15  flush out ways we could iterate and improve upon the design

16  before it was even built and launched out to customers.

17      Q.   And some of the research you conducted concerned

18  enrollment and cancellation, correct?

19      A.   Correct.  Yeah.

20      Q.   And is that with respect to -- some of that -- let

21  me just withdraw it.

22          Some of that was with respect to enrollment and

23  cancellation on Prime, correct?

24      A.   Yes.

25      Q.   Was any of that with respect to enrollment and

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                              8/16/2022

1    years, but I worked for a team that was focused on core
2    shopping features, which included the home page, the global
3    navigation, the nav headers, the hamburger menu, stuff like
4    that; the product page, like product details, reviews, stuff
5    like that; and checkout, the thank you page.  Those are kind
6    of core areas that our organization owned from a design and
7    research standpoint.
8            Through the course of doing naturalistic research,
9    you can't skip things like watching people search for stuff.
10   So, even though we didn't own search from an organizational
11   standpoint, we would certainly watch people search for things
12   and see interesting insights with respect to search.
13           When people are going through a product page, they
14   might encounter things like related to delivery messaging or
15   Prime upsells.  That would be something we would observe, as
16   well.  Through the course of checkout, you might find people
17   going through Prime upsell interstitials, so we would see
18   people interact with those, as well.
19           So, while it wasn't the core focus of my
20   organizational chain, through the course of doing
21   naturalistic research, we would observe people interacting
22   with that.  It was not the primary focus.  I did not report
23   in to the Prime organization.  So that research was much more
24   broad and holistic in nature.
25       Q.   What's a customer frustration?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                             8/16/2022

1           A.    A customer frustration, which we also called

2    shopper frustrations -- we went through some back and forth

3    banding on that program -- it's a program that we started in

4    2014 within our organization under that kind of that core

5    shopping pillar that I was telling you about.  The

6    organization is referred to as Consumer Engagement.

7               Sebastian Gunningham was our SVP at the time, kind

8    of our sponsor.  And in a meeting, I think early 2014, he

9    loved all the research, loved that researchers were

10   generating insights, issues, problems to solve, but he wanted

11   us to have a closed loop process, meaning he didn't want to

12   just have us finding things and not having some sort of

13   mechanism to service those teams regularly until there was

14   some sort of answer on would they fix it or not, when could

15   they fix it, when could they prioritize the technical work

16   and the design work to solve X, Y, Z problem.

17              That request then led to the shopper frustrations

18   program.  The shopper frustrations program, our main charter

19   was to have a place for researchers to pool their insights

20   and to work with the respective owning tech teams and product

21   teams to hopefully get them on a roadmap when they could fix

22   them, if they could fix them, et cetera.

23              Later -- I can't remember the exact year -- we

24   rebranded under a different VP leader from shopper

25   frustrations to customer frustrations because they wanted to

Nelson

Amazon.com, Inc.                                                      8/16/2022

1   sort of be able to scale the program beyond just shopping
2   specific insights.  So then we became the customer
3   frustrations elimination program.
4              The definition of a customer frustration or shopper
5   frustration, is effectively any insight that we may have
6   discovered through the course of doing, naturalistic or
7   observational shopping research in our case, but any research
8   for that matter, where a participant, a research participant,
9   is encountering something that is blocking them from their
10  objective or goal, whatever it may be, or creating friction
11  or difficulty or confusion in the process of attempting to
12  achieve that goal, that task, or that need.
13       Q.   You mentioned the notion of pooling insights.
14       A.   Mm-hmm.
15       Q.   Was one of the ways in which you pooled insights
16  the creation of a database?
17       A.   Correct.
18       Q.   Tell me about the creation of the database.
19       A.   So the database was one of the things we created
20  under the umbrella of the shopper frustration aka customer
21  frustration elimination program.  To create a closed loop
22  mechanism, we needed a place to store the insights, and we
23  wanted it to be searchable and accessible, so that designers,
24  product managers, leaders could access the information in a
25  way that was relevant to them and their team, so the Search

Nelson

Amazon.com, Inc.                                        8/16/2022

1    team could see the items related to search, the Prime time
2    could see the items related to Prime, and we could -- and
3    researchers had a place where we could, in a living and
4    breathing and dynamic way, pool our insights.
5           So, if we discover, for example, somebody had
6    difficulty finding customer reviews on the detail page, just
7    to give you an example -- it's pretty far down the page --
8    rather than having a bunch of siloed PDF documents where
9    Researcher A does some study in 2013 and then Researcher B
10   finds the same exact problem in 2014 in a different study, it
11   would -- we had a place where we could combine our insights
12   at that granular issue level, and then it would be
13   searchable.
14          Q.   Whose idea was the database?
15          A.   The idea of the database, again, kind of came back
16   to sort of Sebastian telling us we needed a closed loop
17   process and then our team coming together, banding together,
18   to respond to that leadership request and figuring out what
19   would be the best way to do this.
20          Q.   Before I miss this, backing up an answer, you
21   mentioned this undertaking was moved to a different VP, or
22   did I misunderstand?
23          A.   We were under the same SVP, but, at some point
24   along the way -- we were at originally under Llew.
25          Q.   That's Llew Mason?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                          8/16/2022

1    comparable or similar.

2            One key differences was that there wasn't any

3    information about price or auto renewal in the German

4    version.  And the reason for that was because, on the page

5    that then followed, which is the final page of checkout,

6    where you can -- or I guess the penultimate page of checkout,

7    where click place order, sort of confirms what's in your

8    order, how much it is.

9            If you had opted into Prime from the previous page,

10   that second page, the order confirmation page, is where the

11   sort of terms on pricing and auto renew show up for the

12   German version.  And then the experience of -- or the

13   obligation of becoming Prime is not finalized, was not

14   finalized in the German version, until the customer clicks

15   place order.  So that, if they had opted in and perhaps

16   didn't want to opt in or change their mind about their order

17   and cancelled, they wouldn't sort of still be Prime at that

18   point.

19           In the U.S., by contrast, when people finish adding

20   address and payment method and hit that Prime upsell page,

21   there would be terms and conditions.  And clicking the yellow

22   button, get free one-day delivery, get free two-day delivery,

23   whatever the phrase was, it confirmed the signup action and

24   then started the obligation.  So there were pricing terms,

25   et cetera, on that page.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Nelson

Amazon.com, Inc.                                                    8/16/2022

```
 1              If somebody did opt in from that page and then move
 2     forward to the next page, or confirmation page, and then
 3     decided they didn't want that order, they abandoned -- maybe
 4     they were checking price, whatever -- the Prime membership
 5     subscription would stick with their account, it wasn't
 6     cancelled, in the way that it was cancelled in Germany.
 7              Does that make sense?
 8         Q.   It does.
 9         A.   Okay.
10         Q.   So I have a couple of follow-up questions about it.
11         A.   Okay.
12         Q.   You said a lot of important things there.
13         A.   Sure.  Yeah.
14         Q.   I want to make sure I understood your testimony
15     correctly.  I'm not trying to lead you.
16         A.   Sure.
17         Q.   But at this point in time, if I understood what you
18     were saying correctly, in the United States, if a customer
19     chose the Prime option during the enrollment flow but
20     subsequently abandoned her cart, she would still become
21     Prime, correct?
22         A.   Correct.
23         Q.   And at least during your tenure through, I believe
24     July of 2022, that remained the case, correct?
25                   MS. VANDRUFF:   Objection to form.
```

Nelson

Amazon.com, Inc.                                    8/16/2022

1              You may answer the question, Mr. Nelson.
2              Do you need the question read back?
3              THE WITNESS:  Yeah.  Could you read the
4     question back.
5                   (The previous question was
6                    read back.)
7         A.   Meaning that, if somebody opted in but then
8     abandoned their order, they would remain Prime?
9         Q.   Correct.
10        A.   That was the case throughout my tenure at Amazon.
11   It was under an AB test experimentation, where some
12   percentage of the population was in that -- it was called
13   ASINization, but, at any rate -- some percent of the U.S.
14   population was in the treatment that treated Prime as an item
15   in their order, if that makes sense.
16        Q.   That's what ASINization --
17        A.   That would then be abandoned -- that, if an order
18   were abandoned, so too Prime.  That was calls ASINization.
19   It was launched in Germany.  It was in an experimental phase
20   in the U.S.  I can't remember exactly which dates.
21             Did that answer the question?
22             MS. VANDRUFF:  Mr. Nelson, for the court
23   reporter, can you spell -- is it ASINization?
24        Q.   I can do it.  Go ahead, you can do it.
25        A.   A-S-I-N, all caps, the rest lower case,

Nelson

Amazon.com, Inc.                                                                    8/16/2022

1    i-z-a-t-i-o-n.  Yeah.

