149  These trust impacts show up in the Prime Cancellation Survey as well, a survey that appears for randomly-selected customers after
150  they complete self-service cancellation. From May to October 2020 (N=███), █% of survey respondents in the US reported that
151  they cancelled because "I didn't intend to sign up". These customers reported that they were significantly less satisfied with Amazon
152  overall compared to groups cancelling due to other reasons (Top2 box █%, ████ bps vs. total). This dissatisfaction was reflected in
153  customers' verbatims as well (e.g., *"I never Authorized this payment, or the previous from before. My bank made me aware of this*
154  *situation. I am incredibly unhappy."*).

155  Unexpected charges can also lead to overdraft fees, further breaking trust, and driving CS contacts and escalations to Jeff B. In 2019,
156  approximately ██████ in concession refunds were distributed to US customers to cover the cost of Prime-triggered overdraft fees.

157  **What specific features & design patterns are causing these poor customer outcomes?** Analyses from UX Research and Voice of
158  Customer (VOC) channels have revealed four key frustration themes related to pre-sign-up, post-sign-up, and cancellation CX.

159  **Theme 1: Misleading designs for call-to-actions (CTAs) in subscription marketing features.** CTAs provide customers with "critical
160  path" buttons or links to move through and make key decisions in a subscription flow. This can include (1) ingresses to enter an
161  acquisition flow (e.g., via a buy box upsell on the detail page, or a radio button upsell in Ship Options), (2) opt-in / opt-out CTAs in an
162  interstitial/popup (e.g., when opening the app for the first time, or checking out with an item), and (3) buttons to move through a
163  self-service cancellation flow.

164  In 2017 Prime Finance did a meta-analysis of experiments involving the Prime checkout interstitial (UPDP). They learned that the
165  most impactful weblabs for driving sign-up metrics were those that involved changes to CTA design (labels, button styles, etc).
166  However, we have observed cases where the CX treatments for CTAs have not helped customers understand the consequences of
167  their clicks. In some cases, the lack of clarity stems from the labels themselves, like customers clicking on the UPDP sign-up button
168  *"Get FREE one-day delivery"*, not realizing this signs them up for a Prime membership. In other cases it has to do with the visual style
169  of the CTA. For example, we have observed customer fail to discover the "No thanks" option when it is presented as a low-
170  prominence link rather than a button. Or similarly, we have observed customers click on yellow sign-up buttons without reading
171  their labels, because the color yellow is used for normal "continue" / "purchase" buttons elsewhere on Amazon.

172  The design industry refers to misleading designs like these as **Anti Patterns**, or "deceptive UI interactions, designed to mislead or
173  trick users" to make them do something they don't want to do, like signing up for a recurring bill, favoring shareholder value over
174  user value". Customers have used the following words when encountering these patterns in Amazon subscription flows: *"I'm furious*
175  *they set a trap", "I fell for it", "this is misleading", "don't get fooled by this", "they're invading your privacy", "this is an infringement*
176  *from Amazon", "get lawyers involved", "they were cheating me", "I felt tricked", "you feel vulnerable", "it seems sleazy", "very*
177  *sneaky", "that Jedi thing with the button color when cancelling Music Unlimited is so dark I feel like I need a shower", "the moment I*
178  *open the Amazon app, it uses dark patterns to trick me into accidentally signing up for prime", "Amazon, don't you make enough*
179  *money without having to stoop to being deceptive and dishonest?"*. These specific examples were pulled from UX studies,
180  Twitter/Reddit posts, and Amazon App reviews. They include customer voices from the NA, EU, Asia, and LatAm.

181  **Theme 2: Obfuscated financial obligations in subscription upsells.** Even when customers understand they're signing up for a
182  subscription trial, not all are doing so with the understanding that these trials will automatically renew. This is because key details
183  are presented in legal T&Cs, typically at the bottom of a page in small print. Customers, moving quickly, frequently overlook or
184  ignore those T&Cs (or if they have Accessibility/zoom settings enabled, this information can show up outside of their viewport). As
185  seen through UX research, and corroborated by the 2017 Prime Finance meta-analysis of UPDP, customers are focusing their
186  attention on the CTAs, since they are the critical action they must take on that page. We have observed customers sign up without
187  awareness of pricing and auto-renew, due to these obligations not being proximal to the CTAs they're focusing on.

188  **Theme 3: Lack of control over the renewal event.** Customers have expressed frustration when forgetting about (or not being aware
189  of) a renewal event. In fact, knowing that a membership will auto-renew can push customers to avoid subscribing to begin with, due
190  to the fear of forgetting. To combat this fear and to prevent unwanted renewals, Audible sends out proactive reminders via email
191  when their trial is about to renew, and they inform customers of this during Audible's sign-up flow ("You will get an email reminder
192  5 days before your trial ends"). This messaging led to an increase in free trial starts, resulting in ██ incremental paid Audible
193  members, or ███% ([see weblab](#)). Presently, Audible is the only subscription program doing this on behalf of customers. All other
194  programs require customers to manually opt into these reminders. And opting into reminders (or turning off auto-renew) is an
195  unintuitive process that takes multiple taps/clicks to complete. It requires opening up the self-service cancellation flow, and finding
196  the options to *"remind me later"* or *"end membership on X date"*. This could be made easier for customers.

197  **Theme 4: Difficulty starting and finishing the cancellation flow.** Self-service cancellation can be difficult for customers to find,
198  because the ingress is not surfaced prominently in all expected locations and/or because it uses an unintuitive label. Taking Prime
199  for example, customers have looked for this functionality in the "Prime" navigation link. On desktop web, this takes them to a

Amazon Privileged & Confidential                                                                                      4

200 benefits page, with an ingress at the top "Manage My Membership". Through UX research, we have observed customers overlook
201 or fail to identify with this kind of "manage membership" language, where they instead seek out the more precise term "Cancel".

202 On Mobile, the Prime benefits page does not provide an ingress to the cancellation flow, so customers need to go through 'Your
203 Account > Manage Prime Membership' (or by searching for "Cancel Prime" in a product search). Once they find their way to the
204 Manage Prime Membership page, the cancellation option is hidden behind a "Manage membership" drop down. Adelheid, a
205 customer from a 2019 DE/AT shopping study, hit all of these friction points when attempting to cancel. As she said, *"It's interesting
206 that they show you everything you can do with the Prime membership. But the part that tells you how to cancel is very hard to find."*

207 Once customers start the cancellation flow, they are presented with three additional steps where they must re-confirm their choice
208 to cancel. Combined with the taps to enter the flow, it takes a total of 9 taps to start and finish the cancellation process. For
209 customers who understand what is happening, some think of this as a "mean" tactic (as Adelheid said *"I think this is mean of
210 Amazon"*). But there are others who don't realize that there are multiple steps, and who abandon the flow prematurely on the
211 incorrect assumption that they finished. As Kevin (Munich, 2019) stated, *"Amazon makes it extremely difficult to make the
212 cancellation final, because of the many steps we just taken...As a customer I expect a certain degree of appreciation...that I can
213 do things efficiently. I had to tell them several times that I absolutely wanted to cancel it...I can imagine that many people would not
214 finish the cancellation, because of these many steps."*

215 **For rich anecdotes demonstrating these four frustration themes, including video clips and screenshots, refer to this quip**
216 **document**. See also Appendix 2 for a full list of shopper frustrations tickets tagged 'subscription clarity'.

217 **4. Two key root causes that are leading to these CX issues**

218 To solve and prevent these issues at scale, the Shopper Frustrations team inspected what factors may be causing these CX issues to
219 proliferate. Below are the two root causes that we believe are the most important to address:

220 **Root Cause 1: Anti patterns thrive in environments where teams don't have customer-centric metrics and goal incentives.** Prime
221 is aligned that clarity is important, and has made multiple attempts to test out of unfriendly design patterns. However, they have
222 not launched these improvements because doing so would cause them to miss on growth goals.

223 For example, in 2018 Prime ran two key experiments to address clarity-related trustbusters on UPDP, which included tweaks to
224 CTAs and pricing display (Project codename "Lucent"). Sign-ups and paid yield were significant and negative across the ▆▆▆▆
225 variations tested (sign-up impacts ranged from ▆▆% to ▆▆% across treatments). While Customer Service cancellation rate improved
226 (ranging from ▆% to ▆% across treatments), the team ultimately opted not to launch the clarity improvements. As mentioned
227 earlier in the doc, Prime ran these same UPDP clarity tests again in September 2020, rolled back the improvements in December
228 due to similar impacts to growth metrics.

229 Another unlaunched clarity initiative took place in 2019 (Project Phoenix), where Prime presented a proposal to Amazon Consumer
230 CEO that would automatically cancel any monthly subscribers who had not been using benefits for 12 months (i.e., inactives). Despite
231 being a customer-obsessed feature, and something Amazon was already doing for annual subscribers, the proposal was not
232 approved given the economic impact associated with those auto-cancels.

233 The durable learning here is that Prime's ongoing attempts to address clarity issues have not been successful, because they are at
234 odds with economically-driven goals. To launch these improvements, teams' goals / success baselines will need to be recalibrated.
235 Anti patterns are too performant to test out of with current baselines and metrics.

236 **Root Cause 2: Teams lack a shared perspective on subscription clarity, and are missing mechanisms to drive a consistently high**
237 **bar across the company.** The fact that Audible is the only program that proactively sends renewal reminders at the end of a trial is a
238 good example of the lack of connectedness across teams[1]. There are presently no company-wide tenets or design patterns that
239 would align all subscription teams on the "table stakes" for creating customer-obsessed subscription CX. Using the above example,
240 there is no stick, or carrot, that gets all teams to agree that proactive renewal communications should be considered an essential
241 feature that we should just launch. Nor is there a mechanism that would prevent regression should a team decide to take that
242 feature away, when optimizing for a paid yield goal.

243 Another example: Amazon Music is using a "No thanks" link rather than a button for their sign-up pages. Without enforceable
244 design patterns, there is no mechanism that ensures they update this to a button, and keep it that way.

