The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | No. 2:23-cv-0932-JHC |
| Plaintiff, | DEFENDANTS' OPPOSITION TO FTC'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AGAINST ALL DEFENDANTS |
| v. | |
| AMAZON.COM, INC., *et al.*, | |
| Defendants. | NOTED ON MOTION CALENDAR: June 24, 2025 |
| | ORAL ARGUMENT REQUESTED |

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 3

    A.   Amazon Prime Has Used Industry Standard Enrollment and Online Cancellation Flows for Many Years ...................................................... 3

    B.   Amazon Observes Levels of Customer Confusion That Are Inevitable and Unsurprising .................................................................. 5

    C.   Defendants Work to Further Improve the User Experience ......................... 7

    D.   No Defendant Believed the Prime Flows Violate the Law ......................... 11

    E.   The FTC Delays for Years Before Bringing This Action .......................... 12

III. ARGUMENT .................................................................................................... 14

    A.   ROSCA Does Not Apply to Prime .......................................................... 14

    B.   The FTC Is Not Entitled to Summary Judgment on Its Clear and Conspicuous Disclosure Claim ............................................................... 15

        1.   Amazon Clearly and Conspicuously Discloses Prime's Material Terms ....... 15

        2.   The FTC Has Not Met Its Burden to Show That Amazon Does Not Clearly and Conspicuously Disclose All Material Terms .............................. 17

    C.   The FTC Is Not Entitled to Summary Judgment on the Timing of Amazon's Disclosures ........................................................................... 29

    D.   The FTC Is Not Entitled to Summary Judgment on ROSCA's Express Informed Consent Requirement ............................................................... 32

    E.   The FTC Is Not Entitled to Summary Judgment on ROSCA's "Simple Mechanisms" Requirement ..................................................................... 34

        1.   Amazon Provides "Simple" Methods to Stop Recurring Charges Apart from the Methods Challenged by the FTC ...................................... 34

        2.   The FTC Cannot Show That the Challenged Cancellation Mechanisms Are Not Simple as a Matter of Law ............................... 37

    F.   The FTC Is Not Entitled to Summary Judgment That Any Individual Defendant Is Personally Liable .................................................................. 41

    G.   The FTC Is Not Entitled to Summary Judgment on Defendants' Affirmative Defenses ............................................................................. 45

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

        1.     Laches ................................................................................................. 45

2        2.     Due Process ......................................................................................... 46

3    IV.     CONCLUSION.............................................................................................. 48

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## I.    INTRODUCTION

The Federal Trade Commission's accusations against Amazon Prime fell apart during discovery. Ignoring the undisputed evidence in Amazon's favor, the FTC seeks to parlay its narrow win on Amazon's Motion to Dismiss into summary judgment of liability. But the evidence is against the FTC at every turn. Specifically:

ROSCA's Application. The FTC cannot show that Prime is a "negative option feature" to which ROSCA applies at all. A negative option feature exists only when a seller interprets a consumer's "silence or failure to take an affirmative action" as "acceptance" of the seller's "offer … to sell or provide any goods or services." 16 C.F.R. § 310.2(w). But it is undisputed that every enrollment flow requires affirmative action to accept Amazon's offer to join Prime. Those flows encompass the one and only "offer" Amazon makes to "provide" Prime "services," so any subsequent silence or inaction (such as at the time of a monthly payment) is irrelevant as a matter of law.

Enrollment (Clear and Conspicuous Disclosures and Express Informed Consent). It is undisputed that each enrollment flow discloses Prime's material terms in language that is understandable. There is likewise no dispute that Amazon's flows tell consumers, in plain language next to the enrollment button, that by clicking, they agree to join Prime. Such disclosures are clear and conspicuous, and clicking constitutes express informed consent. To avoid Amazon's ample evidence demonstrating that the enrollment flows are clear, the FTC relies heavily upon its unsubstantiated assertions of what consumers may or may not "notice" in "context." This subjective inquiry is immaterial, but even if it were not, it is fact-intensive, heavily disputed, and inappropriate for summary judgment. The FTC invites the Court to enter judgment based on a "facial" analysis of the flows, but the FTC's own witness admitted that "the material terms of Prime" are disclosed "on the same page in which the customer is clicking a button to sign up" in "every one of the flows that are at issue in th[is] case." Ex. 2 at 347:17–348:2.[1] And the very witnesses the FTC touts as confused consumers testified that they understood how to enroll or opt out of Prime when shown images of

---

[1] "Ex." or "Exs." refer to exhibits attached to the May 27, 2025 Omnibus Declaration of Joseph Reiter (Dkt. 327) (Exs. 1–59) or the June 17, 2025 Omnibus Declaration of Joseph Reiter (Exs. 60–134) unless stated otherwise.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    Amazon's checkout flows. Never mind that Amazon's experts also refuted the FTC's theories and

2    showed that consumers understand how to navigate Amazon's industry-standard enrollment flows.

3    Genuine disputes of material fact pervade and undermine all of the FTC's arguments.

4        Cancellation ("Simple" Mechanisms). It is undisputed that Amazon offers at least four

5    "simple" mechanisms to stop recurring Prime charges—phone, email, chat, and membership

6    pause—beyond the online cancellation methods the FTC challenges (which, in any event, are also

7    "simple"). That satisfies ROSCA, because the law requires only that a company provide "simple"

8    mechanisms" to stop recurring charges, not that every "mechanism[]" offered be "simple." The FTC

9    does not meaningfully contest that these additional "mechanisms," above and beyond the online

10   cancellation flows, are "simple." The agency claims instead that the alternative methods are

11   insufficiently "prominent." But ROSCA does not require "prominent mechanisms," and Amazon's

12   evidence shows that consumers know how to find these alternative methods. For several of the years

13   at issue, more than ███████ customers cancelled Prime via Amazon customer service *without* being

14   provided a link to the online cancellation flows. Having failed to prove that any of these four

15   alternative cancellation methods is not "simple," the Court can dismiss the FTC's "simple

16   mechanisms" claim without addressing the online cancellation processes.

17        Even if the Court reaches the online-cancellation question, however, the FTC's Motion

18   ignores Amazon's objective survey data (corroborated by other fact and expert evidence) showing

19   that users could cancel Prime online in under 90 seconds. The online cancellation flows are thus

20   "simple," and the FTC has not carried its burden to show that they are not as a matter of law.

21        Individual Liability and Penalties. The FTC's bid to hold three Amazon employees

22   personally liable, and to extract exorbitant penalties from them, should end here. Nothing in the

23   record shows that Russell Grandinetti, Jamil Ghani, and Neil Lindsay (collectively, the "Individual

24   Defendants" or "Individuals") knew, or could have known, that Amazon's industry-standard

25   practices were unlawful years before the FTC decided to bring this case. Nor can the FTC present

26   sufficient evidence for a reasonable jury to conclude that the Individuals controlled or directly

27   participated in the alleged unlawful conduct during the whole period for which it seeks liability. The

1    Individual Defendants are entitled to summary judgment, not the FTC.

2        At bottom, the FTC does not and cannot cite any case granting summary judgment to the

3    agency under circumstances like these. Its Motion should be denied.

4                          **II.    STATEMENT OF FACTS**

5    **A.    Amazon Prime Has Used Industry Standard Enrollment and Online Cancellation Flows
        for Many Years**

6        By the time the FTC launched its ROSCA investigation of Amazon in 2021, the Prime flows

7    at issue had already been in use for many years. Amazon implemented the Prime enrollment flow

8    more than a decade ago. Ex. 117 at 13:1–6, 43:17–44:10 (employee who joined in 2012 recalling

9    that "throughout [his] tenure at Amazon," customers could enroll in Prime during checkout); *see*

10   *also* Ex. 20 at ROG 10 (FTC asserting that "Amazon's Enrollment Flows have violated ROSCA and

11   Section 5 since at least 2014."). And Amazon adopted the online cancellation flow at issue in 2016.

12   Ex. 111 11:19–12:18; *see also* Ex. 20 at ROG 10 (FTC asserting that "Amazon's … Cancellation

13   Flows [have violated ROSCA and Section 5] since at least 2016.").

14       At all relevant times, the Prime flows consisted of common design elements that are "widely

15   used across the industry." Dkt. 320-23 ¶ 9.a.iii. Discovery has revealed that even the designs that the

16   FTC colorfully characterizes as "dark patterns," Dkt. 69 ¶ 231, are, in fact, truthful, intuitive, and

17   "well-accepted design standards," Dkt. 320-23 ¶¶ 9.a.iii, 27–36; *see also* Ex. 100 at 73:13–74:12

18   (FTC expert agreeing that what she "would characterize as dark patterns" are "quite prevalent in

19   online commerce"); Ex. 60 (former FTC commissioner describing "dark patterns" as a "popular …

20   business practice"). For example:

21       •    The FTC claims it is a "dark pattern" to "present[] asymmetric choices" through "the

22            use of a link rather than a button" to decline. Dkt. 69 ¶ 231(b)(i), (c)(i), (d)(i), (d)(ii).

23            But one of the FTC's likely trial witnesses has admitted that it is "fairly common in

24            the industry to have some visual asymmetry between an enrollment option as

25            compared to a decline option." Ex. 94 at 92:10–15; *see also* Ex. 96 at 108:7–109:9

26            (former Amazon director of shopping design testifying that "it is not uncommon that

27            the button that is associated with the upsell has more prominence" and observing that

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    this practice "is helpful to a user, as they scan the page"). Another one of the FTC's

2    anticipated witnesses has acknowledged that the use of a "no thanks" link, as opposed

3    to a button, is a "fairly common marketing practice." Ex. 103 at 113:3–7. Even the

4    FTC, *on its own website*, uses this exact design:



14  Ex. 95.

15    •    The FTC claims that "forc[ing] the consumer to choose whether to enroll" during the

16          checkout process is also an illegal "dark pattern." Dkt. 69 ¶ 231(a)(i). But discovery

17          has confirmed that this practice of "cross-selling" is "commonly used across a variety

18          of industries, including financial services, healthcare, insurance, and retail." Dkt. 318-

19          43 ¶¶ 91–94. Moreover, "[i]t is a standard business practice to present a call-to-action

20          that requires a response (e.g., to purchase additional products, acquire add-ons, join a

21          membership program, provide feedback about their experience)." *Id.* ¶ 168.

22    •    The FTC faults the Prime online cancellation flow for allegedly being "difficult to

23          locate," involving "multiple screens," and presenting information about "options

24          other than cancellation." Dkt. 69 ¶ 231. But discovery has shown that it is "fairly

25          common in the industry to have entry of a cancellation ingress through an account

26          setting or an account management menu," Ex. 94 at 94:1–4, and for the cancellation

27          process to involve multiple steps, Ex. 82 at -86 (noting that YouTube Premium

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    required "4 clicks just to navigate to the cancel flow," and Walmart+ "required

2    customers to fill out a survey before confirming cancellation"). "[M]ost programs"

3    also "remind customers of the benefits they will lose by cancelling and provide

4    options to switch plans, where applicable." Ex. 124 at -2513. The FTC has

5    acknowledged that consumers benefit from these "save offers," observing that "[t]he

6    moment at which a consumer is about to cancel may be the moment when they can

7    get the best deal." 86 Fed. Reg. 60822 60826 n.2.

8    Amazon has long sought to exceed these industry standards for clarity. *See, e.g.*, Ex. 94 at

9    289:3–20 (agreeing that Amazon's clarity working group "raise[d] the bar on subscription clarity

10   across the industry" and went "beyond compliance requirements, or what our competitors are doing,

11   to deliver a best-in-class customer experience"); Ex. 113 at 33:13–34:25 (recalling that Amazon's

12   online cancellation flow had "less steps and ... the wording was more clear" compared to

13   competitors); Ex. 124 at -2513 (memo reporting that "Amazon is slightly better than average in 1)

14   steps to find cancel from the home page, and 2) steps to cancel once entering the flow"). Indeed,

15   Amazon's web designers were frequently asked to "benchmark and make sure, relative to other

16   companies, we were ... best in class, from a trusted customer experience." Ex. 109 at 49:21–50:4; *see*

17   *id.* at 50:12–16 (testifying that he would often advise "don't be Comcast, don't be like your mobile

18   phone operator").

19   **B.     Amazon Observes Levels of Customer Confusion That Are Inevitable and Unsurprising**

20   As the FTC recognizes, "no matter how clear and conspicuous something is, you will always

21   have some number of people that don't understand the disclosure." Ex. 2 at 205:4–8. This reality is

22   well-understood among user researchers; even if an online user interface is "clear for the vast

23   majority of customers, there will always be customers that don't read very closely or skip details."

24   Ex. 73 at 145:13–18; *see also* Ex. 101 at 77:15–22 (Q. "[I]s it possible when you have hundreds of

25   millions of customers to create a website where not one customer could wind up being confused in

26   terms of enrolling or cancelling ...." A. "No, that's not my view.").

27   Unsurprisingly, Amazon's researchers have observed some instances in which customers

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 5

1    appeared to experience "confusion" when interacting with the Prime enrollment flows. *See generally*

2    Dkt. 314 ("FTC Mot.") at 18. These observations were made during "usability studies" conducted on

3    small numbers of participants—from "four to six" to "30-ish people" per study. Ex. 96 at 31:7–13.

4    Amazon conducts these studies because it prioritizes "treating [customer] anecdotes seriously, and

5    looking for every possible opportunity to improve the customer experience." *Id.* at 47:20–48:2. But

6    because of the "small sample" sizes and "qualitative" nature of these studies, their results are

7    "explicitly not to be extrapolated to a larger population." *Id.* 33:4–34:7 Put differently, "usability

8    studies" do not reliably indicate that any customers, other than the specific customers studied, are

9    confused by the Prime flows. *Id.* ("[T]hey don't tell you anything about the large population.").

