# Attachment 209

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,
Plaintiff,
vs. No. 2:23-cv-0932-JHC
AMAZON.COM, et al.
Defendants.
____________________________/

The Above-Captioned Video-Recorded Deposition of
MARSHINI CHETTY, Ph.D.
9:23 a.m. - 6:31 p.m.
April 28, 2025

REPORTED BY:
STEVEN POULAKOS, RPR
JOB NO: J12762346



The above-captioned video-recorded deposition of MARSHINI CHETTY, Ph.D. was held on Monday, April 28, 2025, commencing at 9:23 a.m., at the Offices of the Federal Trade Commission, 400 Seventh Street, S.W., Washington, D.C. 20024, before Steven Poulakos, Notary Public.

REPORTED BY: Steven Poulakos, RPR



APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
OLIVIA JERJIAN, ESQUIRE
JOHANA MEJIA-PORTILLO, ESQUIRE
Federal Trade Commission
400 Seventh Street, S.W.
Washington, D.C. 20580
Telephone: 202.326.2552
Email: ojerjian@ftc.gov

ON BEHALF OF THE PLAINTIFF:
MOEZ KABA, ESQUIRE
CASSIDY O'SULLIVAN, ESQUIRE
Hueston Hennigan, LLP
523 West 6th Street
Suite 400
Los Angeles, California 90014
Telephone: 213.788.4340
Email: mkaba@hueston.com

ALSO PRESENT: NATHAN KANE - THE VIDEOGRAPHER.



INDEX
Deposition of MARSHINI CHETTY, Ph.D
April 28, 2025


| Examination by: | Page |
|---|---|
| Mr. Kaba | 6 |
| Ms. Jerjian | 410 |
| Mr. Kaba | 419 |

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit MC1 | A CV | 35 |
| Exhibit MC2 | Expert report | 42 |
| Exhibit MC3 | A letter dated May 29th, 2021 | 123 |
| Exhibit MC4 | An article published in the November 2019 | 176 |
| Exhibit MC5 | An article | 228 |
| Exhibit MC6 | A participant coding spreadsheet | 360 |
| Exhibit MC7 | Supplemental expert report | 386 |
| Exhibit MC8 | Rebuttal report | 386 |
| Exhibit MC9 | The transcript of participant 15's think aloud thinking | 387 |
| Exhibit MC10 | Contribution page | 405 |

Page 45

Q Okay. You then describe that you conducted what you call a cognitive walkthrough. Do you see that?
A Yes.
Q And the cognitive walkthrough you're referring to is your CandyForever experiment; is that right?
MS. JERJIAN: Objection, form.
THE WITNESS: No.
BY MR. KABA:
Q Okay. So what is the cognitive walkthrough you're referring to?
A It is an inspection method.
Q So it's something that you did?
MS. JERJIAN: Objection, form.
THE WITNESS: Yes.
BY MR. KABA:
Q So how often have you conducted these quote, unquote cognitive walkthroughs?
MS. JERJIAN: Objection, vague.
THE WITNESS: Like do you mean what time period?
BY MR. KABA:
Q No. Like how many times have you conducted a cognitive walkthrough for purposes of rendering an

Page 46

expert opinion in the case?
A Well, I've only been an expert in one case.
Q So the answer to my question is once?
A For an expert opinion as an expert witness, yes.
Q Have you conducted a cognitive walkthrough for an expert opinion even when you haven't been an expert in a case?
MS. JERJIAN: Objection, vague as to expert opinion.
THE WITNESS: I'm not sure what you mean by expert opinion. Do you mean have I just conducted cognitive walkthroughs for other reasons?
BY MR. KABA:
Q Well, no. You used the term expert opinion. So your response to my question was for an expert opinion as an expert witness, so now I'm just -- I'm relying exactly on your own terminology.
A Okay.
Q Okay. So are you with me? Do you understand what I'm doing here?
A I think so.
MS. JERJIAN: Objection.
BY MR. KABA:
Q How many times have you conducted a

Page 47

cognitive walkthrough to offer an expert opinion?
MS. JERJIAN: Vague as to expert opinion, calls for a legal conclusion.
THE WITNESS: Again, I've conducted a cognitive walkthrough once as an expert witness for a case which is the one we're talking about now.
BY MR. KABA:
Q Okay. How many times have you conducted a cognitive walkthrough as part of your research to offer an opinion?
MS. JERJIAN: Objection, vague as to offer an opinion.
THE WITNESS: Again, I'm not sure what you mean by offering an opinion and if you're asking me how many times -- do you mean --
BY MR. KABA:
Q Why don't I do it this way?
A -- for teaching or research?
Q Why don't I do it this way? You say I conducted a cognitive walkthrough to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer.
A Yes.
Q Right? Do you see that?

Page 48

MS. JERJIAN: Objection. Counsel did not read the whole sentence.
THE WITNESS: Yes.
BY MR. KABA:
Q How many times have you conducted a cognitive walkthrough to evaluate the design of the enrollment points within a checkout process and cancellation interfaces from the viewpoint of a consumer?
A Well, again, I'm not sure if you mean other than in this case, for teaching purposes, for research purposes, but in general, many times that are not necessarily for this expert case.
Q Right. I'm not asking you just about the expert opinions. So can you tell me one other time when you have conducted a cognitive walkthrough to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer?
MS. JERJIAN: Objection. Are you referring to this document Exhibit 2, counsel?
THE WITNESS: Yeah. Do you mean like a checkout process -- like do you mean Amazon's checkout process or do you mean any checkout process?
BY MR. KABA:

Page 49

Q Any. I want to know any other time you have conducted a cognitive walkthrough apart from this case to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer.
MS. JERJIAN: Objection, form.
THE WITNESS: Do you mean in the same study or do you mean in separate studies? I mean, I'm assuming if you're saying like have I ever looked at cognitive walkthrough of an enrollment process or a cancellation process, again, I -- I can't say for sure, but I have done them before.
BY MR. KABA:
Q So, Dr. Chetty, you're -- I'm not quite sure why because you are -- you're a professor, right?
A Yes.
Q You're an expert in this case or you're going to be offered as one at least, right?
MS. JERJIAN: Objection, form.
THE WITNESS: Yes, I am an expert.
BY MR. KABA:
Q Okay. I'm reading the words you wrote and you are fighting with me on what I mean when I use the words that you -- these are -- let me -- let me make maybe a basic factual point first. These are your

Page 50

words, right?
MS. JERJIAN: Objection, form.
THE WITNESS: Yes. I'm responsible for all of the words in this report.
BY MR. KABA:
Q That's not my question. These are your words?
A I'm not sure what you mean by are these my words. I did write them.
Q Who else -- who else's words would they be if they're not yours?
MS. JERJIAN: Objection, form.
THE WITNESS: They are my words. I am responsible for all the words in this report.
BY MR. KABA:
Q Okay. So when I asked you these are your words, I'm not -- why did you say I'm not sure what you mean by these are my words?
A Well, again, I'm not sure if you're referring to the sentence or, you know, I was sort of wondering if you were referring to the sentence or if you were again asking me about the study and conducting the study.
Q So you understand what we're talking about here is the sentence that says first I conducted a

Page 51

cognitive walkthrough to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer by studying the design of each interface using foundational principles of good design in HCI.
Do you have that sentence in mind?
A Yes.
Q These are your words, correct?
A Yes.
Q Apart from this case where you have purported to do that with respect to Amazon Prime, when else have you, quote, conducted a cognitive walkthrough to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer by studying the design of each interface using foundational principles of good design and HCI?
MS. JERJIAN: Objection, form.
THE WITNESS: Well, it sounds like you're asking me quite a few questions there because I'm not sure if you're asking if -- I've conducted many cognitive walkthroughs and some have been of enrollment processes in other sites and some have been in cancellation, sometimes in teaching, sometimes in research. So it sounds like you're asking me quite a

Page 52

few questions at a time.
BY MR. KABA:
Q I'm asking you when you have done the same thing you have done in this case as you have identified as the first thing you did in this case?
MS. JERJIAN: Objection.
THE WITNESS: Right. Well, I have not conducted the exact cognitive walkthrough of the enrollment and checkout process on Amazon or cancellation aside from in this case.
BY MR. KABA:
Q I'm not asking you only about on Amazon. I'm asking you for any other subscription service.
A Yes.
Q When have you conducted a cognitive walkthrough to evaluate the design of the enrollment points within the checkout process and cancellation interfaces from the viewpoint of a consumer?
MS. JERJIAN: Objection, form. Are you asking about the checkout process?
MR. KABA: You can state your objection. The witness can -- she's very capable of asking me for clarification.
MS. JERJIAN: Objection.
You can answer.

MS. JERJIAN: Objection, form.
THE WITNESS: Again, based on my recollection if you're asking about research papers or studies -- I'm not sure if you're asking about published studies or not published studies. I haven't done this exact same cognitive walkthrough of a checkout process like the Amazon Prime checkout process.
BY MR. KABA:
Q Have you done a cognitive walkthrough to evaluate the design of the cancellation interfaces in the way that you have done in this case?
MS. JERJIAN: Objection, form.
THE WITNESS: Again, I'm not sure if you're asking about just other than Amazon Prime and for what purpose, but based on my recollection, I haven't done the exact cancellation process like on Amazon for a publication.
BY MR. KABA:
Q For any reason?
A To my knowledge, no.
Q Okay. The same thing. You added all of these qualifications about enrollment process. To your knowledge, have you done a cognitive walkthrough to evaluate the design of the enrollment points within a



checkout process for any purpose?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: Again, I mentioned I haven't done that exact checkout process like on Amazon Prime for a study purpose like a research publication or a cancellation process like for a research publication of an exact checkout or cancellation process like Amazon.
BY MR. KABA:
Q I'm not -- okay. Put aside the purpose whether it's a research publication or a study. Have you done it for any other purpose what you purport to have done in this case?
MS. JERJIAN: Objection, form.
THE WITNESS: Well, sometimes we do it when we're evaluating interfaces we're studying, yes.
BY MR. KABA:
Q Okay. So name for me something that you have done outside of the research study or publication context where you have conducted a cognitive walkthrough to evaluate the design of the enrollment points within a checkout process.
MS. JERJIAN: Objection, form.
THE WITNESS: Well, again, that would -- I have conducted studies like this in the past often in



preparation for research publications that we're doing. One example, you know, as I mentioned is not quite a checkout process, but I looked at something different, subscription process.
BY MR. KABA:
Q So do you remember what my question was?
A No.
Q Okay. So let's try to focus on -- it's going to be a much longer day -- it's going to be a long day anyway.
A Okay.
Q It's going to feel even longer if you don't try to keep my questions in mind. So I'll ask you to -- I'll ask you to try to do that.
A Okay.
Q I would like to know if for any purpose whatsoever you have conducted a cognitive walkthrough to evaluate the design of the enrollment points within a checkout process, yes or no?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: Again, I think I mentioned that I haven't done the exact similar thing.
BY MR. KABA:
Q You're -- Dr. Chetty, you're adding words



to my question. Listen to my question, please. For any purpose whatsoever, have you conducted a cognitive walkthrough to evaluate the design of enrollment points within a checkout process, yes or no?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: I did answer this. I'm going to say no.
BY MR. KABA:
Q For any purpose whatsoever, have you conducted a cognitive walkthrough to evaluate the design of cancellation interfaces, yes or no?
A No.
MS. JERJIAN: Objection, form, asked and answered.
BY MR. KABA:
Q Okay. You then have -- so that was first. Later in that paragraph, you say second I conducted a think aloud study which is an empirical qualitative user study to understand consumers' experiences navigating Prime enrollment within the checkout process and Prime cancellation. Do you see that?
A Yes.
Q And the think aloud studies are your CandyForever study, correct?

Page 65

BY MR. KABA:
Q Have you ever conducted a think aloud study to understand consumers' experiences navigating cancellation, yes or no?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: Again, I mentioned it again, but I'm going to say no.
BY MR. KABA:
Q Okay. How many consumers -- I'm sorry. How many individuals by the way were a part of your think aloud study?
MS. JERJIAN: Objection, form.
THE WITNESS: I'm assuming you mean how many participated in the think aloud study and I'd say 33.
BY MR. KABA:
Q Going back up to the cognitive walkthrough, would you agree with me that -- well, the person who did the cognitive walkthrough was you, right?
A Yes.
Q Is it possible that another person who also has expertise in HCI could have conducted that cognitive walkthrough and reached different conclusions than you?

Page 66

MS. JERJIAN: Objection, form, calls for speculation.
THE WITNESS: Well, if you're asking me to speculate whether someone else doing this would reach different conclusions, I would say it's highly unlikely.
BY MR. KABA:
Q How -- what percent -- what amount of subjectivity is there in conducting a cognitive walkthrough?
MS. JERJIAN: Objection, vague as to amount of subjectivity.
THE WITNESS: I'm not sure what you mean, but a cognitive walkthrough is usually done by experts and so there's some amount of subjectivity.
BY MR. KABA:
Q And so in light of that, there are other experts who could go through the same kind of cognitive walkthrough as you but reach a different conclusion about any particular design element that's present or may not be present, fair?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: As I mentioned before, it's highly unlikely, but possible.

Page 67

BY MR. KABA:
Q Did you consult with any other experts in HCI for purposes of your cognitive walkthrough in this case?
A No.
MS. JERJIAN: Objection, form.
BY MR. KABA:
Q Okay. You have worked with other academics in the HCI field as part of other publications you've done, right?
A Yes.
Q And as part of the work in those other publications, have you and all of those other experts always agreed that something was or was not a dark pattern, for example?
MS. JERJIAN: Objection, form, vague.
THE WITNESS: I'm not sure exactly what you mean by agreed or not agreed. Like do you mean in a data analysis? Do you mean in --
BY MR. KABA:
Q Did you guys have -- when you work with other academics including in the field of HCI, do you have differences of opinion?
A Yes.
Q And those differences of opinion can

Page 68

include things like is this a good design element or a bad design element, correct?
MS. JERJIAN: Objection, vague.
THE WITNESS: Yes.
BY MR. KABA:
Q And those differences of opinion can include what a -- how a consumer might interact with that design element, correct?
MS. JERJIAN: Objection, form, vague.
THE WITNESS: Yes.
BY MR. KABA:
Q And those differences of opinion between you and other experts can also include whether certain information that might be presented or certain friction that might be introduced could be a good thing for a consumer versus a not good thing for a consumer, correct?
MS. JERJIAN: Objection, form.
THE WITNESS: I'm not sure what you mean by good or not good. Like from whose perspective? I mean, I assume, yes, they could have a difference of opinion, but I think it depends on -- it also depends on who's deciding what's good or bad.
BY MR. KABA:
Q Right. I mean, that's a -- a part of

Page 193

top of my head, but if I looked at my notes and looked at my expert report, I could point you to some of the citations I gave about different kinds of shoppers that use the Amazon website. But off the top of my head, I don't have all of that information. I don't have all of the information about the exact age and so on.
Q Did you ever know the demographies of the users of Amazon.com?
MS. JERJIAN: Objection, form.
THE WITNESS: So do you mean like for this case or --
BY MR. KABA:
Q Yes, for this case. You -- one of the things you said you would need to look at in order to determine if the theater was using dark patterns was the users of that theater's website and you said their demography among other characteristics?
A Yes.
Q So did you know that for purposes of this case? Did you evaluate the demography and other characteristics of the users of Amazon?
MS. JERJIAN: Objection, form, vague as to evaluate.
THE WITNESS: Well, could you be more specific about evaluate?

Page 194

BY MR. KABA:
Q Where in your expert report do we see you factoring in the demographics and other characteristics of the users of Amazon.com?
A Well, let me have a moment to go to page 3.
Q Go ahead.
A So when I was conducting my user study, I did look at the time about the demographics of the Amazon users so that when we were recruiting, we could get some users who matched those demographics somewhat. And let's see.
So if you look at -- right. I'm sorry. Thank you for giving me time. It's on page 90 in paragraph 328. So it says we used a recruiting agency based in Chicago, Focuscope, Inc., to recruit participants from a range of age groups, income ranges and education levels to match the demographics of Amazon shoppers. So at that time, I had considered the demographics of Amazon shoppers.
Q Right. So you're -- you're pointing out that you considered the demographics of Amazon shoppers to recruit for your CandyForever study, right?
MS. JERJIAN: Objection, form, mischaracterizes the testimony.
THE WITNESS: As part of my expert report,

Page 195

that is one of the times that I did, yes.
BY MR. KABA:
Q Right. So I want to know how did you consider the demographics and other characteristics of Amazon shoppers to assess whether or not Prime used dark patterns.
MS. JERJIAN: Objection, form.
THE WITNESS: So what do you mean by how did I consider it? Do you mean in my think aloud study or --
BY MR. KABA:
Q No. In your cognitive walkthrough. You did a cognitive walkthrough, didn't you?
A I did do a cognitive walkthrough.
Q And a part -- the goal of your cognitive walkthrough was to identify dark patterns on the Amazon enrollment and cancellation flows?
A That's incorrect. The goal of my cognitive walkthrough was to see whether the enrollment process was simple and whether the information was disclosed in the way that users could understand.
Q How did you -- how do you decide whether or not something is simple?
A Well, as I said in my report, I first performed a cognitive walkthrough and then identified

Page 196

potential issues. And then I conducted a think aloud study to verify if those issues existed with users.
Q Okay. So your cognitive walkthrough does not actually support the conclusion itself that the enrollment process is or is not simple, correct?
MS. JERJIAN: Objection, form, mischaracterizes the witness's testimony.
THE WITNESS: Well, that's incorrect again. Could you repeat that?
BY MR. KABA:
Q So you know I'm incorrect, but you don't know what the question is?
A Yes. Could you repeat the question again about the cognitive walkthrough?
Q Okay. If you only did the cognitive walkthrough and not the think aloud study, could you conclude that an enrollment process was not simple?
A I could conclude that the enrollment process was not simple.
Q In whose opinion?
A In my opinion and an expert opinion since a cognitive walkthrough as an inspection method is quite valid.
Q Okay. But you've never -- I think as we've established, you've never done a cognitive walkthrough

of the enrollment process of any other company?
MS. JERJIAN: Objection, form, mischaracterizes the witness's testimony.
THE WITNESS: Again, I've never done a cognitive walkthrough of an enrollment process on the Amazon -- other than the Amazon Prime website for this particular report because that wasn't relevant, yes.
BY MR. KABA:
Q Your testimony is on the record. My question for you is: Let's put aside your think aloud study and just focus on the cognitive walkthrough for a moment. The cognitive walkthrough is looking at as you described it whether or not the enrollment process is simple. Is that what you said?
A Well, I turned to the -- so I can tell you exactly. If you look at page 1, it sort of outlines again my roles, but the cognitive walkthrough was basically to answer -- let's see if I have it down. Right.
So if you go to page 28, paragraph 78, it said that the FTC asked me to review the online checkout flow and cancellation processes, the interfaces at issue. In this report, it provided me and to opine on them. I opted to use an inspection method that's the cognitive walkthrough and an



empirical study method, that's the think aloud study applying rigorous systematic procedures that are widely accepted in the HCI field.
Q Dr. Chetty, what question are you answering?
A Well, you haven't let me finish. And so just to remind that the FTC asked me to provide on page 1 an expert opinion on whether the design of how Amazon enrolls consumers in Prime during the online checkout process confuses consumers, whether the design of how Amazon enrolls consumers in Prime during the online checkout conveys information on Prime's material terms, the cost at the end of the free trial period and renewal terms that consumers can comprehend. And those are the ones that pertain to the enrollment process. And so the cognitive walkthrough was designed to help me answer those questions.
Q Do you remember what my question was?
A I'd love for you to repeat it.
Q Okay. So you don't remember? You're just answering a question?
MS. JERJIAN: Objection, mischaracterizes the witness's testimony.
THE WITNESS: I believe -- I believe I was answering your question.



BY MR. KABA:
Q Do you remember what the question was?
A I believe you asked me why I did the cognitive walkthrough.
Q Not quite, but let me try again.
A Okay.
Q Put aside the think aloud study. What opinions could you reach in this case based only on the cognitive walkthrough?
MS. JERJIAN: Objection, form.
THE WITNESS: So while both my studies work in tandem just to be clear and the cognitive walkthrough does allow me to indicate points of confusion in the enrollment process if that's the one you're asking about.
BY MR. KABA:
Q Well, it allows you to indicate points of confusion, but does it allow you to conclude that they are, in fact, confusing?
MS. JERJIAN: Objection, form, mischaracterizes the testimony.
THE WITNESS: So could you clarify what you mean by conclude because --
BY MR. KABA:
Q Right. I want -- so I'm trying to



understand how -- how intertwined these two assessments are. So let's say you have no think aloud study whatsoever in this case. You didn't do your 30-person CandyForever study. Okay?
A Okay.
Q What conclusions did you reach in this case based only on the cognitive walkthrough analysis that you personally performed?
A Okay. So based on -- you know, so you're asking me to pretend like I didn't do the second study, so this is sort of guessing of what I would think.
Q No. I'm not. And you're again trying to recharacterize my question. Ask me -- ask me if you don't understand my question, but we can't go through every time I ask a question --
A Well --
Q Let me finish, please. Every time I ask a question, then you recharacterize that question. Then you answer the question that you think I'm asking and then I have to go back to my question. And we just -- we're building in a lot more time that feels unnecessary here. If I can clarify, I will clarify. What I'm asking you is -- and the answer to this question may be I can't separate the two out and that's perfectly okay.

Page 285

MS. JERJIAN: Objection, form.
THE WITNESS: Which questions?
BY MR. KABA:
Q Paragraph 65, your report, the expert should determine whether the user one, two, three, four. Do you see that?
A I do, yes.
Q Is it possible that a different expert also an expert in the same areas as your expertise would perform the cognitive walkthrough and reach different conclusions than you did in response to the questions you are looking at?
MS. JERJIAN: Objection, form.
THE WITNESS: What do you mean by different conclusions?
BY MR. KABA:
Q Different determinations.
MS. JERJIAN: Same objection.
THE WITNESS: So determinations how? Like would they -- like I'm still not quite understanding.
BY MR. KABA:
Q Do you believe that every other expert who performs the cognitive walkthrough you performed in this case would arrive at the same conclusions that you arrived as a result of that walkthrough?

Page 286

MS. JERJIAN: Objection, vague as to expert.
THE WITNESS: Well, assuming that they were trying to the answer same research questions that I was trying to answer which I pointed out on page 1 of my report, it's highly likely that they would arrive at similar conclusions, but quite possible they could arrive and have additional conclusions.
BY MR. KABA:
Q And it's possible they could arrive at different conclusions than you, correct?
MS. JERJIAN: Objection, form.
THE WITNESS: Well, what do you mean by different?
BY MR. KABA:
Q What do you understand the word different to mean, Dr. Chetty?
A Well, it could mean many things. It could mean, you know, conclusions that have additional, for example, problematic issues because sometimes when multiple cognitive walkthroughs are performed, they may uncover additional issues. That's one definition. There are other definitions of different.
Q Is it possible that another expert could do the same cognitive walkthrough as you did and find that

Page 287

some of the design interfaces being used were not problematic even though you thought they were problematic?
MS. JERJIAN: Objection, form.
THE WITNESS: It's highly unlikely, but theoretically possible.
BY MR. KABA:
Q Are you aware of a single court anywhere in the country that has accepted a cognitive walkthrough as an acceptable expert methodology?
MS. JERJIAN: Objection, form, calls for a legal conclusion.
THE WITNESS: I -- I am not a legal expert and so I don't know every single court case and I just don't know the answer to that.
BY MR. KABA:
Q So I'm not asking you again about every single court case. I know you don't know every court case. Okay?
A Yes.
Q I'm asking for your knowledge. Are you aware of a single court anywhere in the country that has accepted a cognitive walkthrough as an acceptable expert methodology?
MS. JERJIAN: Objection, asked and

Page 288

answered, form, calls for a legal conclusion.
THE WITNESS: Again, I'm not a legal expert and I don't know about every single court case.
BY MR. KABA:
Q Do you know of any, any court anywhere in the country that has accepted a quote, unquote cognitive walkthrough as an acceptable expert methodology?
MS. JERJIAN: Objection, form, calls for a legal conclusion, asked and answered.
THE WITNESS: Well, again, I, you know --
BY MR. KABA:
Q Are you aware of any?
A I'm not --
MS. JERJIAN: Let the witness finish.
THE WITNESS: I'm not sure of what you mean by any court and like do you mean in the U.S. or I'm not aware of --
BY MR. KABA:
Q So my question was any court in the country. So the country I would generally assume to be the U.S.
A I apologize because sometimes I didn't quite catch all of your question.
Q Okay.

BY MR. KABA:
Q Yes.
A So, yes. I ran the think aloud study with 30 people and ten people saw three or each saw a different version of UPDP.
Q And then how about for cancellation flow, did everybody see the same cancellation flow?
MS. JERJIAN: Objection, form.
THE WITNESS: So I'm assuming you mean the Iliad flow and if so, everyone saw the same flow.
BY MR. KABA:
Q Well, there -- your -- your expert report actually talks about two different Iliad flows, doesn't it?
A It does, yes.
Q So which -- which of the Iliad flows did participants in your study actually see as part of your think aloud study?
A I believe they saw Iliad, not Iliad 2.0.
Q Okay. Did you test Iliad 2.0?
A I did not.
Q Did you test Amazon's enrollment process through the mobile app, through the mobile interface?
MS. JERJIAN: Objection, form, asked and answered.



THE WITNESS: I think I mentioned I only conducted the think aloud on the Amazon MPP flow on desktop.
BY MR. KABA:
Q So the answer to my question is no, you did not -- did you -- did you attempt to test the mobile flow?
MS. JERJIAN: Objection, form, asked and answered.
THE WITNESS: I did not test the mobile flow.
BY MR. KABA:
Q Okay. Do you believe the 30 -- strike that.
What is Max QDA?
A Max QDA is a piece of software for qualitative data analysis.
Q So the results of your -- sorry -- think aloud study, you would agree the results are qualitative, not quantitative, right?
A That is correct.
Q So how many people were involved in coding the participants' kind of thinking aloud responses?
A Two.
Q And did -- were you one of those people?



A Yes.
Q And your graduate assistant was the other one?
A Correct.
Q And did you -- did you both code every single one of the 30 participants or did you split it up?
A We both watched all of these.
Q Did you both code every single one of the participants or did you split it up?
A We -- it depends on what you mean. Do you mean -- what do you mean by splitting it up?
Q So did one of you code for 15 and the other code for the other 15?
A Each of us coded each one of the transcripts.
Q All 30 of them?
A All 33 of them, yes.
Q Well, 30 for the actual think loud study. Three were the pilot, correct?
A Correct, yes.
Q And did you and your research assistant ever have a disagreement on how a participant should be coded?
MS. JERJIAN: Objection.



BY MR. KABA:
Q It's just a yes or no for now.
A Yes.
Q Do you recall for how many participants you had disagreements with your colleague about how a participant should be coded?
A Not offhand and I would have to review our privileged communications, so I'm not sure I can answer that question.
Q Okay. In the event of a disagreement, did your view govern?
A What do you mean by govern?
Q So each of the participants was coded, right, along various different measures; is that right?
MS. JERJIAN: Objection, form.
THE WITNESS: What do you mean by measures?
BY MR. KABA:
Q Sure. Let's --
(Chetty Exhibit MC6 was marked for purposes of identification.)
BY MR. KABA:
Q So I'm going to mark as MC6 a document that was produced natively to us as part of your expert report in this case.
A What does produce natively mean?

Page 361

Q I'll explain in a second.
A Okay.
Q A document that was produced to us in electronic form that in order for us to use at this deposition, we had to print out.
So I'll represent to you that this was a participant coding spreadsheet that was completed in your expert materials.
A Thank you for clarifying.
Q You're welcome. So along the left, we see PID which I think means participant ID number and goes from 1 to 33. One to 3 is shaded which I think is the pilot and then 4 to 33 are your actual study participants, right?
A Based on my recollection, that sounds correct.
Q And then each participant was coded along as we can see in these various columns including whether enrolled in Premium, when enrolled, Premium interest at SOSP, whether read UPDP fine print, whether new premium cost, et cetera, et cetera, right?
A Yes, that looks correct.
Q Okay. So what I'm asking you is where you and your research assistant disagreed about whether or not someone should be coded in a particular category,

Page 362

how did you make the decision on where they would, in fact, be coded?
A Well, in --
MS. JERJIAN: I would counsel you not to reveal any privileged information.
THE WITNESS: Generally in qualitative data analysis, people discuss points of disagreement and try to achieve consensus.
BY MR. KABA:
Q Okay. And did you -- okay. That's fair. So if we go to your report again which is MC2.
A Yes.
Q And let's go to 351.
A Which page is that?
Q Page 95.
A Okay. Okay. I'm on page 95.
Q Okay. On paragraph 351, you said over one-third of participants 12 out of 30 enrolled in premium as part of your think aloud study, correct?
MS. JERJIAN: Objection, form.
THE WITNESS: That is correct.
BY MR. KABA:
Q Okay. And 18 of the 30 did not enroll in premium, right?
A That is correct.

Page 363

Q So over half of them knew how to navigate to the no thanks button and click it even in your CandyForever study, correct?
MS. JERJIAN: Objection, form, vague as to your report.
THE WITNESS: I'm not sure I understand your question. Could you -- could you be more specific about what you're asking?
BY MR. KABA:
Q How would someone as part of your study elect not to enroll in premium?
A Well, there are multiple ways to enroll in premium because it tries to mimic Prime.
Q So in -- in your study, how would participants reflect that they did not want to enroll in premium?
MS. JERJIAN: Objection, form.
THE WITNESS: Well, again, there are multiple detours in premium that mimicked the Prime detours to enroll in premium. So there would be multiple ways to decline or -- well, there would be multiple detours to be able to enroll. So, again, I'm not quite sure what you're asking because I can't -- I would have to go look at how each person enrolled which I think we do state here. I do state this in the

Page 364

report to be able to answer your question.
BY MR. KABA:
Q I'm just trying to get to a common vocabulary here.
A Right.
Q Thirty people were shown one version of the Prime enrollment UPDP, correct?
A Thirty people were shown three different versions of the premium UPDP which was based on the Prime UPDP.
Q So 30 people were shown a version of the CandyForever premium UPDP that you tried to mimic from what Prime's UPDP was, correct?
MS. JERJIAN: Objection, form.
THE WITNESS: So, again, we based the premium UPDPs on the Prime UPDPs. And, yes, we used three different versions of the Prime UPDP to mimic in the premium UPDP.
BY MR. KABA:
Q And in order to decline enrollment in CandyForever premium on any of those UPDPs, the user had to click a no thanks or a no, some kind of decline enrollment button, right, or link?
MS. JERJIAN: Objection, form.
THE WITNESS: Well, they did all have to go

Page 413

subsection 1, forced action. Do you see that?
A Yes.
Q Is forced action an example of a dark pattern?
MR. KABA: Objection, leading.
THE WITNESS: Yes.
BY MS. JERJIAN:
Q And this dark pattern was present in Dr. Grey's Ontology, correct?
A Correct.
Q Turning to paragraph -- subparagraph 2 on page 20, interface interference is another example of a kind of dark pattern and that was present in Dr. Grey's Ontology, correct?
A Yes.
Q And this entire section just set out multiple examples of dark patterns in Dr. Grey's Ontology, correct?
A Correct.
Q Turning to page 12 of your report starting on paragraphs 33 through 35, do you see those paragraphs?
A Yes.
Q Do these paragraphs lay out the foundational principles of good design and human

Page 414

computer interaction?
A Yes.
Q Could a business look to these foundational principles of good design in order to understand principles of good design?
MR. KABA: Objection, speculation.
THE WITNESS: Yes.
BY MS. JERJIAN:
Q And you've cited several sources in drafting paragraphs in supporting paragraphs 33 through 35, correct?
A Correct.
Q Similarly could a business look to Dr. Grey's dark pattern ontology as described in paragraphs 49 through 55 in your report to understand what a dark pattern is?
MR. KABA: Objection, speculation, leading.
THE WITNESS: Yes.
BY MS. JERJIAN:
Q And you've also cited -- included references in this section, correct?
A Yes.
Q Did you review -- did you review the foundational principles of good design or rather what you call the foundational principles of good design in

Page 415

human computer interaction in order to form your opinions in this matter?
A Yes.
Q And you applied those foundational principles of good design in order to -- in drafting your report?
A Yes.
Q Similarly with Dr. Grey's Ontology, did you review Dr. Grey's Ontology in order to form your opinion in this case?
A Yes.
MR. KABA: Objection, leading.
BY MS. JERJIAN:
Q And you applied Dr. Grey's Ontology to the Amazon enrollment and cancellation processes that you received from the FTC in order to form your opinion in this case or your opinions in this case; is that correct?
MR. KABA: Objection, leading, vague, form.
THE WITNESS: Yes.
BY MS. JERJIAN:
Q Could a business who wants -- strike that.
Could a business that wants to understand dark patterns look to these same sources for the items in understanding dark patterns?

Page 416

MR. KABA: Objection, speculation, form.
THE WITNESS: Yes.
BY MS. JERJIAN:
Q Dr. Chetty, have you conducted cognitive walkthroughs before this case?
A Yes.
Q Have you conducted think aloud studies prior to this case?
A Yes.
Q Do you need to conduct AB testing in order to identify dark patterns in any given flow?
MR. KABA: Objection, form, speculation.
THE WITNESS: No.
BY MS. JERJIAN:
Q Earlier you referred to videotapes with respect to your think aloud study, correct?
A Yes.
Q Did those videotapes contain audio records in addition to visual records?
A Yes. They contained audio of the participants as well as all the screens they were navigating and what they were doing on the screens.
Q When you say that you reviewed those video recordings, did you mean that you listened to the audio portions and watched the video portions of the video

Page 417

recordings?
A Yes.
Q Did you need to be physically present at the think aloud study?
A No.
Q Why not?
A Because I had the video which had the audio and video footage of everything a participant was doing and also the audio of everything that the research assistant was saying during the study as well as field notes to rely on.
Q If you could please pull up Exhibit MC6 which is from your think aloud study.
A Yes.
Q Did you do -- what, if anything, did you do to confirm the accuracy of the coding in this study on MC6?
A So both the research assistant and I coded each of the participant videos and primarily the videos, but also listening to the transcripts for each one of the participants that were in the study.
Q Do you need to review the video recordings of the participants in order to confirm the accuracy of the data presented at MC6?
A No. I don't need to review the videos to

Page 418

confirm the accuracy of the data, but to know all the words in the transcript, yes, or the data coding should I say, yes.
Q Thank you.
MS. JERJIAN: No further questions, but I do just want to put on the record that the FTC only received notice of the videotaping portion of this deposition on Friday, April 25th for the first time which provided zero business days before today's deposition and we reserve our right to object to the use of the video at trial given the lack of notice and, therefore, the prejudice that that created in preparing the witness for the videotaped component of today's deposition.
MR. KABA: You have our position that's already been stated on the record.
Dr. Chetty --
MS. JERJIAN: Counsel, you're out of time though.
MR. KABA: Are you going to prevent me from asking follow-up questions to the questions you asked? If you're going to take that position, I can deal with it in court, but you've asked questions, that you didn't notice this witness's deposition as you know. Are you preventing me from asking follow-up questions

Page 419

on the questions that you asked?
MS. JERJIAN: Yes, I am.
MR. KABA: Okay. Then we're going to object and move to strike all of your responses as not giving us a fair opportunity to redirect the witness.
MS. JERJIAN: You didn't have enough time. You ran out time in your seven hours. We provided you more than the seven hours and let you go on beyond. So unless you tell me that you have one or two questions --
MR. KABA: I have two questions.
MS. JERJIAN: I'll allow two questions.
FURTHER EXAMINATION BY MR. KABA
Q Dr. Chetty, did you discuss any of the questions you were just asked by counsel during any of the recesses of today's deposition?
A The questions, you mean the -- which questions?
Q Did you discuss the substance of any of your testimony either that you gave to me or that you were asked about by counsel today during any of the breaks during today's deposition?
A Only in the last break.
Q What was that?
A Counsel mentioned she was going to ask me a

Page 420

bunch of questions.
Q Did you have an understanding of what those questions were?
MS. JERJIAN: I think you're over the two questions that you said you had.
MR. KABA: You surely are going to allow me to inquire.
MS. JERJIAN: I'll ask you -- let you this one last question. You're -- you're -- you're over time, counsel.
MR. KABA: You're -- you're saying --
MS. JERJIAN: You're over time, counsel.
MR. KABA: -- you would like the record to reflect that you discussed the substance of the witness's testimony during break and not --
MS. JERJIAN: That is not what -- that is not what the witness said.
MR. KABA: And not --
MS. JERJIAN: That is not what the witness said. I'll allow you this one last question. That is it.
MR. KABA: Are you -- are you going to cut me off from inquiring of the witness what was discussed during the break, yes or no?
MS. JERJIAN: That's not what the witness