# Attachment 222

FEDERAL TRADE COMMISSION,

        Plaintiff,

    v.

AMAZON.COM, INC., a corporation;

NEIL LINDSAY, individually and as an officer of AMAZON.COM, INC.;

RUSSELL GRANDINETTI, individually and as an officer of AMAZON.COM, INC.; and

JAMIL GHANI, individually and as an officer of AMAZON.COM, INC.,

        Defendants.

Case No. 2:23-cv-0932-JHC

Honorable John H. Chun

# EXPERT REPORT OF DR. RAN KIVETZ

**CONFIDENTIAL**

"Nonconsensual Enrollment" or unintentional enrollment, the FTC relies on the results of surveys conducted by Amazon in the ordinary course of its business among customers who recently canceled their Prime membership[6] (the "[Amazon] Cancellation Survey"). For example, the FTC alleges:[7]

> […] In early 2019, for example, an Amazon survey showed ▇▇▇▇ of consumers stated their reason for cancelling Prime was that they never intended to enroll in the first place. And in September 2020, Amazon estimated that nearly ▇▇▇▇ Prime subscribers were "unaware" they had subscribed to Prime.

And:[8]

> Amazon knows that Nonconsensual Enrollment is widespread. In fact, Amazon periodically surveys consumers who cancel Prime to determine their reason. For example, from November 2018 to February 2019, ▇▇ of U.S. consumers Amazon surveyed gave "I did not mean to sign up for Amazon Prime" as their "[r]eason for cancellation."

19. I understand that the Amazon Cancellation Survey was an online survey, launched by a team at Amazon in the ordinary course of business in late 2018, with the goal of improving retention by tracking "directional inputs" (*i.e.*, general trends) over time and better understanding members' experiences and satisfaction with Prime.[9] Although multiple versions of the Amazon

---

[6] Unless otherwise indicated, I refer to Prime "memberships" and Prime "subscriptions" interchangeably. Because I understand that Amazon maintains the same static customer ID for a single customer (or household) over multiple Prime membership enrollments and cancellations, the raw data does not directly distinguish between separate memberships (or subscriptions) by the same customer. For purposes of my analyses conducted based on available Amazon data produced in this litigation, I calculated the timing of memberships based on a signup date, cancellation date, and last Prime benefit availability date (*i.e.*, last benefit or end of benefits date for that membership). I supplemented the "Period Plan" data table—a key data table which tracks changes in customers' Prime membership status over time (*e.g.*, whether and on what date a given membership becomes active, lapsed, terminated, etc.)—with membership-relevant variables from multiple other Amazon data tables (specifically, the sign_up_location, cancel_records, and auto_renew tables). I then coded customers' membership status into separate memberships based on these criteria, identified the start date, cancellation date, and last benefits date for each distinct membership, as well as other membership-level variables. See Exhibit F.3 for documentation.
[7] Amended Complaint, ¶ 3.
[8] *Id.*, ¶ 177.
[9] *See, e.g.*, AMZN_00037413; AMZN_00021537; AMZN_00001517; AMZN_00003654; "SV_2beUgzULi0i4ZA9_US+Prime+Cancellation+Survey+-+October+[ENDED]_February+5,+2024_16.32.csv."

Cancellation Survey were conducted since approximately September 2018,[10] the data was not collected on a regular basis until 2020,[11] and the version of the survey that has been operative since approximately April 2020 (the "2020 [Amazon] Cancellation Survey")[12] is the longest-running and most standardized (*i.e.*, largely unchanged) version used by Amazon in the U.S.[13]

20.     One of the answer choices presented to survey respondents, appearing in three separate questions, was "I did not intend to sign up for Prime."  I will refer to this answer choice using the abbreviation "DNI."  Specifically, Question 3 of the Cancellation Survey asked: "What was your **main** reason for canceling Prime?" (emphasis in the original); respondents could select one option out of the following answer choices: "The Prime membership fee was too expensive"; "I was not making enough purchases on Amazon for it to be worthwhile"; "I was not using the Prime benefits enough (e.g. Prime Video, Amazon Fresh, etc.)"; "I experienced a problem with Prime (e.g. delivery issue, customer service problem, etc.)"; "I did not intend to sign up for Prime"; and "Other (please specify)."  Question 4 asked: "Are there additional reasons why you canceled your Prime membership? What are the other reasons? (select all that apply)"; respondents could select all that apply out of the same list of answer choices they were presented in Q.3 (except for the option they selected in Q.3), in addition to "No, there were no other reasons."  Yet another question (Q.7), presented only to respondents who selected the "I experienced a problem with Prime [….]" option in Questions 3 or 4, asked: "What problem(s) did you experience with Prime? (select all that apply)"; one of the seven non-"Other" answer choices respondents could select was "I did not intend to sign up for Prime."

21.     The FTC also points to calls made to Amazon's customer service (or support) center as another channel through which consumers purportedly reported alleged unintentional

---

[10] *See* "SV_2beUgzULi0i4ZA9_US+Prime+Cancellation+Survey+-+October+[ENDED]_February+5,+2024_16.32.csv," indicating the earliest start date of September 17, 2018.
[11] *See, e.g.*, AMZN_00039590.
[12] *See, e.g.*, August 6, 2021 Amazon's CID Response ("August 6, 2021 Response"), Exhibit G; AMZN-PRM-FTC-002704613 – 72.
[13] *See, e.g.*, AMZN_00040674; AMZN_00001705; August 6, 2021 Response, p. 4.

> we have not collected a lot of data or insights on member-initiated cancellations. This makes it difficult to determine why customers are leaving and what we can do to improve the Prime program to retain more members.
>
> To get more insight on why people are leaving Prime, we started including a link to a cancellation survey on the Iliad cancellation flow and on the cancellation emails so that customers can provide candid feedback. The cancellation survey was re-launched in the US on May 15, 2019 with new questions and features, enabling us to tie the survey responses to customers. We received ▮ responses in the first 30 days of the survey. The top three cancellation reasons provided in this time period were: 'I did not by [sic] enough to make it worth it' ▮), 'The membership fee is too expensive' ▮ and 'I do not need Prime right now' ▮.
>
> By comparing customer and usage data to the cancellation survey responses, we hope to determine a customer's likelihood of cancelling in advance and why they are likely to cancel. With this knowledge, we intend to course-correct the customer through personalized engagement and risk reduction strategies.

An internal email thread in June of 2020 discussed the launch of the Cancellation Survey through a pop-up on Prime Central and characterized the survey as follows:[30]

> **Why is this launch important?**
> By launching the cancellation survey WW [worldwide], we can collect valuable insights and trends for each locale on why members have decided to cancel and what problems they experienced as a Prime member. We are also receiving anecdotes from customers via free-text response options that provide insight for specific trends or topics. Beyond the trends, survey responses are directly tied to customer IDs which gives us opportunities to proactively identify members by various cancel reasons and action against them. This is still Day 1, but as next steps we will look for opportunities to feed survey inputs into ML models and existing applications (i.e. Diego) to better understand at-risk member cohort, and build both proactive as well as reactive retention applications using this enhanced targeting.

In response to the launch email, an Amazon employee replied:[31]

> Well done Team. Excited to see how we will continue to scale data/insights to actions for a better CX [customer experience] for members.

26.     As these documents make clear, the Cancellation Survey was designed to provide general insights into why consumers might cancel Prime, to predict existing Prime members' likelihood of canceling, and to enhance or improve these members' experience. However, as discussed further in Subsection A.2.1, Amazon employees acknowledged that the limitations of the Cancellation Survey meant it could not be used to draw more detailed conclusions about customer

---

[30] AMZN_00001517, pp. 1 – 2.
[31] *Id.*, p. 1.

preferences and intentions.[32]  Importantly, Amazon's Cancellation Survey was *not* designed, nor can it be used, to accurately measure or quantify the number of unintended Prime sign-ups.

27. ***Survey Versions and Changes Over Time.***  I understand that Amazon used multiple different versions of the Cancellation Survey, beginning in September to October 2018,[33] and that the survey data was not collected on a regular basis until approximately mid-2020.[34]  Around that time, Amazon standardized the Cancellation Survey and, although there have been some changes, the version of the Cancellation Survey that launched in April 2020 (the "2020 Cancellation Survey") in the United States[35] has continued running and remained largely unchanged since that time.[36]  Between May 2020 and February 2024, approximately ▆▆▆▆▆▆ customers responded to the 2020 Cancellation Survey;[37] by contrast, across nine other cancellation surveys of which I am

---

[32] *See, e.g.*, AMZN_00034290 at 34291; AMZN_00040674 at 40677; AMZN 00003654 at 3662; AMZN_00021537 at 21539.

[33] *See, e.g.*, AMZN_00001517 (noting that "Prime cancellation survey initially launched in October 2018 in US, UK< CA, JP, DE, IT, ES, and MX […]" and discussing the launch of "Prime Cancellation Survey 2.0 via Prime Central"); *see also* "SV_2beUgzULi0i4ZA9  US+Prime+Cancellation+Survey+-+October+[ENDED]_February+5,+2024_16.32.csv" (indicating that data were first recorded in approximately mid-September 2018).

[34] *See, e.g.*, AMZN_00039590.

[35] I summarize the version of the survey documented in AMZN-PRM-FTC-002704613 – 72, which has the same question wording as the version of the survey outlined in Exhibit G to Amazon's August 6, 2021 Response to Follow-up Request 7.  Data for the 2020 Cancellation Survey has been collected since May of 2020; *see* "SV_0OInYvHGGzsKsBf US+Prime+Cancellation+Survey+2020_February+5,+2024_16.13.csv."

[36] *See, e.g.*, August 6, 2021 Response, p. 4 ("[…] Amazon standardized its cancellation survey across an expanded set of countries and re-launched the survey in 2020"); AMZN_00040674 at 40677 (email dated February 18, 2020 noting: "We are in the process of standardizing our surveys WW with flavor of locale questions or answer options"); AMZN_00087978, SP Master tab, Row 2180 ("Create a new cancellation survey and standardise the questions and responses WW. Launch the survey on PC (US and JP already exist)"); AMZN_00001705 at 1708 (internal memo dated February 27, 2020 listing a key action item as "**Standardizing and Scaling Cancellation Survey WW [worldwide] (Status: Not-Started)**" and noting, for example, "We are kick starting the work to drive parity for cancellation survey WW and through all channels (Prime Central and cancellation email) on 3/5. This will include 1) Standardizing the survey questions and answers WW; 2) Enabling the survey capability both on Prime Central and Cancellation emails; 3) Capturing Survey results on Prime Dashboards. **Action 1 (Open)**: We will achieve parity WW by early Q2 Ishan Agnihotri: 4-7-20" [emphases added]).  I understand that the Cancellation Survey has undergone various minor modifications from 2020 to the present (2024), with the most substantial change being the additional of two questions regarding consumers' intention to rejoin Prime (Q.9 and Q.10) beginning in November 2022.  *See* "SV_0OInYvHGGzsKsBfUS+Prime+Cancellation+Survey+2020_February+5,+2024_16.13.csv."

[37] *See* "SV_0OInYvHGGzsKsBfUS+Prime+Cancellation+Survey+2020_February+5,+2024_16.13.csv." Amazon produced a "mapping file"—that is, a file that matches hashed Amazon customer IDs to survey

aware, Amazon collected less than ▮▮▮ responses.[38] Accordingly, throughout this *Expert Report*, I will focus on the 2020 Cancellation Survey. However, having carefully reviewed all of the different versions and available data[39] of Amazon's Cancellation Survey, my professional opinions regarding the fundamental inability of the data from the 2020 Amazon Cancellation Survey to measure or quantify unintended enrollment also apply to the other versions of the Cancellation Survey.

28.  **_Sampling and Recruitment_.**  The Amazon Cancellation Survey was offered to some Prime members when they canceled their Prime membership. My understanding is that during the time periods when the survey was active, approximately ▮▮▮ of customers who canceled their

---

response IDs—containing mapping information for over ▮▮▮▮▮▮▮▮▮▮▮▮ out of the approximately ▮▮▮▮▮ responses recorded in the 2020 Cancellation Survey ▮▮▮▮▮▮. *See* Exhibit A to February 13, 2025 Amazon Letter, S3 Data Productions Log, AMZN-PRM-FTC-DATA-00000022.

[38] *See* "SV_0GkXmH9Y7IvEkTP US+Prime+Cancellation+Survey+V2_February+5,+2024_16.34.csv," "SV_1Lga0LSP2wOKq6F US+Prime+Cancellation+Survey+-+November+-++CS+Force+Cancels+[ENDED]_February+5,+2024_16.29.csv," "SV_2beUgzULi0i4ZA9 US+Prime+Cancellation+Survey+-+October+[ENDED]_February+5,+2024_16.32.csv," "SV_2rR9sLG9KVsmAtL - US+Prime+Cancellation+Survey+-++10years+_February+5,+2024_16.24.csv," "SV_3XcioufqyzeMQPb US+Prime+Cancellation+Survey+-+(0-11+months)_February+5,+2024_16.33.csv," "SV_5j8ERxbwvbdiaJ7 US+Prime+Cancellation+Survey+-+Student_February+5,+2024_16.27.csv," "SV_38eUyIrbnOniVJb US+Prime+Cancellation+Survey+-+5-9+years_February+5,+2024_16.28.csv," "SV_bPnxWJu8GXyKv5P US+Prime+Cancellation+Survey_February+5,+2024_16.26.csv," and "SV_eJvufvuQLbvqIHr US+Prime+Cancellation+Survey+-+(1-4+years)_February+5,+2024_16.31.csv."

[39] The raw data containing survey-takers' responses for each of these nine surveys (cited above) were produced in this litigation. I understand that unlike for the 2020 Cancellation Survey, no "mapping file" was available for these nine surveys, because the responses for these surveys: (*i*) "correspond to consumers whose data did not appear among the data for the roughly ▮▮▮▮▮ consumers for whom Amazon produced data" or (*ii*) "were recorded in the logs of Qualtrics, the host of the cancel survey, without any Amazon customer ID value," which was "generally the case for responses collected prior to 2020." *See* February 19, 2025 Defendant Amazon.com, Inc.'s Amended Written Objections and Responses to Plaintiff Federal Trade Commission's Notice of Rule 30(B)(6) Deposition of Amazon ("February 19, 2025 Amazon's Amended Objections and Responses"), Response to Topic 6.

> (*vi*)   failed to include *any* survey control against which to "net" survey error/"noise" (including due to guessing) or that can establish a relevant baseline (or minimum level) of irreducible consumer "confusion."

For the above reasons, and as further evinced by response patterns that cast serious doubt on the validity of selections of the "DNI" answer choice (*see* Section B), the results of the Cancellation Survey are completely uninformative, unscientific, and unreliable with respect to whether (and how many) customers in fact unintentionally signed up for Prime.

### A.2.   The Cancellation Survey is a Customer Satisfaction "Exit" Interview that Cannot be Used to Reliably Assess Consumers' State of Mind, Perceptions, or Intentions When They *Enrolled* in Prime

46.   To understand the purposes for which the Amazon Cancellation Survey can and cannot be used, it is important to clarify the goals and limitations of such a survey. As I explain, given the inherent nature and limitations of the Cancellation Survey,[72] it is impossible to derive scientifically valid or reliable conclusions regarding consumers' mindsets when they first *enrolled* in Prime from their responses to the Cancellation Survey.

#### A.2.1.   *The Amazon Cancellation Survey was Designed to Identify Trends in Customer Satisfaction at the Time of Cancellation*

47.   Because surveys conducted by a company in the ordinary course of business can serve different purposes and functions, the types of inferences and conclusions that can be drawn from a given survey depend heavily on the nature of that survey. The Amazon Cancellation Survey represents a basic type of survey commonly and routinely conducted by companies in the ordinary course of business: an internal customer satisfaction survey.[73] As Professors Kotler and Keller write in their seminal textbook, *Marketing Management*: "Many companies are

---

[72] As noted by the *Manual for Complex Litigation*, among other sources, key factors for assessing the validity of a survey in litigation include: that the population was properly chosen and defined; and that the data gathered were accurately reported; *Manual for Complex Litigation* (2004), p. 103.

[73] Kotler, Philip and Kevin L. Keller (2009), *Marketing Management*, 13th Ed., Upper Saddle River, NJ: Pearson Prentice Hall, pp. 125 – 127; Lehmann, Donald R., Sunil Gupta, Joel H. Steckel, and Sunil Gupta (1998), *Marketing Research*, Reading, MA: Addison-Wesley, p. 80 & 177 (*e.g.*, "Satisfaction measurement focuses on its three major determinants: expectations, performance, and the gap between expectations and performance" [citations omitted; p. 177]).

systematically measuring how well they treat their customers, identifying the factors shaping satisfaction, and making changes in their operations and marketing as a result."[74]  More specifically, the Amazon Cancellation survey is an "exit interview"[75] or "customer loss"[76] satisfaction survey, in which the company "contact[s] customers who have stopped buying or who have switched to another supplier to find out why."[77]  The Amazon Cancellation Survey includes multiple customer satisfaction questions (Q.1, Q.2, and Q.9), as well as other questions about specific factors relevant to customer satisfaction and dissatisfaction.  More recent versions of the 2020 Cancellation Survey also inquired about whether and when the customer had any intention to rejoin Prime.

48.  Customer satisfaction surveys are generally designed to track directional comparisons over time, rather than to quantify specific perceptions or behaviors.  As one textbook on customer satisfaction measurement specifies:[78]

> CSat [customer satisfaction] should be viewed primarily as a longitudinal assessment, to determine whether your product's ratings are changing over time.  A good practice is to begin such a project with an initial data collection period to determine the baseline level of satisfaction, and to adapt the data collection methods (survey, response scales, panel sources, etc.).
>
> Once the baseline period has passed, do not change the sample sources, rating questions, or rating scale.  Those should remain consistent over time to ensure comparability to past data.

And:[79]

> Always compare CSat to a baseline such as results from the same sample source in a previous time period.  Don't compare across disparate populations such as substantially different products, user groups, or countries.

---

[74] Kotler and Keller (2009), p. 125.
[75] Kon, Martin (2004), "Stop Customer Churn Before It Starts," *Harvard Management Update*, 9(7), 3 – 5; *see also* Kumar, V., Agata Leszkiewicz, and Angeliki Herbst (2018), "Are you Back for Good or Still Shopping Around? Investing Customers' Repeat Churn Behavior," *Journal of Marketing Research*, 55(2), 208 – 225.
[76] Kotler and Keller (2009), p. 126.
[77] *Ibid*.
[78] Chapman, Chris and Kerry Rodden (2023), "Customer Satisfaction Surveys," in *Quantitative User Experience Research: Informing Product Decisions by Understanding Users at Scale*, Berkeley, CA: Apress, p. 139.
[79] *Id.*, p. 158.

49. According to internal Amazon documents, Amazon employees recognized and informed executives about the limitations of the Cancellation Survey, including what the survey could or could not be used for. For example, on February 18, 2020, Ishan Agnihotri, who at the time was the Product Manager on Renewals and the "owner" of the Cancellation Survey,[80] explained in an email that the results should be interpreted as *directional* instead of being taken "at face value":[81]

> Also, my suggestion is that **survey data may not be taken at face value due to biases in response** due to 1) Options given; 2) Member Frustration at time of cancellation (may lead to inaccurate answers) and other factors that influence survey responses. I recommend to use them as **directional inputs to be tracked monthly to monitor improvements** once standardized.

Similarly, an internal Amazon memo that discussed the Prime membership strategy for 2021 specified that the Cancellation Survey was used for directional analysis to generate hypotheses that would be tested subsequently (*i.e.*, as opposed to being used to establish facts or quantitative estimates, or to test the hypotheses themselves):[82]

> The customer feedback gathered from the survey allowed for reactive and **ad-hoc analysis of various trends to inform hypotheses** and experiments since the launch.

And:[83]

> In addition, as COVID-19 situation arose starting March, we were able to use the survey results and free-text **to identify trends with the cancellation motivation** driven by the pandemic and how it was leading to customers' decision to cancel their membership **anecdotally**.

50. Deposition testimony from Benjamin Hills, Amazon's general manager for Prime retention and business intelligence services between January 2018 and January 2021, also stressed that the Cancellation Survey data was used "mostly for signals of like ideas and then for

---

[80] AMZN_00040674 at 40677.
[81] *Ibid*. [emphases added].
[82] AMZN_00003654 at 3662 [emphasis added].
[83] *Ibid*. [emphases added]

propensity targeting,"[84] to "look for opportunities to improve,"[85] and "as an input to think about how we could build experiences."[86] With respect to some Amazon employees' efforts to construct a so-called "clarity score,"[87] Mr. Hills testified that "there is no way to appropriately measure"[88] clarity (itself a concept for which "there was never a fully aligned upon definition")[89] and that such efforts were meant to give "directional inputs and ideas on how to make the experience better."[90]

---

[84] Hills Deposition, p. 53 (noting also that the survey data was not used "as a KPI or a means by which to say for financial forecasting or planning"). *See also id.*, p. 55 ("The attempt was to use the survey data to create propensity scores with as much precision as useful in order to target a solution."). Mr. Hills testified that "the cancel survey data itself never bore fruit in terms of the targeting"; *id.*, p. 42.
[85] *Id.*, p. 70.
[86] *Id.*, p. 181 ("So we used it as an input to think about how we could build experiences. So, for example, building the benefit engagement widgets correlation to customers saying I'm not using my benefits enough, building of the account reminders, so you can say those that don't remember when their billing dates are or whatever else, so they can create a reminder of when they're billed, creating the different price plan widgets. It's too expensive. So we used all that data to say, okay, what should we actually build. That's the welcome we build. Then we started down the path. We didn't conclude or I don't know how much further around propensity scoring for targeting to set solutions.").
[87] *See, e.g.*, AMZN_00022477 – 9 (Hills Deposition, Exhibit BH-11).
[88] *Id.*, p. 89 ("Q. […] What were you – what did you mean by there's no way to appropriately measure? A. It's very much what we just talked about. Q. Okay. No way to – A. Measure clarity, yes, and there's two parts. There's the clarity wasn't defined and then even if you did define it – if you did define it, maybe there would be and then there's certainly no way to measure it.") (citing to AMZN_00022477). *See also id.*, pp. 88 ("Problem two, there's no way to actually measure what [clarity] is, what you actually have to determine what that is to begin with.") & 191 ("THE WITNESS: There's no way to measure intent. That's been the problem the entire time.").
[89] *Id.*, p. 88 ("The biggest problem with this entire project was, and this is the pursuit of clarity in itself, the term was never – there was never a fully aligned upon definition of that.").
[90] *Id.*, p. 183 ("There wasn't a way [to have a number that's very useful to be representative of the base] which is why they kept having a problem. How do you measure clarity and everything else? That should just give you directional inputs and ideas on how to make the experience better. You can do that. How that impacts the whole, you don't know."). *See also id.*, pp. 186 ("Q. Just to summarize, your effort to quantify the number of customers who self-reported unintentional sign up for Prime first sought to identify the magnitude of that customer issue and second sought to create a benchmark for directional results when your team undertook content testing, correct? A. You got it, yes.") & 92 ("Q. So I take it from your statement you never – Prime organization never developed the clarity score or finished work on the clarity score? […] THE WITNESS: I don't know where they landed. A little bit goes back to the definition was never really true and then the way to capture that was also – there was no way to capture that.").

51. An internal Amazon report summarizing results from the Cancellation Survey conducted between November 2019 and February 2020 discussed the potential for biases in measurement while emphasizing that the goal was to focus on changes over time:[91]

> As with any optional survey, we face **selection bias** in that only customers that have pre-maturely cancelled their Prime memberships are shown the survey. Customers may also exhibit **availability bias**, where more recent experiences influence the feedback they provide and **responses may not match actual behavior**. We have included a NPS question in the new survey to measure customers' overall satisfaction with Amazon as a whole at the time of cancelling their membership as well as with Prime. Our goal will be for this **measure to increase over time**, hopefully indicating a higher propensity to rejoin Prime in the future.

52. Another internal communication thread regarding efforts to test the effect of different checkout flows noted that any statements regarding unintentional signup rates were subject to multiple assumptions, as "the currently available data will not allow us to make a 100% accurate determination at the time of cancellation of whether a specific customer signed up unintentionally, and particularly not at scale."[92]

53. Further, a July 2019 internal Amazon report cautioned against assuming a single interpretation of the "I did not mean to sign up for Prime" response option used in the Cancellation Survey, instead suggesting multiple explanations or understandings for such an answer:[93]

> ■ of customers responded that their primary reason for cancelling was that they never intended to sign up for Prime. However, we are not sure how this mistaken signup occurred, or if the customer meant they never intended to pay for Prime (rather than sign up). In some instances, customers may have been confused by the language or experience when signing up (e.g., order agnostic SPC). Some people may have turned AC/AR off, and unintentionally turned AR [auto-renew] back on through risk messaging. Kids may have signed up through Alexa or FireTV without telling their parents.

---

[91] AMZN_00034290 at 34291 [emphases added]. *See also* AMZN_00106463 at 6466 (noting a goal of identifying "key customer pain points across different stages of customer lifecycle" and "aiming to eventually predict how changes in members' perception could impact membership growth").

[92] AMZN_00136625 at 136635 ("I'm afraid we will need to operate with assumptions (e.g. constant measurement error, constant ratio of CS contacts to unintentional signups) if we want to make any statement as I think the currently available data will not allow us to make a 100% accurate determination at the time of cancellation of whether a specific customer signed up unintentionally, and particularly not at scale.").

[93] AMZN_00021537 at 21539.

At his deposition, Mr. Hills likewise acknowledged that the preselected reasons in the Cancellation Survey did not necessarily map onto respondents' actual reasons for cancellation.[94] Based on his observations and review of customer service calls, survey information (including free text verbatim responses), and customer behavior data,[95] Mr. Hills further testified that the "mistaken sign up" (or "DNI") option was susceptible to multiple interpretations and likely reflected a range of different customer experiences unrelated to true unintentional enrollment, such as a customer's child signing them up, only intending to sign up for a free trial, or concerns with fraud.[96]

---

[94] Hills Deposition, pp. 24 – 25 ("Q. Did – do you have any reason to believe that Prime members' self-reported cancel reason doesn't map back to their actual cancel reason? A. Yes, absolutely. Q. And what reason is that or what reasons do you have for that belief? A. Two primary, but there's a long tail of others. Q. Sure. A. One primary is when observing the free type and then looking at what they actually selected, sometimes they don't map and part of that reason is the preselection didn't cover their reason which means that the preselected probably needed to be better worded or identified.") & 27 – 28 ("Both were signals that the higher – the overarching reason may not actually represent in specifics the reasons why the customers were calling to cancel or why they were online to cancel").

[95] *Id.*, pp. 179 – 180.

[96] *Id.*, pp. 25 ("An example, the mistaken sign up which was one that's obviously covered in a lot of this. There's a pretty big long tail of how to interpret that. So one is the wanted it for the free trial and forgot to call in and cancel. There's the my kid signed me up on Prime video to watch something and I did or did not give them permission which are two different forks in the road as well. I'm not aware that I was signed up. Hence the fraud piece. So there's a lot of like nuance to those. So although you get the coded [*sic*] in the high level cancel self-selected cancel reason, there's a long tail of other stuff needed to be mapped back to which made it harder, more difficult to scale."), 179 ("There's the customer, what they actually say in the free type and through that, there are examples of kids signed me up. I knew I signed up, but I need to cancel it for now. […] Listening to the calls, the biggest concern was, you know, a really sizable percentage of cancels that didn't want to cancel, but beyond that, when you get into the actual anecdotes themselves, then you get into the, oh, wow, there's – they had their credit card compromised. There's a lot of like that going on. So that's why you kind of dig into the details. And then outside of the observable stuff, signals that you don't know what a person is thinking, but after the call when they sign up, so I called. I canceled mistaken and then sign up and start using again like within whatever period after and then the continuous engagement. So there's a lot of like mixed signals happening there. You can't necessarily conclude there's like a one size fits all thing happening."), & 180 ("Q. Based on your review of that information, what types of customer experiences did you identify as associated with customers self-reporting unintentional or mistaken sign up on the cancel survey? […] A. It pretty much ran the entire gamut of self-reporting cancellations. […] I meant to only use the free trial or I wanted to cancel during this period. My children – I told my children they could sign up or my children signed me up and I didn't tell them they could sign me up. There was the fraud related or stuff that were absolutely unrelated altogether. It's the I hate Bezos or just like a whole bunch of random political [*sic*]. It's just all over the place.").

54. Some Amazon employees—perhaps unaware of or disregarding the invalidity of relying on the Cancellation Survey results at face value—nevertheless used the Cancellation Survey results (alone or with other data) to attempt to extrapolate and quantify the number of unintended signups.[97] However, the fact that *some* Amazon employees attempted to draw conclusions from the rate of "mistaken signup" responses in the survey does not justify taking the survey results at face value nor scientifically validate extrapolating the survey's results (*e.g.*, to all Prime members).[98] To the contrary, as demonstrated below, numerous flaws and limitations inherent to the Cancellation Survey's design mean that the survey's results *cannot* be taken at face value; such flaws also preclude any conclusions or generalization about the true rate or absolute number of any alleged unintentional enrollment.

55. Overall, Amazon's internal discussions of its Cancellation Survey and the content of the survey itself make clear that the survey functioned as a customer satisfaction "exit"

---

[97] *See, e.g.*, AMZN_00014152; AMZN_00029142; AMZN_00091284; AMZN_00091287; *see also* Hills Deposition, p. 47. Note that even these attempts at extrapolation discuss the difficulty in knowing whether any extrapolated number is correct or even plausible; *see, e.g.*, AMZN_00029142 (raising questions such as "Would customers remember the reason? Could there be any incentive for customers to choose mistaken sign up as a reason in the survey?"); AMZN_00091287 at 91290 ("We acknowledge that there could be self-selection bias with respect to clarity signals").

[98] Indeed, this point was recognized by Mr. Hills, Amazon's former general manager of Prime retention, who testified that another employee's conclusions regarding the percentage of member-initiated cancellations purportedly due to unintentional enrollment were not justified by the data. *See* Hills Deposition, pp. 47 – 49 ("Q. And in the second sentence after increasing membership clarity reads we know through survey data that ▮ percent of member initiated cancellations occur because members do not know they were signed up for Prime. CX contact data supports this finding. Did I read that correctly? […] THE WITNESS: So the – this is a bit broad. So Cami would make pretty assertive statements that weren't grounded in data. So that was part of her feedback during her time there as well. […] It was general. For example, where it says this statement, we know through customer survey that ▮ percent of member initiated cancels occurred because members do not know. That's simply just not true. I would ask her in one-on-one settings and others how she came to that conclusion before we assumed that it wasn't true and she couldn't explain it. So she recognized that that was probably stated incorrectly. I can't speak for her, but this is just in our conversations."). *See also id.*, pp. 111 – 112 ("Q. […] Then you attribute ▮ percent of these potential ▮▮▮▮ mistaken sign ups to the UPDP enrollment page; is that correct? A. Correct. And, again, these are all just taking the observable metrics. We know how many sign ups are UPDP. We know how many cancels or what distribution of sign ups were from check out, et cetera, et cetera. What we don't actually know and didn't do the CID level tracking plus not everyone answers the survey of how many actually coded it if we were to directly map that stuff. So there's crazy mixed shifts across the board that are going to occur there. That's why it's a little bit dangerous to infer any like absolute direction from any of this stuff.").

survey, *not* as a scientific or empirical measurement of consumers' state of mind, intentions, or perceptions at the time of enrollment.  While the Cancellation Survey could impart business insights into general trends over time (*e.g.*, customer pain points and brand attitudes regarding Amazon and Prime), it would be inappropriate to use results from such a survey to attempt to quantify the rate of unintentional enrollment or test whether a given Prime membership was the result of alleged unintentional enrollment.

### A.2.2. *The Cancellation Survey is Not Informative About Consumers' <u>Enrollment</u> Decisions and Perceptions Due to the Limitations of Human Memory*

56.    To the extent that the FTC or certain Amazon employees seek (or may have sought) to estimate a rate of unintentional enrollment based on data from the Cancellation Survey, such an extrapolation would *not* be scientifically valid or reliable, because the underlying survey instrument is not scientifically valid or reliable for these purposes.  Consistent with its name, Amazon's Cancellation Survey (including the 2020 Cancellation Survey) was designed to test issues regarding customers' satisfaction and dissatisfaction with Prime ***at the time of cancellation***, *not* their mindsets *at the time of enrollment*—the latter of which would have generally occurred weeks or months earlier (if not longer).   In particular, the Cancellation Survey cannot be used to test whether a Prime member had been aware that they were signing up for Prime when they enrolled.  That could instead be addressed by a well-designed *consumer perception* survey, which is frequently and widely used in litigation to test for (likelihood of)