UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC; NEIL LINDSAY, individually and as an officer of Amazon.com, Inc.; RUSSELL GRANDINETTI, individually and as an officer of Amazon.com, Inc.; JAMIL GHANI, individually and as an officer of Amazon.com, Inc.,<br><br>Defendants. | CASE NO. 2:23-cv-00932-JHC<br><br>ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD D. WILCOX, PH.D. |

# I
## INTRODUCTION

This matter comes before the Court on Plaintiff FTC's Rule 702 Motion to Exclude Expert Testimony of Ronald, T. Wilcox, Ph.D. Dkt. # 309. The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary. Being fully advised, for the reasons below, the Court DENIES the motion.

ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD D. WILCOX, PH.D. - 1

## II

### BACKGROUND

The FTC sued Amazon.com, Inc. and three of the company's executives, Neil Lindsay, Russell Grandinetti, and Jamil Ghani, alleging that they violated Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403. Dkt. # 67 at 1–2 ¶ 1. The FTC contends that Amazon tricked, coerced, and manipulated consumers into subscribing to Amazon Prime. *Id*. at 2 ¶ 2. According to the FTC, this was accomplished by failing to disclose the material terms of the subscription clearly and conspicuously and by failing to obtain the consumers' informed consent before enrolling them. *Id*. The FTC also alleges that Amazon did not provide simple mechanisms for subscribers to cancel their Prime memberships. *Id*. at 3 ¶ 7.

Ronald T. Wilcox, Ph.D., is a Professor of Business Administration at the University of Virginia's Darden Graduate School of Business Administration. Dkt. # 320-24 at 4 ¶ 1. He conducts research and teaches classes on marketing. *Id.* His areas of expertise within marketing are branding, consumer behavior, surveys, statistical modeling of consumer choice, and the public policy implications of marketing. *Id.* Amazon requested that Wilcox conduct two surveys: (1) "A survey to assess the extent to which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com as described in the Amended Complaint" (Cancellation Survey); and (2) "A survey to assess the experiences of US consumers with free trials of memberships or subscriptions that automatically turn into paid memberships or subscriptions unless cancelled" (Free Trial Survey). *Id.* at 8 ¶ 11. While conducting these

surveys, he relied on his training, experience, and expertise in marketing and consumer behavior. *Id.* He also considered other resources, including academic literature and case materials. *Id.*[1]

Wilcox reports that the Cancellation Survey, designed to assess which Prime members can locate and complete the desktop version of the Cancellation Flow on Amazon.com, shows 99.8% of respondents (529 of 530) located the Cancellation Flow and 96.4% of respondents (511 of 530) paused or ended their Prime membership. *Id.* at 9 ¶ 15. The respondents that were able to pause or end their Prime Membership took an overall average time of 74 seconds to identify the Cancellation Flow and to pause or end their Prime Membership. *Id.* According to Wilcox, these "results are inconsistent with the FTC's allegation that the online cancellation process inhibited or prevented Prime members who intended to cancel from being able to do so." *Id.*

The Free Trial Survey, designed to assess the extent of U.S. consumers' experience with free trial memberships or subscriptions, particularly those that automatically turn into paid memberships or subscriptions, found 92.5% of respondents currently pay for at least one of the memberships or subscriptions on the list provided to respondents. *Id.* at 9 ¶ 16. It also found 58.0% of respondents reported signing up for one or more free trial memberships or subscriptions in the last 12 months. *Id.* Among respondents who reported signing up for a free trial membership or subscription, 85.0% said the most recent free trial they signed up for either automatically turned into a paid membership or subscription, or would have turned into a paid membership or subscription if they did not cancel before the end of the trial period. *Id.* at 9–10 ¶ 16.

---

[1] Amazon also submitted a "Declaration of Dr. Ronald Wilcox in support of Amazon's Opposition to FTC's Motion to Exclude his Expert Testimony," Dkt. # 353, but the Court does not consider this declaration because it was untimely. *See* Dkt. # 198.

The FTC moves to exclude these survey results. Dkt. # 309. It asserts that the results of the first survey should be excluded for two reasons: (1) Wilcox recruited and sampled only the most technology-savvy, attentive survey takers; and (2) he failed to ensure the respondents were representative of U.S. Amazon Prime members seeking to cancel their memberships. *Id.* at 12–15. The FTC likewise moves to exclude the results of the second survey because it says nothing about respondents' understanding of Prime memberships. *Id.* at 15–17.

## III
### DISCUSSION

A.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2]

Courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)). They have

---

[2] Rule 702 was amended in 2023. *See* Notes of Advisory Committee on 2023 Amendments to Rule 702. The Advisory Committee Notes to the 2023 amendment state that the changes were intended to "clarify and emphasize" the plain language of Rule 702. *Id.* And "[n]othing in the amendment imposes any new, specific procedures." *Id.* Thus, cases interpreting Rule 702 that predate the 2023 amendment still apply. *See Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

"broad discretion" in making such evidentiary rulings. *Id.* (citing *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S. 579, 589 (1993) (citing Fed. R. Evid. 702(a)). "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995)). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Courts apply four factors in determining whether expert testimony is reliable. These include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94). But this list of factors is neither exhaustive nor intended to be applied in every case. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted). And "[w]hile evidence that suffer[s] from serious methodological flaws . . . can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage."

ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD D. WILCOX, PH.D. - 5

*Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (internal quotations and citations omitted) (second alteration in original).

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also Qualey v. Pierce Cnty.*, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025). And courts liberally construe Rule 702 in favor of admissibility. *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, 2021 WL 5200171 (W.D. Wash. Nov. 9, 2021).

B.    Wilcox's Surveys

The admissibility of a survey is a "a threshold question that must be resolved by a judge." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087 (9th Cir. 2005) (citing *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)). A survey "should be admitted as long as it is conducted according to accepted principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010) (internal citation and quotation omitted). Once a survey is admitted, "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Clicks Billiards*, 251 F.3d at 1263. As a result, "courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or underinclusive target population." *Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) (collecting cases).

Despite this high bar to exclude survey evidence, the FTC contends that Wilcox should not be allowed to testify about these surveys because they are methodologically flawed and irrelevant. *See* Dkt. # 309 at 12–17. The Court addresses these arguments below.

//

1.      Cancellation Survey

The FTC says that testimony about the Cancellation Survey must be excluded because nothing indicates the respondents were representative of U.S. Prime members. Dkt. # 309 at 12. In particular, it argues that Wilcox selected only the most tech-savvy, attentive respondents to take this survey, and that he ignores this bias. *Id.* at 12–13. And the survey must also be excluded, according to the FTC, because Wilcox did not verify that the respondents appropriately represented key demographics. *Id.* at 14.

Defendants respond that the FTC's criticisms go to weight, not admissibility. Dkt. # 352 at 2–5. Defendants also contend that the agency is attempting to reframe the argument that Wilcox used an unrepresentative sample into an argument that he did not rely on generally accepted survey principles. *Id.* But, according to Defendant, these challenges are distinct and there is no caselaw to support the FTC's position. *Id.*

The Court agrees that testimony about the Cancellation Survey is admissible. In designing and conducting this survey, Wilcox followed "generally accepted guidelines, including those set out in commonly referenced sources, such as the *Reference Guide on Survey Research*, and based on [his] own experience and expertise designing and conducting numerous surveys." Dkt. # 320-34 at 10 ¶ 17. Because Wilcox used techniques with general acceptance in the market research community, this shows the survey is sufficiently reliable. The Cancellation Survey was also intended to test whether respondents were able locate the Cancellation Flow and pause or end a Prime membership. *Id.* at 9 ¶ 15. This is pertinent to the allegation that Amazon "knowingly complicated the cancellation process for Prime subscribers who sought to end their membership" and "fail[s] to provide simple mechanisms for a consumer to stop recurring charges" for Prime membership. Dkt. # 67 at 3, 90. Thus, the survey is relevant.

ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD D. WILCOX, PH.D. - 7

        The FTC's contrary arguments do not dictate a different conclusion.  First, it says the sample group was skewed towards tech-savvy participants.  *See* Dkt. # 388 at 4.  But this is a critique of the survey's design and methodology, which goes to weight—not admissibility.  *Clicks Billiards*, 251 F.3d at 1263.  Similarly, the FTC' second argument against Wilcox's use of attention checks goes to weight because technical unreliability—for example, issues with the format of the questions or how the survey was conducted—goes to the weight afforded a survey, not admissibility.  *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982) (citing *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1055 n.10 (5th Cir. 1981)); *see* Dkt. # 388 at 5.  The FTC's third point, that it is problematic to have a greater percentage of people who have used the Cancellation Flow among the survey respondents than exists in the general population of Prime members, also goes to weight.  Dkt. # 388 at 6.  As does its fourth argument, that Wilcox did not consider relevant socio-demographic information.  *Id.* at 6–7.  These third and fourth arguments both go to weight because "[t]he selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility."  *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, 2023 WL 137478, at *3 (N.D. Cal. Jan. 9, 2023) (quoting 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:162 (5th ed. 2018)).  And even if, as the FTC claims, these issues "impact[] the reliability and generalizability of the survey results," that still means they only go to weight.  Dkt. # 388 at 6; *Clicks Billiards*, 251 F.3d at 1263.

        While the FTC identifies a number of purported defects with the Cancellation Survey, precluding Wilcox from testifying about this survey is unwarranted.  *See* Dkt. # 309 at 17.  This evidence "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano*, 598 F.3d at 564.

//

### 2. Free Trial Survey

The FTC next claims the Free Trial survey must be excluded because it is irrelevant. Dkt. # 309 at 15–17. It objects to this survey on the grounds that it says nothing about Prime membership, and whatever respondents think about a free trial of a gym membership, streaming service subscription, or other subscription service other than Prime has no bearing on this litigation. *Id.* at 16. In addition, this survey must be excluded, according to the FTC, because Wilcox does not provide any evidence to connect the results of the Free Trial Survey to consumers' understanding of Prime's enrollment process. *Id.*

Defendants respond that Wilcox's testimony about this survey is relevant for three reasons. First, the survey concerns the FTC's allegation that consumers are unaware of Prime's auto-renewal features. Dkt. # 352 at 10. It is likewise related to Dr. Chetty's claim that some Prime features could cause a user to "not understand that the free trial will auto-renew and that they will be charged periodically once their trial period ends, until they cancel the subscription." *Id.* (quoting Dkt. # 327 at 456–57 ¶ 55(iv)). Second, the FTC has repeatedly argued that the context of disclosures matters, and this survey provides context about consumers' understanding of subscriptions, free trials, and auto-renew features. *Id.* at 11. Third, Defendants' marketing and online consumer behavior expert, Dr. Donna Hoffman, connects the Free Trials survey to her opinions that many consumers are familiar with free trials and that consumers' familiarity with free trials suggests they are familiar with free trial enrollment and cancellation. *Id.*

At a minimum, this survey engages with the FTC's argument that context matters when evaluating the conspicuousness of online disclosures. *See* Dkt. # 314 at 55. In particular, the Free Trial Survey is related to the FTC's argument that Amazon's strategies "made it unlikely many ordinary consumers would even look for Prime's material terms, much less notice that Amazon was enrolling them in a Prime free trial or that the Prime free trial automatically

renewed as a paying subscription." *Id.* at 56.  This is because Wilcox's survey purports to show that consumers are generally aware of paid subscriptions' auto-renewal features.  *See* Dkt. # 352 at 10–11.  Thus, the Free Trial Survey is relevant and admissible because it may aid the trier of fact in determining a fact in issue.  Fed. R. Evid. 702(a).

## IV
### Conclusion

For the reasons above, the Court DENIES the motion.  Dkt. # 309.

Dated this 6th day of August, 2025.

John H. Chun
United States District Judge

ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD D. WILCOX, PH.D. - 10