UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC; NEIL LINDSAY, individually and as an officer of Amazon.com, Inc.; RUSSELL GRANDINETTI, individually and as an officer of Amazon.com, Inc.; JAMIL GHANI, individually and as an officer of Amazon.com, Inc.,<br><br>Defendants. | CASE NO. 2:23-cv-00932-JHC<br><br>SEALED ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE DR. MARSHINI CHETTY'S TESTIMONY |

# I
## INTRODUCTION

This matter comes before the Court on Defendants' Rule 702 Motion to Exclude Dr. Marshini Chetty's Testimony. Dkt. # 322. The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary. Being fully advised, for the reasons below, the Court DENIES the motion.

## II

### BACKGROUND

The FTC sued Amazon.com, Inc. and three of the company's executives, Neil Lindsay, Russell Grandinetti, and Jamil Ghani, claiming that they violated Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403. Dkt. # 67 at 1–2 ¶ 1. The FTC alleges that Amazon tricked, coerced, and manipulated consumers into subscribing to Amazon Prime by failing to disclose the material terms of the subscription clearly and conspicuously and by failing to obtain the consumers' informed consent before enrolling them. *Id*. at 2 ¶ 2. It also alleges that Amazon did not provide simple mechanisms for subscribers to cancel their Prime memberships. *Id*. at 3 ¶ 7.

Dr. Marshini Chetty, Ph.D. is an Associate Professor in the University of Chicago's Department of Computer Science. Dkt. # 360-24 at 2. She has 20 years of experience in human-computer interaction (HCI), and her research focuses on the usability of web interfaces and the presence of manipulative designs (also known as "dark patterns"). *Id.* The FTC requested that Dr. Chetty provide an expert opinion on (1) whether the design of how Amazon enrolls consumers in Prime during online checkout confuses consumers; (2) whether the design of how Amazon enrolls consumers in Prime during online checkout conveys information on Prime's material terms (cost, end of free trial period, and renewal terms) that consumers can comprehend; and (3) whether the design of the Prime Iliad and Iliad 2.0 cancellation processes confuses consumers. *Id.*

In forming her opinion, Dr. Chetty conducted two studies. First, she conducted a "cognitive walkthrough." *Id.* This is an inspection mechanism that evaluates the design "within the checkout process and cancellation interfaces from the viewpoint of a consumer by studying

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 2

the design of each interface using foundational principles of good design in HCI." *Id.* Second, Dr. Chetty conducted a "think-aloud" study. *Id.* This is "an empirical, qualitative user study to understand consumers' experience navigating Prime enrollment within the checkout process and Prime cancellation." *Id.* Dr. Chetty concludes that "the designs of Prime enrollment within the checkout process are confusing to some consumers, who, as a result of dark patterns, unintentionally select an option to enroll in Prime when purchasing a product online." *Id.* She also says that "the designs of Prime cancellation are confusing to some consumers, who do not successfully cancel online as a result of dark patterns." *Id.*

Defendants move to exclude Dr. Chetty's expert testimony. Dkt. # 322. They assert that her "cognitive walkthrough" is neither relevant nor reliable. *Id.* at 5–9. They also contend that her "think-aloud" study is flawed and inadmissible. *Id.* at 9–14.

## III
### DISCUSSION

A.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 3

Courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)). They have "broad discretion" in making such evidentiary rulings. *Id.* (citing *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S. 579, 589 (1993) (citing Fed. R. Evid. 702(a)). "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995)). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Courts apply four factors in determining whether expert testimony is reliable. These include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94). But this list of factors is neither exhaustive nor intended to be applied in every case. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted). And "[w]hile

evidence that suffer[s] from serious methodological flaws . . . can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (internal quotations and citations omitted) (second alteration in original).

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also Qualey v. Pierce Cnty.*, No. 3:23-CV-05679-TMC, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025). And courts liberally construe Rule 702 in favor of admissibility. *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021 WL 5200171 (W.D. Wash. Nov. 9, 2021).

B.  Dr. Chetty's Cognitive Walkthrough

Defendants assert that Dr. Chetty's cognitive walkthrough opinions are unhelpful. *See* Dkt. # 322 at 5–9. They also say that her opinions are unreliable because they are not premised on any scientific methodology. *Id.*

1.  Helpfulness of Dr. Chetty's Opinions

"Whether testimony is helpful within the meaning of Rule 702 is in essence a relevance inquiry." *Tekoh v. Cnty. of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023). The court's duty as a gatekeeper is to "ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). And Rule 702's requirement that the proffered testimony assist the trier of fact "goes primarily to relevance" because if it "does not relate to any issue in the case, it is not relevant and, ergo, non-helpful." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 542 (S.D.N.Y. 2024) (quoting *Daubert I*, 509 U.S. at 591) (cleaned up).

Defendants assert that Dr. Chetty's opinions are not helpful because her cognitive walkthrough "amounts to nothing more" than her personal observations. Dkt. # 322 at 6. They say that her opinions supplant the jury's role as factfinder. *Id.*

The FTC responds that Dr. Chetty's cognitive walkthrough opinions are relevant because "they help the factfinder determine the question at issue—consumer understanding of Prime enrollment and cancellation." Dkt. # 355 at 7. The agency says that a layperson cannot "conduct a cognitive walkthrough to identify manipulative designs." *Id.* It explains that a layperson "cannot properly apply principles from HCI to evaluate whether an interface can cause users to perform acts that do not align with their intentions." *Id.* The FTC underscores that a cognitive walkthrough is a well-accepted methodology in the HCI field and commonly used to identify interface design issues. *Id.* at 7.

Dr. Chetty describes a "cognitive walkthrough" as an "inspection method" "usually used to evaluate how easy (or not) it is for a user to use a system by simulating a user's problem solving process at each point in a set of interaction flows with the system." Dkt. # 360-24 at 26 ¶ 63. And a cognitive walkthrough "can indicate how easy it is for a user to learn how to use a system, and it can also uncover general usability issues." *Id.* Contrary to Defendants' characterization of Dr. Chetty's opinions as "nothing more" than personal observations, she relies on, among other things, her 20 years of experience in HCI, peer-reviewed literature, and a well-known and accepted methodology. *See id.* at 2. She uses "foundational HCI design principles and the Gray Dark Pattern Ontology" in forming her opinions about the Prime sign up and cancellation flows. *Id.* at 30 ¶ 86. Dr. Chetty says that the Gray Dark Pattern Ontology is a way of classifying "manipulative designs in the interfaces of websites, apps, social media, voice user interfaces and other platforms to help identify common tactics that service providers use to manipulate users." *Id.* at 19 ¶ 49. She describes the Gray Dark Pattern Ontology "as the most

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 6

comprehensive" and one of the most "frequently used" ontologies in HCI. *Id.* at 19 ¶ 50. Based on this ontology, Dr. Chetty offers her opinions on the "strategies" and "manipulative designs" she observed during her cognitive walkthrough of the Prime enrollment and cancellation flows. *Id.* at 20–23 ¶ 49.

In sum, because interface design and usability problems are beyond the common knowledge of laypersons, Dr. Chetty's walkthrough opinions could help jurors better understand the design elements of the Prime signup and cancellation flows. Her opinions would also provide jurors with helpful information about foundational principles of interface design. *Tekoh*, 75 F.4th at 1265 ("Our case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge."); *see also Nat'l Ass'n for Advancement of Colored People, Inc. v. City of Myrtle Beach*, 504 F. Supp. 3d 513, 518 (D.S.C. 2020) ("Expert testimony concerning matters beyond the comprehension of laypersons will almost always assist the trier of fact. . .") (internal quotation omitted).

        2.        Reliability of Dr. Chetty's Cognitive Walkthrough

Defendants contend that Dr. Chetty's cognitive walkthrough is "methodologically deficient." Dkt. # 322 at 6. They say that her cognitive walkthrough is simply "subjective judgment unmoored from data, testing, or replicable standards." *Id.* at 7. They also contend that her methodology largely consists "of adopting pejorative names" and "subjectively assigning those pejoratives to Amazon." *Id.* Defendants also assert that Dr. Chetty's "subjective opinions" merely mirror the FTC's allegations. *Id.* at 9.

The FTC responds that a cognitive walkthrough is a well-accepted methodology in HCI and other fields. Dkt. # 355 at 8 (citation omitted). The agency says that Dr. Chetty performed the walkthrough to determine whether Amazon's interface had "design elements likely to result

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 7

in consumers making selections that do not reflect their intentions." *Id.* It also says that Dr. Chetty uses Gray's Ontology to orient her opinions. The agency notes that Dr. Chetty did not create "pejorative names" that she then assigned to Amazon. *Id.* The FTC underscores that its expert identified within Prime's signup and cancellation flows "manipulative designs that other HCI experts have described and organized." *Id.*

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano*, 598 F.3d at 565 (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). And assessing an expert's reliability is a "fact-specific inquiry" that depends on "the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony." *Hankey*, 203 F.3d at 1168; *see also Kumho Tire*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon personal knowledge or experience" of the expert).

Defendants say that Dr. Chetty said during her deposition that "other experts could reach different conclusions using the same methods." Dkt. # 322 at 7 (citations omitted). They say that her testimony supports their argument that her expert opinions are "little more than a stylized articulation of personal preferences." *Id.* But during her deposition, Dr. Chetty stated that it was "highly unlikely, but possible" that an another HCI expert could reach "different conclusions" "about any particular design element." Dkt. # 360-26 at 6. She also testified that it is "highly likely" that other HCI experts "would arrive at similar conclusions, but quite possible they could arrive and have additional conclusions." *Id.* at 9. Her testimony does not show that her expert opinions are merely a "stylized articulation" of personal preferences. She instead acknowledges the "highly unlikely" possibility that an expert could reach a different conclusion about a design element. As the Ninth Circuit has noted, "Lack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565.

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 8

And as to Defendants' contention that Dr. Chetty's opinions are nothing more than "subjective beliefs," her opinions are based on, among other things, her 20 years of experience in HCI, peer-reviewed literature, and a well-known, widely used methodology in the HCI field. *See* Dkt. # 360-24 at 2. And Defendants provide no support for their assertion that Dr. Chetty's methodology is unreliable because she never spoke to someone who unintentionally enrolled in Prime or encountered difficulties in trying to cancel their Prime subscription. To the extent that Defendants disagree with Dr. Chetty's opinions about consumer confusion and Prime's checkout and cancellation flows, this can be addressed through the adversarial process—competing expert testimony, other contrary evidence, and the "crucible of cross-examination." *See Encompass Ins. Co. v. Norcold, Inc.*, No. 2:23-CV-231, 2025 WL 36025, at *3 (W.D. Wash. Jan. 6, 2025) (reasoning that any alleged shakiness in the expert witness's opinion "should be addressed through the crucible of cross-examination and the adversarial process"); *see also Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) ("The inquiry into admissibility of expert opinion is a 'flexible one,' where shaky 'but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'") (quoting *Primiano*, 598 F.3d at 564)).

C.    Dr. Chetty's "Think-Aloud" Study

Defendants say that Dr. Chetty's "think-aloud" study should be excluded because the study does not "fit" the facts of the case—i.e., it is not sufficiently tied to the facts of the case. *See* Dkt. # 322 at 9–14. They also contend that the study violates scientific norms. *Id.*

1.    Tied to the Facts of the Case

Defendants contend that Dr. Chetty's "think-aloud" study should be excluded because her expert testimony is not tied to the facts of the case. Dkt. # 322 at 10. They say that her testimony will thus not aid a jury in resolving a factual dispute. They say that Dr. Chetty did not

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 9

test Prime's enrollment or cancellation flows, and instead, created a fake website called "CandyForever" and a fake subscription for "CandyForever Premium." *Id.* They say that CandyForever "offered [study participants] fabricated features rather than the wide array of tangible benefits associated with Prime." *Id.* They explain that, with Amazon Prime, consumers can purchase an array of goods and services: streaming content, electronics, groceries and more. *Id.* Meanwhile, the study participants could only purchase candy with CandyForever. *Id.* Defendants contend that the single-product nature of CandyForever renders Dr. Chetty's experiment "substantially dissimilar" from Amazon Prime. *Id.* at 11. They underscore that "Amazon has enormous real-world brand recognition, powerful consumer expectations, and subscription incentives" and Dr. Chetty's experiment "fails to replicate any of these factors." *Id.* at 12.

The FTC responds that while CandyForever is a fictional website and subscription program, its checkout and cancellation process are "so nearly the same" as the Amazon checkout and Prime cancellation flow "as to provide a fair comparison." Dkt. # 355 at 10 (quoting *United States v. Norris*, 217 F.3d 262, 270 (5th Cir. 2000)). It states that the product being sold is irrelevant to determining whether consumers become confused while navigating the checkout and cancellation processes. *Id.* at 10–11. The agency underscores that the purpose of the study was to observe whether participants knowingly enrolled in the subscription, understood the material and relevant terms, and could easily cancel their subscriptions. *Id.* at 11.

In her report, Dr. Chetty says that she modeled CandyForever after the "Amazon enrollment detours in its online product checkout and cancellation processes." Dkt. # 360-24 at 83 ¶ 291. She also included a subscription called "Premium" modeled after Prime. *Id.* The CandyForever checkout includes the same upsells to enroll in CandyForever Premium that a consumer would encounter if they were on Amazon enrolling in Prime. *Id.* at 84 ¶ 295.

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 10

Likewise, to cancel CandyForever Premium, the study participants went through the same cancellation processes that a consumer would encounter in cancelling Prime. *Id.* Dr. Chetty says that CandyForever has the same visual styles as the checkout and cancellation processes as seen on Amazon's site and in the documents provided to her by the FTC. *Id.* at 83 ¶ 292. She says that the primary differences between the CandyForever site and Amazon's site include "the color scheme, the sale inventory, the slogans, and logos, which depict a fictional candy store selling a variety of international and domestic candies." *Id.* Dr. Chetty explains that she included these differences "to avoid confusing consumers who would have recognized the Amazon website." *Id.*

An expert's proffered testimony "fits" the factual dispute at issue when it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 576 (S.D.N.Y. 2006) (quotation omitted). This requirement goes to the relevance of the expert's testimony. *See Daubert I*, 509 U.S. at 591; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002). And once the court determines that an expert's data or evidence is sufficiently tied to the facts of the case, "the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1020 (S.D. Cal. 2023) (quoting *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)) (cleaned up).

Contrary to Defendants' contention that Dr. Chetty's opinions are inadmissible because her study fails to replicate relevant factors about Amazon and Prime, the CandyForever site was modeled after Amazon's site and the CandyForever Premium subscription was modeled after the Prime enrollment and cancellations flows. Dkt. # 360-24 at 83 ¶ 291. As Dr. Chetty notes in her expert report, the study focused on the responses of the participants to the design *techniques* used

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 11

by Amazon in the Prime signup and cancellation flows. *See* Dkt. # 360-24 at 85. ¶ 303. And Dr. Chetty explains that she used the fictional CandyForever "to study users' behavior and interactions without biasing them with the real purpose of the study." *Id.* at 85 ¶ 303. Thus, Dr. Chetty's think-aloud study is sufficiently tied to the facts of the case because the focus is the design elements of the signup and cancellation flows for the subscription. Her testimony could help a jury understand the evidence as it relates to the FTC's claims and overall theory of the case. *See SQM N. Am. Corp.*, 750 F.3d at 1044 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury.").[1]

### 2. Scientific Norms

Defendants say that Dr. Chetty's think-aloud study should be excluded because it included only 30 participants. Dkt. # 322 at 12. They contend that Prime has hundreds of millions of subscribers and that Dr. Chetty is trying to draw conclusions about Prime from a 30-person study. *Id.* They say that this sample size is statistically insignificant. *Id.* Defendants

---

[1] Defendants also contend that because Dr. Chetty allowed participants to use gift cards to sign up for CandyForever Premium instead of their personal credit cards (like a customer would use to sign up for Prime) this renders the study too dissimilar to the Prime experience. Dkt. # 332 at 11. They also assert that Dr. Chetty did not replicate the "demographics of Amazon's consumer group." *Id.* And they also say that the study was not even a rough approximation of the "real Amazon experience" because participants were paid at least $125 to participate. *Id.*
As noted above, the focus on Dr. Chetty's study was to examine what confusion, if any, participants encountered while navigating the checkout and cancellation processes. Defendants cursorily assert that the study is flawed because participants did not provide their credit card information while signing up for CandyForever Premium. They do not explain how this warrants exclusion under *Daubert*. *See Primiano*, 598 F.3d at 564 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.") (quotation omitted) (alteration in original). Dr. Chetty also notes that think-aloud studies are not "meant to generate large quantitative effects or significant statistical measures because they are typically conducted on smaller sample sizes. Rather, they are meant to produce in-depth insights and anecdotes of users' lived experiences to identify interface strengths and weaknesses." Dkt. # 360-24 at 28 ¶ 75. And Defendants do not explain how Dr. Chetty's opinions are inadmissible because she monetarily compensated the study's participants for their time. Defendants' expert, Dr. Wilcox, conducted a survey about Amazon's Iliad cancellation flow and monetarily compensated participants for their time. *See* Dkt. # 360-22 at 45.

also contend that Dr. Chetty did not use a reliable methodology to reach her conclusions. *Id.* at 13. They say that her think-aloud study consists merely of "isolated and anecdotal statements" and that her "coding process" for synthesizing the data was subjective. *Id.* at 12–13.

The FTC counters that the think-aloud methodology is widely accepted in the HCI field. Dkt. # 355 at 12. The agency notes that Dr. Chetty's study was aimed at identifying potential points of confusion during the signup and cancellation process; she did not conduct the study "to generate large quantitative effects or significant statistical measures." *Id.* at 13. It points out that Dr. Chetty is offering her opinion only on whether the Prime enrollment and cancellation flows are "likely to cause nonconsensual enrollment and produce difficulty cancelling." *Id.* They also note that Dr. Chetty's coding methodology is "well-accepted in the field of HCI." *Id.* at 14.

Dr. Chetty says that HCI researchers use think-aloud studies to better understand "how users are thinking about and understanding a system." Dkt. # 360-24 at 27 ¶ 69. She explains that "[b]y asking users to think aloud and verbalize their though processes as they navigate a website or interface, a researcher can map out their cognitive processes, such as how they are engaging in decision-making and what factors on the interface are affecting their choices and their understanding of the system at any given point in time." *Id.* at 27 ¶ 90. She also notes that think-aloud studies have been widely and extensively used in HCI since the technique was first developed. *Id.* at 28 ¶ 74. In her report, Dr. Chetty explains that she used a qualitative data analysis tool known as "MaxQDA" to label the qualitative data from the study and derive themes from the data in a "principled manner." *Id.* at 94 ¶ 339. She also explains the coding system she and her research assistant used. *Id.* at 94–95 ¶¶ 339–46. Although Defendants contend that Dr. Chetty's opinions simply rely on "anecdotal" statements from the study's participants, Dr. Chetty explains that think-aloud studies are common in the HCI field and that she used a known HCI tool to organize the data from the study. Based on Dr. Chetty's report, nothing suggests that her

analysis was "unstructured" or "subjective." *See Hankey*, 203 F.3d at 1167 (noting that several factors may bear on the reliability analysis including, "whether the theory or technique enjoys general acceptance within the relevant scientific community") (citing *Daubert I*, 509 U.S. at 592–94).[2]

Further, Dr. Chetty explains that think-aloud studies are typically conducted with smaller groups because "they are meant to produce in-depth insights and anecdotes of users' lived experiences to identify interface strengths and weaknesses." Dkt. # 360-24 at 28 ¶ 75. Defendants contend that because hundreds of millions of people subscribe to Prime, Dr. Chetty cannot derive meaningful results from her think-aloud study. But the focus of a think-aloud study is to "provide a sense" of how users are thinking about and interacting with an interface; it is not meant to provide statistically significant evidence that can be extrapolated to a wider data set. Dr. Chetty does not comment on the statistical significance of the evidence.

In certain types of studies, a large number of participants is critical to the analysis. *See, e.g.*, *Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1048, 1058 (S.D. Ill. 2007) (noting that to provide a meaningful analysis "studying [suicide] for purposes of causation requires a huge number of participants"). But Dr. Chetty has explained why think-aloud studies do not require many participants. And she has not opined that the results of her study are statistically significant or in any way representative of a wider class of consumers. Thus, the number of participants in Dr. Chetty's study goes to the weight that should be afforded to her testimony rather than its

---

[2] Defendants suggest that Dr. Chetty's opinions should also be excluded because she "cherry picked" her data by failing to report anecdotal statements that would have undermined her conclusions. But Dr. Chetty stated during her deposition that she and her research assistant "coded each of the participant videos," watched each participant video, and recorded and transcribed what each participant said during the think-aloud study. Dkt. ## 360-24 at 94 ¶ 340; # 370-26 at 13. And she accounted for participants who enrolled in CandyForever Premium "knowingly" and "intentionally" and those who cancelled their subscription without needing help or stopping too soon in the cancellation process. Dkt # 360-24 at 98–104 ¶¶ 351–58. Nothing suggests that Dr. Chetty "cherry picked" the data or failed to adequately report the results of the study.

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 14

admissibility. *See Primiano*, 598 F.3d at 564 (noting that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion").

## IV
### Conclusion

Based on the above, the Court DENIES Defendants' motion to exclude testimony of Dr. Marshini Chetty, Ph.D. The Court provisionally files this Order under seal. The Court DIRECTS the parties to file a joint statement, on or before August 15, 2025, indicating what redactions, if any, should be included in the public version of the Order.

Dated this 8th day of August, 2025.

John H. Chun
United States District Judge

SEALED ORDER DENYING DEFENDANTS'
MOTION TO EXCLUDE DR. MARSHINI
CHETTY'S TESTIMONY - 15