1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8    FEDERAL TRADE COMMISSION,              CASE NO. 2:23-cv-00932-JHC

9                                           ORDER DENYING MOTION TO
                         Plaintiff,         EXCLUDE DEFENDANTS' EXPERT
                                            DONNA L. HOFFMAN, PH.D.
10           v.

11   AMAZON.COM, INC; NEIL LINDSAY,
     individually and as an officer of
12   Amazon.com, Inc.; RUSSELL
     GRANDINETTI, individually and as an
13   officer of Amazon.com, Inc.; JAMIL GHANI,
     individually and as an officer of
14   Amazon.com, Inc.,

15
                         Defendants.
16

17

18                                   I

19                            INTRODUCTION

20          This matter comes before the Court on Plaintiff FTC's Rule 702 Motion to Exclude

21   Defendants' Expert Donna L. Hoffman, Ph.D.  Dkt. # 321.  The Court has considered the

22   materials filed in support of and in opposition to the motion, the rest of the file, and the

23   governing law.  The Court finds oral argument unnecessary.  Being fully advised, for the reasons

24   below, the Court DENIES the motion.

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 1

## II

### BACKGROUND

The FTC sued Amazon.com, Inc. and three of the company's executives, Neil Lindsay, Russell Grandinetti, and Jamil Ghani, claiming that they violated Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403. Dkt. # 67 at 1–2 ¶ 1. The FTC alleges that Defendants tricked, coerced, and manipulated consumers into subscribing to Amazon Prime. *Id*. at 2 ¶ 2. According to the FTC, this was accomplished by failing to disclose the material terms of the subscription clearly and conspicuously and by failing to obtain the consumers' informed consent before enrolling them. *Id*. The FTC also alleges that Amazon did not provide simple mechanisms for subscribers to cancel their Prime memberships. *Id*. at 3 ¶ 7.

Donna L. Hoffman, Ph.D., is a marketing professor at The George Washington University School of Business. Dkt. # 336-34 at 5 ¶ 1. She has a Ph.D. from the University of North Carolina at Chapel Hill and her training is in psychometrics, a field of behavior science that focuses on experimental design and human cognition and behavior. *Id*. at 5 ¶ 2. Counsel for Defendants asked her to: (1) "Analyze Amazon Prime's enrollment . . . and cancellation flows discussed in the Amended Complaint and assess the FTC's allegations about UI design elements at issue in those flows within the context of online consumer experience and behavior"; (2) "Review current enrollment and cancellation flows of popular paid digital membership/subscription programs to assess whether the UI design elements at issue in Amazon Prime's enrollment and cancellation flows (or those similar to them) are commonly used in online contexts and are likely to be familiar to online consumers"; and (3) "Review documents discussing Amazon's . . . clarity testing and assess any methodological limitations of those studies." *Id*. at 10–11 ¶ 22.

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 2

To generate her opening report, she (1) relied on her academic expertise and experience in marketing and consumer behavior; (2) considered academic articles; and (3) reviewed other documents that she identifies in Appendix B of her report.  *Id.* at 11 ¶ 23.  She also received assistance from Cornerstone Research, who worked under her direction.  *Id.* ¶ 24.

Hoffman's report offers five opinions.  First, she says that analysis of online consumer experience must account for consumers' goals, past experiences, and expectations.  *Id.* ¶ 26. Second, she says the definition of "dark patterns" is vague and lacks scholarly consensus.  *Id.* at 12 ¶ 27.  She also says the subjective interpretation of this term may misidentify common legitimate marketing practices as "dark patterns."  *Id.*  Third, she says the FTC's claims regarding the UI design elements in Amazon Prime Enrollment and Cancellation Flows are "unfounded."  *Id.* at 13 ¶ 28.  Fourth, she says the UI design elements at issue are common online and likely familiar to consumers.  *Id.* at 15 ¶ 29.  Fifth, she says Amazon's clarity improvement initiatives had methodological limitations that limited Amazon's ability to interpret the results.  *Id.* at 16 ¶ 30.

The FTC makes two primary arguments to exclude Hoffman's testimony.  First, it says her analysis of the Prime Enrollment and Cancellation Flows is irrelevant and unreliable.  Dkt. # 321 at 7–12.  The FTC maintains that this testimony is irrelevant because Hoffman admits she does not opine on whether the Prime enrollment disclosures were presented clearly and conspicuously or whether the cancellation process for Prime is simple.  *Id.* at 7.  It says this testimony is unreliable because she does not provide a methodology for her conclusions.  *Id.* at 8–12.  Second, it says her comparative analyses of UI elements is similarly irrelevant and unreliable.  *Id.* at 12–17.  It contends these analyses are irrelevant because it omitted analysis of Amazon programs and the factfinder must consider only Amazon's practices.  *Id.* at 12.  This testimony is unreliable, according to the FTC, because Hoffman created her methodology for this

litigation, she fails to adequately explain her methodology, and she provides no support for the

inferences that underpin her analysis.  *Id.* at 12–17.

### III

### DISCUSSION

A.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under Rule

702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or

education may testify in the form of an opinion or otherwise" provided:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[1]

Courts must ensure "that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand."  *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir.

2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).  They have

"broad discretion" in making such evidentiary rulings.  *Id.* (citing *City of Pomona v. SQM N. Am.

Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or

to determine a fact in issue."  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S.

---

[1] Rule 702 was amended in 2023.  *See* Notes of Advisory Committee on 2023 Amendments to Rule 702.  The Advisory Committee Notes to the 2023 amendment state that the changes were intended to "clarify and emphasize" the plain language of Rule 702.  *Id.*  And "[n]othing in the amendment imposes any new, specific procedures."  *Id.*  Thus, cases interpreting Rule 702 that predate the 2023 amendment still apply.  *See Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 4

579, 589 (1993) (citing Fed. R. Evid. 702(a)).  "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'"  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995)).

Courts apply four factors in determining whether expert testimony is reliable.  These include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community."  *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94).  But this list of factors is neither exhaustive nor intended to be applied in every case.  *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted).  And "[w]hile evidence that suffer[s] from serious methodological flaws . . . can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage."  *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (internal quotations and citations omitted) (second alteration in original).

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence.  *See Qualey v. Pierce Cnty.*, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025) (citing *Daubert I*, 509 U.S. at 592 n.10).  And courts liberally construe Rule 702 in favor of admissibility.  *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, 2021 WL 5200171 (W.D. Wash. Nov. 9, 2021).

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 5

1

2

B.      Relevance of Hoffman's Testimony

3

        1.      Analysis of Prime Enrollment and Cancellation Flows

4

        The FTC argues that Hoffman's analysis of the Prime Enrollment and Cancellation Flows

5

is irrelevant.  Dkt. # 321 at 7.  It says this analysis is irrelevant because it will not help the

6

factfinder determine whether Amazon disclosed Prime's terms clearly and conspicuously,

7

obtained informed consent from Prime subscribers, or provided simple mechanisms to cancel

8

Prime.  *Id.*  Defendants respond that the FTC's argument oversimplifies its own case and

9

Hoffman's analysis supports their argument that Amazon's enrollment and cancellation flows do

10

not deceive or manipulate a reasonable consumer.  Dkt. # 349 at 7–8.

11

        Defendants have shown by a preponderance of the evidence that the analysis is relevant.

12

The FTC contends that Prime's enrollment and cancellation flows include manipulative designs.

13

Dkt. # 67 at 74–78.  And Hoffman's analysis directly responds to this allegation by saying,

14

among other things, "the FTC's failure to consider consumers' familiarity with design elements

15

or standard marketing practices severely undermines their conclusions about whether the alleged

16

UI design elements at issue in Amazon Prime's enrollment and cancellation flows would 'trick,'

17

'manipulate,' or 'mislead' consumers and influence their behaviors or 'complicate' these

18

processes[.]"  Dkt. # 336-43 at 28.  Thus, her testimony on this topic "will help the trier of fact to

19

. . . determine a fact in issue[.]"  Fed. R. Evid. 702;  *see Daubert I*, 509 U.S. at 591 ("Rule

20

702 . . . requires that the evidence or testimony 'assist the trier of fact to understand the evidence

21

or to determine a fact in issue.' This condition goes primarily to relevance.").

22

        2.      Comparative Analyses of UI Elements

23

        The FTC also says that Hoffman's comparative analyses are irrelevant because they are

24

not focused on Prime.  Dkt. # 321 at 12.  According to the FTC, regardless of the practices

employed by other subscription services, the factfinder must evaluate Amazon's conduct

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 6

independently.  *Id.*  But Defendants say this testimony is relevant to the "reasonable consumer" standard.  Dkt. # 349 at 10.  Defendants add that this testimony will help the factfinder determine whether Amazon Prime's enrollment and cancellation flows are confusing to consumers.  *Id.* at 11.

Defendants also satisfy their burden of showing that this testimony is relevant.  At a minimum, much like her analysis of the Prime enrollment and cancellation flows, Hoffman's comparative analyses respond to the FTC's allegation that Amazon employs manipulative designs.  *See* Dkt. # 336-43 at 155–56; *see* Section III.B.1, *supra*.  She presents two comparative analyses that suggest "these UI design elements at-issue (or those similar to them) are commonly used online, and many consumers are likely to be familiar with them independent of their interactions with Amazon website."  Dkt. # 336-43 at 156.  Thus, this analysis is similarly likely to help the trier of fact determine a fact in issue.  Fed. R. Evid. 702.

C.    Reliability of Hoffman's Testimony

    1.    Analysis of Prime Enrollment and Cancellation Flows

The FTC argues that Hoffman's analysis of the Prime enrollment and cancellations flows is unreliable.  It says that she does not refer to any methodology in her report and that she suggested nine methodologies during her deposition.  Dkt. # 321 at 8–11.  The FTC adds that even if the Court accepts that Hoffman used a methodology, the methodology is insufficiently reliable because she never defines "legitimate marketing practice."  *Id.* at 12–16.  Defendants respond that Hoffman details her methodology in her report and explained it during her deposition.  Dkt. # 349 at 6–7.  They also say she reviewed the available academic research on consumer behavior, considered relevant marketing materials, and applied this information—as well as her own education and experience—to the analysis she conducted.  *Id.* at 7–8.

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 7

Defendants have shown by a preponderance of proof that Hoffman uses a reliable methodology for this analysis. Although the FTC argues that she described nine methodologies, that does not appear to be the case. *See* Dkt. # 321 at 8–11. Instead, she applied the "concepts and constructs from [her] discipline to evaluate the flows." Dkt. # 338-32 at 71:3–5. As one example of this, she evaluated allegations the FTC made about the complexity of Amazon Prime's cancellation process. Dkt. # 336-43 at 109. She explained how, in her opinion, the FTC overlooked "legitimate and standard marketing practice" when making these allegations. *Id.* at 110. Her report also applies pertinent academic marketing and consumer behavior literature. *Id.* She used a marketing management textbook to explain the complexity of a consumer's decision-making process. *Id.* at 111. She presented cognitive psychology research to support her assertion that the "progressive disclosure of information in the cancellation process provides consumers with the benefits and costs associated with Prime membership in a gradual way that is unlikely to overwhelm the consumer, so that they can make an informed choice about cancelling." *Id.* at 116. And from this foundation, she provides conclusions that advance Defendants' arguments: "the cancellation process provides information that can be relevant for different groups of consumers with different goals and motivations" and "[r]ather than overwhelming the consumer by presenting [] information all at once, the information is presented progressively." *Id.* at 116–17. Hoffman's report shows that she used a similar method for the other at-issue Prime flows. *See id.* at 48–140.

In other words, Hoffman relied on her education and experience to reach conclusions, showed how her education and experience helped her form those conclusions, explained that the conclusions were sufficiently supported by research in her field, and demonstrated that she reached those conclusion after reliably applying the facts here. So her analysis is sufficiently reliable under Federal Rule of Evidence 702. *See Moussouris v. Microsoft Corp.*, 311 F. Supp.

3d 1223, 1246 (W.D. Wash. 2018) (quoting Fed. R. Civ. P. 702, Advisory Committee Notes, 2000 Amendments).

The FTC also challenges Hoffman's failure to define "legitimate marketing practices," but her report does provide examples that she believes fall within the ambit of this term.  Dkt. # 321 at 11–12; *see, e.g.*, Dkt. # 336 at 29 (citing two sources for the proposition that there are legitimate marketing activities a business can use "to attempt to persuade consumers to try, purchase, or its products/services.").  Thus, the terminology Hoffman uses to underpin her conclusions are not "so lacking in probative force and reliability that no reasonable expert could base an opinion on them[.]"  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994).  This criticism would be better leveled through the adversarial process.

2.    Comparative Analyses of UI Elements.

The FTC argues that Hoffman's comparative analyses are insufficiently reliable as well. It says she created the method she used for these analyses specifically for the purposes of this litigation.  Dkt. # 321 at 12.  The FTC also takes issue with the methodology's standards.  *Id.* at 12–16.  It contends that she does not explain how she chose to "operationalize" certain UI design elements or how she identified comparative programs.  *Id.*  And the FTC maintains that Hoffman did not provide adequate support for her claim that the prevalence of the at-issue UI design elements makes consumers more familiar with navigating the Amazon Prime enrollment and cancellation flows.  *Id.* at 16–17.  Defendants respond that Hoffman included her methodology in her report, attached an appendix to explain it in further detail, and testified about it at her deposition.  Dkt. # 349 at 9–10.  In Defendants' view, the FTC's other arguments are disagreements with Hoffman's conclusions.  *Id.* at 10–12.  In their view, these arguments go to the weight, not the admissibility, of her testimony.  *Id.*

Defendants have shouldered their burden of showing that Hoffman used reliable methods to conduct her comparative analyses. She first identified the most visited government websites and most popular paid digital membership/subscription programs. Dkt. # 336-43 at 156, 214. She used monthly visit data to determine the most visited government websites. *Id.* at 214 n.504. And she determined the most popular paid digital membership/subscription programs based on a survey from Forbes Advisor (and conducted by market research company Prolific). *Id.* at 156–57. She then used the allegations in the FTC's complaint to describe at-issue UI design elements, which she describes as "mapping." *Id.* at 334. Two independent coders subsequently reviewed screenshot bundles of the government websites and digital membership/subscription programs to determine how often the at-issue UI design elements appeared. *Id.* at 342–43, 352–64. Hoffman then employed statistical methods to quantify the "level of agreement between the two coders' assessment of the presence or absence of at-issue UI design elements in the enrollment and cancellation processes[.]" *Id.* at 343. When the coders differed in their assessment, a third coder was used to resolve disagreements. *Id.* She ultimately found the data she collected suggested "the at-issue UI design elements (or those similar to them) are commonly used online." *Id.* at 161; *see id.* at 220.

None of the arguments presented by the FTC support the conclusion that Hoffman's methodology is insufficiently reliable. First, the FTC says it is suspect that Hoffman developed her comparative analysis specifically for purposes of this litigation. Dkt. # 321 at 12. To be sure, "[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317; *see* Dkt. # 321 at 12–13. Here, Hoffman's report indicates that she offers conclusions "growing naturally and directly" from her education and

experience in marketing research techniques. *See* Dkt. ## 336-43 at 156–61; 338-32 at 154:17–19 ("[W]e are trained in basic principles, which then can be applied as we encounter problems in the real world."). She also testified that she "followed widely established -- commonly established and accepted approaches for this particular comparative analysis." Dkt. # 338-32 at 152:8–10; *id.* at 152:11–156:4. And the empirical model she used to form her conclusions has been published and rigorously peer reviewed. *Id.* at 284:2–6. This "peer review and publication 'increase[s] the likelihood that substantive flaws in methodology will be detected." *Daubert II*, 43 F.3d at 1318 (quoting *Daubert I,* 509 U.S. at 593). So, on balance, Hoffman's comparative analysis need not be excluded simply because she developed it for the purposes of this litigation.

Second, the FTC says that Hoffman's methodology lacks acceptable standards. Dkt. # 321 at 12. For instance, the FTC complains that Hoffman does not explain how she chose to "map" each of the UI design elements that she supplied to the independent coders. *See* Dkt. ## 321 at 13–15; 380 at 5–6. But she identifies the specific paragraph of the complaint that she used to generate her description of the at-issue UI element. Dkt. # 336-43 at 334. When an expert in an uncertain field is "extrapolat[ing] from existing data and generat[ing] novel hypotheses about complex issues," she is "permitted wide latitude to offer opinions[.]" *Elosu*, 26 F. 4th at 1026 (internal citations and quotations omitted). So the Court does not deem her methods unreliable because she does not explain precisely how she got from the allegations in the complaint to the analyzed UI design element. Hoffman adequately articulates her methodological choices and provides a foundation for the data she incorporated into her report. *See* Dkt. # 336-43 at 156–61, 334–35. The FTC's other arguments criticizing Hoffman's methodology similarly fail to persuade the Court that her report is the product of unreliable methods. The purported issues identified by the FTC are "best settled by a battle of the experts before the fact finder, not by judicial fiat." *City of Pomona*, 750 F.3d at 1049.

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 11

Third, the FTC says that there is an analytical gap between Hoffman's data and her conclusions.  Dkt. # 321 at 16–17.  The Court disagrees.  On this point, the FTC appears to misapprehend Hoffman's report because it does not attempt to define a specific threshold at which the prevalence of a UI design element makes it "familiar" to consumers or how familiarity with one website gives consumers familiarity with an Amazon website.  *Contra id.*  To the contrary, as Hoffman explained in her deposition, her goal was to establish that certain UI elements are common across commercial and government websites, and a consumer's familiarity with these features "could likely implicate -- likely impact their, you know, understanding and their interaction behavior, and things like that."  Dkt. # 338-32 at 268:4–11.  Consistent with this, Hoffman used quantitative analysis to show the prevalence of the at-issue UI design elements across popular commercial and government websites.  *See, e.g.*, Dkt. # 336-43 at 162 (Exhibit 54 showing a comparison of the Desktop Enrollment Flow UI elements across popular commercial websites).  Because Hoffman finds that these UI elements, or those similar to them, are common online, she concludes that they are likely familiar to consumers.  *See, e.g.*, *id.* at 220 ("[T]he use of UI design elements at-issue is common among government websites, and many consumers are likely to be familiar with them, independent of their interactions with Amazon website.").  She also explained that her conclusion—familiarity with UI elements influences users' experiences on later use—is based on her empirical model that "has been quite comprehensively tested by thousands and thousands of research papers that have flowed – followed from the original paper, and then several follow-up papers."  Dkt. # 338-32 at 284:2–6.  So Hoffman presented a conclusion that is supported by empirical data and she also explained how she reached that conclusion.  This is sufficient at the admissibility stage.  *See Elosu*, 26 F. 4th at 1025 (Federal Rule of Evidence 702 requires a district court to determine whether an expert has a factual "foundation, not corroboration[,]" for her conclusions).

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 12

Finally, the FTC says that Hoffman's methodology rests on a "shaky foundation." Dkt. # 321 at 17. Yet "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

## IV

### CONCLUSION

For the reasons above, the Court DENIES the motion. Dkt. # 321.

Dated this 19th day of August, 2025.

John H. Chun
United States District Judge

ORDER DENYING MOTION TO EXCLUDE
DEFENDANTS' EXPERT DONNA L. HOFFMAN,
PH.D. - 13