1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable John H. Chun

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

FEDERAL TRADE COMMISSION,

     Plaintiff,

  v.

AMAZON.COM, INC., *et al*.

     Defendants.

Case No. 2:23-cv-0932-JHC

**FTC'S TRIAL BRIEF**

## I.  **INTRODUCTION**

     Amazon has long known that millions of its customers struggled with enrollment and cancellation of its subscription service, Prime.  Millions of consumers accidentally enrolled in Prime without knowledge or consent, but Amazon refused to fix this known problem, described internally by employees as an "unspoken cancer" (Dkt. 317 Att. 37 at 4) because clarity adjustments would lead to a drop in subscribers.  Similarly, Prime's cancellation flow, known internally as "Iliad," is a labyrinthian mechanism that Defendants know deters consumers from cancelling or misleads consumers into believing they successfully cancelled Prime when they in fact did not.

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

The Restore Online Shoppers Confidence Act ("ROSCA") requires companies that sell subscriptions via negative option features to: (1) provide text that clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information; (2) obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account through the transaction; and (3) provide simple mechanisms for consumers to cancel their subscription. 15 U.S.C. § 8403. Moreover, Section 5 of the FTC Act prohibits "unfair" acts or practices in commerce, including unauthorized billing. 15 U.S.C. §§ 45(a)(1), 45(n) (noting that an unfair act or practice is one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); *see also, e.g., FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004-1005 (N.D. Cal. 2010) (granting summary judgment that defendants engaged in unfair billing practices in violation of Section 5 of the FTC Act). At trial, including both the jury and bench phases, the Federal Trade Commission ("FTC" or "Commission") will demonstrate: that Amazon and the Individual Defendants—Jamil Ghani, Neil Lindsay, and Russell Grandinetti—are liable for violating ROSCA and Section 5 of the FTC Act; that the Court should accordingly enter a permanent injunction to stop their unlawful conduct and monetary relief (consumer redress) pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57(b); and that Amazon and the Individual Defendants knowingly violated each of ROSCA's three statutory requirements, making them liable for civil penalties under Section 5(m) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                    2

## II.  ISSUES TO BE DECIDED AT TRIAL

### A.  Whether ROSCA Applies to Amazon Prime.[1]

ROSCA's provisions apply to "goods or services sold in a transaction effected on the Internet through a negative option feature."  15 U.S.C. § 8403.  A negative option feature is "a provision under which the customer's silence or failure to take an affirmative action to reject goods or service to cancel the agreement is interpreted by the seller as acceptance of the offer."  15 U.S.C. § 8403 (incorporating 16 C.F.R. § 310.2(w)).

Prime falls squarely within ROSCA's regulatory ambit.  First, Prime is indisputably a "service" sold "on the Internet."  *Id.; see also* Dkt. 462 at 12 (summarizing Amazon's previous admissions of these facts).  Furthermore, Prime is a negative option feature because Amazon interprets a Prime enrollee's failure to take "affirmative action" to cancel their subscription as acceptance for Amazon to continue charging the customer at regular intervals.  As other courts in this circuit have held, "automatically renew[ing]" subscriptions like Prime "are 'textbook example[s] of a negative option feature.'"  *See* Order Denying Motion to Dismiss, *United States v. Adobe, Inc., et al.,* No. 24-cv-363-, Dkt. 84 (N.D. Cal. May 2, 2025) (quoting *United States v. Mylife.com, Inc.*, 499 F. Supp. 3d 757, 762 (C.D. cal. 2020*); Fed. Trade Comm'n v. Doxo, Inc.*, 771 F. Supp. 3d 1162, 1180 (W.D. Wash. 2025) ("The statutory definition is not as narrow as Defendants argue, and courts have applied it broadly to renewal subscriptions.").

### B.  Whether Amazon Failed to Clearly and Conspicuously Disclose All Material Terms for Prime.

Amazon is required to "clearly and conspicuously disclose[] all material terms" of Prime before obtaining consumers' billing information.  15 U.S.C. § 8403(1).  A "clear and conspicuous" disclosure is one that a "reasonable [consumer] would notice and understand."

---

[1] ROSCA's application to Prime is the subject of pending summary judgment motions and the FTC's motion to establish facts that are not genuinely disputed.  Dkts. 314 at 45-46; 319 at 4-8; 462 at 11-12.  While the facts related to this question are not genuinely disputed, the FTC nevertheless includes this issue in its list of matters to be decided because those motions remain pending.

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

Case No. 2:23-cv-0932-JHC                    3

*Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (defining "clear and conspicuous" under the Truth in Lending Act).  Other circuit courts have observed that "consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items. . . .  This low degree of care does not make consumers unreasonable—it makes them human" and "vulnerable to exploitation by unfair and deceptive practices."  *See, e.g.*, *Kahn v. Walmart Inc.*, 107 F.4th 585, 597 (7th Cir. 2024).  Similarly, the Ninth Circuit has ruled when applying consumer protection statues, like ROSCA, "any misleading ambiguity [in defendants' disclosures] . . . should be resolved in favor of the consumer."  *Rubio v. Capital One Bank,* 613 F.3rd 1195, 1200 (9th Cir. 2010) (cleaned up) (applying principle to Truth in Lending Act).  This Court, in fact, ruled at the motion-to-dismiss stage that the "material disclosures in [Amazon's Universal Prime Decision Page] on their face were not clear and conspicuous."  Dkt. 165 at 18 n.4.

The Commission will show at trial that Amazon has failed to clearly and conspicuously disclose all material terms for Prime subscriptions before obtaining consumers' billing information.  In the context of a free trial upsell, Amazon takes advantage of the fact that consumers are less likely "to scrutinize the [website] for small text" as they are "merely attempting to start a free trial."  *Oberstein v. Live Nation Ent., Inc*., 60 F.4th 505 (9th Cir. 2023).  For example, across multiple versions of Amazon's Universal Prime Decision Page ("UPDP")— one of the challenged flows—Amazon declared: "we're giving you a 30-day FREE Trial of Prime" (*e.g*., Dkt. 317-4 at 19) thereby creating an impression that the Prime trial is an automatic add-on, rather than an option the consumer may opt into.  This interpretation is bolstered by Amazon telling customers, in the present tense, what "Your Prime benefits include," (*see id*.) implying the consumer need not do anything else to receive the benefits.  Furthermore, the UPDP pages generally had an enrollment button that reads "Get FREE Same-Day Delivery" (*id.*) or similar language, creating the impression the button only relates to the shopper's product

FTC'S TRIAL BRIEF

purchase.  However, a consumer who clicked on "Get FREE Same-Day Delivery" will be enrolled in Prime, *even if the customer does not complete their product purchase.*  Dkt. 317-132 at 88:17-89:21, 103:8-18.

Despite variations across different versions, all UPDP pages share the same general issues.  UPDP pages have generally not conspicuously displayed the material terms of  Prime's price, the fact that there is a price, or the fact that consumers are regularly charged the price, prior to said consumers' arrival at the UPDP page.  Dkt. 317-2 at 14-19.  Furthermore, the UPDP pages' orange call-to-action buttons have immediately enrolled the consumer in Prime, even when they make no reference to the subscription service.

For the other two Prime enrollment flows at issue, Amazon does not just bury the material terms in fine print but omits them from the page altogether.  Besides UPDP, Amazon can also enroll customers in Prime via its Ship Option Selection Page ("SOSP").  On the SOSP upsell page, Amazon offers various shipping speed options. Dkt. 317-4 at 10.  One option offers same-day shipping with a bold "Today" with a message below in lighter, innocuous writing saying, "FREE Same-Day Delivery with a free trial of Amazon Prime."  *Id*.  Amazon does not disclose in any place on the SOSP page Prime's material terms or that it is subscription that will charge consumers at regular intervals.  *See id.*  Instead, consumers who click the top Prime shipping option are then shown a version of the UPDP, on which clicking the orange button to continue to their purchase enrolls the consumers in Prime.

Amazon similarly omits material terms on its Single Page Checkout ("SPC") offer page.  The SPC page has similar shipping choices as the SOSP page.  For example, an option on the page offered same day shipping, and in faint, less prominent writing said, "FREE Same-Day Delivery with a free trial of Prime."  *See id.* at 26.  Selecting this option would enroll the consumer in Prime with no mention of price or other material terms.  Once a consumer selected this option, the SPC page populated small fine print under the large, orange "Place your order"

FTC'S TRIAL BRIEF

button. *See id.* at 27. However, Prime's terms were not even in the fine print directly below the order button, but were actually buried beneath in the third paragraph down. *See id.*

Prime's lack of clear and conspicuous disclosures is also borne out in empirical evidence which shows consumers did not understand clicking the buttons on the UPDP, SOSP, and SPC would enroll them in Prime. *See Rubio*, 613 F.3d at 1200 ("Empirical evidence is helpful in determining what a reasonable consumer will understand and readily notice."). For example, Amazon conducted multiple types of user experience research, which repeatedly demonstrated that the enrollment process confused consumers and resulted in unintentional signups. *See* Dkt. 314 at 18-25. Moreover, the FTC will present evidence that the user experience expert the FTC retained reached the same conclusion after conducting her own user studies.

Amazon's internal survey evidence likewise proves many Prime enrollees did not understand what they were signing up for. Starting in mid-2020, Amazon internally conducted a large-scale cancellation survey to measure the reasons why consumers had cancelled their Prime subscriptions. Dkt. 318-12 ¶ 39. This cancellation survey – sent to consumers that had successfully cancelled their Prime subscriptions – asked consumers why they cancelled their Prime subscription, with one possible answer choice indicating the consumer did not intend to sign up for Prime. *Id.* The survey establishes that on average ▆▆ of all Prime members who enrolled through UPDP picked a survey response showing that they did not knowingly enroll in Prime. *Id.* Furthermore, when Amazon introduced clarity adjustments to the UPDP flow, survey responses indicating unintentional enrollment dropped to ▆▆. *Id.* However, when Amazon rolled back these clarity improvements, the rate of unintentional signups rose to ▆▆ of all UPDP enrollees. *Id.* Likewise, for the other enrollment pages at issue, Amazon's internal cancellation survey reported that ▆▆ of SPC and ▆▆ SOSP Primes enrollees did not intend to sign up for Prime. *Id* at 94.

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                                   6

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

### C.  Whether Amazon Failed to Obtain Consumers' Express Informed Consent to Automatically Renewing Prime Subscriptions.

Beyond mandating clear and conspicuous disclosures of all material terms for subscriptions, ROSCA requires that sellers, like Amazon, obtain "a consumer's express informed consent" to those terms before charging the consumer's credit card, debit card, bank account, or other financial account through the transaction.  15 U.S.C. § 8403.  During trial, the Commission will show that Amazon does not obtain express informed consent before enrolling consumers in Prime.  As a threshold matter, Amazon cannot obtain express informed consent since it fails to clearly and conspicuously disclose all material terms for Prime.  It is black letter law that consumers cannot provide "informed consent" to material terms, like price and the fact that the subscription renews, when those terms are buried in fine print.  *See Barrer*, 566 F.3d at 892 (holding under less exacting contract standards that provisions "buried too deeply in the fine print" were not clear and conspicuous).

Furthermore, even if the fact finder applied a less-demanding contract approach to terms acceptance, Amazon still would not obtain mere consent, let alone "express informed consent" as ROSCA requires.  *See id*; 15 U.S.C. § 8403.  It is well established that consumers consent to contact terms by taking "some action, such as clicking a button or checking a box that *unambiguously* manifests [their] assent to those terms."  *Berman*, 30 F.4th 856 (emphasis added). Here, however, the evidence at trial will show that Amazon fails to receive such assent because Prime consumers are not "explicitly advised that clicking will constitute assent to the terms" and a reference to "terms and conditions" appearing "in proximity" to, or even "directly above," an enrollment button is not enough to establish consent.  *Id*.  For example, the UPDP channel discussed above enrolls consumers through a button saying, "Get FREE Same-Day Delivery." Dkt. 317-4 at 19.  Nothing about this button informs a consumer that clicking it will "unambiguously manifests [their] assent" to Prime's price or that Amazon will regularly bill them.  *See Berman*, 30 F.4th 856.  Similarly, the SOSP and SPC pages generally enroll

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

consumers by having them select a bolded "Today," shipping option with faint, inconspicuous text below that says, "FREE Same-Day Delivery with a free trial of Prime." *See* Dkt. 317-4 at 26-27. Consumers cannot give express informed consent on these two enrollment pages because Amazon has provided no information on Prime's price or that Prime auto-renews. *See id.*

In other challenged flows, the critical terms a consumer would need to know to give express informed consent to Prime are buried at the bottom of the page in fine print. Dkt. 317-4 at 19. This lack of consent is reflected in the empirical evidence. ▇ of consumers enrolled via UPDP, ▇ for SPC, and ▇ for SOSP, upon cancelling, reported to Amazon that they were unaware that they had enrolled in Prime. Dkt. 318-12 ⁋ 39, 94. In fact, this Court already reached this same conclusion, stating "[T]he failure to disclose that consumers were even signing up for Prime in the first place—means that Amazon did not receive consumers' 'express informed consent.'" Dkt. 165 at 27.

### D. Whether Amazon Provides Consumers with Simple Cancellation Mechanisms to Stop Recurring Charges for Prime.

ROSCA requires Amazon to provide "simple mechanisms for a consumer to stop recurring charges" of Prime. 15 U.S.C. § 8403(3). A district court in the Ninth Circuit found a cancellation process violated this provision of ROSCA where Defendants subjected consumers calling to cancel to "a six-part 'retention' sales script aimed at convincing the customer not to cancel," instead of simply processing the request. *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1167-69 (C.D. Cal. 2021). Similarly, Amazon's cancellation flow, known as the Iliad, does not "simply process[]"cancellation requests, but forces Prime consumers to go through multiple steps aimed at "convincing the customer not to cancel." *See id*.

In order to start the Iliad cancellation flow, consumers need to make at least three clicks to navigate Amazon's website and find the "Manage Membership" link on Prime Central— which was relatively inconspicuous compared to the page's marketing material. *See* Dkt. 320-40 at 115. However, once a consumer finally found the "End Membership" button, clicking on it

FTC'S TRIAL BRIEF

did not end their membership. *Id.* at 158. Instead, it forced consumers to click through three new pages: the "Marketing Page," the "Offer Page," and finally, the "Cancellation Page." Dkt. 314 at 34-38. In one version of the Marketing Page, consumers were greeted by a banner message reading "thank you for being a member with us. Take a look back at your journey with Prime." *Id.* at 34. This message confusingly implies that the consumer *already* ended their journey with Prime. However, the consumer still had two more pages to click through to successfully terminate their Prime subscription. The Marketing Page was especially treacherous for those on mobile devices as consumers could not see the buttons on the bottom of the screen and would have to scroll down to see they had not yet cancelled. The Offer Page and Cancellation Page similarly made various offers to keep the Prime customer from cancelling their accounts. Rather than simply allowing consumers to cancel, each page of Amazon's Iliad process bombards consumer with links, offers, and other information to remove them from the cancellation flow.

Amazon's own internal data unambiguously establishes that customers struggle to navigate the Iliad flow. For example, ███ of customers that fail to complete Iliad *do not use any Prime benefits* for the next 90 days, suggesting this cohort believed they had successfully cancelled their Prime membership. Dkt. 318-12 at 57. Additionally, the ██████ of those who fail to complete Iliad do not proceed past the first page described above. Dkt. 320-20 at 2. ███ consumers who exit the Iliad take no "exit action"—meaning, for example, the consumer simply closes their browser—rather than affirmatively click a button or link that signifies they made an affirmative decision not to cancel. *Id.* at 4-5.

### E. Whether Amazon Violated the FTC Act.

Charging consumers without authorization is an unfair practice that violates Section 5 of the FTC Act. *E.g., FTC v. Ideal Fin. Solutions, Inc.*, 2015 WL 4032103, at *8 (D. Nev. June 30, 2015) ("Courts regularly find unauthorized billing to be unfair."); *FTC v. Amazon.com, Inc.*,

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                9

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) (collecting cases finding unauthorized billing is an unfair practice). As outlined above, the FTC will demonstrate at trial Amazon Prime's enrollment and cancellation practices caused consumers to either enroll in or remain in a Prime subscription they did not want. Amazon charged these consumers for Prime subscriptions they did not authorize, in violation of the FTC Act. *See FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010).

### F. Whether the Individual Defendants are Liable for Amazon's Violations of ROSCA and the FTC Act.

The Individual Defendants are liable for Amazon's ROSCA and FTC Act violations, and the FTC will demonstrate at trial that Individual Defendants "participated directly in, or had the authority to control the unlawful acts or practices at issue" and are thus individually liable for injunctive relief. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 493, 600 (9th Cir. 2016). The Commission does not need to show *sole* authority to control (*see e.g., FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297 (W.D. Wash. 2024) ("The FTC counters that it 'need not establish sole authority to control to prevail against an individual defendant.' The Court agrees.") (cleaned up)) and an individual can be held liable on authority to control even if they did not "exercise" that authority. *FTC v. Loewen,* 2013 WL 5816420, at *7 (W.D. Wash. Oct. 2013).

The FTC will establish that all three Individual Defendants are liable for Prime's enrollment and cancellation practices. Ghani and Lindsay had "consistent oversight over the Prime enrollment and cancellation process," "would have been included in any significant discussion of . . . enrollment and cancellation," and "*were most responsible for any decisions in those areas.*" Dkt. 320-131 at 2, 5 (emphasis added). As for Grandinetti, the Prime organization began reporting to him in November 2021, at which time he assumed control over the enrollment and cancellation practices at issue. Dkt. 171 at 6.

The FTC will also present evidence not just of the Individual Defendants' authority to control, but also that all three directly participated in perpetuating well-known issues with Prime.

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

For example, in 2020, Ghani and Lindsay approved certain clarity improvements to Prime's enrollment flow, but rapidly rolled back these improvements when Amazon's Prime enrollment numbers began to drop.  Dkt. 317-44 at 209:11-210:4.  Similarly, an internal Amazon team pushed Grandinetti to address Prime's unintentional enrollment issues to no avail, as Grandinetti was instead focused on increasing the growth of Prime's paying subscriber base.  Dkts. 255-18; 320-19 at 3; 255-15 at 4.

It is the same story for Prime's cancellation practices.  Amazon's employees continually flagged the problems consumers encountered when cancelling Prime to all three Individual Defendants.  At one meeting, Defendants Lindsay and Ghani decided, *even with the FTC's investigation pending*, that their goal was to cause customers who had already decided to "end [their] membership" "to pause and think a bit before cancelling."  Dkt. 317-53 at 2.  Grandinetti was kept informed about Prime's cancellation issues, and yet he still decided to do nothing to solve Prime consumers' cancellation frustrations.  Dkt. 320-125.

Finally, the FTC will demonstrate the three individuals are personally liable, jointly and severally with Amazon, for consumer redress as well because they had knowledge—whether actual knowledge, reckless indifference, or intentionally avoided knowledge—of the violative actions.[2]  *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014*); FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  Direct participation in the violations will indicate the individual had sufficient knowledge.  *See, e.g., FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).  And indeed, as discussed above, each of the three individuals had ample, direct, personal knowledge of the nonconsensual enrollments and consumers' difficulty cancelling.  Their employees told them of these problems, over and over, and they repeatedly declined to fix them, or even rolled back improvements once enrollment numbers dropped.

---

[2] Should the jury find the individuals acted with knowledge that ROSCA prohibited their actions, that finding will necessarily establish that they were aware of those actions—a lesser knowledge standard—allowing for the Court to hold them individually liable for consumer redress under Section 19 without further findings as to their knowledge.

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

1

### III. AMAZON'S CONDUCT DURING THE FTC'S INVESTIGATION EQUITABLY ESTOPS IT FROM ENFORCING THE STATUTE OF LIMITATIONS.

2

3      The FTC's ability to seek consumer redress under Section 19 of the FTC act is limited by

4   a three-year statute of limitation.  15 U.S.C. § 57b.  However, the FTC Act is subject to equitable

5   estoppel doctrines.  *See e.g., Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1034-35 (9th Cir. 2013)

6   (recognizing "rebuttable presumption" in favor of equitable tolling's availability).  Equitable

7   estoppel tolls the statute of limitations when a plaintiff proves:  "(1) knowledge of the true facts

8   by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in that

9   intent; (3) ignorance of the true facts by the relying party; and (4) detrimental reliance." *Estate*

10  *of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) (quoting *Bolt v. United States*,

11  944 F.2d 603, 609 (9th Cir. 1991)).  Equitable estoppel "focuses primarily on actions taken by

12  the defendant in preventing a plaintiff from filing suit." *Id*.  "Estoppel may be appropriate in the

13  statute of limitations context where the defendant's act or omission reasonably induced the

14  plaintiff to refrain from filing a timely suit." *Bianco v. Warner*, 562 F. Supp. 3d 526, 533 (C.D.

15  Cal. 2021) (cleaned up; applying California law).  To successfully bring a claim of equitable

16  estoppel, the FTC need only "designat[e] 'specific facts demonstrating the existence of genuine

17  issues for trial.'" *Becker v. TIG Ins. Co.*, 649 F. Supp. 3d 1065, 1074 (W.D. Wash. 2022)

18  (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The FTC met this

19  threshold in its Amended Complaint.  *See* Dkt. 69 ¶¶ 235-255.[3]

### A.  The FTC Will Put Forward Two Different Equitable Estoppel Theories.

      At trial during the bench phase, the Commission will prove two discrete but related

equitable estoppel theories.  First, Amazon's conduct, including falsely labelling documents as

"privileged" and wrongfully withholding them—conduct that the Court found "tantamount to

_____

[3] Additionally, the parties have taken extensive discovery on equitable estoppel, one attorney  from each side was deposed on the topic, and the parties reached an agreement that the FTC would not pursue a theory of equitable estoppel against the Individual Defendants.

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

bad faith," Dkt. 404 at 8—delayed the Commission's investigation.[4]  Second, during the

investigation, Amazon's lead counsel misrepresented to the Commission that Amazon would, in

good faith, provide the FTC with the information necessary to complete its investigation.  The

complete facts are presented in the FTC's Opposition to Defendants' Motions for Summary

Judgment.  Dkt. 354 at 43-65.  Below, the Commission summarizes the key points.

### 1. Amazon Wrongfully Withheld Documents During the Investigation Through Conduct this Court Found "Tantamount to Bad Faith."

This Court recently sanctioned Amazon for conduct "tantamount to bad faith" for

withholding documents that should have been produced to the FTC.  Dkt. 404 at 8.  While this

ruling covered Amazon's conduct during litigation, it also covered the period during the FTC's

CID investigation when Amazon wrongfully labeled 6,700 documents in order to withhold them

from the FTC.  *See id*. at 7; Dkt. 356 ¶¶ 11-15.  Despite Amazon's purposeful conduct in

withholding these documents, in October 2022, Amazon in-house counsel responsible for

privilege assertions, Benjamin Langer, certified to the FTC that its CID productions and

privilege assertions were "complete and true and correct to the best of my knowledge

information, and belief" under penalty of perjury.  *See* Dkt. 288-18.  His statement to the FTC,

sworn under penalty of perjury, was false and delayed the FTC's investigation.

### 2. Amazon Misrepresented That It Would Provide the FTC with the Documents It Needed to Complete Its Investigation.

Amazon's counsel, a former FTC official, relied in part on her personal relationship with

the FTC attorney handling the matter to secure the FTC's agreement to permit Amazon's counsel

to structure the initial document production, subject to the FTC's reservation of rights to request

additional search terms and custodians.  *See e.g.*, Dkt. 359-11 at 192:12-18; 231:25-232:9; 241:2-

---

[4] In recent rulings on the parties' motions in limine, the Court reserved judgment on whether it will receive evidence related to its prior finding on conduct tantamount to bad faith during the bench-trial phase in this matter. Dkt. 474 at 1.

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                    13

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

20.  In particular, on or about April 29, 2021, during a one-on-one call with the FTC's attorney—specially requested by Amazon's attorney—Amazon's counsel assured the FTC's counsel that Amazon would cooperate with the FTC's investigation and get the FTC attorney "what [she] needed." Dkt. 359-10 at 141:14-142:8; *id.* at 143:16-144:5.  However, when Amazon's initial production proved woefully inadequate, and the FTC asked for additional search terms and custodians, Amazon's counsel refused.  Dkt. 359-11 at 261:1-21.  By spring 2021, it became evident that Amazon's counsel had steered the FTC away from significant inculpatory materials.

### B.  The FTC Meets All Four Equitable Estoppel Elements.

The FTC meets the four elements needed to equitably estop Section 19's three-year statute of limitations.  *See* 15 U.S.C. § 57b; *Estate of Amaro*, 653 F.3d at 813.  First, Amazon knew the true facts about which employees possessed unique responsive information to the FTC's CID.  *See Estate of Amaro*, 653 F.3d at 813.  Most importantly, Amazon knew it had instructed employees to falsely mark all documents relating to Prime Enrollment and cancellation as privileged.  Second, Amazon induced the FTC's reliance with assurances that it would select appropriate custodians and search terms to provide the documents needed, and produce in scope documents.  *See id*.  Amazon's counsel has even confirmed that the FTC was relying on Amazon for that purpose.  Dkt. 359-11 at 192:12-18.  For equitable estoppel's third element, the FTC was largely unaware of the true facts, even if it suspected them.  *See Estate of Amaro*, 653 F.3d at 813.  Last, the FTC relied on Amazon's assurances to its detriment because the Commission's trust that Amazon would act in good faith when selecting reasonable custodians and search terms postponed the FTC's ability to initiate proceedings against Amazon for its extensive ROSCA violations.  *Id*.

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                    14

**IV.** **THE FTC IS ENTITLED TO CONSUMER REDRESS, CIVIL PENALTIES, AND A PERMANENT INJUNCTION AGAINST ALL DEFENDANTS**

The FTC respectfully requests this court award appropriate consumer redress for harm caused by the Defendants' ROSCA violations, civil penalties for the same, and a permanent injunction to fence-in Defendants' future conduct.

### A. The FTC Seeks Full Consumer Redress for ROSCA Violations.

Section 19 of the FTC Act empowers this court to grant redress to consumers injured when a person violates any rule enforced by the Commission. 15 U.S.C. § 57b. ROSCA is treated as one such rule. 15 U.S.C. § 8404. When calculating consumer redress, the FTC is not required to give an exact account of harm, but if it "reasonably approximated the amount of customers' net losses . . . then the burden shifts to the defendants to show that those figures were inaccurate." *F.T.C. v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997); *FTC v. Amazon.com, Inc*., 2016 WL 10654030, at *7 (W.D. Wash. July 22, 2016).[5]

The Commission's expert identified two categories of harm to support redress under Section 19: (1) harm to consumers who unintentionally enrolled in a Prime subscription via one of the three challenged upsells during the relevant time period ("Unintentional Enrollment Harm"); and (2) harm to consumers who had difficulty cancelling their Prime subscriptions, such as those that entered the cancellation flow, but failed to complete the cancellation process ("Cancellation Harm").

As the FTC will demonstrate at trial for the Unintentional Enrollment Harm, the Commission's expert—Dr. Neale Mahoney—relied on internal Amazon survey evidence and consumer data produced to the Commission to develop a linear regression model showing that

---

[5] *Febre* was a consumer redress case under FTC Act, Section 13, which is no longer a basis for awards of consumer redress under the Supreme Court's *AMG Capital Management, LLC v. FTC* ruling. 593 U.S. 67 (2021). However, the analysis of consumer injury calculations previously applied under Section 13 applies equally to consumer injury calculations under Section 19 of the FTC Act, which explicitly allows for courts to "grant such relief as the court finds necessary to redress injury to consumers." *See* 15 U.S.C. § 57b; *see also FTC v. Figgie Intern., Inc*., 994 F.2d 595, 605-606 (9th Cir. 1993) (applying consumer harm calculation principles from Section 13 cases under Section 19).

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

nearly 40 million consumers had been unintentionally enrolled in a Prime subscription during the relevant time period. From this, and consistent with the Ninth Circuit law outlined in this Court's order denying Defendants' Motion to Exclude the Commission's damages expert, Dr. Mahoney estimated the harm to unintentionally enrolled consumers using the cost of the Prime subscription. Dkt. 432 at 5-7, 9.

For the Cancellation Harm, the FTC will show at trial that Dr. Mahoney—using Amazon's internal consumer data and survey evidence—analyzed multiple factors to find millions of consumers unsuccessfully sought to cancel Amazon Prime. Dr. Mahoney reviewed consumers' behavior within the Iliad flow (*i.e.*, what, if anything, they clicked after entering the flow), subscription charges and post-entry Prime payments among subscribers who entered the flow but did not cancel, and whether their Prime benefits usage subsequently dropped. *Id.* at 10-11. Dr. Mahoney used this data to ascertain the extent of the harm.

### B. The FTC Seeks Civil Penalties for Defendants' ROSCA Violations.

In addition to consumer redress, the FTC Act also empowers the Commission to seek civil penalties for knowing violations of its rules, which means either "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m). The civil penalty amount for each violation of ROSCA, which by statute carries civil penalties, can be up to $53,088. 15 U.S.C. § 45(m)(1)(A); 16 CFR § 1.98. When determining the total civil penalties amount, "the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C). When agencies have sought civil penalties for rule violations, courts have started from the harm amount and then "add[ed] an appropriate multiplier." *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020); *see also FTC v. Romero*, 658 F. Supp. 3d 1129, 1146 (M.D. Fla. 2023) (relying on *Dish Network* to treble damages for violations of the

FTC'S TRIAL BRIEF

FTC MITOR Rule).  "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future . . . violations." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) (citing *SEC v. Sargent*, 329 F.3d 34, 41 n. 2 (1st Cir.2003)).  Here, Amazon runs the world's largest subscription service – a fact that makes its ROSCA violations particularly consequential.  More important, the evidence at trial will show that Amazon repeatedly chose to roll back or stall changes that would have stopped problems it knew were occurring.  Put another way, Amazon was aware for years that it was taking consumers' money without their consent, yet chose to do nothing about it.  Given the size of the Prime subscription service and the unusually egregious nature of this misconduct, it is likely that a treble multiplier is inadequate to deter Amazon and others from similar behavior.

### 1. Defendants had knowledge of ROSCA.

Imposition of civil penalties requires Defendants' actual knowledge or knowledge fairly implied on the basis of objective circumstances that the action was prohibited.  15 U.S.C. § 45(m)(1)(A).  Amazon is one of the world's largest and most well-resourced companies, with extensive legal resources, including in-house and outside counsel with expertise in the FTC Act, ROSCA, and the company's other consumer protection obligations.  At trial, the FTC will show that Amazon's in-house counsel were aware of consumer protection statutes, including ROSCA.  Similarly, the FTC will show all three Individual Defendants, as high-level Amazon executives, had access to and consulted with their in-house counsel.  Indeed, the deep involvement of Amazon's lawyers—who were included on many key communications about the violative behavior and attended pivotal meetings about it—gives rise to a strong inference that all the Defendants knew their actions violated ROSCA.  *See* Dkts. 425 at 11-16, 453 at 10-13, 473 at 2, 474 at 2.

FTC'S TRIAL BRIEF

Case No. 2:23-cv-0932-JHC                    17

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

1

2

3   **2.   The civil penalties factors support entry of penalties.**

4   The first civil penalty factor courts must consider is "degree of culpability."  15 U.S.C. §

5   45(m)(1)(C).  The degree of culpability can be assessed from defendants' "deliberat[e] and

6   knowing[]" illegal conduct that was not an "isolated incident."  *FTC v. Braun*, 2024 WL 449288,

7   at * 10 (S.D.N.Y. 2024) (holding that such conduct made defendant "highly culpable and this

8   factor favors the imposition of a very substantial civil penalty amount").  As described above, the

9   FTC will demonstrate at trial that Amazon and the Individual Defendants possess a high degree

10   of culpability because they were well aware consumers were mistakenly enrolling in Prime and

11   having difficulty cancelling, yet they declined and even rolled back improvements to those

12   processes because any fixes caused membership to drop.  Importantly, Defendants continued to

13   violate ROSCA even after they became aware of the pending FTC investigation.  *See Romero*, F.

14   Supp. 3d. at 1146 (continuing to violate the rule, even after Defendant knew the FTC was

15   investigating, relevant to degree of culpability); Dkt. 317-53 at 2.

16   Courts must also analyze defendants' "history of prior such conduct." 15 U.S.C. §

17   45(m)(1)(C).  Continued violative conduct after prior government investigations can warrant

18   civil penalties.  *See United States v. Dish Network LLC,* 256 F. Supp. 3d 810, 978 (C.D. Ill.

19   2017) (listing prior engagement with governments to show prior history); *United States v.*

20   *Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008) (holding defendants' "long

21   history' of violating an FTC rule "supports imposing a large civil penalty").  Prior to the FTC's

22   investigation, the European Commission expressed concerned to Amazon about Prime

23   enrollment.  Dkt. 318-35 at 9, 4.  After the European Commission reached out to Amazon, it

made improvements to its European Prime flows, but did not extend those fixes to its American

Prime flows.  *Id.* (Europe); Dkt. 318-46 at 3 (U.S.).  Amazon's decision to not fix its Prime

issues across the board, even after the European Commission's investigation, favors this court

issuing civil penalties.  Furthermore, as early as 2015, Amazon was aware that its enrollment

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

flows caused consumers to unintentionally enroll in Prime.  Dkt. 317-14 at 4.  Amazon's long

history of knowing it harmed consumers but doing nothing to fix these issues warrants

imposition of civil penalties.

The final factors are a defendant's "ability to pay" and "effect on ability to continue to do

business." 15 U.S.C. § 45(m)(1)(C).  Given the immense resources at Amazon's disposal, it is

highly unlikely that Amazon would be unable to pay a civil penalty crafted by this Court or that

such penalty would negatively impact Amazon's continued business.  Amazon's unusual amount

of resources, in fact, militates for an especially high penalty in order to ensure its longstanding,

egregious, knowing violations of ROSCA do not simply become a "cost of doing business." The

FTC respectfully requests this court choose an "appropriate multiplier" to penalize Amazon.  *See*

*Dish Network*, 954 F.3d at 980 (discussing multiplying harm for civil penalties); *see also*

*Romero*, 658 F. Supp. at 1146 (relying on *Dish Network* to treble damages for violations of the

FTC MITOR Rule); *Monterosso*, 756 F.3d at 1338 ("Civil penalties are intended to punish the

individual wrongdoer and to deter him and others from future . . . violations.").

As the Court is aware, the FTC has not yet been permitted to conduct discovery regarding

the parties' assets, because matters related solely to the amount of civil penalties have been

postponed until after trial on the Defendants' liability.  Dkt. 295 at 2.  Accordingly, should the

FTC prevail in holding the Defendants liable for ROSCA violations and securing jury findings

that those violations were knowing, the FTC will renew its motions for discovery on this topic

and will seek further proceedings to fix the amount of civil penalties.

### C.  The FTC Seeks a Permanent Injunction Against All Defendants.

Section 13 of the FTC Act permits this Court to grant a permanent injunction against the

Defendants.  15 U.S.C. § 53(b)(2).  The Ninth Circuit has held that "injunctive relief under the

FTC Act may be framed 'broadly enough to prevent respondents from engaging in similarly

illegal practices in [the] future.' . . . The injunction will be upheld so long as it bears a

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

'reasonable relation to the unlawful practices found to exist.'" *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (quoting *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 395 (1965); *see also FTC v. Nat'l Lead Co*., 352 U.S. 419, 431 (1957) ("Those caught violating the [FTC] Act must expect some fencing in.").  As shown above, Defendants knew about the staggering amount of harm their practices caused Prime consumers, and yet they did nothing to solve the problem, or even required it to continue, out of fear of harming Amazon's bottom line. *See e.g.*, Dkt. 317 Att. 44 at 209:11-210:4.  Their conduct warrants this court granting "broad[]" injunctive relief (*Grant Connect*, 763 F.3d 1105) to ensure defendants are "fenc[ed] in" (*Nat'l Lead Co*., 352 U.S. at 43) from causing similar harm in the future.  Accordingly, should the FTC prevail at jury trial in holding Defendants liable for violations of ROSCA and the FTC Act, the FTC will propose an appropriate permanent injunction for the Court's consideration.

Dated:  September 15, 2025          */s/ Eli R. Freedman*
                                   JONATHAN COHEN (DC Bar # 483454)
                                   EVAN MENDELSON (DC Bar #996765)
                                   OLIVIA JERJIAN (DC Bar #1034299)
                                   JONATHAN WARE (DC Bar #989414)
                                   ANTHONY SAUNDERS (NJ Bar #008032001)
                                   SANA CHAUDHRY (NY Bar #5284807)
                                   ELI FREEDMAN (CA Bar #345432)

                                   Federal Trade Commission
                                   600 Pennsylvania Avenue NW
                                   Washington DC 20580

                                   (202) 326-2551 (Cohen); -3320 (Mendelson); -2726
                                   (Ware); -2749 (Jerjian); -2917 (Saunders); -2679
                                   (Chaudhry), -2030 (Freedman)

                                   JCohen2@ftc.gov; EMendelson@ftc.gov;
                                   JWare1@ftc.gov; OJerjian@ftc.gov;

1

ASaunders@ftc.gov; SChaudhry@ftc.gov;
EFreedman@ftc.gov

2

COLIN D. A. MACDONALD (WSBA # 55243)

3

Federal Trade Commission
915 Second Ave., Suite 2896

4

Seattle, WA 98174
(206) 220-4474; CMacdonald@ftc.gov

5

RACHEL F. SIFUENTES

6

(IL Bar #6304016; CA Bar #324403)
Federal Trade Commission

7

230 S. Dearborn St., Room 3030
Chicago, IL 60604

8

(312) 960-5617; RSifuentes@ftc.gov

9

JEFFREY TANG (CA Bar #308007)
Federal Trade Commission

10

10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024

11

(310) 824-4303; JTang@ftc.gov

12

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

13

14

15

16

17

18

19

20

21

22

23

FTC'S TRIAL BRIEF

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2030

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23