The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

                Plaintiff,

    v.

AMAZON.COM, INC., *et al.*,

                Defendants.

No. 2:23-cv-0932-JHC

DEFENDANTS' TRIAL BRIEF

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     SUMMARY OF FACTS ................................................................................ 2

    A.      Enrolling in Prime.............................................................................. 3

    B.      Stopping Recurring Charges from Prime............................................ 3

    C.      Amazon Observes Levels of Customer Confusion that Are a Standard and
             Fully Expected Feature of All User Experiences................................... 4

    D.      Defendants Work to Further Improve the Customer Experience. ........ 5

    E.      No Defendant Believed that the Prime Flows Violated the Law. ......... 5

III.    THE FTC'S CLAIMS ..................................................................................... 6

IV.     DEFENDANTS' RESPONSES AND DEFENSES ........................................ 8

    A.      The FTC Cannot Prove that Defendants Violated ROSCA................... 8

    B.      The FTC Cannot Prove that It Is Entitled to Civil Monetary Penalties. ............. 14

    C.      The FTC Cannot Prove that the Individual Defendants Are Liable. .................. 15

    D.      The FTC Cannot Defeat Defendants' Affirmative Defenses............................ 16

V.      REMEDIES..................................................................................................... 17

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

## I.     INTRODUCTION

The evidence at trial will disprove the Federal Trade Commission's claim that Amazon tricked and trapped its customers into unwanted Prime subscriptions. Contrary to the FTC's narrative, Amazon has always been transparent about Prime's terms, and Amazon offers straightforward ways to end a Prime membership. Specifically, the evidence will show that Amazon satisfies the Restore Online Shoppers' Confidence Act's ("ROSCA") three basic requirements, because:

- •     Every Prime enrollment page discloses the material terms of Prime in text that is easy to see and to understand;

- •     Customers cannot join Prime without affirmatively clicking a sign-up button; and

- •     Amazon offers multiple simple methods to stop recurring charges, including cancellation via phone, online chat, and online cancellation flows.

The FTC will try to twist and stretch ROSCA by suggesting that it mandates specific font sizes, colors, or a set number of clicks. But ROSCA says nothing about these kinds of web-design choices, and the FTC has admitted as much—even while insisting that statutory compliance turns on an undefined list of factors that it could not articulate. To this day, the FTC has not identified what it believes Amazon could change about its flows to make them compliant. The FTC cannot meet its burden at trial without identifying a statutory or regulatory standard that Amazon violated, and the FTC has not done so.

Faced with this gap, the FTC will misinterpret internal Amazon documents discussing how some consumers signed up for Prime unintentionally or had difficulty cancelling. But occasional customer frustrations and mistakes are inevitable—especially for a program as popular as Amazon Prime. Evidence that a small percentage of customers misunderstood Prime enrollment or cancellation does not prove that Amazon violated the law. ROSCA requires objectively clear disclosures and a simple process to stop recurring charges (not perfection). Amazon provided both.

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

The FTC also seeks civil penalties, but obtaining penalties requires additional proof the FTC does not have. The FTC will need to show that Amazon and Defendants Neil Lindsay, Russell Grandinetti, and Jamil Ghani (collectively, "Individual Defendants") each violated ROSCA knowingly—that is, with knowledge of ROSCA's specific requirements and knowledge that Amazon's conduct violated those requirements. But there was no reason for anyone in Defendants' positions to believe that Amazon's design choices—which are standard across the industry and had existed in plain sight for many years—violated ROSCA's bare-bones guidelines. The FTC hopes that the jury will infer knowledge from Amazon's internal customer-frustration data and from Amazon's robust program to understand and address those customer frustrations. But knowledge that some customers may have been confused, and taking steps to understand and try to improve those customers' experiences, is not knowledge that Amazon was breaking the law.

Finally, the FTC claims that the Individual Defendants, three senior Amazon executives, are personally liable for decisions Amazon made. But the Individual Defendants did not create the enrollment or cancellation processes the FTC challenges, nor did they have independent authority to change or to veto changes to those web flows. To the extent the Individual Defendants were involved in Prime, they supported efforts to increase clarity, wanted a straightforward process for stopping recurring charges, expressed their desire to avoid unintentional sign-ups, and prioritized an actively engaged Prime membership. There is no basis for individual liability.

For these reasons, and others detailed below, the FTC cannot prove that Amazon or the Individual Defendants violated ROSCA or the FTC Act—let alone did so knowingly.

## II.     SUMMARY OF FACTS

Amazon Prime is one of the most popular subscription services in the United States. It offers an array of benefits—free and fast shipping; unlimited access to thousands of movies and television shows; exclusive discounts; and numerous other benefits. Its large member base reflects the value and reliability that customers associate with Prime membership.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### A.    Enrolling in Prime.

Prime's enrollment process is easy for consumers to understand and navigate. Important details vary across the enrollment flows the FTC challenges, but all of the flows clearly disclose Prime's material terms and obtain consent from consumers before they enroll. Each enrollment flow sets out the key terms of membership—including price, automatic renewal, and the scope of benefits—in plain language that is easy to spot. And each flow requires consumers to take an affirmative step—clicking a button—before joining. The text on and surrounding the button provides customers with the information they need to make informed decisions and makes clear to consumers that, by clicking, they are accepting an offer to enroll in Prime.

Amazon's enrollment pages use web design elements common across the industry. Those elements include familiar visual cues, such as bolded text and blue hyperlinks, that highlight important information. And they include using colors and text placement to ensure that customers know what they are selecting. Amazon has frequently benchmarked its flows against other subscription services' sites to ensure Amazon's enrollment flows were not only in line with industry norms but, in many respects, clearer and more customer friendly.

### B.    Stopping Recurring Charges from Prime.

Amazon likewise ensures that customers who want to end their Prime memberships can readily do so. Although ROSCA requires only one simple method for stopping recurring charges, Prime members have always had multiple, straightforward ways to do so. The FTC challenges just one of these methods: online cancellation, asserting that cancelling Prime online is not simple because it requires one or two too many clicks.

Amazon launched the first version of the online cancellation flow in 2016. The flows are designed to be completed in only a few clicks, and (like the enrollment pages) include design elements commonplace on other websites and among other popular paid digital memberships. These features help ensure that Prime's online cancellation processes fit consumers' expectations about how content is presented online. These web design elements also help consumers. For example, progressive disclosure of information across multiple pages reduces the mental effort a

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

consumer needs to digest information. Similarly, confirmation dialogs (*e.g.* "Are you sure you wish to proceed?") are an expert-recommended technique to minimize the frequency of consumer errors. And providing information about membership benefits and alternatives short of cancellation provides flexibility and allows consumers to make more informed decisions.

Apart from online cancellation, customers may also stop recurring Prime charges by phone, e-mail, or web chat. In addition, Amazon offers the option to pause membership indefinitely, which halts charges until the customer chooses to reactivate. Millions of Prime members cancel or pause each year through these various pathways, confirming that consumers understand how to end their memberships and can do so quickly when they choose.

### C.  Amazon Observes Levels of Customer Confusion that Are a Standard and Fully Expected Feature of All User Experiences.

As the FTC itself recognizes, no matter how clear an online interface is, some customers will inevitably struggle, fail to read, make mistakes, or become confused. *See* Dkt. 366 at 5. That reality is well understood by user-experience designers and researchers, including those Amazon employs, and by the experts in this case. Unsurprisingly, Amazon's small-scale usability studies—typically involving only a handful of participants, often in other countries—reveal some instances of customer confusion. But Amazon conducts these studies because it takes customer anecdotes seriously; their results are explicitly not to be extrapolated to the larger population. Despite this, the FTC and a few former Amazon employees it will call as witnesses attempt to do just that.

Even the self-selected exit surveys the FTC emphasizes (despite their methodological flaws) show that self-reported unintentional signups constitute an extremely small percentage of Prime memberships in the United States. *See id.* at 7. Some customers cancelling Prime claimed in these exit surveys that they "did not intend to sign up for Prime." But those self-reports are unreliable and impossible to verify. There will always be customers who overlook details, forget they joined after a free trial, or later claim they never meant to sign up. In many cases, such claims are motivated by a customer's desire for a refund or by account activity from a family

member using a shared device. Within Amazon, employees consistently recognized that only a tiny fraction of Prime members joined without intending to, and those rare cases often involved family account sharing, forgotten free trials, or similar explanations unrelated to the enrollment process itself.

### D. Defendants Work to Further Improve the Customer Experience.

Amazon nonetheless invested heavily in improving customer clarity. The company launched dedicated programs to study customer frustrations, gathered feedback through surveys and testing, and experimented with ways to simplify the Prime experience further. Teams at Amazon engaged in constructive but spirited debates over how aggressively to implement changes that were hypothesized, but not proven, to improve clarity. Amazon's investment in clarity research, and its commitment to open dialogue about improving the customer experience, are unique elements of its corporate culture, not found at most other companies.

Amazon's years of research and experimentation led to meaningful changes: the company introduced the ability to pause memberships, reduced the number of steps in the online cancellation flow, added improved language around enrollment choices, and adjusted how options were displayed to customers. Not every experiment succeeded in measurably improving clarity, but leadership consistently emphasized that customer trust—which will be broken if customers feel tricked, confused, or deceived—was paramount. Teams across Amazon understood that Prime's long-term success depended on making sure that members felt informed and confident in their choices.

### E. No Defendant Believed that the Prime Flows Violated the Law.

At all times, Amazon and the Individual Defendants believed the Prime flows complied with the law. Amazon adhered to widely accepted industry standards and, when foreign regulators mandated specific changes, promptly implemented them. Because the FTC never issued similar guidance in the United States, Amazon reasonably relied on ROSCA's plain text, the law's enforcement history, and the fact that Amazon's flows had existed for years without any regulatory scrutiny. Internally, employees understood the enrollment and cancellation processes

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  to be lawful, and no one believed that they violated any legal requirements. Amazon's focus has

2  always been on delivering clarity and value to its customers—not on concealing information or

3  impeding customer freedom.

### III.    THE FTC'S CLAIMS

5        The FTC claims that Amazon violated ROSCA, which makes it "unlawful for any person

6  to charge or attempt to charge any consumer for any goods or services sold in a transaction

7  effected on the Internet through a negative option feature"—unless the person meets three

8  requirements. 15 U.S.C. § 8403. Those requirements are to:

9    •  "provide[] text that clearly and conspicuously discloses all material terms of the

10       transaction before obtaining the consumer's billing information," *id.* § 8403(1);

11   •  "obtain[] a consumer's express informed consent before charging the consumer[]" for the

12       transaction, *id.* § 8403(2); and

13   •  "provide[] simple mechanisms for a consumer to stop recurring charges," *id.* § 8403(3).

14       The FTC asserts Defendants violated all three requirements in offering Prime:

15   •  Count II claims that Defendants failed to clearly and conspicuously disclose all material

16       terms of Prime before obtaining billing information;

17   •  Count III claims that Defendants failed to obtain consumers' express informed consent

18       before charging them for Prime; and

19   •  Count IV claims that Defendants failed to provide simple mechanisms to stop recurring

20       charges for Prime.

21  *See* Dkt. 69 ("FAC") ¶¶ 272-80. The FTC can succeed on each Count only if it proves the

22  relevant violation by a preponderance of the evidence.

23       The FTC also makes two equitable arguments that should *not* be submitted to the jury.

24  First, Count I alleges that Defendants violated the FTC Act by "charg[ing] consumers without

25  their express informed consent." *Id.* ¶ 263. Because the FTC seeks only equitable relief on this

26  claim, *see* Dkt. 69 at 91, Count I must be submitted to the Court (not the jury), *see Reidy v. Cent.*

27  *Puget Sound Transit Reg'l Auth.*, 2014 WL 7340373, at *9 (W.D. Wash. Dec. 22, 2014)

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 6

("[P]recedent indicates that such plaintiffs cannot demand a jury trial when they seek purely equitable relief."). As the Court has recognized, the FTC Act claim "cannot survive independent of Count III," which alleges a violation of ROSCA's express informed consent requirement. Dkt. 165 at 27. So if, and only if, the jury finds a Defendant liable on Count III should the parties proceed to a separate evidentiary hearing before the Court to address whether that Defendant is liable on Count I. That evidentiary hearing should address the additional elements that the FTC must prove to establish a violation of the FTC Act, including "substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers." 15 U.S.C. § 45(n); *see also* FAC ¶ 262. At this hearing, Defendants will present evidence on each of these elements, including evidence about the myriad benefits of Prime, such as free same-day to two-day delivery on millions of items and unlimited streaming via Prime Video. *See, e.g.*, Amazon Prime, www.amazon.com/exploreprimebenefits.

Second, the FTC argues that Defendants are equitably estopped from raising their statute of limitations defenses. That assertion, too, is equitable and is therefore for the Court (not for the jury). *Phillips-Kerley v. City of Fresno*, 2025 WL 1825305, at *10 (E.D. Cal. July 2, 2025) ("[E]vidence relat[ing] only to the Court's equitable obligations … is not relevant or admissible at the trial."). The FTC forfeited this claim by failing to plead it with particularity, blocking discovery into relevant evidence, and refusing to disclose its legal and factual bases. Regardless, equitable estoppel does not apply here, for three reasons. The FTC has not specified any "true facts" of which it was ignorant during the period in which it delayed filing suit. *Est. of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011). Moreover, Defendants' conduct could not have "caused the plaintiff's" delay. *Bertucci v. Gen. Teamsters Union Loc. No. 174*, 867 F.2d 612, *7 (9th Cir. 1989) (mem. op.), because the Prime flows—the bases of the FTC's claims—were not hidden by Amazon; they were public, and easily discoverable. Finally, the FTC cannot show diligence, as it must: any delays in the FTC's investigation were attributable to its own decision to do *nothing* to pursue its claims for at least five years, between when the allegedly

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

violative cancellation process launched through the start of the FTC's investigation in 2021. Dkt. 378 at 20.

## IV.    DEFENDANTS' RESPONSES AND DEFENSES

### A.    The FTC Cannot Prove that Defendants Violated ROSCA.

#### 1.    The FTC Cannot Prove that ROSCA Applies to Prime.

The FTC's ROSCA claims fail at the outset, because the Commission cannot show that ROSCA applies here. To do so, the FTC must demonstrate that Amazon "charge[s] or attempt[s] to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature." 15 U.S.C. § 8403. Although Prime is a service sold on the internet, Prime enrollment is not effected through a negative option. *See* Dkt. 319 at 5-8; Dkt. 378 at 1-2. In this context, a negative option feature "means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see also* 15 U.S.C. § 8403.

Prime enrollment does not qualify. When Amazon extends an offer to enroll in Prime, the consumer's "acceptance of the offer" is manifested not by "silence" or a "failure to … reject … or cancel" Prime, *id.*, but by affirmative conduct: clicking the sign-up button. Affirmative assent is the opposite of "silence" or "failure to … reject." *Id.* Nor does it matter that a Prime member incurs recurring charges after accepting Amazon's offer. "Acceptance" of an offer is "manifestation of assent to" all "the terms thereof." Restatement (Second) of Contracts § 50(a) & cmt. A (1981). Here, Amazon's offer includes a term under which a Prime member will be charged after the free-trial period (if any) and then periodically, unless the consumer cancels. *See, e.g.*, Dkt. 69, Att. A. In other words, the Prime enrollment offer itself includes an agreement to pay recurring charges. Contrary to the FTC, *see* Dkt. 351 at 2, Amazon's single offer to enroll in Prime does not transform into multiple offers (to which the member silently assents) simply because the Prime membership requires recurring payments. After a consumer accepts Amazon's

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

offer to enroll in Prime, there is no additional "offer" from Amazon that the customer could "accep[t]" by "silence." Thus, there is no negative option.

If the Court does not resolve this issue as a matter of law before trial, the jury must decide whether the FTC has proven that Prime enrollment occurs through a negative option.

### 2.    The FTC Cannot Prove that Any Prime Enrollment Flow Violated ROSCA.

Assuming that ROSCA does apply here, that law requires Amazon to clearly and conspicuously disclose Prime's material terms and to obtain express informed consent before charging consumers. 15 U.S.C. § 8403(1), (2). Amazon's enrollment flows unequivocally meet that bar, and the FTC cannot prove otherwise.

### a.    Clear and Conspicuous Disclosures.

Disclosures are "clear and conspicuous" if a reasonable consumer would notice and understand them. *See Gilberg v. Cal. Check Cashing Stores, LLC,* 913 F.3d 1169, 1176 (9th Cir. 2019) ("[C]lear means 'reasonably understandable'" and "[c]onspicuous means 'readily noticeable to the consumer'). ROSCA imposes no mandate for any specific font size, color, or placement of the disclosure—and it does not require disclosures to be the most prominent feature of a webpage. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) ("To be conspicuous, notice 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'"). This objective standard for disclosure, like all of ROSCA's standards, looks to the typical online consumer exercising ordinary caution, not to an inexperienced or imprudent online shopper.

Prime's sign-up pages easily satisfy this test, because they prominently display, in readable print, all of Prime's material terms. The FTC will first need to establish what the material terms of Prime are. *See, e.g.*, *Hillsdale Assocs. v. E. Channel Corp., N.V.*, 1991 WL 174617, at *2 (9th Cir. Sept. 6, 1991) (unpublished) ("It is for the jury, not the court, to determine whether any facts that may not have been disclosed were material."); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Until recently, it has asserted only three: (1) that the

1  consumer is enrolling in Prime; (2) that a free trial automatically converts into a paid

2  membership; and (3) the monthly cost of Prime. *See* Dkt. 315 at 48; *but see* Dkt. 462-1 at 2 ¶ 4

3  (identifying four supposedly material terms).

4        Each enrollment page displays these terms in plain text. Details vary across the flows the

5  FTC challenges, but they all share the same critical features. Each page states in bold font: "Your

6  Amazon Prime membership continues until cancelled," followed by the membership price. Dkt.

7  319 at 9. Each enrollment flow also includes a notice (often directly above or below the sign-up

8  button) informing the user that Amazon is authorized to charge the customer's payment method

9  after the 30-day free trial. *See id.* In addition, a hyperlink to the full Prime Terms & Conditions is

10  always available for users who want more detail. Consistent with the face of the flows, the FTC's

11  own corporate representative (and its expert) admitted under oath that Amazon consistently

12  discloses Prime's material terms on the same page as the sign-up action, that none of the flows

13  make any false statement, and that she personally understood the terms when enrolling in Prime.

14  *See id.*

15        The FTC cannot meet its burden by critiquing Amazon's web design choices and

16  marketing strategies. The FTC complains about font sizes, colors, and so-called "dark patterns" in

17  Amazon's flows. ROSCA does not mention, much less define or even provide any guidance as to

18  what a "dark pattern" might be. And the FTC's own witness conceded that ROSCA does not

19  require any particular font size or color, *id.* at 13, nor prohibit online retailers from promoting

20  memberships through upsells or cross-sells, *id.* at 14. Far from deceiving consumers (as the FTC

21  will assert), Amazon's marketing expert, Dr. Donna Hoffman (and other evidence), will

22  demonstrate that Amazon's industry-standard web design and marketing elements—such as

23  bolding text, varying colors, placing disclosures close to the enrollment button, and cross-selling

24  memberships—are common across the industry, familiar to consumers, and help ensure that

25  ordinary online shoppers can navigate the Prime enrollment process. *See, e.g.*, Dkt. 375, Ex. 6,

26  ¶¶ 28, 93, 140, 276.

27

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### b.    Express Informed Consent.

A consumer gives express informed consent when, after receiving disclosure of the material terms, they take an affirmative action—such as clicking a button—indicating agreement. *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). The button need only convey, in context, that clicking will trigger the transaction; the button need not contain language such as "I agree" or "I assent." *See Austin v. Experian Info. Sols., Inc.*, No. 23-2301, 2025 WL 2177331, at *2 (4th Cir. Aug. 1, 2025).

Again, Prime's sign-up pages easily satisfy this test, because customers must affirmatively click a button to join Prime. Again, although details vary across the enrollment flows, they share key elements. Customers always click a button to enroll in Prime, and the text surrounding each button makes clear the consequences of clicking. A gray box immediately beneath each button includes prompts such as: "Start your Prime FREE trial," "Sign up for Prime," or "Get FREE Prime Delivery with Prime." *See* Dkt. 319 at 16. What is more, adjacent text explicitly informed users what that click meant by stating, for example: "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your default payment method after your 30-day free trial", or "By placing your order, you agree to [the] Terms and Conditions, and authorize us to charge your default payment method." *Id.* at 16-17. This and other evidence will show that the pages as a whole leave reasonable consumers with no doubt that, by clicking, they are accepting an offer to enroll in Prime.

The FTC will argue that internal Amazon data suggests that some consumers may have been confused about what Amazon's buttons meant, leading to unintentional signups. But this data cannot establish that reasonable consumers would be misled. *See, e.g.*, *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) ("[T]he reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled."). For example, the FTC relies heavily on Amazon's exit poll of users who cancelled their Prime memberships, highlighting that some chose "I did not intend to sign up for Prime" as their reason for cancelling. As Amazon's fact and

expert witnesses will explain, however, that survey was designed to collect anecdotal insights into the consumer experience—not to measure unintentional sign-up rates. *See* Dkt. 421 at 18-23; Dkt. 366 at 26-29. The survey questions were leading, and the sample of users was unrepresentative of the typical Prime member, among other methodological flaws. *See* Dkt. 421 at 18-23. And even if the jury were to accept the cancellation survey's figures at face value, they show that unintentional sign-ups represent a miniscule fraction of Prime members. Dkt. 366 at 7. That is not enough to establish a violation of ROSCA's express informed consent requirement.

### 3. The FTC Cannot Prove that Prime Cancellation Violated ROSCA.

Finally, the FTC cannot prove that Amazon failed to provide at least one "simple" way to cancel Prime. *See* 15 U.S.C. § 8403(3).

A cancellation method is "simple" if a reasonable consumer can understand or perform it. *See* Merriam Webster's College Dictionary (11 ed. 2011). Any type of cancellation method—online, phone, in person—can qualify as "simple" under ROSCA. *See* Declaration of Theo Lesczynski ("Lesczynski Decl."), Ex. 2 (FTC Rule 30(b)(6) designee agreeing that the mechanism for cancellation "could be a telephonic cancellation mechanism" or "canceling by email" or "a message through a customer service chat," and that ROSCA does not "require an online cancellation mechanism"). And if a company chooses to offer more than one way to cancel, ROSCA does not require that all of those methods be "simple." *See* 15 U.S.C. § 8403(3). Put differently, ROSCA does not purport to forbid non-simple methods of cancellation, so long as there is at least one simple method available. *See* FTC Business Blog, *Time for a ROSCA recap* (July 2, 2018), https://www.ftc.gov/business-guidance/blog/2018/07/time-rosca-recap-ftc-says-risk-free-trial-was-risky-not-free ("The law bans online negative options unless the seller … provides *a simple mechanism* for stopping recurring charges") (emphasis added).

The evidence will show that Amazon offers at least three straightforward and simple ways to cancel Prime: phone, online chat, and online cancellation flow. The FTC meaningfully challenges only the online process. But even if the jury accepts the FTC's critiques of that single cancellation method, the jury must still find that Amazon complied with ROSCA, because

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

customers could also readily stop recurring Prime charges by calling customer service or using Amazon's chat feature. *See* Dkt. 366 at 35-37. The FTC's accusations that these cancellation methods are rarely used and not widely advertised are not only factually incorrect, they are beside the point: ROSCA does not require that a cancellation mechanism be well-promoted or popular. *See* Dkt. 378 at 10-11. In all events, consumers routinely cancel Prime via Amazon customer service.

Moreover, the FTC cannot prove that the online process is *not* simple. Falsely equating "simple" with "one step," the FTC will tell the jury that the cancellation flows are non-compliant because they are not present on Amazon's homepage and require a few clicks to complete. But there are at least 40 different ways to access Amazon's cancellation flow, and once there, consumers can end or pause their memberships in a matter of seconds. *See* Dkt. 319 at 20-21. The FTC will also object that the online process contains savings offers, "warnings" regarding the loss of Prime benefits, and additional alternative membership options and deals. But these industry-standard marketing practices are not themselves unlawful, as the FTC itself has acknowledged. *See* Dkt. 366 at 39. The FTC believes that information about, and deals to save on, Prime derail consumers' efforts to cancel. But the question is not whether a few customers would occasionally be distracted by a save offer or reminder about Prime's benefits. In all events, the evidence shows that the information Amazon provides to customers during cancellation does not render the process complicated. Consumers are familiar with—and therefore readily understand and navigate—cancellation processes that contain offers and other marketing information. *See id.* at 39-40; Dkt. 319 at 21-22. Indeed, consumers often benefit when companies provide information relevant to a customer's decision to cancel, as the FTC itself has acknowledged. *See, e.g.*, 86 Fed. Reg. 60822, 60826 n.2 (Nov. 4, 2021) (money-saving offers benefit customers because it is right before cancellation that consumers can get the "best deal").

*      *      *

The FTC cannot meet its burden of proving that Amazon failed to satisfy ROSCA's three basic requirements in offering Prime.

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 13

**B.    The FTC Cannot Prove that It Is Entitled to Civil Monetary Penalties.**

If the Court does not bar the FTC's penalty demand as untimely, *see* Dkt. 319 at 26-28, the jury will also decide whether the FTC has proven that any Defendant knowingly violated ROSCA. To obtain civil penalties, the FTC must show that a Defendant had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that" the relevant conduct was "unfair or deceptive *and … prohibited by*" ROSCA. 15 U.S.C. § 45(m)(1)(A) (emphasis added); *see also id.* § 8404(b). "Actual knowledge" requires that a person "in fact be aware" of the relevant information. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020). And "knowledge fairly implied" arises only if a reasonable person under the same circumstances would have known that ROSCA's requirements existed and that the conduct violated those requirements, *United States v. Dish Network LLC*, 954 F.3d 970, 978 (7th Cir. 2020); *see also CFTB v. CashCall, Inc*., 2018 WL 485963, at *14 (C.D. Cal. Jan. 19, 2018) (describing this standard as higher than "recklessness"), *rev'd in part on other grounds*, 35 F.4th 734 (9th Cir. 2022). Under these standards, civil penalties are unavailable when a Defendant did not know what the law required. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 584 (2010); *see also United States v. Dish Network L.L.C.*, 954 F.3d 970, 978 (7th Cir. 2020); Dkt. 354 at 29 (acknowledging that a mistake-of-law defense is permitted).

The FTC cannot establish either actual knowledge or knowledge fairly implied for any Defendant. It will contend that Amazon's knowledge can be inferred because Amazon is a large company with access to legal counsel. But the evidence, including Amazon's expert, Professor James Cooper, will show that, given ROSCA's vague terms and its enforcement history, no reasonable person or company—even one with sophisticated lawyers—would have anticipated that the conduct alleged in the Complaint violated ROSCA before this case was filed. Dkt. 317-23 ¶ 215. The FTC will also point to internal Amazon reports, including the cancellation survey, indicating that some customers unintentionally enrolled in Prime or experienced difficulty cancelling. At most, these internal documents reflect awareness of occasional consumer confusion. They do not show—as the FTC must to obtain civil penalties—that Amazon or the

1   Individual Defendants knew that Amazon's enrollment or cancellation practices violated

2   ROSCA's specific requirements.

3   **C.      The FTC Cannot Prove that the Individual Defendants Are Liable.**

4       Even if the FTC were to prove that Amazon's enrollment or cancellation flows violated

5   ROSCA, the FTC could not make the additional showing required to hold the Individual

6   Defendants personally liable.

7       To hold any of the Individual Defendants liable, the FTC must first show by a

8   preponderance of the evidence that each Individual Defendant either participated directly in or

9   had authority to control the specific conduct found to be unlawful. *See FTC v. Publ'g Clearing*

10  *House, Inc*., 104 F.3d 1168, 1170-71 (9th Cir. 1997). Mere status as a corporate officer is not

11  enough. *See, e.g.*, *FTC v. Swish Mktg*., 2010 WL 653486, at *5, n.1 (N.D. Cal. Feb. 22, 2010).

12  The FTC cannot make that showing. As an example, consider Russell Grandinetti: he did not

13  begin overseeing Prime until November 2021, years after the challenged enrollment and

14  cancellation flows were put in place. Grandinetti therefore could not have exercised control over

15  Prime "at the time the scheme was organized;" nor could he have "directly participated in

16  establishing the scheme." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1103 (9th Cir. 2014). The

17  FTC thus seeks (for the first time ever in a ROSCA case) to punish individual corporate officers

18  for failing to change practices implemented long before they had any say-so. And the FTC lacks

19  evidence linking Grandinetti, or any of the other Individual Defendants, to relevant decisions

20  about enrollment and cancellation. *See* Dkt. 316 at 12-13; Dkt. 379 at 5-7.

21      To hold any of the Individual Defendants liable for monetary relief, the FTC must also

22  prove by a preponderance of the evidence that the individual knew of the ROSCA violations.

23  *Publ'g Clearing House*, 104 F.3d at 1170. In this context, knowledge means actual knowledge, or

24  awareness of a high probability of wrongdoing plus intentional avoidance of learning the truth.

25  *See Grant Connect*, 763 F.3d at 1101–02; *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019). Once

26  again, the FTC will point to anecdotes and internal consumer surveys observing isolated

27  consumer frustrations. But the Individual Defendants' awareness of consumer complaints—and

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 15

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Defendants' well-documented efforts to address those complaints—cannot establish reckless indifference or intentional avoidance of deceptive or fraudulent conduct. *See* Dkt 316 at 10-11; Dkt. 370 at 3-5.

**D.      The FTC Cannot Defeat Defendants' Affirmative Defenses.**

Based on the evidence presented at trial and the evidence and briefing throughout the case, the Court will need to decide whether relief is barred, in whole or in part, by Defendants' affirmative defenses. Those defenses are:

Due Process—Unconstitutional Vagueness and Lack of Fair Notice: Enforcing ROSCA against Defendants would violate the Due Process Clause of the Fifth Amendment, because ROSCA, as interpreted by the FTC here, is unconstitutionally vague and failed to give Defendants fair notice that their conduct was unlawful. *See* Dkt. 316 at 13-16.

First Amendment: Relatedly, enforcing ROSCA here would violate the First Amendment. *See id.* at 16-18. The FTC wants to restrict Defendants' truthful communications with consumers about Prime, and there is no substantial government interest that could be directly and materially advanced by those restrictions. *See, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1113 (9th Cir. 2023).

Separation of Powers: The FTC's claims are also barred because the Commission's prosecution of this enforcement action violates the Constitution's separation of powers. The President "alone" has the "entire" power to execute federal law. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). The "general rule" is that the President has "unrestricted removal power" over executive officers. *Id.* at 2198. FTC Commissioners, however, are not freely removable by the President. *See* 15 U.S.C. § 41 (permitting removal only for "inefficiency, neglect of duty, or malfeasance in office."). Although the Supreme Court upheld the restriction on removing FTC Commissioners 90 years ago in *Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935), *Humphrey's* will not save the FTC's action here, *see Trump v. Wilcox*, --- U.S. ---, 145 S. Ct. 1415, 1418 (2025) (Kagan, J., dissenting) (explaining that the Court has "overrule[d] or revise[d]"

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 16

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Humphrey's*). This for-cause removal scheme violates the Constitution's separation of powers and renders the FTC's enforcement action unlawful.

<u>Major Questions</u>: The FTC's claims are barred because they seek to radically expand the FTC's power to regulate nearly all e-commerce websites without the express authorization of Congress. *See* Dkt. 171 at 74.

<u>Statute of Limitations—Civil Monetary Penalties</u>: The FTC's demand for civil penalties is untimely. A penalties demand is time-barred when not brought "within five years from the date when the claim first accrued." 28 U.S.C. § 2462; *see also FTC v. Braun*, 2024 WL 449288, at *10 (S.D.N.Y. Feb. 6, 2024). Here, the underlying claims accrued no later than 2014 and 2016, because the FTC alleges that the Prime enrollment and cancellation flows were violating ROSCA and the FTC Act as of these dates. Accordingly, the FTC only had until 2019 and 2021 to seek penalties for claims based on the Prime enrollment and cancellation flows, respectively. But the FTC did not file this lawsuit until 2023.[1]

<u>Laches</u>: The FTC's claims are barred by the doctrine of laches because the FTC engaged in affirmative misconduct—including at least in connection with its investigation of Amazon and selective enforcement of ROSCA and the FTC Act—and egregiously delayed in filing and serving the Complaint against Amazon, thereby prejudicing Amazon. For example, the FTC alleges that Amazon began violating ROSCA no later than 2014 and 2016, and yet did not file this lawsuit until 2023. In the meantime, the Prime flows (which the FTC now claims were facially unlawful) were public, and FTC attorneys and staff enrolled in Prime. But the FTC failed to take any action, for almost a decade.

## V.    REMEDIES

The parties are continuing to negotiate how, if necessary, evidence relating to the FTC's requested remedies will be presented to the Court.

---

[1] Defendants also assert that, in the event of liability, the FTC is barred from recovering consumer redress for any claims predating June 21, 2020—three years before the Complaint was filed on June 21, 2023. *See* 15 U.S.C. § 57b(d).

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 17

DATED this 15th day of September, 2025.

DAVIS WRIGHT TREMAINE LLP

By s/ *Kenneth E. Payson*
    Kenneth E. Payson, WSBA #26369
    James Howard, WSBA #37259
    920 Fifth Avenue, Suite 3300
    Seattle, WA  98104-1610
    Telephone: (206) 622-3150
    Fax: (206) 757-7700
    E-mail: kenpayson@dwt.com
            jimhoward@dwt.com

COVINGTON & BURLING LLP

    Stephen P. Anthony*
    Laura Flahive Wu*
    Laura M. Kim*
    John D. Graubert*
    850 Tenth Street, NW
    Washington, DC  20001
    Telephone: (206) 662-5105
    E-mail: santhony@cov.com
            lflahivewu@cov.com
            lkim@cov.com
            jgraubert@cov.com

    John E. Hall*
    415 Mission Street, Suite 5400
    San Francisco, CA  94105
    Telephone: (415) 591-6855
    E-mail: jhall@cov.com

    Megan L. Rodgers*
    3000 El Camino Real
    Palo Alto, CA  94306
    Telephone: (650) 632-4734
    E-mail: mrodgers@cov.com

    Anders Linderot*
    620 Eighth Avenue
    New York, NY 10018
    Telephone: (212) 841-1000
    Email: alinderot@cov.com

DEFENDANTS' TRIAL BRIEF
(2:23-cv-0932-JHC) - 18

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

HUESTON HENNIGAN LLP

John C. Hueston*
Moez M. Kaba*
Joseph A. Reiter*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
E-mail: jhueston@hueston.com
        mkaba@hueston.com
        jreiter@hueston.com

*admitted pro hac vice

Attorneys for Defendants AMAZON.COM, INC.,
NEIL LINDSAY, RUSSELL GRANDINETTI,
AND JAMIL GHANI

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax