The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

          Plaintiff,

    v.

AMAZON.COM, INC., *et al.*,

          Defendants.

No. 2:23-cv-0932-JHC

DECLARATION OF THEO A. LESCZYNSKI IN SUPPORT OF DEFENDANTS' TRIAL BRIEF AND JOINT STATEMENT OF DISPUTED JURY INSTRUCTIONS

I, Theo A. Lesczynski, declare as follows:

1.     I am an attorney at the law firm Davis Wright Tremaine LLP ("DWT"), counsel for Defendants Amazon.com, Inc., Russell Grandinetti, Neil Lindsay, and Jamil Ghani in the above-captioned case. All facts stated herein are true to the best of my knowledge and belief and are based either on my personal knowledge or review of documents attached as exhibits hereto.

2.     Attached hereto as **Exhibit 1** is a true and correct excerpted copy of the FTC's Second Supplemental Responses and Objections to Amazon.com, Inc.'s First Set of Interrogatories, dated August 2, 2024.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the excerpted transcript of the deposition of Amanda Basta, taken on September 10, 2024.

LESCZYNSKI DECL. ISO DEFS.' TRIAL BRIEF &
JOINT STATEMENT OF DISPUTED JURY INSTRUCTIONS
(2:23-cv-0932-JHC) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this 15th day of September, 2025 in Seattle, Washington.

3

4                                          s/ *Theo A. Lesczynski*
                                          Theo A. Lesczynski

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

LESCZYNSKI DECL. ISO DEFS.' TRIAL BRIEF &
JOINT STATEMENT OF DISPUTED JURY INSTRUCTIONS
(2:23-cv-0932-JHC) - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# EXHIBIT 1

The Honorable John H. Chun

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                Plaintiff,<br><br>    v.<br><br>AMAZON.COM, INC., et al.,<br><br>                Defendants. | No. 2:23-cv-0932-JHC<br><br>**FEDERAL TRADE COMMISSION'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO AMAZON.COM, INC.'S FIRST SET OF INTERROGATORIES** |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Federal Trade Commission ("FTC") hereby objects and responds to Defendant Amazon.com, Inc.'s First Set of Interrogatories ("Interrogatories"). These Second Supplemental Responses supersede the FTC's previous responses and objections, dated October 2, 2023 and January 23, 2024.

## GENERAL RESPONSES AND OBJECTIONS

1.      Discovery has not concluded in this litigation. Accordingly, the FTC's responses and objections are based upon the information available to the FTC at this stage in the litigation and presently known by the FTC. The FTC reserves the right to supplement, revise, modify, or

Interface Interference.  "Interface Interference" is a design element that manipulates the user interface in ways that privilege certain specific information relative to other information. Amazon uses Interface Interference in the Iliad Flow by emphasizing options that divert the consumer from the flow without cancelling and by employing warning icons near the option to cancel, which evokes anxiety and fear of loss in consumers.  The presence of Interface Interference complicates the Iliad Flow.

Obstruction ("Roach Motel").  "Obstruction," also known as the "roach motel" technique, is a design element that involves intentionally complicating a process through unnecessary steps to dissuade consumers from an action.  Amazon uses Obstruction in its Iliad Flow by:  (1) making the ingress to the Iliad Flow difficult for consumers to locate; and (2) forcing consumers who have already expressed an intent to cancel by locating and entering the Iliad Flow to view marketing and reconsider options other than cancellation.  The presence of Obstruction complicates the Iliad Flow.

Misdirection.  "Misdirection" is a design element that focuses a consumer's attention on one thing to distract from another.  Amazon uses Misdirection in its Iliad Flow by presenting consumers with asymmetric choices that make it easier to abandon an attempted Prime cancellation than to complete it.  In particular, Amazon uses attractors such as animation, a contrasting color blue, and text to draw consumers' attention to "Remind me later" and "Keep my benefits" options rather than "Continue to Cancel."  Amazon further misdirects consumers who have entered the Iliad Flow by presenting visually appealing options to perform acts other than cancel, such as exploring the benefits of the subscription service (thereby exiting the Iliad Flow).  The presence of Misdirection complicates the Iliad Flow.

**INTERROGATORY NO. 9:  Describe with particularity the features that You contend**

48

make a cancellation method sufficiently "simple" under ROSCA, including but not limited to all factors you consider in that analysis and the weight You assign to each of those factors.  Your response should include the number of clicks that You consider to be excessive such that an online cancellation method is not sufficiently "simple" under ROSCA.

RESPONSE: The FTC objects to this Interrogatory on the grounds that it seeks information protected by the attorney work product doctrine, attorney-client privilege, or deliberative process privilege, insofar as it calls for internal FTC information or analyses of a "simple" cancellation method.

The FTC further objects that the request goes beyond the permissible scope of discovery in that it seeks legal analysis, rather than relevant facts or the FTC's contentions regarding how the law applies to the relevant facts.  *See, e.g.*, Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that *relates to fact* or *the application of law to fact . . . .*"  (emphasis added)); *A.G. v. Oregon Dep't of Human Servs.*, 2015 WL 1548919, at *2 (D. Oregon Apr. 7, 2015) (rejecting interrogatory that did "not ask for facts or the application of law to facts" and instead sought "discovery on defendants' motion argument, not facts relevant to [plaintiffs'] claims").

Without waiving those objections, the FTC notes that the Commission's Enforcement Policy Statement Regarding Negative Option Marketing provides guidance regarding simple cancellation mechanisms.  Additionally, in response to Interrogatory 8 (and in the Amended Complaint paragraphs referenced therein), the FTC identified ways in which the Amazon Prime cancellation process is not "simple."

Without waiving its objections, the FTC further responds to this interrogatory with a list

49

of non-exhaustive factors it contends may be relevant in determining whether a cancellation method is "simple" under ROSCA. We have not, however, specified the number of clicks we "consider to be excessive" such that an online cancellation method is not "simple." This is because determining whether an online cancellation process is "simple" is a fact-specific inquiry into that particular process, not necessarily determined solely by the number of clicks to cancel.

- Whether cancellation mechanisms are at least as easy to use as the method the consumer used to initiate the negative option feature.

- Whether negative option sellers subject consumers to new offers or similar attempts to save the negative option arrangement that impose unreasonable delays on consumers' cancellation efforts.

- Whether negative option sellers provide cancellation mechanisms through the same medium (such as website or mobile application) the consumer used to sign up for the negative option feature.

- If the seller provides for telephone cancellation, whether the seller provides a telephone number, answers all calls to this number during normal business hours, within a short time frame, and ensures the calls are not lengthier or otherwise more burdensome than the telephone call the consumer used to sign up for the negative option feature.

- Whether sellers impede the effective operation of promised cancellation procedures, and whether they honor cancellation requests that comply with such procedures.

- Whether there is a clear and prominent link to cancel subscriptions in locations where subscribers would expect to find it and whether the link is clearly labeled.

- Whether there is use of misleading language, including language that falsely or misleadingly suggests that subscribers have cancelled when they have not yet done so, or

if there is use of language that clearly indicates to consumers how to complete any cancellation mechanisms.

- Whether the user interface tricks, manipulates, or otherwise misleads consumers into abandoning the cancellation flow before they have completed cancellation.
- The number of steps a consumer must complete in order to cancel.
- The number of clicks a consumer must make to cancel.
- The number of pages a consumer must navigate to cancel.
- The length of time to cancel.
- The number of alternatives to cancellation presented to a consumer seeking to cancel.
- The number of times a consumer must request cancellation (or continue to "proceed to cancel") in order to actually cancel.
- Whether the option to cancel is "above the fold" on a webpage or mobile device, or if consumer must "scroll down" to cancel.
- If the cancellation process has multiple pages or steps, whether the design and layout of each step or page is consistent or inconsistent.
- The number of steps to navigate to or otherwise access the cancellation process.
- The number of clicks to navigate to or otherwise access the cancellation process.
- The number of pages to navigate to or otherwise access the cancellation process.
- The length of time to navigate to or otherwise access the cancellation process.
- Whether there is a clear and prominent link or other way to navigate to or otherwise cancellation.
- Whether the consumer is presented with repetitive information while attempting to cancel.

- Whether the consumer is presented with distracting information while attempting to cancel.

- Whether the consumer is presented with extraneous information while attempting to cancel.

- Whether a consumer who attempts to cancel via one medium is redirected to cancel via a different medium (e.g., whether a consumer who tries to cancel via telephone is redirected to cancel online).

**INTERROGATORY NO. 10:** **State the complete factual basis for Your contention that Amazon is "about to violate" the "laws enforced by the Commission" as You contend in paragraph 242 of the Complaint.**

**RESPONSE:** The FTC objects that the Interrogatory misstates the FTC's allegations. In particular, the FTC alleged that it "has *reason to believe* that [Amazon] is violating, and is about to violate, laws enforced by the Commission because Defendant has engaged in ROSCA violations repeatedly and knowingly for years. Those violations are ongoing. Even if Amazon halts or has halted some problematic conduct, Amazon has consistently pressured its employees to maintain Prime subscription numbers, meaning the incentive for enrollment and cancellation process violations remains." Compl. ¶ 242 (emphasis added).

The FTC further objects that the Interrogatory seeks information that is irrelevant to any party's claim or defense or, even if relevant, is disproportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Specifically, the question whether the FTC has "reason to believe" that a defendant is violating or is about to violate the law (under 15 U.S.C. § 53(b)) is non-justiciable. *See, e.g.*, *FTC v. Nat'l Urological Group, Inc.*, 2006 WL 8431977, at *3 (N.D. Ga. Jan. 9, 2006) ("reason to believe" language does not provide meaningful standard for judicial review); *Boise*

the Nonconsensual Enrollment of consumers from at least 2014 through the present, and (2) Amazon failed to offer consumers a simple mechanism to cancel their Prime subscription from the time it start using its Iliad cancellation flow (which the FTC currently believes was in 2016) through the present.

Dated: August 2, 2024                     /s/ Thomas Maxwell Nardini
                                          EVAN MENDELSON (DC Bar #996765)
                                          OLIVIA JERJIAN (DC Bar #1034299)
                                          THOMAS MAXWELL NARDINI
                                          (IL Bar # 6330190)
                                          Federal Trade Commission
                                          600 Pennsylvania Avenue NW
                                          Washington DC 20580
                                          (202) 326-3320; emendelson@ftc.gov (Mendelson)
                                          (202) 326-2749; ojerjian@ftc.gov (Jerjian)
                                          (202) 326-2812; tnardini@ftc.gov (Nardini)

                                          COLIN D. A. MACDONALD (WSBA # 55243)
                                          Federal Trade Commission
                                          915 Second Ave., Suite 2896
                                          Seattle, WA 98174
                                          (206) 220-4474; cmacdonald@ftc.gov (MacDonald)

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION

## <u>VERIFICATION</u>

I am authorized to verify Plaintiff's Second Supplemental Responses and Objections to Amazon.com, Inc.'s First Set of Interrogatories on behalf of the Federal Trade Commission, and I declare under penalty of perjury that the foregoing responses are true and correct to the best of my knowledge.

Executed on August 2, 2024                    /s/ Evan Mendelson

                                             Evan Mendelson

# EXHIBIT 2

1               UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4      --------------------------

5      FEDERAL TRADE COMMISSION,

6             Plaintiff,

7      V.                          No. 2:23-cv-0932-JHC

8      AMAZON.COM, INC., et al.,

9             Defendant.           VOLUME I

10     --------------------------

11

12      30(B)(6) VIDEO-RECORDED DEPOSITION OF AMANDA BASTA

13                    ON BEHALF OF

14              FEDERAL TRADE COMMISSION

15

16           Tuesday, September 10, 2024

17                    8:51 AM

18

19

20

21     Reported by:  Denise Dobner Vickery, RMR, CRR

22     JOB NO.:  J11644778



1  person to stay in the program versus canceling.  So

2  it's -- it's marketing offers that are kind of

3  interspersed with the cancellation transaction.

4           Q.   Okay.  Do you know when a customer

5  calls Amazon to cancel their Prime subscription

6  whether they are presented with any save offers at

7  all?

8           A.   I don't.

9           Q.   Okay.  And there's nothing unlawful

10 about presenting a sales -- a save offer to a

11 customer who is seeking to cancel; correct?

12          A.   Not currently, no.

13               MR. MENDELSON:  Objection.  Calls

14 for a legal opinion.

15               THE WITNESS:  Sorry.

16 BY MR. KABA:

17          Q.   I'm sorry.  We got the --

18          A.   Entangled.

19          Q.   We got a little entangled there.  So

20 let me try again.

21               Ms. Basta, ROSCA does not prohibit a

22 company from presenting a save offer, as you've



1    defined it, to a consumer who calls or goes online

2    or chats to cancel; correct?

3                    MR. MENDELSON:  Objection.  Scope.

4    Calls for legal opinion.

5                    THE WITNESS:   There's no per se

6    bar, no.

7    BY MR. KABA:

8         Q.   Thank you.

9              I think because I asked "does not" and

10    then you said "no," we've now got a double negative.

11    So I'm going to try it one more time.

12         A.    (Laugh).

13         Q.   Ms. Basta, regardless of the mechanism

14    to cancel either on the phone, through the website

15    cancellation flow, through the chatbot or through

16    the e-mail, ROSCA does not prohibit a company from

17    presenting a save offer prior to processing a

18    cancellation request; correct?

19         A.   There's --

20                    MR. MENDELSON:   Same objections.

21                    THE WITNESS:   There's no pro se

22    prohibition on save offers in ROSCA.



1    BY MR. KABA:

2            Q.   So my statement is correct.  Yes?

3                    MR. MENDELSON:  Same objection.

4                    THE WITNESS:   I'm trying to avoid

5    the double negative.

6    BY MR. KABA:

7            Q.   My statement is correct that ROSCA does

8    not bar or prohibit a company from presenting a save

9    offer prior to processing a cancellation request;

10   correct?

11           A.   To the extent that it does not -- to

12   the extent that there is a simple mechanism even

13   with a save offer, yes.

14           Q.   Okay.  So if a consumer can call to

15   cancel their Prime subscription and before the

16   subscription is canceled they get an offer that

17   says, hey, we'll give you a discount or why don't

18   you -- we'll give you three more months for free,

19   that's not prohibited by ROSCA; correct?

20                   MR. MENDELSON:  Objection.  Vague.

21                   THE WITNESS:   If it -- it is not

22   prohibited by ROSCA if the mechanism is simple



1    whether or not disclosures are clear and conspicuous

2    is the prominence of the disclosures; right?

3            A.    Yes.

4            Q.    And that could include font size?

5            A.    Yes.

6            Q.    Does the FTC or ROSCA anywhere say what

7    font size is required for a disclosure to be

8    considered prominent?

9            A.    No, because, again, it's going to

10   depend.  Like if the biggest font on the screen is

11   48 point, would it -- would a 48 point do it.  Would

12   it have to be bigger than 48.  Could it be slightly

13   smaller than.

14               It's just one of those things where

15   until you see what is around it.  If all of the

16   print is a certain size, having something that's

17   larger, you know, might do it.  It might distract.

18   It just, again, depends on the design of the page,

19   and in a vacuum, you can't make that determination.

20           Q.    So even what you just said.

21           A.    Uh-huh.

22           Q.    Like you look at the other fonts on the



1   page, etc.

2          A.    Uh-huh.

3          Q.    Does ROSCA itself say anything about --

4   about what you would need to look at to determine

5   whether or how prominent a disclosure is?

6          A.    No.

7          Q.    Okay.  So that's how I want to go

8   through this.

9          A.    Uh-huh.

10          Q.    So does the FTC or ROSCA say anywhere

11   what the font size needs to be in order for a

12   disclosure to be considered prominent?

13          A.    I don't think there's a one-size-fits

14   answer -- fits-all answer, so no.

15          Q.    Does ROSCA -- I'm sorry.

16              Does the FTC or ROSCA say anywhere what

17   color the disclosure needs to be in order to satisfy

18   the clear and conspicuous standard?

19                    MR. MENDELSON:  Objection.  Scope.

20                    THE WITNESS:   Not that I'm aware

21   of, no.

22   BY MR. KABA:



1  the word "simple" here in this context, look at the

2  dictionary definition?

3                    MR. MENDELSON:  Same objection.

4                    THE WITNESS:   Certainly.

5  BY MR. KABA:

6       Q.   Same question about mechanism.  How

7  would you define "mechanism"?

8                    MR. MENDELSON:  Same objection.

9                    THE WITNESS:   Again, without a

10  definition in the statute -- and I'm just going to

11  look one more time to make sure that there isn't

12  one.

13                    (Reviews document.)

14                    Then that certainly consistent

15  with statutory interpretation principles, that's

16  where I would look.

17  BY MR. KABA:

18       Q.   You -- you paused without actually

19  telling me where you would look.  You did the first

20  part of your sentence and the last part, but you

21  didn't -- you didn't connect it.  So let me ask you

22  the question again.



1              How do you define the word "mechanism"

2     as used in the statute?

3                         MR. MENDELSON:  Same objection.

4                         THE WITNESS:   (Reviews document.)

5              That's a different question.

6              I define it as the means by which.

7     BY MR. KABA:

8         Q.   Okay.  How -- where would one look to

9     get the actual definition of the word "mechanism" as

10    used in this statute?

11                        MR. MENDELSON:  Same objection.

12                        THE WITNESS:  Again, it's a legal

13    interpretation question.  Where there's not a

14    definition in the statute, generally speaking,

15    courts look to the ordinary meaning of terms, which

16    generally comes from a dictionary.

17    BY MR. KABA:

18        Q.   Okay.  And here the mechanisms for

19    cancellation could be an online cancellation

20    mechanism; correct?

21        A.   Yes.

22                        MR. MENDELSON:  Objection.  Vague.



1    BY MR. KABA:

2         Q.   It could be a telephonic cancellation

3    mechanism; correct?

4              MR. MENDELSON:  Same objection.

5              THE WITNESS:  Yes.

6    BY MR. KABA:

7         Q.   It could be canceling by e-mail.

8    That's a mechanism of cancellation; correct?

9         A.   Yes.

10        Q.   And sending a message through a

11   customer service chat is another mechanism to

12   cancel; correct?

13        A.   Yes.

14        Q.   Okay.  Does ROSCA require an online

15   cancellation mechanism?

16             MR. MENDELSON:  Objection.  Scope.

17             THE WITNESS:   Not necessarily,

18   no.

19   BY MR. KABA:

20        Q.   Okay.  Now, you can comply with ROSCA

21   even if you don't have an online cancellation

22   mechanism?



 1                    MR. MENDELSON:  Objection.  Vague.

 2    Scope.

 3                    THE WITNESS:   It depends.  Would

 4    it be simple for a consumer who signed up for a

 5    program online to have to go to a different method?

 6    I don't know that we have enough information for

 7    that.  You know, are they looking to cancel online?

 8    Is there -- can they easily find the number to

 9    cancel if they signed up online?

10                    Like it's, again, that's -- that's

11    part of that contextual inquiry.

12    BY MR. KABA:

13         Q.    Yeah.  The soup that you have to look

14    at?

15         A.    Uh-huh.

16         Q.    For every one of these elements in

17    ROSCA, there's sort of a soup of different kinds of

18    information you need to look at to determine whether

19    or not there's a violation; right?

20                    MR. MENDELSON:  Objection.  Form.

21    Scope.

22                    THE WITNESS:  Sure.  Different



1    evidence depending on the circumstance.

2    BY MR. KABA:

3         Q.   Okay.  So what I'm asking is about what

4    ROSCA itself requires.

5              You could satisfy ROSCA even if you

6    don't have an online method of cancellation;

7    correct?

8              Strike that.

9              A company could satisfy ROSCA even if

10   it does not have an online mechanism to cancel;

11   correct?

12                  MR. MENDELSON:  Objection.  Vague.

13   Scope.

14                  THE WITNESS:   Theoretically, yes.

15   BY MR. KABA:

16        Q.   Okay.  Because ROSCA does not require

17   or prescribe any particular cancellation mechanism.

18             It just says that you need to have a

19   simple mechanism to cancel; right?

20        A.   Simple mechanisms, yes.

21        Q.   Okay.  Okay.  Can you tell -- identify

22   for us any companies that you would contend use a



1  negative option feature that do provide a ROSCA

2  compliant simple mechanism to cancel?

3                    MR. MENDELSON:  Objection.  Scope.

4                    THE WITNESS:   Again, it's not one

5  of the topics that I was designated to testify on

6  today, but I don't know one way or the other.

7  BY MR. KABA:

8       Q.   Okay.  You are -- you referred to -- to

9  topics at various points.

10      A.   Uh-huh.

11      Q.   But I'm asking you -- you are the

12  Assistant Director of the Division of Enforcement.

13  Yes?

14      A.   Yes.

15      Q.   And in that, there's three assistant

16  directors; correct?

17      A.   Yes.

18      Q.   And the Division of Enforcement is

19  primarily responsible for ROSCA compliance; right?

20      A.   Yes.

21      Q.   Okay.  So even in that role, Ms. Basta,

22  are you able to identify for us any company that you



1                CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA        )

3           I, Denise Dobner Vickery, CRR, RMR and

4    Notary Public, hereby certify the witness, AMANDA

5    BASTA, was by me first duly sworn to testify to the

6    truth; that the said deposition was recorded by me

7    and thereafter reduced to printing under my

8    direction; and that said deposition is a true

9    transcript of my original stenographic notes.

10          I certify the inspection, reading and

11   signing of said deposition were NOT waived by

12   counsel for the respective parties and by the

13   witness; that I am not a relative or employee of any

14   of the parties, or a relative or employee of either

15   counsel, and I am in no way interested directly or

16   indirectly in this action.

17   CERTIFIED TO THIS 20TH DAY OF SEPTEMBER, 2024.

18                    _Denise D. Vickery_

19                    DENISE DOBNER VICKERY, CRR,RMR
                      Notary Public in and for the
20                    District of Columbia

21

22   My Commission expires:  March 14, 2028

