UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 2:23-cv-00932-JHC |
| Plaintiff, | ORDER |
| v. | |
| AMAZON.COM, INC; NEIL LINDSAY, individually and as an officer of Amazon.com, Inc.; RUSSELL GRANDINETTI, individually and as an officer of Amazon.com, Inc.; JAMIL GHANI, individually and as an officer of Amazon.com, Inc., | |
| Defendant. | |

# I

## INTRODUCTION

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. ## 314, 316, 319. Plaintiff, the Federal Trade Commission (FTC), seeks partial summary judgment as to liability against Defendant Amazon.com, Inc. (Amazon) and three Defendant Amazon executives (Individual Defendants), for alleged violations of Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and Section 4 of the Restore Online

Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403.  Dkt. # 314.  Defendants contend that, as a matter of law, they are not liable for violations of the FTC Act or ROSCA, and that the FTC is not entitled to any compensatory relief or civil monetary penalties.  Dkt. ## 316, 319.  For the reasons below, the Court GRANTS in part and DENIES in part the FTC's motion for summary judgment, and DENIES Defendants' motions for summary judgment.

## II
### BACKGROUND

A.    Factual Background

Amazon Prime (Prime) is an online "membership subscription service that provides benefits and discounts."  *See* Dkt. # 316 at 4.  Defendants use enrollment and cancellation "flows" to up-sell customers to Prime and to allow Prime members to cancel their membership.  *Id.* at 5; *see* Dkt. ## 317-4 at 3–28 (enrollment); 318-42 at 28–30 (cancellation).  The FTC maintains that the enrollment flow has violated ROSCA since 2014 and the cancellation flow has violated ROSCA since 2016.  Dkt. # 325 at 657.

1.    Prime Enrollment Flow

A consumer that makes a purchase on Amazon.com typically encounters multiple Prime enrollment offers while completing their product purchase.  *See generally* Dkt. # 317-4.  Before October 2022, Amazon referred to this checkout process and the associated Prime offers as the Multi-Page Pipeline (MPP).  Dkt. # 318-7 at 28.  The three pages that comprised the MPP were the (1) "Ship Option Selection Page" (SOSP); (2) "Universal Prime Decision Page" (UPDP) or "SOSP Prime Decision Page" (SOSP PDP); and (3) "Single Page Checkout" Page (SPC).  *Id.*  A flowchart of the MPP is depicted below:



*Id.*

      a.    SOSP

      At the start of the MPP, some customers with saved "defaults" (a default delivery address and payment method) and all customers without saved defaults encounter the SOSP.  Dkt. # 317-2 at 15, 27 ("Prior to October 2022, non-Prime customers who have saved their default billing information and default shipping information with Amazon prior to checkout might also have been presented with the Ship Option Select Page ('SOSP') during the checkout process.").  An example image of the SOSP is below:



Dkt. # 317-4 at 10.  Consumers that select the "Prime" shipping option are not immediately

enrolled in Prime. *Id.* at 11.  Instead, regardless of the shipping option they choose, consumers

need to click the orange "Continue" button.  *Id.* at 10.  Customers then arrive at the "Payment

Selection Page."  *Id.* at 11.  An example of the Payment Selection Page is below:

*Id.* at 11.  Defendants obtain customers' billing information on this page.  *Id.*

1

        b.      UPDP

2        Amazon customers who do not select a Prime shipping option on the SOSP next see the

3 UPDP. Dkt. # 317-2 at 16–18. The UPDP page has varied over time and was "personalized

4 based on a variety of factors unique to that customer, such as their prior interactions with

5 Amazon, eligibility for Prime, and the items in the customer's shopping cart." *Id.* at 31; *see also*

6 Dkt. # 314 Figures 5–11 (depicting various iterations of the UPDP). An example of a UPDP

7 page is below:

8

9

10

11

12

13

14

15

16

17



18 Dkt. # 317-4 at 19. In this example, the only way for a customer to proceed past this page

19 without signing up for Prime is to click the "No thanks, I do not want FREE delivery" hyperlink.

20 *See* Dkt. # 320-22 at 28 (100:11-16), 33 (105:17-22), 47 (119:7-11).[1] Customers that click the

21 orange "Get FREE Same-Day Delivery" button enroll in Prime. *Id.*[2] Even if a customer does

22

23      [1] Different versions of the UPDP page use different language for this hyperlink. *See* Dkt. # 317-2 at 11.

24      [2] Different versions of the UPDP page use different language for this button. *See* Dkt. # 317-2 at 11.

not finalize the product purchase that led them to this page, they still enroll in Prime.  Dkt. # 320-22 at 16–17 (88:17–89:21).  The customer is charged for a Prime membership (immediately or after a free-trial period) using the payment method either previously provided on the "Payment Selection Page" or saved as the "default" payment method in a prior visit to the website.  Dkt. # 317-2 at 12; *see* Dkt. # 320-22 at 42–43 (114:22–115:22).

        c.       SOSP PDP

A customer that selects the "Amazon Prime" shipping option on the SOSP is directed to the SOSP PDP.  Dkt. # 317-2 at 16–18.  This page is pictured below and functions much like the UPDP:



Dkt. # 317-4 at 12.

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

        d.     SPC

     The final page of the MPP, the SPC, allows a customer to complete their product purchase. *Id.* at 26. Clicking the orange "Place your order" button allows the customer to complete their product purchase. *Id.* This page also includes two options to join Prime: (1) the "Try Prime FREE for 30 days" button and (2) the "Today" button. *Id.* An example image of the SPC is below:



*Id.* If a customer clicks the "Try Prime FREE for 30 days" button, the page changes to the version below, and if a customer wants to remove the Prime membership from their order after clicking this button, they need to click the "Delete" hyperlink in the middle of the page:

1
2
3
4
5
6
7
8
9
10
11
12



13

*Id.* at 27; *see* Dkt. # 320-22 at 49 (121:19–24).

14

e.      TrueSPC

15

Around October 2022, Amazon launched TrueSPC to replace the MPP.  Dkt. # 318-7 at

16

28.  A comparison of the two flows is shown below:

17
18
19
20
21
22
23
24

ORDER - 8

1
2
3
4
5
6
7
8
9
10
11
12
13



14  *Id.*  This change removed the SOSP and SOSP PDP pages from the Prime enrollment flow.  *Id.*

15  In this new flow, only customers with saved default delivery address and payment methods are

16  shown the UPDP.  *Id.*  And all consumers, regardless of whether they encountered the UPDP, are

17  directed to the SPC page.  *Id.*

18        2.      Prime Cancellation Flow

19        There are several ways for a Prime member to cancel their membership, including

20  through the Prime cancellation flow.  Dkt. # 318-43 at 19–21.  Amazon internally refers to the

21  Prime cancellation flow as "Iliad."  Dkt. # 320-20 at 3.  And there are several ways to "ingress"

22  to this cancellation flow.  Dkt. # 318-43 at 19.

23
24

Once a Prime member enters Iliad, they must reaffirm their desire to cancel on three pages before they complete the cancellation process: (1) the Marketing Page; (2) the Offer Page; and (3) the Cancel Page.  Dkt. # 318-42 at 30.

        a.     Marketing Page

The Marketing Page is the first page customers encounter in the Iliad flow.  *Id.*  To proceed to the next page, a customer must click the "Cancel My Benefits" button in the example below.  *Id.*[3]



*Id.*  To "manage customer expectations that [this] button w[ouldn]'t immediately cancel," and in response to concerns from the European Commission, Amazon changed the label on this button to "Continue to Cancel" in 2021.  Dkt. # 318-35 at 4, 7.  This change was not implemented in the United States until October 2022.  Dkt. # 318-46 at 3.

//

//

---

[3] At times, this "Cancel My Benefits" button was labeled "Cancel My Membership" or "End My Benefits."  *See* Dkt. ## 318-37 at 3 (End My Benefits); 318-44 at 5 (Cancel My Membership).

b.    Offer Page

The offer page presents alternative Prime payment plans, offers a student Prime membership, and suggests a membership for customers on government assistance.  *See* Dkt. # 318-42 at 30.  A customer that intends to proceed to the next page of Iliad must click the "Continue to Cancel" button in the example below:



*Id.*

c.    Cancel Page

The final page of Iliad is the cancel page.  *Id.*  A customer that entered Iliad wishing to end their membership does so only once they click the "End on October 19, 2021" button in the example below.



*Id.* In response to government regulators, Amazon launched a two-page version of Iliad in the United States in March 2023.  Dkt. ## 318-47 at 4–5 (showing the two-page version); 320-1 at 2 (describing environment of regulatory "enforcement").  This version removes the Offer Page and introduces a shortened Cancel Page.  Dkt. # 318-47 at 4–5.

       3.     Individual Defendants

       The Individual Defendants are Amazon executives.  Dkt. # 320-21 at 2–5.  Russell Grandinetti is the Senior Vice President (SVP) for Amazon International Stores and he primarily manages Amazon's e-commerce business outside the U.S. and Canada. Dkt. # 325 at 970.  He has been an SVP at Amazon since 2016, and he assumed direct authority over Prime in November 2021.  *Id.* at 973–74, 978.

Neil Lindsay was Vice President for Prime and Marketing, Worldwide Consumer from February 2017 to July 2021, and was an SVP for that organization from July to November 2021. *Id.* at 810–11. In this role, he had "a wide range of responsibilities," including "leading the team and developing technologies[.]" *Id.* at 812. Since 2021, he has been an SVP for Amazon Health Services, which is not part of the Prime organization. *Id.* at 806.

Jamil Ghani is a VP of Prime with worldwide responsibility. *Id.* at 778. He assumed this title in October 2019. *Id.* Before October 2019, he was a VP of International Prime. *Id.* Since November 2021, he has reported to Grandinetti. *Id.* at 975.

4.      Defendants' Understanding

Defendants' understanding of customer frustrations and problems caused by the flows—if any—is disputed. For instance, several Amazon employees testified that only a small number of customers enrolled in Prime unintentionally. Dkt. ## 361-1 at 148 (177:5–22); 361-2 at 152–53 (189:12–190:8); 361-2 at 106–07 (253:14–254:13); 361-2 at 163–64 (9:24–10:2). And there is evidence that Amazon established a "Shopper Frustration" team that the company's leadership supported and was "very successful" at "driving customer experience improvements at Amazon." Dkt. # 361-2 at 3 (25:5–8), 5 (27:14–28:4). The Individual Defendants likewise testified they worked "constantly" to "improve the customer experience," *see* Dkt. # 325 at 1015 (211:1–8), and none of them believe the flows were deceptive. *Id.* at 769 (24:4–22); *see id.* at 994 (88:6–13); 822–23 (46:24–47:5). By contrast, the FTC presents evidence that Amazon employees discussed customer frustration with the enrollment flow; one document saying, "Prime sign-ups are not always transparent; customers sign up without knowing they did." Dkt. # 317-26 at 5. Another document puts it more bluntly and describes unintentional Prime enrollment as "an unspoken cancer" that the company "need[ed] to correct[.]" Dkt. # 317-37 at 4. And cancellation surveys conducted by Amazon showed that many customers signed up

unintentionally.  *See* Dkt. ## 318-11; 318-12 at 27; 318-14 at 8–9.  The FTC likewise provides evidence that suggests Amazon knew the Iliad cancellation flow was not straightforward; rather, "The goal of project Iliad was to improve [Amazon's] ability to retain members who attempt to cancel their membership."  Dkt. # 318-29 at 2.

## III
### Discussion

A.    Summary Judgment Standards

Summary judgment is warranted when the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).  Courts must "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris,* 550 U.S. 372, 378 (2007).

When a court considers cross-motions for summary judgment, "[e]ach motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal citation omitted).  The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the lack of such a dispute by either: (1) producing evidence negating an essential element of the nonmoving party's case, or (2) showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Metro. Grp. Prop. & Cas.*

*Ins. Co. v. Fite*, 738 F. Supp. 3d 1371, 1376 (W.D. Wash. 2024) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000)).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250).

B.      ROSCA's Application

        The parties dispute whether Section 4 of ROSCA regulates Prime.  ROSCA makes it unlawful

> for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—
>
> (1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;
>
> (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and
>
> (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

15 U.S.C. § 8403.  "Negative option feature" means "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. 310.2(w).

        The FTC says Prime is sold through a negative option feature because consumers who are enrolled in Prime and do nothing still have their Prime membership automatically renewed.  Dkt. # 314 at 52–53.  And the agency notes that Defendants did not question whether ROSCA applied at the motion to dismiss stage of this litigation.  *Id.* at 52; *see* Dkt. # 165 at 14 ("Amazon does

not contest that its Prime automatic renewal and free trials qualify as negative option features."). The FTC identifies three other cases, including one from this District, in which courts analyzed this issue and ruled that ROSCA applied to automatically renewing online membership programs like Prime. *Id.* at 53.

Defendants respond that consumers manifest acceptance of an offer to join Prime only once—by actively clicking a button—so joining Prime is not a negative option feature and ROSCA does not apply. Dkt. # 365 at 17. They contend that the other decisions interpreting the application of this statute are erroneous or distinguishable. *Id.* at 18. Defendants also point out that these other decisions do not address the FTC's recent rulemaking on negative option features, which expands the definition of a negative option feature to include provisions that the customer's silence is considered acceptance or continuing acceptance of an offer. *Id.*

The plain language of ROSCA and the Federal Trade Commission's Telemarketing Sales Rule confirm that Prime is subject to ROSCA. It is undisputed that Prime is a service sold in transactions effected on the internet. 15 U.S.C. § 8403. And Prime includes a negative option feature because Defendants' offer to provide Prime has "*a provision* under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2 (w) (emphasis added). This provision of the Prime agreement is what allows Defendants to automatically continue billing consumers for the service until they affirmatively cancel their membership. *See* Dkt. # 317-4 at 12 ("Your Amazon Prime membership continues until cancelled. If you do not wish to continue for $12.99/month plus any applicable taxes, you may cancel anytime by visiting Your Account and adjusting your membership settings.") (emphasis removed). Prime also has a similar provision that automatically converts a trial membership to a paid membership after the trial period. *See* Dkt. # 317-2 at 14–19. Thus, Prime is subject to

ROSCA because it is a service "sold in a transaction effected on the Internet through a negative option feature[.]" 15 U.S.C. § 8403.

Defendants' artful application of contract law does not allow them to avoid this straightforward understanding of ROSCA. According to Defendants, the initial Prime offer includes a term that informs customers they will be charged periodically, unless the customer cancels their membership. Dkt. # 319 at 8 ("[T]he Prime enrollment offer itself includes an agreement to pay recurring charges."). They say that when a customer pays the recurring Prime membership fee, they do not accept any offer by their silence, instead, the customer is simply abiding by the terms of the original offer. *Id.* But Defendants' singular focus on the initial offer to join Prime is misplaced. Dkt. # 365 at 17; *see* Dkt. # 319 at 8–11. To be sure, as the Williston treatise states, "a contract for a year's service is not split into 12 contracts by a provision that the employee is entitled to his or her pay in monthly installments." 15 Williston on Contracts § 45:1 (4th ed. May 2025); *see* Dkt. # 319 at 8. But there is no rigid test for divisibility and "each case depend[s] largely on its own facts and circumstances." 15 Williston on Contracts § 45:1 (4th ed. May 2025).

This is significant because divisibility "reduces the risk of forfeiture by giving a party who has performed one part of the performances agreed to be exchanged by the parties the right to its agreed equivalent *as if the parties had made a separate contract with regard to that pair of corresponding parts*." *Id.* (emphasis added). And this treatise further notes,

> A contract may be entire in the sense that there is but one agreement covering all the terms and yet it may be that the performance under the contract will be divided into different groups each set embracing performances which are the agreed exchange for each other, the result being that the contract is entire but divisible.

*Id.*

//

The evidence here shows the Prime contract is entire but divisible because "by its terms, nature, and purpose, it is susceptible of division and apportionment, having two or more parts which are not necessarily dependent upon each other nor intended by the parties to be so." *Id.*; *see Hudson v. Wylie*, 242 F.2d 435 (9th Cir. 1957). Indeed, the Prime contract says, for example, that customers will "pay $12.99/month plus any applicable taxes" and "you may cancel anytime." Dkt. # 317-4 at 12. This indicates the contract is susceptible to division into multiple parts, and the parties to the contract do not intend the parts to be dependent upon each other. *See also* 15 Williston on Contracts § 45:7 (4th ed. May 2025) ("[t]he essential feature of a divisible contract is that a portion of the price is set off against a portion of the performance.") (internal citation omitted). So when a customer pays their recurring Prime membership fee, it is as if Amazon and the customer made a separate contract with regard to that payment and that term of Prime membership. *See* 15 Williston on Contracts § 45:1 (4th ed. May 2025). A customer can accept this recurring offer to enter the Prime contract through silence. *See* Dkt. # 317-4 at 12. Consequently, the Prime contract includes a provision under which the consumer's silence is understood by Amazon as continuing acceptance of its offer. *See* 16 C.F.R. § 310.2(w). Thus, Prime is sold through a negative option feature.

Other courts to consider this issue have reached the same conclusion about similar online membership services. *See, e.g.*, *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 762 (C.D. Cal. 2020) ("[The defendant's] automatic renewal default for its subscriptions is a textbook example of a negative option feature."); *FTC v. Doxo, Inc.*, 771 F. Supp. 3d 1162, 1180 (W.D. Wash. 2025) ("The statutory definition [of negative option features] is not as narrow as Defendants argue, and courts have applied it broadly to renewal subscriptions."); *United States v. Adobe, Inc.*, 2025 WL 1303419, at *8 (N.D. Cal. May 2, 2025) ("[s]ubscriptions that automatically renew by default unless the consumer affirmatively cancels" have negative option

features).  The Court does not agree that these other decisions "are mistaken."  Dkt. # 319 at 10.

Nor can the Court agree that the FTC's recent rulemaking on negative option features

meaningfully alters this analysis.  *See* Dkt. # 365 at 18.  Defendants do not explain how

rulemaking in 2024 would change the meaning of a statute adopted in 2010 and its

accompanying regulations.  And they similarly fail to explain how *the FTC's* definition of a

negative option feature would change the definition chosen by *Congress*.  Congress chose to

define negative option feature—as it is used in ROSCA—with the definition found in the

"Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal

Regulations[.]"  15 U.S.C. § 8403.  But the FTC's 2024 Negative Option Rulemaking appears in

an entirely different section of the federal register: 16 C.F.R. § 425.2.  *See also Connecticut Nat.*

*Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says

in a statute what it means and means in a statute what it says there.").  What is more, two of these

three cases, which Defendants attempt to distinguish, were decided after the FTC issued its

negative option rulemaking.  *See* Dkt. # 381 at 6.  This lends further support to the Court's

conclusion that the FTC's rulemaking does not meaningfully change this analysis.

      Thus, the Court concludes that Section 4 of ROSCA regulates Prime.

C.    ROSCA's Requirements

      The FTC brings a claim against Defendants for violating each of ROSCA's three

requirements.  Dkt. # 67 at 89–90.  The parties cross-move for summary judgment on each of

these.  *See* Dkt. ## 314 at 53–72; 319 at 11–28.

      1.    Clear and Conspicuous Disclosure Before Obtaining Billing Information

      Under ROSCA, Amazon must "provide[] text that clearly and conspicuously discloses all

material terms of the transaction before obtaining the consumer's billing information" when

enrolling consumers in Prime.  *See* 15 U.S.C. § 8403(1).  "Clear[] and conspicuous" is not

defined in ROSCA, but the Court has interpreted this language based on "cases concerning state laws with similar terms and caselaw defining similar terms in other federal statutes."  Dkt. # 165 at 16; *see id.* at 15–20 (describing caselaw that the Court looks to).  "Clear" means "reasonably understandable" and "[c]onspicuous" means "readily noticeable to the consumer."  *Gilberg v. California Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir. 2019) (quoting *Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010)).  The "full context of the transaction" is necessary to evaluate disclosures under ROSCA.  *Chabolla v. ClassPass Inc.*, 2023 WL 4544598, at *5 n.5 (N.D. Cal. June 22, 2023), *aff'd*, 129 F.4th 1147 (9th Cir. 2025); *see* Dkt. # 165 at 18–20.  And the Court evaluates the disclosures under a reasonable consumer standard. *See* Dkt. # 165 at 17–18; *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).

The FTC says Amazon violates ROSCA's first requirement both because it does not make clear and conspicuous disclosures and because it does not make these disclosures before obtaining a customer's billing information.  Dkt. # 314 at 55, 62.  Defendants maintain that Amazon's disclosures are clear and conspicuous and that it makes the disclosures before obtaining consent to use a customer's billing information.  Dkt. # 365 at 18–19, 32.

a.    Disclosure

The FTC argues the disclosure of Prime's material terms is not clear and conspicuous from a facial analysis.  Dkt. # 314 at 55.  It says users would not have understood (1) that they were enrolling in Prime, (2) that Prime automatically renews, or (3) Prime's monthly cost.  Dkt. # 314 at 48.  And the agency contends that both the UPDP and SPC enrollment flows fail to meet ROSCA's requirements.  Dkt. # 314 at 56–59.

But Defendants say the flows themselves disprove the FTC's arguments.  Dkt. # 314 at 24.  They also say the design elements the flows employ are commonplace and consumers are likely to be familiar with them.  *Id.* at 16–17.  According to Defendants, the FTC's critique about

the context of the flows likewise does not pass muster because no law prevents offers while consumers are shopping for a different product. *Id.* at 17.

There is a genuine dispute of material fact about whether Amazon's disclosures of the material terms of Prime are "clear and conspicuous." 15 U.S.C. § 8403(1). The FTC has presented figures showing the flows at issue, and based on these images a reasonable jury could find the disclosure of Prime's material terms does not meet ROSCA's requirements. *See* Dkt. # 314 at 12–21 (Figures 4–10); *see Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (conspicuousness of a disclosure can be evaluated on its face). The FTC also presented additional evidence to support its argument that both the UPDP and SPC flows did not make clear and conspicuous disclosures. *See* Dkt. # 314 at 56–60. For instance, Amazon calls Prime "FREE" four times in the SPC flow and says Prime comes with "no commitments." Dkt. # 317-4 at 26. In another example, in the UPDP flow, Amazon tells shoppers they will "save" money by enrolling in Prime even if they are already entitled to free shipping based on the dollar value of the products they are purchasing from Amazon. Dkt. # 317-5. Based on this evidence, a reasonable jury could find in favor of the FTC.

But Defendants present contrary evidence. They provide empirical evidence to support their claim that consumers are likely to be familiar with and understand the features of the enrollment flows. Dkt. # 325 at 370–71. They also identify expert testimony that says, contrary to the FTC's arguments, Amazon's design choices make it more likely that a reasonable consumer would notice Prime's material disclosures. Dkt. # 325 at 359–60. And based on this evidence, a reasonable jury could find in favor of Amazon. Thus, the Court denies both sides'

motions for summary judgment on whether Defendants "clearly and conspicuously" disclose Prime's material terms. 15 U.S.C. § 8403(1).[4]

          b.     Timing

The FTC also contends that Defendants violate ROSCA because Amazon collects consumers' billing information before disclosing the material terms of Prime. Dkt. # 314 at 62. According to the FTC, Amazon uses customers' stored information to charge them when they later enroll, whether the enrollment is consensual or not, in Prime. *Id.* at 63. And the FTC adds that in some cases Defendants do not collect or confirm a consumer's billing information at all before enrolling them in Prime. *Id.* at 63.

Defendants contend that Amazon complies with ROSCA's disclosure requirements because the website discloses Prime's terms before obtaining a customer's consent to use their billing information. Dkt. # 365 at 32. They say that in each of the flows, Amazon discloses Prime's terms and then obtains consent to use the customer's billing information. *Id.* at 33–34. Defendants' final argument is that this is a disputed question because Amazon's material terms are "ubiquitous" on its website and in its advertisements. *Id.* at 34.

The evidence presented by the FTC establishes that it is entitled to summary judgment on this issue. The FTC highlights images that show Amazon collects a customer's billing information before the material terms of Prime are disclosed to a customer. *See, e.g.*, Dkt. # 317-4 at 18 (in the UPDP flow, customer's billing information is obtained); *id.* at 19 (in the UPDP flow, the next page discloses the material terms of Prime); *id.* at 11 (in the SOSP flow, customer's billing information is obtained); *id.* at 12 (in the SOSP flow, the next page discloses

---

[4] Analyses of other Amazon flows performed by other courts do not dictate a different conclusion. The Court must evaluate the flows at issue in the context that they are presented to consumers. *See Chabolla*, 2023 WL 4544598, at *6 (performing a contextual analysis and noting that, when the provided the opportunity, the Ninth Circuit did not discredit a similar contextual analysis).

the material terms of Prime).  This practice violates the plain text of ROSCA.  15 U.S.C. §

8403(1).  No reasonable jury could find in favor of Amazon when provided with this evidence.

Defendants try to avoid this uncomplicated reasoning by arguing that Amazon obtains

*consent* to use a customer's billing information at the same time they disclose Prime's material

terms.  Dkt. # 365 at 32–34.  But this argument is at odds with the plain language of ROSCA.

The statute requires "text that clearly and conspicuously discloses all material terms of the

transaction *before obtaining* the customer's billing information."  15 U.S.C. § 8403 (1)

(emphasis added); *see* Dkt. # 165 at 26 ("Nothing in ROSCA says that companies such as

Amazon may not give consumers the option to autofill the billing information already on file or

simply to provide billing information after the disclosures, but ROSCA requires that consumers

be given that choice after the disclosures.").  So Defendants' arguments miss the mark.

Defendants also point to expert testimony that mentions some locations *where* the material terms

of Prime are disclosed.  *See* Dkt. # 318-43 at 17–18.  But this evidence says nothing about *when*

a customer's billing information is obtained in relation to the disclosure of Prime's material

terms.  In other words, this may show "the mere existence of a scintilla of evidence," but is not

enough to establish that a reasonable jury would find against the FTC on this issue.  *Anderson*,

477 U.S. at 252.  As a result, the Court grants the FTC summary judgment on whether Amazon

discloses all material terms of a Prime transaction before obtaining a customer's billing

information.  15 U.S.C. § 8403(1).

2.      Express Informed Consent[5]

ROSCA requires Amazon to "obtain[] a consumer's express informed consent before

charging the consumer's credit card, debit card, bank account, or other financial account for"

---

[5] Defendants say that the FTC Act claim (Count I) does not survive without Count III (ROSCA).
Dkt. # 319 at 11 n.3.  The Court agrees and analyzes these two counts together.  *See also* Dkt. # 165 at 27.

Prime.  *See* 15 U.S.C. § 8403(2).  In ROSCA cases, the failure to clearly and conspicuously disclose the material terms of a transaction can constitute evidence that a defendant did not obtain express informed consent before charging a consumer's cards or accounts.  *See FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015).  And even if the material terms of a transaction are not clearly and conspicuously disclosed, "[t]o form a contract . . . there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022)).  The Court assesses Section 5 violations under a reasonable consumer standard and applies that standard here to determine whether a reasonable consumer would know that by pressing a button they were consenting to become a Prime member and to the material terms of the transaction.  Dkt. # 165 at 28; *see FTC v. Stefanchik,* 559 F.3d 924, 928 (9th Cir. 2009).

The FTC contends that it is entitled to summary judgment on express informed consent because Amazon (1) fails to obtain any consent from consumers to enroll in Prime and because (2) it fails to obtain *informed* consent from consumers.  Dkt. # 314 at 63.  In particular, the FTC says Amazon does not obtain consent because they do not disclose the consequences of clicking certain buttons in the enrollment flows.  *Id.* at 64.  The FTC also points to empirical evidence to support its conclusion that Amazon does not obtain consent before enrolling consumers in Prime. *Id.* at 67–68.  And the FTC argues that Amazon does not obtain informed consent because Prime does not make clear and conspicuous disclosures, so consumers did not give their informed consent before enrolling them in Prime.  *Id.*

On the other hand, Defendants contend that they are entitled to summary judgment because every enrollment flow adequately discloses the terms of Prime and every flow adequately explains the effect of clicking the disputed buttons.  Dkt. # 365 at 35.  Defendants add

that the flows' disclosures are clear and conspicuous, or at a minimum, this is a disputed factual issue that is inappropriate for summary judgment. Dkt. # 365 at 35–37. They also say that other courts have held that similar flows obtain express informed consent. Dkt. # 319 at 20. And they add that discovery has disproven the accuracy of the FTC's empirical evidence, and that this evidence cannot be used for the FTC's intended purpose. *Id.*

There are genuine disputes of material fact that preclude summary judgment for either side on this issue. The FTC has introduced evidence that suggests the UPDP flow does not obtain consent from consumers before enrolling them in Prime because some consumers "would not have seen or recognized any alternative to clicking the orange enrolling button if they wanted to complete their underlying product purchase." Dkt. # 314 at 67; *see* Dkt. # 317-10. The images presented by the FTC would also allow a reasonable jury to agree that the UPDP flow's "by signing up" text is inconspicuous and does not obtain express informed consent from consumers. Dkt. # 317-10. And the FTC has provided evidence that the SPC flow hides Prime's terms and conditions, so consumers navigating this flow do not provide express informed consent before enrolling Prime. *See* Dkt. # 317-4 at 27. There is also empirical evidence that UPDP, SPC, and SOSP PDP enrollees did not provide express informed consent before enrolling in Prime.[6] Dkt. # 318-12 at 94. Based on this evidence, a reasonable jury could find in favor of the FTC.

Conversely, a reasonable jury could find in favor of Amazon. Defendants' evidence suggests that the text of the website's buttons and surrounding text demonstrates the user's

---

[6] The FTC has met its burden to show that this evidence is admissible. It has shown the survey it relies on was conducted according to generally accepted survey principles. Dkt. # 318-72 at 36–46. Defendants' criticisms go to the weight, not the admissibility of this evidence. *See Monster Energy Co. v. Vital Pharms., Inc.*, 2025 WL 1111495, at *1 (9th Cir. Apr. 15, 2025) ("methodological concerns with a survey go to weight rather than admissibility").

express informed consent before enrollment.  Dkt. # 319 at 19–20.  Defendants highlight

additional evidence to show the other elements of the flows' design illustrate that a consumer

provides express informed consent before enrolling in Prime.  *Id.* at 20.  And there is evidence

that when a "consumer sees a blue or gray 'No Thanks' link next to an orange or yellow 'Start

your Prime FREE trial' button, they are likely to understand that clicking the orange or yellow

button triggers a Prime purchase."  *Id.*  This evidence could lead a reasonable jury to find in

favor of Amazon on this issue.  Thus, the Court denies summary judgment for both sides on

whether Defendants obtain express informed consent before enrolling consumers in Prime.  *See*

15 U.S.C. § 8403(2).

        3.      Simple Mechanisms

      ROSCA requires that Amazon "provide[] simple mechanisms for a consumer to stop

recurring charges from being placed on the consumer's credit card, debit card, bank account, or

other financial account."  15 U.S.C. § 8403(3).  ROSCA does not define "simple mechanisms."

"Without a statutory definition," courts "turn to the phrase's plain meaning at the time of

enactment."  *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020).

      Defendants say that "simple" means "readily understood or performed."  Dkt. # 319 at

22.  And Defendants define "mechanism" as a "process . . . by which something is done," or "[a]

system of parts that operate or interact like those of a machine."  *Id.*  The FTC says "simple"

means "easy."  Dkt. # 314 at 68.  And the FTC notes, "It is far more likely that Congress

intended 'mechanism' to mean '[a]n instrument or a process, physical or mental, by which

something [here, cancellation] is done[.]'"  Dkt. # 351 at 31.  The Court adopts the definition of

"simple" proposed by Defendants because that is the plain meaning of the term at the time of

ROSCA's enactment.  Merriam-Webster's Online Dictionary (2010),

https://tinyurl.com/4mndw7zx.  And the Court defines "mechanism" as "a process, technique, or

system for achieving a result [here, cancellation]" because this is the meaning that makes the most sense in context.  Merriam-Webster's Online Dictionary (2010), https://tinyurl.com/4898ps2x; *see United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them.  That is just as true when . . . a court must choose among multiple ordinary meanings[.]").

The FTC says it is entitled to summary judgment because the Iliad cancellation flow is not simple.  Dkt. # 314 at 69.  It also says the mere availability of other cancellation methods does not demonstrate that ROSCA's cancellation methods satisfy ROSCA.  *Id.* at 71–72.

On the other hand, Defendants argue that summary judgment in their favor is appropriate because the flow's methods are simple.  Dkt. # 319 at 23.  They also point out that ROSCA does not require that every cancellation method be simple.  *Id.* at 22.  And Defendants add that the law similarly does not forbid non-simple cancellation methods, so long as other simple methods are provided.  *Id.*

There is a genuine dispute of material fact about whether a reasonable consumer would understand the Iliad cancellation method to be simple.  The FTC presents evidence that even entering the Iliad cancellation flow is not readily understood because the "End Membership" button that starts the cancellation process does not, in fact, end the customer's membership.  *See* Dkt. # 320-40 at 115.  The FTC also provides evidence that consumers needed to reaffirm their desire to cancel their Prime membership three times once they enter the flow.  *See* Dkt. ## 318-42 at 369; 320-3 at 7; 320-3 at 8 (showing various pages in the Iliad cancellation flow).  And the FTC highlights evidence demonstrating Amazon employees knew the goal of Iliad was to "retain members who attempt to cancel their membership."  Dkt. # 318-29 at 2.  There is also empirical evidence that many failed Iliad cancellers did not use any Prime benefits for the next 90 days, and users that failed to cancel their membership did not click a button to affirmatively keep their

membership (as opposed to, for instance, simply navigating to a different webpage). Dkt. ## 318-12 at 57–59; 320-20 at 4–5. Based on this evidence, a reasonable jury could find that the Iliad cancellation flow is not simple.

But Defendants present empirical evidence that shows consumers can readily locate, understand, and complete the Iliad cancellation flow. Dkt. # 325 at 598–99. Defendants also present empirical evidence that Amazon's cancellation processes are similar to those offered by other digital membership services, and these features are familiar and understandable to consumers. *Id.* at 372–73. A reasonable jury could, based on this evidence, find against the FTC and in Defendants' favor because the Iliad cancellation flow is simple. Thus, there is a genuine dispute of material fact about whether the Iliad cancellation flow is simple.

There is also a genuine dispute of material fact about whether the other cancellation methods for Prime are simple. Defendants present evidence that Amazon has at least four non-Iliad methods for Prime membership cancellation: calling customer service, having an online chat, emailing customer service, and using Amazon's customer service help page. *Id.* at 350, 642. Defendants also present evidence that users can cancel through these methods. Dkt. ## 318-14 at 6; 364-1 at 302, 319. This evidence could lead a reasonable jury to find in Defendants' favor because Amazon does in fact offer "simple" methods for cancellation.[7]

The FTC presents contrary evidence that shows these other cancellation methods are very rarely used, as compared to the Iliad cancellation flow. *See* Dkt. ## 320-10 at 3; 320-11 at 27, 29. And frequency of use is probative of a method's simplicity. As Defendants agree, "simple"

---

[7] Although Defendants accuse the FTC of adding "new allegations" that challenge these non-Iliad cancellation methods, the FTC's legal theory remains unchanged from the complaint: "Defendants fail to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account." Dkt. # 67 at 90; *see* Dkt. # 378 at 12.

means "readily understood." Dkt. # 319 at 22. At the time of ROSCA's enactment, "understood" meant "apprehended" and "apprehended" meant to be made "aware of." Merriam-Webster's Online Dictionary (2010), https://tinyurl.com/ysdcsavz. This understanding is also consistent with ROSCA's directive to provide simple cancellation methods. 15 U.S.C. § 8403(3). A cancellation method is not "provided" unless it is "made available." Merriam-Webster's Online Dictionary (2010), https://tinyurl.com/aexeetmn. So a reasonable jury could find the non-Iliad cancellation methods offered by Amazon were not simple because a reasonable consumer would not have been aware of them. *See also* Dkt. # 365 at 39 (accepting that if prominence of a cancellation method bears on its simplicity, that is a fact in dispute).

Because there is a genuine dispute of material fact about whether Defendants offer any "simple" cancellation methods, summary judgment is not warranted for either side on this issue.

D.    Individual Liability under the FTC Act and ROSCA

The Ninth Circuit has "established a two-pronged test for determining when an individual may be held personally liable for corporate violations of the FTC Act." *FTC v. Com. Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016). This test requires the FTC to prove the individual:

> (1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and

> (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth.

*Id.* (citing *FTC v. Network Services Depot, Inc.,* 617 F.3d 1127, 1138–39 (9th Cir. 2010); *see Stefanchik,* 559 F.3d at 931). In addition, "[t]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *FTC v. Affordable Media,* 179 F.3d 1228, 1235 (9th Cir. 1999). But the

FTC need not show "a defendant intended to defraud consumers in order for that individual to be personally liable." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014).

The parties cross-move for summary judgment on the personal liability of the Individual Defendants. *See* Dkt. ## 314 at 72–74; 316 at 10–15.[8]

1.     Defendants Ghani and Lindsay

The FTC cites extensive evidence that shows Ghani and Lindsay had authority to control Prime's enrollment and cancellation flows. Amazon told the FTC that Ghani and Lindsay were two of the individuals "most responsible for any decisions" in "enrollment and cancellation in the Prime program." Dkt. # 320-21 at 2. The FTC also presented evidence showing Amazon identified Lindsay as "the Senior Vice President responsible for Prime and a member of Amazon's S-Team"[9] and Ghani as "the Vice President responsible for Prime." *Id.* at 5. Ghani and Lindsay "had the most consistent management authority over the policies, practices, and procedures" of the "Enrollment and Unsubscribe process for Amazon Prime." Dkt. # 320-2 at 3–4. These individuals also "have or had primary oversight and leadership over the Prime program." Dkt. # 320-9 at 9. This evidence establishes that Ghani and Lindsay had authority to control Amazon's Prime enrollment and cancellation practices.

This high degree of involvement also supports the FTC's argument that these Defendants had actual knowledge of, or were recklessly indifferent to, the alleged issues with Amazon's flows. *See Grant Connect*, 763 F.3d at 1101. And the FTC introduces further documentary evidence to support this argument. For example, Lindsay knew changes to the UPDP enrollment

---

[8] The FTC says, "Ghani and Lindsay do not seek summary judgment on their liability for Amazon's ROSCA and FTC Act violations, assuming the existence of Amazon's violations." Dkt. # 351 at 33. But the Court disagrees because the Individual Defendants' motion repeatedly states that they are not liable for violations of the FTC Act and ROSCA. *See generally* Dkt. # 316.

[9] "S-Team" is the name for the Senior Management Team at Amazon, and this team "works together as a whole to manage Amazon's entire worldwide business." Dkt. # 320-9 at 11.

button reduced nonconsensual enrollment.  Dkt. # 317-17 at 2–4.  A Prime Content Testing Team memorandum sent to Ghani similarly said, "[W]e know that a portion of Prime members were not aware when they signed up for Prime[.]"  Dkt. # 317-36 at 2.  And Ghani and Lindsay received a comprehensive memorandum reporting on issues with Prime enrollment and cancellation.  Dkt. # 320-1.  Even viewing this evidence in the light most favorable to Defendants Ghani and Lindsay, no reasonable jury could find they are not personally liable for Amazon's alleged FTC Act and ROSCA violations.

Defendants' counterarguments are unavailing.  First, Defendants argue that the FTC has not presented evidence that these Defendants acted with "actual, subjective awareness" of the deceptive nature of the flows.  Dkt. # 365 at 44–45.  But the FTC does not need to present this evidence; it has highlighted evidence that shows Ghani's and Lindsay's high degree of involvement in the Prime program, and that Ghani and Lindsay repeatedly received reports detailing consumers' problems with Prime.  And this evidence is not meaningfully rebutted by these Defendants' after-the-fact testimony that they did not intend to violate ROSCA.  *See* Dkt. # 316 at 12–13 (collecting testimony).  This testimony is not corroborated by any record evidence.  And the Ninth Circuit "has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996)).

Second, Defendants' argument that Ghani and Lindsay cannot be held liable because authority to control Prime was distributed across multiple teams or de-centralized is misguided.  Dkt. # 365 at 44–45.  The FTC does not need to establish sole authority to control to establish personal liability.  *See FTC v. World Media Brokers Inc.*, 2004 WL 432475, at *9 (N.D. Ill. Mar.

2, 2004), *aff'd sub nom. FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005); *see* Dkt. #
165 at 38.

Third, Defendants misplace their reliance on *Grant Connect* for the proposition that
Ghani and Lindsay cannot be held liable because they did not have authority to control Prime
when the flows were established.  *See* Dkt. # 365 at 45.  To be sure, in *Grant Connect* the Ninth
Circuit held an individual defendant liable because "he both controlled [the liable corporation] at
the time the scheme was organized, and directly participated in establishing the scheme."  *Grant
Connect*, 763 F.3d at 1103.  But there is nothing in the *Grant Connect* decision that says an
individual defendant is liable for a corporation's misconduct *only* if they participate in
establishing the unlawful scheme.  Defendants advocate for a result where an individual
defendant who, for years, exercises control over—but does not establish—an unlawful scheme
can escape liability.  Such a result finds no support in the caselaw presented by Defendants.  *Cf.
id.* at 1104 (the defendant was not liable for Acai Total Burn Scheme because he did not have
authority to control the corporation when the scheme was developed *and* did not directly
participate in the scheme).

The parties also agree on the liability period for Defendants Ghani and Lindsay.
Defendants and the FTC both say liability starts for Lindsay in 2017 and for Ghani in October
2019.  Dkt. ## 365 at 45; 381 at 26.  Thus, to the extent that the FTC establishes Amazon is
liable for violations of the FTC Act and ROSCA, the Court grants the FTC's motion for
summary judgment on this issue, and liability starts for Lindsay in 2017 and Ghani in October
2019.

2.    Defendant Grandinetti

Evidence submitted by the FTC likewise shows that Grandinetti had the authority to
control the Prime enrollment and cancellation flows.  For one thing, Grandinetti testified that he

would expect to be consulted on major changes to the Prime enrollment flow.  Dkt. # 317-28 at 18:19–25.  And since March 2018, Grandinetti has been an S-Team member "with responsibility for Prime."  Dkt. # 320-9 at 12.  Grandinetti was a "required" in-person attendee at a March 2019 meeting to discuss "Prime signup frustration"—specifically that "prime sign-ups are not always transparent; customers sign up without knowing they did."  Dkt. # 317-26 at 5.  As part of Amazon's corporate practice, all attendees—including Grandinetti—would have been required to read the document that discussed these Prime sign-up frustrations.  Dkt. # 318-8 at 6 (44:20–25).  After this meeting, Grandinetti provided "guidance" to the Prime and Shopping Design Teams on these frustrations.  *Id.* at 7 (47:13–17).  And Amazon employees understood that they were required to follow his "guidance" on Prime at this time.  *Id.* at 8 (52:16–19).  Consistent with his Prime responsibilities, Grandinetti also received a memorandum from Amazon's "Benchmarking" organization in November 2019 that disclosed Prime customers "who attempted to cancel post-signup struggled with the process (how, where, and when)."  Dkt. # 254-11 at 3.  A reasonable jury could find against Grandinetti and in favor of the FTC on his individual liability based on this evidence.

But here, Defendants introduce sufficient evidence to create a genuine dispute of material fact.  The Prime organization did not directly report to Grandinetti until 2021.  Dkt. # 325 at 843, 978.  At Grandinetti's deposition, the FTC did not ask him about anything that would have shown he was involved in decisions related to the cancellation flow.  *Id.* at 1018.  And about 30,000 people worldwide fall under the umbrella of his role, "[p]erhaps more."  *Id.* at 974; Dkt. # 316 at 7.  This evidence suggest that Grandinetti had less involvement in the operation of the Prime organization, as compared to Ghani and Lindsay.  Based on this evidence, a reasonable jury could find against the FTC and find that Grandinetti is not personally liable for Amazon's

violations of the FTC Act and ROSCA.  So the Court denies both sides' motions for summary judgment on this issue.

E.    Defendants' Affirmative Defenses

The FTC moves for summary judgment on Defendants' equitable and due process affirmative defenses.  Dkt. # 314 at 75–80.  Defendants move for summary judgment on their due process and First Amendment defenses.  Dkt. # 316 at 15–21.

Because the FTC does not bear the burden of persuasion at trial, it can show there is no genuine dispute of material fact "by showing that [Defendants] lack[] evidence of an essential element of [their] claim or defense."  *Metro. Grp.*, 738 F. Supp. 3d at 1376 (citing *Nissan Fire*, 210 F.3d at 1106).  "[T]he burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor."  *Id.* (citations omitted).

1.    Equitable Defenses

The Defendants raise three equitable affirmative defenses: unclean hands, equitable estoppel, and laches.  Only the FTC moves for summary judgment on these affirmative defenses.  *See* Dkt. # 314 at 75–77; *see generally* Dkt. ## 316, 319.

a.    Unclean Hands and Equitable Estoppel

The FTC shows that Defendants do not have evidence to support their unclean hands and equitable estoppel defenses.  *See* Dkt. # 314 at 75–77.  And Defendants present no evidence to support these defenses; nor do they mention them in their motions.  *See* Dkt. # 365 at 48–49 (only making arguments in support of its laches defense); *see generally* Dkt. ## 316, 319.  The Court grants the FTC summary judgment on these defenses.

//

//

1

   b.  Laches

2   To establish the equitable defense of laches, the "defendant must prove both an

3 unreasonable delay by the plaintiff and prejudice to itself." *Danjaq LLC v. Sony Corp.*, 263 F.3d

4 942, 951 (9th Cir. 2001) (quoting *Couveau v. Am. Airlines, Inc.,* 218 F.3d 1078, 1083 (9th Cir.

5 2000)).  Some courts have recognized that this defense is available against a government

6 enforcement action but requires the defendant to show "affirmative misconduct."  *See FTC v.*

7 *Directv, Inc.*, 2015 WL 9268119, at *3 (N.D. Cal. Dec. 21, 2015).

8   Defendants argue "affirmative misconduct" can be shown by "egregious instances of

9 government delay."  Dkt. # 365 at 49 (citing *CFPB v. TransUnion*, 701 F. Supp. 3d 744, 754

10 (N.D. Ill. 2023)).  But there is no binding authority presented by either side that supports or

11 discredits this position.  In any event, even if affirmative misconduct can be shown by egregious

12 delay, there is no evidence the FTC has engaged in such a delay.  At most, this case involves a

13 seven-to-nine year delay before the FTC filed suit.  *See* Dkt. # 365 at 49 ("this case involves an

14 undisputed ***seven-to-nine year*** delay").  And Defendants provide no authority or evidence that

15 would suggest this length of delay qualifies as "egregious."  The only case cited by either side in

16 which the government's delay supported a laches defense involved a delay of over 200 years

17 between the filing of a treaty and a lawsuit challenging the validity of the treaty.  *See Cayuga*

18 *Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005).  There are also cases

19 presented by the FTC in which trial courts have denied the laches defense for a similar, or

20 longer, delay than the delay at issue here.  *See, e.g.*, *TransUnion*, 701 F. Supp. 3d at 754 (five-

21 year delay not egregious); *Groves v. United States*, 2017 WL 1806593, at *6 (N.D. Ill., May 5,

22 2017) (ten-year delay not egregious).  And this case is distinguishable from the caselaw

23 presented by Defendants because here there is no dispute about the maximum length of the

24 FTC's delay.  *See FTC v. Directv, Inc.*, 2016 WL 6947503, at *3 (N.D. Cal. Nov. 26, 2016)

("there is a genuine dispute between the parties regarding the inferences that should be drawn from the facts that are material to whether the FTC engaged in affirmative misconduct"); *FTC v. Hang-Ups Art Enters., Inc.*, 1995 WL 914179, at *4 (C.D. Cal. Sept. 27, 1995) ("The facts of the case should decide whether there has been affirmative misconduct by the government such that laches might apply."). Thus, the FTC shows that Defendants lack an essential element of their laches defense, and Defendants do not identify any facts that would allow a reasonable jury to find in their favor. The Court grants the FTC summary judgment on this issue.

2.    Due Process Defenses

Defendants move for summary judgment on three due process affirmative defenses: as-applied and facial vagueness challenges and an as-applied challenge under the First Amendment. *See* Dkt. # 316 at 16–20. The FTC moves for summary judgment only on Defendants' vagueness challenges. Dkt. # 314 at 77–80.

a.    Vagueness

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle is violated if a law either "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In the context of civil statutes regulating economic activities, such as ROSCA, a law is unconstitutionally vague only where it is "so vague and indefinite as really to be no rule or standard at all." *Boutilier v. INS*, 387 U.S. 118, 123 (1967); *see* Dkt. # 180 at 11 (Court applying this standard to Defendants' due process arguments). In addition, the Court evaluates Defendants' as-applied and facial vagueness challenges simultaneously because "the substantive legal tests used in the two challenges are invariant."

*Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (internal citations and quotations omitted); *see Hightower v. City & Cnty. of San Francisco*, 77 F. Supp. 3d 867, 886 (N.D. Cal. 2014), *aff'd sub nom. Taub v. City & Cnty. of San Francisco*, 696 F. App'x 181 (9th Cir. 2017) ("[T]here is no analytic or legally operative distinction between an as-applied vagueness challenge and a facial vagueness challenge.").

Defendants say ROSCA is overly vague both as-applied and on its face. They argue they should not be required to determine the meaning of a statute when the agency responsible for enforcing the statute does not understand its meaning. Dkt. # 316 at 17. Defendants also say that there are no judicial opinions on the meaning of "simple mechanisms." *Id.* And they contend that the requirement to "clearly and conspicuously" disclose material terms is similarly standardless. *Id.* at 18. So, according to Defendants, Amazon can only guess at ROSCA's requirements. Dkt. # 316 at 18.

The FTC responds that these arguments do not survive any scrutiny. Dkt. # 314 at 78. The agency says Defendants' vagueness challenge is meritless because, in effect, the parties ask the Court to apply the same standards. Dkt. # 351 at 41. And the FTC emphasizes that it does not urge a subjective test for ROSCA; the agency asks the Court to simply apply the law to the facts. *Id.* The FTC also contends that it does not advocate for any of the per se bans that Defendants claim. *Id.* at 41–42.

Defendants' vagueness challenges fail because ROSCA specifies a standard of conduct. Indeed, in their motion to dismiss briefing, Defendant represented to the Court that ROSCA is a "clear statute" and "ROSCA is facially clear[.]" Dkt. # 84 at 31 (first quotation); Dkt. # 131 at 29 (second quotation). The Court relied on these representations. Dkt. # 165 at 41. ROSCA also uses familiar legal terms and standards that are often found in state and federal law. Dkt. # 165 at 43; *see, e.g.*, *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1091 (9th Cir. 2020) (Fair Credit

Reporting Act and Truth in Lending Act have a "clear and conspicuous" requirement with the same meaning that the Court has employed here). So, at bottom, Defendants assert that ROSCA is impermissibly vague because it includes some amount of vagueness. But "[t]he Supreme Court and the Ninth Circuit have recognized that '[m]any statutes will have some inherent vagueness' and that a certain quantum of vagueness is permissible—and even necessary." *Oregon Ass'n of Hosps. & Health Sys. v. Oregon*, 734 F. Supp. 3d 1139, 1154 (D. Or. 2024), *aff'd*, 2025 WL 1833815 (9th Cir. July 3, 2025) (citing *Rose v. Locke*, 423 U.S. 48, 49–50 (1975); *McSherry v. Block*, 880 F.2d 1049, 1054 (9th Cir. 1989)); *see Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."); Dkt. # 165 at 40–45 (rejecting many of the vagueness arguments that Defendants make again here). Accordingly, the FTC is granted summary judgment on Defendants' due process vagueness challenges.

### b.    First Amendment

Defendants also say ROSCA violates their First Amendment rights. *See* Dkt. # 316 at 18–20. So Defendants must "demonstrate that the First Amendment even applies." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024), *cert. denied sub nom. B&L Prods. v. Newsom*, 145 S. Ct. 1958, 221 L. Ed. 2d 738 (2025) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). "The First Amendment only applies when conduct with a significant expressive element drew the legal remedy or the statute has the inevitable effect of singling out those engaged in expressive activity." *Id.* at 113 (citation modified) (internal citations and quotations omitted).

Defendants say the First Amendment applies to ROSCA because "the FTC reads ROSCA to prohibit truthful commercial speech." Dkt. # 316 at 19. And they say it applies because the FTC's Rule 30(b)(6) witness agreed that the Government takes "issue" with "the words that

Amazon is using." *Id.* (quoting Dkt. # 325 at 44–45 (106:20–107:8)).  Defendants also look to the verbs that the FTC used in its summary judgment motion to support their argument that ROSCA regulates speech.  Dkt. # 379 at 11.  As a result, Defendants contend that the FTC wants to prevent Amazon from using truthful speech to persuade customers to join Prime.  Dkt. # 316 at 19.

But these arguments are unpersuasive and do not demonstrate that ROSCA implicates First Amendment rights.  Defendants do not show that selling goods or services on the Internet is conduct with a significant expressive element.  Nor they do they show that ROSCA has the inevitable effect of singling out persons engaged in expressive activity.  What is more, the Court does not look to the FTC's words to determine if ROSCA implicates the First Amendment, it looks to the words of the statute.  *Contra id.*; *see B & L Prods*, 104 F.4th at 113 (conducting First Amendment analysis based on language of challenged statutes).  ROSCA regulates conduct: how goods and services are sold on the internet.  15 U.S.C. § 8403.  And Defendants do nothing, beyond provide a single citation, to develop their argument that "A disclosure requirement like section 8403(1) is a textbook speech regulation."  Dkt. # 379 at 11.  ROSCA is a regulation directed at internet commerce and, at most, imposes an incidental burden on Defendants' speech. *See also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").  Thus, the Court denies Defendants' motion for summary judgment on whether ROSCA violates their First Amendment rights.

F.    Monetary Penalties

Defendants move for summary judgment on the FTC's ability to obtain civil penalties. Dkt. # 316 at 21–24; Dkt. # 319 at 28–37.  They also move for summary judgment on whether

the FTC can toll the statute of limitations in 15 U.S.C. § 57b(d) under a theory of equitable estoppel.  Dkt. # 319 at 37.

### 1. Civil Monetary Penalties

The FTC is authorized to "commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."  15 U.S.C. § 45(m)(1)(A).  "Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors.  A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision."  *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996); *see* Dkt. # 165 at 46.  Put differently, defendants face civil monetary liability if they either "knew that the act was unlawful or if [they] should have known the act was unlawful ('knowledge fairly implied')."  *See United States v. Dish Network LLC*, 954 F.3d 970, 978 (7th Cir. 2020) (citing *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010)).  This language permits a mistake-of-law defense.  *Jerman*, 559 U.S. at 630; *see id.* at 630 (Kennedy, J., dissenting) ("[T]here is no doubt that § 45(m)(1)(A) permits a mistake-of-law defense.").

#### a. Time-Barred

Defendants argue that the FTC's demand for civil monetary penalties is time barred.  They say the FTC's claim for these penalties accrued in 2014 for the enrollment flows and 2016 for the cancellation flows.  Dkt. # 319 at 29.  So, according to Defendants, the FTC was required to bring its civil monetary penalty demand by 2019 or 2021 and failed to do so.  *Id.*  Defendants also contend the language of 28 U.S.C. § 2462 does not allow for a continuing violations theory,

1    nor does it allow the Government to delay accrual under the discovery rule.  *Id.*  And Defendants

2    say that all of the FTC's other tolling arguments fail too.  *Id.* at 29–31.

3         Yet the FTC argues that it seeks penalties from Defendants for each instance where

4    Amazon charged a consumer in violation of ROSCA.  Dkt. # 351 at 63.  The FTC adds that its

5    theory is consistent with the statute's language.  *Id.*  And the agency seeks to recover for each

6    violation that occurred within the limitations period.  *Id.* at 64–66.  The FTC further notes that

7    Defendants' arguments ignore that the precise manner in which Amazon has violated ROSCA

8    has changed over time.  *Id.* at 66–67.

9         Viewing the evidence in the light most favorable to the FTC, the Court does not believe it

10   can grant Defendants' motion for summary judgment on this topic.  The language of ROSCA

11   makes clear that a claim accrues each time there is a "charge or attempt to charge" a consumer in

12   violation of the statute.  15 U.S.C. § 8403.  So even if a ROSCA claim first accrued against

13   Amazon in 2014, new claims would continue to accrue each time it charged a customer in

14   violation of the law.  This tracks the FTC's position that Amazon has continuously violated

15   ROSCA since 2014.  *See, e.g.*, Dkt. # 325 at 34 (89:16–19) (FTC Rule 30(b)(6) witness agreeing

16   that Amazon has "continuously violated ROSCA" since 2014).  The FTC's claims under

17   ROSCA further illustrate that the agency is alleging a series of repeated violations, rather than

18   one continuing violation, because it alleges Amazon has violated ROSCA "[i]n numerous

19   instances."  Dkt. # 67 at 89–90.  This differentiates this case from the primary authority relied on

20   by Defendants, *Sierra Club v. Oklahoma Gas and Elec. Co.*, because there, the plaintiff's claim

21   was "best characterized as a continuing violation rather than a series of repeated violations."  816

22   F.3d 666, 671 (10th Cir. 2016); *see*  Dkt. # 319 at 29.  As a consequence, the Court denies

23

24

1    Defendants' motion for summary judgment on whether the FTC's claim for civil monetary

2    penalties is time barred.[10]

3            b.    Support for Penalties

4            Defendants also argue there is insufficient evidence to support an award of civil monetary

5    penalties.  They say there is no evidence that they had "actual knowledge" of any ROSCA

6    violations.  Dkt. # 319 at 32–33.  They say that even though the FTC says Amazon violated

7    ROSCA since 2014, the agency never told it that its flows violated the law.  *Id.*  Amazon's

8    employees also repeatedly testified that they thought the flows complied with the law.  *Id.* at 33.

9    Nor is it enough, Defendants say, for the FTC to claim that Amazon is a big company with

10   lawyers because the FTC cannot link this premise to any evidence of knowledge of ROSCA

11   violations.  *Id.* at 34.  The Individual Defendants similarly argue that no evidence shows that any

12   of them knew Amazon's practices were unfair or deceptive.  Dkt. # 316 at 21–24.

13           The FTC responds by saying there is substantial evidence that Defendants knew

14   ROSCA's requirements.  Dkt. # 351 at 44.  At a minimum, according to the FTC, Defendants

15   knew about ROSCA's requirements in 2021—when the FTC told Amazon it was under

16   investigation for potential ROSCA violations.  *Id.*  And the FTC says there is evidence of

17   Defendants' pre-2021 knowledge because Amazon's initial submissions to the FTC track

18   ROSCA's requirements.  *Id.* at 44–45.  The FTC also argues that Defendants had knowledge

---

[10] The Court does not address all of Defendants' tolling arguments because the FTC does not
assert fraudulent concealment tolling.  *See* Dkt. # 319 at 29–30; *see IQVIA Inc. v. MedImpact Healthcare
Sys., Inc.*, 2022 WL 6258369, at *5 (S.D. Cal. Oct. 7, 2022) ("Even though the Ninth Circuit has referred
to equitable estoppel as fraudulent concealment . . . the elements to support equitable estoppel are distinct
from fraudulent concealment.") (collecting cases).  Nor does the Court address Defendants' diligence
arguments because the FTC seeks tolling only based on equitable estoppel and diligence is not an element
of equitable estoppel.  Section III.5.b, *supra*.  Defendants misquote Ninth Circuit authority to make it
appear as if diligence is an element of equitable estoppel.  *Compare* Dkt. # 378 at 22 (putting "Equitable
estoppel" in quotation marks) *with Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1193 (9th Cir. 2001) (the
words "Equitable estoppel" not appearing anywhere in the vicinity of the other language quoted by
Defendants).

fairly implied of ROSCA's requirements because a reasonable company—particularly one with the "largest subscription program in the United States"—would have known of the existence of ROSCA. *Id.* at 44–50.

There is a legitimate factual dispute about the FTC's ability to impose civil monetary penalties. The FTC provided evidence that Amazon was aware of ROSCA in 2021 when the FTC informed the company that it was under investigation for possible ROSCA violations. Dkt. # 90-2 at 79. There is also evidence that Amazon was aware of ROSCA prior to 2021 because an early Amazon submission to the FTC described the enrollment and cancellations flows in terms that mirror ROSCA's requirements. Dkt. # 320-4 at 29. For instance, Amazon said it "requires express consent from customers prior to enrolling them in Prime" and "Each Prime enrollment channel . . . clearly and conspicuously discloses the material terms of Prime membership." *Id.* The evidence also suggests that Amazon knew it was violating ROSCA because it was nonconsensually enrolling customers in Prime. *See, e.g.*, Dkt. # 317-14 at 4 (employee stating that as early as 2015 Amazon knew customers found the Prime enrollment process to be "deceiving"). Evidence similarly suggests Amazon knew it was violating ROSCA because, rather than offer Prime members a simple cancellation method, the Iliad cancellation flow was designed to retain members that wanted to cancel their membership. Dkt. # 318-29 at 2. There is likewise evidence that suggests the Individual Defendants knew Amazon was violating ROSCA. *See* Dkt. ## 254-11; 318-15 at 9, 22; 318-33 at 7–8. Thus, viewing the evidence in the light most favorable to the FTC, there is a genuine dispute of material fact on this issue. Defendants' motion for summary judgment on whether the FTC can support a claim for civil monetary penalties is denied.

//

//

1

2.      Estoppel[11]

2

Equitable doctrines do not apply to jurisdictional rules.  *Kwai Fun Wong v. Beebe*, 732

3

F.3d 1030, 1035 (9th Cir. 2013), *aff'd and remanded sub nom. United States v. Wong*, 575 U.S.

4

402 (2015).  Unless Congress clearly states that a rule is jurisdictional, courts should treat the

5

rule as nonjurisdictional.  *Id.* at 1036.

6

In order to toll a statute of limitations based on equitable estoppel, the plaintiff must

7

plead and prove "(1) knowledge of the true facts by the party to be estopped, (2) intent to induce

8

reliance or actions giving rise to a belief in that intent, (3) ignorance of the true facts by the

9

relying party, and (4) detrimental reliance."  *Est. of Amaro v. City of Oakland*, 653 F.3d 808, 813

10

(9th Cir. 2011) (quoting *Bolt v. United States,* 944 F.2d 603, 609 (9th Cir. 1991)).

11

Defendants move for summary judgment on the period over which the FTC can seek

12

redress for consumer harm.  Dkt. # 319 at 37.  They say that the FTC cannot recover for

13

consumer harm before June 21, 2020 because the complaint was filed on June 21, 2023 and 15

14

U.S.C. § 57b(d)—the statute that entitles the FTC to seek redress for consumer harm—has a 3-

15

year statute of limitations.  *Id.*; *see* Dkt. # 1.  But the FTC argues that Defendants' efforts to

16

impede its investigation should toll this statute of limitations.  Dkt. # 351 at 50–51.

17

Congress did not clearly state that 15 U.S.C. § 57b(d) is jurisdictional, so the Court

18

should treat it as nonjurisdictional.  *Kwai Fun Wong*, 732 F.3d at 1036.  Accordingly, equitable

19

doctrines—like equitable estoppel—can be applied to the statute of limitations in 15 U.S.C. §

20

57b(d).  *Id.*  Defendants do not make any arguments to refute this conclusion; instead they focus

21

their arguments on the sufficiency of the FTC's evidence.  *See* Dkt. # 378 at 20–22.  Nor does

22

23

24

[11] The FTC makes clear that it does not seek compensatory monetary relief from the Individual Defendants for any harm before June 21, 2020.  Dkt. # 351 at 51 n.25.

the statute include any language that would indicate equitable estoppel should not apply.  So the Court concludes that this statute is subject to tolling under a theory of equitable estoppel.

And the FTC supports its theory of equitable estoppel with evidence.  The FTC provides evidence that shows Amazon knew of employees that were likely to possess information and documents responsive to the FTC's investigation and search terms that were likely to return information and documents relevant to the FTC's investigation; yet Amazon did not initially share this information with the FTC.  *See* Dkt. ## 317-24; 317-36; 317-59 at 21–22 (64:3–65:9); 318-15.  There is also evidence that Amazon took action to induce the FTC's reliance or that Amazon's actions led the FTC to believe they intended to induce reliance, and this evidence also suggests the FTC relied on Amazon to its detriment.  Dkt. # 359-11 at 6 (121:19–122:6), 24 (241:2–20).  The FTC's evidence further demonstrates it was ignorant of the true facts.  *See* Dkt. ## 90-2 at 7–10; 140-1 at 3–4; 217 at 1–2; *see generally* Dkt. ## 286, 302, 334.  This evidence creates a genuine issue of material fact as to whether the FTC can seek redress for consumer harm before June 21, 2020.

Defendants' counterarguments lack merit.  First, Defendants apply the wrong legal standards.  Dkt. # 378 at 21–22.  The court in *Wasco* decided "the narrow question of whether Wasco was required to plead a civil conspiracy in order to raise the issue," and only held "that under federal law a plaintiff must plead, at a minimum, the basic elements of a civil conspiracy if the object of the conspiracy is fraudulent." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 990–91 (9th Cir. 2006); *see Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1022 (C.D. Cal. 2009) (distinguishing *Wasco* and describing the portion of the opinion relied on by Defendants as "dicta.").  *Wasco* does not apply here because the FTC does not plead a civil conspiracy.  Defendants' reliance on *Guerrero v. Gates* is similarly misplaced because the language cited by Defendants discusses "the facts which give rise to the claim of fraudulent

concealment." 442 F.3d 697, 706–07 (9th Cir. 2006). The FTC does not make a claim of fraudulent concealment and, as the Court has noted *infra* n.10, the elements of fraudulent concealment and equitable estoppel are distinct. Second, Defendants rely on dicta to argue equitable estoppel requires the estopped party to have caused the plaintiff's failure to file suit. Dkt. # 378 at 21. Read in context, the selective language quoted by Defendants was not necessary to these decisions; therefore, it has no binding authority. *Export Group v. Reef Indus., Inc.,* 54 F.3d 1466, 1472 (9th Cir. 1995); *see Bertucci v. Gen. Teamsters Union Loc. No. 174,* 867 F.2d 612 at *7 (9th Cir. 1989); *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1108 (W.D. Wash. 2007). Even so, only Defendants have moved for summary judgment on this topic. As the non-moving party, the FTC must be given the "the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (internal citations omitted). And the reasonable inference from the evidence presented by the FTC is that Defendants prevented the agency from suing—at least for a time. Third, contrary to Defendants' arguments, diligence is not an element of equitable estoppel. Dkt. # 378; *Amaro*, 653 F.3d at 813. So the FTC need not show diligence to support its equitable estoppel arguments. Thus, the Court denies Defendants' motion for summary judgment on the time period when the FTC can seek redress for consumer harm.

//

//

//

//

//

//

//

ORDER - 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## IV

### CONCLUSION

The Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.  Dkt. # 314.  And the Court DENIES Defendants' motions for summary judgment. Dkt. ## 316, 319.

The FTC's motion for summary judgment is GRANTED with respect to (1) whether ROSCA regulates Prime; (2) whether Amazon discloses the material terms of the Prime transaction before obtaining a customer's billing information, *see* 15 U.S.C. § 8403(1); (3) the personal liability of Defendants Ghani and Lindsay; (4) Defendants' affirmative defenses of equitable estoppel, unclean hands, and laches; and (5) Defendants' as-applied and facial vagueness challenges.

Dated this 17th day of September, 2025.

John H. Chun
United States District Judge

ORDER - 47