December 24, 2025

# Initial Report of the Independent Claims Supervisor

*Federal Trade Commission v. Amazon.com, Inc.*

Case No. 2:23-CV-0932-JHC

# Table of Contents

I.     Executive Summary .................................................................................................... 1

II.    Background and Settlement of FTC Enforcement Case ............................................ 4

   A.  FTC and Amazon Execute Settlement Agreement ........................................ 5

   B.  Administration of the Settlement Program .................................................... 6

   C.  Establishment of Consumer Fund ................................................................. 7

III.   Role of Independent Claims Supervisor ................................................................... 8

IV.   Overview of the Settlement Program ...................................................................... 11

   A.  Automatic Pay Out Process ......................................................................... 13

   B.  Claims Process ............................................................................................ 15

   C.  Notice Program for Claims Process Eligible Consumers ........................... 16

V.    Amazon's Key Scoping Determinations and Application of Settlement Agreement Terms........ 19

VI.   Amazon's Data Scoping Efforts and Generation of Eligible Consumer Lists............................ 27

   A.  Data Environment ....................................................................................... 27

   B.  Approach to Scoping Responsive Records .................................................. 29

   C.  Quality Assurance and Quality Control Measures...................................... 31

VII.  Amazon's Administration of the Settlement Program .................................................. 33

   A.  Notice and Distribution of "Automatic Pay Outs" ..................................... 33

   B.  Notice to "Claims Process" Eligible Population and Preparations to Administer Redress Payments ........................................................................................................ 37

VIII.  Settlement Program Performance .......................................................................... 40

   A.  Consumer Notices ...................................................................................... 41

   B.  Distribution and Acceptance of Redress Payments Directed to Automatic Pay Out Consumers  42

   C.  Customer Support Engagement .................................................................. 44

IX.   Conclusion ............................................................................................................. 45

i

Pursuant to the requirements of the settlement order defined herein, the Court-appointed Claims Supervisor has generated this first quarterly report, which, unless otherwise specified, addresses progress in connection with the administration of the Amazon.com, Inc. ("Amazon" or the "Company") consumer redress program during the three-month period between September 25, 2025, through December 24, 2025 (the "Reporting Period").

## I.    Executive Summary

Following the entry of a September 25, 2025 settlement order to resolve the U.S. Federal Trade Commission (the "FTC") civil enforcement case before Federal District Court Judge John H. Chun in Seattle (the "Court"), Amazon immediately got to work to address its obligations under the negotiated terms of the Stipulated Order for Permanent Injunction, Monetary Relief, Civil Penalty Judgment, and Other Relief (the "Settlement Order" or "Order").[1]   Among other things, the Settlement Order required Amazon to coordinate and administer a consumer redress program with very aggressive timetables in order to make up to $1.5 billion in total payments to tens of millions of qualifying Prime benefits program subscribers during a five-year period dating back to June 23, 2019 (the "Settlement Program" or "Redress Program").   The Settlement Order also required the appointment of an independent third-party Claims Supervisor to monitor and report on Amazon's progress in meeting the mandates of the Settlement Program.   Following a recommendation from the FTC, a team of professionals from FTI Consulting, Inc. ("FTI") was appointed by the Court on October 6, 2025 to serve in the role (the "Claims Supervisor" or the "Claims Supervisor Team").   This initial report of the Claims Supervisor is respectfully submitted to the Court and the parties on December 24, 2025 (the "Report").

---

[1] Capitalized and/or abbreviated terms in this report are meant to be read in accordance with the definitions in the Settlement Order.

1

In order to evaluate Amazon's efforts and progress under the Settlement Order following its appointment, the Claims Supervisor Team conducted extensive fact-finding during the balance of the initial three-month Reporting Period by seeking records, considering available data, and interviewing various personnel who contributed to the development and implementation of the Redress Program for impacted consumers. Among other things, in order to meet the requirements of the Settlement Order, Amazon began its efforts by designating senior professionals within the Company's legal and technology organizations to oversee the process of scoping and extracting the massive amounts of consumer-based transactional information and metrics that would form the basis of Settlement Program eligibility and payment amount determinations in accordance with definitions and parameters required by the Order. Moreover, Amazon established a dedicated project management team of in-house company professionals who were appropriately credentialed and highly knowledgeable relative to the Company's technology systems, processes, and personnel (the "Project Management Team" or "Project Team"). The Project Management Team coordinated the process of culling through terabytes of data housed in disparate technology system environments in seeking to extract and conform the necessary information for the administration of the Settlement Program in compliance with the requirements of the Settlement Order.

To assist in developing the required work product in accordance with Settlement Order mandates, Amazon also enlisted the services of an Am Law 100 law firm to provide counsel and assist with the coordination of certain required workstreams (the "Law Firm Advisor"). In addition, Amazon engaged an experienced mass claims administration vendor (the "Claims Administration Vendor") to undertake Settlement Program processing and consumer engagement responsibilities, leveraging the detailed consumer data compiled and organized by the Project Management Team. Relative to the diagram below, and as further explained in this Report, Amazon invested significant

2

in-house resources and also integrated these two key external resources to stand up the Settlement

Program in accordance with the requirements of the Settlement Order:



More particularly, between the entry of the September 25, 2025 Settlement Order and the

December 24, 2025 date of this Report,[2] Amazon made substantial progress in advancing the first

phase of the Settlement Program to administer the "Automatic Pay Out" payments to Eligible

Consumers via PayPal, Venmo and check.  And, as of December 22, 2025, Amazon provided

performance data reflecting outreach to more than 12.5 million consumers eligible for the automatic

payments, and the transfer of more than $146 million in payments to approximately 4.45 million of

those consumers.  The transfer of additional funds is expected to continue well into the next

reporting period.

---

[2] While the Settlement Order contemplates December 24, 2025 as the date for Amazon to achieve and commence specified Settlement Program administration benchmarks, due to the expanded 2025 Federal Holiday schedule by virtue of the December 18, 2025 Presidential Executive Order (the "Presidential EO"), Rule 6 of the Federal Rules of Civil Procedure ("Rule 6") had the effect of extending the original 90-day period for those benchmarks to December 29, 2025.

In addition, Amazon undertook significant preparations to plan for the launch of the second phase of the Settlement Program to commence within 30 days after December 29, 2025, as required by the Settlement Order.[3]  The second phase requires Amazon to initiate redress via a separate "Claims Process" for other Eligible Consumers under the court-ordered Settlement Program, which calls for the submission of applications to qualify.  Amazon anticipates distributing more than 10 million notices to qualifying Eligible Consumers in January 2026 to advise that an online Claims Form is available for submission.

As explained in greater detail in this Report, assigned Amazon resources were consumed during most of the Reporting Period in driving to meet the aggressive timetables of the Settlement Order, and the Claims Supervisor Team adapted its fact-finding efforts accordingly to facilitate the prioritization of Redress Program administration.  While significant foundational perspective was developed relative to Amazon's project management efforts and relevant technology environments, the Claims Supervisor Team is expected to concentrate over the course of the next three-month reporting cycle on more particularized validation of the underlying data used to implement the Settlement Program, as well as Settlement Program performance, pursuant to the requirements of the Settlement Order.

## II.    Background and Settlement of FTC Enforcement Case

Amazon is one of the largest online retailers in the world.  It operates a number of business lines, including Amazon Prime, which offers subscription-based membership services that enable subscribers to, among other things, receive free expedited shipping in connection with a marketplace of online

---

[3] As noted, while the Settlement Order contemplates December 24, 2025 as the date for Amazon to achieve and commence specified Settlement Program administration benchmarks, by virtue of the 2025 Federal Holiday schedule being expanded by Presidential EO, Rule 6 had the effect of extending the original 90-day period for those benchmarks to December 29, 2025.

goods, access on-demand videos available on Amazon's Prime Video platform, and listen to music on Amazon Music Prime.[4]

On June 21, 2023, the FTC filed a complaint against Amazon for Permanent Injunction, Civil Penalties, Monetary Relief, and Other Equitable Relief in the United States District Court for the Western District of Washington. The complaint, as later amended (the "Amended Complaint"), alleged that Amazon had caused millions of consumers to enroll in Amazon Prime without their consent, in violation of the FTC Act and the Restore Online Shoppers' Confidence Act. The FTC further alleged that Amazon's cancellation process was designed to deter consumers from successfully unsubscribing from Prime.

### A.    FTC and Amazon Execute Settlement Agreement

After more than two years of litigation, during the first week of a jury trial before the Court in Seattle, the FTC and Amazon settled the matter pursuant to the terms in the Settlement Order. While Amazon resolved the case without admitting or denying any of the allegations in the Amended Complaint (except as expressly indicated in the Settlement Order), the Order requires Amazon to make significant changes to the Prime enrollment and cancellation processes, imposes a $1 billion civil penalty -- the largest ever in a case involving an FTC rule violation -- and provides up to $1.5 billion in consumer redress, which represents the second-highest restitution award ever obtained by the FTC. The FTC estimated that as many as 35 million consumers may be eligible for relief under the Settlement Order, but the Order's terms and conditions for eligibility necessarily drive the scoping of participation.

---

[4] A more comprehensive overview of the nearly 50 available Prime benefits services that are relevant to the Settlement Program considerations herein is presented in Section V below.

### B.    Administration of the Settlement Program

Immediately following the entry of the Settlement Order, Amazon designated senior-level in-house professionals to oversee the development and implementation of the Settlement Program. Moreover, the Company deployed more than 40 highly-experienced and knowledgeable employees from across its legal department, technology team, and Prime organization, as well as an array of other business units, to assist in scoping the massive volumes of data to meet the Settlement Order eligibility and award requirements.[5]

During the Reporting Period, the day-to-day development and administration of the Redress Program was primarily managed by an Amazon attorney who had already been serving in a lead capacity to support the Amazon Prime business (the "Amazon Prime Attorney"), and ultimately overseen by Amazon's legal department leadership, with support from the Law Firm Advisor. As a starting point, the Amazon personnel and the Law Firm Advisor coordinated efforts to translate the Settlement Order requirements into actionable work product that would support the administration of the Redress Program on pace with the prescribed timetables.

To enable the complex data scoping and extraction work streams, the Amazon Prime Attorney engaged regularly with designated leaders within Amazon's Prime Technology Team of data scientists and engineers. They, in turn, leveraged the broader Prime Technology Team to assist in identifying the relevant Amazon Prime databases and data sets in order to capture a vast scope of transactional data points (including benefits engagement), as well as consumer-based information necessary to identify

---

[5] The help of business leaders and data engineers was solicited from several business units like Prime Video Finance, Music Technology, Prime Gaming, Amazon Photos, and others to contribute to the information-gathering efforts tied to a broad array of required Settlement Program data, including data relating to benefit engagement, subscription payments, and refunds.

Eligible Consumers and determine award amounts.  Subsequently, senior data engineers from Prime's Business Intelligence Team helped to manage the massive data collection process.

As noted above, Amazon also hired the Claims Administration Vendor[6] to engage with consumers, process claims forms, and coordinate the distribution of payments once the Amazon data was scoped, extracted, conformed, and provided.  Given the size and complexity of the Settlement Program, Amazon's Claims Administration Vendor assembled a multidisciplinary team that has included contributions from more than 50 employees in performing a variety of claims administration tasks, including data review and analysis, print production, fund accounting, web development, and customer support.  The Claims Administration Vendor Team is co-led by three senior personnel with decades of industry experience.[7]  To meet the aggressive deadlines of the Settlement Order, the Claims Administration Vendor advised that, during the Reporting Period, it convened daily standing coordination calls to, among other things: (i) ensure that tasks were timely and appropriately assigned; (ii) facilitate coordination among the various project team members; (iii) assess the progress of various workstreams; and (iv) identify issues and challenges, so that they could be addressed expeditiously.

### C.    Establishment of Consumer Fund

As mentioned above, Amazon agreed to provide up to $1.5 billion in consumer redress under the Settlement Order.  Section IX.A of the Settlement Order required Amazon to deposit $1.5 billion into the dedicated Consumer Fund within 30 days from the entry of the Order (the "Consumer Fund").  In compliance therewith, on October 23, 2025, Amazon transferred the full amount to a U.S.-based bank.

---

[6] The Claims Administration Vendor is a multinational company comprised of hundreds of employees that, among other things, provides specialized legal administration and claims management services for large, complex cases involving consumer redress.

[7] One of the co-leaders, in particular, indicated that he has overseen more than 1,500 settlements of varying sizes and complexities.

As of October 31, 2025, bank records reflected that $500 million of the proceeds were in a checking account, and the remaining balance was in a separate interest bearing account.  Moreover, for the month of November 2025, the bank statements reflect disbursements from the checking account, which the Claims Supervisor Team understands were directed exclusively for purposes of paying Eligible Consumers.  The Claims Supervisor will continue to monitor the Consumer Fund, further evaluate disbursements, and assess whether it remains appropriately funded throughout the duration of the Settlement Program.

Upon completion of the Settlement Program and payment of all distributions to Eligible Consumers, to the extent that any funds remain in the Consumer Fund, they are to revert back to Amazon in accordance with the terms of the Settlement Order.

### III.    Role of Independent Claims Supervisor

The Settlement Order required that the FTC nominate a Claims Supervisor for Court approval within fourteen days from entry of the Order.  In response to the FTC's nomination of FTI, the Court entered an Order Appointing FTI as Claims Supervisor on October 6, 2025.  The Claims Supervisor Team has extensive experience managing and overseeing complex, high-stakes government enforcement and private party mass claims redress programs.  Among other things, the team incorporates multi-disciplinary professionals with expertise serving as court-appointed fiduciaries, independent monitors, forensic investigators, data scientists, and claims administrators.  Under the Settlement Order, Amazon is responsible for all reasonable costs, fees, and expenses of the Claims Supervisor, and the Order expressly sets forth that *none of the costs* may be paid out of the Consumer Fund.

The Claims Supervisor Team is charged with monitoring Amazon's compliance with the sections of the Settlement Order entitled "Settlement Program" (Section IX) and the "Consumer Fund Distribution Process" (Section X).  More specifically, the Claims Supervisor must review the payments

automatically made to Eligible Consumers pursuant to Section X.A of the Order, as well as claims for compensation from Claims Process Eligible Consumers pursuant to Section X.B of the Order, to ensure that Amazon appropriately processes and adjudicates the claims in accordance with the Consumer Fund Distribution Process.  In connection with these responsibilities, the Claims Supervisor must ensure that:

- Redress is calculated and paid correctly;

- Claims are processed in an efficient and consistent manner;

- The calculations of approved payments comply with the Settlement Order; and

- Determinations by Amazon that claims are ineligible or invalid are proper.

Pursuant to the requirements of the Settlement Order, from the date of entry on September 25, 2025, the Claims Supervisor must submit a status report to the Court and the parties every three months for a period of 18 months.  More particularly, the reports are to include:

- An update on Amazon's progress with the requirements of the Settlement Program and Consumer Fund Distribution Process, and Amazon's cooperation with the Claims Supervisor and its requests;

- A summary of the total number of claims submitted to Amazon, the total number of claims verified and paid by Amazon, the total number of claims rejected or deemed ineligible by Amazon, and the total amount of claims verified and paid by Amazon;

- Information regarding notice provided to Claims Process Eligible Consumers, including the number of consumers who received electronic mail and the number of unique visitors to the settlement website;

- Any complaints related to Eligible Consumers' efforts to participate in the Settlement Program or Consumer Fund Distribution Process; and

- The Claims Supervisor's review of claims rejected or deemed ineligible or invalid by Amazon.

In accordance with the Settlement Order's requirements, FTI professionals commenced activities serving as the Claims Supervisor on October 7, 2025.  Since that day, the Claims Supervisor Team has submitted several formal requests for records and informational meetings with knowledgeable Amazon personnel and its retained agents to understand: (i) the composition of the Company's extended team responsible for the Settlement Program; (ii) the approach to implementing the requirements of the Settlement Order; (iii) the work assigned to outside vendors; and (iv) the process for identifying, collecting, and analyzing massive amounts of data to determine consumer eligibility and corresponding award amounts, among other topics.  Members of the Claims Supervisor Team also periodically visited and reviewed the content of the settlement website --

https://www.subscriptionmembershipsettlement.com/ -- established pursuant to Section IX of the Settlement Order.

In the weeks following the entry of the Settlement Order, the Amazon Project Management Team was fully consumed with scoping the required data and information housed within the Company's technology systems, and developing and applying related queries in the form of Structured Query Language ("SQL") computer code (the "Queries") to generate a master list of Eligible Consumers for its Claims Administration Vendor to distribute notices and payments consistent with the programmatic requirements and deadlines prescribed in the Settlement Order.  Once the initial master list was developed by Amazon, more significant records productions to the Claims Supervisor Team began in mid-November 2025, and continued through the date of this Report.  Responsive records to the Claims Supervisor information requests identified, among other things:

- The Amazon employees working on the implementation of the Settlement Program;

10

- Amazon's approach to scoping, identifying, capturing, and analyzing data to facilitate the identification of Eligible Consumers and determine payment amounts;

- The master list for the Automatic Pay Out population, as well as a preliminary list of consumer data for those expected to receive a claims form notice pursuant to the Claims Process;

- The scope of services to be provided by the Claims Administration Vendor, as well as the form of certain notices sent by the Claims Administration Vendor to Eligible Consumers; and

- Bank accounts opened to satisfy the Consumer Fund requirements set forth in the Settlement Order.

During the Reporting Period, members of the Claims Supervisor Team participated in several fact-finding meetings with various personnel from Amazon, the Law Firm Advisor, and the Claims Administration Vendor to further understand the Company's thinking, efforts, and work product developed to implement the Redress Program within the bounds of the Settlement Order.

## IV.    Overview of the Settlement Program

The Settlement Order's definitions and terms inform the Settlement Program parameters in several important ways.  Section X of the Order, for example, provides that the Consumer Fund shall be used under the Settlement Program to compensate Eligible Consumers.  Moreover, an Eligible Consumer is defined as any U.S. consumer that:

- Signed up for an Amazon Prime subscription for the United States market during the Relevant Time Period through a Challenged Enrollment Flow; or

- Unsuccessfully attempted to cancel their Amazon Prime subscription for the United States market by entering, but failing to complete, the online cancellation process or by

11

inadvertently taking a Save Offer during the online cancellation process during the Relevant Time Period.

Challenged Enrollment Flow is defined as the method by which the Eligible Consumer signed up for Amazon Prime, and includes the Universal Prime Decision Page, the Shipping Option Select Page, Prime Video enrollment flow, and the Single Page Checkout.  Further, Save Offer is defined in the Settlement Order as "an attempt by Amazon to retain a customer seeking to cancel an existing agreement, and includes presenting any offer, reason to retain an agreement, modification or proposed modification to an agreement, or similar information."

As reflected in the timeline diagram below, Amazon was required to establish the $1.5 billion Consumer Fund on or before October 25, 2025 to enable redress payments across aggressive distribution timelines for the two Settlement Program phases corresponding to each of the Eligible Consumer categories: those entitled to receive "Automatic Pay Out" payments, and those eligible to participate in a "Claims Process," requiring the submission of a claims form.[8]

---

[8] As previously explained, while the Settlement Order contemplates December 24, 2025 as the deadline for Amazon to achieve and commence specified Settlement Program administration benchmarks, by virtue of the 2025 Federal Holiday schedule being expanded by Presidential Executive Order, Rule 6 of the Federal Rules of Civil Procedure had the effect of extending the original 90-day period for those benchmarks to December 29, 2025.

## Settlement Program Timeline



Under the Settlement Order, eligibility for both the Automatic Pay Out and Claims Process categories is determined, in part, by the number of Prime Benefits utilized by consumers during a twelve-month period. Prime Benefit is defined in the Settlement Order as "goods or services provided to Amazon Prime members as a result of their Amazon Prime subscription membership and which the member would not have received if they were not a Prime member."

### A.      Automatic Pay Out Process

Under the Settlement Order, the Automatic Pay Out process applies to Eligible Consumers who enrolled through a Challenged Enrollment Flow and used no more than three Prime Benefits in any twelve-month period following enrollment.[9]  Amazon is required to pay Eligible Consumers who are entitled to the Automatic Pay Out process the total amount of Amazon Prime membership fees paid

---

[9]  The Automatic Pay Out population does not include Eligible Consumers who unsuccessfully attempted to cancel their Amazon Prime membership.

13

during the duration of the subscription period, up to a cap of $51.[10]  Settlement Program administration did not require consumers to submit a claim form to receive benefits under the Automatic Pay Out process.  Moreover, payments were to be made within 90 days of the entry of the Settlement Order, or by December 29, 2025.[11]

Settlement Program payments to Eligible Consumers could be made through any payment method approved by the FTC.  For the Automatic Pay Out Eligible Consumers, Amazon's Claims Administration Vendor employed a "waterfall" approach based on available contact information.  As explained in greater detail below, where an email address is available for a consumer, Amazon attempted to make payments via PayPal.  If the email address matched a PayPal account, the funds were to be automatically deposited into the account.  If the email address does not match, the consumer was to receive an email notification that the funds were available, and they were provided with fifteen days to claim the payment.  In the absence of an email address, if a mobile telephone number is available, Amazon employed essentially the same process using Venmo.

Amazon's vendor validates payment through reconciliation reports provided by the digital payment processors.  Programmatically, if the digital payment was not completed within fifteen days, the unclaimed funds should be returned, and the Claims Administration Vendor would endeavor to issue a paper check to the Eligible Consumer, assuming a physical mailing address is available.  Similarly, if

---

[10] In the event the total amount of payments otherwise due to Eligible Consumers in the Automatic Pay Out process exceeds the total amount of funds in the Consumer Fund, payments will be distributed on a *pro rata* basis.

[11] As explained, while the Settlement Order contemplates December 24, 2025 as the date for Amazon to achieve specified Settlement Program administration benchmarks, by virtue of the 2025 Federal Holiday schedule being expanded by Presidential EO, Rule 6 had the effect of extending the original 90-day period for the automatic payment process to December 29, 2025.

14

email address and phone number are unavailable, the Claims Administration Vendor would also seek to

issue a paper check to the Eligible Consumer when possible.

**B.    Claims Process**

Under the Settlement Order, the Claims Process applies to Eligible Consumers that either signed

up for an Amazon Prime subscription through a Challenged Enrollment Flow or unsuccessfully

attempted to cancel their Amazon Prime subscription.  In addition, to qualify for this class of Eligible

Consumer, they must have used more than three, but not more than ten Prime Benefits during any

twelve-month period of enrollment in Prime.  Notably, Claims Process Eligible Consumers do not

include any Eligible Consumers that qualified for the Automatic Pay Out redress payments.

The Settlement Order also requires that, for Prime subscribers who submit valid claims for

unintentional enrollment, Amazon pay the total amount of Prime membership fees paid during the

duration of their Prime subscription, up to a maximum of $51.  Similarly, for Amazon Prime subscribers

who submit valid claims for unsuccessful cancellation, Amazon will pay the total amount of Amazon

Prime membership fees paid following the first unsuccessful cancellation attempt, up to a maximum of

$51.[12]

Amazon is required, pursuant to the Settlement Order, to distribute at least $1 billion in funds to

Eligible Consumers.  In the event that less than $1 billion has been distributed after the completion of

the Claims Process, the Settlement Order directs Amazon to continue to make additional rounds of

automatic payments to Eligible Consumers until $1 billion in funds is distributed.  Pursuant to the

Settlement Order, these additional payments would start with Claims Process Eligible Consumers who

---

[12] If the Consumer Fund has insufficient funds to fully redress all Claims Process Eligible Consumers, Amazon
will pay such claims on a *pro rata* basis.  The *pro rata* calculation will factor in the number of Prime Benefits
used following their enrollment in Prime or their unsuccessful cancellation attempt.

used no more than four Prime Benefits during a twelve-month period, and Amazon would continue to add groups to this automatic payout by adding one benefit to the threshold until $1 billion is paid out. Each of these additional payments would be capped at $51.

As mentioned above, unlike the Automatic Pay Out population, Claims Process Eligible Consumers are required under the Settlement Order to submit a claims form.  Amazon must make the claims form available to all Claims Process Eligible Consumers within thirty days following the completion of the Automatic Pay Out process or by January 28, 2026.[13]  The claims form will enable Claims Process Eligible Consumers to confirm they were unintentionally enrolled in an Amazon Prime subscription during the Relevant Time Period, unsuccessfully attempted to cancel an Amazon Prime subscription during the Relevant Time Period, or both.  Claims Process Eligible Consumers will have up to 180 days after receiving the claims form to submit it to Amazon via electronic mail, First-Class postage pre-paid mail, or through the settlement website.  For any claims form received from a Claims Process Eligible Consumer, Amazon will have up to 30 days to review the validity of the claim and determine entitlement to redress according to the methodology outlined in Section X.B.4 of the Settlement Order.

### C.    Notice Program for Claims Process Eligible Consumers

Since Claims Process Eligible Consumers must submit a claims form, the Settlement Order requires that Amazon administer a notice program -- beginning within thirty days of the conclusion of

---

[13] As noted previously, while the Settlement Order contemplates December 24, 2025 as the deadline to meet certain requirements for the Automatic Pay Out phase of the Settlement Program administration, by virtue of the 2025 Federal Holiday schedule being expanded by Presidential Executive Order, Rule 6 of the Federal Rules of Civil Procedure had the effect of extending the original 90-day period until December 29, 2025.

the Automatic Pay Out period on December 29, 2025[14] -- directed to Claims Process Eligible Consumers. The notice program must advise these consumers of the settlement, their rights under the Settlement Order, and instructions for submitting a claims form to seek redress from the Consumer Fund.

With respect to consumer engagement and communications, the Settlement Order requires that Amazon:

- Establish a settlement website -- which shall remain live and publicly available for the duration of the Settlement Program -- to provide Claims Process Eligible Consumers with information about the Settlement Order, their rights under the Order, and instructions for submitting a claims form to seek redress;

- Provide written notice to Claims Process Eligible Consumers via electronic mail and First-Class postage pre-paid mail (to the extent addresses are maintained by Amazon);[15] and

- Post links to the settlement website on the landing pages of www.amazon.com and www.amazon.com/amazonprime, or a similar page on the mobile application, with the links remaining posted for the first thirty days of the Settlement Program.[16]

---

[14] Again, while the Settlement Order contemplates December 24, 2025 as the deadline for Amazon to trigger this Settlement Program administration benchmarks, by virtue of the 2025 Federal Holiday schedule being expanded by Presidential Executive Order, Rule 6 of the Federal Rules of Civil Procedure had the effect of extending the original 90-day period until December 29, 2025.

[15] Under the terms of the Settlement Order, the FTC was required to approve the content and format of the notice and settlement website.

[16] Amazon has informed the Claims Supervisor Team that the links are expected to be posted on January 1, 2026 and will be placed on the footers of www.amazon.com and www.amazon/com/amazonprime, as well as on the mobile application and mobile web browser. The links are expected to be accompanied by the following text: "Information about the FTC Prime settlement https://www.subscriptionmembershipsettlement.com/."

In accordance with the notice requirements, on November 12, 2025, Amazon launched the settlement website (available at https://www.subscriptionmembershipsettlement.com/).  The website provides general information about the lawsuit and settlement, frequently asked questions ("FAQs") related to the Settlement Program, and copies of the Settlement Order and the Order granting in part and denying in part the defendants' motion for summary judgment.  As of the date of this Report, the FAQs are comprised of 23 questions and answers that cover topics including background on the settlement, key definitions in the Settlement Order, eligibility requirements, the process to receive redress payments, the amount and calculation of redress payments, and payment method options.  Amazon's first FAQ provides instructions -- through PayPal's website -- on how consumers can successfully claim their money, including by adding or updating their email address. The Settlement Program website also includes a "File Claim" tab for Claims Process Eligible Consumers that, while not currently populated, instructs consumers to check back after December 23, 2025.[17]  In addition, the settlement website contains a link to an electronic Check Reissue Request portal, which is available to facilitate the reissuance of payments.[18]

Although Amazon did not originally offer dedicated customer support resources, as of December 12, 2025, it implemented live agent email support (at admin@SubscriptionMemberSettlement.com)

---

[17] The File Claim tab is expected to go live one business day prior to the issuance of Claims Process notices.

[18] To complete a reissue request through the portal, consumers are required to input their Claim ID and then indicate whether they are updating their name and/or address, and how they would like to receive payment (*i.e.*, through PayPal, Venmo or check).  They are then required to: (i) declare under penalty of perjury that the information they provided relative to the reissue request is true and correct to the best of their knowledge, and that they are authorized to make the submission; and (ii) acknowledge that the information they submitted is subject to audit, review, and validation.

18

through its Claims Administration Vendor.[19]  Amazon has also advised that its Claims Administration

Vendor is in the process of setting up a call center for consumers who do not wish to use the website or

email for their questions.  The call center is expected to go live in early January 2026.  In addition,

Amazon has provided guidance to its own customer support agents to address Settlement Program-

related inquiries.  In response to such inquiries, Amazon agents are, among other thing: (i) advising

consumers that customer support is being handled by the Claims Administration Vendor; and (ii)

referring them to the settlement website.  Metrics associated with customer support engagement are set

forth in Section VIII below.

## V.    Amazon's Key Scoping Determinations and Application of Settlement Agreement Terms

In identifying the Eligible Consumers entitled to receive redress payments under the terms

of the Settlement Order, Amazon advised the Claims Supervisor Team that it made a series of

threshold determinations relative to the scoping of the Eligible Consumer populations.  As reflected

in the summary diagram below, the Settlement Order set forth several criteria that would impact

necessary data scoping by Amazon:

---

[19] Amazon's Claims Administration Vendor advised that between November 11, 2025 and December 11, 2025
consumers who sent emails to admin@SubscriptionMemberSettlement.com received an automatic reply advising
them that the email box was not monitored and directing them to the Settlement Program website for more
information, including answers to FAQs.  As of December 12, 2025, the email address has been actively
monitored by the Claims Administration Vendor.

## Amazon Data Capture Required by Settlement Order

**"Relevant Time Period"**
June 23, 2019 – June 23, 2025

**"Challenged Enrollment Flow"**
• Universal Prime Decision Page  • Shipping Option Select Page
• Prime Video Enrollment Flow  • Single Page Checkout

**"Covered Goods or Service"**
Prime Subscription in US or Successor Subscription Program

**"Prime Benefit"**
Goods or Services offered to Prime members,
except for free / expedited shipping if otherwise free

**"Eligible Consumer"**
• Signed up for Prime through "Challenged
  Enrollment Flow", OR
• Unsuccessfully attempted to cancel by:
    • Failing to complete cancellation, OR
    • Inadvertently taking "Save Offer" during
      cancellation

**"Save Offer"**
• Efforts to retain customer seeking to cancel
  existing agreement by
    • Presenting any offer,
    • Presenting any reason to retain
      agreement, modification to agreement,
      proposed modification, or
    • Similar

**"Automatic Payout" Consumers**
• Subscribed through "Challenged Enrollment
  Flow"
• Used 0-3 Prime Benefits during 12-month
  period
• Payment calculation capped at $51

**"Claims Process" Consumers**
• Subscribed through "Challenged Enrollment Flow"
    • Used 4-10 Prime Benefits during 12-month period
• Unsuccessfully attempted to cancel
    • Used 0-10 Prime Benefits during 12-month period
• Payment calculation capped at $51

To inform the construction and development of its Queries, Amazon analyzed the requirements of

the Settlement Order and, with the advice and counsel of the Law Firm Advisor, reached decisions

on how to interpret the defined terms and implement approaches to identifying, among other things, the following data points:[20]

_Membership Start and End Dates_. As a general matter, Amazon informed that it calculated membership start dates based on when consumers signed up for Prime (_i.e._, clicked the subscribe button), as opposed to when payment was actually made (which is occasionally delayed from the time of sign up). The Company indicated that it calculated membership end dates based on when a Prime subscription had lapsed, was suspended, or was terminated (but not when a subscription was paused). Pacific Time was used in determining time periods related to sign-ups and end dates, as well as for other related Settlement Program calculations.

_Sign-Up Location_. Amazon determined consumer sign-up locations based on the Prime domain utilized (_i.e_., all customers who signed up for Prime on Amazon.com), as opposed to the consumer's physical mailing address. Accordingly, consumers who signed-up for a Prime subscription using Amazon's U.S.-based domain were considered to be eligible under the Settlement Order (provided they met its other requirements), regardless of their physical location or residence (whether in the U.S. or outside the U.S.). Accordingly, the eligible populations capture certain consumers who may have actually been located outside of the U.S. at the time they signed up.

---

[20] The following includes some of the key decision points that Amazon has conveyed to the Claims Supervisor Team to date. As mentioned above, the Claims Supervisor's fact-finding activities relative to Amazon's efforts to identify and effectively scope the relevant consumer populations are ongoing and will extend into the next reporting period.

*Challenged Enrollment Flows*.  Amazon advised that it captured Prime sign-ups for the Automatic Pay Out population through the following Challenged Enrollment Flow website locations:

- the Ship Option Selection Page (which is the first step in the checkout page process);

- the Ship Option Selection Page - Prime Decision Page (which is a page shown to customers eligible for a Prime membership before they reach the Single Page Checkout);

- the Single Page Checkout (which is a feature that enables consumers to review all checkout information and place orders on a single page, including through the desktop checkout experience);

- the Universal Prime Decision Page (which is a page shown to customers before they reach the final checkout page and considered by Amazon to be an "upsell" to join Prime); and

- Prime membership sign-up locations on "Prime Video surfaces" (*i.e.*, sign-ups within Prime Video managed experiences).

Amazon also informed the Claims Supervisor Team that certain Prime-branded offerings (*e.g.*, Business Prime and Prime Video standalone plans) were not considered within the scope of the Settlement Program because they are materially different from the "core" Prime membership. Amazon also determined that Prime subscriptions made through Fuse and Google Play Billing fall

outside the scope of the Settlement Program because Amazon reports that the sign up process for each materially differs from the Challenged Enrollment Flows and the online cancellation flow.[21]

_Scope of Prime Benefits_. During the data scoping process, the Amazon Project Team identified nearly 50 Prime Benefit types -- the vast majority of which are considered direct first-party benefits, with the balance being considered third-party benefits.[22]  Examples of first-party Prime Benefits include: Prime Shipping (_e.g._, two-day shipping, one-day shipping and same-day shipping), Prime Video, Prime Music, Prime Reading, Prime Photos, Prime Gaming, Shopping Exclusives (_e.g._, early access to "Lightning Deals" and exclusive access to "Deals of the Day"), Shopping Savings and Rewards (_e.g._, Prime shopping in Amazon stores, Whole Foods discounts and credit card rewards), and access to certain add-ons & additional benefits or discounts on standalone subscriptions.  Third-party benefits include discounts with, and offers from, Amazon partners such as Grubhub, BP, and Calm.

_Usage of Prime Benefits_. Amazon advised the Claims Supervisor Team that it calculated Prime Benefit usage over "trailing" twelve-month periods.  In applying this methodology, consumers who signed up through a Challenged Enrollment Flow and used no more than three Prime Benefits over a twelve-month period would be eligible to receive an Automatic Pay Out (provided they met the other Settlement Order terms).  Any other Eligible Consumer who used ten

---

[21] Fuse is Amazon's partner marketing channel, which enables third parties to offer access to Amazon memberships, including Prime.  Google Play is a digital distribution service for Android devices that acts as an application store.  Amazon determined that Prime subscriptions through Fuse are out of scope because they do not meet the definition of Challenged Enrollment Flow and consumers must cancel through a different process than Prime's online cancellation flow.  Amazon also determined that Prime subscriptions through Google Play Billing are out of scope because -- although Google Play Billing is flagged by Amazon as a being part of a Challenged Enrollment Flow -- Amazon considers it a separate enrollment and payment experience, and consumers must cancel through a different process than Prime's online cancellation flow.

[22] Some Prime Benefits available at various points in time during the Relevant Time Period have been discontinued.

or fewer Prime Benefits over a twelve-month period would be determined to be a Claims Process Eligible Consumer.  Amazon advised that it decided to apply this approach regardless of the number of Prime memberships a consumer held over the Relevant Time Period because some consumers may sign up for and cancel subscriptions multiple times over the course of a 365-day period in order to access certain benefits at particular times.  By way of example, the use of more than three Prime Benefits over any 365-day period -- even if it spanned multiple membership periods -- would have disqualified a consumer from receiving an Automatic Pay Out, but may have qualified the consumer for a redress payment as a Claims Process Eligible Consumer.[23]

As a general matter, Amazon counted the usage of Prime Benefits utilizing one of the following methods, depending on Prime Benefit type:[24]

- the number of times that a consumer used a particular Prime Benefit (commonly used by the Company to measure the use of Prime shipping and purchase of Prime Shopping Exclusives);[25]

---

[23] Amazon advised that it started measuring consumer usage as of January 1, 2019, even though this predates the beginning of the Relevant Time Period start date of June 23, 2019 set forth in the Settlement Order.

[24] The Claims Supervisor Team is continuing to conduct fact-finding relative to Amazon's approaches to counting usage across the nearly 50 Prime Benefits.

[25] As further explained in Section VI, Amazon considered multiple ways to account for Prime shipping benefits, but ultimately applied usage on an order basis.  Accordingly, if a single order contained five items that were shipped using a Prime shipping speed, Amazon assigned only one Prime Benefit usage to the transaction (as opposed to five).  With respect to the exclusion contained in Definition L of the Settlement Order that Prime Benefit "shall not include free, expedited shipping if the transaction at issue would have had that shipping speed for free without an Amazon Prime subscription membership," Amazon advised that, based on an analysis of relevant data over the Relevant Time Period, the weighted average speed promised on Prime deliveries was substantially faster than the weighted average speed promised on non-Prime free deliveries by an average of 3-6 days.  Consequently, Amazon determined that the foregoing exclusion did not impact the analysis of Prime Benefit usage.

- the number of days that a consumer used a particular benefit (commonly used by the Company to measure the use of digital Prime Benefits, such as Prime Music, Prime Video, Prime Reading, Prime Photos and Prime Gaming);[26] or

- the number of times that a consumer activated or redeemed benefits through certain subscriptions, including those offered through third parties.[27]

Amazon also advised that, in counting Prime Benefit usage, the Company limited the scope of usage to primary household members. Accordingly, Prime "invitees" and non-primary household members were intended to be excluded in the Prime Benefit usage calculations.

The quantification of benefits was made more challenging in certain instances by a lack of available data. For instance, the Amazon Prime Team did not maintain, in the ordinary course of business, the requisite data to determine the usage of Prime Benefits related to Amazon Pharmacy, the RXPass add-on, the One Medical add-on, and Kids+ due to data privacy restrictions. As a result, Amazon excluded these benefits -- and certain others for which it lacked sufficient data[28] -- from its calculations.[29]

---

[26] For this category, Amazon calculated usage by day irrespective of the number of times that a consumer actually utilized the Prime Benefit in a single day. For instance, if a consumer listened to five songs through Prime Music on a given day, Amazon counted that as usage of a single Prime Benefit (as opposed to five separate Prime Benefits).

[27] Amazon advised that it does not have sufficient visibility into Prime members' actual usage of some third-party services (such as Grubhub+) so, in these instances, Amazon limited the calculation of Prime Benefits to the *initial* redemption or activation of these third-party services (which typically included discounts) as opposed to the actual number of times the Prime member *subsequently* utilized or interacted with the partner service. Some third party benefits, such as BP fuel discounts, may have resulted in Prime members exercising multiple offers. The acceptance of each offer would count toward a benefit usage.

[28] Examples of other Prime Benefits that Amazon excluded from its calculations include Buy with Prime, discounts on Prime Video Sports Channels, and download credits for Audible.

[29] There were also instances in which Amazon lacked certain information due to consumers' requests made under privacy laws that their data be deleted. Amazon advised that this issue mainly affected Eligible Consumers who

*Unsuccessful Cancellations*. To determine which consumers under the requirements or the Settlement Order "[u]nsuccessfully attempted to cancel their Amazon Prime subscription … by entering, but failing to complete, the online cancellation process or by inadvertently taking a Save Offer during the online cancellation process…," Amazon informed the Claims Supervisor Team that it identified the universe of consumers who entered the online cancellation flow, but ultimately did not cancel their Prime subscription during the Relevant Time Period.  Amazon's scoping included consumers who accepted a Save Offer -- as, by doing so, these consumers would *not* have successfully cancelled their Prime subscription.  Amazon advised that <u>all</u> consumers who did not successfully cancel Prime subscriptions through corresponding cancellation flows, used fewer than ten Prime Benefits, and otherwise met the eligibility criteria were deemed to be Claims Process Eligible consumers by the Company, regardless of whether they originally signed up for Prime through a Challenged Enrollment Flow.

*Calculation of Payout Amounts*. Amazon determined payout amounts based on the membership fees paid inclusive of tax, less any refunds or chargebacks.[30]  Amazon advised the Claims Supervisor Team that membership payments were generally measured from the time of Prime sign-ups through a Challenged Enrollment Flow, with the exception of membership payments by consumers who unsuccessfully attempted to cancel their Prime subscription, which were measured from the time a consumer first entered a cancellation flow and did not successfully cancel.  Amazon further informed that all membership fees, refunds, and chargebacks were stored

---

unsuccessfully attempted to cancel their Prime subscription.  Accordingly, consumers for whom Amazon lacked data due to deletion requests could not be included in the Settlement Program.

[30] Chargebacks are generally initiated by a consumer's bank or credit card issuer when the consumer disputes a charge, and result in the previously disbursed funds being returned to the consumer.

in local currencies, and have been converted to U.S. dollars using the prevailing exchange rate in effect at the time of the underlying transaction.

* * *

While Amazon shared with the Claims Supervisor Team that its methodologies for determining the usage of Prime Benefits were generally intended to be conservative in favor of potential Settlement Program consumer beneficiaries -- and, at times, for example, directed approaches that resulted in the undercounting of the number of Prime Benefits that were actually included -- the Claims Supervisor Team plans to conduct further analysis of the Company's data scoping efforts over the course of the next three-month reporting cycle to endeavor to validate that key assumptions and determinations were made in accordance with the requirements of the Settlement Order.

## VI.    Amazon's Data Scoping Efforts and Generation of Eligible Consumer Lists

### A.    Data Environment

Practically, effective implementation of the redress components of the Settlement Order is dependent on Amazon's efforts to successfully identify, collect, and analyze vast amounts of data in order to determine the eligibility of, and corresponding award amounts for, impacted consumers. Consequently, the Claims Supervisor Team initially sought to gain perspective on the Company's technology environments where relevant data was housed.  Based on records produced in response to detailed requests, as well as information shared by Amazon's Project Team personnel during interviews, the Claims Supervisor Team developed a foundational understanding of various data platforms containing information related to Amazon Prime enrollments, cancellations, and benefit engagement, among other topics.

Leaders from Amazon's Prime Tech Team explained that they created datasets for the settlement using "standard source-of-truth" databases that are used for business reporting and analysis in the ordinary course of business. The Prime Tech Team generally tracks each customer interaction at granular levels to understand customer habits and preferences, with the goal of improving the customer experience. Therefore, data that Amazon maintained and routinely tracked could be leveraged to help inform Settlement Program administration.

The databases from where Amazon collected relevant data were housed in  Importantly, Prime Tech representatives reported that they generally did not need to access archived databases to obtain relevant data for the Settlement Program. Rather, due to an extended data retention policy, nearly all of the information and data were available in the Databases.[31]

The Claims Supervisor Team has requested to perform testing in order to further validate the Settlement Program data provided by Amazon to the Claims Administration Vendor. In response, the Company has been collaborating to ensure that the Claims Supervisor Team has the ability to validate the Queries and approaches that have been implemented to fully scope the data. It is expected that the Claims Supervisor Team's data validation efforts will continue into the next reporting cycle, and be presented in future reporting.

---

[31] Amazon did advise of an instance where responsive information related to Prime Exclusive benefit engagement data appeared to be missing from one of the data sets and required restoration.

## B.    Approach to Scoping Responsive Records

As referenced above, with guidance from Amazon's legal team and the Law Firm Advisor, Prime Tech leaders also evaluated the Settlement Order and sought to meet the Settlement Program data scoping and extraction requirements to facilitate administration via the Claims Administration Vendor. Members of the Company's Project Management Team explained that they met frequently in September and October 2025 to refine efforts to effectively scope the data requirements, including by seeking to identify the relevant data tables within the Databases, and generate the above-referenced Queries in SQL. As noted, the Queries were designed to extract all of the necessary data that would inform the Eligible Consumer populations and their corresponding Settlement Program redress payments, among other things.

Once the requirements were scoped, the Claims Supervisor Team learned that the Prime Tech Team identified fifteen existing datasets in the Databases that contained foundational information, which included:

- Three datasets used to identify Prime cancel flow visits;

- One used to identify all Prime signup events;

- One used to identify Prime signup locations;

- One used to identify Prime membership periods;

- One used to identify the subscription plan;

- Seven used to identify Prime benefit engagement; and

- One used to identify Prime subscription transactions and refunds.

The data was then ported to a segregated "sandbox" environment so that it could be preserved, further refined, and sorted.

During the Reporting Period, Amazon provided the Claims Supervisor with twelve foundational SQL-based Queries that the Company used to identify records necessary for the Settlement Program. More particularly, the Queries were used to identify and extract information relating to, among other things:

- Sign-ups under Challenged Enrollment Flows;

- Unsuccessful cancelation events;

- First-party (*i.e.*, Prime) and third-party benefit usage; and

- Charges, refunds and chargebacks.

Ultimately, the Queries were used to extract data relating to millions of consumers. Once extracted, the data was organized by Amazon into three lists: (1) the "Auto Payment List;" (2) the "Enrollment List;" and (3) the "Cancellation List." These lists were then consolidated by Amazon personnel to create a comprehensive master list of Eligible Consumers for the Claims Administration Vendor. Once the master list was created, additional Queries were generated to identify and join "general account" or contact information (*e.g.*, mobile, e-mail, customer name, and address information) for each Eligible Consumer to enable Settlement Program noticing and payment administration. This information was not previously included in the data extraction process to limit the broader project team's access to customer personally identifiable information.

As of the date of this report, Amazon has issued four versions of the master list. The first version was transmitted to the Claims Administration Vendor on or about November 5, 2025. Shortly thereafter, Amazon generated a second version of the master list due to an issue the Company identified that caused discrepancies with consumer addresses. The issue did not impact the number of Eligible Consumers. A third version of the master list, which was produced on or about December 3, 2025, changed the way Amazon counted Prime shipping benefit usage. Previously, Amazon quantified benefit

engagement by the number of different Prime shipping speed options selected for each order.  The new logic counted one entire order that had at least one item shipped at Prime speed as a single benefit engagement, which resulted in additional consumers becoming eligible for the Settlement Program.  The third version also adjusted the benefit engagement SQL query to only measure benefit engagement from January 1, 2019 onwards.  A fourth version of the master list was provided to the Claims Administration Vendor on or about December 17, 2025.  This updated version addressed inadvertent overcounting of customer engagement with Prime Music as a result of a customer's use of Amazon Music Unlimited. By virtue of the several revisions to the master list, the Eligible Consumer population expanded by a substantial sum.

The Claims Supervisor Team continues to request information from Amazon to further analyze and validate the Settlement Program data scoping details and decisions associated with the data scoping efforts outlined above.  Further engagement is planned to extend into the next reporting period to meet the independent oversight mandates required by the Settlement Order.

### C.    Quality Assurance and Quality Control Measures

To maintain data integrity and accuracy, the Amazon Project Team described a number of quality assurance and quality control ("QA/QC") measures that were incorporated into the Company's process steps in order to test the validity of its data scoping and extraction efforts.  Amazon representatives confirmed that the QA/QC process followed similar guidelines typically employed by technical members of the Project Team as part of their day-to-day business practices in analyzing Prime data.

Based on information provided by Company personnel during interviews and in QA/AC documentation, Amazon employed multi-tiered QA/QC approaches that were incorporated into accelerated project management timetables to meet aggressive Settlement Order timetables.  As a

general matter, for each query that the Prime Tech Team developed, Project Team leadership assigned a primary query writer, a reviewer, and a quality control reviewer of the code.  In addition, upstream data source owners reviewed and verified the scope of the queries.  Moreover, depending on the data source, independent checks were performed by other Amazon personnel to further validate the results.

In preparing the data for the Claims Administration Vendor, the Amazon Project Team explained that QA/QC also involved building validation queries against alternate data sources or Prime business leadership dashboards to validate pre-production output accuracy and confirm that the data generated in pre-production was comparable to the final output.  In addition, when the Project Team moved to concatenate the staging tables to get to the final Eligible Consumer output lists, Amazon personnel reviewed the SQL code to confirm that filters and joins over the modules were accurate and matched the requirements.

Amazon personnel also advised that the Company ran the full data flow for reduced time periods to build manageable outputs for further testing.  They ran row count validations against base tables, tested individual metrics in the output datasets, and performed spot checks for sampled customers end-to-end in the flow.  They also prepared the data flow to run against the entire time period relative to the requirements.  The final pipeline results were then reviewed with senior technical leaders possessing extensive expertise and experience in the Prime organization.  The Claims Supervisor Team was also informed that Amazon staff separately directed reviews of the table selections, code base, pipeline, and the flow setup using a data expert who was otherwise external to the Settlement Program project and, therefore, offered an independent perspective.  Examples of specific QA/QC activities include the following:

- Membership end dates were validated using a combination of random sampling and comparison to available membership dashboards;

- Alternate "sources of truth" (*e.g.*, the Subscription system) were reviewed to confirm the queries calculated subscription end dates correctly; and

- Aggregate results were compared to business as usual data (*e.g.*, customer dashboards).

The QA/QC steps described by Amazon are being further assessed by the Claims Supervisor Team and will be used to evaluate the detailed work undertaken by Company personnel to scope and extract the complete population of Eligible Consumers.

## VII.    Amazon's Administration of the Settlement Program

### A.    Notice and Distribution of "Automatic Pay Outs"

Following the foregoing efforts to scope the Eligible Consumer populations and Redress Program benefits, Amazon provided its Claims Administration Vendor with relevant datasets that included identifying information for Eligible Consumers as well as capped payout amounts for each.  As described above, Amazon determined payment amounts for Automatic Pay Out consumers based on the membership fees paid inclusive of tax, less any refunds or chargebacks measured from the time of Prime sign-ups through a Challenged Enrollment Flow, capped at $51.

While Amazon's Claims Administration Vendor was not responsible for scoping the Eligible Consumer population -- which reflected a total preliminary population of 14,127,077 consumers who appeared to be eligible under the Settlement Order parameters to receive the Automatic Pay Out payments -- the vendor conducted customary reviews of the master list before distributing redress payments that reduced that figure.  Based on background shared by Amazon, the reviews included: (i) an Office of Foreign Assets Control ("OFAC") [32] screen to compare the customer information against the

---

[32] OFAC is part of the United States Treasury Department and oversees the United States government's sanctions and embargo programs, publishing various sanctions lists.

U.S. Treasury's sanctions list to ensure payments are not sent to sanctioned individuals, including terrorists and traffickers; (ii) analysis to determine if there was sufficient contact information to send payment (including name and address); and (iii) searches for entries that contained the same email address, as each entry was intended to be a separate consumer and multiple entries with the same email address could indicate fraud, bot activity, or other issues.[33] After these process steps, Amazon determined that 1,060,639 participants included on the original master list could not advance, which left a total of 13,066,440 Eligible Consumers for which payment could be made. As of December 22, 2025, Amazon informed that, for 12,540,985 of these consumers, payment outreach had been initiated, and that the Company anticipated that all 13,066,440 payments would be distributed as of December 24th. With respect to the 1,060,639 entries where payments could not proceed, Amazon has informed the Claims Supervisor that additional evaluation on a case-by-case basis is ongoing to determine if redress payments can be made, and, if so, the Claims Administration Vendor will proceed with processing.

To promote consumer participation, Amazon issued emails in advance of rendering payments to advise Automatic Pay Out consumers for whom they had valid email addresses that: (i) they were eligible for payment under the terms of the Settlement Agreement; (ii) Amazon's records showed that, during the Relevant Time Period, they were enrolled in an Amazon Prime membership through a Challenged Enrollment Flow and they used no more than three Prime benefits in any twelve-month period following enrollment; (iii) they were entitled to a payment for the Prime membership fees they paid, up to a maximum payment of $51; and (iv) they would be receiving an email in the next few days with an electronic payment from PayPal and/or Venmo.

---

[33] By way of example, Amazon informed the Claims Supervisor Team that one particular email address was associated with 4,825 separate accounts in the master list.

With respect to receiving and accepting payment, the notice further advised Eligible Consumers that:

- if they had an existing account with PayPal or Venmo, they did not need to take further action, as the funds would be deposited directly in their account;

- if they did not have a PayPal or Venmo account, they would have 15 days to follow the instructions to accept their payment;

- after 15 days, if they took no action, the electronic payment method would expire and a check would be sent to their default shipping address with Amazon; and

- if they had questions about the payment, they could find more information at the Settlement Program website (www.SubscriptionMembershipSettelment.com).

As reflected in the email notice (and generally described above), in distributing redress payments to Eligible Consumers, Amazon employed a "waterfall" approach based on available consumer contact information to determinate whether Automatic Pay Out Eligible Consumers would receive payment by PayPal, Venmo, or paper check.  The waterfall approach was implemented as follows:

*PayPal*: If Amazon had a valid email address for an Automatic Pay Out Eligible Consumer believed to be located in the U.S., it would issue payment via PayPal.  If the email address matched an existing PayPal account, the funds were automatically deposited into the account.  If the email address did not match an existing account, consumers were advised in the accompanying email notice that they had fifteen days to claim their payment by clicking the "Claim Your Money" button located at the bottom of the email.  The email notice directed consumers to

admin@SubscriptionMemberSettlement.com if they had questions.[34]  Amazon advised that PayPal also

sent out to two additional notices to consumers -- four and fourteen days following the initial email

notice -- reminding them to accept payment within the fifteen-day window (to the extent they had not

already done so).

*Venmo:* If Amazon did not have a valid email address for an Automatic Pay Out Eligible

Consumer or if the consumer did not timely accept a PayPal payment, Amazon rendered payment

through Venmo provided it possessed an available U.S. mobile telephone number for the consumer.  The

Venmo notice advised that the payment was issued "from the settlement in the FTC v. Amazon.com

Prime subscription case" with a reference to the consumer's Claim ID.  There were no reminder notices

sent to Venmo payees.

*Paper Checks:* Amazon's Claims Administration Vendor validated the status of electronic

payments through reconciliation reports provided by PayPal and Venmo.  If the electronic payment

was not accepted by PayPal in the first instance or Venmo in the second instance, the unclaimed

funds reverted to the Settlement Fund, and Amazon's vendor issued a paper check to the Eligible

Consumer's default shipping address, provided it was available.  Consumers without an email

address or phone number, or consumers known to be located internationally, were not subjected to

the waterfall approach and immediately entered into the check payment group.[35]  For U.S.-based

consumers who were issued checks, Amazon ran their physical mailing addresses through the

United States Postal Service ("USPS") National Change of Address ("NCOA") and Coding

---

[34] As mentioned above, Amazon's claims administration vendor advised that the
admin@SubscriptionMemberSettlement.com address was not actively monitored until December 12, 2025.

[35] Amazon advised that, in the interest of ensuring timely payment, it generally decided to send redress payments
by check to Automatic Pay Out consumers with a foreign address, email, and/or phone number instead of
attempting the waterfall approach.

Accuracy Support System ("CASS") services.  Collectively, these resources identify when a

change-of-address has been filed within the USPS and validate addresses against USPS standards,

with the ability to add or correct elements such as ZIP and ZIP+4 codes, thereby enhancing the

likelihood of successful mail delivery.  Check recipients received a notice advising them to deposit

their check within 60 days of issuance.  To the extent that the check recipient preferred to receive

payment through PayPal or Venmo, the notice directed them to the settlement website

(www.SubscriptionMembershipSettlement.com) to submit a check reissue request.  As referenced

above, the settlement website contains a link to an electronic Check Reissue Request Portal, which

is available to facilitate the reissuance of payments.

**B.      Notice to "Claims Process" Eligible Population and Preparations to Administer Redress Payments**

In January 2026, Amazon plans to distribute notice by email and postcards (sent by first-class

mail) to more than 10 million Claims Process Eligible Consumers of, among other things, their potential

eligibility to participate in Settlement Program and the process for doing so.[36]  More specifically, the

email and postcard notices are expected to state that: (i) the FTC reached a settlement with Amazon

regarding Prime subscription practices; (ii) under the Settlement Agreement, they may be eligible to

submit a claim for a settlement payment of up to $51 because records show that they may meet the

eligibility criteria; and (iii) consumers are eligible if they:

- are a U.S. consumer who signed up for Prime;

---

[36] Based on the data scoping performed by Amazon, approximately 12 million consumers have been identified in its master list as potentially eligible to participate in the Claims Process based on the criteria set forth in the Settlement Order.  Amazon intends to provide notice to the Eligible Consumers for whom it has the necessary contact information.

- unintentionally enrolled in a Prime membership through a Challenged Enrollment Flow during the Relevant Time Period or tried to cancel their Prime membership through the online cancellation process during the Relevant Time Period, but were unable to do so;

- used less than ten Prime Benefits during any twelve-month period of enrollment in Prime; and

- did not already receive an automatic payment.

The notices will advise consumers that, to apply for a settlement payment, they are required to complete and submit a valid claims form, which can be accessed online at the settlement website. The notices will further state that: (i) the Claims Administration Vendor will review the submission to determine whether the consumer meets the eligibility criteria for a settlement payment; (ii) the claims form must be submitted electronically or postmarked by the date set forth in the notice; (iii) to submit a valid claims form, consumers must provide their Claim ID and PIN, which can be found in the notice; and (iv) if consumers have questions or need further assistance, they can visit the settlement website.[37] The Company expects to distribute the notices to Claims Process Eligible Consumers by email and first-class mail as early as the week of January 5, 2026.

Amazon, in coordination with the Claims Administration Vendor, also developed an FTC-approved claims form that can be submitted online through the settlement website or by mail.[38] The claims form is comprised of the following five sections:[39]

---

[37] The postcard notice contains a QR code that provides access to the settlement website.

[38] Amazon has advised the Claims Supervisor Team that claims forms will not be accepted by email due to concerns related to incomplete, duplicative, or potentially fraudulent submissions (as well as process control limitations). Any claims form received by email will receive a response from customer support directing the consumer to the settlement website for submission through the portal.

[39] The clams form includes a QR code in the top right corner that provides access to the settlement website.

*Instructions:*  Section I -- entitled "Instructions" -- states that, "to receive a Settlement Benefit, you must enter all requested information, sign, and submit this settlement Claim Form on or before" the date set forth in the notice.

*Background:* Section II -- entitled "Background" -- requires consumers to provide their full name, primary address, email address, and telephone number.

*Eligibility for Settlement Payment*: Section III -- entitled "Eligibility for Settlement Payment" -- sets forth the eligibility criteria (consistent with the notices).  It advises consumers that Amazon will determine all criteria with the exception of whether a consumer unintentionally enrolled in a Prime membership through a Challenged Enrollment Flow during the Relevant Time Period or tried to cancel their Prime membership through the online cancellation process during the Relevant Time Period, but were unable to do so.  For that criterion, Amazon directed consumers to fill in one or more of the following circles to indicate which option(s) apply:

> ○ I was unintentionally enrolled in Prime by Amazon between June 23, 2019 and June 23, 2025.
> ○ I tried to cancel Amazon Prime through the online cancellation process between June 23, 2019 and June 23, 2025, but was unable to complete it or I inadvertently took a save offer when I intended to cancel.
> ○ None of the above apply.

The claims form further states that, after submission, it will be reviewed to determine eligibility for a settlement payment.

*Payment Election:* Section IV -- entitled "Payment Election" -- directs consumers to fill in one circle indicating whether they would like to receive a digital payment or check if their claim is approved. Consumers are advised that, if they wish to receive their payment electronically, they must submit their claims form through the settlement website, and that if they wish to receive their payment by check, it will be sent to the address provided in Section II.

*Required Affirmations.* Section V -- entitled Required Affirmations" -- states that "[b]y submitting this Claim Form, I certify that the information contained in this Claim Form is true and correct to the best of my knowledge" and "I understand that my Claim Form may be subject to audit and verification." The claims form includes lines for consumers to print and sign their name, along with a line for the date of submission.

As described above, Amazon determined payout amounts for Claim Process Eligible Consumers based on the membership fees paid inclusive of tax, less any refunds or chargebacks measured from the time of Prime sign-ups through a Challenged Enrollment Flow, with the exception of membership payments by consumers who unsuccessfully attempted to cancel their Prime subscription, which were measured from the time a consumer first entered a cancellation flow and did not successfully cancel.

\* \* \*

Amazon has advised that, in coordination with its Claims Administration Vendor, it is continuing to prepare a work plan and approach to reviewing claims forms, and the Claims Administration Vendor is making available dozens of staff members to process claims forms depending on volume.

## VIII.    Settlement Program Performance

The following provides an overview of Amazon's progress relative to: (i) transmission of consumer notices; (ii) distribution and acceptance of redress payments; and (iii) delivery of customer support. The data compiled below was provided through Amazon, its Law Firm Advisor, and its Claims Administration Vendor, and is subject to further review and analysis by the Claims Supervisor over the next Reporting Period, as validation efforts remain ongoing.

Based on the master list of Eligible Consumers generated by Amazon, more than 14 million consumers have been identified as eligible to receive an Automatic Pay Out. As mentioned above, following the Claims Administration Vendor's review and analysis, Amazon indicated that, as of the

date of this Report, 1,060,639 entries contained in the master file could not be submitted for payment due to potential OFAC hits, insufficient contact information, and entries that contained the same email address multiple times -- leaving a total of 13,066,440 entries for which payment could be made.

### A.    Consumer Notices

As reflected in Table 1 below, as of December 22, 2025, Amazon advised that it had issued more than 8 million notices to Automatic Pay Out consumers by email,[40] with approximately 80% of those emails being successfully delivered based on available data:

### Table 1
### *Automatic Pay Out Notices*
### (as of Close of Business December 22, 2025)

|  | Number of Notices Issued | Number of Email Bouncebacks |
|---|---|---|
| Initial Notices Issued by Claims Administration Vendor | 8,409,919 | 1,725,956 |

In addition, based on available data as of close of business December 22, 2025, PayPal and Venmo had issued 7,519,275 and 4,245,946 notices, respectively, advising of the availability of redress payments to Eligible Consumers.[41]  As mentioned above, Amazon advised that PayPal also distributed up to two additional consumer notices -- four and fourteen days following the initial email notice -- reminding consumers to accept payment within the fifteen-day window (to the extent that they had not

---

[40] These notices were not required by the Settlement Order, but rather were sent to facilitate participation in the Settlement Program.  They were transmitted by email and, therefore, were not provided to consumers for whom Amazon did not have a valid email address.

[41] Data regarding PayPal and Venmo bouncebacks was not available at the time of the report.  The Claims Supervisor Team will continue to request and evaluate available information regarding consumer notices over the next reporting period.

already done so).  With respect to check payments, Amazon advised that 6,741,837 letters accompanying check payments had been issued as of close of business December 22, 2025.

It is anticipated that Amazon will be transmitting notices to Claims Process Eligible Consumers, which is currently comprised of approximately 12 million consumers based on Amazon's master list, by email and first-class mail as early as the week of January 5, 2026.

**B.    Distribution and Acceptance of Redress Payments Directed to Automatic Pay Out Consumers**

Available data from Amazon reflects that, as of December 22, 2025, Amazon had initiated outreach in connection with more than 12.5 million payments to Automatic Pay Out consumers totaling over $406 million.  As of that same time period, available data reflects that 4,453,722 consumers had accepted payment, resulting in $146,060,977.97 in funds being successfully transferred.  Based on this preliminary data, Eligible Consumers who have accepted their payment have received an average amount of approximately $32.50.  Amazon and its Claims Administration Vendor are continuing to implement the waterfall process described above through the issuance of checks and, as referenced above, have indicated that they will also be processing additional payments in response to reissue requests during the upcoming Report Period.  The following tables reflect Amazon's progress relative to the distribution of redress payments to the Automatic Pay Out consumer population.

**Table 2**

**Automatic Pay Out Distribution Overview For Eligible Consumers[42]**

**(as of close of business December 22, 2025)**

| Number of Payments Issued[43] | Monetary Amount Issued | Number of Payments Issued and Released[44] | Monetary Amount Issued and Released | Number of Payments Accepted by Consumers | Monetary Amount Accepted by Consumers |
|---|---|---|---|---|---|
| 13,066,440 | $425,266,189.52 | 12,540,985 | $406,470,548.19 | 4,453,722 | $146,060,977.97 |

---

[42] For purposes of Tables 2 & 3, "Eligible Consumers" means the total number of consumers eligible to receive a payment -- as captured in Amazon's master list -- *minus* consumers for whom payment is currently being held back for the reasons set forth in Section VII. As further described in Section VII, it is expected that the number of Eligible Consumers will change as Amazon and the Claims Administration Vendor further review, analyze and process holdbacks, and ultimately are able to issue additional payments.

[43] "Issued" payments include those payments for which a check has been printed and funded, but not necessarily sent.

[44] "Issued and Released" payments include those payments for which a check has been printed, funded and sent to an Eligible Consumer. Amazon has advised that it anticipates the release of all payments to Eligible Consumers by December 24, 2025.

**Table 3[45]**

**Automatic Pay Out Distribution by Payment Type**

**(as of close of business December 22, 2025)**

| Payment Method | Number of Payments Initially Issued | Monetary Amount of Payments Initially Issued | Number of Second Attempt Payments Issued | Monetary Amount of Second Attempt Payments Issued | Number of Consumers Accepting Payment | Aggregate Amount of Payments Accepted |
|---|---|---|---|---|---|---|
| PayPal | 7,519,275 | $239,123,749.72 | 0 | 0 | 2,379,500 | $75,122,736.87 |
| Venmo | 3,595,867 | $120,623,656.31 | 650,079 | $19,645,316.91 | 1,603,693 | $53,368,173.85 |
| Check | 1,951,298 | $65,518,783.49 | 4,790,539 | $159,465,245.64 | 470,529 | $17,570,067.25 |
| **Total** | **13,066,440** | **$425,266,189.52** | **5,440,618** | **$179,110,562.55** | **4,453,722** | **$146,060,977.97** |

### C.    Customer Support Engagement

With respect to customer support engagement, based on available data provided to the Claims Supervisor Team as of December 19, 2025, the Claims Administration Vendor had received 4,068 emails at the admin@SubscriptionMemberSettlement.com email address, and responded to 1,148. Although the Claims Administration Vendor's customer support system is not designed for customer support agents to categorize inquiries based on topic, the vendor conducted a sampling of inquiries to identify trends. Amazon reported that, out of the sample of inquiries reviewed, the majority related to initial payment questions (*e.g.*, eligibility requirements and receipt of automatic payments). Other inquiry topics included requests for payments to be reissued and general settlement-related questions

---

[45] The data in this table reflects application of the waterfall process whereby payments were first attempted by PayPal and then subsequently through Venmo and check, as necessary. Accordingly, some consumers were issued multiple payments.

(*e.g.*, background on the settlement and questions regarding its legitimacy).  While the Claims Administration Vendor identified nearly no complaints to date based on the application of the sampling approach, the FTC reported that, as of the week of December 15, 2025, it received outreach from 306 consumers, which involved questions regarding the Settlement Program as well as complaints.

With respect to the settlement website, through December 21, 2025, Amazon informed that there had been 339,571 unique visitors, 397,874 total visits, and 596,847 page views.

The Claims Supervisor Team will continue to request customer engagement data from Amazon over upcoming reporting cycles to facilitate reporting on consumer complaints in accordance with the terms of the Order.[46]

## IX.    Conclusion

During the Reporting Period, Amazon and its Law Firm Advisor coordinated a team of attorneys, technologists, and subject matter experts to rapidly translate the Settlement Order requirements into actionable data scoping work plans, and developed Queries to analyze terabytes of Company data in order to identify Eligible Consumers and corresponding redress payment amounts in accordance with the mandates of the Settlement Order.  They also engaged a Claims Administration Vendor to administer consumer outreach and payment processes for engagement with more than 12.5 million individuals in the Automatic Pay Out population.  At the direction of Amazon, customer support resources were also established by the Claims Administration Vender to answer questions and provide assistance to Eligible Consumers.

---

[46] Amazon also estimates that from September 14, 2025 to December 7, 2025 it received outreach to its own customer support agents from more than 6,000 consumers generally relating to the matter.  Amazon was not actively cataloguing the outreach, but identified these communications through targeted keyword searches.

As part of its oversight responsibilities, the Claims Supervisor engaged in extensive fact-finding to seek to understand Amazon's governance structure for the Settlement Program, as well as its approach to develop its administration under the requirements of the Settlement Order. During the Reporting Period, the Claims Supervisor Team also focused extensively on developing foundational perspective concerning Amazon's vast technology environments, and began efforts to conduct a more granular evaluation of the data compiled by Amazon to fully scope Eligible Consumers and award amounts. The Claims Supervisor Team plans to conduct further analysis to seek to validate the Company's data scoping efforts over the next three-month reporting cycle, and additional findings will be included in future reporting.

Sincerely,

**FTI CONSULTING, INC.**


Marc-Philip Ferzan
Senior Managing Director

Terrence S. Brody
Senior Managing Director

Michael B. Schultz
Managing Director


Submitted: December 24, 2025