September 24, 2026

# Fourth Report of the Independent Claims Supervisor

*Federal Trade Commission v. Amazon.com, Inc.*

Case No. 2:23-CV-0932-JHC

## Table of Contents

I. Executive Summary ........ 1
II. Amazon's Efforts to Develop the Customer List Identifying Eligible Consumers and the Claims Supervisor Team's Actions to Evaluate the List ........ 3
III. Amazon and the FTC Developed an Escalation Plan in an Effort to Expand the Settlement Program and Achieve at Least $1 Billion in Payments to Consumers ........ 7
IV. Settlement Program Administration Progress ........ 10
A. Status of Automatic Pay Outs (Phase 1) ........ 11
B. Status of Automatic Pay Out Holdbacks ........ 14
C. Status of Claims Process Eligible Consumers (Phase 2) ........ 16
D. Status of Escalation Plan Eligible Consumers (Phase 3) ........ 22
E. Customer Support Engagement ........ 23
F. Consumer Fund ........ 28
V. Review of the Claims Administration Vendor's Payment Activities ........ 30
VI. Conclusion ........ 33

Pursuant to the requirements of the Order for Permanent Injunction, Monetary Relief, Civil Penalty Judgment, and Other Relief entered September 25, 2025 (the "Settlement Order" or "Order") and the Stipulated Motion and Order Regarding Residual Payouts of Consumer Redress Fund entered September 14, 2026 (the "Escalation Plan Order"), the Court-appointed Claims Supervisor has generated this fourth quarterly report, which, unless otherwise specified, addresses progress in connection with the administration of the Amazon.com, Inc. ("Amazon" or the "Company") consumer redress program (the "Settlement Program") during the three-month period from June 25, 2026 through September 24, 2026 (the "Reporting Period").[1]

## I. Executive Summary

Over the past year since the entry of the Settlement Order on September 25, 2026, Amazon made substantial organizational, operational, and financial investments into the development and administration of the Settlement Program to endeavor to meet the Order's requirements. As a threshold, achieving the primary objectives and timetables mandated by the Settlement Order to issue redress payments to Eligible Consumers required the Company to: (i) scope and extract massive volumes of data from different internal systems to generate master listings of millions of Automatic Pay Out and Claims Process Eligible Consumers (the "Customer List"); (ii) coordinate dedicated staffing, processes, and electronic database systems for outreach to the Eligible Consumer classes; (iii) review and adjudicate claims forms submitted by the Claims Process Eligible Consumers; and (iv) issue and account for qualifying redress payments. In addition, Amazon enabled the availability of customer support resources by email and telephone to address Settlement Program questions and facilitate participation.

[1] Capitalized and/or abbreviated terms in this report are meant to be read in accordance with the definitions in the Settlement Order and the Escalation Plan Order.

During this most recent Reporting Period, Amazon concentrated on key initiatives to enable expedited progress in accordance with the requirements *and spirit* of the Settlement Order. Among other things, the Company engaged in an intricate exercise to "match" a more comprehensive and updated Customer List to supersede the claims list that had previously been used by its Claims Administration Vendor to interface with consumers and issue redress payments. In addition, Amazon further evaluated the Claims Administration Vendor's data management capabilities and engaged with external experts to further facilitate the timely and accountable reporting of Settlement Program metrics. Among other things, Amazon's data experts undertook a range of work to assist the Claims Administration Vendor with data scoping, management, analytics, and tracking. And, perhaps most notably, the Company proactively continued its efforts to analyze Settlement Program progress and performance, as well as underlying Prime data, to proactively develop what it referred to as an "Escalation Plan" in coordination with the Federal Trade Commission (the "FTC"). The Escalation Plan's primary objectives are centered around meeting the Settlement Order's $1 billion redress payout threshold as expeditiously as possible. In this regard, on September 11, 2026, Amazon and the FTC jointly filed a stipulated motion and proposed form of order with the Court to seek authorization for the implementation of the Escalation Plan (the "Escalation Plan Order"). The Court entered the Escalation Plan Order on September 14, 2026.

By virtue of these and other initiatives over the three-month Reporting Period, Settlement Program payment outreach advanced substantially through September. The Company issued approximately 11.7 million new payment offers totaling more than $415 million, and approximately 340,000 individuals accepted more than $11.7 million in redress funds. For broader context, since the inception of the Settlement Program last year through September 10,

2026, Amazon had attempted payments to nearly 25 million people in an aggregate amount of approximately $845 million, resulting in the distribution of Settlement Program funds to approximately 6.96 million Eligible Consumers in excess of $237 million. Moreover, at the one-year anniversary of the Settlement Order, Amazon has complied with the technical requirements of the Settlement Order and timely issued redress payments to Eligible Consumers, accounting for limited instances where payments were held back for additional review based on, among other things, indicia of fraud, required regulatory reviews and missing contact information, as well as in instances involving inadvertent errors that were subsequently corrected.

Amazon has informed the Claims Supervisor Team that it is poised for significant additional redress payment progress in the coming months, particularly as it begins distributing funds to the expanded universe of Eligible Consumers contemplated by the Escalation Plan Order. The Claims Supervisor Team will continue to evaluate and report on the Company's efforts and progress in accordance with the parameters of the original Settlement Order and the recently-entered Escalation Plan Order.

## II. Amazon's Efforts to Develop the Customer List Identifying Eligible Consumers and the Claims Supervisor Team's Actions to Evaluate the List

Following the entry of the Settlement Order on September 25, 2025, Amazon invested substantial resources to assemble a coordinated team of internal and external capabilities to develop the Settlement Program and meet the aggressive timetables for launch and administration specified by the original controlling Order. As part of the Company's efforts, it had to expeditiously scope, extract, and conform massive amounts of data housed in different systems to generate a comprehensive Customer List for use by its Claims Administration Vendor in contacting prospective qualifying beneficiaries and distributing redress payments. The initial Customer List developed by Amazon was intended to include both: (i) consumers identified by

the Company that met the eligibility criteria under the Settlement Order for immediate, "Automatic Pay Out" redress payments under the first phase of the Settlement Program; and (ii) those consumers potentially eligible for the second phase, which required the submission of a claims form for individuals to qualify for "Claims Process" redress payments.

Since the creation of the initial Customer List, Amazon implemented various quality control measures to seek to ensure that the full scope of Eligible Consumers were identified and included. The extensive scoping and data integrity work resulted in the development of a series of updated versions of the Customer List over several months, which, among other things, relied on recalibrated computer code-based queries to better capture relevant Settlement Program data, including information related to Prime Benefit usage and consumer contact information. Factoring in its own review of the data, Claims Administration Vendor feedback, and the Claims Supervisor's analysis and engagement, the Company generated four subsequent versions of the Customer List. As detailed in prior reporting, the fifth version of the Customer List ("Version Five") was completed near the end of the third quarterly Reporting Period, and is now intended to serve as the single, comprehensive list of qualifying Settlement Program beneficiaries for Automatic Pay Out and Claims Process redress payments.

Following the entry of the Settlement Order and Amazon's development of the initial Customer List, the Claims Supervisor Team initiated significant efforts to evaluate and test Amazon's scoping and data extraction work. Among other things, the Claims Supervisor: (i) reviewed records and interviewed Amazon representatives to develop an understanding of Amazon's systems and data environment; (ii) evaluated the code within Amazon's queries used to generate the Customer List in accordance with the Settlement Order requirements; (iii) analyzed a statistically significant sample set of Eligible Consumer claims to validate the

Company's eligibility and award determination calculations; and (iv) conducted data validation exercises directly in Amazon's live environment with the assistance of Amazon personnel.

Based on this work by Amazon and its own independent evaluations, the Claims Supervisor Team concluded that the Company's iterative data scoping and extraction processes were performed in a sound and methodical manner. And importantly, when discrepancies were identified, the Company demonstrated its commitment to addressing them in a manner consistent with Settlement Order requirements. Accordingly, upon the completion of Version Five of the Customer List, the Company took steps to match the consumer records contained therein to the operative customer lists previously used by the Claims Administration Vendor during the administration of the Settlement Program to ensure that updated data for each individual claim could be reconciled. This matching process was necessary because the Claims Administration Vendor had already provided notice to certain Eligible Consumers and rendered a volume of payments to Settlement Program beneficiaries, and some of the beneficiary records were inadvertently duplicated by the Claims Administration Vendor as a result of the creation of successive Customer Lists.[2]

---

[2] As noted by the Claims Supervisor in prior reports, since the Claims Administration Vendor had "stacked" records from prior Customer Lists provided by Amazon, the integration of Version Five also required a de-duplication of certain consumer records to avoid the inclusion of redundant and/or conflicting claims for individual consumers. Specifically, when the third and fourth versions of updated consumer data were provided to the Claims Administration Vendor, Amazon prepared and produced files reflecting instances of new Eligible Consumers not included in a prior version of the Customer List, and those requiring a change to a consumer's eligibility category from the preceding version (the "Delta Versions"). Among other things, the Delta Versions identified changes to enable the Claims Administration Vendor to track and administer the impacted claims accordingly. Following receipt of the Delta Versions, the Claims Administration Vendor "stacked" the records from the Delta Versions on top of the second version of the Customer List. The stacking of the data in this manner caused approximately 660,000 unique consumers to be reflected in both the Automatic Pay Out and the Claims Process eligibility categories because, based on the re-scoped data, their eligibility status had changed between versions.

Over the course of the last quarterly reporting period and extending into the beginning of this fourth Reporting Period, the Claims Supervisor Team also considered Amazon's matching methodology – as the integration of the Company's Version Five data is what would ultimately enable the Claims Administration Vendor to administer and account for the Settlement Program in accordance with the new Customer List. While the overall approach outlined for the Claims Supervisor Team was deemed to be sound, follow up questions were presented to Amazon regarding its stated plans to also create independent consumer records for a certain subset of claims that were *not* associated with an Amazon hashed ID (the unique Company identifier for individual consumer claims) in Version Five of the Customer List. More particularly, with respect to any limitations on the reconciliation of claims to the Company's Customer List, the Claims Supervisor Team has requested further explanation for how such claims could be validated relative to compliance with eligibility and redress payment requirements under the Settlement Order. Amazon informs the Claims Supervisor that it will continue to engage with the Claims Supervisor on this issue over the next reporting period.

With respect to other discrete data reconciliation discrepancies identified in connection with the Customer List, they were deemed by the Claims Supervisor Team to be more isolated and of the limited nature that would be expected when compiling datasets of this size, complexity, and scope.[3] Nevertheless, the Claims Supervisor Team highlighted the individual issues for the Company's further consideration.

[3] The Claims Supervisor Team identified that Amazon was unable to match a total of 4,466 Amazon hashed IDs in Amazon's Customer List to the Claims Administration Vendor's claim IDs as a result of the stacking issue described in footnote 2. While Amazon has advised that only approximately 1,000 of these customer records have any PII available to notify and pay consumers, it indicated that it would treat these hashed IDs as "net new" claims in the Customer List.

## III. Amazon and the FTC Developed an Escalation Plan in an Effort to Expand the Settlement Program and Achieve at Least $1 Billion in Payments to Consumers

As Amazon evolved its Customer List and conducted ongoing analysis of Settlement Program metrics, performance data revealed that the Company likely would need to expand the list of potentially Eligible Consumers in order to meet the obligation in the Settlement Order to pay at least $1 billion in redress to consumers.[4] Therefore, in order to expand the scope of the Settlement Program and accelerate the pace of redress payments, in or about March 2026, the Company began developing what it termed an "Escalation Plan." At the time, Amazon advised that it intended to finalize the proposed Escalation Plan following the completion of Version Five of the Customer List.

With the updated Customer List completed, the Company continued work during the instant Reporting Period to analyze consumer data and refine the Escalation Plan in coordination with the FTC. The final approach is memorialized in the Escalation Plan Order entered by the Court on September 14, 2026. The Escalation Plan Order most significantly modified the Settlement Program under the terms of the original Settlement Order in the following ways:

- The Escalation Plan Order authorized Amazon to initiate payments to *all* Claims Process Eligible Consumers identified in Amazon's business records as meeting the eligibility criteria in the Settlement Order, regardless of whether the Eligible Consumer submitted a

[4] The total value of all claims for the Automatic Pay Out and Claims Process Eligible Consumers identified in Version Five of the Customer List was less than $900 million, and not all Eligible Consumers have accepted (or will accept) their payment. Therefore, Amazon could not reach $1 billion in payments to Eligible Consumers solely based on the population of consumers identified in Version Five of the Customer List.

valid claims form – provided that the consumer had not already been issued a settlement payment.[5,6]

- The Escalation Plan Order also authorized Amazon to begin issuing Automatic Payments to Eligible Consumers identified in Amazon's business records who used between 11 and 20 Prime Benefits during any 12-month period of enrollment in Prime, and otherwise met the original eligibility criteria in the Settlement Order (*e.g.*, signed up for Prime through a Challenged Enrollment Flow or unsuccessfully attempted to cancel their Prime membership during the Relevant Time Period), provided that the consumer had not already been issued a settlement payment.[7] As detailed below, the Escalation Plan Eligible Consumers will be paid in accordance with the waterfall process and will have at least 60 days to accept payments.[8] All unaccepted payments will be voided by the

[5] As reported in the Claims Supervisor's prior quarterly report, on June 23, 2026, the Claims Administration Vendor had initiated an initial round of payment attempts in the aggregate amount of approximately $10 million to more than 300,000 Claims Process Eligible Consumers that submitted valid claims forms on or before March 31, 2026.

[6] Amazon has advised that, pursuant to the Escalation Plan Order, all payments issued prior to June 25, 2026 (including all Automatic Pay Outs), which were not accepted by consumers as of September 15, 2026, were voided and will not be reissued.

[7] The Settlement Order provides that, if less than $1 billion in funds are distributed from the Consumer Fund, Amazon will continue making additional rounds of automatic payments to Eligible Consumers until the $1 billion threshold is met. The Order contemplates that additional automatic payments will start with Claims Process Eligible Consumers who used no more than four Prime Benefits during a 12-month period. As referenced in the Escalation Plan Order, Amazon and the FTC recognized that issuing payments to one benefit group at a time (*i.e.*, first issuing payments to Escalation Plan Eligible Consumers who used 11 Prime Benefits before issuing payments to Escalation Plan Eligible Consumers who used 12 Prime Benefits) would extend the distribution period several months beyond the concluding date for the Consumer Fund Distribution Process (January 25, 2027) and unnecessarily delay redress. Accordingly, the parties agreed that Amazon could accelerate the process by simultaneously issuing payments across all Escalation Plan benefit groups, rather than escalating by one benefit group at a time.

[8] Claims Process Eligible Consumers who were issued payment after June 25, 2026 will have until December 14, 2026 to request a reissued payment. Reissued payments are expected to be made on a monthly cadence.

Claims Administration Vendor by March 5, 2027 and no new payments will be reissued for this population.

- In addition, if less than $1 billion in redress payments are transferred to Eligible Consumers following the implementation of the Escalation Plan Order directives and a reconciliation of the Consumer Fund, the Escalation Plan Order also enables Amazon to issue *pro rata* payments from the remaining funds up to $1 billion to all Eligible Consumers and Escalation Plan Eligible Consumers who previously accepted a payment at any point during the Consumer Fund Distribution Process ("*Pro Rata* Recipients"). Under the Escalation Plan Order, *pro rata* distributions would be capped at $149, thus providing for a potential total payment of up to $200 to Eligible Consumers. If necessary, these *pro rata* payments will be issued in the same form previously accepted by the *Pro Rata* Recipients. The *Pro Rata* Recipients will be given at least 60 days to accept the issued payments, regardless of the form of delivery. Upon the conclusion of the 60-day period, the Escalation Plan Order provides that all outstanding payments can be voided and not be subject to reissue.
- Finally, the Escalation Plan Order sets forth that, after the *pro rata* payment round concludes and any outstanding payments are voided, Amazon has the option to issue another round of payments to consumers or to direct funds to the U.S. Treasury as part of its civil penalty payment, until the $1 billion minimum is met.

These mechanisms outlined in the Escalation Plan Order should enable Amazon and its Claims Administration Vendor to not only expand the class of Settlement Program beneficiaries significantly, but also to accelerate redress payment offers and transfers. The Claims Supervisor

Team will, of course, monitor the implementation of the Escalation Plan and report on Settlement Program progress in future reporting.

## IV. Settlement Program Administration Progress[9]

As the Escalation Plan initiatives were under development during the Reporting Period, Amazon geared up to make significant advancements in processing claims and issuing payments to Eligible Consumers. Indeed, pursuant to the Escalation Plan Order, the Company was able to disburse approximately 11.7 million redress payments to individuals, totaling more than $415 million in the aggregate, before the end of the Reporting Period. Accordingly, from the inception of the Settlement Program to September 10, 2026, a total of more than 24.8 million payments had been issued to consumers in the aggregate amount of more than $845 million. For the same time period, more than 6.95 million payments amounting to more than $237 million had been accepted by consumers pursuant to Settlement Program requirements. Claims Administration Vendor data made available to the Claims Supervisor reflects that Eligible Consumers who accepted payments through September 10, 2026 had received an average of approximately $34.00. The below chart provides an overview of additional Settlement Program payment detail as of that same date.[10]

---

[9] The data included below is derived from reporting provided by the Claims Administration Vendor and a data consulting firm that was retained by the Company to address historical data reporting challenges. The data consulting firm has been engaged to, among other things, work closely with the Claims Administration Vendor to ensure the accuracy and clarity of the Settlement Program reporting. Over the Reporting Period, the data consulting firm, in coordination with the Claims Administration Vendor, undertook substantial efforts to enhance reporting processes relating to the presentation of Settlement Program performance metrics. Consequently, some metrics have been adjusted from prior reports based on ongoing efforts by the Claims Administration Vendor and data consulting firm to analyze Settlement Program performance and generate accurate reporting.

[10] During the prior reporting period, the Claims Administration Vendor identified an isolated error related to reissued payments that caused some consumers to receive incorrect payment amounts. Upon identifying the error (through the monitoring of customer support inquiries), the matter was investigated and the Claims Administration Vendor determined that approximately 10,000 payments were impacted,

**Chart 1**
**Overall Payment Distribution Overview**
**(as of September 10, 2026)**

| Number of Payments Issued[11] | Aggregate Amount of Payments Issued | Number of Payments Accepted by Consumers | Aggregate Amount of Payments Accepted by Consumers | Aggregate Amount of Payments Credited Pursuant to the Settlement Order[12] |
|---|---|---|---|---|
| 24,885,601 | $845,146,881 | 6,958,119 | $237,420,999 | $237,212,875 |

The following summarizes additional corresponding redress payment performance metrics relating to the Automatic Pay Out phase ("Phase 1"), the Claims Process phase ("Phase 2"), and the Escalation Plan phase ("Phase 3") of Settlement Program administration.

### A. Status of Automatic Pay Outs (Phase 1)

Based on data provided by Amazon and its Claims Administration Vendor as of September 10, 2026, the Company had attempted nearly 13.2 million payments to Automatic Pay Out consumers in the aggregate amount of approximately $430 million.[13] Moreover, as of that

---

all of which were part of the March 31, 2026 reissue batch. Of these impacted payments, the vendor further determined that, approximately 4,800 consumers were underpaid by a total amount of approximately $131,000, approximately 2,000 consumers were overpaid by a total of approximately $38,000 (which the Claims Administration Vendor has advised has been refunded to the Settlement Fund), and the balance of the consumers were correctly paid despite the error. The Claims Supervisor Team has been advised that the process of issuing supplemental payments to all consumers who initially received underpayments has been completed (with the exception of one consumer for whom there is an OFAC restriction) with money coming from outside the qualified settlement fund. Separate and apart from the foregoing, the Claims Administration Vendor also identified approximately $170,000 in duplicate payments that were inadvertently issued. The overpayments and duplicate payments are not considered for purposes of the Company's payment obligations under the terms of the Settlement Order.

[11] The "Number of Payments Issued" and "Aggregate Amount of Payments Issued" columns in Charts 1 & 2 are intended to capture initial payments issued to unique consumers to avoid the double counting of subsequent payments that are issued as part of the waterfall process.

[12] The "Aggregate Amount of Payments Credited Pursuant to the Settlement Order" column in Charts 1 & 2 excludes a limited number of overpayments and duplicate payments referenced in footnote 10 above and, accordingly, captures the amount that can be credited towards the $1 billion payout minimum pursuant to Section X.B.5 of the Settlement Order.

[13] The Automatic Pay Out distribution followed the issuance of notices to more than 8.4 million consumers advising them of their eligibility to receive redress payments. Available data reflects that

date, Settlement Program data reflects that 6,644,953 of those payments (50.4%) had been accepted. As a result, a total of $226,614,509 in Phase 1 payments had been successfully transferred and credited pursuant to the Settlement Order as of September 10, 2026.

As described in prior reports, Amazon employed a "waterfall" approach in distributing redress payments relative to available consumer contact information to inform whether Automatic Pay Out consumers would be sent payment by PayPal, Venmo, or in the form of a paper check – with the goal of issuing staggered payments in these alternative forms (as necessary) to facilitate Settlement Program participation. This approach was implemented by the Claims Administration Vendor in late 2025 by first attempting payment by PayPal (where a valid email address was available); then by Venmo (if a PayPal payment was either not attempted or accepted, and a U.S. mobile telephone number was available); and finally by check (if an electronic payment was either not attempted or accepted, and a mailing address was available).[14] Consumers without an email address or phone number listed in their Amazon Prime account, or consumers known to be located outside of the United States, were not subject to the waterfall approach and instead were immediately channeled into the check payment group. Further, those Eligible Consumers designated to receive checks were mailed accompanying correspondence

approximately 80% of those emails – nearly 6.7 million – were successfully delivered (without an indication of a bounce back).

[14] For U.S.-based consumers who were issued checks, the Claims Administration Vendor advised that it cross-referenced available physical mailing addresses against the United States Postal Service ("USPS") National Change of Address and Coding Accuracy Support System ("CASS") services. Collectively, these resources can help identify when a change of address has been filed within the USPS, and also enable additions or corrections to particular elements, such as ZIP and ZIP+4 codes, thereby enhancing the likelihood of successful mail delivery.

with their check advising them to deposit redress payments within 60 days of check issuance.[15] On the other hand, Eligible Consumers who were issued digital payments had 15 days to accept the Phase 1 payments.

The following chart reflects Amazon's progress over the Reporting Period relative to the distribution of redress payments to the Automatic Pay Out consumer population:

**Chart 2**
**Automatic Payment Distribution Overview**
**(as of September 10, 2026)**

| Number of Payments Issued | Aggregate Amount of Payments Issued | Number of Payments Accepted by Consumers | Aggregate Amount of Payments Accepted by Consumers | Aggregate Amount of Payments Credited Pursuant to the Settlement Order |
|---|---|---|---|---|
| 13,190,510 | $429,877,279 | 6,644,953 | $226,822,633 | $226,614,509 |

Based on the application of the waterfall process, following an initial payment attempt, the Company issued nearly 5.5 million in additional payments (through Venmo and check) in an aggregate amount of approximately $179 million. To the extent that Eligible Consumers required a payment to be reissued (*e.g.*, where payee information may have been incorrect or a payment was not timely accepted), they were able to submit their request through the settlement website (www.SubscriptionMembershipSettlement.com). The settlement website contained a link to an electronic payment reissue request portal. To complete a reissue request through the portal, consumers were required to input their Claim ID and then indicate whether they were updating their name and/or address, and how they would like to receive payment (*i.e.*, through PayPal, Venmo, or check). Consumers who submitted reissue requests received confirmation of their submission from the Claims Administration Vendor by follow up email, which included

[15] To facilitate ongoing participation, Amazon did not enforce the 60-day check void dates until September 15, 2026 (in accordance with the Escalation Plan Order), which enabled many consumers to accept their check up to seven months (or more) after issuance.

reference to their unique Claim ID.[16] The following chart reflects reissue activity for Automatic Pay Out consumers over the Reporting Period.

**Chart 3**[17]
**Automatic Pay Out Reissue Distributions**
**(as of September 10, 2026)**

| Number of Payment Reissue Requests | Aggregate Amount of Payment Reissues Requested | Number of Payments Reissued | Aggregate Amount of Payments Reissued | Number of Reissued Payments Accepted | Aggregate Amount of Reissued Payments Accepted |
|---|---|---|---|---|---|
| 97,696 | $3,622,693 | 40,458 | $1,480,240 | 32,615 | $1,192,851 |

**B. Status of Automatic Pay Out Holdbacks**

As detailed in prior Claims Supervisor reporting, following receipt of the early iteration of the Customer List scoped by Amazon in October 2025, the Claims Administration Vendor conducted necessary background integrity reviews in preparation for distributing redress payments to the class of identified beneficiaries, including: (i) an Office of Foreign Assets Control ("OFAC")[18] screen to compare the Amazon customer information against the U.S. Treasury's sanctions list to ensure payments are not sent to prohibited individuals; (ii) analysis to determine if there was sufficient contact information, including names, email addresses, telephone numbers and mailing addresses, to send payment; and (iii) searches for entries that

[16] The Company recently closed the reissue portal, but will be accepting reissue requests by phone and email in accordance with the timeframes set forth in the Escalation Plan Order. As mentioned above, the Escalation Plan Order provides that all payments issued prior to June 25, 2026 (including all Automatic Pay Outs), which were not accepted by consumers as of September 15, 2026, will not be reissued. However, payments issued after June 25, 2026 are subject to reissue until December 14, 2026.

[17] This table includes supplemental payments issued to consumers who initially received underpayments (as referenced in footnote 10).

[18] OFAC is part of the United States Treasury Department and oversees the United States government's sanctions and embargo programs, publishing various sanctions lists.

contained multiple instances of the same email address, indicating the potential for fraud, bot activity, or other concerns.

Following these process steps, Amazon determined that, as of December 24, 2025, a subset of over 1 million consumers included in its Customer List could not be issued payments, and corresponding claims were held back (the "Holdbacks") in consideration of potential OFAC list flags, insufficient contact information, and entries that contained multiple instances of the same email address. With this exclusion, a total of more than 13 million Automatic Pay Out consumers remained in the queue for redress payment distribution.

By the end of the prior reporting period concluding on June 24, 2026, Amazon and the Claims Administration Vendor had reduced the number of Holdbacks to approximately 940,000. Further analysis over this most recent Reporting Period informed Amazon's decision that approximately 871,000 of those Holdbacks would not receive redress payment offers, mostly because of inadequate name or address information, while 66,000 Holdbacks could potentially be part of a Phase 3 distribution by virtue of the incorporation of supplemental address information in Version Five of the Customer List. Moreover, with respect to potentially Eligible Consumers for whom multiple instances of the same email address have been identified, Amazon has advised that it determined not to issue payment offers to consumers with more than eight accounts based on fraud concerns.[19] The Claims Supervisor expects to provide further updates regarding the treatment of remaining Holdbacks in future reporting.

---

[19] Amazon has informed the Claims Supervisor Team that, based on internal analyses and patterns it has observed in the ordinary course of its business, when many accounts are created with the same email address (or even variations of the same email address), this can be indicia of fraudulent card-testing schemes in which bad actors attempt to validate payment card credentials by submitting numerous combinations of card information during account creation or during Prime sign-up flows. When valid payment credentials are identified, those credentials may then be used for unauthorized transactions or resold through illicit marketplaces.

### C. Status of Claims Process Eligible Consumers (Phase 2)

To promote the participation of Claims Process Eligible Consumers, Amazon, in accordance with Sections IX.B.1, IX.B.2 and X.B.1 of the Settlement Order, provided notice of the claims process on the settlement website, through links to the settlement website on http://www.amazon.com and www.amazon.com/amazonprime (in both the web browser and mobile web browser forms),[20] as well as through notices sent to consumers by postcard and email (to the extent sufficient contact information was available).[21] Although not required under the terms of the Settlement Order, Amazon continues to post information about the Settlement Program on its Help & Customer Service, Legal Policies webpage, which remains live through this link as of the date of this report. The deadline for Claims Process Eligible Consumers to submit a claims form was July 27, 2026.

Data reflects that a total of 7,601,551 claims forms were submitted, 526,419 of which were completed by consumers using their assigned Claim ID and PIN (which was provided in their notice), and 7,075,132 of which were submitted through an "open filing path."[22] The open

---

[20] The links were accessible by clicking on text that read "Information about the FTC Prime Settlement." The Company also posted notices with links to the settlement website on the mobile app main page and mobile app Prime page, which were similarly available by clicking on "Information about the FTC Prime Settlement." Amazon confirmed that all of these links remained active from January 1, 2026 through the first week of February 2026, in accordance with Section IX.B.1 of the Settlement Order, which required that the links be posted for 30 days.

[21] This notice phase to alert potentially eligible consumers of the requirement to file a claims form to obtain redress was completed by January 28, 2026. The Claims Administration Vendor identified approximately 165,000 Claims Process Eligible Consumers – out of more than 12.5 million – for whom a claims notice had not been issued and/or delivered due to incomplete, missing or inaccurate contact information and/or because instances were identified where the same email address was listed multiple times.

[22] The sharp rise of approximately 5.6 million in open path claims form submissions over the Reporting Period was attributable, in part, to bot activity. The Claims Administration Vendor advised that some bot activity was blocked before intake, while other bot submissions were subsequently identified and screened out through a cybersecurity review process. The vendor has indicated that it implemented processes to ensure that bot submissions do not result in the issuance of redress payments.

filing path enabled potential Eligible Consumers to submit a claims form without a Claim ID or PIN. The following chart reflects the number of claims forms submitted since the inception of the Claims Process.

**Chart 4**
**Weekly Number of Claims Forms Submitted by Consumers**




As detailed in prior reporting, the Claims Administration Vendor developed a work plan with standard operating procedures to guide the review and adjudication of claims forms. The work plan processes generally included three primary categories: (i) verification of credentials; (ii) determination of eligibility; and (iii) distribution of redress payments.

According to the Claims Administration Vendor, consumers who successfully inputted a Claim ID and PIN from corresponding notices were deemed as having provided valid credentials. Consumers who submitted claims through the open filing path, on the other hand, were required by the work plan to provide additional information to be verified, including the email address used for their affected Amazon account as of September 2025 (or the most recent

email address they could remember), their phone number used for the affected Amazon account as of September 2025 (to the extent they had previously provided it to Amazon), the approximate date when they signed up for Prime, and/or the approximate date when they attempted to cancel their Prime account subscription. Under the work plan, Claims Administration Vendor personnel applied a matching methodology across various identifiers to determine whether an open path filing consumer could be verified against Amazon's Customer List, with the objective of balancing Settlement Program inclusivity with data integrity.[23] In instances in which the Claims Administration Vendor was able to verify a consumer's credentials – which, as mentioned above, was automatic if the proper Claim ID and PIN were correctly entered – its work plan protocols directed an eligibility determination based on Section III of the claims form. Section III required that Claims Process Eligible Consumers fill in one or more of the following circles to indicate which option(s) applied:

- I was unintentionally enrolled in Prime by Amazon between June 23, 2019 and June 23, 2025.
- I tried to cancel Amazon Prime through the online cancellation process between June 23, 2019 and June 23, 2025, but was unable to complete it or I inadvertently took a save offer when I intended to cancel.
- None of the above apply.

If the consumer's selection in the claims form matched what was contained in Amazon's Customer List, then the claim was deemed eligible by Claims Administration Vendor

[23] Generally, the Claims Administration Vendor attempted to match information provided by consumers in the claims form with Amazon's Customer List using a tiered approach based on combinations of the following data elements: first name, last name, physical address, email address, and phone number. In implementing this approach, the Claims Administration Vendor advised that it followed a protocol that accounted for different matching combinations and types (*e.g.*, all fields, two or more fields, a single field, and partial matches). The objective was to identify submissions that could be reliably linked to Amazon's consumer records using unique or near-unique identifiers, while minimizing false positives arising from common names or partial data overlaps.

personnel.[24] According to the Claims Administration Vendor, the vast majority of claims forms were adjudicated within the 30-day window required by Section X.B.3 of the Settlement Order.[25]

Although the waterfall payment process for Claims Process Eligible Consumers was substantially similar to the one utilized for Automatic Pay Out consumers, the Claims Administration Vendor advised that there were certain additional operational efficiencies and controls implemented for the Claims Process Eligible Consumer population.

First, before payments to Claims Process Eligible Consumers were initiated, the Claims Administration Vendor delivered the proposed payment populations to the data consultant for review and approval. Second, for consumers who submitted valid claims forms, the Claims Administration Vendor evaluated whether the payment information contained in the submitted claims forms could be used to issue payment. In instances where that information could be utilized, the Claims Administration Vendor issued payment using the consumer-provided information (rather than relying on information contained in Amazon's Customer List). Third, if

---

[24] The Claims Administration Vendor has indicated that it performed multiple levels of review, including an automated review and matching process combined with two layers of human review. The automated component of the process involved an algorithmic matching and scoring of open path claims against the Customer List, rather than a fully end-to-end automatic review of all claims. The Claims Administration Vendor informed the Claims Supervisor Team that human review remained a critical component of the claims review process and that 16 employees were assigned to review claims forms over the Reporting Period.

[25] The Claims Administration Vendor advised that an intermittent technical issue kept certain batches of open path filing submissions attempts from being timely imported into the claims forms intake system, resulting in approximately 680,000 affected claims forms not being reviewed within the 30-day window (with the delay extending between 6 and 139 days). The vendor advised that the vast majority of the impacted claims forms submissions were likely fraudulent or bot-generated, with approximately 15,000 of those claims forms ultimately determined to be valid. After identifying the issue, the Claims Administration Vendor: (i) conducted analysis to scope the affected population; (ii) prioritized the review and adjudication of the affected claims; and (iii) conferred with the data consultants to ensure the accuracy of its assessment. The Claims Administration Vendor reported that all impacted claims forms were reviewed by August 7, 2026 (fewer than two weeks following the claims form submission deadline), and there were no resulting delays to the issuance of redress payments.

a consumer provides updated contact information or submits a request for a different payment method during the waterfall process, the Claims Administration Vendor has the ability to issue payment using the updated information and/or requested payment method without requiring the consumer to proceed through the entire waterfall process.

Claims Process Eligible Consumers are provided 30 days to accept digital payments and 60 days to accept payments by check.[26] Consumers receiving PayPal payments are expected to be issued a total of three email reminders within the first 30 days following the issuance of payment.

Data provided by the Claims Administration Vendor reflects that, as of September 4, 2026, a total of 332,953 claims forms submitted with Claim IDs and PINs (*i.e.*, credential-based claims form submissions) were accepted and validated for payment, and 193,466 credential-based claims forms were flagged as ineligible. Relatedly, a total of 134,236 open filing claims forms were accepted and validated for payment, and approximately 6,940,896 open filing claims forms were flagged as ineligible or unmatched. Consistent with Amazon's Escalation Plan, the Claims Administration Vendor advised that, on June 23, 2026, it initiated aggregate payments of approximately $10 million to more than 300,000 Claims Process Eligible Consumers who had submitted a claims form by March 31, 2026 and were determined to meet the eligibility requirements.

In accordance with the Escalation Plan Order, the Company also initiated payments to the remaining Claims Process Eligible Consumers who: (i) submitted an approved claims form between April 1, 2026 to July 27, 2026; (ii) did not submit a claims form at all; or (iii) submitted

[26] As mentioned earlier, for U.S.-based consumers who were issued checks, the Claims Administration Vendor cross-checked available physical mailing addresses through the USPS National Change of Address and CASS services to improve address quality and deliverability.

a claims form that did not meet the eligibility requirements.[27] Payments to this group of Claims Process Eligible Consumers were issued between August 14, 2026 and August 31, 2026. As of September 10, 2026, Amazon advised that it had distributed 11,695,091 redress payments in the aggregate of $415,269,602 to Claims Eligible Process Consumers. As of that same date, Settlement Program data reflects that 313,166 Claims Process Eligible Consumers had accepted their payment for a total of $10,598,366.[28]

The Company's progress over the Reporting Period with respect to Claims Process Eligible Consumers is reflected in the following chart:

**Chart 5**
**Claims Process Eligible Consumer Distribution Overview**
**(as of September 10, 2026)**

| Number of Payments Issued[29] | Aggregate Amount of Payments Issued | Number of Payments Accepted by Consumers | Aggregate Amount of Payments Accepted by Consumers | Aggregate Amount of Payments Credited Pursuant to the Settlement Order |
|---|---|---|---|---|
| 11,695,091 | $415,269,602 | 313,166 | $10,598,366 | $10,598,366 |

The below chart reflects reissue activity for Claims Process Eligible Consumers over the Reporting Period.

[27] Claims Process Eligible Consumers were not eligible for redress if they previously received an Automatic Pay Out.

[28] At the time of this report, the Company reported to the Claims Supervisor Team two separate calculations for the number of pending Holdbacks (based on different "methodologies"). The Claims Supervisor Team will seek to better understand the actual number of Claims Process Eligible Consumer Holdbacks based on additional supporting detail to be provided by Amazon's Claims Administration Vendor and data consultant.

[29] With payments to this consumer group being issued between from mid- to-late-August (less than a month prior to the date of this report), the Claims Administration Vendor had not yet issued secondary payments through the waterfall process as of September 10, 2026.

**Chart 6**
**Claims Process Eligible Reissue Distributions**
**(as of September 10, 2026)**

| Number of Payment Reissue Requests[30] | Aggregate Amount of Payment Reissues Requested | Number of Payments Reissued | Aggregate Amount of Payments Reissued | Number of Reissued Payments Accepted | Aggregate Amount of Reissued Payments Accepted |
|---|---|---|---|---|---|
| 992 | $36,584 | 482 | $17,108 | 118 | $4,115 |

### D. Status of Escalation Plan Eligible Consumers (Phase 3)

As mentioned above, the Company also undertook efforts to develop a supplemental list of consumers to receive payments in connection with Phase 3 of the Settlement Program (the "Supplemental Customer List"). Amazon utilized the same processes to generate the Supplemental Customer List for Escalation Plan Eligible Consumers (those consumers who otherwise met the original eligibility criteria, but used between 11 and 20 Prime Benefits) as it did for the original Customer List (which captured consumers who met all of original eligibility criteria, including using no more than 10 Prime Benefits).

Consistent with Escalation Plan Order, the Company is expected to follow the same waterfall payment methodology that was applied to Phase 2 payments. Escalation Plan Eligible Consumers will have 30 days to accept PayPal and Venmo payments, and 60 days to accept check payments. Amazon projects it will begin issuing a total of approximately 9 million redress payments to Escalation Plan Eligible Consumers in the aggerate amount of more than $350 million by October 1, 2026.

---

[30] As mentioned above, consistent with the Escalation Plan Order, all payments issued prior to June 25, 2026 (including all Automatic Pay Outs), which were not accepted by consumers as of September 15, 2026, were voided and will not be reissued. Claims Process Eligible Consumers who were issued payment after June 25, 2026 will have until December 14, 2026 to request a reissued payment.

### E. Customer Support Engagement

As described in prior reporting, although not expressly mandated by the terms of the Settlement Order, Amazon established – and continues to maintain – customer support resources, including a dedicated email address and toll-free call center number to endeavor to enhance Settlement Program administration. Both the email address and call center number remain available on the settlement website, as well as on Amazon's Help & Customer Service, Legal Policies webpage (accessible through this link). Consumer engagement metrics reflected substantial increases in website activity, as well as email and call volume, over the Reporting Period. This spike in activity was to be expected, as it coincided with the lead-up to the claims form submission deadline, as well as the distribution of millions of new redress payments to Claims Process Eligible Consumers. Data from the Claims Administration Vendor indicates that:

- Through September 4, 2026, there has been 19,792,714 unique visitors to the Settlement Program website (approximately 12.7 million more unique visitors as compared to the prior reporting period),[31] 20,556,545 total sessions/hits (approximately 12.8 million more sessions/hits as compared to the prior reporting period), and 43,797,508 page views (approximately 27 million more page views as compared to the prior reporting period);
- Through September 14, 2026, 162,786 emails had been received at the admin@SubscriptionMemberSettlement.com email address since the inception of the

[31] "Unique visitors" is measured by the Claims Administration Vendor's web analytics tool. The vendor has advised that the metric is based on standard session and browser identifiers and does not involve geolocation, IP-based profiling, or tracking of any personally identifiable behavior without user consent.

Settlement Program with response times over the Reporting Period ranging from under one day to approximately 16 days;[32] and

- Through September 14, 2026, 10,066 phone calls had been received since the beginning of the Settlement Program, with an average speed to answer ranging from 14 to 24 seconds, an average handle time of under five minutes, and a call abandonment rate of under 5%.[33]

Customer support inquiries were handled by between six and seven dedicated agents, with the oversight of a dedicated team leader. The following charts reflect email and call activity on a weekly basis since the inception of the Settlement Program.

[32] The high end of the range occurred after the passage of the claims form submission deadline.

[33] "Average handle time" refers to the duration of a call from beginning to end and "call abandonment rate" refers to the percentage of calls for which a caller hangs up before speaking with a customer support agent.

**Chart 7**

**Weekly Email Outreach to Dedicated Settlement Program Customer Service Resources – Via Claims Administration Vendor**




**Chart 8**

**Weekly Telephone Outreach to Dedicated Settlement Program Customer Service Resources – Via Claims Administration Vendor**



Consumer inquiries have generally been categorized by the Claims Administration Vendor based on the primary FAQ to which they relate. The majority of inquiries since the inception of the Settlement Program have pertained to topics that include: (i) the timing of the receipt of claims form notices; (ii) issues associated with Claim IDs; (iii) the process associated with submitting claims forms and requesting reissued payments; (iv) eligibility criteria; (v) the timing of distribution redress payments; and (vi) the process of accepting redress payments. The Claims Administration Vendor has identified more than 700 complaints (based on application of the revised definition of "complaint" instituted over the prior reporting period).[34] The complaints related to, among other things, challenges accessing the claims form, the timing of payments (including reissues), and issues inputting Claim IDs into the claims form or reissue portal. In addition, the FTC advised that, over the Reporting Period, it had received at least 238 calls and complaints.[35]

Due to the meaningful impact that customer support delivery can have on Settlement Program performance and payment conversion rates, the Claims Supervisor Team has continued

---

[34] The Company broadened the definition of "complaint" over the prior reporting period to include, among other things, consumers expressing dissatisfaction, frustration, and/or anger regarding aspects of the Settlement Program in order to better assess customer support performance. Prior to the revision, the Claims Administration Vendor's definition of "complaint" was more limited, as it primarily included: (i) requests for comment from a member of the media; (ii) requests to speak with a manager; (iii) outages impacting the Claims Administration Vendor's services; and (iv) threats. The Claims Supervisor Team conveyed to Amazon that the revised definition would better facilitate the reporting obligations under the Settlement Order. Amazon accepted this recommendation and instructed the Claims Administration Vendor to apply a broader definition.

[35] Amazon estimates that, from September 15, 2025 to September 10, 2026, its own customer support agents received 28,724 consumer inquiries in connection with the FTC case and/or settlement. Amazon identified these communications through targeted searches for key words and phrases that would indicate that a customer inquiry likely relates to the FTC case and/or settlement. Amazon has provided guidance to its customer support agents to address Settlement Program-related inquiries. Specifically, it has instructed its agents to: (i) advise consumers that payment and customer support is being handled by the Claims Administration Vendor; and (ii) refer consumers to the settlement website for more information.

to assess the quality of customer support engagement by conducting reviews of approximately 600 consumer emails chains and 300 consumer phone calls received by the Claims Administration Vendor over the Reporting Period. Based on the sample emails and calls the Claims Supervisor Team reviewed, the main issues raised by consumers included delays in receiving reissued payments, challenges accessing the claims form portal (due to rate-limiting following the entry of incorrect credentials), and questions pertaining to the acceptance of recently-issued PayPal payments.[36] The review of the sample communications generally reflected an adequate level of customer support. The Claims Supervisor Team did, however, identify that response times to emails were slower on average following the significant spike in consumer contacts leading up to and after the passage of the claims form submission deadline, and a number of audited responses revealed customer support agents' uncertainty regarding the process for reissuing payments.

To further enhance customer support delivery and consistency, the Claims Administration Vendor advised that it, among other things, continued to: (i) update the settlement website FAQs, as well as its own internal FAQs and Knowledge Center[37] materials, to enable the delivery of accessible guidance to consumers in response to Settlement Program

---

[36] The Claims Administration Vendor advised that it partners with a global cloud platform, which provides website security to, among other things, prevent malicious attacks. As part of security measures, the vendor advised that rate-limiting controls may occasionally be triggered by legitimate user activity, such as multiple submissions or rapid entry of information, even when there is no improper activity. The Claims Administration Vendor informed the Claims Supervisor Team that it continuously evaluates its website configuration and security controls to balance the need to protect the integrity of the claims process with providing an accessible user experience. When rate-limit errors have been encountered, the Claims Administration Vendor's customer support team has remained available to provide assistance.

[37] The Knowledge Center, which was developed over the prior reporting period, was designed to be an additional repository of answers to commonly received questions based on insights initially gleaned from performing a review of approximately 300 customer support communications received in April 2026. In conducting the evaluation, the Claims Administration Vendor identified what it determined to be the most commonly raised questions and created additional, more tailored responses for participating consumers.

inquiries, including anticipated redress payment timelines; (ii) direct agents to request additional information and undertake more in-depth reviews of consumer information – including Claims IDs and PINs – to enable responses that are tailored based on whether the individual is an Automatic Pay Out consumer or Claims Process Eligible Consumer; (iii) leverage a dedicated team to address complex requests and situations when customers convey complaints;[38] and (iv) provide ongoing training to customer support agents. In addition, the Claims Administration Vendor created a decision tree that provides customer support agents enhanced clarity regarding the appropriate responses to deliver to consumers who are seeking additional information or requiring direction.

The Claims Supervisor Team plans to continue evaluating Settlement Program customer engagement data over upcoming reporting periods in accordance with the requirements of the Settlement Order.

### F. Consumer Fund

During the Reporting Period, the Claims Supervisor Team continued to monitor the Consumer Fund by evaluating disbursements and assessing funding levels. The Settlement Program continues to utilize four bank accounts at a U.S.-based bank to administer the Consumer

---

[38] As previously reported, the Claims Supervisor Team was advised that protocols were implemented to address complaints through a multi-tiered review process. Under the protocols, front line customer support agents have been trained to segregate potential complaints and questions that cannot be answered by existing FAQs or other materials. Subsequently, these complaints and questions are to be directed by the line agents to a team lead for review (particularly in cases where there may be uncertainty as to whether the communication constitutes a complaint and/or a consumer threatens legal action). If further review is required, the matter can then be escalated to designated Claims Administration Vendor senior team members (including the Call Center Head, Client Services Director, Vice President of Settlement Administration, and Senior Vice President of Settlement Administration, as necessary). In instances where further legal or compliance guidance may be necessary, complaints may also be referred to Amazon and/or its counsel for review and direction. The dedicated team addressed a declining number of complaints requiring escalation over the Reporting Period (232 complaints in June, 101 complaints in July, and two complaints from August 1 - 26, 2026).

Fund payment process – three of which are non-interest-bearing and one of which is interest-bearing. Bank statement activity through August 2026 reflects disbursements from two of the non-interest-bearing checking accounts (which the Claims Supervisor Team has been informed are exclusively used for purposes of paying Eligible Consumers), and a transfer from the interest-bearing account to fund disbursement activity.[39] Further, in August 2026, a transfer was made to the fourth account (a non-interest bearing checking account), which is being used as the check distribution account for Claims Process Eligible Consumers. As of August 31, 2026, copies of the bank statements produced to the Claims Supervisor reflect nearly $234.9 million of the $1.5 billion in dedicated Consumer Fund proceeds had been paid or were in transit to consumers. The following chart reflects the balance of the Consumer Fund proceeds from the inception of the Settlement Program through August 31, 2026:

[39] As a general matter, one checking account is used to issue check payments for Phase 1, another checking account is used to issue check payments for Phase 2, and the remaining checking account is leveraged for PayPal and Venmo payments. Bank records reflect that the Company has made quarterly and annual disbursements from the interest-bearing account to satisfy tax obligations arising from the interest earned on the account.

**Chart 9**[40]




Upon completion of the Settlement Program and payment of all distributions to Eligible Consumers, to the extent that any funds remain in the Consumer Fund, they are to revert back to Amazon in accordance with the terms of the Settlement Order.

## V. Review of the Claims Administration Vendor's Payment Activities

During the Reporting Period, the Claims Supervisor Team conducted targeted assessments of the Claims Administration Vendor's payment administration activities. The Claims Supervisor focused its review primarily on payments issued and/or accepted between May 21, 2026 and August 18, 2026.[41] During this time period, records show that there were

---

[40] The decrease in funds reflected in November 2025 is associated with transfers to fund the PayPal and Venmo digital payment distributions to Automatic Pay Out Consumers. In accordance with the waterfall process, some of these payments were returned to the Consumer Fund in subsequent months due to digital payments not being accepted.

[41] During the prior reporting period, the Claims Supervisor Team reviewed the Claims Administration Vendor's payment activities between March 13, 2026 through May 20, 2026.

5,842,612 payments issued, and 4,696,945 payments accepted, by Eligible Consumers, with corresponding funds successfully transferred.[42]

As part of its evaluation of these payment transactions, the Claims Supervisor Team conducted a series of tests to consider whether the Claims Administration Vendor's payment records reconciled with the source account records prepared by PayPal and Venmo, as well as the bank holding the Consumer Fund proceeds. To enable the review, the Claims Supervisor requested the production of specified payment documentation: (i) the Claims Administration Vendor's payment register reflecting all payment transactions through August 18, 2026;[43] (ii) detailed PayPal and Venmo payment reports; and (iii) bank records. The Claims Administration Vendor was able to timely produce the requested records, and below is a summary of the Claims Supervisor Team's findings.

<u>Review of PayPal and Venmo Records</u>: Where digital payments were attempted between May 21, 2026 and July 31, 2026, the Claims Supervisor Team sought to confirm that the distribution of funds accounted for in the Claims Administration Vendor's payment register aligned with the transactions reflected in daily reports issued by PayPal and Venmo.[44] The

---

[42] As discussed in Section IV above, the Claims Administration Vendor had initiated approximately 11.7 million payments during the Reporting Period; however, many of these payment attempts were not yet captured in the payment register, and therefore are not reflected in the Claims Supervisor Team's analysis. These payments will be reviewed by the Claims Supervisor Team in the following reporting period.

[43] The payment register is a SQL-based system maintained by the Claims Administration Vendor that includes a record of all payments attempted.

[44] The Claims Supervisor Team requested detailed PayPal and Venmo payment reports for all days on which payments were issued between May 21, 2026 and August 18, 2026. During this timeframe, 5,620,122 payments were attempted by PayPal and Venmo. The Claims Administration Vendor produced PayPal and Venmo payments reports for payments issued through July 31, 2026, which included 119,358 payment attempts, of which 112,216 were accepted by consumers. PayPal and Venmo generally produce their reports at least 30 days after the payment issuance date. As a result, the reports covering payments issued in August 2026 were not yet available. These payments will be reviewed by the Claims Supervisor Team in the following reporting period.

review substantiated that all 119,358 digital PayPal and Venmo payment attempts and corresponding payment amounts reflected in the payment register for the period fully reconciled with the activity reflected in the PayPal and Venmo records.[45]

Review of Bank Records Reflecting Check Transactions: The Claims Supervisor Team also sought to assess whether check payments reflected in the Claims Administration Vendor's payment register matched the transactions identified in the bank's records. For the period between May 21, 2026 and August 18, 2026, the payment register reflected that consumers had deposited 176,447 checks. Of these deposited checks, review of the Account Reconcilement Processing reports (the "ARP Reports") produced by the bank substantiated that 176,431 (99.99%) of the checks were negotiated during the timeframe, and that the payment amounts reflected in the payment register and bank records aligned.[46] However, the remaining sixteen check transactions did not appear in the ARP Reports.

Following a request from the Claims Supervisor Team, the Claims Administration Vendor produced certain bank portal "screenshots" which appear to indicate that two of the checks were cashed after initially being flagged as part of a positive pay integrity review process, one was improperly linked to the wrong customer due to a check numbering error, and two were later reversed. Insufficient documentation has been provided to the Claims Supervisor Team to reconcile the remaining eleven transactions that were flagged. Therefore, the Claims Supervisor

[45] One of the records in the payment register showed a different clear date from what was reflected in the PayPal report. The Claims Supervisor Team was, however, able to validate from the PayPal report that the consumer was paid.

[46] The Claims Supervisor Team historically has relied upon the bank's ARP reports for purposes of validating payments by check. Occasionally, however, the ARP reports may not reflect a cashed check where, for example, there was a bank error, a processing issue, or some other type of exception. In these instances, the Claims Supervisor Team will seek alternative documentation to support the validation of the payments reflected in the payment register.

Team will seek to better understand the underlying accounting and related recordkeeping for these and similar transactions in the next reporting period.

Duplicate Payments: Finally, the Claims Supervisor Team sought to confirm that no individual Claim ID received more than one payment, pursuant to Settlement Order administration parameters for the Settlement Program. With the exception of certain previously identified payment errors that occurred on March 31, 2026, and as described in the Claims Supervisor's June 24, 2026 report, no additional duplicate payments were identified in the payment register.[47]

With the full integration of the comprehensive Version Five of the Customer list into Settlement Program administration, the Claims Supervisor Team expects to undertake additional focused auditing and payment validation assessments facilitated by the unique IDs associated with claims as Settlement Program administration continues.

## VI. Conclusion

At the one-year anniversary of the Settlement Order, Amazon is to be credited with having made the necessary internal and external organizational and staffing investments to develop and implement the Settlement Program in accordance with highly-particularized administration and aggressive timeline requirements. Amazon concentrated on key initiatives over the Reporting Period to advance progress, including perhaps most notably by obtaining

[47] As discussed in footnote 10, on March 31, 2026, the Claims Administration Vendor erroneously issued a limited number of overpayments to consumers. Amazon had explained that the Claims Administration Vendor had used incorrect Claim IDs when reissuing certain payments, which led to some payments appearing uncashed and eligible for reissue, even where the payment associated with the correct Claim ID had already been accepted. Although not identified in the payment register, the Claims Administration Vendor also identified $170,000 in duplicate payments that were inadvertently issued. The overpayments and duplicate payments are not considered for purposes of the Company's payment obligations under the terms of the Settlement Order.

Court approval to execute the Escalation Plan, developed in collaboration with the FTC, to expand the scope of eligible consumers and accelerate redress payments.

Pursuant to the Escalation Plan Order that was entered on September 14, 2026, the Company issued approximately 11.7 million new payment offers totaling more than $415 million. Over the Reporting Period, approximately 340,000 individuals accepted payments in the aggregate amount of more than $11.7 million. And, as of September 10, 2026, Amazon had attempted payments from the inception of the Settlement Program to nearly 25 million people in an aggregate amount of approximately $845 million. All of these efforts resulted in the total distribution of Settlement Program redress funds to approximately 6.96 million Eligible Consumers in excess of $237 million.

Amazon anticipates significant additional redress payment progress in the coming months, particularly as it administers additional payments to approximately 9 million newly-eligible consumers in accordance with the Escalation Plan Order. The Claims Supervisor Team will continue to report on Settlement Program progress in accordance with the Court's Order.

Sincerely,

**FTI CONSULTING, INC.**

| | | |
|---|---|---|
| Marc-Philip Ferzan<br>Senior Managing Director | Terrence S. Brody<br>Senior Managing Director | Michael B. Schultz<br>Managing Director |

Submitted: September 24, 2026