2        Q.   You're going to be entered into the next round of

3    the spelling bee.

4             Just for the record, can you just tell everybody

5    what is an ASIN, that is part of the word "ASINization."

6        A.   Amazon Selection Identification Number.  I don't

7    know.  Something like that.

8        Q.   Do you know why that process was called

9    ASINization?

10       A.   Yes.  Because they were equating a Prime

11   subscription to, as though it were an item added to your

12   cart.  An ASIN is like an item on Amazon, something you would

13   add to your cart, a product.

14       Q.   And a consequence of ASINization was that consumers

15   in the United States would then have the opportunity, like

16   consumers in Germany, to see the terms and conditions in

17   their cart and also remove Prime from their cart before they

18   placed their order?

19              MS. VANDRUFF:  Objection to form.

20              You may answer the question.

21       A.   That, what you stated, was sort of incorrect.

22       Q.   Fix it for me.

23       A.   They're not really in their cart at that stage.

24   They're in the order confirmation page, similar to cart,

25   but --

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                         )   ss
3    COUNTY OF KING      )

4

5           I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to administer
6    oaths and affirmations in and for the State of Washington, do
     hereby certify:  That the foregoing Investigational Hearing
7    of the witness named herein was taken stenographically before
     me and reduced to a typed format under my direction;

8
            That I am not a relative or employee of any
9    attorney or counsel or participant and that I am not
     financially or otherwise interested in the action or the
10   outcome herein;

11          That the Investigational Hearing, as transcribed,
     is a full, true and correct transcript of the testimony,
12   including questions and answers and all objections, motions
     and examinations and said transcript was prepared pursuant to
13   the Washington Administrative Code 308-14-135 preparation
     guidelines.

14

15
                         Wade J. Johnson, Certified Court
16                       Reporter 2574 for the State of Washington
                         residing at Seattle, Washington.
17                       My CCR certification expires on 09/18/22.

18

19

20

21

22

23

24

25

# EXHIBIT 118

```
 1                    FEDERAL TRADE COMMISSION
 2
 3    In the Matter of:            )
 4    AMAZON.COM, INC.,            ) File No. 212-3050
 5                  a corporation. )
 6    -----------------------------)
 7                                 Wednesday, January 19, 2023
 8
 9                                 Room 10102
10                                 Federal Trade Commission
11                                 Constitution Center
12                                 400 7th Street, S.W.
13                                 Washington, D.C.  20024
14
15            The above-entitled matter came on for
16    investigational hearing, pursuant to
17    civil investigative demand, at 9:36 a.m.
18
19
20
21
22
23
24
25
```

5

Gunningham

Amazon.com, Inc.                                          1/19/2023

```
 1                P R O C E E D I N G S
 2                -    -    -    -    -
 3    Whereupon --
 4                SEBASTIAN JORGE GUNNINGHAM
 5    a witness, called for examination, having been first
 6    duly sworn, was examined and testified as follows:
 7                        EXAMINATION
 8         BY MR. NARDINI:
 9         Q.   Okay.  We're on the record.
10              Could you please state your full name for the
11    record.
12         A.   Sebastian Jorge Gunningham.
13         Q.   Good morning, Mr. Gunningham.
14              My name is Max Nardini.  I'm an attorney with
15    the Federal Trade Commission.
16              I'm joined here today by several colleagues,
17    Olivia Jerjian to my right, who is also an attorney
18    with the Federal Trade Commission, and several
19    colleagues, Jake Frech and Ryan Zwonik, who are
20    paralegals with the Federal Trade Commission, and
21    Daniele Apanavicute, which I can also spell for the
22    record, who is another colleague of ours at the
23    Federal Trade Commission as well.  And the spelling
24    there is A-P-A-N-Q-U-I-C-I-U-T-E [sic].
25              Mr. Gunningham -- oh, sorry.  Oh, right.
```

108

Gunningham

Amazon.com, Inc.                                              1/19/2023

1    ranges for the same product, lack of clarity if
2    products are genuine/guaranteed — leaving new customers
3    to question if purchasing is secure or if they are
4    getting the best deal."
5          Did I read that correctly?
6    A.   Yes.
7    Q.   Uh-huh.
8          So there's a -- there are several points
9    identified there, and I'll start with "unfamiliar
10   language."
11         How would unfamiliar language contribute to
12   Amazon shoppers experiencing friction?
13   A.   I think like, you know, when you go to any site
14   and you find new language or new names, the shopper
15   takes a subsecond to try and to -- you know, to try and
16   understand what that means.  And we were constantly
17   introducing new programs, and so that was -- that was
18   always, as I recall, a challenge to make sure we were
19   being clear with customers.
20   Q.   So a lack of clarity, as you've described it,
21   would be a type of friction; correct?
22         MR. HALL:  Object to form.  Mischaracterizes
23   his testimony.
24         THE WITNESS:  Not necessarily friction.  Could
25   be a moment of confusion.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Gunningham

Amazon.com, Inc.                                          1/19/2023

```
 1          BY MR. NARDINI:
 2     Q.   Would you consider -- oh, I apologize.
 3     A.   Okay.
 4     Q.   Would you consider --
 5     A.   Yeah.
 6     Q.   -- a moment of confusion to be a type of
 7  friction?
 8     A.   Could be.
 9     Q.   I guess I'm thinking generally, and you can
10  tell me if you agree with this or not, as friction is
11  basically anything that impedes the customer in
12  achieving their goal.
13          Is that a fair characterization of what you
14  mean by "friction" or would you define it differently?
15     A.   It varies.  I mean, some things just are
16  complicated, and not everything in the world can be
17  simplified, and so in some cases there's confusion
18  that you always are going to have to manage, in some
19  cases it's confusion that you can eliminate, so it
20  vary -- it's really context by context.  There's lots
21  of examples I would have thought of different --
22  different contextual reasons to have confusion and
23  friction.
24     Q.   But confusion would -- even if you can't have a
25  truly -- even if it's not possible to have a -- or
```

Gunningham

Amazon.com, Inc.                                                    1/19/2023

1   even, you know, advisable to have a totally

2   frictionless environment, you would agree that

3   confusion from the customer's perspective is a type of

4   friction.  Is that a fair characterization?

5          MR. HALL:  Object to form.

6          THE WITNESS:  Yeah.  Could be.

7          BY MR. NARDINI:

8      Q.  Are there any circumstances in which you would

9   think confusion from the customer's perspective would

10  not be sort of fairly characterized as a type of

11  friction?

12         MR. HALL:  Same objection.

13         THE WITNESS:  Again, I think it's contextual.

14  If a person has never used a computer, it's going to be

15  a confusing first couple of minutes shopping online, so

16  it's very contextual again, so -- yeah, I'm not --

17  you're trying to attach the word "friction" to that.  I

18  guess -- I guess that could be.

19         (Document review.)

20         BY MR. NARDINI:

21     Q.  And Mr. Gunningham, I'll just note you're

22  reviewing the document, which is fine, but I didn't

23  want to interrupt you.  Were you still answering or

24  were you complete?

25     A.  No.  I'm trying to read the second paragraph

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1    DISTRICT OF COLUMBIA, to wit:

2         I, Josett F. Whalen, before whom the foregoing

3    deposition was taken, do hereby certify that the

4    within-named witness personally appeared before me at

5    the time and place herein set out, and after having

6    been duly sworn by me, according to law, was examined

7    by counsel.

8         I further certify that the examination was

9    recorded stenographically by me and this transcript is

10   a true record of the proceedings.

11        I further certify that I am not of counsel to

12   any party, nor an employee of counsel, nor related to

13   any party, nor in any way interested in the outcome of

14   this action.

15        As witness my hand and notarial seal

16   this 2nd day of February 2023.

17

18                        _Josett F. Whalen_

19

20             JOSETT F. WHALEN

21               Notary Public

22   MY COMMISSION EXPIRES:  9-14-2025

23

24

25

# EXHIBIT 119

| | |
|---|---|
| **From:** | Brightman, Jason [/o=Amazon/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=brightmab93] |
| **Sent:** | 5/22/2018 4:09:08 PM |
| **To:** | Brightman, Jason [brightma@amazon.com]; Lindsay, Neil [nlindsay@amazon.com]; Carrel, David [dccarrel@amazon.com]; Mittal, Pranav [pranavm@amazon.com]; Patrikios, Jay [jaypat@amazon.com]; Smith, Cami [camism@amazon.com]; Hills, Benjamin [bhills@amazon.com]; White, Teddy [thwhite@amazon.com]; Lin, Jonny [jonatl@amazon.com]; Ressmeyer, Karen [karenr@amazon.com]; Tuladhar, Praju [tuladhar@amazon.com]; Burghardt, Jake [jbu@amazon.com]; Gotschall, Mary Pat [marypat@amazon.com]; Hamel, Andrew [ahamel@amazon.com]; Patrao, Jason [jpatrao@amazon.com]; Nelson, Reid [reidn@amazon.com]; Sambrook, Roger [brookrog@amazon.com]; Gunter, Sarah Jane [gunter@amazon.com]; Grimes, Eric [ewg@amazon.com] |
| **CC:** | Fuller, Dan [danfull@amazon.com]; Sibay, Cem (Jem) [cems@amazon.com]; Honore-Jones, Philippe [honorejp@amazon.com] |
| **Subject:** | Prime Deep Dive: Customer Frustrations (Privileged \| Confidential) |
| **Attachments:** | Appendix_Top_Customer_Frustrations_Planning (Privileged Confidential).docx; Top_Customer_Frustrations_Planning (Privileged Confidential).docx |
| **Location:** | Triumph East 03.106 |
| **Start:** | 6/15/2018 2:00:00 PM |
| **End:** | 6/15/2018 3:00:00 PM |
| **Show Time As:** | Busy |

| | |
|---|---|
| **Required Attendees:** | Lindsay, Neil; Carrel, David; Mittal, Pranav; Patrikios, Jay; Smith, Cami; Hills, Benjamin; White, Teddy; Lin, Jonny; Ressmeyer, Karen; Tuladhar, Praju; Burghardt, Jake; Gotschall, Mary Pat; Hamel, Andrew; Patrao, Jason; Nelson, Reid; Sambrook, Roger; Gunter, Sarah Jane; Grimes, Eric |
| **Optional Attendees:** | Fuller, Dan; Sibay, Cem (Jem); Honore-Jones, Philippe |

==In an April 19 review of the Customer Frustrations Elimination program, Neil asked a Deep Dive on status of Prime-related frustrations.==

In this meeting, we will discuss status of projects to address Top frustrations, 2018 plans, and next steps.

 

Top_Customer_F...        Appendix_Top_C...
(Privileged Confi...     (Privileged Confi...

**Required attendees:**
Sarah Jane Gunter
Cem Sibay
David Carrel
Pranav Mittal
Jay Patrikios
Cami Smith
Benjamin Hills
Teddy White
Jonny Lin
Karen Ressmeyer
Praju Tuladhar
Jake Burghardt
Mary Pat Gotschall

**Optional attendees:**

CONFIDENTIAL TREATMENT REQUESTED

Neil Lindsay
Andrew Hamel
Jason Patrao
Reid Nelson
Roger Sambrook

What is the Frustrations program?
Customer Frustrations Elimination is a consumer-wide initiative to promote customer obsession. Since 2014,
24 experiments that referenced and resolved customer frustrations generated ███████ annualized OPS across teams,
with accumulated results annualized for 1 year (https://tiny.amazon.com/1ex4jkaod).    Based in CXT, the Frustration
program's mission is to drive toward a zero-frustration shopping experience that customers love, closing the loop on
customer frustrations.

What goals is the program flash reporting against?
CLT Goal: Eliminate at least 70% of frustrations in top 3 most frustrating customer themes ('Prime-related frustration,'
'Finding Lowest Item Price,' 'Not Receiving Free Shipping') worldwide by Dec 31, 2018.
Team Goal: Drive improvements against at least 50 frustrations within the Top 4-10 customer frustrations themes by
Dec 31, 2018.

Where can I learn more?
Frustrations program overview: https://tiny.amazon.com/y8rgjyht
Top 10 customer frustration themes, including videos of customers and links to insight tickets:
https://tiny.amazon.com/qwfuha6t

CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT 120

| | |
|---|---|
| **From:** | Qiao, Fang [/O=AMAZON/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FF2762941D824B14AEC1755C3F13F238-FANGQIAO] |
| **Sent:** | 10/28/2020 10:54:28 AM |
| **To:** | Moeller, Caroline [cmmoell@goodreads.com]; Ghani, Jamil [ghanijam@amazon.com]; Davidai, Nahshon [ndavidai@amazon.com]; Leung, Lisa [lileung@amazon.com]; Balakrishnan, Sanjay [bsanjay@amazon.co.uk]; Baidwan, Nikki [nikbai@amazon.com]; Malhotra, Neel [neelmal@amazon.com]; Schmitz, Erik [eschmitz@amazon.com]; Kremer, Susan [skremer@amazon.com]; meet@chime.aws; pin+6410875480@chime.aws; Srinivasan, Bharath [bharaths@amazon.com]; Lahood, Simone [lahood@amazon.com]; Maceratesi, Federico [maceratf@amazon.lu]; Morey, Rex [rexford@amazon.com]; Hills, Benjamin [bhills@amazon.com]; Hankin, Jediah [jediahh@amazon.com] |
| **Subject:** | RE: Clarity Working Group: October Review [Privileged and Confidential] |
| **Attachments:** | 20201028_Prime_Clarity_Score_P&C_vF.docx |

+ Adding Rex, Ben & Jediah

---

**From:** Qiao, Fang
**Sent:** Wednesday, October 28, 2020 10:50 AM
**To:** Moeller, Caroline <cmmoell@amazon.com>; Ghani, Jamil <ghanijam@amazon.com>; Davidai, Nahshon <ndavidai@amazon.com>; Leung, Lisa <lileung@amazon.com>; Balakrishnan, Sanjay <bsanjay@amazon.co.uk>; Baidwan, Nikki <nikbai@amazon.com>; Malhotra, Neel <neelmal@amazon.com>; Schmitz, Erik <eschmitz@amazon.lu>; Kremer, Susan <skremer@amazon.com>; meet@chime.aws; pin+6410875480@chime.aws; Srinivasan, Bharath <bharaths@amazon.com>; Lahood, Simone <lahood@amazon.com>; Maceratesi, Federico <maceratf@amazon.lu>
**Subject:** RE: Clarity Working Group: October Review [Privileged and Confidential]

+ Susan, seeking legal guidance.

Team – Please see attached document on clarity score for review today. Thanks –Fang

-----Original Appointment-----
**From:** Moeller, Caroline <cmmoell@goodreads.com>
**Sent:** Wednesday, July 8, 2020 3:34 PM
**To:** Moeller, Caroline; Ghani, Jamil; Davidai, Nahshon; Leung, Lisa; Balakrishnan, Sanjay; Baidwan, Nikki; Malhotra, Neel; Schmitz, Erik; Kremer, Susan; Qiao, Fang; meet@chime.aws; pin+6410875480@chime.aws; Srinivasan, Bharath; Lahood, Simone; Maceratesi, Federico
**Subject:** Clarity Working Group: October Review [Privileged and Confidential]
**When:** Wednesday, October 28, 2020 11:00 AM-12:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Meeting ID: 9829 24 3191

Updating to 10/28 due to Prime Day conflicts

Updating Attendees

This is a recurring forum for leadership to review clarity progress, align on launch decisions, and provide guidance for ongoing clarity workstreams. Agenda to be shared prior to the meeting.

---------- Amazon Chime Meeting Information ----------

You have been invited to an online meeting, powered by Amazon Chime.

Download Amazon Chime at https://aws.amazon.com/chime/download
For information about creating an Amazon Chime account, see https://aws.amazon.com/chime/getting-started

Click to join the meeting: https://chime.aws/9829243191
Meeting ID: 9829 24 3191
A headset is recommended or you may use your computer's microphone and speakers.

Call in using your phone:
United States Toll-Free: +1 855-552-4463
Meeting ID: 9829 24 3191
One-click Mobile Dial-in (United States Toll-Free): +1 855-552-4463,,,9829243191#
United States (1): +1 206-462-5569
International: https://chime.aws/dialinnumbers/
Dial-in attendees must enter *7 to mute or unmute themselves.

To connect from an in-room video system, use one of the following Amazon Chime bridges:
SIP video system: 9829243191@meet.chime.in or meet.chime.in
H.323 system: 13.248.147.139 or 76.223.18.152
If prompted enter the Meeting PIN: 9829243191#

---------- End of Amazon Chime Meeting Information ---------

CONFIDENTIAL TREATMENT REQUESTED

# EXHIBIT 121

**From:**  Nelson, Reid [/o=Amazon/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=reidn]
**Sent:**  2/9/2021 1:09:04 PM
**To:**  Ong (Design Tech), Tim [timong@amazon.com]; Gotschall, Mary Pat [marypat@amazon.com]
**Subject:**  Re: Clarity workstream

Will do. Thanks Tim.

---

**From:** "Ong (Design Tech), Tim" <timong@amazon.com>
**Date:** Tuesday, February 9, 2021 at 1:08 PM
**To:** "Nelson, Reid" <reidn@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** Re: Clarity workstream

Yes, please include Debbie as much as possible.

---

**From:** "Nelson, Reid" <reidn@amazon.com>
**Date:** Tuesday, February 9, 2021 at 11:40 AM
**To:** "Ong (Design Tech), Tim" <timong@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>
**Subject:** Re: Clarity workstream

*[reducing audience]*

Hey Tim,

Thanks again for pulling Steven and Nathan into the clarity work stream, they've done some really great work so far!

So as Katey called out below, the CWG meeting is getting rescheduled for a TBD later date, but Llew and Jamil have aligned on a design collaboration in the short-term. For both sign-up as well as cancellation CX. It sounds like Katey would like Rio to continue participating in that collab.

I will set up a kickoff meeting with the relevant folks in Prime + Shopping Design for us to talk through the engagement model and workback schedule. Should I include Debbie in the kickoff to help organize the Rio team's efforts in this work stream?


Thanks so much!
Reid

---

**From:** "Muus, Katey" <kateymuu@amazon.com>
**Date:** Monday, February 8, 2021 at 2:18 PM
**To:** "Nelson, Reid" <reidn@amazon.com>, "Ong (Design Tech), Tim" <timong@amazon.com>, "Pizzutelli, Antonio" <pantonio@amazon.com>, "Edelstein, David" <edelstei@amazon.com>, Mary Pat Gotschall <marypat@amazon.com>, "Morgan, AmyLeigh" <amyleigh@amazon.com>, "Jensen, Gloria" <glojen@amazon.com>, "Neuman, Steven" <neumansn@amazon.com>, "Magnusson, Nathan" <magnun@amazon.com>, "Ogborn, Ryan" <ogborn@amazon.com>, "Teska, Danielle" <teskad@amazon.com>
**Subject:** Re: Clarity workstream

CONFIDENTIAL TREATMENT REQUESTED

*Forgive the double send, I didn't capture all recipients.*

Hi team,

I am very excited about the work that was shown this morning, thank you all!

Llew and Jamil agree that there is work to be done before exhausting experimentation as a way to find the right balance for customers. They do not feel there is a debate to be framed **for C-team** at this time, and **are cancelling the review**. Llew is pleased with the work this team has driven so far, " I do think we've helped the Prime team think differently about this (the metrics point), and I do want us to partner to help here on the design side. I think there are possible wins without big sacrifices."

Please move forward with the design work and mock doc in progress, with a shifted audience of the teams that directly support these workstreams. Bonus: This buys us more time. Jamil is interested in simplifying the cancel flow – now that we have time it would be great to make recommendations for best practices for copy and design for cancellation. In addition, Reid – please continue to see what threads you can pull on with data, I think GCCP is an interesting direction to explore.

Could this group could put together a workback schedule for reviewing at the Director level with Prime and myself? (I'm not sure who the right Director from Prime is?)

Thank you!

AMZN_00100863

# EXHIBIT 122

| | |
|---|---|
| **From:** | Nelson, Reid [/o=Amazon/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=reidn] |
| **Sent:** | 8/20/2020 12:35:01 PM |
| **To:** | Moeller, Caroline [cmmoell@goodreads.com]; Remien, Sonja [sonkle@amazon.de]; Dunn, Marla [mpdunn@amazon.com] |
| **Subject:** | RE: Privileged and Confidential: Prime Subscription Clarity Doc |
| **Attachments:** | Privileged and Confidential Prime Clarity Review.pdf |

--retaining privilege—

Adding Sonja for visibility on Prime's latest approach to Clarity. Of particular relevance is the section in the attached document on "measuring high confidence sign ups".

(Thanks again for sending this Caroline)

**From:** "Moeller, Caroline" <cmmoell@goodreads.com>
**Date:** Wednesday, August 12, 2020 at 11:38 AM
**To:** "Nelson, Reid" <reidn@amazon.com>, "Morgan, AmyLeigh" <amyleigh@amazon.com>, "Edelstein, David" <edelstei@amazon.com>, "Kremer, Susan" <skremer@amazon.com>
**Subject:** Privileged and Confidential: Prime Subscription Clarity Doc

Hi Reid, Amy Leigh, and David,

As Jamil alluded to in his response yesterday, please find attached a P&C document that we (incl Jamil, Sanjay, Nahshon, Nikki) reviewed with Llew Mason and Jody Biggs yesterday. This is a slightly updated version of the doc we had previously reviewed with Neil Lindsay on 7/24, outlining our learnings on implementing clarity, Prime's mental model for clarity moving forward, and planned 2020/2021 iniatives across content and product.

The review with Neil went very well, and Neil was aligned that we need to reset our clarity bar, and that 2020 is a great year to do so given positive business performance. Sharing this document for visibility into the internal conversations we are having including the changes we plan to make in 2020.  As I mentioned last week, the blocker in Prime has not been *testing* clarity initiatives, but rather 1) getting buy in to make dial up decisions across all templates/locations with a significant negative impact to paid members 2) getting confirmation that these changes *actually* improve clarity 3) implementing these changes consistently (across all of the ▮ UPDP templates, across all locales as each have separate leadership chains).

Thanks and please reach out with any questions or feedback,


**Caroline Moeller**
Content Experimentation, Prime
cmmoell@amazon.com



# EXHIBIT 123

**Privileged & Confidential: Prime Framework for Clarity**

**Overview:**
The Prime team manages high visibility locations across Amazon's site that inform and encourage prospective Prime members to join Prime, and Prime members to discover their benefits and manage their membership. As evidenced by open customer frustrations tickets and CS contacts related to clarity issues, customers can be frustrated and confused by some of these experiences. One prominent example is the full page Prime signup interstitial that appears during checkout (UPDP), which is leading some customers to sign up for Prime without intending to do so. Over the past few years we have invested material efforts in tackling this issue as part of a broader effort to improve clarity in Prime CX by running content tests, analyzing customer surveys, diving into CS contacts, leveraging User Testing to scale direct customer research, and launching product improvements (e.g. ASINization). However, clarity can be difficult to measure and operationalize at scale, and it is challenging to directly impact business metrics (e.g. memberships, subs revenue) without simultaneously demonstrating how we are improving outcomes from customers. Therefore, in spite of good intentions and a number of actions we have taken in the previous three years, we have not made enough sustained progress to improve clarity in the Prime membership experience. Our overall learning from this effort is that in order to make meaningful progress on the topic, we need i) a mental model that allows us to operationalize clarity into our business inputs at scale; and ii) mechanisms that allow us to iterate on the specific problems we are solving as we uncover new defects. The purpose of this document is to share a brief overview of our learnings thus far and our forward looking mental model for improving clarity across Prime owned locations. We would like to discuss our planned approach for enhancing clarity across the Prime CX and how Prime can work with partner teams such as Customer Journeys (CJ) to maintain the highest bar on customer experience while driving the best outcomes for Amazon.

**Section 1: Insights from actions so far**

**1.1 We have accumulated a significant clarity debt that we need to start paying down:** Customer anecdotes suggest that the Prime CX does not meet an acceptable clarity bar for many customers. The top issues surfaced through channels such as customer contacts, customer frustrations, user studies, and social media are that customers are not always aware that they are signing up for Prime, and they find it difficult to get information and proceed with membership cancellation if they wish to do so. ▇% of respondents of the Prime cancel survey for H1 2020 indicated "I didn't mean to sign up for Prime" and ▇ of the ▇ Prime customer frustrations are related to unintended Prime signups (See Appendix A). Several user tests we conducted on our checkout upsells resulted in at least ▇ customer from the test groups either not aware they joined Prime or not able to find the option to decline the FT. We need to take immediate action to address these pressing CX issues.

**1.2 Our understanding of clarity does not always match customers' perception.** ==In spite of well-intended efforts at creating and enforcing clarity guardrails, some of the hypotheses developed internally to improve clarity have turned out not to be correct.== Two examples: first, the hypothesis behind our push for Prime ASINization was that by adding Prime as an ASIN to the shopping cart on single page checkout (SPC), we can increase visibility into the Prime purchase and provide customers the option to remove the subscription. However, in customer research studies, we found that customers didn't notice the added ASIN as part of their order or didn't realize that they can remove it. Second, a common feedback on the Prime upsell interstitial in checkout is that the negative CTA (Decline option) is not as prominent as the positive CTA. In DE, we tested a treatment where we ==added a box around the decline option to make it more prominent. However, user testing revealed that even more customers had trouble identifying the decline option with this treatment.== Therefore, we cannot rely on internal perspectives alone to develop clarity improvements and must actively solicit and incorporate user feedback in developing and validating experiment hypotheses.

**1.3 Thus far we have launched clarity improvements in an ad hoc and sporadic manner.** So far, all initiatives to improve clarity have been focused on isolated elements of the CX. Project Lucent was entirely focused on content updates on specific locations and ASINization was a single product improvement in checkout without corresponding content enhancements throughout the checkout flow. Both initiatives had a significant negative short-term impact on signups without any measurable improvements in awareness, engagement or yield and therefore, were not rolled out fully. By examining each of these changes in isolation, we miss the opportunity to evaluate improvements and impact across the entire customer sign-up journey. A customer has various touch points with our CX, therefore we must view clarity as a holistic journey covering the entire experience from ingress to the desired end point.

**1.4 We need to consider revolutionary vs. evolutionary approaches.** We have been working under the assumption that the Prime full page interstitial in checkout, Prime Universal Decision Page (UPDP), is our most important acquisition location

CONFIDENTIAL                                                                                   AMZN_00101500

(driving ■ % of WW signups) and have been making incremental changes to the location by modifying CTAs and benefits. For instance, an experiment on UPDP Free Trial Desktop in the US in Jan 2020 where we enhanced clarity of CTAs led to a ■ % drop in signups(Appendix C). However, in a recent experiment in the UK on mobile Free-Trial we tested the impact of removing UPDP entirely from the checkout flow (Appendix D). This led to a ■ % impact on Prime signups (with ■ % on OPS), suggesting that some signups lost from UPDP would be picked up on other checkout locations, and as such, the standard metrics overstate the real incrementality of UPDP.  While we do not accept solutions that will lead to a loss of Prime members, we take this experiment as an indication that by considering bold changes in our customer flows, we can create win-win solutions that are net neutral or positive in business impact while improving the overall CX.

## Section 2: Approach to clarity moving forward

**2.1 – Vision:**  Our North Star is to have 100% of our member base feel informed about and be aware of their membership status ("I know I have joined Prime, a paid subscription program and am aware how much I'm paying and when"). We aspire to achieve this vision through guidelines and tenets coupled with a clear measurement framework.

### 2.2 Tenets for Clarity (unless you know better):

1. **We are proud of the Prime CX.** We believe in Prime's value proposition, and communicate all aspects of the membership clearly to customers.
2. **We optimize for aggregate measures, but pay attention to customer-level defects.** When there is a conflict between aggregated metrics and anecdotes, we prioritize customer anecdotes to resolve concerns for small customer segments.
3. **We will not trade-off long term improvements for short-term results.** We work relentlessly to identify root causes, and are empowered to implement remediation even at a significant short term cost. While initial results may be negative, we will find ways to mitigate impact to business goals.
4. **Clarity is contextual and we do not force a one size fits all approach globally.** We will work with global teams to build localized guidelines and solutions where relevant.
5. **We do not view clarity as a one-time exercise.** We view clarity as a core pillar of member trust and will develop mechanisms to continually monitor and improve across all aspects of our CX.

### 2.3  Measurement and enforcement:

We view clarity as an ongoing workstream across multiple teams in Prime, akin to Risk, as opposed to ad hoc actions meant to address specific customer frustrations. Our intent is to create an 'as automated as possible' approach to clarity measurement and enforcement, grounded in common tenets / guidelines, that will be scaled WW.

**WW Guidelines and Automated Enforcement:** We have partnered with the Prime design team (GPX) to develop a set of clarity guidelines that will be applied to all new content experiments (See Appendix E). We will continually vet and refine these guardrails based on customer feedback to validate that these changes are improving our experience for customers. These guidelines will be enforced through an automated QA process which will flag treatments that lack clarity guardrails such as price prominence, decline buttons, or Prime logos. (Phase 1 launch 9/30). Additionally we will work with GPX and Brand teams to codify UX building blocks for content locations in Content Catalog, which would mean, for example, that marketers no longer have the ability to change a button into a link or include four buttons on one page.

**Clarity Bar Raisers:** To manage this program and monitor clarity's impact to the business over time, we are starting a monthly clarity working group as a forum for Prime leadership to discuss clarity metrics, review recent clarity experiment results, and make dial up decisions. To ensure we are regularly reviewing our holistic CX for clarity, we have instituted a monthly global walk the store series for Prime where we audit recent content and product winners to ensure we are enhancing the CX with key launches.

**Clarity Score:** To measure continuous progress on this front, we propose creating a Clarity Score that we will report as a Defects Per Million metric to indicate how confident we are that members are aware of their membership status. We will create this score as a 'level of confidence' metric, based on a combination of Exposure (saw Prime messages >= X times), Interaction (Clicked/Swiped Prime messages), Confirmation (explicitly signaled they know they are Prime, e.g. by visiting Prime Central and changing their settings OR selected the Prime filter on the Search page), and Denial (explicitly signaled that they did not think they were Prime, e.g. via CS contacts or onboarding widget responses). We will qualify our member metrics with this confidence

112 score, and set OP2 goals that align clarity and business goals, (e.g. OP2 goal to achieve 180MM *high confidence* Prime member
113 balance by 12/31'

114

115 **2.4 Planned Actions for 2020 HY2 and 2021:**

116

117 <u>Pre-Sign Up</u>
118 As part of 2021 OP1, we are proposing a redesign for Prime upsells in checkout. Our goal with this project is to revamp the end to
119 end upsell experience in checkout to be more personalized and engaging for customers, enabling them to complete checkout
120 with minimal friction and to opt into Prime fully informed about how Prime can enhance their Amazon experience. We have
121 ongoing experiments that will inform the vision for this overall redesign. First, as mentioned previously, we are encouraged by
122 initial results from the UK UPDP mobile Free Trial suppression test, and plan to expand this experiment to other use cases and
123 locales. Secondly, we are working with the Customer Journeys (CJ) team to dial up a desktop True Single Page Checkout flow in
124 the US, measuring impact to GCCP and Prime signups when we simplify the steps in the checkout flow, testing versions with
125 UPDP and without (ETA: 8/15).

126

127 In H2 2020, while we experiment with longer term solves, our first priority is to update the CTAs on UPDP, which we believe to
128 be one of the biggest customer pain points. This location drives 2x more mistaken signups than SPC and 4x more than SOSP, and
129 has low member yield (25% of signups vs 8% of members). We will update the positive CTA so customers understand they are
130 starting a Prime membership by clicking the button and make the Decline CTA easier to find (e.g. by replacing the text link with a
131 button). We are prioritizing this update due to the prominence of this interstitial in checkout and its impact on mistaken signups.
132 This CTA change in UPDP will be locale-specific, based on insights from User Tests and locale-specific legal guidance with the aim
133 to complete these in 2020.  In JP, we are continuing to experiment with checkout ASINization, so that customers who do not
134 complete checkout after signing up on UPDP will not become Prime members, but the Prime ASIN will persist in their cart ( initial
135 rollout dialed up on 8/6).

136

137 <u>Post Sign Up:</u>
138 Within the Prime activation experience, we will create interactive member confirmation experiences which will allow members
139 to let us know that they realize they are Prime (or not), which can then feed our inspection metrics and ML models to inform
140 further content refinements. We also plan to expand outbound membership notifications, including sending SMS for sign up
141 confirmations to specific customer cohorts, and sending proactive membership renewal notifications to members with 0 or one-
142 time benefit usage. Additionally, we plan to add links to Prime Central on signup confirmation pages to allow customers to
143 correct mistaken signups. In H2 2020, we are enhancing the membership summary widget within the Prime Welcome Email to
144 make it clear how customers will be charged for Prime (ETA 8/15).

145

146 Ease of cancellation is a related area we are focused on. Within the cancellation process, we want to simplify the experience for
147 members of all tenures by helping them easily find the cancel flow and reducing clicks to cancel. We see personalization and
148 automation as the long term solve for enhancing the cancellation CX when mitigating business impact, and will make it even
149 easier for high-cancellation-propensity members to discover the cancel flow (as identified by an ML model based on Ret score).
150 In H2 2020, we plan to make all cancel buttons above the fold in Iliad (first experiment launched 7/22), and we will also create
151 unique customer cancellation journeys based on tenure and Prime experiences (UK launch 8/22).

152

153 **Section 3: FAQs**

154

155     **1.  How is this attempt at clarity different from efforts in the past that were not implemented globally?**
156         Past efforts to fix the long standing CX issues described in this document have stalled due to the i) negative short-term
157         impact they had on signup and membership volumes and ii) lack of a sustained mechanism to ensure progressive
158         implementation of changes. We continue to be concerned about the short term business impact of the changes we are
159         proposing. We estimate a 2020 impact of -710K members based on our prioritized initiatives (see Appendix F for
160         annualized estimates). Even with this immediate impact, we believe strongly that we need to start taking action to fix
161         these gaps and that we have a unique opportunity to do so in 2020 due to the tailwinds provided by COVID-19. As of
162         June 2020, we are exceeding Prime OP2 goals and we have aligned with Prime leadership that we will invest some of
163         this exceedance to plan into clarity, starting with UPDP.
164         In addition, we are now adopting a programmatic approach to clarity, with a single threaded leader who will take goals
165         and lead clarity efforts across Prime. To ensure changes are actually working for customers, we have implemented a
166         strong voice of the customer program as the cornerstone of our clarity enhancements. Each initiative is first shared with
167         customers for feedback and confirmation that it enhances clarity, then launched as an experiment to measure the

CONFIDENTIAL                                                                                    AMZN_00101502

# EXHIBIT 124

Prime Account CX Satisfaction - Privileged & Confidential

134  confirmation options post signup to ensure members are aware of their Prime trial or subscription (see Appendix C for mocks, ETA
135  5/14). However, we acknowledge that this is a gradual approach that leaves a gap in our CX that continues to surface as a key
136  source of customer frustration. If this slow approach and current CX are not acceptable, we would like to discuss if we are we
137  willing to budget a loss on business metrics (and how much) to invest in the CX. We have outlined some options below for
138  immediate changes that we can make to UPDP along with estimated impact of these changes . We seek alignment on the options
139  we should pursue and the timing of these changes globally.
140

> **Commented [MOU17]:** Nice work on these – love to see the "a la carte" menu of improvements. The only thing I think that's missing is the estimated impact each has on customer-focused metrics. For example, the options that change the CTAs will likely have the largest improvements to CS cancel contacts for SIC unintended.



| Control | Option 1 : 1) add price at renewal near positive CTA and 2) update language fort decline CTA, keeping as a link<br>**Estimated Impact: -2MM** estimated paid members annualized worldwide |
|---|---|

**Option 2 : 1)** add price at renewal near positive CTA,  adding Prime into positive CTA button and 2) update language from decline CTA and 3) Test positive CTA language options, adding Prime to positive CTA  or "Start your 30 day FREE trial"
**Estimated Impact: -4MM-5MM** estimated paid members annualized worldwide

**Option 3: 1)** add renewal price near positive CTA, 2) update language for positive CTA ( test options above) 3) make negative CTA a button with updated language

Amazon Privileged & Confidential 4

AMZN_00102512

Prime Account CX Satisfaction - Privileged & Confidential

141  **Cancel Flow:**
142  There were ▮▮▮▮▮ WW member cancel initiations in 2020 WW, of which ▮▮▮▮▮% are online and ▮▮▮% though CS. ▮▮%
143  of members who enter the online cancelation flow end up staying with Prime (▮▮▮▮▮). The online cancellation process features a
144  flow that presents pertinent information to members such as alternate plan types or options (e.g. monthly vs annual, or pausing
145  the membership instead of canceling) and additional information relevant to the customer's membership (e.g. Prime benefits, next
146  billing date, billing reminders). Customers enter the cancelation flow by clicking on 'end my membership' within the Prime
147  management page. Through CS contact mining, cancel survey free form text, and customer studies, we are aware that some
148  customers find the online cancelation flow hard to navigate and use. Further, some customers in customer focus groups and UX
149  studies have expressed frustration and confusion at the number of clicks they need to perform in the cancel flow, to be able to
150  cancel their Prime. Recent regulatory complaints in the EU and US[1] are consistent with these customer pain points.
151
152  As Kevin (Munich, 2019) stated, "*Amazon makes it extremely difficult to make the cancellation final, because of the many steps we have just*
153  *taken...As a customer I expect a certain degree of appreciation...that I can do things efficiently. I had to tell them several times that I absolutely*
154  *wanted to cancel it...I can imagine that many people would not finish the cancellation, because of these many steps.*"
155
156  Similar to the upsell flow, we believe the difficulty in finding/completing the experience is applicable only to a small set of
157  customers. Data from the cancel flow (Appendix F) suggests that the vast majority of users achieve their objectives. ▮▮% of those
158  that enter the flow (for US, UK, DE, and FR in FY 2020) make it through to the last page. Of those that enter the flow and decide
159  not to cancel Prime, only ▮% choose to subsequently call CS to cancel in the next 30 days, and ▮▮% use benefits within the next 30
160  days (▮▮▮▮bps vs average Prime member base over a comparable 30 day time frame: indicating to us that it is prudent to remind
161  members of benefits Prime gives them, when they are considering cancelation.
162
163  *Benchmark comparison(s)*
164  We compared the Prime cancellation experience across the upsell programs used in the sign-up experience as well as other well-
165  known digital subscriptions (Netflix, Hulu, Disney+, Spotify Premium, YouTube Premium). Comparing CX for these programs across
166  the top customer frustrations, Amazon is slightly better than the average in 1) steps to find cancel from the home page, and 2)
167  steps to cancel once entering the flow. (See Table 2 on the next page). Within the cancel flow, most programs remind customers
168  of the benefits they will lose by cancelling and provide options to switch plans, where applicable. Walmart+ requires customers to
169  specify a reason before they can cancel and others like Spotify offer a 1 question survey post cancellation. In comparison, the
170  Prime cancel flow takes 3 clicks to access but could be confusing for customers to discover the variety of bundle programs and
171  options and programs customers can access/subscribe to on the Amazon account page. At 3 clicks through to cancel, the cancel
172  flow is similar in length to other programs and offers customers a chance to switch plans or pause membership before cancelling.
173

> **Commented [MOU18]:** Is ▮▮% a 'vast majority'? This kind of language runs the risk of minimizing the ▮▮%, which is still a large number.

> **Commented [MOU19]:** Are we including abandoners in this analysis? If yes, then "decide" is not the right verb as we don't know that the abandonment was an intentional decision.
>
> As per previous doc feedback, this analysis should include a breakdown on what happens with the abandoners. How many of those folks go on to contact CS to cancel, use benefits, etc? This is the most relevant segment for Cancellation Clarity as we don't know if the abandon was a 'save' or a mistake.

---

[1] The Prime cancel flow is the subject of a complaint made to Norway's Consumer Council (NCC) citing a report ("You can log out but you can never leave") as well as an FTC complaint in the US.

Prime Account CX Satisfaction - Privileged & Confidential

174

Table 3: Cancel flow comparison

| | Online Cancel Available? | # Steps to Reach Cancel Flow | # Steps to Cancel | Alternative Payment Options/Plans | Option to Pause Membership | Renewal Reminder Opt In | Cancel survey | Benefits that will be lost w/ Cancellation | Benefits extended through end of billing/trial cycle | Special Offers in Cancel Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| Related Frustrations | | T-3138 | T-3144 | | | | | | | |
| Prime | ✓ Yes | 4 | 3 | ✓ Yes | ✓ Yes | ✓ Yes | ✓ Yes - Post cancellation | ✓ Yes | ✓ Yes | ● No |
| Walmart+ | ✓ Yes | 4 on desktop 3 on mobile | 2 | ● No | ● No | ● No | ● Yes - Pre cancellation | ✓ Yes | ✓ Yes | ● No |
| ZalandoPlus | ✓ Yes | 3 on desktop 2 on mobile | 2 on desktop 3 on mobile | ● No | ● No | ● No | ● Yes - Pre cancellation | ✓ Yes | ✓ Yes | ● No |
| FNAC+ | ● No - can disable renewals online | N/A | N/A | ● No | ● No | ● No | ● No | ✓ Yes | ✓ Yes | ● No |
| YouTube Premium | ✓ Yes | 5 | 3 | ● No | ✓ Yes | ● No | ● No | ✓ Yes | ✓ Yes | ● No |
| Spotify Premium | ✓ Yes | 4 | 2 | ✓ Yes | ● No | ● No | ✓ Yes - Post cancellation | ● No | ✓ Yes | ● No |
| Netflix | ✓ Yes | 3 | 2 | ● No | ● No | ● No | ● No | ● No | ✓ Yes | ● No |
| Hulu | ✓ Yes | 3 | 4 | ● No | ✓ Yes | ● No | ● Yes - Pre cancellation | ● No | ✓ Yes | ● No |
| Disney+ | ✓ Yes | 4 on desktop 5 on mobile | 2 | ● No | ● No | ● No | ● No | ● No | ✓ Yes | ● No |

175
176
177 _Testing and Learnings_
178 Our successful experiments and learnings on the cancel flow have been organized into three hypotheses. First, we wanted to test
179 whether certain customers benefit from easier access to the cancel flow. Towards this, in 2020 we experimented with improved
180 accessibility to 'end membership', for certain groups of customers we identified as 'low propensity to remain Prime'. For these
181 customers, we increased visibility of Prime membership management options on high traffic Prime locations and have found that
182 these initiatives were highly beneficial to customers (600K+ CS contacts reduced). Additionally, they were also member accretive,
183 indicating to us that when membership management is made accessible to targeted sets of customers, they end up engaging with
184 the membership. Second, we wanted to test whether customers value the opportunity to make more informed decisions at the
185 time of canceling Prime. Towards this, in 1H 2020 we enhanced the customer service cancel experience - by enabling customer
186 service agents WW to direct customers contacting CS with intent to cancel, to the online cancelation flow. In doing so, we realized
187 about 2.0MM member renewals annually via the mix shift (+1000bps in 2021Q1 vs 2019Q1), as our online cancelation flow
188 provides pertinent information – alternate plans, offers and benefits info. Lastly, we wanted to also validate whether we can make
189 simplifications in the Iliad flow, while yielding accretive business outcomes. Towards this, we unified 'cancel Prime' and 'Pause my
190 membership' options into a single 'stop billing me' CTA: we were able to accomplish the cognitive load reduction with a net
191 positive outcome in the US, in Q1 2021 (+120K members retained incrementally annualized, on account of members returning to
192 the program at a higher rate). We have also learned that members do not value overly generic information in the cancelation flow,
193 telling us our interventions in the flow have to be highly targeted and relevant. In Q3 2020, we tried generic messaging in the flow
194 on shipping and streaming, to members with no recent (T30) day history of using these benefits, resulting in negative results. We
195 subsequently dialed down, with the learning that our customers' bar for relevance is much higher.
196
197 _Planned approach moving forward_
198 We are aware of two distinct issues that a certain subset of our customers face with our cancel flow today. (1) It is hard to find the
199 flow within the regular customer journey on Amazon; and (2) once customers find the flow, they find the number of clicks through
200 to cancelation irksome. At the same time, a large number of our users appear to use the flow as intended, and the flow saved us
201 21MM members annually in 2020. Blunt force instruments to shorten the flow, or increase visibility to cancel flow may impact
202 these numbers drastically. Acknowledging the high idea risk here, our mental model towards this space is threefold. **First**, we are
203 working on bringing the number of clicks in the cancelation flow down. Our 2021 goal is to bring Iliad down to a single page flow.
204 We know that nearly a third of customers entering the Iliad flow have very poor retention probability (as defined by Prime's
205 Retention propensity modeling), and these customers have a retention rate of <1% in Iliad. For these customers, we will test
206 making cancelation significantly easier, by testing single page or shortened flows. For the remainder of customers, finding the right
207 testing, segmentation and relevance strategy is of utmost importance here, on account of the Iliad flow in current form presently
208 saving 21MM members annually. We are testing this simplification initiative (named Café) in Q2 and Q3 – starting with deprecating

CONFIDENTIAL TREATMENT REQUESTED    AMZN_00102514

# EXHIBIT 125

1  **Improving the clarity of Amazon's subscription programs** | Shopper Frustrations Team | December 16, 2020

2  **1. Overview**

3  Customers encounter confusion interacting with Amazon's digital subscription services, leading to mistaken sign-ups, unexpected
4  renewal/charges, and/or difficulty cancelling. We've been actively tracking these "subscription clarity" issues since 2016 through the
5  Shopper Frustrations program. Since these issues propagate across organizations, features and programs, the Shopper Frustrations
6  team set up a cross-org work stream (QBR Goal #172231) to inspect Amazon's various service-oriented subscription programs,
7  specifically focusing on Prime, Audible, Kindle Unlimited, Music Unlimited, and Prime Video Channels. Through the work stream,
8  designers, researchers, PMs and BIEs across Consumer Engagement, Prime, Customer Service and other subscription teams have
9  collaborated to develop a set of recommendations that we believe will address and prevent these issues at scale.

10  The objective of this meeting is to review the top proposals we landed on through this work stream, provide more background on
11  the customer problems and root causes we worked backwards from, and discuss next steps for moving forward.

12  **2. Proposals for raising the bar on subscription clarity across Amazon**

13  The Prime Member Growth team has prioritized clarity and member trust as an ongoing global work stream in 2020 and 2021. In-
14  progress efforts include 1) establishing WW Prime content testing guidelines with automated enforcement, 2) conducting monthly
15  clarity reviews and walk-the-stores of holistic CX, 3) inventing a Clarity Score to predict and track high vs. low confidence sign-ups,
16  and 4) testing clarity-related CX improvements to acquisition and retention flows.

17  Our subscription clarity working group identified opportunities to build on Prime's work so far, and to further raise the bar for
18  customers of both Prime and other subscription programs. Below are four proposals we believe will address the organizational root
19  causes that cause trustbusters to proliferate across Amazon's subscription programs. (Customer problems and root causes are
20  outlined in Sections 3 and 4 of this doc).

21  **Proposal 1: Adopt clarity tenets for subscription programs** (unless you know better ones)

22      1.  **We don't let financial impact impede efforts to build a trustworthy CX.** We make it clear to customers what they're being
23          offered, even if doing so results in fewer sign-ups or paid members. We tolerate these losses, because it's the right thing to
24          do.
25      2.  **We treat misleading CX as a defect.** Teams are incentivized to fix these issues quickly, and prevent their recurrence, as
26          they would a sev-1 or sev-2. These are not feature requests that need to be prioritized.
27      3.  **All information a customer needs to make a decision is provided where they need to make that decision.** We do this
28          outside the T&Cs to ensure that customers see and comprehend these details.
29      4.  **Customers can confidently predict the result of their actions.** Given that some customers will still make mistakes, we also
30          provide obvious confirmations and easy 'undo' paths.
31      5.  **We make it as easy to cancel our services as it is to join them.** We ensure that the ingress to self-service cancellation is
32          easily discovered, and the flow quickly and confidently finished.
33      6.  **We raise the bar on subscription clarity across the industry.** We go beyond compliance requirements, or what our
34          competitors are doing, to deliver a best-in-class customer experience.

35  **Proposal 2: Create metrics and guardrails that protect customer trust.** For teams to design and launch a frustration-free
36  subscription CX, we need goals and metrics that will take customer intention and sentiment into account. Our mental model and
37  metrics should view goals met and revenue gained from unintentional sign-ups as growth we did not earn.

38  Prime has faced challenges making meaningful progress on addressing clarity issues due to the cost to key growth metrics of sign-
39  ups and paid member yield (see Section 4, pg 5, for historic experiment examples). In September 2020, Prime experimented with CX
40  improvements to Universal Prime Decision Page (UPDP) that addressed a variety of critical shopper frustrations. The new template
41  changed the small opt-out link into a more visually prominent button; updated the label from *"No thanks, I don't want FREE
42  shipping"* to simply *"No thanks"*; changed the sign-up label from *"Get FREE one-day delivery" to "Start your Prime FREE trial";* and
43  displayed pricing info in the main body content, not just in T&Cs (See T3 in this weblab). Prime launched the new treatment despite
44  ██% sign-ups and ██% paid members because of their focus on improving clarity. In a December 2020 SVP review, Prime escalated
45  these negative metrics impacts as a hotly debated topic since they were missing their 2020 S-team growth goals. The outcome was
46  to lean into Prime acquisition during the holiday period and Prime took an immediate action to roll back to the previous CX.

47  We propose that individual feature teams (e.g., acquisition, retention) identify tension goals & experiment guardrails that protect
48  their respective CX from frustration-provoking outcomes. Below are example customer outcomes and metrics that teams could start

CONFIDENTIAL TREATMENT REQUESTED                                                                         AMZN_00113643

49  working backwards from, where success is oriented to the goals a customer may have for a subscription feature, rather than the
50  business outcomes that Amazon wants that CX to drive.

- 51  **CS metrics:** Customers shouldn't need to contact customer service about an unwanted subscription and/or to cancel it.
52  Teams could take YoY goals to drive these contacts down, and also implement experiment guardrails around them. Note
53  that measuring this in a precise and automatable way would require investments on behalf of CS and Subscription Teams,
54  as these CS contact types presently require manual Heartbeat data pulls due to inconsistencies with agent-assigned simple-
55  issue-codes (SICs). These also are not currently tied to weblab.

- 56  **Benefit usage and other clarity indicators:** Customers should be getting value from their subscription by using their
57  benefits. To optimize for this outcome, the Prime team is working on two initiatives – 1) A 'Clarity Score' that predicts high
58  vs. low-confidence sign-ups based on indicators like benefit usage. 2) A Machine Learning initiative where Prime ML and DE
59  Customer Insights teams work backwards from Prime's post-cancellation survey, inspecting the factors that are leading
60  customers to select the survey response option "I didn't intend to sign up for Prime", and identifying remediation actions.
61  Prime plans to track these metrics and initiatives to set baselines for 2021, and will evaluate setting goals to improve this
62  metric in 2022. We propose that other subscription teams teams create similar clarity indicators for their own purposes.

- 63  **Subscription awareness survey:** Settled customers should be aware that they are paying for a subscription. In 2019 Prime
64  ran a survey to get a pulse on this, where they reached out to a sample of 9+ month tenured members in France asking a
65  simple question *"Are you Prime?"* (results described in section 3, pg 3). This survey method helped size the percentage of
66  settled customers who were unaware of their membership status, something that CS metrics and cancellation data were
67  under-reporting. We propose that Prime and other subscription teams create recurring awareness surveys like this one,
68  and that they define decision-making criteria around them, setting YoY goals to drive improvements, and creating
69  experiment guardrails to prevent regressions.

- 70  **Measuring discoverability of the cancellation flow:** We propose inspecting discoverability through measurement of CS
71  cancellation contacts that happen after a customer accesses a member benefits or subscription management page (a proxy
72  that the customer may have had trouble finding the cancellation ingress, so turned to CS).

- 73  **Measuring completion of cancellation flow:** We have observed customers in UX research misunderstand their progress
74  during self-service cancellation, sometimes abandoning the flow early thinking they had finished it. We propose that
75  subscription teams dive deep on these abandons to discriminate what is a "real save" (i.e., customer changed their mind)
76  vs. abandonment due to partial refunds vs. an accidental abandon. We should create guardrails that prevent those
77  accidental abandons - such as measuring the # of customers who abandon self-service, then contact Amazon to cancel a
78  few billing cycles later; or measuring the # of customers who abandon self-service, but do not use benefits after.

79  **Proposal 3: Define a common set of trust-building features and design patterns for subscription CX.** On June 17th, we conducted
80  an all-day cross-team design ideation session that generated over 100 ideas for addressing subscription clarity issues. Out of these
81  ideas emerged a set of customer-obsessed features and design patterns that can help us build trust with our customers. We
82  propose that these be considered "table stakes" for any subscription CX at Amazon. Here are a few examples to illustrate:

- 83  A sign-up CTA must include price and auto-renew. These details cannot only be shown in T&Cs.
- 84  A sign-up CTA must use a secondary button style and cannot use a color that is reserved for standard flow/purchase
85  buttons (e.g., if 'Add to cart', 'Proceed to Checkout', 'Continue', etc. are all yellow buttons, then a subscription interstitial
86  cannot use a yellow sign-up button.)
- 87  Customers must have the ability to instantly 'undo' a mistaken sign-up without leaving their context.
- 88  All free trial members receive a reminder (e.g., an email) a few days before their renewal/charge. They also receive a
89  transactional notification on the first day their card is charged. We do this proactively for them; they don't have to opt into
90  these initial subscription notifications.
- 91  All members who are inactive (not using benefits) after a specified number of months are notified of their inactivity, and
92  then auto-cancelled if they do not respond or show a change in benefit usage. (Note: Netflix started doing this for
93  customers in May 2020: https://techcrunch.com/2020/05/21/netflix-to-start-cancelling-inactive-accounts).

94  We have created a **companion "mock doc"** with a more complete list of proposed features & design patterns, and visual examples
95  of what they would look like when applied to production CX for Prime and other programs.

96  **Proposal 4: Invent additional mechanisms to raise our CX bar at scale.** Creating a best practices pattern library for subscription CX
97  is a great first step, but with the sheer number of content tests happening at any given moment (e.g., Prime alone ran ▮▮▮▮
98  experiments in 2020), there may still be instances where poor CX slips through. To address this, we propose that we invent
99  additional mechanisms that raise the bar on content testing.

Amazon Privileged & Confidential                                                                                                    2

CONFIDENTIAL TREATMENT REQUESTED                                                                    AMZN_00113644

100  One proposal is to double down on the bar-raising mechanisms that Prime is currently building, and find ways to scale them to the
101  other subscription teams. Specifically, Prime is working on the following in 2020/2021:

102  • A "Clarity Bar-Raising Program", in which Prime leadership conducts monthly walk-the-stores, and audits recent "winners"
103    to ensure they are using good CX.
104  • An automated QA mechanism that can check and enforce clarity guidelines like CTA language.

105  In addition we propose the creation of self-service "empathy trainings" where marketing PMs and content testers get exposed to
106  customer data/videos/anecdotes related to subscription clarity, and the design patterns that have historically provoked frustration.
107  Between UX research and other voice-of-the-customer channels, we have a wide range of content that could be translated into
108  training materials with relatively little effort (e.g., like this video highlight reel, which new hires could watch as part of a launch
109  plan). We would need to compile these insights and videos into a self-service tool with a mechanism that gets teams to consume it.

110  **3. What customer problems are we trying to solve?**

111  To arrive at the proposals above, we worked backwards from data and anecdotes observed through UX Research, Customer Service,
112  social media, app reviews, survey research, and behavioral analytics. The insights roll up into the following three buckets: 1)
113  customers unintentionally signing up for subscriptions, 2) customers signing up for a trial intentionally, but not realizing the
114  subscription will auto-renew, and 3) customers having difficulty cancelling.

115  These shopper frustrations are a top contact driver. Looking at US Prime contacts in the last 6 months, Customer Service estimates
116  that we receive ████ annual contacts regarding mistaken sign-ups or unexpected renewal charges (███% of an estimated ████
117  annual sign-ups). The frustrations are also the largest driver of Prime cancellations initiated through Customer Service, accounting
118  for ██% of Prime's estimated ████ annual CS cancellation contacts.

119  Member inactivity is another symptom of clarity issues. If customers unknowingly sign up, or are unaware of auto-renew, they can
120  go through multiple billing cycles without using benefits. For example, from January-Oct 2020 in the US, ██% of 10-month settled
121  Prime members had not used any benefits during their paid tenure. In the same timeframe, this percentage was ███% for Audible,
122  ██% for Kindle Unlimited, and ██% for Prime Video Channels. See Appendix 1 for these inactivity metrics, along with CS
123  cancellation data, by program.

124  Further, these metrics are under-reporting the true incidence of customers who are encountering subscription clarity problems. As
125  customers do not always check their card activity, not all are aware there is a problem to contact us about, and some of these
126  customers use benefits without realizing they're paying for them. For example, in 2019 the Prime France Retention team surveyed
127  9+ month paid Prime members (N = ████), asking whether they were Prime or not (Yes/No), and analyzed the accuracy of their
128  responses. The team found that over a third incorrectly reported that they were not Prime, and that many of these customers still
129  had used benefits (see results below). Note that when customers used multiple benefit types (e.g. free Prime shipping, Prime
130  Music/Video, etc.), and used these benefits frequently, membership awareness improved:

131  • Customers with 1 free shipping order in 10 months: Only ███% correctly reported that they were Prime
132  • 2-4 orders in 10 months: ███% reported they were Prime
133  • Low digital usage, no shipping usage: ███% reported they were Prime
134  • High usage (shipping and digital): ███% reported they were Prime
135  • Non-Prime Amazon customers (NPAs) were also surveyed for baseline comparison, of which ███% correctly reported they
136    were NOT Prime

137  **When customers encounter clarity issues, it can erode their trust in Amazon.** According to the Executive Customer Relations (ECR)
138  team, customers frequently email Jeff B about subscription clarity (for a variety of programs, not just Prime). Doing a deep dive on
139  Prime, the ECR team estimates that Jeff receives approximately ███ customer emails/year related to mistaken Prime sign-ups
140  and/or unexpected renewals. Below is a February 2020 example from a US customer named Kevin, who reached out to Jeff about
141  unknown charges for Prime and Amazon Music Unlimited subscriptions (which he also had trouble cancelling):

142  *Jeff, I am pretty upset. I received a letter in the mail that I hadn't used my prime video subscription and that I was an Amazon*
143  *Prime member. I logged on as I wasn't aware I had Amazon Prime, but apparently I do! It used my saved card info and purchased*
144  *prime for me at $12.99 per month. THEN I see I have had Amazon Music for six months... I never signed up for this either!*

145  *I was able to cancel the music, although it was difficult to figure out how to cancel the subscription which is shady. I could NOT*
146  *cancel the Prime video as the buttons on THAT service mysteriously don't work.*

147  *I have removed my active credit card information from Amazon. If I can't trust Amazon I will no longer use the company. I*
148  *demand a full investigation and I would like a personal communication from you.*

CONFIDENTIAL TREATMENT REQUESTED                                                                      AMZN_00113645