245 To raise the CX bar at scale, we believe Amazon would benefit from a shared vision of clarity, with mechanisms that steer us to that
246 vision, across all subscription programs, features, locales, and devices.

---

[1] See Appendix 3 for a cross-program CX audit done by the Customer Service org on features related to subscription clarity
Amazon Privileged & Confidential                                                                                                      5

247 **5. Next steps**

248 To determine a path forward, we would like to discuss/debate the following two topics.

249 **1. Do we agree with Prime's recent rollback to lower-clarity UPDP templates?** The guidance in Prime's December goal review with
250 SVPs was to use an upsell CX that optimizes for customer acquisition, and to correct unintentional sign-ups and renewals by making
251 clarity improvements to post-sign-up CX (e.g., using confirmation features, email communications, etc). With this guidance, Prime
252 dialed down the UPDP clarity updates they launched in September[2]. While this strategy will improve growth metrics, the tradeoff is
253 that it is a known trustbusting CX. Furthermore, post-sign-up CX will not be able to course-correct all customers (e.g., a customer
254 may not see the email reminder). Given these risks, the Shopper Frustrations team proposes we urgently revisit this rollback
255 strategy with the right decision-makers. We believe it is important that leaders review all the inputs that demonstrate the impact
256 this CX has on customers. We are concerned that previous escalations have not fully conveyed this impact, and there is an
257 opportunity to inject customer empathy into the discussion.

258 **2. Should we invest in building mechanisms to drive company-wide alignment on Subscription Clarity?** To drive progress on the
259 proposed initiatives in this document, teams will need to align and take goals. This includes 1) the individual subscription program
260 teams, who own the features, goals, and success metrics that are creating the frustration-provoking CX; 2) the Customer Service
261 organization, who owns tools for analyzing and standardizing subscription-related contacts; and 3) the Shopping Design
262 organization, who owns Rio Design System, Working Backwards, and Shopper Frustrations. Given the number of organizations
263 involved, and teams' history of not addressing these issues, we believe a single-threaded mechanism owner is required to drive
264 meaningful progress. We recognize this is a costly ask, and outside of operational planning cycles, but we believe it merits
265 consideration. If we agree with the proposal of dedicating a single-threaded owner, we seek guidance on whether to pursue this
266 through Prime's existing Subscription Clarity program, or if there is appetite to own in CE (or other relevant org, such as Customer
267 Service).

---

[2] These changes included: 1) reverting to an opt-out link *"No thanks, I don't want FREE shipping"* (instead of a *"No thanks"* button), 2) removing pricing information from main body content (leaving it only in T&Cs), and 3) reverting to the sign-up CTA *"Get FREE one-day delivery"* (instead of *"Start your FREE Prime trial"*).

Amazon Privileged & Confidential                                                                                                6

CONFIDENTIAL TREATMENT REQUESTED                                                                    AMZN_00113648

268  **Appendix 1 - Member inactivity and Customer Service Cancellation data across digital subscription programs**
269  Timeframe: January - October 2020



270  *Note: The Music Unlimited team did not have these data points readily available for their program, and did not have the BIE
271  resources to pull them for this review.

272

Amazon Privileged & Confidential

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00113649

273    **Appendix 2: Shopper frustrations tagged to theme 'Subscription Clarity'**

| Ticket | Frustration Summary |
|---|---|
| IT-4690 | Customers were frustrated by button labels for cancelling their Prime membership (e.g., "I renounce my benefits", rather than "Cancel membership") |
| IT-4672 | Customers were confused/frustrated when 'Welcome to Prime' did not arrive in a timely fashion |
| IT-4653 | Customers signed up for Prime without awareness of what they were doing, because terms and conditions related to pricing and auto-renew were entirely absent from UPDP (post-ASINization) |
| IT-4518 | Customers felt Amazon designed a CX that did not have their best interests at heart. They were frustrated by paid shipping defaults, confusing/disruptive Prime marketing, a high density of Ads/Sponsored Products, refunds defaulting to gift cards, etc |
| IT-3866 | Customers signed up for Prime during checkout, then subsequently abandoned the product purchase. Result: Unknowingly becoming an auto-renewing Prime member, because the sign-up was still activated despite order abandonment. |
| IT-3830 | Customers were frustrated when offered only a partial refund for Prime charges (via self-service and CS), despite unknowingly signing up and not using any benefits over an extended period of time. |
| IT-3829 | Customers unknowingly became "settled" Prime members for multiple months, because 1) they signed up accidentally and/or didn't see auto-renewal terms, 2) we didn't send them reminders / charge communications, and 3) they didn't check their card activity |
| IT-3828 | Customers accidentally signed up for Prime when logging into the Amazon app for the first time. Rather than going to Gateway, they were intercepted by a Prime upsell with a yellow button that they thought was simply taking them into the app. |
| IT-3732 | Customers didn't notice or read the 'Welcome to Prime' text on SPC, which was critical for helping them recover from accidental sign-ups on the previous page. This happened pre- and post-ASINization. |
| IT-3458 | Latency: Shoppers attempted to sign up for Prime (through UPDP) before the Prime logo image had loaded & appeared. This image was the only thing above-the-fold conveying that the customer was signing up for Prime. |
| IT-3417 | Customers had trouble finding/reading important T&Cs in retention offers like the trial extension (i.e., that there would be an auto-renewing charge) |
| IT-3301 | Non-Prime and Prime customers incorrectly assumed that Prime badges next to a price = "The Prime Price" or "Discounts for Prime members" (i.e., that the price would be higher for Non-Prime customers) |
| IT-3145 | Non-Prime customers were perplexed when they encountered UPDP messaging that said "Why pay for shipping?", despite purchasing an item that was eligible for non-Prime free shipping |
| IT-3144 | Customers had difficulty completing the Prime cancellation process due to 1) the number of steps/pages involved in cancellation, and 2) a lack of clear progress indication leading customers to assume they had completed the flow when they hadn't |
| IT-3138 | Shoppers had difficulty finding the ingress/link to cancel their Prime membership, due to its lack of prominence on the page or unintuitive location |
| IT-2965 | Shoppers interpreted the double-stacked/"shadowed" Prime sign-up button as two distinct click targets, a Yes and a No |
| IT-2964 | Customers were frustrated / confused by Prime Upsell opt-out links that put words in their mouth, e.g., "No thanks, I don't want free shipping" |
| IT-2963 | Shoppers were frustrated they didn't have enough control over reminders for Prime's renewal / cancellation (e.g., they were only given an email reminder option, rather than SMS) |
| IT-2961 | Customers were concerned about forgetting to cancel an auto-renewing subscription, and getting charged without their final say. Result: CS contacts, concessions, and general avoidance of free trials that auto-renew (e.g., Prime, Music Unlimited) |

CONFIDENTIAL TREATMENT REQUESTED                                                    AMZN_00113650

| IT-2829 | Shoppers had trouble cancelling Prime due to the unintuitive language of the cancellation ingress. They looked for familiar phrases like "Cancel" rather than "Do not continue", "End membership", "Manage membership", "Update settings", etc |
|---|---|
| IT-2323 | Customers clicked on yellow buttons expecting to simply move forward in the checkout flow. Not reading their labels, they were frustrated when they later found out that the buttons were adding "something special." |
| IT-2277 | Customers frustrated by unexpected 1 dollar charge on credit card after signing up for Free Prime Trial (unaware that this is a credit card authorization) |
| IT-2240 | Shoppers who have previously signed up for a Prime membership without realizing it become skeptical of Prime marketing and Amazon in general |
| IT-2199 | The Prime welcome email does not make it clear to shoppers that they have actually signed up for an auto-renewing paid subscription |
| IT-2186 | Customers who signed up for Prime were frustrated when they could not immediately undo that action (i.e., they have to go into their prime settings and wait for a credit card check to 'activate' their membership) |
| IT-2173 | Shoppers were derailed when they tried to go back to previously viewed Prime upsell pages that were not stored in history |
| IT-2172 | Customers read the BBOP and Ship Options upsells "FREE 2-day shipping with Prime", not realizing this required a subscription. Result: Confusion when later intercepted with UPDP, and frustration over unexpected financial obligation. |
| IT-2171 | Customers did not understand the impact of their choice on Prime Upsell Pages when clicking on buttons titled "Get started", "Continue with FREE 1-day shipping", "Get free two day shipping", "Proceed to next (Try)", "Continue with free premium delivery" |
| IT-2170 | Customers had difficulty discovering the less prominent 'No Thank You' link on the Prime upsell checkout intercept - Universal Prime Decision Page (UPDP) |
| IT-2168 | Within an upsell, shoppers could not always discern how much Prime costs, how long the trial was, and how charges/cancellations worked. Did not feel confident signing up as a result, or signed up without knowing about auto-renew. |
| IT-1111 | Prime Upsells like BBOP, SOSP and UPDP caused non-Prime shoppers to incorrectly conclude they will only receive free shipping with Prime |
| IT-209 | Shoppers were confused when they saw a Prime badge next to the Core Free Shipping message (e.g., in OLP, Search, Detail Page, etc); They thought they had to be Prime to get free shipping |

274

Amazon Privileged & Confidential

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00113651

275    **Appendix 3. Cross program audit of select clarity features and recommendations** (Author: Customer Service)

| Feature | Kindle Unlimited + Periodicals | Music Unlimited | PV Channels | Freetime Unlimited | Audible | Amazon Prime | CS Recommended Experience |
|---|---|---|---|---|---|---|---|
| **Typical Free-Trial Period** | 30-days | 30-days | 7-30 days (varies) | 1-month | 30 days | 30-days | N/A |
| **Able to disable auto-renewal at signup?** | ● No | ● No | ● No | ● No | ● No | ● No | Yes (Opt-out option at sign-up) |
| **Transparency (Transactional Notifications)** | | | | | | | |
| **Registration Notification** | ✓ Welcome email at signup | ✓ Welcome email at signup | ✓ Welcome email at signup | ✓ Welcome email at signup | ✓ Welcome email at signup | ✓ Welcome email at signup | Welcome email at sign-up w/ conversion date |
| **Renewal Reminder Notifications** | ● None (Testing Experiments) | ● None by default; in Settings Customers can opt-in to alert 3-days before next charge | ● None | ● None | ✓ Reminder email automatically sent 5 days before renewal | ● Opt-in 'remind me' feature in settings; Experiment to enable for inactive customers. | Customers get automatic reminder notifications before renewal event. They don't need to opt into them. |
| **Notification at Conversion to Paid** | ● None | ● None | ● None | ● None | ● None | ● None | Customers get notification of all free-trial conversions. |
| **Notification of Recurring Subscription Payments** | ● None | ● None | ● None | ● None | ● None | ● None | Customers receive email of their recurring payments. |
| **Self-Service Features** | | | | | | | |
| **Disable Subscription Renewal Self-service** | ● Available on Web, Tablet | ● Web Store, Web App, Android App, Tablet | ● Available on Web, Mobile, Android App | ● Available on Web, Mobile, Eink, Tablet | ● No | ✓ Available on Web, Mobile Apps | Self-service parity on all devices/apps. |
| **1-way subscriptions (places you can register but can't cancel)** | ● Eink | ● Echo, iOS App, FTV | ● FTV, 3P Living Room Devices [Planned expansion in 2021] | ✓ None | ✓ None | ● Edge-case Prime Sign-Ups on FireTV, Living Room Devices | No one-way subscription CX on any device/app. |
| **Subscription Charge Transactions in Your Orders Page?** | ✓ Yes | ✓ Yes | ● No, available on PV Channels Settings page. [YO planned July 2020] | ✓ Yes | ● No | ● No (but searchable on Your Orders page) | All subscription payments are visible in the YO page. |

Amazon Privileged & Confidential

CONFIDENTIAL TREATMENT REQUESTED    AMZN_00113652

| | | | | | | |
|---|---|---|---|---|---|---|
| **'Memberships and Subscriptions'** | ✓ Yes | ✓ Yes | ✓ Yes | ✓ Yes | ● No | ✓ Yes | All subscriptions accessible in this menu |
| **Self-service refunds?** | ● No (though available for purchased eContent) | ● No | ● Yes, 1-month on web and Android App (with no streaming) | ● No | ● Yes, refunds for purchased content can be done in-app. Membership refunds are accessed through Amazon Settings > Audible.com | ● Yes, prorated if customer is eligible and has not used benefits. | Provide self-service refunds (with abuse checks) |

| **Preventing No-Usage Customers from Ongoing Payments** | | | | | | |
|---|---|---|---|---|---|---|
| **Inactive Subscription CX** | ● Email Campaigns to reengage starting 6 month inactive; 36 inactivity auto-cancellation. Additional experiments on inactives in 2020/1. | ● No tailored CX | ● Planned work on inactive re-engagement. | ● No tailored CX | ● No tailored CX | ● Annual members with no usage for 12 months are auto-cancelled. Not applied to monthly subscribers. | Inactive customers targeted with marketing; auto-renew off for longstanding inactivity. |

276

CONFIDENTIAL TREATMENT REQUESTED                                                                              AMZN_00113653

# EXHIBIT 126

New Structure:

**Overview:**
The Prime team is responsible for high visibility locations throughout Amazon that provide information about joining Prime to Non Prime Amazon (NPA) customers and about managing and enjoying Prime memberships to Prime members. As evidenced by xx customer frustrations, responses to Prime cancellation survey and xx Prime related cs contacts, customers are frustrated and confused by some of these experiences. This lack of clarity leads to wrong outcomes for customers (mistaken signups, unwanted charges) and for Amazon as over time, it leads to an erosion of member trust and negatively impacts Prime's brand equity. Although this issue is not new, it has been challenging to implement sustainable solutions as increasing clarity has often come at a high, immediate cost to business results, leading to an immediate or gradual reversal of clarity enhancing actions. Therefore, in spite of good intentions and a number of actions we have taken over time, we have not made sustained progress in improving clarity. To make meaningful progress on the topic, we need a cohesive framework to define and measure clarity that enables us to i) operationalize it into our business inputs at scale; and ii)  iterate on the specific problems we are solving as we uncover new defects . In this document, we will review the learnings we have gathered to date, present our forward looking mental model on clarity and seek feedback on the immediate next steps we will take in order to enhance clarity for customers.

**Actions taken YTD and learnings (Observations/Insights)**

**1. We have clear opportunities to raise the bar in current Prime CX .** Prime CX does not meet our bar for clarity consistently. Based on business metrics and VOC, the areas we are prioritizing for immediate fixes are i. Pop-up interstitial ( Universal Prime Decision Page - UPDP) in checkout, ii. Providing relevant and timely information to customers immediately post signup and iii. improving the process of cancelling Prime for those members that wish to.

**2. To date, our approach to clarity has focused on short term impact, not on long-term member trust and value creation.** Many previous clarity experiments were launched with a hypothesis that clarity enhancing improvements would reduce upfront signups but have a flat or increased benefit usage and member yield due to aware and engaged members. However, from WW clarity experiments dating back to 2018, we have consistently not found this to be the case. While clarity enhancements reduce signups, we have not observed a corresponding increase in member yield or increased benefit usage that can offset the impact (See Appendix X for details). We hypothesize that these results are partially due to our timeframe of analysis, and examining clarity experimentation on a longer time horizon (6 months or more) reduces the impact due to convergence over time (experimenting with Auto RML emails had an estimated -1.3MM WW annualized impact when looking at 30 Day AR-On results, which then reduced to -319k when looking at 120 day impact[BN1] ).

AMZN-PRM-FTC-002620178

**3. Our understanding of clarity does not always match customers' perception.** Some of our hypothesis to improve clarity have turned out not to be fully correct: (a) ASINization. The leading hypothesis that clarity is increased by adding Prime as ASIN to the shopping cart on SPC and as such have more visibility into what is happening and leaving customers an additional option to remove the subscription has been proven wrong in direct customer research studies. Customers didn't notice the added ASIN or where unaware that this is part of their order. Even if they noticed Prime in the overview they didn't realize that they have the option to remove the ASIN. (b) Making the decline option more prominent. In DE, by leveraging user testing we verified that by adding a box around the decline option on UPDP to make it stand out and with that easier to find was not confirmed by the testers. In fact, even more customers had troubles identifying the decline option.

**4. We have alternated between a content OR product led solve for clarity, instead of a holistic approach.** So far, all initiatives to improve and experiment for clarity have been focusing on single elements or parts of the CX. Project Lucent was entirely focused on content updates which lead to two main outcomes: (1) We did not observe any increase in yield, conversion rates or benefit use for the almost all experiment with clearer content and (2) The signup button with gray shadow was considered as example of a successful experiment with increase clarity and yield - something we by now are challenging based on anecdotes and customer research. Introducing ASINization was a single product improvement of the entire checkout CX which also has by now verified to be less effective in terms of clarity. Improving single elements is making it difficult to increase overall clarity for our customer and members. A customer has various touch points with our CX, changing one element and leaving the rest as is will cause any clarity improvement to quickly fade out in customer perception.

**5. Taking bolder and more risky approaches might open new opportunities.** Until now, we have been working under the assumption that UPDP is our most important acquisition location (driving X% of all signups). In an experiment in UK on mobile Free-Trial we tested the impact of removing UPDP entirely from the checkout flow. The results of impact on Prime signups by - ▇% to ▇% (with▇% on OPS) confirm that UPDP cannibalizes all other checkout locations and as such the standard metrics over-state the real incrementality of UPDP. This is also means that we have the opportunity to consider dropping UPDP altogether as source of the most customer frustrations if our attempts to improve clarity on this location have a larger impact. Additional experiments have to be planned to confirm these results. As part of 2021 OP1, we are also proposing a redesign for Prime upsells in checkout and will set up a separate session to review that proposal in detail.

## Defining Clarity and approach moving forward

We define clarity as a holistic CX where customers feel informed about and are aware of their membership status . Our North Star is to have 100% of our member base be aware of their membership status ("I know I have joined Prime,  a paid subscription program and am aware how much I'm paying and when"). We will achieve this vision through an approach that

AMZN-PRM-FTC-002620179

integrates proactive guidelines informed by customer anecdotes and feedback with a comprehensive measurement framework to track and continuously improve clarity.

**Tenets for Clarity (unless you know better):**
1. We are proud of the Prime CX. We believe in Prime's value proposition, and will communicate all aspects of the membership clearly to customers.
2. We review clarity of our experiences not just in isolation but as part of the full journey that customers are engaging in.
3. We look to our customers to help assess the clarity of experiences vs relying on internal perspective. We will be intentional about creating mechanisms to solicit customer feedback and use that to iterate our understanding of clarity.
4. We optimize for aggregate measures, but don't allow that to explain away segment-specific defects. When there is a conflict between aggregated metrics and anecdotes, we prioritize customer anecdotes to understand and mitigate concerns for specific groups of customers.
5. Solve clarity defects at the core, even at the expense of short-term results. We work relentlessly to identify root causes and are empowered to test and implement remediation even at a significant short term cost (e.g., to member balance).
6. Meet business goals while minimizing long term reputational risk. While initial results may be negative, we do not accept these as a given and will find ways to mitigate negative impact to business goals.
7. Don't force one size fits all. While our scope is global, we will partner with our WW partners to build localized solutions, empowering them to identify the unique clarity and business considerations in each locale.
8. Clarity is a moving target. It is not a problem that can be solved once. We need to set up mechanisms to address this as an ongoing workstream.

Measurement approach

**Planned Actions for HY2 and 2021**
- o Content improvements ( pre sign up and post signup - UPDP min cx bar, UPDP suppression, true SPC)
- o **Clarity guidelines :** In partnership with GPX, we defined a set of clarity guidelines to be applied to all new content experiments. Please find the complete list of guardrails in Appendix B. These guidelines will be enforced through an automated QA process which will flag treatments that lack clarity guardrails such as price prominence, decline buttons, or Prime logos. (Phase 1 launch 9/30). We will continually vet and refine these guardrails based on customer feedback through User Testing  - an online portal in which testers can provide feedback on existing or proposed experiences. Relying on customer feedback rather than internal perspectives allows us to validate that these changes are improving our experience for customers.  Additionally we will work with GPX and Brand teams to codify UX building blocks for content locations in Content Catalog, which would mean that marketers no longer have the ability to change a button into a link, or include four buttons on one page.

AMZN-PRM-FTC-002620180

# EXHIBIT 127

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE WESTERN DISTRICT OF WASHINGTON

3  --------------------------------------x
   FEDERAL TRADE COMMISSION,

4

5          Plaintiff,          Civil Action No.
                               2:23-cv-0932-JHC

6

7      vs.

8  AMAZON.COM, INC., et al.,

9          Defendants.
   --------------------------------------x

10

11

12       CONFIDENTIAL DEPOSITION OF DR. RAN KIVETZ

13               New York, New York

14             Tuesday, May 20, 2025

15

16

17

18

19

20

21  Reported by:
    Frank J. Bas, RPR, CRR
22  Job No. J12740847

23

24

25



Case 2:23-cv-00932-JHC    Document 361-3    Filed 06/17/25    Page 15 of 54

DR. RAN KIVETZ Conf.                                          May 20, 2025
FTC vs AMAZON.COM, et al.                                              5

1          THE COURT REPORTER:  We're on the
2      record at 9:05 Eastern.
3          Would counsel please state their
4      appearances for the record.
5          MR. WARE:  Jonathan Ware on behalf
6      of the Federal Trade Commission.  And
7      with me is Phoebe Taylor and Eric
8      Spurlino.
9          MR. LINDEROT:  Anders Linderot from
10      Covington & Burling for defendants.  And
11      with me is Haley Johnson and John
12      Graubert, also from Covington & Burling.
13          And also attending remotely is
14      Laura Flahive Wu, F-L-A-H-I-V-E, new
15      word, W-U.  And we may during the day
16      have Amazon in-house counsel.
17                    — — —
18
19  DR. RAN KIVETZ,
20  called as a witness, having been first duly
21  sworn by a Notary Public, was examined and
22  testified as follows:
23  EXAMINATION BY
24  MR. WARE:
25          Q.   Good morning.  I'm Jonathan Ware.



Case 2:23-cv-00932-JHC    Document 361-3    Filed 06/17/25    Page 16 of 54

DR. RAN KIVETZ  Conf.                                    May 20, 2025
FTC vs AMAZON.COM, et al.                                        129

1          Assumes facts not in the record.

2          A.    I mean, they -- I'm not aware that

3     the surveys that I analyzed and relied on in

4     this matter purposely did that at the point of

5     enrollment.  But even the Amazon cancellation

6     survey, there's a segment of people in

7     Section C, in my customer behavior analysis,

8     that I analyze and explain support,

9     substantiate, why their behavior and survey

10    responses are inconsistent with interpreting

11    DNI, did not intend to sign up, as the alleged

12    unintentional enrollment.  These are folks who

13    sign up and cancel within two calendar days.

14    I mean, they might cancel a few hours after

15    signing up.  And then in the survey response

16    they say there were issues, often too many, or

17    whatever the language, I don't want to

18    paraphrase it, often had issues with

19    deliveries.

20          It's an unreasonable -- it shows

21    the lack of reliability of those survey

22    responses because they just signed up, they

23    just cancelled.  And so that's an example of

24    somebody who received a cancellation survey,

25    self-selected to participate in the



Case 2:23-cv-00932-JHC    Document 361-3    Filed 06/17/25    Page 17 of 54

DR. RAN KIVETZ  Conf.                                    May 20, 2025
FTC vs AMAZON.COM, et al.                                      130

1  cancellation survey and did that soon after

2  enrolling and cancelling.

3          But I'm not saying it's the

4  majority.  It's not the intention of the

5  survey.  There are many people in the survey,

6  in the cancellation survey, that are answering

7  more than a year after they enrolled.  And as

8  I explained, their memory of whether they

9  enrolled intentionally or not a year later

10  cannot -- cannot be reliable.  And there's

11  considerable academic research, seminal

12  academic research, that supports my opinion

13  about that.

14      Q.   Apart from the cancellation survey,

15  did you review any surveys that Amazon

16  conducted close to or at the time of

17  consumers' enrollment in Prime?

18          MR. LINDEROT:  Objection; assumes

19      facts not in the record.  Foundation.

20      A.   A similar answer I would provide

21  you, sir, with respect to the Amazon search

22  sentiment survey.  It was not a survey

23  intended to survey people at the point of

24  enrollment.  There are people there who are

25  surveyed years after they enrolled.  But there



1   are some who are surveyed in the beginning of

2   their trial or at the beginning of their paid

3   subscription, relatively soon after they

4   enrolled.  There are some like that.  And

5   there are some who were surveyed there years

6   after they enrolled.

7          Q.   Apart from the Amazon cancellation

8   survey and the search sentiment survey, did

9   you review any surveys conducted by Amazon

10  close to or at the time of a consumer's

11  enrollment in Prime?

12          MR. LINDEROT:  Objection; assumes

13       facts not in the record.  Foundation.

14          A.   Everything that I have considered,

15  that I relied on, is disclosed in my reports

16  in this matter.  That includes the -- my

17  opinions and analysis of the customer service

18  calls.  That includes the two types of surveys

19  that we discussed.  And that's my answer, sir.

20          Q.   Apart from the Amazon cancellation

21  survey and the search sentiment survey, what

22  materials did you consider that consisted of

23  surveys Amazon conducted close to or at the

24  time of consumers' enrollment in Prime?

25          MR. LINDEROT:  Objection; asked and



1          C E R T I F I C A T E

2     STATE OF NEW YORK        )

3     COUNTY OF NEW YORK       )

4          I, FRANK J. BAS, a Certified Shorthand Reporter

5     and Notary Public within and for the State of New

6     York, do hereby certify:

7          That the witness whose testimony is hereinbefore

8     set forth, was duly sworn by me and that such

9     testimony given by the witness was taken down

10    stenographically by me and then transcribed.

11         I further certify that I am not related by blood

12    or marriage to any of the parties in this matter and

13    that I am in no way interested in the outcome of this

14    matter.

15         That any copy of this transcript obtained from a

16    source other than the court reporting firm, including

17    from co-counsel, is uncertified and may not be used at

18    trial.

19         IN WITNESS WHEREOF, I have hereunto set my hand

20    this 23rd day of May, 2025.

21    _____

22    FRANK J. BAS, RPR, CRR

23

24

25



# EXHIBIT 128

**From:**       Ikeda-Flowers, Emily [ikeemily@amazon.com]
**Sent:**       2/18/2019 3:25:20 PM
**To:**         Prime-ceo-team-seattle@amazon.com
**CC:**         Mittal, Pranav [pranavm@amazon.com]
**Subject:**    [Launch] Mobile PDP Sticky Footer
**Attachments:** [LAUNCH - Acquisition] PRIMECEO-3803 AT Mobile UPDP - Winback Small Tiles and Large Tiles.msg

Hi Team –

Wanted to share a minor feature launch: we've successfully implemented the sticky footer on mobile UPDP (see JJ's launch email attached for reference), which means we now have more real estate for content testing since we can utilize the sticky footer if our content pushes the T&Cs below the fold.

How it works:
* Always shows CTA, Decline text, 2 lines of T&Cs, and "…See more" at the end of the T&Cs
* The footer overlay disappears when you scroll down to the non-overlay CTA
* Clicking "…See more" will auto-scroll the page down to show the rest of the legal text

I'm going to be working with Alan to incorporate this into his UPDP common template so it'll be easy for marketers to turn it on by changing a "false" to a "true". For now, it lives here: https://prime-cm.amazon.com/content/editor?locale=US&messageTemplateId=PIP_Mobile_Sticky_Footer&stageVersion=@MS3Mainl ineDevo

Special thanks to JJ for the opportunity to bring this to life and Alan for the many, many sanity checks (I also heavily borrowed from the javascript used for WLP sticky footer).

**amazon** *Prime*

Joshua, why pay for shipping?
Save $5.99 with FREE Two-Day
Shipping on this order

Your Prime benefits include:









Fast, free shipping on over 100
million items

Early access and special
discounts for Prime members



Get FREE Two-Day Shipping

No thanks, I do not want FREE Two-Day
Shipping

By signing up, you acknowledge that you have
read and agree to the Amazon Prime Term... See all

CONFIDENTIAL

AMZN-PRM-FTC-001684334

million items                    discounts for Prime members




Unlimited access to millions of
songs and custom playlists ad-
free



Prime Originals, movies & TV
shows, live events, and more

Get FREE Two-Day Shipping

No thanks, I do not want FREE Two-Day
Shipping

After your free trial, Amazon Prime is just
$12.99/month. Cancel anytime.

By signing up, you acknowledge that you have
read and agree to the Amazon Prime Terms and
Conditions and authorize us to charge your credit
card (Visa ****-0768) or another available credit
card on file after your 30-day free trial. **Your
Amazon Prime membership continues until
cancelled. If you do not wish to continue for
$12.99/month plus any applicable taxes, you
may cancel anytime by visiting Your Account and
adjusting your membership settings.**

Emily Ikeda  |  Marketing Content Specialist, Prime  |  ikeemily@amazon.com

CONFIDENTIAL                                          AMZN-PRM-FTC-001684335

# EXHIBIT 129

Prime – Desktop Experience

# Checkout: UPDP (cont'd)

amazon.com

SIGN IN    SHIPPING & PAYMENT    GIFT OPTIONS    PLACE ORDER

## Test, thank you for being a loyal customer.
## We're giving you Prime FREE for 30 days.

**Receive eligible items Tomorrow, May 5 by 8PM with Prime**

Your top Prime eligible item in cart:



Your Prime benefits include:

prime

| Delivery Speed | |
| --- | --- |
| Same-Day Delivery (in select cities) | FREE |
| One-Day Delivery | FREE |
| Two-Day Delivery | FREE |

**Save $5.99** on your Prime eligible items with FREE One-Day Delivery on this order. After your FREE trial, Prime is just $14.99/month.

No thanks

**Get FREE One-Day Delivery with Prime**
Enjoy Prime FREE for 30 days

Benefits page to check various shipping options.

By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your default payment method (Visa ****-3838) or another available payment method on file after your 30-day free trial. **Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $14.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.** For customers in Hawaii, Puerto Rico, and Alaska please visit the Amazon Prime Shipping

Having difficulties? Please visit our Help page to learn more about placing an order.

Conditions of Use | Privacy Notice © 1996-2022, Amazon.com, Inc.

CONFIDENTIAL TREATMENT REQUESTED

AMZN_00037197

# EXHIBIT 130

Privileged and Confidential | Prime CX Satisfaction – Upsells | Execution Strategy

1   **Purpose and Background**

2   The purpose of this document and discussion is to review our two-phase execution strategy to address the Prime CX
3   Satisfaction (Upsells) headwind. In prior discussions, we aligned on the mental model and short-term strategy for CX
4   enhancements; this strategy is now Phase 1, while Phase 2 addresses the long-term capabilities necessary to safeguard
5   against CX Satisfaction regression and support easier (i.e., less manual) mass content changes in the future. In today's meeting
6   we provide a status update on Phase 1 and seek feedback on our Phase 2 approach, and on the discussion topic listed below.

7   **Phase 1: CX Baselining**

8   Phase 1 covers the short-term CX enhancements that may help ensure that our existing experience address potential
9   customer concerns on Prime upsells. The objective of Phase 1 is to implement the CX enhancements we have aligned on
10  (listed below). Together, with the changes and updates being rolled out for TrueSPC, this will reset the CX baseline for Prime
11  upsells in checkout and enable us to make further iterations from there. The estimated impact from these Phase 1 changes
12  is -7.8 MM (-2.7 in 2022, -5.1 in 2023) impact to Prime member balance (See Appendix A for impact model).

13  Phase 1 will improve our CX by addressing the following customer concerns:

14      1. CTAs, specifically the positive CTA on UPDP, could be confusing to a percentage of customers (e.g., customers may
15         think they are agreeing to free delivery without realizing they are signing up for Prime) (IT-2171). We will ensure that
16         all positive CTAs in our signup locations include mention of Prime or the Prime offer being shown.
17      2. Price and terms of the subscription are hard to find because they are only in the T&Cs (IT-2168). We will ensure that
18         price and certain key terms of the subscription are present and visible to customers outside of the T&Cs.
19      3. Languages in certain CTAs (e.g., "No, I don't want fast, FREE delivery") may be perceived by some as encouraging
20         customers to sign up for Prime (IT-2964). We are simplifying our decline CTAs to remove any possible customer
21         misinterpretation of strings attached (e.g., "No thanks" vs. "No, I don't want…").

22  We are targeting 12/31/2021 to complete auditing, QAing, and staging changes for this phase. Our recommendation is that
23  we make these changes in early January 2022 when the content teams undertake an effort to update Auto-Targeting
24  baselines. The advantage of this is that we can reduce by 33% the number of templates needing updates by only updating
25  the 2022 baseline in each Auto-Targeting group (versus all live templates), and avoid making performance-impacting changes
26  after Auto-Targeting models have already been started to learn for 2022. If we were to push changes after
27  baselining, we would need to also update any new treatments introduced by marketers YTD and may impact Auto-Targeting
28  optimization in-progress. The downsides are that we need to consider the impact and timelines of other headwinds in each
29  country; accordingly, we will align with local business stakeholders to determine the optimal timing per locale.

30  As of 8/3 we have completed an initial audit to scope effort to update all core Prime UPDP upsells in EU7[1] and will complete
31  a similar exercise for ROW by 11/5.            **Redacted - Privileged**
32
33                                  **Redacted - Privileged**

34  The biggest risk to successful implementation of Phase 1 is that we are yet to audit or scope lower priority use cases (i.e.,
35  Student, UP upsells and non-UPDP locations). However, the core Prime UPDP templates we have audited account for
36  approximately 43.4% of WW checkout signups are the primary sources of customer frustration, so we will continue to
37  prioritize staging UPDP changes by our 12/31/2021 target date and will address the remaining changes as P1 fast follows
38  during Q1 2022.

39  **Phase 2: Long-Term Capabilities and Regression Safeguards**

40  Phase 2 covers the long-term changes we would like to make and capabilities we consider necessary to better safeguard
41  against CX Satisfaction regression and support easier content management across all of our use cases. The primary goal of
42  Phase 2 is to enable marketers and content managers to more easily maintain our high bar for CX Satisfaction in Prime upsells.

43  We have identified the following objectives to achieve through Phase 2 (additional details on each below):

44      1. Use cases and templates should be manageable at scale.

---

[1] https://quip-amazon.com/WPIJAdMAHtxe/CX-Satisfaction-EU-roadmap

# EXHIBIT 131

Lisa

---

**From:** Ikeda-Flowers, Emily
**Sent:** 09 February 2022 3:25 AM
**To:** Srinivasan, Bharath <bharaths@amazon.com>; Morey, Rex <rexford@amazon.com>; Grimes, Eric
<ewg@amazon.com>; Eltaweel, Moud <eltaweel@amazon.com>; England, Mark <marengl@amazon.co.uk>
**Cc:** van Tonder, Jacques <tonderj@amazon.com>; May, Matt <matmaym@amazon.com>; Mayr, Christoph
<mayrchri@amazon.com>; Taylor, Mckenzie <taylmcke@amazon.com>; Dinani, Alnoor <dalnoor@amazon.com>; Leung,
Lisa <lileung@amazon.com>
**Subject:** Re: [Privileged & Confidential] US CX Satisfaction Change Rollout

+ Alnoor, Lisa

*Retaining Privilege*

Hi All,

Sharing preliminary results:

**Changes made:** We completed changes on Desktop UPDP last week (2/1-2/3) and have data available through 2/6. Due
to a small number of templates requiring additional technical assistance and QA, we have achieved 90.3% coverage of
Desktop UPDP templates and will address the remaining 9.7% by 2/10. In total, our changes address approximately
32.9% of UPDP impressions.

**Impact**: Overall, the changes made on Desktop UPDP have resulted in an estimated **8.1-11.2% decrease in Desktop
UPDP signups** which would result in an estimated **444.7-615.5k annualized decrease in paid members**. Taking a
straight-line extrapolation for all of UPDP (i.e., once mobile changes are complete), we estimate the resulting impact to
be **1,352-1,871k annualized decrease in paid members**, which is consistent with the -1,818k impact estimated by
finance, but frontloads the 2022 impact (-553k) and 2023 impact (-1,264k) to 2022 entirely.

**Assumptions:** Due to the Prime price increase announced on 2/3, we are using the impact to non-UPDP checkout and
using that to normalize the impact we see on UPDP (See this Quip for calculation details). Additionally, due to the limited
data currently available, we are calculating both WoW and MoM changes to determine min/max ranges. As more data
becomes available, this range will narrow. All data should be taken as directional until we have additional data points
available (at least 7 full days).

**Upcoming:** We are completing CX Satisfaction changes on Mobile UPDP this week (ETA 2/9). All outstanding use cases
that have required additional review will be addressed and deployed by 2/10. We expect to have the first week of
results by 2/21 but will share preliminary results next week.

Please reach out with any details and refer to this Quip for calculations. Once this group has had a chance to review, I
will add a high-level callout to WBR. Also, as more information becomes available I will work with Alnoor to validate
what we are seeing.

Also, thank you so much to Jacques, Matt, Christoph, and Mckenzie who have been working hard to make all of this
possible.

---

**From:** "Srinivasan, Bharath" <bharaths@amazon.com>
**Date:** Thursday, February 3, 2022 at 9:16 PM
**To:** "Morey, Rex" <rexford@amazon.com>, "Grimes, Eric" <ewg@amazon.com>, "Ikeda-Flowers, Emily"
<ikeemily@amazon.com>, "Eltaweel, Moud" <eltaweel@amazon.com>, "England, Mark"
<marengl@amazon.co.uk>

                                                                    AMZN-PRM-FTC-002670755

**Cc:** "van Tonder, Jacques" <tonderj@amazon.com>, "May, Matt" <matmaym@amazon.com>, "Mayr, Christoph" <mayrchri@amazon.com>, "Taylor, Mckenzie" <taylmcke@amazon.com>
**Subject:** Re: [Privileged & Confidential] US CX Satisfaction Change Rollout

Thanks Emily. Per our chat, do catch up with Ben G who had some learnings on measurement on Café (cancel flow headwind). Otherwise, sounds good on the below, and broadly agree with the measurement strategy and baselining with Puma. Let's continue to closely monitor signup rates and daily/weekly trends, and surface up in WBR for the next few weeks.

Thanks
bharath

---

**From:** "Morey, Rex" <rexford@amazon.com>
**Date:** Thursday, February 3, 2022 at 3:54 PM
**To:** "Grimes, Eric" <ewg@amazon.com>, "Ikeda-Flowers, Emily" <ikeemily@amazon.com>, "Eltaweel, Moud" <eltaweel@amazon.com>, "England, Mark" <marengl@amazon.co.uk>
**Cc:** Bharath Srinivasan <bharaths@amazon.com>, "van Tonder, Jacques" <tonderj@amazon.com>, "May, Matt" <matmaym@amazon.com>, "Mayr, Christoph" <mayrchri@amazon.com>, "Taylor, Mckenzie" <taylmcke@amazon.com>
**Subject:** RE: [Privileged & Confidential] US CX Satisfaction Change Rollout

Hey Emily, thanks for the additional info on the measurement plan. Makes sense to me. Thanks!

---

**From:** Grimes, Eric
**Sent:** Thursday, February 3, 2022 3:50 PM
**To:** Ikeda-Flowers, Emily <ikeemily@amazon.com>; Morey, Rex <rexford@amazon.com>; Eltaweel, Moud <eltaweel@amazon.com>; England, Mark <marengl@amazon.co.uk>
**Cc:** Srinivasan, Bharath <bharaths@amazon.com>; van Tonder, Jacques <tonderj@amazon.com>; May, Matt <matmaym@amazon.com>; Mayr, Christoph <mayrchri@amazon.com>; Taylor, Mckenzie <taylmcke@amazon.com>
**Subject:** Re: [Privileged & Confidential] US CX Satisfaction Change Rollout

Got it. Thanks. Sorry I missed that.

---

**From:** "Ikeda-Flowers, Emily" <ikeemily@amazon.com>
**Date:** Thursday, February 3, 2022 at 3:36 PM
**To:** Eric Grimes <ewg@amazon.com>, "Morey, Rex" <rexford@amazon.com>, "Eltaweel, Moud" <eltaweel@amazon.com>, "England, Mark" <marengl@amazon.co.uk>
**Cc:** "Srinivasan, Bharath" <bharaths@amazon.com>, "van Tonder, Jacques" <tonderj@amazon.com>, "May, Matt" <matmaym@amazon.com>, "Mayr, Christoph" <mayrchri@amazon.com>, "Taylor, Mckenzie" <taylmcke@amazon.com>
**Subject:** Re: [Privileged & Confidential] US CX Satisfaction Change Rollout

Hi Rex and Eric,

Since Puma will be impacting signup behavior across all Prime locations, we will take the overall Puma impact on checkout as our baseline and single out the impact from CX Satisfaction by looking at the additional/incremental change on the locations we changed each day (e.g., Desktop UPDP FT on Tuesday). It won't be as precise as a Weblab but for the reasons mentioned below (FAQ 1 Option 2) we have made the conscious decision not to run Weblabs.

CONFIDENTIAL                                          AMZN-PRM-FTC-002670756

We do not have impact yet from 2/1 and 2/2 due to the standard 2-3 day data delay. I will be reviewing and sharing out impact numbers as they become available.

---

**From:** "Grimes, Eric <ewg@amazon.com>
**Date:** Thursday, February 3, 2022 at 2:56 PM
**To:** "Morey, Rex" <rexford@amazon.com>, "Ikeda-Flowers, Emily" <ikeemily@amazon.com>, "Eltaweel, Moud" <eltaweel@amazon.com>, "England, Mark" <marengl@amazon.co.uk>
**Cc:** "Srinivasan, Bharath" <bharaths@amazon.com>, "van Tonder, Jacques" <tonderj@amazon.com>, "May, Matt" <matmaym@amazon.com>, "Mayr, Christoph" <mayrchri@amazon.com>, "Taylor, Mckenzie" <taylmcke@amazon.com>
**Subject:** Re: [Privileged & Confidential] US CX Satisfaction Change Rollout

+1 to Rex's comments. And are we not able to do holdouts given the nature of the changes? Seems like it would be good to even if temporarily to quantify impact.

---

**From:** "Morey, Rex" <rexford@amazon.com>
**Date:** Thursday, February 3, 2022 at 1:50 PM
**To:** "Ikeda-Flowers, Emily" <ikeemily@amazon.com>, Eric Grimes <ewg@amazon.com>, "Eltaweel, Moud" <eltaweel@amazon.com>, "England, Mark" <marengl@amazon.co.uk>
**Cc:** "Srinivasan, Bharath" <bharaths@amazon.com>, "van Tonder, Jacques" <tonderj@amazon.com>, "May, Matt" <matmaym@amazon.com>, "Mayr, Christoph" <mayrchri@amazon.com>, "Taylor, Mckenzie" <taylmcke@amazon.com>
**Subject:** RE: [Privileged & Confidential] US CX Satisfaction Change Rollout

Emily, thanks for providing an update on the CX Satisfaction changes. How are we measuring the impact of these changes on signups? Since these changes are happening at the same time as the Project Puma announcement, it might be difficult to determine the impact of these changes vs. the price change. Do we have a way to separate out the impact? Did we see any impact on 2/1 and 2/2?

Thanks,
Rex

---

**From:** Ikeda-Flowers, Emily
**Sent:** Monday, January 31, 2022 1:30 PM
**To:** Grimes, Eric <ewg@amazon.com>; Morey, Rex <rexford@amazon.com>; Eltaweel, Moud <eltaweel@amazon.com>; England, Mark <marengl@amazon.co.uk>
**Cc:** Srinivasan, Bharath <bharaths@amazon.com>; van Tonder, Jacques <tonderj@amazon.com>; May, Matt <matmaym@amazon.com>; Mayr, Christoph <mayrchri@amazon.com>; Taylor, Mckenzie <taylmcke@amazon.com>
**Subject:** [Privileged & Confidential] US CX Satisfaction Change Rollout

*Seeking legal guidance*

Hi Eric, Rex, and Moud,

I am reaching out to notify you of our planned rollout of CX Satisfaction changes this week and next in accordance with recent alignment between business and legal to accelerate this workstream. We have received the green light from Jamil and Lisa and Jamil has notified Russ and Doug as well. We included in OP2 a **-553,301** paid membership impact from implementing these changes, and accelerating changes to this month will result in an incremental impact of **-22.700** paid members (total impact **-580,301 paid members**).

The changes that will be made to UPDP include:

AMZN-PRM-FTC-002670757

1.    The positive CTA button in UPDP will refer to "*Prime*";
2.    The negative CTA link will be shortened from "*No thanks, I do not want FREE delivery*" to "*No thanks*";
3.    The membership price and auto-renewal information will be displayed more clearly outside of the disclosure footer.


Thanks to the team's hard work, we have staged most changes in devo and will push them to prod in phases according to the following schedule. We will not be gating these changes behind Weblab (see FAQ 1 below) and will monitor metrics throughout (FAQ 2).

- 2/1: Desktop UPDP Free Trial
- 2/2: Desktop UPDP Hard Offer / Paid Trial
- 2/3: Desktop UPDP Misc offers (Surprise, Intro Offers, etc.)
- 2/7: Mobile UPDP Free Trial
- 2/8: Mobile UPDP Hard Offer / Paid Trial
- 2/9: Mobile UPDP Misc offers (Surprise, Intro Offers, etc.)


Please reach out if you have any questions.

---

**FAQ 1 – What were the approaches considered for this change?**
1.    **Option 1** (3 weeks): Marketing team executes updates throughout a 2 week period, batching changes by dates (Desktop FT one day, Mobile FT another day, etc.). Monitor impact per location for 10 days following each change (est. 3 day data delay + 7 day tracking)
a.            **Pros**: Changes can be implemented faster, without creating templates and Weblabs.
b.            **Cons**: Changes are deployed immediately to Prod when pushed, resulting in higher risk.
2.    **Option 2** (6 weeks): Marketing team gates all live UPDP, SPC Popover, TrueSPC content behind Weblabs and stage changes over a 4 week period. Dial up incrementally over a 1 week period, reaching 100% after 1 week. Monitor for 10 days following each change (est. 3 day data delay + 7 day tracking)
a.            **Pros**:  Changes can be released in discrete phases, with ability to dial up/down as needed
b.            **Cons**: Significant incremental lift to configure multiple Weblabs. Introduce 250-300 new templates (templates containing our changes). All ongoing AT optimization will be disrupted and models will need to be reset when new content is promoted to Prod. Opportunity cost of pausing experimentation for 6 weeks (-556k annualized based on 2021 impact)

**FAQ 2 – How will we monitor these changes?**
We will be monitoring via iGraph and Carnaval alarms to ensure our changes do not result in rendering issues, latency spikes, etc. We are not making any changes on Fridays so that we do not risk having any undetected issues surface over the weekend.


**Emily Ikeda-Flowers**
Manager, Prime CXO Marketing/Tech Shared Services
ikeemily@amazon.com


                                                                      AMZN-PRM-FTC-002670758

# EXHIBIT 132

```
1              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
2                    AT SEATTLE
    - - - - - - - - - - - - - - - - x
3  FEDERAL TRADE COMMISSION,      :

4        Plaintiff,               :
                                         Civil Action No.
5     v.                          :

6  AMAZON.COM, INC., et al,       :   2:23-cv-0932-JHC

7        Defendants.              :
    - - - - - - - - - - - - - - - - x
8

9          Oral videotaped deposition of NEALE

10  MAHONEY, taken on behalf of the Defendant's,

11  beginning at 9:13 a.m., on Friday, May 9th,

12  2025, at Covington & Burling, LLP, One

13  CityCenter, 850 Tenth Street, NW, Washington,

14  DC 20001, before Okeemah S. Henderson, RRP,

15  CaseViewNet Realtime Reporter, and Notary

16  Public for the District of Columbia.

17  (REPORTER'S NOTE: All quotations from exhibits

18  are reflected in the manner in which they were

19  read into the record and do not necessarily

20  denote an exact quote from the document.)

21

22  Reported by: Okeemah S. Henderson, RPR
```



 1                    NEALE MAHONEY,

 2   was called as a witness, and having been first

 3   duly sworn, was examined and testified as

 4   follows:

 5                    EXAMINATION

 6   BY MS. WU:

 7             Q.   Good morning, Doctor.  Thank

 8   you for being here today.  As you heard, my

 9   name is Laura Wu, and I represent the

10   defendants in this litigation.  We appreciate

11   your time for your deposition today.  I'm going

12   to start with just a few preliminary matters to

13   make sure the day goes in an orderly fashion.

14        Doctor, have you ever been deposed

15   before?

16             A.   I have not.

17             Q.   Have you ever testified at

18   trial previously?

19             A.   I have not.

20             Q.   Given that you have haven't

21   been deposed before, I'm just going to set

22   forth a few ground rules.  First of all, your



1    discussed in your report was presented to

2    certain Prime members at the time of

3    cancellation, correct?

4             A.    Yes, that is correct.

5             Q.    The cancellation survey cited

6    in your report was not presented to Prime

7    members at the time of their enrollment,

8    correct?

9             A.    Yes, that is correct.

10            Q.    The cancellation survey cited

11   in your report but offered to approximately 

12   percent of Prime members who executed

13   cancellation of their Prime subscriptions

14   online, correct?

15            A.    Yes, that is correct.

16            Q.    Not all Prime members who

17   cancel their Prime subscriptions are presented

18   with the option to take the cancel survey

19   discussed in your report, correct?

20            A.    Yes, that is correct.

21            Q.    Not all Prime members who are

22   presented with the option to take the cancel

ESQUIRE
DEPOSITION SOLUTIONS

1    survey complete that survey, correct?

2            A.    Yes, that is correct.

3            Q.    The cancel survey referenced in

4    your report has a low response rate, correct?

5            A.    No.   "Low" is a term that is --

6    should be viewed in context.

7            Q.    Let me see if we can short

8    circuit this.  We'll use you, not Professor

9    Diamond this time.  Let's go to your report,

10    Exhibit 1, and look at paragraph 52.

11            A.    Okay.

12            Q.    Okay.  As set forth in your

13    report, paragraph 52, [As read] "Between May

14    2020 and June 2023, Amazon prompted ███

15    ███████ Prime customers who canceled online to

16    complete the survey."

17        Correct?

18            A.    Correct.

19            Q.    Of these customers about █

20    percent completed some or all of the survey,

21    correct?

22            A.    Yes.  That's correct.



1          Q.    The cancellation survey

2    discussed in your report did not include any

3    filter questions, correct?

4          A.    Yes, that is correct.

5          Q.    The cancellation survey

6    discussed in your report did not include any

7    "Do not know" or "No opinion" option in

8    response to the survey questions, correct?

9          A.    You're correct.  It did not

10   include a "Did not know" or "No opinion"

11   response, but it did -- many of questions

12   included another category, which is, in my

13   professional judgment, similar.

14         Q.    The cancellation survey

15   discussed in your report did not include any

16   "Do not know" or "No opinion" options in

17   response to the survey questions, posed,

18   correct?

19         MR. WARE:  Objection.  Asked and

20   answered.

21         A.    I have nothing to add to my

22   previous response.



1   characteristics.  Those characteristics can

2   address -- can address biases including

3   those -- potential biases including those

4   raised by the Amazon employee.

5            Q.   You used the data citing

6   Exhibit 7 but never acknowledged the concerns

7   about bias that Mr. Agnihotri identifies in his

8   e-mail, correct?  You don't cite

9   Mr. Agnihotri's concerns about bias anywhere in

10  your report, correct?

11           MR. WARE:  Objection.  Compound.

12           A.   In my report I address issues

13  that may lead -- that could lead to bias in the

14  survey response and conduct analysis to assess

15  the validity of the survey.  This includes

16  issues raised by Amazon employee.

17  BY MS. WU:

18           Q.   Nowhere in your report do you

19  mention Mr. Agnihotri or the concerns

20  referenced in Exhibit 7, correct?  That's not

21  in your report.

22           A.   I do not use -- to the best of



1    my knowledge, I do not use the term "member

2    frustration" at the time of cancellation.

3              Q.    And you do not specifically

4    reference Mr. Agnihotri and his concerns about

5    bias in the cancel survey instrument, correct?

6              A.    I do not reference this,

7    Mr. Agnihotri and his specific -- and his

8    specific concerns in my expert report.

9              Q.    In connection with your

10   analysis based on the cancel survey data, you

11   treat DNI as a response to the survey as an

12   unintentional enrollment in Prime correct?

13             A.    Yes.

14             Q.    The cancellation survey

15   includes the DNI response option, quote, [As

16   read] "I did not intend to signed up for

17   Prime," end quote, correct?

18             A.    Correct.

19             Q.    Dr. Mahoney, you acknowledge

20   there are many customers, such as yourself, who

21   intentionally sign up for Prime, correct?

22             A.    Yes.



1          Q.   You don't know whether any

2    particular customer who selected a DNI response

3    in the cancellation survey actually enrolled in

4    Prime intentionally, correct?

5          A.   Yes, that is correct.  My

6    analysis does not examine behavior at an

7    individual level.

8          Q.   Instead, you assume for

9    purposes of your analysis that if a customer

10   selected DNI in response to question 3 or 4 on

11   the cancellation survey that the customer

12   reported accurately that they unintentionally

13   enrolled in Prime, correct?

14         A.   No.  I do not make that

15   assumption.

16         Q.   I'd ask you to pull out your

17   report, which is Exhibit 1, and turn to

18   paragraph 73, which is on page 40.  I'm going

19   to call you to the second sentence.  It reads

20   [As read] "I consider individuals as

21   unintentional enrollees if they responded that

22   they did not intend to sign up to either the



1                        CERTIFICATE

2

3           I, Okeemah S. Henderson, RPR, the officer before

4    whom the foregoing deposition was taken, do hereby certify

5    that the foregoing transcript is a true and correct record

6    of the testimony given; that said testimony was taken by me

7    stenographically and thereafter reduced to typewriting

8    under my direction; that reading and signing was not

9    requested; and that I am neither counsel for, related to,

10   nor employed by any of the parties to this case and have no

11   interest, financial or otherwise, in its outcome.

12           IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 14th day of May, 2025.

14   My commission expires:

15   September 30, 2029

16

17

18           Okeemah S. Henderson, RPR
             Official Court Reporter

19

20

21

22



# EXHIBIT 133

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF WASHINGTON

 3   _____

 4
     FEDERAL TRADE COMMISSION,          )
 5                                      )
                                        )
 6                  Plaintiff,          )    Case No.
                                        )
 7            vs.                       )    2:23-cv-00932-JHC
                                        )
 8   AMAZON.COM, INC., et al.,          )
                                        )
 9                                      )
                                        )
10                  Defendants.         )
                                        )
11                                      )

12   _____

13

14             REMOTE DEPOSITION OF EMILY IKEDA

15           * * * CONFIDENTIAL PORTIONS * * *

16       Page 12, Line 16 through Page 211, Line 6

17                   February 20, 2025

18        Witness Location:  Seattle, Washington

19

20

21
     Reported by:
22   Connie Recob, CCR, RMR, CRR
     Washington CCR No. 2631
23   Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801
24   Idaho CCR No. SRL-1220
     Job No. J12359065
25
```



```
 1                        BE IT REMEMBERED that on Thursday,

 2    February 20, 2025, at Seattle, Washington, at 8:40 a.m.

 3    before Connie Recob, CCR, RMR, CRR, remotely appeared EMILY

 4    IKEDA, the witness herein;

 5                        WHEREUPON, the following proceedings were

 6    had, to wit:

 7

 8                        <<<<<<  >>>>>>

 9

10    EMILY IKEDA,              having been first duly sworn,

11                             deposed and testified as

12                             follows:

13

14                        MR. MENDELSON:  Good morning, Ms. Ikeda.

15    My name is Evan Mendelson.  I'm an attorney representing the

16    Federal Trade Commission.  It looks like I'm currently joined

17    on the line by Thomas Maxwell Nardini, also from the FTC.  He

18    and others might come and go during the day.

19        If I could just have -- if I could ask your counsel or

20    Amazon's counsel to introduce themselves.

21                        MS. DING:  Karen Ding for Hueston

22    Hennigan on behalf of the witness.  And it looks like we also

23    have Laura Craig on behalf of Amazon on the line.

24        I did want to check one thing before we got started.  I

25    see on the platform that it says on the record/video
```



 1    with implementing the CX satisfaction changes in the U.S.; is

 2    that right?

 3  A.  That's what it looks like, yes.

 4  Q.  Okay.  Do you have any independent recollection of that

 5    separate from reading it in the document?

 6  A.  I do not, no.

 7  Q.  Okay.  Mr. Ghani -- you write here that Mr. Ghani notified

 8    Russ and Doug as well.

 9        Do you see that?

10  A.  Yes, I see that.

11  Q.  And Russ is Russ Grandinetti, correct?

12  A.  Yes, that's correct.

13  Q.  And Doug is Doug Herrington; is that correct?

14  A.  Yes, that's correct.

15  Q.  What's your understanding of what Russ Grandinetti's role at

16    Amazon was as of January 31st, 2022?

17                      MS. DING:  Objection.  Vague.

18                      THE WITNESS:  I don't specifically recall

19    really what his role was at that time.

20  BY MR. MENDELSON:

21  Q.  Do you recall whether he had any role in or -- role in or

22    oversight of the Prime organization?

23  A.  I recall that the Prime organization rolled up into him, but

24    I don't know how involved he was.

25  Q.  Okay.  All right.  And at least as of -- going back to the



1    text of your e-mail here, you're estimating a decrease in

2    about 580,000 paid members as a result of rolling out the CX

3    satisfaction changes in the U.S.; is that right?

4   A.  Yes.  That was the prediction for the impact in 2022.

5   Q.  Okay.  All right.  Let's skip ahead, so we're going back a

6    couple pages to the page ending in 755.

7        There's an e-mail from you dated February 9th, 2022, so

8    about nine days later.  Let me know when you're there.

9   A.  Okay.

10  Q.  And so in the changes made paragraph of your e-mail, you

11   confirm that between February 1st and February 3rd you

12   made -- you implemented changes to the U.S. desktop UPDP; is

13   that correct?

14  A.  Yes, that's what it looks like.

15  Q.  Okay.  It looks like you made it through about -- in that

16   time period, you made it through about 90 percent -- you're

17   about 90 percent coverage of desktop UPDP templates, so you

18   weren't completely done yet, correct?

19  A.  That's what I read, yes.

20  Q.  Okay.  And then if you look down at upcoming, your plan looks

21   like as of this time you're planning on making the CX

22   satisfaction changes to the mobile UPDP during the week of

23   February 9th; is that right?

24  A.  That's what it looks like, yes.

25  Q.  Okay.  All right.  And then I want to skip all the way ahead



 1   to the first page of Exhibit EI -- I think we're on 17, yep,
 2   Exhibit EI-17.  There is an e-mail from -- at the bottom of
 3   the page from Mr. Dinani to yourself to a few other people.
 4        Do you see that?
 5   A.  Yes, I see that.
 6   Q.  Okay.  And go ahead and read Mr. Dinani's e-mail, and let me
 7   know when you're done.
 8                    MS. DING:  Just for clarity of the
 9   record, this is a fairly lengthy e-mail chain, and the
10   witness has not reviewed the entire document and has only
11   reviewed the portions that Counsel has directed.
12   BY MR. MENDELSON:
13   Q.  Sure.  And, Ms. Ikeda, obviously, in response to my
14   questions, if you want to review other portions, you should
15   feel free to do so.
16   A.  Okay.  Okay.  I've reviewed the February 10th e-mail from
17   Omar.
18   Q.  Okay.  In that e-mail, I guess at a high level, Mr. Dinani is
19   reporting on the business impact of -- at least preliminary
20   results of the business impact from implementing the CX
21   satisfaction changes on that UPDP desktop; is that right?
22   A.  My understanding from reading this is there was a difference
23   between the estimates and what was observed based on early
24   data, and we thought it was one reason, and it ended up being
25   not that reason.



1                         REPORTER'S CERTIFICATE

2

3          I, CONNIE A. RECOB, the undersigned Certified Court

4    Reporter, authorized to administer oaths and affirmations in

5    and for the States of Washington, Oregon, Utah and Idaho, do

6    hereby certify that the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given before me at the

8    time and place stated therein; that any and/or all

9    witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me

11   stenographically recorded and transcribed under my

12   supervision, to the best of my ability; that the foregoing

13   transcript contains a full, true, and accurate record of all

14   the sworn testimony and/or proceedings given and occurring at

15   the time and place stated in the transcript; that a review of

16   which was requested; that I am in no way related to any party

17   to the matter, nor to any counsel, nor do I have any

18   financial interest in the event of the cause.

19         WITNESS MY HAND and SIGNATURE this 3rd day of March,

20   2025.

21

22   

23   _____
     /s/CONNIE A. RECOB, RMR, CRR
     Washington CCR No. 2631

24   Oregon CCR No. 15-0436
     Utah CCR No. 1133171-7801

25   Idaho CCR No. SRL-1220



# EXHIBIT 134

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:23-cv-0932-JHC |
| Plaintiff, | Honorable John H. Chun |
| v. | |
| AMAZON.COM, INC., a corporation; | |
| NEIL LINDSAY, individually and as an officer of AMAZON.COM, INC.; | |
| RUSSELL GRANDINETTI, individually and as an officer of AMAZON.COM, INC.; and | |
| JAMIL GHANI, individually and as an officer of AMAZON.COM, INC., | |
| Defendants. | |

**REBUTTAL EXPERT REPORT OF DR. RAN KIVETZ (CORRECTED)**

**CONFIDENTIAL**

203.    Dr. Mahoney's above claims, which relate to the issue of response bias, are speculative, contradicted by academic literature, and both theoretically and empirically unfounded.

**B.6.1.    *Dr. Mahoney's Theoretical Arguments Dismissing Response Biases are Speculative, Erroneous, and Inconsistent with Relevant Academic Literature***

204.    A major threat to the representativeness of a sample is ***non-response bias*** (*i.e.*, the fact that some potential respondents choose *not to* participate) and, relatedly, as Dr. Mahoney acknowledges in his academic writing,[321] ***self-selection*** (*i.e.*, the fact that certain respondents or types of respondents are more likely to choose *to* participate).[322]  Contrary to Dr. Mahoney's assertions, such response biases are a serious concern for the Cancellation Survey and would likely *overstate*, not understate, selections of "DNI."

205.    ***First***, the *vast majority* of Prime-canceling customers declined the invitation to take the Cancellation Survey.  My analysis of a random sample of ███ customers (*see* Subsection C.1 of my February 24, 2025 *Expert Report*) estimated an approximate "response rate" of only ██%—reflecting the fact that among the recorded survey pop-ups that invited a random sample of Prime customers to take the Cancellation Survey upon canceling, ██% of the pop-ups resulted in a completed, or partially completed, survey.  According to the Mahoney

---

[321] *See, e.g.*, Agarwal, Sumit, Souphala Chomsisengphet, Neale Mahoney, and Johannes Stroebel (2015), "Regulating Consumer Financial Products: Evidence from Credit Cards," *Quarterly Journal of Economics*, 130(1), 111 – 164 ("We do not restrict the analysis to a balanced panel of accounts, because doing so would require us to drop accounts, for example, that were closed in mid-sample due to delinquency, and thereby create sample selection bias"; p. 122); Cabral, Marika, Michael Gerusa, and Neale Mahoney (2018), "Do Larger Health Insurance Subsidies Benefit Patients or Producers? Evidence from Medicare Advantage," *American Economic Review*, 108(8), 2048 – 2087 (*e.g.*, "[A]s a robustness test, we replicate all our analyses using a balanced sample of counties with an MA plan in each year between 1997 and 2003. These estimates […] are very similar and confirm that selection is not biasing the results").

[322] *See, e.g.*, Malhotra (2012), pp. 194 – 195.  In my own peer-reviewed research, I explicitly consider, and empirically account for, self-selection.  *See, e.g.*, Kivetz, Urminsky, and Zheng (2006) (finalist, Paul Green Award), which explored the "*goal gradient*" phenomenon—the finding that customer effort to reach a threshold increases or accelerates with proximity to that threshold (*e.g.*, greater consumption/expenditure as one is about to reach a reward goal or coupon expiration date)—and explicitly ruled out self-selection as an alternative explanation (*e.g.*, "The finding of postreward resetting is a key corollary of the goal-gradient hypothesis; it demonstrates that effort expenditure is a function of goal distance and rules out learning and other time-trend effects as well as a self-selection (or survivor) rival account. Self-selection is also inconsistent with the analysis of participants' entire sequence of ratings […]"; pp. 53 – 54).

Report, of the over ▮▮▮▮▮ customers whom Amazon prompted to take one or more Cancellation Surveys, about ▮% did so[323]—again, a low response rate.

206.    When considering the specific setting in which the Cancellation Survey was presented to potential respondents—as a pop-up embedded within the Prime cancellation process that explicitly asked customers who just canceled to share their feedback about their cancellation—the fact that the *vast majority* of cancelers did not wish to provide Amazon with feedback (about the issue they are dealing with at that moment) is problematic and raises a heightened concern that the small proportion of respondents who end up taking the survey are a non-representative subset of the broader population (*i.e.*, of those who received a survey invitation).[324]  This makes it even more critical to rule out response (or non-response) biases if a researcher attempts to generalize from a small fraction of Cancellation Survey respondents to the vast pool of Prime cancelers who actively refused to inform Amazon about their cancellation reasons.

207.    ***Second***, for multiple reasons as explained in my February 24, 2025 *Expert Report*, the Cancellation Survey was highly susceptible to both non-response bias (*i.e.*, such that many customers, including those who were satisfied with Prime, declined to take the survey) and self-selection (*i.e.*, such that the survey likely overrepresented customers who had certain motivations, including those who were dissatisfied with Prime or who sought recompense).

208.    Customers who canceled Prime and encountered the Cancellation Survey pop-up invitation made a deliberate decision about whether to participate in this survey.  Those who did not want to discuss their cancellation with Amazon, who were satisfied with Prime's services, or

---

[323] Mahoney Report, ¶ 52.  Note that Dr. Mahoney's calculation of a response rate is at the individual customer level.  However, Amazon customers could (and, in fact, many did) cancel multiple Prime memberships, in which case they would be exposed to multiple pop-up invitations to multiple Cancellation Surveys.  Indeed, the data show that each unique customer received on average approximately ▮ survey pop-up invites (*i.e.*, pop-ups assigned to the "treatment" condition for multiple surveys) during the applicable period.  My response rate calculation appropriately takes this into account, by examining the ratio between all completed (or partially completed) surveys to all survey invites presented—leading to a lower "true" survey response rate of approximately ▮%.

[324] The type of setting in which the Cancellation Survey was presented is very different from, for example, the procedure of recruiting participants from an online survey panel, where low response rates may stem from factors such as inability to contact or reach an individual and are more likely to reflect consumers' general ability to take a survey at a given time.

inflated; the survey is unrepresentative of all Prime cancelers due to systematic response biases; and the survey lacks any control or benchmark to account for various sources of error.

234.    Dr. Mahoney's regression analysis is only as good as its input variables, consistent with a principle known as "garbage in, garbage out" ("GIGO").[349]  Because his regression model entirely relies on a Cancellation Survey-based estimate of "DNI" to quantify alleged unintentional enrollment, and because this survey is invalid and unreliable for purposes of quantifying unintentional enrollment from "DNI" responses (for the reasons set forth in the preceding sections of this *Rebuttal Expert Report* and in my February 24, 2025 *Expert Report*), any analysis using the Cancellation Survey as its primary input is also invalid and unreliable.

235.    Therefore, assuming for the sake of argument that Dr. Mahoney's regression were valid, it could, *at most*, predict only rates of *"DNI" answers* for Amazon customers.  Dr. Mahoney's regression would *not* predict rates of unintentional enrollment, for the simple reason that "DNI" responses do not reliably measure, and cannot be equated with, unintentional enrollment.  Indeed, as my empirical analyses of the Cancellation Survey data and of the customer behavior data demonstrate, and as evident in the *very low* rates of "DNI" responses that could even be argued to be consistent with potential unintentional enrollment (*see* Subsection B.1.3), Dr. Mahoney's analysis would dramatically overestimate the degree of "harm" arising from alleged unintentional enrollment.

236.    I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Rebuttal Expert Report* in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This *Rebuttal Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.

| | |
|---|---|
| April 28, 2025 | *R. Kivetz* |
| Date | Dr. Ran Kivetz, Ph.D. |

---

[349] *See, e.g.*, https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095842747 ("Used to express the idea that in computing and other spheres, incorrect or poor quality input will always produce faulty output (often abbreviated as *GIGO*).  The saying is recorded from the mid 20th century.").