10        Larger studies of Amazon customers, similarly, do not suggest that a significant number of

11    Prime members experience confusion during the Prime enrollment process. Although some

12    customers indicate in Prime's cancellation survey that they "did not intend to sign up for Prime,"

13    FTC Mot. 28, those self-reports are inherently unreliable and impossible to verify, Ex. 108 at 69:7–

14    19 ("We can't really go into their minds and truly understand if it was unintentional or not."). It is a

15    "common occurrence at every company" that "some consumers" will "sign up intentionally … and

16    later say they did not intend to sign up." Ex. 90 at 40:14–42:4. One reason for this is that customers

17    perceive that the "easiest thing" to say if they "would like a refund for their Prime membership …

18    would be that [they] didn't mean to sign up." Ex. 73 at 252:9–253:16. Other customers may select

19    the "did not intend" option because a family member used a shared device to enroll, or because the

20    primary account holder intended to enroll in a free trial then forgot to cancel, or because a third-party

21    engaged in fraud. Ex. 91 at 24:20–25:23. And still more customers might not accurately recall the

22    particulars of signing up, which occurred months or years before the moment they decided to take an

23    exit survey after cancelling. Ex. 127 at 130:3–13.

24        Tellingly, among Amazon's employees, the predominant view was that, at most, a very small

25    number of customers have enrolled unintentionally. *See, e.g.*, Ex. 93 at 177:13–17 (recalling that

26    mistaken sign-ups were estimated to be "very small, like maybe a percent or two total Prime

27    members"); Ex. 109 at 189:12–190:8 ("I just know it was a very small decimal percentage of our

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    membership base."); Ex. 105 at 253:14–254:5 ("That number in percentage terms is under █%.");

2    Ex. 110 at 9:14–10:2 (reports of accidental sign-ups are "a small percent overall of the customer

3    base and, within that, a smaller percent deemed accidental"); Ex. 67 at 132:15–23 ("I don't believe

4    there's a lot of people walking around who have signed up for Prime unknowingly.").

5         Yet even accepting at face value the estimates of accidental signups cited in the FTC's

6    Motion, they do not represent more than a small fraction of the total number of Amazon customers

7    who encounter the Prime enrollment flows. As of 2022, there were approximately 168 million Prime

8    members in the United States. Dkt. 318-43 ¶ 33. Of these, between approximately 1% and 3% of

9    members (~1.6 million to ~4.8 million) cancel every year. Dkt. 318-49 ¶ 118. So even if the results

10   of the Prime cancellation survey actually indicated—as the FTC's Motion varyingly suggests—that

11   either ████████████████████████████████████ of cancelling Prime

12   members had enrolled unintentionally, *see* FTC Mot. 28–29, those figures would only comprise

13   *between* ████████████ *of all Prime members*. Likewise, even if it were true that "████████

14   U.S. consumers signed up for Prime unintentionally" every year, *id.* at 30, that figure would

15   comprise only ~████ *of all Prime members*. These very low percentages shrink to even smaller

16   figures when compared to the total number of customers who are exposed to the Prime enrollment

17   flows, including the "many millions" of customers who "successfully don't sign up for Prime." Ex.

18   31 at 132:17–19.[2]

19   **C.    Defendants Work to Further Improve the User Experience**

20        Nevertheless, Amazon devoted significant resources to investigating these customers'

21   reports, and designing and testing changes to further reduce reported customer frustrations. On

22   clarity, Amazon set high aspirational goals for itself; its "North Star" was "to have 100% of our

23   member base feel informed about and be aware of their membership status ('I know I have joined

24

25   [2] The FTC's Motion also asserts that certain experimental changes to the enrollment flows caused Prime sign-ups to
     decrease by as much as 30%. FTC Mot. 23. To be sure, this does not imply that as many as 30% of Prime sign-ups are

26   unintentional. *See* Ex. 93 at 177:5–122 ("[T]he number of people that suddenly weren't signing up for Prime based on
     these changes was not equal to the number of people that were signing up and weren't realizing that they were signing up

27   for Prime.… [T]he amount of people we were hypothesizing were mistakenly signing up was very small, like maybe a
     percent or two [of] total Prime members."); Ex. 105 at 91:20–92:13 (describing the inference that reduced Prime-sign
     ups are avoided unintentional sign ups as a "logical fallacy").

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 7

1    Prime, a paid subscription program and am aware how much I'm paying and when')." Ex. 123 at -

2    501. Amazon aims to provide the "best possible experience" for customers, which includes the

3    "clearest possible experience." Ex. 114 at 119:13–19.

4            To that end, Amazon established the Customer Frustrations Elimination Program ("CFEP"),

5    Ex. 117 at 18:1–19:12, with a mandate "to improve the customer experience, and to ensure that these

6    insights that happened in the course of the user research session were making it in front of the people

7    who could potentially take action on them," Ex. 96 at 21:15–23; *id.* 54:13–55:17 ("This was Amazon

8    employees, leaders paying attention to customer anecdotes, in order to figure out how they can make

9    the experience better for customers."). The CFEP was "very successful" at "driving customer

10   experience improvements at Amazon." *Id.* at 27:14–28:4.

11           The Individual Defendants encouraged this work, including by supporting research and

12   experimentation to improve clarity in the Prime flows. *See, e.g.*, Ex. 96 at 25:5–8 ("Q. So in your

13   experience, was Amazon's leadership supportive of the Shopper Frustration Program? A. They

14   were."); Ex. 119 ("In an April 19 review of the Customer Frustrations Elimination program, Neil

15   [Lindsay] asked [for] a Deep Dive on status of Prime-related frustrations."); Ex. 122 at -499 ("The

16   review with Neil went very well, and Neil was aligned that we need to reset our clarity bar."); Ex. 96

17   at 96:12–24 ("I found that Neil was always very rigorous in encouraging teams to make their

18   experiences more clear, more simple and do the right thing for customers."); Ex. 121 at -63 ("Jamil

19   [Ghani] is interested in simplifying the cancellation flow."); Ex. 94 at 166:5–10 (agreeing that Ghani

20   was "actively involved in making improvements to boost customer trust in Prime" and recalling that

21   he "wanted very clear CX tenets"); Ex. 96 at 97:1–18 (recalling that Grandinetti was "always …

22   pushing for more clarity" and a "better customer experience"); Ex. 84 at -13 ("Russ [Grandinetti]

23   and Neil made it clear that we needed subjective, not just objective, guardrails to prevent clickbait

24   CX.")

25           Despite support from leadership, many proposed changes were not demonstrated to improve

26   clarity, so progress was not linear. Because Amazon's customer base "is very large [and] very

27   diverse," identifying changes that improve "clarity" for all customers presents significant challenges.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Ex. 67 at 137:25–138:7; *see also* Ex. 118 at 109:15–23 (former Amazon SVP testifying, "some things just are complicated, and not everything in the world can be simplified," leading to confusion that a company like Amazon "always [is] going to have to manage"). "In spite of well-intended efforts at creating and enforcing clarity guardrails," at least "some of the hypotheses [that Amazon] developed internally to improve clarity … turned out not to be correct." Ex. 123 at -500.

For example, Amazon experimented with incorporating "ASINization," wherein once a customer clicked a button to enroll in Prime, the Prime membership would be added as an item to the customer's shopping cart. *Id.* Although user experience researchers at Amazon believed that this would be a "clarity improvement," subsequent user testing "did not find that it improved clarity." Ex. 116 at 187:3–15; *see also* Ex. 126 at -179 ("The leading hypothesis that clarity is increased by adding Prime as ASIN to the shopping cart … has been proven wrong in direct customer research studies."). Similarly, when Amazon experimented with "add[ing] a box around the decline option to make it more prominent," "user testing revealed that even more customers had trouble identifying the decline option with this treatment." Ex. 123 at -500.

Although Amazon proposed and tested numerous changes to the Prime enrollment and cancellation flows between 2018 and 2021, most were not shown to improve clarity or reduce reports of unintentional enrollment.[3] *See, e.g.*, Ex. 108 at 124:3–125:8 (recalling that data "suggested we may not have actually improved clarity and reduced unintentional [sign-ups]"). As one witness described the progress as of February 2021:

> [W]e had not run any experiments that had actually shown that the metrics you would expect to improve with improved clarity actually did improve. All of the experiments we ran related to the changes we've talked about … resulted in essentially either no impact or actually negative impact to metrics like the settlement rate. And so it wasn't clear that the changes that we tried to improve the clarity for customers had actually improved the clarity.

Ex. 73 at 209:9–210:2.

But despite those disappointing results, and the reality that Amazon understood these issues

---

[3] These include the September 2020 changes, which the FTC alleges that Lindsay and Ghani rolled back. FTC Mot. 24-25. The FTC's Rule 30(b)(6) witness admitted that she does not "know one way or the other" whether those changes "in fact, improve clarity," or whether the resulting flows would have been ROSCA-complaint. Ex. 89 at 518:3–521:13.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    to affect only a relatively small percentage of its customers, clarity remained an issue that Amazon

2    cared deeply about. Accordingly, teams at Amazon engaged in constructive but spirited debates over

3    how aggressively to implement changes that were hypothesized but not proven to improve clarity.

4    *See* Ex. 94 at 292:4–9 (recalling "ongoing debate and discussion as to how to set a high clarity bar"

5    and "which metrics would best test those clarity changes"). On one side, "a number of different

6    people across Amazon"— not "limited to leaders"—"wanted assurances" that proposed changes

7    "would actually be addressing mistaken signups and customer comprehension." Ex. 93 at 239:4–16.

8    Others at Amazon were less cautious, preferring to press ahead with significant changes to the Prime

9    flows, even if "it was unclear whether the hypotheses that they had were actually the right things to

10   do." Ex. 113 at 43:4–44:1. The latter group presented "anecdotal" data in a "hyperbolic way," rather

11   than marshalling evidence that their proposals would improve the customer experience. *Id.* As one

12   former employee described Reid Nelson, a particularly outspoken researcher who is now a disclosed

13   FTC witness: "Any issue that he observed, whether it was [raised by] one person or five, he would

14   really, really try to drive action on by using sort of, like, increasingly strong and sometimes

15   hyperbolic language when talking about it." Ex. 96 at 59:6–25.[4]

16          Nevertheless, Amazon's years of research and experimentation ultimately resulted in

17   numerous permanent improvements to the Prime enrollment and cancellation flows. Among other

18   changes:

19   •    In 2019, Amazon launched "Project Iceperson," which gave Prime members the

20        option to "pause" their membership. Ex. 111 at 116:7–117:11. While membership is

21        paused, the customer "is out of the membership" and can "stay paused indefinitely."

22        *Id.* at 160:8–12. Throughout the duration of the pause, the customer does not pay a

23        subscription fee. Ex. 107 at 52:11–13.

24   •    In 2019, Amazon added a "sticky footer" to its mobile Prime offers, a design element

25        that stays on the screen as the customer scrolls up or down. Ex. 128. The sticky footer

26        ensures that, even with limited screen real estate, a customer always sees the option to

27

---

[4] The FTC's Motion is premised in substantial part on testimony from, documents authored by, and emails sent by this small group of former employees.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 10

decline Prime and has easy access to expand and view the terms and conditions. *Id.* at -35.

- In "late 2020," Amazon began "Project Café." Ex. 112 at 267:12–268:3. This initiative had "two primary goals": "to improve on the relevance [] of the information [] within the cancellation flow" and to "further simplify the cancellation flow." Ex. 92 at 76:23–77:2. Through Project Café, Amazon shortened the online cancellation flow from three pages to two, among other changes designed to improve the cancellation experience. Ex. 97 at 91:2–9.

- In February 2022, Amazon revised the UPDP in three ways to "address potential customer concerns on Prime upsells": (1) the language on the button to enroll in Prime would include a reference to "Prime" or the Prime offer being shown; (2) the price of a Prime subscription would be stated outside of the terms and conditions disclosure; and (3) the language on the option to decline Prime was simplified to just "No thanks," removing language that "may be perceived by some as encouraging customers to sign up for Prime" (e.g., "No, I don't want free shipping"). Ex. 130 at -569; Ex. 133 at 115:10–24; Ex. 131 at -755 to -758; *see also* Ex. 123 at -97.

These changes comprise only a few of the countless decisions that Amazon has made and continues to make to improve the customer experience. Indeed, Amazon has a well-deserved reputation for prioritizing customers over short-term profits. *See, e.g.*, Ex. 99 at 306:20–307:14 (noting that customer service agents have complete discretion to give refunds "above and beyond" the standard refund policy, and their performance is "measured on customer satisfaction"); Ex. 108 at 98:20–99:1 (noting that it is "part of Amazon's DNA and philosophy" to be "generous" with refunds).

## D.     No Defendant Believed the Prime Flows Violate the Law

Throughout the relevant period, neither Amazon, nor the Individual Defendants, nor any other employee believed that the Prime Flows violated ROSCA. *See, e.g.*, Ex. 93 at 237:14–18 (describing her understanding that Amazon was "always meeting the legal requirements" for Prime

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

enrollment); Ex. 91 at 192:3–18 ("[W]e never put anything out that we thought [or] that was deemed would not be" compliant with the laws governing Prime enrollment and cancellation").

To be sure, when Amazon receives guidance from regulators, it follows that guidance. *See, e.g.*, Ex. 67 at 120:17–121:2 ("[W]hen we have clear instructions from a regulatory body or anything else, we will follow those instructions ….."); Ex. 68 at 133:7–21 ("Any time we are aware of specific requirements, we comply with them."). In Germany, for example, the government enacted regulations requiring specific changes to the Prime enrollment flow, and with those "instructions as to how things should work," Amazon promptly complied. Ex. 67 at 120:17–121:2.

But with respect to the FTC and ROSCA, similar guidance never came. *Id.* at 125:12–16 ("If there are regulatory instructions or instructions that are made clear to those selling subscriptions, we will follow them, and I sometimes wish the FTC was clear with us as to what their expectations were, and they never have been."). To the contrary, throughout the relevant period, there was widespread public recognition—including by the FTC—that ROSCA "does not provide clarity about how to avoid deceptive negative option disclosures and procedures." 88 Fed. Reg. 24716, 24718; *see also* Ex. 89 at 502:16–19 (FTC 30(b)(6) designee agreeing that "ROSCA compliance" can "create[] challenges even for those who are trying to comply with the law").

**E.     The FTC Delays for Years Before Bringing This Action**

The timing of this action strongly suggests that the FTC—like Amazon—did not believe that the Prime flows violated ROSCA's requirements. ROSCA was enacted in 2010, and the FTC now contends that the Prime enrollment and cancellation flows have violated ROSCA since at least 2014 and 2016. Ex. 20 at ROG 10.

But from the moment those violations supposedly began, the FTC would almost certainly have been aware of them. The Prime flows have been public for as long as they have existed and can be easily viewed on Amazon's website. Ex. 2 at 89:16–91:2. Katherine Johnson, an FTC attorney assigned to the pre-suit investigation, testified in November 2024 that she signed up for Prime "[p]robably" "[m]ore than seven years" ago (i.e., 2017), although she was "not sure" if it was more than "ten years ago" (i.e., 2014). Ex. 23 at 274:10–275:1; *see also* Ex. 2 at 40:3–13; Ex. 64 at 43:6–

1    44:4 (FTC supervising attorney recalling enrolling in Prime herself). The FTC also "has full access"

2    to a "Consumer Sentinel database," Ex. 64 at 45:10–46:1, which contains, as far back as at least

3    2014, complaints regarding frustrations regarding the Prime flows. *E.g.*, Ex. 22; *see also* Ex. 76 at

4    RFA Nos. 172–73 (admissions that the FTC received consumer complaints "regarding difficulty

5    cancelling Prime" by February 2019, and consumer complaints regarding "Nonconsensual

6    Enrollment" by March 2019).

7           But prior to February 2021, the FTC did not pursue an investigation regarding the Prime

8    flows, inform Amazon of any legal issues regarding the Prime flows, or otherwise indicate in any

9    way that it believed the Prime flows may not comply with ROSCA. Ex. 64 at 77:21–80:20, 269:10–

10   270:18. Nor would the FTC have had any basis to do so, given that the Prime flows were consistent

11   with or better than the industry standard. *See supra* Section II.A. Even in March 2021, when the FTC

12   served Amazon with a Civil Investigative Demand—and by which point the FTC had undoubtedly

13   reviewed the Prime flows—the FTC "didn't tell Amazon or anybody" that the company was

14   "violating ROSCA;" the FTC "just said, [']we're looking into whether or not you are.[']"

15          For the following year, the FTC assigned to the investigation only one attorney and only one

16   investigator. The attorney admitted to Amazon's counsel that "she wouldn't have the capacity to

17   devote much time and attention to the matter," Ex. 27 at 168:16–169:7, waited months before even

18   opening Amazon's productions, Ex. 59, could not recall if she ever reviewed all the documents that

19   Amazon produced, Ex. 23 at 130:11–131:16, and was removed because "the needs of this case were

20   not compatible with her other obligations," Ex. 15 at 592:20–593:21. The investigator, for his part,

21   "didn't review any of the documents that Amazon produced." Ex. 24 at 30:2–5.

22          The FTC filed this lawsuit in June 2023, Dkt. 1, alleging that Amazon had been violating

23   ROSCA for the prior nine years, Ex. 20 at ROG 10. To this day, the FTC has not disclosed what

24   changes it believes Amazon could make to the Prime flows that would bring them into compliance

25   with ROSCA under the FTC's current interpretation of the law. Ex. 64 at 260:9–14, 266:17–267:5.

26   FTC has also refused, on privilege grounds, to disclose why it waited until 2021 to launch an

27   investigation of Amazon. *Id.* at 267:7–18.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 13

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# III.     ARGUMENT

## A.     ROSCA Does Not Apply to Prime

The FTC's Motion fails because the FTC has conceded facts establishing that Prime is *not* a "negative option feature" under ROSCA. *See* 15 U.S.C. § 8403 (defining "negative option feature" with reference to the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310.2(w)). When Amazon extends an offer to enroll in Prime, the consumer's "acceptance of the offer" is manifested not by "silence" or a "failure to … reject … or cancel" the service, 16 C.F.R. § 310.2(w), but by affirmative conduct: clicking the sign-up button. As the FTC's 30(b)(6) witness admitted, "[w]ith respect to every flow alleged in the complaint, a consumer has to take some affirmative step, checking a box or clicking a button, before they get enrolled in Prime." Ex. 2 at 249:4–12. That means, as a matter of law, Prime enrollment is not "effected … through a negative option feature," and thus that ROSCA does not apply, 15 U.S.C. § 8403; *see also* Dkt. 319 ("Amazon Mot.") at 5–6 (discussing statutory and regulatory history supporting this analysis).

The FTC's attempts to escape this straightforward conclusion fail. It first emphasizes that "each month or year that a customer fails to take 'affirmative action' to cancel their membership, Amazon interprets that failure as the customer's acceptance to remain a Prime member and continue paying the monthly feature." FTC Mot. 45–46. But a "negative option feature" exists only if the customer's silence is taken as acceptance of "an *offer* … to sell or provide any goods or services." 16 C.F.R. § 310.2(w) (emphasis added). And "an *offer* to … provide" Prime is not made "each month or year." It is made once—when the customer has the chance to join Prime in the first instance. Ex. 2 at 249:4–12. The customer undisputedly accepts *that* offer by affirmative conduct.

The FTC admits that its argument would subject every "automatically renewing subscription program[]" to ROSCA, and claims that ROSCA is "obvious[ly]" so broad. FTC Mot. 46. But just because a customer pays for Prime in periodic installments does not render each installment a separate offer and assent any more than a tenant's monthly rent payments create a new lease every 30 days. *See* 15 Williston on Contracts § 45:1 (4th ed. May 2025).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    The FTC is wrong to seek solace in *Adobe*, *MyLife*, and *Doxo*. *See* FTC Mot. 46. These three

2    non-binding decisions are either mistaken or distinguishable, as Amazon has already explained. *See*

3    Amazon Mot. Section III.A. What is more, none of those decisions addressed the FTC's recent rule

4    on the subject, which tellingly expands the definition of negative option to include provisions under

5    which the customer's silence is interpreted as "acceptance *or continuing acceptance* of the offer." 16

6    C.F.R. § 425.2 (emphasis added); *see* Amazon Mot. Section III.A. At least as of November 2024, the

7    FTC apparently did not think ROSCA covered all recurring subscriptions, and certainly ROSCA did

8    not "obvious[ly]" do so. *Contra* FTC Mot. 46. Confronted with the FTC's near-concession that

9    ROSCA does not apply to all recurring subscriptions, *Adobe*, *MyLife*, and *Doxo* may well have

10   reached different conclusions.

11   Prime's single enrollment offer is accepted by affirmative conduct, so there is no negative

12   option. The FTC's Motion should be denied.

**B.    The FTC Is Not Entitled to Summary Judgment on Its Clear and Conspicuous Disclosure Claim**

13   Defendants are entitled to summary judgment on Count II for the reasons outlined in

14
15   Amazon's Motion. But even if the Court does not grant summary judgment to the Defendants, the

16   FTC's Motion on this count must be denied because the FTC has not met its burden of showing that

17   Amazon's disclosures are *not* clear and conspicuous as a matter of law.

18
     **1.    Amazon Clearly and Conspicuously Discloses Prime's Material Terms**

19   As discussed in Amazon's Motion for Summary Judgment, undisputed facts show that

20   Amazon "clearly and conspicuously discloses all material terms" of Prime. *See* Amazon Mot.

21   Section III.A (discussing 15 U.S.C. § 8403(1)). The FTC agrees that "there is no genuine dispute of

22   material fact as to … the Prime enrollment pages," FTC Mot. 2, and nowhere contests that these

23   enrollment pages in fact disclose the material terms—enrollment in Prime, automatic renewal, and

24   the price of a Prime membership, *see id.* at 49. Judged by the proper legal standard—whether the

25   disclosures are "reasonably understandable" and "readily noticeable" to the "reasonable

26   consumer"—Amazon's disclosures are clear and conspicuous. *See* Amazon Mot. Section III.B

27   (citing, *inter alia*, *Gilberg v. Cal. Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir. 2019)).

As Amazon has explained, the FTC's own corporate witness and liability expert admit that these terms are disclosed and understandable. *See* Amazon Mot. Section III.B.1 (collecting evidence). And as discussed further below, the FTC presents no contrary evidence suggesting that the terms are not "reasonably understandable" or "readily noticeable to the consumer." *See infra* Section III.B.2.

The conclusion that Amazon's disclosures are clear and conspicuous as a matter of law is consistent with multiple decisions (within and outside this District) holding that nearly identical disclosures for other Amazon programs are clear and conspicuous and granting Amazon judgment as a matter of law under analogous consumer statutes. *See Nicholas v. Amazon.com, Inc.*, 740 F. Supp. 3d 1099, 1103 (W.D. Wash. 2024); *Viveros v. Audible, Inc.*, 2023 WL 6960281, at *7–8 (W.D. Wash. Oct. 20, 2023); *cf. Daly v. Amazon.com, Inc.*, 718 F. Supp. 3d 1378, 1387 (W.D. Wash. 2024) (concluding that "Amazon's subscription and cancellation terms are sufficient under" California and Oregon automatic-renewal laws).

The FTC's Motion undercuts none of these cases. After conceding that the question under ROSCA is whether Amazon's disclosures would be "clear and conspicuous" to the "reasonable consumer," FTC Mot. 46–47, the FTC cites case after case applying a different standard. The FTC's cases ask whether private plaintiffs (not the FTC) had "actual or constructive notice" of terms hidden in "clickwrap" or "browsewrap," so as to bind individuals to a forced arbitration clause. *See* FTC Mot. 48–54.[5] Put slightly differently, the FTC's cases ask what an individual consumer or class of consumers saw or should reasonably have seen, in an effort to avoid the "unfairness of enforcing" an arbitration clause the customer "never intended to accept." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2024). But binding arbitration clauses have broad legal consequences for individual consumers, so it is natural that these cases would impose a higher standard than ROSCA—not a "laxer" one.

---

[5] *Lopez v. Dave Inc.*, 2022 WL 17089824, at *1 (N.D. Cal. Nov. 21, 2022); *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *3 (N.D. Cal. June 22, 2023); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014); *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2021); *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *7 (N.D. Cal. July 31, 2023); *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019); *Keebaugh v. Warner Bros. Ent. Inc.*, 2022 WL 7610032, at *5 (C.D. Cal. Oct. 13, 2022), *rev'd & remanded*, 100 F.4th 1005 (9th Cir. 2024); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 509 (9th Cir. 2023); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018).

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 16

*Contra* FTC Mot. 53 (asserting that the arbitration cases apply "laxer standards"). ROSCA does not police binding contract formation or agreement to arbitration clauses; it merely seeks to prevent unfair and deceptive sales practices. *See* S. Rep. No. 111-240 (Aug. 2, 2010) (describing purposes of ROSCA). So under ROSCA and laws like it, the fundamental question is an *objective* assessment of the disclosure, not a *subjective* inquiry into what the consumer paid attention to.[6] *See, e.g.*, *Hrdina v. World Sav. Bank, FSB*, 2013 WL 12172993, at *3 (N.D. Cal. Apr. 29, 2013) ("[T]he adequacy of a … disclosure is judged objectively, not subjectively" under the "clear and conspicuous" standard). And cases asking what Amazon clearly and conspicuously disclosed have sided with Amazon as a matter of law. *See Nicholas*, 740 F. Supp. 3d at 1103; *Viveros*, 2023 WL 6960281, at *7–8. The Court should do so again here.

Even assuming that the FTC's cases are legally relevant here, those cases involve plainly distinguishable disclosures that ignored "customary [web] design elements," *Lopez*, 2022 WL 17089824, at *2, including by hiding hyperlinks in faintly colored print, *id.* at *2; *Sellers*, 289 Cal. Rptr. 3d at 29; *Chabolla*, 2023 WL 4544598, at *4, and by isolating (sometimes hidden) hyperlinks without surrounding language prompting users to read the terms, *Nguyen*, 763 F.3d at 1178–79; *Berman*, 30 F.4th at 856–57 ("[T]he failure to clearly denote the hyperlinks here fails our conspicuousness test."). There is no evidence that any of those features is present in any of the contested Prime signup flows.

Because Amazon "clearly and conspicuously" discloses the material terms of Prime as a matter of law, the FTC's Motion on Count II should be denied.

### 2. The FTC Has Not Met Its Burden to Show That Amazon Does Not Clearly and Conspicuously Disclose All Material Terms

Alternatively, the FTC's Motion fails because the agency has not met its burden. To prevail at summary judgment, the FTC must present actual evidence demonstrating that Amazon's disclosures were *not* clear and conspicuous and that no reasonable juror could find otherwise. *E.g.*,

---

[6] The FTC's two FTC Act cases are no more apt. Both involved claims that companies made material misrepresentations. *See FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861, at *9 (N.D. Cal. Nov. 29, 2018); *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). But the FTC (by its own admission) has "not brought a deception count" here, FTC Mot. 47 n.26.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 17

1   *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 2015 WL 537771, at *3 (N.D. Cal. Jan. 30, 2015)

2   ("While [a] claim may be sufficiently plausible for purposes of pleading, at the summary judgment

3   stage it is incumbent on [the plaintiff] to come forward with actual evidence."), *aff'd in part on other*

4   *grounds*, 874 F.3d 1083 (9th Cir. 2017). And the FTC must also show that there is not a single

5   material fact in dispute as to whether Amazon clearly and conspicuously disclosed Prime's material

6   terms. The FTC has not presented sufficient evidence to show that it is entitled to judgment as a

7   matter of law, and for each of the facts the FTC admits it needs to prove, there is significant

8   evidence showing the opposite.

9           **a.      The FTC's Speculation That Consumers Might Fail to "Notice"**
            **Disclosures in "Context" Is Irrelevant and Cannot Meet Its Burden**

10          The FTC's leading theory is that Amazon's disclosures violate ROSCA because consumers

11  are "unlikely" to "notice" those disclosures "in context," where "the relevant context" is "primarily"

12  the flows' location "within the product-checkout process." FTC Mot. 49. Beyond that theory's

13  reliance on legally distinguishable cases, *supra* Section III.B.1, it rests on factual questions that are

14  inappropriate for summary judgment.

15          To start, the FTC's core claim is admittedly fact-bound. More specifically, the FTC admits

16  that ROSCA imposes no bar on membership cross-sells (or upsells) during the checkout process but

17  claims that Amazon unlawfully interrupts a customer's shopping experience with a Prime

18  membership cross-sell. *See* Ex. 3 at 443:5–19 (FTC corporate witness admitting that "there's no bar"

19  on presenting such offers); *see also* Dkt. 318-43 ¶¶ 88–95 (explaining cross-sells). To support that

20  counterintuitive theory, the FTC claims that ROSCA sometimes permits and sometimes forbids

21  cross-sells, depending on a non-exhaustive "soup" of factors, including what "consumers are

22  understanding." Ex. 64 at 211:1–9, 216:17–18; *see also* Ex. 3 at 444:13–22; Ex. 2 at 157:6–10 (FTC

23  corporate representative agreeing that "clear and conspicuous is context-specific"); Ex. 02 at 162:3–

24  7 (same witness agreeing that "there's no checklist of things that one could look at" and know they

25  had complied with ROSCA). But even setting aside Amazon's disagreement with the FTC's theory,

26  that sort of "non-exhaustive, multi-factor, fact-intensive" inquiry is generally inappropriate for

27

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 18

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    resolution at summary judgment. *JL Beverage Co. v. Jim Beam Brands Co*., 828 F.3d 1098, 1105

2    (9th Cir. 2016).

3         In any event, the FTC presents no actual evidence to support its "context" theory. That theory

4    rests on caselaw positing that a user signing up for a free trial is less likely to look for "small-text

5    disclosures" than a user who "contemplates some sort of continuing relationship" with the merchant.

6    FTC Mot. 49. But once again, all these cases asked whether it was fair to bind individual consumers

7    to forced arbitration agreements. *See supra* Section III.B.1 (discussing *Chabolla*, 2023 WL 4544598;

8    *Keebaugh*, 2022 WL 7610032; *Nguyen*, 763 F.3d at 1177). Moreover, judicial instinct cannot meet

9    the FTC's evidentiary burden at summary judgment.

10         There is also evidence to the contrary. Fact witnesses testified that cross-sells and upsells are

11    "common ways to promote … subscription services," Ex. 94 at 120:19–22, and are equivalent to

12    long-accepted marketing practices like "putting chocolate bars and celebrity magazines near the

13    checkout line," Ex. 115 at 95:6–21. Other popular subscription services, including YouTube TV and

14    Instacart deploy these same marketing tactics. Ex. 94 at 115:13–116:3, 123:19–20. As a result,

15    consumers are familiar with these marketing moves, and objectively understand how to navigate

16    them.

17         Experts agree. Amazon's marketing expert, Dr. Donna Hoffman, a Professor of Marketing

18    with decades of experience studied academic and industry literature on cross-sells and the

19    enrollment processes of 48 other popular digital membership services. *See* Dkt. 318-43 ¶¶ 22–23.

20    Dr. Hoffman concluded that "[t]he FTC's allegations stating that consumers would not notice the

21    terms of Prime enrollment in the context of the checkout process do not take into account

22    consumers' familiarity with checkout flows and their experiences with similar interfaces." *Id.* ¶ 128.

23    "[C]ross-sells are likely to be familiar to many consumers, and those prior online experiences would

24    serve to provide additional context for interpreting and understanding encountered … design

25    elements during a shopping experience on the Amazon website." *Id.* ¶ 291; *see also id.* ¶¶ 93, 147–

26

27

1    48, 167, 291 (comparing Prime to other industry cross-sells); *id.* ¶ 128 ("[T]heir familiarity with

2    similar interfaces informs the way in which they navigate and interact with flows.").[7]

3         The FTC ignores Amazon's evidence, but it demonstrates that there is at least substantial

4    dispute about whether consumers would "notice" Amazon's disclosures in "context."

5         **b.    The FTC's More Specific "Context" Arguments Also Cannot Meet Its**
             **Burden**

6

7         Equally flawed are the FTC's more specific arguments about the "context" of Amazon's

     disclosures. FTC Mot. 49. Both the disclosures themselves and Amazon's evidence refute the FTC's

8    arguments for summary judgment and demonstrate material disputes of fact.

9         <u>SPC.</u> The flows themselves disprove the FTC's view that consumers would look for the

10   disclosures earlier in the flow or above (rather than below) the enrollment button. *See* FTC Mot. 52.

11   As shown below, the disclosures are right there, in the consumer's line of sight, in bold, as the

12   consumer clicks the button to enroll.[8]

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ---

[7] The Court credited the FTC's argument that context weighed against adequate disclosure in deciding Amazon's Motion
to Dismiss. *See FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1318 (W.D. Wash. 2024). But the Court lacked this
evidentiary record.
27   [8] *American Financial Benefits Center*, 2018 WL 11354861, at *9, does not help the FTC here, *see* FTC Mot. 52, because
Amazon's disclosures are simultaneous with, not after, enrollment.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 20

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

In addition to the flows, Amazon's expert testimony strongly disputes the FTC's assertions that consumers would miss the disclosures. Dr. Hoffman explains why Amazon's visual design choices (such as bolding the key disclosures) draw consumers' attention. Dkt. 318-43 ¶ 148; *see also id.* ¶¶ 159–60 (explaining the SPC disclosures). And she opines that 96% of comparable subscription services used comparable visual differences, indicating that consumers are familiar with and respond to those cues. *Id.* ¶ 288. The FTC's Motion ignores this testimony, but it creates a material dispute of fact about the FTC's "context" theory.

<u>UPDP.</u> Once again, the flows themselves disprove the FTC's view that the UPDP leads consumers to believe that they are being automatically enrolled in Prime—without a way to decline the offer. *See* FTC Mot. 49–50. As shown below, Amazon explains to users that they are "signing up" for Prime and gives them the option to click "No thanks." Dkt. 317-4 at 18.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1



2

3

4

5

6

7

8

9

10

11

12

13

14

15      If more were needed, the evidence also again sharply contradicts the FTC's view—

16  establishing genuine disputes of material fact. Notably, multiple consumers who filed declarations

17  on behalf of the FTC testified that they understood how to enroll or opt out of Prime when shown

18  images of Amazon's checkout flows. *See* Ex. 71 at 69:4–20; Ex. 70 at 171:17–22.

19      The evidence also contradicts the FTC's view that certain elements in the UPDP flow would

20  distract or confuse consumers. For example, three fact witnesses—the same three the FTC trumpets

21  as critics of the Prime flows—testified that having a "no thanks" button is a "common" industry

22  practice. Ex. 96 at 108:7–110:8; Ex. 103 at 113:3–7; Ex. 94 at 88:15–19. Experts agree: Dr. Hoffman

23  shows that the websites of both the Centers for Disease Control *and the FTC itself* use "No thanks"

24  buttons or links similar to the one in the UPDP flow. Dkt. 318-43 ¶¶ 314–15.

25      Nor would the offer of a free trial be confusing, *contra* FTC Mot. 49, given the evidence

26  showing that consumers understand free trials. Dr. Hoffman concluded based on academic literature

27  that "the majority of consumers are familiar with" free trials, Dkt. 318-43 ¶ 80, while Professor

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    Ronald Wilcox's nationwide consumer survey proves that fact empirically: over half of the

2    respondents signed up for at least one trial in the last 12 months, and of those, 85% reported

3    understanding that the trial would automatically convert to a paid subscription if they did not cancel,

4    Dkt. 320-34 ¶ 16. Consumers therefore know that websites typically require consumers to actively

5    sign up for free trials.

6          The FTC's additional arguments do not support a grant of summary judgment. The FTC also

7    claims, for example, that the UPDP leads consumers to believe that the Prime offer "relates only to

8    the shopper's product purchase"—not to an ongoing subscription. FTC Mot. 50-51. To be sure, the

9    button that consumers click to enroll in Prime states "Get FREE Same-Day Delivery." Dkt. 317-4 at

10   18. But that button appears on a page that states—in huge, bolded text—that the offer is for a "30-

11   day FREE trial of Prime." *Id.* And immediately around the enrollment button is a larger box stating

12   "Enjoy Prime FREE for 30 days." *Id.* At best for the FTC, then, how consumers understand the

13   button (if ignoring everything else on the page) is ambiguous, precluding a finding that there is no

14   genuine dispute of fact. And consumers would not ignore everything else on the page. As discussed,

15   the evidence shows that consumers are familiar with cross-sells and free trials embedded in product

16   purchase pages and would therefore understand how to navigate the UPDP flow.[9] *See* Dkt. 318-43

17   ¶¶ 136, 167–70.

18         Next, the FTC guesses that consumers would miss the terms of Prime "because there is no

19   indication … that there are such terms." FTC Mot. 51. But the terms themselves are displayed in the

20   bottom fifth of the screen. And even the FTC's corporate witness conceded they are disclosed. Ex. 2

21   at 347:17–348:2. Further, Amazon's evidence that consumers are "likely to be familiar with" free

22   trial offers and cross-sells shows that consumers are trained to look for the terms of this kind of offer

23   when navigating "today's online interfaces." Dkt. 318-43 ¶ 128; *see also id.* ¶ 45 ("[O]nline

24   consumers typically look in areas of the screen where they expect to find the relevant element and

25

26

27   ─────────────────────────
[9] In deciding Amazon's Motion to Dismiss, this Court found it plausible that consumers might think this button was
related to shipping speed, *Amazon.com*, 735 F. Supp. 3d at 1318, but this is summary judgment, and plausibility is no
longer the standard. Furthermore, the Court did not have the benefit of this evidentiary record.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 23

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    information because they have found that element and information in a similar location on webpages

2    they had visited in the past.").

3            Finally, the FTC's reliance on cherry-picked statements by certain Amazon employees about

4    unintentional sign ups cannot support summary judgment. *See* FTC Mot. 50 (quoting Amazon user-

5    experience research manager); *id.* at 18, 20, 22. Under ROSCA, the subjective opinions of

6    individuals at Amazon are legally irrelevant. *See supra* Section III.B.1. Regardless, the FTC's

7    point—that Amazon's own employees thought the flows were confusing—is hotly disputed. *See*

8    *supra* Section II.C. Indeed, a number of Amazon witnesses the FTC deposed stated that the Prime

9    sign-up process was clear. *See* Ex. 73 at 81:4–9 ("The interstitial was certainly clear in terms of

10   outlining the membership program, the terms of the membership program, what would happen if you

11   signed up."); Ex. 29 at 163:22–25 ("Q: In your experience, did you understand that most customers

12   of Amazon understood the enrollment flow for Prime? A: Yes."); Ex. 104 at 161:14–19 ("[I]t's clear

13   to people, when they sign up for Prime, the benefits they're receiving from Prime, and then clear—if

14   they're going to cancel, that they understand the benefits they get from Prime, so clearly understand

15   the benefits of Prime."); Ex. 108 at 212:23–25 ("I do think our checkout process was clear and had

16   all the information for customers laid out in front of them."). At summary judgment, the Court

17   cannot credit the views of the FTC's favored witnesses over Amazon's, *Nelson v. City of Davis*, 571

18   F.3d 924, 929 (9th Cir. 2009), so even if these subjective opinions were legally relevant, there is a

19   genuine dispute of material fact that precludes summary judgment.

20           **c.      The FTC Cannot Prevail "Even [I]gnoring [C]ontext"**

21           The FTC's fallback argument is that it should win "[e]ven ignoring context," because, for

22   example, Amazon's font is too small and the disclosures appear below (rather than above) the button

23   to enroll. FTC Mot. 53. This argument fails for at least two reasons.

24           First, the FTC presents no legal standard to evaluate such a theory because there is none. As

25   the FTC knows and concedes, ROSCA does not "anywhere say what font size is required," and

26   indeed the FTC cannot "identify … a document that … says, … use the following font size and you

27   will be ROSCA compliant." Ex. 2 at 218:6–10, 319:18–320:1. Nor does ROSCA require that

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 24

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    disclosures appear in a particular spot on the screen. So the FTC pivots to saying that ROSCA-

2    compliant font size and placement "depend" on the circumstances. *See id.* at 218:9–19, 219:13–15;

3    Ex. 64 at 216:6–19. Although Amazon disagrees with the FTC's premise, this sort of "it depends"

4    theory cannot be resolved at summary judgment. *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d

5    1169, 1181 (9th Cir. 1998) ("[G]iven the intensely factual nature of the inquiry, summary judgment

6    is inappropriate.").

7           Second, the FTC simply has not established that there is no genuine dispute of material fact

8    over whether Amazon's font is too small or whether its disclosures are too far from the enrollment

9    button to be clear and conspicuous. For its part, the FTC presents no actual evidence, resorting again

10   to its own subjective judgments about what is too small and what is too far. It does not help the FTC

11   that these subjective judgments sometimes appear in caselaw. As discussed, the FTC's cases apply

12   different law to different facts. *See supra* Section III.B.1 (distinguishing *Berman*, *Cyberspace.com*,

13   and the FTC's other cases); *see also infra* Section III.D (further distinguishing *Berman*).

14   *Cyberspace.com*, for example, involved a deception claim under the FTC Act, and the FTC

15   (admittedly) "has not brought a deception count" here. FTC Mot. 47 n.26. And the case involved

16   *paper* "check[s], invoice[s], and marketing insert[s]" that were deceptive on their face and only

17   attempted to clarify the deception in "fine print on the back of the solicitation." *Cyberspace.com*,

18   453 F.3d at 1198, 1200–01. Legally and factually distinguishable cases cannot stand in for evidence.

19          Indeed, Amazon's evidence contradicts the FTC's claim that Amazon's design elements

20   make its disclosures unclear and inconspicuous. According to experts with decades of experience in

21   industry-standard marketing, Amazon "follows principles of effective [user interface] design" that

22   "help[] consumers navigate pages with more ease." Dkt. 318-43 ¶ 140. Indeed, Amazon's usability

23   expert, Dr. Craig Rosenberg, opines that "many customers, especially repeat customers, … prefer

24   that the [user experience] emphasize actual steps to complete their checkout process," rather than

25   repeated, overly obtrusive "display of terms and conditions." Dkt. 318-49 ¶ 53. So ultimately,

26   Amazon's design "likely works to the advantage of many consumers." *Id.* At the very least, these are

27   hotly disputed questions of fact.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 25

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### d.    The "Cancellation Survey" Is Disputed

The FTC's final assertion is that Amazon's internal "cancellation survey"—an optional exit survey for customers who have cancelled their Prime subscriptions—provides "undisputed" evidence that "many" consumers unintentionally enrolled in Prime, because "Prime's material terms" were "difficult to locate."[10] FTC Mot. 28–30, 55. Amazon designed the survey as a rudimentary method of gathering insights into customer experiences, not to precisely measure unintentional sign-up rates; and Amazon employees recognized the limited usefulness of the survey. Ex. 12 at -677 (cautioning that "[the cancellation] survey data may not be taken at face value"); *see also, e.g.*, Ex. 76 at 2 (acknowledging the inherent "bias[es]" in "optional survey[s]"); Ex. 80 at 1 (recommending "not start[ing] with the survey data … where members self-identify cancelation reasons"); Ex. 30 at 28:2–5 (testifying that the cancellation survey "is not representative of all cancelling members"); Ex. 98 at 142:24–143:2 ("[T]he Prime cancellation survey isn't meant to be representative of customers-- all customers that cancel."); Ex. 91 at 19:6–18 (testifying that Amazon had "concerns" that the Prime cancellation survey "was providing ambiguous or nonactionable inputs" including that "anything that a customer gives you … generally is ambiguous unless you actually have a conversation with them").

The FTC draws unfounded and unreasonable inferences from this survey data. There is no evidentiary basis for the FTC's speculative leap that "[t]he only plausible explanation" to draw from the survey's results is that the disclosures were "difficult to locate." FTC Mot. 55. At summary judgment, this Court cannot accept that conjecture.[11] *See Tanaka v. Kaaukai*, No. 20-00205-SOM-RT, 2021 WL 1936807, at *9 (D. Haw. May 13, 2021) ("On a motion for summary judgment, the movant must do more than speculate.").

---

[10] The FTC is also misusing the survey for reasons other than its intended purpose and for which the survey is not admissible, *see* Amazon Mot. Section III.B, and Amazon will move to exclude the survey from trial at the appropriate time, if the case is not resolved at summary judgment.

[11] The sole case cited by the FTC does not say otherwise. *See* FTC Mot. 55 (citing *Rubio v. Cap. One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010)). *Rubio* involved directly on point survey evidence that was considered sufficiently reliable by the Federal Reserve Board of Governors to support a rule change. 613 F.3d at 1200, 1202. Here, by contrast, the FTC asks the Court to grant it judgment as a matter of law based on attenuated inferences from a rudimentary internal business survey designed for an unrelated purpose.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT (2:23-cv-0932-JHC) - 26

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1          The FTC's interpretation of the data is also vigorously disputed by Amazon's survey expert,

2     Dr. Ran Kivetz. As Dr. Kivetz explains, the survey falls short due to myriad methodological flaws,

3     including the ambiguity of the "I did not intend to sign up for Prime" answer choice; the use of

4     leading questions and answers; low response rates and negativity bias; substantial guessing among

5     respondents; and the lack of any control or filter questions. Ex. 61 ¶¶ 80–187. Low response and

6     negativity bias also mean the survey results cannot be extrapolated as the FTC does. *Id.* ¶ 72. Only

7     2% of those customers who were offered the cancellation survey completed it. Ex. 134 ¶ 205 &

8     n.323; *see also* Ex. 132 at 103:12–22 (FTC expert testifying that █% of customers who cancelled

9     their Prime membership completed at least *some* questions). The FTC's own expert admits that such

10    a low response rate is known to produce bias in survey results. Ex. 106 at 78:24–79:11. Yet that

11    same expert admitted that he "did not conduct any analysis to determine whether the results of [the

12    cancellation survey] was biased by nonresponse error." *Id.* at 79:18–21.; *see also* Ex. 132 at 116:18–

13    117:7 (another FTC expert acknowledged that he did not mention or reference an Amazon

14    employee's "concerns about bias in the cancel survey instrument" anywhere in his report).

15          Moreover, Dr. Kivetz's analysis demonstrates that, for many consumers who selected the

16    "did not intend to sign up for Prime" (DNI) option, the sign-ups were in fact *not* unintentional. *See*

17    Ex. 61 ¶¶ 253–370. For example, many (█████) of DNI respondents reported high satisfaction with

18    Prime and an intent to rejoin, suggesting that they did not want a paid Prime membership but were

19    happy with their free trial and intended to enroll in another such trial. *See* Ex. 61 ¶¶ 210–12. As

20    another example, for a substantial majority of DNI respondents—██████—interpreting that response

21    as "unintentional enrollment," as the FTC does, would be inconsistent with the customer's actual

22    behavior (e.g., repeatedly enrolling in and using benefits during a free trial), suggesting that the DNI

23    selection meant something other than confusion at enrollment. *See* Ex. 61 ¶ 255. Accounting for all

24    of this and more, Dr. Kivetz estimates the probability that an individual consumer unintentionally

25    signs up for Prime because of an "upsell" at no more than ████—meaning, on average, Amazon

26    would have to show customers nearly ███ upsells before one of them would inadvertently sign up.

27    *Id.* ¶ 258, 384. All of this demonstrates not only why the survey data cannot support the conclusions

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 27

1   the FTC draws from it, or be used for the purposes for which the FTC uses it, but also that there is a

2   material dispute of fact.

3          Even aside from Dr. Kivetz's expert analysis, the evidence shows that the survey found an

4   exceptionally low rate of customer confusion. *See supra* Section II.B. Amazon has "hundreds of

5   millions" of customers in the United States. Ex. 96 at 31:18-23, the vast majority of whom either are

6   Prime members or have gone through the checkout process. On that scale, it would take tens of

7   millions of mistaken sign ups to get to even a single digit rate of confusion. But the FTC can point

8   only to "hundreds of thousands of Prime subscribers"—less than 0.1%—who have supposedly

9   "explicitly told Amazon they 'did not intend' to sign up for Prime, FTC Mot. 28, in response to the

10  cancellation survey—even though the survey was offered to approximately ▆▆▆▆ Prime

11  customers. Ex. 132 at 103:12–22. The respondents who selected DNI in the cancellation survey

12  constitute ▆▆% of the entire Prime US customer base.

13         Regardless of how the data is viewed, the FTC cannot show that a "significant minority of

14  reasonable consumers" were confused—let alone that there is no genuine factual dispute on that

15  point. *See In re Telebrands Corp.*, 140 F.T.C. 278, 291, 325 (2005) ("10.5% to 17.3%" of consumers

16  misled is a "significant minority" under FTC Act); *see also William H. Morris Co. v. Group W, Inc.*,

17  66 F.3d 255, 258 (9th Cir. 1995) (per curiam) (nearly 3% misled is not a "significant portion" of

18  consumers; reversing Lanham Act liability). Even taking the survey's results at face value (which is

19  inappropriate for the reasons discussed above), at most ▆▆% of Prime customers answered "did not

20  intend to sign up" in the cancellation survey—a far cry from a "significant minority."

21         The FTC argues in passing that it need not satisfy the "significant minority" standard,

22  because "the disclosures on their face [are] not clear and conspicuous." FTC Mot. 47. But in the

23  process, the FTC misrepresents this Court's motion to dismiss order, which concluded only that "the

24  Court need not consider whether a 'significant minority' of consumers were deceived to determine

25  that the FTC *stated claims* under ROSCA." *Amazon.com*, 735 F. Supp. 3d at 1315 n.4 (emphasis

26  added). But this is summary judgment, and the significant minority test applies here. That test is a

27  well-accepted facet of the "reasonable consumer" standard that the FTC admits governs. 86 Fed.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 28

1    Reg. 60822, 60825 (Nov. 4, 2021) (applying an "ordinary consume[r]" standard under ROSCA); *see*

2    *also Amazon.com, Inc.,* 735 F. Supp. 3d at 1315 (this Court acknowledging that a "reasonable

3    consumer" standard applies to ROSCA's "clear and conspicuous" disclosure requirement); *see*

4    *Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1068–69 (10th Cir. 2022) (explaining the

5    "significant minority" aspect of the "reasonable consumer" standard under the FTC Act).

6    　　　　The FTC cannot meet its burden of showing that the disclosures were *not* clear and

7    conspicuous as a matter of law by misinterpreting contested evidence.

8    **C.    The FTC Is Not Entitled to Summary Judgment on the Timing of Amazon's Disclosures**

9    　　　　The FTC also has not met its burden to show that Amazon fails to "disclose[] all material

10   terms of the transaction before obtaining the consumer's billing information." 15 U.S.C. § 8403(1).

11   Amazon complies with ROSCA by disclosing Prime's material terms before obtaining each

12   consumer's consent to use their billing information to enroll them in Prime.

13   　　　　The FTC claims that Amazon violates this requirement by "collect[ing] consumers' billing

14   information in connection with the consumers' product purchases, *before* making the UPDP and

15   SPC Prime upsells." FTC Mot. 55; *see also id.* at 56 ("[I]f a customer has provided 'default' billing

16   information on a prior visit, Amazon simply uses that information to bill the consumer for Prime.").

17   But that theory fails as a matter of law. As this Court has already explained, "[n]othing in ROSCA

18   says that companies such as Amazon may not give consumers the option to autofill the billing

19   information already on file." *Amazon.com, Inc.*, 735 F. Supp. 3d at 1320. Indeed, citing to that very

20   phrase of the Court's opinion, the FTC itself recognized in a recent ROSCA rulemaking: "[W]here a

21   consumer has previously provided account information to the seller and expressly allowed the seller

22   to store that information," the seller may use that information to enroll the consumer in a

23   subscription—so long as the seller "make[s] the required disclosures prior to obtaining the

24   consumer's consent to use saved account information." 89 Fed. Reg. 90476, 90498 & n.305 (Nov.

25   15, 2024). The FTC cannot reasonably contend that Amazon's practice violates ROSCA if its own

26   rulemaking states otherwise.

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    And Amazon does just what the FTC's rule asks. In each of the flows, Amazon discloses

2    Prime's material terms *and then* obtains customers' consent to use their billing information. *See* Dkt.

3    317-4 at 11, 18, 26, 29, 37, 39, 41, 43. For example, as shown below, the SPC flow states—in the

4    box disclosing Prime's terms—"[b]y placing your order, you ... authorize us to charge your default

5    payment method or any other payment method on file." Dkt. 317-4 at 26. Right next to that

6    statement, Amazon displays the payment method being applied in the transaction, with a button that

7    says "Change," which allows the customer to change their billing information. *Id.*

8    
9    

10   
11   
12   
13   
14   
15   
16   
17   
18   
19   

20   Similarly, as shown below, the UPDP flow states—in the paragraph disclosing Prime's

21   terms—"by signing up, you ... authorize us to charge your default payment method (Mastercard

22   ****-2871) or another available payment method on file after your 30-day free trial." Dkt. 317-4 at

23   18.[12] Thus, even if a consumer has provided "default" billing information on a prior visit, no billing

24   
25   

26   _____

[12] The FTC wrongly states that "in some cases, Amazon does not … confirm a consumer's billing information at all during their site visit before enrolling them in Prime." FTC Mot. 56 (citing Dkt. 317-2 at 12). As just explained, in each challenged flow, Amazon at least confirms the user's payment method, right alongside the disclosures. The evidence the FTC cites does not show otherwise; it contains a screenshot of a page of the SPC flow prior to the page disclosing Prime's terms and confirming the billing information. *Compare*, Dkt. 317-2 at 12, *with id.* at 13.

27   DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 30

1    information is "obtained" for purposes of the Prime transaction until the consumer specifically

2    authorizes Amazon to charge the default payment method.



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    Even if Amazon's compliance were not apparent on the face of the flows, whether Amazon

18    adequately discloses Prime's terms before enrolling consumers is in real dispute. Amazon regularly

19    discloses the material terms of Prime—which are ubiquitous on Amazon's website and in other

20    advertisements. *See* Dkt. 318-43 ¶¶ 31–34. Imagine, for example, a customer who opened up an

21    Amazon.com account in March 2018, saved their billing information, and declined a Prime offer,

22    and was then presented with the UPDP cross-sell again in May 2018. That customer was already

23    provided the Prime disclosures in March, before enrolling in Prime in May. Given the evidence that

24    Prime's disclosures are ubiquitous, the FTC cannot establish as a matter of law that Amazon does

25    not disclose Prime's material terms before enrolling consumers.

26                                    *        *        *

27    For the foregoing reasons, the Court should grant the Defendants' motions for summary

judgment on Count II. Regardless, the FTC is not entitled to summary judgment on that count.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 31

**D.    The FTC Is Not Entitled to Summary Judgment on ROSCA's Express Informed Consent Requirement**

Amazon's Motion explains why its enrollment processes satisfy ROSCA's express informed consent requirement as a matter of law. *See* Amazon Mot. Section III.C. That requirement is satisfied if "the consumer takes some action, such as clicking a button," after being informed of the material terms and that taking that action will trigger the transaction. *Keebaugh*, 100 F.4th at 1014. Every enrollment flow adequately discloses the terms, *see supra* Section III.B, and every flow requires the user to affirmatively click a button to enroll, while elaborating on the effect of clicking the button, *see* Amazon Mot. 16. So unsurprisingly, courts have held that similar flows obtain express informed consent, including for Amazon products. *See Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1173, 1177 (W.D. Wash. 2014); *Adams v. Amazon.com, Inc.*, 2023 WL 4002534, at *1 (W.D. Va. June 14, 2023).

Nothing in the FTC's Motion undermines this. To the contrary, the FTC's own leading case confirms Amazon's compliance. In *Berman*, the "defect" (*see* FTC Mot. 57) "could easily have been remedied by including language such as 'By clicking the Continue >> button, you agree to the Terms & Conditions.'" *Berman*, 30 F.4th at 858. And Amazon's flows included even more explicit "by clicking" language. For example: "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your default payment method … or another available payment method on file after your 30-day free trial." Dkt. 317-4 at 18. In short, when a consumer clicks the button, he or she gives express informed consent to join Prime.

The FTC cannot avoid this conclusion by rehashing its flawed arguments that Amazon's disclosures are not conspicuous. First, the FTC asserts again that Amazon's "by clicking" statements were too "inconspicuous," FTC Mot. 57, citing cases involving disclosures that were obviously far less conspicuous than Amazon's, *see Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013) (disclosures in small, light-colored print not near the action button); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017) (disclosures behind difficult-to-spot hyperlink); *see also supra* Section III.B.1 (distinguishing additional cases). For all the reasons already given, Amazon's disclosures are

1    "conspicuous," or at least, their conspicuousness is a hotly disputed factual issue for a jury to decide.

2    *See supra* Section III.B.

3          Second, the FTC continues to insist that Amazon violates ROSCA because its disclosures are

4    not "immediately below the button" to enroll. FTC Mot. 58. But the single unreported district court

5    case it cites for this proposition was not interpreting ROSCA, *see In re Ring LLC Privacy Litig.*,

6    2021 WL 2621197 (C.D. Cal. June 24, 2021), and as already explained, ROSCA does not contain

7    rule specifying a location for disclosures, *see supra* Section III.B.2.c. Regardless, the FTC's factual

8    premise is wrong: Amazon's "by clicking" language does appear either immediately below (SOSP,

9    UPDP, SPC), or above (Video), the button. *See* Dkt. 317-4 at 11 (SOSP), 19 (UPDP), 26 (SPC), 29

10   (Video). For example, consider the SOSP flow:



26         Third, the FTC doubles down on its unfounded conclusion that reasonable consumers would

27   not understand that by clicking the button, they are signing up for Prime—not making a product

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 33

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  purchase. FTC Mot. 59–60. But as already explained, this theory depends on ignoring numerous

2  other aspects of the flows, as well as piles of evidence demonstrating that consumers understand not

3  only free trials and Prime but also the design features that Amazon employs. *See supra*

4  Section III.B.2. At least, Amazon's evidence creates a factual dispute about what reasonable

5  consumers would understand.

6  Finally, the "cancellation survey" data cannot help the FTC meet its burden. *See* FTC Mot.

7  60–61. There is serious dispute about the FTC's claim that the "survey" shows that a substantial

8  number of consumers unintentionally enrolled in Prime. *See supra* Section III.B.2.d.

9  *            *            *

10  For these reasons, the Court should grant the Defendants' motions for summary judgment on

11  Counts I and III, or at least deny the FTC's Motion, because the FTC has not shown as a matter of

12  law that Amazon fails to obtain users' express informed consent.

13  **E.    The FTC Is Not Entitled to Summary Judgment on ROSCA's "Simple Mechanisms"**
        **Requirement**

14
15  The FTC's Motion as to Count IV should be denied for two separate reasons. First, the FTC's

16  Motion confirms that Amazon provides "simple mechanisms for a consumer to stop recurring

    charges" because it provides four "simple" methods aside from the online cancellation flows at issue

17  here. 15 U.S.C. § 8403(3). Second, the FTC has not met its burden to show that it is entitled to

18  judgment as a matter of law.

19
20  **1.    Amazon Provides "Simple" Methods to Stop Recurring Charges Apart from the**
        **Methods Challenged by the FTC**

21  ROSCA's plain language requires only that "simple mechanisms" be provided. It does not

22  require that every cancellation method offered be "simple." Nor does it prohibit voluntarily offering

23  extra cancellation methods, even those methods are not "simple." So long as Amazon provides one

24  or more "simple mechanism[]" to stop recurring Prime charges, ROSCA is satisfied.

25  That is fatal to the FTC's Motion for Summary Judgment on Count IV. Here, the FTC cannot

26  dispute that Amazon provides at least four mechanisms for consumers to stop recurring Prime

27  charges, *apart* from the online methods the FTC challenges. And the FTC has developed no

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 34

1  evidence that these mechanisms are not "simple."

2          To start, it is undisputed that Amazon provides four other "mechanisms … to stop recurring

3  charges," beyond online cancellation: phone, email, chat, and membership pause. *See, e.g.*, Ex. 19 at

4  30 (phone); Ex. 6 ¶ 37 (phone, email, chat); Ex. 15 at 755:4–17, 756:1–7 (pause); FTC Mot. 64

5  ("[A]ny individual who interacts with customer service via email may reply to th[e] email address to

6  cancel." (quoting Dkt. 320-11 at 27)); Dkt. 320-14 at 6 (real customer chat cancelling Prime).

7  Indeed, the FTC's own consumer witness testified that she readily cancelled multiple times through

8  multiple of these methods. *See* Ex. 72 at 68–70 (testifying that she "successfully canceled [her]

9  Prime membership six different times" using "multiple different cancellation methods" including

10  "by contacting Amazon customer service," by using "the Amazon app," and "on the Amazon

11  website").

12          There is also no genuine dispute that these methods are "simple."

13          <u>Chat.</u> The FTC nowhere mentions the chat option for cancellation, presumably because the

14  agency developed no evidence that chat cancellation is *not* "simple." *See, e.g.*, Ex. 2 at 375:18–376:2

15  (the FTC's corporate witness explaining that she did not know how long it would take to cancel

16  Prime via chat). And indeed unrebutted evidence demonstrates that consumers can almost instantly

17  cancel by sending an instant message asking to end their Prime memberships. *See* Dkt. 320-14 at 6

18  (real customer chat cancelling Prime, in which the customer receives confirmation that Prime has

19  been canceled 22 seconds after stating "I want to cancel Amazon Prime").

20          <u>Email.</u> There is also no real question about the simplicity of email cancellation. The FTC

21  maintains that this mechanism is an "afterthought," because fewer customers choose to cancel via

22  email than online. FTC Mot. 64. But that argument says nothing about whether cancellation is in fact

23  "simple," and the FTC never argues that few customers choose to cancel via email because it is not

24  "simple" to do so. Nor could it: sending an email asking to cancel Prime is objectively "simple." The

25  FTC has developed nothing to the contrary.

26          <u>Membership Pause.</u> Pausing a Prime membership "stop[s] recurring charges," as the FTC's

27  corporate representative acknowledged. Ex. 15 at 756:1–7. It is undisputed that Amazon offers

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 35

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1   consumers the option of pausing their Prime memberships in the course of the cancellation flow.

2   *E.g.*, Dkt. 320-40 at 13. And although the FTC takes issue with other aspects of that flow, the FTC

3   has presented no evidence that pausing a Prime membership is *not* "simple." To the contrary, the

4   FTC's own statement of facts demonstrates that pausing is as "simple" as clicking the "Pause"

5   button on the cancellation page. *See* FTC Mot. 39.

6          Phone. The evidence shows that consumers can—and do—readily cancel by calling customer

7   service and stating simply "I would like to cancel Prime." *See* Dkt. 320-10 at 3; *see* Ex. 69 at 68:15–

8   20 (FTC consumer witness recalling a call to Amazon customer service that "went well" and

9   agreeing that "it was simple for you to cancel your Prime membership"); Ex. 70 at 100:2–16 (FTC

10  consumer witness agreeing that she was "able to cancel [her] Prime membership through a call to

11  Amazon's customer service"). The FTC claims that consumers who call to cancel are "redirect[ed]"

12  to the online cancellation flows, FTC Mot. at 65, but that is not true of every consumer, *see* Dkt.

13  320-10 at 3 (between 2020 and 2022, ███████ consumers a year cancel Prime via contacting

14  customer service without receiving an email from customer service directing them to the online

15  flow); *see also* Ex. 64 at 57:21–60:2 (FTC's corporate representative admitting that she did not know

16  whether all callers were directed online); *see also* Ex. 65 at 639:18–640:2 (agreeing that the FTC did

17  not allege in its Amended Complaint that cancellation by phone is not "simple"). The FTC also

18  insists that phone cancellation "is still far less prominent than" online cancellation. FTC Mot. 65.

19  But again, that is legally irrelevant: ROSCA nowhere requires that a mechanism for stopping

20  recurring charges be frequently used—only that it be "provided." And here, phone cancellation is

21  plainly available. As noted above, between 2020 and 2022, ███████ customers a year used

22  customer service—including the customer service phone number—to cancel Prime. *See* Dkt. 320-10

23  at 3. Regardless, even if the "prominen[ce]" of a cancellation method bears on its simplicity, that is,

24  at most, a fact in dispute. One of the FTC's own consumer witnesses testified that "it is easy [to]

25  Google" Amazon's customer service telephone number, for example. Ex. 71 at 159:19–23. And

26  Jamil Ghani testified that "calling customer service" was one of "two primary methods in which a

27  member can cancel their [Prime] subscription." Ex. 111 at 6:12–17.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 36

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1      Having failed to prove that Amazon's other four methods to stop recurring Prime charges are

2   *not* "simple," the FTC cannot meet its burden. The Court can deny the FTC's cancellation claim

3   without addressing the online cancellation mechanisms.

4       **2.      The FTC Cannot Show That the Challenged Cancellation Mechanisms Are Not
               Simple as a Matter of Law**

5

6           **a.      The Challenged Cancellation Mechanisms Are "Simple" as a Matter of
                   Law**

7      The FTC's Motion for Summary Judgment on Count IV starts off on the wrong foot by

8   urging the Court to adopt a Dictionary.com definition that equates "simple" with "easy."[13] FTC Mot.

9   61. But "easy" is a "subjective, comparative term[]," *FTC v. Trudeau*, 579 F.3d 754, 765 (7th Cir.

10  2009), and ROSCA's standard is objective: it asks about the "ordinary" or "reasonable consumer,"

11  *see* 86 Fed. Reg. at 60825 (applying an "ordinary consume[r]" standard under ROSCA);

12  *Amazon.com*, 735 F. Supp. 3d at 1315 (this Court acknowledging that a "reasonable consumer"

13  standard applies to ROSCA's "clear and conspicuous" disclosure requirement). So "simple" here

14  means "readily understood or performed" by the "reasonable consumer," as Amazon's Motion

15  explains. *See* Amazon Mot. Section III.D.1. And under that objective standard, it is not enough for

16  the FTC to show that some small minority of consumers was confused by Amazon's cancellation

17  process. *Contra* FTC Mot. 41 ("some customers" were confused about how to cancel, and

18  "sometimes" abandon the flow prematurely); *id.* at 42 ("one" Prime employee believed that the

19  cancellation process was a "UX anti-pattern" or "dark" pattern).

20      The FTC has no actual evidence that reasonable consumers could not readily understand or

21  perform the challenged cancellation processes. Indeed, Amazon's survey evidence establishes that

22  96% of real users could cancel Prime in less than 90 seconds. Amazon Mot. 20–21; Dkt. 320-24 at

23  34. The FTC has no quantitative survey evidence, so Amazon's should be dispositive. But at the

24  very least, Amazon's survey establishes a dispute of material fact.

25

26

27  _____

[13] Although the word "easy" is not much guidance, it is more than the FTC has previously given about the meaning of "simple." As recently as April 2023, the FTC refrained from providing any guidance to Amazon or the public regarding the meaning of "simple." *See* 88 Fed. Reg. 24716, 24718 (Apr. 24, 2023) (FTC proposed rule, noting that the statute lacks "guidance about what is simple").

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 37

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

b.    **The FTC Has Not Met Its Burden to Show That Online Cancellation Is** *Not* **"Simple"**

Even if the Court does not grant Amazon summary judgment on Count IV, it should still deny the FTC's Motion. The agency's arguments are legally irrelevant, unsupported by evidence, or squarely contradicted by the extensive record developed during discovery.

First, the FTC claims that customers have difficulty finding the button to begin the cancellation flow, and that consumers mistakenly think that this button instantly ends the membership upon clicking. *See* FTC Mot. 62. But this is disputed, by fact and expert testimony alike. The fact testimony includes statements from the FTC's own consumer witnesses, who agreed that the cancellation process was "simple" and "very straightforward and easy to accomplish." Ex. 71 at 158:9–13. Other fact witnesses—including Amazon employees who are critical of certain aspects of the Prime flows—confirm. *See*, *e.g.*, Ex. 113 at 186:10–22 (Amazon-employee fact witness recalling internal Amazon discussion concluding that the Prime online cancellation flow "was superior" to competitors, including in "[n]umber of clicks and clarity of instructions"). Beyond this, Dr. Wilcox's survey demonstrates that customers can quickly locate the cancellation flow— including by clicking a button clearly labeled "Manage Membership – Update, cancel and more."[14] Indeed, 99.8% of survey participants located the cancellation flow, and took an average of 47 seconds to do so. Dkt. 320-34 ¶¶ 15, 32. A majority of survey participants found it in less than 30 seconds. *Id.* ¶ 33. And in the end over 96% of participants successfully paused or cancelled Prime, *id.* ¶ 31, belying the FTC's unfounded accusation that consumers are duped into thinking that the "End Membership" button at the beginning of the flow cancels Prime with a single click. The speed with which consumers locate the cancellation flow, and their lack of confusion about the "End Membership" button, are unsurprising given the evidence that consumers are familiar with similar online cancellation processes. Dr. Hoffman's empirical analysis of 48 other popular digital

---

[14] The FTC's descriptions of how consumers access the cancellation flow are misleading. What the FTC refers to as "Prime Central," the primary page for Prime membership management, can be accessed by clicking a button clearly labeled "Prime membership" from the "Account" menu on the homepage. Dkt. 318-43 ¶ 205. From that page, a prominent button appears at the top labeled "Manage Membership – Update, cancel and more." *Id.* ¶ 206. Any reasonable consumer seeking to cancel a Prime membership would know to navigate to the page about Prime memberships, and then to click the button that says Manage membership—and mentions "cancel" (though the FTC conveniently omits that part of the button label).

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 38

1    membership services shows striking similarities with Prime, including that every one of those

2    services put the entry point to its cancellation flow in a similar place. Dkt. 318-43 ¶¶ 294–96, 187.

3            Second, the FTC contends that three clicks to cancel Prime is too many. *See* FTC Mot. 62.

4    As a matter of law, this argument cannot entitle the FTC to summary judgment. ROSCA's plain text

5    permits multistep cancellation processes, by requiring "simple *mechanisms*" for stopping recurring

6    charges. 15 U.S.C. § 8403(3) (emphasis added). The FTC does not—and could not—point to any

7    case or other legal authority saying that a three-click process violates ROSCA. Indeed, the FTC's

8    own corporate witness admitted as much, agreeing that there is no "document … that tells people X

9    number of clicks is okay, but X plus 1 number of clicks now makes the cancellation process no

10   longer simple." Ex. 64 at 359:3–6.[15]

11           Third, the FTC objects that the process contains savings offers, "warnings" regarding the loss

12   of Prime benefits, and additional alternative membership options and deals. FTC Mot. 63. But again,

13   as a matter of law, this argument does not support summary judgment. ROSCA nowhere prohibits

14   these industry-standard practices, as the FTC itself has acknowledged. 86 Fed. Reg. at 60826

15   (adopting the view that the "simple mechanisms" standard only prohibits these practices when they

16   "impose unreasonable delays on consumers' cancellation efforts"); *see also* Dkt. 318-43 ¶¶ 217,

17   226–28 (explaining that these practices are standard in the industry). Indeed, the FTC's recent

18   rulemaking considered, and rejected, a requirement that would prohibit such practices. *See* 89 Fed.

19   Reg. at 90512 (noting that some "consumers might not understand the negative consequences of

20   cancellation, and the [rejected] provision might prevent consumers from taking advantage of money-

21   saving offers prior to cancellation."). In all events, here too, the FTC catalogs purportedly

22   "repetitive" and "distracting" elements of the cancellation process, without presenting any evidence

23

24   ---
     [15] Here too, the FTC claims that buttons labeled "End My Benefits" or "Cancel My Benefits" create the "false
     impression that the consumer was finished upon clicking that button." FTC Mot. 63. And the FTC insists that the "sorry

25   to see you go" page header implies "that the member has already '*gone*'"—inexplicably ignoring the obvious difference
     in verb tense. *Id.* at 38. But the evidence shows that buttons and messages like this are common across the Internet and

26   would not confuse consumers. Consumers are familiar with websites that ask you to click "Log in" or "Buy Now" and
     then require additional steps and confirmation before login or purchase is complete. And again, the vast majority of

27   surveyed consumers could quickly and successfully pause or cancel. *See* Dkt. 320-24 at 31–33. In any event, the FTC's
     assertion that Amazon chose "misleading button labels" to stop cancellations is both false and disputed, because the
     button labels are clear. FTC Mot. 63.

     DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
     (2:23-cv-0932-JHC) - 39

1    that those elements in fact impeded customers' ability to quickly cancel or pause Prime. FTC Mot.

2    63. And the actual evidence is to the contrary. The evidence shows that consumers often benefit

3    when companies provide information relevant to the consumer's decision to cancel, *see* Dkt. 318-43

4    ¶ 83, as the FTC itself has acknowledged, *see, e.g.*, 21 Fed. Reg. 60822, 60826 n.2 (Nov. 4, 2021)

5    (money-saving offers benefit customers because it is right before cancellation that consumers can get

6    the "best deal"). Nor does that information "derail" consumers' efforts to cancel. FTC Mot. 62.

7    Consumers are familiar with—and therefore readily understand—cancellation processes that contain

8    "links, offers, and other information." FTC Mot. 63; *see* Dkt. 318-43 ¶¶ 300, 302, 188–90

9    (explaining that these practices are standard in the industry).

10       Finally, the FTC relies heavily on *United States v. MyLife.com*, 567 F. Supp. 3d 1152 (C.D.

11   Cal. 2021), which concluded that a company violated the "simple mechanisms" requirement when it

12   offered only a single, extremely difficult-to-access cancellation method. But the facts of that case

13   underscore why there is no ROSCA violation here, for at least three reasons. First, MyLife

14   effectively "offered one method of cancellation: the telephone." *Id.* at 1169 & n.6. Here, it is

15   undisputed that Amazon offers multiple cancellation methods—phone, chat, email, and online. *See*

16   *supra* Section III.E.1. Second, even that single cancellation method was often not meaningfully

17   available in *MyLife.com*, because "customers frequently did not reach or speak to an agent" when

18   they called, which led as many as 50% of customers to abandon their attempts to cancel. *Id.* at 1160.

19   Of course, there could be no comparable allegation here, where millions of consumers successfully

20   cancel Prime every year through multiple means. And third, MyLife customer agents (when they

21   could be reached) were instructed to deceive consumers by (1) saying that subscriptions were

22   nonrefundable; and (2) *never* mentioning a "customer's auto-renewal status." *Id.* But here, the FTC

23   affirms that it "has not brought a deception count," FTC Mot. 47 n.26, and can point to no evidence

24   of false statements. Amazon's online processes—which consumers can and do complete in less than

25   90 seconds—bear no resemblance to the processes in *MyLife.com*.

26       Lacking legal support, the FTC falls back on Amazon's internal membership data.[16] *See* FTC

27

---

[16] The FTC also points to (1) internal Amazon memoranda discussing potential improvements to the cancellation process; and (2) voluntary changes made to the cancellation process. *See* FTC Mot. 39–40. But all this is legally

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  Mot. 64. But that data does not prove that the cancellation process is *not* "simple." Just the opposite:

2  Consistent with Dr. Wilcox's survey, the membership data shows that a supermajority of members

3  (██%) who initiate the cancellation process online successfully pause or cancel Prime. Dkt. 320-10

4  at 2. The FTC has no evidence to support its claim that Prime subscribers "who fail to complete the

5  process … only do so because they think they have finished the process" and therefore prematurely

6  exit at the cancellation flow's "Marketing Page." FTC Mot. 64. This is merely the FTC's

7  assumption. In reality, the evidence demonstrates that consumers choose not to cancel for all kinds

8  of reasons, including because they entered the flow never intending to cancel, because they accepted

9  a lower-cost offer for Prime, or because they were reminded of Prime's benefits. Dkt. 320-34 ¶ 47.

10  The consumers the FTC highlights, for example, may have exited at the "Marketing Page" because it

11  provided them with helpful *marketing* information that persuaded them not to cancel.

12       In the end, if the Court were to adopt the FTC's view that Amazon cannot provide customers

13  with truthful information about Prime during the cancellation process, this would raise serious First

14  Amendment concerns. *See* Amazon Mot. Section III.E; Dkt. 316 ("Individuals Mot.") Section IV.C.

15  The Court should deny the FTC's Motion for Summary Judgment on Count IV.

16  **F.     The FTC Is Not Entitled to Summary Judgment That Any Individual Defendant Is Personally Liable**

17       For four reasons, the FTC cannot carry its burden to show that a jury would be required to

18  find the Individual Defendants personally liable.

19       First, for the reasons above and in Amazon's Motion for Summary Judgment, Amazon is not

20  liable and thus the Individual Defendants cannot be liable either. *See* Individuals Mot. 7.

21       Second, the FTC does not even argue, let alone produce evidence, showing that any

22  Individual Defendant acted with "knowledge of the deceptive nature of the scheme." *FTC v. Moses*,

23  913 F.3d 297, 306 (2d Cir. 2019); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101–02 (9th Cir.

24  2014). The FTC's argument at the motion to dismiss stage that knowledge is required to impose only

---

irrelevant, as the FTC implicitly acknowledges by omitting these points from its argument section. ROSCA does not ask whether there are "simpler" alternatives or why a company chose the "mechanisms" it did. *Cf. id.* at 45. Nor are "remedial measures" admissible to demonstrate culpability. *See* Fed. R. Evid. 407. Finally, the internal debates about user experience demonstrate that the need for improvements was disputed. *See supra* Section II.C.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 41

1   civil penalties is wrong as a matter of law, since knowledge is required to impose *any* form of

2   monetary liability. *See* Individuals Mot. 8–9 & n.2. As the Individual Defendants' Motion describes

3   in detail, the law requires "actual, subjective awareness" that the action was false or deceptive, but

4   the record evidence demonstrates that none of the Individuals believed Amazon's conduct was

5   deceptive. *Id.* at 8–11. That includes evidence from the FTC's own corporate witness who repeatedly

6   testified that there is not guidance "out there in the world that will tell" a company what specific

7   conduct does and does not violate ROSCA. Ex. 64 at 358:18–359:11; *see also* Individuals Mot. 3–4,

8   15. As a result, the FTC cannot obtain judgment as a matter of law that any Individual Defendant is

9   liable for monetary relief. *See id.* at 9.

10          Third, the FTC presents no evidence establishing that the Individuals had authority over or

11   direct involvement in the Prime flows throughout the period for which it seeks to hold the

12   individuals liable. An individual cannot be liable for a corporation's conduct during a time when he

13   lacked control over or direct participation in the conduct. *See Grant Connect*, 763 F.3d at 1104.

14   What is more, the Individuals' control or participation did not arise until well after the challenged

15   flows were established. That means they cannot be held liable at all because they did not exercise

16   control "at the time the scheme was organized" or directly participate in "establishing the scheme."

17   *Grant Connect*, 763 F.3d at 1103. At minimum, the FTC is not entitled to summary judgment on

18   individual liability for periods during which there is no evidence of authority or direct participation:

19   before 2017 for Lindsay, before October 2019 for Ghani, and before 2021 for Grandinetti.[17]

20          Fourth, and in all events, there are genuine disputes regarding the facts the FTC points to

21   about the Individuals' authority or direct participation.

22          Grandinetti. The FTC's allegations about Grandinetti confirm he is entitled to summary

23   judgment of no liability. *See* Individuals Mot. 11–13.

24          To begin, as a matter of law, the FTC has not established that Grandinetti had authority to

25   control the supposedly deceptive components of the Prime flows. The FTC rests primarily on

26

27   _____

[17] It is undisputed that Lindsay began as a Vice President involved with Prime in 2017; that Ghani did not even become a Vice President for Prime until October 2019; and that Grandinetti did not assume responsibility for Prime until November 2021. *See* Individuals Mot. 4–5.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 42

1    Grandinetti's role as Senior Vice President assigned to manage Prime since November 2021, FTC

2    Mot. 66–67, but Grandinetti's role looks nothing like the authority to control deceptive conduct that

3    courts have found sufficient to impose individual liability. Relevant cases have effectively required

4    alter-ego status, for example, that the defendant-company was "wholly controlled" by the individual

5    defendant, such that the defendant was "responsible for creating and organizing" the company,

6    hiring the team, and overseeing the deceptive scheme. *Grant Connect*, 763 F.3d at 1097; *see also*

7    *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989) (individuals were "principal

8    shareholders and officers of the closely held defendant corporations"); *Moses*, 913 F.3d at 307

9    (individual founded and held majority stake in companies). The FTC's own cases say the same. *See*

10   *FTC v. Com. Planet, Inc.*, 878 F. Supp. 2d 1048, 1081 (C.D. Cal. 2012) (individual was company

11   "president, de facto executive and in-house counsel, and director" and, with one other person,

12   "comprised the company's executive staff"); *FTC. v. World Media Brokers Inc.*, 2004 WL 432475,

13   at *5–6, *9 (N.D. Ill. Mar. 2, 2004) (individuals were "clearly at the center of the Corporate

14   Defendants' operations" and also personally participated in approving deceptive scripts and

15   arranging for offshore credit card processing). Here, by contrast, Grandinetti is a senior vice

16   president at a massive, publicly traded corporation. He manages many corporate divisions, oversees

17   over ███ people worldwide, and manages Amazon's entire e-commerce business outside of the

18   U.S. and Canada. Ex. 37 at 7:13–23, 18:18–21. As a matter of law, his general managerial "status

19   …, standing alone," is "not enough to demonstrate the requisite control." *FTC v. Swish Mktg.*, 2010

20   WL 653486, at *5, n.1 (N.D. Cal. Feb. 22, 2010) (collecting cases). To hold otherwise would subject

21   virtually all executives at major corporations to personal liability for all conduct of the organization.

22        Beyond his title, which is not enough as a matter of law, the FTC points to no evidence that

23   Grandinetti had actual authority to determine the content of the flows. And why would he

24   unilaterally have such authority? After all, Prime is an organization with many "stakeholders," i.e.,

25   people with decision-making input and authority. *See* Ex. 67 at 37:1–20; 38:11–20; 200:11–12.

26        Nor has the FTC established as a matter of law that Grandinetti directly participated in

27   crafting Prime enrollment and cancellation flows, at any time. The FTC does not point to any

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 43

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    instance in which Grandinetti was presented with a flow for the purpose of making a relevant

2    decision. Much less does it contend that Grandinetti was ever presented with, and vetoed, a ROSCA-

3    compliant flow. On enrollment, the FTC rests its claim of direct participation on a single incident:

4    after a 2019 meeting, Grandinetti "[a]greed" that two project initiatives relating to Prime enrollment

5    had a goal "to improve messaging clarity while not hurting signups" and encouraged recipients to

6    "keep pushing for both." Dkt. 317-27; FTC Mot. 67. But the FTC twists this statement to make the

7    far-fetched and unsupported assertion that this shows Grandinetti himself made a "decision not to

8    address the nonconsensual-enrollment issue if doing so would hurt Prime enrollment." FTC Mot. 67;

9    Ex. 31 at 102:5. He merely agreed that Amazon should "push for" several goals, including improved

10   clarity. And again, "Prime did not [even] report to" Grandinetti in 2019, and Grandinetti therefore

11   had no authority to make any "decision" not to improve clarity. *Id.* at 102:5. As Grandinetti himself

12   testified, he had "no interest in customers signing up for Prime mistakenly." Ex. 37 at 130:11–12.

13        The FTC has even less to say on cancellation, confirming Grandinetti is entitled to summary

14   judgment on that claim. The sum total of its proffered evidence of Grandinetti's purported direct

15   participation in Prime cancellation flows is Grandinetti's receipt of a 2021 memorandum which

16   stated that "some customers find the online cancellation flow hard to find and navigate." FTC Mot.

17   41, 67. The FTC offers no evidence that Grandinetti reviewed the memorandum, much less was

18   presented with or participated in any resulting decision. And the FTC admits it is unclear whether

19   Grandinetti even attended the related meeting. FTC Mot. 26 n. 21; Ex. 66 at 184:22–24. The FTC is

20   not entitled to summary judgment with respect to Grandinetti.

21        <u>Ghani & Lindsay</u>. Nor has the FTC presented sufficient evidence that it is entitled to

22   judgment as a matter of law on Ghani's and Lindsay's liability. Responsibility for the Prime

23   enrollment and cancellation flows was distributed across multiple teams and stakeholders at

24   Amazon, including many individuals not named as defendants. *See* Ex. 73 at 17:1–3 ("[P]robably

25   more than 50 teams … would have involvement in checkout for various different reasons"); Ex. 77

26   at 16:19–17:1, 30:22–23 (testifying that "the decision making is broad in Prime" and "the broader

27   the impact, the broader the inclusivity with decision making"); Ex. 67 at 32:16–36:4. Authority over

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 44

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  Prime simply was not, as in the cases cited by the FTC, centralized in a single individual. The FTC's

2  evidence that Ghani and Lindsay (who became involved years after the challenged flows were

3  initiated) had *some* authority over Prime thus fails to prove beyond genuine dispute that those

4  individuals had sufficient control over the allegedly deceptive conduct to hold them individually

5  liable.

6       The FTC's claim that Ghani and Lindsay participated in the allegedly "unlawful enrollment

7  practices" is also heavily contested. The Individuals testified that when they were directly involved

8  in decisions regarding Prime flows, they worked "constantly" to "improve the customer experience."

9  Ex. 37 at 211:1–8. Lindsay's team spent a "great deal of time, … years, trying to understand the

10 extent" of any potential systemic mistaken sign-up issue because it was "interested in understanding

11 whether [they] can minimize any frustration." Ex. 31 at 48:1–7. After investigating the source of

12 these frustrations, his team concluded that mistaken sign ups were likely the result of "a natural

13 variance": "in any experience or signup process, there will always be some confusion, you can never

14 get 100 percent of people who find an experience perfect for them." *Id.* at 48:22–25; *see also id.* at

15 83:5–10. Ghani similarly testified that his team worked to "reduc[e] the small number of members

16 that then later report that they had some issue in the signup experience" because Amazon's "business

17 and long-term customer trust is predicated on … members … choosing to become Prime members,

18 having gotten all the relevant information to that decision, and then going on and actually using their

19 membership." Ex. 30 at 55:19–21, 65:1–5. Ghani "explicitly was committed to these efforts [to

20 improve clarity] and wanted to move forward." Ex. 68 at 101:13–102:24. In short, there is

21 substantial dispute and admissible factual testimony undermining what the FTC says about the

22 Individuals.

23 **G.    The FTC Is Not Entitled to Summary Judgment on Defendants' Affirmative Defenses**

24      Finally, the FTC cannot show that it is entitled to summary judgment on Defendants' laches

25 and constitutional defenses.

26      **1.    Laches**

27      The FTC fails to demonstrate that it is entitled to summary judgment on Defendants' laches

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 45

1    defense. Indeed, the FTC does not even dispute that there are triable issues as to the core elements of

2    laches: "an unreasonable delay by the plaintiff and prejudice to [defendants]." *FTC v. DIRECTV,*

3    *Inc.*, 2015 WL 9268119, at *2 (N.D. Cal. Dec. 21, 2015). Rather, the FTC argues that laches is

4    unavailable only because, to assert laches against the government, there must be a "showing of

5    affirmative misconduct." FTC Mot. 68–70 (quoting *United States v. Ruby Co.*, 588 F.2d 697, 705

6    (9th Cir. 1978)). That argument fails because "affirmative misconduct" can be shown by "'egregious

7    instances' of government delay," *Consumer Fin. Prot. Bureau v. TransUnion*, 701 F. Supp. 3d 744,

8    754 (N.D. Ill. 2023) (quoting *United States v. Admin. Enters., Inc.*, 46 F.3d 670, 673 (7th Cir.

9    1995)), and such a delay occurred here.

10        As detailed in Amazon's Motion for Summary Judgment, this case involves an undisputed

11   *seven-to-nine-year* delay. Amazon Mot. 26. The FTC alleges that Amazon began violating ROSCA

12   no later than 2014 and 2016, yet did not file this lawsuit until 2023. *Id.* at 26. In the interim, the

13   Prime flows were public, and according to the FTC, "a facial analysis of the ... enrollment methods

14   [would have] clearly demonstrate[d] Defendants' ROSCA violations." FTC Mot. 18; *id.* at 62–64

15   (similar analysis for the cancellation flow). But despite FTC attorneys and staff enrolling in Prime

16   and receiving precisely the kinds of consumer complaints that the FTC now argues facially prove a

17   ROSCA violation, the FTC failed to take *any action* during this period. *Id.* at 27–28. This egregious,

18   unjustified delay renders summary judgment inappropriate. *See also FTC v. Hang-Ups Art Enters.,*

19   *Inc.*, 1995 WL 914179, at *4 (C.D. Cal. Sept. 27, 1995) ("The facts of the case should decide

20   whether there has been affirmative misconduct by the government such that laches might apply.");

21   *FTC v. DIRECTV, Inc.*, 2016 WL 6947503, at *3 (N.D. Cal. Nov. 26, 2016) (denying motion for

22   summary judgment as to laches defense).

23        **2.    Due Process**

24        The FTC seeks summary judgment on just one of Defendants' three distinct constitutional

25   defenses. *See* Amazon Mot. Section IV.E; Individuals Mot. Section IV.C (presenting as-applied and

26   facial vagueness challenges and an as-applied First Amendment challenge). It contends that

27   ROSCA's "clear and conspicuous" disclosure and "simple" cancellation mechanism requirements

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 46

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  are not unconstitutionally vague as applied because Defendants were on notice that "not disclosing

2  terms clearly and conspicuously" and "making cancellation difficult … was illegal." FTC Mot. 71.

3  But the FTC cannot defeat an as-applied challenge by simply stating that the public could have read

4  the statutory text. Instead, as the FTC recognizes, an as-applied vagueness challenge like

5  Defendants' asks "whether, as applied to this specific factual scenario, a reasonable person of

6  average intelligence in Defendants' position would be on notice that their conduct was legally

7  prohibited." FTC Mot. 71 (cleaned up). So the question here is: would a reasonable person know

8  from ROSCA's text that Amazon's enrollment practices, including disclosures below a certain font

9  size, are not "clear[]" and "conspicuous[]?" And would a reasonable person know from ROSCA's

10  text that a cancellation mechanism that employs save offers or takes two more clicks than sign-up is

11  not "simple?" And on those questions, the FTC is mum.

12       The FTC otherwise takes aim at two mischaracterizations of Defendants' position. *First*, the

13  FTC fights the notion that it is "attempting to impose some new standard, above and beyond that

14  imposed by Congress in ROSCA." FTC Mot. 71. But Defendants' as-applied vagueness challenge

15  (like any other) asserts that *even if* ROSCA covers the conduct the FTC says is actionable here, the

16  Court cannot impose liability for that conduct because it is so close to the statutory boundary that

17  Defendants lacked fair notice. *See Butcher v. Knudsen*, 38 F.4th 1163, 1171–75 (9th Cir. 2022).

18  *Second*, the FTC disputes whether its rulemaking statements can "somehow make an act of Congress

19  unconstitutional as applied to Defendants." FTC Mot. 71. Again, Defendants are not claiming

20  otherwise. Yet just because the FTC's statements do not control what ROSCA means, *see generally*

21  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), it does not follow that the FTC's

22  statements are irrelevant entirely. An agency's confession that it cannot figure out the meaning of the

23  statute it is charged with implementing is surely probative evidence of a vagueness problem apparent

24  on the statute's face, or at least evidence non-lawyer executives would not understand that their

25  conduct allegedly violated the law. *See United States v. AMC Ent., Inc.*, 549 F.3d 760, 769 (9th Cir.

26  2008). Having said next to nothing about the actual constitutional defenses in this case, the FTC is

27  not entitled to summary judgment on this issue.

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 47

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

**IV.    CONCLUSION**

2          The Court should deny the FTC's Motion for Partial Summary Judgment.

3          DATED this 17th day of June, 2025.

4          I certify that this memorandum contains 17,507 words, in compliance with the Local Civil

5    Rules.

6                                          DAVIS WRIGHT TREMAINE LLP

7                                          By *s/ Kenneth E. Payson*
                                                 Kenneth E. Payson, WSBA #26369
8                                                James Howard, WSBA #37259
                                                 920 Fifth Avenue, Suite 3300
9                                                Seattle, WA 98104-1610
                                                 Telephone: (206) 622-3150
10                                               Fax: (206) 757-7700
                                                 E-mail:kenpayson@dwt.com
11                                                      jimhoward@dwt.com

12                                         COVINGTON & BURLING LLP

13

14                                               Stephen P. Anthony*
                                                 Laura Flahive Wu*
15                                               Laura M. Kim*
                                                 John D. Graubert*
16                                               850 Tenth Street, NW
                                                 Washington, DC 20001
17                                               Telephone: (206) 662-5105
                                                 E-mail:santhony@cov.com
18                                                      lflahivewu@cov.com
19                                                      lkim@cov.com
                                                        jgraubert@cov.com
20
                                                 John E. Hall*
21                                               415 Mission Street, Suite 5400
                                                 San Francisco, CA 94105
22                                               Telephone: (415) 591-6855
                                                 E-mail:jhall@cov.com
23

24                                               Megan L. Rodgers*
                                                 3000 El Camino Real
25                                               Palo Alto, CA 94306
                                                 Telephone: (650) 632-4734
26                                               E-mail: mrodgers@cov.com

27

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 48

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Anders Linderot*
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Email: alinderot@cov.com

HUESTON HENNIGAN LLP

John C. Hueston*
Moez M. Kaba*
Joseph A. Reiter*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
E-mail:jhueston@hueston.com
          mkaba@hueston.com
          jreiter@hueston.com

*admitted pro hac vice

Attorneys for Defendants AMAZON.COM, INC.,
NEIL LINDSAY, RUSSELL GRANDINETTI,
and JAMIL GHANI

DEFENDANTS' OPP. TO FTC'S MOT. FOR SUMMARY JUDGMENT
(2:23-cv-0932-JHC) - 49

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax